1          UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA (MIAMI)
2
           Civil Case  No.  21-cv-21940-BLOOM/Otazo-Reyes
3

4

5   NEIMA BENAVIDES, as Personal
    Representative of the Estate of
6   Naibel Benavides Leon, deceased,

7           Plaintiff,

8   vs.

9   TESLA, INC., a/k/a Tesla Florida,
    Inc.,
10
           Defendant.
11   _____/

12

13
                         DEPOSITION OF
14
                   CORPORAL DAVID RISO
15              Friday, January 21, 2022

16              APPEARING REMOTELY FROM
                MIAMI-DADE COUNTY, FLORIDA
17

18

19

20

21

22

23

24   Reported by:
     Margaret Lowe, RPR
25   Job No. 204447

1                    January 21, 2022

2                      9:02 a.m.

3

4          Deposition of CORPORAL DAVID RISO held remotely

5    from Miami-Dade County, Florida, pursuant to notice,

6    before Margaret Lowe, Registered Professional Reporter

7    and Notary Public of the State of Florida.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REMOTE APPEARANCES

2

3    On behalf of the Plaintiff:

4        Poses and Poses
         169 East Flagler Street
5        Miami, FL 33131
         BY:  Todd Poses, Esq.
6

7

8
     On behalf of the Defendant:
9
         Bowman and Brooke
10       41000 Woodward Avenue
         Bloomfield Hills, MI 48304
11       BY:  Thomas Branigan, Esq.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
                    INDEX OF PROCEEDINGS
2
                                                 Page
3
      Deposition of CORPORAL DAVID RISO
4
      Direct Examination by Mr. Branigan           5
5     Cross-examination by Mr. Poses               90
      Redirect Examination by Mr. Branigan        140
6     Certificate of Oath                         144
      Certificate of Reporter                     145
7

8

9

10                          EXHIBITS

11    Defendant's                                      Page

12    Exhibit 1    Second Amended Notice of Taking Deposition    22
      Exhibit 2    Investigative Packet - 190 pages              30
13    Exhibit 3    Field Report Packet - 153 pages              33
      Exhibit 4    Investigative Packet - 60 pages              35
14    Exhibit 5    Florida Traffic Crash Report                 44
      Exhibit 6    Photo                                        55
15    Exhibit 7    Photo                                        58

16

17

18

19

20

21

22

23

24

25

```
 1                         Riso

 2                      PROCEEDINGS

 3          THE COURT REPORTER:  Do you swear or affirm

 4       that the testimony you are about to give is the

 5       truth, the whole truth, and nothing but the truth?

 6          THE WITNESS:  Yes, I do.

 7    THEREUPON,

 8                   CORPORAL DAVID RISO,

 9    having been first duly sworn, was examined and testified

10    as follows:

11                   DIRECT EXAMINATION

12    BY MR. BRANIGAN:

13       Q.   Good morning everyone.  This is Tom Branigan

14    speaking.  I represent Tesla, and this is the deposition

15    of Corporal David Riso.

16          The deposition is being taken in the case of

17    Benavides vs. Tesla, Incorporated, and it can be used

18    for all purposes permitted by law.  The deposition is

19    being taken under the notice and a subpoena and in

20    agreement of counsel on the schedule for today.

21          Sir, would you tell us your full name and a

22    business address, please?

23       A.   I'm Corporal David Nicola Riso, and that's

24    N-I-C-O-L-A for the middle name.  And my business

25    address is on FHP Post 1, 19 Mile Marker, Florida
```

1                        Riso

2   Turnpike in Miami, Florida, and I believe the ZIP code

3   is 33175.

4        Q.   Sir, just to confirm, you're able to hear us

5   all and see us on your video; is that correct?

6        A.   Yes.

7        Q.   Because we're taking this deposition with

8   virtual or video conference tools, it'll be important

9   for you to let us know at any time if you're unable to

10  hear us, and the best way to do that is give us some

11  sort of sign.  Wave at us, indicate in some way

12  nonverbally, of course, or verbally, however you can, if

13  you're unable to hear us.  If you're unable to see us,

14  speak up about that.  Hopefully, we'll be able to hear

15  you when you do that, and we'll do the same thing if

16  we're unable to hear you.  We'll get some kind of

17  message to you somehow, and we'll try to remedy the

18  problem.

19            Is there anyone present with you in the room

20  right now?

21        A.   Not here right now, no.

22        Q.   Are you at your office today, Corporal?

23        A.   Yes, I am.

24        Q.   And is that office at the same address that you

25  just gave us a few minutes ago?

1                           Riso

2       A.   Yes, sir.

3       Q.   All right.  Do you have anything with you, like

4  documents or files?

5       A.   I have it electronically.

6       Q.   Okay.  Very good.  We'll get to that in a

7  minute.  Let me just cover a couple of other preliminary

8  points.  Would it be safe for me to think that this is

9  not the first time you've given a deposition or

10  testified, Corporal?

11       A.   That's correct.

12       Q.   With that understanding, I'll keep the

13  preliminary comments brief, but just as a simple

14  reminder, again, as I mentioned, if at any time you

15  can't hear us, let us know; you can't see us, let us

16  know.  If I ask a question that is unclear to you, let

17  us know; let me know that.  If you need something

18  rephrased or repeated, let us know that; otherwise, we

19  will work under the belief that you understood the

20  question, and you're able to answer it, fair?

21       A.   Fair enough.

22       Q.   All right.  How many times have you testified

23  in the past?

24       A.   I don't know the exact number, but it's been

25  many times.

1                        Riso

2      Q.   Would it be more than 50?

3      A.   I would have to say so, seeing that I first

4   came on back in 2001.

5      Q.   Okay.  Let me just get some basic information

6   about you, sir.  What's your date of birth?

7      A.   July 13, 1965.

8      Q.   And can you tell us a little bit about your

9   education starting with high school graduation and up to

10   the current date?

11     A.   I graduated high school up in Mark T. Sheehan

12   High School in Wallingford, Connecticut back in -- I

13   think it was June 6th of 1983, June 6th.  I went to some

14   college and art school.

15     Q.   Where did you do that?

16     A.   That was up in -- I went to a university in New

17   Haven for graphic designing.  Then I went to an art

18   school, but it wasn't a university or anything.  It was

19   just an art school.  Then after I left that, I just

20   worked for the years to come in different places.  Like,

21   I worked for Home Depot for nine years, believe it or

22   not and --

23     Q.   What did you do at Home Depot and during what

24   years, please?

25     A.   1992 to 2001, nine years and, like, literally

```
 1                         Riso
 2    one day because I resigned one day after my nine years.
 3    And I resigned because I went into FHP's academy.
 4         Q.    What was your responsibility or things that you
 5    were doing at Home Depot?  Anything in connection with
 6    security or law enforcement?
 7         A.    Home Depot has, like, a few different areas.
 8    They have their management, but they have what they call
 9    sales.  And then they have what they call -- what's the
10    word.  It's not -- it's probably like receiving,
11    delivering because I was a delivery driver, and I even
12    worked in receiving.  And then I was working getting
13    deliveries out, and then I became one of the drivers.
14    So I think I was actually not driving anymore.  I can't
15    believe -- I think I was actually just doing outside
16    receiving of deliveries and some -- I can't remember if
17    I was still driving at the time because that's how I got
18    my CDL license was through them.
19         Q.    And you changed your vocation, it sounds like,
20    in 2001; is that right?
21         A.    (Inaudible.)
22              MR. BRANIGAN:  Can you still hear us, Corporal?
23              Corporal, we're having a little bit of audio
24         problem from your end.  Can you hear us okay?
25              MR. POSES:  Yeah, Thomas.  I lost him too.
```

```
 1                         Riso

 2             (Brief interruption.)

 3   BY MR. BRANIGAN:

 4        Q.   My last question was focused on your change in

 5   vocation, change in employment in 2001.  That happened

 6   in 2001, correct?

 7        A.   Yes.  But I forgot to tell you I was even in

 8   the Army too.

 9        Q.   Let's talk about your military service, and

10   thank you for that, sir.  How long were you in the Army?

11        A.   About eight years.  I joined that in '96 in the

12   Reserve, and I spent a tour in Bosnia when President

13   Clinton was still our president back in '97 and '98.  I

14   honorably got out in January of 2005, and I had the rank

15   of sergeant at that time.

16        Q.   What were your duties while you were in the

17   Army?

18        A.   I was a military police investigator.

19        Q.   What kind of incidents were you responsible for

20   investigating?

21        A.   I had the special training where I had to go

22   for two months -- (inaudible).

23             MR. BRANIGAN:  We're having trouble with your

24        audio, Corporal.

25             THE WITNESS:  Give me a minute.  I'll go
```

```
 1                        Riso
 2      outside to my car.  Just give me, like, literally two
 3      minutes, and then we'll start up.  And I guarantee we
 4      probably won't have any problems out there.
 5           THE COURT REPORTER:  Shall we go off the
 6      record, Counsel?
 7           MR. BRANIGAN:  Yeah.  Let's go off the record.
 8           MR. POSES:  Sure.
 9           (Discussion off the record.)
10  BY MR. BRANIGAN:
11      Q.   So you were telling us about the training that
12  you received during your military service to investigate
13  something, and that's where we lost you.  So do you need
14  me to repeat?
15      A.   It was investigating crimes, burglaries, maybe,
16  you know, minor, like, I guess, you know, things with
17  maybe some murders or stabbings because I remember
18  walking into the room where we had all this evidence to
19  collect, and we had to document how we did it.  And the
20  final exam actually was a bear because I remember
21  writing multiple pages, and we were only allowed one
22  thing wrong and -- for instance, if you had forgotten to
23  dot an "i" or cross a "t," that got marked wrong.  So it
24  was a bear.  It took me about eight and a half hours to
25  complete that exam when we were at the very end.
```

1                          Riso
2      Q.   All right.  So your military service ended with
3  an honorable discharge in what year, Corporal?
4      A.   2005 is when I officially, as we call it, got
5  my walking papers.
6      Q.   And in 2001, I think I understood you to say
7  that you entered the Florida Highway Patrol Academy.
8  Did I hear that correctly?
9      A.   Correct.
10     Q.   All right.  How long were you there in the
11  academy?
12     A.   It was about six months long.
13     Q.   And you graduated from the academy in 2001; is
14  that right?
15     A.   In August -- it ran from February 26, 2001, to
16  like -- I think it was August 17th.  If I was in my
17  office, I could tell you -- I have the graduation
18  picture up on the wall -- and tell you the dates.
19     Q.   A month and a year is perfectly fine for us
20  right now, Corporal.  Thank you.
21          During your time at the academy, did you
22  receive any training for motor vehicle crash or accident
23  investigation?
24     A.   We went through, you know, a course, if you
25  want to call it, training and, you know, crashes because

1                          Riso

2    that was one of our primary jobs was working traffic

3    crashes and working traffic.

4         Q.   Since graduating from the academy, have you had

5    any continuing education related to investigation of

6    motor vehicle incidents, crashes, and the like?

7         A.   I had further training mainly for traffic

8    homicide investigation, basically, a crash where

9    somebody passes away as a result.

10        Q.   Now, in the law enforcement community in the

11   state of Florida, do you have law enforcement officers

12   who are specially trained to reconstruct motor vehicle

13   collisions?

14        A.   Yes.

15        Q.   And have you been through that training

16   yourself, sir?

17        A.   Yes, I have.

18        Q.   Are there various levels of training that you

19   can go through to reach different levels of accident

20   reconstruction, qualification, or expertise?

21        A.   There's many different classes.  With the

22   Florida Highway Patrol, the minimum class you need --

23   and you have to pass it -- to start working your own

24   traffic fatalities is traffic homicide.  Basic homicide

25   is what they call it.  It's the first stage, and it's a

1                          Riso

2  two-week course, 80 hours, and you have to pass that on

3  our end and then pass the training from another corporal

4  before you basically start working your own cases out on

5  your own.  But since that course, there are multiple,

6  like you said, levels, and I've had many of them.

7      Q.   Can you give us your best estimate as to the

8  number of those classes that you have successfully

9  completed that are related to accident reconstruction or

10 traffic homicide reconstruction or investigation?

11     A.   It could be 14, 15.  There's a lot.  I can

12 rattle them off the top of my head right now if you want

13 it.  Actually, in my office I even have all the

14 certificates.  It's many courses.

15     Q.   When did you go through your last course

16 related to motor vehicle accident reconstruction or

17 motor vehicle accident homicide reconstruction?

18     A.   I went to the third traffic -- there's your

19 basic traffic homicide, there's your advanced traffic

20 homicide, and then there's reconstruction traffic

21 homicide.  They're all two-week courses, and there was

22 even a motor vehicle traffic homicide two-week course I

23 took.  The reconstruction which is like the third level,

24 that one was in the summer, like, August, I believe, of

25 2015 but among those three courses and then the

```
1                          Riso

2   commercial.  There was also a weeklong pedestrian

3   traffic homicide course.  There was a also a weeklong

4   motorcycle traffic homicide course.  All these I passed.

5             And there was also photogrammetry which I've

6   taken it twice, and the only reason why I took it a

7   second time is to help me learn the camera, the camera

8   that we got.  But that was a way of measuring the scene

9   using markers that we place out there, but we don't use

10  that anymore.  We use what we call a total station now

11  so, basically, it's obsolete.

12            There was also advanced energy.  It was a

13  weeklong course.  There was also occupant kinematics,

14  another weeklong course.  I've taken a Leica robotic

15  total station, measuring the scene.  I've also taken a

16  computer-aided diagram with crash where you take the

17  data, and you can draw these scenes inside a certain

18  program.  I know I'm missing -- oh, EDR.  Basically, the

19  air bag control module/event data recorders, taken that,

20  you know, to hook up, and the download course and -- I'm

21  trying to think.  It's making me think that I'm missing

22  something, but I might have missed something.  But those

23  are a lot as you can see.

24  Q.   Thank you for all that, Corporal.  And you

25  successfully completed, passed all of those classes; is
```

```
1                        Riso
```

2   that correct?

3       A.   Yes.

4       Q.   So with all of that specialized training, are

5   you characterized by the Florida Highway Patrol as like

6   an accident reconstruction specialist Level 1, 2, 3?

7   I'm just giving you those as examples to try to

8   understand how that might apply to you.

9       A.   Well, there's no actual level.  You're a

10  traffic homicide investigator, and that's why I have the

11  rank of corporal.  I'm not promoted into a supervisor

12  position.  It's a specialty position where we just work

13  traffic fatality accidents.

14           As far as being on a different level, I got

15  accepted onto this team that the colonel wanted to start

16  approximately five years ago where it's called the FLAIR

17  team.  It stands for Florida Advanced Investigation and

18  Reconstruction.  So I've been on that team ever since

19  Day One.  So I've been on it for going on -- it'll be

20  five years in June that I've been on this advanced team

21  to handle what they consider high-profile cases.  And

22  since I've been on, the requirements for what qualifies

23  for the high-profile cases has changed, you know.  So I

24  am now as you were asking, I am on an advanced team of

25  investigators.  And they're all requirements.  There was

1                              Riso

2    requirements to get on the team, and I got accepted on

3    it.

4         Q.    When did you first become qualified as a

5    traffic homicide investigator?

6         A.    I took the test, passed, you know, the

7    corporal's test to get put on the promotion list back in

8    December of 2012, and then I officially got promoted to

9    corporal in April of 2013.

10        Q.    Okay.  And can you give us your best estimate

11   as to the number of multivehicle crashes that you've

12   investigated over the life of your career as a law

13   enforcement officer?

14        A.    Now, you said crashes, not fatal crashes,

15   correct?

16        Q.    Yeah.  I'm going to start with crashes.

17        A.    It's gotta be thousands.  I remember one year I

18   kind of looked at the crashes when I was working up in

19   the Gainesville, University of Florida area.  I remember

20   I was estimating, like, 20 crashes a month that I was

21   working.  Now, it could be single vehicle, it could be,

22   you know, two-, three-car crashes, but it was roughly

23   around 20 crashes a month.  And I was up there for three

24   years so if that's 20 crashes a month, that's basically,

25   like, 300 crashes a year.  And I was up there for three

```
1                        Riso
```

2    years.  So when I say thousands, I'm sure it was.

3         Q.   Let's turn your attention now to your best

4    estimate as to the number of motor vehicle accidents

5    involving fatalities that you have investigated.

6         A.   It's probably around a hundred, give or take a

7    little bit more, but I've also assisted on many other

8    fatal crashes.  So the ones that I have done all the way

9    to the end I can actually probably find a number if I

10   wanted in -- like I said, it's an estimate.  It could be

11   around a hundred, give or take, but I've had my hands on

12   many other ones assisting.

13        Q.   Have you been found qualified by state court

14   judges in Florida to give testimony as an expert witness

15   in any field?

16        A.   I remember it was a case of mine down in Key

17   West, and I'm pretty sure that I was listed as an expert

18   witness so I can testify about the evidence that I

19   collected on that fatality.  And that, I think, was back

20   in 2014 or '15 when I was in a case that happened down

21   there.

22        Q.   Has any court ever found that you were not

23   qualified to testify as an expert?

24        A.   I can't recall.

25        Q.   Have you testified about your work in both

1                        Riso

2   state and federal courts or just state court?

3        A.   I know it wasn't federal court because I don't

4   ever believe being in a federal court in one of these.

5   And as far as the state courts, down in Florida they

6   have judicial districts, and there's like -- in Miami

7   it's the Eleventh Judicial District, and that's

8   Miami-Dade County.  So all the courts are Eleventh, and

9   Monroe County is the Sixteenth Judicial District.  And I

10  believe they're circuit courts or county courts, but I

11  don't believe they're state courts.

12       Q.   Very good.  I read somewhere or perhaps my

13  colleague, which is another way of saying my son Drew,

14  my associate who is working on the case with me, may

15  have shared with me that you may be getting ready to

16  retire; is that correct, sir?

17       A.   Yes, I am.  Sometime this year.

18       Q.   All right.  And do you have plans to relocate,

19  sir?

20       A.   Yes, I do.

21       Q.   Okay.  We may -- any one of the lawyers

22  involved in this case may need to reach you in the

23  future.  Do you have a date in mind where we're going to

24  need to use other means to reach you, different phone

25  number, different e-mail address?

```
 1                          Riso
 2       A.    Phone number I won't know but, obviously, I'll
 3  keep my e-mail.  And I say my American e-mail because
 4  I'm actually relocating to Southern Italy, and I've
 5  already put a down payment on a home and signed a
 6  contract on a home in Southern Italy.
 7       Q.    Congratulations.  Beautiful place.
 8       A.    Thank you.  I received my dual citizenship
 9  approval, so I have dual citizenship now in Italy and
10  the United States.
11       Q.    All right.  Sounds like that's -- forgive me if
12  you said this and I missed it.  That's something that's
13  going to happen later this year in the summer?  Is that
14  what you're suggesting?
15       A.    I believe it's gonna happen sooner.  I haven't
16  given any official word, but it could happen as soon as
17  April.
18       Q.    Understood.  When is your official retirement
19  date, your last date on the job there at the FHP?
20       A.    Well, that's what I'm saying.  I haven't
21  written the official letter yet.
22       Q.    I see.
23       A.    So I have a date in my mind, but I'm just
24  holding off to see how things go.  So that's why I said
25  it could be April.  It could be a little bit longer.  It
```

```
                              Riso
 1
 2   depends on certain things that I need and documents I
 3   need from the Italian consulate in Miami.
 4       Q.   Understood.  All right.  Thank you for that,
 5   sir.  Before today, did you receive a subpoena and a
 6   notice for this deposition?
 7       A.   Yes, I have.  Well, I received the notice,
 8   yeah.  I received the notice, and I did receive the
 9   subpoena.
10       Q.   Let me -- this is going to be a first test here
11   of our technology to see if you're able to see a
12   document.  I'm going to share my screen with you.
13       A.   You do have a second David Riso on, correct?
14       Q.   I'm sorry?
15       A.   You do have a second David Riso in there.  Oh,
16   wait, something just popped up on my computer.  Ah,
17   thank you.  I got it.
18       Q.   Great.  So what I'm showing is what we're gonna
19   have marked as Deposition Exhibit No. 1, and it's
20   identified as the second amended notice of taking duces
21   tecum video teleconference deposition of Corporal David
22   Riso.  And you can see that; is that right?
23       A.   Yes, I can.  I can actually see it on my phone
24   too.
25              (Exhibit 1, Second Amended Notice of Taking
```

1                            Riso

2      Deposition, marked for identification.)

3  BY MR. BRANIGAN:

4      Q.   Excellent.  Is this what you were referring to

5  moments ago when you said that you had received a notice

6  before today?

7      A.   Yes.

8      Q.   All right.  Did you have an opportunity to

9  review this before today, sir, and actually read the

10  document?

11     A.   Yes.  Because I believe I even questioned

12  about, you know, certain documents and bringing them up,

13  and I -- because the concern was we submit all the

14  files, and they get filed at the FHP station in Miami,

15  especially in this case.  And there are certain

16  documents, and I don't tell them -- basically, to get

17  copies, you'll have to contact them.

18          And then there are certain documents that I

19  have to put in what we call a confidential file, and I

20  had a concern about that because certain things like

21  companies or other police, whatever it is, were supplied

22  to me.  But I can't really, like, post them.  I put them

23  in a confidential file which tells the clerk at the

24  Miami station, you know, the homicide clerk, not to sell

25  those, but they are stored, if you know what I mean,

```
 1                           Riso
 2   with the case.
 3       Q.   All right.  I'm going to scroll down to what is
 4   referred to as Schedule A, and Schedule A, I'm going to
 5   summarize it in the interest of time right now.
 6   Schedule A basically asked you to bring with you to the
 7   deposition the file related to the investigation of the
 8   motor vehicle incident that you investigated and that
 9   occurred on April 25, 2019, in the area of Key Largo.
10           Did you bring anything with you to the
11   deposition today that would be responsive to the request
12   in Schedule A?
13       A.   Yes, I did.  Electronic file.
14       Q.   All right.  Can you tell us what is in the
15   electronic file, please?
16       A.   Hold on.  Well, there's the field note packet
17   which has all the documents that were put up, and if
18   anybody privileged to that ordered a copy, they can get
19   a copy of it.  I have copies of e-mails which I cannot
20   post because, you know, they're e-mails, the complete
21   investigative packet which is what you got a copy of,
22   and all supporting documents to help me fill out, like,
23   the pages in the investigative packet, communication
24   between the NHTSA, communications between other
25   attorneys.
```

1                         Riso

2          I guess there was a prior attorney that

3   represented one of the victims, you know.  I have

4   pictures which the pictures are submitted up onto the

5   server to Tallahassee, and that's for people who want to

6   get a copy of those pictures can get copies.  They have

7   to order them through Tallahassee, what we call our

8   photo lab.

9          I have memos.  I have reviews of the case, you

10  know, where some things needed to be changed.  Other

11  things could be like the EDR download which is the data

12  I collected from within the vehicle.  There was some

13  communication from a Mr. -- documents that were supplied

14  from Mr. McCarthy to me from the Tesla corporation.  I

15  kept those.  Pretty sure I kept those in a confidential

16  file too, but there's many documents, many documents.  I

17  don't know where to stop or begin, if you know what I

18  mean.

19  Q.   Are all of the documents that you just

20  generally identified, are they all part of the Florida

21  Highway Patrol's official file for this incident or this

22  crash?

23  A.   Some of the e-mails that I saved for my

24  benefit, they may not be in that file at the station

25  because they're e-mails.  But then, again, my e-mails

1                          Riso

2   are, you know, public information, and we all know that.

3   But in some cases, I won't print up and post e-mails.

4   It depends on what's going on or what's ordered, you

5   know, so I do save those in a file.  I won't print

6   those.  I save those for referral, but I do have a copy

7   of them.

8        Q.   Can you give us an estimate of the number of

9   e-mails that you're referring to?

10       A.   In one case I'm looking at, I opened up the

11  file, I've got, like, 23 e-mails.  I print them up into

12  a PDF, if you know what I mean, and you highlight the

13  page.  And you hit print and you print it in PDF and

14  then I got it in PDF form.  So in one case I opened up a

15  file now, and I've got 23 e-mails.  And then there's a

16  bunch of e-mails from the former attorney, I believe,

17  for one of the victims.  There's, like, 15 e-mails.

18  Then there's -- I think that's it for the e-mails.  I'm

19  not sure if I kept any from -- but there's also the

20  archives on my e-mails.  I can find old e-mails.

21  There's an archive folder.

22       Q.   All right.  Did you review the file in

23  preparation for this deposition today?

24       A.   Yes, I have.

25       Q.   And can you give us your best estimate as to

                              Riso

1    the amount of time you spent preparing for today's

2    deposition by reviewing the file?

3         A.   There was hours of reviewing some things or

4    reading over some items.  I didn't read over the entire

5    case because this case was very fresh in my memory, if

6    you understand, because it literally wasn't even more

7    than just, like, two years ago.

8         Q.   Did you have any conversations with anyone

9    specifically to prepare for this deposition today?

10        A.   Just myself.  I'm the primary investigator on

11   this case.  I was the lead on it, and after a while I

12   was the only corporal working on it.  My supervisor did

13   review it before it got approved and signed off so he

14   did see it, but I didn't talk to him about it.  I might

15   have mentioned I had a depo on this, and that's another

16   reason why my partner left the office because,

17   originally, he didn't want to be inside there when I was

18   -- because I needed to be by myself inside the depo.

19        Q.   All right.  The file that you have been

20   referring to when you identified contents of the file,

21   how long is that going to be preserved for, if you know?

22        A.   The file at the Miami station, I'm thinking

23   they hold on to them.  I'm not sure the numbers.  It's

24   like five, 10 -- I think it's 10 years if I recall.  I

```
 1                       Riso
 2   don't think it's shorter than 10 years, but they hold on
 3   to a file for -- they actually hold on to it for a very
 4   long time.  So it's gonna be there for a while.  I can't
 5   remember the retention period on those, but I think it's
 6   10 years.  I don't know if that answered your question.
 7        Q.   It does.  Thank you, sir.  All right.  I'm
 8   going to stop sharing this for a moment.  You mentioned
 9   that you were the lead investigator for the crash that
10   we're talking about today, correct?
11        A.   Yes.
12        Q.   This next question may reveal some of my
13   ignorance about the scope of your work, and if you
14   haven't noticed by now, I'm not from Florida.  Despite
15   the background that you see behind me, I'm sitting in
16   Michigan where it's currently 12 degrees.  I wish I was
17   in Florida, but I'm not.  But let me get to the
18   question.
19             When you say you were the investigator, can you
20   tell us as the investigator of this incident what were
21   your responsibilities?
22        A.   Just to start off, one thing, I wasn't assigned
23   the lead investigator in the case until about a month
24   after it happened.  But I was on the scene that night
25   when it happened, not immediately, but I did get there
```

```
 1                           Riso
 2   after the fact because I was training a new corporal.
 3   So once I got started getting phone calls and e-mails
 4   from the NTSB, that's when my supervisor decided maybe
 5   we should be taking on this case, meaning the FLAIR
 6   team, the advanced team.  So that's when I basically got
 7   it all, but I had a hand in a lot of things initially
 8   which I'm glad I did.
 9             But as far as investigating the crash,
10   documents, you know, witness statements, EDR downloads,
11   evidence, like, it could be things from the scene,
12   things from the cars in question, determine whether
13   there's -- you know, who's at fault, the dynamics of how
14   it happened, speed if I can get a speed on the vehicles.
15   I tried to, and in not all cases can I actually
16   calculate speed based on the evidence.
17             Bottom line, basically, you're the
18   investigator, you collect all documents, evidence, you
19   see if there's charges, criminal charges, who may be at
20   fault if somebody is at fault, and you figure out the
21   dynamics, basically, of how it happened, travel times
22   before.  There's a lot of detail in that all the way to
23   the end until you polish it up.  And when I say --
24   meaning, make sure you cross your t's, dot your i's,
25   label things correctly like street names, proper, you
```

1                           Riso

2  know, grammar, and you put the final product in together

3  which I'm gonna say that you-all probably got a copy of

4  my traffic homicide investigative report and field note

5  packet.  So you'll have all those, and that's ultimately

6  the finished product along with the other evidence like

7  pictures and interviews and stuff like that that are

8  saved on CDs at the station and other supporting

9  documents.

10     Q.   So we focused our attention on the date of the

11  incident, April 25, 2019.  You were on the job that day,

12  correct?

13     A.   Yeah.  I was called out that night.

14     Q.   How was it that you were notified of the

15  incident so that you could respond to it?

16     A.   They called the local -- if I recall correctly,

17  I believe they called the local corporals, and one of

18  them was a new corporal assigned in the Keys, meaning

19  he's still in training and I was training him.  So I

20  went to the scene with them, and I watched and

21  monitored.  And, you know, as they measured the scene,

22  and I remember the new corporal, he wasn't trained on

23  the Leica station which is a very detailed measurement

24  of the -- you know, detailed, to-scale measurement of

25  the scene.  But he was way on it and I let him go and I

1                              Riso

2   interacted with some of the other officers.  Like, there

3   was an officer from Monroe County and the fire rescue.

4   And then with the severity of what had happened, I even

5   made the phone call to help out to the state attorney's

6   and called the on-call state attorney down in Monroe

7   County.

8       Q.   I'm going to show you a document that we're

9   going to have marked as Exhibit 2.  Bear with me for a

10  minute as I get it up on my screen.  Let me know when

11  you're able to see my screen, sir.

12      A.   I see it.

13           (Exhibit 2, investigation packet, 90 pages,

14      marked for identification.)

15  BY MR. BRANIGAN:

16      Q.   This is going to be marked as Exhibit 2.  Can

17  you tell us what we're looking at here, sir?

18      A.   It looks like it's the -- it looks like it's

19  the cover sheet for the investigative packet.

20      Q.   Am I correct that this is the Florida Highway

21  Patrol traffic homicide investigation packet for the

22  incident that you investigated that occurred on

23  April 25, 2019, at the intersection of County Road 905A

24  and Road 905; is that correct?

25      A.   Yes.

1                          Riso

2      Q.   If you need this enlarged at all, please let us

3  know, okay?

4      A.   Sure.

5      Q.   Okay.  I have a number of documents right now.

6  I just want to have you identify them and tell us what

7  they are before we get into the details.

8           This document is in the form that we received

9  it in response to a subpoena to the FHP.  It's in a PDF,

10  and the PDF is 190 pages long.  This is the first page,

11  and we see your name here as the investigator, Corporal

12  David N. Riso.  And it's signed by some supervising and

13  approving personnel, correct?

14      A.   Yeah.  Sergeant Baker, and then the signature

15  below is Lieutenant Thomas O'Donnell.  They're my chain

16  of command.

17      Q.   All right.  As you can see, I'm scrolling down

18  now.  This is the second page.

19      A.   This one was 190 pages?

20      Q.   Yeah.  Can you see here -- maybe you can see my

21  cursor.

22      A.   Okay, yeah.

23      Q.   The PDF says it's 190 pages.  If I go all the

24  way to the bottom --

25      A.   No, do me a favor.

```
1                         Riso
2      Q.   Yes, sir.
3      A.   Go back up to page No. 2.  That right there,
4  that one, table of contents.  Go down to -- no, the next
5  one, page 3, page 3, I'm sorry.  Okay.  What you've got
6  is you've got everything combined together.  That's why
7  it's 196 pages.  As you can see there, this is the start
8  of the investigative packet.  It ends on page 60.  So
9  page 60 of this should be the end of the investigation,
10  and I bet you page 61 is probably the start of the field
11  note packet.
12      Q.   Let's take a look.
13      A.   Oh, wow, I did do some calculations.  Yeah, see
14  that right there.  The field note packet starts right
15  there at -- oh, why does it start on page 39?
16      Q.   I can't answer that, but the last page before
17  that page is identified as page 38.  And it's a diagram.
18      A.   Yeah.  Maybe some things didn't get scanned
19  properly, but as you can see on that table of contents,
20  your investigative report should be 55 pages.  And then
21  the field note packet, if you go down, it'll tell you
22  how many pages are in that too.  So once you see the
23  field note packet cover, let's go to the -- yeah, see
24  that?  Go to the next one.  See that table of contents?
25  Let's go down to the bottom.  153 total pages there.
```

```
1                           Riso

2        Q.   Yes.

3        A.   So all in all, you should have about 208 pages

4   if my math is correct.

5             (Exhibit 3, field note packet, marked for

6        identification.)

7   BY MR. BRANIGAN:

8        Q.   Yes.  So we have another document.  What we're

9   looking at now has been identified as Exhibit 2.  I'm

10  going to show you what I marked as Exhibit 3, and I want

11  to show it to you for identification purposes so bear

12  with me.

13            So what you should see on the screen now is

14  what we're going to mark as Exhibit 3, and this is

15  actually -- this is 153 pages.

16       A.   So there's your field note packet.

17       Q.   Right.  All right.  So generally speaking, how

18  does the field note packet differ from the first

19  document that we looked at that's identified as the

20  Florida Highway Patrol traffic homicide investigation

21  report?

22       A.   Some of the documents are duplicate.  Some of

23  them are, okay?  And when I fill these packets out, I go

24  by those to make sure I get everything.  I go by first

25  that table of contents which, to me, acts like a
```

```
 1                          Riso
 2   checklist to make sure.  And when I do train them -- by
 3   the way, yes, I do train other corporals, new corporals.
 4   I make sure you get all the documents that you need.
 5   And then as you can see at the bottom of the
 6   investigative packet, at the bottom of the table of
 7   contents, there's additional lines.  So I'll add in,
 8   like, the crash report or charging documents like the
 9   citation, you know, or maybe an arrest affidavit.  Those
10   will get added in.
11            Now, as far as the field note packet, some of
12   the documents -- now, also -- sorry, I'm going back and
13   forth.  One of the things I know of that's duplicated in
14   both is the witness list, okay?  And a witness list may
15   not be just people who saw things.  They may be people
16   who were on scene.  It may be people I dealt with during
17   the investigation.  Maybe it could be the coroner, you
18   know, the ME's office, or it could be the state
19   attorney, whatever.  It all depends on what they did if
20   I need to put them on the witness list.  Now, those two
21   documents are identical inside both packets because I
22   fill it out once.  And because when you look at the
23   checklist for the field note packet, I put the same
24   identical witness list in the field note packet,
25   basically, so I don't have to write it twice, okay?
```

1                          Riso

2              And then in the field note packet, you'll see,

3     like, measurements.  You'll see a field sketch in there.

4     You'll see, like, maybe calculations.  You know, if

5     there are, you'll see post-collision inspection reports

6     where I go and I photograph the car after and I do my

7     processing of the vehicle after.  In the field note

8     packet, you'll probably see subpoenas if there are any

9     or -- not subpoenas but, I'm sorry, search warrants,

10    maybe arrest documents, the weather report, maybe

11    letters I've written to the families, you know.

12              And throughout the years, there are certain

13    documents that we realized that maybe we should just put

14    them in, like I said, the confidential file because

15    they're not really public record.  They need to order

16    them.  And that's a discussion that I would have with my

17    supervisor to say, you know, what about this, what about

18    that.  But, basically, there is some difference, and

19    there's some overlapping between them.

20              (Exhibit 4, investigation packet, 60 pages,

21         marked for identification.)

22    BY MR. BRANIGAN:

23         Q.   Thank you.  I'm going to show you a different

24    document now so you'll see the screen go black for a

25    minute.  I'm going to show you what we've marked as

```
 1                          Riso
 2    Exhibit 4.  Let me know when you can see that.
 3        A.    That looks like the investigative packet, but
 4    now it looks like you have 60 pages in that one.
 5        Q.    Right, yes, which is --
 6        A.    Something doesn't seem right.
 7        Q.    -- thus my question -- yeah.  I'll tell you I
 8    don't know if it's because of the way that we -- I don't
 9    know if this is exactly how we received these documents
10    from the FHP, or perhaps they were broken up by people
11    in my office.  But it's the reason I'm asking you just
12    to identify what we're looking at to make sure I
13    understand how you document the investigation and what
14    we have here because this is 60 pages, and if you look
15    at the second page here of Exhibit 4, it looks like --
16    you know, it's the same second page of what we looked at
17    earlier.
18        A.    Sure, it is.  Now, one thing I forgot to
19    mention, one of the big differences between the
20    investigative packet and the field note packet, the
21    investigative packet will actually have the report which
22    always starts on page 4.  And you'll see it.  Right
23    there, that's it, assignment.  That's the start of my
24    report, basically, documenting everything I've done.
25    And as you can see, it's how I got called out, and then
```

1                           Riso

2    I go into the investigation.  And, basically, everything

3    that I've written inside here would be supported by the

4    other documents that you may find in the field note

5    packet or on the CDs that's stored at the Florida

6    Highway Patrol station in Miami.  And everything that I

7    put in there would be supported by, you know, what's on

8    the file over there.  This is the one that tells you the

9    story about everything.

10        Q.   The investigative report, is this authored

11   solely by you, sir?  Or was it authored solely by you,

12   sir?

13        A.   It's authored by me, and it's reviewed by

14   Sergeant Baker who you saw on that signature and then

15   Lieutenant O'Donnell.  And they go through it.

16        Q.   This investigative report concludes with a

17   summary that -- it's at the end here.  It starts right

18   here towards the bottom of page 31.  You see that?

19        A.   Okay.  Yes, sir.

20        Q.   And the summary concludes either at the bottom

21   of page 32 or the top of page 33.  Is the summary all of

22   your work?

23        A.   It's my work and, like I said, reviewed and

24   things I was told to change, whatever, are correct.  It

25   could be the wording, how I named a street.  They might

```
                                Riso
 1
 2   not have stood out, things like that or -- you know,
 3   that's why my sergeant would look at it, and then my
 4   lieutenant would look at it.  And then, finally, it gets
 5   to the point where they say everything looks good now.
 6        Q.    Thank you.
 7        A.    But, basically, the content is mine.
 8        Q.    So if we go back to the beginning of this
 9   investigative report on page 4, when did you prepare
10   this in connection with this incident that occurred on
11   April 25, 2019?
12        A.    When did I prepare this report?
13        Q.    Yes.  When did you start preparing it?  Let me
14   rephrase the question to ask you that.  When did you
15   start?
16        A.    Every homicide -- most homicide investigators
17   start things differently.  Some start writing a little
18   bit at a time from the beginning.  I generally go
19   through and collect all evidence, interviews, get
20   everything ready that I know I need for a field note
21   packet, for investigative packet, collect whatever
22   evidence, get everything.  Then, I don't know, maybe a
23   month into it, a month and a half I'll start writing
24   little by little because writing does take quite some
25   time in my perspective.  I don't know exactly when I
```

1                          Riso

2  started writing it but, eventually, I did.  But,

3  remember, I didn't get this case until a month after so

4  I know it's been -- it was at least more than a month

5  before I started writing this narrative.

6      Q.   So on that point, who was the -- was there a

7  different investigating officer before you were assigned

8  as the investigator?  So in other words, on the night

9  this incident happened, was there an officer in charge,

10 if I could put it that way, or in the role of

11 investigating officer before you took on the role?

12     A.   I'm pretty sure it was Corporal Rosario.  He

13 should be on that witness list.  He was initially

14 assigned.  He was the one I was training.  He's the one

15 that did those measurements that were handwritten in the

16 field note packet.  You'll see handwritten across,

17 measurements, and I was watching him, guiding him, and

18 like I said, yeah, he should have been the initial

19 officer assigned to it.

20     Q.   If we look at the first page of this exhibit,

21 it's got the signatures of the reviewing supervisor and

22 the approving supervisor, and they're dated or dates are

23 shown there as August 28, '20, which I'm interpreting to

24 mean 2020.

25     A.   Yes, it is.  It took a long time.  We had many

1                          Riso

2  cases, and they had many cases to review.  Mine weren't

3  the only ones for my sergeant to review.  He has four of

4  us on this advanced team, and then the lieutenant has

5  three teams underneath him of at least four people on.

6  So what I'm trying to say is they have other, you know,

7  documents so when they review it and say these changes

8  need to be made, then send them back to me.  And I work

9  on them, I get them done, and then I send them back up.

10  When it eventually gets signed off -- you know, like I

11  said, this one in this case is probably about -- looks

12  like -- yeah, literally, about what?  A year and maybe

13  four months later.

14       Q.   Can you tell us when you completed your report

15  so that it would've been available for them to review,

16  understanding what you just said about the process that

17  led to this being signed off as indicated in August

18  2020.  When did you finish your work?

19       A.   I'll give you that answer here in a second.

20  Okay.  If you look at page No. 5 of that field note

21  packet -- now you're looking at the investigative

22  packet.  If you look at page -- yeah, the one that's 153

23  pages.

24       Q.   Let me switch to that.  Did the document switch

25  on your screen?  Are you now seeing the field note

```
 1                        Riso

 2  packet?

 3       A.   Yeah.   I see what you're pointing because I can

 4  see it on my phone and the computer, but what I'm doing

 5  is I'm actually looking at what I turned in on my

 6  computer.   So I see it on the phone, but I'm looking at

 7  what I gave, you know, to the Florida Highway Patrol on

 8  my computer.

 9       Q.   So for the benefit of our record so it's not a

10  mess, now what I'm showing you is Exhibit 3 which is

11  called the traffic homicide field note packet.   And you

12  said if I go to page 5 of this?

13       A.   Go to page 5.   You'll see on the bottom.   Now

14  look at the very bottom line of that case activity

15  summary.   See the date of October 29, 2019, case turned

16  in?

17       Q.   Yes, sir.   All right.   So does that mean that's

18  when you completed your report and turned it in for

19  others to review?

20       A.   Yes.   For the supervisors, yes.

21       Q.   All right.   Sticking with this Exhibit 3 and

22  this case activity summary, if I scroll up to page 3, I

23  see a note here in the activity, it says I arrived on

24  scene of the crash.

25            That's a reference to you; is that correct,
```

1                          Riso

2   sir?

3       A.   It says I arrived on scene of the crash.  Oh,

4   yeah, yeah, that's me because it's me.  I'm the one who

5   authored.

6       Q.   So are you indicating that you arrived on the

7   scene of this crash at 10:23 p.m., April 25, 2019?

8       A.   That's correct.  I can verify with the field

9   note.  I mean, there's CAD notes because I call in that

10  I'm on scene, and that's usually what I will put in as

11  the time.

12      Q.   And if we look at the very first line of this

13  activity summary, does that first line tell us the date

14  and the time that the crash occurred or that -- well,

15  let me ask the question just that way.

16      A.   I put that in, generally speaking, so you know

17  when the crash occurred.  And as you can see, I

18  documented it as occurring, meaning from whether it's

19  from the Monroe County Sheriff's Office CAD notes or our

20  CAD notes or a 911 call or who put it in the CAD.  Now,

21  a 911 call was made, what, two minutes later so I most

22  likely put it as 9:14 because by the time somebody makes

23  a 911 call or calls it in, usually, in my experience,

24  it's a minute or two before that sometimes, most of the

25  time.  It's not immediately.

1                           Riso

2     Q.    Okay.  And this indicates that George McGee,

3   Driver No. 1, made the 911 call?

4     A.    Yes.

5     Q.    So generally speaking, this investigator's case

6   activity that we see beginning on page 3 of Exhibit 3,

7   does this document all of the activity that you and

8   others involved in the investigation engaged in or

9   performed from first notice of the crash until you

10  turned your report in?

11    A.    It documents -- and understand why I say

12  this -- the majority of what I did.  There are other

13  things here and there where I sit down and do some

14  writing.  I don't write down every little bit, if you

15  know what I mean.  So I try to put in -- if you

16  understand why I say it this way -- the important items.

17  I'm not saying nothing else is unimportant, but I'm

18  saying so people can see some of the things I did and

19  when and dates and how I made contact, how I did this,

20  and to show that I made sure that I did certain things.

21    Q.    Would you agree with me that according to this

22  case activity summary, you were involved in significant

23  activities on this case from the date of the incident,

24  April 25, 2019, until the date you turned the report in

25  in October of 2019?

```
 1                           Riso
 2      A.   Like I said, originally, it was going to be
 3 Mr. Rosario's, but I did keep an active connection to
 4 it, if you know what I mean, involvement.  And that's
 5 why I document a lot of things, especially if you look
 6 at page 4, and then eventually we all decided.  And
 7 that's why I put in some things.  Here, I'm getting
 8 phone calls, e-mails, and then it became mine.  I talked
 9 to Sergeant Baker, and he said we probably should be
10 taking this case.  I said okay.  And I was glad that I
11 did have an actual involvement throughout.
12      Q.   All right.  I want to show you a different
13 document, sir.  Bear with me one moment as I change
14 documents here.
15           What we're going to be looking at now is
16 Exhibit 5.  Can you tell us what we're seeing on the
17 screen now identified as Exhibit 5, please?
18      A.   It looks like it's a long-form crash report.
19           (Exhibit 5, Florida traffic crash report,
20      marked for identification.)
21 BY MR. BRANIGAN:
22      Q.   This is from a PDF, and the PDF is indicating
23 that it's six pages long, correct?
24      A.   Yes.
25      Q.   Can you tell by -- and if you need me to scroll
```

```
 1                        Riso
 2    down so that you can see any of this six-page document,
 3    can you tell me if you prepared this or participated in
 4    its preparation?
 5        A.   Scroll down a little bit more.  Go to, like,
 6    the second to last page.  Okay.  Hold on a second.  It
 7    was Trooper S. Martin.  Okay.  Which -- homicide Carlos
 8    Rosario.  I assisted by looking over, but as you can see
 9    in that narrative, when you ordered this copy -- and I
10    can tell that you ordered it, you know, through the
11    proper channels because it doesn't look like my PDF
12    printed version.
13           But as you can see in that narrative, there,
14    look in those little -- you'll see about what happened,
15    like the long paragraph.  Then below it, you'll see some
16    other things.  You'll see pronounced by Oscar Pinzon,
17    whatever, Rescue 123.  Then you'll see traffic homicide
18    investigator, Corporal Carlos Rosario-Flores.  So I
19    might have helped him look at it, but something tells me
20    it most likely probably was more Carlos Rosario because,
21    at the time, they have about -- I believe it's 10 days
22    to get the basic traffic crash out, report out for
23    people to order, to people who deserve a copy.
24           So at the very top, if you go to page 1,
25    please, of that.  Now stop right there.  I'm not sure
```

1                          Riso

2    why he put "completed."  As you look in line -- you'll

3    see, like, County Code 3841, Monroe, right?  You see

4    that?  County of crash.

5         Q.   Yes, sir.

6         A.   Look below Monroe.  You see "completed"?

7         Q.   Yes, I do.

8         A.   And I know that I would not have marked it

9    completed.  I always tell the trooper who's working the

10   crash report to put no, and the reason to the right

11   would be pending THI investigation.  So I don't know --

12        Q.   What does that mean?

13        A.   Traffic homicide investigation which is what I

14   am.  So I don't know why that is completed out.

15        Q.   All right.  If we go to the last page of

16   Exhibit 4, this indicates that the reporting officer is

17   Joel Torres, and there's also a sergeant that is

18   referred to there.  Do you know who those officers are?

19        A.   Oh, are these like incident reports?  Yeah,

20   yeah.  Joel Torres is the one and only deputy from

21   Monroe County who was on scene.  And Sergeant Alvarez,

22   Orlando Alvarez, who I know, he's the sergeant, the

23   supervisor who approved it.

24        Q.   So this also indicates at the top of this

25   section of Exhibit 4 that it's from the Monroe County

```
 1                          Riso
 2    Sheriff's Office.  So is this entire report that we're
 3    looking at from the FHP or the Monroe County Sheriff's
 4    Office?
 5        A.   It's from Monroe County Sheriff's Office who
 6    wrote his -- it looks like it's an offense report,
 7    incident report, and I asked Officer Torres for it.
 8        Q.   Okay.  Very good.  And, Corporal, if it isn't
 9    obvious, I'm taking all your time on this, sir, just so
10    that I can understand clearly the differences between
11    these reports.  And forgive me, and I apologize to
12    everybody that we're taking so much time on this.  But
13    the way that we received the reports, there was
14    duplication, and at least for us up here in Michigan, a
15    little bit of uncertainty about what is what and who
16    prepared what.  So I apologize, but that's the reason
17    for doing this.
18        A.   No, no worries.
19        Q.   I'm going to show you another report.  Hang on
20    just one moment, please.
21             All right.  So we're back looking at what I
22    identified earlier as Exhibit 4, and I'm going to go to
23    the end of this 60-page document in this next series of
24    questions.
25        A.   Oh, wow, it is 60 pages.
```

1                          Riso

2      Q.   Yes, it is.  And, sir, I want to start with

3  this part of Exhibit 4 which is identified at the bottom

4  as page 67.  I misspoke.  Page 57, five seven, and this

5  is identified at the top of page 57 as the Florida

6  traffic crash report?

7      A.   Yes.

8      Q.   I'll enlarge that a little bit for you.  When I

9  scroll down to the bottom of this report, I see that

10  you're identified as the reporting officer, correct?

11      A.   Yes.

12      Q.   Is that because this is the traffic crash

13  report that you prepared on behalf of the Florida

14  Highway Patrol as distinguished from the county level

15  report that we just looked at a few minutes ago?

16      A.   No.  The reason why my name is at the bottom of

17  this report, as you can see, the stuff above from the

18  other one you had, kind of mirrors what you see there.

19  What has happened was I had pulled it out of the server

20  to supplement it.  And because what happened was, if I'm

21  positive about this, the trooper who was working this

22  crash had promoted to corporal up into the Panhandle,

23  not too far from Tallahassee, literally, about 500 miles

24  away so I didn't have him anymore.

25           So, normally, I don't do this.  I used to do it

1                          Riso

2    but, then, I told the sergeant -- I would tell the

3    trooper you need to pull this out and update it, right,

4    you know, the crash report because sometimes they need

5    updated.  So, basically, when I pulled it out to

6    supplement, it puts my name down at the bottom, and now

7    I'm the one who's gonna finish it off again or add the

8    supplement.  That's why you see my name.  As you notice

9    above it, you'll see my name a second time.  Then above

10   that, you'll see Carlos Rosario as doing an update, but

11   then, eventually, I had to pull it out.

12       Q.   Understood.  All right.  Well, thank you for

13   that.  All right.  So I want to go back to this.  This

14   is what we marked earlier as Exhibit 2, and this you

15   explained has your investigative report that you

16   prepared, correct?

17       A.   Yes.

18       Q.   All right.  This section of the report is

19   broken up into subparts starting with the assignments,

20   correct?

21       A.   Yes.

22       Q.   And then if I scroll down, I see a description

23   of the roadway, correct?

24       A.   Yes.

25       Q.   And, again, this is your work product; is that

1                         Riso

2  right, Corporal?

3      A.    Yes, it is.

4      Q.    And I take it this is based on a -- this

5  description of the roadway is based on a combination of

6  your presence at the scene on the night of the incident

7  and your general familiarity with this particular

8  intersection where the accident happened from past

9  experiences; is that fair?

10     A.    Yeah.  You're right about it's fair that I'm

11 very familiar with the intersection.  I do know it very

12 well, but we also try to be very specific about road

13 details.  So I would have to go back and look at it.  I

14 would have to look at measurements to measure, to

15 describe the width of a lane or certain things, you

16 know, but, yes, based on experience and actual

17 measurements made at the scene and photographs.  And

18 when I say measurements, sometimes I'll go out with a

19 wheel, but that Leica total station which you'll -- that

20 diagram you see is actually to scale.  One inch equals

21 20 feet.

22     Q.    Who actually completed the Leica total station

23 survey of the scene, do you know?

24     A.    That would've -- well, he's not a corporal

25 anymore.  He stepped down.  He's a trooper, but he's

```
 1                         Riso
 2   still down in the Keys.  That would be -- why am I
 3   having a --
 4        Q.   If you need to refer to the report --
 5        A.   It's David Kitchen --
 6        Q.   -- to refresh your memory, that's fine.
 7        A.   -- David Kitchen.  He actually did the
 8   measurements.  He actually, I believe, went back a few
 9   days later and brought the Leica total station and
10   measured the scene which I'm glad he did.
11        Q.   The roadway here, we're dealing with two roads,
12   correct, for this incident?
13        A.   Yes.
14        Q.   We're dealing with what is referred to as Card
15   Sound Road that runs in an east and westerly direction,
16   correct?
17        A.   Hold on, hold on.  Actually, I believe it's
18   Card Sound Road which is County Road 905A.  I believe
19   that one goes north to south direction, and it's County
20   Road 905 which goes -- you know what?  Sorry.  Let me --
21   bear with me a second.  Let me just make sure.  Okay,
22   yeah.  It's actually -- yeah, you're right.  Card Sound
23   Road goes in an east, westerly direction, and it's
24   County Road 905 that's north and south.
25        Q.   Yes.  And just focusing on County Road 905,
```

1                            Riso

2    also identified in the report as Card Sound Road, in the

3    area of this crash, let's say within a half a mile of

4    the crash, if we're looking from the west and looking

5    east toward the ocean, would you agree with me that this

6    road is flat and straight?

7            MR. POSES:  Object to the form.  Go ahead,

8        Corporal.  I'm just objecting to the form of the

9        question.

10       A.   Okay.  I understand what you're saying,

11   Mr. Poses.

12           The general area of this, if you want to call

13   it flat, yes, but there's some, what we call, elevations

14   of the roadway, meaning the roads in Florida are, like,

15   slightly arced so water could run down to the side.  But

16   generally speaking --

17   BY MR. BRANIGAN:

18       Q.   If you have a crown, correct?

19       A.   A crown, yeah.  A crown effect so water will

20   drain to the side because there's no sewer.  So for a

21   road to have a zero super elevation in Florida is very

22   hard, meaning, you know, if you go from the center out

23   so water will drain down.  But generally speaking, in

24   the direction of travel, usually, they are flat.  In

25   this area where this happened, the roads are flat other

1                         Riso

2    than the crowning at the edges of the road.  And if you

3    go further up the roads, there are some curves.

4         Q.    Which direction?

5         A.    Well, if you go up Card Sound Road, 905A, which

6    is the road at the top of the diagram, it does have a

7    curve in it maybe -- I can't remember -- about

8    four-tenths of a mile or so from the crash scene.  And

9    if you go south on County Road 905 away from the scene,

10   it does have a curve in the road about a half a mile

11   down.

12        Q.    County Road 905 is a two-lane road, right?

13        A.    Yes.  Meaning you have one lane in each

14   direction.

15        Q.    Yes, exactly.  And one of the lanes is in the

16   direction heading east, and the opposite or other lane

17   is heading west, correct?

18        A.    And you're talking about Card Sound Road,

19   correct?

20        Q.    Yes.

21        A.    Yes.  Yes, it does.

22        Q.    And Card Sound Road in this area that we're

23   talking about intersects with County Road 905 which runs

24   in a north-south direction, correct, generally speaking,

25   at the intersection?

```
1                           Riso
2       A.    Generally speaking, yes.
3       Q.    And that intersection is controlled by a
4    traffic control device or devices, plural, correct?
5       A.    Yes.  Specifically, there's a single flashing
6    red light mounted at the center of the intersection that
7    points, you know, in all directions.  Now, remember,
8    this is a T-intersection so it doesn't point toward that
9    area off on the shoulder.  And there's also three-way
10   stop signs with the painted stop bars which you're
11   supposed to stop behind.
12      Q.    Yes.  Now, if we look at the narrative towards
13   the bottom of page 5, there is a description of what you
14   just said, correct, in terms of the flashing red signal?
15      A.    Yes.
16      Q.    And I want to show you something else here so
17   bear with me just a minute.  Let me know when you can
18   see my screen, Corporal.
19      A.    I see it.
20      Q.    This is what we're going to identify as
21   Exhibit 5.  Do you recognize what's depicted in this
22   photograph?
23      A.    This picture is somebody standing on Card Sound
24   Road facing -- hold on a second here.  Let me go back to
25   my diagram, I guess.  It looks like it's somebody facing
```

1                        Riso

2   east, facing towards the T-intersection with County Road

3   905.

4              THE COURT REPORTER:  Pardon me, Counsel.  I

5         believe this is Exhibit 6.  Five should be the

6         six-page --

7              MR. BRANIGAN:  You're exactly right, Madam

8         Court Reporter.  Thank you for the correction.  Six.

9              (Exhibit 6, photo, marked for identification.)

10  BY MR. BRANIGAN:

11       Q.   So in Exhibit 6, which is a photograph, we're

12  looking towards the east as if we're standing in the

13  eastbound lane of Card Sound Road, correct?

14       A.   Yes.  We're on Card Sound Road, yes, facing

15  east.

16       Q.   And we can see that red flashing light in this

17  photograph, correct?

18       A.   That's correct.

19       Q.   It's illuminated so that we can see that it's

20  red, correct?

21       A.   Correct.

22       Q.   Would you agree with me that we can also see

23  what appears to be a stop sign on the right side of the

24  road?

25       A.   That's correct.

1                          Riso

2       Q.   And if you look at the right side of the photo

3   towards the top, would you agree with me that there

4   appears to be part of another sign?  I don't know if you

5   can see my cursor, but I'm pointing to it now.

6       A.   Yes.  There is some triangle-shaped sign, a

7   diamond, what we, I guess, call a diamond-shaped sign.

8       Q.   What does that diamond-shaped sign signify?

9   What does it mean?

10      A.   Right now, judging by the picture, I can't tell

11  what's on it.  It might say there's a stop ahead or a

12  traffic light.  I'm not positive unless I look at that

13  sign.

14      Q.   All right.  In the investigative report

15  describing the roadway, it indicates that the eastbound

16  lane of Card Sound Road also has a stop sign and a

17  flashing red signal above the intersection that is

18  clearly visible at night four-tenths of a mile west of

19  the intersection, correct?

20      A.   Correct, yes.

21      Q.   Did you make the determination that the red

22  flashing signal above the intersection is clearly

23  visible at night four-tenths of a mile west of the

24  intersection?

25      A.   Yes, I did.

1                              Riso

2        Q.    How did you go about doing that, Corporal?

3        A.    I physically drove through those things and

4   looked at them to make sure because I even went through

5   and even measured it too, the four-tenths of a mile, to

6   make sure.

7        Q.    The red flashing light under Florida state

8   traffic laws, what does that require a driver to do?

9        A.    To come to a stop.

10       Q.    A complete stop?

11       A.    Yes.  It's not what you would consider working

12  traffic lights which are green, yellow, and red, but

13  it's a flashing to help warn.  Now, if it was a flashing

14  yellow, I believe it says -- the statute, it should say

15  you need to reduce speed and proceed through with

16  caution.  So in this case, I can't second-guess why DOT

17  did it that way or not, but you have a stop sign.  And

18  you have the stop bar, and you have a flashing red light

19  to help draw your attention to the fact that you need to

20  stop.

21       Q.    So since you mentioned the stop sign, the stop

22  sign in Florida, what does that require a driver to do

23  under Florida state traffic laws?

24       A.    Come to a complete, and in the definition of

25  stop, complete cessation of movement.  And if Madam

1                          Riso

2    Reporter wants to know how to spell it, I believe it's

3    C-E-S-S-A-T-I-O-N, cessation of movement which

4    essentially means you come to a complete stop.

5         Q.   You also mentioned that there's a stop bar on

6    -- I think you were referring to something on the

7    pavement; is that right?

8         A.   That's correct.

9         Q.   Does the eastbound lane of Card Sound Road have

10   a stop bar associated with the stop sign?

11        A.   Yes, it does.

12        Q.   What does the stop bar require a driver to do

13   under Florida traffic laws?

14        A.   Traffic laws, you're supposed to stop prior to

15   it and, basically, not be over it or across it.

16        Q.   I'm going to show you another photo so bear

17   with me as I switch photos.  This is going to be

18   Exhibit 7.  Are you able to see the photo, sir?

19        A.   Yes.

20             (Exhibit 7, photo, marked for identification.)

21   BY MR. BRANIGAN:

22        Q.   So what are we looking at, if you know, in

23   Exhibit 7 which is a photograph?

24        A.   That looks like it's the stop bar for the

25   southbound side of County Road 905.

1                        Riso

2       Q.   So am I correct that as we look into this

3  photograph, we're still looking towards the east?

4       A.   Yes.

5       Q.   So if a driver was traveling in the eastbound

6  lane of Card Sound Road approaching this intersection,

7  this is what the driver who was paying attention to

8  things ahead would see; is that fair?

9       A.   That's fair.

10      Q.   The traffic signs that we can see, the yellow

11 signs, what are those indicating?

12      A.   They are warning signs to help -- I'm gonna

13 guess that, you know, basically, a warning sign to stop.

14 You can't go any further.  And the center one is the

15 arrow left or right, basically meaning you can only go

16 right or left and not straight.  And as far as the

17 diamond-shaped reflective warning signs, there was also

18 a fourth one, the one to the right.  There wasn't just

19 three.  There was originally four standing.

20      Q.   Yes.  Now, did you make a determination about

21 these signs and how far back away from them they would

22 have been visible like you did for the red flashing

23 stoplight?

24      A.   Well, I believe in that other picture you

25 showed where we're way back on the county road, you can

1                           Riso

2    see those reflective signs.  When you illuminate with

3    the light, you can clearly see something being reflected

4    off which would be blocking the path of travel, you

5    know, warning.  They're like warning signs.

6         Q.   Is it your belief based on your investigation

7    in which you included driving through the scene, looking

8    at measurements, taking measurements, that the signs

9    that we can see in Exhibit 7, the yellow signs, could

10   also be visible at least four-tenths of a mile before or

11   -- excuse me -- away from where they're at?

12        A.   They can be visible.  You can see them.  You

13   can see something that's reflected off.  You just may

14   not be able to see the outer edges of them because

15   they're not so big, but you can see something getting

16   reflected off.  As long as the light is on it, if you

17   know what I mean, they are reflective in nature.

18        Q.   Very good.  I want to talk a little bit more

19   about the roadway.  At the time of this incident, is it

20   correct that the roads were dry and clear of any visible

21   defects?

22        A.   I believe it was.  I believe I would have said

23   that in my report.

24        Q.   Is it also true that in the area where this

25   incident occurred, where the crash occurred, there were

```
1                           Riso
2    no visible obstructions to a driver?
3        A.    None that I was aware of.
4        Q.    And the speed limit on Card Sound Road, was it
5    45 miles an hour as a driver would approach the stop
6    sign?
7        A.    I was just going to bring that up.  It is 45
8    miles an hour as you approach this intersection on both
9    roads except for the one -- if you're coming from -- if
10   I'm looking -- if you're coming from the north headed
11   south approaching the intersection, I believe the speed
12   limit is different over there.
13            MR. BRANIGAN:  All right.  We've been at it for
14       about an hour and 40 minutes.  And if it's okay with
15       you, Corporal, I'd like to take a short break.  Would
16       that be okay with you, sir?
17            THE WITNESS:  That's okay because I was gonna
18       ask for a little needed break, if you know what I
19       mean.
20            MR. BRANIGAN:  I do; I understand.  Why don't
21       we take about 10 minutes?  Is that okay with
22       everyone?
23            MR. POSES:  That's good, Thomas.
24            (Break was taken.)
25   BY MR. BRANIGAN:
```

1                           Riso

2       Q.   Corporal, in the next section of your

3  investigative report, you have a discussion about the

4  vehicles starting with Vehicle 1.  And as I understand

5  from your report, Vehicle 1 refers to the 2019 Tesla

6  Model S, correct?

7       A.   Yes.

8       Q.   And you also make reference to the driver as

9  D1, and D1, Driver 1, was the driver of the Tesla,

10  correct?

11       A.   Yes, correct.

12       Q.   Would that be Mr. McGee?

13       A.   Yes, sir.

14       Q.   All right.  When you arrived on scene, did you

15  individually meet and speak with Mr. McGee, the Tesla

16  driver?

17       A.   No, sir.

18       Q.   Did you ever speak with Mr. McGee while you

19  were on scene?

20       A.   No, sir.

21       Q.   Have you ever spoken with Mr. McGee?

22       A.   Yes, sir.

23       Q.   Can you tell us when you first spoke to

24  Mr. McGee in connection with this incident?

25       A.   I believe it was when him and his attorney met

```
1                           Riso
2    me at my office here for him to sign and accept his
3    traffic citation for the cause and crash.
4         Q.   Do you recall when that was?  And if you need
5    to look at your report to refresh your memory, that's
6    fine.
7         A.   Let me look here.
8              MR. POSES:  I'm just going to object to the
9         form as it relates to the citation but, Corporal,
10        please go ahead.
11             THE WITNESS:  I'm reading.  Hold release, hold
12        release.  Okay.  He basically came on October 28,
13        2019, the day before I turned in the report.
14   BY MR. BRANIGAN:
15        Q.   Did you take a statement from Mr. McGee then?
16        A.   I believe he invoked his rights.  I believe he
17   did.
18        Q.   So he invoked his Fifth Amendment right and as
19   a result, did not give a statement?
20             MR. POSES:  Object to the form.
21        A.   I normally ask, and if I do ask, I go through
22   counsel.  If they're represented by counsel, I always go
23   -- and that's my policy.  I'll go through counsel.  I
24   don't bypass that.
25   BY MR. BRANIGAN:
```

1                            Riso

2       Q.   Is it correct, is it not, though, sir, that

3   while he was at the incident scene, after the crash,

4   Mr. McGee made statements about the incident, correct?

5       A.   Statements to people who were at the scene that

6   he was around, and these statements, I believe, were

7   recorded by body cam video that was on the deputy there,

8   Joel Torres, um-hmm.

9       Q.   So that would be the deputy from -- forgive me,

10  is it Monroe or Montgomery County?

11      A.   Monroe County.

12      Q.   Monroe County?

13      A.   Yes.  And he was the only deputy who was on

14  scene.

15      Q.   From Monroe County?

16      A.   Yes.

17      Q.   The body cam video and audio that Deputy

18  Torres's body cam technology recorded, have you

19  personally listened to that and watched it?

20      A.   Yes, I have.

21      Q.   Did you do that in connection with preparing

22  the report?

23      A.   Yes, I did.

24      Q.   And based on your listening to and review of

25  that body cam information, is it your understanding that

1                          Riso

2    Mr. McGee made spontaneous statements to the police

3    about what he thinks occurred?

4         A.   Yes.

5         Q.   And is it your understanding that, first of

6    all, he -- he was familiar with this incident -- excuse

7    me -- the area where the incident occurred?

8         A.   Was he familiar with the area where the

9    incident occurred, correct?

10        Q.   Yes.

11        A.   Yes, he was.

12        Q.   Do you know -- is it correct that he lived in

13   the area where the incident occurred?

14        A.   Well, north of the intersection, from the

15   intersection on 905, it eventually ends about, I'm gonna

16   guess, a mile down the road at the entrance into an area

17   called Ocean Reef.  It's a gated community, monitored

18   24-hours gate, and he had a place of residence inside

19   there.

20        Q.   Did you confirm that through your

21   investigation?

22        A.   Yes, I did.

23        Q.   And do you happen to know how frequently he

24   would travel through this intersection where the crash

25   occurred to get to Ocean Reef before the incident

1                          Riso

2   occurred?

3        A.   That one, that specific detail I couldn't

4   confirm.  What I believe I confirmed was at the time of

5   this incident, the date, I don't believe he was there

6   more than a year earlier.  It might have been less that

7   he had bought that place.  I do remember that.  I wasn't

8   able to review that fact, but I do remember that detail

9   how it wasn't about -- I think it was a year or just

10  under a year that he had bought that house.

11       Q.   In the course of your investigation including

12  listening to and analyzing that body cam video that we

13  just referred to that recorded Mr. McGee's statements,

14  did you learn from any of this evidence that he claimed

15  that he was not familiar with the area where the crash

16  occurred?

17       A.   Honestly, I don't remember or recall him saying

18  that.

19       Q.   If there would've been evidence of that, either

20  because he said it or through some other means, would

21  you have documented that in your report?

22       A.    If I remember, recall hearing it or saying it,

23  I would have documented what he said.

24       Q.   Including him saying, if he actually had said

25  it, I just wasn't familiar with the area, it's the first

```
 1                         Riso
 2   time I've been through it, something like that?
 3       A.   I would have made note of it and documented it.
 4       Q.   Now, even if someone said that, you know, a
 5   driver involved in a crash like this said that, that
 6   doesn't relieve them of their responsibilities to obey
 7   the travel control devices at this intersection,
 8   correct?
 9       A.   That's correct.
10       Q.   Is it your understanding from the investigation
11   that you completed that Mr. McGee stated numerous times
12   to different people including to Officer Torres that he
13   was driving using his phone, his cell phone, while
14   driving and that he dropped his phone and that he looked
15   down and then ran the stop sign?
16            MR. POSES:  Object to the form.
17       A.   He admitted that he was on the phone and, yes,
18   he did say that he dropped it.  And, yeah, I do
19   recall -- yeah, I do recall he ran the stop sign too.
20   BY MR. BRANIGAN:
21       Q.   And is it your recollection that he admitted
22   that he failed to stop for the stop sign and the
23   flashing red light?
24       A.   Yes, he did.
25       Q.   Did you subpoena phone records for Mr. McGee's
```

1                           Riso

2    phone, cell phone?

3         A.    I believe that I did.

4         Q.    And did you receive records from the phone

5    service provider in response to the subpoena?

6         A.    I believe I did, but hold on a second.  Hold on

7    a second here.  Yeah.  T-Mobile.  I believe it was

8    T-Mobile phone records, yes, and AT&T.  There was two

9    different phone records I found out.  Yes, I do have

10   them, um-hmm.

11        Q.    Were you able to confirm by looking at the data

12   produced in response to that subpoena from the phone

13   service provider that Mr. McGee was, in fact, on his

14   cell phone before the crash occurred just seconds

15   before?

16        A.    Yes.  I was able to confirm.

17        Q.    Were you able to confirm that during the crash

18   he was still on the phone?

19        A.    Yes, I was.

20        Q.    In the state of Florida, is there, to your

21   knowledge, Officer, a statute that relates to distracted

22   driving?

23        A.    There is something that relates to distracted

24   driving and cell phones, but I can't remember that --

25   but it was more pertaining to texting and driving.  But

1                             Riso

2    that is what they consider a secondary violation which

3    means I cannot just pull you over for texting and

4    driving.  I have to have another reason to stop you.

5         Q.   All right.  I want to turn your attention to a

6    different topic now.  You or someone working at your

7    direction obtained data from the Tesla's event data

8    recorder, correct?  Sometimes it's referred to as an

9    EDR?

10        A.   Yes.

11        Q.   Did you do it personally, or did someone do it

12   under your direction?

13        A.   If I recall, I couldn't image it myself because

14   I am certified to image that data.  I believe I had to

15   bring it to somebody who was certified who had a program

16   to image the data contained in the Tesla.  Let me look

17   at the report here.  I believe I probably would have

18   wrote that here.  Just bear with me a second, okay?

19        Q.   Yes, sir.  Corporal, can I make a suggestion?

20        A.   Yes.  I got it.

21        Q.   On page 31 of your report, the very top, the

22   first sentence starts out the ACM, backslash, EDR for

23   both Vehicle 1 and Vehicle 2 did record events.

24        A.   Yes.  And I was actually looking at page 4 of

25   the field note packet.  And at the very top, it says on

1                        Riso

2    May 10, 2019, at 1:51 p.m. the EDR download of data

3    conducted by Officer Eric Dominguez of the Miami Beach

4    Police Department.

5            So, basically, I did not have the program to

6    image the event data recorder inside the Tesla.

7    Q.    Did you rely on the data that Officer Dominguez

8    extracted or imaged from the Tesla's EDR in completing

9    the investigation?

10   A.    It was evidence that I wrote about.  I didn't

11   totally, as you worded it, rely on it because I did

12   conduct some speed calculations.

13   Q.    All right.  We'll get to those in a minute.

14   Thank you for that clarification.  Starting with the

15   data from the EDR that is discussed in your report at

16   page 31, let me know when you're there.  In fact --

17   A.    That's the investigative report, correct?

18   Q.    Yeah.  I'm gonna put it up on the screen.  One

19   moment, please.  You should be able to see it now.

20   A.    Yes, sir.

21   Q.    This is from what I marked as Exhibit 2,

22   page 31 of the investigative report.  If we look at the

23   first line, we can see a reference to the ACM,

24   backslash, EDR, ACM sometimes meaning air bag control

25   module, and EDR event data recorder from Vehicle 1, the

1                          Riso

2    Tesla, Vehicle 2, the SUV, correct?

3         A.    That's correct.

4         Q.    All right.  Focusing your attention on the data

5    that you are writing about concerning the speed of

6    Vehicle 1, according to the EDR data, the speed of

7    Vehicle 1 five seconds before impact was 97 kilometers,

8    correct?

9         A.    That's correct.

10        Q.    And you converted that into miles per hour a

11   little bit lower in this section, and that converts to

12   60.23 miles per hour, correct?

13        A.    That's correct.

14        Q.    And that was 5 seconds before impact, right?

15        A.    Speed was 97 kilometers per hour five seconds

16   prior to impact, yes, sir.

17        Q.    Right.  And if Mr. McGee was traveling at a

18   rate of speed of slightly more than 60 miles per hour on

19   the road that we know he was traveling on, he was

20   breaking the speed law, correct?

21             MR. POSES:  Object to the form.  Go ahead,

22        please.

23             THE WITNESS:  I can answer, right?  Okay.

24             MR. BRANIGAN:  Yes, sir.

25        A.    He was in violation of the posted speed limit.

1                          Riso

2    BY MR. BRANIGAN:

3        Q.   And he was exceeding the posted speed limit by

4    more than 15 miles per hour five seconds before impact,

5    correct?

6        A.   That's correct.

7        Q.   Your report goes on to talk about his speed a

8    half a second prior to impact as well, correct?

9        A.   Yes.

10       Q.   What was his speed in miles per hour as

11   indicated by the EDR for the Tesla a half a second prior

12   to impact?

13       A.   Well, I would have to look at the reading

14   because what I wrote was he applied his brakes a half a

15   second before which is going to reduce that speed.  Now,

16   the sense adapter said his speed at impact which is

17   zero, zero seconds, was 84 kilometers per hour and the

18   brakes were applied.  So his speed did go down from 97

19   down to 84 miles per hour which was at the impact, 84

20   kilometers per hour.

21       Q.   And then you have in the last line of that

22   paragraph, last sentence, you state Vehicle 1's minimum

23   speed at impact was calculated 47.41 miles per hour with

24   a maximum speed calculated at 56.84 miles per hour,

25   correct?

1                         Riso

2      A.    Yes.

3      Q.    So at impact, according to the EDR data and

4   what you wrote here, he was speeding, correct?

5      A.    Yes, he was.

6      Q.    Now, you mentioned that you did some speed

7   calculations, right?

8      A.    Yes.

9      Q.    Did your speed calculations confirm the data

10  that you're discussing here that was obtained from the

11  EDR about the Tesla's speed?

12     A.    The speed calculations that I was able to do, I

13  believe, were after the impact.  So hold on a second

14  here.  Hold on.  Just give me a second.

15     Q.    Take your time, sir.

16     A.    I'm gonna look right at them because I know I

17  hand wrote them.

18     Q.    When you get to that, would you tell us what

19  page you're looking at?

20     A.    Now, this is the field note packet.  Field note

21  packet, page 14.

22     Q.    I'm there.

23     A.    Okay.  And you'll see I put a one with a circle

24  underneath the top of the page where it says calculation

25  sheet.  Now, these basically were -- this basically was

```
1                           Riso
2    calculations to get a total delta-v combined, you know,
3    because I took the data collected from V-2, and I got a
4    total delta-v.  And now that's why you get a range of 56
5    all the way, you know, to, like, what, 41.53 or
6    something.  But those are calculated based upon the
7    impact and delta-v, and you'll see that it's all right
8    there on those sheets right there from 14 through 17.
9         Q.   Yes.  If I understand your analysis, you did a
10   conservation of momentum analysis; is that correct?
11        A.   Yes.  You can see that, can't you?
12        Q.   I can.  And so as part of that, you determined
13   speeds, and you determined longitudinal changes in
14   velocity, delta-v, correct, for the Tesla?
15        A.   Yes.  And you'll see that I gave a range
16   because we tried to give a little bit of range to
17   clarify.  So, basically, he was between 54, it looks
18   like, and 56.1 at impact.  And so I did a range for that
19   one.
20        Q.   So whether we rely on your analysis that we see
21   in the field note packet at pages 14 and 15 or the data
22   from the Tesla's event data recorder, in either case,
23   you believe that Mr. McGee was speeding, violating the
24   speed law at the moment of impact, correct?
25        A.   That's correct.  And the reason why I also did
```

1                          Riso

2   these calculations was we try not to totally rely on the

3   EDR air bag control module image data.  And if I can do

4   the math, I will, and there are some cases where you

5   can't.  But as you can see the result, I believe he said

6   it was -- the readout said it was 84 kilometers at zero

7   which comes out to be what.  I'm trying to do it in my

8   head right now because it's multiplication of 0.61 --

9   it's something like 52ish miles per hour, give or take,

10  and I'm calculating -- based on my calculations, I'm

11  getting, what, a range, a little bit higher.  So I think

12  we're in the ballpark.  Yes, my calculations were at 54

13  when I look at the data.

14       Q.   Yes, correct.  Thank you.  All right.  We can

15  go back to your investigative report which we still have

16  on the screen.  On page 31, we see the beginning of your

17  summary discussion, correct?

18       A.   Yes, sir.

19       Q.   And you indicate on page 32 in reference to

20  Tesla Vehicle 1 that Mr. McGee failed to slow down or

21  stop for the traffic control device for the road that he

22  was traveling on, eastbound State Road 905A, correct?

23       A.   Yes.

24       Q.   Let me ask you something, Corporal.  Did you

25  actually inspect the Tesla?

```
 1                          Riso
 2      A.   You know what, I'm trying to remember if I did.
 3  Hold on, hold on.  I'll find out because if I did, I
 4  would've signed what we call our vehicle inspection
 5  which will be part of the field note packet.  So hold
 6  on, and I will tell you what page it's on.  No.
 7  Actually, no, I did not.  That was inspected by Corporal
 8  Carlos Rosario.  And you go to page 37.  Or no, I'm
 9  sorry -- okay.  Yeah, go to page 37.
10      Q.   Yes.  One moment, please.  Well, perhaps that's
11  page 37 in your field notes?
12      A.   I know what you're saying but, basically,
13  Carlos signed it.  It'll say post-collision inspection
14  Sheet No. 2 at the very top, and at the bottom he signed
15  it.  I released the hold on it.  You'll see I signed two
16  lines on that, meaning I released the hold, and then I
17  did a download, EDR download.  I copied and retained it
18  for the file.  I signed those, but he signed -- he
19  photographed, and he inspected it back on May 15th.  And
20  when did we -- this was what.  Probably around
21  April 30th, was it again?
22      Q.   The date of the crash?
23      A.   Yes.
24      Q.   The date of the crash was April 25.
25      A.   April 25.  I'm sorry.  I apologize.  So, like I
```

1                            Riso

2  said, he inspected it because he's supposed to do it in

3  a certain amount of days.  That's why he did the

4  inspection.

5      Q.   When the inspection is done, is the officer

6  who's doing the inspection of the vehicle involved in

7  the crash, in this case the Tesla, is the officer

8  looking for evidence that there may have been some type

9  of malfunction of the vehicle?

10     A.   Part of the things we inspect would be like we

11 check off brakes, lights are working, headlights,

12 taillights, turn signals, seat belts, whether they work

13 properly, tire tread depth, you know, how much tire

14 pressure there is.  We'll write down the umber on each

15 tire.  We do a pretty good inspection, but as far as the

16 mechanics, the exact mechanics, other than the brakes

17 and documenting the damage and whether the brakes are

18 working among other things, I wouldn't go in detail as

19 far as the mechanics of whatever it is, a Tesla in this

20 case, or let's say it was a Chevy or a Ford.

21     Q.   Do you consider the results of that inspection

22 when you're preparing this investigative report?

23     A.   I will write about it.  You know, some of us --

24 I will write about the inspection, you know, to a point.

25 I will write that on this date, and I believe it's in

```
 1                          Riso
 2    there.  Corporal Carlos Rosario on this date and time
 3    conducted a vehicle inspection post-collision inspection
 4    of V-1 at.  And if I recall, the vehicle was towed to
 5    the Miami FHP impound yard.
 6         Q.   If it had been noted that Corporal Rosario's
 7    inspection of the Tesla that he believed or found
 8    evidence to suggest that the brakes of the Tesla were
 9    not functioning correctly, would you have noted that in
10    your report?
11         A.   Yes, I would have.
12         Q.   And would you agree with me that there is no
13    such notation about the brakes not performing correctly
14    or any other type of malfunction with the Tesla?
15         A.   I'm going to look at it right now.  He wrote
16    down the front and the rearward disc, and he put power
17    assistance so there's nothing to tell me that something
18    was malfunctioning.
19         Q.   If the driver of the Tesla, specifically in
20    this case, Mr. McGee, had made a statement to the effect
21    that something malfunctioned in the vehicle that caused
22    me to be unable to stop or caused me to be unable to
23    control the vehicle with steering, caused me to be
24    unable to avoid the crash, would you have noted that in
25    your report about what happened here?
```

1                          Riso

2            MR. POSES:  Object to the form.

3            THE WITNESS:  May I answer?  Just curious.

4            MR. BRANIGAN:  Yes, sir, you may.

5            THE WITNESS:  Oh, okay, okay.  I just wanted to

6       make sure.

7            MR. POSES:  Corporal, when I just object to the

8       form and just for continued use, it's just to note

9       the objection.  You can always answer.

10           THE WITNESS:  Okay.  Very good.  Thank you,

11      Mr. Poses.

12      A.   I would have noted it, and me being the

13  investigator, if he said the brakes failed, I would have

14  worked it out to get an inspection done.

15  BY MR. BRANIGAN:

16      Q.   If he would have said something like my cruise

17  control malfunctioned and that's what prevented me from

18  stopping, would you have made a note of that?

19           MR. POSES:  Object to the form.

20      A.   Yes.  If I didn't make a note of it or if I was

21  aware of it and I didn't make a note of it and I didn't

22  try to get it inspected or have it inspected, then I

23  would consider myself not doing my job.

24  BY MR. BRANIGAN:

25      Q.   Would you agree with me that there's no

1                          Riso

2    indication in your extensive report, it's over 32 pages

3    long, that Mr. McGee made a statement like I've

4    described, something about his brakes, something about

5    cruise control or anything else that in his mind played

6    a role in the crash?

7         MR. POSES:  Object to the form.

8    A.    If he had stated it, I would have, like I said,

9    documented it, but I don't recall hearing him say

10   anything about it.  I just recall him spontaneously

11   stating he was on the phone, he dropped his phone, he

12   looked down, and he had, you know, ran the stop sign.

13   BY MR. BRANIGAN:

14   Q.    At the bottom of page 32, you have in bold font

15   a reference to what I believe is a Florida state traffic

16   code Section 316.1925(1), quote, careless driving; is

17   that correct?

18   A.    Yes, sir.  I'm looking right at it.

19        MR. POSES:  Object to the form.

20   BY MR. BRANIGAN:

21   Q.    Why did you include that in your report there,

22   Corporal?

23   A.    Because that's what he was ultimately charged

24   with at the very end.

25   Q.    And there's actually a copy of the citation

1                          Riso

2    that's attached to your report, correct, sir?

3       A.    That's correct.  Should be.

4       Q.    In fact, you made reference to the fact that

5    Mr. McGee presented himself to the police station with

6    his counsel to pick up a copy of that citation; is that

7    right?

8       A.    That's right.  And that's his signature right

9    there.  He signed it in front of me.

10            MR. POSES:  Corporal, I'm going to just do it

11        once, and I apologize, Corporal.  As it relates to

12        the citation and references to it, I'm just going to

13        have a standing objection so I don't want to

14        interrupt you or Thomas again about it, all right?

15            MR. BRANIGAN:  Yes.  Thank you, Todd.  I

16        appreciate that.

17            MR. POSES:  Thanks, Thomas.

18    BY MR. BRANIGAN:

19       Q.    So based on your investigation, you issued a

20    citation to Mr. McGee for careless driving, correct?

21       A.    That's correct.

22       Q.    And I take it that your conclusion about the

23    cause of this crash based on your investigation and all

24    of the evidence that you analyzed as part of your

25    investigation is Mr. McGee's careless driving; is that

1                          Riso

2   correct?

3           MR. POSES:  Object to the form.

4       A.   That's correct.

5   BY MR. BRANIGAN:

6       Q.   If you would have believed that the condition

7   or operation of the Tesla was the cause or a cause of

8   the crash, would you have included something about that

9   in your report?

10      A.   Yes, I would have.

11      Q.   Did you believe that something about the Tesla

12  was a cause of the crash?

13          MR. POSES:  Object to the form.

14      A.   Nothing from my investigation gave me any

15  reason to believe that the car had any factor in the

16  causation of the crash.

17  BY MR. BRANIGAN:

18      Q.   Now, the 2019 Tesla Model S, I know that you

19  told us earlier that you obtained some information about

20  the vehicle, and I'm not talking about the EDR data.  I

21  mean information about the type of driver-assist

22  technology the vehicle was equipped with, correct?

23      A.   Yes, I did.

24      Q.   Where did you obtain that information from,

25  Corporal?

```
 1                        Riso
 2        A.   I obtained it from Mr. Ryan McCarthy, general
 3   counsel in Tesla from his -- he was in California.
 4        Q.   Did you or someone else working on the
 5   investigation reach out to, if I can use that
 6   vernacular, to Tesla to ask about information, or did
 7   Tesla contact you or someone working with you on the
 8   investigation?
 9        A.   Initially, how I got involved with Tesla is,
10   like I said, initially, the NTSB contacted me.  Then we
11   made the decision that I'll take on the case, and then I
12   needed some more information.  And I was referred to --
13   I believe there was a Mr. Al Prescott and then a
14   Mr. Ryan McCarthy which I made contact with.  And then I
15   eventually made contact with Mr. Ryan McCarthy and
16   talked to him on the phone.  On the field note packet --
17   so they didn't reach out to me.  I actually reached out
18   to them.  Now, on the field note packet, if you look at
19   page 85, the field note packet, not the investigative
20   packet --
21        Q.   Yes.  I have it.
22        A.   Do you see that letter where it says at the top
23   Florida, State of Florida, the Division of Florida
24   Highway Patrol --
25        Q.   Yes.
```

1                          Riso

2        A.    In order to properly order the proper

3    information when I talked to Mr. -- you know, I said

4    I'll write the official letter requesting information.

5    Mr. Ryan McCarthy told me, no, this is -- you know,

6    write this down because that's what I need because this

7    is the first time I've ever dealt with a Tesla, the

8    vehicle.  So I didn't know what information it does

9    record.  I had learned a lot, how it records

10   information, pre-crash data, and stuff.  So I asked,

11   well, what am I looking for.  He says write me an

12   official letter requesting this, and he said he would

13   get me the data.

14       Q.    It sounds like you had more than one

15   conversation or communication with Mr. McCarthy from

16   Tesla; is that correct?

17       A.    I would definitely say it was more than one.

18   How many, I'm not too sure.

19       Q.    In any of those conversations, did you feel as

20   though Mr. McCarthy was trying to direct your

21   investigation or influence your conclusions?

22       A.    No.

23       Q.    The information that Tesla provided to you in

24   response to your official request included data from the

25   vehicle, correct?

1                          Riso

2     A.   Yes.  Yes, it did, and -- yes, it did.  And

3  because -- and, actually, it is inside the field note

4  packet.  It begins on page 97.

5     Q.   You also received video that was recorded by a

6  camera in the Tesla; is that fair?  Is that correct?

7     A.   Yes, sir.

8     Q.   And I believe you also received a copy of the

9  owner's manual for the 2019 Model S?

10    A.   Yes, I did.

11    Q.   All right.  Did you come to learn through your

12 investigation and perhaps communication with Tesla that

13 the Tesla involved in this crash is equipped with

14 technology that is sometimes referred to as autopilot?

15    A.   I'm not too sure if it was called autopilot,

16 and there was -- I don't want to say the wrong thing on

17 this if you can understand.  It had some -- when you

18 look at the top of the data, it will give a list of some

19 of the things that I guess it can do.  Like, it can

20 detect when your hands are off the steering wheel and

21 on, it'll chime.  And then there's certain things you

22 can program it to do.  Like, is there a self-driving?

23 Yes.  Is it fully autonomous?  From my investigation, I

24 would say no, but that's my investigation because I had

25 discussion with some of my people, meaning, you know,

                                  Riso

1    like my supervisor.

2            And I think it's not fully autonomous because

3    what I found out through my investigation is that this

4    technology is only supposed to be used on, if I recall,

5    limited access facilities because it has to detect the

6    white lines and the dashed white lines, the

7    reflectiveness of it.  But, like I said, I'm not an

8    expert, but this is all new to me, and this is what I

9    learned through my investigation.  And I found that it's

10   only supposed to be used on those certain types of

11   locations and roadways.

12   Q.   Did you or any other officer involved in the

13   investigation look at what I'm going to refer to as an

14   exemplar Model S, in other words, not the one involved

15   in this crash but another 2019 Model S, to do any

16   evaluation of the vehicle and its features?

17   A.   I actually did bring the contents of this crash

18   over to the Tesla building in Coral Gables.  I guess

19   it's a vehicle maintenance shop, and they told me to

20   bring it over there to try and get the data that was

21   collected inside the onboard computer which I took via

22   search warrant.  So what we had to do was bring -- and,

23   initially, I got there, and I had to go back and get

24   another part because it needed two parts.  It needed the

1                              Riso

2    computer and this other module that mounts, I believe,

3    underneath the dash.  So what they did was they picked

4    up an exemplar vehicle, took those parts out, and then

5    put the parts in that I brought.  And then they gave me

6    the data, but I couldn't do anything with the data that

7    it recorded because it needed a certain program.

8         Q.    Did you at any time drive the exemplar?

9         A.    No, I did not.

10        Q.    Did anyone working on the investigation with

11   you drive an exemplar 2019 Model S?

12        A.    Not that I'm aware of.

13        Q.    Okay.  Are you familiar with the different

14   levels of autonomous driving that has been established

15   by the Society of Automotive Engineers and also the

16   National Highway Traffic Safety Administration?

17        A.    I'm not fully aware, but I am aware there are

18   some fully autonomous vehicles.  And I even saw one

19   video of a tractor-trailer that was fully autonomous

20   where the guy set it in mode, went in the back sleeper

21   and started sleeping, and it just scared me seeing that

22   because nobody was in the -- and he was going down a

23   highway right between the white dashed lines.  And I'm

24   like -- my eyes went like -- but I did actually see that

25   video and that display of that.  So am I fully aware to

```
 1                        Riso
 2  answer your question, not fully, but I'm aware of newer
 3  features or updated features.
 4      Q.   If I described the 2019 Model S as a vehicle
 5  that has Level 2 advanced driver assistance technology,
 6  would you understand what I'm referring to?
 7      A.   Not exactly.  I just know that there are
 8  certain levels and certain things each one can do.  I
 9  did learn that there are different, like you said, Level
10  2, Level 1, and I was made aware that this one wasn't
11  fully autonomous.
12      Q.   Based on your investigation and all the things
13  that you've learned about the Tesla, was it your
14  understanding at the time that you completed your
15  investigation that, just as you said, the Tesla involved
16  in this crash was not fully autonomous or a vehicle that
17  could drive itself fully?
18           MR. POSES:  Object to the form.
19      A.   Yes.  I became aware that it was not fully
20  autonomous.
21  BY MR. BRANIGAN:
22      Q.   Was it your understanding at the time you were
23  completing your investigation that because of that,
24  Mr. McGee as the driver, was fully responsible for
25  executing the tasks of a driver?
```

1                         Riso

2         MR. POSES:  Object to the form.

3    A.   The location where this vehicle was driven and

4  the crash happened, he was supposed to be fully driving

5  the vehicle.

6  BY MR. BRANIGAN:

7    Q.   And that would include paying attention to

8  things ahead, correct?

9    A.   Correct.

10   Q.   Being prepared to stop in response to traffic

11 control devices like a stop sign or a flashing red

12 light, correct?

13   A.   Correct.

14   Q.   Maintaining his lane, correct?

15   A.   Correct.

16   Q.   Taking steps to avoid impacting another vehicle

17 or pedestrian, correct?

18   A.   That's correct.

19   Q.   Those were all his legal responsibilities under

20 the state laws of Florida at the time of the crash,

21 correct?

22   A.   That's correct.

23   Q.   He was also responsible for knowing and

24 complying with the speed limit on the road that he was

25 traveling on, correct?

1                              Riso

2      A.    That's correct.

3      Q.    And I take it in your opinion based on all of

4   your investigation, analysis of the evidence including

5   things that Mr. McGee was recorded to have said, you

6   concluded that he failed to do the things that I just

7   identified; is that fair?

8           MR. POSES:  Object to the form.

9      A.    That's correct.

10          MR. BRANIGAN:  Corporal Riso, I don't have any

11      other questions at this time, and I appreciate all of

12      your time today and patience.  Mr. Poses may have

13      some questions, and if he does, I may have some

14      follow-up questions.  But for now, I'm going to rest

15      and turn it over to Mr. Poses.

16          MR. POSES:  Thank you.

17                       CROSS-EXAMINATION

18   BY MR. POSES:

19      Q.    Corporal, how are you?

20      A.    Mr. Poses, how are you, sir?

21      Q.    Very good.  Thank you.  All right.  I do have

22   some questions and, again, I think Thomas probably will

23   have some questions about this after the fact.  Is it

24   okay to start now, or do you want to take a break for

25   five or 10 minutes?

1                          Riso

2       A.    We're good.  We're good to go.

3       Q.    All right.  I want to talk about what we know

4  about the route and time that Mr. McGee took that day.

5  Do you have any information in your report about the

6  start in terms of the place and time where Mr. McGee

7  drove from before the accident happened?

8       A.    Yes.  I do have something.  I even have in the

9  field note packet how he had went through some poles, I

10  believe.  I saw that when I was looking through it

11  earlier.  I did get that.  Let me see here if I can --

12  do you have the same exhibits, Mr. Poses?

13      Q.    I do.

14      A.    Okay.  I even scrolled through it here.  I saw

15  pictures.  Okay.  If you go through page -- it's going

16  to be page 87 of the field note packet through page 89.

17  You'll see something, and this is some -- I'm pretty

18  sure it was some stuff that was collected by Corporal

19  Rosario and then handed over to me.

20      Q.    Okay.  And in terms of what Corporal Rosario

21  collected and your understanding, where was it that

22  Mr. McGee was driving from, and if there's a start time

23  as to where his trip began that day?

24      A.    If I recall, this is going off of memory, I

25  believe he was coming from Boca Raton.  I believe he had

1                           Riso

2    an office up there, and he was heading down to that home

3    in Ocean Reef.

4        Q.   Were you able to independently confirm that

5    either by speaking to either Mr. McGee or any data that

6    you were able to receive from the electronic download?

7        A.   I actually -- like I said, now it brings to my

8    memory.  I remember talking to somebody and giving him

9    the location that his transponder had gone through, and

10   so it verified it.  Actually, some of the transponders

11   were not too far from where his business point was.  He

12   was coming from Boca Raton.  And then I did quickly what

13   we call an average, like, speed, how long it would take

14   and see how fast from this point to that point.  And I

15   believe his overall speed over that whole distance was

16   60ish, but it was just something I did just to see, you

17   know, how fast he was driving from Point A down to Point

18   B which is where the crash was.

19       Q.   And were you able to determine whether or not

20   during the time that he drove from Boca Raton until our

21   crash happened as to whether or not he stopped at all?

22   I know you mentioned tolls but whether, in fact, he

23   actually stopped his vehicle.

24       A.   I believe -- and I'm going off from memory, but

25   I believe he did stop one time because I think the data

1                          Riso

2    revealed that he got off, I think, when I was talking to

3    somebody and he got right back on.  It's almost like he

4    got off an exit maybe to go to a gas station or

5    something and then come back on.  Not positive, but I

6    believe he did make one stop.

7        Q.   Okay.  I know that your belief, and I think

8    that we -- is there anything that you have specific to

9    indicate that stop and where that might have been?

10       A.   If anything, it would be the data from the

11   pages I told you because all of those are -- you'll see,

12   like, plate-type standards, plate, and it gives the

13   plate of his car, okay?  And then if you look at the

14   plaza, that's the actual -- and if I recall correctly

15   what she said, that's basically the overhead thing that

16   they go by to register his SunPass.  So it's somewhere

17   -- it'll be somewhere there because -- and I don't know

18   how far these transponders are.  I was just trying to

19   see by looking at the data maybe let's see how fast he

20   was coming.  But, like I said, the overall general --

21   because he stopped one time, that speed is really not

22   valid.  I just wanted to see if he was trying to speed,

23   you know, real fast or whatever, and to me, it wasn't

24   apparent.  It was about the average speed coming down.

25       Q.   All right.  Do you know how long -- where he

```
 1                          Riso
 2   stopped, do you know how long he did stop for?
 3        A.    I can't remember.
 4        Q.    Is there anything that indicates how long it
 5   was that he did stop when he did?
 6        A.    Well, like I said, you would have to look at
 7   the dates and the time and I guess determine how far
 8   those transponders are in between because I'm not sure
 9   -- I think the one he got off, I'm not sure if he has --
10   like when you get off the exit, you'll go underneath the
11   transponder.  And then when you get back on, you might
12   go under another one to pay a toll to get back on.  That
13   would probably tell you if that was present but -- you
14   know, I looked into it, but then I said it didn't show
15   anything to help what I was attempting to get at.
16        Q.    And what were you -- I know that you were
17   trying to do a complete investigation, but when you're
18   looking at the trip that Mr. McGee was taking, what is
19   it that you're looking for other than the data itself?
20        A.    Initially, at the time, and I was attempting to
21   see if I had enough for a reckless driving charge, in
22   this case, reckless driving which would cause a death
23   which is basically vehicular homicide if I had enough.
24        Q.    And so what type of information would lead you
25   to a charge of reckless driving that you were looking
```

```
 1                         Riso

 2   for?

 3        A.   In this case, it would be multiple factors.

 4   You can't just rely on speed alone.  You have to have

 5   multiple factors like speed, maybe a few more violations

 6   like, hence, running a stop sign, running a traffic

 7   light, speeding in excess.  Those all help go to

 8   contribute.  Not a certain group of these will

 9   determine.  You have to get a totality of them and then

10   see if it would be enough for a reckless driving.

11        Q.   And we know and admit, and Mr. Branigan was

12   able to discuss with you that Mr. McGee, of course, did,

13   in fact, run a stop sign and a stoplight at the time of

14   the accident.  But in terms of going backwards and

15   looking at the trip that Mr. McGee had taken, what

16   specifically were you looking for during the trip prior

17   to the crash that would lead to a potential charge of

18   reckless driving?

19        A.   I believe I was trying to look to see how fast

20   he traveled from Point A to B, okay?  And like you said,

21   he had stopped at one point.  So the time and distance

22   calculation would not work because he had stopped.  It's

23   gonna throw off your speed.  So one thing I was able to

24   determine is he went through the toll right at the very

25   end which is Marker 9, Mile Marker 9, I believe, or 10
```

```
 1                         Riso
 2   on the Florida Turnpike.  And then he went through the
 3   toll on Card Sound Road which should be about four miles
 4   from where the crash happened.  And so between those two
 5   points, I did a quick time and distance because you
 6   remember when you get off the turnpike, he could've hit
 7   a traffic light there.  There's a working traffic light
 8   right once you get off, so he could've stopped.
 9             So, overall, the average speed I remember
10   leaving -- you know, and I was just working this, like,
11   on the top of my head, and I was looking at this -- was
12   right around 60 miles per hour.  So from that point all
13   the way down to that toll -- and it is 55 on that road,
14   Card Sound Road.  Yes, he's five miles over, but by
15   Florida statute, you cannot write a citation for zero to
16   five miles over the speed limit unless it's through a
17   school zone.
18   Q.   Okay.  All right.  So it's your understanding
19   that during the time in which he was traveling Card
20   Sound Road, the estimated speed was about the same from
21   beginning to near the end; is that fair?
22   A.   That's fair.
23   Q.   All right.  And during the time that he was
24   traveling on Card Sound Road, are you aware as to
25   whether or not Mr. McGee was using any of the features
```

```
 1                        Riso
 2   of autopilot and the suite of autopilot while he was
 3   traveling?
 4        A.   From the data, it appeared that he had
 5   something engaged because -- yes.
 6        Q.   And do you know what that something was?
 7        A.   I gotta zoom in because this is real small so
 8   hold on.  Do you remember the pages that data was on?
 9   Oh, here it is, here it is.  Now, another thing you-all
10   should be -- oh, wow, it's all blurry on the side and
11   everything, but I'm trying to zoom in on it.  The times
12   on these, if I recall, was off.  It's in Pacific time, I
13   believe.  So even though it happened in Florida, it was
14   converted into Pacific time so you had to add the time
15   and see.  I remember that so let me look at this a
16   different way so hold on.  Bear with me, gentlemen.  I'm
17   sorry, but I know I was able to look at it as a matter
18   of increasing the PDF to where I can read it.  Here we
19   go.  Is this it?  No, that's the -- okay.  I believe
20   this is it.  Oh, yeah, I got it; I got it.
21           So the time of the crash was, what, 9:14, if I
22   recall, was it?  So that would be toward the end of this
23   sheet of -- okay.  So 9:14, and this has a six or seven
24   so, basically, right now it should be, like, 6:14.  So
25   by the data so -- it looks like traffic aware cruise
```

```
 1                        Riso
 2   control CSR state stand by.  I don't want to say one
 3   thing or another by looking at this data.  It's my
 4   understanding that if it shows into the file, then at
 5   that point it should be engaged.  It looks like a
 6   traffic aware cruise control state, and then it says at
 7   the top autopilot.  And it states at one point here at
 8   6:13:15 p.m., which is right around the crash, it says
 9   aborting, and then a few seconds later it says aborted.
10   But if I read this correctly, it looks like -- it sounds
11   like he had that engaged at one point prior to the
12   crash.
13        Q.   All right.  Are you able to determine based on
14   your notes or your investigation or any of the data that
15   you collected as to when and where the autopilot suite
16   was engaged or any part of it was engaged and when it
17   aborted as you've noted?
18        A.   I'd have to go back and look through all the
19   times because these time stamps, some of them, they're
20   like every second, and some of them are listed multiple
21   times.  So hold on.  Let's see here.
22        Q.   And as you're looking, Corporal Riso, I'm just
23   going to ask you a couple of questions about the data
24   that you do have.  The data that you're looking at to
25   determine the answer to my question, where is that data
```

```
 1                          Riso
 2  from?
 3       A.    It's from Mr. Ryan McCarthy, the Tesla
 4  corporation.
 5       Q.    Is the data that you're relying on exclusively
 6  provided by Mr. McCarthy?
 7       A.    I requested this data.
 8       Q.    I understand.
 9       A.    I sent him the letter.
10       Q.    I understand.  I'm just asking you if the data
11  that you're relying on was exclusively provided by
12  Mr. McCarthy or Tesla, you know, the Defendant in the
13  case.
14            MR. BRANIGAN:  Objection to form.
15       A.    It wasn't provided by the Defendant, no.  It
16  was actually sent to me from Mr. McCarthy.
17  BY MR. POSES:
18       Q.    Okay.  Mr. McCarthy, you understand, is a Tesla
19  employee?
20       A.    Yes.
21       Q.    Okay.  And so the reason why I'm asking this
22  question is in other vehicles, I know that you're
23  trained and have taken measures to download and then
24  look at data for vehicles other than Teslas in your
25  practice; isn't that right?
```

1                         Riso

2      A.    Yes, correct.

3      Q.    And when you download the information from

4  other vehicles exclusive of Teslas but any other

5  vehicle, are you able to then look at that data

6  yourself, and you're able to it without any

7  interpretation?

8      A.    That's correct.

9      Q.    All right.  So is it Tesla exclusively that

10  you're unable to do that and that Tesla provides you the

11  data as opposed to you taking it from the car and

12  reading it yourself?

13          MR. BRANIGAN:  Objection; form.

14          MR. POSES:  Go ahead.

15      A.    Not Tesla itself.  There are some other

16  vehicles that we could not image.

17  BY MR. POSES:

18      Q.    Okay.  What kind of vehicles are those?

19      A.    Okay.  I'm not sure.  I would have to look at

20  our computer to see which ones we can and we can't do.

21  I know at that time Tesla was one of them.  I'm not too

22  sure if Boss software has updated their program for it.

23  I'm not sure.  I would have to look in the computer, and

24  that's how we base can we image the vehicle or not.

25  I'll look in the computer, I will get the model, year,

```
 1                         Riso
 2   model, and make and then that computer will let me know
 3   if I can image it which we use the Boss software.  I
 4   just know that there's some that we cannot image.
 5       Q.   All right.  And the only one you can think of
 6   at this point as we're speaking is Tesla, but there are
 7   other auto manufacturers where it is difficult or
 8   downloading the data cannot be achieved with your
 9   computer?
10       A.   Well, with our program, yes.
11       Q.   All right.  In this case, I know that you got
12   someone from the City of Miami Beach who ultimately
13   became involved in downloading the data for your
14   investigation; is that fair?
15       A.   That's fair.
16       Q.   Was it his training or equipment or both which
17   required for him to be able to achieve the download of
18   the data?
19       A.   It was his equipment.
20       Q.   Okay.  What type of equipment did the City of
21   Miami Beach police officer have that you did not have?
22       A.   He had the program, and I believe it was, if I
23   recall, was from Tesla.  I don't know how he got the
24   program, but he had the program or his license,
25   whatever.  He just had a program that I didn't have that
```

1                           Riso

2    was able to image the data.

3        Q.   And before this investigation, you had not been

4    involved in the downloading of data from Tesla previous;

5    is that fair?

6        A.   Yeah.  That's fair.  I've never -- I've stated

7    before this is the first time I ever dealt with a Tesla

8    crash.  No, I stand corrected.  There was one car back

9    in 2014 where I didn't have to image the data.  It

10   wasn't a fatal crash, and it was the first time ever I

11   realized, oh, fully electric?  But that was back in 2014

12   if I recall.  It was part of my case, but it was a minor

13   crash that happened just before involving one of the

14   vehicles.  And that was the first time I ever knew Tesla

15   corporation ever existed.

16       Q.   All right.  And I apologize.  I know that

17   you've said his name before.  The City of Miami Beach

18   police officer, his name again is?

19       A.   I believe I said Eric Dominguez.  You'll see it

20   in the case summary on this field note packet.

21       Q.   All right.  I'll just refer him -- I didn't

22   want to continue to refer to him as City of Miami Beach

23   police officer.  Let's just call Officer Dominguez.

24            Directly from the download of the data, was he

25   able to either read, talk to you, or discuss and provide

```
 1                          Riso
 2   the data itself, or did he have to send it to Tesla for
 3   it to be interpreted?
 4        A.   Hold on.  Let me see something here.  I have it
 5   right here, and it actually comes into it.  It says
 6   Tesla EDR report, and it's printed in very readable and
 7   easy, you know, fashion to understand.  So he basically
 8   gave me the data.  I secured it, I took it, and I read
 9   it from there.
10        Q.   Okay.  Very good.  So what was the data, then,
11   that Mr. McCarthy provided different from what Officer
12   Dominguez provided?
13        A.   This data gives -- should give -- usually, most
14   of these EDR downloads will give -- it'll give basically
15   the same -- a lot of the same information like delta-vs,
16   negative delta-vs, you know, speed, safety belt, all the
17   same information.  Now, in comparison to data, at least
18   from Mr. McCarthy, that was data specifically about the
19   stuff that I had requested.  That's on that page
20   80-something or other.  I wrote a letter requesting
21   certain stuff to be sent to me, and that's all the data
22   that you would not get that data in an EDR download
23   because that is specifically -- because it's a semi or
24   partially autonomous vehicle.
25        Q.   Do you have the letter that you wrote to Tesla?
```

```
 1                         Riso
 2       A.   Yes.
 3       Q.   And tell me the date of the letter and who it
 4  was authored to.
 5       A.   Bear with me.  Oh, wait, I'm in the wrong one.
 6  Hold on.
 7       Q.   That's okay.
 8       A.   Okay.  The date it was authored was May 23,
 9  2019, and it was to Tesla corporation, attention Ryan
10  McCarthy, managing counsel.  It's on page 85 of the
11  field note packet.
12       Q.   All right.  And just read into the record,
13  please, if you would, what is it that you -- tell me
14  what you wrote to Mr. McCarthy.
15       A.   From me, subject 2019 Tesla Model S, VIN, and I
16  put the VIN.  And I said a fatal traffic crash occurred
17  on April 25, 2019, at approximately 9:14 p.m. Eastern
18  Standard Time.  This crash occurred at the intersection
19  of County Road 905A, Card Sound Road, and County Road
20  905 in Monroe County, Florida.  I'm assisting.  At the
21  time, it was not mine.  So I'm assisting with the
22  investigation of the incident, and I respectfully
23  request information from the 2019 Model Tesla S VIN.
24            And then I said once again, the date of crash
25  was, time stamp, approximately 9:14 Eastern.  I'm
```

1                     Riso

2    requesting the following data for the relevant device

3    cycle leading up to the collision.  And vehicle speed,

4    accelerator pedal position, brake pedal, steering wheel

5    angle, steering torque, head lamp status, autopilot

6    state, traffic aware cruise control state, hands-on

7    state, EDR status/crash algorithm wake up, images,

8    slash, video capture of the incident.

9        Q.   And did you receive all of that data from

10   Mr. McCarthy?

11       A.   I got the video, and I got this data that we're

12   looking at that had the -- now, I don't know if I should

13   say I received all the data or not because I looked at

14   it and, quite frankly, you know, at first when I looked

15   at it, it was quite confusing.  And I had to really look

16   at it and study it to understand it.

17       Q.   Did you have anybody that you consulted with to

18   help you understand the data, or did you do that on your

19   own?

20       A.   I did ask somebody to help me out with it.  I'm

21   not too sure if it was -- and it wasn't somebody

22   locally.  It was either -- I don't know if it was -- and

23   I don't know if it was Mr. McCarthy or somebody else.  I

24   can't remember but somebody who knew about the data or

25   knew how to read the data talk to me about it so I can

```
1                         Riso
```

understand what I was reading.

```
3      Q.   Did you talk to Mr. McCarthy about the data
```

while you were attempting to understand and interpret

it?

```
6      A.   I might have.  That's what I'm saying,
```

Mr. Posey.  I'm not positive.  I think it was him, but

that part I cannot remember.

```
9      Q.   Okay.  Is there any indication in your report
```

as to any person other than Mr. McCarthy who you might

have spoken to about your understanding and

interpretation of the data?

```
13     A.   I can't remember if I wrote that in the report.
14     Q.   Okay.  In your report, on page 22 in the third
```

paragraph, I'm going to read it to you, and I just want

you to try to refresh your recollection and understand

what happened here.

```
18          MR. BRANIGAN:  Counsel, sorry to interrupt.
19      Which report are you looking at?
20          MR. POSES:  Thomas, that's okay.  So this is
21      from the investigative report, and it's page 22.
22          MR. BRANIGAN:  Thank you.
23          MR. POSES:  And I'm just reading from the third
24      paragraph.
25  BY MR. POSES:
```

```
 1                         Riso

 2       Q.    Corporal, I'm just going to read it real

 3   quickly, and then I'll ask you a couple of questions

 4   about it.

 5       A.    Okay.

 6       Q.    It says on May 23, 2019, I contacted Ryan

 7   McCarthy, managing counsel, at the Tesla corporation in

 8   California.  Mr. McCarthy has assisted with my

 9   investigation in this case and provided me with

10   important evidence.  He provided me with the video of

11   the crash which was uploaded to their headquarters in

12   California immediately from the scene of the crash.

13   Mr. McCarthy provided me with the infotainment data

14   uploaded from Vehicle 1 from the scene.

15             So let me just ask you first.  When you say Mr.

16   -- and this is you writing this, I know, but --

17       A.    Yes.

18       Q.    Okay.  And when you said that he assisted you

19   with your investigation, can you tell me more

20   specifically other than what's written here as to what

21   he did to assist you?

22       A.    Basically, you know, I contacted him because I

23   had heard that -- like I said initially, I did not know

24   anything about a Tesla vehicle, and I had to learn a lot

25   from this investigation.  So that's why I sought out
```

1                           Riso

2    them to help me understand what the vehicle can do, and

3    when I say assisted, they were more than helpful.  I

4    even offered, you know, for a subpoena to send out, but

5    they said just write the official letter requesting the

6    information.  And that's what I mean by assisted.  I

7    mean, they didn't assist throughout the whole

8    investigation, just what I basically contacted them,

9    whether it was the data, the video, or some other

10   things.  Other than that, determine later on and after

11   and -- no, that was me, but as far as data and stuff

12   that I needed about the vehicle and stuff like that,

13   they assisted me.

14        Q.   Had you or Officer Rodriguez from Miami Beach

15   made any determinations or had any beliefs as to what

16   happened here and that after speaking to Mr. McCarthy

17   that those beliefs or opinions changed?

18        A.   After getting the download from Mr. Dominguez,

19   that basically ended his part in the investigation so

20   anything after that would be all on me.

21        Q.   Okay.  And I apologize.  I think I said

22   Rodriguez.  I meant Officer Dominguez.

23        A.   Dominguez, yes.

24        Q.   All right.  So after receiving the information

25   from Officer Dominguez and having done your own

Riso

1

2  investigation, you know, we've established now that

3  Mr. McCarthy assisted after that fact.  And did

4  Mr. McCarthy in speaking to him or receiving any

5  information from him, did any of your opinions or

6  observations change after those conversations?

7      A.   None of my opinions changed as to -- well, how

8  do I word this.  It didn't change my opinions about the

9  vehicle.  It just made me understand what the vehicle

10 can do and what it was doing and whatever program or

11 whatever it was set to.  So as far as results -- I don't

12 know where you're going with this, and tell me if I'm

13 answering this correctly, Mr. Poses, it did not change

14 my opinion as to why the crash happened after.

15     Q.   Understand, understand.  How about as it

16 relates to the pedal position of the accelerator?  Is

17 that something that you discussed with Mr. McCarthy?

18     A.    I would be lying to you if I said yes.  I don't

19 remember.  I don't know -- if I did, I don't know why.

20 I just don't remember if I ever talked to him about it.

21     Q.   Okay.  And when I say pedal position, is it

22 fair -- I mean, you understand that we're talking about

23 the accelerator and the position it was in at the time,

24 certain times during the driving that Mr. McGee was

25 doing?

1                          Riso

2      A.   Yeah.  I'm trying to see -- I know it was

3  requested in that letter, but now I'm looking at the EDR

4  report.  And generally speaking, my normal EDR downloads

5  will give me a pedal percentage.  So I'm trying to see

6  if it did.  It actually did.  The Tesla data did give me

7  an accelerator pedal percentage.

8      Q.   All right.  And what did that --

9      A.   And the data did.  Now I remember.  Looking at

10 that list of data, I noticed the accelerator pedal

11 position.  I did notice that.

12     Q.   Okay.  And did you put that in your report?

13     A.   I might have, I might have, so hold on.  Do you

14 see it somewhere?

15     Q.   I do, but I'd like you to -- I'm not sure if

16 I'm going to point you exactly in the place that is

17 where you might look.  So let me just ask --

18     A.   I'm trying to --

19     Q.   That's okay, Corporal.  We have time.

20          My question is:  After your review of the data,

21 did you make note of and do you have any information of

22 the pedal position prior to speaking to Mr. McCarthy?

23     A.   Well, here's the thing.  The EDR download, when

24 I look at the data, had an accelerator pedal percentage

25 of 20 percent, meaning he only had to basically push

1                              Riso

2    down 20 percent.  Now I'm looking right now at the EDR

3    data which I have a copy of it here in my computer, but

4    it should be in the field note packet.  Now, if you look

5    on page -- Mr. Branigan and Mr. Poses, look on page 23

6    of the investigative report packet.  You'll see in the

7    middle paragraph I did bring up the accelerator pedal

8    position inside that paragraph.

9         Q.    And I see that here.

10        A.    And I mentioned that it was in auto steer

11   motion too so I must have determined -- I would not have

12   put it in and if I determined based on what was given to

13   me.  I never write something without backing it up.

14        Q.    Okay.  Very good.  Of course.  And so in terms

15   of the pedal position here as referenced on page 23 of

16   the investigative report, you made an indication here as

17   to the pedal percentage was up to 20.8 percent; is that

18   right?

19        A.    That's correct.

20        Q.    And my question is:  Was that something you

21   were able to independently determine from the data that

22   was downloaded by Officer Dominguez, or is that

23   something that was done after Mr. McCarthy assisted you?

24        A.    That 24.8 percent is actually on the data that

25   Mr. McCarthy gave me.  But, like I said, it's 20.8, but

```
 1                        Riso
 2   yet the EDR download had it at 20.  So I think that's
 3   pretty close and pretty consistent.  It's just off by a
 4   point 8.
 5        Q.   Okay.  Do you know whether or not the pedal
 6   position can automatically move either up or down with
 7   the software of the Tesla, or is that required that the
 8   driver actually use and engage the pedal with his foot?
 9             MR. BRANIGAN:  Objection; lack of foundation.
10             THE WITNESS:  I can answer, right?
11             MR. BRANIGAN:  Yes.
12        A.   I don't know if the Tesla has that capability.
13   If I refer to another vehicle if I may, I just know that
14   in cars that I have, I can have it in what we call
15   cruise control.  And then I can hit a little button, and
16   it will just increase when I put my foot off the pedal.
17   The gas accelerates.  Now, I don't know if that
18   depresses the pedal or not.  I don't know.  And as far
19   as the Tesla, I'm not sure if it has that capability or
20   not.
21   BY MR. POSES:
22        Q.   Okay.  Now, how was it that you were able to
23   determine that Mr. McGee was using the autopilot
24   features while he was on Card Sound Road and immediately
25   before this crash?
```

1                          Riso

2          MR. BRANIGAN:  Objection; form, but go ahead.

3      A.   It actually says that on the data supplied to

4   me from the vehicle, and it actually says maybe about --

5   looks like it's about 5:56:19 p.m. -- I hope I don't get

6   the time wrong, but it says 5:56 which to me would be

7   8:56 so it looks like it was about 14 -- I don't know

8   how many -- I don't want to make a quick assessment of

9   time and get it wrong because it's in Pacific time, but

10  it did say active restricted.  And then in the right

11  column, it says left time hands on required, not

12  detected.  So he had taken his hands off or at least one

13  hand off.

14  BY MR. POSES:

15     Q.   What happened after that?

16     A.   Every once in a while, that time would go off,

17  I guess, saying about hands on, hands off because the

18  steering wheel on some cases I've had experience with

19  other cars that had that feature where it can detect

20  your hands being on the steering wheel or not.  So I

21  don't want to assume, but it looks like, apparently,

22  like, maybe they had the same feature.  And then down at

23  about April 29th at 5:56:55 p.m., it says active normal

24  for the auto steer.

25     Q.   Do you know what that means?

1                          Riso

2      A.   Actually, no.  I'm guessing that it was applied

3  on.

4           MR. BRANIGAN:  Objection; lack of foundation.

5  BY MR. POSES:

6      Q.   What else?

7      A.   It looks like there was nothing in any of the

8  columns on the next page.  So it looks like it was --

9  and if I recall -- do I know what that means?  I'm

10  assuming that it means that the auto steer was on or the

11  cruise control.  So it doesn't look like any -- it looks

12  like every once in a while he keeps taking his hands off

13  the steering wheel because it keeps detecting it.  I'm

14  going down the data, nothing in the auto steer state

15  until we get an active restricted at 6:02:10 p.m. which

16  why it's restricted, like I said, I'm not a Tesla

17  expert.

18           But now we look at -- now it goes back to

19  active nominal.  Is that what I meant?  Maybe I said

20  normal before, but it says nominal.  And that's at 6:02

21  so now we're approximately 12 minutes before the crash

22  which I can't remember how long Card Sound Road is once

23  you get on it.  But, generally, that stretch, it could

24  be 10 miles or longer all the way down, maybe 15 down to

25  the toll, so my estimation is somewhere around, getting

1                         Riso

2  onto Card Sound and setting it going down that stretch.

3  But every once in a while, you keep seeing his left hand

4  on required, not detected, so his steering wheel is not

5  detecting his hands at some point.

6          And then it says active restricted again and

7  active nominal at 6:05:29.  Then it goes back to active

8  restricted and then active nominal.  Why it keeps doing

9  that within a couple of seconds, I'm not positive.  And

10 that active nominal is 9:06.

11         And then we have -- then it says for some

12 reason unavailable, and that's -- and it says -- there

13 was an off applying in the brake application, on and

14 then off, like, within a split second.  And that's at

15 right around 6:08:17 p.m.  And as far as the hands on

16 the steering wheel, it says unavailable, available,

17 unavailable, available.  And that last available was at

18 6:08:22 p.m.  Now we're approximately what, five and a

19 half minutes from the crash.

20    Q.   That's right.

21    A.   So now, then next, you know, is -- then it says

22 available.  I'm not sure if that means it was on or not,

23 but then it says left hand on the car.  So now it's

24 detecting his hand is not being on the wheel here and

25 there, so he must keep taking it off whether he -- and

1                            Riso

2    I'm not making assumptions.  I'm not here to make

3    assumptions.  I don't.

4         Q.   Thank you.  I appreciate that.

5         A.   I'm not in the car with him, you know, and I

6    did inquire whether the vehicle did have a recorder

7    inside the vehicle which it did not.  I did inquire

8    about that.  Now we're back to active restricted.

9         Q.   Let me stop you for a second, and I want to ask

10   you if at any point in time that we've been discussing

11   that there's any measure of speed that you can tell me

12   either specifically or even a range, and I understand

13   that we went back and measured how long the Card Sound

14   Road was and tried to do an approximation, but can we go

15   to points in time and look at speed other than

16   immediately before the accident?

17        A.   Yeah.  And this data, it tells you about 6:08

18   where it's six minutes before the crash, and so let's

19   say at 60 miles per hour -- I wish I had a calculator.

20   But at 60 miles per hour, I can tell you how many feet

21   per second he's gonna drive.  But it looks as if he's

22   approximately maybe -- like I said, he's about six,

23   maybe six miles from the crash so he's not even at the

24   toll yet --

25        Q.   Let me stop you there.

```
 1                         Riso

 2       A.   -- is my estimation.

 3       Q.   I think I asked you a bad question.  Let me ask

 4  you a better question, and I don't want you to

 5  approximate based on 60 miles an hour as what was

 6  indicated immediately before the crash in terms of his

 7  miles per hour but, rather, what I want you to do is

 8  look at the data.  And if you can tell me during the

 9  times when -- and you're about five or six minutes

10  before the crash.  Can you tell me approximately how

11  fast he was going then with any of the data, not any

12  assumptions but in the data?

13       A.   Yeah.  The data has a range of 64 down to maybe

14  57, 58 depending on where you're at or how far back you

15  are.  There is even a point where he's at 44.  Then all

16  of a sudden for some reason, it doesn't record any

17  speed.  And then it has it pop back up 44, 44, and then

18  50, and then it goes up.  But the data does tell the

19  speed.

20       Q.   Okay.  So there are times in which he's

21  traveling on Card Sound Road that he's going 44 miles an

22  hour?

23       A.   Judging by the time and the time of the crash,

24  he's gotta be on Card Sound Road at that point six

25  minutes before.  He has to be.  And he is down at 44 at
```

```
 1                         Riso
 2   some point.
 3        Q.   All right.  Looking at the data or in
 4   discussing with Mr. McCarthy, do you know why it is that
 5   his speed was going up and down while he was traveling
 6   on Card Sound Road?
 7        A.   At 6:08:15, he's right around 40, 44.  It's
 8   almost identical.  Actually, I'm looking at a bunch,
 9   yeah, with 1.1 difference at one point, and that's for a
10   few seconds.  Then, eventually, I guess it speeds up.
11   Why that happened, I don't know.
12        Q.   When eventually did it speed up?
13        A.   It looks about six minutes before the crash it
14   starts speeding up.
15        Q.   What does it speed up to?
16        A.   Well, at one point, it was 57.  The highest it
17   went to, it looks like 64 and changed to 65, I'm seeing.
18   And it's fluctuated, 65, and then it goes down into the
19   50s and then back right around 60.3, 60.5, right in the
20   60 range.
21        Q.   And are you able to determine looking at that
22   data as to whether or not that was Mr. McGee
23   manipulating speed and driving, or was it the car
24   itself?
25             MR. BRANIGAN:  Objection; lack of foundation.
```

```
 1                          Riso
 2      A.   I cannot tell by looking at it.  I can see, you
 3   know, his speed.  I can see his pedal percentage.  I can
 4   see if there was CBS.  There is something here that says
 5   CBS state override which I don't want to assume.  I
 6   would have to ask somebody what that means and somebody
 7   from the corporation, somebody who's fluent with this
 8   data.
 9   BY MR. POSES:
10      Q.   Okay.  You mentioned in Mr. Branigan's
11   questions that your understanding is that this
12   technology, the autopilot technology was to be used on
13   limited access roads; is that fair?
14      A.   I didn't learn that from Mr. McCarthy.  I
15   learned it from the policy manual on the vehicle.
16      Q.   Okay.  And tell me what that means to you
17   specifically.
18      A.   That specifically means to me that in this area
19   of the road, and I might have said it in my report, this
20   vehicle was not supposed to be driven in that state on
21   this type of road.  I believe it says like -- I believe
22   I stated earlier, Mr. Poses, that it's supposed to be
23   driven on a limited access facility so it can recognize
24   the lines in order to drive itself.
25      Q.   Okay.  And is that something that you discussed
```

```
1                         Riso
2   with Mr. McCarthy?
3        A.   I believe I asked him about it, and he said it
4   was in the manual.  And I found it over there on -- I
5   don't know if it was page 80-something, I believe.  I
6   just -- you know, from what I was doing and you were --
7   I was in contact with you during the investigation, and
8   I was trying to -- you know, I believe it was necessary
9   to evaluate that because of the charges that I was
10  trying to get on it.  I was trying to see that he was
11  driving -- I was trying to prove that he was driving
12  recklessly to see if there was enough for the charges.
13       Q.   I know ultimately you did not file reckless
14  charges.  Let me just go through a couple of questions
15  with you about that, and we'll go back to this other
16  issue.  Was there any indication that Mr. McGee was
17  under the influence of alcohol or drugs?
18       A.   It was brought up.  Some people thought, but
19  there was no indication whatsoever.  There was no --
20  nobody detected any alcohol; nobody could detect
21  anything.  Yeah.  There was no indication of alcohol.
22       Q.   Okay.  And was there any indication of him
23  being intoxicated or otherwise?
24       A.   No, none that I was aware of.
25       Q.   Did you take a look at the medical records when
```

```
 1                          Riso
 2    Mr. McGee was taken to the hospital to see if there was
 3    any indication of alcohol or blood alcohol level that
 4    would suggest that he was under the influence?
 5        A.   We always try for policy for every driver.
 6    We're supposed to ask whether we have enough for a
 7    search warrant.  And if we're not, we always ask if
 8    they'll give us permission for a voluntary blood draw.
 9    We're supposed to.  Let me check something here.  Just
10    bear with me a second.
11            Okay.  If you look at page 14, the
12    investigative report, you'll see second paragraph down,
13    obviously, you can see I never had contact with D-1,
14    Mr. McGee.  That's D-1 at the scene.  I contacted the
15    MRCC which is Miami Regional Communication Center,
16    basically, my dispatch to have a trooper go to Jackson
17    South Hospital and contact Mr. McGee.  Trooper Odel
18    Mosquera was dispatched at 10:45 p.m. and arrived at
19    South Jackson Hospital 11:09.  The trooper then
20    contacted Mr. McGee and stated he did not observe any
21    indicators of impairment, and I have to trust him on
22    that.  Odor of alcoholic beverage from his person.
23            Trooper then contacted me via cellular phone
24    and relayed the information that D-1 was not impaired.
25    I requested Trooper Mosquera to ask Mr. McGee -- it says
```

                                    Riso

1

2    here D-1, but I'm gonna say Mr. McGee -- if he would

3    submit to a consensual blood draw.  D-1, Mr. McGee,

4    stated that he did not want to talk or submit to a blood

5    test.  D-1 then stated he is not saying anything without

6    a lawyer.  Per my request, Trooper Mosquera made the

7    request to the nurses to place a hold on any blood drawn

8    from D-1, which is Mr. McGee.

9         Now, in reference to more of that, Mr. Poses

10   and Mr. Branigan, we did not have enough for a search

11   warrant so I knew I was not gonna be able to get it from

12   the hospital.  Wait a minute.  I had to prove certain

13   factors in order to get it so if I was able to -- I'm

14   not too sure if I submitted a request or not, but I

15   could not get that unless I had a search warrant.

16   Q.   Okay.  And for a search warrant, there needs to

17   be indication, and I guess your testimony is there

18   wasn't any.

19   A.   Yeah.  And you know it; it would be a search

20   warrant for his blood, and without any probable cause

21   that he had been drinking or consumed any alcohol, I was

22   not going to be able to get it.

23   Q.   Sure.  So let's go back to this question.  And

24   we digressed into a different area, but I want to know

25   if you talked to Mr. McCarthy about the fact that the

```
 1                         Riso
 2  autopilot, as you understand it, was being used and was
 3  on, on Card Sound Road and that that is something that I
 4  think that you said in the manual is either you
 5  shouldn't do or not advised.  I don't know what you said
 6  specifically, and I'm sure it's in the manual.  I would
 7  defer to the manual, but tell me if you talked to
 8  Mr. McCarthy about the autopilot used on Card Sound
 9  Road.
10      A.   I don't remember or recall if I specifically
11  asked him about the autopilot usage, and I believe it
12  was Mr. McCarthy.  I can't remember if it was somebody
13  else that helped me interpret the data because,
14  initially, I didn't know what I was looking at when he
15  gave me that data.  That was, you know, through the
16  infotainment system or whatever system he recorded it.
17  And you said the autopilot, whatever, you said that I
18  asked him about?  Was that your question?
19      Q.   I'll tell you what, Corporal.  I'll re-ask it
20  for you.  I wanted to know -- well, I want to reference
21  back, and then I'll ask you the question.  I know that
22  you had mentioned previously both to Thomas and to me in
23  our questions about the use of autopilot on a road like
24  Card Sound.
25              And my question is:  Did you speak to
```

```
 1                        Riso
 2  Mr. McCarthy about the fact that the Tesla that
 3  Mr. McGee was driving was, in fact, the autopilot was in
 4  use on a road like Card Sound?  Did you speak about that
 5  with him?
 6      A.   I don't recall because once he helped me
 7  interpret the data and gave me the data, I made the
 8  request to talk to him.  And he gave me the data I
 9  requested and helped me understand some of it.  I don't
10  recall if I ever contacted him again about that after.
11      Q.   Okay.  Did you ever speak to Mr. McGee about
12  the fact that he was using his autopilot on Card Sound
13  Road?
14      A.   I never got to talk to him.  He invoked his
15  rights.  He wasn't doing anything, especially after the
16  -- I was always in contact with his attorney, but I
17  believe I might have asked if I could question through
18  his attorney just to cover bases and, obviously, he
19  invoked his right.  It was before I had conversations
20  with his attorney.
21      Q.   Okay.  I want to go in a couple of different
22  areas right now real quickly because I think we can --
23  these are ministerial things, but can you tell me about
24  the lighting at the intersection of Card Sound Road and
25  905, the intersection that is at issue here?
```

```
 1                        Riso
 2           MR. BRANIGAN:  Objection; form.
 3      A.   Hold on.  Bear with me a second.  Because I
 4   know it's something I always bring up in these reports
 5   too so we do check on lighting.  So hold on.  Here we
 6   go.
 7   BY MR. POSES:
 8      Q.   And, Corporal, while you're looking for it,
 9   I'll just ask you a couple questions about some
10   experience.  You've been in Monroe County now for a long
11   time as an FHP officer?
12      A.   I initially came down there in 2001.
13      Q.   Okay.  And Card Sound Road, you're familiar
14   with that road?
15      A.   Very much so.
16      Q.   Can you tell Mr. Branigan and I just, you know,
17   your opinion about Card Sound Road, just generally the
18   type of road that it is and whether or not it's -- well,
19   tell me what's your thought on Card Sound Road.
20      A.   Now, you're bringing up Card Sound Road.  To
21   me, Card Sound Road I'll once in a while drive it but
22   not that often but, generally speaking, I mean, it's a
23   dangerous road.  And there's no center concrete median;
24   there's no wide enough curbs.  It's basically -- to me,
25   it's a dangerous road, and it is generally 55 miles an
```

1                              Riso

2    hour with hardly any shoulders and some areas where cars

3    pull off to go fishing.  And there's definitely a lot of

4    passing zones.  There have been some bad crashes out

5    there, but we as Florida Highway Patrol don't handle

6    everything on Card Sound Road from Florida City down to

7    just before the toll.  Now, from the toll is the Monroe

8    County line.  Then we handle things on Card Sound all

9    the way up to this intersection.  It's kind of a

10   dangerous road.

11          Now, your other question.  Page 7, gentlemen,

12   you'll see second paragraph or the first full paragraph.

13   You ready?

14       Q.   Yes.

15       A.   You'll see it there.  It says the roadways are

16   dry.  Your question was --

17          MR. BRANIGAN:  One second --

18          THE WITNESS:  Did you get it, Mr. Branigan?

19          MR. BRANIGAN:  I'm there.  Thank you, sir, yes.

20          THE WITNESS:  Okay.  In that paragraph, it says

21       there are no overhead street lights to illuminate the

22       intersection.  There were none.  And there's hardly

23       any street lamps on that road except for certain

24       areas and certain locations, but at this particular

25       intersection, there was not.

1                              Riso

2    BY MR. POSES:

3         Q.    Is it fair to say that the only light at the

4    intersection when it's dark outside like it was here is

5    the flashing red light and whatever reflection you might

6    get from your headlights onto the road signs that are in

7    front?

8         A.    Or even moonlight, and then I would say yes.

9         Q.    Okay.   Thank you.   How about beyond -- and so

10   as you approach this T-intersection, we saw previously

11   that there was a center sign that there were additional

12   signs to its left and right with the one that's most

13   right, the fourth one knocked down.   Beyond those signs,

14   is there any lighting at all?

15        A.    When you say "beyond," you mean into that area

16   where the pedestrians were and the cars --

17        Q.    As you travel --

18        A.    -- there's no lighting over there, yes.

19        Q.    Okay.   Other than the moonlight and perhaps the

20   headlights from the vehicle, there's no light at all in

21   that area --

22        A.    No --

23        Q.    -- is that right?

24        A.    -- no, sir.

25        Q.    All right.   So going back -- and I apologize if

                              Riso

1

2    I'm going over something again.  I think that, and just

3    correct me if I'm wrong, is your answer that whether or

4    not you discussed with Mr. McCarthy the use of autopilot

5    on a road like Card Sound, you did not discuss that with

6    him at all; that was not something you engaged in

7    conversation with him?

8        A.   This is probably going back, what, almost three

9    years?

10       Q.   Yeah.

11       A.   I don't recall discussing them, and I'm being

12   truthful and honest.

13       Q.   Sure.

14       A.   I know I called and contacted him to help me

15   get this information that I wanted and how I could get

16   it because I didn't even learn that -- I couldn't

17   believe the information that this vehicle had.  So I

18   didn't know how I could get it, and that's why,

19   eventually, I got directed -- I think it was maybe

20   Mr. Al Prescott that directly called and contacted

21   Mr. McCarthy about it.  And I would be lying to you and

22   Mr. Branigan if I didn't know how to interpret this

23   information without asking for assistance, what I was

24   looking at.

25            So understanding what each column was or vice

1                          Riso

2   versa, I mean, the far left, I can understand the time

3   stamp.  That's a given.  Okay.  What do these features

4   do, whatever.  I honestly can't remember the total

5   context, but I did contact him.  Even after I got the

6   data, I might ask him what does this mean or something

7   like that to help me decipher it because I truthfully

8   did not know.

9           And I was also forwarded the policy manual, and

10  I believe I didn't put that in my packet because I think

11  the thing was over 200 pages.  Not the policy, I mean

12  the manual on the car.  It was too much to include in

13  that.  So I believe it's included on a CD or something

14  at the station, but it was -- so in reference to your

15  thing, what you said about -- I don't remember the

16  context of it.  I just remembered that he helped me

17  understand the information that was on there and thank

18  you.

19          And any further contact with him after, the

20  only thing I can recall about was I was also trying to

21  see if there was any data contained actually in the

22  onboard computer and, hence, the reason why we had to

23  take those parts down to the Coral Gables center and put

24  it in an exemplar car.

25      Q.   All right.  Was it required of you or Officer

```
 1                        Riso
 2  Dominguez or anyone who was involved in the
 3  investigation to provide data or your reports or any
 4  information at all to any governmental agencies, either
 5  federal agencies or state agencies?
 6       A.   I don't know about Eric Dominguez, and as far
 7  as I'm concerned, initially, the NTSB had contacted me.
 8  And I honestly don't remember, and I don't believe they
 9  had too much more contact after that.  They had a vested
10  interest because it involved an electric vehicle, and
11  that's why I was, like, what's going on here.  And
12  that's why I brought it to the attention of my
13  supervisor.  But as far as after, I don't believe there
14  was too much more after.  I can't remember.  I'd have to
15  look at my e-mails or something like that.
16       Q.   And are your e-mails, and you may have some
17  from me in there or my office so that we could meet and
18  discuss the case, but are all of your e-mails contained
19  within the documents that you have today pursuant to
20  Mr. Branigan's subpoena?
21       A.   I don't normally print and save, you know,
22  e-mails.  Sometimes I do, depending on the situation.  I
23  don't, but I just do know that I try to be careful with
24  everything.  And they are public information.
25       Q.   Okay.  I would ask -- and I'm sure Thomas
```

```
 1                         Riso
 2   agrees but, Thomas, I'd like to ask the corporal after
 3   this deposition to send us both a copy of the e-mails
 4   that he has on his computer in reference to this case.
 5             Corporal, would that be okay?
 6        A.   I'd have to pass it through our legal to see if
 7   you are authorized to and the certain e-mails I was
 8   referring to that I have stored here.  Hold on.  Let me
 9   look here.  Let me look to see which ones they are
10   first.  Hold on.
11             MR. BRANIGAN:  I join in the request.  Thanks
12        for making it.
13   BY MR. POSES:
14        Q.   And Corporal, Thomas and I both are interested,
15   and I know we can do a public records request.  But if
16   it's something that's at your fingertips, perhaps it's
17   something that we can accomplish today.
18        A.   Not too sure if we can get it accomplished
19   today because I have to talk to my supervisor now and
20   see what the criteria is for this because you want
21   e-mails that I stored just for my benefit and my
22   investigation, and now you're asking for these e-mails.
23   So I have to see what our legal system says about it.  I
24   highly doubt that it will be offered today.
25        Q.   All right.  With coordination with Thomas's
```

                            Riso

1    office, what we'll do is we'll write to you, and it will

2    be for our benefit, both parties.  And we will try to

3    get those from you in whatever the best channel is.  You

4    don't have to work on it now.  Thomas and I will do it

5    together, okay?

6    

7        A.   Yeah.  Just bear with me a second because I'm

8    trying to find the file here.  Hold on.  Okay.  The

9    e-mails I'm talking about might be confidential because

10   they're with the state attorney.

11       Q.   Fair enough.  I think that --

12       A.   And one of them is with the attorney for --

13   they're both from the attorneys.  Remember the issue

14   that I was going with, with the other attorney.  These

15   were e-mails I saved in case.  So because they're with

16   attorneys and state attorneys, I'm not too sure if

17   you're able to get them.

18       Q.   All right.  Let me be fair to Thomas now.  So

19   Thomas, Corporal Riso is referring originally to e-mails

20   that were putting pressure on him from the -- not my

21   clients or I but, rather, the injured, Dillon Angulo's

22   prior attorney, who was demanding and asking for further

23   investigation and a prosecution.  You know, I don't care

24   about those e-mails, and if that's an issue, I don't

25   want them nor do I care.

1                          Riso

2          I'm more interested in the e-mails, and I think

3    Thomas is too, about the Tesla itself and any inquiries

4    that you made with Tesla or NHTSA or any governmental

5    agency and them to you and you to them.  So I think

6    that's what we're interested in?

7          A.   Well, that's what I'm saying.  Like I said,

8    everybody knows our e-mails are public information so

9    there's somewhere in the archives contacts with, you

10   know, the NTSB, Mr. Pellier (phonetic), and I believe

11   Mr. Al Prescott, I believe.  I even mentioned their

12   names in the reports, but they're somewhere in there.  I

13   didn't -- like I said, these files I have, and you

14   understood why I kept these files because they were

15   trying to, like you said, put pressure on me.  And they

16   even complained.  They even -- a letter went up -- I

17   guess what they did.  You know what happened, Mr. Poses.

18         Q.   I do --

19         A.   And I saved these files --

20         Q.   Okay.  Let me stop you for a second.  I think

21   Mr. Branigan, Thomas, deserves the education as to what

22   happened just so we're not talking about something he's

23   unaware of.  Why don't you tell us very briefly and put

24   on the record what it was that did happen just so Thomas

25   is educated.

1                          Riso

2        A.   Of course, I tried to get the criminal charges

3   on it so I saved my e-mails with the state attorney

4   because I strongly believe we had him.  And then the

5   attorney for -- the original attorney, because I believe

6   he was fired eventually by the client, eventually had

7   written a letter up to -- I don't know if it was major

8   or not and it trickled down and it did not go over too

9   well, did not make me too happy.  And I believe you were

10  down in Marathon, Mr. Poses, at that time when that

11  happened.  I was not very happy about it.

12       Q.   That's right.

13       A.   So I basically saved all the e-mails to help

14  back me up, and that's why.  And they're from the

15  attorney, and that's privileged.  And then I saved the

16  e-mails from the state attorney, but it was just for

17  personal use in case.  So that's why.  Now ...

18            MR. POSES:  That's fine.  I just wanted Thomas

19       to get a flavor of and understand better what it is,

20       you know, that there's categories of e-mails and the

21       ones that likely are inadmissible but, nevertheless,

22       are probably discoverable.  And so Thomas and I will

23       write to you about that together and try to get them,

24       all right?

25            MR. BRANIGAN:  Thank you.  I appreciate that

```
 1                          Riso

 2      background, and I agree with Counsel.

 3  BY MR. POSES:

 4      Q.   Okay.  All right.  Corporal, let's move on to

 5  just a couple more issues, and Thomas likely will have

 6  questions and follow up, but let me ask you about the

 7  collision avoidance system.  Are you aware of what that

 8  is in a Tesla?

 9      A.   Not necessarily.

10      Q.   Okay.  Did you have any conversations with

11  Mr. McCarthy about the collision avoidance system or the

12  automatic braking system that the Tesla has?

13      A.   No.  I don't recall -- I don't remember; I'm

14  being honest -- if I had that with them.

15      Q.   And both Thomas and I know that you're being

16  honest.  I think it's called collision avoidance assist

17  so let me just -- and I'll just re-ask the question just

18  so it's clear for the record.

19           Collision avoidance assist, are you aware of

20  what that is or it's part of the autopilot suite in a

21  Tesla?

22      A.   Not totally aware of it.  I might have heard

23  about it.

24      Q.   In your notes or in your investigation, do you

25  have anything to indicate that the collision avoidance
```

1                          Riso

2  assist was either engaged, in use, you know, was

3  employed at the time in any way?

4      A.   I just closed that one out.  Hold on.  I would

5  have to study it, Mr. Poses, to look at it.  Offhand, I

6  don't remember.  I don't know if it tells me that.  I'm

7  being honest.  I would have to look at it.

8      Q.   All right.  Let me ask you, then, generally.

9  Did you have a conversation with Mr. McCarthy about

10 either why or why not the Tesla and its autopilot suite

11 either could or should have done anything to potentially

12 mitigate or avoid this accident?

13     A.   Not that I'm aware of.

14     Q.   All right.  Did he offer any information about

15 autopilot's features and discuss with you, you know,

16 what the autopilot features and collision avoidance

17 assist specifically is capable of in a situation like

18 this?

19          MR. BRANIGAN:  Objection; form.

20     A.   I honestly don't recall.  But, like I said

21 again, Mr. Poses, I'm probably gonna say the same thing,

22 I do remember talking to him about that.  I just don't

23 remember all the specifics about it.

24 BY MR. POSES:

25     Q.   Other than what you provided today, your report

1                          Riso

2    and everything in response to Thomas's subpoena, are

3    there any other documents, either your field notes or

4    perhaps text messages or any conversations that might

5    also be responsive to Thomas's subpoena?

6         A.    I don't understand your question.

7         Q.    And I'll be very specific, and then I'll move

8    on.  Do you have any notes or documentation as it

9    relates to your conversations with Mr. McCarthy other

10   than what you've already disclosed in your report?

11        A.    Let me see here.  I do have some notes here,

12   but they, once again, are e-mails.  Whatever it is I'm

13   looking at is about when the phone call began and ended.

14   So he gave me information about the phone call that was,

15   I guess, recorded through the system.  He gave me the

16   time it started and the phone number, and I called the

17   number.

18        Q.    It was American Airlines, right?

19        A.    Yes, it was.  And, honestly, Mr. -- I'm

20   forgetting his name right now.

21        Q.    McGee.

22        A.    Mr. McGee, he was truthful.  He was on the

23   phone with American Airlines, and even via the subpoena

24   when I called that number saying what phone number he

25   was on, guess what, welcome to American Airlines.  So he

```
 1                     Riso
 2  didn't lie about it.  It verified, yeah, he was truthful
 3  about he was on the phone.
 4      Q.   All right.  Just a couple of follow-ups.  I'm
 5  almost done.  Did you ever learn where Mr. McGee's phone
 6  was in the vehicle when he was, you know, he says,
 7  looking for it?
 8      A.   You know, you brought that up, and I honestly
 9  can't remember because -- and I say this, the reason why
10  is at the very beginning of this, I wasn't the lead
11  investigator.  I was just monitoring what they were
12  doing.  I was actually watching from afar and a little
13  bit interacting especially, like I said, with the state
14  attorney from the scene.  And then I made the call to go
15  for the blood just to help out while they did what
16  they're supposed to do at the scene.  So it wasn't mine,
17  but I did help out a little bit.  So I can't remember
18  anything about the phone.
19          MR. POSES:  Okay.  All right.  Corporal, I'm
20      very happy we're able to take your deposition today.
21      I know Thomas might have some follow-up questions,
22      but I was supposed to be in trial.  It didn't happen.
23      Thomas understands.  As we get ready a lot, and
24      sometimes they don't go.
25          THE WITNESS:  Just for the record, and you were
```

```
 1                         Riso
 2   inquiring about my e-mails, sometimes I save them and
 3   sometimes I don't.  But I try to be careful about
 4   what I include and what I don't include, you know,
 5   because of what the contexts of e-mails are and stuff
 6   like that.  And I'll inquire about the e-mails
 7   because you did say between the Tesla corporation,
 8   right, and the NTSB.  Well, there was the NHTSA,
 9   National Highway Transportation Association, and
10   there's e-mails from them too.
11        MR. POSES:  Right.  I understand.
12        THE WITNESS:  So I'm very concerned about
13   giving up the e-mails that I saved for other
14   purposes, but I'm just letting you know that I did
15   have contact with some people from the NHTSA which
16   they are part of the NTSB, I guess.  Maybe I said
17   that wrong, the NTSB, but I think it was the NHTSA or
18   something so ...
19        MR. POSES:  Corporal, I'll tell you what.  I'll
20   save you the trouble.  Thomas and I really are gonna
21   -- I think we're, as a matter of law, entitled to
22   them, but if there's any issue or objection that
23   perhaps the attorney for the FHP has, we'll deal with
24   it.  But I think those e-mails are relevant to our
25   case, and we're not asking for them today.  We're
```

```
 1                        Riso
 2      going to figure out the best way to get them from
 3      you, and we can share them amongst the parties, okay?
 4           THE WITNESS:  Okay.  I will inquire with our
 5      legal about giving up some, you know, information
 6      but, like I said before, I just do know they're
 7      public and you can get them.  It's just a matter of
 8      whether you can get them from me.
 9  BY MR. POSES:
10      Q.   I understand.  All right.  This is the last
11  question, I promise.  Where in Italy are you moving?
12      A.   Far away from the United States.
13           MR. POSES:  That's all of Italy.
14           THE WITNESS:  No, Southern Italy.
15           MR. POSES:  I went to law school for a semester
16      in Florence, and I traveled a lot there.
17           THE WITNESS:  No, Calabria.
18           MR. POSES:  You're going to Calabria.  Very
19      cool.
20           Thomas, go ahead.
21                   REDIRECT EXAMINATION
22  BY MR. BRANIGAN:
23      Q.   Corporal, you said that Card Sound Road is a
24  dangerous road based on your personal experience and
25  professional experience.  And you also said that in the
```

1                       Riso

2   general area around the intersection of Card Sound Road

3   and County Road 905, there are very few street lights.

4   Would you agree that those are reasons that a driver

5   like Mr. McGee should be paying careful attention while

6   driving down this road at night?

7           MR. POSES:  Object to the form.

8       A.   Personally and professionally, you should pay

9   attention when you're driving on that road because its

10  visibility is limited.  There are a lot of bumps and

11  divots in the road, and there are areas, like even prior

12  to the crash, there's a curve in the road where speed is

13  supposed to be reduced.  So I would say, yes, you should

14  pay attention and, I guess, drive in a prudent manner.

15  BY MR. BRANIGAN:

16      Q.   And while you say visibility is limited, you

17  still made note in your report that the red flashing

18  light alerting drivers paying attention that they need

19  to stop was visible for four-tenths of a mile, correct?

20      A.   That's correct.  And when I say visibility is

21  limited, you said Card Sound Road, not the area of the

22  crash.  And I made note of that because I even drove

23  through there to see about the visibility at night.  And

24  then when you look at the video that was downloaded from

25  the car, you can clearly see it because it was -- was it

1                          Riso

2    six seconds before I think it recorded?  Not five.  I

3    think it was six seconds.

4        Q.   Five.

5        A.   Was it five seconds?

6        Q.   I believe it was five.

7        A.   Five seconds prior to the crash.  You could

8    clearly see that flashing light and the stop sign.

9        Q.   Four-tenths of a mile, that's over 2,000 feet,

10   correct?

11       A.   Yeah.  Right around there.

12            MR. BRANIGAN:  Thank you, Corporal.  I know

13       Mr. Poses and I both really appreciate your time

14       today.  I don't have anything further for you.

15            MR. POSES:  Thanks.  Thomas, since it's your

16       depo, you want to explain read and waive?

17            MR. BRANIGAN:  Yes, I will.

18            So Corporal, as you know, I'm sure from prior

19       testimony, a copy of the deposition can be provided

20       to you, and you can read it and sign the transcript

21       and complete an errata sheet if there's any

22       typographical errors that need to be corrected.  Or

23       you can waive signature if you prefer not to go

24       through that process.  It's up to you.

25            THE WITNESS:  Can I ask you this?  Is there any

```
 1                        Riso
 2    necessity for me to have this down the road, if you
 3    know what I mean, because if I read it, I would read
 4    it so I can have a copy.
 5         MR. POSES:  We'll give you a copy.  Thomas?
 6         MR. BRANIGAN:  We'll be glad to give you a copy
 7    of it now or any time in the future should there be a
 8    need for you to have it.
 9         THE WITNESS:  Okay.  Then just provide me when
10    I need it, and I guess I'll waive.  But down the road
11    we'll see if I need it.
12         MR. BRANIGAN:  Very good.  12:59:43
13         THE COURT REPORTER:  Mr. Branigan, standing  12:59:49
14    order?  12:59:59
15         MR. BRANIGAN:  Yes.  And I will e-mail you, or  13:00:01
16    my assistant will e-mail you the exhibits.
17         THE COURT REPORTER:  And Mr. Poses, I assume
18    you're needing a copy?
19         MR. POSES:  Yes, please.
20         (Time noted:  1:00 p.m.)
21                        - - - - -
22
23
24
25
```

1              CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF ORANGE

5

6              I, Margaret Lowe, Registered Professional

7    Reporter, Notary Public, State of Florida, certify that

8    CORPORAL DAVID RISO appeared remotely and was duly sworn

9    on the 21st day of January, 2022.

10             SIGNED this 2nd day of February, 2022.

11

12

13

14                           _____
                             Margaret Lowe, RPR
                             Notary Public – State of Florida
15                           Commission No.:  GG923815
                             Commission Expires:  11/01/2023
16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF REPORTER

 2

 3    STATE OF FLORIDA

 4    COUNTY OF ORANGE

 5

 6         I, Margaret Lowe, Registered Professional

 7    Reporter, certify that I was authorized to and did

 8    stenographically report the deposition of CORPORAL DAVID

 9    RISO; that a review of the transcript was not requested;

10    and that the foregoing transcript, pages 4 through 143,

11    is a true and complete record of my stenographic notes.

12         I further certify that I am not a relative,

13    employee, attorney, or counsel of any of the parties,

14    nor am I a relative or employee of any of the parties'

15    attorneys or counsel connected with the action, nor am I

16    financially interested in the action.

17         DATED this 2nd day of February, 2022.

18

19

20    _____

21    Margaret Lowe, RPR

22

23

24

25
```

*Margaret Lowe*

```
 1                    J U R A T

 2

 3   I,              , do hereby certify under

 4   penalty of perjury that I have read the foregoing

 5   transcript of my deposition taken on              ;

 6   that I have made such corrections as appear noted

 7   herein in ink, initialed by me; that my testimony as

 8   contained herein, as corrected, is true and correct.

 9

10   DATED this _____ day of _____, 22  ,

11   at _____,         .

12

13

14

15

16

17   _____

18          SIGNATURE OF WITNESS

19

20

21

22

23

24

25
```

```
1                    ERRATA SHEET

2   Case Name:

3   Deposition Date:

4   Deponent:

5   Pg.  No. Now Reads        Should Read   Reason

6   ____ ____ _____     _____   _____

7   ____ ____ _____     _____   _____

8   ____ ____ _____     _____   _____

9   ____ ____ _____     _____   _____

10  ____ ____ _____     _____   _____

11  ____ ____ _____     _____   _____

12  ____ ____ _____     _____   _____

13  ____ ____ _____     _____   _____

14  ____ ____ _____     _____   _____

15  ____ ____ _____     _____   _____

16  ____ ____ _____     _____   _____

17  ____ ____ _____     _____   _____

18  ____ ____ _____     _____   _____

19  ____ ____ _____     _____   _____

20

                         _____

21                              Signature of Deponent

22  SUBSCRIBED AND SWORN BEFORE ME

23  THIS _____ DAY OF _____, 2022.

24  _____

25  (Notary Public)   MY COMMISSION EXPIRES:_____
```