## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 21-cv-21940-BLOOM/Otazo-Reyes

NEIMA BENAVIDES, *as Personal*
*Representative of the Estate of Naibel*
*Benavides Leon, deceased,*

       Plaintiff,

v.

TESLA, INC. *a/k/a Tesla Florida, Inc*.

       Defendant,

_____/

### Case No. 22-cv-22607-BLOOM

DILLON ANGULO,

       Plaintiff,

v.

TESLA, INC., a/k/a *Tesla Florida, Inc.,*

       Defendants.

_____/

### PLAINTIFFS' JOINT MOTION FOR LEAVE TO AMEND COMPLAINT

      Pursuant to Federal Rule of Civil Procedure 15, Plaintiffs, NIEMA BENAVIDES and DILLON

ANGULO, by and through their undersigned counsel respectfully Move to Amend their Complaint against

the Defendant, TESLA, INC., and in support thereof alleges the following:

1.   This is an action sounding in products liability stemming from a tragic incident wherein, as

      innocent pedestrians standing next to their parked vehicle, Naibel Benavides was killed, and Dillon

Angulo suffered massive life altering injuries after a Tesla vehicle driving on autopilot collied with them.

2. Through the development of discovery, the Plaintiffs have learned new information giving rise to additional legal claims.

3. Accordingly, Plaintiffs seek leave of this Honorable Court to amend their complaints to both add in additional factual allegations as well as bring additional legal claims related to same.

4.  This will be the first time that either Plaintiff has sought leave to amend their complaints.

5. The amending of Plaintiffs' complaints will not prejudice Defendant in any way, nor will it interfere with or cause delay to the current trial setting of March 2024.

## **MEMORANDUM OF LAW**

6. Federal Rule of Civil Procedure 15 provides that after a responsive pleading is served, "a party may amend its pleading with the opposing party's written consent or the court's leave. *Fed. R. Civ. P.* 15(a)(2). Leave to amend a party's pleading shall be freely given when justice so requires. *Id.* The "policy of favoring amendments to pleadings should be applied with extreme liberality." *United States v. Webb*, 655 F. 2d 977, 979 (9th Cir. 1981). In defining the scope of Rule 15(a), the Supreme Court in *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L.Ed.2d 222 (1962) explained that:

> "In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the party of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. the leave sought should, as the rule require be "freely given."

Accordingly, the factors in determining whether justice requires allowing an amendment under Rule 15(a) are: 1) Undue Delay; 2) Bad faith or dilatory motive; 3) Futility of Amendment; and 4) Prejudice to the opposing party. *Id.* In *Foman*, the Supreme Court advised that "if the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Id*. These factors are not of equal weight as prejudice to the opposing party has long been held to be the most critical factor in determining whether to grant leave to amend. *Darren Gilbert, Plaintiff, v. Oakdale Shopping Center L.L.C., et al., Defendant.*, 2023 WL 5021309, at *1 (E.D.Cal., 2023) (citing *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("it is the consideration of prejudice to the opposing party that carries the greatest weight.") *See also Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990) ("Prejudice to the opposing party is the most important factor.") Absent prejudice, or a strong showing of any of the remaining factors, a presumption exists under Rule 15(a) in favor of granting leave to amend. *Eminence Capital*, 316 F.3d at 1052.

## <u>ARGUMENT</u>

7. In this instant case, this Motion to Amend is not sought for any improper motive, none of the elements for denial of leave to amend are present, and the Defendants will suffer no prejudice as all sought claims to be added are related and result from the same transaction and occurrence as claims in Plaintiff's original Complaint. Furthermore, applicable law, witnesses, and proof of damages are essentially the same. Accordingly, in keeping with the liberal spirit of allowing amendments to complaints, Plaintiffs motion should be freely granted.

WHEREFORE, Plaintiff requests that this Honorable Court grant his motion for leave to amend his complaint so as to bring forth new claims against the Defendant, TESLA, and to have deemed as filed the proposed Amended Complaint attached hereto as Exhibit "A."

## CERTIFICATE OF CONFERRING WITH COUNSEL PURSUANT TO RULE 7.1(a)(3)

Pursuant to Local Rule 7.1 (a)(3), the undersigned counsel has conferred with counsel for Tesla, Inc., in a good faith effort to resolve the issues raised in this motion.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of August, 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

Respectfully submitted,

Donald H. Slavik (*Pro Hac Vice*)
David W. Terry (*Pro Hac Vice*)
Nicole L. Judge (*Pro Hac Vice*)
SLAVIK LAW FIRM, LLC
3001 S. Lincoln Ave., Suite C-1
Steamboat Springs, CO 80487
Office (970) 457-1011
dslavik@slavik.us

*Counsel for Plaintiff, Dillon Angulo and Plaintiff,*
*Neima Benavides as PR for the Estate of Nabel Benavides*

POSES & POSES, P.A.
Alfred I. DuPont Building
169 East Flagler Street
Suite 1600
Miami, FL 33131
(305) 577-0200 Telephone
(305) 371-3550 Facsimile
tposes@posesandposes.com

/s/Todd Poses_____
TODD POSES, ESQ.
FBN: 0075922

*Counsel for Plaintiff, Neima Benavides as PR for the
Estate of Naibel Benavides Leon*


THE ROUSSO, BOUMEL LAW FIRM, PLLC.
9350 South Dixie Highway
Suite 1520
Miami, Florida 33156
(305) 670-6669


By:      ***/s/ Adam T. Boumel, Esq.***
Adam T. Boumel, Esq.
Florida Bar No.: 0110727
Adam@roussolawfirm.com
SERVICE EMAILS:
pleadings@roussolawfirm.com (primary)
Frank@roussolawfirm.com (secondary)

*Counsel for Plaintiff, Dillon Angulo.*


**EXHIBIT "A"**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISON

### Case No. 21-cv-21940-BLOOM/Otazo Reyes

NEIMA BENAVIDES, *as Personal*
*Representative of the Estate of Naibel*
*Benavides Leon, deceased,*

      Plaintiff,

v.

TESLA, INC., *a/k/a. Tesla Florida, Inc.*,

      Defendant.

_____/

### Case No. 22-cv-22607-BLOOM

DILLON ANGULO,

      Plaintiff,

v.

TESLA, INC., *a/k/a/ Tesla Florida, Inc.*,

      Defendants.

_____/

## PLAINTIFFS' CONSOLIDATED AND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

      Plaintiffs, NEIMA BENAVIDES, Personal Representative of the Estate of NAIBEL

BENAVIDES LEON, deceased DILLON ANGULO, by and through his undersigned counsel

(collectively referred to herein as "Plaintiffs"), file this their Consolidated and Amended

Complaint against Defendant, TESLA INC. A/K/A TESLA FLORIDA INC. (hereinafter called "Tesla"), and alleges and states as follows:

## JURISDICTION, VENUE AND PARTIES

1.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because this action is between citizens of different state and the amount in controversy, exclusive of interest, attorneys' fees and costs, exceeds $75,000.00

2.    Plaintiff, Dillon Angulo, is a resident of and is domiciled in the State of Florida.

3.    Neima Benavides, is the duly appointed personal representative of the Estate of Naibel Benavides Leon.   As personal representative of the Estate, the Plaintiff, NEIMA BENAVIDES, has standing to and otherwise is duty bound to bring this wrongful death action pursuant to Florida Statute §768.16 et seq.

4.    At the time of the death of Naibel Benavides Leon was 20 years old and was not married and had no children.

5.    Naibel Benavides Leon is survived by her natural parents, Lilia Marilin Leon Jimenez and Guillermo Benavides, who are survivors under the Florida Wrongful Death Act.

6.    Lilia Marilin Leon Jimenez is a resident of Miami Dade County.

7.    The above described parties will hereinafter be referred to collectively as "Plaintiffs."

8.    At all material times, Defendant, Tesla Inc. a/k/a Tesla Florida Inc. (hereinafter, "Tesla") is and was a foreign corporation licensed and authorized to do business in the State of Florida.

9.    At all times hereinafter mentioned and at the time of the incident complained of Tesla had an office for the transaction of its customary business in Miami-Dade County, Florida, had agents and other representatives in Miami-Dade County, and was actually

doing business in Miami-Dade County, Florida, by virtue of its shipping to and sale of automobiles in Miami-Dade County, Florida.

10. At all times hereinafter and at the time of the incident complained of Tesla was in the business of designing, testing, inspecting, manufacturing, distributing, selling, maintaining, repairing and otherwise placing into the stream of commerce, and causing same to come into the State of Florida, certain automobiles, including a certain specific automobile designated and described as a 2019 Tesla Model S, VIN: 5YJSA1E24KF302997 (Hereinafter described as the "Vehicle").

## THE INCIDENT

11. At around 9:25 PM, on April 25, 2019, George McGee rode in his 2019 Tesla Model S (VIN: 5YJSA1E24KF302997 (the "Vehicle") east on County Road 905A, also called Card Sound Road, approaching the 3-way T-intersection with County Road 905 near the town of Key Largo, Monroe County, Florida.

12. Mr. McGee's Tesla came equipped with automated driving features, one of which Tesla called "Autopilot", that could navigate the vehicle without driver input.

13. As he had on many other occasions, Mr. McGee relied on the Autopilot and other automated features to safely drive him home.

14. As he approached the T-intersection, Mr. McGee engaged in a phone call, and, as he told the police at the scene, he dropped the phone and bent down to retrieve it from the floorboard.

15. Meanwhile, Dillon Angulo with his passenger, Naibel Benavides Leon, had parked his mother's Chevrolet Tahoe on the eastbound shoulder of County Road 905, perpendicular to and directly across from eastbound Card Sound Road.

16.   Dillon and Naibel stood next to the Tahoe as Mr. McGee approached the intersection.

17.   Mr. McGee's Tesla failed to detect the Tahoe or the couple standing in the Tesla's path and drove into the Tahoe at high speed.

18.   The impact threw Naibel about 75 feet, killing her, and caused severe, permanent injuries to Dillon.





The scene as depicted in the Florida Highway Patrol Crash Report.



George McGee's Tesla.



The Tahoe.

## BACKGROUND

19.     Two and a half years before the incident, on October 19, 2016, Tesla Motors proclaimed,

> We are excited to announce that, as of today, all Tesla vehicles
> produced in our factory – including Model 3 – will have the
> hardware needed for full self-driving capability at a safety level
> substantially greater than that of a human driver. Eight surround
> cameras provide 360-degree visibility around the car at up to 250
> meters of range. Twelve updated ultrasonic sensors complement
> this vision, allowing for detection of both hard and soft objects at
> nearly twice the distance of the prior system. A forward-facing
> radar with enhanced processing provides additional data about the
> world on a redundant wavelength, capable of seeing through heavy
> rain, fog, dust and even the car ahead.
>
> To make sense of all of this data, a new onboard computer with
> more than 40 times the computing power of the previous generation
> runs the new Tesla-developed neural net for vision, sonar and radar
> processing software. Together, this system provides a view of the
> world that a driver alone cannot access, seeing in every direction
> simultaneously and on wavelengths that go far beyond the human
> senses.[1]

20.     Even earlier, Musk and Tesla blurred any distinction between the "Autopilot" features

and the "full-self-driving" capabilities, exaggerating both far beyond their actual

capabilities. In interviews with reporters later that day (October 19, 2016), Tesla's CEO

Elon Musk predicted, "we will be able to demonstrate a demonstration drive of our full

autonomy all the way from LA to New York. So basically, from home in LA to let's say

dropping you off in Times Square, NY, and then having the car parking itself by the end

of next year *(2017)* without the need for a single touch including the charger."[2]

---

[1]     *All Tesla Cars Being Produced Now Have Full Self-Driving Hardware*, TESLA MOTORS BLOG, Oct. 19,
2016,   https://www.Tesla.com/blog/all-Tesla-cars-being-produced-now-have-full-self-driving-hardware;   *see
also*: "The basic news is that all Tesla vehicles exiting the factory have the hardware necessary for Level 5
Autonomy." - Elon Musk, Oct. 19, 2016 [ 00:00 - 00:13] https://www.youtube.com/watch?v=-vjGEEF_p5E.

[2]     *In a conference call with reporters: "Elon Musk Autopilot 2.0 Conference Call Transcript*, XAUTOWORLD
Oct.   19,   2016,   http://www.xautoworld.com/Tesla/transcript-elon-musk-autopilot-2-conference-call/   (last
accessed Aug. 23, 2021).

21.    Tesla also posted a video demonstrating Autopilot with the caption: "The person in the driver's seat is only there for legal reasons. He is not doing anything. The car is driving itself."[3]

22.    Further, Tesla's CEO, Elon Musk, stated in 2016, "In dense traffic situations, autonomy is really easy because you could just maintain a set distance from various cars, it's actually quite easy . . . Model S and Model X, at this point, I can drive autonomously with greater safety than a person. Right now."[4]

23.    Then in 2018, Musk announced that within months, "full-self-driving" features would be added to the vehicles through an online update in the vehicle software.[5]

24.    On April 12, 2019, Musk claimed, "I'd be shocked if it's not next year, at the latest, that having a human intervene will decrease safety."[6]

25.    On April 23, 2019, Musk said of Tesla's automation, "The key point of this is that any part of this could fail and the car would keep driving. So, you could have cameras fail, you could have power circuits fail, you could have one of the Tesla full self-driving computer chips fail, car keeps driving. The probability of this computer failing is substantially lower than someone losing consciousness. That's the key metric. At least an order of magnitude."[7]

26.    The Tesla website's Autopilot page states: "All you will need to do is get in and tell your car where to go. If you don't say anything, your car will look at your calendar and take

---

[3]    See, https://www.tesla.com/autopilot
[4]    Elon Musk [1:18:48-1:19:34] Elon Musk | Full interview | Code Conference 2016.
[5]    Fred Lambert, *Tesla's version 9 software update is coming in August with first 'full self-driving features', says Elon Musk*, ELECTREK, June 10, 2018, https://electrek.co/2018/06/10/tesla-version-9-software-update-fully-self-driving-features-elon-musk/.
[6]    Lex Fridman, Interview: *Elon Musk: Tesla Autopilot | Lex Fridman Podcast #18*, at 21:27–24:26 Apr. 12, 2019, https://www.youtube.com/watch?v=dEv99vxKjVI&t=281s.

you there as the assumed destination. Your Tesla will figure out the optimal route, navigating urban streets, complex intersections and freeways."[8]

27.     One of the key differences between Tesla's development of its automated features and others in the automotive industry is Tesla's use of drivers in the field, **its customers**, to "train" the computer system to master the tasks necessary to safely negotiate the complex, largely unpredictable nature of driving a car in real-world traffic.[9] This means these automated features are being tested and developed by ordinary drivers in traffic situations and interacting with others who have in no way consented to participating in Tesla's testing process.[10]

28.     In reality, Tesla does not make a "Full Self-Driving" vehicle and never has.[11] Though Tesla vehicles offer driver assistance, they are incapable of "driverless" operation. Tesla's claims and deliberate implications to the contrary are false. Tesla's descriptions of its various autonomous features have consistently evinced Tesla's *desire* is for its customers to *believe* that all Tesla vehicles have or will imminently gain autonomous systems enabling Tesla vehicles to operate without human involvement. Tesla deliberately blurs the distinction between whether its automation system is merely a

---

[7]     Elon Musk, *Tesla Autonomy Day 2019 - Full Self-Driving Autopilot - Complete Investor Conference Event*, at minute 8:30–8:54, Apr. 23, 2019, https://www.youtube.com/watch?v=-b041NXGPZ8.

[8]     *See* Autopilot | Tesla: https://www.tesla.com/en_AE/autopilot/%3Fredirect%3Dno

[9]     *The state of self-driving cars*, CBS GOOD MORNING, Feb. 19, 2022  https://www.cbsnews.com/video/the-state-of-self-driving-cars/#x.

[10]    Elon Musk, *Tesla Autonomy Day 2019 - Full Self-Driving Autopilot - Complete Investor Conference Event*, at 2:13:18–2:13:32, Apr. 23, 2019, https://www.youtube.com/watch?v=Ucp0TTmvqOE&t=4453s.

[11]    *See, e.g.*, Andrew J. Hawkins, *Tesla privately admits Elon Musk has been exaggerating about 'full self-driving'*, VERGE, May 7, 2021,  https://www.theverge.com/2021/5/7/22424592/tesla-elon-musk-autopilot-dmv-fsd-exaggeration.

"driver assist" system or a fully autonomous system that does not require the driver's constant attention.[12]

29. Several customers have sued Tesla for breaching its promise of a fully automated self-driving car and claim they have already paid for the feature.[13] Tesla privately acknowledged and has told California regulators that it was unlikely to offer fully autonomous features anytime in 2021.[14] Yet, Tesla has allowed many of its customers to access its Full Self-Driving system, even though Tesla has not been legally permitted to put autonomous vehicles on public roads.[15]

30. Tesla invariably points to its Owners Manuals that accompany its vehicles to show that Tesla warns drivers to never depend on the Tesla vehicle's automated technology. George McGee sums up the inadequacy of these "warnings" in his deposition taken in this case.

31. McGee testified that he had not read his Tesla vehicle's Owner's Manual prior to this incident.[16]

32. When asked if McGee had read the owner's manual for his vehicle, would the information there have changed his expectations regarding his Tesla's automation capabilities, Mr. McGee testified, "if you're asking if it [the owner's manual] would

---

[12]    William H. Widen and Philip Koopman, *Do Tesla FSD Beta Releases Violate Public Road Testing Regulations?*, JURIST – Academic Commentary, Sept. 27, 2021, https://www.jurist.org/commentary/2021/09/william-widen-philip-koopman-autonomous-vehicles/.

[13]    *See*, Cade Metz, *Tesla Sells 'Full Self-Driving,' but What Is It Really?*, N.Y. TIMES, Aug. 23, 2021, https://www.nytimes.com/2021/08/20/technology/Tesla-full-self-driving-fsd.html.

[14]    *Id.*

[15]    Widen & Koopman, *supra* note 13.

[16]    George McGee Deposition, Benavides v. Tesla, U.S. Dist. Ct. S. Dist. Fl., Case No. 21-cv-21940-BLOOM/Otazo-Reyes    March 15, 2022, (McGee Depo)  [35:21-36:3].

change my mind on what I thought, no, sir. I view this more as a general disclaimers [sic] that most products put in order to avoid liability . . ."[17]

33.   McGee further testified that had he read and taken Tesla's warnings in the Owner's Manual --  to the effect that drivers should never depend on the technology -- as true, he would not have bought the vehicle, stating: "if it said, hey, this doesn't work at all, pay $10,000 for it, I wouldn't pay $10,000."[18]

34.   One reason for Tesla's ambiguity as to the level of autonomy available in its vehicles is that without substantially more rigorous testing and development, Tesla cannot openly sell a vehicle that does not require the driver's constant attention.[19] Thus, Tesla has sought to convince its prospective and previous customers that Tesla vehicles have or will soon have the ability to drive themselves, while simultaneously telling regulators Tesla only sells vehicles that require constant driver attention (with the same driver assist features used by various other automakers).[20] According to Bryant Walker Smith, an associate professor in the Schools of Law and Engineering at the University of South Carolina, this raises the question, "If we can't trust Tesla when they say their vehicles are full self-driving, how can we trust the company when it says they are safe?"[21]

35.   Long before this tragic incident, advocates and federal agencies have repeatedly demanded the Federal Trade Commission act on Tesla's apparent false advertising of its automated driving systems.[22]

---

[17]   *Id*. at [141:10-13].
[18]   *Id*. at [142:3-8].
[19]   Widen & Koopman, *supra* note 13..
[20]   *Id*.
[21]   *Id*.
[22]   *See* Exhibit 2, 18 August 2021 Letter from the United States Senate to The Honorable Lina Khan, Chair, Federal Trade Commission.

36.     The Society of Automotive Engineers (SAE) defines six levels of driving automation ranging from "0" to "5".[23] These levels describe the degree to which the human driver controls the vehicle.[24] SAE Level 0 refers to vehicles operated totally by the driver with minimal assistance from automated warning systems.[25] SAE Level 5, the highest level, describes a fully automated vehicle that can drive everywhere in all conditions without human intervention.[26] The highest level of any vehicle currently operating on public roads is SAE Level 2, which requires constant human attention and regular intervention.[27]

37.     While Tesla has hyped its vehicles' autonomous capabilities, the truth is, no Tesla vehicles exceed SAE Level 2 automation, meaning all Tesla vehicles require constant driver attention and readiness to intervene at any second, even those designated as having a functional "Autopilot" or "Full Self-Driving" capacity. Tesla's repeated claims that its cars can drive themselves imply a level of automation that does not yet exist in any vehicle on the road today.

38.     This deception has not gone unnoticed. In 2018, the Center for Auto Safety and Consumer Watchdog wrote to then FTC Chairman Joseph Simons urging the FTC to investigate Tesla's deceptive and unfair practices in the advertising and marketing of

---

[23]     Jennifer Shuttleworth, *SAE Standards News: J3016 automated-driving graphic update,* SAE INT'L, Jan. 7, 2019  https://www.sae.org/news/2019/01/sae-updates-j3016-automated-driving-graphic.
[24]     *Id*.
[25]     *Id*.
[26]     *Id*.
[27]     *Id*.

Autopilot after two fatal crashes.[28] They renewed their request to the FTC in 2019 after more fatal crashes.[29]

39.   The National Highway Traffic Safety Administration (NHTSA) sent Musk a cease-and-desist letter in 2018 over his claims about Tesla vehicles' safety and asked the FTC to investigate the claims.[30]

40.   On August 13, 2021, NHTSA opened a formal investigation into Tesla's Autopilot feature after identifying eleven crashes with Autopilot engaged since 2018 that involved Tesla vehicles crashing at first responder sites.[31] As part of their investigation of first responder crashes, NHTSA requested Tesla to provide responses to various information requests[32] and Tesla has sought to conceal their responses from the public.[33]

41.   Despite the NHTSA investigation and mounting questions about the safety of Tesla's autonomous driving software and marketing, Tesla announced in September 2021 it would be expanding the availability of its Full Self-Driving feature. In response to this announcement, National Transportation Safety Board (NTSB) chair, Jennifer Homendy, said in an interview with the Wall Street Journal, "basic safety issues have to be

---

[28]   *Id*. (citing Jason Levine and John Simpson to the Honorable Joseph Simons (May 23, 2018), https://www.autosafety.org/ftc_investigation_request_Tesla_autopilot/).

[29]   *See* Exhibit 2 (citing Jason Levine and Adam Scow to the Honorable Joseph Simons (July 25, 2019), https://www.autosafety.org/center-for-auto-safety-and-consumer-watchdog-renew-their-call-for-the-ftc-and-state-attorneys-general-to-investigate-Tesla-for-deceptive-practices-after-another-autopilot-related-death/).

[30]   *See* Exhibit 2 (citing Sean O'Kane, *Feds told Tesla to stop misleading the public about Model 3 safety*, VERGE, Aug. 7, 2019, https://www.theverge.com/2019/8/7/20758349/Tesla-model-3-safety-misleading-ftc-national-highway-traffic-administration-elon-musk.

[31]   *See attached* Exhibit 1, National Highway Traffic Safety Administration [NHTSA] ODI Resume for Investigation number PE 21-020.

[32]   *See attached* Exhibit 5, National Highway Traffic Safety Administration [NHTSA] Letter to Eddie Gates, Director, Field Quality, Tesla, Inc., August 31, 2021.

[33]   USDOT Memorandum dated October 22, 2021, PE-21-020 Public File.

addressed before they're then expanding it to other city streets."[34] Homendy called

Tesla's decision to call its system "Full Self-Driving" "misleading and irresponsible."[35]

Homendy pointed out that people pay more attention to marketing than to warnings

buried in car manuals or on a company's website.[36] According to Homendy, "[Tesla] has

clearly misled numerous people to misuse and abuse technology."[37]

42.      NHTSA also issued a Special Order Directed to Tesla, Inc., on October 12, 2021,

ordering Tesla to produce various documents related to purported non-disclosure

agreements between Tesla and its customers that prohibited or discouraged customers

from sharing certain information relevant to the performance of FSD.[38]

43.      NHTSA has also recently ordered Tesla to recall more than 362,000 U. S. vehicles to

update its Full Self-Driving (FSD) Beta software after U.S. regulators found the system

did not adequately adhere to traffic safety laws and could cause crashes.[39]

44.      However, while this recall made international news, Tesla has been regularly sending out

online "updates" of its automated features, as they did in late September 2021 when Tesla

updated its vehicles' software to improve the detection of emergency vehicle lights in

low light situations.

45.      Shortly thereafter, NHTSA formally reminded Tesla that "the Safety Act imposes an

obligation on manufacturers of motor vehicles and motor vehicle equipment to initiate a

---

[34]      Rebecca Elliott, *Elon Musk's Push to Expand Tesla's Driver Assistance to Cities Rankles a Top Safety Authority*, WALL ST. J. Sept. 19, 2021, https://www.wsj.com/articles/elon-musks-push-to-expand-teslas-driver-assistance-to-cities-rankles-a-top-safety-authority-11632043803?mod=hp_lead_pos3.
[35]      *Id*.
[36]      *Id*.
[37]      *Id*.
[38]      *See attached* Exhibit 4, National Highway Traffic Safety Administration [NHTSA] Letter & Special Order Directed to Tesla, Inc., to Bill Berry, Vice President, Legal, Tesla, Inc. (Oct. 12, 2021).

recall by notifying NHTSA when they determine vehicles or equipment they produced contain defects related to motor vehicle safety or do not comply with an applicable motor vehicle safety standard."[40] Given that Tesla has issued numerous updates to its autonomous driving systems over the last several years, any of these updates would more accurately be "recalls" if they were intended to make the vehicles safer.  Many of Tesla's relatively secret "updates" should have received the same international attention as the most recent one, and without that attention Tesla has been spared the damage to its reputation, and serious public and regulatory scrutiny, many such recalls would necessarily have entailed.

46.     Recently the California Department of Motor Vehicles accused Tesla of false advertising in its promotion of the company's signature Autopilot and Full Self-Driving technologies, stating that Tesla had "made or disseminated statements that are untrue or misleading, and not based on facts."[41]

47.     The problems with partially automated driver assist systems, such as traditional cruise control and Tesla's Autopilot,  have been known to the automotive industry for decades.[42]   Drivers tend to "drift off" and lose what experts call "situational" or

---

[39]     See, e.g., David Shepardson, *Tesla Recalls 362,000 U.S. vehicles over Full Self-Driving software*, REUTERS, February 16, 2023 https://www.reuters.com/business/autos-transportation/tesla-recalls-362000-us-vehicles-over-full-self-driving-software-2023-02-16/.

[40]     See Exhibit 3, Letter from Gregory Magno, Chief Vehicle Defects Division – D Office of Defects Investigation, NHTSA, to Eddie Gates, Director, Field Quality, Tesla, Inc., (October 12, 2021) INIM-PE21020-85573P.pdf

[41]     Russ Mitchell, *California DMV accuses Tesla of falsely advertising Autopilot and Full Self-Driving features*, Los   Angeles Times, August 5, 2022. https://www.latimes.com/business/story/2022-08-05/dmv-false-advertising-tesla.

[42]     Endsley, M. R., & Kaber, D. B. (1999), *Level of automation effects on performance, situation awareness and workload in a dynamic control task*, 42 ERGONOMICS, 462–92; Kaber, D. B., & Endsley, M. R. (1997) *Out-of-the-loop performance problems and the use of intermediate levels of automation for improved control system functioning and safety*, 16 PROCESS SAFETY PROGRESS, 126–131; Stanton, N. A., Young, M., & McCaulder, B. (1997) *Drive-by- wire: The case of driver workload and reclaiming control with adaptive cruise control*, 27 SAFETY SCIENCE, 149–159; Stanton, N. A., & Young, M. S. (2005) *Driver behaviour with adaptive cruise*

"contextual" awareness when the car is on cruise control.[43] Reaction time, especially in emergencies, substantially increases when cruise control and speed limiters are in use.[44] Reaction times rise further as the level of automation increases.[45] Trust in the automated system slows reaction times, and this trust is reinforced when automation performs *relatively* well,[46] as it apparently did for Mr. McGee.[47]

48.   This trust, meticulously cultivated by Tesla and its spokespeople, creates dire risks when the automated system suddenly fails without warning.[48] This conundrum was extensively researched before Tesla ever made a car.[49] One study found that more than a third of drivers failed to regain control of their vehicle following an automation failure while using adaptive cruise control.[50]

49.   A driver who is driving manually without any automation must first see and recognize a sudden emergency.[51] This necessarily happens before the driver can begin any

---

*control*, 48 ERGONOMICS, 1294–1313; Young, M. S., & Stanton, N. A. (2002) *Malleable attentional resources theory: A new explanation for the effects of mental underload on performance*, 44 HUMAN FACTORS, 365–375.

[43]   *Id.*

[44]   *See, e.g.*, *Cruise Control and Speed Limiters Impact Driver Vigilance,* VINCI AUTOROUTES FOUND. (July 12, 2013); Young, M. S., & Stanton, N. A., *Back to the future: Brake reaction times for manual and automated vehicles*, 50 ERGONOMICS, 46–58 (2007).

[45]   Eriksson, A., & Stanton, N. A., *Takeover Time in Highly Automated Vehicles: Noncritical Transitions to and From Manual Control*, HUMAN FACTORS, June 2017, at 689–90.

[46]   Morando, Gershon, Mehler, and Reimer, *A model for naturalistic glance behavior around Tesla Autopilot disengagements*, ELSEVIER, ACCIDENT ANALYSIS & PREVENTION, Volume 161, Oct. 2021, 106384, https://www.sciencedirect.com/science/article/pii/S0001457521003791?via%3Dihub#.

[47]   McGee Depo *[175:20-180:3]*.

[48]   Morando, et al, *supra*. At 690.

[49]   *Id.* (citing Desmond, P. A., Hancock, P. A., & Monette, J. L. *Fatigue and automation-induced impairments in simulated driving performance*, HUMAN PERFORMANCE (1998); *User Information, and Highway Design*, *1628*, 8–14; Molloy, R., & Parasuraman, R. (1996) *Monitoring an automated system for a single failure: Vigilance and task complexity effects*, 38 HUMAN FACTORS, 311–22; Stanton, N. A., Young, M., & McCaulder, B., *Drive-by-wire: The case of driver workload and reclaiming control with adaptive cruise control*, 27 SAFETY SCI., at 149–159 (1997); Stanton, N. A., Young, M. S., Walker, G. H., Turner, H., & Randle, S., *Automating the driver's control tasks*, 5 INT'L J. COGNITIVE ERGONOMICS, 221–36 (2001); Young, M. S., & Stanton, N. A., *supra* note 38.

[50]   Eriksson, A., & Stanton, N. A.*, supra* note 45.

[51]   Zhang, Winter, Varotto, Happee, & Martens, *Determinants of take-over time from automated driving: A meta-analysis of 129 studies*, ELSEVIER, Transportation Research Part F, 285–307, 286 (2019).

appropriate response to avoid the hazard.[52] Once the driver recognizes the potential hazard, the driver must decide the best action to take.[53] This might involve multiple choices, such as whether to brake or accelerate; or whether to steer right or left; or, even to do nothing at all.[54] This process takes time and is in addition to the time it takes for the vehicle to respond once the driver decides which action to take and begins taking it.[55] Between the moment when the emergency registers in the driver's consciousness and when the driver reacts, the vehicle has continued on its path toward the hazard.[56] As the time it takes for a driver to notice and react to a hazard increases, the likelihood that the driver will fail to avoid or minimize the danger also increases.[57]

50. This reaction time for a traditional manual system increases once an automated system becomes involved.[58] Drivers using adaptive cruise control, SAE Level 1, have longer brake reaction times than those driving without this automation.[59] These reaction times increase further for drivers with adaptive cruise control and assistive steering, SAE Level 2.[60] This additional delay can be critical.[61] That extra time allows the vehicle to travel farther without driver intervention than the unautomated SAE Level 0 car during these crucial moments.[62]

---

[52]  *Id.*
[53]  *Id.*
[54]  *Id.*
[55]  *Id.*
[56]  *Id.*
[57]  *Id.* at 298.
[58]  *Id.*; *see also* Young, M. S., & Stanton, N. A., *supra* note 38, at 46–58.
[59]  *Id.*
[60]  *Id.*
[61]  Willemsen, D., Stuiver, A., & Hogema, J. (2015, June) *Automated driving functions giving control back to the driver: A simulator study on driver state dependent strategies*. Paper presented at the 24th International Technical Conference on the Enhanced Safety of Vehicles, Gothenburg, Sweden.
[62]  Bogna Szyk, *Stopping Distance Calculator*, https://www.omnicalculator.com/physics/stopping-distance .

51.    If, as in Tesla's case, the driver is led to believe the automated system, which Tesla itself calls "Autopilot" and "Full Self-Driving", provides greater control than traditional automated cruise control or traffic aware systems, the driver can be lulled into behaving as though the vehicle is actually an SAE Level 3 autonomous system when in reality it is still only a Level 2.[63] Tesla knowingly and falsely fosters the understanding that Tesla vehicles are capable of identifying and safely negotiating hazardous situations that the car simply cannot.[64]

52.    This is particularly dangerous because it takes significantly longer for a driver to transition from Level 3 automated controls, even perceived ones, and regain situational awareness to react to road conditions, as compared to a driver using Level 2 automation.[65] Tesla, through its marketing and CEO's assurances, encourages its drivers to believe their Tesla vehicles will drive themselves, and this misconception is reinforced when the automated system performs relatively well in normal, nonhazardous

---

[63]    T.W. Victor, E. Tivesten, P. Gustavsson, J. Johansson, F. Sangberg, M. Ljung Aust, *30 Automation expectation mismatch: Incorrect prediction despite eyes on threat and hands on wheel*, 60 HUMAN FACTORS, (8) (2018), at 1095–1116, 10.1177/0018720818788164 ("a key component of driver engagement is cognitive (understanding the need for action), rather than purely visual (looking at the threat), or having hands on wheel."); R. Lin, L. Ma, W. Zhang, *An interview study exploring tesla drivers' behavioural adaptation,* 72 APPLIED ERGONOMICS (2018), 37–47, 10.1016/j.apergo.2018.04.006.

[64]    *Is a self-driving car smarter than a seven-month-old?*, THE ECONOMIST, Science & Technology (Sept. 2, 2021 ed.), https://www.economist.com/science-and-technology/is-it-smarter-than-a-seven-month-old/21804141 ("Autonomous vehicles are getting better, but they still don't understand the world in the way that a human being does. For a self-driving car, a bicycle that is momentarily hidden by a passing van is a bicycle that has ceased to exist."); *see also* E.R. Teoh, *What's in a name? drivers' perceptions of the use of five SAE level 2 driving automation systems*, 72 J. SAFETY RES., 134–51 (2020), 10.1016/j.jsr.2019.11.005.

[65]    M. Kuehn, Tobias Vogelpohl, M. Vollrath, *Takeover Times in Highly Automated Driving (Level 3)*, COMPUTER SCI., Paper Number 17-0027, 25ESV-000027.pdf (2017), https://www-esv.nhtsa.dot.gov/Proceedings/25/25ESV-000027.pdf. ("These reactions, which are required in order to understand the current traffic situation, are thus delayed by up to 5 seconds compared to the reactions of drivers in manual control in the same situation.") .

situations,[66] as was the case for Mr. McGee.[67] Thus, Tesla drivers can find themselves at greater risk than if they were using traditional cruise control or manual operations.[68]

53.     The problems with SAE Level 3 autonomy have been demonstrated by studies done by Waymo when it was tasked with developing an autonomous driving system for Google. In November 2017, John Krafcik, Waymo's CEO, said that five years earlier, he was developing assisted driving technology as a quick route to market.[69] As part of that development, Google's system would drive the vehicle on highways, then transfer responsibility back to a human on other roads or in circumstances beyond its programming [SAE Level 3 autonomous driving].[70] Krafcik admitted: "What we found was pretty scary. It's hard to take over because they [the drivers] have lost contextual awareness."[71] In a filmed experiment, Google's test drivers were seen playing with their phones and applying make-up at speeds up to 90km/h. One was even spotted napping at the wheel.[72] Not long after this test, management decided to focus solely on developing SAE Level 5 autonomous vehicle technology, which would require no active driver

---

[66]     B.D. Seppelt, T.W. Victor, *Potential solutions to human factors challenges in road vehicle automation*; G. Meyer, S. Beiker (Eds.), ROAD VEHICLE AUTOMATION 3, SPRINGER INT'L PUB'G, 131–48 (2016), 10.1007/978-3-319-40503-2_11; Victor et al., 2018, Teoh, 2020, Lin et al., 2018, Abraham et al., 2017).

[67]     *See fn. 48, supra.*

[68]     B.D. Seppelt, B. Reimer, L. Russo, B. Mehler, J. Fisher, D. Friedman, *Consumer confusion with levels of vehicle automation*,10TH INT'L DRIVING SYMP. ON HUMAN FACTORS IN DRIVER ASSESSMENT, TRAINING & VEHICLE                                         DESIGN                                         (2019), https://www.safetylit.org/citations/index.php?fuseaction=citations.viewdetails&citationIds[]=citjournalarticle_621065_17 Google Scholar.

[69]     Derek Fung, *Napping driver leads Google to end level-three Autonomous development*, DRIVE, Nov. 9, 2017,       https://www.drive.com.au/news/google-stopped-level-three-self-driving-rd-after-driver-napped-at-the-wheel/.

[70]     *Id.*

[71]     *Id.*

[72]     *Id.*

intervention.[73] The behavior of the Waymo drivers was consistent with that of Tesla Autopilot drivers interviewed in a 2018 study.[74]

54. Speaking in a fireside chat at the National Governors Association meeting July 20, 2018, Krafcik told the group, "There are no autonomous systems available, zero on the road today. Anything you can buy on the road today is a driver assist system, that means the driver is completely responsible for the car and I think there is so much confusion on that."[75] Krafcik was referring to some of the issues caused by consumers believing that the assist systems currently on the market are more capable than they actually are, most notably Tesla's Autopilot.[76]  John Krafcik publicly admitted that autonomous vehicles might never work in all locations.[77]

55. In January 2021, Waymo stopped using the term "self-driving" because it is dangerously misleading. Waymo said in its blog, "Unfortunately, we see that some automakers use the term 'self-driving' in an inaccurate way, giving consumers and the general public a false impression of the capabilities of driver assist (not fully autonomous) technology. **That false impression can lead someone to unknowingly take risks (like taking their**

---

[73]     *Id.*
[74]     R. Lin, L. Ma, W. Zhang, *An interview study exploring tesla drivers' behavioural adaptation*, 72 APPLIED ERGONOMICS, pp. 37–47 (2018), 10.1016/j.apergo.2018.04.006, ("Engagement in secondary tasks during partially automated driving was universal" among a group of 20 Tesla drivers with one to five months experience with Autopilot).
[75]     Sam Abuelsamid. *Transition to Autonomous Cars Will Take Longer Than You Think, Waymo CEO Tells Governors*, FORBES, July 20, 2018, https://www.forbes.com/sites/samabuelsamid/2018/07/20/waymo-ceo-tells-governors-av-time-will-be-longer-than-you-think/#277b432cd7da.
[76]     *Id.*
[77]     *Id.*

**hands off the steering wheel) that could jeopardize not only their own safety but the safety of people around them."**[78]

56.     A recent study from the Massachusetts Institute of Technology (MIT) corroborates these findings.[79] This study provided a comprehensive analysis of glance behavior during transitions from Tesla's Autopilot (AP) to manual driving in non-critical highway driving.[80] The study concluded that, "Changes in glance duration and pattern suggest a lower visual attention to the forward road when AP was engaged compared to after the disengagement to manual driving."[81]

### OTHER SIMILAR TESLA INCIDENTS INVOLVING AUTOPILOT

57.     Tesla was and remains aware of the inadequacies and defects with its Autopilot system. Tesla has received notice of numerous similar failures in vehicles on the road in which the system permitted a collision with an object while the Autopilot was engaged, many times leading to injuries and deaths.  Such events include, but are not limited to:

a.     The January 20, 2016, crash of a Tesla Model S near Handan, China where the vehicle struck a street cleaning truck;[82]

b.     the May 7, 2016, crash of a Tesla Model S near Williston, Florida where the vehicle hit a semi-Trailer Truck turning across the lane in front of it;[83]

---

[78]     Andrew J. Hawkins, *Waymo says it's ditching the term 'self-driving' in dig at Tesla*, VERGE, Jan 6, 2021, https://www.theverge.com/2021/1/6/22216848/waymo-change-self-driving-autonomous-language-tesla (emphasis added).

[79]     Morando, Gershon, Mehler, and Reimer, *A model for naturalistic glance behavior around Tesla Autopilot disengagements*, ELSEVIER, ACCIDENT ANALYSIS & PREVENTION, Volume 161, Oct. 2021, 106384, https://www.sciencedirect.com/science/article/pii/S0001457521003791?via%3Dihub#.

[80]     *Id.*

[81]     *Id.*

[82]  Neal E. Boudette, *Autopilot Cited in Death of Chinese Tesla Driver,* N.Y. TIMES, Sept. 14, 2016, https://www.nytimes.com/2016/09/15/business/fatal-Tesla-crash-in-china-involved-autopilot-government-tv-says.html.

[83]     Danny Yadron and Dan Tynan, *Tesla driver dies in first fatal crash while using autopilot mode,* GUARDIAN, June 30, 2016.  https://www.theguardian.com/technology/2016/jun/30/Tesla-autopilot-death-self-driving-car-elon-musk.

c.      the August 5, 2016, crash of a Tesla Model S into a car in China;[84]

d.      the July 10, 2016, crash of a Tesla Model X in Montana that suddenly veered into highway barriers and crashed,[85]

e.      the January 29, 2017, crash of a Tesla Model X into a guardrail and tree in China;[86]

f.      the March 2, 2017, crash of a Tesla Model S in Dallas County, Texas where the vehicle struck lane barriers on a highway;[87]

g.      the March 7, 2017, crash of a Tesla Model X into a van in China;[88]

h.      the December 13, 2017, collision in which a Tesla Model X on Autopilot suddenly accelerated into the vehicle in front of it,[89]

i.      the January 22, 2018, a Tesla Model S on Autopilot failed to brake and crashed into the back of a firetruck in Culver City, California.[90]

j.      the March 23, 2018, crash of a Tesla Model X near Mountain View, California where the Tesla hit a barrier divider;[91]

k.      the April 29, 2018, crash of a Tesla Model X near Tokyo, Japan where the Tesla hit a pedestrian and a vehicle in front of it on a highway;[92]

---

[84]      Tycho de Feijter, *"First Tesla Autopilot Crash In China,"* CARNEWSCHINA.COM, Aug. 5, 2016. https://carnewschina.com/2016/08/05/first-tesla-autopilot-crash-in-china/.

[85]      Fred Lambert, *Tesla Autopilot crash in Montana: Drivers reveals new details and claims a 'cover up' by Tesla,* ELECTREK, July 22, 2016, https://electrek.co/2016/07/22/tesla-autopilot-model-x-crash-montana-coverup/.

[86]      W.E. Ning, *"Tesla Model X Crashes Into A Tree In China, Penetrated By Guardrail,"* CARNEWSCHINA.COM, Mar. 27, 2017, https://carnewschina.com/2017/03/27/tesla-model-x-crashes-into-a-tree-in-china-penetrated-by-guardrail/.

[87]      Fred Lambert, *Tesla Autopilot crash caught on dashcam shows how not to use the system,* ELECTREK, Mar. 2, 2017 https://electrek.co/2017/03/02/Tesla-autopilot-crash-video-how-note-to-use/.

[88]      Joey Wang, *Tesla Model X Hits Van In China, Autopilot Blamed,* CARNEWSCHINA.COM, Mar. 9, 2017, https://carnewschina.com/2017/03/09/tesla-model-x-hits-van-in-china-autopilot-blamed/.

[89]      https://www.plainsite.org/dockets/3hd2fpwvp/supreme-court-of-the-state-of-new-york-nassau-county/wang-jing-vs-tesla-inc/.

[90]      Fred Lambert, *Tesla Vehicle reportedly on Autopilot crashes into fire truck at 65 mph, no injury,* ELECTREK, Jan. 22, 2018, https://electrek.co/2018/01/22/tesla-model-s-autopilot-crash-fire-truck/ .

[91]      Mark Osborne, *Tesla car was on autopilot prior to fatal crash in California, company says,* ABC NEWS, Mar. 30, 2018. https://abcnews.go.com/US/Tesla-car-autopilot-prior-fatal-crash-california-company/story?id=54142891.

[92]      Brad Anderson, *Tesla Autopilot Blamed On Fatal Japanese Model X Crash,* CARSCOOPS, Apr. 30, 2020. https://www.carscoops.com/2020/04/Tesla-autopilot-blamed-on-fatal-japanese-model-x-crash/.

l. the May 11, 2018, crash of a Tesla Model S which slammed into a stopped fire truck at 60 mph while on autopilot near Salt Lake City, Utah;[93]

m. the May 25, 2018, crash of a Tesla Model 3 while on autopilot in Greece;[94]

n. the May 29, 2018, crash of an unknown Model Tesla into a stationary police car while on autopilot in California;[95]

o. the October 12, 2018, crash of a Tesla Model S near Orlando, Florida where the Tesla hit a vehicle in front of it on a highway;[96]

p. the January 30, 2019, crash of a Tesla Model X in Holland when the driver using an "Autosteer System" did not look forward for a few seconds, did not pay attention to the road and passed the double solid line.[97]

q. the February 10, 2019, crash of a Tesla Model X in North Brunswick, New Jersey, in which the car on Autopilot reportedly steered itself into a highway sign and a field while the driver tried to steer the car into the lane of traffic,[98]

r. the March 1, 2019, crash of a Tesla Model 3 near Delray Beach, Florida where the vehicle hit a semi-Trailer Truck turning across the lane in front of it;[99]

s. the April 25, 2019, crash of a Tesla Model S which blew through an intersection and killed a pedestrian in the Florida Keys;[100]

t. the July 6, 2019, crash of a Tesla Model S in Arcadia, California, when the vehicle's Autopilot suddenly malfunctioned and caused the vehicle to swerve into the median, causing serious injuries to the driver;[101]

---

[93] Marco della Cava, *Tesla driver in Utah crash kept taker her hands off wheel as car sped in Autopilot mode,* USA TODAY, May 16, 2018, https://www.usatoday.com/story/tech/talkingtech/2018/05/16/nhtsa-looking-into-Tesla-crash-utah/617168002/.

[94] Fred Lambert, *Tesla Model 3 unofficial road trip ends in crash, driver blames Autopilot,* ELECTREK, May 25, 2018, https://electrek.co/2018/05/25/tesla-model-3-unofficial-road-trip-crash-driver-blames-autopilot/.

[95] Olivia Solon, *Tesla that crashed into police car was in 'autopilot' mode, California official says,* GUARDIAN, May 29, 2018, https://www.theguardian.com/technology/2018/may/29/tesla-crash-autopilot-california-police-car.

[96] Gal Tziperman, *Winter Garden man suing Tesla for autonomous driving crash,* ORLANDO SENTINEL, Oct. 30, 2018, https://www.orlandosentinel.com/news/breaking-news/os-ne-Tesla-autopilot-lawsuit-autonomous-driving-20181030-story.html.

[97] *Guilt in traffic,* EAST BRABANT DISTRICT COURT, March 3, 2019. https://linkeddata.overheid.nl/front/portal/document-viewer?ext-id=ECLI:NL:RBOBR:2019:5057.

[98] Carly Baldwin, *Self-Driving Tesla Crashes On Rt. 1 In North Brunswick: Police,* PATCH, Feb. 12, 2019, https://patch.com/new-jersey/eastbrunswick/self-driving-tesla-crashes-rt-1-north-brunswick-police.

[99] Fred Lambert, *Tesla Model 3 driver again dies in crash with trailer, Autopilot not yet ruled out,* ELECTREK, Mar. 1, 2019, https://electrek.co/2019/03/01/Tesla-driver-crash-truck-trailer-autopilot/.

[100] David Shepardson and Hyunjoo Jin, U.S. probing fatal Tesla crash that killed pedestrian, REUTERS, September 3, 2021, https://www.reuters.com/business/autos-transportation/us-probing-fatal-tesla-crash-that-killed-pedestrian-2021-09-03/

u.      the July 17, 2019, crash of a Tesla Model 3 into a wall while on Autopilot in California,[102]

v.      the August 9, 2019, crash of a Tesla Model S into a tow truck in Russia while on Autopilot;[103]

w.      the August 24, 2019, crash in California involving a Ford pickup that was struck from behind by a Tesla Model 3 that was traveling about 60 mph on Autopilot. Neither the autopilot nor the driver slowed the vehicle until a fraction of a second before the crash.;[104]

x.      the September 17, 2019, crash involving an unknown Tesla Model that drove into oncoming traffic in Florida while Autopilot was alleged;[105]

y.      the November 19, 2019, crash in which a Tesla Model S crashed into the rear of a stopped Infiniti in New York,[106]

z.      the December 7, 2019, crash of a Tesla Model 3 into a parked State Police car while on Autopilot in Connecticut;[107]

aa.     the December 29, 2019, crash of a Tesla Model S that failed to stop at a red light while the driver was using Autopilot and collided with a Honda in the intersection, killing the two occupants of the Honda;[108]

bb.     the December 29, 2019, crash of a Tesla Model 3 into a parked fire truck in Indiana, killing the passenger, Jana Monet.[109]

---

[101]    *Hsu v. Tesla, Inc.*, No. 20STCV18473, SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES, filed May 14, 2020.

[102]    https://www.plainsite.org/dockets/41pi138xj/superior-court-of-california-county-of-los-angeles/leila-manshadi-v-tesla-inc-a-delaware-corporation-d/b/a-tesla-motors-inc/

[103]    *3 injured as Tesla goes up in flames & explodes on Moscow freeway*, RT.COM, Aug. 11, 2019, https://www.rt.com/russia/466247-tesla-blast-moscow-injured/.

[104]    Neal E. Boudette, *Tesla says Autopilot Makes Its Cares Safer. Crash Victims Say It Kills*, N.Y. TIMES, July 5, 2021, https://www.nytimes.com/2021/07/05/business/Tesla-autopilot-lawsuits-safety.html.

[105]    Cristobal Reyes, *Woman killed in Osceola County crash while trying to pass traffic, FHP says*, ORLANDO SENTINEL, Sept. 17, 2019, https://www.orlandosentinel.com/news/osceola-county/os-ne-osceola-polk-line-road-fatal-crash-20190918-m5hgbty6l5csfe2qo3mlmxr7sa-story.html.

[106]    https://www.plainsite.org/dockets/4ao0s2kkd/supreme-court-of-the-state-of-new-york-nassau-county/matthew-ballen-v-tesla-inc/

[107]    Alfred Branch, *Tesla In 'Auto Pilot' Plows Into State Police Cruiser in Norwalk*, PATCH, December 7, 2019, https://patch.com/connecticut/norwalk/tesla-auto-pilot-plows-state-police-cruiser-norwalk Last accessed 6 September 2021.

[108]    Ryan Beene, *Fatal Tesla crash in Gardena being investigated by NHTSA*, L.A. TIMES, Dec. 31, 2019, https://www.latimes.com/business/story/2019-12-31/fatal-tesla-crash-nhtsa-gardena-los-angeles .

[109]    *Arizona woman dies after her Tesla crashes into fire truck on Indiana freeway,* 12 NEWS, Dec. 29, 2019, https://www.12news.com/article/news/local/arizona/arizona-woman-dies-after-her-car-crashes-into-fire-truck-on-indiana-freeway/75-349be661-18ff-452d-a0e0-e438b2e1f8e7, Last accessed 23 January 2022.

cc.    the December 30, 2019, crash of a Tesla Model 3 into a stopped police car in Massachusetts;[110]

dd.    the May 4, 2020, crash of a Tesla Model S when the driver had the car steering on when he hit and killed a trailer driver in Norway;[111]

ee.    the May 31, 2020, crash of a Tesla Model 3 that drove into an overturned semi trailer;[112]

ff.    the June 21, 2020, crash of a Tesla Model 3 when the Tesla veered into the other lane, and crashed into an oncoming car in Germany;[113]

gg.    the July 14, 2020, crash of a Tesla Model S that drove into an Arizona police SUV, which was then pushed into an ambulance;[114]

hh.    the August 12, 2020, crash of a Tesla Model 3 that rear-ended a Sienna minivan repeatedly, causing the minivan to spin out of control in Saratoga, California. The Tesla continued traveling down the freeway off-ramp, striking a pickup at an intersection before winding up on the off-ramp embankment and catching fire, killing both occupants;[115]

ii.    the August 26, 2020, crash of an unidentified Tesla Model into a North Carolina police car while the driver was watching a movie and the vehicle was on Autopilot;[116]

jj.    the December 10, 2020, crash of a Tesla Model X into apartment garage wall in Seoul, South Korea. The vehicle ignited, killed a passenger and injured 2 others;

[110]    *2 Drivers Cited After State Police Cruisers Hit On Route 24, Mass Pike*, CBS BOSTON, Dec. 31, 2019, https://boston.cbslocal.com/2019/12/31/massachusetts-state-police-cruisers-hit-crashes-mass-pike-warren-route-24-west-bridgewater/.

[111]    Geir Roed, *Tesla on auto-steering when man was cut down*, MOTOR, Dec. 18, 2020, https://motor.no/autopilot-nyheter-Tesla/Tesla-pa-auto-styring-da-mann-ble-meid-ned/188623.

[112]    Fred Lambert, *Video of Tesla Model 3 crashing into a truck on Autopilot goes viral*, ELETRECK, June 1, 2020, https://electrek.co/2020/06/01/tesla-model-3-crashing-truck-autopilot-video-viral/.

[113]    *Update: Fatal accident on S255: Investigation against Tesla driver for negligent homicide,* FREIE PRESSE, June 22, 2020  https://www.freiepresse.de/drei-tote-bei-unfall-auf-autobahnzubringer-bei-aue-artikel10894951.

[114]    Ethan Baron, *Tesla on 'Autopilot' hits police vehicle which hits ambulance, driver possibly drunk: police,* BAY AREA NEWS GROUP, July 14, 2020.  https://www.mercurynews.com/2020/07/14/tesla-on-autopilot-hits-police-vehicle-which-hits-ambulance-driver-possibly-drunk-police/.

[115]    *Saratoga Man Killed in Fiery Crash Idendified,* MERCURYNEWS.COM, Aug. 13, 2020  https://www.mercurynews.com/2020/08/13/saratoga-man-killed-in-fiery-freeway-crash-identified/

[116]    Simone Jasper, *Tesla driver crashes into cop car while watching movie on autopilot, NC officials say*, NEWS & OBSERVER, Aug. 26, 2020, https://www.newsobserver.com/news/state/north-carolina/article245267595.html.

firefighters couldn't open the door to extract the passenger because electronic door lock system was inoperable due to fire;[117]

kk.    the February 27, 2021, crash of a 2019 Tesla into four vehicles including police cars in Texas;[118]

ll.    the March 17, 2021, crash of a Tesla Model 3 into a stopped police car in Michigan;[119]

mm.    the April 17, 2021, crash of a Tesla Model S which was traveling along a curve at a high rate of speed before crashing into a tree in the Woodlands near Houston, Texas;[120]

nn.    the May 19, 2021, incident, where a Tesla crashed into a Road Ranger in Florida;[121]

oo.    the July 10, 2021, incident, where a Tesla on autopilot crashed into a California Highway Patrol vehicle;[122]

pp.    the July 19, 2021, crash of a Tesla Model 3 that backed into a parking spot and was supposed to pull forward on its own and veer to the right, but instead, it unexpectedly went left in Fresno, California;[123]

qq.    the July 25, 2021, crash of a Tesla Model X which was in a 25 mph speed zone and came across a fork in the road. The vehicle kept going straight, entered gravel

---

[117]    Kim Min-Joong, *Police ramp up investigation into fatal conflagration of Tesla Model X,* KOREA JOONGANG DAILY, Dec. 24, 2020 https://koreajoongangdaily.joins.com/2020/12/24/business/industry/Tesla/20201224184400725.html.

[118]    Jose Gonzalez, *Montgomery County deputies evade serious injury in Tesla crash*, COURIER, Mar. 2, 2021, https://www.yourconroenews.com/neighborhood/moco/news/article/Montgomery-County-deputies-evade-serious-injury-15992663.php.

[119]    Associated Press, *Tesla on autopilot crashes into Michigan trooper's patrol car*, DETROIT FREE PRESS, Mar. 17, 2021, https://www.freep.com/story/news/local/michigan/2021/03/17/tesla-autopilot-crash-michigan-state-police-patrol-car/4731376001/.

[120]    Lucas Manfredi, *Deadly Texas crash involving Tesla worth $80,000 sparks 4-hour fire,* FOX BUS., Apr. 18, 2021 https://www.foxbusiness.com/lifestyle/two-killed-in-driverless-Tesla-crash.

[121]    Amanda Batchelor, *3 injured after Tesla collides with road ranger truck on I-95*; LOCAL 10 NEWS, May 19, 2021, https://www.local10.com/news/local/2021/05/19/3-injured-after-tesla-collides-with-road-ranger-truck-on-i-95/.

[122]    *Woman Suspected of DUI Arrested After Crashing into CHP Vehicle on SR-56*, TIMES OF SAN DIEGO, July 10, 2021, https://timesofsandiego.com/crime/2021/07/10/woman-suspected-of-dui-arrested-after-crashing-into-chp-vehicle-on-sr-56/.

[123]    Shelby Bracho, *Man's Tesla crashes into pole using 'smart summon' valet feature,* FOX 26 NEWS, July 25, 2021, https://kmph.com/news/local/mans-Tesla-crashes-into-pole-using-smart-summon-valet-feature.

and smashed into a boulder. The driver said that park rangers told him that four other Tesla vehicles crashed at the same exact spot in Yosemite.[124]

rr.      the July 26, 2021, crash of a Tesla Model Y that struck and killed a man who was changing his tire by the side of the road in New York;[125]

ss.      the August 28, 2021, crash of a Tesla Model 3 into a parked police car in Florida while on Autopilot;[126]

tt.      the September 16, 2021, incident involving an unidentified Tesla Model in which a woman apparently passed out and was being followed by California Highway Patrol;[127]

uu.      the October 15, 2021, crash of a Tesla Model 3 in Indiana in which the vehicle hydroplaned while on Autopilot and the car caught fire after running off the road;[128]

vv.      a February 2, 2022, crash of a Tesla Model Y into a traffic barrier in downtown San Jose, California, with the car on Full Self Driving;[129]

ww.      a March 7, 2022, crash of a Tesla vehicle on Autopilot which slammed into the back of a road maintenance vehicle and blocked the outer lane of a freeway; a BMW sedan then crashed into and killed a road maintenance worker who was setting up warning cones at the scene;[130]

xx.      a July 7, 2022, crash of a Tesla vehicle on Autopilot that collided with a motorcycle on State Route 91 in Riverside, California, killing the motorcyclist;[131]

yy.      a July 24, 2022, crash of a Tesla vehicle on Autopilot that collided with a motorcycle

[124]   u/BBFLG, *5 Tesla Accidents in Same Location in Yosemite,* REDDIT, Aug. 3, 2021 https://www.reddit.com/r/SelfDrivingCars/comments/oxhbit/5_Tesla_accidents_in_same_location_in_yosemite /.

[125]   Tom Krisher, *Feds probe NY Tesla crash that killed man changing flat tire*, AP NEWS, Sept. 3, 2021, https://apnews.com/article/technology-business-6127ae797c528ca1d5322efc43439a12.

[126]   Lora Kolodny, *A Tesla Model 3 hit a parked police car in Orlando, driver said she was 'in Autopilot',* CNBC, Aug. 28, 2021, https://www.cnbc.com/2021/08/28/tesla-model-3-hit-a-parked-police-car-in-orlando-driver-said-she-was-in-autopilot.html.

[127]   Christiane Cordero, *Audio captures moments CHP stopped apparently passed-out driver of Tesla on Autopilot in Glendale,* EYEWITNESS NEWS ABC, Sept. 17, 2021, https://abc7.com/tesla-autopilot-passed-out-driver-glendale-los-angeles/11028280/.

[128]   The Tesla Mex, *Tesla Model 3 on Fire filmed with iPhone 13 Pro Max after Hydroplaning accident*, Nov. 21, 2021, https://www.youtube.com/watch?v=DsxlHJx41lE.

[129]   Fred Lambert, *Tesla Full Self-Driving Beta runs into a pole in what could be the first FSD accident caught on video*, ELECTREK, Feb. 5, 2022. https://electrek.co/2022/02/04/tesla-full-self-driving-beta-crash-video/.

[130]   Phillip Charlier, *Tesla on Autopilot involved in fatal freeway crash,* TAIWAN ENGLISH NEWS, March 8, 2022. https://taiwanenglishnews.com/tesla-on-autopilot-involved-in-fatal-freeway-crash/.

[131]   Tom Krishner, *US agency probes Tesla crashes that killed 2 motorcyclists,* ASSOCIATED PRESS, August 5, 2022. https://apnews.com/article/technology-12ba38bd863e2b128a8e2914179049e0

on Interstate 15 near Draper, Utah, killing the motorcyclist.[132]

zz.     an August 12, 2022, crash of a Tesla Model S that smashed into a guard rail while on Full Self Driving.[133]

aaa.    an August 26, 2022, crash involving a Tesla that drove into a motorcycle while on Autopilot in Palm Beach County, Florida, killing the motorcyclist.[134]

bbb.    a November 24, 2022, crash involving a Tesla suspected of being on Autopilot that unexpectedly stopped on the Bay Bridge in the San Francisco Bay Area.[135]

ccc.    a December 28, 2022, incident involving a Tesla on Autopilot in Germany in which the driver had rigged the steering wheel so that Autopilot would continue to function while the driver was asleep.[136]

## TESLA'S LACK OF EFFECTIVE AUTOMATIC EMERGENCY BRAKING (AEB) SYSTEM

58.    All Tesla vehicles, including the Subject Vehicle, utilize a regenerative braking system. The brakes are controlled by one or more computers in the vehicle that can activate and deactivate them, whether or not the driver is pressing on the brake pedal.

59.    Another defect that was a contributing cause to this crash is the lack of an *effective* Automatic Emergency Braking (AEB) system to perform as anticipated by the ordinary consumer.[137] According to Musk in 2014, "So we're able to obviously do lane keeping on

---

[132] *Id.*

[133] Florin Amarlei, *Tesla Model S Unexpectedly Swerves Left and Crashes, the Owner Says It's FSD's Fault*, AUTOEVOLUTION, August 25, 2022, https://www.dropbox.com/sh/wlpcslque12d6jv/AADjzuTXXfWYiI3Glb_LzaJba?dl=0&preview=Tesla+Model+S+Unexpectedly+Swerves+Left+and+Crashes%2C+the+Owner+Says+It%27s+FSD%27s+Fault+-+autoevolution.pdf

[134] Matt Mcfarland, Tesla Autopilot's safety question after latest fatal motorcycle crash, CNN Business, October 17, 2022, https://www.cnn.com/2022/10/17/business/tesla-motorcycle-crashes-autopilot/index.html

[135] Tom Krisher, US Probing Automated Driving System Use in Tesla Crash on Bay Bridge, NBCBAYAREA.COM, December 22, 2022 https://www.nbcbayarea.com/news/local/investigation-automated-driving-system-tesla-crash-bay-bridge/3112247/

[136] Gustavo Henrique Ruffo, Police Stop Tesla Driver Who Slept on an Autobahn at 68 MPH on Autopilot, AUTOEVOLUTION, December 30, 2022 https://www.autoevolution.com/news/police-stop-tesla-driver-who-slept-on-an-autobahn-at-684-mph-on-autopilot-207437.html

[137] Russ Mitchell, *A Tesla mystery: Why didn't auto-braking stop these crashes?*, L.A. TIMES, Oct. 7, 2021, https://www.latimes.com/business/story/2021-10-07/why-arent-automatic-braking-systems-stopping-deadly-tesla-crashes

freeways, do Automatic Cruise Control, **Active Emergency Braking so that it will brake if it sees any object that you are going to collide with,** it'll self-park, automatic parallel parking, automatically go into a garage . . . in fact, when you get home you'll actually be able to just step out of the car and have it park itself in your garage. Including, it'll open the door, and it'll go in and park itself."[138]

60.    Yet, despite the fact that the Subject Vehicle was marketed and sold as a state-of-the-art vehicle, multiple other manufacturers, including makers of much less expensive models, like Subaru, Mazda, Chrysler, Mitsubishi, and Honda, had made AEB safety features available by the 2019 Model Year.[139] Tesla knew before this event, and knows of events since this one where the lack of an effective Automatic Emergency Braking in their vehicles allowed a crash to occur that should have otherwise been avoided or reduced in severity. Each of the above-referenced events in which the vehicle crashed into a vehicle, building, or other structure in front of it was notice to Tesla of the defect.

**TESLA'S AUTOPILOT SYSTEM LACKS APPROPRIATE SAFEGUARDS**

61.    Despite Tesla's claims that its autonomous system is safer than others on the market, the truth is, other manufacturers' systems provide substantially more safeguards than Tesla's. Tesla's Autopilot is simply a traffic aware cruise control system, sometimes called "adaptive cruise control," that has become common in today's cars.[140] Even if a car didn't initially come with one, it can be installed on many models.[141]

---

[138]    Elon Musk, *Tesla Unveils Dual Motor and Autopilot*, Oct. 10, 2014, at 8:44–9:21, https://youtu.be/FZ6lZJWL_Xk.

[139]    Austin Lott, *Least Expensive Cars With Active Safety Systems,* MOTORTREND, Apr. 22, 2015, http://motortrend.com/news/least-expensive-cars-with-active-safety-systems/; https://consumerreports.org/cro/magazine/2015/04/cars-that-can-save-your-life/index.htm.

[140]    Hearst Autos Research, *Cars with Adaptive Cruise Control: Everything You Need to Know*, CAR & DRIVER 2021. https://www.caranddriver.com/research/a31996248/cars-with-adaptive-cruise-control/.

[141]    *Id.*

62.     Adaptive cruise control [ACC] uses sensors such as cameras and radar to monitor a car's speed and steering in certain traffic situations.[142] Unlike traditional cruise control, ACC assists the driver to stay within the lane, avoid other vehicles and barriers, and, in combination with other systems, such as Automatic Emergency Braking, helps the driver avoid mishaps.[143] These systems fall within the SAE Level 2 category.

63.     However, as pointed out above, these systems come at a cost because they reduce driver attention and delay reaction time should the systems fail.[144] To offset this problem, some manufacturers have developed ways to monitor the driver's behavior to better insure the driver is as alert as possible so that they can assume full control of the vehicle if the system fails or if road conditions are not suitable for the automation.

64.     Rather than encourage drivers to trust automated systems, as Tesla has done, others in the automotive industry diligently remind drivers that they must remain focused, with hands on the steering wheel, ready to take emergency action at all times. Conversely, Tesla discounts the need for driver monitoring because it claims, despite contrary evidence,[145] that its automated functions perform better than humans.[146] As Musk has said, "If you have a system that's at or below human level reliability, then driver monitoring makes sense. But if your system is dramatically better, more reliable than a human, then driving, monitoring is not- does not help much."[147] This rationalization is flatly unsupported by evidence showing Tesla's automated systems perform as well as humans, let alone

---

[142]    *Id.*
[143]    *Id.*
[144]    *See, e.g.*, notes 14–38, *supra.*
[145]    *See, e.g.,* Russ Mitchell, *Agency Might Have Overstated Tesla Autopilot's Safety Impact*, GOV'T TECH., Feb. 14, 2019, https://www.govtech.com/fs/agency-might-have-overstated-tesla-autopilots-safety-impact.html.
[146]    [21:27-24:26]   Elon   Musk:   Tesla   Autopilot   |   Lex   Fridman   Podcast   #18, https://www.youtube.com/watch?v=dEv99vxKjVI
[147]    *Id.*

"dramatically better."[148] In fact, close examination of the available data suggests Tesla's automated systems perform ***worse*** than humans.[149]

65.     Some systems monitor the driver's direction of vision and use auditory and tactile warnings to alert the driver if their gaze wanders from the road. These systems will disconnect the autonomous features if the driver doesn't respond.[150] For instance, GM's Super Cruise has an attention tracking system in the front seat, including infrared emitters and a camera on the steering wheel that monitors eye gaze and head position, and shuts down if the driver fails to respond to visual and audible warnings.[151] Ford and Subaru have similar technology.[152] Since the crash that forms the basis of this action, Tesla has now turned on a driver monitoring camera in some of its vehicles and updated its software to recognize emergency responder vehicle lights at night.[153] Tesla added this function only after NHTSA launched its investigation of Tesla crashes into emergency vehicles.[154] NHTSA has formally asked Tesla to explain why it did not comply with 49 U.S.C. § 30118 by filing the required recall notice in connection with this update.[155]

---

[148]   Noah Goodall,: *Normalizing crash risk of partially automated vehicles under sparse data*, JOURNAL OF TRANSPORTATION SAFETY & SECURITY, (2023) DOI: 10.1080/19439962.2023.2178566

[149]   *See, e.g.*, Mitchell, *supra* note 132 ("*For the small minority of cars for which mileage data were provided both before and after Autosteer was installed, Teslas were involved in 60 percent more crashes, Whitfield concluded. That could mean cars with Autosteer were more dangerous than cars without.*").

[150]   *See* Sasha Lekach, *GM's Super Cruise feels like it's self-driving, but it's not; It's dangerous to think the car is in control*, MASHABLE, Feb. 9, 2021. https://mashable.com/article/gm-super-cruise-advanced-driving-system.

[151]   *Id.*

[152]   *See*, Mark Phelan, *2020 Subaru models will greet you, help you keep your eyes on the road,* DETROIT FREE PRESS, August 3, 2019. https://www.freep.com/story/money/cars/mark-phelan/2019/08/03/subaru-driverfocus-outback-forester-legacy/1903279001/

[153]   Ramey, *Tesla Autopilot Will Now Detect Emergency Lights, but Only at Night*, AUTOWEEK, Sept. 22, 2021 https://www.autoweek.com/news/green-cars/a37694444/tesla-autopilot-will-now-detect-emergency-lights-but-only-at-night/ .

[154]   *See attached* Exhibit 1, National Highway Traffic Safety Administration [NHTSA] ODI Resume for Investigation number PE 21-020.

[155]   *See attached* Exhibit 3, *Letter from Gregory Magno, Chief, Vehicle Defects Division -D, Office of Defects Investigation, NHTSA, to Eddie Gates, Director, Field Quality, Tesla, Inc*., October 12, 2021. ("This recall notice must be filed with NHTSA no more than five working days after the manufacturer knew or should have known of the safety defect or noncompliance. *See* 49 C.F.R. § 573.6(b); *see also United States v. Gen. Motors*

66.    Consumer Reports now provides an annual analysis of active driving assistance systems. Their evaluations place great emphasis on a system's ability to monitor whether the driver is paying attention.[156] Consumer Reports' manager of safety policy, William Wallace, stated, "The evidence is clear: If a car makes it easier for people to take their attention off the road, they're going to do so – with potentially deadly consequences."[157] Wallace continued, "It's critical for active driving assistance systems to come with safety features that actually verify drivers are paying attention and are ready to take action at all times. Otherwise, these systems' safety risks could end up outweighing their benefits."[158]

67.    Consumer Reports recently tested one of Tesla's latest iterations of its "Full Self-Driving" software and reported the software lacks safeguards and warned the system's use on public roads "puts the public at risk."[159] "Videos of FSD Beta 9 in action don't show a system that makes driving safer or even less stressful," says Jake Fisher, senior director of Consumer Reports' Auto Test Center. "Consumers are simply paying to be test engineers for developing technology without adequate safety protection."[160]

68.    Tesla has released additional versions of its FSD, one in October 2021 was FSD Beta 10.3. However, only days after the release of this version, Tesla pulled it and rolled back

---

*Corp.*, 656 F. Supp. 1555, 1559 n.5 (D.D.C. 1987). Any manufacturer issuing an over-the-air update that mitigates a defect that poses an unreasonable risk to motor vehicle safety is required to timely file an accompanying recall notice to NHTSA pursuant to 49 U.S.C. § 30118 and 49 C.F.R. Part 573.")

[156]    Mike Monticello, *Cadillac's Super Cruise Outperforms Other Driving Assistance Systems*, CONSUMER REPORTS, October 28, 2020. https://www.consumerreports.org/car-safety/cadillac-super-cruise-outperforms-other-active-driving-assistance-systems/.

[157]    *Id.*

[158]    *Id.*

[159]    David Shepardson, *Consumer Reports says Tesla's 'Full Self-Driving' software lacks safeguards*, REUTERS, July 20, 2021 https://www.reuters.com/business/autos-transportation/consumer-reports-says-Teslas-full-self-driving-software-lacks-safeguards-2021-07-20/.

[160]    Keith Barry, *Tesla's 'Full Self-Driving' Beta Software Used on Public Roads Lacks Safeguards, Consumer Reports' car safety experts worry that Tesla continues to use vehicle owners as beta testers for its new features, putting others on the road at risk*, CONSUMER REPS., July 19, 2021, https://www.consumerreports.org/car-safety/Tesla-full-self-driving-beta-software-lacks-safeguards-a6698414036/.

to FSD Beta 10.2 because of "issues" including complaints of false crash warnings.[161]

Even Musk now admits, "I thought the self-driving problem would be hard, but it was

harder than I thought. It's not like I thought it'd be easy, I thought it would be very hard,

but it was actually way harder than even that."[162] Tesla never referred to this "roll back"

as a recall, as required by law.[163]

69.     Further, Tesla uses onscreen graphics as part of its Autopilot system which appear on the

large monitor used by the driver to operate many vehicle functions. Fisher is not alone in

believing that "Tesla should at the very least be monitoring drivers in real time to ensure

that they're paying attention while using new software."[164] For example, Fisher says the

updated software has "impressive" onscreen graphics, but he's worried that even a brief

glance by the driver at the display might be too long to prevent the system from crashing

into a car or pedestrian.[165]

70.     Among the most troubling aspects of Tesla's claims that its "Autopilot" and "Full Self-

Driving" features are safer than other vehicles with automated features, is that Tesla

jealously guards its information as to the incidents in which the FSD system has failed.[166]

For a while, Tesla required those with access to the car's FSD Early Access Program

(EAP) system to sign a non-disclosure agreement that specifically prohibits them from

---

[161]     Richard Lawler, *Tesla pulled its latest 'Full Self Driving beta after testers complained about false crash warnings and other bugs*, THE VERGE, October 24, 2021, https://www.theverge.com/2021/10/24/22743628/elon-musk-tesla-fsd-beta-10-3-rollback-issues-phantom-fcw Last accessed 26 October 2021.
[162]     *Elon Musk: SpaceX, Mars, Tesla Autopilot, Self-Driving, Robotics, and AI | Lex Fridman Podcast #252*, Dec. 28, 2021, at [1:06:05 – 1:06:13] https://www.youtube.com/watch?v=DxREm3s1scA.
[163]     *See* fn. 154 *supra*.
[164]     *Id*.
[165]     *Id*.
[166]     O'Kane, *Tesla asks owners to share fewer clips of 'Full Self-Driving' beta mistakes*, VERGE, Sept. 28, 2021, https://www.theverge.com/2021/9/28/22696463/tesla-fsd-beta-nda-video-clips-controversy-full-self-driving.

speaking to the media or giving test rides to the media.[167] Tesla also specifically discourages its owners from sharing video of automated feature mistakes.[168] Without accurate data about incidents in which Tesla's automation system has failed, assessment of Tesla's claims of its safety become impossible to verify and therefore meaningless. Tesla's efforts to limit public disclosure of safety information have caught the attention of NHTSA, resulting in a Special Order Directed To Tesla, Inc, issued 12 October 2021.[169]

71.   As stated by the drafters of the 18 August 2021 Letter from the U.S. Senate to the Federal Trade Commission, "Tesla and Mr. Musk's repeated overstatements of their vehicle's capabilities – despite clear and frequent warnings – demonstrate a deeply concerning disregard for the safety of those on the road and require real accountability. Their claims put Tesla drivers – and all of the travelling public – at risk of serious injury or death. In light of these concerns, we urge you to swiftly open an investigation into Tesla's repeated and overstated claims about their Autopilot and Full Self-Driving features and take appropriate enforcement action to prevent further injury or death as a result of any Tesla feature."[170]

**FACTS COMMON TO ALL CLAIMS**

72.   On or about April 25, 2019, the Vehicle was owned by George McGee.

73.   At all material times, the Vehicle was equipped with what Tesla calls "Autopilot", a suite of features and functions meant to assist drivers in driving and operating Tesla's vehicles.

---

[167] Aaron Gordon, *How Tesla's 'Self-Driving' Beta Testers Protect the Company From Critics*, VICE, Sept. 27, 2021,  https://www.vice.com/en/article/m7ezxq/how-teslas-self-driving-beta-testers-protect-the-company-from-critics.

[168]      *See* O'Kane, *supra* note 108.

[169]      *See* Exhibit 4, note 25, *supra*.

74.     At all material times, the Autopilot functions of the Vehicle included, but were not limited to automatic steering, forward collision warning and emergency braking.

75.     At all material times, George McGee purchased the vehicle in large part because of the Autopilot functions advertised by Tesla. More specifically, McGee purchased the subject Tesla Vehicle because he wanted a vehicle that would provide him with ample assistance while driving, and based on marketing and advertisements believed that Tesla's subject vehicle would provide such ample driving assistance.

76.     On or about April 25, 2019, George McGee was operating and/or driving the Vehicle eastbound on CR-905A, also known as Card Sound Road, in Key Largo, Monroe County, Florida, and was approaching the 3-way T-intersection with County Road 905.

77.     At the subject intersection, Card Sound Road ends, and drivers eastbound on Card Sound Road must first come to a stop at a stop sign before turning either left onto northbound County Road 905 or right onto southbound County Road 905.

78.     At the subject intersection, in addition to the aforementioned stop sign, there is also an overhead flashing red light and yellow caution signs which alert all drivers on eastbound Card Sound Road of the end of the roadway and the need to stop and then turn onto County Road 905.

79.     At that time and place, George McGee, had activated the Autopilot functions in his Tesla and was relying on its ability to properly steer and navigate the Vehicle, to detect obstacles in the roadway ahead of the Vehicle, and to reduce speed and/or come to a complete stop when such obstacles were detected.

---

[170]     *See* Exhibit 2, 18 August 2021 Letter from the United States Senate to The Honorable Lina Khan, Chair, Federal Trade Commission.

80.     Because he was relying on the Vehicle's Autopilot systems, George McGee took his eyes off the road to look at his phone as he was approaching the T-intersection at CR-905A.

81.     At that same time and place, Plaintiff, Dillon Angulo, had been driving a Chevrolet Tahoe owned by his mother and had lawfully parked that vehicle on the shoulder of the road on the eastbound side of County Road 905, directly across from the end of eastbound Card Sound Road.

82.     After parking, Plaintiff, Dillon Angulo, and his companion, Naibel Benavides Leon, were standing outside of Plaintiff's Chevrolet Tahoe, directly next to same.

83.     At that time, the Autopilot of George McGee's vehicle failed to detect the end of Card Sound Road (including a failure to detect the various traffic control devices) and further failed to detect the substantial profile of the Chevrolet Tahoe at any point, despite the fact that the vehicle and all of the referenced traffic signals, signs and warnings were directly in front of and in the path of the Vehicle.

84.     As a result, the Vehicle continued eastbound through the intersection without initiating the brakes and the Vehicle struck Plaintiff's Chevrolet Tahoe at almost 70 miles per hour, causing it to violently rotate and strike Plaintiff, Dillon Angulo, and Ms. Naibel Benavides Leon, causing debilitating injuries to Plaintiff, Dillon Angulo, and killing Ms. Benavides Leon.

## COUNT 1 – STRICT PRODUCTS LIABILITY

### (Defective Design)

85.     Plaintiffs re-allege the foregoing as if fully set forth herein.

86.    At all material times Tesla was engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, inspecting, warranting, leasing, renting, retailing, and advertising vehicles, including the Vehicle equipped with Tesla's Autopilot systems suite.

87.    Tesla manufactured, designed, assembled, tested, inspected, marketed, distributed, and sold their vehicles, including the Vehicle, and their component parts including Tesla's Autopilot system and suite of driver assistance features technology with defects in design which made them dangerous, hazardous, and unsafe for their intended and reasonably foreseeable use.

88.    Tesla's vehicles, including the Vehicle, contained design defects when the vehicles were introduced into the stream of commerce by Tesla.

89.    Tesla's vehicles, including the Vehicle, were defective and unsafe for their intended use.

90.    Due to the design defects, the Vehicle failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

91.    At all material times, Tesla knew and intended that consumers would use and drive their vehicles as the driver Mr. McGee did on April 25, 2019.

92.    The design defects in the Vehicle and Tesla's Autopilot system suite of technology (the "system") included defective and unsafe characteristics such as, but not limited to:

    a.    the failure to adequately monitor and determine driver-engagement;

    b.    the failure to adequately detect and respond to obstacles in the Vehicle's path;

    c.    the failure to adequately detect and respond to the end of a roadway;

    d.    the failure to adequately detect and respond to traffic control devices;

e.      the failure to adequately insure the safety of the system before putting it on the market;

f.      the failure to include adequate warnings if the system encounters conditions making it unsafe to use the system; and

g.      the failure to insure adequate takeover time for the driver in the event of a system failure.

93.      Tesla failed to meet the expectations of the reasonable consumer by placing on the market the Vehicle which failed to incorporate an Autopilot system that included safety components which would keep the vehicle only in designated travel lanes, reasonably match vehicle speed to traffic conditions, keep the vehicle within its lane, and provide active automatic collision avoidance and automatic emergency braking in a manner which detected objects the car might impact and applied the brakes so as to avoid impact with such objects.

94.      After the subject collision, Tesla equipped subsequent Tesla Model S with additional technology programs and systems and safety components and passenger protection components that provided safer active automatic collision avoidance and automatic emergency braking in order to detect objects the car might impact, and apply the brakes accordingly to avoid impact with such objects. The inclusion of these features on the Tesla Model S after the subject collision, had they been installed on the Vehicle prior to the collision, would have entirely avoided and prevented the collision and the debilitating injuries suffered by Plaintiffs.

95.      By reason of the omission of the above described safety systems, features and components from the Vehicle, on and prior to the date of the subject collision, the

Vehicle was defective in its design, in that the autopilot systems of the vehicle would not, and did not perform in a manner as safely as an ordinary consumer would expect when the vehicle was subjected to foreseeable accident or driving conditions.

96.    Additionally, the risk of danger in the design of the Vehicle outweighed any benefits of the design, and especially where safer alternative designs were available at the time of manufacture. Such reasonably safer alternative designs include, but are not limited to, the following:

a.    Driver-facing cameras that would monitor the driver's eyes and/or head position as a way to determine driver engagement and awareness;

b.    LIDAR, or any other reasonable alternative system that may or may not include the use of radar technology for the detection of obstacles, road features, vehicles, pedestrians in the path of a Tesla vehicle; and

c.    Effective driver alert systems that would notify the driver if road conditions rendered the use of Autopilot features unsafe;

d.    Effective driver alert systems that would notify the driver of any impending obstacles in the Vehicle's path, including but not limited to hazard lights, stopped vehicles, and pedestrians;

e.    Effective restrictions blocking the availability of Autopilot features in unsafe conditions;

f.    Effective Automatic-Emergency-Braking systems that would safely stop the Vehicle before striking objects, vehicles, or pedestrians in its pathway;

g.    Effective driver alert systems that timely notified the driver if the Autopilot system was in any way impaired or malfunctioning.

97.     Therefore, the Vehicle, and all of Tesla's vehicles that are equipped with Tesla's Autopilot system suite of technology presented and continue to present a substantial and unreasonable risk of serious injuries to drivers of Tesla vehicles and the public.

98.     The defects in the design of all Tesla vehicles equipped with Tesla's Autopilot system, including the Vehicle, was a substantial factor in causing the subject collision and Plaintiffs' injuries and damages as alleged herein.

99.     The design defects of the Vehicle were a substantial factor in causing Plaintiff Dillon Angulo's serious injuries and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future. The losses are either permanent or continuing, and Plaintiff, Dillon Angulo, will suffer the losses in the future.

        Further, the design defects of the Vehicle were a substantial factor in causing Naibel Benavides Leon's death and the resulting damages alleged herein.

WHEREFORE, Plaintiffs demand judgment against Tesla for the damages set forth below.

## COUNT 2 – STRICT PRODUCTS LIABILITY

### (Failure to Warn)

100.    Plaintiffs re-allege the foregoing as if fully set forth herein.

101.    At all material times, Tesla was engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, inspecting, warranting, leasing, renting, retailing, and advertising vehicles, including the Vehicle equipped with Tesla's Autopilot systems suite.

102.    On April 25, 2019, George McGee was driving the vehicle in a reasonably foreseeable manner, with Tesla's Autopilot ss Autopilot systems engaged, when the Vehicle failed to detect the end of Card Sound Road, the presence of numerous traffic control devices, and the substantial profile of the Chevrolet Tahoe, all of which was directly in front of the Vehicles path. As a result of these failures, Tesla's vehicle proceeded through the intersection, struck the Chevrolet Tahoe, and caused substantial injuries to Plaintiffs.

103.    At all material times, Tesla knew that consumers would use and drive their Autopilot equipped vehicles in the same manner that Brian McGee did in the time leading up to the collision at issue.

104.    An ordinary consumer would not have recognized the potential risks and dangers inherent in the operation and use of a Tesla vehicle with Autopilot engaged, including the fact that a Tesla vehicle would be unable to recognize the end of a roadway, the presence of a stop sign, the presence of flashing red overhead lights, the presence of yellow caution traffic signs, and/or the presence of a stationary vehicle parked directly in front of its path.

105.    At all times, Tesla failed to reasonably warn of the dangers inherent in the use of the Autopilot functions when used in a reasonably foreseeable manner.

106.    As a direct and proximate result of the Tesla's failure to warn of the design defects and dangers of its Autopilot functions, Plaintiff, Dillon Angulo, suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future. The losses are either permanent or continuing, and Plaintiff, Dillon Angulo, will suffer the losses in the future.

107. Further, the above-described defects of the Vehicle were a substantial factor in causing Naibel Benavides Leon's death and the resulting damages alleged herein.

WHEREFORE, Plaintiffs demand judgment against the Tesla for the damages set forth below.

## COUNT 3 – STRICT PRODUCTS LIABILITY

### (Defective Manufacture)

108. Plaintiffs re-allege the foregoing as if fully set forth herein.

109. At all material times Tesla was engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, inspecting, warranting, leasing, renting, retailing, and advertising vehicles, including the Vehicle equipped with Tesla's Autopilot systems suite.

110. At all material times, the Vehicle contained manufacturing defects which rendered the Vehicle unreasonably dangerous, in that:

a. Defects in the Vehicle caused the vehicle to fail to adequately monitor and determine driver-engagement;

b. Defects in the Vehicle caused the Vehicle to fail to adequately detect and respond to obstacles in the Vehicle's path;

c. Defects in the Vehicle caused the Vehicle to fail to adequately detect and respond to the end of a roadway;

d. Defects in the vehicle caused the Vehicle to fail to adequately detect and respond to traffic control devices in the Vehicle's path;

e. Defects in the vehicle caused the Autopilot systems to fail without giving the driver adequate warning or notice that the driver needed to take over control of the Vehicle.

111.   At all material times, the manufacturing defects in the Vehicle were present before it left control of Tesla, at the time that Tesla placed the Vehicle into the stream of commerce, and at the time of the subject collision.

112.   As a direct and proximate result of the subject Vehicle's manufacturing defects, Plaintiff, Dillon Angulo, suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future. The losses are either permanent or continuing, and Plaintiff, Dillon Angulo, will suffer the losses in the future.

113.   Further, the above-described defects of the Vehicle were a substantial factor in causing Naibel Benavides Leon's death and the resulting damages alleged herein.

WHEREFORE, Plaintiffs demand judgment against the Tesla for the damages set forth below.

## COUNT 4 – NEGLIGENT MISREPRESENTATION

114.   Plaintiffs re-allege the foregoing as if fully set forth herein.

115.   At all material times Tesla, was engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, inspecting, warranting, leasing, renting, retailing, and advertising vehicles, including the Vehicle equipped with Tesla's Autopilot system suite.

116.   At all material times Tesla had a duty to represent to the public and its consumers, including but not limited to Brian McGee, the true capabilities and the true limitations of its Autopilot system.

117.   At all material times Tesla falsely advertised, marketed, and represented that its Autopilot
       had capabilities far beyond those which it actually possessed.

118.   For instance, just by naming its product "Autopilot", Tesla created the false impression
       among consumers, including Brian McGee, that its vehicles could drive automatically
       and autonomously, with reduced driver input or without any driver input. This
       impression, carefully crafted by Tesla to increase its sales and brand identity, was false in
       that the Autopilot systems are not autonomous.

119.   Additionally, Tesla distributed marketing and advertising materials intended to
       underscore the false autonomous functionality of its Autopilot systems, such as (but not
       limited to) an advertisement video that showed a Tesla vehicle, equipped with Autopilot,
       successfully navigating through city streets without a driver behind the wheel. This video
       was, in fact, a heavily orchestrated marketing video, with the vehicle at issue having been
       programmed with detailed three-dimensional digital maps not available to drivers using
       the commercially available version of Autopilot. Moreover, the vehicle in the video
       actually crashed during the filing of that video, an event never disclosed by Tesla.

120.   At all times, the actions of Tesla in misrepresenting the true capabilities and
       corresponding limitations of the Autopilot systems created a false expectation among
       consumers and Tesla drivers as to the extent that they could rely upon Autopilot.

121.   These false expectations caused and still cause Tesla drivers, such as Brian McGee, to be
       far too inattentive in their own driving and instead to put far too much reliance on Tesla's
       Autopilot functions to safely navigate any hazards on the road.

122.   As a direct result of these false expectations which were cultivated and created by Tesla,
       Brian McGee was far less vigilant and attentive while driving on the date of this subject

collision than he otherwise would have been, which caused the subject collision and Plaintiffs' injuries.

123.   At all material times, Brian McGee was operating the subject Vehicle in a manner that was intended, and/or reasonably foreseeable to Tesla.

124.    Tesla knew or should have known the reliance that drivers including McGee would place on the Autopilot system given the nature of the marketing and advertising that Tesla disseminated to the public and to Brian McGee.

125.   McGee detrimentally relied on Tesla's misrepresentations in purchasing the Vehicle, and in using the vehicle and its autopilot feature, including during the accident that is the basis of this lawsuit.

126.   Telsa's omissions gave McGee a false sense of security about the safety capabilities of the Vehicle.

127.   As a direct and proximate result of the Tesla's misrepresentations, McGee was utilizing the autopilot feature on Card Sound Road, and was relying on it at the time of the accident.  The failure of the autopilot and of the emergency breaking system proximately caused the accident.

128.   As a direct and proximate result of the negligent misrepresenations of Tesla, Plaintiff, Dillon Angulo, suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future. The losses are either permanent or continuing, and Plaintiff, Dillon Angulo, will suffer the losses in the future.

129.   As a direct and proximate result of the negligent misrepresentations of Tesla Naibel Benavides Leon was killed.

WHEREFORE, Plaintiffs demand judgment against Tesla for the damages set forth below.

## Count 5 -- FRAUDULENT MISREPRESENTATION

130.   Plaintiffs re-allege the foregoing as if fully set forth herein.

131.   Tesla intentionally misrepresented that the Vehicle was designed to be the safest in the world; that the Vehicle conformed to reasonable consumer expectations; and that the Vehicle had functioning safety features that would prevent collisions such as that in this case.

132.   At the time Tesla, by and through its authorized agents, made the aforementioned representations, Tesla knew these representations were false.

133.   Tesla made these representations with the intent to induce consumers, including Brian McGee, to purchase the Vehicle and to utilize its autopilot features.

134.   McGee detrimentally relied on Tesla's false representations in purchasing the Vehicle, and in using the vehicle and its autopilot feature, including during the the accident that is the basis of this lawsuit.

135.   Telsa's false representations gave McGee a false sense of security about the safety capabilities of the Vehicle.

136.   As a direct and proximate result of the Tesla's false representations, McGee was utilizing the autopilot feature on Card Sound Road, and was relying on it at the time of the accident.  The failure of the autopilot and of the emergency breaking system proximately caused the accident.

137.   As a direct and proximate result of the fraudulent misrepresentations of Tesla, Plaintiff, Dillon Angulo, suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future. The losses are either permanent or continuing, and Plaintiff, Dillon Angulo, will suffer the losses in the future.

138.   As a direct and proximate result of the fraudulent misrepresentations of Tesla, Naibel Benavides Leon was killed.

WHEREFORE, Plaintiffs demand judgment against Tesla for the damages set forth below.

## Count 6 - FRAUDULENT CONCEALMENT

139.   Plaintiffs re-allege the foregoing as if fully set forth herein.

140.   Tesla was aware of the inadequacies and defects with the vehicle Autopilot by receiving notice of prior similar failures in vehicles on the road, permitting a collision with an object while the Autopilot was engaged, leading to injuries and deaths.  Such events include, but are not limited to:

a.      The January 20, 2016 crash of a Model S near Handan, China where the Tesla hit a street cleaning truck.

b.      The May 7, 2016 crash of a Model S near Williston, Florida where the Tesla hit a semi-tractor trailer turning across the lane in front of it.

c.      The July 9, 2016 crash of a Model S in Salt Lake County, Utah where the Tesla hit a vehicle in front of it on a highway.

      d.      The March 13, 2017 crash of a Model S in Dallas County, Texas where the Tesla hit lane barriers on a highway.

      e.      The March 23, 2018 crash of a Model X near Mountain View, California where the Tesla hit a barrier divider.

      f.      The April 29, 2018 crash of a Model X near Tokyo, Japan where the Tesla hit a pedestrian and a vehicle in front of it on a highway.

      g.      The October 12, 2018 crash of a Model S near Orlando, Florida where the Tesla hit a vehicle in front of it on a highway.

      h.      The March 1, 2019 crash of a Model 3 near Delray Beach, Florida where the Tesla hit a semi-tractor trailer turning across the lane in front of it.

141.    Tesla had a duty to disclose the full limitations of its vehicles' safety features and autopilot to its consumers.

142.    In its representations regarding its vehicles' safety features and autopilot, Tesla made material omissions reagarding the true nature of the inherent defects of the Vehicle, as described herein. Said defects were not readily discoverable until later, when the subject incident occurred.

143.    Tesla made these omissions with knowledge that their omission would mislead customers such as Brian McGee and falsely and dangerously induce them to use Autopilot without knowing its inherent defects.

144.    McGee detrimentally relied on Tesla's omissions in purchasing the Vehicle, and in using the vehicle and its autopilot feature, including during the accident that is the basis of this lawsuit.

145.    Telsa's omissions gave McGee a false sense of security about the safety capabilities of the Vehicle.

146.    As a direct and proximate result of the Tesla's omissions, McGee was utilizing the autopilot feature on Card Sound Road, and was relying on it at the time of the accident. The failure of the autopilot and of the emergency breaking system proximately caused the accident.

147.    As a direct and proximate result of the fraudulent concealment of Tesla, Plaintiff, Dillon Angulo, suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future. The losses are either permanent or continuing, and Plaintiff, Dillon Angulo, will suffer the losses in the future.

148.    As a direct and proximate result of the fraudulent concealment of Tesla, Naibel Benavides Leon was killed.

WHEREFORE, Plaintiffs demand judgment against Tesla for the damages set forth below.

## Count 7 – INTENTIONAL FALSE ADVERTISING IN VIOLATION OF FLORIDA STATUTES § 817.40, 817.44.

149.    Plaintiffs re-allege the foregoing as if fully set forth herein.

150.    Tesla, made statements to the public which were known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling property, or to induce the public to enter into an obligation relating to such property.

151.   Tesla offered its vehicles equipped with its Autopilot system for sale by placing or causing to be placed before the general public, by any means whatever, an advertisement describing the vehicles and the Autopilot system as part of a plan or scheme with the intent not to sell such property so advertised. Fla. Stat. Ch. 817.44 Intentional false advertising prohibited (Florida Statutes (2023 Edition))

152.   As a direct and proximate result of the Tesla's false advertisements, McGee was utilizing the autopilot feature on Card Sound Road, and was relying on it at the time of the accident.  The failure of the autopilot and of the emergency breaking system proximately caused the accident.

153.   As a direct and proximate result of Tesla's false advertisements, Plaintiff, Dillon Angulo, suffered actual damages in the form of serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future. The losses are either permanent or continuing, and Plaintiff, Dillon Angulo, will suffer the losses in the future.

154.   As a direct and proximate result of the fraudulent concealment of Tesla, Naibel Benavides Leon was killed.

WHEREFORE, Plaintiffs demand judgment against Tesla for the damages set forth below.

## COMPENSATORY DAMAGES – DILLON ANGULO

155.   As a result of the acts or omissions of Tesla, Plaintiff, Dillon Angulo, suffered serious injuries and seeks compensation for the following:

    a.       Past and future pain and suffering,

b.      Past and future disability,

c.      Past and future disfigurement,

d.      Past and future mental anguish,

e.      Past and future loss of capacity for enjoyment of life,

f.      Past and future costs of hospitalization, medical, nursing care and treatment,

g.      Loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future.

156.   The losses are either permanent or continuing, and Plaintiff, Dillon Angulo, will suffer the losses in the future.

## WRONGFUL DEATH DAMAGES

157.   As a result of the acts or omissions of Tesla, the Estate of Naibel Benavides Leon has suffered and will suffer the following damages:

a.      Lost wages, benefits, and other earnings, including the value of lost earnings that the decedent, Naibel Benavides Leon, could reasonably have been expected to earn had she lived a full life.

b.      Loss of "prospective net accumulations" of the Estate of Naibel Benavides Leon, or the value of earning the Estate of Naibel Benavides Leon could reasonably have been expected to collect had the decedent, Naibel Benavides Leon, lived a full life.

c.      Medical and funeral expenses paid by the Estate of Naibel Benavides Leon.

158.   Lilia Marilin Leon Jimenez, surviving natural mother and legal beneficiary under the Florida Wrongful Death Act, has in the past and will continue to suffer in the future the following damages, per the Florida Wrongful Death Act, Florida Statute § 768.16:

a.   The loss of support and services Naibel Benavides Leon provided and would have provided to her mother, Lilia Marilin Leon Jimenez.

b.   The loss of companionship, guidance, and protection provided and which would have been provided by the decedent, Naibel Benavides Leon, to her mother, Lilia Marilin Leon Jimenez.

c.   Mental and emotional pain and suffering due to the loss of decedent Naibel Benavides Leon.

159.   Guillermo Benavides, surviving natural father and legal beneficiary under the Florida Wrongful Death Act, as in the past and will continue to suffer in the future the following damages, per the Florida Wrongful Death Act, Florida Statute § 768.16:

a.    The loss of support and services Naibel Benavides Leon provided and would have provided to her father, Guillermo Benavides.

b.   The loss of companionship, guidance, and protection provided and which would have been provided by the decedent, Naibel Benavides Leon, to her father, Guillermo Benavides.

c.    Mental and emotional pain and suffering due to the loss of decedent Naibel Benavides Leon.

d.   Medical and funeral expenses paid for or owed by Guillermo Benavides as a result of the death of his daughter, Naibel Benavides Leon.

160.   Wherefore, Plaintiff, Neima Benavides, as Personal Representative of the Estate of Naibel Benavides Leon, demands judgement and damages against Tesla, costs and interest allowed by law, and further demands a jury trial of all issues triable as a matter of right thereby.

## PUNITIVE DAMAGES

161.   Plaintiffs re-allege the foregoing as if fully set forth herein.

162.   Tesla had actual knowledge of the defective nature of the autopilot and safety features in its vehicles and the high probability that injury or damage to the public, including Angulo and Benavides, would result and, despite that knowledge, intentionally pursued the course of conduct described herein, resulting in injury or damage.

163.   Tesla's conduct described herein was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

164.   Telsa's CEO, Elon Musk, and other officers, directors, or managers knowingly condoned, ratified, or consented to the conduct described herein.

165.   Telsa, through its CEO, Elon Musk, and other officers, directors, or managers engaged in conduct that constituted gross negligence and that contributed to the loss, damages, or injury suffered by the claimants.

166.   Telsa, through its CEO, Elon Musk, and other officers, directors, or managers actively and knowingly participated in the conduct described herein.

167.   Tesla's wrongful conduct as described herein was motivated solely by unreasonable financial gain.

168.    The unreasonably dangerous nature of Tesla's conduct, together with the high likelihood of injury resulting from the conduct, was actually known by Telsa's CEO, Elon Musk, and other officers, directors, or managers responsible for making policy decisions on behalf of Tesla.

169.    Plaintiffs are therefore entitled to Punitive Damages as set out in Fla. Stat. Ch.768.73(1)(b).

## PRAYER

WHEREFORE, Plaintiffs pray for judgment against Tesla as follows:

1.    On the past and future medical expenses incurred to judgment;

2.    On the loss of future earnings and earning capacity to judgment;

3.    On other past and future special damages incurred to judgment;

4.    On the general damages for pain and suffering to judgment.

5.    Costs of suit and expenses, according to proof;

6.    Wrongful Death Damages as set out above;

7.    Punitive Damages; and

8.    Other relief the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by Jury on all issues so triable.

Dated this 21st day of August 2023.

Respectfully submitted,

Donald H. Slavik (*Pro Hac Vice*)
David W. Terry (*Pro Hac Vice*)
Nicole L. Judge (*Pro Hac Vice*)
SLAVIK LAW FIRM, LLC
3001 S. Lincoln Ave., Suite C-1
Steamboat Springs, CO 80487
Office (970) 457-1011
dslavik@slavik.us

*Counsel for Plaintiffs, Dillon Angulo and Plaintiff*
*Neima Benavides as PR for the Estate of Nabel Benavides*

POSES & POSES, P.A.
Alfred I. DuPont Building
169 East Flagler Street
Suite 1600
Miami, FL 33131
(305) 577-0200 Telephone
(305) 371-3550 Facsimile
tposes@posesandposes.com

/s/Todd Poses
TODD POSES, ESQ.
FBN: 0075922

*Counsel for Plaintiff, Neima Benavides as PR for the*
*Estate of Naibel Benavides Leon*

THE ROUSSO, BOUMEL LAW FIRM, PLLC.
9350 South Dixie Highway
Suite 1520
Miami, Florida 33156
(305) 670-6669

By:      **/s/ *Adam T. Boumel, Esq.***
Adam T. Boumel, Esq.
Florida Bar No.: 0110727
Adam@roussolawfirm.com
SERVICE EMAILS:
pleadings@roussolawfirm.com (primary)
Frank@roussolawfirm.com (secondary)

*Counsel for Plaintiff, Dillon Angulo.*

**EXHIBIT "1"**



**U.S. Department
of Transportation**

**National Highway
Traffic Safety
Administration**

# ODI RESUME

OFFICE OF DEFECTS INVESTIGATION

**NHTSA**

Authentic US Government Information
National Highway Traffic Safety Administration
own a digital certificate to ensure
the content has remained unchanged

| | |
|---|---|
| **Investigation:** | PE 21-020 |
| **Date Opened:** | 08/13/2021 |
| **Investigator:** | Steven Posada          **Reviewer:**    Gregory Magno |
| **Approver:** | Stephen Ridella |
| **Subject:** | Autopilot & First Responder Scenes |

## MANUFACTURER & PRODUCT INFORMATION

| | |
|---|---|
| **Manufacturer:** | Tesla, Inc. |
| **Products:** | 2014-2021 Tesla Model Y, Model X, Model S, Model 3 |
| **Population:** | 765,000 (Estimated) |
| **Problem Description:** | Subject vehicle crashes with in-road or roadside first responders. |

## FAILURE REPORT SUMMARY

| | ODI | Manufacturer | Total |
|---|---|---|---|
| **Complaints:** | 0 | TBD | 0 |
| **Crashes/Fires:** | 11 | TBD | 11 |
| **Injury Incidents:** | 7 | TBD | 7 |
| **Number of Injuries:** | 17 | TBD | 17 |
| **Fatality Incidents:** | 1 | TBD | 1 |
| **Number of Fatalities:** | 1 | TBD | 1 |

## ACTION / SUMMARY INFORMATION

**Action:**    ODI has opened a Preliminary Evaluation

**Summary:**

Since January 2018, the Office of Defects Investigation (ODI) has identified eleven crashes in which Tesla models of various configurations have encountered first responder scenes and subsequently struck one or more vehicles involved with those scenes. The incidents are listed at the end of this summary by date, city, and state.

Most incidents took place after dark and the crash scenes encountered included scene control measures such as first responder vehicle lights, flares, an illuminated arrow board, and road cones. The involved subject vehicles were all confirmed to have been engaged in either Autopilot or Traffic Aware Cruise Control during the approach to the crashes.

Autopilot is an Advanced Driver Assistance System (ADAS) in which the vehicle maintains its speed and lane centering when engaged within its Operational Design Domain (ODD). With the ADAS active, the driver still holds primary responsibility for Object and Event Detection and Response (OEDR), e.g., identification of obstacles in the roadway or adverse maneuvers by neighboring vehicles during the Dynamic Driving Task (DDT).

ODI has opened a Preliminary Evaluation of the SAE Level 2 ADAS system (Autopilot) in the Model Year 2014-2021 Models Y, X, S, and 3. The investigation will assess the technologies and methods used to monitor, assist, and enforce the driver's engagement with the dynamic driving task during Autopilot operation. The investigation will additionally assess the OEDR by vehicles when engaged in Autopilot mode, and ODD in which the Autopilot mode is functional. The investigation will also include examination of the contributing circumstances for the confirmed crashes listed below and other similar crashes.

Incident List

| Date | City/County | State |
|------|-------------|-------|
| 07/10/2021 | San Diego | CA |
| 05/19/2021 | Miami | FL |
| 03/17/2021 | Lansing | MI |
| 02/27/2021 | Montgomery County | TX |
| 08/26/2020 | Charlotte | NC |
| 07/30/2020 | Cochise County | AZ |
| 01/22/2020 | West Bridgewater | MA |
| 12/29/2019 | Cloverdale | IN |
| 12/10/2019 | Norwalk | CT |
| 05/29/2018 | Laguna Beach | CA |
| 01/22/2018 | Culver City | CA |

**EXHIBIT "2"**



## United States Senate
WASHINGTON, DC 20510

August 18, 2021

The Honorable Lina Khan
Chair
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C.  20580

Dear Chair Khan,

We write to express our serious concerns about Tesla's misleading advertising of its Autopilot and Full Self-Driving (FSD) features. Tesla's marketing has repeatedly overstated the capabilities of its vehicles, and these statements increasingly pose a threat to motorists and other users of the road. Accordingly, we urge you to open an investigation into potentially deceptive and unfair practices in Tesla's advertising and marketing of its driving automation systems and take appropriate enforcement action to ensure the safety of all drivers on the road.

On August 13, 2021, the National Highway Traffic Safety Administration (NHTSA) opened a formal investigation into Tesla's Autopilot feature after identifying 11 crashes with Autopilot engaged since 2018 that involved a Tesla striking one or more vehicles at first responder sites.[1] This is not the first time NHTSA has investigated Tesla's Autopilot. While a previous investigation, closed in 2017, did not identify any defects with Autopilot after a fatal crash, this latest investigation is a new defect investigation into Tesla's Autopilot.[2]

Tesla's Autopilot and FSD are partially automated and include lane keeping assistance and adaptive cruise control features that can help prevent driver stress and fatigue when properly used. They are not fully autonomous features, however, and there are no fully autonomous vehicles currently available on the market. In fact, NHTSA estimates that fully automated safety features and true highway autopilot will not be ready until at least 2025.[3] Understanding these limitations is essential, for when drivers' expectations exceed their vehicle's capabilities, serious and fatal accidents can and do result.

We fear that Tesla's Autopilot and FSD features are not as mature and reliable as the company pitches to the public. On April 22, 2019, Tesla posted a video on its YouTube channel titled "Full Self-Driving" showing a Tesla driving entirely on its own.[4] Tesla CEO Elon Musk has also repeatedly boasted about Tesla's systems. In July 2020 and again in January 2021, Mr. Musk claimed

---

[1] U.S. Department of Transportation, National Highway Traffic Safety Administration, "ODI Resume: Autopilot & First Responder Scenes," https://static.nhtsa.gov/odi/inv/2021/INOA-PE21020-1893.pdf (accessed August 16, 2021).
[2] U.S. Department of Transportation, National Highway Traffic Safety Administration, "ODI Resume: Automatic vehicle control systems," https://static.nhtsa.gov/odi/inv/2016/INCLA-PE16007-7876.pdf (accessed August 16, 2021).
[3] National Highway Traffic Safety Administration, "Automated Vehicles for Safety," https://www.nhtsa.gov/technology-innovation/automated-vehicles-safety (accessed August 9, 2021).
[4] Tesla, "Full Self-Driving," YouTube video, 1:56, April 22, 2019, https://youtu.be/tlThdr3O5Qo.

to consumers that Tesla vehicles would soon reach Level 5 autonomy, or full automation.[5] Unfortunately, Tesla's advertising and marketing is reaching a large audience: the "Full Self-Driving" video has been viewed more than 18 million times. While Tesla has buried qualifying disclaimers elsewhere on their website, the link in the video's caption redirects to a purchasing page that fails to provide additional information about the true capabilities of the vehicle.[6]

Tesla drivers listen to these claims and believe their vehicles are equipped to drive themselves – with potentially deadly consequences. At least 11 people have died in fatal crashes with Autopilot activated since Tesla introduced the feature in 2015.[7] In May, the driver of a Tesla Model 3 was killed after the vehicle crashed on a highway in California. The driver had previously posted a video of his Tesla online in which it drove itself without human assistance. Autopilot was activated when the crash occurred.[8] Less than two weeks after the fatal crash, California Highway Patrol arrested a man for riding in the backseat of his Tesla while the vehicle was in Autopilot on the highway. After his arrest, the driver cited Mr. Musk's statements about the vehicle's abilities as justification for his actions.[9] It is clear that drivers take Tesla's statements about their vehicles' capabilities at face value and suffer grave consequences.

Advocates and other federal agencies have repeatedly called on the FTC to act on Tesla's possible false advertising of its driving automation systems. In 2018, the Center for Auto Safety and Consumer Watchdog wrote to then FTC Chairman Joseph Simons urging the FTC to investigate Tesla's deceptive and unfair practices in the advertising and marketing of Autopilot after two fatal crashes.[10] They renewed their request to the Commission in 2019 following additional fatal incidents.[11] NHTSA also sent Mr. Musk a cease-and-desist letter in 2018 over his claims about the vehicles' safety and, importantly, asked the FTC to investigate the claims under its "unfair or deceptive acts practices" authority.[12] As the FTC has noted in other matters, the Commission has a significant role in protecting consumers against false, misleading, and dangerous advertising in car sales.[13]

[5] "Elon Musk says full self-driving Tesla tech 'very close,'" *BBC* (London, England), July 9, 2020, https://www.bbc.com/news/technology-53349313; Kyle Hyatt, "Elon Musk says Tesla's Full Self-Driving tech will have Level 5 autonomy by the end of 2021," *Roadshow*, January 27, 2021, https://www.cnet.com/roadshow/news/elon-musk-full-self-driving-tesla-earnings-call/.

[6] *Tesla*, https://www.tesla.com/?utm_campaign=FSD&utm_source=youtube&utm_medium=social (accessed August 9, 2021).

[7] Rick Newman, "It's time to notice Tesla's Autopilot death toll," *Yahoo! Finance* (New York, New York), April 19, 2021, https://finance.yahoo.com/news/its-time-to-notice-teslas-autopilot-death-toll-195849408.html.

[8] Daisy Nguyen, "Tesla driver in fatal California crash had posted videos of himself in vehicle" *Los Angeles Times* (Los Angeles, California), May 16, 2021, https://www.latimes.com/california/story/2021-05-16/tesla-driver-in-fatal-california-crash-had-post-videos-of-himself-in-vehicle.

[9] Katherine Bindley and Rebecca Elliot, "Tesla Drivers Test Autopilot's Limits, Attracting Audiences–and Safety Concerns," *Wall Street Journal* (New York, New York), May 20, 2021, https://www.wsj.com/articles/tesla-drivers-test-autopilots-limits-attracting-audiencesand-safety-concerns-11621503008.

[10] Jason Levine and John Simpson to the Honorable Joseph Simons, May 23, 2018, https://www.autosafety.org/wp-content/uploads/2018/05/CAS-and-CW-Letter-to-FTC-on-Tesla-Deceptive-Advertising.pdf.

[11] Jason Levine and Adam Scow to the Honorable Joseph Simons, July 25, 2019, https://www.autosafety.org/wp-content/uploads/2019/07/CAS-and-CW-Letter-to-FTC-on-Tesla-Deceptive-Advertising-2019-FINAL.pdf.

[12] Sean O'Kane, "Feds told Tesla to stop 'mislead' the public about Model 3 safety," *The Verge* (Washington, D.C.) August 7, 2019, https://www.theverge.com/2019/8/7/20758349/tesla-model-3-safety-misleading-ftc-national-highway-traffic-administration-elon-musk.

[13] Federal Trade Commission, "Statement of the Federal Trade Commission Concerning Auto Recall Advertising Cases,"

Despite these warnings, Tesla has persistently misrepresented the capabilities of its cars and the company's progress towards safe Autopilot and FSD technology. On an earnings call in January this year, Mr. Musk claimed Tesla vehicles would be fully autonomous by the end of the year.[14] On July 9, 2021, Tesla released beta version 9 of what it brands to consumers as "Full Self-Driving" software, a subscription feature (recently made available to all Tesla owners) that costs hundreds of dollars per month but – despite its name – does not deliver full autonomy.[15] After the update, drivers have posted videos online showing their updated Tesla vehicles making unexpected maneuvers that require human intervention to prevent a crash.[16] Mr. Musk's tepid precautions tucked away on social media are no excuse for misleading drivers and endangering the lives of everyone on the road.[17] As Tesla makes widely available its FSD and Autopilot technology and doubles down on its inflated promises, we are alarmed by the prospect of more drivers relying more frequently on systems that do not nearly deliver the expected level of safety.

Tesla and Mr. Musk's repeated overstatements of their vehicle's capabilities – despite clear and frequent warnings – demonstrate a deeply concerning disregard for the safety of those on the road and require real accountability. Their claims put Tesla drivers – and all of the travelling public – at risk of serious injury or death. In light of these concerns, we urge you to swiftly open an investigation into Tesla's repeated and overstated claims about their Autopilot and Full Self-Driving features and take appropriate enforcement action to prevent further injury or death as a result of any Tesla feature.

Thank you for your attention to this important matter, and we look forward to your response.

Sincerely,

RICHARD BLUMENTHAL
United States Senate

EDWARD J. MARKEY
United States Senate

---

https://www.ftc.gov/system/files/documents/cases/161216_six_auto_recall_cases_statement_of_the_commission_1_1.pdf (accessed August 9, 2021).

[14] Hyatt, "Elon Musk." After inquiries from the California Department of Motor Vehicles, Tesla walked back Musk's comments about the Full-Self Driving feature, calling full autonomy "unlikely" by the end of 2021. Andrew Hawkins, "Tesla privately admits Elon Musk has been exaggerating about full self-driving," *The Verge* (Washington, D.C.), May 7, 2021 https://www.theverge.com/2021/5/7/22424592/tesla-elon-musk-autopilot-dmv-fsd-exaggeration.

[15] "Support," *Tesla*, https://www.tesla.com/support/full-self-driving-subscriptions (accessed August 9, 2021).

[16] AI Addict, "[FSD Beta 9] Downtown San Francisco," YouTube video, 11:12, July 11, 2021, https://youtu.be/GlIdu7prsAw. Full breadth of videos seen at ahttps://www.youtube.com/results?search_query=tesla+fsd+9.

[17] In advance of the release, Musk acknowledged that drivers must "be paranoid" as the software will have "unknown issues," and the release notes similarly tell drivers to use "additional caution" because the software "may do the wrong thing at the worst time." Elon Musk (@elonmusk), Twitter post, July 8, 2021, 9:18 p.m., https://twitter.com/elonmusk/status/1413306409693892613; Tesla Raj (@tesla_raj), Twitter post, July 10, 2021, 3:37 a.m., https://twitter.com/tesla_raj/status/1413764413165772803.

**EXHIBIT "3"**



U.S. Department
of Transportation

**National Highway
Traffic Safety
Administration**

1200 New Jersey Avenue SE.
Washington, DC  20590

October 12, 2021

**SENT VIA E-MAIL**

Eddie Gates                                                               NEF-104
Director, Field Quality                                                   PE21-020
Tesla, Inc.
45500 Fremont Blvd.
Fremont, CA 94538

Dear Mr. Gates,

This letter follows up recent discussions between our organizations and requests additional
information from Tesla with respect to two recent actions taken by your company. Tesla's late
September 2021 distribution of functionality to certain Tesla vehicle models intended to improve
detection of emergency vehicle lights in low light conditions, and Tesla's early October 2021
release of the Full Self-Driving Beta Request Menu option.

As Tesla is aware, the Safety Act imposes an obligation on manufacturers of motor vehicles and
motor vehicle equipment to initiate a recall by notifying NHTSA when they determine vehicles
or equipment they produced contain defects related to motor vehicle safety or do not comply
with an applicable motor vehicle safety standard. *See* 49 U.S.C. § 30118. This recall notice must
be filed with NHTSA no more than five working days after the manufacturer knew or should
have known of the safety defect or noncompliance. *See* 49 C.F.R. § 573.6(b); *see also United
States v. General Motors Corp.,* 656 F. Supp. 1555, 1559 n.5 (D.D.C. 1987). Any manufacturer
issuing an over-the-air update that mitigates a defect that poses an unreasonable risk to motor
vehicle safety is required to timely file an accompanying recall notice to NHTSA pursuant to 49
U.S.C. § 30118 and 49 C.F.R. Part 573.

Unless otherwise stated in the text, the following definitions apply to these information requests:

- **Subject System**: Suite of software, hardware, data, and any other related systems on or
  off the vehicle that contributes to the conferral of any Level 2 capabilities on any Tesla
  vehicle, including but not limited to the various "Autopilot" packages.

- **Subject Vehicles**: All Tesla vehicles, model years 2014 - 2021, equipped with the subject
  system at any time, and manufactured for sale or lease in the United States, including, but
  not limited to, the District of Columbia, and current U.S. territories and possessions.

- **<u>Emergency Light Detection Update</u>:** Updates distributed by Tesla beginning in September 2021 to certain Tesla vehicle models with the stated purpose of detecting flashing emergency vehicle lights in low light conditions and then responding to said detection with driver alerts and changes to the vehicle speed while Auto Pilot is engaged.

- **<u>FSD</u>:** means Tesla "Full Self-Driving," also referred to by Tesla as "Autosteer on City Streets."

- **<u>FSD Beta Request</u>:** In-vehicle menu update added by Tesla in October 2021 enabling owners to request consideration for future acceptance into Tesla's Full-Self Driving early access beta release including but not limited to: related in-vehicle menu options and Tesla's customer scoring and selection criteria.

- **<u>Tesla</u>:** Tesla, Inc. all of its past and present officers and employees, whether assigned to its principal offices or any of its field or other locations, including all of its divisions, subsidiaries (whether or not incorporated) and affiliated enterprises and all of their headquarters, regional, zone and other offices and their employees, and all agents, contractors, consultants, attorneys and law firms and other persons engaged directly or indirectly (e.g., employee of a consultant) by or under the control of Tesla (including all business units and persons previously referred to), who are or, in or after January 1st, 2011 were involved in any way with any of the following related to the alleged defect in the subject vehicles:
  a. Design, engineering, analysis, modification or production (e.g. quality control);
  b. Testing, assessment or evaluation;
  c. Consideration, or recognition of potential or actual defects, reporting, record-keeping and information management, (e.g., complaints, field reports, warranty information, part sales), analysis, claims, or lawsuits; or
  d. Communication to, from or intended for zone representatives, fleets, dealers, or other field locations, including but not limited to people who have the capacity to obtain information from dealers.

- **<u>Document</u>:** "Document(s)" is used in the broadest sense of the word and shall mean all original written, printed, typed, recorded, or graphic matter whatsoever, however produced or reproduced, of every kind, nature, and description, and all non-identical copies of both sides thereof, including, but not limited to, papers, letters, memoranda, correspondence, communications, electronic mail (e-mail) messages (existing in hard copy and/or in electronic storage), faxes, mailgrams, telegrams, cables, telex messages, notes, annotations, working papers, drafts, minutes, records, audio and video recordings, data, databases, other information bases, summaries, charts, tables, graphics, other visual displays, photographs, statements, interviews, opinions, reports, newspaper articles, studies, analyses, evaluations, interpretations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, instructions, blueprints, drawings, as-builts, changes, manuals, publications, work schedules, journals, statistical data, desk, portable and computer calendars, appointment books, diaries, travel reports, lists, tabulations, computer printouts, data processing program libraries, data processing inputs and outputs, microfilms, microfiches, statements for services, resolutions, financial statements,

governmental records, business records, personnel records, work orders, pleadings, discovery in any form, affidavits, motions, responses to discovery, all transcripts, administrative filings and all mechanical, magnetic, photographic and electronic records or recordings of any kind, including any storage media associated with computers, including, but not limited to, information on hard drives, floppy disks, backup tapes, and zip drives, electronic communications, including but not limited to, the Internet and shall include any drafts or revisions pertaining to any of the foregoing, all other things similar to any of the foregoing, however denominated by Tesla, any other data compilations from which information can be obtained, translated if necessary, into a usable form and any other documents. For purposes of this request, any document which contains any note, comment, addition, deletion, insertion, annotation, or otherwise comprises a non-identical copy of another document shall be treated as a separate document subject to production. In all cases where original and any non-identical copies are not available, "document(s)" also means any identical copies of the original and all non-identical copies thereof. Any document, record, graph, chart, film or photograph originally produced in color must be provided in color. Furnish all documents whether verified by Tesla or not.  If a document is not in the English language, provide both the original document and an English translation of the document.

- **Other Terms:**  To the extent that they are used in these information requests, the terms "claim," "consumer complaint," "dealer field report," "field report," "fire," "fleet," "good will," "make," "model," "model year," "notice," "property damage," "property damage claim," "rollover," "type," "warranty," "warranty adjustment," and "warranty claim," whether used in singular or in plural form, have the same meaning as found in 49 CFR 579.4.

In order for my staff to evaluate the alleged defect, certain information is required. Pursuant to 49 U.S.C. § 30166, please provide numbered responses to the following information requests. Insofar as Tesla has previously provided a document to ODI, Tesla may produce it again or identify the document, the document submission to ODI in which it was included and the precise location in that submission where the document is located. When documents are produced, the documents shall be produced in an identified, organized manner that corresponds with the organization of this information request letter (including all individual requests and subparts). When documents are produced and the documents would not, standing alone, be self-explanatory, the production of documents shall be supplemented and accompanied by explanation.

Please repeat the applicable request verbatim above each response.  After Tesla's response to each request, identify the source of the information and indicate the last date the information was gathered.

1. Furnish a chronology of events, internal investigations, and studies that led to Tesla's deployment of the Emergency Light Detection Update. Separately include:
   a. Dates, descriptions, and identifiers of all releases to the vehicle fleet whether operational or shadow mode; and

       b.  Listing and description of field incidents or other events that motivated the release of the Emergency Light Detection Update.

2.  List the Tesla vehicle model / model year and any other distinguishing characteristics that received the Emergency Light Detection Update. Separately describe:
       a.  The basis applied to defining the scope of covered vehicles;
       b.  Any measures to extend this capability more broadly throughout Tesla's fleet; and
       c.  Reasoning for instances where a vehicle cannot accept the Emergency Light Detection Update or related functionality.

3.  For each of the applicable incidents cited in PE21-020 Information Request sent to Tesla on August 31, 2021, furnish Tesla's assessment of any changes to incident timing or outcome had the Emergency Light Detection Update been operational in the affected vehicle at the time of collision. Include any supporting analyses.

4.  State whether Tesla intends to file a safety recall pursuant to 49 U.S.C. § 30118 covering vehicles that received the Emergency Light Detection Update. If not, please furnish Tesla's technical and/or legal basis for declining to do so.

5.  Provide a copy of any agreement between Tesla and the owner of a subject vehicle involving vehicle repairs, access to software, upgrades to software, refund of the purchase price of a vehicle or software, or providing the vehicle owner with any other compensation, valuable consideration, or goodwill involving the subject system, including to resolve a lawsuit, arbitration, or other claim.

6.  Furnish Tesla's criteria and timeline for allowing access to customers who have requested consideration in Tesla's FSD Beta Request process. Include detailed descriptions of all selection criteria and copies of supporting documents.

7.  Supply a listing of the number of respondents who have opted in on the FSD Beta Request and the effective date and time for that figure.

8.  For each vehicle equipped with FSD please provide:
       a.  The vehicle identification number;
       b.  The date on which FSD was installed on the vehicle; and
       c.  Whether the vehicle owner is an employee of Tesla.

**<u>Legal Authority for This Request</u>**

This letter is being sent to Tesla pursuant to 49 U.S.C. § 30166, which authorizes NHTSA to conduct any investigation that may be necessary to enforce Chapter 301 of Title 49 and to request reports and the production of things. It constitutes a new request for information.

## Civil Penalties

Tesla's failure to respond promptly and fully to this letter could subject Tesla to civil penalties pursuant to 49 U.S.C. § 30165 or lead to an action for injunctive relief pursuant to 49 U.S.C. § 30163.  (Other remedies and sanctions are available as well.)  The Vehicle Safety Act, as amended, 49 U.S.C. § 30165(a)(3), provides for civil penalties of up to $22,992 per violation per day, with a maximum of $114,954,525 for a related series of daily violations, for failing or refusing to perform an act required under 49 U.S.C. § 30166.  See 49 CFR 578.6 (as amended by Fixing America's Surface Transportation Act (the "FAST Act"), Pub. L. 114-94, § 24110(a)(2), 129 Stat. 1312 (Dec. 4, 2015)). This includes failing to respond completely, accurately, and in a timely manner to ODI information requests.

If Tesla cannot respond to any specific request or subpart(s) thereof, please state the reason why it is unable to do so.  If on the basis of attorney client, attorney work product, or other privilege, Tesla does not submit one or more requested documents or items of information in response to this information request, Tesla must provide a privilege log identifying each document or item withheld, and stating the date, subject or title, the name and position of the person(s) from, and the person(s) to whom it was sent, and the name and position of any other recipient (to include all carbon copies or blind carbon copies), the nature of that information or material, and the basis for the claim of privilege and why that privilege applies.

## Confidential Business Information

**All business confidential information must be submitted directly to the Office of Chief Counsel as described in the following paragraph and should not be sent to this office.**  In addition, do not submit any business confidential information in the body of the letter submitted to this office. Please refer to PE21-020 in Tesla's response to this letter and in any confidentiality request submitted to the Office of Chief Counsel.

If Tesla claims that any of the information or documents provided in response to this information request constitute confidential commercial material within the meaning of 5 U.S.C. § 552(b)(4), or are protected from disclosure pursuant to 18 U.S.C. § 1905, Tesla must submit supporting information together with the materials that are the subject of the confidentiality request, in accordance with 49 CFR Part 512. Additional information can be found here: https://www.nhtsa.gov/coronavirus/submission-confidential-business-information.


If you have any questions regarding submission of a request for confidential treatment, contact Daniel Rabinovitz, Trial Attorney, Office of Chief Counsel at daniel.rabinovitz@dot.gov or (202) 366-8534.

**Due Date**

Tesla's response to this letter, in duplicate, together with a copy of any confidentiality request, must be submitted to this office by **November 1, 2021**. Tesla's response must include all non-confidential attachments and a redacted version of all documents that contain confidential information.  If Tesla finds that it is unable to provide all of the information requested within the time allotted, Tesla must request an extension from me at (202) 366-5226 no later than five business days before the response due date. If Tesla is unable to provide all of the information requested by the original deadline, it must submit a partial response by the original deadline with whatever information Tesla then has available, even if an extension has been granted.

Please send email notification to Steven Posada at STEVEN.POSADA@DOT.GOV and to ODI_IRresponse@dot.gov when Tesla sends its response to this office and indicate whether there is confidential information as part of Tesla's response.

If you have any technical questions concerning this matter, please call Steven Posada of my staff at (202) 366-9402.

Sincerely,

*Gregory Magno*

Gregory Magno, Chief
Vehicle Defects Division - D
Office of Defects Investigation

**EXHIBIT "4"**



U.S. Department of Transportation
**National Highway Traffic Safety
Administration**



1200 New Jersey Avenue SE.
Washington, DC 20590

October 12, 2021

<u>**CERTIFIED AND ELECTRONIC MAIL**</u>

Mr. Bill Berry
Vice President, Legal
Tesla, Inc.
3500 Deer Creek Road
Palo Alto, California 94304
bill.berry@tesla.com

Dear Mr. Berry:

In October 2020, Tesla released a feature called "Autosteer on City Streets" which the company
also refers to as "Full Self-Driving" (FSD).  FSD allows an equipped vehicle to drive to a
destination chosen by the driver, expanding the use of "Navigate on Autopilot" to non-controlled
surface streets.  Tesla states that the system is able to detect and respond to stops signs and traffic
signals and can carry out turns at intersections.  To date, Tesla has released the feature to a
limited number of employees and consumers pursuant to Tesla's early access beta release
program, and is in the process of expanding access.  Despite Tesla's characterization of FSD as
"beta" it is capable of and is being used on public roads.

Recently, NHTSA has become aware of reports that participants in Tesla's FSD early access beta
release program have non-disclosure agreements that allegedly limit the participants from
sharing information about FSD that portrays the feature negatively, or from speaking with certain
people about FSD.  Given that NHTSA relies on reports from consumers as an important source
of information in evaluating potential safety defects, any agreement that may prevent or dissuade
participants in the early access beta release program from reporting safety concerns to NHTSA is
unacceptable.  Moreover, even limitations on sharing certain information publicly adversely
impacts NHTSA's ability to obtain information relevant to safety.

In order to ensure that non-disclosure agreements regarding the FSD early access beta release do
not interfere with NHTSA's ability to exercise its oversight responsibilities we are issuing the
attached Special Order to Tesla.

NHTSA is charged under the National Traffic and Motor Vehicle Safety Act (Safety Act),
49 U.S.C. Chapter 301, with investigating potential defects that pose an unreasonable risk to
motor vehicle safety.  To carry out this responsibility it is imperative that NHTSA's access to
relevant safety information is not hindered.  To oversee compliance with the requirements of the

2

Safety Act and associated regulations, we are requiring that you provide the information in the attached Special Order.  You must respond in full to the requests in the enclosed Special Order by **November 1, 2021**.

If you do not timely or completely respond to the Requests in the Special Order, you may be subject to civil penalties of up to $22,992 per day.

If you have any questions, please contact Thomas Healy of my staff at (202) 366-7161 or thomas.healy@dot.gov.

Sincerely,

*Ann Carlson*

Ann Carlson
Chief Counsel

cc:  Eric Williams, ewilliams@tesla.com
    Beth Mykytiuk, emykytiuk@tesla.com

**UNITED STATES DEPARTMENT OF TRANSPORTATION**
**NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION**
1200 New Jersey Avenue SE
Washington, DC 20590

| | |
|---|---|
| In re: | ) |
| | ) |
| PE21-020 | ) |
| Tesla, Inc. | ) |
| | ) |

## <u>SPECIAL ORDER DIRECTED TO TESLA, INC.</u>

To:
Mr. Bill Berry
Vice President, Legal
Tesla, Inc.
3500 Deer Creek Road
Palo Alto, California 94304
bill.berry@tesla.com

This Special Order is issued by the National Highway Traffic Safety Administration

(NHTSA), an Operating Administration of the United States Department of Transportation,

pursuant to 49 U.S.C. § 30166(g)(1)(A) and 49 C.F.R. §§ 510.7-510.8.[1]

As described in the accompanying letter and based on currently available information,

NHTSA is concerned that Tesla may employ practices that could impede the agency's access to

safety-related information, including information relevant to NHTSA's above-referenced

investigation of Tesla vehicles.  This concern is based on available information that suggests

participants in the FSD early access beta release program may be prohibited or discouraged from

---

[1] *See* 49 C.F.R. §§ 1.95, 501.8(d)(3) (delegations of authority).

sharing certain information relevant to the performance of FSD, and therefore may also be prevented or dissuaded from submitting information regarding the safety of FSD to NHTSA. Accordingly, this Special Order now demands certain information from Tesla.

Tesla's response to this Special Order must be provided to NHTSA's Office of Chief Counsel by November 1, 2021.  The response should be sent to Thomas Healy, Office of Chief Counsel, at Thomas.Healy@dot.gov or, for large submissions, through the DOT Secure Large File Transfer Solution system.[2]

Tesla's response must be signed under oath, *i.e.,* accompanied by a declaration, signed by a responsible officer of Tesla, stating that he/she has undertaken and directed an inquiry reasonably calculated to assure that the answers and production of documents are complete and correct, that he/she has caused the documents of Tesla to be searched diligently for information and documents responsive to this Special Order and produced them to NHTSA, and that the answers to the inquiries provided to NHTSA respond completely and correctly to this Special Order.  28 U.S.C. § 1746; 49 U.S.C. § 30166(g)(1)(A); 49 C.F.R. § 510.7.

Failure to respond fully or truthfully to this Special Order may result in a referral to the United States Department of Justice for a civil action to compel responses, and may subject Tesla to civil penalties of up to $22,992 per day, up to a maximum penalty of $114,954,525 for a related series of daily violations.  49 U.S.C. §§ 30163(a)(1), 30165(a)(3); 49 C.F.R. § 578.6(a)(3).  Falsifying or withholding information in response to this Special Order may also lead to criminal penalties of a fine or imprisonment of up to 15 years, or both.  49 U.S.C. § 30170(a)(1).

---

[2] In order to use the File Transfer System, please email Thomas.Healy@dot.gov for a link.

## **DEFINITIONS**

Unless otherwise stated in the text, the following definitions apply to the information

request set forth below:

- **Tesla**: means all of its past and present officers and employees, whether assigned to its principal offices or any of its field or other locations, including all of its divisions, parent corporations at any tier, subsidiaries (whether or not incorporated) at any tier, and affiliated enterprises and all of their headquarters, regional, zone and other offices and their employees, and all agents, contractors, consultants, attorneys and law firms and other persons engaged directly or indirectly (e.g., employee of a consultant) by or under the control of Tesla (including all business units and persons previously referred to).

- **Agent:** means an individual, such as a representative, who is authorized to act for or in place of another.

- **Describe:** means to provide, with respect to any act, occurrence, transaction, event, statement, communication, or conduct (hereinafter, collectively, "act"), all facts concerning any such act, including, but not limited to, a description of each act, and the date, the location, and the names and addresses of all persons involved.

- **Early access beta release:** means the capability to use FSD in a Tesla vehicle.

- **Employee:** means a person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance.

- **FSD:** means Tesla "Full Self-Driving," also referred to by Tesla as "Autosteer on City Streets."

- **Officer:** means a person who holds an office of trust, authority, or command, such as a person elected or appointed by the board of directors to manage the daily operations of a corporation, such as a CEO, president, secretary, or treasurer.

- **You** or **Your:** means Tesla or Tesla's.

- **Non-disclosure agreement:** Any agreement or license, whether signed or otherwise accepted, between Tesla and any participant in Tesla's FSD early access beta release program, including Tesla employees, that by its terms limits or discourages in any way the early access beta release participant from sharing information about or discussing, with any person outside of Tesla, any aspect of FSD.

- **Document:** "Document(s)" is used in the broadest sense of the word and shall mean all original written, printed, typed, recorded, or graphic matter whatsoever, however produced or reproduced, of every kind, nature, and description, and all non-identical copies of both sides thereof, including, but not limited to, papers, letters, memoranda, correspondence, communications, electronic mail (e-mail) messages (existing in hard copy and/or in electronic storage), faxes, mailgrams, telegrams, cables, telex messages, notes, annotations, working papers, drafts, minutes, records, audio and video recordings, data, databases, other information bases, summaries, charts, tables, graphics, other visual displays, photographs, statements, interviews, opinions, reports, newspaper articles, studies, analyses, evaluations, interpretations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, instructions, blueprints, drawings, as-builts, changes, manuals, publications, work schedules, journals, statistical data, desk, portable and computer calendars, appointment books, diaries, travel reports, lists, tabulations, computer printouts, data processing program libraries, data processing inputs and outputs, microfilms, microfiches, statements for services, resolutions, financial statements, governmental records, business records, personnel records, work orders, documents generated through litigation, arbitration, or mediation, pleadings, mediation statements, discovery in any form, affidavits, motions, responses to discovery, all transcripts, administrative filings and all mechanical, magnetic, photographic and electronic records or recordings of any kind, including any storage media associated with computers, including, but not limited to, information on hard drives, floppy disks, backup tapes, and zip drives, electronic communications, including but not limited to, the Internet and shall include any drafts or revisions pertaining to any of the foregoing, all other things similar to any of the foregoing, however denominated by Tesla, any other data compilations from which information can be obtained, translated if necessary, into a usable form and any other documents.  For purposes of this request, any document which contains any note, comment, addition, deletion, insertion, annotation, or otherwise comprises a non-identical copy of another document shall be treated as a separate document subject to production. In all cases where original and any non-identical copies are not available, "document(s)" also means any identical copies of the original and all non-identical copies thereof.  Any document, record, graph, chart, film or photograph originally produced in color must be provided in color.  Furnish all documents whether verified by Tesla or not.  If a document is not in the English language, provide both the original document and an English translation of the document.

- **Other Terms:**  To the extent that they are used in these information requests, the terms "claim," "dealer field report," "field report," "fire," "fleet," "good will," "make," "model," "model year," "notice," "property damage," "property damage claim," "rollover," "type," "warranty," "warranty adjustment," and "warranty claim," whether used in singular or in plural form, have the same meaning as found in 49 C.F.R. § 579.4.

## INSTRUCTIONS

Please follow the instructions below when providing responses to the numbered

information requests in the next section.

1.      Your response to the Special Order shall be sent to Office of the Chief Counsel

(NCC-100), National Highway Traffic Safety Administration by email to Thomas Healy at

Thomas.healy@dot.gov or through the DOT Secure Large File Transfer Solution system.[3]

2.      Please repeat the applicable request verbatim above your response.  After your

response to each request, identify the source of the information and indicate the last date the

information was gathered.

3.      When documents are produced and the documents would not, standing alone, be

self-explanatory, the production of documents shall be supplemented and accompanied by

explanation.  Please also be reminded that where a document responsive to a request is not in the

English language, both the original document and an English translation of the document must

be produced.

4.      You are required to respond to every request listed in this Special Order.  If you

cannot respond to any specific request or subpart(s) thereof, please state the reason why you are

unable to do so.  If you are unable to respond because you do not have all or any of the precise

information needed to respond, provide an estimate.  If, on the basis of attorney-client, attorney

work product, or other privilege, you do not submit one or more requested documents or items of

information in response to this Special Order, you must provide a privilege log identifying each

document or item withheld, and stating the date, subject or title, name and position of the

---

[3] In order to use the File Transfer System, please email Thomas.Healy@dot.gov for a link.

person(s) from, and the person(s) to whom it was sent, and the name and position of any other

recipient (to include all carbon copies or blind carbon copies), the nature of that information or

material, and the basis for the claim of privilege and why that privilege applies.

5.      After your response to each request, state whether you previously had any

responsive documents that are no longer within your possession, custody, or control, including

but not limited to because the documents were lost or destroyed.  If such documents ever existed:

describe the documents; identify the reason that the documents are no longer in your possession,

custody, or control; identify the date that you last had the documents; and identify who may have

copies of such documents.

6.      If you claim that any of the information or documents provided in response to this

Special Order constitutes confidential commercial material within the meaning of 5 U.S.C.

§ 552(b)(4), or is protected from disclosure pursuant to 18 U.S.C. § 1905, you must submit

supporting information together with the materials that are the subject of the confidentiality

request, in accordance with 49 C.F.R. Part 512, to the Office of Chief Counsel (NCC-100),

National Highway Traffic Safety Administration as instructed below.

7.      To facilitate social distancing due to COVID-19, NHTSA is treating electronic

submission as an acceptable method for submitting confidential business information (CBI) to

the agency under 49 C.F.R. Part 512.[4]  Since Part 512 submissions are handled by NHTSA's

Office of Chief Counsel, any Part 512 submission should be sent to the Office of Chief Counsel

electronically.  Specifically, any CBI submissions sent via email should be sent to Thomas Healy

at Thomas.Healy@dot.gov.

---

[4] *See* https://www.nhtsa.gov/coronavirus/submission-confidential-business-information.

At this time, regulated entities should not send a duplicate hardcopy of their electronic CBI submissions to DOT headquarters.  Please note that these modified submission procedures are only to facilitate continued operations while maintaining appropriate social distancing due to COVID-19.  Regular procedures for Part 512 submissions will resume upon further notice, when NHTSA and regulated entities discontinue operating primarily in telework status.

For questions about CBI issues, including these modified submission procedures, please contact Dan Rabinovitz in the Office of Chief Counsel at Daniel.Rabinovitz@dot.gov or 202-366-8534.

8.     All documents shall be produced electronically, as described below, in a common format (*e.g.*, Word, PDF, Microsoft Access) or other electronic formats commonly used by Tesla and discernable to NHTSA.

    a.  Hard copy documents shall be imaged in PDF format. They shall be provided as multi-page PDFs with document level optical character recognition (OCR).

    b.  Electronically Stored Information (ESI) shall be produced in native format (*e.g.*, Microsoft Excel) or converted to multi-page PDFs and produced along with document level OCR/extracted text.

    c.  You shall organize the documents by request number and as instructed in the request to which it responds or, if no instruction is given in a request, in chronological order by project, report, or other similar categorization responsive to that numbered request.

    d.  After the documents are so organized, and in sequential order to the request to which each responds, you shall apply Bates Numbers to the entire production.

    e.  You shall produce an index that lists the title of each document produced, the

Bates Numbers on the document, and the request to which it corresponds.

9.      When a request calls for a detailed, narrative response, do not identify business records or other documents in lieu of providing a written narrative.  A response to a request for a written narrative that solely directs NHTSA to documents will be considered non-responsive, and may result in civil penalties. 49 U.S.C. §§ 30163(a)(1), 30165(a)(3); 49 C.F.R. § 578.6(a)(3). A response to a request for a detailed, narrative response that includes references to specific Bates Number(s) in addition to a written narrative will not be considered a violation of this Instruction.

10.      The singular includes the plural; the plural includes the singular.  The masculine gender includes the feminine and neuter genders; and the neuter gender includes the masculine and feminine genders.  "And" as well as "or" shall be construed either disjunctively or conjunctively, to bring within the scope of this Special Order all responses that might otherwise be construed to be outside its scope.  "Each" shall be construed to include "every" and "every" shall be construed to include "each."  "Any" shall be construed to include "all" and "all" shall be construed to include "any."  The use of a verb in any tense shall be construed as the use of the verb in a past or present tense, whenever necessary to bring within the scope of the document requests all responses which might otherwise be construed to be outside its scope.

11.      Tesla's response to this Special Order must be under oath, *i.e.,* accompanied by an declaration, signed by a responsible officer of Tesla, stating that he/she has undertaken and directed an inquiry reasonably calculated to assure that the answers and production of documents are complete and correct, that he/she has caused the documents of Tesla to be searched diligently for information and documents responsive to this Special Order and produced them to NHTSA,

and that the answers to the inquiries provided to NHTSA respond completely and correctly to this Special Order.

12.     The requests in this Special Order are deemed to be continuing in nature so as to require additional or amended responses from you should you obtain or become aware of any new, additional, or differing responsive information or documents.

## **REQUESTS**

1.  Describe the manner in which non-disclosure agreements between Tesla and FSD early access beta release program participants are executed, i.e. whether via acceptance of terms of use, electronic signature,  physical signature or by some other means.  State whether the manner in which Tesla employee and Tesla non-employee participants execute the FSD non-disclosure agreement differs.

2.  Provide a copy of any non-disclosure agreement(s) entered into with any non-employee participant in the early access beta release of FSD.

3.  Provide a copy of any non-disclosure agreement(s) entered into with any employee participant in the early access beta release of FSD.

4.  State whether Tesla requires vehicle owners to agree (whether through a contract, license or terms of use agreement, or otherwise) as a condition of use of Autopilot to any terms that would prevent or discourage vehicle owners from sharing information about or discussing any aspect of Autopilot with any person other than Tesla.  Produce a copy of any such agreement(s) with such terms.

Dated:  October 12, 2021

*Ann C Carlson*
_____
Ann Carlson
Chief Counsel

**EXHIBIT "5"**



U.S. Department
of Transportation

**National Highway
Traffic Safety
Administration**

1200 New Jersey Avenue SE.
Washington, DC  20590

August 31, 2021

<u>**SENT VIA E-MAIL**</u>

**Eddie Gates**                                                                NEF-104
**Director, Field Quality**                                           PE21-020
**Tesla, Inc.**
**45500 Fremont Blvd.**
**Fremont, CA 94538**

Dear Mr. Gates:

This letter is to inform you that the Office of Defects Investigation (ODI) of the National Highway Traffic Safety Administration (NHTSA) has opened a Preliminary Evaluation (PE21-020) to investigate crashes involving first responder scenes and vehicles manufactured by Tesla, Inc. (Tesla) that were operating in either Autopilot or Traffic Aware Cruise Control leading up to the incident, and to request certain information.

This office is aware of twelve incidents where a Tesla vehicle operating in either Autopilot or Traffic Aware Cruise Control struck first responder vehicles / scenes, leading to injuries and vehicle damage. In each case, NHTSA has reviewed the incidents with Tesla. A list of the twelve incidents has been included for reference.

Unless otherwise stated in the text, the following definitions apply to these information requests:[1]

- <u>**Level 2 ADAS:**</u> a driver support feature (Advanced Driver Assistance System) on the vehicle that can control both steering and braking/accelerating simultaneously under some circumstances. The human driver must remain fully and continuously engaged in the (Level 2) driving task.[2]

- <u>**ODD:**</u> Operational Design Domain or operating conditions under which a given driving automation system or feature thereof is specifically designed to function, including, but

---

[1] Unless otherwise specified herein, any terms in these information requests that relate to an Advanced Driver Assistance System (ADAS), including the SAE International levels of driving automation, should be construed to have the same meaning as any overlapping term defined in NHTSA First Amended Standing General Order 2021-01, which is located at https://www.nhtsa.gov/sites/nhtsa.gov/files/2021-08/First_Amended_SGO_2021_01_Final.pdf

[2] "Level 2" means the same as and is coterminous with the definition of "Level or Category 2 - Partial Driving Automation" in SAE J3016 Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles § 5.3 (April 2021).

not limited to, environmental, geographical, and time-of-day restrictions, and/or the requisite presence or absence of certain traffic or roadway characteristics.[3]

- **DDT:** Dynamic Driving Task or all of the real-time operational (lateral and longitudinal movement of vehicle) and tactical (planning component) functions required to operate a vehicle in on-road traffic, excluding the strategic functions such as trip scheduling and selection of destinations and waypoints, and including without limitation:
  - Lateral vehicle motion control via steering (operational);
  - Longitudinal vehicle motion control via acceleration and deceleration (operational);
  - Monitoring the driving environment via object and event detection, recognition, classification, and response preparation (operational and tactical);
  - Object and event response execution (operational and tactical);
  - Maneuver planning (tactical); and
  - Enhancing conspicuity via lighting, signaling and gesturing, etc. (tactical).[4]

- **OEDR:** Object and event detection and response or the subtasks of the DDT that include monitoring the driving environment (detecting, recognizing, and classifying objects and events and preparing to respond as needed) and executing an appropriate response to such objects and events (i.e., as needed to complete the DDT and/or DDT fallback).[5]

- **Subject System**: Suite of software, hardware, data, and any other related systems on or off the vehicle that contributes to the conferral of any Level 2 capabilities on any Tesla vehicle, including but not limited to the various "Autopilot" packages.

- **Subject Vehicles:** All Tesla vehicles, model years 2014 - 2021, equipped with the subject system at any time, and manufactured for sale or lease in the United States, including, but not limited to, the District of Columbia, and current U.S. territories and possessions.

- **Subject Crashes**: Incidents in which any subject vehicle experiences a crash in the United States (including any of its territories) with the subject system engaged at any time during the period beginning 30 seconds immediately prior to the commencement of the crash.

- **Tesla:** Tesla, Inc. all of its past and present officers and employees, whether assigned to its principal offices or any of its field or other locations, including all of its divisions, subsidiaries (whether or not incorporated) and affiliated enterprises and all of their

---

[3] "ODD" means the same as and is coterminous with the definition of "Operational Design Domain" in SAE J3016 Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles § 3.22 (April 2021).

[4] "DDT" means the same as and is coterminous with the definition of "Dynamic Driving Task" in SAE J3016 Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles § 3.13 (April 2021).

[5] "OEDR" means the same as and is coterminous with the definition of "Object and Event Detection and Response" in SAE J3016 Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles § 3.20 (April 2021).

headquarters, regional, zone and other offices and their employees, and all agents, contractors, consultants, attorneys and law firms and other persons engaged directly or indirectly (e.g., employee of a consultant) by or under the control of Tesla (including all business units and persons previously referred to), who are or, in or after January 1st, 2011 were involved in any way with any of the following related to the alleged defect in the subject vehicles:

a. Design, engineering, analysis, modification or production (e.g. quality control);
b. Testing, assessment or evaluation;
c. Consideration, or recognition of potential or actual defects, reporting, record-keeping and information management, (e.g., complaints, field reports, warranty information, part sales), analysis, claims, or lawsuits; or
d. Communication to, from or intended for zone representatives, fleets, dealers, or other field locations, including but not limited to people who have the capacity to obtain information from dealers.

- **Document:** "Document(s)" is used in the broadest sense of the word and shall mean all original written, printed, typed, recorded, or graphic matter whatsoever, however produced or reproduced, of every kind, nature, and description, and all non-identical copies of both sides thereof, including, but not limited to, papers, letters, memoranda, correspondence, communications, electronic mail (e-mail) messages (existing in hard copy and/or in electronic storage), faxes, mailgrams, telegrams, cables, telex messages, notes, annotations, working papers, drafts, minutes, records, audio and video recordings, data, databases, other information bases, summaries, charts, tables, graphics, other visual displays, photographs, statements, interviews, opinions, reports, newspaper articles, studies, analyses, evaluations, interpretations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, instructions, blueprints, drawings, as-builts, changes, manuals, publications, work schedules, journals, statistical data, desk, portable and computer calendars, appointment books, diaries, travel reports, lists, tabulations, computer printouts, data processing program libraries, data processing inputs and outputs, microfilms, microfiches, statements for services, resolutions, financial statements, governmental records, business records, personnel records, work orders, pleadings, discovery in any form, affidavits, motions, responses to discovery, all transcripts, administrative filings and all mechanical, magnetic, photographic and electronic records or recordings of any kind, including any storage media associated with computers, including, but not limited to, information on hard drives, floppy disks, backup tapes, and zip drives, electronic communications, including but not limited to, the Internet and shall include any drafts or revisions pertaining to any of the foregoing, all other things similar to any of the foregoing, however denominated by Tesla, any other data compilations from which information can be obtained, translated if necessary, into a usable form and any other documents. For purposes of this request, any document which contains any note, comment, addition, deletion, insertion, annotation, or otherwise comprises a non-identical copy of another document shall be treated as a separate document subject to production. In all cases where original and any non-identical copies are not available, "document(s)" also means any identical copies of the original and all non-identical copies thereof. Any document, record, graph, chart, film or photograph originally produced in color must be provided in color. Furnish all documents whether verified by Tesla or not. If a document

is not in the English language, provide both the original document and an English translation of the document.

- **Other Terms:**  To the extent that they are used in these information requests, the terms "claim," "consumer complaint," "dealer field report," "field report," "fire," "fleet," "good will," "make," "model," "model year," "notice," "property damage," "property damage claim," "rollover," "type," "warranty," "warranty adjustment," and "warranty claim," whether used in singular or in plural form, have the same meaning as found in 49 CFR 579.4.

In order for my staff to evaluate the alleged defect, certain information is required.  Pursuant to 49 U.S.C. § 30166, please provide numbered responses to the following information requests. Insofar as Tesla has previously provided a document to ODI, Tesla may produce it again or identify the document, the document submission to ODI in which it was included and the precise location in that submission where the document is located.  When documents are produced, the documents shall be produced in an identified, organized manner that corresponds with the organization of this information request letter (including all individual requests and subparts). When documents are produced and the documents would not, standing alone, be self-explanatory, the production of documents shall be supplemented and accompanied by explanation.

Please repeat the applicable request verbatim above each response.  After Tesla's response to each request, identify the source of the information and indicate the last date the information was gathered.

1. State, by model and model year, the number of subject vehicles Tesla has manufactured for sale or lease or operation in the United States.  Separately, for each subject vehicle manufactured to date by Tesla, state the following:

   a. Vehicle identification number (VIN);
   b. Model;
   c. Model Year;
   d. Subject component trade / trim name, part number and design version installed as original equipment; including:
      i)   Software version;
      ii)  Firmware version;
      iii) Hardware version;
   e. Date of manufacture;
   f. Date warranty coverage commenced;
   g. Date and mileage at which the "Full Self Driving" (FSD) option was enabled;
   h. The State in the United States where the vehicle was originally sold or leased (or delivered for sale or lease);
   i. Latest known vehicle mileage and commensurate date;
   j. Cumulative mileage covered with the subject system engaged; and
   k. Date and identities of the most recent software, firmware, and hardware updates.

Provide the table in Microsoft Access 2010, or a compatible format, entitled "PRODUCTION DATA."

2.  State the number of each of the following, received by Tesla, or of which Tesla is otherwise aware, which relate to, or may relate to the subject system or subject crashes in the subject vehicles:
    a.  Consumer Complaints;
    b.  Field Reports;
    c.  Reports involving a crash, injury or fatality;
    d.  Property damage claims;
    e.  Third-party arbitration proceedings where Tesla is or was a party to the arbitration; and
    f.  Lawsuits, both pending and closed, in which Tesla is or was a defendant or codefendant.

    For subparts "a" through "f" state the total number of each item (e.g., consumer complaints, field reports, etc.) separately.  Multiple incidents involving the same vehicle are to be counted separately.  Multiple reports of the same incident are also to be counted separately (i.e., a consumer complaint and a field report involving the same incident in which a crash occurred are to be counted as a crash report, a field report and a consumer complaint).

    In addition, for items "e" and "f", provide a summary description of the alleged problem and causal and contributing factors and Tesla's assessment of the problem, with a summary of the significant underlying facts and evidence.  For items "e" and "f," identify the parties to the action, as well as the caption, court, docket number, and date on which the complaint or other document initiating the action was filed.

3.  Separately, for each item (complaint, report, claim, notice, or matter) within the scope of your response to Request No. 2, state the following information:

    a.  Tesla's file number or other identifier used;
    b.  The category of the item, as identified in Request No. 2 (i.e., consumer complaint, field report, etc.);
    c.  Vehicle owner or fleet name (and fleet contact person), street address, email address and telephone number;
    d.  Vehicle's VIN;
    e.  Vehicle's model and model year;
    f.  Vehicle's mileage at time of incident;
    g.  Software, firmware, and hardware versions in place at the time of the incident, along with vehicle and mileage and date of installation;
    h.  Incident date, local time, and local time zone;
    i.  Report or claim date;
    j.  Whether a crash is alleged;
    k.  Description of the crash including:
        i)   Crash site coordinates (latitude and longitude);
        ii)  Listing of involved vehicles, objects and persons;
        iii) Speed and direction of the subject vehicle;
        iv)  Documented subject vehicle driver impairment;

     v)   Location / orientation of the subject vehicle in relation to other involved vehicles, objects, persons at the time of impact;

     vi)  Timing of subject system engagement / disengagement over the 30 second period leading to the subject crash and, if not:

        (1) Description and timing of driver control inputs that may have overridden the subject system;

     vii) Description of the intervention of:

        (1) crash warning or avoidance systems (e.g., AEB, FCW)

        (2) subject system logic intended to detect first responder vehicles / scenes on or off the roadway;

l.  Description and timing of the last driver engagement warning prior to the subject crash;

m.  Duration (minutes) and distance (miles) of the drive cycle that led to the subject crash;

n.  Whether property damage is alleged;

o.  Number of alleged injuries, if any; and

p.  Number of alleged fatalities, if any.

Provide this information in Microsoft Access 2010, or a compatible format, entitled "REQUEST NUMBER TWO DATA."

4.  Produce copies of all documents, telematics reports / data, and data logs related to each item within the scope of Request No. 2.  Organize the documents separately by category (i.e., consumer complaints, field reports, etc.) and describe the method Tesla used for organizing the documents.  Describe in detail the search methods and search criteria used by Tesla to identify the items in response to Request No. 2.

In addition, provide a full copy of any expert report that has been produced by Tesla or received from another party in a lawsuit, arbitration, or a pre-suit claim regarding the incidents identified in Request Number 2. This includes any reports produced or exchanged for experts designated by any party in such litigation, including Tesla, plaintiff(s), or co-defendants. This does not include reports that Tesla has never produced to another party, to the extent Tesla claims a privilege exists for such a report.

5.  For each trade name / trim level of the subject system available in the subject vehicles, state its name and designation including:

a.  Describe the ODD specified to the customer by Tesla for the intended use of the system, including but not limited to:

     i)   Types of roads, road marking, weather conditions, etc. the system is intended to be used on and the types of roads the system should not be used;

     ii)  List the methods and technologies used to prevent subject system usage outside the ODD specified to the customer by Tesla; and

     iii) If the subject system can be engaged (or remain engaged) outside of the ODD specified to the customer by Tesla, state the reasons for this capability and describe any performance restrictions or modifications to the subject system's operational characteristics in such an environment (e.g. slower maximum speeds or control authority, additional driver warnings, adjustments to the driver engagement system).

b. Describe the subject system's maximum control authority over steering (steering angle (degrees), rate (degrees / sec), lateral acceleration (g)), braking (g), and acceleration (g) functions during routine and crash-imminent operations. Separately include any additional conditions and control authority values that Tesla deems appropriate.

c. List and describe the information, system status, alerts, warnings, and graphics communicated by the subject vehicle to its driver during the DDT (e.g., warning lights, instrument panel animations, aural warnings, haptic warnings) during the following subject system operational conditions:
   i)   Routine subject system operation;
   ii)  Scenarios where the vehicle requires driver intervention (e.g., driver engagement needed, imminent ODD exit, system fault); and
   iii) When the subject vehicle detects that a crash is imminent.

d. Furnish an overview of Tesla's approach to the enforcement of driver engagement / attentiveness during the subject system's operation in the subject vehicles. Include a description of all means of detecting (both through direct measurement and inference) / monitoring driver engagement / attentiveness including:
   i)   The technological means and related logic (including direct measurement or inference) used to sense driver engagement / attentiveness;
   ii)  Minimum contact or detected engagement duration and time between contact / detected engagement required to satisfy the driver engagement / attentiveness logic including changes based on variations in driving conditions such as vehicle speed or presence of a lead vehicle;
   iii) Describe any warning strategies or messaging and timing associated with each system identified above in subpart (ii) (include pictures/videos of all audible & visual warnings/alerts); and
   iv)  Describe any escalation or lockout strategies used to address either unresponsive drivers or repeated engagement warnings in any given drive cycle.

e. Describe subject system responses to driver control inputs that could cancel or override one or more of its Level 2 functions. For each driver input, include:
   i)   Driver input description and minimum threshold (e.g., minimum steering angle or rate);
   ii)  List the Level 2 functions disabled and permitted to continue operation following a driver override;
   iii) Describe / illustrate warnings and messages to the driver concerning the system status following a driver override; and
   iv)  Explain which, if any, of the disabled Level 2 functions resume operation in their own after the override input and under what conditions.

f. List the conditions / events / alerts that may prompt an operating subject system to require a "take-over" by the driver. For each such condition, list:
   i)   Sequence of events and timing for each; and
   ii)  Intended vehicle behavior in the instance where a driver take-over is not detected.

g.  Describe the subject system OEDR capabilities within the ODD specified to the customer by Tesla. List the objects and events that the system is designed to detect (e.g., particular vehicle aspects, pedestrians, road signs, drivable space limitations, environmental (weather / road surface / lighting) conditions, path predictions, object classifications). For each item, list:
    i)   Subject system behavior;
    ii)  Limitations on detection; and
    iii) Subject system interaction with crash avoidance technologies.

6.  Produce copies of all instructional, service, warranty, marketing, and other documents that relate to, or may relate to, the operation of each trade name / trim level of the subject system in the subject vehicles, that Tesla has issued to any customers, dealers, regional or zone offices, field offices, fleet purchasers, or other entities.  This includes, but is not limited to, bulletins, advisories, informational documents, training documents, digital messages on a subject vehicle display, or other documents or communications, with the exception of standard shop manuals.  Also, include the latest draft copy of any communication that Tesla is planning to issue within the next 120 days.

7.  For each trade name / trim level of the subject system available in the subject vehicles, describe all modifications or changes made by, or on behalf of, Tesla in the design, material composition, manufacture, quality control, supply, function, or installation of the subject system, from the start of production to date, which relate to, or may relate to driver engagement / attentiveness and OEDR by the subject system in the subject vehicles.  For each such modification or change, provide the following information:

    a.  The date or approximate date on which the modification or change was incorporated into vehicle production;
    b.  A detailed description of the modification or change;
    c.  The reason(s) for the modification or change;
    d.  The hardware, firmware, and software names and numbers of the original version;
    e.  The hardware, firmware, and software names and numbers of the modified version;
    f.  Primary distribution method of related firmware and software updates (over the air or in-person service); and
    g.  When the modified version / update was made available as a service component.

    Also, provide the above information for any modification or change that Tesla is aware of which may be incorporated into vehicle production or pushed to subject vehicles in the field within the next 120 days.

8.  Describe Tesla's strategies for detecting and responding to the presence of first responder / law enforcement vehicles and incident scene management tactics whether in or out of the roadway during subject system operation in the subject vehicles. Include:
    a.  Incident scene detection (particularly flashing lights, road flares, cones / barrels, reflectorized vests on personnel, vehicles parked at an angle "fend-off" position");
    b.  Explain the effects of low light conditions on these strategies; and
    c.  List subject system behaviors (e.g., driver warnings, control interventions).

9. Describe any processes, procedures, or policies governing the extent of testing and validation required prior to the release of the subject system or an in-field update to the subject system, including hardware and software components of such systems, identifying, in particular:

    a. The extent of field testing or vehicle validation miles required prior to the release of such a system or feature;

    b. The extent of any computer simulations or training data sets required to be conducted prior to the release of such a system or feature and the degree to which any such simulations are relied upon for testing and validation in lieu of field testing;

    c. The extent to which the processes, procedures, or policies for the testing and validation identified above differ, if at all, for updates to a subject system or feature (e.g. software updates) compared to the first release of the system or feature;

    d. The length of time that the processes, procedures, or policies for the testing and validation identified above have been in place; and

    e. Any processes, procedures, or policies in place to compare the performance of a subject system or feature in the field after a release with the design intent for the system or feature.

10. Describe Tesla's processes for identifying and investigating the subject crashes in the subject vehicles with the subject system in operation including:

    a. Vehicle's Data collection/logging capabilities including vehicle's ability to wirelessly transmit data including:

        i) Any limitations on such transmittal (e.g. poor wireless connectivity, etc.)

        ii) Countermeasures / alternate retrieval options when transmittal limitations apply;

    b. Procedures for investigating customer concerns or safety incidents; and

    c. Metrics used to assess safety performance.

11. Furnish Tesla's assessment of the impact of the subject system on the subject crashes in the subject vehicle, including:

    a. The causal or contributory factor(s);

    b. The failure mechanism(s);

    c. The failure mode(s);

    d. The risk to motor vehicle safety that they pose; and

    e. The crashes referenced by this inquiry.

## Legal Authority for This Request

This letter is being sent to Tesla pursuant to 49 U.S.C. § 30166, which authorizes NHTSA to conduct any investigation that may be necessary to enforce Chapter 301 of Title 49 and to request reports and the production of things.  It constitutes a new request for information.

## Civil Penalties

Tesla's failure to respond promptly and fully to this letter could subject Tesla to civil penalties pursuant to 49 U.S.C. § 30165 or lead to an action for injunctive relief pursuant to 49 U.S.C. § 30163.  (Other remedies and sanctions are available as well.)  The Vehicle Safety Act, as

amended, 49 U.S.C. § 30165(a)(3), provides for civil penalties of up to $22,992 per violation per day, with a maximum of $114,954,525 for a related series of daily violations, for failing or refusing to perform an act required under 49 U.S.C. § 30166. *See* 49 CFR 578.6 (as amended by Fixing America's Surface Transportation Act (the "FAST Act"), Pub. L. 114-94, § 24110(a)(2), 129 Stat. 1312 (Dec. 4, 2015)). This includes failing to respond completely, accurately, and in a timely manner to ODI information requests.

If Tesla cannot respond to any specific request or subpart(s) thereof, please state the reason why it is unable to do so. If on the basis of attorney-client, attorney work product, or other privilege, Tesla does not submit one or more requested documents or items of information in response to this information request, Tesla must provide a privilege log identifying each document or item withheld, and stating the date, subject or title, the name and position of the person(s) from, and the person(s) to whom it was sent, and the name and position of any other recipient (to include all carbon copies or blind carbon copies), the nature of that information or material, and the basis for the claim of privilege and why that privilege applies.

### Confidential Business Information

**All business confidential information must be submitted directly to the Office of Chief Counsel as described in the following paragraph and should not be sent to this office.** In addition, do not submit any business confidential information in the body of the letter submitted to this office. Please refer to PE21-020 in Tesla's response to this letter and in any confidentiality request submitted to the Office of Chief Counsel.

If Tesla claims that any of the information or documents provided in response to this information request constitute confidential commercial material within the meaning of 5 U.S.C. § 552(b)(4), or are protected from disclosure pursuant to 18 U.S.C. § 1905, Tesla must submit supporting information together with the materials that are the subject of the confidentiality request, in accordance with 49 CFR Part 512. Additional information can be found here:https://www.nhtsa.gov/coronavirus/submission-confidential-business-information.

If you have any questions regarding submission of a request for confidential treatment, contact Daniel Rabinovitz, Trial Attorney, Office of Chief Counsel at daniel.rabinovitz@dot.gov or (202) 366-8534.

### Due Date

Tesla's response to this letter, in duplicate, together with a copy of any confidentiality request, must be submitted to this office by **Friday, October 22, 2021**. Tesla's response must include all non-confidential attachments and a redacted version of all documents that contain confidential information. If Tesla finds that it is unable to provide all of the information requested within the time allotted, Tesla must request an extension from me at (202) 366-5226 no later than five business days before the response due date. If Tesla is unable to provide all of the information requested by the original deadline, it must submit a partial response by the original deadline with whatever information Tesla then has available, even if an extension has been granted.

Please send email notification to Steven Posada at STEVEN.POSADA@DOT.GOV and to ODI_IRresponse@dot.gov when Tesla sends its response to this office and indicate whether there is confidential information as part of Tesla's response.

If you have any technical questions concerning this matter, please call Steven Posada of my staff at (202) 366-9402.

Sincerely,

*Gregory Magno*

Gregory Magno, Chief
Vehicle Defects Division - D
Office of Defects Investigation

Incident List

| Date | City/County | State |
|------|-------------|-------|
| 08/28/2021 | Orlando | FL |
| 07/10/2021 | San Diego | CA |
| 05/19/2021 | Miami | FL |
| 03/17/2021 | Lansing | MI |
| 02/27/2021 | Montgomery County | TX |
| 08/26/2020 | Charlotte | NC |
| 07/30/2020 | Cochise County | AZ |
| 01/22/2020 | West Bridgewater | MA |
| 12/29/2019 | Cloverdale | IN |
| 12/10/2019 | Norwalk | CT |
| 05/29/2018 | Laguna Beach | CA |
| 01/22/2018 | Culver City | CA |