**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO: 21-cv-21940-BLOOM/Otazo-Reyes**

NEIMA BENAVIDES, as Personal
Representative of the Estate of
NAIBEL BENAVIDES LEON, deceased,
And DILLON ANGULO

      Plaintiffs,

v.

TESLA, INC. a/k/a TESLA FLORIDA,
INC.,

      Defendant.

_____/

**PLAINTIFFS' MOTION TO EXTEND AMENDMENT DEADLINE AND FOR LEAVE**
**TO CONSOLIDATE AND AMEND THEIR COMPLAINT**
**AND MEMORANDUM OF LAW IN SUPPORT**

      COME NOW Plaintiffs Neima Benavides, as Personal Representative of the Estate of Naibel Benavides Leon, deceased, and Dillon Angulo, pursuant to Federal Rules of Civil Procedure 16(b)(4) and 15(a), and hereby file this Motion to Extend the Amendment Deadline and for Leave to Consolidate and Amend their Complaint to Assert a Claim for Punitive Damages, Fraudulent Misrepresentation, Fraudulent Concealment, and Intentional False Advertising under Florida Statute §817.44, against Defendant TESLA, INC. (Tesla) and Memorandum of Law in Support.

**I. BACKGROUND**

      From the outset of this lawsuit, Plaintiffs have advised the court that the National Highway Traffic Safety Administration (NHTSA) was conducting an investigation in the autopilot system at issue in this lawsuit and that Plaintiff intended to rely, in part, on its findings. On December 12,

2023, NHTSA issued a recall of virtually all Tesla vehicles made since 2015, including the Model S that was involved in this accident. [Exhibit 1] NHTSA's findings provide new, previously undiscoverable evidence of the defect alleged in this case. Further, Tesla's inadequate response to NHTSA's actions provide further new, previously undiscoverable evidence of Tesla's callous indifference to the safety of others and fraud. This new evidence could not have been discovered prior to the October 28, 2022, deadline for the parties to amend pleadings.

Accordingly, Plaintiffs move this Court for leave to amend their complaint to assert a claim for punitive damages, fraudulent mistatement and concealment, and intentional false advertising under Florida Statute §817.44, as set forth in the proposed Amended Complaint. [Exhibit 2].

A. The NHTSA Recall

Plaintiffs have alleged that the McGee Model S had an Autopilot system that was not fully tested for safety and was not designed to be used on roadways with cross-traffic or intersections but was nevertheless allowed by Tesla to be operated in such areas. Tesla programed Autopilot to allow it to be used on roadways that Tesla knew were not suitable for its use and knew this would result in collisions causing injuries and deaths of innocent people, such as Plaintiffs, who did not choose to be a part of Tesla's experiments. Tesla has known for years of other fatal collisions when Autopilot was being used outside of the area for which it was designed. Specifically, Tesla knew as of May 2016, almost three years before this crash, that Tesla drivers would overestimate Autopilot's capabilities and result in fatal crashes.

Despite knowing of Autopilot's deficiencies, Tesla advertised Autopilot in a way that greatly exaggerated its capabilities and hid its deficiencies. Rather than taking appropriate steps to ensure the safety of its customers and others, Tesla and its CEO, Elon Musk, made the intentional decision to continue encouraging Tesla drivers to over-rely on its Autopilot system. Tesla chose to continue profiting from the sales of their defective vehicles and software systems rather than heed warnings from government agencies, experts, and other car companies.

B. New Information – Autopilot Recall December 12, 2023, and Tesla's Response

Plaintiff seeks to add allegations regarding the NHTSA recall and Tesla's inadequate response thereto. On December 12, 2023, the National Highway Traffic Safety Administration (NHTSA) submitted its Part 573 Safety Recall Report number 23V-838, recalling virtually all Tesla vehicles made since 2012, potentially 2,031,220 vehicles. [Exhibit 1]

This recall resulted from investigations NHTSA conducted over the past few years, beginning with a Preliminary Evaluation (PE21-020) investigation into Tesla's Autopilot on August 13, 2021, based on eleven incidents involving stationary first-responder vehicles and Tesla vehicles that were operating with Autopilot's Autosteer function engaged. [Exhibit 3] On June 8, 2022, NHTSA upgraded PE21-020 to Engineering Analysis (EA) EA22-002, studying the potential for driver misuse when Autosteer is engaged. [Exhibit 4]

NHTSA described the Autopilot defect in part, saying, "In certain circumstances when Autosteer is engaged, the prominence and scope of the feature's controls may not be sufficient to prevent driver misuse of the SAE Level 2 advanced driver-assistance feature." [Exhibit 1]

NHTSA described the safety risk as follows: "In certain circumstances when Autosteer is engaged, if a driver misuses the SAE Level 2 advanced driver-assistance feature such that they fail to maintain continuous and sustained responsibility for vehicle operation and are unprepared to intervene, fail to recognize when the feature is canceled or not engaged, and/or fail to recognize when the feature is operating in situations where its functionality may be limited, there may be an increased risk of a collision." [Id.]

On December 5, 2023, Tesla determined to voluntarily administer a recall and provide an over-the-air software update to address NHTSA's concerns. [Id.] Despite the NHTSA recall, Tesla continues to allow drivers to use its Autopilot system in places where it is not designed to operate safely with insufficient protection from foreseeable driver misuse. Tesla's recall will apparently only involve an over-the-air software update that provides additional warnings when the Autopilot

system senses driver inattention.[1] However, even if the update adds visual and audible warnings, this fix is inadequate. Tesla's response to NHTSA's findings leave much doubt as to whether Tesla has or will ever effectively address Autopilot's defects.

Despite claims that Tesla has fully complied with NHTSA's recall, early indications are that Tesla's software updates have done little, if anything, to address the regulator's concerns. Testers at Consumer Reports "did not notice any differences when activating or using Autopilot's flagship feature, Autosteer, outside of the controlled-access highways where Tesla says the software is designed to be used."[2] Testers also discovered that "it's still possible to cover the cabin camera while using Autopilot, meaning drivers can neutralize one of the two main ways the car monitors if they are paying attention to the road."[3]

Further, despite NHTSA's findings, Tesla has evidently not agreed to restrict Autopilot and Autosteer to the kind of roads on which the technology was designed to operate.[4] Although Tesla had been notified of the potential for foreseeable misuse of its Autopilot system years before this incident,[5] and despite NHTSA's recent recall, Tesla steadfastly refuses to restrict operation of Autopilot and Autosteer to the areas in which this technology was designed to operate, a remedy that would further help correct the dangerously defective system.[6]

---

[1] Faiz Siddiqui and Trisha Thadani, *Recalling almost every Tesla in America won't fix safety issues, experts say*, THE WASHINGTON POST, December 16, 2023, https://www.washingtonpost.com/technology/2023/12/16/tesla-autopilot-recall/

[2] Sean O'Kane, *Consumer Reports says Tesla's Autopilot recall fix is 'insufficient'*, TECHCRUNCH, December 20, 2023, https://techcrunch.com/2023/12/20/tesla-autopilot-recall-consumer-reports/

[3] *Id*.

[4] *Id*.

[5] Rachel Lerman, Faiz Siddiqui, Aaron Gregg and Trisha Thadani, *How Tesla Autopilot got grounded*, THE WASHINGTON POST, December 16, 2023, https://www.washingtonpost.com/business/2023/12/16/tesla-autopilot-recall-timeline/

[6] Faiz Siddiqui and Trisha Thadani, *Recalling almost every Tesla in America won't fix safety issues, experts say*, THE WASHINGTON POST, December 16, 2023, https://www.washingtonpost.com/technology/2023/12/16/tesla-autopilot-recall/

Before NHTSA's recall, Plaintiffs knew of Autopilot's defects and knew of Tesla's failure to correct the defects when it knew or should have known of them. However, NHTSA's findings and, particularly, Tesla's response provide compelling new, previously undiscoverable evidence of Tesla's gross indifference to safety and its willingness to intentionally mislead the public and its customers.

**C. Tesla's History of Promoting Overreliance on Autopilot.**

During an October 14, 2015, Tesla Press Conference for the Autopilot v7.0 Software, TESLA CEO Elon Musk stated: "The forward-facing camera is able to determine where the lanes are, where the cars are ahead of it, and it's also able to read signs. It's been able to read speed signs for a while, for example, but it's able to read pretty much any sign. Then that's combined with the forward radar. The radar is very good at detecting fast moving large objects, and it can actually see through fog, rain, snow, and dust. So, the forward radar gives the car superhuman sensors. It can see through things that are close to the car."[7]

Little of this statement was remotely true. No version of Autopilot has ever been able to read "pretty much any sign". This statement, made over three years before this incident, clearly implied that this "ever-improving" system would recognize a stop sign, flashing lights, a barrier, and a large SUV. Yet, Tesla knew its Autopilot system could do no such thing. The fact that NHTSA has called for more prominence and scope of Autopilot's controls to prevent misuse over eight years after these remarks speaks volumes about Tesla's unwillingness to be clear and truthful about Autopilot's capabilities. Tesla's continued flagrant disregard of NHTSA's recall screams its gross indifference to safety.

Other statements over the years that encouraged overreliance on Autopilot also reinforced the defect pointed out by NHTSA and further underscore Tesla's continued indifference to

---

[7] Tesla Press Conference for the Autopilot v7.0 Software, at approximately time 00:03:46 to 00:04:29.

correcting this defect. Two and a half years before the subject incident, on October 19, 2016, TESLA CEO Elon Musk stated: "The basic news is that all Tesla vehicles exiting the factory have the hardware necessary for Level 5 Autonomy."[8]

On September 11, 2016, TESLA CEO Elon Musk stated: "The exciting thing is that even if the vision system doesn't recognize what the object is because it could be a very strange-looking vehicle, it could be a multi-car pileup, it could be a truck crossing the road, it really could be anything – an alien spaceship, a pile of junk metal that fell off the back of a truck. It actually doesn't matter what the object is, it just knows that there's something dense that it is going to hit – and it should not hit that."[9]

As part of an October 2016 event, Tesla posted a video, set to the Rolling Stones' "Paint it Black," demonstrating what it purports to be the self-driving capabilities of its Autopilot system. The video opens with the caption: "The person in the driver's seat is only there for legal reasons. He is not doing anything. The car is driving itself."[10]

Six years after posting this video, which still contains no disclaimer that the video does not depict the capabilities of any vehicle Tesla has ever sold, Tesla's head of Autopilot testified that the video did not represent the true capabilities of the car, and that the video was staged.

Further, Tesla's CEO, Elon Musk, stated in 2016, "Model S and Model X, at this point, can drive autonomously with greater safety than a person. Right now."[11]

## II. ARGUMENT AND AUTHORITY

The Court denied Plaintiff's previous motion for leave to amend, holding that Plaintiff failed to request an extension of the amendment deadline during previous revisions of the scheduling order, and holding that Plaintiff failed to show good cause for seeking amendment after

---

[8] See: Elon Musk, Oct. 19, 2016 [time 00:00 - 00:13] https://www.youtube.com/watch?v=-vjGEEF_p5E.
[9] September 11, 2016, Tesla Press Conference, at approximately time 00:03:07-00:03:50.
[10] See, https://www.tesla.com/autopilot (last viewed December 20, 2023).
[11] Elon Musk [1:18:48-1:19:34] Elon Musk | Full interview | Code Conference 2016.

the amendment deadline. [DE143]  The order did not however, preclude Plaintiff from seeking to amend if Plaintiff could establish good cause for doing so.

**A. Application of Rule 16(b)(4).**

First,  Plaintiff suggests that when this Court found good cause to extend the discovery and trial deadlines, as it has repeatedly done, the good cause sufficient to support the resetting of those deadlines should also have been sufficient to reset the amendment deadline as well. Plaintiffs are filing this Motion to set a new amendment deadline and for Leave to Amend **eleven** months prior to the October 29, 2024 trial period.  Prior scheduling orders set the amendment deadline ten months before trial and eight months before trial, respectively. [DE8 and DE50]  So, by necessity, Tesla cannot be prejudiced by the timing of this motion.

As the district court in *Abruscato v. GEICO Gen. Ins. Co*., 3:13-CV-962-J-39JBT, 2014 WL 12616965, at *3 (M.D. Fla. May 30, 2014), explained:

> As explained in *Auto–Owners*, "[p]erhaps the most prominent reason for the good cause standard is to avoid prejudice to the litigants who are ... bound by the case management and scheduling order." *Auto–Owners Ins. Co.*, 648 F. Supp. 2d at 1376. The undersigned agrees that prejudice to the non-movant is of primary concern, and Defendant has not shown that it will be prejudiced here. Therefore, good cause exists to re-open discovery as to this file so that "the ultimate resolution of disputed issues ... may be based on a full and accurate understanding of the true facts." *See Gonzalez*, 2014 WL 1250034, at *2; *Barnette*, 2011 WL 2413437, at *1.

Here, Plaintiffs seek nothing more than to amend to conform the pleadings to newly disclosed evidence.  In *Perez Ramones v. AR Res., In*c., 19-62949-CIV, 2021 WL 247999, at *3 (S.D. Fla. Jan. 7, 2021), *aff'd sub nom. Perez Ramones v. Experian Info. Sols., LLC,* 19-62949-CIV, 2021 WL 244975 (S.D. Fla. Jan. 25, 2021), the Plaintiff sought leave to amend based on discovery materials obtained after the amendment deadline had passed.  The magistrate explained "good cause exists when evidence supporting the proposed amendment would not have been discovered in the exercise of reasonable diligence until after the amendment deadline had passed." The Court granted leave to amend, holding that "the proposed amendment will not change Plaintiff's theory of liability in this case nor will it affect any future deadlines in the Court's

Scheduling Order." *Id.* Finally, the Court noted that "Plaintiff's Motion to Amend serves the claimed and important purpose of conforming the pleadings to the evidence in the case." *Id.*

Good cause should be found here for the same reasons. Because NHTSA did not issue its recall until December 12, 2023, Plaintiffs could not have included allegations in their complaint regarding it until now.   The amendment will not change Plaintiffs' theory of liability in the case, because claims for product defect and misrepresentation are already pending. Amendment will not affect any future deadlines in the Court's most recent scheduling order.  The Plaintiffs should be entitled to conform their pleadings to the evidence in this case.

Because no amount of diligence on Plaintiffs' part could have discovered the recent NHTSA findings or Tesla's response to them, Plaintiffs argue that the evidence they rely on in this Motion for Leave to Amend satisfies the good cause standard called for in Rule 16(b)(4), and therefore seek the Court's permission to amend to add the proposed claims.

## B. Application of Rule 15(a).

Once the Court finds good cause to revise the scheduling order exists, it then applies the amendment standard of Rule 15(a). Under the Rule, "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

Federal law is clear that delay alone is not a basis to deny leave to amend.  In *Moore v. City of Paducah,* 790 F.2d 557, 561–62 (6th Cir. 1986), the Court held "Delay that is neither intended to harass nor causes any ascertainable prejudice is not a permissible reason, in and of itself, to disallow an amendment of a pleading."  *Moore* relied on the Eighth Circuit's decision in *Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 644 F.2d 690 (8th Cir.1981), which held:

> The [district] court placed great reliance on the two and one-half year delay between the filing of the complaint and plaintiffs' request for leave to amend. However, it is well-settled that delay alone is not a sufficient reason for denying leave. The delay must have resulted in prejudice to the party opposing the motion.

*Buder* at 694 (internal citations omitted).  The Court further relied on *Davis v. Piper Aircraft Corp.,* 615 F.2d 606, 613 (4th Cir.1980), which held, "Delay alone [], without any specifically resulting prejudice, or any obvious design by dilatoriness to harass the opponent, should not suffice as reason for denial."  The Defendant must show either futility or prejudice.[12]  As we will demonstrate below, Defendant cannot establish either element.

Amendment is not futile because the NHTSA recall provides unequivocal information defining the nature and scope of Autopilot's defectiveness and of Tesla's misrepresentations, supporting both Plaintiff's prior allegations and their newly proposed allegations.  NHTSA's findings and the underlying data supporting them are indisputably relevant to proving Plaintiff's product defect and fraud claims.  As the 11th Circuit explained in *Tran v. Toyota Motor Corp.*, 420 F.3d 1310, 1316 (11th Cir. 2005), a plaintiff may introduce evidence of substantially similar accidents to prove a product defect claim: "The doctrine of substantial similarity applies when one party seeks to admit prior accidents or occurrences involving the opposing party, in order to show, for example notice, magnitude of the danger involved, the [party's] ability to correct a known defect, the lack of safety for intended uses, strength of a product, the standard of care, and causation."  NHTSA reports containing such information are admissible. *See Jones v. Ford Motor Co.*, 204 Fed. Appx. 280, 283 (4th Cir. 2006) (NHTSA Report on sudden acceleration crashes admissible under public records exception in Federal Rule of Evidence 803(8).)

Additionally, evidence of Tesla's response (or lack thereof) to NHTSA's clear findings describing the defect in Tesla's Autopilot system and the danger posed by this defect is relevant to Plaintiff's claim for punitive damages.  Pursuant to *Johns-Manville Sales Corp. v. Janssens*, 463

---

[12] Defendant has not alleged bad faith.

So. 2d 242, 248 (Fla. 1st DCA 1984), among the aggravating factors a jury may consider in awarding punitive damages are:

> (2) the seriousness of the hazard to the public, (3) the profitability of the marketing misconduct (increased by an appropriate multiple); (4) the attitude and conduct of the enterprise upon discovery of the misconduct; (5) the degree of the manufacturer's awareness of the hazard and of its excessiveness; (6) the number and level of employees involved in causing or covering up the marketing misconduct; (7) the duration of both the improper marketing behavior and its cover-up.

*Johns-Manville Sales Corp. v. Janssens*, 463 So. 2d 242, 248 (Fla. 1st DCA 1984)

In *Wasdin v. Cheetah Transp.,LLC*, 5:05 CV 340 DF, 2006 WL 3534969 (M.D. Ga. Dec. 7, 2006), the district court allowed amendment to add a claim for punitive damages based on evidence discovered during the course of the lawsuit:

> First, Plaintiff has proffered sufficient evidence of a viable punitive damages claim. "Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of *conscious indifference to consequences.*" O.C.G.A. § 51-12-5.1 (emphasis added). In her Motion to Amend, Plaintiff contends-without objection-that Defendant Cheetah Transportation had reason to know of co-Defendant Allen Watts's propensity to operate his vehicle in an impaired manner by driving excessive hours, a claim that could not have been properly pled based on Defendants' initial interrogatory answers.

*Wasdin* at *3.  Here, Plaintiff could not have plead allegations related to "the attitude and conduct of the enterprise upon discovery of the misconduct" until the recall was issued and Tesla failed to respond in any meaningful way. Accordingly, leave to amend to include a claim for punitive damages is appropriate.

Tesla will not be prejudiced by the amendment because of the addition of new claims. As the court in *Seneca Ins. Co., Inc. v. Hanover Ins. Co.,* 2017 WL 10434402, at *8 (C.D. Cal. Aug. 30, 2017), explains, "If the very addition of claims were prejudicial, no party could seek leave to amend its complaint to add new causes of action—the additional claims would certainly always require additional time and expense to the detriment of the party opposing amendment."  Even  it

**Page 10**

the addition of new theories of liability could cause prejudice, Tesla is already defending each of the theories of liability contained in the proposed amended complaint. As noted above, Plaintiff Angulo has already pled negligent misrepresentation in his complaint, a claim which will remain part of this action at least through summary judgment.  Tesla can hardly claim prejudice from having to litigate that claim on behalf of both Plaintiffs as opposed to only one.  Killing two birds with one stone was the very basis for consolidation of these claims.  Allowing Benavides to join in the negligent misrepresentation claim will not add to Tesla's labors in any fashion.

Similarly, Tesla will be unable to explain how the addition of the fraud and false advertising claims to Angulo's already existing negligent misrepresentation claim will increase its labor.  Each of these four counts rely on the same predicate facts alleged in ¶¶ 19 through 33 alleged in Angulo's existing complaint.  Tesla will have to contest these facts whether or not Counts 5,6, and 7 are added.

Also, Tesla is involved in another case involving Autopilot in which the trial court has allowed the plaintiffs to include a claim for punitive damages. [See Exhibit 5] While Tesla has filed a notice of appeal of that ruling, Tesla is likely to need to prepare to defend itself from punitive damage claims at some point in this or another case. Tesla currently has more time following a motion to amend to prepare a defense regarding all of Plaintiffs' proposed new claims than at any other stage of this litigation. Experts have yet to be named, fact witness depositions are being scheduled but most have not occurred, and written discovery is ongoing. None of Plaintiffs' proposed new claims need disturb any of the other deadlines in the Court's current Scheduling Order. Plaintiffs argue that justice cannot be fully served in this case unless a jury has a chance to evaluate Plaintiffs' new claims, particularly the claim for punitive damages.

As set out above, the recent recall issued by NHTSA and Tesla's actions and inactions in response, along with much information from previous investigations that has come to light because of the NHTSA recall, constitute new evidence that was previously undiscoverable, justifying

<div align="center">**Page 11**</div>

Plaintiffs' entitlement to amend their complaint to add the above-described claims. This new information sheds light on Tesla's previous and ongoing indifference to the safety of the public.

## II. CONCLUSION

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order granting Plaintiffs' Motion to Extend the Amendment Deadline and for Leave to Consolidate and Amend their Complaint.

Respectfully submitted,

By: */s/  Douglas F. Eaton*

DOUGLAS F. EATON

FBN: 129577
**EATON & WOLK, PL**
*Co-counsel for Plaintiff*
2665 S. Bayshore Drive, Suite 609
Miami, Florida 33133
Telephone: 305-249-1640
Email: deaton@eatonwolk.com


THE ROUSSO, BOUMEL LAW FIRM, PLLC.
9350 South Dixie Highway
Suite 1520
Miami, Florida 33156
(305) 670-6669


By:      */s/ Adam T. Boumel, Esq.*
            Adam T. Boumel, Esq.
Florida Bar No.: 0110727
Adam@roussolawfirm.com
SERVICE EMAILS:
pleadings@roussolawfirm.com (primary)
Assistant@roussolawfirm.com (secondary)

*Counsel for Plaintiff, Dillon Angulo.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing was filed on **<u>December 29, 2023</u>**, using the CM/ECF filing system and served via e-mail to: **HENRY SALAS, ESQ.,** Cole, Scott & Kissane, *Attorneys for Defendant Tesla, Inc.*, 9150 S. Dadeland Blvd., Suite 1400, Miami, FL 33156; henry.salas@csklegal.com; **TODD POSES, ESQ.,** Poses & Poses, P.A., *Co-counsel for Plaintiff*, 169 E. Flagler Street, Suite 1600, Miami, FL 33130; tposes@posesandposes.com; maria@posesandposes.com; **DREW P. BRANIGAN, ESQ.** and **THOMAS P. BRANIGAN, ESQ.,** Bowman & Brooke, LLP., *Co-counsel for Defendant*, 41000 Woodward Avenue, Suite 200 East, Bloomfield Hills, MI 48304; drew.branigan@bowmanandbrooke.com and thomas.branigan@bowmanandbrooke.com; and **ADAM T. BOUMEL, ESQ., DARREN J. ROUSSO, ESQ.,** The Rousso, Boumel Law Firm, PLLC, *Attorneys for Dillon Angulo*, 9350 So. Dixie Hwy., Suite 1520, Miami, FL 33156; adam@roussolawfirm.com; pleadings@roussolawfirm.com.

By: */s/ Douglas F. Eaton*
    DOUGLAS F. EATON

By: /s/ Adam Boumel
    ADAM BOUMEL

**<u>Local Rule 7.1(a)(3) Certification</u>**

Pursuant to Local Rule 7.1(a)(3) of the Southern District of Florida, Counsel for the Movant and Defendant corresponded by email concerning Plaintiffs' proposed filing of this Motion for Leave to Amend on December 22nd, 2023. Counsel for Defendant Tesla responded that Tesla opposes this Motion.

By: */s/ Douglas F. Eaton*
    DOUGLAS F. EATON


By: /s/ Adam Boumel
    ADAM BOUMEL

**EXHIBIT "1"**

OMB Control No.: 2127-0004

# Part 573 Safety Recall Report                23V-838

Manufacturer Name : Tesla, Inc.
Submission Date : DEC 12, 2023
NHTSA Recall No. : 23V-838
Manufacturer Recall No. : SB-23-00-008



**NHTSA**
NATIONAL HIGHWAY TRAFFIC
SAFETY ADMINISTRATION

**Manufacturer Information :**

Manufacturer Name : Tesla, Inc.
Address : 1 Tesla Road
Austin TX 78725
Company phone : 6506815000

**Population :**

Number of potentially involved : 2,031,220
Estimated percentage with defect : 100 %

**Vehicle Information :**

Vehicle 1 : 2012-2023 Tesla Model S
Vehicle Type :
Body Style :
Power Train : NR
Descriptive Information : The subject population includes certain MY 2012-2023 Model S that are equipped with Autosteer and were produced between October 5, 2012, and December 7, 2023, and all MY 2016-2023 Model X vehicles, all MY 2017-2023 Model 3 vehicles and all MY 2020-2023 Model Y vehicles that are equipped with Autosteer and were produced through December 7, 2023.
Production Dates : OCT 05, 2012 - DEC 07, 2023
VIN Range 1 : Begin : NR            End : NR            ☐ Not sequential

Vehicle 2 : 2016-2023 Tesla Model X
Vehicle Type :
Body Style :
Power Train : NR
Descriptive Information : The subject population includes certain MY 2012-2023 Model S that are equipped with Autosteer and were produced between October 5, 2012, and December 7, 2023, and all MY 2016-2023 Model X vehicles, all MY 2017-2023 Model 3 vehicles and all MY 2020-2023 Model Y vehicles that are equipped with Autosteer and were produced through December 7, 2023.
Production Dates : SEP 15, 2015 - DEC 07, 2023
VIN Range 1 : Begin : NR            End : NR            ☐ Not sequential

The information contained in this report was submitted pursuant to 49 CFR §573

# Part 573 Safety Recall Report                23V-838        Page 2

| | |
|---|---|
| Vehicle 3 : | 2017-2023 Tesla Model 3 |
| Vehicle Type : | |
| Body Style : | |
| Power Train : | NR |
| Descriptive Information : | The subject population includes certain MY 2012-2023 Model S that are equipped with Autosteer and were produced between October 5, 2012, and December 7, 2023, and all MY 2016-2023 Model X vehicles, all MY 2017-2023 Model 3 vehicles and all MY 2020-2023 Model Y vehicles that are equipped with Autosteer and were produced through December 7, 2023. |
| Production Dates : | JUL 15, 2017 - DEC 07, 2023 |
| VIN Range  1 : Begin : | NR          End :  NR                          ☐ Not sequential |

| | |
|---|---|
| Vehicle 4 : | 2020-2023 Tesla Model Y |
| Vehicle Type : | |
| Body Style : | |
| Power Train : | NR |
| Descriptive Information : | The subject population includes certain MY 2012-2023 Model S that are equipped with Autosteer and were produced between October 5, 2012, and December 7, 2023, and all MY 2016-2023 Model X vehicles, all MY 2017-2023 Model 3 vehicles and all MY 2020-2023 Model Y vehicles that are equipped with Autosteer and were produced through December 7, 2023. |
| Production Dates : | JAN 09, 2020 - DEC 07, 2023 |
| VIN Range  1 : Begin : | NR          End :  NR                          ☐ Not sequential |

# Part 573 Safety Recall Report       *23V-838*       Page 3

Description of Defect :

Description of the Defect : Basic Autopilot is a package that includes SAE Level 2 advanced driver-assistance features, including Autosteer and Traffic-Aware Cruise Control (TACC), that drivers may choose to engage subject to certain defined operating limitations. Autosteer is an SAE Level 2 advanced driver-assistance feature that, in coordination with the TACC feature, can provide steering, braking and acceleration support to the driver subject to certain limited operating conditions. Autosteer is designed and intended for use on controlled-access highways when the feature is not operating in conjunction with the Autosteer on City Streets feature. When Autosteer is engaged, as with all SAE Level 2 advanced driver-assistance features and systems, the driver is the operator of the vehicle. As the vehicle operator, the driver is responsible for the vehicle's movement with their hands on the steering wheel at all times, remaining attentive to surrounding road conditions, and intervening (e.g., steer, brake, accelerate or apply the stalk) as needed to maintain safe operation.

When Autosteer is engaged, it uses several controls to monitor that the driver is engaged in continuous and sustained responsibility for the vehicle's operation as required. If the driver attempts to engage Autosteer when conditions are not met for engagement, the feature will alert the driver it is unavailable through visual and audible alerts, and Autosteer will not engage. Likewise, if the driver operates Autosteer in conditions where its functionality may be limited or has become deteriorated due to environmental or other circumstances, the feature may warn the driver with visual and audible alerts, restrict speed, and/or instruct the driver to intervene immediately.

In certain circumstances when Autosteer is engaged, the prominence and scope of the feature's controls may not be sufficient to prevent driver misuse of the SAE Level 2 advanced driver-assistance feature.

FMVSS 1 : NR

FMVSS 2 : NR

Description of the Safety Risk : In certain circumstances when Autosteer is engaged, if a driver misuses the SAE Level 2 advanced driver-assistance feature such that they fail to maintain continuous and sustained responsibility for vehicle operation and are unprepared to intervene, fail to recognize when the feature is canceled or not engaged, and/or fail to recognize when the feature is operating in situations where its functionality may be limited, there may be an increased risk of a collision.

Description of the Cause : NR

Identification of Any Warning that can Occur : For a description of Autosteer's general design, including visual and audible alerts, please see the description of the defect above.

Involved Components :

# Part 573 Safety Recall Report          23V-838          Page 4

Component Name 1 : Vehicle Software

Component Description : All versions of Autosteer leading up to the version(s) that contains the recall remedy.

Component Part Number : NR

---

**Supplier Identification :**

**Component Manufacturer**

Name : Tesla, Inc.

Address : 1 Tesla Road
Austin Texas 78725

Country : United States

---

Chronology :

- On August 13, 2021, NHTSA opened a Preliminary Evaluation (PE21-020) to investigate eleven incidents involving stationary first-responder vehicles and Tesla vehicles that were operating with Autosteer engaged.

- Over the next year, as part of PE21-020, Tesla, in full cooperation, responded to extensive information requests from NHTSA and participated in several meetings with the agency.

- On June 8, 2022, NHTSA upgraded PE21-020 to Engineering Analysis ("EA") EA22-002.

- Over the next year, as part of EA22-002, Tesla, in full cooperation, responded to extensive information requests from NHTSA and participated in several meetings with the agency.

- From October 16, 2023, through December 4, 2023, NHTSA and Tesla conducted several meetings to discuss the agency's tentative conclusions regarding EA22-002, as they related to the issue of potential driver misuse when Autosteer is engaged, expectations to address the agency's concerns through a voluntary recall, and Tesla's proposed over-the-air ("OTA") software remedies in response.

- While not concurring with the agency's analysis, in the interest of resolving EA22-002, Tesla determined on December 5, 2023, to voluntarily administer a recall and provide the remedy described below.

- As of December 8, 2023, Tesla has identified 9 warranty claims, received between July 13, 2021, and September 17, 2023, that may be related to the condition described above.

# Part 573 Safety Recall Report                    23V-838         Page 5

**Description of Remedy :**

Description of Remedy Program :  At no cost to customers, affected vehicles will receive an over-the-air software remedy, which is expected to begin deploying to certain affected vehicles on or shortly after December 12, 2023, with software version 2023.44.30. Remaining affected vehicles will receive an over-the-air software remedy at a later date. The remedy will incorporate additional controls and alerts to those already existing on affected vehicles to further encourage the driver to adhere to their continuous driving responsibility whenever Autosteer is engaged, which includes keeping their hands on the steering wheel and paying attention to the roadway. Depending on vehicle hardware, the additional controls will include, among others, increasing the prominence of visual alerts on the user interface, simplifying engagement and disengagement of Autosteer, additional checks upon engaging Autosteer and while using the feature outside controlled access highways and when approaching traffic controls, and eventual suspension from Autosteer use if the driver repeatedly fails to demonstrate continuous and sustained driving responsibility while the feature is engaged.

Tesla does not plan to include a statement in the Part 577 owner notification about pre-notice reimbursement because there are no out-of-warranty repairs related to this condition.

How Remedy Component Differs from Recalled Component :  The remedy component incorporates the software remedy described above whereas the recalled component does not incorporate the software remedy described above.

Identify How/When Recall Condition was Corrected in Production :  Beginning midday on December 7, 2023, Model S, Model X, Model 3 and Model Y vehicles in production received a software release that incorporates the software remedy.

---

**Recall Schedule :**

Description of Recall Schedule :  All Tesla stores and service centers will be notified about this recall on or shortly after December 12, 2023. Owner notification letters will be mailed in accordance with 49 C.F.R. § 577.7.

Planned Dealer Notification Date :  DEC 12, 2023 - DEC 12, 2023

Planned Owner Notification Date :  FEB 10, 2024 - FEB 10, 2024

---

\* NR - Not Reported

**EXHBIT "2"**

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 1:22-cv-22607

NEIMA BENAVIDES, as Personal
Representative of the Estate of
NAIBEL BENAVIDES LEON, deceased,
and DILLON ANGULO,

              Plaintiffs,

v.

TESLA, INC. a/k/a TESLA FLORIDA, INC.

              Defendant.
_____/

### PLAINTIFFS' CONSOLIDATED AND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

      Plaintiffs, NEIMA BENAVIDES, as Personal Representative of the Estate of Naibel Benavides Leon, deceased, and DILLON ANGULO, by and through their undersigned counsel (collectively referred to herein as "Plaintiffs"), file this their Consolidated and Amended Complaint against Defendant, TESLA, INC. a/k/a TESLA FLORIDA, INC. (hereinafter called "Tesla"), and allege and state as follows:

### JURISDICTION, VENUE AND PARTIES

1.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332 because this action is between citizens of different states and the amount in controversy, exclusive of interest, attorneys' fees and costs, exceeds $75,000.00

2.     Plaintiff Dillon Angulo is a resident of and is domiciled in the State of Florida.

3.      Neima Benavides is the duly appointed personal representative of the Estate of Naibel Benavides Leon.   As personal representative of the Estate, the Plaintiff, NEIMA BENAVIDES, has standing to and otherwise is duty bound to bring this wrongful death action pursuant to Florida Statute §768.16 et seq.

4.      At the time of her death, Naibel Benavides Leon was 20 years old, was not married, and had no children.

5.      Naibel Benavides Leon is survived by her natural parents, Lilia Marilin Leon Jimenez and Guillermo Benavides, who are survivors under the Florida Wrongful Death Act.

6.      Lilia Marilin Leon Jimenez is a resident of Miami Dade County.

7.      The above-described parties will hereinafter be referred to collectively as "Plaintiffs".

8.      At all material times, Defendant, Tesla, Inc. a/k/a Tesla Florida, Inc. (hereinafter "Tesla") is and was a foreign corporation licensed and authorized to do business in the State of Florida.

9.      At all times hereinafter mentioned and at the time of the incident complained of, Tesla had an office for the transaction of its customary business in Miami-Dade County, Florida, had agents and other representatives in Miami-Dade County, and was actually doing business in Miami-Dade County, Florida, by virtue of its shipping to and sale of automobiles in Miami-Dade County, Florida.

10.     At all times hereinafter and at the time of the incident complained of, Tesla was in the business of designing, testing, inspecting, manufacturing, distributing, selling, maintaining, repairing and otherwise placing into the stream of commerce, and causing same to come into the State of Florida, certain automobiles, including a certain specific

automobile designated and described as a 2019 Tesla Model S, VIN: 5YJSA1E24KF302997 (hereinafter described as the "Vehicle").

**THE INCIDENT**

11.    At around 9:25 PM on April 25, 2019, George McGee rode in his 2019 Tesla Model S, VIN: 5YJSA1E24KF302997 (the "Vehicle") east on County Road 905A, also called Card Sound Road, approaching the 3-way T-intersection with County Road 905 near the town of Key Largo, Monroe County, Florida.

12.    Mr. McGee's Tesla came equipped with automated driving features, one of which Tesla called "Autopilot", that could navigate the vehicle without driver input.

13.    As he had on many other occasions, Mr. McGee relied on the Autopilot and other automated features to safely drive him home.

14.    As he approached the T-intersection, Mr. McGee engaged in a phone call, and, as he told the police at the scene, he dropped the phone and bent down to retrieve it from the floorboard.

15.    Meanwhile, Dillon Angulo, with his passenger Naibel Benavides Leon, had parked his mother's Chevrolet Tahoe on the east shoulder of County Road 905, perpendicular to and directly across from eastbound Card Sound Road.

16.    Dillon and Naibel stood next to the Tahoe as Mr. McGee approached the intersection.

17.    Mr. McGee's Tesla failed to detect the Tahoe or the couple standing in the Tesla's path and drove into the Tahoe at high speed.

18.    The impact threw Naibel about 75 feet, killing her, and caused severe, permanent injuries to Dillon.







The scene as depicted in the Florida Highway Patrol Crash Report.



George McGee's Tesla.



The Tahoe.

## BACKGROUND

### The Autopilot System

19.     The McGee Tesla Model S had an Autopilot system that was not fully tested for safety and was not designed to be used on roadways with cross-traffic or intersections but was nevertheless allowed by Tesla to be operated in such areas.

20.     Tesla programed Autopilot to allow it to be used on roadways that Tesla knew were not suitable for its use and knew this would result in collisions causing injuries and deaths of innocent people who did not choose to be a part of Tesla's experiments, such as Plaintiffs.

21.     Tesla has known for years of other fatal collisions when Autopilot was being used outside of the area for which it was designed. Specifically, Tesla knew as of May 2016, almost three years before this crash, that Tesla drivers would overestimate Autopilot's capabilities, resulting in fatal crashes.

22.     Despite knowing of Autopilot's deficiencies, Tesla advertised Autopilot in a way that greatly exaggerated its capabilities and hid its deficiencies. Rather than taking appropriate steps to ensure the safety of its customers and others, Tesla and its CEO, Elon Musk, made the intentional decision to continue encouraging Tesla drivers to over-rely on its Autopilot system. Tesla chose to continue profiting from the sales of their defective vehicles and software systems rather than heed warnings from government agencies, experts, and other car companies.

23.     NHTSA has now provided unequivocal information defining the nature and scope of Autopilot's defectiveness. However, Tesla's response to NHTSA's clear findings describing the defect in Tesla's Autopilot system and the danger posed by this defect has

so far demonstrated no willingness to honor those findings or even provide the safety technology it promised in responding to NHTSA's findings.

**Autopilot Recall December 12, 2023, and Tesla's Response**

24.  On December 12, 2023, the National Highway Traffic Safety Administration (NHTSA) submitted its Part 573 Safety Recall Report number 23V-838, recalling virtually all Tesla vehicles made since 2012, potentially 2,031,220 vehicles. [Exhibit 1]

25.  This recall resulted from investigations NHTSA conducted over the past few years, beginning with a Preliminary Evaluation (PE21-020) investigation into Tesla's Autopilot on August 13, 2021, based on eleven incidents involving stationary first-responder vehicles and Tesla vehicles that were operating with Autopilot's Autosteer function engaged. [Exhibit 3]

26.  On June 8, 2022, NHTSA upgraded PE21-020 to Engineering Analysis (EA) EA22-002, studying the potential for driver misuse when Autosteer is engaged. [Exhibit 4]

27.  On December 5, 2023, Tesla determined to voluntarily administer a recall and provide an over-the-air software update to address NHTSA's concerns. [Exhibit 1]

28.  NHTSA described the Autopilot defect in part, saying, "In certain circumstances when Autosteer is engaged, the prominence and scope of the feature's controls may not be sufficient to prevent driver misuse of the SAE Level 2 advanced driver-assistance feature." [*Id*.]

29.  NHTSA described the safety risk as follows: "In certain circumstances when Autosteer is engaged, if a driver misuses the SAE Level 2 advanced driver-assistance feature such that they fail to maintain continuous and sustained responsibility for vehicle operation and are unprepared to intervene, fail to recognize when the feature is canceled or not engaged,

and/or fail to recognize when the feature is operating in situations where its functionality may be limited, there may be an increased risk of a collision." [*Id*.]

30.     Despite the NHTSA recall, Tesla continues to allow drivers to use its Autopilot system in places where it is not designed to operate safely with insufficient protection from foreseeable driver misuse. Tesla's recall will apparently only involve an over-the-air software update that provides additional warnings when the Autopilot system senses driver inattention.[1] However, even if the update adds visual and audible warnings, this fix is too little, too late. Tesla has known since at least September of 2016 that its driver warning system was grossly inadequate.

31.     In his press conference on September 11, 2016, TESLA CEO Elon Musk stated that some people get comfortable using Autopilot and "so we will see half a dozen or more, sometimes as many as 10 warnings in the space of an hour continuously ignored by the driver. So, we really want to avoid that situation."[2] Tesla's response to NHTSA's findings leaves much doubt as to whether Tesla has or will ever effectively address Autopilot's defects.

32.     Despite claims that Tesla has fully complied with NHTSA's recall, early indications are that Tesla's software updates have done little, if anything, to address the regulator's concerns. Testers at Consumer Reports "did not notice any differences when activating or using Autopilot's flagship feature, Autosteer, outside of the controlled-access highways

---

[1] Faiz Siddiqui and Trisha Thadani, *Recalling almost every Tesla in America won't fix safety issues, experts say*, THE WASHINGTON POST, December 16, 2023, https://www.washingtonpost.com/technology/2023/12/16/tesla-autopilot-recall/
[2] Elon Musk Press Conference on September 11, 2016, at approximately time 00:14:40-00:15:04

where Tesla says the software is designed to be used."[3] Testers also discovered "it's still possible to cover the cabin camera while using Autopilot, meaning drivers can neutralize one of the two main ways the car monitors if they are paying attention to the road."[4]

33.     Further, despite NHTSA's findings, Tesla has evidently not agreed to restrict Autopilot and Autosteer to the kind of roads on which the technology was designed to operate.[5] Although Tesla had been notified of the potential for foreseeable misuse of its Autopilot system years before this incident,[6] and despite NHTSA's recent recall, Tesla steadfastly refuses to restrict operation of Autopilot and Autosteer to the areas in which this technology was designed to operate, a remedy that would further help correct the dangerously defective system.[7]

34.     Before NHTSA's recall, Plaintiffs knew of Autopilot's defects, and knew of Tesla's failure to correct the defects when it knew or should have known of them. However, NHTSA's findings and, particularly, Tesla's response provide compelling new, previously undiscoverable evidence of Tesla's gross indifference to safety and its willingness to intentionally mislead the public and its customers.

**Tesla's History of Promoting Overreliance**

35.     During an October 14, 2015, Tesla Press Conference for the Autopilot v7.0 Software, Tesla CEO Elon Musk stated: "The forward-facing camera is able to determine where the

---

[3] Sean O'Kane, *Consumer Reports says Tesla's Autopilot recall fix is 'insufficient'*, TECHCRUNCH, December 20, 2023, https://techcrunch.com/2023/12/20/tesla-autopilot-recall-consumer-reports/
[4] *Id.*
[5] *Id.*
[6] Rachel Lerman, Faiz Siddiqui, Aaron Gregg and Trisha Thadani, *How Tesla Autopilot got grounded*, THE WASHINGTON POST, December 16, 2023, https://www.washingtonpost.com/business/2023/12/16/tesla-autopilot-recall-timeline/
[7] Faiz Siddiqui and Trisha Thadani, *Recalling almost every Tesla in America won't fix safety issues, experts say*, THE WASHINGTON POST, December 16, 2023, https://www.washingtonpost.com/technology/2023/12/16/tesla-autopilot-recall/

lanes are, where the cars are ahead of it, and it's also able to read signs. It's been able to read speed signs for a while, for example, but it's able to read pretty much any sign. Then that's combined with the forward radar. The radar is very good at detecting fast moving large objects, and it can actually see through fog, rain, snow, and dust. So, the forward radar gives the car superhuman sensors. It can see through things that are close to the car."[8]

36.     Little of this statement was remotely true. No version of Autopilot has ever been able to read "pretty much any sign". This statement, made over three years before this incident, clearly implied that this "ever-improving" system would recognize a stop sign, flashing lights, a barrier, and a large SUV. Yet, Tesla knew its Autopilot system could do no such thing.

37.     The fact that NHTSA has called for more prominence and scope of Autopilot's controls to prevent misuse over eight years after these remarks speaks volumes about Tesla's unwillingness to be clear and truthful about Autopilot's capabilities. Tesla's continued flagrant disregard of NHTSA's recall screams its gross indifference to safety.

38.     Other statements over the years that encouraged overreliance on Autopilot also reinforced the defect pointed out by NHTSA and further underscore Tesla's continued indifference to correcting this defect.

39.     Two and a half years before the subject incident, on October 19, 2016, Tesla CEO Elon Musk stated: "The basic news is that all Tesla vehicles exiting the factory have the hardware necessary for Level 5 Autonomy."[9]

---

[8] Tesla Press Conference for the Autopilot v7.0 Software, at approximately time 00:03:46 to 00:04:29.
[9] See: Elon Musk, Oct. 19, 2016 [time 00:00 - 00:13] https://www.youtube.com/watch?v=-vjGEEF_p5E.

40.  On September 11, 2016, Tesla CEO Elon Musk stated: "The exciting thing is that even if the vision system doesn't recognize what the object is because it could be a very strange-looking vehicle, it could be a multi-car pileup, it could be a truck crossing the road, it really could be anything – an alien spaceship, a pile of junk metal that fell off the back of a truck. It actually doesn't matter what the object is, it just knows that there's something dense that it is going to hit – and it should not hit that."[10]

41.  As part of an October 2016 event, Tesla posted a video, set to the Rolling Stones' "Paint It Black", demonstrating what it purports to be the self-driving capabilities of its Autopilot system. The video opens with the caption: "The person in the driver's seat is only there for legal reasons. He is not doing anything. The car is driving itself."[11]

42.  Six years after posting this video, which still contains no disclaimer that the video does not depict the capabilities of any vehicle Tesla has ever sold, Tesla's head of Autopilot testified that the video did not represent the true capabilities of the car and that the video was staged.

43.  Further, Tesla's CEO, Elon Musk, stated in 2016, "Model S and Model X, at this point, can drive autonomously with greater safety than a person. Right now."[12]

44.  Musk and Tesla blurred any distinction between the "Autopilot" features and the "full-self-driving" capabilities, exaggerating both far beyond their actual capabilities. In interviews with reporters that day (October 19, 2016), Tesla's CEO Elon Musk predicted, "we will be able to demonstrate a demonstration drive of our full autonomy all the way from LA to New York. So basically, from home in LA to let's say dropping you off in

---

[10] September 11, 2016, Tesla Press Conference, at approximately time 00:03:07-00:03:50.
[11] *See*, https://www.tesla.com/autopilot (last viewed December 20, 2023).
[12] Elon Musk [1:18:48-1:19:34] Elon Musk | Full interview | Code Conference 2016.

Times Square, NY, and then having the car parking itself by the end of next year *(2017)* without the need for a single touch including the charger."[13]

45.     Further, Tesla's CEO, Elon Musk, stated in 2016, "In dense traffic situations, autonomy is really easy because you could just maintain a set distance from various cars, it's actually quite easy . . . Model S and Model X, at this point, I can drive autonomously with greater safety than a person. Right now."[14]

46.     Then in 2018, Musk announced that within months, "full-self-driving" features would be added to the vehicles through an online update in the vehicle software.[15]

47.     On April 12, 2019, Musk claimed, "I'd be shocked if it's not next year, at the latest, that having a human intervene will decrease safety."[16]

48.     Tesla's descriptions of its various autonomous features have consistently evinced Tesla's *desire* is for its customers to *believe* that all Tesla vehicles have or will imminently gain autonomous systems enabling Tesla vehicles to operate without human involvement.

49.     Tesla deliberately blurs the distinction between whether its automation system is merely a "driver assist" system or a fully autonomous system that does not require the driver's constant attention.[17]

---

[13] *In a conference call with reporters: "Elon Musk Autopilot 2.0 Conference Call Transcript*, Xautoworld Oct. 19, 2016, http://www.xautoworld.com/Tesla/transcript-elon-musk-autopilot-2-conference-call/  (last accessed Aug. 23, 2021).

[14] Elon Musk [1:18:48-1:19:34] Elon Musk | Full interview | Code Conference 2016.

[15] Fred Lambert, ***Tesla's version 9 software update is coming in August with first 'full self-driving features', says Elon Musk***, ELECTREK, June 10, 2018, https://electrek.co/2018/06/10/tesla-version-9-software-update-fully-self-driving-features-elon-musk/.

[16] Lex Fridman, Interview: *Elon Musk: Tesla Autopilot | Lex Fridman Podcast #18*, at 21:27–24:26 Apr. 12, 2019, https://www.youtube.com/watch?v=dEv99vxKjVI&t=281s.

[17] William H. Widen and Philip Koopman, *Do Tesla FSD Beta Releases Violate Public Road Testing Regulations?*, JURIST – Academic Commentary, Sept. 27, 2021, https://www.jurist.org/commentary/2021/09/william-widen-philip-koopman-autonomous-vehicles/.

50.     One reason for Tesla's ambiguity as to the level of autonomy available in its vehicles is that without substantially more rigorous testing and development, Tesla cannot openly sell a vehicle that does not require the driver's constant attention.[18]

51.     Thus, Tesla has sought to convince its prospective and previous customers that Tesla vehicles have or will soon have the ability to drive themselves, while simultaneously telling regulators Tesla only sells vehicles that require constant driver attention (with the same driver-assist features used by various other automakers).[19]

52.     According to Bryant Walker Smith, an associate professor in the Schools of Law and Engineering at the University of South Carolina, this raises the question, "If we can't trust Tesla when they say their vehicles are full self-driving, how can we trust the company when it says they are safe?"[20]

**Tesla Uses Its Untrained Customers to Train Autopilot**

53.     One of the key differences between Tesla's development of its automated features and others in the automotive industry is Tesla's use of drivers in the field, **its customers**, to "train" the computer system to master the tasks necessary to safely negotiate the complex, largely unpredictable nature of driving a car in real-world traffic.[21]

54.     Tesla's Autopilot system is still in "beta", that is, it is still in the process of being tested. The Autopilot system was not and never has been considered by Tesla or anyone else to be a finished product. Instead, Autopilot is being tested and developed by ordinary

---

[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *The state of self-driving cars*, CBS GOOD MORNING, Feb. 19, 2022  https://www.cbsnews.com/video/the-state-of-self-driving-cars/#x.

drivers in traffic situations and interacting with others who have in no way consented to participating in Tesla's testing process.[22]

55. The first fatality involving Autopilot occurred in May of 2016, nearly three years before this incident, and over seven years before this writing. Throughout that time Tesla has continued to use its untrained customers to beta-test its system.

56. Tesla is the only carmaker that beta-tests its semi-autonomous driving system on the public.[23] This was true in 2016 and it remains true today. "Every other automaker – from BMW to Cadillac – flat-out refuses to beta-test driverless tech on the public."[24]

**Federal Agencies Have Repeatedly Called Attention to Tesla's False Advertising**

57. Long before this tragic incident, advocates and federal agencies have repeatedly demanded the Federal Trade Commission act on Tesla's apparent false advertising of its automated driving systems.[25]

58. In 2018, the Center for Auto Safety and Consumer Watchdog wrote to then-FTC Chairman Joseph Simons urging the FTC to investigate Tesla's deceptive and unfair practices in the advertising and marketing of Autopilot after two fatal crashes.[26] They renewed their request to the FTC in 2019 after more fatal crashes.[27]

---

[22] Elon Musk, *Tesla Autonomy Day 2019 - Full Self-Driving Autopilot - Complete Investor Conference Event*, at 2:13:18–2:13:32, Apr. 23, 2019, https://www.youtube.com/watch?v=Ucp0TTmvqOE&t=4453s.

[23] Nick Jaynes, *Tesla is the only carmaker beta testing 'autopilot' tech, and that's a problem*, MASHABLE, July 9, 2016 https://mashable.com/article/tesla-beta-testing-autopilot-on-public

[24] *Id.*

[25] *See* Exhibit 5, 18 August 2021 Letter from the United States Senate to The Honorable Lina Khan, Chair, Federal Trade Commission.

[26] *See* Exhibit 6, May 23, 2018, Letter from the Center for Auto Safety to Hon. Joseph Simons, Chair FTC.

[27] *See* Exhibit 7, July 25, 2019, Letter from the Center for Auto Safety to Hon. Joseph Simons, Chair FTC.

59.     The National Highway Traffic Safety Administration (NHTSA) sent Elon Musk a cease-and-desist letter in 2018 over his claims about Tesla vehicles' safety and asked the FTC to investigate the claims.[28]

60.     On August 13, 2021, NHTSA opened a formal investigation into Tesla's Autopilot feature after identifying eleven crashes with Autopilot engaged since 2018 that involved Tesla vehicles crashing at first responder sites.[29] As part of their investigation of first responder crashes, NHTSA requested Tesla to provide responses to various information requests[30] and Tesla has sought to conceal their responses from the public.[31]

61.     Despite the NHTSA investigation and mounting questions about the safety of Tesla's autonomous driving software and marketing, Tesla announced in September 2021 it would be expanding the availability of its Full Self-Driving feature. In response to this announcement, National Transportation Safety Board (NTSB) chair, Jennifer Homendy, said in an interview with the Wall Street Journal, "basic safety issues have to be addressed before they're then expanding it to other city streets."[32] Homendy called Tesla's decision to call its system "Full Self-Driving" "misleading and irresponsible."[33] Homendy pointed out that people pay more attention to marketing than to warnings

---

[28] *See* Exhibit 5 (citing Sean O'Kane, *Feds told Tesla to stop misleading the public about Model 3 safety*, VERGE, Aug. 7, 2019, https://www.theverge.com/2019/8/7/20758349/Tesla-model-3-safety-misleading-ftc-national-highway-traffic-administration-elon-musk.

[29] *See attached* Exhibit 3, National Highway Traffic Safety Administration [NHTSA] ODI Resume for Investigation number PE 21-020.

[30] *See attached* Exhibit 8, National Highway Traffic Safety Administration [NHTSA] Letter to Eddie Gates, Director, Field Quality, Tesla, Inc., August 31, 2021.

[31] USDOT Memorandum dated October 22, 2021, PE-21-020 Public File.

[32] Rebecca Elliott, *Elon Musk's Push to Expand Tesla's Driver Assistance to Cities Rankles a Top Safety Authority*, WALL ST. J. Sept. 19, 2021, https://www.wsj.com/articles/elon-musks-push-to-expand-teslas-driver-assistance-to-cities-rankles-a-top-safety-authority-11632043803?mod=hp_lead_pos3.

[33] *Id*.

buried in car manuals or on a company's website.[34] According to Homendy, "[Tesla] has clearly misled numerous people to misuse and abuse technology."[35]

62.    NHTSA also issued a Special Order Directed to Tesla, Inc., on October 12, 2021, ordering Tesla to produce various documents related to purported non-disclosure agreements between Tesla and its customers that prohibited or discouraged customers from sharing certain information relevant to the performance of Full Self-Driving.[36]

63.    Prior to the most recent recall involving all Tesla vehicles, NHTSA ordered Tesla to recall more than 362,000 U. S. vehicles to update its Full Self-Driving (FSD) beta software after U.S. regulators found the system did not adequately adhere to traffic safety laws and could cause crashes.[37]

64.    However, while this recall made international news, Tesla has been regularly sending out online "updates" of its automated features, as they did in late September 2021 when Tesla updated its vehicles' software to improve the detection of emergency vehicle lights in low light situations.

65.    Shortly thereafter, NHTSA formally reminded Tesla that "the Safety Act imposes an obligation on manufacturers of motor vehicles and motor vehicle equipment to initiate a recall by notifying NHTSA when they determine vehicles or equipment they produced

---

[34] *Id.*
[35] *Id.*
[36] *See attached* Exhibit 11, National Highway Traffic Safety Administration [NHTSA] Letter & Special Order Directed to Tesla, Inc., to Bill Berry, Vice President, Legal, Tesla, Inc. (Oct. 12, 2021).
[37] See, e.g., David Shepardson, *Tesla Recalls 362,000 U.S. vehicles over Full Self-Driving software*, REUTERS, February 16, 2023 https://www.reuters.com/business/autos-transportation/tesla-recalls-362000-us-vehicles-over-full-self-driving-software-2023-02-16/.

contain defects related to motor vehicle safety or do not comply with an applicable motor vehicle safety standard."[38]

66.    Given that Tesla has issued numerous updates to its autonomous driving systems over the last several years, any of these updates would more accurately be "recalls" if they were intended to make the vehicles safer.  Many of Tesla's relatively secret "updates" should have received the same international attention as the most recent one, and without that attention, Tesla has been spared the damage to its reputation and serious public and regulatory scrutiny many such recalls would necessarily have entailed.

67.    Additionally, the California Department of Motor Vehicles accused Tesla of false advertising in its promotion of the company's signature Autopilot and Full Self-Driving technologies, stating that Tesla had "made or disseminated statements that are untrue or misleading, and not based on facts."[39]

68.    The problems with partially automated driver assist systems, such as traditional cruise control and Tesla's Autopilot,  have been known to the automotive industry for decades.[40]   Drivers tend to "drift off" and lose what experts call "situational" or "contextual" awareness when the car is on cruise control.[41] Reaction time, especially in

---

[38]  See Exhibit 9, Letter from Gregory Magno, Chief Vehicle Defects Division – D Office of Defects Investigation, NHTSA, to Eddie Gates, Director, Field Quality, Tesla, Inc., (October 12, 2021) INIM-PE21020-85573P.pdf

[39]  Russ Mitchell, *California DMV accuses Tesla of falsely advertising Autopilot and Full Self-Driving features*, Los   Angeles Times, August 5, 2022. https://www.latimes.com/business/story/2022-08-05/dmv-false-advertising-tesla.

[40]  Endsley, M. R., & Kaber, D. B. (1999), *Level of automation effects on performance, situation awareness and workload in a dynamic control task*, 42 ERGONOMICS, 462–92; Kaber, D. B., & Endsley, M. R. (1997) *Out-of-the-loop performance problems and the use of intermediate levels of automation for improved control system functioning and safety*, 16 PROCESS SAFETY PROGRESS, 126–131; Stanton, N. A., Young, M., & McCaulder, B. (1997) *Drive-by- wire: The case of driver workload and reclaiming control with adaptive cruise control*, 27 SAFETY SCIENCE, 149–159; Stanton, N. A., & Young, M. S. (2005) *Driver behaviour with adaptive cruise control*, 48 ERGONOMICS, 1294–1313; Young, M. S., & Stanton, N. A. (2002) *Malleable attentional resources theory: A new explanation for the effects of mental underload on performance*, 44 HUMAN FACTORS, 365–375.

[41]  *Id.*

emergencies, substantially increases when cruise control and speed limiters are in use.[42] Reaction times rise further as the level of automation increases.[43] Trust in the automated system slows reaction times, and this trust is reinforced when automation performs *relatively* well,[44] as it apparently did for Mr. McGee.[45]

69. This trust, meticulously cultivated by Tesla and its spokespeople, creates dire risks when the automated system suddenly fails without warning.[46]

**The Problem with Partial Automation**

70. The conundrum created by a partially automated system was extensively researched before Tesla ever made a car.[47] One study found that more than a third of drivers failed to regain control of their vehicle following an automation failure while using adaptive cruise control.[48]

---

[42] *See, e.g.*, *Cruise Control and Speed Limiters Impact Driver Vigilance,* VINCI AUTOROUTES FOUND. (July 12, 2013); Young, M. S., & Stanton, N. A., *Back to the future: Brake reaction times for manual and automated vehicles*, 50 ERGONOMICS, 46–58 (2007).

[43] Eriksson, A., & Stanton, N. A., *Takeover Time in Highly Automated Vehicles: Noncritical Transitions to and From Manual Control*, HUMAN FACTORS, June 2017, at 689–90.

[44] Morando, Gershon, Mehler, and Reimer, *A model for naturalistic glance behavior around Tesla Autopilot disengagements*, ELSEVIER, ACCIDENT ANALYSIS & PREVENTION, Volume 161, Oct. 2021, 106384, https://www.sciencedirect.com/science/article/pii/S0001457521003791?via%3Dihub#.

[45] *See* Exhibit 10, McGee Depo *[175:20-180:3].*

[46] Morando, et al, *supra.* At 690.

[47] *Id.* (citing Desmond, P. A., Hancock, P. A., & Monette, J. L. *Fatigue and automation-induced impairments in simulated driving performance*, HUMAN PERFORMANCE (1998); *User Information, and Highway Design*, 1628, 8–14; Molloy, R., & Parasuraman, R. (1996) *Monitoring an automated system for a single failure: Vigilance and task complexity effects*, 38 HUMAN FACTORS, 311–22; Stanton, N. A., Young, M., & McCaulder, B., *Drive-by-wire: The case of driver workload and reclaiming control with adaptive cruise control*, 27 SAFETY SCI., at 149–159 (1997); Stanton, N. A., Young, M. S., Walker, G. H., Turner, H., & Randle, S., *Automating the driver's control tasks*, 5 INT'L J. COGNITIVE ERGONOMICS, 221–36 (2001); Young, M. S., & Stanton, N. A., *supra*.

[48] Eriksson, A., & Stanton, N. A*., supra*.

71.     A driver who is driving manually without any automation must first see and recognize a sudden emergency.[49] This necessarily happens before the driver can begin any appropriate response to avoid the hazard.[50]

72.     Once the driver recognizes the potential hazard, the driver must decide the best action to take.[51] This might involve multiple choices, such as whether to brake or accelerate, or whether to steer right or left, or even to do nothing at all.[52]

73.     This process takes time and is in addition to the time it takes for the vehicle to respond once the driver decides which action to take and begins taking it.[53]  Between the moment when the emergency registers in the driver's consciousness and when the driver reacts, the vehicle has continued on its path toward the hazard.[54] As the time it takes for a driver to notice and react to a hazard increases, the likelihood that the driver will fail to avoid or minimize the danger also increases.[55]

74.     This reaction time for a traditional manual system increases once an automated system becomes involved.[56] Drivers using adaptive cruise control, SAE Level 1, have longer brake reaction times than those driving without this automation.[57] These reaction times increase further for drivers with adaptive cruise control and assistive steering, SAE Level 2.[58] This additional delay can be critical.[59] That extra time allows the vehicle to travel

---

[49] Zhang, Winter, Varotto, Happee, & Martens, *Determinants of take-over time from automated driving: A meta-analysis of 129 studies*, ELSEVIER, Transportation Research Part F, 285–307, 286 (2019).
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.* at 298.
[56] *Id.*; *see also* Young, M. S., & Stanton, N. A., *supra*, at 46–58.
[57] *Id.*
[58] *Id.*

farther without driver intervention than the unautomated SAE Level 0 car during these crucial moments.[60]

75.     If, as in Tesla's case, the driver is led to believe the automated system, which Tesla itself calls "Autopilot" and "Full Self-Driving", provides greater control than traditional automated cruise control or traffic aware systems, the driver can be lulled into behaving as though the vehicle is actually an SAE Level 3 autonomous system when in reality it is still only a Level 2.[61] Tesla knowingly and falsely fosters the understanding that Tesla vehicles are capable of identifying and safely negotiating hazardous situations that the car simply cannot.[62]

76.     This is particularly dangerous because it takes significantly longer for a driver to transition from Level 3 automated controls, even perceived ones, and regain situational awareness to react to road conditions, as compared to a driver using Level 2 automation.[63]

---

[59] Willemsen, D., Stuiver, A., & Hogema, J. (2015, June) *Automated driving functions giving control back to the driver: A simulator study on driver state dependent strategies.* Paper presented at the 24th International Technical Conference on the Enhanced Safety of Vehicles, Gothenburg, Sweden.

[60] Bogna Szyk, *Stopping Distance Calculator*, https://www.omnicalculator.com/physics/stopping-distance .

[61] T.W. Victor, E. Tivesten, P. Gustavsson, J. Johansson, F. Sangberg, M. Ljung Aust, *30 Automation expectation mismatch: Incorrect prediction despite eyes on threat and hands on wheel*, 60 HUMAN FACTORS, (8) (2018), at 1095–1116, 10.1177/0018720818788164 ("a key component of driver engagement is cognitive (understanding the need for action), rather than purely visual (looking at the threat), or having hands on wheel."); R. Lin, L. Ma, W. Zhang, *An interview study exploring tesla drivers' behavioural adaptation,* 72 APPLIED ERGONOMICS (2018), 37–47, 10.1016/j.apergo.2018.04.006.

[62] *Is a self-driving car smarter than a seven-month-old?*, THE ECONOMIST, Science & Technology (Sept. 2, 2021 ed.), https://www.economist.com/science-and-technology/is-it-smarter-than-a-seven-month-old/21804141 ("Autonomous vehicles are getting better, but they still don't understand the world in the way that a human being does. For a self-driving car, a bicycle that is momentarily hidden by a passing van is a bicycle that has ceased to exist."); *see also* E.R. Teoh, *What's in a name? drivers' perceptions of the use of five SAE level 2 driving automation systems*, 72 J. SAFETY RES., 134–51 (2020), 10.1016/j.jsr.2019.11.005.

[63] M. Kuehn, Tobias Vogelpohl, M. Vollrath, *Takeover Times in Highly Automated Driving (Level 3)*, COMPUTER SCI., Paper Number 17-0027, 25ESV-000027.pdf (2017), https://www-esv.nhtsa.dot.gov/Proceedings/25/25ESV-000027.pdf. ("These reactions, which are required in order to understand the current traffic situation, are thus delayed by up to 5 seconds compared to the reactions of drivers in manual control in the same situation.").

77.     Tesla, through its marketing and its CEO's assurances, encourages its drivers to believe
        their Tesla vehicles will drive themselves, and this misconception is reinforced when the
        automated system performs relatively well in normal, nonhazardous situations,[64] as was
        the case for Mr. McGee.[65] Thus, Tesla drivers can find themselves at greater risk than if
        they were using traditional cruise control or manual operations.[66]

78.     The problems with SAE Level 3 autonomy have been demonstrated by studies done by
        Waymo when it was tasked with developing an autonomous driving system for Google.
        In November 2017, John Krafcik, Waymo's CEO, said that five years earlier, he was
        developing assisted driving technology as a quick route to market.[67] As part of that
        development, Google's system would drive the vehicle on highways, then transfer
        responsibility back to a human on other roads or in circumstances beyond its
        programming (SAE Level 3 autonomous driving).[68] Krafcik admitted: "What we found
        was pretty scary. It's hard to take over because they [the drivers] have lost contextual
        awareness."[69]

79.     In a filmed experiment, Google's test drivers were seen playing with their phones and
        applying make-up at speeds up to 90km/h. One was even spotted napping at the wheel.[70]
        Not long after this test, management decided to focus solely on developing SAE Level 5

---

[64] B.D. Seppelt, T.W. Victor, *Potential solutions to human factors challenges in road vehicle automation*; G. Meyer, S. Beiker (Eds.), ROAD VEHICLE AUTOMATION 3, SPRINGER INT'L PUB'G, 131–48 (2016), 10.1007/978-3-319-40503-2_11; Victor et al., 2018, Teoh, 2020, Lin et al., 2018, Abraham et al., 2017).

[65] *See* Exhibit 10.

[66] B.D. Seppelt, B. Reimer, L. Russo, B. Mehler, J. Fisher, D. Friedman, *Consumer confusion with levels of vehicle automation*,10TH INT'L DRIVING SYMP. ON HUMAN FACTORS IN DRIVER ASSESSMENT, TRAINING & VEHICLE DESIGN (2019), https://www.safetylit.org/citations/index.php?fuseaction=citations.viewdetails&citationIds[]=citjournalarticle_6 21065_17 Google Scholar.

[67] Derek Fung, *Napping driver leads Google to end level-three Autonomous development*, DRIVE, Nov. 9, 2017, https://www.drive.com.au/news/google-stopped-level-three-self-driving-rd-after-driver-napped-at-the-wheel/.

[68] *Id.*

[69] *Id.*

autonomous vehicle technology, which would require no active driver intervention.[71] The behavior of the Waymo drivers was consistent with that of Tesla Autopilot drivers interviewed in a 2018 study.[72]

80. Speaking in a fireside chat at the National Governors Association meeting July 20, 2018, Krafcik told the group, "There are no autonomous systems available, zero on the road today. Anything you can buy on the road today is a driver-assist system, that means the driver is completely responsible for the car and I think there is so much confusion on that."[73] Krafcik was referring to some of the issues caused by consumers believing that the assist systems currently on the market are more capable than they actually are, most notably Tesla's Autopilot.[74]   John Krafcik publicly admitted that autonomous vehicles might never work in all locations.[75]

81. In January 2021, Waymo stopped using the term "self-driving" because it is dangerously misleading. Waymo said in its blog, "Unfortunately, we see that some automakers use the term 'self-driving' in an inaccurate way, giving consumers and the general public a false impression of the capabilities of driver-assist (not fully autonomous) technology. **That false impression can lead someone to unknowingly take risks (like taking their**

---

[70] *Id.*
[71] *Id.*
[72] R. Lin, L. Ma, W. Zhang, *An interview study exploring tesla drivers' behavioural adaptation*, 72 APPLIED ERGONOMICS, pp. 37–47 (2018), 10.1016/j.apergo.2018.04.006, ("Engagement in secondary tasks during partially automated driving was universal" among a group of 20 Tesla drivers with one to five months experience with Autopilot).
[73] Sam Abuelsamid. *Transition to Autonomous Cars Will Take Longer Than You Think, Waymo CEO Tells Governors*, FORBES, July 20, 2018, https://www.forbes.com/sites/samabuelsamid/2018/07/20/waymo-ceo-tells-governors-av-time-will-be-longer-than-you-think/#277b432cd7da.
[74] *Id.*
[75] *Id.*

**hands off the steering wheel) that could jeopardize not only their own safety but the safety of people around them.**"[76]

82.    A recent study from the Massachusetts Institute of Technology (MIT) corroborates these findings.[77] This study provided a comprehensive analysis of glance behavior during transitions from Tesla's Autopilot (AP) to manual driving in non-critical highway driving.[78] The study concluded that, "Changes in glance duration and pattern suggest a lower visual attention to the forward road when AP was engaged compared to after the disengagement to manual driving."[79]

## OTHER SIMILAR TESLA INCIDENTS INVOLVING AUTOPILOT

83.    Tesla was and remains aware of the inadequacies and defects with its Autopilot system. Tesla has received notice of numerous similar failures in vehicles on the road in which the system permitted a collision with an object while the Autopilot was engaged, many times leading to injuries and deaths.  Such events include, but are not limited to:

    a.    The January 20, 2016, crash of a Tesla Model S near Handan, China where the vehicle struck a street cleaning truck;[80]

    b.    the May 7, 2016, crash of a Tesla Model S near Williston, Florida where the vehicle hit a semi-Trailer Truck turning across the lane in front of it;[81]

---

[76] Andrew J. Hawkins, *Waymo says it's ditching the term 'self-driving' in dig at Tesla*, VERGE, Jan 6, 2021, https://www.theverge.com/2021/1/6/22216848/waymo-change-self-driving-autonomous-language-tesla (emphasis added).

[77] Morando, Gershon, Mehler, and Reimer, *A model for naturalistic glance behavior around Tesla Autopilot disengagements*, ELSEVIER, ACCIDENT ANALYSIS & PREVENTION, Volume 161, Oct. 2021, 106384, https://www.sciencedirect.com/science/article/pii/S0001457521003791?via%3Dihub#.

[78] *Id.*

[79] *Id.*

[80] Neal E. Boudette, *Autopilot Cited in Death of Chinese Tesla Driver,* N.Y. TIMES, Sept. 14, 2016, https://www.nytimes.com/2016/09/15/business/fatal-Tesla-crash-in-china-involved-autopilot-government-tv-says.html.

[81] Danny Yadron and Dan Tynan, *Tesla driver dies in first fatal crash while using autopilot mode,* GUARDIAN, June 30, 2016. https://www.theguardian.com/technology/2016/jun/30/Tesla-autopilot-death-self-driving-car-elon-musk.

c.      the August 5, 2016, crash of a Tesla Model S into a car in China;[82]

d.      the July 10, 2016, crash of a Tesla Model X in Montana that suddenly veered into highway barriers and crashed,[83]

e.      the January 29, 2017, crash of a Tesla Model X into a guardrail and tree in China;[84]

f.      the March 2, 2017, crash of a Tesla Model S in Dallas County, Texas where the vehicle struck lane barriers on a highway;[85]

g.      the March 7, 2017, crash of a Tesla Model X into a van in China;[86]

h.      the December 13, 2017, collision in which a Tesla Model X on Autopilot suddenly accelerated into the vehicle in front of it,[87]

i.      the January 22, 2018, incident in which a Tesla Model S on Autopilot failed to brake and crashed into the back of a firetruck in Culver City, California.[88]

j.      the March 23, 2018, crash of a Tesla Model X near Mountain View, California where the Tesla hit a barrier divider;[89]

k.      the April 29, 2018, crash of a Tesla Model X near Tokyo, Japan where the Tesla hit a pedestrian and a vehicle in front of it on a highway;[90]

l.      the May 11, 2018, crash of a Tesla Model S which slammed into a stopped fire truck at 60 mph while on autopilot near Salt Lake City, Utah;[91]

---

[82] Tycho de Feijter, *"First Tesla Autopilot Crash In China,"* CARNEWSCHINA.COM, Aug. 5, 2016. https://carnewschina.com/2016/08/05/first-tesla-autopilot-crash-in-china/.

[83] Fred Lambert, *Tesla Autopilot crash in Montana: Drivers reveals new details and claims a 'cover up' by Tesla,* ELECTREK, July 22, 2016, https://electrek.co/2016/07/22/tesla-autopilot-model-x-crash-montana-coverup/.

[84] W.E. Ning, *"Tesla Model X Crashes Into A Tree In China, Penetrated By Guardrail,"* CARNEWSCHINA.COM, Mar. 27, 2017, https://carnewschina.com/2017/03/27/tesla-model-x-crashes-into-a-tree-in-china-penetrated-by-guardrail/.

[85] Fred Lambert, *Tesla Autopilot crash caught on dashcam shows how not to use the system,* ELECTREK, Mar. 2, 2017 https://electrek.co/2017/03/02/Tesla-autopilot-crash-video-how-note-to-use/.

[86] Joey Wang, *Tesla Model X Hits Van In China, Autopilot Blamed,* CARNEWSCHINA.COM, Mar. 9, 2017, https://carnewschina.com/2017/03/09/tesla-model-x-hits-van-in-china-autopilot-blamed/.

[87] https://www.plainsite.org/dockets/3hd2fpwvp/supreme-court-of-the-state-of-new-york-nassau-county/wang-jing-vs-tesla-inc/.

[88] Fred Lambert, *Tesla Vehicle reportedly on Autopilot crashes into fire truck at 65 mph, no injury,* ELECTREK, Jan. 22, 2018, https://electrek.co/2018/01/22/tesla-model-s-autopilot-crash-fire-truck/.

[89] Mark Osborne, *Tesla car was on autopilot prior to fatal crash in California, company says,* ABC NEWS, Mar. 30, 2018. https://abcnews.go.com/US/Tesla-car-autopilot-prior-fatal-crash-california-company/story?id=54142891.

[90] Brad Anderson, *Tesla Autopilot Blamed On Fatal Japanese Model X Crash,* CARSCOOPS, Apr. 30, 2020. https://www.carscoops.com/2020/04/Tesla-autopilot-blamed-on-fatal-japanese-model-x-crash/.

m.    the May 25, 2018, crash of a Tesla Model 3 while on autopilot in Greece;[92]

n.    the May 29, 2018, crash of an unknown Tesla model into a stationary police car while on autopilot in California;[93]

o.    the October 12, 2018, crash of a Tesla Model S near Orlando, Florida where the Tesla hit a vehicle in front of it on a highway;[94]

p.    the January 30, 2019, crash of a Tesla Model X in Holland when the driver using an "Autosteer System" did not look forward for a few seconds, did not pay attention to the road and passed the double solid line.[95]

q.    the February 10, 2019, crash of a Tesla Model X in North Brunswick, New Jersey, in which the car on Autopilot reportedly steered itself into a highway sign and a field while the driver tried to steer the car into the lane of traffic,[96]

r.    the March 1, 2019, crash of a Tesla Model 3 near Delray Beach, Florida where the vehicle hit a semi-trailer truck turning across the lane in front of it;[97]

s.    the incident giving rise to this action, the April 25, 2019, crash of a Tesla Model S which blew through an intersection and killed a pedestrian in the Florida Keys;[98]

---

[91] Marco della Cava, *Tesla driver in Utah crash kept taker her hands off wheel as car sped in Autopilot mode,* USA TODAY, May 16, 2018, https://www.usatoday.com/story/tech/talkingtech/2018/05/16/nhtsa-looking-into-Tesla-crash-utah/617168002/.

[92] Fred Lambert, *Tesla Model 3 unofficial road trip ends in crash, driver blames Autopilot,* ELECTREK, May 25, 2018, https://electrek.co/2018/05/25/tesla-model-3-unofficial-road-trip-crash-driver-blames-autopilot/.

[93] Olivia Solon, *Tesla that crashed into police car was in 'autopilot' mode, California official says,* GUARDIAN, May 29, 2018, https://www.theguardian.com/technology/2018/may/29/tesla-crash-autopilot-california-police-car.

[94] Gal Tziperman, *Winter Garden man suing Tesla for autonomous driving crash,* ORLANDO SENTINEL, Oct. 30, 2018, https://www.orlandosentinel.com/news/breaking-news/os-ne-Tesla-autopilot-lawsuit-autonomous-driving-20181030-story.html.

[95] *Guilt in traffic,* EAST BRABANT DISTRICT COURT, March 3, 2019. https://linkeddata.overheid.nl/front/portal/document-viewer?ext-id=ECLI:NL:RBOBR:2019:5057.

[96] Carly Baldwin, *Self-Driving Tesla Crashes On Rt. 1 In North Brunswick: Police,* PATCH**,** Feb. 12, 2019, https://patch.com/new-jersey/eastbrunswick/self-driving-tesla-crashes-rt-1-north-brunswick-police.

[97] Fred Lambert, *Tesla Model 3 driver again dies in crash with trailer, Autopilot not yet ruled out,* ELECTREK, Mar. 1, 2019, https://electrek.co/2019/03/01/Tesla-driver-crash-truck-trailer-autopilot/.

[98] David Shepardson and Hyunjoo Jin, U.S. probing fatal Tesla crash that killed pedestrian, REUTERS, September 3, 2021, https://www.reuters.com/business/autos-transportation/us-probing-fatal-tesla-crash-that-killed-pedestrian-2021-09-03/

t.      the July 6, 2019, crash of a Tesla Model S in Arcadia, California, when the vehicle's Autopilot suddenly malfunctioned and caused the vehicle to swerve into the median, causing serious injuries to the driver;[99]

u.      the July 17, 2019, crash of a Tesla Model 3 into a wall while on Autopilot in California;[100]

v.      the August 9, 2019, crash of a Tesla Model S into a tow truck in Russia while on Autopilot;[101]

w.      the August 24, 2019, crash in California involving a Ford pickup that was struck from behind by a Tesla Model 3 that was traveling about 60 mph on Autopilot. Neither Autopilot nor the driver slowed the vehicle until a fraction of a second before the crash;[102]

x.      the September 17, 2019, crash involving an unknown Tesla model that drove into oncoming traffic in Florida while Autopilot was alleged;[103]

y.      the November 19, 2019, crash in which a Tesla Model S crashed into the rear of a stopped Infiniti in New York;[104]

z.      the December 7, 2019, crash of a Tesla Model 3 into a parked State Police car while on Autopilot in Connecticut;[105]

aa.     the December 29, 2019, crash of a Tesla Model S that failed to stop at a red light while the driver was using Autopilot and collided with a Honda in the intersection, killing the two occupants of the Honda;[106]

---

[99] *Hsu v. Tesla, Inc.*, No. 20STCV18473, SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES, filed May 14, 2020.

[100] https://www.plainsite.org/dockets/41pi138xj/superior-court-of-california-county-of-los-angeles/leila-manshadi-v-tesla-inc-a-delaware-corporation-d/b/a-tesla-motors-inc/

[101] *3 injured as Tesla goes up in flames & explodes on Moscow freeway*, RT.COM, Aug. 11, 2019, https://www.rt.com/russia/466247-tesla-blast-moscow-injured/.

[102] Neal E. Boudette, *Tesla says Autopilot Makes Its Cares Safer. Crash Victims Say It Kills*, N.Y. TIMES, July 5, 2021, https://www.nytimes.com/2021/07/05/business/Tesla-autopilot-lawsuits-safety.html.

[103] Cristobal Reyes, *Woman killed in Osceola County crash while trying to pass traffic, FHP says*, ORLANDO SENTINEL, Sept. 17, 2019, https://www.orlandosentinel.com/news/osceola-county/os-ne-osceola-polk-line-road-fatal-crash-20190918-m5hgbty6l5csfe2qo3mlmxr7sa-story.html.

[104] https://www.plainsite.org/dockets/4ao0s2kkd/supreme-court-of-the-state-of-new-york-nassau-county/matthew-ballen-v-tesla-inc/

[105] Alfred Branch, *Tesla In 'Auto Pilot' Plows Into State Police Cruiser in Norwalk*, PATCH, December 7, 2019, https://patch.com/connecticut/norwalk/tesla-auto-pilot-plows-state-police-cruiser-norwalk Last accessed 6 September 2021.

[106] Ryan Beene, *Fatal Tesla crash in Gardena being investigated by NHTSA*, L.A. TIMES, Dec. 31, 2019, https://www.latimes.com/business/story/2019-12-31/fatal-tesla-crash-nhtsa-gardena-los-angeles .

bb.      the December 29, 2019, crash of a Tesla Model 3 into a parked fire truck in Indiana, killing the passenger;[107]

cc.      the December 30, 2019, crash of a Tesla Model 3 into a stopped police car in Massachusetts;[108]

dd.      the May 4, 2020, crash of a Tesla Model S when the driver had the car steering on when he hit and killed a trailer driver in Norway;[109]

ee.      the May 31, 2020, crash of a Tesla Model 3 that drove into an overturned semi trailer;[110]

ff.      the June 21, 2020, crash of a Tesla Model 3 when the Tesla veered into the other lane and crashed into an oncoming car in Germany;[111]

gg.      the July 14, 2020, crash of a Tesla Model S that drove into an Arizona police SUV, which was then pushed into an ambulance;[112]

hh.      the August 12, 2020, crash of a Tesla Model 3 that rear-ended a Sienna minivan repeatedly, causing the minivan to spin out of control in Saratoga, California. The Tesla continued traveling down the freeway off-ramp, striking a pickup at an intersection before winding up on the off-ramp embankment and catching fire, killing both occupants;[113]

ii.      the August 26, 2020, crash of an unidentified Tesla model into a North Carolina police car while the driver was watching a movie and the vehicle was on Autopilot;[114]

---

[107] *Arizona woman dies after her Tesla crashes into fire truck on Indiana freeway,* 12 NEWS, Dec. 29, 2019, https://www.12news.com/article/news/local/arizona/arizona-woman-dies-after-her-car-crashes-into-fire-truck-on-indiana-freeway/75-349be661-18ff-452d-a0e0-e438b2e1f8e7, Last accessed 23 January 2022.

[108] *2 Drivers Cited After State Police Cruisers Hit On Route 24, Mass Pike*, CBS BOSTON, Dec. 31, 2019, https://boston.cbslocal.com/2019/12/31/massachusetts-state-police-cruisers-hit-crashes-mass-pike-warren-route-24-west-bridgewater/.

[109] Geir Roed, *Tesla on auto-steering when man was cut down,* MOTOR, Dec. 18, 2020, https://motor.no/autopilot-nyheter-Tesla/Tesla-pa-auto-styring-da-mann-ble-meid-ned/188623.

[110] Fred Lambert, *Video of Tesla Model 3 crashing into a truck on Autopilot goes viral,* ELETRECK, June 1, 2020, https://electrek.co/2020/06/01/tesla-model-3-crashing-truck-autopilot-video-viral/.

[111] *Update: Fatal accident on S255: Investigation against Tesla driver for negligent homicide,* FREIE PRESSE, June 22, 2020  https://www.freiepresse.de/drei-tote-bei-unfall-auf-autobahnzubringer-bei-aue-artikel10894951.

[112] Ethan Baron, *Tesla on 'Autopilot' hits police vehicle which hits ambulance, driver possibly drunk: police,* BAY AREA NEWS GROUP, July 14, 2020. https://www.mercurynews.com/2020/07/14/tesla-on-autopilot-hits-police-vehicle-which-hits-ambulance-driver-possibly-drunk-police/.

[113]      *Saratoga Man Killed in Fiery Crash Identified,* MERCURYNEWS.COM, Aug. 13, 2020 https://www.mercurynews.com/2020/08/13/saratoga-man-killed-in-fiery-freeway-crash-identified/

[114] Simone Jasper, *Tesla driver crashes into cop car while watching movie on autopilot, NC officials say*, NEWS & OBSERVER, Aug. 26, 2020, https://www.newsobserver.com/news/state/north-carolina/article245267595.html.

jj.    the December 10, 2020, crash of a Tesla Model X into apartment garage wall in Seoul, South Korea. The vehicle ignited, killed a passenger and injured 2 others; firefighters couldn't open the door to extract the passenger because electronic door lock system was inoperable due to fire;[115]

kk.    the February 27, 2021, crash of a 2019 Tesla into four vehicles including police cars in Texas;[116]

ll.    the March 17, 2021, crash of a Tesla Model 3 into a stopped police car in Michigan;[117]

mm.    the April 17, 2021, crash of a Tesla Model S which was traveling along a curve at a high rate of speed before crashing into a tree in The Woodlands near Houston, Texas;[118]

nn.    the May 19, 2021, incident, where a Tesla crashed into a Road Ranger in Florida;[119]

oo.    the July 10, 2021, incident, where a Tesla on Autopilot crashed into a California Highway Patrol vehicle;[120]

pp.    the July 19, 2021, crash of a Tesla Model 3 that backed into a parking spot and was supposed to pull forward on its own and veer to the right, but instead, it unexpectedly went left in Fresno, California;[121]

qq.    the July 25, 2021, crash of a Tesla Model X which was in a 25 mph speed zone in Yosemite National Park and came across a fork in the road. The vehicle kept going straight, entered gravel and smashed into a boulder. The

---

[115] Kim Min-Joong, *Police ramp up investigation into fatal conflagration of Tesla Model X,* KOREA JOONGANG DAILY, Dec. 24, 2020 https://koreajoongangdaily.joins.com/2020/12/24/business/industry/Tesla/20201224184400725.html.

[116] Jose Gonzalez, *Montgomery County deputies evade serious injury in Tesla crash,* COURIER, Mar. 2, 2021, https://www.yourconroenews.com/neighborhood/moco/news/article/Montgomery-County-deputies-evade-serious-injury-15992663.php.

[117] Associated Press, *Tesla on autopilot crashes into Michigan trooper's patrol car,* DETROIT FREE PRESS, Mar. 17, 2021, https://www.freep.com/story/news/local/michigan/2021/03/17/tesla-autopilot-crash-michigan-state-police-patrol-car/4731376001/.

[118] Lucas Manfredi, *Deadly Texas crash involving Tesla worth $80,000 sparks 4-hour fire,* FOX BUS., Apr. 18, 2021 https://www.foxbusiness.com/lifestyle/two-killed-in-driverless-Tesla-crash.

[119] Amanda Batchelor, *3 injured after Tesla collides with road ranger truck on I-95*; LOCAL 10 NEWS, May 19, 2021, https://www.local10.com/news/local/2021/05/19/3-injured-after-tesla-collides-with-road-ranger-truck-on-i-95/.

[120] *Woman Suspected of DUI Arrested After Crashing into CHP Vehicle on SR-56*, TIMES OF SAN DIEGO, July 10, 2021, https://timesofsandiego.com/crime/2021/07/10/woman-suspected-of-dui-arrested-after-crashing-into-chp-vehicle-on-sr-56/.

[121] Shelby Bracho, *Man's Tesla crashes into pole using 'smart summon' valet feature,* FOX 26 NEWS, July 25, 2021, https://kmph.com/news/local/mans-Tesla-crashes-into-pole-using-smart-summon-valet-feature.

driver said that park rangers told him that four other Tesla vehicles crashed at the same exact spot in Yosemite.[122]

rr.    the July 26, 2021, crash of a Tesla Model Y that struck and killed a man who was changing his tire by the side of the road in New York;[123]

ss.    the August 28, 2021, crash of a Tesla Model 3 into a parked police car in Florida while on Autopilot;[124]

tt.    the September 16, 2021, incident involving an unidentified Tesla model in which a woman apparently passed out and was being followed by California Highway Patrol;[125]

uu.    the October 15, 2021, crash of a Tesla Model 3 in Indiana in which the vehicle hydroplaned while on Autopilot and the car caught fire after running off the road;[126]

vv.    a February 2, 2022, crash of a Tesla Model Y into a traffic barrier in downtown San Jose, California, with the car on Full Self Driving;[127]

ww.    a March 7, 2022, crash of a Tesla vehicle on Autopilot which slammed into the back of a road maintenance vehicle and blocked the outer lane of a freeway; a BMW sedan then crashed into and killed a road maintenance worker who was setting up warning cones at the scene;[128]

xx.    a July 7, 2022, crash of a Tesla vehicle on Autopilot that collided with a motorcycle on State Route 91 in Riverside, California, killing the motorcyclist;[129]

yy.    a July 24, 2022, crash of a Tesla vehicle on Autopilot that collided with a

[122] u/BBFLG, *5 Tesla Accidents in Same Location in Yosemite,* REDDIT, Aug. 3, 2021 https://www.reddit.com/r/SelfDrivingCars/comments/oxhbit/5_Tesla_accidents_in_same_location_in_yosemite/.

[123] Tom Krisher, *Feds probe NY Tesla crash that killed man changing flat tire,* AP NEWS, Sept. 3, 2021, https://apnews.com/article/technology-business-6127ae797c528ca1d5322efc43439a12.

[124] Lora Kolodny, *A Tesla Model 3 hit a parked police car in Orlando, driver said she was 'in Autopilot',* CNBC, Aug. 28, 2021, https://www.cnbc.com/2021/08/28/tesla-model-3-hit-a-parked-police-car-in-orlando-driver-said-she-was-in-autopilot.html.

[125] Christiane Cordero, *Audio captures moments CHP stopped apparently passed-out driver of Tesla on Autopilot in Glendale,* EYEWITNESS NEWS ABC, Sept. 17, 2021, https://abc7.com/tesla-autopilot-passed-out-driver-glendale-los-angeles/11028280/.

[126] The Tesla Mex, *Tesla Model 3 on Fire filmed with iPhone 13 Pro Max after Hydroplaning accident*, Nov. 21, 2021, https://www.youtube.com/watch?v=DsxlHJx41lE.

[127] Fred Lambert, *Tesla Full Self-Driving Beta runs into a pole in what could be the first FSD accident caught on video,* ELECTREK, Feb. 5, 2022. https://electrek.co/2022/02/04/tesla-full-self-driving-beta-crash-video/.

[128] Phillip Charlier, *Tesla on Autopilot involved in fatal freeway crash,* TAIWAN ENGLISH NEWS, March 8, 2022. https://taiwanenglishnews.com/tesla-on-autopilot-involved-in-fatal-freeway-crash/.

[129] Tom Krishner, *US agency probes Tesla crashes that killed 2 motorcyclists,* ASSOCIATED PRESS, August 5, 2022. https://apnews.com/article/technology-12ba38bd863e2b128a8e2914179049e0

motorcycle on Interstate 15 near Draper, Utah, killing the motorcyclist.[130]

zz.     an August 12, 2022, crash of a Tesla Model S that smashed into a guard rail while on Full Self Driving.[131]

aaa.     an August 26, 2022, crash involving a Tesla that drove into a motorcycle while on Autopilot in Palm Beach County, Florida, killing the motorcyclist.[132]

bbb.     a November 24, 2022, crash involving a Tesla suspected of being on Autopilot that unexpectedly stopped on the Bay Bridge in the San Francisco Bay Area.[133]

ccc.     a December 28, 2022, incident involving a Tesla on Autopilot in Germany in which the driver had rigged the steering wheel so that Autopilot would continue to function while the driver was asleep.[134]

### TESLA'S LACK OF EFFECTIVE AUTOMATIC EMERGENCY BRAKING (AEB) SYSTEM

84.     Another defect that was a contributing cause to this crash is the lack of an *effective* Automatic Emergency Braking (AEB) system to perform as anticipated by the ordinary consumer.[135] According to Musk in 2014, "So we're able to obviously do lane keeping on freeways, do Automatic Cruise Control, **Active Emergency Braking so that it will brake if it sees any object that you are going to collide with,** it'll self-park, automatic parallel parking, automatically go into a garage . . . in fact, when you get home you'll

---

[130]  *Id.*

[131]  Florin Amarlei, *Tesla Model S Unexpectedly Swerves Left and Crashes, the Owner Says It's FSD's Fault*, AUTOEVOLUTION, August 25, 2022, https://www.dropbox.com/sh/wlpcslque12d6jv/AADjzuTXXfWYiI3Glb_LzaJba?dl=0&preview=Tesla+Model+S+Unexpectedly+Swerves+Left+and+Crashes%2C+the+Owner+Says+It%27s+FSD%27s+Fault+-+autoevolution.pdf

[132]  Matt Mcfarland, Tesla Autopilot's safety question after latest fatal motorcycle crash, CNN Business, October 17, 2022, https://www.cnn.com/2022/10/17/business/tesla-motorcycle-crashes-autopilot/index.html

[133]  Tom Krisher, US Probing Automated Driving System Use in Tesla Crash on Bay Bridge, NBCBAYAREA.COM, December 22, 2022 https://www.nbcbayarea.com/news/local/investigation-automated-driving-system-tesla-crash-bay-bridge/3112247/

[134]  Gustavo Henrique Ruffo, Police Stop Tesla Driver Who Slept on an Autobahn at 68 MPH on Autopilot, AUTOEVOLUTION, December 30, 2022 https://www.autoevolution.com/news/police-stop-tesla-driver-who-slept-on-an-autobahn-at-684-mph-on-autopilot-207437.html

actually be able to just step out of the car and have it park itself in your garage. Including, it'll open the door, and it'll go in and park itself."[136]

85.    Yet, despite the fact that the Subject Vehicle was marketed and sold as a state-of-the-art vehicle, multiple other manufacturers, including makers of much less expensive models like Subaru, Mazda, Chrysler, Mitsubishi, and Honda, had made Automatic Emergency Braking ("AEB") safety features available by the 2019 Model Year.[137] Tesla knew before this event, and knows of events since this one, that the lack of an effective Automatic Emergency Braking system in their vehicles allowed a crash to occur that should have otherwise been avoided or reduced in severity. Each of the above-referenced events in which the vehicle crashed into a vehicle, building, or other structure in front of it was notice to Tesla of the defect.

## TESLA'S AUTOPILOT SYSTEM LACKS APPROPRIATE SAFEGUARDS

86.    Despite Tesla's claims that its semi-autonomous system is safer than others on the market, the truth is, other manufacturers' systems provide substantially more safeguards than Tesla's. Tesla's Autopilot is simply a traffic aware cruise control system, sometimes called "adaptive cruise control", that has become common in today's cars.[138] Even if a car didn't initially come with one, it can be installed on many models.[139]

---

[135] Russ Mitchell, *A Tesla mystery: Why didn't auto-braking stop these crashes?*, L.A. TIMES, Oct. 7, 2021, https://www.latimes.com/business/story/2021-10-07/why-arent-automatic-braking-systems-stopping-deadly-tesla-crashes
[136] Elon Musk, *Tesla Unveils Dual Motor and Autopilot*, Oct. 10, 2014, at 8:44–9:21, https://youtu.be/FZ6lZJWL_Xk.
[137] Austin Lott, *Least Expensive Cars With Active Safety Systems,* MOTORTREND, Apr. 22, 2015, http://motortrend.com/news/least-expensive-cars-with-active-safety-systems/; https://consumerreports.org/cro/magazine/2015/04/cars-that-can-save-your-life/index.htm.
[138] Hearst Autos Research, *Cars with Adaptive Cruise Control: Everything You Need to Know*, CAR & DRIVER 2021. https://www.caranddriver.com/research/a31996248/cars-with-adaptive-cruise-control/.
[139] *Id*.

87.     Adaptive cruise control ("ACC") uses sensors such as cameras and radar to monitor a
car's speed and steering in certain traffic situations.[140] Unlike traditional cruise control,
ACC assists the driver to stay within the lane, avoid other vehicles and barriers, and, in
combination with other systems, such as Automatic Emergency Braking, helps the driver
avoid mishaps.[141] These systems fall within the SAE Level 2 category.

88.     However, as pointed out above, these systems come at a cost because they reduce driver
attention and delay reaction time should the systems fail. To offset this problem, some
manufacturers have developed ways to monitor the driver's behavior to better insure the
driver is as alert as possible so that they can assume full control of the vehicle if the
system fails or if road conditions are not suitable for the automation.

89.     Rather than encourage drivers to trust automated systems, as Tesla has done, others in the
automotive industry diligently remind drivers that they must remain focused, with hands
on the steering wheel, ready to take emergency action at all times. Conversely, Tesla
discounts the need for driver monitoring because it claims, despite contrary evidence,[142]
that its automated functions perform better than humans.[143] As Musk has said, "If you
have a system that's at or below human level reliability, then driver monitoring makes
sense. But if your system is dramatically better, more reliable than a human, then driving,
monitoring is not – does not help much."[144] This rationalization is flatly unsupported by
evidence showing Tesla's automated systems perform as well as humans, let alone

---

[140] *Id*.

[141] *Id*.

[142] *See, e.g.,* Russ Mitchell, *Agency Might Have Overstated Tesla Autopilot's Safety Impact*, GOV'T TECH., Feb. 14,
2019, https://www.govtech.com/fs/agency-might-have-overstated-tesla-autopilots-safety-impact.html.

[143] [21:27-24:26]    Elon    Musk:    Tesla    Autopilot    |    Lex    Fridman    Podcast    #18,
https://www.youtube.com/watch?v=dEv99vxKjVI

[144] *Id*.

"dramatically better".[145] In fact, close examination of the available data suggests Tesla's automated systems perform *worse* than humans.[146]

90.     Some systems monitor the driver's direction of vision and use auditory and tactile warnings to alert the driver if their gaze wanders from the road. These systems will disconnect the autonomous features if the driver doesn't respond.[147] For instance, GM's Super Cruise has an attention tracking system in the front seat, including infrared emitters and a camera on the steering wheel that monitors eye gaze and head position, and it shuts down if the driver fails to respond to visual and audible warnings.[148] Ford and Subaru have similar technology.[149] Since the crash that forms the basis of this action, Tesla has now turned on a driver monitoring camera in some of its vehicles and updated its software to recognize emergency responder vehicle lights at night.[150] Tesla added this function only after NHTSA launched its investigation of Tesla crashes into emergency vehicles.[151] NHTSA has formally asked Tesla to explain why it did not comply with 49 U.S.C. §30118 by filing the required recall notice in connection with this update.[152]

---

[145]   Noah Goodall, *Normalizing crash risk of partially automated vehicles under sparse data*, JOURNAL OF TRANSPORTATION SAFETY & SECURITY, (2023) DOI: 10.1080/19439962.2023.2178566

[146]   *See, e.g.*, Mitchell, *supra,* ("*For the small minority of cars for which mileage data were provided both before and after Autosteer was installed, Teslas were involved in 60 percent more crashes, Whitfield concluded. That could mean cars with Autosteer were more dangerous than cars without*.").

[147]   *See* Sasha Lekach, *GM's Super Cruise feels like it's self-driving, but it's not; It's dangerous to think the car is in control*, MASHABLE, Feb. 9, 2021. https://mashable.com/article/gm-super-cruise-advanced-driving-system.

[148]   *Id*.

[149]   *See*, Mark Phelan, *2020 Subaru models will greet you, help you keep your eyes on the road,* DETROIT FREE PRESS, August 3, 2019. https://www.freep.com/story/money/cars/mark-phelan/2019/08/03/subaru-driverfocus-outback-forester-legacy/1903279001/

[150]   Ramey, *Tesla Autopilot Will Now Detect Emergency Lights, but Only at Night*, AUTOWEEK, Sept. 22, 2021 https://www.autoweek.com/news/green-cars/a37694444/tesla-autopilot-will-now-detect-emergency-lights-but-only-at-night/ .

[151]   *See attached* Exhibit 1, National Highway Traffic Safety Administration [NHTSA] ODI Resume for Investigation number PE 21-020.

[152]   *See attached* Exhibit 3, *Letter from Gregory Magno, Chief, Vehicle Defects Division -D, Office of Defects Investigation, NHTSA, to Eddie Gates, Director, Field Quality, Tesla, Inc*., October 12, 2021. ("This recall notice must be filed with NHTSA no more than five working days after the manufacturer knew or should have known of the safety defect or noncompliance. *See* 49 C.F.R. § 573.6(b); *see also United States v. Gen. Motors*

91.     Consumer Reports now provides an annual analysis of active driving assistance systems. Their evaluations place great emphasis on a system's ability to monitor whether the driver is paying attention.[153] Consumer Reports' manager of safety policy, William Wallace, stated, "The evidence is clear: If a car makes it easier for people to take their attention off the road, they're going to do so – with potentially deadly consequences."[154] Wallace continued, "It's critical for active driving assistance systems to come with safety features that actually verify drivers are paying attention and are ready to take action at all times. Otherwise, these systems' safety risks could end up outweighing their benefits."[155]

92.     Consumer Reports recently tested one of Tesla's latest iterations of its "Full Self-Driving" software and reported the software lacks safeguards and warned the system's use on public roads "puts the public at risk."[156] "Videos of FSD Beta 9 in action don't show a system that makes driving safer or even less stressful," says Jake Fisher, senior director of Consumer Reports' Auto Test Center. "Consumers are simply paying to be test engineers for developing technology without adequate safety protection."[157]

93.     Tesla has released additional versions of its FSD, one in October 2021 was FSD Beta 10.3. However, only days after the release of this version, Tesla pulled it and rolled back

---

*Corp.*, 656 F. Supp. 1555, 1559 n.5 (D.D.C. 1987). Any manufacturer issuing an over-the-air update that mitigates a defect that poses an unreasonable risk to motor vehicle safety is required to timely file an accompanying recall notice to NHTSA pursuant to 49 U.S.C. § 30118 and 49 C.F.R. Part 573.")

[153] Mike Monticello, *Cadillac's Super Cruise Outperforms Other Driving Assistance Systems*, CONSUMER REPORTS, October 28, 2020. https://www.consumerreports.org/car-safety/cadillac-super-cruise-outperforms-other-active-driving-assistance-systems/.

[154] *Id*.

[155] *Id.*

[156] David Shepardson, *Consumer Reports says Tesla's 'Full Self-Driving' software lacks safeguards*, REUTERS, July 20, 2021 https://www.reuters.com/business/autos-transportation/consumer-reports-says-Teslas-full-self-driving-software-lacks-safeguards-2021-07-20/.

[157] Keith Barry, *Tesla's 'Full Self-Driving' Beta Software Used on Public Roads Lacks Safeguards, Consumer Reports' car safety experts worry that Tesla continues to use vehicle owners as beta testers for its new features, putting others on the road at risk*, CONSUMER REPS., July 19, 2021, https://www.consumerreports.org/car-safety/Tesla-full-self-driving-beta-software-lacks-safeguards-a6698414036/.

to FSD Beta 10.2 because of "issues" including complaints of false crash warnings.[158] Even Musk now admits, "I thought the self-driving problem would be hard, but it was harder than I thought. It's not like I thought it'd be easy, I thought it would be very hard, but it was actually way harder than even that."[159] Tesla never referred to this "roll back" as a recall, as required by law.[160]

94.     Further, Tesla uses onscreen graphics as part of its Autopilot system which appear on the large monitor used by the driver to operate many vehicle functions. Fisher is not alone in believing that "Tesla should at the very least be monitoring drivers in real time to ensure that they're paying attention while using new software."[161] For example, Fisher says the updated software has "impressive" onscreen graphics, but he's worried that even a brief glance by the driver at the display might be too long to prevent the system from crashing into a car or pedestrian.[162]

95.     Among the most troubling aspects of Tesla's claims that its "Autopilot" and "Full Self-Driving" features are safer than other vehicles with automated features is that Tesla jealously guards its information as to the incidents in which the FSD system has failed.[163] For a while, Tesla required those with access to the car's FSD Early Access Program (EAP) system to sign a non-disclosure agreement that specifically prohibits them from

---

[158]     Richard Lawler, *Tesla pulled its latest 'Full Self Driving beta after testers complained about false crash warnings and other bugs*, THE VERGE, October 24, 2021, https://www.theverge.com/2021/10/24/22743628/elon-musk-tesla-fsd-beta-10-3-rollback-issues-phantom-fcw Last accessed 26 October 2021.

[159]     *Elon Musk: SpaceX, Mars, Tesla Autopilot, Self-Driving, Robotics, and AI | Lex Fridman Podcast #252*, Dec. 28, 2021, at [1:06:05 – 1:06:13] https://www.youtube.com/watch?v=DxREm3s1scA.

[160]     *See* Exhibit 9.

[161]     *Id*.

[162]     *Id*.

[163]     O'Kane, *Tesla asks owners to share fewer clips of 'Full Self-Driving' beta mistakes*, VERGE, Sept. 28, 2021, https://www.theverge.com/2021/9/28/22696463/tesla-fsd-beta-nda-video-clips-controversy-full-self-driving.

speaking to the media or giving test rides to the media.[164] Tesla also specifically discourages its owners from sharing video of automated feature mistakes.[165] Without accurate data about incidents in which Tesla's automation system has failed, assessment of Tesla's claims of its safety becomes impossible to verify and therefore meaningless. Tesla's efforts to limit public disclosure of safety information have caught the attention of NHTSA, resulting in a Special Order Directed to Tesla, Inc, issued 12 October 2021.[166]

96.    As stated by the drafters of the 18 August 2021 Letter from the U.S. Senate to the Federal Trade Commission, "Tesla and Mr. Musk's repeated overstatements of their vehicle's capabilities – despite clear and frequent warnings – demonstrate a deeply concerning disregard for the safety of those on the road and require real accountability. Their claims put Tesla drivers – and all of the travelling public – at risk of serious injury or death. In light of these concerns, we urge you to swiftly open an investigation into Tesla's repeated and overstated claims about their Autopilot and Full Self-Driving features and take appropriate enforcement action to prevent further injury or death as a result of any Tesla feature."[167]

## FACTS COMMON TO ALL CLAIMS

97.    Plaintiffs re-allege the foregoing as if fully set forth herein.

98.    On or about April 25, 2019, the Vehicle was owned by George McGee.

---

[164] Aaron Gordon, *How Tesla's 'Self-Driving' Beta Testers Protect the Company From Critics*, VICE, Sept. 27, 2021, https://www.vice.com/en/article/m7ezxq/how-teslas-self-driving-beta-testers-protect-the-company-from-critics.

[165] *See* O'Kane, *supra*.

[166] *See* Exhibit 11.

[167] *See* Exhibit 5, 18 August 2021 Letter from the United States Senate to The Honorable Lina Khan, Chair, Federal Trade Commission.

99.   At all material times, the Vehicle was equipped with what Tesla calls "Autopilot", a suite of features and functions meant to assist drivers in driving and operating Tesla's vehicles.

100.  At all material times, the Autopilot functions of the Vehicle included but were not limited to automatic steering, forward collision warning and emergency braking.

101.  At all material times, George McGee purchased the vehicle in large part because of the Autopilot functions advertised by Tesla. More specifically, McGee purchased the subject Tesla Vehicle because he wanted a vehicle that would provide him with ample assistance while driving, and based on marketing and advertisements he believed that Tesla's subject vehicle would provide such ample driving assistance.

102.  On or about April 25, 2019, George McGee was operating and/or driving the Vehicle eastbound on CR-905A, also known as Card Sound Road, in Key Largo, Monroe County, Florida, and was approaching the 3-way T-intersection with County Road 905.

103.  At the subject intersection, Card Sound Road ends, and drivers eastbound on Card Sound Road must first come to a stop at a stop sign before turning either left onto northbound County Road 905 or right onto southbound County Road 905.

104.  At the subject intersection, in addition to the aforementioned stop sign, there is also an overhead flashing red light and yellow caution signs which alert all drivers on eastbound Card Sound Road of the end of the roadway and the need to stop and then turn onto County Road 905.

105.  At that time and place, George McGee had activated the Autopilot functions in his Tesla and was relying on its ability to properly steer and navigate the Vehicle, to detect obstacles in the roadway ahead of the Vehicle, and to reduce speed and/or come to a complete stop when such obstacles were detected.

106.   Because he was relying on the Vehicle's Autopilot systems, George McGee took his eyes off the road to look at his phone as he was approaching the T-intersection at CR-905A.

107.   At that same time and place, Plaintiff, Dillon Angulo, had been driving a Chevrolet Tahoe owned by his mother and had lawfully parked that vehicle on the shoulder of the road on the east side of County Road 905, directly across from the end of eastbound Card Sound Road.

108.   After parking, Plaintiff Dillon Angulo and his companion Naibel Benavides Leon were standing outside of and directly next to Plaintiff's Chevrolet Tahoe.

109.   At that time, the Autopilot of George McGee's vehicle failed to detect the end of Card Sound Road (including a failure to detect the various traffic control devices) and further failed to detect the substantial profile of the Chevrolet Tahoe at any point, despite the fact that the vehicle and all of the referenced traffic signals, signs and warnings were directly in front of and in the path of the Vehicle.

110.   As a result, the Vehicle continued eastbound through the intersection without initiating the brakes, and the Vehicle struck Plaintiff's Chevrolet Tahoe at almost 70 miles per hour, causing it to violently rotate and strike Dillon Angulo and Naibel Benavides Leon, causing debilitating injuries to Dillon Angulo and killing Ms. Benavides Leon.

111.   As set out above, NHTSA has issued a recall of all Tesla vehicles equipped with Autopilot or Full Self-Driving software to address the defect NHTSA described as follows: "In certain circumstances when Autosteer is engaged, the prominence and scope of the feature's controls may not be sufficient to prevent driver misuse of the SAE Level 2 advanced driver-assistance feature."

112.   Thus far, it is apparent that Tesla has not adequately responded to NHTSA's findings by adding warnings. Testers at Consumer Reports "did not notice any differences when activating or using Autopilot's flagship feature, Autosteer, outside of the controlled-access highways where Tesla says the software is designed to be used".[168]

113.   Further, Tesla continues to steadfastly refuse to restrict operation of Autopilot and Autosteer to the areas in which this technology was designed to operate, a remedy that would further help correct the dangerously defective system.[169]

## COUNT 1 – STRICT PRODUCTS LIABILITY

### (Defective Design)

114.   Plaintiffs re-allege the foregoing as if fully set forth herein.

115.   At all material times Tesla was engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, inspecting, warranting, leasing, renting, retailing, and advertising vehicles, including the Vehicle equipped with Tesla's Autopilot systems suite.

116.   Tesla manufactured, designed, assembled, tested, inspected, marketed, distributed, and sold their vehicles, including the Vehicle, and their component parts including Tesla's Autopilot system and suite of driver assistance features technology with defects in design which made them dangerous, hazardous, and unsafe for their intended and reasonably foreseeable use.

---

[168] Sean O'Kane, *Consumer Reports says Tesla's Autopilot recall fix is 'insufficient'*, TECHCRUNCH, December 20, 2023, https://techcrunch.com/2023/12/20/tesla-autopilot-recall-consumer-reports/

[169] Faiz Siddiqui and Trisha Thadani, *Recalling almost every Tesla in America won't fix safety issues, experts say*, THE WASHINGTON POST, December 16, 2023, https://www.washingtonpost.com/technology/2023/12/16/tesla-autopilot-recall/

117.    Tesla's vehicles, including the Vehicle, contained design defects when the vehicles were introduced into the stream of commerce by Tesla.

118.    Tesla's vehicles, including the Vehicle, were defective and unsafe for their intended use.

119.    Due to the design defects, the Vehicle failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

120.    At all material times, Tesla knew and intended that consumers would use and drive their vehicles as the driver Mr. McGee did on April 25, 2019.

121.    The design defects in the Vehicle and Tesla's Autopilot system suite of technology (the "system") included defective and unsafe characteristics such as, but not limited to:

   a.    the failure to adequately monitor and determine driver engagement;

   b.    the failure to adequately detect and respond to obstacles in the Vehicle's path;

   c.    the failure to adequately detect and respond to the end of a roadway;

   d.    the failure to adequately detect and respond to traffic control devices;

   e.    the failure to adequately insure the safety of the system before putting it on the market;

   f.    the failure to include adequate warnings if the system encounters conditions making it unsafe to use the system;

   g.    the failure to insure adequate takeover time for the driver in the event of a system failure; and

   h.    the failure to restrict the ability of drivers to use Autopilot in areas outside which Tesla designed the system to operate safely.

122.    Tesla failed to meet the expectations of the reasonable consumer by placing on the market the Vehicle which failed to incorporate an Autopilot system that included safety

components which would keep the vehicle only in designated travel lanes, reasonably match vehicle speed to traffic conditions, keep the vehicle within its lane, and provide active automatic collision avoidance and automatic emergency braking in a manner which detected objects the car might impact and applied the brakes so as to avoid impact with such objects.

123.    By reason of the omission of the above-described safety systems, features and components from the Vehicle, on and prior to the date of the subject collision, the Vehicle was defective in its design, in that the Autopilot systems of the Vehicle would not and did not perform in a manner as safely as an ordinary consumer would expect when the vehicle was subjected to foreseeable accident or driving conditions.

124.    Additionally, the risk of danger in the design of the Vehicle outweighed any benefits of the design, and especially where safer alternative designs were available at the time of manufacture. Such reasonably safer alternative designs include, but are not limited to, the following:

   a.    Driver-facing cameras that would monitor the driver's eyes and/or head position as a way to determine driver engagement and awareness;

   b.    LIDAR or any other reasonable alternative system that may or may not include the use of radar technology for the detection of obstacles, road features, vehicles, pedestrians in the path of a Tesla vehicle;

   c.    Effective driver alert systems that would notify the driver if road conditions rendered the use of Autopilot features unsafe;

d.   Effective driver alert systems that would notify the driver of any impending obstacles in the Vehicle's path, including but not limited to hazard lights, stopped vehicles, and pedestrians;

e.   Effective restrictions blocking the availability of Autopilot features in unsafe conditions;

f.   Effective Automatic-Emergency-Braking systems that would safely stop the Vehicle before striking objects, vehicles, or pedestrians in its pathway;

g.   Effective driver alert systems that would timely notify the driver if the Autopilot system was in any way impaired or malfunctioning.

125. Therefore, the Vehicle and all of Tesla's vehicles that are equipped with Tesla's Autopilot system suite of technology presented and continue to present a substantial and unreasonable risk of serious injuries to drivers of Tesla vehicles and the public.

126. The defects in the design of all Tesla vehicles equipped with Tesla's Autopilot system, including the Vehicle, were a substantial factor in causing the subject collision and Plaintiffs' injuries and damages as alleged herein.

127. The design defects of the Vehicle were a substantial factor in causing Plaintiff Dillon Angulo's serious injuries and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future. The losses are either permanent or continuing, and Plaintiff Dillon Angulo will suffer the losses in the future.

128. Further, the design defects of the Vehicle were a substantial factor in causing Naibel Benavides Leon's death and the resulting damages alleged herein.

WHEREFORE, Plaintiffs demand judgment against Tesla for compensatory damages together with post-judgment interest and taxable costs incurred in this action.

## COUNT 2 – STRICT PRODUCTS LIABILITY

### (Failure to Warn)

129. Plaintiffs re-allege the foregoing as if fully set forth herein.

130. At all material times, Tesla was engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, inspecting, warranting, leasing, renting, retailing, and advertising vehicles, including the Vehicle equipped with Tesla's Autopilot systems suite.

131. On April 25, 2019, George McGee was driving the vehicle in a reasonably foreseeable manner, with Tesla's Autopilot systems engaged, when the Vehicle failed to detect the end of Card Sound Road, the presence of numerous traffic control devices, and the substantial profile of the Chevrolet Tahoe, all of which were directly in front of the Vehicle's path. As a result of these failures, Tesla's vehicle proceeded through the intersection, struck the Chevrolet Tahoe, and caused substantial injuries to Plaintiffs.

132. At all material times, Tesla knew that consumers would use and drive their Autopilot-equipped vehicles in the same manner that George McGee did in the time leading up to the collision at issue.

133. An ordinary consumer would not have recognized the potential risks and dangers inherent in the operation and use of a Tesla vehicle with Autopilot engaged, including the fact that a Tesla vehicle would be unable to recognize the end of a roadway, the presence of a stop sign, the presence of flashing red overhead lights, the presence of yellow caution traffic signs, and/or the presence of a stationary vehicle parked directly in front of its path.

134.    At all times, Tesla failed to reasonably warn of the dangers inherent in the use of the Autopilot functions when used in a reasonably foreseeable manner.

135.    As a direct and proximate result of Tesla's failure to warn of the design defects and dangers of its Autopilot functions, Plaintiff Dillon Angulo suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future. The losses are either permanent or continuing, and Plaintiff Dillon Angulo will suffer the losses in the future.

136.    Further, the above-described defects of the Vehicle were a substantial factor in causing Naibel Benavides Leon's death and the resulting damages alleged herein.

WHEREFORE, Plaintiffs demand judgment against Tesla for compensatory damages together with post-judgment interest and taxable costs incurred in this action.

## COUNT 3 – STRICT PRODUCTS LIABILITY

### (Defective Manufacture)

137.    Plaintiffs re-allege the foregoing as if fully set forth herein.

138.    At all material times Tesla was engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, inspecting, warranting, leasing, renting, retailing, and advertising vehicles, including the Vehicle equipped with Tesla's Autopilot systems suite.

139.    At all material times, the Vehicle contained manufacturing defects which rendered the Vehicle unreasonably dangerous, in that:

a.    Defects in the Vehicle caused the vehicle to fail to adequately monitor and determine driver-engagement;

b.    Defects in the Vehicle caused the Vehicle to fail to adequately detect and respond to obstacles in the Vehicle's path;

c.    Defects in the Vehicle caused the Vehicle to fail to adequately detect and respond to the end of a roadway;

d.    Defects in the Vehicle caused the Vehicle to fail to adequately detect and respond to traffic control devices in the Vehicle's path;

e.    Defects in the Vehicle caused the Autopilot systems to fail without giving the driver adequate warning or notice that the driver needed to take over control of the Vehicle.

140.   At all material times, the manufacturing defects in the Vehicle were present before it left control of Tesla, at the time that Tesla placed the Vehicle into the stream of commerce, and at the time of the subject collision.

141.   As a direct and proximate result of the subject Vehicle's manufacturing defects, Plaintiff Dillon Angulo suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future. The losses are either permanent or continuing, and Plaintiff Dillon Angulo will suffer the losses in the future.

142.   Further, the above-described defects of the Vehicle were a substantial factor in causing Naibel Benavides Leon's death and the resulting damages alleged herein.

WHEREFORE, Plaintiffs demand judgment against Tesla for compensatory damages together with post-judgment interest and taxable costs incurred in this action.

## COUNT 4 – NEGLIGENT MISREPRESENTATION

143.    Plaintiffs re-allege the foregoing as if fully set forth herein.

144.    At all material times Tesla was engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, inspecting, warranting, leasing, renting, retailing, and advertising vehicles, including the Vehicle equipped with Tesla's Autopilot system suite.

145.    At all material times Tesla had a duty to represent to the public and its consumers, including but not limited to George McGee, the true capabilities and the true limitations of its Autopilot system.

146.    At all material times Tesla falsely advertised, marketed, and represented that its Autopilot had capabilities far beyond those which it actually possessed.

147.    For instance, just by naming its product "Autopilot", Tesla created the false impression among consumers, including George McGee, that its vehicles could drive automatically and autonomously, with reduced driver input or without any driver input. This impression, carefully crafted by Tesla to increase its sales and brand identity, was false in that the Autopilot systems are not autonomous.

148.    Additionally, Tesla distributed marketing and advertising materials intended to underscore the false autonomous functionality of its Autopilot systems, such as (but not limited to) an advertisement video that showed a Tesla vehicle, equipped with Autopilot, successfully navigating through city streets without a driver behind the wheel. This video was, in fact, a heavily orchestrated marketing video, with the vehicle at issue having been

programmed with detailed three-dimensional digital maps not available to drivers using the commercially available version of Autopilot. Moreover, the vehicle in the video actually crashed during the filming of that video, an event never disclosed by Tesla.

149.     At all times, the actions of Tesla in misrepresenting the true capabilities and corresponding limitations of the Autopilot systems created a false expectation among consumers and Tesla drivers as to the extent that they could rely upon Autopilot.

150.     These false expectations caused and still cause Tesla drivers, such as George McGee, to be far too inattentive in their own driving and instead to put far too much reliance on Tesla's Autopilot functions to safely navigate any hazards on the road.

151.     As a direct result of these false expectations which were cultivated and created by Tesla, George McGee was far less vigilant and attentive while driving on the date of this subject collision than he otherwise would have been, which caused the subject collision and Plaintiffs' injuries.

152.     At all material times, George McGee was operating the subject Vehicle in a manner that was intended and/or reasonably foreseeable to Tesla.

153.      Tesla knew or should have known the reliance that drivers including McGee would place on the Autopilot system, given the nature of the marketing and advertising that Tesla disseminated to the public and to George McGee.

154.     As a direct and proximate result of the negligent acts or omissions of Tesla, Plaintiff Dillon Angulo suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future. The losses are

either permanent or continuing, and Plaintiff Dillon Angulo will suffer the losses in the future.

155.   Further, the above-described defects of the Vehicle were a substantial factor in causing

156.   Naibel Benavides Leon's death and the resulting damages alleged herein.

WHEREFORE, Plaintiffs demand judgment against Tesla for compensatory damages together with post judgment interest and taxable costs incurred in this action.

## COUNT 5 -- INTENTIONAL MISREPRESENTATION

157.   Plaintiffs re-allege the foregoing as if fully set forth herein.

158.   Tesla intentionally misrepresented that the Vehicle was designed to be the safest in the world; that the Vehicle conformed to reasonable consumer expectations; and that the Vehicle had functioning safety features that would prevent collisions such as that in this case.

159.   At the time Tesla, by and through its authorized agents, made the aforementioned representations, Tesla did not intend to perform said promises or to perform as represented but rather made said promises and representations with the intent to induce George McGee to purchase the Vehicle and to believe it was safe to operate the Vehicle as he did in this case.

160.   George McGee relied on Tesla's representations in purchasing the Vehicle, and in using the vehicle, including during the event made the basis of this lawsuit.

161.   As a direct and proximate result of the Tesla's fraud Plaintiffs have incurred special damages as set forth herein and which will be shown at trial according to proof.

## <u>COUNT 6 - COMMON LAW FRAUDULENT CONCEALMENT</u>

162.   Plaintiffs re-allege the foregoing as if fully set forth herein.

163.   Tesla was aware of the inadequacies and defects with the vehicle and its Autopilot features by receiving notice of prior similar failures in vehicles on the road which permitted a collision with an object while the Autopilot was engaged, leading to injuries and deaths.  Such events include, but are not limited to:

   a.   The January 20, 2016 crash of a Model S near Handan, China where the Tesla hit a street cleaning truck.

   b.   The May 7, 2016 crash of a Model S near Williston, Florida where the Tesla hit a semi-tractor trailer turning across the lane in front of it.

   c.   The July 9, 2016 crash of a Model S in Salt Lake County, Utah where the Tesla hit a vehicle in front of it on a highway.

   d.   The March 13, 2017 crash of a Model S in Dallas County, Texas where the Tesla hit lane barriers on a highway.

   e.   The March 23, 2018 crash of a Model X near Mountain View, California where the Tesla hit a barrier divider.

   f.   The April 29, 2018 crash of a Model X near Tokyo, Japan where the Tesla hit a pedestrian and a vehicle in front of it on a highway.

   g.   The October 12, 2018 crash of a Model S near Orlando, Florida where the Tesla hit a vehicle in front of it on a highway.

   h.   The March 1, 2019 crash of a Model 3 near Delray Beach, Florida where the Tesla hit a semi-tractor trailer turning across the lane in front of it.

164.   Tesla made material omissions concerning presently existing or past facts. Specifically, Tesla withheld from its customers, including George McGee, the true nature of the

inherent defects of the Vehicle as described herein. Said defects were not readily discoverable until later, when the subject incident occurred.

165. As a result, George McGee was fraudulently induced to purchase the Vehicle with the above-described defects and to rely on the Vehicle's defective Autopilot system.

166. Tesla made these omissions with knowledge that their omission would mislead customers such as George McGee and falsely and dangerously induce them to use Autopilot without knowing its inherent defects.

167. George McGee reasonably relied on these omissions in purchasing and using the Vehicle.

168. Plaintiffs suffered damages as a result, which are set out herein.

**COUNT 7 – INTENTIONAL FALSE ADVERTISING IN VIOLATION OF FLORIDA STATUTES § 817.40, 817.44.**

169. Plaintiffs re-allege the foregoing as if fully set forth herein.

170. Tesla made statements to the public which were known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling property, or to induce the public to enter into an obligation relating to such property.

171. Tesla offered its vehicles equipped with its Autopilot system for sale by placing or causing to be placed before the general public, by any means whatever, an advertisement describing the vehicles and the Autopilot system as part of a plan or scheme with the intent not to sell such property so advertised. Fla. Stat. Ch. 817.44 Intentional false advertising prohibited (Florida Statutes (2023 Edition))

## COMPENSATORY DAMAGES – DILLON ANGULO

172.   Plaintiffs re-allege the foregoing as if fully set forth herein.

173.   As a result of the acts or omissions of Tesla, Plaintiff Dillon Angulo suffered serious injuries and seeks compensation for the following:

      a.   Past and future pain and suffering,

      b.   Past and future disability,

      c.   Past and future disfigurement,

      d.   Past and future mental anguish,

      e.   Past and future loss of capacity for enjoyment of life,

      f.   Past and future costs of hospitalization, medical, nursing care and treatment,

      g.   Loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future.

174.   The losses are either permanent or continuing, and Plaintiff Dillon Angulo will suffer the losses in the future.

## WRONGFUL DEATH DAMAGES

175.   Plaintiffs re-allege the foregoing as if fully set forth herein.

176.   As a result of the acts or omissions of Tesla, the Estate of Naibel Benavides Leon has suffered and will suffer the following damages:

      a.   Lost wages, benefits, and other earnings, including the value of lost earnings that the decedent, Naibel Benavides Leon, could reasonably have been expected to earn had she lived a full life.

      b.      Loss of "prospective net accumulations" of the Estate of Naibel Benavides Leon, or the value of earning the Estate of Naibel Benavides Leon could reasonably have been expected to collect had the decedent, Naibel Benavides Leon, lived a full life.

      c.      Medical and funeral expenses paid by the Estate of Naibel Benavides Leon.

177. Lilia Marilin Leon Jimenez, surviving natural mother and legal beneficiary under the Florida Wrongful Death Act, has in the past and will continue to suffer in the future the following damages, per the Florida Wrongful Death Act, Florida Statute §768.16:

      a.      The loss of support and services Naibel Benavides Leon provided and would have provided to her mother, Lilia Marilin Leon Jimenez.

      b.      The loss of companionship, guidance, and protection provided and which would have been provided by the decedent, Naibel Benavides Leon, to her mother, Lilia Marilin Leon Jimenez.

      c.      Mental and emotional pain and suffering due to the loss of decedent Naibel Benavides Leon.

178. Guillermo Benavides, surviving natural father and legal beneficiary under the Florida Wrongful Death Act, as in the past and will continue to suffer in the future the following damages, per the Florida Wrongful Death Act, Florida Statute § 768.16:

      a.      The loss of support and services Naibel Benavides Leon provided and would have provided to her father, Guillermo Benavides.

b.      The loss of companionship, guidance, and protection provided and which would have been provided by the decedent, Naibel Benavides Leon, to her father, Guillermo Benavides.

c.      Mental and emotional pain and suffering due to the loss of decedent Naibel Benavides Leon.

d.      Medical and funeral expenses paid for or owed by Guillermo Benavides as a result of the death of his daughter, Naibel Benavides Leon.

179.    Wherefore, Plaintiff, Neima Benavides, as Personal Representative of the Estate of Naibel Benavides Leon, demands judgement and damages against Tesla, costs and interest allowed by law, and further demands a jury trial of all issues triable as a matter of right thereby.

## **PUNITIVE DAMAGES**

180.    Plaintiffs re-allege the foregoing as if fully set forth herein.

181.    Tesla's wrongful conduct as described herein was motivated solely by unreasonable financial gain.

182.     The unreasonably dangerous nature of Tesla's conduct, together with the high likelihood of injury resulting from the conduct, was actually known by the managing agent, director, officer, or other person responsible for making policy decisions on behalf of Tesla.

183.    Plaintiffs are therefore entitled to punitive damages as set out in Fla. Stat. Ch. 768.73(1)(b).

## **PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Tesla as follows:

1.  On the past and future medical expenses incurred to judgment;

2.  On the loss of future earnings and earning capacity to judgment;

3.  On other past and future special damages incurred to judgment;

4.  On the general damages for pain and suffering to judgment.

5.  Costs of suit and expenses, according to proof;

6.  Wrongful Death Damages as set out above;

7.  Punitive Damages; and

8.  Other relief the Court deems appropriate.

### DEMAND FOR JURY TRIAL

Plaintiffs demand trial by Jury on all issues so triable.

Dated this 29th day of December, 2023.

Respectfully submitted,

THE ROUSSO, BOUMEL LAW FIRM, PLLC.
9350 South Dixie Highway, Suite 1520
Miami, Florida 33156
(305) 670-6669

By:    */s/ Darren J. Rousso, Esq.*
Darren J. Rousso, Esq.
Florida Bar No.: 97410
Darren@roussolawfirm.com
SERVICE EMAILS:
pleadings@roussolawfirm.com

By:    */s/ Adam T. Boumel, Esq.*
Adam T. Boumel, Esq.
Florida Bar No.: 0110727
Adam@roussolawfirm.com
SERVICE EMAILS:
pleadings@roussolawfirm.com (primary)

**EXHIBIT "1"**

OMB Control No.: 2127-0004

# Part 573 Safety Recall Report 23V-838

Manufacturer Name : Tesla, Inc.
Submission Date : DEC 12, 2023
NHTSA Recall No. : 23V-838
Manufacturer Recall No. : SB-23-00-008



**NHTSA**
NATIONAL HIGHWAY TRAFFIC
SAFETY ADMINISTRATION

---

**Manufacturer Information :**

Manufacturer Name : Tesla, Inc.
Address : 1 Tesla Road
Austin TX 78725
Company phone : 6506815000

**Population :**

Number of potentially involved : 2,031,220
Estimated percentage with defect : 100 %

---

**Vehicle Information :**

Vehicle 1 : 2012-2023 Tesla Model S
Vehicle Type :
Body Style :
Power Train : NR
Descriptive Information : The subject population includes certain MY 2012-2023 Model S that are equipped
with Autosteer and were produced between October 5, 2012, and December 7, 2023,
and all MY 2016-2023 Model X vehicles, all MY 2017-2023 Model 3 vehicles and all
MY 2020-2023 Model Y vehicles that are equipped with Autosteer and were produced
through December 7, 2023.
Production Dates : OCT 05, 2012 - DEC 07, 2023
VIN Range 1 : Begin : NR          End : NR          ☐ Not sequential

---

Vehicle 2 : 2016-2023 Tesla Model X
Vehicle Type :
Body Style :
Power Train : NR
Descriptive Information : The subject population includes certain MY 2012-2023 Model S that are equipped
with Autosteer and were produced between October 5, 2012, and December 7, 2023,
and all MY 2016-2023 Model X vehicles, all MY 2017-2023 Model 3 vehicles and all
MY 2020-2023 Model Y vehicles that are equipped with Autosteer and were produced
through December 7, 2023.
Production Dates : SEP 15, 2015 - DEC 07, 2023
VIN Range 1 : Begin : NR          End : NR          ☐ Not sequential

---

The information contained in this report was submitted pursuant to 49 CFR §573

# Part 573 Safety Recall Report     23V-838     Page 2

|  |  |  |  |  |
|---|---|---|---|---|
| Vehicle 3 : | 2017-2023 Tesla Model 3 | | | |
| Vehicle Type : | | | | |
| Body Style : | | | | |
| Power Train : | NR | | | |
| Descriptive Information : | The subject population includes certain MY 2012-2023 Model S that are equipped with Autosteer and were produced between October 5, 2012, and December 7, 2023, and all MY 2016-2023 Model X vehicles, all MY 2017-2023 Model 3 vehicles and all MY 2020-2023 Model Y vehicles that are equipped with Autosteer and were produced through December 7, 2023. | | | |
| Production Dates : | JUL 15, 2017 - DEC 07, 2023 | | | |
| VIN Range 1 : Begin : | NR | End : | NR | ☐ Not sequential |

|  |  |  |  |  |
|---|---|---|---|---|
| Vehicle 4 : | 2020-2023 Tesla Model Y | | | |
| Vehicle Type : | | | | |
| Body Style : | | | | |
| Power Train : | NR | | | |
| Descriptive Information : | The subject population includes certain MY 2012-2023 Model S that are equipped with Autosteer and were produced between October 5, 2012, and December 7, 2023, and all MY 2016-2023 Model X vehicles, all MY 2017-2023 Model 3 vehicles and all MY 2020-2023 Model Y vehicles that are equipped with Autosteer and were produced through December 7, 2023. | | | |
| Production Dates : | JAN 09, 2020 - DEC 07, 2023 | | | |
| VIN Range 1 : Begin : | NR | End : | NR | ☐ Not sequential |

# Part 573 Safety Recall Report          *23V-838*

**Description of Defect :**

Description of the Defect :  Basic Autopilot is a package that includes SAE Level 2 advanced driver-assistance features, including Autosteer and Traffic-Aware Cruise Control (TACC), that drivers may choose to engage subject to certain defined operating limitations. Autosteer is an SAE Level 2 advanced driver-assistance feature that, in coordination with the TACC feature, can provide steering, braking and acceleration support to the driver subject to certain limited operating conditions. Autosteer is designed and intended for use on controlled-access highways when the feature is not operating in conjunction with the Autosteer on City Streets feature. When Autosteer is engaged, as with all SAE Level 2 advanced driver-assistance features and systems, the driver is the operator of the vehicle. As the vehicle operator, the driver is responsible for the vehicle's movement with their hands on the steering wheel at all times, remaining attentive to surrounding road conditions, and intervening (e.g., steer, brake, accelerate or apply the stalk) as needed to maintain safe operation.

When Autosteer is engaged, it uses several controls to monitor that the driver is engaged in continuous and sustained responsibility for the vehicle's operation as required. If the driver attempts to engage Autosteer when conditions are not met for engagement, the feature will alert the driver it is unavailable through visual and audible alerts, and Autosteer will not engage. Likewise, if the driver operates Autosteer in conditions where its functionality may be limited or has become deteriorated due to environmental or other circumstances, the feature may warn the driver with visual and audible alerts, restrict speed, and/or instruct the driver to intervene immediately.

In certain circumstances when Autosteer is engaged, the prominence and scope of the feature's controls may not be sufficient to prevent driver misuse of the SAE Level 2 advanced driver-assistance feature.

FMVSS 1 :  NR

FMVSS 2 :  NR

Description of the Safety Risk :  In certain circumstances when Autosteer is engaged, if a driver misuses the SAE Level 2 advanced driver-assistance feature such that they fail to maintain continuous and sustained responsibility for vehicle operation and are unprepared to intervene, fail to recognize when the feature is canceled or not engaged, and/or fail to recognize when the feature is operating in situations where its functionality may be limited, there may be an increased risk of a collision.

Description of the Cause :  NR

Identification of Any Warning that can Occur :  For a description of Autosteer's general design, including visual and audible alerts, please see the description of the defect above.

**Involved Components :**

# Part 573 Safety Recall Report          23V-838          Page 4

---

Component Name 1 : Vehicle Software

Component Description : All versions of Autosteer leading up to the version(s) that contains the recall remedy.

Component Part Number : NR

---

Supplier Identification :

**Component Manufacturer**

Name : Tesla, Inc.

Address : 1 Tesla Road
Austin Texas 78725

Country : United States

---

Chronology :

- On August 13, 2021, NHTSA opened a Preliminary Evaluation (PE21-020) to investigate eleven incidents involving stationary first-responder vehicles and Tesla vehicles that were operating with Autosteer engaged.

- Over the next year, as part of PE21-020, Tesla, in full cooperation, responded to extensive information requests from NHTSA and participated in several meetings with the agency.

- On June 8, 2022, NHTSA upgraded PE21-020 to Engineering Analysis ("EA") EA22-002.

- Over the next year, as part of EA22-002, Tesla, in full cooperation, responded to extensive information requests from NHTSA and participated in several meetings with the agency.

- From October 16, 2023, through December 4, 2023, NHTSA and Tesla conducted several meetings to discuss the agency's tentative conclusions regarding EA22-002, as they related to the issue of potential driver misuse when Autosteer is engaged, expectations to address the agency's concerns through a voluntary recall, and Tesla's proposed over-the-air ("OTA") software remedies in response.

- While not concurring with the agency's analysis, in the interest of resolving EA22-002, Tesla determined on December 5, 2023, to voluntarily administer a recall and provide the remedy described below.

- As of December 8, 2023, Tesla has identified 9 warranty claims, received between July 13, 2021, and September 17, 2023, that may be related to the condition described above.

---

# Part 573 Safety Recall Report          23V-838

**Description of Remedy :**

| | |
|---|---|
| Description of Remedy Program : | At no cost to customers, affected vehicles will receive an over-the-air software remedy, which is expected to begin deploying to certain affected vehicles on or shortly after December 12, 2023, with software version 2023.44.30. Remaining affected vehicles will receive an over-the-air software remedy at a later date. The remedy will incorporate additional controls and alerts to those already existing on affected vehicles to further encourage the driver to adhere to their continuous driving responsibility whenever Autosteer is engaged, which includes keeping their hands on the steering wheel and paying attention to the roadway. Depending on vehicle hardware, the additional controls will include, among others, increasing the prominence of visual alerts on the user interface, simplifying engagement and disengagement of Autosteer, additional checks upon engaging Autosteer and while using the feature outside controlled access highways and when approaching traffic controls, and eventual suspension from Autosteer use if the driver repeatedly fails to demonstrate continuous and sustained driving responsibility while the feature is engaged.<br><br>Tesla does not plan to include a statement in the Part 577 owner notification about pre-notice reimbursement because there are no out-of-warranty repairs related to this condition. |
| How Remedy Component Differs from Recalled Component : | The remedy component incorporates the software remedy described above whereas the recalled component does not incorporate the software remedy described above. |
| Identify How/When Recall Condition was Corrected in Production : | Beginning midday on December 7, 2023, Model S, Model X, Model 3 and Model Y vehicles in production received a software release that incorporates the software remedy. |

**Recall Schedule :**

| | |
|---|---|
| Description of Recall Schedule : | All Tesla stores and service centers will be notified about this recall on or shortly after December 12, 2023. Owner notification letters will be mailed in accordance with 49 C.F.R. § 577.7. |
| Planned Dealer Notification Date : | DEC 12, 2023 - DEC 12, 2023 |
| Planned Owner Notification Date : | FEB 10, 2024 - FEB 10, 2024 |

\* NR - Not Reported

**EXHIBIT "3"**



**U.S. Department of Transportation**

**National Highway Traffic Safety Administration**

# ODI RESUME

OFFICE OF DEFECTS INVESTIGATION
IDI/IDS
**NHTSA**
Authentic US Government information
National Highway Traffic Safety Administration
uses a digital certificate to ensure
the content has remained unchanged

| | |
|---|---|
| **Investigation:** | PE 21-020 |
| **Date Opened:** | 08/13/2021 |
| **Investigator:** | Steven Posada    **Reviewer:** Gregory Magno |
| **Approver:** | Stephen Ridella |
| **Subject:** | Autopilot & First Responder Scenes |

## MANUFACTURER & PRODUCT INFORMATION

| | |
|---|---|
| **Manufacturer:** | Tesla, Inc. |
| **Products:** | 2014-2021 Tesla Model Y, Model X, Model S, Model 3 |
| **Population:** | 765,000 (Estimated) |
| **Problem Description:** | Subject vehicle crashes with in-road or roadside first responders. |

## FAILURE REPORT SUMMARY

| | ODI | Manufacturer | Total |
|---|---|---|---|
| **Complaints:** | 0 | TBD | 0 |
| **Crashes/Fires:** | 11 | TBD | 11 |
| **Injury Incidents:** | 7 | TBD | 7 |
| **Number of Injuries:** | 17 | TBD | 17 |
| **Fatality Incidents:** | 1 | TBD | 1 |
| **Number of Fatalities:** | 1 | TBD | 1 |

## ACTION / SUMMARY INFORMATION

**Action:** ODI has opened a Preliminary Evaluation

**Summary:**

Since January 2018, the Office of Defects Investigation (ODI) has identified eleven crashes in which Tesla models of various configurations have encountered first responder scenes and subsequently struck one or more vehicles involved with those scenes. The incidents are listed at the end of this summary by date, city, and state.

Most incidents took place after dark and the crash scenes encountered included scene control measures such as first responder vehicle lights, flares, an illuminated arrow board, and road cones. The involved subject vehicles were all confirmed to have been engaged in either Autopilot or Traffic Aware Cruise Control during the approach to the crashes.

Autopilot is an Advanced Driver Assistance System (ADAS) in which the vehicle maintains its speed and lane centering when engaged within its Operational Design Domain (ODD). With the ADAS active, the driver still holds primary responsibility for Object and Event Detection and Response (OEDR), e.g., identification of obstacles in the roadway or adverse maneuvers by neighboring vehicles during the Dynamic Driving Task (DDT).

ODI has opened a Preliminary Evaluation of the SAE Level 2 ADAS system (Autopilot) in the Model Year 2014-2021 Models Y, X, S,and 3. The investigation will assess the technologies and methods used to monitor, assist, and enforce the driver's engagement with the dynamic driving task during Autopilot operation. The investigation will additionally assess the OEDR by vehicles when engaged in Autopilot mode, and ODD in which the Autopilot mode is functional. The investigation will also include examination of the contributing circumstances for the confirmed crashes listed below and other similar crashes.

Incident List

| Date | City/County | State |
|------|-------------|-------|
| 07/10/2021 | San Diego | CA |
| 05/19/2021 | Miami | FL |
| 03/17/2021 | Lansing | MI |
| 02/27/2021 | Montgomery County | TX |
| 08/26/2020 | Charlotte | NC |
| 07/30/2020 | Cochise County | AZ |
| 01/22/2020 | West Bridgewater | MA |
| 12/29/2019 | Cloverdale | IN |
| 12/10/2019 | Norwalk | CT |
| 05/29/2018 | Laguna Beach | CA |
| 01/22/2018 | Culver City | CA |

**EXHIBIT "4"**



**U.S. Department of Transportation**

**National Highway Traffic Safety Administration**

# ODI  RESUME

OFFICE OF DEFECTS INVESTIGATION
**NHTSA**
Authentic US Government Information
National Highway Traffic Safety Administration
uses a digital certificate to ensure
the content is verified and unchanged

| | |
|---|---|
| **Investigation:** | EA 22-002 |
| **Prompted by:** | PE21-020 |
| **Date Opened:** | 06/08/2022 |
| **Investigator:** | Steven Posada        **Reviewer:**    Gregory Magno |
| **Approver:** | Stephen Ridella |
| **Subject:** | Autopilot & First Responder Scenes |

## MANUFACTURER & PRODUCT INFORMATION

| | |
|---|---|
| **Manufacturer:** | Tesla, Inc. |
| **Products:** | 2014-2022 Tesla Model Y, Model X, Model S, Model 3 |
| **Population:** | 830,000 (Estimated) |
| **Problem Description:** | Subject vehicle crashes with in-road or roadside first responders. |

## FAILURE REPORT SUMMARY

| | ODI | Manufacturer | Total |
|---|---|---|---|
| **Complaints:** | 0 | 0 | 0 |
| **Crashes/Fires:** | 14 | 0 | 14 |
| **Injury Incidents:** | 7 | 0 | 7 |
| **Number of Injuries:** | 15 | 0 | 15 |
| **Fatality Incidents:** | 1 | 0 | 1 |
| **Number of Fatalities:** | 1 | 0 | 1 |
| **Other*:** | 2 | 0 | 1 |

**\*Description of Other:** Collisions identified by Tesla in their response to NHTSA's April 2021 Information Request: Belmont CA, Mount Pleasant SC

## ACTION / SUMMARY INFORMATION

**Action:**   Open an Engineering Analysis.

**Summary:**

On August 13, 2021, NHTSA's Office of Defects Investigation (ODI) opened a Preliminary Evaluation (PE21-020) to assess the performance of Tesla's Autopilot system (a system characterized by Tesla as an SAE Level 2 driving automation system designed to support and assist the driver in performing the driving task) available in Tesla vehicles. The investigation opening was motivated by an accumulation of crashes in which Tesla vehicles, operating with Autopilot engaged, struck stationary in-road or roadside first responder vehicles tending to pre-existing collision scenes. Upon opening the investigation, NHTSA indicated that the PE would also evaluate additional similar circumstance crashes of Tesla vehicles operating with Autopilot engaged, as well as assess the technologies and methods used to monitor, assist, and enforce the driver's engagement with the dynamic driving task during Autopilot operation.

PE21-020 is upgraded to an Engineering Analysis (EA) to extend the existing crash analysis, evaluate additional data sets, perform vehicle evaluations, and to explore the degree to which Autopilot and associated Tesla systems may exacerbate human factors or behavioral safety risks by undermining the effectiveness of the driver's supervision. In doing so, NHTSA plans to continue its assessment of vehicle control authority, driver engagement technologies, and related human factors considerations.

The attached Detailed Summary further describes NHTSA's review to date and the basis for upgrade to an EA.

**PE21-020 Upgrade to EA22-002 Detailed Summary**

On August 13, 2021, NHTSA's Office of Defects Investigation (ODI) opened a Preliminary Evaluation (PE21-020) to assess the performance of Tesla's Autopilot system (a system characterized by Tesla as an SAE Level 2 driving automation system designed to support and assist the driver in performing the driving task) available in Tesla vehicles. The investigation opening was motivated by an accumulation of crashes in which Tesla vehicles, operating with Autopilot engaged, struck stationary in-road or roadside first responder vehicles tending to pre-existing collision scenes. Upon opening the investigation, NHTSA indicated that the PE would also evaluate additional similar circumstance crashes of Tesla vehicles operating with Autopilot engaged, as well as assess the technologies and methods used to monitor, assist, and enforce the driver's engagement with the dynamic driving task during Autopilot operation.

Between August 31, 2021, and September 13, 2021, NHTSA sent information request (IR) letters to Tesla and twelve other vehicle manufacturers, requesting production and field incident reporting data as well as information concerning the engineering and performance of their systems designated as Level 2.

On October 12, 2021, NHTSA sent two additional sets of requests to Tesla: (1) an IR letter to obtain information on the company's changes to subject vehicles' functionality through software updates intended to improve the detection of emergency vehicle lights in low light conditions; and (2) a Special Order (SO) to request information concerning Tesla's use of nondisclosure agreements with consumers whose vehicles were included in a Full Self-Driving (FSD) "beta" release program.

NHTSA augmented its PE21-020 analysis with crashes reported by Tesla in response to an IR letter sent on April 19, 2021, and via the Standing General Order (SGO) issued by NHTSA on June 29, 2021 (amended on August 5, 2021).

Collectively, these sources provide NHTSA with a significant number of complaints and   crashes involving vehicles equipped with systems designated as Level 2. Throughout the course of this investigation, NHTSA has prioritized the collection and review of this information.

NHTSA undertook a detailed review of the crash pattern that formed the principal basis for opening PE21-020: the eleven collisions of subject Tesla vehicles with other vehicles stopped at first responder scenes reported between January 2018 and July 2021. During this investigation, six additional such incidents were subsequently identified and added to the crash analysis: Three crashes (Orlando, Petaluma, Desert Center) involved first responder or crash attenuator trucks in the roadway and occurred after PE21-020 opened. A 2020 additional crash (El Paso) in which a police vehicle was struck was reported via the SGO in March 2022. Two additional 2021 crashes (Belmont and Mount Pleasant) involving a first responder and a crash attenuator truck, respectively, were reported to NHTSA in response to NHTSA's April 19, 2021, IR letter to Tesla. Further review of the Laguna Beach crash listed on the PE21-020 opening resume has led to its removal from this consideration because the struck vehicle was parked out of traffic with no lights illuminated. The Laguna Beach incident remains within NHTSA's broader crash analysis within this investigation.

The agency's analysis of these sixteen subject first responder and road maintenance vehicle crashes indicated that Forward Collision Warnings (FCW) activated in the majority of incidents immediately prior to impact and that subsequent Automatic Emergency Braking (AEB) intervened in approximately half of the collisions. On average in these crashes, Autopilot aborted vehicle control less than one second prior to the first impact.

All subject crashes occurred on controlled-access highways. Where incident video was available, the approach to the first responder scene would have been visible to the driver an average of 8 seconds leading up to impact. Additional forensic data available for eleven of the collisions indicated that no drivers took evasive action between 2-5 seconds prior to impact, and the vehicle reported all had their hands on the steering wheel leading up to the impact. However, most drivers appeared to comply with the subject vehicle driver engagement system as evidenced by the hands-on wheel detection and nine of eleven vehicles exhibiting no driver engagement visual or chime alerts until the last minute preceding the collision (four of these exhibited no visual or chime alerts at all during the final Autopilot use cycle).

During the PE, the agency also closely reviewed 191 crashes involving crash patterns not limited to the first responder scenes that prompted the investigation opening. Each of these crashes involved a report of a Tesla vehicle operating one of its Autopilot versions (Autopilot or Full-Self Driving, or associated Tesla features such as Traffic-Aware Cruise Control, Autosteer, Navigate on Autopilot, and Auto Lane Change). These crashes were identified from a variety of sources, such as IR responses, SGO reporting, SCI investigations, and Early Warning Reporting (EWR). These incidents, which are a subset of the total crashes reported, were identified for a particularly close review not only because sufficient data was available for these crashes to support a detailed evaluation, but also because the crash scenarios appeared characteristic of broader patterns of reported crashes or complaints in the full incident data.

A detailed review of these 191 crashes removed 85 crashes because of external factors, such as actions of other vehicles, or the available information did not support a definitive assessment. As a primary factor, in approximately half of the remaining 106 crashes, indications existed that the driver was insufficiently responsive to the needs of the dynamic driving task (DDT) as evidenced by drivers either not intervening when needed or intervening through ineffectual control inputs.

In approximately a quarter of the 106 crashes, the primary crash factor appeared to relate to the operation of the system in an environment in which, according to the Tesla owner's manual, system limitations may exist, or conditions may interfere with the proper operation of Autopilot components. For example, operation on roadways other than limited access highways, or operation while in low traction or visibility environments, such as rain, snow, or ice.

For all versions of Autopilot and road types, detailed car log data and enough additional detail was available for 43 of the 106 crashes. Of these, 37 indicated that the driver's hands were on the steering wheel in the last second prior to the collision.

Although this subset of crashes is not exhaustive, the crash review identified patterns in system performance and associated driver behavior across different sets of circumstances that enable the agency to identify areas of engineering inquiry that warrant an upgrade of this Preliminary Evaluation to an Engineering Analysis (EA).

With respect to driver behavior, during this PE, NHTSA examined information submitted by Tesla and peer manufacturers in response to an IR question that requested driver engagement and attentiveness strategies to the DDT during system operation designated as Level 2. Of those crashes involving first responder or roadside maintenance vehicles for which car log data existed, under the driver engagement strategy alerts were presented to only two of the drivers within 5 minutes of the crash. This suggests that drivers may be compliant with the driver engagement strategy as designed.

A driver's use or misuse of vehicle components, or operation of a vehicle in an unintended manner does not necessarily preclude a system defect. This is particularly the case if the driver behavior in question is foreseeable in light of the system's design or operation. For systems labeled as SAE Level 2 ADAS, important

design considerations include the ways in which a driver may interact with the system or the foreseeable ranges of driver behavior, whether intended or unintended, while such a system is in operation. This is because these systems still depend upon the driver to maintain supervisory responsibility for the DDT, whereas the vehicle features perform only a support role. As such, ensuring the system facilitates the driver's effective performance of this supervisory driving task presents an important safety consideration.

Accordingly, PE21-020 is upgraded to an Engineering Analysis to extend the existing crash analysis, evaluate additional data sets, perform vehicle evaluations, and to explore the degree to which Autopilot and associated Tesla systems may exacerbate human factors or behavioral safety risks by undermining the effectiveness of the driver's supervision. In doing so, NHTSA plans to continue its assessment of vehicle control authority, driver engagement technologies, and related human factors considerations.

Incident List (PE21-020 Opening)

| Date | City/County | State |
| --- | --- | --- |
| Jul 2021 | San Diego | CA |
| May 2021 | Miami | FL |
| Mar 2021 | Lansing | MI |
| Feb 2021 | Montgomery County | TX |
| Aug 2020 | Charlotte | NC |
| Jul 2020 | Cochise County | AZ |
| Jan 2020 | West Bridgewater | MA |
| Dec 2019 | Cloverdale | IN |
| Dec 2019 | Norwalk | CT |
| Jan 2018 | Culver City | CA |

Incident List (EA22-002 Upgrade)

| Date | City/County | State |
| --- | --- | --- |
| Jan 2022 | Desert Center | CA |
| Sep 2021 | Petaluma | CA |
| Aug 2021 | Orlando | FL |
| Apr 2021 | Belmont | CA |
| Jan 2021 | Mount Pleasant | SC |
| Nov 2020 | Houston | TX |

**EXHIBIT "5"**



**United States Senate**
WASHINGTON, DC 20510

August 18, 2021

The Honorable Lina Khan
Chair
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C.  20580

Dear Chair Khan,

We write to express our serious concerns about Tesla's misleading advertising of its Autopilot and Full Self-Driving (FSD) features. Tesla's marketing has repeatedly overstated the capabilities of its vehicles, and these statements increasingly pose a threat to motorists and other users of the road. Accordingly, we urge you to open an investigation into potentially deceptive and unfair practices in Tesla's advertising and marketing of its driving automation systems and take appropriate enforcement action to ensure the safety of all drivers on the road.

On August 13, 2021, the National Highway Traffic Safety Administration (NHTSA) opened a formal investigation into Tesla's Autopilot feature after identifying 11 crashes with Autopilot engaged since 2018 that involved a Tesla striking one or more vehicles at first responder sites.[1] This is not the first time NHTSA has investigated Tesla's Autopilot. While a previous investigation, closed in 2017, did not identify any defects with Autopilot after a fatal crash, this latest investigation is a new defect investigation into Tesla's Autopilot.[2]

Tesla's Autopilot and FSD are partially automated and include lane keeping assistance and adaptive cruise control features that can help prevent driver stress and fatigue when properly used. They are not fully autonomous features, however, and there are no fully autonomous vehicles currently available on the market. In fact, NHTSA estimates that fully automated safety features and true highway autopilot will not be ready until at least 2025.[3] Understanding these limitations is essential, for when drivers' expectations exceed their vehicle's capabilities, serious and fatal accidents can and do result.

We fear that Tesla's Autopilot and FSD features are not as mature and reliable as the company pitches to the public. On April 22, 2019, Tesla posted a video on its YouTube channel titled "Full Self-Driving" showing a Tesla driving entirely on its own.[4] Tesla CEO Elon Musk has also repeatedly boasted about Tesla's systems. In July 2020 and again in January 2021, Mr. Musk claimed

[1] U.S. Department of Transportation, National Highway Traffic Safety Administration, "ODI Resume: Autopilot & First Responder Scenes," https://static.nhtsa.gov/odi/inv/2021/INOA-PE21020-1893.pdf (accessed August 16, 2021).
[2] U.S. Department of Transportation, National Highway Traffic Safety Administration, "ODI Resume: Automatic vehicle control systems," https://static.nhtsa.gov/odi/inv/2016/INCLA-PE16007-7876.pdf (accessed August 16, 2021).
[3] National Highway Traffic Safety Administration, "Automated Vehicles for Safety," https://www.nhtsa.gov/technology-innovation/automated-vehicles-safety (accessed August 9, 2021).
[4] Tesla, "Full Self-Driving," YouTube video, 1:56, April 22, 2019, https://youtu.be/tlThdr3O5Qo.

to consumers that Tesla vehicles would soon reach Level 5 autonomy, or full automation.[5] Unfortunately, Tesla's advertising and marketing is reaching a large audience: the "Full Self-Driving" video has been viewed more than 18 million times. While Tesla has buried qualifying disclaimers elsewhere on their website, the link in the video's caption redirects to a purchasing page that fails to provide additional information about the true capabilities of the vehicle.[6]

Tesla drivers listen to these claims and believe their vehicles are equipped to drive themselves – with potentially deadly consequences. At least 11 people have died in fatal crashes with Autopilot activated since Tesla introduced the feature in 2015.[7] In May, the driver of a Tesla Model 3 was killed after the vehicle crashed on a highway in California. The driver had previously posted a video of his Tesla online in which it drove itself without human assistance. Autopilot was activated when the crash occurred.[8] Less than two weeks after the fatal crash, California Highway Patrol arrested a man for riding in the backseat of his Tesla while the vehicle was in Autopilot on the highway. After his arrest, the driver cited Mr. Musk's statements about the vehicle's abilities as justification for his actions.[9] It is clear that drivers take Tesla's statements about their vehicles' capabilities at face value and suffer grave consequences.

Advocates and other federal agencies have repeatedly called on the FTC to act on Tesla's possible false advertising of its driving automation systems. In 2018, the Center for Auto Safety and Consumer Watchdog wrote to then FTC Chairman Joseph Simons urging the FTC to investigate Tesla's deceptive and unfair practices in the advertising and marketing of Autopilot after two fatal crashes.[10] They renewed their request to the Commission in 2019 following additional fatal incidents.[11] NHTSA also sent Mr. Musk a cease-and-desist letter in 2018 over his claims about the vehicles' safety and, importantly, asked the FTC to investigate the claims under its "unfair or deceptive acts practices" authority.[12] As the FTC has noted in other matters, the Commission has a significant role in protecting consumers against false, misleading, and dangerous advertising in car sales.[13]

---

[5] "Elon Musk says full self-driving Tesla tech 'very close,'" *BBC* (London, England), July 9, 2020, https://www.bbc.com/news/technology-53349313; Kyle Hyatt, "Elon Musk says Tesla's Full Self-Driving tech will have Level 5 autonomy by the end of 2021," *Roadshow*, January 27, 2021, https://www.cnet.com/roadshow/news/elon-musk-full-self-driving-tesla-earnings-call/.

[6] *Tesla*, https://www.tesla.com/?utm_campaign=FSD&utm_source=youtube&utm_medium=social (accessed August 9, 2021).

[7] Rick Newman, "It's time to notice Tesla's Autopilot death toll," *Yahoo! Finance* (New York, New York), April 19, 2021, https://finance.yahoo.com/news/its-time-to-notice-teslas-autopilot-death-toll-195849408.html.

[8] Daisy Nguyen, "Tesla driver in fatal California crash had posted videos of himself in vehicle" *Los Angeles Times* (Los Angeles, California), May 16, 2021, https://www.latimes.com/california/story/2021-05-16/tesla-driver-in-fatal-california-crash-had-post-videos-of-himself-in-vehicle.

[9] Katherine Bindley and Rebecca Elliot, "Tesla Drivers Test Autopilot's Limits, Attracting Audiences–and Safety Concerns," *Wall Street Journal* (New York, New York), May 20, 2021, https://www.wsj.com/articles/tesla-drivers-test-autopilots-limits-attracting-audiencesand-safety-concerns-11621503008.

[10] Jason Levine and John Simpson to the Honorable Joseph Simons, May 23, 2018, https://www.autosafety.org/wp-content/uploads/2018/05/CAS-and-CW-Letter-to-FTC-on-Tesla-Deceptive-Advertising.pdf.

[11] Jason Levine and Adam Scow to the Honorable Joseph Simons, July 25, 2019, https://www.autosafety.org/wp-content/uploads/2019/07/CAS-and-CW-Letter-to-FTC-on-Tesla-Deceptive-Advertising-2019-FINAL.pdf.

[12] Sean O'Kane, "Feds told Tesla to stop 'mislead' the public about Model 3 safety," *The Verge* (Washington, D.C.) August 7, 2019, https://www.theverge.com/2019/8/7/20758349/tesla-model-3-safety-misleading-ftc-national-highway-traffic-administration-elon-musk.

[13] Federal Trade Commission, "Statement of the Federal Trade Commission Concerning Auto Recall Advertising Cases,"

Despite these warnings, Tesla has persistently misrepresented the capabilities of its cars and the company's progress towards safe Autopilot and FSD technology. On an earnings call in January this year, Mr. Musk claimed Tesla vehicles would be fully autonomous by the end of the year.[14] On July 9, 2021, Tesla released beta version 9 of what it brands to consumers as "Full Self-Driving" software, a subscription feature (recently made available to all Tesla owners) that costs hundreds of dollars per month but – despite its name – does not deliver full autonomy.[15] After the update, drivers have posted videos online showing their updated Tesla vehicles making unexpected maneuvers that require human intervention to prevent a crash.[16] Mr. Musk's tepid precautions tucked away on social media are no excuse for misleading drivers and endangering the lives of everyone on the road.[17] As Tesla makes widely available its FSD and Autopilot technology and doubles down on its inflated promises, we are alarmed by the prospect of more drivers relying more frequently on systems that do not nearly deliver the expected level of safety.

Tesla and Mr. Musk's repeated overstatements of their vehicle's capabilities – despite clear and frequent warnings – demonstrate a deeply concerning disregard for the safety of those on the road and require real accountability. Their claims put Tesla drivers – and all of the travelling public – at risk of serious injury or death. In light of these concerns, we urge you to swiftly open an investigation into Tesla's repeated and overstated claims about their Autopilot and Full Self-Driving features and take appropriate enforcement action to prevent further injury or death as a result of any Tesla feature.

Thank you for your attention to this important matter, and we look forward to your response.

Sincerely,

RICHARD BLUMENTHAL
United States Senate

EDWARD J. MARKEY
United States Senate

---

https://www.ftc.gov/system/files/documents/cases/161216_six_auto_recall_cases_statement_of_the_commission_1_1.pdf (accessed August 9, 2021).

[14] Hyatt, "Elon Musk." After inquiries from the California Department of Motor Vehicles, Tesla walked back Musk's comments about the Full-Self Driving feature, calling full autonomy "unlikely" by the end of 2021. Andrew Hawkins, "Tesla privately admits Elon Musk has been exaggerating about full self-driving," *The Verge* (Washington, D.C.), May 7, 2021 https://www.theverge.com/2021/5/7/22424592/tesla-elon-musk-autopilot-dmv-fsd-exaggeration.

[15] "Support," *Tesla*, https://www.tesla.com/support/full-self-driving-subscriptions (accessed August 9, 2021).

[16] AI Addict, "[FSD Beta 9] Downtown San Francisco," YouTube video, 11:12, July 11, 2021, https://youtu.be/GlIdu7prsAw. Full breadth of videos seen at ahttps://www.youtube.com/results?search_query=tesla+fsd+9.

[17] In advance of the release, Musk acknowledged that drivers must "be paranoid" as the software will have "unknown issues," and the release notes similarly tell drivers to use "additional caution" because the software "may do the wrong thing at the worst time." Elon Musk (@elonmusk), Twitter post, July 8, 2021, 9:18 p.m., https://twitter.com/elonmusk/status/1413306409693892613; Tesla Raj (@tesla_raj), Twitter post, July 10, 2021, 3:37 a.m., https://twitter.com/tesla_raj/status/1413764413165772803.

**EXHIBIT "6"**

 

May 23, 2018

The Honorable Joseph Simons
Chairman
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

**<u>Request for Investigation of Deceptive and Unfair Practices in Advertising and
Marketing of the "Autopilot" Feature Offered in Tesla Motor Vehicles</u>**

Dear Chairman Simons:

 Two Americans are dead and one is injured as a result of Tesla deceiving and misleading consumers into believing that the Autopilot feature of its vehicles is safer and more capable than it actually is. After studying the first of these fatal accidents, the National Transportation Safety Board (NTSB) determined that over-reliance on and a lack of understanding of the Autopilot feature can lead to death. The marketing and advertising practices of Tesla, combined with Elon Musk's public statements, have made it reasonable for Tesla owners to believe, and act on that belief, that a Tesla with Autopilot is an autonomous vehicle capable of "self-driving".

 Consumers in the market for a new Tesla see advertisements proclaiming, "Full Self-Driving Hardware on All Cars." They are directed to videos of Tesla vehicles driving themselves through busy public roads, with no human operation whatsoever. They see press releases alleging that Autopilot reduces the likelihood of an accident by 40%. They also hear statements like "the probability of an accident with Autopilot is just less" from Tesla's CEO, Elon Musk. Or they hear him relate Autopilot in a Tesla to autopilot systems in an aircraft. Such advertisements and statements mislead and deceive consumers into believing that Autopilot is safer and more capable than it is known to be.

 Pursuant to the Commission's Rules, 16 C.F.R §§ 2.1 and 2.2, the Center for Auto Safety (Center) and Consumer Watchdog respectfully request that the U.S. Federal Trade Commission (FTC) initiate an investigation of the dangerously misleading and deceptive advertising and marketing practices and representations of Tesla Motors, Inc.[1] (Tesla) regarding the safety and capabilities of its Autopilot feature. These advertising and marketing efforts violate section 5 of

---

[1] Tesla Motors, Inc. is headquartered at 2500 Deer Creek Road, Palo Alto, CA 94304.

the Federal Trade Commission Act (Section 5)[2] because they are likely to deceive even diligent consumers, who would act reasonably in believing them, and are likely to use Autopilot differently than they would if Tesla employed more honest and transparent marketing and advertising strategies.

Tesla manufactures and sells electric vehicles in the United States. Currently, Tesla offers three vehicle models: (1) Model S; (2) Model X; and (3) Model 3.[3] All of these vehicles come equipped with the Autopilot feature.[4] Unlike what the name of this feature suggests, Autopilot is only capable of SAE Level 2 automation.[5] As the CEO of Tesla himself has recognized, Tesla consumers often perceive Autopilot to be safer than it actually is, and have been killed or injured while using the feature.[6] Recent high profile incidents, as well as various user accounts, evidence that Tesla is misleading consumers about the safety performance and autonomous capabilities of its Autopilot feature.

The Center, founded in 1970, is an independent, non-profit consumer advocacy organization dedicated to improving vehicle safety, quality, and fuel economy not only for our members, but all drivers, passengers, and pedestrians across the county.

Consumer Watchdog is a nonprofit organization dedicated to providing an effective voice for taxpayers and consumers in an era when special interests dominate public discourse, government and politics.

## I.     Autonomous Vehicle Levels of Automation and Advertising

The National Highway Traffic Safety Administration (NHTSA) has provided nonbinding guidance on autonomous vehicles (AVs) on two occasions, in September 2016 and September 2017.[7] That guidance indicates that the U.S. Department of Transportation intends to use SAE International's Levels of Automation to define the autonomous capabilities of motor vehicles.[8] Only vehicles with Level 1 or 2 autonomous capabilities are currently available for sale in the U.S. Such vehicles, at most, have "partial automation", which means that "the driver must remain engaged with the driving task and monitor the environment at all times."[9] Level 3 vehicles are described as those in which the "Driver is a necessity, but is not required to monitor

---

[2] See 15 U.S.C. § 45.

[3] *See* https://www.tesla.com/.

[4] *See* https://www.tesla.com/autopilot.

[5] *Automated Vehicles for Safety*, NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., https://www.nhtsa.gov/technology-innovation/automated-vehicles-safety (last accessed May 22, 2018).

[6] *See* Sean O'Kane, *Tesla Will Regularly Release Data About the Safety of Autopilot, Elon Musk Says*, VERGE (May 2, 2018), https://www.theverge.com/2018/5/2/17313324/tesla-autopilot-safety-statistics-elon-musk-q1-earnings.

[7] *Federal Automated Vehicles Policy: Accelerating the Next Revolution in Roadway Safety,* NAT'L HIGHWAY TRAFFIC SAFETY ADMIN (2016), https://www.transportation.gov/sites/dot.gov/files/docs/AV%20policy%20guidance%20PDF.pdf; *Automated Driving Systems: A Vision for Safety* 2.0, NAT'L HIGHWAY TRAFFIC SAFETY ADMIN. (2017), https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/documents/13069a-ads2.0_090617_v9a_tag.pdf.

[8] *Id* at page 4.

[9] *Id*.

the environment. The driver must be ready to take control of the vehicle at all times *with notice*" (emphasis added).[10] Thus, if an automaker markets or advertises its vehicles as being capable of Level 3 automation or higher, when in fact those vehicles are only capable of Level 2 automation, the automaker is deceiving consumers, irrespective of whether the SAE Levels of Automation are explicitly mentioned.

Several automotive manufacturers sell Level 2 vehicles for use by U.S. consumers. Most of these manufacturers market their vehicles as having "driver assistance" or "active safety" features.[11] Notably, these manufacturers do not make any claims about their vehicles being "self-driving" or "fully autonomous" or even "autonomous". Generally, these vehicles are capable of maintaining their position in lanes at highway speeds, accelerating or decelerating in response to surrounding traffic (adaptive cruise control), automatically braking to avoid collisions, passing other vehicles when requested by the driver, and assisting the driver with parking.

## II. Tesla's Deceptive Marketing and Advertising Practices

Tesla is the only automaker to market its Level 2 vehicles as "self-driving", and the name of its driver assistance suite of features, Autopilot, connotes full autonomy. In addition to these formal marketing and advertising ploys, Elon Musk, Tesla's CEO, frequently misleads and deceives consumers about Autopilot's safety and capabilities. Also, technical aspects of Autopilot, such as allowing for prolonged periods without touching the steering wheel with no way of determining whether drivers are in fact monitoring their driving environment- a required task for drivers of SAE Level 2 vehicles- deceive and mislead consumers into believing Autopilot is more advanced than it is. These formal and informal representations, combined with the technical features of Tesla vehicles, lead reasonable consumers to believe that Autopilot is more than mere *driver assistance*.

Visitors to the Autopilot page on Tesla's website are greeted with large typeface proclaiming, "Full Self-Driving Hardware on All Cars" and below that message, in standard sized typeface, "All Tesla vehicles produced in our factory, including Model 3, have the hardware needed for full self-driving capability at a safety level substantially greater than that of a human driver."[12] After presenting two links to order a Model S or Model X, ostensibly with "full self-driving hardware", there is a video of a Tesla vehicle driving itself through a suburb; the video begins with the typed words "THE PERSON IN THE DRIVER'S SEAT IS ONLY THERE FOR LEGAL REASONS. HE IS NOT DOING ANYTHING. THE CAR IS DRIVING ITSELF."[13]

---

[10] *Id.*

[11] For examples of the language used by Tesla's competitors, *see* Audi https://www.audiusa.com/models/audi-a8; Toyota https://www.toyota.com/safety-sense/?addisclaimer=tss,lda,drcc,auto_highbeam,pre_collision_tss&srchid=sem%7cGOOGLE%7cSafety%7cSupport_Safety_Brand%7cSafety_Brand_Technology%7cETA_Launch_11.21.17%7cTSS&gclid=EAIaIQobChMIv5uGhfKK2wIVhlqGCh0bgwAJEAAYASAAEgJE2vD_BwE&gclsrc=aw.ds; Cadillac http://www.cadillac.com/world-of-cadillac/innovation/super-cruise; and Honda https://automobiles.honda.com/sensing.

[12] *See* https://www.tesla.com/autopilot.

[13] *Id.*

Additionally, Tesla has expressly claimed that Autopilot is safer than human drivers. After a man tragically died in March 2018 when his Model X collided with a crash attenuator while operating in Autopilot, Tesla released a statement claiming that "Autopilot was found by the U.S. government to reduce crash rates by as much as 40%."[14] That same statement went on to say "The consequences of the public not using Autopilot, because of an inaccurate belief that it is less safe, would be extremely severe. . . . We expect the safety level of autonomous cars to be 10 times safer than non-autonomous cars."[15]

However, the findings that Tesla cited were not the result of methodologically sound research. NHTSA, the entity that provided the data cited by Tesla, acknowledged on May 2, 2018, that it did not assess the safety or effectiveness of Autopilot in its 2017 report.[16] The data does show that Tesla vehicles *equipped* with Autopilot are less likely to crash than vehicles without Autopilot, but the information does not reveal whether the *use* of Autopilot results in fewer accidents. Tesla has used this dubious statistic to promote Autopilot's safety. Of course, this is merely correlation, not causation, and Tesla must be aware of this fact. Still, Tesla continues to claim that a vehicle operating in Autopilot is safer than a vehicle operated by a human. Further, by making claims about the safety level of "autonomous cars", Tesla blatantly lies to consumers by referring to its vehicles as "autonomous."

Elon Musk also makes statements referring to Autopilot as safer than it actually is. In an interview with CBS in April 2018, after Musk was asked what the purpose of Autopilot is if drivers still have to touch the steering wheel, he responded "because the probability of an accident with Autopilot is just less".[17] On May 14, 2018, after a woman in Utah plowed her Model S into a firetruck at 60 miles-per-hour while using Autopilot, Musk took to Twitter to say "What's actually amazing about this accident is that a Model S hit a firetruck at 60mph and the driver only broke an ankle. An impact at that speed usually results in severe injury or death."[18] Thus, Musk conflates Autopilot's safety, or lack thereof, with the Model S's ability to withstand a crash. Almost 22 million people follow Musk on Twitter.

In addition to making false claims about Autopilot's safety, Musk deceives consumers into believing Autopilot is more capable than it actually is. On October 20, 2016, Musk shared a video on Twitter of a Tesla vehicle driving itself with the caption, "Tesla drives itself (no human input at all) thru urban streets to highway to streets, then finds a parking spot". [19] In January 2017, after being asked "At what point will 'Full Self-Driving Capability' features noticeably

---

[14] *An Update on Last Week's Accident*, TESLA (March 30, 2018) https://www.tesla.com/blog/update-last-week%E2%80%99s-accident.

[15] *Id.*

[16] David Shepardson, *U.S. Safety Agency Says 'Did Not Assess' Tesla Autopilot Effectiveness*, REUTERS (May 2, 2018), https://www.reuters.com/article/us-tesla-autopilot/us-safety-agency-says-did-not-assess-tesla-autopilot-effectiveness-idUSKBN1I334A.

[17] *Tesla CEO Elon Musk Addresses Autopilot System Safety Concerns: 'We'll Never be Perfect'*, CBS (April 13, 2018), https://www.cbsnews.com/news/tesla-ceo-elon-musk-addresses-autopilot-safety-concerns/.

[18] Elon Musk, @elonmusk, Twitter.com (May 14, 2018, 1:57 PM), https://twitter.com/elonmusk/status/996132429772410882.

[19] Elon Musk, @elonmusk, Twitter.com (Oct. 20, 2016, 1:23 AM), https://twitter.com/elonmusk/status/789019145853513729?lang=en.

depart from 'Enhanced Autopilot' features?" Musk responded, "3 months maybe, 6 months definitely".[20]

The name "Autopilot" is deceptive and misleading in and of itself. When Americans hear the word "autopilot", they reasonably envision the system on airplanes that safely flies hundreds of millions of passengers through our skies. Elon Musk even analogized Tesla's Autopilot to the autopilot systems in airplanes in a 2014 interview.[21] Unfortunately, in the vehicle context, the passengers are also the drivers, or, to carry out the analogy, the "pilots". Unlike the varied and often lax requirements for a driver's license, pilots of airplanes with autopilot systems must possess extensive training and experience before they are permitted to operate such systems with live passengers.[22] The Federal Aviation Administration (FAA) sets such rigorous standards for the pilots of aircraft with autopilot systems because the risk of failure is so great. More than just setting the standards for the pilots, the FAA has strict and robust requirements for the technical aspects of aircraft autopilot systems.[23] There are no such requirements for Tesla's Autopilot. Thus, Tesla misleads and deceives consumers by referring to its suite of driver assistance technology as "Autopilot" because that technology and its users are not subject to the extensive requirements that aircraft autopilot systems are, and such a system is what reasonably comes to mind when the term "autopilot" is used.

Even with the affirmative knowledge that consumers misunderstand the capabilities of Autopilot, Tesla now advertises that its vehicles are equipped with "Enhanced Autopilot", yet those vehicles are still at SAE Level 2.[24] What is especially concerning about this advertising ploy is that current owners of Tesla vehicles may be led to believe that if they upgrade to the "Enhanced Autopilot" then they can pay even less attention to their driving environment.

Finally, the technical features of Tesla vehicles cause consumers to erroneously believe that Autopilot is more than just Level 2 autonomy. The NTSB investigated the fatal crash in Williston, Florida in 2016 where a Model S operating in Autopilot collided with a tractor-trailer and found that, of the 37.5 minutes Autopilot was activated, the driver only had his hands on the wheel for approximately 30 seconds.[25] Additionally, there is no way for Tesla vehicles to determine whether a driver is in fact monitoring the driving environment. Though Tesla considered additional sensors to track the eyes and face of drivers to know whether they were

---

[20] Elon Musk, @elonmusk, Twitter.com (Jan. 23, 2017, 7:00 PM), https://twitter.com/elonmusk/status/823727035088416768?tfw_site=technology&ref_src=twsrc%5Etfw&ref_url=https%3A%2F%2Fwww.bloomberg.com%2Fnews%2Farticles%2F2017-10-25%2Fcan-tesla-make-up-for-autopilot-s-lost-year.

[21] *Elon Musk on Tesla's Auto Pilot and Legal Liability*, BLOOMBERG (Oct. 10, 2014), https://youtu.be/60-b09XsyqU.

[22] *Become a Pilot*, FED. AVIATION ADMIN., https://www.faa.gov/pilots/become/ (last accessed May 22, 2018).

[23] Federal Aviation Administration Advisory Circular 25.1329-1C, Approval of Flight Guidance Systems, Oct. 27, 2014, https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC_25_1329-1C.pdf.

[24] https://www.tesla.com/autopilot

[25] National Transportation Safety Board HAR-17/02, Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016, at page 14, September 12, 2017, https://www.ntsb.gov/investigations/AccidentReports/Reports/HAR1702.pdf.

looking at the road or elsewhere, the company chose not to install such features.[26] Thus, Autopilot only warns drivers to touch the steering wheel after it detects that the steering wheel has not been touched for a certain amount of time, and there are already companies that have built devices to trick Autopilot into thinking that the steering wheel has been touched.[27] While these technical aspects are not marketing or advertising, they contribute to the circumstances that would lead a reasonable person to believe Autopilot is self-driving or autonomous technology.

### III.    Consumers Reasonably Altered Their Behavior When Using Autopilot in Response to Tesla's Misleading and Deceptive Marketing and Advertising

Consumers of Tesla vehicles have already been killed or injured because they misunderstood the safety and capabilities of Autopilot. There is an abundance of Tesla consumers who brag about their vehicles' "self-driving" abilities. News and other media outlets describe Autopilot as "self-driving". These realities prove that Tesla, with assistance from Elon Musk, has successfully deceived consumers into believing that Autopilot is safer and more capable than it actually is.

Unfortunately, there is no way to know exactly what the two drivers were doing in the moments preceding the collisions in the deadly Autopilot accidents in May 2016 and March 2018. The man who died in Williston, Florida, Joshua Brown, was known to frequently post videos of himself driving handsfree in his Model S.[28] Witnesses of the crash claim that Mr. Brown may have been watching a movie on a portable DVD player at the time of the collision.[29] Tellingly, the NTSB found that Mr. Brown's "pattern of use of the Autopilot system indicated an over-reliance on the automation and a lack of understanding of the system limitations".[30]

The NTSB is still investigating the deadly California crash involving a Model X colliding with a crash attenuator while in Autopilot. Tesla claims that the driver had at least five seconds, or approximately 500 feet, of unobstructed view before the fatal collision occurred.[31] Had the driver understood that he was required to constantly monitor his driving environment, and done so, he might still be alive today.

The woman who was recently injured in Utah when her Model S collided with a firetruck admitted that she was looking at her phone when the collision occurred.[32] Additionally, she had

---

[26] Tim Higgins, *Tesla Considered Adding Eye Tracking and Steering-Wheel Sensors to Autopilot System*, WALL STREET JOURNAL (May 14, 2018), https://www.wsj.com/articles/tesla-considered-adding-eye-tracking-and-steering-wheel-sensors-to-autopilot-system-1526302921.
[27] *See* https://www.autopilotbuddy.com/ (last accessed May 22, 2018).
[28] Rachel Abrams and Annalyn Kurtz, *Joshua Brown, Who Died in Self-Driving Accident, Tested Limits of His Tesla*, NEW YORK TIMES (July 1, 2016), https://www.nytimes.com/2016/07/02/business/joshua-brown-technology-enthusiast-tested-the-limits-of-his-tesla.html.
[29] Sam Levin and Nicky Woolf,  *Tesla Driver Killed While Using Autopilot Was Watching Harry Potter, Witness Says*, GUARDIAN (July 1, 2016), https://www.theguardian.com/technology/2016/jul/01/tesla-driver-killed-autopilot-self-driving-car-harry-potter.
[30] *Driver Errors, Overreliance on Automation, Lack of Safeguards, Led to Fatal Tesla Crash*, NAT'L TRANSP. SAFTEY BOARD (Sept. 12, 2017), https://www.ntsb.gov/news/press-releases/Pages/PR20170912.aspx.
[31] *An Update on Last Week's Accident*, TESLA (March 30, 2018) https://www.tesla.com/blog/update-last-week%E2%80%99s-accident.
[32] *Update – Crash Involving Tesla Model S – 10400 South Bangerter Highway*, SOUTH JORDAN POLICE DEP'T (May 14, 2018), http://www.sjc.utah.gov/wp-content/uploads/2018/05/Update-Crash-involving-Tesla-Model-S-10400-South-Bangerter-Highway.pdf.

not touched the steering wheel for 80 seconds preceding the crash.[33] If this woman had not been misled by Tesla into believing that her Model S was safer and more capable than it really is, she would have known that she needed to constantly monitor her driving environment, and the collision may have never occurred. Additionally, had Tesla installed eye and/or face monitoring technology, the vehicle would have known that this driver was not watching the road, and could have responded.

On the popular video-sharing website YouTube, Tesla consumers fondly refer to their vehicles as "self-driving". Some titles of these videos include: "SELF DRIVING 'AUTOPILOT' TESLA MODEL S! THE FUTURE IS NOW! …YO!", "2018 Tesla Model S Autopilot Demonstration - AMAZING Self-Driving Car", "2018 Tesla Model X Full-Self Driving TEST DRIVE- Amazing Autopilot System of Elon Musk !", and "My 2,000+ mile Full Self Driving Tesla Model X AutoPilot Trip from DC to Naples │ AP2".[34] Some Tesla consumers are so confident in Autopilot that they have uploaded videos of themselves using drugs behind the wheel while Autopilot is engaged.[35] Combined, these videos have millions of views. Clearly, these consumers are misinformed about the true nature of Autopilot's capabilities. If they knew that Autopilot is only capable of driver assistance, and not "self-driving", they would presumably behave much differently.

Tesla's deceptive marketing and advertising techniques regarding Autopilot have fooled not only average consumers, but sophisticated news and media outlets as well. When reporting on the Williston, Florida accident, the New York Times ran an article titled "Joshua Brown, Who Died in Self-Driving Accident, Tested Limits of His Tesla".[36] On October 20, 2016, NPR ran the headline "Tesla Has Begun Making All Its New Cars Self-Driving".[37] Adweek ran the headline "Elon Musk Defends Tesla Following Latest Self-Driving Accident" on May 15, 2018.[38] USA Today titled an article "After a Tesla crash, more doubts drivers can be trusted with self-driving tech such as AutoPilot" on May 18, 2018.[39] If Tesla is able to fool entities with substantial access to information resources, such as the New York Times and NPR, into thinking Autopilot is a self-driving feature, one can begin to see how consumers are even more susceptible to perceiving Autopilot as equivalent to self-driving capability.

---

[33] Ryan Beene and Dana Hull, *Police Confirm Tesla Driver Was Looking at Her Phone Before Utah Crash*, BLOOMBERG (May 16, 2018), https://www.bloomberg.com/news/articles/2018-05-16/u-s-auto-safety-agency-probing-utah-crash-of-tesla-on-autopilot.

[34] jasontman36 (Oct. 17, 2015), https://www.youtube.com/watch?v=0S-WUbLtFHY; AutoMoHo (June 21, 2017), https://www.youtube.com/watch?v=mCj_C1NOVxw; Auto TV (Mar. 11, 2018), https://www.youtube.com/watch?v=0NtdZNWUBik; aDigitalNomad . net (May 22, 2017), https://www.youtube.com/watch?v=G9xRPU6R_bs.

[35] lilduval (Nov. 11, 2017), https://www.instagram.com/p/BbXXWEtlZs1/.

[36] Rachel Abrams and Annalyn Kurtz, *Joshua Brown, Who Died in Self-Driving Accident, Tested Limits of His Tesla*, NEW YORK TIMES (July 1, 2016), https://www.nytimes.com/2016/07/02/business/joshua-brown-technology-enthusiast-tested-the-limits-of-his-tesla.html.

[37] Sonari Glinton, *Tesla Has Begun Making All Its New Cars Self-Driving*, NPR (Oct. 20 2016), https://www.npr.org/sections/thetwo-way/2016/10/20/498753508/tesla-has-begun-making-all-its-new-cars-self-driving.

[38] Alissa Fleck, *Elon Musk Defends Tesla Following latest Self-Driving Accident*, ADWEEK (May 15, 2018), https://www.adweek.com/digital/elon-musk-defends-tesla-following-latest-self-driving-accident/.

[39] Marco della Cava, *After a Tesla Crash, More Doubts Drivers Can Be Trusted with Selff-Driving Tech Such as Auto-Pilot*, USA TODAY (may 18, 2018), https://www.usatoday.com/story/tech/talkingtech/2018/05/18/after-tesla-crash-more-doubts-drivers-can-trusted-self-driving-tech-like-autopilot/619767002/.

Though it is not required that Tesla know that its advertising and marketing strategies are deceptive, it is worth mentioning that Elon Musk has recognized that consumers do not understand the safety and capabilities of Autopilot. In a call with analysts on May 2, 2018, Musk discussed recent accidents involving Autopilot and said "the issue is…more one of complacency, like we get used to it."[40] Thus, while Musk may not have explicitly said that Tesla is deceiving its customers, he realizes that Tesla customers do not have sufficiently clear information.

Additionally, reports and statements issued by NHTSA expressly cite consumers' lack of understanding of Autopilot as a safety risk. After completing a study on partially autonomous vehicles in 2015, NHTSA found that "When engaged in a non-driving task, some participants exhibited a primary task reversal and chose to prioritize the completion of the non-driving task over the operation of the partially automated vehicle. This phenomenon (overreliance on vehicle automation) has the potential to counteract many of the safety benefits of automated vehicle technologies."[41] In 2017, after completing its investigation of Joshua Brown's death, NHTSA spokesman Bryan Thomas said "We are concerned about drivers operating these vehicles having a good understanding of the capabilities and limitations of the systems. . . . It's not enough to put it in an owners' manual and hope that drivers will read it and follow it."[42] Tesla and Elon Musk are certainly aware of these concerns, yet they continue to use marketing and advertising practices that deceive and mislead consumers.

Tesla consumers are especially susceptible to unfair and deceptive advertising and marketing practices because Tesla has successfully lobbied states to allow for direct-to-consumer sales. Thus, when a consumer is shopping for a new Tesla there is no "middle-man" (automotive dealerships) to provide a different perspective on Autopilot's safety and capabilities. Consumers only talk to Tesla employees who receive their information, instruction on how to market that information, and repercussion for offering different information, directly from Tesla. While a direct-to-consumer model *can* be beneficial to consumers, as the FTC has recognized, Tesla is abusing this model by positioning itself as the sole source of information on its Autopilot feature.

## IV. <u>Conclusion</u>

Tesla's marketing and advertising of its Autopilot feature violates Section 5 of the FTC Act because it is likely to mislead consumers into reasonably believing that their vehicles have self-driving or autonomous capabilities, and those consumers behave differently while using Autopilot than if they understood that Autopilot was merely a driver assistance feature that requires them to constantly monitor the driving environment and be ready to take control of the

---

[40]  Tim Higgins, *Tesla Considered Adding Eye Tracking and Steering-Wheel Sensors to Autopilot System*, WALL STREET JOURNAL (May 14, 2018), https://www.wsj.com/articles/tesla-considered-adding-eye-tracking-and-steering-wheel-sensors-to-autopilot-system-1526302921.

[41] M. Blanco *et al*, *Human Factors Evaluation of Level 2 and Level 3 Automated Driving Concepts*, (Report No. DOT HS 812 812), pages 10-11, NAT'L HIGHWAY TRAFFIC SAFETY ADMIN (Aug. 2015), https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/812182_humanfactorseval-l2l3-automdrivingconcepts.pdf

[42] Ianthe Jeanne Dugan and Mike Spector,  *Tesla's Push to Build a Self-Driving Car Sparked Dissent Among Its Engineers,* WALL STREET JOURNAL (Aug. 24, 2017),  https://www.wsj.com/articles/teslas-push-to-build-a-self-driving-car-sparks-dissent-among-its-engineers-1503593742.

vehicle *without notice*. Both Tesla's and Elon Musk's public statements regarding Autopilot mislead and deceive consumers.

Sadly, at least two of Tesla's consumers have already died, and at least one has been injured. In the case of the sole accident the NTSB was able to fully analyze, the Board attributed a lack of understanding of Autopilot's capabilities to the death of one of these consumers. The burden now falls on the FTC to investigate Tesla's unfair and deceptive practices so that consumers have accurate information, understand the limitations of Autopilot, and conduct themselves appropriately and safely. The Center for Auto Safety and Consumer Watchdog urge the FTC to conduct a timely investigation in order to prevent further tragedies.

Sincerely,

Jason Levine
Executive Director
Center for Auto Safety

John Simpson
Privacy and Technology Project Director
Consumer Watchdog

**Cc:**  Commissioner Maureen Ohlhausen
Commissioner Rohit Chopra
Commissioner Noah Phillips
Commissioner Rebecca Slaughter
Donald S. Clark, FTC Secretary
Andrew Smith, Director, FTC Bureau of Consumer Protection

Page 9 of 9

**EXHIBIT "7"**

 

July 25, 2019

The Honorable Joseph Simons
Chairman
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

## Renewed Request for Investigation of Deceptive and Unfair Practices in Advertising and Marketing of the "Autopilot" Feature Offered in Tesla Motor Vehicles

Dear Chairman Simons:

Over a year ago, following several high profile deaths, injuries, and crashes, the Center for Auto Safety (Center) and Consumer Watchdog (CW) asked the Federal Trade Commission (FTC or Commission) to investigate the false and deceptive marketing and advertising perpetrated by Tesla in connection with their "Autopilot" feature.[1]  Now, three Americans are dead—one more since our last request for an investigation—and at least one more has been injured as a result of Tesla, and its CEO Elon Musk,[2] continuing to mislead consumers into believing that the Autopilot feature makes the vehicles "self-driving."

Pursuant to the Commission's Rules, 16 C.F.R §§ 2.1 and 2.2, the Center and CW again respectfully and urgently request that the FTC initiate an investigation of the dangerously misleading and deceptive practices and representations of Tesla Motors, Inc.[3] regarding the safety and capabilities of its Autopilot feature. These representations continue to violate section 5 of the FTC Act (Section 5)[4] because they are likely to deceive even diligent consumers, who would act reasonably in believing them. These consumers are therefore likely to use Autopilot

---

[1] The Center for Auto Safety & Consumer Watchdog, *Request for Investigation of Deceptive and Unfair Practices in Advertising and Marketing of the "Autopilot" Feature Offered in Tesla Motor Vehicles* (May 23, 2018), https://www.autosafety.org/wp-content/uploads/2018/05/CAS-and-CW-Letter-to-FTC-on-Tesla-Deceptive-Advertising.pdf
[2] *See, e.g., Tesla CEO Elon Musk Addresses Autopilot System Safety Concerns: 'We'll Never be Perfect'*, CBS NEWS (April 13, 2018), https://www.cbsnews.com/news/tesla-ceo-elon-musk-addresses-autopilot-safety-concerns/; Elon Musk (@elonmusk), Twitter (Jan. 9, 2019, 10:40 PM), https://twitter.com/elonmusk/status/1083252225449840642; *Tesla CEO Elon Musk: The 60 Minutes Interview*, CBS NEWS (Dec. 9, 2018), https://www.cbsnews.com/news/tesla-ceo-elon-musk-the-2018-60-minutes-interview/
[3] Tesla Motors, Inc. is headquartered at 2500 Deer Creek Road, Palo Alto, CA 94304.
[4] *See* 15 U.S.C. § 45.

Center for Auto Safety and Consumer Watchdog Letter to FTC on Tesla Deceptive Practices – July 2019

differently than they would if Tesla were more honest and transparent regarding the capabilities of their product.

After studying the first of these fatal accidents, the National Transportation Safety Board (NTSB) determined that over-reliance on and a lack of understanding of the Autopilot feature can lead to death. There can no longer be any question that these deceptive practices have made it reasonable for Tesla owners to believe that a Tesla with Autopilot is an autonomous vehicle capable of self-driving. To be clear, it is not.

Consumers in the market for a new Tesla see the company proclaiming, "Full Self-Driving Hardware on All Cars." They are directed to videos of Tesla vehicles driving themselves through busy public roads, with no human operation whatsoever. They see press releases alleging that Autopilot reduces the likelihood of an accident by 40%.[5] They also hear statements like: "the probability of an accident with Autopilot is just less," from Mr. Musk.[6] Other consumers have heard him relate Autopilot in a Tesla to autopilot systems in an aircraft. These deceptive statements mislead and deceive consumers into believing that Autopilot, and thus Tesla vehicles, possess capabilities the manufacturer knows that it does not.

Tesla manufactures and sells electric vehicles in the United States. Currently, Tesla offers three vehicle models: (1) Model S; (2) Model X; and (3) Model 3.[7] All of these vehicles are equipped with the Autopilot feature.[8] Unlike what the name of this feature suggests, Autopilot is only capable of SAE Level 2 automation.[9] As the CEO of Tesla himself has recognized, Tesla consumers often perceive Autopilot to be safer than it actually is, and have been killed or injured while using the feature.[10]  Continued high profile incidents, as well as various user accounts, show that Tesla is misleading consumers about the safety performance and autonomous capabilities of its Autopilot feature.

The Center, founded in 1970, is an independent, non-profit consumer advocacy organization dedicated to improving vehicle safety, quality, and fuel economy not only for our members, but all drivers, passengers, and pedestrians across the country.

Consumer Watchdog is a nonprofit organization dedicated to providing an effective voice for taxpayers and consumers in an era when special interests dominate public discourse, government and politics.

---

[5] *An Update on Last Week's Accident*, TESLA (March 30, 2018), https://www.tesla.com/blog/update-last-week%E2%80%99s-accident
[6] *Tesla CEO Elon Musk Addresses Autopilot System Safety Concerns: 'We'll Never be Perfect'*, CBS NEWS (April 13, 2018), https://www.cbsnews.com/news/tesla-ceo-elon-musk-addresses-autopilot-safety-concerns/
[7] *See* https://www.tesla.com/.
[8] *See* https://www.tesla.com/autopilot.
[9] *Automated Vehicles for Safety*, NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., https://www.nhtsa.gov/technology-innovation/automated-vehicles-safety (last accessed June 20, 2019) (SAE Level 2 automation involves an advanced driver assistance system that can control both steering and accelerating/braking under certain circumstances. A human driver must monitor the driving environment at all times and perform the other driving tasks.).
[10] *See* Sean O'Kane, *Tesla Will Regularly Release Data About the Safety of Autopilot, Elon Musk Says*, VERGE (May 2, 2018), https://www.theverge.com/2018/5/2/17313324/tesla-autopilot-safety-statistics-elon-musk-q1-earnings

Tesla's Deceptive Practices

Tesla continues to be the only automaker to describe its Level 2 vehicles as "self-driving," and the name of its driver assistance suite of features, Autopilot, connotes full autonomy. Elon Musk, Tesla's CEO, frequently misleads and deceives consumers about Autopilot's safety and capabilities. Also, technical aspects of Autopilot, such as allowing for prolonged periods without touching the steering wheel with no way of determining whether drivers are in fact monitoring their driving environment—a required task for drivers of SAE Level 2 vehicles—deceive and mislead consumers into believing Autopilot makes the car self-driving. These formal and informal representations, combined with the technical features of Tesla vehicles, lead reasonable consumers to believe that Autopilot is more than mere *driver assistance*.

Visitors to the Autopilot page on Tesla's website are confronted with a variety of exaggerated and misleading claims about Autopilot's capabilities. Visitors to the site first see a message in large type proclaiming Autopilot as the "Future of Driving," with a message below that in smaller type noting that "All new Tesla cars come standard with advanced hardware capable of providing Autopilot features today, and full self-driving capabilities in the future—through software updates designed to improve functionality over time."[11] After presenting links to order a Model S, Model 3, or Model X, ostensibly with "full self-driving capabilities," there is a video of a Tesla vehicle driving itself through a suburb; the video begins with the typed words "THE PERSON IN THE DRIVER'S SEAT IS ONLY THERE FOR LEGAL REASONS. HE IS NOT DOING ANYTHING. THE CAR IS DRIVING ITSELF."[12] When scrolling further down the page, a visitor sees the headline "Full Self-Driving Capability" in large type.[13] It is only in smaller type below this headline and in small type at other places on the Autopilot page that Tesla notes that its cars do not have "Full Self-Driving Capability" and that "[c]urrent Autopilot features require active driver supervision and do not make the vehicle autonomous."[14]

Moreover, Tesla has expressly claimed that Autopilot is safer than human drivers. After a man tragically died in March 2018 when his Model X, while operating in Autopilot mode, collided with a crash attenuator. Tesla released a statement claiming that "Autopilot was found by the U.S. government to reduce crash rates by as much as 40%."[15] That same statement went on to say "The consequences of the public not using Autopilot, because of an inaccurate belief that it is less safe, would be extremely severe. . . . We expect the safety level of autonomous cars to be 10 times safer than non-autonomous cars."[16]

However, the findings that Tesla cited were not the result of a statistically significant study.  The National Highway Traffic Safety Administration (NHTSA), the agency that provided the data, contradicted Tesla on May 2, 2018, stating it did not assess the safety or effectiveness of

---

[11] *Autopilot*, Tesla https://www.tesla.com/autopilot (last visited July 15, 2019).
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] TESLA, *supra* note 3.
[16] *Id.*

Center for Auto Safety and Consumer Watchdog Letter to FTC on Tesla Deceptive Practices – July 2019

Autopilot in its 2017 report.[17] While the data does show that Tesla vehicles *equipped* with Autopilot are less likely to crash than vehicles without Autopilot, the information does not lead to the conclusion on whether the *use* of Autopilot results in fewer crashes. Further, NHTSA made no such public announcement. Tesla has used this dubious statistic to promote Autopilot's safety. This is merely correlation, not causation, and Tesla must be aware of this fact. Still, Tesla continues to claim that a vehicle operating in Autopilot is safer than a vehicle operated by a human—a claim based on wishing, not knowing. Further, by making claims about the safety level of "autonomous cars," Tesla blatantly lies to consumers by referring to its vehicles as "autonomous." Notably, after another fatal accident involving Autopilot on March 1, 2019, Tesla issued no such official statements on its website as it had before yet has not withdrawn its previous inaccurate statements made after the March 2018 fatal Model X crash.

Elon Musk also makes statements referring to Autopilot as safer than it actually is. In an interview with CBS in April 2018, after Musk was asked what the purpose of Autopilot is if drivers still have to touch the steering wheel, he responded "because the probability of an accident with Autopilot is just less."[18] On May 14, 2018, after a woman in Utah plowed her Model S into a firetruck at 60 miles per hour while using Autopilot, Musk took to Twitter to say "What's actually amazing about this accident is that a Model S hit a firetruck at 60mph and the driver only broke an ankle. An impact at that speed usually results in severe injury or death."[19] Thus, Musk conflates Autopilot's safety, or lack thereof, with the Model S's ability to withstand a crash. On January 9, 2019, Musk claimed on Twitter that a "Tesla *with* Autopilot engaged is twice as safe" as that those operate in standard driving mode, yet another unsubstantiated claim.[20] Over 27 million people follow Musk on Twitter,[21] placing him in the top 100 most followed users of the platform.[22]

Musk has himself continued to contribute significantly to consumer misunderstanding of Autopilot's capabilities through his public misuse of Autopilot. In December 2018, Musk appeared on the CBS news program *60 Minutes* for an interview with broadcast journalist Lesley Stahl.[23] During the interview, Musk occupied the driver's seat in a Tesla Model 3 with Stahl in the passenger seat.[24] After activating the Autopilot system, Musk relaxed in his seat, took his hands off the steering wheel, and placed his hands on his stomach. Musk describes his actions as

---

[17] David Shepardson, *U.S. Safety Agency Says 'Did Not Assess' Tesla Autopilot Effectiveness*, REUTERS (May 2, 2018), https://www.reuters.com/article/us-tesla-autopilot/us-safety-agency-says-did-not-assess-tesla-autopilot-effectiveness-idUSKBN1I334A

[18] *Tesla CEO Elon Musk Addresses Autopilot System Safety Concerns: 'We'll Never be Perfect'*, CBS NEWS (April 13, 2018), https://www.cbsnews.com/news/tesla-ceo-elon-musk-addresses-autopilot-safety-concerns/

[19] Elon Musk (@elonmusk), Twitter (May 14, 2018, 1:57 PM), https://twitter.com/elonmusk/status/996132429772410882

[20] Elon Musk (@elonmusk), Twitter (Jan. 9, 2019, 10:40 PM), https://twitter.com/elonmusk/status/1083252225449840642

[21] Elon Musk (@elonmusk), TWITTER, https://twitter.com/elonmusk (last visited July 15, 2019).

[22] *Twitter: Most Followers*, FRIEND OR FOLLOW, https://friendorfollow.com/twitter/most-followers/ (last visited June 26, 2019).

[23] *Tesla CEO Elon Musk: The 60 Minutes Interview*, CBS NEWS (Dec. 9, 2018), https://www.cbsnews.com/news/tesla-ceo-elon-musk-the-2018-60-minutes-interview/

[24] *Id.*

Center for Auto Safety and Consumer Watchdog Letter to FTC on Tesla Deceptive Practices – July 2019

"Not doing anything. No hands. No feet."[25] When Stahl asks him if he feels safe, Musk's response is simply "Yeah."[26] Musk's actions are misleading, dangerous, and contrary to Tesla's guidelines for use of the Autopilot system. The Tesla owner's manual for the Model 3 notes that "[y]ou must keep your hands on the steering wheel at all times."[27]

Later, in January 2019, Musk made inaccurate and misleading comments during Tesla's fourth-quarter earnings call, saying that "[Tesla] already [has] full self-driving capability on highways . . . so from highway on-ramp to highway exit, including passing cars and going from one highway interchange to another, full self-driving capability is there."[28] These statements again failed to accurately describe Autopilot's capabilities, leading a business analyst to call them "reckless" and "putting [Musk's] customers at risk.[29] Musk continues to be either unwilling or unable to accurately describe the capabilities and requirements for operation of the Autopilot system safely, further endangering drivers and the public.

As recently as June 27, 2019, Musk re-tweeted another Twitter user who shared a video of a person test-driving a Tesla in Autopilot mode without using their hands on the steering wheel.[30] The user retweeted by Musk stated that the Tesla in the video was "driving itself."[31] Musk's promotion of this inaccurate statement and dangerous and misleading video fits his pattern of making exaggerated statements about the safety and capability of Autopilot.

The name "Autopilot" is deceptive and misleading in and of itself. When Americans hear the word "autopilot," they reasonably envision the system on airplanes that safely flies hundreds of millions of passengers through our skies. Elon Musk even analogized Tesla's Autopilot to the autopilot systems in airplanes in a 2014 interview.[32] Unfortunately, in the vehicle context, the passengers are also the drivers, or, to carry out the analogy, the "pilots." Unlike the varied and often lax requirements for a driver's license, pilots of airplanes with autopilot systems must possess extensive training and experience before they are permitted to operate such systems with live passengers.[33] The Federal Aviation Administration (FAA) sets such rigorous standards for the pilots of aircraft with autopilot systems because the risk of failure is so great. More than just setting the standards for the pilots, the FAA has strict and robust requirements for the technical

---

[25] *Id.*

[26] *Id.*

[27] Tesla, *Model 3 Owner's Manual* 75
https://www.tesla.com/sites/default/files/model_3_owners_manual_north_america_en.pdf (last visited June 26, 2019).

[28] Mark Matousek, *Elon Musk's 'reckless' comment about the capabilities of Tesla's Autopilot could put drivers at risk, an analyst says*, BUSINESS INSIDER (Feb. 11, 2019), https://www.businessinsider.com/elon-musk-comment-about-tesla-autopilot-may-put-drivers-at-risk-2019-2

[29] *Id.*

[30] Jesse Ridgway (@McJuggerNuggets), Twitter (June 27, 2019, 12:35 PM),
https://twitter.com/McJuggerNuggets/status/1144328368378302464 (retweeted by Elon Musk on June 27, 2019).

[31] *Id.*

[32] *Elon Musk on Tesla's Auto Pilot and Legal Liability*, BLOOMBERG (Oct. 10, 2014), https://youtu.be/60-b09XsyqU

[33] *Become a Pilot*, FED. AVIATION ADMIN., https://www.faa.gov/pilots/become/ (last accessed May 22, 2018).

aspects of aircraft autopilot systems.[34] There are no such requirements for Tesla's Autopilot. Thus, Tesla misleads and deceives consumers by referring to its suite of driver assistance technology as "Autopilot" because that technology and its users are not subject to the extensive requirements that aircraft autopilot systems are, and such a system is what reasonably comes to mind when the term "autopilot" is used.

Use of the name Autopilot continues to create confusion among consumers. A recent study by the Insurance Institute for Highway Safety (IIHS) examined consumer understanding of SAE Level 2 driving automation systems.[35] IIHS surveyed over 2,000 drivers regarding behaviors they believed were safe while a Level 2 system was operating. IIHS concluded that "[t]he name 'Autopilot' was associated with the highest likelihood that drivers believed a behavior was safe while in operation, for every behavior measured, compared with other system names."[36] Notably, 48 percent of respondents believed that it was safe to take one's hands off the steering wheel when using Autopilot, compared to a maximum of 33 percent for any other Level 2 system mentioned.[37]

Moreover, the technical features of Tesla vehicles cause consumers to erroneously believe that Autopilot is more than just Level 2 autonomy. The NTSB investigated the fatal crash in Williston, Florida in 2016 where a Model S operating in Autopilot collided with a tractor-trailer and found that, of the 37.5 minutes Autopilot was activated, the driver only had his hands on the wheel for approximately 30 seconds.[38] Additionally, there is no way for Tesla vehicles to determine whether a driver is in fact monitoring the driving environment. Though Tesla considered additional sensors to track the eyes and face of drivers to know whether they were looking at the road or elsewhere, the company chose not to install such features.[39] Thus, Autopilot only warns drivers to touch the steering wheel after it detects that the steering wheel has not been touched for a certain amount of time, and there is ample evidence consumers are able to deceive the detection system.[40] While these technical aspects are not representations, they are evidence that reasonable people have been led to believe Autopilot is self-driving or autonomous technology.

Misuse of Tesla's Autopilot system continues to lead to fatal crashes. The most recent crash involving Autopilot that resulted in a driver death occurred in Delray Beach, Florida on March 1,

[34] Federal Aviation Administration Advisory Circular 25.1329-1C, Approval of Flight Guidance Systems, Oct. 27, 2014, https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC_25_1329-1C.pdf
[35] Eric R. Teoh, *What's in a name? Drivers' perception of the use of five SAE Level 2 driving automation systems*, INSURANCE INSTITUTE FOR HIGHWAY SAFETY (June 2019), https://www.iihs.org/api/datastoredocument/bibliography/2190
[36] *Id* at 2.
[37] *Id* at 10.
[38] National Transportation Safety Board HAR-17/02, Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016, at page 14, September 12, 2017, https://www.ntsb.gov/investigations/AccidentReports/Reports/HAR1702.pdf
[39] Tim Higgins, *Tesla Considered Adding Eye Tracking and Steering-Wheel Sensors to Autopilot System*, WALL STREET JOURNAL (May 14, 2018), https://www.wsj.com/articles/tesla-considered-adding-eye-tracking-and-steering-wheel-sensors-to-autopilot-system-1526302921
[40] *Video Appears To Show Man Asleep Behind Wheel Of Self-Driving Car On LA Freeway | NBC Nightly News,* NBC NEWS (June 14, 2019), https://www.youtube.com/watch?v=0rio08bhc-A

Center for Auto Safety and Consumer Watchdog Letter to FTC on Tesla Deceptive Practices – July 2019

2019.[41] In this incident, the driver's Tesla Model 3 was driving on U.S. Route 441 when a semitrailer pulled out into the road from a driveway, blocking the Model 3's path.[42] The Tesla struck the semitrailer, shearing the roof off the car and killing the driver.[43] Preliminary data from the vehicle showed that the Autopilot system had been engaged about 10 seconds before the fatal crash, and that the driver's hands were not detected on the steering wheel for about eight seconds before the crash.[44] The Tesla was traveling at about 68 miles per hour when it struck the semitrailer, and neither the Autopilot system nor the driver made any evasive actions to avoid the crash. As with previous incidents, if the driver of this Tesla had understood that the Autopilot system required constant attention to the driving environment, he might still be alive today.

Consumers of Tesla vehicles have already been killed or injured because they misunderstood the safety and capabilities of Autopilot. There is an abundance of Tesla consumers who brag about their vehicles' "self-driving" abilities. News and other media outlets describe Autopilot as "self-driving." These realities prove that Tesla, with assistance from Elon Musk, has successfully deceived consumers into believing that Autopilot is safer and more capable than it actually is.

Unfortunately, there is no way to know exactly what the three drivers were doing in the moments preceding the collisions in the deadly Autopilot accidents in May 2016, March 2018, and March 2019. The man who died in March 2016, Joshua Brown, was known to frequently post videos of himself driving handsfree in his Model S.[45] Witnesses of the crash claim that Mr. Brown may have been watching a movie on a portable DVD player at the time of the collision.[46] Tellingly, the NTSB found that Mr. Brown's "pattern of use of the Autopilot system indicated an over-reliance on the automation and a lack of understanding of the system limitations."[47]

The NTSB is still investigating the deadly California crash involving a Model X colliding with a crash attenuator while in Autopilot. Tesla claims that the driver had at least five seconds, or approximately 500 feet, of unobstructed view before the fatal collision occurred.[48] Had the driver understood that he was required to constantly monitor his driving environment, and done so, he might still be alive today.

---

[41] *Highway Preliminary Report: HWY19FH008*, NAT'L TRANSP. SAFETY BD. (May 16, 2019), https://www.ntsb.gov/investigations/AccidentReports/Reports/HWY19FH008-preliminary.pdf
[42] *Id* at 1.
[43] *Id* at 2.
[44] *Id* at 2.
[45] Rachel Abrams and Annalyn Kurtz, *Joshua Brown, Who Died in Self-Driving Accident, Tested Limits of His Tesla*, NEW YORK TIMES (July 1, 2016), https://www.nytimes.com/2016/07/02/business/joshua-brown-technology-enthusiast-tested-the-limits-of-his-tesla.html
[46] Sam Levin and Nicky Woolf, *Tesla Driver Killed While Using Autopilot Was Watching Harry Potter, Witness Says*, GUARDIAN (July 1, 2016), https://www.theguardian.com/technology/2016/jul/01/tesla-driver-killed-autopilot-self-driving-car-harry-potter
[47] *Driver Errors, Overreliance on Automation, Lack of Safeguards, Led to Fatal Tesla Crash*, NAT'L TRANSP. SAFETY BD (Sept. 12, 2017), https://www.ntsb.gov/news/press-releases/Pages/PR20170912.aspx.
[48] *An Update on Last Week's Accident*, TESLA (March 30, 2018), https://www.tesla.com/blog/update-last-week%E2%80%99s-accident

Center for Auto Safety and Consumer Watchdog Letter to FTC on Tesla Deceptive Practices – July 2019

On the popular video-sharing website YouTube, Tesla consumers fondly refer to their vehicles as "self-driving."[49] Some Tesla consumers are so confident in Autopilot that they have uploaded videos of themselves using drugs behind the wheel,[50] sitting in the backseat,[51] engaging in sex acts,[52] or eating and drinking with both hands[53] all while Autopilot is engaged. Multiple drivers have recently been spotted by others on the road sleeping while their Tesla operated with Autopilot.[54] Combined, these videos have millions of views. These consumers are clearly misinformed about the true nature of Autopilot's capabilities.

Tesla's deceptive marketing and advertising techniques regarding Autopilot have fooled not only average consumers, but sophisticated news and media outlets as well. When reporting on the Williston, Florida accident, the New York Times ran an article titled "Joshua Brown, Who Died in Self-Driving Accident, Tested Limits of His Tesla."[55] On October 20, 2016, NPR ran the headline "Tesla Has Begun Making All Its New Cars Self-Driving."[56] Adweek ran the headline "Elon Musk Defends Tesla Following Latest Self-Driving Accident" on May 15, 2018.[57] USA Today titled an article "After a Tesla crash, more doubts drivers can be trusted with self-driving tech such as AutoPilot" on May 18, 2018.[58] If Tesla is able to fool entities with substantial access to information resources, such as the New York Times and NPR, into thinking Autopilot is a self-driving feature, one can begin to see how consumers are even more susceptible to perceiving Autopilot as equivalent to self-driving capability.

---

[49] *See, e.g.*, jasontman36, *SELF-DRIVING 'AUTOPILOT' TESLA MODEL S! THE FUTURE IS NOW! . . . YO!*, YOUTUBE (Oct. 17, 2015), https://www.youtube.com/watch?v=0S-WUbLtFHY; Car News Today, *2018 Tesla Model X Full-Self Driving TEST DRIVE- Amazing Autopilot System of Elon Musk !*, YOUTUBE (Mar. 11, 2018), https://www.youtube.com/watch?v=0NtdZNWUBik; aDigitalNomad . net, *My 2,000+ mile Full Self Driving Tesla Model X AutoPilot Trip from DC to Naples | AP2*, YOUTUBE (May 22, 2017), https://www.youtube.com/watch?v=G9xRPU6R_bs
[50] lilduval, INSTAGRAM (Nov. 11, 2017), https://www.instagram.com/p/BbXXWEtlZs1/.
[51] Jason Torchinsky, *This Video of a YouTuber's Tesla Driving on Autopilot With No One in the Driver's Seat Is Deeply Stupid*, JALOPNIK (June 4, 2019, 5:20 P.M.), https://jalopnik.com/this-video-of-a-youtubers-tesla-driving-on-autopilot-wi-1835238759
[52] Bryan Clark, *These idiots shot a porno in an Autopilot-enabled Tesla and Elon Musk deserves some blame*, THE NEXT WEB (May 8, 2019, 10:24 P.M.), https://thenextweb.com/cars/2019/05/09/these-idiots-shot-a-porno-in-an-autopilot-enabled-tesla-and-elon-musk-deserves-some-blame/
[53] The Golden Drive, *Idiot EATS BURGER with TESLA AUTO PILOT in CANYONS (Angeles Crest Highway)* YOUTUBE (Aug. 4, 2017), https://www.youtube.com/watch?v=0JlLUpsVgj4
[54] Jason Murdock, *Disturbing Video Shows Driver Apparently Asleep in Tesla Cruising Along Los Angeles Freeway During Rush Hour*, Newsweek (June 13, 2019), https://www.newsweek.com/tesla-autopilot-driver-asleep-video-california-los-angeles-freeway-self-driving-cars-1443746
[55] Rachel Abrams and Annalyn Kurtz, *Joshua Brown, Who Died in Self-Driving Accident, Tested Limits of His Tesla*, NEW YORK TIMES (July 1, 2016), https://www.nytimes.com/2016/07/02/business/joshua-brown-technology-enthusiast-tested-the-limits-of-his-tesla.html
[56] Sonari Glinton, *Tesla Has Begun Making All Its New Cars Self-Driving*, NPR (Oct. 20 2016), https://www.npr.org/sections/thetwo-way/2016/10/20/498753508/tesla-has-begun-making-all-its-new-cars-self-driving
[57] Alissa Fleck, *Elon Musk Defends Tesla Following latest Self-Driving Accident*, ADWEEK (May 15, 2018), https://www.adweek.com/digital/elon-musk-defends-tesla-following-latest-self-driving-accident/
[58] Marco della Cava, *After a Tesla Crash, More Doubts Drivers Can Be Trusted with Selff-Driving Tech Such as Auto-Pilot*, USA TODAY (May 18, 2018), https://www.usatoday.com/story/tech/talkingtech/2018/05/18/after-tesla-crash-more-doubts-drivers-can-trusted-self-driving-tech-like-autopilot/619767002/

Though it is not required that Tesla know that its representations are deceptive, it is worth mentioning that in this instance it would appear that the company is well aware. Elon Musk has recognized that consumers do not understand the safety and capabilities of Autopilot. In a call with analysts on May 2, 2018, Musk discussed recent accidents involving Autopilot and said "the issue is…more one of complacency, like we get used to it."[59] Thus, while Musk may not have explicitly said that Tesla is deceiving its customers, he realizes that Tesla customers do not have sufficiently clear information, which creates an act of omission on Tesla's part.

Additionally, reports and statements issued by NHTSA expressly cite consumers' lack of understanding of Autopilot as a safety risk. After completing a study on partially autonomous vehicles in 2015, NHTSA found that "When engaged in a non-driving task, some participants exhibited a primary task reversal and chose to prioritize the completion of the non-driving task over the operation of the partially automated vehicle. This phenomenon (overreliance on vehicle automation) has the potential to counteract many of the safety benefits of automated vehicle technologies."[60] In 2017, after completing its investigation of Joshua Brown's death, NHTSA spokesman Bryan Thomas said "We are concerned about drivers operating these vehicles having a good understanding of the capabilities and limitations of the systems. . . . It's not enough to put it in an owners' manual and hope that drivers will read it and follow it."[61] Tesla and Elon Musk are certainly aware of these concerns, yet they continue to choose make representations that deceive and mislead consumers.

Tesla consumers are especially susceptible to these deceptive representations because Tesla has successfully lobbied states to allow for direct-to-consumer sales. Thus, when a consumer is shopping for a new Tesla there is no "middle-man" (automotive dealerships) to provide a different perspective on Autopilot's safety and capabilities. Consumers only talk to Tesla employees who receive their information, instruction on how to market that information, and repercussion for offering different information, directly from Tesla. While a direct-to-consumer model *can* be beneficial to consumers, as the FTC has recognized, Tesla is abusing this model by positioning itself as the sole source of information on its Autopilot feature.

---

[59]  Tim Higgins, *Tesla Considered Adding Eye Tracking and Steering-Wheel Sensors to Autopilot System*, WALL STREET JOURNAL (May 14, 2018), https://www.wsj.com/articles/tesla-considered-adding-eye-tracking-and-steering-wheel-sensors-to-autopilot-system-1526302921
[60] M. Blanco *et al*, *Human Factors Evaluation of Level 2 and Level 3 Automated Driving Concepts*, (Report No. DOT HS 812 812), pages 10-11, NAT'L HIGHWAY TRAFFIC SAFETY ADMIN (Aug. 2015), https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/812182_humanfactorseval-l2l3-automdrivingconcepts.pdf
[61] Ianthe Jeanne Dugan and Mike Spector, *Tesla's Push to Build a Self-Driving Car Sparked Dissent Among Its Engineers,* WALL STREET JOURNAL (Aug. 24, 2017), https://www.wsj.com/articles/teslas-push-to-build-a-self-driving-car-sparks-dissent-among-its-engineers-1503593742

Center for Auto Safety and Consumer Watchdog Letter to FTC on Tesla Deceptive Practices – July 2019

<u>Levels of Autonomous Vehicle Automation and Advertising</u>

NHTSA has provided nonbinding guidance on autonomous vehicles (AVs) on three occasions—in September 2016,[62] September 2017,[63] and October 2018.[64] This guidance continues to indicate that the U.S. Department of Transportation intends to use SAE International's Levels of Automation to define the autonomous capabilities of motor vehicles.[65] Only vehicles with Level 1 or 2 autonomous capabilities are currently available for sale in the United States. Such vehicles have at most "partial automation," which means that "the driver must remain engaged with the driving task and monitor the environment at all times."[66] Level 3 vehicles are described as those in which the "Driver is a necessity, but is not required to monitor the environment. The driver must be ready to take control of the vehicle at all times *with notice*" (emphasis added).[67] Thus, if an automaker markets or advertises its vehicles as being capable of Level 3 automation or higher, when in fact those vehicles are only capable of Level 2 automation, the automaker is deceiving consumers, regardless of whether the SAE Levels of Automation are explicitly mentioned.

Several automotive manufacturers sell Level 2 vehicles for use by U.S. consumers. Most of these manufacturers market their vehicles as having "driver assistance" or "active safety" features.[68] Notably, these manufacturers do not make any claims about their vehicles being "self-driving" or "fully autonomous" or even "autonomous." Generally, these vehicles can maintain their position in lanes at highway speeds, accelerating or decelerating in response to surrounding traffic (adaptive cruise control), automatically braking to avoid collisions under certain circumstances, passing other vehicles when requested by the driver, and assisting the driver with parking.

<u>Conclusion</u>

Tesla's representations of its Autopilot feature continue to violate Section 5 of the FTC Act because they are materially deceptive as they are likely to mislead consumers into reasonably believing that their vehicles have self-driving or autonomous capabilities.[69] Thus, those consumers behave as if Autopilot is more than a driver assistance feature that requires them to

---

[62] *Federal Automated Vehicles Policy: Accelerating the Next Revolution in Roadway Safety,* NAT'L HIGHWAY TRAFFIC SAFETY ADMIN (2016), https://www.transportation.gov/sites/dot.gov/files/docs/AV%20policy%20guidance%20PDF.pdf
[63] *Automated Driving Systems: A Vision for Safety* 2.0, NAT'L HIGHWAY TRAFFIC SAFETY ADMIN. (2017), https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/documents/13069a-ads2.0_090617_v9a_tag.pdf
[64] *Preparing for the Future of Transportation: Automated Vehicles 3.0*, NAT'L HIGHWAY TRAFFIC SAFETY ADMIN. (2018), https://www.transportation.gov/sites/dot.gov/files/docs/policy-initiatives/automated-vehicles/320711/preparing-future-transportation-automated-vehicle-30.pdf
[65] *Id* at vi.
[66] NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., *supra* note 2, at 4.
[67] *Id*. at 4.
[68] For examples of language used by Tesla's competitors, *see* Audi, https://www.audiusa.com/technology/intelligence/adaptive-cruise-assist; Toyota, https://www.toyota.com/safety-sense/animation/drcc; Cadillac, https://www.cadillac.com/world-of-cadillac/innovation/super-cruise; Honda, https://automobiles.honda.com/sensing
[69] The Center for Auto Safety believes Tesla's acts are also violative of some state unfair and deceptive acts and practices statutory protections and will be contacting a variety of state Attorneys General to request state action be taken in addition to a possible federal investigation.

Center for Auto Safety and Consumer Watchdog Letter to FTC on Tesla Deceptive Practices – July 2019

constantly monitor the driving environment and be ready to take control of the vehicle *without notice*. Both Tesla's and Elon Musk's public statements regarding Autopilot mislead and deceive consumers.

Sadly, at least three of Tesla's consumers have now died in the United States, and at least one has been injured, and in each instance Autopilot was likely a contributing factor. In the sole crash that the NTSB has been able to fully analyze, the board attributed a lack of understanding of Autopilot's capabilities to the death of one of these consumers. The FTC's failure to pursue this issue continues to endanger consumers as well as other drivers and pedestrians exposed to Tesla vehicles with Autopilot systems that are misused. The FTC must act and investigate Tesla's unfair and deceptive practices so that consumers have accurate information, understand the limitations of Autopilot, and conduct themselves appropriately and safely. The Center for Auto Safety and Consumer Watchdog urge the FTC to begin a timely investigation to prevent further tragedies.

Sincerely,

Jason Levine
Executive Director
Center for Auto Safety

Adam Scow
Senior Advocate
Consumer Watchdog

cc:   Commissioner Noah Phillips
      Commissioner Rohit Chopra
      Commissioner Rebecca Slaughter
      Commissioner Christine Wilson
      April Tabor, FTC Secretary
      Andrew Smith, Director, FTC Bureau of Consumer Protection

**EXHIBIT "8"**



U.S. Department
of Transportation

**National Highway
Traffic Safety
Administration**

1200 New Jersey Avenue SE.
Washington, DC  20590

August 31, 2021

<u>**SENT VIA E-MAIL**</u>

**Eddie Gates**                                                                                    NEF-104
**Director, Field Quality**                                                              PE21-020
**Tesla, Inc.**
**45500 Fremont Blvd.**
**Fremont, CA 94538**

Dear Mr. Gates:

This letter is to inform you that the Office of Defects Investigation (ODI) of the National
Highway Traffic Safety Administration (NHTSA) has opened a Preliminary Evaluation
(PE21-020) to investigate crashes involving first responder scenes and vehicles manufactured by
Tesla, Inc. (Tesla) that were operating in either Autopilot or Traffic Aware Cruise Control
leading up to the incident, and to request certain information.

This office is aware of twelve incidents where a Tesla vehicle operating in either Autopilot or
Traffic Aware Cruise Control struck first responder vehicles / scenes, leading to injuries and
vehicle damage. In each case, NHTSA has reviewed the incidents with Tesla. A list of the twelve
incidents has been included for reference.

Unless otherwise stated in the text, the following definitions apply to these information requests:[1]

- <u>**Level 2 ADAS:**</u> a driver support feature (Advanced Driver Assistance System) on the
vehicle that can control both steering and braking/accelerating simultaneously under
some circumstances. The human driver must remain fully and continuously engaged in
the (Level 2) driving task.[2]

- <u>**ODD:**</u> Operational Design Domain or operating conditions under which a given driving
automation system or feature thereof is specifically designed to function, including, but

---

[1] Unless otherwise specified herein, any terms in these information requests that relate to an Advanced Driver
Assistance System (ADAS), including the SAE International levels of driving automation, should be construed to
have the same meaning as any overlapping term defined in NHTSA First Amended Standing General Order 2021-
01, which is located at https://www.nhtsa.gov/sites/nhtsa.gov/files/2021-
08/First_Amended_SGO_2021_01_Final.pdf
[2] "Level 2" means the same as and is coterminous with the definition of "Level or Category 2 - Partial Driving
Automation" in SAE J3016 Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-
Road Motor Vehicles § 5.3 (April 2021).

not limited to, environmental, geographical, and time-of-day restrictions, and/or the requisite presence or absence of certain traffic or roadway characteristics.[3]

- **DDT:** Dynamic Driving Task or all of the real-time operational (lateral and longitudinal movement of vehicle) and tactical (planning component) functions required to operate a vehicle in on-road traffic, excluding the strategic functions such as trip scheduling and selection of destinations and waypoints, and including without limitation:
  - Lateral vehicle motion control via steering (operational);
  - Longitudinal vehicle motion control via acceleration and deceleration (operational);
  - Monitoring the driving environment via object and event detection, recognition, classification, and response preparation (operational and tactical);
  - Object and event response execution (operational and tactical);
  - Maneuver planning (tactical); and
  - Enhancing conspicuity via lighting, signaling and gesturing, etc. (tactical).[4]

- **OEDR:** Object and event detection and response or the subtasks of the DDT that include monitoring the driving environment (detecting, recognizing, and classifying objects and events and preparing to respond as needed) and executing an appropriate response to such objects and events (i.e., as needed to complete the DDT and/or DDT fallback).[5]

- **Subject System**: Suite of software, hardware, data, and any other related systems on or off the vehicle that contributes to the conferral of any Level 2 capabilities on any Tesla vehicle, including but not limited to the various "Autopilot" packages.

- **Subject Vehicles:** All Tesla vehicles, model years 2014 - 2021, equipped with the subject system at any time, and manufactured for sale or lease in the United States, including, but not limited to, the District of Columbia, and current U.S. territories and possessions.

- **Subject Crashes**: Incidents in which any subject vehicle experiences a crash in the United States (including any of its territories) with the subject system engaged at any time during the period beginning 30 seconds immediately prior to the commencement of the crash.

- **Tesla:** Tesla, Inc. all of its past and present officers and employees, whether assigned to its principal offices or any of its field or other locations, including all of its divisions, subsidiaries (whether or not incorporated) and affiliated enterprises and all of their

---

[3] "ODD" means the same as and is coterminous with the definition of "Operational Design Domain" in SAE J3016 Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles § 3.22 (April 2021).

[4] "DDT" means the same as and is coterminous with the definition of "Dynamic Driving Task" in SAE J3016 Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles § 3.13 (April 2021).

[5] "OEDR" means the same as and is coterminous with the definition of "Object and Event Detection and Response" in SAE J3016 Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles § 3.20 (April 2021).

headquarters, regional, zone and other offices and their employees, and all agents, contractors, consultants, attorneys and law firms and other persons engaged directly or indirectly (e.g., employee of a consultant) by or under the control of Tesla (including all business units and persons previously referred to), who are or, in or after January 1st, 2011 were involved in any way with any of the following related to the alleged defect in the subject vehicles:

a. Design, engineering, analysis, modification or production (e.g. quality control);
b. Testing, assessment or evaluation;
c. Consideration, or recognition of potential or actual defects, reporting, record-keeping and information management, (e.g., complaints, field reports, warranty information, part sales), analysis, claims, or lawsuits; or
d. Communication to, from or intended for zone representatives, fleets, dealers, or other field locations, including but not limited to people who have the capacity to obtain information from dealers.

- **Document:** "Document(s)" is used in the broadest sense of the word and shall mean all original written, printed, typed, recorded, or graphic matter whatsoever, however produced or reproduced, of every kind, nature, and description, and all non-identical copies of both sides thereof, including, but not limited to, papers, letters, memoranda, correspondence, communications, electronic mail (e-mail) messages (existing in hard copy and/or in electronic storage), faxes, mailgrams, telegrams, cables, telex messages, notes, annotations, working papers, drafts, minutes, records, audio and video recordings, data, databases, other information bases, summaries, charts, tables, graphics, other visual displays, photographs, statements, interviews, opinions, reports, newspaper articles, studies, analyses, evaluations, interpretations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, instructions, blueprints, drawings, as-builts, changes, manuals, publications, work schedules, journals, statistical data, desk, portable and computer calendars, appointment books, diaries, travel reports, lists, tabulations, computer printouts, data processing program libraries, data processing inputs and outputs, microfilms, microfiches, statements for services, resolutions, financial statements, governmental records, business records, personnel records, work orders, pleadings, discovery in any form, affidavits, motions, responses to discovery, all transcripts, administrative filings and all mechanical, magnetic, photographic and electronic records or recordings of any kind, including any storage media associated with computers, including, but not limited to, information on hard drives, floppy disks, backup tapes, and zip drives, electronic communications, including but not limited to, the Internet and shall include any drafts or revisions pertaining to any of the foregoing, all other things similar to any of the foregoing, however denominated by Tesla, any other data compilations from which information can be obtained, translated if necessary, into a usable form and any other documents.  For purposes of this request, any document which contains any note, comment, addition, deletion, insertion, annotation, or otherwise comprises a non-identical copy of another document shall be treated as a separate document subject to production. In all cases where original and any non-identical copies are not available, "document(s)" also means any identical copies of the original and all non-identical copies thereof.  Any document, record, graph, chart, film or photograph originally produced in color must be provided in color.  Furnish all documents whether verified by Tesla or not.  If a document

is not in the English language, provide both the original document and an English translation of the document.

- **Other Terms:**  To the extent that they are used in these information requests, the terms "claim," "consumer complaint," "dealer field report," "field report," "fire," "fleet," "good will," "make," "model," "model year," "notice," "property damage," "property damage claim," "rollover," "type," "warranty," "warranty adjustment," and "warranty claim," whether used in singular or in plural form, have the same meaning as found in 49 CFR 579.4.

In order for my staff to evaluate the alleged defect, certain information is required.  Pursuant to 49 U.S.C. § 30166, please provide numbered responses to the following information requests. Insofar as Tesla has previously provided a document to ODI, Tesla may produce it again or identify the document, the document submission to ODI in which it was included and the precise location in that submission where the document is located.  When documents are produced, the documents shall be produced in an identified, organized manner that corresponds with the organization of this information request letter (including all individual requests and subparts). When documents are produced and the documents would not, standing alone, be self-explanatory, the production of documents shall be supplemented and accompanied by explanation.

Please repeat the applicable request verbatim above each response.  After Tesla's response to each request, identify the source of the information and indicate the last date the information was gathered.

1. State, by model and model year, the number of subject vehicles Tesla has manufactured for sale or lease or operation in the United States.  Separately, for each subject vehicle manufactured to date by Tesla, state the following:

   a. Vehicle identification number (VIN);
   b. Model;
   c. Model Year;
   d. Subject component trade / trim name, part number and design version installed as original equipment; including:
      i)   Software version;
      ii)  Firmware version;
      iii) Hardware version;
   e. Date of manufacture;
   f. Date warranty coverage commenced;
   g. Date and mileage at which the "Full Self Driving" (FSD) option was enabled;
   h. The State in the United States where the vehicle was originally sold or leased (or delivered for sale or lease);
   i. Latest known vehicle mileage and commensurate date;
   j. Cumulative mileage covered with the subject system engaged; and
   k. Date and identities of the most recent software, firmware, and hardware updates.

5

Provide the table in Microsoft Access 2010, or a compatible format, entitled "PRODUCTION DATA."

2.  State the number of each of the following, received by Tesla, or of which Tesla is otherwise aware, which relate to, or may relate to the subject system or subject crashes in the subject vehicles:
    a.  Consumer Complaints;
    b.  Field Reports;
    c.  Reports involving a crash, injury or fatality;
    d.  Property damage claims;
    e.  Third-party arbitration proceedings where Tesla is or was a party to the arbitration; and
    f.  Lawsuits, both pending and closed, in which Tesla is or was a defendant or codefendant.

    For subparts "a" through "f" state the total number of each item (e.g., consumer complaints, field reports, etc.) separately.  Multiple incidents involving the same vehicle are to be counted separately.  Multiple reports of the same incident are also to be counted separately (i.e., a consumer complaint and a field report involving the same incident in which a crash occurred are to be counted as a crash report, a field report and a consumer complaint).

    In addition, for items "e" and "f", provide a summary description of the alleged problem and causal and contributing factors and Tesla's assessment of the problem, with a summary of the significant underlying facts and evidence.  For items "e" and "f," identify the parties to the action, as well as the caption, court, docket number, and date on which the complaint or other document initiating the action was filed.

3.  Separately, for each item (complaint, report, claim, notice, or matter) within the scope of your response to Request No. 2, state the following information:

    a.  Tesla's file number or other identifier used;
    b.  The category of the item, as identified in Request No. 2 (i.e., consumer complaint, field report, etc.);
    c.  Vehicle owner or fleet name (and fleet contact person), street address, email address and telephone number;
    d.  Vehicle's VIN;
    e.  Vehicle's model and model year;
    f.  Vehicle's mileage at time of incident;
    g.  Software, firmware, and hardware versions in place at the time of the incident, along with vehicle and mileage and date of installation;
    h.  Incident date, local time, and local time zone;
    i.  Report or claim date;
    j.  Whether a crash is alleged;
    k.  Description of the crash including:
        i)   Crash site coordinates (latitude and longitude);
        ii)  Listing of involved vehicles, objects and persons;
        iii) Speed and direction of the subject vehicle;
        iv)  Documented subject vehicle driver impairment;

> v) Location / orientation of the subject vehicle in relation to other involved vehicles, objects, persons at the time of impact;
> vi) Timing of subject system engagement / disengagement over the 30 second period leading to the subject crash and, if not:
> > (1) Description and timing of driver control inputs that may have overridden the subject system;
> vii) Description of the intervention of:
> > (1) crash warning or avoidance systems (e.g., AEB, FCW)
> > (2) subject system logic intended to detect first responder vehicles / scenes on or off the roadway;
> l. Description and timing of the last driver engagement warning prior to the subject crash;
> m. Duration (minutes) and distance (miles) of the drive cycle that led to the subject crash;
> n. Whether property damage is alleged;
> o. Number of alleged injuries, if any; and
> p. Number of alleged fatalities, if any.

Provide this information in Microsoft Access 2010, or a compatible format, entitled "REQUEST NUMBER TWO DATA."

4. Produce copies of all documents, telematics reports / data, and data logs related to each item within the scope of Request No. 2.  Organize the documents separately by category (i.e., consumer complaints, field reports, etc.) and describe the method Tesla used for organizing the documents.  Describe in detail the search methods and search criteria used by Tesla to identify the items in response to Request No. 2.

In addition, provide a full copy of any expert report that has been produced by Tesla or received from another party in a lawsuit, arbitration, or a pre-suit claim regarding the incidents identified in Request Number 2. This includes any reports produced or exchanged for experts designated by any party in such litigation, including Tesla, plaintiff(s), or co-defendants. This does not include reports that Tesla has never produced to another party, to the extent Tesla claims a privilege exists for such a report.

5. For each trade name / trim level of the subject system available in the subject vehicles, state its name and designation including:

> a. Describe the ODD specified to the customer by Tesla for the intended use of the system, including but not limited to:
> > i) Types of roads, road marking, weather conditions, etc. the system is intended to be used on and the types of roads the system should not be used;
> > ii) List the methods and technologies used to prevent subject system usage outside the ODD specified to the customer by Tesla; and
> > iii) If the subject system can be engaged (or remain engaged) outside of the ODD specified to the customer by Tesla, state the reasons for this capability and describe any performance restrictions or modifications to the subject system's operational characteristics in such an environment (e.g. slower maximum speeds or control authority, additional driver warnings, adjustments to the driver engagement system).

b. Describe the subject system's maximum control authority over steering (steering angle (degrees), rate (degrees / sec), lateral acceleration (g)), braking (g), and acceleration (g) functions during routine and crash-imminent operations. Separately include any additional conditions and control authority values that Tesla deems appropriate.

c. List and describe the information, system status, alerts, warnings, and graphics communicated by the subject vehicle to its driver during the DDT (e.g., warning lights, instrument panel animations, aural warnings, haptic warnings) during the following subject system operational conditions:
   i) Routine subject system operation;
   ii) Scenarios where the vehicle requires driver intervention (e.g., driver engagement needed, imminent ODD exit, system fault); and
   iii) When the subject vehicle detects that a crash is imminent.

d. Furnish an overview of Tesla's approach to the enforcement of driver engagement / attentiveness during the subject system's operation in the subject vehicles. Include a description of all means of detecting (both through direct measurement and inference) / monitoring driver engagement / attentiveness including:
   i) The technological means and related logic (including direct measurement or inference) used to sense driver engagement / attentiveness;
   ii) Minimum contact or detected engagement duration and time between contact / detected engagement required to satisfy the driver engagement / attentiveness logic including changes based on variations in driving conditions such as vehicle speed or presence of a lead vehicle;
   iii) Describe any warning strategies or messaging and timing associated with each system identified above in subpart (ii) (include pictures/videos of all audible & visual warnings/alerts); and
   iv) Describe any escalation or lockout strategies used to address either unresponsive drivers or repeated engagement warnings in any given drive cycle.

e. Describe subject system responses to driver control inputs that could cancel or override one or more of its Level 2 functions. For each driver input, include:
   i) Driver input description and minimum threshold (e.g., minimum steering angle or rate);
   ii) List the Level 2 functions disabled and permitted to continue operation following a driver override;
   iii) Describe / illustrate warnings and messages to the driver concerning the system status following a driver override; and
   iv) Explain which, if any, of the disabled Level 2 functions resume operation in their own after the override input and under what conditions.

f. List the conditions / events / alerts that may prompt an operating subject system to require a "take-over" by the driver. For each such condition, list:
   i) Sequence of events and timing for each; and
   ii) Intended vehicle behavior in the instance where a driver take-over is not detected.

g. Describe the subject system OEDR capabilities within the ODD specified to the customer by Tesla. List the objects and events that the system is designed to detect (e.g., particular vehicle aspects, pedestrians, road signs, drivable space limitations, environmental (weather / road surface / lighting) conditions, path predictions, object classifications). For each item, list:
   i)  Subject system behavior;
   ii)  Limitations on detection; and
   iii) Subject system interaction with crash avoidance technologies.

6. Produce copies of all instructional, service, warranty, marketing, and other documents that relate to, or may relate to, the operation of each trade name / trim level of the subject system in the subject vehicles, that Tesla has issued to any customers, dealers, regional or zone offices, field offices, fleet purchasers, or other entities. This includes, but is not limited to, bulletins, advisories, informational documents, training documents, digital messages on a subject vehicle display, or other documents or communications, with the exception of standard shop manuals. Also, include the latest draft copy of any communication that Tesla is planning to issue within the next 120 days.

7. For each trade name / trim level of the subject system available in the subject vehicles, describe all modifications or changes made by, or on behalf of, Tesla in the design, material composition, manufacture, quality control, supply, function, or installation of the subject system, from the start of production to date, which relate to, or may relate to driver engagement / attentiveness and OEDR by the subject system in the subject vehicles. For each such modification or change, provide the following information:

   a. The date or approximate date on which the modification or change was incorporated into vehicle production;
   b. A detailed description of the modification or change;
   c. The reason(s) for the modification or change;
   d. The hardware, firmware, and software names and numbers of the original version;
   e. The hardware, firmware, and software names and numbers of the modified version;
   f. Primary distribution method of related firmware and software updates (over the air or in-person service); and
   g. When the modified version / update was made available as a service component.

   Also, provide the above information for any modification or change that Tesla is aware of which may be incorporated into vehicle production or pushed to subject vehicles in the field within the next 120 days.

8. Describe Tesla's strategies for detecting and responding to the presence of first responder / law enforcement vehicles and incident scene management tactics whether in or out of the roadway during subject system operation in the subject vehicles. Include:
   a. Incident scene detection (particularly flashing lights, road flares, cones / barrels, reflectorized vests on personnel, vehicles parked at an angle "fend-off" position");
   b. Explain the effects of low light conditions on these strategies; and
   c. List subject system behaviors (e.g., driver warnings, control interventions).

9.  Describe any processes, procedures, or policies governing the extent of testing and validation required prior to the release of the subject system or an in-field update to the subject system, including hardware and software components of such systems, identifying, in particular:

    a.  The extent of field testing or vehicle validation miles required prior to the release of such a system or feature;

    b.  The extent of any computer simulations or training data sets required to be conducted prior to the release of such a system or feature and the degree to which any such simulations are relied upon for testing and validation in lieu of field testing;

    c.  The extent to which the processes, procedures, or policies for the testing and validation identified above differ, if at all, for updates to a subject system or feature (e.g. software updates) compared to the first release of the system or feature;

    d.  The length of time that the processes, procedures, or policies for the testing and validation identified above have been in place; and

    e.  Any processes, procedures, or policies in place to compare the performance of a subject system or feature in the field after a release with the design intent for the system or feature.

10. Describe Tesla's processes for identifying and investigating the subject crashes in the subject vehicles with the subject system in operation including:

    a.  Vehicle's Data collection/logging capabilities including vehicle's ability to wirelessly transmit data including:

        i)  Any limitations on such transmittal (e.g. poor wireless connectivity, etc.)

        ii) Countermeasures / alternate retrieval options when transmittal limitations apply;

    b.  Procedures for investigating customer concerns or safety incidents; and

    c.  Metrics used to assess safety performance.

11. Furnish Tesla's assessment of the impact of the subject system on the subject crashes in the subject vehicle, including:

    a.  The causal or contributory factor(s);

    b.  The failure mechanism(s);

    c.  The failure mode(s);

    d.  The risk to motor vehicle safety that they pose; and

    e.  The crashes referenced by this inquiry.

**<u>Legal Authority for This Request</u>**

This letter is being sent to Tesla pursuant to 49 U.S.C. § 30166, which authorizes NHTSA to conduct any investigation that may be necessary to enforce Chapter 301 of Title 49 and to request reports and the production of things.  It constitutes a new request for information.

**<u>Civil Penalties</u>**

Tesla's failure to respond promptly and fully to this letter could subject Tesla to civil penalties pursuant to 49 U.S.C. § 30165 or lead to an action for injunctive relief pursuant to 49 U.S.C. § 30163.  (Other remedies and sanctions are available as well.)  The Vehicle Safety Act, as

amended, 49 U.S.C. § 30165(a)(3), provides for civil penalties of up to $22,992 per violation per day, with a maximum of $114,954,525 for a related series of daily violations, for failing or refusing to perform an act required under 49 U.S.C. § 30166. *See* 49 CFR 578.6 (as amended by Fixing America's Surface Transportation Act (the "FAST Act"), Pub. L. 114-94, § 24110(a)(2), 129 Stat. 1312 (Dec. 4, 2015)). This includes failing to respond completely, accurately, and in a timely manner to ODI information requests.

If Tesla cannot respond to any specific request or subpart(s) thereof, please state the reason why it is unable to do so. If on the basis of attorney-client, attorney work product, or other privilege, Tesla does not submit one or more requested documents or items of information in response to this information request, Tesla must provide a privilege log identifying each document or item withheld, and stating the date, subject or title, the name and position of the person(s) from, and the person(s) to whom it was sent, and the name and position of any other recipient (to include all carbon copies or blind carbon copies), the nature of that information or material, and the basis for the claim of privilege and why that privilege applies.

## Confidential Business Information

**All business confidential information must be submitted directly to the Office of Chief Counsel as described in the following paragraph and should not be sent to this office.** In addition, do not submit any business confidential information in the body of the letter submitted to this office. Please refer to PE21-020 in Tesla's response to this letter and in any confidentiality request submitted to the Office of Chief Counsel.

If Tesla claims that any of the information or documents provided in response to this information request constitute confidential commercial material within the meaning of 5 U.S.C. § 552(b)(4), or are protected from disclosure pursuant to 18 U.S.C. § 1905, Tesla must submit supporting information together with the materials that are the subject of the confidentiality request, in accordance with 49 CFR Part 512. Additional information can be found here:https://www.nhtsa.gov/coronavirus/submission-confidential-business-information.

If you have any questions regarding submission of a request for confidential treatment, contact Daniel Rabinovitz, Trial Attorney, Office of Chief Counsel at daniel.rabinovitz@dot.gov or (202) 366-8534.

## Due Date

Tesla's response to this letter, in duplicate, together with a copy of any confidentiality request, must be submitted to this office by **Friday, October 22, 2021**. Tesla's response must include all non-confidential attachments and a redacted version of all documents that contain confidential information. If Tesla finds that it is unable to provide all of the information requested within the time allotted, Tesla must request an extension from me at (202) 366-5226 no later than five business days before the response due date. If Tesla is unable to provide all of the information requested by the original deadline, it must submit a partial response by the original deadline with whatever information Tesla then has available, even if an extension has been granted.

Please send email notification to Steven Posada at STEVEN.POSADA@DOT.GOV and to ODI_IRresponse@dot.gov when Tesla sends its response to this office and indicate whether there is confidential information as part of Tesla's response.

If you have any technical questions concerning this matter, please call Steven Posada of my staff at (202) 366-9402.

Sincerely,

*Gregory Magno*

Gregory Magno, Chief
Vehicle Defects Division - D
Office of Defects Investigation

Incident List

| Date | City/County | State |
|---|---|---|
| 08/28/2021 | Orlando | FL |
| 07/10/2021 | San Diego | CA |
| 05/19/2021 | Miami | FL |
| 03/17/2021 | Lansing | MI |
| 02/27/2021 | Montgomery County | TX |
| 08/26/2020 | Charlotte | NC |
| 07/30/2020 | Cochise County | AZ |
| 01/22/2020 | West Bridgewater | MA |
| 12/29/2019 | Cloverdale | IN |
| 12/10/2019 | Norwalk | CT |
| 05/29/2018 | Laguna Beach | CA |
| 01/22/2018 | Culver City | CA |

**EXHIBIT "9"**



**U.S. Department
of Transportation**

**National Highway
Traffic Safety
Administration**

1200 New Jersey Avenue SE.
Washington, DC  20590

October 12, 2021

**SENT VIA E-MAIL**

Eddie Gates                                                                    NEF-104
Director, Field Quality                                                        PE21-020
Tesla, Inc.
45500 Fremont Blvd.
Fremont, CA 94538

Dear Mr. Gates,

This letter follows up recent discussions between our organizations and requests additional
information from Tesla with respect to two recent actions taken by your company. Tesla's late
September 2021 distribution of functionality to certain Tesla vehicle models intended to improve
detection of emergency vehicle lights in low light conditions, and Tesla's early October 2021
release of the Full Self-Driving Beta Request Menu option.

As Tesla is aware, the Safety Act imposes an obligation on manufacturers of motor vehicles and
motor vehicle equipment to initiate a recall by notifying NHTSA when they determine vehicles
or equipment they produced contain defects related to motor vehicle safety or do not comply
with an applicable motor vehicle safety standard. *See* 49 U.S.C. § 30118. This recall notice must
be filed with NHTSA no more than five working days after the manufacturer knew or should
have known of the safety defect or noncompliance. *See* 49 C.F.R. § 573.6(b); *see also United
States v. General Motors Corp.,* 656 F. Supp. 1555, 1559 n.5 (D.D.C. 1987). Any manufacturer
issuing an over-the-air update that mitigates a defect that poses an unreasonable risk to motor
vehicle safety is required to timely file an accompanying recall notice to NHTSA pursuant to 49
U.S.C. § 30118 and 49 C.F.R. Part 573.

Unless otherwise stated in the text, the following definitions apply to these information requests:

- **Subject System**: Suite of software, hardware, data, and any other related systems on or
  off the vehicle that contributes to the conferral of any Level 2 capabilities on any Tesla
  vehicle, including but not limited to the various "Autopilot" packages.

- **Subject Vehicles**: All Tesla vehicles, model years 2014 - 2021, equipped with the subject
  system at any time, and manufactured for sale or lease in the United States, including, but
  not limited to, the District of Columbia, and current U.S. territories and possessions.

- **Emergency Light Detection Update:** Updates distributed by Tesla beginning in September 2021 to certain Tesla vehicle models with the stated purpose of detecting flashing emergency vehicle lights in low light conditions and then responding to said detection with driver alerts and changes to the vehicle speed while Auto Pilot is engaged.

- **FSD:** means Tesla "Full Self-Driving," also referred to by Tesla as "Autosteer on City Streets."

- **FSD Beta Request:** In-vehicle menu update added by Tesla in October 2021 enabling owners to request consideration for future acceptance into Tesla's Full-Self Driving early access beta release including but not limited to: related in-vehicle menu options and Tesla's customer scoring and selection criteria.

- **Tesla:** Tesla, Inc. all of its past and present officers and employees, whether assigned to its principal offices or any of its field or other locations, including all of its divisions, subsidiaries (whether or not incorporated) and affiliated enterprises and all of their headquarters, regional, zone and other offices and their employees, and all agents, contractors, consultants, attorneys and law firms and other persons engaged directly or indirectly (e.g., employee of a consultant) by or under the control of Tesla (including all business units and persons previously referred to), who are or, in or after January 1st, 2011 were involved in any way with any of the following related to the alleged defect in the subject vehicles:
  a. Design, engineering, analysis, modification or production (e.g. quality control);
  b. Testing, assessment or evaluation;
  c. Consideration, or recognition of potential or actual defects, reporting, record-keeping and information management, (e.g., complaints, field reports, warranty information, part sales), analysis, claims, or lawsuits; or
  d. Communication to, from or intended for zone representatives, fleets, dealers, or other field locations, including but not limited to people who have the capacity to obtain information from dealers.

- **Document:** "Document(s)" is used in the broadest sense of the word and shall mean all original written, printed, typed, recorded, or graphic matter whatsoever, however produced or reproduced, of every kind, nature, and description, and all non-identical copies of both sides thereof, including, but not limited to, papers, letters, memoranda, correspondence, communications, electronic mail (e-mail) messages (existing in hard copy and/or in electronic storage), faxes, mailgrams, telegrams, cables, telex messages, notes, annotations, working papers, drafts, minutes, records, audio and video recordings, data, databases, other information bases, summaries, charts, tables, graphics, other visual displays, photographs, statements, interviews, opinions, reports, newspaper articles, studies, analyses, evaluations, interpretations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, instructions, blueprints, drawings, as-builts, changes, manuals, publications, work schedules, journals, statistical data, desk, portable and computer calendars, appointment books, diaries, travel reports, lists, tabulations, computer printouts, data processing program libraries, data processing inputs and outputs, microfilms, microfiches, statements for services, resolutions, financial statements,

3

governmental records, business records, personnel records, work orders, pleadings, discovery in any form, affidavits, motions, responses to discovery, all transcripts, administrative filings and all mechanical, magnetic, photographic and electronic records or recordings of any kind, including any storage media associated with computers, including, but not limited to, information on hard drives, floppy disks, backup tapes, and zip drives, electronic communications, including but not limited to, the Internet and shall include any drafts or revisions pertaining to any of the foregoing, all other things similar to any of the foregoing, however denominated by Tesla, any other data compilations from which information can be obtained, translated if necessary, into a usable form and any other documents. For purposes of this request, any document which contains any note, comment, addition, deletion, insertion, annotation, or otherwise comprises a non-identical copy of another document shall be treated as a separate document subject to production. In all cases where original and any non-identical copies are not available, "document(s)" also means any identical copies of the original and all non-identical copies thereof. Any document, record, graph, chart, film or photograph originally produced in color must be provided in color. Furnish all documents whether verified by Tesla or not.  If a document is not in the English language, provide both the original document and an English translation of the document.

- **Other Terms:**  To the extent that they are used in these information requests, the terms "claim," "consumer complaint," "dealer field report," "field report," "fire," "fleet," "good will," "make," "model," "model year," "notice," "property damage," "property damage claim," "rollover," "type," "warranty," "warranty adjustment," and "warranty claim," whether used in singular or in plural form, have the same meaning as found in 49 CFR 579.4.

In order for my staff to evaluate the alleged defect, certain information is required. Pursuant to 49 U.S.C. § 30166, please provide numbered responses to the following information requests. Insofar as Tesla has previously provided a document to ODI, Tesla may produce it again or identify the document, the document submission to ODI in which it was included and the precise location in that submission where the document is located. When documents are produced, the documents shall be produced in an identified, organized manner that corresponds with the organization of this information request letter (including all individual requests and subparts). When documents are produced and the documents would not, standing alone, be self-explanatory, the production of documents shall be supplemented and accompanied by explanation.

Please repeat the applicable request verbatim above each response.  After Tesla's response to each request, identify the source of the information and indicate the last date the information was gathered.

1. Furnish a chronology of events, internal investigations, and studies that led to Tesla's deployment of the Emergency Light Detection Update. Separately include:
   a. Dates, descriptions, and identifiers of all releases to the vehicle fleet whether operational or shadow mode; and

      b.  Listing and description of field incidents or other events that motivated the release of the Emergency Light Detection Update.

2. List the Tesla vehicle model / model year and any other distinguishing characteristics that received the Emergency Light Detection Update. Separately describe:
   a. The basis applied to defining the scope of covered vehicles;
   b. Any measures to extend this capability more broadly throughout Tesla's fleet; and
   c. Reasoning for instances where a vehicle cannot accept the Emergency Light Detection Update or related functionality.

3. For each of the applicable incidents cited in PE21-020 Information Request sent to Tesla on August 31, 2021, furnish Tesla's assessment of any changes to incident timing or outcome had the Emergency Light Detection Update been operational in the affected vehicle at the time of collision. Include any supporting analyses.

4. State whether Tesla intends to file a safety recall pursuant to 49 U.S.C. § 30118 covering vehicles that received the Emergency Light Detection Update. If not, please furnish Tesla's technical and/or legal basis for declining to do so.

5. Provide a copy of any agreement between Tesla and the owner of a subject vehicle involving vehicle repairs, access to software, upgrades to software, refund of the purchase price of a vehicle or software, or providing the vehicle owner with any other compensation, valuable consideration, or goodwill involving the subject system, including to resolve a lawsuit, arbitration, or other claim.

6. Furnish Tesla's criteria and timeline for allowing access to customers who have requested consideration in Tesla's FSD Beta Request process. Include detailed descriptions of all selection criteria and copies of supporting documents.

7. Supply a listing of the number of respondents who have opted in on the FSD Beta Request and the effective date and time for that figure.

8. For each vehicle equipped with FSD please provide:
   a. The vehicle identification number;
   b. The date on which FSD was installed on the vehicle; and
   c. Whether the vehicle owner is an employee of Tesla.

**Legal Authority for This Request**

This letter is being sent to Tesla pursuant to 49 U.S.C. § 30166, which authorizes NHTSA to conduct any investigation that may be necessary to enforce Chapter 301 of Title 49 and to request reports and the production of things. It constitutes a new request for information.

## Civil Penalties

Tesla's failure to respond promptly and fully to this letter could subject Tesla to civil penalties pursuant to 49 U.S.C. § 30165 or lead to an action for injunctive relief pursuant to 49 U.S.C. § 30163.  (Other remedies and sanctions are available as well.)  The Vehicle Safety Act, as amended, 49 U.S.C. § 30165(a)(3), provides for civil penalties of up to $22,992 per violation per day, with a maximum of $114,954,525 for a related series of daily violations, for failing or refusing to perform an act required under 49 U.S.C. § 30166.  See 49 CFR 578.6 (as amended by Fixing America's Surface Transportation Act (the "FAST Act"), Pub. L. 114-94, § 24110(a)(2), 129 Stat. 1312 (Dec. 4, 2015)). This includes failing to respond completely, accurately, and in a timely manner to ODI information requests.

If Tesla cannot respond to any specific request or subpart(s) thereof, please state the reason why it is unable to do so.  If on the basis of attorney client, attorney work product, or other privilege, Tesla does not submit one or more requested documents or items of information in response to this information request, Tesla must provide a privilege log identifying each document or item withheld, and stating the date, subject or title, the name and position of the person(s) from, and the person(s) to whom it was sent, and the name and position of any other recipient (to include all carbon copies or blind carbon copies), the nature of that information or material, and the basis for the claim of privilege and why that privilege applies.

## Confidential Business Information

**All business confidential information must be submitted directly to the Office of Chief Counsel as described in the following paragraph and should not be sent to this office.**  In addition, do not submit any business confidential information in the body of the letter submitted to this office. Please refer to PE21-020 in Tesla's response to this letter and in any confidentiality request submitted to the Office of Chief Counsel.

If Tesla claims that any of the information or documents provided in response to this information request constitute confidential commercial material within the meaning of 5 U.S.C. § 552(b)(4), or are protected from disclosure pursuant to 18 U.S.C. § 1905, Tesla must submit supporting information together with the materials that are the subject of the confidentiality request, in accordance with 49 CFR Part 512. Additional information can be found here: https://www.nhtsa.gov/coronavirus/submission-confidential-business-information.

If you have any questions regarding submission of a request for confidential treatment, contact Daniel Rabinovitz, Trial Attorney, Office of Chief Counsel at daniel.rabinovitz@dot.gov or (202) 366-8534.

**<u>Due Date</u>**

Tesla's response to this letter, in duplicate, together with a copy of any confidentiality request, must be submitted to this office by **November 1, 2021**. Tesla's response must include all non-confidential attachments and a redacted version of all documents that contain confidential information.  If Tesla finds that it is unable to provide all of the information requested within the time allotted, Tesla must request an extension from me at (202) 366-5226 no later than five business days before the response due date. If Tesla is unable to provide all of the information requested by the original deadline, it must submit a partial response by the original deadline with whatever information Tesla then has available, even if an extension has been granted.

Please send email notification to Steven Posada at STEVEN.POSADA@DOT.GOV and to ODI_IRresponse@dot.gov when Tesla sends its response to this office and indicate whether there is confidential information as part of Tesla's response.

If you have any technical questions concerning this matter, please call Steven Posada of my staff at (202) 366-9402.

Sincerely,

*Gregory Magno*

Gregory Magno, Chief
Vehicle Defects Division - D
Office of Defects Investigation

**EXHIBIT "10"**

1

2                UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF FLORIDA (MIAMI)

4     NEIMA BENAVIDES, as        )     Civil Case No.

5     Personal                   )     21-cv-21940-BLOOM

6     Representative of          )     /Otazo-Reyes

7     Naibel Benavides Leon,     )

8     deceased,                  )

9              Plaintiff,        )

10               v.              )

11    TESLA, INC., a/k/a         )

12    Tesla Florida, Inc.,       )

13             Defendant.        )

14

15              DEPOSITION OF GEORGE McGEE

16               Tuesday, March 15, 2022

17

18

19

20

21

22

23    Reported by:

24    Vanese Killingbeck, RPR, CRR

25    JOB NO. 207717

Page 174

McGee

1
2  why it was that you decided to purchase the Tesla.
3      A.   It was a pretty frustrating experience,
4  because, you know, on the personal level, my family
5  was living 100 miles from my office, despite the
6  fact if you travel some.  And so it became a very
7  large strain on my relationship with my wife,
8  clearly.  A pretty big strain on my office, my
9  business partner.  So effectively I was pulled in
10 multiple directions, my family, business, personal
11 life.  Everybody wanted me in one place, and I
12 happened to be nowhere all at once.  And so with
13 that, I had been looking for something to help make
14 the commute less painful, or I might be able to be
15 on the phone, work, et cetera, feel like, you know,
16 I'm more available in the car than when I'm kind of
17 knuckle on the -- on the steering wheel.
18     Q.   Okay.  Counsel talked to you about you
19 bought this electronically and maybe you watched
20 some videos or, you know, specifically, perhaps, the
21 media influenced you.  But I want to ask you much
22 more specifically about what your experience was
23 prior to buying the Tesla, okay?
24     A.   Okay.
25     Q.   All right.  So tell me, if you can recall,

Page 175

McGee

1
2  what videos or what information you received from
3  videos that gave you confidence in buying a Tesla
4  that would achieve ultimately what you just
5  described, more autonomy as you -- or the car had
6  more autonomy, giving you more freedom.
7      A.   Big picture, and even the ride taken, it
8  was the ability to help me navigate, because I find
9  that navigating is, you know, one of the things that
10 I was spending time trying to do.  I notice I could
11 get there or there were a couple different routes,
12 and going to South Florida when they were doing
13 construction on 95.  I found it was useful for that
14 to help me navigate, which was -- which was
15 frustrating, you know, big picture.  But that's kind
16 of -- if that answers your question.
17     Q.   Well, in terms of the autonomous
18 driving --
19     A.   Right.
20     Q.   -- and autopilot feature, what did that do
21 different in -- in providing you as it relates to
22 you wanting to have, you know, more time to do
23 things in the car that would be more productive?
24     A.   Right --
25          MR. BRANIGAN:  Objection to form.

Page 176

McGee

1
2          THE WITNESS:  Can I answer?
3          MR. LIRO:  Go ahead.  You can answer.
4      A.   I thought it would help me, again, if I
5  did miss seeing a parked car or something, not that
6  I planned to, obviously, it would then be there as
7  well as copilot, if you will.
8          So I viewed it as something to assist me
9  in my drive, and I was actually quite excited about
10 purchasing it for that reason despite the
11 disclaimers, because I believed it would help assist
12 me in being able to go on the highway and do a work
13 call or what have you.
14 BY MR. POSES:
15     Q.   The Maserati you had before this had had
16 Bluetooth, I assume.
17     A.   Yes, sir.
18     Q.   All right.  So tell me about what level
19 of -- what was different about the Tesla than the
20 Maserati besides -- because they both had Bluetooths
21 to talk hands-free.
22          What was different?
23     A.   Really the only -- to help steer and
24 direct the car in traffic.  I've seen quite a few
25 videos of people riding in them in California where

Page 177

McGee

1
2  there would be in traffic and -- now, it wasn't
3  correct -- but they were riding in the backseat or
4  what have you, and I don't know how they figured out
5  the steering wheel thing.  I don't care.  Wasn't
6  planning on doing that.  Generally believe myself to
7  be a safe driver.  But what was an average idea to
8  help me steer and stay in traffic.  Particularly on
9  a 100-mile commute when you generally encounter
10 quite a bit of traffic.  So on a good day, it's two
11 hours.  On a bad day, it's -- you guys live down
12 here, it's four hours.
13          And so with that stretch of highway in
14 Miami proper, and I'm unfortunately going from Boca
15 to Key Largo, unless you've got an aerial vehicle,
16 you risk massive traffic.  And so the other thing
17 that enamored me quite a bit was the ability to help
18 me in traffic.
19     Q.   Okay.  Now, from January from the time of
20 purchase up until the time this accident happened,
21 you spoke to us about the fact that you had -- you
22 said about 90 percent of the time on the drive; is
23 that right?
24     A.   Yes, sir.
25     Q.   Tell me about the other 10 percent and why

Page 178

McGee

1
2  you didn't use it, if you can recall.
3      A.   It's a good question.  I can't really
4  recall.  I was probably thinking it was, again,
5  primarily related to really quick, hey, ran to the
6  gas station.  Not really going to use autopilot for
7  that, or, as I mentioned, I think some of my office
8  drives, it actually was a great driving car as well.
9  Did my driving for 2.7 miles.
10     Q.   Okay.  So and maybe -- I think I got it
11 wrong then.  So when you -- you would use autopilot,
12 then, when you took the long drives; is that right?
13     A.   Oh, yes, sir.  Always.
14     Q.   Okay.
15     A.   Just thinking it -- I'm out driving,
16 90 percent of the time it was on.
17     Q.   I understand.  Okay.  In the times that
18 you used the autopilot in that three months or so,
19 have either of the autopilot, autosteer, or the
20 automatic braking system or collision avoidance,
21 these types of features, had they engaged
22 automatically while you were driving?
23          MR. BRANIGAN:  Objection to form.
24     A.   I feel like I had observed it working.
25 Right when I first purchased the car, I was more

Page 179

McGee

1
2  tentative about what it could or couldn't do.  I
3  never had one or driven one at that point.  And as I
4  spent more time with it, got more comfortable, I
5  thought, obviously not -- not on what it could and
6  couldn't do.
7  BY MR. POSES:
8      Q.   When you say you were tentative in the
9  beginning, talk to me about that.
10     A.   Meaning I was learning the new car and the
11 new technology.  Much like any other car, usually
12 it's a period of time for you to acclimate yourself
13 to the vehicle.  Given this had other features that
14 I was excited about, I was tentative about how they
15 might work.  And, again, I thought I learned how to
16 use them.
17     Q.   Tell me which features you're talking
18 about specifically.
19     A.   Primarily the autopilot, but I believe
20 that engages everything.  I'm not -- technically
21 accurate, I'm not sure, but I believe that engaged
22 everything.  So it was the autopilot generally,
23 which, like I said, I was recalling, and I hadn't
24 thought about this in a couple years.  I think you
25 tap twice on that little stick and it turns

Page 180

McGee

1
2  everything on.  Again, could be wrong, but that was
3  my recollection.
4      Q.   All right.  Just jumping around a little.
5  You testified earlier that you never looked at the
6  manual -- through the physical manual or online on
7  the dash; is that right?
8      A.   Yes, sir, I believe so.
9      Q.   Okay.  You went through a Maserati.  You
10 talked about your first car, a Prelude.
11     A.   Mm-hmm.
12     Q.   Mine too.
13     A.   Yeah.
14     Q.   And a Jeep that you rebuilt in '79.  Or at
15 least a '79 Jeep.
16     A.   Yes, sir.
17     Q.   And perhaps other vehicles that -- any of
18 those vehicles that you spent any time with the
19 owner's manual?
20     A.   No, sir.
21     Q.   Why not?
22     A.   Generally feel I usually have a pretty
23 good feel for cars and rightly or wrongly, I'm
24 probably someone who learns by experience and videos
25 and things.  I just read a lot of paper, period.

Page 181

McGee

1
2      Q.   All right.  Even the Jeep that you
3  rebuild, the owner's manual, you ever spend any time
4  with it?
5      A.   Definitely not.  Now, I did -- I did have
6  a book -- I still have it -- of how to assemble a
7  Jeep.  But I would say it's more of a repair manual
8  so I can take one apart, put it back together.  But
9  I, you know, didn't read the owner's manual for
10 that.
11     Q.   So you -- you took that Jeep apart and put
12 it back together absent the owner's manual entirely?
13     A.   Yes, sir.
14     Q.   Okay.  Have you, since the accident,
15 looked at the owner's manual to learn about this
16 Tesla any more so than you had taken the time to do
17 previously?
18     A.   No, sir.
19     Q.   You told me you bought the car -- you told
20 counsel and us you bought the car with an app or
21 electronically; is that right, on your phone?
22     A.   Yes, sir.
23     Q.   Tell me -- walk me through that.
24     A.   I had -- just putting -- sometimes make
25 impulsive purchases.  I wanted a car -- I've been

**EXHIBIT "11"**



U.S. Department of Transportation
**National Highway Traffic Safety
Administration**



1200 New Jersey Avenue SE.
Washington, DC 20590

October 12, 2021

<u>**CERTIFIED AND ELECTRONIC MAIL**</u>

Mr. Bill Berry
Vice President, Legal
Tesla, Inc.
3500 Deer Creek Road
Palo Alto, California 94304
bill.berry@tesla.com

Dear Mr. Berry:

In October 2020, Tesla released a feature called "Autosteer on City Streets" which the company also refers to as "Full Self-Driving" (FSD). FSD allows an equipped vehicle to drive to a destination chosen by the driver, expanding the use of "Navigate on Autopilot" to non-controlled surface streets. Tesla states that the system is able to detect and respond to stops signs and traffic signals and can carry out turns at intersections. To date, Tesla has released the feature to a limited number of employees and consumers pursuant to Tesla's early access beta release program, and is in the process of expanding access. Despite Tesla's characterization of FSD as "beta" it is capable of and is being used on public roads.

Recently, NHTSA has become aware of reports that participants in Tesla's FSD early access beta release program have non-disclosure agreements that allegedly limit the participants from sharing information about FSD that portrays the feature negatively, or from speaking with certain people about FSD. Given that NHTSA relies on reports from consumers as an important source of information in evaluating potential safety defects, any agreement that may prevent or dissuade participants in the early access beta release program from reporting safety concerns to NHTSA is unacceptable. Moreover, even limitations on sharing certain information publicly adversely impacts NHTSA's ability to obtain information relevant to safety.

In order to ensure that non-disclosure agreements regarding the FSD early access beta release do not interfere with NHTSA's ability to exercise its oversight responsibilities we are issuing the attached Special Order to Tesla.

NHTSA is charged under the National Traffic and Motor Vehicle Safety Act (Safety Act), 49 U.S.C. Chapter 301, with investigating potential defects that pose an unreasonable risk to motor vehicle safety. To carry out this responsibility it is imperative that NHTSA's access to relevant safety information is not hindered. To oversee compliance with the requirements of the

Safety Act and associated regulations, we are requiring that you provide the information in the attached Special Order.  You must respond in full to the requests in the enclosed Special Order by **November 1, 2021**.

If you do not timely or completely respond to the Requests in the Special Order, you may be subject to civil penalties of up to $22,992 per day.

If you have any questions, please contact Thomas Healy of my staff at (202) 366-7161 or thomas.healy@dot.gov.

Sincerely,

*Ann C Carlson*

Ann Carlson
Chief Counsel

cc:  Eric Williams, ewilliams@tesla.com
      Beth Mykytiuk, emykytiuk@tesla.com

3

**UNITED STATES DEPARTMENT OF TRANSPORTATION**
**NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION**
1200 New Jersey Avenue SE
Washington, DC 20590

_____

In re:                                                    )
                                                          )
PE21-020                                                  )
Tesla, Inc.                                               )
_____)

## SPECIAL ORDER DIRECTED TO TESLA, INC.

To:
Mr. Bill Berry
Vice President, Legal
Tesla, Inc.
3500 Deer Creek Road
Palo Alto, California 94304
bill.berry@tesla.com

This Special Order is issued by the National Highway Traffic Safety Administration

(NHTSA), an Operating Administration of the United States Department of Transportation,

pursuant to 49 U.S.C. § 30166(g)(1)(A) and 49 C.F.R. §§ 510.7-510.8.[1]

As described in the accompanying letter and based on currently available information,

NHTSA is concerned that Tesla may employ practices that could impede the agency's access to

safety-related information, including information relevant to NHTSA's above-referenced

investigation of Tesla vehicles.  This concern is based on available information that suggests

participants in the FSD early access beta release program may be prohibited or discouraged from

_____

[1] *See* 49 C.F.R. §§ 1.95, 501.8(d)(3) (delegations of authority).

4

sharing certain information relevant to the performance of FSD, and therefore may also be prevented or dissuaded from submitting information regarding the safety of FSD to NHTSA. Accordingly, this Special Order now demands certain information from Tesla.

Tesla's response to this Special Order must be provided to NHTSA's Office of Chief Counsel by November 1, 2021.  The response should be sent to Thomas Healy, Office of Chief Counsel, at Thomas.Healy@dot.gov or, for large submissions, through the DOT Secure Large File Transfer Solution system.[2]

Tesla's response must be signed under oath, *i.e.,* accompanied by a declaration, signed by a responsible officer of Tesla, stating that he/she has undertaken and directed an inquiry reasonably calculated to assure that the answers and production of documents are complete and correct, that he/she has caused the documents of Tesla to be searched diligently for information and documents responsive to this Special Order and produced them to NHTSA, and that the answers to the inquiries provided to NHTSA respond completely and correctly to this Special Order.  28 U.S.C. § 1746; 49 U.S.C. § 30166(g)(1)(A); 49 C.F.R. § 510.7.

Failure to respond fully or truthfully to this Special Order may result in a referral to the United States Department of Justice for a civil action to compel responses, and may subject Tesla to civil penalties of up to $22,992 per day, up to a maximum penalty of $114,954,525 for a related series of daily violations.  49 U.S.C. §§ 30163(a)(1), 30165(a)(3); 49 C.F.R. § 578.6(a)(3).  Falsifying or withholding information in response to this Special Order may also lead to criminal penalties of a fine or imprisonment of up to 15 years, or both.  49 U.S.C. § 30170(a)(1).

---

[2] In order to use the File Transfer System, please email Thomas.Healy@dot.gov for a link.

## <u>DEFINITIONS</u>

Unless otherwise stated in the text, the following definitions apply to the information

request set forth below:

- **<u>Tesla</u>**: means all of its past and present officers and employees, whether assigned to its principal offices or any of its field or other locations, including all of its divisions, parent corporations at any tier, subsidiaries (whether or not incorporated) at any tier, and affiliated enterprises and all of their headquarters, regional, zone and other offices and their employees, and all agents, contractors, consultants, attorneys and law firms and other persons engaged directly or indirectly (e.g., employee of a consultant) by or under the control of Tesla (including all business units and persons previously referred to).

- **<u>Agent:</u>** means an individual, such as a representative, who is authorized to act for or in place of another.

- **<u>Describe</u>:** means to provide, with respect to any act, occurrence, transaction, event, statement, communication, or conduct (hereinafter, collectively, "act"), all facts concerning any such act, including, but not limited to, a description of each act, and the date, the location, and the names and addresses of all persons involved.

- **<u>Early access beta release:</u>** means the capability to use FSD in a Tesla vehicle.

- **<u>Employee:</u>** means a person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance.

- **<u>FSD:</u>** means Tesla "Full Self-Driving," also referred to by Tesla as "Autosteer on City Streets."

- **<u>Officer:</u>** means a person who holds an office of trust, authority, or command, such as a person elected or appointed by the board of directors to manage the daily operations of a corporation, such as a CEO, president, secretary, or treasurer.

- **<u>You</u> or <u>Your:</u>** means Tesla or Tesla's.

- **<u>Non-disclosure agreement:</u>** Any agreement or license, whether signed or otherwise accepted, between Tesla and any participant in Tesla's FSD early access beta release program, including Tesla employees, that by its terms limits or discourages in any way the early access beta release participant from sharing information about or discussing, with any person outside of Tesla, any aspect of FSD.

6

- **Document:** "Document(s)" is used in the broadest sense of the word and shall mean all original written, printed, typed, recorded, or graphic matter whatsoever, however produced or reproduced, of every kind, nature, and description, and all non-identical copies of both sides thereof, including, but not limited to, papers, letters, memoranda, correspondence, communications, electronic mail (e-mail) messages (existing in hard copy and/or in electronic storage), faxes, mailgrams, telegrams, cables, telex messages, notes, annotations, working papers, drafts, minutes, records, audio and video recordings, data, databases, other information bases, summaries, charts, tables, graphics, other visual displays, photographs, statements, interviews, opinions, reports, newspaper articles, studies, analyses, evaluations, interpretations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, instructions, blueprints, drawings, as-builts, changes, manuals, publications, work schedules, journals, statistical data, desk, portable and computer calendars, appointment books, diaries, travel reports, lists, tabulations, computer printouts, data processing program libraries, data processing inputs and outputs, microfilms, microfiches, statements for services, resolutions, financial statements, governmental records, business records, personnel records, work orders, documents generated through litigation, arbitration, or mediation, pleadings, mediation statements, discovery in any form, affidavits, motions, responses to discovery, all transcripts, administrative filings and all mechanical, magnetic, photographic and electronic records or recordings of any kind, including any storage media associated with computers, including, but not limited to, information on hard drives, floppy disks, backup tapes, and zip drives, electronic communications, including but not limited to, the Internet and shall include any drafts or revisions pertaining to any of the foregoing, all other things similar to any of the foregoing, however denominated by Tesla, any other data compilations from which information can be obtained, translated if necessary, into a usable form and any other documents.  For purposes of this request, any document which contains any note, comment, addition, deletion, insertion, annotation, or otherwise comprises a non-identical copy of another document shall be treated as a separate document subject to production.  In all cases where original and any non-identical copies are not available, "document(s)" also means any identical copies of the original and all non-identical copies thereof.  Any document, record, graph, chart, film or photograph originally produced in color must be provided in color.  Furnish all documents whether verified by Tesla or not.  If a document is not in the English language, provide both the original document and an English translation of the document.

- **Other Terms:**  To the extent that they are used in these information requests, the terms "claim," "dealer field report," "field report," "fire," "fleet," "good will," "make," "model," "model year," "notice," "property damage," "property damage claim," "rollover," "type," "warranty," "warranty adjustment," and "warranty claim," whether used in singular or in plural form, have the same meaning as found in 49 C.F.R. § 579.4.

## INSTRUCTIONS

Please follow the instructions below when providing responses to the numbered information requests in the next section.

1.      Your response to the Special Order shall be sent to Office of the Chief Counsel (NCC-100), National Highway Traffic Safety Administration by email to Thomas Healy at Thomas.healy@dot.gov or through the DOT Secure Large File Transfer Solution system.[3]

2.      Please repeat the applicable request verbatim above your response.  After your response to each request, identify the source of the information and indicate the last date the information was gathered.

3.      When documents are produced and the documents would not, standing alone, be self-explanatory, the production of documents shall be supplemented and accompanied by explanation.  Please also be reminded that where a document responsive to a request is not in the English language, both the original document and an English translation of the document must be produced.

4.      You are required to respond to every request listed in this Special Order.  If you cannot respond to any specific request or subpart(s) thereof, please state the reason why you are unable to do so.  If you are unable to respond because you do not have all or any of the precise information needed to respond, provide an estimate.  If, on the basis of attorney-client, attorney work product, or other privilege, you do not submit one or more requested documents or items of information in response to this Special Order, you must provide a privilege log identifying each document or item withheld, and stating the date, subject or title, name and position of the

---

[3] In order to use the File Transfer System, please email Thomas.Healy@dot.gov for a link.

person(s) from, and the person(s) to whom it was sent, and the name and position of any other recipient (to include all carbon copies or blind carbon copies), the nature of that information or material, and the basis for the claim of privilege and why that privilege applies.

5.      After your response to each request, state whether you previously had any responsive documents that are no longer within your possession, custody, or control, including but not limited to because the documents were lost or destroyed.  If such documents ever existed: describe the documents; identify the reason that the documents are no longer in your possession, custody, or control; identify the date that you last had the documents; and identify who may have copies of such documents.

6.      If you claim that any of the information or documents provided in response to this Special Order constitutes confidential commercial material within the meaning of 5 U.S.C. § 552(b)(4), or is protected from disclosure pursuant to 18 U.S.C. § 1905, you must submit supporting information together with the materials that are the subject of the confidentiality request, in accordance with 49 C.F.R. Part 512, to the Office of Chief Counsel (NCC-100), National Highway Traffic Safety Administration as instructed below.

7.      To facilitate social distancing due to COVID-19, NHTSA is treating electronic submission as an acceptable method for submitting confidential business information (CBI) to the agency under 49 C.F.R. Part 512.[4]  Since Part 512 submissions are handled by NHTSA's Office of Chief Counsel, any Part 512 submission should be sent to the Office of Chief Counsel electronically.  Specifically, any CBI submissions sent via email should be sent to Thomas Healy at Thomas.Healy@dot.gov.

---

[4] *See* https://www.nhtsa.gov/coronavirus/submission-confidential-business-information.

At this time, regulated entities should not send a duplicate hardcopy of their electronic CBI submissions to DOT headquarters.  Please note that these modified submission procedures are only to facilitate continued operations while maintaining appropriate social distancing due to COVID-19.  Regular procedures for Part 512 submissions will resume upon further notice, when NHTSA and regulated entities discontinue operating primarily in telework status.

For questions about CBI issues, including these modified submission procedures, please contact Dan Rabinovitz in the Office of Chief Counsel at Daniel.Rabinovitz@dot.gov or 202-366-8534.

8.    All documents shall be produced electronically, as described below, in a common format (*e.g.*, Word, PDF, Microsoft Access) or other electronic formats commonly used by Tesla and discernable to NHTSA.

a.  Hard copy documents shall be imaged in PDF format. They shall be provided as multi-page PDFs with document level optical character recognition (OCR).

b.  Electronically Stored Information (ESI) shall be produced in native format (*e.g.*, Microsoft Excel) or converted to multi-page PDFs and produced along with document level OCR/extracted text.

c.  You shall organize the documents by request number and as instructed in the request to which it responds or, if no instruction is given in a request, in chronological order by project, report, or other similar categorization responsive to that numbered request.

d.  After the documents are so organized, and in sequential order to the request to which each responds, you shall apply Bates Numbers to the entire production.

e.  You shall produce an index that lists the title of each document produced, the

Bates Numbers on the document, and the request to which it corresponds.

9.      When a request calls for a detailed, narrative response, do not identify business records or other documents in lieu of providing a written narrative.  A response to a request for a written narrative that solely directs NHTSA to documents will be considered non-responsive, and may result in civil penalties. 49 U.S.C. §§ 30163(a)(1), 30165(a)(3); 49 C.F.R. § 578.6(a)(3). A response to a request for a detailed, narrative response that includes references to specific Bates Number(s) in addition to a written narrative will not be considered a violation of this Instruction.

10.      The singular includes the plural; the plural includes the singular.  The masculine gender includes the feminine and neuter genders; and the neuter gender includes the masculine and feminine genders.  "And" as well as "or" shall be construed either disjunctively or conjunctively, to bring within the scope of this Special Order all responses that might otherwise be construed to be outside its scope.  "Each" shall be construed to include "every" and "every" shall be construed to include "each."  "Any" shall be construed to include "all" and "all" shall be construed to include "any."  The use of a verb in any tense shall be construed as the use of the verb in a past or present tense, whenever necessary to bring within the scope of the document requests all responses which might otherwise be construed to be outside its scope.

11.      Tesla's response to this Special Order must be under oath, *i.e.,* accompanied by an declaration, signed by a responsible officer of Tesla, stating that he/she has undertaken and directed an inquiry reasonably calculated to assure that the answers and production of documents are complete and correct, that he/she has caused the documents of Tesla to be searched diligently for information and documents responsive to this Special Order and produced them to NHTSA,

and that the answers to the inquiries provided to NHTSA respond completely and correctly to this Special Order.

12.     The requests in this Special Order are deemed to be continuing in nature so as to require additional or amended responses from you should you obtain or become aware of any new, additional, or differing responsive information or documents.

## REQUESTS

1.   Describe the manner in which non-disclosure agreements between Tesla and FSD early access beta release program participants are executed, i.e. whether via acceptance of terms of use, electronic signature,  physical signature or by some other means.  State whether the manner in which Tesla employee and Tesla non-employee participants execute the FSD non-disclosure agreement differs.

2.   Provide a copy of any non-disclosure agreement(s) entered into with any non-employee participant in the early access beta release of FSD.

3.   Provide a copy of any non-disclosure agreement(s) entered into with any employee participant in the early access beta release of FSD.

4.   State whether Tesla requires vehicle owners to agree (whether through a contract, license or terms of use agreement, or otherwise) as a condition of use of Autopilot to any terms that would prevent or discourage vehicle owners from sharing information about or discussing any aspect of Autopilot with any person other than Tesla.  Produce a copy of any such agreement(s) with such terms.

Dated:  October 12, 2021

*Ann C Carlson*
_____
Ann Carlson
Chief Counsel

**EXHIBIT "3"**



**U.S. Department of Transportation**

**National Highway Traffic Safety Administration**

# ODI RESUME

OFFICE OF DEFECTS INVESTIGATION
IDI1339
**NHTSA**

Authentic US Government information
National Highway Traffic Safety Administration
uses a digital certificate to ensure
the content has remained unchanged

| | |
|---|---|
| **Investigation:** | PE 21-020 |
| **Date Opened:** | 08/13/2021 |
| **Investigator:** | Steven Posada |
| **Approver:** | Stephen Ridella |
| **Subject:** | Autopilot & First Responder Scenes |

**Reviewer:** Gregory Magno

## MANUFACTURER & PRODUCT INFORMATION

| | |
|---|---|
| **Manufacturer:** | Tesla, Inc. |
| **Products:** | 2014-2021 Tesla Model Y, Model X, Model S, Model 3 |
| **Population:** | 765,000 (Estimated) |

| | |
|---|---|
| **Problem Description:** | Subject vehicle crashes with in-road or roadside first responders. |

## FAILURE REPORT SUMMARY

| | ODI | Manufacturer | Total |
|---|---|---|---|
| **Complaints:** | 0 | TBD | 0 |
| **Crashes/Fires:** | 11 | TBD | 11 |
| **Injury Incidents:** | 7 | TBD | 7 |
| **Number of Injuries:** | 17 | TBD | 17 |
| **Fatality Incidents:** | 1 | TBD | 1 |
| **Number of Fatalities:** | 1 | TBD | 1 |

## ACTION / SUMMARY INFORMATION

**Action:**   ODI has opened a Preliminary Evaluation

**Summary:**

Since January 2018, the Office of Defects Investigation (ODI) has identified eleven crashes in which Tesla models of various configurations have encountered first responder scenes and subsequently struck one or more vehicles involved with those scenes. The incidents are listed at the end of this summary by date, city, and state.

Most incidents took place after dark and the crash scenes encountered included scene control measures such as first responder vehicle lights, flares, an illuminated arrow board, and road cones. The involved subject vehicles were all confirmed to have been engaged in either Autopilot or Traffic Aware Cruise Control during the approach to the crashes.

Autopilot is an Advanced Driver Assistance System (ADAS) in which the vehicle maintains its speed and lane centering when engaged within its Operational Design Domain (ODD). With the ADAS active, the driver still holds primary responsibility for Object and Event Detection and Response (OEDR), e.g., identification of obstacles in the roadway or adverse maneuvers by neighboring vehicles during the Dynamic Driving Task (DDT).

ODI has opened a Preliminary Evaluation of the SAE Level 2 ADAS system (Autopilot) in the Model Year 2014-2021 Models Y, X, S, and 3. The investigation will assess the technologies and methods used to monitor, assist, and enforce the driver's engagement with the dynamic driving task during Autopilot operation. The investigation will additionally assess the OEDR by vehicles when engaged in Autopilot mode, and ODD in which the Autopilot mode is functional. The investigation will also include examination of the contributing circumstances for the confirmed crashes listed below and other similar crashes.

Incident List

| Date | City/County | State |
|------|-------------|-------|
| 07/10/2021 | San Diego | CA |
| 05/19/2021 | Miami | FL |
| 03/17/2021 | Lansing | MI |
| 02/27/2021 | Montgomery County | TX |
| 08/26/2020 | Charlotte | NC |
| 07/30/2020 | Cochise County | AZ |
| 01/22/2020 | West Bridgewater | MA |
| 12/29/2019 | Cloverdale | IN |
| 12/10/2019 | Norwalk | CT |
| 05/29/2018 | Laguna Beach | CA |
| 01/22/2018 | Culver City | CA |

**EXHIBIT "4"**



**U.S. Department of Transportation**

**National Highway Traffic Safety Administration**

# ODI  RESUME

OFFICE OF DEFECTS INVESTIGATION
NHTSA

Authentic US Government Information
National Highway Traffic Safety Administration
uses a digital certificate to ensure
the content from remained unchanged

| | |
|---|---|
| **Investigation:** | EA 22-002 |
| **Prompted by:** | PE21-020 |
| **Date Opened:** | 06/08/2022 |
| **Investigator:** | Steven Posada |
| **Approver:** | Stephen Ridella |
| **Subject:** | Autopilot & First Responder Scenes |

**Reviewer:**    Gregory Magno

## MANUFACTURER & PRODUCT INFORMATION

| | |
|---|---|
| **Manufacturer:** | Tesla, Inc. |
| **Products:** | 2014-2022 Tesla Model Y, Model X, Model S, Model 3 |
| **Population:** | 830,000 (Estimated) |
| **Problem Description:** | Subject vehicle crashes with in-road or roadside first responders. |

## FAILURE REPORT SUMMARY

| | ODI | Manufacturer | Total |
|---|---|---|---|
| **Complaints:** | 0 | 0 | 0 |
| **Crashes/Fires:** | 14 | 0 | 14 |
| **Injury Incidents:** | 7 | 0 | 7 |
| **Number of Injuries:** | 15 | 0 | 15 |
| **Fatality Incidents:** | 1 | 0 | 1 |
| **Number of Fatalities:** | 1 | 0 | 1 |
| **Other*:** | 2 | 0 | 1 |

**\*Description of Other:** Collisions identified by Tesla in their response to NHTSA's April 2021 Information Request: Belmont CA, Mount Pleasant SC

## ACTION / SUMMARY INFORMATION

**Action:**    Open an Engineering Analysis.

**Summary:**

On August 13, 2021, NHTSA's Office of Defects Investigation (ODI) opened a Preliminary Evaluation (PE21-020) to assess the performance of Tesla's Autopilot system (a system characterized by Tesla as an SAE Level 2 driving automation system designed to support and assist the driver in performing the driving task) available in Tesla vehicles. The investigation opening was motivated by an accumulation of crashes in which Tesla vehicles, operating with Autopilot engaged, struck stationary in-road or roadside first responder vehicles tending to pre-existing collision scenes. Upon opening the investigation, NHTSA indicated that the PE would also evaluate additional similar circumstance crashes of Tesla vehicles operating with Autopilot engaged, as well as assess the technologies and methods used to monitor, assist, and enforce the driver's engagement with the dynamic driving task during Autopilot operation.

PE21-020 is upgraded to an Engineering Analysis (EA) to extend the existing crash analysis, evaluate additional data sets, perform vehicle evaluations, and to explore the degree to which Autopilot and associated Tesla systems may exacerbate human factors or behavioral safety risks by undermining the effectiveness of the driver's supervision. In doing so, NHTSA plans to continue its assessment of vehicle control authority, driver engagement technologies, and related human factors considerations.

The attached Detailed Summary further describes NHTSA's review to date and the basis for upgrade to an EA.

**PE21-020 Upgrade to EA22-002 Detailed Summary**

On August 13, 2021, NHTSA's Office of Defects Investigation (ODI) opened a Preliminary Evaluation (PE21-020) to assess the performance of Tesla's Autopilot system (a system characterized by Tesla as an SAE Level 2 driving automation system designed to support and assist the driver in performing the driving task) available in Tesla vehicles. The investigation opening was motivated by an accumulation of crashes in which Tesla vehicles, operating with Autopilot engaged, struck stationary in-road or roadside first responder vehicles tending to pre-existing collision scenes. Upon opening the investigation, NHTSA indicated that the PE would also evaluate additional similar circumstance crashes of Tesla vehicles operating with Autopilot engaged, as well as assess the technologies and methods used to monitor, assist, and enforce the driver's engagement with the dynamic driving task during Autopilot operation.

Between August 31, 2021, and September 13, 2021, NHTSA sent information request (IR) letters to Tesla and twelve other vehicle manufacturers, requesting production and field incident reporting data as well as information concerning the engineering and performance of their systems designated as Level 2.

On October 12, 2021, NHTSA sent two additional sets of requests to Tesla: (1) an IR letter to obtain information on the company's changes to subject vehicles' functionality through software updates intended to improve the detection of emergency vehicle lights in low light conditions; and (2) a Special Order (SO) to request information concerning Tesla's use of nondisclosure agreements with consumers whose vehicles were included in a Full Self-Driving (FSD) "beta" release program.

NHTSA augmented its PE21-020 analysis with crashes reported by Tesla in response to an IR letter sent on April 19, 2021, and via the Standing General Order (SGO) issued by NHTSA on June 29, 2021 (amended on August 5, 2021).

Collectively, these sources provide NHTSA with a significant number of complaints and   crashes involving vehicles equipped with systems designated as Level 2. Throughout the course of this investigation, NHTSA has prioritized the collection and review of this information.

NHTSA undertook a detailed review of the crash pattern that formed the principal basis for opening PE21-020: the eleven collisions of subject Tesla vehicles with other vehicles stopped at first responder scenes reported between January 2018 and July 2021. During this investigation, six additional such incidents were subsequently identified and added to the crash analysis: Three crashes (Orlando, Petaluma, Desert Center) involved first responder or crash attenuator trucks in the roadway and occurred after PE21-020 opened. A 2020 additional crash (El Paso) in which a police vehicle was struck was reported via the SGO in March 2022. Two additional 2021 crashes (Belmont and Mount Pleasant) involving a first responder and a crash attenuator truck, respectively, were reported to NHTSA in response to NHTSA's April 19, 2021, IR letter to Tesla. Further review of the Laguna Beach crash listed on the PE21-020 opening resume has led to its removal from this consideration because the struck vehicle was parked out of traffic with no lights illuminated. The Laguna Beach incident remains within NHTSA's broader crash analysis within this investigation.

The agency's analysis of these sixteen subject first responder and road maintenance vehicle crashes indicated that Forward Collision Warnings (FCW) activated in the majority of incidents immediately prior to impact and that subsequent Automatic Emergency Braking (AEB) intervened in approximately half of the collisions. On average in these crashes, Autopilot aborted vehicle control less than one second prior to the first impact.

All subject crashes occurred on controlled-access highways. Where incident video was available, the approach to the first responder scene would have been visible to the driver an average of 8 seconds leading up to impact. Additional forensic data available for eleven of the collisions indicated that no drivers took evasive action between 2-5 seconds prior to impact, and the vehicle reported all had their hands on the steering wheel leading up to the impact. However, most drivers appeared to comply with the subject vehicle driver engagement system as evidenced by the hands-on wheel detection and nine of eleven vehicles exhibiting no driver engagement visual or chime alerts until the last minute preceding the collision (four of these exhibited no visual or chime alerts at all during the final Autopilot use cycle).

During the PE, the agency also closely reviewed 191 crashes involving crash patterns not limited to the first responder scenes that prompted the investigation opening. Each of these crashes involved a report of a Tesla vehicle operating one of its Autopilot versions (Autopilot or Full-Self Driving, or associated Tesla features such as Traffic-Aware Cruise Control, Autosteer, Navigate on Autopilot, and Auto Lane Change). These crashes were identified from a variety of sources, such as IR responses, SGO reporting, SCI investigations, and Early Warning Reporting (EWR). These incidents, which are a subset of the total crashes reported, were identified for a particularly close review not only because sufficient data was available for these crashes to support a detailed evaluation, but also because the crash scenarios appeared characteristic of broader patterns of reported crashes or complaints in the full incident data.

A detailed review of these 191 crashes removed 85 crashes because of external factors, such as actions of other vehicles, or the available information did not support a definitive assessment. As a primary factor, in approximately half of the remaining 106 crashes, indications existed that the driver was insufficiently responsive to the needs of the dynamic driving task (DDT) as evidenced by drivers either not intervening when needed or intervening through ineffectual control inputs.

In approximately a quarter of the 106 crashes, the primary crash factor appeared to relate to the operation of the system in an environment in which, according to the Tesla owner's manual, system limitations may exist, or conditions may interfere with the proper operation of Autopilot components. For example, operation on roadways other than limited access highways, or operation while in low traction or visibility environments, such as rain, snow, or ice.

For all versions of Autopilot and road types, detailed car log data and enough additional detail was available for 43 of the 106 crashes. Of these, 37 indicated that the driver's hands were on the steering wheel in the last second prior to the collision.

Although this subset of crashes is not exhaustive, the crash review identified patterns in system performance and associated driver behavior across different sets of circumstances that enable the agency to identify areas of engineering inquiry that warrant an upgrade of this Preliminary Evaluation to an Engineering Analysis (EA).

With respect to driver behavior, during this PE, NHTSA examined information submitted by Tesla and peer manufacturers in response to an IR question that requested driver engagement and attentiveness strategies to the DDT during system operation designated as Level 2. Of those crashes involving first responder or roadside maintenance vehicles for which car log data existed, under the driver engagement strategy alerts were presented to only two of the drivers within 5 minutes of the crash. This suggests that drivers may be compliant with the driver engagement strategy as designed.

A driver's use or misuse of vehicle components, or operation of a vehicle in an unintended manner does not necessarily preclude a system defect. This is particularly the case if the driver behavior in question is foreseeable in light of the system's design or operation. For systems labeled as SAE Level 2 ADAS, important

design considerations include the ways in which a driver may interact with the system or the foreseeable ranges of driver behavior, whether intended or unintended, while such a system is in operation. This is because these systems still depend upon the driver to maintain supervisory responsibility for the DDT, whereas the vehicle features perform only a support role. As such, ensuring the system facilitates the driver's effective performance of this supervisory driving task presents an important safety consideration.

Accordingly, PE21-020 is upgraded to an Engineering Analysis to extend the existing crash analysis, evaluate additional data sets, perform vehicle evaluations, and to explore the degree to which Autopilot and associated Tesla systems may exacerbate human factors or behavioral safety risks by undermining the effectiveness of the driver's supervision. In doing so, NHTSA plans to continue its assessment of vehicle control authority, driver engagement technologies, and related human factors considerations.

Incident List (PE21-020 Opening)

| Date | City/County | State |
|------|-------------|-------|
| Jul 2021 | San Diego | CA |
| May 2021 | Miami | FL |
| Mar 2021 | Lansing | MI |
| Feb 2021 | Montgomery County | TX |
| Aug 2020 | Charlotte | NC |
| Jul 2020 | Cochise County | AZ |
| Jan 2020 | West Bridgewater | MA |
| Dec 2019 | Cloverdale | IN |
| Dec 2019 | Norwalk | CT |
| Jan 2018 | Culver City | CA |

Incident List (EA22-002 Upgrade)

| Date | City/County | State |
|------|-------------|-------|
| Jan 2022 | Desert Center | CA |
| Sep 2021 | Petaluma | CA |
| Aug 2021 | Orlando | FL |
| Apr 2021 | Belmont | CA |
| Jan 2021 | Mount Pleasant | SC |
| Nov 2020 | Houston | TX |

**EXHIBIT "5"**

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

TESLA, INC. a/k/a TESLA FLORIDA, INC.,    CASE NO. 2019-CA-009962

            Defendant/Appellant,

v.

KIM BANNER, as Personal Representative
of the ESTATE OF JEREMY BANNER,
deceased,

            Plaintiff/Appellee.

_____/

## NOTICE OF APPEAL

      NOTICE IS HEREBY GIVEN that Defendant, Tesla, Inc. a/k/a Tesla Florida, Inc., appeals

to the Fourth District Court of Appeal, the order of this Court, Order Granting Plaintiff's Motion

for Leave to Amend to Plead Punitive Damages, rendered November 17, 2023 by Circuit Judge

Reid P. Smith (copy attached). The nature of the order is a nonfinal order. The Court has

jurisdiction pursuant to Fla. R. App. P. 9.130(a)(3)(G).

<table>
<tr><td>

**DEREK L. SHAFFER**
(admitted pro hac vice)
**QUINN EMANUEL URQUHART**
**& SULLIVAN LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
Tel. (202) 538-8000/Fax: (202) 538-8100
derekshaffer@quinnemanuel.com

**LAURA N. FERGUSON**
Florida Bar No. 1047701
**QUINN EMANUEL URQUHART**
**& SULLIVAN LLP**
2601 S. Bayshore Drive, Suite 1500
Miami, Florida 33133
Tel. (305) 402-4880/Fax: (305) 901-2975
lauraferguson@quinnemanuel.com

</td><td>

/s/ *Wendy F. Lumish*
_____
**JOEL SMITH**
(admitted pro hac vice)
**ROBERT J. RUDOCK**
Florida Bar No. 365157
**WENDY F. LUMISH**
Florida Bar No. 334332
**WHITNEY V. CRUZ**
Florida Bar No. 800821
**BOWMAN AND BROOKE LLP**
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134
Tel. (305) 995-5600/Fax: (305) 995-6090
Joel.Smith@bowmanandbrooke.com
Robert.Rudock@bowmanandbrooke.com
Wendy.Lumish@bowmanandbrooke.com
Whitney.Cruz@bowmanandbrooke.com

</td></tr>
</table>

**ISAAC N. SAIDEL-GOLEY**
(pro hac vice pending)
**QUINN EMANUEL URQUHART**
**& SULLIVAN LLP**
111 Huntington Avenue, Suite 520
Boston, MA 02199
Tel. (617) 712-7100/Fax: (617) 712-7200
isaacsaidelgoley@quinnemanuel.com

*Attorneys for Defendant Tesla, Inc. d/b/a Tesla Florida, Inc.*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of Court through the Florida Courts eFiling Portal and served via e-mail on this 14th day of December 2023 to: **Lake H. Lytal, III, Esq., Daniel Jensen, Esq., Marc Hernandez, Esq.,** *Attorneys for Plaintiff/Appellee,* Lytal, Reiter, Smith, Ivey & Fronrath, 515 N. Flagler Drive, 10th Floor, West Palm Beach, FL 33401, Telephone: (561) 655-1990; tlytal@foryourrights.com; djensen@foryourrights.com; mhernandez@foryourrights.com.

/s/ *Wendy F. Lumish*
**WENDY F. LUMISH**

2

IN THE CIRCUIT COURT IN AND FOR
PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION: "AH"
CASE NO.: 50-2019-CA-009962-XXXX-MB

KIM BANNER,
     Plaintiff/Petitioner
vs.
FIRSTFLEET INC OF TENNESSEE,
RICHARD KEITH WOOD,
TESLA INC,
     Defendant/Respondents.
_____/

## ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO AMEND TO PLEAD PUNITIVE DAMAGES

**(It is HEREBY ORDERED that the Clerk shall keep the following orders confidential except from the parties to the case until further order of the Court.  This is in compliance with the prior Order of Protective Order filed July 15, 2020 (DE # 76).**

    **THIS CAUSE** came on for consideration before this Court on September 18, 2023 on the Plaintiff's Motion for Leave to Amend to Plead Punitive Damages. This Court having reviewed the Court file in its entirety, reviewed the submissions and evidence by both the Plaintiff and the Defendant, reviewed all the applicable case law and statutory authority provided by the Plaintiff and the Defendant, heard the arguments from both the Plaintiff and the Defendant at the Omnibus Motion Hearings on September 18, 2023, reviewed all supplemental authority provided by both the Plaintiff and the Defendant and otherwise being fully advised in the premises hereby **GRANTS** the Plaintiff's Motion for Leave to Amend to Plead Punitive Damages and makes the following findings in support thereof:

## STATEMENT OF THE CASE AND RELEVENT FACTS

I. **Mr. Banner and his Tesla**

    This case stems from an automobile accident, which occurred on or about

March 1, 2019 in the city of Delray Beach, Palm Beach County, Florida. The immediate facts surrounding the actual crash are largely not in dispute. The accident occurred in the outside southbound lane of State Road 7, County Road 441 in the early morning hours. On that morning, the deceased in this case, Jeremy Banner (Banner) occupied his 2018 Tesla Model 3 sedan from the driver's seat. Banner purchased the Tesla Model 3 with an optional package called "Enhanced Autopilot." Mr. Banner did not purchase the "Full Self Driving Capability Package." "Enhanced Autopilot" package was an upgrade over the standard "Autopilot" package. The "Enhanced Autopilot" package included several premium features, two of which were named "Traffic Aware Cruise Control (TACC)" and "Autosteer." The Tesla also employed a steering wheel torque system as a means of monitoring driver inattention. By all accounts in the record Banner was an extremely educated and highly technically proficient person in all areas of computers and technology.

The 2018 Tesla Model 3 was classified as a "level 2" autonomous vehicle based on the classifications of the Society of Automotive Engineers (SAE). It was, and is still, the highest level of vehicle available on the market for consumer purchase. However, the reality is that a "level 2" vehicle is not a fully autonomous vehicle and does require does human interaction to safely and fully control. On the morning of the crash, Banner left for work in his Tesla, traveling southbound on State road 7. As he approached an access road just north of Boynton Beach Boulevard, a semi-tractor trailer driven by Richard Wood (Wood) approached State Road 7 from a west direction. As Wood approached the intersection, he failed to properly stop at a stop sign and drove through the south bound lanes on State Road 7 in an attempt to make a left hand turn to proceed north bound. At the time that Wood entered the path of travel of the south bound lane on State Road 7, Banner quickly approached from the north.

Approximately 10.2 seconds prior to the impact, Banner turned on the "TACC" function of his Tesla. At 9.2 seconds prior to the crash, Mr. Banner engaged the "Autosteer" function. As the Tesla approached an access road south of Boynton Beach, Boulevard, Mr. Wood was driving the tractor trailer in the east bound direction attempting to cross State Road 7. The evidence is undisputed that

Case No. 50-2019-CA-009962-XXXX-MB

Wood failed to stop at the stop sign and proceeded into the south bound lane as Mr. Banner approached from the north. At the time the Tesla approached the tractor trailer, the Tesla was traveling at a speed of 69 miles per hour. The Defendant submitted for the Court's review, the actual video from inside the Tesla. The video captured the sequence of events leading up to the crash to the point of impact. The Defendant also submitted a simulation of the crash, using multiple camera angles for the Court's review.

While is it is clear from the video from inside of the Tesla that the tractor trailer driven by Wood is visible, it is somewhat more difficult to see due to lighting conditions at that time. It is important to note that the lighting conditions on that morning were dimly lit dawn-like conditions, making the tractor trailer more difficult to see than had it been later in the day. At that time, Wood would likely have had a superior position of visibility being at a higher elevation than the Tesla.

At approximately 7.7 seconds prior to the accident, the Tesla no longer detected Banner's hands on the steering wheel. The Tesla utilized a "torque detection" system on the steering wheel as a means of attenuating driver inattention when "Autopilot" features were engaged. The Tesla quickly approached the tractor trailer from the north direction, never slowing or stopping, and impacted the tractor trailer approximate halfway on the side of the trailer. As the Tesla traveled underneath the tractor trailer it sheared the top portion of the Tesla off the vehicle and instantly killing Mr. Banner. This suit was initiated in 2019. The co-defendant Wood is no longer a party to this action, having settled his liability.

II. **Marketing Strategy by Tesla and CEO Elon Musk**

As part of her proffer, the Plaintiff presented a number of events and circumstances, predating Mr. Banner's death as proof that (1) the Tesla vehicle in question had a defective Autopilot system that was not fully tested for driving on roadways with cross-traffic; (2) Tesla was aware of problems with their Autopilot software and programed the vehicles to use the software knowing that they were not suitable for such; and (3) that Tesla continued to intentionally oversell the capabilities of the system and their vehicle despite this knowledge.

Case No. 50-2019-CA-009962-XXXX-MB

### A. **Representations made by Tesla**

The Plaintiff proffered a number of representations made by Mr. Elon Musk (Musk), either personally or vicariously, and Tesla made in the years before Mr. Banner was killed.  At all times when Musk made the statements he was the Chief Executive Officer of Tesla, Inc.

1. In 2014 Tesla began equipping its Model S sedan with hardware intended to make the vehicles autonomous.  Tesla eventually coined this feature "Autopilot."  The proffered evidence showed that the name "Autopilot" concerned some engineers within Tesla, but was ultimately affirmed by Musk.

2. In December 2015, Musk stated publicly that Teslas would drive themselves "within about two years."  This predates the death of Mr. Joshua Brown (discussed later) and Banner.

3. In January 2016, Musk stated that "Autopilot" was better than a human driver and that Teslas would drive significantly better than a human within two to three years.  (Predates death of Brown and Banner).

4. In June 2016, Musk stated, that "autonomous driving" was "basically a solved problem" and that they were "two years away from complete autonomy." (Statement after death of Brown but prior to death of Banner).

5. In July 2016, Musk commented by means of Tesla's official blog that once approved by regulators, Teslas could be "summoned" from anywhere, drive autonomously (without the driver in the vehicle) to pick up its "driver" and the occupant would be able to ride to its destination while reading, sleeping etc.  (Statement after death of Brown but prior to death of Banner).

6. In August 2016, Tesla announced that all new Tesla cars would come with "Autopilot 2" comprising of all new technology allowing the cars to soon become autonomous.  Tesla further announced that all of its vehicles would have hardware needed for full self-driving capacity. (Statement after death of Brown but prior to death of Banner).

7. In October 2016 Tesla held a conference call during which Musk stated that all new Tesla cars would include all hardware needed for "full self-driving." (Statement after death of Brown but prior to death of Banner).

B. **"Autopilot" Video**

The Plaintiff proffered evidence that Tesla produced a video, in October 2016, showing a Tesla vehicle driving without any human intervention as a way to market their Advanced Driver Assistance Systems (ADAS) "Autopilot" Technology. The video is cited to in the Plaintiff's motion and depicts a video from the inside of a Tesla vehicle showing the vehicle driving autonomously through a series of intersections, cross walks with pedestrians, turns and curves in the road, and other customary driving obstacles and hazards. The beginning of the video shows a disclaimer which reads ***"The person in the driver's seat is only there for legal reasons. He is not driving anything. The car is driving itself."*** The video shows the Tesla vehicle camera on the left side of the screen showing the car driving itself, while on the right side of the screen there are digital illustrations that appear to show the "Autopilot" computer of the vehicle recognizing and analyzing the surrounding environment while driving.[1] The representation from the video is clearly for the purposes of demonstrating advanced technological capabilities. On the bottom of the screen at 00:15 there is a banner which reads *"Advanced Sensor Coverage: Eight cameras and powerful vision processing provide 360 degrees of visibility at up to 250 meters of range."* At 00:25, 00:39, 01:32 the video depicts the Tesla approaching intersections with cross traffic not dissimilar from the general situation encountered by Banner, in which the Tesla slows, stops and turns without human intervention. Absent from this video is any indication that the video is aspirational or that this technology doesn't currently exist in the market.

C. **Deposition of Chris Payne:**

The Plaintiff proffered the deposition of Mr. Chris Payne (Payne) for the Court's consideration. At the time of his deposition Payne was an "Autopilot" engineer at Tesla. Mr. Payne stated that there was a failure to detect the semi-tractor in the case of Banner's death due to lighting conditions and limitations of the Tesla's capabilities. This failure was a cause of the vehicle failing to decelerate prior to the crash. (Payne Depo. P. 59). Payne testified that the vehicle's "Autopilot" system could not detect cross traffic (Payne Depo. P. 31-

Case No. 50-2019-CA-009962-XXXX-MB

32). Payne testified that it was technically possible for the "Autopilot" system to detect when the vehicle was on roads with cross traffic and could gradually disengage. (Payne Depo. P. 90-95). Payne also testified that he was not aware of any changes to the "Autopilot" system following the death of Joshua Brown in Williston, Florida. (Payne Depo. P. 17). Payne also testified that all the directors of the "Autopilot" program reported directly to Mr. Musk. (Payne Depo. P. 10-11).

D. **Depositions of Mr. Richard Baverstock and Mr. Ashok Elluswamy:**

The Plaintiff proffered the deposition testimony of Mr. Richard Baverstock, Tesla "Autopilot" engineer. At numerous points in his deposition Baverstock acknowledges Mr. Musk's knowledge and involvement with the "Autopilot" program. Mr. Elluswamy, another "Autopilot" engineer, echoed Mr. Baverstock's testimony regarding Mr. Musk's decision making and involvement with the "Autopilot" program. (Elluswamy Depo. P. 9). Elluswamy also stated he reported directly to Musk regarding the "Autopilot" program. (Elluswamy Depo. P. 9).

E. **Depositions of Mr. Andrej Karpathy and Mr. Milan Kovac:**

The Plaintiff proffered the deposition testimony of two directors of the Tesla "Autopilot" program who testified they met with Mr. Musk regarding the "Autopilot" program and that Mr. Musk was intimately involved in the development and testing of the "Autopilot" program. Mr. Kovac further acknowledged that there was no intermediary between himself and Musk.

F. **Deposition of Mr. Adam Gustafsson:**

The Plaintiff presented the deposition of Mr. Adam Gustafsson. Mr. Gustafsson was a systems engineer on the "Autopilot" program. Gustafsson testified that he was aware of and investigated both the Banner crash as well as the Joshua Brown crash that occurred three years prior to Banner. Gustafsson testified

that in both Banner's case and Brown's case the "Autopilot" failed to detect the semi-tractor and stop the vehicle. Gustafsson testified that there were no changes made to the cross traffic detection warning system from the date of Brown's crash until Banner's crash to account for cross traffic. (Gustafsson Depo. P. 40-41).

### G. Evidence of Prior Crashes Involving ADAS

#### 1. Death of Joshua Brown: Williston, Florida

The Plaintiff's proffered the accident and death of Mr. Joshua Brown who was killed in Williston, Florida on May, 7, 2016 while occupying a Tesla Model S using Tesla's "Autopilot" feature. Mr. Brown's Tesla crashed into the side of a tractor trailer, passing under at approximately 74 miles per hour. Tesla allegedly stated publically that the "Autopilot" software failed to detect the tractor trailer crossing in front of Brown's vehicle. Although Tesla claimed that the software issue was remedied after the accident, the Plaintiff's proffered evidence from Banner's accident to suggest this was incorrect.

#### 2. Death of Walter Huang: Mountain View, California

The Plaintiff also proffered the facts and circumstances surrounding the death of Mr. Walter Huang, who died in March 2018 in California when his Tesla Model X veered into a concrete barrier. At the time of the accident, the Tesla Model X had the "Autopilot" feature engaged. The Defendant presented proffered testimony and argument that the deceased occupant was playing a video game at the time of the accident as proof that the accident was not substantially similar to Banners. The Court took this into consideration and gave the evidence the appropriate weight considering the specific facts and circumstances surrounding the accident.

### H. The Testimony of Dr. Mary "Missy" Cummings

The Plaintiff proffered the testimony of Dr. Mary "Missy" Cummings (Cummings). Dr. Cummings holds a Ph.D. in systems engineering and has spent

Case No. 50-2019-CA-009962-XXXX-MB

her career studying and working in the fields of human systems engineering, driver monitoring systems, human monitoring systems, and autonomous systems in vehicles.  Dr. Cummings reviewed documents, data, videos, images, reports, advertisement materials, depositions, and pleadings relevant to the subject crash in offering her opinions.  Dr. Cummings provided her expert opinions in multiple forms including an enumerated professional opinion, a sworn affidavit, and deposition testimony.  Dr. Cummings provided the Court with a number of expert opinions citing to actions of the Defendant Tesla, which the Plaintiff argues are negligent.  Dr. Cummings also provided testimony that refuted some of the Defendant's claimed undisputed facts.

Cummings gave the following opinions:

1. That Tesla should not have allowed their vehicles' "Autopilot" system to be used on roads and areas with cross traffic and should not have been allowed to exceed the speed limit.
2. That Tesla made statements over representing the "Autopilot" technology as far more capable than it actually was.
3. That the "Autopilot" system increased risk of secondary engagement in tasks over time causing drivers to shift their attention to other tasks while "driving."
4. That Tesla used insufficient avoidance detection technology and failed to retrain its computers following a series of crashes in which "Autopilot" was engaged.
5. That the steering wheel torque driver inattention attenuation technology was substandard to driver facing cameras used by other auto manufacturers.
6. That Tesla failed to provide an adequate warning system to its drivers about the dangers and limitations of the "Autopilot" technology.
7. That Tesla failed to use proper testing of its Autopilot features.
8. That the clickwrap agreement insufficiently warned drivers of the dangers of using "Autopilot" and that its effects were outweighed by the autonomous vehicle marketing campaign of Tesla.

9.  That users failed to read the information in a clickwrap agreement.
10. That based on the totality of her opinions, the foregoing all led to the foreseeability of the resulting crash in this case.

Dr. Cummings also provided testimony that disputed some claims of undisputed facts of the Defendant. Cummings disagreed with the Defendant's assertion that the with respect to level two autonomous vehicles that it is the driver who decides when to engage the autonomous driving systems. Cummings testified that there was a debate within the scientific community as to the adequacy of the control exerted by Tesla in allowing the "Autopilot" to be used outside of its "Operational Design Domain (ODD)." This is a genuine issue of disputed fact.

I.  **Testimony of Mr. Daniel Melcher**

The Plaintiff proffered the testimony of Mr. Daniel Melcher (Melcher). Melcher is an expert in the area of accident reconstruction with over 25 years of professional experience in the field. Mr. Melcher reviewed the relevant data, images, reports, photographs, and videos documenting the crash that killed Banner. Melcher gave the following opinions:

1.  The emergence of the tractor trailer created an immediate clear and present danger that required the Tesla to slow or stop to avoid the collision.
2.  That, based on the physical evidence, Wood had the best opportunity to avoid the crash, followed by the "Autopilot" system of the Tesla, followed by Banner himself.

Melcher stated that his opinion was based on the physical evidence of the crash as well as an understanding of the human visual and cognitive processing. Melcher also relied upon the stopping data provided by Tesla engineers in offering opinions in the form of hypotheticals.

J. **Testimony of William Vigilante**

The Plaintiff presented the testimony of Dr. William Vigilante (Vigilante), Ph.D.  Vigilante is an expert in the area of human factors-ergonomics with 24 years' experience in evaluating and designing consumer and commercial products and equipment, warnings systems and instructional materials.  Vigilante provided his opinions by way of an extensive enumerated outline as well as deposition testimony.  Vigilante opined that Tesla conflicting messages between their marketing materials their manual led to driver's developing a trust and overreliance on the system.  Vigilante opined it was foreseeable that driver would relinquish control to the autonomous features leading to an increased crash risk.

LEGAL STANDARDS

A. **Generally**

In general, leave of court to amend or supplement a pleading shall be given freely "when justice so requires." Fla. R. Civ. P. 1.190(a). "Florida courts follow a liberal policy with regard to the amendment of pleadings so that claims may be determined on their merits. Mender v. Kauderer, 143 So. 3d 1011, 1013-14 (Fla. 3d DCA 2014).  "Refusal to allow an amendment is an abuse of . . . discretion unless it clearly appears that allowing the amendment would prejudice the opposing party, the privilege to amend has been abused, or amendment would be futile.'" Impulsora de Productos Sustentables v. Garcia, 347 So.3d 470, 471 (Fla. 3d DCA 2022).

A claim for punitive damages shall make a ***reasonable showing*** by record evidence ***or proffered evidence*** that provides a ***reasonable basis*** for recovery of such damages. Fla. R. Civ. P. 1.190(f); Fla. Stat. s. 768.72(1).  A defendant may be held liable for punitive damages only if the trier of fact finds by clear and convincing evidence that the Defendant was personally guilty of intentional misconduct or gross negligence. Fla. Stat. s. 768.72(2).  A review of whether a trial court has departed from the essential requirements of law in granting a motion to amend for punitive damages in limited to whether the court complied with

Florida Statute section 768.72. Bulk Express Transport Inc. v. Diaz, 343 So. 3d 646, 647 (Fla. 3d DCA 2022) Citing Levin v. Pritchard, 258 So. 3d 545, 547 (Fla. 3d DCA 2018).  Once there is a showing of any evidence to support entitlement to an award of punitive damages, the matter should be left for the jury to decide, even if the court believes that the preponderance of the evidence weighs against the Plaintiff. Id. Citing Otey v. Florida Power & Light Co., 400 So. 2d 1289, 1291 (Fla. 5th DCA 1981). See also Doral Country Club, Inc. v. Lindgren Plumbing Co., 175 So. 2d 570 (Fla. 3d DCA 1965).  The evidence and any interpretations on the evidence shall be viewed in the light most favorable to the plaintiff. Haynes v. Alabama, 192 So. 3d 546 (Fla. 5th DCA 2016) (quoting Wakenhut Corp. v. Canty, 359 So. 2d 430, 435-36 (Fla. 1978).

For the court to allow an amendment to plead punitive damages, the plain unambiguous language of Florida Statute section 768.72 requires a **"reasonable showing"** by evidence in the record or proffered by the claimant which would provide  a **"reasonable basis"** for the recovery of such damages. Fla. Stat. 768.72(1).  The statute is clear that the showing may be made by evidence at a hearing, or by way of a proffer made by the claimant.  An evidentiary hearing is not necessary.  Solis v. Calvo, 689 So. 2d 366, 269 (Fla. 3d DCA 1997); Strasser v. Yalamanchi , 677 So. 2d 22, 23 (Fla. 4th DCA 1996); Will v. Systems Eng'g Consultants, Inc., 554 So. 2d 591 (Fla. 3d DCA 1989).

There is nothing magical or strict in the requirement of a "proffer" as contemplated by the statute.  As defined in the jurisprudence, a "proffer" connotes merely an "offer" of evidence. Estate of Despain v. Avante Group, Inc., 900 So. 2d 637, 642 (Fla. 5th DCA 2005).  It is simply a representation of what evidence the [claimant] proposes to present, it is not actual evidence. Id. Citing Grim v. State, 841 So. 2d 455, 462 (Fla. 2003); Lamarca v. State, 785 So. 2d 1209, 1216 (Fla. 2001).

B. **The Role of the Trial Court**

It is the role and duty of the trial court to act as the gatekeeper in

determining whether to permit the plaintiff to plead punitive damages.   The Plaintiff should be forbidden to plead punitive damages unless and until there has been a determination that there is a reasonable evidentiary basis for recovery of punitive damages. Globe Newspaper Co. v. King, 658 So. 2d 518 (Fla. 1995); see also Taylor v. Gunter Trucking Co. Inc., 520 So. 2d 624 (Fla. 1st DCA 1988) (holding the trial court's duty is to determine whether punitive damages could be properly awarded by a jury).  Florida Statute section 768.72 created a "substantive legal right not to be subject to a punitive damages claim and ensuing financial worth discovery until the trial court makes a determination that there is a reasonable evidentiary basis for such a recovery. Bristline v. Rogers, 215 So. 3d 607 (Fla. 4th DCA 2017).   The Court should view the evidence and interpretation of the evidence *in the light most favorable to the plaintiff*. Haynes v. Arman, 192 So. 3d 546 (Fla. 5th DCA 2016).

The trial court must consider evidentiary showings by both sides. Fed. Ins. Comp. v. Perlmutter, 2023 WL 6278887 *5 (Fla. 4th DCA Sept. 27, 2023) Citing Werner Enters., Inc. v. Mendez, 362 So. 3d 278, 282 (Fla. 5th DCA 2023).  Further, the law is clear that the Court shall make a determination of the pretrial evidentiary showing without weighing evidence or witness credibility and shall consider *all reasonable inferences*. Id at *6 citing Manheimer v. Fla. Power & Light Co., 48 Fla. L. Weekly D2495 WL 4919540, at *3 (Fla. 3d DCA Aug. 2, 2023).

C. **Standards for Pleading Punitive Damages**

The primary foundational requirement under both Florida Statute 768.72(1) and Florida Rule of Civil Procedure 1.190(f) is a "reasonable showing by evidence in the record or proffered by the claimant which would provide a reasonable basis for the recovery of such damages." Fla. Stat. s. 768.72(1); Fla. R. Civ. P. 1.190(f).

A defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct *or* gross negligence.  Section 768.72 pertinently

Case No. 50-2019-CA-009962-XXXX-MB

provides:

(1) In any civil action, no claim for punitive damages shall be permitted <u>unless there is a reasonable showing by evidence in the record or proffered by the claimant</u> which would provide a <u>reasonable basis for recovery</u> of such damages. The claimant may move to amend her or his complaint to assert a claim for punitive damages as allowed by the rules of civil procedure. The rules of civil procedure shall be liberally construed so as to allow the claimant discovery of evidence which appears reasonably calculated to lead to admissible evidence on the issue of punitive damages. No discovery of financial worth shall proceed until after the pleading concerning punitive damages is permitted.

(2) A defendant may be held liable for punitive damages only if the trier of fact, <u>based on clear and convincing evidence</u>, finds that the defendant was personally guilty of intentional misconduct or gross negligence. As used in this section, the term:

(a) "Intentional misconduct" means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.

(b) "Gross negligence" means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

Fla. Stat. s. 768.72(1) & (2). Rule 1.190(f) similarly provides as follows:

(f) Claims for Punitive Damages. A motion for leave to amend a pleading to assert a claim for punitive damages shall make a <u>reasonable showing</u>, by evidence in the record or <u>evidence to be proffered by the claimant</u> that provides a <u>reasonable basis</u> for recovery of such damages. The motion to amend can be filed separately and before the supporting evidence or proffer, but each shall be served on all parties at least 20 days before the hearing.

It is therefore very clear there is a difference in the burden of proof at the pleading stage and the proof required at the trial stage. The legislature is clear that the required showing at the pleading stage is a reasonable showing, as opposed to clear and convincing evidence at the trial stage. <u>Deaterly v. Jacobson</u>, 313 So. 3d 798 (Fla. 2d DCA 2021). While the trial Court certainly remains mindful of the standard at trial, the standard at the pleading stage is without

question a lower hurdle.

Further, there are different requirements as to the type of evidence required for a plaintiff to proceed under a punitive damages theory of intentional misconduct as opposed to gross negligence.  The plain language of Florida Statute section 768.72 is clear and unambiguous as to the type and degree of proof required.

To merit leave to plead punitive damages under a theory of intentional misconduct, the proffer need only show that the defendant had "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." Fla. Stat. 768.72(2) (a); Bric McMann Industries v. Regatta Beach Club Condo. Ass'n, Inc., No. 2D22-2454, 2023 WL 5986432, at *2 (Fla. 2d DCA Sept. 15, 2023).

To merit an award of punitive damages under a gross negligence theory, the defendant's conduct must be egregious and sufficiently reprehensible to rise to the level of truly culpable behavior.  Bristline, 215 So. 3d at 607.   The behavior must be made in "an outrageous manner or with fraud, malice, wantonness or oppression." Winn & Lovett Grocery Co. v. Arthur, 17 So. 214 (Fla. 1936); see also Lee Cnty. Bank v. Wilson, 444 So. 2d 469, 463 (Fla. 2d DCA 1983).   It requires the type of proof which has been described as the equivalent to criminal manslaughter. Valladares v. Bank of Am. Corp., 197 So. 3d 1, 11 (Fla. 2016).  However, Courts have found that the question of punitive damages is a question for the jury in products liability cases involving automobile defects when the evidence showed that the defendant had knowledge of design defects and in wanton disregard for the safety of the purchasing public continued to market the product without correction, and the defects resulted in death. Toyota Motor Co., Ltd. v. Moll, 438 So. 2d 192 (Fla. 4th DCA 1983).

Because the type of proof required to plead an award for punitive damages under a gross negligence theory has been described as the type of evidence required to prove criminal manslaughter, this Court believes that an examination of the standards in a criminal case are warranted.

Similar to the filing of a complaint in a civil matter, every criminal

Case No. 50-2019-CA-009962-XXXX-MB

prosecution begins with the filing of a charging document (either an Information or an Indictment), which is based on a finding of probable cause. A showing of probable cause is more than just mere suspicion but less than proof beyond a reasonable doubt and indeed, less than a preponderance of the evidence (the standard of proof in a civil matter). <u>J.J. v. State</u>, 312 So. 3d 116, 121 (Fla. 3d DCA 2020) citing <u>United States v. Burnett</u>, 827 F. 3d 1108, 1114 (D.C. Cir. 2016). Probable cause doesn't require proof that something is more likely true than false. It only requires a fair probability, a standard understood to mean something more than a bare suspicion but less than a preponderance of the evidence at hand.

<u>United States v. Denson</u>, 775 F. 3d 1214, 1217 (10th Cir. 2014). As explained by Chief Justice Canady

"[t]he probable cause standard merely requires the facts available to the officers would warrant a man of reasonable caution in the belief that evidence of a crime may be found. It does not demand any showing that such a belief be correct or even more likely true than false."

<u>Harris v. State</u>, 71 So. 3d 756, 776 (Fla. 2011).

Probable cause exists where the facts and circumstances, as analyzed, from the officer's knowledge, special training and practical experience, and of which he has ***reasonable*** trustworthy information, are sufficient themselves to warrant a ***reasonable*** man to reach the conclusion that an offense has been committed. <u>Robinson v. State</u>, 556 So. 2d 450 (Fla. 1st DCA 1990).

Thus, the question of burden of proof for the purposes of pleading punitive damages is a two part analysis. The first part being ***how much*** evidence is required and the second being, ***what kind*** of evidence is required.

The answer to the first question is (1) a "reasonable showing" on which the trier of fact could "reasonably return a verdict for punitive damages" under (2) either an "intentional misconduct" or a "gross negligence" theory. This is the plain and unambiguous language of section 768.72. The Court reads this standard as analogous to the probable cause standard in criminal law, which uses similar

Case No. 50-2019-CA-009962-XXXX-MB

language to describe the burden.  Both burdens of proof use the touchstone of
"reasonableness" as the bench mark for the initiation of a case or charge.  Probable
cause is one of the lowest standards in the criminal justice system and it is the
standard upon which cases are started by way of an arrest, Information or
Indictment. This is true no matter the gravity of the offense (i.e. from Retail Theft
to First Degree Murder).  In both the criminal and civil context, it is a lesser
standard than that required at jury trial.

      The second question is what type of evidence is required to plead punitive
damages.  With respect to a theory of intentional misconduct, that standard is
knowledge and high probability of injury as outlined in section 768.72(1) (a).
With respect to a theory of gross negligence, the answer is evidence of
"wantonness," "reckless disregard for the lives and safety of those exposed to
your behavior."  The type of evidence changes neither from civil law to criminal
law nor from arrest to conviction.  The kind of evidence is always at the level of
being either "intentional" or "grossly negligent."  The only burden that changes is
the level of that burden (i.e. in criminal law from probable cause to beyond a
reasonable doubt.)  At the pleading stage it is reasonableness (under either a civil
or criminal standard) while at the trial it is much higher in both.

      Thus the Court must consider whether there has been a reasonable showing
of evidence from which the trier of fact could reasonably return in favor of the
plaintiffs on the issue of punitive damages, and that the evidence considered is of
the type that would warrant an award of punitive damages.  In assessing whether "a
reasonable evidentiary basis exists for the recovery of punitive damages," the
trial court must consider both the movants proffer of evidence as well as "the other
side's showing." Napleton's North Palm Auto Park, Inc. v. Agosto , 364 So. 3d
1103, 1105-06 (Fla. 4 th DCA 2023) citing Marder v. Mueller, 358 So. 3d 1242,
1246 (Fla. 4th DCA 2023); see also Perlmutter supra at *5.  A legal basis for
punitive damages is established in a products liability case where the
manufacturer is shown to have knowledge that it's product is inherently dangerous
to persons or property and that its continued use is likely to cause injury or death
but nevertheless continues to market the product without making feasible

modifications to eliminate the dangers or making adequate disclosure and warning of such danger. <u>Chrysler Corp v. Wolmer</u>, 499 So. 2d 823 (Fla. 1986) citing <u>Johns-Manville Sales Corp. v. Janssens</u>, 463 So. 2d 242 (Fla. 1st DCA 1984).

D. **Admissibility of Evidence Under the Florida Evidence Code**

1. **Admissions by a Party Opponent**

Admissions by a party opponent are admissible as substantive evidence. Fla. Stat. s. 90.803(18). Admissions by a party opponent include not only statements made by the adverse party, but also admissions by silence, adoptive admissions and admissions by agents. Florida Statute section 90.803(18)(d) provides that an agent or employee may make admission, which is admissible against his employer if it concerns a matter within the scope of the agency or employment and is made during the existence of the relationship. <u>Hunt v. Seaboard Coast Line R. Co.</u>, 327 So. 2d 193, 195 (Fla. 1976); <u>Troya v. Miami Beach Health Care Group, Inc.</u>, 780 So. 2d 288, 229-30 (Fla. 3d DCA 2001); <u>Wright Fruit Co., Inc. v. Morrison</u>, 309 So. 2d 54, 55 (Fla. 2d DCA 1975) (A statement by an employee that they informed the president of a company about a defective condition was admissible.) Further, when the conduct of an adverse party circumstantially indicates that party's assent to the truth of the statement made by another person, it may be attributable to that adverse party. <u>Philip Morris USA Inc. v. Pollari</u>, 228 So. 3d 115, 123-24 (Fla. 4th DCA 2017). The fact that admissions are made by way of the internet or social media does not, by itself, alter their admissibility. <u>United States v. Browne</u>, 834 F. 3d 403 (3d Cir. 2016) (Statements made on Facebook chats were admissible against the Defendant).

2. **The Effect on the Listener**

An out of court statement that may be otherwise prohibited as hearsay may be admissible as evidence not for the truth of the matter asserted, but for the effect or to show the state of mind of the listener. Fla. Stat. 90.801; <u>Dorsey v. Reddy</u>, 931 So. 2d 259, 267 (Fla. 5th DCA 2006); <u>Dade County Police Benev. Ass'n v.</u>

Town of Surfside, 721 So. 2d 746, 747 (Fla. 3d DCA 1998).

3. **Evidence of Other Substantially Similar Events as Evidence of Knowledge**

Similar fact evidence involving "substantially similar" incidents may be admissible to prove an entitlement to punitive damages. Fla. Stat. 90.404(2) (a); Ford Motor Co. v. Hall-Edwards, 971 So. 2d 854, 856 (Fla. 3d DCA 2007); Long Term Care Foundation, Inc. v. Martin, 778 So. 2d 1100 (Fla. 5th DCA 2001).

4. **Use of Inadmissible Evidence by an Expert Witness**

An expert may rely on facts or data that have not been admitted, or are not even admissible, when those facts are the type reasonably relied upon by experts in the subject to support their opinions. Fla. Stat. 90.704; Coddington v. Nunez, 151 So. 3d 445, 447-8 (Fla. 2d. DCA 2013) (Error to prohibit expert from using calculations from a video simulation of an accident that was itself ruled inadmissible).  See also Houghton v. Bond, 680 So. 2d 514, 522 (Fla. 1st DCA 1996).

5. **Use of Deposition Testimony in a Trial**

The deposition of any witness, whether or not a party, may be used by any party for any purpose if the court finds that: (A) the witness is dead; (B) the witness is at a greater distances than 100 miles from the place of the trial or out of the state, unless the absence was procured by the person offering the deposition as testimony; (C) the witness is unable to attend due to illness, age, infirmity or imprisonment; (D) the party offering the deposition has been unable to procure the attendance of the witness by subpoena; (E) there are exceptional circumstances that make it desirable, in the interest of fairness and justice to allow the deposition to be used; and (F) the witness is an expert witness. Fla. R. Civ. P. 1.330(a) (3); Fla. Stat. s. 90.803(22) & 90.804.

EVIDENCE PROFFERED BY THE PLAINTIFF AND ANALYSIS

As previously stated, a plaintiff may move to plead for an award of punitive damages either under a theory of "intentional misconduct" or "gross

Case No. 50-2019-CA-009962-XXXX-MB

negligence."  In the present case, the Plaintiff has alleged in their motion that the Defendant is guilty intentional misconduct and gross negligence.   Because the Plaintiff alleges that the Defendant's conduct qualifies as potentially both intentional misconduct and gross negligence, the conduct must be examined under both standards.  Specifically, the Plaintiff alleges the following:

1. That Tesla through its officers, employees and agents knew the vehicle at issue had a defective autopilot system and allowed the vehicle with the system to be driven on roads not suitable for said technology.
2. That Tesla, despite knowing these deficiencies, marketed the vehicle in a way that greatly overestimated its capabilities and hid its deficiencies.
3. That Tesla, having knowledge of a substantially similar accident involving similar circumstances, made no efforts to correct the defective product.

The Court finds that the Plaintiff has sufficiently presented a "reasonable showing" of proffered evidence which could provide a "reasonable basis" for the recovery punitive damages such to permit her to amend the complaint and seek punitive damages at jury trial.

A.  **Standard**

The Court finds based on an analysis of the plain language of Florida Statute section 768.72(1) (a) that what is required is a "reasonable" showing of evidence from which a jury could "reasonably" award punitive damages.  This is not the level of proof required at trial, however this is the pleading stage.  The standard is on par with that in the criminal system for the initiation of a prosecution.  It is the starting point, not the conclusion.  It is the standard for allowing the Plaintiff to make a showing of evidence for the jury's ultimate determination based on a higher standard.  While the Court understands that it opens the door for a more extensive discovery inquiry, such is the case in a First Degree Murder in which the State is seeking the ultimate penalty.  The potential outcome at the end of the trial doesn't change the plain language of the statute articulating the pleading burden.  For these reasons, the Court reads the plain language of Florida Statute section 768.72(1) (a) as it is written, requiring a

Case No. 50-2019-CA-009962-XXXX-MB

reasonable showing.

B. **Intentional Misconduct**

First, the Court finds based on the totality of the above proffered evidence that there is reasonable evidence from which the finder of fact could conclude that Tesla through its officers, employees and agents knew the vehicle at issue had a defective Autopilot system and allowed the vehicle with the system to be driven in areas not safe for that technology. The Court bases it finding on the prior fatal crash involving Joshua Brown, the testimony of Tesla Autopilot systems engineers specifically Mr. Adam Gustafsson and the testimony of Dr. Cummings. The Court finds that all of the evidence articulated in this order and presented by the Plaintiff would likely be admissible under various evidentiary theories outlined above. The statements by Musk, Tesla, and Tesla engineers would be admissible as admissions. The Joshua Brown fatality would be admissible as similar fact evidence. Even if a particular piece of evidence were to be ruled inadmissible, an expert (Dr. Cummings) may be able to rely on that evidence in rendering an expert opinion.

The fatal crash of Brown and Banner are eerily similar in that both involve a failure of the Autopilot system to detect cross traffic and both involve a fatality of a Tesla vehicle traveling underneath a tractor trailer at a high rate of speed. The evidence proffered was that Tesla admitted that a failure of the "Autopilot" system led to the crash. Further, Mr. Gustafsson was the investigator on both crashes and was a systems engineer who according to his testimony the "Autopilot" in both Banner's case and Brown's case failed to detect the semi-tractor and stop the vehicle. This demonstrates that Tesla as an organization was certainly aware of a problem with the "Autopilot" programming. Gustafsson testified that there were no changes made to the cross traffic detection warning system from the date of Brown's crash until Banner's crash to account for cross traffic. It is reasonable based on Gustafson's testimony that engineers within the "Autopilot" program were aware of the issue that led to the death of Brown. Further, based on the proffered testimony of the other Tesla engineers specifically that Mr. Musk was intimately involved in the "Autopilot" development program it

would be reasonable to conclude that the Defendant Tesla through its CEO and engineers was acutely aware of the problem with the "Autopilot" failing to detect cross traffic.

Knowing that the "Autopilot" system had previously failed, had limitations and according to Gustafson had not been modified, Tesla still permitted the "Autopilot" system to be engaged on roads that encountered areas of cross traffic. Dr. Cummings also provided evidence by way of her proffered testimony as to the negligence in the Defendant failing to retrain the computer systems following Brown's fatal crash.  Further, as evidenced by the repeated statements of Musk and the Tesla "Autopilot" marketing strategy, the Defendant pursued a course of conduct that led to the vehicle in this case being equipped with the same technology and operating in similar traffic conditions.  Further, the Defendant continued the same marketing strategy prior to Banner's death.  The consistent message has been, that Tesla vehicles are "autonomous."  This is evident in the naming of the technology as "Autopilot," from the continuous narrative from the Defendant that "'autonomous driving' was 'basically a solved problem' and that they were 'two years away from complete autonomy.' Tesla cars would include all hardware needed for 'full self-driving.'"  It is noteworthy that these statements were made more than two years before Banner's death. It is also evident from the "Autopilot" video that remains on the Tesla website.   It would reasonable to conclude that the Defendant dismissed the information it had available in favor of its marketing campaign for the purpose of selling vehicles under the label of being autonomous.

When viewed in the light most favorable to the plaintiff and taking into consideration the totality of the circumstances, it is reasonable to conclude that a jury could find that Defendant had actual knowledge of the defect and nevertheless allowed the "Autopilot" feature to be used without intervention.   The proffered evidence also provides a reasonable showing from which a jury could reasonably determine that the Defendant continued its marketing strategy after Brown's death, continuing up to the present.   Further given the fatal result of the Brown crash, it was reasonable for the Defendant to believe that allowing the "Autopilot" feature to be used in such a way would lead to harmful and potentially fatal results.  The

Case No. 50-2019-CA-009962-XXXX-MB

Court finds that it this is a reasonable showing, at the pleading stage, of proffered evidence from which a reasonable finder of fact could conclude that Tesla's acts rise to the level of either "intentional misconduct."

C. **Gross Negligence**

Relying on the same aforementioned evidence, the Court finds that the Plaintiff has proffered a reasonable showing of evidence from which a reasonable person could find that the Defendant's conduct was so reckless and wanting of care that it constituted a conscious disregard or indifference to the life, safety or rights of person exposed to such conduct.

Again, there is a reasonable showing that the Defendant had actual and constructive knowledge that their products, Tesla vehicle and "Autopilot" technology, were flawed in that it could not effectively operate in conditions that contained cross traffic. This is evidenced by the investigation and findings of the Brown fatality which occurred years prior to the crash in this case. During that time the Defendant made strong public statements and engaged in a marketing strategy that painted the products as autonomous. The range of the Defendant's reach with its "voice" and marketing is important. Given some of the statements were made by the CEO of the company and that the Tesla product is extremely popular and profitable, it is reasonable to conclude that the narrative had a significant effect on the belief about the capabilities of the products. Such statements or admissions could be considered by their potential effects on their audience. While the Defendant argues that it's manual and the "clickwrap" agreement sufficiently warned owners of their products of the limitations of the "Autopilot," that is an arguable issue for the trier of fact. It is an issue that is disputed by the Plaintiff's experts Dr. Cummings and Dr. Vigilante. The Plaintiff has made a reasonable showing that a reasonable person could find that the warnings were inadequate and that the Defendant's aggressive strategy was grossly negligent given the totality of the circumstances.

---
[1] www.tesla.com/autopilot

Case No. 50-2019-CA-009962-XXXX-MB

**ORDERED AND ADJUDGED** that the Plaintiff's Motion for Leave to Amend to Plead Punitive Damages is GRANTED.

**DONE AND ORDERED** in Chambers, at West Palm Beach, Palm Beach County, Florida.



50-2019-CA-009962-XXXX-MB     11/17/2023
Reid P. Scott
Judge

**COPIES TO:**

| | | |
|---|---|---|
| ANNIE C. WARREN | No Address Available | ANNIE.WARREN@BOWMANANDBROOKE.COM |
| CAROLINA PINERO | No Address Available | Carolina.Pinero@bowmanandbrooke.com<br>maria.esteva@bowmanandbrooke.com |
| CHRISTY.CUNETTA | No Address Available | christy.cunetta@bowmanandbrooke.com |
| DANIEL C JENSEN | No Address Available | djensen@foryourrights.com<br>kharris@foryourrights.com |
| DEBRA MINNICK | No Address Available | Debra.Minnick@bowmanandbrooke.com |
| EDWINA V. KESSLER | 633 SOUTH ANDREWS AVE- THIRD FLOOR<br>FT LAUDERDALE, FL 33301 | pleadingsevk@chkklaw.com<br>ekessler@chkklaw.com |
| JOEL H. SMITH | 1441 MAIN STREET SUITE 1200<br>COLUMBIA, SC 29201 | Joel.Smith@bowmanandbrooke.com<br>Ashley.Lord@bowmanandbrooke.com |
| JOHN F. EVERSOLE III | No Address Available | jeversole@foryourrights.com<br>acarrelli@foryourrights.com |
| LAKE H. LYTAL, III | 515 N FLAGLER DR 10TH FL<br>10TH FLOOR<br>WEST PALM BEACH, FL 33401 | TLYTAL@FORYOURRIGHTS.COM<br>cwilkinson@palmbeachlaw.com |
| LAURA NICOLE FERGUSON | No Address Available | lauraferguson@quinnemanuel.com |

NOT A CERTIFIED COPY

Case No. 50-2019-CA-009962-XXXX-MB

| | | |
|---|---|---|
| MICHAEL ALVAREZ | No Address Available | michaelalvarez@quinnemanuel.com |
| QE DOCKETING | No Address Available | newyorkcalendar@quinnemanuel.com<br>calendar@quinnemanuel.com |
| ROBERT J. RUDOCK | TWO ALHAMBRA PLAZA<br>SUITE 800<br>MIAMI, FL 33134 | BOB.RUDOCK@BOWMANANDBROOKE.COM<br>april.smith@bowmanandbrooke.com<br>estela.martinez@bowmanandbrooke.com |
| VINCENT GALVIN | No Address Available | Vincent.Galvin@bowmanandbrooke.com<br>Letty.Robles@bowmanandbrooke.com |
| VINCENT GALVIN | 1741 TECHNOLOGY<br>DRIVE, SUITE 200<br>SAN JOSE, CA 95110 | VINCENT.GALVIN@BOWMANANDBROOKE.COM |
| WENDY F. LUMISH | TWO ALHAMBRA PLAZA,<br>SUITE 800<br>CORAL GABLES, FL 33134 | WENDY.LUMISH@BOWMANANDBROOKE.COM<br>andrea.abuakel@bowmanandbrooke.com<br>wlumish@carltonfields.com |
| WHITNEY V. CRUZ | No Address Available | Whitney.Cruz@bowmanandbrooke.com<br>april.smith@bowmanandbrooke.com<br>juliet.menendez@bowmanandbrooke.com |

NOT A CERTIFIED COPY