# EXHIBIT A

# FLORIDA
# HIGHWAY PATROL

SUBJECT:    **TRAFFIC HOMICIDE INVESTIGATION RELEASE**

CASE NO.:    FHP719-38-002

INVESTIGATOR:    Corporal    **David N. Riso**

                **Snapper Creek Svc Plz MM 19**

                **Miami, Florida 33175**

This is to certify that the above captioned case was reviewed by the Florida Highway Patrol and does not meet the Florida Highway Patrol's requirements for State Attorney review or release. The Florida Highway Patrol will release the above captioned case as a public record in accordance with Florida Statutes.

(Signature of Reviewing Supervisor)

Sergeant John Baker
(Reviewing Supervisor's Name – Typed/Printed)

8/28/2020
(Date)

(Signature of Approving Supervisor)

Lieutenant Thomas O'Donnell
(Approving Supervisor's Name – Typed/Printed)

8-28-20
(Date)

# FLORIDA HIGHWAY PATROL



# TRAFFIC HOMICIDE INVESTIGATION

**PREPARED BY:**   Corporal David N. Riso

**Case Number**   FHP719-38-002

Page 2

HSMV 62699 (REV.09/08)

# TABLE OF CONTENTS
# UPDATE

Page(s)

1      Prosecutor's or Supervisor's Release (HSMV 62710 or HSMV 62004)

2      Cover Sheet (HSMV 62699) or (HSMV 62700)

3      Table of Contents (HSMV 62701)

4-33      Investigative Report (HSMV 62702)

34-38      Reconstruction Diagram (HSMV 62703)

39-45      Witness List (HSMV 62704)

46-51      Statements and/or Written Interviews (If applicable)
                    (HSMV 62705, HSMV 62751, HSMV 62752)

52-54      Chemical Test Information (HSMV 62706)

55      Arrest Information (HSMV 62709)

56      Exhibits *     Florida Uniform Traffic Citation

57-60     *    Florida Traffic Crash Report-Long Form

N/A     *    N/A

N/A     *    N/A

N/A     *    N/A

Investigation Conducted by: Corporal David N. Riso       08/28/2020
                        Traffic Homicide Investigator         Date

Investigation Reviewed by:   Sergeant John E. Baker        8/28/2020
                                Supervisor            Date

Investigation Reviewed by:   Lieutenant Thomas M. O'Donnell    8-28-20
                                Captain / Designee         Date

Case Number    FHP719-38-002              Page   3

HSMV 62701A (Rev. 09/08)

**INVESTIGATIVE REPORT**

## ASSIGNMENT

On Thursday, April 25, 2019, at 9:14 PM a crash occurred on an unpaved shoulder 44 feet 9 inches east of County Road 905. At 9:29 PM, the Florida Highway Patrol Miami Regional Communication Center (MRCC) received a call-in reference to a two-vehicle crash with one fatality, one (1) incapacitating injury and one (1) non-incapacitating injury. One of the vehicles involved was a 2019 Tesla model "S" and the other was a 2010 Chevrolet Tahoe. Two of the victims were pedestrians, who were outside the parked Chevrolet Tahoe. This crash occurred in the unincorporated area of Monroe County, 9 miles north of the city limits of Key Largo. Monroe County Sheriff Office Deputy Joel Torres was dispatched at 9:20 PM and arrived on scene at 9:21 PM. Florida Highway Patrol Trooper Shawn Martin was notified at 9:38 PM and arrived on scene at 9:53 PM. Florida Highway Patrol Trooper David Williams was notified at 9:38 PM and arrived on scene at 10:10 PM. Florida Highway Patrol Corporal David Kitchen was notified at 9:50 PM and arrived on scene at 10:19 PM. I was notified at 9:54 PM and arrived on scene at 10:23 PM. Florida Highway Patrol Corporal Carlos J. Rosario Flores was notified at 9:58 PM. Corporal Rosario Flores arrived on scene at 10:48 PM to initiate his traffic homicide investigation. Florida Highway Patrol Sergeant Rafael Lola was notified at 10:03 PM and arrived on scene at 11:10 PM. Florida Highway Patrol Trooper Keil Nanan was notified at 10:04 PM and arrived on scene at 11:08 PM. Florida Highway Patrol Trooper Daniel Montero was notified at 10:05 PM and arrived on scene at 11:08 PM. Trooper Martin prepared a traffic crash report, with case number FHPE19OFF022748. Initially this crash did not meet the criteria to be assigned to the Florida Advanced Investigation and Reconstruction (FLAIR). On May 29, 2019, the National

**INVESTIGATIVE REPORT**

Highway Safety Administration inquired about crash which involved a vehicle with autopilot features and met the criteria of FLAIR. Florida Highway Patrol Sergeant John Baker, FLAIR Team 6 Supervisor informed me the case was being reassigned to FLAIR. I was assigned this case in HITS on May 29, 2019.

## ROADWAY

County Road 905 is straight, level and has an asphalt surface. There is one northbound lane and one southbound lane. There are paved asphalt shoulders on the east and west sides of the roadway. County Road 905 has a double yellow line dividing both travel lanes leading up to the stop bar near the location of the crash. Card Sound Road (County Road 905A) intersects with County Road 905 and ends at this location. It is level with an asphalt surface. Card Sound Road has one eastbound lane and one westbound lane with asphalt paved shoulders on the north and south sides of the road. The roadway is divided by a double yellow line leading up to stop bar at the intersection with County Road 905. Both roadways intersect at a "T" formation at this location. Inside this intersection there are no line markings. At the "T" intersection there are stop signs located for the northbound/southbound sides, along with a single flashing red signal directly above the center of the intersection for both directions. The eastbound lane of Card Sound Road also has a stop sign and a flashing red signal above the intersection that is clearly visible at night 4/10 of a mile west of the intersection. This stop sign is situated on the southwest side of the intersection. There is a solid white painted stop bar on Card Sound Road at this same location marking where eastbound traffic needs to stop prior to entering the intersection.

## INVESTIGATIVE REPORT

The location where the crash occurred was level and on the gravel portion of the shoulder east of County Road 905. There are four (4) yellow in color, diamond shaped, reflector signs mounted on metal poles. These yellow signs are 16 feet east from the edge of the roadway for County Road 905 and directly across from Card Sound Road. In the middle of these two signs is an orange in color rectangular shaped sign mounted on a metal pole with a double ended arrow pointing south and north. These signs warn traffic approaching on Card Sound Road the roadway ends at County Road 905. Eastbound traffic can only make a left/right turn to travel north or south at the intersection. On the east side of these signs is an open area of approximately 39 feet between the tree lines. These tree lines are on the north and south side of this open as they extend easterly away from County Road 905. In the middle of the open area is a paved asphalt apron. The start of the asphalt apron is 56 feet east of County Road 905, 19 feet in width and extends easterly away from the roadway.

The southbound and northbound lanes of County Road 905 are bordered by solid white lines as they intersect at this location. The eastbound and westbound lanes of Card Sound Road have solid white painted lines on the outer edges of the roadway next to the paved shoulders.

The eastbound and westbound lanes of Card Sound Road both measured 11 feet 9 inches in width. The eastbound shoulder of Card Sound Road measured 6 feet 7 inches in width. The westbound shoulder of Card Sound Road measured 5 feet 7 inches in width. The northbound lane of County Road 905 as it approaches the scene measured 12 feet in width with the northbound shoulder measuring 4 feet in width. In the area of the crash, the northbound paved shoulder measured 10 feet 7 inches in width with a ½ inch drop to the gravel shoulder. The northbound

**INVESTIGATIVE REPORT**

lane of County Road 905, as it travels away from the scene, measured 11 feet 10 inches in width with the paved shoulder measuring 4 feet in width. The southbound lane of County Road 905, as it approaches the scene, measured 11 feet 8 inches in width with the paved shoulder measuring 4 feet 1 inch width.

The roadways were dry, clear of any physical defects, visual obstructions, and physical obstructions for all lanes as they approach and travel away from the intersection. There are no overhead street lamps to illuminate the intersection. The coefficient of friction for the asphalt portion of County Road 905 was .71, while the coefficient of friction for the gravel portion of the east shoulder is .48. The coefficient of friction for the asphalt on the east shoulder was .61. The grade was level for County Road 905, the gravel shoulder and the paved asphalt portion on the east shoulder.

The coefficient of friction for eastbound lane of County Road 905A was .64 with the super elevation .04. The coefficient of friction for eastbound asphalt shoulder was .65 with the super elevation at .08. The The posted speed limit for the two intersecting roadways at the area of the crash is 45 miles per hour with the nearest sign on Card Sound Road .41 miles west of the crash scene. Traffic control, roadway and the weather were not contributing factors in this crash. The weather was 72 degrees with fair skies.

## VEHICLE 1: V-1

V-1 was a 2019, silver in color, Tesla model "S", with an assigned Vehicle Identification Number (VIN) of 5YJSA1E24KF302997 and displayed a valid Florida tag of LFYB88. The registered owner was George Brian McGee, whose last known address was 75 Snapper Lane in

**INVESTIGATIVE REPORT**

Key Largo (Ocean Reef), Florida 33037. V-1 is a fully electric vehicle with autopilot features such as Traffic Aware Cruise Control State, Autosteer State (Autopilot State) and Autosteer Hands-On Detection. The bottom of the car between the wheels and the four doors is the battery, which is 6 to 7 inches in width. V-1 has dual electric motors, with one motor on the center of the front axle and one motor on the center of the rear axle. V-1 was equipped with power assisted front and rear ABS disc brakes, standard seating, standard lights and power assisted steering. The occupant restraint system provides a lap belt and shoulder harness for the seated occupants. V-1 is equipped with airbags. The front, side and knee airbags deployed in this crash. The curb weight of V-1 was 4638 pounds (lbs.), as it was not weighed during inspection.

**Occupant: V-1: Driver:** D-1 was identified as George Brian McGee, whose last known address was 75 Snapper Lane in Key Largo (Ocean Reef), Florida 33037. D-1 is a 42-year old Caucasian male, who held a valid class "E" Florida driver's license with the number of M200-302-76-412-0 and the expiration date of November 12, 2021. D-1 did not have any restrictions or endorsements. D-1 was identified as the driver of V-1 by his spontaneous statement on a police body camera. D-1 was recorded at the scene by a police body camera, which was worn by Deputy Torres. The driver's seat belt of V-1 was stretched out, did not recoil and had stretch marks on the outer edges. This indicated that D-1 was wearing his seat belt. D-1 stated on the body camera footage he had left work in Boca Raton, and was heading to his home in Ocean Reef, Key Largo which was two miles north of the scene of this crash. D-1 was familiar with the surrounding area and with V-1. Deputy Torres asked D-1 if he had anything to drink and he said no. No odor alcohol detected on D-1's person at the scene, as indicated by medical personnel who were at the

## INVESTIGATIVE REPORT

scene. D-1 did not display any signs of being under the influence of a controlled substance, as indicated by medical personnel at the scene. This was also confirmed by the recorded body camera footage. D-1 sustained non-incapacitating injuries from this crash and was transported to Jackson South hospital in Miami by Ocean Reef Fire Rescue. Florida Highway Patrol Trooper Odel Mosquera made contact with D-1 at Jackson South Hospital and did not detect any alcohol nor drugs on D-1. Trooper Mosquera asked D-1 for a voluntary blood sample and he refused.

### VEHICLE 2: V-2:

V-2 was a 2010, black in color, Chevrolet Tahoe sport utility vehicle, with an assigned Vehicle Identification Number (VIN) of 1GNMCBE35AR246876 and displayed a valid state of Florida tag of DXTRR. The registered owner is Dawn Darlene Angulo, whose last known address was 12300 Southwest 92nd Avenue in Miami, Florida 33176. V-2 was equipped with an 5.3 litre V-8 gasoline engine, automatic transmission, power assisted front and rear ABS disc brakes, standard seating, standard lights, and power assisted steering. The occupant restraint system provides a lap belt and shoulder harness for the front and rear seated occupants. occupant restraint system provides a lap belt and shoulder harness for the seated occupants. V-2 is equipped with airbags, with the side airbags having deployed as a result of this crash. V-2 was unoccupied at the time of the crash. V-1's curb weight was 5,277 pounds (lbs.), as it was not weighed during inspection.

### PEDESTRIAN:

**Pedestrian: P-1 (Section 2)** was identified as Dillion Austin Angulo, whose last known address was 12300 Southwest 92nd Avenue, Miami, Florida 33176. P-1 was a 27-year-old Caucasian male, who held a valid class "E" Florida driver's license. At the time of the crash, P-1 was on the

## INVESTIGATIVE REPORT

east side of V-2 near "B" pillar and driver's door. This was recorded by V-1's video of the crash. P-1 was wearing black in color shorts that extend down to the knees with no footwear. P-1 had properly parked V-2, facing south on the east shoulder next to County Road 905. There was no odor of an alcoholic beverage detected on P-1's person at the scene, as indicated by medical personnel. There was no evidence found on scene to indicate P-1 was under the influence of a controlled substance. Prior to the crash occurring, P-1 was operating V-2 with P-2 as the front seated passenger. They had stopped in Key Largo at his uncle's home after fishing. P-1 and P-2 began to travel back to Miami-Dade County. P-1 could not recall much detail after the crash and could not explain why he parked V-2 at the scene. It is unknown if P-1 was familiar with the surrounding area. P-1 sustained incapacitating injuries and was transported to Jackson South Hospital by Air Rescue South. P-1's incapacitating injuries sustained were classified as serious bodily injuries.

**Pedestrian: P-2 (Section 3)** was identified as Naible Benavides Leon, whose last known address was 10321 Southwest 24th Street, apartment 103 in Miami, Florida 33165. P-2 was a 22-year-old Hispanic female, who held a valid class "E" Florida driver's license. At the time of the crash, P-2 was walking around the front of V-2 on the east shoulder to County Road 905. This was recorded by V-1's video of the crash. P-2 was wearing pull over top which was light blue and white in color. P-2 was also wearing a white in color knitted shirt over the pull-over top. P-2 was wearing green in color shorts and no footwear. Brown sandals with a red strap were found at the scene with one under the front of V-2 at final rest. V-2 was positioned in a stop position facing south at this location. There was no odor of an alcoholic beverage detected on P-2's person at the scene,

## INVESTIGATIVE REPORT

as indicated by medical personnel. There was no evidence found on scene to indicate P-2 was under the influence of a controlled substance. Prior to the crash occurring, P-2 was the front seated passenger of V-2, which was operated by P-1. It is unknown if P-2 was familiar with the surrounding area. P-2 sustained fatal injuries as a result of this crash and was pronounced deceased at 9:53 PM on scene by Paramedic Oscar Pinzon of Key Largo Rescue 123. Allen Beyers Funeral Home in Key Largo transported P-2 from the scene for the District Sixteen Medical Examiner's Office out of Marathon, Monroe County.

### INVESTIGATION

I arrived at the scene of the crash and the intersection of County Road 905 and Card Sound Road was not blocked. A Monroe County Sheriff's Office (MCSO) police car was parked on the gravel portion of the east shoulder to County Road 905 and next to the tree line. This marked MCSO police car was north of the crash scene and facing in a southeasterly direction. A 2010 black in color Chevrolet Tahoe (V-2) was on the paved asphalt portion of the east shoulder facing in a westerly direction. A 2019 grey in color Tesla model "S" (V-1) was on the south side of the east shoulder on the gravel up against the tree line. Two (2) fully marked Florida Highway Patrol Dodge Chargers and one Chevrolet Tahoe were parked on the east shoulder. No vehicles were on the main traveled portion of the roadway as they all were on the east shoulder. County Road 905 and Card Sound Road were not obstructed by any vehicles upon my arrival.

Deputy Torres was the first law enforcement officer to arrive on scene. Deputy Torres conducted an on-scene investigation contacting D-1 and a good Samaritan by the name of Karin Elizabeth Saldivia Santibanez. Deputy Torres had a body worn camera mounted on his chest area and was

## INVESTIGATIVE REPORT

recording. Deputy Torres asked D-1 which car he was driving and D-1 pointed towards V-1 and said, "this one." The body camera recorded D-1 being initially asked questions about the crash. After the initial set of questions, D-1 continued to state numerous times that he was driving, using his phone, dropped his phone, looked down and ran the stop sign.

Ms. Saldivia Santibanez did not witness the crash but was passing by the scene and stopped to assist. Female footwear was witnessed under V-2 and brought to Deputy Torres's attention. A woman's purse was discovered inside of V-2 and in the area of the front passenger seat. On scene fire personnel and Deputy Torres then began a search for a second victim. P-2 was found a short time later at 9:31 PM. P-2 was officially pronounced deceased at 9:53 PM by Oscar Pinzon of Key Largo Rescue 123.

Corporal Kitchen, Trooper Martin and Trooper Williams were already on scene. Deputy Torres and Corporal Kitchen both advised me of what had happened. P-1 was treated at the scene and then air lifted to Jackson South Hospital. D-1 was attended to by Rescue 26 out of Ocean Reef. At 9:50 PM, Rescue 26 left the scene and transported D-1 to Jackson South Hospital.

Naible Benavides Leon (P-2) was still at the scene and on the ground within the tree line. P-2 was officially pronounced deceased on Thursday, April 25, 2019, at 9:53 PM, by Oscar Pinzon of Key Largo Rescue 123.

Corporal Rosario Flores took the scene photographs and had drawn the rough sketch of the scene. Corporal Rosario Flores, who was assisted by Corporal Kitchen, measured the crash scene using a roller wheel. Corporal Rosario Flores documented zero point as electrical pole AZ77 and reference line as the northbound solid white painted line of County Road 905.

## INVESTIGATIVE REPORT

V-1's front right tire left a mark on the paved portion of the emergency lane east of the solid white painted line for County Road 905. This tire mark began with an easterly direction, but with a slight southerly direction. This same front right tire mark immediately began to curve slightly north still maintaining its easterly direction. This was an indication that D-1 steered V-1 to the left. The tire marks continued onto the gravel surface of the east shoulder and began a slight curve to the right with V-1's front right striking the sign post. These tires tracks were overlapping, then were side by side indicating that D-1 steered V-1 to the right and the left front tire was tracking inside with its left rear tracking outside. The start of V-1's front right tire mark on the roadway and its path of travel onto the east shoulder was not documented.

There was a furrow mark on the surface of the gravel portion of the east shoulder. The start of this furrow mark was measured 7 feet west of the paved asphalt apron, which was on the shoulder east of County Road 905. This is where V-2's front right tire was stopped, then struck by V-1. This was documented as the area of collision between V-1 and V-2.

V-2's front right passenger door and the "A" frame on this side received severe damage. The passenger door was curled out away from the "B" pillar on the door handle side. This damage was clearly the area of V-2 that was struck by V-1's front.

It was explained to me that P-1 and P-2 were ejected out of V-2. I reviewed the scene and looked over V-2 and concluded that P-1 and P-2 could not have been inside of V-2 at the time of the crash. I discovered some indentations on the left front quarter panel of V-2. These indentations were clearly indicative of V-2 striking both P-1 and P-2. The distance from this area of collision

Case Number: FHP718-38-002                                    Page __13__

HSMV 62702 (Rev. 1/89)

## INVESTIGATIVE REPORT

to the location where P-2 was found lying in the tree line was measured to be 82 feet. It was clearly obvious P-2 had struck multiple trees stopping her from traveling any further.

Corporal Rosario-Flores arrived on scene, followed by Trooper Nanan, Trooper Montero and Sergeant Lola. Corporal Rosario Flores was the initial and primary traffic homicide investigator assigned to this case and began measuring the scene through the zero point and reference line method. I marked and documented the scene to preserve the evidence.

I had no contact with D-1 at the scene. I contacted the MRCC to have a Trooper go to Jackson South Hospital and contact D-1. Trooper Odel Mosquera was dispatched at 10:45 PM and arrived at Jackson South Hospital at 11:09 PM. Trooper Mosquera contacted D-1 and stated he did not observe the indicators of impairment or an odor of an alcoholic beverage from his person. Trooper Mosquera then contacted me via our cellular telephones and relayed the information that D-1 was not impaired. I requested Trooper Mosquera to ask D-1 if he would submit to a consensual blood draw. Trooper Mosquera ask D-1 if he would provide a consensual blood draw. D-1 stated he does not want to talk or submit to a blood test. D-1 stated he is not saying anything without a lawyer. Per my request, Trooper Mosquera made the request to the nurses to place a hold on any blood drawn from D-1.

On Friday, April 26, 2019, at 1:32 AM, I made contact from the scene with Assistant State Attorney Gail Conolly of the Sixteenth Judicial Circuit. ASA Conolly works out of the Plantation Key office of Monroe County, Florida. I discussed the case with the details at the current time and date of this investigation.

## INVESTIGATIVE REPORT

On Wednesday, April 26, 2019, at 2:25 AM, Sergeant Lola and Trooper Nanan were on scene and assisted with the towing of V-1 and V-2. Both V-1 and V-2 were towed from the scene, with Trooper Nanan and Sergeant Lola following the evidence, to the Florida Highway Patrol station in Miami, Florida. Both V-1 and V-2 were secured and placed into evidence.

At 3:30 AM, Trooper Mosquera arrived at 12300 Southwest 92nd Avenue in Miami, Florida to make notification to P-1's family. Trooper Mosquera spoke with Dawn Angulo and Victor Angulo, P-1's parents.

At 5:26 AM, Trooper Mosquera and I arrived at 10321 SW 24th Street, Apartment 103, in Miami, Florida 33165. We contacted Lilia Marilin Leon Jimenez, who is the mother of P-2. Trooper Mosquera and I made notification of kin at 5:45 AM to P-2's mother. I explained briefly what had happened. I also supplied her with case numbers and my contact information.

On Monday, April 29, 2019, I contacted Ron Wheeler of the Monroe County Sheriff's Department. Mr. Wheeler is a video technician for the department and works out of their Marathon office. I made the request for a copy of the body camera video footage from Deputy Torres. I obtained the copy of the video from Mr. Wheeler and placed the footage into the case file.

At 8:00 AM, Corporal David Kitchen went back to the scene. Corporal Kitchen utilized the Leica Geosystems Robotic Total Station TS12, serial number 879292, to assist in reconstructing the crash, which was later used to produce the attached reconstruction diagram. The reference point (Total Station RP) was positioned on the east shoulder next to the northbound side of County Road 905 and directly across from Card Sound Road. The reference mark (RM) was documented

Case Number: FHP718-38-002                                 Page   15

## INVESTIGATIVE REPORT

20 feet north of the Total Station (RP) on the paved asphalt shoulder. The RP was located 24 feet 9 inches south and 73 feet 3 inches east of concrete pole with a DOT camera mounted on top. This pole is situated on the northwest corner of the intersection.

Using the total station, the following items were measured. The area of collision was located 44 feet 9 inches east of County Road 905. V-1 left skid marks on the asphalt portion of the east shoulder after the impact with V-2. This impact forced V-2's front end to rotate in a counterclockwise motion striking P-2 with its left side front projecting her in a northeasterly direction. V-2's left side front also impacted P-1 projecting him in an easterly direction onto the paved asphalt portion of the shoulder. The damages to the left side of V-2 were consisted with a pedestrian impact.

V-1 continued traveling in an easterly direction through the A.O.C. V-1 and V-2 then slapped each other as V-1's left side struck V-2's right side. V-2 continued its counterclockwise rotation traveling in a backwards and easterly direction. V-2's traveled to its final rest position next to the tree line on the north side of the paved asphalt portion of the shoulder, which was 85 feet 3 inches east of the solid white painted line. V-1 traveled in an easterly direction to its final rest position on a grassy portion of the east shoulder 7 feet 5 inches south of the asphalt edge. V-1's final rest position was 106 feet 9 inches east of the solid white painted line.

The start of V-1's left side skid mark was located 78 feet 8 inches east of County Road 905 with the same skid mark ending 97 feet east. The start of V-1's right side skid mark was located 80 feet 4 inches east with the same skid mark ending 99 feet 2 inches east of County Road 905.

**INVESTIGATIVE REPORT**

The final rest of V-1's front left tire was located 112 feet east of County Road 905. The final rest of V-1's left rear tire was located 103 feet 8 inches east of County Road 905. The final rest of V-1's right rear tire was located 102 feet east of County Road 905.

The start of a scuff mark left by V-2's right rear tire was located 63 feet 2 inches east of County Road 905 with the end of that scuff mark located 89 feet 9 inches east. The start of a scuff mark left by V-2's left rear tire was located 81 feet east of County Road 905 with the end of this scuff mark located 89 feet 10 inches.

P-1 had come to rest on the paved asphalt shoulder between V-1 and V-2 with his feet north and his head south. The final rest of P-1's head was located 84 feet 7 inches east of the solid white painted line for northbound County Road 905. P-2 was projected 82 feet in a northeasterly direction into the tree line on the north side of the paved asphalt portion of the shoulder. This location is where P-2 had come to final rest, which was 115 feet 4 inches east of the solid white painted line.

At 10:22 AM, I reviewed the copy of Deputy Torres's body camera video I obtained from the Monroe County Sheriff's Office. The video shows D-1 standing near P-1. In the video, D-1 states more than two times that he was the driver, was using his phone, dropped the phone and was looking for it. D-1 also stated that he ran the stop sign.

On Friday, May 3, 2019, at 3:49 PM, I prepared a search warrant to properly obtain evidence from V-1. I forwarded the search warrant to Assistant State Attorney Michael Filteau of the Eleventh Judicial Circuit in Miami-Dade County. ASA Filteau reviewed and approved the search warrant to be presented to the judge. On Tuesday, May 7, 2019, the Honorable Judge Stacy D.

## INVESTIGATIVE REPORT

Glick of the Eleventh Judicial Circuit in Miami-Dade County, reviewed and signed the search warrant.

At 4:46 PM, I received and e-mail from Brittany Brown of the Monroe County Sheriff's Office (MCSO). Ms. Brown is the Central Records Supervisor and supplied me with MCSO Computer Aided Dispatch (CAD) notes, dispatch audio and the 911 call. D-1 exited V-1 and initiated the 911 call, which was received and documented by the MCSO dispatch at 9:16 PM on Thursday, April 25, 2019. D-1 stated on the 911 call he just ran into a car and he missed his turn. Rescue 26 was the first rescue personnel to arrive on scene, which was 9:23 PM. The Miami Regional Communications Center received the call a 9:29 PM.

On Tuesday, May 7, 2019 at 7:00 AM, Florida Highway Patrol Corporal Lynn Stine and Corporal Rosario Flores conducted a post collision inspection of V-2 at the Florida Highway Patrol station in Miami, Florida. The station is located at 1011 Northwest 111 Avenue. The damage to V-2 was concentrated to the front passenger door and to the "A" frame. The deepest part of the crush at this area of impact was 20 inches. The fender over the right front tire had inward crushed. This fender was also pushed down towards the right front wheel with the front of the fender protruding out from its normal position. The front right wheel was separated from the vehicle as a result of the impact. The right front passenger door was attached at the hinges and the door was curled out at the top of the "B" frame area. The top rear corner of this door measured 2 feet 10 inches outward from the right side of V-2 "B" pillar. The passenger side of the windshield has a "spider" crack that starts at the bottom corner and extends upward in a curve form to the top corner. The entire front grill was separated from the front of V-2. The fender over

Case Number: FHP718-38-002                                        Page ___18___

HSMV 62702 (Rev. 1/89)

## INVESTIGATIVE REPORT

the front left tire was crushed inward from the "A" pillar to the front left corner. There are two dents in this fender, one on the front portion and the other on the rear portion next to the "A" pillar. These dents are significant because those are the impact areas to both P-1and P-2 respectively. The front dent was where P-2 was struck and the dent near the "A" pillar was where P-1 was struck. The left side of the hood was slightly out of its normal alignment. There was a small crease at the seam of the left fender below the hood. In the same area the hood was crushed/creased that was caused by the impact to P-2. The right-side rear corner of V-2 had scrapes on it and on the bumper. The right rear bumper was crushed inward. The damage to this area of V-2 was caused when both V-1 and V-2 secondary impact. The linear perimeter of the initial inspection was conducted utilizing tape measures. No headlights nor parts thereof were on the front of the vehicle, so a check for hot shock was not possible. The taillight lenses were intact with no damage, but there was no power to the taillights. The damage on the passenger side of V-2 was primarily to the front right passenger door, "A" frame and the front right quarter panel. The damage started 9 feet 3 inches from the front of the vehicle. There was damage and scrape marks on the right rear side measuring 15 inches from the rear. There was damage on the front left quarter panel that measured 52 inches from the front.

On Wednesday, May 8, 2019, at 10:00 AM, I served the search warrant on V-1. One of the items seized per issuance of the search warrant was the touch screen computer mounted in the center of the V-1's dash. The passive safety restraint control module (EDR/ACM) and the body control unit were also seized. A flat, silver in color, metal box with multi-colored video cable connections was seized. It was discovered in the dash mounted above the glove box. The airbag

Case Number: <u>FHP718-38-002</u>                     Page ___19___

HSMV 62702 (Rev. 1/89)

## INVESTIGATIVE REPORT

with suspected blood DNA on it from the driver's steering wheel, the airbag from the driver's knee with suspected blood DNA and the driver's side airbag were seized. All items were submitted into evidence at the Miami Florida Highway Patrol station.

On Friday, May 10, 2020, I took the passive safety restraint control module (EDR/ACM) out of evidence and over to the Miami Beach Police Department contacting Officer Eric Dominguez. At 1:44 PM, Officer Dominguez was able to image the data from within the unit. V-1's speed was at 98 kilometers per hour 4.5 seconds to ½ second prior to impact. I converted that speed into miles per hour and V-1's speed was 60.85 miles per hour. V-1's speed at impact was 84 kilometers per hour converted to 52.164 miles per hour. The service brake was off all the way until ½ second prior to impact. The vehicle's accelerator pedal percentage was at 20 % from the 5 seconds to ½ second prior to impact. D-1 never applied V-1's brakes until just before the impact with V-2.

On Wednesday, May 15, 2019, at 7:00 AM, Corporal Stine and Corporal Rosario Flores conducted a post collision inspection of V-1 at the Florida Highway Patrol station in Miami, Florida. The station is located at 1011 North West 111 Avenue. V-1 had extensive damage to the front. V-1's entire front bumper assembly area had been separated from the vehicle exposing the area under the hood. The entire hood was buckled and creased. The hood was displaced upward and redirected rearward towards the windshield and not in its proper alignment. V-1's headlights were detached from the vehicle. The front left fender was crushed and had creases as it was redirected towards the driver's door. The fender was overlapping the seam with the driver's door. The windshield had severe damage (shattered) on the driver's side with a large hole protruded through exposing the interior of the vehicle. The rest of the windshield had "spider" cracks,

Case Number: FHP718-38-002                          Page __20__

## INVESTIGATIVE REPORT

except the passenger side had scratch marks on top. The area of the driver's door below the "B" pillar had horizontal scrape marks that continued onto the back-passenger door. These scrapes marks were more severe on the rear passenger door as it had been crushed in from its center. The rear of this passenger door was out of alignment at the seam below the "C" pillar. The window of this passenger door and the small window behind it were shattered. The fender around V-1's left rear wheel had horizontal scrape marks. The scrape marks and damage to V-1's left side indicates the area were both vehicles "slapped" after the initial impact. The entire front of V-1 was damaged measuring 60 inches across. V-1's left front was buckled back 26 inches from the impact with V-2. On V-1's left side 104 inches from the front and 13 inches from the ground was contact damage. On the same left side and 154 inches from the front was contact damage. The contact damage to V-1's left side was from the two vehicles slapping each other after the intial impact. V-1's headlights were not attached to the vehicle during the inspection. The headlight assemblies were discovered at the scene close to V-1's final rest and placed into evidence. The headlight assemblies had LED type lights, so a check for hot shock was not possible. At the scene of the crash, V-1's taillights were illuminated. The linear perimeter of the initial inspection was conducted utilizing tape measures. The inspection concluded at 10:00 AM.

On May 22nd, 2019, I submitted a request for a subpoena to be issued on D-1's phone. The request was submitted to Assistant State Attorney Luke Bovil, of the Plantation Key State Attorney's Office in Monroe County. ASA Bovil then forwarded the request to their Key West office to be written up and the subpoenas forwarded to both AT&T and T-Mobile cell phone providers.

## INVESTIGATIVE REPORT

On May 22, 2019, I contacted Mark Bagnard, Chief of investigations Division of NTSB- Office of Highway Safety in Washington, DC. Mr. Bagnard gave me the contact information for Mr. Al Prescott, an Associate General Counsel at the Tesla Corporation in California.

On May 23, 2019, I contacted Mr. Al Prescott. We discussed information about the Tesla model "S." Mr. Prescott gave me the contact information for Ryan McCarthy, who is the Managing Counsel for the Tesla Corporation, which is located at 901 Page Avenue in Fremont, California 94538.

On May 23, 2019, I contacted Ryan McCarthy, Managing Counsel at the Tesla Corporation in California. Mr. McCarthy has assisted with my investigation in this case and provided me with important evidence. He provided me with the video of the crash, which was uploaded to their headquarters in California immediately from the scene of the crash. Mr. McCarthy provided me with the "Infotainment" data uploaded from V-1 from the scene.

On Friday, May 24, 2019, I received a phone call to my work cellular phone from an unidentified number with a (202) area code. I immediately received an e-mail from John Brophy, with the same (202) area code and phone number out of Washington DC. Mr. Brophy is with the United States Department of Transportation serving as the chief of crash investigations for the National Highway Transportation Safety Administration (NHTSA) in Washington DC.

After speaking with Mr. Brophy, I contacted Sergeant Baker and informed him that the USDOT from Washington, DC was contacting me and inquiring about the crash and the Tesla "S" (V-1) involved. A short time later, Sergeant Baker informed me that FLAIR would be taking this over case. I was assigned this case in HITS on May 29, 2019, at 8:18 PM by Sergeant Baker.

Case Number: FHP718-38-002                                        Page __22__

## INVESTIGATIVE REPORT

V-1 had the ability to collect driving history data and record six (6) seconds of video of any crash. As a result of this crash, data was collected and uploaded via D-1's cellular telephone to the Tesla Corporation in California. I talked to Ryan McCarthy, Managing Counsel of the Tesla Corporation in Freemont, California. I inquired about obtaining this data and the crash video. I also asked Mr. McCarthy if he needed a subpoena from me for this information. Mr. McCarthy stated that he did not require a subpoena.

On June 1, 2019, Mr. Ryan McCarthy e-mailed me the uploaded data and video from the 2019 Tesla Model "S" (V-1). I also received the owner's manual for V-1. The data revealed D-1 had overridden V-1's auto steer's cruise control portion by pressing on the accelerator. V-1 was in auto steer mode and its speed was set at 44.6 miles per hour. The accelerator pedal position was also at 0 %. V-1 was still in the auto steer mode and D-1 pressed on the accelerator increasing the pedal percentage up to 20.8 %. This increased V-1's speed up to 62.2 miles per hour, which was approximately one (1) second prior to impact. The data also revealed that D-1 did have his hands on the steering wheel at the time of he crash. The video showed V-1 was traveling east on Card Sound Road towards the intersection with County Road 905. It also displayed a clearly visible stop sign and a working single flashing red light above the intersection. The video shows V-1 traveling through the intersection failing to stop at the stop sign and the flashing red light. The video revealed a properly parked V-2 on the shoulder east of the northbound lane of County Road 905. V-2 was parked facing south behind the four (4) yellow diamond reflector signs and the left/right arrowed sign.

## INVESTIGATIVE REPORT

The video shows V-2's front passenger door open with P-1 standing on the east side of V-2 near the driver's door. The video shows P-2 walking from the front area of V-2 towards the area where P-1 was standing. It shows V-1 eventually moving (turning), but not until it is on the northbound lane of County Road 905. The video shows V-1 striking the southernmost diamond shaped yellow reflector sign and the right side of V-2 under its "A" frame.

The owner's manual for V-1 states the following: "Auto steer is a function of the 2019 Tesla "S" intended for use only on highways and limited-access roads with a fully attentive driver. When using autosteer, hold the steering wheel and be mindful of road conditions and surrounding traffic. Do not use autosteer on city streets, in construction zones, or in areas where bicyclists or pedestrians may be present. Never depend on autosteer to determine an appropriate driving path. Always be prepared to take immediate action. Failure to follow these instructions could cause damage, serious injury or death."

On June 7, 2019, I had a meeting with Monroe County State Attorney Dennis Ward and ASA Conolly at Plantation Key office to discuss the case. The evidence obtained at this point of the investigation was presented to them. The evidence presented was the owners manual, Tesla uploaded data, passive safety restraint control module (EDR/ACM) imaged data and the fact that D-1 violated multiple moving violations were presented to them.

On Monday, June 17, 2019, at 12:30 PM, I conducted a sworn recorded interview of Karin Elizabeth Saldivia Santibanez. The interview was conducted at the Florida City Driver's License Office (T06), which is located at 1448 South Krome Avenue # 103 in Florida City, Florida 33034. The following is a synopsis of the interview. Ms. Saldivia Santibanez is the lead

Case Number: FHP718-38-002                                    Page __24__

## INVESTIGATIVE REPORT

supervisor at the Beach Bar in Ocean Reef and had left her work station around 8:30 PM. She traveled through the gate at the entrance to Ocean Reef with the windows down. As she was traveling south on County Road 905 approaching the stop sign at the intersection with Card Sound Road, she had heard someone yelling for help. Ms. Saldivia Santibanez looked over and noticed P-1 lying on the ground and that D-1 was standing next to him. She had parked her car and walked over to where they were standing and noticed P-1 bleeding from his mouth. Ms. Saldivia Santibanez called the public safety office, which is out of the Ocean Reef Club. She stated D-1 was nervous, kind of in shock, and she did not know if he had called 911. Ms. Saldivia Santibanez stated D-1 was on his phone when she arrived at the scene. She stated D-1 was looking down at P-1 and was talking to him. Ms. Saldivia Santibanez advised D-1 seemed to be stressed out saying he did not know what he did, he was sorry, he is not a bad person, and he was not paying attention. Ms. Saldivia Santibanez asked D-1 to calm down and unbutton his shirt to check to see if he had more injuries other than the bump on his head. I asked Ms. Saldivia Santibanez if she smelled the odor of an alcoholic beverage on D-1 and she replied "no." I asked Ms. Saldivia Santibanez if she was close enough to D-1 that she would have been able to detect any alcohol and she said yes. Ms. Saldivia Santibanez believed she even asked D-1 if he drank any alcohol and he replied "no." Ms. Saldivia Santibanez advised D-1 had told her he had left work and was on his way home to his wife and kids, because they must go to a funeral. I asked Ms. Saldivia Santibanez about the two vehicles involved and she stated they were a black Chevrolet Tahoe and a sedan Tesla. I asked Ms. Saldivia Santibanez if she knew which vehicle D-1 was driving and she advised the Tesla. I asked Ms. Saldivia Santibanez how she knew this,

## INVESTIGATIVE REPORT

and she said D-1 had entered inside of the Tesla, so she figured it was his. She advised D-1 looked around V-1 to see if anyone else was involved and she told him not to touch anything. Ms. Saldivia Santibanez advised some other people (un-identified) had stopped and noticed there were woman's flip flops underneath Chevrolet Tahoe. Ms. Saldivia Santibanez advised Deputy Torres and the public safety officers (Ocean Reef Rescue 26) searched the surrounding area and located P-2 within the mangroves. The interview concluded at 12:39 PM.

On Tuesday, June 18, 2019, at 11:30 AM, I had an in-person meeting/interview with Dillion Austin Angulo (P-1) at his home, which was located at 12300 Southwest 92nd Avenue in Miami, Florida 33176. Present at the meeting/interview were Dawn Darlene Angulo (mother), Victor Angulo (father), Blake Angulo (brother) and Robert N. Pelier, P.A. I asked if the meeting/interview could be recorded. P-1 preferred the meeting/interview not be recorded but did not mind me taking notes. P-1 stated he was fishing with P-2 and stopped by is uncles house at the 95 Mile Marker Ocean side of US-1 (State Road 5) in Key Largo. P-1 and P-2 left his uncles house traveling back to Miami. P-1 stated he wanted to avoid traffic by taking Card Sound Road. P-1 stated he did not remember anything about the crash and remembers waking up in the hospital. This meeting/Interview concluded at 12:30 PM.

On Wednesday, June 19, 2019, the computer and the necessary components seized per search warrant, were signed out of evidence by me and brought to the Tesla repair center in Coral Gables, Florida. In order to download the data contained within the computer, the silver box which was mounted in the dash and above the glove box had to be utilized at the same time. An exemplar car as V-1 was utilized. In order to download the data, the identical two computer

**INVESTIGATIVE REPORT**

components were taken out of the exemplar car and replaced with the two computer components from V-1. The Tesla technician who downloaded the data was Mike Calafell. The data was downloaded from the computer and uploaded to the server in Tesla (California). I also received a copy of the data, but the files were corrupted, and I did not have the software to read the data. Throughout the process the evidence had remained in my chain of custody. The two computer components were submitted back into evidence later the same day.

On Monday, July 1, 2019, at 5:52 PM eastern time, I received the infotainment data for V-1 from Ryan McCarthy. The data revealed D-1 had made a phone call to 1 800-237-7976 on Thursday, April 25, 2019, at 18:00:02.316. This phone call ended on the same date at 18:13:18.041. I dialed the phone number D-1 had called and discovered it was for American Airlines. D-1 then made a 911 call at 18:16:06 which ended at 18:20:09.868 on the same date. The time stamps on this data is in Pacific Time which is three (3) hours behind Eastern Time, which is the time zone for Monroe County. Any data the company receives is converted into Pacific time because the Tesla corporation is in California.

On Tuesday, July 16, 2019, at 9:18 AM, I received the records for D-1's phone pursuant to the subpoena request for his phone records. On the night of the crash, D-1 initiated a call to the phone number of 1-800-237-7976. That call lasted 13 minutes and 13 seconds. The call ended a two (2) seconds after the crash had occurred. This phone number was the same phone number from the infotainment data, which was for American Airlines.

On Wednesday, July 31, 2019, at 7:00 AM, I conducted conducting a linear perimeter of V-1 at the Miami FHP station using the Leica Total Station. At 7:00 AM, Corporal Andrew Chong-Yen

## INVESTIGATIVE REPORT

assisted me by conducting a linear perimeter of V-2 utilizing the Leica Total Station at the Miami FHP station.

On Friday, August 9, 2019, at 9:30 AM, A scheduled meeting took place with Monroe County State Attorney Ward, ASA Conolly and ASA Bovil at the Plantation Key State Attorney's Office. In attendance at meeting was the Miami Florida Highway Patrol legal counsel April Haile, Sergeant Baker, Florida Highway Patrol Corporal Stephen Rudd and I. A discussion of the facts of the case were presented to the State Attorney's Office. They stated there was not enough evidence for Vehicular Homicide charges.

On Sunday, September 1, 2019, at 6:30 AM, I arrived at Ocean Reef Rescue Station 26. The rescue station is located at 110 Anchor Drive in Ocean Reef (Key Largo), Florida 33037. Members of the rescue station were either working or coming onto shift. I traveled there to obtain sworn written statements.

At 6:30 AM, I obtained a sworn written statement from Jonathan Miguel Saldana. The following is a synopsis of the statement. Mr. Saldana is a paramedic for Rescue 26 and responded to the scene of this crash. Mr. Saldana was the lead paramedic and immediately tended to P-1, who was lying on the ground and in critical condition. Mr. Saldana stated he did not have any patient contact with any other victims, including D-1 nor P-2.

At 6:30 AM, I obtained a sworn written statement from Alejandro Amado Del Rio. The following is a synopsis of the statement. Mr. Del Rio works for Rescue 26 and responded to the scene of this crash. Mr. Del Rio stated when he arrived on scene, he noticed that two vehicles were involved. Mr. Del Rio noticed P-1 was lying on the ground near the driver's door of V-2.

Case Number: FHP718-38-002                                     Page ___28___

HSMV 62702 (Rev. 1/89)

## INVESTIGATIVE REPORT

Mr. Del Rio contacted D-1 asking him if he was okay and what had happened. D-1 stated to Mr. Del Rio he was on the phone with his wife talking about airline tickets. Mr. Del Rio stated D-1 did not appear to be inebriated and he articulated well. Mr. Del Rio then began to assist with patient care.

At, 6:30 AM, I obtained a sworn written statement from Kevin Marshall Hulse. The following is a synopsis of the statement. Mr. Hulse works for Rescue 26 and responded to the scene of this crash. Mr. Hulse arrived on scene and noticed P-1 lying on the ground and D-1 walking around. Mr. Hulse began to assist in treating P-1 and overheard D-1 state he had dropped his phone which is why he had crashed. D-1 was overheard stating he did not have any alcohol or drugs. Mr. Hulse was relieved from treating P-1 and then began assisting in treating D-1 inside of the other rescue unit. Mr. Hulse could not smell any alcohol on D-1 and he was not slurring his words.

At 6:30 AM, I obtained a sworn written statement from Enrique De Jesus Abilleira. The following is a synopsis of the statement. Mr. Abilleira works for Rescue 26 and responded to the scene of this crash. Upon arrival at the scene, Mr. Abilleira noticed P-1 lying on the ground and D-1 standing to the side. Mr. Abilleira did not make direct contact with D-1. Mr. Abilleira did not have a "face to face" conversation with D-1, nor did he smell alcohol, sense alcohol or if D-1 was intoxicated.

On Thursday, September 5, 2019, at 5:30 AM, I obtained a sworn written statement from Michael Anthony Rodriguez. The following is a synopsis of the statement. Mr. Rodriguez works for Rescue 126 and responded to the scene of this crash. Mr. Rodriguez was on the engine and

Case Number: FHP718-38-002

HSMV 62702 (Rev. 1/89)

## INVESTIGATIVE REPORT

the second unit to respond after rescue. Mr. Rodriguez began assisting with P-1. Once P-1 was airlifted to the hospital, he began to stabilize V-1 and V-2. Mr. Rodriguez noticed a female's shoe and began looking for P-2, who was in the mangroves. Once additional help arrived on scene, Mr. Rodriguez drove the ambulance that was transporting D-1 to the hospital. Mr. Rodriguez did not have any contact with D-1.

I prepared a search warrant for D-1's cellular telephone used at the scene of the crash. The probable cause statement in this search warrant was the same submitted to the Miami-Dade State Attorney's office for V-1's search warrant. This probable cause statement had additional evidence that was discovered during the on-going investigation. This additional evidence aided in solidifying the probable cause D-1 was operating V-1 in a reckless manner at the time of the crash.

On Wednesday, October 2, 2019, at 12:27 PM, I forwarded the cellular telephone search warrant to ASA Conolly. I asked her to review the search warrant. The same afternoon, at 3:56 PM, ASA Conolly replied "a thorough analysis of the case law based on the evidence presented fails to establish probable cause to believe that a crime has been committed."

On Thursday, October 10, 2019, ASA Conolly signed the Florida Highway Patrol Traffic Homicide Investigation Release form. The form states the Monroe County State Attorney's Office of the Sixteenth Judicial Circuit reviewed the case. ASA Conolly checked off the line which states; "We do not intend to file a criminal information based on the information provided."

## INVESTIGATIVE REPORT

The ACM/EDR from both V-1 and V-2 did record events that can be attributed to this crash. The results from the imaging of V-1's EDR/ACM displayed a speed of 97 kilometers per hour 5 seconds prior to impact. 4.5 seconds to ½ second prior to impact, V-1's speed was 98 Kilometers per hour. V-1's brakes were applied at ½ second prior to impact. V-1's speed at impact (0) was 84 kilometers per hour and the brakes were applied. V-1's speeds were converted into miles per hour, showing its speed was to be 60.23, 60.85 and 52.16 miles per hour at impact. V-1's recorded delta V was -54 kilometers per hour, which was converted to -33.53. V-1's exit speed after impacting V-2 was calculated to be 32.99 miles per hour. V-1's minimum speed at impact was calculated to be 47.41 miles per hour with its maximum speed calculated at 56.84 miles per hour.

V-2 was parked with its engine idling when it was impacted by V-1. The imaged data from V-2's EDR/ACM indicated it's engine speed was at a constant 576 revolutions per minute (RPM), its throttle position was at a constant 5 % and its vehicle speed was zero (0) miles per hour. The data indicated V-2 had a lateral delta V of -26 and a longitudinal delta V of 2. Its combined total delta V was 26.07, which represents a conservative post crash speed of V-2. The total delta V of V-2 was a direct result of the impact from V-1.

### SUMMARY

Based upon all the facts gathered during this investigation, which includes the recorded statements, physical evidence, and medical examiner's reports, I have determined the following. V-1 was traveling eastbound on State Road 905A (Card Sound Road) approaching the "T" intersection of State Road 905. V-2 was properly parked on the east side paved/gravel shoulder

## INVESTIGATIVE REPORT

of State Road 905 facing in a southerly direction. Both P-1 and P-2 were standing outside V-2's left side. V-1 failed to slow/stop for the traffic control device for eastbound State Road 905A at the "T" intersection for northbound State Road 905. V-1 crossed the intersection of State Road 905 and entered the outside shoulder and struck a yellow directional sign. V-1 continued in an easterly direction and struck the right front of V-2 with its front. After impact, V-2 was redirected in an easterly direction rotating counterclockwise. V-2's left side struck both P-1/P-2, causing them to be thrown. P-1 was thrown in an easterly direction and P-2 was thrown in a northeasterly direction. After the initial collision between both V-1/V-2, a secondary collision occurred and that V-1's left side struck the right side of V-2. P-1 came to final rest on the asphalt surface between the final rest locations of V-1 and V-2. P-2 came to final rest with the tree line of the mangrove bushes on the north side of the paved asphalt shoulder.

D-1 operated his vehicle in a careless manner by traveling in excess of the posted speed limit, failing to stop at a stop sign, failing to stop at a flashing red traffic light and was distracted by use of his cellular telephone. These multiple moving violations resulted in the damages to V-1, V-2, the serious bodily injury to P-1, and the untimely demise of P-2.

Based on the facts of this case, D-1 did commit the following:

**316.1925(1) Careless Driving:** "Any person operating a vehicle upon the streets or highways within the state shall drive the same in a careful and prudent manner, having regard for the width, grade, curves, corners, traffic, and all other attendant circumstances, so as not to endanger the life, limb, or property of any person. Failure to drive in such manner shall constitute careless driving and a violation of this section."