# EXHIBIT D

1

2                  UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF FLORIDA (MIAMI)

4     NEIMA BENAVIDES, as          )     Civil Case No.

5     Personal                     )     21-cv-21940-BLOOM

6     Representative of            )     /Otazo-Reyes

7     Naibel Benavides Leon,       )

8     deceased,                    )

9              Plaintiff,          )

10                  v.             )

11    TESLA, INC., a/k/a           )

12    Tesla Florida, Inc.,         )

13              Defendant.         )

14

15              DEPOSITION OF GEORGE McGEE

16                Tuesday, March 15, 2022

17

18

19

20

21

22

23    Reported by:

24    Vanese Killingbeck, RPR, CRR

25    JOB NO. 207717

1

2                     March 15, 2022

3                  9:06 a.m. to 3:05 p.m.

4

5

6                     Deposition of GEORGE McGEE, held

7   remotely before Vanese Killingbeck, a Registered

8   Professional Reporter, and Notary Public of the

9   State of Florida.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2   A P P E A R A N C E S:

3

4              POSES AND POSES, P.A.

5              Attorney for Plaintiff

6                   169 East Flagler Street

7                   Miami, Florida 33131

8         BY:    TODD POSES, ESQ.

9

10             BOWMAN AND BROOKE LLP

11             Attorney for Defendant

12                  41000 Woodward Avenue

13                  Bloomfield Hills, Michigan 48304

14        BY:   THOMAS BRANIGAN, ESQ.

15

16            WICKER SMITH O'HARA MCCOY & FORD, P.A.

17            Attorney for George McGee

18            2800 Ponce de Leon Boulevard

19            Coral Gables, Florida

20        BY:  JACOB LIRO, ESQ.

21

22   ALSO PRESENT:

23                  Carlos Sofos, Videographer

24

25

```
 1                     McGee
 2          VIDEOGRAPHER:  This is the start of
 3  Media Label Number 1 of the video-recorded
 4  deposition of George McGee in the matter
 5  Neima Benavides versus Tesla, Inc.
 6          This deposition is being held at
 7  9150 South Dadeland Boulevard, Miami, Florida, on
 8  March 15th, 2022, at approximately 9:07:00 a.m.
 9          My name is Carlos Sofos, the video
10  specialist for TSG Reporting, Inc.
11          The court reporter is Vanese Killingbeck
12  in association with TSG Reporting.
13          Will counsel please introduce yourselves
14  for the record.
15          MR. POSES:  Todd Poses for the Plaintiff.
16          MR. BRANIGAN:  Tom Bran -- excuse me.
17      Tom Branigan for Tesla, Incorporated.
18          MR. LIRO:  Jacob Liro for Mr. McGee.
19          VIDEOGRAPHER:  Will the court reporter
20      please swear in the witness.
21              G E O R G E   M c G E E
22          Called as a witness, having been duly
23      sworn by a Notary Public, was examined and
24      testified as follows:
25
```

```
 1                    McGee

 2   EXAMINATION

 3   BY MR. BRANIGAN:

 4        Q.   Good morning, sir.  My name is

 5   Tom Branigan, I introduced myself to you before we

 6   got started, and I represent Tesla.  And today is

 7   the day for your deposition.  The deposition is

 8   being taken in response to a notice and a subpoena,

 9   and it can be used for all purposes permitted by

10   law.

11             Would you tell us your full name and

12   address, please.

13        A.   George Brian McGee, 60 Palm Square,

14   Delray Beach, Florida 33483.

15        Q.   Is that your business address or home

16   address?

17        A.   Home address.

18        Q.   What is your business address, please?

19        A.   2424 North Federal Highway Suite 418,

20   Boca Raton, Florida 33481.

21        Q.   As I understand it, you, at one point in

22   time -- and maybe that's still true today -- had an

23   address at the Ocean Reef Club; is that right?

24        A.   Yes, sir.

25        Q.   What is the address there, please?
```

```
 1                    McGee
 2         A.    It's 75-A Snapper Lane, Key Largo, Florida
 3    33037.
 4         Q.    All right.
 5               COURT REPORTER:  I'm sorry.  I'm having
 6         difficulty hearing the witness.
 7         A.    I'm sorry.  Yes, ma'am.  Let me try this
 8    again.  75-A Snapper Lane, Key Largo, Florida 334 --
 9    or, I'm sorry, 33037.
10    BY MR. BRANIGAN:
11         Q.    Have you ever had your deposition taken
12    before, Mr. McGee?
13         A.    Yes, sir.
14         Q.    How many times?
15         A.    I don't recall, a few.
16         Q.    And when was the last time you had your
17    deposition taken?
18         A.    Approximately four months ago.
19         Q.    Was it for a personal matter, business
20    matter, or something else?
21         A.    Personal matter.
22         Q.    All right.  Well, let me just cover a
23    couple of pointers about the deposition process to
24    refresh your memory.  Because we have a court
25    reporter recording everything that's being said
```

```
 1                        McGee
 2   while we're on the record, we need you to give only
 3   a verbal response.  So please avoid nonverbal
 4   communication, like a nod of the head, which is what
 5   you're doing right now --
 6        A.   Yes, sir.
 7        Q.   -- which is perfectly --
 8        A.   Yes, sir.
 9        Q.   -- normal, and so we'll be able to
10   communicate with each other.
11             But during a deposition, it makes it
12   difficult for the court reporter to record what
13   you're saying --
14        A.   Yes, sir.
15        Q.   -- or what you're trying to convey.  So
16   please give a verbal response only.
17             If I ask you a question that you don't
18   understand, please let me know and ask me to
19   rephrase something, define something, repeat
20   something.  Otherwise, if you answer, I will assume
21   that you understood my question and that you're able
22   to answer, fair?
23        A.   Yes, sir.
24        Q.   If you need to take a break at any time,
25   let us know.  We can do that.
```

```
 1                    McGee

 2        A.   All right, sir.

 3        Q.   What's your date of birth?

 4        A.   November 12, 1976.

 5        Q.   And your age today?

 6        A.   45.

 7        Q.   Are you married?

 8        A.   Yes, sir.

 9        Q.   And what is your spouse's name?

10        A.   Ashley Noelle McGee.

11        Q.   Do you have any children?

12        A.   Yes, sir.

13        Q.   How many?

14        A.   Two.

15        Q.   Their names and ages, please.

16        A.   It's George Ozzie McGee and

17   Van Azure McGee.

18        Q.   You mentioned that you were deposed fairly

19   recently, couple of months ago.

20        A.   Yes, sir.

21        Q.   Is that right?

22        A.   Yes, sir.

23        Q.   What was the reason for that deposition?

24             THE WITNESS:  Is that relevant?

25             MR. LIRO:  You can -- you can answer.
```

```
 1                    McGee

 2      A.   Dissolution of marriage.  My wife and I

 3   are not getting along.

 4   BY MR. BRANIGAN:

 5      Q.   Okay.  So you -- you also told us that you

 6   think you've been deposed a couple of times.  So

 7   that wasn't your only deposition; is that right?

 8      A.   Yes, sir, correct.

 9      Q.   All right.  How many times total do you

10   think you've -- you've given a deposition?

11      A.   I've given only -- again, I believe a few.

12   I've sat through more.  I used to work in debt

13   restructuring business.  And so whereby you'd sit

14   next to someone like yourself.  You'd be deposing

15   someone, I'd be providing questions.  And then I was

16   an expert witness in a case, and I was deposed on

17   that years ago.  But it's been a long time.

18      Q.   Okay.  What is your educational background

19   starting with the year you graduated from high

20   school?

21      A.   I graduated from high school in 1995,

22   Charlotte Catholic School, Charlotte,

23   North Carolina.  And I attended Davidson College for

24   four years.  Double major in economics and political

25   science.  And graduated in 1999.  And that's all of
```

Page 10

```
 1                        McGee
 2     my education.
 3          Q.   And after you graduated --
 4          COURT REPORTER:   Sorry.  I did not get the
 5     end of your answer.
 6          A.   Sorry.  Last was Davidson College,
 7     graduated in 1999.
 8   BY MR. BRANIGAN:
 9          Q.   What is your degree in?
10          A.   A double major in economics and political
11     science.
12          Q.   Do you have any certificates, licenses
13     related to professional endeavors, practices, work?
14          A.   Nothing that's current.  At one point I
15     was registered, you know, in a Series 763 securities
16     things probably 20 years ago.  But in my business
17     today, I don't need it, so I don't think there's
18     anything recent that's active.
19          Q.   Where are you employed today?
20          A.   I am self-employed technically, but with a
21     firm called New Water Capital.
22          Q.   And where is that located?
23          A.   Boca Raton, Florida.
24          Q.   Can you give me the address, please?
25          A.   Yes, sir.  It's the previous address.
```

1                        McGee

2    2424 North Federal Highway, Boca Raton, Florida

3    33431.

4        Q.   What's the nature of the firm's business?

5        A.   It's a private equity management company.

6        Q.   And what is your position there?

7        A.   Partner.

8        Q.   Do you have any administrative

9    responsibilities that give you a title besides

10   partner or any other roles in the firm?

11       A.   It's a -- it's a small firm, so I've got

12   some titles also as responsibilities, head of HR,

13   although I don't do quite a -- much in it, to be

14   honest.  And I think technically I'm head of IT.

15   But our CFO pretty much does that.  After that, I'm

16   just a partner.

17       Q.   How many people work at the firm?

18       A.   Approximately 14.

19       Q.   Have long have you worked there?

20       A.   We started the firm in June of 2015

21   technically, so sometime formation in 14 through

22   today.

23       Q.   And where were you employed before that?

24       A.   Another firm in town, Boca Raton, called

25   Sun Capital Partners.

1                          McGee

2       Q.   All right.  Am I correct in saying that

3    you don't have any education in the field of

4    automotive engineering or engineering in general?

5       A.   Correct.

6       Q.   Am I correct in thinking that you're not a

7    automotive mechanic in any way?

8       A.   Not in any way, sir.

9       Q.   Would it be true that you're not even what

10   some people would might refer to as a shadetree

11   mechanic?  In other words, you don't repair your own

12   vehicles?

13      A.   That's not entirely true.  I do work on an

14   old vehicle that I repaired as a child.

15      Q.   What -- what kind of vehicle?

16      A.   It's a 1979 Jeep CJ7.

17      Q.   Do you have any certifications as a

18   mechanic --

19      A.   No, sir.

20      Q.   -- from any certifying body?

21      A.   No, sir.

22      Q.   Do you consider yourself a person who has

23   expertise when it comes to automotive design?

24      A.   No, sir.

25      Q.   Automotive performance?

```
 1                      McGee
 2        A.   No, sir, other than as, again, being a guy
 3   who knows, you know, how to put a chip in a car or
 4   something like that.
 5        Q.   So I want to make sure --
 6        A.   Sorry.  Very -- no, sir.
 7        Q.   I want to make sure --
 8        A.   No, sir.  I do not know about --
 9        Q.   You don't consider yourself an expert --
10        A.   No, sir.
11        Q.   -- on putting a chip in a car?
12        A.   No, sir.
13        Q.   Okay.  Do you know what the acronym ADAS,
14   A-D-A-S, stands for?
15        A.   No, sir.
16        Q.   All right.  I take it that -- just to
17   round this out -- you don't consider yourself to
18   have any special expertise when it comes to advanced
19   driver assist systems, autonomous driving,
20   self-driving?
21        A.   No, sir.
22        Q.   Okay.  You mentioned -- back to your
23   experience with the litigation world, you mentioned
24   depositions and cases that you've been involved in.
25   Have you ever been a party to a lawsuit, excluding
```

```
1                      McGee

2    your family matter that you described a minute ago?

3         A.   On a personal level?

4         Q.   Yes.

5         A.   No, sir.  I'm just thinking to be

6    100 percent sure.  No, sir, I've never been party to

7    a lawsuit other than this wife situation.

8         Q.   All right.  Well, we're here today because

9    of a motor vehicle accident that you were involved

10   in.  Were you sued in that case?

11        A.   Oh, yes, sir.  I'm sorry, yes, sir, I was.

12        Q.   Okay.  Other than that case, have you ever

13   been sued before, or have you ever been the party,

14   the plaintiff suing someone else?

15        A.   No, sir.

16        Q.   The -- the lawsuit that you were involved

17   in concerning this motor vehicle accident, I want to

18   talk to you for a minute about that.  In the course

19   of that lawsuit, did you give a deposition?

20        A.   No, sir.

21        Q.   Did you give a recorded statement to

22   anyone?

23        A.   No, sir.

24        Q.   Let me explain what I mean by recorded

25   statement.  Recorded statement would be where you
```

1                          McGee

2    are speaking and either, in your own words,

3    saying -- making a statement, or you're answering

4    questions and the statement is being recorded.

5    Either it's being recorded by a court reporter, like

6    we have here today, someone is taking notes and

7    recording it, and then you sign the statement under

8    oath, or there's a recording that's being made, an

9    audio or audio-video recording.

10           So with that definition, have you given a

11   statement before today about this crash?

12        A.   I was on a -- a body camera that evening,

13   so I guess that's a recording device.  And,

14   obviously, I spoke to the officer there.  But that's

15   all that I recall giving any statements to.

16        Q.   All right.  The lawsuit that was filed

17   against you as a result of this crash, is it

18   resolved?

19        A.   Yes, sir.

20        Q.   Settled?

21        A.   Yes, sir.

22        Q.   And when did it resolve?

23        A.   Approximate -- let's say approximately

24   April of last year.  I don't know the exact date.

25   Last year.

```
 1                         McGee
 2        Q.   You're looking at your lawyer, which is --
 3        A.   Yes, sorry.  I can't --
 4        Q.   It's natural, but --
 5        A.   I understand.  But I don't recall.
 6        Q.   -- this is for you --
 7        A.   I don't recall.  I believe it's about a
 8    year ago.
 9        Q.   Okay.  All right.  Before that lawsuit was
10    settled, do you know if you or your lawyer on behalf
11    of you consulted with any engineer or expert witness
12    about the performance of -- or the design of the
13    vehicle that you were driving?
14             MR. LIRO:  Hold on, Brian.  That question
15             necessarily is going to get into
16             attorney-client communications.
17             So to the extent that the only information
18             that you have regarding that answer is based on
19             conversations with myself or people from my
20             office, I'm going to direct you not to answer.
21             THE WITNESS:  Okay.
22    BY MR. BRANIGAN:
23        Q.   Okay.  All right.  And to be clear, I'm
24    not interested in conversations that you had with
25    your lawyer, advice that you may have had -- excuse
```

1                                        McGee

2   me -- advice that you may have requested, or advice

3   that may have been provided to you.

4              But as a matter of fact, do you know,

5   perhaps because you pay the bill, whether an expert

6   witness was retained -- an engineer or an accident

7   reconstruction expert, or an accident investigator

8   was retained for you on your behalf in that case?

9        A.   I don't recall that.

10       Q.   Do you know if the vehicle that you were

11  driving -- first of all, do you recall what vehicle

12  you were driving that night?

13       A.   Yes, sir.

14       Q.   What was it?

15       A.   Tesla Model S.

16       Q.   What year?

17       A.   I don't recall.  I think I bought it in

18  January.  I don't recall.  I want to say -- I don't

19  recall.  Approximately 2019, 2018.

20       Q.   January of what year did you buy it?

21       A.   January of 2019.

22       Q.   Okay.  So do you know if, in that

23  litigation, any expert witnesses, any engineers, any

24  automotive specialists, any mechanics -- I'm trying

25  to be broad in describing -- you know --

```
 1                      McGee
 2      A.   Yes, sir.
 3      Q.   -- defining expert witness -- or expert
 4  looked at the Tesla and provided any reports or
 5  opinions about what they think happened or how they
 6  think the Tesla operated?
 7      A.   No, sir, not to my knowledge.
 8      Q.   All right.  You mentioned that you gave a
 9  statement to the police about the incident.  I think
10  you were referring to statements that you made that
11  were recorded by a police body camera video -- body
12  video -- excuse me, body camera and video, correct?
13      A.   Yes, sir.
14      Q.   Other than that statement that you refer
15  to, did you give any statements to the police after
16  the night of the incident?
17      A.   I do recall a signed statement.  I don't
18  know if it was for the policeman or for Mr. Poses'
19  side and the litigation, but I did give a brief
20  written statement that I signed.
21      Q.   Do you have a copy of that?
22      A.   No, sir.
23      Q.   Do you know if your lawyer has a copy of
24  that?
25      A.   Yes, sir.
```

```
 1                      McGee
 2       Q.   You're here today under -- under subpoena,
 3   correct?
 4       A.   I do not recall, sir.  Yes, sir.
 5       Q.   And let me show you what we're going to
 6   mark as Exhibit 1.
 7       (Exhibit 1 was marked for identification.)
 8            MR. BRANIGAN:  Madam Court Reporter, we'll
 9            make arrangements to send you the exhibits at
10            the end of the deposition.  All of my exhibits
11            are -- excuse me, with one exception, are hard
12            copy.  Is that okay with you?
13            COURT REPORTER:  That's fine, Counsel.
14   BY MR. BRANIGAN:
15       Q.   So I've just handed Mr. McGee Exhibit 1.
16   And Exhibit 1 is the Amended Notice of Duces Tecum
17   in person in video-recorded deposition of
18   George McGee.
19            Do you see that, sir?
20       A.   Yes, sir.
21       Q.   Have you -- have you had a chance to --
22   have seen this before today?
23       A.   Yes, sir.
24       Q.   Have you had a chance to look at this and
25   review it before today?
```

```
 1                      McGee

 2        A.   I just looked at it briefly, sir, when it

 3   came in the e-mail, but once I saw the address and

 4   the time, I confirmed, I just closed it.  Very

 5   cursory review.

 6        Q.   All right.  When do you think that was

 7   that you looked at it?

 8        A.   Last Friday, I believe.  Jacob sent it

 9   Friday.

10        Q.   If you look at the last page of --

11        A.   Yes, sir.

12        Q.   -- these pages -- this document -- this

13   copy is double sided.

14        A.   Yes, sir.

15        Q.   So if you look at the last page, there's

16   a -- there's a section of this that's called

17   Schedule A.

18        A.   Yes, sir.

19        Q.   And did you have a chance to look at that

20   before today?

21        A.   No, sir.

22        Q.   All right.  Would you take a minute or two

23   or whatever time you need and review exhibit --

24   excuse me -- Exhibit 1, Schedule A, Items 1 through

25   10, please.
```

```
 1                    McGee
 2      A.   Yes, sir, I reviewed it.
 3      Q.   Did you bring any documents with you today
 4  in response to Schedule A?
 5      A.   No, sir.
 6      Q.   Well, let's go through these.  First of
 7  all, Item Number 1, do you have any documents that
 8  you received through your purchase or lease of the
 9  Tesla that we're talking about here today?
10      A.   No, sir.
11      Q.   I don't mean with you today.  I mean, if
12  you have them with you today, great.  But I mean do
13  you have any documents concerning that vehicle?
14      A.   No, sir.  I'm not very organized, to be
15  quite frank, so I don't -- I'm sure I had probably
16  produced the first one, because it's got to be
17  somewhere or attorney has it.  But I don't have any
18  of these, no, sir.
19      Q.   And you haven't made any search or
20  investigation before today to see if you have any of
21  those documents, correct?
22          MR. LIRO:  Hold on a second.
23          Again, we've had certain communications,
24      and we've reviewed the duces tecum.  And I can
25      tell you that Mr. McGee does not have these
```

                              McGee

1

2      documents in his possession.  So I want to put

3      on the record that we have reviewed this.

4      There are no responsive documents in

5      Mr. McGee's possession.  We can go one by one

6      and you can confirm that.  But just so you

7      know, we did perform our due diligence in

8      addressing the duces tecum portion of the -- of

9      the deposition.

10          MR. BRANIGAN:  When you say you have no

11      documents, are you -- are you broadly

12      addressing the whole request, Items 1

13      through 10, or just one right now.

14          MR. LIRO:  We do not -- Mr. McGee does not

15      have Items 1 though 10 in his possession,

16      custody, or control.  The Tesla's no longer in

17      his possession.  The materials associated with

18      the Tesla are no longer in his materials.

19   BY MR. BRANIGAN:

20      Q.   Mr. McGee, did you have documents that

21   would be responsive to Item Number 1 that you

22   provided to your lawyer or to anyone else?

23          MR. POSES:  Wait.  I'm not going to have

24      him provide you information regarding what he

25      provided me.  That's -- we're dancing too close

```
 1                         McGee

 2         to the attorney-client privilege.  I believe

 3         that you're entitled to ask him if he has these

 4         materials, but not what he's provided his

 5         counsel.

 6    BY MR. BRANIGAN:

 7         Q.   Have you provided the documents responsive

 8    to Number 1 to anyone other than your lawyer?

 9         A.   No, sir.

10         Q.   Item Number 2, all manuals, guides, or

11    instructions for the subject Tesla, which means the

12    Tesla you were driving, the 2019 Model S, on the

13    night of the crash.

14              Do you have any documents responsive to

15    Item Number 2?

16         A.   No, sir.

17         Q.   When you -- first of all, did you purchase

18    or lease the car?

19         A.   I purchased the car.

20         Q.   Did you purchase it personally, or did

21    you -- your business purchase it?

22         A.   I purchased it personally.

23         Q.   Okay.  When you purchased the vehicle, did

24    you receive documents with the vehicle, for example,

25    a purchase agreement?
```

```
 1                    McGee
 2      A.   I do not recall because I bought it on my
 3 phone, believe it or not, purely electronically, so
 4 I don't know.
 5      Q.   You took delivery of the vehicle, correct?
 6      A.   Yes, sir.
 7      Q.   Did the vehicle -- was it delivered to you
 8 or to your place of business or home, or did you go
 9 to a Tesla store to pick it up?
10      A.   I went to a Tesla store and picked it up.
11      Q.   And when do you think you did that?
12      A.   In January of that year when I purchased
13 it.
14      Q.   Do you remember -- do you remember the
15 name or names of anyone that you were dealing with
16 there when you took delivery of the vehicle?
17      A.   No, sir.
18      Q.   Do you remember the name or names of
19 anyone that you dealt with at Tesla before you took
20 the delivery, before the purchase was consummated?
21      A.   No, sir.  Like I said, it was highly
22 electronic.  So I don't recall speaking to anyone,
23 but it's been a long time.
24           COURT REPORTER:  Sorry, you were --
25      A.   Oh, I'm sorry.  I said I did the purchase
```

1                    McGee

2    electronically.  I don't recall speaking to anyone.

3   BY MR. BRANIGAN:

4        Q.   Do you think you still have an electronic

5    record of any communications that you received from

6    anyone at Tesla or any communications that you sent

7    to someone at Tesla about the purchase of the

8    vehicle?

9        A.   No, sir.

10        Q.   And you say you did it all over your

11   phone?

12        A.   Yes, sir.

13        Q.   Do you still have that phone today?

14        A.   No, sir.

15        Q.   Do you know where that phone is?

16        A.   No, sir.

17        Q.   Is that the phone that you had with you on

18   the night of the crash?

19        A.   I don't recall, sir.

20        Q.   Do you think more than likely it was,

21   since you made the purchase in January of 2019 and

22   the crash happened four months later?

23        A.   I couldn't speculate.  I go through phones

24   quite frequently.

25        Q.   All right.  Look at Number 3, please.

1                        McGee

2            Do you have any documents that are

3    responsive to Number 3?

4         A.   No, sir.

5         Q.   How about Number 4?

6         A.   No, sir.

7         Q.   Number 5?

8         A.   No, sir.

9         Q.   Number 6?

10        A.   No, sir.

11        Q.   Number 7?

12        A.   No, sir.

13        Q.   Number 8?

14        A.   No, sir.

15        Q.   Number 9?

16        A.   No, sir.

17        Q.   Number 10?

18        A.   No, sir.

19        Q.   Would you agree with me that the documents

20   that are asked for in Items 3 through 10 relate to

21   certain features on the vehicle, the 2019 Model S?

22        A.   I can't recall all the features, but they

23   seem to be a Tesla feature probably.  I just

24   couldn't speak to every feature.  I don't understand

25   the acronyms, et cetera.

1                        McGee

2       Q.   For example, Item Number 3 asks you to

3  bring documents that bring support your

4  understandings -- or understanding, I think it's a

5  typo -- of the performance of the autopilot features

6  on the subject Tesla Model S before the date of the

7  subject, the date of the crash that we're here for,

8  correct?

9       A.   Yes, sir.

10      Q.   Do you recall receiving any documents or

11  any information with the car that explained

12  autopilot?

13      A.   No, sir.

14      Q.   Before you decided to purchase the car,

15  what caused you to be interested in the car?

16      A.   I'm doing a long commute, as we

17  referenced, from Key Largo to my office in

18  Boca Raton.  And the car's feature broadly seemed

19  attractive for making that commute.

20      Q.   What features are you referring to?

21      A.   As you mentioned, kind of the self-driving

22  autopilot to help me, if you will, on my trips back

23  and forth.

24      Q.   How did you find out about the car and its

25  features before you made a decision to buy it?

1                    McGee

2      A.   I'm not sure.  The media.  I really don't

3  know.  Been in a few before I bought it, a few folks

4  that had them.  So general awareness of the vehicle.

5  And like I said, I rode in a few.  I think that's

6  it.

7      Q.   You rode in a few.  Did you ever drive one

8  before you made a decision to buy the car?

9      A.   No, sir.

10     Q.   Did you do any research of your own in any

11 way, Internet, social media, print media, anything

12 like that, to investigate the car before you -- you

13 bought it?

14     A.   I'm confident I did, but I can't recall

15 what that was.  Most of the times when I'm looking

16 at things in cars, it's Internet-related, as a kind

17 of reference.  But I don't recall what

18 particularly -- I'm sure I did look at videos on the

19 Internet about the car.

20     Q.   Before you made your decision to buy the

21 vehicle, did you go to a Tesla store, talk to a

22 sales representative, sales consultant?

23     A.   No, sir.

24     Q.   Did you go to a Tesla store and test drive

25 one?

```
 1                      McGee

 2        A.   No, sir.

 3        Q.   Did you contact Tesla in California and

 4   make any request for information?

 5        A.   No, sir.

 6        Q.   So I want to make sure I understand the

 7   totality of what you did before you made your

 8   decision to buy this vehicle.

 9        A.   Yes, sir.

10        Q.   You -- if I understand you correctly, you

11   think you rode in one or two of them that may have

12   been owned by a friend or a family member; is that

13   right?

14        A.   Yes, sir.

15        Q.   Do you remember the name of the person who

16   owned the Tesla that you rode in before you

17   purchased yours?

18        A.   I do recall riding with a guy named

19   Chuck Smith in Michigan years ago.  He had

20   a Model X.  The one with the X Wing, Model X.  Is

21   that right?  And I don't recall if I rode with my

22   other friend.  Another friend has one, but I can't

23   recall if I rode in it.

24        Q.   Chuck Smith, this is someone who lives in

25   Michigan?
```

```
 1                        McGee
 2       A.   Yes, sir.
 3       Q.   Do you know where?
 4       A.   I don't believe he lives there anymore.
 5  It was in Muskegon, Michigan.  It was a business
 6  trip.
 7       Q.   Did you drive that vehicle?
 8       A.   No, sir.
 9       Q.   Did he operate any of the features of the
10  vehicle that are referred to as autopilot features?
11       A.   He did probably, but I can't recall.
12  Again, it was a new experience for me.  That's
13  pretty much all I recall.  It was a ride to lunch or
14  something like that.
15       Q.   And how far -- how much time before you
16  decided to buy your Tesla did that ride happen?
17       A.   I couldn't tell you.  It wasn't -- it
18  wasn't like I rode in his car the week prior and got
19  excited and went and bought it.  It was a
20  substantial period of time, but I couldn't tell you.
21       Q.   Less than a year?  More than a year?
22       A.   I honestly don't know.
23       Q.   Were you in the front seat of that vehicle
24  or the rear?
25       A.   I do not -- I don't recall actually.  I
```

```
 1                          McGee
 2   believe people were with us.  But, again, it was a
 3   long time ago, so I can't recall.
 4        Q.   How long did the ride last?
 5        A.   I can't recall.  But, again, I believe it
 6   would have been to a meal, a lunch, or a dinner, so
 7   it would have been short.
 8        Q.   Did you have another experience with a
 9   Tesla vehicle after that one where you were riding
10   in the vehicle, driving the vehicle, and before you
11   decided to buy your Model S?
12        A.   No, sir.
13        Q.   Other than the autopilot features, was
14   there anything else about the Model S that
15   interested you --
16        A.   Yes, sir.
17        Q.   -- or motivated you to buy the vehicle?
18        A.   Yes, sir.
19        Q.   What else?
20        A.   The aesthetics of the vehicle itself.
21   Overall, it was enamoring.  I thought it was a
22   beautiful car, quite frankly, and I like cars.  And
23   so, hence, when I decided to buy one, I did it
24   fairly quickly, as we talked about.  But thought it
25   was a beautiful car.  And the interior was also
```

1                              McGee

2    highly attractive, very user-friendly.  And I

3    thought it was an amazing vehicle.

4        Q.   So let me go back to the point in time at

5    which you took delivery of the vehicle.  Do you

6    remember when that was?

7        A.   I don't.  I'm making the assumption it was

8    January, I'm pretty sure, is when I picked it up.  I

9    remember it being sunny outside.  And then -- and

10   that's pretty much it.  It was a small place I think

11   in Fort Lauderdale.  But, again, I can't recall if

12   that's still there or --

13       Q.   Do you remember the cross streets or the

14   address?

15       A.   I don't.  No, sir.  I believe you can see

16   it from the highway.  I'm not sure.  I speculate on

17   that.

18            COURT REPORTER:  Sorry.

19       A.   I'm sorry.  I was saying I believe you can

20   see it from the highway, but I speculate on that.  I

21   don't recall.  I think it was it was somewhere in

22   Fort Lauderdale because it was in between Key Largo

23   and Boca Raton.

24   BY MR. BRANIGAN:

25       Q.   And do you remember the name of the person

1                        McGee

2    that you met with when you took delivery?

3         A.   No, sir.

4         Q.   I may have asked you.  Forgive me, if you

5    answered.

6         A.   No, sir.  I don't recall.

7         Q.   How -- was anyone with you when you took

8    delivery of the Tesla?

9         A.   No, sir.

10        Q.   So it's just you meeting with someone

11   there?

12        A.   Yes, sir.  I, again, was using the app to

13   pretty much execute my purchase from the time I put

14   my deposit down until that day.

15        Q.   Did you have any specific questions that

16   you asked about the vehicle before you drove off in

17   it?

18        A.   I don't recall.

19        Q.   How much time were you there before you

20   actually, you know -- when you went to the Tesla

21   store to take delivery, how much time were you there

22   before you actually drove off in the vehicle?

23        A.   I don't recall.

24        Q.   Do you think it was more than an hour?

25        A.   No, sir.

```
 1                      McGee
 2      Q.   Were you satisfied with the information
 3 that was provided to you by the person that you were
 4 dealing with from Tesla?
 5      A.   I honestly don't recall.
 6      Q.   You don't recall if you're satisfied?
 7      A.   No, sir.
 8      Q.   Do you think that Tesla should have
 9 provided you with information that you weren't
10 provided?
11      A.   No, sir.
12      Q.   So you get the car in January of 2019,
13 correct?
14      A.   Yes, sir.
15      Q.   And were you the primary driver of the
16 vehicle, then?
17      A.   Yes, sir.
18      Q.   Did anyone else ever drive the vehicle?
19      A.   Yes, sir.
20      Q.   Who else drove the vehicle?
21      A.   I let some of my friends drive the --
22 drive the vehicle.  That's pretty much it.  It
23 wasn't a daily driver for anyone else.
24      Q.   Did your wife occasionally drive the
25 vehicle?
```

```
 1                        McGee

 2        A.   No, sir.

 3        Q.   After taking delivery of the vehicle, did

 4   you do anything to educate yourself with the

 5   features of the vehicle?  Features of the vehicle --

 6   I'm going to focus my attention or our attention to

 7   the -- on the features that are sometimes referred

 8   to as autopilot features.

 9        A.   I'm sorry, sir.  Could you repeat the

10   question?

11        Q.   Yes.  Did you do anything to educate

12   yourself about the autopilot features in the

13   vehicle, how to activate them, how to -- how to

14   deactivate them, when to use them, when not to use

15   them, and the like?

16        A.   I don't recall.  But I'm confident that I

17   found a way to operate it.  But I can't recall what

18   I would have done.  Knowing myself, I probably would

19   have watched videos on some format, the company

20   website.  But I'm speculating.  I don't recall.

21        Q.   The vehicle has an owner's manual.

22        A.   Yes, sir.

23        Q.   Do you know that?

24        A.   I am highly confident it has an owner's

25   manual just given it's an automobile, not that I
```

```
 1                        McGee
 2    kind of set my eyes on it.  I would probably say,
 3    again, I'm very electronic versus paper.
 4          Q.   Do you recall --
 5               COURT REPORTER:  Sorry.
 6               MR. BRANIGAN:  He said --
 7          A.   I said I'm very electronic instead of
 8    paper.  Apologies.
 9    BY MR. BRANIGAN:
10          Q.   Being, as you said, a very electronic
11    person, did you recognize that the vehicle allowed
12    you to access the owner's manual electronically
13    while you were in the vehicle?
14          A.   No, sir, not that I recall.
15          Q.   You didn't know that?
16          A.   Not that I recall, no, sir.
17          Q.   All right.  Let me turn your attention
18    away from the Model S for a minute.  Focusing your
19    attention on January 2019, what -- what vehicle were
20    you driving before you started driving the Model S?
21          A.   I was driving a Maserati Quattroporte GTS.
22          Q.   What model year?
23          A.   I don't recall.  I'm going to speculate.
24    It was a lease.  2015, I believe, or '16.
25          Q.   Did that vehicle have any advance driver
```

1                        McGee

2    assistance technology in it?

3         A.   No, sir, not that I'm aware of.

4         Q.   All right.  Let me -- let me give you some

5    examples so that we're both on the same page in

6    communicating with each other.  Did that vehicle

7    have any form of advanced or radar control cruise

8    control?

9         A.   Not that I know of.  But, again, if so, I

10   never used it.

11        Q.   Okay.  Again, let me give you a little

12   definition there so that we're not passing like

13   ships in the night here.

14             Generally speaking, radar-controlled

15   cruise control will allow you to set the cruise

16   control and define the distance that you want the

17   front of your vehicle to stay back from the rear of

18   the vehicle that it's following.

19             Are you with me so far?

20        A.   Yes, sir.

21        Q.   And the vehicle, once it's set, will

22   maintain that distance or gap or occasionally change

23   it depending on your settings.

24        A.   Yes, sir.

25        Q.   Is it your recollection of the Maserati

1                           McGee

2    that you were driving did not have that kind of

3    technology?

4         A.   Yes, sir.

5         Q.   Yes, sir, it did not?

6         A.   It did not, that I know of.  If it did, I

7    did not use that technology.

8         Q.   Do you know what lane-keeping assist or

9    lane-centering assist is?

10        A.   Broadly speaking, but I prefer you to walk

11   me through.

12        Q.   Well, that would be technology that

13   allows -- well, that helps the driver keep the

14   vehicle in the center of its lane.

15        A.   Yes, sir.

16        Q.   This Maserati that you were driving before

17   you bought the Tesla have lane-keeping assist?

18        A.   No, sir.

19        Q.   Do you know what lane departure warning

20   is?

21        A.   Pretty good idea now, sir.

22        Q.   Lane-departure warning, generally

23   speaking, would be a system in the vehicle that

24   warns the driver or alerts the driver if the driver

25   is drifting out of the lane that the driver is

1                         McGee

2     driving in and getting into an adjacent lane.

3     Sometimes those warnings can come through sounds

4     audible to the -- to the driver, lights, or a haptic

5     sensation through the steering wheel.

6              Did the Maserati have anything like that?

7         A.   No, sir.

8         Q.   Did the Maserati have forward-collision

9     warning?

10        A.   Not that I recall.

11        Q.   Do you know what forward-collision warning

12    is?

13        A.   Yes, sir.

14        Q.   Did the Maserati have automatic emergency

15    braking?

16        A.   Not that I recall either.  It was actually

17    pretty dearth in its features, believe it or not,

18    for a car.

19        Q.   And it had no self-driving capability,

20    correct?

21        A.   No, sir.  No, sir.

22        Q.   Before you bought the Model S, did you or

23    your wife own any vehicle -- own or lease any

24    vehicle that had any advanced driving assistance

25    systems or technology like I just described?

```
 1                    McGee

 2          If and you need me to run down that list

 3   again, I'd be happy to do that.

 4          A.   I believe I see what you're looking for.

 5   I'm thinking.  I had some other cars.  I believe our

 6   Chevy Tahoe -- I'm dating myself -- GMC Yukon or

 7   Tahoe had the lane departure, because it would

 8   vibrate under your leg.  What I did not own at the

 9   time was a car owned previously.

10          Other than that, I believe I recall --

11   whatever -- whatever these systems are called where

12   your side view mirrors will show and indication if

13   somebody is next to you.  I'm not sure what

14   that's --

15          Q.   Blind-spot warning?

16          A.   Blind-spot warning, yes, sir.  So I've

17   definitely had that in some -- in a car.  I believe

18   that's it.  My -- my wife's current car may have

19   some of the stopping assistance that you're saying,

20   but I can't recall because I only drove it a few

21   times before things didn't work out.

22          Q.   What vehicle was that?

23          A.   It's a Mercedes E550 Cabriolet.

24          Q.   What model year?

25          A.   2019, I believe.  Again, I'm speculating
```

```
 1                        McGee
 2  but I believe it was a 2019.
 3       Q.   That was not the vehicle that you drove on
 4  a regular basis before getting the Model S; is that
 5  fair?
 6       A.   Correct.
 7       Q.   That was your wife's vehicle?
 8       A.   Yes, sir.  I don't think she owned it at
 9  the time.
10       Q.   You don't think she owned it when you --
11       A.   At the time of the accident.  Correct,
12  sir.  This was subsequent to that.
13       Q.   Did you have any other vehicle in the
14  family at the time that you had the Model S?
15       A.   Still had the Maserati for a period of
16  time.  It was a lease.  Again, I'd gotten it from a
17  friend very cheap, and so kept it through its lease.
18  So I may have still owned that car at the time of
19  the accident.  I can't recall.  It would have been
20  somewhere -- I think the lease was in June or May.
21  I can't recall.
22            Also have a 1979, as we talked about,
23  Jeep CJ7 that I've had since I was 16.  And I
24  believe that's it.  I don't think my wife had a car
25  at the time.  She had a golf cart, I believe.
```

1                    McGee

2    Q.   Clearly no --

3    A.   Yes.  I apologize.  I said I believe my

4  wife did not have a car at the time.  The cars were

5  the old Jeep and the Tesla Model S and the Maserati

6  before the lease was up.  And my ex-wife or wife

7  drove a golf cart.

8    Q.   How about your children?  Are they driving

9  age?

10   A.   No, sir.

11   Q.   All right.  Did you have any trouble with

12 the -- the Model S, mechanical trouble, performance

13 trouble, from the date you took possession of it and

14 up until the date of the crash, obviously excluding

15 the crash?

16   A.   No, sir.

17   Q.   Did you take it in for service or any --

18 or maintenance or for any reason?  And when I say

19 take it in, let me first focus your attention on

20 taking it into a Tesla service center.

21   A.   Yes, sir.  Not that I recall.  Only reason

22 I would pause is I remember some part or something

23 that needed to be come in and changed, but I can't

24 recall if I went in.  But, honestly, I don't recall.

25 I can't give you a clear answer.  If so, it would

```
1                        McGee
2    have been the one time it was some kind of --
3    honestly, I have enough of a vague memory to think
4    something popped up.  But I can't recall if I took
5    it in or not.
6         Q.   In that period of time, January 2019 until
7    the date of the crash, did you receive any
8    information from Tesla about the vehicle.  And I'm
9    going to give you, just by way of example, a couple
10   of examples.
11             Did you receive any notice of a recall?
12        A.   No, sir, not that I recall.
13        Q.   Did you receive any notice of the ability
14   to have something on the vehicle updated through an
15   over-the-air update or sometimes it's referred to as
16   a update or flash?
17        A.   I don't recall, but it sounds familiar.  I
18   just -- it's been three years.  I don't recall,
19   honestly.
20        Q.   While you had the Model S and before the
21   date of the crash, did you have the Tesla app on
22   your phone so that you could receive information --
23        A.   Yes, sir.
24        Q.   -- and monitor information about the
25   vehicle?
```

1                        McGee

2        A.   Yes, sir.  I did have a Tesla app.

3        Q.   And do you recall ever receiving any type

4   of notification from Tesla about the need to have

5   anything updated on the vehicle during that time

6   frame?

7        A.   As I mentioned, I think there was one time

8   it was something, but, again, I can't remember what

9   it was, whether it was small or inconsequential or I

10  got a -- I can't recall.  If so, one incident, and

11  it wouldn't have been anything that I recall was

12  major.

13       Q.   Did you have trouble -- trouble -- did you

14  have a problem, trouble, operating any of the

15  features on the vehicle that we've been talking

16  about so far that are sometimes referred to as

17  autopilot features?

18       A.   I don't recall.  I assume there was a

19  learning curve, but I don't recall.

20       Q.   What is your understanding of what the

21  autopilot features were on that vehicle?

22       A.   Generally, it would help me navigate

23  and -- and steer to a destination.  So as we

24  mentioned, the reason I was -- one of the reasons I

25  was attracted to the vehicle was that it would

```
 1                        McGee
 2   assist in my drive from Boca Raton to Key Largo on a
 3   regular basis.  It's about 100 miles.  And so I
 4   understood it would keep me in the lane, avoid
 5   crashes, and direct me to where I needed to go.
 6        Q.   You say it would avoid crashes.
 7             What do you mean by that?
 8        A.   My assumption was that, again, some of
 9   these features, like the lane assist or collision
10   assist, you know, would help me see any ongoing
11   traffic or any issues on the road as I going with
12   the systems it had to help me -- I assume -- to put
13   better -- that would help me make the drive as far
14   as any possible people changing in my lane.  It
15   would help me stop or turn or avoid that crash or
16   someone that stopped ahead, it would slow down and
17   stop, so it wouldn't have a collision.
18        Q.   What is that -- what are those assumptions
19   based on?
20        A.   That's a great question.  Assume just
21   information that I absorbed looking at information
22   on the vehicle and probably some presumptions of
23   what auto -- autopilot does.  But I couldn't tell
24   you exactly.  I assume a bit of osmosis from being,
25   you know, around, you know, today's technology.
```

```
 1                        McGee
 2      Q.   What -- when you say looking at
 3  information on the vehicle, what specifically are
 4  you referring to, sir?
 5      A.   As we talked about before, I assume I --
 6  and I know I would have looked at videos on YouTube
 7  or the company website about features of the vehicle
 8  and how they work generally.
 9      Q.   Can you identify any video specifically
10  that you recall looking at?
11      A.   No, sir.
12      Q.   Can you tell me with any specificity when
13  it was that you looked at any of these videos?
14      A.   No, sir.
15      Q.   Is it your testimony that you looked at
16  the videos that you're referring to before the date
17  of the crash, April 25, 2019?
18      A.   I'm sure I educated myself through some
19  videos before the crash and before I operated the
20  vehicle.  But I don't recall what those are or the
21  amount or nature of them.
22      Q.   How much time do you think you spent
23  looking at those videos before the date of the
24  crash?
25      A.   I really can't speculate.
```

```
 1                      McGee

 2      Q.   Have you looked at videos about the

 3 vehicle since the date of the crash?

 4      A.   No, sir.

 5      Q.   Or features on the vehicle?

 6      A.   No, sir.

 7      Q.   Did you look at any documents to prepare

 8 yourself for today's deposition before now?

 9      A.   Yes, sir.

10      Q.   What did you look at?

11      A.   I looked at -- I guess briefly looked at

12 this, and I briefly looked at my statement when --

13 that I signed that you asked about earlier.

14      Q.   When you said this, you're referring to

15 the deposition, right?

16      A.   Yes, sir.  Obviously, the notes on the

17 back, we've already discussed those at length, so.

18      Q.   And when did you look at the statement

19 that you signed?

20      A.   This morning, briefly.

21      Q.   Do you have that statement with you?

22      A.   No, sir.

23           MR. BRANIGAN:  Counsel, do you have that

24      statement?

25           MR. POSES:  I believe -- I don't know.
```

```
 1                    McGee
 2        You might want to ask him if he's referring to
 3        discovery responses that he signed as part of
 4        the prior case.
 5             MR. BRANIGAN:  Let me show you what's been
 6        marked as Exhibit 2.
 7        (Exhibit Number 2 was marked for identification.)
 8   BY MR. BRANIGAN:
 9        Q.   Take a look at that and let me know when
10   you're finished looking at it, sir.
11        A.   Yes, sir, I'm ready.
12        Q.   Is that the statement that you --
13        A.   Yes, sir.
14        Q.   Is that the document you're referring to
15   as the statement?
16        A.   Yes -- yes, sir.
17        Q.   All right.  In preparation for today's
18   testimony, did you look at any other documents
19   besides those two that are in front of you?
20        A.   No, sir.
21        Q.   All right.  Have -- have you gone and
22   looked at the vehicle, the Model S, at any time
23   since the date of the crash?
24        A.   No, sir.
25        Q.   Do you know if anyone on your behalf has
```

```
 1                        McGee
 2   gone to the vehicle and removed anything from the
 3   vehicle since the date of the crash?
 4        A.   No, sir.  Other than I got some personal
 5   effects back from the salvage company.
 6        Q.   What did you receive back?
 7        A.   Can't recall exactly.  I think some things
 8   were missing.  I believe an overnight bag with some
 9   clothing in it.
10        Q.   So --
11        A.   My backpack -- work backpack, I believe.
12   I believe there were two bags, but I can't recall
13   completely.  It wasn't everything.  It was -- but
14   that's what I received.
15        Q.   All right.  Do you have a driver's license
16   today?
17        A.   Yes, sir.
18        Q.   Can you tell us your driver's license
19   number, please.
20        A.   No, sir.
21        Q.   Well, I mean, I understand you may not
22   have it memorized.
23        A.   I have to look it up.
24        Q.   Yes, sir.
25        A.   Oh, I apologize.
```

```
1                        McGee

2       Q.   Can you take your driver's license out --

3       A.   Sorry.  I apologize.

4       Q.   -- and tell us your driver's license

5   number.

6       A.   Yes, sir.  I was going to say I'm not that

7   good.  M-200-302-76-412-0.

8       Q.   That's a Florida driver's license?

9       A.   Yes, sir.

10       Q.   And what is the date of expiration of that

11   license?

12       A.   November 12, 2029.

13       Q.   When did you have your license last

14   renewed?

15       A.   I don't recall the date.  I believe it was

16   June of -- does it tell me on here or is there an

17   easier answer -- oh, here we go.  August 31st, 2020.

18       Q.   Did you have to take a test of any sort

19   before that was renewed in August 2020?

20       A.   Yes, sir.

21       Q.   Did you have to go to the

22   Department of Motor Vehicles and actually sit and

23   take a test, or did you do it online?

24       A.   Yes, sir.  I had to attend.  And I believe

25   I went in a car with a driving instructor.
```

```
 1                        McGee

 2        Q.   Was -- was that something that you had to

 3   do just in the ordinary course of renewing your

 4   license, or were you required to do that for some

 5   other reason?

 6        A.   I was required for some other reason.

 7        Q.   What was the other reason?

 8        A.   To reinstate my license.  It was revoked

 9   for six months.

10        Q.   All right.  What -- what was the reason

11   for your license being revoked?

12        A.   I was charged with careless driving in

13   Monroe County, and I was educated I believe in

14   January of that year.  I can't remember exactly.  Of

15   2020.

16        Q.   And was that charge related to this

17   crash --

18        A.   Yes.

19        Q.   -- or something else?

20        A.   Related to this crash.

21        Q.   And as part of the -- or one of the

22   conditions for regaining your driving privileges,

23   you had to take a driver education course; is that

24   right?

25        A.   Yes, sir.
```

1                    McGee

2     Q.   And how long was that course?

3     A.   I don't recall.  I believe 20 hours in

4  total.  16 hours.  I don't recall exactly, but it

5  was quite a few hours.  Must have been between

6  16 hours and 20.

7     Q.   What were the other requirements that you

8  had to fulfill in order to regain your driving

9  privileges?

10    A.   That was it.

11    Q.   Where did you take the driver's education

12 course?

13    A.   It was done online.  It was during COVID.

14    Q.   And if you recall, who -- who put that

15 course on or what agency in the State of Florida?

16 I'm assuming it was a Florida State agency, like the

17 Department of Motor Vehicles or --

18    A.   I believe it was some sort of -- I'm going

19 to give probably nontechnical terms, but some sort

20 of service provider or contractor that's approved by

21 Florida.  But I believe -- again, I don't recall the

22 name of the company.  I believe it's the name of the

23 company certified by the State of Florida that they

24 can give the traffic school.

25    Q.   It sounds like you also had to take a road

```
 1                      McGee

 2   test?

 3        A.   Yes, sir.

 4        Q.   Or driving test behind the wheel?

 5        A.   Yes, sir.

 6        Q.   When did you do that?

 7        A.   This August of 2020 when the license was

 8   renewed.  They did it in person and issued the

 9   license that day.

10        Q.   Have you ever had your driver's license

11   revoked for any other reason?

12        A.   No, sir.

13        Q.   Have you ever had your driver's license

14   suspended for any other reason?

15        A.   No, sir.

16        Q.   Have you had your driver's license limited

17   in some way?  For example, limited in terms of the

18   hours that you could drive or the places where you

19   could drive or in a way that required you to have

20   someone with you in the vehicle while driving?

21        A.   No, sir, not since I was 15 and had my

22   learner's permit.  Obviously, I had some

23   restrictions there.  Outside of that, no, other than

24   I used to wear glasses.  And I'm supposed to wear

25   glasses.  I think that's specifies on your license.
```

```
 1                    McGee

 2        Q.   Going back to --

 3             COURT REPORTER:  Sorry.

 4        A.   I apologize.  I said I had glasses years

 5   ago and had that specified on my license as a

 6   requirement, I think.  But then I had Lasik.

 7   BY MR. BRANIGAN:

 8        Q.   Going all the way back to when you -- you

 9   first started driving, you mentioned back when you

10   were 15 years old, at that time did you take a

11   driver's education course?

12        A.   Yes, sir.

13        Q.   Was it through the State of Florida or

14   some -- some other organization?

15        A.   That would have been North Carolina.

16        Q.   Sorry?

17        A.   I lived in North Carolina at the time.

18   And it would have been North -- the state of

19   North Carolina, I believe, through a local high

20   school, but, again, I can't fully recall.  I

21   remember --

22        Q.   And when did you receive your full

23   driver's license?

24        A.   On my 16th birthday, so that would have

25   been November 12th in '90 -- oh shoot, '92, '93.
```

```
 1                      McGee

 2    '92.

 3       Q.   And that was in the state of

 4  North Carolina?

 5       A.   Yes, sir.

 6       Q.   Was your North Carolina driver's license

 7  ever revoked or suspended or limited in any way?

 8       A.   No, sir.

 9       Q.   Before this motor vehicle accident that

10  we're here to talk about today, have you been

11  involved in any other motor vehicle accidents?

12       A.   Yes, sir.

13       Q.   How many?

14       A.   I believe I want to say two in total.

15       Q.   Did either of those involve property

16  damage or personal injury?

17       A.   The first, very minor property damage.  My

18  sister was rear-ended on the way to high school.

19  And the other one had property damage to the vehicle

20  itself.  I was, I believe, about 19 years ago.

21       Q.   The one involving your sister, the

22  incident involving your sister, were you were --

23  were you the driver of the vehicle or the passenger

24  in that vehicle?

25       A.   The passenger.
```

1                          McGee

2      Q.   All right.   The one that you were involved

3   in when you were about 19 years old, were you the

4   driver of that vehicle?

5      A.   Yes, sir.

6      Q.   Tell me what happened in that incident.

7      A.   I was driving late at night and ended up

8   slipping off the road and having an accident.

9      Q.   Was anyone injured?

10     A.   No, sir.

11     Q.   You mentioned property damage.   What kind

12  of property damage?

13     A.   The -- the car was damaged.

14     Q.   What kind of vehicle were you driving?

15     A.   Honda Prelude.

16     Q.   Where did that happen?

17     A.   I don't recall exactly.   Somewhere in

18  South Carolina.

19     Q.   Have you received any moving violations

20  while driving a motor vehicle outside of this crash,

21  not including the crash that we're here for today?

22     A.   In my lifetime?

23     Q.   Yes, sir.

24     A.   Yes, sir.   Let me think hard about this

25  one.   I got a speeding ticket when I was 16.   It was

McGee

1

2   then -- I don't know what the proper terminology is,

3   but went to court and the judge let it go.  But I

4   did have a speeding ticket when I was 16.  I don't

5   believe I've had any other traffic violations.  I'm

6   trying to think hard.  Been driving for 30 years.

7   No others I recall.

8       Q.   All right.  You were issued a citation for

9   the crash that occurred with the Tesla, correct?

10      A.   Yes, sir.

11           MR. LIRO:  You're making me work.  I threw

12      my back out at the gym this morning.

13           MR. BRANIGAN:  Sorry.

14           Todd, this is Exhibit 3.  It's a part --

15      we've got multiple police reports.

16           MR. POSES:  Is it the police report or the

17      homicide report?

18           MR. BRANIGAN:  This is the Florida traffic

19      crash report.

20           MR. POSES:  Okay.  Good.

21           MR. BRANIGAN:  And attached to it is

22      page 56 of the -- I think it's the -- I'm not

23      sure if it's the homicide report or the other

24      really big report that's 60 pages long.

25           MR. POSES:  I remember going through this

```
 1                    McGee

 2        with you --

 3             MR. BRANIGAN:  With Rizzo, yeah.

 4             So page 56 of that 60-page report is the

 5        actual citation that I've just attached to this

 6        for brevity's sake.

 7             MR. POSES:  Okay.  Understood.

 8        (Exhibit 3 was marked for identification.)

 9   BY MR. BRANIGAN:

10        Q.   All right.  Mr. McGee, I've handed you and

11    your counsel a copy of Exhibit 3.  Can you take a

12    look at that for us for a minute, please.

13        A.   Yes, sir.

14        Q.   Do you recognize this document, Mr. McGee?

15        A.   Yes, sir.

16        Q.   Have you seen it before today?

17        A.   Yes, sir.

18        Q.   This is the Florida trash -- crash report

19    for the crash that you were involved in with the

20    Model S, correct?

21        A.   Yes, sir.

22        Q.   All right.  Sir, are you aware that there

23    is another more extensive -- I'm just going to refer

24    to it as police or police investigation report

25    concerning the crash?
```

Page 59

```
1                        McGee

2        A.   Yes, sir.

3        Q.   Have you -- have you seen that larger

4   report that I just referred to before today?

5        A.   I don't recall.  Actually, when you just

6   mentioned it, I thought to myself I may have seen it

7   during our original suit, but I don't recall.

8        Q.   All right.  But you've seen what I've

9   shown -- what I've put in front of you --

10       A.   Yes, sir.

11       Q.   -- as Exhibit 3, correct?

12       A.   Yes, sir.

13       Q.   And have you had a chance to review the

14  entire document before today?  It's a multi-page

15  document.

16       A.   I believe so, sir.  I recall -- I thought

17  I was at the office of Sergeant Rizzo in

18  Snapper Creek when I received this.  I thought it

19  was a pink sheet of paper.

20       Q.    There is a citation that's attached to

21  Exhibit 3.  At the top it says,

22  Florida Uniform Traffic Citation.

23            Do you see that?

24       A.   Oh, yes, sir.  Yes, sir.

25       Q.   Is that what you think you received in a
```

```
 1                        McGee
 2    different format, maybe the color was a different
 3    color pink or a different color?
 4          A.   Yes, sir.
 5          Q.   All right.  And you recognize, sir, that
 6    this is a Florida traffic citation that was issued
 7    to you by the Florida Highway Patrol as a result of
 8    the crash that you were involved in with the
 9    Model S; is that correct?
10          A.   Yes, sir.
11          Q.   And is it correct that you were cited with
12    careless driving?
13          A.   Yes, sir.
14          Q.   Is it also correct that the reason you
15    were cited with careless driving is because the
16    Florida Highway Patrol officer that investigated
17    this incident and the Florida Highway Patrol in
18    general determined that you were speeding?
19               MR. LIRO:  Form.  You can answer.
20          A.   I don't know -- I know why they gave it to
21    me for the accident.  I don't know why they
22    qualified it as -- as what they did.
23    BY MR. BRANIGAN:
24          Q.   All right.  Well, sir, if you look at the
25    last page of Exhibit 3, it's got page 56 at the
```

```
 1                        McGee
 2   bottom.
 3        A.   Yes, sir.
 4        Q.   You're looking at it.
 5        A.   I see it, yes, sir.
 6        Q.   I'm gonna direct your attention to the
 7   middle of the page where it says, Other violations
 8   or comments.
 9        A.   Yes, sir.
10        Q.   All right.  You see where it says,
11   Careless driving?
12        A.   Yes, sir.
13        Q.   All right.  Do you agree with me that it
14   also indicates that your vehicle was speeding, and
15   that you were going 60 miles an hour in a
16   45-mile-an-hour zone?
17        A.   Where do you see that?  I apologize.  I'm
18   not following you all of a sudden.
19        Q.   Right here, sir.  Right here.
20        A.   My eyes -- oh, hang on.  Yes, sir.  Yes,
21   sir, I do see that.
22        Q.   Do you deny that you were traveling
23   60 miles an hour in a zone or on a road that was
24   posted with a 45-mile-an-hour speed limit?
25             MR. LIRO:  Hold on, Brian.
```

```
 1                        McGee

 2              I'm not going to have him admit to any

 3         type of criminal type activity that's an

 4         impingement on his Fifth Amendment privilege,

 5         so he's not going to answer that.

 6              MR. BRANIGAN:  Well, I don't know that

 7         there's a criminal -- that this asks about

 8         whether he committed a crime.  It's a moving

 9         violation.

10              MR. LIRO:  You're literally asking him if

11         he committed a crime associated with a traffic

12         homicide, so I'm going to invoke his

13         5th Amendment privilege.

14    BY MR. BRANIGAN:

15         Q.   Well, sir, it's your privilege.  Are you

16    raising your Fifth Amendment right?

17              MR. LIRO:  Brian, I'm counseling you to

18         invoke your 5th Amendment privilege in response

19         to that question.

20         A.   Yes.

21              MR. BRANIGAN:  All right.  I disagree that

22         this raises that, but I respect your right to

23         raise it, if you're -- that's the form of your

24         objection.

25
```

1                        McGee

2    BY MR. BRANIGAN:

3         Q.   Sir, it also indicates that you ran a stop

4    sign.  Did you run -- did you run a stop sign, sir?

5              MR. LIRO:  Brian, I'm going to suggest

6         that you invoke your privilege in response to

7         that as well.

8         A.   I invoke my privilege.

9

10   BY MR. BRANIGAN:

11        Q.   And it also indicates that you were

12   distracted by a -- your phone or distracted by

13   phone.  Do you agree that that occurred on the night

14   of the incident before the crash, sir?

15             MR. LIRO:  You can answer.

16        A.   I don't recall.

17   BY MR. BRANIGAN:

18        Q.   Well, take a look at this -- at this

19   document.

20        A.   I can tell you what the document says.  I

21   don't recall.

22        Q.   The document, does it not refresh your

23   memory about whether you were distracted or using a

24   telephone before the crash occurred?

25        A.   No, sir.

```
 1                        McGee
 2        Q.   You were, in fact, using a telephone
 3   before the crash occurred, correct?
 4        A.   I recall being on Bluetooth telephone
 5   call.  But, quite frankly, the events of that night
 6   are very blurry for me for obvious reasons.  So as
 7   we led up to this, as you asked if we reviewed other
 8   documents, I thought to myself going through it, I
 9   have very little recollection of exactly what was
10   happening at that moment until at the scene of the
11   crime -- or the accident, and everyone is
12   obviously -- things were happening so...
13        Q.   You know that there is body-camera video
14   of -- of the scene of the incident, correct?
15        A.   Yes.  Yes, sir.
16        Q.   That includes not just the scene of the
17   incident, but also includes you, correct?
18        A.   Yes, sir.  Yes, sir.
19        Q.   And includes statements that you made at
20   the scene, correct?
21        A.   Yes, sir.
22        Q.   Have you observed that video since the
23   night of the crash?
24        A.   No, sir.
25        Q.   Have you listened to the audio from the
```

1                              McGee

2    video?

3         A.    No, sir.

4         Q.    Has anyone shown you a transcription of

5    what you said that was recorded in the video?

6         A.    Not that I recall.

7         Q.    How was it that you know that there was

8    body-cam video?

9         A.    Pretty much everybody in the world has

10   seen it and mentioned it, so I think it's fairly

11   common knowledge.

12        Q.    Everybody in the world has seen it and

13   mentioned it, but you've never seen it before

14   yourself?

15        A.    Yes, sir, that's correct.  I don't want to

16   see it.

17        Q.    So you've made a conscious decision to not

18   watch that video.  Is that what you're telling us?

19        A.    I'm telling you that there was no event in

20   which I felt the need to watch the video personally.

21   It was a personal decision on my front.  I didn't

22   feel a need to watch the video.

23        Q.    All right.  So -- which means you decided

24   not to watch the video, correct?

25        A.    Correct.

1                         McGee

2       Q.    Has your wife watched the video?

3       A.    I wouldn't know.

4       Q.    After the crash occurred, how did you

5    leave the scene?

6       A.    In an ambulance.

7       Q.    And where were you taken?

8       A.    I don't recall the hospital.  I want to

9    say Jackson Memorial, but I can't remember.

10      Q.    Were you admitted overnight in the

11   hospital?

12      A.    Yes, sir.

13      Q.    And --

14      A.    I was admitted -- I don't know overnight,

15   I don't recall what time I left.

16      Q.    How was it that you left the hospital?

17            Let me ask a better question.

18            Did someone come and get you from the

19   hospital --

20      A.    Yes.  Someone -- I was trying to think

21   of -- yes, someone came and got me.

22      Q.    Who was that person?

23      A.    That's what I was trying to think of.  I

24   believe it was my wife and her friend,

25   Jill Richardson.  But I was trying to recall if that

1                    McGee

2   was the case.  I'm pretty confident it was.

3        Q.   Jill Richardson?

4        A.   Yes, sir.

5        Q.   How do you spell Jill's last name?

6        A.   R-i-c-h-a-r-d-s-o-n.

7        Q.   Where does she live?

8        A.   Currently, she lives in Stuart, Florida, I

9   believe.

10        Q.   Do you know her address?

11        A.   No, sir.

12        Q.   Were you picked up the day after the crash

13   occurred by your wife and Ms. Richardson?

14        A.   I believe so, yes, sir.

15        Q.   And do you recall what time that was?

16        A.   I don't.

17        Q.   In between the time that you were picked

18   up to leave the hospital by your wife and her friend

19   and the time that you got to the hospital, did you

20   have any conversations with your wife?

21        A.   I don't recall.

22        Q.   So you don't recall if you called her or

23   she called you?

24        A.   No, sir.

25        Q.   How was it that your wife found out about

the incident?

A. I don't recall. I can't remember if I called her. I'm sure I tried to call her. I just -- again, it's a -- it's a blur.

Q. All right. We -- we know that you had a phone with you at the time of the incident and before the incident, correct?

A. Yes, sir.

Q. That's an established fact. You know that, right?

A. Yes, sir.

Q. Did you leave the scene of the crash with the phone on your possession?

A. I believe so. Yes, sir, I did.

Q. And did you use the phone that night to call anyone?

A. Yeah, I don't recall. I'm pretty confident I called my wife. And I may have called my sister. I'm, again, speculating. I'm sure I called my wife.

Q. Who is your sister? What's her name?

A. Heather Thornton, T-h-o-r-n-t-o-n.

Q. Where does she live?

A. North Carolina.

1                          McGee

2      Q.   Can you tell us her -- the number that you

3  called to reach her?

4      A.   It would have been most likely her cell

5  phone number.

6      Q.   What's that number?

7      A.   (704) 771-6112.

8      Q.   Did you communicate with anyone else on

9  the night of the crash on your cell phone, either

10  voice, text, e-mail, instant message?

11      A.   I don't recall.  Honestly, I believe I had

12  a concussion that night as well, so I don't recall.

13      Q.   Why do you believe you had a concussion?

14      A.   My eyes were swollen shut, and wife told

15  me the doctor said I had a concussion.

16      Q.   Do you recall the name of the doctor that

17  treated you?

18      A.   No, sir.

19      Q.   Did you delete anything that was on your

20  phone, any messages that night?

21      A.   I have no idea, sir.

22      Q.   Did you alter or change anything

23  message-wise, communication-wise that was on your

24  phone that night or anytime after the date of this

25  crash?

```
1                        McGee
2        A.    No, sir.  Not that I recall.
3        Q.    Did there come a point in time where you
4   provided the phone physically to any law enforcement
5   official?
6        A.    Yes -- no, sir, I don't believe it was
7   law -- I'm looking at the lawyer.  I don't believe I
8   provided it to a -- believe I provided it to a
9   third-party company.
10        Q.    When did you do that?
11        A.    I don't recall.  Sometime during the
12   pendency of the law -- the plaintiff's initial
13   lawsuit.
14        Q.    Do you know the name of the company?
15        A.    No, sir.  I gave it to my attorney.
16   That's the last I heard of it.
17        Q.    In between the moment of the crash and the
18   moment you tendered the phone to your attorney so
19   that it could be provided to a third party, did you
20   delete, change, or alter anything that was on the
21   phone?
22        A.    I assume I used the phone in a normal
23   course to put apps and things on it.  But that's it.
24   Just used the phone, I'm sure.
25        Q.    Did you delete any messages about this
```

1                           McGee

2     crash or that you may have had talking about the

3     crash?

4          A.    Not that I recall.

5          Q.    Did you take any photographs using your

6     phone while you were at the scene?

7          A.    No, sir.  Not that I recall, no.

8          Q.    Getting back to Exhibit 3, do you see

9     anything in Exhibit 3 that you disagree with?

10          A.    I want to say, also, when we get like in

11     the next 10 or 15 minutes, can we use the restroom?

12          Q.    Absolutely.  Sure.

13          A.    Anyway, natural stopping point.

14          Q.    After this question, we'll take a break.

15          A.    Okay.  Whenever you get there.  I'm

16     starting to fill up here.

17          Q.    Sure.

18          A.    Sorry.  Would you ask that question again?

19          Q.    The question is:  Do you see anything in

20     Exhibit 3, the Florida Traffic Crash Report, that

21     you disagree with?

22               MR. POSES:  Object to the form.

23          A.    I don't see anything kind of reading it

24     pretty quickly here.  But, again, lot of information

25     here.

```
 1                    McGee

 2   BY MR. BRANIGAN:

 3        Q.   Let me ask a very specific question, sir:

 4   On the bottom of the -- excuse me -- on the page

 5   that says -- at the bottom of page 2 of 2, do you

 6   see that?

 7        A.   Yes, sir.  Yes, sir.

 8        Q.   I'd like to direct your attention to the

 9   text that's at the top of that page.  The last

10   sentence of the first paragraph says, He

11   unequivocally.

12             Do you see that?

13        A.   Yes, sir.  The last sentence in the first

14   paragraph.

15        Q.   He unequivocally stated he did not stop at

16   the stop sign before crossing the intersection.

17             Do you disagree with that?

18        A.   No, sir.

19        Q.   The sentence that precedes that sentence

20   says, McGee -- referring to you -- stated he was

21   attempting to retrieve his fallen phone when he

22   struck the Tahoe.

23             Do you disagree with that, sir?

24        A.   No, sir.  I'm sure I said if it's here and

25   it was on the body cam.  I just don't recall
```

1                          McGee

2     actually saying it.  But I see it here.  And I don't

3     recall it.  I said it was on the body camera.

4          Q.   All right, sir.

5               VIDEOGRAPHER:  Time is 10:17 a.m.  We're

6          going off the record.

7                    (Recess taken.)

8               VIDEOGRAPHER:  The time is 10:28 a.m., and

9          we're back on the record.

10   BY MR. BRANIGAN:

11        Q.   Sir, I want to -- I want to talk to you

12   more about the Model S and your understanding of its

13   capabilities and functionality, both when you bought

14   it and after you bought it and before the date of

15   the crash.

16             But let's start with at the time that you

17   bought it.  So we're talking about January 2019 on

18   the calendar.  And was it your understanding that

19   the Model S was a completely self-driving vehicle?

20        A.   No.

21        Q.   Did you understand that even though the

22   car had certain driver-assist systems, like we've

23   discussed, that anytime you were driving the

24   vehicle, meaning sitting in the driver's seat, you

25   were the driver?

1                          McGee

2        A.   Yes, sir.

3        Q.   Did you understand that anytime you were

4   driving the vehicle with any of the driver-assist

5   features activated, the advanced cruise control,

6   the -- what's sometimes referred to as autosteer,

7   any of the advanced driving assistance systems

8   activated, that it was your complete responsibility

9   to drive the vehicle?

10       A.   Yes, sir.  I think what you're asking is

11  was I responsible at the end of the day for the --

12  for the driving the vehicle or operating the

13  vehicle, yes, sir.

14       Q.   Yes, that's what I'm asking.

15       A.   Yes, sir.

16       Q.   And did you understand that before you

17  bought the car?

18       A.   Yes, sir.

19       Q.   And you -- I take it you certainly

20  understood that after you took delivery of the car

21  and started driving it?

22       A.   Yes, sir.

23       Q.   Did you understand that the -- I'm going

24  to be a little generic or general now -- the

25  autopilot features are all features on that car that

```
 1                    McGee
 2    you had to decide to enable or activate?
 3          A.    Yeah.
 4                MR. POSES:   Objection to form.
 5    BY MR. BRANIGAN:
 6          Q.    Did you understand that?
 7          A.    To turn it on, yes, sir.
 8          Q.    Right.  So -- so that there's no confusion
 9    about this, the -- when you got into the Model S.
10          A.    Yes, sir.
11          Q.    In your driveway -- in your driveway or
12    garage, and you're getting ready to drive to
13    wherever, just as a for instance, you're getting
14    ready to drive to the office, and you turn the
15    vehicle on, the autopilot features are not -- they
16    were not automatically enabled, correct?
17          A.    Yes, sir.
18          Q.    You had to make the decision to enable
19    them or activate them.
20          A.    Yes.  Yes, sir.
21          Q.    And you had to take action to do that,
22    correct?
23          A.    Yes, sir.
24          Q.    So if you wanted to use what Tesla refers
25    to as traffic aware cruise control, the advanced
```

1                           McGee

2    cruise control system, you had to decide to do that

3    and actually turn it on, correct?

4         A.   Yes, sir.

5         Q.   All right.  If you wanted to use the

6    autosteer feature, you had to decide to do that, and

7    you had to actually turn it on, correct?

8         A.   Yes, sir.  I just can't recall if it all

9    turned on at once.  Again, it's been a few years

10   since I turned it on, so I was trying to recall as

11   you talked how you even turn it on.  I think you

12   double tap on something.  But, again, I can't recall

13   what turns on.  But it turns on the general features

14   of the self-driving.

15        Q.   And before the date of the crash, how did

16   you go about educating yourself about how to use

17   those features?

18        A.   Like I said, I'm sure I watched videos and

19   things.  Again, I'm highly electronic so probably

20   looked at clatter on Tesla's website.  But I'm

21   speculating exactly where because I don't recall.  I

22   do know I would have watched some videos on how to

23   use things.  It's generally how I educate myself on

24   things.

25        Q.   Do you recall the purchase price of the

1                        McGee

2    vehicle?

3         A.   Not exactly.  Around about $100,000.

4         Q.   Did you pay cash for it, or did you buy it

5    on credit?

6         A.   I can't recall.  I think I bought it on --

7    actually, I can't recall.

8         Q.   All right.  Back to the features.

9              If you wanted to disable them, deactivate

10   them during your drive, you could do that, too,

11   correct?

12        A.   Yes, sir.  I just can't recall exactly

13   how.

14        Q.   Right.  I'm not asking you the actual

15   mechanics of it --

16        A.   Okay.

17        Q.   -- I'm just asking you whether you

18   understood it.  Using that technology, to put it

19   generally, was entirely up to you, right?

20        A.   Yes, sir.

21        Q.   Because you could drive the vehicle, use

22   the vehicle for its intended purpose, a motor

23   vehicle for mobility, without using any of that

24   technology ever, correct?

25        A.   Yes, sir.

1                        McGee

2        Q.   So if you wanted to go to work in the

3   morning and just drive by you -- hands on the

4   steering wheel, foot in -- foot on the accelerator

5   or the brake, while the vehicle's in gear, you could

6   do all of that yourself, correct?

7        A.   Yes, sir.

8        Q.   Right.  And the vehicle would be fully

9   useful to you in that way, correct?

10       A.   Yes, sir.

11            THE WITNESS:  Can you hear me okay, ma'am?

12            COURT REPORTER:  Much better.  Thank you.

13  BY MR. BRANIGAN:

14       Q.   Now, before you made the decision to buy

15  the Tesla, did you understand that the autopilot

16  features had certain limitations to them?

17       A.   I don't recall specifically.  I know there

18  are several packages you could buy of levels of the

19  autonomous driving, and I bought the highest

20  package.  But I couldn't have told you what exactly

21  that was.  I'm not 100 percent aware exactly of what

22  I was buying other than I usually, you know, bought

23  what has the most features.  That's a general how I

24  did things.

25       Q.   Well, even the -- the equipment that you

1                          McGee

2    bought, would you agree with me that you understood

3    that even that equipment had limitations?

4                MR. POSES:  Object to the form.

5          A.   I believe I did.  Again, I'm speculating

6    on what I knew.  I knew I didn't know everything

7    about what it could do, but I remember thinking I

8    wanted the best package so it could do the most for

9    me, whatever that meant.

10   BY MR. BRANIGAN:

11         Q.   What did you understand that to mean when

12   you bought it?  To do the most for you, what would

13   that mean?

14         A.   I don't recall completely, but I believe I

15   wasn't 100 percent sure exactly.  I tend to

16   sometimes get things and then figure them out.  And

17   so I don't know that I knew exactly what every

18   feature was.  Again, it's three years ago, so I'm

19   struggling to recall some of that.  I just recall,

20   again, it's a general thing I've done rightly or

21   wrongly in the past, I just get the highest package

22   of features.

23         Q.   So when you say get the highest package of

24   features and figure them out, were you, from time to

25   time, figuring them out as you were literally

```
 1                        McGee

 2   driving the vehicle?

 3        A.   I don't recall.  I doubt I would have done

 4   that.  I think what I was referring is I believe

 5   there was a -- and I don't know the terminology, but

 6   a Stage 1 you can buy for autonomous driving, and a

 7   Stage 2 -- I don't know what the terminology is for

 8   Tesla -- Stage 2.  And I bought whatever the most

 9   you could buy at the time was.  But I understood

10   there were some advance features they were still

11   working on or beta testing.  Again, that's kind of

12   all I recall.  But I know there were -- there was

13   quite a bit to it.

14        Q.   How many -- how many times a week do you

15   think you drove the vehicle in between the time that

16   you took delivery of it in January of 2019 and the

17   day of the crash in April 2019?

18        A.   You want me to give you a -- like a four

19   days a week, or would you rather me kind of do the

20   math of like if that was 90 days, or does it matter?

21        Q.   Well, what I'd like to know now is your

22   best estimate, in terms of the --

23        A.   How long I drove it before.

24        Q.   Yeah.  I mean, would you drive it seven

25   days a week, five days a week, that's an example --
```

```
 1                          McGee
 2        A.    Okay.   It -- I'd say -- generally I'd say
 3   five days a week, because I probably didn't drive
 4   it -- whatever it was, I either traveled for work
 5   for a day or two.   I travel for work also, so if
 6   you -- if you just estimate work travel, and maybe
 7   not driving on a weekend day, probably five days a
 8   week.   But it was my everyday car for when I was not
 9   traveling.
10        Q.    And the trip you would make every day just
11   one way to the office from your home, how long would
12   that be?
13        A.    So it varied, unfortunately, as we talked
14   about with the living situation.   It would be as far
15   as 100 miles.   So my office is approximately
16   100 miles from Ocean Reef Club where family was
17   living -- but I also had a house in Boca Raton, so
18   sometimes I would stay at my house.   So it was
19   either -- it was quite different.   It was either a
20   2.7-mile drive from home or it was a 100-mile drive.
21   Depending on the day and circumstance, I would say
22   that's as general as if I were in Boca Raton, I
23   probably was there Monday to Wednesday, so it was
24   probably more like a 3-mile drive.   And then, you
25   know, I would be back and forth on a Sunday, on
```

```
 1                        McGee
 2   Thursday, and on Saturday.  I'm generalizing.  Just
 3   trying to help.  Say 100-mile drive.
 4        Q.   Would you use the autopilot features on --
 5   on the drive to and from the office regardless of
 6   whether it was the shorter distance or the longer
 7   distance?
 8        A.   I don't recall.  I'm confident I used it
 9   on the longer distance.  The short distance, I don't
10   recall.
11        Q.   Can you give me your best estimate as to
12   the number of miles that were on the car before the
13   date of the crash?
14        A.   Best estimate, and I definitely kind of
15   guessing/recalling what I would have seen in some of
16   these documents.  I want to say 10 -- 10,000 or
17   16,000.  Again, I'm guessing.  But I remember seeing
18   a number somewhere.  But, again, I can't recall
19   exactly.
20        Q.   All right.  I think you told me that for
21   whatever the mileage is, you drove those miles,
22   correct?
23        A.   Yes, sir.
24        Q.   All right.  And can you put a percentage
25   on -- on the mileage or the time during the use of
```

1                          McGee

2    the vehicle that you would have had autopilot

3    engaged?

4         A.   On the 100-mile drive, 90 percent of the

5    drive.  Again, I was enamored with the technology of

6    assisting me during the drive, understanding it, so

7    probably 90 percent of that.

8         Q.   All right.  Now, are you aware that when

9    you're using autopilot, on the Model S that you had,

10   that you needed to have your hands on the steering

11   wheel at all time?

12        A.   Yes, sir.

13        Q.   And are you aware that if you used the

14   Model S with autopilot engaged and you did not have

15   your hands on the steering wheel, your hands were

16   not detected on the steering wheel, you would be

17   alerted by the vehicle of that fact?

18        A.   Yes, sir.  Now that you're mentioning it,

19   I do recall that.

20        Q.   And what do you -- what do you recall

21   about that process, that alert process?

22        A.   I believe the wheel shook.  I think the

23   wheel -- again, I'm trying to recall.  I believe the

24   wheel shook and it beeped.  Or I believe both.  I

25   think it beeped and the wheel shook if your hands

                         McGee

1

2    weren't on the wheel or your hand wasn't on the

3    wheel.  I can't remember if it was one or two.  But

4    I believe it either beeped or shook or both.

5         Q.   And you knew what that meant when that

6    happened, correct?

7         A.   Yes, sir.  I would have known what that

8    meant.

9         Q.   You knew tat that meant you needed to put

10   your hands on the steering wheel, correct?

11        A.   Yes, sir.

12        Q.   Did you also know that if that happened a

13   certain number of times, that autopilot would

14   automatically disengage because it was not detecting

15   your hands on the steering wheel?

16        A.   I am recalling that now, yes, sir.

17        Q.   You actually had that happen to you during

18   your use of the autopilot on the Model S, correct?

19        A.   I believe I did, but I don't recall

20   specifically, but it sounds familiar.

21        Q.   Do you recall that it actually happened to

22   you on the evening of the crash before the crash

23   occurred?

24        A.   No, sir.  I don't recall.

25        Q.   Let's focus your attention on the evening

1                          McGee

2   of the crash.

3              Do you recall what day of the week it was?

4       A.   No, sir.

5       Q.   It was April 25, 2019, correct?

6       A.   Yes, sir, I believe so.

7       Q.   And where did you start your drive from?

8       A.   I believe I started in my office, but,

9   again, it's pretty blurry.  I know I left the

10  office, and that's pretty much it.

11      Q.   And the office at the time was in Boca?

12      A.   Yes, sir.

13      Q.   And where were you intending to go?

14      A.   Ocean Reef Club.

15      Q.   What -- as best as you can remember, what

16  time did you leave your office?

17      A.   I don't recall.  I want to say

18  7 o'clock-ish or something like that.

19      Q.   Do you know the route you would have taken

20  to go from your office to where you were headed?

21      A.   Not exactly, no, sir.  I -- general -- no,

22  because sometimes it would take the turnpike.  I'm

23  not sure.

24      Q.   Well, did you have like one or two routes

25  that you would take, depending on time or traffic?

1                        McGee

2        A.    There are three, but I'm just trying to

3    recall.  Because I think I still sometimes use GP --

4    I can't recall.  But there are three.  You can

5    either go 95 all the way.  You could do 95 to 595.

6    You could do 95 to the turnpike.  Those are kind of

7    the three general ones.  I generally took the

8    turnpike, because it was the straightest route, but

9    I can't recall.

10       Q.    And did -- you were using autopilot

11   features during that drive, correct?

12       A.    Yes, sir.  Boca, yes.

13       Q.    Did you make any stops along the way?

14       A.    I don't recall.

15       Q.    Do you recall having to stop at least once

16   to turn the vehicle on and off so that you could use

17   autopilot again?

18       A.    No, sir, I don't recall.

19       Q.    You understand that one of the reasons

20   that you would stop to turn autopilot on and off is

21   because autopilot would automatically disengage

22   because it didn't detect your hands on the steering

23   wheel?

24             MR. POSES:  Objection to the form.

25       A.    I'm sorry, I lost the -- apologize.  What

```
1                    McGee

2    was the question again?

3    BY MR. BRANIGAN:

4         Q.   Do you agree that one of the reasons to

5    stop the vehicle, turn it on and off, is because of

6    the fact that autopilot disengaged on its own after

7    not detecting your hands on the steering wheel?

8              MR. POSES:   Same objection.

9         A.   Still trying to put it together, but

10   you're saying does the car -- you have to stop the

11   car to reset the autopilot?

12   BY MR. BRANIGAN:

13        Q.   Yes.  Do you understand --

14        A.   You said -- yes, sir.  You said that a

15   number of times, yes, sir.

16        Q.   You understand that that would be required

17   if autopilot automatically disengaged because it did

18   not detect your hands on the steering wheel,

19   correct?

20        A.   If you wanted to use it again, right, yes,

21   sir.

22        Q.   And you don't recall having to do that on

23   the night of the crash before the crash happened?

24        A.   No, sir.

25        Q.   If I said that the data from the car
```

```
 1                         McGee

 2    indicates that you had to do that at least once, do

 3    you have any reason to disagree with me?  The data

 4    itself.

 5         A.   No, sir.  I don't have a recollection of

 6    most of that.

 7         (Exhibit 4 was marked for identification.)

 8  BY MR. BRANIGAN:

 9         Q.   I'm handing you what I just marked as

10    Exhibit 4.

11              MR. POSES:  Do you have another copy of

12         this?

13              MR. BRANIGAN:  I do.  I have one more

14         copy.

15              MR. POSES:  Tom, is this a piece of the

16         manual?

17              MR. BRANIGAN:  It is, yes.

18              I'll tell you what, Todd, I don't have the

19         actual copy, but I have the actual manual here

20         that it comes from.

21              MR. POSES:  Great.  Thank you.

22              MR. BRANIGAN:  So I'll give you the whole

23         thing if you want to read along.

24              MR. POSES:  That's great.  Thank you.

25              THE WITNESS:  I'm sorry.
```

```
 1                    McGee

 2              MR. POSES:  I think this is the --

 3    BY MR. BRANIGAN:

 4         Q.   All right.  Sir, I just handed you what

 5    I've marked as Exhibit 4.  And I will represent to

 6    you that this is a copy of the -- excuse me -- the

 7    Tesla Model S owner's manual in hard copy that

 8    applied to your vehicle, the Model S, the 2019

 9    Model S.  And you can see that it's dated at the

10    bottom there on the first page.

11         A.   Yes, sir.

12         Q.   It's dated December 17, 2018.

13              Do you see that?

14         A.   Yes, sir.

15         Q.   And so there's no mistake or lack of

16    clarity here.  These are -- Exhibit 4 is a

17    collection of pages from the overall owner's manual.

18    I don't mean to suggest that what you have in

19    Exhibit 4 is the entirety of the owner's manual.  So

20    what Mr. Poses has in his hand is the entirety of

21    the owner's manual.  But I want to focus your

22    attention on the number of pages that relate to the

23    autopilot features.  All right?

24         A.   Okay.

25         Q.   So first of all, have you ever seen this
```

Page 90

```
 1                         McGee

 2    document before or the larger document that

 3    Mr. Poses has in his hand?

 4         A.   I don't recall seeing this before, no,

 5    sir.

 6         Q.   All right.  In fairness to you, I will

 7    tell you that the document itself is probably not

 8    the same size as this 8-and-a-half-by-11 copy that

 9    we have that probably is a little smaller and looks

10    like a more traditional owner's manual.

11         A.   Yes, sir.

12         Q.   But for the sake of making a copy, this is

13    what it looks like.  All right?

14         A.   Yes, sir.

15         Q.   So what I'd like you to do now is go to

16    the second page of Exhibit 4.

17              MR. POSES:  Tom, tell me what page it is

18         on the manual.

19              MR. BRANIGAN:  Yeah.  This is page 80.

20              MR. POSES:  8?

21              MR. BRANIGAN:  8-0.

22              MR. POSES:  80.

23              MR. BRANIGAN:  Yeah.

24    BY MR. BRANIGAN:

25         Q.   Are you with me, Mr. McGee?
```

1                         McGee

2       A.   Yes, sir.

3       Q.   All right.  Would you agree with me that

4  this page is entitled, About Autopilot?

5       A.   Yes, sir.

6       Q.   And this page -- I'm paraphrasing now, but

7  this page starts with a discussion about features,

8  then goes on to calibration, correct?

9       A.   Yes, sir.

10      Q.   And then on the left -- excuse me, on the

11  right-hand side of the page, there's a statement

12  about limitations, correct?

13      A.   Yes, sir.

14      Q.   And then eventually when you get down to

15  the midsection on the right-hand side of page 80,

16  there's a warning.

17           Do you see that?

18      A.   Yes, sir.

19      Q.   And there's also a -- a red triangle with

20  a white exclamation point, correct?

21      A.   Yes, sir.

22      Q.   All right.  And this warning says, The

23  list above does not represent an exhaustive list of

24  situations that may interfere with proper operation

25  of auto components -- autopilot components, correct?

1                          McGee

2          A.   Yes, sir.

3          Q.   And then the next statement starts off

4     with, Never depend on these components to keep you

5     safe.

6               Do you see that?

7          A.   Yes, sir.

8          Q.   It's the driver's responsibility to stay

9     alert, drive safely, and be in control of the

10    vehicle at all times, correct?

11         A.   Yes, sir.

12         Q.   That's -- did I read that correctly?

13         A.   You did, sir.  Yes, sir.

14         Q.   And do you agree that it was your

15    responsibility to never depend on the components of

16    autopilot as you were driving the vehicle, but to be

17    the driver?

18              MR. POSES:  Object to the form.  You can

19              answer.

20         A.   Yes, sir.  I expect to be the driver and

21    be responsible for this.

22    BY MR. BRANIGAN:

23         Q.   Do you agree that you should have never

24    depended on those components to keep you safe?

25              MR. POSES:  Object to the form.  You can

```
 1                        McGee

 2        answer.

 3        A.   Yes, sir, I do believe I shouldn't have

 4   depended on the -- the components of technology.

 5   BY MR. BRANIGAN:

 6        Q.   Do you agree that it was always your

 7   responsibility as the driver, while using autopilot,

 8   to stay alert?

 9             You're looking at your lawyer.

10        A.   Yes, sir, I am.  To make sure I can

11   answer.

12             MR. LIRO:  Unless I -- unless I tell you

13        not to answer, you can answer.

14        A.   Okay.  Yes, sir.  Yes, sir.

15   BY MR. BRANIGAN:

16        Q.   Do you agree that it was always your

17   responsibility as the driver of the vehicle, even

18   with autopilot activated, to drive safely and be in

19   control of the vehicle at all times?

20        A.   Yes, sir.

21        Q.   If you turn to the next page in the

22   exhibit, page 82 of the manual, are you with me?

23        A.   Yes, sir.

24        Q.   This is for traffic aware cruise control,

25   correct?
```

```
 1                        McGee

 2        A.   Yes, sir.

 3        Q.   At the very top it says, Note, traffic

 4   aware cruise control is a beta feature, correct?

 5        A.   Yes, sir.

 6        Q.   Was that your understanding when you

 7   bought the vehicle?

 8        A.   I don't recall.  Obviously, I mentioned

 9   something being beta, but I don't recall.

10        Q.   If you go down towards the midsection of

11   page 82 where you see that first warning.  Are you

12   with me?

13        A.   Yes, sir.  The one that begins, Traffic

14   aware of cruise control?

15        Q.   Right.

16        A.   Yes, sir.

17        Q.   I want to focus your next attention on

18   that for this next question.  But before we start

19   with that --

20        A.   Okay.

21        Q.   -- you had cruise control activated just

22   before the crash occurred, correct?

23        A.   Yes, sir.  I believe so.

24        Q.   You remember that, right?

25        A.   I don't recall engaging it, but obviously
```

```
 1                        McGee
 2   everything around it, the body camera, discussion,
 3   it's -- it's clear it was.  I just -- I don't recall
 4   engaging it.
 5        Q.   All right.  So with that understanding,
 6   there's a warning here that relates to traffic aware
 7   cruise control that you were using on the night of
 8   the crash, correct?
 9        A.   Yes, sir.  There's a warning here.
10        Q.   Right.  And if you go to the midpart of
11   that first warning, would you agree that there's a
12   sentence that says, Never depend on traffic aware
13   cruise control to adequately slow down Model S.
14             Did I read that correctly?
15        A.   Yes, sir, you did.
16        Q.   And you understand today and you
17   understood on the night of the crash that never
18   depend means never ever, right?
19             MR. POSES:  Object to form.
20        A.   Yes, sir.  Never depend does mean never.
21   BY MR. BRANIGAN:
22        Q.   The warning goes on to say, Always watch
23   the road in front of you and be prepared to take
24   corrective action at all times.
25             That was your responsibility, correct?
```

```
 1                         McGee
 2        A.   Yes, sir.
 3        Q.   Failure to do so can result in serious
 4   injury or damage, correct?
 5        A.   Yes, sir.
 6        Q.   There's another wording that follows that
 7   that talks about autopilot -- excuse me, traffic
 8   aware cruise control's capability of detecting
 9   pedestrians and cyclists, correct?
10        A.   Yes, sir.
11        Q.   But even there it says to never depend on
12   traffic aware cruise control to adequately slow your
13   Model S down for those types of objects, correct?
14        A.   Yes, sir.
15        Q.   It also instructed you or advised you or
16   warned you to always watch the road in front of you
17   and to be prepared to take corrective action at all
18   times, right?
19        A.   Yes, sir.
20        Q.   I'd like to focus your attention on
21   page 83, which is the next page.  I'd like to focus
22   your attention now on the bottom right-hand corner
23   of page 83.  There's another warning there, correct?
24        A.   Yes, sir.
25        Q.   And would you agree with me that this
```

1                         McGee

2    warning relates to traffic aware cruise control?

3         A.   Yes, sir.

4         Q.   And this warning says, Warning, traffic

5    aware cruise control cannot detect all objects, and

6    especially in situations when you're driving over

7    50 miles an hour may not brake, decelerate -- now

8    I'm on the next page -- when a vehicle or object is

9    only partially in a driving way or when a vehicle

10   you are following moves out of the driving path in a

11   stationary or slow moving or object is in front of

12   you.  Always pay attention to the road ahead and

13   stay prepared to take immediate corrective action.

14            Did I read that correctly?

15        A.   I was just following you real quickly.

16   Yes, sir, I believe you did.

17        Q.   All right.  Now, there's no doubt that at

18   the time of -- of this incident before the crash

19   actually occurred, you were driving at a speed that

20   was at least 50 miles an hour, if not higher,

21   correct?

22            MR. LIRO:  Form.

23        A.   Yes -- yes, sir.  That's what it says.

24   BY MR. BRANIGAN:

25        Q.   No.  I'm asking you whether you were

1                              McGee

2    driving at a speed -- of at least 50 miles an hour

3    immediately before the crash.

4         A.   I don't recall what my speed was

5    immediately other than the papers in front of me are

6    reminding me.  I just don't recall.

7         Q.   Sir, are you aware that your Model S was

8    equipped with a device that's called a

9    Event Data Recorder?

10        A.   Not specifically.  But I know it has a

11   device that records data.  I just don't know what

12   it's called.

13        Q.   Are you aware that your vehicle was

14   equipped with censors that could record your forward

15   velocity, sometimes people refer to that as speed?

16        A.   I assume so, yes, sir, more or less.

17        Q.   Are you aware that the data indicates that

18   you were traveling in excess of 50 miles an hour

19   before you applied the brakes with your foot?

20        A.   I honestly didn't see much of the data,

21   but, I mean, I am aware it's here and everywhere

22   else, I'm sure, is accurate.

23        Q.   You don't have any reason to disagree with

24   that, correct?

25        A.   No, sir.  No, sir.

1                          McGee

2      Q.   All right.  Continuing on, I'm looking at

3  page 84 of Exhibit 4.  There's another warning there

4  with a red triangle, white exclamation point.  And

5  if you go down to the second half of that warning,

6  you'll see it starts -- a sentence starts, Never

7  depend.

8           Do you see that?

9      A.   Yes, sir.

10     Q.   Never depend on traffic aware cruise

11  control to slow down the vehicle enough to prevent a

12  collision.  Always keep your eyes on the road when

13  driving and be prepared to take corrective action as

14  needed, correct?

15          Did I read that correctly?

16     A.   Yes, sir.

17     Q.   That's what this owner's manual advised

18  you to do, correct?

19     A.   Yes, sir.

20     Q.   It's also correct that the owner's manual

21  advised you that depending on traffic aware cruise

22  control to slow the vehicle down enough to prevent a

23  collision can result in serious injury or death,

24  correct?

25     A.   Yes, sir.

```
 1                    McGee

 2       Q.   All right.  You knew all those things

 3   before this collision occurred, correct?

 4            MR. LIRO:  Form.

 5   BY MR. BRANIGAN:

 6       Q.   All those things meaning you should never

 7   depend on traffic aware cruise control to slow you

 8   down to prevent a collision, correct?

 9            MR. POSES:  Objection.  Form.

10            MR. LIRO:  Form.

11       A.   I would say specifically I was aware that

12   the car was my responsibility.  I didn't read all

13   these statements and passages, but I'm aware the car

14   was my responsibility.

15   BY MR. BRANIGAN:

16       Q.   You knew that the vehicle had limitations

17   and that it wouldn't always be able to automatically

18   bring your vehicle to a complete stop or to take

19   some step to avoid a collision, correct?

20            MR. POSES:  Form.

21            MR. LIRO:  Form.

22       A.   I don't believe I knew that, quite

23   frankly.

24   BY MR. BRANIGAN:

25       Q.   What -- what is the reason that you think
```

```
 1                        McGee

 2    you didn't know that?

 3         A.   I don't really want to speculate.  I would

 4    just say, as you pointed out that there's different

 5    levels of the feature of the vehicle.  I don't know

 6    that I specifically knew each one and -- and kind of

 7    how it worked.  But, again, I did know it's my

 8    responsibility to operate the car safely, period.

 9         Q.   And to be prepared to take corrective

10    action if necessary when you have these technologies

11    engaged, correct?

12         A.   Yes, sir.  I would say that's probably

13    more my general driving awareness versus kind of

14    relative to the direction of the manual.

15         Q.   If you look through Exhibit 4 through

16    page 91, from where we were just at, which was

17    page 84.

18              MR. POSES:  Hey, Tom, I apologize.  You

19         want us to go to 91?

20              MR. BRANIGAN:  I'm sorry.

21    BY MR. BRANIGAN:

22         Q.   The question is if you look through those

23    pages, 84 through 91.

24         A.   Yes, sir.

25         Q.   The kinds of warnings that we just went
```

1                     McGee

2  over are repeated multiple times in that section of

3  the manual.  Would you agree with me?

4       A.   Yes, sir.  I see several warnings.  I was

5  going to kind of skim them briefly, but --

6       Q.   You can take whatever time you need to

7  read those.

8       A.   Okay.  Give me a few minutes.

9       Q.   Sure.

10      A.   I'm sure it does.  I just rather be

11 certain.

12      Q.   Take whatever time you need.

13      A.   Okay.  I apologize.  Can you repeat the

14 question?

15      Q.   Yes.  My question, generally speaking, is

16 that over the course of those pages that range from

17 page 84 through 91 that discuss the feature known as

18 traffic aware cruise control and also autosteer, the

19 warnings that tell you to never depend on the

20 technology and to always watch the road and be

21 prepared to take corrective action, they're repeated

22 multiple times in that span of pages, correct?

23      A.   Yes, sir.

24      Q.   Now, if you look at page 127 in Exhibit 4,

25 that page at the top says,

1                    McGee

2    Collision Avoidance Assist, correct?

3         A.   Yes, sir.

4         Q.   And on the --

5              MR. POSES:  Wait, Tom, I apologize, were

6         you were on page -- what page, I'm sorry?

7              MR. BRANIGAN:  127.

8              MR. POSES:  127?

9              MR. BRANIGAN:  Yeah.  What do you have

10        there?

11             MR. POSES:  It has media and audio just on

12        this page.  But if you don't mind, I'll just

13        try to reference it.  127.

14             MR. BRANIGAN:  Todd, tell me, what's

15        the -- is there a date on the front page of

16        that one?

17             MR. POSES:  It's the same, December 2018.

18        Yeah.

19             MR. BRANIGAN:  On the big one that you

20        have?

21             MR. POSES:  Yeah, it's December 2018.

22             MR. BRANIGAN:  Huh.

23             MR. POSES:  Yeah.  December 17, 2018.

24             MR. BRANIGAN:  Okay.  Well, I'm confident

25        that this page is in there.

1                    McGee

2          MR. POSES:  Let me just grab it real

3     quick.

4          MR. BRANIGAN:  Sure.  Go ahead.

5          MR. POSES:  Because I think yours is

6     page 79.

7          All right.  In the manual it's page 102,

8     of this manual, but I'm on the same page.  Let

9     me just compare the language and make sure it's

10    the same.  So it's different, but -- okay.  I'm

11    going to share it with you.

12         MR. BRANIGAN:  Sure.  So you got -- the

13    manual you've got 102?

14         MR. POSES:  It is.  It's page 102 in the

15    manual.  The language is slightly different.

16         MR. BRANIGAN:  All right.

17         MR. POSES:  The colors are different and

18    things like that, but let's do our best.

19         MR. BRANIGAN:  Sure.

20 BY MR. BRANIGAN:

21    Q.   Okay.  So, Mr. McGee, focusing your

22 attention on page 127 of Exhibit 4, this relates to

23 collision avoidance assist, and it makes reference

24 to automatic emergency braking and forward collision

25 warning, correct?

```
1                    McGee

2       A.   Yes, sir.

3       Q.   And there's a warning on the left side of

4   the page that actually says, Warning, forward

5   collision warning is for guidance purposes only and

6   not a substitute for attentive driving and sound

7   judgment, correct?

8       A.   Yes, sir.

9       Q.   First of all, your vehicle had forward

10  collision warning, correct?

11      A.   Yes, sir.  I believe so.

12      Q.   And do you understand how that -- I'm not

13  asking you how it works technically speaking, but

14  when it would work, under what conditions?

15      A.   Could you clarify the question?

16      Q.   Sure.  Let me ask a better question about

17  it.

18           Do you understand what would happen if it

19  was activated, how it would give you a warning?

20      A.   No, sir, let me try and see --

21      Q.   Sure.

22      A.   I think my understanding is when there's

23  an object in front, it would usually brake or I

24  believe there might have been a red light on the

25  dash, but, again, I can't recall.  I know my current
```

1                    McGee

2    car has a red light, so I may be blurring the two

3    together.  But I believe a light comes on and it

4    slows down, but -- if it saw an object.

5         Q.   The forward collision warning system is a

6    warning.

7         A.   Okay.

8         Q.   And I'll distinguish that from automatic

9    emergency braking in which the actual braking

10   process to slow, to decelerate the vehicle.  All

11   right?

12        A.   Okay.

13        Q.   So on the Tesla Model S, do you ever

14   recall, while you were driving the vehicle,

15   receiving a warning from the vehicle about the

16   possibility of a collision ahead through the forward

17   collision warning system?

18        A.   I don't recall.  Honestly trying to in my

19   head, but I don't recall.

20        Q.   Well, would you agree with me that the

21   warning here in the manual indicates that it's not a

22   substitute for attentive driving and sound judgment?

23        A.   Yes, sir.  I believe that's written in

24   there.  Yes, sir, I see it right here.

25        Q.   Right.  And you agree with that, correct?

1                              McGee

2          A.   Yes, sir.

3          Q.   If you go down to the next warning, it

4     relates to automatic emergency braking.

5               Do you agree with me that Tesla was

6     warning you that that system is not designed to

7     prevent all collisions?

8          A.   Yes, sir.  Sorry.

9          Q.   Was that your understanding at the time

10    of -- you bought the vehicle.

11              MR. POSES:  Form.

12         A.   I don't think I really contemplated one

13    way or another.  Again, I'm speculating because it's

14    been three years and I don't recall.  But I don't

15    think I probably would opine on, you know, the

16    ability of it to stop.  I believe I would have

17    thought it would stop.  But, again, probably didn't

18    spend a lot of time thinking about the specific

19    feature and how it functioned.

20    BY MR. BRANIGAN:

21         Q.   Well, is there something that you received

22    from Tesla or that someone at Tesla told you that

23    caused you to form the opinion that the vehicle

24    would always stop because of this technology and

25    that you wouldn't have to do something to stop the

1                        McGee

2    vehicle?

3              MR. POSES:   Object to the form.

4         A.   Not specifically, no, sir.  Not that I can

5    point to.

6    BY MR. BRANIGAN:

7         Q.   Was it your expectation when you bought

8    the vehicle or after you took delivery of the

9    vehicle that the vehicle would work that way?  In

10   other words, that the technology of the vehicle

11   would always stop the vehicle for you and that you

12   wouldn't have to apply the brakes?

13        A.   I wouldn't answer always, because

14   obviously, as you said, you can also drive it as a

15   normal car.  I believe I thought when it was on

16   autopilot, if there was an object in the way, it

17   would stop regardless of any car.  I mean,

18   obviously, we've read about cars, pedestrians,

19   et cetera, so I didn't probably think about all the

20   different types.  But, generally speaking, yes, I

21   thought if I engaged autopilot and there was a

22   parked car, it would stop and not hit it.  Or the

23   car that brake and would stop.

24        Q.   And was that your expectation regardless

25   of the speed that you were traveling?

1                          McGee

2       A.   Again, I don't think I really thought

3   about -- it sounds like you're spending a lot of

4   time thinking about exactly what speed and the

5   features if there was something I contemplated.  But

6   honestly, I don't recall contemplating a speed or if

7   it would stop or not stop.

8       Q.   Was that your expectation regardless of

9   the speed you were traveling and the distance

10  between the front of your vehicle and the object?

11      A.   Oh, I see what you mean.  Could you ask

12  one more time, because I think I know what you mean?

13      Q.   Yeah.  Do you -- was it your expectation

14  that while using autopilot, the automatic emergency

15  braking feature of autopilot would always bring the

16  vehicle to a stop regardless of your rate of speed,

17  the forward velocity, and the distance between the

18  front of your vehicle and the object ahead?

19      A.   I see what you're asking.

20           MR. POSES:  Object to the form.

21      A.   I'm sure I didn't believe that.  Clearly

22  there's a speed at which -- from a distance from

23  another car that just scientifically can't stop in

24  time.  So I'm sure I didn't believe that regardless

25  of speed and gap of -- between my next object, it

```
 1                           McGee
```

 2    would definitely be able to prevent an accident.

 3    Again, that's a bit intuitive and I'm speculating on

 4    what I thought.  But just knowing how my mind works,

 5    I'm sure I knew that if you were going excessive

 6    speed, whatever it was, and you were a foot away

 7    from another car, it's not going to stop.

 8  BY MR. BRANIGAN:

 9        Q.   Was it your expectation that with

10    autopilot engaged that the automatic emergency

11    braking system would be able to detect any object in

12    front of your vehicle and always bring the vehicle

13    to a stop?

14             MR. POSES:  Form.

15        A.   Again, I don't believe I -- I don't

16    believe I contemplated that, but, no, I think

17    there's some logical element of that to say, no, if

18    there's a rabbit in the road, I don't think I

19    thought the Tesla would stop.  Just for example.

20    The limitations, I'm sure, that I would have thought

21    logically, in my head, there's limitations.

22  BY MR. BRANIGAN:

23        Q.   And with those limitations in mind, would

24    you agree with me that that's one of the primary

25    reasons that anytime that you drove the Tesla on

```
 1                       McGee

 2   autopilot engaged that you were responsible for

 3   actually being the driver?

 4       A.   You have to repeat that one just to make

 5   sure I know what I --

 6       Q.   With those limitations in mind, are those

 7   limitations reasons that you knew that anytime you

 8   drove the Tesla with autopilot engaged, you had to

 9   still be the driver?

10       A.   For me it was just the broader

11   responsibility of being a driver, and so, yes, I was

12   highly aware that was still my responsibility to

13   operate the vehicle safely.  I probably didn't go

14   through the decision of each feature and say -- but,

15   of course, the logic in me would say clearly I

16   needed to -- to manage the technology.

17       Q.   And that included being aware of your

18   surroundings and being alert about things in front

19   of you, correct?

20       A.   Yes, sir.

21       Q.   Including objects in front of you vehicle?

22       A.   Yes, sir.

23       Q.   That included being aware of the speed

24   limit on the road, correct?

25       A.   Sure.  Yes, sir.
```

```
1                         McGee
2      Q.   That included being aware of traffic
3 control devices on the road?
4      A.   Well, I wouldn't say Tesla also told you
5 the speed limit of the road you were as well for the
6 data.  So I got it from the car or the road just to
7 be clear.
8           What was the last question?  I apologize.
9      Q.   That would include being aware of speed
10 control devices on the road, for example, a
11 stoplight.  It was your job to look out for those,
12 correct?
13      A.   Yes, sir.
14      Q.   A stop sign?
15      A.   Yes, sir.
16      Q.   All right.  A flashing red light?
17      A.   Yes, sir.
18      Q.   All right.  And you understood before this
19 crash occurred that the Tesla was not designed to
20 identify and respond to any of those traffic control
21 devices, right?
22           MR. POSES:  Objection to form.
23      A.   I wasn't aware of kind of how far along
24 they were, but I was certainly aware that they
25 couldn't do the complete traffic -- I don't the
```

1                     McGee

2   terminology, but I wasn't looking for stoplights and

3   things.  I just -- again, I don't think -- I

4   suspecting.  I don't recall.  But I don't think I

5   really assumed that it would stop at stop signs and

6   stoplights and those sorts of things, no.

7   BY MR. BRANIGAN:

8       Q.   Before the crash occurred, you knew that

9   was your job to detect and react properly to a stop

10  sign or red flashing light, correct?

11      A.   Yes.

12      Q.   Was not the car's job, right?

13      A.   Yes.

14      Q.   Wasn't Tesla's job; it was your job?

15      A.   Yes, sir.

16      Q.   In between the time you took delivery of

17  the Tesla and the date of the crash, did you ever

18  call Tesla, communicate with Tesla in some way,

19  electronically or otherwise with any questions about

20  how the vehicle operated?

21      A.   Not that I recall.

22      Q.   And forgive me, Mr. McGee, I think I asked

23  you this, but the -- you recognize that the

24  Tesla Model S had a center display, right?

25      A.   Yes, sir.

1                           McGee

2      Q.   That you could access information through.

3           Did you know that the owner's manual,

4   including the information that we just looked at

5   from the owner's manual in Exhibit 4, was available

6   to you through the center display?

7      A.   Yeah, I don't recall everything, but I

8   don't recall knowing it was the available to me,

9   yes, sir.

10     Q.   I want to turn your attention now to, I

11  think it's marked as Exhibit 3, the answers to

12  interrogatories.

13          Do you have those in front of you?

14     A.   Yes, sir.

15     Q.   All right.  What I have here is a document

16  that's entitled,

17  Notice of Serving Answers to Interrogatories.  And

18  it's -- it appears to be dated May 20, 2020,

19  according to the first page.

20          Is that what you have?

21     A.   Yes, sir.  Yes, sir.

22     Q.   And if you look at the last page of the

23  document, there's a signature page, and it appears

24  that it has a signature above the line that says,

25  George Brian McGee; is that right?

1                         McGee

2        A.   Yes, sir.

3        Q.   Is that your signature, sir?

4        A.   Yes, sir.  It looks like it is, yes, sir.

5        Q.   And that's dated June 19, 2020, correct?

6        A.   Yes, sir.

7        Q.   All right.  These -- these are the answers

8   that you gave, with the assistance of your lawyers,

9   to the interrogatories that were submitted to you in

10  the case of Benavides versus you,

11  George Brian McGee, correct?

12       A.   Yes, sir.  I believe so.

13       Q.   All right.  You had counsel at the time,

14  correct?

15       A.   Yes, sir.

16       Q.   And is Mr. Liro the lawyer that's with you

17  here today, correct?

18       A.   Yes, sir.

19       Q.   He was your counsel at the time?

20       A.   Yes, sir.

21       Q.   When did you retain Mr. Liro or -- let me

22  be more general.

23            When did you first retain counsel after

24  this crash?

25       A.   I don't recall specifically.  Like

1                        McGee

2    approximately a week.  But I honestly don't recall

3    exactly.

4         Q.   About a week after the crash?

5         A.   I think more or less.  I don't recall.

6    Yes, sir, I think so.

7         Q.   And was it -- was it Mr. Liro that you

8    retained?

9         A.   I retained Mr. Liro through insurance and

10   also retained additional counsel.

11        Q.   Who were the additional lawyers that you

12   retained?

13        A.   Michael Malone and Michael Tine

14   (Phonetically).

15        Q.   And what were they doing?  Were they

16   representing you in the matter related to the crash

17   itself and not this lawsuit?

18        A.   They were representing me in both.

19   Additional counsel, I guess, is just for me.

20        Q.   Do you recall answering any other

21   questions in writing besides these that we have here

22   that we've marked as Exhibit 3?

23        A.   No --

24        Q.   Answers to interrogatories?

25        A.   No, sir.  I don't recall answering more

1                         McGee

2    than these.

3         Q.   All right.  I think I asked you this

4    earlier, forgive me if I did.  Did you give a --

5    you're giving a deposition here today.

6         A.   Yes.

7         Q.   Did you give a deposition in the course of

8    this lawsuit --

9         A.   Yes.

10        Q.   -- against you personally?

11        A.   No, sir.

12        Q.   Did you provide any documents to Mr. Poses

13   or his client in the course of that lawsuit?

14        A.   I'm trying to recall if I did provide some

15   financial documents, but that is all I can recall.

16   I can't remember if we -- I can't -- I'd have to

17   look at them, I guess.  I believe I provided

18   financial documents, but I can't recall if I did or

19   not.

20        Q.   Financial documents related to what?

21        A.   My personal financial.

22        Q.   Did you make a court appearance for this

23   lawsuit where you actually went to court?

24        A.   No, sir.

25        Q.   All right.  I want to turn your attention

1                          McGee

2    to some of the questions and the answers that you

3    gave.

4              Turning to the second page of the

5    document.  Number 5.

6         A.   Yes, sir.

7         Q.   Interrogatory number 5.

8              Interrogatory 5 states, and I quote,

9    Describe in detail how the incident described in the

10   complaint happened, including all actions taken by

11   you to prevent the incident.

12             Did I read that correctly?

13        A.   Yes, sir.

14        Q.   All right.  And then there's an answer.

15   And the answer is about a couple sentences long,

16   maybe a paragraph long.

17             Did you write out this answer?  Is this

18   your answer?

19        A.   I can't recall who wrote it, sir.

20        Q.   Do you think you contributed to it?

21        A.   Yes, sir.  I believe so.  My answer --

22        Q.   And you stand by -- you signed this as

23   your --

24        A.   Yes, sir.

25        Q.   -- answers and you realized you were

```
 1                    McGee

 2   signing these and swearing --

 3        A.   Yes, sir.

 4        Q.   -- under oath that these were you answers,

 5   correct?

 6        A.   Yes, sir.

 7        Q.   In your answer, you indicate that on the

 8   date of the incident -- I'm paraphrasing now -- you

 9   were traveling eastbound on Card Sound Road with

10   your vehicle's autopilot feature engaged and your

11   hands on the steering wheel, correct?

12        A.   Yes, sir.

13        Q.   You indicate that as you approached the

14   intersection of Card Sound Road in County Road 905A,

15   the vehicle's autopilot system and other safety

16   features, i.e., automatically emergency braking and

17   front collision warning malfunctioned, which caused

18   you to not stop at the intersection and impact the

19   illegally parked Chevrolet Tahoe.

20        A.   Yes, sir.

21        Q.   Can you tell me in your own words how the

22   automatic emergency braking now functioned to cause

23   you to not stop?

24        A.   I believe at the time that it did not see

25   the parked car.  It was a black parked car on a dark
```

1                         McGee

2   night.  And so it didn't -- the brake -- what do you

3   call -- brake assist didn't trigger at all.  At

4   least my presumption -- again, the evening, looking

5   back, is a little bit blurry after the accident.

6   But it was -- it was my belief that the car didn't

7   indicate -- the warning indication you mentioned

8   didn't go off, and it didn't attempt to stop for the

9   black Tahoe.

10          Q.    You talked about what the car didn't do.

11          A.    Yes, sir.

12          Q.    How about you?  You were the drive of the

13   car, right?

14          A.    Yes, sir.

15          Q.    Did you fail to see the stop sign?

16          A.    Yes, sir.

17          Q.    There was a red flashing light in the

18   controlling intersection as well, correct?

19          A.    Yes, sir.

20          Q.    Did you fail to see the red flashing

21   light?

22          A.    Yes, sir.

23          Q.    Did you fail to see the Tahoe that was

24   parked east of the eastern edge of County Road 905

25   before it was too late to avoid the collision?

```
 1                    McGee
 2      A.   Yes, sir.
 3      Q.   So you don't indicate your response to
 4  number 5 that you failed to do those things, right?
 5      A.   Correct.
 6      Q.   You just blamed the car, correct?
 7      A.    In this statement, yes, sir.  It's focused
 8  on the car.
 9      Q.   Well, actually -- well, your statement is
10  focused on the car.  The question's not just focused
11  on the car, is it?
12      A.   I'm sorry.  You lost me.
13      Q.    You said the statement is focused on the
14  car.  But my question is the question itself,
15  number 5, is not focused on anything except asking
16  you to describe what happened.
17      A.   I understand.  And I believe the car did
18  not stop in time and see a parked car.  But, again,
19  my expectation was it would have done that, stop the
20  car.  Is it ultimately my responsibility, yes, sir.
21  But I believe the car did not stop.  It had features
22  it would stop, and that's the statement I have.
23      Q.   And you didn't do anything to stop the car
24  until it was too late, correct?
25      A.   That part I can't recall.  Obviously, it's
```

1                            McGee

2    too late.  So, I guess, stopping there, it was too

3    late.  Whatever I did -- I can't recall if I hit the

4    brakes or not right beforehand.  Again, it's just

5    blurry, this incident, given what happened.  But

6    obviously, no, sir, I did not prevent the accident.

7         Q.    You were on the phone at the time, right?

8         A.    Yes, sir, I believe I was on speaker

9    phone.

10        Q.    What kind of phone were you using that

11   night?

12        A.    It would have been an iPhone connected to

13   the Bluetooth of the -- of the vehicle.

14        Q.    Were you holding the phone in your hands?

15        A.    I don't recall, sir, but unlikely, because

16   I usually put it in the center console and use

17   Bluetooth/Siri to make phone calls.

18        Q.    Who were you talking to?

19        A.    I was on hold with the airline.

20        Q.    Which airline?

21        A.    Again, I believe it was American airlines,

22   because it was a flight to Charlotte and typically

23   long hold times, so I had been on hold for some

24   time.

25        Q.    Had you actually communicated with a

```
 1                        McGee

 2   person, or had you just dialed into their system and

 3   then you were put on hold?

 4        A.   I speculating a bit.  I don't fully

 5   recall.  I was on hold, so I believe I was still on

 6   hold.  And it was -- it would have been with a

 7   special services group.  I was calling to get

 8   something added for my wife.

 9        Q.   If you had the car -- excuse me.  If you

10   had the car phone for your phone, hooked up to the

11   car via Bluetooth, it could be operated in a

12   hands-free way, correct?

13        A.   Yes, sir.

14        Q.   And that would include actually starting

15   the call, right?

16        A.   It could, yes, sir.

17        Q.   And that would also include deciding which

18   number to call, correct?

19        A.   Okay.  You lost me.  Yes, sir.

20        Q.   Let me ask -- let me ask a better

21   question.

22             If you had your cell phone -- was it an

23   iPhone?

24        A.   Yes, sir.

25        Q.   If you had your iPhone hooked up to a
```

1                         McGee

2    vehicle through Bluetooth so that you could operate

3    the phone, use the phone in a hands-free way, you

4    could -- you could use voice activated controls to

5    make a phone call, correct?

6         A.   Yes, sir.

7         Q.   And so while you're doing that, you could

8    have both hands on the steering wheel, correct?

9         A.   Yes, sir.

10        Q.   And your eyes on the road, correct?

11        A.   Yes, sir, you could.

12        Q.   There would be no need to hold the phone,

13   right?

14        A.   Yes, sir.

15        Q.   You told the police at the scene that you

16   had bent over to pick up your phone?

17        A.   Yes, sir.

18        Q.   How is it that your phone needed to be

19   picked up if you were using Bluetooth to make the

20   call?

21             MR. POSES:   Form.

22        A.   I honestly -- I honestly can't recall.  It

23   could have fallen off.  It's a pretty crummy --

24   crummy road.  I could have not dialed with

25   Bluetooth.  I just don't know.  Honestly, I don't

1                          McGee

2    recall how I dialed the phone number, how long I was

3    on hold.  I would have to look at the phone record.

4    But I just don't know how I made the call.  It could

5    have fallen off.  It's a bumpy road.  I don't know

6    honestly.  I can't recall.

7    BY MR. BRANIGAN:

8         Q.   It is a fact, though, that for some period

9    of time before the impact occurred, you had --

10   excuse me -- you taken your eyes off the road and

11   bent down somehow to pick up your phone, correct?

12        A.   I believe that's why I say, again, I just

13   can't recall the night -- recall the incident.  It's

14   pretty blurry.

15        Q.   Looking at interrogatory number 6.

16        A.   I apologize.  Once we do this one, can I

17   use the restroom again?

18        Q.   Sure.

19        A.   Again, I can hold it until we're through.

20        Q.   Interrogatory number 6 asks you to

21   describe in detail each act or omission on the part

22   of any lost -- on the part of any party to this

23   lawsuit that you contend constituted negligence that

24   was a contributing legal cause of the incident in

25   question, correct?

1                          McGee

2       A.   Yes, sir.  That's what it says.

3       Q.   Could you read your answer for us, please.

4       A.   It says, Enabled the latest, was

5   neglect -- negligence, excuse me, and contributed to

6   the subject accident issues in violation of Florida

7   administrative code rules 62 -- 62D-2.014 at the

8   time the incident occurred.

9       Q.   So in response to 6, you're blaming the

10  decedent, Neima Benavides, and saying she was

11  negligent?

12      A.   Yes, sir.  It says negligent, yes, sir.

13      Q.   Can you say in your own words what you

14  think she did wrong to cause the accident?

15      A.   Yes, sir.  In this case it was parked in a

16  restricted area.

17      Q.   You don't identify yourself as someone, a

18  party to the lawsuit, that was negligent for a

19  contributing legal cause to the incident, correct?

20      A.   Correct.

21      Q.   And I take it you think that you were not

22  negligent at all in any way in causing the accident?

23          MR. LIRO:  Hold on.  Wait.  Wait.  Wait.

24      That's -- first of all, there has been a

25      settlement of the civil suit, and the part of

```
 1                    McGee

 2        the settlement is that there was no admission

 3        of guilt.  So I want to be clear about that.

 4        Number one, there's been no judicial

 5        determination as to any guilt of any party.

 6             So with that on the record, you can

 7        answer, if you know.

 8             MR. BRANIGAN:  And I'm not talking about

 9        guilt in the criminal sense; I'm talking about

10        negligence in the sense of failing to exercise

11        reasonable care.

12        A.   I'm not sure I understand the question

13   other than is this my answer?  This is my answer.

14   BY MR. BRANIGAN:

15        Q.   And your answer doesn't make any reference

16   to yourself as being negligent in this situation in

17   causing or contributing to the incident, correct?

18        A.   That's correct.

19             MR. BRANIGAN:  All right.  Let's take a

20        break.

21             VIDEOGRAPHER:  Time is 11:24 a.m.  We're

22        going off the record.

23                  (Recess taken.)

24             VIDEOGRAPHER:  Time is 11:36 a.m.  We're

25        back on the record.
```

```
 1                    McGee

 2  BY MR. BRANIGAN:

 3       Q.   Sir, focusing your attention again on

 4  Exhibit 3 in looking at interrogatory 8.  Let me

 5  know when you're there.

 6       A.   Yes, sir.

 7       Q.   All right.  Interrogatory number 8 --

 8  excuse me -- asks whether you contend any person or

 9  entity, other than you, is or may be liable in whole

10  or in part for the claims served against you in this

11  lawsuit, the lawsuit brought by the estate of

12  Ms. Benavides.  And if so, state the full name and

13  address of each person or entity or legal basis for

14  your contention, the facts or evidence upon which

15  your contention is based, and whether or not you

16  have notified each -- such person or entity of your

17  contention.

18            And you answer by identifying the

19  decedent, Ms. Benavides, correct?

20       A.   Yes, sir.

21       Q.   And you also identified Dillon Angulo,

22  correct?

23       A.   Yes, sir.

24       Q.   And you identified Tesla, correct?

25       A.   Yes, sir.
```

```
 1                        McGee

 2      Q.   What is it that you think Mr. Angulo did

 3  wrong?

 4      A.   Again, they were both parked in a

 5  restricted area.

 6      Q.   The fact that they were parked in the

 7  restricted area, is that why you claim you couldn't

 8  stop the vehicle before the collision?

 9      A.   I'm sorry, are you asking about this

10  question, or is it a different question?

11      Q.   Just in general.  You said the fact that

12  Mr. Angulo and the decedent were parked -- their

13  Tahoe was parked in a restricted area, is that why

14  you're saying you could not have seen them and you

15  could not have stopped the vehicle to avoid the

16  collision?

17      A.   No, sir.  I believe here I was opining if

18  their vehicle wasn't there, I wouldn't have been

19  hit.

20      Q.   I see.  So you would have just gone

21  through the stop sign and gone on across the road

22  and not hit anything?

23      A.   I don't know what I would have hit, trees,

24  something, but it wouldn't have been the car.  So my

25  contention was the car was there, and then therefore
```

1                     McGee

2    it got hit.

3        Q.   Okay.  And in response to it, you also

4    identified Tesla, correct?

5        A.   Yes, sir.

6        Q.   What do you think Tesla did wrong?

7        A.   Again, I felt the car should have detected

8    that there was an obstruction and then it should

9    have assisted in stopping the car.  I thought it

10   would have notified me.

11       Q.   After you were sued in this case by the

12   estate of Ms. Benavides --

13       A.   Yes, sir.

14       Q.   -- you did not file a lawsuit against

15   Tesla, correct?

16       A.   Correct.

17       Q.   And not only did you not file a lawsuit

18   against Tesla, you haven't made a claim against

19   Tesla, correct?

20       A.   Correct.

21       Q.   You understand the difference -- I want to

22   make sure we're clear -- between a claim and a

23   lawsuit?

24       A.   Help me out.  I'm pretty sure, but just so

25   I make sure I can give you the right answer.

Page 131

```
 1                        McGee

 2       Q.   All right.  After the -- the incident

 3  happened, April 25, 2019, after you were sued by

 4  Ms. Benavides' estate, you or your lawyers never

 5  contacted Tesla to say, Hey, Tesla, Mr. McGee -- or

 6  I've been sued because of this crash, and I'm making

 7  a claim that I shouldn't be sued, you should be

 8  sued.  You're the reason this crash happened.

 9            You didn't do that, correct?

10       A.   No, sir.  I'm not -- the only part I'm not

11  clear on, I'm not sure if my attorneys contacted

12  Tesla at all, but I did not.

13       Q.   And that's still true to this day.  I

14  mean, you haven't contacted Tesla, right?

15       A.   Correct.

16       Q.   You never sued Tesla, right?

17       A.   Correct.

18       Q.   You didn't sue Tesla for your injuries,

19  correct?

20       A.   Correct.

21       Q.   In fact, for the most part, you got out of

22  the Tesla that night and walked away, correct?

23            MR. LIRO:  Form.

24       A.   Physically or my injuries or --

25
```

1                    McGee

2   BY MR. BRANIGAN:

3        Q.   Yeah.  Physically.

4        A.   No, sir.  I was -- I was taken in

5   ambulance to the hospital.

6        Q.   Well, I was being a bit overly broad and

7   facetious and I don't mean to make light of the

8   situation.

9        A.   Okay.

10        Q.   So let me -- first of all, seriously, I

11   don't mean to make light of the situation.

12        A.   I understand.

13        Q.   It's a very serious situation.  And I mean

14   very seriously that you -- you didn't sustain any

15   serious injury as a result of the crash, correct?

16        A.   Not long-term.  I did have a pretty bad

17   injury, but, yes, not serious.

18        Q.   What was your injury?

19        A.   Yeah.  I think it was a concussion and a

20   swollen eye.  So nothing -- again, not to minimize

21   the people who were really hurt.  So, no, it was not

22   a serious injury.

23        Q.   Did you miss any work?

24        A.   I can't recall, but I believe I stayed out

25   of work for a few weeks, but I can't recall.  But I

```
 1                    McGee
 2  don't know if it's accident related, injury related,
 3  if you're trying to parse out, you know, I just --
 4        Q.   Because of physical injuries, did you miss
 5  any work?
 6        A.   Again, I -- the swollen eye, I definitely
 7  would not have gone to work with for some time.  But
 8  outside of that, nothing else.
 9        Q.   Did you continue to treat with a physician
10  or a medical care provider after you were discharged
11  from the hospital?
12        A.   I did.  However, I still have a neurology
13  follow-up I didn't -- I didn't end up doing.  But,
14  yes, sir, I did follow up with a doctor at some
15  point.
16        Q.   Do you believe that you have any residual
17  physical problems since the crash?
18        A.   No, sir.
19        Q.   You're not taking any medication or
20  seeking any treat -- continuing --
21        A.   Relative to this accident, no, sir.
22        Q.   Relative to this accident --
23        A.   No, sir.
24        Q.   -- you're not taking any medication or
25  undergoing any treatment?
```

```
 1                         McGee

 2        A.   No, sir.

 3        Q.   Physical --

 4        A.   Physical.

 5        Q.   -- treatment, how about psychological?

 6             MR. LIRO:  Hold on.  Wait.

 7             So Mr. McGee is not placing his

 8        psychological condition at issue in this case,

 9        and will not be answering questions related to

10        any type of psychological treatment that he

11        received pursuant to Florida statute privilege

12        recognition.

13             MR. BRANIGAN:  Understood.  And that's

14        fair.

15   BY MR. BRANIGAN:

16        Q.   On the night of the crash, you were able

17   to get out of the Tesla under your own power,

18   correct?

19        A.   Yes, sir.  I believe so.

20        Q.   And you exited the vehicle and you were

21   able to move around the crash scene, correct?

22        A.   Yes, sir.  Again, it's -- it's a bit

23   blurry of all of what happened.  But, yes, sir, I

24   was able to move around the crash scene, and I found

25   Mr. Angulo.  So yes, sir, I was able to move around.
```

1                           McGee

2    I remember being disoriented, obviously, but

3    that's -- I was able to move around.

4         Q.   You were able to speak to the law

5    enforcement officials at the crash scene, correct?

6         A.   Yes, sir.

7         Q.   They asked you questions and you were able

8    to answer them, correct?

9         A.   Yes, sir.

10        Q.   One of the questions that they asked you

11   is, you know, who you were, where -- right?

12        A.   Again, I don't recall the questions

13   specifically.  But I was in his body camera footage

14   that I had not watch.  But I'm sure they did.  I

15   just -- again, I can't recall what they asked.  It

16   was a tough situation.

17        Q.   Turning back to Exhibit 3, looking at

18   interrogatory 19, you were asked, Did any mechanical

19   defect in the motor vehicle in which you were riding

20   at the time of the incident, described in the

21   complaint, contribute to the incident?  If so,

22   describe the nature of the defect and how it

23   contributed to the incident.

24             And you said in response, Upon information

25   and belief, defendant's vehicle's autopilot's

1                          McGee

2    system, automatic emergency braking system, and

3    front collision warning malfunctioned at the time of

4    the incident.

5            Tell me in your own words, if you would,

6    sir, how it malfunctioned it, how the -- first, the

7    automatic emergency braking system malfunctioned.

8            MR. POSES:  Form.  You can answer.

9        A.   Additionally, I thought, again, when --

10   one, I would probably go back up and say I would

11   start with a detection to say -- I believe it didn't

12   warn me.  Again, I can't recall exactly how

13   everything happened at the moment.  But it didn't

14   detect the vehicle or automatically emergency brake.

15   So those were my beliefs at the time that those

16   things did not work properly.

17   BY MR. BRANIGAN:

18       Q.   We spent a fair amount of time before the

19   break going over the portions of the owner's manual

20   that I marked as Exhibit 4 that talk about the way

21   that automatic emergency braking works.

22       A.   Yes, sir.

23       Q.   Forward collision warning works.

24       A.   Yes, sir.

25       Q.   Including the warnings to you and also the

<pre>
 1                    McGee
 2   limitations of the system.
 3            Having read through that -- that section
 4   of the owner's manual, and if you want to look at if
 5   again, you can for this next series of questions,
 6   but does it change your mind about whether the --
 7   the system actually failed to operate as it was
 8   designed to operate?
 9        A.   No, sir.
10        Q.   So if we turn to Exhibit 4 again,
11   page 129.
12        A.   Yes, sir.
13        Q.   Top left corner of exhibit -- excuse me,
14   of page 129, it starts out with that warning.
15        A.   Sure.  The top one?
16        Q.   Yeah.
17        A.   Yes, sir.  I see it.
18        Q.   Do you see where it says, Several factors?
19        A.   Yes, sir.  The warning below that starts,
20   Automatic emergency braking?
21        Q.   No.  I want the -- read the one above that
22   first.
23        A.   Okay.
24        Q.   The one that says, Warning, several
25   factors can affect the performance of automatic
</pre>

1                         McGee

2   emergency braking causing either no braking or

3   inappropriate or untimely braking, such as when the

4   vehicle was partially in the path of travel or there

5   is road debris.  It is the driver's responsibility

6   to drive safely and remain in control of the vehicle

7   at all times.  Never depend on automatic emergency

8   braking to avoid or reduce the impact or collision.

9           So in light of that statement to you about

10  limitations of automatic emergency braking in your

11  vehicle, do you believe that the vehicle's

12  automatic -- automatic emergency braking system had

13  a defect and that's why it didn't slow you down?

14      A.   I believe it didn't slow me down.  Again,

15  applying on the defect, yes, sir, because I believe

16  that this is giving me a warning that if can't -- as

17  I look at the next one, it can reduce the impact.

18  But, again, to have no indication and no braking, I

19  believe it should have had some indications of

20  braking.

21      Q.   What are the parameters that you believe

22  the system should have worked under, specifically

23  the automatic emergency braking system?

24           MR. POSES:  Object to the form.

25           MR. LIRO:  Join.

```
 1                    McGee

 2          THE WITNESS:  I can answer that, right?

 3          MR. LIRO:  You can answer.

 4   BY MR. BRANIGAN:

 5      Q.   Yes, you can.

 6      A.   I believe it would have sighted the car

 7   and, again, would have stopped completely in time,

 8   as we talked about.  I don't know.  I can't opine on

 9   that and can't -- it's just not my science.  But I

10   do believe that the car would have stopped at some

11   way or attempted to stop or warn me in some way when

12   a large black SUV was -- was sighted.  So that was

13   my belief at the time and still is.

14      Q.   Do you believe that a vehicle has a speed

15   or distance -- let me rephrase that.

16          The automatic -- automatic emergency

17   braking feature of the vehicle has a speed or

18   distance parameter to it?

19          MR. POSES:  Objection to form.

20          MR. LIRO:  Join.

21      A.   Yes, sir.  We talked about it.  I believe

22   there's -- there's some parameter with any device

23   with speed and proximity to another object, whether

24   it's broke or brakes or automatic or manual, whether

25   you can stop in time to prevent a collision.
```

```
 1                    McGee

 2  BY MR. BRANIGAN:

 3       Q.   Before the crash occurred, what was your

 4  understanding of those parameters?

 5            MR. POSES:   Form.

 6       A.   The Tesla itself or just in life --

 7  BY MR. BRANIGAN:

 8       Q.   No.   On the car that you bought that you

 9  were driving.

10       A.   You got to -- would you mind rephrasing

11  the question so I make sure I understand?

12       Q.   Yes.   Before the crash occurred, what was

13  your understanding of those parameters for automatic

14  emergency braking on the car that you were driving?

15       A.   I believe mine were more a general nature.

16  Again, we talked about the features.  And I believe

17  that if the car -- for instance, I drive a Jeep now.

18  And if there's something in the front, it detects,

19  it gives me a warning, and tries to brake.  And so I

20  believe it would try to brake and give me a warning.

21  I don't know if it would have prevented a collision

22  given distance and proximity, and probably had a

23  parameters, but I believe it would have indicate

24  and/or brake in some fashion.  Would it have stopped

25  in time, I don't know.
```

```
 1                        McGee

 2       Q.   Do you think if you would have read the

 3  information in the owner's manual that we've spent

 4  time reading today before the date of the crash that

 5  you would have had the same expectation?

 6            MR. POSES:  Form.

 7            MR. LIRO:  Join.

 8            THE WITNESS:  I can answer?

 9            MR. LIRO:  Yep.

10       A.   No, sir.  I don't think -- if you're

11  asking if it would change my mind on what I thought,

12  no, sir.  I view this more as a general disclaimers

13  that most products put in order to avoid liability

14  when there is an implicit knowledge base that, yes,

15  people are buying the car to help you drive.  Are

16  they absolving themselves of liability to the words

17  on the page, I don't know.  But that probably

18  wouldn't have changed my mind except I would have

19  made a business judgment or a personal judgment to

20  say I see the warnings, but I know what they're

21  trying to do, right, trying to help people drive as

22  opposed to assist.  And I probably would have made

23  the same misinterpretation of this or whatever you

24  want to call it or whatever -- yeah.

25
```

```
 1                    McGee

 2   BY MR. BRANIGAN:

 3        Q.   So you're saying you would have

 4   misinterpreted language, like, never depend on the

 5   technology?

 6        A.   Yes, I wouldn't have bought it.  I

 7   wouldn't have -- if it said, hey, this doesn't work

 8   at all, pay $10,000 for it, I wouldn't pay $10,000.

 9        Q.   Well, this information was available

10   before you purchased the vehicle, correct?

11             MR. POSES:  Just wait until he asks the

12        question.

13             THE WITNESS:  Yeah, sorry.

14             MR. BRANIGAN:  It's all right.  It's my

15        fault.  I was slow on the draw there.  Let me

16        start over.

17   BY MR. BRANIGAN:

18        Q.   You said you never would have bought this

19   had you -- never would have spent the money to buy

20   the technology had you known that -- I'm

21   paraphrasing now, but what I understood you to say

22   is that had you had known that Tesla said never

23   depend on the technology, always pay attention,

24   you're always responsible, you're saying you

25   wouldn't have bought this technology.  This
```

```
 1                    McGee

 2   information was available to you before you bought

 3   the technology, correct?

 4        A.   I would say you just misparaphrased what I

 5   said, so I wouldn't actually stipulate that that's

 6   what I said.

 7        Q.   What did you say, then?

 8        A.   I'd rather you repeat the question so I

 9   can answer appropriately, because I believe you just

10   asked if I would never bought the car if I read

11   this, and that's not what I said.  If I read this, I

12   still would have bought the car.  So I was hoping

13   you could rephrase the question so I can answer it

14   correctly.

15        Q.   If you would have read this information in

16   Exhibit 4.

17        A.   Yes, sir.

18        Q.   And I'm paraphrasing now, but we, I think

19   we can agree that throughout Exhibit 4, multiple

20   times used the user of the vehicle word advise to

21   never depend on the technology --

22        A.   Yes, sir.

23        Q.   -- to always pay attention, to always be

24   the driver.

25        A.   Yes, sir.
```

```
 1                    McGee

 2        Q.   If you had been advised of those warnings

 3   before you bought the vehicle, you're telling me

 4   that your expectation about the vehicle stopping to

 5   avoid this collision on the night of the crash would

 6   have been the same?

 7        A.   Yes, sir.

 8             MR. POSES:  Object to the form.

 9        A.   Yes, sir.

10   BY MR. BRANIGAN:

11        Q.   Are you also standing by what you said a

12   few minutes ago that even with the technology, you

13   realize you were the driver and you were responsible

14   for being the driver and doing the tasks of driving?

15             MR. POSES:  Object to the form.

16        A.   Yes, sir, I'm still responsible for the

17   car I'm driving.  Yes, sir.

18   BY MR. BRANIGAN:

19        Q.   And that would include being responsible

20   yourself as a human being driving a car to look for

21   things ahead of the vehicle, correct?

22        A.   Yes, sir.

23        Q.   And to recognize that there was something

24   ahead, like a truck on the other side of the road,

25   correct?
```

1                          McGee

2          A.   Yes, sir.

3          Q.   And to respond or react to observing or

4    something like that, a truck on the other side of

5    the intersection, so that you could apply your

6    brakes or maybe steer the wheel in a way to avoid

7    that crash, correct?

8          A.   Yes, sir.

9          Q.   There was nothing about the vehicle itself

10   on the night of the crash that stopped you from

11   doing that, correct?

12         A.   No, sir.

13              MR. POSES:  Object to the form.

14   BY MR. BRANIGAN:

15         Q.   There was nothing about the roadway that

16   stopped you from doing those things, correct?

17         A.   Could you -- I'm sorry, I don't mean to

18   make you belabor, but those things?

19         Q.   Yes.  Those things would mean stopping at

20   a stop sign, stopping for the red flashing light.

21   Nothing about the car prevented you from doing that

22   as the driver, correct?

23         A.   No, sir.

24         Q.   Nothing about the road prevented you from

25   doing that, correct?

```
1                        McGee

2         A.    No, sir.

3         Q.    Nothing about the lighting conditions that

4    existed at the time of this incident prevented you

5    from seeing the stop sign, correct?

6         A.    I'm unsure on that statement, again, I

7    don't recall everything, so I couldn't tell you

8    exactly what I saw.  But that road is extremely

9    dark, and so I'm not sure if the lighting could have

10   affected me seeing the sign or not.

11        Q.    Let's explore that.

12             MR. POSES:  Last couple of questions you

13        said correct and you responded.  So it might be

14        on the record.

15             MR. BRANIGAN:  Yeah.  I appreciate that.

16             Let me go back over those.

17   BY MR. BRANIGAN:

18        Q.    Would you agree with me that there was

19   nothing about the vehicle that prevented you from

20   stopping at the stop sign?  You could have done

21   that, correct?

22        A.    I could have done that, yes, sir.

23        Q.    And there was nothing about the vehicle

24   itself that prevented you from stopping or paying

25   attention to the red flashing light, correct?
```

```
 1                      McGee

 2         A.   Yes, sir, correct.

 3         Q.   And there was nothing about the vehicle

 4    itself that prevented you from stopping and/or

 5    steering to avoid impacting the Tahoe, correct?

 6         A.   Correct.

 7         Q.   If you could go to --

 8              MR. BRANIGAN:  I think we're on Exhibit 5.

 9         Anybody disagree?

10              MR. POSES:  No.  You're right.

11         (Exhibit 5 was marked for identification.)

12    BY MR. BRANIGAN:

13         Q.   Do you recognize what we're looking at in

14    Exhibit 5, sir?

15         A.   I believe so.

16         Q.   What is depicted -- Exhibit 5 is a copy of

17    a photograph, correct?

18         A.   Yes, sir.

19         Q.   And what's depicted there?

20         A.   I'm speculating, but I believe that is

21    that is the T intersection of Card Sound Road and

22    905.

23         Q.   Right.  And you say you're speculating.

24    You really don't need to speculate, because you're

25    familiar with this -- this intersection, correct?
```

1                         McGee

2       A.   Well, I just don't know if there's other

3   intersections with lights at the end and similar

4   poles, but it looks very familiar.  I'm not trying

5   to be coy.  It looks like it.  But it doesn't have a

6   street sign, and so I'm not 100 percent sure.

7       Q.   All right.  You've been through this

8   intersection many times before the night of the

9   crash, correct?

10      A.   Yes, sir.

11      Q.   The residents that you have at Ocean Reef,

12  75 Snapper Lane?

13      A.   Yes.

14      Q.   How far is that, mileage-wise, from the

15  intersection that we're looking at here?

16      A.   Less than 5 miles.  I want to say 3 or 4.

17      Q.   And what do you do when you get to the

18  stop sign?  Which way do you turn?  Do you turn to

19  the left, which would be to the north, or do you

20  turn to the right, which would be to the south, to

21  get to your residence at Ocean Reef?

22      A.   The left, which would be the north.

23      Q.   So in the vantage point that we have in

24  Exhibit 5, would you agree me with me that this

25  photograph was taken by someone who was standing on

                          McGee

1

2   Card Sound Road looking east?

3        A.   Yes, sir, I believe so.

4        Q.   And we can see the outline of the stop

5   sign and the reflection of the stop sign there,

6   correct?

7        A.   Yes, sir.

8        Q.   And, by the way, this photograph was taken

9   during nighttime hours, correct?

10       A.   Yes, sir.  It appears so.  It has to be.

11  It's dark, so.

12       Q.   I will represent to you, sir, that these

13  photographs were taken by law enforcement officials

14  after the crash on the night of the crash.

15       A.   Okay.

16       Q.   All right.  And this is -- as I think

17  you've realized, this is the intersection of

18  Card Sound Road and County Road 905A.

19       A.   Yes, sir.

20       Q.   And we're facing east towards the

21  Atlantic Ocean, correct?

22       A.   Yes, sir.

23       Q.   Would you agree with me that in addition

24  to the reflective surface of the stop sign, we can

25  also see the illuminated red flashing light

1                    McGee

2    overhead?

3          A.   Yes, sir.

4          Q.   And would you agree with me that we can

5    see other signs that are below, if you will, from

6    the vantage point of this photograph, the red -- the

7    illuminated red flashing light?

8          A.   Yes, sir.

9          Q.   And how would you describe those other

10   signs?

11         A.   Yellow, and then I think -- I think the

12   middle one is white.  And also looks to be

13   reflecting.

14         Q.   And how many do you see there?

15         A.   I see four of them.

16         Q.   Everything that we can see in Exhibit 5,

17   photograph taken at night, is something that you

18   could have seen on the night of the crash before the

19   crash happened if you were looking in the direction

20   the photographer was looking, correct?

21              MR. LIRO:   Form.

22         A.   Based on this picture, yes, sir, I believe

23   so.

24   BY MR. BRANIGAN:

25         Q.   Have you seen any -- any of the

1                        McGee

2   photographs taken by the law enforcement officials

3   before today?

4        A.   I honestly don't recall.  I could have

5   seen some prior, but I don't recall.

6        Q.   Do you think what we see in Exhibit 5

7   accurately depicts what would have been visible to

8   you from this vantage point on the night of the

9   crash?

10        A.   I mean, given you said it was the -- the

11   day or two other, I wasn't sure that these other

12   lights were, but, yes, sir, I believe so.

13        Q.   And to make contact with the Tahoe, you

14   actually had to drive very close to those four

15   reflective signs east of the eastern edge of

16   County Road 902A, correct?

17        A.   Yes, sir.  But I wasn't sure if the Tahoe

18   was in front of those signs or behind those signs.

19        Q.   At the risk of making things really

20   confusing, and I apologize for this, but I'm going

21   to show you the exhibit that comes from the

22   deposition of Corporal Rizzo.  And we're marking it

23   as Exhibit 6 to this deposition, but it's -- you'll

24   see that it was actually marked as Exhibit 7 for

25   Corporal Rizzo's deposition, but today it's marked

```
 1                    McGee

 2     as Exhibit 6.

 3              Do you see Exhibit 6?

 4      A.   Yes, sir.

 5      Q.   And Exhibit 6, it's another photograph,

 6     correct?

 7      A.   Yes, sir.

 8      (Exhibit 6 was marked for identification.)

 9  BY MR. BRANIGAN:

10      Q.   Taken at night?

11      A.   Yes, sir.

12      Q.   And do you recognize what we're looking at

13     in Exhibit 6?

14      A.   Yes, sir.  I believe those are the same

15     signs at the end on Card Sound Road.

16      Q.   Right.  So those are -- well, the

17     photograph was taken by someone standing east of

18     those -- actually west of those signs, correct?

19      A.   Yes, sir.  It appears so.

20      Q.   And facing east looking at those signs,

21     correct?

22      A.   Yes, sir.

23      Q.   And your recollection was that the Tahoe

24     was located where before impact?

25      A.   I honestly don't recall.  I think,
```

1                        McGee

2    initially, I had spectators in front of the signs, I

3    think, but I honestly don't -- I don't know.  I

4    honestly don't know.

5         Q.   The stop sign that we can see in

6    Exhibit 5, do you see that?

7         A.   I'm sorry.  Yes, sir.  Yes, sir.

8         Q.   That was the stop sign that you were

9    supposed to stop for at that intersection, and at

10   the point where you either had to turn left or

11   right, correct?

12        A.   Yes, sir.

13        Q.   So the signs that we see, the yellow

14   reflective signs, the four of them in Exhibit 6,

15   those were actually all the way across on the other

16   side of the road, correct?

17        A.   Yes, sir.

18        Q.   I asked you a few minutes ago about your

19   general experience and knowledge of this area.  For

20   how long had you owned property at Ocean Reef before

21   this incident occurred?

22        A.   Approximately, I think it's been five

23   years now.  So I'd say approximately two years.

24        Q.   And how frequently would you -- would you

25   spend time down there?

```
 1                        McGee

 2       A.    Um --

 3       Q.    Let me -- let me see if I can --

 4       A.    Sure.

 5       Q.    Sorry to interrupt you.

 6       A.    It's good.

 7       Q.    Just for -- for the purposes of focusing

 8  on a weekly basis, would you be there once a week,

 9  twice a week?  That's what I'm asking.

10       A.    Twice -- speculate -- well, I'm trying to

11  summarize.  Twice a week using weekends.  Great

12  place to spend the weekends.  And then a day during

13  the week if -- you know, an evening during the week,

14  if possible.

15       Q.    So do you think you would have traveled

16  down there at least once a week in the couple years

17  before the date of the incident?

18       A.    Not at least, because it increased over

19  time when we bought the property.  Initially we

20  were -- we were rent, only rent.  And so over time

21  it increased.  I would say by the time the incident

22  occurred, I was going on a weekly basis.

23       Q.    On the night of the incident, did you --

24  did you have navigation activated in your vehicle to

25  get you from where you started to where you wanted
```

1                          McGee

2   to end up?

3       A.   I don't recall.

4       Q.   Would you have known how to get from where

5   you were starting from, your office, to your place

6   at 75 Snapper Lane without navigation activated?

7       A.   Yes, sir, depending on the route, yes,

8   sir.

9       Q.   So you didn't need navigation assistance;

10  you could drive there because you knew how to get

11  there, correct?

12      A.   Yes, sir.

13      Q.   You could drive there on your own.  You

14  could -- you could mentally navigate on your own

15  without navigation assistance.  Is that fair?

16      A.   Yes, sir.

17      Q.   Would you agree with me that your memory

18  of this incident, things that happened immediately

19  before, things that happened immediately after,

20  things that you may have said to people, was much

21  stronger right on the evening of the incident than

22  it is today?

23      A.   Yes.  Are you saying do I recall more than

24  I did that night?

25      Q.   Yes.  Yes.

```
 1                        McGee

 2        A.    Yes, sir.

 3        Q.    Why don't you tell me in your own words

 4   what you recall happening.

 5        A.    Primarily, I recall just right prior to

 6   the incident.  And honestly, given we're coming

 7   here, I've been thinking about quite a bit, thinking

 8   about what I can recall.  And really what I truly

 9   recall is feeling bumpiness on the road, which I've

10   now speculated it must have been the dirt part.  And

11   I don't recall if I looked up and saw the truck or

12   what -- again, it's very blurry.  I think the most

13   vivid for me is subsequent to an incident occurring.

14   I recall, in vivid detail, finding Mr. Angulo on the

15   ground and speaking with 911 to try to figure out

16   how he had gotten out of the car, because I thought

17   I hit people that were in the car at the time.  And

18   so I recall the confusion around that and then --

19   and the people and all the scene.  I recall flagging

20   someone down on the road to try to help in the

21   immediate time.  But I can't piece together exactly

22   the incident, so the -- you know, exactly from the

23   time frame when waving them down.  And then I recall

24   them, quite in excruciating detail, finding the

25   young lady's flip-flops in the back of the car, and
```

```
 1                    McGee

 2   that's when we realized -- when I realized they were

 3   pedestrians.

 4        Q.   Do you -- do you recall ever seeing the

 5   stop sign as you approached the intersection before

 6   the incident occurred?

 7        A.   I don't recall.

 8        Q.   Do you think you did see the stop sign?

 9        A.   Do I think I did?

10        Q.   Yes.

11        A.   To speculate, is that okay?

12        Q.   I'm not asking you to speculate.  I'm

13   asking you what you think or what you recall.

14        A.   I don't recall.

15        Q.   What about the red flashing light?  Do you

16   recall seeing the red flashing light?

17        A.   I don't recall that.

18        Q.   You don't recall seeing that today, as you

19   sit here today?

20        A.   No, sir.

21             MR. POSES:  Tom, our lunch is here.

22             MR. BRANIGAN:  Yeah, I know.  And this

23        would be a good time to stop.  I need to do

24        something before we get into the next line of

25        questions.  So if we want to take a break and
```

1                     McGee

2          have lunch now.  It's a good time for me, so...

3              MR. LIRO:  It's also outside in the other

4          room, so if you guys want to eat there or eat

5          here, whatever you guys want to do.

6              Should we go off the record?

7              MR. BRANIGAN:  Yeah.  Why don't we -- why

8          don't we tell the court reporter what we're

9          doing?  Why don't we take 30 minutes or so for

10         lunch?  It's 12:08.

11             MR. POSES:  12:40?

12             MR. BRANIGAN:  Yeah.  That sounds good.

13             VIDEOGRAPHER:  Time is 12:08 p.m.  We're

14         going off the record.

15                  (Recess taken.)

16             VIDEOGRAPHER:  The time is 1:01 p.m.

17         We're back on the record.

18     BY MR. BRANIGAN:

19         Q.   Mr. McGee, the lawsuit that was filed

20     against you by the estate of Ms. Benavides, that is

21     resolved now, right?

22         A.   Yes, sir.

23         Q.   That was settled between the parties; is

24     that correct?

25         A.   Yes, sir.

1                              McGee

2      Q.    And I take it that there's a settlement

3  agreement, a written document, that sets out the

4  terms of the settlement that you and others that are

5  parties to the lawsuit signed?

6      A.    Yes, sir.

7      Q.    Do you have a copy of that?

8      A.    No, sir.

9      Q.    I -- forgive me -- let me be more

10 specific.  I don't mean on your presence right now,

11 but do you have a copy of that settlement agreement?

12     A.    Electronically.  I know Jake has one.  I

13 don't know if I have a filed one myself or not.

14     Q.    Okay.  Is there a -- if I use the phrase

15 confidentiality provision in the agreement, do you

16 know if there's a confidentiality provision in the

17 agreement?

18     A.    I believe there is, yes, sir.

19     Q.    All right.  I take it that the litigation

20 between the -- the Benavides estate and you was

21 settled for a sum of money; is that correct?

22     A.    Correct.

23     Q.    And I -- I take it that the amount of the

24 settlement, the settlement fund amount, is what's

25 covered by the confidentiality provision in the

```
 1                    McGee

 2    settlement agreement; is that right?

 3         A.   I couldn't upon, yeah.  A bit more broad,

 4    though.

 5              MR. LIRO:  I think it's a little bit

 6         broader than that.  And so for that reason and

 7         that reason alone, I think we're skirting kind

 8         of close to the terms of the agreement and the

 9         amount of -- the monetary amounts.

10    BY MR. BRANIGAN:

11         Q.   All right.  So was there anything else

12    provided by you besides money to settle the

13    litigation?

14              MR. POSES:  That, we can't answer that,

15         pursuant to the terms of the confidentiality

16         agreement.  If you want to go off the record --

17         are you okay going off the record?

18              MR. BRANIGAN:  I am.

19              MR. POSES:  I think -- I think I know what

20         you're going into --

21              MR. BRANIGAN:  So should I tell her --

22              VIDEOGRAPHER:  The time is 1:04:00 p.m.

23         We're going off the record.

24                   (Recess taken.)

25              VIDEOGRAPHER:  It time is 1:07 p.m.  We're
```

```
1                     McGee

2         back on the record.

3   BY MR. BRANIGAN:

4         Q.   All right.  While we were off the record,

5    the lawyers with the parties of the witness had a

6    conversation about the settlement that was reached

7    between the Benavides estate and you, Mr. McGee.

8    And the lawyers have agreed to continue discussing

9    the possibility of some sort of disclosure of some

10   of the terms of the settlement of -- it's my

11   position that my client is entitled to know the

12   terms of the settlement.  We'll address that on a

13   different day, but at this point, I -- it's my

14   understanding that your lawyer was advising you to

15   not answer any more questions about the settlement.

16             MR. BRANIGAN:  Is that right, Counsel?

17             MR. POSES:  That's correct.

18   BY MR. BRANIGAN:

19         Q.   All right.  And, Mr. McGee, you're going

20   to follow that advice from your lawyer?

21         A.   Yes, sir.

22         Q.   Okay.  All right.  The only other thing --

23   I have two things I would like to cover with you.

24   One of them involves a video that I'm still waiting

25   to receive.  And so I don't delay the process, I'm
```

```
 1                        McGee
 2   going to turn the floor, if you will, over to
 3   Mr. Poses.  He has some questions.  The only other
 4   thing that I would like to address with you concerns
 5   the document that we talked about a few minutes go.
 6       A.   Okay.
 7       Q.   This power of attorney document that
 8   allows you to transfer title of the Tesla to my --
 9   well, that would be to my law firm on behalf of
10   Tesla.  We let you and your lawyer know on the break
11   that the document that you already signed, according
12   to the State of Florida, does not allow the title to
13   be transferred to my law firm.  So we have another
14   document, it's another power of attorney for motor
15   vehicle, motor home, or vessel transfer that we're
16   going to prepare and ask you to sign.
17            Will you agree to do that --
18       A.   Yes, sir.
19       Q.   -- if your -- if your counsel says it's
20   okay?
21       A.   Yes --
22            MR. LIRO:  I don't --
23            THE WITNESS:  Absolutely.
24            MR. LIRO:  We'll agree.
25            MR. BRANIGAN:  Okay.  We'll fill that out
```

```
 1                        McGee

 2          and we'll hopefully give you a filled-out

 3          version to sign before you leave here today.

 4          If not, if we're not able to do that, we'll

 5          send it to Jacob Liro, your counsel, he'll send

 6          it to you, and then you'll send it -- excuse

 7          me, sign it and send it back to us.  Fair?

 8               THE WITNESS:  Yes, sir.

 9               MR. BRANIGAN:  Okay.  With that, I'm going

10          to turn the questioning over to Mr. Poses.

11               All right, sir.  Thank you.

12    EXAMINATION

13    BY MR. POSES:

14          Q.   Mr. McGee.

15          A.   Yeah.

16          Q.   Good afternoon.

17          A.   Good afternoon.

18          Q.   You answered a lot of questions that was

19    extensive, so I'm going to try to highlight the

20    things that are important to me and not go over the

21    things we've already talked about, okay?

22          A.   Yes, sir.

23          Q.   All right.  First I want to talk about

24    your history.  You said you went to Davidson and

25    you're from Charlotte?
```

```
 1                    McGee

 2        A.   Yes, sir.

 3        Q.   And that's just north to there; is that

 4   right?

 5        A.   Yes, sir.

 6        Q.   And what brought you to Davidson?  Was

 7   there -- just local, was there a scholarship or --

 8        A.   It was football.  I played college

 9   football.  And one of the few schools that wanted me

10   to play for them.

11        Q.   Okay.  You were -- I guess you preceded

12   Stephen Curry?

13        A.   I did.  I was not quite as good.

14        Q.   All right.  You're not as highly decorated

15   as he was?

16        A.   Not quite.

17        Q.   Okay.  But you said you studied economics

18   and poly sci.  Was that your plan going there?  And

19   tell me about your studies.

20        A.   Yes, sir.  Like every, probably young,

21   college student, I wasn't sure exactly what I was

22   interested in.  I was interested in business and

23   just had a keen interest in politics.  And so I

24   studied economics deliberately and I studied

25   politics accidentally.  Meaning, I took enough
```

1                         McGee

2   courses, and senior year, one of the advisors came

3   to me and said, Hey, did you know you could be a

4   political science major?  I see you in one of my

5   classes, why are you here?  And I said I'm just

6   fascinated, and so ended up having a double major.

7        Q.   Okay.  Did you receive any accommodations,

8   decorations, or awards when you were in school for

9   academics?

10       A.   No, sir.

11       Q.   Okay.  And after college, tell me about

12  your career before you got to -- I know that you

13  were at Sun Capital.

14       A.   Yes, sir.

15       Q.   You left there in 2015 for New Water, your

16  company now.  But talk to me about, you know,

17  leaving school in your -- in your path.

18       A.   Yes, sir.  I left school in May of 1999.

19  I took a job with a small -- not so small, a roll-up

20  commercial printing company called

21  Consolidated Graphics.  I wanted to learn how to

22  manage businesses, and so I joined their management

23  development program at the age of 22, worked with

24  that company for a little under a year.  Found

25  myself not challenged and bored, and so went out

1                          McGee

2  looking for something more challenging.  I found an

3  investment banking position with the

4  Bank of America.  And so ended up interviewing,

5  getting the job, starting as an investment analyst

6  there in April of 2000, and spent seven years doing

7  investment banking there.  Went out to LA.

8  Subsequent to that, I worked for a small shop doing

9  what they call debt restructuring advisory.  Did

10  that for a couple of years.  I had some capital

11  there through transactions.  And capital, like what

12  I to offer, hired me over to Florida.  So if I could

13  give you more, I can give you a brief history.

14        Q.   That's fine.  Bank of America, they're in

15  Charlotte?

16        A.   Yes, sir.

17        Q.   That's their corporate office?

18        A.   Yes, sir.

19        Q.   All right.  And tell me about your

20  experience in the seven years you were there.  Tell

21  me what type of transactions you were involved in

22  and what type of business you were involved?

23        A.   I was involved in quite a few transactions

24  in what they call basic materials and industrials.

25  So anything from steel minimills to packaging

1                         McGee

2  companies to -- we even did a death care company,

3  which provide services -- it's funeral services and

4  things.  So anything industrial to services, we

5  spent time understanding the business, and

6  ultimately, the goal there is to try to sell or do

7  capital markets as -- as an advisor.

8       Q.   Okay.  And during your time at

9  Bank of America, what positions did you hold, or was

10 it the same from start to finish?

11      A.   So I was an analyst, an assistant vice

12 president briefly in the main bank, and then I was

13 an associate, which is an investment banking title I

14 left in 2005.

15      Q.   When you left, you went out to LA, you

16 said?

17      A.   Yes, sir.

18      Q.   And what was -- how did that happen?  Tell

19 me about that.

20      A.   I had been in a large organization,

21 Bank of America, for quite some time.  Didn't really

22 enjoy the red tape of a large organization and was

23 looking for something smaller, more exciting, where

24 I could control more of my own destiny.  And so

25 found the small firm that did debt restructuring

1                           McGee

2    advisory.  It also seemed like a nice economic hedge

3    for me, because the business I was in booms when the

4    economy booms, and it does poorly when the economy

5    does poorly.

6         Q.   Okay.

7         A.   And so when it does poorly, the banks fire

8    everyone and add it back to their profitability to

9    make their profits look higher.  Meaning, not much

10   job security.  I decided to take a debt

11   restructuring job because you're still doing similar

12   work, but when things go really poorly, there's more

13   debt restructuring, so you have more business.  So

14   my thought was you get paid in a good economy, still

15   get paid in a bad economy.  So I took this debt

16   restructuring job, and it was -- it was a fun

17   entrepreneurial experience.

18        Q.   Okay.  How long were you in LA?  Is

19   that --

20        A.   Two years.

21        Q.   Okay.

22        A.   Yes, sir.  '05 to '07.  Sun Capital in

23   '07.

24        Q.   Okay.  '07?

25        A.   Yes, sir.

1                          McGee

2        Q.   All right.  And at Sun Capital, what were

3   you hired to do?

4        A.   I was hired to be an investment associate

5   initially.  But my broad job was to evaluate

6   investment opportunities, diligence opportunities,

7   and then execute the close and negotiate those

8   opportunities going into closing.  I progressed from

9   an associate to a principal, which is several layers

10  higher, before I departed to start my own business.

11       Q.   Did you leave Sun Capital with people at

12  Sun to start New Water?

13       A.   Yes, sir.

14       Q.   All right.  Great.  Who were they?

15       A.   Jason Neimark, my part -- my business

16  partner.  We started it together.

17       Q.   Neimark is still there?

18       A.   Yes, sir.

19       Q.   We talked about a Series 7 previous

20  license that you held so that you can do potential

21  banking transactions or debt restructure; is that

22  right?

23       A.   Yes, sir.

24       Q.   And that sunsets at some point?

25       A.   It sunsets at some point.  You need to

1                          McGee

2    renew it if you work for a NASDAQ registered

3    security and it will sunset, or you have to do any

4    renewals based on whatever you have.

5         Q.   I think I have a pretty good idea as to

6    what it is.  But talk to me just generally about

7    what a Series 7 -- what's required of you to obtain

8    one and what it allows you to do when you achieve

9    it.

10        A.   7s and 63s is a little bit different, and

11   I'm going to date myself on knowledge base.  But a 7

12   really allows you to transact an equity transaction

13   generally.  And a 63, I believe it's more insurance

14   and structuring.  Both of them have a computer test.

15   One's really easy.  The 63, the 7, most folks have

16   to study for.  If your passing grade -- I can't

17   remember anymore.  It was a 75 or 80 it's pass --

18   simple pass/fail.  And the trick to the test people

19   try to do is just barely pass.  So they study just

20   enough.

21        Q.   How did you do?

22        A.   Really well.  I think 90 something.  93, I

23   want to say.

24        Q.   All right.  That was for the 7, the 63, or

25   both?

```
 1                    McGee

 2      A.   7.   The 63 I can't recall.  But I didn't

 3  put much time into it because it was simple.

 4      Q.   Okay.  But you did pass that as well?

 5      A.   Yes, sir.

 6      Q.   All right.  You don't need those to -- at

 7  New Water?

 8      A.   No, sir.

 9      Q.   All right.  And tell me now at New Water,

10  give me an example of a day, or perhaps a week, in

11  terms of the business that you're running there.

12      A.   It varies quite a bit, as you might

13  imagine.  My partner, Jason, might run the firm.

14  And so at a high level, we run an investment firm,

15  which means we have our own employees, approximately

16  14.  We have our own HR, IT.  It's its own business.

17  We have our own office, and we're what they call a

18  management company.  And so at a high level, I run

19  that company with my partner.

20           At -- at a granular level, our objective

21  is to make investments in private companies,

22  generally try to improve them in some way, whether

23  they're already broken or whether they're growing

24  and need some help.  And so day-to-day basis for me

25  is -- is pretty varied.  Anything from raising the
```

1                          McGee

2    funds necessary to execute on transactions, because

3    we raise a cap fund of -- a capital at one time and

4    invest it and then raise another, stair-step.  So we

5    raise the capital, we go find companies to invest in

6    with that capital.  And if things check out, we use

7    that capital to invest behind the businesses.

8    Ultimately develop strategy to operate the

9    businesses and hopefully improve them.  Also sit on

10   all the board of directors for the companies that we

11   own as well.

12        Q.   Okay.  And do you take a deposition and

13   equity position, or both or sometimes one?

14        A.   Usually equity always.  We say always, but

15   most of the time --

16        Q.   Yeah.

17        A.   -- we take some debt.  But usually only

18   for mutual control.  We're control investors, so we

19   don't see anything we can't control.

20        Q.   Okay.  Understood.  So in 2019, you bought

21   this Tesla?

22        A.   Yes, sir.

23        Q.   And you've been, I guess, at New Water for

24   some time?

25        A.   Yes, sir.

1                          McGee

2        Q.    About four years.  And I know that you

3   were talking to counsel about how long you have been

4   going down to Key Largo -- or not Key Largo, but for

5   Ocean Reef for -- and just remind me, how long --

6   when was it you started kind of moving your family

7   down there and spending a lot of time?

8        A.    So initially it was just socially.  And

9   then -- I don't know the exact date.  I want to say

10  June of 2018 we purchased the property there.  We

11  were probably going there once every few weekends to

12  rest -- prior to that, because it was a fun place to

13  take the kids on the weekends.  And subsequent to

14  buying the place -- I don't know how much detail you

15  want, but a lot of things transpired with my now

16  soon-to-be ex-wife.  Which, you know, in fact, she

17  wanted to stay there.  I worked quite a bit with my

18  business.  And so we came to an agreement that the

19  family would reside there and I would commute.

20       Q.    Okay.  I guess what I'm asking is you

21  spent a number of hours and times going back from

22  Boca to Ocean Reef before this happened; is that

23  right?

24       A.    Yes, sir.

25       Q.    And talk to me about that experience and

1              McGee

2   why it was that you decided to purchase the Tesla.

3        A.   It was a pretty frustrating experience,

4   because, you know, on the personal level, my family

5   was living 100 miles from my office, despite the

6   fact if you travel some.  And so it became a very

7   large strain on my relationship with my wife,

8   clearly.  A pretty big strain on my office, my

9   business partner.  So effectively I was pulled in

10  multiple directions, my family, business, personal

11  life.  Everybody wanted me in one place, and I

12  happened to be nowhere all at once.  And so with

13  that, I had been looking for something to help make

14  the commute less painful, or I might be able to be

15  on the phone, work, et cetera, feel like, you know,

16  I'm more available in the car than when I'm kind of

17  knuckle on the -- on the steering wheel.

18       Q.   Okay.  Counsel talked to you about you

19  bought this electronically and maybe you watched

20  some videos or, you know, specifically, perhaps, the

21  media influenced you.  But I want to ask you much

22  more specifically about what your experience was

23  prior to buying the Tesla, okay?

24       A.   Okay.

25       Q.   All right.  So tell me, if you can recall,

1                            McGee

2   what videos or what information you received from

3   videos that gave you confidence in buying a Tesla

4   that would achieve ultimately what you just

5   described, more autonomy as you -- or the car had

6   more autonomy, giving you more freedom.

7        A.   Big picture, and even the ride taken, it

8   was the ability to help me navigate, because I find

9   that navigating is, you know, one of the things that

10  I was spending time trying to do.  I notice I could

11  get there or there were a couple different routes,

12  and going to South Florida when they were doing

13  construction on 95.  I found it was useful for that

14  to help me navigate, which was -- which was

15  frustrating, you know, big picture.  But that's kind

16  of -- if that answers your question.

17       Q.   Well, in terms of the autonomous

18  driving --

19       A.   Right.

20       Q.   -- and autopilot feature, what did that do

21  different in -- in providing you as it relates to

22  you wanting to have, you know, more time to do

23  things in the car that would be more productive?

24       A.   Right --

25            MR. BRANIGAN:  Objection to form.

1                          McGee

2          THE WITNESS:  Can I answer?

3          MR. LIRO:  Go ahead.  You can answer.

4     A.    I thought it would help me, again, if I

5     did miss seeing a parked car or something, not that

6     I planned to, obviously, it would then be there as

7     well as copilot, if you will.

8          So I viewed it as something to assist me

9     in my drive, and I was actually quite excited about

10    purchasing it for that reason despite the

11    disclaimers, because I believed it would help assist

12    me in being able to go on the highway and do a work

13    call or what have you.

14  BY MR. POSES:

15    Q.    The Maserati you had before this had had

16    Bluetooth, I assume?

17    A.    Yes, sir.

18    Q.    All right.  So tell me about what level

19    of -- what was different about the Tesla than the

20    Maserati besides -- because they both had Bluetooths

21    to talk hands-free.

22          What was different?

23    A.    Really the only -- to help steer and

24    direct the car in traffic.  I've seen quite a few

25    videos of people riding in them in California where

```
 1                        McGee

 2    there would be in traffic and -- now, it wasn't

 3    correct -- but they were riding in the backseat or

 4    what have you, and I don't know how they figured out

 5    the steering wheel thing.  I don't care.  Wasn't

 6    planning on doing that.  Generally believe myself to

 7    be a safe driver.  But what was an average idea to

 8    help me steer and stay in traffic.  Particularly on

 9    a 100-mile commute when you generally encounter

10    quite a bit of traffic.  So on a good day, it's two

11    hours.  On a bad day, it's -- you guys live down

12    here, it's four hours.

13            And so with that stretch of highway in

14    Miami proper, and I'm unfortunately going from Boca

15    to Key Largo, unless you've got an aerial vehicle,

16    you risk massive traffic.  And so the other thing

17    that enamored me quite a bit was the ability to help

18    me in traffic.

19        Q.   Okay.  Now, from January from the time of

20    purchase up until the time this accident happened,

21    you spoke to us about the fact that you had -- you

22    said about 90 percent of the time on the drive; is

23    that right?

24        A.   Yes, sir.

25        Q.   Tell me about the other 10 percent and why
```

1                          McGee

2  you didn't use it, if you can recall.

3      A.   It's a good question.  I can't really

4  recall.  I was probably thinking it was, again,

5  primarily related to really quick, hey, ran to the

6  gas station.  Not really going to use autopilot for

7  that, or, as I mentioned, I think some of my office

8  drives, it actually was a great driving car as well.

9  Did my driving for 2.7 miles.

10     Q.   Okay.  So and maybe -- I think I got it

11 wrong then.  So when you -- you would use autopilot,

12 then, when you took the long drives; is that right?

13     A.   Oh, yes, sir.  Always.

14     Q.   Okay.

15     A.   Just thinking it -- I'm out driving,

16 90 percent of the time it was on.

17     Q.   I understand.  Okay.  In the times that

18 you used the autopilot in that three months or so,

19 have either of the autopilot, autosteer, or the

20 automatic braking system or collision avoidance,

21 these types of features, had they engaged

22 automatically while you were driving?

23         MR. BRANIGAN:  Objection to form.

24     A.   I feel like I had observed it working.

25 Right when I first purchased the car, I was more

1                         McGee

2    tentative about what it could or couldn't do.  I

3    never had one or driven one at that point.  And as I

4    spent more time with it, got more comfortable, I

5    thought, obviously not -- not on what it could and

6    couldn't do.

7  BY MR. POSES:

8       Q.   When you say you were tentative in the

9    beginning, talk to me about that.

10      A.   Meaning I was learning the new car and the

11   new technology.  Much like any other car, usually

12   it's a period of time for you to acclimate yourself

13   to the vehicle.  Given this had other features that

14   I was excited about, I was tentative about how they

15   might work.  And, again, I thought I learned how to

16   use them.

17      Q.   Tell me which features you're talking

18   about specifically.

19      A.   Primarily the autopilot, but I believe

20   that engages everything.  I'm not -- technically

21   accurate, I'm not sure, but I believe that engaged

22   everything.  So it was the autopilot generally,

23   which, like I said, I was recalling, and I hadn't

24   thought about this in a couple years.  I think you

25   tap twice on that little stick and it turns

1                    McGee

2  everything on.  Again, could be wrong, but that was

3  my recollection.

4      Q.   All right.  Just jumping around a little.

5  You testified earlier that you never looked at the

6  manual -- through the physical manual or online on

7  the dash; is that right?

8      A.   Yes, sir, I believe so.

9      Q.   Okay.  You went through a Maserati.  You

10  talked about your first car, a Prelude.

11      A.   Mm-hmm.

12      Q.   Mine too.

13      A.   Yeah.

14      Q.   And a Jeep that you rebuilt in '79.  Or at

15  least a '79 Jeep.

16      A.   Yes, sir.

17      Q.   And perhaps other vehicles that -- any of

18  those vehicles that you spent any time with the

19  owner's manual?

20      A.   No, sir.

21      Q.   Why not?

22      A.   Generally feel I usually have a pretty

23  good feel for cars and rightly or wrongly, I'm

24  probably someone who learns by experience and videos

25  and things.  I just read a lot of paper, period.

```
 1                         McGee

 2        Q.   All right.  Even the Jeep that you

 3   rebuild, the owner's manual, you ever spend any time

 4   with it?

 5        A.   Definitely not.  Now, I did -- I did have

 6   a book -- I still have it -- of how to assemble a

 7   Jeep.  But I would say it's more of a repair manual

 8   so I can take one apart, put it back together.  But

 9   I, you know, didn't read the owner's manual for

10   that.

11        Q.   So you -- you took that Jeep apart and put

12   it back together absent the owner's manual entirely?

13        A.   Yes, sir.

14        Q.   Okay.  Have you, since the accident,

15   looked at the owner's manual to learn about this

16   Tesla any more so than you had taken the time to do

17   previously?

18        A.   No, sir.

19        Q.   You told me you bought the car -- you told

20   counsel and us you bought the car with an app or

21   electronically; is that right, on your phone?

22        A.   Yes, sir.

23        Q.   Tell me -- walk me through that.

24        A.   I had -- just putting -- sometimes make

25   impulsive purchases.  I wanted a car -- I've been
```

1                          McGee

2  wanting a Tesla for some time, understanding, at

3  least in my mind, what I thought it could do.  And,

4  actually, I was able to -- at dinner one night, go

5  to the app, hit the button, put a deposit down, and

6  I kind of didn't believe necessarily it was real,

7  but it was actually a good experience without one.

8  I wasn't a huge fan of interface with a bunch of

9  people.  So to be able to purchase this on the app,

10  it said you put a deposit on your Tesla, and then

11  you start getting notifications.  I can't recall

12  exactly the process after that, but it was all

13  electronic to the point where I don't know if I ever

14  spoke to anybody.

15      Q.   Okay.  Now, you said that you bought the

16  highest level package that was offered within those

17  features.  And you told us that you did that because

18  you normally did that.  But be more specific why is

19  it that you purchased, you know, all the features

20  that Tesla had to offer at that time?

21      A.   And to be fair, I didn't buy the most

22  expensive, complete Model S they had.

23      Q.   Okay.

24      A.   I was referring specifically to the

25  navigation.  So there was a faster one that you

1                         McGee

2    could buy, but I figured this one was plenty fast.

3    For what I needed this car, the best, so I didn't

4    get the fastest car.  Still a Model S, just as a

5    clarification.  But I did get the most navigation

6    purchases.  And as I mentioned, I remember there was

7    one that said something about beta, and I think I

8    said it in there.  I wanted the most, because the

9    most attractive feature to me was the assistance

10   with driving or, yeah, autopilot.

11        Q.   You think you would be more safe if you

12   had these features?

13        A.   I did.

14        Q.   You have a pretty good driving record

15   where you drove off the road when you were a kid.

16   And absent that, no other accidents other than you

17   were a passenger.  There were no injuries either.

18   Why do you feel that you needed to have more safety

19   features?

20        A.   As I said, I was tired from the drive, and

21   I was repeatedly driving 100 miles, and that was new

22   for me.  I never had an interest in long-term

23   commute.  And I was spending sometimes four hours,

24   sometimes a day, on the road.  And so I thought

25   better for me to have safety features, then I could

1                        McGee

2    also utilize -- make myself feel more comfortable,

3    because despite even things, like being on the

4    phone, for me and say the Maserati driving, I feel

5    more distracted talking on the phone than I do not

6    talking on the phone.

7        Q.   Okay.  So was there any questionnaire or

8    anything that you were required to fill out to put a

9    down payment on the Tesla when you did, other than

10   provide them money?

11       A.   Money and name and address.  No, that was

12   it.

13       Q.   Did you have to answer questions, or did

14   you have any questions specific to the Tesla at that

15   time when you put down the down payment?

16       A.   I don't recall if they asked questions,

17   but I don't recall any.

18       Q.   Okay.  When was it that you put the down

19   payment down, more or less?

20       A.   More or less late in the year prior,

21   because it took -- you had to order it, and they

22   were pretty popular, so I want to say probably

23   November, December, is a good guess to get it in

24   January.  Sometime fourth quarter.

25       Q.   Okay.  During the time that you put down

1                          McGee

2    the down payment to the time that you received the

3    Tesla, what education did you get, if any, on the

4    Tesla and its features and specifically the

5    autopilot and those features?

6         A.   I don't recall.

7         Q.   Okay.  You don't recall getting an

8    education at all or didn't happen or neither?

9    Explain that.

10        A.   I don't recall getting an education.  I

11   would have been trying to educate myself, like I

12   said, through the means that I use, but I don't

13   recall getting a formal education.

14        Q.   Did anyone from Tesla, either from one of

15   the -- I know not the dealership per se, but the

16   local place where which you picked it up or anyone

17   nationally call you or e-mail you or try to contact

18   you to discuss with you, you know, this new car that

19   you were purchasing?

20        A.   Not that I recall.  I don't recall.

21        Q.   All right.  And you didn't contact them?

22        A.   No, sir.

23        Q.   Okay.  Is -- so the day of purchase, or at

24   least the day of receipt of the -- of the vehicle,

25   you talked about it being just off 95.  I think I

```
1                        McGee
2  know what you're talking about.  And talk to me
3  about that transaction to the most -- as many
4  specifics as you can.
5       A.   I was trying to recall it.  I figured it
6  might be a question --
7       Q.   Let me ask you:  How did you get there?
8       A.   That's a good question.
9       Q.   If you don't know, it's okay.
10      A.   I probably -- I don't know.  I want to
11  probably -- I don't know.
12      Q.   It's fine.  But did you Uber there, or
13  someone drove you there --
14      A.   I Uber'd and someone drove me.  They
15  dropped me off to pick the car up.
16      Q.   All right.  And you had the transaction
17  was all of an hour or likely less?
18      A.   Likely less.  I recall a few things,
19  walking in and not really being able to find anybody
20  to talk to, someone of my experience with buying the
21  car, which, again, it wasn't like that.  But I
22  remember trying to find somebody to help me and
23  taking a little bit, but that's all I really recall,
24  and then leaving with the car.  And I remember
25  seeing it in the back of the showroom in between two
```

                              McGee

1

2    other cars.  Whatever it is.

3         Q.   All right.  So you showed up to Tesla.

4    Did they know you were coming?  Had you announced --

5         A.   I think so.  I think I had an appointment.

6    I'm pretty sure I had an appointment.

7         Q.   All right.  Did you have an appointment

8    with a person or just the dealership itself?

9         A.   I don't recall.  Pretty certain it's just

10   the dealership, but I'm not 100 percent sure.

11        Q.   Did you deal with one or more people when

12   you picked up your Tesla?

13        A.   One person.  It was a gentleman.

14        Q.   And what did they recommend themselves as

15   when they came to you?

16        A.   I don't know.  I don't know.  They had a

17   different name for everything, so something -- I

18   don't know.

19        Q.   All right.  And tell me about the

20   conversation that you had with them other than the

21   transaction itself.  Was there anything that you

22   spoke to them about, about the function of either

23   the car or specifically the autopilot and its

24   features?

25        A.   Not that I recall, no.

Page 188

```
 1                         McGee

 2        Q.    Okay.  Did you ask?

 3        A.    Not that I recall.

 4        Q.    All right.  So take me through it.  You

 5   drive it off the lot.  This is a different type of

 6   car than you've owned before, and, you know, than

 7   most people have seen before.

 8              Tell me about your learning curve and --

 9   and tell me about the very first day what you did or

10   didn't do.

11        A.    I can't recall much, honestly, for the

12   first day.  I was actually trying to think of how I

13   engaged it for the first time, but certainly I

14   looked at the video of how to turn it on.  But I

15   honestly don't recall what I did the first day.  I

16   think, again, speculation, that I was headed to

17   Ocean Reef for the first time in the car.  And so I

18   was speculating it was that one highway.  I'm pretty

19   sure it was.  Because I wanted someone to drop me

20   off or got dropped off.  I was going to pick it up

21   and then drive down to Ocean Reef.  So I believe I

22   took it on a long trip on that first day.

23        Q.    How old are your kids now?

24        A.    9 and 12 now.

25        Q.    So about three years ago, what was their
```

1               McGee

2   impression of the car?

3        A.   They thought it was neat.  I mean,

4   they're -- they're kids.  Mostly little kids love

5   technology, and so they were blown away.  So a lot

6   of neat features for a kid to like.

7        Q.   What did you show them?

8        A.   I showed them the display.  I showed them

9   there's some funny sounds that you can set the

10  display to make that are entertaining to children,

11  like fart sounds and things like that.  And so kids

12  are enamored with that.  You could actually turn it

13  on a seat, they could sit in it, and then make the

14  sound.  So we did that quite often.  You could also

15  change the screen quite a bit.  And my oldest son's

16  smarter than me with technology, so he was able to

17  do some of those things, because I guess they have

18  some secret stuff that's fun stuff.

19            COURT REPORTER:  Mr. McGee, sorry, can you

20       please speak up?

21            THE WITNESS:  I'm sorry.  Yes, ma'am.

22       A.   So they had a bunch of fun features with

23  the display that we had toyed with, and they had

24  some games that you can play when you're parked and

25  that sort of thing.

```
 1                    McGee

 2   BY MR. POSES:

 3        Q.   Okay.  And then you said you had some

 4   friends who you showed the car to.  Tell me about

 5   those interactions.

 6        A.   Obviously, everyone was interested,

 7   because obviously it was new and neat, and so

 8   everyone was -- was quite a fan of it.  It was -- a

 9   couple of the young guys who work for me drive it.

10   You know, then the street next to my office thought

11   it was a really neat car.  I mean, it actually is.

12   And same with my wife -- my wife's friend's

13   husband -- I'm being quiet -- also went riding with

14   him here at -- at Ocean Reef, I remember, at some

15   point.  But everyone was very impressed with it.

16        Q.   Did any of those people end up buying the

17   car based on their experience with you?

18        A.   No.

19        Q.   Okay.  As set aside, it's something I

20   really don't know.  Were you ever personally

21   contacted by NHTSA or any other governmental agency

22   following this accident to discuss the accident and

23   details with you?

24        A.   No, sir.

25        Q.   Okay.  All right.  All right.  So I want
```

1                           McGee

2     to go back and talk about the videos that you saw.

3     They're a variety that I'm not going to play it for

4     you now.  It's been a long time, and I'm not sure if

5     you're going to remember them specifically.  But you

6     said you learn a lot through video.

7          A.   Yes, sir.

8          Q.   And watching videos.  Is there anything

9     that you can recall in the videos that prompted you

10    to buy the Tesla?  Anything specific?

11         A.   I don't think anything specific was --

12    again, I'm trying to recall a long time ago.  I

13    believe for me it was kind of seeing how things

14    worked, more so than -- better for worse, sometimes

15    I get pretty bought into an idea.  And this idea

16    seemed to be something that was going to alleviate

17    some personal pain, and the -- and so I was in love

18    with the idea.  So I probably didn't see anything to

19    change my mind.

20         Q.   There's a video that there's a vehicle

21    that an individual does not drive in, but is in the

22    vehicle nevertheless.  And the vehicle travels out

23    of a Tesla dealership and drives around town,

24    stoplights and traffic signs, there are pedestrians

25    and dogs and bicycles and vehicles.  And the person

1                        McGee

2    never touches the steering wheel.  And the Tesla

3    ends up back at the Tesla dealership about three

4    minutes later, which concludes the video.  Do you

5    recall seeing that video?

6              MR. BRANIGAN:  Objection to form.

7         Foundation.

8         A.   No, sir.

9    BY MR. POSES:

10        Q.   That's fine.

11             All right.  There's a buddy of yours,

12   Chuck Smith.  We talked about him just briefly.

13   What, if anything, did you recall about the

14   experience with him and the Tesla that, you know,

15   prompted you to either buy the Tesla or that you

16   learned something from that experience that

17   initiated our purchase?

18        A.   The navigation part.  Like I said, it

19   was -- I remember it being a short ride somewhere,

20   food of some sort, but I was impressed that it was

21   able to know where to go and where to turn, and it

22   was able to do that.

23        Q.   Phones do that, right?

24        A.   Yes, sir.

25        Q.   Did they do that at the time?

```
 1                    McGee

 2      A.   I don't know.

 3      Q.   Okay.

 4      A.   That's a good question.  I'm not sure.

 5      Q.   All right.  Did you ever use your phone

 6 for navigation when you used your Maserati setting?

 7      A.   I probably did, yes, sir.

 8      Q.   Tesla had a -- was it a bigger display or

 9 was it more accurate?  What do you recall --

10      A.   It was a display, but it was also steering

11 the car when we would get to critical turns.  I

12 don't know how it did it, quite frankly, because --

13 but it was able to steer.  And that's what I found

14 interesting.  Again, thinking about my situation.

15      Q.   Okay.  So that's -- that's what I want to

16 talk to you about is I recall you saying that this

17 was a pretty short drive you went on with your

18 friend, Chuck.

19      A.   Yes, sir.

20      Q.   And that you can't recall if you were in

21 the front or backseat.  But you recall that he put

22 the place, dinner or lunch, was a business meeting,

23 and that the car turned on its own without the --

24 without the driver doing it himself?

25      A.   Yes, sir.  I remember it steering when we
```

1                          McGee

2    were in there.  I don't know.  Again, I have to

3    think about the practicality of where his hands were

4    and all that, I don't know, because I wasn't

5    thinking about it at the time.  It was the first

6    drive I had in one.  But it was able to make turns.

7         Q.   Make turns without his hands on the wheel?

8         A.   I can't recall where his hands were, but

9    the car was doing the work.

10        Q.   Okay.

11        A.   Whether or not his hands were on it.

12        Q.   Was it doing the work, slowing down and

13   speeding up into those turns as well?

14             MR. BRANIGAN:  Objection to form.

15        A.   I can't recall.

16   BY MR. POSES:

17        Q.   What's -- what is a beta test to you?

18   What does that mean?

19        A.   Generally, I'm using my technical terms,

20   but it's usually when you're taking software or

21   something else and rolling it out for a certain test

22   group of people to make sure it all validates and

23   works before you send it out to everybody.

24        Q.   And what's your understanding as to the

25   technology you had in your car on whether or not it

1                        McGee

2    was actually -- your car was a beta test vehicle?

3         A.   I can't recall.  But thinking about the

4    different levels that I bought of the autonomous

5    driving, I think the highest level was the beta

6    test.  Not 100 percent sure.  But I mentioned that,

7    I think, in my previous testimony, which I was

8    thinking whatever I purchased was beta.  So I could

9    use it, but they were still figuring it all out.

10        Q.   Okay.  Did you make any inquiries to Tesla

11   or did they contact you about the fact that your car

12   was a beta test vehicle?

13        A.   No --

14             MR. BRANIGAN:  Objection to form.

15   BY MR. POSES:

16        Q.   Do you know if whether or not Tesla was

17   collecting data on your driving, driving habits, and

18   your actions because, in fact, it was a beta test

19   vehicle?

20        A.   I had --

21             MR. BRANIGAN:  Objection to form.  Lack of

22        foundation.

23   BY MR. POSES:

24        Q.   Go ahead.

25        A.   I had a feeling Tesla was -- Tesla was

1                           McGee

2    tracking all information.

3         Q.   You had a feeling about it or do you know

4    about it or tell me about that.

5         A.   I had a, I mean, fair amount of knowledge

6    right about, I guess -- I don't know what it was

7    called, but the black box.  So assumed Tesla was

8    tracking quite a bit of information.  You know, for

9    instance, it was -- I understood my -- it was able

10   to indicate my hands on the wheel, that impact.  So

11   I didn't know exactly how much, but I knew it could

12   track my information.

13        Q.   Okay.  All right.  Have you made any

14   inquiries after the accident about the beta test

15   that you're, you know, potentially involved in, in

16   terms of the technology that was employed in your

17   vehicle?

18        A.   No, sir.

19             MR. BRANIGAN:  Same objection.  Form.

20        Foundation.

21   BY MR. POSES:

22        Q.   Subsequent to this, and counsel asked you

23   if whether or not there were any extra tired, were

24   you consulted with any extra technology.  And

25   your -- I think your answer is no; is that right?

1                        McGee

2        A.    Yes, sir.

3        Q.    Okay.  And so -- but as -- if we're clear

4   and you did not go out and solicit you personally,

5   an expert or an opinion or seek knowledge about how

6   and why this happened and the way in which the

7   technology interface with your driving.  You didn't

8   do that?

9        A.    No, sir.

10        Q.    Okay.  There was a quote -- I'm going to

11   quote you from your testimony.  You said you never

12   set eyes on the owner's manual.

13            And so would this be new technology and

14   sort of different in every car you experienced, why

15   didn't you?

16        A.    That's a good question.

17        Q.    Okay.

18        A.    I just said I generally didn't.  It was

19   still an automobile.  I tend to trust my general

20   abilities to figure things out, for better for

21   worse.  Maybe with this case, not good.  But my

22   father was an engineer, just like I rebuilt a car

23   when I was 16, right -- probably wrongly have a high

24   opinion of my ability to figure things out.  And I

25   had watched videos, so I figured I would figure

1                          McGee

2    things out, because, again, I know me versus I

3    couldn't tell you at that moment when I had that

4    thought.

5         Q.    What kind of engineer was your dad?

6         A.    Civil.

7         Q.    In North Carolina?

8         A.    Yes, sir.

9         Q.    Buildings?  Bridges?  Houses?

10        A.    No -- well, bridges, houses,

11   infrastructure.  He was a -- he went through quite a

12   career.  So anything from industrial builder -- he

13   helped build the Sunshine Skyway Bridge in Tampa, to

14   his current business before he passed away, which

15   was construction consultant expert witness in claim

16   analysis.

17             And so, speaking of depositions, he did

18   hundreds of these.  Was an expert witness in a lot

19   of EIFS and stucco issues, meaning water gets behind

20   the synthetic stucco EIFS building.  It's got

21   issues.  They've done something wrong, and so all

22   kinds of construction consulting.

23        Q.    You still need to speak up.

24        A.    Sorry.  All kinds of construction

25   consulting.

```
 1                        McGee

 2       Q.   Okay.  I'm sorry.

 3            So did you build this Jeep growing up with

 4  your dad?

 5       A.   Yes, sir.

 6       Q.   And was it your idea, his, or something

 7  you could do together?

 8       A.   Something we could do together.  We had

 9  a -- we had a deal in place if we could find a car

10  to remodel, he would pay two-thirds, I would pay

11  one.  He had all veto power to expenditures, but it

12  was all me to do all the work and labor, as well as

13  make a third of the money and recommendations on

14  parts.

15       Q.   Okay.  And you still have --

16       A.   Yes, sir.

17       Q.   Great.  You also said, you know, I think

18  it's a quote, but I'll just, you know, paraphrase to

19  make it easier, that you didn't look at the owner's

20  manual electronically either.  And I think you said

21  you weren't aware that you could, even if you wanted

22  to look at it electronically; is that right?

23       A.   Yes, sir.

24       Q.   All right.  Was there ever an occasion

25  where -- strike that.
```

1                    McGee

2          I know you told counsel you got a speeding

3    ticket when you were 16 years old.

4          A.   Yes, sir.

5          Q.   That's about a par or maybe a birdie.

6          A.   Yeah.

7          Q.   But no tickets since then until this

8    accident?

9          A.   I don't believe so, no, sir.  I'm trying

10   to rack my brain, but, no.  I'm, again, I believe, a

11   fairly cautious driver generally and --

12         Q.   All right.  Now, counsel was referencing

13   the model and owner's manual.  And there were things

14   in that that I wanted to point out, too, and ask you

15   if you were made aware of any of these things either

16   by salesperson -- unlikely, considering your

17   testimony -- where you learned at some point either

18   before or perhaps even after this accident.  And

19   were you aware that -- per the owner's manual --

20   that the autopilot was not supposed to be used on a

21   road like Card Sound?

22         A.   No, sir.

23         Q.   You used it every time on Card Sound?

24         A.   I could make that statement, but most

25   likely.  As I mentioned, I liked the technology and

1                    McGee

2    I thought I had learned it.

3         Q.   And you would engaged in the evening of

4    the accident, correct?

5         A.   Yes, sir.

6         Q.   On Card Sound Road?

7         A.   Yes, sir.

8         Q.   Was there ever anything that the car told

9    you that said the autopilot is -- you shouldn't use

10   it here or it's not going to work here, anything

11   like that that the car communicated to you?

12        A.   Not that I recall.  Again, that night was

13   pretty blurry, though, but I don't recall that.

14        Q.   All right.  And you used it most of the

15   time, and so there was a number of times the car

16   could have instructed you, I guess, that it wasn't

17   suppose to be used on a road like Card Sound; is

18   that right?

19        MR. BRANIGAN:  Objection to form.

20        Foundation.

21        A.   Yeah, just -- I don't recall

22   unfortunately.

23   BY MR. POSES:

24        Q.   Okay.  And tell me about Card Sound Road.

25   I know you described it, generally, but

1                          McGee

2   specifically, tell me about the lighting first.

3        A.   Very dark road.  I believe it's -- I could

4   be wrong, but I believe it's 19 miles long.  And

5   it's a complete straight drive through, effectively,

6   the Everglades.  And so on each side I don't believe

7   there's any lights other than the bridges.  And it

8   tends to be quite dark at night.  People have said

9   they've seen snakes and things kind of crawling

10  across in the middle of the night.

11       Q.   During the times in which you were

12  traveling in the dark through Card Sound, did the

13  autopilot or any of its features engage or -- or --

14  strike that.  Let me re-ask the question.

15            Tell me about your prior experiences

16  before the accident on Card Sound Road as it relates

17  to the use of the autopilot.

18       A.   Nothing really stands out.  Quite frankly,

19  there's one pretty tight turn on Card Sound Road

20  that I remember being impressed the car could make

21  quite easily.  Obviously, I had my hand on the

22  wheel, but it's supposed to -- it's just a drive.

23  But, otherwise, nothing remarkable other than the

24  steering and staying in the lanes.

25       Q.   So tell me about that.  Where -- and I

```
 1                        McGee

 2   think we know where it is.  But for the record, talk

 3   to me about where that turn is.  Describe it for me.

 4   I guess the best question I could ask you first is

 5   it before or after Alabama Jacks as you're going --

 6        A.   I was actually going to say

 7   River's Pointe.  I believe it's after Alabama Jacks.

 8   It's closer to Ocean Reef than that.

 9        Q.   Okay.

10        A.   I believe it's right after.  And it's very

11   woodsy.  If it was going east, so going east, it's

12   very main grove covered on both sides.  I believe it

13   has a guardrail on what would be the right-hand side

14   if you're going east.  And it's a very tight -- I

15   believe a tight turn and then straightens out.

16        Q.   Talk to me about your experience in how

17   many times you may have had it as it relates to the

18   autopilot or the autosteer of that area?

19             MR. BRANIGAN:  Objection.  Form.

20        A.   I can't recall how many times.  I just

21   remember being impressed that it was able to steer

22   through that.  Whatever the times I've been -- I

23   mean, clearly I bought one in January.  I would make

24   that drive at least ten times.  And I remember being

25   impressed.  Again, I was very impressed with it.
```

```
 1                        McGee

 2  BY MR. POSES:

 3         Q.   Did the -- negotiating the turn, did it --

 4   only the steering wheel engaged as it negotiated the

 5   turn, or is it also the car would slow up or slow

 6   down or speed up into or out of that turn?

 7              MR. BRANIGAN:  Objection.  Lack of

 8         foundation.

 9         A.   And I don't -- I honestly don't recall.

10  BY MR. POSES:

11         Q.   Okay.  All right.  So just so we're clear,

12   the autosteer took you through the turn, but the

13   speed, you're not sure if that was something you

14   could control or the car did?

15         A.   Correct.  I can't recall honestly.

16         Q.   All right.  That's fine.  About how far

17   west on the intersection the accident happened is

18   that turn approximately?

19         A.   It's a little tough, because I can't

20   recall if it was before that really -- the big

21   bridge that you can see through --

22         Q.   Yeah.

23         A.   -- overseas highway -- or not over -- over

24   the -- I can't recall.  I think it's -- I would have

25   said it's -- it's east of that big bridge, but I'm
```

```
 1                        McGee

 2   not 100 percent sure.

 3        Q.   All right.  The night of the accident, I

 4   know you left your office after work, and

 5   Officer Rizzo, you know, saw where you were and

 6   calculated the timing and estimated your speed.

 7   Counsel had asked you whether or not you had

 8   stopped -- physically stopped the car from the time

 9   that you left work until the time of the accident

10   happened.  Do you know if you did or did not?

11        A.   I don't know.

12        Q.   You don't know?

13        A.   No, sir.

14        Q.   Okay.  That's fine.  Had you ever stopped

15   on Card Sound Road, or do you recall at least that

16   night specifically stopping on Card Sound Road for

17   any reason?

18        A.   I don't -- I don't, but I -- I mean, I

19   have stopped on Card Sound.  Generally my stops were

20   to go to the bathroom.  It's a two-hour drive.  So

21   that occasionally was Snapper Creek, which is

22   Exit 20 on 95.  And once or twice is on the side of

23   the road on Card Sound Road.  But that -- I don't

24   recall stopping on that night, but I don't -- I

25   wouldn't -- I don't know.
```

1                        McGee

2        Q.    When you negotiated this turn on

3   Card Sound, do you recall if it was, in fact, dark

4   out or was it during late hours, or do you have any

5   recollection either way?

6        A.    The first time it was late hours, I

7   recall.  But after that, I mean, I'm sure it was --

8        Q.    Now, also in the owner's manual, there's

9   something that says that the cameras that are on the

10  Tesla itself must be clean, because if they're not,

11  they may not necessarily pick up the data that's

12  required for artifical intelligence.  Are you aware

13  of that?

14       A.    Clean cameras, no, sir.  I mean, as far

15  as -- as far as the clean cameras, no, sir.

16       Q.    Keep them clean.

17       A.    No, sir.

18       Q.    Is this the first time you've heard of

19  that, today me asking you that question?

20       A.    Yes, sir.

21       Q.    All right.  Was there -- so during that --

22  during the purchase or the transaction of acquiring

23  the Tesla, no one ever told you about that?

24       A.    No, sir.

25       Q.    Okay.  What was your habit -- and this may

1                        McGee

2   be disparaging in some way.  I went into the vehicle

3   after -- so what -- kind of like mine.  A lot of,

4   you know, young kids, a lot of clothes, and so --

5   you know -- but what was your habit keeping the car

6   in, I guess, ship shape for those cameras

7   specifically?

8       A.   It probably is really good.  I mean, there

9   was a bunch of stuff in the car probably from coming

10  down to see the kids, but I'm fairly anal retentive

11  about keeping a nice car clean, a beautiful car, so.

12      Q.   Okay.  Okay.  What did you do to keep it

13  clean?  What -- you know, did you -- tell me about

14  that.

15      A.   Well, wash, wax.  Got a guy who comes to

16  the office that'll wash the cars, or at least the

17  time that I was doing that, they'd wash the car for

18  you during the week.  But I had -- I took a lot of

19  pride in keeping it very clean.  Like I said, a few

20  people had seen it, and it was -- you know, it was

21  an awesome car.

22      Q.   Are you aware that the owner's manual

23  suggests that there is a way in which it is best to

24  clean the vehicle so that the cameras are without

25  filter or film or, you know, anything blocking its

```
 1                      McGee

 2   view?

 3       A.   No, sir.

 4       Q.   Do you know what type of wax your guy

 5   used, and could you instruct him as to how to clean

 6   it?

 7       A.   No, sir.

 8       Q.   Okay.  Who cleaned your car?

 9       A.   I can't remember the name of this company

10   now.  A Perfect Touch Detail was the name of this

11   company, but I can't remember his name.

12       Q.   Okay.  Perfect Touch Detail?

13       A.   Yes, sir.

14       Q.   Is he still around?

15       A.   I probably could find his number.

16       Q.   All right.  If I ask -- and certainly will

17   copy Mr. Branigan.  But I'm going to ask your

18   counsel to be able to provide me that.

19       A.   Okay.  I'll ask the dealership to track

20   him down.  It's a wacky bunch.  So somebody over in

21   his bunch.  But I can -- I probably can track him

22   down.

23       Q.   Did they clean the car in Ocean Reef or

24   Boca?

25       A.   It would have been Boca, my office.
```

```
 1                        McGee

 2        Q.    Okay.  And would they come to your

 3   building?

 4        A.    Yes, sir.  They come to my building.  They

 5   do it in the parking lot.

 6        Q.    In the parking lot.

 7        A.    While we were working.

 8        Q.    All right.  And they're -- and they're

 9   still around, I guess park in the, you said, same

10   building you're at?

11        A.    Yes, sir.

12        Q.    Okay.  All right.  Thanks.

13        A.    Yes, sir.

14        Q.    When you had the autopilot engaged and its

15   features, as you were traveling from Boca to

16   Ocean Reef, prior to this accident, tell me an

17   experience you had where you -- where the car did,

18   in fact, brake or steer or move for safety issues.

19             Did you ever experience that, first?

20             MR. BRANIGAN:  Objection.  Form.

21        A.    I can't recall a specific incident, but as

22   I mentioned, certainly got more comfortable.  It

23   was -- I felt it was keeping me safer over time.  As

24   I said, I think the first trip was on the highway.

25   Extremely tender about what the car could do, not
```

1                    McGee

2    do.  I never been in one or driven one extensively

3    that had this autopilot.  But I did get more

4    comfortable with what it could and couldn't -- I

5    thought it could or couldn't do.

6    BY MR. POSES:

7         Q.   Okay.  So you were driving down near --

8    this is -- were the autopilot, in fact, engaged and

9    did some protective measure or move?

10        A.   Not that I can recall.  There may have

11   been one, it just was awhile ago.

12        Q.   All right.  Did anybody -- strike that.

13             So I'm going to read something to you from

14   the collision avoidance assist, and this is on

15   page 127, counsel's previous disclosure.  I guess

16   this is exhibit -- I think it's three, but it's --

17        A.   Four.

18        Q.   Four?  Okay.  Thanks.

19             MR. BRANIGAN:  What page on the bottom?

20             MR. POSES:  127.  And it's -- I apologize,

21             not on the bottom.  There's a yellow triangle.

22             And it's different than the manual that we have

23             here, and it's absent in this manual.  But here

24             it exists.  It's a yellow triangle, and it

25             says, Ensure all cameras and censors are clean.

```
 1                    McGee

 2        Unclean cameras and censors, as well as

 3        environmental conditions, such as rain and

 4        faded lane markings can affect autopilot

 5        performance.

 6   BY MR. POSES

 7        Q.   Now, you already testified you haven't

 8   read this manual.  This is the first time you're

 9   really looking at it today.  I talked to you

10   generally about it.  But, specifically, you didn't

11   know anything about this?

12        A.   No, sir.

13        Q.   All right.  This wasn't talked to you --

14   no one from Tesla during the transaction or when you

15   picked it up told you about this?

16        A.   No, sir.

17        Q.   All right.  And then on the same page and

18   to the right, it says, Forward collision warning.

19             And it in that paragraph, it says, The

20   forward looking cameras in the radar sensor monitor,

21   the area in front of the Model S for the presence of

22   an object, such as a vehicle, motorcycle, bicycle,

23   or pedestrian.  If a collision is considered likely,

24   unless you take immediate directive action, forward

25   collision warning is designed to shine and highlight
```

1                    McGee

2   the vehicle in front of you in red on the instrument

3   panel.  If this happens, take immediate corrective

4   action.

5           Now, before you hit that vehicle, you went

6   through road signs, didn't you?

7       A.   Yes, sir.

8       Q.   Do you know how many you -- you ran

9   through?

10      A.   In retrospect, yeah, the stop sign, I

11   believe one.

12      Q.   I don't mean the stop sign.  I mean

13   actually the --

14      A.   Oh.

15      Q.   -- road signs directly in the path of the

16   Tahoe --

17      A.   Yes, sir.

18      Q.   -- that you hit before you struck the

19   Tahoe.

20           Do you recall going through those road

21   signs?

22      A.   I don't.  But I've seen the pictures, and

23   they were -- one we were looking at, there were

24   three or four.

25      Q.   Four in total.

1                          McGee

2        A.    In a cluster.

3        Q.    Okay.  And I think you testified earlier

4    that there wasn't a warning as it relates to the

5    Tahoe being in your path.  But was there a warning

6    or any sign at all that there was anything in your

7    path even proceeding the collision with the Tahoe?

8        A.    I don't recall that, no, sir.  Like I

9    said, I thought initially the Tahoe was in front of

10   the signs.  Obviously, I don't believe it was, upon

11   the information provided, but, no.

12       Q.    Okay.  Is -- do you recall striking the

13   sign?  Is that what potentially alerted you to

14   ultimately brake the car, although it was too

15   late -- brake the car?

16       A.    As I was mentioning, I think, to the best

17   of my knowledge, it was when the tires hit the dirt,

18   because it was like a -- immediate bumpiness.

19   Again, that's just a weird recall in my head.  So

20   I'm not 100 percent sure exactly what triggered.

21   But I do vividly remember kind of just feeling the

22   road change.

23       Q.    Had you ever received a warning from the

24   collision of the wind system or the autopilot that

25   there was, in fact, something in your path and you

1                          McGee

2    responded accordingly?  Did that ever happen before

3    this accident?

4         A.    Normal course, it had happened, yes, sir.

5         Q.    All right.  If you can remember any

6    specific incident, share it with me.

7         A.    I really can't.  I recall using it quite a

8    bit in Miami traffic.  And so doing a lot of the

9    starting and stopping for you, just keeping your

10   fingers on the wheel.  But I don't recall a specific

11   incident.

12        Q.    Okay.  Coming down underneath the picture

13   there, the white -- red car, there's a paragraph and

14   then a second one.  It says, If immediate action is

15   not taken when Model S issues a forward collision

16   warning, automatic emergency braking, if enabled,

17   they automatically apply the brakes if a collision

18   is considered imminent.

19              And I think you answered the question from

20   counsel, but the only braking that occurred here was

21   manually when you applied the brakes, albeit too

22   late; is that fair?

23        A.    I believe so, sir.  Again, I can't recall,

24   so I'm starting to think maybe they did do

25   something.  But, again, my recall, that was it.

```
 1                    McGee

 2       Q.   Okay.  On page -- I apologize for jumping

 3  around, but I probably will.  But on page 90 -- on

 4  page 90, which is the autosteer.  And on the left

 5  side it says, Restricted speed.

 6            And so we referenced this before, but I'm

 7  going to talk to you about more specifically.

 8  Autosteer is intended for use only by a fully

 9  attentive driver on freeways and highways where

10  access is limited by entry and exit ramps.

11            Do you see that?

12       A.   Yes, sir.

13       Q.   Now, you talked about autosteer and its

14  use on Card Sound; is that right?

15       A.   Yes, sir.

16       Q.   In fact, you told me that you did it to

17  your satisfaction and you were impressed with it; is

18  that right?

19       A.   Yes, sir.

20       Q.   But that's not a freeway or a highway,

21  Card Sound Road, is it?

22       A.   No, sir.

23       Q.   And you testified earlier that you used

24  autosteer and autopilot on Card Sound almost every

25  time you drove down the road; is that right?
```

1                          McGee

2       A.   Yes, sir.

3       Q.   Okay.  Following that same paragraph, it

4  says, If you choose to use autosteer on residential

5  roads or road without a center divider or road where

6  access is not limited, autosteer may limit the

7  maximum allowed of cruising speed.

8            Do you see that?

9       A.   Yes, sir.

10       Q.   They would limit the maximum cruising

11  speed if you're not on one of those divided highways

12  that we discussed; is that -- that's the way you

13  read that?

14       A.   Yes, sir.

15       Q.   All right.  And it says that the maximum

16  allowed cruising speed on such roads is calculated

17  based on the detected speed limit, including a speed

18  assist offset of approximately, I guess it says up

19  to 5 miles an hour.

20            Do you see that?

21       A.   Yes, sir.

22       Q.   So counsel asked you not to answer

23  questions about speed.  And I'm not going to ask you

24  about the speed specific to which you were

25  traveling.  But let me ask you some very general

1                          McGee

2    questions.  The speed limit on Card Sound Road is

3    what, if you know.

4         A.   I don't recall.  But I knew there were two

5    different ones that changes.

6         Q.   Okay.

7         A.   I can't recall.  I know there's two

8    different ones.  It steps down towards the --

9         Q.   Steps down as you go further east towards

10   the intersection?

11        A.   Yes, sir.

12        Q.   Okay.  And is the link?

13        A.   55, 45.  But it's been awhile.

14        Q.   55 and 45?

15        A.   Yes, sir.  I believe so.

16        Q.   And when were you using the autosteer and

17   when it was engaged the way you described it, were

18   you going the speed limit or plus, you know, within

19   5 miles an hour of it?

20        A.    In this specific event, obviously I can't

21   recall, but generally that was my practice.  As I

22   mentioned, I thought of myself as a pretty safe

23   driver, so stayed within the range of whatever

24   autosteer was.

25        Q.   Okay.  Had you ever manipulated any of the

```
 1                        McGee

 2   settings of the cruising speed for which you were

 3   allowed to -- to engage in?  Had you ever, you know,

 4   electronically gone into the Tesla and changed the

 5   settings?  Let me ask you more generally.

 6           MR. BRANIGAN:  Objection.  Form.

 7       A.   Generally, I probably did.  It sounds like

 8   something I would do.  Specifically, I can't recall,

 9   but pretty much every gismo I've ever messed with, I

10   messed with settings.  So I probably did.

11   BY MR. POSES:

12       Q.   Okay.  All right.  What do you recall

13   doing here with the settings on your Tesla?  And

14   tell me when how that happened, and, you know, I

15   know that's a pretty broad question.  It's hard to

16   remember specifically.  But tell me as much as you

17   can.

18       A.   It's ironic.  Most of the settings stuff I

19   played with was display settings for the kids and

20   kind of fun settings for it.

21       Q.   Okay.

22       A.   So I do recall tinkering with those.  But

23   that's -- I'm trying -- it's been a while.  I

24   remember some of the other settings.  I can even see

25   a sliding bar, but I can't remember what did what.
```

1                          McGee

2          Q.   All right.  So you're not sure?

3          A.   No, sir.

4          Q.   Okay.  If you had adjusted the settings,

5     why -- would it be for performance or safety or

6     curiosity?  I mean, I'm trying to jog your memory a

7     little to see if you can recall something specific.

8               MR. BRANIGAN:  Objection.  Lack of

9          foundation.  Calls for speculation.  You can

10         answer.

11         A.   I -- yeah.  All three probably.

12    Curiosity.  I would have wanted to see what it felt

13    like from a different performance and suspension.  I

14    don't even know if it has suspension adjust, but

15    that would be something -- I don't know, something I

16    like about cars.  So I would have tinkered with it,

17    and then probably settle on whatever was reliable.

18    BY MR. POSES:

19         Q.   And I know that -- I think this -- know

20    the answer, but you didn't -- you didn't reference

21    the guide or the owner's manual to do any of these

22    things.  It was something you played with on your

23    own?

24         A.   Played with on my own or I would have

25    found it on the Internet.  Like, once I found out

1                        McGee

2  there was some fun modes, I would have found out on

3  the Internet how to find those.

4       Q.    All right.  Going in that same line where

5  it says, Restricted speed, there's a second

6  paragraph there.  And it says, In situations where

7  the speed limit cannot be detected where autosteer

8  is engaged, autosteer reduces your driving speed and

9  limits the set speed to 45 miles an hour.

10          Let me ask you if, in your experience

11  driving on Card Sound Road, if the car itself slowed

12  down to a speed, you know, to accommodate, I guess,

13  this settling, if you recall.

14       A.    I don't recall.

15       Q.    Okay.  I'm going to ask you to go to

16  page 128.  Going to read into the record some of

17  this, and then ask you questions about it.

18          Where it says on the right, Emergency

19  braking in progress.  It says the following:  You're

20  driving 35 miles an hour or faster, the brake are

21  released.  After automatic emergency braking has

22  reduced your driving speed by 30 miles an hour.  For

23  example, if automatic emergency braking applies,

24  braking when driving 56 miles an hour, it releases

25  the brakes when your speed has been reduced to

```
 1                    McGee

 2   26 miles an hour.

 3             So let me ask you first if you ever

 4   experienced that in the three months or so that

 5   you've had the car.

 6        A.   I can't recall.

 7        Q.   Can't recall?  Okay.

 8        A.   No, sir.

 9        Q.   All right.  And then it says, Automatic

10   emergency braking operates only when driving between

11   approximately 7 miles an hour and 90 miles an hour.

12             Without -- I understand your advice of

13   counsel, is it fair to say you were driving that

14   evening somewhere between 7 and 90 miles an hour?

15        A.   Yes, sir.

16        Q.   Okay.  There are a couple things you said

17   and I wrote them down, and I want to talk to you

18   about them more specifically.

19             You said, quote, I believed I thought the

20   car would stop.

21             Tell me why you thought it would stop.

22   And I think that obviously why you're referencing

23   before it hit the Tahoe, or perhaps before it hit

24   the road signs in front of it.  Tell me more

25   specifically why you believe that.
```

```
 1                      McGee

 2        A.   I believe, even in retrospect, that if it

 3   saw the vehicle, you know, a Tahoe, for example, in

 4   front of me impeding my progress, it would stop.

 5   The automatic brake would apply, and it would stop

 6   or assist in the stopping of the vehicle.

 7        Q.   What kind of car do you have now?

 8        A.   A Jeep Wrang -- or Gladiator.  It's a

 9   pickup truck.

10        Q.   Has that Jeep done that?

11        A.   It --

12             MR. BRANIGAN:  Objection.  Form.

13        A.   I don't know if it's actually stopped, but

14   it -- I notice it yells at me.  But front and back

15   and makes a pretty loud noise and indicates if I'm

16   backing up.  Or if I'm actually just in my parking

17   garage at work, there's kind of a dead end before

18   you take a left, and before I go to the dead end, it

19   always yells at me, even though I'm going to take a

20   left because it thinks I'm going to drive into the

21   cars parked there.

22   BY MR. POSES:

23        Q.   Okay.  Have you read the owner's manual of

24   that Jeep?

25        A.   No, sir.
```

1                        McGee

2        Q.   You said rabbit in the road, you wouldn't

3   expect it to see something like that.  But was your

4   expectation I know that it would see a car, what

5   about a road sign?

6        A.   I was unclear.  I don't think I expected

7   it to see that stop sign.

8        Q.   Not the stop sign.

9        A.   Any road sign --

10       Q.   I apologize.  The one that you drove

11   through.

12       A.   Okay.

13       Q.   Fixed object in the road.

14       A.   Right.  Oh, those -- those signs.  Yes,

15   sir.  I would have thought anything in front of it.

16       Q.   Card Sound Road went for about a little

17   bit more than a mile and a half.  It was a direct

18   straight path up until you get to that intersection;

19   is that right?

20       A.   Yes, sir.

21       Q.   And your lights were on?

22       A.   Yes, sir.

23       Q.   They automatically turn on, right?

24       A.   Yes, sir.

25       Q.   And so if your lights are on, lights then

```
1                          McGee

2     would be facing straight, and you're driving

3     straight and the road signs were directly in your

4     path; is that right?

5          A.   Yes, sir.

6          Q.   Okay.  And at no point did you deviate

7     left or right, but you drove straight through that

8     mile 6 approximately?

9          A.   Yes, sir.

10         Q.   All right.  And the car never beeped or

11    stopped or gave any indication there was something

12    in its path?

13         A.   Not to my recollection.

14              MR. BRANIGAN:  Objection.  Form.  Leading.

15    BY MR. POSES:

16         Q.   Okay.  Had you -- I know we talked about

17    the automatic braking system, whether or not it had

18    performed on the highway.  I think you didn't need

19    it.  Or if you did, you don't recall anything

20    dramatic.  But what about on Card Sound Road, and

21    specifically when it was dark out, did you ever

22    receive any warnings, or did the car engage in any

23    way to engage you because there was something in the

24    roadway prior to this -- well, it didn't happen on

25    the date of the accident, but any other time prior
```

```
1                        McGee

2    to that?

3         A.   I don't recall engaging anything to stop.

4    I just -- as I mentioned, the first time I took it

5    on Card Sound Road, I recall being more tentative,

6    because it is a old beat-up road.  But, again,

7    was -- I thought it was working on the road fine.

8    So I don't recall encountering any immediate stops

9    or anything that was a memorable from a scare

10   perspective, but.

11        Q.   Did the autosteer, on what you consider to

12   be a relatively dark area in a winding turn, give

13   you more confidence with the autonomy of the

14   vehicle?

15             MR. BRANIGAN:  Objection.  Form.

16   BY MR. POSES:

17        Q.   Is that fair?

18        A.   Yes.

19        Q.   And tell me did you have other experiences

20   that you can recall specifically that, I guess, your

21   confidence evolved and became greater in the vehicle

22   and its abilities during the three months that you

23   drove it?

24        A.   I don't recall a specific incident.  I

25   just know from beginning to the three-month period,
```

1                        McGee

2    I got more and more comfortable.  Again, I was

3    making a lot of 100-mile drives, which is quite an

4    amount of time to experience and learn the car.  So

5    I do recall feeling more confident, overly confident

6    obviously, in retrospect, in what I could do with me

7    operating it.

8        Q.   Okay.  There was an update or something at

9    least that you mentioned that happened in March

10   about a month, month and a half or so before the

11   accident happened.  And, generally, we talked about

12   it.  I don't know that you weren't sure about what

13   it was specifically.  Let me ask you if you had to

14   take the car into, not the dealership, but the area

15   where you -- where you picked up the car or a place

16   like that.  Did you have to bring the car in?

17       A.   I can't recall, because I have a very

18   vague recollection of getting a notification on the

19   app.  But I can't remember if I brought it in or

20   not.

21       Q.   Okay.  Have you, either as a result of the

22   prior litigation or in this litigation, downloaded

23   or saved somewhere the notifications that you

24   received from Tesla or any electronic communications

25   between you and them?

```
 1                    McGee

 2      A.   No, sir.

 3      Q.   Okay.

 4      A.   I don't think I've been on that app since

 5 the accident.

 6      Q.   I'm going to come back to that in a

 7 second.  Let me just ask you about this.  I know

 8 that you went -- had your eye and went to the

 9 hospital.  And you mentioned that your wife and a

10 woman named Jill Richardson came with your wife.

11 Tell me who's Jill Richardson.  Must be a friend,

12 but tell me who she is.

13      A.   She was a good friend of my wife's.

14      Q.   Okay.

15      A.   She -- prior member of Ocean Reef.  Taught

16 marine biology at University of Miami.  And had a

17 child similar age of our child.  Our children are

18 friends as well, so personal friend.

19      Q.   Great.  And your -- tell me about your

20 wife's education and -- and employment.

21      A.   Wife was a graduate of UNC Chapel Hill.

22 And went to a high school in Hendersonville,

23 North Carolina.  Graduated from college in 1999.

24 Received her master's degree in education in college

25 in 2002, I'm guessing a little bit, but close.  And
```

1                           McGee

2    then she worked as a schoolteacher, a welfare

3    teacher.  And then worked in some other education

4    jobs up until she had children.

5         Q.   Okay.  Great.  So at the time of the

6    accident, she was helping raise the kids obviously.

7         A.   Yes.

8         Q.   All right.  Did you call 911?

9         A.   Yes, sir.

10        Q.   Did you call 911 before you called your

11   sister or your wife?

12        A.   I believe so.  But I can't recall who I

13   called first, but I believe so.  I can't remember if

14   I did that or I ran out to the street, because I was

15   trying to flag down some help.  Again, it's a bit of

16   a blur.

17        Q.   Okay.  When you called 911, did you know

18   that they were injured people other than yourself?

19        A.   I don't -- yes, sir.  I'm trying to think

20   when I saw Mr. Angulo laying on the ground, and

21   that's when I realized someone was hurt.  And I know

22   I recall being on the phone with 911, trying to find

23   out if someone else was in the car.  And then opened

24   the car door and seeing a cooler and a fishing pole.

25   And nobody was in there, but then I started to think

```
 1                      McGee
 2    how is this person outside the car.  I guess my gut
 3    was I hit a car with people in it.  Again, it was
 4    dark.  It happened fast.  And then I found
 5    Mr. Angulo on the ground, and that's when I knew
 6    people were involved.
 7         Q.   Okay.
 8              MR. BRANIGAN:  Do you mind if we take a
 9         quick break?
10              MR. POSES:  Of course.  Yeah.  Absolutely.
11              VIDEOGRAPHER:  We're taking a two-minute
12         restroom break.  The time is 2:15.
13                   (Recess taken.)
14              VIDEOGRAPHER:  Time is 2:28 p.m.  We're
15         back on the record.
16    BY MR. POSES:
17         Q.   All right.  Thank you.  Like I told
18    counsel, I think I'll be an hour or less.  And these
19    questions are a little more general, so -- and,
20    again, if you don't understand one of my questions,
21    like you've been doing all day, just tell me and
22    I'll rephrase it for you, okay?
23         A.   Okay.
24         Q.   In any of the videos that you watched
25    before or after you purchased the Tesla, did any of
```

1                           McGee

2    them show users, drivers using the Tesla without

3    their hands?

4         A.   Yes.

5         Q.   What -- what do you recall about that?

6         A.   It was a curious -- curiosity thing that I

7    saw.  But it was about how people emulated hand

8    pressure on the steering wheel.  So anything from

9    stuffing a piece of fruit and to the wedge there, to

10   a tennis ball, et cetera.  Again, I had no interest

11   in operating the vehicle that way.

12        Q.   Sure.

13        A.   So taking didn't any of those ideas.  But

14   those are some of the things I saw where people were

15   able to -- one guy was watching -- or reading the

16   paper in the backseat while he was in traffic in LA

17   or something like that.  So there were some people

18   doing things they weren't supposed to be doing.

19        Q.   And -- and I think I understand what

20   you're saying.  But tell me specifically what they

21   did with this fruit or I think you said a ball or --

22        A.   Yeah, and I think Tesla may have changed

23   it so -- it's just the video I saw.  But people were

24   trying to figure out -- their belief was that that

25   warning that occurs when you're hand comes off for a

1                         McGee

2    period of time could be prevented if you simulated

3    hand pressure on a steering wheel.  And so people

4    were trying different things to simulate the hand

5    pressures so they could actually make the car steer

6    without using their hands, even though they weren't

7    supposed to.

8         Q.   All right.  You didn't do that?

9         A.   No, sir.  Never.

10        Q.   But did you take your hands -- when

11   autopilot was in use, did you sometimes take your

12   hands off the steering wheel to either, you know,

13   grab something for comfort or whatever the reason it

14   may be?

15        A.   Yes, sir, at times.

16        Q.   And when autopilot was on, did it always

17   tell you that you had to put both hands back on the

18   wheel?

19        A.   I can't recall.  But, I mean, over a

20   period of time, I do recall it telling me to put it

21   back on the wheel.

22        Q.   Okay.  And when -- you say over a period

23   of time.  What does that mean exactly?

24        A.   I can't recall when it happened, but I

25   know it happened enough to -- when we started

1                         McGee

2  talking about or recollected, you know, the wheel

3  shaking or beeping and then putting my hands back on

4  the wheel.

5       Q.   Is that as soon as you took your hands off

6  the wheel, or was there some period of time that it

7  gave you before it warned you?

8       A.   There was a period of time, seconds, I

9  don't know how many, but there was a period of time.

10       Q.   All right.  When you did turn it on

11  autopilot, and you described, you know, clicking the

12  stick twice, what then did you do with your hands

13  typically?

14       A.   I don't really know.  I'm just -- I really

15  don't know what I did with my right hand other than

16  steering when I needed to.  But generally keep my

17  left hand on the wheel.  You needed one hand on the

18  wheel.

19       Q.   Okay.

20       A.   I believe.  I could be wrong, but I

21  believe it was one.  And I would generally keep it

22  right here on the wheel so that it was there to help

23  assist, but I was hoping the car would do the main

24  steering and I would be the assist, if need be.

25       Q.   And you experienced that?

```
 1                    McGee
 2      A.   Yes, sir.
 3      Q.   Okay.  Did you ever test the autopilot out
 4 with no hands on the wheel, despite the warnings?
 5      A.   Not specifically that I recall, but
 6 certainly there were times, I'm sure I've tried --
 7 I've tried to see what it could do.  But, again, I
 8 was -- I thought I was being pretty safe.
 9      Q.   I think it's safe to say you know who
10 Elon Musk is.
11      A.   Yes, sir.
12      Q.   Did you pay attention to anything that he
13 said or did about his -- specifically about the
14 Tesla before you bought it?
15      A.   No, sir.  I kind of -- ironically, my
16 political science degree, I don't really like the
17 politics part of it, so kind of stayed away from him
18 and everybody on the other side.
19      Q.   Okay.
20      A.   I mean, I don't really tweet or any of
21 those things.
22      Q.   Okay.  How about in interviews or articles
23 that you've read or anything like that where
24 Mr. Musk himself would say things or -- or, you
25 know, release statements about the autopilot and its
```

1                          McGee

2  features?

3       A.   No, sir.  Again, I don't know if I've ever

4  heard him speak, believe it or not, other than I

5  watched the introduction of the sports car and the

6  semi truck.  He spoke of those, but I kind of stay

7  out of it.

8       Q.   All right.  So that had no affect on your

9  purchasing of the vehicle?

10      A.   No sir.  No, sir.

11      Q.   Or the use of the vehicle?

12      A.   No, sir.

13      Q.   Okay.  What about friends of yours that

14  would discuss Tesla and, you know, what its

15  capabilities were, you know, was -- you know, did

16  they credit Musk or talk about, you know, what he

17  did or what he's doing, something different and

18  unique?

19           MR. BRANIGAN:  Objection.  Form.

20           Foundation.

21      A.   Not really honestly.  It was -- I'm

22  thinking of the one friend that actually had one,

23  and his wife really drove it.  We both just thought

24  it was really great technology.

25

```
 1                         McGee

 2   BY MR. POSES:

 3        Q.   Okay.  We talked about what the owner's

 4   manual says about using autopilot and some of its

 5   features on a road like Card Sound.  Why didn't you

 6   turn it off on Card Sound Road?

 7             MR. BRANIGAN:  I'm sorry.  Did you say why

 8        did he not --

 9             MR. POSES:  Why did he not turn it off

10        when he got to Card Sound Road?

11        A.   I don't recall specifically, but, like I

12   said, generally I like to have it help me steer.

13   And it's a dark road and it's nighttime and I was

14   tired.

15   BY MR. POSES:

16        Q.   You always use a seat belt when you drive?

17        A.   Yes, sir.

18        Q.   Why?

19        A.   To protect myself in an accident always.

20        Q.   Need anyone to remind you?

21        A.   No, sir.

22        Q.   If you don't put on your seat belt, does

23   the car tell you?  Let's say the one that you have

24   right now, the Jeep.

25        A.   Yes, sir, it does.
```

1                          McGee

2          Q.   How about the -- how about the Tesla, did

3     it automatically engaged a seat belt, or did it

4     remind you if you didn't put it on?  Or tell me

5     about that.

6          A.   I don't recall.  I believe it would have

7     reminded me, but I don't recall.  It didn't put it

8     on for me.  It wasn't electronic.

9          Q.   Okay.  Okay.

10             MR. POSES:  I thought I was going to be

11        longer.  I may have five or ten more minutes.

12             MR. BRANIGAN:  No one objects.

13             MR. POSES:  No, you won't.

14             MR. BRANIGAN:  To answer your question,

15        yes.  I understand what you mean.

16             MR. POSES:  All right.  I'm going to let

17        Tom ask you a couple more questions, or

18        whatever he's got.  I may have a couple more

19        follow-up afterwards, but thank you very much,

20        Mr. McGee.

21             THE WITNESS:  Sure.  Thank you.

22    EXAMINATION

23    BY MR. BRANIGAN:

24          Q.   Mr. McGee, the videos that you were just

25     talking about a few minutes ago that you said you

```
 1                         McGee

 2    watched videos of people doing things to the

 3    steering wheel, all the videos that you generally

 4    referred to as showing people doing things that

 5    you're not supposed to do.

 6         A.   Yes, sir.

 7         Q.   I want to ask you some follow-up questions

 8    about those, okay?  First of all, would you agree

 9    that those are not videos that were presented by

10    Tesla?

11         A.   Yes.

12         Q.   You agree?  They were not?

13         A.   They were not.  They were individuals,

14    yes, sir.

15         Q.   Right.  And you agree that those are the

16    messages that were being conveyed during those

17    videos.  Those were not Tesla's messages, right?

18         A.   Correct.

19         Q.   And the messages that were being conveyed

20    were not even encouraged by Tesla, correct?

21         A.   Correct.

22         Q.   You were asked a number of questions by

23    plaintiff's counsel about the pages of the owner's

24    manual that relate to forward collision warning and

25    automatic emergency braking.  Those are found in
```

```
 1                    McGee
 2    Exhibit 4.  Do you still have that handy, sir?
 3         A.   Yes, sir.
 4         Q.   If you would you, please turn to page 129
 5    in Exhibit 4.
 6              Excuse me.  That page has at the top,
 7    Collision Avoidance Assistance.  But I think if you
 8    look at the earlier pages in that section, under
 9    Collision Avoidance Assistance, you'll see that it
10    covers both of these two technologies, forward
11    collision warning and automatic emergency braking.
12              Would you agree with me?
13         A.   One second.  I'm missing the reference
14    you're making here.
15         Q.   Sure.
16         A.   You're on page 129?
17         Q.   I'm on 29, right, but -- that section.
18    Sorry.
19         A.   I just want to confirm we're on --
20    automatic emergency braking 128.  And that rolls
21    over -- yes, yes, sir.
22         Q.   Right.  There -- there's also a reference
23    to obstacle aware acceleration on page 129, right?
24         A.   Yes, sir.
25         Q.   Okay.  So what I want to focus your
```

1                   McGee

2    attention on now is the portion of page 129 that

3    says, Limitations and inaccuracies.

4          Do you see that?

5    A.   Yes, sir.

6    Q.   And it says, Collision avoidance features

7    cannot always detect all objects, vehicles, bikes,

8    or pedestrians.  And you may experience unnecessary,

9    inaccurate, invalid, or missed warnings for many

10   reasons, particularly if -- and it gives a number of

11   examples starting with, Road has sharp curves,

12   visibility is poor, right?

13   A.   Yes, sir.

14   Q.   Then on the next page, 130, there's

15   another warning.  Do you see that next warning that

16   says, Warning, the limitations previously described?

17   A.   Yes, sir.

18   Q.   That goes on to say that, The limitations

19   previously described do not represent an exhaustive

20   list of situations that may interfere with proper

21   operation of collision avoidance assistance

22   features.  These features may fail to provide their

23   intended function for many other reasons.  It is the

24   driver's responsibility to avoid collisions by

25   staying alert, paying attention, and taking

1                            McGee

2   corrective action as early as possible, correct?

3        A.   Yes, sir.  That's what it says.

4        Q.   And you agree with that, correct?

5        A.   One second.  I apologize.  I was listening

6   to you, but I was -- the words versus interpreting

7   you're saying (sotto voce).

8        Q.   The question is you agree that it's the

9   driver's responsibility to avoid collisions by

10  staying alert, paying attention, taking corrective

11  action as early as possible?

12       A.   Yes, sir.

13       Q.   Correct?

14       A.   Yes, sir.

15       Q.   Now, you said also in response to

16  questions from Mr. Poses that you talked about your

17  expectations, and you said you expected the Tesla to

18  see the signs in front of you?

19       A.   Yes, sir.

20       Q.   Well, did that mean or does that mean that

21  you felt it was okay to stop looking ahead and --

22  and making observations of what was in front of the

23  vehicle as you were driving it just because you had

24  autopilot on?

25       A.   No, sir.

1                            McGee

2          Q.   Right.  So we can agree that whatever your

3     expectations were about the vehicle, you still had

4     to pay attention, correct?

5          A.   Yes, sir.

6          Q.   You still had to look ahead for signs,

7     like the signs that we could see in the photographs

8     that we at looked earlier, correct?

9          A.   Yes, sir.

10         Q.   And the stop sign?

11         A.   Yes, sir.

12         Q.   And the red flashing light, right?

13         A.   Yes, sir.

14         Q.   And would you agree that based on what we

15    can see in Exhibit 5, which you still have in front

16    of you, which is the photo that shows the signs,

17    just a piece of the eastern edge of County Road --

18    of the county road, had you been looking ahead, you

19    would have seen those?

20              MR. POSES:  Form.

21    BY MR. BRANIGAN:

22         Q.   Would you agree with that?

23         A.   The question is would I have seen those

24    signs -- can you ask again?

25         Q.   Yes.  If you had been looking ahead as you

```
 1                    McGee

 2   approached the intersection, those signs would have

 3   been visible to you.

 4             MR. POSES:  Form.

 5        A.   I believe so.

 6   BY MR. BRANIGAN:

 7        Q.   You were asked whether you read the

 8   owner's manual.  I -- we both -- both counsel,

 9   Mr. Poses and I, asked you whether you read the

10   owner's manual either before you purchased the

11   vehicle or after you took delivery of the vehicle

12   and before the crash, and you said no, correct?

13        A.   Yes, sir.

14        Q.   Would you agree with me that nothing Tesla

15   did or did not do prevented you from reviewing the

16   owner's manual at any time?

17             MR. POSES:  Object to the form.

18        A.   No one didn't prevented me, no, sir.

19   BY MR. BRANIGAN:

20        Q.   Including Tesla?

21        A.   Right.

22        Q.   Nothing about the vehicle prevented you

23   from accessing the owner's manual, the electronic

24   version of the owner's manual that was available to

25   you through the center display of the vehicle,
```

1                    McGee

2  correct?

3       A.   Yes, sir, correct.

4       Q.   You were asked some questions about things

5  that activated in the autopilot suite automatically.

6            Do you remember those questions?

7       A.   Not specifically.  Generally, I do

8  remember, but, no.  If you could elaborate, it'd be

9  helpful.

10       Q.   Sure.  Well, let me start with traffic

11  aware cruise control, the advance cruise control

12  technology on the vehicle.  You had to actually

13  activate that yourself, it didn't activate

14  automatically, correct?

15       A.   Correct.  Talking about the thing where

16  you hit the two sticks.

17       Q.   Yeah.

18       A.   Yes, sir.

19       Q.   And to be more precise in my question,

20  when I say activate, I mean -- excuse me, to

21  actually enable it to make it work?

22       A.   Right.  At that -- like whatever moment in

23  time you're driving did I turn it on.

24       Q.   Right.  So to put it in other terms,

25  traffic aware cruise control wasn't defaulted to be

1                       McGee

2  on all the time.  You had to decide, yes, I want to

3  have traffic aware cruise control on, right?

4      A.   Yes, sir.

5      Q.   And then you had to take steps physically

6  to enable it, correct?

7      A.   Yes, sir.

8      Q.   Right.  And your vehicle also had

9  autosteer, correct?

10     A.   Yes, sir.

11     Q.   Now, before you actually activated

12  autosteer, you would actually see a message on the

13  center display, wouldn't you?

14     A.   I don't recall.  But it sounds vaguely

15  familiar.

16     Q.   Let me see if I can refresh your memory.

17     A.   Okay.

18     Q.   Do you recall seeing a message on the

19  center display of your vehicle concerning autosteer

20  that advised you that autosteer is a feature that is

21  currently in beta?

22     A.   I don't recall specifically, but obviously

23  I knew something was in beta.  But I just don't

24  recall what the message said.

25     Q.   Do you recall seeing a message that said

1                         McGee

2   autosteer is a driver assistance feature and does

3   not make your vehicle autonomous?

4        A.   I don't recall that, but I have no reason

5   to debate it.

6        Q.   Do you recall seeing a message on the

7   center display that said, Please use it -- meaning

8   autosteer -- only if you would pay attention to the

9   road and keep your hands on the steering wheel and

10  be prepared to take over at any time?

11       A.   I don't recall the message, but, yes, sir,

12  I understood what they were saying.

13       Q.   Do you recall seeing a message on the

14  center display when you wanted to use autosteer that

15  said, Autosteer is designed for use on highways that

16  may have a center divider, clear lane markings, and

17  no cross traffic.  It should not be used on highways

18  that have very sharp turns or have markings that are

19  absent, vague, or ambiguous?

20       A.   I don't recall that.  But, again, doesn't

21  surprise me that it has those.

22       Q.   Do you recall seeing this message on the

23  center display:  Autosteer is currently in beta,

24  which we say to encourage a higher level of

25  vigilance.  If this were a computer or a mobile

1                          McGee

2    phone, we would not refer to it that way, but we

3    believe the technology -- do you remember something

4    like that?

5         A.   Again, I remember -- I don't remember

6    these specific messages, but I do remember things

7    like this.

8         Q.   Excuse me.  To complete that -- struggling

9    to see with my eyes here.  We believe the standards

10   are considerably higher for vehicle control and want

11   to be clear about the proper use of autosteer.

12             Do you remember seeing something like

13   that?

14        A.   I don't remember that message, but I do

15   remember some automated messages.

16        Q.   And then, finally, before you could

17   actually enable autosteer to make it work, do you

18   recall reading this on the center display:  Do you

19   want to enable auto -- autosteer while it is in

20   beta, yes or no?

21             Do you remember having to hit yes or no

22   before you could actually enable it?

23        A.   No, sir.  But could I ask a quick

24   question?  Not all these questions are asked every

25   time I turned it on.  You're talking about there's

1                          McGee

2    like a -- an enabling process at the beginning?

3        Q.   Yes.

4        A.   Okay.  Thank -- I --

5        Q.   Yes.

6        A.   Okay.  I don't remember clinking that

7    button, but I'm sure I did.

8        Q.   All right.  And you're sure that you

9    answered yes after those kinds of statements?

10       A.   Pretty confident, given I used it quite a

11   bit.  I don't recall doing it, but it sounds like

12   something I would have done.

13       Q.   Okay.  So with respect to traffic aware

14   cruise control and autosteer, you agree that those

15   did not become enabled automatically, right?

16       A.   I believe -- from what you're telling me,

17   I believe so, yes, sir.

18       Q.   You had to make a conscious decision to

19   enable those features when you drove the vehicle?

20       A.   If you're saying so, I believe that would

21   be the case as well.  I just don't recall the

22   incident.

23            MR. Liro:  Form to the last question.  Let

24       me get my objection in.

25

```
 1                    McGee

 2  BY MR. BRANIGAN:

 3       Q.   The point of what I'm asking, sir, is that

 4  with respect to these technologies, traffic aware

 5  cruise control, autosteer, you had to -- you had a

 6  choice to make about whether you were going to,

 7  first of all, even buy the content for your vehicle,

 8  correct?

 9       A.   Yes, sir.

10       Q.   And then use it when you drove the

11  vehicle, correct?

12       A.   Yes, sir.  Yes, sir.

13       Q.   And anytime you wanted to disable it, you

14  had a choice in that regard as well.  You could have

15  disabled it, stopped using it, right?

16       A.   Yes, sir.

17       Q.   So in other words, if you felt

18  uncomfortable about using it on a particular road or

19  even unsafe, you could have decided, as the driver,

20  to disable the technology and then just drive the

21  vehicle like any other vehicle that you would drive

22  with your own eyes and your own hands and your own

23  feet, right?

24       A.   Yes, sir.  If I felt uncomfortable, I

25  could have done that.  Yes, sir.
```

1                              McGee

2      Q.    Another video question.   You said you saw

3  a video of people riding in the backseat, some guy

4  reading the newspaper while in the backseat.   Do you

5  believe that video was not a Tesla video, correct?

6      A.    Absolutely not.

7      Q.    And I would take it you would also agree

8  Tesla would never encourage people to do that,

9  right?

10      A.    Correct.   Nor would I ever endeavor to do

11  something like that.

12      Q.    The specific videos that you looked at,

13  can you -- can you tell us anything that you

14  remember about any of them?

15      A.    I guess only the vague recollection,

16  because it was a little odd of people stuffing

17  things in the steering wheel, water bottles, what I

18  recall.   But outside of that, no.   I mean, it was

19  more instructional to say -- I'm speculating.   I

20  know I would have done the same -- how do I turn on

21  autopilot, how do I -- et cetera.

22          No, I don't recall, unfortunately.

23      Q.    Do you have a specific recollection of

24  going to the Tesla Inc. website ever before you

25  purchased the vehicle or after you took to the

```
 1                      McGee

 2   delivery of the vehicle?

 3       A.   Specifically, no.  I know I did, but, no.

 4       Q.   All right.  At this point Mr. McGee I

 5   would like to show you a video.  And I'll tell you

 6   that this is a video that we obtained from the

 7   Florida Highway Patrol.  It is a video that is made

 8   by one of the officers' body cameras who was on

 9   scene.  And I'm going to show you a piece of it and

10   ask you some questions.  It is a very long video.

11   I'm not -- I have no intention of showing you the

12   entirety of it, because frankly it lasts over an

13   hour.  But I have the intention of showing you

14   minutes, if that much, okay?

15       A.   Okay.  Yes, sir.

16            MR. POSES:  Is it going to be up here?

17            MR. BRANIGAN:  Unfortunately, I don't

18       think I have a way to do that.  So what I'm

19       going to do is play it and show it to Mr. McGee

20       on my laptop.

21            And, plaintiff's counsel, if you want to

22       see it.

23            MR. POSES:  What I would say, Tom, the

24       27-second mark and the 40-second mark.

25            MR. BRANIGAN:  Yeah.  I was going to say
```

```
 1                    McGee

 2  the same thing.  So there's a -- exactly.

 3        And we're on the same page.  This is the

 4  singular video from the body cam of the

 5  police -- investigating police officer.  And we

 6  both have it.

 7        MR. POSES:  The length of the whole video.

 8        MR. BRANIGAN:  Yeah.  The length of the

 9  video that we received is 1 hour, 12 minutes,

10  and 11 seconds.  And give me one second.  I'll

11  give you some specifics about where I'm going

12  to play, okay?

13        Todd, do you want take a look at this

14  before I roll it?

15        MR. POSES:  Tell you what, I have it

16  marked.  Just tell me what you got.

17        MR. BRANIGAN:  Yeah.  I'm going to start

18  it just to get it rolling.  Because it starts

19  very dark, because the officer turns the camera

20  on and takes a little -- takes a couple of

21  seconds, maybe 20 seconds, to sort of wake up.

22        THE WITNESS:  Do you want me to get a

23  little -- I'll stay close.

24        MR. BRANIGAN:  We'll move it over to you.

25  As soon as I get it to the point, I'll move it
```

```
 1                          McGee

 2         over.

 3              THE WITNESS:  Gotcha.

 4              MR. POSES:  Hey, Tom, so you know, I have

 5         no objection to any piece of it you use.  I was

 6         going to not stand over your shoulder while

 7         you're -- while you're playing it.  That's all.

 8              MR. BRANIGAN:  Okay.  And I appreciate

 9         that.

10    BY MR. BRANIGAN:

11         Q.   What you're hearing right now is the

12    officer with the body cam still in his squad car

13    driving.  So I've got -- I'm just going let it play

14    to get up to the point.

15                   (Video played.)

16         (Exhibit 7 was marked for identification.)

17              MR. LIRO:  It's only 20 seconds.  Did you

18         want --

19              MR. BRANIGAN:  Did you want Mr. McGee to

20         step out for a second?

21              MR. POSES:  Just to make sure I'm not

22         standing over him.

23              MR. BRANIGAN:  On, no.  You can just stand

24         over my shoulder, if you want.

25
```

1                     McGee

2    BY MR. BRANIGAN:

3         Q.   Okay.  I'm going to stop it there, and I'm

4    going to back it up just a little bit here, and I'm

5    going to show it to you and ask you some questions,

6    okay?

7         A.   Okay.

8         Q.   Okay.  So what I'm about to show you now,

9    Mr. McGee, is at the 55-second mark of this video.

10   And what I'd like to do is just have you look at

11   this.  I'm going to let it run for about a minute,

12   and then I'm going to ask you some questions, okay?

13        A.   Yes, sir.

14        Q.   First of all, can you see the screen okay?

15        A.   Yes, sir.

16        Q.   Okay.  So we're starting at the 55-second

17   mark.

18             All right.  I've stopped it at the

19   1 minute, 7 second mark.  The person that we can see

20   on the screen now, sir, in the short sleeve shirt,

21   is that you?

22        A.   Yes, sir.

23        Q.   Al right.  The person that we just heard

24   saying what he said, was that you?

25        A.   Yes, sir.

1                     McGee

2      Q.   All right.  We're going to stop it at the

3  138 mark.  And that was still you talking; is that

4  right?

5      A.   Yes, sir.

6      Q.   All right.  And you've not seen this

7  before today?

8      A.   No, sir.

9      Q.   All right.

10          MR. BRANIGAN:  Okay.  Mr. McGee, I don't

11      have any other questions about this videotape.

12      What we're going to do, counsel, is identify

13      this as exhibit -- I think it's 8.  I think

14      that's the next number in line.

15          MR. POSES:  I think you're right, but

16      court reporter's not here.  They usually keep

17      us in check.

18          MR. BRANIGAN:  Madam Court Reporter, are

19      you hearing us?

20          COURT REPORTER:  Absolutely.  I'm

21      scrolling to verify, if you don't mind.

22          MR. POSES:  Thank you.

23          MR. BRANIGAN:  So the video will be --

24      that we just played and that the witness just

25      authenticated will be Exhibit 7.  And -- excuse

```
1                         McGee

2          me, Counsel, I'm not proposing that we attach,

3          like, the entire video.  I think what we'll do

4          is make some, like a slip sheet or something

5          that just identifies the video as Exhibit 7.

6          And we'll identify with specificity the body

7          camera video from this officer, yeah, so that

8          everybody knows what it is.

9               MR. POSES:  That's fair.

10               MR. BRANIGAN:  All right.  Mr. McGee, at

11          this time, I don't have any other questions for

12          you, sir.  I appreciate your time and patience.

13   EXAMINATION

14   BY MR. POSES:

15          Q.   I just have a couple more, but really,

16     we're really done.  Let me just ask you a couple

17     things.

18               The driver's education course for the

19     driving test that you took to get your license back,

20     was there any indication about autonomous vehicles

21     or self-driving vehicles or that technology at all?

22          A.   No, sir, not that I recall.

23          Q.   Okay.  And we watched part of the video.

24     I don't know if you're aware of this, but are you

25     aware that contemporaneously that evening that you
```

1                    McGee

2     also said that the autopilot failed or something was

3     wrong with the autopilot, do you recall saying that?

4              MR. BRANIGAN:  Objection.  Form.

5              Foundation.

6     BY MR. POSES:

7              Q.   That's fine.

8              A.   Yes, sir.  I believe so.  I don't know

9     because I've heard it.  I mean, I've seen it, I've

10    heard it, but, yes, sir.

11             Q.   All right.  Do you remember specifically

12    what you said and let me ask you -- let me first ask

13    you that.

14             A.   Sure.  I read some articles.  I haven't

15    watched the videos, but some of the quotes are in

16    there, so I probably do know what was said.

17             Q.   Okay.  Why did you say that that evening?

18             A.   I believe that's -- had occurred.  And,

19    again, I was surprised I made contact with the

20    vehicle.

21             Q.   Okay.  Last question.  I think you're

22    aware of this.  There was an article specific in the

23    New York Times about our case.

24             A.   Yes, sir.

25             Q.   Okay.  Did you speak to any journalist

```
 1                         McGee

 2     from either the New York Times or anyone else about

 3     this case?

 4          A.   No, sir.

 5               MR. BRANIGAN:  Form.

 6  BY MR. POSES:

 7          Q.   Okay.  There's a journalist named

 8     Neal Boudette who authored that article.  Did he --

 9     you did not speak to him.  Is that fair?

10          A.   Yes, sir.  I believe he contacted Jacob.

11          Q.   Good.  Okay.  And has anyone contacted you

12     since the publication of that article, could be from

13     The Times or any other media source about this

14     specifically?

15               MR. BRANIGAN:  Wasn't there one other

16          reporter that contacted you?

17          A.   I haven't spoken to anyone.

18  BY MR. POSES:

19          Q.   Okay.

20          A.   I believe some other reporter -- there was

21     two articles, weren't there?  The one prior to

22     The Times.  So I think there was a call both times

23     there.  But since, not at all.

24          Q.   And so what probably counsel and I want to

25     know is there any statement that you made other than
```

1                         McGee

2    what the interrogatories that were produced that

3    counsel has as well and your deposition today to any

4    journalists that we're unaware of?

5         A.   No, sir.

6         Q.   Okay.

7              MR. POSES:  Mr. McGee, again, thank you

8         for your time.

9              THE WITNESS:  Yes, sir.

10             MR. BRANIGAN:  Last couple here.  Sorry.

11             MR. POSES:  I actually believe him.

12             THE WITNESS:  Yes, sir.

13   EXAMINATION

14   BY MR. BRANIGAN:

15        Q.   Is it your testimony, sir, that you have a

16   specific recollection of telling a law enforcement

17   person, a police officer, a deputy, what have you,

18   at the scene of the crash before you left the crash

19   scene that autopilot malfunctioned or failed or

20   didn't operate like you expected?

21        A.   No, sir.  My testimony is I recall saying

22   something, I think I called it cruise control.  But,

23   again, I don't know if I actually recall it or if I

24   read in the articles, because they wrote my quote

25   exactly.  And, unfortunately, I didn't watch the

```
 1                        McGee
 2   videos.  But I do read the articles, because I'm
 3   concerned of my impact, you know, what's going on.
 4   So I read the articles.  My only point is I recall
 5   that statement, whether it was because I read the
 6   articles and they said I said it or actually said
 7   it.  I'm not sure how to assess that part of my
 8   brain.  But it's certainly something that I have
 9   recall on now.  You know what I mean?  I couldn't
10   bifurcate one from the other.
11        Q.   You were interviewed by the police after
12   the night of the crash, correct?
13        A.   I don't believe so.  Was I?
14        Q.   You tell me.  I'm asking the question.
15        A.   No, sir.  I don't believe I was.
16        Q.   All right.  Just to be clear, so your
17   testimony is the only time that you were interviewed
18   by law enforcement officials, police, deputies,
19   attorneys, for the state or county is the night of
20   the crash?
21        A.   Yes, sir.  I believe so.
22             MR. POSES:  Just for the record, I'm not
23        going to stipulate that the exchange was
24        interviewed by the police.  I think that --
25             MR. BRANIGAN:  Yeah, I understand.  I
```

```
 1                    McGee

 2        understand what you're getting at.

 3   BY MR. BRANIGAN:

 4        Q.   I don't mean to suggest that it was -- my

 5   point is really as sort of an adjunct to what

 6   Mr. Poses asked you about statements that you made.

 7   And I'm using statements now in a general way, not

 8   in a formal, sworn statement, recorded.  But I'm

 9   just wondering, you now, is -- is it your testimony

10   that the only time you talked to law enforcement

11   about the crash was while you were at the crash

12   scene the night of the crash?

13        A.   The scene and -- yes, sir, I believe so.

14        Q.   Okay.

15             MR. POSES:  I'll help you out on that.  I

16        would not allow him to discuss with the police

17        absent counsel present.  We were not present at

18        any communications.  I object to any objects

19        from journalists to discuss the issue with

20        Mr. McGee.

21   BY MR. BRANIGAN:

22        Q.   All right.  So to the extent you did say

23   anything about autopilot or cruise control or

24   anything about the vehicle, you would have set it to

25   law -- if you said something like that to law
```

1                    McGee

2  enforcement, you would have said to right there at

3  the scene, correct?

4        A.   I believe so, yes, sir.

5             MR. BRANIGAN:  All right.  Thank you, sir.

6             MR. POSES:  And just last thing for the

7        record.  We had this -- we'll make it

8        Exhibit 8, if that's okay.  This is just the

9        hard copy of the manual, the reference to that

10       one.

11            MR. BRANIGAN:  Yeah, that's fine.

12            MR. POSES:  There's a slight difference,

13       so we'll make this Exhibit 8.  And this is

14       yours.

15       (Exhibit 8 was marked for identification.)

16            MR. BRANIGAN:  Why don't I do this.  I'll

17       send the court -- because I have to send all

18       the hard copies to the court reporter, so I'll

19       send that to the court reporter.

20            MR. POSES:  Good.  All right.

21            VIDEOGRAPHER:  The time on the video is

22       3:03 p.m.  We're going off the record.

23        (An off-the-record discussion was held.)

24            COURT REPORTER:  As far as the transcript

25       goes, is anyone ordering the transcript?

```
 1                        McGee

 2              MR. BRANIGAN:  Yeah, both of us.

 3              MR. POSES:  Both of us.

 4              (Deposition concluded at 3:05 p.m.)

 5                       _____

 6                            GEORGE McGEE

 7     Subscribed and sworn to before me

 8     this     day of          2022.

 9

10     _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                    C E R T I F I C A T E

3

4    STATE OF FLORIDA     )

5    COUNTY OF VOLUSIA    )

6

7         I, VANESE KILLINGBECK, a Notary Public within

8    and for the State of Florida, do hereby certify:

9         That GEORGE McGEE, the witness whose

10   deposition is hereinbefore set forth, was duly sworn

11   by me and that such deposition is a true record of

12   the testimony given by such witness.

13        I further certify that I am not related to

14   any of the parties to this action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17        IN WITNESS WHEREOF, I have hereunto set my

18   hand this 29th day of March 2022.

19

20        _____

21        Vanese Killingbeck, RPR, CRR

22

23

24

25

1

2     _____INDEX_____

3     WITNESS                    EXAMINATION BY        PAGE

4     GEORGE McGEE               MR. BRANIGAN            5

5                                MR. POSES            163

6                                MR. BRANIGAN         236

7                                MR. POSES            255

8                                MR. BRANIGAN         258

9     _____EXHIBITS_____

10                                                    PAGE

11    Exhibit 1

12    Amended Notice of Duces Tecum                    19

13    Exhibit 2

14    Statement                                        48

15    Exhibit 3

16    Florida Crash Report                             58

17    Exhibit 4

18    Tesla Model S Owner's Manual                     88

19    Exhibit 5

20    Photograph                                      147

21    Exhibit 6

22    Corporal Rizzo's deposition                     152

23    Exhibit 7

24    Videotape                                       252

25

```
1

2    _____INDEX_____

3    WITNESS                    EXAMINATION BY        PAGE

4    GEORGE McGEE               MR. BRANIGAN            5

5                               MR. POSES             163

6                               MR. BRANIGAN          236

7                               MR. POSES             255

8                               MR. BRANIGAN          258

9    _____EXHIBITS_____

10                                                   PAGE

11

12   Exhibit 8

13   Hard Copy of Manual                             261

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                   ERRATA SHEET FOR THE TRANSCRIPT OF:

3   Case Name:        Neima Benavides v. Tesla, Inc.

4   Dep. Date:        March 15, 2022

5   Deponent:         GEORGE McGEE

6                        CORRECTIONS:

7   Pg.  Ln.   Now Reads        Should Read        Reason

8   _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17                        _____

18                        Signature of Deponent

19

20  SUBSCRIBED AND SWORN BEFORE ME

21  THIS_____DAY OF_____, 2022.

22

23  _____

24  (Notary Public)  MY COMMISSION EXPIRES:  _____

25