**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-cv-21940-BLOOM/Otazo-Reyes**

NEIMA BENAVIDES, *as Personal*
*Representative of the Estate of Naibel*
*Benavides Leon, deceased*,

      Plaintiff,

v.

TESLA, INC., *a/k/a. Tesla Florida, Inc.*,

      Defendant.

_____/

**Case No. 22-cv-22607-BLOOM**

DILLON ANGULO,

      Plaintiff,

v.

TESLA, INC., *a/k/a/ Tesla Florida, Inc.*,

      Defendants.

_____/

**PLAINTIFFS' REQUEST FOR ORAL ARGUMENT AND REPLY IN SUPPORT OF
PLAINTIFFS' JOINT MOTION TO EXTEND AMENDMENT DEADLINE AND FOR
LEAVE TO CONSOLIDATE AND AMEND COMPLAINT [D.E. 165]**

      Plaintiffs, jointly through their undersigned counsel, submit this Request for Oral

Argument and Reply in Support of Plaintiffs' Joint Motion to Extend the Amendment Deadline

and for Leave to Consolidate and Amend Complaint [D.E. 165], and state as follows:

**I.**    **Request for hearing / oral argument**

      At the outset, Plaintiffs would respectfully request that this Honorable Court conduct a

hearing / entertain oral arguments on this Motion.  A hearing is desired because this issue is foundational in that it will determine what damages our jury will be considering at the time of trial. Plaintiffs believe in good faith that this hearing would be helpful to the Court in that the parties will be able to present in greater detail the conclusions and new issues raised by the subject recall, as well as answer any questions that the Court may have. Plaintiffs estimated that 30 minutes to one (1) hour will be required for said hearing.

## II.   The NHTSA recall does provide new evidence which is directly relevant to the issues in this action.

While Defendant is correct that NHTSA's investigation is not new, the conclusions reached by NHTSA and Tesla's resulting inadequate recall issued on December 12, 2023, most certainly are.  Again,  NHTSA's conclusions and the recall are directly relevant to  the exact issues present in this case.

Specifically, the recall states that "Autosteer is designed and intended for use on controlled access highways" and indicates that the recall will place "additional checks upon engaging Autosteer and while using the feature outside controlled access highways and when approaching traffic controls".  Notably, one of Plaintiffs' primary allegations in this case is that Tesla was negligent in allowing the use of Autopilot on a road such as Card Sound Road (where this collision occurred), which is not a controlled access highway and which did contain traffic controls (including at the specific site of this collision)[1].

Likewise, the recall specifies that "[i]n certain circumstances when Autosteer is engaged, the prominence and scope of the feature's controls may not be sufficient to prevent driver misuse of the SAE Level 2 advanced driver-assistance feature" and indicates that the recall will

---

[1]  Plaintiffs also correspondingly allege that Tesla was negligent in failing to properly warn, instruct and train the drivers of its vehicles on the danger of using Autopilot on roads which are not control access highways (such as Card Sound Road).

"incorporate additional controls and alerts to those already existing on affected vehicles to further encourage the deriver to adhere to their continuous driving responsibility whenever Autosteer is engaged, which includes keeping their hands on the steering wheel and paying attention to the roadway."   Notably, another of Plaintiffs' primary allegations in this case is that Tesla was negligent in failing to utilize adequate measures to monitor and ensure that the drivers of its vehicles remained attentive while driving, despite knowing that its drivers become overly complacent and reliant on automated driving technology.

Of further note is that in a hearing conducted before this Honorable Court on April 12, 2022 (before Dillon Angulo filed suit and this case was consolidated), counsel for Neima Benavides appeared before this Court and requested a stay pending the results of the NHTSA investigation.  (*See*, hearing transcript attached as "Exhibit A".)   In that hearing, this Court rightfully asked questions to understand the issues involved in the NHTSA investigation and whether they were substantially similar to the facts at issue here.  (*See*, e.g.,. 22:2-5:  "Mr. Branigan, since you did state in your response with regards to the facts, I just want to ask overall how the incidents that NHTSA is investigating are substantially different from the facts in this case.")  While at the time of the hearing Plaintiff's counsel was unable to answer those questions with any certainty, with the conclusion of NHTSA's investigation and the issuance of the recall, the answer to that question is available.  Not only was the recall applicable to every single Tesla sold to the American public, but the recall specifically addressed two of Plaintiffs' primary and most foundational allegations of negligence in this action.

### III.   Florida's Punitive Damage Statute §768.72 does not apply to this action.

In its Response, Defendant asserts that Plaintiffs were required to adhere to the process specified by Florida Statute §768.72 in amending to add claims for punitive damages.  This is not

so. Instead, as has been specifically explained by the Eleventh Circuit:

> In our prior opinion in this case, **we held that Florida Statute §768.72 conflicts with and must yield to the "short and plain statement" rule contained in Federal Rule of Civil Procedure 8(a)(3), and as a result a Florida plaintiff in federal court because of diversity jurisdiction need not obtain leave of court before pleading a request for punitive damages.** *Cohen v. Office Depot, Inc.*, 185 F.3d 12929, 1295-99 (11th Cir. 1999) ("*Cohen I*"). We adhere to and leave that part of our earlier opinion intact.

*Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1072 (11th Cir. 2000) (emphasis added).

Indeed, this Court has previously cited to *Cohen* in rejecting this very argument in

<u>*McNamara v. Florida Power & Light Co.*</u>, 17-CV-81181, 2018 WL 582537, at *7 (S.D. Fla. Jan. 29, 2018):

> [T]he Eleventh Circuit Court of Appeals has determined that "the pleading requirements of Florida Statutes § 768.72 are inapplicable in federal diversity cases." *Cohen v. Office Depot, Inc.*, 184 F.3d 1292, 1299 (11th Cir. 1999), *opinion vacated in part on reh'g*, 204 F.3d 1069 (11th Cir. 2000); *see also Valderrama v. Rousseau*, No. 11-24637-CV, 2012 WL 12925364, at *2 (S.D. Fla. Dec. 12, 2012), *report and recommendation adopted*, No. 11-CIV-24637, 2013 WL 12177327 (S.D. Fla. Jan. 31, 2013) ("In 2000, the Eleventh Circuit reaffirmed that § 768.72 conflicts with, and must yield to, the 'short and plain statement' rule contained in Fed.R.Civ.P. 8, as a result a Plaintiff in federal court, even on diversity grounds, need not obtain leave of court before pleading a request for punitive damages."). Thus, **Plaintiff is not required to make a showing or seek leave of Court before pleading punitive damages under her state-law claims**.

Tesla either missed this law in its research or is breaching its duty of candor to the tribunal. Either way, the argument is without merit.

## IV.    <u>Plaintiffs have standing to bring the misrepresentation, fraud and false advertising claims.</u>

Defendant claims that Plaintiffs should not be allowed to amend to add counts for negligent

misrepresentation, fraudulent misrepresentation, fraudulent concealment and false advertising

because they fail to state causes of action.[2]  With respect to the first three counts, Defendant argues that the counts do not state a cause of action because they fail to allege that the *Plaintiffs* relied to their detriment on Tesla's misrepresentations or omissions.

Plaintiffs concede the absence of this allegation, but it is not necessary under our theory of liability.  Plaintiffs' claim that Tesla's misrepresentations and omissions (which are set forth with sufficient specificity to satisfy Rule 9(b) in paragraphs 35 through 52 of the proposed amended complaint) were made to consumers like McGee.  McGee detrimentally relied on these misrepresentations and omissions, using Autopilot in a manner that proximately caused the crash, Dillon Angulo's injuries, and Naibel Benavides Leon's death.

It is indisputable that had McGee been injured in this accident, he would have been able to maintain each of these claims against Tesla.  The question before this Court is whether a plaintiff injured as a result of third-party McGee's reliance can maintain the same claims against Tesla. Florida law is silent on the issue, notwithstanding Tesla's representations.  The Florida cases cited by Tesla in its response only set forth the elements of the various causes of action.  None of them involve a plaintiff attempting to bring a claim for injuries sustained as a result of a third party's reliance on the defendant's fraudulent misrepresentations.  Accordingly, none of them can bar Plaintiffs' attempt to do so here.

While Florida courts have not addressed this question, federal courts have.  In *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), the Supreme Court recognized the viability of the claims Plaintiffs seek to bring here.  In *Bridge,* the defendants argued, as Tesla does here, that "[u]nder well-settled common-law principles, proximate cause is established for fraud claims only where the plaintiff can demonstrate that he relied on the misrepresentation."  *Bridge* at 655.  The defendants suggested that as a result, "a plaintiff asserting a civil RICO claim predicated on mail

---

[2]  As Tesla notes, Angulo's complaint currently contains a claim for negligent misrepresentation.  Tesla has already answered that count.  It will remain a claim of this case regardless of how the Court rules on this motion, at least through summary judgment.  This fact severely undermines Tesla's claim of prejudice, which will be discussed further below.

fraud cannot satisfy the proximate cause requirement unless he can establish that his injuries resulted from his reliance on the defendant's fraudulent misrepresentation." *Id.*

The Supreme Court rejected this argument for two independent reasons, the second of which is applicable here. First, it held that reliance was not an element of a civil RICO claim based on mail fraud. *Id.* Second, the Court held that:

> While it may be that first-party reliance is an element of a common-law fraud claim, there is no general common-law principle holding that a fraudulent misrepresentation can cause legal injury only to those who rely on it. The Restatement provision cited by petitioners certainly does not support that proposition. It provides only that the plaintiff's loss must be a foreseeable result of *someone's* reliance on the misrepresentation. It does not say that only those who rely on the misrepresentation can suffer a legally cognizable injury. And any such notion would be contradicted by the long line of cases in which courts have permitted a plaintiff directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation. Indeed, so well established is the defendant's liability in such circumstances that the *Restatement (Second) of Torts* sets forth as a "[g]eneral [p]rinciple" that "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances." § 870.

> As an illustration, the Restatement provides the example of a defendant who "seeks to promote his own interests by telling a known falsehood to *or about* the plaintiff or his product." *Id.,* Comment *h* (emphasis added). And the Restatement specifically recognizes "a cause of action" in favor of the injured party where the defendant "defrauds another for the purpose of causing pecuniary harm to a third person." *Id*., § 435A, Comment *a*. Petitioners' contention that proximate cause has traditionally incorporated a first-party reliance requirement for claims based on fraud cannot be reconciled with these authorities.

> Nor is first-party reliance necessary to ensure that there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury to satisfy the proximate-cause principles articulated in *Holmes* and *Anza*. Again, this is a case in point. Respondents' alleged injury—the loss of valuable liens—is the direct result of petitioners' fraud. It was a foreseeable and natural consequence of petitioners' scheme to obtain more liens for themselves that other bidders would obtain fewer liens. And here, unlike in *Holmes* and *Anza,* there are no independent factors that account for respondents' injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue.

*Bridge* at 655-658.

The two footnotes to this excerpted section provide additional support for our argument. First, the Court responded to defendants' invocation of Comment *a* to 3 *Restatement (Second) of Torts* § 548A (1976), which provided that "[c]ausation, in relation to losses incurred by reason of a misrepresentation, is a matter of the recipient's reliance in fact upon the misrepresentation in taking some action or in refraining from it." The Court responded that the comment did "not support [defendant's] argument," explaining "of course, a misrepresentation can cause harm only if a recipient of the misrepresentation relies on it. But that does not mean that the only injuries proximately caused by the misrepresentation are those suffered by the recipient." *Bridge* at 656, FN6.

The Court further responded to the defendants' dismissal of the "long line of cases" referenced in the excerpt in which courts allowed a plaintiff injured by fraudulent misrepresentation to recover even though it was a third party who relied on the misrepresentation. *Bridge* at 656. The Court explained that these cases were "not cited as evidence that common law fraud can be established without showing first party reliance." *Bridge* at 657, FN7. Instead, they "show that a fraudulent misrepresentation can proximately cause actionable *injury even to those who do not rely on the misrepresentation*." *Id.* (emphasis supplied)[3]

Applying the holding of *Bridge* to the facts of this case, Plaintiffs' physical injuries are the direct result of Defendant's misrepresentations and omissions. It was not just foreseeable that Tesla drivers would ignore the dictates of Tesla's operating manual and become overly reliant on Tesla's autopilot features. Tesla knew that this was occurring and knew that it was leading to accidents. Yet Tesla took no further action to protect its drivers from their own human nature. Here, as in *Bridge*, there were no independent factors that account for Plaintiffs' injuries. The

---

[3]  *See also In re Neurontin Mktg., Sales Practices & Products Liab. Litig.,* 618 F. Supp. 2d 96, 110 (D. Mass. 2009) ("a consumer injured by a fraudulent misrepresentation to his doctor has a claim based on third party reliance."); and *In re Orthopedic Bone Screw Liab. Litig.,* 159 F.3d 817, 828–29 (3d Cir. 1998), *rev'd on other grounds, Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341 (2001) ("As we have earlier noted, § 310 of the *Restatement (Second) of Torts* suggests that when someone makes a fraudulent misrepresentation for the purpose of inducing action by A which, if taken by A, will involve an unreasonable risk of injury to B, B may recover for resulting physical injury even though he was unaware of the fraudulent misrepresentation.")

accident was indisputably caused by McGee's reliance on the autopilot feature.  It will be for the jury to determine who is to blame for that reliance: McGee, Tesla, or both.

## <u>Conclusion</u>

The collision at issue in this action was horrific in every sense. It killed Naibel Benavides, an incredibly bright young woman of just 22 years of age, and resulted in devastating, life-altering injuries to Dillon Angulo, then only 23 years old.

Based on the brand-new recall issued by Tesla, we now know with certainty that the specific issues and defects which Plaintiffs allege contributed to this tragic incident are the specific defects which Tesla knew about and which NHTSA was investigating. In good faith, Plaintiffs believe the interests of justice requires that Plaintiffs be given leave to amend their Complaint to include these new allegations and to seek punitive damages.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this January 17, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

THE ROUSSO, BOUMEL LAW FIRM, PLLC.
9350 South Dixie Highway
Suite 1520
Miami, Florida 33156
(305) 670-6669

By:     **_/s/ Adam T. Boumel, Esq._**
Adam T. Boumel, Esq.
Florida Bar No.: 0110727
Direct email: adam@roussolawfirm.com
Service emails:
Pleadings@roussolawfirm.com
assistant@roussolawfirm.com

EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:21-cv-21940-BB

NEIMA BENAVIDES, as Personal
Representative of the Estate of
Naibel Benavides Leon, deceased,

   Plaintiff,      April 12, 2022
              9:02 a.m.
  vs.

TESLA, INC., a/k/a Tesla Florida, Inc.,

   Defendant.      Pages 1 THROUGH 57
_____

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE

Appearances:

FOR THE PLAINTIFF: POSES LAW GROUP, PA
        TODD POSES, ESQ.
        169 East Flagler Street, Suite 1600
        Miami, Florida 33131

FOR THE DEFENDANT: BOWMAN and BROOKE, LLP
        THOMAS P. BRANIGAN, ESQ.
        41000 Woodward Avenue, Suite 200
        Bloomfield Hills, Michigan 48304

        COLE, SCOTT & KISSANE, PA
        HENRY SALAS, ESQ.
        9150 South Dadeland Boulevard, 14th Floor
        Miami, Florida 33156

COURT REPORTER:  Yvette Hernandez
        U.S. District Court
        400 North Miami Avenue, Room 10-2
        Miami, Florida 33128
        yvette_hernandez@flsd.uscourts.gov

1          (Call to order of the Court, 9:02 a.m.)

2          COURTROOM DEPUTY:  Calling Case Number 21-21940,

3    Civil, Bloom, Otazo-Reyes, Neima Benavides, as Personal

4    Representative of the Estate of Naibel Benavides Leon,

5    deceased, Plaintiff, v. Tesla, Inc., also known as Tesla

6    Florida, Inc.

7          Counsel, please state your appearance, beginning with

8    the Plaintiff.

9          MR. POSES:  Todd Poses for the Plaintiff Estate.

10         THE COURT:  Hi.  Good morning.

11         MR. BRANIGAN:  Good morning.  May it please the Court.

12         Tom Branigan from the Bowman and Brooke Law Firm for

13    Tesla, Incorporated.

14         MR. SALAS:  Henry Salas from Cole, Scott, Kissane,

15    also on behalf of Tesla.

16         THE COURT:  Good morning to each of you.

17         And let me advise that if you are fully vaccinated,

18    and you feel comfortable, you are certainly permitted to take

19    your mask off.

20         MR. POSES:  Thank you.

21         MR. BRANIGAN:  Thank you.

22         THE COURT:  Somewhat of a welcome relief, yes?

23         And I hope everyone is safe and well.

24         And before the Court for hearing this morning is the

25    Plaintiff's motion to stay the proceedings until the conclusion

1    of the NHTSA investigation.  That's Docket Entry 24.

2          I do appreciate the parties complying with the Court's

3    expedited briefing schedule in order to address fully the

4    motion today.  And I noted in the reply last night that the

5    Plaintiff did not address the Defendant's statement within its

6    response of the standard.  And I just want to make sure that we

7    are clear on the standard.  Because the Court has reviewed the

8    response that cited an Eleventh Circuit case of Garcia-Mir v.

9    Meese, and that appeared to be a grant of an emergency motion

10   to stay a mandate, and that does not appear to be the standard.

11         But I'll let Mr. Poses, since it is your motion -- to

12   address it, so that we can make sure that we're looking at the

13   correct standard to be applied.

14         MR. POSES:  Great.  Thank you, Judge.

15         So Mr. Eaton prepared these papers, but I'm certainly

16   familiar with them and the law.  And what Mr. Eaton illuminated

17   here is that the issue is whether or not it unduly burdens

18   either of the parties in the event that you grant a stay.

19         And so, in this case, we think that the opposite is

20   true, and in fact it will help and assist the parties because

21   certainly the outcome of the NHTSA investigation will

22   illuminate certain issues that are at issue in this case.  And

23   that outcome is going to be held onto tight by either party,

24   dependent upon the outcome.  And so, when we think about

25   burden, we think about whether or not it's going to cost more

 1   time or money.  But the time here is irrelevant to the

 2   Plaintiff certainly, and I can't imagine it's relevant to the

 3   Defendant.  The damages certainly aren't affected either way on

 4   the Plaintiff's side.  This is a death case.

 5           But the knowledge that's going to be brought forth

 6   from the NHTSA investigation is critical and will make this

 7   trial fair and right.  And I will tell you that my clients are

 8   a family of engineers.  They are people who are used to getting

 9   things right, and it's important to them to understand the

10   facts of the case before moving forward.

11           I will tell Your Honor that we waited the two years to

12   file this case with the hope that this NHTSA investigation was

13   going to happen sooner, and that was the expectation by people

14   in the media, and also, you know, resources that I have and

15   experts that I have spoken to.  It took a long time to get its

16   footing.  But now that it's happening, it directly impacts and

17   is going to investigate the issues in our case.

18           And so what better way to understand best our case

19   than to allow NHTSA and the federal government to look at cases

20   that are similar, or almost identical, and then tell us the

21   answers that we're seeking, instead of guessing?

22           THE COURT:  But as I understand the briefing, the

23   Defendant notes that the Plaintiff has already hired two

24   experts, John Lee and Andres Navarro.

25           MR. POSES:  We have.

```
 1        THE COURT:  And have those individuals, one or both of

 2   them, looked at the software in George McGee's Tesla to

 3   determine whether, in fact, the facts are substantially similar

 4   to the vehicles that are going to be investigated as part of

 5   the NHTSA investigation?

 6        MR. POSES:  So we do have two experts.  John Lee,

 7   first, is a human factors expert.  He is a colleague, actually,

 8   of Mary Cummings, who now is heading up the NHTSA

 9   investigation.  But his purview and his expertise, again, is

10   human factors.  He understands and can talk fluently about the

11   technology aspect of this, but he will not be qualified to

12   discuss the technology aspect of this case.  He's only talking

13   about the human factors elements and the way in which people

14   interface with technology.  And so that's Mr. Lee's expertise.

15        Mr. Navarro is a local expert from Kimley-Horn.  He is

16   more of a -- I would say a ministerial expert, someone who is

17   collecting information and data, and ultimately will be able to

18   disseminate that information and data to other experts, who

19   then ultimately will look at this vehicle the way that you're

20   describing, three dimensionally.

21        THE COURT:  But do you have the software from

22   Mr. McGee's vehicle?

23        MR. POSES:  We've downloaded -- well, actually --

24   well, we do.  We have the requisite information that would be

25   necessary to evaluate this, but I haven't hired anybody because
```

1   the landscape in which we need to look at this is going to be

2   determined, I think -- and what most people think -- by this

3   NHTSA investigation.

4            And if I can explain a little further.  The Tesla has

5   this camera system that is the periphery of the car, so that it

6   accepts information through the camera system and then turns it

7   into artificial intelligence that then the Tesla reacts

8   accordingly.  And what our contention is, and what we believe,

9   is that that camera system is flawed and defective, and those

10  are in our papers.

11           And so that's exactly what's being investigated here.

12  It's that artificial intelligence that's absorbed by the Tesla

13  and reacts either accordingly or not.  And these subset of

14  accidents that are now at issue before NHTSA are just like our

15  accident, where they're stopped vehicles, vehicles directly in

16  the path of a moving vehicle that's on autopilot, which we have

17  here, and that nevertheless not only is the -- some of these

18  Teslas not recognize something directly in its path, but they

19  even speed up into it.  And so there's a flaw that we believe

20  that will be discussed and understood much better with this

21  NHTSA investigation.

22           THE COURT:  But I want to understand in terms of this

23  cases and this particular Tesla what autopilot features were

24  even in use at the time.

25           MR. POSES:  So Mr. McGee testified that he used

1   autopilot every time that he drove down south from Boca Raton

2   to Key Largo, and to his home in Ocean Reef, and it was engaged

3   at that time.  And the collision avoidance system is a piece of

4   technology that goes -- is on regardless.  And this collision

5   avoidance technology is something that Tesla has bragged is

6   superior to other collision avoidance technology that's in

7   other vehicles, where it was going to recognize people or

8   things in its path, either behind it, to the side of it, or

9   directly in front of it, and is otherwise going to stop and

10  warn the driver, to which in this case we know it did not do.

11       And so the issue now is why.  And on the things

12  Tesla's investigating are lighting conditions and road

13  conditions, speed conditions, other traffic conditions that

14  might challenge the Tesla from producing fair and good

15  artificial intelligence.

16       THE COURT:  Well, I want to understand, because

17  Mr. Salas and Mr. Branigan, in their response, specifically

18  stated, and they've conceded that he had autopilot engaged.

19  But due to the type of road he was on, autopilot limited the

20  vehicle speed to 45 miles per hour.  So he was pressing the

21  accelerator pedal to go faster over the speed limit.  How was

22  that information gained?  Was that through the software?

23       MR. POSES:  It was through the software and also

24  through Mr. McGee's testimony.  I think that -- I know that

25  when there was the homicide investigation, and we deposed the

1    homicide investigator, he was able to -- I think through the

2    City of Miami Beach, because he was unfamiliar with it, they

3    did a digital download.  And some of that information was then

4    made available to the homicide investigator, who then consulted

5    actually with a lawyer from Tesla to understand better what

6    this technology actually says.

7          And so, in his report -- even though there are certain

8    things that our experts may ultimately disagree with, in his

9    report, he discusses those same things that you're discussing

10   with me.

11         THE COURT:  But if these facts are true, and if the

12   driver is pressing the accelerator, does the driver override

13   the autopilot or cruise control system?

14         MR. POSES:  Unsure.  And I know that is being

15   investigated at present.  But one of the things it doesn't

16   override, and the reason why we believe that this

17   investigation -- this NHTSA investigation has merit and is

18   important to our case is because it never overrides the

19   collision avoidance system.  The collision avoidance system

20   operates alongside of and accepts the data that the cameras are

21   ultimately going to give it that artificial intelligence.

22         But regardless of whether the override happened or

23   not -- and we're not sure about that issue, but one thing we

24   are sure of is that the collision avoidance was working and

25   failed.  That's what we believe.  And that system works

1    independent of the autopilot.  It works hand in hand when the

2    autopilot's on.  But if it's off, and if it was off here, it

3    still should work independent.

4         THE COURT:  I just want to understand to determine

5    whether the facts make this investigation relevant or

6    irrelevant.  In this case, Mr. McGee testified that he had

7    cruise control, and the parties are conceding that that's akin

8    to autopilot.

9         So does the autopilot, which now you're terming as

10   collision avoidance does it stop the vehicle it or does it

11   simply warn the driver that the driver may be approaching a

12   vehicle and the driver should press the brake and stop the

13   vehicle?  What type of system does it provide for?

14        MR. POSES:  It is supposed to do both, and it did

15   neither.  And so what happened in this case is that Mr. McGee

16   is driving east on Card Sound Road, towards Ocean Reef.  He's

17   approaching the intersection, which you may be familiar with,

18   which allows you to go north to Ocean Reef or south down to Key

19   Largo.  And there are road signs directly in his path, four

20   road signs, not to mention a stoplight and stop sign -- but

21   road signs directly in its path.  It's at that point, and long

22   before he drives through those same road signs, that it's our

23   contention that the car should recognize those things, warn

24   him, and apply brakes on its own.

25        You know, we know that other vehicles do that now, and

| | |
|---|---|
| 1 | Tesla advertises and brags that it does it and does it better. |
| 2 | But after going through the road signs, it still has its lights |
| 3 | baring down, going straight and almost a hundred feet off of |
| 4 | that same road onto a dirt road, where my client was standing |
| 5 | behind a truck, and that truck was directly in the path of the |
| 6 | Tesla.  The Tesla never warned the driver, nor did it slow down |
| 7 | for one second at all.  It did nothing, with a truck directly |
| 8 | in its path, a large truck.  And it's very similar to the cases |
| 9 | that are being investigated by NHTSA now as to why it failed. |
| 10 | THE COURT:  So collision avoidance is always on |
| 11 | despite whether the autopilot is on or off? |
| 12 | MR. POSES:  That's right, Your Honor. |
| 13 | THE COURT:  So Mr. Poses, you've stated that it's your |
| 14 | contention -- and it's twofold -- that it should have warned |
| 15 | the driver and that brakes should apply on its own. |
| 16 | MR. POSES:  That's right. |
| 17 | THE COURT:  Did the software reveal either of those? |
| 18 | MR. POSES:  It shows that that did not happen. |
| 19 | THE COURT:  There was no warning to the driver and |
| 20 | there was no deceleration of the vehicle. |
| 21 | MR. POSES:  The only deceleration of the vehicle, just |
| 22 | for the record, was based on a split second before the accident |
| 23 | itself.  The driver, after having driven through the road signs |
| 24 | and probably was alerted of the issue, tried to put on his |
| 25 | brakes, but it was too late. |

1          THE COURT:  So it still leads me back to what

2     Mr. Salas and Mr. Branigan placed -- since you both signed the

3     response, that due to the type of road he was on, autopilot

4     limited the vehicle speed to 45 miles per hour, so he was

5     pressing the accelerator pedal to go faster.  Where would those

6     facts be gleaned from?

7          MR. POSES:  Well, I don't necessarily agree with that

8     statement as a whole.  I agree with the fact that he was going

9     faster than 45 miles an hour.

10          I know that this might be somewhat off topic, but I

11     think it relates back to what you're asking, and that's this:

12     During Mr. McGee's deposition, we spent a lot of time going

13     through the owner's manual.  And there's no question that

14     Mr. McGee owns the vehicle and is responsible for its course.

15     And Mr. Branigan spent a lot of time going over that with him.

16     And Mr. McGee admits that he's the captain of the ship and he

17     owns some of the fault here.

18          But Mr. McGee himself, in the previous litigation

19     which I initiated against him and ultimately settled, and now

20     in deposition and in an interrogatory, says that the autopilot

21     failed him, and that the autopilot was, in fact, engaged.  The

22     autopilot was working over 40 miles an hour.  And in that same

23     manual, when I questioned him, he said, A, he's never read it.

24     He's never read an owner's manual, which is very common for

25     people.  He never received any instruction as to the way in

1   which this new technology works or how he should engage it.  He

2   self-taught how he was going to interface with the vehicle, as

3   opposed to getting any guidance from Tesla.  And in the same

4   manual that says you need to be self-determined and control the

5   vehicle on your own, it also says that you shouldn't use this

6   vehicle on a road like Card Sound.  You shouldn't use it.

7         And it even says that it's going to maybe not work as

8   well because of conditions that are different than divided

9   highways.  But that was never told -- that's buried deep in the

10   manual, which Tesla and every other manufacturer knows that no

11   one reads.

12         So -- go ahead.

13         THE COURT:  So I guess, Mr. Poses, it leads to -- the

14   obvious question with regard to the NHTSA investigation is, if,

15   in fact, the discovery so far has revealed that the autopilot

16   failed Mr. McGee, if the software supports that conclusion,

17   then why would the Court stay the proceeding for a NHTSA

18   investigation, when you already have all the information you

19   need from the driver and from Tesla that, in this particular

20   2019 Tesla Model S, the collision avoidance and the autopilot

21   failed?

22         MR. POSES:  So we have done a handful of focus groups

23   on the case, and the question always is why it failed.  And I

24   think that's what NHTSA is going to investigate.  And that's

25   what a jury deserves, and that's what I think my clients

1    deserve, is an understanding as to why this happened.

2          Just saying that it did and then someone saying that

3    it didn't, and here's why, I don't think is a fair jury trial,

4    especially considering what we're seeing in focus groups, where

5    juries are asking:  "What is it about this that didn't work and

6    why didn't it work?  Explain it to me." And that's a difficult

7    thing, and that's what NHTSA's investigating.

8          So what I do know is that -- and this is a published

9    paper by Mary Cummings, who now is investigating this.  And

10   she's a former fighter pilot, interested in autonomous

11   technology as a result of her days as a fighter pilot, a triple

12   engineer, and touted to do this research.  And one of the

13   papers that she wrote, but with the limited resources, is that

14   the camera system that's at issue here does not repeat the same

15   result, even given the same data.

16         And so, for instance, if you take a Tesla and you run

17   it through a series of events, and those same events play out

18   each and every time the same way, you might not get the same

19   result from the Tesla in terms of its reaction.  And the

20   question is why.  And so, in these cases, that's what she's

21   going to -- what I know is that she's going to test that

22   theory, with all the data that she's received and all the

23   subpoenas that she sent to Tesla, to objectively look at the

24   system itself and see why it isn't working.  And if it isn't,

25   what conclusions can we make and how NHTSA can weigh in on what

1    can be done differently.

2         THE COURT:  Well, Mr. Poses, I started with the

3    standard.  And the Court notes that there's three prongs to the

4    Court's exercise of its discretion as to whether a stay is

5    appropriate.  And one is whether it will unduly prejudice, in

6    this case, the Defendant; whether it will simplify the issues

7    and streamline the trial; and third is reduce the burden of

8    litigation, not only on the Court, but certainly for the

9    parties.

10        And I'm having a hard time with regard to the

11   streamlining of the issues related to the NHTSA investigation,

12   if, in fact, you've already told the Court that you know that

13   the autopilot failed Mr. McGee and that the software supports

14   that failure.  Because you've stated in your motion that:

15   "As" -- and this is your representation -- "As a starting

16   point, if NHTSA's investigation ultimately reaches a conclusion

17   that there is simply no defect in the autopilot system as

18   deployed" -- and that's with regard to these particular

19   vehicles that are part of this investigation -- "such a

20   conclusion would almost certainly lead to a resolution of this

21   case in terms highly favorable to the Defendant."

22        And I'm not quite certain that I understand that.

23   Does that mean that you will be dismissing this action against

24   Tesla, even in spite of the fact that you have software from

25   Mr. McGee's Tesla that shows that the autopilot failed him?

 1          MR. POSES:  So you know, I think that perhaps

 2     Mr. Eaton and I would use different words.  So let me try to

 3     explain a little better what our paper suggests.

 4          I am not sitting here before you, Your Honor, and

 5     telling you that I am -- that we believe that our prima facie

 6     case is a hundred percent.  We haven't had an expert that's

 7     looked at the software that can tell me those specific issues.

 8     I know factually that the car didn't stop in a place where

 9     there was something directly in front of it and as advertised

10     it should.  The issue is why.

11          And so the only -- the connecting piece, and the

12     reason why we think all three prongs are met, is because that

13     "why" is critical to understanding how the Tesla works, how

14     people interface with it, and give jurors and the public

15     answers as to the very thing that perhaps we were somewhat

16     cavalier in our suggestion that we know that it failed.  It's

17     our assumption based on these facts, but no expert has told us

18     that specifically.  Peripherally they have, but we believe the

19     investigation is going to tell us specifically that that's true

20     or not.

21          THE COURT:  And I just want to make sure I understand,

22     because I've looked at some of the case law with regard to the

23     admissibility of a NHTSA investigation under the public records

24     exception.  And in this case, are you conceding that -- let's

25     say the NHTSA investigation finds that there's absolutely no

1    problem with the autopilot in any of these vehicles.  Is the

2    Plaintiff going to concede that that fact should be presented

3    to the jury, that that's relevant in terms of NHTSA's

4    investigation relating to the other incidents and the other

5    vehicles?

6         MR. POSES:  I think it depends.  But I think that the

7    Defense is going to try very hard to use that same fact to

8    their advantage, no different than we would use the NHTSA

9    investigation to ours.

10        THE COURT:  Of course.

11        So I guess the question is:  Is it even relevant?  In

12   other words, if the Court permits a stay of the proceeding, if

13   we accept that a one-year time frame would take us to September

14   of 2022 at the very least, and then there's another layer

15   depending upon that investigation, Tesla has an opportunity to

16   respond.  So now there's a second layer.  And if the Court were

17   to allow now, let's say, a two-year stay of these proceedings,

18   and we ultimately get to the point where we're ready to present

19   the case to trial, am I going to receive a motion in limine

20   that that NHTSA investigation that found that there maybe were

21   some defects, maybe some were not found -- or let's say that

22   NHTSA found that there was absolutely no problem with these

23   select models.  Am I going to have an issue of whether that's

24   admissible?  And if so, if it's not germane or relevant to

25   these proceedings, what does it matter what NHTSA determines?

```
 1            And I draw from other cases.  For example, the Takata
 2     airbag litigation, where the Defendant moved to stay the
 3     proceedings, and the Court found that that wasn't germane.  So
 4     how is this any different when it comes to the ultimate
 5     conclusion of NHTSA?
 6            MR. POSES:  So I think there are two pieces of the
 7     investigation.  The simple piece is a yes or no, or maybe and
 8     here's why.  But there's also all of the information and data
 9     that is going to be understood and received that has already
10     been subpoenaed by Dr. Cummings and her team.
11            And so it's those documents -- and I can tell you that
12     I've talked to many colleagues around the country who are
13     litigating Tesla cases no different than I, and this
14     information that Dr. Cummings is going to receive and evaluate
15     is information that isn't available to the public even through
16     subpoena.  You know, there are fights all over the country to
17     protect -- because they have -- you know, they have software
18     and issues that they want to protect because of -- you know,
19     it's their own -- they're trying to protect the information
20     that they have.  And the federal government now finally has the
21     power to get that information, evaluate it, and comment on it
22     different than and better than any lawyer can in any individual
23     case.
24            And so it's not just the yes or no, or maybe, from the
25     NHTSA investigation, but it's all of the data that is going to
```

1    illuminate Tesla's practices, their design, all the design

2    features, their failures, how many times they've failed.  And

3    if it fails consistently, and they know it, that's an important

4    fact that any jury should know.  And that's what Dr. Cummings

5    is going to reveal in her investigation we, believe.

6            So I don't think it's just a:  "This investigation was

7    good or bad or slightly revealing or not, or a yes or no."

8    There's a lot of data and documents that are going to help all

9    litigants around the country understand this best.  And so I

10   think that that information is going to be germane and front

11   and center in the case.

12           THE COURT:  And are you claiming that the failure in

13   Mr. McGee's vehicle relates to the autopilot and the collision

14   avoidance system?

15           MR. POSES:  Yes.  So --

16           THE COURT:  And the reason I ask is I'm looking at

17   your complaint, and it speaks of the autopilot.  But now it's

18   also the collision avoidance system?

19           MR. POSES:  So the autopilot suite has a number of

20   features.  There's steer assist and driver's assist.  There's

21   adaptive cruise control.  There's collision avoidance.  There's

22   a number of pieces to the autopilot suite.

23           So autopilot is not the traditional sense of what you

24   and I have probably have experienced, where you press a button,

25   and it stays at a certain speed.  But rather, it does a number

1    of things for you that otherwise other vehicles do not.  And

2    for instance, Mr. McGee in his testimony said that on Card

3    Sound Road -- he was amazed that as he's driving east on Card

4    Sound Road that the car itself would take the turns on its own

5    and that it would hug these turns even at the speeds he was

6    going at, and that the car was doing the driving for him.

7          And so these are things that -- these are novel.  It's

8    a different time.  These are novel issues, and it's a very

9    different type of vehicle that, in terms of the human factors

10   aspect of it, people have come to, over a period of time, rely

11   on their Teslas to do a lot of the work for them.  And the

12   subset of accidents being investigated by NHTSA, and this case,

13   and a number of cases around the country are somewhat unique in

14   terms of their existence, as opposed other auto manufacturers,

15   where people lose their vigilance on the road.  And that human

16   factors aspect relates back to their reliance on this autopilot

17   and its features.

18         So you know, this NHTSA investigation is a large swath

19   of information that we don't have access to.  It's being

20   followed closely by media outlets because it is the landscape

21   in the brave new world that we're looking at in terms of how as

22   individuals we are going to interface with traffic and

23   traveling.  And they're trying to get this right, and so am I,

24   and we believe that the NHTSA investigation is going to do just

25   that.

1    THE COURT:  And let me ask, Mr. Poses, what steps have

2    you taken to investigate the defects in this vehicle so far?

3    MR. POSES:  So we downloaded -- I've consulted with

4    experts.  Originally, Dr. Cummings was someone we had

5    solicited, and then she ultimately decided to go to the federal

6    government and assist them.  And since that time, as you know,

7    we've hired two experts and consulted with a handful more.

8    We've also consulted with other people around the country and

9    understood their expert reports and what they're suggesting.

10   Every case is different, but a lot of the issues

11   overlap.  And so while I might be comfortable talking about

12   this type of thing to you here in your courtroom now, before a

13   jury and what the bar is going to be in terms of expertise is

14   not someone that we have on our roster at this point that can

15   talk about this fluently in terms of the technical aspects that

16   you started with -- you know, asking me about, you know, the

17   technical issues.

18   THE COURT:  So you've hired two experts.  Have you

19   deposed any of Tesla's representatives or any of Tesla's

20   experts?

21   MR. POSES:  By design, I -- and this is the reason for

22   the stay.  To me, it is critical to understand what Tesla knew,

23   because all the data that they're going to turn over, and the

24   compliance with the subpoenas, is going to illuminate a lot of

25   what testing they did, what they knew about the success or

 1   failures of the system.  And these issues are the ones that --

 2   I would like to have that knowledge to be able to then depose

 3   them with that information.  I don't have that information.

 4           THE COURT:  And how long are you requesting in terms

 5   of a stay?

 6           MR. POSES:  Judge, you know -- and I would talk to

 7   Henry and Tom about that.  You know, my -- the attitude that I

 8   have about this is that the NHTSA investigation -- once it's

 9   complete, they will issue a report and they will also, as a

10   matter of public record, have everything available that was

11   part and parcel to that same investigation.  And so it's that

12   information that we seek.

13           I don't know when the NHTSA investigation will be

14   complete.  I certainly have resources I've spoken to, but

15   there's no way to give you a drop-dead date.  It's very hard.

16   And I came here this morning, trying last night to see if I

17   could give you even a range, and there's just no way.  It's

18   anticipated that it will be within this year, this calendar

19   year, that the NHTSA investigation will be complete.  That's

20   anticipated, but not known.  And that's the only thing that I

21   can educate the Court about that date.

22           THE COURT:  All right.  Thank you, Mr. Poses.

23           MR. POSES:  Thank you.

24           THE COURT:  And I'm not -- is it Mr. Branigan that be

25   responding or --

```
 1              MR. BRANIGAN:  Yes, Your Honor.

 2              THE COURT:  Mr. Branigan, since you did state in your

 3    response with regard to the facts, I just want to ask overall

 4    how the incidents that NHTSA is investigating are substantially

 5    different from the facts in this case.

 6              MR. BRANIGAN:  Sure.

 7              Well, if you look at the -- what's referred to as the

 8    ODI, Office of Defects Investigation Resume that Plaintiff's

 9    counsel attached to his motion, it provides a summary of

10    information and a subject of the investigation.  I'm sort of

11    going in reverse order from top to bottom, if I go more

12    logically with the document.

13              The subject of the investigation is at the top, and it

14    says:  "Autopilot and First Responder Scenes."  And then, in

15    the summary information, about two-thirds of the way down, you

16    can see a description from NHTSA, where NHTSA is saying that,

17    since January of 2018, the Office of Defects Investigation has

18    identified 11 crashes in which Tesla models of various

19    configurations have encountered first responder scenes.

20              If I can stop there, I can tell the Court, based on my

21    knowledge of this investigation and my representation of Tesla

22    generally, that I know what is being referred to here with this

23    reference:  "First Responder Scenes."  A first responder scene

24    is a scene that we've all seen on the highway, where there's a

25    police car with its lights on, there's a fire truck, there's
```

```
1    some other emergency responder, first responder to a crash, or
2    a disabled vehicle, or people -- motorists needing help.
3    They're on the side of the road, they may be blocking part of
4    the road, and they have their flashers on, or they have flares
5    out, or they have put orange cones out.
6          And you can see reference to those things in the next
7    paragraph of the summary, where it says:  "Most incidents took
8    place after dark and the crash scenes encountered included
9    scene control measures, such as first responder vehicle lights,
10   flares, an illuminated arrow board, and road cones."  We don't
11   have any of those things at our crash scene.
12         THE COURT:  Well, this incident did take place after
13   dark, correct?
14         MR. BRANIGAN:  Well, yeah.  I'm sorry.  You're right.
15         THE COURT:  And it did involve a stationary vehicle,
16   in this case, a Tahoe, and not a first responder vehicle.
17         MR. BRANIGAN:  Yes.  And I apologize to Your Honor.
18         When I said our crash does not involve any of those
19   things, I was really focusing on the responder with vehicle
20   lights -- responder vehicle lights, flares, an illuminated
21   arrow board, road cones.  None of those things existed at our
22   scene, but those are the kinds of things that exist at a first
23   responder scene that NHTSA is trying to determine if those
24   things are throwing the Tesla object detection technology off
25   in a way that could lead to a crash that otherwise would not
```

1  occur in the absence of those, I suppose, unique things,

2  emergency vehicle flashing lights, flares, cones, and the like,

3  at a scene in the dark.  Again, we don't have any of those

4  things here.

5       THE COURT:  Let me ask you with regard to those

6  facts -- and I don't want to cut off our argument.  But you did

7  depose the investigating officer, Corporal Riso.

8       MR. BRANIGAN:  Right.

9       THE COURT:  And was it revealed that this Tahoe had

10  any lights, hazard lights, or the lights on the vehicle on at

11  the time?

12       MR. BRANIGAN:  Well, it's been revealed through the

13  investigation in total -- I don't remember if Officer Riso --

14  or Corporal Riso commented on that.  But we know from the very

15  extensive investigation of the crash that the Tahoe was legally

16  parked, engine off, lights off, and it was parked behind some

17  road signs that advise a driver that they are approaching a

18  T-intersection here, and they need to turn right or left.

19       THE COURT:  So no hazard lights that would be akin to

20  the first responder vehicle lights, flares, or any illuminated

21  board, or anything to show the driver that there was something

22  in the roadway?

23       MR. BRANIGAN:  Correct.  Right.

24       THE COURT:  All right.

25       MR. POSES:  Your Honor, if I may, I'd like to touch on

1   a couple of things.

2           THE COURT:  Hold on, Mr. --

3           MR. POSES:  Oh.  Sorry.

4           THE COURT:  Hold on.  Let me -- just because I do want

5   to ask Mr. Branigan about the other two prongs.  I know we're

6   talking about the substantial similarity.  So I just wanted to

7   make sure I understood in terms of what was at the scene,

8   because I only have snippets of the deposition.  So if you

9   would like to proceed, Mr. Branigan.

10          MR. BRANIGAN:  Well, sure.  And I can give you some

11  more information about what was at the scene.  And we know this

12  from, again, a combination of going to the scene afterwards,

13  seeing the very fulsome investigation from the Florida state

14  police and the county police department that was also involved,

15  taking the deposition of Officer Riso, seeing photographs that

16  were taken by police officers on the scene after the crash.

17  There was a stop sign, and there's an overhead flashing red

18  light that controls the intersection and requires the motorist

19  approaching that red light from west to east to stop.

20  Otherwise, this was an unlit area where two roads come together

21  at a T intersection, that there are mangroves off the side of

22  the road, and you know, the pavement, and that's about what the

23  scene was made up of.

24          Before I move on, any other questions about that, Your

25  Honor?

1          THE COURT:  Yes.  In terms of the ODI Resume and the

2    NHTSA investigation, I just want to make sure, because it

3    doesn't appear that NHTSA is investigating the collision

4    avoidance feature or does it?  Does it appear that -- and I

5    know there's different verbiage that's used, traffic awareness,

6    cruise control.  There's an Object and Event Detection and

7    Response.  Is that akin to the collision avoidance system that

8    Mr. Poses speaks of?

9          MR. BRANIGAN:  Well, I think NHTSA is interested in

10   looking at what they refer to as the Object and Event Detection

11   and Response technology in the vehicle.  If you look at the

12   summary statement, it does make reference to that.

13         THE COURT:  So that is, in fact, the collision

14   avoidance system?

15         MR. BRANIGAN:  That's NHTSA's way of describing the

16   collision avoidance system.  In a minute, I'd like to touch on

17   what that really is in the Tesla.  But just to focus on what

18   NHTSA said, I think NHTSA's curiosity is whether this first

19   responder scene, where vehicles have their emergency flashers,

20   or their flares perhaps, road cones, may be doing something to

21   interfere with the performance of what NHTSA calls the

22   vehicle's Object and Event Detection and Response technology.

23         THE COURT:  So how would that investigation differ

24   with the conclusions to be drawn related to the software in

25   Mr. McGee's vehicle?

```
1            MR. BRANIGAN:  Well, the conclusions to be drawn -- it
2    would differ substantially, in our view.  I mean, I think we're
3    talking about apples and oranges here.  Again, starting with
4    the differences in the scene of the crash that we're dealing
5    with and the scenes that are being investigated in these very
6    specific events that are identified in the ODI Resume.  But
7    here the Plaintiffs have alleged that autopilot failed because
8    it didn't bring the vehicle to a stop when Mr. McGee was
9    driving it, and that traffic aware cruise control should have
10   operated that way to bring the vehicle to a stop.
11           Well, what we know from the data that we have
12   jointly -- meaning our experts with Plaintiff's experts have
13   extracted from the vehicle -- is that while Mr. McGee did have
14   traffic aware cruise control, which is an advanced cruise
15   control system that is part of the vehicle's autopilot suite of
16   advanced driver assistance technologies -- while driver
17   aware -- excuse me -- traffic aware cruise control was
18   activated, he overrode that cruise control system by pressing
19   the accelerator.
20           THE COURT:  So it effectively was not -- it was not --
21           MR. BRANIGAN:  It was disengaged by the fact that he
22   was pressing the accelerator pedal with his left foot.
23           THE COURT:  So the technology reveals that his
24   acceleration immediately disengaged the traffic control cruise
25   control?
```

1          MR. BRANIGAN:  Yes.  We know that because the Tesla is

2    equipped with a variety of sensors that allow us to collect

3    data about the vehicle's performance, both when these autopilot

4    features are engaged and when they're not engaged.  And one of

5    the sensors is on the accelerator pedal.  So we know from this

6    data whether the vehicle is accelerating because of the driver

7    planting his left foot on the accelerator pedal, which was what

8    was happening in this instance, or because the traffic aware

9    cruise control system is causing the vehicle to accelerate

10   based on settings selected by the driver.

11          In this case, the data shows that it was Mr. McGee's

12   left foot pressing the accelerator that caused the vehicle to

13   accelerate.  That's all in the data that's been provided to

14   Mr. Poses.

15          So when we see that in the data, we know that traffic

16   aware cruise control has been overridden.  I've used the word

17   disengaged.  That may not be the most precise word because if

18   you take your foot off the accelerator, but you haven't changed

19   the settings of traffic aware cruise control, it will revert to

20   the settings that you as a driver originally selected.  You

21   can't totally disengage it, but you can override it

22   temporarily, like Mr. McGee did by pressing the accelerator

23   with his left foot, and that's what he did.

24          But when you override it, you're now doing all of the

25   driving.  You're pressing the accelerator.  You're in control.

1    And that's exactly what the data shows us was happening here.

2            THE COURT:  So given that there is a difference, I

3    just want to make sure I understand how this stay will harm the

4    Defendant.

5            MR. BRANIGAN:  Well, we'd like to move forward with

6    this case and resolve it in a reasonable course of time, which

7    we think is consistent with what the Court would like to do.

8            We've pointed out to Your Honor in our brief that

9    NHTSA could take a year to conclude the preliminary evaluation

10   stage of this investigation, which is where it is right now.

11   And then, if it decides to elevate the investigation to an

12   engineering analysis, that could take even more time.  And I

13   would be guessing if I tried to predict how much more time

14   would be involved in the -- as its known, the EA, engineering

15   analysis stage.

16           Then NHTSA could say:  "Tesla, we have determined that

17   there's a defect that creates an unreasonable risk to safety,

18   and we want you to recall the vehicle."  Then Tesla has the

19   right to say:  "We disagree, NHTSA, and we're not going to

20   follow that recall order, and instead we're going to litigate

21   whether your finding is accurate, and we're going to do so in

22   the federal district court in Washington, DC."

23           Those are Tesla's rights.  And obviously, Tesla, if it

24   lost at the district court level, has an appellate right.  So

25   this could be going on for months, years.  It's hard to predict

1    how long this will occur.  We want some time certainty here to

2    resolve this case, which is why we're in this courtroom.  We

3    have a scheduling order that sets dates out.  We have a trial

4    date that sets a trial date with some certainty.  We know that,

5    you know, occasionally trial dates get moved, especially in a

6    COVID environment.  But it's certainly more certainty than we

7    have with NHTSA, because NHTSA takes whatever time it needs to

8    reach whatever determination it's going to reach.  And in some

9    situations, NHTSA investigates and then decides to just close

10    its investigation without making a finding.

11           THE COURT:  So putting aside the fact that a stay may

12    be for an indefinite or prolonged period of time, if one of the

13    concerns and one of the bases to determine whether a stay is

14    appropriate is inconsistent resolutions, would the stay of the

15    case allow for the NHTSA conclusion, as far as its

16    investigation, prevent that possibility of inconsistent

17    resolutions?

18           MR. BRANIGAN:  Well, based on the scope of the ODI

19    investigation, I don't see that the resolution -- first of all,

20    it's hard to predict what the resolution's going to be.  But

21    looking at what they're looking at, trying to determine whether

22    emergency vehicles and these other variables related to a first

23    responder scene could interfere with the vehicle's ability to

24    operate on autopilot, I think that that is not consistent with

25    what we're looking at here.

```
 1          What we're looking at here is whether -- first of all,

 2   whether autopilot was engaged -- and we think the data already

 3   shows that it's not -- and whether the limitations of autopilot

 4   and its other features, for example, automatic emergency

 5   braking and forward collision warning, were appropriately

 6   designed to work in the situation that we're dealing with in

 7   the crash in this case.

 8          I'm not sure NHTSA's actually looking at those

 9   features in the same way that we're looking at them here.

10          THE COURT:  Well, I just want to make sure I --

11   because you just said the autopilot was not engaged.

12          MR. BRANIGAN:  Right.

13          THE COURT:  It was engaged, but it was overridden by

14   Mr. McGee's acceleration.

15          MR. BRANIGAN:  Correct.  That's correct.

16          THE COURT:  All right.  And with regard to the

17   inconsistent resolutions, it's already been determined, at

18   least through the ODI Resume, that, in addition to the

19   autopilot, there is also the investigation related to the

20   Object and Event Detection and Response.  So would that also

21   allow for a determination as to whether there was a defect in

22   that collision avoidance system?

23          MR. BRANIGAN:  I don't think so, Your Honor.  Because

24   I think what NHTSA is looking at is whether the Object and

25   Event Detection and Response technology is being thrown off by
```

1    things like responder vehicle lights, flares, illuminated arrow

2    boards, road cones.  And, we don't have that here.

3           What we have is a system that -- just focusing on

4    automatic emergency braking and forward collision warning,

5    which are not systems that are really unique to Tesla, those

6    are technologies that are driver assist technologies in a

7    variety of vehicles that -- they have limitations.  They have

8    speed limitations.  They have limitations in their ability to

9    slow a vehicle down, depending on -- and to avoid a collision,

10   depending on the speed that the vehicle is traveling at when

11   the technology activates, and the distance between the front of

12   that vehicle and the object ahead.  Those are the issues that

13   we're looking at here.

14          So I am concerned about how the results of the NHTSA

15   investigation might be used when they're eventually reached

16   here, because I think that they're going to be substantially

17   different.

18          THE COURT:  And let me ask --

19          MR. BRANIGAN:  Yes?

20          THE COURT:  -- in terms of the reducing the burden of

21   litigation, and streamlining the trial -- and this also factors

22   into the prejudice -- if the Court were to stay the case

23   pending the conclusion of the investigation, and the Plaintiff

24   agrees to produce key witnesses -- and I'm not certain who may

25   be left, if there are witnesses that are on the scene,

1    certainly you have the human factors expert and your other

2    engineer -- and if you were able to depose them to preserve

3    their testimony, would that lessen the prejudice to the

4    Defendant, and what harm would the Defendant suffer if the

5    Court were to permit that discovery to continue?

6            MR. BRANIGAN:  Well, there's a lot of technical

7    discovery that needs to be done here, including work by

8    experts, and we'd like that work to start now.  We've already

9    started that work.  We've invested in it.  We'd like our people

10   to finish.  From our perspective, it's work that Plaintiffs --

11   we think they've started it as well.  We'd like to get at the

12   work that they have completed thus far before more time goes

13   on.

14           You know, my client is operating in a

15   highly-competitive environment, where people with knowledge of

16   the technology at the company move from one company to another.

17   They become more difficult for us to work with over time.  Just

18   within the last 12 months that's occurred.  It's occurring

19   throughout this industry because this is such a fiercely

20   competitive environment, where people with very, very high

21   levels of technical knowledge are being attracted by one

22   company, you know, to leave their current employer.  That is a

23   legitimate practical issue for us.

24           Obviously, we don't want that to happen.  But we live

25   in the real world, and we know it does, and those people become

1    harder to reach over time.

2          THE COURT:  And did you want to speak to the

3    admissibility -- for example, if the NHTSA investigation shows

4    that there was no product defect in this 2019 Tesla Model S, do

5    you believe that those findings would be admissible in this

6    case?

7          MR. BRANIGAN:  Well, I think -- first of all, I'd like

8    the short answer to be absolutely.  But I've been doing this

9    long enough to know that it's rarely the right answer, and it

10   would depend on a number of things.

11         It would depend on whether there is substantial

12   similarity between the vehicles that NHTSA was looking at, the

13   crash scenarios that NHTSA was looking at, and our vehicle and

14   crash scenario here.  And I've just spent most of my time

15   telling you that I think there is not substantial similarity.

16         There are other issues that we've raised in the case

17   law that we cited to the Court about problems with

18   admissibility.  It depends on whether the -- the agency

19   information that one party would want to use -- in this case,

20   under your scenario, I suppose it would be us -- is final

21   determinations by NHTSA, and I don't know that it would be.

22         So I think that the easiest thing for me to say -- and

23   this is essentially what we've said in our response -- is that

24   there's a real open question about whether the findings of

25   NHTSA, the work of NHTSA in this investigation, would be

1    admissible for either party.

2              And I found it interesting -- I was struck by the

3    answer that brother counsel gave you.  It's a bit similar to

4    mine, but he wasn't willing to say:  "Yeah, if there's a

5    finding of no defect, it would be admissible against us."  And

6    he's also not necessarily willing to say:  "Yeah, if there's a

7    finding of no defect, we're just going to drop this case and

8    walk away."

9              THE COURT:  Well, that's a concern that the Court has,

10   is we get all the way to the end of the road, we wait for

11   NHTSA's determination, and then we litigate whether, in fact,

12   those findings and what NHTSA investigated are even similar at

13   all to the facts of Mr. McGee and the facts before the Court.

14   And that's where I do have somewhat of a concern.

15             But let me allow you to conclude your argument,

16   Mr. Branigan, and then I'll turn it over to Mr. Poses.

17             MR. BRANIGAN:  Sure.

18             Plaintiff's counsel said that it's really important

19   for him and his experts to allow the NHTSA investigation to be

20   completed while there's a stay, so that he could have access to

21   the technical information that is being collected by NHTSA from

22   Tesla.

23             Well, he has the power to conduct discovery in this

24   case as Plaintiff's counsel.  He has the -- and I'm not

25   encouraging him to do this, but he certainly has the legal

1   ability to serve us with discovery asking for the same kind of

2   technical information that he thinks NHTSA is asking Tesla to

3   produce in the investigation.  He just hasn't done it.  We have

4   not received a single discovery request from the Plaintiff in

5   this case, not one, and months of discovery have gone by, and

6   we've extended the schedule at least once.

7          The reason that we have the vehicle data from the

8   Tesla involved in this crash is because we, as counsel for

9   Tesla, arranged the inspection.  And it took some doing to

10  arrange the inspection.  We located the vehicle.  We moved the

11  vehicle to an inspection facility.  We got everybody together

12  that had an interest, including Mr. Poses and his experts, and

13  we took the steps necessary to extract that data.

14         So we're the --

15         THE COURT:  That wasn't at the Plaintiff's request.

16  There's been no written discovery in terms of these witnesses

17  George McGee, the investigating officer?  Those were

18  depositions that were prompted by the Defendant?

19         MR. BRANIGAN:  Yes.  I noticed those depositions -- I

20  and my colleagues on the defense side, we noticed those

21  depositions.  It took quite some doing to get the deposition of

22  Mr. McGee.  We finally got him deposed last month.  The

23  deposition of Corporal Riso was under our deposition notice.

24  That occurred in January.

25         We're the ones doing the discovery.  We've served

```
 1    discovery requests.  It's taken -- and I don't mean to be --
 2    I'm not trying to be critical of Mr. Poses.  He's a busy
 3    lawyer.  We're all busy.  We're all working under unusual
 4    circumstances.  But my point is, we've served the discovery.
 5    It hasn't happened conversely from the other side.
 6         I defend car companies in product liability litigation
 7    all over the country.  The bane of my existence is responding
 8    to discovery from plaintiffs.  They have every right to serve
 9    it, but I spend most of my working day responding to discovery
10    requests made to my automotive clients from plaintiffs.  So
11    they're all very good at doing it.  It's just not happening in
12    this case.
13         And so my point is that Mr. Poses doesn't have to wait
14    for Tesla to collect information from -- excuse me -- NHTSA
15    from -- he doesn't have to wait for NHTSA to collect
16    information from Tesla.  He can serve us with requests.  If he
17    doesn't want to, that's fine.  But it's within his power to do
18    so.
19         He made the comment about, you know, one of his
20    experts was Dr. Cummings, and she's no longer available to him
21    anymore.  Well, Dr. Cummings was hired by NHTSA.  I'm not quite
22    certain of her role.  I'm not sure if she's an employee or a
23    consultant.  But I'm certain of this:  She is not -- contrary
24    to the representations that have been made, she is not leading
25    the investigation that we're talking about here, conducted by
```

1    NHTSA.

2         It was reported widely in the media in January of this

3    year that Dr. Cummings was required to recuse herself from the

4    investigations at NHTSA involving Tesla.  She's not involved in

5    this.  We can see the identity of the investigators right on

6    the ODI Resume.  They're identified as Investigator Steven

7    Posada, Reviewer Gregory Magno, and Approver Steven Ridella.

8    No Dr. Cummings.  That's a bit of a side point, but I think

9    it's worth correcting because the Plaintiffs seem to make much

10   of the fact that Dr. Cummings is involved in this, when she is

11   not.  And there certainly are other experts that they can

12   consult with.  It's happening in other litigation that I'm

13   defending for Tesla right now.

14        So my point is:  There isn't -- and I think Your Honor

15   seized on this already.  There isn't a reason to stay the case

16   to wait for data, to wait for things to happen.  Mr. Poses has

17   identified data that he said he's already got, that he thinks

18   proves the vehicle is defective.  We agree he has data.  We

19   disagree with his interpretation of that data.  We don't think

20   it means what he thinks it means, but he clearly has the data.

21   He has experts.  He could hire more.  He has the power of

22   discovery.  He's conducted none.  Why?  He can tell you that.

23   I don't know why.  But he could ask us for the kind of data

24   that he says he needs to wait for NHTSA to collect.

25        THE COURT:  All right.

 1            MR. BRANIGAN:  I -- Your Honor, just to conclude here,

 2   you started your comments talking about the law and the

 3   standard that applies here.  And you're right.  We did cite the

 4   Garcia-Mir case, but we cited some other cases as well, and

 5   Plaintiff's counsel cited cases in his brief.  And even if we

 6   look at the case cited in Plaintiff's counsel's brief that

 7   relates to the legal basis for a stay, or the requirements that

 8   the Plaintiff must meet, I don't think these requirements have

 9   been met here.  I don't even think we're close to them being

10   met.

11            For example, yes, Your Honor absolutely has discretion

12   to stay the proceedings.  But the stay should not be entered

13   unless the Plaintiff can show that -- you know, after a

14   balancing test is applied, where Plaintiff bears the burden of

15   showing a clear case of hardship or inequity, I don't think

16   that exists here at all.  I think what the record shows is a

17   clear case of inactivity, but not hardship or inequity.

18            And I also think that there is a likelihood that Tesla

19   will be harmed if this case doesn't have some certainty, and it

20   lingers on and on and on, and then we get to the end of the

21   NHTSA investigation and we're fighting about whether it's

22   admissible and what it means.

23            So Your Honor, I think the Plaintiff has not met the

24   burden that they're obligated to meet to ask this Court to stay

25   the proceedings, and we would ask that the Court deny the

1   motion.

2          Just one last point.  I'm mindful of the fact that our

3   scheduling order for discovery is really, really close to the

4   end.  And I wrote Mr. Poses an email yesterday, and I said to

5   him:  "You know, Todd, as you know, we oppose your request for

6   a stay, but we are willing to agree to a reasonable extension

7   of time of the dates."

8          And I think, rather than a stay, a reasonable

9   extension of the dates is what would make more sense here.  The

10  expert disclosures were due on March 15.  We're obviously past

11  that.  And as the Court probably remembers, the parties did

12  submit a request to extend that deadline until after you ruled

13  on this motion.  The discovery is to be completed by tax day,

14  this Friday, April 15.  So we're right on top of that.  And

15  then pretrial motions are due on April 29.  So we're just a

16  couple weeks away from that.

17         So I just want to be clear that, while we absolutely

18  object to and request that no stay is issued, we're willing to,

19  if the Court permits, agree to an extension -- a reasonable

20  extension of the dates.

21         THE COURT:  Thank you, Mr. Branigan.

22         MR. BRANIGAN:  Thank you.

23         THE COURT:  I appreciate that.

24         Mr. Poses, why has the Plaintiff not conducted any

25  discovery in this case?

1        MR. POSES:  Okay.  The reason why is because the type

2  of discovery that we believe will illuminate the issues that we

3  care about is exactly what NHTSA has subpoenaed.  They've gone

4  deep into Tesla to get all of their records, because Tesla

5  keeps records not just of the vehicles at issue, but all of

6  their records and their failures.  And so those are the very

7  types of things that have been objected to all over the

8  country, held up in litigation.  Our case is from 2021.  There

9  are cases from 2016 and '17 still held up on those very same

10  issues before courts --

11        THE COURT:  Specifically, tell me what issue is

12  present in this case that you believe that there would be an

13  objection that obviated your desire or requirement to conduct

14  discovery on your client's behalf.

15        MR. POSES:  It's the scope of knowledge that Tesla had

16  that the camera system that they have designed specifically for

17  their cars, and is present in no other vehicle in the world, is

18  actually failed and flawed.

19        THE COURT:  But I asked you, before I turned the

20  argument over, whether you deposed any of Tesla's

21  representatives, or even any of their experts, and you have not

22  done that to even find out that that answer.

23        MR. POSES:  Because I won't get the answer.

24        THE COURT:  But how do you know?  In other words, if

25  you haven't submitted even written interrogatories, or sought

```
 1    to depose a representative of Tesla or their designated
 2    experts, how do you know you're not going to get that
 3    information?
 4          MR. POSES:  Because no one gets it all over the
 5    country, and there are so many -- there's so much precedent of
 6    that in every jurisdiction where there's a Tesla case.
 7          THE COURT:  I don't know if that helps to satisfy your
 8    burden, if you haven't even made the effort.
 9          MR. POSES:  I don't have -- my only answer is that it
10    was going to be, in my opinion -- consulting with people
11    locally and people in San Francisco who have a number of these
12    cases, that they have been held up for years on those same very
13    issues, and when NHTSA decided they were going to investigate
14    this case, and get that information, and more of it, for me, it
15    was a decision that I made that, instead of moving forward with
16    an incomplete set of facts and understanding, that we would get
17    that very same thing from this NHTSA investigation.
18          I want to tell you why the NHTSA investigation in this
19    case -- Mr. Branigan gave somewhat -- and I agree with
20    everything Mr. Branigan said.  I respect him and Henry
21    personally.  But I think that the way in which they're looking
22    at this case in terms of autopilot and saying it was disengaged
23    is a red herring.  There's a flashing red light right near this
24    car, and this is about -- which is pretty important here, when
25    we're looking at this accident as it relates to that subset of
```

1    accidents they're looking at.  It's not to suggest that it's

2    identical, but it's substantially similar.

3          But the larger picture, and most important thing, is

4    what they're looking at to determine the defect.  It's not just

5    those accidents, but all of the data that Tesla can give them

6    to show that they knew -- that they knew, that these problems

7    existed long before this investigation, and did nothing,

8    nothing, about it.

9          And so I'm not going to get that as local lawyer here

10   against Tesla, when it's been -- you know, when all over the

11   country they've said:  "No," and it's held up in litigation as

12   to what they're going to give.  There are hearings all over,

13   and they are still objecting to it.

14         NHTSA has the ability and power to get me that

15   information without the Court's involvement.

16         THE COURT:  Well, let me then turn it back to your

17   experts.  What expert has advised you that he or she is in need

18   of specific data that can only be obtained through the NHTSA

19   investigation, as opposed to through Mr. Branigan and Tesla?

20         MR. POSES:  The NHTSA investigation, from our

21   understanding, is going to reveal something that I can't get

22   just in this case.

23         THE COURT:  Specifically, what has your expert told

24   you that the NHTSA investigation, in terms of the data, has

25   that Tesla does not?

1          MR. POSES:  That Tesla knew, and for years, that their

2     camera system was a failure.  That's what we believe is going

3     to be revealed in the NHTSA investigation.  They're not going

4     to admit that.  They're not going to give us data that's going

5     to support that.  They'll never say that in a deposition or in

6     an interrogatory.

7          But it's our understanding and belief, and others'

8     understanding and belief that this camera system that's unique

9     to Tesla and different than the LiDAR system that's used with

10    ever other vehicle, which is the international standard, is no

11    good, that it fails, that it's defective, that it doesn't work,

12    and it doesn't work for a variety of conditions.

13         And the converse of that is that Tesla has taken a

14    position that it's better than all other systems, that it can

15    be relied on more frequently and in more variety of conditions.

16         And so you have a subset of information that NHTSA can

17    achieve and evaluate based on all the data they've extracted

18    and are going to extract from Tesla.  That is a fact that I

19    can't get to in my litigation.

20         THE COURT:  But Mr. Poses, you do understand that you

21    have just told the Court that the data that you can only get

22    from NHTSA would be that Tesla knew for years that the camera

23    was a failure.

24         MR. POSES:  Yeah.

25         THE COURT:  There is nothing within this ODI Resume

1   that reflects that NHTSA is investigating the knowledge on the

2   part of Tesla for years that the camera was a failure.  In

3   fact, they are very specific in terms of their investigation of

4   a very specific number of vehicles involved in specific

5   accidents.

6           MR. POSES:  That's true.  Those are the subset of

7   accidents they're investigating.  Absolutely.  But what -- but

8   the data that they're going to look at is going to be not just

9   those accidents in a vacuum.  They're going to look at the

10  system in general and Tesla's ability, or lack thereof, to fix

11  it, when they knew that there was an issue.  That's what we

12  believe is part and parcel to the NHTSA investigation, which is

13  why it weighs heavily on our case.

14          And so, when we think about this camera system, we

15  don't look at it in a vacuum.  We look at it as the main reason

16  why which Tesla says that their system is better.  They say

17  their camera system is able to absorb information, turn it into

18  artificial intelligence, and that the car is going to react

19  accordingly.  And for years people have posted videos online

20  showing Teslas driving straight at mannequins, or people

21  walking across the street, or dummies and things like that, and

22  showing it doesn't work.  And finally, NHTSA is going to do the

23  work that has been asked for them to have done for years.

24          I will tell the Court, in 2017, there was a NHTSA

25  investigation slated by President Obama, and it was canceled by

1    the second -- by the next administration, and it was going to

2    investigate those same facts and those same issues.  And now

3    we're four or five years later, and this NHTSA investigation is

4    long awaited about the potential failure of this camera system.

5    And so, you know, this is not a subset of 11 accidents that

6    we're going to look at, because that wouldn't be worthy of all

7    their time.  This is to look at a larger issue that weighs and

8    impacts heavily on our case.

9          And so I -- you know, I don't -- you know -- you know,

10   I'm trying not to speak in a way in which is going to -- you

11   know, I can only prove what I can prove.  So I don't want to

12   take the NHTSA investigation and suggest that it's something

13   larger than it is without a basis or knowledge.  But it is my

14   good-faith belief that's exactly that they're looking at, is

15   this very system that failed in our case and why it failed in

16   these accidents.  But the "why" is going to be based on all the

17   data that Tesla has to give NHTSA for them to evaluate.

18         And again, it's our belief that Tesla knew that this

19   strange subset of accidents that's exclusive to Tesla is

20   because of their camera system -- that they knew it, and that

21   is germane to our case.

22         THE COURT:  And specific to the data in this case, has

23   your expert looked at the data to determine whether what

24   Mr. Branigan has stated, that the traffic control cruise

25   control was activated but overridden by Mr. -- I believe it's

1   Mr. McGee.

2           MR. POSES:  Mr. McGee.

3           THE COURT:  Yes.

4           MR. POSES:  And we have no -- again, that's a red

5   herring.  We don't believe that it was -- oh, you know, I

6   understand Mr. Branigan disagrees.

7           THE COURT:  But how is that a red herring, based on

8   Mr. McGee's particular actions in this case?  I mean, that led

9   to filing an action against Mr. McGee based on his erratic

10  driving.

11          So I understand that that was resolved and this is

12  against Tesla.  But Mr. McGee's actions on that evening are

13  certainly relevant, and the data that stores and preserves the

14  driver's actions are certainly relevant.  So has your expert

15  looked at the data to determine whether, in fact, it was

16  overridden or disengaged by Mr. McGee?  I mean, that's the

17  critical fact that would have a bearing as to whether this

18  investigation would be similar or not.

19          MR. POSES:  And we disagree.  Now, that's why we

20  disagree --

21          THE COURT:  But has the expert looked at the data,

22  your expert?

23          MR. POSES:  Yes.  Yes.  But that, to me -- and with

24  all due respect to the Court and Mr. Branigan, that, to me, is

25  the red herring.  That's the issue that I'm trying to

1    illuminate here, is that the collision avoidance system, the

2    camera technology, independent of that happening or not, if I

3    agreed with Mr. Branigan's -- and I think that I do.  And we

4    took Mr. McGee's testimony.  It's very clear what he did that

5    evening.  I don't think anyone has any misinterpretation of

6    what happened with Mr. McGee, but that's not the issue here.

7         The issue is that there's a camera system where there

8    are road signs, a flashing red light, and then a car beyond it,

9    that are very similar, eerily similar, to what's being

10   investigated at present by NHTSA.  That flashing red light is

11   not the red herring.  That is the critical issue that makes

12   this case very similar to those cases, a flashing red light,

13   just above and very close to this vehicle that's stopped in the

14   middle of the road.  It's right there, and this camera system

15   doesn't see any of it.

16        THE COURT:  All right.  So that's the collision

17   avoidance.  So are you conceding that based on the data that

18   the autopilot was disengaged at the time because of Mr. McGee's

19   actions?

20        MR. POSES:  I don't know if that's the correct term.

21   And I apologize.  This is me.  I mean, I'm not quarreling with

22   you in any way.  The autopilot, according to Mr. McGee, was on.

23   Whether it was disengaged as a matter of engineering based on

24   his overriding because he had his gas on the pedal, I don't

25   have a comment on that --

1      THE COURT:  But does your expert have a comment?

2  Because I think that's critical in terms of the similarity of

3  the NHTSA investigation versus the facts of this case.

4      MR. POSES:  And we don't think so.  That's the point,

5  is that the NHTSA investigation is looking at the ability of

6  the Tesla to receive data and interpret it correctly with their

7  camera system.  That is what is being investigated.

8      The autopilot could be on or off, but that camera

9  system is the intelligence.  That's the brain of the car.  And

10  it is going right at these emergency vehicles because it sees

11  something and interprets it the wrong way.  And we think that

12  happened here.  And so -- and we've got those flashing red

13  lights and flashing lights.  We have got a parked vehicle.  It

14  drives straight into it and doesn't recognize it in any way.

15      And so while -- if it disengaged right before it

16  blasted in through the signs and blasted into the truck, it may

17  have.  But it still didn't recognize it, despite what they have

18  advertised and what it's supposed to do.

19      THE COURT:  But Mr. Poses, you're arguing the point

20  without bringing forth any information that your expert even

21  reviewed it and is frustrated because he or she needs some

22  information from -- through the NHTSA investigation or through

23  Tesla that he or she does not have.

24      MR. POSES:  I apologize.

25      THE COURT:  And I think that's your burden.

1      MR. POSES:  Yeah.  So I apologize.  I didn't address

2  that.  They do.  When I spoke to John Lee, who is the human

3  factors expert, part of his analysis also is implicit in the

4  NHTSA investigation because we believe that the NHTSA

5  investigation, after -- there are drivers of all of these 11

6  cars.  They're all going to be deposed.  They're going to give

7  statements to NHTSA.  They're going to say what it is they

8  experienced and why, and what their actions or lack thereof

9  were.

10      Those, we think, are extremely relevant.  And John Lee

11  has already said he would -- that that information is critical

12  to him.  Because if it's substantially similar to Mr. McGee,

13  then you can rely on this same set of accidents as similar as

14  well.  Our guy at Kimley-Horn is saying:  "Well, let's wait.

15  Let's wait for all this data," because the only -- the best

16  source of information is going to be the federal government

17  extracting everything that we can't get all the stuff on our

18  own.

19      And it's then that we can weigh in more heavily on the

20  defect, on Mr. McGee's actions versus -- I mean, Judge,

21  understand -- and we've talked about this plenty.  Mr. McGee --

22  and I said this in the beginning -- was the captain of the

23  ship.  But there are two factors that are being looked at here

24  as to why the comparative negligence, you know, is -- or not

25  comparative, but contributory negligence of a Fabre defendant

```
 1    is de minimis.  And it's for the reasons that we're talking
 2    about.  One, that the car should have acted a certain way.  And
 3    two, that he would have acted a certain way, but because of his
 4    continued reliance and his vigilance decreasing over time, that
 5    these are the types of things that happen.  They're looking at
 6    these things in the NHTSA investigation.
 7         And so these two experts of mine -- when I consulted
 8    with Dr. Cummings, when I've spoken to other lawyers around the
 9    country -- and their experts are having the same frustration.
10    They also want this swath of information because it will assist
11    them in understanding not just why the Tesla works or why it
12    fails, but, most importantly, Judge, that Tesla knew this for
13    years and did nothing about it.
14         THE COURT:  But Mr. Poses, the similarity begins and
15    ends with your concession that the data shows that the
16    autopilot was disengaged by Mr. McGee based on his
17    acceleration.
18         MR. POSES:  Again, Judge, that's the red herring.
19    That doesn't matter.  This is about the -- the autopilot
20    engaged or disengaged has nothing to do with the cameras and
21    their ability to detect objects in front of it and accordingly
22    stop and warn the driver.  That is going to happen independent
23    of the autopilot being engaged or not.
24         THE COURT:  But the data that you have received
25    through Tesla would show you whether the Object and Event
```

1    Detection and Response System alerted the driver, would it not?

2          MR. POSES:  The answer is:  It did not.  And the issue

3    is why.  And what I was talking to Your Honor about before is

4    that's what's most important in any case, is when a jury is

5    deliberating -- and we've watched in this case in focus

6    groups -- when they're deliberating, why didn't it work and

7    what did Tesla know or what did they do to fix it if there was

8    some problem with it?  That's what we're looking at here.

9    That's what the NHTSA investigation is.

10         And so when you're sitting there and looking at the

11   curiosity of a handful of panels who all are saying the same

12   thing, we know that that's the critical issue, and it's what's

13   going to be addressed by NHTSA.  And that's an authority that

14   won't have experts battling.  Potentially, they will over

15   certain issues, but certainly there's going to be a large

16   weigh-in with information to back it up as to why.  And that,

17   you know, has proven, in my experience in this case, to be the

18   most critical issue that people are trying to understand best.

19   And I think that's what NHTSA's going to tell us.

20         THE COURT:  All right.  And I thank each of you for

21   your time.  I certainly have asked enough questions with regard

22   to the autopilot, the Advanced Driver Assistance System, and

23   the Object and Event Detection and Response System, which is

24   the collision avoidance system that you referred to.  And it

25   appears to the Court that the NHTSA investigation with regard

1    to these specific 11 vehicles that were involved in first

2    responder accidents where the autopilot engaged, shows the

3    Court the dissimilarity even from the beginning with regard to

4    the ultimate conclusion.  And the ultimate conclusion will be

5    with regard to whether the autopilot was engaged and whether

6    the OEDR system would have detected those -- specifically what

7    they refer to as first responder vehicle lights, flares, an

8    illuminated arrow board, and road cones.  And that's -- all

9    that the Court can learn from the motion is the ODI Resume and

10   the extent of the NHTSA investigation.

11        But I do not believe that staying the case would

12   promote judicial economy.  I don't believe that it would reduce

13   prejudice or prevent the possibility of inconsistent

14   resolutions.  And an indefinite stay in this matter, which

15   would be at the very least for one year, and as it's clear to

16   the Court, there would then be another EA stage to the extent

17   that there were identified problems in these 11 vehicles -- I

18   think an indefinite stay would prejudice the Defendant.

19        I don't believe it would simplify the issues and

20   streamline the trial.  And I don't think that it would reduce

21   the burden of litigation because I think, in the end, the

22   question is whether the NHTSA investigation would be even

23   relevant.

24        At this point, I will certainly extend the period of

25   time for the parties to engage in discovery.  And Mr. Poses,

1    I'll turn to you to advise the Court how much time you would

2    need to engage in discovery from this point forward.

3           MR. POSES:  Thank you, Judge.

4           And I appreciate the time this morning.  What I would

5    ask the Court ore tenus is that we do both an extension for the

6    discovery and also perhaps to accommodate the amount of

7    discovery that likely is anticipated as to also move the trial

8    so that we can accommodate all this discovery that we intend to

9    do.  And you know, I certainly can consult with Tom and Henry

10   about what works best, if the Judge --

11          THE COURT:  Yes.  How much time do you need?  I'll

12   certainly give you the time for discovery and then I'll push

13   the trial forward.

14          MR. POSES:  That's fine.  That's great.

15          THE COURT:  How much time do you need?

16          MR. BRANIGAN:  Your Honor, I had proposed yesterday

17   120 days for the dates other than trial.  So extending all

18   dates 120 days is what I had proposed, and I sent that

19   proposition to Mr. Poses yesterday.

20          THE COURT:  That would take us to August.  Would that

21   give you enough time for the discovery and then we would

22   obviously move the trial?

23          MR. POSES:  I'd like 30 -- I'd like into September.  I

24   know during summer is difficult with travel schedules, and

25   things like that, of probably all of us.

1        MR. BRANIGAN:  No objection.

2        THE COURT:  So five additional months for discovery?

3        MR. POSES:  Judge, if I could, to be very careful, can

4    we extend it to October, instead of August?

5        THE COURT:  Any objection to a -- and the reason I

6    think it may be appropriate is you haven't engaged in any

7    discovery in this case.

8        MR. POSES:  Yeah.

9        THE COURT:  Is there any objection?

10       MR. BRANIGAN:  October is fine, Your Honor.

11       THE COURT:  All right.  So then the Court will extend

12   the discovery period, and obviously that will extend the

13   pretrial motions and the calendar call and the trial.

14       And let me just state for the record, with regard to

15   Docket Entry 24, the Plaintiff's motion to stay the case

16   following the conclusion of the NHTSA investigation would be

17   denied.

18       Is there anything further that the Court can assist

19   with?

20       MR. POSES:  Thank you, Judge.

21       MR. BRANIGAN:  Your Honor, just with respect to the

22   trial date, will you just send us a trial date?  The reason I'm

23   asking is because I don't have my phone and my laptop, and

24   that's where I keep my trial schedule, and if you were inclined

25   to set a date right now --

1        THE COURT:  Well, I can share you with that Docket

2   Entry 20 is the order amending the scheduling order.  I'm now

3   going to move the discovery from April -- yes -- from April

4   15th until October 15th.  So that will inevitably move the

5   calendar call four months forward.  So that would take us most

6   likely into January.

7        MR. BRANIGAN:  All right.

8        If I look at my trial schedule once I get back online

9   and discover that I've got like five trails already in

10  January -- which may sound facetious, but it's somewhat real

11  these days -- can we advise the Court?

12       THE COURT:  Yes.  Of course.

13       MR. BRANIGAN:  Okay.

14       THE COURT:  The scheduling order is obviously to

15  assist the parties in terms of the discovery.  But if the

16  ultimate trial date becomes an issue, then we can address that

17  as we get closer to trial.

18       MR. BRANIGAN:  Thank you, Your Honor.  Appreciate the

19  Court's time.

20       THE COURT:  All right.  Take good care.

21       Thank you for your time.  Thank you for educating me.

22     (Proceedings concluded at 10:22 a.m.)

23

24

25

57

1    UNITED STATES OF AMERICA       )

2    ss:

3    SOUTHERN DISTRICT OF FLORIDA  )

4                    C E R T I F I C A T E

5           I, Yvette Hernandez, Certified Shorthand Reporter in

6    and for the United States District Court for the Southern

7    District of Florida, do hereby certify that I was present at,

8    and reported in machine shorthand, the proceedings had the 12th

9    day of April, 2022, in the above-mentioned court; and that the

10   foregoing transcript is a true, correct, and complete

11   transcript of my stenographic notes.

12          I further certify that this transcript contains pages

13   1 - 57.

14          IN WITNESS WHEREOF, I have hereunto set my hand at

15   Miami, Florida, this 15th day of January, 2024.

16

17                      /s/Yvette Hernandez
                        Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
18                      400 North Miami Avenue, 10-2
                        Miami, Florida 33128
19                      (305) 523-5698
                        yvette_hernandez@flsd.uscourts.gov
20

21

22

23

24

25