**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO: 21-cv-21940-BLOOM/Otazo-Reyes**

NEIMA BENAVIDES, as Personal
Representative of the Estate of
NAIBEL BENAVIDES LEON, deceased,
And DILLON ANGULO

       Plaintiffs,

v.

TESLA, INC. a/k/a TESLA FLORIDA,
INC.,

       Defendant.

_____/

**PLAINTIFFS' MOTION TO MODIFY PROTECTIVE ORDER
AND MEMORANDUM OF LAW IN SUPPORT**

      COME NOW Plaintiffs Neima Benavides, as Personal Representative of the Estate of

Naibel Benavides Leon, deceased, and Dillon Angulo, pursuant to Federal Rules of Civil

Procedure 16(b)(4) and 15(a), and hereby file this Motion to Modify the Protective Order entered

by this Court on July 7, 2023, [Exhibit 1] and Memorandum of Law in Support.

**INTRODUCTION**

      Plaintiff, Dillon Angulo, was severely injured, and Naibel Benavides Leon died when

George McGee's Tesla vehicle drove into the parked vehicle Plaintiffs were standing beside.  Mr.

McGee was driving with Autosteer, a component of Tesla's Autopilot, engaged at the time of the

collision. Plaintiffs have alleged, among other claims, that McGee's Tesla vehicle was defective

because 1) it lacked a driver monitoring system that effectively ensured the driver was adequately

aware and attentive to the driving tasks when the Autopilot/Autosteer system was active; and 2)

that Tesla programed Autopilot/Autosteer system such that drivers could foreseeably misuse the system in situations where its functionality was known to be limited.

**This Product Liability Case Involves Tesla's Autopilot System that Was Subject to a Safety Recall.**

On December 12, 2023, the National Highway Traffic Administration, [NHTSA] issued its Part 573 Safety Recall Report concerning a recall of all Tesla vehicles equipped with Autosteer. [See Exhibit 2]. This recall potentially involved 2,031,220 vehicles, virtually every Tesla made since October 5, 2012. [Id., p. 1]

NHTSA described the Autopilot defect in part, saying, "In certain circumstances when Autosteer is engaged, the prominence and scope of the feature's controls may not be sufficient to prevent driver misuse of the SAE Level 2 advanced driver-assistance feature." [Id., p. 3]

NHTSA described the safety risk as follows: "In certain circumstances when Autosteer is engaged, if a driver misuses the SAE Level 2 advanced driver-assistance feature such that they fail to maintain continuous and sustained responsibility for vehicle operation and are unprepared to intervene, fail to recognize when the feature is canceled or not engaged, and/or fail to recognize when the feature is operating in situations where its functionality may be limited, there may be an increased risk of a collision." [Id.]

Plaintiffs have alleged claims against Tesla concerning these defects in the McGee vehicle. [See Exhibits 3 and 4]. Further, Plaintiffs have moved jointly for leave to amend their complaint based on these new NHTSA findings and Tesla's inadequate response to them. [See DE 165]

Plaintiffs' attorneys know of at least 13 other fatal incidents involving crashes when Tesla's Autopilot was engaged, with 11 currently in litigation. However, recent investigative reports indicate a far higher number of these incidents.[1] The allegations in all these cases, i.e., that Tesla's

---

[1] Faiz Siddiqui and Jeremy B. Merrill, *"17 Fatalities, 736 crashes: The shocking toll of Tesla's Autopilot,"* The Washington Post, June 10, 2023, https://www.washingtonpost.com/technology/2023/06/10/tesla-autopilot-crashes-elon-musk/

Autopilot system, which includes Autosteer, is dangerously defective, involve similar discovery requests from the Plaintiffs, and likely similar objections from Tesla.

**The Current Sharing Provision and Plaintiffs' Proposed Modification**

The current Protective Order [Exhibit 1] provides a provision allowing limited sharing of confidential material with other attorneys in pending lawsuits. That provision, at Paragraph 16(i), reads:

> a.    Other attorneys of record in other pending lawsuits against Tesla, Inc., in the United States of America involving the same alleged defect claims as stated in Plaintiffs' operative complaints involving **a 2019 Tesla Model S with HW 3.0, Software version 9.0**, resulting in personal injuries and/or death. [*Id. emphasis added*].

Plaintiffs hereby seek to modify this language as follows:

> a.    Other attorneys of record in other pending lawsuits against Tesla, Inc. in the United States of America involving the same alleged defect claims as stated in plaintiffs' operative complaints, involving **the Autopilot/Autosteer system in any Tesla vehicle equipped with Autopilot**, resulting in personal injuries and/or death ("Sharing Attorneys").

**There Is No Longer Any Basis for Limiting Sharing to Certain Models or Software Versions**

NHTSA's recall applied to "All versions of Autosteer leading up to the version(s) that contains the recall remedy." [Exhibit 2, p. 4] Thus, NHTSA's recall makes no distinction between various Models, Model Years, Hardware Versions, or Software Versions in Tesla's vehicles. [Id., pp. 1-2] NHTSA found that all Tesla vehicles equipped with Autosteer had the same defects. [Id., p. 4] Therefore, all claims related to the defective nature of Tesla Autopilot's Autosteer function

share the same facts relative to the design, programing, and function of Autosteer, as well as Tesla's attempts to comply with NHTSA's defect findings.

Accordingly, Plaintiffs seek a Protective Order that will allow Plaintiffs' counsel to share Discovery in this case with select people, including attorneys in other cases involving Tesla Autopilot's Autosteer function.

## II.    ARGUMENT

**1.    Overview of Plaintiffs' Proposal and the Disputes at Issue.**

Plaintiffs' Proposed Protective Order provides for a very specific, Court supervised mechanism for protecting privileged material, while allowing a limited degree of sharing to take place.[2] The Proposed Order specifically limits dissemination of privileged material to certain categories of people, under strict rules to protect Tesla's rights. All people receiving privileged material would be bound by signed agreements and subject to this Court's supervision.[3] The bulk of these would be directly associated with this case, such as attorneys, their staff, outside litigation support contractors, expert witnesses, and court personnel. All parties essentially agree on these provisions.[4]

The defects described in NHTSA's recall apply to all cases involving Tesla's Autopilot/Autosteer system. Allowing Plaintiffs to share discovery related to that system with other attorneys in those cases would not burden Tesla, it would in fact reduce their burden.

The parties have been unable to agree on Plaintiffs' counsel's qualified right to share/discuss the substance of information produced by Tesla with other counsel involved in litigating substantially similar claims regarding Tesla's Autopilot. Plaintiffs maintain that these

---

2    Plaintiffs' Proposed Protective Order, pp. 10-13, Par.8.2.
3    See Exhibit A to Plaintiffs' Proposed Protective Order.
4     See Tesla's proposed Confidentiality Agreement and Protective Order

provisions are consistent with the Court's inherent authority, the Rules of Procedure, case law, and the interests of justice. Plaintiffs set out this argument and authority below.

## 2.     This Court's Discretionary Authority

The issue to be resolved relates to the scope of a protective order. Plaintiffs are not – at this juncture – challenging Tesla's right to unilaterally designate materials as confidential. Instead, we address the importance of allowing for limited disclosure outside the confines of this lawsuit. The formulation of a protective order – once the need for confidentiality is proven – rests with the Court's discretionary authority to supervise litigation.[5] A trial court must balance the various interests in deciding whether [and to what extent] dissemination of the documents should be restricted.[6] Plaintiffs' proposed order includes provisions to prevent the disclosure or discussion of Tesla's data with its competitors or the public. Specifically, the order states,

> "Such Protected Material may be disclosed only to the categories of persons and under the conditions as are described herein. Under no circumstances should this Order be read to allow disclosure of any Protected Material to a Trade Competitor of Defendant." [7]

In regard to sharing material with other counsel, Plaintiffs' Proposed Order allows sharing only with:

> 16(i)   "Other attorneys of record in other pending lawsuits against Tesla, Inc. in the United States of America involving the same alleged defect claims as stated in plaintiffs' operative complaints, involving **the Autopilot/Autosteer system in any**

---

5   Fed. R. Civ. Proc. 26(c).
6   *Id.*
7   *Plaintiffs' Proposed Protective Order, p.7, Paragraph 17.i.*

**Tesla vehicle equipped with Autopilot**, resulting in personal injuries and/or death ("Sharing Attorneys").

>    (1)    Each Sharing Attorney shall sign Exhibit A annexed hereto and agree to be subjected to the jurisdiction of this Court for enforcement of the Protective Order prior to receiving any Confidential Information;

>    (2)    Each Sharing Attorney shall provide the original or a copy of the executed Exhibit A to the counsel in these Actions who provided Confidential Information to the Sharing Attorney;

>    (3)    Counsel for all Parties to these Actions shall maintain the originals and/or copies of the Exhibit A that are executed by Sharing Attorneys;

>    (4)    Sharing Attorneys shall only use Confidential Information for purposes of the specific case or cases for which the Sharing Attorney is counsel of record or for purposes related to these Actions; and

>    (5)    Sharing Attorneys shall not further share Confidential Information with anyone other than the category of persons or entities described above in subparagraphs a-h, for the specific case or cases for which the Sharing Attorney is counsel of record, and only after the persons or entities have executed the Exhibit A.  Sharing Attorneys shall not further share Confidential Information with any counsel, person or entity not described above."[8]

The underlying predicate for these provisions arises from accepted principles. Generally, what transpires in the courtroom is public property. When information produced in pre-trial discovery is deemed confidential, courts encourage sharing provisions with certain limitations to

---

[8]  *Id.*

protect trade secret information or confidential research, development or commercial information from being revealed to a defendant's competitor.  A party seeking to restrict discovery or the sharing thereof  must show "a particular and specific demonstration of fact as distinguished from stereotyped conclusory statements."[9] Sweeping predictions of injury and "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning," do not justify a protective order.[10] As Plaintiffs set out below, such sharing is not only consistent with this Court's inherent discretionary authority, it is well supported by the Rules of Civil Procedure, case law, and public policy.

Plaintiffs seek an order that would maximize efficiency, protect Defendant's privileges, and promote justice. Plaintiffs' proposed order fulfills Federal Rule of Civil Procedure 1's command that all of the civil rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."[11]  Sharing provisions have been embraced by jurisdictions around the country because they accomplish precisely what Rule 1 demands – an increase in both the efficiency and the fairness of the system.[12] Moreover, the sharing provision proposed by Plaintiffs is fully consistent with Rule 26, in that it will not harm Defendant because only a narrow class of similarly situated plaintiffs, not competitors, may receive

---

9    United States v. Garrett, 571 F.2d 1323, 1326 n. 3 (5th Cir.1978).

10   Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3rd Cir.1986).

11   Fed. R. Civ. P. 1 (emphasis added).

12   See, e.g., Pincheira v. Allstate Ins. Co., 190 P.3d 322, 324 (N.M. 2008); Garcia v. Peeples, 734 S.W.2d 343, 346 (Tex.  1987); Raymond Handling Concepts Corp., 39 Cal.  App.  4th at 591; Miller v.  Gen. Motors Corp., 192 F.R.D.  230, 231 (E.D.  Tenn.  2000); see also Ward v. Ford Motor Co., 93 F.R.D.  579, 580 (D.  Colo.  1982); Cowan v.  Gen.  Motors Corp., 06-1330-MLB, 2007 WL 1796198 (D. Kan. June 19, 2007); Brownlow v. Gen. Motors Corp., CIV. A. 3:05CV-414-R, 2007 WL  2712925 (W.D.  Ky.  Sept.  13, 2007); Kamp Implement Co., Inc.  v.  J.I.  Case Co., 630 F. Supp. 218 (D.  Mont.  1986); Duling v.  Gristede's Operating Corp., 266 F.R.D. 66 (S.D.N.Y.  2010); Idar v.  Cooper Tire &  Rubber Co., C-10-217, 2011 WL  688871 (S.D.  Tex. Feb.  17, 2011); In re Abbott Laboratories Sec.  Litig., 92-C-3869, 1993 WL  616693 (N.D.  Ill. Nov. 15, 1993); Am. Honda Motor Co., Inc.  v. Dibrell, 736 S.W.2d 257, 258 (Tex.  App. 1987) (holding that trial court did not abuse its discretion by signing a sharing protective order); see also In re QSS, 05-10-00801-CV, 2010 WL 4192897 (Tex. App. Oct. 26, 2010), mandamus dismissed (Mar.  4, 2011).

documents under the provision.[13] Indeed, Plaintiffs' proposed sharing provision is narrowly tailored to avoid injuring Defendant. Finally, discovery sharing provisions are favored over later intervention and modification procedures.[14]

### 4.      The Benefits of Discovery Sharing Are Widely Accepted by Courts

Sharing provisions are widely accepted as part of a protective order.[15] "Protective orders may, of course, authorize disclosure of confidential documents to counsel in other related cases . . . [because] discovery already completed should ordinarily be made available to litigants in the other cases."[16] Further, "Shared discovery is an effective means to insure full and fair disclosure. Parties subject to a number of suits concerning the same subject matter are forced to be consistent in their responses by the knowledge that their opponents can compare those responses."[17]

### 5.      Sharing Increases Litigation Efficiency and Fairness

### a.      No "Reinventing the Wheel"

Sharing discovery facilitates the exchange of discovery without requiring litigants to "reinvent the wheel" in similar cases.[18]  Courts  have aptly noted that denying a request for a sharing provision "forces similarly situated parties to go through  the  same  discovery  process time  and time  again,  even  though  the  issues  involved  are  virtually identical."[19]  Indeed, "[a]

---

13  *Id.*
14  *Kamp Implement Co., Inc. v. J.I. Case Co.*, 630 F. Supp. 218, 220 (D. Mont. 1986).
15  See fn 14 above.
16  *Manual for Complex Litigation* § 21.431, at 53 n. 61 and § 31.13, at 258 (2d 1985).
17  S. Baldwin, F. Hare, F. McGowan, *The Preparation of a Product Liability Case* § 5.2.5 (1981).
18  Kraszewski v.  State Farm Gen.  Ins.  Co., 139 F.R.D. 156 (N.D.  Cal.  1991)(modifying protective order to allow sharing because "[i]t simply does not make sense to force...counsel to reinvent the wheel and to promulgate discovery requests and take depositions when much of the same discovery has already taken place").
19  *Id.*

protective order prohibiting discovery sharing can make other litigation more difficult, costly and less efficient."[20]

      b.    **Streamlines Discovery Requests**

Sharing reduces the number of discovery requests and responses required by litigants. Sharing provisions allow lawyers to collaborate and specifically tailor requests to the real needs of the case,[21] and fill gaps in the shared production, rather than starting from scratch.[22] Plaintiffs become more able to tailor requests to specific types, titles, and even bates ranges of documents.

      c.    **Conserves Judicial Rescources**

Discovery sharing conserves scarce judicial resources by minimizing discovery disputes. This is especially true in cases with multiple mind-numbing motions to compel that cover dozens, or even hundreds, of requests and could involve hundreds of thousands of documents.  When fully litigated, even mundane discovery disputes can consume many hours of Court time.    And Court time is just one cost to the system.  Both defendants and plaintiffs may spend hundreds of hours and many thousands of dollars on a single dispute.[23] Discovery sharing provisions reduce the number of these disputes.[24]

      d.    **Eliminates Third-Party Interventions**

Discovery sharing eliminates the need for third-party litigants to later intervene seeking to modify a non-sharing protective order.[25] This cumbersome process takes place one litigant at a

---

20  *Pincheira v. Allstate Ins. Co.,* 190 P.3d 322, 337 (N.M. 2008).
21  *See Ward v. Ford Motor Co.*, 93 R.R.D. 579, 580 (D.Colo. 1982).
22  Indeed, with an authentication agreement from the defendant, plaintiffs may not even have to re-request shared documents at all.
23  *See Comes v. Microsoft Corp.*, 775N.W.2d 302, 309-11 (Iowa 2009)(noting that Microsoft spent $5.5 million responding to a single discovery order and upholding the trial court's modification of a protective order to allow discovery sharing).
24  See id. (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682-83 (1958))("The goal of modern discovery rules is to 'make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.'").
25  *Kamp Implement Co., Inc. v. J.I. Case Co.,* 630 F.Supp. 218, 220 (D. Mont. 1986) (entering sharing protective

time, usually requires a hearing, and ultimately modifies the order for only one litigant.[26] This unnecessary millstone leaves future litigants to go through the same process, resulting "in duplication of time and effort [for the court and the parties] in each instance where discovery is sought."[27]

e.   **Encourages Transparency**

Discovery sharing leads to transparency by incentivizing consistent discovery responses.[28] The prospect of exposing inconsistent discovery productions encourages litigants to be candid in discovery responses.[29]  When plaintiffs' counsel work in isolation, defendants may respond to similar or identical discovery responses inconsistently without fear of recourse.

f.   **Levels the Playing Field**

Sharing levels the playing field between adversaries with vastly disparate resources.[30] Tesla litigates on a national scale, leveraging a vast array of resources to its advantage at every turn.[31] It is free to consult with lawyers defending claims all over the country in order to get their input on strategy and approaches to take with respect to the issues and documents. Tesla's counsel's cross-examination of Plaintiffs' experts will most certainly reflect such collaborative and coordinated efforts.  For defense counsel to have access to their mechanisms of information sharing, but seek to deny Plaintiffs' attorneys access to a similar sharing mechanism is manifestly unfair, increases

---

order to avoid wasteful intervention and modification procedure).

26   *See id.*

27   *See id.*

28   See id.; see also *In re Abbott Laboratories Sec. Litig.,* 92 C 3869, 1993 WL 616693, *4 (N.D. Ill. Nov. 15, 1993) (discovery sharing "allows plaintiffs' counsel to verify that they, in their respective cases, have in fact received all of the documentation they are entitled to").

29   *See id.*

30   *See Ward v. Ford Motor Co.*, 93 F.R.D. 579, 580 (D. Colo. 1982)(noting that automotive manufacturers are capable of coordinating defenses on a national scale and approving a discovery sharing arrangement).

31   *Cf. Ward v. Ford Motor Co*., 93 F.R.D. 579 (D. Colo. 1982) (noting that auto manufacturers are "capable of coordinating defenses nationwide").

the likelihood of discovery abuse, and increases the cost of litigation.[32] Some corporate defendants have made it a practice to seek the imposition of overly broad protective orders in order to increase costs and isolate plaintiffs.[33] Without a sharing provision, Plaintiffs and others with similar claims will be forced to litigate in unjust isolation.

### III. CONCLUSION

Our collective job here is to somehow find justice. Without truth, we wonder aimlessly in the dark, and if we stumble upon justice, it's purely by accident. Our Discovery process should help us find the truth. It is not a game, nor a weapon. If ten litigants all allege the same kind of automated driving system caused them grave injuries, then the same evidence related to that driving system should be available to all ten litigants. Yes, the Tesla deserves to protect legitimate trade-secrets from competitors. If Tesla's Autopilot is not defective, Plaintiffs' counsel has no incentive to risk their reputation, money, law licenses, or even their freedom, to share evidence of a safe driving system. But if Tesla has evidence its Autopilot system is indeed defective, the disclosure of this evidence could not possibly benefit anyone other than people harmed by the driving system or in danger of being so. No other vehicle manufacturer would dream of wanting the means to make a defective driving system. Indeed, such evidence might go a long way toward preventing other manufacturers from making the same mistake. The only reason Tesla would resist Plaintiffs' counsel's qualified ability to share such evidence of a defect would be to prevent the

---

32 *Ericson v. Ford Motor Co.*, 107 F.R.D. 92, 94 (E.D. Ark 1985) ("District courts are today being being bombarded by an ever-increasing number of requests for protective orders. Some of the increase may be attributed to legitimate attempts by litigants to stem the increasing use of abusive discovery tactics. Much of the increase, though, must be attributed to a practice among some attorneys to automatically seek protective orders in every case where any potential for embarrassment or harm, no matter how slight, exists.")

33 *Thayer v. Liggett & Myers Tobacco Co.*, CA No. 5314 (W.D. Mich., February 19, 1970), reprinted in F. H. Hare, Jr., J.L. Gilbert & W.M. Remine III, *Confidentiality Orders* (1988) ("Defendant in this case enjoyed all the advantages that wealth naturally produces . . . It sough, in addition, to restrict Plaintiffs' own flexibility in trial preparation. The success of this effort magnified the existing inequalities of these parties . . . . As the total picture developed during trial, it appeared that the protective order was serving defendant well in areas unrelated to the protection of its trade secrets or legitimate rights. . . It is calculated to do so.").

truth from getting out. Plaintiffs therefore respectfully requests this Court issue a Protective Order such as that proposed by Plaintiff, consistent with Plaintiffs' counsel's qualified right to share discovery in this case with counsel involved in other substantially similar cases.

Respectfully submitted:

ROUSSO, BOUMEL LAW FIRM, PLLC.
9350 South Dixie Highway, Suite 1520
Miami, Florida 33156
(305) 670-6669

By:    */s/ Adam T. Boumel, Esq.*
Adam T. Boumel, Esq.
Florida Bar No.: 0110727
Direct email: adam@roussolawfirm.com
Service emails:
Pleadings@roussolawfirm.com (primary)
Adam@roussolawfirm.com (secondary)
Assistant@roussolawfirm.com (secondary)
ATTORNEYS FOR PLAINTIFF

BY:    "/s/ Donald H. Slavik"
Donald H. Slavik, Esq.
Texas State Bar No. 20434093
Texas Fed. Bar ID No. 3284281
Slavik Law Firm, LLC
2955 Village Drive, Suite 16
Steamboat Springs, CO 80487
Tel: (970) 457-1011
Fax: (267) 878-7697
dslavik@slavik.us
ATTORNEYS FOR PLAINTIFF

**EXHIBIT "01"**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF
FLORIDA

Case No.: 21-cv-21940-BLOOM/Otazo-Reyes

NEIMA BENAVIDES, as Personal
Representative of the Estate of Naibel
Benavides Leon, deceased,

Plaintiff,

v.

TESLA, INC., a/k/a Tesla Florida, Inc.,

Defendant.

_____/

DILLON ANGULO,                              Case 1:22-22607-KMM

Plaintiff,

v.

TESLA, INC. a/k/a Tesla Florida, Inc.

Defendant.

_____/

## CONFIDENTIALITY  PROTECTIVE  ORDER

WHEREAS the Plaintiffs and Defendant Tesla, Inc. (collectively "the

Parties" and individually "Party") wish to engage in discovery, including

production of documents and other materials within the above-entitled action

1

("the Action");

WHEREAS all Parties are retaining and reserving their rights to seek a modification of the Protective Order;

NOW, THEREFORE, in order to protect such information, as may be entitled to protection, and which is produced in connection with this case including documents, deposition testimony, deposition exhibits, interrogatory responses, responses to request for admission, responses to request for production of documents, and all other discovery obtained pursuant to the Federal Rules of Civil Procedure in connection with this Action ("Discovery Material"), the Parties, by and through their respective undersigned counsel and subject to the approval of the Court, agree as follows:

I.    **DESIGNATION OF MATERIAL AS "CONFIDENTIAL" OR "HIGHLY CONFIDENTIAL**"

1.    The Parties agree to take care to limit any designation to specific material that qualifies under the appropriate standards below. To the extent it is practical to do so, the designating Party must designate for protection only those parts of the material, documents, items, or oral or written communications that qualify.

2.    Any Party or non-party ("Producing Party") may designate Discovery Material as "Confidential" or "Highly Confidential" (hereinafter referred to collectively as "Covered Information") under the terms of this

2

Protective Order if the Producing Party in good faith reasonably believes that such "Covered Information" meets the criteria set forth below.

      a.    **Confidential Information.** For purposes of this Protective Order, Confidential Information includes information that a Producing Party believes in good faith to be confidential or sensitive non-public internal proprietary business; (ii) marketing; (iii) financial; (iv) technical information unrelated to Autopilot technology; (v) non-public communications with United States and foreign patent offices; (vi) non-public communications with United States or foreign regulatory agencies; (vii) financial information, including non-public sales information, customer lists, purchases by customers, communications with potential customers, sales projections, profit calculations, income and costs (i.e., production, marketing and overhead), Tesla current/former employee personal identifying information; and; (viii) design, development, and testing materials related to the design and development of Tesla vehicles unrelated to the Autopilot technology, as such terms are used in relevant state law.

      b.    **Highly Confidential Information.** For purposes of this Protective Order, Highly Confidential Information includes information that contains highly sensitive competitive business, technical, and/or proprietary information that warrants the highest level of confidentiality the disclosure of

which will be detrimental to the Producing Party's business and will place the Producing Party at a competitive disadvantage, or any other category of information subsequently agreed to by the parties in writing as constituting Highly Confidential Information. Any Producing Party may designate such highly sensitive documents as Highly Confidential Information. Highly Confidential Information specifically includes documents and information that relate to or concern the design, development, testing and deployment of, and updates to, Tesla's Autopilot technology (including related Advanced Driver Assist Systems).

3.     Other than marking the document "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" and making other obvious redactions as appropriate, the Producing Party represents that the document is a true and correct copy of the original. In no instance may any party remove, obscure or otherwise modify a document or other Covered Information in a manner that either removes an assigned Bates Number and/or confidential designation. This designation will also encompass the following: (1) any information copied or extracted from Covered Information; (2) all copies, excerpts, summaries, or compilations of Covered Information; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Covered Information.

4

4.      Copies of discovery responses and documents containing Covered Information shall not be filed with the Court, except in accordance with Paragraph 5.

5.      In connection with any motions or pre-trial proceedings as to which a Party submits Confidential Information, the Parties shall follow the Local Rules of the Court.

6.      Medical records (records from any health care provider[1]) provided by any Producing Party shall automatically be deemed marked "CONFIDENTIAL" and treated as such whether or not so marked. Anyone who receives any material which is not easily identifiable as a medical record will use best efforts to determine if it is a medical record subject to protection.

7.      The designation of Covered Information in a document or discovery response shall be made by labeling each page containing Covered Information with the word "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" in one or more margin of the page. Where a document or response consists of more than one page not all of which contain Covered Information, at minimum the first page shall also be so labeled. In the case of information disclosed in or by a non-paper medium *(e.g.,* videotape, audiotape, computer disk, or other tangible

---

[1] Defined as: a Doctor of Medicine or osteopathy, podiatrist, dentist, chiropractor, clinical psychologist, therapist, optometrist, nurse practitioner, nurse-midwife, or a clinical social worker who is authorized to practice by the State and performing within the scope of their practice as defined by State law.

thing), the "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" label shall be affixed to the outside of the medium or its container, or in the case of electronics it may be part of the file name, so as to clearly give notice of the designation. The parties agree to not modify the file name in order to ensure anyone receiving or having access to the Covered Information is aware of its status as such.

8.     Inadvertent or unintentional production of documents or information containing Covered Information that should have been designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" shall not be deemed a waiver in whole or in part of a Parties' claims of confidentiality and will be deemed Covered Information upon notice to all parties receiving such inadvertent or unintentional production. Likewise, if information is produced which should have been withheld on the basis or should have included redactions for privilege or relating to private information of third parties, the Producing Party may replace ("claw-back") the information with appropriate redactions and the Parties must return and/or destroy the information without redactions within five days of receipt of the properly redacted version.

9.     Any notes, lists memoranda, summaries, indices, compilations, electronically stored information, reports, records, and documents prepared or based on an examination of Covered Information and any summaries of

28206289v6

Covered Information which quote from, identify, or refer to the Covered Information with such specificity that the Covered Information can be identified, or by reasonable logical extension can be identified, shall be accorded the same status of confidentiality as the underlying Covered Information from which they are made, and shall be subject to all of the terms of this protective order.

9.    A Producing Party may designate information disclosed during a deposition as Confidential Information or Highly Confidential Information by so indicating it on the record at the deposition. A Producing Party may designate the entire deposition as Confidential Information or Highly Confidential Information if the scope of the witness's testimony and/or the content of the exhibits, in large part, comprise Confidential Information and/or Highly Confidential Information.  Any party opposing such designation may identify the challenged testimony by page and line, and the dispute will be handled as proscribed in Paragraph 12. The Court Reporter will be instructed by counsel how the Covered Information shall be marked and bound. The Court Reporter shall operate in a manner consistent with this Protective Order and separately label the confidential portions of the deposition transcript, including documents and other exhibits containing the Covered Information as Confidential Information or Highly Confidential Information. The Covered

28206289v6

Information shall be separately bound. Those pages in any transcript referring to Covered Information shall include a stamp identifying all such pages as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL." Failure of the Court Reporter to operate in this manner shall not constitute a waiver by the Producing Party as to the status of the testimony as Covered Information.

10.     Deposition testimony or information disclosed during the deposition that is not designated as Covered Information at the deposition may be so designated by a Producing Party within thirty (30) court days of when the deposition transcript is made available, by giving written notice to all Parties of the page and line numbers where the newly designated information appears on the transcript. All rough or final deposition transcripts shall be treated as "Covered Information" until thirty (30) court days after the deposition testimony is made available. Should a pending motion or procedural requirement necessitate an earlier date, the Parties shall meet and confer as to a reasonable date for provision of the confidentiality designation notice.

11.     Any non-party may obtain the protections of this Protective Order by consenting to the jurisdiction of this Court solely with regard to the production of its or their documents by designating any discovery in accordance with the provisions of this Protective Order. Such designation shall confer upon the non-party all of the rights and obligations of a designating party as set forth

herein. Non-parties are not entitled to receipt or review of Covered Information by any other Producing Party unless all Parties agree in writing, and the non-party also executes Exhibit A prior to receipt or review of the Covered Information. Any medical records produced by a non-party in response to any subpoena issued in this case shall be treated as Confidential under the terms of this Protective Order.

II.   **CHALLENGING DESIGNATION OF "CONFIDENTIAL INFORMATION," OR "HIGHLY CONFIDENTIAL INFORMATION"**

12.   If a Party contends that any material is not entitled to confidential treatment, such Party must give written notice to the Producing Party who designated the material by: (1) providing the Bates number of each challenged document or the page and line of each portion of testimony subject to challenge and (2) state the basis for each challenge. The Parties agree that such challenges shall be made in good faith. In the case of materials or testimony designated as Highly Confidential Information, the Party challenging the designation must state whether their position is the material should be designated as Confidential Information or have no designation under this Protective Order. The Parties shall meet and confer regarding the challenged designations within thirty (30) court days of receipt of the challenge. If the challenge is not resolved in the meet-and-confer process, the Producing Party shall have thirty (30) court days from the

date of the termination of the meet and confer effort to seek an order from the Court that such designated material is subject to protection as Confidential Information or Highly Confidential Information. The Producing Party seeking the order has the burden of establishing that each designated document or item is entitled to protection. If a motion is not timely filed, the challenged material shall lose its designated protection and be assigned the protection requested by the challenging party. If the Producing Party files a motion with the Court, the designated items shall remain protected pursuant to their designation until the Court rules on the motion.

13.     Notwithstanding any challenge to the designation of material as Covered Information as described in Paragraph 12, all documents shall be treated as designated and shall be subject to the provisions hereof unless and until one of the following occurs:

        a.      the Producing Party who claims that the material is Confidential Information or Highly Confidential Information withdraws such designation in writing; or

        b.      the Producing Party who claims that the material is Confidential Information or Highly Confidential Information fails to apply to the Court for an order designating the material confidential within the time period specified above after receipt of a written challenge to such designation; or

        c.      the Court rules the material is not Confidential Information or

Highly Confidential Information.

14.     No Party shall be obliged to challenge the propriety of a Confidential Information or Highly Confidential Information designation at any specified time, and a failure to do so shall not preclude a subsequent challenge to the propriety of such a designation.

## III.   USE AND ACCESS TO "CONFIDENTIAL INFORMATION" AND "HIGHLY CONFIDENTIAL INFORMATION"

15.     Confidential Information and Highly Confidential Information shall not be used for any business, commercial, competitive, personal, or other purpose. Persons receiving Covered Information shall not under any circumstances sell, offer for sale, advertise, or publicize Covered Information or any information contained therein.

16.    Persons authorized to receive Confidential Information. Confidential Information, as defined in Paragraph 2(a), may be disclosed only to the following "Qualified Persons":

a.     The Court, including attorneys, employees, judges, magistrates, secretaries, special masters, stenographic reporters, staff, transcribers, and all other personnel necessary to assist the Court in its function, and the jury;

b.     Mediators or other individuals engaged or consulted in settlement of all or part of these Actions, or discovery referees to the extent one or more are engaged in connection with these Actions provided they execute Exhibit A;

11

c.      the Parties and their employees;

d.      Counsel of record for the Parties, including all partners, members, and associate attorneys of such counsel's law firms who are assisting in the conduct of the Action. Including, but not limited to, all clerks, employees, independent contractors, consultants, investigators, paralegals, assistants, secretaries, staff and stenographic, computer, audio-visual, and clerical employees and agents thereof when operating under the supervision of such partners or associate attorneys;

e.      litigation support services, including outside copying services, court reporters, stenographers, or companies engaged in the business of supporting computerized or electronic litigation discovery or trial preparation, retained by a Party or its counsel, provided that they execute Exhibit A;

f.      Any individual expert, consultant, or expert consulting firm retained by counsel of record in connection with these Actions to the extent necessary for the individual expert, consultant, or expert consulting firm to prepare a written opinion, to prepare to testify, or to assist counsel of record in the prosecution or defense of these Actions, provided, however, that: (i) the expert/consultant will designate the team working on this engagement and such disclosure will be limited to such "Designated Expert Personnel" involved in this engagement; (ii) the expert/consultant and Designated Expert Personnel use the information solely in connection with these Actions; (iii) expert/consultant and/or a representative of each expert consulting firm sign Exhibit A on behalf of any Designated Expert Personnel associated with that firm;

12

(v) the terms of Paragraph 18 of this Protective Order are satisfied; and (vi) a Producing Party may share Confidential Information that it produced with its own individual expert or Designated Expert Personnel without requiring compliance with this Protective Order;

g.      Except persons subject to the limitation set forth in Paragraph 18, any person (i) who created, authored, received, or reviewed such Confidential Information; (ii) is or was a custodian of the Confidential Information; (iii) is identified in Confidential Information; or (iv) is or was an employee of the Producing Party and is reasonably believed to have knowledge of the matters in the Confidential Information; and

h.      any other person as may be designated by written agreement by the Producing Party or by order of the Court.

i.      Other attorneys of record in other pending lawsuits against Tesla, Inc. in the United States of America involving the same alleged defect claims as stated in Plaintiffs' operative complaints involving a 2019 Tesla Model S with HW 3.0, Software version 9.0, resulting in personal injuries and/or death.

1. Each Sharing Attorney shall sign Exhibit A annexed hereto and agree to be subjected to the jurisdiction of this Court for enforcement of the Protective Order prior to receiving any Covered Information

2. Each Sharing Attorney shall provide the original or a copy

of the executed Exhibit A to counsel in these Actions who provided Covered Information to the Sharing Attorney;

3. Counsel for all Parties to these Actions shall maintain the originals and/or copies of the Exhibit A that are executed by Sharing Attorneys;

17.   Persons authorized to receive Highly Confidential Information. Highly Confidential Information, as defined in Paragraph 2(b), may be disclosed only to the persons identified and conditions set forth in Paragraphs 16(a), (d), (e), (f), (g), and (i).  For those persons permitted to receive Highly Confidential Information and who are required to execute an Exhibit A, the Exhibit A must be provided to counsel for the Producing Party within five court days of execution and before any Highly Confidential Information is provided to ensure compliance with this Protective Order. The distribution of Highly Confidential Information shall be limited to the consultants/experts that truly need to see them for their work in this litigation.

Sharing Attorneys shall not further share Covered information with anyone other than the category of persons or entities described in Paragraphs 16(a), (d), (e), (f), (g), and (i) for the specific case or cases for which the Sharing Attorney is counsel of record, and only after the persons or entities have executed the Exhibit A.  Sharing Attorneys shall not further share with any counsel, person, or entity

not described above.

18.     The following persons are not authorized to receive Covered information as defined in Paragraphs 2(a)and (b): Any current owner, director, employee or consultant of any entity that competes with Tesla or is otherwise engaged in the design and development of automotive components and autonomous vehicle technology.

19.     **EXECUTING THE NON-DISCLOSURE AGREEMENT.**

Each person as identified in Paragraphs 16(e), (f), (g) (former employees only), and (h), and 17, to whom Confidential Information or Highly Confidential Information is disclosed shall execute a non-disclosure agreement in the form attached as Exhibit A before receiving such information. Copies of the executed Exhibit A shall be retained by counsel disclosing Covered Information to such person, to the extent the person receiving Confidential Information is a designated expert under Paragraph 1 6(f) their signed Exhibit A shall be produced as part of their expert file and produced to counsel for the Producing Party pursuant to Paragraph 17 in the case of Highly Confidential Information.

20.     **SECURITY OF COVERED INFORMATION.**

Any person in possession of a Producing Party's Covered Information shall exercise the same care with regard to the storage, custody, or use of Covered Information as they would apply to their own material of the same or comparable

15

sensitivity. Covered Information may not be disseminated by email or other non-secured means; a secure file transfer protocol is permitted as is an encrypted, password protected flash drive, but in both instances the password must be separately transmitted to the recipient.

21.    Any persons receiving Covered Information shall not reveal or discuss such information to or with any person who is not entitled to receive such information, except as set forth herein. If a Party or any of its representatives, including counsel, inadvertently discloses any Covered Information to persons who are not authorized to use or possess such material, the Party shall provide immediate written notice of the disclosure including all known relevant information concerning the nature and circumstances of the disclosure to the Party whose material was inadvertently disclosed. The responsible Party shall also promptly take all reasonable measures to ensure that no further or greater unauthorized disclosure or use of such Covered Information is made and shall make reasonable efforts to retrieve all such Covered Information. Each Party shall cooperate in good faith in that effort.

## IV.    INADVERTENT FAILURE TO DESIGNATE "CONFIDENTIAL" OR "HIGHLY CONFIDENTIAL"

22.    In the event that information is produced by a Producing Party without a Confidential or Highly Confidential designation and then later designates as Confidential or Highly Confidential, said information, upon notice of the inadvertent

28206289v6

production, all receiving parties shall employ reasonable efforts to ensure that the previously inadvertently non-designated information is subsequently treated as Confidential Information or Highly Confidential Information pursuant to the terms of this Protective Order.

## V.    MISCELLANEOUS TERMS

23.    All provisions of this Protective Order restricting the communication or use of Covered Information shall continue to be binding after the conclusion of this Action, unless otherwise agreed or ordered.

24.    Any witness or other person, firm, or entity from which discovery is sought may be informed of and may obtain the protection of this Protective Order by written advice to the Parties' respective counsel or by oral advice at the time of any deposition or similar proceeding.

25.    A person with custody of documents designated as Covered Information shall maintain them in a manner that limits access to those documents to only those persons entitled under this Protective Order to examine them.

26.    The use of Covered Information at any trial proceeding shall be governed by Federal law. The Parties agree to take reasonable steps to maintain the confidentiality of any Covered Information at any hearing or upon trial of this matter in such a manner and until such time as the Court may direct, and/or as the Parties may otherwise agree.

17

27.     The terms of this Protective Order do not preclude Tesla, Inc. from providing confidential and/or protected information and documents to the National Highway Traffic Safety Administration ("NHTSA") either voluntarily or in connection with Tesla, Inc.'s obligations under the National Traffic and Motor Vehicle Safety Act of 1966 ("Safety Act"), 49 U.S.C. § 30101, et seq.

28.     The Court retains jurisdiction even after termination of this Action to enforce this Protective Order and to make such deletions from or amendments, modifications, and additions to the Protective Order as the Court may from time to time deem appropriate. The Parties hereto reserve all rights to apply to the Court at any time, before or after termination of these Actions, for an order modifying this Protective Order or seeking further protection against disclosure or use of claimed Confidential Information or Highly Confidential Information.

29.     Within 60 (sixty) days after the conclusion of this Action, all produced documents that contain or reflect Covered Information shall be returned to counsel for the designating party and all electronic copies will be destroyed and deleted from any computers, hard drivers, servers, or cloud storage. The Party given the Covered Information will certify in writing that there is compliance with this provision.

30.     Failure to comply with, or violation of, this Protective Order shall be considered a material breach for which the aggrieved party may seek any and all relief from this Court.

28206289v6

IT IS SO ORDERED:

_____
U.S. DISTRICT COURT JUDGE

Respectfully Submitted by:

Approved as to Form:

\_/s/ Adam T. Boumel\_\_\_\_
ADAM T. BOUMEL,
ESQ.
Florida Bar No.:
0110727
DARREN J. ROUSSO, ESQ.
Florida Bar No.: 97410
THE ROUSSO, BOUMEL LAW
FIRM, PLLC.
9350 South Dixie Highway
Suite 1520
Miami, Florida 33156
(305) 670-6669
Adam@roussolawfirm.com
***Attorneys for Plaintiff Dillon Angulo***

/s/ Henry Salas
HENRY SALAS, ESQ.
COLE, SCOTT & KISSANE, P.A.,
9150 S, Dadeland Blvd., Suite 1400
Miami, Florida 33156
henry.salas@csklegal.com
leisy.martinez@csklegal.com
***Counsel for Defendant, Tesla, Inc.***

 /s/ Todd Poses
Todd Poses, Esquire
Florida Bar No.: 0075922
POSES & POSES, P.A.
Alfred I. Dupont Building
169 East Flagler Street Suite 1600
Miami, Florida 33131
(305) 577-0200 Tel
(305) 371-3550 Fax
tposes@posesandposes.com
maria@posesandposes.com
**Attorneys for Plaintiff Neima Benavides**

 /s/ Donald H. Slavik
Donald H. Slavik (*Admitted Pro Hac Vice*)
SLAVIK LAW FIRM LLC
3001 South Lincoln Avenue
Suite C-1
Steamboat Springs, CO  80487
970-457-1011 / 267-878-7697 fax
dslavik@slavik.us
**Co-Counsel for both Plaintiffs**

 /s/ Douglas Eaton
Douglas Eaton, Esquire
Florida Bar No.:  129577
EATON & WORK, PL
2665 S. Bayshore Drive, Suite 609
Miami, FL  33133
(786) 752-4752 / (786) 350-3079 fax
deaton@eatonwolk.com
**Co-Counsel for both Plaintiffs**

Dated:   July 28th, 2023

/s/ Thomas P. Branigan
THOMAS P. BRANIGAN *(Pro Hac Vice)*
DREW P. BRANIGAN *(Pro Hac Vice)*
BOWMAN AND BROOKE LLP
101 West Big Beaver Road, Suite 1100
Troy, MI 48084
(248) 205-3300 ph. / (248) 205-3399 fax
thomas.branigan@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com
**Counsel for Defendant, Tesla, Inc.**

28206289v6

**(Exhibit A)**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF
FLORIDA

Case No.: 21-cv-21940-BLOOM/Otazo-Reyes

NEIMA BENAVIDES, as Personal
Representative of the Estate of Naibel
Benavides Leon, deceased,

Plaintiff,

v.

TESLA, INC., a/k/a Tesla Florida, Inc.,

Defendant.

_____/

DILLON ANGULO,                              Case 1:22-22607-KMM

Plaintiff,

v.

TESLA, INC. a/k/a Tesla Florida, Inc.

Defendant.

_____/

   I hereby certify that I have read the Protective Order entered in the case

entitled *Neima Benavides, as Personal Representative of the Estate of Naibel*

*Benavides Leon, Deceased and Dillon Angulo v. Tesla, Inc., a/k/a Tesla Florida,*

*Inc.,* Case No. 21-cv-21940-BLOOM/Otazo-Reyes, Before reviewing or receiving access to the contents of any of the documents or material subject to the protection of that Protective Order and as a condition of such review or access, I understand and agree that I am personally bound by and subject to all of the terms and provisions of the Protective Order.  I am not an owner, director, employee or consultant of any entity that competes with Tesla or is otherwise engaged in the design and development of automotive components and autonomous vehicle technology.

I subject myself to the jurisdiction and venue of the United States District Court for the State of Florida, for purposes of enforcement of this Protective Order.

_____
*Signature*

_____
*Printed Name*                    *Date*

22

28206289v6

**EXHIBIT "02"**

OMB Control No.: 2127-0004

# Part 573 Safety Recall Report     23V-838

| | |
|---|---|
| **Manufacturer Name :** | Tesla, Inc. |
| **Submission Date :** | DEC 12, 2023 |
| **NHTSA Recall No. :** | 23V-838 |
| **Manufacturer Recall No. :** | SB-23-00-008 |



**Manufacturer Information :**

Manufacturer Name : Tesla, Inc.

Address : 1 Tesla Road
Austin TX 78725

Company phone : 6506815000

**Population :**

Number of potentially involved : 2,031,220
Estimated percentage with defect : 100 %

**Vehicle Information :**

Vehicle 1 : 2012-2023 Tesla Model S
Vehicle Type :
Body Style :
Power Train : NR
Descriptive Information : The subject population includes certain MY 2012-2023 Model S that are equipped with Autosteer and were produced between October 5, 2012, and December 7, 2023, and all MY 2016-2023 Model X vehicles, all MY 2017-2023 Model 3 vehicles and all MY 2020-2023 Model Y vehicles that are equipped with Autosteer and were produced through December 7, 2023.
Production Dates : OCT 05, 2012 - DEC 07, 2023
VIN Range 1 : Begin :      NR      End :   NR    ☐ Not sequential

Vehicle 2 : 2016-2023 Tesla Model X
Vehicle Type :
Body Style :
Power Train : NR
Descriptive Information : The subject population includes certain MY 2012-2023 Model S that are equipped with Autosteer and were produced between October 5, 2012, and December 7, 2023, and all MY 2016-2023 Model X vehicles, all MY 2017-2023 Model 3 vehicles and all MY 2020-2023 Model Y vehicles that are equipped with Autosteer and were produced through December 7, 2023.
Production Dates : SEP 15, 2015 - DEC 07, 2023
VIN Range 1 : Begin :      NR      End :   NR    ☐ Not sequential

# Part 573 Safety Recall Report          23V-838

|  |  |
|---|---|
| Vehicle 3 : | 2017-2023 Tesla Model 3 |
| Vehicle Type : |  |
| Body Style : |  |
| Power Train : | NR |
| Descriptive Information : | The subject population includes certain MY 2012-2023 Model S that are equipped with Autosteer and were produced between October 5, 2012, and December 7, 2023, and all MY 2016-2023 Model X vehicles, all MY 2017-2023 Model 3 vehicles and all MY 2020-2023 Model Y vehicles that are equipped with Autosteer and were produced through December 7, 2023. |
| Production Dates : | JUL 15, 2017 - DEC 07, 2023 |
| VIN Range  1 : Begin : | NR                    End :    NR                    ☐ Not sequential |

|  |  |
|---|---|
| Vehicle 4 : | 2020-2023 Tesla Model Y |
| Vehicle Type : |  |
| Body Style : |  |
| Power Train : | NR |
| Descriptive Information : | The subject population includes certain MY 2012-2023 Model S that are equipped with Autosteer and were produced between October 5, 2012, and December 7, 2023, and all MY 2016-2023 Model X vehicles, all MY 2017-2023 Model 3 vehicles and all MY 2020-2023 Model Y vehicles that are equipped with Autosteer and were produced through December 7, 2023. |
| Production Dates : | JAN 09, 2020 - DEC 07, 2023 |
| VIN Range  1 : Begin : | NR                    End :    NR                    ☐ Not sequential |

# Part 573 Safety Recall Report      23V-838

## Description of Defect :

**Description of the Defect :** Basic Autopilot is a package that includes SAE Level 2 advanced driver-assistance features, including Autosteer and Traffic-Aware Cruise Control (TACC), that drivers may choose to engage subject to certain defined operating limitations. Autosteer is an SAE Level 2 advanced driver-assistance feature that, in coordination with the TACC feature, can provide steering, braking and acceleration support to the driver subject to certain limited operating conditions. Autosteer is designed and intended for use on controlled-access highways when the feature is not operating in conjunction with the Autosteer on City Streets feature. When Autosteer is engaged, as with all SAE Level 2 advanced driver-assistance features and systems, the driver is the operator of the vehicle. As the vehicle operator, the driver is responsible for the vehicle's movement with their hands on the steering wheel at all times, remaining attentive to surrounding road conditions, and intervening (e.g., steer, brake, accelerate or apply the stalk) as needed to maintain safe operation.

When Autosteer is engaged, it uses several controls to monitor that the driver is engaged in continuous and sustained responsibility for the vehicle's operation as required. If the driver attempts to engage Autosteer when conditions are not met for engagement, the feature will alert the driver it is unavailable through visual and audible alerts, and Autosteer will not engage. Likewise, if the driver operates Autosteer in conditions where its functionality may be limited or has become deteriorated due to environmental or other circumstances, the feature may warn the driver with visual and audible alerts, restrict speed, and/or instruct the driver to intervene immediately.

In certain circumstances when Autosteer is engaged, the prominence and scope of the feature's controls may not be sufficient to prevent driver misuse of the SAE Level 2 advanced driver-assistance feature.

**FMVSS 1 :** NR

**FMVSS 2 :** NR

**Description of the Safety Risk :** In certain circumstances when Autosteer is engaged, if a driver misuses the SAE Level 2 advanced driver-assistance feature such that they fail to maintain continuous and sustained responsibility for vehicle operation and are unprepared to intervene, fail to recognize when the feature is canceled or not engaged, and/or fail to recognize when the feature is operating in situations where its functionality may be limited, there may be an increased risk of a collision.

**Description of the Cause :** NR

**Identification of Any Warning that can Occur :** For a description of Autosteer's general design, including visual and audible alerts, please see the description of the defect above.

## Involved Components :

# Part 573 Safety Recall Report     23V-838

| | |
|---|---|
| Component Name 1 : | Vehicle Software |
| Component Description : | All versions of Autosteer leading up to the version(s) that contains the recall remedy. |
| Component Part Number : | NR |

**Supplier Identification :**

**Component Manufacturer**

| | |
|---|---|
| Name : | Tesla, Inc. |
| Address : | 1 Tesla Road |
| | Austin Texas 78725 |
| Country : | United States |

**Chronology :**

- On August 13, 2021, NHTSA opened a Preliminary Evaluation (PE21-020) to investigate eleven incidents involving stationary first-responder vehicles and Tesla vehicles that were operating with Autosteer engaged.

- Over the next year, as part of PE21-020, Tesla, in full cooperation, responded to extensive information requests from NHTSA and participated in several meetings with the agency.

- On June 8, 2022, NHTSA upgraded PE21-020 to Engineering Analysis ("EA") EA22-002.

- Over the next year, as part of EA22-002, Tesla, in full cooperation, responded to extensive information requests from NHTSA and participated in several meetings with the agency.

- From October 16, 2023, through December 4, 2023, NHTSA and Tesla conducted several meetings to discuss the agency's tentative conclusions regarding EA22-002, as they related to the issue of potential driver misuse when Autosteer is engaged, expectations to address the agency's concerns through a voluntary recall, and Tesla's proposed over-the-air ("OTA") software remedies in response.

- While not concurring with the agency's analysis, in the interest of resolving EA22-002, Tesla determined on December 5, 2023, to voluntarily administer a recall and provide the remedy described below.

- As of December 8, 2023, Tesla has identified 9 warranty claims, received between July 13, 2021, and September 17, 2023, that may be related to the condition described above.

# Part 573 Safety Recall Report              23V-838

**Description of Remedy :**

| | |
|---|---|
| Description of Remedy Program : | At no cost to customers, affected vehicles will receive an over-the-air software remedy, which is expected to begin deploying to certain affected vehicles on or shortly after December 12, 2023, with software version 2023.44.30. Remaining affected vehicles will receive an over-the-air software remedy at a later date. The remedy will incorporate additional controls and alerts to those already existing on affected vehicles to further encourage the driver to adhere to their continuous driving responsibility whenever Autosteer is engaged, which includes keeping their hands on the steering wheel and paying attention to the roadway. Depending on vehicle hardware, the additional controls will include, among others, increasing the prominence of visual alerts on the user interface, simplifying engagement and disengagement of Autosteer, additional checks upon engaging Autosteer and while using the feature outside controlled access highways and when approaching traffic controls, and eventual suspension from Autosteer use if the driver repeatedly fails to demonstrate continuous and sustained driving responsibility while the feature is engaged.<br><br>Tesla does not plan to include a statement in the Part 577 owner notification about pre-notice reimbursement because there are no out-of-warranty repairs related to this condition. |
| How Remedy Component Differs from Recalled Component : | The remedy component incorporates the software remedy described above whereas the recalled component does not incorporate the software remedy described above. |
| Identify How/When Recall Condition was Corrected in Production : | Beginning midday on December 7, 2023, Model S, Model X, Model 3 and Model Y vehicles in production received a software release that incorporates the software remedy. |

**Recall Schedule :**

| | |
|---|---|
| Description of Recall Schedule : | All Tesla stores and service centers will be notified about this recall on or shortly after December 12, 2023. Owner notification letters will be mailed in accordance with 49 C.F.R. § 577.7. |
| Planned Dealer Notification Date : | DEC 12, 2023 - DEC 12, 2023 |
| Planned Owner Notification Date : | FEB 10, 2024 - FEB 10, 2024 |

\* NR - Not Reported

**EXHIBIT "03"**



# Legal Document

Florida Southern District Court
Case No. 1:22-cv-22607-KMM
**Angulo v. Tesla, Inc**

Document 1



**View Document**



**View Docket**

Cover art © 2015 Think Computer Corporation. All rights reserved.
Learn more at http://www.plainsite.org.

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 1:22-cv-22607

DILLON ANGULO,

        Plaintiff,

v.

TESLA, INC. a/k/a TESLA FLORIDA, INC.

        Defendant.

_____/

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Dillon Angulo, by and through his undersigned counsel, sues Defendant, Tesla Inc. a/k/a Tesla Florida Inc., and alleges and states as follows:

## JURISDICTION, VENUE AND PARTIES

1.    This is an action for damages in excess of Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest and costs.

2.    Plaintiff, Dillon Angulo, is a resident of and is domiciled in the State of Florida.

3.    At all material times, Defendant, Tesla Inc. a/k/a Tesla Florida Inc. (hereinafter, "Tesla") is and was a foreign corporation licensed and authorized to do business in the State of Florida.

4.    At all times hereinafter mentioned and at the time of the incident complained of, Defendant, Tesla, had an office for the transaction of its customary business in Miami-Dade County, Florida, had agents and other representatives in Miami-Dade County, and

was actually doing business in Miami-Dade County, Florida, by virtue of its shipping to and sale of automobiles in Miami-Dade County, Florida.

5.  At all times hereinafter and at the time of the incident complained of, Defendant, Tesla, was in the business of designing, testing, inspecting, manufacturing, distributing, selling, maintaining, repairing and otherwise placing into the stream of commerce, and causing same to come into the State of Florida, certain automobiles, including a certain specific automobile designated and described as a 2019 Tesla Model S, VIN: 5YJSA1E24KF302997 (Hereinafter described as the "Vehicle").

6.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because this action is between citizens of different state and the amount in controversy, exclusive of interest, attorneys' fees and costs, exceeds $75,000.00

## FACTS COMMON TO ALL CLAIMS

7.  On or about April 25, 2019, the Vehicle was owned by George McGee.

8.  At all material times, the Vehicle was equipped with what Tesla calls "Autopilot", a suite of features and functions meant to assist drivers in driving and operating Tesla's vehicles.

9.  At all material times, the Autopilot functions of the Vehicle included, but were not limited to automatic steering, forward collision warning and emergency braking.

10. At all material times, George McGee purchased the vehicle in large part because of the Autopilot functions advertised by Tesla. More specifically, McGee purchased the subject Tesla Vehicle because he wanted a vehicle that would provide him with ample assistance while driving, and based on marketing and advertisements believed that Tesla's subject vehicle would provide such ample driving assistance.

11.    On or about April 25, 2019, George McGee was operating and/or driving the Vehicle eastbound on CR-905A, also known as Card Sound Road, in Key Largo, Monroe County, Florida, and was approaching the 3-way T-intersection with County Road 905.

12.    At the subject intersection, Card Sound Road ends, and drivers eastbound on Card Sound Road must first come to a stop at a stop sign before turning either left onto northbound County Road 905 or right onto southbound County Road 905.

13.    At the subject intersection, in addition to the aforementioned stop sign, there is also an overhead flashing red light and yellow caution signs which alert all drivers on eastbound Card Sound Road of the end of the roadway and the need to stop and then turn onto County Road 905.

14.    At that time and place, George McGee, had activated the Autopilot functions in his Tesla and was relying on its ability to properly steer and navigate the Vehicle, to detect obstacles in the roadway ahead of the Vehicle, and to reduce speed and/or come to a complete stop when such obstacles were detected.

15.    Because he was relying on the Vehicle's Autopilot systems, George McGee took his eyes off the road to look at his phone as he was approaching the T-intersection at CR-905A.

16.    At that same time and place, Plaintiff, Dillon Angulo, had been driving a Chevrolet Tahoe owned by his mother and had lawfully parked that vehicle on the shoulder of the road on the eastbound side of County Road 905, directly across from the end of eastbound Card Sound Road.

17.    After parking, Plaintiff, Dillon Angulo, and his companion, Naibel Benavides Leon, were standing outside of Plaintiff's Chevrolet Tahoe, directly next to same.

18.     At that time, the Autopilot of George McGee's vehicle failed to detect the end of Card
        Sound Road (including a failure to detect the various traffic control devices) and further
        failed to detect the substantial profile of the Chevrolet Tahoe at any point, despite the fact
        that the vehicle and all of the referenced traffic signals, signs and warnings were directly
        in front of and in the path of the Vehicle.

19.     As a result, the Vehicle continued eastbound through the intersection without initiating
        the brakes and the Vehicle struck Plaintiff's Chevrolet Tahoe at almost 70 miles per hour,
        causing it to violently rotate and strike Plaintiff and Ms. Naibel Benavides Leon, causing
        debilitating injuries to Plaintiff and killing Ms. Benavides Leon.

## <u>COUNT 1 – STRICT PRODUCTS LIABILITY</u>

### (Negligent design)

20.     Plaintiff re-alleges paragraphs 1-19 as if fully set forth herein.

21.     At all material times, Defendant, TESLA, was engaged in the business of manufacturing,
        fabricating, designing, assembling, distributing, selling, inspecting, warranting, leasing,
        renting, retailing, and advertising vehicles, including the Vehicle equipped with Tesla's
        Autopilot systems suite.

22.     Tesla's vehicles, including the Vehicle, contained design defects when the vehicles were
        introduced into the stream of commerce by Tesla.

23.     Tesla's vehicles, including the Vehicle, contained design defects when the vehicles were
        introduced into the stream of commerce by Tesla.

24. Tesla's vehicles, including the Vehicle, were defective and unsafe for their intended use. Due to the design defects, the Vehicle failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

25. At all material times, Tesla knew that consumers would use and drive their vehicles as the driver Mr. McGee did on April 25, 2019. Tesla manufactured, designed, assembled, tested, inspected, marketed, distributed, and sold their vehicles, including the Vehicle, and their component parts including Tesla's Autopilot system and suite of driver assistance features technology with defects in design which made them dangerous, hazardous, and unsafe for their intended and reasonably foreseeable use.

26. The design defects in the Vehicle and Tesla's Autopilot system suite of technology included defective and unsafe characteristics such as, but not limited to:

   a.   the failure to adequately monitor and determine driver-engagement;

   b.   the failure to adequately detect and respond to obstacles in the Vehicle's path of travel;

   c.   the failure to adequately detect and respond to the end of a roadway; and

   d.   and the failure to adequately detect and respond to traffic control devices.

27. Tesla failed to meet the expectations of the reasonable consumer by placing on the market the Vehicle which failed to incorporate an Autopilot system that included safety components which would keep the vehicle only in designated travel lanes, reasonably match vehicle speed to traffic conditions, keep the vehicle within its lane, and provide active automatic collision avoidance and automatic emergency braking in a manner which detected objects the car might impact and applied the brakes so as to avoid impact with such objects.

28. Subsequent to subject collision, TESLA equipped subsequent Tesla Model S with additional technology programs and systems and safety components and passenger protection components that did, in fact, provide active automatic collision avoidance and automatic emergency braking in order to detect objects the car might impact, and apply the brakes accordingly to avoid impact with such objects. The inclusion of these features on the Tesla Model S after the subject collision, had they been installed on the Vehicle prior to the collision, would have entirely avoided and prevented the collision and the debilitating injuries suffered by Plaintiff.

29. By reason of the omission of the above -described safety systems, features and components from the Vehicle, on and prior to the date of the subject collision, the Vehicle was defective in its design, in that the auto pilot systems of the vehicle would not, and did not perform in a manner as safely as an ordinary consumer would expect when the vehicle was subjected to foreseeable accident or driving conditions.

30. The risk of danger in the design of the Vehicle outweighed any benefits of the design, and especially where safer alternative designs were available at the time of manufacture. Such reasonably safer alternative designs include, but are not limited to, the following:

a. Driver-facing cameras that would monitor the driver's eyes and/or head position as a way to determine driver engagement and awareness;

b. LIDAR, or any other reasonable alternative system that may or may not include the use of radar technology for the detection of obstacles and surroundings of a Tesla vehicle; and

c. Recoding of Tesla's proprietary software for its Autopilot technology and suite of driver assistance features, specifically, the Traffic Aware Cruise Control feature.

31.     Therefore, the Vehicle, and all of Tesla's vehicles that are equipped with Tesla's Autopilot system suite of technology presented and continue to present a substantial and unreasonable risk of serious injuries to drivers of Tesla vehicles and the public

32.     The defects in the design of all Tesla vehicles equipped with Tesla's Autopilot system, including the Vehicle at issue, was a substantial factor in causing the subject collision and Plaintiff's injuries and damages as alleged herein.

33.     As a direct and proximate result of the design defects of the Vehicle, Plaintiff, Dillon Angulo, suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future. The losses are either permanent or continuing, and Plaintiff, Dillon Angulo, will suffer the losses in the future.

WHEREFORE, Plaintiff, Dillon Angulo, demands judgment against the Defendant, Tesla Inc., a/k/a Tesla Florida Inc., for compensatory damages together with post- judgment interest and taxable costs incurred in this action.

## COUNT 2 – STRICT PRODUCTS LIABILITY

### (Failure to Warn)

34.     Plaintiff re-alleges paragraphs 1-19 as if fully set forth herein.

35.     At all material times, Defendant, Tesla, was engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, inspecting, warranting, leasing, renting, retailing, and advertising vehicles, including the Vehicle equipped with Tesla's Autopilot systems suite.

36.     On April 25, 2019, George McGee was driving the vehicle in a reasonably foreseeable manner, with Tesla's Autopilot ss Autopilot systems engaged, when the Vehicle failed to detect the end of Card Sound Road, the presence of numerous traffic control devices, and the substantial profile of the Chevrolet Tahoe, all of which was directly in front of the Vehicles path. As a result of these failures, Tesla's vehicle proceeded through the intersection, struck the Chevrolet Tahoe, and caused substantial injuries to Plaintiff.

37.     At all material times, Tesla knew that consumers would use and drive their Autopilot equipped vehicles in the same manner that Brian McGee did in the time leading up to the collision at issue.

38.     An ordinary consumer would not have recognized the potential risks and dangers inherent in the operation and use of a Tesla vehicle with Autopilot engaged, including the fact that a Tesla vehicle would be unable to recognize the end of a roadway, the presence of a stop sign, the presence of flashing red overhead lights, the presence of yellow caution traffic signs, and/or the presence of a stationary vehicle parked directly in front of its path.

39.     At all times, Tesla failed to warn of the dangers inherent in the use of the Autopilot functions when used in a reasonably foreseeable manner.

40.     As a direct and proximate result of the Tesla's failure to warn of the design defects and dangers of its Autopilot functions, Plaintiff, Dillon Angulo, suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future. The losses are either permanent or continuing, and Plaintiff, Dillon Angulo, will suffer the losses in the future.

WHEREFORE, Plaintiff, Dillon Angulo, demands judgment against the Defendant, Tesla Inc., a/k/a Tesla Florida Inc., for compensatory damages together with post- judgment interest and taxable costs incurred in this action.

### COUNT 3 – STRICT PRODUCTS LIABILITY

### (Negligent Manufacture)

41.     Plaintiff re-alleges paragraphs 1-19 as if fully set forth herein.

42.     At all material times, Defendant, Tesla, was engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, inspecting, warranting, leasing, renting, retailing, and advertising vehicles, including the Vehicle equipped with Tesla's Autopilot systems suite.

43.     At all material times, the subject Vehicle contained manufacturing defects which rendered the Vehicle unreasonably dangerous, in that:

a.      Defects in the Vehicle caused the vehicle to fail to adequately monitor and determine driver-engagement;

b.      Defects in the Vehicle caused the Vehicle to fail to adequately detect and respond to obstacles in the Vehicle's path of travel;

c.      Defects in the Vehicle caused the Vehicle to fail to adequately detect and respond to the end of a roadway;

d.      Defects in the vehicle caused the Vehicle to fail to adequately  detect and respond to traffic control devices in the Vehicle's path of travel;

e.      Defects in the vehicle caused the Vehicle to accelerate without driver input;

f.      Defects in the vehicle caused the Autopilot systems to turn off and/or disengage without driver input.

44.     At all material times, the manufacturing defects in the subject Vehicle were present before it left control of Tesla, at the time that Tesla placed the Vehicle into the stream of commerce, and at the time of the subject collision at issue.

45.     As a direct and proximate result of the subject Vehicle's manufacturing defects, Plaintiff, Dillon Angulo, suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future. The losses are either permanent or continuing, and Plaintiff, Dillon Angulo, will suffer the losses in the future.

WHEREFORE, Plaintiff, Dillon Angulo, demands judgment against the Defendant, Tesla Inc., a/k/a Tesla Florida Inc., for compensatory damages together with post- judgment interest and taxable costs incurred in this action.


## COUNT 4 – NEGLIGENT MISREPRESENTATION

46.     Plaintiff re-alleges paragraphs 1-19 as if fully set forth herein.

47.     At all material times, Defendant, Tesla, was engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, inspecting, warranting, leasing, renting, retailing, and advertising vehicles, including the Vehicle equipped with Tesla's Autopilot systems suite.

48.     At all material times, Defendant, Tesla, had a duty to represent to the public and general, and its consumers specifically, including but not limited to Brian McGee, the true capabilities and just as importantly the true limitations of the Autopilot functions.

49.   At all material times, Defendant, Tesla, falsely advertised, marketed, and represented that its Autopilot had capabilities far beyond those which it had.

50.   For instance, just by terming the name of its product "Autopilot", Tesla created the false impression and understanding among consumers that its vehicles could drive automatically and autonomously, with reduced driver input or without any driver input. This impression, carefully crafted by Tesla to increase its sales and brand identity, was false in that the Autopilot systems are not autonomous and in fact require substantial and constant input from drivers.

51.   Additionally, Tesla distributed marketing and advertising materials intended to underscore the false autonomous functionality of its Autopilot systems, such as (but not limited to) an advertisement video that showed a Tesla vehicle, equipped with Autopilot, successfully navigating through city streets without a driver behind the wheel. This video was, in fact, a heavily orchestrated marketing video, with the vehicle at issue having been programmed with detailed three-dimensional digital maps not available to drivers using the commercially available version of Autopilot. Moreover, the vehicle in the video actually crashed during the filing of that video, an event never disclosed by Tesla.

52.   At all times, the actions of Tesla in misrepresenting the true capabilities and corresponding limitations of the Autopilot systems created a false expectation among consumers and Tesla drivers as to the extent that they could rely upon Autopilot.

53.   These false expectations caused and still cause Tesla drivers, such as Brian McGee, to be far too inattentive in their own driving and instead to put far too much reliance on Tesla's Autopilot functions to safely navigate any hazards on the road.

54.     As a direct result of these false expectations which were cultivated and created by Tesla, on the date of this subject collision, Brian McGee was far less vigilant and attentive while driving than he otherwise would have, and placed far too much reliance on Autopilot to safely navigate and operate the subject Vehicle, which caused the subject collision and Plaintiff's injuries.

55.     At all material times, Brian McGee was operating the subject Vehicle in a manner that was reasonably foreseeable to Tesla in that Tesla knew or should have known the reliance that driver's including McGee place on the Autopilot system given the nature of the marketing and advertising that Tesla disseminated to the public at large.

56.     As a direct and proximate result of the negligent acts or omissions of Tesla, Plaintiff, Dillon Angulo, suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings and wages in the past as well as loss of and/or reduction of earning capacity in the future. The losses are either permanent or continuing, and Plaintiff, Dillon Angulo, will suffer the losses in the future.

WHEREFORE, Plaintiff, Dillon Angulo, demands judgment against the Defendant, Tesla Inc., a/k/a Tesla Florida Inc., for compensatory damages together with post- judgment interest and taxable costs incurred in this action.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by Jury on all issues so triable.

Dated this 16th day of August, 2022

Respectfully submitted,

THE ROUSSO, BOUMEL LAW FIRM, PLLC.
9350 South Dixie Highway
Suite 1520
Miami, Florida 33156
(305) 670-6669

By:     ***/s/ Darren J. Rousso, Esq.***
Darren J. Rousso, Esq.
Florida Bar No.: 97410
Darren@roussolawfirm.com
SERVICE EMAILS:
pleadings@roussolawfirm.com
Frank@roussolawfirm.com

By:     ***/s/ Adam T. Boumel, Esq.***
Adam T. Boumel, Esq.
Florida Bar No.: 0110727
Adam@roussolawfirm.com
SERVICE EMAILS:
pleadings@roussolawfirm.com (primary)
Frank@roussolawfirm.com (secondary)