# EXHIBIT B

Case 1:21-cv-21940-BB   Document 195-2   Entered on FLSD Docket 02/27/2024   Page 2 of 15

Platinum Properties Investor Network, Inc. v. Sells, Not Reported in Fed. Supp. (2019)

2019 WL 2247544
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

PLATINUM PROPERTIES INVESTOR NETWORK, INC.; the Hartman Media Company, LLC; and Jason Hartman, Plaintiffs,
v.
Charles SELLS; Stephanie Putich; Young Chung; the Pipgroup, LLC; and John Does 1-10, Defendants.

CASE NO. 18-61907-CIV-GAYLES/SELTZER
|
Signed 04/11/2019

**Attorneys and Law Firms**

Brock Austin Hankins, Ava K. Doppelt, Allen, Dyer, Doppelt Gilchrist PA, Orlando, FL, Steven Pollack, Pro Hac Vice, New York, NY, for Plaintiffs Jason Hartman, The Hartman Media Company, LLC.

Brock Austin Hankins, Ava K. Doppelt, Allen, Dyer, Doppelt Gilchrist PA, Orlando, FL, Steven Pollack, Pro Hac Vice, New York, NY, for Plaintiff Platinum Properties Investor Network, Inc.

Jeffrey Michael Partlow, Cole, Scott, Kissane, P.A., Orlando, FL, David S. Klein, Rountree, Leitman & Klein, LLC, Atlanta, GA, for Defendants.

### REPORT AND RECOMMENDATION

BARRY S. SELTZER, United States Magistrate Judge

*1 THIS CAUSE is before the Court on Defendants' Amended Motion to Dismiss ("Motion") (DE 32). This matter was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the Southern District of Florida (DE 41). The undersigned has carefully reviewed the file, and is otherwise fully advised in the matter. For the reasons stated below, the undersigned RECOMMENDS that Defendants' Motion (DE 32) be GRANTED in part and DENIED in part.

### I. BACKGROUND

The record in this case paints a picture of a professional relationship between rival real estate investors, Jason Hartman ("Hartman") and Charles Sells ("Sells"), that has soured into a personal feud. The present matter arises out of an internet and email campaign that Sells allegedly initiated to harm Hartman's reputation and steal his clients. Based on this conduct, Hartman and his related entities (collectively, "Plaintiffs"), sued Sells, and his company (The PIP Group), and others believed to be involved in the campaign (collectively, "Defendants").

In sum, Plaintiffs contend that Defendants set up counterfeit websites and phony email addresses, incorporating Plaintiffs' registered trademarks to confuse consumers and thereby divert internet traffic to Defendants' websites, with the ultimate objectives of simultaneously ruining Plaintiffs' business and capturing Plaintiffs' goodwill for their own commercial benefit. Defendants dispute this contention, arguing that their web addresses, although similar, are nothing more than so-called "gripe sites" containing mere disparagements and condemnations that are non-commercial and dispel any affiliation with Plaintiffs.

In their First Amended Complaint (DE 21), Plaintiffs assert the following claims: federal service mark counterfeiting (Count I); federal service mark infringement (Count II); cybersquatting (Count III); federal unfair competition, false representation of origin, and false designation (Count IV); federal dilution (Count V); Florida dilution (Count VI); Florida statutory false advertising (Count VII); Florida civil conspiracy (Count VIII); common law unfair competition (Count IX); common law tortious interference (Count X); common law fraud (Count XI); negligent misrepresentation (Count XII); and, invasion of privacy (Count XIII).

Defendants moved to dismiss the First Amended Complaint for lack of personal jurisdiction, lack of standing, and failure to state a claim. (DE 32). For the reasons that follow, the undersigned RECOMMENDS that the Motion be GRANTED in part and DENIED in part.

Case 1:21-cv-21940-BB   Document 195-2   Entered on FLSD Docket 02/27/2024   Page 3 of 15

Platinum Properties Investor Network, Inc. v. Sells, Not Reported in Fed. Supp. (2019)

II. MOTION TO DISMISS

   A. Jurisdiction

"[J]urisdictional questions generally should be decided before reaching the merits." Courboin v. Scott, 596 Fed. Appx. 729, 735 (11th Cir. 2014). To determine whether personal jurisdiction exists over a non-resident defendant, courts employ a two-step process. "First, we examine whether the exercise of jurisdiction would be appropriate under that state's long-arm statute. Second, we examine whether the exercise of personal jurisdiction over the defendant would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." Internet Sols. Corp. v. Marshall, 557 F.3d 1293, 1295–96 (11th Cir. 2009) (internal quotations and citations omitted).

1. Florida's Long-Arm Statute

**\*2** The Florida "long-arm" statute extends jurisdiction over nonresident defendants who "commit a tortious act within this state." Fla. Stat. § 48.193(1)(a)(2). The Eleventh Circuit has previously evaluated the contours of the "tortious acts" provision in § 48.193(1)(a)(2) in the context of trademark infringement claims. See Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1353–54 (11th Cir. 2013); Licciardello v. Lovelady, 544 F.3d 1280, 1283 (11th Cir. 2008). Those cases govern this inquiry.

In Lovelady, the Eleventh Circuit examined whether Florida courts had jurisdiction over a nonresident who allegedly infringed a plaintiff's trademarks on an internet website. Id. at 1282. The defendant, Lovelady, resided in Tennessee, while the owner of the mark, Licciardello, resided in Florida. Id. The Eleventh Circuit reversed the dismissal of the trademark claims for lack of jurisdiction, holding that the website caused injury and occurred in Florida "by virtue of the website's accessibility in Florida." Id. at 1283.

Later, in Mosseri, the Eleventh Circuit determined that allegations that a New York-based defendant was selling counterfeit and infringing Louis Vuitton products through a website into Florida were sufficient to satisfy the personal jurisdiction requirements of the Florida long-arm statute. Mosseri, 736 F.3d at 1354. The court reiterated its prior holding that accessibility of the website in Florida, by itself, was sufficient to satisfy the demands of Florida's long-arm statute. Id. (citing and applying Lovelady, 544 F.3d at 1283). The court alternatively concluded that jurisdiction was proper because "Mosseri's trademark infringing goods were not only accessible on the website, but were sold to Florida customers through that website." Id.

Applying the holdings of Lovelady and Mosseri to this case, the undersigned concludes that Plaintiffs have satisfied Florida's long-arm statute. Plaintiffs made unrebutted allegations, supported by affidavit, that Defendants' "infringing websites" were not only accessible, but actually accessed in Florida and caused actual consumer confusion resulting in lost business. (DE 34-7, and exhibits thereto). In addition, substantial harm was suffered in Florida: Hartman resides in Florida, he owns and operates both HMC and Platinum from Florida, and he uses the Hartman trademarks in connection with Florida business. (DE 21 ¶¶ 8,11; DE 34-7 ¶ 6). In sum, the exercise of personal jurisdiction over Defendants is appropriate under Florida's long-arm statute.[1]

2. Due Process

In addition to determining whether Florida's long-arm statute authorizes the exercise of personal jurisdiction, the Court must determine whether the exercise of jurisdiction over Defendants in Florida comports with due process. This determination entails a three-part inquiry:

> **\*3** (1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice."

Mosseri, 736 F.3d at 1355 (citations omitted). "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, 'a defendant must make a "compelling" case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice.' " Id. (quoting Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, 1267 (11th Cir. 2010)).

Case 1:21-cv-21940-BB   Document 195-2   Entered on FLSD Docket 02/27/2024   Page 4 of 15

Platinum Properties Investor Network, Inc. v. Sells, Not Reported in Fed. Supp. (2019)

### a. "Arising Out of" or Relatedness

To determine whether Plaintiffs' claims arise out of or relate to one of the Defendants' contacts with Florida, "[o]ur inquiry must focus on the direct causal relationship between the defendant, the forum, and the litigation." Mosseri, 736 F.3d at 1355-56 (quoting Fraser v. Smith, 594 F.3d 842, 850 (11th Cir. 2010)).

Here, as Plaintiffs' unrebutted affidavits show, the offending websites were not only accessible—but, indeed, were accessed—in Florida, and Defendants' alleged misuse of the Hartman marks on the websites was the cause of injury in Florida. Thus, Defendants' Florida contact was sufficiently related to Plaintiffs' claims. See Lovelady, 544 F.3d at 1285 n. 4, and 5 (concluding that "it is clear" the offending website and the plaintiff's claims are related "inasmuch as the website is the location of the offending trademark use," despite defendant's contention that offending website "was never fully functional nor advertised and never generated any income") (citing approvingly to JB Oxford Holdings, Inc. v. Net Trade, Inc., 76 F. Supp. 2d 1363, 1367 (S.D. Fla. 1999) (concluding that use of mark on website accessible in Florida was related to cause of action for infringement of Florida resident's trademark)).

### b. Purposeful Availment

In intentional tort cases, two alternative tests may be used to determine whether purposeful availment occurred: (1) the "effects test"; and (2) the traditional "minimum contacts" test. Mosseri, 736 F.3d at 1356 (citing Calder v. Jones, 465 U.S. 783 (1984) and Keeton v. Hustler Magazine, Inc., 465 U.S. 770 (1984)). Because the undersigned concludes that Defendants have established purposeful availment using the "effects test," it is unnecessary to analyze minimum contacts.

"Under the 'effects test,' a nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum state. This occurs when the tort: '(1) [was] intentional; (2) [was] aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state.' " Mosseri, 736 F.3d at 1356 (quoting Lovelady, 544 F.3d at 1285–86, 1287–88).

Based on the same combination of allegations and evidence previously discussed, the undersigned concludes that Defendants purposely availed themselves of the Florida forum "in such a way that [they] could reasonably foresee being haled into a Florida court." Id. at 1357. More specifically, Defendants' alleged misconduct involves intentionally targeting Hartman's trademarks, professional and personal reputation, and clients on a website accessible in Florida, with the purpose of damaging Hartman's business and stealing his clients.

**\*4** Moreover, Hartman and his companies are competitors and former business clients of Sells and his companies, in a "close and intimate industry." (DE 21 ¶¶ 59, 88). Sells was linked to Hartman's social media accounts. (DE 34-7 ¶¶ 10-12). Plaintiffs assert that Defendants had actual and constructive knowledge of Hartman's place of residence and substantial business activities in Florida. (Id. ¶¶ 4, 12, 45-46). And, significantly, Defendants do not deny any of this in their affidavits. Thus, Plaintiffs have satisfied their burden of demonstrating that Defendants were aware that the brunt of their infringement campaign would be felt in Florida.

The facts of this case are similar to those of Lovelady. There, the appellate court held that the "effects test" was satisfied where a defendant used a Florida-based plaintiff's trademarked name and picture on a website accessible in Florida to make money from plaintiff's implied endorsement, and it explained that "[t]he unauthorized use of [plaintiff's mark] ... individually targeted [plaintiff] in order to misappropriate his name and reputation for commercial gain." Lovelady, 544 F.3d at 1287–88; see also Calder, 465 U.S. at 790 (affirming jurisdiction in California over Florida newspaper and two of its employees based on allegedly libelous article about California-based plaintiff, reasoning that article was "expressly aimed at California" because defendants knew their article would have a "potentially devastating impact" on California plaintiff and "brunt of the injury" would be felt where plaintiff lives and works, and where the paper had largest circulation). Because Defendants specifically targeted Hartman, who lives and works in Florida and does substantial business in Florida, the same result holds here.

Case 1:21-cv-21940-BB   Document 195-2   Entered on FLSD Docket 02/27/2024   Page 5 of 15

Platinum Properties Investor Network, Inc. v. Sells, Not Reported in Fed. Supp. (2019)

#### c. "Fair Play and Substantial Justice"

Finally, the exercise of personal jurisdiction over Defendants in Florida comports with traditional notions of fair play and substantial justice. "In this analysis, we consider these factors: (1) 'the burden on the defendant'; (2) 'the forum's interest in adjudicating the dispute'; (3) 'the plaintiff's interest in obtaining convenient and effective relief'; and (4) 'the judicial system's interest in resolving the dispute.' " Mosseri, 736 F.3d at 1358 (quoting Lovelady, 544 F.3d at 1288).

Defendants have not proffered any evidence, financial or otherwise, showing that they would be burdened by litigating this case in Florida.[2] Further, Florida has a strong interest in hearing the case and protecting consumers from confusion that results from Defendants' infringement in Florida, particularly given Hartman's residence and substantial business activity in Florida.

Finally, Hartman and the entities he operates have "an undeniable interest in litigating the case in their chosen forum." Id.[3] Accordingly, the undersigned concludes that jurisdiction over Defendants is proper. See Lovelady, 544 F.3d at 1288 (holding that a "Florida plaintiff, injured by the intentional misconduct of a nonresident expressly aimed at the Florida plaintiff," is not constitutionally required to travel to the nonresident's state of residence to obtain a remedy).

### B. Standing

**\*5** Beyond their jurisdictional challenge, Defendants challenge the standing of certain Plaintiffs to bring the trademark-related claims in Counts I – VI.[4] Specifically, Defendants argue that Lanham Act relief is only available to the "owner" of the mark, and because HMC is alleged to be the owner of the mark, the claims brought by Hartman and Platinum must be dismissed. (DE 32: 3-4).

Defendants are partially correct. Although standing to bring Counts III (cybersquatting), V (federal dilution) and VI (Florida dilution) is limited to the "owner" of the mark, see 25 U.S.C. § 1125 (d) and (c); Fla. Stat. § 495.151(1), Counts I (counterfeiting) and II (infringement) are brought under 15 U.S.C. § 1114 and are not restricted to the "owner," but rather, to the "registrant" of the mark. See id. § 1114(1); Heron Dev. Corp. v. Vacation Tours, Inc., 2017 WL 5957743, at * *8-10 (S.D. Fla. Nov. 30, 2017). According to the First Amended Complaint, (DE 21 ¶¶ 50, 52), neither Hartman nor Platinum appear to be "registrants" or "owners" of the Hartman marks. And they offer no specific opposition to the Motion to Dismiss their Counts I – III, V, and VI for lack of standing. Accordingly, the undersigned recommends dismissal of Counts I – III, V and VI with respect to Plaintiff Hartman and Plaintiff Platinum.

### C. Sufficiency of Claims

#### 1. Legal Standard

At the pleading stage, a complaint must contain "a short and plain statement of the claim showing the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). Although Rule 8(a) does not require "detailed factual allegations," it does require "more than labels and conclusions"; a "formulaic recitation of the cause of action will not do." Bell Atl. Corp v. Twombly, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, "factual allegations must be enough to raise a right to relief above the speculative level" and must be sufficient "to state a claim for relief that is plausible on its face." Id. at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

In considering a Rule 12(b)(6) motion to dismiss, the court's review is generally "limited to the four corners of the complaint." Wilchombe v. TeeVee Toons, Inc., 555 F.3d 949, 959 (11th Cir. 2009) (quoting St. George v. Pinellas County, 285 F.3d 1334, 1337 (11th Cir. 2002)). However, the court may properly consider documents that the complaint incorporates by reference and matters of which a court may take judicial notice. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). In reviewing the complaint, the court must do so in the light most favorable to the plaintiff, and it must generally accept the plaintiff's well-pleaded facts as true. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1057 (11th Cir. 2007). But "[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent

Case 1:21-cv-21940-BB   Document 195-2   Entered on FLSD Docket 02/27/2024   Page 6 of 15

Platinum Properties Investor Network, Inc. v. Sells, Not Reported in Fed. Supp. (2019)

dismissal." Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citation omitted); see also Iqbal, 129 S. Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

2. Analysis

a. Count I – IV (Infringement Claims)

**\*6** In Counts I – IV, Plaintiffs accuse Defendants of coupling Plaintiffs' registered trademarks, "Jason Hartman" and "JasonHartman.com," with generic terms such as "property," "media," "investments," and "real estate investments" to create substantially similar web and email addresses. Plaintiffs allege that Defendants have used the infringing addresses to divert internet traffic to mine consumer data and generate sales leads for Defendants' competitive real estate investment business.

The lynchpin of a claim for trademark infringement under the Lanham Act, whether brought under 15 U.S.C. §§ 1114 or 1125, is the likelihood of consumer confusion. See id. Defendants seek the collective dismissal of Counts I though IV for failing to "present a likelihood of confusion" as matter of law. (DE 32: 4).

Defendants do not appear to dispute that their marks are substantially similar to Plaintiffs' marks. Rather, they argue that Plaintiffs' claims are simply not actionable because the websites and emails are "quintessential 'gripe' site[s] and 'gripe' email...." (DE 32: 6). Defendants point out that their emails and websites contain a litany of derogatory information about Mr. Hartman, as well as phrases such as "investigation," "bad news," and "the truth about." Id. Defendants suggest that a visitor to their websites would not be under the mistaken impression that they were sponsored or endorsed by Plaintiffs. Defendants muse, "[W]hy would Mr. Hartman be sending out emails that are critical of himself?" Id. In support, Defendants cite several cases concluding that gripe sites do not pose a threat of consumer confusion. E.g., Taubman Co. v. Webfeats, 319 F.3d 770, 777–78 (6th Cir. 2003); NCC Bus. Servs., Inc. v. Lemberg & Assocs., LLC, 2014 WL 5510892, at * *6-7 (M.D. Fla. June 6, 2014); deVere Grp. GmbH v. Opinion Corp., 877 F. Supp. 2d 67 (E.D.N.Y. 2012); Taylor Building Corp. of Am. v. Benfield, 507 F. Supp. 2d 832, 847 (S.D. Ohio 2007).

Plaintiffs offer two distinct but interrelated observations in rebuttal. They respond that the disputed websites do not contain disparaging terms alongside the offending trademark within the actual web address, as is typical of "gripe site" cases. See deVere, 877 F. Supp 2d at 72 ("Courts have consistently held that so-called 'gripe sites' **incorporating derogatory or critical terms alongside a company's trade name**, in both the domain name and the website contents, do not present a likelihood of confusion...." (emphasis added)). Plaintiffs also highlight the commercial and competitive nature of Defendants' alleged infringement. Taking the allegations in the First Amended Complaint as true for purposes of this Motion, the undersigned concurs that the claims are actionable.

First, the consumer confusion Plaintiffs allege is in the nature of "initial interest" confusion and, therefore, liability does not necessarily depend on the disparaging content of the infringing website, as Defendants posit, but rather, on the initial confusion generated by the misleading web addresses. Stated differently, even though Defendants' websites may have eventually dispelled any affiliation to Plaintiffs once a diverted consumer discovered negative information about Hartman, consumers were nonetheless initially led to the web pages through confusingly similar domain names and email addresses, which failed to reveal that they were "gripe sites" or "gripe emails" until a visitor followed through to the landing page. At that point, Defendants took the opportunity to capture Plaintiffs' business and interfere with their business relations.

**\*7** Some federal circuits have determined that the initial confusion theory is actionable. See, e.g., Promatek Industries, Ltd. v. Equitrac Corp., 300 F.3d 808 (7th Cir. 2002); Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036 (9th Cir. 1999). Although the Eleventh Circuit has not determined whether initial interest confusion alone can supply the predicate for a Lanham Act claim, it has broadly recognized that liability for trademark infringement can arise where a defendant's misuse of a mark causes confusion indirectly or suggestively. See, e.g., N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522

Case 1:21-cv-21940-BB   Document 195-2   Entered on FLSD Docket 02/27/2024   Page 7 of 15

Platinum Properties Investor Network, Inc. v. Sells, Not Reported in Fed. Supp. (2019)

F.3d 1211, 1216 (11th Cir. 2008) (holding that the use of a trademark in hidden metatags intended to influence internet search engines could be the basis of a trademark infringement claim based on "source" confusion where competitor caused search results to display offending trademark in description of its own website). Based on Axiom, Promatek, and Brookfield, the undersigned concludes that a financial injury that results from an indirect or suggestive use of a trademark may supply the necessary predicate for a Lanham Act claim.

Here, the First Amended Complaint sufficiently alleges that Defendants benefitted commercially from the misdirected web traffic by harvesting the personal data of visitors to solicit competitive business opportunities. Because their alleged infringement was connected to a commercial purpose, even though the connection may have been indirect, the undersigned concludes that Plaintiffs have stated plausible claims. Accordingly, the undersigned RECOMMENDS that the Motion be DENIED as to Counts I – IV.

b. Counts V – VI (Dilution Claims)

In Counts V and VI, Plaintiffs assert trademark dilution claims under federal and Florida law. To state a prima facie case of dilution under the Federal Trademark Dilution Act, the plaintiff must show that "(1) the mark is famous; (2) the alleged infringer adopted the mark after the mark became famous; (3) the infringer diluted the mark; and (4) the defendant's use is commercial and in commerce." Brain Pharma, LLC v. Scalini, 858 F. Supp. 2d 1349, 1356 (S.D. Fla. 2012) (quoting Portionpac Chem. Corp. v. Sanitech Sys., Inc., 217 F.Supp.2d 1238, 1251 (M.D. Fla. 2002)); see also 15 U.S.C. § 1125(c)(1).

Florida's dilution statute similarly provides:

> The owner of a mark that is famous in this state shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction and to obtain such other relief against another person's commercial use of a mark or trade name if such use begins after the mark has become famous and is likely to cause dilution of the distinctive quality of the famous mark, as provided in this section.

Fla. Stat. § 495.151(1).

Case law provides that the same principles apply to federal and Florida dilution claims. See, e.g., Scalini, 2012 WL 1563917, at *8 (finding that plaintiff's inability to state claim for trademark dilution under federal law required finding that plaintiff failed to state dilution claim under Florida law); Provide Commerce, Inc. v. Preferred Commerce, Inc., 2008 WL 926777, at *4 (S.D. Fla. 2008) ("[B]oth the Federal and Florida state causes of action for dilution involve the same principles."); see also Great Southern Bank v. First Southern Bank, 625 So. 2d 463, 471 (Fla. 1993) (concluding that federal dilution principles are appropriately applied to dilution actions under Florida law).

Defendants seek dismissal of Plaintiffs' federal and state dilution claims on the ground that Plaintiffs cannot meet the famousness prong of a dilution claim as a matter of law. Defendants' arguments are well taken: Plaintiffs repeatedly indicate that the fame of their marks is limited to a niche segment within real estate investing circles. Accordingly, the undersigned concludes that these counts are subject to dismissal.

**\*8** For a trademark to be considered "famous" for purposes of a dilution claim, it must be "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). Although under federal law a plaintiff must allege that the mark is famous among "the general consuming public" nationally, id., under the Florida Anti-Dilution Act, a plaintiff must allege only that the mark is famous in Florida. See Fla. Stat. § 495.151(1) ("The owner of a mark that is famous **in this state**...." (emphasis added)).

Relevant factors include:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

Case 1:21-cv-21940-BB   Document 195-2   Entered on FLSD Docket 02/27/2024   Page 8 of 15

Platinum Properties Investor Network, Inc. v. Sells, Not Reported in Fed. Supp. (2019)

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A); see also Fla. Stat. § 495.151(1)(a) – (g).

State and federal courts have emphasized "that to be 'famous' a mark must be very strong and distinctive." Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc., 830 F.3d 1242, 1259–60 (11th Cir. 2016) (interpreting Florida's anti-dilution statute and citing MPS Entm't, LLC v. Abercrombie & Fitch Stores, Inc., 2013 WL 3288039, at *16 (S.D. Fla. June 28, 2013) ("To be 'famous' in the context of a trademark dilution claim, '[t]he mark must have a degree of distinctiveness and strength beyond that needed to serve as a trademark; it must be 'truly prominent and renowned.' ' ")); see also It's a 10, Inc. v. Beauty Elite Grp., Inc., 2013 WL 6834804, at *8 (S.D. Fla. Dec. 23, 2013) (interpreting federal dilution statute and stating: "The threshold for a showing of fame ... is exceptionally high.... In other words, [a] party claiming dilution must establish that its mark is practically a household name, of the likes of such giants of branding as Exxon, Kodak, and Coca-Cola.").

Consistent with these principles, the requirement of fame among the "general consuming public" has been understood to eliminate "niche fame." It's a 10, Inc., 2013 WL 6834804, at *8 (citing Top Tobacco, L.P. v. N. Atl. Operating Co., 509 F.3d 380, 384 (7th Cir. 2007)); see also Michael Caruso & Co. v. Estefan Enters., Inc., 994 F. Supp. 1454, 1463 (S.D. Fla. 1998) ("[E]ven if a mark is distinctive in its particular market, it does not render it inherently distinctive so as to engender immediate recognition in the general public of a particular product."), aff'd, 166 F.3d 353 (11th Cir. 1998). Put differently, "[a] claimant must show that, when the general public encounters the mark in almost any context, it associates the term, at least initially, with the mark's owner." Holding Co. of the Villages, Inc. v. Little John's Movers & Storage, Inc., 2017 WL 6319549, at *4 (M.D. Fla. Dec. 11, 2017) (internal quotations omitted) (quoting Coach Servs., Inc. v. Triumph Learning LLC, 668 F.3d 1356, 1373 (Fed. Cir. 2012) (concluding that luxury good manufacturer failed to establish that its "COACH" mark for fashion accessories was famous for dilution purposes)).

Against this backdrop, in the First Amended Complaint Plaintiffs assert that "Mr. Hartman is a world-renowned industry professional who has been involved in several thousand real estate transactions and has owned income properties in 11 states and 17 cities, including multiple cities in Florida." (DE 21 ¶ 45). Further, Plaintiffs claim that "Mr. Hartman serves as a guru in his trade," who spent "years" building his name and reputation and has drawn "tens of thousands of people" to speaking engagements "around the world." (Id. ¶ 47). According to Plaintiffs, they collectively earn an annual revenue of more than $ 3 million and have been "recognized by INC. magazine as among the INC. 5000 Fastest Growing Private Companies." (Id. ¶ 48). Plaintiffs reference the marks' "prominence developed ... in the real estate investment industry over the years." (Id. ¶ 49). They further allege that their trademarks have been in continuous use for more than 20 years and registered for nearly five years. (Id. ¶ 54). Plaintiffs purportedly "expend $ 1.5 million annually on marketing in connection with the JASON HARTMAN mark." (Id. ¶ 58).

*9 Defendants argue that Plaintiffs' marks do not meet the exceedingly high bar for fame required by law. They point out that Plaintiffs' marks are not "truly famous"; that is, they do not have the status of household names "widely recognized by the general consuming public" on the order of "Budweiser," "Camel," or "Barbie." Additionally, Defendants contend that whatever fame is associated with the Hartman marks is limited—by Plaintiffs' own allegations—to a niche within their own industry. The undersigned concurs.

Although Plaintiffs allege that they have achieved a sizeable revenue stream and advertising budget, and that Hartman has achieved considerable professional recognition, his "guru" status, as Plaintiffs readily acknowledge, is limited to "his **trade**." (Id. ¶ 47) (emphasis added). Likewise, Plaintiffs specify that Hartman's prominence is recognized "in the real estate investment **industry**...." (Id. ¶ 49) (emphasis added). Plaintiffs further specify that Hartman is a "world-renowned **industry** professional." (Id. ¶ 45) (emphasis added).

The undersigned notes Plaintiffs' allegations that the Hartman trademarks are "well known to the public" and "famous" for purposes of dilution, (Id. ¶ 57), yet these

Case 1:21-cv-21940-BB   Document 195-2   Entered on FLSD Docket 02/27/2024   Page 9 of 15

Platinum Properties Investor Network, Inc. v. Sells, Not Reported in Fed. Supp. (2019)

conclusory allegations are insufficient to render the dilution claims plausible under Twombly and Iqbal, particularly given that the First Amended Complaint makes plain that Hartman's fame, whatever its magnitude, does not extend beyond the real estate investment trade or industry. See 411 Kitchen Cabinets LLC v. King of Kitchen & Granite Inc., 2016 WL 7335840, at *5 (S.D. Fla. Oct. 25, 2016) ("Here, Plaintiff has not alleged facts to show that its mark is 'famous' .... At most, Plaintiff has alleged that its mark 'has enjoyed a good name and reputation in the cabinets, countertops, vanities and granite industry.' That allegation does not establish the requisite fame required for a dilution claim...."); see also Freedom Mentor, LLC v. Saeger, 2019 WL 313788, at *6 (M.D. Fla. Jan. 24, 2019) (dismissing dilution claim based on insufficient allegations of famousness despite contention that the trademarks at issue "have gained significant market recognition over the years of continual use" and are "highly recognizable" and that plaintiff is an "industry leader" and "has spent significant time and money" promoting its brand and services); Brookwood Funding, LLC v. Avant Credit Corp., Inc., 2015 WL 11504556, at * *3–4 (N.D. Ga. July 28, 2015) (dismissing dilution claim, stating: "Other than general allegations that it has invested time and money into its mark, Plaintiff has not alleged any fact which would make it plausible that the Brookwood mark is 'famous' for [ ] purposes of a federal dilution claim[ ].").

The conclusion that Plaintiffs cannot state a plausible claim for trademark dilution under federal or state law finds support in another consideration: principles of trademark dilution have no application in scenarios where, as here, the owner of the mark, and the infringer, are involved in the same trade. See Heron Dev. Corp., 2017 WL 5957743, at *11 (dismissing a federal dilution claim, reasoning that "where the case is one of competitive or closely similar goods or services ... the dilution theory is not applicable") (quoting 4 McCarthy on Trademarks and Unfair Competition § 24:74, and citing Community Fed. Sav. & Loan Ass'n v. Orondorff, 678 F.2d 1034, 1037 (11th Cir. 1982) (reviewing Florida dilution claim and adopting the general rule that dilution applies "for a product so dissimilar from the product of the prior user that there is no likelihood of confusion of the products or sources")).

*10 In this case, Plaintiffs allege that Defendants "staunchly compete" and are "business competitors in every way." (DE 21 ¶ 59). Plaintiffs further allege that the Defendants' infringing use of the subject trademarks was intended to "enjoy the spoils" of Plaintiffs' success by stealing their clients in the same "close and intimate industry." (Id. ¶¶ 59-66, 84). Therefore, just as in Heron Dev. Corp., "the dilution of the marks is addressed and remedied by federal trademark [infringement] law, [and] it is not necessary to seek the broader protections of the antidilution act." 2017 WL 5957743, at *11 (first alteration in original) (quoting Harley-Davidson Motor Co. v. Iron Eagle of Cent. Florida, Inc., 973 F.Supp. 1421, 1426 (M.D. Fla. 1997)). Accordingly, as the the federal and state anti-dilution statutes are inapplicable in this case, and famousness has not been sufficiently alleged, the undersigned RECOMMENDS that Counts V and VI be DISMISSED.

### c. Claims VII, XI, XII (Misrepresentation Claims)

Count VII asserts a statutory claim for false advertising under Florida law. Count XI is a claim for common law fraud, and Count XII is a claim for negligent misrepresentation.

Defendants move to dismiss these counts; they contend that justifiable reliance lies at the center of each of these claims and that first-party reliance is a required element of a prima facie case. According to Defendants, the allegations in the Complaint demonstrate, at most, that a third-party visitor to the infringing web addresses—not Plaintiffs—may have justifiably relied on the allegedly infringing use of the marks. Plaintiffs counter that third-party reliance is a permissible basis for establishing a fraud or negligent misrepresentation claim. The undersigned, however, does not agree and recommends that Counts VII, XI, and XII be dismissed.

Defendants are correct that justifiable reliance lies at the center of each challenged count. See Joseph v. Liberty Nat. Bank, 873 So. 2d 384, 388 (Fla. 5th DCA 2004) (stating that Florida statutory claim for "misleading advertising is a particularized form of fraud" which requires proof of justifiable reliance); First Union Disc. Brokerage Servs., Inc. v. Milos, 997 F.2d 835, 845 (11th Cir. 1993) (stating that common law fraud requires proof of justifiable reliance);

Case 1:21-cv-21940-BB   Document 195-2   Entered on FLSD Docket 02/27/2024   Page 10 of 15

Platinum Properties Investor Network, Inc. v. Sells, Not Reported in Fed. Supp. (2019)

Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010) (stating that a required element of a negligent misrepresentation claim is justifiable reliance on the misrepresentation). The question here is whether the conduct that forms the basis of the misrepresentation claims—that Defendants' allegedly lured third-party visitors to their web pages by using false and misleading web addresses—is actionable given that Plaintiffs are not the parties alleged to have been deceived or induced by the misrepresentation. More specifically, with respect to false advertisement, Plaintiffs expressly state that "Plaintiffs' **clients and colleagues** did in fact rely upon the false and misleading representation by Defendants in using the Impersonator Account." (DE 21 ¶¶ 228-231) (emphasis added). Plaintiffs make identical allegations with respect to their common-law fraud and negligent misrepresentation claims, emphasizing that it was their "clients and colleagues" who relied on the misrepresentations—not them. (Id. ¶¶ 246-249, 253).

The undersigned has not located any authority under Florida law that would support Plaintiffs' position that a third-party's reliance on a misrepresentation is sufficient to plead a claim in fraud or negligence where there has been no actual reliance on that misrepresentation by the plaintiff.

Although there are some well-established circumstances in which a plaintiff can properly plead a claim for fraud or negligence through indirect reliance, the circumstances in which those claims have been recognized contemplate that the party claiming injury based on the misrepresentation is the **same** party who relies upon the misrepresentation. See, e.g., Cmty. Bank, Lake Oswego, Oregon v. Bank of Hallandale & Tr. Co., 482 F.2d 1124, 1127 (5th Cir. 1973) (resolving sufficiency of a fraud claim brought by the relying party and stating: "It is the general law, as well as the controlling law in Florida, that recovery may be had for misrepresentation as to a third party's financial condition where a person, for the purpose of inducing another to lend money to said third person, misrepresents the financial responsibility or solvency of such third person.") (citing Forbes v. Auerbach, 56 So.2d 895 (Fla. 1952) (discussing numerous examples)); First Fla. Bank, N.A. v. Max Mitchell & Co., 558 So. 2d 9, 14 (Fla. 1990) (holding that absence of privity was not a bar to negligence action based on misrepresentation of accountant that foreseeably induced third party to loan or invest in account's client, and adding further, that "absence of privity shall continue to be no bar to charges of fraud").

**\*11** Federal courts routinely apply those Florida principles. Accord TracFone Wireless, Inc. v. Adams, 98 F. Supp. 3d 1243, 1260 (S.D. Fla. 2015) ("By Adams' own admission, he knowingly made false statements to TracFone employees in order to coerce them into adding free airtime to prearranged phone numbers.... TracFone's employees acted upon Adams' false statements ..., which resulted in a financial loss to TracFone."); Koch v. Royal Wine Merchants, Ltd., 907 F. Supp. 2d 1332, 1345 (S.D. Fla. 2012) (denying dismissal of fraud claim against importer of counterfeit wine based on plaintiff's reliance on counterfeit labels affixed to bottles sold to him via third-party resellers). Stated simply, there is a distinct difference between indirect first-party reliance, which is a well-established theory in Florida, and third-party reliance, which is not.

Plaintiff's citation to Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008) is unavailing; it does not support the conclusion that an injured party may properly state a claim for fraud or negligence in Florida based upon a misrepresentation without pleading first-party reliance on the misrepresentation.

First, Bridge did not interpret Florida law: it involved a federal RICO claim, predicated on the federal criminal mail fraud statute, which is a "statutory offense unknown to the common law." 553 U.S. at 652. This alone renders the case irrelevant, given that "[t]he common-law requirements of 'justifiable reliance' and 'damages[ ]' ... plainly have no place in the federal fraud statutes." Neder v. United States, 527 U.S. 1, 24–25 (1999).

Moreover, Bridge does not support Plaintiffs' argument that common-law fraud permits recovery where an injured plaintiff does not rely on the misrepresentation in question. Indeed, the Bridge Court did not dispute that "first-party reliance is an element of a common-law fraud claim...." Id. at 657. Although the Court went on to cite a "long line of cases in which courts have permitted a plaintiff directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation," id. at 656, the Court acknowledged that many of the historical examples it cited

Case 1:21-cv-21940-BB   Document 195-2   Entered on FLSD Docket 02/27/2024   Page 11 of 15

Platinum Properties Investor Network, Inc. v. Sells, Not Reported in Fed. Supp. (2019)

have evolved into specialized torts such as "intentional interference with economic relations," Id. at n. 7, or other actions along the lines of defamation. Contrary to Plaintiffs' argument, the Bridge Court specifically cautioned that "[t]he cases are not cited as evidence that common-law fraud can be established without showing first-party reliance." Id.

Absent further guidance from Florida courts, the undersigned finds no reason to depart from the typical (and intuitive) rule in contemporary law that first-party reliance is the centerpiece of a fraud claim. See Restatement (Second) of Torts § 537 (1977) ("The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if, (a) he relies on the misrepresentation in acting or refraining from action, and (b) his reliance is justifiable." (emphasis added)); see also Colite Int'l Inc. v. Robert L. Lipton, Inc., 2006 WL 8431656, at *6 (S.D. Fla. June 6, 2006) ("To assert a ... common law fraud claim **a plaintiff must plead that she justifiably relied** upon the fraudulent representations made by the defendants.") (emphasis added) (citing Mergens v. Dreyfoos, 166 F.3d 1114, 1117 (11th Cir. 1999) and Biscayne Inv. Group. Ltd., et al. v. Guarantee Mmgt. Serv., Inc., 903 So. 2d 251, 255 (Fla. 3rd DCA 2005)).

Indeed, Florida law is replete with examples of courts refusing to recognize a fraud claim where the plaintiff is aware of the misrepresentation, which is consistent with the notion that first-party reliance is a pleading requirement of fraud. See, e.g., M/I Schottenstein Homes, Inc. v. Azam, 813 So.2d 91, 94-95 (Fla. 2002) ("The question ... is whether the recipient of the misrepresentation is 'justified in relying upon its truth.' For if the recipient 'knows that it [the statement] is false or its falsity is obvious to him,' his reliance is improper, and there can be no cause of action for fraudulent misrepresentation.") (quoting Besett v. Basnett, 389 So.2d 995, 997 (Fla. 1980)).

*12 Because Plaintiffs allege mere third-party reliance as the predicate for false advertisement, common-law fraud, and negligent misrepresentation, the undersigned concludes Plaintiffs cannot state a claim for relief as to Counts VII, XI, and XII. Accordingly, the undersigned RECOMMENDS those counts be DISMISSED.

d. Civil Conspiracy (Count VIII), Unfair Competition (Count IX), Tortious Interference (Count X).

Defendants' challenge to Plaintiffs' state-law civil conspiracy and unfair competition claims is essentially a derivative one: Defendants' argue that because Plaintiffs' infringement claims fail, the civil conspiracy and unfair competition claims based on the same underlying conduct necessarily fail as well. However, for reasons previously set forth, the undersigned concludes that Plaintiffs can state plausible claims for infringement in Counts I – IV. Therefore, because they are based on the same underlying conduct, Plaintiffs' civil conspiracy and unfair competition counts also state plausible claims for relief.

As to the tortious interference count, Defendants argue that Plaintiffs have not sufficiently identified "specific business relationships or the clients who allegedly terminated their business relationships with Plaintiffs." (DE 32: 10). Yet, the First Amended Complaint contains allegations indicating that "Defendants' activities did either break contractual agreements with Plaintiffs and/or stopped doing business with Plaintiffs as a result of Defendants' intentional and unjustified interference.... For example, one client of Plaintiffs' canceled a speaking engagement ... worth tens of thousands of dollars...." (DE 21 ¶ 243). The undersigned concludes that a terminated business relationship was sufficiently pled to withstand dismissal. Accordingly, the undersigned RECOMMENDS that the Motion be DENIED as to Counts VIII, IX, and X.

e. Invasion of Privacy (Count XIII)

Finally, Count XIII asserts an invasion of privacy claim under Florida law. The Florida Supreme Court first recognized the right to sue for invasion of privacy as a distinct civil tort in Cason v. Baskin, 20 So.2d 243 (Fla. 1945). In Cason, the court described the essence of the right as the "protection of the individual in the enjoyment of all of his inherent and essential rights and to afford a legal remedy for their invasion." 20 So.2d at 250. In subsequent years, the Florida Supreme Court has refined the tort to include four general categories of invasion of privacy based on William L. Prosser's 1960 article on privacy. See Jews For Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1102-1103 (Fla. 2008) (discussing

Case 1:21-cv-21940-BB   Document 195-2   Entered on FLSD Docket 02/27/2024   Page 12 of 15

Platinum Properties Investor Network, Inc. v. Sells, Not Reported in Fed. Supp. (2019)

origins of Florida privacy laws, citing William L. Prosser, Privacy, 48 Cal. L.Rev. 383 (1960)).

The four interests, as set forth by Professor Prosser and recognized by Florida courts, consisted of: "(1) intrusion upon the seclusion of another; (2) commercial appropriation of one's name or likeness; (3) publication of private facts; and (4) false light." Id. at 1102. Prosser's paradigm was later codified in the Restatement (Second) of Torts §§ 652B-652E (1976). Jews For Jesus, 997 So. 2d at 1103.

Florida's privacy laws have continued to evolve, with the effect of both expanding and narrowing the tort in different ways. For instance, the Florida Legislature later enacted Fla. Stat. § 540.08 and "amplified the remedies available for ... commercial exploitation of the property value of a person's name or personality." Loft v. Fuller, 408 So. 2d 619, 622 (Fla. 4th DCA 1981); see also Weaver v. Myers, 229 So. 3d 1118, 1128 n. 2 (Fla. 2017) ("Florida recognizes both a statutory and common law right of publicity.").

**\*13** On the other hand, the Florida Supreme Court determined that false light claims were no longer a "viable cause of action in this state." Jews For Jesus, 997 So. 2d at 1115. In Jews For Jesus, the court expressed its concern about the substantial overlap between defamation law and false light theory, id. at 1105, and opined that the "extensive" First Amendment protections governing defamation, which has "slowly developed over the years," through both case law and statute, could potentially be circumvented by plaintiffs asserting a false light claim "in order to ensure recovery, even though the same conduct could equally be remedied under defamation law." Id. at 1112.

With these principles in mind, the undersigned turns to the First Amended Complaint. In Count XIII, Plaintiffs allege that the "Infringing Website was, and still is, completely devoid of any privacy policy.... and solicited visitor[s'] information through a 'Contact Us' fill-in webform." (DE 21 ¶ 256). Plaintiffs further allege that Defendants' fraudulently obtained and published Hartman's "personal IP address, email address, and personal information, which was obtained when Mr. Hartman sent the cease-and-desist demand through the Infringing Website's 'Contact Us' webform." (Id. ¶ 257). Plaintiffs state that the "Infringing Website publicly disclosed Plaintiffs' private information." (Id. ¶ 258).

Initially, it is not entirely clear from the pleading under which invasion-of-privacy theory, or theories, Plaintiffs purport to travel. For instance, Plaintiffs unrelatedly argue in response to the Motion that "Defendants 'exploited' or 'appropriated' Hartman's personality" and reference general allegations from the Complaint primarily connected to their infringement claims, even though Count XIII does not recite the elements of a right-of-publicity privacy claim or otherwise notify the Defendants that such a claim has been asserted. (DE 34: 19). Despite Plaintiffs' attempt to signal the existence of a publicity claim buried somewhere in their pleading, this approach does not meet the "fair notice" requirements of Fed. R. Civ. P. 8(a).

In further support of their privacy claim, Plaintiffs point to their allegations that "the Infringing Website is replete with false statements relating to Plaintiffs' business, financial history, litigation history, commercial dealings, alleged prurient nature, credibility, and trustworthiness." (Id.) (alteration omitted) (quoting DE 21 ¶ 77). However, to the extent that Plaintiffs' invasion-of-privacy claim is predicated on false statements, Florida law does not recognize this to be a viable ground. Jews For Jesus, 997 So. 2d at 1115.

The disclosure of Hartman's "personal IP address, email address, and personal information" is the only remaining ground for Plaintiffs' privacy claim. However, Plaintiffs allege that they voluntarily disclosed the above information to Defendants in the form of a demand letter submitted through the "Contact Us" webform on Defendants' "Infringing Websites." (DE 21 ¶ 257). In Florida, it is generally recognized that "before the right of privacy is attached ... a reasonable expectation of privacy must exist." Winfield v. Div. of Pari-Mutuel Wagering, Dep't of Bus. Regulation, 477 So. 2d 544, 547 (Fla. 1985).

Because Plaintiffs voluntarily disclosed the allegedly private information to Defendants, their competitors and adversaries, they cannot reasonably expect the information to remain private. See, e.g., Nucci v. Target Corp., 162 So. 3d 146, 153–54 (Fla. 4th DCA 2015) ("We agree with those cases concluding that, generally, the photographs posted on a social networking site are neither privileged nor protected by any right of privacy, regardless of any privacy settings that the user may have established."); Berkeley v. Eisen, 699 So.

Case 1:21-cv-21940-BB   Document 195-2   Entered on FLSD Docket 02/27/2024   Page 13 of 15

Platinum Properties Investor Network, Inc. v. Sells, Not Reported in Fed. Supp. (2019)

2d 789, 791 (Fla. 4th DCA 1997) ("Assuming, as Berkeley argues, that its client lists are trade secrets and proprietary business data, those privileges would have been waived by Berkeley's voluntary disclosure."); Slim-Fast Foods Co. v. Brockmeyer, 627 So. 2d 104, 106 (Fla. 4th DCA 1993) ("We conclude that by disclosing information about their medical conditions as part of a consumer complaint made directly to the manufacturer, without requesting or receiving any express assurance that the information would be kept confidential, the consumers acted in a manner that was inconsistent with any reasonable expectation of privacy.") Indeed, the same rule is applied in federal courts. See United States v. Davis, 785 F.3d 498, 519 (11th Cir. 2015) ("The Supreme Court 'consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.' ") (quoting Smith v. Maryland, 442 U.S. 735, 743-744 (1979)).

**\*14** The legal insufficiency of Plaintiffs' privacy claim is further underscored by the fact that in Florida, residential addresses and contact information do not typically fall within the parameters of "private" information. In this vein, except in cases involving individuals exempt for public records disclosures under Florida Statutes, Chapter 119 (such as police officers or judges), Florida authorities suggest that professionals cannot reasonably expect that this type of information will remain private given the necessity of certain disclosures for state licensing applications, such as those relevant to the real estate and investment sectors. See, e.g., Bd. of Cty. Comm'rs of Palm Beach Cty. v. D.B., 784 So. 2d 585, 587 (Fla. 4th DCA 2001) (holding that an adult entertainer could not prevent disclosure of her stage name, real name, address, or telephone number as part of licensure application, despite purported safety risks, explaining that courts cannot engraft exceptions to Florida's Sunshine Laws).

These principles apply with particular force here, not only due to Hartman's licensure, (DE 21 ¶ 42), but because Hartman also then provided his "full name, date of birth, cell phone number, home phone number, and home address" to police in Palm Beach County when he lodged a criminal complaint against Defendants. (DE 34-7: 5). That information was subsequently incorporated into a police report (Id., Ex B), and became a public record. See Fla. Stat. § 119.105 ("Police reports are public records except as otherwise made exempt or confidential.") Thus, Hartman's expectations of privacy, even if reasonable, are ultimately irrelevant as these quintessentially public records are not entitled to privacy protection under Florida's Sunshine Laws in any event. Forsberg v. Hous. Auth. of City of Miami Beach, 455 So. 2d 373, 374 (Fla. 1984) (holding that public records are exempt from privacy laws).

In sum, the undersigned finds that the only aspect of invasion of privacy that could potentially state a plausible claim for relief involves commercial appropriation. The undersigned concludes that Count XIII is legally insufficient, but that Plaintiffs should not be foreclosed from developing their allegations further, and accordingly RECOMMENDS that Count XIII be DISMISSED with leave to amend.

### III. CONCLUSION

For the foregoing reasons, the undersigned respectfully RECOMMENDS that Defendants' Motion to Dismiss (DE 32) be GRANTED in part and DENIED in part. Specifically, the undersigned recommends as follows:

> A. Counts I – III: As to Jason Hartman and Platinum Properties Investment Network, GRANTED, for lack of standing. As to The Hartman Media Company, LLC, DENIED.
>
> B. Count IV: As to all Plaintiffs, DENIED.
>
> C. Counts V – VI: As to all Plaintiffs, GRANTED. The undersigned recommends dismissal with prejudice.
>
> D. Counts VII, XI, XII: As to all Plaintiffs, GRANTED. The undersigned recommends dismissal with prejudice.
>
> E. Counts VIII, IX, X: As to all Plaintiffs, DENIED.
>
> F. Count XIII: As to all Plaintiffs, GRANTED. The undersigned recommends dismissal without prejudice.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Darrin P. Gayles, United States District Judge. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from

Case 1:21-cv-21940-BB   Document 195-2   Entered on FLSD Docket 02/27/2024   Page 14 of 15

Platinum Properties Investor Network, Inc. v. Sells, Not Reported in Fed. Supp. (2019)

attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

DONE AND SUBMITTED in Chambers, Fort Lauderdale, Florida, this 11th day of April 2019.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2247544

Platinum Properties Investor Network, Inc. v. Sells, Not Reported in Fed. Supp. (2019)

## Footnotes

1   Defendants do not rebut the allegations of conspiracy in their respective affidavits. Because the undersigned concludes that a civil conspiracy has been properly pled, as discussed in greater detail below, jurisdiction accordingly extends over each defendant. See United Techs. Corp. v. Mazer, 556 F.3d 1260, 1281–82 (11th Cir. 2009)("Florida courts have held that the state's long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida.")

2   Although Defendant Putich states that she is currently unemployed and has a newborn, (DE 32-3 ¶¶ 4-5), she does not indicate that litigating in Florida would pose a unique financial impediment. Moreover, Putich's affidavit reveals that she has been able to successfully study and work in across state lines. (Id. ¶¶ 5-6).

3   Notably, as in Mosseri, when Plaintiffs here filed their lawsuit, they "did not know who was behind the websites or where the person was." Id. Under these circumstances, "[r]equiring two lawsuits when one would do makes little sense." Id.

4   In their Reply, Defendants concede that Plaintiffs' claim for false designation of origin under 25 U.S.C. § 1125(a) may be brought by "any person" aggrieved by a violation of that statute and therefore withdraw their standing challenge as to Count IV. (DE 35: 7, and n. 4).

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.