# EXHIBIT A

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                  CASE NO. 1:21-cv-21940-BB
 3
     NEIMA BENAVIDES, as Personal
 4   Representative of the Estate of
     Naibel Benavides Leon, deceased,
 5
                 Plaintiff,              March 1, 2024
 6                                       1:19 p.m.
             vs.
 7
     TESLA, INC., a/k/a Tesla Florida, Inc.,
 8
                 Defendant.              Pages 1 THROUGH 45
 9   _____

10                TRANSCRIPT OF MOTION HEARING
               BEFORE THE HONORABLE BETH BLOOM
11                UNITED STATES DISTRICT JUDGE

12
     Appearances:
13
     FOR THE PLAINTIFF:    EATON & WOLK, PL
14                         DOUGLAS F. EATON, ESQ.
                           2665 South Bayshore Drive, Suite 609
15                         Miami, Florida 33133

16                         THE ROUSSO LAW FIRM
                           ADAM T. BOUMEL, ESQ.
17                         9350 South Dixie Highway, Suite 1520
                           Miami, Florida 33156

18

19   FOR THE DEFENDANT:    BOWMAN and BROOKE, LLP
                           WHITNEY V. CRUZ, ESQ.
20                         Two Alhambra Plaza, Suite 800
                           Coral Gables, Florida 33134

21

22   COURT REPORTER:       Yvette Hernandez
                           U.S. District Court
23                         400 North Miami Avenue, Room 10-2
                           Miami, Florida 33128
24                         yvette_hernandez@flsd.uscourts.gov

25
```

```
 1          (Call to order of the Court, 1:19 p.m.)
 2          COURTROOM DEPUTY:  Calling Civil Case Number 21-21940,
 3     Neima Benavides and Dillon Angulo v. Tesla, Inc.
 4          Counsel, please state your appearances for the record,
 5     beginning with Plaintiffs' counsel.
 6          MR. EATON:  Doug Eaton and Adam Boumel on behalf of
 7     the Plaintiffs.
 8          MS. CRUZ:  Whitney Cruz on behalf of Tesla, Inc.
 9          THE COURT:  Good afternoon to each of you.
10          MS. CRUZ:  Good afternoon.
11          MR. EATON:  Good afternoon, Your Honor.
12          MR. BOUMEL:  Good afternoon, Your Honor.
13          THE COURT:  Certainly the motion for and the request
14     for oral argument was granted, and before the Court for hearing
15     is Docket Entry 165.  But I also do want to address the joint
16     motion to extend the discovery deadline, because I think that
17     the decision on the Plaintiffs' motion will certainly dovetail
18     into the parties' readiness for trial.  So why don't we address
19     the motion for leave to consolidate and amend the complaint.
20          I know that there were issues that you wanted to bring
21     to the Court's attention following -- I think we had stayed
22     this case, and then there was some more time that was given
23     with regard to the recall and the investigation.  So perhaps if
24     you can just give me an update on where we are with the case.
25          MR. EATON:  Sure, Your Honor.
```

1          We actually did not stay the case, so that -- we had

2     requested a stay pending the outcome of this very investigation

3     that we're here about.  The Court had denied that, but the case

4     was continued when the second Plaintiff was added, Mr. Angulo,

5     and the Court issued new deadlines at that point.

6          But the fact that we had asked for a stay -- the

7     reason we had asked for the stay is because all along we were

8     hoping that the NHTSA investigation would produce what it did,

9     in fact, end up producing, which is a finding of product defect

10    and a recall, and Tesla sending out notices to its customers,

11    saying:  "Our product is defective and we hope we're going to

12    fix it."

13         And we had told you very early on in the case if NHTSA

14    had not found that, we may very well drop the case.  But they

15    did, in fact, find this.  And so, here we are now, which is

16    essentially where we wanted to start the lawsuit, but -- and I

17    think that's what's really important here in this motion, is

18    looking at -- not at the age of the case, but at where we are

19    in the case.  And when we first filed our first motion for

20    leave to amend in last August, at that point -- we had received

21    zero discovery from Tesla at that point.

22         And since then, we've started to get some documents,

23    and we think that some of the agreements that we had reached on

24    some of the production -- they've gone back on them.  We

25    detailed that fairly extensively in our proffer related to the

```
1    joint motion to extend the discovery deadline, just so the

2    Court had kind of a flavor of what we've been going through and

3    why this has been moving slower than perhaps the Court would

4    like.

5         THE COURT:  And let me just ask, Mr. Eaton, so the

6    parties did not -- did the parties continue with discovery?

7    Because I know that there was a request to stay pending the

8    outcome of the investigation.  The case proceeded, but --

9    because obviously it is a 2021 case.  But the progress of the

10   discovery -- did the parties themselves stop at one point?

11        MR. EATON:  No.  There was -- most of the discovery

12   was -- and I will say candidly that from the Benavides

13   standpoint that the Plaintiffs were not pushing the discovery

14   on that.  The Defendants were.  And they did, you know, take

15   some discovery of the Plaintiff, and there was discovery

16   exchanged on that.  But ever since Mr. Angulo came in the case,

17   which I believe was at the end of 2022, the parties have been

18   aggressively pushing discovery.  And we added -- our co-counsel

19   out in California, we added them earlier last year, and they

20   have been assisting us with discovery on the merits.

21        So really, things started to pick up in the case when

22   Mr. Boumel's client joined the case.  And that's, you know,

23   really what our focus is.  And to the extent that the Court is

24   concerned about the Benavides Plaintiffs not moving the case

25   significantly, this case is consolidated and we wouldn't want
```

1    it to prejudice Mr. Angulo.

2              THE COURT:  Of course.

3              MR. EATON:  So we don't think that's a basis to look

4    at this and say:  "Well, I'm not going allow an amendment as a

5    result of what the Benavides Plaintiff did."

6              THE COURT:  I agree with you.

7              MR. EATON:  Thank you.

8              So presumably, the point of an amendment deadline is

9    so that there's enough time after the pleadings are closed to

10   allow discovery on the issues that are related in the pleadings

11   and the allegations.  So the Court's previous scheduling orders

12   gave time periods of eight months and 10 months from the

13   amendment deadline to trial, and we filed this motion 11 months

14   prior to trial.  So just on that basis alone, it can't be

15   considered:  "Okay.  Well, it's too close to trial."

16             So what Tesla is arguing is:  "Well, you missed the

17   deadline and you didn't get a new deadline."  We believe that

18   the Plaintiffs showed sufficient good cause, and some of these

19   were joint motions to continue the trial.  If there was good

20   cause to continue the trial and to continue the discovery

21   deadlines, it seems that it would naturally follow that there

22   would be good cause to extend the amendment deadlines.  And so,

23   otherwise, we're just elevating form over substance.  We're

24   just picking this date, and saying:  "That's it.  Two years ago

25   was your last chance to amend, even though you haven't gotten

1   any discovery from Tesla yet and Mr. Angulo had only been in

2   the case three months."  You know, we think that that unfairly

3   prejudices at least Mr. Angulo for that.

4          But when we asked for leave to amend last time, the

5   Court denied it, and the Court said:  "Because this is

6   information that you guys had previously."  We now have

7   information that we could not have had previously because it

8   did not exist, and that is the NHTSA recall.  Tesla argued in

9   their response that we did know about it.  Well, no.  We knew

10  about the investigation, obviously, but the investigation is

11  not admissible because it hadn't produced any results.

12         And we know documentation from the investigation --

13  one of the things we asked for was all the documents you

14  provided to NHTSA, and they've been fighting us on that since

15  as long as we can remember.  So we don't have the data that was

16  provided, and so we don't have the output that NHTSA has.  We

17  don't have the results.  So none of this is -- can be

18  considered information that we could have obtained through due

19  diligence.  It didn't exist.  The recall came out in December,

20  and that's the very first time we could act on it.  And we

21  acted on it immediately at that point to ask for leave to amend

22  because we now had new information.

23         The recall is important because -- especially to our

24  proposed punitive damage claim, because the response to knowing

25  about a defect, how its handled, is relevant to punitive

```
1   damages.
2           THE COURT:  And the punitive damages claim would
3   attach to which cause of action?
4           MR. EATON:  All of them, Your Honor.  It's my
5   understanding we requested on all claims.
6           THE COURT:   Including a negligent misrepresentation?
7           MR. EATON:  Well, the way that -- and you can correct
8   me if I'm wrong.  But the way that I've always understood
9   punitive damages to work is that first you need to have -- you
10  need to win a claim.  And then, once you do that, that opens
11  the door.  Then you have a second layer that you have to prove.
12  You have to prove beyond clear and convincing evidence that
13  either they were grossly negligent or intentional -- had
14  intentional misconduct.  And if you have one of the predicate
15  claims, then you still have to prove this other layer.
16          So it's not a specific claim that you have to prove to
17  get punitive damages.  It's basically you're going to prove two
18  things -- two claims, one on top of the other.  You have to win
19  one first, and then you prove -- and that's the Soffer case
20  that I cited in my response -- and that the standard for
21  punitive damages does not vary based on the underlying claim.
22  You still have to prove that they either were grossly negligent
23  or that they committed intentional misconduct.
24          I hope that answers your question on that.  But we've
25  alleged -- we've asked for punitive damages for all claims.
```

1            THE COURT:  All right.

2            MR. EATON:  Okay.

3            So with respect to the punitive damages, Tesla argued

4    that we had to comply with the Florida statute on making the

5    proffer, and that's -- I cited to one of the opinions from this

6    Court which says very clearly that's not the case.  It's

7    procedural.  It doesn't apply.  It's simply you just add in the

8    addendum clause and that's all it is.  But -- so that's not a

9    basis to deny amendment for the punitive damages claim.

10            Then Tesla's next argument is futility.  And this

11    one -- I think it's an interesting one because in some

12    respects, at least in Florida, it's a case of first impression.

13    Florida law is silent on whether or not you can have

14    reliance -- damages sustained by someone else's reliance and

15    resulting injury.  Tesla has cited to cases that say, well, the

16    elements are, you know, first-party reliance.  But none of the

17    cases that they cite to are actually addressing the question.

18    They're just setting forth the elements.  And so none of

19    that -- that's all -- it's not helpful to the Court.  It

20    doesn't address the restatement that is cited in Bridge v.

21    Phoenix.  And I want to talk about that a little bit more, but

22    before I get into the weeds on that --

23            THE COURT:  Yeah, because the Defendant has filed its

24    notice of supplemental authority, and at least two judges in

25    this district have granted motions to dismiss finding that

```
 1    plaintiff's citation to Bridge was unavailing.

 2             MR. EATON:  Yeah.  I'm glad you raised that because

 3    that was the point I was going to make before I actually

 4    started talking about the merits, is that those were on a

 5    motion to dismiss.  And this, I think, merits more briefing

 6    than what we've, you know, been able to do here because it's an

 7    important issue.  And, you know, I think we've already got a

 8    negligent misrepresentation claim in here that's been answered.

 9             So regardless of whether the Court grants leave to

10    amend these other counts, there's going to be a summary

11    judgment motion on that down the road.  We're going to have to

12    fight it at that point.  So it doesn't matter whether there's

13    four counts or one count.  There's still misrepresentation and

14    reliance.

15             Now, let me talk about the supplemental authority

16    cases.  I read both of them, and I think they both -- the way

17    that they distinguished Bridge was -- I didn't think it was

18    very deep.  They just simply said:  "Well, Bridge is a RICO

19    case, and it's not common law, and therefore it's

20    distinguishable."  But Bridge went out of its way to explain

21    that that didn't matter.  It said specifically:  "While it may

22    be that first-party reliance is an element of a common law

23    fraud claim, there is no general common-law principle holding

24    that a fraudulent misrepresentation can cause legal injury only

25    to those who rely on it."
```

1       So Bridge spent a long time explaining why it didn't

2    matter that this was a RICO case.  They talked about in the

3    common law perspective.  They cited to the restatement.  And

4    the restatement applied in various circumstances outside of

5    RICO, outside of a statutory basis.

6       And the two cases that were cited on motion to dismiss

7    simply said, you know, it's not a common law case.  So we're

8    going to -- it didn't get any of Bridge's analysis.  And Bridge

9    actually addressed in their footnote -- and if I may --

10    THE COURT:  But -- I'm sorry.  You're seeking to amend

11    the complaint to include three new claims --

12    MR. EATON:  Correct.

13    THE COURT:  -- intentional misrepresentation, common

14    law fraudulent concealment, and intentional false advertising,

15    relying on Florida Statute 817.40 and 817.44.  I want to put

16    aside the Florida statute on the false advertising.  But as to

17    those two claims --

18    MR. EATON:  Right.

19    THE COURT:  -- it appears that my colleagues, at least

20    in the Southern District, in looking at the same argument with

21    regard to Bridge, found that:  "Because plaintiffs allege mere

22    third-party reliance as the predicate for false advertisement,

23    common law fraud, and negligent misrepresentation" -- which is

24    already part of this case -- "the undersigned concludes that

25    plaintiff cannot state a claim for relief.  Accordingly, the

1    undersigned recommends that the counts be dismissed."

2          So why would the Court not follow that?

3          MR. EATON:  Because you're not bound by a magistrate's

4    ruling.

5          THE COURT:  No.  I understand that.

6          MR. EATON:  You're bound by the Supreme Court -- the

7    US Supreme Court.  And what the US Supreme Court says -- in

8    addressing the argument that was made by your colleagues, it

9    says:  "Petitioners missed the point.  These cases are not

10   cited as evidence that common law fraud can be established

11   without showing first-party reliance."

12         And we're not suggesting that either.  We have to

13   prove that the driver relied on the misrepresentations and

14   misused the product as a result.  So we still are proving

15   reliance.  We're proving all of the elements of a

16   misrepresentation and fraud claim.  The only difference is, is

17   that the person who is injured is not the person who relied on

18   the misrepresentation.

19         And so what Bridge says is you can do that.  It says:

20   "Rather, they, along with the Restatement's recognition of

21   specialized torts based on third-party reliance, show that

22   fraudulent misrepresentation can proximately cause actionable

23   injury even to those who do not rely on the misrepresentation."

24         So Bridge has addressed the argument that the other

25   two courts dismissed the claims on, and rejected it.  So that's

1    not a basis to reject this.  The statement of tort says this.

2    So this is the US Supreme Court.  Can't get any higher

3    authority than that.  So that's why I'm suggesting that, at the

4    amendment stage, this is perhaps not the best time to make a

5    decision on the viability of these claims, and perhaps, you

6    know, a more thorough briefing at the motion to dismiss or

7    summary judgment stage would be more appropriate on that, Your

8    Honor.

9        So the other issue is, even if you don't have a

10   misrepresentation claim in there, the misrepresentations are

11   still relevant to the punitive damages claims.  I've got a

12   number of cases here, and I cited to some of them in one of my

13   responses, the Soffer case, the Johns-Manville v. Janssens --

14   and I can give these cases to all of you -- Boerner v. Brown &

15   Williamson Tobacco and Owens v. Ballard.  Johns-Manville and

16   Ballard are asbestos cases.  And what these cases stand for --

17   in each of these cases, there was no fraud claim, there was no

18   misrepresentation claim, but evidence that was submitted by the

19   plaintiffs of misrepresentation regarding the products to

20   consumers was cited as a basis for punitive damages because

21   it's intentional misconduct.

22       You don't have an element of reliance when it comes to

23   proving intentional misconduct sufficient to prove punitive

24   damages in federal and state court.  So you can still --

25   that -- the misrepresentations related to Tesla's marketing is

1   still relevant.  And so even without the addition of these

2   claims, the allegations -- the additional allegations we

3   have -- which are not new allegations, so much as more

4   detailed.  And that's really -- besides the NHTSA allegations,

5   what our proposed amended complaint is is a far more

6   detailed -- you know, it just puts some meat on the bones of

7   what were the initial complaints in this case.

8           That's not really alleging new counts, causes of

9   actions, because fraud and misrepresentation -- negligent

10  misrepresentation and fraudulent misrepresentation, it's

11  still -- you still have to get into discovery as to what the

12  belief of the driver was.  All of the -- you still have to

13  cover all of the same issues for a claim that's already in this

14  case.

15          So that goes to the last issue that Tesla raises,

16  which is prejudice.  And prejudice is saying:  "Oh, well, we

17  have to add experts and take all this additional discovery."

18  That's just not true.  That can't be true, because every

19  element of these new claims is already in this case, and at

20  least Mr. Angulo's case on misrepresentation.

21          So whether or not McGee relied on it, it's already

22  part of this case.  And they've already taken discovery from

23  him on that.  So it's not like they need to take additional

24  discovery.  They put -- they went outside the four corners of

25  the complaint and put it in their response.  So there are not

1    going to be any new experts needed.  It's the same experts

2    they're going to have because it's the same defenses they're

3    going to raise.  So I just don't see that their claim of

4    prejudice has any basis for it.

5         If the Court has any other questions, I'm happy to

6    answer them, but that's the sum of my argument.

7         THE COURT:  Other than your reliance on Bridge, is

8    there any Florida case that would permit the-- and I understand

9    that you want the Court to kind of allow this to proceed and

10    address it by way of a motion to dismiss, but I look at it as

11    the Court should address it now because that tells the parties,

12    and certainly the Court, how long the discovery will proceed on

13    this 2021 case.

14         And if the law does not support on a third-party

15    foreseeability or reliance, if there is -- if here there can be

16    no intentional misrepresentation and common law fraudulent

17    concealment claim, under the facts of this case and the law in

18    this state, then I would like to address it now because that

19    lends directly to the futility argument.  Putting aside --

20    procedurally, I understand that this case has traveled slowly

21    and this is well past the deadline for amending pleadings.  I

22    want to kind of get past that and look at substantively the

23    issue of whether this claim is even viable.

24         And let me say, before I turn it over for Ms. Cruz to

25    argue, you didn't respond at all to the intentional false

1    advertising under Florida Statute 817.40 and 817.44.  So what

2    would be the basis -- I didn't see a reply that addressed the

3    Defendant's arguments.

4          MR. EATON:  I believe they argued it suffers from the

5    same defects as our other fraud claims.  So I think the

6    argument would be the same with respect to those.  If I'm wrong

7    on that, please let me know.

8          THE COURT:  Well, I mean, I'm looking specifically on

9    Page 16 of Docket Entry 169, Tesla's response, where Tesla

10   states:  "Plaintiffs do not allege that Tesla advertised the

11   Model S to them or anyone else with the intent not to sell it

12   or with the intent to sell it at a price other than advertised.

13   Courts have strictly construed the applicability of the statute

14   to only prohibit the advertisement of sale where the advertiser

15   has no intent to sell or has no intent to sell at the

16   advertised price," and cites to a Fourth DCA case dismissing an

17   18 -- Section 817.44 claim.

18         So I'm asking you directly:  What would be the

19   viability of an intentional false advertising claim given the

20   facts of this case?

21         MR. EATON:  Give me a moment, Your Honor.  Let me look

22   at my previous response.  And if it's not addressed in there,

23   then I'm ...

24       (Pause in proceedings.)

25         THE COURT:  And I'm not even -- because I'm accepting

1    the allegations as true.  The Defendant goes on to state that:

2    "It's clear from the deposition testimony of Mr. McGee that he

3    was not influenced."

4         I'm looking at just the case law and the viability of

5    that cause of action.

6         MR. EATON:  All right.  Here's -- I did not respond to

7    that, Your Honor.  Samuels is distinguishable on its facts.

8    The wrongdoing alleged in Samuels was the disposition of the

9    plaintiff's training vehicle prior to formation of a binding

10   contract.  The Court in Samuels explained:  "The plaintiffs did

11   not allege" --

12     (Court reporter interruption.)

13        THE COURT:  Just a little bit slower, Mr. Eaton.

14        MR. EATON:  I'm sorry.  I tend to rush when I'm

15   reading.  I'll start again.

16        The Court explained:  "Here, the plaintiffs did not

17   allege that the misleading statement was made with the purpose

18   of selling or disposing of any property.  Rather, according to

19   to the implications inherent in the allegations, King Motor

20   made the alleged misleading statement for purposes of inducing

21   the plaintiffs to give possession of their trade-in vehicle to

22   him."

23        And what I wrote was that Plaintiffs alleged that

24   Tesla offered its vehicles equipped with its autopilot system

25   for sale, through an advertisement describing the vehicles and

```
1    the autopilot system, knowing that it was not selling vehicles
2    with the autopilot system described in Paragraphs 19 to 26.
3    Selling a product that did not function as advertised is
4    actionable under Florida's bait and switch intentional false
5    advertising statute, 817.44.  And I cited to Argentine v. Bank
6    of America Corp., 2015 Westlaw 3547141, Middle District of
7    Florida.
8              THE COURT:  All right.
9              MR. EATON:  So that may have not been carried over
10   into -- this was from Document 141, my reply to the first time
11   around we argued this.
12             THE COURT:  All right.
13             MR. EATON:  It may not have been carried over into the
14   most recent reply.
15             Now, let me go back to the other question you asked
16   me, which was:  Is there any Florida case on this?  There is
17   not.  Believe me, I looked.  There's no case that says it one
18   way or another.  There's no case that addresses -- there's no
19   case that says you cannot have a misrepresentation case where
20   the party that is injured is not the party that was deceived.
21   And so that's why we're left with this kind of decision where
22   you have to make -- well, are you going to follow the US
23   Supreme Court or -- basically, no Florida court has addressed
24   something like this before.
25             All the cases that Tesla has cited to are third-party
```

1    cases -- I'm sorry -- first-party cases.  So there isn't any

2    court that said, like the cases -- the two cases in the

3    supplemental authority that say that from Florida courts.

4              But let me go back and say:  Okay.  So what's the

5    import of that?  You -- in asking the question, you said:  "All

6    I want to know, how long is the discovery going to on?"  Which

7    brings me back to:  What change will there be if you allow

8    amendment to add these counts?  And the answer is none.

9    Discovery is not going to go on any longer than we need to

10   discover what is already in this case.  Because again, we

11   already have the misrepresentation case.  If the Court allows

12   for punitive damages, then we would be entitled to get into all

13   of the -- what we allege to be intentional misconduct or gross

14   negligence, which includes misrepresentations.

15             So misrepresentation is already is part of this case.

16   Even if you denied this, it's still going to be in there.  So

17   we contend it's not going to change the amount of time needed

18   to take discovery in this case at all.  At all.  It's going to

19   stay the same.

20             Now, do we need more time to take discovery for

21   everything?  Yes.  But it's not because of the amendment.  It's

22   not because of our proposed amendment.  That's not going to

23   change the time.  The time that we need is because of -- you

24   know, Tesla wants to defend against our discovery request, as

25   they have a right to.  And we have to come to the Court and

```
1    say:  "Hey, you know, we think we should get this stuff."  And

2    then you guys decide whether we do or not.

3         But that's the reason why we need more time on it, not

4    this potential amendment.  So I don't think that that is

5    something that should concern the Court, that adding these

6    counts will change that in any way, shape, or form.

7         THE COURT:  Okay.

8         MR. EATON:  Thank you.

9         THE COURT:  Thank you, Mr. Eaton.

10        Ms. Cruz?

11        MS. CRUZ:  I'm not sure where Court wants me to start.

12        THE COURT:  Well, I'd like you to start with the

13   amendment that's proposed relating to Counts 5, 6, and 7.

14        MS. CRUZ:  Okay.  And that's in regards to the

15   negligent misrepresentation and the fraudulent --

16        THE COURT:  No.  Count 4 is already part of the case.

17   So the proposed amended complaint includes three additional

18   counts; Count 5, the intentional misrepresentation; Count 6,

19   the common law fraudulent concealment; and Count 7, the

20   intentional false advertising under 817.40 and 817.44.

21        MS. CRUZ:  Okay.  I mean, I think as the Court has

22   realized, there are two cases that we found at least that are

23   instructive on the issue.  And it's our belief that there

24   probably aren't more cases out there because it's axiomatic

25   that reliance has to be a first-party reliance.
```

1       It's an actual element of the claim.  If you look at

2  the elements, one element of fraudulent concealment, for

3  example, it has to induce the Plaintiffs to act.  The

4  Plaintiffs.  Another element is that the Plaintiffs

5  detrimentally relied on the misinformation.  So there's no case

6  law because people probably don't -- plaintiffs probably don't

7  bring these claims when they know they can't even meet the

8  elements.

9       I mean, Plaintiffs have admitted -- there's not even

10 an allegation in the complaint that the Plaintiffs have

11 relied -- so they haven't even alleged -- I mean, their basic

12 requirement is to allege the requirements for the claim, and

13 they haven't even made those allegations.  And so I just don't

14 see how you get past trying to file a claim and the Court would

15 find that it's not futile to allow Plaintiffs to add a claim

16 where they haven't even pled the elements.

17      And I don't know -- I mean, you know, really, the

18 court in the Platinum Properties case did a really good job of

19 explaining why Bridge v. Phoenix doesn't apply.  And the simple

20 fact -- and one that Plaintiffs didn't mention today when they

21 were going through it, because they probably want to ignore

22 this -- is the fact that it's a federal RICO claim.  It's based

23 on the federal criminal mail fraud statute.

24      So as the court said in Platinum Properties, that

25 alone renders the case irrelevant.  And so, yes, there is no

1    authority.  But like I said, I think that's axiomatic, because

2    you can't even -- it's in the requirements for the claim.  It's

3    one of the requirements for the claim.

4            So -- and as far as the false advertising, the reason

5    we cited the Samuels case is because the -- Samuels is just one

6    in a long line in cases in Florida that have found that there

7    are two circumstances under which you complete false

8    advertising under Florida Statute Section 817.44.  And that's

9    where the advertiser, number one, has no intent to sell the

10   product, or number two, has no intent to sell product at the

11   advertised price.  So that claim is just completely

12   inapplicable.  I mean, there's no way that that could fit in

13   the facts of this case.

14           THE COURT:  And actually, I also do want you to

15   respond to the punitive damages claim as to --

16           MS. CRUZ:  Yes.  So I think we need to take a step

17   back and do more of a deep dive.  And if I may just address the

18   whole -- because we seem to be focused on the prejudice issue,

19   and that's important in how long the case is going to take,

20   but -- so maybe if I can just -- if the Court will allow me to

21   just back up and address the timing and what's been going on in

22   the case and where we are.

23           The case has been pending since 2021.  Since it was

24   filed, Tesla has been actively taking depositions, sending

25   discovery.  For over a year in the case, the Benavides

1   Plaintiff, which was the only Plaintiff involved at that time,

2   didn't respond to written discovery, responded late, asked for

3   extensions, moved the Court to extend the trial date.  In fact,

4   the trial date was already extended once to accommodate

5   Plaintiffs' counsel trial schedule.

6        So Tesla has been diligently working to move this case

7   along.  The fact witness depositions -- the deposition of the

8   driver has been taken.  Tesla took that deposition.  And this

9   is something that we -- not myself, but my partner discussed

10  with the Court at length when we were here on Plaintiffs'

11  request for -- to stay the case pending the NHTSA

12  investigation.

13       So Tesla's been doing what it should do to move this

14  case along.  In the past three months, the Plaintiff has filed

15  over 300 discovery requests.  Three hundred.  We are -- this is

16  almost every week that they're filing discovery requests.

17  Trial is in November, and this is an extended trial date.  So I

18  understand that Plaintiff is now, for some reason, trying to do

19  all this discovery and -- but that's not Tesla's fault.  And as

20  this time goes by, and deadlines get extended, and trial dates

21  get moved, we're not only conducting discovery that's frankly

22  not relevant, but Tesla is expending time and resources, and so

23  is the Court.  We're going to be down here next week on a

24  motion to compel relating to discovery issues that should have

25  been dealt with way, way long ago.

1          And as far as whether the Plaintiffs have been able to

2     discover materials related to the NHTSA investigation as part

3     of this case, they have -- I don't even know -- hundreds, maybe

4     thousands of pages from that investigation.  And to say that we

5     haven't been forthcoming I don't think is really correct.  This

6     issue has been decided by the magistrate judge in this case,

7     and the magistrate defined the scope for what documents Tesla

8     was going to produce in regards to the NHTSA investigation, and

9     Tesla has produced those documents.

10          In fact, the vast majority of the documents that have

11     been produced in this case relate to that NHTSA investigation.

12     And that dovetails into this issue about the investigation.

13     Plaintiffs have -- and this really goes into what I

14     understood -- I wasn't present at the hearing.  But from

15     reading the Court's orders, when you look at the Court's orders

16     on Plaintiffs' request to stay the case pending the NHTSA

17     investigation, and when you look at the Court's order on

18     Plaintiffs' original motion to amend -- so basically, they

19     filed a motion to extend the deadlines and amend -- and this is

20     essentially a renewed motion -- the Court really looked at the

21     NHTSA investigation at that time.

22          And if you take those two rulings, and you also look

23     at the Plaintiffs' renewed motion, their proposed amended

24     complaint, including all the exhibits, you will see that the

25     vast majority of the information -- I haven't sat down and

1  figured out the percentages, but I'm going to say 97 percent of

2  the arguments, the alleged misrepresentations, this NHTSA

3  investigation, these are things that were going on -- forget

4  about before the deadline expired, forget about before the

5  lawsuit was filed -- these things were going on, some of them,

6  before the crash even happened.

7       So to come in here now and act like these things are

8  new, to even be bringing up these alleged misrepresentations,

9  news articles, and statements from Elon Musk from 2015, is --

10  when there's already been a ruling by the Court that -- in

11  other words, the way I understood the Court's order was:  "I'm

12  looking at this NHTSA investigation.  I've read all the

13  documents and the information that you have presented to me.  I

14  haven't found good cause," because that's what the law

15  requires, good cause.  And the Court said:  "This NHTSA

16  investigation is not goods cause to stay the case.  This NHTSA

17  investigation is not good cause to excuse the delay."

18       So before we even get to the merits of the recall --

19  and I'm going to go into that, but I think that we really need

20  to stop and pause, as the Court did on the first time around,

21  and look at whether this renewed motion is still untimely.  And

22  there is absolutely zero reason that it wouldn't be.  And the

23  recall is simply the culmination of the NHTSA investigation.

24  And so the basis is essentially the same as it was last time.

25  And every single word of the Court's order regarding the

1    original motion to extend the deadline applies here.  So it's

2    Tesla's position that the inquiry should stop there, period.

3    The Court's already looked at this issue.

4         Now, if the Court is inclined to consider the recall

5    as something totally different, right, and unrelated to the

6    NHTSA investigation, the only -- and Plaintiffs gloss over

7    this.  They want to talk about the misrepresentations and the

8    NHTSA investigation.  The Court's already ruled on that.  The

9    only possibly to be considered new evidence is this recall,

10   which is a letter from NHTSA.  It was not something ordered by

11   NHTSA.  It was a voluntary recall by Tesla.  And then Tesla did

12   the voluntary recall, and NHTSA issued the Part 573 Safety

13   Recall Report.

14        This is the only document -- the only piece of paper

15   out of all of this -- everything that Mr. Eaton said,

16   everything that's in the pleadings, this piece of paper is the

17   only thing that could possibly be considered as new.  So then

18   we move to the recall, considering the recall and whether that

19   could be the basis of the punitive damages motions.  The

20   biggest issue is that the recall is unrelated to this crash.

21   You never heard once -- you never saw in the -- you never heard

22   one argument today about how the recall relates to this crash,

23   and that's because it doesn't.

24        And I'll go into that, but the second issue is that

25   the recall is not intentional conduct that rises to the level

1    of criminal manslaughter.  So even if the Court found that the

2    recall related to this case, then we have to move to, well,

3    does it rise to the level -- and maybe there was a

4    misunderstanding.  And I apologize if it was in Tesla's papers.

5    Of course we know that Florida standards regarding proffer and

6    punitive damages don't apply.  That's procedural, and the

7    federal rules apply.  What we were trying to say was that the

8    Florida standard for punitive damages, what you have to show,

9    that applies.  And so there has to be a colorable claim of

10   gross negligence, intentional conduct that rises to the level

11   of criminal manslaughter, and that is not here.  That is not

12   what's in the recall, and I'll explain why.

13         The third reason that the recall can't provide the

14   basis for this punitive damages claim is that even if the

15   recall was related -- so it was related to this case; in other

16   words, after the crash, Tesla's now done a recall that

17   would have -- that's relevant and that would have prevented

18   this crash, that would be a subsequent remedial measure, and it

19   would be inadmissible under Florida Rule of Evidence 407.

20         So let's talk about the recall.  So as I think --

21   there's been many hearings now, and I think the Court has an

22   understanding kind of of, you know, these basic -- the way that

23   the autopilot system works.  So autopilot is not a thing.

24   Autopilot is a word that describes a suite of features.  And

25   the two features that are kind of in play here are the

```
 1    Traffic-Aware Cruise Control and the Autosteer.  As to the

 2    Traffic-Aware Cruise Control, that basically -- that controls

 3    the Tesla speed.  So it keeps the Tesla a safe distance from

 4    the car in front of it.  In this case, it's undisputed that the

 5    driver had his foot on the accelerator pedal, so he overrode

 6    the cruise control system.  So the system -- the cruise control

 7    system wasn't in control.  The driver was in control.  He was

 8    doing all the driving.  And the recall has nothing do with

 9    cruise control.

10          So then we have Autosteer.  The purpose of Autosteer

11    is to keep the vehicle in the center of the lane.  And again,

12    the recall relates only to Autosteer.  And one of the most

13    common misuses of Autosteer is drivers taking their hands off

14    the wheel.  And so the recall focused on getting people who

15    were using Autosteer to keep their hands on the wheel.

16          But that wasn't the issue in this case.  Here, we know

17    it's undisputed the driver had his hands on the wheel.  So we

18    don't have a hands-off-the-wheel problem, like the recall was

19    addressing.  Here we have an eyes-off-the-road problem, we had

20    a foot-on-the-accelerator problem, and neither of those issues

21    were addressed by the recall.

22          And so the two things really -- what the recall

23    addressed were, number one, the remedies.  They -- it changed

24    the messaging to remind the driver to keep their hands on the

25    wheel.  And the other thing the recall did was it addresses
```

1  something called mode confusion with Autosteer.  And to turn on

2  Autosteer, you have to pull what's called the stalk.  So you

3  have the steering wheel, and then you have like -- excuse me --

4  and then you have the stalks coming out from the steering

5  wheel.  And to activate Autosteer, you've got to pull on the

6  stalk twice.  Sometimes what happens is people might pull on

7  the stalk once or they don't pull on it at all.  But for some

8  reason, the driver thinks that Autosteer is activated, so they

9  take their hands off the wheel.  But it's not actually

10  activated.  And so, the recall changes the messaging to tell

11  the driver whether Autosteer is on or off, and remind them to

12  keep their hands on the wheel.

13          And so, if you look at the Part 573 Safety Recall

14  Report -- remember, that's the only thing that's new.  Out of

15  all of these pleadings that Plaintiff filed, that's the only

16  thing that's new since the Court entered its last order.  If we

17  look here -- and this was attached to Plaintiffs' motion, I

18  believe, as an exhibit to their motion the extend the deadline.

19  And if you look at the last page of the report -- it's called

20  "Part 573 Safety Recall Report."  That's the name of the

21  document.  And if you look at Page 5, the last page, there's a

22  Description of Remedy Section.

23          And under the Description of Remedy Section, it says:

24  "The remedy will incorporate additional controls and alerts to

25  those already existing to further encourage the driver to

1    adhere to their continuous driving responsibility whenever

2    Autosteer is engaged, which includes keeping their hands on the

3    steering wheel and paying attention to the roadway."

4          So -- and the focus for this exercise is really not on

5    what the recall says.  It's what the recall doesn't say.  It

6    doesn't deal with any of the allegations in this case.  It

7    doesn't require changes to address -- if the Court remembers,

8    what happened in this case was the driver is driving down a

9    road.  He has Autosteer and cruise control activated.  He's

10   overridden cruise control because he's got his foot on the

11   accelerator.  He's going 60 miles an hour.  He comes to the end

12   of a T-intersection.  There's a flashing red light.  There's a

13   bunch of -- there's stop signs.  There's a bunch of signs

14   indicating that it's the end of the road.  And he drives

15   through that intersection and into a parked car on the other

16   side of the T-intersection on the side of the roadway.

17         So the issues are detection of other vehicles,

18   detection of vehicles in the lane; automatic emergency braking,

19   and why that didn't stop for the vehicle in the lane; the

20   system recognizing traffic lights or road signs and controlling

21   for them.  But you didn't hear about that in the recall because

22   that's not part of the recall.  The recall is about hands on

23   the wheel.  The recall doesn't require changes to address

24   detection of other vehicles.  The recall doesn't require

25   changes to the ability of automatic emergency braking to detect

1   objects in the lane.  The recall doesn't require changes to

2   Autosteer to detect for traffic lights or stop signs.

3          So it's completely unrelated to this case.  So they

4   want to wave around the recall because this is the only new

5   thing that they have, but I feel like they're not really going

6   into the details.  And they want to talk about everything that

7   happened before, and Elon Musk made this misrepresentation

8   years ago.  That's what all the -- that's what the amended

9   complaint says, and that's what all the exhibits to the amended

10  complaint are.  But if you look at the recall, it's unrelated

11  to this case.  It completely unrelated to this case.  So that's

12  the first reason why the recall can't form the basis for this

13  punitive damages claim.

14         The second issue -- the second reason, I should say,

15  is that the recall is -- I think now we're in agreement.  As I

16  explained, it seems like Mr. Eaton and I are in agreement about

17  what the standard is.  So it's not that a proffer is required.

18  It's:  What's the standard?  Was there gross negligence or

19  intentional conduct that rises to the level of criminal

20  manslaughter?

21         I don't think there's even an argument that could be

22  made that changing the messaging so that the alerts that the

23  driver receives when their hands are off the wheel could rise

24  to the level of criminal manslaughter.  And it's our position

25  that that's not possible and that's not even a viable claim.

1    So then we move to the issue of the subsequent

2  remedial measure.  So if the recall's relevant, then we have to

3  look at Federal Rule 407 because Federal Rule -- excuse me --

4  Federal Rule of Evidence 407 bars subsequent remedial measures

5  from being introduced into evidence when they're used to prove,

6  among other things, negligence and culpable conduct.  And

7  that's exactly what they're trying to use the recall to prove

8  here.  They're trying to use the recall to prove culpable

9  conduct.  So therefore, under 407, the recall could not --

10  would not be admissible.  And if it's not admissible, then it

11  certainly couldn't form the basis of a claim for punitive

12  damages.

13    So that's really the issue with the recall.  I'm happy

14  to talk about the recall more, if the Court has questions.  But

15  I think the really overarching issue here is that this recall

16  and hands off the wheel is not the problem that we had in this

17  case.  So that makes the recall irrelevant.

18    THE COURT:  All right.  Thank you, Ms. Cruz.

19    And Mr. Eaton, can you address the -- even assuming

20  that the recall is marginally relevant to the issues in this

21  case, how it's's not a subsequent remedial measure.

22    MR. EATON:  Well, Your Honor, under Florida and

23  federal law, one of the factors that the Court can consider

24  with respect to punitive damages is the attitude and conduct of

25  the enterprise upon discovery of the misconduct.  And so what

```
 1    we're alleging here is that -- and this -- again, this is a --
 2    she's reading from a recall that they volunteered to do.  And
 3    our position is, is that the recall is grossly inadequate and
 4    therefore the response is indicative of their failure to
 5    address this problem.
 6               THE COURT:  But the recall is a subsequent remedial
 7    measure.  Would you agree?
 8               MR. EATON:  It is.
 9               THE COURT:  So to that extent, how would it be
10    relevant and how would it form the basis of the Plaintiffs' new
11    proposed claims?
12               MR. EATON:  I think that a recall can be admissible if
13    it's not used to prove negligence, Your Honor, if it's used to
14    prove a different element.  And here --
15               THE COURT:  Well, you're seeking to prove that it
16    equates to conduct that would warrant punitive damages.  So
17    wouldn't that be more exacting?
18               MR. EATON:  We think it's relevant because the
19    response is inadequate.  And so that's what it proves, is that
20    all they did is add on these little mooring lights.  They
21    didn't do anything about -- and in particular, the recall
22    stated that it would place additional checks upon engaging
23    Autosteer while using the future outside controlled access
24    highways when approaching traffic controls.
25               One of the primary allegations that we have in this
```

| | |
|---|---|
| 1 | case, Your Honor, is that this system was not equipped to be |
| 2 | used on the roads like where this accident occurred, and they |
| 3 | knew that, but they allowed it to go forward.  They allowed |
| 4 | people to use it because they used Tesla drivers as beta |
| 5 | testers and guinea pigs, essentially, in order to collect data |
| 6 | to develop their full self-driving system.  And so, when the |
| 7 | time came, when NHTSA says: "Your product is subject to |
| 8 | foreseeable misuse.  Fix it," Tesla's response, which is this |
| 9 | recall, was wholly inadequate because it doesn't address the |
| 10 | issues that are leading to these accidents. |
| 11 | THE COURT:  But adequate or inadequate, it's a |
| 12 | subsequent remedial measure.  So how would -- in the first |
| 13 | instance, how would it even be relevant or even admissible -- |
| 14 | and certainly not part of the predicate for the claims that |
| 15 | you're seeking to include, the intentional misrepresentation |
| 16 | and the common law fraudulent concealment. |
| 17 | MR. EATON:  Well, it's also relevant to the punitive |
| 18 | damages, Your Honor.  And -- but what we're focusing on for the |
| 19 | punitive damages element -- and it's not related to the other |
| 20 | claims, other than the fact that these are things that Tesla |
| 21 | knew a long time ago were inadequate and they didn't take |
| 22 | action on that.  So their misrepresentations as to what the car |
| 23 | could do were inconsistent with that they knew the car could |
| 24 | do.  Okay?  That's how it's's relevant to the misrepresentation |
| 25 | claims. |

1           But as far as the punitive damages go, the reason that

2      it's relevant is because they're saying, okay, now they've been

3      told this, here's their response.  What is relevant to the

4      punitive damages analysis is that the response is inadequate,

5      that they are not fixing the problem.  That even though they

6      have been told they have this problem, they're not doing

7      anything about it.  And that's why it's relevant.

8           And you can't get to that point without explaining

9      what it is that they did to show that it's inadequate.  And if

10     you can't show that -- what the response was, then you can't

11     show that it's's inadequate.  So we have to be able to show

12     what the response was to be able to say:  "Okay.  This is why

13     this doesn't work, and therefore your response being inadequate

14     is something the jury should consider in determining whether or

15     not punitive damages are appropriate."

16          Now, that is not the entire basis for punitive

17     damages.  The rest of the allegations in the complaint, the

18     existing and current, are also related to that.  So we're not

19     seeking to add that -- we're not saying that the sole basis we

20     have for punitive damages is the recall or the inadequacy of

21     the recall.  That is no in way, shape, or form what we're

22     saying here.

23          I want to address some of the other arguments my

24     colleague made.  First off, going back to Bridge, the very

25     first thing I told this Court was that -- the basis upon which

1    the Southern District cases distinguish Bridge, which was to

2    say that Bridge was a RICO case.  And I said that that basis

3    for distinguishing wasn't sufficient to me, because the Supreme

4    Court said -- dealt with that, because it said that:  "A

5    remedial scheme keyed to the commission of mail fraud, a

6    statutory offense that is distinct from common law fraud and

7    that does not require proof of reliance."  That's Bridge

8    talking about RICO.

9         But then they go on and say:  "Second, while it may be

10   that a first-party reliance is an element of a common law fraud

11   claim, there's no general common-law principle holding that a

12   fraudulent misrepresentation can cause legal injury only to

13   those who rely on it."

14        So the Supreme Court said one of the reasons why it

15   doesn't matter is because this is a RICO case.  But -- and then

16   the two Southern District cases said:  "That's it.  That's why

17   we're distinguishing this case.  Doesn't apply here."

18        But the Supreme Court said way more than that.  The

19   second thing it said was:  "That doesn't matter," because

20   here's their statement and how it talks about in common law

21   cases -- and there is no prohibition on bringing a reliance

22   case where the person that is injured is not the person that

23   does the reliance.

24        So that's why I'm saying that the fact that they

25   relied on -- or rejected Bridge as a case, I would simply

1    request that the Court read Bridge in its entirety -- and I've

2    got a copy here.  I'm happy to hand it up to you before I

3    leave -- and compare that with the analysis of these two cases.

4    And I think that the Court will find that their basis for

5    distinguishing it is insufficient because the US Supreme Court

6    addresses the argument that they're dealing with a statutory

7    claim and not common law, and then to say it doesn't matter.

8    And they're basically saying their reasoning would apply in a

9    common law situation as well.  That's why I think Bridge

10   holds -- that's why I think Bridge allows for that.

11        Now -- okay.  A lot of what we just heard, everything

12   about:  "Oh.  It's undisputed this.  It's undisputed that," we

13   dispute it.  That's a wonderful argument for summary judgment.

14   It's a wonderful argument for trial.  But we're at the

15   amendment stage.  And at this time the Court has to look at

16   what our pleadings say and take that -- she's making

17   representations that things we say are inaccurate.  That's not

18   what we're here to do.  You're not weighing who's telling

19   you -- you know, what's truth or not and what the nature of the

20   accident is.

21        Our position is, is that this system did not work and

22   it failed this driver, and he relied on it because he was told

23   it could do one thing when it couldn't.  And that's why this

24   Plaintiff -- one of them is dead and the other is injured,

25   because he was overreliant on this, and that Tesla knew that

1   this product could be misused and they did not put up

2   safeguarding, among them, things that the recall is addressing;

3   engaging Autosteer while using it outside of controlled areas.

4   So that is the basis for punitive damages.

5          Now, she told you that, again, we had all this

6   information regarding the investigation.  Not so.  The first

7   time we got any of this discovery was at the end of October

8   last year.  So we didn't have it during our first motion for

9   leave to amend.  We just got that information from Tesla at the

10  end of October, and the recall happened in December.  So

11  that's -- again, that's not a lack of diligence on our part.

12  The hundred -- the thousands of pages of documents that they

13  produced was after we had to compel them to produce them, and

14  that happened last October.

15         So again, part of this -- and I think the other

16  objection was:  "Okay.  Well, the only thing they're saying is

17  new is the recall."  And that's true.  It is the hat -- it is

18  the -- you know, the hanger that we're trying to put our --

19  hang our hat on here.  But the additional allegations, I don't

20  think there's any rule that says, okay, well, if the Court

21  allows an amendment, that you can't then allow the rest of the

22  amendment to conform the case to the evidence that has been

23  developed so far, that it can only be the newly discovered

24  information that can be included in the pleading.  If an

25  amendment is allowed, the complaint should be allowed to be

1    brought up to speed, essentially.

2           One of the reasons I think it's important is that --

3    we're going to have a discovery hearing next week.  Tesla's

4    objecting to discovery related to the controlled areas, the

5    geofencing -- the use of the geofencing, because it's's saying

6    that it's not specifically pled in our complaint.

7           Now, we believe that our complaint adequately alleges

8    something that -- you know, sufficiently to cover that area.

9    But they're saying:  "Well, you don't mention geofencing

10   specifically."  The amended complaint does.  And so, you know,

11   we're facing discovery objections based on the generality of

12   the existing complaint.  And so I just don't think that that's

13   a basis to say, okay, we're not allowed to, you know, be more

14   specific in an amended complaint if we have good cause to amend

15   the complaint.

16          I think I've addressed everything I wrote down here.

17   So unless the Court has any other questions ...

18          THE COURT:  Mr. Eaton, the law is the law.  And while

19   I appreciate the argument, I do believe that Bridge is

20   inapposite to this case.  And I think that it's clear that

21   there's no first-party reliance and a third-party reliance as

22   the predicate for the claims that you're seeking to assert,

23   Counts 5 and 6 do not state viable claims.

24          I also believe that with regards to the false

25   advertising, pursuant to Florida Statute 817.44 and 817.40, the

1   intentional false advertising, that based on the proposed

2   complaint that there is no viable cause of action, and you have

3   not persuaded the Court otherwise by argument or by case law

4   that would support including these claims.

5           Let me start by saying that this incident -- the

6   unfortunate incident occurred in April of 2019, and this case

7   was filed in May of 2021.  Here we are now some time later and

8   this Court has amended, amended, and amended the scheduling

9   order.  And procedurally, there's no good cause to permit the

10  amendment to the complaint.  This was filed more than one year

11  after this Court entered its last deadline of October 28th of

12  2022 to amend the pleadings.  And even if the Court were to

13  address them substantively, the three claims are futile.  So

14  the motion to amend the complaint is denied.

15          The parties have jointly requested that they be

16  permitted additional time for discovery and to exchange expert

17  witness summaries and reports.  And I will enter an order that

18  amends Docket Entry 156, which is the present scheduling order,

19  to permit the extension of time to from March 8th to June 3rd

20  for the expert summaries, and the rebuttal to June 17.  The

21  discovery shall be completed by June 28th.  And that gives a

22  month before the parties file dispositive motions.  And to that

23  extent, the calendar call, the dispositive motions deadline, as

24  well as the trial in ECF 156, will remain in place.  And that

25  is the Court's ruling.

```
 1            Are there any other issues that the Court can address
 2       for the parties?
 3            MR. EATON:  May I request clarification, Your Honor?
 4            THE COURT:  I'm sorry?
 5            MR. EATON:  May I request a clarification?
 6            THE COURT:  Yes, sir.
 7            MR. EATON:  If the Court is disallowing the amendment
 8       on the additional claims, may we still amend to add a claim
 9       for -- damages for punitive damages?
10            THE COURT:  Well, let me say this, Mr. Eaton -- and I
11       neglected to address that -- I believe in the response the
12       Defendant made argument with regard to the negligent
13       misrepresentation claim.  It is part of this case.  And to that
14       extent, unless there is some law for the Court to consider, I
15       do believe that you should be able to assert the punitive
16       damages claim at this point, and the Court can certainly
17       address it at a later point in time if there's a challenge to
18       its appropriateness.
19            MR. EATON:  Thank you, Your Honor.
20            Does that give us any right to amend the factual
21       allegations of the pleading?
22            THE COURT:  I also want to address that issue, because
23       I know that there was a voluminous proposed complaint and the
24       parties sought to seal certain items that were not numbered.
25       They weren't attached as exhibits and therefore the clerk was
```

1     not able to seal certain items.  The Court did, on Docket Entry

2     193, direct the clerk to seal certain -- 176-6, 176-10.  What I

3     would suggest from this point forward is that if there are

4     items to be sealed that they be attached as exhibits and the

5     Court will permit you file those under seal.

6               So for purposes of clarity in terms of the pleadings,

7     I do not want another round of motions to dismiss.  You can

8     amend the complaint by interlineation in terms of including the

9     punitive damages claim.  So you can file a complaint that

10    consists of the four counts, the defective design, the failure

11    to warn, the defective manufacturing, the strict liability

12    claims, as well as the negligent misrepresentation.  Those

13    claims are already embodied in the present complaint.  You can

14    include the punitive damages.  And to the extent that you want

15    to buttress the facts, since the Defendant will have an

16    opportunity to answer the complaint, then I think that would be

17    appropriate.

18              MR. EATON:  Okay.  So understanding this will be a

19    consolidated complaint as well?  We have two --

20              THE COURT:  Yes.  And I think that makes sense for

21    purposes of the trial for there to be a consolidated complaint.

22              MR. EATON:  So our consolidated amended complaint will

23    be we can add our new factual allegations, no additional

24    counts, claims for punitive damages on the four existing

25    counts.

```
 1              THE COURT:  That's correct.

 2              Now, how much time do you need, Mr. Eaton?

 3              MR. EATON:  Seven days.

 4              THE COURT:  Okay.

 5              MS. CRUZ:  Your Honor -- and just so I'm clear,

 6    because I thought I understood, but I definitely don't.  The

 7    basis of the punitive damages claim is not the recall.  So the

 8    recall is not -- by virtue of the Court's allowance of the

 9    punitive damages, that doesn't make the recall fair play; in

10    other words, it's not in bounds now.

11              The basis of the punitive damages motion -- I'm

12    sorry -- the punitive damages claim, is strictly the negligent

13    misrepresentation claim.  And I ask also because I know we

14    can't respond to the -- we can't move to dismiss the complaint.

15    But of course the thing we're going to do is file a summary

16    judgment on the negligent misrepresentation claim.  So I just

17    want to be clear that when we do that it's going to be a motion

18    for summary judgment on the negligent misrepresentation and the

19    punitive damages claim, so we're clear what the confines are so

20    that those two are tied together and that is the basis.

21              THE COURT:  Well, I'm certainly not going to advise

22    what the summary judgment motion that you may file may look

23    like.  But for purposes of additional facts, I think it's's

24    been made clear -- and I do agree that the recall is a

25    subsequent remedial measure.  So to that extent, if the
```

1    punitive damages are solely based on the NHTSA recall, then I

2    can foresee some problems down the road.

3           But in terms of the four pending claims, to the extent

4    that the Plaintiff is able to show within the claims that there

5    was conduct that rises to the level of warranting punitive

6    damages, then they are entitled to move forward with that

7    claim.  So to that extent, Mr. Eaton, you may plead that within

8    your complaint.

9           So let me make clear that I'm denying the motion to

10   amend to assert the three additional claims, Counts 5, 6 and 7.

11   I am permitting you within -- and you did ask for the seven

12   days.  So I'm permitting you -- today, obviously, we know is

13   March 1st.  So I will -- by Monday, March 11th, if you'll file

14   the complaint.  If you will attach any documents that you have

15   attached in this proposed complaint -- if you want them to not

16   be subject to public disclosure, and you want to file them

17   under seal, then I will allow you to separately file those

18   under seal as exhibits to the complaint, and you may include

19   the additional facts and you may include the claim for punitive

20   damages.

21          MR. EATON:  Thank you, Your Honor.

22          THE COURT:  Is there any further clarification that's

23   needed?

24          MR. EATON:  Not for Plaintiff.

25          MS. CRUZ:  Not for the Defendant, Your Honor.

1           THE COURT:  Good to see each of you.  And I look

2    forward to trying this case or certainly proceeding with

3    whatever additional motions are before the Court.

4           MS. CRUZ:  Thank you, Your Honor.

5           THE COURT:  Have a nice afternoon.

6           MS. CRUZ:  Thank you.  You as well.

7           COURT SECURITY OFFICER:  All rise.

8        (Proceedings concluded at 2:21 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    UNITED STATES OF AMERICA      )

 2    ss:

 3    SOUTHERN DISTRICT OF FLORIDA  )

 4                       C E R T I F I C A T E

 5         I, Yvette Hernandez, Certified Shorthand Reporter in

 6    and for the United States District Court for the Southern

 7    District of Florida, do hereby certify that I was present at,

 8    and reported in machine shorthand, the proceedings had the 1st

 9    day of March, 2024, in the above-mentioned court; and that the

10    foregoing transcript is a true, correct, and complete

11    transcript of my stenographic notes.

12         I further certify that this transcript contains pages

13    1 - 45.

14         IN WITNESS WHEREOF, I have hereunto set my hand at

15    Miami, Florida, this 12th day of March, 2024.

16

17                       /s/Yvette Hernandez
                         Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
18                       400 North Miami Avenue, 10-2
                         Miami, Florida 33128
19                       (305) 523-5698
                         yvette_hernandez@flsd.uscourts.gov
20

21

22

23

24

25
```