# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-cv-21940-BLOOM/Otazo-Reyes**

NEIMA BENAVIDES, *as Personal*
*Representative of the Estate of Naibel*
*Benavides Leon, deceased*,

      Plaintiff,

v.

TESLA, INC., *a/k/a Tesla Florida, Inc.*,

      Defendant

_____/

**Case No. 22-cv-22607-BLOOM**

DILLON ANGULO,

      Plaintiff,

v.

TESLA, INC., *a/k/a Tesla Florida, Inc.*,

      Defendant

_____/

**PLAINTIFFS' NOTICE OF DEPOSITION PURSUANT TO FED.R.CIV.P. 30(b)(6)**

TO:    TESLA, INC., DEFENDANT [Tesla], AND ITS ATTORNEYS:

      **PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure 30(b)(6), the stenographic video-recorded deposition of a Tesla representative or representatives with knowledge about the subject matters listed below will be taken before a qualified Notary Public via zoom, on **March 21, 2024, at 10:00 a.m., EST**, and thereafter by adjournment until the same shall be completed. A remote online notary public will administer the oath remotely. Prior to the

deposition, the Court Reporting agency will provide the necessary information to access the remote electronic platform.

Notice is hereby given that the video is intended for use at trial.

Pursuant to Federal Rule of Civil Procedure 30(b)(6) Tesla is **required** to designate and fully prepare one or more officers, directors, managing agents or other persons who consent to testify on behalf of Tesla, and whom Tesla will fully prepare to testify regarding the following designated matters and as to such information that is known or reasonably available to Tesla's organization. TESLA, INC., pursuant to FRCP 30(b)(6), shall designate and produce at deposition those of its officers, directors, managing agents, employees, or agents, who are most qualified to testify on its behalf as to the matters identified in the AREAS OF INQUIRY below.

## <u>DEFINITIONS</u>

<u>**DOCUMENT(S)**</u> is used in the broadest sense of the word and shall mean all original written, printed, typed, recorded, or graphic matter whatsoever, however produced or reproduced, of every kind, nature, and description, and all non-identical copies of both sides thereof, including, but not limited to, papers, letters, memoranda, correspondence, communications, electronic mail (e-mail) messages (existing in hard copy and/or in electronic storage), faxes, mailgrams, telegrams, cables, telex messages, notes, annotations, working papers, drafts, minutes, records, audio and video recordings, data, databases, other information bases, summaries, charts, tables, graphics, other visual displays, photographs, statements, interviews, opinions, reports, newspaper articles, studies, analyses, evaluations, interpretations, contracts, agreements, jottings, agendas, bulletin, notices, announcements, instructions, blueprints, drawings, as-builts, changes, manuals, publications, work schedules, journals, statistical data, desk, portable and computer calendars, appointment books, diaries, travel reports, lists, tabulations, computer printouts, data processing program libraries, data processing inputs and outputs, microfilms, microfiches, statements for services, resolutions, financial statements, governmental records, business records, personnel records, work orders, pleadings, discovery in any form, affidavits, motions, responses to discovery, all transcripts, administrative filings and all mechanical, magnetic, photographic and electronic records or recordings of any kind, including any storage media associated with computers, including, but not limited to, information on hard drives, floppy disks, backup tapes, and zip drives, electronic communications, including but not limited to, the Internet and shall include any drafts or revisions pertaining to any of the foregoing, all other things similar to any of the foregoing, however denominated by TESLA, any other data compilations from which information can be obtained, translated, if necessary, into a usable form and any other documents. For purposes of this request, any document which contains any note, comment, addition, deletion, insertion, annotation, or otherwise comprises a non-identical copy of another document shall be treated as a separate

document subject to production. In all cases where original and any non-identical copies are not available, "document(s)" also means any identical copies of the original and all nonidentical copies thereof. Any document, record, graph, chart, film or photograph originally produced in color must be provided in color. Furnish all documents whether verified by TESLA or not. If a document is not in the English language, provide both the original document and an English translation of the document.

**ELECTRONICALLY STORED INFORMATION** (**ESI**) should be afforded the broadest possible meaning and includes (by way of example and not as an exclusive list) potentially relevant information electronically, magnetically, optically or otherwise possessed by TESLA or contained in TESLA's DATA STORAGE SYSTEM as:

a.  Digital communications (*e.g.*, Slack, e-mail, voice mail, instant messaging, internal chat features, text messages, and any other similar communication);
b.  E-Mail Server Stores (*e.g.*, Lotus Domino.NSF or Microsoft Exchange .EDB);
c.  Word processed documents (*e.g.*, Word or WordPerfect files and drafts);
d.  Spreadsheets and tables (*e.g.*, Excel or Lotus 123 worksheets);
e.  Digital modeling and/or testing (*e.g.*, CAD, CATIA, AUTODESK ALIAS, DELMIA, any form of Finite Element Analysis, whether public or proprietary);
f.  Accounting Application Data (*e.g.*, QuickBooks, Money, Peachtree data);
g.  Image and Facsimile Files (*e.g.*, .PDF, .TIFF, .PNG, .JPG, .GIF images);
h.  Sound Recordings (*e.g.*, .WAV and .MP3 files);
i.  Video and Animation (*e.g.*, .AVI and .MOV files);
j.  Databases (*e.g.*, Access, Oracle, SQL Server data, SAP);
k.  Contact and Relationship Management Data (*e.g.*, Outlook, ACT!);
l.  Calendar and Diary Application Data (*e.g.*, Outlook PST, blog entries);
m.  Online Access Data (*e.g.*, Temporary Internet Files, History, Cookies);
n.  Presentations (*e.g.*, PowerPoint, Corel Presentations);
o.  Network Access and Server Activity Logs;
p.  Project Management Application Data;
q.  Backup and Archival Files (*e.g.*, Veritas, Zip, .GHO);
r.  JIRA Issue Tickets;
s.  MATLAB, SIMULINK and other model-based development programs and files;
t.  Agile Development Software and files;
u.  Python, Git and other source control platform files;
v.  "Toolbox" and other TESLA proprietary databases;
w.  Event Data Recorder (EDR) files (see 49 C.F.R. 563 for regulations about the contents of the event data recorder);
x.  TESLA vehicle "Log Files", including any applications such as Periscope used to collect, store, or analyze TESLA vehicle performance, including but not limited to collisions, engagement of ADS features, and/or any DMS features;
y.  Autopilot D-16 Reports;
z.  Confluence data;
aa.  Snapshot data;
bb.  FleetNet data.

**SUBJECT INCIDENT:** The crash that occurred on or about April 25, 2019, at approximately 9:14 PM, in Monroe County, Florida, as further detailed and referenced in Plaintiffs' Complaints.

**SUBJECT VEHICLE:**   The 2019 TESLA MODEL S bearing Florida license plate number LFYB88, Vehicle Identification Number 5YJSA1E24KF302997.

**ANGULO VEHICLE:**   The 2010 Chevrolet Tahoe, Vehicle Identification Number 1GNMCBE35AR246876 owned by Dillon Angulo's mother, Dawn Darlene Angulo, which was involved in the SUBJECT INCIDENT.

**AUTOPILOT:** Includes all AUTOPILOT related safety features, and convenience features as described in the Owner's Manual applicable to the SUBJECT VEHICLE.

**AUTOSTEER:** Includes all AUTOSTEER related features as described in the Owner's Manual applicable to the SUBJECT VEHICLE.

**COLLISION AVOIDANCE:** Refers to the COLLISION-AVOIDANCE ASSIST features as described in the Owner's Manual applicable to the SUBJECT VEHICLE.

**SPEED ASSIST:** Refers to the SPEED ASSIST features as described in the Owner's Manual applicable to the SUBJECT VEHICLE.

**AUTOMATIC EMERGENCY BRAKING (AEB):** Refers to the TESLA AUTOMATIC EMERGENCY BRAKING system on the SUBJECT VEHICLE as described in the Owner's Manual applicable to the SUBJECT VEHICLE.

**SIGNAL(s):** Refers to data such as appears in the "signal name" column of Bates Numbers BENAVIDES-00001244-00001319 produced by TESLA in this case, as well as sources of data such as appears in TESLA diagnostic log data files, CarLogs, log information captured by Event Data Recorders, or other DOCUMENTS or ESI regarding vehicle and/or occupant performance or behavior captured, stored, or transmitted to or from the SUBJECT VEHICLE and/or TESLA regarding the SUBJECT VEHICLE including but not limited to all signals related to:



**DRIVER MONITORING SYSTEM (DMS):** This includes:

a.   any feature of a TESLA vehicle that involves the use of cameras, sensors, radar, and/or other technology used to determine whether the driver of a TESLA vehicle is looking at the road ahead, and/or engaged in the driving process consistent with that of a reasonable driver under the circumstances;

b.   technology and strategies to ensure appropriate driver engagement;

c.   any feature on a TESLA vehicle that automatically disengages any automated functions depending on the level of driver engagement;

d.   any feature on a TESLA vehicle that warns the driver if the driver shows signs of insufficient engagement in the driving process that might be unreasonable under the circumstances;

e.   any feature that warns or notifies persons outside the TESLA vehicle that the TESLA vehicle is being operated using some form of AUTOPILOT.

**AUTOPILOT USE RESTRICTIONS:** The conditions under which a given driver assist system or feature thereof is specifically designed to function, including, but not limited to, environmental, geographical, and time-of-day restrictions, and/or the requisite presence or absence of certain traffic or roadway characteristics.

**LEVEL 2 ADVANCED DRIVER ASSIST SYSTEMS (ADAS):** "LEVEL 2" means the same as and is coterminous with the definition of "Level or Category 2 - Partial Driving Automation" in SAE J3016 Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles § 5.3 (April 2021) (i.e., a driver support feature on the vehicle that can control both steering and braking/accelerating simultaneously under some circumstances).

**DRIVABLE SPACE:** Refers to the area where a vehicle operating with ADAS can safely operate while using a driver support feature on the vehicle that can control both steering and braking/accelerating simultaneously and is used to inform driving decisions such as obstacle avoidance and trajectory planning.

**HARDWARE SUITE**: refers to the in-vehicle onboard computer systems and their components in SUBJECT VEHICLES used to process data from SENSORS in SUBJECT VEHICLES and serve as one of the foundations for the AUTOPILOT and other ADAS in SUBJECT VEHICLES.

**SOFTWARE/FIRMWARE VERSION(S)**: refers to over-the-air updates that add new features and change existing ones associated with functions, including, but not limited to, AUTOPILOT and other ADAS in SUBJECT VEHICLES.

**TESLA:** TESLA, Inc., all of its past and present OFFICERs and EMPLOYEEs, whether assigned to its principal offices or any of its field or other locations, including all of its divisions, subsidiaries (whether or not incorporated) and affiliated enterprises and all of their headquarters, regional, zone and other offices and their EMPLOYEES, and all AGENTS, contractors, consultants, attorneys and law firms and other persons engaged directly or indirectly (e.g., EMPLOYEE of a consultant) by or under the control of TESLA (including all business units and persons previously referred to), who are or, on or after January 1, 2011 were, involved in any way with any of the following related to the alleged defect in the SUBJECT VEHICLES:

a.   Design, engineering, analysis, modification or production (e.g. quality control);
b.   Testing, assessment or evaluation;
c.   Consideration or recognition of potential or actual defects, reporting, recordkeeping and information management (e.g., complaints, field reports, warranty information, part sales), analysis, claims, or lawsuits; or
d.   Communication to, from, or intended for zone representatives, FLEETs, dealers, or other field locations, including but not limited to people who have the capacity to obtain information from dealers.

## AREAS OF INQUIRY

**1.   Updates to AUTOPILOT and/or DMS After the SUBJECT INCIDENT:**

a.   the identification and substance of all DOCUMENTS and/or ESI and communications exchanged with any regulatory authorities, including but not limited to the National Highway Traffic Safety Administration [NHTSA] and the National Transportation Safety Board [NTSB], related to NHTSA's Part 573 Safety Recall Report 23V-838;

b.   the identification and substance of all DOCUMENTS and/or ESI and communications exchanged with any regulatory authorities, including but not limited to the NHTSA and the NTSB, related to any investigations of TESLA's AUTOPILOT, AUTOSTEER, and DMS;

c.   descriptions of all AUTOPILOT and/or DMS related SOFTWARE/FIRMWARE VERSION(S) updates issued to TESLA vehicles **after NHTSA's Part 573 Safety Recall Report 23V-838;**

d.   for all AUTOPILOT and/or DMS related SOFTWARE/FIRMWARE VERSION(S) updates issued to TESLA vehicles **after NHTSA's Part 573 Safety Recall Report 23V-838**, identification of:

   i.   how those updates changed vehicle operation and/or performance;
   ii.  whether the updates could have been made before the SUBJECT INCIDENT;
   iii. The names, job titles, and if no longer employed, all known contact information for all TESLA employees and representatives who were involved in designing, programing, evaluating, and/or testing the updates;

e.   for all AUTOPILOT and/or DMS related SOFTWARE/FIRMWARE VERSION(S) updates issued by TESLA **after NHTSA's Part 573 Safety Recall Report 23V-838**, identification of why those updates were made, including:

   i.   the recommendations and input of all TESLA employees and representatives in the decision to recall the vehicles;

      ii.   the identification and substance of all DOCUMENTS and/or ESI and correspondence reflecting the decision to recall the vehicles;

      iii.  the names, job titles, and if no longer employed, all known contact information for all TESLA employees and representatives who were involved in the decision to recall the vehicles;

      iv.  the substance of involvement of each TESLA employee and representative in the decision to recall the vehicles, and the dates of said involvement.

f.     the description of updates to AUTOPILOT and/or DMS related SOFTWARE/FIRMWARE VERSION(S) **after the SUBJECT INCIDENT and prior to NHTSA's Part 573 Safety Recall Report 23V-838**;

g.     for the AUTOPILOT and/or DMS related SOFTWARE/FIRMWARE VERSION(S) updates **after the SUBJECT INCIDENT and prior to NHTSA's Part 573 Safety Recall Report 23V-838**, identification of:

      i.   a description of how those updates changed the performance and or operation of the vehicles;

      ii.  whether the updates could have been made before the SUBJECT INCIDENT;

      iii.  names, job titles, and if no longer employed, all known contact information for all TESLA employees and representatives who were involved in the design, evaluation, and/or testing of the updates;

      iv.  the recommendations and input of all TESLA employees and representatives in the decision-making process to allow the updates to be issued to TESLA customers;

      v.   the identification and substance of all DOCUMENTS and/or ESI and correspondence reflecting the decision to update the software;

      vi.  the names, job titles, and if no longer employed, all known contact information for all TESLA employees and representatives who were involved in the decision to update the software;

      vii.  the substance of involvement of each TESLA employee and representative in the decision to update the software, and the dates of said involvement.

2.    **Design of and Updates to AUTOPILOT and/or DMS related systems before the SUBJECT INCIDENT.**

a.     descriptions of all TESLA AUTOPILOT and/or DMS related SOFTWARE/FIRMWARE VERSION(S) updates sent to the SUBJECT VEHICLE;

b.     descriptions of all information that accompanied TESLA AUTOPILOT and/or DMS related SOFTWARE/FIRMWARE VERSION(S) updates sent to the SUBJECT VEHICLE;

c. for all updates regarding AUTOPILOT and/or DMS related SOFTWARE/FIRMWARE VERSION(S) sent to the SUBJECT VEHICLE, identification of:

  i. a description of how those updates changed the operation and/or performance of the SUBJECT VEHICLE;

  ii. the names, job titles, and if no longer employed all known contact information for all TESLA employees and representatives who were involved in the design, programing, evaluation, and/or testing of these SOFTWARE/FIRMWARE VERSION(S) updates;

  iii. the criteria used to determine that updates to SOFTWARE/FIRMWARE VERSION(S) would perform as intended;

  iv. the criteria used to determine that updates to SOFTWARE/FIRMWARE VERSION(S) did perform as intended after its release to customers;

  v. the recommendations and input of all TESLA employees and representatives in the decision-making process regarding whether the updates were safe to be issued to customers;

  vi. the identification and substance of all DOCUMENTS and/or ESI and correspondence reflecting that decision-making process;

  vii. the substance of involvement of each TESLA employee and representative in that decision-making process, and the dates of said involvement;

d. the identification of all studies, testing, experiments, and any other research and development activities TESLA relied on in deciding to make AUTOPILOT and its related functions available for use by TESLA customers;

e. all engineering and testing of TESLA's AUTOPILOT and/or DMS systems before any of these features were available to any purchasers of TESLA vehicles;

f. the recommendations and input of TESLA employees in the decision-making process to allow these features to be available to customers;

g. the identification and substance of all DOCUMENTS and/or ESI and correspondence reflecting this decision-making process;

h. the names, job titles, and if no longer employed, all known contact information for all TESLA employees and representatives who were involved in this decision-making process;

i. the substance of involvement of each TESLA employee and representative in this decision-making process, and their dates of involvement.

**3. Beta Testing – subtopics include:**

a. the meaning of TESLA's statement in the Owner's Manual for the SUBJECT VEHICLE that "AUTOSTEER is a BETA feature";

b.      the reasons why AUTOPILOT/AUTOSTEER and its related functions were made available for use by customers while in Beta;

c.      the identification and substance of all DOCUMENTS AND/OR ESI and/or ESI and correspondence reflecting TESLA's decision to make AUTOPILOT/AUTOSTEER and related functions available for use while in Beta.

4.      **TESLA's AUTOPILOT USE RESTRICTIONS, including but not limited to Geofencing of AUTOSTEER [not already covered in depositions of Akshay Phatak taken July 20 and August 2, 2023] -- subtopics include:**

a.      TESLA's capability to implement AUTOPILOT USE RESTRICTIONS during operation of AUTOPILOT and its related features on roads with cross-traffic and in locations that are outside of that which TESLA intended AUTOPILOT to be used by customers;

b.      all actions taken and being taken regarding AUTOPILOT USE RESTRICTIONS during operation of AUTOPILOT on roads and in locations that are outside the places where TESLA intended AUTOPILOT and its related features to be used by customers;

c.      TESLA's evaluation and/or analysis of fleet data relating to AUTOPILOT's use in places where TESLA intended AUTOPILOT and its related features not to be used by customers;

d.      standards, best practices and research relied upon by TESLA in development of its AUTOPILOT USE RESTRICTIONS, and/or the determination of places where TESLA intended AUTOPILOT and its related features not to be used by customers;

e.      TESLA's evaluation of and consideration of data, research and studies regarding driver complacency with ADAS, factors that influence driver take-over time when ADAS are in use, and impact of ADAS on driver situational awareness and attention to safe driving tasks;

f.      all actions taken by TESLA regarding NTSB Safety Recommendations H- 17-041 and H-17-042;

g.      the descriptions referred to on Bates No. BENAVIDES-00001319 regarding FleetNet's Telemetry Record Definitions;

h.      all actions taken by TESLA involving AUTOPILOT USE RESTRICTIONS in response to the May 7, 2016, incident involving Joshua Brown;

i.      all actions taken by TESLA involving AUTOPILOT USE RESTRICTIONS in response to the March 23, 2018, incident involving Walter Huang;

j.      the identification of all warnings and instructions (including the substance of the warning/ instruction, the manner in which it was provided, and the dates provided) that TESLA provided to the drivers and purchasers of its vehicles regarding what streets and roadways AUTOPILOT and its related functions were intended by TESLA to be operated on, and conversely what streets and roadways AUTOPILOT and its related functions TESLA intended for them not be operated on;

k.      for each warning and/or instruction identified in response to the above area of inquiry:

    i.      the purpose for such warning and/or instruction;

    ii.      the identification of all studies, testing, experiments, and any other research and development activities utilized in making the decision to provide such warning and/or instruction;

    iii.      the recommendations and input of TESLA employees, representatives and consultants in the decision to provide such warning or instruction;

    iv.      the identification and substance of all DOCUMENTS and/or ESI and correspondence reflecting the decision to provide such warning and/or instruction;

    v.      the names, job titles, and if no longer employed all known contact information for all TESLA employees and representatives who were involved in the decision-making process regarding such warning or instruction;

    vi.      the substance of involvement of each TESLA employee and representative in the decision-making process regarding such warning or instruction, and the dates of said involvement;

l.      the identification of all warnings and instructions (including the substance of the warning/ instruction, the way it was provided, and the dates provided) that TESLA provided specifically to George Brian McGee regarding what streets and roadways TESLA intended AUTOPILOT and its related functions to be operated on, and conversely what streets and roadways TESLA intended AUTOPILOT and its related functions not to be operated on.

**5.      Driver Monitoring System (DMS) Development for AUTOPILOT/AUTOSTEER not already covered in depositions of Akshay Phatak taken July 20 and August 2, 2023] -- subtopics include:**

a.      description of any DMS on the SUBJECT VEHICLE;

b.      reasons why a particular DMS detection method was selected;

c.      alternative DMS detection methods considered;

d.      alternative DMS detection methods evaluated;

e.   dates and details of any changes to the DMS scheme and warnings between 2012 and the present (including identification of changes made, reasons for changes and dates of changes across all versions of AUTOPILOT/AUTOSTEER software);

f.   all actions taken and being taken in response to the NHTSA's Part 573 Safety Recall Report 23V-838, and findings that AUTOPILOT features may not have sufficient controls to prevent driver misuse;

g.   knowledge that warnings could be repeatedly ignored by the driver without causing AUTOPILOT/AUTOSTEER to disengage;

h.   TESLA's evaluation and/or analysis of fleet data relating to its DMS;

i.   standards, best practices and research relied upon by TESLA in development of its DMS;

j.   TESLA's evaluation of and consideration of data, research and studies regarding driver complacency with ADAS, factors that influence driver take-over time when ADAS are in use, and impact of ADAS on driver situational awareness, and attention to safe driving;

k.   actions taken by TESLA since NTSB Safety Recommendations H- 17-041 and H-17-042 regarding TESLA's DMS systems;

l.   actions taken by TESLA after the May 7, 2016, incident involving Joshua Brown regarding TESLA's DMS systems;

m.   actions taken by TESLA after the March 23, 2018, incident involving Walter Huang regarding TESLA's DMS systems;

n.   actions taken by TESLA after the March 1, 2019, incident involving Jeremy Banner regarding TESLA's DMS systems;

o.   the identification of all warnings and instructions (including the substance of the warning/instruction, the manner in which it was provided, and the dates provided) that TESLA provided to the drivers and purchasers of its vehicles regarding driver attentiveness and/or driver complacency while using AUTOPILOT and its related functions;

p.   for each warning and/or instruction identified in response to the above area of inquiry:

    i.   the reason and purpose for such warning and/or instruction;
    ii.   the identification of all studies, testing, experiments, and any other research and development activities utilized in making the decision to provide such warning and/or instruction;

iii.  the recommendations and input of all TESLA employees, representatives, and consultants in the decision to provide such warning or instruction;

iv.  the identification and substance of all DOCUMENTS and/or ESI and correspondence reflecting the decision to provide said warning or instruction;

v.  the names, job titles, and if no longer employed all known contact information for all TESLA employees and representatives who were involved in the decision-making process to provide said warning or instruction;

vi.  the substance of involvement of each TESLA employee and representative in the decision-making process, and their dates of involvement in the decision-making process to provide said warning or instruction;

q.  the identification of all warnings and instructions (including the substance of the warning/instruction, the manner in which it was provided, and the dates provided) that TESLA provided specifically to George Brian McGee regarding driver attentiveness and/or driver complacency while utilizing AUTOPILOT and its related functions in the SUBJECT VEHICLE.

**6.    AUTOMATIC EMERGENCY BRAKING (AEB) – subtopics include:**

a.  the reasons why AEB failed to stop or slow the SUBJECT VEHICLE in the SUBJECT INCIDENT;

b.  the decision-making process involved in designing AEB to operate the way it did in the SUBJECT VEHICLE at or around the time of the SUBJECT INCIDENT;

c.  TESLA's evaluation and/or analysis of fleet data relating to its AEB;

d.  standards, best practices and research relied upon by TESLA in development of its AEB;

e.  all actions taken by TESLA since NTSB Safety Recommendations H-17-041 and H-17-042 regarding its AEB systems;

f.  all actions taken by TESLA in response to the May 7, 2016, incident involving Joshua Brown regarding its AEB systems; and

g.  all actions taken by TESLA in response to the March 23, 2018, incident involving Walter Huang regarding its AEB systems;

h.  actions taken by TESLA after the March 1, 2019, incident involving Jeremy Banner regarding TESLA's DMS systems.

**7.    Specifics of McGee's car: the Delivery Process – subtopics include:**

     a.     identification of the substance and all terms of any contracts and sales DOCUMENTS and/or ESI entered between George Brian McGee and TESLA;

     b.     identification of the substance and all line items of George Brian McGee's mobile and online ordering summary for the SUBJECT VEHICLE;

     c.     identification of the substance of all line items on the window sticker or any substantially similar document related to the SUBJECT VEHICLE;

     d.     identification of the full name of all standard AUTOPILOT related functions and features which the SUBJECT VEHICLE was originally equipped with;

     e.     identification of the full name of all AUTOPILOT related functions and features which were added as options for the SUBJECT VEHICLE at the time of sale to George Brian McGee;

     f.     identification of all interactions by and between George Brian McGee and any TESLA employees or representatives;

     g.     identification of the details of the car delivery process for George Brian McGee regarding the SUBJECT VEHICLE;

     h.     identification of all training, instruction, and/or education provided by TESLA to George Brian McGee related to the operation of the SUBJECT VEHICLE.

**8.    Specifics of All Warnings Provided to Mr. McGee – subtopics include:**

     a.     identification of the nature and substance of all instructions and warnings provided by TESLA to George Brian McGee regarding the operation of AUTOPILOT;

     b.     identification of the way TESLA provided an owner's manual to George Brian McGee and how TESLA expected he would access the Owner's Manual in order to find information on how to safely use AUTOPILOT and its related features;

     c.     identification of each instance wherein George Brian McGee accessed the owners' manual, including the dates and the specific subjects that he accessed.

**9.    Tesla's Interpretation of Car Log, Diagnostic Log Data, SIGNALS, and Other Data Relating to the Subject Vehicle – subtopics include:**

     a.     data and ESI, including Car Log files, Diagnostic Log Data, SIGNALS, and other data regarding the operation of AUTOPILOT and its various components, including but not limited to AUTOSTEER, during the drive cycle involving the

SUBJECT INCIDENT, "including but not limited to: Diagnostic Log Data, SIGNALS, and other data along with a glossary of the signal definitions regarding the operation of AUTOPILOT and its various components, including but not limited to AUTOSTEER, during the drive cycle involving the SUBJECT INCIDENT related to the following:

All SIGNALS, including time, date, location, signal unavailable default, and unit of measurement, for the final drive cycle from every vehicle system, including but not limited to ██████████████████████████████████████████████████████ ████████████████████████████████████████regarding:

1. Autopilot
    (a) Autosteer
    (b) Traffic-Aware Cruise Control
    (c) Collision Avoidance Assist
    (d) Speed Assist
        i. Related to:
        (a) Steering
        (b) Driver Monitoring
        (c) Vehicle and Motor Speed Control
        (d) Forward Collision Avoidance –
            (i) Detection
            (ii) Prevention
            (iii)        Warning
        (e) Crash Detection
        (f) Object Detection –
            (i) Radar
            (ii) Camera
        (g) Road Type Detection
        (h) GPS Data
2. Camera Calibration – All Cameras
3. Driver
    (a) Driver's Seat – all signals
    (b) Signals Reflecting Movement
    (c) Interaction with Steering Wheel
    (d) Interaction with Steering Column
    (e) Interaction with Pedals
3. Brake and Accelerator Pedal Movement
4. Vehicle Braking and Acceleration
5. Gear Selection
6. Vehicle Speed
7. Motor Speed and Torque

      8.   Steering

      9.   Headlights

b.    data and ESI, including Car Log files, Diagnostic Log Data, SIGNALS, and other data concerning the operation of all DMSs during the drive cycle involving the SUBJECT INCIDENT;

c.    data and ESI, including Car Log files, Diagnostic Log Data, SIGNALS, and other data concerning the operation of AEB in the SUBJECT VEHICLE during the ten seconds leading up to and including the SUBJECT INCIDENT;

d.    all DOCUMENTS and ESI concerning the SUBJECT VEHICLE, not including attorney work product or attorney client communications;

e.    the use of AP VIS software;

f.    the Snapshot file regarding this incident;

g.    Tesla's ability to create an Augmented Vision video regarding this incident; and

h.    whether Tesla created such a video in this case; if not, why not.

**10.**    **Bates No. BENAVIDES-00001244 – Catalog of Signal Names – subtopics include:**

a.    identification of the meaning of various SIGNALS listed in Bates No. BENAVIDES-00001244;

b.    comparison of the names of various SIGNALS listed in Bates No. BENAVIDES-00001244 with Log Files, or "Diagnostic Log Data", TESLA has produced regarding the SUBJECT VEHICLE;

c.    identification of SIGNALS available for compiling Log Files, or "Diagnostic Log Data", regarding the SUBJECT VEHICLE;

d.    identification of all DOCUMENTS and/or ESI and any other material listing all SIGNALS and video files that are recorded to any data source regarding the SUBJECT VEHICLE, including definitions of each signal;

e.    identification of any different SIGNALS currently being used to create Log Files, or Diagnostic Log Data, that were not in use by TESLA regarding the SUBJECT VEHICLE;

f.    the timing of when certain SIGNALS used to create Log Files, or Diagnostic Log Data, became available for use by TESLA.

**11.**    **Real Time Data Value System (RTDV) – subtopics include:**

a. identification of any RTDV system used by TESLA;

b. the purpose and function of any such RTDV system used by TESLA;

c. description of the data generated by any RTDV system used by TESLA;

d. the identities of TESLA employees most familiar with any RTDV system used by TESLA;

e. the identity and location of DOCUMENTS and/or ESI reflecting data from any RTDV system used by TESLA;

f. the identity and location of DOCUMENTS and/or ESI reflecting data from any RTDV system used by TESLA regarding the SUBJECT VEHICLE;

g. description of any TESLA RTDV system involved with the SUBJECT VEHICLE;

h. description of any data regarding any RTDV system TESLA possesses or has possessed regarding the SUBJECT VEHICLE;

i. identification of persons involved in the collection, interpretation, evaluation, or calculations of any RTDV system regarding the SUBJECT VEHICLE.

**12. FleetNet (see BENAVIDES-00001244) – subtopics include:**

a. identification of any FleetNet system used by TESLA;

b. the purpose and function of any such FleetNet system used by TESLA;

c. description of the data generated by any FleetNet system used by TESLA;

d. the identities of TESLA employees most familiar with any FleetNet system used by TESLA;

e. the identity and location of DOCUMENTS and/or ESI reflecting data from any FleetNet system used by TESLA;

f. the identity and location of DOCUMENTS and/or ESI reflecting data from any FleetNet system used by TESLA regarding the SUBJECT VEHICLE;

g. description of any TESLA FleetNet system involved with the SUBJECT VEHICLE;

h. description of any data regarding any FleetNet system TESLA possesses or has possessed regarding the SUBJECT VEHICLE;

      i.      identification of persons involved in the collection, interpretation, evaluation, or calculations of any FleetNet system regarding the SUBJECT VEHICLE.

**13.**    **Marketing and Advertisements – subtopics include:**

      a.      identification of the substance and specifics of each advertisement, press campaign, or other public statement made by TESLA relating to the functionality and capabilities of AUTOPILOT and its related functions made at any time prior to the date of the SUBJECT INCIDENT;

      b.      identification of the TESLA employees who participated in generating the content of each such advertisement, press campaign, or other public statement made by TESLA relating to the functionality and capabilities of AUTOPILOT and its related functions made at any time prior to the date of the SUBJECT INCIDENT.

**14.**    **Vehicle Safety Report – And Relative Safety of AUTOPILOT Compared with Manual Driving and Other Vehicles [not already covered in depositions of Akshay Phatak taken July 20 and August 2, 2023] – subtopics include:**

      a.      identification of all persons involved with compiling, interpreting and promulgating the Vehicle Safety Report (VSR);

      b.      identification of the data used by TESLA to calculate the number of crashes per miles driven for TESLA vehicles from 2012 to the present;

      c.      identification of the data used by TESLA to calculate the number of crashes per miles driven for all non-TESLA vehicles;

      d.      the reasons why TESLA chose to start using D16 Reports as its basis for calculating VSR data;

      e.      identification of the methods TESLA used prior to the third quarter of 2018 to evaluate the relative safety of driving using AUTOPILOT compared to driving manually;

      f.      identification of all people involved in compiling data regarding the relative safety of driving using AUTOPILOT compared with driving manually prior to the third quarter of 2018;

      g.      correlation of crash statistics with Software/Firmware releases

      h.      estimates of numbers of crashes of TESLA vehicles in which airbags or seat restraint pretensioners did not activate and the basis for such estimates;

      i.      the relative safety of TESLA vehicles being driven with AUTOPILOT active compared to TESLA vehicles being driven manually;

j.     the relative safety of TESLA vehicles being driven with AUTOPILOT active compared to non-TESLA vehicles;

k.     the relative safety of TESLA vehicles being driven with AUTOPILOT active compared to non-TESLA vehicles being driven with some type of ADAS activated.

**15.     TESLA's Investigations into Other AUTOPILOT Crashes – subtopics include:**

a.     the identification of all other crashes known by or investigated by TESLA wherein it was found or alleged that the crash occurred with AUTOPILOT or its related functions active within five seconds of the crash. For each such crash, the identification of:

     i.   all facts known by TESLA regarding how the crash occurred;
     ii.  the detailed nature of the allegations related to the involvement of AUTOPILOT;
     iii. the full names of the person(s) involved;
     iv. the full names of all lawyers involved in making such claims or allegations;
     v.  the detailed findings of TESLA's investigation.

b.     The identification of all other crashes known by or investigated by TESLA wherein it was found or alleged that the crash occurred while AUTOPILOT/AUTOSTEER was engaged on a non-limited access roadway. For each such crash, the identification of:

     i.   all facts known by TESLA regarding how the crash occurred;
     ii.  the detailed nature of the allegations related to the involvement of AUTOPILOT/AUTOSTEER;
     iii. the full names of the person(s) involved;
     iv. the full names of all lawyers involved in making such claims or allegations;
     v.  the detailed findings of TESLA's investigation.

c.     The identification of all other crashes known by or investigated by TESLA wherein it was found or alleged that the crash occurred while a TESLA driver was not adequately paying attention while engaging AUTOPILOT/AUTOSTEER. For each such crash, the identification of:

     i.   all facts known by TESLA regarding how the crash occurred;
     ii.  the detailed nature of the allegations related to the involvement of AUTOPILOT/AUTOSTEER;
     iii. the full names of the person(s) involved;
     iv. the full names of all lawyers involved in making such claims or allegations;
     v.  the detailed findings of TESLA's investigation.

d.     Identification of all Tesla crashes where one or more augmented videos were created. For each of these:

     i.   the reason the videos were created;
    ii.   how soon after the incident were these videos created;
  iii.   whether any of these videos were created independent of litigation;
   iv.   how long the videos take to create;
    v.   who is involved in creating them;
   vi.   whether Tesla provided these videos to the other party(s) in other cases without a Court order;
  vii.   how these videos created;
 viii.   what the videos they depict;
   ix.   whether Plaintiffs can produce one of these videos independent of Tesla proprietary software and/or platforms used by Tesla to process data;
    x.   factors determining whether it is possible for Tesla to create one of these videos for a given crash; and
   xi.   whether there is anything different about the ability to create such a video in this case as opposed to the other cases where such a video has been created.

**16.**    **International Issues – subtopics include:**

    a.    identification and description of international regulations regarding the use, availability and name of AUTOPILOT;

    b.    communications and DOCUMENTS AND/OR ESI and/or ESI exchanged between TESLA and any international regulatory authorities pertaining to AUTOPILOT;

    c.    regulations involving driver monitoring, driver alerts, and geofencing.

**17.**    **TESLA and Ryan McCarthy's Involvement in Any Government-related Investigation of this Incident – subtopics include:**

    a.    why TESLA and Ryan McCarthy involved themselves in the Florida Highway Patrol investigation of the SUBJECT INCIDENT;

    b.    all facts related to any involvement by TESLA or Ryan McCarthy with any investigation of the SUBJECT INCIDENT;

    c.    the identities of all people, besides TESLA legal counsel, or TESLA employees, who TESLA or Ryan McCarthy communicated with concerning the facts involved regarding the SUBJECT INCIDENT;

    d.    the dates of all communication between TESLA or Ryan McCarthy and any person, not including TESLA employees or legal counsel, which involved the investigation of the SUBJECT INCIDENT;

e.   the factual substance of all communications by TESLA and/or Ryan McCarthy with anyone concerning the facts involved in the SUBJECT INCIDENT – this does not include attorney-client communications.

18.   **Issues Related to DRIVABLE SPACE – subtopics include:**

a.   where the DRIVABLE SPACE was in the area within one-quarter mile of the intersection involved in the SUBJECT INCIDENT;

b.   how the SUBJECT VEHICLE calculated the DRIVABLE SPACE at the intersection;

c.   what the SUBJECT VEHICLE was programmed to do in relation to the DRIVABLE SPACE at the intersection;

d.   TESLA's decision-making process for determining how to program the SUBJECT VEHICLE and the AUTOPILOT/AUTOSTEER system regarding DRIVABLE SPACE;

e.   the identity of all TESLA employees who participated in the decision-making process for determining how to program the SUBJECT VEHICLE and the AUTOPILOT/AUTOSTEER system regarding DRIVABLE SPACE;

f.   TESLA's decision-making process for deciding not to use offline high-definition maps combined with online high-precision localization and/or lidar sensing to determine DRIVABLE SPACE;

g.   issues related to annotated videos of the last five (5) minutes leading to the SUBJECT INCIDENT, such as:

i.   what information they processed;
ii.   why the videos processed this information;
iii.   what TESLA intended for the car to do in response to the information processed.

## DESCRIPTION OF MATERIALS TO BE PRODUCED

Deponent is required to bring to his/her deposition the materials or categories of materials described below:

## GENERAL REQUESTS PERTAINING TO ALL SUBJECTS

**REQUEST FOR PRODUCTION NO. 1:**  All DOCUMENTS and/or ESI read or reviewed in any fashion (including documents that were read to the witness without having been seen by the

witness) in preparation for giving testimony in this action (if the DOCUMENTS were previously produced by any Defendant, the witness could identify the numbers on the DOCUMENTS reviewed rather than producing a hard copy).

**REQUEST FOR PRODUCTION NO. 2:** All DOCUMENTS and/or ESI read or reviewed in any fashion (including documents that were read to the witness without having been seen by the witness) that have refreshed the recollection of the witness relative to any testimony in this action (if the DOCUMENTS were previously produced by any Defendant, the witness could identify the numbers on the DOCUMENTS reviewed rather than producing a hard copy).

**REQUEST FOR PRODUCTION NO. 3:** All DOCUMENTS and/or ESI that name any of the Plaintiffs, George McGee, or the SUBJECT VEHICLE, not including attorney client privileged or attorney work product information.

## REQUESTS RELATED TO DMS

**REQUEST FOR PRODUCTION NO. 4:** All DOCUMENTS and/or ESI that reflect the design, development, and testing of the DMS for TESLA's vehicles that operate when an AUTOPILOT system is activated, including but not limited to DOCUMENTS that reflect deliberation regarding the DMSs available for use when AUTOPILOT and its related systems such as Autosteer and Traffic Aware Cruise Control are operating.

## REQUESTS RELATED TO AUTOPILOT GEOFENCING

**REQUEST FOR PRODUCTION NO. 5:** All DOCUMENTS and/or ESI that reflect the design, development, and testing of the AUTOPILOT USE RESTRICTIONS for TESLA's AUTOPILOT system, including but not limited to DOCUMENTS that reflect deliberation regarding the AUTOPILOT USE RESTRICTIONS during use of AUTOPILOT and its related systems such as Autosteer and Traffic Aware Cruise Control.

**REQUESTS RELATED TO AEB**

**REQUEST FOR PRODUCTION NO. 6:** All DOCUMENTS and/or ESI that reflect the design, development, and testing of the AEB system used in the SUBJECT VEHICLE, including but not limited to DOCUMENTS and/or ESI that reflect deliberations regarding the types of sensors used, number of sensors used, capabilities of the sensors, specifications of the sensors, desired performance of the sensors, and operational parameters of AEB.

**REQUESTS RELATED TO SUBJECT VEHICLE DATA**

**REQUEST FOR PRODUCTION NO. 7:** All DOCUMENTS and/or ESI relating to and including SIGNALS and other data stored on and/or transmitted from the SUBJECT VEHICLE between November 30, 2018, and May 31, 2019, including all data uploaded to TESLA, all visualization data, diagnostic log data, all Mission Planner data, all Road Estimator data, all Path Planner data, all visualization data, all control data, all real time data values, and including but not limited to any and all data that can be utilized by Kibana or LECT.

**REQUEST FOR PRODUCTION NO. 8:** DOCUMENTS and/or ESI describing the Real Time Data Values "RTDV" system.

**REQUEST FOR PRODUCTION NO. 9:** DOCUMENTS and/or ESI containing any Real Time Data Values "RTDV" system information regarding the SUBJECT VEHICLE.

**REQUEST FOR PRODUCTION NO. 10:** DOCUMENTS and/or ESI regarding the SUBJECT VEHICLE having to do with FleetNet.

**REQUEST FOR PRODUCTION NO. 11:** FleetNet Telemetry Record Definitions referred to on Bates No. BENAVIDES-00001319.

DATED March 12, 2024.

SLAVIK LAW FIRM LLC
3001 South Lincoln Ave., Ste. C-1
Steamboat Springs, CO 80487
(970) 457-1011

By:      **/s/ _Donald H. Slavik._**
Donald H. Slavik, Esq.
*Admitted Pro Hac Vice 02/02/2023*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 12, 2024, a true and correct copy of the foregoing was served via email to all counsel identified in the below service list.

By:  **/s/ *Donald H. Slavik.***
Donald H. Slavik, Esq.

| | |
|---|---|
| **<u>Cole, Scott & Kissane, PA</u>**<br>9150 S. Dadeland Blvd., Ste. 1400<br>Miami, FL 33156<br>**Attn: Henry Salas, Esq.**<br><u>henry.salas@csklegal.com</u><br><u>leisy.martinez@csklegal.com</u><br>*Counsel for Defendant, Tesla, Inc.* | **<u>Eaton & Wolk PL</u>**<br>2665 South Bayshore Dr., Ste. 609<br>Miami, FL 33133<br>**Attn: Doug Eaton, Esq.**<br><u>deaton@eatonwolk.com</u><br>*Co-Counsel for both Plaintiffs* |
| **<u>Bowman and Brooke LLP</u>**<br>41000 Woodward Ave., Ste. 200E<br>Bloomfield Hills, MI 48304<br>**Attn: Thomas P. Branigan, Esq.**<br>**Attn: Drew P. Branigan, Esq.**<br><u>thomas.branigan@bowmanandbrooke.com</u><br><u>drew.branigan@bowmanandbrooke.com</u><br>*Counsel for Defendant, Tesla, Inc.* | |
| **<u>Arias Sanguinetti Wang & Torrijos, LLP</u>**<br>2200 Powell Street, Ste. 740<br>Emeryville, CA 94608<br>**Attn: Elise R. Sanguinetti, Esq.**<br><u>elise@aswtlawyers.com</u><br><u>ncservice@aswtlawyers.com</u><br>*Co-Counsel for both Plaintiffs* | |
| **<u>Poses & Poses, PA</u>**<br>169 East Flagler Street, Ste. 1600<br>Miami, FL 33156<br>**Attn: Todd Poses, Esq.**<br><u>tposes@posesandposes.com</u><br><u>Maria@posesandposes.com</u><br>*Counsel for Plaintiff, Neima Benavides* | |
| **<u>The Rousso, Boumel Law Firm, PLLC</u>**<br>9350 South Dixie Highway, Ste. 1520<br>Miami, FL 33156<br>**Attn: Adam T. Boumel, Esq.**<br>adam@roussolawfirm.com<br>*Counsel for Plaintiff, Dillon Angulo* | |