## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 21-cv-21940-BLOOM/Otazo-Reyes

NEIMA BENAVIDES, *as Personal*
*Representative of the Estate of Naibel*
*Benavides Leon, deceased,*

      Plaintiff,

v.

TESLA, INC. *a/k/a Tesla Florida, Inc*.

      Defendant,

_____/

### Case No. 22-cv-22607-BLOOM

DILLON ANGULO,

      Plaintiff,

v.

TESLA, INC., a/k/a *Tesla Florida, Inc.,*

      Defendants.

_____/

### PLAINTIFFS' MOTION TO RE-OPEN THE FACT DISCOVERY PERIOD, AND, IF NECESSARY, CONTINUE THE CURRENT TRIAL DATE

Plaintiffs, Neima Benavides and Dillon Angulo, by and through undersigned counsel, respectfully files this motion to re-open the fact discovery period, and, if necessary, continue the trial of this matter, as grounds therefore state:

### I.      Request for hearing / oral argument

At the outset, Plaintiffs would respectfully request that this Honorable Court conduct a hearing / entertain oral arguments on this Motion.  Given the broad scope of the issues implicated in this motion, Plaintiffs believe in good faith that oral argument would help the Court more fully understand the need for this final extension of the deadlines. Additionally, because Tesla does not

oppose substantial parts of the relief requested herein, if the Court grants the motion in part or in full, the presence of the parties would allow the Court to come up with a final discovery and trial schedule at the time of the hearing. Plaintiffs estimate that 30 minutes to one (1) hour will be required for said hearing.

## II.     The recent issuance of NHTSA's investigation report merits a re-opening of the fact discovery period.

Before we begin, we readily acknowledge that this Court has previously stated that trial in this case will go forward on this November docket, with no exceptions. What the Court and the parties could have never anticipated is that just two months ago, NHTSA would release a fully admissible investigative report which included clear findings of fact that Tesla's Autopilot had (and continues to have) critical safety gaps – the same exact safety gaps that Plaintiffs have alleged in this case from day one. While Plaintiffs fully understand and appreciate the need for this Court to expeditiously get this case to trial, this case involves important safety issues which impact not only the litigants, but the American public as a whole.   Given the significance of this newly disclosed evidence, the interests of justice in this case weigh in favor of re-opening fact discovery to allow the Plaintiffs to fully present the merits of their case.

NHTSA began investigating failures of Tesla's autopilot system in 2017.  Plaintiff initially requested that this case be stayed pending the outcome of the NHTSA investigation, because its outcome would be determinative as to whether this case would proceed. (DE 24). This Court held a hearing on April 12, 2022, on the motion to stay. **(Ex.1)** During the hearing, the Court expressed concern that the investigation did not address substantially similar accidents.  Specifically, the Court was concerned that the investigation was limited to "11 vehicles that were involved in first responder accidents where the autopilot engaged" and that the driver of the Tesla in this accident had disengaged the autopilot based on his acceleration. **(Ex.1 at 53, 51)**

Admittedly, the ODI Resume that the Court had before it at that time addressed a limited scope of accidents. This part of the NHTSA investigation was prompted, in part, by a number of collisions with parked first responder vehicles. However, on June 8, 2022, (two months after the Court heard the motion to stay), NHTSA significantly expanded the scope of the investigation, such that, by the time of its completion, it encompassed the defect issues directly relevant to Plaintiff's theories of liability.

On April 25, 2024, NHTSA issued the attached summary of their investigation results.

**(Ex.2)** First, NHTSA summarized how it had expanded the scope of the investigation:

> The Office of Defects Investigation (ODI) upgraded PE21020 to EA22002 on June 8, 2022, to extend work and deepen the PE21020 crash analysis, to supplement that analysis with additional data, and to perform vehicle evaluations to understand how Tesla's Autopilot system may exacerbate human factors or behavioral safety risks by undermining the effectiveness of the driver's supervision. To support this work, ODI collected additional crash information and assessed vehicle control authority, driver engagement technologies, and related human factors considerations associated with partial automation via analysis of peer vehicle data and hands-on vehicle evaluation, assessments from NHTSA human factors subject matter experts, and reviews of related publications dedicated to partial driving automation.

Next, NHTSA summarized its findings as follows:

> ODI completed an analysis of 956 crashes reported up to August 30, 2023. In approximately half (489) of those crashes, ODI found: 1.) that there was insufficient data to make an assessment; 2.) the other vehicle was at fault; 3.) Autopilot was found to not be in use; or 4.) the crash was otherwise unrelated to EA22002. Of the remaining 467 crashes, ODI identified trends resulting in three categories: <u>collisions in which the frontal plane of the Tesla struck another vehicle or obstacle with adequate time for an attentive driver to respond to avoid or mitigate the crash (211), roadway departures where Autosteer was inadvertently disengaged by the driver's inputs</u> (111), and roadway departures in low traction conditions such as wet roadways (145). ODI observed this pattern across all Tesla models and hardware versions. Crash and human factors assessment showed that Autopilot controls did not sufficiently ensure driver attention and appropriate use. At the same time, peer analysis and vehicle evaluations established that Autopilot invited greater driver confidence via its higher control authority and ease of engagement. This mismatch of weak usage controls and high control authority was evident in these crash categories, which included indications of driver disengagement from the driving task. This mismatch was also evident in roadway departures when the system was engaged in low traction conditions outside of Tesla's

recommendations. Additional information regarding NHTSA's crash analysis is available in the EA22002 file. (emphasis added)

NHTSA thus expanded the scope of its investigation from collisions with first responders to autopilot collisions in general. It further investigated accidents where human factors resulted in inadvertent disengagement of auto pilot features.  These defects were found across all Tesla models and hardware versions.  All of these findings are relevant to Plaintiff's theories of liability. The scolding that NHTSA and the Office of Defect Investigation (ODI) gave Tesla in the investigative report is worth block quoting in full:

- "ODI's analysis of crash data indicates that, prior to Recall 23V838, Autopilot's design was not sufficient to maintain drivers' engagement."

- In its review of 956 Autopilot crashes "ODI observed a trend of avoidable crashed involving hazards that would have been visible to an attentive driver".

- "When a driver is disengaged with the Tesla vehicle operating in Autopilot and the vehicle encounters a circumstance outside of Autopilot's object or event detection response capabilities (e.g., obstacle detection and/or forward path planning), crash outcomes are often severe because neither the system nor the driver reacts appropriately, resulting in high-speed differential and high energy crash outcomes."

- "Drivers either did not brake or braked less than one second prior to the crash in 82 percent of the incidents, and either did not steer or steered less than one second prior to impact in 78 percent of the incidents."

- "This analysis, conducted before Recall 23V838, indicated that drivers involved in the crashes were not sufficiently engaged in the driving task and that the warnings provided by Autopilot when Autosteer was engaged did not adequately ensure that drivers maintained their attention on the driving task. The drivers were involved in crashes while using Autopilot despite fulfilling Tesla's pre-recall driver engagement monitoring criteria. Crashes with no or late evasive action attempted by the driver were found across all Tesla hardware versions and crash circumstances."

- "Gaps in Tesla's telematic data create uncertainty regarding the actual rate at which vehicles operating with Autopilot engaged are involved in crashes. Tesla is not aware of every crash involving Autopilot even for severe crashes because of gaps in telematic reporting. Tesla receives telematic data from its vehicles, when appropriate cellular connectivity exists and the

4

antenna is not damaged during a crash, that support both crash notification and aggregation of fleet vehicle mileage. Tesla largely receives data for crashes only with pyrotechnic deployment (e.g. deployment of airbags, seat belt pretensioners or pedestrian impact mitigation features in the hood) which are a minority of police reported crashes. A review of NHTSA's 2021 FARS and Crash Report Sampling System (CRSS) finds that only 18 percent of police-reported crashes include airbag deployments."

- "A comparison of Tesla's design choices to those of L2 peers (other Level 2 autonomous system auto manufacturers) identified Tesla as an industry outlier in its approach to L2 technology by mismatching a weak driver engagement system with Autopilot's permissive operating capabilities."

- "Notably, the term "Autopilot" does not imply an L2 assistance feature, but rather elicits the idea of drivers not being in control. This terminology may lead drivers to believe that the automation has greater capabilities than it does and invite drivers to overly trust the automation. Peer vehicles generally use more conservative terminology like "assist," "sense," or "team" to imply that the driver and automation are intended to work together, with the driver supervising the automation."

**(Ex.3)**

Shortly after the investigation summary was issued, on May 6, 2024, NHTSA opened a new investigation to "Evaluate the adequacy of Recall 23V838, including the prominence and scope of Autopilot controls to address misuse, mode confusion, or usage in environments the system is not designed for." In the summary, NHTSA explained the reason for this new investigation as follows:

EA22002 (upgraded from PE21020) was opened to investigate whether Tesla's Autopilot contained a defect that created an unreasonable risk to motor vehicle safety and involved extensive crash analysis, human factors analysis, vehicle evaluations, and assessment of vehicle control authority and driver engagement technologies. The work conducted in these investigations aligns with Tesla's conclusion in its 23V838 recall filing. During EA22002, ODI identified at least 13 crashes involving one or more fatalities and many more involving serious injuries in which foreseeable driver misuse of the system played an apparent role.
Tesla filed Recall 23V838 to address concerns regarding the Autopilot system investigated in EA22002. Following deployment of the remedy in Recall 23V838, ODI identified concerns due to post-remedy crash events and results from preliminary NHTSA tests of remedied vehicles. Also, Tesla has stated that a portion of the remedy both requires the owner to opt in and allows a driver to readily reverse it. Tesla has also deployed non-remedy updates to address issues that appear related

to ODI's concerns under EA22002. This investigation will consider why these updates were not a part of the recall or otherwise determined to remedy a defect that poses an unreasonable safety risk. ODI is therefore opening this Recall Query investigation to further evaluate the adequacy of the remedy for recall 23V838.

**(Ex.4)** In its letter to Tesla, ODI noted that there had been 20 post remedy crashes, 14 of which involved the front-end crashes or inadvertent disengagement relevant to the instant case. **(Ex.5)**

Unfortunately, both the investigative report issued in EA22002, and the new investigation into the adequacy of Tesla's response to the investigation were issued just as fact discovery in this case is drawing to a close.  To obtain the benefit of these investigative results, Plaintiff first has to obtain them, then authenticate them with deposition testimony, then provide them to our experts to incorporate into their opinions. This will take time, but Plaintiff has acted diligently to conduct this process.

Shortly after the release of the investigative summary, Plaintiffs substituted their lead counsel, replacing the Slavik Law Firm, LLC, and Arias Sanguinetti Wang & Torrijos, LLP with the Singleton Schreiber firm on May 9, 2024.  One of the Singleton Firm's first actions was to send a request to NHTSA to provide Plaintiffs with the information supporting the crash analysis. **(Ex.6)**

Under 49 CFR Part 9, a party must make a direct request to NHTSA to obtain documents and testimony of employees.  On June 7, 2024, NHTSA responded to Plaintiff's request, indicating that it had been received and that they were working on them. **(Ex.7)** Plaintiff followed up with NHTSA last week and received a response that NHTSA will have a better idea on the status of the production early this week.  **(Ex.8)** There is no mechanism, subpoena or otherwise, that we can utilize to expedite NHTSA's production.  We are essentially at their mercy.  Nevertheless, we are optimistic that we will have the requested documentation and access to witnesses in the immediate future.

### a. Plaintiff's Twelfth Request for Production

In addition to requesting documents from NHTSA, the Singleton firm issued Plaintiff's Twelfth Request for Production which addressed two document subsets related to NHTSA's investigations. **(Ex.9)** First, the first 15 requests directed toward specific documents that Tesla has provided to NTSB or NHTSA but failed to provide to Plaintiff, despite the Magistrate's June 14, 2023, Order compelling Tesla to produce "all documents previously provided to NHTSA … related to Tesla vehicle crashes into stationary vehicles." **(Ex.10)** In response to this Order, Tesla produced its written response to NHTSA's PE21-020, but failed to produce any of the attachments to that response. Instead of asking for all attachments, Plaintiff's request for production asked for specific documents referenced in the response letter. On June 26, 2024, Tesla responded to Plaintiff's request for production, objecting to every single item requested claiming the item was beyond the scope of the initial request. (**Ex. 11**)

The first request (Request 93) is for the complete unredacted response to the original NHTSA autopilot investigation in 2017. Tesla objects that it didn't involve a 2019 Model S. This is not a valid objection. As noted above, the defect in Tesla's autopilot system exists in all of models, and in all of its hardware and software versions. The 2017 investigation was about the misuse of autopilot outside the areas where it was intended to be used and the development of driving warnings. **(Ex.12)** The redacted responses to the questions posed by NHTSA describe what Tesla knew about driver misuse of autopilot, research on the effect of autopilot on driver behavior, steps taken to ensure safe operation, the development of driver warnings, and internal concerns raised by Tesla engineers about driver misuse of autopilot. Tesla's awareness of these defects and response to that awareness in its subsequent model years, including the 2019 Model S at issue in this case, are obviously relevant to determination of their liability for that defect, and for punitive damages as well, as discussed more fully below.

Request 94 asks for the information (attachment 5b) given to NHTSA about a driver's maximum control authority during routine and crash imminent operations. This would necessarily include the driver's ability (or lack thereof) to avoid crashes into stationary vehicles, stationary objects, the rear of vehicles in front of it, etc. So yes, it would (a) be responsive per the Court's earlier order and (b) is being sought with greater particularity/specificity now.

Request 95 asks for the information (attachment 5c) given to NHTSA about visual, tactile and auditory warnings given to the driver during operations – including when driver intervention is needed and/or when a crash is imminent.  Again, an imminent crash will necessarily involve crashes into stationary vehicles, stationary objects, rear of vehicles, etc.

Request 96 asks for the information (attachment 5d) given to NHTSA about driver engagement/attentiveness including how they monitor driver behavior, what strategies they employ to keep drivers engaged and what lock out strategies they've developed for bad driver behavior.  This request does *not* specifically speak to crash imminent scenarios of any kind but it is certainly relevant to our claims vis a vis McGee's misuse and abuse of the system.

Request 97 asks for the information (attachment 5e) given to NHTSA about the driver's ability to override the system. Tesla has repeatedly argued that McGee's depressing the gas pedal overrode the use of emergency braking.  Plaintiff disputes this, but that is their stated position. Again, this request goes to the issues of driver monitoring and drivers' ability to override systems that *could* lead to a crash.

Request 98 asks for the information (attachment 5f) given to NHTSA about Take Over warnings.  Since "Take Over Immediately" warnings are issued prior to crashes (in McGee's case it apparently appeared within one second of impact) this is relevant since it relates to crashes into stationary vehicles or any other type of crash where a driver is told to take over.

Request 99 asks for the information (attachment 5g_Vision Signals) given to NHTSA about vision signals for objects (which includes stationary vehicles) and the environment autopilot is running in.  Again, what signals vehicles equipped with radar (like McGee's) can and cannot 'see' and its interaction with other crash avoidant systems (like automatic emergency breaking or forward collision warning) is directly relevant to our crash.

Request 102 asks for the information (attachment CBI_ Question 7) given to NHTSA about design, development and modification of driver engagement and OEDR (object and event detection and response) systems from before our crash through 2021. By definition "object detection" will necessarily include "stationary objects" or vehicles.

Request 103 asks for the information (attachment CBI_question 8) given to NHTSA about the subject system's 'OEDR capabilities with respect to caution lights'. While this necessarily involved crashes into stationary emergency vehicles (ergo stationary vehicles) it's also relevant to our case into why the OEDR system didn't recognize the flashing/caution light at the T-intersection where the collision occurred.

Requests 104-108 asks for the (presumably Powerpoint) presentations given by Tesla to NHTSA (in June 2018, March 2019, May 2021 and Sept 2021) about its testing and validation of autopilot improvements prior to release.  Again, this invariably will involve development of systems to avoid crashes into stationary vehicles, amongst other things.

The second twelve requests related to documents produced in response to NHTSA's May 6, 2024, request for information.  Tesla objected to every single one of these requests, invoking the Court's March 1, 2024, hearing wherein this Court commented that evidence of the December 2023 recall would likely constitute an inadmissible subsequent remedial measure.  First, that statement by the Court was on the admissibility of the recall, not discovery related to NHTSA's continuing investigation.  Second, as discussed below, Tesla's inadequate response to the initial

investigation and the recall is a relevant factor the jury may take into consideration when determining the Plaintiff's entitlement to punitive damages.  Tesla is improperly using the Court's statement regarding the likely inadmissibility of the recall to hide any evidence that has any tenuous connection to the existence of recall.  There is no basis for this in the law.  If there were, Tesla could have taken no action as a result of the recall, yet could hide that fact from the jury on the basis that anything related to the recall constitutes a "subsequent remedial measure."  It obviously does not but we are unable to obtain any relief with respect to these objections because, despite our request, the Magistrate will not give us hearing time because the fact discovery period had ended two days after Tesla responded with objections to our every request.  **(Ex.13)**

Since the outset of this case, it has been Plaintiff's expectation that NHTSA's investigation would yield significant evidence supporting Plaintiff's allegations that Tesla's autopilot collision detection and avoidance systems were defectively designed and that they were susceptible to the foreseeable misuse of Tesla's customers.  That expectation proved to be accurate.  NHTSA has now completed its wide-ranging investigation into the various defects of Tesla's auto pilot system and produced evidence supporting the finding of product defect that supports Plaintiff's claims for liability and for punitive damages. It would be a grievous injustice to deprive the Plaintiff of the ability to use this evidence simply because the report was issued too close to the fact discovery cut-off.

In addition to this newly disclosed evidence that is crucial to Plaintiff's case, Tesla has put up various obstacles in front of Plaintiff's efforts to complete the necessary fact discovery during the current discovery period.

### b.  Deposition of Robert Sumwalt

In April of this year, Plaintiff notified Tesla that they intended to depose Robert Sumwalt, the former chairman of the NTSB.  Rather than allow the deposition to proceed and then object to

its use at trial, Tesla lodged an objection to the deposition itself, requiring a hearing on the matter before Magistrate Torres on May 23, 2024.  Notwithstanding the fact that under 49 CFR 835.7, "it is not necessary to request [NTSB] approval for testimony of a former board employee," Tesla insisted on being able to send a notice of their objection to the NTSB prior to the deposition being taken, which Magistrate Torres allowed.  Plaintiff sent a response to Tesla's objection, and unsurprisingly, the NTSB offered no response to Tesla's objection because it does not care whether Mr. Sumwalt is deposed or not.  However, due to this unnecessary delay, Mr. Sumwalt will not be deposed until July 9th.

### c. Depositions of Tesla employees

Almost immediately upon their appearance in the case on May 21, 2024, the Singleton Firm noticed the depositions of Tesla's Director of AutoPilot, Director of Engineering, and its Director of Field Quality.  These depositions were unilaterally set for June 13th, 14th, and 17th, but we indicated the willingness to schedule them at an agreed mutually date and time.  Two weeks after the notice, on June 3, 2024, Tesla filed an objection to the depositions claiming they were related to the recall.  On June 13, 2024, Tesla filed a motion for protective order as to the Director of AutoPilot and the Director of Engineering.  The Court granted the motion. Tesla's Director of AutoPilot, Mr. Elluswamy has been deposed on at least 3 separate occasions in prior cases.  In none of those cases did Tesla raise the objection that Mr. Elluswamy was an apex witness.  This is the first time Tesla has raised such an objection.  Plaintiff will need Court time to address Tesla's claim that Mr. Elluswamy is an apex witness, that his testimony will not be relevant, and to discuss the possibility of allowing the use of Mr. Elluswamy's testimony from his prior depositions in lieu of producing him for deposition here.  With respect to Tesla's Director of Engineering, Plaintiff is willing to accept Defendant's offer to provide Peter Scheutzow in his stead.  Tesla' did not seek a protective order for Mr. Gates, so his deposition will be going forward.

Finally, on our May 23, 2024, hearing before Magistrate Torres, we expressed our intention to use the depositions of Tesla's 30(b)(6) and fact witnesses to come back before the Magistrate and address some outstanding discovery issues, including but not limited to Tesla's ability to manually create a visual overlay of the accident using the data that it has obtained from the McGee's car. The Magistrate indicated he would not allow the Plaintiffs to be prejudiced if we could show that discovery was improperly withheld. But Plaintiff needs to complete the depositions before it can do so.

Accordingly, Plaintiff has been working diligently to complete fact discovery within the allotted timeframe, but due to the complexity of this case, and Tesla's decision to exercise its right to object to the vast majority of Plaintiff's discovery requests, the discovery cut-off approaches while much remains to be completed. We readily acknowledge that Tesla has every right to raise objections to our discovery requests. However, Tesla should not be allowed to use the delays caused by those objections to prevent Plaintiffs from obtaining the discovery they need to try this case. Plaintiffs are requesting a final extension sufficient to allow Plaintiff to obtain the discovery related to the NHTSA investigation, address Tesla's discovery objections with the Magistrate, and complete the fact witness discovery needed to properly try this case.

Plaintiffs' request for relief here is the extension of the fact discovery deadline, which Tesla opposes. Tesla does not oppose a continuance of the trial date (provided the new trial date does not conflict with Tesla's counsel's existing trial schedule), or extension of the expert discovery period, but neither of these extensions will cure the prejudice Plaintiffs are facing. Plaintiffs need to obtain the discovery related to NHTSA's investigations, authenticate it for admission at trial, and allow their experts to evaluate it. Extending the fact discovery deadline necessarily requires the extension of the expert discovery deadline, which would require extension of the dispositive

motion deadline. Moving these deadlines will almost certainly require the continuance of the trial, which is why the Plaintiffs have included the request for continuance as part of the relief sought.

<u>**MEMORANDUM OF LAW**</u>

When deciding to grant a motion for continuance, the District Court considers the following factors:

> (1) the moving party's diligence in its efforts to ready its case prior to the date set for hearing; (2) the likelihood that the need for a continuance would have been remedied had the continuance been granted; (3) the extent to which granting the continuance would have inconvenienced the court and the opposing party; (4) the extent to which the moving party might have suffered harm as a result of the district court's denial.

*Romero v. Drummond Co.,* 552 F.3d 1303, 1320 (11th Cir.2008) (quoting *Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1296 (11th Cir.2005).

*Wright* and *Miller* explains that a district court should approach such motions by applying "a flexible examination of the circumstances of the particular case rather than a mechanical application of a rigid test."). *Gastaldi v. Sunvest Resort Communities, LC*, 709 F. Supp. 2d 1284, 1291 (S.D. Fla. 2010).

As demonstrated above, the Plaintiffs have been diligent in their efforts to prepare this case for trial, notwithstanding the difficulties they faced which led to the replacement of their lead counsel with the Singleton Firm. But the more important fact to consider for the diligence element is the recent release of the NHTSA investigative report, which occurred less than two months prior the fact discovery deadline. The Plaintiffs have moved as expeditiously as possible to obtain the discovery related to this report, but are effectively at the mercy of NHTSA in obtaining these documents and the necessary certification depositions.

It is inarguable that an extension of the fact discovery deadline, and if necessary, a continuance will remedy the need for the extension that has arisen as a result of the publication of this investigation. Tesla does not oppose an extension of the expert discovery period, and it does

not oppose a continuance of the trial date, provided the new trial fits into counsel's schedule.  Tesla only objects to an extension of the fact discovery deadline.  Tesla will thus not be able to claim prejudice from a continuance that it does not oppose.

Conversely, without the continuance, Plaintiff will likely suffer the extreme prejudice of being precluded from using the most significant piece of evidence in support of the Plaintiff's liability and punitive damages claims available in this case.  Plaintiffs waited until the end of their respective statues of limitations before filing their lawsuits in hopes that they would have this evidence in hand early in the process.  Plaintiffs moved to stay this case so that they could wait for the outcome of this investigation.  As we indicated above, it would be manifestly unjust to deprive Plaintiff of the ability to use this evidence simply because of the date in which it was finally issued.

Other factors the Court can and should take into account in evaluating the merits of this motion are Tesla's practice of objecting to virtually every discovery request made by Plaintiff, and the delays caused by that practice, and Plaintiffs' replacement of their lead counsel in April, 2024.

I.   **PLAINTIFF SHOULD HAVE THE TIME NECESSARY TO OBTAIN, AUTHENTICATE, AND PROVIDE THEIR EXPERTS WITH THE DISCOVERY RELATED TO NHTSA'S INVESTIGATION REPORT.**

As noted above, this Court denied Plaintiff's motion to stay because it determined that the original scope of the NHTSA investigation was not substantially similar to the accident in this case.  That has changed.  The results of NHTSA's investigation, which apply to every car in Tesla's stable, cover the very issues that are at the heart of this case.  The report concludes that the autopilot features are unreasonably dangerous because they fail to account for foreseeable misuse from Tesla's drivers, resulting in over 200 collisions of the type that occurred here.

### a.  The NHTSA investigation documents are admissible.

During the hearing on the motion to stay, the Court and Tesla's counsel briefly touched on the issue of admissibility of NHTSA investigative reports.  The following colloquy occurred:

THE COURT: And did you want to speak to the admissibility -- for example, if the NHTSA investigation shows that there was no product defect in this 2019 Tesla Model S, do you believe that those findings would be admissible in this case?

MR. BRANIGAN: Well, I think -- first of all, I'd like the short answer to be absolutely. But I've been doing this long enough to know that it's rarely the right answer, and it would depend on a number of things. It would depend on whether there is substantial similarity between the vehicles that NHTSA was looking at, the crash scenarios that NHTSA was looking at, and our vehicle and crash scenario here.

(Ex.1 at 34) Mr. Branigan's concession was accurate. Both plaintiffs and defendants have successfully used Government investigative reports in trials when they support their client's respective positions.

As the Court noted at the motion to stay hearing, FRE 803(8) allows for the admissibility of government reports under the public records exception:

(8) Public Records. A record or statement of a public office if:
(A) it sets out:
(i) the office's activities;
(ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
(iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
(B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803

There is ample federal case law which supports the admission of NHTSA reports and documents, both for Plaintiffs and Defendants. See, e.g., *Jones v. Ford Motor Co*., 204 Fed. Appx. 280, 283-85 (4th Cir. 2006) (affirming admission of NHTSA report under Rule 803(8) in support of Ford's defense); *Jarvis v. Ford Motor Co*., 283 F.3d 33, 49, 53 (2nd Cir. 2002) (Sotomayor, J.) (same and stating: "[t]he weight given to conclusions in the NHTSA report ... was a matter for the jury to decide"); *Seese v. Volkswagenwerk A.G.*, 648 F.2d 833, 846 (3rd Cir. 1981) (admitting NHTSA's Fatal Accident Reporting System data in support of Plaintiff's claims); *Estate of Edward W. Knoster v. Ford Motor Co.,* 200 Fed. Appx. 106, 111 (3d Cir. 2006), (Approving admission of

NHTSA report in support of Ford's defense); *Guild v. Gen. Motors Corp.,* 53 F. Supp. 2d 363, 365 (W.D.N.Y. 1999); (Allowing GM "to introduce a certified copy of the NHTSA as evidence of non-defect."); *Castaldi v. Land Rover N Am.*, No. 06-CV-1008 (JG), 2007 WL 4165283, *2, 11 (E.D.N.Y. Nov. 21, 2007) (admitting NHTSA report under Rule 803(8) in support of Plaintiff's claim); *Miller v. Ford Motor Co*., No. 2:0l-CV-545-FTM-29DNF, 2004 WL4054843, *5 (M.D. Fla. July 22, 2004) (admitting NHTSA report under Rule 803(8) in support of Ford's defense).

Florida courts have also approved the admission of NHTSA documents and investigative reports of other federal agencies. In *American Motors Corp. v. Ellis*, 403 So. 2d 459 (Fla. 5th DCA 1981), the court affirmed the trial court's admission of a NHTSA report on a study of the severity of crashes. The court held that "[t]he report is admissible under the public record exception to the hearsay rule." Id. at 468. More recently, the Fourth District approved the admission of a report by the federal agency charged with supervision of public safety in railroads, the Federal Railroad Administration ("FRA"), in a similar case involving train accidents. *CSX Transp., Inc. v. Palank*, 743 So. 2d 556, 560 (Fla. 4th DCA 1999). Even though the agency's report addressed a different division of the defendant company, "[t]he evidence regarding the audit showed prior knowledge of dangerous similar conditions within the [CSX] system," so the report "was relevant to demonstrate that CSX had actual prior knowledge that its practices in the Hamlet Division did not meet the FRA standards." Id. at 561.

NHTSA records may also be admitted to show notice. Even if they were inadmissible for the truth of the matter asserted, the documents may be admitted for a non-hearsay purpose, in which case admissibility would not turn on the public records exception. The NHTSA documents from 2016-2019 would thus be relevant to show that Tesla was placed on notice of a potential defect in its autopilot system prior to the instant accident. At least one Florida court has admitted a federal government safety investigation to show that the defendant had notice before an accident

of a potential safety hazard. See *CSX Transp., Inc. v. Palank*, 743 So. 2d 556,561 (Fla. 4th DCA 1999).

   **b.  The scope of discovery should not be limited by car model or timeframe.**

Throughout this case, Tesla has sought to limit discovery to the time period prior to the accident and to the model of Tesla involved in the accident.  Although Plaintiff always objected to this limitation, there was at least a facially logical basis for it.  This is no longer the case.  As the NHTSA documents clearly demonstrate, NHTSA found the defect existed in 100% of Tesla's cars that were equipped with autopilot.  The defect existed regardless of model, year, hardware, or software version.  Tesla acknowledged the existence of the defect and vowed to fix it in *all* of its cars.

Accordingly, there should be no limitation on Plaintiff's ability to obtain and utilize crash data from all models, years, hardware and software versions.  Caselaw demonstrates that relevant NHTSA reports are not simply limited to the same make and model as the cars involved in the accident.  In *Livingston v. Isuzu Motors, Ltd.,* 910 F. Supp. 1473 (D. Mont. 1995), the district court allowed the admissibility of NTHSA reports regarding rollover characteristics of utility vehicles made by other manufacturers but the same class as the car at issue, holding those reports were clearly relevant.  *Livingston* at 1496.  The court held that the information "was probative of defendant's knowledge of safety standards being developed for utility vehicles similar to the Trooper II."  *Id.* at 1496-97.  Here, Plaintiff is seeking discovery regarding the defects in the auto pilot system, which is present in each Tesla.  This information is indisputably relevant.

Plaintiff's ability to obtain evidence of autopilot accidents occurring after the subject accident should also not be constrained.  In *Trull v. Volkswagen of Am., Inc.,* 187 F.3d 88 (1st Cir. 1999), the plaintiff objected to the use of a study that "included data gathered after the date of her accident."  The Court held that post-accident data was relevant to the company's defense because

the "more comprehensive, up to date information demonstrated that a seatbelt system using only lap belts was reasonably safe." *Trull* at 97. It necessarily follows that more comprehensive, up to date information can be used by plaintiffs here to demonstrate that the auto pilot system was unreasonably dangerous at all points in time.

Additionally, Plaintiff has a claim for punitive damages in this case. When determining entitlement to punitive damages, the jury may consider Tesla's conduct both before and after the accident. Specifically, the Florida Supreme Court has delineated the following factors that a jury may consider in determining entitlement to punitive damages:

> (1) an amount reasonable in relation to the harm likely to result from Owens–Corning's conduct as well as the harm that actually has occurred; (2) the degree of reprehensibility of Owens–Corning's conduct, the duration of that harmful conduct, Owens–Corning's awareness, any concealment and the existence and frequency of similar past conduct; (3) the profitability to Owens–Corning of the wrongful conduct and the desirability of removing that profit and of having Owens–Corning also sustain a loss; (4) the financial condition of Owens–Corning and the probable effect thereon of a particular judgment; (5) all the costs of litigation to defendant and to the plaintiff; (6) the total punishment Owens–Corning has or will probably receive from other sources, as a mitigating factor; (7) the seriousness of the hazard to the public, the attitude and conduct of Owens–Corning upon discovery of the misconduct; (8) the degree of Owens–Corning's awareness of the hazard and of its excessiveness; (9) the number and level of employees involved in causing or covering up the marketing misconduct; (10) the duration of both the improper marketing behavior and its cover-up.

*Owens-Corning Fiberglas Corp. v. Ballard*, 749 So.2d 483, 484-85 (1999).

Per *Owens-Corning,* the jury will be entitled to consider all the harm that has resulted from this defect, not just the harm occurring prior to the accident. The jury will be entitled to consider the duration of the conduct, Tesla's awareness of the hazard, and Tesla's attitude and conduct after having been placed on notice of the hazard at various points in time. While Tesla may claim, albeit implausibly, that it was unaware of the hazard created by its defective auto pilot system up through 2023, it certainly cannot make such a claim after acknowledging the existence of the defect existence in 100% of its cars. While the fact of the recall itself may be inadmissible, Tesla's failure to actually do anything to address the defect after 2023 most certainly is.

As a final basis for obtaining discovery of all of the accidents reviewed by NTHSA, a plaintiff is "free to show harm to other victims in order to demonstrate reprehensibility." *Philip Morris USA v. Williams*, 549 U.S. 346, 355 (2007). "Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible." *Id.*

## II.   TESLA'S APPROACH TO DISCOVERY MERITS AN EXTENSION OF THE FACT DISCOVERY PERIOD AND A CONTINUANCE.

As we noted above, with a few exceptions, Tesla objected to every single request for production, request for admission, and interrogatory sent over the course of discovery.  Plaintiffs have either had to engage in lengthy meet and confers or seek intervention from the Magistrate in order to obtain discovery in this case.  Of course, Tesla has every right to object to our discovery requests and make sure that they are in fact valid.  But it cannot use the delays necessarily resulting by this approach to simply run out the clock on fact discovery and prevent the Plaintiffs from obtaining the discovery necessary to prove their case.  The relief the Plaintiffs are requesting here is limited to seeking a resolution of the current outstanding objections raised by Tesla, not to open additional discovery.

## III.   PLAINTIFFS HAVE REPLACED LEAD COUNSEL.

In an effort to obtain the best possible outcome for our clients, Plaintiffs' Florida counsel retained the Slavik Law Firm and the Arias, Sanguinetti firm, based on their involvement in several prior high-profile cases against Tesla.  Unfortunately, these firms did not live up to their obligations to the Plaintiffs, and Florida counsel was forced to replace them with the Singleton, Schreiber firm in May of this year.  Since the Singleton firm has joined the team, they have worked tirelessly to get up to speed on the case and fill in any discovery gaps left by prior primary counsel.

Courts have acknowledged that the need to obtain new counsel can provide a basis for continuance. *See Gastaldi v. Sunvest Resort Communities, LC,* 709 F. Supp. 2d 1284, 1296 (S.D. Fla. 2010) ("denials of continuance have been held to cause prejudice where, for example, a party

needed time to obtain new counsel."); *Knauf Insulation, LLC v. Johns Manville Corp.,* 115CV00111TWPMJD, 2023 WL 4564429, at *1 (S.D. Ind. July 17, 2023) (Continuance granted a new counsel two months after their appearance who "has worked diligently to get up to speed," because "this case is large, complex and highly technical.")

We realize this is a minor factor in the Court's overall consideration, but it is nevertheless a factor to consider.  The Plaintiffs should not be prejudiced because the Tesla specialists initially retained by Florida counsel failed to live up to their billing.  We are simply requesting the Court provide the modest extension of time necessary to allow the Plaintiffs' new primary counsel to do their job and complete discovery in this matter.

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order Granting an extension of the fact discovery deadline, and if necessary, a continuance of this trial. [1]

### **Local Rule 7.1(a)(3) Certification**

Pursuant to S.D.FL. Local Rule 7.1(a)(3), counsel for Plaintiff began attempting to confer with Defendant's counsel the week of June 24th.  Tesla's counsel, Mr. Branigan, was out of the office for a family wedding the end of that week, and was unable to get us an answer from Tesla to complete our meet and confer until July 5, 2024.  We raise this issue not to cast aspersions on Mr. Branigan for this delay, but to establish that Plaintiffs attempted to fulfill our meet and confer obligations prior to the fact discovery cut-off. Tesla objects to the re-opening the fact discovery period, but does not oppose the extension of the expert discovery deadline, or a continuance of the trial, so long as the new trial date doesn't conflict with Tesla's counsel's other future trials.

---

[1] Client Consents to a continuance are attached as **Exhibit 14**.

EATON & WOLK PL

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of July, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

THE ROUSSO, BOUMEL LAW FIRM, PLLC.
9350 South Dixie Highway
Suite 1520
Miami, Florida 33156
(305) 670-6669

By:    **/s/ *Adam T. Boumel, Esq.***
Adam T. Boumel, Esq.
Florida Bar No.: 0110727
Direct email: adam@roussolawfirm.com
Service emails:
Pleadings@roussolawfirm.com
assistant@roussolawfirm.com

By: */s/ Douglas F. Eaton*
DOUGLAS F. EATON
FBN: 129577
**EATON & WOLK, PL**
*Co-counsel for Plaintiff*
2665 S. Bayshore Drive, Suite 609
Miami, Florida 33133
Telephone: 305-249-1640
Email: deaton@eatonwolk.com
cgarcia@eatonwolk.com