# EXHIBIT 9

# UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

## Case No. 21-cv-21940-BLOOM/Otazo-Reyes

NEIMA BENAVIDES, *as Personal Representative of the Estate of Naibel Benavides Leon, deceased*,
Plaintiff,

v.

TESLA, INC., *a/k/a. Tesla Florida, Inc.*,
Defendant.

_____/

## Case No. 22-cv-22607-BLOOM

DILLON ANGULO,
Plaintiff,

v.

TESLA, INC., *a/k/a/ Tesla Florida, Inc.*,
Defendant.

_____/

## PLAINTIFF DILLON ANGULO'S TWELFTH REQUEST FOR PRODUCTION TO DEFENDANT TESLA, INC.

PLEASE TAKE NOTICE that the following Twelfth Requests for Production of Documents are propounded to Defendant Tesla, Inc., by Plaintiff, Dillon Angulo, pursuant to Fed. R. Civ. P. 34. Responses to these requests should be provided to The Rousso, Boumel Law Firm, 9350 South Dixie Highway, Ste. 1520, Miami, FL 33156, or to Singleton Schreiber, LLP, 591 Camino de la Reina, Suite 1025, San Diego, CA 92108, within thirty (30) days from service of this request.

## INSTRUCTIONS

For Plaintiff to evaluate the alleged defects in this case, certain information is required.

When DOCUMENTS are produced in a .pdf format, the DOCUMENTS shall be OCR'd and produced in an identified, organized manner that corresponds with the organization of this Request for Production so that Plaintiff may know which DOCUMENTS are responsive to each Request.

Please repeat the applicable request verbatim above each response. After TESLA's response to each request, identify the source of the information and indicate the last date the information was gathered.

If a DOCUMENT or ESI uses a program other than Word, Excel, or other such generally available application, provide an executable installation link to the applicable program. Only produce complete DOCUMENTS. Production of incomplete DOCUMENTS will result in unnecessary discovery disputes and motions, wasting time and Court resources.

If TESLA refuses to respond to any request in whole or in part on the basis of attorney- client, attorney work product, or other privilege, and TESLA does not submit one or more requested DOCUMENTS or items of information in response to this Request for Production, Plaintiff requests that TESLA provide a privilege log identifying each DOCUMENT or item withheld, and stating the date, subject or title, the name and position of the person(s) from, and the person(s) to whom it was sent, and the name and position of any other recipient (to include all carbon copies or blind carbon copies), the nature of that information or material, and the basis for the claim of privilege and why that privilege applies.

## <u>DEFINITIONS</u>

**<u>DOCUMENT(S)</u>** is used in the broadest sense of the word and shall mean all original written, printed, typed, recorded, or graphic matter whatsoever, however produced or reproduced, of every kind, nature, and description, and all non-identical copies of both sides thereof, including, but not limited to, papers, letters, memoranda, correspondence, communications, electronic mail (e-mail) messages (existing in hard copy and/or in electronic storage), faxes, mailgrams, telegrams, cables, telex messages, notes, annotations, working papers, drafts, minutes, records, audio and video recordings, data, databases, other information bases, summaries, charts, tables, graphics, other visual displays, photographs, statements, interviews, opinions, reports, newspaper articles, studies, analyses, evaluations, interpretations, contracts, agreements, jottings, agendas, bulletin, notices, announcements, instructions, blueprints, drawings, as-builts, changes, manuals, publications, work schedules, journals, statistical data, desk, portable and computer calendars, appointment books, diaries, travel reports, lists, tabulations, computer printouts, data processing program libraries, data processing inputs and outputs, microfilms, microfiches, statements for

services, resolutions, financial statements, governmental records, business records, personnel records, work orders, pleadings, discovery in any form, affidavits, motions, responses to discovery, all transcripts, administrative filings and all mechanical, magnetic, photographic and electronic records or recordings of any kind, including any storage media associated with computers, including, but not limited to, information on hard drives, floppy disks, backup tapes, and zip drives, electronic communications, including, but not limited to, the Internet and shall include any drafts or revisions pertaining to any of the foregoing, all other things similar to any of the foregoing, however denominated by TESLA, any other data compilations from which information can be obtained, translated, if necessary, into a usable form and any other documents. For purposes of this request, any document which contains any note, comment, addition, deletion, insertion, annotation, or otherwise comprises a non-identical copy of another document shall be treated as a separate document subject to production. In all cases where original and any non-identical copies are not available, "document(s)" also means any identical copies of the original and all nonidentical copies thereof. Any document, record, graph, chart, film or photograph originally produced in color must be provided in color. Furnish all documents whether verified by TESLA or not. If a document is not in the English language, provide both the original document and an English translation of the document.

**NHTSA**:  refers to the National Highway Traffic Safety Administration.

**TESLA:** TESLA, Inc., all of its past and present OFFICERs and EMPLOYEEs, whether assigned to its principal offices or any of its field or other locations, including all of its divisions, subsidiaries (whether or not incorporated) and affiliated enterprises and all of their headquarters, regional, zone and other offices and their EMPLOYEES, and all AGENTS, contractors, consultants, attorneys and law firms and other persons engaged directly or indirectly (*e.g.*, EMPLOYEE of a consultant) by or under the control of TESLA (including all business units and persons previously referred to), who are or, on or after January 1, 2011, were, involved in any way with any of the following related to the alleged defect in the SUBJECT VEHICLE:

a.   Design, engineering, analysis, modification or production (*e.g.*, quality control);

b.   Testing, assessment or evaluation;

c.   Consideration, or recognition of potential or actual defects, reporting, recordkeeping and information management (*e.g.*, complaints, field reports, warranty information, part sales), analysis, claims, or lawsuits; or

d.   Communication to, from or intended for zone representatives, FLEETs, dealers, or other field locations, including but not limited to people who have the capacity to obtain information from dealers.

## REQUESTS FOR PRODUCTION

### REQUEST NUMBER 93.

Please produce TESLA's complete unredacted response to NHTSA's Special Order 16-007 dated December 30, 2016 sent on behalf of Todd Maron, General Counsel to Paul Hemmersbaugh, Chief Counsel of NHTSA. (For convenience and ease of reference a true and correct copy of the NHTSA's Special Order 16-007 is attached as Exhibit A.)

### REQUEST NUMBER 94.

Please produce the document titled "CBI Question 5b.pdf" contained in TESLA's response to Preliminary Evaluation 21-020. (For convenience and ease of reference a true and correct copy of TESLA's response to PE 21-020 [produced as BENAVIDES -001016 to 001035] is attached as Exhibit B and the specific document requested is referenced at BENAVIDES-1021.)

### REQUEST NUMBER 95.

Please produce the document titled "CBI_Question 5c.pdf" contained in TESLA's response to Preliminary Evaluation 21-020. (For convenience and ease of reference a true and correct copy of TESLA's response to PE 21-020 [produced as BENAVIDES -001016 to 001035] is attached as Exhibit B and the specific document requested is referenced at BENAVIDES-1022.)

### REQUEST NUMBER 96.

Please produce the document titled "CBI_Question 5d.pdf" contained in TESLA's response to Preliminary Evaluation 21-020. (For convenience and ease of reference

a true and correct copy of TESLA's response to PE 21-020 [produced as

BENAVIDES -001016 to 001035] is attached as Exhibit B and the specific

document requested is referenced at BENAVIDES-1023.)

## **REQUEST NUMBER 97.**

Please produce the document titled "CBI_Question 5e.pdf" contained in TESLA's

response to Preliminary Evaluation 21-020. (For convenience and ease of reference

a true and correct copy of TESLA's response to PE 21-020 [produced as

BENAVIDES -001016 to 001035] is attached as Exhibit B and the specific

document requested is referenced at BENAVIDES-1023.)

## **REQUEST NUMBER 98.**

Please produce the document titled "CBI_Question 5f.pdf" contained in TESLA's

response to Preliminary Evaluation 21-020. (For convenience and ease of reference

a true and correct copy of TESLA's response to PE 21-020 [produced as

BENAVIDES -001016 to 001035] is attached as Exhibit B and the specific

document requested is referenced at BENAVIDES-1024.)

## **REQUEST NUMBER 99.**

Please produce the document titled "CBI_Question 5g_Vision Signals.pdf"

contained in TESLA's response to Preliminary Evaluation 21-020. (For

convenience and ease of reference a true and correct copy of  TESLA's response to

PE 21-020 [produced as BENAVIDES -001016 to 001035] is attached as Exhibit B

and the specific document requested is referenced at BENAVIDES-1024.)

**REQUEST NUMBER 100.**

Please produce the document titled "CBI_Question

5g_Autopilot_Functional_Requirements_Longinatudinal_Collision_Management.p

df" contained in TESLA's response to Preliminary Evaluation 21-020. (For

convenience and ease of reference a true and correct copy of  TESLA's response to

PE 21-020 [produced as BENAVIDES -001016 to 001035] is attached as Exhibit B

and the specific document requested is referenced at BENAVIDES-1024.)

**REQUEST NUMBER 101**

Please produce the document titled "CBI_Question 5g_Vision Signals.pdf"

contained in TESLA's response to Preliminary Evaluation 21-020. (For

convenience and ease of reference a true and correct copy of TESLA's response to

PE 21-020 [produced as BENAVIDES -001016 to 001035] is attached as Exhibit B

and the specific document requested is referenced at BENAVIDES-1024.)

**REQUEST NUMBER 102**

Please produce the document titled "CBI_Question 7.pdf" contained in TESLA's

response to Preliminary Evaluation 21-020. (For convenience and ease of reference

a true and correct copy of TESLA's response to PE 21-020 [produced as

BENAVIDES -001016 to 001035] is attached as Exhibit B and the specific

document requested is referenced at BENAVIDES-1025.)

**REQUEST NUMBER 103**

Please produce the document titled "CBI_Question 8.pdf" contained in TESLA's

response to Preliminary Evaluation 21-020. (For convenience and ease of reference

a true and correct copy of TESLA's response to PE 21-020 [produced as BENAVIDES -001016 to 001035] is attached as Exhibit B and the specific document requested is referenced at BENAVIDES-1027.)

## REQUEST NUMBER 104

Please produce TESLA's presentation materials submitted to NHTSA for TESLA's voluntary quarterly update to ODI on June 15, 2018 (For convenience and ease of reference a true and correct copy of TESLA's response to PE 21-020 [produced as BENAVIDES -001016 to 001035] is attached as Exhibit B and the specific document requested is referenced at BENAVIDES-1027.)

## REQUEST NUMBER 105

Please produce TESLA's presentation materials submitted to NHTSA for TESLA's voluntary quarterly update to ODI on March 27, 2019 (For convenience and ease of reference a true and correct copy of TESLA's response to PE 21-020 [produced as BENAVIDES -001016 to 001035] is attached as Exhibit B and the specific document requested is referenced at BENAVIDES-1027.)

## REQUEST NUMBER 106

Please produce TESLA's presentation materials submitted to NHTSA for TESLA's meeting with NHTSA leadership on May 12, 2021. (For convenience and ease of reference a true and correct copy of TESLA's response to PE 21-020 [produced as BENAVIDES -001016 to 001035] is attached as Exhibit B and the specific document requested is referenced at BENAVIDES-1027.)

**REQUEST NUMBER 107**

Please produce TESLA's presentation materials submitted to NHTSA for TESLA's meeting with NHTSA leadership on May 26, 2021. (For convenience and ease of reference a true and correct copy of TESLA's response to PE 21-020 [produced as BENAVIDES -001016 to 001035] is attached as Exhibit B and the specific document requested is referenced at BENAVIDES-1031.)

**REQUEST NUMBER 108**

Please produce TESLA's presentation materials submitted to NHTSA for TESLA's meeting with NHTSA on September 17, 2021. (For convenience and ease of reference a true and correct copy of TESLA's response to PE 21-020 [produced as BENAVIDES -001016 to 001035] is attached as Exhibit B and the specific document requested is referenced at BENAVIDES-1031.)

**REQUEST NUMBER 109.**

Please produce TESLA's complete response to NHTSA's Information Request ID RQ24009 (For convenience and ease of reference a true and correct copy of NHTSA's Information Request Letter to Tesla, dated May 6, 2024 is attached as Exhibit C.)

**REQUEST NUMBER 110.**

Please produce TESLA's any appendices or attachments that TESLA prepared in response Question 3 to NHTSA's Information Request ID RQ24009 (For convenience and ease of reference a true and correct copy of NHTSA's Information Request Letter to Tesla, dated May 6, 2024, is attached as Exhibit C.)

**REQUEST NUMBER 111.**

Please produce TESLA's any appendices or attachments that TESLA prepared in response Question 5 to NHTSA's Information Request ID RQ24009 (For convenience and ease of reference a true and correct copy of NHTSA's Information Request Letter to Tesla, dated May 6, 2024, is attached as Exhibit C.)

**REQUEST NUMBER 112.**

Please produce TESLA's any appendices or attachments that TESLA prepared in response Question 7 to NHTSA's Information Request ID RQ24009 (For convenience and ease of reference a true and correct copy of NHTSA's Information Request Letter to Tesla, dated May 6, 2024, is attached as Exhibit C.)

**REQUEST NUMBER 113.**

Please produce TESLA's any appendices or attachments that TESLA prepared in response Question 8 to NHTSA's Information Request ID RQ24009 (For convenience and ease of reference a true and correct copy of NHTSA's Information Request Letter to Tesla, dated May 6, 2024, is attached as Exhibit C.)

**REQUEST NUMBER 114.**

Please produce TESLA's any appendices or attachments that TESLA prepared in response Question 10 to NHTSA's Information Request ID RQ24009 (For convenience and ease of reference a true and correct copy of NHTSA's Information Request Letter to Tesla, dated May 6, 2024, is attached as Exhibit C.)

**REQUEST NUMBER 115**

Please produce TESLA's any appendices or attachments that TESLA prepared in response Question 11 to NHTSA's Information Request ID RQ24009 (For convenience and ease of reference a true and correct copy of NHTSA's Information Request Letter to Tesla, dated May 6, 2024, is attached as Exhibit C.)

**REQUEST NUMBER 116**

Please produce TESLA's any appendices or attachments that TESLA prepared in response Question 15 to NHTSA's Information Request ID RQ24009 (For convenience and ease of reference a true and correct copy of NHTSA's Information Request Letter to Tesla, dated May 6, 2024, is attached as Exhibit C.)

**REQUEST NUMBER 117**

Please produce TESLA's any appendices or attachments that TESLA prepared in response Question 17 to NHTSA's Information Request ID RQ24009 (For convenience and ease of reference a true and correct copy of NHTSA's Information Request Letter to Tesla, dated May 6, 2024, is attached as Exhibit C.)

DATED May 21, 2024        SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Tel: (619) 771-3473
*/s/ **Brett J. Schreiber, Esq.***
Brett J. Schreiber, Esq.
California Bar No. 239707
(Admitted *Pro Hac Vice*
*05/07/2024) Attorney for Plaintiffs*
bschreiber@singletonschreiber.com
SERVICE EMAILS:
bschreiber@singletonschreiber.com
vas@singletonschreiber.com

cbirnbaum@singletonschreiber.com
eelms@singletonschreiber.com

**_/s/Todd Poses_____**
Todd Poses
FBN: 75922
POSES LAW GROUP, P.A.
169 East Flagler Street, Suite 1600
Miami, Florida 33131
Tel: (305) 577-0200
tposes@poseslawgroup.com
maria@poseslawgroup.com
shelly@poseslawgroup.com
*Attorney for Plaintiff Benavides*

THE ROUSSO, BOUMEL LAW FIRM, PLLC.
9350 South Dixie Highway
Suite 1520
Miami, Florida 33156
Tel: (305) 670-6669
**_/s/ Adam T. Boumel, Esq._**
Adam T. Boumel, Esq.
Florida Bar No.: 0110727
Adam@roussolawfirm.com
SERVICE EMAILS:
pleadings@roussolawfirm.com (primary)
 assistant@roussolawfirm.com
*Attorney for Plaintiff Angulo*

# EXHIBIT A

**UNITED STATES DEPARTMENT OF TRANSPORTATION**
**NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION**
1200 New Jersey Avenue, SE
West Building, W41-326
Washington, DC 20590

**In re:**                                              )
                                                        )
PE 16-007                                               )
Tesla Motors, Inc.                                      )
                                                        )

## SPECIAL ORDER DIRECTED TO TESLA MOTORS, INC.

To:

Tesla Motors, Inc.
1050 K Street N.W., Suite 101
Washington, D.C. 20001

This Special Order[1] is issued to Tesla Motors, Inc. ("Tesla") by the Secretary of

Transportation pursuant to 49 U.S.C. § 30166(g)(1)(A) and 49 C.F.R. §§ 510.7 and 510.8, and

pursuant to the delegation of authority to the Chief Counsel of the National Highway Traffic

Safety Administration ("NHTSA"), an Operating Administration of the United States

Department of Transportation. 49 C.F.R. § 1.95.

NHTSA has opened a preliminary evaluation, PE16-007, to investigate, among other

things, the design and performance of Tesla's automated driving systems. As part of this ongoing

investigation, NHTSA hereby demands, by this Special Order, additional information regarding

driver misuse and abuse of the Autopilot system.

Your response to this Special Order must be provided by **December 30, 2016**. Your

response must be signed under oath, i.e., accompanied by an affidavit, signed by a responsible

officer of Tesla, stating that he/she has undertaken and directed an inquiry reasonably calculated

to assure that the answers and production of documents are complete and correct, that he/she has

---

[1] Pursuant to 49 U.S.C. § 30166(g), this Special Order is equivalent to a subpoena.

caused the documents of your company to be searched diligently for information and documents responsive to this Special Order and produced them to NHTSA, and that the answers to the inquiries provided to NHTSA respond completely and correctly to this Special Order. 49 U.S.C. § 30166(g)(1)(A); 49 C.F.R. § 510.7.

Failure to respond promptly and fully to this Special Order may result in a referral to the United States Department of Justice for a civil action to compel responses, and may subject you to civil penalties of up to $21,000 per day, with a maximum of $105,000,000, for a related series of daily violations. 49 U.S.C. §§ 30163(a)(1), 30165(a); 49 CFR 578.6(a)(3). Falsifying or withholding information in response to this Special Order may also lead to criminal penalties of a fine or imprisonment of up to 15 years, or both. 49 U.S.C. § 30170(a)(1).

**DEFINITIONS**

To the extent used in this Special Order, the following definitions apply:

1.      **"Autopilot"** means the Tesla product, including hardware and software, designed for use as an advanced driver assistance system, and it includes both Traffic Aware Cruise Control and Autosteer enabled and active.

2.      **"Describe"** means to provide, with respect to any act, occurrence, transaction, event, statement, communication, or conduct (hereinafter, collectively, "act"), all facts concerning any such act, including, but not limited to, a description of each act, and the date, the location, and the names and addresses of all persons involved.

3.      **"Document(s)"** is used in the broadest sense of the word under Rule 34 of the Federal Rules of Civil Procedure and shall mean all written, printed, typed, recorded, or graphic matter of every kind, nature, and description, however produced or reproduced, whether draft or final, original or reproduction, signed or unsigned, electronic or hard copy, and regardless of whether approved, signed, sent, received, redrafted, or executed, including but not limited to:

2

written communications, letters, correspondence, facsimiles, e-mail, instant messages, text messages, agendas, memoranda, minutes, notes, summaries, reports, voicemails, films, photographs, recordings of any type, transcripts, contracts, agreements, purchase or sales orders, specifications, drawings, diagrams, diaries, journals, logs, desk calendars, interoffice communications, reports, studies, bills, checks, income statements, balance sheets, books of account, ledgers and other financial records, and all information generated by or stored by computer, including without limitation, electronic writings, records, files, reports, hard drives, backup data, removable computer storage media (such as flash drives, tapes, disks, and cards), printouts, document image files, web pages, databases, spreadsheets, software, and digital recordings, or material similar to any of the foregoing however denominated, by whomever prepared, and to whomever addressed, which are in your possession, custody or control or to which you have had or can obtain access. Any document, record, graph, chart, film or photograph originally produced in color must be provided in color.

4.  **"Employee"** means a person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance.

5.  **"Officer"** means a person who holds an office of trust, authority, or command, such as a person elected or appointed by the board of directors to manage the daily operations of a corporation, such as a CEO, president, secretary, or treasurer.

6.  **"You"** or **"your"** means Tesla Motors, Inc., and all of its officers and employees, whether assigned to its principal offices or any of its field or other locations, including all of its divisions, subsidiaries (whether or not incorporated), and affiliated enterprises and all of their headquarters, regional, zone, and other offices and their employees, and all agents, contractors, consultants, attorneys, and law firms, and other persons engaged directly or indirectly (e.g.,

3

employee of a consultant) by or under the control of Tesla (including all business units and persons previously referred to).

## INSTRUCTIONS

1.      Your response to the Special Order shall be sent to Office of the Chief Counsel (NCC-111), National Highway Traffic Safety Administration, West Building, W41-326, New Jersey Avenue, SE, Washington, DC 20590.

2.      Please repeat the applicable question verbatim above your response. After your response to each question, identify the source of the information and indicate the last date the information was gathered.

3.      When documents are produced and the documents would not, standing alone, be self-explanatory, the production of documents shall be supplemented and accompanied by explanation. Where a document responsive to a request is not in the English language, both the original document and an English translation of the document must be produced.

4.      You are required to respond to every question listed in this Special Order. If you cannot respond to any specific request or subpart(s) thereof, please state the reason why you are unable to do so. If you are unable to fully respond because you do not have any or all of the precise information needed, provide as much information as you have. If, on the basis of attorney-client, attorney work product, or other privilege, you do not submit one or more required documents or items of information in response to this Special Order, you must provide a privilege log identifying each document or item withheld, and stating the date, subject or title, name and position of the person(s) from, and the person(s) to whom it was sent, and the name and position of any other recipient (to include all carbon copies or blind carbon copies), the nature of the information or material, and the basis for the claim of privilege and why that privilege applies.

4

5.      The response to this Special Order, including any documents produced, must be submitted in duplicate, together with a copy of any confidentiality request, to this office by the deadline stated above.

6.      If you claim that any of the information or documents provided in response to this Special Order constitutes confidential material within the meaning of 5 U.S.C. §§ 552(b)(4) or 552(b)(6), or is protected from disclosure pursuant to 18 U.S.C. § 1905 or other applicable law, then you must submit supporting information together with the materials that are the subject of the confidentiality request, in accordance with 49 C.F.R. Part 512, to the Office of Chief Counsel (NCC-100), National Highway Traffic Safety Administration, West Building, W41-326, 1200 New Jersey Avenue, SE, Washington, DC 20590. A copy of your request for confidential treatment and accompanying materials shall be sent by electronic mail to Beth Mykytiuk (Elizabeth.Mykytiuk@dot.gov).

7.      All documents shall be produced electronically, as described below, in a common format (e.g., Word or PDF).

      a.      Hard copy documents shall be imaged in PDF format. They shall be provided as multi-page PDFs with document level optical character recognition ("OCR").

      b.      Electronically Stored Information ("ESI") shall be converted to multi-page PDFs and produced along with document level OCR/extracted text.

      c.      You shall produce an index that lists the title of each document produced and the request to which it corresponds.

8.      The singular includes the plural; the plural includes the singular. The masculine gender includes the feminine and neuter genders; and the neuter gender includes the masculine and feminine genders. "And" as well as "or" shall be construed either disjunctively or

conjunctively, to bring within the scope of this Special Order all responses that might otherwise be construed to be outside its scope. "Each" shall be construed to include "every" and "every" shall be construed to include "each." "Any" shall be construed to include "all" and "all" shall be construed to include "any." The use of a verb in any tense shall be construed as the use of the verb in a past or present tense, whenever necessary to bring within the scope of the document requests all responses that might otherwise be construed to be outside its scope.

9.      Your response to this Special Order must be signed under oath, i.e., accompanied by an affidavit, signed by a responsible officer of Tesla, stating that he/she has undertaken and directed an inquiry reasonably calculated to assure that the answers and production of documents are complete and correct, that he/she has caused the documents of your company to be searched diligently for information and documents responsive to this Special Order and produced them to NHTSA, and that the answers to the inquiries provided to NHTSA respond completely and correctly to this Special Order.

## REQUESTS

1.      Describe the intended use of Autopilot by a driver of a Tesla vehicle.

2.      Describe any and all potential driver misuse(s) or abuse(s) of Autopilot that Tesla considered or evaluated prior to launching Autopilot 7.0 in October 2015. Your response should include, but not be limited to: (i) the types of potential misuses and/or abuses considered; (ii) any related analysis or testing performed by Tesla or third parties on behalf of Tesla, and (iii) any ranking or categorization performed by Tesla as to the likelihood, nature, and/or severity of those potential misuses and abuses.

3.      Describe any research or testing performed by Tesla, or by any third party on Tesla's behalf, prior to October 2015, regarding the impact of Autopilot on driver behavior, including, but not limited to, the potential for misuse and/or abuse, including but not limited to

6

distracted driving.

4.      Describe the steps you took prior to October 2015 to ensure the safe operation of a Tesla vehicle equipped with Autopilot. Your response should include, but not be limited to, a summary of any and all safeguards against driver misuse or abuse that were considered by Tesla, and an explanation for any safeguard that was not ultimately implemented.

5.      Describe the development of the written warnings contained in the Tesla Model S User Manual listed in the section on Driver Assistance, which is attached hereto as Exhibit 1. Your response should include a description of any alternative language that was considered, as well as a summary of any focus group testing or other research that was conducted, before such warnings were published.

6.      Describe the development of the Hold Steering Wheel message on a Tesla vehicle's instrument panel and accompanying audible chime warning that was part of Autopilot 7.0. Your response should include any focus group testing or other research conducted by Tesla or any third party on Tesla's behalf in connection with the development of these in-vehicle warnings, as well as any alternatives that Tesla considered implementing to monitor or influence driver attentiveness and hands on the wheel.

7.      Describe any knowledge you have of driver misuse or abuse of Autopilot since October 2015, including when you gained that knowledge and whether the misuse or abuse resulted in a death or injury. Your response should also describe any efforts by Tesla to monitor for Autopilot misuse or abuse on social media (including, but not limited to, YouTube, Facebook, Snapchat, Twitter) and elsewhere.

8.      Describe in detail all modifications or changes made to Autopilot from October 2015 to date. For each such modification or change, provide the following information:

        a.      The date or approximate date on which the modification or change was

7

incorporated into Autopilot;

b.     A detailed description of the modification or change;

c.     The reason(s) for the modification or change;

d.     A description of any testing or analysis done before instituting the modification or change;

e.     When the modification or change was made available to consumers; and

f.     How the modification or change can be interchanged with earlier versions of Autopilot.

9.     Describe the steps (other than those described in your response to Request No. 8) that you have taken since October 2015 to ensure the safe operation of a Tesla vehicle operating in Autopilot mode. Your response should include, but not be limited to: (i) a summary of any additional safeguards against driver misuse or abuse that were considered by Tesla, but were not ultimately implemented, including the rationale for the decision not to implement a safeguard; (ii) a summary of any and all driver education or monitoring that Tesla performs or has performed to confirm whether Autopilot is being used as intended; and (iii) a detail of any research performed by Tesla or by any third party on Tesla's behalf regarding the impact of Autopilot on driver behavior, including distracted driving.

10.     Describe in detail any and all concerns or allegations (regardless of whether or not such concerns or allegations were substantiated) raised by a Tesla employee or contractor regarding the safety of Autopilot or the potential for driver misuse or abuse. Your response should include a description of the actions you took to investigate and address each concern or allegation.

11.     Describe in detail any and all safety concerns that Mobileye Inc. ("Mobileye") communicated to Tesla regarding Autopilot, as described in the September 16, 2016 press

8

release included as Exhibit 99.1 to Mobileye's Form 6-K for the month of September 2016 filed with the U.S. Securities and Exchange Commission and attached hereto as Exhibit 2. Your response should include the date of any such communications as well as a description of the actions you took to investigate and address, if applicable, the safety concerns. Your response should also include copies of all written communications from Mobileye expressing those safety concerns and any internal Tesla communications documenting or memorializing them.

12.     Describe in detail what, if any, information or guidance you received from Mobileye regarding: (i) the potential for driver misuse or abuse of Autopilot; (ii) the intended purpose of Autopilot; (iii) and the limitations of Autopilot. Your response should include the dates on which when Tesla received the information or guidance from Mobileye and what, if any, actions Tesla took or decisions it made as a result of that information or guidance.

13.     Provide a list of every lawsuit filed on or after October 14, 2015 naming Tesla as a defendant, for which Tesla has raised consumer misuse or abuse of Autopilot as a defense. For each lawsuit, provide the full case caption (including case number and jurisdiction), the name and contact information for the plaintiff's counsel, and the current status of the lawsuit. Your response should include copies of all pleadings, transcripts, opinions, and discovery responses that discuss or concern driver misuse or abuse, with the applicable passages highlighted or flagged.

14.     Provide any additional information that you believe demonstrates that Tesla took appropriate action to address driver misuse or abuse of Autopilot.

Dated:  December 15, 2016

Paul A. Hemmersbaugh
Chief Counsel

9

About Driver Assistance 

### Driver Assistance Components

A Model S equipped with Driver Assistance features includes the following components that actively monitor the surrounding roadway:



1. Ultrasonic sensors are located near the front and rear bumpers.
2. A forward looking camera is mounted on the windshield above the rear view mirror.
3. Radar is mounted in the front grill.

Driver Assistance vehicles also include high precision electrically-assisted braking and steering systems.

Exhibit 1

## About Driver Assistance



Note: The exact detection zone may vary depending on environmental conditions.

## About Driver Assistance 

### Driver Assistance Features

These safety features are available on all Model S vehicles equipped with Driver Assistance components:

- Lane Assist (see Lane Assist on page 84).
- Collision Avoidance Assist (see Collision Avoidance Assist on page 86).
- Speed Assist (see Speed Assist on page 89).

These convenience features, designed to reduce driver workload, are available only if Model S is equipped with the optional Autopilot Tech Package:

- Traffic-Aware Cruise Control (see Traffic-Aware Cruise Control on page 68).
- Autosteer (see Autosteer on page 74).
- Auto Lane Change (see Auto Lane Change on page 77).
- Autopark (see Autopark on page 79).
- Auto High Beam (see High Beam Headlights on page 51).

You can enable/disable driver assistance features and in some cases, control how they work. To access settings for Driver Assistance features, touch Controls > Settings > Driver Assistance.

### Limitations

Many factors can impact the performance of Driver Assistance components, causing them to be unable to function as intended. These include (but are not limited to):

- Poor visibility (due to heavy rain, snow, fog, etc.).
- Bright light (oncoming headlights or direct sunlight).
- Damage or obstructions caused by mud, ice, snow, etc.
- Interference or obstruction by object(s) mounted onto Model S (such as a bike rack or a sticker).
- Narrow or winding roads.
- A damaged or misaligned bumper.
- Interference from other equipment that generates ultrasonic waves.
- Extremely hot or cold temperatures.

⚠ Warning: The list above does not represent an exhaustive list of situations that may interfere with proper operation of Driver Assistance components. Never depend on these components to keep you safe. It is the driver's responsibility to stay alert, drive safely, and be in control of the vehicle at all times.

⚠ Caution: If a windshield replacement is needed on a Model S equipped with the forward looking camera, you must take your vehicle to Tesla Service. This will ensure appropriate handling and mounting of the camera. Failure to do so can cause one or more Driver Assistance features to malfunction.

### Cleaning Driver Assistance Components

To ensure the various Driver Assistance components can provide information that is as accurate as possible, keep them clean and free of obstructions. Occasionally remove any buildup of dirt by wiping with a soft cloth dampened with warm water.

⚠ Caution: Do not use chemical-based or abrasive cleaners. Doing so can damage surfaces.

⚠ Caution: Avoid using a high-pressure power washer.

⚠ Caution: Do not clean an ultrasonic sensor with a sharp or abrasive object that can scratch or damage its surface.

 **Traffic-Aware Cruise Control**

If Model S is equipped with Driver Assistance components (see About Driver Assistance on page 65) and you have purchased the optional Autopilot Tech Package, the forward looking camera and the radar sensor are designed to determine when there is a vehicle in front of you in the same lane. If the area in front of Model S is clear, Traffic-Aware Cruise Control maintains a set driving speed. When a vehicle is detected, Traffic-Aware Cruise Control is designed to slow down Model S as needed to maintain a selected time-based distance from the vehicle in front, up to the set speed. Traffic-Aware Cruise Control does not eliminate the need to watch the road in front of you and to apply the brakes when needed.

Traffic-Aware Cruise Control is primarily intended for driving on dry, straight roads, such as highways and freeways. It should not be used on city streets.

⚠ Warning: Traffic-Aware Cruise Control is designed for your driving comfort and convenience and is not a collision warning or avoidance system. It is your responsibility to stay alert, drive safely, and be in control of the vehicle at all times. Never depend on Traffic-Aware Cruise Control to adequately slow down Model S. Always watch the road in front of you and be prepared to take corrective action at all times. Failure to do so can result in serious injury or death.

⚠ Warning: Do not use Traffic-Aware Cruise Control on city streets or on roads where traffic conditions are constantly changing and where bicycles and pedestrians are present.

⚠ Warning: Do not use Traffic-Aware Cruise Control on winding roads with sharp curves, on icy or slippery road surfaces, or when weather conditions (such as heavy rain, snow, fog, etc) make it inappropriate to drive at a consistent speed. Traffic-Aware Cruise Control does not adapt driving speed based on road and driving conditions.

## Operating Traffic-Aware Cruise Control

 The instrument panel displays a gray speedometer icon on the left side of the driving speed to indicate that Traffic-Aware Cruise Control is available but the cruising speed has not been set. Unless a vehicle is detected ahead of you, you must be driving at least 18 mph (30 km/h) to use Traffic-Aware Cruise Control. If a vehicle is detected ahead of you, you can use Traffic-Aware Cruise Control at any speed, even when stationary.

When driving at your desired speed, set the cruising speed by moving the cruise control lever up or down (or pulling it briefly toward you), then releasing.



 The speedometer icon on the instrument panel turns blue and displays the set speed to indicate that Traffic-Aware Cruise Control is actively maintaining the set speed.

You can now release the accelerator pedal and allow Traffic-Aware Cruise Control to maintain your set speed. When no vehicle is detected ahead, Traffic-Aware Cruise Control maintains the set speed. If a vehicle is detected, Traffic-Aware Cruise Control maintains your chosen following distance, up to the set speed, accelerating and decelerating Model S as needed. When the vehicle you are following is no longer detected, Traffic-Aware Cruise Control accelerates back to the set speed. Traffic-Aware Cruise Control also adjusts the speed as appropriate when entering and exiting curves.

## Traffic-Aware Cruise Control 

You can accelerate at any time when driving at a set speed using Traffic-Aware Cruise Control. But when you release the accelerator, Model S returns to the set speed.

When following a vehicle, Traffic-Aware Cruise Control remains active at low speeds, even if Model S comes to a standstill while following a vehicle. When traffic is moving again, Traffic-Aware Cruise Control resumes operating at your currently set speed. However, if a pedestrian or object is detected in front of Model S, Traffic-Aware Cruise Control goes into a HOLD state and the instrument panel displays a message indicating that you need to resume cruise control. To resume, press the accelerator pedal or pull the cruise control lever toward you (see Canceling and Resuming on page 72).

In right hand traffic, engaging the right turn signal when driving in the right-most lane within 164 feet (50 meters) of an exit (on a restricted access road only, such as a highway or freeway), causes Traffic-Aware Cruise Control to assume you are exiting. As a result, Traffic-Aware Cruise Control begins to slow down the vehicle. Likewise in left hand traffic, when engaging the left turn signal when driving in the left-most lane within 164 feet (50 meters) of an exit. The onboard GPS (Global Positioning System) determines if you are driving in a region with right or left hand traffic. In situations where GPS data is unavailable (for example, inadequate signal), engaging the turn signal near an exit does not cause Traffic-Aware Cruise Control to slow down the vehicle.

Note: If you double-pull the cruise control lever, Autosteer activates and the set speed changes to your current driving speed. If you pull and hold the lever momentarily, your set cruising speed is adjusted to either your current driving speed, or the speed limit that is in effect, whichever is greater (see Cruising at the Speed Limit on page 70).

Note: When Traffic-Aware Cruise Control is actively slowing down Model S to maintain the selected distance from the vehicle ahead, the brake lights turn on to alert other road users that you are slowing down. You may also notice slight movement of the brake pedal.

⚠ Warning: Due to limitations inherent in the onboard GPS, you may experience situations in which Traffic-Aware Cruise Control slows down the vehicle, especially near highway exits where a curve is detected and/or you are actively navigating to a destination and not following the route.

⚠ Warning: Traffic-Aware Cruise Control can not detect all objects and may not brake/decelerate for stationary vehicles, especially in situations when you are driving over 50 mph (80 km/h) and a vehicle you are following moves out of your driving path and a stationary vehicle or object, bicycle, or pedestrian is in front of you instead. Always pay attention to the road ahead and stay prepared to take immediate corrective action. Depending on Traffic-Aware Cruise Control to avoid a collision can result in serious injury or death. In addition, Traffic-Aware Cruise Control may react to vehicles or objects that either do not exist or are not in the lane of travel, causing Model S to slow down unnecessarily or inappropriately.

⚠ Warning: Traffic-Aware Cruise Control may be unable to provide adequate speed control because of limited braking capability and hills. It can also misjudge the distance from a vehicle ahead. Driving downhill can increase driving speed, causing Model S to exceed your set speed. Never depend on Traffic-Aware Cruise Control to slow down the vehicle enough to prevent a collision. Always keep your eyes on the road when driving and be prepared to take corrective action as needed. Depending on Traffic-Aware Cruise Control to slow the vehicle down enough to prevent a collision can result in serious injury or death.

⚠ Warning: Traffic-Aware Cruise Control may occasionally brake Model S when not required or you are not expecting it. This can be caused by closely following a vehicle ahead, detecting vehicles or objects in adjacent lanes (especially on curves), etc.

## Adjust your following distance

To adjust the distance you want to maintain between Model S and a vehicle traveling ahead of you, rotate the cruise control lever to choose a setting from 1 (the closest following distance) to 7 (the longest following distance). Each setting corresponds to a time-based distance that represents how long it takes for Model S, from its current location, to reach the location of the rear bumper of the vehicle ahead.

 **Traffic-Aware Cruise Control**



Note: A horizontal line displays on the instrument panel to represent your following distance from a vehicle ahead (see Instrument Panel - Driving on page 46).

As you rotate the cruise control lever, the instrument panel displays the current setting. Release the lever when the desired setting is displayed.



### Cruising at the Speed Limit

Traffic-Aware Cruise Control makes it easy to cruise at the speed limit. Once you've initially set a cruising speed, you can adjust the speed to cruise at the speed limit that is currently being determined by Speed Assist (see Speed Assist on page 89). To do so, pull the cruise control lever toward you and hold momentarily (about half a second). When you release, your cruising speed is set to the speed that is automatically or manually being determined by Speed Assist, taking into consideration any offset you have specified. If you are already driving faster than the speed limit when you pull and momentarily hold the lever, the set speed does not adjust to the speed limit—it adjusts to your current driving speed.

Note: When you adjust the cruising speed based on the speed limit, the set speed does not change when the speed limit changes. You must pull and hold the cruise control lever again to cruise at the new speed limit. You can also manually adjust your cruising speed at any time (see Changing the Set Speed on page 70).

Note: If Speed Assist is unable to determine a speed limit, your set speed does not change

when you pull the cruise control lever toward you and hold momentarily.

⚠ Warning: Do not rely on Speed Assist to determine an accurate or appropriate cruising speed. Always cruise at a safe speed based on road conditions.

### Changing the Set Speed

To change the set speed while using Traffic-Aware Cruise Control, move the cruise control lever up (increase) or down (decrease) until your desired speed is reached.



To increase/decrease speed by 1 mph (1 km/h), move the lever up or down to the first position and release. To increase/decrease speed to the closest 5 mph (5 km/h) increment, move the lever up/down to the second position and release. For example, if you are traveling at 57 mph and you move the lever up to the second position and release, the speed increases to 60 mph. You can also increase/decrease speed by holding the lever in the full up/down position and releasing when the desired speed displays below the cruise control icon.

To cruise at the speed limit that is currently being determined by Speed Assist (including any offsets that you have set), pull the cruise control lever toward you and hold momentarily (about half a second). See Speed Assist on page 89.

Note: It may take a few seconds for Model S to reach the new cruising speed.

Note: The maximum set speed is 90 mph (150 km/h).

## Traffic-Aware Cruise Control 

### Overtake Acceleration

When following a vehicle with Traffic-Aware Cruise Control active, engaging the turn signal to indicate a move into the passing lane briefly accelerates Model S towards the vehicle ahead. By momentarily holding the turn signal lever up or down (depending on the region you are driving in), you can quickly accelerate up to your set speed without having to press the accelerator pedal. The turn signal accelerates Model S only when the following conditions are met:

- Traffic-Aware Cruise Control is operating and detecting a vehicle in front.
- No obstacles or vehicles are detected in the target lane.
- Model S is traveling below the set speed, but over 45 mph (72 km/h).
- The turn signal indicates a move into the passing lane.

Overtake Acceleration is intended as an aid when passing a vehicle ahead of you. When the turn signal is engaged, Traffic-Aware Cruise Control continues to maintain distance from the vehicle ahead, but allows you to drive slightly closer than your selected distance.

Note: Model S uses its onboard GPS (Global Positioning System) to determine if you are driving in a region with right or left hand traffic. This enables the appropriate turn signal to provide overtake acceleration. When driving in right hand traffic, only the left turn signal indicates a move into the passing lane. In left hand traffic, only the right turn signal (moving the turn signal lever up) indicates passing. In situations where GPS data is unavailable (for example, inadequate signal), the turn signal does not activate Overtake Acceleration.

Acceleration cancels when:

- You reach your set cruising speed.
- Changing lanes takes too long.
- Model S gets too close to the vehicle ahead.

  OR
- You disengage the turn signal.

Note: Your chosen setting is retained until you manually change it.

Note: Overtake Acceleration occurs when you either fully engage the turn signal, or you hold the turn signal in the momentary position (partially engaged). When you release or disengage the turn signal, Model S stops accelerating (in the same way as when you release the accelerator pedal) and resumes the set speed.

⚠ Warning: Overtake Acceleration can cancel for many unforeseen reasons in addition to those listed above (for example, lack of GPS data). Stay alert and never depend on Overtake Acceleration to increase your driving speed.

⚠ Warning: Overtake Acceleration increases your driving speed whenever the appropriate turn signal is engaged, and accelerates Model S closer to the vehicle ahead. Although Traffic-Aware Cruise Control continues to maintain distance from the vehicle ahead, it is important to be aware that your selected following distance is reduced when Overtake Acceleration is active, particularly in cases where it may not be your intention to overtake the vehicle you are following.

 **Traffic-Aware Cruise Control**

## Canceling and Resuming

To manually cancel Traffic-Aware Cruise Control, briefly push the cruise control lever away from you or press the brake pedal. The speedometer icon on the instrument panel turns gray to indicate that cruise control is not actively controlling your speed.



To resume cruising at the previously set speed, briefly pull the cruise control lever toward you.



Note: Depending on date of manufacture, some Model S vehicles have a button on the end of the cruise control lever. Pressing this button when cruise control is active cancels cruise control.

Note: When Traffic-Aware Cruise Control cancels, Model S does not coast. Instead, regenerative braking slows down Model S in the same way as when you move your foot off the accelerator when driving without cruise control (see Regenerative Braking on page 55).

⚠ Warning: Traffic-Aware Cruise Control cancels, or may not be available, in the following situations:

- You press the brake pedal.
- Your driving speed drops below 18 mph (30 km/h) in situations when Model S does not detect a vehicle ahead within the specified distance.
- Your driving speed exceeds the maximum cruising speed of 90 mph (150 km/h).
- You shift Model S out of Drive.
- The driver's seat belt is unbuckled.
- A door is opened.

- The view from the radar sensor or camera is obstructed. This could be caused by dirt, mud, ice, snow, fog, etc.
- The traction control setting is manually disabled or is repeatedly engaging to prevent wheels from slipping.
- The wheels are spinning while at a standstill.
- The cruise control system is failing.
- The cruise control system requires service.

When Traffic-Aware Cruise Control is unavailable or cancels, Model S no longer drives consistently at a set speed and no longer maintains a specified distance from the vehicle ahead.

⚠ Warning: Traffic-Aware Cruise Control can cancel unexpectedly at any time for unforeseen reasons. Always watch the road in front of you and stay prepared to take appropriate action. It is the driver's responsibility to be in control of Model S at all times.

## Summary of Cruise Indicators

 Traffic-Aware Cruise Control is available but is not actively controlling your speed until you set the cruising speed. Accelerate until you reach a desired cruising speed, then briefly tap the cruise control lever up or down (or pull briefly toward you).

 Traffic-Aware Cruise Control is operating and is either maintaining the set speed (no vehicle in front) or is maintaining a chosen following distance from a vehicle in front (up to the set speed).

 Model S has fully stopped behind a vehicle it was following but a pedestrian or object was detected in front of Model S, causing Traffic-Aware Cruise Control to be in a HOLD state. Tap the accelerator pedal to resume cruising at the set speed.

## Traffic-Aware Cruise Control



### Limitations

Traffic-Aware Cruise Control is particularly unlikely to operate as intended in the following types of situations:

- The road has sharp curves.
- Visibility is poor (due to heavy rain, snow, fog, etc.).
- Bright light (oncoming headlights or direct sunlight) is interfering with the camera's view.
- The radar sensor in the center of the front grill is obstructed (dirty, covered, etc.).
- The windshield area in the camera's field of view is obstructed (fogged over, dirty, covered by a sticker, etc.).

 **Autosteer**

Note: Autosteer is a BETA feature in Release 7.1.

If Model S is equipped with Driver Assistance components (see About Driver Assistance on page 65), and you have purchased the optional Autopilot Tech Package, you can use Autosteer to manage steering and speed under certain circumstances. Autosteer builds upon Traffic-Aware Cruise Control, intelligently keeping Model S in its driving lane when cruising at a set speed. Using the forward looking camera, the radar sensor, and the ultrasonic sensors, Autosteer detects lane markings and the presence of vehicles and objects, steering Model S based on the lane markings and the vehicle directly in front of you.

⚠ Warning: Autosteer is a hands-on feature. You must keep your hands on the steering wheel at all times.

⚠ Warning: Autosteer is intended for use only on highways and limited-access roads with a fully attentive driver. When using Autosteer, hold the steering wheel and be mindful of road conditions and surrounding traffic. Do not use Autosteer on city streets or in areas where bicyclists or pedestrians may be present. Never depend on Autosteer to determine an appropriate driving path. Always be prepared to take immediate action. Failure to follow these instructions could cause serious property damage, injury or death.

## Operating Autosteer

Before you can operate Autosteer, you must enable it by touching Controls > Settings > Driver Assistance > Autosteer > Enable.

To indicate that Autosteer is available (but not actively steering Model S), the instrument panel displays a gray Autosteer icon on the right side of the driving speed as shown here:



To initiate Autosteer, pull the cruise control lever toward you twice in quick succession. Autosteer briefly displays a message on the instrument panel reminding you to pay attention to the road and be ready to take over at any time. To indicate that Autosteer is now actively steering Model S, the instrument panel displays the Autosteer icon in blue. When Autosteer is able to detect lane markings, it also displays the driving lane in blue:



Note: To initiate Autosteer, you must be driving at least 18 mph (30 km/h) on a roadway with visible lane markings. If a vehicle is detected ahead of you, you can initiate Autosteer at any speed, even when stationary.

Note: In most cases, Autosteer attempts to center Model S in the driving lane. However, if the sensors detect the presence an obstacle (such as a vehicle or guard rail), Autosteer may steer Model S in a driving path that is offset from the center of the lane.

Note: In situations where you attempt to engage Autosteer but you are not driving within the required driving speed for Autosteer to operate, or Autosteer is not receiving adequate data from the camera or sensors, a message displays on the instrument panel indicating that Autosteer is temporarily unavailable.



Autosteer

### Restricted Roads

Autosteer is intended for use on freeways and highways where access is limited by entry and exit ramps. When using Autosteer on residential roads, a road without a center divider, or a road where access is not limited, Autosteer limits the driving speed. The maximum driving speed is calculated based on the detected speed limit plus 5 mph (10 km/h). In situations where the speed limit can not be detected, speed is limited to 45 mph (70 km/h). When Autosteer is engaged on a restricted road, it reduces the speed to be within these limits, even if the set cruising speed is higher. The instrument panel displays a message indicating that you are driving on a restricted road. You can manually accelerate to exceed the limited speed, but when you release the accelerator pedal, Autosteer slows Model S to the limited speed. When you leave the restricted road, or disengage Autosteer by using the steering wheel, Model S resumes cruising at the set speed.

### Hold Steering Wheel

Autosteer uses data from the camera, sensors, and GPS system to determine where to drive. It also requires you to hold the steering wheel. When entering a curve or driving at a high speed, if Autosteer does not detect your hands on the steering wheel, it displays the following message on the instrument panel and eventually sounds a chime:



When you see this message, you may need to tighten your grip on the steering wheel. When your hands are detected, Autosteer resumes normal operation.

Note: Be careful not to apply any steering. Doing so cancels Autosteer.

If Autosteer does not detect your hands on the steering wheel, the Hold Steering Wheel request escalates by sounding two additional chimes. The chimes increase in frequency until Autosteer detects your hands. If no action is taken, Autosteer begins to decelerate Model S and displays the following message on the instrument panel:



Autosteer turns on the hazard warning flashers and decelerates the vehicle to a full stop.

### Take Over Immediately

In situations where Autosteer is unable to steer Model S, Autosteer sounds a warning chime and displays the following message on the instrument panel:



When you see this message, TAKE OVER STEERING IMMEDIATELY.

### Canceling Autosteer

Autosteer cancels when:

- You start steering manually.
- You press the brake pedal.
- You push the cruise control lever away from you.
- You unbuckle the driver's seat belt.
- The maximum speed that Autosteer supports (90 mph/150 km/h) is exceeded.
- You shift out of the Drive gear.
- An Automatic Emergency Braking event occurs (see Collision Avoidance Assist on page 86).

When Autosteer cancels, the Autosteer icon is gray to indicate that Autosteer is no longer active.

Note: If Autosteer cancels because you started steering manually, Traffic-Aware Cruise Control remains active. Disengage Traffic-Aware Cruise Control as you normally would, by pressing the brake or briefly pushing the cruise control lever away from you.

To disable Autosteer so it is no longer available, touch Controls > Settings > Driver Assistance > Autosteer > OFF.

### Limitations

Autosteer is particularly unlikely to operate as intended in the following situations:

 Autosteer

- Autosteer is unable to accurately determine lane markings due to poor visibility (heavy rain, snow, fog, etc.), or an obstructed, covered, or damaged camera or sensor.
- When driving on hills.
- The road has sharp curves or is excessively rough.
- Bright light (such as direct sunlight) is interfering with the camera's view.
- The sensors are affected by other electrical equipment or devices that generate ultrasonic waves.

 Warning: Many unforeseen circumstances can impair the operation of Autosteer. Always keep this in mind and remember that as a result, Autosteer may not steer Model S appropriately. Always drive attentively and be prepared to take immediate action.

Auto Lane Change 

If Model S is equipped with Driver Assistance components (see About Driver Assistance on page 65), and you have purchased the optional Autopilot Tech Package, you can use Auto Lane Change to move Model S into an adjacent lane without touching the steering wheel (which would cancel Autosteer). When both Traffic-Aware Cruise Control and Autosteer are active, Auto Lane Change intelligently steers Model S into an adjacent driving lane. Using the forward looking camera, the radar sensor, and the ultrasonic sensors, Autosteer detects lane markings and the presence of other vehicles.

Auto Lane Change is designed for use on highways and main roads with visible lane markings and under relatively predictable circumstances in which minimal steering and driver intervention is needed.

⚠ Warning: It is the driver's responsibility to determine whether a lane change is safe and appropriate. Auto Lane Change can not detect oncoming traffic in the target lane, especially fast moving vehicles from the rear. Therefore, before initiating a lane change, always check blind spots, lane markings, and the surrounding roadway to confirm it is safe and appropriate to move into the target lane.

⚠ Warning: Never depend on Auto Lane Change to determine an appropriate driving path. Drive attentively by watching the road and traffic ahead of you, checking the surrounding area, and monitoring the instrument panel for warnings. Always be prepared to take immediate action.

⚠ Warning: Do not use Auto Lane Change on city streets or on roads where traffic conditions are constantly changing and where bicycles and pedestrians are present.

⚠ Warning: The performance of Auto Lane Change depends on the forward looking camera's ability to recognize lane markings.

⚠ Warning: Do not use Auto Lane Change on winding roads with sharp curves, on icy or slippery roads, or when weather conditions (such as heavy rain, snow, fog, etc.) may be obstructing the view from the camera or sensors.

## Operating Auto Lane Change

Before you can operate Auto Lane Change, you must enable it by touching Controls > Settings > Driver Assistance > Auto Lane Change > On.

Note: Before you can turn on Auto Lane Change, you must turn on Autosteer (see Autosteer on page 74). Without Autosteer, Auto Lane Change can not operate.

Note: Your chosen setting is retained until you manually change it. It is also saved in your driver profile.

To change lanes using Auto Lane Change:

- Perform visual checks to make sure it is safe and appropriate to move into the target lane.
- Engage the turn signal.

Auto Lane Change moves Model S into the adjacent lane in the direction indicated by the turn signal, provided the following conditions are met:

- The Auto Lane Change setting is turned on.
- The turn signal is engaged.
- Autosteer is actively steering Model S.
- The ultrasonic sensors detect no vehicle or obstacles up to the center of the target lane.
- The camera's view is not obstructed.
- Lane Assist does not detect a vehicle in the blind spot (see Lane Assist on page 84).
- Midway through the lane change, Auto Lane Change can detect the outside lane marking of the target lane.
- Driving speed is at least 30 mph (45 km/h).

As the lane change is in progress, Overtake Acceleration is activated, allowing Model S to accelerate closer to a vehicle in front (see Overtake Acceleration on page 71). Midway through the lane change, Auto Lane Change must be able to detect the target lane's outside lane marking. If this lane marking can not be detected, both Auto Lane Change and Autosteer will cancel.

Note: Auto Lane Change moves Model S one lane at a time. Moving into an additional lane requires you to engage the turn signal a second time when the first lane change is complete.

⚠ Warning: If Auto Lane Change can not detect the outside of the target lane

 **Auto Lane Change**

midway through the lane change, both Auto Lane Change and Autosteer will cancel. The instrument panel displays a message instructing you to take over the steering wheel immediately.

When Auto Lane Change is active, it is important to monitor its performance by watching the driving path in front of you and the surrounding area. Stay prepared to take over steering at any time. On the instrument panel, the lane you are crossing over displays as a dashed blue line and once in your new lane, the lane markings display as solid blue lines.

In situations where Auto Lane Change is unable to operate at optimal performance, or can not operate due to inadequate data, the instrument panel displays a series of warnings. Therefore, when using Auto Lane Change, always pay attention to the instrument panel and be prepared to manually steer Model S.

⚠ Warning: When Auto Lane Change is actively steering Model S, the steering wheel moves accordingly. Any significant restriction of the steering wheel's movement can cancel Auto Lane Change.

## Canceling Auto Lane Change

Auto Lane Change cancels when you manually move the steering wheel, press the brake pedal, or disengage the turn indicator before Model S crosses the markers on the existing lane.

To disable Auto Lane Change so it is no longer available, touch Controls > Settings > Driver Assistance > Auto Lane Change > Off.

## Limitations

Auto Lane Change is particularly unlikely to operate as intended in the following types of situations:

- Auto Lane Change is unable to accurately determine lane markings. For example, lane markings are excessively worn, have been adjusted due to road construction, are changing quickly (lanes branching off, crossing over, or merging), objects or landscape features are casting strong shadows on the lane markings, or the road surface contains pavement seams or other high-contrast lines.
- A side collision warning is active (see Lane Assist on page 84) when you engage the turn signal.

- The road has sharp curves.
- Visibility is poor (due to heavy rain, snow, fog, etc.) or weather conditions are interfering with sensor operation.
- Bright light (oncoming headlights or direct sunlight) is interfering with the camera's view.
- A sensor or the camera is damaged or obstructed (such as by mud, fog, ice, or snow).
- The sensors are affected by other electrical equipment or devices that generate ultrasonic waves.
- Model S is being driven very close to a vehicle in front of it, which is blocking the camera's view.

⚠ Warning: Many unforeseen circumstances can impair the operation of Auto Lane Change. Always keep this in mind and remember that as a result, Auto Lane Change may not steer Model S appropriately. Always drive attentively and stay prepared to immediately take action at any time.

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

Exhibit 2

FORM 6-K

REPORT OF FOREIGN PRIVATE ISSUER
PURSUANT TO RULE 13a-16 OR 15d-16 OF
THE SECURITIES EXCHANGE ACT OF 1934

For the month of September 2016

Commission File No. 001-36566

---

MOBILEYE N.V.

(Translation of registrant's name into English)

---

Har Hotzvim
13 Hartom Street
PO Box 45157
Jerusalem 9777513, Israel

(Address of Principal Executive Offices)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F:

**Form 20-F** ✸                                        **Form 40-F** ⭘

Indicate by check mark whether the registrant by furnishing the information contained in this form is also thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934:

**Yes** ⭘                                        **No** ✸

Mobileye N.V. (the "Company") addressed by press release (see exhibit 99.1 hereto) certain inquiries regarding false allegations made in the press relating to the termination of its relationship with Tesla.

| Exhibit No. | Description of Exhibit |
|---|---|
| 99.1 | Press release dated September 16, 2016 |

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated: September 16, 2016

### MOBILEYE N.V.

By: /s/ Ofer Maharshak
Ofer Maharshak
Chief Financial Officer

**Exhibit 99.1**



## MOBILEYE RESPONDS TO FALSE ALLEGATIONS

**JERUSALEM, Israel – September 16, 2016** – (NYSE: MBLY) – In response to inquiries received this morning, Mobileye N.V. notes that the allegations recently attributed to a spokesperson for Tesla regarding Mobileye's position in respect of Tesla internal computer visions efforts are incorrect and can be refuted by the facts.

It has long been Mobileye's position that Tesla's Autopilot should not be allowed to operate hands-free without proper and substantial technological restrictions and limitations. In communications dating back to May 2015 between the Mobileye Chairman and Tesla's CEO, Mobileye expressed safety concerns regarding the use of Autopilot hands-free. After a subsequent face to face meeting, Tesla's CEO confirmed that activation of Autopilot would be "hands on." Despite this confirmation, Autopilot was rolled out in late 2015 with a hands-free activation mode. Mobileye has made substantial efforts since then to take more control on how this project can be steered to a proper functional safety system.

Tesla's response to the May 7 crash, wherein the company shifted blame to the camera, and later corrected and shifted blame to the radar, indicated to Mobileye that Mobileye's relationship with Tesla could not continue. Failing agreement on necessary changes in the relationship, Mobileye terminated its association with Tesla. As for Tesla's claim that Mobileye was threatened by Tesla's internal computer vision efforts, the company has little knowledge of these efforts other than an awareness that Tesla had put together a small team.

In any event, it is Mobileye's policy not to respond to rumors or other spurious claims in the press. Mobileye has commented fully on its relationship with Tesla and will not provide further comment. Mobileye's deeply held view is that the long-term potential for vehicle automation to reduce traffic injuries and fatalities significantly is too important to risk consumer and regulatory confusion or to create an environment of mistrust that puts in jeopardy technological advances that can save lives.

**About Mobileye**

Mobileye N.V. is the global leader in the development of computer vision and machine learning, data analysis, localization and mapping for Advanced Driver Assistance Systems and autonomous driving. The Company's technology keeps passengers safer on the roads, reduces the risks of traffic accidents, saves lives and has the potential to revolutionize the driving experience by enabling autonomous driving. The Company's proprietary software algorithms and EyeQ® chips perform detailed interpretations of the visual field in order to anticipate possible collisions with other vehicles, pedestrians, cyclists, animals, debris and other obstacles. The Company's products are also able to detect roadway markings such as lanes, road boundaries, barriers and similar items; identify and read traffic signs, directional signs and traffic lights; create a Roadbook™ of localized drivable paths and visual landmarks using REM™; and provide mapping for autonomous driving. The Company's products are or will be integrated into car models from 25 global automakers. The Company's products are also available in the aftermarket.

**Forward-Looking Statements**

This press release contains certain forward-looking statements. Words such as "believes," "intends," "expects," "projects," "anticipates," and "future" or similar expressions are intended to identify forward-looking statements. These statements are only predictions based on the Company's current expectations and projections about future events. You should not place undue reliance on these statements. Many factors may cause the Company's actual results to differ materially from any forward-looking statement, including the risk factors and other matters set forth in the Company's filings with the U.S. Securities and Exchange Commission, including its Annual Report on Form 20-F for the year ended December 31, 2015. The Company undertakes no obligation to update or revise any forward-looking statement, whether as a result of new information, future events or otherwise, except as may be required by law.

# EXHIBIT B

CONFIDENTIAL BUSINESS INFORMATION



45500 Fremont Blvd.
Fremont, CA 94538

October 22, 2021

**VIA SECURE ELECTRONIC TRANSFER**

Gregory Magno

Chief, VDD-D Division

Office of Defects Investigation

National Highway Traffic Safety Administration

1200 New Jersey Avenue, S.E.

Washington, D.C. 20590

RE: Preliminary Evaluation (PE) 21-020 – Response to Request for Information

Dear Mr. Magno,

This letter and its accompanying attachments respond in part to the information request (IR) dated August 31, 2021, wherein the National Highway Traffic Safety Administration ("NHTSA" or the "Agency") seeks information in connection with Preliminary Evaluation (PE) 21-020. As explained in our October 6, 2021 email, we have included complete responses to Questions 1, 2, 5, and 7-10, and partial responses to Questions 6 and 11. We will produce supplemental responses to these requests, as well as responses to Questions 3-4, on a rolling basis. Thank you for the opportunity to respond.

1. *State, by model and model year, the number of subject vehicles Tesla has manufactured for sale or lease or operation in the United States. Separately, for each subject vehicle manufactured to date by Tesla, state the following:*
   a. *Vehicle identification number (VIN);*
   b. *Model;*
   c. *Model Year;*
   d. *Subject component trade / trim name, part number and design version installed as original equipment; including:*
      i) *Software version;*
      ii) *Firmware version;*
      iii) *Hardware version;*
   e. *Date of manufacture;*
   f. *Date warranty coverage commenced;*
   g. *Date and mileage at which the "Full Self Driving" (FSD) option was enabled;*
   h. *The State in the United States where the vehicle was originally sold or leased (or delivered for sale or lease);*
   i. *Latest known vehicle mileage and commensurate date;*
   j. *Cumulative mileage covered with the subject system engaged; and*
   k. *Date and identities of the most recent software, firmware, and hardware updates.*

   *Provide the table in Microsoft Access 2010, or a compatible format, entitled "PRODUCTION DATA."*

CONFIDENTIAL BUSINESS INFORMATION

Page 2

Please see the attached Excel file titled "CBI_PE21-020_ProductionData.xlsx" in the accompanying folder marked for Question 1.

Please note that for Question 1(g), we do not collect or maintain such mileage information. As for the date the FSD Capability package was enabled, if the package was purchased with the vehicle, then we have included the date of delivery. If the package was purchased after delivery or by subscription, then we have provided the date of purchase/subscription. There are circumstances, however, where we may not collect or maintain such date, *e.g.*, where the package was part of a goodwill arrangement or where the vehicle has been sold and/or the package was enabled or disabled multiple times.

Please note that for Question 1(j), Tesla does not collect or maintain the requested information on an individual vehicle basis. Based upon available data, cumulative mileage from June 10, 2018, through October 20, 2021, includes:

- 2,118,529,105.84358 miles with only Traffic Aware Cruise Control ("TACC") engaged;

- 3,497,859,570.95444 miles with Autopilot (Autosteer plus TACC) engaged; and

- 1,049,679,493.0418 miles with Navigate on Autopilot engaged

For a total of 6,666,068,169.84 cumulative miles (inclusive of TACC miles, Autopilot miles, and Navigate on Autopilot miles).

2. ***State the number of each of the following, received by Tesla, or of which Tesla is otherwise aware, which relate to, or may relate to the subject system or subject crashes in the subject vehicles:***
   a. ***Consumer Complaints;***
   b. ***Field Reports;***
   c. ***Reports involving a crash, injury or fatality;***
   d. ***Property damage claims;***
   e. ***Third-party arbitration proceedings where Tesla is or was a party to the arbitration; and***
   f. ***Lawsuits, both pending and closed, in which Tesla is or was a defendant or codefendant.***

   ***For subparts "a" through "f" state the total number of each item (e.g., consumer complaints, field reports, etc.) separately. Multiple incidents involving the same vehicle are to be counted separately. Multiple reports of the same incident are also to be counted separately (i.e., a consumer complaint and a field report involving the same incident in which a crash occurred are to be counted as a crash report, a field report and a consumer complaint).***

   ***In addition, for items "e" and "f", provide a summary description of the alleged problem and causal and contributing factors and Tesla's assessment of the problem, with a summary of the significant underlying facts and evidence. For items "e" and "f," identify the parties to the action, as well as the caption, court, docket number, and date on which the complaint or other document initiating the action was filed.***

CONFIDENTIAL BUSINESS INFORMATION

Page 3

Tesla objects to this request on the basis that it is overly broad and unduly burdensome. Items that "may relate to the subject system" is not sufficiently specific to allow us to reasonably respond to this request. We discussed this concern with you on October 1, 2021, and we followed up with an alternative proposal on October 6, 2021. While we appreciate that NHTSA tried to narrow the scope in its October 19, 2021 response by explaining that they are interested in items that "implicate" the subject system, this clarification does not sufficiently narrow the request. The definition of "subject system" itself remains so overly broad that it could lead to the inclusion of claims that are not reasonably related to the investigation, *e.g.*, it could include claims alleging the unavailability of Autosteer and/or Traffic Aware Cruise Control due to a sensor fault, but nevertheless may still "implicate" the system.

In addition, during our discussion and in our email, we proposed to narrow the scope of responsive items to May 1, 2018. The basis for this proposal was, in large part, the unavailability of data before that time. NHTSA has nevertheless requested that we go back as far as January 19, 2017, the date the Agency closed PE16-007. However, because the response to Question 2 forms the basis for the information to be provided in Questions 3-4, we propose that once the Agency has had the opportunity to review this response, we discuss a reasonable path forward for those responses.

That said, please see the following number of responsive items between early January 2017 and mid-October 2021:

| Category | # of responsive items |
|---|---|
| a. Consumer complaints, including those from fleet operators; | 893 |
| b. Field reports, including dealer field reports; | 249 |
| c. Reports involving a crash, injury, or fatality, based on claims against the manufacturer involving a death or injury, notices received by the manufacturer alleging or proving that a death or injury was caused by a possible defect in a subject vehicle, property damage claims, consumer complaints, or field reports; | -- |
| d. Property damage claims; | 0 |
| e. Third-party arbitration proceedings where Tesla is or was a party to the arbitration; and | 1 |
| f. Lawsuits, both pending and closed, in which Tesla is or was a defendant or codefendant. | 26 |

To arrive at the numbers responsive to Question 2(a), we started with our entire customer complaint and service visit databases, which are tagged to more than 3,000 symptoms. We reviewed the symptom list for any that might reasonably be related to Autopilot or FSD Capability, or their underlying hardware and software, resulting in about 132 discrete symptoms. When we filtered by that symptom subset, the result was still too voluminous to reasonably review for relevancy because it would require manual review of the complaint narratives. However, in spot checking these results, we were able to confirm that many

HIGHLY CONFIDENTIAL

CONFIDENTIAL BUSINESS INFORMATION

Page 4

complaints either were not relevant to the investigation or did not reasonably "implicate" the subject system, so we further concluded that this result set was not the appropriate one to provide. As examples, this initial filtering included results like the following:

Example 1:

- Complaint Narrative (stated by Customer): "Customer states that TACC is not working at all."
- Technician Narrative (stated by Service tech): "Condensation in left hand repeater caused malfunction in repeater camera, which caused fault in TACC. Replacement of repeater on line 3 resolved this concern."

Example 2:

- Complaint Narrative (stated by Customer): "#VSC [FastLane] Concern 1: Autopilot is no longer working - needs radar calibration Tech Notes: Perform a radar calibration and verify correct operation of the autopilot system."
- Technician Narrative (stated by Service tech): "Push latest firmware to customer vehicle. Check camera calibration. Test autopilot on several roads and highways. Verify proper operation after repairs."

Example 3:

- Complaint Narrative (stated by Customer): "#VSC Client states the auto park feature is not operational. The "blue box" for auto parking rarely lit up."
- Technician Narrative (stated by Service tech): "2019-05-05 20:29:16 Confirmed auto park feature works. performed front and rear parking sensor test and confirmed working as design. no problem found with autopark feature.  2019-05-05 20:25:38 Function tested all parking sensors and confirmed all sensors are communicating. Road tested vehicle and tested auto-park feature. Able to enable the auto-park feature in parallel and perpendicular parking situation. The vehicle must complete certain criteria (see owners manual) in order to enable the option to use the auto-park feature."

In an attempt to filter some of this "noise," we ran a query against the narratives in the initial results, looking broadly for anything that may have involved a potential safety impact. Our search included terms such as "accident," "crash," "colli," "hit," "injur," "hurt," "death," and "property damage." This query led us to more than 6,000 results, which we then manually reviewed to see whether the text narratives "implicated" the subject system by alleging that a crash occurred and that the subject systems was the cause of the concern. Based upon this review, we were able to determine the approximately 900 items reasonably responsive to subpart (a).

BENAVIDES-00001019

CONFIDENTIAL BUSINESS INFORMATION

Page 5

As for subparts (b) through (f), because these databases are significantly more manageable, we included any responsive items that included allegations related in any way to the subject system in a subject vehicle.

5. **For each trade name / trim level of the subject system available in the subject vehicles, state its name and designation including:**
   a. **Describe the ODD specified to the customer by Tesla for the intended use of the system, including but not limited to:**
      i) **Types of roads, road marking, weather conditions, etc. the system is intended to be used on and the types of roads the system should not be used;**
      ii) **List the methods and technologies used to prevent subject system usage outside the ODD specified to the customer by Tesla; and**
      iii) **If the subject system can be engaged (or remain engaged) outside of the ODD specified to the customer by Tesla, state the reasons for this capability and describe any performance restrictions or modifications to the subject system's operational characteristics in such an environment (e.g. slower maximum speeds or control authority, additional driver warnings, adjustments to the driver engagement system).**

Autopilot and FSD Capability are SAE Level 2 driving automation system features designed solely to support and assist – and not to replace – the driver in performing the driving task. As driver support features, Autopilot and FSD Capability are currently capable of performing only part of the driving task (*i.e.*, longitudinal and lateral vehicle motion control and *some* object and event detection and recognition), while the driver is required to perform the remaining tasks, supervise system performance, and respond to inappropriate actions taken by the system. Under the SAE Level 2 taxonomy, the driver's role also includes "[d]etermin[ing] whether/when engagement and disengagement of the driving automation system is appropriate." *See* SAE J3016, Table 2 (Apr. 2021).

Given the significant role that the driver plays, a rigid set of operational design domains centered around road classification or geometry is not necessary or even appropriate. The world is a complex, often-changing environment and drivers of vehicles equipped with SAE Level 2 driving automation system features – like the subject systems – may find themselves in a wide variety of scenarios. As a result, the usage of such features is more appropriately determined by the driver, who is best suited to assess his or her surroundings in real time and determine whether the system can be safely and appropriately used.

That said, there are limits to the currently available technological capabilities of the subject systems (including object and event detection and recognition) and there are preferred environments and conditions the subject systems are designed to be operated in, which could be loosely construed as an operational design domain. In some cases, where conditions may be inadequate to provide optimal performance, we opt to limit availability of features. For example, Autosteer performance may be limited in certain conditions, such as when visibility is poor (*e.g.*, heavy rain, snow, fog, etc.), weather conditions are interfering with sensor operation (*e.g.*, ice or snow), or when bright light (*e.g.*, direct sunlight) is interfering with the view of the camera(s). To mitigate these scenarios, Autopilot's vision system will

CONFIDENTIAL BUSINESS INFORMATION

Page 6

attempt to detect when the forward-facing cameras are occluded and issue a "take over immediately" alert to the driver.

Similarly, we may limit the availability of features based upon the presence or absence of certain road characteristics. For example, Autosteer may be restricted if the system detects the presence of a gore area or infeasible path, or the absence of lane lines. We may also restrict the use of some features to specific road types, such as is the case for Smart Summon. We may further limit the ability of the driver to set the cruising speed above a certain threshold on some roads based on road class or detected road speed restrictions.

As SAE Level 2 driving automation system features, the subject systems attempt reasonable, but not complete, control for undesirable conditions and adverse scenarios; hence the role of the driver as the supervisor. As we've previously explained in connection with PE16-007, we considered the possibility that drivers may attempt to use the system outside of preferred environments and conditions and in circumstances that the subject system does not control for. To curb such use, we developed extensive warnings in the owner's manual; additional in-vehicle warnings both when enabling Autosteer functionality for the first time and every subsequent time Autosteer is engaged; a user interface that displays the system's detection of lanes and surrounding vehicles; and roadway-dependent speed restrictions.

For a more fulsome description of Autopilot and FSD Capability features, including how to engage and operate the system, intended use and limitations, and warnings provided to customers, please see the "Autopilot" section of the owner's manual for each vehicle model, available at: https://www.tesla.com/ownersmanual. (To access the owner's manual, select a vehicle model, then select English (United States/Canada) under the North America heading, and then select the Autopilot drop-down.) For the FSD Capability City Streets (Beta) feature, owner's manual content is only available in-vehicle for those customers that are part of the pilot. A copy of this section is attached in the accompanying folder marked for Question 5.

> **b.   Describe the subject system's maximum control authority over steering (steering angle (degrees), rate (degrees / sec), lateral acceleration (g)), braking (g), and acceleration (g) functions during routine and crash-imminent operations. Separately include any additional conditions and control authority values that Tesla deems appropriate.**

Please see the attached file titled "CBI_Question 5b.pdf" in the accompanying folder marked for Question 5.

> **c.   List and describe the information, system status, alerts, warnings, and graphics communicated by the subject vehicle to its driver during the DDT (e.g., warning lights,**

CONFIDENTIAL BUSINESS INFORMATION

Page 7

*instrument panel animations, aural warnings, haptic warnings) during the following*
*subject system operational conditions:*
*i)   Routine subject system operation;*
*ii)  Scenarios where the vehicle requires driver intervention (e.g., driver engagement*
*needed, imminent ODD exit, system fault); and*
*iii) When the subject vehicle detects that a crash is imminent.*

Please see the attached file titled "CBI_Question 5c.pdf" in the accompanying folder marked for Question
5.

 

 

  d.  *Furnish an overview of Tesla's approach to the enforcement of driver engagement /*
      *attentiveness during the subject system's operation in the subject vehicles. Include a*
      *description of all means of detecting (both through direct measurement and inference) /*
      *monitoring driver engagement / attentiveness including:*
      *i)   The technological means and related logic (including direct measurement or inference)*
      *used to sense driver engagement / attentiveness;*
      *ii)  Minimum contact or detected engagement duration and time between contact /*
      *detected engagement required to satisfy the driver engagement / attentiveness logic*
      *including changes based on variations in driving conditions such as vehicle speed or*
      *presence of a lead vehicle;*
      *iii) Describe any warning strategies or messaging and timing associated with each*
      *system identified above in subpart (ii) (include pictures/videos of all audible & visual*
      *warnings/alerts); and*
      *iv)  Describe any escalation or lockout strategies used to address either unresponsive*
      *drivers or repeated engagement warnings in any given drive cycle.*

Driver distraction and inattentiveness in manual driving is a long-standing cause of a significant
percentage of crashes and injuries on U.S. roadways each year. As we explained in our prior response in
PE16-007, reducing the risk of such occurrences is one of the most important benefits of Autopilot and
FSD Capability. However, just as countless drivers fail to pay attention during manual driving, Tesla
engineers considered that a driver might also fail to pay attention while using Autopilot. To that end, we
have made several design implementations in driver engagement and monitoring, both to prevent
distraction and mitigate attempts to abuse the monitoring system. As the fleet grows and we gain billions
of more miles of experience, we learn more and more about driver usage and rare corner cases and will
continue to make improvements and updates as needed to maximize overall vehicle safety.

We use a combination of sensors to measure driver engagement, including a steering torque sensor,
steering wheel stalks, scroll wheels and buttons, an interior camera, seatbelt buckle sensors, seat
occupancy sensors, and exterior cameras that detect road conditions (*e.g.*, poor weather, emergency
lights, construction zones, tollbooths). Our approach does not rely on any single source of information,
but rather a combination of inputs from available sensors, vehicle conditions, roadway scenarios, and
patterns of driver interaction with the system that together increase the system's confidence in driver
attentiveness. While the introduction of new signals (such as the recent introduction of cabin cameras)
can help to catch more cases of distraction, ultimately existing signals such as steering wheel torque are

CONFIDENTIAL BUSINESS INFORMATION

Page 8

still needed to provide holistic assessments of attention and engagement. For an SAE Level 2 driving automation system feature where the driver is responsible to supervise system performance and respond to inappropriate actions taken by the system, periodically requesting torque on the steering wheel can also minimize latency, should the driver need to intervene.

If a driver is determined to be inattentive or unresponsive, the vehicle will issue audible, visual, and/or haptic warnings (*e.g.*, steering wheel vibration for an LDW or for lane change confirmation) to indicate that the driver needs to engage with the system. In issuing such warnings, we err on the side of caution. In some cases, the system may issue these attentiveness alerts or require confirmation to take certain actions even when the driver is fully attentive. The frequency and timing of these warnings may vary depending on vehicle speed, road conditions, and the presence of other vehicles. If the driver does not provide confirmation of attentiveness, Autopilot functions are made unavailable. Our approach accounts for sensor variation, measurement noise inherent in nominal driving, and patterns that emerge in different roadway scenarios. We also go beyond simple monitoring, including implementing changes that mitigate effectiveness of defeat devices and attempts to trick seat sensors or interfere with the interior camera. Implementation details are outlined below.

Driver monitoring is one of many important considerations in Tesla's approach to increasing overall vehicle safety, and the success of these combined efforts is best reflected by a lower overall collision rate compared to manual driving when Autopilot is engaged (as reported in our Quarterly Safety Reports available at https://www.tesla.com/VehicleSafetyReport).

For further detail, please see the attached file titled "CBI_Question 5d.pdf" in the accompanying folder marked for Question 5.

 

 

e. **Describe subject system responses to driver control inputs that could cancel or override one or more of its Level 2 functions. For each driver input, include:**
   i) **Driver input description and minimum threshold (e.g., minimum steering angle or rate);**
   ii) **List the Level 2 functions disabled and permitted to continue operation following a driver override;**
   iii) **Describe / illustrate warnings and messages to the driver concerning the system status following a driver override; and**
   iv) **Explain which, if any, of the disabled Level 2 functions resume operation in their own after the override input and under what conditions.**

Please see the attached file titled "CBI_Question 5e.pdf" in the accompanying folder marked for Question 5.

 

 

f. **List the conditions / events / alerts that may prompt an operating subject system to require a "take-over" by the driver. For each such condition, list:**
   i) **Sequence of events and timing for each; and**

CONFIDENTIAL BUSINESS INFORMATION

Page 9

*ii)   Intended vehicle behavior in the instance where a driver take-over is not detected.*

Please see the attached file titled "CBI_Question 5f.pdf" in the accompanying folder marked for Question 5.

**g.   Describe the subject system OEDR capabilities within the ODD specified to the customer by Tesla. List the objects and events that the system is designed to detect (e.g., particular vehicle aspects, pedestrians, road signs, drivable space limitations, environmental (weather / road surface / lighting) conditions, path predictions, object classifications). For each item, list:**
**i)   Subject system behavior;**
**ii)   Limitations on detection; and**
**iii)   Subject system interaction with crash avoidance technologies.**

The subject systems use information from the camera and/or the radar to form "control relevant tracks." Each control relevant track can be a combination of vision detections and radar detections or may be composed of detections from only one sensor depending upon vehicle equipment and circumstance. If the track is consistent, we model realistic boundaries and use them to determine how the vehicle should interact with the object detected. For example, the vision system takes camera images and runs them through a set of neural networks to generate detections of objects, and then classifies them into "types" including: Bicyclist, Motorbike, Pedestrian, Animal, Vehicle.

There are a number of signals used to generate tracks (*e.g.*, for objects) or to otherwise perceive the environment (*e.g.*, visibility) or determine driveable regions within the field of view (*e.g.*, lane lines). Each signal has a large set of attributes that undergo threshold tuning based on factors such as precision/recall and qualitative inspection. Heuristics are implemented to account for detection limitations that may occur, *e.g.*, false positives, occlusions, rare object types, or visually challenging conditions. The exact set of signals running at any given point may depend on several factors such as road conditions, hardware configuration (*e.g.*, radar equipped, HW3, etc.), and release version. Because vision signals are used as one factor among many to determine crash avoidance behavior, the interaction of these signals with crash avoidance technologies is a function of several environmental and road scenario specific factors.

For a list of signals broken down by vehicles equipped with radar and those built without, please see the attached file titled "CBI_Question 5g_Vision Signals.pdf." For further detail on the relationship between vision signals and crash avoidance features, please see the attached file titled "CBI_Question 5g_Autopilot_Functional_Requirements_Longinatudinal_Collision_Management.pdf." Both files are included in the accompanying folder marked for Question 5.

**6.   Produce copies of all instructional, service, warranty, marketing, and other documents that relate to, or may relate to, the operation of each trade name / trim level of the subject system in the subject vehicles, that Tesla has issued to any customers, dealers, regional or zone**

CONFIDENTIAL BUSINESS INFORMATION

Page 10

*offices, field offices, fleet purchasers, or other entities. This includes, but is not limited to, bulletins, advisories, informational documents, training documents, digital messages on a subject vehicle display, or other documents or communications, with the exception of standard shop manuals. Also, include the latest draft copy of any communication that Tesla is planning to issue within the next 120 days.*

Please see the attached files in the accompanying folder marked for Question 6, which includes the results of our preliminary search for responsive documents. Specifically included are service communications, bulletins, Toolbox articles, and other service-related information, as well as some digital messages on a subject vehicle display. Please note that for service communications and announcements, as explained during our October 1, 2021 discussion and in our October 6, 2021 email, we migrated to a new database in or about November 2019. Not all historic documentation migrated over and, as a result, some documentation may not have been preserved. For service materials that pre-date the migration, we have identified an unrelated legal production that may contain responsive materials. We are reviewing those records and will supplement our response as necessary once that review is complete.

We are continuing to search for marketing materials and other customer facing communications and will supplement this response once that review is complete. In the meantime, we direct your attention to our Autopilot webpage (tesla.com/autopilot), company blog posts (tesla.com/blog), and social media accounts (@Tesla on Twitter, LinkedIn, YouTube, and Vimeo, and @Teslamotors on Instagram).

7. **For each trade name / trim level of the subject system available in the subject vehicles, describe all modifications or changes made by, or on behalf of, Tesla in the design, material composition, manufacture, quality control, supply, function, or installation of the subject system, from the start of production to date, which relate to, or may relate to driver engagement / attentiveness and OEDR by the subject system in the subject vehicles. For each such modification or change, provide the following information:**
   a. *The date or approximate date on which the modification or change was incorporated into vehicle production;*
   b. *A detailed description of the modification or change;*
   c. *The reason(s) for the modification or change;*
   d. *The hardware, firmware, and software names and numbers of the original version;*
   e. *The hardware, firmware, and software names and numbers of the modified version;*
   f. *Primary distribution method of related firmware and software updates (over the air or in person service); and*
   g. *When the modified version / update was made available as a service component.*

   *Also, provide the above information for any modification or change that Tesla is aware of which may be incorporated into vehicle production or pushed to subject vehicles in the field within the next 120 days.*

Please see the attached file titled "CBI_Question 7.pdf" in the accompanying folder marked for Question 7. Based upon a reasonable inquiry, the file contains a chronology of FW releases that included a

BENAVIDES-00001025

CONFIDENTIAL BUSINESS INFORMATION

Page 11

material or otherwise significant update or improvement to driver state monitoring or object and event detection and recognition.

8. **Describe Tesla's strategies for detecting and responding to the presence of first responder / law enforcement vehicles and incident scene management tactics whether in or out of the roadway during subject system operation in the subject vehicles. Include:**
   a. **Incident scene detection (particularly flashing lights, road flares, cones / barrels, reflectorized vests on personnel, vehicles parked at an angle "fend-off" position");**
   b. **Explain the effects of low light conditions on these strategies; and**
   c. **List subject system behaviors (e.g., driver warnings, control interventions).**

In general, the subject systems do not differentiate emergency vehicles with activated caution lights from other vehicles on the road, regardless of whether it's day or night. For vehicles not running Tesla Vision, the current vision system is based on single frames, so it sees each moment of time individually and tries to detect a vehicle in each frame using only that frame. In the case of flashing lights, the frames will alternate between extremely saturated (*i.e.*, bright, blinding light washing out the camera) and extremely dark (*i.e.*, no light in the scene). A human interprets this rapidly oscillating light intensity as a source of caution whereas the current Autopilot system sees frames that are either very dark or very bright, which may lead to missed detections.

Because the subject systems are SAE Level 2 driver support features, they are not currently designed to be responsible for complete object and event detection and recognition. The driver therefore maintains dual responsibility for this part of the driving task. He or she is responsible for supervising system performance and responding to inappropriate actions taken by the system, including where the system is unable to detect an object in the vehicle's path. The owner's manual clearly explains that Autopilot "may not recognize or detect oncoming vehicles, stationary objects, and special-use lanes such as those used exclusively for bikes, carpools, emergency vehicles, etc." It further instructs the driver: "Remain alert at all times and be prepared to take immediate action. Failure to do so can cause damage, injury or death." (*See* owner's manuals linked in Question 5.a. above).

Notwithstanding the above, in an effort to continuously improve the customer experience and enhance our customers' overall safety, last month, we deployed a software update to certain vehicles equipped with HW3 to enhance system detectability for activated caution lights. We previously discussed this improvement with NHTSA beginning on March 19, 2021, followed by a revisit on July 16, 2021, and most recently a deeper dive on September 22, 2021.[1]

---

[1] Copies of the presentation materials for all discussions were submitted to NHTSA Chief Counsel under a request for confidential treatment.

BENAVIDES-00001026

CONFIDENTIAL BUSINESS INFORMATION

Page 12

For further information on the subject systems' OEDR capabilities with respect to caution lights, please see the attached file titled "CBI_Question 8.pdf" in the accompanying folder marked for Question 8.

With respect to incident scene detection of cones/barrels, where there is a series of cones adjacent to the ego vehicle's lane, the system will perform an uncommanded lane change in the opposite direction of the cones if safe and available to do so. For further information, please see the "Lane Change Away from Cones" information provided in our response to Question 7.

9. **Describe any processes, procedures, or policies governing the extent of testing and validation required prior to the release of the subject system or an in-field update to the subject system, including hardware and software components of such systems, identifying, in particular:**
   a. **The extent of field testing or vehicle validation miles required prior to the release of such a system or feature;**
   b. **The extent of any computer simulations or training data sets required to be conducted prior to the release of such a system or feature and the degree to which any such simulations are relied upon for testing and validation in lieu of field testing;**
   c. **The extent to which the processes, procedures, or policies for the testing and validation identified above differ, if at all, for updates to a subject system or feature (e.g. software updates) compared to the first release of the system or feature;**
   d. **The length of time that the processes, procedures, or policies for the testing and validation identified above have been in place; and**
   e. **Any processes, procedures, or policies in place to compare the performance of a subject system or feature in the field after a release with the design intent for the system or feature.**

During the past five years, Tesla provided NHTSA with information on our development, validation, and testing process on numerous occasions; including, but not limited to, our December 30, 2016, response to the Special Order issued in PE16-007, our voluntary Quarterly Updates to ODI on June 15, 2018, and March 27, 2019, and most recently during our May 12, 2021, meeting with NHTSA leadership.[2] While the processes and procedures have grown and matured organically over time, they have largely followed the same pattern, employing both internal development and validation activities, as well as in-field evaluation, as the significant investment, overhead, and time required to do this well is essential to unlocking quick iteration and high-quality software improvements.

At a high level, the development process begins at inception, *i.e.*, the point at which we have the idea to pursue an update or feature. We regularly review real world use of the subject systems and constantly learn from the fleet about our customers' interaction with these features. This data allows us to identify opportunities for continuous improvement, introduce new features, and highlight additional areas for research.

---

[2] Copies of the presentation materials for all discussions were submitted to NHTSA Chief Counsel under a request for confidential treatment.

CONFIDENTIAL BUSINESS INFORMATION

Page 13

After defining specifications and requirements for these software updates, we develop and validate the software using industry best practices. Validation includes initial software functional development, simulation, hardware and software in-the-loop testing, system-level and regression testing, and test track and on-road engineering testing. Multiple departments perform cross-functional reviews of the entire process. Their reviews may include demonstrations of the specifications, risk management and mitigation, development and validation results, compliance reviews, and failure modes and effects analysis.

After validation and reviews are complete, we often release a feature to our Early Access customer program and other small stage rollouts to gauge initial feedback and identify any unforeseen challenges with implementation. We make more refinements as necessary, and only after we are fully satisfied with performance, integrity, and safety do we finally push the feature or improvement to the entire customer fleet as part of an OTA software update.

The graphic below further illustrates the current process at a high level:



While this graphic illustrates the general activities in the validation process, the extent to which we use any one activity may vary by individual update, as does the amount of time that may be spent on each activity. Also, this process is not strictly linear. If at any point in the process, further development or validation appears necessary or appropriate, the update will go back through the cycle.

The key activities in this process can be further described as follows:

BENAVIDES-00001028

CONFIDENTIAL BUSINESS INFORMATION

Page 14

**Internal Development**

- Vision Network Evaluation – Each neural network undergoes quantitative review (*e.g.*, precision/recall), and models are selected based on their detection performance on extensive test sets of real-world scenarios. Our vision network test sets currently include nearly 200,000 images and more than 20,000 video clips that have been hand-picked for the evaluation set.

- Hardware in-the-Loop Simulation – Changes are tested against computer simulated scenarios to ensure edge cases, or scenarios that are infrequent during real world driving, are properly tested. Our simulation sets are parameterized to ensure a wide range of vehicle (*e.g.*, vehicle speed) and environmental (*e.g.*, road congestion) situations are represented. Our simulation set includes approximately 680,000 scenarios that are tested every week.

- Regression Evaluation – Before every release, a full regression test is performed using historical data. This evaluation includes approximately 17,500 clips curated over the past 3 years that are tested regularly and used to sign off all new software releases. This evaluation dataset has been extracted from roughly 29 billion total miles or 6.7 billion TACC/AP/NoA miles of driving from the fleet as well as internal testing.

- QA Vehicle Testing – Candidate builds are driven by trained operators who provide qualitative (*e.g.*, discomfort approaching curbs) and quantitative (*e.g.*, number of interventions) feedback on the software. The testing fleet includes more than 300 vehicles across more than 10 U.S. cities, including approximately 50 test routes executed each week and more than 2,000 test miles per day on latest software:



- Track Testing – Closed loop tests with pedestrian and vehicle dummies are performed to ensure compliance with regulatory standards and confirm expected behavior in real world, safety critical

BENAVIDES-00001029

CONFIDENTIAL BUSINESS INFORMATION

Page 15

scenarios. We have capabilities to run 30+ vehicle and 15+ pedestrian/bike tests in-house. Tests are usually run multiple times a month, depending on the frequency of major changes.

**In-Field Evaluation**

- Shadow Mode – Once a feature has undergone sufficient internal testing and we are ready to evaluate its performance in a scaled environment, we typically introduce it inertly into customer vehicles to observe how it performs across millions of real-world miles. When operating in this mode, the feature does not control the car. The software silently operates in the background, logging and analyzing the action it would have performed had it been active while transmitting anonymized data back to our development team for evaluation. From this data, we assess things like true-positive performance rates, false-positive performance rates or disagreements between what the driver did and what the feature did. This data is fed back into engineering development to build out evaluations and improve the feature until the Shadow Mode results confirm a feature's performance metrics are sufficient for it to be enabled for control in a production environment. Shadow Mode is primarily used as a tool for measuring performance at scale, since it operates in an open-loop environment (which means the feature's performance is dependent on how the customer drives). For some features, it is also helpful to measure closed-loop behavior (where the feature's action at $t+1$ is dependent on its action at $t$ rather than the driver's action at $t$). This is why the Early Access Program and the Phased Release evaluations are also useful (see below).

- Early Access Program ("EAP") – Once a feature has undergone sufficient internal testing and/or Shadow Mode, we are ready to evaluate the subjective customer experience and closed-loop behavior in a wider audience. We release it to a small subset of customers who have volunteered to test new features and provide feedback. During this phase of the development process, a feature typically undergoes evaluation by up to approximately 2,000 customers including up to one million miles of driving, depending on the need. We collect data and drive-reports from these testers, feed that back into the engineering development loop to build out evaluations and make iterative improvements to the feature, often releasing several new software versions to the EAP group before exploring a Phased Release.

- Phased Release and Continuous Improvement – Only after features make it through our validation procedures in Shadow Mode and/or Early Access do we begin to roll it out to the entire customer base, in a gradual manner consisting of increasingly large waves of customers. General customers who are not in the Early Access Program can request to be part of the 'early waves' of a wide release, which gives us another opportunity to learn more about the new feature, in a controlled manner, as it begins to scale. As waves are released, and as data quickly

CONFIDENTIAL BUSINESS INFORMATION

Page 16

accumulates, we continue to monitor key performance indicators of the new feature to ensure it scales safely and as expected.

We also make ongoing improvements as more mileage is accumulated over time with the feature enabled. These ongoing improvements, depending on their size, may only require a subset of the development/validation procedures described above.

**10. Describe Tesla's processes for identifying and investigating the subject crashes in the subject vehicles with the subject system in operation including:**
   **a. Vehicle's Data collection/logging capabilities including vehicle's ability to wirelessly transmit data including:**
      **i) Any limitations on such transmittal (e.g. poor wireless connectivity, etc.)**
      **ii) Countermeasures / alternate retrieval options when transmittal limitations apply;**
   **b. Procedures for investigating customer concerns or safety incidents; and**
   **c. Metrics used to assess safety performance.**

During the past five years, Tesla provided NHTSA with information on our vehicle data collection and logging capabilities and our process for identifying and investigating crashes on numerous occasions; including, but not limited to our voluntary Quarterly Update to ODI on June 15, 2018, and our recent May 26, 2021, meeting with NHTSA leadership.[3]

**Vehicle Data Collection/Logging Capabilities**

Our principal collision data collection and logging capabilities can be summarized as follows:



COLLISION DATA STREAMS

---

[3] Copies of the presentation materials for all discussions were submitted to NHTSA Chief Counsel under a request for confidential treatment.

CONFIDENTIAL BUSINESS INFORMATION

Page 17

Specific sources of collision data include:

- UI Telemetry/D16 – Varying data of interest based on internal needs (may include data regarding AP, charging, UI interactions, etc.); closest to "streaming" telemetry, these files are the smallest, and have the highest chance of upload.

- Event Data Recorder ("EDR") – Following a crash, an urgent alert is immediately transmitted; the alert is a small file that contains crash notification, timestamp, and VIN; and depending on model, may also include vehicle speed, steering angle, pedal applications, and seatbelt status.

- Carlogs – Data regarding vehicle state (*e.g.*, speed, gear, alerts); periodically transmitted pseudonomously, but may be uploaded by VIN via cellular for urgent events (*e.g.*, crash); contains more than 10,000 distinct signals.

- Autopilot Clips (formerly, Snapshots) – Data regarding Autopilot performance (may include video (~30s), CAN traces, and other vital information); collected based on certain trigger conditions (*e.g.*, AEB events, crashes, other topics of interest).

- Other Data Sources:

  - Autopilot Syslogs – Text logs that provide diagnostic information about how the AP computer is functioning.

  - "Triplogs" – Text file uploaded by the Autopilot computer at the end of each trip (*i.e.*, when the vehicle shifts to park); anonymized and contains a very high-level overview of what happened in the trip (*e.g.*, the number of miles driven, the percent of time that the driver was using different functions, at what speeds the car was travelling, how many lane changes were made, etc.).

Remote upload of data (*i.e.*, via cellular or wi-fi networks) greatly depends on vehicle connectivity, cellular reception, vehicle damage, state of power, and crash severity. Upload can range from full to partial to no data sets. The default method for transmitting data is largely determined by urgency and cost. Examples of urgent items that may be transmitted over cellular networks (LTE) include collision data and Early Access Program information. Example of low-cost items that may be transmitted by LTE include small telemetry files (*e.g.*, D16) and triplogs. Everything else is generally transmitted over wi-fi. If there is a collision and the vehicle cannot connect to a wi-fi network, then any data that has a wi-fi-only upload policy (*e.g.*, carlogs) will not be uploaded until the vehicle can again connect to a wi-fi network. If we do not receive data wirelessly, we may be able to retrieve it physically from the vehicle (*e.g.*, by retrieving the EDR module or SD card). There also may be instances where a crash is so severe that physical retrieval does not yield any readable data.

BENAVIDES-00001032

CONFIDENTIAL BUSINESS INFORMATION

Page 18

**Procedures for Investigating Customer Concerns or Specific Incidents**

Tesla collects information regarding potential customer concerns primarily from Tesla service technicians (who are also employees of the Company). Tesla service staff and technicians monitor potential vehicle malfunctions, issues, or complaints from their customers and report this information to field technical specialists, service management, and service engineering through Toolbox.[4] A Tesla service technician may create a Toolbox session for a particular issue involving a specific vehicle or they may report issues appearing on multiple vehicles. The Toolbox session is then the forum for determining the appropriate resolution and escalating topics to service engineering staff, such as where there have been repeat visits for the same issue, an issue that is not covered by existing repair procedures or other service documentation, or an issue that is novel, complex, or otherwise appropriate for escalation based on the service technician's judgment.

Tesla may also learn of potential vehicle malfunctions, issues, and complaints in the field through vehicle telematics, NHTSA VOQs, customer service contacts, social media postings, media reports, and government inquiries.

As items are escalated, they are fed into a twice-weekly forum of responsible engineering leaders, subject matter experts, field quality personnel, and legal staff. The team assesses the issue, determines appropriate actions regarding investigation, data collection, and failure analysis, evaluates root cause, and makes recommendations on appropriate field action if necessary.

In addition, Tesla has implemented a robust, automated process for receiving vehicle crash data that may identify incidents responsive to NHTSA Standing General Order 2021-01, which we explained to NHTSA on August 24 and September 17, 2021[5]. As we explained, through this process, we receive D16 crash records and run a process to check them against EDR and available tow data to determine whether they are responsive to the SGO criteria. Incidents meeting the criteria of the SGO are then reported within 1 day. We also review all reportable events received within a given week at the end of the week to evaluate whether we have received any new information.

---

[4] Toolbox is a proprietary Tesla platform that enables service technicians to capture vehicle details, including photographs, videos, and log data, as well as tag regional leads who may in turn tag subject matter experts and responsible service engineers for assistance diagnosing or repairing a vehicle.

[5] Copies of the September 17, 2021 presentation materials were submitted to NHTSA Chief Counsel under a request for confidential treatment.

BENAVIDES-00001033

CONFIDENTIAL BUSINESS INFORMATION

Page 19

**11. Furnish Tesla's assessment of the impact of the subject system on the subject crashes in the subject vehicle, including:**
   **a. The causal or contributory factor(s);**
   **b. The failure mechanism(s);**
   **c. The failure mode(s);**
   **d. The risk to motor vehicle safety that they pose; and**
   **e. The crashes referenced by this inquiry.**

For our assessment of the 12 crashes identified in the IR letter, please see the Excel file titled, "CBI_PE21-020_Incident List" in the accompanying folder marked for Question 11. As explained during our October 1, 2021 discussion and in our October 6, 2021 email, the full response to Question 11 is dependent upon the response to Question 3, for which we have proposed a rolling submission. To that end, we intend to add an "assessment" column to the responsive spreadsheet for Question 3, similar to what we did for the rolling productions in response to the April 19, 2021 Autopilot IR.

Included in the attached Excel file are Tesla's assessments for each of the 12 incidents. As explained during our October 1, 2021 discussion and in our October 6, 2021 email, the information provided for the 12 incidents in this response is generally duplicative of the information provided in our responses to prior requests from NHTSA about these 12 incidents. Specifically, information about the incidents (available data logs, EDR, clips, and/or answering specific questions or requests from NHTSA, etc.) was previously submitted to the Agency on the following dates:

| Incident Reference | Information Submitted to NHTSA in Response to Agency Requests |
|---|---|
| Charlotte, NC – Aug. 2020 | Feb 5, 2021; May 19, 2021 (duplicative) |
| Cloverdale, IN – Dec. 2020 | Jan 2, 2020; Feb 14, 2020; May 19, 2021 (duplicative) |
| Culver City, CA – Jan 2018 | May 18, 2018 |
| Laguna Beach, CA – May 2018 | Aug. 12, 2019; May 19, 2021 (duplicative) |
| Lansing, MI – March 2021 | March 17, 2021; March 25, 2021; May 19, 2021 (duplicative) |
| Miami, FL – May 2021 | May 29, 2021 |
| Montgomery (Splendora), TX – Feb 2021 | March 7, 2021; May 19, 2021 (duplicative) |
| Norwalk, CT – Dec. 2019 | Dec. 18, 2019; May 19, 2021 (duplicative) |
| Orlando, FL – Aug. 2021 | Aug. 29, 2021; Aug. 30, 2021 (SGO-duplicative) |
| San Diego, CA – July 2021 | July 12, 2021 |
| Tucson, AZ – July 2020 | Sep. 3, 2020; May 19, 2021 (duplicative) |
| W. Bridgewater, MA – Dec. 2019 | Jan. 31, 2020; May 19, 2021 (duplicative) |

As a courtesy, we are providing the same information for the 12 incidents again in the accompanying sub-folders titled by incident location and date in the folder marked for Question 11.

* * *

CONFIDENTIAL BUSINESS INFORMATION

Page 20

Thank you for your consideration. If you have any questions, please contact me at egates@tesla.com.

Sincerely,

Eddie Gates
Director, Field Quality

# EXHIBIT C



U.S. Department of Transportation
**National Highway Traffic Safety Administration**



May 6, 2024

**<u>VIA EMAIL</u>**

Eddie Gates
Director, Field Quality
Tesla, Inc.
45500 Fremont Blvd
Fremont, CA 94538

Subject: Information Request ID RQ24009

Dear Mr. Gates:

This letter is to inform you that the Office of Defects Investigation (ODI) of the National Highway Traffic Safety Administration (NHTSA) has opened a Recall Query (RQ24009) to investigate the remedy effectiveness of Recall 23V838.

**<u>EA22002 and Recall 23V838 Timeline</u>**

In a series of meetings beginning on October 16, 2023, NHTSA reviewed observations and concerns regarding investigation EA22002, Autopilot[1] System Driver Controls, with Tesla. After continued meetings between Tesla and NHTSA, Tesla submitted a recall to NHTSA on December 12, 2023. In describing the safety defect, Tesla's Defect Information Report (DIR) explained that "the prominence and scope of the system's controls may be insufficient to prevent driver misuse," and Tesla committed to the deployment of a multipart remedy aimed at improving system controls and engagement controls and reducing mode confusion. Tesla's five-part remedy involved changes to the system or introduction of new features.

1. Item 1: Mode confusion
   *Remedy:* Add a single-pull activation option for the activation of Autopilot. Enablement of this optional function causes inadvertent steering overrides to disengage both Autosteer and TACC leading to a more pronounced slowdown to alert the driver that Autosteer has been canceled and they must resume immediate control of the vehicle. This function is not default on vehicles who received the remedy in the field and can readily be enabled and disabled by consumers.

2. Item 2: Autopilot can be engaged off-highway

---

[1] The simultaneous engagement of Tesla's Traffic-Aware Cruise Control (TACC) and Autosteer.

*Remedy:* Increase strictness of driver attentiveness requirements when approaching traffic controls off-highway.

3. <u>Item 3: Immediate Driver disengagement upon Autopilot activation</u>
   *Remedy:* Increase driver monitoring in the moments following Autopilot engagement.

4. <u>Item 4: Drivers may disengage from task</u>
   *Remedy:* Introduction of a one-week suspension of Autopilot for drivers who receive three or five forced Autopilot disengagements (depending on cabin camera availability), also called a strikeout. A strikeout occurs after three strikes, which result after an alert escalation or receiving frequent warnings for inattention, however other factors may be required to receive a strike.

5. <u>Item 5: Prominence and size of alerts</u>
   *Remedy:* Enlarge attentiveness notification font and move the alert higher on center screen closer to the driver's range of vision (Model 3 and Model Y only).

**<u>Remedy Concerns</u>**
ODI has identified several concerns regarding the 23V838 remedy:

<u>Crash circumstances:</u>
The preliminary analysis shows that crashes occurred in vehicles with the remedy installed across all three crash types identified in ODI's investigation number EA22002. These crash types are discussed in the document "Additional Information Regarding EA22002" which is available in the investigation file for that investigation. ODI plans to evaluate the impact of the recall remedy on these crash types as well as whether the remedy resolved the defect identified in Safety Recall Report 23V838.

| Crash Type | Total |
|---|---|
| Frontal Plane Struck Vehicle / Object / Person in travel path | 9 |
| Yaw / Spin / Understeer (Low traction environment) | 6 |
| Inadvertent Steering Override (Cancel Autosteer, keep TACC) | 5 |
| ***Total*** | ***20*** |

*Table 1: Preliminary Crash Analysis of Vehicles with the Remedy Installed at the Time of the Incident, Conducted by NHTSA*

<u>VRTC Testing:</u>
NHTSA completed preliminary testing at its Vehicle Research and Test Center (VRTC) . In its evaluation of the remedy, VRTC was unable to identify a difference in the initiation of the driver warning cascade between pre-remedy and post-remedy (camera obscured) conditions. ODI will evaluate the adequacy of recall remedy warnings as part of this investigation.

Remedy Permanence:
Tesla changed the sensitivity and sample window of the increased driver attentiveness requirements after Autopilot engagement (Item 3). ODI will evaluate this change and any other changes in the 23V838 remedy along with their reasons and effects.

Notably, Item 1 of the recall (single pull activation of Autopilot) is not the default setting on vehicles that received the remedy in the field. For those vehicles, the consumer must navigate to a menu and enable the feature. Additionally, the feature can readily be enabled and disabled by the driver. VRTC testing also showed it was possible to make this change while driving.

Non-Remedy Updates:
Tesla has released non-remedy updates related to conditions investigated in EA22002 and identified by NHTSA to Tesla prior to 23V838. The known released non-remedy updates include:

1. Update to reduce Hydroplane (Yaw) Crashes
2. Update to reduce High Speed Captive Turn Lane Collisions

ODI will assess the timing and driving factors behind these updates, their impacts on subject vehicle field performance, and Tesla's basis for not including them in 23V838.


**Information Request**
To support this continued work, we request updated and additional information from Tesla.

Unless otherwise stated in the text, the following definitions apply to this information request:

- **OEDR:** Object and event detection and response or the subtasks of the dynamic driving task (DDT)[2] that include monitoring the driving environment (detecting, recognizing, and classifying objects and events and preparing to respond as needed) and executing an appropriate response to such objects and events (i.e., as needed to complete the DDT and/or DDT fallback).[3]

- **Subject System:** Suite of software, hardware, data, and any other related systems on or off the vehicle that contribute to the conferral of any vehicle capabilities that Tesla labels Level 2 or above, including but not limited to the various "Autopilot" packages, but not including Full-Self Driving Supervised/Beta.

- **Subject Vehicles:** All Tesla vehicles, model years 2014 - 2024, equipped with the subject system at any time, manufactured for sale or lease in the United States, including, but not limited to, the District of Columbia, and current U.S. territories and possessions.

---

[2] "DDT" means the same as and is coterminous with the definition of "Dynamic Driving Task" in SAE J3016, Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles § 3.13 (April 2021).
[3] "OEDR" means the same as and is coterminous with the definition of "Object and Event Detection and Response" in SAE J3016, Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles § 3.20 (April 2021).

4

- **Subject Crashes:** Incidents in which subject vehicles experience a crash in the United States (including any of its territories) with the subject system engaged at any time during the period beginning 30 seconds immediately prior to the commencement of the crash.

- **Non-remedy Update:** any update by Tesla to the subject system on or after September 1, 2023 (regardless of delivery method) that relate to or may relate to the subject crashes, including any such update that is currently under development.

- **Tesla:** Tesla, Inc., all of its past and present officers and employees, whether assigned to its principal offices or any of its field or other locations, including all of its divisions, subsidiaries (whether or not incorporated) and affiliated enterprises and all of their headquarters, regional, zone and other offices and their employees, and all agents, contractors, consultants, attorneys and law firms and other persons engaged directly or indirectly (e.g., employee of a consultant) by or under the control of Tesla (including all business units and persons previously referred to), who are or were involved in any way as of January 1, 2011 with any of the following related to the subject crashes and/or the subject system in the subject vehicles:

  a. Design, engineering, analysis, modification or production (e.g., quality control);
  b. Testing, assessment or evaluation;
  c. Consideration or recognition of potential or actual defects, reporting, record-keeping and information management (e.g., complaints, field reports, warranty information, part sales), analysis, claims, investigations, inquiries, lawsuits or arbitrations; or
  d. Communication to, from, or intended for zone representatives, fleets, dealers, or other field locations, including but not limited to persons who have the capacity to obtain information from dealers.

- **Document:** "Document" is used in the broadest sense of the word and shall mean all original written, printed, typed, recorded, or graphic matter whatsoever, however produced or reproduced, of every kind, nature, and description, and all non-identical copies of both sides thereof, including, but not limited to, papers, letters, memoranda, correspondence, communications, electronic mail (e-mail) messages (existing in hard copy and/or in electronic storage), faxes, mailgrams, telegrams, cables, telex messages, notes, annotations, working papers, drafts, minutes, records, audio and video recordings, data, databases, other information bases, summaries, charts, tables, graphics, other visual displays, photographs, statements, interviews, opinions, reports, newspaper articles, studies, analyses, evaluations, interpretations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, instructions, blueprints, drawings, as-builts, changes, manuals, publications, work schedules, journals, statistical data, desk, portable and computer calendars, appointment books, diaries, travel reports, lists, tabulations, computer printouts, data processing program libraries, data processing inputs and outputs, microfilms, microfiches, statements for services, resolutions, financial statements, governmental records, business records, personnel records, work orders, pleadings, discovery in any form, affidavits, motions, responses to discovery, all transcripts, administrative filings and all mechanical, magnetic, photographic and electronic records or recordings of any kind, including any storage media associated with computers,

including, but not limited to, information on hard drives, floppy disks, backup tapes, and zip drives, electronic communications, including but not limited to, the Internet and shall include any drafts or revisions pertaining to any of the foregoing, all other things similar to any of the foregoing, however denominated by Tesla, any other data compilations from which information can be obtained, translated if necessary, into a usable form and any other documents. For purposes of this request, any document which contains any note, comment, addition, deletion, insertion, annotation, or otherwise comprises a non-identical copy of another document shall be treated as a separate document subject to production. In all cases where original and any non-identical copies are not available, "document" also means any identical copies of the original and all non-identical copies thereof. Any document, record, graph, chart, film or photograph originally produced in color must be provided in color. Furnish all documents whether verified by Tesla or not. If a document is not in the English language, provide both the original document and an English translation of the document.

- **Other Terms:**  To the extent that they are used in these information requests, the terms "claim," "consumer complaint," "dealer field report," "field report," "fire," "fleet," "good will," "make," "model," "model year," "notice," "property damage," "property damage claim," "rollover," "type," "warranty," "warranty adjustment," and "warranty claim," whether used in singular or in plural form, have the same meaning as found in 49 C.F.R. § 579.4.

For my staff to evaluate the 23V838 recall remedy and related matters, certain information is required. Pursuant to 49 U.S.C. § 30166, please provide numbered responses to the following information requests. When documents are produced, the documents shall be produced in an identified, organized manner that corresponds with the organization of this information request letter (including all individual requests and subparts). When documents are produced and the documents would not, standing alone, be self-explanatory, the production of documents shall be supplemented and accompanied by explanation.

Responses to these questions should reply wholly to the request without referencing previously submitted documents.

Please repeat the applicable request verbatim above each response. After Tesla's response to each request, identify the source of the information and indicate the last date the information was gathered.

1. State, by model and model year, the number of subject vehicles Tesla has manufactured for sale or lease in the United States. Separately, for each subject vehicle manufactured to date by Tesla, state the following:
   a. Vehicle identification number (VIN);
   b. Model;
   c. Model Year;
   d. Subject component trade/trim name, part number and design version installed as original equipment, including:
       i. Software version;

      ii.  Firmware version;
      iii.  Hardware version;
      iv.  Cabin Camera installed (yes/no);

e. Date of manufacture;
f. Date warranty coverage commenced;
g. Date subject recall was sent to the vehicle;
h. Date subject recall was installed on the vehicle;
i. The number of strikes the vehicle has received related to Autopilot;
j. The date(s) of the strikes;
k. The number of strikeouts the vehicle has received related to Autopilot;
l. The date(s) of the strikeouts;
m. The number of suspensions the vehicle has received related to Autopilot;
n. The date(s) of the suspensions;
o. Date and mileage of Cabin Camera Data Sharing enabled;
p. The state or territory in the United States where the vehicle was originally sold or leased (or delivered for sale or lease);
q. Latest known vehicle mileage and commensurate date;
r. Subject component trade/trim name, part number and design version installed as an aftersales customer-requested upgrade; including:
      i.  Software version;
      ii.  Firmware version;
      iii.  Hardware version;
      iv.  Cabin Camera installed (yes/no);
s. Whether the vehicle ever had Full-Self Driving Supervised/Beta including free trials;
      i.  Start date of Full-Self Driving enrollment Supervised/Beta;
      ii.  End date of Full-Self Driving Supervised/Beta enrollment;
t. Date and identities of the most recent software, firmware, and hardware updates, including but not limited to all such updates related to the subject recall.

Provide the table in Microsoft Access 2010, or a compatible format, entitled "PRODUCTION DATA."


2. Provide the cumulative mileage covered by Model/Model Year and HW (Autopilot hardware) version in the following categories:
a. January 2021 through December 12, 2023 by month starting on the first of the month;
      i.  With the subject system in use; and
      ii.  Without the subject system in use.
b. Post December 12, 2023 by week, with a week defined as seven days starting on Sunday;
      i.  With the subject system in use and the subject recall remedy installed;
      ii.  With the subject system in use and without the subject recall remedy installed; and
      iii.  Without the subject system in use.

A pre-formatted data collection file, which provides further details regarding this submission, will be provided to you.

3. Describe in detail the process (including supporting engineering and safety assessment evidence and any other relevant information) by which Tesla decided to file the Part 573 Safety Recall Report assigned No. 23V838.

Provide copies of all documents related to Tesla's decision, regardless of whether the documents are in interim, draft, or final form.

4. Describe in detail, separately for each non-remedy update relating to the subject system, the process used to formulate and deploy that update (including supporting engineering and safety assessment, evidence and any other information) including but not limited to:
   a.    The reasoning regarding why the update was not included in Recall 23V838;
   b.    How the update relates to crash types investigated in EA22002;
   c.    How the problem/issue was identified;
   d.    The expected crash reduction related to the update;
   e.    The actual crash reduction related to the update;
   f.    Tesla's assessment regarding the safety implications of the update; and
   g.    State whether Tesla intends to file a safety recall pursuant to 49 U.S.C. § 30118 covering
      this update. If not, please furnish Tesla's technical and/or legal basis for declining to do so.

Provide copies of all documents related to these updates, regardless of whether the documents are in interim, draft, or final form.

5. Furnish a count of Hands-on-Wheel warnings displayed by the subject system by Model/Model Year and HW version in the following categories:
   a.  January 2021 through December 12, 2023 by month starting on the first of the month;
   b.    Post December 12, 2023 by week, with a week defined as seven days starting on Sunday;
         i.  With the subject recall remedy installed; and
         ii.  Without the subject recall remedy installed.

6. Explain and describe in detail the process, engineering and safety explanation, evidence, and information used for design decisions regarding Tesla's decision to implement a single-pull activation option for the activation of Autopilot as part of the remedy for recall 23V838, including but not limited to:
   a.  Explain how this aspect of the remedy addresses the defect;
   b.  All reasoning, engineering rationale, and all relevant information used to design this feature;
   c.  What human factors[4] considerations and principles were used when designing this feature;

---

[4] See, e.g., https://www.hfes.org/About-HFES/What-is-Human-Factors-and-Ergonomics.

      i. Explain how the design was validated using human factors (including, but not limited to human participant evaluations);

     ii. Identify the identifier in part e of this Request;

d. State whether Tesla calculated a predicted effectiveness percentage concerning crashes addressed by this feature.

      i. If so, provide this value;

     ii. Explain in detail how this value was calculated including where the analysis variables originated;

e. Describe all assessments, analyses, tests, test results, studies, surveys, simulations, investigations, inquiries and/or evaluations (collectively, "actions") that relate to, or may relate to, this item in the subject recall in the subject vehicles that have been conducted, are being conducted, are planned, or are being planned by, or for, Tesla. For each such action, provide the following information:

      i. Action title or identifier;

     ii. The actual or planned start date;

    iii. The actual or expected end date;

    iv. Brief summary of the subject and objective of the action;

     v. Engineering group(s)/supplier(s) responsible for designing and for conducting the action;

    vi. A brief summary of the findings and/or conclusions resulting from the action;

f. For all deployed modification/changes to this item, provide separately:

      i. The identifier/title related to this item in Request 15;

     ii. Explain in detail the reasons for this modification/change;

    iii. Explain how this modification/change impacts the effectiveness of this feature;

g. Explain the reasoning, engineering rationale, and all relevant information used regarding the decision to allow vehicle owners to revert the single pull feature to the prior double pull activation setting;

h. Explain the reasoning, engineering rationale, and all relevant information used regarding the decision for the single pull activation setting not to be the default activation setting on vehicles subject to recall 23V838;

i. Describe the consumer facing notifications and communications regarding the single pull activation setting, including but not limited to feature description and feature enablement. Provide dates that all consumer facing notifications and communications were first issued or appeared in vehicles; and

j. Provide the number of vehicles with the single pull feature active and inactive by week and model/model year, with a week defined as seven days starting on Sunday, since the introduction of the recall remedy.

Provide copies of all documents related to the action, regardless of whether the documents are in interim, draft, or final form. Organize the documents by parts a - j.

7. Explain and describe in detail the process, engineering and safety explanation, and evidence for design decisions regarding Tesla's decision to increase the strictness of driver attentiveness requirements when approaching traffic controls off-highway as part of the remedy for recall 23V838, including but not limited to:

a. Explain how this item of the remedy addresses the defect;

    b.    All reasoning, engineering rationale and all relevant information used to design this

    feature;

    c.    What human factors considerations and principles were used when designing this feature;

        i.  Explain how the design was validated using human factors (including, but not limited to human participant evaluations);

       ii.  Identify the identifier in part e of this Request;

d. State whether Tesla calculated a predicted effectiveness percentage concerning crashes addressed by this feature.

        i.  If so, provide this value;

       ii.  Explain in detail how this value was calculated including where the analysis variables originated;

e. Describe all assessments, analyses, tests, test results, studies, surveys, simulations, investigations, inquiries and/or evaluations (collectively, "actions") that relate to, or may relate to, this item in the subject recall in the subject vehicles that have been conducted, are being conducted, are planned, or are being planned by, or for, Tesla. For each such action, provide the following information:

        i.  Action title or identifier;

       ii.  The actual or planned start date;

      iii.  The actual or expected end date;

       iv.  Brief summary of the subject and objective of the action;

       v.  Engineering group(s)/supplier(s) responsible for designing and for conducting the action;

       vi.  A brief summary of the findings and/or conclusions resulting from the action;

    f.    For all deployed modification/changes to this item, provide separately:

        i.  The identifier/title related to this item in Request 15;

       ii.  Explain in detail the motivation for this modification/change;

      iii.  Explain how this modification/change impacts the effectiveness of this feature;

g. Explain the triggering criteria for increased monitoring of this feature;

h. Explain in detail the requirements for a driver to receive alerts under this item; and

i. The number of Hands-on-Wheel Warnings by week with a week defined as seven days starting on Sunday, by Model and HW version, displayed by the subject system related to this aspect of the remedy.

Provide copies of all documents related to the action, regardless of whether the documents are in interim, draft, or final form. Organize the documents by parts a - i.

8. Explain and describe in detail the process, engineering and safety explanation, and evidence for design decisions regarding Tesla's decision to increase driver monitoring in the moments following Autopilot engagement as part of the remedy for recall 23V838, including but not limited to:

a. Explain how this item of the remedy addresses the defect;

b.  All reasoning, engineering rationale and all relevant information used to design this feature;

c.  What human factors considerations and principles were used when designing this feature;

    i.  Explain how the design was validated using human factors (including, but not limited to human participant evaluations);

    ii.  Identify the identifier in part e of this Request;

d.  State whether Tesla calculated a predicted effectiveness percentage concerning crashes addressed by this feature.

    i.  If so, provide this value;

    ii.  Explain in detail how this value was calculated including where the analysis variables originated;

e.  Describe all assessments, analyses, tests, test results, studies, surveys, simulations, investigations, inquiries and/or evaluations (collectively, "actions") that relate to, or may relate to, this item the subject recall in the subject vehicles that have been conducted, are being conducted, are planned, or are being planned by, or for, Tesla. For each such action, provide the following information:

    i.  Action title or identifier;

    ii.  The actual or planned start date;

    iii.  The actual or expected end date;

    iv.  Brief summary of the subject and objective of the action;

    v.  Engineering group(s)/supplier(s) responsible for designing and for conducting the action;

    vi.  A brief summary of the findings and/or conclusions resulting from the action;

f.    For all deployed modification/changes to this item, provide separately:

    i.  The identifier/title related to this item in Request 15;

    ii.  Explain in detail the motivation for this modification/change;

    iii.  Explain how this modification/change impacts the effectiveness of this feature ;

g.  Explain the triggering criteria for increased driver monitoring of this item;

h.  Explain in detail the requirements for a driver to receive alerts under this item; and

i.  Provide the number of Hands on Wheel Warnings by week with a week defined as seven days starting on Sunday, by Model, Model Year and HW version, displayed by the subject system related to this feature of the remedy.

Provide copies of all documents related to the action, regardless of whether the documents are in interim, draft, or final form. Organize the documents by parts a - i.

9.  Explain and describe in detail the process, engineering and safety explanation and evidence for design decisions regarding Tesla's decision to implement a one-week suspension policy based on accumulated strikeouts as part of the remedy for recall 23V838, including but not limited to:

a.      Explain how this item of the remedy addresses the defect;

b.      All reasoning, engineering rationale, and all relevant information used to design this feature;

c.      What human factors considerations and principles were used when designing this

feature;

      i. Explain how the design was validated using human factors (including, but not limited to human participant evaluations);

      ii. Identify the identifier in part e of this Request;

d. State whether Tesla calculated a predicted effectiveness percentage concerning crashes addressed by this feature.

      i. If so, provide this value;

      ii. Explain in detail how this value was calculated including where the analysis variables originated;

e. Describe all assessments, analyses, tests, test results, studies, surveys, simulations, investigations, inquiries and/or evaluations (collectively, "actions") that relate to, or may relate to, this item in the subject recall in the subject vehicles that have been conducted, are being conducted, are planned, or are being planned by, or for, Tesla. For each such action, provide the following information:

      i. Action title or identifier;

      ii. The actual or planned start date;

      iii. The actual or expected end date;

      iv. Brief summary of the subject and objective of the action;

      v. Engineering group(s)/supplier(s) responsible for designing and for conducting the action;

      vi. A brief summary of the findings and/or conclusions resulting from the action;

      f. For all deployed modifications/changes to this item provide separately:

      i. The identifier/title related to this item in Request 15;

      ii. Explain in detail the motivation of this modification/change;

      iii. Explain how this modification/change impact the effectiveness of this feature;

g. Explain in detail the requirements for a driver to receive strikes under this item; and

h. The number of strikes, strikeouts, and suspensions incurred through use of the subject system by week with a week defined as seven days starting on Sunday and by Model, Model Year and HW.

Provide copies of all documents related to the action, regardless of whether the documents are in interim, draft, or final form. Organize the documents by parts a - h.

10. Explain and describe in detail the process, engineering and safety explanation and evidence for design decisions regarding Tesla's decision to increase the size and prominence of driver facing alerts and warnings as part of the remedy for recall 23V838, including but not limited to:

a. Explain how this item of the remedy addresses the defect;

b. All reasoning, engineering rationale and all relevant information used to design this feature;

c. What human factors considerations and principles were used when designing this feature;

      i. Explain how the design was validated using human factors (including, but not limited to human participant evaluations);

      ii. Identify the identifier in part e of this Request;

    d. State whether Tesla calculated a predicted effectiveness percentage concerning crashes addressed by this feature.
   - i. If so, provide this value;
   - ii. Explain in detail how this value was calculated including where the analysis variables originated;

    e. Describe all assessments, analyses, tests, test results, studies, surveys, simulations, investigations, inquiries and/or evaluations (collectively, "actions") that relate to, or may relate to, this item in the subject recall in the subject vehicles that have been conducted, are being conducted, are planned, or are being planned by, or for, Tesla. For each such action, provide the following information:
   - i. Action title or identifier;
   - ii. The actual or planned start date;
   - iii. The actual or expected end date;
   - iv. Brief summary of the subject and objective of the action;
   - v. Engineering group(s)/supplier(s) responsible for designing and for conducting the action;
   - vi. A brief summary of the findings and/or conclusions resulting from the action.

    f. For all deployed modifications/changes to this item provide separately:
   - i. The identifier/title related to this item in Request 15;
   - ii. Explain in detail the motivation of this modification/change;
   - iii. Explain how this modification/change impact the effectiveness of this feature.

Provide copies of all documents related to the action, regardless of whether the documents are in interim, draft, or final form. Organize the documents by parts a - f.

11. Describe Tesla's use of human factor science in its design and sustainment of the subject system, including but not limited to:
    a. Tesla's design process as it relates to human factors;
    b. Tesla's assessment of the importance of human factors;
    c. The human factors validation of the subject system;
    d. Identify each and every job or position title related to human factors involving the design and development of the subject system since the inception of the subject system:
   - i. Identify the role;
   - ii. Number of employees that hold this role currently (noting vacancies);
   - iii. Role creation date;
   - iv. Typical prior experience historically;
   - v. Typical education historically;
   - vi. Required prior human factors experience historically;
   - vii. State whether this position still exists;
     - (1) If not, provide the end date of the position and explain why this position no longer exists.

Provide copies of all documents related to the action, regardless of whether the documents are in interim, draft, or final form. Organize the documents.

12. Describe the role that the cabin camera plays in the enforcement of driver engagement / attentiveness and the manner in which its inputs are factored into the subject system's operation prior to, and after, December 12, 2023, including but not limited to:

    a. Whether changes relating to the cabin camera were incorporated into the remedy for recall 23V838;

    b. The impact of any changes on driver engagement alert types and timing and how those changes integrate with the existing engagement strategy;

    c. Recoverable data elements pointing to the cabin camera's influence either via telemetry or from the vehicle's onboard storage; and

    d. The cabin camera's impact on driver alerting and recoverable data if the driver does not opt to share data from the camera with Tesla.


13. Explain in detail the process Tesla uses to learn of/identify crashes reportable under NHTSA's Standing General Order 2021-01 ("the SGO") including but not limited to current and previously used sources.


14. Explain in detail for each source identified in Question 13 the following:

    a. The start date of the source's use;

    b. The end date of the source's use;

    c. Whether Tesla receives information from this source by notification or whether Tesla actively searches this source;

        i. If the source is searched, how often is a search performed;

    d. The number of crashes initially identified (prior to qualification by Tesla) by this source by month;

    e. All search and system constraints of the source;

    f. Enabling criteria which would result in Tesla being aware of a reportable crash;

    g. All changes and modifications to the source or in the search method of the source since Tesla was first served with the SGO including but not limited to any changes in c – f :

        i. The date or approximate date on which the modification or change was incorporated;

        ii. A detailed description of the modification or change;

        iii. The reason(s) for the modification or change; and

        iv. How the modification or change effects Tesla's reporting pursuant to the SGO.

    Provide copies of all policies, procedures, and documents referenced in response to a-g.


15. For each trade name/trim level of the subject system available in the subject vehicles, describe all modifications or changes made by, or on behalf of, Tesla in the design, material composition, manufacture, quality control, supply, function, or installation of the subject system that relate to, or may relate to, driver engagement/attentiveness and OEDR by the subject system in the subject vehicles since July 1, 2023. For each such modification or change, provide the following information:

    a. Action title or identifier;
    b. The date or approximate date on which the modification or change was incorporated into vehicle production;
    c. A detailed description of the modification or change;
    d. The reason(s) for the modification or change;
    e. If the change is related to the remedy for recall 23V838;
        i. What aspects(s)of the remedy is affected;
    f. The hardware, firmware, and software names and numbers of the original version;
    g. The hardware, firmware, and software names and numbers of the modified version;
    h. Primary distribution method of related firmware and software updates (over the air or in-person service); and
    i. When the modified version / update was made available as a service component.

Also, provide the above information for any modification or change that Tesla is aware of which may be incorporated into vehicle production or pushed to subject vehicles in the field within the next 120 days.

A pre-formatted data collection file, which provides further details regarding this submission, will be provided to you.


16. For all subject crashes of which Tesla is aware, including but not limited to crashes previously reported pursuant to the SGO after December 12, 2023, provide the following:
    a. VIN;
    b. Incident date and time;
    c. Location of the crash;
    d. Road class type;
    e. SGO number;
    f. Driving mode;
    g. Remedy on vehicle at the time of incident;
    h. Related remedy items;
    i. Firmware at the time of incident;
    j. Number of Hands on Wheel Alerts in the incident drive cycle;
        i. Visual
        ii. Audible
        iii. Visual + Audible
    k. Time interval between last Hands on Wheel alert and collision;
    l. Last Hands on Wheel Alert Type (visual, audible, visual + audible)
    m. Strikes at time of incident;
    n. Strikeouts at time of incident;
    o. Speed at impact; and
    p. List the available documents related to this incident including but not limited to:
        i. Time interval between last Hands-on-Wheel alert and collision;
        ii. EDR
        iii. CAN logs
        iv. Video/imagery

      v.  PAR

Provide copies of all documents referenced in response to Request 16 part p.

A pre-formatted data collection file, which provides further details regarding this submission, will be provided to you.

17. Furnish copies of all internal and external communications that are related to or may relate to the subject recall and subject non-remedy updates, including but not limited to communications that are related to or may relate to the following:
    a.  Tesla's safety defect determination decision making;
    b.  Issue investigation;
    c.  Action design including human factors considerations (initial and modifications); and
    d.  Testing.

Organize response documents in chronological order and identify the following: sender, receiver(s), subject, and date sent.

## Legal Authority for This Request

This letter is being sent to Tesla pursuant to 49 U.S.C. § 30166, which authorizes NHTSA to conduct any investigation that may be necessary to enforce Chapter 301 of Title 49 and to request reports. It constitutes a new request for information.

## Civil Penalties

Tesla's failure to respond promptly and fully to this letter could subject Tesla to civil penalties pursuant to 49 U.S.C. § 30165 or lead to an action for injunctive relief pursuant to 49 U.S.C. § 30163. (Other remedies and sanctions are available as well.) The Vehicle Safety Act, 49 U.S.C. § 30165(a)(3), provides for civil penalties of up to $27,168 per violation per day, with a maximum of $135,828,178 for a related series of daily violations, for failing or refusing to perform an act required under 49 U.S.C. § 30166. *See* 49 C.F.R. § 578.6(a)(3). Such violations include failing to respond completely, accurately, or in a timely manner to ODI information requests.

If Tesla cannot respond to any specific request or subpart(s) thereof, please state the reason why it is unable to do so. If on the basis of attorney-client privilege, attorney work product protection, or other privilege or protection, Tesla does not submit one or more requested documents or items of information in response to this information request, Tesla must provide a privilege log identifying each document or item withheld, and stating the date, subject or title, the name and position of the person(s) from, and the person(s) to whom it was sent, and the name and position of any other recipient (to include all carbon copies or blind carbon copies), the nature of that information or material, and the basis for the claim of privilege and why that privilege applies.

## Confidential Business Information

If Tesla's response contains any information that you claim is confidential business information (CBI), Tesla must request two secure electronic file transfer links from Alexa Ardron at alexa.ardron@dot.gov. One secure electronic file transfer link is for your request for confidential treatment. Please see enclosure 1 for additional instructions on submitting a request for confidential treatment that is compliant with 49 C.F.R. Part 512 (specifically, a request for confidential treatment must include the four required parts that are discussed in enclosure 1). The second secure electronic file transfer link is for your non-confidential response to this letter. Do not submit any confidential business information in your non-confidential submission. Please refer to RQ24009 in Tesla's response to this letter and in a request for confidential treatment that Tesla may submit.

In addition to submitting your request for confidential treatment and any files containing CBI through the secure electronic file transfer link, as a CBI Portal Pilot participant, you will also need to submit your request and files containing CBI to NHTSA's Office of the Chief Counsel via the CBI Portal. If you do not submit your request and files containing CBI to NHTSA's Office of the Chief Counsel via the CBI Portal, you must notify the investigator referenced in this IR to ensure that the secure file transfer link for your request for confidential treatment is directed to the Office of the Chief Counsel accordingly.

**Due Date**

Tesla's response to this letter must be submitted to this office by July 1, 2024. If Tesla finds that it is unable to provide all of the information requested within the time allotted, Tesla must request an extension from me at gregory.magno@dot.gov no later than five business days before the response due date. If Tesla is unable to provide all of the information requested by the original deadline, it must submit a partial response by the original deadline with whatever information Tesla then has available, even if an extension has been granted.

If you have any technical questions concerning this matter, please contact Alexa Ardron of my staff at alexa.ardron@dot.gov.

Sincerely,

# Gregory Magno

Gregory Magno, Chief
Vehicle Defects Division - D
Office of Defects Investigation

Enclosure 1, Information for Requests for Confidential Treatment.

All pre-formatted data collection files will be provided after a meeting regarding these requests.

ENCLOSURE 1 – INFORMATION FOR REQUESTS FOR CONFIDENTIAL TREATMENT

If you believe that your response contains any material that you claim is confidential business information, submit these materials to NHTSA's Office of the Chief Counsel in accordance with 49 C.F.R. Part 512. **All requests for confidential treatment must be submitted directly to the Office of the Chief Counsel. Upon request, ODI will provide you with a secure file transfer link for your submission to the Office of the Chief Counsel.**

**In addition, as a CBI Portal Pilot participant, you will also need to submit your request and files containing CBI to NHTSA's Office of the Chief Counsel via the Confidential Business Information Portal. If you are not currently registered for the CBI Portal, please send a registration request to cbi-helpdesk@dot.gov.**

Requests for confidential treatment are governed by Part 512. A current version of this regulation is available on the internet at https://www.ecfr.gov/current/title-49/subtitle-B/chapter-V/part-512.

How to request confidential treatment:

NHTSA is currently treating electronic submission as an acceptable method for submitting confidential business information to the agency under Part 512. If you claim that any of the information or documents provided in your response constitutes confidential business information within the meaning of 5 U.S.C. § 552(b)(4) or are protected from disclosure pursuant to 18 U.S.C. § 1905, you must request a secure file transfer link from the ODI contact listed in your Information Request. ODI will copy a representative from the Office of the Chief Counsel on the secure file transfer link for your request for confidential treatment. You must submit supporting information together with the materials that are the subject of the confidentiality request, in accordance with Part 512, to the Office of the Chief Counsel. Do not send a hard copy of a request for confidential treatment to NHTSA's headquarters.

Your request must include a request letter that contains supporting information, pursuant to Part 512.8. Your request must also include a certificate, pursuant to Part 512.4(b) and Part 512, Appendix A.

You are required to submit one unredacted "confidential version" of the information for which you are seeking confidential treatment. Pursuant to Part 512.6, the words "ENTIRE PAGE CONFIDENTIAL BUSINESS INFORMATION" or "CONFIDENTIAL BUSINESS INFORMATION CONTAINED WITHIN BRACKETS" (as applicable) must appear at the top of each page containing information claimed to be confidential. Where not all information on a page is claimed to be confidential, identify each item of information for which confidentiality is requested within brackets: "[   ]."

You are also required to submit one redacted "public version" of the information for which you are seeking confidential treatment. Pursuant to Part 512.5(a)(2), the redacted "public version" should include redactions of any information for which you are seeking confidential treatment (i.e., the only information that should be unredacted is information for which you are **not** seeking confidential treatment).

For questions about a request for confidential treatment, please contact Dan Rabinovitz in the

Office of the Chief Counsel at Daniel.Rabinovitz@dot.gov or (202) 366-8534.

# CERTIFICATE OF SERVICE

We hereby certify that on May 21, 2024, the foregoing document was served electronically to all counsel of record listed as follows:

| | |
|---|---|
| **Adam T. Boumel, Esq.** Florida Bar No. 0110727 **Darren J. Rousso, Esq.** Florida Bar No. 97410 THE ROUSSO, BOUMEL LAW FIRM, PLLC 9350 South Dixie Highway Suite 1520 Miami, FL 33156 Tel. 305-670-6669 Adam@roussolawfirm.com darren@roussolawfirm.com pleadings@roussolawfirm.com *Attorneys for Plaintiff Dillon Angulo* | **Todd Poses, Esq.** Florida Bar No. 0075922 POSES & POSES, P.A. Alfred I. Dupont Building 169 East Flagler Street, Suite 1600 Miami, FL 33131 Tel. 305-577-0200 Fax: 305-371-3550 tposes@posesandposes.com maria@posesandposes.com *Attorneys for Plaintiff Neima Benavides* |
| **Whitney V. Cruz, Esq.** Florida Bar No. 800821 **BOWMAN AND BROOKE LLP** Two Alhambra Plaza, Suite 800 Coral Gables, FL 33134 Tel. 305-995-5600 / Fax: 305-995-6100 whitney.cruz@bowmanandbrooke.com *Attorneys for Defendant Tesla, Inc.* | **Douglas F. Eaton, Esq.** Florida Bar No. 0129577 EATON & WOLK PL 2665 South Bayshore Drive, Suite 609 Miami, FL 33133 Tel. 305-249-1640 Fax: 786-350-3079 deaton@eatonwolk.com cgarcia@eatonwolk.com lhuete@eatonwolk.com *Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides* |
| **THOMAS P. BRANIGAN** (Admitted *Pro Hac Vice*) **DREW P. BRANIGAN** (Admitted *Pro Hac Vice*) | |

| **BOWMAN AND BROOKE LLP** 101 W. Big Beaver Road, Suite 1100 Troy, MI 48084 Tel. 248-205-3300 / Fax: 248-205-3399 thomas.branigan@bowmanandbrooke.com drew.branigan@bowmanandbrooke.com *Attorneys for Defendant Tesla, Inc.* | |

*/s/ Ericka Elms*
Ericka Elms