```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                       CASE NO. 21-21940 BLOOM
 3

 4   NEIMA BENAVIDES, et al,              Miami, Florida

 5       Plaintiffs,                      April 4, 2024

 6          vs.                           TRANSCRIPTION FROM
                                          RECORDING
 7   TESLA, INC.,

 8       Defendant.                       Pages 1 to 66
     _____
 9


10                    PLAINTIFF'S MOTION TO COMPEL
11             BEFORE THE HONORABLE EDWIN G. TORRES
                  UNITED STATES MAGISTRATE JUDGE
12
     APPEARANCES:
13
     FOR THE PLAINTIFF:        ADAM BOUMEL, ESQ.
14                             ROUSSO BOUMEL LAW FIRM
                               9350 South Dixie Highway
15                             Suite 1520
                               Miami, FL  33156
16

17                             TODD POSES, ESQ.
                               POSES LAW GROUP
18                             169 East Flagler Street
                               #1600
19                             Miami, FL  33131
                               Shelly@poseslawgroup.com
20

21                             ELISE R. SANGUINETTI, ESQ.
                               ARIAS SANGUINETTI WANG & TORRIJOS, LLP
22                             2200 Powell Street, Suite 740
                               Emeryville, CA  94608
23                             Elise@aswtlawuers.com

24

25
```

```
 1    APPEARANCES (Cont'd)

 2
      FOR THE DEFENDANT:          WHITNEY V. CRUZ, ESQ.
 3                                Bowman & Brooke
                                  Two Alhambra Plaza
 4                                Suite 800
                                  Coral Gables, FL 33134
 5

 6

 7                                 —       —       —

 8

 9
                      STENOGRAPHICALLY REPORTED BY:
10
                                  SHARON VELAZCO, RPR, FPR
11                                Official Court Reporter
                                  United States District Court
12                                400 North Miami Avenue
                                   Miami, Florida 33128
13

14

15                                 —       —       —

16

17

18

19

20

21

22

23

24

25
```

1          (The following is a transcription from a recording.)

2          THE COURTROOM DEPUTY:  The United States District Court

3     for the Southern District of Florida is now in session.  The

4     Honorable Chief Magistrate Judge Edwin G. Torres presiding;

5     calling case of Neima Benavides versus Tesla, Incorporated,

6     Case Number 21-21940, civil, Judge Bloom.

7          Counsel, please state your appearances for the record

8          MR. BOUMEL:  Adam Boumel and Todd Poses on behalf of

9     the plaintiffs.

10         MS. CRUZ:  I am sorry, I think -- aren't there

11    plaintiffs' attorneys on the phone?

12         THE COURT:  Oh, there is somebody on the phone?

13         MS. SANGUINETTI:  Yes, your Honor.  Elise Sanguinetti

14    on behalf of plaintiff.

15         THE COURT:  Thank you.

16         MS. CRUZ:  Whitney Cruz on behalf of Tesla, Inc.

17         THE COURT:  Good afternoon, Whitney.

18         This is a discovery hearing requested by one of the

19    parties in the case -- I believe by the defendant, as I recall.

20    Right?

21         MR. BOUMEL:  No, your Honor.  It was originally

22    requested by the plaintiff, but Tesla added -- agreed to, so --

23         THE COURT:  So, back to the plaintiff?

24         MR. BOUMEL:  I think we are going to be here -- not

25    quite as long as last time.

1          THE COURT:  Oh, good.  In that case, then I will turn

2    it to you, Mr. Boumel.

3          MR. BOUMEL:  Thank you, your Honor.

4          So, the first issue that we have today, your Honor, IS

5    our request for -- plaintiffs' request to modify the protective

6    order.

7          Early on in the case, we -- Tesla asked us to do -- to

8    enter into a protective order for the production of their

9    confidential documents.  We had a disagreement on the scope.

10   We had an argument in front of the former magistrate on the

11   file, and, the former magistrate on the file limited the

12   sharing provisions to the specific year and model of the Tesla

13   at issue in this case.

14         And, since that time, obviously, this -- you have been

15   made aware of there has been a recall, and the recall touches

16   every single Tesla manufactured and sold in the United States.

17   And, that recall addresses two of the key allegations that are

18   central to this case; specifically, Tesla's failure to

19   geofence, and -- which means limited use of autopilot arose,

20   that it was designed to be used on, which is highways,

21   limited-access highways, and this accident happened on a

22   nonlimited-access highway, which was one of the major issues in

23   this case, as well as -- the issue also addressed giving more

24   prominent warnings to inattentive drivers and have a -- having

25   a more robust driver monitoring system, which is also a central

1    issue to this case.

2         So, the recall touched on two issues that are central

3    to this case, and it applied to every single model or every

4    single Tesla that was made up.  It addressed autopilot and auto

5    steer.

6         It didn't differentiate between models.  It didn't

7    differentiate between years.  It is every single Tesla with

8    autopilot, which is every Tesla.

9         So, we are asking the Court to modify the protective

10   order to allow for sharing with other cases involving

11   allegations of autopilot negligence.

12        That is all I've got for you on that, your Honor.

13        THE COURT:  And, just specifically, what provision are

14   you talking about?

15        MR. BOUMEL:  When you say, "which provision" --

16        THE COURT:  Of the protective order.

17        MR. BOUMEL:  The provision of the protective order, the

18   sharing, we are currently only allowed to share with other

19   cases that involving a 2018, 2019 model S.  We are asking for

20   that to be changed to allow sharing with any other cases

21   involving allegations of issues related to autopilot, because

22   the product is autopilot, the product at issue in this case is

23   autopilot, and not auto steer, not a 2019 model S.

24        And, I think, if you were thinking of it, you know, in

25   terms of other cases, that go, for instance, to like a

1    defective airbag case, right, it doesn't matter if it is in a

2    Hyundai or it doesn't matter if it is in a Honda, or any other

3    car, the product is the airbags in those cases.  And here, it

4    is the same thing.  It doesn't matter if this is a 2019, 2018,

5    or model S, model i, model 3.  They all have the same product.

6           THE COURT:  And what, I see now the paragraph, sharing

7    paragraph.  In 17, 16.

8           So, the language that you are talking about is 16I,

9    "Other attorneys of record in pending lawsuits against Tesla,

10   involving the same alleged defect claims as stated in the

11   complaint and involving a 2019 Tesla model S."

12          MR. BOUMEL:  That is it, your Honor.

13          THE COURT:  And, tell me what the, just so I

14   understand, what is the -- how does it benefit the plaintiff to

15   be able to do that with other lawyers in other cases?

16          MR. BOUMEL:  Frankly, it doesn't affect us, your Honor;

17   but, it enables a more free-flow of information on these cases

18   throughout the country.  There are a -- in terms of a number of

19   other cases throughout country, and plaintiffs across the

20   country are now moving for this because we believe it is in,

21   you know, judicial efficiency to allow for sharing among

22   different plaintiffs and different litigants across the

23   country.

24          THE COURT:  How so?

25          MR. BOUMEL:  Well, because they are trying to silo it.

 1    They are trying to limit everything, everybody to what they

 2    produce in that specific case, and "Here is your universe of

 3    information that you are allowed to utilize," when we know that

 4    there is a much broader universe of information available.

 5         And, different law firms throughout the country have

 6    different information.  It all relates to the same product.  It

 7    all relates to the same allegations of product defect.  So, why

 8    should a lawyer in Colorado have access to documents that we

 9    don't get in this case, and why should we have access to

10    documents that they don't have for a case in California, or

11    wherever it may be.  It is the same product, same, you know --

12    it is the same product.

13         And, autopilot is on trial right now.  I mean, there is

14    trials going on as we speak, trials about the start -- we are

15    going to trial on November.  This is an important issue, and

16    there is no justification or rationale for saying, "Hey, if you

17    have information in one case about defects, you shouldn't be

18    allowed to share it with these parties in this other case

19    regarding that same defect."

20         THE COURT:  But, that -- doesn't that undermine the

21    purpose of a protective order, which is to keep everything

22    having -- everything that was procured in connection with a

23    case, within the case?

24         MR. BOUMEL:  The purpose of a protective order is to

25    protect their confidential information and their business

1    interests, not to give them litigation advantage.

2         THE COURT:  But, how do they do it in this case?

3         I don't understand.

4         MR. BOUMEL:  Well, if they get a litigation advantage,

5    they get to silo each case and have attorneys not being able to

6    share with each other, or across the country, and then they

7    gain a litigation advantage, right, they -- they have -- you

8    know, these attorneys in this state don't know information that

9    was discovered by these attorneys in this state.

10        And, this case, they know information that these other

11   attorneys don't know.

12        That's -- that's what this is designed to do.

13        I mean, from an overall view, what a protective order

14   is supposed to do is it is supposed to protect their business

15   information so they don't lose any commercial advantages,

16   right, that is outside of the scope of litigation.

17        Or, hear, what we are saying is, "Of course, your guy's

18   information deserves to be protected from any unauthorized

19   disclosure which would conceivably affect your business

20   interests."

21        That goes without saying; but, at the same time, if

22   there is evidence in a case in California that they discover

23   and it pertains to our case, why don't we get that?

24        I mean, we should be able to get that.  That is a

25   free-flow of information, and it is -- it is freely -- just the

 1    only reason not to do that, is to get to stall litigation.

 2         THE COURT:  So, you would change language how, again?

 3         MR. BOUMEL:  We would change it to -- what I would

 4    propose is to say it applies to any actions against us where

 5    there are allegations of defects or issues with autopilot and

 6    auto steering.

 7         THE COURT:  All right.  Well, let me turn to the

 8    defendant.

 9         What is wrong with that?

10         MS. CRUZ:  I think it is important to understand the

11    background of counsel.

12         THE COURT:  Microphone, or lectern.

13         MS. CRUZ:  I have never been accused of being too

14    quiet.  I am going to pass that on to my family.

15         This protective order was -- is the product of

16    extensive negotiations that just took place about, I don't

17    know, eight months ago, in mid 2023.

18         And, one of the things that the parties could not agree

19    on was the sharing provision.  And, so, there was a hearing, I

20    believe it was in June of 2023, in front of Judge Otazo-Reyes,

21    and she decided, amongst other things, the sharing provision.

22         And, the scope that plaintiff is proposing now is the

23    same exact scope that they were proposing last year.  And, the

24    scope of the protective order currently is the same that Tesla

25    is proposing should stay in place.  Nothing is different.

1   Nothing has changed.

2         And, just to put a fine point on what plaintiffs are

3   asking for, because I don't know that it was made clear, what

4   they are asking for is they want to be able to share highly

5   confidential, proprietary Tesla design documents with every

6   single other attorney in every case in the country in regards

7   to any Tesla vehicle -- Tesla vehicles first started coming out

8   in 2014 -- any Tesla vehicle.

9         So, that's ten model years of vehicle, four different

10  models, I don't even know how many different types of hardware

11  and software; a vehicle, a crash that happened at any time.

12        So, under their -- their scope is so broad and so out

13  of proportion for what is needed or what would be reasonable in

14  this case, and a great example of that is this year, Tesla came

15  out with a cyber truck.  I don't know if the Court has seen it.

16  It looks like something from Mad Max, something from the

17  future.  It --

18        THE COURT:  I saw one yesterday.

19        MS. CRUZ:  Oh, my gosh, it is so cool, right?

20        THE COURT:  It is so hideous.  I don't understand.

21        MS. CRUZ:  No comment, but --

22        THE COURT:  How much does that cost?

23        Like a hundred thousand dollars?

24        MS. CRUZ:  I think it is anywhere from 75 to a hundred.

25        MR. BOUMEL:  People are paying 50 or 60 over sticker

1    right now.  It is insane.

2        THE COURT:  People buy Rolex watches, I just found out,

3    for like a million dollars.  So, the world's crazy.

4        Go ahead.  Sorry.

5        MS. CRUZ:  So, under their scope -- so, an accident

6    that happened last week with a 2024 cyber truck, okay, that

7    had -- which every single Tesla has some form of autopilot.

8        Now, I will get into the difference between, but the

9    autopilot '18 is just the name of a suite of features.

10       So, what a 2014 model S has, that autopilot is not

11   anywhere near what a -- the autopilot systems and features and

12   sensors and cameras as that a cyber -- a 2024 cyber truck has.

13       And, that system, if it was activated, the autopilot

14   system in a cyber truck was involved in a crash last week, how

15   would that be comparable to a 2014 model S sedan that has the

16   first version of hardware, the first version of software, was

17   just put into production in probably 2013, how would those two

18   be comparable?

19       But, that is the -- that is the broad, broad, in nature

20   of the scope that they are asking for.

21       And, Tesla's proposed scope and which the Court

22   previously entered is incidents that involved a 2019 model S

23   with hardware 3.0 and software 9.0 -- which is what this car

24   has -- regardless of when the accident was, because as long as

25   it had the same hardware and the same software and it was the

1    same vehicle, the system would work, the automatic emergency

2    braking, and auto steer, which are the features at issue in

3    this case, would work the same, because you are dealing with

4    the same hardware.  When I said, "hardware," the hard

5    components on the vehicle, and the same software running the

6    vehicle.  Basically, the same technology.

7           And, Tesla believed back in June and the Court agreed

8    and we still believe now that that is a proper scope which

9    strikes the balance between protecting this extremely and

10   proprietary, cutting edge information and technology, and yet

11   still allowing plaintiffs to obviously, you know, have whatever

12   documents they need and obtain whatever documents they need for

13   this case; but, also to share it with other attorneys in other

14   cases, like Mr. Boumel pointed out they wanted to do.

15          And as I was saying, the reason for that is that the

16   autopilot technology was first made available in 2014, and it

17   has been evolving since that time.

18          And, a Tesla design process is an iterative design

19   process, probably more so, than I would say most other

20   automobile manufacturers, because of the way that information

21   is exchanged between the vehicles and Tesla.

22          They are constantly sending out software updates.  They

23   send out software updates over the air.  So, if you have a

24   Nissan, and there is an update to their software, that is only

25   going to happen when you go into the dealership and they plug

1    your car in and they update the system.

2         Tesla sends updates over the air, which means you get a

3    little popup on the screen of your car which says, "There is a

4    new update.  Press this button if you want to see what it

5    involves, and press this button if you want to go ahead and

6    install the update."

7         So, the updates happen, I think it is monthly, or,

8    there is a lot of updates to the vehicle.

9         And then, the firmware, which is kind of like another

10   version of the software, is also updated.

11        And then, you have the hardware, which are the physical

12   components.

13        So, when autopilot was first released, the hardware was

14   hardware 1 -- and, I am not sure of the exact version of

15   software, if it was one or one point something; but, that was

16   in 2014.

17        By the time this -- when this crash occurs, we were up

18   to software 9.0, I think.  Now, we are up to software 11 or 12,

19   either they just rolled out 12 or they are going to roll it

20   out.

21        And so, not every Tesla has autopilot, which is --

22   every Tesla has some form of autopilot.  Some have advanced

23   autopilot, some have full, self-driving capabilities.

24        The cars in 2014 only had one camera.  Then, at another

25   point, there were eight cameras.

1           The sensors have changed.  I couldn't tell you all the

2    differences.  I don't know if anyone could tell you -- one

3    person could tell you all the differences between all the

4    hardware and all the software.  But, there has been a lot of

5    changes, you know, in this design process over the past ten

6    years.

7           And, so, it is -- it was our contention last year, and

8    it is still our contention now, that it would not help

9    plaintiffs to share these documents with other attorneys that

10   are working on, for example, you know, a case involving a cyber

11   truck, or even something that is closer in time to this case,

12   let's say.

13          And, I don't know when all the different software

14   changes took place.  But, this car is a 2019.  Even if there is

15   a 2020 model S, the same model but different year, and the

16   hardware, if there was a hardware change, those two cars are

17   going to be very different, because maybe one has one camera

18   and the other one has eight cameras.

19          THE COURT:  Now, why isn't that, though, just to follow

20   up on that point -- for purposes of -- I mean, for purposes of

21   attorney sharing, and as set forth in paragraph 16 and 17 --

22   and you could argue that that shouldn't be permitted at all,

23   but, put that aside for a moment -- if you are going to have

24   the concept of it in the sense of promoting judicial economy by

25   making it available, making the litigation process generally

1    more efficient, why does it have to be to the exact vehicle and

2    exact software at the time?

3          Why would discovery of -- for example, why wouldn't

4    discovery of the prior software version and a later software

5    version be potentially relevant in terms of understanding this,

6    the way this system works?

7          The differences that -- in other words, why would --

8    why would discovery be limited to the exact software when, in

9    fact, understanding the way that software works may require you

10   to understand different iterations, to understand the point

11   that you are making?

12         MS. CRUZ:  Well --

13         THE COURT:  Does that make sense?

14         MS. CRUZ:  Yes, I think I understand the question.

15         Well, one of the issues is that -- which I don't want

16   to go down this rabbit hole, because it is not for today and we

17   went down it last time, and we seem to go down it every time we

18   come here, the last few times, events of hearings, but, if

19   there was a change, like an update to software, and they say,

20   "Well, that update would have prevented this crash, and you did

21   the update afterwards," or, "You changed the hardware or the

22   firmware," that would be a subsequent remedial measure, that

23   falls squarely within what a subsequent remedial pleasure would

24   be.  So, that would address anything before.

25         And, I can tell you, as far as --

1           THE COURT:  But, I don't decide discovery matters based

2       on that.  That goes to the admissibility.  In other words, in

3       other words, that goes to the ultimate question of whether or

4       not it can come in.  And, some remedial measures can come in,

5       depending on what the issues are.  So, that's why a discovery

6       matter -- I can't decide it based on that, because that goes

7       the ultimate issue, right?

8           MS. CRUZ:  Right.

9           THE COURT:  But, for discovery purposes, I could see

10      where documents relevant to, for example, software 4.0 may be

11      just as relevant to this case as 2.0 or 3.0.

12          Does that make sense?

13          MS. CRUZ:  Well, respectfully, no. I think it -- a few

14      things:  So, what I was going to say, with the issues that --

15      as far as old technology, you don't really see -- plaintiffs

16      don't allege, "Oh, you should have kept that old technology,

17      that old technology was better."

18          So, that is not, you know, what I mean.  That is not

19      really an argument the plaintiffs make.  It is always that

20      something you did in the future, was it feasible for you to do

21      it before?

22          And, that's where the rub is.

23          So, I don't see a case how -- where it would be

24      relevant as to what we did seven years ago, like, "What did you

25      do seven years ago," what a manufacturer was doing seven years

1    ago, how that would relate to technology that was in the

2    vehicle that was purchased in 2019 or late 2018.

3           This guy only had the car for three years.  So, from

4    the date it was purchased to the day he had it, I don't see how

5    what the manufacturer was doing seven years before would be

6    relevant to that.

7           Now, all that being said, just saying, I am wrong and

8    you are right, right, and the Court is right.  The most

9    important thing here is balancing the protections that are

10   afforded by protective orders, and, what we are dealing with,

11   with Tesla, is very different than what we are dealing with,

12   and what is typically dealt with in other manufacturers.

13          Tesla is on the cutting edge.  I don't think this is in

14   dispute by anyone.  Tesla is absolutely the leader and

15   absolutely on the cutting edge of ADA's technology, which is

16   technology that relates to advanced driver's assistance

17   systems.  That is what it is called.  Just -- that is not a

18   Tesla term.  That is out in the world.  Tesla is undoubtedly

19   the leader in that technology.

20          They have a way of doing things that is different from

21   what other manufacturers do.  They have a way of designing, in

22   their process, and their software and their coding, and the

23   people that they hire, the whole structure of the

24   organization -- they are so different than other manufacturers.

25          And, they have been able to stay at the head of the

1    market.

2         And, so, this is a very, very, very sensitive issue for

3    them.  And, it is very, very important that we protect this

4    information as much as we can to preserve this technology.

5         And, their proprietary ownership of this technology is

6    not something we are arguing with them just to argue.  And, you

7    know, "We don't want you sharing it, just to share it."

8         There has been zero allegations that plaintiffs in this

9    case don't have what they need.

10        And, there is a sharing provision.  There are cases

11   where there is no sharing provision.  That --

12        THE COURT:  I was going to ask you about that.

13        MS. CRUZ:  Yes.

14        THE COURT:  When -- what do other sharing provisions

15   that you are familiar with at Tesla each look like?

16        MS. CRUZ:  Sometimes, there is no sharing provision.

17   Typically, in the cases that I have been involved in and that I

18   am aware of -- obviously, I cannot speak for every case.  But,

19   they are typically limited to the model year and the hardware

20   and the software.

21        And, I think the equivalent of that would be, we are --

22   it is kind of what makes Tesla different, let's say, again, to

23   use like a Nissan, they have platforms.  So, what that scope

24   would typically be -- I know you asked about Tesla, but just to

25   compare it to another, you know, auto products case -- for a

1  Nissan, you would look at the platform.  So, that would mean --

2  I am sorry, the generation.  So, the generation would be like

3  2019 through 2022.  And, Nissan, you know, Rogue and whatever,

4  it is usually just one vehicle, though, because even amongst

5  their vehicles, they are different.

6       You don't typically have a scope, let's say, for

7  Nissan, that covers ten different vehicles.  It is not like

8  that, because they are different.  You are dealing with SUVs.

9  You are dealing with cars, some are smaller.

10       Some technology is worked into, you know, the vehicles,

11  the more expensive, higher-end vehicles, and then it works its

12  way down through the other vehicles.

13       But, you don't have -- I mean, I honestly have never

14  seen a protective order that says, "You get all the documents

15  for every model year for every model involving any hardware or

16  software that you have in the vehicle."

17       That's -- that's not what you see.

18       And, the issues in this case, this isn't like the

19  Tocano litigation.  The issue in this case -- and that was

20  because I wasn't involved in that case, but my limited

21  understanding is, that inflater is the same.  The inflater is

22  the issue, and the inflater was the same.

23       And, in this case, you don't have that.  So, one of

24  their allegations is that the auto emergency braking, which is

25  actually not part of the autopilot sweep.  That is something

1   that most cars have.  They call it different things.  But, your

2   car probably has it, if it was made in the past, you know,

3   three to five years.  It senses the vehicle in front of it, and

4   it slows the car down, for lack of a more technical

5   explanation.

6           So, one of their allegations, their main allegations is

7   that the automatic emergency braking didn't recognize the

8   flashing red light and the parked Tahoe at the end of the

9   street, and didn't stop the car, didn't slow the car down, or,

10  stop the car, and prevent that accident.  Right?

11          That has nothing to do with the case.  There is a case

12  in California that Mr. Boumel is probably speaking of where a

13  driver was -- the driver in our case had his hands on the

14  wheel, so, that is a big deal with the driver monitoring

15  systems and the warnings.  The allegation is sometimes we

16  didn't give enough warnings for drivers that had their hands

17  off the wheel.  The driver in this case has his hands on the

18  wheel.  That is in dispute.  The case that he was referring to

19  in. California, in which the insinuation was "We want to share

20  in cases like that," this driver was -- did not have eyes on

21  the road.  Did not have his hands on the wheel.  Had autopilot

22  on.  Was playing a video game.  And, the car thought that it --

23  the car was supposed to turn off, and the car was turning off,

24  and it ran into a gore, which is a --

25          THE COURT:  A what?

1          MS. CRUZ:  It is called a gore, G-O-R-E, like Al Gore.

2      It is called a gore.  It is like when you go into an exit ramp,

3      that, like, triangle, you are facing like a triangle that

4      separates the roads.  So, the car went off and didn't recognize

5      the lanes correctly, and crashed into a gore.  So, that --

6          THE COURT:  Is that like a barrier, or --

7          MS. CRUZ:  Yes, a crash attenuator.

8          So, that involved the auto steer technology in

9      recognizing lanes.  And, there is a -- there is an issue about

10     whether the lane markers were clear enough; why were -- because

11     the car went into the wrong lane.  We didn't have that here.

12         So, another case that they refer to is a case that I

13     worked on, and in that case, that case involved crossing

14     traffic.  So, what happened is there was a tractor-trailer

15     coming across the crossing traffic.  The driver did not have

16     his hands on the wheel.  So, the big allegation in that case is

17     you should have had more warnings to say, "Hey, you have your

18     hands off the wheel," or, the system should have shut off.  Or,

19     "You should have had a camera inside of the car to see that the

20     driver did not have his hands on the wheel."

21         So, that case is completely -- even though it is an

22     autopilot case, and there are -- the allegation isn't

23     autopilot.  That is not a thing.  You have to say that you --

24     you have to say what component was defective, and how it was

25     defective.

 1              So, in this case, they are saying the automatic

 2    emergency braking should have recognized the traffic light and

 3    should have stopped.  The auto steer auto should have

 4    recognized the traffic light and should have stopped.  That is

 5    completely different from the allegations in the Banner case,

 6    up in West Palm Beach, where they are saying the car didn't

 7    detect crossing traffic.  It is a different thing.

 8              THE COURT:  But, I guess -- but I guess the problem

 9    that I have -- I understand all that, for purposes of the

10    substance of the case; but, when it comes down to the question

11    of, if you contemplate that some sharing of litigation has a

12    public purpose, then the question is, well, how do you measure

13    that, and why is the measurement of that the very narrow

14    definition of this particular car as opposed to the technology

15    as a whole?

16              I guess that is the question.

17              MS. CRUZ:  Well, I mean -- first of all -- I mean,

18    again, you have to balance that with the extreme proprietary

19    nature of what we are trying to protect and what Tesla is

20    trying to protect and weigh that against this idea of sharing.

21              The other thing is --

22              THE COURT:  The problem with that, the problem with

23    that is you are already talking about two sets of people that

24    have access to confidential information.  In other words, a

25    plaintiff lawyer has access to confidential information that

1   was produced in that case.  This lawyer has access to

2   confidential information produced in this case.  Right?

3            So, everybody -- everybody in the equation is subject

4   to a protective order and subject to the consequences of

5   violating it.  Right?

6            So, it is not like -- it is not as if you are going to

7   have a competitor, or an outside litigation person is going to

8   have access to one versus another.  They don't have access to

9   either.

10            MS. CRUZ:  Well, we actually have had that issue.  Two

11   things that I can tell you that have happened -- which, again,

12   have -- I can tell you now, were even more -- I don't know what

13   the word -- it is even more important that this technology is

14   protected now than it was back in June of 2023.

15            We have had -- there have been instances -- again, this

16   is a very small -- this area of tech is very -- especially at

17   the level that Tesla is at, is very small.  And, there have

18   been instances where consultants, so people that Tesla doesn't

19   even know exist, because they have not even been disclosed, and

20   even experts have left their field, or left their firm, like,

21   left being an expert, and went to a competitor of Tesla.

22            And, so, then they had access and knowledge to this

23   information.  You can't undo that.  You can't undo that.

24            And, another thing that is happening is that just this

25   week, Tesla had to send a cease and desist letter to a

1    plaintiff's attorney in this case, not Mr. Poses or not

2    Mr. Boumel, but another attorney that is not here, but it is a

3    plaintiff's attorney in this case, named Don Slavik.  They had

4    to send a cease and desist order because he has been violating

5    the protective orders, and was admonished by a court in

6    California for doing so.

7         And, so, Tesla has had a lot of problems.  And this, I

8    can tell you, we had an issue with it, too, in the Banner case.

9         And, Tesla has had a lot of problems controlling and

10   enforcing protective orders.  And, it is getting to the point

11   where this information is -- really confidential information is

12   being shared so much, Tesla is devoting all this time to just

13   enforcing their protective orders because it is so important.

14        If we lose this edge, this is what they have, like,

15   this is -- this is what they do.  Autopilot is Tesla's thing.

16   Like, this isn't -- you know, a seatbelt.

17        And so, I don't know, and I am making general

18   statements now, but someone who has only worked on automotive

19   products liability cases for 18 years, yes, there is different

20   technology in seatbelts.  Is it like this?

21        Do you have the differences between Tesla's autopilot

22   system that you have in a Nissan system?  So, you can't even

23   compare.  You can't even compare.

24        And, so, that's why we are so adamant about this, and

25   that's why it is so important to protect this.

1         So, you know -- and there is a case, but it seems like

2    the judge -- your Honor knows, but there is a case in re:

3    Chiquita Brands, by the 11th Circuit, it is 965 Fed.3d 1238,

4    that says that when a protective order is entered with good

5    cause, the burden falls on the party seeking to modify it to

6    show whether it has good cause for the modification.

7         And, the Court goes through and applies the same

8    factors that are in several -- Federal Rules of Civil Procedure

9    26(c), which is the same rules that Judge Otazo-Reyes based her

10   prior ruling on when she looked at, again, this same exact

11   issue that they are trying re-litigate now.

12        And, two of them don't really apply.  One was like the

13   duration of the order; but, one factor is the severity and the

14   likelihood of the perceived harm to the producing party.

15        There is such a need to protect this information.

16        This is such a niche area of technology, and it is so

17   highly confidential.  And, I can tell you Tesla's process and

18   what Tesla does, how they work, how they design this

19   technology; number one, it changes all the time.

20        As lawyers, we can't even keep up with what's happening

21   with our own clients, if it comes to another client, if it is

22   Nissan or Toyota I can tell you, this is how the roofs work,

23   this is how the bags work, this is -- are there changes?

24        Yes.  Every few years, you might have changes.

25        Tesla is, like, this technology changes all the time.

1   So, software 9 that was in this car is different than software

2   12 that is on the cyber truck.

3            So, those things work differently.  So, not only are

4   they not the same, but, the technology changes so often, and so

5   advanced, Tesla has to protect the way that they do things.

6            And, even with technology that is older, it is not just

7   the technology.  It is their process.  They don't work the way

8   a traditional auto manufacturer works.

9            And, that model, if you will, has been successful for

10  them.

11           And, they have a right to be able to protect that.

12           And, when you weigh that against wanting to share with

13  other lawyers in other cases that aren't related -- and you

14  know, there are other ways, too.

15           I mean, it is not like they are being hamstrung.  They

16  can ask for anything they want in a case, anything they want.

17  And, if they have some reason to believe that Tesla is

18  violating an order for some reason, they can go to the Court on

19  that.  They can have a corporate representative and ask, "Does

20  the document likes this exist?"

21           I mean, there are other things that they can do.

22           This thing about siloing, and that we are -- I mean,

23  first of all, that is not our intention.  Our intention is to

24  do what I said, which is protect the technology, which has

25  nothing to do with lawsuits and litigations.  If Tesla doesn't

1   have that edge and they don't have the technology, what do they

2   have?

3              Autopilot is their thing.  This is their thing.  This

4   is what makes them different.  This is what makes them

5   successful.  This is why you see all these Teslas on the road

6   now.

7              So, this is -- it is just -- it is very, very important

8   that they protect this technology.  And, when you weigh that

9   against these other factors, I see some of the points that the

10  Court is making.  You know, could those things possibly come

11  up?  Yes.

12             Another thing I wanted to point out was, you know, as

13  we said -- and this was the Court's ruling last time, and I

14  think this is, it was a good idea, and it still stands -- I

15  mean, well, the ruling is the ruling, so, it is still there,

16  regardless of what happens today.  But, this is what Judge

17  Otazo-Reyes's ruling was.  She said -- this is in the

18  transcript, Page 19, line 14 --

19             THE COURT:  Is this from the June hearing?

20             MS. CRUZ:  Yes, June 28, 2023.

21             THE COURT:  I couldn't find it.

22             But, go ahead.

23             MS. CRUZ:  She said, "I will make the ruling sharing of

24  information in this case only with plaintiffs' counsel involved

25  in cases where the accident or incident vehicle was a 2019

1    model S hardware version 3, software version 9.  If there is

2    something Mr. Slavik" -- that is a plaintiff's attorney that's

3    not here today, but one of the plaintiffs' attorneys -- "if

4    there's something, Mr. Slavik, that you come up with that is

5    some sort of like an unusual situation, and you want to seek

6    relief from the Court because it is very important that you

7    share something, along the lines of what you said of the model

8    X or something like that" -- he was giving an example of "What

9    if I have a case with a model X and I want to use a document,"

10   she said, "You can come to the Court for relief.  But, that

11   way, we know we are solidly on ground.  And, if there is

12   something that cries out for special consideration, then I will

13   allow you to seek permission and then we will consider that

14   situation."

15        And then, we go on -- my partner goes on to say --

16   "And, just so you know, Court, just so you know, your Honor,

17   we're happy to meet with them.  If there is a specific document

18   that they feel like they need to use in another case, some

19   special consideration, I mean, obviously, the Court requires us

20   to meet and confer.  But, you know, we can certainly talk about

21   that special situation that the Court referred to."

22        And, her ruling was without prejudice, with this --

23   with this narrowly tailored instance.

24        So, it would have been with prejudice with exception

25   for this.

1        And, this unique situation that requires special

2   consideration, they haven't -- they haven't said anything about

3   that today.  There is no argument about that.  They are simply

4   using the fact -- and I hate to say this, but, they have a new

5   judge.

6        So, they are taking the same exact argument that they

7   made six months ago, the same exact scope, and they are

8   bringing up this issue with the Court again.

9        And, our position is the same as it was before.  When

10  you look at the factors that are -- that have been used by the

11  11th Circuit, that have been implied and that are enunciated

12  under Federal Rule of Federal Procedure 26, it -- would those

13  factors weigh heavily in favor of keeping the protective order

14  that is currently operative in place?

15       THE COURT:  Okay.

16       Reply?

17       MR. BOUMEL:  Thank you, your Honor.

18       Thank you, Ms. Cruz.

19       So, your Honor, we agree one billion percent that Tesla

20  is entitled to protect its confidential business information

21  for commercial purposes.  That's not what they are trying to do

22  here.  And, I don't know the facts behind it, but I did briefly

23  read the cease and desist letter to our cocounsel, Mr. Slavik.

24  One of the items they accused him of was sharing information

25  with himself.  With himself.

1          So, that's not trying to protect a confidential

2    information for a business purposes.  That is trying to gain a

3    litigation advantage.

4          Had you learned some information in this case, you are

5    not allowed to use it in this other case, and you represent the

6    parties in both cases.

7          That's what Tesla is trying to do here.

8          Now, in terms of what's changed between now and when we

9    had the hearing in front of Judge Otazo-Reyes, very simple.

10          This recall that touches every single Tesla that was

11    made and sold from the beginning of when Tesla sold vehicles

12    until 2023.  So, to the extent we are going to limit it, and

13    maybe we limit it to that every vehicle touched by the recall,

14    which ends in 2023, I think that would be fair.  But, that's

15    the change in circumstance.  Right?  We now know --

16          THE COURT:  How does that change anything, though, for

17    purposes of a protective order in a case?

18          I don't understand that.

19          MR. BOUMEL:  Because before -- I mean, when we were in

20    front of, in that other case in front of Judge Otazo-Reyes, Mr.

21    Brandon, who is Ms. Cruz's cocounsel, he made much the same

22    arguments that Ms. Cruz made to you:  "Everything is so

23    different from year to year, everything is so different from

24    model to model.  One has nothing to do with the other" -- but,

25    guess what.  That's not true.  Right?

1            We know, number one, that autopilot is a product that

2    stays -- I am sure there are different iterations of it.  But,

3    the basic components are the same, and that is why this recall

4    didn't single out at the Tesla 2025 -- 2021 model, with

5    hardware 3.0, or, with this or with that.  It is every single

6    Tesla with autopilot, which is every single Tesla.

7            THE COURT, but how does that -- in other words, why

8    does the -- why is the -- is the Government's decision to

9    impose a recall changing the parameters of Rule 26(c) here in

10   that order, protective order for production of documents?

11           I don't -- that is the part that I don't understand.

12           I don't understand the "why," you know, a government

13   recall of a series of cars, or a series of technology changes

14   the equation at all.

15           MR. BOUMEL:  Because, first of all, it is not just a

16   government recall that is issued by the government, but, it was

17   voluntary.  It was Tesla's own wording, right?

18           They are the one that wrote this recall.

19           What it does is, it is an acknowledgment that the

20   product at issue is autopilot, and that autopilot is -- there

21   is an issue with autopilot across the board.  It is not

22   specific to one, one model, one year, one hardware version.

23   The issue was common among every single model, year model

24   version, hardware version.

25           So, I think that is the change in circumstances.

1   Right?

2         We now know that what Ms. Cruz has been arguing is not

3   entirely accurate with all respect to Ms. Cruz, in the terms of

4   there is no relation from one hardware version to the other.

5   That is just not true.  I mean, if you look at this recall, we

6   know that that's not true.

7         Have I answered your question, your Honor, or not

8   really?

9         THE COURT:  Well, I guess you -- you have answered it,

10   I just don't know if -- I just don't understand it.  I just

11   don't understand why --

12         MR. BOUMEL:  Maybe it is because I didn't fully

13   understand your question.  The rule that you are citing to, I

14   don't have it in my head.

15         THE COURT:  No.  In other words, the whole -- when you

16   argued this back in June, obviously, you were arguing for a

17   broader scope of sharing, on paragraph 16, right?

18         MR. BOUMEL:  Yes.

19         THE COURT:  And, they were arguing before that, no, it

20   has to be this car, this technology, this thing.

21         MR. BOUMEL:  Yes.

22         THE COURT:  And then the judge balanced all those

23   arguments, and exercised her discretion to come up with the

24   limitation that she came up with.

25         And, you can argue whether or not that should be

1    different; but, you can argue that in every case, right?

2         So, in this case, she made that judgment call.  So,

3    then the question I have is how does the fact that this

4    technology, in general, has been subject to a recall changed

5    her analysis?

6         I don't understand how one has any bearing on another.

7         MR. BOUMEL:  I think, again, and I hope I'm explaining

8    this in a clear way than the previous hearing.  What we have

9    heard today is there is no similarities at all between any of

10   the different -- or any of the different models or model years

11   or hardware versions.

12        You can't put just one of any conclusions or achieve

13   any relevant information that pertains to a different model

14   year, different hardware version.  We now know that to be not

15   true, right, because the recall and the issues at issue, at --

16   that were addressed in the recall, which are two primary front

17   and center issues in our case, right, were common among every

18   single version.  And, what this recall is -- is an evidence of

19   is, it wasn't one hardware version that was at issue.  It

20   wasn't one model year that was at issue.  It is the autopilot's

21   -- itself, which is common among all hardware versions, all

22   model numbers.

23        THE COURT:  Well, maybe the -- to understand, maybe I

24   should ask you, what was the defect that was at issue in the

25   recall?

1          MR. BOUMEL:  There were two things addressed in the

2    recall; geofencing and driver monitoring.  What geofencing is,

3    is this:  Tesla's autopilot is designed only to be used on

4    limited access highways.  That means limited access roads.

5    That means highways with a divider, no stop sign, no

6    traffic-controlled devices, and no cross streets.  That is what

7    it is designed for.  On Page 70 or 150 of the manual, it says,

8    "Warning, do not use this on any nonlimited access roads."

9    Okay?

10          Tesla has the ability to control where the auto is

11   used, and that is the technology that is used by other car

12   manufacturers, where they limit their autonomous driving to

13   only be allowed to be used on streets that it is safe for, that

14   it is designed to be used on.

15          Our accident in this case was not a limited access

16   highway.  It was a road with cross traffic, and, this fatal

17   accident occurred.

18          So, one of our allegations in this case is if Tesla had

19   geofenced this, and had precluded autopilot from being used on

20   this road -- which we think they should have, and what other

21   auto manufacturers do -- this collision would not have happened

22   and this gentleman would not have been on autopilot, and, our

23   client, you know, one of our clients would be alive and one of

24   them wouldn't be dealing with, you know, lifelong injuries.

25   Right?

1          So, that's one of the main issues with the recall.

2          The other issue that the recall touched on is driver

3    monitoring.  There has been a known issue from the advent of

4    autopilot, not that long ago, that drivers become overly

5    complacent when they use autopilot.  The more you get behind

6    the wheel of a car with autopilot, the more complacent you

7    become.  And, it is -- automation complacency is a known

8    phenomenon in airlines.  There are tons of systems and programs

9    and framing to address it, from a pilot's standpoint of view,

10   so that they know how to combat it.

11         And, what we are alleging in our case and what was

12   addressed in the safety recall is hey, we need better driver

13   monitoring systems.  We need more robust warning systems,

14   because we know that drivers are not paying attention when they

15   have autopilot engaged, and that is a safety issue.

16         So, those are the two things were that were addressed

17   in the recall, two issues that were front and center in our

18   case.

19         THE COURT:  Well, did the topic of a recall come up at

20   the June hearing?

21         MS. CRUZ:  Your Honor --

22         MR. BOUMEL:  I am sorry, your Honor.  I had somebody in

23   my ear.

24         THE COURT:  Did the topic of a recall come up at the

25   June hearing?

1          MR. BOUMEL:  No, because there was no recall at that

2     time.

3          THE COURT:  And, now that there has been a recall and

4     there has been a government investigation, don't you have

5     access to those materials?

6          Isn't a lot of that public record?

7          MR. BOUMEL:  We do have access to those; but, what --

8     we have access to some, not all.  And, we are seeking more,

9     right, but that's not what is at issue here.  What is at issue

10    is when we went to that other hearing, there were limitations

11    placed based on artificial constraints, which we now know to be

12    artificial.

13         I mean, that is what this is about.  And, going after

14    your Honor's own point, right, all this, all -- everything we

15    are talking about is a discovery issue, not an admissibility

16    issue.  Right?

17         We understand that before we come to trial, we are

18    going to be dealing with a ton of, you know, motions in limine,

19    and, we are going to have to prove that everything we want to

20    introduce is relevant to the causes of action in this case.

21    Right?

22         This is just discovery.  It is promoting an exchange of

23    information between attorneys.  It is promoting our cocounsel's

24    ability to share information with himself on different cases

25    that he's, you know, acting as counsel on.

1      That's all this is.  And, there is no commercial

2  reason -- again, if we take a look at what the protective order

3  is, there is no commercial reason not to allow this.  That is

4  what a protective order is for.  Let's protect Tesla's

5  business.  We agree with that.  But, let's not give them a

6  litigation advantage.  Let's not -- not allow them to tell our

7  cocounsel "Hey, what you know in this case, you can't use in

8  that case."

9      MS. CRUZ:  Your Honor, if I may --

10      THE COURT:  Well, I guess -- well, I mean, there is --

11  to raise a couple of things, I suppose, one, one has to do with

12  how that gets enforced with -- in connection with that.  But,

13  that's not what is being presented to me.

14      MR. BOUMEL:  Correct.

15      THE COURT:  So, so, even if I agree with you that it is

16  not being presented to me, the only thing that is presented to

17  me is, if we have a protective order that was negotiated, then

18  litigated, the judge makes a ruling, I would have made a

19  different ruling.  But, that's not necessarily the standard.

20  Right?

21      The standard is, all right, you -- at some point,

22  somebody makes the call.  It is a discretionary call, arguably.

23  I may not have allowed any sharing because, you know, what is

24  the point of a protective order if all of a sudden you have a

25  provision that allows you to share for purposes other than this

1    case?

2         So, you could -- you could argue both sides to that.

3    But, ultimately, she agrees with some of your arguments and

4    some of her arguments, and, she reaches a conclusion that is

5    certainly within the realm of reason.

6         So, therefor, now the issue is what good cause exists

7    for me to modify it?

8         And, that part, I just don't -- I am not understanding

9    because I don't -- I haven't seen anything.  And, the fact that

10   there is a government recall that involves the technology, I

11   don't see how that -- I don't see the connection to how I frame

12   a protective order.  I don't see it.

13        MR. BOUMEL:  I mean, I hate to repeat myself.  I don't

14   have much more to add than I have already stated.

15        THE COURT:  Right.

16        MR. BOUMEL:  But, I think, for a two-second

17   reiteration, the argument was made that there is commonality

18   between different hardware versions or different model years,

19   and therefore, one --

20        THE COURT:  But wasn't it really made -- because, of

21   course, it has commonality.  I mean, the idea that there is,

22   that there is no commonality between version 2.8 and version

23   3.0 of a software, is just -- nobody could possibly say that.

24        MR. BOUMEL:  Well, Ms. Cruz --

25        THE COURT:  There is commonality because they are both

1    coming from the same general place; but, they changed it over

2    time.  I get that.

3              But, commonality is -- that's not the issue.  Right?

4              MR. BOUMEL:  Well, I think that is what you heard from

5    Ms. Cruz today, and I think that is what was heard, what was

6    argued in the hearing -- whenever the last hearing was on this

7    issue.

8              I mean, that's what Tesla's arguing, is "Hey, what you

9    learned about a 2019 model, right, over a 3.0 has no bearing

10   over what happened in this case, whether the 2019 model S, with

11   version 2.0 -- that is what they are arguing.

12             And, I think this recall shows us that that is just

13   plain not true.

14             And, then, to go to your Honor's own point, you talked

15   about -- well, that I mean -- we heard from Ms. Cruz about the

16   evolution of the different hardware systems, and she is saying,

17   "Well, there is no, you know, nexus between those and what's

18   the -- what is the -- I mean, your Honor -- exactly, those

19   different hardware versions, the evolution of this technology,

20   that's potentially important information for this case.  Right?

21             That can lead to an abundance of admissible, you know,

22   discovery.  So -- or admissible evidence, sorry.

23             So, why limit our discovery if it can lead to

24   admissible evidence?

25             I mean, that's important to this case.

1           THE COURT:  Okay.

2           You had something else?

3           MS. CRUZ:  Yes.  I was just going to say, I mean, it --

4    I am not sure whether your Honor -- if your decision is turning

5    on this recall piece --

6           THE COURT:  Yes.  Respond to his argument on the

7    significance of the recall being -- what he is arguing is that

8    the good cause to modify --

9           MS. CRUZ:  Right.

10          THE COURT:  If that is the appropriate statement, which

11   I think it is.  He is saying that "What we didn't know back

12   then is the scope of the recall, the significance of the

13   recall, and therefor, had Judge Reyes known -- or any judge

14   known about that, at the time, that would have changed the

15   analysis as to why you limited that paragraph 16 limitation in

16   this way.

17          MS. CRUZ:  Right.  And, I think the Court has it right.

18   Not Judge Otazo-Reyes, but yourself, in that it doesn't change

19   anything.

20          And, with all due respect to Mr. Boumel, his -- his

21   representation of the recall was kind of -- what I heard was,

22   "It is autopilot, and it is all the same, and they are all

23   recalled."

24          These are the only recall remedies.  There were two of

25   them.  Okay?

1        The first one related to different types of warnings.

2   The warnings that come up on the instrument panel, we changed

3   voluntarily.  We changed the size of the font.  We changed the

4   location of the warnings.

5        Okay?  That's what was done.

6        Nothing related to automatic emergency braking, the

7   issues in the case, I should have started off -- let me back

8   up.

9        If the recall remedies were done on this car before the

10  crash, the crash -- this crash would have still happened.  They

11  are completely unrelated to this crash.  So, it has absolutely

12  no bearing.

13       THE COURT:  What was the second part?

14       MS. CRUZ:  The second part -- so I just want to say,

15  the second part is -- was to eliminate something called mode

16  confusion.  And, that's when drivers think that they activated

17  autopilot by pulling on the stock, next to the -- kind of like

18  what you might have as a turn signal.  It used to be that you

19  pulled on that once to activate autopilot.

20       Now, you have to pull on it twice, because there were

21  some drivers that were saying, "I pulled on it and I thought it

22  was activated but it didn't."

23       So, now you have to pull on it twice just to be sure

24  that it is activated.  That's it.  That's it.

25       So, that has nothing to do with this case.

1          He talked about geofencing and which roads the cars can

2     be used on.

3          This car -- if you take a car, I have the Tesla, it is

4     updated.  Obviously, the update was done in December 2023.  I

5     can still take my car, put it on autopilot, and go drive on

6     Card Sound Road at the T-intersection where this crash

7     happened.  You can still use the car.

8          So, obviously, we have differences about whether there

9     is a defect.

10          And, he quoted from the owner's manual.  I don't think

11     that quote is correct.  I mean, there is a lot of things that I

12     think were inaccurate that he said, and were just kind of -- it

13     just kind of glossed over things without really drilling down

14     and being specific about what the facts are.  But, what I can

15     tell you is that these recall remedies, they don't relate to

16     this case.

17          You know, this -- in this case, what happened was the

18     driver had his hands on the wheel.  He dropped the cell phone

19     and he bent down to pick up his cell phone.

20          Now, if the recall remedy was:  We are going to put a

21     camera inside the car, a driver-facing camera, and so when we

22     see that your eyes aren't on the road, or we see that your head

23     is missing from, you know, the headrest area, we're going to do

24     this loud alert or some warning, or something to say, hey, we

25     know that you are not properly in the driver's seat -- now, if

1    that was the recall in this case, now, we are getting to

2    whether the recall is even applicable.  But -- then the recall

3    would apply to these facts.

4         But, these two conditions, mode confusion, there is no

5    allegation that autopilot wasn't on in this case.  He was

6    driving with autopilot on for like an hour.  That is not an

7    issue in this case.

8         We took his deposition.  He never said -- that's not an

9    issue.  They are not even alleging that -- either one of these

10   things.

11        There is no allegations that the size of the font

12   should have been bigger.  I mean, and, Tesla -- so, that's it.

13        I mean, again, I don't want to go into the reason for

14   the recall, but I agree with you, it doesn't even matter.  Even

15   if the recall is relevant, it doesn't change Judge Otazo-Reyes'

16   analysis.

17        And, what I can also tell you is this, the NTSA

18   investigation was going on for -- I am not exactly sure, but

19   probably about two years.  That recall has been an issue in

20   this case for a long time, going back and forth.

21        They wanted discovery about the recall.  So, she

22   certainly knew about the recall.  I would have to go through

23   the whole transcript.  I only looked at the Suri (phonetic)

24   provision to see if we talked about the recall.  But -- or was

25   there an investigation, but, all the documents from the recall

1    are publicly available.

2        And, Judge Otazo-Reyes ordered, I don't know, about a

3    year ago, that we produce the documents that we provided to

4    NTSA for the investigation to them.

5        So, because you had a question about that -- and so I

6    was just letting you know that yes, they have that.

7        But, this just is so unrelated.  This is like let's

8    take the recall and dangle it out here.  But, when you drill

9    down -- not "dangle" it, but try to apply it here -- it is --

10   it couldn't be less related to the facts of this case.

11       But, I think what the Court was saying, which I still

12   think is true, even if it was, it still doesn't change, and it

13   still doesn't provide the good cause that is required by the

14   11th Circuit to reverse and change a very specific ruling on

15   the same exact issue that was previously made in the case.

16       THE COURT:  Anything else?

17       MR. BOUMEL:  Briefly, your Honor.

18       So, there are a couple of things we take issue with,

19   factually.

20       So, first of all, the recall was issued on December 12,

21   2023, which was well after the hearing, right?

22       And which was just a few months ago.  So, what Ms. Cruz

23   is saying is that we have known about this recall for years.

24   We knew about the investigation for years.  But, we didn't know

25   about the ultimate recall findings, which were December 12th,

1   2023.

2        Ms. Cruz also told you that the recall had nothing to

3   do with what I told you, which was geofencing, and driver

4   monitoring.  I am going to read from the recall, itself.

5        "The remedy will incorporate additional controls and

6   alerts to those already existing to further encourage the

7   driver to adhere to their driving responsibility whenever auto

8   steer is engaged, which includes keeping their hands on the

9   steering wheel and paying attention to the roadway."

10       Driver monitoring, and paying attention to the roadway.

11       Then it also places additional checks upon engaging

12   auto steer and -- while using the feature outside

13   controlled-access highways.  That's geofencing.

14       So, the recall does absolutely touch those two

15   subjects, which are absolutely front and center in this fatal

16   accident.

17       THE COURT:  All right.  Well, I -- having now heard

18   you, and then taking a look at the record here on what happened

19   in June, the legal question is whether there is good cause to

20   modify.

21       And, I -- I disagree with the plaintiff.  There is, I

22   think, a cause to modify based on the -- I just don't see the

23   connection between the fact of the recall, the nature of the

24   recall and the scope of the 2016 order.

25       Now, I could go back and change it on the basis that I

1  would have done it differently.  But, that's not fair, because

2  number one, the parties spent a lot of time on it; number two,

3  the judge spent a lot of time on it, number three, these are

4  discretionary calls by definition, and, you could do things

5  differently.

6       And, so, it would be a bad precedent to say that just

7  simply because I would have done something differently in a

8  case, I inherited, I should undermine what the Court has done.

9  So, if there was good cause, I agree.  But, I don't think there

10  is good cause.

11       MR. BOUMEL:  We certainly understand, your Honor.

12       THE COURT:  So, I will leave it in place, as-is.

13       And then what else?

14       MR. BOUMEL:  So, your Honor, the next and last issue, I

15  believe, is our scheduling of Tesla's 30(b)(6) corporate

16  representative.  And, as the caveat to this, I will tell you

17  that Ms. Cruz and her office and us have been communicating

18  well.

19       We worked well together, and we are in no way, shape,

20  or form trying to insinuate that Ms. Cruz or her firm has done

21  anything wrong here.  We just have an issue that we have to

22  bring to your Honor.

23       So, basically, we have been trying to take Tesla's

24  30(b)(6) representative deposition.  We first started

25  circulating emails regarding it in December.  We communicated

1   all through January.  We were told, "Hey, we are going to get

2   you dates by the end of February."

3          That didn't happen.  And then, ultimately, at the end

4   of February, Tesla gave us one single date for their corporate

5   representative, that is his deposition, and they gave us

6   March 21st.

7          And, we agreed to it because it was the only date that

8   they gave us.  And then we had it set.

9          Unfortunately, our cocounsel, who wanted to take the

10  deposition -- he is an engineer, we are not.  So, it made more

11  sense for him to do it.  He had a conflict with an expert

12  deposition in another Tesla matter.  And we said, "Hey,

13  March 21st doesn't work for us.  We need another date."

14         And, they gave us dates at the end of May and said,

15  "Our witness is out of the country for the next few months.

16  So, the first availability we can give you is the end of May."

17         Well, that's all good and well, except that we have a

18  discovery cutoff of June.  And that -- I mean, our experts are

19  waiting for this information to formulate their opinions.

20         The deposition has --

21         THE COURT:  Have you taken any party, any --

22  non30(b)(6) Tesla's depos?

23         MR. BOUMEL:  No, because they objected to producing

24  anybody until the 30(b)(6) was taken, and they said we did --

25         THE COURT:  Oh, I can fix that.

1        MS. CRUZ:  They did already take -- they did already

2    take a -- 15 hours of an autopilot corporate rep deposition.

3    This is going to be the second autopilot corporate rep depo.

4        THE COURT:  You only get one.

5        MR. BOUMEL:  Well --

6        THE COURT:  Wait.  You only get one depo -- corporate

7    rep depo.

8        MR. BOUMEL:   I believe that was cross-noticed in

9    another case.  It wasn't taken in this case.  It was just

10    cross-noticed in this case.

11        But, it wasn't -- there were no facts of this case

12    explored in that deposition.  It was merely our attorney sat in

13    on that case, and cross-noticed his appearance.

14        MS. CRUZ:  And, he asked questions.  It was

15    cross-noticed for this case.  We appeared, as well.  My partner

16    appeared, and Mr. Slavik --

17        THE COURT:  Well, the sharing thing, why did you let

18    him appear?

19        MS. CRUZ:  Because we are trying to deal with the --

20        THE COURT:  You could have silently --

21        MS. CRUZ:  But, that is what we said.  We said to

22    streamline things -- again, this goes along with we are not

23    trying to hide -- we are thinking, we are not trying to prevent

24    them from getting information.  We are trying to streamline the

25    process.

1          THE COURT:  So, why didn't you -- now, in fairness to

2     you, you did give them a date in March and they cancelled it.

3     Right?

4          MR. BOUMEL:  Yes.

5          MS. CRUZ:  Yes.  I can tell you what I just --

6          THE COURT:  So -- so then is -- just to cut to the

7     chase --

8          MS. CRUZ:  Yes.

9          THE COURT:  Because it is not worth spending too much

10    time on --

11         MS. CRUZ:  This is what happened.

12         THE COURT:  -- at least, for me.

13         Is the guy that you want to use no longer available

14    until May?

15         MS. CRUZ:  No, this is what happened.

16         Forgetting -- I can tell you about everything before.

17    I just want to make it clear to the Court, which I don't think

18    plaintiff represented that it didn't happen.

19         But, they asked for the depo in January.  And, since

20    then, I think we have talked about this depo and the topic and

21    dates probably at least every two weeks since then.  So, we

22    have been working on it.  This was not a situation where they

23    asked.  Okay?

24         THE COURT:  Straight up, my question is:  The guy won't

25    be available?

1          MS. CRUZ:  Yes.  Well --

2          THE COURT:  Okay.  He is on a honeymoon or something?

3          MS. CRUZ:  Yes.  And when they called five days before

4     the March 21st deposition, we had already told him, "You can

5     either do the depo" -- this is the conversations that were at

6     the beginning of February.

7          We said, "Let's do the depo in March, or you have to

8     wait all the way until the end of May because he is going on

9     vacation.  He is getting married.  He is going on a honeymoon.

10    He is going to be gone."

11         And they said, "Okay, let's do it for March."

12         So, we said, "Okay, March 21st.

13         The depo was set for March 21st.

14         THE COURT:  Did you know about the honeymoon problem?

15         MS. CRUZ:  Yes.

16         MR. BOUMEL:  I believe I may have, your Honor.

17         MS. CRUZ:  Yes.  And so then, on March -- then a few

18    days before March 21st, Ms. Sanguinetti, who is on the phone,

19    called me and said, "I know we are supposed to do the depo next

20    week.  But, the one attorney that we want to do the depo, he is

21    not available.  Will you all agree to push the depo back?"

22         So, I talked to the client and I confirmed, of course,

23    the guy is getting married and going on a honeymoon.  That is

24    not going to change.  But, I confirmed.  I said, "We are fine

25    with moving it back from March 21st.  But, just like we told

1    you guys before, Mr. Rubio" -- they know the witness, they have

2    taken his depo before, plaintiff's attorney took it before in

3    another case.  We said, "Mr. Rubio" -- who is the witness --

4    "he is going to be out, and he won't be available until late

5    May.  Are you sure you guys are okay waiting until then?"

6         "Yeah, that's fine.  No problem."

7         We would have never agreed to take the depo off and to

8    postpone it from March 21st if would -- knew they were going to

9    try to come back and try to force us to produce a different

10   witness.

11        And, Mr. Boumel, we have talked about this.

12        THE COURT:  Ms. Sanguinetti, is that right?

13        Did you indicate there would be no problem with doing

14   it in the end of May?

15        Are you there?

16        Did I lose you?

17        And then, what happened?  Is that who you talked to?

18        MS. CRUZ:  Yeah, yeah.  And then the conversation was,

19   she said, "I will give you some dates in May."

20        And I said, "Okay."

21        And then -- and then plaintiff's counsel sent an email,

22   and they said, "Can we do the depo at the end of the week of

23   May 20th?"

24        So, that would have been -- Thursday and Friday will be

25   the 24th and 25th.  And, I responded to them and I said, "The

 1    witness can't do the 24th or the 25th.  But, he can do the 29th

 2    or 31st.

 3              THE COURT:  Of?

 4              MS. CRUZ:  Of May.  So, then they proposed May 24th or

 5    25th, and I said, "He can't do it, but he can do it the 29th or

 6    30th."

 7              And then I didn't hear from them for two weeks.  And

 8    then they said, "Well, we changed our minds.  I know we said

 9    that we can do it in late May" --

10              I said, "But what is the problem?  I am offering you

11    dates that are five days after what you just asked me for."

12              "I know, but we have been looking at the schedule, and

13    we" --

14              I mean, I don't mean to talk in a way -- it is just

15    that this is frustrating.

16              THE COURT:  You are -- I know, you are talking in a

17    way.

18              MS. CRUZ:  I know.  And I don't mean to.  And we all

19    get along well.  It is just you make all these agreements and

20    you have all these conversations, and then they come to court

21    and it is like -- it is frustrating, because it almost seems

22    like we are being forced --

23              THE COURT:  Do you mean to make this -- is there a

24    reason that you have to take only this gentleman as your

25    corporate rep?

1          Wouldn't there be other corporate reps that you would

2    use?

3          MS. CRUZ:  Well, no.

4          Well, first of all, Tesla has the right to choose the

5    witness.  And, it also seems like they are trying -- they know

6    who the witness is, and they know he is unavailable.

7          And, I don't know if they want the witness to be

8    somebody else.  But, it sure does seem like that --

9          THE COURT:  Um-hmm.

10         MS. CRUZ:  -- because they made all these agreements

11   going along, and then are now coming around and asking the

12   Court, you know, for a different -- for a different witness.

13         THE COURT:  Now, is it correct that they asked for

14   individual depos and you declined?

15         MS. CRUZ:  Yes.

16         THE COURT:  Okay.

17         MS. CRUZ:  Yes.  And so --

18         THE COURT:  On what day basis can I do that?

19         On what basis do you decline?

20         MS. CRUZ:  The basis was, No. 1, they have already

21   taken 15 hours of an autopilot deposition.

22         Number two, we are producing a second autopilot.

23         And, so, if you feel like there is information that you

24   need -- which we don't even believe that this second deposition

25   is appropriate.  We could have taken the position -- which your

1   Honor kind of said, "Well, you only get one," we could have

2   done that.

3         But, we said, "Okay.  There are additional things you

4   guys have determined that you now want to ask about.  Fine.  We

5   will produce another corporate rep.

6         "But, why not identify the topics and then talk about

7   them?"

8         They talk about taking specific engineers, and pulling

9   them away from their duties of being engineers, and questioning

10  them about this and this and this and this, instead of going to

11  a corporate rep?

12        And, this case has been pending for almost three years.

13        They have had all this time to do this.

14        And, now, it is like Tesla is being backed into a

15  corner and is being prejudiced because they chose to wait.

16  They chose not to do the depo in March 21st.

17        THE COURT:  But, how are you prejudiced, though?

18        I don't understand.

19        MS. CRUZ:  Because now, we are talking about having to

20  produce other witnesses instead of the corporate rep, and

21  possibly choosing a new witness.

22        THE COURT:  But, that's not unusual to Tesla.

23        I mean, that happens in lots of cases where you have a

24  30(b)(6), but then you also depose an individual officer -- not

25  "officer," an individual employee who has significant personal

1   knowledge.

2          MS. CRUZ:  And, typically, the order is do the

3   corporate rep, and if you don't get information that you need,

4   then we can drill down to a specific witness that you believe,

5   by name, has that information.

6          That's typically the order in which things are done.

7   And, what that does is that eliminates the need, so now --

8          THE COURT:  That's not a rule.  And, what the rule says

9   is that one person's discovery doesn't affect another person's

10  discovery, right?

11         That is what the rule actually says.

12         So, I don't see -- I don't see where that comes from.

13         MS. CRUZ:  I will not disagree with you about what the

14  rule says about a corporate rep.  It certainly doesn't say you

15  can't depose other people.

16         THE COURT:  Right.

17         MS. CRUZ:  But, there has to be some process.  You

18  can't just go -- they can't just go and name whoever they want

19  and try to take their depositions.

20         THE COURT:  I agree with that, obviously.

21         If they named, you know, what is his name -- the owner

22  of Tesla, I wouldn't let them do that.  But, if they know a

23  particular person that has significant personal knowledge of

24  the issues in this case, and they -- and they are -- they could

25  take that person's deposition, right, is there anything in the

1    rule that bars it?

2          MS. CRUZ:  No.  And we didn't say that we wouldn't

3    produce them.  We have produced witnesses, individual witnesses

4    in other cases.  I am not disagreeing with you.

5          THE COURT:  Right.

6          MS. CRUZ:  The agreement was this is the way that we

7    would do things, and now --

8          THE COURT:  Well, obviously, you don't have an

9    agreement, at this point.  So --

10         MS. CRUZ:  Yes.

11         THE COURT:  So, I certainly won't compel your 30(b)(6)

12   witness, under the circumstances, before -- before he gets back

13   from his vacation because they had an opportunity to take him.

14   They didn't take him.  That is on them.

15         So, I can't do anything about that.

16         But, I -- I can't stop them from using the interim

17   period.  We have a whole month and a half before that is -- or

18   a month and two-thirds -- of doing something else.  I mean --

19         MS. CRUZ:  I don't disagree with you on that.

20         THE COURT:  Yes.  So --

21         MS. CRUZ:  That is not an issue for today, but --

22         THE COURT:  So, who did you want to take?

23         MR. BOUMEL:  I don't have the three names in front of

24   us, your Honor.

25         THE COURT:  Okay.

1       MR. BOUMEL:  Just for the record, your Honor, we

2   actually -- the last hearing that we were before your Honor, we

3   had numerous items noticed for hearing, compelling those

4   individual -- the development was one of those items, we just

5   never reached it.  We ran out of time.

6       THE COURT:  Okay.

7       MR. BOUMEL:  But, there were three individuals that we

8   want -- one of them was the one that was cross-noticed in the

9   other case.  But, there are two others that have not been

10  deposed.

11      And then --

12      THE COURT:  And do they have -- the key would be, do

13  they have unique personal knowledge about the issues in this

14  case?

15      MR. BOUMEL:  I can't -- I can't tell you.  I can't

16  affirm that, your Honor --

17      THE COURT:  Well --

18      MR. BOUMEL:  -- because we have more specialized

19  counsel that does these issues.

20      THE COURT:  To the extent that that is who you are

21  asking for, then go forward.  In the interim period -- and, you

22  can't decline on the basis of you have to take the 30(b)(6)

23  first.  There is no such rule.  And, you know, if some judge

24  has followed that rule, it is entirely possible.  It is a

25  perfectly reasonable, discretionary thing to do.

1          Again, it goes to my point about what a protective

2     order -- there are different ways we can go about doing this.

3     And, I am not doubting that that is a reasonable thing to do in

4     the case.

5          MS. CRUZ:  Right.

6          THE COURT:  I don't do that simply because I follow the

7     four corners of the Rule.  One person's discovery doesn't

8     affect another person.  You are entitled to do that, with the

9     predicate knowledge that it has to be somebody with material

10    personal knowledge of the issues in this case.  Right?

11         Okay.

12         So, if in the interim period, he wishes to take that

13    deposition before the 30(b)(6), you can't just say, "Well, the

14    30(b)(6) is not until the end of May, or at the end of the

15    cutoff, so you don't get any" -- no.

16         MS. CRUZ:  No. I am not --

17         THE COURT:  So, go back and he will give you a proffer

18    of the two people he wants.  If you have a dispute about one of

19    them, I am perfectly willing to hear that.

20         MS. CRUZ:  I understand.

21         THE COURT:  And, otherwise, otherwise, if I can't get

22    to you, I will order it after the discovery cutoff so you can

23    have that.

24         But, go ahead and do that process.

25         I will agree, you know, you don't have to produce your

 1   30(b)(6) until the date you provided counsel, and that they

 2   initially agreed to, and now don't want to agree to.  So, there

 3   are consequences to that.  I agree with you as to that.  There

 4   is nothing for me to compel.

 5        But, on this issue, you have my ear on that.  So if you

 6   don't have agreement next week or so, then notice it, and I bet

 7   that will fix it.  Okay?

 8        MR. BOUMEL:  And, your Honor, just briefly, we

 9   understand your ruling, and I am not saying that your ruling

10   should be altered in any way.  We agree with it.  We understand

11   it.  Let's say that.

12        With respect -- with regard to the 30(b)(6) though,

13   there is going to be a timing issue in terms of we are taking

14   it now at the end of May.

15        Discovery cutoff -- I forget if it is the end of June

16   or beginning of June.  But, we are going to have issues with

17   the timing of the discovery cutoff and the timing of this

18   30(b)(6).

19        You know, we don't anticipate -- you know, we have --

20   we have heard that Tesla's representatives come to these

21   depositions and they are unable to answer many of the

22   designated areas of inquiry.  We expect to go back before your

23   Honor for those purposes.

24        Then we also expect --

25        THE COURT:  It sounds like this guy wouldn't do that,

1    because it sounds like he is kind of their go-to person.

2         MR. BOUMEL:  And, we have heard -- I can't tell you

3    this from personal experience.  But, I have heard from my

4    cocounsel that what they did in these corporate representative

5    depos is a lot of "I don't knows," which, as you and I and

6    Ms. Cruz know, we all know if you say, "I don't know," for an

7    area of inquiry, that is an issue.

8         THE COURT:  Well, that's why I am also giving you leave

9    to take somebody with knowledge.  So --

10        MR. BOUMEL:  Right.

11        THE COURT:  But, we will have to deal with it as we

12   deal with it.  There is nothing much else I can do about it.

13        MS. CRUZ:  Your Honor, just for clarification, and just

14   so the Court know, I definitely wasn't saying they don't have a

15   right to try to take anybody else's deposition.

16        But, I just want to be clear, because I don't even know

17   who these witnesses are.  I knew, at one time.  But I don't

18   know now who they might be.

19        But, you said send a notice.  These are witnesses that

20   I -- for sure, I know don't live in Florida.  And, that we may

21   or may not have control over -- a lot of times, people are

22   former employees.  I don't even know who they are.  So, I just

23   want to make sure.

24        THE COURT:  I am assuming you have control over the

25   witness.  So, if you don't have control over the witness, then

1    they should just issue a subpoena.  Right?

2         If you don't have control over the witness, tell them

3    you don't have control.

4         MS. CRUZ:  No.  I am just saying -- I just want to make

5    it clear that the Court's order is that we should work together

6    and they can identify some other witnesses they want to depose,

7    and we will meet and confer on it, not that we are required to

8    produce the three people for deposition that they identified,

9    that no one is sitting in the room with right now knows who

10   they are.

11        THE COURT:  No, and I am not ruling on it.

12        MS. CRUZ:  Okay.

13        THE COURT:  Other than if they given you somebody who

14   has personal knowledge, and is under the control of the

15   company, they are entitled to depose that person, even if the

16   30(b)(6) deposition is not yet done.

17        MS. CRUZ:  Understood.

18        THE COURT:  That is my ruling.

19        Now, as to the particulars of that, you may object, for

20   example to an individual noticing, A, they want to depose the

21   Elon Musk.

22        MS. CRUZ:  Right.

23        THE COURT:  We will have a hearing on that.

24        MS. CRUZ:  I understand.

25        THE COURT:  So, all those arguments were preserved.  I

1   am just saying to the extent that you are --

2         MS. CRUZ:  Understood.

3         THE COURT:  -- that to the extent you are relying on

4   that argument, I won't enforce that.

5         MS. CRUZ:  And, I wasn't making it -- I just -- was

6   just saying that was the agreement.

7         THE COURT:  I got you.

8         MS. CRUZ:  As opposed to -- maybe if we just --

9         THE COURT:  Well, he has clearly changed his mind.

10        MS. CRUZ:  Yes.

11        No, there is -- that's fine.

12        MR. BOUMEL:  There is no agreement with that.

13        THE COURT:  If there is no agreement with that, that is

14   fine.

15        So, so those are the -- those are the -- that is what

16   we will do for now.  Okay?

17        MS. CRUZ:  I understood.

18        THE COURT:  And, then, we will plan -- I am sure we

19   will have some issues at the beginning in June.  So, maybe we

20   should just go ahead and set a hearing at the beginning of June

21   to preserve your --

22        MS. CRUZ:  Well --

23        MR. POSES:  Judge, can I make one point?

24        THE COURT:  Sure.

25        MR. POSES:  If you recall, earlier, from your prior

1    hearing, that I -- our concern --

2         THE COURT:  That was the Three Stooges.  Right.

3         That is before your time.

4         MS. CRUZ:  I remember.

5         THE COURT:  Work from the 1900s.  The Three Stooges

6    matters.

7         MR. POSES:  Our concern, which Adam, you know, told the

8    Court, is in timing, one, and so when we take these depositions

9    late and have a cutoff soon after, and an expert needs to have

10   this information and a transcript needs to be created, it does

11   create timing issues.

12        So, we don't want to lose the trial date.

13        But, we also -- we don't want to have to issue -- but,

14   at the same time, is there any prejudice to extending deadlines

15   as we, you know, for discovery purposes and to do these

16   depositions.

17        THE COURT:  By agreement, you know, of course, you can

18   do anything by agreement, anything by agreement.

19        MR. POSES:  Sure.

20        THE COURT:  The only thing is, your trial deadline, I

21   know your expert disclosure deadline is the end of --

22        MR. POSES:  June 28th, I believe.

23        THE COURT:  June 28th.  Now, in fairness, though, given

24   how much you know of what the issues are and given the amount

25   of documents that an expert is going to have, if you go to

1    Judge Bloom -- and I don't control her schedule, she does --

2    so, if you go to Judge Bloom, say, "We think we are going to

3    need more time, because we can't disclose -- our expert can't

4    disclose everything he is going to know," that is going to be

5    hard for her to stomach simply because, number one, the case

6    has been going for a while;

7            Number two, he has so much information;

8            And, number three, there is always the possibility of

9    supplementing an expert's opinion when something new comes out.

10           MR. POSES:  Fair.

11           THE COURT:  So, my suggestion to you is, don't -- go

12   with that date.  Get your expert ready.  If you need to

13   supplement either side's experts, that will be much easier for

14   me to approve than for you to go to Judge Bloom and say, "We

15   would like to move this on the chance that we won't be able to

16   get everything done."

17           She is not going to hear you on this.

18           This is -- this is a 2021 case.  So, don't do that.

19           So, by agreement, you can do anything by agreement.

20   And, I encourage you.

21           What is your trial date?

22           MR. POSES:  November.

23           MS. CRUZ:  November.

24           THE COURT:  We have plenty of time.  So, there is no

25   reason why the parties can't, by agreement -- for example, if

1    somebody is sick, and they need to be deposed in June, and the

2    parties agree to depose the person, there is no reason why you

3    shouldn't be able to do that.  You have plenty of time.

4         The June 28th deadline, though, right, expert, yeah,

5    you can't always get every piece of discovery done before an

6    expert's opinion is due.  That is fine.

7         99 percent of what your expert s going to say, he knows

8    right -- or she knows right now.  So, give that opinion, and

9    then get leave to supplement.  That is something I can do.

10        I can do that.  Right?

11        You can come to me and say, if there is a dispute, "We

12   want to supplement with this additional information because of

13   what the witness said in June, or" -- why would I deny that?

14        Right?

15        MR. POSES:  Very good.

16        So, we will order just this part of the transcript.

17        THE COURT:  So, don't blow it on the June 28th

18   deadline.  Stick to it, and you will be much better off.

19        MR. POSES:  Judge, thanks.  The case is old, but it is

20   brand new, with the recall and new information.

21        THE COURT:  I get that.

22        MR. POSES:  That is the reason we waited as long as we

23   did.

24        THE COURT:  I got you.

25        MR. BOUMEL:  Thank you, your Honor.

1          MS. CRUZ:  Thank you, your Honor.

2          (End of transcription of Recording.)

3

4                        —      —      —

5

6

7

8                    C E R T I F I C A T E

9

10         I hereby certify that the foregoing is an

11  accurate transcription of the proceedings in the

12  above-entitled matter.

13

14  July 16, 2024        /s/Sharon Velazco
    DATE                 SHARON VELAZCO, RPR, FPR
15                       Official Court Reporter
                         United States District Court
16                       400 North Miami Avenue
                         9th Floor
17                       Miami, Florida 33128

18

19

20

21

22

23

24

25

## #

**#1600** [1] - 1:18

## '

**'18** [1] - 11:9

## /

**/s/Sharon** [1] - 66:14

## 1

**1** [3] - 1:8, 13:14, 53:20
**11** [1] - 13:18
**11th** [3] - 25:3, 29:11, 44:14
**12** [4] - 13:18, 13:19, 26:2, 44:20
**1238** [1] - 25:3
**12th** [1] - 44:25
**14** [1] - 27:18
**15** [2] - 48:2, 53:21
**150** [1] - 34:7
**1520** [1] - 1:15
**16** [5] - 6:7, 14:21, 32:17, 40:15, 66:14
**169** [1] - 1:18
**16l** [1] - 6:8
**17** [2] - 6:7, 14:21
**18** [1] - 24:19
**19** [1] - 27:18
**1900s** [1] - 63:5

## 2

**2.0** [2] - 16:11, 39:11
**2.8** [1] - 38:22
**2013** [1] - 11:17
**2014** [6] - 10:8, 11:10, 11:15, 12:16, 13:16, 13:24
**2016** [1] - 45:24
**2018** [3] - 5:19, 6:4, 17:2
**2019** [11] - 5:19, 5:23, 6:4, 6:11, 11:22, 14:14, 17:2, 19:3, 27:25, 39:9, 39:10
**2020** [1] - 14:15
**2021** [2] - 31:4, 64:18
**2022** [1] - 19:3
**2023** [9] - 9:17, 9:20, 23:14, 27:20, 30:12, 30:14, 42:4, 44:21, 45:1
**2024** [4] - 1:5, 11:6, 11:12, 66:14

**2025** [1] - 31:4
**20th** [1] - 51:23
**21-21940** [2] - 1:2, 3:6
**21st** [9] - 47:6, 47:13, 50:4, 50:12, 50:13, 50:18, 50:25, 51:8, 54:16
**2200** [1] - 1:22
**24th** [3] - 51:25, 52:1, 52:4
**25th** [3] - 51:25, 52:1, 52:5
**26** [1] - 29:12
**26(c** [2] - 25:9, 31:9
**28** [1] - 27:20
**28th** [4] - 63:22, 63:23, 65:4, 65:17
**29th** [2] - 52:1, 52:5

## 3

**3** [2] - 6:5, 28:1
**3.0** [5] - 11:23, 16:11, 31:5, 38:23, 39:9
**30(b)(6)** [11] - 46:15, 46:24, 47:24, 54:24, 56:11, 57:22, 58:13, 58:14, 59:1, 59:12, 61:16
**30(b)(6)** [1] - 59:18
**30th** [1] - 52:6
**31st** [1] - 52:2
**33128** [2] - 2:12, 66:17
**33131** [1] - 1:19
**33134** [1] - 2:4
**33156** [1] - 1:15

## 4

**4** [1] - 1:5
**4.0** [1] - 16:10
**400** [2] - 2:12, 66:16

## 5

**50** [1] - 10:25

## 6

**60** [1] - 10:25
**66** [1] - 1:8

## 7

**70** [1] - 34:7
**740** [1] - 1:22
**75** [1] - 10:24

## 8

**800** [1] - 2:4

## 9

**9** [2] - 26:1, 28:1
**9.0** [2] - 11:23, 13:18
**9350** [1] - 1:14
**94608** [1] - 1:22
**965** [1] - 25:3
**99** [1] - 65:7
**9th** [1] - 66:16

## A

**ability** [2] - 34:10, 36:24
**able** [8] - 6:15, 8:5, 8:24, 10:4, 17:25, 26:11, 64:15, 65:3
**above-entitled** [1] - 66:12
**absolutely** [5] - 17:14, 17:15, 41:11, 45:14, 45:15
**abundance** [1] - 39:21
**access** [18] - 4:21, 4:22, 7:8, 7:9, 22:24, 22:25, 23:1, 23:8, 23:22, 34:4, 34:8, 34:15, 36:5, 36:7, 36:8, 45:13
**accident** [8] - 4:21, 11:5, 11:24, 20:10, 27:25, 34:15, 34:17, 45:16
**accurate** [2] - 32:3, 66:11
**accused** [2] - 9:13, 29:24
**achieve** [1] - 33:12
**acknowledgment** [1] - 31:19
**acting** [1] - 36:25
**action** [1] - 36:20
**actions** [1] - 9:4
**activate** [1] - 41:19
**activated** [4] - 11:13, 41:16, 41:22, 41:24
**ADA's** [1] - 17:15
**ADAM** [1] - 1:13
**Adam** [2] - 3:8, 63:7
**adamant** [1] - 24:24
**add** [1] - 38:14
**added** [1] - 3:22
**additional** [4] - 45:5, 45:11, 54:3, 65:12
**address** [2] - 15:24,

35:9
**addressed** [6] - 4:23, 5:4, 33:16, 34:1, 35:12, 35:16
**addresses** [1] - 4:17
**adhere** [1] - 45:7
**admissibility** [2] - 16:2, 36:15
**admissible** [3] - 39:21, 39:22, 39:24
**admonished** [1] - 24:5
**advanced** [3] - 13:22, 17:16, 26:5
**advantage** [5] - 8:1, 8:4, 8:7, 30:3, 37:6
**advantages** [1] - 8:15
**advent** [1] - 35:3
**affect** [4] - 6:16, 8:19, 55:9, 58:8
**affirm** [1] - 57:16
**afforded** [1] - 17:10
**afternoon** [1] - 3:17
**afterwards** [1] - 15:21
**ago** [8] - 9:17, 16:24, 16:25, 17:1, 29:7, 35:4, 44:3, 44:22
**agree** [13] - 9:18, 29:19, 37:5, 37:15, 43:14, 46:9, 50:21, 55:20, 58:25, 59:2, 59:3, 59:10, 65:2
**agreed** [5] - 3:22, 12:7, 47:7, 51:7, 59:2
**agreement** [12] - 56:6, 56:9, 59:6, 62:6, 62:12, 62:13, 63:17, 63:18, 64:19, 64:25
**agreements** [2] - 52:19, 53:10
**agrees** [1] - 38:3
**ahead** [5] - 11:4, 13:5, 27:22, 58:24, 62:20
**air** [2] - 12:23, 13:2
**airbag** [1] - 6:1
**airbags** [1] - 6:3
**airlines** [1] - 35:8
**al** [1] - 1:4
**Al** [1] - 21:1
**alert** [1] - 42:24
**alerts** [1] - 45:6
**Alhambra** [1] - 2:3
**alive** [1] - 34:23
**allegation** [4] - 20:15, 21:16, 21:22, 43:5
**allegations** [12] -

**4:17**, 5:11, 5:21, 7:7, 9:5, 18:8, 19:24, 20:6, 22:5, 34:18, 43:11
**allege** [1] - 16:16
**alleged** [1] - 6:10
**alleging** [2] - 35:11, 43:9
**allow** [6] - 5:10, 5:20, 6:21, 28:13, 37:3, 37:6
**allowed** [6] - 5:18, 7:3, 7:18, 30:5, 34:13, 37:23
**allowing** [1] - 12:11
**allows** [1] - 37:25
**almost** [2] - 52:21, 54:12
**altered** [1] - 59:10
**amount** [1] - 63:24
**analysis** [3] - 33:5, 40:15, 43:16
**answer** [1] - 59:21
**answered** [2] - 32:7, 32:9
**anticipate** [1] - 59:19
**appear** [1] - 48:18
**appearance** [1] - 48:13
**appearances** [1] - 3:7
**APPEARANCES** [2] - 1:12, 2:1
**appeared** [2] - 48:15, 48:16
**applicable** [1] - 43:2
**applied** [1] - 5:3
**applies** [2] - 9:4, 25:7
**apply** [3] - 25:12, 43:3, 44:9
**appropriate** [2] - 40:10, 53:25
**approve** [1] - 64:14
**April** [1] - 1:5
**area** [4] - 23:16, 25:16, 42:23, 60:7
**areas** [1] - 59:22
**arguably** [1] - 37:22
**argue** [2] - 14:22, 18:6, 32:25, 33:1, 38:2
**argued** [2] - 32:16, 39:6
**arguing** [7] - 18:6, 32:2, 32:16, 32:19, 39:8, 39:11, 40:7
**argument** [7] - 4:10, 16:19, 29:3, 29:6, 38:17, 40:6, 62:4
**arguments** [5] -

30:22, 32:23, 38:3, 38:4, 61:25

**ARIAS** [1] - 1:21

**arose** [1] - 4:19

**artificial** [2] - 36:11, 36:12

**as-is** [1] - 46:12

**aside** [1] - 14:23

**assistance** [1] - 17:16

**assuming** [1] - 60:24

**attention** [3] - 35:14, 45:9, 45:10

**attenuator** [1] - 21:7

**attorney** [9] - 10:6, 14:21, 24:1, 24:2, 24:3, 28:2, 48:12, 50:20, 51:2

**attorneys** [10] - 3:11, 6:9, 8:5, 8:8, 8:9, 8:11, 12:13, 14:9, 28:3, 36:23

**auto** [14] - 5:4, 5:23, 9:6, 12:2, 18:25, 19:24, 21:8, 22:3, 26:8, 34:10, 34:21, 45:7, 45:12

**automatic** [4] - 12:1, 20:7, 22:1, 41:6

**automation** [1] - 35:7

**automobile** [1] - 12:20

**automotive** [1] - 24:18

**autonomous** [1] - 34:12

**autopilot** [48] - 4:19, 5:4, 5:8, 5:11, 5:21, 5:22, 5:23, 7:13, 9:5, 11:7, 11:9, 11:10, 11:11, 11:13, 12:16, 13:13, 13:21, 13:22, 13:23, 19:25, 20:21, 21:22, 21:23, 24:15, 24:21, 27:3, 31:1, 31:6, 31:20, 31:21, 34:3, 34:19, 34:22, 35:4, 35:5, 35:6, 35:15, 40:22, 41:17, 41:19, 42:5, 43:5, 43:6, 48:2, 48:3, 53:21, 53:22

**autopilot's** [1] - 33:20

**availability** [1] - 47:16

**available** [8] - 7:4, 12:16, 14:25, 44:1, 49:13, 49:25, 50:21,

51:4

**Avenue** [2] - 2:12, 66:16

**aware** [2] - 4:15, 18:18

# B

**backed** [1] - 54:14

**background** [1] - 9:11

**bad** [1] - 46:6

**bags** [1] - 25:23

**balance** [2] - 12:9, 22:18

**balanced** [1] - 32:22

**balancing** [1] - 17:9

**Banner** [2] - 22:5, 24:8

**barrier** [1] - 21:6

**bars** [1] - 56:1

**based** [5] - 16:1, 16:6, 25:9, 36:11, 45:22

**basic** [1] - 31:3

**basis** [5] - 45:25, 53:18, 53:19, 53:20, 57:22

**Beach** [1] - 22:6

**bearing** [3] - 33:6, 39:9, 41:12

**become** [2] - 35:4, 35:7

**BEFORE** [1] - 1:11

**beginning** [5] - 30:11, 50:6, 59:16, 62:19, 62:20

**behalf** [3] - 3:8, 3:14, 3:16

**behind** [2] - 29:22, 35:5

**BENAVIDES** [1] - 1:4

**Benavides** [1] - 3:5

**benefit** [1] - 6:14

**bent** [1] - 42:19

**bet** [1] - 59:6

**better** [3] - 16:17, 35:12, 65:18

**between** [14] - 5:6, 5:7, 11:8, 12:9, 12:21, 14:3, 24:21, 30:8, 33:9, 36:23, 38:18, 38:22, 39:17, 45:23

**big** [2] - 20:14, 21:16

**bigger** [1] - 43:12

**billion** [1] - 29:19

**BLOOM** [1] - 1:2

**Bloom** [4] - 3:6, 64:1, 64:2, 64:14

**blow** [1] - 65:17

**board** [1] - 31:21

**Boumel** [7] - 3:8, 4:2, 12:14, 20:12, 24:2, 40:20, 51:11

**BOUMEL** [49] - 1:13, 1:14, 3:8, 3:21, 3:24, 4:3, 5:15, 5:17, 6:12, 6:16, 6:25, 7:24, 8:4, 9:3, 10:25, 29:17, 30:19, 31:15, 32:12, 32:18, 32:21, 33:7, 34:1, 35:22, 36:1, 36:7, 37:14, 38:13, 38:16, 38:24, 39:4, 44:17, 46:11, 46:14, 47:23, 48:5, 48:8, 49:4, 50:16, 56:23, 57:1, 57:7, 57:15, 57:18, 59:8, 60:2, 60:10, 62:12, 65:25

**Bowman** [1] - 2:3

**braking** [5] - 12:2, 19:24, 20:7, 22:2, 41:6

**brand** [1] - 65:20

**Brandon** [1] - 30:21

**Brands** [1] - 25:3

**briefly** [3] - 29:22, 44:17, 59:8

**bring** [1] - 46:22

**bringing** [1] - 29:8

**broad** [3] - 10:12, 11:19

**broader** [2] - 7:4, 32:17

**Brooke** [1] - 2:3

**burden** [1] - 25:5

**business** [6] - 7:25, 8:14, 8:19, 29:20, 30:2, 37:5

**button** [2] - 13:4, 13:5

**buy** [1] - 11:2

**BY** [1] - 2:9

# C

**CA** [1] - 1:22

**California** [5] - 7:10, 8:22, 20:12, 20:19, 24:6

**camera** [5] - 13:24, 14:17, 21:19, 42:21

**cameras** [3] - 11:12, 13:25, 14:18

**cancelled** [1] - 49:2

**cannot** [1] - 18:18

**capabilities** [1] - 13:23

**car** [29] - 6:3, 11:23,

13:1, 13:3, 14:14, 17:3, 20:2, 20:4, 20:9, 20:10, 20:22, 20:23, 21:4, 21:11, 21:19, 22:6, 22:14, 26:1, 32:20, 34:11, 35:6, 41:9, 42:3, 42:5, 42:7, 42:21

**Card** [1] - 42:6

**cars** [6] - 13:24, 14:16, 19:9, 20:1, 31:13, 42:1

**CASE** [1] - 1:2

**case** [109] - 3:5, 3:19, 4:1, 4:7, 4:13, 4:18, 4:23, 5:1, 5:3, 5:22, 6:1, 7:2, 7:9, 7:10, 7:17, 7:18, 7:23, 8:2, 8:5, 8:10, 8:22, 8:23, 10:6, 10:14, 12:3, 12:13, 14:10, 14:11, 16:11, 16:23, 18:9, 18:18, 18:25, 19:18, 19:19, 19:20, 19:23, 20:11, 20:13, 20:17, 20:18, 21:12, 21:13, 21:16, 21:21, 21:22, 22:1, 22:5, 22:10, 23:1, 23:2, 24:1, 24:3, 24:8, 25:1, 25:2, 26:16, 27:24, 28:9, 28:18, 30:4, 30:5, 30:17, 30:20, 33:1, 33:2, 33:17, 34:15, 34:18, 35:11, 35:18, 36:20, 37:7, 37:8, 38:1, 39:10, 39:20, 39:25, 41:7, 41:25, 42:16, 42:17, 43:1, 43:5, 43:7, 43:20, 44:10, 44:15, 46:8, 48:9, 48:10, 48:11, 48:13, 48:15, 51:3, 54:12, 55:24, 57:9, 57:14, 58:4, 58:10, 64:5, 64:18, 65:19

**Case** [1] - 3:6

**cases** [19] - 5:10, 5:19, 5:20, 5:25, 6:3, 6:15, 6:17, 6:19, 12:14, 18:10, 18:17, 20:20, 24:19, 26:13, 27:25, 30:6, 36:24, 54:23, 56:4

**causes** [1] - 36:20

**caveat** [1] - 46:16

**cease** [3] - 23:25, 24:4, 29:23

**cell** [2] - 42:18, 42:19

**center** [3] - 33:17,

35:17, 45:15

**central** [3] - 4:18, 4:25, 5:2

**certainly** [6] - 28:20, 38:5, 43:22, 46:11, 55:14, 56:11

**certify** [1] - 66:10

**chance** [1] - 64:15

**change** [13] - 9:2, 9:3, 14:16, 15:19, 30:15, 30:16, 31:25, 40:18, 43:15, 44:12, 44:14, 45:25, 50:24

**changed** [13] - 5:20, 10:1, 14:1, 15:21, 30:8, 33:4, 39:1, 40:14, 41:2, 41:3, 52:8, 62:9

**changes** [8] - 14:5, 14:14, 25:19, 25:23, 25:24, 25:25, 26:4, 31:13

**changing** [1] - 31:9

**chase** [1] - 49:7

**checks** [1] - 45:11

**Chief** [1] - 3:4

**Chiquita** [1] - 25:3

**choose** [1] - 53:4

**choosing** [1] - 54:21

**chose** [2] - 54:15, 54:16

**Circuit** [3] - 25:3, 29:11, 44:14

**circulating** [1] - 46:25

**circumstance** [1] - 30:15

**circumstances** [2] - 31:25, 56:12

**citing** [1] - 32:13

**civil** [1] - 3:6

**Civil** [1] - 25:8

**claims** [1] - 6:10

**clarification** [1] - 60:13

**clear** [6] - 10:3, 21:10, 33:8, 49:17, 60:16, 61:5

**clearly** [1] - 62:9

**client** [3] - 25:21, 34:23, 50:22

**clients** [2] - 25:21, 34:23

**closer** [1] - 14:11

**cocounsel** [5] - 29:23, 30:21, 37:7, 47:9, 60:4

**cocounsel's** [1] - 36:23

**coding** [1] - 17:22

**collision** [1] - 34:21
**Colorado** [1] - 7:8
**combat** [1] - 35:10
**coming** [4] - 10:7,
21:15, 39:1, 53:11
**comment** [1] - 10:21
**commercial** [4] -
8:15, 29:21, 37:1,
37:3
**common** [3] - 31:23,
33:17, 33:21
**commonality** [5] -
38:17, 38:21, 38:22,
38:25, 39:3
**communicated** [1] -
46:25
**communicating** [1] -
46:17
**company** [1] - 61:15
**comparable** [2] -
11:15, 11:18
**compare** [3] - 18:25,
24:23
**compel** [2] - 56:11,
59:4
**COMPEL** [1] - 1:10
**compelling** [1] - 57:3
**competitor** [2] -
23:7, 23:21
**complacency** [1] -
35:7
**complacent** [2] -
35:5, 35:6
**complaint** [1] - 6:11
**completely** [3] -
21:21, 22:5, 41:11
**component** [1] -
21:24
**components** [3] -
12:5, 13:12, 31:3
**conceivably** [1] -
8:19
**concept** [1] - 14:24
**concern** [2] - 63:1,
63:7
**conclusion** [1] - 38:4
**conclusions** [1] -
33:12
**conditions** [1] - 43:4
**confer** [2] - 28:20,
61:7
**confidential** [10] -
4:9, 7:25, 10:5, 22:24,
22:25, 23:2, 24:11,
25:17, 29:20, 30:1
**confirmed** [2] -
50:22, 50:24
**conflict** [1] - 47:11
**confusion** [2] -
41:16, 43:4

**connection** [4] -
7:22, 37:12, 38:11,
45:23
**consequences** [2] -
23:4, 59:3
**consider** [1] - 28:13
**consideration** [3] -
28:12, 28:19, 29:2
**constantly** [1] -
12:22
**constraints** [1] -
36:11
**consultants** [1] -
23:18
**Cont'd** [1] - 2:1
**contemplate** [1] -
22:11
**contention** [2] -
14:7, 14:8
**control** [8] - 34:10,
60:21, 60:24, 60:25,
61:2, 61:3, 61:14,
64:1
**controlled** [2] - 34:6,
45:13
**controlled-access**
[1] - 45:13
**controlling** [1] - 24:9
**controls** [1] - 45:5
**conversation** [1] -
51:18
**conversations** [2] -
50:5, 52:20
**cool** [1] - 10:19
**Coral** [1] - 2:4
**corner** [1] - 54:15
**corners** [1] - 58:7
**corporate** [14] -
26:19, 46:15, 47:4,
48:2, 48:3, 48:6,
52:25, 53:1, 54:5,
54:11, 54:20, 55:3,
55:14, 60:4
**correct** [3] - 37:14,
42:11, 53:13
**correctly** [1] - 21:5
**cost** [1] - 10:22
**counsel** [7] - 3:7,
9:11, 27:24, 36:25,
51:21, 57:19, 59:1
**country** [8] - 6:18,
6:19, 6:20, 6:23, 7:5,
8:6, 10:6, 47:15
**couple** [2] - 37:11,
44:18
**course** [4] - 8:17,
38:21, 50:22, 63:17
**court** [2] - 24:5,
52:20
**Court** [26] - 2:11,

2:11, 3:2, 5:9, 10:15,
11:21, 12:7, 17:8,
25:7, 26:18, 27:10,
28:6, 28:10, 28:16,
28:19, 28:21, 29:8,
40:17, 44:11, 46:8,
49:17, 53:12, 60:14,
63:8, 66:15, 66:15
**COURT** [119] - 1:1,
3:12, 3:15, 3:17, 3:23,
4:1, 5:13, 5:16, 6:6,
6:13, 6:24, 7:20, 8:2,
9:2, 9:7, 9:12, 10:18,
10:20, 10:22, 11:2,
14:19, 15:13, 16:1,
16:9, 18:12, 18:14,
20:25, 21:6, 22:8,
22:22, 27:19, 27:21,
29:15, 30:16, 31:7,
32:9, 32:15, 32:19,
32:22, 33:23, 35:19,
35:24, 36:3, 37:10,
37:15, 38:15, 38:20,
38:25, 40:1, 40:6,
40:10, 41:13, 44:16,
45:17, 46:12, 47:21,
47:25, 48:4, 48:6,
48:17, 48:20, 49:1,
49:6, 49:9, 49:12,
49:24, 50:2, 50:14,
51:12, 52:3, 52:16,
52:23, 53:9, 53:13,
53:16, 53:18, 54:17,
54:22, 55:8, 55:16,
55:20, 56:5, 56:8,
56:11, 56:20, 56:22,
56:25, 57:6, 57:12,
57:17, 57:20, 58:6,
58:17, 58:21, 59:25,
60:8, 60:11, 60:24,
61:11, 61:13, 61:18,
61:23, 61:25, 62:3,
62:7, 62:9, 62:13,
62:18, 62:24, 63:2,
63:5, 63:17, 63:20,
63:23, 64:11, 64:24,
65:17, 65:21, 65:24
**Court's** [2] - 27:13,
61:5
**COURTROOM** [1] -
3:2
**covers** [1] - 19:7
**crash** [10] - 10:11,
11:14, 13:17, 15:20,
21:7, 41:10, 41:11,
42:6
**crashed** [1] - 21:5
**crazy** [1] - 11:3
**create** [1] - 63:11
**created** [1] - 63:10

**cries** [1] - 28:12
**cross** [7] - 34:6,
34:16, 48:8, 48:10,
48:13, 48:15, 57:8
**cross-noticed** [5] -
48:8, 48:10, 48:13,
48:15, 57:8
**crossing** [3] - 21:13,
21:15, 22:7
**CRUZ** [74] - 2:2,
3:10, 3:16, 9:10, 9:13,
10:19, 10:21, 10:24,
11:5, 15:12, 15:14,
16:8, 16:13, 18:13,
18:16, 21:1, 21:7,
22:17, 23:10, 27:20,
27:23, 35:21, 37:9,
40:3, 40:9, 40:17,
41:14, 48:1, 48:14,
48:19, 48:21, 49:5,
49:8, 49:11, 49:15,
50:1, 50:3, 50:15,
50:17, 51:18, 52:4,
52:18, 53:3, 53:10,
53:15, 53:17, 53:20,
54:19, 55:2, 55:13,
55:17, 56:2, 56:6,
56:10, 56:19, 56:21,
58:5, 58:16, 58:20,
60:13, 61:4, 61:12,
61:17, 61:22, 61:24,
62:2, 62:5, 62:8,
62:10, 62:17, 62:22,
63:4, 64:23, 66:1
**Cruz** [13] - 3:16,
29:18, 30:22, 32:2,
32:3, 38:24, 39:5,
39:15, 44:22, 45:2,
46:17, 46:20, 60:6
**Cruz's** [1] - 30:21
**cut** [1] - 49:6
**cutoff** [6] - 47:18,
58:15, 58:22, 59:15,
59:17, 63:9
**cutting** [3] - 12:10,
17:13, 17:15
**cyber** [7] - 10:15,
11:6, 11:12, 11:14,
14:10, 26:2

**D**

**dangle** [2] - 44:8,
44:9
**DATE** [1] - 66:14
**date** [9] - 17:4, 47:4,
47:7, 47:13, 49:2,
59:1, 63:12, 64:12,
64:21
**dates** [5] - 47:2,

47:14, 49:21, 51:19,
52:11
**days** [3] - 50:3,
50:18, 52:11
**deadline** [4] - 63:20,
63:21, 65:4, 65:18
**deadlines** [1] - 63:14
**deal** [4] - 20:14,
48:19, 60:11, 60:12
**dealership** [1] -
12:25
**dealing** [7] - 12:3,
17:10, 17:11, 19:8,
19:9, 34:24, 36:18
**dealt** [1] - 17:12
**December** [4] - 42:4,
44:20, 44:25, 46:25
**decide** [2] - 16:1,
16:6
**decided** [1] - 9:21
**decision** [2] - 31:8,
40:4
**decline** [2] - 53:19,
57:22
**declined** [1] - 53:14
**defect** [5] - 6:10, 7:7,
7:19, 33:24, 42:9
**defective** [3] - 6:1,
21:24, 21:25
**defects** [2] - 7:17,
9:5
**DEFENDANT** [1] -
2:2
**defendant** [3] - 1:8,
3:19, 9:8
**definitely** [1] - 60:14
**definition** [2] - 22:14,
46:4
**deny** [1] - 65:13
**depo** [15] - 48:3,
48:6, 48:7, 49:19,
49:20, 50:5, 50:7,
50:13, 50:19, 50:20,
50:21, 51:2, 51:7,
51:22, 54:16
**depos** [3] - 47:22,
53:14, 60:5
**depose** [6] - 54:24,
55:15, 61:6, 61:15,
61:20, 65:2
**deposed** [2] - 57:10,
65:1
**deposition** [16] -
43:8, 46:24, 47:5,
47:10, 47:12, 47:20,
48:2, 48:12, 50:4,
53:21, 53:24, 55:25,
58:13, 60:15, 61:8,
61:16
**depositions** [4] -

55:19, 59:21, 63:8, 63:16

**DEPUTY** [1] - 3:2
**deserves** [1] - 8:18
**design** [5] - 10:5, 12:18, 14:5, 25:18
**designated** [1] - 59:22
**designed** [5] - 4:20, 8:12, 34:3, 34:7, 34:14
**designing** [1] - 17:21
**desist** [3] - 23:25, 24:4, 29:23
**detect** [1] - 22:7
**determined** [1] - 54:4
**development** [1] - 57:4
**devices** [1] - 34:6
**devoting** [1] - 24:12
**difference** [1] - 11:8
**differences** [5] - 14:2, 14:3, 15:7, 24:21, 42:8
**different** [43] - 6:22, 7:5, 7:6, 9:25, 10:9, 10:10, 14:13, 14:15, 14:17, 15:10, 17:11, 17:20, 17:24, 18:22, 19:5, 19:7, 19:8, 20:1, 22:5, 22:7, 24:19, 26:1, 27:4, 30:23, 31:2, 33:1, 33:10, 33:13, 33:14, 36:24, 37:19, 38:18, 39:16, 39:19, 41:1, 51:9, 53:12, 58:2
**differentiate** [2] - 5:6, 5:7
**differently** [4] - 26:3, 46:1, 46:5, 46:7
**disagree** [3] - 45:21, 55:13, 56:19
**disagreeing** [1] - 56:4
**disagreement** [1] - 4:9
**disclose** [2] - 64:3, 64:4
**disclosed** [1] - 23:19
**disclosure** [2] - 8:19, 63:21
**discover** [1] - 8:22
**discovered** [1] - 8:9
**discovery** [21] - 3:18, 15:3, 15:4, 15:8, 16:1, 16:5, 16:9, 36:15, 36:22, 39:22, 39:23, 43:21, 47:18, 55:9,

55:10, 58:7, 58:22, 59:15, 59:17, 63:15, 65:5
**discretion** [1] - 32:23
**discretionary** [3] - 37:22, 46:4, 57:25
**dispute** [4] - 17:14, 20:18, 58:18, 65:11
**DISTRICT** [2] - 1:1, 1:1
**District** [4] - 2:11, 3:2, 3:3, 66:15
**divider** [1] - 34:5
**DIVISION** [1] - 1:2
**Dixie** [1] - 1:14
**document** [3] - 26:20, 28:9, 28:17
**documents** [13] - 4:9, 7:8, 7:10, 10:5, 12:12, 14:9, 16:10, 19:14, 31:10, 43:25, 44:3, 63:25
**dollars** [2] - 10:23, 11:3
**Don** [1] - 24:3
**done** [12] - 4:15, 41:9, 42:4, 46:1, 46:7, 46:8, 46:20, 54:2, 55:6, 61:16, 64:16, 65:5
**doubting** [1] - 58:3
**down** [11] - 15:16, 15:17, 19:12, 20:4, 20:9, 22:10, 42:13, 42:19, 44:9, 55:4
**drill** [2] - 44:8, 55:4
**drilling** [1] - 42:13
**drive** [1] - 42:5
**driver** [16] - 4:25, 20:13, 20:14, 20:17, 20:20, 21:15, 21:20, 34:2, 35:2, 35:12, 42:18, 42:21, 45:3, 45:7, 45:10
**driver's** [2] - 17:16, 42:25
**driver-facing** [1] - 42:21
**drivers** [6] - 4:24, 20:16, 35:4, 35:14, 41:16, 41:21
**driving** [4] - 13:23, 34:12, 43:6, 45:7
**dropped** [1] - 42:18
**due** [2] - 40:20, 65:6
**duration** [1] - 25:13
**duties** [1] - 54:9

E

**ear** [2] - 35:23, 59:5
**early** [1] - 4:7
**easier** [1] - 64:13
**East** [1] - 1:18
**economy** [1] - 14:24
**edge** [5] - 12:10, 17:13, 17:15, 24:14, 27:1
**EDWIN** [1] - 1:11
**Edwin** [1] - 3:4
**efficiency** [1] - 6:21
**efficient** [1] - 15:1
**eight** [3] - 9:17, 13:25, 14:18
**either** [5] - 13:19, 23:9, 43:9, 50:5, 64:13
**eliminate** [1] - 41:15
**eliminates** [1] - 55:7
**Elise** [1] - 3:13
**ELISE** [1] - 1:21
**elise@aswtlawuers .com** [1] - 1:23
**Elon** [1] - 61:21
**email** [1] - 51:21
**emails** [1] - 46:25
**emergency** [5] - 12:1, 19:24, 20:7, 22:2, 41:6
**Emeryville** [1] - 1:22
**employee** [1] - 54:25
**employees** [1] - 60:22
**enables** [1] - 6:17
**encourage** [2] - 45:6, 64:20
**End** [1] - 66:2
**end** [14] - 19:11, 20:8, 47:2, 47:3, 47:14, 47:16, 50:8, 51:14, 51:22, 58:14, 59:14, 59:15, 63:21
**ends** [1] - 30:14
**enforce** [1] - 62:4
**enforced** [1] - 37:12
**enforcing** [2] - 24:10, 24:13
**engaged** [2] - 35:15, 45:8
**engaging** [1] - 45:11
**engineer** [1] - 47:10
**engineers** [2] - 54:8, 54:9
**enter** [1] - 4:8
**entered** [2] - 11:22, 25:4
**entirely** [2] - 32:3,

57:24
**entitled** [4] - 29:20, 58:8, 61:15, 66:12
**enunciated** [1] - 29:11
**equation** [2] - 23:3, 31:14
**equivalent** [1] - 18:21
**especially** [1] - 23:16
**ESQ** [4] - 1:13, 1:17, 1:21, 2:2
**et** [1] - 1:4
**events** [1] - 15:18
**evidence** [4] - 8:22, 33:18, 39:22, 39:24
**evolution** [2] - 39:16, 39:19
**evolving** [1] - 12:17
**exact** [9] - 9:23, 13:14, 15:1, 15:2, 15:8, 25:10, 29:6, 29:7, 44:15
**exactly** [2] - 39:18, 43:18
**example** [7] - 10:14, 14:10, 15:3, 16:10, 28:8, 61:20, 64:25
**except** [1] - 47:17
**exception** [1] - 28:24
**exchange** [1] - 36:22
**exchanged** [1] - 12:21
**exercised** [1] - 32:23
**exist** [2] - 23:19, 26:20
**existing** [1] - 45:6
**exists** [1] - 38:6
**exit** [1] - 21:2
**expect** [2] - 59:22, 59:24
**expensive** [1] - 19:11
**experience** [1] - 60:3
**expert** [9] - 23:21, 47:11, 63:9, 63:21, 63:25, 64:3, 64:12, 65:4, 65:7
**expert's** [2] - 64:9, 65:6
**experts** [3] - 23:20, 47:18, 64:13
**explaining** [1] - 33:7
**explanation** [1] - 20:5
**explored** [1] - 48:12
**extending** [1] - 63:14
**extensive** [1] - 9:16
**extent** [4] - 30:12, 57:20, 62:1, 62:3

**extreme** [1] - 22:18
**extremely** [1] - 12:9
**eyes** [2] - 20:20, 42:22

F

**facing** [2] - 21:3, 42:21
**fact** [5] - 15:9, 29:4, 33:3, 38:9, 45:23
**factor** [1] - 25:13
**factors** [4] - 25:8, 27:9, 29:10, 29:13
**facts** [5] - 29:22, 42:14, 43:3, 44:10, 48:11
**factually** [1] - 44:19
**failure** [1] - 4:18
**fair** [3] - 30:14, 46:1, 64:10
**fairness** [2] - 49:1, 63:23
**falls** [2] - 15:23, 25:5
**familiar** [1] - 18:15
**family** [1] - 9:14
**far** [2] - 15:25, 16:15
**fatal** [2] - 34:16, 45:15
**favor** [1] - 29:13
**feasible** [1] - 16:20
**feature** [1] - 45:12
**features** [2] - 11:9, 11:11, 12:2
**February** [3] - 47:2, 47:4, 50:6
**Fed.3d** [1] - 25:3
**Federal** [3] - 25:8, 29:12
**few** [6] - 15:18, 16:13, 25:24, 44:22, 47:15, 50:17
**field** [1] - 23:20
**file** [2] - 4:11
**findings** [1] - 44:25
**fine** [7] - 10:2, 50:24, 51:6, 54:4, 62:11, 62:14, 65:6
**FIRM** [1] - 1:14
**firm** [2] - 23:20, 46:20
**firms** [1] - 7:5
**firmware** [2] - 13:9, 15:22
**first** [15] - 4:4, 10:7, 11:16, 12:16, 13:13, 22:17, 26:23, 31:15, 41:1, 44:20, 46:24, 47:16, 53:4, 57:23
**five** [3] - 20:3, 50:3,

52:11
**fix** [2] - 47:25, 59:7
**FL** [3] - 1:15, 1:19, 2:4
**Flagler** [1] - 1:18
**flashing** [1] - 20:8
**Floor** [1] - 66:16
**FLORIDA** [1] - 1:1
**Florida** [5] - 1:4, 2:12, 3:3, 60:20, 66:17
**flow** [2] - 6:17, 8:25
**follow** [2] - 14:19, 58:6
**followed** [1] - 57:24
**following** [1] - 3:1
**font** [2] - 41:3, 43:11
**FOR** [2] - 1:13, 2:2
**force** [1] - 51:9
**forced** [1] - 52:22
**foregoing** [1] - 66:10
**forget** [1] - 59:15
**forgetting** [1] - 49:16
**form** [3] - 11:7, 13:22, 46:20
**former** [3] - 4:10, 4:11, 60:22
**formulate** [1] - 47:19
**forth** [2] - 14:21, 43:20
**forward** [1] - 57:21
**four** [2] - 10:9, 58:7
**FPR** [2] - 2:10, 66:14
**frame** [1] - 38:11
**framing** [1] - 35:9
**frankly** [1] - 6:16
**free** [2] - 6:17, 8:25
**free-flow** [2] - 6:17, 8:25
**freely** [1] - 8:25
**Friday** [1] - 51:24
**FROM** [1] - 1:6
**front** [10] - 4:10, 9:20, 20:3, 30:9, 30:20, 33:16, 35:17, 45:15, 56:23
**frustrating** [2] - 52:15, 52:21
**full** [1] - 13:23
**fully** [1] - 32:12
**future** [2] - 10:17, 16:20

### G

**Gables** [1] - 2:4
**gain** [2] - 8:7, 30:2
**game** [1] - 20:22
**general** [3] - 24:17, 33:4, 39:1

**generally** [1] - 14:25
**generation** [2] - 19:2
**gentleman** [2] - 34:22, 52:24
**geofence** [1] - 4:19
**geofenced** [1] - 34:19
**geofencing** [5] - 34:2, 42:1, 45:3, 45:13
**given** [3] - 61:13, 63:23, 63:24
**glossed** [1] - 42:13
**go-to** [1] - 60:1
**gore** [4] - 20:24, 21:1, 21:2, 21:5
**GORE** [1] - 21:1
**Gore** [1] - 21:1
**gosh** [1] - 10:19
**government** [5] - 31:12, 31:16, 36:4, 38:10
**Government's** [1] - 31:8
**great** [1] - 10:14
**ground** [1] - 28:11
**GROUP** [1] - 1:17
**guess** [6] - 22:8, 22:16, 30:25, 32:9, 37:10
**guy** [5] - 17:3, 49:13, 49:24, 50:23, 59:25
**guys** [3] - 51:1, 51:5, 54:4

### H

**half** [1] - 56:17
**hamstrung** [1] - 26:15
**hands** [9] - 20:13, 20:16, 20:17, 20:21, 21:16, 21:18, 21:20, 42:18, 45:8
**happy** [1] - 28:17
**hard** [2] - 12:4, 64:5
**hardware** [27] - 10:10, 11:16, 11:23, 11:25, 12:4, 13:11, 13:13, 13:14, 14:4, 14:16, 15:21, 18:19, 19:15, 28:1, 31:5, 31:22, 31:24, 32:4, 33:11, 33:14, 33:19, 33:21, 38:18, 39:16, 39:19
**harm** [1] - 25:14
**hate** [2] - 29:4, 38:13
**head** [3] - 17:25, 32:14, 42:22

**headrest** [1] - 42:23
**hear** [4] - 8:17, 52:7, 58:19, 64:17
**heard** [9] - 33:9, 39:4, 39:5, 39:15, 40:21, 45:17, 59:20, 60:2, 60:3
**hearing** [16] - 3:18, 9:19, 27:19, 30:9, 33:8, 35:20, 35:25, 36:10, 39:6, 44:21, 57:2, 57:3, 61:23, 62:20, 63:1
**hearings** [1] - 15:18
**heavily** [1] - 29:13
**help** [1] - 14:8
**hereby** [1] - 66:10
**hide** [1] - 48:23
**hideous** [1] - 10:20
**higher** [1] - 19:11
**higher-end** [1] - 19:11
**highly** [2] - 10:4, 25:17
**Highway** [1] - 1:14
**highway** [2] - 4:22, 34:16
**highways** [5] - 4:20, 4:21, 34:4, 34:5, 45:13
**himself** [3] - 29:25, 36:24
**hire** [1] - 17:23
**hmm** [1] - 53:9
**hole** [1] - 15:16
**Honda** [1] - 6:2
**honestly** [1] - 19:13
**honeymoon** [4] - 50:2, 50:9, 50:14, 50:23
**Honor** [32] - 3:13, 3:21, 4:3, 4:4, 5:12, 6:12, 6:16, 25:2, 28:16, 29:17, 29:19, 32:7, 35:21, 35:22, 37:9, 39:18, 40:4, 44:17, 46:11, 46:14, 46:22, 50:16, 54:1, 56:24, 57:1, 57:2, 57:16, 59:8, 59:23, 60:13, 65:25, 66:1
**Honor's** [2] - 36:14, 39:14
**Honorable** [1] - 3:4
**HONORABLE** [1] - 1:11
**hope** [1] - 33:7
**hour** [1] - 43:6
**hours** [2] - 48:2, 53:21

**hundred** [2] - 10:23, 10:24
**Hyundai** [1] - 6:2

### I

**idea** [3] - 22:20, 27:14, 38:21
**identified** [1] - 61:8
**identify** [1] - 54:6, 61:6
**implied** [1] - 29:11
**important** [7] - 7:15, 9:10, 17:9, 18:3, 23:13, 24:13, 24:25, 27:7, 28:6, 39:20, 39:25
**impose** [1] - 31:9
**inaccurate** [1] - 42:12
**inattentive** [1] - 4:24
**INC** [1] - 1:7
**Inc** [1] - 3:16
**incident** [1] - 27:25
**incidents** [1] - 11:22
**includes** [1] - 45:8
**incorporate** [1] - 45:5
**Incorporated** [1] - 3:5
**indicate** [1] - 51:13
**individual** [6] - 53:14, 54:24, 54:25, 56:3, 57:4, 61:20
**individuals** [1] - 57:7
**inflater** [1] - 19:21, 19:22
**information** [39] - 6:17, 7:3, 7:4, 7:6, 7:17, 7:25, 8:8, 8:10, 8:15, 8:18, 8:25, 12:10, 12:20, 18:4, 22:24, 22:25, 23:2, 23:23, 24:11, 25:15, 27:24, 29:20, 29:24, 30:2, 30:4, 33:13, 36:23, 36:24, 39:20, 47:19, 48:24, 53:23, 55:3, 55:5, 63:10, 64:7, 65:12, 65:20
**inherited** [1] - 46:8
**injuries** [1] - 34:24
**inquiry** [2] - 59:22, 60:7
**insane** [1] - 11:1
**inside** [2] - 21:19, 42:21
**insinuate** [1] - 46:20
**insinuation** [1] - 20:19

**install** [1] - 13:6
**instance** [2] - 5:25, 28:23
**instances** [2] - 23:15, 23:18
**instead** [2] - 54:10, 54:20
**instrument** [1] - 41:2
**intention** [2] - 26:23
**interests** [2] - 8:1, 8:20
**interim** [3] - 56:16, 57:21, 58:12
**intersection** [1] - 42:6
**introduce** [1] - 36:20
**investigation** [5] - 36:4, 43:18, 43:25, 44:4, 44:24
**involved** [7] - 11:14, 11:22, 18:17, 19:20, 21:8, 21:13, 27:24
**involves** [2] - 13:5, 38:10
**involving** [7] - 5:10, 5:19, 5:21, 6:10, 6:11, 14:10, 19:15
**IS** [1] - 4:4
**issue** [46] - 4:4, 4:13, 4:23, 5:1, 5:22, 7:15, 12:2, 16:7, 18:2, 19:19, 19:22, 21:9, 23:10, 24:8, 25:11, 29:8, 31:20, 31:21, 31:23, 33:15, 33:19, 33:20, 33:24, 35:2, 35:3, 35:15, 36:9, 36:15, 36:16, 38:6, 39:3, 39:7, 43:7, 43:9, 43:19, 44:15, 44:18, 46:14, 46:21, 56:21, 59:5, 59:13, 60:7, 61:1, 63:13
**issued** [2] - 31:16, 44:20
**issues** [21] - 4:22, 5:2, 5:21, 9:5, 15:15, 16:5, 16:14, 19:18, 33:15, 33:17, 35:1, 35:17, 41:7, 55:24, 57:13, 57:19, 58:10, 59:16, 62:19, 63:11, 63:24
**items** [3] - 29:24, 57:3, 57:4
**iterations** [2] - 15:10, 31:2
**iterative** [1] - 12:18
**itself** [2] - 33:21, 45:4

## J

**January** [2] - 47:1, 49:19
**Judge** [14] - 3:4, 3:6, 9:20, 25:9, 27:16, 30:9, 30:20, 40:13, 40:18, 43:15, 44:2, 64:1, 64:2, 64:14
**judge** [9] - 25:2, 29:5, 32:22, 37:18, 40:13, 46:3, 57:23, 62:23, 65:19
**JUDGE** [1] - 1:11
**judgment** [1] - 33:2
**judicial** [2] - 6:21, 14:24
**july** [1] - 66:14
**June** [20] - 9:20, 12:7, 23:14, 27:19, 27:20, 32:16, 35:20, 35:25, 45:19, 47:18, 59:15, 59:16, 62:19, 62:20, 63:22, 63:23, 65:1, 65:4, 65:13, 65:17
**justification** [1] - 7:16

## K

**keep** [2] - 7:21, 25:20
**keeping** [2] - 29:13, 45:8
**kept** [1] - 16:16
**key** [2] - 4:17, 57:12
**kind** [8] - 13:9, 18:22, 40:21, 41:17, 42:12, 42:13, 54:1, 60:1
**knowledge** [8] - 23:22, 55:1, 55:23, 57:13, 58:9, 58:10, 60:9, 61:14
**known** [5] - 35:3, 35:7, 40:13, 40:14, 44:23
**knows** [5] - 25:2, 60:5, 61:9, 65:7, 65:8

## L

**lack** [1] - 20:4
**lane** [2] - 21:10, 21:11
**lanes** [2] - 21:5, 21:9
**language** [2] - 6:8, 9:2
**last** [11] - 3:25, 9:23, 11:6, 11:14, 14:7,

15:17, 15:18, 27:13, 39:6, 46:14, 57:2
**late** [4] - 17:2, 51:4, 52:9, 63:9
**LAW** [2] - 1:14, 1:17
**law** [1] - 7:5
**lawsuits** [2] - 6:9, 26:25
**lawyer** [3] - 7:8, 22:25, 23:1
**lawyers** [3] - 6:15, 25:20, 26:13
**lead** [2] - 39:21, 39:23
**leader** [2] - 17:14, 17:19
**learned** [2] - 30:4, 39:9
**least** [2] - 49:12, 49:21
**leave** [3] - 46:12, 60:8, 65:9
**lectern** [1] - 9:12
**left** [2] - 23:20, 23:21
**legal** [1] - 45:19
**less** [1] - 44:10
**letter** [2] - 23:25, 29:23
**letting** [1] - 44:6
**level** [1] - 23:17
**liability** [1] - 24:19
**lifelong** [1] - 34:24
**light** [3] - 20:8, 22:2, 22:4
**likelihood** [1] - 25:14
**limine** [1] - 36:18
**limit** [5] - 7:1, 30:12, 30:13, 34:12, 39:23
**limitation** [2] - 32:24, 40:15
**limitations** [1] - 36:10
**limited** [10] - 4:11, 4:19, 4:21, 15:8, 18:19, 19:20, 34:4, 34:15, 40:15
**limited-access** [1] - 4:21
**line** [1] - 27:18
**lines** [1] - 28:7
**litigants** [1] - 6:22
**litigate** [1] - 25:11
**litigated** [1] - 37:18
**litigation** [11] - 8:1, 8:4, 8:7, 8:16, 9:1, 14:25, 19:19, 22:11, 23:7, 30:3, 37:6
**litigations** [1] - 26:25
**live** [1] - 60:20
**LLP** [1] - 1:21

**location** [1] - 41:4
**look** [6] - 18:15, 19:1, 29:10, 32:5, 37:2, 45:18
**looked** [2] - 25:10, 43:23
**looking** [1] - 52:12
**looks** [1] - 10:16
**lose** [4] - 8:15, 24:14, 51:16, 63:12
**loud** [1] - 42:24

## M

**Mad** [1] - 10:16
**magistrate** [2] - 4:10, 4:11
**Magistrate** [1] - 3:4
**MAGISTRATE** [1] - 1:11
**main** [2] - 20:6, 35:1
**major** [1] - 4:22
**manual** [2] - 34:7, 42:10
**manufactured** [1] - 4:16
**manufacturer** [3] - 16:25, 17:5, 26:8
**manufacturers** [6] - 12:20, 17:12, 17:21, 17:24, 34:12, 34:21
**March** [13] - 47:6, 47:13, 49:2, 50:4, 50:7, 50:11, 50:12, 50:13, 50:17, 50:18, 50:25, 51:8, 54:16
**markers** [1] - 21:10
**market** [1] - 18:1
**married** [2] - 50:9, 50:23
**material** [1] - 58:9
**materials** [1] - 36:5
**matter** [7] - 6:1, 6:2, 6:4, 16:6, 43:14, 47:12, 66:12
**matters** [2] - 16:1, 63:6
**Max** [1] - 10:16
**mean** [35] - 7:13, 8:13, 8:24, 14:20, 16:18, 19:1, 19:13, 22:17, 26:15, 26:21, 26:22, 27:15, 28:19, 30:19, 32:5, 36:13, 37:10, 38:13, 38:21, 39:8, 39:15, 39:18, 39:25, 40:3, 42:11, 43:12, 43:13, 47:18, 52:14, 52:18, 52:23, 54:23, 56:18

**means** [4] - 4:19, 13:2, 34:4, 34:5
**measure** [2] - 15:22, 22:12
**measurement** [1] - 22:13
**measures** [1] - 16:4
**meet** [3] - 28:17, 28:20, 61:7
**merely** [1] - 48:12
**MIAMI** [1] - 1:2
**Miami** [7] - 1:4, 1:15, 1:19, 2:12, 2:12, 66:16, 66:17
**microphone** [1] - 9:12
**mid** [1] - 9:17
**might** [3] - 25:24, 41:18, 60:18
**million** [1] - 11:3
**mind** [1] - 62:9
**minds** [1] - 52:8
**missing** [1] - 42:23
**mode** [2] - 41:15, 43:4
**model** [34] - 4:12, 5:3, 5:19, 5:23, 6:5, 6:11, 10:9, 11:10, 11:15, 11:22, 14:15, 18:19, 19:15, 26:9, 28:1, 28:7, 28:9, 30:24, 31:4, 31:22, 31:23, 33:10, 33:13, 33:20, 33:22, 38:18, 39:9, 39:10
**models** [3] - 5:6, 10:10, 33:10
**modification** [1] - 25:6
**modify** [7] - 4:5, 5:9, 25:5, 38:7, 40:8, 45:20, 45:22
**moment** [1] - 14:23
**monitoring** [7] - 4:25, 20:14, 34:2, 35:3, 35:13, 45:4, 45:10
**month** [2] - 56:17, 56:18
**monthly** [1] - 13:7
**months** [4] - 9:17, 29:7, 44:22, 47:15
**most** [3] - 12:19, 17:8, 20:1
**MOTION** [1] - 1:10
**motions** [1] - 36:18
**move** [1] - 64:15
**moving** [2] - 6:20, 50:25
**MR** [57] - 3:8, 3:21,

3:24, 4:3, 5:15, 5:17, 6:12, 6:16, 6:25, 7:24, 8:4, 9:3, 10:25, 29:17, 30:19, 31:15, 32:12, 32:18, 32:21, 33:7, 34:1, 35:22, 36:1, 36:7, 37:14, 38:13, 38:16, 38:24, 39:4, 44:17, 46:11, 46:14, 47:23, 48:5, 48:8, 49:4, 50:16, 56:23, 57:1, 57:7, 57:15, 57:18, 59:8, 60:2, 60:10, 62:12, 62:23, 62:25, 63:7, 63:19, 63:22, 64:10, 64:22, 65:15, 65:19, 65:22, 65:25
**MS** [74] - 3:10, 3:13, 3:16, 9:10, 9:13, 10:19, 10:21, 10:24, 11:5, 15:12, 15:14, 16:8, 16:13, 18:13, 18:16, 21:1, 21:7, 22:17, 23:10, 27:20, 27:23, 35:21, 37:9, 40:3, 40:9, 40:17, 41:14, 48:1, 48:14, 48:19, 48:21, 49:5, 49:8, 49:11, 49:15, 50:1, 50:3, 50:15, 50:17, 51:18, 52:4, 52:18, 53:3, 53:10, 53:15, 53:17, 53:20, 54:19, 55:2, 55:13, 55:17, 56:2, 56:6, 56:10, 56:19, 56:21, 58:5, 58:16, 58:20, 60:13, 61:4, 61:12, 61:17, 61:22, 61:24, 62:2, 62:5, 62:8, 62:10, 62:17, 62:22, 63:4, 64:23, 66:1
**Musk** [1] - 61:21

## N

**name** [4] - 11:9, 55:5, 55:18, 55:21
**named** [2] - 24:3, 55:21
**names** [1] - 56:23
**narrow** [1] - 22:13
**narrowly** [1] - 28:23
**nature** [3] - 11:19, 22:19, 45:23
**near** [1] - 11:11
**necessarily** [1] - 37:19
**need** [14] - 12:12,

18:9, 25:15, 28:18,
35:12, 35:13, 47:13,
53:24, 55:3, 55:7,
64:3, 64:12, 65:1
**needed** [1] - 10:13
**needs** [2] - 63:9,
63:10
**negligence** [1] - 5:11
**negotiated** [1] -
37:17
**negotiations** [1] -
9:16
**NEIMA** [1] - 1:4
**Neima** [1] - 3:5
**never** [5] - 9:13,
19:13, 43:8, 51:7,
57:5
**new** [6] - 13:4, 29:4,
54:21, 64:9, 65:20
**next** [5] - 41:17,
46:14, 47:15, 50:19,
59:6
**nexus** [1] - 39:17
**niche** [1] - 25:16
**Nissan** [7] - 12:24,
18:23, 19:1, 19:3,
19:7, 24:22, 25:22
**NO** [1] - 1:2
**nobody** [1] - 38:23
**non30(b)(6** [1] -
47:22
**nonlimited** [2] - 4:22,
34:8
**nonlimited-access**
[1] - 4:22
**North** [2] - 2:12,
66:16
**nothing** [10] - 9:25,
10:1, 20:11, 26:25,
30:24, 41:6, 41:25,
45:2, 59:4, 60:12
**notice** [2] - 59:6,
60:19
**noticed** [6] - 48:8,
48:10, 48:13, 48:15,
57:3, 57:8
**noticing** [1] - 61:20
**November** [3] - 7:15,
64:22, 64:23
**NTSA** [2] - 43:17,
44:4
**Number** [1] - 3:6
**number** [10] - 6:18,
25:19, 31:1, 46:2,
46:3, 53:22, 64:5,
64:7, 64:8
**numbers** [1] - 33:22
**numerous** [1] - 57:3

## O

**object** [1] - 61:19
**objected** [1] - 47:23
**obtain** [1] - 12:12
**obviously** [9] - 4:14,
12:11, 18:18, 28:19,
32:16, 42:4, 42:8,
55:20, 56:8
**occurred** [1] - 34:17
**occurs** [1] - 13:17
**OF** [1] - 1:1
**offering** [1] - 52:10
**office** [1] - 46:17
**officer** [2] - 54:24,
54:25
**official** [1] - 2:11
**Official** [1] - 66:15
**often** [1] - 26:4
**old** [4] - 16:15,
16:16, 16:17, 65:19
**older** [1] - 26:6
**once** [1] - 41:19
**one** [61] - 3:18, 4:22,
7:17, 9:18, 10:18,
13:15, 13:24, 14:2,
14:17, 14:18, 15:15,
19:4, 19:23, 20:6,
23:8, 25:12, 25:13,
25:19, 28:3, 29:19,
29:24, 30:24, 31:1,
31:18, 31:22, 32:4,
33:6, 33:12, 33:19,
33:20, 34:18, 34:23,
35:1, 37:11, 38:19,
41:1, 43:9, 46:2, 47:4,
48:4, 48:6, 50:20,
54:1, 55:9, 57:4, 57:8,
58:7, 58:18, 60:17,
61:9, 62:23, 63:8,
64:5
**operative** [1] - 29:14
**opinion** [3] - 64:9,
65:6, 65:8
**opinions** [1] - 47:19
**opportunity** [1] -
56:13
**opposed** [2] - 22:14,
62:8
**order** [32] - 4:6, 4:8,
5:10, 5:16, 5:17, 7:21,
7:24, 8:13, 9:15, 9:24,
19:14, 23:4, 24:4,
25:4, 25:13, 26:18,
29:13, 30:17, 31:10,
37:2, 37:4, 37:17,
37:24, 38:12, 45:24,
55:2, 55:6, 58:2,
58:22, 61:5, 65:16
**ordered** [1] - 44:2

**orders** [4] - 17:10,
24:5, 24:10, 24:13
**organization** [1] -
17:24
**originally** [1] - 3:21
**Otazo** [8] - 9:20,
25:9, 27:17, 30:9,
30:20, 40:18, 43:15,
44:2
**Otazo-Reyes** [6] -
9:20, 25:9, 30:9,
30:20, 40:18, 44:2
**Otazo-Reyes'** [1] -
43:15
**Otazo-Reyes's** [1] -
27:17
**otherwise** [2] - 58:21
**outside** [3] - 8:16,
23:7, 45:12
**overall** [1] - 8:13
**overly** [1] - 35:4
**own** [4] - 25:21,
31:17, 36:14, 39:14
**owner** [1] - 55:21
**owner's** [1] - 42:10
**ownership** [1] - 18:5

## P

**Page** [2] - 27:18,
34:7
**Pages** [1] - 1:8
**Palm** [1] - 22:6
**panel** [1] - 41:2
**paragraph** [5] - 6:6,
6:7, 14:21, 32:17,
40:15
**parameters** [1] - 31:9
**parked** [1] - 20:8
**part** [7] - 19:25,
31:11, 38:8, 41:13,
41:14, 41:15, 65:16
**particular** [2] -
22:14, 55:23
**particulars** [1] -
61:19
**parties** [7] - 3:19,
7:18, 9:18, 30:6, 46:2,
64:25, 65:2
**partner** [2] - 28:15,
48:15
**party** [3] - 25:5,
25:14, 47:21
**pass** [1] - 9:14
**past** [2] - 14:5, 20:2
**paying** [4] - 10:25,
35:14, 45:9, 45:10
**pending** [2] - 6:9,
54:12
**people** [9] - 10:25,

11:2, 17:23, 22:23,
23:18, 55:15, 58:18,
60:21, 61:8
**perceived** [1] - 25:14
**percent** [2] - 29:19,
65:7
**perfectly** [2] - 57:25,
58:19
**period** [3] - 56:17,
57:21, 58:12
**permission** [1] -
28:13
**permitted** [1] - 14:22
**person** [7] - 14:3,
23:7, 55:23, 58:8,
60:1, 61:15, 65:2
**person's** [4] - 55:9,
55:25, 58:7
**personal** [6] - 54:25,
55:23, 57:13, 58:10,
60:3, 61:14
**pertains** [2] - 8:23,
33:13
**phenomenon** [1] -
35:8
**phone** [5] - 3:11,
3:12, 42:18, 42:19,
50:18
**phonetic** [1] - 43:23
**physical** [1] - 13:11
**pick** [1] - 42:19
**piece** [2] - 40:5, 65:5
**pilot's** [1] - 35:9
**place** [6] - 9:16, 9:25,
14:14, 29:14, 39:1,
46:12
**placed** [1] - 36:11
**places** [1] - 45:11
**plain** [1] - 39:13
**PLAINTIFF** [1] - 1:13
**plaintiff** [8] - 3:14,
3:22, 3:23, 6:14, 9:22,
22:25, 45:21, 49:18
**plaintiff's** [5] - 24:1,
24:3, 28:2, 51:2,
51:21
**PLAINTIFF'S** [1] -
1:10
**plaintiffs** [9] - 3:9,
6:19, 6:22, 10:2,
12:11, 14:9, 16:15,
16:19, 18:8
**Plaintiffs** [1] - 1:5
**plaintiffs'** [4] - 3:11,
4:5, 27:24, 28:3
**plan** [1] - 62:18
**platform** [1] - 19:1
**platforms** [1] - 18:23
**playing** [1] - 20:22
**Plaza** [1] - 2:3

**pleasure** [1] - 15:23
**plenty** [2] - 64:24,
65:3
**plug** [1] - 12:25
**point** [14] - 10:2,
13:15, 13:25, 14:20,
15:10, 24:10, 27:12,
36:14, 37:21, 37:24,
39:14, 56:9, 58:1,
62:23
**pointed** [1] - 12:14
**points** [1] - 27:9
**popup** [1] - 13:3
**Poses** [1] - 3:8
**POSES** [12] - 1:17,
1:17, 62:23, 62:25,
63:7, 63:19, 63:22,
64:10, 64:22, 65:15,
65:19, 65:22
**poses** [1] - 24:1
**position** [2] - 29:9,
53:25
**possibility** [1] - 64:8
**possible** [1] - 57:24
**possibly** [3] - 27:10,
38:23, 54:21
**postpone** [1] - 51:8
**potentially** [2] - 15:5,
39:20
**Powell** [1] - 1:22
**precedent** [1] - 46:6
**precluded** [1] - 34:19
**predicate** [1] - 58:9
**prejudice** [3] - 28:22,
28:24, 63:14
**prejudiced** [2] -
54:15, 54:17
**presented** [3] -
37:13, 37:16
**preserve** [2] - 18:4,
62:21
**preserved** [1] - 61:25
**presiding** [1] - 3:4
**press** [2] - 13:4, 13:5
**prevent** [2] - 20:10,
48:23
**prevented** [1] - 15:20
**previous** [1] - 33:8
**previously** [2] -
11:22, 44:15
**primary** [1] - 33:16
**problem** [7] - 22:8,
22:22, 50:14, 51:6,
51:13, 52:10
**problems** [2] - 24:7,
24:9
**Procedure** [2] - 25:8,
29:12
**proceedings** [1] -
66:11

**process** [10] - 12:18, 12:19, 14:5, 14:25, 17:22, 25:17, 26:7, 48:25, 55:17, 58:24
**procured** [1] - 7:22
**produce** [8] - 7:2, 44:3, 51:9, 54:5, 54:20, 56:3, 58:25, 61:8
**produced** [3] - 23:1, 23:2, 56:3
**producing** [3] - 25:14, 47:23, 53:22
**product** [11] - 5:22, 6:3, 6:5, 7:6, 7:7, 7:11, 7:12, 9:15, 31:1, 31:20
**production** [3] - 4:8, 11:17, 31:10
**products** [2] - 18:25, 24:19
**proffer** [1] - 58:17
**programs** [1] - 35:8
**prominent** [1] - 4:24
**promoting** [3] - 14:24, 36:22, 36:23
**proper** [1] - 12:8
**properly** [1] - 42:25
**proportion** [1] - 10:13
**propose** [1] - 9:4
**proposed** [2] - 11:21, 52:4
**proposing** [3] - 9:22, 9:23, 9:25
**proprietary** [4] - 10:5, 12:10, 18:5, 22:18
**protect** [14] - 7:25, 8:14, 18:3, 22:19, 22:20, 24:25, 25:15, 26:5, 26:11, 26:24, 27:8, 29:20, 30:1, 37:4
**protected** [2] - 8:18, 23:14
**protecting** [1] - 12:9
**protections** [1] - 17:9
**protective** [26] - 4:5, 4:8, 5:9, 5:16, 5:17, 7:21, 7:24, 8:13, 9:15, 9:24, 17:10, 19:14, 23:4, 24:5, 24:10, 24:13, 25:4, 29:13, 30:17, 31:10, 37:2, 37:4, 37:17, 37:24, 38:12, 58:1
**prove** [1] - 36:19
**provide** [1] - 44:13

**provided** [2] - 44:3, 59:1
**provision** [10] - 5:13, 5:15, 5:17, 9:19, 9:21, 18:10, 18:11, 18:16, 37:25, 43:24
**provisions** [2] - 4:12, 18:14
**public** [2] - 22:12, 36:6
**publicly** [1] - 44:1
**pull** [2] - 41:20, 41:23
**pulled** [2] - 41:19, 41:21
**pulling** [2] - 41:17, 54:8
**purchased** [2] - 17:2, 17:4
**purpose** [3] - 7:21, 7:24, 22:12
**purposes** [10] - 14:20, 16:9, 22:9, 29:21, 30:2, 30:17, 37:25, 59:23, 63:15
**push** [1] - 50:21
**put** [6] - 10:2, 11:17, 14:23, 33:12, 42:5, 42:20

## Q

**questioning** [1] - 54:9
**questions** [1] - 48:14
**quiet** [1] - 9:14
**quite** [1] - 3:25
**quote** [1] - 42:11
**quoted** [1] - 42:10

## R

**rabbit** [1] - 15:16
**raise** [1] - 37:11
**ramp** [1] - 21:2
**ran** [2] - 20:24, 57:5
**rationale** [1] - 7:16
**re** [2] - 25:2, 25:11
**re-litigate** [1] - 25:11
**reached** [1] - 57:5
**reaches** [1] - 38:4
**read** [2] - 29:23, 45:4
**ready** [1] - 64:12
**really** [7] - 16:15, 16:19, 24:11, 25:12, 32:8, 38:20, 42:13
**realm** [1] - 38:5
**reason** [2] - 9:1, 12:15, 26:17, 26:18, 37:2, 37:3, 38:5,

43:13, 52:24, 64:25, 65:2, 65:22
**reasonable** [3] - 10:13, 57:25, 58:3
**recalled** [1] - 40:23
**recognize** [2] - 20:7, 21:4
**recognized** [2] - 22:2, 22:4
**recognizing** [1] - 21:9
**record** [5] - 3:7, 6:9, 36:6, 45:18, 57:1
**Recording** [1] - 66:2
**recording** [1] - 3:1
**RECORDING** [1] - 1:6
**red** [1] - 20:8
**refer** [1] - 21:12
**referred** [1] - 28:21
**referring** [1] - 20:18
**regard** [1] - 59:12
**regarding** [2] - 7:19, 46:25
**regardless** [2] - 11:24, 27:16
**regards** [1] - 10:6
**reiteration** [1] - 38:17
**relate** [2] - 17:1, 42:15
**related** [5] - 5:21, 26:13, 41:1, 41:6, 44:10
**relates** [3] - 7:6, 7:7, 17:16
**relation** [1] - 32:4
**released** [1] - 13:13
**relevant** [8] - 15:5, 16:10, 16:11, 16:24, 17:6, 33:13, 36:20, 43:15
**relief** [2] - 28:6, 28:10
**relying** [1] - 62:3
**remedial** [3] - 15:22, 15:23, 16:4
**remedies** [3] - 40:24, 41:9, 42:15
**remedy** [2] - 42:20, 45:5
**remember** [1] - 63:4
**rep** [9] - 48:2, 48:3, 48:7, 52:25, 54:5, 54:11, 54:20, 55:3, 55:14
**repeat** [1] - 38:13
**reply** [1] - 29:16
**REPORTED** [1] - 2:9
**Reporter** [2] - 2:11,

66:15
**represent** [1] - 30:5
**representation** [1] - 40:21
**representative** [5] - 26:19, 46:16, 46:24, 47:5, 60:4
**representatives** [1] - 59:20
**represented** [1] - 49:18
**reps** [1] - 53:1
**request** [2] - 4:5
**requested** [2] - 3:18, 3:22
**require** [1] - 15:9
**required** [2] - 44:13, 61:7
**requires** [2] - 28:19, 29:1
**respect** [3] - 32:3, 40:20, 59:12
**respectfully** [1] - 16:13
**respond** [1] - 40:6
**responded** [1] - 51:25
**responsibility** [1] - 45:7
**reverse** [1] - 44:14
**Reyes** [7] - 9:20, 25:9, 30:9, 30:20, 40:13, 40:18, 44:2
**Reyes'** [1] - 43:15
**Reyes's** [1] - 27:17
**road** [5] - 20:21, 27:5, 34:16, 34:20, 42:22
**Road** [1] - 42:6
**roads** [4] - 21:4, 34:4, 34:8, 42:1
**roadway** [2] - 45:9, 45:10
**robust** [2] - 4:25, 35:13
**Rogue** [1] - 19:3
**Rolex** [1] - 11:2
**roll** [1] - 13:19
**rolled** [1] - 13:19
**roofs** [1] - 25:22
**room** [1] - 61:9
**ROUSSO** [1] - 1:14
**RPR** [2] - 2:10, 66:14
**rub** [1] - 16:22
**Rubio** [2] - 51:1, 51:3
**Rule** [2] - 29:12, 31:9, 58:7
**rule** [8] - 32:13, 55:8, 55:11, 55:14, 56:1, 57:23, 57:24

**Rules** [1] - 25:8
**rules** [1] - 25:9
**ruling** [14] - 25:10, 27:13, 27:15, 27:17, 27:23, 28:22, 37:18, 37:19, 44:14, 59:9, 61:11, 61:18
**running** [1] - 12:5

## S

**safe** [1] - 34:13
**safety** [2] - 35:12, 35:15
**Sanguinetti** [3] - 3:13, 50:18, 51:12
**SANGUINETTI** [3] - 1:21, 1:21, 3:13
**sat** [1] - 48:12
**saw** [1] - 10:18
**schedule** [2] - 52:12, 64:1
**scheduling** [1] - 46:15
**scope** [16] - 4:9, 8:16, 9:22, 9:23, 9:24, 10:12, 11:5, 11:20, 11:21, 12:8, 18:23, 19:6, 29:7, 32:17, 40:12, 45:24
**screen** [1] - 13:3
**seat** [1] - 42:25
**seatbelt** [1] - 24:16
**seatbelts** [1] - 24:20
**second** [7] - 38:16, 41:13, 41:14, 41:15, 48:3, 53:22, 53:24
**sedan** [1] - 11:15
**see** [19] - 6:6, 13:4, 16:9, 16:15, 16:23, 17:4, 19:17, 21:19, 27:5, 27:9, 38:11, 38:12, 42:22, 43:24, 45:22, 55:12
**seek** [2] - 28:5, 28:13
**seeking** [2] - 25:5, 36:8
**seem** [2] - 15:17, 53:8
**self** [1] - 13:23
**self-driving** [1] - 13:23
**send** [4] - 12:23, 23:25, 24:4, 60:19
**sending** [1] - 12:22
**sends** [1] - 13:2
**sense** [4] - 14:24, 15:13, 16:12, 47:11
**senses** [1] - 20:3
**sensitive** [1] - 18:2

**sensors** [2] - 11:12, 14:1

**sent** [1] - 51:21

**separates** [1] - 21:4

**series** [2] - 31:13

**session** [1] - 3:3

**set** [4] - 14:21, 47:8, 50:13, 62:20

**sets** [1] - 22:23

**seven** [4] - 16:24, 16:25, 17:5

**several** [1] - 25:8

**severity** [1] - 25:13

**shape** [1] - 46:19

**share** [12] - 5:18, 7:18, 8:6, 10:4, 12:13, 14:9, 18:7, 20:19, 26:12, 28:7, 36:24, 37:25

**shared** [1] - 24:12

**sharing** [21] - 4:12, 5:10, 5:18, 5:20, 6:6, 6:21, 9:19, 9:21, 14:21, 18:7, 18:10, 18:11, 18:14, 18:16, 22:11, 22:20, 27:23, 29:24, 32:17, 37:23, 48:17

**SHARON** [2] - 2:10, 66:14

**shelly@ poseslawgroup.com** [1] - 1:19

**show** [1] - 25:6

**shows** [1] - 39:12

**shut** [1] - 21:18

**sick** [1] - 65:1

**side's** [1] - 64:17

**sides** [1] - 38:2

**sign** [1] - 34:5

**signal** [1] - 41:18

**significance** [2] - 40:7, 40:12

**significant** [2] - 54:25, 55:23

**silently** [1] - 48:20

**silo** [2] - 6:25, 8:5

**siloing** [1] - 26:22

**similarities** [1] - 33:9

**simple** [1] - 30:9

**simply** [4] - 29:3, 46:7, 58:6, 64:5

**single** [13] - 4:16, 5:3, 5:4, 5:7, 10:6, 11:7, 30:10, 31:4, 31:5, 31:6, 31:23, 33:18, 47:4

**sitting** [1] - 61:9

**situation** [5] - 28:5, 28:14, 28:21, 29:1,

49:22

**six** [1] - 29:7

**size** [2] - 41:3, 43:11

**Slavik** [5] - 24:3, 28:2, 28:4, 29:23, 48:16

**slow** [1] - 20:9

**slows** [1] - 20:4

**small** [2] - 23:16, 23:17

**smaller** [1] - 19:9

**software** [28] - 10:11, 11:16, 11:13, 11:25, 12:5, 12:22, 12:23, 12:24, 13:10, 13:15, 13:18, 14:4, 14:13, 15:2, 15:4, 15:8, 15:9, 15:19, 16:10, 17:22, 18:20, 19:16, 26:1, 28:1, 38:23

**sold** [3] - 4:16, 30:11

**solidly** [1] - 28:11

**someone** [1] - 24:18

**sometimes** [2] - 18:16, 20:15

**soon** [1] - 63:9

**sorry** [5] - 3:10, 11:4, 19:2, 35:22, 39:22

**sort** [1] - 28:5

**Sound** [1] - 42:6

**sounds** [2] - 59:25, 60:1

**South** [1] - 1:14

**Southern** [1] - 3:3

**SOUTHERN** [1] - 1:1

**speaking** [1] - 20:12

**special** [4] - 28:12, 28:19, 28:21, 29:1

**specialized** [1] - 57:18

**specific** [8] - 4:12, 7:2, 28:17, 31:22, 42:14, 44:14, 54:8, 55:4

**specifically** [2] - 4:18, 5:13

**spending** [1] - 49:9

**spent** [2] - 46:2, 46:3

**squarely** [1] - 15:23

**stall** [1] - 9:1

**standard** [2] - 37:19, 37:21

**standpoint** [1] - 35:9

**stands** [1] - 27:14

**start** [1] - 7:14

**started** [2] - 10:7, 41:7, 46:24

**state** [3] - 3:7, 8:8, 8:9

**statement** [1] - 40:10

**statements** [1] - 24:18

**STATES** [2] - 1:1, 1:11

**States** [4] - 2:11, 3:2, 4:16, 66:15

**stay** [2] - 9:25, 17:25

**stays** [1] - 31:2

**steer** [7] - 5:5, 5:23, 12:2, 21:8, 22:3, 45:8, 45:12

**steering** [2] - 9:6, 45:9

**STENOGRAPHICA LLY** [2] - 2:9

**stick** [1] - 65:18

**sticker** [1] - 10:25

**still** [11] - 12:8, 12:11, 14:8, 27:14, 27:15, 41:10, 42:5, 42:7, 44:11, 44:12, 44:13

**stock** [1] - 41:17

**stomach** [1] - 64:5

**Stooges** [2] - 63:2, 63:5

**stop** [4] - 20:9, 20:10, 34:5, 56:16

**stopped** [2] - 22:3, 22:4

**straight** [1] - 49:24

**streamline** [2] - 48:22, 48:24

**street** [1] - 20:9

**Street** [2] - 1:18, 1:22

**streets** [2] - 34:6, 34:13

**strikes** [1] - 12:9

**structure** [1] - 17:23

**subject** [3] - 23:3, 23:4, 33:4

**subjects** [1] - 45:15

**subpoena** [1] - 61:1

**subsequent** [2] - 15:22, 15:23

**substance** [1] - 22:10

**successful** [2] - 26:9, 27:5

**sudden** [1] - 37:24

**suggestion** [1] - 64:11

**suite** [1] - 11:9

**Suite** [3] - 1:15, 1:22, 2:4

**supplement** [3] - 64:13, 65:9, 65:12

**supplementing** [1] - 64:9

**suppose** [1] - 37:11

**supposed** [4] - 8:14, 20:23, 50:19

**Suri** [1] - 43:23

**SUVs** [1] - 19:8

**sweep** [1] - 19:25

**system** [9] - 4:25, 11:13, 11:14, 12:1, 13:1, 15:6, 21:18, 24:22

**systems** [7] - 11:11, 17:17, 20:15, 35:8, 35:13, 39:16

**T**

**T-intersection** [1] - 42:6

**Tahoe** [1] - 20:8

**tailored** [1] - 28:23

**tech** [1] - 23:16

**technical** [1] - 20:4

**technology** [32] - 12:6, 12:10, 12:16, 16:15, 16:16, 16:17, 17:1, 17:15, 17:16, 17:19, 18:4, 18:5, 19:10, 21:8, 22:14, 23:13, 24:20, 25:16, 25:19, 25:25, 26:4, 26:6, 26:7, 26:24, 27:1, 27:8, 31:13, 32:20, 33:4, 34:11, 38:10, 39:19

**ten** [3] - 10:9, 14:5, 19:7

**term** [1] - 17:18

**terms** [6] - 5:25, 6:18, 15:5, 30:8, 32:3, 59:13

**TESLA** [1] - 1:7

**Tesla** [62] - 3:5, 3:16, 3:22, 4:7, 4:12, 4:16, 5:4, 5:7, 5:8, 6:9, 6:11, 9:24, 10:5, 10:7, 10:8, 10:14, 11:7, 12:7, 12:18, 12:21, 13:2, 13:21, 13:22, 17:11, 17:13, 17:14, 17:18, 18:15, 18:22, 18:24, 22:19, 23:17, 23:18, 23:21, 23:25, 24:7, 24:9, 24:12, 25:18, 25:25, 26:5, 26:17, 26:25, 29:19, 30:7, 30:10, 30:11, 31:4, 31:6, 34:10, 34:18, 42:3, 43:12, 47:4, 47:12, 53:4, 54:14, 54:22, 55:22

**Tesla's** [13] - 4:18,

11:21, 24:15, 24:21, 25:17, 31:17, 34:3, 37:4, 39:8, 44:15, 46:23, 47:22, 59:20

**Teslas** [1] - 27:5

**THE** [122] - 1:11, 1:13, 2:2, 3:2, 3:12, 3:15, 3:17, 3:23, 4:1, 5:13, 5:16, 6:6, 6:13, 6:24, 7:20, 8:2, 9:2, 9:7, 9:12, 10:18, 10:20, 10:22, 11:2, 14:19, 15:13, 16:1, 16:9, 18:12, 18:14, 20:25, 21:6, 22:8, 22:22, 27:19, 27:21, 29:15, 30:16, 31:7, 32:9, 32:15, 32:19, 32:22, 33:23, 35:19, 35:24, 36:3, 37:10, 37:15, 38:15, 38:20, 38:25, 40:1, 40:6, 40:10, 41:13, 44:16, 45:17, 46:12, 47:21, 47:25, 48:4, 48:6, 48:17, 48:20, 49:1, 49:6, 49:9, 49:12, 49:24, 50:2, 50:14, 51:12, 52:3, 52:16, 52:23, 53:9, 53:13, 53:16, 53:18, 54:17, 54:22, 55:8, 55:16, 55:20, 56:5, 56:8, 56:11, 56:20, 56:22, 56:25, 57:6, 57:12, 57:17, 57:20, 58:6, 58:17, 58:21, 59:25, 60:8, 60:11, 60:24, 61:11, 61:13, 61:18, 61:23, 61:25, 62:3, 62:7, 62:9, 62:13, 62:18, 62:24, 63:2, 63:5, 63:17, 63:20, 63:23, 64:11, 64:24, 65:17, 65:21, 65:24

**therefor** [2] - 38:6, 40:13

**therefore** [1] - 38:19

**thinking** [2] - 5:24, 48:23

**thirds** [1] - 56:18

**thousand** [1] - 10:23

**three** [8] - 17:3, 20:3, 46:3, 54:12, 56:23, 57:7, 61:8, 64:8

**Three** [2] - 63:2, 63:5

**throughout** [3] - 6:18, 6:19, 7:5

**Thursday** [1] - 51:24

**timing** [5] - 59:13,

59:17, 63:8, 63:11
**TO** [1] - 1:10
**Tocano** [1] - 19:19
**today** [8] - 4:4,
15:16, 27:16, 28:3,
29:3, 33:9, 39:5,
56:21
**TODD** [1] - 1:17
**Todd** [1] - 3:8
**together** [2] - 46:19,
61:5
**ton** [1] - 36:18
**tons** [1] - 35:8
**took** [4] - 9:16,
14:14, 43:8, 51:2
**topic** [3] - 35:19,
35:24, 49:20
**topics** [1] - 54:6
**Torres** [1] - 3:4
**TORRES** [1] - 1:11
**TORRIJOS** [1] - 1:21
**touch** [1] - 45:14
**touched** [3] - 5:2,
30:13, 35:2
**touches** [2] - 4:15,
30:10
**Toyota** [1] - 25:22
**tractor** [1] - 21:14
**tractor-trailer** [1] -
21:14
**traditional** [1] - 26:8
**traffic** [7] - 21:14,
21:15, 22:2, 22:4,
22:7, 34:6, 34:16
**traffic-controlled** [1]
- 34:6
**trailer** [1] - 21:14
**transcript** [4] -
27:18, 43:23, 63:10,
65:16
**TRANSCRIPTION** [1]
- 1:6
**transcription** [3] -
3:1, 66:2, 66:11
**trial** [6] - 7:13, 7:15,
36:17, 63:12, 63:20,
64:21
**trials** [2] - 7:14
**triangle** [2] - 21:3
**truck** [6] - 10:15,
11:6, 11:12, 11:14,
14:11, 26:2
**true** [6] - 30:25, 32:5,
32:6, 33:15, 39:13,
44:12
**try** [5] - 44:9, 51:9,
55:19, 60:15
**trying** [16] - 6:25,
7:1, 22:19, 22:20,
25:11, 29:21, 30:1,

30:2, 30:7, 46:20,
46:23, 48:19, 48:23,
48:24, 53:5
**turn** [4] - 4:1, 9:7,
20:23, 41:18
**turning** [2] - 20:23,
40:4
**twice** [2] - 41:20,
41:23
**Two** [1] - 2:3
**two** [24] - 4:17, 5:2,
11:17, 14:16, 22:23,
23:10, 25:12, 33:16,
34:1, 35:16, 35:17,
38:16, 40:24, 43:4,
43:19, 45:14, 46:2,
49:21, 52:7, 53:22,
56:18, 57:9, 58:18,
64:7
**two-second** [1] -
38:16
**two-thirds** [1] -
56:18
**types** [2] - 10:10,
41:1
**typically** [7] - 17:12,
18:17, 18:19, 18:24,
19:6, 55:2, 55:6

**U**

**ultimate** [3] - 16:3,
16:7, 44:25
**ultimately** [2] - 38:3,
47:3
**um-hmm** [1] - 53:9
**unable** [1] - 59:21
**unauthorized** [1] -
8:18
**unavailable** [1] -
53:6
**under** [5] - 10:12,
11:5, 29:12, 56:12,
61:14
**undermine** [2] -
7:20, 46:8
**understood** [3] -
61:17, 62:2, 62:17
**undo** [2] - 23:23
**undoubtedly** [1] -
17:18
**unfortunately** [1] -
47:9
**unique** [2] - 29:1,
57:13
**UNITED** [2] - 1:1,
1:11
**united** [1] - 2:11
**United** [3] - 3:2, 4:16,
66:15

**universe** [2] - 7:2,
7:4
**unrelated** [2] - 41:11,
44:7
**unusual** [2] - 28:5,
54:22
**up** [17] - 5:4, 13:17,
13:18, 14:20, 22:6,
25:20, 27:11, 28:4,
29:8, 32:23, 32:24,
35:19, 35:24, 41:2,
41:8, 42:19, 49:24
**update** [8] - 12:24,
13:1, 13:4, 13:6,
15:19, 15:20, 15:21,
42:4
**updated** [2] - 13:10,
42:4
**updates** [5] - 12:22,
12:23, 13:2, 13:7,
13:8
**utilize** [1] - 7:3

**V**

**vacation** [2] - 50:9,
56:13
**vehicle** [15] - 10:7,
10:8, 10:9, 10:11,
12:1, 12:5, 12:6, 13:8,
15:1, 17:2, 19:4,
19:16, 20:3, 27:25,
30:13
**vehicles** [8] - 10:7,
12:21, 19:5, 19:7,
19:10, 19:11, 19:12,
30:11
**Velazco** [1] - 66:14
**VELAZCO** [2] - 2:10,
66:14
**version** [18] - 11:16,
13:10, 13:14, 15:4,
15:5, 28:1, 31:22,
31:24, 32:4, 33:14,
33:18, 33:19, 38:22,
39:11
**versions** [4] - 33:11,
33:21, 38:18, 39:19
**versus** [2] - 3:5, 23:8
**video** [1] - 20:22
**view** [2] - 8:13, 35:9
**violating** [2] - 23:5,
24:4, 26:18
**voluntarily** [1] - 41:3
**voluntary** [1] - 31:17
**vs** [1] - 1:6

**W**

**wait** [3] - 48:6, 50:8,

54:15
**waited** [1] - 65:22
**waiting** [2] - 47:19,
51:5
**WANG** [1] - 1:21
**wants** [1] - 58:18
**Warning** [1] - 34:8
**warning** [2] - 35:13,
42:24
**warnings** [7] - 4:24,
20:15, 20:16, 21:17,
41:1, 41:2, 41:4
**watches** [1] - 11:2
**ways** [2] - 26:14,
58:2
**week** [6] - 11:6,
11:14, 23:25, 50:20,
51:22, 59:6
**weeks** [2] - 49:21,
52:7
**weigh** [4] - 22:20,
26:12, 27:8, 29:13
**West** [1] - 22:6
**wheel** [7] - 20:14,
20:17, 20:18, 20:21,
21:16, 21:18, 21:20,
35:6, 42:18, 45:9
**WHITNEY** [1] - 2:2
**Whitney** [2] - 3:16,
3:17
**whole** [5] - 17:23,
22:15, 32:15, 43:23,
56:17
**willing** [1] - 58:19
**wishes** [1] - 58:12
**witness** [16] - 47:15,
51:1, 51:3, 51:10,
52:1, 53:5, 53:6, 53:7,
53:12, 54:21, 55:4,
56:12, 60:25, 61:2,
65:13
**witnesses** [6] -
54:20, 56:3, 60:17,
60:19, 61:6
**word** [1] - 23:13
**wording** [1] - 31:17
**words** [6] - 15:7,
16:2, 16:3, 22:24,
31:7, 32:15
**works** [4] - 15:6,
15:9, 19:11, 26:8
**world** [1] - 17:18
**world's** [1] - 11:3
**worth** [1] - 49:9
**wrote** [1] - 31:18

**Y**

**year** [14] - 4:12, 9:23,
10:14, 14:7, 14:15,

18:19, 19:15, 30:23,
31:22, 31:23, 33:14,
33:20, 44:3
**years** [17] - 5:7, 10:9,
14:6, 16:24, 16:25,
17:3, 17:5, 20:3,
24:19, 25:24, 33:10,
38:18, 43:19, 44:23,
44:24, 54:12
**yesterday** [1] - 10:18
**yourself** [1] - 40:18

**Z**

**zero** [1] - 18:8