# EXHIBIT C

**1**

```
1           UNITED STATES DISTRICT COURT
2           SOUTHERN DISTRICT OF FLORIDA
3  ----------------------------------x
4  Case No.: 21-cv-21940-BLOOM/Torres :
5  NEIMA BENAVIDES, as Personal       :
6  Representative of the Estate       :
7  of Naibel Benavides Leon,          :
8  deceased,                          :
9           Plaintiff,                :
10      v.                            :
11 TESLA, INC., a/k/a Tesla           :
12 Florida, Inc.,                     :
13          Defendant.                :
14 ----------------------------------x
15 Case No.: 22-22607-KMM             :
16 DILLON ANGULO,                     :
17          Plaintiff,                :
18      v.                            :
19 TESLA, INC., a/k/a Tesla           :
20 Florida, Inc.,                     :
21          Defendant.                :
22 ----------------------------------x
23        DEPOSITION OF ALAN B. MOORE
24          FRIDAY, JULY 12, 2024
25        (caption continued below)
```

**2**

```
1            10:05 a.m. EST
2          CONDUCTED VIRTUALLY
3
4  Job No.:  544316
5  Pages 1 - 250
6  Reported by:  APRIL REID, RPR, CRR (Stenographer)
7
8
9
10       Deposition of ALAN B. MOORE, held virtually.
11 All appeared remotely.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1            A P P E A R A N C E S
2
3  ON BEHALF OF THE PLAINTIFFS:
4       BRETT SCHREIBER, ESQ.
5       SINGLETON SCHREIBER
6       591 Camino de la Reina
7       Suite 1025
8       San Diego, CA  92108
9       (619) 771-3473
10 and
11      ADAM T. BOUMEL, ESQ.
12      THE ROUSSO BOUMEL LAW FIRM, PLLC
13      9350 South Dixie Highway
14      Suite 1520
15      Miami, FL  33156
16      (305) 670-6669
17
18 ON BEHALF OF THE DEFENDANTS:
19      WHITNEY V. CRUZ, ESQ.
20      BOWMAN and BROOKE, LLP
21      Two Alhambra Plaza
22      Suite 800
23      Miami, FL  33134
24      (305) 995-5600
25
```

**4**

```
1          A P P E A R A N C E S  cont'd
2
3  ALSO PRESENT:
4       TESS GODHARDT, Tesla
5       SEAN SCALLY, Tesla
6       LIONA SCULLY, Tesla
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Transcript of Alan B. Moore
Conducted on July 12, 2024

5

1                    I N D E X

2  ALAN B. MOORE                              PAGE

3  Examination by Ms. Cruz                      6

4

5

6                  E X H I B I T S

7  NUMBER           DESCRIPTION              PAGE

8  Exhibit 1        Slide outlining recall    149

9                   countermeasures

10 Exhibit 2        File of Alan B. Moore      232

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1              P R O C E E D I N G S

2        THE STENOGRAPHER:  As we begin this

3  proceeding, I will ask our witness to please

4  raise your right hand.

5        THE WITNESS:  (Complies.)

6        THE STENOGRAPHER:  Do you swear or

7  affirm that the testimony you're about to

8  give will be the truth, the whole truth, and

9  nothing but the truth?

10       THE WITNESS:  Yes, I do.

11       THE STENOGRAPHER:  Thank you.

12 THEREUPON:

13            ALAN B. MOORE

14       being first duly sworn or affirmed to

15  testify to the truth, the whole truth, and

16  nothing but the truth, was examined and

17  testified as follows:

18       THE STENOGRAPHER:  We may begin.

19            EXAMINATION

20 BY MS. CRUZ:

21    Q.  Good morning, Mr. Moore.  Good to see

22 you again.

23    A.  Good morning.  Good to see you.

24    Q.  When were you retained in this case?

25    A.  On or around May 16th of '23.

7

1    Q.  By who were you retained?

2    A.  Todd Poses and Adam Boumel.

3    Q.  And what were you asked to do by

4  Mr. Poses and Mr. Boumel?

5    A.  Perform an accident reconstruction and

6  evaluate the ADAS performance of the Tesla.

7    Q.  And did you do those things?

8    A.  Yes.

9    Q.  Were you asked to evaluate the design of

10 the ADAS system in the Tesla?

11    A.  I don't think I was asked specifically

12 to do that, but, to me, that's a big part of it.

13 Evaluating the performance of ADAS also includes

14 evaluating the design of it.

15    Q.  In what area -- areas are you here today

16 to offer opinions on?

17    A.  Accident reconstruction and ADAS

18 performance.

19    Q.  So do you consider yourself to be an

20 expert in the field of accident reconstruction?

21    A.  Yes, I do.

22    Q.  Okay.  And as far as your reconstruction

23 is concerned, did you do any independent analysis

24 or did you just rely on the EDR and the videos

25 from the crash?

8

1    A.  So I did a lot of analysis.  The vast

2  majority of it was of electronic data.

3        So I'm often asked, did I do a complete

4  accident reconstruction.  Well, accident

5  reconstruction includes a lot of different facets.

6  I never use all of them on every case.

7        On this one I didn't need to use that

8  many because primarily I was looking at ADAS

9  performance.  So there's lots of accident

10 reconstruction methods I didn't use on this case.

11    Q.  Right.

12       You didn't do the normal things, like

13 figuring out the delta-V of the vehicles; right?

14    A.  Correct, I did not.

15    Q.  Or, like, principal direction of force?

16    A.  Correct.

17    Q.  The path of the vehicles?

18    A.  I'm sorry.  The what?

19    Q.  The paths of the vehicles.  The paths

20 that the vehicles took.

21       Did you look at roadway evidence and

22 figure out the exact paths?

23       Did you do calculations?

24       Did you take measurements at the scene,

25 anything like that, to determine the paths of the

9

1 vehicles?
2   A. Not to a great extent, no.
3   Once the -- once the Tesla passed the
4 stop sign, I didn't do a lot of analysis of its
5 path. It was pretty clear from that point on.
6   Q. Have you read Mr. Walker's report?
7   A. Yes.
8   Q. Okay. Is there anything -- putting
9 aside what he might have said about ADAS, is there
10 anything in his reconstruction that you disagree
11 with?
12   MR. SCHREIBER: Just object as a bit
13 overbroad.
14   A. No.
15   Q. Okay. You said that you're also giving
16 opinions -- before we get to the ADAS, are you
17 giving opinions in the field of human factors in
18 this case?
19   MR. SCHREIBER: Object to the form.
20   You can move on. Go ahead.
21   A. Yes. Yes, to some extent.
22   Q. Okay. What aspects of your education or
23 your training qualify you as an expert in human
24 factors?
25   A. Well, specifically, I do have

10

1 specialized education, training, and experience in
2 the field of human factors, specifically as it
3 relates to accident reconstruction.
4   And I clarify it that way because human
5 factors is a huge field. There's a lot of parts
6 of it that I don't have expertise in. But
7 specifically where it interacts or overlaps with
8 accident reconstruction, that's the area where I
9 have expertise.
10   Q. But exactly what aspects of the
11 education or the training do you have in -- in the
12 area of human factors?
13   A. I'm sorry. I'm not following your
14 question.
15   Q. What education, what coursework have you
16 taken that qualifies you as an expert in human
17 factors?
18   A. Okay. So you're asking for my training
19 regarding human factors?
20   Q. Well, I started with your education.
21 But you can talk about them both together. You
22 were just saying your education and training
23 qualify you.
24   What exactly within your education or
25 your training qualifies you as an expert in human

11

1 factors?
2   A. So I think this is the fourth time
3 you've asked me this question, and I'm still not
4 clear what you're asking, but I'll do my best to
5 answer it by going through my training and
6 experience relevant to human factors, and we'll
7 see if that covers it, if that's okay.
8   Q. (Nods head.)
9   A. So I'll just go through my CV.
10 Hopefully, you have a copy of it.
11   Let's see.
12   My first training course in human
13 factors was in 1997. It was a human factors
14 related to test driving of vehicles through Paul
15 Stewart Racing. That was a 40-hour course.
16   And then I jump up to 2008. I took a
17 40-hour course offered by Jeff Muttart. And --
18 let's see -- that was through an organization
19 called Accident Dynamics. That was titled Human
20 Factors for Accident Reconstruction.
21   A number of other courses I've taken.
22 Let's see. If I jump up to -- sorry. Just going
23 through my CV here to find the next one.
24   Yeah, 2013 I took another course at
25 Northwestern University, Advanced Crash

12

1 Reconstruction Utilizing Human Factors.
2   And then I have a variety of other
3 courses and conference presentations specific to
4 human factors.
5   One is in 2011, Optics, Lighting and
6 Visibility for the Forensic Investigator. That
7 had a major portion of human factors. Primarily
8 to do with nighttime visibility.
9   Q. That's a seminar that you attended or --
10 or conducted?
11   A. That's one I attended.
12   And that was either a 32- or 40-hour
13 course.
14   Another one was just a RedVector class
15 in 2013, highway engineering, driver, pedestrian,
16 vehicle and traffic characteristics. That was
17 probably a 4- to 8-hour course, somewhere around
18 there.
19   And then -- let's see. Oh. In 2008,
20 through Grady Bishop, I took a course on precision
21 and stunt driving. It's called the Precision and
22 Stunt Driving Clinic. There was a fairly large
23 component in that regarding placement of vehicles,
24 visibility, yaw rate sensitivity. Some issues
25 like that.

Transcript of Alan B. Moore
Conducted on July 12, 2024

13

1   So -- and then a number of other courses
2 have pieces of human factors in it, but those are
3 probably the largest of them.
4   And then, of course, I've been doing
5 accident reconstruction now for 22 years and every
6 case I have has some component of human factors to
7 it.
8   Q.  Have you ever been qualified by a court
9 as an expert in human factors?
10   A.  Yes.  I have been qualified and allowed
11 to testify numerous times on human factors as it
12 relates to accident reconstruction.
13   Q.  But I'm talking about where you were
14 specifically qualified as an expert in human
15 factors.  Not in accident reconstruction.  Just in
16 human factors.
17   A.  I can try again to answer your question.
18   I have been qualified as an expert
19 several times in the state and federal courts as
20 an expert in human factors as it relates to
21 accident reconstruction.
22   And I clarify it that way because there
23 are many parts of human factors that I'm not an
24 expert in.  But the portions of it that relate to
25 accident reconstruction is where my expertise

14

1 lies.
2   Q.  Which cases have you been qualified as
3 an expert in human factors?
4   A.  I'm looking at my testimony history
5 here.  Would you like me to read you the case
6 style, or how would you like me to relay this
7 information to you?
8   Q.  Yeah, just -- just the style.  Maybe the
9 first name.  I think I should be able to follow
10 along.  I have your testimony list here.
11   A.  Okay.  So you're looking at trials, I'm
12 sure.
13   Q.  Uh-hmm.
14   A.  So the first one would be Darios Rivers.
15 That one had a human factors component to it.
16   If I jump down -- let's see.  I'm on
17 page 3.  So a 2022 trial, Dusevon Aquis
18 (phonetic).  That had a human factors component to
19 it.
20   Bottom of page 3, Charles Marcus, III,
21 in 2021.  That had a human factors component.
22   Q.  Are there any cases where you've given
23 an accident reconstruction opinion and they don't
24 include human factors?
25   A.  I'm sure there are.  I'm going through

15

1 the list here.  You know, the -- the -- the memory
2 gets a little vague as we go further back.  I'm
3 sure there are some where I haven't given a human
4 factors opinion.
5   Oh, here's one, actually.  So on page 6,
6 Curtis Saylor (phonetic).  I don't think that had
7 any human factors component to it, as I recall.
8   But the vast majority of --
9   Q.  Okay.
10   A.  -- my trials do have a human factors
11 component to it.  Almost every case.
12   Q.  Okay.  I don't have a page 6.  Is that
13 because -- what are the dates of the cases on your
14 page 6?
15   A.  So that one would be a 2019 case.
16   Q.  Okay.  So we only have going back to
17 2020.  That's why.  Okay.
18   A.  Yes.  I'm looking at my full list here
19 and you probably only have the last three or
20 four years.
21   Q.  Right.
22   So if I understand what you're saying --
23 well, strike that.
24   Have you ever been qualified as a human
25 factors expert where your human factors testimony

16

1 was not a component of your accident
2 reconstruction?
3   A.  Can you repeat the question one more
4 time?
5   Q.  Sure.
6   Have you ever been qualified as a human
7 factors expert where that qualification was not a
8 subpart of your accident reconstruction?
9   A.  Probably not.  I can't think of a case
10 where that's happened.
11   In all of the cases where I've testified
12 with human factors opinions, it has been related
13 to accident reconstruction, in one way or another.
14   Q.  Have you been qualified to testify as to
15 vehicle design or vehicle development where it
16 wasn't a subpart of accident reconstruction?
17   A.  I'm sorry.  The Zoom call cut out there.
18 Could you repeat that for me?
19   Q.  Sure.
20   A.  The first part cut out.
21   Q.  Sure.
22   Have you ever been qualified as an
23 expert in any type of vehicle design, componentry
24 or vehicle system where that wasn't a subpart of
25 your accident reconstruction opinion?

Transcript of Alan B. Moore
Conducted on July 12, 2024

---

17

1          MR. SCHREIBER:  That's a bit vague.
2      **A.  So I don't think I have ever had a trial**
3  **appearance that didn't involve an accident**
4  **reconstruction to some extent, even cases where**
5  **I'm hired to do a specific piece of the work and**
6  **someone else is doing accident reconstruction. I**
7  **think every one of my trial appearances has had**
8  **some accident reconstruction content to it.**
9      **So I'm not sure I can answer that**
10 **question.**
11     Q.  What cases have you given an opinion
12 that a component, system, part of a vehicle was
13 defective, if ever?
14     **A.  I -- I know that I have.  Can I pick out**
15 **my testimony history which ones they are, I'm not**
16 **sure.  But I've definitely testified that a**
17 **vehicle component was defective.**
18     Q.  Okay.  Can you take a look through the
19 testimony list, at least the past four years.
20     **A.  So -- well, I don't have a lot of trials**
21 **in the past four years.**
22     **I'm looking at one here from 2017, Clive**
23 **Plummer, that had a vehicle defect in it.**
24     Q.  Can you give me the style of that case?
25     **A.  You want the entire style?**

---

18

1     Q.  Please.
2     **A.  Okay.  It's -- I'll spell this for the**
3  **court reporter.  Clive Plummer, P-L-U-M-M-E-R,**
4  **versus Atunaisa, A-T-U-N-A-I-S-A, last name**
5  **Tuikaba, T-U-I-K-A-B-A, in Orange County.  That**
6  **was in Florida.**
7     Q.  And what component or system of the
8  vehicle did you testify was defective?
9     **A.  I think it was lighting on that case.**
10    Q.  Any others that you can think of that
11 are on the testimony list or that you can -- any
12 others that are on your testimony list or that you
13 can think of?  Any other cases where you've
14 testified that a vehicle component was defective?
15    **A.  I'm sure I have.**
16    **Again, as I go back further in the list,**
17 **I don't recall what -- what was in the cases, but**
18 **I'm certain that I have.**
19    Q.  Have you ever been qualified -- excuse
20 me.
21    Have you ever been qualified as an
22 expert witness in ADAS?
23    **A.  The Zoom call's cutting out again.  I**
24 **missed a word in there.**
25    Q.  Have you ever testified -- been

---

19

1  qualified as an expert in the field of ADAS?
2     **A.  I've never testified in trial in a case**
3  **in -- well, let me just double-check that.  Hold**
4  **on.**
5      **Yeah, I've never testified in trial in a**
6  **case involving ADAS componentry.**
7     Q.  Okay.  Have you testified at deposition
8  in a case involving ADAS componentry?
9     **A.  I believe so.  Let me look for that.**
10    Q.  What did you say?  I'm sorry.  I
11 couldn't hear you.
12    **A.  Sorry.**
13    **I believe so.  Give me just a moment to**
14 **look for it.**
15    Q.  Oh, okay.
16    **A.  Yeah, the -- I call it the Daico case,**
17 **D-A-I-C-O, in 2022.  I had a deposition on that.**
18 **That was a collision warning case.**
19    Q.  And by who were you hired?
20    **A.  I was hired by a defense firm, Grant**
21 **Liser.**
22    Q.  Which case is that?  Because I don't see
23 that attorney's name and I don't see Daico.
24    **A.  Let's see.**
25    **So that's page 3 on my list, January**

---

20

1  18th of 2022.
2     Q.  Oh, I see.
3     Julian Doug Mitchell?
4     **A.  Yes, that's it.**
5     Q.  Okay.  And what opinion did you give in
6  that case?
7     **A.  I don't recall.  It was regarding**
8  **collision warning.**
9     Q.  Okay.  Any other cases where you gave
10 testimony as an expert in ADAS?
11    **A.  Not that I recall.**
12    Q.  Are there any cases where you haven't
13 given testimony but you've been disclosed, to your
14 knowledge, as an expert in ADAS?
15    **A.  I usually don't know when I'm disclosed,**
16 **but I've had many cases involving ADAS**
17 **performance.**
18    Q.  What aspects of your education qualify
19 you, do you believe, as an expert in ADAS?
20    **A.  So if I go through my CV, it starts with**
21 **an SAE course on highly-automated vehicles in**
22 **2017.  Another SAE course in 2017 on automatic**
23 **emergency braking.**
24    **Several conferences.  The Florida**
25 **Automated Vehicles Summit, an I-CAR training**

---

Transcript of Alan B. Moore
Conducted on July 12, 2024

6 (21 to 24)

---

21

1  course on Advanced -- on ADAS.  A Ford course on
2  ADAS in 2019.
3      And then much of my expertise beyond
4  that results from my own research and testing and
5  developing of a course through the Society of
6  Automotive Engineers on this topic.
7      Q.  Okay.  So I want to separate out
8  training that you've given as opposed to training,
9  education, things that you received.
10     A.  Sure.
11     Q.  So you talked about the seminars that
12 you attended.  Anything besides -- anything other
13 than those courses and seminars that you attended,
14 any part of your training or education, formal
15 education in ADAS?
16     A.  So, obviously, my college degrees
17 predate ADAS.  So there's nothing in those.
18     It would all be in, you know,
19 specialized training.  And I think we've covered
20 it.
21     There are some conferences that I've
22 gone to that may not show up on my CV.
23     The AVS, the Automated Vehicle
24 Symposium, I think.
25     Q.  Have you designed or been involved with

---

22

1  the development of an ADAS system?
2      A.  No, I have not.
3      Q.  So let's talk about ADAS a little bit.
4      What is the purpose of ADAS Systems?
5      A.  It's to assist the driver in perceiving
6  the roadway environment and responding to it.
7      Q.  And would you agree another one of the
8  purposes of ADAS Systems is to reduce crashes?
9      A.  At least to reduce the severity of
10 crashes.  Not always to actually reduce the crash
11 rate.
12     Q.  But the goal is to reduce the severity
13 or reduce the number of crashes; right?
14     A.  Yes.  That is one goal of ADAS
15 technology.
16     Q.  Okay.  And what is a Level 2 driver
17 assistance system?
18     A.  I'm sorry.  Could you repeat the
19 question again?
20     Q.  Sure.
21     What is a Level 2 driver assistance
22 system?
23     A.  According to SAE J3016, it's
24 technology -- or, actually, not even a technology,
25 a function in use at the time in a vehicle that

---

23

1  provides both lateral and longitudinal control of
2  the vehicle to assist the driver.
3      Q.  Okay.  So if you have a vehicle and the
4  system is not using lateral and longitudinal
5  control, then at that point in time it wouldn't be
6  an L2 system; correct?
7      A.  It would not be an L2 operation at that
8  time.
9      The same vehicle could have several
10 different levels of operation available.  The
11 level only describes the operation in use at the
12 time.
13     Q.  Does an L2 system require driver
14 monitoring?
15     A.  It assumes driver monitoring.  It
16 assumes that the driver will conduct the OEDR or
17 basically monitor the roadway.
18     Q.  And why does a Level 2 system require
19 driver monitoring?
20     A.  Because it has a limited ability to
21 handle hazards beyond lead vehicles and lane line
22 recognition.
23     Q.  And is an L2 system required to have a
24 driver monitoring system built into it?
25     A.  In 2019 in the U.S., I don't recall if

---

24

1  there were any requirements on driver monitoring.
2      SAE J3016, which is basically what we're
3  talking about, is a recommended practice but not a
4  requirement.
5      Q.  And does J3016 recommend that there's a
6  driver monitoring system -- that driver monitoring
7  system should be a component of an L2 system?
8      A.  Yes.
9      Q.  And why is that?
10     A.  Well, basically, to prevent abuse.
11     Q.  Okay.  And do you agree that in an L2
12 system the driver is driving whenever those driver
13 support features are engaged, even if their feet
14 are off the pedals and they're not steering?
15     A.  No.  I'm not really interested in
16 semantics of the word "driving."
17     I would certainly agree that the
18 operator of the vehicle is in control of the
19 vehicle and responsible for what occurs with the
20 vehicle.
21     Q.  Okay.  Would you disagree, then, with
22 the statement that "The driver is driving whenever
23 these driver support features are engaged, even if
24 their feet are off the pedals and they're not
25 steering"?

---

25

1      A.  I answered your question once already.
2          I'll answer part of it again by saying
3  I'm not interested in getting into the semantics
4  of the word "driving."
5          But I think I've answered your question
6  to the best of my ability.
7      Q.  But the question wasn't are you
8  interested in getting into the semantics.  It was:
9  Do you disagree with the statement?  I'm giving
10  you a statement.  I'm asking whether you agree or
11  disagree.  You can, of course, explain why you
12  agree or disagree.
13          But the question was:  Do you agree with
14  the statement, which is found in SAE paper that
15  you referred to, or recommendation that you
16  referred to, that "The driver is"--
17  quote/unquote -- "driving whenever these driver
18  support features are engaged, even if your feet
19  are off the pedal and you are not steering"?
20          That's a statement by SAE.  Do you agree
21  or disagree with it?
22      A.  So you're reading that from J3016?
23      Q.  Yep.
24      A.  Give me just a moment, please.
25          Is that the 2018 version you're looking

26

1  at?
2          Do you have that in front of you?
3      Q.  Is there something wrong with my
4  question now?
5      A.  I'm looking at the 2016 version, and
6  that text does not show up in there.  Maybe it's
7  in the 2018 version.
8      Q.  Okay.  Well, regardless of whether it's
9  in there or not, is that a statement that you
10  agree with or disagree with?
11      A.  Well, whether it's in a document is an
12  important distinction.  Because you've told me
13  that it is, but I've looked through two versions
14  of it and I don't see that statement in there.
15          And, otherwise, I think I've answered
16  your question to the best of my ability.
17      Q.  Okay.  So you're not sure whether you
18  agree or disagree with it?
19      A.  I do not agree with that statement.
20      Q.  Why don't you agree with it?
21      A.  Well, I'm sure of my answer, and I
22  provided you my answer.
23      Q.  You --
24      A.  You asked me several times.  I don't
25  have any more information to provide on this

27

1  topic.
2      Q.  But you said you didn't -- you don't
3  agree with it.  So I'm just asking:  Why don't you
4  agree with that statement?
5          MR. SCHREIBER:  He didn't agree with
6      your recharacterization of his answer.  That
7      was what he was disagreeing with you on, I
8      believe.
9          THE WITNESS:  (Nods head.)
10      A.  Yes.  That's correct.
11      Q.  Okay.  So I'm going to give you the
12  statement again and you tell me -- forget about it
13  being in the SAE recommendation.
14          I'm going to give you a statement.
15  Here's the statement:  The driver is driving
16  whenever these driver support features, referring
17  to an L2 system, are engaged, even if your feet
18  are off the pedals and you are not steering.  Do
19  you agree or disagree with that statement?
20          MR. SCHREIBER:  Lacks foundation, it's
21      an incomplete hypothetical, it's asked and
22      answered.
23      A.  We discussed this several times.  I
24  think I've provided all the information I can in
25  response to that question.

28

1      Q.  So it sounds like you can't say --
2  you're not sure whether you agree or disagree with
3  the statement.
4      A.  I have provided all the information I
5  can regarding that question.
6      Q.  Okay.  Do you agree that in an L2
7  system, the driver must constantly supervise the
8  support features; they must steer, brake or
9  accelerate, as needed, to maintain safety?
10          MR. SCHREIBER:  Same objections, except
11      for the asked and answered one.
12          Let me rephrase.  It is an incomplete
13      hypothetical, may lack foundation.
14      A.  So I think your question was specific to
15  a Level 2 system.  And your question doesn't make
16  sense.
17          In a Level 2 system, the driver wouldn't
18  be steering and braking.  The driver would be
19  monitoring roadway environment.
20          I'm sorry.  Your question doesn't even
21  make sense to me.
22      Q.  Okay.  Let me read it again so maybe
23  you'll be able to understand it.
24          Do you agree that in an L2 system, the
25  driver must constantly supervise the support

Transcript of Alan B. Moore
Conducted on July 12, 2024

29

1 features; they must steer, brake, or accelerate,
2 as needed, to maintain safety?
3     **A. I already gave you the answer.**
4         MR. SCHREIBER: Yeah, same objections.
5     **A. I don't agree with that statement. It**
6 **literally doesn't make sense.**
7         **In a Level 2 system, a driver wouldn't**
8 **be steering or braking in normal use.**
9     Q. Do you agree that in a Level 2 system,
10 Autopilot feature -- features such as Autopilot
11 are driver support features?
12    **A. I've seen technical -- technical**
13 **documentation that calls Level 2 a driver support**
14 **feature. I don't agree with that wording, but I**
15 **know it exists in the field.**
16    Q. Do you agree that in a Level 2 system,
17 the features are not automated driving features?
18        MR. SCHREIBER: I'm sorry?
19    **A. The Zoom keeps cutting out. I keep**
20 **missing words for some reason. Can you repeat it**
21 **for me?**
22    Q. Yeah.
23        And I am not -- I'm not sure why. I can
24 hear you so clearly, so I'm not sure.
25    **A. And it's -- unfortunately, it's always a**

30

1 **key word that cuts out. Literally drops it in the**
2 **sentence. And I don't dare to answer it unless I**
3 **know what that word is.**
4    Q. Sure.
5        The question was: Do you agree that in
6 a Level 2 system, the features are not automated
7 driving features?
8        MR. SCHREIBER: It's an incomplete --
9        it's somewhat unintelligible.
10    **A. So I'm a little concerned about this**
11 **line of questioning because it's -- it's out of**
12 **context. I'm not sure what you're referring to.**
13        **But if I just look at J3016, it tells me**
14 **an automated driving system only applies to**
15 **Levels 3 to 5.**
16        **And that's about all the information I**
17 **can give you on that.**
18    Q. Okay. Do you agree that in a Level 2
19 system, the driver must drive and monitor the
20 roadway?
21    **A. As I said before, I'm not interested in**
22 **getting involved in the semantics of the word**
23 **"drive" or "driving," but I do agree that the**
24 **driver must monitor the roadway in a Level 2**
25 **system.**

31

1    Q. Do you agree that in a Level 2 system,
2 the driver is fully responsible for driving the
3 vehicle while the system provides continuous
4 assistance with both acceleration, braking, and
5 steering?
6        MR. SCHREIBER: May call for a legal
7        conclusion, foundation, speculation,
8        incomplete.
9    **A. Could you repeat the question one more**
10 **time?**
11    Q. Sure.
12        Do you agree that in a Level 2 system,
13 the driver's fully responsible for driving the
14 vehicle?
15        MR. SCHREIBER: Same objection.
16    **A. There was more to the question the first**
17 **time, wasn't there? I thought there was quite a**
18 **bit more to that.**
19    Q. Well, this is the question I'm asking
20 now.
21    **A. Well, in that case, I haven't answered**
22 **the previous question. Do we need to skip the**
23 **prior question or is that --**
24    Q. I'll ask again.
25    **A. I'm not sure what we're doing here.**

32

1        **I was asking you to repeat the prior**
2 **question to make sure I understood it after the**
3 **objection, and then you changed the question. So**
4 **I'm not sure which question to answer now.**
5    Q. All right. The question is: Do you
6 agree that in a Level 2 system, the driver's fully
7 responsible for driving the vehicle?
8    **A. As I said before, I'm not interested in**
9 **getting into the semantics of the word "driving"**
10 **in this -- in this context.**
11    Q. Do you agree that in a Level 2 system,
12 that driver's fully responsible for driving the
13 vehicle while the system provides continuous
14 assistance with both acceleration, braking, and
15 steering?
16        MR. SCHREIBER: Same objections.
17    **A. Yeah, I don't agree with that statement.**
18    Q. And I think this -- the answer to this
19 question is "yes," based on your prior testimony,
20 but I'll just ask it so it's clear.
21        Have you given testimony in a case that
22 involved a Level 2 driving system?
23    **A. No, I have not.**
24    Q. What is a Level 1 driving system?
25    **A. Level 1 is very close to Level 2, except**

Transcript of Alan B. Moore
Conducted on July 12, 2024

33

1 that it provides either lateral or longitudinal
2 control, but not both.
3    Q.  Does a Level 1 system require a driver
4 monitoring system?
5    **A.  Well, nothing requires driver**
6 **monitoring, but J3016 strongly recommends driver**
7 **monitoring for both Levels 1 and 2.**
8    Q.  What level ADAS system did McGee's Tesla
9 have?
10    **A.  It was capable of Level 2 operation.**
11    **I understand there's somewhat of a**
12 **dispute on what level was in use at the time,**
13 **between myself and Mr. Harrington.**
14    **I see it as a Level 2 system with the**
15 **driver overriding the speed control.**
16    Q.  What -- what is your understanding of
17 Autopilot?
18    **A.  So it's a little bit of a misnomer.**
19 **What Tesla actually offers is TACC, Traffic Aware**
20 **Cruise Control, which is an adaptive cruise**
21 **control, and Autosteer, which is their lane**
22 **centering function.  The two together, I think,**
23 **are loosely referred to as "Autopilot."**
24    Q.  And what is a TACC?
25    **A.  I just described that.**

34

1    Q.  TACC?  You described TACC?
2    **A.  I literally just described TACC in my**
3 **prior answer.**
4    Q.  Okay.  So you have no other information
5 to describe TACC?
6    MR. SCHREIBER:  I mean, other than it's
7 name and how it's described?
8    **A.  There's a lot of information I can**
9 **provide about TACC.**
10    **I -- what you're asking me, I literally**
11 **just answered in the prior answer.  So I'm not --**
12 **if you want to ask me a different question, I'd be**
13 **happy to try to answer that.**
14    Q.  How do you activate TACC on McGee's
15 vehicle?
16    **A.  On McGee's vehicle, that would be --**
17 **depending on how it's set up, it should be a**
18 **single pull of the lower left stock on the**
19 **steering column.**
20    Q.  And what is Autosteer?
21    **A.  That is -- again, I just answered it in**
22 **a previous answer, but that's Tesla's term for**
23 **lane centering.**
24    Q.  And how do you activate auto steering on
25 Mr. McGee's vehicle?

35

1    **A.  On his vehicle, it should be two pulls**
2 **of the lower left stock on the steering column.**
3    Q.  And are you prepared to render your
4 opinions today?
5    **A.  Yes, I am.**
6    Q.  And are your opinions final?
7    **A.  Probably not.**
8    **I understand there is more discovery to**
9 **come, and there will be depositions of defense**
10 **experts coming.  So I'm sure I will have**
11 **additional thoughts and analysis.  But as of**
12 **today, I've done all the analysis on the**
13 **information I have, with the exception of a depo I**
14 **received yesterday.  Of course, what I don't know**
15 **is what new information will be coming.**
16    Q.  So other than anything that might be
17 presented in the depositions of Tesla's experts
18 which are not in their reports, are your opinions
19 final?
20    **A.  I'm sorry.  I just answered that**
21 **question a moment ago.**
22    **I'm not sure I can provide you any more**
23 **information other than the name of the depo I**
24 **received yesterday, which I have not fully**
25 **reviewed.**

36

1    Q.  Okay.  And, I'm sorry, you did say that.
2    You said -- so with the exception of
3 Robert Stonewall's deposition testimony, which you
4 received yesterday, and the depositions of Tesla
5 experts, which are coming up, are your opinions
6 final?
7    **A.  I'm sorry.  I've already answered that**
8 **question.**
9    Q.  Is there any work -- other work that you
10 plan on doing in this case?
11    **A.  Work that I plan on doing is probably**
12 **preparing trial exhibits.  And I don't really have**
13 **a vision yet of what those will be or what I will**
14 **do.**
15    **But my concern is -- I have an**
16 **understanding that there's quite a bit of more**
17 **information that will be coming.  Obviously, I**
18 **can't say my opinions are final for trial without**
19 **having seen that information.**
20    Q.  What information do you understand will
21 be coming?
22    **A.  At a minimum, depositions of other**
23 **experts.  Beyond that, I have no idea.  You might**
24 **know more than I do.**
25    Q.  So with the exception of the experts who

Transcript of Alan B. Moore
Conducted on July 12, 2024

37

1  have not yet been deposed, what other information
2  do you understand is coming?
3      **A.  I'm sorry.  I just answered that**
4  **question.  I don't have any more information to**
5  **provide you on it.**
6      Q.  You said there's other information
7  coming, so your opinions aren't final; right?
8      **A.  I'm sorry.  That is not what I said.**
9      Q.  Okay.  Well, I misunderstood.
10     Is there -- why are your opinions not
11 final?
12     **A.  I did not say that my opinions are not**
13 **final.  I said I am under -- under -- have the**
14 **understanding there is more information to be**
15 **coming.**
16     **I can't tell you how that will affect my**
17 **opinions, if it will change them or cause them to**
18 **render new opinions.  I don't know what**
19 **information's there.**
20     **Based on the information that I have**
21 **today, with the exception of Stonewall's**
22 **deposition, I have rendered all the opinions I**
23 **plan, but I know there is more information coming.**
24 **How that affects my opinions, I can't tell you**
25 **today.**

38

1      Q.  Did someone tell you that there's more
2  information coming?
3      **A.  Yes.**
4      **My client told me that they are still**
5  **working on discovery, there may be changes in**
6  **discovery.  And I am assuming, based on my own**
7  **information, that there will be depositions of**
8  **opposing experts for me to review.**
9      Q.  Okay.  What -- who -- who's your client?
10 Who told you that?
11     **A.  Well, I have four lawyers who are my**
12 **clients.  It -- one of the four.  I forget which**
13 **one told me that they are working on discovery and**
14 **more information may become available.  What it**
15 **is, when it may come, I have no idea.**
16     Q.  Okay.  So, I guess, that's my question.
17 Did they tell you what information may become
18 available besides the upcoming depositions of
19 experts?
20     **A.  No.**
21     Q.  Okay.  Is there any other information
22 that you feel like you need in order to render
23 opinions?
24     MR. SCHREIBER:  That's overbroad,
25     incomplete.

39

1      **A.  Well, in my field, more information is**
2  **always better.  I have sufficient information for**
3  **the opinions I've rendered today.  More**
4  **information will allow me to do more work.**
5      Q.  Is there any information that you asked
6  the lawyers to get that you don't have?
7      **A.  Annotated video; in other words, video**
8  **from the Tesla vehicle showing augmented views of**
9  **the data it was processing.  That's the one thing**
10 **I can think of.**
11     Q.  But you're able to come to your opinions
12 with a degree of engineering certainty without
13 that video; correct?
14     **A.  Based on the information I have today,**
15 **yes.**
16     Q.  Why do you feel like you need or want
17 the annotated video, if there is one?
18     **A.  It shows in -- well, it could show**
19 **information that is not accessible to me today.**
20 **In particular, an indication of free space or**
21 **drivle -- drivle -- drivable space, any image**
22 **recognition of signs or the flashing red light,**
23 **and any Fusion data regarding the signs in the**
24 **stopped Tahoe.**
25     Q.  Why is it important to you to understand

40

1  if the video shows free space or drivable space?
2      **A.  At this point, it's not.  Once I see it,**
3  **it might become very important.**
4      Q.  Why?
5      **A.  But I don't know until I see it.**
6      Q.  Why would that matter?  How -- how could
7  that possibly affect your opinion?
8      **A.  I'll give you one example.  There can be**
9  **several.**
10     **If the annotated or augmented video**
11 **were -- and I don't think it will in this case,**
12 **but this is one example.  If it were to show me a**
13 **continuation of drivable space impeded by an**
14 **object, a stationary object in the drivable space,**
15 **that's relevant information for a Level 2 system.**
16     **If it doesn't show a target at all of**
17 **the other vehicle, that's relevant information.**
18 **When it shows an end of drivable space, if it**
19 **does, that's relevant.  Whether it shows any**
20 **traffic sign recognition would be relevant.**
21     **What I could do with those, I can't tell**
22 **you at this point because I don't know if those**
23 **exist.  I don't know what that data would say**
24 **until I see it.**
25     Q.  If the video showed that there was

Transcript of Alan B. Moore
Conducted on July 12, 2024

11 (41 to 44)

41

1 drivable space, how would that affect your
2 opinion?
3 　　MR. SCHREIBER: That's an incredibly
4 　incomplete hypothetical.
5 　　A. I think I just expressed that I don't
6 know how these things will affect my opinions
7 until I see them. I gave you one example that I
8 don't think applies to this case.
9 　　So in this case, I don't know. I'd have
10 to see the data to know what to do with it.
11 　　Q. And it could be that even if there was
12 an augmented video, which there's not, but if
13 there was an augmented video for this crash, it
14 could have no effect on your opinions whatsoever;
15 right?
16 　　MR. SCHREIBER: That assumes facts that
17 　there isn't one or that one couldn't be
18 　created.
19 　　But with that said, you can answer.
20 　　A. I think this is the third time you've
21 asked me what my opinions will be when I get this
22 information.
23 　　I can't tell you what my opinions will
24 be; therefore, I can't tell you if it would have
25 any influence on my opinions, until I see the

42

1 data.
2 　　Q. The question was -- that wasn't -- I
3 didn't ask the question before.
4 　　The question was: Isn't it true that
5 even if there was an augmented video, which I can
6 tell you that there's not, but even if there was,
7 it is possible that it would have no effect on
8 your opinions?
9 　　It wouldn't matter to you?
10 　　A. Yes, that is possible.
11 　　Q. Okay. So let's go through your
12 opinions. If you can please tell me what they
13 are.
14 　　A. All right. So what I will read into the
15 record is my list of conclusions from my report.
16 And then, of course, I have lots of supporting
17 information for them.
18 　　The first one is that Tesla contributed
19 to the accident by supporting Autopilot use
20 outside of its ODD, or operational design domain,
21 and on the subject road.
22 　　The second -- I assume you want me to
23 just read them into the record all at once.
24 　　Q. Sure.
25 　　Let's -- let's read them all into the

43

1 record, and then we'll go one by one.
2 　　A. Okay.
3 　　The second one is that Tesla's driver
4 monitoring approach relied on insufficient proxy
5 for driver awareness, which contributed to the
6 subject accident.
7 　　Third, Tesla's training and
8 familiarization with Autopilot for new owners was
9 insufficient, which increased the risk of the
10 subject accident.
11 　　Number 4, although Tesla recorded
12 Mr. McGee's abuse and misuse of the Autopilot
13 system, it did not change his behavior, provide
14 additional training, or significantly restrict his
15 use of the feature.
16 　　Number 5, Tesla allowed Mr. McGee to
17 take a significant level of personal risk in
18 operating beta software in a vehicle. I'll
19 probably mispronounce this name. Angulo and Leon
20 were not able to assess their risk tolerance of
21 the beta software. They were unaware and
22 unwilling participants in a beta test.
23 　　And number 6, Tesla's decision to
24 support Autopilot use on Card Sound Road, outside
25 of its ODD, without sufficient driver awareness

44

1 and without driver training, was a significantly
2 larger contributor to the accident than
3 Mr. McGee's decision to use Autopilot at that
4 time.
5 　　Q. So let's go back to the first opinion,
6 which is that Tesla contributed to the accident by
7 supporting Autopilot use outside of its ODD and on
8 the subject road.
9 　　What is the basis for that opinion?
10 　　A. So the basis for that is the information
11 I have regarding the ODD, which was obtained from
12 the owner's manual, the Blanco depo, and a
13 document Tesla submitted to NTSHA.
14 　　(Tess Godhardt entered the virtual
15 　deposition room.)
16 　　Q. What information in the owner's manual
17 are you relying on as a basis for that opinion?
18 　　A. Sure.
19 　　It's on the bottom of page 5 of my
20 report. I read out of the owner's manual that
21 "Autosteer is intended for use only on highways
22 and limited access roads for the fully attentive
23 driver."
24 　　And I'm kind of taking pieces out of
25 this. "Do not use where bicycles or pedestrians

Transcript of Alan B. Moore
Conducted on July 12, 2024

12 (45 to 48)

45

1 may not be present."
2        And then, number two also out of the
3 owner's manual, "It's intended for use only by a
4 fully attentive driver on freeways and highways
5 where access is limited by entry and exit ramps.
6 If you choose to use Autosteer on residential
7 roads, roads without a center divider, or a road
8 where access is not limited, Autosteer may limit
9 the maximum allowed cruising speed."
10        And separately in the document, "You can
11 manually accelerate to exceed the limited speed."
12        Number 3, also from the manual,
13 "Autosteer is unlikely to operate as intended when
14 driving on hills, approaching a toll booth or
15 driving on a road that has sharp curves."
16        Number 4, this is from Blanco's
17 deposition, Exhibit Number 2, "Autosteer is
18 designed for use on highways that have a center
19 divider and clear lane markings."
20        And then in Tesla's response to a NHTSA
21 request, "The driver is best suited to determine
22 whether the system can be safely and appropriately
23 used."
24    Q.  Okay.  So all three of those bases, what
25 you just read, the owner's manual, the testimony

46

1 by Mr. Blanco, and the document that Tesla
2 submitted to NHTSA, all of those things discuss
3 limitations of the Autopilot system; correct?
4    A.  I mean, there are other limitations.
5        These specifically describe the ODD.
6 And the ODD is not just the limitations that apply
7 to a system but where it's intended to be used.
8 Basically, the roadway environment in which it's
9 intended to be used.
10    Q.  Right.
11        So those limitations, the basis that you
12 just outlined in the owner's manual, Mr. Blanco's
13 depo, and the document that Tesla submitted to
14 NHTSA, those discuss the limitations of -- as to
15 ODD in the Autopilot system; correct?
16    A.  No.  I'm sorry.  You're misstating my
17 testimony.
18        I've already described that these items
19 describe the ODD for which -- within which the
20 vehicle is intended to be used.
21        Separately, I describe some limitations
22 that apply to TACC and Autosteer, but limitations
23 on the performance are not the same as ODD.  They
24 are two different things.  What I am describing
25 here is specifically the ODD --

47

1    Q.  Okay.
2    A.  -- based on Tesla documents.
3    Q.  So those are facts, then, as to what the
4 ODD consists of; right?
5    A.  Well, they're Tesla's descriptions of
6 the ODD.
7    Q.  Right.
8        Okay.  So -- but your opinion is that
9 Tesla contributed to the accident.  So -- well,
10 strike that.
11        So I understand that those documents
12 outline the ODD, but where is the support for the
13 statement in your opinion 1 that Tesla contributed
14 to the accident?
15    A.  By supporting Autopilot use outside of
16 its ODD.
17        Oh.  Well, that's -- yeah.  So if you
18 look on the top of page 9 of my report, Card Sound
19 Road was outside of Autopilot's ODD for a pretty
20 long list of reasons:  It was not a limited access
21 road; it contained winding roads with sharp
22 curves; it had site distance limitations; it had
23 cross-traffic; it had vehicles stopped on the road
24 edge.
25        This isn't quite applicable to the ODD,

48

1 but it had occasional but predictable flooding,
2 the presence of bicycles and pedestrians, no
3 center divider or raised median.  It had hills, it
4 had a toll booth, and it had a residence, all
5 things that are outside of Tesla's described ODD.
6    Q.  And did any of those things that you
7 just identified, the low-lying road, prone to
8 flooding, the fact that people sometimes fish on
9 the side of the road or there might be
10 pedestrians, did those -- were those -- any of
11 those in play at the time of the crash?
12        Did any of those have an effect on the
13 crash?
14    A.  Yes.
15    Q.  Which of those factors were present and
16 part of the crash?
17    A.  The first one, not a limited access
18 road.
19    Q.  So you're saying that this crash
20 occurred because Card Sound Road was not a limited
21 access road?
22    A.  Yes.
23        There's another piece to that.  If it
24 were a limited access road, it would not end in a
25 T intersection.  It would not have a stop sign at

Transcript of Alan B. Moore
Conducted on July 12, 2024

13 (49 to 52)

---

49

1  a T intersection. So this crash could not happen
2  on a limited access road.
3      Q.  But is there any reason to believe that
4  Mr. McGee wouldn't have been on his cell phone
5  even if this wasn't a limited access road?
6          MR. SCHREIBER:  It's an incomplete
7  hypothetical.
8      A.  We're completely jumping topics here.
9          Are you -- it might be worth discussing
10 first, do I believe that he was on his cell phone?
11 Yes, it appears the evidence is consistent with
12 that.
13         I'm not sure how that is relevant to
14 whether this is a limited access roadway or not.
15     Q.  Do you have any evidence that if this
16 was a limited access road, that Mr. McGee would
17 not have been on his cell phone?
18     A.  No, I do not.
19     Q.  Is there any other basis, other than
20 what we've already talked about, for your opinion
21 that Tesla contributed to the accident by allowing
22 Autopilot to be used outside of the ODD?
23     A.  Well, also on page 9, I discuss how Card
24 Sound Road is not only outside of Autopilot's ODD,
25 it's also unique among rural two-lane roads. It's

---

50

1  an unusually high-risk rural two-lane road.
2          But in support of my opinion that Tesla
3  contributed, it's important -- important to
4  identify that Tesla, or Autopilot, had ways to
5  determine that this was outside of the ODD based
6  on the road classification.
7          And that's kind of funny, in federal
8  cases we end up almost reading my report.
9          But in the bottom of page 9 and top of
10 page 10, I talk about how we know that Tesla had
11 the information within Autopilot to determine that
12 this roadway was not within its ODD; therefore,
13 information was available to the vehicle, if it
14 were programmed, to simply not allow Autopilot use
15 here, to geo fence this area.
16     Q.  And what is the basis for your belief
17 that if the car -- if Autopilot was not in use,
18 that the crash would not have occurred?
19     A.  So if Autopilot was not in use, this
20 crash wouldn't have happened.
21         There's a couple possibilities of what
22 could have happened. We're kind of, you know,
23 reaching here into hypotheticals, but one
24 possibility is we have the same lack of driver
25 awareness, because we certainly have a lack of

---

51

1  driver awareness in this case. That same lack of
2  driver awareness, without lane centering, would
3  have led to a lane departure sometime well before
4  this crash, sometime in the 100 miles leading up
5  to the stop sign. Alternatively, driving without
6  lane centering most likely would have led to a
7  different level of driver awareness. I don't know
8  what that is, but it would be some different
9  level, which most likely would result in a
10 different crash or no crash.
11         It would be unlikely for him to make it
12 this hundred miles at that same level of driver
13 awareness without lane centering. So I'm not
14 saying he wouldn't crash at all. I'm saying he
15 wouldn't have this crash.
16     Q.  And is it possible that under those
17 circumstances -- so, in other words, if Autopilot
18 wasn't activated, that there would have still been
19 a deadly crash?
20     A.  That is not my opinion.
21     Q.  What's your opinion?
22     A.  That this accident would not have
23 occurred. Maybe no accident at all. Maybe a
24 different accident. I can't say. But this
25 accident would not have occurred.

---

52

1      Q.  Can you say with a degree of engineering
2  certainty that if Autopilot wasn't activated; in
3  other words, let's say, it wasn't -- Autopilot
4  wasn't allowed to be used outside of its ODD, was
5  not allowed to be used on Card Sound Road, that
6  there still wouldn't have been a deadly crash when
7  Mr. McGee was using his cell phone?
8          MR. SCHREIBER:  Objection. It's an
9  incomplete hypothetical. It calls for
10 speculation. Yeah. I'll stop there.
11     A.  So I think I just described that this
12 crash would not have happened.
13         What else could have happened, I can't
14 say. He might have made it with no accident. He
15 might have got off the road somewhere else or hit
16 something else. That certainly happens, right.
17 But this accident would not have happened.
18         And that's -- that's been the focus of
19 my work, is whether this accident would have
20 occurred.
21     Q.  And it's possible that he could have
22 been on his phone and he could have crashed into
23 the Tahoe anyways, right, even if Autopilot wasn't
24 activated?
25         MR. SCHREIBER:  Foundation, speculation,

---

Transcript of Alan B. Moore
Conducted on July 12, 2024

14 (53 to 56)

53

1    incomplete.
2    A.   I regularly have crashes where people
3  run stop signs and hit things.  That can certainly
4  happen.
5    Q.   So I don't know if that really answers
6  my question.
7       Is it possible that even with Autopilot
8  activated, that Mr. McGee still could have been
9  distracted and would have crashed into the Tahoe?
10      Is that possible?
11      MR. SCHREIBER:  Same objections.
12      It also doesn't matter what's possible;
13  we live in a world of probabilities.
14      But go ahead.
15   A.   I think you might have misspoke.  What
16  you described actually is this crash.  I'm not
17  sure what you asked is what you intended to ask.
18  But what we've described is the crash we have.
19   Q.   Is it possible if Autopilot wasn't
20  activated, Autopilot -- because it was not allowed
21  to be used outside of its ODD, it was not allowed
22  to be used on Card Sound Road, that even if that
23  was true, that Mr. McGee could have been
24  distracted by his cell phone and crashed into the
25  Tahoe?

54

1       MR. SCHREIBER:  Same objection.
2    A.   Oh, anything's possible.  That's
3  certainly possible.  Other crashes have happened
4  at this intersection.
5    Q.   So let's talk about your opinion
6  number 2.
7       MR. SCHREIBER:  Oh.  Ms. Cruz, can we
8  take, like, a 90-second break before we jump
9  into opinion 2?
10      MS. CRUZ:  Yeah, sure.  Let's take
11  five minutes.
12      MR. SCHREIBER:  Perfect.
13      THE WITNESS:  Sounds good.  Thank you.
14      (Recess in proceedings.)
15  BY MS. CRUZ:
16   Q.   Okay.  So we'll talk about ODD a
17  little -- a little bit more later, but I just want
18  to kind of continue to go through your opinions
19  and get the basis so we have that done.
20   A.   Okay.
21   Q.   The second opinion was that the driver
22  monitoring system relied on insufficient proxy for
23  driver awareness.
24      What does "insufficient proxy" mean?
25   A.   So by "proxy," I mean that it doesn't

55

1  directly measure something.  It doesn't directly
2  measure driver awareness.  It measures something
3  else that might correlate with driver awareness or
4  might not.
5    Q.   Okay.
6    A.   What I mean by proxy insufficient is
7  because it's not good enough.  It's not a good
8  enough measure of driver awareness.  It's too
9  prone to false positives, where it shows driver
10  awareness that doesn't exist and it's too easy to
11  defeat or abuse.
12   Q.   Okay.  And we'll talk about that more
13  later, but just to finish the rest of the opinion,
14  it's that the driver monitoring -- Tesla's driver
15  monitoring approach relied on insufficient proxy
16  for driver awareness, which contributed to the
17  subject accident.  What is the basis for that
18  opinion?
19   A.   So, I guess, I just gave you part of it.
20      The other part is, how did it contribute
21  to this accident, which is kind of interesting
22  since it looks like the driver's hands were on the
23  wheel in the last 20 seconds or so.
24      But what I see in the entire drive cycle
25  is a history of -- of driver inattention.  And

56

1  when he was passed by another vehicle and he
2  responded by accelerating after he was passed,
3  that suggests, to me, that he was inattentive to
4  the pass until it actually happened.
5       And then the driver awareness is clear
6  in the 20 or 30 seconds leading to the impact.
7    Q.   Okay.  Any --
8    A.   So it --
9    Q.   Go ahead.
10   A.   I'm sorry.
11      So a better driver monitoring system or
12  a different driver monitoring approach could have
13  prevented this accident by either disengaging the
14  Autopilot system a long time before the crash --
15  not one second before, but many seconds before --
16  or by issuing warnings or requiring behavior
17  changes of the driver.
18   Q.   Okay.  Do you agree that this crash
19  happened -- the reason that the Tesla drove into
20  the Tahoe was because Mr. McGee had his foot
21  firmly planted on the accelerator pedal?
22      Right?
23      MR. SCHREIBER:  Incomplete hypothetical,
24  calls for speculation, it's argumentative.
25   A.   I do not agree with that statement.  The

Transcript of Alan B. Moore
Conducted on July 12, 2024

15 (57 to 60)

57

1 cause of this crash was not that Mr. McGee had his
2 foot on the accelerator pedal.
3     Q.  What was the cause of the crash?
4     A.  Well, there are several of them.  One,
5 obviously, was driver inattention, or lack of
6 driver awareness.  The others are my six opinions.
7     Q.  Okay.  Any other basis for this opinion
8 that the driver monitoring approach was
9 insufficient, which contributed to the accident?
10    A.  Give me just a moment.
11        I think we've covered it.  I have
12 additional bases to it, but it's really basis for,
13 say, number 4, but also kind of supports number 2,
14 in that basically the fact that there's data
15 showing that McGee did not respond
16 appropriately -- appropriately to a driver
17 monitoring system, he intention- -- intentionally
18 abused it, and that Tesla not only tolerated that
19 abuse, to some extent they encouraged it by giving
20 him the information on how to abuse it.
21        But all that leads to a Level 2 system
22 being operated with an inattentive driver.
23    Q.  Okay.  And what data are you relying on
24 for the opinion 2 that you just talked about?
25        You said "data," but I'm not sure what

58

1 data you're referring to.
2     A.  Oh.  The log data shows his history of
3 driver inattention:  Receiving visual warnings
4 that he ignores; receiving audible warnings that
5 he ignores; having the Autosteer disabled, and
6 then pulling over, resetting it, and immediately
7 continuing his trip -- his trip.  His repetitive
8 occurrence of doing that.
9         So, in other words, the driver
10 monitoring system in this vehicle had actually
11 done nothing to encourage or improve his
12 awareness.  It simply encouraged him to defeat the
13 system, which is exactly what he did.
14    Q.  Do you believe that because a user
15 ignores the warning, that makes the warning
16 defective?
17        MR. SCHREIBER:  Incomplete hypothetical,
18 overbroad.
19    A.  I do not agree with that statement.
20    Q.  Why not?
21    A.  Well, I mean, anybody can ignore a
22 warning.  All a warning can do is provide
23 information that people can use or disregard.
24    Q.  So how do you determine whether a
25 warning's effective?

59

1     A.  I'm not a warnings expert.
2     Q.  But you just -- you just said that part
3 of your opinion is that the warnings that the
4 Tesla gave were insufficient.
5     A.  Yeah.  Well, my opinion is the driver
6 monitoring system is insufficient.  One component
7 of that is warnings that clearly had no effect on
8 this driver.  And the only effect they had was it
9 encouraged him to defeat the driver monitoring
10 system.
11        So I'm not saying that warnings are
12 defective in this case.  I'm saying the driver
13 monitoring system is insufficient.
14    Q.  Okay.  So you don't have an opinion --
15 just so we're clear, you don't have an opinion
16 that Tesla's warnings were defective; right?
17        MR. SCHREIBER:  It's incomplete.  It's
18 overbroad.
19    A.  Well, yes, I agree with that statement,
20 specifically with warnings; however, later in my
21 report I talk about communications or messages or
22 ways to change behavior which, you know, kind of
23 flirts with the topic, but not quite.
24    Q.  Okay.  Let's move on, then, to
25 opinion 3.

60

1        "Tesla's training and familiarization
2 with Autopilot for new owners was insufficient,
3 which increased the risk of the subject accident."
4        What is the basis for that opinion?
5     A.  So the basis of that is partly McGee's
6 depo, where it basically says he recalls nothing
7 about how to operate it.  He doesn't recall
8 receiving any documents that explained Autopilot.
9        And I'm just reading from page 6, at the
10 bottom of my report.
11        He does not recall knowing that the
12 owner's manual was electronic and in the vehicle.
13 He didn't recall understanding Autopilot had
14 limitations.  He didn't recall getting an
15 education on it.  He didn't know it wasn't
16 supposed to be used on roads like Card Sound Road.
17        But, interestingly, he was confident he
18 found a way to operate it.  He was sure that he
19 educated himself.  And he thought he had learned
20 how to use it.  It's an important distinction.
21 Although he had no training, he thought he had
22 learned how to use it.
23        And then in Blanco's depo, he said, "My
24 understanding is that upon delivery, delivery
25 specialists will go through the details of the

Transcript of Alan B. Moore
Conducted on July 12, 2024

61

1  vehicle and answer any questions."
2       That's very far from any kind of
3  training on this specific operation.
4       And then -- give me just a moment here.
5       Yeah, it's on page 15 of my report.  I
6  talk about how the delivery and the training at
7  delivery was insufficient.  Not only for Mr.
8  McGee, but for other customers I've spoken to, and
9  for myself.  Tesla just generally does not provide
10  much training at all on their Autopilot system.
11       At that time, there was no training in
12  the vehicle at all, other than just one kind of
13  disclaimer that you click accept on.
14       There was no supervision or oversight of
15  use as a driver becomes familiar with it.  There
16  was no phase-in of functionality, which is often
17  used on systems as operator familiarity increased.
18       In fact, I have an example that the --
19  the Toy Box feature that Tesla offered, I think in
20  later models, actually provided more contextual
21  training.  And by that I mean, training at the
22  point of an interested user's use.  It provided
23  more of that than the Autopilot system did.
24       Q.  What customers did you talk to to form
25  your basis for this opinion 3?

62

1       A.  I would have had this discussion with
2  probably more than 50 Tesla customers, and I can't
3  name them off the top of my head.
4       And this is consistent with my
5  experience, not only buying a vehicle, but
6  attending numerous Tesla events, that there's no
7  training offered at all.
8       Q.  Let's start with -- let's just talk
9  about just the customers here.
10       Where in your file can we find
11  information about the customers that you talked
12  to, what they said, what you said?
13       A.  It's not contained in my file.  It's
14  part of my collective experience in my field.
15       Q.  So what -- what information -- what else
16  can you tell me about these conversations that you
17  had with customers?
18       Who were the customers?
19       A.  I mean, I pretty much just described it.
20  They were Tesla customers.
21       Q.  What are their names?
22       A.  I already described to you, I can't list
23  their names.
24       There were about 50 of them overall, but
25  I can't tell you who they are or give you their

63

1  names.
2       Q.  When did you talk to them?
3       A.  Some at Tesla dealerships, some people
4  driving Teslas that I talked to at different
5  places, some through Internet forums.
6       Q.  Can you provide any more specificity
7  about any of these conversations that you had with
8  Tesla customers?
9       A.  No.
10       Q.  It sounds, to me, like these are casual
11  conversations that you have with maybe your Tesla;
12  right?
13       A.  I'm sorry?
14       MR. SCHREIBER:  You broke up.
15       A.  Yeah.  It broke up.
16       Q.  You own a Tesla vehicle; correct?
17       A.  My company does; yes.
18       Q.  Okay.  And that's your primary vehicle?
19       A.  It's one of my vehicles.
20       Q.  Okay.  How often do you drive your
21  Tesla?
22       A.  Every day for two weeks, and then not at
23  all for two weeks.  It's very irregular.  But I
24  put about 12-, 14,000 miles a year on it.
25       Q.  And how long have you had it?

64

1       When did you buy it?
2       A.  Somewhere around 2017.
3       Q.  You bought it used?
4       A.  Yes.
5       Q.  Who did you buy it from?
6       A.  Tesla's Service Center.
7       Q.  Okay.  So going back to my question
8  about different Tesla customers and conversations
9  that you've had with them, are these informal
10  conversations that you have when you come across a
11  Tesla customer or are these formal conversations
12  planned as part of your work as an expert witness?
13       A.  Those two overlap greatly.
14       This was not an effort to do any kind of
15  statistical survey.  It was an effort to gain
16  information from other Tesla customers that
17  overlaps both my personal interest and my
18  professional interest in this field.  So I would
19  not say that they were informal at all.  It was a
20  deliberate attempt on my part to gain information
21  from others.
22       Q.  Do you have any notes, recordings,
23  documents related to any of these conversations?
24       A.  No, I do not.
25       Q.  Is there any way that anyone else could

Transcript of Alan B. Moore

17 (65 to 68)

Conducted on July 12, 2024

65

1 go back and look at what was said during these
2 conversations?
3 **A. There is no record of them.**
4 Q. Okay. So what exactly about these
5 conversations are you relying on to support this
6 opinion 3?
7 **A. So on page 15 of my report, I say,**
8 **"Little or no training was provided at delivery of**
9 **the vehicle."**
10 **That is based on McGee's deposition, on**
11 **Blanco's deposition, on my own experience, and on**
12 **experiences of others I've spoken with. So that's**
13 **what is relevant.**
14 Q. But my question was: What about these
15 conversations, what happened during these
16 conversations, what was said during the
17 conversations that provides support for your
18 opinion 3?
19 **A. That zero training was provided on the**
20 **use of Autopilot at initial delivery of a new**
21 **Tesla.**
22 Q. And you said that you're relying on your
23 own personal experience?
24 **A. Yes.**
25 Q. What do you mean by that?

66

1 **A. So I took delivery of a vehicle at Tesla**
2 **Service Center, received zero training on**
3 **Autopilot use.**
4 **I've been to probably four events now at**
5 **Tesla Service Centers where I've been offered the**
6 **opportunity to drive a Tesla and experience**
7 **Autopilot or Full Self-Driving, where I've been**
8 **able to take the vehicle and use it with, again,**
9 **zero training on how to use the features. And,**
10 **more importantly, zero training on the risks and**
11 **limitations of the features.**
12 Q. Have you accessed the owner's manual in
13 your Tesla?
14 **A. That's not possible in my Tesla. If I**
15 **click the owner's manual button, it is blank.**
16 **And one -- you had asked what**
17 **information I would like on this case. I would**
18 **like to power up the MCU, connect it to cell**
19 **service, and see if the owner's manual actually**
20 **exists on these -- on this vehicle. Because it**
21 **does not on mine.**
22 Q. Okay. And you inspected the vehicle;
23 right?
24 **A. Yes.**
25 **The MCU was missing and there was no**

67

1 **power to the vehicle at the time.**
2 Q. Okay. Have you asked the lawyers that
3 you're working for that hired you to obtain the
4 MCU from the police?
5 **A. Yes.**
6 Q. Okay. You understand that the police
7 removed the MCU; right?
8 **A. That is not my understanding, but I'm**
9 **not sure I would know that either way.**
10 Q. What's your understanding of what
11 happened to the MCU?
12 **A. That it was removed and preserved by, I**
13 **believe, the FHP.**
14 **But as far as who removed it, that, I**
15 **don't know. I doubt the FHP removed it on their**
16 **own. That seems unlikely to me.**
17 Q. But it's your understanding that the FHP
18 had the MH -- the MCU, or they were the last ones
19 to have the MCU?
20 **A. That's not my understanding. I**
21 **understand that they preserved it.**
22 **Where it is today, I have no idea.**
23 **Apparently, that may be in question.**
24 Q. When did you tell the lawyers that you
25 wanted to access the MCU?

68

1 **A. Probably on the day of my inspection of**
2 **it, which would have been in June of this year.**
3 Q. But you've been working on the case
4 since 20- -- May of 2023?
5 **A. I don't agree with that statement.**
6 Q. Oh. I thought you said you were
7 retained March [sic] 16th of 2023.
8 **A. I did. But I have not been working on**
9 **the case since then. I did a surge of initial**
10 **work probably in the first week, and then I didn't**
11 **touch the case for months.**
12 **So your characterization that I've been**
13 **working on the case since that time is not**
14 **accurate.**
15 Q. Okay. Well, you were retained as a
16 consultant on the case in May of 2023; right?
17 **A. Yes.**
18 Q. Did you ask -- or did you tell the
19 lawyers that you wanted to access the MCU at that
20 time?
21 **A. I don't recall. I may have.**
22 Q. Okay. You mentioned that there was no
23 phase-in of training on the Autopilot for
24 customers.
25 **A. Uh-huh.**

Transcript of Alan B. Moore
Conducted on July 12, 2024

18 (69 to 72)

---

69

1    Q.  What other OEMs are you aware of that
2  have a Level 2 system that offer the phase-in that
3  you're criticizing the Tesla for not having?
4    **A.  I haven't done a survey of other Level 2**
5  **systems that offer that, but there's lots of other**
6  **technologies that do offer a phase-in of**
7  **technology.**
8       **One great example is drones, that have**
9  **autonomous features.  Those generally start on**
10 **delivery or purchase with a simpler set of**
11 **features that can be expanded with use.**
12      **That's just one example of where this**
13 **occurs.**
14   Q.  Do you have any evidence of exactly what
15 videos or training Mr. McGee received or obtained
16 in regards to Autopilot?
17   **A.  Just based on his deposition where he**
18 **said he found YouTube videos.**
19      **Disturbingly, the ones he referenced**
20 **first were ones showing defeat of the driver**
21 **monitoring system by putting weights on the**
22 **steering wheel.  So it's clear that the**
23 **information he found wasn't the best information**
24 **on how to use Autopilot and wasn't produced by**
25 **Tesla.  It sounded like he was searching on**

---

70

1  **YouTube.**
2    Q.  Do you know which videos on YouTube he
3  watched?
4    **A.  No, I do not.**
5    Q.  Do you know anything else that he might
6  have viewed other than these videos on YouTube,
7  which you can't identify?
8    **A.  It's not a question of whether I can**
9  **identify them.  It's a question of whether he**
10 **could identify them.  And in his deposition, he**
11 **did not.**
12      **I'm relying entirely on his deposition**
13 **for information on what videos he would have seen.**
14 **I don't have any -- any independent knowledge of**
15 **that.**
16   Q.  Are you --
17   **A.  However -- sorry.**
18      **However, if I look on YouTube, I could**
19 **easily find a large number of examples of abuse of**
20 **Tesla's driver monitoring system.**
21   Q.  But my question relates to what evidence
22 you have as to what Mr. McGee saw, not what's
23 available in the public.  So --
24   **A.  Just -- sorry.**
25      **I literally just answered both parts of**

---

71

1  that question.
2    Q.  Let me finish the question.
3       Other than the YouTube videos that he
4  says that he saw, which you cannot identify, do
5  you have any evidence of anything that you know
6  that Mr. McGee read, saw, or watched in regards to
7  Autopilot?
8    **A.  I'm sorry.  You just misstated my**
9  **testimony.  And I've already answered that**
10 **question.**
11   Q.  Are you aware of any other videos --
12 other than the YouTube videos that you referred
13 to, are you aware of any other information or
14 videos that Mr. McGee read or watched that relate
15 to Autopilot prior to the crash?
16   **A.  I'm sorry.  I've already answered that**
17 **question.**
18   Q.  Okay.  Well, I -- can you answer it
19 again?  Because I don't -- I don't understand the
20 answer.  So I'm going to ask the question again.
21      Other than the YouTube videos that you
22 referenced, that you can't specifically identify,
23 are you aware of any other information or videos
24 that Mr. McGee read or watched about Autopilot
25 prior to the crash?

---

72

1       MR. SCHREIBER:  Overbroad, incomplete,
2    asked and answered.
3    **A.  Give me just a moment.  There's going to**
4  **be a noise outside.  Just a moment.**
5       **So, once again, you've misstated my**
6  **testimony.**
7       **More importantly, what I said earlier**
8  **was that all of the information I have about what**
9  **Mr. McGee would have viewed in terms of videos or**
10 **training materials is based entirely on his**
11 **deposition.  So you would have to ask him.  I**
12 **don't have any more information on what he saw**
13 **than what he said.**
14   Q.  You haven't spoken to him; right?
15   **A.  I've never met him.**
16   Q.  All right.  Are you familiar with the
17 "Paint it Black" video?
18   **A.  I've seen that terminology.**
19      **I may have seen the video, but I don't**
20 **refer to it as that.  If you could describe it**
21 **better, I may have a different answer.**
22   Q.  Okay.  Are you familiar -- or strike
23 that.  That's okay.  We'll move on.
24      Okay.  Let's talk about opinion 4.
25 "Although Tesla recorded his abuse and misuse of

Transcript of Alan B. Moore
Conducted on July 12, 2024

19 (73 to 76)

73

1 the Autopilot system, it did not change his
2 behavior, provide additional training, or
3 significantly restrict his use of the feature."
4     What is the basis for that opinion?
5     **A.  So the basis for that is basically log**
6 **data that I received.**
7     **Hopefully, you're aware that I have log**
8 **data not only for the drive cycle of the crash but**
9 **for what appears to be actually his entire**
10 **ownership of the vehicle.**
11     **So I made a composite of all that data**
12 **and looked for patterns in it.  And some of the**
13 **things that I found are -- they start on page 10.**
14 **And they show a history not only of him abusing**
15 **the Autopilot system, or more specifically the**
16 **driver monitoring system, but that his abuse**
17 **increased throughout his ownership, leading up to**
18 **the crash.**
19     **I don't -- I don't know if you want me**
20 **to carry on or if you want to ask me specific**
21 **questions; otherwise, I could ramble on for quite**
22 **awhile on this.**
23     Q.  I just want an understanding of the
24 basis for his opinion -- for this opinion
25 number 4.

74

1     So it sounds like you're relying on the
2 log data.  Do you have any other basis for
3 opinion 4?
4     **A.  Yeah, so there's the log data and then**
5 **there's comparison to other features in the**
6 **vehicle that attempt to change behavior or provide**
7 **additional training.  And those features are the**
8 **battery management, the light status, and then the**
9 **launch mode.**
10     **And then, further, regarding his**
11 **restriction of use of the feature, part of the**
12 **basis for that -- give me just a moment here --**
13 **part of the basis for that is on page 6, the**
14 **limitations on use of pack and Autopilot.**
15     **So I talk about significantly**
16 **restricting the use of the feature.  On page 6, I**
17 **give examples of how and where Tesla does restrict**
18 **someone's use of Autopilot features, but didn't**
19 **here, didn't in this case.**
20     Q.  Any other basis for opinion 4?
21     **A.  I believe we've covered it.**
22     Q.  Okay.  Opinion 5, "Tesla allowed
23 Mr. McGee to take a significant level of personal
24 risk in operating beta software in a vehicle.
25 Angulo and Leon were not able to assess their risk

75

1 tolerance of beta software.  They were unaware and
2 unwilling participants."
3     What is the basis for opinion 5?
4     **A.  So, to a great extent, that speaks for**
5 **itself.**
6     **I do have prior experience as a beta**
7 **tester.  And just for this case, I looked up**
8 **several beta software agreements from -- from**
9 **different examples.  And they all had one thing in**
10 **common.  They all required that the beta tester**
11 **accept any adverse events, any improper behavior**
12 **that occurs.**
13     **So for Mr. McGee to accept any improper**
14 **behavior of Autopilot is one thing.  Angulo and**
15 **Leon did not have that opportunity.  So I think**
16 **that covers my basis.**
17     Q.  Opinion number 6, "Tesla's decision to
18 support Autopilot use on Card Sound Road outside
19 of its ODD without sufficient driver awareness and
20 without driver training was a significantly larger
21 contributed [sic] to the accident than Mr. McGee's
22 decision to use Autopilot at that time."
23     What is the basis for that opinion?
24     **A.  That's mostly captured on page 15, where**
25 **I say that Tesla had infinitely more information**

76

1 **regarding the risks and limitations of Autopilot**
2 **than McGee did; therefore, they had a better**
3 **ability to decide whether it should be used here**
4 **or not.**
5     **And this is not something I've come up**
6 **with.  This is described in two SAE documents,**
7 **J3016 and J3114, in that a Level 2 system carries**
8 **an expectation that the driver will conduct OEDR.**
9 **Basically, the driver will monitor the roadway,**
10 **that misuse or abuse can occur, and that**
11 **countermeasures may be necessary to correct the**
12 **driver's behavior.**
13     **That covers my basis for number 6.**
14     Q.  And according to those same requirements
15 in the SA -- in the SAE document, the driver is
16 the one that determines whether to use a Level 2
17 system; correct?
18     **A.  That is what J3016 -- I'm sorry.  Can**
19 **you repeat the question one more time or have the**
20 **court reporter read it back?  Either way is fine**
21 **with me.**
22     Q.  That's okay.  I can repeat it.
23     In accordance with the SAE requirement
24 that you just read into the record, in that same
25 document doesn't it also say that in a Level 2

Transcript of Alan B. Moore
Conducted on July 12, 2024

77

1  system the driver -- not the car, the driver
2  determines whether it's appropriate to activate a
3  Level 2 system?
4       Correct?
5  **A. Yes.**
6       **That is indicated in J3016. And that**
7  **conflicts with Tesla's own documentation regarding**
8  **when Autopilot can be used. So I had evidence**
9  **that Tesla does not follow J3016's recommendation**
10 **on that topic.**
11 Q. Can you point to a Tesla document in
12 which Tesla has said that the driver is not the
13 one that's responsible for activating Autopilot?
14 **A. Yes. Give me just a moment here.**
15 **So in the middle of page 6 of my report,**
16 **I give four -- I guess, five examples where Tesla**
17 **does not allow the driver to decide on engagement.**
18 **Tesla requires, for Autopilot use, that the doors,**
19 **trunk, and front trunk are closed, that the**
20 **vehicle speed is below 90 miles per hour, and the**
21 **driver's seat belt is fastened.**
22 **So a driver doesn't have the choice of**
23 **engaging Autopilot if the driver wants to use**
24 **Autopilot without a seat belt, above 90, or with**
25 **the door open.**

78

1       **Trailer mode cannot be in use. Or the**
2  **driver has to defeat trailer mode by saying, "I**
3  **don't have a trailer, I have a bike rack on the**
4  **back;" otherwise, they can't use Autopilot.**
5       **And then, although I couldn't find**
6  **documentation of this in 2019, but I know in other**
7  **model years of Tesla, that Autosteer won't engage**
8  **if the headlights are off.**
9       **So those are, I think, five examples of**
10 **where Tesla says, no, the driver is not the best**
11 **suited to decide when to use Autopilot, Tesla will**
12 **decide for the driver.**
13 Q. And does Tesla tell drivers that
14 whenever you're going to engage Autopilot, there
15 are limitations on the system, and the driver
16 should maintain attentiveness?
17 **A. So -- yes.**
18 **And many of those limitations are**
19 **performance limitations because there's**
20 **performance limitations on any ADAS system.**
21 **These are not performance limitations.**
22 **These are -- an example of a performance**
23 **limitation would be a 2019 vehicle with pedestrian**
24 **automatic braking, not being able to brake for a**
25 **pedestrian at night. That's a performance**

79

1  **limitation of the technology. There wasn't much**
2  **of a way to get around that in 2019.**
3       **This is different. These are decisions**
4  **Tesla made. Tesla said "A driver cannot engage**
5  **Autopilot under these conditions." Tesla doesn't**
6  **allow the driver to decide that.**
7       **These are different than performance**
8  **limitations because, literally, with a flip of a**
9  **switch in the software, Autopilot could be used**
10 **with a door open or over 90 miles per hour or with**
11 **the driver's seatbelt unfastened. Those are Tesla**
12 **decisions, not performance limitations.**
13 Q. But is there anywhere specifically,
14 whether in the owner's manual, in the warnings in
15 the vehicle, anywhere on the Tesla website, where
16 you have found that Tesla has said it's not the
17 driver's responsibility to drive the vehicle when
18 a Level 2 system is activated?
19       MR. SCHREIBER: It's an incomplete
20 hypothetical. It's overbroad. It's somewhat
21 unintelligible.
22 **A. Yeah, I -- I don't expect that I would**
23 **find that statement.**
24 **But what I just described is five**
25 **examples of where Tesla does say the driver**

80

1  doesn't get to choose when to engage. That's five
2  examples where -- where Tesla specifically
3  contradicts J3016, which they can do because it's
4  only a recommendation. But it's hard to then say,
5  look at J3016, it's the driver's decision. Tesla
6  said it's not.
7  Q. Is there any other basis for your
8  opinion 6?
9  **A. I think we've covered it.**
10 **You know, when I say "I think we've**
11 **covered it," if we look later, compare the**
12 **transcript to the report, maybe there's a sentence**
13 **in here I didn't include, but it's in the report.**
14 **But I think we've covered it.**
15 Q. Well, I want to know specifically what
16 the bases are for these opinions. So if there's
17 another basis for opinion 6, please tell me what
18 it is.
19 **A. Okay. This is an important one. I'd**
20 **like to take a minute to think about it. If you**
21 **want to take a break while I do it, that's fine.**
22 **If you want to just, you know, give me a minute**
23 **because, yeah, I think this is important for me to**
24 **look through.**
25 **Yes. So there's a couple things that**

Transcript of Alan B. Moore
Conducted on July 12, 2024

81

1  apply to number 6, and also a bit to number 4 as
2  well, that I think are important as far as the
3  idea that the usage of Autopilot is most
4  appropriately determined by the driver.
5       What we can tell by the log data of
6  Mr. McGee's ownership, and that's clearly not true
7  in this case, that he was not capable of
8  appropriately determining when Autopilot should be
9  used.
10       But beyond that, if I look on page 13,
11  there's a number of examples -- I'm just trying to
12  think of whether this is a basis for 6 or 4, but a
13  number of examples of -- where Tesla had
14  opportunity to monitor the misuse of the system,
15  had the opportunity to change the driver's
16  behavior, and had the opportunity to simply lock
17  out the technology, as they do today. If on a --
18  in a -- on a newer Tesla, this crash wouldn't have
19  happened for a number of different reasons. But
20  an important one here is that Autosteer would have
21  been locked out for one week, after three
22  strikeouts, which means it could not have been in
23  use on the day of this crash.
24       So there's a number of things on the
25  bottom of page 13 that are relevant.

82

1       I think I'm kind of rambling a little
2  bit.
3     Q.  Is it your opinion that a defect in
4  Autosteer caused this crash?
5     A.  So I think it's a little bit hard to
6  call this a design defect, like we might talk
7  about with a mirror or a door handle. What we're
8  really talking about is tuning of an algorithm and
9  decisions on risk management.
10       Certainly the tuning of this algorithm
11  and Tesla's decisions on risk management
12  contributed to this crash. Whether that's a
13  defect or not, I'm going to leave that to the
14  lawyers.
15       What I will show is how these decisions
16  contributed to this crash and how this crash
17  wouldn't have happened if Tesla had made different
18  decisions.
19       But as far as calling it a defect or
20  not, I think I'll leave that to the lawyers.
21     Q.  So you're not going to give an opinion
22  at trial that Autosteer was defective?
23     A.  "Defective" is not a word used anywhere
24  in my report. So at this time, I don't plan on
25  using the word "defective" in trial. My clients

83

1  may, but I don't plan to.
2     Q.  And Autosteer controls the lateral
3  movement of the vehicle; correct?
4     A.  That's correct. The lateral -- yes, the
5  lane centering, basically.
6     Q.  And what happened in this crash is that
7  the vehicle longitudinally, the front of the
8  vehicle, collided with the Tahoe; correct?
9     A.  Yes.
10     Q.  And Autosteer was active at the time of
11  the crash; right?
12     A.  No, it was not. Autosteer disengaged
13  about a second prior. And I have a -- a
14  conspicuous lack of evidence as to why it
15  disengaged.
16       You're asking me what augmented videos
17  would show me, that's one thing I would look for,
18  is why Autosteer disengaged one second, roughly,
19  before impact.
20     Q.  If Auto -- if Autosteer deactivated,
21  would that have been done when McGee pressed the
22  brakes?
23     A.  No. No. The aborting phase started
24  before he touched the brake. And at the time the
25  aborting mode started, he had not provided any

84

1  significant steering inputs or follow position
2  changes. I didn't see any evidence that it did,
3  so that's what I have.
4     Q.  Is it your opinion that any issue -- I
5  know you're not saying it's a defect, but that
6  Autosteer caused this crash?
7     A.  So you made an earlier distinction that
8  Autosteer is just lane centering, which it is; but
9  Autopilot is a combination of Autosteer and -- and
10  TACC, which is kind of a bigger package. And I'm
11  absolutely saying that Autopilot contributed to
12  this accident.
13       I don't think I used the word "caused"
14  anywhere in my report. I say "contributed."
15     Q.  But my question is specifically about
16  Autosteer because Autosteer and TACC are two
17  different things; right?
18     A.  I just described the difference between
19  them in my prior answer.
20     Q.  Right.
21       So you agree they're two different
22  things?
23     A.  Yes, they are.
24     Q.  Autosteer controls the lateral movement
25  of the vehicle, and TACC controls the longitudinal

Transcript of Alan B. Moore
Conducted on July 12, 2024

22 (85 to 88)

---

85

1   movement of the vehicle; right?
2       **A. Roughly, yes.**
3       Q.  And there -- this crash wasn't caused
4   because the Tesla veered out of its lane; right?
5       **A. Technically, it did.  There was no lane**
6   **in the area of travel leading to impact for the**
7   **last, say, roughly 50 feet.  There was no lane.**
8   **So you could argue that Autosteer did travel out**
9   **of its lane.**
10      Q.  Well, I'm not asking what you could
11  argue.  I'm asking what your opinions are as an
12  expert witness and what you're going to testify to
13  at trial.
14          Are you going to testify that this crash
15  was caused -- this crash occurred because the
16  Tesla veered out of its lane?
17      **A. That's not my opinion.**
18      Q.  Is it your opinion that Autosteer
19  contributed to this crash?
20      **A. So I'm looking at my page 2, "List of**
21  **Final Opinions," and I don't have the word**
22  **"Autosteer" anywhere on that page.**
23          **I'm using Autopilot as a package of TACC**
24  **and Autosteer together.  I'm saying Autopilot**
25  **contributed to this crash, but I'm not**

---

86

1   **specifically calling out Autosteer separately in**
2   **my final opinions.**
3       Q.  Did TACC contribute to the crash, a
4   failure of TACC?
5       **A. Same answer.  It's the package of**
6   **Autopilot that I'm referring to in my opinions.**
7       Q.  Okay.  But Autopilot is just a word that
8   describes two features; right?
9           Autopilot isn't a thing; right?
10          It's just a descriptive word; correct?
11      **A. Your Zoom call cut out there, but I**
12  **think I got everything.**
13          **I mean, Autopilot is a package or a**
14  **suite.  It includes two things.  What's**
15  **interesting is when you put the two together --**
16  **this is not in my opinions, but there's a whole**
17  **series of expectations of consumers that comes**
18  **along with Autopilot when you package the two**
19  **together.  And that's not part of my opinions.**
20  **But I'm referring to Autopilot as the package.**
21      Q.  Okay.  So I want to talk about TACC and
22  Autosteer different, because they're two different
23  features; right?
24      **A. So it sounds like what you're attempting**
25  **to do is reword my opinions.  And I'm not**

---

87

1   **interested in doing that.**
2           **If I look through my report, I do**
3   **separately specify Autosteer and TACC for some**
4   **things.  For example, system limitations on**
5   **engagement, they're slightly different between**
6   **TACC and Autopilot or Autosteer.  But at the end**
7   **of the report, when I look at my conclusions, I'm**
8   **talking about Autopilot.  I'm not going to take my**
9   **page of conclusions and reword it to have a page**
10  **for TACC and a page for Autosteer.**
11          **I have conclusions for Autopilot, which**
12  **is a term that Tesla developed.  So I'm using a**
13  **Tesla term in my opinions.**
14      Q.  Was the TACC feature active at the time
15  of the crash?
16      **A. No.  TACC was not active at the time of**
17  **impact.**
18      Q.  And why wasn't it active?
19      **A. It would have disengaged when McGee**
20  **touched the brake pedal.  And it may have**
21  **disengaged when Autopilot aborted.  I'd have to go**
22  **look through the log data to see that.**
23      Q.  Do you have any other opinions than what
24  we've just talked about -- I'm sorry, any other
25  basis than what we just talked about for

---

88

1   opinion 6?
2       **A. I think we've covered it.**
3       Q.  So let's talk about the accident facts
4   now.
5           What was the speed limit on Card Sound
6   Road in the area where the accident occurred?
7       **A. 45.**
8       Q.  And what were the lighting conditions at
9   the time of the accident?
10      **A. There's no ambient lighting in that area**
11  **at all.  There's just the red flashing stoplight.**
12      Q.  The accident occurred about 9:00 at
13  night?
14      **A. Roughly, yes.**
15      Q.  Okay.  So it was dark at that time?
16      **A. Yes.**
17      Q.  And like you said, no ambient lighting?
18      **A. Correct.**
19      Q.  Okay.  And what's your understanding of
20  how the accident occurred?
21      **A. Mr. McGee's Tesla ran a stop sign,**
22  **impacted the side of the Tahoe, which then**
23  **impacted two individuals standing beside the**
24  **Tahoe.**
25      Q.  And is it your understanding that

---

Transcript of Alan B. Moore
Conducted on July 12, 2024

89

1  Mr. McGee was driving on Card Sound Road just
2  prior to the accident and approaching the
3  intersection?
4      A.  Yes.
5      Q.  And across the intersection was where
6  the Tahoe was located; right?
7      A.  Yes.
8      Q.  I'm sorry.  I don't know if Zoom cut
9  off.  You said "yes"?
10     A.  I did say "yes."
11         And I saw the video froze for a second.
12 But my answer to your prior question was "yes."
13     Q.  And the Tahoe was parked perpendicular
14 to the Tesla?
15     A.  Yes.
16     Q.  And it was stationary; correct?
17     A.  Yes.
18     Q.  If you know, how far back did Mr. McGee
19 have a clear view of the intersection?
20     A.  I'll call it a long distance.  Long
21 enough that it doesn't matter too much what it is.
22 There were no site distance obstructions leading
23 to the stop sign.
24     Q.  Would you agree that his visibility was
25 completely obstructed [sic] for at least a

90

1  thousand feet prior to the intersection?
2         MR. SCHREIBER:  I think that came out in
3     reverse, or that was Zoom.
4      A.  Technically, my answer would be no, but
5  it -- I might recommend you restate the question.
6  I think something cut out there.  I heard
7  "obstructed."  You might have meant
8  "unobstructed."
9         MR. SCHREIBER:  Me, too.  That's what I
10    meant.  You said it was obstructed for a
11    thousand feet leading up.  I don't think
12    that's what you meant.  So either it didn't
13    come through clearly or it wasn't said
14    clearly.
15        MS. CRUZ:  I don't know which one
16    because, Brett, you just froze, too, when you
17    were objecting.  But I'll repeat the
18    question.
19 BY MS. CRUZ:
20     Q.  Do you agree that Mr. McGee's visibility
21 was completely unobstructed for at least a
22 thousand feet prior to the intersection?
23     A.  Almost.  I will agree that a driver in
24 the normal driving position had an unobstructed
25 view for at least about a thousand feet.

91

1         The reason I clarify it that way is I
2  don't know for sure what Mr. McGee was doing
3  inside his vehicle.
4      Q.  Do you have any reason to believe that
5  the visibility from the Tesla on the day of the
6  crash was unobstructed for at least a thousand
7  feet prior to the intersection?
8      A.  I think we're having the same problem
9  again.
10        I believe the visibility from the Tesla
11 to the accident site was unobstructed for up to
12 about a thousand feet.
13     Q.  Okay.  And we talked about this a little
14 bit before, but on page 3 of your report you
15 mention many characteristics of the road,
16 including the fact that the road -- you believe
17 that the road is low lying; you believe that it's
18 prone to flooding; there's a residence and a
19 restaurant along the road, on -- on the road;
20 people frequently stop on the side of the road;
21 the road is used by bicyclists and pedestrians.
22        None of those facts had any relation
23 to -- or were in effect on the day of this crash;
24 right?  At the timing of this crash?
25        MR. SCHREIBER:  It's vague.

92

1      A.  Maybe I'm not understanding your
2  question.  But all of those are relevant because
3  they all describe this road, which is outside of
4  Autopilot's ODD.  That's the relevance.
5      Q.  Okay.  Was the road flooding at the time
6  of the crash?
7      A.  Not that I'm aware of.
8      Q.  Was the toll booth involved in the crash
9  in any way?
10     A.  The toll booth was in use on the day of
11 the crash.
12     Q.  But was it involved in the crash?
13        Was it a part of the crash?
14     A.  So I guess the answer is yes, because it
15 was in use on that day.
16     Q.  But did the toll booth have anything to
17 do with the crash itself?
18     A.  Yes.  Because it was one of the
19 indicators that this road is outside of the ODD
20 for Autopilot.
21     Q.  Okay.  Were there pedestrians on the
22 side of the road at the time of the crash?
23     A.  Yes.
24     Q.  Other than Mr. Angulo and Ms. Leon?
25     A.  Not that I'm aware of.

Transcript of Alan B. Moore
Conducted on July 12, 2024

24 (93 to 96)

93

1    Q.  Were there bicyclists on the road at the
2  time of the crash?
3    A.  I don't know.
4       And the importance of those parameters
5  isn't whether they were present at that time, but
6  that there is a pattern of them on this road.
7  That's part of what puts this road outside of
8  Tesla's ODD.
9       On an expressway, you might occasionally
10 see a pedestrian, but very rare.  So you could say
11 that an expressway does not have pedestrians on
12 it, regardless of whether there's one present at a
13 given time or not.
14    Q.  Do you have any information regarding
15 what Mr. McGee was doing prior to the incident,
16 prior to the crash?
17       MR. SCHREIBER:  Vague as to time.
18    A.  Can you clarify a time or distance on
19 that.
20    Q.  Sure.
21       What was Mr. McGee doing ten seconds
22 prior to the crash?
23    A.  My understanding is that he was on a
24 phone call and possibly fumbling for his phone
25 inside the vehicle.

94

1       I can tell that his right leg was
2  virtually stationary; i.e., he wasn't putting much
3  force or movement into it, but that at least one
4  of his hands was moving.
5    Q.  How do you know that he was fumbling for
6  his phone exactly ten seconds prior to the
7  incident?  What's the basis for that?
8    A.  I don't.  That's based only on his -- I
9  think his depo testimony and maybe a statement to
10 the FHP that that's what he recalls doing.  And
11 the exact timing of it, I would have no way of
12 knowing.
13    Q.  Okay.  So, fair to say, the only thing
14 that there's evidence of in this case that
15 Mr. McGee was doing ten seconds prior to the crash
16 was that he was -- his phone line was connected to
17 the airlines; he was on a phone call?
18    A.  I don't have that independent
19 information.  My understanding is that was the
20 conclusion by the FHP.  I don't have any reason to
21 dispute that.
22       The reason I put it that way is I don't
23 know -- I don't recall when the call started, how
24 long it was, what the interaction was.  But my
25 understanding is he was on a phone call in the

95

1  moments leading to the impact.
2    Q.  Do you know when -- how long before the
3  crash he bent down to pick up his phone?
4    A.  I do not know that.
5       I don't even know that he actually did
6  bend down to pick up his phone.
7    Q.  Do you know how long he was -- well, he
8  testified that he was looking for his phone at the
9  time of the crash; right?
10    A.  Yes, that's what I recall.
11    Q.  Do you know when he started looking for
12 his phone?
13    A.  No, I do not.
14    Q.  Do you know how long he was looking for
15 his phone?
16    A.  No, I do not.
17    Q.  Do you know exactly where inside the
18 vehicle he was looking for the phone?
19    A.  No.
20    Q.  Other than the fact that he was on a
21 phone call, do you know what Mr. McGee was doing
22 five seconds prior to the crash?
23    A.  No.
24       What did catch my attention was the
25 constant accelerator pedal application, which

96

1  isn't completely determinant, but isn't fully
2  consistent with someone fumbling around under the
3  seat.
4    Q.  So, is it fair to say, then -- or, I
5  guess, I'm trying to understand your answer.
6       Five seconds prior to the crash, is it
7  your understanding that Mr. McGee was on a phone
8  call and that he had his foot on the accelerator
9  pedal?
10    A.  I guess, I'd have to bring up the EDR
11 data if you're asking me at a specific point in
12 time.  But just generally in the 30 seconds before
13 impact, that's my recollection.
14    Q.  And -- yeah.  He had his foot on the
15 accelerator pedal for at least 30 seconds before
16 the crash; right?
17    A.  Give me just a moment to bring up some
18 data to look at.  This will take me a minute.
19       Okay.  So his foot was -- well, the
20 reading of the accelerator pedal position was
21 constant for at least 34 seconds before impact.
22    Q.  And when did he hit the brakes, if at
23 all?
24    A.  .3 to .4 seconds before impact.
25    Q.  And he released the accelerator 1.1

Transcript of Alan B. Moore
Conducted on July 12, 2024

25 (97 to 100)

97

1 seconds prior to the impact; correct?
2    A.  Yes.
3        And I should probably clarify, I'm
4 looking in log data.  If I look at EDR data, the
5 time steps might be slightly different.  So it's
6 log data that I'm referring to, to answer these
7 questions.
8    Q.  Understood.
9        Do you have any information regarding
10 where Mr. McGee was looking anytime in the
11 30 seconds prior to the crash?
12   A.  No, I do not.
13   Q.  And I think you said earlier that you
14 agree that Mr. McGee was inattentive at the time
15 of the crash; right?
16   A.  Yes.  He ran a stop sign.
17   Q.  And if he was looking at the roadway at
18 the time of the crash, was this accident
19 avoidable?
20   A.  This --
21       MR. SCHREIBER:  Incomplete, overbroad.
22       Go ahead.
23   A.  This accident was avoidable by an
24 attentive driver.
25   Q.  I'm sorry.  The Zoom cut off.

98

1    A.  I don't know why it's doing that.
2        My answer was, "This accident was
3 avoidable by an attentive driver."
4    Q.  How familiar was McGee with this
5 roadway?
6    A.  Very familiar, based on his deposition
7 testimony.
8    Q.  And do you think that's relevant to your
9 opinions?
10   A.  It's not relevant to my opinions.  I
11 could often other experts on the case being very
12 interested in that, but for my work, he ran a stop
13 sign.  How familiar he was with that stop sign
14 doesn't matter for my work.
15   Q.  Okay.  But you would agree that this was
16 a roadway and an intersection that he was very
17 familiar with; right?
18   A.  Yes, that's my understanding.
19   Q.  All right.  And this intersection was
20 just a few miles from his house?
21   A.  Yes, that's my understanding.
22   Q.  And he would drive back and forth -- for
23 the entirety of the time that he owned the Tesla,
24 he would drive back and forth from his place of
25 employment in Boca to his house in the Keys, which

99

1 was very close to this intersection, multiple
2 times a week; right?
3    A.  Generally, yes.  Unfortunately, he never
4 said it very clearly in his depo.  But I concluded
5 it was probably about twice a week.  But I never
6 really could grab a sentence from his depo that
7 clearly said that.
8    Q.  You don't have any reason to believe
9 that he wasn't familiar with this intersection;
10 right?
11   A.  It's one of those questions I don't know
12 which way to answer it.
13       Can you rephrase the question?
14   Q.  Sure.
15       You don't have any reason to believe
16 that he was unfamiliar with this intersection;
17 correct?
18   A.  That is correct.
19   Q.  And how long had Mr. McGee owned the
20 vehicle at the time of the crash?
21   A.  Roughly, three months.
22   Q.  And what's your understanding of his
23 experience with using TACC and Autosteer?
24   A.  It's based entirely upon what he said in
25 his depo, which that he wasn't familiar with it

100

1 before he bought the vehicle.  And we've discussed
2 his training regarding TACC and Autosteer.
3    Q.  And what's your understanding of how
4 familiar with it he was not prior to the time he
5 bought the vehicle but at the time of the crash?
6    A.  Oh.  Well, we discussed that earlier,
7 that he described his training, or lack thereof.
8        But what was concerning to me is he
9 described his confidence that he knew how to use
10 it, which we know he did not.
11   Q.  How often did Mr. McGee use TACC and
12 Autosteer?  If you know.
13   A.  Yeah.  On -- I did the math on -- on the
14 last drive cycle, on the crash drive cycle, and
15 about 90 percent of his distance or time was with
16 Autopilot engaged.
17       I have not done that for the full -- if
18 I did it for the full ownership, I don't recall
19 it.  But it's clearly a high percentage of his
20 use, at least on the day of the crash.
21   Q.  Well -- I'm talking about not just
22 the day of the crash.  From when he purchased the
23 vehicle, which was a few months before the crash.
24       He testified that the Tesla was his
25 everyday vehicle; right?

Transcript of Alan B. Moore
Conducted on July 12, 2024

101

1    A.  Yes.
2        Q.  And he testified that he drove the
3    vehicle at least five days a week when he wasn't
4    traveling for work; right?
5        **A.  Again, his testimony wasn't as clear as**
6    **I'd like to see on that.**
7        Q.  Well, do you dispute five days a week
8    when he wasn't traveling for work?
9        **A.  If I were to search in his transcript**
10   **for five days a week if he wasn't traveling for**
11   **work, I don't think I would find that phrase, and**
12   **I don't recall him saying that.**
13       Q.  Okay.  So it sounds like you don't know,
14   one way or the other, whether it's true that he
15   testified that he drove the vehicle at least five
16   days a week when he wasn't traveling for work.
17       **A.  I'm sorry.  I don't follow your**
18   **question.**
19       Q.  Is it fair to say that you don't know,
20   one way or the other, whether he testified that he
21   drove the vehicle at least five days a week when
22   he wasn't traveling for work?
23       **A.  I believe -- it's in his transcript.**
24   **Either it's there or it's not.  I don't recall**
25   **seeing it there.  My impression is he did not say**

102

1    it that clearly.
2        **It's not part of my opinions whether he**
3    **did or did not.  That's really all I have to tell**
4    **you about that issue.**
5        Q.  Do you agree that he stated that he
6    would use Autopilot in his vehicle during
7    90 percent of his drives?
8        **A.  Give me just a moment.**
9        **So he said that 90 percent of the**
10   **hundred-mile drive was Autopilot.  That's not**
11   **quite the same as 90 percent of all of his**
12   **driving.**
13       **He said on page 178 -- and I'm probably**
14   **paraphrasing here, "I always used Autopilot on**
15   **long drives, 90 percent of the time it was on,"**
16   **which fits the day of the crash.**
17       **But again, these are both relevant to a**
18   **long drive, not to all of his driving.  And your**
19   **prior questions were about all of his driving.**
20       Q.  And when he made the 106-mile drive to
21   and from Boca Raton to Key Largo, which is
22   something that he did a few days a week, he would
23   use Autopilot 90 percent of the time on those
24   106-mile drives; right?
25       **A.  So I can answer that three different**

103

1    ways.
2        **I can answer it based on the log data**
3    **for the crash date, I can answer it based on his**
4    **transcript, or I can see if I have the answer**
5    **based on all of his log data for the entire**
6    **ownership.**
7        **I'm not sure which source of information**
8    **you're looking for, for the question.**
9        Q.  Well, I'm not asking for a source.  I'm
10   asking what your opinion is.
11       Would you agree that he stated that he
12   used Autopilot 90 percent of the time when he made
13   the 106-mile drive to and from Boca Raton and Key
14   Largo?
15       MR. SCHREIBER:  Well, objection.  It's
16   an improper question to ask his opinion about
17   a fact.
18       He's offering you the source of those
19   facts.  Which one do you want?
20       **A.  So I had my opinions laid out in my**
21   **report.  And in my report, I say he spent 84 to 91**
22   **percent of his time on Autopilot on the last drive**
23   **cycle.**
24       MR. SCHREIBER:  There you go.
25       Q.  I'm not asking for his last drive cycle,

104

1    though.  I'm asking about the entirety of his time
2    that he owned the vehicle.
3        Do you disagree or agree that when he
4    was making the drive to and from Boca and Key
5    Largo, that he would use Autopilot 90 percent of
6    the time he made those drives?
7        **A.  That statement is consistent with the**
8    **log data on the crash date and with his testimony.**
9        **And that's all the information I have to**
10   **offer you about that.**
11       Q.  Okay.  Are you aware of any research on
12   Tesla drivers and their familiarity with Autopilot
13   and their driving behavior?
14       **A.  I'm aware of some, and I know that there**
15   **is quite a bit of it.**
16       Q.  Okay.  What research papers are you
17   aware of that talk about Tesla drivers' behavior?
18       **A.  I don't have a list of references of**
19   **that in front of me.  I have a number of them.  I**
20   **know there's a lot more out there.**
21       Q.  Do you have any of them in your file?
22       **A.  I don't see any of them that I've**
23   **independently obtained.**
24       **I probably have some as an exhibit to**
25   **one of the Tesla people or -- yeah, that's the**

Transcript of Alan B. Moore
Conducted on July 12, 2024

27 (105 to 108)

105

1 only place I would have it, in my file anyway.
2     Q.  Okay.  But you don't have any research
3 papers on Tesla's drivers' behaviors within your
4 file, as part of your own personal file?
5     A.  Correct, not as part of work product
6 I've created.
7     Q.  Are you familiar with an article by
8 Schuko and some other folks regarding Tesla
9 driving behavior?
10    A.  I may have read it.  I don't recall it
11 off the top of my head.
12    Q.  Okay.  And it's an SAE paper from 2018.
13 Does that jog your memory?
14    A.  No.
15    Q.  Okay.  And then, I guess, you're not
16 aware that in that Schuko research paper, he and
17 others did a study that found that Tesla drivers
18 understood that Autopilot did not have capability
19 to drive without supervision, and they understood
20 that drivers remained responsible?
21    A.  I have seen conclusions similar to that,
22 and I have had other papers with very disparate
23 conclusions from that.
24        So it's kind of an interesting topic.
25 It seems to depend on who does the research and

106

1 what the research is on regarding what consumers'
2 opinions of the feature is.
3     Q.  What papers are you aware of that
4 disagree with those findings?
5     A.  I can't tell you, off the top of my
6 head.
7         I'm sure I have some of them in my
8 library, but I've not referenced any of them for
9 this case.
10    Q.  And you're not relying on them for your
11 opinions; is that correct?
12    A.  That is correct.
13        Yeah, I don't have any opinion on what
14 Autopilot users in general think of Autopilot
15 limitations.
16    Q.  And are you aware that the Schuko study
17 found that the level of Autopilot usage did not
18 influence the percentage of eyes on or eyes off or
19 road glance in Tesla drivers, and that Tesla
20 drivers rarely glanced away from the roadway for
21 more than four seconds, contrary to the common
22 perception of disengagement?
23    A.  So I understand the quote you just read
24 to me from the paper, but I'm not sure what your
25 question is regarding that quote.

107

1     Q.  Are you aware of that finding in that
2 study?
3     A.  Yes, I am.
4     Q.  And how are you aware of that?
5     A.  I think Dr. Cades (phonetic) referenced
6 it in his report.
7     Q.  Other than reading that finding in
8 Dr. Cades's report that you got a few weeks ago,
9 were you aware of that finding before that?
10    A.  I have read papers that express similar
11 findings.  I don't know if I've read that exact
12 one or not.
13    Q.  But you can't list for us any of those
14 papers, as you sit here today; right?
15    A.  I'm not prepared to do so today.
16    Q.  Okay.  Let's talk a little bit -- going
17 back to your first opinion now, and let's talk
18 about ODD.
19        Is ODD a defined term of art?
20    A.  Yes.  It's codified in J3016.
21    Q.  Okay.  And how does J3016 define ODD?
22    A.  How does it define ODD?
23    Q.  I'm sorry.  If you said something, I
24 didn't hear you.
25    A.  Oh.  Sorry.  I just repeated your

108

1 question.  I was thinking out loud.  Give me just
2 a moment.
3         I'm looking in the 2018 version, which
4 defines it -- and so far I'm not finding the
5 actual definition.  So give me just a minute.
6     Q.  And if you can't find it, that's fine.
7 We'll just agree that there's a definition for ODD
8 in 3016.
9     A.  I'm finding it.  It's in here.  I mean,
10 this is the document that defines it.  I see it in
11 there, in the search.
12    Q.  So what factors define ODD?
13    A.  Environmental and geographical factors
14 are the primary ones.
15    Q.  And according to 3016, the driver,
16 quote, "determines whether and when engagement and
17 disengagement of the driving automation system is
18 appropriate."
19        Correct?
20    A.  I'm assuming you're reading directly
21 from it.  I could search for that.  But that's my
22 recollection, that it has text very similar to
23 that.
24    Q.  Okay.  So, then, would you agree that it
25 was Mr. McGee's responsibility to determine when

Transcript of Alan B. Moore
Conducted on July 12, 2024

28 (109 to 112)

109

1    to engage or disengage TACC and Autosteer?
2        A.   I don't agree with that statement, but
3    that is what J3016 says.
4        Q.   Okay.  Why don't you agree with it?
5        A.   Well, one, it's clear that he was not
6    appropriately deciding when to engage and
7    disengage it; and, two, Tesla did not give him the
8    opportunity to decide when to engage and disengage
9    it.
10       Q.   Well, certainly he could have disengaged
11   Autopilot whenever he wanted; right?
12       A.   Yes.
13       Q.   Okay.  And my question wasn't what did
14   he do or not do.
15           My question was:  In accordance with
16   J3016, was it McGee's responsibility?
17       A.   I'm sorry.  The Zoom call is cutting out
18   again.  Can you repeat that question?
19       Q.   Sure.
20           My -- I said, my question wasn't what
21   did Mr. McGee do.
22           My question was:  In accordance with
23   J3016, was it Mr. McGee's responsibility to
24   determine when to engage and disengage TACC and
25   Autosteer?

110

1        A.   Yes, according to J3016.
2        Q.   Okay.  And did Mr. McGee fulfill his
3    role as a Level 2 driver in supervising the
4    driving automation system and intervening, as
5    necessary, to maintain safe op- -- operation of
6    the vehicle?
7        A.   No, he did not.
8        Q.   Okay.  And are you aware of any other
9    Level 2 vehicles in 2019 that could be used
10   outside of their ODD?
11       A.   There is a mix.
12           There is a Cadillac Super Cruise that
13   had a very strict ODD.  It could not be used
14   outside of it at all.  I'm familiar with Volvo and
15   Nissan vehicles that could be used outside of
16   their ODD but with significantly different
17   operation than Tesla's Autopilot, to where they're
18   not directly comparable.
19       Q.   You mentioned Volvo and -- what was the
20   other OEM that you mentioned?
21       A.   Nissan.
22       Q.   Okay.  So it's your opinion that
23   Cadillac Super Cruise could not be used outside of
24   its ODD as of 2019?
25       A.   That's correct.

111

1        Q.   And it's your opinion that the -- a
2    Volvo and a Nissan vehicle -- and we'll get to the
3    model.
4            Well, which model Volvo?
5        A.   Well, the -- the model doesn't matter so
6    much as the technology that was used on it.  And I
7    don't have that information in front of me.
8        Q.   So you're not sure which Volvos and
9    which Nissans you're giving the opinion about;
10   right?
11           Just that, generally, you're talking
12   about how their systems work?
13       A.   Correct.
14       Q.   And what's the name of Volvo's L2 system
15   as of 2019?
16       A.   I mix up Nissan and Volvo.  One is
17   Pilot -- I think Volvo is Pilot Assist and I think
18   Nissan is ProPILOT.  I may have those reversed.
19       Q.   Okay.  And it's your opinion that
20   pilot -- Volvo's Pilot Assist and Nissan's
21   ProPILOT were both L2 systems that in 2019 could
22   be operated outside of their ODD?
23       A.   That is my recollection.
24           If I go back through testing I did, I'll
25   probably find it was actually a different model

112

1    year and perhaps a different type of road, but
2    that is my recollection.
3        Q.   What testing are you referring to?
4        A.   Testing I've done on a Nissan and on a
5    Volvo.
6        Q.   Is the testing part of your file?
7        A.   No, it is not.
8        Q.   So how could our experts go and look at
9    this opinion about what other peer vehicles were
10   available and what features they have if you don't
11   have this testing, in your opinion?
12       A.   So if I look through my report, I don't
13   see any reference of peer vehicles, other than a
14   Cadillac Super Cruise.  I don't see any mention of
15   doing an evaluation of other vehicles, other than
16   Cadillac Super Cruise, regarding this issue.
17           These are questions you've asked me.
18   I'm providing information on them based on my
19   experience.
20       Q.   Okay.
21       A.   But this is -- I guess, you would call
22   this a new opinion you're asking me about.  I
23   don't have any information in my file to support
24   it because it's not an opinion I plan to
25   prepare -- express at trial.

Transcript of Alan B. Moore
Conducted on July 12, 2024

29 (113 to 116)

113

1    Q.  Okay.  And what evaluation or testing
2  have you done for this case in regards to Cadillac
3  Super Cruise?
4    A.  It's described in my report.  Give me
5  just a moment.
6        So on page 8, I describe the 2019 CT6
7  warning algorithm and disablement of Super Cruise
8  and the fact that it uses a driver-facing camera
9  instead of steering wheel torque.
10       And then --
11   Q.  So it looks --
12   A.  Sorry.  I'm still answering that prior
13  question.
14   Q.  Okay.
15   A.  If you could give me a moment.
16       On the bottom of page 14, I talk about
17  their algorithm for basically a strikeout, the
18  driver who's not paying attention.
19       And I also comment that Super Cruise is
20  much more aggressive than Tesla's Autopilot was in
21  2019 about inattentive drivers.
22       It would -- in my testing, it would give
23  me no more than about five seconds of eyes off the
24  road before it started to warn, and then later
25  intervene.

114

1    Q.  What pages of the Cadillac owner's
2  manual are you relying on?
3    A.  Yeah, I don't have the page number
4  called out here.  I would have to look in the
5  manual.  The owner's manual is in my file.  You
6  should have that.
7    Q.  Okay.  So the owner's manual is in your
8  file, but you can't point us to exactly what
9  you're referring to in the owner's manual, the
10  specific language?
11   A.  You're misstating my testimony.
12       What I told you is I can't tell you what
13  page number it is on.  I can tell you, either
14  paraphrasing or exactly what the text says, but
15  we'd have to search for it and find the page
16  number.  I can do that, if you'd like.
17   Q.  Okay.  But as you sit here, you don't --
18  you don't know where that is in the owner's
19  manual?
20       You can't refer us to a specific page?
21   A.  I certainly can refer you to a specific
22  page.  I just offered to do so.
23   Q.  Okay.  So I'm going to ask that you do
24  that on a break.
25   A.  I'm about due for a break anyway.

115

1    Q.  On the Cadillac Super Cruise -- did you
2  do testing for this case on the Super Cruise?
3    A.  Not for this case.
4    Q.  Have you done testing on the Super
5  Cruise that you're relying on in this case?
6    A.  I have done testing on a Super Cruise.
7  I don't know what model year it was.
8    Q.  Okay.  Where is that testing within your
9  file?
10   A.  It is not in my file.
11   Q.  But you're relying on that testing;
12  right?
13   A.  I'm relying on my experience, which
14  includes that testing.
15       So my opinion on page 14, "Super Cruise
16  often presents a warning if the driver's eyes are
17  off the road for more than about five seconds,"
18  that's based on my experience.  That experience
19  includes testing I've done, not as part of this
20  case.
21   Q.  When did you do testing on the Super
22  Cruise?
23   A.  It would have been around 2019.  It
24  could have been up to, I guess, about a year prior
25  to that.

116

1    Q.  And fair to say, you don't know what the
2  model year was of the vehicle?
3    A.  I don't recall.
4    Q.  Okay.  And you don't know what version
5  of Super Cruise was on the vehicle?
6    A.  Like what software version it was?
7    Q.  Sure.
8    A.  I'm not sure what you mean by "what
9  version."
10   Q.  Right.
11       Well, I assume that Super Cruise today
12  is different than it was in 2018; right?
13   A.  I'm sure it is.
14   Q.  Okay.  So you don't know which version
15  of Super Cruise was on the vehicle at the time of
16  the testing, as you sit here, or do you, I should
17  say -- strike that.
18       Do you know what version of Super Cruise
19  was enabled on the vehicle at the time you did
20  your testing?
21   A.  I do not.
22   Q.  And what did your testing consist of?
23   A.  Driving the vehicle and evaluating Super
24  Cruise use within its ODD on limited access
25  expressway and evaluating the driver monitoring

Transcript of Alan B. Moore
Conducted on July 12, 2024

117

1  system, in particular the eye tracking.
2      Q.  What was the methodology for the test?
3      A.  I just described it to you.  I'm not
4  sure what else you're asking.
5      Q.  Can you describe it with any more
6  specificity?
7      A.  It was a subjective evaluation.
8      Q.  What does that mean?
9      A.  It means there were no measurements or
10 recording devices used.
11     Q.  What roads did you drive on?
12     A.  Limited access expressways.
13     Q.  Which roads?
14     A.  I-95.
15     Q.  Where on I-95?  From where to where?
16     A.  Oh, it was -- would have been north of
17 Daytona, south of Jacksonville in Florida.
18     Q.  Can you say with any more specificity
19 what roadway you did this test on?
20     A.  I just described the roadway to you.
21     Q.  So the answer is, no, you can't describe
22 it with any more specificity?
23         MR. SCHREIBER:  You mean other than the
24     exact roadway, the geographic location, and
25     the type of road that it was in?

118

1          MS. CRUZ:  Other than what he's already
2      said.
3      Q.  Can you give any more specificity about
4  where this test was done?
5      A.  Yes.
6      Q.  Okay.  Can you give us more specificity?
7      A.  It is a limited access expressway
8  consisting of semi-porous asphalt, two or three
9  lanes, speed limit between 65 and 70 miles per
10 hour, with reflective pavement markers every
11 40 feet, reflective paint stripes every 40 feet,
12 and a depressed shoulder on each side of the road.
13         It is -- I can give you more
14 information, if you want.  I'm not sure if this is
15 a good use of your time.
16     Q.  Did you make any notes or records when
17 you did the test or after the test?
18     A.  I believe so.
19     Q.  Okay.  And do you have those notes or
20 records?
21     A.  I don't know.  I'd have to look.
22     Q.  Okay.
23     A.  I do not have them as part of this file.
24 This is not testing I did as part of this case.
25     Q.  Okay.  But you are relying on this

119

1  testing that you did on the Super Cruise as part
2  of your opinions; right?
3      A.  No.  I'm relying on my experience
4  regarding Super Cruise.
5      Q.  And your experience is based on this
6  test that you did; right?
7      A.  It is based in part on this testing.
8      Q.  Okay.  What other experience do you have
9  with Super Cruise besides this test that you just
10 described?
11     A.  Talking to Super Cruise owners, watching
12 videos of Super Cruise in use, reading documents
13 about Super Cruise operation and reading research
14 papers about Super Cruise.
15     Q.  Okay.
16     A.  None of which is in my file.
17     Q.  Okay.  Which Super Cruise customers did
18 you talk to?
19     A.  I don't have any record of that.
20     Q.  Was this a formal study or was this like
21 the Tesla customers, just when you come across
22 somebody you chatted up with them about how Super
23 Cruise works?
24     A.  It was not formal or informal.  It was a
25 discussion with Super Cruise owners about their

120

1  experience with their vehicles, both for my
2  personal interest and for my professional
3  interest.
4      Q.  And how did you come about talking with
5  these Super Cruise customers?
6      A.  The -- the -- I'm sorry.  The Zoom cut
7  out again.
8          MR. SCHREIBER:  Yeah.
9      Q.  I said:  How did it come about that you
10 were talking with these Super Cruise customers?
11     A.  Either I met them -- I met them
12 somewhere.  I don't recall.  Some -- I remember
13 one I met at a gas station and asked him about it.
14 Another one was a client who had one, and I asked
15 him about it.  Yeah, I don't recall all of them.
16     Q.  You said that you read -- you've read
17 scientific papers about Super Cruise.  What papers
18 did you read?
19     A.  I don't have those references handy.
20 They're not part of my file.  I didn't read them
21 referencing this case specifically.
22     Q.  Okay.  And I think you said you read
23 other materials or watched things online about
24 Super Cruise.  What were those?
25     A.  I don't have a list of references for

Transcript of Alan B. Moore
Conducted on July 12, 2024

121

1  those.  They're not in my case file.  I didn't do
2  them as part of this case.
3      Q.  Okay.  So we talked about, in terms of
4  your opinion in regards to Super Cruise, you are
5  referring to the Super Cruise -- the 2019 Cadillac
6  CT owner's manual, which is in your file, and the
7  testing that you did on Super Cruise that you
8  talked about, and talking with Super Cruise
9  customers that you talked about, and reading
10 articles or publications.
11     Anything else that forms the basis of
12 your opinion as it relates to Super Cruise?
13     A.  I think that covers it.
14     Q.  Does every vehicle have an ODD?
15     A.  While we're switching topics, this would
16 be a great time to take a break, and this is my
17 second request for a break.
18     MS. CRUZ:  Sure.  That's fine.
19     Brett, just for planning purposes, are
20 you guys going to want to stop for lunch --
21 or maybe I should be asking you, Alan.  Are
22 you guys going to want to stop for lunch or
23 do you want to just keep going with kind of
24 like hour breaks or so?
25     MR. SCHREIBER:  I would defer both to

122

1  the witness as well as to the reporter.
2      THE WITNESS:  I'm fine with an hour
3  break.  Maybe if we just make it ten minutes
4  this time.  I don't really need to take a
5  lunch time.  But I'm open to what the court
6  reporter wants to do also.
7      (Off-the-Record Discussion.)
8      MS. CRUZ:  Okay.  So we'll take ten now
9  then.
10     (Recess in proceedings.)
11 BY MS. CRUZ:
12     Q.  I think my last question, which I let go
13 unanswered, but I shouldn't have -- and we took a
14 break -- because there was a pending question, but
15 I think my question to you was:  Does every
16 vehicle have an ODD?
17     MR. SCHREIBER:  It's overbroad, it's
18 incomplete.
19     A.  Levels 1 through, I believe, 4 should
20 all have an ODD.  Level 5 would not.
21     Q.  All right.  I guess, my -- I have a
22 same -- that same question, but in regards to
23 Level 0 vehicles.
24     So does every vehicle, regardless of the
25 SAE automation level, have an ODD?

123

1      MR. SCHREIBER:  Same objections.
2      A.  Give me just a moment here.  I'm both
3  looking and thinking.  I've never really thought
4  about that scenario.
5      Yeah, J3016 says the ODD is not
6  applicable for a Level 0 system.
7      Q.  Okay.
8      A.  And I would agree with that.
9      Q.  So are you aware of any vehicle that's
10 without automation, so a level -- a Level 0
11 vehicle that would fully restrict operability in
12 its ODD or to its ODD?
13     A.  Yeah, I don't think that question is
14 even definable, at least according to J3016 it's
15 not.
16     I could probably think of vehicles that
17 can't be operated outside of certain geographic or
18 environmental constraints, but I don't think
19 that's really relevant to our discussion.
20     Q.  Are there other factors of ODD besides
21 the geographical and environmental factors?
22     A.  There are.
23     And it's bothering me that I can't find
24 the definition in the 2018 version.  Give me just
25 a moment here to find that because I know it's in

124

1  here.
2      Here we go.  I found it.  Section 3.22
3  is the ODD.  So, yeah, environmental,
4  geographical, and time-of-day restrictions, and
5  the presence or absence of certain traffic or
6  roadway characteristics.  So that's pretty vague.
7  But, basically, the type of roadway environment is
8  the way I consider ODD.
9      Q.  Have you ever activated Autopilot on
10 your Tesla outside of its ODD?
11     A.  Yes.
12     I've done so on Card Sound Road.
13     Q.  Have you done so on other roads that are
14 not part of the ODD?
15     A.  Yes.  Yes.
16     In fact, I've gone to great effort to
17 activate it intentionally way outside of its ODD.
18     Q.  Why would you activate Autopilot outside
19 of the ODD?
20     A.  Almost all of my work with ADAS is
21 somewhere near a performance limitation.  So when
22 ADAS is being used right within the middle of what
23 it's designed to use, I'm never involved.
24     Whenever I'm involved, there's a system
25 operating near a performance limitation.  So

Transcript of Alan B. Moore
Conducted on July 12, 2024

32 (125 to 128)

125

1  pretty much every chance I get, I take an ADAS
2  system and operate it near its performance
3  limitation in testing to see what it's going to do
4  and how it's going to respond.
5      And I do that frequently with Teslas,
6  just to learn how it handles different situations.
7      Q.  Okay.  So, then, is it fair to say that
8  frequently when you're driving your Tesla on
9  Autopilot, you activate it and use Autopilot
10 outside of the ODD?
11     A.  I've done so many times.
12     Q.  Okay.  One thing I want to go back to
13 real quick.  You talked a little bit about there
14 not being an explanation for why Autosteer aborted
15 approximately one second prior to crash.
16     Do you remember that testimony?
17     A.  Yes.
18     Q.  Could that have been because the vehicle
19 drove past the stop bar and into the intersection
20 where there were no lane markings?
21     A.  So you asked me two questions there.
22     One, if driving past the stop bar would
23 have triggered that.  I've not seen clear evidence
24 that Autopilot would disengage or abort in that
25 scenario, but where it has lost lane lines and,

126

1  therefore, probably lost drivable space or free
2  space, that could trigger an Autopilot abort.
3      I would expect that to coincide with a
4  "takeover immediately" warning.  I didn't see any
5  evidence that that occurred.  And I would think
6  McGee might have remembered that, but I'm not
7  certain.
8      Q.  All right.  And that was my question.
9  My question wasn't did driving past the stop bar,
10 could that have triggered Autosteer to -- to
11 disable, but -- or abort, as you used the word.
12     But the question was really:  Could it
13 be that the lane markings disappeared when McGee
14 drove into -- when Mr. McGee drove into the
15 intersection, and that's what caused Autosteer to
16 abort?
17     A.  I think that's pretty unlikely.
18     And to be clear, "abort" is Tesla's
19 term.  I took that literally right out of the log
20 data.
21     But Autopilot is designed to travel
22 across intersections with no lane lines.  So for
23 Autopilot to do that here is normal.
24     Now, this is a T intersection, which
25 creates an obvious problem.

127

1      But, yeah, the lack of lane lines
2  itself, I wouldn't expect to cause this abort.  A
3  lack of drivable space might do it.  But again, I
4  would expect a "take over immediately" indication.
5  And if it happened, I don't have any evidence of
6  it.
7      Q.  And -- well, so it sounds like your
8  answer to that is you think it's unlikely, but you
9  don't have evidence to say, one way or the other;
10 is that fair?
11     A.  I'm not sure what question you're giving
12 me an answer to, so I --
13     Q.  The question as to whether Autosteer
14 could have aborted because he drove into the
15 intersection and there were no more lane markings.
16     A.  I think that is unlikely.
17     Q.  Based on what?
18     A.  Based on what I've just described, that
19 Autopilot, as designed, can drive through
20 intersections without lane lines and usually make
21 it to the other side in roughly the right place.
22 So for Autopilot to drive through an intersection
23 with no lane lines is -- is a common occurrence.
24     Q.  Okay.  And as part of your opinion that
25 if Tesla had prevented Autopilot use outside of

128

1  the ODD that the accident wouldn't have
2  occurred -- you talk in that same section of your
3  report about the lack of driver awareness and your
4  opinion that the lack of driver awareness would
5  not have occurred in the same manner, it wouldn't
6  have occurred without Autopilot use, it wouldn't
7  have resulted in a lane departure -- or would have
8  resulted in a lane departure and increase in
9  driver awareness related to manual driving would
10 have resulted in a different outcome, either no
11 accident or a different accident.  What is the
12 basis of your opinion that it would have resulted
13 in a different outcome?
14     How do you know that?
15     A.  I mean, you're looking at the top of
16 page 10 of my report.  I think that kind of covers
17 it.
18     So let's just take the 16-mile trip on
19 Card Sound Road, just that piece alone.  If we had
20 the same lack of driver awareness, had no -- no
21 Autosteer engaged, he never would have made it to
22 the stop sign.  He would have driven off the road
23 at one of the curves or hit the toll booth or hit
24 the bridge above it.  He would have had some lane
25 departure occur.  Probably not too likely.

Transcript of Alan B. Moore
Conducted on July 12, 2024

129

1       What's more likely is without Autosteer,
2   he would have a different level of driver
3   awareness, probably slightly higher because
4   otherwise he would run off the road. So with a
5   higher level of driver awareness, something
6   different would happen. I'm not saying no crash
7   would happen, but some different crash would
8   happen. This crash would not happen.
9       Q. And Mr. McGee didn't tell you that he
10  wouldn't have used the phone if he didn't have
11  Autopilot or if he was on Autopilot suspension;
12  right?
13      A. I'm sorry. That -- I think the Zoom cut
14  out again. Could you repeat it for me?
15      Q. Mr. McGee did not tell you that he
16  wouldn't have used his phone if he was on an
17  Autopilot suspension or if Autopilot wasn't
18  active; right?
19      He never told you that?
20      A. I've never spoken to Mr. McGee, so he
21  had no opportunity to tell me anything.
22      But what I'm evaluating here is the
23  Autopilot function. He could or could not use his
24  phone at any time on any drive.
25      Q. And you would agree that drivers get

130

1   distracted by their cell phones when driving
2   manual vehicles; right?
3       A. Yes.
4       Q. It's hard to drive somewhere nowadays
5   where you don't see someone on their cell phone
6   while driving; right?
7       A. I agree with that statement.
8       Q. Okay. And would you agree that driving
9   a cell phone -- driving while using a cell phone
10  is certainly something that's not limited to
11  Tesla's drivers who are using Autopilot; right?
12      A. I agree with that statement.
13      Q. Okay. Are you aware that NHTSA has
14  reported that 13 percent of all
15  distraction-affected crashes and 7 percent of all
16  people injured in distraction-affected crashes
17  were due to drivers using their cell phones?
18      A. I don't recall those exact numbers, but
19  I remember them being lower than I expected.
20      Q. And why is that?
21      Why -- why would you expect them to be
22  higher?
23      A. Oh. I just -- cell phone use and
24  distraction is highly correlated with crash risk,
25  so I expected those numbers to be higher for just

131

1   that reason.
2       Q. And drivers taking their eyes off the
3   road to use their cell phone or do something
4   unrelated to the driving task is something that
5   was happening well before Autopilot was
6   introduced; right?
7       A. My answer is yes, but there's an
8   important distinction there because you've --
9   you've kind of conflated two things. One is cell
10  phone use, which is definitely a distraction. But
11  taking the eyes off the road is a whole human
12  factors field by itself. We don't spend as much
13  time as you might think looking straight down the
14  road.
15      So I just think it's worth separating
16  those two factors here. But, yeah, both factors
17  existed before Tesla's Autopilot was ever created.
18      Q. Right.
19      And my question was: Drivers taking
20  their eyes off the road to do something unrelated
21  to driving, whatever that is, that is something
22  that's been happening probably for the past 100
23  years, since cars were put on the road; right?
24      A. Yes.
25      But the interesting fact is drivers take

132

1   their eyes off the road to do driving-related
2   tasks as well. And that's why I just point out
3   that drivers spend a surprising amount of time not
4   looking straight ahead, whether they're doing a
5   driving task or not.
6       Q. Have you ever investigated a crash where
7   a driver was distracted by a cell phone?
8       A. Too many, yes.
9       Q. Okay. And was it your finding that the
10  driver distraction was the cause of the crash in
11  those cases?
12      A. At least a contributor, if not the
13  cause.
14      Q. Did any of those cases involve -- did
15  any of those crashes occur when an L2 ADAS system
16  was activated?
17      A. No.
18      Q. Are you aware that research shows that
19  reaching for or handling objects while driving is
20  associated with an increased risk in crash that
21  could be up to threefold?
22      A. I'm not familiar with that specific
23  study, but it -- the number surprises me, but the
24  trend does not.
25      Q. Let's talk now about your opinion -- and

Transcript of Alan B. Moore
Conducted on July 12, 2024

34 (133 to 136)

133

1  I'm not sure -- it's hard to tell which statements
2  are part of which opinions.
3        But you have an opinion that Tesla's
4  countermeasure, the recent countermeasure that
5  they deployed back in December of 2023, which
6  consists partially of a one-week suspension or
7  disablement of Autopilot, that that would have
8  prevented this crash.
9        What is the basis for that opinion?
10  A.  So the basis for that is the log data
11  for the entire ownership of the vehicle.
12       And a good example of it is on page 11.
13  I have Fig. 2, which shows the number of what I'm
14  calling strikeouts per day.  I believe that was a
15  term Blanco used also.
16       And roughly four days before the
17  crash -- I'm not sure what Mr. McGee was doing,
18  but he had nine strikeouts in one day.  Nine times
19  he pulled over to reset Autopilot.  And so that
20  definitely would have meant that -- meant that
21  disablement -- disablement was available in later
22  software versions.  And so because of that, then,
23  on the day of the crash, his Autopilot wouldn't
24  have been functional at all.  So he wouldn't have
25  this crash.

134

1        Now, might we have a different crash, I
2  don't know, but we wouldn't have this crash.
3   Q.  But isn't it true that the cadence of
4  the strikeouts would have been different if the
5  one-week suspension was in place?
6        The strikeouts -- just like you say the
7  crash would have been different, the strikeouts
8  would have been different if, for example, let's
9  say, he was on a suspension on 4/18 -- I'm sorry,
10  4/19/19.  What if he was on a suspension and he
11  got off the suspension the next day?
12  A.  Let's see.  Just a moment here.
13       Yeah.  So, I guess, you could argue over
14  the whole 90 days, would this shift somewhere.
15  I'm sure you could -- and, yeah, I'm sure you
16  could try to pick a scenario that would move that
17  week suspension.  Magically, he'd have it
18  available on the day of the crash.
19       If that were the case, I would expect
20  that that week disablement would do exactly what
21  it's intended to do, which is change his opinion.
22  You know, if every time this happens he gets
23  locked out for a week, so he has to drive to Boca
24  and back twice without Autopilot, I would expect
25  that would cause a change in behavior.

135

1        And that's kind of a -- you know, a lot
2  of my, you know, opinions.  2 through 4 and 6 all
3  say that Tesla could have done something to change
4  his behavior.  A week disablement would.
5        But, yeah, if I just take the nine
6  strikeouts in one day, that would create a week
7  disablement.  It wouldn't be in use in this crash.
8  But you can certainly slice this other ways, if
9  you wanted to.
10  Q.  What is your basis for that expectation?
11  A.  Which expectation?
12  Q.  The expectation that you just referred
13  to.  That was your words, your "expectation."
14  A.  I'm sorry.  If I used that word, I don't
15  recall using it, so I don't know the context of
16  what you're asking me.
17  Q.  You did.
18       You said it's your expectation that the
19  strikeout -- that the disablement would have
20  changed his behavior.  What is the basis of your
21  expectation that this one-week disablement would
22  have changed his behavior?
23  A.  Oh.  That's -- that's the whole reason
24  it exists, is to change behaviors of people who
25  chronically abuse the system.  That's why that

136

1  exists.
2        And if you're looking for a basis for
3  it, one basis would be the -- the DOD document
4  that I referenced that states that automated
5  functions shall monitor user actions to minimize,
6  resist, and tolerate errors.  That's exactly what
7  that one-week disablement is meant to do.
8        If we look in J3114, that document
9  almost entirely deals with abuse of a system, how
10  it's foreseeable and how to try to correct user
11  actions to prevent it.  And that's exactly what
12  Tesla did with that later update.
13  Q.  How can you be sure, how can you give an
14  expert opinion, with engineering certainty, that
15  with the one-week disablement or suspension of
16  Autopilot, that that would have caused a change in
17  Mr. McGee's tendency to abuse the system?
18  A.  Well, it's certainly possible that he
19  was on a mission to abuse this and would continue
20  doing so.  But I don't think -- I don't see any
21  evidence that Mr. McGee was intentionally trying
22  to damage his Tesla or damage Autopilot.  He just
23  wanted to have the vehicle drive itself while he
24  did something else.  That seems pretty clear to
25  me.

Transcript of Alan B. Moore
Conducted on July 12, 2024

137

1    So how do you change that behavior,
2  right?  Well, you can communicate risk to him, you
3  can warn him, and then you can limit his use of
4  it.
5    Limiting his use of it does two things.
6  One, it limits the risk of all other road users of
7  his misuse; but, two, it makes it so inconvenient
8  for him to misuse it, something in his behavior
9  will change.
10    Q.  Have you done any testing or any studies
11  to support that opinion?
12    A.  I've done an empirical study of Full
13  Self-Driving, which has a similar lockout.  And
14  one thing I hear constantly from drivers is their
15  concern about getting locked out.  Because on
16  that, you get -- it's either three or five
17  strikeouts.  And then FSD would disable
18  completely.
19    Q.  And what --
20    A.  And that was very, very prevalent in
21  minds of the drivers I've spoken to.  So it was
22  clearly effective with Full Self-Driving.
23    Q.  What were the parameters of the study
24  that you did?
25    A.  Similar as to what we talked about --

138

1  about before.  I've talked to owners who have Full
2  Self-Driving and asked their thoughts on it.  And
3  that's one thing that always came up, is I don't
4  want to get locked out of the Full Self-Driving,
5  as in that would affect their behavior, that
6  deterrent, that negative reinforcement.
7    Q.  So when you say "study," what you mean
8  is that you talked to people that you come across
9  about how they would feel about a disablement or a
10  suspension of an ADAS system?
11    A.  Yes.  Specifically with Tesla Full
12  Self-Driving.
13    Q.  Do you have any documents related to
14  this study?
15    A.  Zoom completely froze.
16    But, no, I do not have any documents
17  related to that study.
18    Q.  Have there are been -- ever been any
19  documents related to the study?
20    A.  I'm sure there are studies that do --
21  you know, that have done similar analysis, but I
22  don't have any documentation of it, that I'm aware
23  of.
24    Q.  No.  I'm asking about the study that you
25  say that you did.

139

1    A.  Are you asking me a second time if I
2  have any documentation of the study after I told
3  you I don't have any documentation of the study?
4    Q.  No.  I'm asking if there were ever any
5  documents.
6    Were any documents ever made to, for
7  lack of a better term, document this study that
8  you did?
9    A.  That's the third time you've asked me if
10  I have any documents for a study after I've told
11  you I have no documents for the study.
12    Q.  Okay.  So the basis for this opinion is
13  that you, over the years, have talked to people
14  who are Tesla owners who drive Tesla with
15  Autopilot activated, and you've asked them about
16  how they would feel or how they would react to a
17  one-week suspension of Autopilot?
18    MR. SCHREIBER:  Misstates --
19    Q.  Is that -- am I correct?
20    MR. SCHREIBER:  Misstates the testimony.
21  It's incomplete.
22    Go ahead.
23    A.  You have misstated my testimony on
24  multiple levels, to the extent that I'm not sure
25  I've explained it well.

140

1    Q.  Okay.  So tell me what's incorrect about
2  it.
3    A.  The entire statement is incorrect.  I'm
4  sorry.  I'm not even sure where to start with that
5  statement.
6    MR. SCHREIBER:  And I'm not even sure
7  what opinion you're claiming this is the
8  basis of.
9    MS. CRUZ:  It's the opinion that Tesla's
10  later countermeasure consisting of a one-week
11  disablement of Autosteer would have prevented
12  the subject accident.
13    MR. SCHREIBER:  Okay.
14    MS. CRUZ:  It's his basis, not mine.
15  BY MS. CRUZ:
16    Q.  So I'm trying to understand this study
17  that you did and what it consisted of.
18    What I heard you say was the study
19  consists -- consisted of talking to owners of
20  Tesla vehicles who have driven their Tesla with
21  Autopilot engaged and talking to them about how a
22  one-week suspension of Autopilot would affect
23  their driving behavior and their use of Autopilot.
24    Is my understanding correct?  And if
25  it's not, tell me how it's not correct.

Transcript of Alan B. Moore
Conducted on July 12, 2024

36 (141 to 144)

141

1    A.  No, it's not correct.  That's not at all
2 what I said.
3        We're about three levels removed from
4 the opinions I plan to express at trial.  And
5 maybe -- and it's unfortunate, but it happens in
6 deposition where you ask me questions, I tend to
7 answer them, and we end up well away from what I
8 plan to express in trial.  And then you ask me if
9 that's my opinion.  No, it's not, but I'm
10 answering your question.
11       So the -- the opinion is that that
12 one-week suspension would have prevented this
13 crash.  The study you're asking me about is
14 specific to Tesla's Full Self-Driving, which is a
15 different functionality at a different period of
16 time.  But I'm trying to answer your question, so
17 I'm giving you that information.  And then you're
18 bringing that back to this case, but it doesn't
19 apply directly to this case.
20       But the idea that a disablement of an
21 automated function on Tesla -- a Tesla will change
22 drivers' behaviors is something I found in this
23 other study that's relevant here.  It's relevant
24 because you had asked me how do I know a one-week
25 disablement would change behavior.  I've given you

142

1 evidence of how I think it would.  You don't have
2 to agree, and that's okay, but that's the evidence
3 that I have.
4    Q.  Okay.  So you said the study does not
5 apply.  If the study does not apply here, then we
6 don't need to talk about it.
7        So the study does not apply, the study
8 that you were talking about, about talking to
9 Tesla drivers about their expectations.  That
10 doesn't apply here?
11   A.  I'm tempted to ask the court reporter to
12 repeat my prior answer, but, unfortunately, it's a
13 long one.  I said a lot more than "the study
14 doesn't apply."
15       And, I'm sorry, I really don't want to
16 argue with you about this.  I'm trying to give you
17 the information you're asking for, but I'm not
18 interested in arguing over it.
19   Q.  But you're not interested in what?
20   A.  In arguing over it.
21       If you don't like my opinion, that's
22 okay.  But if you take it out of context and twist
23 it and argue with me about it, I -- there's really
24 no answer I can give you at that point.
25   Q.  Sir, I am just trying to understand your

143

1 opinions.  I repeated to you what I understood
2 your opinion to be, and I said, if it's incorrect,
3 correct me, let me know how it's incorrect.
4        So are you -- does this study that
5 you're -- that you referred to that consisted of
6 you talking to Tesla drivers, does it apply to
7 your opinions in this case?
8    A.  No.  It applies to a question you've
9 asked me.
10   Q.  Okay.  Did the vehicle need to have
11 Autosteer activated for this crash to occur?
12   A.  So we discussed previously, all of my
13 conclusions are based on the Autopilot package
14 in use.  I'm not going to take my page of conclusions
15 and separate it out by TACC and Autosteer.  You
16 can ask me that, but I don't have any opinion on
17 that.
18       My opinions are based on Autopilot as a
19 whole in use.
20       MR. SCHREIBER:  And before we go on, I
21 just wanted to also just make a comment here
22 on the record, as I'll go back, that, in
23 fact, Tesla was asked in RFP 12 for the
24 supporting documentation that they provided
25 to the federal government in response to

144

1 21-020, which asks for the analysis and work
2 done by Tesla in determining the escalation
3 and lockout strategies used to respond to
4 unresponsive drivers.
5        Clearly, this line of inquiry for the
6 last ten minutes by Ms. Cruz suggests that
7 Tesla finds that very relevant to these
8 proceedings and to Mr. Moore's opinions and,
9 yet, has actually refused to produce that
10 information in discovery, and is one of the
11 other remaining outstanding discovery issues
12 that we, too, are trying to seek because we'd
13 like to know why Tesla made the decisions it
14 did to implement the lockout strategies it
15 has today as opposed to at the time of this
16 crash.
17        Sorry for the interruption, but if I
18 didn't say it now, I would forget.
19 BY MS. CRUZ:
20   Q.  Even if Autosteer wasn't activated,
21 Mr. McGee still could have put his foot on the
22 accelerator pedal and drove into the Tahoe;
23 correct?
24       MR. SCHREIBER:  It's an incomplete
25 hypothetical.

Transcript of Alan B. Moore
Conducted on July 12, 2024

145

1   A.  That is not correct.
2   Q.  Why is that not correct?
3   A.  Because Autosteer was engaged.
4   Q.  But if it wasn't engaged, he still could
5  have put his foot on the accelerator pedal,
6  pressed the accelerator pedal, and drove into the
7  Tahoe; right?
8   A.  Certainly he could cause a number of
9  different crashes with or without Autosteer.
10   I'm not -- I'm sorry, I don't understand
11  your hypothetical.
12   Q.  Do you recall lots of publicly-available
13  documents regarding Tesla's recall, Autopilot
14  recall that was done in December of 2023?
15   A.  I think Zoom cut out again.
16   I have read documents about the recall.
17  I'm not sure if that's your question or not.
18   Q.  Did you read the documents that Tesla
19  produced in this case?
20   Have you read any documents that Tesla
21  produced in this case about the recall?
22   A.  I have some, yes.
23   Q.  Okay.  And did you go on NHTSA's website
24  and try to obtain documents regarding the recall?
25   A.  Not that I recall.

146

1   Q.  Okay.  But you would agree that there
2  are documents regarding the recall that are
3  publicly available on -- on NHTSA's website;
4  right?
5   A.  I'm sure there are.
6   Q.  Okay.  And have you gone to look for any
7  of the documents regarding NHTSA's followup
8  investigation that's related to the recall?
9   A.  Not that I recall.
10   Q.  And let's talk about the recall for a
11  second, just so we're clear.
12   Do you understand, or do you have
13  knowledge of what the countermeasures are that are
14  offered in the recall?
15   A.  I'd like to clarify what recall you're
16  referring to, rather than generically calling it a
17  "recall."
18   Q.  Sure.  I'm referring to the Autopilot
19  recall that was issued in December of 2023.
20   A.  Okay.  And, I'm sorry, what was your
21  question about it?
22   Q.  Are you familiar with the
23  countermeasures that are a part of that recall?
24   A.  I'm familiar with some of the
25  countermeasures that were reportedly applied to

147

1  vehicles.  But from what I can tell, it actually
2  didn't come out the way it was intended.  So I'm a
3  bit unclear on the difference between the intent
4  and the actual implementation.
5   Q.  Okay.  But do you understand what the
6  countermeasures are?  It's written out in the
7  recall bulletin.
8   A.  I -- I don't recall.  I don't have the
9  recall in front of me.
10   Q.  Okay.
11   A.  It's not a basis for my work.  I -- I
12  mean, I read it, but I don't recall a lot about
13  it.
14   Q.  So none of the recall documents that
15  you've read so far and that Tesla has produced in
16  this case are basis for your opinions; is that
17  fair?
18   A.  Yes.
19   Let me rephrase that.
20   Nothing in the recall itself is a basis
21  for my opinions.  I don't know off the top of my
22  head what supporting documents are there.  Might
23  some of the documents I referred to also be in the
24  docket for the recall?  Maybe.  And I don't know.
25  But I have not obtained anything from the recall

148

1  that I've relied upon for this case.
2   Q.  Right.
3   And that would include the investigation
4  PE 2120 that was going on for about two years or
5  so that led up to the recall.
6   Tesla produced, I don't know, maybe
7  hundreds -- I'm not really sure of the number of
8  documents related to this investigation that led
9  up to the recall, which the recall is just one
10  piece of paper.
11   So are you relying on any of the
12  documents that relate in any way or are part of
13  PE 2120 or the recall itself, the piece of paper,
14  the bulletin?
15   A.  So I'm not relying on the recall at all.
16   I do refer to Tesla's response to 2120,
17  Bate stamped 1016 through 1035.  That is the basis
18  for part of my report.
19   But the actual recall I have not used in
20  this case.
21   Q.  Okay.  And are there any other documents
22  related to the recall that you've asked
23  plaintiff's counsel for and that you need to form
24  your opinions?
25   A.  Not that I recall.

Transcript of Alan B. Moore
Conducted on July 12, 2024

149

1    Q.  Okay.  So let me just share my screen
2  with you.
3        Can you see the slide?
4    **A.  Yes.**
5    Q.  Okay.
6        MS. CRUZ:  We'll mark this as Exhibit 1.
7        (Exhibit 1 was marked for identification
8        and is attached to the transcript.)
9  BY MS. CRUZ:
10   Q.  This is a slide that outlines the recall
11 countermeasures.  I'll let you read through it for
12 a second.
13   **A.  Okay.**
14   Q.  Okay.  Other than the 5 forced Autopilot
15 disengagement results in one-week suspension, so
16 the first bullet, would you agree that none of
17 these other countermeasures are relevant to this
18 case?
19       MR. SCHREIBER:  That may call for a
20   legal conclusion.  It's not really his
21   determination.  So relevance.  Nor is it mine
22   or yours.
23   **A.  I'm a little confused of why we're**
24 **looking at this.  But the second item -- I'm**
25 **really not understanding where we're going here.**

150

1  **But the second item, alerts at stop signs, that**
2  **seems relevant here.  I don't know why we would**
3  **consider that irrelevant.**
4    Q.  Well, this is for hands off the wheel,
5  but Mr. McGee had his hands on the wheel; right?
6    **A.  Can we start over?  I'm not sure what**
7  **you're asking me here.  I must have misunderstood**
8  **your question.**
9    Q.  Sure.
10       I guess -- and you can look at the
11 slide, but is it your opinion that any of the
12 recall countermeasures are applicable in this case
13 or would have prevented this crash?
14       We talked about the first one.  I
15 understand that opinion.
16       But do you have an opinion that any of
17 the other recall countermeasures would have
18 prevented this crash?
19   **A.  Well, this postdates the crash by four**
20 **or five years.**
21   I assume, you're implying that if these
22 had been in place at the time of the crash?
23   Is that what you're asking me?
24   Q.  Well, it's your opinion that this first
25 recall, if it was in place at the time of the

151

1  crash, it would have prevented the crash.
2    **A.  Yes.  I believe -- I believe it's**
3  **actually 3, not 5, but I could be mistaken on**
4  **that.**
5        **I -- yeah, I'm really sorry, I'm not**
6  **sure what we're doing with this.  I don't know**
7  **what you're asking.**
8    Q.  Okay.  So you don't know, one way or the
9  other.  That's fine.
10   **A.  No.  To be clear, I don't understand**
11 **your question.**
12   Q.  Okay.
13   **A.  I want to be very clear on that.  I'm**
14 **not issuing or answering a question that "I don't**
15 **know."  I'm answering a question with "I don't**
16 **understand your question."  Very big distinction.**
17   Q.  The question is:  The countermeasures
18 that are part of the Autopilot recall that was
19 issued in December of 2023, with the exception of
20 the countermeasures that relates to the Autopilot
21 suspension, are you going to give an opinion at
22 trial that any of the other countermeasures, if
23 they were implemented at the time of the crash,
24 that they would have prevented the crash?
25   **A.  So --**

152

1        MR. SCHREIBER:  Vague and incomplete and
2    is asking the witness to rely upon your
3    PowerPoint slide characterization of what
4    those countermeasures were, which,
5    respectfully, are not --
6        MS. CRUZ:  He doesn't have to rely on my
7    slide.  The bulletin is the bulletin is the
8    bulletin.  That's the recall.  He has an
9    opinion about the recall, that one of the
10   countermeasures would have prevented the
11   accident.
12 BY MS. CRUZ:
13   Q.  So my question is:  The other
14 countermeasures that are part of the recall, is it
15 your opinion that they would have prevented the
16 accident?
17       Are you going to give that opinion at
18 trial?  That's the question.
19       MR. SCHREIBER:  Same objections.
20   **A.  So I don't have any opinions about this**
21 **recall.  I have an opinion about a change of -- of**
22 **software and algorithm for Tesla.**
23       **But since you showed me that, the second**
24 **bullet item "alerts at stop signs," that could**
25 **absolutely be helpful in this case.  And that was**

Transcript of Alan B. Moore
Conducted on July 12, 2024

39 (153 to 156)

153

1 implemented partially in Tesla software after the
2 crash.
3       Would we have a different crash if that
4 were available at the time of this crash?
5 Possibly. I don't know. But it certainly seems
6 relevant. If he's going to run a stop sign, that
7 there could be technology that could alert him
8 before running a stop sign. I don't know how that
9 couldn't be relevant.
10      Q.   Well -- and that's based on technology
11 that has been introduced since 2019 that allows
12 the vehicle -- the vehicle to control for
13 stoplights and stop signs; correct?
14      A.   Well, what we're talking about here --
15 what I'm talking about and what you showed me is
16 an alert for a stop sign, which is different than
17 control for a stop sign.
18      The alert for a stop sign, that
19 technology existed within Tesla prior to
20 approximately March of 2019. So it was definitely
21 available. When it was implemented is a different
22 question.
23      But would it have affected this crash?
24 I can't imagine we could rule out it affecting
25 this crash if it were available on the day of this

154

1 crash.
2      Q.   What's the basis for your opinion that
3 it was feasible for the Tesla, as of March of
4 2019, to stop for stop signs?
5          MR. SCHREIBER:  Misstates testimony.
6      A.   You have misstated my testimony on about
7 three levels. I -- I'm not even sure how to
8 answer that question.
9      Q.   You said that it was feasible for the
10 technology that allows the vehicle to detect and
11 control for stop signs, for that to have been
12 implemented prior to the crash. Did you say that?
13      Maybe I misunderstood. If you didn't,
14 just say "I didn't say that."
15      A.   I did not say that.
16      Q.   Okay. Okay.
17      Okay. Let's talk now about your
18 opinions regarding the driver monitoring system.
19 You have an opinion that the driver monitoring
20 system relied on the steering wheel torque and
21 that that was the -- an inefficient proxy for
22 driver awareness, and that that contributed to the
23 crash.
24      What experience or training, education
25 do you have on human driver awareness?

155

1      A.   Well, that falls into the human factors
2 training we talked about previously.
3      Q.   All right. And have you published any
4 research on the topic of human driver awareness?
5      A.   The Zoom cut out again. I missed
6 probably two important words in there.
7      Q.   Have you published any research on the
8 topic of human driver awareness?
9      A.   No.
10      Q.   Have you published -- have you written
11 any peer-review articles?
12      A.   I have.
13      Q.   And what do they relate to?
14      A.   Just a moment.
15      Q.   Are they in your CV?
16      A.   Yes, they are.
17      Yes.  I have an article I wrote or a
18 paper I wrote on pedestrian automatic braking.
19 Another one on Toyota's vehicle control history,
20 which is relevant to ADAS.
21      Q.   Okay. Wait a minute.
22      Go ahead. We'll go back. What was the
23 second one, the Toyota? Okay.
24      A.   Yes.
25      Do you have my CV in front of you?

156

1      Q.   Yes.
2      A.   Okay. And then, let's see, further down
3 there's a presentation I did, "Human Factors" --
4 yeah, "Human Factors Aspects of Autonomous
5 Vehicles in ADAS." I presented that to the Human
6 Factors Society.
7      Q.   Okay. The question was: Have you
8 published any peer-review articles? That was the
9 question.
10      A.   Okay. Gotcha.
11      Q.   On human driver -- (electronic
12 interference.)
13      A.   I don't know why this Zoom keeps cutting
14 out, but I missed part of that question.
15      Q.   That's okay. Just -- just let me know.
16 I can't tell because it's not cutting out for me,
17 so it's hard for me to tell, so just let me know.
18      I was just redirecting you because my
19 question was: Have you published any peer-review
20 articles about human driver awareness?
21      A.   Oh, I thought you asked me a different
22 question.
23      No, I don't think I have any
24 peer-reviewed articles I've written about human
25 driver awareness. Yeah. You asked me something

Transcript of Alan B. Moore
Conducted on July 12, 2024

40 (157 to 160)

157

1  else earlier.
2      Q.  Okay.  Do you have -- have you written
3  any peer-review articles?
4      A.  Yes.
5      Q.  Okay.  Which were those?
6      A.  Okay.  So in my CV on -- it should be on
7  page 5.
8      Q.  Uh-hmm.
9      A.  The second one down, "Pedestrian
10 Automatic Emergency Braking."  The third one down,
11 "How-To Guide for Downloading Toyotas."  The
12 fourth one, "Vehicle Speed From Sound."  And then,
13 oh, I don't know, maybe ten down, "Evaluation of
14 Runoff Accidents on the Judge Seeber Bridge."  And
15 I think that is all of them.
16     Q.  Okay.  So you talked earlier about how a
17 proxy is the -- the proxy is the steering wheel
18 torque system; right?
19     A.  Well, that's an insufficient proxy for
20 driver awareness monitoring and driver monitoring.
21     Q.  Right.
22         But the proxy you're talking about is
23 the steering wheel torque.  You're -- you're
24 critical of the steering wheel torque system.
25     A.  Well, I mean, I'm not specifically

158

1  critical of steering wheel torque.  I mean, that
2  can be beneficial.  But Tesla's implementation of
3  it is insufficient.
4      Q.  Okay.  And was the steering wheel torque
5  system, was that substantially different to what
6  other peer vehicles in 2019 were using for driver
7  monitoring systems?
8      A.  So we talked earlier about Nissan and
9  Volvo, which are two systems that I have some
10 familiarity with.  And while they both use
11 steering wheel torque, their implementation of
12 Level 2 was very different, such that it's, in my
13 opinion, not directly comparable to Autopilot.
14     Q.  What is different about the Nissan and
15 the Volvo?
16         Let's talk about Nissan first.  What's
17 different about their implementation of their L2
18 system?
19     A.  My subjective description of it is that
20 it is very obtrusive.  It constantly beeps and
21 warns the driver and engages and disengages.  It's
22 obtrusive to the extent that, frankly, it's hard
23 to use.  But one of the benefits of that is it's
24 hard to be complacent with it, it is hard to
25 over-rely on it.

159

1      Q.  And do you believe it's good to have a
2  driver monitoring system that beeps annoyingly to
3  where it's -- I'm sorry.  I can't remember the
4  words that you used, but --
5      A.  Obtrusive.
6      Q.  -- obtrusive?
7      A.  No.  No, I didn't find the system
8  beneficial at all.  Other than my evaluation of
9  it, for the rest of my time in that vehicle I just
10 turned it off.
11     Q.  And what about the Nissan system, how is
12 it different?
13     A.  So that one, again, subjectively I would
14 describe as unpredictable.  It would engage and
15 disengage without much warning to the driver, to
16 where I constantly had to look at the -- at the
17 center stack, or the instrument panel, to see if
18 it was in use.  And it would engage and disengage
19 so frequently that, again, it appeared unreliable.
20 Once I was done with my evaluation of it, I didn't
21 continue to use it any further.
22         So the bottom line is that both systems
23 were not smooth to use and not likely to stay
24 engaged for very long, at least in my use, which
25 was very, very different than Autopilot in 2019.

160

1      Q.  But the Nissan and the Volvo systems
2  both use a steering wheel torque driver monitoring
3  system?
4      A.  Yes.
5      Q.  Okay.  And you think that -- or it's
6  your opinion that Tesla's implementation of the
7  driver monitoring system was insufficient.
8         What system -- what proxy is sufficient?
9      A.  Well, I think eye tracking is, by far,
10 the best method.  You know, it has shortcomings as
11 well, but I think eye tracking is far better.  Not
12 that steering wheel torque can't be used at all.
13 But if you're asking me which one is better, I
14 think eye tracking is better.
15     Q.  What system in 2019 used eye tracking?
16     A.  The Cadillac CT6.
17     Q.  And what's the basis for your opinion
18 that eye tracking is a sufficient driver
19 monitoring system?
20     A.  I didn't use the word "sufficient."  I
21 said "better."
22         And what makes it better is it actually
23 estimates gaze, where is the driver looking.  If
24 you're looking down at your cell phone, that's
25 very different than looking forward out the

Transcript of Alan B. Moore
Conducted on July 12, 2024

41 (161 to 164)

161

1  windshield. And that's a better indication of
2  driver awareness than a weight on a steering
3  wheel. It's also harder to abuse.
4      Q. What's the basis for your opinion that
5  that's better than steering wheel torque?
6      How do you know that?
7      A. There's papers that describe that, which
8  I have in my library. Not in this file. I
9  haven't reviewed them for this case. But there
10 are studies that show that that's the case.
11     Q. What studies?
12     A. But, more importantly, that gaze, if
13 we're looking at driver awareness, basically where
14 the driver is looking, gaze directly measures
15 where the driver's looking. Torque on a steering
16 wheel doesn't measure that at all.
17     Now, could a driver look but not see
18 something? That's a whole different field. But
19 gaze is a better measure than force on the
20 steering wheel.
21     Q. What studies are the basis for that
22 opinion?
23     You referenced some studies. You said
24 "some studies." What studies?
25     A. I didn't referse- -- reference them. I

162

1  said they exist and they're in my library, and I
2  can't tell you off the top of my head what they
3  are.
4      Q. Have you conducted any type of
5  analysis -- or other than driving the Super Cruise
6  vehicle that you talked about earlier, have you
7  conducted any other analysis to determine the
8  effectiveness of the in-cabin camera, the eye
9  tracking system?
10     A. I have reviewed data on the
11 effectiveness of it. Specifically, the in-cabin
12 camera that Tesla now uses which, you know,
13 obviously didn't exist at the time of this crash.
14     Q. But have you done any analysis of the
15 eye tracking system that you're saying would have
16 been effective or -- excuse me -- would have been
17 sufficient for this vehicle, for McGee's vehicle
18 in 2019, other than driving a Cadillac that you
19 talked about earlier?
20     A. I didn't say that eye tracking would be
21 sufficient. I said it was better.
22     I don't think I ever said that that
23 should have been in place in McGee's vehicle in
24 2019.
25     Q. Well, my --

163

1      A. You're asking me about the differences
2  in driver monitoring technologies, and I discussed
3  that with you.
4      But when you come back to this vehicle,
5  I'm not saying that this vehicle should have had
6  eye tracking, although it would have been a better
7  method.
8      Q. But my question was: What proxy would
9  you have deemed sufficient?
10     A. Oh, eye tracking would be sufficient.
11     Now, the thing is, steering wheel torque
12 by itself can be pretty good. Tesla's
13 implementation of it, at the time of this
14 accident, was not good.
15     Q. What are the benefits of the steering
16 wheel torque system?
17     A. It's better than nothing. It uses
18 technology that's in the vehicle for other reasons
19 anyway, so there's no need to add additional
20 parts. That's about it.
21     Q. Okay. What are the limits- -- some of
22 the limitations of a steering wheel torque system?
23     A. Well, it's a proxy. It doesn't directly
24 measure what it's trying to estimate. It's easy
25 to defeat. It is susceptible to a fairly wide

164

1  noise band. Sometimes it's actually hard for it
2  to measure what it's trying to measure. And it
3  can be confusing for a driver to understand.
4      "Put your hand on the wheel" is a
5  warning. It doesn't say the same is "Apply
6  rotational torque to the wheel," which is what the
7  vehicle really needs to see. So it can be
8  confusing for drivers on how to comply with the
9  system.
10     Q. But it wasn't -- there was no indication
11 or no -- no evidence, I should say, that Mr. McGee
12 was confused about how the steering wheel torque
13 system worked; right?
14     A. I think there is very clear evidence
15 that Mr. McGee was confused about the entire
16 Autopilot system.
17     Q. But I'm just asking specifically about
18 the steering wheel torque system. He understood
19 that when he took his hands off the wheel, that he
20 would get an alert; right?
21     And after a certain number of alerts,
22 the system would turn off and he would have to
23 pull over to the side of the -- of the roadway and
24 restart the car; right? He understood that.
25     MR. SCHREIBER: Objection.

Transcript of Alan B. Moore
Conducted on July 12, 2024

42 (165 to 168)

165

1      A. He did --
2      Q. And that's something that he did --
3      THE WITNESS: Sorry. I was pausing to
4  let counsel object further, if he was going
5  to.
6      MR. SCHREIBER: Yes, foundation.
7      Go ahead. I'm sorry.
8      A. Yes, he did understand that. He was
9  clear that he was using that as a way to
10 effectively abuse the system.
11     Nowhere in his testimony or in the log
12 data did I see that he was using steering wheel
13 torque as a way to communicate his continued
14 awareness.
15     In fact, it's very clear, when I look
16 into the log data, he would get a visual alert,
17 apply a spike of steering wheel torque, and then
18 let go of the wheel again. So, basically, what he
19 learned is: When I get this alert, bump the
20 steering wheel; and then go back to whatever
21 secondary task that he was doing.
22     Very few times did I see him get an
23 alert and then continue to maintain steering
24 torque on the wheel, which is the intended purpose
25 of this.

166

1      Q. So he certainly understood the warnings
2  that the steering wheel torque system was giving
3  him?
4      A. It's clear he understood the -- the
5  response necessary to make the warning go away,
6  bump the steering wheel.
7      Q. And he --
8      A. But he didn't understand the intent,
9  which is keep your hand on the steering wheel. He
10 clearly failed at that part of the task.
11     Q. He didn't understand -- you think that
12 he didn't understand that he needed to have hands
13 on the wheel?
14     A. Oh, I think that's very clear.
15     I mean, in my report I outline how
16 many -- how -- the frequency with which he
17 received these alerts. I mean, it's -- it's hard
18 for me to understand how a driver could have this
19 many warnings and not change his behavior, but he
20 did.
21     Q. Right.
22     Because he was determined to misuse the
23 system; right?
24     A. He was very clearly misusing it.
25     Q. Right.

167

1      And all the times, though, that he
2  pulled over to the side of the road and restarted
3  the car, he understood that he was being struck
4  out, if you will, for misusing the system, to
5  continue to misuse it; right?
6      That wasn't an accident, that was
7  intentional; right?
8      MR. SCHREIBER: Foundation, speculation.
9      A. So, yes, it was clearly intentional. No
10 question about that.
11     What's not clear to me is if he knew he
12 was misusing the system or if he thought, oh, this
13 is just how these work, this will just be normal
14 operation, it will be completely hands-free and
15 once every hundred miles, I have to pull over and
16 reset it. I don't know what his mindset was, but
17 it -- it doesn't make a lot of sense to me.
18     But looking at the data from the
19 vehicle, it's very clear there's a problem with
20 this driver using Autopilot. That stands out very
21 clearly.
22     Q. And Mr. McGee testified that he
23 understood that the Model S was not a completely
24 self-driving vehicle; right?
25     A. Yes, he did.

168

1      Q. And he testified that he knew that he
2  had to be prepared to take corrective actions, if
3  necessary, with the technology engaged; right?
4      A. If I search his transcript for the
5  phrase "corrective actions," I don't think I will
6  find it in there.
7      Q. Well, he --
8      A. I don't think so.
9      Q. -- had to be prepared to take over,
10 right, when necessary?
11     A. I don't recall seeing that in his
12 transcript. I can look to it.
13     Q. Is it your understanding that he didn't
14 know that he had to be prepared to take over with
15 the technology engaged?
16     MR. SCHREIBER: Misstates his testimony.
17 It's not his -- it's not his position.
18     But go ahead.
19     A. I'm just looking through a summary here
20 to see what he did say. The words you're using
21 are not words I recall seeing in this transcript.
22 I'm not interested in arguing over what's in his
23 transcript. I would rather just find it and read
24 it.
25     Q. Don't worry about that. Let's just go

Transcript of Alan B. Moore
Conducted on July 12, 2024

43 (169 to 172)

---

169

1  on.
2       Are you aware that he agreed it was his
3  responsibility to watch the road in front of him?
4       A.  So I'm not interested in trying to use
5  my memory to recall what he said or didn't say and
6  repeat that back for -- to you.  I would rather
7  just find it in his transcript.
8       So, if you'd like, I can look to his
9  transcript, or the summary of it, where he says it
10  was his responsibility to look on the road ahead.
11  But I'm not interested in trying to remember if
12  that's what he said.
13      Q.  Do you have his transcript there or are
14  you looking at your summary?
15      A.  I am just waiting for a question.  But I
16  have my summary of it here.
17      Q.  Well, you said you didn't want to
18  answer; you wanted to look at his testimony.  So I
19  was giving you time to look at his testimony.
20      A.  Okay.  If we're going to do this, then,
21  ask me the question from his transcript, I'll find
22  it in his transcript, and I'll read it back to
23  you.
24      I didn't think that was a good use of
25  our time, but we can do that.

---

170

1       What was the question you were --
2       Q.  You seem to be clear about what his
3  understanding was, and you're making -- you're
4  giving opinions about he would -- or what he would
5  or would not have done.  So I think it's important
6  to go through and see if you have an understanding
7  of what he said he did or did not understand that
8  the system would do.
9       So the question was:  Did Mr. McGee
10  understand, did he know that he had to be prepared
11  to take corrective action, if necessary, when he
12  had Autopilot engaged?
13      Did he know that?
14      I'll direct you to his deposition at
15  pages 73 through 74, 101, and 241.
16      A.  Yeah, I don't see in my summary the
17  phrase "corrective action," but I see he's
18  answering questions about he knew it was his
19  responsibility and to be prepared to take action.
20      Q.  Okay.  He knew that it was his
21  responsibility to watch the road in front of him;
22  right?
23      A.  Would you like to direct me to where he
24  said that in his transcript so I can read it back
25  to you?

---

171

1       Q.  Sure.
2       It's on page 92, 95 through 96, 100,
3  101, 111 to 112, 144 to 145, 240 or 240 -- and
4  241.
5       A.  Yeah, I don't see what you're saying on
6  those pages in my summary.
7       On 144, I see where he says, "I am still
8  responsible for driving."
9       So, I don't know.  We can keep reading
10  his transcript to each other, but I'm not sure
11  that's really what we're here to do.
12      Q.  Well, again, you're -- you're going to
13  give opinions about what he would or would not
14  have done.  Do you think it's important for you to
15  know what his understanding was of how the system
16  worked?
17      A.  Sure.  Yeah.
18      On the bottom of page 6 of my report, I
19  described the parts of it I'm using.  We can find
20  other parts of it, but that's what I'm relying
21  upon.
22      Q.  Okay.  So you're only relying on the
23  parts of his testimony that you picked out, but
24  you're ignoring the other parts of the testimony
25  that I'm referring to?

---

172

1       A.  No.  No.  I'd be happy to look at parts
2  of the deposition that you think conflict with
3  what I've sampled out of here.  If they exist,
4  they certainly do.
5       But again, I'm just -- we can read his
6  transcript to each other.  I don't think that is a
7  great use of time, but it's up to you.
8       Q.  Okay.  Well, is it your understanding
9  that he agreed that whatever his expectations were
10  about the vehicle, he still had to pay attention?
11      Right?
12      He knew that?
13      A.  I'm -- on what page are you reading that
14  so I can find it in my summary?
15      Q.  Are you there, 241?
16      A.  I'm sorry.  I was waiting for a
17  question.  What are we doing?
18      Q.  Are you aware that he understood that he
19  had to pay attention?
20      He knew that; right?
21      A.  You're referring to a comment on
22  page 241?
23      Q.  Did Mr. McGee know that he had to pay
24  attention while driving with Autopilot engaged?
25      A.  I think we've gotten off track here.

---

Transcript of Alan B. Moore
Conducted on July 12, 2024

44 (173 to 176)

173

1 I'm not sure what we're doing.
2      If you're asking me what he knew, I
3 can't tell you what he knew.  I can read his
4 transcript and see what he says he knew.  And if
5 you're reading the transcript to me, shall I find
6 it in the transcript and read it back to you?  I
7 can do that.  Would you like me to do that on page
8 241?  I'm not sure how that helps us.
9      Q.  I'm asking you to answer my question --
10     A.  But I can't tell you what he knew or
11 what he understood.  I can only tell you what he
12 said in his transcript, which we both have.
13     Q.  Do you agree that he said in his
14 deposition that regardless of what his
15 expectations were about the vehicle, he still had
16 to pay attention?
17     Agree?
18     A.  Give me just a moment.
19        MR. SCHREIBER:  And, Ms. Cruz, if
20 there's a page and line where he says those
21 exact words --
22        MS. CRUZ:  241.
23        MR. SCHREIBER:  241, 8 through 21?
24        MS. CRUZ:  We've been waiting for
25 five minutes for him to find 241.

174

1        MR. SCHREIBER:  No, we have not.
2     A.  And Mr. McGee does not say that on
3 page 241.  And now we begin an argument over what
4 he does say, which I'm frankly not interested at
5 all in being part of.  But you've misquoted his
6 testimony.
7     Q.  Are you aware that on page 241 of his
8 deposition the question was asked:
9        "QUESTION:  Right.  So we can agree that
10    whatever your expectations were about the
11    vehicle, you still had to pay attention;
12    correct?
13        "ANSWER:  Yes, sir."
14     A.  I am aware of that.
15     Q.  Okay.  Are you aware that also in his
16 deposition, on page 241, starting at line 6, he
17 was asked the question:
18        "QUESTION:  You still had to look ahead
19    for signs, like the signs that we could see
20    in the photographs that we looked at earlier;
21    correct?
22        "ANSWER:  Yes, sir."
23        Right?
24     A.  Yes, I am aware of that.
25     Q.  Okay.  And when he was asked about the

175

1 stop sign, so it goes, page 241, line 10:
2        "QUESTION:  And the stop sign?
3        "ANSWER:  Yes, sir."
4        You're aware of that?
5     A.  Yes, I am.
6     Q.  Okay.  And it goes on.  And then we ask
7 him about the red flashing light.  Again, talking
8 about how he still had to look ahead, he was
9 responsible for looking ahead.  Line 12:
10        "QUESTION:  And the red flashing right;
11    right?
12        "ANSWER:  Yes, sir."
13        Right?  That's what he -- that was his
14 testimony?
15     A.  Yes.  You are reading me the transcript
16 and I am reading it along with you.
17     Q.  Okay.  Do you have all of this in your
18 summary, your depo summary?
19     A.  I have a paraphrasing of it, that he
20 knew he was responsible to drive the vehicle.  And
21 that's about it.
22        You know, this does not -- it's not
23 significant to me.  It doesn't change my opinion
24 in any way.
25        You are welcome to use it as you wish,

176

1 but it's not relevant to me.
2     Q.  His understanding of how the system
3 worked and what his responsibility was was not
4 significant -- it's not significant to you; right?
5        MR. SCHREIBER:  Form, incomplete,
6    misstates.
7     A.  You've misstated my testimony.
8     Q.  You just said that this testimony is not
9 significant to you.
10     A.  That's correct.
11     Q.  Okay.  What are the limitations of a
12 driver-facing camera?
13        MR. SCHREIBER:  It's overbroad.  It's
14    incomplete.
15     A.  I assume, you're referring it -- to
16 using it as a driver monitoring system?
17     Q.  Yes.
18     A.  Two big ones are nighttime use and
19 polarized sunglasses.  There are others, but those
20 are two big ones.
21     Q.  When you say "nighttime use," what does
22 that mean?
23     A.  Some of those systems at night almost
24 don't work at all.
25        In fact, on the system Tesla uses today,

Transcript of Alan B. Moore
Conducted on July 12, 2024

45 (177 to 180)

177

1  in full darkness, it's almost -- the data I've
2  seen shows that it's almost completely blinded.
3     Q.  What about the Super Cruise system that
4  you say was in effect as of 2019, does that have
5  limitations?
6     A.  It does.  It does.  Yeah.  I -- I think
7  the -- I haven't tested this.  I believe they can
8  get around the nighttime limitation using infrared
9  lighting and pose, just where the head is facing.
10  They're not actually using eye tracking at that
11  point.
12        I do know that it is prone to the
13  limitation of polarized sunglasses.
14     Q.  Any other limitations, generally, that
15  you're aware of for a driver monitoring system
16  that uses a driver-facing camera?
17     A.  The other big one is whether gaze ahead
18  equals awareness.
19        We've probably all seen dash cam video
20  of the driver who's looking straight ahead and,
21  yet, still runs into something.  You know, their
22  eyes are out there; they're just not perceiving
23  the hazard.  So that could happen with a
24  driver-facing camera.
25     Q.  And that would be a limitation of the

178

1  Super Cruise system that was in effect in 2019 as
2  well?
3     A.  It certainly could be, yes.
4     Q.  What other limitations are there on the
5  Super Cruise system that Cadillac was using in
6  2019?
7     A.  Those are all the ones I can think of as
8  I sit here.  I'm sure there's more, but I can't
9  think of them at the moment.
10     Q.  Can a driver-facing camera be defeated
11  by the user, by the driver?
12     A.  I've seen an attempt -- I've seen two
13  attempts to do it.  One with basically Polaroid
14  sunglasses.  The other one, kind of a parlor
15  trick, basically putting the picture of a person's
16  face in front of it, which is not as effective as
17  I first would have thought it would be.
18        There may be other ways to defeat it as
19  well, but I'm not aware of them.
20     Q.  Have you ever done any research or read
21  any studies about how driver-facing cameras can be
22  defeated?
23     A.  I just described that.  That was my
24  prior answer.
25     Q.  I think my question was:  Have you read

179

1  any studies about how driver-facing cameras or
2  any -- or have you done any research yourself,
3  that was my question, about how driver-facing
4  cameras can be defeated.
5     A.  That literally was my prior answer.
6        I didn't list references for them
7  because I don't have them off the top of my head.
8  I didn't review them for this case.  They're not
9  in this case file.
10     Q.  Okay.  Tell me about the studies that
11  you've done to determine how driver-facing cameras
12  can be defeated.
13     A.  You're misstating my testimony.  I
14  didn't say that I've done any studies on them.
15     Q.  Okay.  That was my question.
16        Have you ever done any studies about how
17  or if driver-facing cameras can be defeated?  It
18  sounds like the answer is no.
19     A.  I believe your prior question was:  Have
20  I read any studies?  Yes.
21        Have I done any studies on it?  No.
22     Q.  And is it your opinion that a
23  driver-facing camera would have changed the
24  outcome of this accident?
25     A.  If I look at my list of opinions I'm

180

1  prepared to express at trial in this case, that is
2  not listed on my opinions.
3     Q.  And so, fair to say, you haven't done
4  any test -- I shouldn't say that.  Strike that.
5        Have you done any testing to determine
6  whether a driver-facing camera would have made a
7  difference in this crash?
8     A.  No.
9     Q.  Is every ADAS system that uses steering
10  wheel torque for driver monitoring defective?
11        MR. SCHREIBER:  It's overbroad.  It's
12  incomplete.  It calls for speculation.  It's
13  irrelevant.
14     A.  So "defective" is not a word that I use
15  in this case.  Others may, but I don't.
16        So I would not call driver monitoring by
17  steering wheel torque defective.  I would call it
18  insufficient in the vehicle in this case.
19        But I described a Nissan and a Volvo
20  that use steering wheel torque, and I don't think
21  those are insufficient because of other
22  characteristics of their system.
23     Q.  So the Nissan and the Volvo ADAS system
24  that use steering wheel torque are sufficient; is
25  that what you're saying?

Transcript of Alan B. Moore
Conducted on July 12, 2024

46 (181 to 184)

181

1      A.  I haven't done enough testing to say
2  that they are sufficient, but I would not call
3  them insufficient because of other
4  characteristics.  Basically because they're so
5  difficult to use, that I don't think anyone would
6  use them long enough for it to matter.
7      Autopilot is very different.  People
8  will use it for a much longer time.  This becomes
9  more important.
10      Q.  Are there --
11      A.  I'm sorry.  Go ahead.
12      Q.  No.  I understand what you're saying.
13      Are there any ADAS systems that you're
14  familiar with that use steering wheel torque that
15  you believe are sufficient?
16      A.  There aren't any that I would identify
17  as sufficient.  I'm not saying that there aren't
18  any, but just not that I would identify that way.
19      Q.  Okay.  If the Tesla at this -- at the
20  time of the crash had been equipped with a
21  driver-facing camera and that was the driver
22  monitoring system as opposed to the steering wheel
23  torque, and McGee took his eyes off the road,
24  Autosteer would have been disabled; right?
25      A.  That's a really broad question.

182

1      And it's important to identify, too,
2  that when we're talking about a driver monitoring
3  system, we're not talking just about a piece of
4  hardware.  I'm not talking about a torque sensor
5  or a camera.  We're talking about the whole
6  algorithm behind it, including the time between
7  measurements and the time behind warnings.
8      So if we just take this crash and just
9  throw a camera in there, I can't say exactly how
10  that would change the crash because the other
11  variable is:  What does the vehicle do with that
12  data?  If you see eyes off the road for two
13  seconds or 30 seconds, how do you respond?  That's
14  a whole new hypothetical, right.  We don't have
15  evidence of what that would be.
16      Now, it would be interesting to take
17  Super Cruise and, you know, get it in this
18  environment, or something close to it where it
19  would still work, and see what the -- the driver
20  warnings would be in that case.  That probably
21  would be our closest comparison.
22      Q.  And have you done that?
23      A.  No.
24      Probably -- technically, that's not
25  possible because you can't use Super Cruise on

183

1  this road.  So you would have to generate a
2  scenario that's close.  And maybe that's not even
3  doable.  I'm not sure.
4      Q.  Okay.  So how can you give an opinion
5  about Super Cruise and whether it would have had
6  any effect on this case if you haven't done any
7  testing on it?
8      A.  Again, you -- you've misstated my
9  testimony on multiple levels to where I'm not even
10  sure how to answer this question.  I honestly
11  don't know where to go with it.
12      Q.  Okay.  So let me go back to the
13  hypothetical I was asking you about before.
14      So if we assume that all other things
15  about this crash remain the same, so everything
16  about the driving, the roadway, the phone call to
17  American Airlines, with the exception of the
18  driver monitoring system and instead of a steering
19  wheel torque system, there was an in-cabin camera
20  system.  Okay?  And Mr. McGee took his eyes off
21  the road, like he testified that he did, right.
22  In that case, in that situation, that would have
23  disabled Autosteer; right?
24      MR. SCHREIBER:  Incredibly incomplete
25  still.

184

1      But go ahead.
2      A.  I've answered this question previously.
3      We can't just swap out a piece of
4  hardware and say everything else is the same.
5  That's not how this works.
6      I mean, the driver monitoring system is
7  not just the piece of hardware, it's also the
8  warnings, the timing of the warnings, the
9  consequences of the failure to respond to the
10  warnings.  So there's so many differences.  We
11  can't just swap this part out.
12      And my opinion is not that the steering
13  wheel torque measurement itself is insufficient,
14  the whole driving monitoring system.
15      So, for example, let's say you have
16  steering wheel torque measurement only, but as
17  soon as you have five seconds of no torque
18  measurement, you just disable the system for a
19  week or a month, right.  That would be the same
20  hardware, but a totally different driver
21  monitoring system.  That probably would have
22  prevented this crash.
23      But if we put in a camera but try to use
24  the same algorithm that the steering torque
25  uses -- I'm not even sure if that's possible -- I

Transcript of Alan B. Moore
Conducted on July 12, 2024

47 (185 to 188)

185

1  mean, you're asking me to guess what the outcome
2  would be.  Because it's not just the hardware,
3  it's the algorithm behind it that is part of
4  the -- of the driver monitoring system.
5      Q.  Right.
6          And the algorithm is part of the driver
7  monitoring system.  It's a system.
8          So do you have an alternative design or
9  another driver monitoring system besides the one
10 that was in the vehicle at the time of the crash
11 that would have prevented the crash?
12     A.  So what's so interesting about this case
13 from a -- I guess a defect standpoint, even though
14 I'm not using the word "defect," is that I'm not
15 saying that we need a different piece of hardware.
16 We just need to change a switch or move a knob in
17 software, is all we need to do.  And there's
18 lots --
19     Q.  I'm sorry.  I didn't mean to stop you,
20 but I didn't understand what you said.
21     A.  What I'm saying in this case isn't that
22 we need a new piece of hardware.  We don't need to
23 redesign a mirror or redesign a door handle.  We
24 need equipment that's there to do the job.
25         What it needs is a change in how you're

186

1  turning a knob, flipping a switch, you know, not
2  allowing use outside of its ODD, using a more
3  aggressive driver monitoring system, disabling
4  Autosteer after a certain number of forced
5  disengagements.  None of those are really design
6  changes; they're more tuning.
7          And how the lawyers use this in the
8  litigation standpoint, I don't know, but I
9  don't -- I don't have an alternative design
10 because I'm not saying that this needs to be a
11 completely different part.  I'm saying the risk
12 management used to put it in the vehicle needs to
13 be different.  That's what would change.
14         And Tesla did change that in future
15 years to -- to kind of what I'm saying would have
16 helped here.
17     Q.  Okay.  So I understand that you don't
18 have an opinion regarding a different part that
19 should have been used, but you're saying that the
20 system wasn't sufficient, so it should have been
21 different.
22         So what is the different system that you
23 believe would have worked in this case to prevent
24 this accident?
25         How does that system work?

187

1          MR. SCHREIBER:  Have you not been here
2  for the last four hours?  I'm sorry.  I'm
3  not -- okay.  Let me rephrase it.
4          MS. CRUZ:  You're going so far beyond
5  the objections that you're allowed to make
6  it's ridiculous.  Okay?
7          I want an answer to my question.  If he
8  doesn't want to answer it, he can say, "I'm
9  not going to answer it."  And if you want to
10 tell him not to answer it, then tell him not
11 to answer it.
12         But I'm tired of all this commentary by
13 you.  I want to get done.  It's Friday.  It's
14 2:00.  Just let him answer the question.
15         MR. SCHREIBER:  Well, it was a terrible
16 question.  So it's exceedingly overbroad,
17 it's been asked and answered, it's
18 incomplete.
19         And we've spent four hours describing to
20 you the differences in the system that he
21 believes would have changed the outcome, but
22 apparently that hasn't gotten through.
23         So, I guess, Mr. Moore could point you
24 to where in his report he says all of those
25 things that we've already covered.

188

1          MS. CRUZ:  Do you need the court
2  reporter to repeat the question?
3          THE WITNESS:  Yeah.  Do you mind.
4          THE STENOGRAPHER:  Just a moment.
5          (Record read back by Stenographer.)
6      A.  Okay.  I'm not suggesting a different
7  system.  Just a change of this system.  And
8  there's a lot of ways that could have been done.
9  One way was done later, which is just disabling
10 Autosteer for a week after what I believe is -- is
11 three forced disengagements.  Maybe it's five, but
12 I thought it was three.
13         Another way is to follow J3114 and use
14 countermeasures to correct the user behavior.  A
15 way to do that would, again, be just to disable
16 Autosteer for a certain amount of time.
17         Some other measures could be really
18 simple:  Not telling the driver in the owner's
19 manual how to defeat this.  Don't tell the driver
20 that they can pull over, put it in park and back
21 in drive and be on their way again.
22         So, basically, the idea is to make an
23 error-tolerant system, make a system that does not
24 allow the driver to abuse it.  And there's a lot
25 of different ways to do that that don't require

189

1   any hardware, that don't require any data that
2   Tesla doesn't already have.
3          Another one would be just limiting the
4   ODD, you know, at which point driver monitoring on
5   this road wouldn't matter at all.
6          Another one would be for every
7   disengagement, provide a training interval for the
8   driver.  Explain to the driver why it disengaged
9   rather than simply showing what I have in Fig. 1,
10  which says, "Autosteer unavailable for the rest of
11  this drive.  Hold steering to drive manually."
12         That provides zero information to the
13  driver on why the disengagement happened.  It has
14  zero ability to change that driver's behavior.
15         So all of those are part of the driver
16  monitoring system.  You change any of those and
17  this crash doesn't happen.
18         And none of those are new hardware.
19  None of those are design changes.  The risk
20  management decisions by Tesla, that easily could
21  have been done in a different way and subsequently
22  were done in a different way.
23     Q.  And if not just one of those things, if
24  all of those things were done, every change that
25  you just mentioned, if that had been done and was

190

1   implemented at the time of the crash, none of that
2   would have prevented Mr. McGee from putting his
3   foot on the accelerator pedal and driving into the
4   Tahoe; right?
5      A.  Well, so, we could certainly have a
6   crash without Autopilot.  People run the stop sign
7   at the intersection.  It's happened before and it
8   will happen again.  But that's not the crash we're
9   talking about.
10         We're crashing -- talking about a crash
11  involving an unaware driver supported by an
12  Autopilot system used outside its ODD.  If we take
13  out Autopilot outside it's ODD, we have a
14  different crash.
15     Q.  Can you say with engineering certainty
16  that if all of those -- all of those changes were
17  made, that Mr. McGee would have not been able to
18  put his foot on the accelerator and drive into the
19  Tahoe, that he would have been prevented from
20  doing that?
21     A.  So --
22         MR. SCHREIBER:  It's incomplete,
23  improper.
24         Go ahead.
25     A.  First of all, I can say that if just one

191

1   of the changes I mentioned were done, this crash
2   wouldn't happen.  I'm not saying Tesla had to do
3   all the changes.
4      Q.  That wasn't my question, sir.
5      A.  I'm sorry.  I'm not done answering.
6          Only one of them had to be done.
7          But if we're looking at a driver
8   accelerating through a stop sign, that's a
9   different crash.
10         What we have here is not a driver
11  accelerating through a stop sign.  We have a
12  driver overriding a cruise control set speed that
13  is created because a vehicle is being used outside
14  of its ODD.
15         So we can't separate him overriding a
16  cruise control set speed from Autopilot and use.
17  They're two different things.  So we can't compare
18  McGee's crash to a Level 0 vehicle with a driver
19  stepping on the gas.  Two completely different
20  crashes.  I'm not saying both don't happen, but
21  they're completely different.
22     Q.  Is there any one of those changes that
23  would have prevented a driver from being able to
24  press the accelerator and drive this car at
25  whatever speed they wanted to?

192

1      A.  Oh, sure.  Yeah.  If we were to take a
2   new Toyota Corolla --
3      Q.  I'm not talking about a Corolla, sir.
4          I'm talking about McGee's vehicle at the
5   time of the crash.  If all of these changes that
6   you specified were implemented, would any of them
7   have made the accelerator pedal unable to be
8   depressed?
9          MR. SCHREIBER:  Incomplete, improper.
10         Go ahead.
11         THE WITNESS:  Can I finish my answer?
12         MR. SCHREIBER:  Please.
13         THE WITNESS:  Thank you.
14     A.  If I were to try to recreate this crash
15  with a new Toyota Corolla with Lane Trace Assist,
16  and I were to step on the accelerator pedal to
17  override the cruise control speed, the Lane Trace
18  Assist would immediately disable, it would sound
19  an alert, and I would be back to Level 0 driving.
20         I'm not saying that Tesla should
21  implement that strategy, but they easily could.
22  Tesla could easily implement a strategy where, on
23  a restricted road with a restricted speed, when a
24  driver tries to override the throttle, the TACC
25  and Autosteer immediately disengage.  That would

193

1  have prevented this crash.  It might have created
2  another crash, but it would have prevented this
3  crash.
4         So I'm not saying that Tesla should have
5  done that.  That's not in my list of opinions.
6  But that is an option.
7      Q.  I'll keep just asking the question until
8  you answer it.  You can talk about a Toyota that's
9  out on the road today and we can go on and on.  I
10 mean, it's Friday at 2:00, but I'll sit here as
11 long as I have to.
12        This is the question:  All of the
13 changes that you believe should have been in
14 place, disabling Autosteer, countermeasures to
15 correct, not being able to be used on outside of
16 the ODD, if not one but all of those things were
17 in place on Mr. McGee's vehicle on the day of the
18 crash, when he approached that intersection, would
19 he still have been able to depress the accelerator
20 pedal?
21        MR. SCHREIBER:  Same objection.
22     A.  Certainly he could.  We know that.
23     Q.  Okay.  And he would still have been able
24 to press the accelerator pedal and drive the car
25 at a speed up to 60 miles an hour; right?

194

1      A.  Certainly.  Any vehicle could to that.
2      Q.  You talked about a change that you
3  recommend that would have changed the outcome of
4  the vehicle, and it involved that for every
5  disengagement training that was provided.  What type of
6  training are you suggesting should have been
7  provided?
8      A.  So on the bottom of page 7, I give three
9  examples from within Tesla vehicles where exactly
10 this process is done, where the driver is alerted
11 of a potential problem, the vehicle explains the
12 consequences to the driver and recommends
13 corrective action.
14        So rather than Fig. 1, "Autosteer
15 unavailable for the rest of the drive," it could
16 be -- and, again, I'm not a warnings expert -- it
17 could be simply a change of warning.  "Autosteer
18 unavailable because driver was" -- you know,
19 "driver's hands were not on the wheel long enough
20 because driver unawareness was detected."
21        Lots of options are available with that.
22 Again, I'm not a warnings expert.  I'm not saying
23 what warnings should be there, but that -- that
24 process of providing -- alerting the driver of a
25 problem, explaining the consequences, and

195

1  recommending corrective action.  Tesla knows how
2  to do it; they've done it elsewhere.  They could
3  do that with the driver monitoring system.
4      Q.  But you're not giving any opinions that
5  the warnings in this case were insufficient;
6  right?
7      A.  I don't have any warnings opinions.
8      Q.  What driver training for an L2 system
9  would be sufficient?
10        What would that look like?
11        MR. SCHREIBER:  It's overbroad.
12     A.  Yes.  On page 15 I describe what it
13 could look like.  It could be training provided at
14 delivery.  That would be an excellent time to do
15 it.  There could be training in the vehicle, like
16 which is done with the Toy Box, with the video
17 games.
18        There could be a phase-in of
19 functionality.  You know, initially available only
20 at low speed or initially only TACC is available
21 or something like that.
22        There could be -- lots of things that
23 could be done.
24        There could be some level of -- not
25 manual supervision, but supervision by the

196

1  Autopilot system, similar to the driver rating
2  system that was in use when FSD first came out.
3        Any of those could be used to improve
4  driver skill and also to identify drivers who
5  aren't skilled enough to use this.
6      Q.  And what are -- what is your basis for
7  the idea that those would have been effective at
8  preventing that crash?
9      A.  Well -- and part of the fact if they are
10 effective elsewhere with the vehicle.  In the
11 other three examples I gave where Tesla does this,
12 they're effective.
13        Other environments, like autonomous
14 drones, use many of the techniques I've described.
15 And they're effective in training drone users.
16 So, I mean, the idea of training an operator is --
17 obviously, that's not a new science.  There's a
18 whole field just on that.
19     Q.  Right.  But we're talking about
20 specifically in this case, the training that could
21 have been provided.
22        You said the training that was provided
23 to Mr. McGee was insufficient and caused this
24 crash.  So I want to know:  Specifically, you as
25 an expert witness, what exact training should have

197

1  been provided to Mr. McGee so that this crash
2  would not have occurred?
3      **A. Well, more specifically, he received no**
4  **training is what evidence I have shows.**
5          **I've described a number of examples of**
6  **how training could have occurred, all of which are**
7  **better than the training he received. And I'm not**
8  **saying they all need to be done, but any of them**
9  **are better than what Mr. McGee received.**
10     Q. Do you have an opinion as to what
11  training should have been provided to Mr. McGee
12  that would have prevented this crash?
13     **A. My opinion is that training should have**
14  **been provided.**
15     Q. Right.
16     **A. But I don't have an opinion -- I'm not**
17  **saying it has to be this type or that type.**
18         **But that training should have**
19  **provided -- been provided not just to Mr. McGee --**
20  **to Mr. McGee, but to all Autopilot users.**
21     Q. But my question was: You said that the
22  training provided to Mr. McGee was insufficient
23  and that that insufficient training caused this
24  crash.
25         What training should have been provided

198

1  to him, if you have an opinion on that, that would
2  have prevented the crash?
3      **A. You have misstated my testimony.**
4      **And I've already answered your question**
5  **to the best of my ability.**
6      Q. So can you describe the training that
7  should have been provided to Mr. McGee that would
8  have prevented the crash?
9      **A. I have already answered your question to**
10  **the best of my ability.**
11     Q. Okay. So it's your opinion, then, that
12  phase-in functionality, in-vehicle training, and
13  training at the time of delivery would have
14  prevented this crash?
15     **A. Yes.**
16     Q. Okay.
17     **A. And supervision or oversight of early**
18  **use could have helped as well.**
19     Q. Other than what you've already said, can
20  you provide any more specificity as to what that
21  training would consist of?
22     **A. I've already answered that question to**
23  **the best of my ability.**
24     Q. How did other OEMs with Level 2 systems
25  in 2019, how did they educate new owners about

199

1  those systems?
2      **A. I don't have information on that. I've**
3  **not done a direct comparison.**
4      Q. Okay. Let's move on to the opinion --
5  your opinion about Tesla ignored -- about Tesla
6  ignoring Mr. McGee's misuse and abuse of the
7  vehicle.
8          Is it your belief that the OEM is
9  responsible for changing the behavior of the
10  driver?
11     **A. No.**
12     Q. Who's responsible for the driver's
13  behavior?
14     **A. The driver.**
15     Q. Do you agree that the purpose of
16  warnings is to influence behavior?
17     **A. I don't have an opinion on what the**
18  **purpose of warnings is.**
19     Q. Okay. Do you know how many times on the
20  drive -- on the day of the crash that Mr. McGee
21  was warned to be prepared to take the vehicle over
22  at any time?
23     **A. I have not counted them.**
24     Q. Do you know how many times the owner's
25  manual for Mr. McGee's vehicle warns about the

200

1  limitations of Autopilot?
2          MR. SCHREIBER: You cut out.
3      **A. Yeah. Zoom cut out. Could you repeat**
4  **it?**
5      Q. Sure.
6          Do you know how many times the owner's
7  manual for Mr. McGee's vehicle warns about the
8  limitations of Autopilot?
9          MR. SCHREIBER: Vague.
10     **A. I haven't counted them.**
11     Q. Do you have the owner's manual for the
12  subject vehicle?
13         Have you looked at that?
14     **A. I look on page 16, I see that I have an**
15  **owner's manual provided by Tesla that is**
16  **reportedly the relevant one for this vehicle at**
17  **this time.**
18         **And then I have, I think, one or two**
19  **other versions of the owner's manual, which are**
20  **different times and have different information in**
21  **them.**
22     Q. Okay. Because I didn't -- I didn't
23  think I saw the Tesla-produced owner's manual. I
24  only saw a generic manual that, I guess, you
25  pulled down.

Transcript of Alan B. Moore
Conducted on July 12, 2024

201

1       So my question was whether you had one
2   for this specific vehicle, one that Tesla
3   produced.  But it sounds like -- yes, you have
4   that; right?  Maybe I just missed it in your file.
5   Could be.
6       **A.   Yeah, I do have it, and I'm looking for**
7   **it in here.**
8       Q.   Okay.  That's fine, if you have it.
9       **A.   Yes.**
10      **Oh.  No.  I'm sorry.  So on page 16, the**
11  **top section, "Received from client," it's the**
12  **bottom line, "Representative owner's manual" --**
13      Q.   Okay.
14      **A.   Base is 1795.**
15      Q.   Okay.  Do you know how many times the
16  owner's manual warns drivers to stay alert, drive
17  safely, and be in control of the vehicle at all
18  times?
19      **A.   No, I do not.**
20      Q.   Do you know how many warnings Mr. McGee
21  was given on the drive that led to the crash?
22      **A.   I have the data on that, but I have not**
23  **added them up.**
24      Q.   Okay.  So it's fair -- is it fair to say
25  that you analyzed his misuse and abuse of the

202

1   vehicle, but you didn't analyze the warnings that
2   he was given on the day of the crash?
3       MR. SCHREIBER:  It's argumentative.
4       **A.   Give me just a moment.**
5       **That's not fair to say.  If I look on**
6   **page 10, I can tell you that he received an**
7   **audible warning, on average, every 33 miles during**
8   **his ownership, and a visual warning every 10 miles**
9   **during his ownership.**
10      **On the final drive cycle, he had already**
11  **received five audible warnings just on that drive**
12  **cycle.  He was getting a visual warning every**
13  **three minutes.  616 times the vehicle documented**
14  **that no hands were detected.**
15      **So, yeah, I've done quite a bit of**
16  **analysis of -- of the warnings he received.**
17      Q.   Is there any evidence that Mr. McGee
18  would not have tried to override another ADAS
19  system?
20      MR. SCHREIBER:  Foundation, speculation,
21  incomplete.
22      **A.   I have no idea.  I can't answer that**
23  **question.**
24      Q.   Let's talk about your opinion regarding
25  Autopilot being in beta.

203

1       Are you aware that there's a warning
2   when Autopilot is initially enabled reminding
3   Mr. McGee that Autosteer is in beta, meaning that
4   its software had limitations, and that he was
5   required to acknowledge that warning before he
6   used Autopilot?
7       **A.   Yes, I'm aware of that.**
8       Q.   Okay.  And you're aware that part of
9   that warning says that Autosteer is a driver
10  assistance feature, it does not make your vehicle
11  autonomous; please use it only if you pay
12  attention to the road; keep your hands on the
13  steering wheel, and be prepared to take over at
14  any time?
15      **A.   So we have two options for this kind of**
16  **question.  I can just say, "Yes, I agree."  But**
17  **I'm hesitant to do that, especially given the**
18  **times we've gone through this before.**
19      **So now I need to find the document,**
20  **review it myself, have you read it to me so I can**
21  **compare it, and say yes or no, I agree.**
22      **But, in reality, I'm sure you're reading**
23  **from a document that I have, so --**
24      Q.   Okay.
25      **A.   -- it would be easier for me just to**

204

1   **agree, but I'm hesitant to do that.**
2       **So this late on a Friday, I'm not sure**
3   **how to deal with this question.  But I think**
4   **you're trying to go somewhere with it.  Maybe we**
5   **could jump ahead to what you're actually trying to**
6   **ask me, but it's up to you.**
7       Q.   Are you aware that he received that
8   warning the first time he enabled AutoPilot?
9       **A.   I'm aware that he received a warning the**
10  **first time someone in that vehicle enabled**
11  **Autopilot.  It's not clear to me that the warning**
12  **he received is what Tesla represents it is.  I**
13  **can't say it's not, but I have question about**
14  **that.  No evidence to support it.**
15      Q.   You can't say, one way or the other?
16      **A.   The content of the message, correct,**
17  **yeah.**
18      **I do know that someone who first enabled**
19  **Autopilot in that vehicle saw a warning similar to**
20  **what you've read.**
21      Q.   Do you have any reason to believe
22  Mr. McGee -- Mr. McGee did not see this warning
23  the first time he enabled Autopilot?
24      **A.   If he was not the first one to enable**
25  **Autopilot in that vehicle, he would not have seen**

Transcript of Alan B. Moore
Conducted on July 12, 2024

205

1 that warning.  And I have no idea if he was the
2 first one or not.
3    Q.  Okay.  And if he was the first time --
4 if he was the first one to activate Autopilot,
5 when he acknowledged the warning he would have had
6 to affirmatively press on the screen to
7 acknowledge the warning; correct?
8    A.  Yes.  That would be the way to handle
9 it.
10    Q.  And in addition, every time he turned on
11 Autosteer, every time Mr. McGee activated
12 Autosteer, the vehicle displayed a message that
13 said, "Please keep your hands on the wheel.  Be
14 prepared to take over at any time."
15    Right?
16    A.  Most likely, yes.  That's certainly the
17 message today.  I don't recall when that message
18 was implemented, but it was probably before this
19 crash.
20    Q.  And when you're driving your Tesla on
21 Autopilot and you get warnings like that, do you
22 heed the warnings?
23    A.  I do.  I keep my hands on the wheel
24 unless I'm doing some level of testing with it.
25    Q.  Let's talk about your opinion regarding

206

1 the cause of the crash.  And you say that Tesla's
2 decision -- or your opinion is that Tesla's
3 decision to support Autopilot outside of ODD
4 without driver training and awareness was a larger
5 contributor to the crash than Mr. McGee's decision
6 to use Autopilot.
7    What were the contributors to the crash?
8    MR. SCHREIBER:  Objection, incomplete.
9    A.  Okay.  You read an opinion and then
10 you -- you asked me a different question.
11    So you're asking me what the
12 contributors to the crash were, I think.
13    Those contributors -- it's a pretty long
14 list, but one of the big ones was an inattentive
15 driver running the stop sign.
16    Another was the list of a Level 2 system
17 outside of its ODD.
18    Another one was insufficient driver
19 monitoring, insufficient drive -- training
20 involving a Level 2 system.
21    Abuse of the Level 2 system by the
22 operator.
23    Those are just some of the ones that
24 come to mind.  And there's others.
25    There's nighttime visibility.  You know,

207

1 the side view of the target vehicle didn't have a
2 lot of reflectivity.  Visual noise from the signs.
3 There's a lot of contributors.
4    Q.  All right.  And all of the contributors
5 to the crash, those factors either stem from
6 Mr. McGee's actions or Tesla's actions, in your
7 opinion; right?
8    A.  Yes.  I would agree with that, in that I
9 don't see any other parties' contributions being
10 at fault; in other words, I don't -- I don't blame
11 the other two people for parking their Tahoe where
12 they did.
13    Q.  And it's your opinion that Tesla
14 contributed more to the crash, or was a greater
15 cause to the crash than Mr. McGee; right?
16    A.  Not quite.  You've misstated my opinion
17 number 6.
18    Q.  What percentage of the crash did Tesla
19 cause?  If you had to break down the contribution.
20    MR. SCHREIBER:  That's an improper
21 question.  He's not answering it.  That's for
22 a jury to decide.
23    Q.  Do you have -- you said that Tesla was a
24 larger contributor to the crash than McGee; right?
25    That's your opinion?

208

1    A.  No.  Again, you've misstated my opinion
2 number 6.
3    Q.  Okay.  So in 6, then, are you only --
4 are you only comparing Tesla's decision -- you're
5 combining Tesla's decision to allow Autopilot use
6 outside of ODD and the lack of training and
7 awareness, you're combining that into one factor
8 and you're saying that that's a larger contributor
9 than McGee's decision to use Autopilot; right?
10    A.  So let me try this.  So what opinion 6
11 says is that Tesla's decision to support Autopilot
12 on this road was a larger contributor to the
13 accident than Mr. McGee's decision to use
14 Autopilot.
15    So that's entirely about whose decision
16 to use Autopilot matters more.  There's other
17 pieces to the crash.  I'm just talking about whose
18 decision to use Autopilot was a bigger
19 contributor.
20    Q.  Okay.  Was Tesla's decision to -- to
21 support Autopilot outside of ODD without driver
22 training and awareness, was that a larger
23 contributor to the crash than Mr. McGee's
24 inattentiveness?
25    A.  That's not my opinion.  Again, I --

Transcript of Alan B. Moore
Conducted on July 12, 2024

209

1    Q.  No.  I'm asking.
2    **A.  Yeah, I have not done that analysis.**
3        **In number 6, I'm comparing Tesla's**
4    **decision to support Autopilot versus McGee's**
5    **decision to use Autopilot.  That's what I'm**
6    **comparing in opinion 6.**
7        **You're asking me something else that I**
8    **have not done analysis on.**
9    Q.  Do you agree that Mr. McGee, at the time
10   of the crash, he was careless in traveling above
11   the speed limit?
12   **A.  He was certainly traveling above the**
13   **speed limit.  Careless sounds a bit like a legal**
14   **conclusion, and I'm not going to comment on that.**
15       **I would call him inattentive, certainly.**
16   **And that was true not just for this section of the**
17   **drive, but for much of his driving of this**
18   **vehicle.**
19   Q.  Is it your understanding that it's
20   against the law to drive above the speed limit?
21   **A.  Yes.**
22   Q.  Is it responsible driving behavior to
23   drive 60 miles an hour on a road with a
24   45-mile-per-hour speed limit?
25       MR. SCHREIBER:  Objection, foundation,

210

1    legal conclusion.
2    **A.  Yeah, that's a whole other discussion.**
3    **I'm not sure where you're going here.**
4    Q.  I'm --
5    **A.  I mean, if you want to talk about design**
6    **speeds and prevailing speeds on roads, we can have**
7    **a whole conversation on that, but I don't -- I'm**
8    **not sure where you're going with this.**
9    Q.  Do you believe it's responsible driving
10   behavior to drive 60 miles per hour on a road with
11   a 45-mile-per-hour speed limit?
12       MR. SCHREIBER:  Same objections.
13   **A.  I'm trying to think of when I've used**
14   **"responsible driving" as a phrase, and that's just**
15   **not something I'd normally use in accident**
16   **reconstruction.**
17       **So I'll say speeding -- and I'm sure the**
18   **jury can make their own assessment of that, but I**
19   **don't think I need to, you know, characterize an**
20   **illegal action as responsible or not.  It is**
21   **speeding.**
22   Q.  So it is illegal to drive 60 miles an
23   hour on a 45-mile-per-hour speed limit; agree?
24   **A.  You're asking me to give a legal**
25   **opinion.  I'm not a lawyer.  It's not my place to**

211

1    offer a legal opinion.
2    Q.  I'm not --
3    **A.  I can offer -- I can offer -- I can**
4    **offer a vehicle speed conclusion and compare that**
5    **to a speed limit.  The inference is obvious.  But**
6    **it's not my role to decide if someone is speeding,**
7    **doing something illegal.**
8    Q.  Do you have a driver's license, a
9    Florida Driver's License?
10   **A.  I do.**
11   Q.  Okay.  So you understand the laws of the
12   road in Florida?
13   **A.  I do.**
14   Q.  And is it your understanding that it's
15   against the law to drive 60 miles per hour on a
16   road with a 45-mile-per-hour speed limit?
17       Is that your understanding as a driver
18   with a Florida driver's license?
19   **A.  Yeah.  Yeah, that's violating the**
20   **statute.**
21   Q.  Okay.  Do you believe that Mr. McGee was
22   careless in failing -- failing to stop at the stop
23   sign?
24       MR. SCHREIBER:  Objection, foundation,
25       speculation.  "Careless?"  I mean, who cares?

212

1    **A.  I don't -- I don't have the word**
2    **"careless" anywhere in my reports.  I would**
3    **certainly say he was inattentive.  That's very**
4    **obvious.  But "careless" sounds, again, a lot like**
5    **a legal conclusion.**
6        **This is the fourth or fifth time you've**
7    **asked me to draw a legal conclusion, and I can't**
8    **tell you too many times more that's not my role**
9    **here.**
10   Q.  As a Florida driver with a Florida
11   Driver's License, is it your understanding that
12   it's against the law to fail to obey a stop sign?
13   **A.  Well, yes.**
14   Q.  Okay.  And so if Mr. McGee failed to
15   obey a stop sign, he failed to stop at the stop
16   sign, he violated the law; correct?
17       Your understanding as a Florida driver
18   with a Florida driver's license.
19   **A.  I'm sorry.**
20       MR. SCHREIBER:  Lack of foundation.
21   Q.  You can't say.  Okay.  That's fine.
22       MR. SCHREIBER:  He's not going to
23   testify to it at trial, so who cares?  This
24   is not what experts do at trial, Whitney.
25   You know that.  I hope so.  I mean, come on.

Transcript of Alan B. Moore
Conducted on July 12, 2024

54 (213 to 216)

213

1  BY MS. CRUZ:
2     Q.  Do you agree that Mr. McGee was careless
3  in failing to stop at the flashing red light?
4        MR. SCHREIBER:  Same objections.  He's
5     not making a distinction about carelessness,
6     so it's improper, form, foundation.
7     **A.  We're on our third time to you asking me**
8  **for a legal conclusion, me telling you I'm not**
9  **going to provide a legal conclusion.  Then you're**
10 **trying to get me to testify, I think kind of as a**
11 **fact witness, as to what a Florida driver would**
12 **do, and then bring that back to this case to get**
13 **me to offer a legal conclusion.**
14       **I'm not going to offer you legal**
15 **conclusions.**
16    Q.  Okay.
17    **A.  I can offer -- I'm sorry.  I'm not done**
18 **with my answer.**
19       **I can offer you engineering conclusions.**
20 **In my engineering work, I have used the word**
21 **"careless" before, but I generally try to use more**
22 **engineering-type terms.**
23       **"Inattentive" is a great engineering**
24 **term for this case.  That one definitely applies.**
25       **Illegal, careless, speeding, I see where**

214

1  **you're going, but this is not my role, to provide**
2  **these terms.  It's not my role to provide these**
3  **conclusions.**
4        **So you can keep asking me, but again,**
5  **we're just going to be here later on a Friday**
6  **afternoon.**
7     Q.  Mr. McGee didn't stop at the flashing
8  red light; right?
9     **A.  That is correct.**
10    Q.  And he was distracted, according to his
11 testimony, by using his cell phone; correct?
12    **A.  That's consistent with the evidence that**
13 **we have, but I can't prove it.  I would say he's**
14 **inattentive.  I don't know why he was inattentive.**
15    Q.  Who was in a better position to avoid
16 the crash, Mr. Mr. McGee or Tesla?
17    **A.  In the last five seconds, Mr. McGee was**
18 **in a better point to avoid the crash.**
19    Q.  And what about before the last
20 five seconds, who was in the best position to
21 avoid the crash, Tesla or Mr. McGee?
22    **A.  For the prior 90 days, Tesla was in a**
23 **good position to avoid this crash because it has**
24 **sufficient information of an untrained or**
25 **unskilled operator of an automated system.**

215

1     Q.  Are you relying on any other incidents
2  as part of your opinion?
3     **A.  Well, I'm relying on his 90 days of**
4  **operation of this vehicle and incidents that**
5  **occurred during that time.**
6     Q.  No.  I mean, any other crashes involving
7  Tesla vehicles.
8     **A.  No.**
9     Q.  Okay.  We talked before, you have a
10 Tesla; right?
11    **A.  I do.**
12    Q.  I think you said it was -- is it a 2015
13 and you purchased it in 2017?
14    **A.  Yes.**
15    Q.  Okay.  And you and I first met at your
16 inspection of the vehicle, and I asked you at that
17 time if you liked your Tesla, and I think your
18 response was "I love it."
19    **A.  My response was probably "the best**
20 **vehicle I've ever had," which is not quite the**
21 **same, but close.**
22    Q.  Okay.  Do you have any other Teslas?
23    **A.  No.  Just this one.**
24    Q.  Have you ever owned any other Teslas?
25    **A.  No.**

216

1     Q.  Have you read the owner's manual for
2  your Tesla?
3     **A.  My Tesla does not have an owner's**
4  **manual.  The screen is blank.**
5     Q.  No -- no owner's manual exists anywhere
6  for your Tesla?
7     **A.  Nope.  Nope.**
8        **When I bought it, there was one that**
9  **would show up.  And around probably a year later,**
10 **around 2018, that disappeared and has never come**
11 **back.  So, yeah, there is no owner's manual in my**
12 **Tesla.**
13    Q.  Did you ask --
14    **A.  Which, again, raises the question of was**
15 **there one in Mr. McGee's vehicle.  And, that, I**
16 **don't know, as we sit here.**
17    Q.  Do you have any reason to believe there
18 wasn't an owner's manual in his Tesla?
19    **A.  I have two reasons to believe that there**
20 **was no owner's -- well, three, I guess.**
21       **I have three reasons to believe there**
22 **was no owner's manual in his Tesla.  There wasn't**
23 **one in mine.  He doesn't recall being aware that**
24 **he has one.  And when I went to the vehicle, there**
25 **was one there, there was no way to view one.**

Transcript of Alan B. Moore
Conducted on July 12, 2024

55 (217 to 220)

217

1    So that's three reasons why I believe
2 there may not have been one. In reality, there
3 probably was, but that's the evidence I have that
4 there may not have been.
5    Q. Did you ever reach out to Tesla and ask
6 them for an owner's manual for your car?
7    A. Not for my car, no.
8    Q. Why not?
9    A. I think it's -- I think I found it
10 online, but it's -- I didn't have a need to. I
11 mean, I've read Tesla owner's manuals before, so
12 the one specific to my model versus a different
13 model year or a different software version isn't
14 too important to me.
15    Q. So I'm not clear. Do you have an
16 owner's manual for your car or do you not? You
17 said you didn't, but now you're saying you do.
18    A. No. I guess I'd have to look.
19    I do not have one in the car is what I
20 said. The only place in the car it would be is on
21 the screen, and that is -- it's just blank,
22 nothing comes up.
23    Q. I know you want to focus on that, and
24 that's great, but that's not the question.
25    The question is: Do you have an owner's

218

1 manual for your car? It's either "Yes, I have it
2 -- "I have one" or "No, I don't."
3    A. I'm sorry. I'm really not interested in
4 arguing over an owner's manual.
5    But the answer to that specific question
6 is no, I don't have an owner's manual because the
7 only source of the owner's manual that applies to
8 my vehicle with my software version is on the MCU.
9 When I go to that, it's blank. There's nothing
10 there. There is no owner's manual --
11    Q. And --
12    A. I'm sorry. I'm not done finishing my
13 answer.
14    Q. Go ahead.
15    A. There is no owner's manual in the glove
16 compartment.
17    I have accessed the owner's manual
18 online several times, but it's not exactly for my
19 model year and my software version.
20    If I look at my computer, I bet at one
21 point I downloaded one that was applicable at that
22 time, but software versions have developed; it's
23 no longer applicable today.
24    And that is all the information I can
25 offer you about the owner's manual for my company

219

1 vehicle.
2    Q. Is there anything that has ever stopped
3 you from reaching out to Tesla and asking them for
4 a copy of the owner's manual for your vehicle?
5    A. Yes. Absolutely. The fact --
6    Q. What --
7    A. The fact that I don't know that I would
8 get a manual that's representative of my model
9 year and my software version. I can go there and
10 get one right now, but does it apply to my
11 software version? I don't know.
12    Q. The question wasn't whether it applies.
13    The question was: Does anything
14 physically stop you from reaching out to Tesla by
15 phone, by e-mail, on the website, and asking them,
16 "Hey, this is my car, here's the VIN, can I please
17 have an owner's manual?"
18    Is there anything that's ever stopped
19 you from doing that?
20    A. Yes.
21    And we shall continue to argue about
22 owner's manuals.
23    My vehicle, for some reason, does not
24 update to the latest version of the software. My
25 vehicle is currently running on a 2022 version. I

220

1 don't know why.
2    If I call Tesla, we will have the
3 discussion you and I are having right now about
4 which software version applies to the owner's
5 manual for my vehicle.
6    They will probably give me an owner's
7 manual for the current software version, which is
8 not going to be exactly the same as what applies
9 to the vehicle that's in my parking lot.
10    The complications of that discussion
11 just aren't really worth my time. Realistically,
12 for most of my use of the vehicle, any software
13 version of the owner's manual would be fine.
14    Q. Okay. So -- but you haven't reached out
15 to Tesla; right, about the owner's manual?
16    I think you said that. You haven't
17 reached out to them; right?
18    MR. SCHREIBER: Ms. Godhardt is on the
19 deposition. Maybe she can just go ahead and
20 take care of that for us.
21    We've got Tesla here, right on the Zoom.
22 Just -- could have been done with this whole
23 line of questioning 20 minutes ago.
24 BY MS. CRUZ:
25    Q. You've never done that; right,

Transcript of Alan B. Moore
Conducted on July 12, 2024

56 (221 to 224)

221

1  Mr. Moore?
2      A.  I have done that.
3      Q.  You reached out to Tesla and asked them
4  for a manual for your car?
5      A.  I did.  I did.
6      Q.  You just said, like five minutes ago,
7  that you didn't do that.
8          MR. SCHREIBER:  No.  That misstates his
9      testimony.
10     A.  I mean, we can go back to the transcript
11  and --
12     Q.  Well, there's no need to.  It says what
13  it says.
14         So now -- now I understand you did reach
15  out to Tesla and you asked them for a copy of the
16  owner's manual for your vehicle; right?
17     A.  You asked me once if I called Tesla.
18  The answer is no, I did not call Tesla.
19         However, at some point I went to Tesla
20  and downloaded the owner's manual that appears to
21  be relevant to software version 8.  Now, whether
22  software version 8 is relevant to my vehicle today
23  is a very different question.  Which manual is
24  relevant to my software version today is not a
25  simple answer.

222

1          So I don't know how much longer we're
2  going to continue to argue this, but I am looking
3  --
4      Q.  You did -- you said you didn't reach
5  out, but you did reach out, and you have a copy of
6  it, and you're looking at it now, the owner's
7  manual for your car; right?
8      A.  No.  No.
9      Q.  Okay.
10     A.  When you asked me the question about
11  reaching out, you said have I called Tesla.  No, I
12  haven't called Tesla about this.
13         I do have an owner's manual.  It's the
14  wrong owner's manual.
15     Q.  And so you don't have an owner's manual
16  for your car?
17     A.  I'm sorry?
18     Q.  You do not have an owner's manual for
19  your car; correct?
20     A.  I do have an owner's manual for my car.
21  I'm looking at it right now.  It's the wrong
22  version.
23     Q.  Okay.  We're done beating a dead horse
24  now.
25         How did you learn how to use Autopilot?

223

1      A.  I did not learn from the dealer or the
2  Service Center at delivery.  I think I learned
3  initially from a friend who showed me how to use
4  it, watched some YouTube videos, and then started
5  reading the manual, which at the time was visible
6  in the vehicle.  I guess for about the first year,
7  the manual was there.
8      Q.  And I'm sorry if I asked you this, I
9  just can't remember.  Have you ever received a
10  "hands off" warning?
11     A.  Yes.  I've -- well, hang on.  What do
12  you mean by "hands off" warning?  Clarify.
13     Q.  Have you ever received a warning saying
14  you don't have your hands on the wheel?
15     A.  Yes.  I've received visual warnings and
16  audible warnings.  And I've had a disengagement
17  twice, I believe, in about 70,000 miles.
18     Q.  Okay.  That is my next question.
19         So two disengagements, two strikeouts?
20     A.  Yeah.
21         One was kind of odd.  I actually pulled
22  the stock four times instead of two, I don't know
23  if my hand just twitched, and it immediately went
24  into a disengagement after that.
25         Oh.  The other one is I was testing it

224

1  to see what would happen, and actually had the
2  vehicle slow down in the lane with the hazard
3  lights on.  I kind of let it do the whole thing.
4      Q.  Do you believe that your vehicle is
5  defective?
6      A.  I do not believe that my vehicle is
7  defective.
8      Q.  Do you believe that the driver
9  monitoring system on your vehicle is defective?
10     A.  I believe that it is insufficient.
11     Q.  Insufficient for what?
12     A.  It's an insufficient proxy for a driver
13  monitoring system, or it's an insufficient proxy
14  for driver awareness.
15     Q.  Do you own any other vehicles with a
16  Level 2 ADAS system?
17     A.  No.
18     Q.  Okay.  Let's go through your file.
19         MS. CRUZ:  I'm almost done here.  Do you
20     want to take a break?
21         THE WITNESS:  I'm up for a break.  That
22     sounds good.
23         MS. CRUZ:  Okay.  Want to just take five
24     and we can power through?
25         THE WITNESS:  Sure.  That sounds good to

Transcript of Alan B. Moore
Conducted on July 12, 2024

57 (225 to 228)

225

1    me.
2         (Recess in proceedings.)
3    BY MS. CRUZ:
4         Q.  Okay.  So let's go through your file.  I
5    have your file here.  It was sent to us a few days
6    ago.  Is this your complete file, what was sent to
7    the lawyers?
8         **A.  I'm sorry.  It did cut out.  One more**
9    **time.**
10        Q.  Sure.
11            Is this your complete file?
12            Did you send your complete file to the
13   lawyers?
14        **A.  So I sent you my complete file.  There**
15   **are -- well, let me rephrase that.  Okay.  So**
16   **there are three things missing.**
17        Q.  Okay.
18        **A.  Would you like me to list those for you?**
19        Q.  Please.
20        **A.  Okay.  The first thing is -- and I have**
21   **them here, I can show you.**
22            **You probably remember, I took the safety**
23   **information and the roadside assistance books out**
24   **of the car at the inspection.  Do you remember**
25   **that?**

226

1         Q.  Uh-hmm.
2         **A.  And then they were wet and damaged, so I**
3    **just bought the same versions.  So I have those.**
4    **I might have one listed in my reference**
5    **materials, but I'm not actually relying on them at**
6    **all.**
7             **The second thing I didn't provide is I**
8    **did a LiDAR scan of the vehicle.  L-I-D-A-R.  It's**
9    **a lot like a laser scan.  I haven't downloaded or**
10   **processed the data.  I haven't looked at it or**
11   **relied on it.  So I can get that to you, but,**
12   **literally, it's still in the scanner.**
13            **And then the third thing is, I had one**
14   **document that I identified as client work product.**
15   **I don't think it was really meant for me, but I**
16   **ended up with it.  I talked to my clients.  I told**
17   **them that I would not produce it, but then I would**
18   **tell you that I didn't produce it.  You guys can**
19   **argue over what to do with it.  I don't care.  I**
20   **didn't rely on it, but it is in my file, and you**
21   **didn't get it.**
22            **Beyond that, you have everything I have.**
23        Q.  Okay.  So let's go backwards.
24            This client document, I think you called
25   it, is it an e-mail?

227

1         **A.  It is a Word document that came by**
2    **e-mail.**
3         Q.  Okay.  And can you describe it without
4    telling me its contents?
5             What is it?
6         **A.  So it's a work --**
7             THE WITNESS:  Yeah, Brett, can you help
8    me out here?
9             I would rather stay out of the middle of
10   this.  I don't care either way.  But if I
11   read her the title, it's telling her what's
12   in it.  I don't know how to handle it.
13            MR. SCHREIBER:  Yeah, I don't really
14   care either way either.  This all occurred
15   long before I got here.
16            It's basically an attempt by lawyers to
17   summarize some data.
18            MR. BOUMEL:  It's my -- it's my
19   technical attempt to analyze log data.  So
20   it's very relevant to everything that we're
21   doing in this case.  This is Adam.
22            MS. CRUZ:  Adam, the expert.
23            MR. BOUMEL:  Exactly.  So...
24   BY MS. CRUZ:
25        Q.  Okay.  Then the second thing was, you

228

1    did a LiDAR scan of the vehicle?
2         **A.  Correct.**
3         Q.  Of the subject vehicle?
4         **A.  Correct.**
5             **I did the inspection at -- in Miami.**
6    **Remember, I was walking around it with what looked**
7    **like an iPad.  I don't know if you remember that.**
8    **But that was the LiDAR scan.**
9         Q.  Okay.  And you haven't downloaded or
10   processed that data, but you have it?
11        **A.  Correct.  Yeah.**
12        Q.  Okay.  I'll ask you to hold on to it.
13        **A.  Okay.**
14        Q.  In case someone wants to see it.
15        **A.  Yeah.  That's fine.**
16        Q.  And then the safety info -- safety info
17   and roadside book, did we decide that you would
18   leave them with the vehicle?
19        **A.  No.  We talked about it and agreed that**
20   **I would take them.  They're here.**
21        Q.  Okay.
22        **A.  And then I bought, on eBay, the same**
23   **versions, you know, same serial numbers, so ones I**
24   **could read.  Because, remember, these were water**
25   **damaged; we couldn't really open the pages.**

Transcript of Alan B. Moore
Conducted on July 12, 2024

58 (229 to 232)

229

1    Q.  Okay.  Do you have pictures of some
2  identifying information on those booklets, like if
3  there's publication dates or version numbers, like
4  the front cover, rear cover, the inside page?  Do
5  you have any photos of those?
6    A.  I believe so.
7        Let me take a look here.  I'm pretty
8  sure I do.  I do for the ones I took out of the
9  vehicle, and then the ones I bought matched those.
10   Q.  Okay.  So you have photos, so we could
11 go and find out what they are?
12   A.  Exactly, yeah.
13       And while we're talking, let me just
14 look in my reference material.  Maybe I didn't
15 even list it because I didn't use it.  Just a
16 minute here.
17   Q.  You're talking about the safety and
18 roadside books, you're not relying on them?
19       That's what you're saying?
20   A.  Correct.  Yeah.
21       I do list the safety booklet as
22 reference information, but I didn't actually use
23 anything out of it.  So it's just listed there.
24   Q.  Okay.  Did you review them?
25   A.  Yes.  Enough to decide I didn't need

230

1  them.  And that was the end of it.
2    Q.  Okay.  Okay.  If you would hold on to
3  those as well, please.
4    A.  Sure.
5    Q.  Okay.  So beside those things -- those
6  three things, anything else missing from your
7  file?
8    A.  Nope.  Everything else was electronic
9  and you got a full copy of it.
10   Q.  Okay.  So let's go through.  And if you
11 can just tell me about what's in here briefly.
12 And then I'll tell you if we need to drill down.
13 But let's see if we can go just go quickly through
14 here.
15   A.  Sure.
16   Q.  This is how I have it set up anyway, how
17 it came to us.
18   A.  Are you sharing your screen?
19   Q.  No, but I can.
20   A.  Oh.  I -- you lost me.  Okay.  Do you
21 want me to walk you through what I have or do you
22 want -- how do you want to do this?
23   Q.  I can share my screen.
24   A.  Okay.
25   Q.  Can you see it?

231

1    A.  Not yet.
2        Ah, here we go.  It's coming up now.
3    Q.  Okay.
4    A.  Okay.  Here we go.
5    Q.  These things are not part of your file.
6  I mean, they might be part of your file, but
7  they -- they were not produced to us in this form
8  as part of your file.  These were things that I
9  saved.
10       So we're just looking at the folders.
11   A.  No.  That's -- that's how I produced my
12 file.  It looks like that.  So there's folders,
13 and then there's, like, five documents that are
14 just --
15   Q.  Oh, you're right.  Yeah, yeah, yeah.  I
16 took a step up from where I was in the folder.
17       Okay.  So all of this is your files.
18 One, two, three, four, five -- six folders and
19 then four PDFs and two Excels; right?
20   A.  Yep.  Three PDFs and a PowerPoint, but
21 yeah.
22   Q.  Oh, yes, you're right.  Okay.
23   A.  Yep.
24   Q.  We'll go ahead and mark your whole file
25 as Exhibit 2.

232

1        (Exhibit 2 was marked for identification
2         and is attached to the transcript.)
3  BY MS. CRUZ:
4    Q.  Okay.  So from client, what is this,
5  what the lawyers sent to you?
6    A.  Yeah.  That -- that should be every
7  document I received from the lawyers.  And on all
8  or almost all of them, the associated e-mail will
9  be in there as well.
10   Q.  Okay.  So these could be e-mails or
11 could be documents, or e-mails attaching
12 documents?
13   A.  Correct.  Correct.
14       And then some of them are -- a couple of
15 them are just scheduling calls, too.  You know, I
16 don't have every -- I don't have every e-mail
17 about scheduling calls in here, but any materials
18 I received are all listed in here.
19   Q.  Okay.  Inspection photographs.  This is
20 from your vehicle inspection that we talked about
21 that you did in June; right?
22   A.  That's the Tesla photographs, the second
23 folder.  Yeah.  That's -- so that was when I met
24 you at Exponent.
25   Q.  Right.

Transcript of Alan B. Moore
Conducted on July 12, 2024

59 (233 to 236)

233

1    A.  The one above that was later that day
2  and that night.  I went to the crash site and did
3  a bunch of stuff there.
4    Q.  Yep.  Yep.
5    A.  And there's a bunch of video in there,
6  of --
7    Q.  Okay.
8    A.  Kind of like drive-through video,
9  basically.
10    Q.  Yep.
11    Okay.  And so you did this drive-through
12  video in your Tesla?
13    A.  Yes.
14    Q.  Okay.  And the hardware in your Tesla is
15  substantially different from the hardware in
16  Mr. McGee's Tesla; right?
17    A.  Yes.  Mine's the AP one, the mobilized
18  system.
19    Q.  You have Hardware 1 and he had
20  Hardware 2.5, which is a completely different
21  camera system; right?
22    A.  Correct.
23    Q.  And what was the purpose of your
24  drive-through?
25    A.  So at the time I wasn't really sure and

234

1  I figured, let me get all the data I can.  So I
2  did several drive-throughs using Autopilot, trying
3  different things to see what would happen in both
4  daytime and at night.
5    And I found some characteristics that
6  are probably representative of what Mr. McGee
7  experienced.  I found others that probably are
8  not.  They are probably things that would be
9  different because of the different hardware
10  versions.
11    At this point, I don't think I'm relying
12  on any of it for my opinions.  So there's a lot of
13  stuff in here.  But, yeah, right now, I don't
14  think I'm relying on any of it for my opinions.  I
15  may try to use some of it for demonstrative aids.
16    Q.  And your drive-through was done
17  five years after the subject accident; right?
18    A.  Correct.  Correct.
19    And, actually -- I stand corrected.  If
20  I go to my photographs, there are some photographs
21  taken during that inspection that are in my
22  report, especially my photograph 10, looking at
23  pavement dropoff and clear zone.  So it raises the
24  question of how much did that change in
25  five years, right.  But, yeah, I do have some

235

1  photographs from my inspection in here.
2    Q.  And when you did do your drive-through,
3  were you mimicking the conditions that Mr. McGee
4  was driving -- well, strike that.
5    You were trying to drive the same speeds
6  that he was driving and the same roadway; right?
7    A.  My -- my initial intent was to follow
8  all of his driver inputs.  And I realized quickly
9  that that wasn't going to happen.
10    So what I then tried to do was basically
11  do a reasonable Autopilot drive through here.  So
12  I was always, I believe, five over the speed
13  limit.  It was always controlling the speed.  And
14  I was hands off as much as possible.  So I would
15  only touch the wheel if I had a safety concern,
16  which came up a couple of times, or if I got a
17  visual alert.  Those are the only times I touched
18  the steering wheel.
19    Q.  And your drive-through -- I know it was
20  different than the drive that Mr. McGee
21  experienced that day and your actions couldn't
22  have been exactly the same as his, and your
23  vehicle has substantially different hardware than
24  his vehicle had, but would you agree that your
25  video shows that if the driver pays attention and

236

1  is attentive, than this L2 system works great?
2    A.  I would not agree with that.
3    Q.  Why not?
4    A.  No, I wouldn't agree with that.
5    Well, since you asked, I'll tell you.
6  In one of these videos, I request a lane change.
7  The Autopilot does a lane change into the oncoming
8  lane and drives continuously in the oncoming lane
9  on Autopilot.
10    I'm not saying that Mr. McGee's vehicle
11  would have done that, but you've asked if it
12  worked appropriately.  I would not call that
13  appropriate operation.
14    Also, it's passed parked vehicles and
15  pedestrians and bicycles without any recognition
16  of their hazards, which this system is not
17  designed to.
18    It did issue -- let's see.  I did get a
19  "Takeover immediately" warning out of it at one
20  point.  I don't remember when.  And I did get a
21  visual warning, apparently triggered by either
22  steering wheel torque or lateral acceleration.
23  Basically, it was going too fast in a curve.  I
24  had it going, I think, 52 miles an hour in a
25  35-zone.

Transcript of Alan B. Moore
Conducted on July 12, 2024

60 (237 to 240)

237

1          I've got a list.  I had a couple other
2   behaviors I observed.  And, again, we're talking
3   about AP 1, not 2.5, so it's not directly
4   comparable.
5          It tried to do curves at 55 miles per
6   hour in a 40-zone.
7          What was most fascinating is that
8   approaching the stop sign -- again, no driver
9   input.  Approaching the stop sign, it slowed to
10  about 28 miles per hour approaching the stop sign,
11  and then tried to roll through the intersection at
12  a constant 28.  You know, had I not braked, that's
13  what it should have done.
14         So I would not say that Autopilot worked
15  fine on this road, based on my evaluation.
16     Q.   And once you started the drive, you
17  realized that you weren't going to be able to
18  duplicate Mr. McGee's driver inputs, the same
19  driver inputs that he did on the day of the crash;
20  right?
21     A.   I mean, I -- I could have -- it --
22  it -- the -- let's see.
23         His initial acceleration to almost
24  90 miles per hour, I just wasn't going to do it on
25  that road.

238

1          The rest of it, I probably could have.
2   And I tried by making a -- like an audio narration
3   of his inputs that I would then listen to while I
4   drove.  And it just -- it got out of hand really
5   quickly, so I stopped doing that and decided, let
6   me do something I can control, which is, you know,
7   full Autopilot control, not touching the wheel
8   unless it told me to.  And that's something more
9   repeatable that I could do.
10     Q.   Right.
11         Well -- and you couldn't do all the same
12  driving inputs that he did.  And when I say
13  "driving inputs," I mean just the driving tasks in
14  general.  Because we've already established that
15  you don't know when he looked away; right?  You
16  don't know when he looked down.  You don't know
17  when he started using the cell phone.  You don't
18  know when he started looking for the cell phone.
19  You don't know how he moved when he started to
20  look at the cell phone.  You don't know when he
21  took his eyes off the road.
22         Right?  All these things are accurate?
23     A.   No.  None of that matters.  No.  When
24  I'm doing this evaluation, it's only the driver
25  inputs to the vehicle I was interested in.

239

1          So when he accelerated to 60 miles an
2   hour in 45; when he did an override on the TACC,
3   that I had initially intended to replicate, and I
4   chose not to when I realized it was just going to
5   be difficult.
6          But, yeah, as far as what he was doing
7   inside the vehicle when he was not having his
8   hands on the wheel and the eyes straight ahead, we
9   know that's happening.  There's no way for me to
10  replicate that.  And I didn't have any interest in
11  replicating that.
12     Q.   Did you produce all your invoices?
13     A.   There should be two in there.
14         Yep.  That's all of them.
15     Q.   Okay.  And what's your hourly rate?
16     A.   700.
17     Q.   And what's the total amount of time
18  you've spent on the case to date?
19     A.   I don't know.
20     Q.   How much time did you spend getting
21  ready for -- how much time have you spent on the
22  case since you sent your last invoice?
23     A.   I don't know.
24     Q.   How much time did you spend getting
25  ready for the depo?

240

1     A.   About three hours yesterday.
2     Q.   You did a vehicle inspection; right?  We
3   talked about that.
4     A.   Yes.
5     Q.   How long was your vehicle inspection?
6          How long were you there?
7     A.   I don't recall.  Maybe an hour or two.
8     Q.   How long was your site inspection?
9     A.   Why don't we open an invoice and look at
10  it?  I don't recall these numbers.
11         Give me just a moment here.  I'm opening
12  it here now.
13         So it looks like I had a 13-1/2-hour day
14  for travel, the vehicle inspection, and the site
15  inspection.  And I don't have records of, you
16  know, how that was broken out from one thing to
17  another.
18     Q.   And you're located in, remind me,
19  Jacksonville?
20     A.   Orlando.
21     Q.   Orlando.
22         So that day, I guess it was June 7th,
23  that was drive down to Miami, do the vehicle
24  inspection, do the scene inspection, drive back to
25  Orlando?

Transcript of Alan B. Moore
Conducted on July 12, 2024

61 (241 to 244)

241

1    A.  Correct.
2    Q.  Okay.  There's a research file.  What's
3  in here?
4    A.  There's a lot of stuff I looked at.
5        Probably almost half of this I decided
6  not to use, but I've learned -- you know, I've
7  been told "don't delete anything."  So there are
8  things in here that I've not relied on, but --
9  yeah, so there's a bunch of stuff.  I don't know.
10        Do you want to go through each one of
11  them or --
12    Q.  Tell me which -- which of your list is
13  longer, what you're relying on or what you're not
14  relying on -- or whichever list is shorter, I
15  should I say.
16    A.  Yeah, yeah.
17        Probably what I'm relying on is probably
18  the better list to go by.
19    Q.  Okay.  So what -- what in the research
20  folder are you relying on?
21    A.  Okay.
22        So I did quite a bit of road
23  classification research and didn't draw a
24  conclusion from it.  But it's one of those things
25  where maybe that matters, that I didn't draw a

242

1  conclusion.  But the -- let's see.
2        The Subaru -- oh, no, the Cadillac
3  owner's manual, the 2019 Cadillac, I relied on
4  that.
5    Q.  Yeah.
6    A.  The automation definitions, J3016, we
7  talked about that.
8        The DOD document, we relied on that.
9        The FDOT 700, the clear zone
10  requirement, that's in my report.
11        The J3114 is in my report.
12        There's another J3016, an earlier one,
13  near the bottom.
14        And then the -- the -- the different
15  example beta software agreements.  I think those
16  are in my report, too.  I loosely reference them.
17        And then in software chronology, I --
18  maybe some of that I used, but I don't recall.  I
19  mean, if we open it, I'll know.
20        Yeah, no, I didn't even use those.
21    Q.  Okay.  So have we gone through
22  everything in the research file that you relied
23  on, and anything else in here you're not relying
24  on?
25    A.  Correct.  Yep.

243

1    Q.  Okay.  To client.
2    A.  That was an estimate for -- I think that
3  was an estimate for the inspections, the vehicle
4  and site.
5    Q.  And the video evals, that's the
6  drive-through that we talked about?
7    A.  Yep.  Yep.  Yep.
8        And primarily the daytime version.  So I
9  did it at daytime and night.  And I don't think
10  I've used the nighttime version at all.
11    Q.  Is the nighttime version -- those videos
12  are within the inspection photographs folder now?
13    A.  Yes.  Yes.  Yep.
14    Q.  Okay.
15    A.  Those Excel files are very large,
16  depending on your computer.
17    Q.  Okay.
18    A.  You may --
19    Q.  The log data?
20    A.  What's that?
21    Q.  Is this the log data?
22    A.  Yeah.  Yeah.  Especially the bottom one.
23  Depending on your computer, you may have issues
24  trying to open that last one.
25    Q.  Okay.  Did you create any of your own

244

1  work product in regard to the log data?
2    A.  Yes.
3    Q.  Okay.  What did you create?
4    A.  So in both of the log files, I took
5  multiple files and combined them together.  And
6  then I did a lot of analysis on it and generated,
7  you know, graphs and calculations and conclusions
8  from it.
9    Q.  And are those -- is that what we're
10  looking at here?
11    A.  That is one of them, yes.
12        You see the tabs on the bottom,
13  that's -- Composite is the raw data, basically.
14    Q.  Got it.  Okay.
15        What is this?
16    A.  You'll see.  You'll see when it comes up
17  here.
18    Q.  Right.
19        What -- it's, like, a PowerPoint slide.
20  Did you create a PowerPoint at some point?
21    A.  So this was the start of it.  Usually on
22  a case, while I'm working on it, if I find things
23  that I think might be good demonstrative aids, I
24  just put them all in the same PowerPoint.
25        And in this case, I only had the one.

Transcript of Alan B. Moore
Conducted on July 12, 2024

62 (245 to 248)

245

1  This is just the -- and I'm not even sure this is
2  something for an expert actually to show, but it's
3  one frame from the Tesla video with a quote from
4  McGee's depo overlaid on it.
5      We'll see what happens.  It's going to
6  take awhile.
7      Q.  Okay.  What -- what is that, the
8  Ownership Composite?
9      A.  Yeah.  So that is 90 days of log data
10 all put together.  It's over 700,000 lines of
11 data.  And then a lot of analysis that I did from
12 it.
13     The results of that analysis are the
14 graphs and the content in my report.  So you can
15 see the output of it in the report, but this
16 spreadsheet's the raw data.
17     Q.  Got it.  Okay.
18     Let's look at your CV quickly.
19     A.  And I think I made an update to it that
20 you might not have.  When you bring it up, we can
21 check.
22     Q.  Okay.  Well, I wasn't going to put it
23 up.  Do you know what it is?  I don't --
24     A.  Yeah.
25     Under Certificates, I added one on the

246

1  bottom of that that I'm a -- a master instructor
2  through SAE.  That might not have been on the
3  version you received.
4      Q.  No, it's not.
5      A.  Okay.  That's the only change.
6      Q.  Got it.
7      Your work at Ford -- you were at Ford
8  for seven years, it looks like, from 1994 to 1999?
9      A.  Yes.
10     Q.  Okay.  And you worked primarily in
11 analyzing tire failures and rollovers?
12     A.  Chassis development was probably the
13 best description of my work there.  But, yeah,
14 tire failures and rollover was part of my work.
15     Q.  Got it.
16     Okay.  And just one question about your
17 rebuttal report.  You had some opinions in there
18 regarding work that Ryan Harrington did.  And
19 that's fine.  I don't -- I don't need to really
20 ask you about that.
21     But you had some opinions that seem to
22 relate to AEB and FCW, automatic emergency braking
23 and forward collision warning.  You're not
24 offering an opinion in this case that AEB was
25 designed to stop or slow the Tesla in response to

247

1  a stationary side profile of the Tahoe; correct?
2      A.  I do not have that opinion.
3      Q.  Okay.  You're not offering an opinion
4  that AEB or forward collision warning were
5  defective or caused this crash; right?
6      A.  I do not have that opinion.
7      MS. CRUZ:  Okay.  I don't think I have
8  any other questions.
9      MR. SCHREIBER:  I don't have any
10 questions for my witness.
11     MS. CRUZ:  Okay.  All right.
12     THE STENOGRAPHER:  Counsel, did you want
13 to e-mail me the exhibits, if I put my e-mail
14 in the chat, or send them in to Planet Depos
15 or have they been uploaded to the repository?
16     MS. CRUZ:  Yes, we'll upload them.
17     THE STENOGRAPHER:  Mr. Schreiber, did
18 you want to let me know your order?
19     MR. SCHREIBER:  I would love a copy.
20     THE STENOGRAPHER:  And do you need a
21 rough?
22     MR. SCHREIBER:  What's your turnaround
23 otherwise?
24     THE STENOGRAPHER:  It's eight to ten
25 business days.

248

1      MR. SCHREIBER:  Yes, I need a rough.
2      THE STENOGRAPHER:  Thank you so much.
3      And then, Ms. Cruz, I do have your
4  order.  Is it still regular turnaround?
5      MS. CRUZ:  No, it's not regular
6  turnaround.  It's a rush, rough.
7      THE STENOGRAPHER:  So I'll get the rough
8  to you this evening.
9      When do you need the final?
10     MS. CRUZ:  Rush also, please.
11     THE STENOGRAPHER:  Like for Monday, or
12 did you have a date-specific?
13     MS. CRUZ:  Monday's good.
14     THE STENOGRAPHER:  Okay.
15     Thank you so much.
16     MS. CRUZ:  Thank you.
17
18     AND FURTHER THIS DEPONENT SAITH NOT.
19     SIGNATURE RIGHTS RESERVED.
20     (Deposition concluded at 3:22 p.m.)
21
22
23
24
25

249

1         ACKNOWLEDGMENT OF DEPONENT
2         I, ALAN B. MOORE, do hereby
3   acknowledge that I have read and examined the
4   foregoing testimony, and the same is a true, correct
5   and complete transcription of the testimony given by
6   me and any corrections appear on the attached Errata
7   sheet signed by me.
8
9   _____
10  (DATE)              (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

250

1   STATE OF FLORIDA:
2   COUNTY OF ORANGE:
3         I, April Reid, Registered Professional
4   Reporter, Certified Realtime Reporter and Notary
5   Public in and for the State of Florida,
6   and whose commission expires August 22, 2027,
7   do certify that the aforementioned appeared
8   before me, was sworn by me, and was thereupon
9   examined by counsel; and that the foregoing is a
10  true, correct, and full transcript of the
11  testimony adduced.
12        I further certify that I am neither
13  related to nor associated with any counsel or
14  party to this proceeding, nor otherwise interested
15  in the event thereof.
16        Given under my hand and notarial seal in
17  Orlando, Florida, this 15th day of July, 2024.
18
19
20  _____
21  April Reid, RPR, CRR, Notary Public
22  State of Florida, County of Orange
23  Commission No. 455787/HH 436060
24
25