# EXHIBIT D

```
 1                  THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2
                            MIAMI DIVISION
 3
                      CASE NO.:  21-cv-21940-BB
 4

 5

 6
    NEIMA BENAVIDES, as             )
 7  Personal Representative         )
    Of the Estate of Naibel         )
 8  Benavides Leon, deceased,       )
                                    )
 9         Plaintiffs,              )              March 7, 2024
                                    )
10  v.                              )
                                    )              Pages 1 - 120
11  TESLA, INC., a/k/a              )
    Tesla Florida, Inc.,            )
12                                  )
              Defendant.            )
13  _____/

14

15

16                       DISCOVERY HEARING

17           BEFORE THE HONORABLE EDWIN G. TORRES
             UNITED STATES CHIEF MAGISTRATE JUDGE
18

19

20
    APPEARANCES:
21
    Counsel on behalf of Plaintiffs:
22
                        EATON & WOLK PL
23                      2665 South Bayshore Drive
                        Suite 609,
24                      Miami, FL 33133
                        BY:  DOUGLAS F. EATON, ESQ.
25
```

```
 1  APPEARANCES CONTINUED:

 2  Counsel on behalf of Plaintiffs:

 3                       POSES LAW GROUP
                         169 East Flagler Street
 4                       Suite 1600,
                         Miami, FL 33131
 5                       BY:  TODD POSES, ESQ.

 6

 7

 8                       THE ROUSSO LAW FIRM
                         9350 South Dixie Hwy
 9                       Suite 1520,
                         Miami, FL 33156.
10                       BY:  ADAM T. BOUMEL, ESQ.

11

12

13  Counsel on behalf of Defendant:

14                       BOWMAN AND BROOKE, LLP
                         2 Alhambra Plaza,
15                       Suite 800,
                         Coral Gables, FL 33134
16                       BY:  WHITNEY V. CRUZ, ESQ.

17

18

19  Transcribed By:

20                       BONNIE JOY LEWIS, R.P.R.
                         7001 SW 13 Street
21                       Pembroke Pines, FL  33023
                         954-985-8875
22                       caselawrptg@gmail.com

23

24

25
```

```
 1              (Thereupon, the following proceeding was held:)
 2              THE COURTROOM DEPUTY:  The United States District
 3    Court for the Southern District of Florida is now in session.
 4    The Honorable Chief Magistrate Judge Edwin G. Torres presiding.
 5              Calling case Neima Benavides, et al., versus Tesla,
 6    Incorporated; Case Number 21-cv-21940-Bloom.
 7              Counsel, your appearances for the record.
 8              MR. EATON:  Good afternoon, Your Honor.
 9              Doug Eaton on behalf of the Plaintiff along with Adam
10    Boumel and Todd Poses.
11              MR. POSES:  Good afternoon, Your Honor.
12              THE COURT:  Good afternoon.
13              MS. CRUZ:  Good afternoon, Your Honor.  Whitney Cruz
14    on behalf of Tesla Inc.
15              THE COURT:  Good afternoon, everybody.
16              You are surrounded, Miss Cruz.
17              MS. CRUZ:  Yes, I see that.  I'm used to it.
18              THE COURT:  Let's see here.
19              I'm pulling up the docket sheet and your materials.
20    And you all sent me your materials, I know I saw a series of
21    proposed orders.
22              MR. EATON:  We did, Your Honor.
23              THE COURT:  You sent them e-mail, correct?
24              MR. EATON:  I believe the materials themselves were
25    attached to the motion for hearing, which is Docket Entry 177.
```

```
 1          THE COURT:  Oh, okay.  What did you say 177?
 2          MR. EATON:  Yes, sir.
 3          THE COURT:  Oh, here it is.
 4       Good.  Okay.  And I think I saw that you all have a
 5   hearing in front of Judge Bloom very recently, correct?
 6          MS. CRUZ:  Right.
 7          THE COURT:  Oh, unfortunately, I don't have a -- do we
 8   have a transcript of that?
 9            So, then, when I was looking at these materials, I
10   wanted to know what that was about in terms of what it is that
11   -- because 198 said that the Plaintiffs' motion for leave to
12   amend the complaint was granted in part and denied in part.
13          MS. CRUZ:  Sure.
14          THE COURT:  So what was that about?
15          MS. CRUZ:  So it was two motions was heard; one was
16   Plaintiffs' motion to amend the complaint to add a complaint
17   for punitive damages and also claims for fraudulent
18   misrepresentation, false advertising, and I think negligent
19   misrepresentation.
20            And the Court denied the request to add the claims for
21   the fraud and misrepresentation and there is one order.  She
22   allowed them admitting.  I think there were two orders entered
23   and that might be why it is confusing, but if you look at
24   Docket Entry 198 she allowed Plaintiffs to amend their
25   complaint to add a complaint for punitive damages and add
```

1    factual allegations.

2           And the other issue, the big issue kind of was that,

3    well, obviously they wanted to amend to add punitive damages

4    based on a recent NHTSA recall.

5           And Judge Bloom found that that recall is a subsequent

6    remedial measure.  So that wouldn't be the basis, but she would

7    allow them to amend the claim for punitive damages based on the

8    allegations that are already in the complaint.

9           THE COURT:  Do you agree with that, Mr. Eaton?

10          MR. EATON:  More or less.

11          THE COURT:  What is the less part?

12          MR. EATON:  Well, I think the finding of the recall of

13   the subsequent remedial is correct, but our issue is effective

14   punitive damages of the things that they didn't do as part of

15   the recall.

16          And so our intention in the re-pleading is to say,

17   okay, setting aside what they did in the recall, the recall was

18   not enough.  One of the issues that is relevant to punitive

19   damages is response to the wrongdoing.  The way you handled it

20   and the way they handled it we believe is inadequate and we

21   have allegations to that effect.

22          So I think this complaint, Whitney might disagree on

23   the interpretation of that, but that's how we view that.

24          THE COURT:  Okay.

25          MR. EATON:  I understand the Court's ruling that she

 1  is not going to let us admit the fact of the recall into

 2  evidence.

 3          THE COURT:  And was that the thrust of the -- other

 4  than the punitive damages claim is that the thrust of the fraud

 5  and the misrepresentation claim?

 6          MR. EATON:  No, Your Honor.

 7          It was new evidence that we did not have when we

 8  initially moved for leave to amend and the Court denied and

 9  said the stuff that you are asking to add, you already have it

10  in your possession.  So I am not going to let you do that

11  because the time to amend has passed.

12          THE COURT:  Right.

13          MR. EATON:  And so we said, okay, well, this is

14  something obviously we did not have at the time because it

15  didn't exist and that's what prompted our second motion for

16  leave to amend the recall issue.

17          THE COURT:  I see.  Okay.

18          MR. EATON:  Yes.

19          THE COURT:  Okay.  Well, let's table that to the

20  extent that it is relevant and obviously you all will raise it,

21  but let me turn to counsel for the Plaintiff on the most

22  important issue we want to tackle.

23          I saw that there are a variety of things.  So rather

24  than going through them one by one, what is the most important

25  issue that you want to attack?

1        MS. CRUZ:  Your Honor, may I just address something

2   with the Court, which is kind an overarching issue that we have

3   in objection to what is set for hearing being set today and

4   just get some guidance?

5        THE COURT:  Well, his number one issue may jive with

6   yours.  So we will find out, but I will hear you out on it.  Go

7   ahead.

8        MS. CRUZ:  Okay.  And I don't think it will.  The

9   issue that we are a little confused about is --

10       THE COURT:  Let him start.

11       MS. CRUZ:  Oh, I'm sorry.  I thought you said go

12   ahead.  I apologize.

13       THE COURT:  Do you have a discovery issue on the

14   Defendant's side?

15       MS. CRUZ:  The issue is that these issues were not

16   properly noticed for hearing and violent the Court's procedures

17   as to how these things are to be handled.

18       THE COURT:  Got you.

19       MS. CRUZ:  That was --

20       THE COURT:  I will hear you out on that, but let's

21   first find out what the most important issue is and then we

22   will tackle that.

23       MS. CRUZ:  Got you.

24       MR. EATON:  Well, It is hard to say what is most

25   important, but I think we can address what she's addressing

1  because that deals with probably what is going to take the

2  majority of time --

3          THE COURT:  Okay.

4          MR. EATON:  -- at this hearing which is the 30(b)(6)

5  deposition.

6          THE COURT:  Okay.

7          MR. EATON:  And I believe what she is referring to is

8  the fact that it is the Court's practice to say go take the

9  depo and then bring the objections back to me after it is done.

10          THE COURT:  Right.

11          MR. EATON:  And what we have gone here is say, well,

12 they basically objected to almost half, if not more, about the

13 items, the scope of their general objections.

14          Not the questions, but the topics and we thought as a

15 matter of expedience we would bring it before you and say they

16 are objecting to all these topics.  These should be

17 discoverable on a 30(b)(6) deposition.

18          And if you rule on them beforehand it will save a lot

19 of time afterwards where we have to avoid taking two

20 depositions where we come back and we present to you 80 pages

21 of objections to topics that are irrelevant.

22          So that's the thing.  Correct me if I'm wrong, but I

23 think that's what you are referring to.

24          THE COURT:  Is that right, Miss Cruz?

25          MS. CRUZ:  My comment was, well, there's --

```
 1          THE COURT:  So is the 30(b)(6) -- he's right.
 2  normally I don't resolve it for many good reasons.  But, on the
 3  other hand, he's here now and then is that issue, was that not
 4  properly noticed, is that what you are saying on that topic?
 5          MS. CRUZ:  Yes and the issue is this.
 6          I mean, number one, as the Court obviously you know
 7  your own procedures is to go and take the deposition.  And what
 8  we have here is almost 200 deposition topics and Plaintiffs
 9  have already taken a 30(b)(6) witness of an auto pilot
10  engineer.
11          So our point was why don't we --
12          THE COURT:  How long was that deposition?
13          MS. CRUZ:  Almost 15 hours.
14          THE COURT:  Oh, okay.  Aren't you out of time away?
15          MS. CRUZ:  Well, that was a California case and the
16  Plaintiffs --
17          THE COURT:  Huh?
18          MS. CRUZ:  Yes.  So it is a California auto pilot
19  case.  Plaintiffs' counsel cross-noticed the corporate
20  representative deposition in that case.  He filed his own
21  notice.  We said go ahead.  That's fine because some of these
22  topics -- I mean, we objected to it, but we ended up working it
23  out.
24          THE COURT:  Okay.
25          MS. CRUZ:  Plaintiffs' counsel appeared at that
```

1   deposition.

2       THE COURT:  Did you appear or did somebody for Tesla

3   appear?

4       MS. CRUZ:  Yes, my partner who also works on this case

5   with me.  Ann works that case and that case is called *Wang* and

6   they made an appearance for the record.

7       THE COURT:  It was a dual notice deposition.

8       MS. CRUZ:  Exactly.

9       THE COURT:  Okay.

10      MS. CRUZ:  Exactly.  And Plaintiffs' counsel who is

11  not Plaintiffs' counsel in the *Wang* case asked questions.

12      THE COURT:  Okay.

13      MS. CRUZ:  So --

14      THE COURT:  And how long was that deposition for?

15      MS. CRUZ:  Almost 15 hours.

16      THE COURT:  And that was of the auto pilot engineer?

17      MS. CRUZ:  Correct.  It was a 30(b)(6) witness about

18  auto pilot topics.

19      THE COURT:  Okay.

20      MS. CRUZ:  So our point to them was let's follow the

21  Court's procedures, which are let's go take the deposition.

22  And we've never said don't take a deposition and I have to say,

23  I mean, we have a very good working relationship with

24  Plaintiffs' counsel.

25      THE COURT:  What other 30(b)(6) are they entitled to?

1           MS. CRUZ:  Well, there are a few topics in here.

2           The vast majority of them we have agreed to.  There

3   are about 200 subtopics.  If you count all the subtopics, there

4   are about 200 topics.  We've agreed to the vast majority of

5   them.

6           And the overarching issue that we are saying is we are

7   not going to let the witness talk about things that are not

8   part of your allegations and we are not going to let the

9   witness give testimony and answer questions that were asked in

10   a prior deposition.  Those were our general objections.

11          THE COURT:  And why are you producing the witness

12   again if he was asked questions in a prior deposition?

13          MS. CRUZ:  Because there are some topics that are

14   relevant in this case that were not asked of the first witness.

15          THE COURT:  Oh, okay.  All right.  So you concede that

16   and you concede that there are topics here that were not asked

17   of the -- what did you call him, an auto pilot engineer?

18          MS. CRUZ:  Yes.  He is an auto pilot engineer.  That's

19   his job.  I mean, he's a high level auto pilot engineer, but he

20   was produced as the corporate representative in that case.

21          THE COURT:  Got you.

22          MS. CRUZ:  So it is an auto pilot case, but every auto

23   pilot -- not every auto pilot case, but a lot of auto pilot

24   cases are different.  You might have one auto pilot case -- I

25   have one auto pilot case where the defect allegation is there

1 was a crossing tractor trailer and the auto pilot system failed

2 to detect the crossing tractor trailer.

3          That is completely different than what happened in the

4 case in California, which deals with whether the car was

5 recognizing lane lines and when it ran into a barrier and the

6 driver didn't have his hands on the wheel, which is different

7 from this case, which is where we have a driver who had his

8 hands on the wheel, bent down real quick to pick up his phone,

9 came back up and drove through a T-intersection and into a

10 parked car on the other side of the street.

11          So just because it is an auto pilot case, it doesn't

12 mean -- it is like saying that all airbag cases are the same.

13          THE COURT:  How many engineers would you be able to

14 produce that deal with auto pilots?  How many auto pilot

15 engineers could be 30(b)(6) witnesses for you?

16          MS. CRUZ:  Well --

17          THE COURT:  As a practical matter.  It's a practical

18 question.

19          MS. CRUZ:  I mean, I don't know how to answer that

20 question because it is the company's knowledge.  You know, what

21 I mean?

22          THE COURT:  Right.  In other words, this individual,

23 is he the individual with the company who decides to use for

24 these kinds of cases?

25          MS. CRUZ:  I don't know how many times the person who

 1    -- I have never heard his name before.

 2          THE COURT:  Okay.

 3          MS. CRUZ:  I have worked on other auto pilot cases.  I

 4    don't work on all of them.  I could tell you that the witness

 5    that we are producing is the auto pilot engineer in this case.

 6    He is not an auto pilot engineer, but the witness who we are

 7    producing in this case is different than that other witness.

 8          THE COURT:  Okay.

 9          MS. CRUZ:  He's also a Tesla engineer, but he's a

10    different witness.

11          THE COURT:  And just so I understand because I think

12    it is going to inform me about this dispute, you chose him

13    because for any non privileged reason you could give me.

14          In other words, does he have a subspecialty?  Does he

15    work -- obviously he is not the engineer that works on cases

16    where somebody reaches down underneath the steering wheel.

17    There's got to be some business purpose categorization for him.

18          What would that be.

19          MS. CRUZ:  Well, I mean, I can say without getting

20    into too much because I work for lots of automotive clients.

21          THE COURT:  Right.

22          MS. CRUZ:  But just generally we don't have engineers

23    that are testifiers.  Every engineer that we produce their

24    primary job is X, whatever it is.

25          THE COURT:  Right.

1           MS. CRUZ:  Developing code for auto pilot.  Battery

2    testing and abuse.  Like these people have, you know, work all

3    day, every day doing their job as an engineer.

4           THE COURT:  All right.

5           MS. CRUZ:  And then when they are knowledgeable about

6    a topic, we pull them away from their job and have them

7    testify.

8           So based on the issues in this case, which there is

9    really -- well, according to Plaintiffs' complaint there are

10   two issues.  There are two defect allegations.

11          One is that the Tesla was on auto pilot and the auto

12   steer system did not recognize a stationery parked vehicle at

13   the end of this T-intersection.  It did not recognize it and it

14   did not control for it and it allowed the Tesla to crash into

15   it.

16          The other part is that the Tesla was defective because

17   it wasn't monitoring what the driver was doing.  It didn't stop

18   the car when the driver bent down to pick up a cell phone on

19   the floorboard.

20          So those are the allegations in this case.  So based

21   on that and based on these topics --

22          THE COURT:  So in light of those allegations, how do I

23   define in advance that the scope of the deposition is how the

24   auto pilot works in what context?  Based on your description --

25          MS. CRUZ:  Yes.

1          THE COURT:  -- that you just gave me on behalf of the

2     Defendant is the issue raised in the complaint about how an

3     auto pilot works and what it can and cannot do?

4          MS. CRUZ:  No.

5          THE COURT:  No?

6          MS. CRUZ:  So auto pilot is not actually a thing.

7          It is not a physical software or thing.  Auto pilot is

8     just a name for a suite feature.  There are different features.

9     So every auto pilot case involves different features.

10          For example, the two basic functions or features of

11    auto pilot is cruise control, traffic ware cruise control, and

12    auto steer.  This driver had traffic ware cruise control on,

13    but he had his foot firmly planted on the accelerator peddle.

14          So he overrode the cruise control.  There is no way

15    for the car to stop itself when the driver is pressing the

16    accelerator peddle.  The driver is always number one in charge.

17          THE COURT:  Is that an end disputed fact?

18          MS. CRUZ:  Yes.  Undisputed fact that he had his foot

19    on the accelerator peddle.  It is in the data; the EDR** data.

20          THE COURT:  Okay.

21          MS. CRUZ:  So the second piece is the auto steer.

22    Auto steer is an issue in this case.  Auto steer is what keeps

23    the vehicle in the lane.

24          And Plaintiffs allege auto steer should have seen the

25    end of the road, seen the flashing traffic light, and seen the

1  stationery parked vehicle that the decedent and the other

2  Plaintiff were standing behind and it should have slowed the

3  vehicle down.

4          So it is about auto steer.  The other allegation is

5  automatic emergency breaking, which that is not really an auto

6  pilot feature.  Your car -- I don't know what kind of car that

7  you have, but it probably has --

8          THE COURT:  It's a Ford, Pinto.

9          MS. CRUZ:  Okay.  So it does not have automatic

10 emergency breaking, but if you a bought a car in the past few

11 years, it has some form of automatic emergency breaking, which

12 is a more basic ADAS or advanced driver feature.

13         They are also alleging that the automatic emergency

14 breaking should have recognized those things that I just talked

15 about; the traffic light, the parked car, the end of the

16 roadway.  And that it should have slowed down or stopped the

17 vehicle and it didn't do that.

18         THE COURT:  Okay.

19         MS. CRUZ:  So the two things at issue in this case and

20 the two features that our witness is going to talk about is

21 auto steer, automatic emergency breaking, and driver

22 monitoring.  Their allegation that the system should have known

23 that this driver bent down and didn't have eyes on the road.

24         So what is Tesla doing when the car is on auto pilot

25 to monitor the driver?  It is called a driver monitoring

1  system.  So you see that's a big part of their notice.  So

2  those are the confines of what we think is relevant in this

3  case.

4          THE COURT:  Okay.

5          MS. CRUZ:  Or what is relevant according to their

6  complaint.  It is not that we agree with that.  I don't want to

7  say that we agree that those are issues, but that is what their

8  complaint says.

9          THE COURT:  Okay.

10          MS. CRUZ:  So to answer your question how would you

11  determine what the scope is, that's the scope.  But I do

12  honestly believe that if we got in the deposition and we did

13  the deposition, and then we went through what is going to be if

14  they want to with Your Honor, the probably -- I'm sure they are

15  going to go the full seven hours because Plaintiffs' attorneys

16  always do and no offence to anyone in the room.

17          THE COURT:  Just on your description of the issues

18  that you conceded the issues that would take seven hours,

19  wouldn't it?

20          MS. CRUZ:  I don't really think so because Plaintiffs'

21  counsel has already tried -- there has only been two auto pilot

22  trials so for; Tesla auto pilot trials.  Plaintiffs' counsel

23  has tried one of them.

24          So he knows about the system.  He knows how this

25  works.  He has taken depositions in addition to the one in this

1 case. You know, he has taken other depositions. So he knows

2 how auto pilot works. This isn't where you are walking -- and

3 sometimes we have cases with lawyers that are not as

4 sophisticated in terms of auto pilot -- not sophisticated, but

5 knowledgeable. And they have to go and start from square one

6 because they are getting their bearings or you have an expert.

7 But now the experts that the other side are using,

8 certainly the experts that they have -- I have another auto

9 pilot case and they have another auto pilot expert and that

10 case is about to go to trial. And so she is certainly

11 knowledgeable about -- the case is going and I know it must be

12 a lot for Your Honor to come into this case.

13 But there is a lot of new stuff that I have been

14 learning for a long time. And I have been working on this for

15 four years and it is a new concept and feature and Tesla's

16 technology is always changing.

17 So every time you learn something they do an update.

18 They change the system. They change the auto pilot system that

19 was in this car is so different from the same exact vehicle

20 right now if you went and bought it today. It is completely

21 different.

22 So we are all learning, but Plaintiffs' counsel knows

23 a lot. He is not going to sit there and ask these basic, you

24 know, how does auto steer work. He is not going to do that

25 because he knows and he has it in other depositions.

```
 1            THE COURT:  Okay.

 2            MS. CRUZ:  So --

 3            THE COURT:  All right.  Now let me turn to counsel for

 4   the Plaintiff.

 5            MR. EATON:  Okay.  First of all, are we talking about

 6   the Fathtag** deposition?  Is that the witness?  Ash Kay

 7   Faithtag**?

 8            MS. CRUZ:  Yes.

 9            MR. EATON:  Okay.  All right.  Has there been an

10   agreement -- because you objected.  Has there been an agreement

11   to allow that 30(b)(6) deposition to be used in this case?

12            MS. CRUZ:  It's --

13            THE COURT:  I thought she said it was cross-noticed.

14            MS. CRUZ:  Here's the notice and here's Plaintiffs'

15   counsel and this is attorney Don Slavik cross-noting this

16   deposition in the matter of Benavides.  And he spells it out:

17   U.S. District Court for the Southern District of Florida, Case

18   Number -- it is already done.

19            MR. EATON:  Right.  But you mentioned that you

20   objected to that process.  So what I am trying to figure out

21   is, first, are they allowing the use of this deposition in this

22   case?  The answer to that is yes.  We ** respect to the topics

23   that were noticed in there that were not very big and there are

24   only two pages of topics.

25            THE COURT:  There was 15 hours of deposition.
```

```
 1              MR. EATON:  Well, he was the one taking it.  It was in
 2   another case.
 3              THE COURT:  Right.
 4              MR. EATON:  So he cross-noticed it.
 5              THE COURT:  Okay.
 6              MR. EATON:  This section was not --
 7              THE COURT:  How long did he take?
 8              MR. EATON:  I don't know, but the actual notice, the
 9   topics are a page and-a-half and what we have here are 13 pages
10   of topics.  So it is much broader --
11              THE COURT:  I'm taking it as that deposition was taken
12   in the case unless you tell me otherwise.
13         I am going to rely on it, right?  Do you have an
14   objection at the time of the taking of the deposition when
15   counsel said I also cross-noticing for this case, did you
16   object.
17              MS. CRUZ:  We did not object --
18              THE COURT:  Okay.
19              MS. CRUZ:  -- on the record.  I believe that we had
20   originally filed a notice, but I can see here that we didn't
21   object on the record.
22              THE COURT:  Okay.
23              MS. CRUZ:  Of course we are going to take the position
24   that much of that testimony is not relevant in this case if it
25   does not relate to --
```

```
 1            THE COURT:  That's a different issue.
 2            MS. CRUZ:  Right.
 3            THE COURT:  In other words, that's a different issue.
 4   His point is he just wants to make clear and I want to make
 5   clear because it effects my ruling that there is no dispute
 6   that that deposition to the extent it is relevant --
 7            MS. CRUZ:  Right.
 8            THE COURT:  -- is a deposition for purposes of Rule 30
 9   in this case.
10            MS. CRUZ:  Absolutely.
11            THE COURT:  Okay.
12            MS. CRUZ:  In addition, to this case to make it any
13   easier as well, there have been more auto pilot documents
14   produced in that case -- it's called the Wang case -- than any
15   other Tesla auto pilot cases to date.  And Plaintiffs' counsel
16   signed a protective order and has full access to all of those
17   documents.  I couldn't give you the number.  I don't know and
18   this is --
19            THE COURT:  Okay.  Let me stop you there.
20            MS. CRUZ:  Okay.
21            THE COURT:  So the stipulation is clear.  Go ahead.
22            MR. EATON:  So to the extent that Don Slavik asked
23   questions on these limited topics, these two pages of topics,
24   he is not going to ask the same question here.  But I don't
25   think he asked case specific questions relative to our case in
```

1    this deposition.  And therefore, of all of the questions he

2    should be entitled to ask them.  I think that's a pretty basic

3    proposition.  We're not wasting time.

4         THE COURT:  Not necessarily.  But, on the other hand,

5    they are not objecting to you taking another, quote unquote,

6    auto pilot engineer specifically for this case.

7         MR. EATON:  Right.

8         THE COURT:  I took her argument to say they are going

9    to have that one and they are going to have this one.  So I

10   heard they are not objecting.  So I am not objecting *sua*

11   *sponte*.

12        So you are taking, in addition to that 15-hour

13   deposition, they are going to produce another engineer is

14   knowledgeable about the auto pilot system.

15        MR. EATON:  Hopefully on the topics that we are

16   talking about here.

17        THE COURT:  Okay.

18        MR. EATON:  So which brings us back to the overarching

19   question, which is are you willing to entertain argument on

20   their general objections to the topics today, or do you want us

21   to take the deposition?

22        THE COURT:  Take the deposition.

23        I think my discussion here has shown quite clearly why

24   I can't possibly answer your question because just -- did you

25   agree with her description that your case is about what she

 1  described?

 2          MR. EATON:  Well, more or less.

 3          THE COURT:  Okay.  That's all you had to say.  More or

 4  less.  That means that you really --

 5          MR. EATON:  The facts of the --

 6          THE COURT:  -- may have additional arguments that you

 7  think this case is about, right?

 8          MR. EATON:  Right.

 9          THE COURT:  But there is some overlap based on what

10  she said.

11          MR. EATON:  Yes.

12          THE COURT:  So then --

13          MR. EATON:  There's an overlap.

14          THE COURT:  So, then, just on the topics that overlap

15  that's going to consume a great deal of time.

16          MR. EATON:  I wouldn't think so.

17          THE COURT:  So to the extent that there is anything

18  else that you want to ask that the witness is not knowledgeable

19  about, right, then, we will have to figure out whether I need

20  to compel it.

21          If the witness is knowledgeable about something that

22  you've asked that's irrelevant, the witness is to answer the

23  question.  They can't instruct him not to answer, right?  So

24  they are actually being, I think, what's the term?  They are

25  being practical.

1          They could produce, you know, an associate law firm,

2   but they are not.  They are producing an actual engineer.  So

3   this person actually has substantive knowledge.  And so,

4   therefore, since he has substantive knowledge he may be able to

5   answer all of your questions.

6          MR. EATON:  That's possible.  The problem is we create

7   a list of things that we want the witness to be educated on.

8          THE COURT:  Okay.

9          MR. EATON:  And they're saying we are not going to

10  educate the witness on these topics.  We object to the topics

11  and we don't consider them relevant.

12         THE COURT:  Give me an example, by the way, just so I

13  understand.  I haven't read your whole notice.

14         MR. EATON:  I'll give you example.

15         THE COURT:  Give me an example of a topic that you

16  think they are objecting to that is borderline frivolous.  In

17  other words, that is ridiculous.  How can you object to this

18  topic given the nature of this case.

19         MR. EATON:  One of the issues that we've raised in

20  here is a topic called geofencing.  Geofencing is you know

21  where your car is at all times --

22         MS. CRUZ:  I'm sorry.  May I just ask for a reference

23  to the topics so I can actually read what it says?

24         MR. EATON:  Sure.

25         MS. CRUZ:  I'm sorry to interrupt.

1        MR. EATON:  Topic 4.

2        THE COURT:  But you said you were not going to raise

3    that today.

4        MR. EATON:  I did not say that I was not going to

5    raise it today.  I specifically said I was going to raise it

6    today.

7        THE COURT:  Go ahead.

8        MR. EATON:  So topic of geofencing.  Geofencing is

9    know where your car is.  You have the ability to turn on and

10   off your system based on where the car is.

11       One of the main issues in this case is this system was

12   not designed to be used on certain streets.  It is designed to

13   be used on highways.

14       And there was an admonition, you know, Tesla tells its

15   drivers use it only on highways and don't use it on service

16   streets.  But they let the driver use it on service streets

17   because they are beta testing the system and they basically

18   essentially use their drivers as guinea pigs to send data back

19   to the company to assist in building their full self-drivers

20   suite.

21       So drivers using this system are giving data to Tesla

22   to build this beta product that is not an issue in this case

23   called self-driving.  So they let people use it on (inaudible)

24   road, which is not what it was designed for because it does not

25   detect stop signs and stoplights and things like that, but they

1   are still allowing them to use it.

2            So one of the issues in this case is why?  Why did you

3   allow people to use that in areas where they shouldn't have

4   been using it.

5            THE COURT:  And which part of the system, by the way?

6   The steering system?

7            MR. EATON:  All of it.

8            THE COURT:  What was it again?  Oh, the cruise

9   control?

10           MR. EATON:  All of it.

11           THE COURT:  The speed control.

12           MR. EATON:  The way this works is a little stop on it.

13   You pull it once and it puts on your cruise control which keeps

14   you in place.  You pull it twice and now you've got lane

15   holding and cruise control.  So it is like one step and then

16   another step.

17           THE COURT:  Okay.

18           MR. EATON:  So that's the auto pilot suite that gives

19   you all those controls and there is emergency breaking, but

20   those two components, auto steer and the cruise control, that's

21   when you turn both of them on, they are both on and they allow

22   them to use that on these streets here.  And that's one of the

23   topics as to why.  Why would you know that this is not ready

24   for prime-time on these streets that you are letting people use

25   that?

1          And they object and said that's outside the scope of

2    your allegations.  It's not.  The original complaint we believe

3    (inaudible), but the amended complaint has numerous allegations

4    regarding geofencing.  I can read some of those to you if you

5    would like.  I brought those down.

6          MS. CRUZ:  What amended complaint?

7          MR. EATON:  The one that was attached to 165, DE-165,

8    which was the amended complaint.

9          MS. CRUZ:  Thank you.

10          MR. EATON:  So.

11          THE COURT:  165?

12          MR. EATON:  Yes, Page 27.

13          THE COURT:  Is that the current operative complaint?

14          MR. EATON:  No, this is the post amended complaint

15    that we have to turn in our revised one on Monday.

16          THE COURT:  Oh, okay.

17          MR. EATON:  But, essentially, it is going to be this

18    minus some of the counts.  Plus some punitive language, more or

19    less.

20          THE COURT:  Okay.

21          MR. EATON:  But the allegations in here 19, 20, it was

22    not designed to be used on roadways, cross traffic, or

23    intersections and, nevertheless, was allowed by Tesla to be

24    operated in such areas.

25          Paragraph 20 it allows you to use it on roadways that

1    Tesla knew were not suitable for its use and knew it would

2    result in collisions causing injuries and death of innocent

3    people who choose not to be part of Tesla's experience.

4          Plaintiffs, on Page 30, allegation -- let's see here.

5    Page 29, allegation 32 talks about outside control of access

6    highways where Tesla says its software is designed to be used.

7          Allegation 33 it did not restrict auto pilot and auto

8    steer to the kind of roads that the technology was designed to

9    operate.

10         The allegation on Page 61 in the products liability

11   allegation, allegation 121-H, the failure to restrict the

12   ability of drivers to use auto pilot in areas outside which is

13   designed to operate safely.

14         So all of that relates to the concept of geofencing.

15   And so it is there in the complaint and they are saying, well,

16   you didn't allege it and use the word geofencing, but that's

17   exactly what geofencing is and they say, well, we are not going

18   to ** talk about that.

19         And that, you know, it seems to me that the Court

20   could simply say you made that allegation and ** in your

21   complaint and your witness should be able to testify as to that

22   topic and that's why, you know, we are here.

23         THE COURT:  I don't know what geofencing is in this

24   context.  What does that mean in the auto pilot context or in

25   the Tesla context?

1          MR. EATON:  That the driver of this car shouldn't have
2  been able to use auto pilot on ** road which would have avoided
3  the accident.
4          THE COURT:  But That is not what geofencing means.
5          My question is what does geofencing mean in the
6  context of the car.
7          MR. EATON:  It is.  That is what geofencing means.  It
8  means that they can tell.  They fence off the areas where it
9  can be used to control that ** highways.  Meaning, once you get
10  off you can't use it anymore.
11          THE COURT:  Okay.
12          MR. EATON:  That's geofencing.
13          THE COURT:  And is that something that they actually
14  use or simply something that you want them to use?
15          MR. EATON:  That is something that they are capable of
16  doing that they did not do.
17          THE COURT:  So you want them to use it?
18          MR. EATON:  Correct.  That's one reason I would say it
19  is defective because they had the capability of doing that and
20  other lawmakers do that.
21          THE COURT:  Okay.
22          MR. EATON:  They did not.
23          THE COURT:  Okay.
24          MR. EATON:  And why not?  Because they were collecting
25  data from their customers to help out their FSD.

1          THE COURT:  And is it correct that other car companies

2    use that geofencing technology in connection with their

3    systems?

4          MR. EATON:  It is my understanding that cars use lane

5    holding and that kind of cruise control.

6    (Audio recording commenced as follows:)

7          MS. CRUZ:  That they are asking the Court to make.

8    And whatever it is, whatever we need to go through with the

9    Court and whatever the Court needs to hear, you know, we will

10   do that, but this is not the proper way to do it.

11          And that's why we propose let's go, after you take

12   what I know is going to be seven hours of testimony, combined

13   with the 14 you already have.

14          We will see what shakes out with the amended complaint

15   because it sounds like there is going to be a dispute about

16   what that is going to actually look like and then we can see

17   where we are.

18          And their response is going to be, oh, but we have

19   deadlines.  It is not Tesla's fault that you waited all these

20   years to do this deposition.  This case went on for the first

21   year to a year and-a-half.

22          We were the ones setting the depositions.  They were

23   asking for discovery extensions.  They were responding late to

24   discovery.  So we took the driver's deposition.

25          And just so you know, I wanted you to know this

1  because it is really important talking about the warnings and I

2  can tell you that it is our position that the warnings aren't

3  relevant.

4          The driver in this case, who they already sued and

5  settled with before they sued Tesla, the police officer had

6  body cam on him.  So not only do we have recordings of what the

7  driver said on the scene, but we took the deposition of the

8  driver.  And he was one of the most upstanding people that we

9  have ever deposed, I think.  I couldn't believe -- I didn't

10 take the deposition.

11         When I read the transcript, he said I have my hands on

12 the wheel and I just bent down to pick up the phone.  It was my

13 fault.  I understand the car doesn't driver itself.  I didn't

14 expect it to stop for traffic.  I knew that I was responsible.

15 I understand.  I never thought this car would drive itself.

16         He was not a driver who said, oh, my gosh, I thought

17 that it was going to stop for a traffic light.  So, for

18 example, their allegation is there was a flashing red light and

19 the car didn't stop.

20         And you have a driver saying, I admit I didn't read

21 the owner's manual.  I didn't read the owner's manual.  I am

22 going to tell you right now I didn't read the owner's manual,

23 but I knew the car had limitations.  I know that these systems

24 are in beta and I understand what that means.

25         That means they are still testing it.  I wanted to buy

1  the car anyway.  I understand limitations like it wouldn't stop

2  for a traffic light.  I understand that and this was my

3  responsibility.  Those were his words.

4        THE COURT:  Did he end up running a light?  Is that

5  what happened?

6        MS. CRUZ:  Yes.  So it was a T-intersection and he was

7  driving and he was on the phone with the airlines.  He was

8  going to a funeral the next day and he was making arrangements

9  for the funeral.

10        We know he had his hands on the wheel from the data in

11  the car.  He stopped at a -- I don't know if he had the phone

12  to his ear or not.  I don't think he said that, but the phone

13  fell on the floorboard and he reached down real quick to pick

14  up the phone.

15        So this isn't even a case of, you know, sometimes we

16  have auto pilot cases where somebody is watching a Harry Potter

17  movie and they are completely distracted and they don't have

18  hands on the wheel.

19        This wasn't that.  These are accident facts that have

20  been happening since you first bought your Ford, Pinto, which

21  is people are driving and they drop something and they bend

22  down real quick to pick it up.

23        So he understood and he used auto pilot every day.

24  This gentlemen worked in Boca and lived in Key Largo.

25        THE COURT:  So you are suggesting there might be a

1  causation problem?  Is that the problem?

2       MS. CRUZ:  A little bit because we have the driver

3  saying --

4       THE COURT:  Let me stop you there.

5       MS. CRUZ:  Yes.

6       THE COURT:  You make a good point.

7       On the other hand, I am not necessarily -- and I take

8  your point that you objected to specific things that you

9  believe are outside the scope of the case and you didn't object

10 to everything having to do with everything that he is talking

11 about and I hear you on that.

12      I think just because I want to move on to see if there

13 is anything else you want me to do.  This discussion has been

14 very interesting and it elucidates precisely why I don't do

15 this normally.

16      And typically, it is for the benefit of a defendant

17 who wants to come in and have me summarily tell the plaintiff

18 you can't ask that and you can't ask this.  I don't do that

19 because the 30(b)(6) witness deposition, you don't get any

20 special benefit as a defendant.

21      On the other hand, the Plaintiff obviously has to ask

22 questions that are relevant to the case and how that comes out

23 is often difficult to say in the abstract.  And I think both of

24 you have identified very legitimate arguments as to things that

25 you are entitled to ask about and things that a witness must

1  answer.  And then the witness will know and if the witness

2  doesn't know, the question is why didn't you know, right?

3        And so I think this perfectly outlines why I follow

4  Judge Gonzalez' order from like 1995.  And that order is

5  correct today, which is I am just not going to sustain the

6  objection.  Nor am I going to compel.  Nor am I going to rule

7  on it.

8        Because I think what normally happens your seven hours

9  you will get enough responsive information, including the

10  things that they objected to that it won't be worth your time

11  and you will move on and that is probably what is going to

12  happen.

13        MR. EATON:  Understood, Your Honor.

14        THE COURT:  So nor am I going to rule on your

15  objections.  Nor am I going to brief on the demand.  Your

16  objections are noted.  The point of Judge Gonzalez' order is

17  and this is what I wanted to make clear.

18        If this is expert -- I keep saying expert.  If this

19  engineer from Tesla knows some specific answer to a question

20  because he's an engineer who works on these cars, he knows

21  everything about it, right?

22        You cannot instruct him not to answer a question that

23  he knows.  You can't do that.  Nobody is entitled to do that.

24  You can certainly object and you have already objected on

25  relevance grounds.

1          So if his answer has nothing to do with the case it

2    should never come in.  That's all that Judge Gonzalez was

3    saying that a corporation can't benefit from the rule by having

4    some prophylactic measure that an individual witness** was the

5    individual who caused the accident doesn't get the benefit of

6    -- he doesn't get the benefit of saying, well, I am going to

7    answer all the questions of one, two, three and four, five, six

8    I am not going to answer.  That was his ruling.

9          So I think that's the reason why it exists because the

10   previous example of why this rule is completely correct.  Not

11   every Judge does this, by the way, but I follow his approach.

12   So I will table that.

13         Anything else that you want to tackle before we

14   adjourn?

15         MR. EATON:  Yes.  I would like to address something.

16         THE COURT:  All right.

17         MR. EATON:  So the other request for production, Your

18   Honor --

19         THE COURT:  Okay.

20         MR. EATON:  So the first one on the list is request

21   for production number 13.

22         THE COURT:  What does that come up, by the way?  Oh,

23   April 5th.  So we are down by a month.

24         MR. EATON:  We have it extended until June, Your

25   Honor.

```
 1              THE COURT:  Oh, I'm sorry.  It's June for November
 2   trial; is that where we are?
 3              THE COURTROOM DEPUTY:  Yes, Your Honor.
 4         MR. EATON:  Yes.
 5         THE COURT:  Okay.  Go ahead.
 6         MR. EATON:  So Document 177, Page 19, is request for
 7   production number 13.
 8         THE COURT:  Number 13?
 9         MR. EATON:  Request number 13.
10         THE COURT:  Okay.
11         MR. EATON:  This is objected to.  This is a document
12   that exists.  It was produced in another case.  So it is not
13   like they have to make it a case that was produced in was --
14   give me one moment.
15              THE COURT:  Produced in a number of vehicles Tesla has
16   sold or leased?
17         MR. EATON:  Yes.
18         THE COURT:  Okay.
19         MR. EATON:  In operation in the United States.
20              And why this is necessary because they have a document
21   called the Vehicle Safety Report, which they would like to put
22   it in trial and they have used in trial.  And say this document
23   shows that are using the ** safe than driving, but what we need
24   for that in order to challenge that is essentially the numbers
25   that go into that.
```

1          And that document utilizes all of the cars they make,

2   all models, and all years.  And then, so we need to know how

3   many cars are out there.  It's that simple and that document

4   was produced in the **Daniel v. Tesla* arbitration.

5          THE COURT:  In other words, the 30(b)(6) witness is

6   not going to deny that they produce hundreds and hundreds and

7   thousands of cars.  Is that in dispute that they produced --

8          MR. EATON:  This is specific.  We need the number of

9   cars.  This is a request for production and not 30(b)(6).

10         THE COURT:  Okay.

11         MR. EATON:  So they are objecting to that as saying it

12  is overly broad and not proportional to the needs of the case.

13         THE COURT:  So you have a particular document in mind

14  that you have seen?

15         MR. EATON:  That our co-counsel has seen.

16         THE COURT:  What is the name of the document?

17         MR. EATON:  It is the sales documents that show the

18  number of subject vehicles that they sold or leased in the

19  United States since inception, essentially.

20         THE COURT:  Okay.

21         MR. EATON:  And it was produced in *Daniel Sung v.

22  Tesla.*  The document exists.

23         THE COURT:  Okay.

24         MR. EATON:  It has already been produced.  So

25  literally just got to hand that over and not create anything

 1  and they are saying it is overbroad.

 2          THE COURT:  And you think it is relevant because it

 3  could impeach their defense at trial that what?

 4          MR. EATON:  In order to challenge their Vehicle Safety

 5  Report, which is this black box that says, well, this is the

 6  number of accidents per **.  We need to know the number of

 7  accidents and the number of cars on the road.  We have the

 8  underlying data, essentially, and that's one piece of that.

 9          THE COURT:  Okay.

10          MR. EATON:  And our expert could say, no, it is wrong

11  because here -- but if they don't give us that information,

12  then we can't challenge it and they just get to go out there

13  and put on their Vehicle Safety Report and that's it.  They won

14  that case.

15          THE COURT:  And they call their document a Vehicle

16  Safety Report?

17          MR. EATON:  Yes.  That's the document that they put on

18  their website that says this is safer.  This document that we

19  are asking for here is not that.  I mean, we have the --

20          THE COURT:  Right.

21          MR. EATON:  This is part of the data that underlies

22  it.

23          THE COURT:  Okay.

24          MS. CRUZ:  I mean, I think the most apparent question

25  is why are they asking for it if they have it?  I haven't seen

1  this document.

2           MR. EATON:  This is another** case.

3           MS. CRUZ:  I haven't seen it, but if you have it, you

4  are not limited to using materials that the other side provides

5  to you.  You can use anything you want as long as you give it

6  to the other side.

7           THE COURT:  Maybe he is subject to a protective order

8  or something.

9           MS. CRUZ:  Well, if he is subject to a protective

10 order, then that was going to be my second point.  I am not

11 familiar with the case that he is talking about.  So it is

12 either one of two things.  Either they rightfully have it and

13 they can use it, obviously.

14           And number two, is if they have it and they are

15 talking about it, you can't take a document that is part of a

16 protective order and go to an unrelated lawsuit and try to use

17 that document, which is essentially what they are doing and

18 that is going to be an issue in other cases.

19           THE COURT:  Well, he claims that it is relevant for

20 impeachment because your defense in the case is that

21 considering how safe the vehicles are, including through the

22 use of this technology and the number of accidents that have

23 been generated, it undermines the Plaintiffs' case --

24           MS. CRUZ:  Right.

25           THE COURT:  -- if there is any defect in the car.

1         MS. CRUZ:  I understand their argument, but they are

2    saying they either have -- I don't know, but they are violating

3    a protective order and --

4         THE COURT:  Let's make believe that it doesn't exist.

5         Okay.  The question would be what would be the basis

6    for me to sustain an objection to the production of a document,

7    if it exists that summarizes the number of cars sold by make

8    and model over the last, say, ten years.  Tesla has been around

9    for ten years, right?

10        MS. CRUZ:  I can tell you that there is no way that we

11   have a document that talks about all the vehicles sold as of

12   today because --

13        THE COURT:  Well, it has to be a certain date,

14   obviously.

15        MS. CRUZ:  And that is something they keep saying that

16   we have this document, but it is actually something that we

17   would have to go and create.

18        THE COURT:  There is no way that that is true.  The

19   data is -- you don't need to create it if you just press a

20   print button.  You are not creating that.  You are just

21   printing it.

22        So the question is does Tesla have a document source

23   for which one can quickly summarize the number of cars sold by

24   make and model for the last ten years.  If the answer to that

25   is yes, right, then what would be the objection other than it

1    is not necessarily relevant, right?  And the answer to that is

2    it depends on how you make it relevant, I suppose.

3          His argument is that you kind of need a denominator to

4    analyze your safety argument at trial.  And his argument is

5    that he knows that because they have tried cases with Tesla and

6    so that's one of the arguments that you would make.

7          And so in order to rebut that, they need to be able to

8    make the argument that they know they only sold this many cars

9    and you are using a false analyze.  That's what he is trying to

10   say.  So it is an impeachment document as best as I can tell.

11         MS. CRUZ:  Right.  I understand that.

12         THE COURT:  So for production purposes, the relevance

13   objection is completely sustained and well taken, but --

14         MS. CRUZ:  Well, I haven't even made my relevance

15   objection yet.

16         THE COURT:  Okay.

17         MS. CRUZ:  I haven't gotten to that part.

18         Your question to me was or my initial response, but I

19   was saying certainly we have to go create something as of today

20   because I don't think that there is just -- I don't know

21   actually.  I don't know.  I don't know if auto manufacturers

22   have something that you can go to and say this is how many cars

23   we have sold since we have been in existence or whatever.

24         THE COURT:  I am just saying for the last ten years.

25         MS. CRUZ:  I can say that I think the scope of ten

1  years is too broad.  I can say that I don't think it is --

2          THE COURT:  So how long has this auto pilot suite

3  technology been in the marketplace.

4          MR. EATON:  I was willing to limit it to part** of

5  functionality.

6          THE COURT:  Right.  How long has it been, around five

7  years?

8          MR. EATON:  No, longer than that.

9          MS. CRUZ:  It has been longer than that.

10         THE COURT:  Seven years?

11         MR. EATON:  Ten at least.

12         THE COURT:  You should have gone by ten then.

13         MR. EATON:  In case it (inaudible).

14         THE COURT:  What difference does it make?

15         It would be just for the last ten years.  And from the

16  pick a date January 1, 2024.  Okay.  So I will compel that.

17         MR. EATON:  Okay.

18         THE COURT:  So what is the next issue?

19         MR. EATON:  The next issue is documents that were

20  produced in -- this is on Page 21.

21         THE COURT:  Request 21?

22         MR. EATON:  I'm sorry.  Request 16 on Page 21 of

23  Document 177.  These documents that they analyze crashes --

24         THE COURT:  You're referencing another lawsuit, right?

25         MR. EATON:  Yes.

1      THE COURT:  In other words, how do I know whether that

2   is relevant here?

3      MR. EATON:  Well, again, this is the situation where

4   our co-counsel in this case.  And what they are saying is the

5   mere, you know, idea that you are referencing the cases is a

6   violation of protective order.  It's not.

7      THE COURT:  It may be.  I don't know.  It depends on

8   how the language of the protective order was.

9      MR. EATON:  Yes.  They are citing the Bates number of

10  a document without any of the content of it, you know, they are

11  welcome to show you the protective order.

12      I don't think they are going to say that's a violation

13  of it, but the bottom line is the mere fact that a protective

14  order is entered in another case doesn't prevent it from being

15  discoverable in this case.

16      THE COURT:  But the way you have defined the request,

17  how do I know what this is about?  I understand for purposes of

18  convenience of the other side that makes perfect sense, but how

19  can I compel this?  I have no idea what the case is about.  I

20  have no idea what the request for production is about.  Do you

21  see my point?  How can I help you?

22      MR. EATON:  I do.  These are documents related to the

23  Vehicle Safety Report that we just discussed.  They analyze

24  crashes --

25      THE COURT:  So why don't you just ask for the Vehicle

1    Safety Report for this model here?

2         MR. EATON:  Well, the Vehicle Safety Report is the one

3    they publish on the website.

4         THE COURT:  Oh, so you have it?

5         MR. EATON:  This is the underlying data that --

6         MS. CRUZ:  It's a public document.

7         THE COURT:  Okay.

8         MR. EATON:  So this is underlying data that the

9    summaries that go into it.

10        THE COURT:  Okay.

11        MR. EATON:  And so --

12        THE COURT:  But do you have a request that does that?

13        MR. EATON:  Well, I think we asked for that generally

14   and they objected.  And when we asked specifically we said,

15   look, we know that you have this document because you produced

16   it in another case.  That was the purpose of this was a matter

17   of expediency.

18        THE COURT:  Okay.  I understand.

19        MR. EATON:  You know, we get an objection -- we asked

20   for a (inaudible) that would encompass that.

21        THE COURT:  And what would be part of the Vehicle

22   Safety Report?  Where would that be?

23        MR. EATON:  It is all the crashes that have been

24   sustained by these vehicles.  And then, the data that is

25   contained in whether they were on auto pilot or whether the

1    driver was driving.  It is all of that underlying data that

2    would allow us to check the --

3              THE COURT:  And is that document and the data turned

4    over to the Government?

5              MR. EATON:  It very likely would have been turned over

6    as far as this investigation.

7              THE COURT:  And then in a normal course would --

8              MR. EATON:  Not in a normal course, but in this

9    investigation and almost certainly they would provide that as

10   well.

11             THE COURT:  Okay.

12             MR. EATON:  So, again, this is shorthand here to let

13   them know this is the information we are looking for.  It is

14   already created.  You don't need to press a button.  It is

15   already there.  Turn that document over because it is relevant

16   here in this case.

17             THE COURT:  Okay.  So if I convert his request to the

18   Vehicle Safety Report in the backup materials that we used to

19   compile the exigent chart that is a summary, the backup

20   materials used to compile it that identify the number of

21   crashes, et cetera, is there a problem with that?

22             MS. CRUZ:  There's a huge problem.

23             THE COURT:  Okay.

24             MS. CRUZ:  The huge problem is Your Honor said I don't

25   know what the protective order says, right?

```
 1          THE COURT:  Right.

 2          MS. CRUZ:  I believe it is attached.  This is the

 3   second time that Plaintiffs' counsel has tried to use documents

 4   and they got in trouble with the Court in California for doing

 5   this.

 6          Let me tell you about the **Harcor case.  You said I

 7   don't know what that case is about.  That is not even an auto

 8   pilot case.  That is a case where a kid --

 9          THE COURT:  That's why --

10          MS. CRUZ:  -- got in a car --

11          THE COURT:  I've already cut to the chase on that.  I

12   am not compelling that request.  I am asking another question.

13          MS. CRUZ:  Okay.

14          THE COURT:  If I compel the Vehicle Safety Report and

15   the backup that was used to compile it, if I were to draft that

16   request, is there something wrong with that in terms of

17   producing that either on relevance grounds, or overbreadth,

18   whatever?

19          MS. CRUZ:  I would have to look in -- I don't know

20   what the materials used to compile the Vehicle Safety Report

21   are.

22          THE COURT:  Okay.

23          MS. CRUZ:  And I would say they have the Vehicle

24   Safety Report.  We produced it in this case.  They have it

25   publically available and we produced it.  And before Judge
```

1  Bloom made the ruling on the recalls, part of the things that

2  we had to submit to NHTSA as part of that investigation was the

3  Vehicle Safety Report and the kinds of documents that I think

4  Your Honor is referring to.

5         THE COURT:  Okay.

6         MS. CRUZ:  And they have that.  They've got thousands

7  of pages of documents that we produced to NHTSA as part of the

8  recall.

9         THE COURT:  I thought you said you don't have that.

10  Do you have it?

11        MR. EATON:  We don't have the documents that are

12  identified here as (inaudible).

13        THE COURT:  My question is do you have backup data for

14  the Vehicle Safety Report as that document was turned over to

15  the Government?  Do you have that here?

16        MR. EATON:  No.

17        THE COURT:  Okay.

18        MR. EATON:  Here's the --

19        THE COURT:  Put it this way.  I will compel that.  To

20  the extent that you don't have that I am compelling it.  So

21  that makes it easier.

22        MS. CRUZ:  You are compelling what?

23        THE COURT:  I am compelling the Vehicle Safety Report

24  and the underlying data as that data was turned over to the

25  Government.

1          MS. CRUZ:  But here's the issue.

2          THE COURT:  Right.

3          MS. CRUZ:  The Government, that recall relates to

4    issues that are unrelated to this case.

5          THE COURT:  But they may have relevant information.

6    That's the point.  Just because the document does not have the

7    four corners of a case, the documents may reveal something that

8    may be relevant.  So that's number one.

9          Number two, it can't be onerous because it was

10   produced to the Government in one particular production about a

11   Vehicle Safety Report that may definitely be relevant in this

12   case.  And in fact, the Defendant may use it in trial, right?

13         So that's the reason why I am narrowing it this way is

14   because I am taking the overbreadth argument out of the picture

15   because it is a discreet series of documents that I'm talking

16   about.

17         The backup materials that were turned over to the

18   Government that's something that has already been produced to a

19   third party and it is easily identifiable.  And it is

20   potentially relevant and it satisfies some of what the

21   Plaintiffs are asking for.  It may not satisfy all of what he

22   is asking for, but for my purposes that's fine.  So that's how

23   I am splitting the baby.  So I am not compelling whatever was

24   produced in another case in California.

25         MS. CRUZ:  You are not granting the request to compel

1 number 16 and overruling the objection.  You are simply --

2           THE COURT:  I am sustaining the objection.  I am

3 making my own request.

4           MS. CRUZ:  Okay.

5           THE COURT:  As far as --

6           MS. CRUZ:  Number one by the Court.

7           THE COURT:  Torres request --

8           MS. CRUZ:  Number one.

9           THE COURT:  You already produced the Vehicle Safety

10 Report, but to the extent backup data, or summaries, or other

11 materials that were used as backup for that report were turned

12 over to the Government, that information may be used for the

13 Plaintiff.  It can't be onerous because it is one file that

14 counsel for Tesla has.

15           MS. CRUZ:  Well, I don't know.  That might not be

16 true.  I mean --

17           THE COURT:  You will find out.

18           MS. CRUZ:  I don't know.

19           THE COURT:  I'm assuming that's not onerous.

20           MS. CRUZ:  Just so the confines are clear, produce to

21 NHTSA as part of PE-2120, which is the investigation that led

22 to the recall that they are talking about.

23           THE COURT:  Well, I'm talking about the Vehicle Safety

24 Report that would encompass this vehicle, right, and as turned

25 over to the Government in connection with the Government

 1  investigation.

 2       MS. CRUZ:  Right.  This Government investigation.  In

 3  other words, there might have been an investigation ten years

 4  ago about something else that -- I don't know.

 5       THE COURT:  Oh, I thought it was more recent.  What

 6  year was it?  Do you want to identify it by investigation?

 7       MS. CRUZ:  It is PE-2120.

 8       MR. EATON:  Yes.  It was filed as an investigation.

 9       MS. CRUZ:  Exactly.

10       THE COURT:  PE-2120.  Whatever that means.

11       MR. EATON:  Your Honor, just to be clear, basically

12  what this is asking for is other accidents.

13       THE COURT:  Yes.  But, in other words, I am not

14  necessarily going to produce other accidents.  I don't think it

15  is relevant.  However, if that information has been produced in

16  material form to the Government as part of this kind of

17  investigation, they have already produced it to a third party.

18  So what's the harm of producing it to you or is there?

19       MR. EATON:  I mean, it should have already been

20  produced.  We asked for --

21       THE COURT:  You are getting it.  What's the next one?

22       MR. EATON:  One problem with that is the Vehicle

23  Safety Report began updating in 2018.  Before that they had a

24  different type of system.  So data that goes into the vehicle

25  may be different than --

```
 1          THE COURT:  I don't need to hear an audit from Tesla.
 2  I just need to give you sufficient documents from which you can
 3  then make an argument at trial in this case.
 4          MR. EATON:  Right.
 5          THE COURT:  So I don't need to do a forensic
 6  accounting of all of Tesla's safety mechanisms.  The only
 7  reason this is relevant is to give you underlying data that you
 8  can then use in connection with your defense.
 9          MR. EATON:  I just want to make sure that the data is
10  comprehensive and covers the time period that we need, which
11  specifically is prior to the accident.  I am happy to take
12  after the accident.
13          THE COURT:  When was of the date of the accident?
14          MR. EATON:  2019; April of 2019.
15          THE COURT:  So if they produced documents in, what,
16  2020?
17          MR. EATON:  Yes.
18          THE COURT:  This is --
19          MR. EATON:  This order will cover 2018 to 2022.
20          THE COURT:  Perfect.
21          MR. EATON:  Okay.  But the problem is that we need the
22  documents prior to 2018 as well because that's when early
23  reiterations of auto pilot, we believe, was less safe.  And
24  therefore, more dangerous and, therefore, more accidents
25  occurred during that timeframe.  And part of the problem is
```

1  that the D-16 reports that they gave us about accidents only

2  are issued when there is a seatbelt retention goes off or an

3  airbag is deployed.

4         Like, for example, neither of these things happened in

5  this case.  If you don't stop or slam on the brakes, or

6  anything like that, then it is not going to show up in the D-16

7  reports.  So we don't have all the data as far as when an

8  accident occurs.

9         So that's why we need the underlying data for all

10 accidents for all models because that's what they are basing

11 their statements on in saying our cars are much safer when

12 using auto pilot versus manual.  So we need them for the manual

13 accidents and the auto pilot accidents.

14        And then we have the information for the sales and we

15 will have the numerators and the denominators.  If we don't

16 have the pre 18 data, then that hurts our ability to argue

17 notice.

18        THE COURT:  Why?

19        MR. EATON:  (Inaudible) this problem.

20        THE COURT:  I understand and you may be entitled to

21 something else in response to a particular request.

22        Your request is for a Vehicle Safety Report as

23 produced in California.  I am sustaining their objection.  I am

24 giving you a compromise.  The Vehicle Safety Report and the

25 underlying documents that were used and submitted to the

 1  Government for that report and apparently it includes 2018

 2  data.  So that would be relevant to you.  So I am compelling

 3  that because I think I can't come up with a good reason not to.

 4          MR. EATON:  Okay.

 5          THE COURT:  What is the next one?

 6          MR. EATON:  So request number 30, which is on Page

 7  30 --

 8          THE COURT:  30.

 9          MR. EATON:  I just want to get a ruling on this so we

10  can adjust accordingly.

11          THE COURT:  Okay.

12          MR. EATON:  These are --

13          THE COURT:  I don't have a 30.  I have 29 is the last

14  one.

15          MR. EATON:  On Page 30 of 177.  It's a 68-page

16  document of 177.

17          THE COURT:  Okay.  I'm sorry.  Page 30, request number

18  30.  I'm with you now.

19          MR. EATON:  So this was, you know, designed to

20  shortcut.  These are all documents that are related to auto

21  pilot issues that we believe should have been produced in this

22  case that are relevant.  So we said here they are and they

23  raised the same objection that we just argued about.

24          THE COURT:  Right.  Are you objecting as well?

25          MS. CRUZ:  Your Honor, I think it is important that

1 | we --

2 | THE COURT:  Simple question.  Yes or no, are you

3 | objecting?

4 | MS. CRUZ:  Are we objecting, yes.  You said on a same

5 | basis and I just --

6 | THE COURT:  Yes.  I can't compel this because I have

7 | no idea whether or not anything is relevant.

8 | You may know it is relevant, but in which case a

9 | (inaudible) request makes it relevant, but I get you.  Amongst

10 | yourselves you can work together to say this is what we are

11 | asking for, but I can't compel something I have no idea what

12 | this is.  So I'm sorry.

13 | MR. EATON:  I understand, Your Honor.

14 | THE COURT:  I have limitations and that is one of them

15 | because I can't compel it.

16 | MR. EATON:  I understand that, Your Honor.

17 | THE COURT:  Okay.

18 | MR. EATON:  Which raises a question that I wanted to

19 | bring up at the beginning of this hearing.

20 | THE COURT:  Okay.

21 | MR. EATON:  Since we have a short amount of time left

22 | and since we may be coming back here on things to get resolved

23 | and we do.  And we do have a lot of meet and confers and I do

24 | want to reiterate that.

25 | THE COURT:  Okay.

1    MR. EATON:  But I am certain that we will have various

2  things to disagree on.  Our co-counsel that have some knowledge

3  in this case that you can't take their knowledge out of their

4  brain, right?  They have it.  So they can explain to you what

5  this is and how they know it is relevant and for future

6  hearings --

7    THE COURT:  I think you've been quite persuasive.  So

8  I don't understand.  Where are these people from?  Is it

9  Sullivan and Cromwell?  No?  In that case, I think you will do

10  just fine.

11    MR. EATON:  My question is in the future if possible

12  if we could do some of these by Zoom that would allow them to

13  appear and answer some of those questions and also their

14  counsel is out of town, too.

15    THE COURT:  I let everybody appear by phone, but as

16  long as you argue it -- in other words, they could have

17  attended the hearing.  If they ever want to attend the hearing,

18  we always let people from out of town do that.

19    MR. EATON:  Okay.

20    THE COURT:  What you are saying is you wanted to let

21  them argue it?

22    MR. EATON:  Potentially some items that they have the

23  knowledge on that I technically can't have because I am not

24  counsel in that case.

25    THE COURT:  If it is so discreet that it doesn't

1  bother the process I never -- I'm not draconian about it, but I

2  don't like having arguments on the telephone and we don't do

3  Zoom anymore because it is much better when I have you in the

4  room.  And most importantly, if that causes more compromise

5  because you have to get on a plain and expose yourself to COVID

6  and come here I am glad.

7          MR. EATON:  Okay.

8          THE COURT:  But I think you are doing just fine, Mr.

9  Eaton.

10          MR. EATON:  I appreciate it.  But to the extent of

11  future hearings I will try to have them available by phone.

12          THE COURT:  Oh, sure.  Absolutely.

13          MR. EATON:  And then, the other overarching thing that

14  I wanted to bring up in the beginning was OCR**.  The documents

15  that Tesla has been producing to us in PDF are not OCR, which I

16  am not going to say that this is not intentionally, but they

17  need to be produced in ways that can be scanned.

18          And we are having to print out and then rescan them

19  and OCR them and it is a very tedious process.  When these are

20  created it is really easy.  You press a button that says these

21  are agreeable and makes them searchable.  And so we simply ask

22  that all future production and past production that is not in

23  the OCR be issued OCR compliant going forward.

24          THE COURT:  Is there a problem with that other than

25  why it can't be done?

57

```
 1          MS. CRUZ:  Yes, the problem is that we produced things
 2   in native form.  So I don't know what all the different forms
 3   are for all the different things that we produced.  And I can't
 4   remember everything that has been produced in this case and I
 5   don't know, but a lot of times we have documents.
 6          You are going to be -- I don't know.  Maybe not you,
 7   but I was shocked when I started working with Tesla how
 8   technologically sophisticated these systems are.  A lot of
 9   these files have file names that I have never heard of, like,
10   Dod Jason**, which is JSM.
11          THE COURT:  I know what that is.
12          In other words, I don't have a problem with you saying
13   to the extent it is technologically feasible to do.  If it is
14   not technologically feasible to do based upon the nature of the
15   document I'm not going to --
16          MS. CRUZ:  Right.  I just don't want to --
17          THE COURT:  There is nothing in Rule 34 that mandates
18   that everything has to be in that nature.
19          MS. CRUZ:  Right.
20          THE COURT:  However, most documents today are
21   **visible.  And so, therefore, his point is not necessarily
22   unreasonable to the extent it can be done.  It should be done
23   in that way unless there is a good reason not to.  I think
24   that's a fair point.
25          MS. CRUZ:  -- order to do something.
```

```
1         THE COURT:  I am not saying that there's a violation
2  of Rule 37.  I'm just saying --
3         MS. CRUZ:  I understand.
4         THE COURT:  -- they should be produced in OCR form if
5  possible.
6         MS. CRUZ:  Understood.
7         THE COURT:  So I will grant that request.
8         MR. EATON:  To be clear, Your Honor, that applies to
9  PDFs and if it is in native format it is not a PDF.  If it is
10  in native format it is searchable because if it is XLS** format
11  it is searchable, but the problem with PDF that is produced and
12  if they are not OCR, then you cannot produce them at all.
13         If you throw something in a scanner and print it
14  out --
15         THE COURT:  I am basically granting your relief.
16         MR. EATON:  I know.  I just wanted to --
17         THE COURT:  With a caveat that I recognize that there
18  are certain categories of this may not be possible.
19         MR. EATON:  Right.
20         THE COURT:  Anything else?
21         MR. EATON:  All right.  Yes, we do.
22         Now we move onto page -- so what we have, Tesla has a
23  video of the accident.  I think it is called EPEX** and our
24  expert has told us --
25         THE COURT:  How does it have a video?
```

1           MR. EATON:  The car has cameras.

2           MS. CRUZ:  What request are you on?  Sorry.

3           MR. EATON:  This would be --

4           THE COURT:  Are the cameras pointing out or pointing

5   in?

6           MR. EATON:  They are all pointing out, Your Honor.

7           THE COURT:  I don't mind if they take pictures when

8   I'm driving.

9           MS. CRUZ:  No, it takes pictures.

10          I have a friend who was in an accident yesterday and

11  she has a Tesla.  And it was one of these scams, we think,

12  where the car in front of her, there was no one in front of

13  that car.

14          THE COURT:  Oh, they tried to bump and --

15          MS. CRUZ:  They stopped and they already went and

16  filed the lawsuit.  I told her your car took a picture and it

17  was recording and there is a video.  And sure enough, she got

18  the video and now it is going to help her.

19          THE COURT:  Okay.  Fair enough.  Well, given that we

20  are the capitol of fraud maybe there's a value.

21          MS. CRUZ:  Well, this was in California, but you know

22  what happens here.  I know that happens here.  I heard about

23  it.  It is really scary.

24          THE COURT:  Okay.  So he is saying he has a request

25  for the camera that was of the accident.

1        MS. CRUZ:  No.  We've already given them all the clips
2   of the accident.  So that is not what --
3        MR. EATON:  It's Page 43 of Document 177, request
4   number 35.
5        THE COURT:  Number 35.  Okay.  Let me get there.
6        MR. EATON:  So it is not just the video of the
7   accident.  They did produce that.
8        THE COURT:  Oh, okay.
9        MR. EATON:  It's the AP** in the data that they have.
10  It's an annotated video essentially.  It shows the video and
11  has a bunch of data on both sides of it.
12       Our expert has said that the annotated videos contain
13  critical information of understanding any Tesla of auto pilot
14  collision.  There are no other means of acquiring same except
15  through Tesla and the software.
16       THE COURT:  Just so I understand.
17       In other words, obviously since you deposed the people
18  from Tesla, but is that the Tesla software product?
19       MR. EATON:  Yes.  And they agreed to produce it and
20  then they decided to not produce it after we had agreed to
21  withdraw a witness and we had an arrangement.  And then, you
22  know, we are not actually going to give you that.  It was just
23  ten minutes prior to the drive with all of the data that goes
24  on the AP** software that's what we are asking for.
25       THE COURT:  Okay.

1          MR. EATON:  And it has been produced in other cases.

2   Our expert has seen it in other cases.  It's entirely relevant

3   because it gives all the data about what's happening in this

4   car up to the time of the accident and --

5          THE COURT:  And it imprints it on the video itself?

6          MR. EATON:  That's correct.

7          THE COURT:  And then, the video that you received,

8   it's deleted?

9          MR. EATON:  The video is pure video.  It is nothing.

10  It has no data on it.

11         THE COURT:  Okay.

12         MR. EATON:  It's like camera view like if you had a

13  video camera up.

14         THE COURT:  Okay.

15         MR. EATON:  So we want the data.

16         THE COURT:  Do you want to respond on that?

17         MS. CRUZ:  Sure.  That's not how it works.

18         THE COURT:  Okay.

19         MS. CRUZ:  Sometimes the camera records the crash in

20  some cases.  In this case it did record the crash.  We gave

21  them that video.

22         THE COURT:  Okay.

23         MS. CRUZ:  What they are talking about is and what

24  their expert has seen -- because I worked in the case.  I work

25  on the case that his expert, ** Missie Cummings is in.  They

```
 1   call it an annotated video, but we call it an augmented video.
 2             THE COURT:  Okay.
 3             MS. CRUZ:  What happened is sometimes after the crash
 4   and what happened in that case was right after the crash Tesla
 5   ran that video through its software so it could try to see what
 6   the auto pilot system saw.
 7             THE COURT:  Okay.
 8             MS. CRUZ:  So that's why it is called a Vision System.
 9   It can see what the --
10             THE COURT:  In other words, it can actually see the
11   data that the auto pilot system is capturing that transpose
12   with the moment in time through the video?
13             MS. CRUZ:  Exactly.
14             THE COURT:  Got you.  Okay.
15             MS. CRUZ:  We do not have that for this case.
16             THE COURT:  Why not?
17             MS. CRUZ:  We did not do that.  It is not done in
18   every case.
19             THE COURT:  So how is it done?  Just so I understand,
20   how does it work?
21             MS. CRUZ:  That's another issue is that how we do that
22   and how we have done that has changed over time with the
23   software.  There is different software.  There are different
24   systems that we use and have used to do that, the Vision
25   Systems that we have used.  And sometimes it cannot even be
```

1  done.  It depends on the model, the year, the hardware in the

2  car, the firmware, the software.

3           THE COURT:  And who does this?

4           MS. CRUZ:  Tesla in-house.

5           THE COURT:  And so they can download video and they

6  run it through their computer system.

7           MS. CRUZ:  It is not a computer.  It is a Vision

8  System.  It's called a Visual System.  It's the specific

9  software that do this thing.  It is called a Vision System.

10          THE COURT:  And it can only be contemporaneously with

11 the video?  In other words, it has to be done at the time?

12          MS. CRUZ:  No, it doesn't have to be done at the time.

13 It is just that sometimes we can do it and sometimes we can't.

14          Another thing we don't have it.  So the answer to the

15 question, the answer to this request is, we don't have it.  And

16 I was not part of the conversation that Mr. Eaton is referring

17 to, but we probably said if we have it, if we did that back

18 then, like we did in this other case called the Banner** case

19 we did that the week after the crash.

20          THE COURT:  Okay.

21          MS. CRUZ:  So we produced that in that case.

22          THE COURT:  Okay.

23          MS. CRUZ:  We said, yeah, we did it.  We made an

24 augmented video and here it is and we produced that in that

25 case.  We don't have that here.  So the simple answer is we

1  don't have it.

2          THE COURT:  Okay.

3          MS. CRUZ:  We didn't do it and we don't have it.

4          THE COURT:  Okay.  So they say it doesn't exist for

5  purposes of this case.

6          MR. EATON:  But it does because it is a combination of

7  the video plus the data that they do have.  And so it is a

8  matter of plugging -- pressing the software button and

9  generating it as you mentioned and discussed previously.

10          So it is not forcing them to create something.  It is

11  taking -- and I've got a case on this, Your Honor, but I think

12  you know the law.  We are not asking them to create data.  The

13  data is there and the video is there.

14          THE COURT:  I take it you have the data?

15          MR. EATON:  Correct.  But the data -- this is an

16  entirely new issue because you are seeing the accident with the

17  data running and it is giving you information about the car in

18  realtime as it is occurring.

19          THE COURT:  Okay.

20          MR. EATON:  Which is obviously much more useful than

21  looking at a piece of paper that says, oh, at this second this

22  was happening and at that second this was happening.  You are

23  seeing everything that is going with the car while the car is

24  going towards the accident.

25          THE COURT:  Okay.

1    MR. EATON:  And they can create that with no problem.

2         She never said they couldn't do it.  They said

3    sometimes we do it and sometimes we don't.  They didn't say we

4    couldn't do it.

5         She said sometimes we do it and sometimes we don't.

6    They didn't say we couldn't do it.  They have the capability of

7    doing it and they have done so on other cases.  So the data is

8    there and we want them to generate that video.

9         THE COURT:  So why am I not then compelling them to

10   generate a trial exhibit for you?  Because if you have an

11   expert that knows how to read that data, he can put together a

12   side-to-side theme with the data and with the video, right?

13        MR. EATON:  They can do that by pressing a button,

14   Your Honor.  They have software to do that.  It is data that

15   they use to evaluate what happens in accidents.  And the fact

16   that they choose not to do it in this case shouldn't prevent us

17   from having that piece of information together in a way that

18   they use to evaluate their accidents.

19        THE COURT:  Do you want to add something?

20        MR. **:  Yes, if I may?

21        So this is really some of the most important evidence

22   in this case and I can't understate that enough, right?

23        What it is, is they take the video and they overlay it

24   through their software.  And as you are watching this augmented

25   video, you see what the car is processing, the information it

1   is taking in and also its outputs; what it is outputting and

2   what it is telling the car to do, right?

3           So as you can imagine, that is crucial, crucial

4   evidence that we are going to see why this car did not pick up

5   a stopped car in its path.  Did it see it?  Did it not see it?

6   Did it give a command to stop?  Did it not give a command to

7   stop?

8           And the only way to do that is through Tesla's

9   proprietary software.  Our experts don't have the capability of

10  doing it.  It is a highly proprietary thing.  They have

11  produced it in other cases.  We have attached them with an

12  affidavit from our expert attesting to that.

13          I was the main part of the communication process.

14  They have agreed to produce it in this case.  We had a meet and

15  confer.  There was a debate of do we give you ten minutes or do

16  we give you five minutes?  We first asked for ten and they said

17  we will only give you five.

18          I e-mailed them back the next day.  You know what?  We

19  will take five with no prejudice to us requesting more if it is

20  deemed necessary.  We got an e-mail back saying we are

21  confirmed as to that.

22          And then, two weeks later or three weeks later they

23  come back to us and say we changed our mind.  We are no longer

24  giving it to you.  It doesn't exist.

25          Now implicit in that representation is we may not have

1  created it yet, but they can do it with a push of a button.  It

2  is the most important evidence in this case and we have no

3  other means of obtaining it.

4            MR. **:  And Your Honor, if I might?

5            THE COURT:  Because you do have the data?

6            MR. ***:  Can I redress that?

7            THE COURT:  What is this, the Three Stooges?  We have

8  three people.

9            MS. CRUZ:  Yeah.

10            MR. EATON:  Obviously we (inaudible).

11            THE COURT:  (Laughing ).  All right.  Well, he gets

12  credit for no (inaudible).  So go ahead.  I will hear from you.

13            MR. ***: So, Judge, the data does not reflect three

14  dimensionally what the car is doing and seeing.  So to

15  extrapolate the data on that as it relates to what the car is

16  doing in realtime, this is the most important thing.

17            So having the data and being able to use it are two

18  different things.  So you must have this video in order to

19  understand the data that has been provided.

20            MR. EATON:  And Your Honor, again --

21            MR. ***:  And so it is an example, it is almost like a

22  video game.  If you are going through a -- if it sees something

23  it is going to be able to identify what that specific thing is

24  and you can see it identifying it object by object.  And so you

25  can't do that based on the data that is provided, but you can

1  do it through the program that they have and only they have.

2          THE COURT:  Had somebody ordered this before?

3          MR. EATON:  Yes.

4          THE COURT:  Is there a case or --

5          MR. EATON:  Yes.  Let's see here.

6          THE COURT:  What is the legal basis upon which I can

7  do that?

8          MR. EATON:  Well, Rule 34, Your Honor, and let me

9  address that.  The Advisory Committee notes to Rule 34 saying

10 that:

11          "When the data can, as a practical matter, be made by

12 the discovering party only in response to devices.  Respondent

13 may be required to use its devices to transfer the data into

14 useable form.  In many instances this means the respondent will

15 have to supply a printout of the computer data."

16          And that is from 1970.  So it is the same type of

17 thing here.

18          THE COURT:  But you have that.  In other words, you

19 have the data?

20          MR. EATON:  The supply is obviously to this video as

21 well.  We can't create the video that they would have to

22 interpret this accident because we don't have the proprietary

23 software that they can generate this in a matter of minutes

24 because they have the data and the program in the software and

25 it attaches to the video.  So this is generated and then we

```
 1   have it.  We can't create it because we don't have the

 2   proprietary software.

 3          In the McLaughlin v. Tesla case --

 4          THE COURT:  Is it correct that you agreed to do it and

 5   then you backed out because you were mad at them or something?

 6          MS. CRUZ:  There are so many inconsistencies.  I'm

 7   just waiting for all -- next time I'm bringing three lawyers.

 8          THE COURT:  You are doing fine, too.  Go ahead.

 9          MS. CRUZ:  I'm kidding.  I don't need three lawyers.

10          There are so many misconceptions here.  Like, number

11   one, like the Court said they have the data.  In every case

12   that I have ever been involved in because I have only worked on

13   auto pilot cases since I have been a law clerk, you have both

14   sides create different 3-D models.

15          You don't even need a side-by-side.  We are so

16   advanced now -- not us, but these experts are so advanced they

17   overlay -- you see it in every single car crash trial I have

18   ever been in you see it.  They overlay the data.

19          So I know that they want maybe what we do.  What we

20   can do sometimes.  So that is the first issue.  This notion

21   that it is so easy and you just push a button that's not the

22   case.  That is not the case.

23          Number two, again, their expert has seen it because it

24   was already created.  That is where they have seen it.  And to

25   my knowledge, I am not familiar with a Court that has ordered
```

1   us to do that and I spoke with the client about this.

2          I am not saying that he said for sure that this is

3   what happened, but we have produced annotated videos in other

4   cases where they exist, but they don't always exist.  We don't

5   create them as a matter of course.  We don't create them for

6   business purposes.

7          Sometimes after a crash, or after other events, they

8   might use the VIS** software to run it back through and it is

9   certainly true that they have the data.

10          The other point is that I did ask the client -- and I

11   think I mentioned this earlier, which is that they use -- it

12   depends on the vehicle, the date of the crash, the firmware on

13   that vehicle, on the subject vehicle, the hardware, the

14   software in the **VIS System.

15          I asked the client if we could take the video of the

16   crash that they already had and make this if you were to order

17   this and for what they can tell we can't do it.  It is not as

18   simple as they make it seem.

19          This isn't take a tape and pop it in the VCR.  This is

20   not that.  These systems are so highly technical and, again,

21   Plaintiffs like to just take auto pilot and ADAS Systems and

22   paint with this broad brush.

23          I understand that they really want the video.  I get

24   that, but in this case it does not exist.  It does not exist.

25   And if now we are going to go, oh, well, Tesla can do this and

1  Tesla can do that and go and create this and go and create this
2  spreadsheet and create this video.  No, that is not the way
3  this works.

4       Oh, I wanted to respond to your comment about that
5  conversation.  My understanding -- I wasn't part of it with Mr.
6  Boumel.  My conversation was it was during a meet and confer.

7       So we were saying let's narrow this down and if it
8  exists, these would be the terms that we can agree with.  They
9  wanted ten minutes and we said five minutes.

10      What happened was when we went to the client -- and
11  the client does not know and we don't know and we have never
12  seen it.  And a lot of times, too, that helps us and I will get
13  to that point in a second.

14      They act like this is something that hurts us and we
15  are trying to hide it.  I can tell you why that certainly
16  wouldn't be the case.  I would love to have a video in this
17  case, but when we went to the client it does not exist.

18      So, yes, the first thing we are going to do is meet
19  and confer with them and say you see our objections.  It is too
20  broad.  It is unlimited in scope.  What can we do to narrow and
21  let's see if we think something is reasonable and we will
22  recommend this to the client.

23      When we went and we spoke to the client, I don't know
24  how else to say it.  We can put it in an affidavit if you want.
25  They can ask the corporate rep if they want and we will give

1   sworn testimony that there is no annotated video.

2        The other thing is they say they needed to know what

3   the car was doing.  There is no dispute that the car did not

4   stop.  That is why we are here.  So we know that the auto pilot

5   system, what was it doing?  Did it detect a light?  No, of

6   course it didn't.  It wasn't designed to.

7        In fact, that is what they are saying is, well, it

8   should have, but it didn't do that.  So I am not really sure

9   what is the burning thing that they need to know.  It didn't

10  stop for the traffic light.  We know that.  They don't need any

11  video to demonstrate that.

12       It didn't see the parked car.  The Tesla ran right

13  into the parked car.  It did not see that.  You don't need an

14  annotated video.  They don't need an annotated video to prove

15  these things that they are talking about.  They are not in

16  dispute.  So this whole big deal is being made about this

17  video.  We don't have it and they don't need it anyway.

18       MR. EATON:  Your Honor, may I approach with the

19  affidavit of our expert?

20       THE COURT:  Sure.

21       MR. EATON:  Which is sworn and we don't have anything

22  sworn from Tesla.

23       MS. CRUZ:  I am in that case.  She has -- Missie

24  Cummings, it is in her affidavit.  She has the video from the

25  Banner**  case because we created it at the time of the

1  accident and then we created another video later on.

2       THE COURT:  Are you saying that just because you

3  created a video in one case doesn't mean you can't in another

4  case based upon the nature of the data?

5       MS. CRUZ:  Well, number one, I am saying we shouldn't

6  have to.  But, number two, you can't just always go back in

7  time.

8       Like, when we created the video there that was soon

9  after the crash.  Like the week after the crash.  For a fact, I

10  can tell you if you ordered us to go and create a video of

11  every crash, I can tell you -- I don't know what the percentage

12  is -- there are going to be crashes for which we cannot go and

13  create video because our software -- the VIS System has

14  changed.

15       The Vision System that we used to create the annotated

16  video has changed over time and it has to interact.  And they

17  are welcome to ask the corporate rep about this and he can

18  explain in better detail than I can how it works, but this

19  isn't just take your VCR and can play any VCR tape from five

20  years ago, or 25, or 40 years ago.  This is not that.

21       There are all these different things that need to work

22  together to even allow you -- and I can represent as an officer

23  of the Court that from what the client can see it does not --

24  and the issue is with the firmware.  They don't think that we

25  would even be able to create it.

1        Now they can go to the ends of the earth to find but

2    then, again, that just goes to show that it's not as easy as

3    they said it is.  It is just not that easy but, you know, I

4    don't know what else to say.

5        THE COURT:  All right.

6        MR. EATON:  What our expert says is that they can

7    create it with ease and she has been down this road before here

8    and that there is no other means requiring (inaudible) except

9    Tesla's proprietary software.

10       To answer your question with the data we have can we

11   create this?  Our expert says, no, you cannot do that.  And so

12   that's why I handed you that Hord** case and the reference to

13   Rule 34, which is that there are no other means they can be

14   compelled to produce their data in a format that we are asking

15   for here.  We don't have --

16       THE COURT:  We don't normally compel one party to

17   produce a trial exhibit for another party.  So I can't do it on

18   that basis.

19       MR. EATON:  For trial it is the way that they analyze

20   these accidents and it is the combination of their data in the

21   form in which it is expressed.

22       THE COURT:  That's a trial exhibit, right?  You are

23   trying to use --

24       MR. EATON:  All documents are trial exhibits.

25       THE COURT:  But you have the data.  The data that was

1  picked up you have, right?

2          MR. EATON:  But it is not delivered to them.

3          They don't sit there and pour over the data when they

4  are analyzing these accidents.  They look at the AP Vis** of

5  the accident and make a determination.

6          THE COURT:  Well, that's a different issue.

7          In other words, what you are saying is that suggests

8  that they did that here and they are not producing it.

9          MR. EATON:  Whether they did it here or not, we don't

10 have any representation that it doesn't exist.

11         THE COURT:  Well, I will --

12         MR. EATON:  Versus they can't do it.  They never said

13 they can't do it under oath.

14         THE COURT:  Right.  That's fine.  I will let you probe

15 on that issue.

16         MR. EATON:  We need to dig into it.

17         THE COURT:  Yes, I will let you dig into it.

18         And I will table it for purposes of the discovery

19 cutoff because I am denying it based on their representation.

20 If you find something else out that undermines that, I will

21 consider it even after the cutoff date.

22         MR. EATON:  Okay.

23         THE COURT:  So I will deny it without prejudice, I

24 guess.

25         MR. EATON:  Now that leaves us to basically our last

1  problem which is the data itself that we have been provided,

2  which they are representing allows us to -- it's a substitute

3  for this AP VIS** document.

4          THE COURT:  Right.

5          MR. EATON:  So we have been provided an index, Bates

6  number 1244, which they have not confirmed -- I am going to

7  give you a copy of it so you know what I am talking about.

8          THE COURT:  Okay.

9          MS. CRUZ:  Which request is this?

10         MR. EATON:  This is the log.  It is footnote request

11 for production 1 and 7 and 8 from request for production 2,

12 numbers 1, 7, and 8.

13         MS. CRUZ:  Thank you.

14         THE COURT:  Second request?

15         MR. EATON:  Second request, yes.

16         THE COURT:  Car log data?

17         MR. EATON:  There is one page here -- it is about

18 seven pages.

19         THE COURT:  Okay.

20         MR. EATON:  And there are a lot of codes and then

21 there are explanations of what those codes mean.

22         THE COURT:  Okay.

23         MR. EATON:  What we have been provided with this

24 document and what we have been told that it is not so

25 applicable to our accident.  And if you look at the codes that

1    were generated in logs for our car, there are a lot of them

2    that don't show up in the glossary.

3            So we need two things.  We know that there are over

4    2,000 codes; 1,700 to 2,000 codes that are specific to that the

5    car is always generating.

6            THE COURT:  Okay.

7            MR. EATON:  We have been provided with documents that

8    include like 80 or 90 and most of them are irrelevant like what

9    is going on with the a.m. radio and the air conditioning and

10   things like that.

11           THE COURT:  Okay.

12           MR. EATON:  We need a glossary that applies to our car

13   so that we look at the code and we turn through the glossary

14   and we will be able to find one in there and see what it means.

15           THE COURT:  Okay.

16           MR. EATON:  And we need the codes that are relevant to

17   this accident.

18           THE COURT:  And what is the technical name of this

19   document?

20           MR. EATON:  There is a Bates number and it is --

21           MS. CRUZ:  (Inaudible).

22           THE COURT:  Did that come from Tesla, though?

23           MR. EATON:  Yes, it is 1244.

24           MR. ***:  Bates 1244.

25           MR. EATON:  Bates 1244.

1      THE COURT:  But it seems to be a printout of codes.

2      MR. EATON:  Correct.

3      THE COURT:  They must have a name for it, right?

4      MR. EATON:  (Inaudible).

5      THE COURT:  Okay.  So what you are saying is you don't

6  think you have all the codes that are relevant to this vehicle?

7      MR. EATON:  We don't know if that glossary -- based on

8  what we have been provided there are codes on the actual data

9  for the car that are not in that 76 pages of codes.  So that

10  glossary may not be applicable.  And they have not said, by the

11  way, that this glossary is applicable to the codes that were

12  provided in the logs; in the data logs.

13      THE COURT:  I see.

14      MR. EATON:  So I need a glossary that actually

15  addresses the data log for this car at the time of the

16  accident.

17      THE COURT:  Okay.

18      MR. EATON:  That's step one.

19      Step two we have provided -- again, there are 2,000

20  codes that are not relevant and we don't need all of them, but

21  we gave them specific codes and we gave them categories of

22  codes that we wanted produced and those have not been produced

23  yet.

24      THE COURT:  And you did that based upon your review of

25  the data?

1          MR. EATON:  We did that based on our review of that

2    glossary.  For example, there are things that talk about

3    obstacle detection.  What is happening with the accelerator

4    peddle.  All of these factors that are in there.

5          THE COURT:  Okay.

6          MR. EATON:  So we created a list of categories and

7    said we want all the codes related to these.

8          THE COURT:  Okay.

9          MR. EATON:  We don't need a.m. radio, or air

10   conditioning, or anything like that.

11         THE COURT:  Oh, I see.

12         MR. EATON:  77 out of 80 --

13         THE COURT:  I see.

14         MR. EATON:  -- that were produced to us that aren't

15   relevant.

16         THE COURT:  So what you gave them was a list of

17   components that you --

18         MR. EATON:  We gave them the things that we felt are

19   relevant and necessary that we want for this accident.

20         THE COURT:  And you want them to identify the code

21   that is relevant to that component?

22         MR. EATON:  We want the data for that code.

23         THE COURT:  I thought you have the data.

24         MR. EATON:  No, they gave us logs that contain mostly

25   irrelevant information.  So we want a log that has the relevant

 1  information.

 2          THE COURT:  Okay.  I guess I am missing it.

 3          MR. EATON:  They gave us a log with 80 codes, okay,

 4  out of 2,000.

 5          THE COURT:  Okay.

 6          MR. EATON:  70 something of those were irrelevant to

 7  the accident.  They were what's going on with the a.m. radio.

 8  What's going on with the air conditioning and we don't care

 9  about those.

10          THE COURT:  Right.

11          MR. EATON:  It is junk.  It is garbage.  It is

12  irrelevant.  We don't want all 2,000 codes for the car because

13  most of it is irrelevant, but we want the relevant codes.

14          THE COURT:  Because you need to match up the codes to

15  the data that you have?

16          MR. EATON:  No, the codes are the data.

17          THE COURT:  Oh, the codes are the data?

18          MR. EATON:  Yes, the codes say the --

19          THE COURT:  How does --

20          MR. EATON:  It gives you the name of the code and the

21  number related to it.

22          THE COURT:  How does that help you?  Don't you need to

23  know --

24          MR. EATON:  That's what the glossary is for.  It

25  explains what the code is.  So we need the glossary that

1  defines the code.

2          THE COURT:  Okay.

3          MR. EATON:  We need the code and we need the data

4  related to that code.

5          THE COURT:  Okay.

6          MR. EATON:  So, for example, it is this obstacle thing

7  and it gives you a value for that code, right?

8          THE COURT:  Got you.

9          MR. EATON:  And so they gave us values for a bunch of

10  codes we don't need.  They gave us a glossary that does not

11  line up with the logs that they did provide.  So we don't know

12  what half the codes mean.

13          THE COURT:  So there is a disconnect there?

14          MR. EATON:  Yes.  We need a glossary that applies to

15  us and we need all the data for the specific codes that we

16  asked for that are related to the accident.

17          THE COURT:  Miss Cruz, that seems reasonable

18  especially since I am not compelling the trial exhibits.

19          MS. CRUZ:  Well, just with all due respect, there is

20  just a huge lack of understanding on their part for

21  misrepresentation on purpose.  I don't know.

22          There are two separate issues, which I think was

23  confusing for the Court because of the way they explained it.

24  The first issue deals with what is called diagnostic log data.

25          Okay.  They asked for diagnostic log data, which is

 1  data that the vehicle's computer records.  There are thousands

 2  and thousands of signals that the computer records every day.

 3          Like it is mind-boggling.  In fact, there is no human

 4  at Tesla that could tell you about all the different signals

 5  because different signals were created and added by different

 6  departments.

 7          So the people that work on windshield wipers they want

 8  to know -- because there are automatic windshield wipers.  I

 9  have a Tesla, too.  Not as long as (inaudible).

10          So there are automatic wipers.  So the people that

11  work and the engineers that work in the windshield wiper

12  department, they probably want to know are automatic windshield

13  wipers working?  Are they too sensitive?  Are they not

14  sensitive enough?

15          There are codes that are generated every single time

16  you open the door.  There are codes that are generated every

17  single time that you change the gear.  When I tell you that

18  there are thousands and thousands of codes, no one even knows

19  all the codes.

20          THE COURT:  And these codes there is no time log for

21  this?

22          MS. CRUZ:  No.  Well, first of all --

23          THE COURT:  In other words, I can't ask you to produce

24  for, like, Tesla -- I am just curious -- how codes are

25  generated between 12:00 and 12:30.

1        MS. CRUZ:  Yes.  And in fact, they asked -- so what

2   that would be what you would ask for they asked for in this

3   case, but instead they made it so broad.

4        They wanted we call it the customer friendly set of

5   data, or signals, or codes.  They wanted it for the life of the

6   vehicle and we agreed to give them that and we gave them that.

7        That's why I need to dispel this misunderstanding that

8   you are right.  You said, well, isn't that reasonable, Miss

9   Cruz?  Yeah, it's reasonable that we would give them the data

10   that you just mentioned.

11        Not only did we give them the customer friendly data

12   for the time of the crash, and not only did we give them the

13   customer friendly data for the entire day of the crash, we have

14   given them the customer friendly data since the day the driver

15   bought the car.

16        In addition to that, there is a set of engineering

17   data.  And what that is, is it is a set of signals that Tesla

18   engineers came up with.  And they say, okay, these are all the

19   signals that are important to look at whenever there is a crash

20   because we typically don't need to know if the passenger rear

21   door was open.

22        Maybe for a certain crash we would and we would have

23   to go outside, but these are engineering signals that we think

24   are important.  Not for this case --

25        THE COURT:  In general.

1          MS. CRUZ:   In general.   We gave them the engineering

2   data for this crash.   Within that is all the engineering data

3   that relates to auto pilot.

4          So they have more data than is even reasonable.   We've

5   been bending over backwards to try to get the -- in my opinion

6   we should have never even given them the customer friendly

7   data.

8          For four months, this guy owned the car four months

9   before the crash.   We gave them data.   I don't even know how

10  many pages.   I haven't looked at it.   These spreadsheets, I

11  haven't looked at the ones for this case, but I looked at ones

12  for other cases.   I bet you that it is hundreds and hundreds

13  and hundreds if not thousands.

14         These columns, there are like hundreds of columns.

15  You can't even understand this.   You have to put it -- you have

16  to write a computer program and put it into a system to even

17  understand it because there is so much data.

18         So we have given them so much data.   What I feel like

19  they want is every single signal that this car ever sent for

20  any time ever, ever , ever.   That's not reasonable.   They

21  continue to want to expand the scope well beyond what is in

22  their complaint.   We are so far afield of that and we have

23  given them so much.

24         Now, to the other case which is this glossary, there

25  is no such thing.   So the answer to that is simple.   It doesn't

1   exist.  We didn't give it to you because it doesn't exist.  We

2   also don't think we have to, but it doesn't exist.

3          Plaintiffs' counsel, previous to asking for this, we

4   referenced in our response and we attached to the response.

5   They have a sworn affidavit explaining:

6          Signals have changed over time.  Signals have been

7   added and deprecated with firmware updates which occur

8   approximately every month and hardware changes and some differ

9   between our vehicles.  I understand this is part of the reason

10  that Tesla does not maintain some comprehensive list or current

11  dictionary of signals.

12         So we have already told them this in a sworn affidavit

13  that we don't have this and they just keep asking for it.  I

14  don't know what else could we possibly -- it doesn't exist.

15         And when they take the corporate rep's deposition, he

16  is the one who made this affidavit.  They can ask him.  They

17  can ask him again and they will have double sworn testimony.

18         There is no glossary and dictionary.  I know they want

19  there to be one and they are welcome to take the data that we

20  have given them and ask him what is this signal?  What is this

21  for and what is that for?

22         I have seen that done actually with this witness in

23  another case.  I mean, they didn't ask for every single signal

24  because there are so many, but they are welcome.

25         And in fact, that is one of the topics that we didn't

1  object to.  There is a whole topic in here about the diagnostic

2  log data and that is what we are talking about.  And we did not

3  object to them asking the witness what all these signals are,

4  but there is no glossary, or dictionary, or key that we can

5  give them that identifies, but they are welcome to ask the

6  witness and he can explain it to them if he knows.

7          THE COURT:  Well, let me step back one second.

8          This document that he is showing me where did this

9  come from?

10         MS. CRUZ:  I believe it looks to be this person at

11  Tesla ran and obtained a set of data for this vehicle.  And

12  this is a set of log data that he pulled for this vehicle or

13  this is a list, it looks like, of some signals and what the

14  signal means.  Maybe he created this.  I don't know.

15         THE COURT:  Isn't that what he is asking for?

16         MS. CRUZ:  But just because Han Sang** created this

17  list of signals, I don't know if he created this, but I can

18  just tell you that there is no master list.  There is no

19  glossary.  There is no key that engineers can go to and say,

20  okay, like what is signal -- I don't know what it is called.

21  Hammer Feed Good**.  Let me go and look at it.

22         THE COURT:  It seems odd, though, that they would have

23  created the signal based upon a certain software for a

24  particular time and then not kept a record of what signals they

25  generated?  That makes no sense, right?

1           MS. CRUZ:  I can only tell you it does not exist.

2           This is what I assume just from -- I am not making a

3   representation that this is how it works, but what I think is

4   different departments ask to add signals at different times

5   because they are looking for different things.

6           So they write the code to look for bugs on the

7   windshield.  So maybe yesterday the windshield guys and gals

8   said we want to know if there are bugs on the windshield that

9   is going to stop the windshield.  So they write a code and they

10  add that signal.  Now the windshield guys know what that is.

11          THE COURT:  But I am only interested in the code that

12  was in effect on the date of the accident.

13          MS. CRUZ:  Right.  And what I am saying is, if they

14  want to go through the codes with this witness, he is very

15  familiar with auto pilot and he is very familiar with analyzing

16  crashes because that is part of what he does.

17          So he can tell them what the codes mean, but he is

18  going to tell you if I want to know what a code means and I

19  don't know, he can tell you about how he does it.

20          I assume he tries to figure out where it could be from

21  and then he goes and asks somebody who might know because he

22  has told you in an affidavit that there is no master list.

23          So it is just like I can't guarantee that he is going

24  to be able to explain every single code that is in the data.

25          THE COURT:  Well, I wouldn't expect somebody to

1  necessarily do that off the top of their head, but it is hard

2  to imagine that there is not a record based upon the -- this is

3  all based on software.  They know what software version was in

4  the car in place on the date of the accident.  So that's not a

5  mistery, right?

6        MS. CRUZ:  No, of course not.

7        THE COURT:  And so, therefore, it is hard to believe

8  that the engineers don't have a contemporaneous record of the

9  codes that you used in this version of the software.  I don't

10 understand.

11       MS. CRUZ:  You know why also --

12       THE COURT:  That part of (inaudible) I understand.  It

13 could just be my ignorance, but on the other hand --

14       MS. CRUZ:  This actually goes to your point and I

15 think he explains why that does not happen.  The signals change

16 all the time.  The signals have been added and deprecated with

17 firmware updates, which occur approximately every month.

18        So if the signals change every month --

19       THE COURT:  But how does the company not have a record

20 of what is in effect at the time?

21       MS. CRUZ:  But why would they?

22       THE COURT:  Well --

23       MS. CRUZ:  If they don't need to -- I mean, now we are

24 just hypothetically speaking.

25       THE COURT:  Why wouldn't they because they created it?

1   In other words --

2           MS. CRUZ:  But they don't need it.  Why would they go

3   and generate --

4           THE COURT:  Why would they get rid of it?  They had to

5   have a record of it at the time they generated it.

6           MS. CRUZ:  No way.

7           THE COURT:  It is just going to be Mr. Wang's head and

8   if Mr. Wang gets run over by Tesla there goes the data; is that

9   what you are saying?

10          MS. CRUZ:  No, no, no.

11          THE COURT:  That's impossible to believe, right?

12          MS. CRUZ:  I think you are misunderstanding what the

13  signal is.  The signal tells you what specific things in the

14  car were happening.  And that might not always be possible or

15  might no longer be possible as the firmware changes which is

16  every month.

17           So you know how there is a dictionary and words just

18  keep getting added to it.  Words don't --

19          THE COURT:  But they don't get rid of the old

20  dictionaries when words get added, right?

21          MS. CRUZ:  And what I am saying is --

22          THE COURT:  Right?

23          MS. CRUZ:  Things are taken out and things are changed

24  and so I can't explain all of this.  I mean, I would encourage

25  them if they want, they can go and talk to this witness, to

1  talk to the 30(b)(6) witness and understand it better.

2       But what I am saying is it is not like a dictionary

3  where these signals, you know, the words exist and then we add

4  words.  So you can go back and see what words were in existence

5  on this date ten years ago.

6       THE COURT:  Right.

7       MS. CRUZ:  Right.  What he is saying is the signals

8  change every month.  They are added and deprecated with

9  firmware updates which occur every month.

10       So that means the signals are changing, being added,

11  and being taken away.

12       THE COURT:  I am following you.  I get you.

13       MS. CRUZ:  So if that changes every day how could you

14  ever have a list if it is changing every single day?

15       THE COURT:  But this is a sophisticated company and

16  they must generate a record of what code was in effect for a

17  certain version of the software.

18       MS. CRUZ:  I have never heard of anything like that.

19  And based on what I know, I see no reason why they would do

20  that.

21       THE COURT:  Well --

22       MS. CRUZ:  And I can only --

23       THE COURT:  With all due respect, we in this room,

24  this is way above our heads.  The only thing --

25       MS. CRUZ:  That's true.

1          THE COURT:  The only thing that I do know is I am

2     going to compel it because I want you to go back to them and

3     explain to them why this idiot Judge has granted the motion,

4     right?

5          Because he doesn't understand how you could not have a

6     contemporaneous record of the codes that were in existence at a

7     particular time and I don't want to know when the car was

8     bought.  I'm talking about the hour before the accident and

9     after the accident, right?

10          So I am compelling that and if you come back with an

11     affidavit and you say, Judge, this is Mr. Wang.  And this is

12     what it means and this is why your order cannot be complied

13     with, that is fine and then he can take that to the deposition.

14          But I am going to compel it because it is hard for me

15     to believe that -- and I believe you.  I believe you that you

16     don't think this is memorialized, but when you go back to them

17     and you say, well, we have been ordered to produce it, maybe it

18     will generate a different response possibly or at the very

19     least, it could generate a more informed response that he would

20     then have at the deposition.

21          So that way, like, for example, how would this

22     engineer that you are prepared to produce necessarily know the

23     code that was in existence in 2020 at 12:00 on the date of that

24     accident?

25          If you are telling me that this code is generated in

1  realtime and deleted in realtime how would he know?

2        MS. CRUZ:  Because we have already given them the data

3  for the crash and they are going to show him the data and they

4  can go through all the signals.  The data isn't gone.  We have

5  already given them the data.

6        THE COURT:  Right.

7        MS. CRUZ:  So it looks like --

8        THE COURT:  See, he is telling me -- maybe that's the

9  problem.  He is telling me that the data that you have given

10 them on the day of the crash, there are data points that are in

11 there that are not glossaried.

12       That is what he is saying to me that the data points

13 and the data that he has that some of which he understands and

14 some of which he has no clue what it means because it is not

15 intuitive and he needs the glossary.

16       MS. CRUZ:  And he can ask the witness every single

17 thing he wants --

18       THE COURT:  What I am saying that this witness could

19 not possibly know that off the top of his head.

20       MS. CRUZ:  He's not going to know all of them.  He's

21 going to know some of them.

22       THE COURT:  So if I put a gun to his head to find this

23 information, what would he do?

24       MS. CRUZ:  I assume that he is going to go and say I

25 don't know.  I have to go asking around to different types of

1  engineers to find out what this is.  I think maybe it is

2  related to the wipers.  Let me go to the wiper engineer and ask

3  them.

4           Listen, there is this code **fish eye cam -- I know

5  it's not the fish eye camera, but what is this code?  Oh, yeah,

6  we wrote that and that means this.

7           THE COURT:  Okay.

8           MS. CRUZ:  So I am agreeing with you there is so much

9  more information in there than what they need.

10           THE COURT:  All right.

11           MS. CRUZ:  And there is going to be stuff that this

12  witness does not know.  This is what I can tell the Court --

13           THE COURT:  In fairness, one of the things that he is

14  saying is that he tried to isolate the codes that he was really

15  interested in because he was trying to isolate the parameters

16  in the car that may be relevant to the case and that he gave

17  you that information.

18           Is this incorrect?

19           MS. CRUZ:  This is where the disconnect is.

20           We are happy for him to go through the stuff that we

21  believe is relevant.  I don't have the list in front of me.

22  And have the witness tell them what they mean.  What we cannot

23  give him because it does not exist is the dictionary, this

24  glossary, because it does not exist.

25           THE COURT:  Okay.

```
 1        MS. CRUZ:  We can't give them something that does not
 2   exist, but he can ask the witness.
 3        THE COURT:  So we have a disconnect, then, right?
 4        So that is the word of the day for this hearing,
 5   disconnect.  I am going to compel that because I can't imagine
 6   that in order to get that information from Tesla's business
 7   purposes they just have to go around, did you know what this
 8   means three years ago.  It is just hard to believe.
 9        Now, on the other hand, maybe it is true in which
10   case, then, okay, well, that's just the way they do things,
11   right, but at least I have compelled it.  You have an order.
12   You are going to go back to the client and say the Judge --
13        MS. CRUZ:  Again --
14        THE COURT:  I told them and the Judge didn't believe
15   me.  Say that.  Okay.  The Judge could not believe that we
16   don't have a record of the contemporaneous time.  I am only
17   talking about the date of the accident, just so we are clear --
18        MS. CRUZ:  Right.
19        THE COURT:  -- that identifies in case one of our
20   engineers dies what that code meant in 2020.
21        MS. CRUZ:  Right.  The order is glossary of codes that
22   existed during the one hour before and one hour -- why would it
23   be after the crash?
24        THE COURT:  Well, whatever.
25        MS. CRUZ:  One hour before the crash and that's what I
```

1  will tell them.

2          THE COURT:  Yes.  And now imagine if they actually

3  don't put that in writing in some form, such that you can just

4  go and refer to it as you are suggesting that they just do this

5  off the top of their head, then alright, then.  He is just

6  going to have to go around and try and fill it in.  If there

7  are people working there, there are people working there.

8          So it seems to me that it would be in the normal

9  course -- I don't compel things that are in the normal course

10 if the Defendant doesn't have, right?  It is just so hard for

11 me to believe that the Defendant doesn't have some way of

12 maintaining this and that is why I am compelling it and so

13 let's see what they come back with.

14         MS. CRUZ:  Yes.  And I think maybe, you know, the

15 witness is going to be able to explain this better than me.

16         THE COURT:  Maybe.

17         MS. CRUZ:  No, he will.

18         THE COURT:  Right.

19         MS. CRUZ:  Because he deals a lot with diagnostic log

20 data.

21         THE COURT:  Right.

22         MS. CRUZ:  He's the one that I believe --

23         THE COURT:  It sounds to me that he is the right

24 person to comply with my discovery order, then.

25         MS. CRUZ:  Well, but he is the person that already

1   made the affidavit in the other case that this was asked for.

2           THE COURT:  And what did he say?

3           MS. CRUZ:  I read it to you.  Maybe that wasn't clear.

4           THE COURT:  Okay.

5           MS. CRUZ:  I was reading to you from his sworn

6   affidavit.

7           THE COURT:  Okay.

8           MS. CRUZ:  This isn't just believe what Whitney says.

9           THE COURT:  And he said in that sworn affidavit that

10  it could not possibly be recreated.

11          MS. CRUZ:  In addition, signals, yes.

12          I mean, I can read the whole thing to you.  They

13  wanted us to translate every single signal on a set of

14  engineering log data in this case and they also wanted the

15  glossary of signals.  I believe it was the same Plaintiffs'

16  attorney that was asking for it.

17          THE COURT:  Okay.

18          MS. CRUZ:  So it is not like there has been

19  inconsistent information out there.  He said translation of the

20  entirety of the log data on the subject vehicle.  Including

21  more than 2,000 data signals and the description of all the

22  signals would be extremely time-consuming.

23          And in my experience I would estimate that it would

24  take upwards of several weeks, if not months.

25          THE COURT:  Now he didn't want 2,000.  How many did

1  you want?

2       MR. EATON:  So that says they could do it.

3       MS. CRUZ:  Well, wait.  Let me --

4       THE COURT:  How many do you want?

5       MR. EATON:  The list that we provided -- give me a

6  second.

7       MS. CRUZ:  Can I read the rest of his affidavit?

8       THE COURT:  You can file it if you want.

9       MS. CRUZ:  It is already filed.

10      THE COURT:  Oh, perfect.

11      MS. CRUZ:  I just want to --

12      THE COURT:  You know what?  I hear what you are

13 saying.

14      MR. EATON:  So --

15      THE COURT:  How many are there?

16      MR. EATON:  So there are six or seven pages of signals

17 here.  I've got to say maybe a 100, 120 signals, maybe.

18      THE COURT:  Now obviously some of them you know, but

19 some of them you don't know.

20      MR. EATON:  Right.  But here's the thing.

21      She said we want this broad brush.  No, we want less.

22 We don't want any irrelevant signals.  We want only relevant

23 signals and they gave us a bunch of irrelevant signals.  We

24 wanted relevant signals.  We want the peddle.  There are

25 signals related to the accelerator peddle.  There are signals

```
 1  related to the brake.  There are signals related to the seating
 2  if he is leaning to the right.
 3          THE COURT:  If we go back and try to comply with the
 4  order and it turns out, then maybe we should try to use this
 5  (inaudible) as an alternative that's fine with me, too.  In
 6  other words, it just seems to me --
 7          MS. CRUZ:  That is completely --
 8          THE COURT:  Different data.
 9          MS. CRUZ:  Unrelated.
10          THE COURT:  Got it.
11          MS. CRUZ:  When I was reading to you that the signals
12  -- it says in addition signals have changed over time.  Signals
13  have been added and deprecated with firmware updates which
14  occur approximately every month and hardware changes and some
15  differ between our vehicles.  Models 3XSY.  I understand that
16  this is part of the reason that Tesla does not maintain some
17  comprehensive list or current dictionary of signals.
18          THE COURT:  Okay.
19          MR. EATON:  I don't --
20          THE COURT:  I'm going to compel it and then let's see
21  what happens.
22          MS. CRUZ:  Okay.
23          MR. EATON:  And we just want the signals relevant --
24          THE COURT:  I just don't believe that they don't have
25  contemporaneous data recorded.
```

1          MS. CRUZ:  I will get you an answer.

2          MR. EATON:  And Your Honor, if you also compel -- we

3     gave them a list of what we wanted of this car one hour before

4     the accident.  That's it.

5          THE COURT:  That's all I will compel.

6          MR. EATON:  And that is the subject matter.  We gave

7     them a list of on these topics.  The only things that are

8     relevant.  Please give us those and --

9          THE COURT:  So we need to put this in a way that

10    translates to engineering speak.

11         MR. EATON:  I have a one-page document literally.  I

12    will give you some of the topics.  Auto pilot and it has

13    several subheadings.

14         THE COURT:  No.  In other words, put it in the order

15    that -- in other words, memorialize what I am doing.  I am

16    granting your request for leave, but memorialize it in a way

17    that would be understandable.

18         MR. EATON:  We will put it in these topics that we

19    gave them --

20         MS. CRUZ:  Well, wait a second.  What are the topics

21    because --

22         THE COURT:  He iis going to give it to you.

23         MS. CRUZ:  I know, but now it is going to be in an

24    order and they definitely -- I could tell you just in the

25    history, I don't know what he is talking about, but it is

100

1    nowhere in the history of the case.  He's asking for signals

2    that are not relevant.

3            What I understood the order was of the glossary of

4    codes that existed one hour before the crash.

5            Are you ordering something else besides that?

6            MR. EATON:  Yes.  We are asking you to order the

7    actual data.

8            THE COURT:  And the production of the data.

9            MS. CRUZ:  What data?

10           MR. EATON:  All of the relevant signals for the hour

11   before the crash.

12           MS. CRUZ:  Right.  We have done that already.

13           MR. EATON:  No, you have not.

14           MS. CRUZ:  So we will just refer to what we have

15   already done.

16           MR. EATON:  They provided us with a bunch of

17   irrelevant signals that has nothing to do -- they gave us 90

18   signals.  Remember there are 2,000.

19           THE COURT:  Right.

20           MR. EATON:  Okay.  80 of them we don't need.  We just

21   needed ten and that way we need another hundred that they

22   didn't provide us.  We want the hundred.

23           THE COURT:  Now, I am not suggesting that there may

24   not be a truthful answer that they don't know what those

25   signals are anymore.  It's possible.

```
 1            MR. EATON:  But it's --

 2            THE COURT:  It's hard --

 3            MR. EATON:  (Inaudible) accident.

 4            THE COURT:  It's hard for me to believe that they

 5   don't have it.  So that's why I am compelling it.  So I am

 6   compelling that.

 7            MR. EATON:  Yes.

 8            THE COURT:  And I am compelling the glossary.

 9            MS. CRUZ:  I am confused about what -- we have already

10   produced two set of engineering data and that includes

11   everything that is relevant to a crash.

12            So I can't even make a -- it is unfair for them for

13   that to be granted when -- where is the piece of paper that

14   tells me what the signals are?  He is referring to something

15   that you don't have in front of you and I don't have in front

16   of me.

17            THE COURT:  Well, he is going to put it in the order.

18            MR. EATON:  We provided this to them.

19            MS. CRUZ:  But we haven't had a chance to argue about

20   it.  Like I haven't --

21            THE COURT:  I am compelling it.

22            MR. EATON:  Thank you.

23            THE COURT:  So put it in the order.

24            And then, obviously, the reason he is asking for it is

25   he doesn't understand what they are, right?  Because,
```

1    obviously, if he understood what the signal meant, then they

2    wouldn't be asking for it.

3              MS. CRUZ:  No, I don't think that's what he is saying.

4              He thinks that there are signals about I don't know

5    what.  He hasn't told you and he hasn't told me and it is not

6    in the papers.  And now he is going to specify what that is in

7    a court order that will require where is the list?  I just

8    don't --

9              MR. EATON:  We provided them a list a while back is

10   when we asked for it.  Second off, I did tell you some of the

11   examples of the things, of the topics that we were looking for;

12   accelerator peddle, the seating, the camera calibration, the

13   obstacle.  There were all these data that were not provided.

14             THE COURT:  Now, by the way, I assume your expert has

15   already taken a look at the data that you have?

16             MR. EATON:  Yes.

17             THE COURT:  Correct?

18             MR. EATON:  Correct.

19             THE COURT:  And he has done this in other cases, I

20   take it?

21             MR. EATON:  Yes, Your Honor.

22             THE COURT:  And in that review with the expert, did he

23   explain to you why he doesn't understand what those signals

24   mean?  In other words, did you verify what you are telling me

25   with your expert?

1        MR. EATON:  Yes.

2        THE COURT:  Okay.

3        MR. EATON:  And Your Honor, again, it goes beyond

4   that.  It goes not just to the glossary, but also critical data

5   that we have not been provided.

6        MR. ***:  (Inaudible).

7        THE COURT:  So I am going to go ahead and grant it.

8        Now if you want to -- comply with the order.  To the

9   extent that you can't comply with the order, right, then

10  obviously you will have a sworn answer to give at the

11  deposition with the engineer and then we will deal with the

12  repercussions of it.

13       Now what I am envisioning is that if, in fact, I am

14  wrong and they don't have any documentary way of verifying the

15  signals that he is asking about, well, then maybe then somebody

16  is going to have to figure out what they are to the extent they

17  can, right?

18       I mean, somebody left and went to work for

19  (inaudible), in which case, you don't have access to that

20  person.  But to the extent you can, as it relates to these

21  missing codes from his perspective, then you do the best you

22  can.

23       MS. CRUZ:  (Inaudible) missing codes.

24       THE COURT:  So that is what I think is reasonable to

25  the request to compel.

1          MR. EATON:  Your Honor, I want to say one thing before

2     we wrap up, Your Honor.  You asked me if a court order

3     compelled the creation of an AP VIS** and the answer is, yes,

4     and that is the *McLaughlin v. Tesla* case and I can send a copy

5     of the order to you.

6          THE COURT:  Okay.

7          MR. EATON:  I understand that you are not ruling on it

8     today.

9          THE COURT:  Right.

10          MR. EATON:  Not to oppose them, but I just wanted to

11     say that they have, in fact, another Court has said go make

12     one.  Go make this AP Vis** and let the Plaintiff view it.

13          THE COURT:  Okay.

14          MR. EATON:  So I will save that to when we come back

15     and talk about it some more and you will have that.

16          THE COURT:  Okay.  So far I am not compelling that.

17          MR. EATON:  I understand.

18          THE COURT:  But, obviously, you can submit whatever

19     you would like.

20          MR. EATON:  Okay.

21          THE COURT:  Okay.  So we will need to memorialize that

22     part of it in the order.  And then, obviously, you will have --

23     here's another thing.

24          To the extent that when he gives you the proposed

25     order, if you want to annotate that with a footnote of why I am

1  completely off (inaudible) and then, I will consider it.  But

2  based upon the description that he has given me, it seems

3  reasonable to me.

4          MS. CRUZ:  So we will include any objections that we

5  have to the list of signals that I haven't yet seen.

6          THE COURT:  Right.  But he claims that you have.  So

7  that's the problem.  We have a disconnect.

8          MS. CRUZ:  Why wouldn't they be included in, like,

9  this is going to be discussed today and then I would have been

10 ready.

11         THE COURT:  He claims that he sent you a list of those

12 things.

13         MS. CRUZ:  But those are the papers.

14         THE COURT:  Right.  What you are saying is he never

15 sent that to you at all?

16         MS. CRUZ:  No.  I am sure at some point in time there

17 were conversations about that.  There were conversations about

18 a lot of things.  Did I know that he was going to come in here

19 today and ask you to compel all the log data for this specific

20 list?

21          It is not in this discovery.  This morning it wasn't

22 even clear what the issues were going to be for today.  So this

23 morning they sent me an e-mail and said these are the numbers

24 at issue.

25         THE COURT:  I hear you.  On the other hand, there is a

 1    month left in discovery.  So to some extent if there is

 2    something manifestly unjust by what I am ordering, which I

 3    don't think there is, you will let me know but --

 4           MS. CRUZ:  I will have to see the signals.  I

 5    understand your ruling.

 6           THE COURT:  Let's see what the signals are.

 7           MS. CRUZ:  We'll see what they are and then make the

 8    objection.  I understand.

 9           THE COURT:  And obviously, talk to your person and you

10    can communicate.  I told Torres everything that you told me to

11    tell him and he doesn't believe in you.

12           MS. CRUZ:  I will --

13           THE COURT:  He can't imagine that there is not some

14    way of cross-referencing data code for a specific version of

15    the software.  That is basically where I am coming down from.

16           MS. CRUZ:  But you are certainly not ordering us to go

17    around and pull everybody at Tesla and ask and send out a mass

18    e-mail and say do you guys know -- you are talking about

19    something that creates this that we can pull down with a list,

20    a glossary of signals that were applicable to this vehicle for

21    the one hour before the crash.

22           THE COURT:  Right.

23           MS. CRUZ:  You're asking --

24           THE COURT:  I am not asking that you basically shut

25    down the factory of safety maintenance where you all sit down

 1    and talking about the Benavides case.  No, I am not doing that,

 2    but I am compelling the data.  So to the extent that it is

 3    accessible, right?

 4            MS. CRUZ:  I understand.

 5            THE COURT:  To the extent it is not, then you are

 6    going to have to defend that position.

 7            MS. CRUZ:  I understand.

 8            THE COURT:  Okay.

 9            MR. EATON:  To be helpful I don't need an index for

10    irrelevant stuff.

11            THE COURT:  Put it in the order.

12            MR. EATON:  Then, the index of the data.  That's it.

13            And I do want to say for the record that she said we

14    were not aware of this.  Literally 5-A says Tesla's failure to

15    produce all relevant car log data for the drive cycle at issue;

16            5-B, Tesla's false representation that it did not

17    possess or continue in failure to provide a full and complete

18    glossary or index of log signals.

19            They are right there.  I mean, I don't understand why

20    this is a surprise that we were going to do this today.  It is

21    their first page of our hearing notice.

22            THE COURT:  I am compelling it.

23            MR. EATON:  Thank you.

24            THE COURT:  So put it in the order.  All right.

25            MR. EATON:  Thank you for your time, Your Honor.

1          THE COURT:  That is as much disconnect as we can have

2     in one day.

3          MS. CRUZ:  Your Honor, there is one other issue

4     because I feel like this is probably going to keep coming up in

5     this case, unfortunately, for you.

6          There are in the past three months Plaintiffs have

7     served literally -- I am not exaggerating -- hundreds of

8     discovery requests and we are responding almost every week.

9          One that we have met and conferred on is a request for

10    admissions that has, I think, 140 or 150 requests in it.  We

11    talked about having a hearing on that.  We told them that we

12    were available next Thursday.  They have not yet noticed the

13    hearing.

14         What I am afraid is going to --

15         THE COURT:  You argue that because, frankly, when you

16    said 150, I thought you were about to say 150,000 because I

17    would have believed you but --

18         MS. CRUZ:  150,000 requests?

19         THE COURT:  Yes.  As it is 150 I'm not --

20         MS. CRUZ:  What?

21         THE COURT:  Is that outrageous?  In other words, given

22    the nature of this case I don't know.

23         MS. CRUZ:  I have literally never seen that ever and

24    I've been doing --

25         THE COURT:  You must be young.

1          MS. CRUZ:  No, in these cases.  I mean, in these

2    cases, for what you need in these cases.

3          THE COURT:  Right.

4          MS. CRUZ:  But I have worked on auto product cases for

5    18 years.

6          THE COURT:  Right.

7          MS. CRUZ:  And I have never even seen half that many.

8          So in terms of this request for admissions, the scope.

9    So they haven't yet set the hearing.

10         So what I am concerned about is they pop up with a

11   notice four days before the hearing.  We are setting 100 and

12   then, the problem is we need to brief something like that.  And

13   so --

14         THE COURT:  You're not briefing.

15         Judge Bloom would not have you briefing on that.  We

16   don't need to brief it.  The only issue is the number of

17   admissions as far as I am concerned.

18         MS. CRUZ:  What do you mean when you say that?

19         THE COURT:  And so we don't do objections on

20   admissions because if it is something that you don't know the

21   answer to, the answer is I don't know.  If it is something that

22   is completely irrelevant and it is true, then you admit it and

23   be done with it.

24         If it is something that is wrong and improperly

25   stated, or it is misleading, state it and you deny it.  You

 1  take the admission as it is.  Can you admit it?  No.  Denied.

 2  So you are at liberty to deny based upon the wording of the

 3  admission.

 4       The consequence of that is if it is something that

 5  should have been admitted you have to pay fees on.  That's the

 6  consequence of the admission, but I don't think 150 in a case

 7  like this is that onerous.  You are talking about somebody who

 8  served 20,000 admissions on one case.

 9       MS. CRUZ:  My God.  No, I am not saying --

10       THE COURT:  So that is why when you said 150, I said

11  oh, that's ridiculous.

12       MS. CRUZ:  I meant it's a lot for you to go through

13  and I also have not seen -- but I mean, we are going to sit

14  here and go through 150 request for admissions.

15       The other thing is it gets abusive at some point when

16  things are so far outside the scope.  Why would we have to

17  answer that?

18       THE COURT:  If you think it is grossly irrelevant and

19  the answer is we don't want to figure it out because it is

20  irrelevant, then deny it.  In other words, the consequence is

21  if it is relevant and you should have admitted it, it is a fee

22  and they have to prove it.  They get their fees, right?

23       But they only get their fees if it is relevant, right?

24  So that is what I am saying with you.  If the wording of it is

25  done that is either misleading, or grossly irrelevant, then

 1  deny it unless it is true, right?

 2          Tesla has thousands of accidents in the month of

 3  March.  That is not relevant to --

 4          MS. CRUZ:  Well, let me be clear.  We are already --

 5          THE COURT:  -- to answer it.

 6          MS. CRUZ:  No.  Let me be clear.  We already answered.

 7  Now I am just.

 8          THE COURT:  Oh, you have already answered it.

 9          MS. CRUZ:  Now I am just trying to understand how you

10  think and what your views are.  I am just letting you talk so I

11  can understand.

12          THE COURT:  But if you already answered what is the

13  problem?

14          MS. CRUZ:  My issue is this that they are going to

15  notice something up.

16          THE COURT:  She answered it.

17          MS. CRUZ:  Yeah.

18          MR. EATON:  She answered it and we sat down in the

19  process of setting down and we mutually cleared the date for --

20          THE COURT:  Oh, you want to compel a better answer?

21          MS. CRUZ:  Yes.  And so --

22          MR. EATON:  (Inaudible).

23          THE COURT:  You should have made that clear at the

24  beginning.  I thought you didn't want to answer 150 admissions.

25          MS. CRUZ:  No, no, no.  My concern was on the fly it's

1  like I don't even know whether the hearing is happening.  Now

2  it is Thursday at 5:00 and I don't know whether they are going

3  to set a hearing for next Thursday.

4         THE COURT:  Well, after listening to me now they may

5  not.

6         MS. CRUZ:  I doubt that.  I mean, that last ruling was

7  pretty good for them.  So I think they will be back.

8         THE COURT:  I don't think so.

9         MS. CRUZ:  I think they will be back.

10        THE COURT:  I don't think so.  In other words --

11        MS. CRUZ:  The issues --

12        THE COURT:  Let me ask it since this is what I am

13  going to give you another ten minutes if I don't see you next

14  week.  Did you object and not answer?

15        MS. CRUZ:  Some of them -- I don't know.  I don't have

16  them in front of me.  I can't say.  Sometimes we --

17        THE COURT:  How many did they --

18        MR. EATON:  I can't give you a number but there were a

19  large amount of --

20        THE COURT:  And that is why you wanted to compel?

21        MR. EATON:  Exactly.

22        THE COURT:  Okay.  Go back --

23        MS. CRUZ:  I have to go look.

24        THE COURT:  Find an associate that has no work.  Tell

25  him or her to pull up that document and say subject to that

 1  waiving this objection the answer is -- whatever the answer is.

 2  There is no objecting.  You can preserve it.  I have no problem

 3  with you preserving it.  I did a million preservations of

 4  admissions.

 5          However, answer the question directly.  If the

 6  question is misleading you can deny it because it is misleading

 7  on its face and, therefore, you can't admit it.  You can't

 8  admit something that is misleading on its face, right?

 9          If the answer is completely irrelevant, how many cars

10  would Tesla have a thousand accidents in March, right?  You

11  know the answer to that is true.  It is completely irrelevant

12  to the case, then admit it.  It doesn't matter, right?

13          So go ahead and do that.  That would solve their

14  problem and that would solve my problem and any objection that

15  you would have is preserved.

16          Does that make sense?

17          MS. CRUZ:  I hear what you are saying.

18          THE COURT:  Okay.  Good.

19          MS. CRUZ:  No comment.

20          THE COURT:  Good.

21          MS. CRUZ:  And I hear --

22          THE COURT:  I don't do objections to admissions.

23  There is no objection to admissions.  You answer it.  Admit,

24  deny, or we have no idea.  That is the answer.

25          MS. CRUZ:  So you are basically giving them carte

 1  blanche to go and serve 300 more and we have to answer.

 2         THE COURT:  No, I think they reached their limit.

 3         So they have 150 and they are entitled to an answer.

 4  And if you want to preserve, you don't have to recreate the

 5  document.  Just add a line subject to this, admit it, denied,

 6  or whatever it is.

 7         MS. CRUZ:  So if that's what the Court -- basically if

 8  that's where we are --

 9         THE COURT:  Yes.

10         MS. CRUZ:  Like Mr. Boumel said, I think there are

11  probably a lot that we objected and didn't answer.  I haven't

12  looked at it lately.

13         THE COURT:  Okay.

14         MS. CRUZ:  If we --

15         THE COURT:  I will give you two weeks.  You don't have

16  to do it tomorrow.  You don't have to do it.  Find an associate

17  with no work.  I'm telling you that is exactly what they are

18  for.

19         MS. CRUZ:  That's not the issue.  The issue is no one

20  knows these things besides the client.

21         THE COURT:  Okay.

22         MS. CRUZ:  An associate, I wish an associate could do

23  this stuff, but they can't.  The client is the one that has to

24  answer this stuff.

25         THE COURT:  That's fine.

1      MS. CRUZ:  So --

2      THE COURT:  Pick your smartest engineer and if he

3  doesn't know the answer -- if he doesn't know the answer, then

4  I am confident that when you say we have no idea, then you are

5  good, right?

6          Do you see what I'm saying?  That is how you do it and

7  you don't have to call up Mr. Musk and say it is one of these

8  admissions.  You pick the person with the most knowledge on

9  this topic and, obviously, it sounds like it is that engineer

10  and since we would like to admit this, can we?  And he will

11  say, no, you can't admit that, then deny it.

12      MS. CRUZ:  The whole problem is --

13      THE COURT:  Deny it.  When in doubt.

14      MS. CRUZ:  Listen, some of those requests for sure are

15  admit that Elon Musk said X.

16      THE COURT:  How would you know that?

17      MS. CRUZ:  I don't know.

18      THE COURT:  So deny it.

19      MS. CRUZ:  Do you think I am going to ask him?  Well,

20  he is the CEO of Tesla.

21      THE COURT:  But you see my point.

22      MS. CRUZ:  Okay.  But that's fine.

23      THE COURT:  But on the other hand, if it is something

24  that your communication department knows he said, then he has

25  to answer it.  You have to do a reasonable investigation.  You

1  don't have to send the admissions request to everybody in
2  Tesla.
3          MS. CRUZ:  But it is like did he say this in 2015 on
4  April 18th at a press conference.  Now we have to go -- it is
5  not that easy.  It is not does the auto pilot work at
6  60 miles-an-hour?  Yeah, that is something the Legal Department
7  can answer, but this is the --
8          MR. EATON:  Provide links to a lot of --
9          MS. CRUZ:  The absurdity of what they are asking --
10         THE COURT:  Then answer it.  You are answering.  You
11 are saying out loud what I am telling you to do.  If it is so
12 absurd --
13         MS. CRUZ:  Try to look for that news article to see if
14 he was quoted in that news article and what he said in the
15 article.
16         THE COURT:  If he attaches the news article.
17         MR. EATON:  We provided those things in the request,
18 Your Honor, to the article.
19         MS. CRUZ:  So does the article quote him as saying X?
20 I mean, but also the article says what it says.
21         MR. EATON:  It is hearsay unless they say -- because
22 he is denying saying that previously.
23         THE COURT:  Bottom line is you have to answer the
24 admissions request.  If you deny something and it is relevant
25 and should have been answered and they have to prove it in

1  trial, your fees.  If the question was grossly misleading, or

2  grossly irrelevant, you don't owe any fees by denying it.

3        Does that make sense?

4        MS. CRUZ:  Yes.

5        THE COURT:  Okay.  So you have your marching orders

6  and, obviously, you don't have to call Mr. Musk.

7        MS. CRUZ:  Yes.

8        THE COURT:  The Communication Department and the

9  Engineering Department sounds like the people that you need to

10  call.  If they don't know the answer, they don't know the

11  answer.  If they know the answer, then put the answer down.

12  That's all.

13        MR. EATON:  A few things, Your Honor.

14        THE COURT:  I am not going to go and review the

15  article and figure out, oh, is this relevant or not.  We all do

16  that.  Just don't answer it.  The consequences is your fees.

17        So if you think that it is a relevant topic, right?

18  For example, say hypothetically Mr. Musk said it in an

19  interview that he is citing the article this is what the

20  technology does, right?

21        And it is basically consistent with their theory that

22  while they marketed these devices in all the brake cars.  I

23  don't know that to be true, but I am just saying

24  hypothetically, right?

25        MS. CRUZ:  Right.

1      THE COURT:  And he said the words X and your

2  Communication Department says he didn't say that, then admit

3  it.  It is irrelevant from your point of view, correct?  That

4  objection is preserved and you can preserve it if you want it

5  specifically.  Do you see my point?

6      I don't need to get into a debate about whether or not

7  his statement is really going to be admissible or not.  That is

8  not the purpose of the exercise.  The purpose for the request

9  for admissions is to reduce the issues in dispute, right?

10     MS. CRUZ:  It has to be proportional to the needs of

11  the case.

12     THE COURT:  Well, I think --

13     MR. EATON:  There is a reason behind the (inaudible),

14  Your Honor.

15     MS. CRUZ:  I mean, also --

16     THE COURT:  I issued over 20,000 discovery requests.

17     MS. CRUZ:  What kind of case is it?

18     THE COURT:  It was a massive fraud case, but it did

19  not involve somebody dying.  I will tell you that.  So for 150

20  admissions, I swear I thought you were going to say 150,000 and

21  I was saying, oh, my God.

22     MS. CRUZ:  Oh, my God.

23     THE COURT:  150 and you just have to answer them.

24     MR. EATON:  Mr. Musk --

25     THE COURT:  And you just have to good faith basis for

1    the answer.  And so if you deny it that's fine with me.  I will

2    not compel you, right?  As long as you have a good faith basis

3    to deny it and if the answer is admit it, then admit it.

4         If he is on video, for example, what if they cite to

5    you a YouTube interview or a Ted Talk and in the Ted Talk he

6    says the words blank.  You are going to say, well, what

7    difference does it make.  It has nothing to do with --

8         MS. CRUZ:  (Inaudible) perspective statement.

9         THE COURT:  Exactly.

10        MS. CRUZ:  But they want to take everything out of

11   context and say these words.

12        THE COURT:  Object.  It is inadmissible.  Cite Rule

13   403 if you want to, to every single one.

14        MS. CRUZ:  Yes.

15        THE COURT:  But admit it.  In other words, do you see

16   what I'm saying?  The fact is true.

17        MS. CRUZ:  We will deal with it down the road.

18        THE COURT:  Exactly.  And then that is the consequence

19   and that is why I don't do this because you could imagine in a

20   complex commercial case where you have a thousand of these

21   things, I am not going to --

22        MS. CRUZ:  That is why I said I foresee us being here

23   and spending a lot of time together.

24        THE COURT:  I don't.  Have a good evening.  We're

25   done.

120

```
 1              MR. CRUZ:  Thank you, Your Honor.

 2              MR. EATON:  I have one last question, Your Honor.

 3              THE COURT:  Go ahead, Mr. Eaton.

 4              MR. EATON:  Is this an order compelling or to answer

 5    them?

 6              THE COURT:  Oh, yes.

 7              MR. EATON:  Okay.  So we'll do an order on that.  It

 8    is hard to explain why --

 9              THE COURT:  You don't need to.  It's 5:00.

10              MS. CRUZ:  Just to make sure it is not overruling any

11    objections.

12              THE COURT:  I'm not ruling on any objections.  I am

13    compelling you to answer the admissions.

14              THE COURTROOM DEPUTY:  Court is now adjourned.

15              (Thereupon, the proceedings concluded.)

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2                              CERTIFICATE

 3

 4         I hereby certify that the foregoing transcript is an

 5   accurate transcript of the audiotape recorded proceedings in

 6   the above-entitled matter.

 7

 8

 9

10
     06/02/24                      Bonnie Joy Lewis,
11                          Registered Professional Reporter
                               CASE LAW REPORTING, INC.
12                             7001 Southwest 13 Street,
                              Pembroke Pines, Florida 33023
13                                   954-985-8875

14

15

16

17

18

19

20

21

22

23

24

25
```