```
 1              THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
                      MIAMI DIVISION
 3
                 CASE NO.:  21-cv-21940-BB
 4

 5

 6
    NEIMA BENAVIDES, as          )
 7  Personal Representative      )
    Of the Estate of Naibel      )
 8  Benavides Leon, deceased,    )
                                 )
 9          Plaintiffs,          )          March 7, 2024
                                 )
10  v.                           )
                                 )          Pages 1 - 121
11  TESLA, INC., a/k/a           )
    Tesla Florida, Inc.,         )
12                               )
            Defendant.           )
13  _____/

14

15

16                    DISCOVERY HEARING

17        BEFORE THE HONORABLE EDWIN G. TORRES
          UNITED STATES CHIEF MAGISTRATE JUDGE
18

19

20
    APPEARANCES:
21
    Counsel on behalf of Plaintiffs:
22
                    EATON & WOLK PL
23                  2665 South Bayshore Drive
                    Suite 609,
24                  Miami, FL 33133
                    BY:  DOUGLAS F. EATON, ESQ.
25
```

```
 1   APPEARANCES CONTINUED:

 2   Counsel on behalf of Plaintiffs:

 3                        POSES LAW GROUP
                          169 East Flagler Street
 4                        Suite 1600,
                          Miami, FL 33131
 5                        BY:  TODD POSES, ESQ.

 6

 7

 8                        THE ROUSSO LAW FIRM
                          9350 South Dixie Hwy
 9                        Suite 1520,
                          Miami, FL 33156.
10                        BY:  ADAM T. BOUMEL, ESQ.

11

12

13   Counsel on behalf of Defendant:

14                        BOWMAN AND BROOKE, LLP
                          2 Alhambra Plaza,
15                        Suite 800,
                          Coral Gables, FL 33134
16                        BY:  WHITNEY V. CRUZ, ESQ.

17

18

19   Transcribed By:

20                        BONNIE JOY LEWIS, R.P.R.
                          7001 SW 13 Street
21                        Pembroke Pines, FL  33023
                          954-985-8875
22                        caselawrptg@gmail.com

23

24

25
```

1           (Thereupon, the following proceeding was held:)

2           THE COURTROOM DEPUTY:  The United States District

3   Court for the Southern District of Florida is now in session.

4   The Honorable Chief Magistrate Judge Edwin G. Torres presiding.

5           Calling case Neima Benavides, et al., versus Tesla,

6   Incorporated; Case Number 21-cv-21940-Bloom.

7           Counsel, your appearances for the record.

8           MR. EATON:  Good afternoon, Your Honor.

9           Doug Eaton on behalf of the Plaintiff along with Adam

10  Boumel and Todd Poses.

11          MR. POSES:  Good afternoon, Your Honor.

12          THE COURT:  Good afternoon.

13          MS. CRUZ:  Good afternoon, Your Honor.  Whitney Cruz

14  on behalf of Tesla Inc.

15          THE COURT:  Good afternoon, everybody.

16          You are surrounded, Miss Cruz.

17          MS. CRUZ:  Yes, I see that.  I'm used to it.

18          THE COURT:  Let's see here.

19          I'm pulling up the docket sheet and your materials.

20  And you all sent me your materials, I know I saw a series of

21  proposed orders.

22          MR. EATON:  We did, Your Honor.

23          THE COURT:  You sent them e-mail, correct?

24          MR. EATON:  I believe the materials themselves were

25  attached to the motion for hearing, which is Docket Entry 177.

1          THE COURT:  Oh, okay.  What did you say 177?

2          MR. EATON:  Yes, sir.

3          THE COURT:  Oh, here it is.

4          Good.  Okay.  And I think I saw that you all have a

5     hearing in front of Judge Bloom very recently, correct?

6          MS. CRUZ:  Right.

7          THE COURT:  Oh, unfortunately, I don't have a -- do we

8     have a transcript of that?

9          So, then, when I was looking at these materials, I

10    wanted to know what that was about in terms of what it is that

11    -- because 198 said that the Plaintiffs' motion for leave to

12    amend the complaint was granted in part and denied in part.

13         MS. CRUZ:  Sure.

14         THE COURT:  So what was that about?

15         MS. CRUZ:  So it was two motions was heard; one was

16    Plaintiffs' motion to amend the complaint to add a complaint

17    for punitive damages and also claims for fraudulent

18    misrepresentation, false advertising, and I think negligent

19    misrepresentation.

20         And the Court denied the request to add the claims for

21    the fraud and misrepresentation and there is one order.  She

22    allowed them admitting.  I think there were two orders entered

23    and that might be why it is confusing, but if you look at

24    Docket Entry 198 she allowed Plaintiffs to amend their

25    complaint to add a complaint for punitive damages and add

1  factual allegations.

2          And the other issue, the big issue kind of was that,

3  well, obviously they wanted to amend to add punitive damages

4  based on a recent NHTSA recall.

5          And Judge Bloom found that that recall is a subsequent

6  remedial measure.  So that wouldn't be the basis, but she would

7  allow them to amend the claim for punitive damages based on the

8  allegations that are already in the complaint.

9          THE COURT:  Do you agree with that, Mr. Eaton?

10          MR. EATON:  More or less.

11          THE COURT:  What is the less part?

12          MR. EATON:  Well, I think the finding of the recall of

13  the subsequent remedial is correct, but our issue is effective

14  punitive damages of the things that they didn't do as part of

15  the recall.

16          And so our intention in the re-pleading is to say,

17  okay, setting aside what they did in the recall, the recall was

18  not enough.  One of the issues that is relevant to punitive

19  damages is response to the wrongdoing.  The way you handled it

20  and the way they handled it we believe is inadequate and we

21  have allegations to that effect.

22          So I think this complaint, Whitney might disagree on

23  the interpretation of that, but that's how we view that.

24          THE COURT:  Okay.

25          MR. EATON:  I understand the Court's ruling that she

1   is not going to let us admit the fact of the recall into

2   evidence.

3          THE COURT:  And was that the thrust of the -- other

4   than the punitive damages claim is that the thrust of the fraud

5   and the misrepresentation claim?

6          MR. EATON:  No, Your Honor.

7          It was new evidence that we did not have when we

8   initially moved for leave to amend and the Court denied and

9   said the stuff that you are asking to add, you already have it

10  in your possession.  So I am not going to let you do that

11  because the time to amend has passed.

12         THE COURT:  Right.

13         MR. EATON:  And so we said, okay, well, this is

14  something obviously we did not have at the time because it

15  didn't exist and that's what prompted our second motion for

16  leave to amend the recall issue.

17         THE COURT:  I see.  Okay.

18         MR. EATON:  Yes.

19         THE COURT:  Okay.  Well, let's table that to the

20  extent that it is relevant and obviously you all will raise it,

21  but let me turn to counsel for the Plaintiff on the most

22  important issue we want to tackle.

23         I saw that there are a variety of things.  So rather

24  than going through them one by one, what is the most important

25  issue that you want to attack?

1          MS. CRUZ:  Your Honor, may I just address something

2   with the Court, which is kind an overarching issue that we have

3   in objection to what is set for hearing being set today and

4   just get some guidance?

5          THE COURT:  Well, his number one issue may jive with

6   yours.  So we will find out, but I will hear you out on it.  Go

7   ahead.

8          MS. CRUZ:  Okay.  And I don't think it will.  The

9   issue that we are a little confused about is --

10         THE COURT:  Let him start.

11         MS. CRUZ:  Oh, I'm sorry.  I thought you said go

12   ahead.  I apologize.

13         THE COURT:  Do you have a discovery issue on the

14   Defendant's side?

15         MS. CRUZ:  The issue is that these issues were not

16   properly noticed for hearing and violent the Court's procedures

17   as to how these things are to be handled.

18         THE COURT:  Got you.

19         MS. CRUZ:  That was --

20         THE COURT:  I will hear you out on that, but let's

21   first find out what the most important issue is and then we

22   will tackle that.

23         MS. CRUZ:  Got you.

24         MR. EATON:  Well, It is hard to say what is most

25   important, but I think we can address what she's addressing

 1 | because that deals with probably what is going to take the

 2 | majority of time --

 3 |         THE COURT:  Okay.

 4 |         MR. EATON:  -- at this hearing which is the 30(b)(6)

 5 | deposition.

 6 |         THE COURT:  Okay.

 7 |         MR. EATON:  And I believe what she is referring to is

 8 | the fact that it is the Court's practice to say go take the

 9 | depo and then bring the objections back to me after it is done.

10 |         THE COURT:  Right.

11 |         MR. EATON:  And what we have gone here is say, well,

12 | they basically objected to almost half, if not more, about the

13 | items, the scope of their general objections.

14 |         Not the questions, but the topics and we thought as a

15 | matter of expedience we would bring it before you and say they

16 | are objecting to all these topics.  These should be

17 | discoverable on a 30(b)(6) deposition.

18 |         And if you rule on them beforehand it will save a lot

19 | of time afterwards where we have to avoid taking two

20 | depositions where we come back and we present to you 80 pages

21 | of objections to topics that are irrelevant.

22 |         So that's the thing.  Correct me if I'm wrong, but I

23 | think that's what you are referring to.

24 |         THE COURT:  Is that right, Miss Cruz?

25 |         MS. CRUZ:  My comment was, well, there's --

```
 1            THE COURT:  So is the 30(b)(6) -- he's right.

 2    normally I don't resolve it for many good reasons.  But, on the

 3    other hand, he's here now and then is that issue, was that not

 4    properly noticed, is that what you are saying on that topic?

 5            MS. CRUZ:  Yes and the issue is this.

 6            I mean, number one, as the Court obviously you know

 7    your own procedures is to go and take the deposition.  And what

 8    we have here is almost 200 deposition topics and Plaintiffs

 9    have already taken a 30(b)(6) witness of an autopilot engineer.

10            So our point was why don't we --

11            THE COURT:  How long was that deposition?

12            MS. CRUZ:  Almost 15 hours.

13            THE COURT:  Oh, okay.  Aren't you out of time away?

14            MS. CRUZ:  Well, that was a California case and the

15    Plaintiffs --

16            THE COURT:  Huh?

17            MS. CRUZ:  Yes.  So it is a California autopilot case.

18    Plaintiffs' counsel cross-noticed the corporate representative

19    deposition in that case.  He filed his own notice.  We said go

20    ahead.  That's fine because some of these topics -- I mean, we

21    objected to it, but we ended up working it out.

22            THE COURT:  Okay.

23            MS. CRUZ:  Plaintiffs' counsel appeared at that

24    deposition.

25            THE COURT:  Did you appear or did somebody for Tesla
```

 1  appear?

 2       MS. CRUZ:  Yes, my partner who also works on this case

 3  with me.  Ann works that case and that case is called *Wang* and

 4  they made an appearance for the record.

 5       THE COURT:  It was a dual notice deposition.

 6       MS. CRUZ:  Exactly.

 7       THE COURT:  Okay.

 8       MS. CRUZ:  Exactly.  And Plaintiffs' counsel who is

 9  not Plaintiffs' counsel in the *Wang* case asked questions.

10       THE COURT:  Okay.

11       MS. CRUZ:  So --

12       THE COURT:  And how long was that deposition for?

13       MS. CRUZ:  Almost 15 hours.

14       THE COURT:  And that was of the autopilot engineer?

15       MS. CRUZ:  Correct.  It was a 30(b)(6) witness about

16  autopilot topics.

17       THE COURT:  Okay.

18       MS. CRUZ:  So our point to them was let's follow the

19  Court's procedures, which are let's go take the deposition.

20  And we've never said don't take a deposition and I have to say,

21  I mean, we have a very good working relationship with

22  Plaintiffs' counsel.

23       THE COURT:  What other 30(b)(6) are they entitled to?

24       MS. CRUZ:  Well, there are a few topics in here.

25            The vast majority of them we have agreed to.  There

1  are about 200 subtopics.  If you count all the subtopics, there

2  are about 200 topics.  We've agreed to the vast majority of

3  them.

4          And the overarching issue that we are saying is we are

5  not going to let the witness talk about things that are not

6  part of your allegations and we are not going to let the

7  witness give testimony and answer questions that were asked in

8  a prior deposition.  Those were our general objections.

9          THE COURT:  And why are you producing the witness

10  again if he was asked questions in a prior deposition?

11          MS. CRUZ:  Because there are some topics that are

12  relevant in this case that were not asked of the first witness.

13          THE COURT:  Oh, okay.  All right.  So you concede that

14  and you concede that there are topics here that were not asked

15  of the -- what did you call him, an autopilot engineer?

16          MS. CRUZ:  Yes.  He is an autopilot engineer.  That's

17  his job.  I mean, he's a high level autopilot engineer, but he

18  was produced as the corporate representative in that case.

19          THE COURT:  Got you.

20          MS. CRUZ:  So it is an autopilot case, but every

21  autopilot -- not every autopilot case, but a lot of autopilot

22  cases are different.  You might have one autopilot case -- I

23  have one autopilot case where the defect allegation is there

24  was a crossing tractor trailer and the autopilot system failed

25  to detect the crossing tractor trailer.

1          That is completely different than what happened in the

2   case in California, which deals with whether the car was

3   recognizing lane lines and when it ran into a barrier and the

4   driver didn't have his hands on the wheel, which is different

5   from this case, which is where we have a driver who had his

6   hands on the wheel, bent down real quick to pick up his phone,

7   came back up and drove through a T-intersection and into a

8   parked car on the other side of the street.

9          So just because it is an autopilot case, it doesn't

10  mean -- it is like saying that all airbag cases are the same.

11          THE COURT:  How many engineers would you be able to

12  produce that deal with autopilots?  How many autopilot

13  engineers could be 30(b)(6) witnesses for you?

14          MS. CRUZ:  Well --

15          THE COURT:  As a practical matter.  It's a practical

16  question.

17          MS. CRUZ:  I mean, I don't know how to answer that

18  question because it is the company's knowledge.  You know, what

19  I mean?

20          THE COURT:  Right.  In other words, this individual,

21  is he the individual with the company who decides to use for

22  these kinds of cases?

23          MS. CRUZ:  I don't know how many times the person who

24  -- I have never heard his name before.

25          THE COURT:  Okay.

1          MS. CRUZ:  I have worked on other autopilot cases.  I

2    don't work on all of them.  I could tell you that the witness

3    that we are producing is the autopilot engineer in this case.

4    He is not an autopilot engineer, but the witness who we are

5    producing in this case is different than that other witness.

6          THE COURT:  Okay.

7          MS. CRUZ:  He's also a Tesla engineer, but he's a

8    different witness.

9          THE COURT:  And just so I understand because I think

10   it is going to inform me about this dispute, you chose him

11   because for any non privileged reason you could give me.

12          In other words, does he have a subspecialty?  Does he

13   work -- obviously he is not the engineer that works on cases

14   where somebody reaches down underneath the steering wheel.

15   There's got to be some business purpose categorization for him.

16          What would that be.

17          MS. CRUZ:  Well, I mean, I can say without getting

18   into too much because I work for lots of automotive clients.

19          THE COURT:  Right.

20          MS. CRUZ:  But just generally we don't have engineers

21   that are testifiers.  Every engineer that we produce their

22   primary job is X, whatever it is.

23          THE COURT:  Right.

24          MS. CRUZ:  Developing code for autopilot.  Battery

25   testing and abuse.  Like these people have, you know, work all

1    day, every day doing their job as an engineer.

2              THE COURT:  All right.

3              MS. CRUZ:  And then when they are knowledgeable about

4    a topic, we pull them away from their job and have them

5    testify.

6              So based on the issues in this case, which there is

7    really -- well, according to Plaintiffs' complaint there are

8    two issues.  There are two defect allegations.

9              One is that the Tesla was on autopilot and the auto

10   steer system did not recognize a stationery parked vehicle at

11   the end of this T-intersection.  It did not recognize it and it

12   did not control for it and it allowed the Tesla to crash into

13   it.

14             The other part is that the Tesla was defective because

15   it wasn't monitoring what the driver was doing.  It didn't stop

16   the car when the driver bent down to pick up a cell phone on

17   the floorboard.

18             So those are the allegations in this case.  So based

19   on that and based on these topics --

20             THE COURT:  So in light of those allegations, how do I

21   define in advance that the scope of the deposition is how the

22   autopilot works in what context?  Based on your description --

23             MS. CRUZ:  Yes.

24             THE COURT:  -- that you just gave me on behalf of the

25   Defendant is the issue raised in the complaint about how an

1    autopilot works and what it can and cannot do?

2              MS. CRUZ:  No.

3              THE COURT:  No?

4              MS. CRUZ:  So autopilot is not actually a thing.

5         It is not a physical software or thing.  Autopilot is

6    just a name for a suite feature.  There are different features.

7    So every autopilot case involves different features.

8         For example, the two basic functions or features of

9    autopilot is cruise control, traffic ware cruise control, and

10   auto steer.  This driver had traffic ware cruise control on,

11   but he had his foot firmly planted on the accelerator peddle.

12        So he overrode the cruise control.  There is no way

13   for the car to stop itself when the driver is pressing the

14   accelerator peddle.  The driver is always number one in charge.

15             THE COURT:  Is that an end disputed fact?

16             MS. CRUZ:  Yes.  Undisputed fact that he had his foot

17   on the accelerator peddle.  It is in the data; the EDR data.

18             THE COURT:  Okay.

19             MS. CRUZ:  So the second piece is the auto steer.

20   Auto steer is an issue in this case.  Auto steer is what keeps

21   the vehicle in the lane.

22        And Plaintiffs allege auto steer should have seen the

23   end of the road, seen the flashing traffic light, and seen the

24   stationery parked vehicle that the decedent and the other

25   Plaintiff were standing behind and it should have slowed the

 1 | vehicle down.

 2 |         So it is about auto steer.  The other allegation is

 3 | automatic emergency breaking, which that is not really an

 4 | autopilot feature.  Your car -- I don't know what kind of car

 5 | that you have, but it probably has --

 6 |         THE COURT:  It's a Ford, Pinto.

 7 |         MS. CRUZ:  Okay.  So it does not have automatic

 8 | emergency breaking, but if you a bought a car in the past few

 9 | years, it has some form of automatic emergency breaking, which

10 | is a more basic ADAS or advanced driver feature.

11 |         They are also alleging that the automatic emergency

12 | breaking should have recognized those things that I just talked

13 | about; the traffic light, the parked car, the end of the

14 | roadway.  And that it should have slowed down or stopped the

15 | vehicle and it didn't do that.

16 |         THE COURT:  Okay.

17 |         MS. CRUZ:  So the two things at issue in this case and

18 | the two features that our witness is going to talk about is

19 | auto steer, automatic emergency breaking, and driver

20 | monitoring.  Their allegation that the system should have known

21 | that this driver bent down and didn't have eyes on the road.

22 |         So what is Tesla doing when the car is on autopilot to

23 | monitor the driver?  It is called a driver monitoring system.

24 | So you see that's a big part of their notice.  So those are the

25 | confines of what we think is relevant in this case.

 1          THE COURT:  Okay.

 2          MS. CRUZ:  Or what is relevant according to their

 3    complaint.  It is not that we agree with that.  I don't want to

 4    say that we agree that those are issues, but that is what their

 5    complaint says.

 6          THE COURT:  Okay.

 7          MS. CRUZ:  So to answer your question how would you

 8    determine what the scope is, that's the scope.  But I do

 9    honestly believe that if we got in the deposition and we did

10    the deposition, and then we went through what is going to be if

11    they want to with Your Honor, the probably -- I'm sure they are

12    going to go the full seven hours because Plaintiffs' attorneys

13    always do and no offence to anyone in the room.

14          THE COURT:  Just on your description of the issues

15    that you conceded the issues that would take seven hours,

16    wouldn't it?

17          MS. CRUZ:  I don't really think so because Plaintiffs'

18    counsel has already tried -- there has only been two autopilot

19    trials so for; Tesla autopilot trials.  Plaintiffs' counsel has

20    tried one of them.

21          So he knows about the system.  He knows how this

22    works.  He has taken depositions in addition to the one in this

23    case.  You know, he has taken other depositions.  So he knows

24    how autopilot works.  This isn't where you are walking -- and

25    sometimes we have cases with lawyers that are not as

1  sophisticated in terms of autopilot -- not sophisticated, but

2  knowledgeable.  And they have to go and start from square one

3  because they are getting their bearings or you have an expert.

4       But now the experts that the other side are using,

5  certainly the experts that they have -- I have another

6  autopilot case and they have another autopilot expert and that

7  case is about to go to trial.  And so she is certainly

8  knowledgeable about -- so it's not going -- I know it must be a

9  lot for Your Honor to come into this case.

10      But there is a lot of new stuff that I have been

11 learning for a long time.  And I have been working on this for

12 four years and it is a new concept and feature and Tesla's

13 technology is always changing.

14      So every time you learn something they do an update.

15 They change the system.  They change the autopilot system that

16 was in this car is so different from the same exact vehicle

17 right now if you went and bought it today.  It is completely

18 different.

19      So we are all learning, but Plaintiffs' counsel knows

20 a lot.  He is not going to sit there and ask these basic, you

21 know, how does auto steer work .  He is not going to do that

22 because he knows and he has it in other depositions.

23           THE COURT:  Okay.

24           MS. CRUZ:  So --

25           THE COURT:  All right.  Now let me turn to counsel for

1    the Plaintiff.

2           MR. EATON:  Okay.  First of all, are we talking about

3    the Phatak (phonetic) deposition?  Is that the witness; Ash Kay

4    Phatak?

5           MS. CRUZ:  Yes.

6           MR. EATON:  Okay.  All right.  Has there been an

7    agreement -- because you objected.  Has there been an agreement

8    to allow that 30(b)(6) deposition to be used in this case?

9           MS. CRUZ:  It's --

10          THE COURT:  I thought she said it was cross-noticed.

11          MS. CRUZ:  Here's the notice and here's Plaintiffs'

12   counsel and this is attorney Don Slavik cross-noticing this

13   deposition in the matter of Benavides and he spells it out:

14   U.S. District Court for the Southern District of Florida, Case

15   Number -- it is already done.

16          MR. EATON:  Right.  But you mentioned that you

17   objected to that process.  And so what I am trying to figure

18   out is, first, are they allowing the use of this deposition in

19   this case?  The answer to that is yes.  At least With respect

20   to the topics that were noticed in there, which were not very

21   big and there are only two pages of topics.

22          THE COURT:  There was 15 hours of deposition.

23          MR. EATON:  Well, he was the one taking it.  It was in

24   another case.

25          THE COURT:  Right.

1          MR. EATON:  So he cross-noticed it.

2          THE COURT:  Okay.

3          MR. EATON:  This section was not --

4          THE COURT:  How long did he take?

5          MR. EATON:  I don't know, but the actual notice, the

6     topics are a page and-a-half and what we have here are 13 pages

7     of topics.  So it is much broader --

8          THE COURT:  I'm taking it as that deposition was taken

9     in the case unless you tell me otherwise.

10          I am going to rely on it, right?  Do you have an

11     objection at the time of the taking of the deposition when

12     counsel said I also cross-noticing for this case, did you

13     object.

14          MS. CRUZ:  We did not object --

15          THE COURT:  Okay.

16          MS. CRUZ:  -- on the record.  I believe that we had

17     originally filed a notice, but I can see here that we didn't

18     object on the record.

19          THE COURT:  Okay.

20          MS. CRUZ:  Of course we are going to take the position

21     that much of that testimony is not relevant in this case if it

22     does not relate to --

23          THE COURT:  That's a different issue.

24          MS. CRUZ:  Right.

25          THE COURT:  In other words, that's a different issue.

 1    His point is he just wants to make clear and I want to make

 2    clear because it effects my ruling that there is no dispute

 3    that that deposition to the extent it is relevant --

 4              MS. CRUZ:  Right.

 5              THE COURT:  -- is a deposition for purposes of Rule 30

 6    in this case.

 7              MS. CRUZ:  Absolutely.

 8              THE COURT:  Okay.

 9              MS. CRUZ:  In addition, to this case to make it any

10    easier as well, there have been more autopilot documents

11    produced in that case -- it's called the *Wang* case -- than any

12    other Tesla autopilot cases to date.  And Plaintiffs' counsel

13    signed a protective order and has full access to all of those

14    documents.  I couldn't give you the number.  I don't know and

15    this is --

16              THE COURT:  Okay.  Let me stop you there.

17              MS. CRUZ:  Okay.

18              THE COURT:  So the stipulation is clear.  Go ahead.

19              MR. EATON:  So to the extent that Don Slavik asked

20    questions on these limited topics, these two pages of topics,

21    he is not going to ask the same question here.  But I don't

22    think he asked case specific questions relative to our case in

23    this deposition.  And therefore, of all of the questions he

24    should be entitled to ask them.  I think that's a pretty basic

25    proposition.  We're not wasting time.

```
 1          THE COURT:  Not necessarily.  But, on the other hand,
 2   they are not objecting to you taking another, quote unquote,
 3   autopilot engineer specifically for this case.
 4          MR. EATON:  Right.
 5          THE COURT:  I took her argument to say they are going
 6   to have that one and they are going to have this one.  So I
 7   heard they are not objecting.  So I am not objecting *sua*
 8   *sponte.*
 9          So you are taking, in addition to that 15-hour
10   deposition, they are going to produce another engineer is
11   knowledgeable about the autopilot system.
12          MR. EATON:  Hopefully on the topics that we are
13   talking about here.
14          THE COURT:  Okay.
15          MR. EATON:  So which brings us back to the overarching
16   question, which is are you willing to entertain argument on
17   their general objections to the topics today, or do you want us
18   to take the deposition?
19          THE COURT:  Take the deposition.
20          I think my discussion here has shown quite clearly why
21   I can't possibly answer your question because just -- did you
22   agree with her description that your case is about what she
23   described?
24          MR. EATON:  Well, more or less.
25          THE COURT:  Okay.  That's all you had to say.  More or
```

1    less.  That means that you really --

2              MR. EATON:  The facts of the --

3              THE COURT:  -- may have additional arguments that you

4    think this case is about, right?

5              MR. EATON:  Right.

6              THE COURT:  But there is some overlap based upon what

7    she said.  I get you.

8              MR. EATON:  Yes.

9              THE COURT:  So then --

10             MR. EATON:  There's an overlap.

11             THE COURT:  So, then, just on the topics that are

12   overlap that is going to consume a great deal of time.

13             MR. EATON:  I wouldn't think so.

14             THE COURT:  So to the extent that there is anything

15   else that you want to ask that the witness is not knowledgeable

16   about, right?  Then, we will have to figure out whether I need

17   to compel it.

18             If the witness is knowledgeable about something that

19   you've asked that's irrelevant, the witness is to answer the

20   question.  They can't instruct him not to answer, right?  So

21   they are actually being, I think, what's the term?  They are

22   being practical.

23             They could produce, you know, an associate law firm,

24   but they are not.  They are producing an actual engineer.  So

25   this person actually has substantive knowledge.  And so,

```
 1  therefore, since he has substantive knowledge he may be able to
 2  answer all of your questions.
 3      MR. EATON:  That's possible.  The problem is we create
 4  a list of things that we want the witness to be educated on.
 5      THE COURT:  Okay.
 6      MR. EATON:  And they're saying we are not going to
 7  educate the witness on these topics.  We object to the topics
 8  and we don't consider them relevant.
 9      THE COURT:  Give me an example, by the way, just so I
10  understand.  I haven't read your whole notice.
11      MR. EATON:  I'll give you example.
12      THE COURT:  Give me an example of a topic that you
13  think they are objecting to that is borderline frivolous.  In
14  other words, that is ridiculous.  How can you object to this
15  topic given the nature of this case.
16      MR. EATON:  One of the issues that we've raised in
17  here is a topic called geofencing.  Geofencing is you know
18  where your car is at all times --
19      MS. CRUZ:  I'm sorry.  May I just ask for a reference
20  to the topics so I can actually read what it says?
21      MR. EATON:  Sure.
22      MS. CRUZ:  I'm sorry to interrupt.
23      MR. EATON:  Topic 4.
24      MS. CRUZ:  But you said you were not going to raise
25  that today.
```

1          MR. EATON:  I did not say that I was not going to

2  raise it today.

3          THE COURT:  Just go ahead.

4          MR. EATON:  I specifically said I was going to raise

5  it today.

6          MS. CRUZ:  Got it.

7          THE COURT:  Just go ahead.

8          MR. EATON:  So the topic of geofencing.  Geofencing is

9  know where your car is.  You have the ability to turn on and

10 off your system based on where the car is.

11         One of the main issues in this case is this system was

12 not designed to be used on certain streets.  It is designed to

13 be used on highways.

14         And there was an admonition, you know, Tesla tells its

15 drivers use it only on highways and don't use it on service

16 streets.  But they let the driver use it on service streets

17 because they are beta testing the system and they basically

18 essentially use their drivers as guinea pigs to send data back

19 to the company to assist in building their full self-driver

20 suite.

21         So drivers using this system are giving data to Tesla

22 to build this beta product that is not an issue in this case

23 called full self-driving.  Okay.  So they let people use it on

24 cars on road, which is not what it was designed for because it

25 does not detect stop signs, or stoplights, or things like that,

1   but they are still allowing them to use it.

2           So one of the issues in this case is why?  Why did you

3   allow people to use that in areas where they shouldn't have

4   been using it.

5           THE COURT:  And which part of the system, by the way?

6   The steering system?

7           MR. EATON:  All of it.

8           THE COURT:  What was it again?  Oh, the cruise

9   control?

10          MR. EATON:  All of it.

11          THE COURT:  The speed control.

12          MR. EATON:  The way this works is a little stop on it.

13  You pull it once and it puts on your cruise control which keeps

14  you in place.  You pull it twice and now you've got lane

15  holding and cruise control.  So it is like one step and then

16  another step.

17          THE COURT:  Okay.

18          MR. EATON:  Okay.  So that's the autopilot suite that

19  gives you all those controls.  And there is emergency breaking,

20  but those two components, auto steer and the cruise control,

21  that's when you turn both of them on, they are both on and they

22  allow them to use that on these streets here.  And so that's

23  one of the topics is to why.  Why would you know that this is

24  not ready for prime-time on these streets that you are letting

25  people use that?

```
 1          And they object and said that's outside the scope of
 2  your allegations.  It's not.  The original complaint we believe
 3  covered it, but the amended complaint has numerous allegations
 4  regarding geofencing.  I can read some of those to you if you
 5  would like.  I brought those down.
 6          MS. CRUZ:  What amended complaint?
 7          MR. EATON:  The one that was attached to 165, DE-165,
 8  which was the amended complaint.
 9          MS. CRUZ:  Thank you.
10          MR. EATON:  So.
11          THE COURT:  165?
12          MR. EATON:  Yes, Page 27.
13          THE COURT:  Is that the current operative complaint?
14          MR. EATON:  No, this is the post amended complaint
15  that we have to turn in our revised one on Monday.
16          THE COURT:  Oh, okay.
17          MR. EATON:  But, essentially, it is going to be this
18  minus some of the counts.  Plus some punitive language, more or
19  less.
20          THE COURT:  Okay.
21          MR. EATON:  But the allegations in here 19, 20, it was
22  not designed to be used on roadways, cross traffic, or
23  intersections and, nevertheless, was allowed by Tesla to be
24  operated in such areas.
25          Paragraph 20 it allows you to use it on roadways that
```

1    Tesla knew were not suitable for its use and knew it would

2    result in collisions causing injuries and death of innocent

3    people who choose not to be part of Tesla's experience.

4            Plaintiffs, on Page 30, allegation -- let's see here.

5    Page 29, allegation 32 talks about outside control of access

6    highways where Tesla says its software is designed to be used.

7            Allegation 33 it did not restrict autopilot and auto

8    steer to the kind of roads that the technology was designed to

9    operate.

10           The allegation on Page 61 in the products liability

11   allegation, allegation 121-H, the failure to restrict the

12   ability of drivers to use autopilot in areas outside which is

13   designed to operate safely.

14           So all of that relates to the concept of geofencing.

15   And so it is there in the complaint and they are saying, well,

16   you didn't allege it.  You didn't use the word geofencing, but

17   that's exactly what geofencing is.  And they say, well, we are

18   not going to (inaudible) you saying we talked about that.

19           And that, you know, it seems to me that the Court

20   could simply say you made that allegations and formed them in

21   your complaint and your witness should be able to testify as to

22   that topic and that's why, you know, we are here.

23           THE COURT:  I don't know what geofencing is in this

24   context.  What does that mean in the automotive context or in

25   the Tesla context?

```
 1          MR. EATON:  That the driver of this car should not
 2  have been able to use autopilot on cars on road which would
 3  have avoided the accident.
 4          THE COURT:  But That is not what geofencing means.
 5          My question is what does geofencing mean in the
 6  context of the car.
 7          MR. EATON:  It is.  That is what geofencing means.  It
 8  means that they can tell.  They fence off the areas where it
 9  can be used to control access to highways.  Meaning, once you
10  get off you can't use it anymore.
11          THE COURT:  Okay.
12          MR. EATON:  That's geofencing.
13          THE COURT:  And is that something that they actually
14  use or simply something that you want them to use?
15          MR. EATON:  That is something that they are capable of
16  doing that they did not do.
17          THE COURT:  So you want them to use it?
18          MR. EATON:  Correct.  That's one reason I would say it
19  is defective because they had the capability of doing that and
20  other lawmakers do that.
21          THE COURT:  Okay.
22          MR. EATON:  They did not.
23          THE COURT:  Okay.
24          MR. EATON:  And why not?  Because they were collecting
25  data from their customers to help out their FSD.
```

1          THE COURT:  And is it correct that other car companies

2     use that geofencing technology in connection with their

3     systems?

4          MR. EATON:  It is my understanding that cars use lane

5     holding and that kind of cruise control.

6     (Audio recording commenced as follows:)

7          MS. CRUZ:  That they are asking the Court to make.

8     And whatever it is, whatever we need to go through with the

9     Court and whatever the Court needs to hear, you know, we will

10    do that, but this is not the proper way to do it.

11          And that's why we propose let's go, after you take

12    what I know is going to be seven hours of testimony, combined

13    with the 14 you already have.

14          We will see what shakes out with the amended complaint

15    because it sounds like there is going to be a dispute about

16    what that is going to actually look like and then we can see

17    where we are.

18          And their response is going to be, oh, but we have

19    deadlines.  It is not Tesla's fault that you waited all these

20    years to do this deposition.  This case went on for the first

21    year to a year and-a-half.

22          We were the ones setting the depositions.  They were

23    asking for discovery extensions.  They were responding late to

24    discovery.  So we took the driver's deposition.

25          And just so you know, I wanted you to know this

1   because it is really important talking about the warnings and I

2   can tell you that it is our position that the warnings aren't

3   relevant.

4          The driver in this case, who they already sued and

5   settled with before they sued Tesla, the police officer had

6   body cam on him.  So not only do we have recordings of what the

7   driver said on the scene, but we took the deposition of the

8   driver.  And he was one of the most upstanding people that we

9   have ever deposed, I think.  I couldn't believe -- I didn't

10  take the deposition.

11         When I read the transcript, he said I have my hands on

12  the wheel and I just bent down to pick up the phone.  It was my

13  fault.  I understand the car doesn't driver itself.  I didn't

14  expect it to stop for traffic.  I knew that I was responsible.

15  I understand.  I never thought this car would drive itself.

16         He was not a driver who said, oh, my gosh, I thought

17  that it was going to stop for a traffic light.  So, for

18  example, their allegation is there was a flashing red light and

19  the car didn't stop.

20         And you have a driver saying, I admit I didn't read

21  the owner's manual.  I didn't read the owner's manual.  I am

22  going to tell you right now I didn't read the owner's manual,

23  but I knew the car had limitations.  I know that these systems

24  are in beta and I understand what that means.

25         That means they are still testing it.  I wanted to buy

1   the car anyway.  I understand limitations like it wouldn't stop

2   for a traffic light.  I understand that and this was my

3   responsibility.  Those were his words.

4          THE COURT:  Did he end up running a light?  Is that

5   what happened?

6          MS. CRUZ:  Yes.  So it was a T-intersection and he was

7   driving and he was on the phone with the airlines.  He was

8   going to a funeral the next day and he was making arrangements

9   for the funeral.

10         We know that he had his hands on the wheel from the

11  data in the car.  He is talking on -- I don't know if he had

12  the phone to his ear or not.  I don't think he said that, but

13  the phone fell on the floorboard and he reached down real quick

14  to pick up the phone.

15         So this isn't even a case of, you know, sometimes we

16  have autopilot cases where somebody is watching a Harry Potter

17  movie and they are completely distracted and they don't have

18  hands on the wheel.

19         This wasn't that.  These are accident facts that have

20  been happening since you first bought your Ford, Pinto, which

21  is people are driving and they drop something and they bend

22  down real quick to pick it up.

23         So he understood and he used autopilot every day.

24  This gentlemen worked in Boca and lived in Key Largo.

25         THE COURT:  So you are suggesting there might be a

1  causation problem?  Is that the problem?

2         MS. CRUZ:  A little bit because we have the driver

3  saying --

4         THE COURT:  Let me stop you there.

5         MS. CRUZ:  Yes.

6         THE COURT:  You make a good point.

7         On the other hand, I am not necessarily -- and I take

8  your point that you objected to specific things that you

9  believe are outside the scope of the case and you didn't object

10  to everything having to do with everything that he is talking

11  about and I hear you on that.

12         I think just because I want to move on to see if there

13  is anything else you want me to do.  This discussion has been

14  very interesting and it elucidates precisely why I don't do

15  this normally.

16         And typically, it is for the benefit of a defendant

17  who wants to come in and have me summarily tell the plaintiff

18  you can't ask that and you can't ask this.  I don't do that

19  because the 30(b)(6) witness deposition, you don't get any

20  special benefit as a defendant.

21         On the other hand, the Plaintiff obviously has to ask

22  questions that are relevant to the case and how that comes out

23  is often difficult to say in the abstract.  And I think both of

24  you have identified very legitimate arguments as to things that

25  you are entitled to ask about and things that a witness must

1  answer.  And then the witness will know and if the witness

2  doesn't know, the question is why didn't you know, right?

3          And so I think this perfectly outlines why I follow

4  Judge Gonzalez' order from like 1985.  And that order is

5  correct today, which is I am just not going to sustain the

6  objection and nor am I going to compel it.  Nor am I going to

7  rule on it.

8          Because I think what normally happens your seven hours

9  you will get enough responsive information.  Including over

10 things that they objected to that it won't be worth your time

11 and you will move on and that is probably what is going to

12 happen.

13         MR. EATON:  I understand, Your Honor.

14         THE COURT:  So nor am I going to rule on your

15 objections.  Nor do I want a brief in advance.  Your objections

16 are noted.  The point of Judge Gonzalez' order is -- and this

17 is what I just want to make clear.

18         If this is expert -- I keep saying expert.  If this

19 engineer from Tesla knows some specific answer to a question

20 because he's an engineer who works on these cars, he knows

21 everything about it, right?

22         You cannot instruct him not to answer a question that

23 he knows.  You can't do that.  Nobody is entitled to do that.

24 You can certainly object and you have already objected on

25 relevance grounds.

1          So if his answer is something that has nothing to do
2    with the case it should never come in.  That's all that Judge
3    Gonzalez was saying that a corporation can't benefit from the
4    rule by having some prophylactic measure that an individual
5    witness, the individual who caused the accident doesn't get the
6    benefit of -- he doesn't get the benefit of saying, well, I am
7    going to answer all the questions of one, two, three and four,
8    five, six I am not going to answer.  That was his ruling.
9          So I think that's the reason why it exists because the
10   previous example of why this rule is completely correct.  Not
11   every Judge does this, by the way, but I follow his approach.
12   So I will table that.
13         Anything else that you want to tackle before we
14   adjourn?
15         MR. EATON:  Yes.  I would like to address something.
16         THE COURT:  All right.
17         MR. EATON:  So the other request for production, Your
18   Honor --
19         THE COURT:  Okay.
20         MR. EATON:  So the first one on the list is request
21   for production number 13.
22         THE COURT:  What does that come up, by the way?  Oh,
23   April 5th.  So we are down by a month.
24         MR. EATON:  We have it extended until June, Your
25   Honor.

```
 1              THE COURT:  Oh, I'm sorry.  It's June for November
 2   trial; is that where we are?
 3              THE COURTROOM DEPUTY:  Yes, Your Honor.
 4         MR. EATON:  Yes.
 5         THE COURT:  Okay.  Go ahead.
 6         MR. EATON:  So Document 177, Page 19, is request for
 7   production number 13.
 8         THE COURT:  Number 13?
 9         MR. EATON:  Request number 13.
10         THE COURT:  Okay.
11         MR. EATON:  This is objected to.  This is a document
12   that exists.  It was produced in another case.  So it is not
13   like they have to make it a case that was produced in was --
14   give me one moment.
15              THE COURT:  Produced in a number of vehicles Tesla has
16   sold or leased?
17         MR. EATON:  Yes.
18         THE COURT:  Okay.
19         MR. EATON:  In operation in the United States.
20              And why this is necessary because they have a document
21   called the Vehicle Safety Report, which they would like to put
22   it in trial and they have used in trial.  And say this document
23   shows that our using the autopilot system is safer than
24   driving, but what we need for that in order to challenge that
25   is essentially the numbers that go into that.
```

1        And that document utilizes all of the cars they make;

2   all models and all years.  And then, so we need to know how

3   many cars are out there.  It's that simple and that document

4   was produced in the *Daniel v. Tesla* arbitration.

5        THE COURT:  In other words, the 30(b)(6) witness is

6   not going to deny that they produce hundreds and hundreds and

7   thousands of cars.  Is that in dispute that they produced --

8        MR. EATON:  This is specific.  We need the number of

9   cars.  This is a request for production and not 30(b)(6).

10       THE COURT:  Okay.

11       MR. EATON:  So they are objecting to that as saying it

12   is overly broad and not proportional to the needs of the case.

13       THE COURT:  So you have a particular document in mind

14   that you have seen?

15       MR. EATON:  That our co-counsel has seen.

16       THE COURT:  What is the name of the document?

17       MR. EATON:  It is the sales documents that show the

18   number of subject vehicles that they sold or leased in the

19   United States since inception, essentially.

20       THE COURT:  Okay.

21       MR. EATON:  And it was produced in *Daniel Sung v.*

22   *Tesla.*  The document exists.

23       THE COURT:  Okay.

24       MR. EATON:  It has already been produced.  So

25   literally just got to hand that over and not create anything

1    and they are saying it is overbroad.

2           THE COURT:  And you think it is relevant because it

3    would impeach their defense at trial that what?

4           MR. EATON:  In order to challenge their Vehicle Safety

5    Report numbers, which is this black box they say, well, this is

6    the number of accidents per mile.  We need to know the number

7    of accidents and the number of cars on the road.  We have the

8    underlying data, essentially, and that's one piece of that.

9           THE COURT:  Okay.

10          MR. EATON:  And our expert could say, no, it is wrong

11   because here -- but if they don't give us that information,

12   then we can't challenge it and they just get to go out there

13   and put on their Vehicle Safety Report and that's it.  They won

14   that case.

15          THE COURT:  And they call their document a Vehicle

16   Safety Report?

17          MR. EATON:  Yes.  That's the document that they put on

18   their website that says this is safer.  This document that we

19   are asking for here is not that.  I mean, we have the --

20          THE COURT:  Right.

21          MR. EATON:  This is part of the data that underlies

22   it.

23          THE COURT:  Okay.

24          MS. CRUZ:  I mean, I think the most apparent question

25   is why are they asking for it if they have it?  I haven't seen

1    this document.

2            MR. EATON:  This is another case.

3            MS. CRUZ:  I haven't seen it, but if you have it, you

4    are not limited to using materials that the other side provides

5    to you.  You can use anything you want as long as you give it

6    to the other side.

7            THE COURT:  Maybe he is subject to a protective order

8    or something.

9            MS. CRUZ:  Well, if he is subject to a protective

10   order -- and that was going to be my second point.  I am not

11   familiar with the case that he is talking about.  So it is

12   either one of two things.  Either they rightfully have it and

13   they can use it, obviously.

14            And number two, is if they have it and they are

15   talking about it, you can't take a document that is part of a

16   protective order and go to an unrelated lawsuit and try to use

17   that document, which is essentially what they are doing and

18   that is going to be an issue in other cases.

19            THE COURT:  Well, he claims that it is relevant for

20   impeachment because your defense in the case is that

21   considering how safe the vehicles are, including through the

22   use of this technology and the number of accidents that have

23   been generated, it undermines the Plaintiffs' case --

24            MS. CRUZ:  Right.

25            THE COURT:   -- if there is any defect in the car.

1       MS. CRUZ:  I understand their argument, but they are

2   saying they either have -- I don't know, but they are violating

3   a protective order and --

4       THE COURT:  Let's make believe that it doesn't exist.

5       Okay.  The question would be what would be the basis

6   for me to sustain an objection to the production of a document,

7   if it exists that summarizes the number of cars sold by make

8   and model over the last, say, ten years.  Tesla has been around

9   for ten years, right?

10      MS. CRUZ:  I can tell you that there is no way that we

11  have a document that talks about all the vehicles sold as of

12  today because --

13      THE COURT:  Well, it has to be a certain date,

14  obviously.

15      MS. CRUZ:  And that is something they keep saying that

16  we have this document, but it is actually something that we

17  would have to go and create.

18      THE COURT:  There is no way that that is true.  The

19  data is -- you don't need to create it if you just press a

20  print button.  You are not creating that.  You are just

21  printing it.

22      So the question is does Tesla have a document source

23  for which one can quickly summarize the number of cars sold by

24  make and model for the last ten years.  If the answer to that

25  is yes, right, then what would be the objection other than it

1  is not necessarily relevant, right?  And the answer to that is

2  it depends on how you make it relevant, I suppose.

3        His argument is that you kind of need a denominator to

4  analyze your safety argument at trial.  And his argument is

5  that he knows that because they have tried cases with Tesla and

6  so that's one of the arguments that you would make.

7        And so in order to rebut that, they need to be able to

8  make the argument that they know they only sold this many cars

9  and you are using a false analyze.  That's what he is trying to

10  say.  So it is an impeachment document as best as I can tell.

11        MS. CRUZ:  Right.  I understand that.

12        THE COURT:  So for production purposes, the relevance

13  objection is completely sustained and well taken, but --

14        MS. CRUZ:  Well, I haven't even made my relevance

15  objection yet.

16        THE COURT:  Okay.

17        MS. CRUZ:  I haven't gotten to that part.

18        Your question to me was or my initial response, but I

19  was saying certainly we have to go create something as of today

20  because I don't think that there is just -- I don't know

21  actually.  I don't know.  I don't know if auto manufacturers

22  have something that you can go to and say this is how many cars

23  we have sold since we have been in existence or whatever.

24        THE COURT:  I am just saying for the last ten years.

25        MS. CRUZ:  I can say that I think the scope of ten

1    years is too broad.  I can say that I don't think it is --

2         THE COURT:  So how long has this autopilot suite

3    technology been in the marketplace?

4         MR. EATON:  I was willing to limit it to parch with

5    autopilot functionality.

6         THE COURT:  Right.  How long has it been?  About five

7    years?

8         MR. EATON:  No, longer than that.

9         MS. CRUZ:  It has been longer than that.

10        THE COURT:  Seven years?

11        MR. EATON:  Ten at least.

12        THE COURT:  You should have gone by ten then.

13        MR. EATON:  Well, in case it was lower --

14        THE COURT:  What difference does it make?

15        It would be just for the last ten years.  And from the

16   pick a date January 1, 2024.  Okay.  So I will compel that.

17        MR. EATON:  Okay.

18        THE COURT:  So what is the next issue?

19        MR. EATON:  The next issue is documents that were

20   produced in -- this is on Page 21.

21        THE COURT:  Request 21?

22        MR. EATON:  I'm sorry.  Request 16 on Page 21 of

23   Document 177.  These documents that they analyze crashes --

24        THE COURT:  You're referencing another lawsuit, right?

25        MR. EATON:  Yes.

1        THE COURT:  In other words, how do I know whether that

2    is relevant here?

3        MR. EATON:  Well, again, this is the situation where

4    our co-counsel in this case.  And what they are saying is the

5    mere, you know, idea that you are referencing the cases is a

6    violation of protective order.  It's not.

7        THE COURT:  It may be.  I don't know.  It depends on

8    how the language of the protective order was.

9        MR. EATON:  Yes.  They are citing the Bates number of

10   a document without any of the content of it, you know, they are

11   welcome to show you the protective order.

12        I don't think they are going to say that's a violation

13   of it, but the bottom line is the mere fact that a protective

14   order is entered in another case doesn't prevent it from being

15   discoverable in this case.

16        THE COURT:  But the way you have defined the request,

17   how do I know what this is about?  I understand for purposes of

18   convenience of the other side that makes perfect sense, but how

19   can I compel this?  I have no idea what the case is about.  I

20   have no idea what the request for production is about.  Do you

21   see my point?  How can I help you?

22        MR. EATON:  I do.  These are documents related to the

23   Vehicle Safety Report that we just discussed.  They analyze

24   crashes whether they are --

25        THE COURT:  So why don't you just ask for the Vehicle

1    Safety Report for this model here?

2          MR. EATON:  Well, the Vehicle Safety Report is the one

3    they publish on their website.

4          THE COURT:  Oh, so you have it?

5          MR. EATON:  This is the underlying data that --

6          MS. CRUZ:  It's a public document.

7          THE COURT:  Okay.

8          MR. EATON:  So this is the underlying data of the

9    summaries that go into it.

10         THE COURT:  Okay.

11         MR. EATON:  And so --

12         THE COURT:  But do you have a request that does that?

13         MR. EATON:  Well, I think we asked for that generally

14   and they objected.  And when we asked specifically we said,

15   look, we know that you have this document because you produced

16   it in another case.  That was the purpose of this was a matter

17   of expediency.

18         THE COURT:  Okay.  I understand.

19         MR. EATON:  You know, we get an objection -- we asked

20   for a (inaudible) that would encompass that.

21         THE COURT:  And what would be part of the Vehicle

22   Safety Report?  Where would that be?

23         MR. EATON:  It is all the crashes that have been

24   sustained by these vehicles.  And then, the data that is

25   contained in whether they were on autopilot or whether the

1   driver was driving.  It is all of that underlying data that

2   would allow us to check the --

3           THE COURT:  And is that document and the data turned

4   over to the Government?

5           MR. EATON:  It very likely would have been turned over

6   as far as this investigation.

7           THE COURT:  And then in a normal course would --

8           MR. EATON:  Not in a normal course, but in this

9   investigation and almost certainly they would provide that as

10  well.

11          THE COURT:  Okay.

12          MR. EATON:  So, again, this is shorthand here to let

13  them know this is the information we are looking for.  It is

14  already created.  You don't need to press a button.  It is

15  already there.  Turn that document over because it is relevant

16  here in this case.

17          THE COURT:  Okay.  So if I convert his request to the

18  Vehicle Safety Report in the backup materials that we used to

19  compile the exigent chart that is a summary, the backup

20  materials used to compile it that identify the number of

21  crashes, et cetera, is there a problem with that?

22          MS. CRUZ:  There's a huge problem.

23          THE COURT:  Okay.

24          MS. CRUZ:  The huge problem is Your Honor said I don't

25  know what the protective order says, right?

1     THE COURT:  Right.

2     MS. CRUZ:  I believe it is attached.  This is the

3  second time that Plaintiffs' counsel has tried to use documents

4  and they got in trouble with the Court in California for doing

5  this.

6     Let me tell you about the Harcourt case.  You said I

7  don't know what that case is about.  That is not even an

8  autopilot case.  That is a case where a kid --

9     THE COURT:  That's why --

10     MS. CRUZ:  -- got in a car --

11     THE COURT:  I've already cut to the chase on that.  I

12  am not compelling that request.  I am asking another question.

13     MS. CRUZ:  Okay.

14     THE COURT:  If I compel the Vehicle Safety Report and

15  the backup that was used to compile it, if I were to draft that

16  request, is there something wrong with that in terms of

17  producing that either on relevance grounds, or overbreadth,

18  whatever?

19     MS. CRUZ:  I would have to look in -- I don't know

20  what the materials used to compile the Vehicle Safety Report

21  are.

22     THE COURT:  Okay.

23     MS. CRUZ:  And I would say they have the Vehicle

24  Safety Report.  We produced it in this case.  They have it

25  publically available and we produced it.  And before Judge

| | |
|---|---|
| 1 | Bloom made the ruling on the recalls, part of the things that |
| 2 | we had to submit to NHTSA as part of that investigation was the |
| 3 | Vehicle Safety Report and the kinds of documents that I think |
| 4 | Your Honor is referring to. |
| 5 | THE COURT:  Okay. |
| 6 | MS. CRUZ:  And they have that.  They've got thousands |
| 7 | of pages of documents that we produced to NHTSA as part of the |
| 8 | recall. |
| 9 | THE COURT:  I thought you said you don't have that. |
| 10 | Do you have it? |
| 11 | MR. EATON:  We don't have the documents that are |
| 12 | identified here as (inaudible). |
| 13 | THE COURT:  My question is do you have backup data for |
| 14 | the Vehicle Safety Report as that document was turned over to |
| 15 | the Government?  Do you have that here? |
| 16 | MR. EATON:  No. |
| 17 | THE COURT:  Okay. |
| 18 | MR. EATON:  Here's the -- |
| 19 | THE COURT:  Put it this way.  I will compel that.  To |
| 20 | the extent that you don't have that I am compelling it.  So |
| 21 | that makes it easier. |
| 22 | MS. CRUZ:  You are compelling what? |
| 23 | THE COURT:  I am compelling the Vehicle Safety Report |
| 24 | and the underlying data as that data was turned over to the |
| 25 | Government. |

1            MS. CRUZ:  But here's the issue.

2            THE COURT:  Right.

3            MS. CRUZ:  The Government, that recall relates to

4    issues that are unrelated to this case.

5            THE COURT:  But they may have relevant information.

6    That's the point.  Just because the document does not have the

7    four corners of a case, the documents may reveal something that

8    may be relevant.  So that's number one.

9            Number two, it can't be onerous because it was

10   produced to the Government in one particular production about a

11   Vehicle Safety Report that may definitely be relevant in this

12   case.  And in fact, the Defendant may use it in trial, right?

13           So that's the reason why I am narrowing it this way is

14   because I am taking the overbreadth argument out of the picture

15   because it is a discreet series of documents that I'm talking

16   about.

17           The backup materials that were turned over to the

18   Government that's something that has already been produced to a

19   third party and it is easily identifiable.  And it is

20   potentially relevant and it satisfies some of what the

21   Plaintiffs are asking for.

22           It may not satisfy all of what he is asking for, but

23   for my purposes that's fine.  So that's how I am splitting the

24   baby.  So I am not compelling whatever was produced in another

25   case in California.

1          MS. CRUZ:  You are not granting the request to compel

2    number 16 and overruling the objection.  You are simply --

3          THE COURT:  I am sustaining the objection.  I am

4    making my own request.

5          MS. CRUZ:  Okay.

6          THE COURT:  As far as --

7          MS. CRUZ:  Torres number one by the Court.

8          THE COURT:  Torres request --

9          MS. CRUZ:  Number one.

10         THE COURT:  You've already produced the Vehicle Safety

11   Report, but to the extent backup data, or summaries, or other

12   materials that were used as backup for that report were turned

13   over to the Government, that information may be used for the

14   Plaintiff.  It can't be onerous because it is one file that

15   counsel for Tesla has.

16         MS. CRUZ:  Well, I don't know.  That might not be

17   true.  I mean --

18         THE COURT:  You will find out.

19         MS. CRUZ:  I don't know.

20         THE COURT:  I'm assuming that's not onerous.

21         MS. CRUZ:  Just so the confines are clear, produce to

22   NHTSA as part of PE-2120, which is the investigation that led

23   to the recall that they are talking about.

24         THE COURT:  Well, I'm talking about the Vehicle Safety

25   Report that would encompass this vehicle, right, and as turned

```
 1   over to the Government in connection with the Government
 2   investigation.
 3           MS. CRUZ:  Right.  This Government investigation.  In
 4   other words, there might have been an investigation ten years
 5   ago about something else that -- I don't know.
 6           THE COURT:  Oh, I thought it was more recent.  What
 7   year was it?  Do you want to identify it by investigation?
 8           MS. CRUZ:  It is PE-2120.
 9           MR. EATON:  Yes.  It was filed as an investigation.
10           MS. CRUZ:  Exactly.
11           THE COURT:  PE-2120.  Whatever that means.
12           MR. EATON:  Your Honor, just to be clear, basically
13   what this is asking for is other accidents.
14           THE COURT:  Yes.  But, in other words, I am not
15   necessarily going to produce other accidents.  I don't think it
16   is relevant.
17           However, if that information has been produced in
18   material form to the Government as part of this kind of
19   investigation, they have already produced it to a third party.
20   So what's the harm of producing it to you or is there?
21           MR. EATON:  I mean, it should have already been
22   produced.  We asked for --
23           THE COURT:  You are getting it.  What's the next one?
24           MR. EATON:  One problem with that is the Vehicle
25   Safety Report began updating in 2018.  Before that they had a
```

1  different type of system.  So data that goes into the vehicle

2  may be different than --

3           THE COURT:  I don't need to hear an audit from Tesla.

4  I just need to give you sufficient documents from which you can

5  then make an argument at trial in this case.

6           MR. EATON:  Right.

7           THE COURT:  So I don't need to do a forensic

8  accounting of all of Tesla's safety mechanisms.  The only

9  reason this is relevant is to give you underlying data that you

10  can then use in connection with your defense.

11          MR. EATON:  I just want to make sure that the data is

12  comprehensive and covers the time period that we need, which

13  specifically is prior to the accident.  I am happy to take

14  after the accident.

15          THE COURT:  When was of the date of the accident?

16          MR. EATON:  2019.

17           MR. POSES:  April of 2019.

18          THE COURT:  So if they produced documents in, what,

19  2020?

20          MR. EATON:  Yes.

21          THE COURT:  This is --

22          MR. EATON:  This order will cover 2018 to 2022.

23          THE COURT:  Perfect.

24          MR. EATON:  Okay.  But the problem is that we need the

25  documents prior to 2018 as well because that's when early

1    reiterations of autopilot, we believe, was less safe.  And

2    therefore, more dangerous and, therefore, more accidents

3    occurred during that timeframe.  And part of the problem is

4    that the D-16 reports that they gave us about accidents only

5    are issued when there is a seatbelt retention goes off or an

6    airbag is deployed.

7          Like, for example, neither of these things happened in

8    this case.  If you don't stop or slam on the brakes, or

9    anything like that, then it is not going to show up in the D-16

10   reports.  So we don't have all the data as far as when an

11   accident occurs.

12         So that's why we need the underlying data for all

13   accidents for all models because that's what they are basing

14   their statements on in saying our cars are much safer when

15   using autopilot versus manual.  So we need them for the manual

16   accidents and the autopilot accidents.

17         And then we have the information for the sales and we

18   will have the numerators and the denominators.  If we don't

19   have the pre 18 data, then that hurts our ability to argue

20   notice.

21         THE COURT:  Why?

22         MR. EATON:  (Inaudible) this problem.

23         THE COURT:  I understand and you may be entitled to

24   something else in response to a particular request.

25         Your request is for a Vehicle Safety Report as

1  produced in California.  I am sustaining their objection.  I am

2  giving you a compromise.  The Vehicle Safety Report and the

3  underlying documents that were used and submitted to the

4  Government for that report and apparently it includes 2018

5  data.  So that would be relevant to you.  So I am compelling

6  that because I think I can't come up with a good reason not to.

7          MR. EATON:  Okay.

8          THE COURT:  What is the next one?

9          MR. EATON:  So request number 30, which is on Page

10  30 --

11          THE COURT:  30.

12          MR. EATON:  I just want to get a ruling on this so we

13  can adjust accordingly.

14          THE COURT:  Okay.

15          MR. EATON:  These are --

16          THE COURT:  I don't have a 30.  I have 29 is the last

17  one.

18          MR. EATON:  On Page 30 of 177.  It's a 68-page

19  document of 177.

20          THE COURT:  Okay.  I'm sorry.  Page 30, request number

21  30.  I'm with you now.

22          MR. EATON:  So this was, you know, designed to

23  shortcut.  These are all documents that are related to

24  autopilot issues that we believe should have been produced in

25  this case that are relevant.  So we said here they are and they

 1 | raised the same objection that we just argued about.

 2 |       THE COURT:  Right.  Are you objecting as well?

 3 |       MS. CRUZ:  Your Honor, I think it is important that

 4 | we --

 5 |       THE COURT:  Simple question.  Yes or no, are you

 6 | objecting?

 7 |       MS. CRUZ:  Are we objecting, yes.  You said on a same

 8 | basis and I just --

 9 |       THE COURT:  Yes.  I can't compel this because I have

10 | no idea whether or not anything is relevant.

11 |       You may know it is relevant, but in which case frame a

12 | request that makes it relevant, but I get you.  Amongst

13 | yourselves you can work together to say this is what we are

14 | asking for, but I can't compel something I have no idea what

15 | this is.  So I'm sorry.

16 |       MR. EATON:  I understand, Your Honor.

17 |       THE COURT:  I have limitations and that is one of them

18 | because I can't compel it.

19 |       MR. EATON:  I understand that, Your Honor.

20 |       THE COURT:  Okay.

21 |       MR. EATON:  Which raises a question that I wanted to

22 | bring up at the beginning of this hearing.

23 |       THE COURT:  Okay.

24 |       MR. EATON:  Since we have a short amount of time left

25 | and since we may be coming back here on things to get resolved

1    and we do.  And we do have a lot of meet and confers and I do

2    want to reiterate that.

3          THE COURT:  Okay.

4          MR. EATON:  But I am certain that we will have various

5    things to disagree on.  Our co-counsel that have some knowledge

6    in this case that you can't take their knowledge out of their

7    brain, right?  They have it.  So they can explain to you what

8    this is and how they know it is relevant and for future

9    hearings --

10         THE COURT:  I think you've been quite persuasive.  So

11   I don't understand.  Where are these people from?  Is it

12   Sullivan and Cromwell?

13         MR. EATON:  No.

14         THE COURT:  No?  In that case, I think you will do

15   just fine.

16         MR. EATON:  My question is in the future if possible

17   if we could do some of these by Zoom that would allow them to

18   appear and answer some of those questions and also their

19   counsel is out of town, too.

20         THE COURT:  I let everybody appear by phone, but as

21   long as you argue it -- in other words, they could have

22   attended the hearing.  If they ever want to attend the hearing,

23   we always let people from out of town do that.

24         MR. EATON:  Okay.

25         THE COURT:  What you are saying is you wanted to let

 1    them argue it?

 2            MR. EATON:  Potentially some items that they have the

 3    knowledge on that I technically can't have because I am not

 4    counsel in that case.

 5            THE COURT:  If it is so discreet that it doesn't

 6    bother the process I never -- I'm not draconian about it, but I

 7    don't like having arguments on the telephone and we don't do

 8    Zoom anymore because it is much better when I have you in the

 9    room.  And most importantly, if that causes more compromise

10    because you have to get on a plane and expose yourself to COVID

11    to come here I am glad.

12            MR. EATON:  Okay.

13            THE COURT:  But I think you are doing just fine, Mr.

14    Eaton.

15            MR. EATON:  I appreciate it.  But to the extent of

16    future hearings I will try to have them available by phone.

17            THE COURT:  Oh, sure.  Absolutely.

18            MR. EATON:  And then, the other overarching thing that

19    I wanted to bring up at the beginning was OCR.  The documents

20    that Tesla has been producing to us in PDF are not OCR, which I

21    am not going to say that this is not intentionally, but they

22    need to be produced in ways that can be scanned.

23            And we are having to print out and then rescan them

24    and OCR them and it is a very tedious process.  When these are

25    created it is really easy.  You press a button that says these

 1    are agreeable and makes them searchable.  And so we simply ask

 2    that all future production and past production that is not in

 3    the OCR be issued OCR compliant going forward.

 4            THE COURT:  Is there a problem with that other than

 5    why it can't be done?

 6            MS. CRUZ:  Yes, the problem is that we produced things

 7    in native form.  So I don't know what all the different forms

 8    are for all the different things that we produced.  And I can't

 9    remember everything that has been produced in this case and I

10    don't know, but a lot of times we have documents.

11            You are going to be -- I don't know.  Maybe not you,

12    but I was shocked when I started working with Tesla of how

13    technologically sophisticated these systems are.  A lot of

14    these files have file names that I have never heard of, like,

15    John Jason (phonetic), which is JSM.

16            THE COURT:  I know what that is.

17            In other words, I don't have a problem with you saying

18    to the extent it is technologically feasible to do.  If it is

19    not technologically feasible to do based upon the nature of the

20    document I'm not going to --

21            MS. CRUZ:  Right.  I just don't want to be --

22            THE COURT:  There is nothing in Rule 34 that mandates

23    that everything has to be in that nature.

24            MS. CRUZ:  Right.

25            THE COURT:  However, most documents today are digital.

```
 1   And so, therefore, his point is not necessarily unreasonable to
 2   the extent it can be done.  It should be done in that way
 3   unless there is a good reason not to.  I think that's a fair
 4   point.
 5          MS. CRUZ:  -- order to do something.
 6          THE COURT:  I am not saying that there's a violation
 7   of Rule 37.  I'm just saying --
 8          MS. CRUZ:  I understand.
 9          THE COURT:  -- they should be produced in OCR form if
10   possible.
11          MS. CRUZ:  Understood.
12          THE COURT:  So I will grant that request.
13          MR. EATON:  To be clear, Your Honor, that applies to
14   PDFs and if it is in native format it is not a PDF.  If it is
15   in native format it is searchable because if it is in XLS
16   format it is searchable, but the problem with PDF they are
17   produced and if they are not OCR, then you cannot search them
18   at all.
19          If you throw something in a scanner then you would
20   print it out --
21          THE COURT:  I am basically granting your relief.
22          MR. EATON:  I know.  I just wanted to answer her
23   question as to --
24          THE COURT:  With a caveat that I recognize that there
25   are certain categories of this that may not be possible.
```

```
 1              MR. EATON:  Right.

 2              THE COURT:  Anything else?

 3              MR. EATON:  All right.  Yes, we do.

 4          So now we move onto page -- so what we have, Tesla has

 5   a video of the accident.  I think it is called APIX (phonetic)

 6   and our expert has told us --

 7              THE COURT:  How does it have a video?

 8              MR. EATON:  The car has cameras.

 9              MS. CRUZ:  What request are you on?  Sorry.

10              MR. EATON:  This would be --

11              THE COURT:  Are the cameras pointing out or pointing

12   in?

13              MR. EATON:  They are all pointing out, Your Honor.

14              THE COURT:  Okay.  I'm not getting a Tesla.  I don't

15   want them taking a picture when I'm driving.

16              MS. CRUZ:  No, it takes pictures.

17          I have a friend who was in an accident yesterday and

18   she has a Tesla.  And it was one of these scams, we think,

19   where the car in front of her, there was no one in front of

20   that car.

21              THE COURT:  Oh, they tried to bump and --

22              MS. CRUZ:  They stopped and they already went and

23   filed the lawsuit.  I told her, I said your car took a picture

24   and it was recording and there is a video.  And sure enough,

25   she got the video and now it is going to help her.
```

```
 1              THE COURT:  Oh, okay.  Fair enough.  Well, given that
 2   we are the capitol of fraud maybe there's a value.
 3              MS. CRUZ:  Well, this was in California.
 4              THE COURT:  Oh, okay.
 5              MS. CRUZ:  But you know what happens here.  I know
 6   that happens here.  I heard about it.  It is really scary.
 7              THE COURT:  Okay.  So he is saying he has a request
 8   for the camera that was of the accident.
 9              MS. CRUZ:  No.  We've already given them all the clips
10   of the accident.  So that is not what --
11              MR. EATON:  It's Page 43 of Document 177, request
12   number 35.
13              THE COURT:  Number 35.  Okay.  Let me get there.
14              MR. EATON:  So it is not just the video of the
15   accident.  They did produce that.
16              THE COURT:  Oh, okay.
17              MR. EATON:  It's the AP VIS that is the data that they
18   have.  It's an annotated video essentially.  It shows the video
19   and has a bunch of data on both sides of it.
20              Our expert has said that the annotated videos contain
21   critical information of understanding any Tesla autopilot
22   collision.  There are no other means of acquiring same except
23   through Tesla and the software.
24              THE COURT:  Just so I understand.
25              In other words, obviously since you deposed the people
```

1  from Tesla before.  Is that the Tesla software product?

2         MR. EATON:  Yes.  And they agreed to produce it and

3  then they decided to not produce it after we had agreed to

4  withdraw a witness and so we had an arrangement.

5         And then, you know, we are not actually going to give

6  you that.  It was just ten minutes prior to the drive with all

7  of the data that goes on the AP software.  That's what we are

8  asking for.

9         THE COURT:  Okay.

10        MR. EATON:  And it has been produced in other cases.

11 Our expert has seen it in other cases.  It's entirely relevant

12 because it gives all the data about what's happening in this

13 car up to the time of the accident and --

14        THE COURT:  And it imprints it on the video itself?

15        MR. EATON:  That's correct.

16        THE COURT:  And then, the video that you received,

17 it's deleted?

18        MR. EATON:  The video is pure video.  It is nothing.

19 It has no data on it.

20        THE COURT:  Okay.

21        MR. EATON:  It's like camera view like if you had a

22 video camera up.

23        THE COURT:  Okay.

24        MR. EATON:  So we want the data.

25        THE COURT:  Do you want to respond on that?

```
 1            MS. CRUZ:  Sure.  That's not how it works.

 2            THE COURT:  Okay.

 3            MS. CRUZ:  There is sometimes the camera records the

 4  crash in some cases.  In this case it did record the crash.  We

 5  gave them that video.

 6            THE COURT:  Okay.

 7            MS. CRUZ:  What they are talking about is and what

 8  their expert has seen -- because I worked in the case.  I work

 9  on the case that his expert, Missy Cummings is in.  They call

10  it an annotated video, but we call it an augmented video.

11            THE COURT:  Okay.

12            MS. CRUZ:  What happened is sometimes after the crash

13  and what happened in that case was right after the crash Tesla

14  ran that video through its software so it could try to see what

15  the autopilot system saw.

16            THE COURT:  Okay.

17            MS. CRUZ:  So that's why it is called a Vision System.

18  It can see what the autopilot --

19            THE COURT:  In other words, it can actually see the

20  data that the autopilot system is capturing that transpose with

21  the moment in time through the video?

22            MS. CRUZ:  Exactly.

23            THE COURT:  Got you.  Okay.

24            MS. CRUZ:  We do not have that for this case.

25            THE COURT:  Why not?
```

1      MS. CRUZ:  We did not do that.  It is not done in

2  every case.

3      THE COURT:  So how is it done?  Just so I understand,

4  how does it work?

5      MS. CRUZ:  Well, that's another issue is that how we

6  do that and how we have done that has changed over time with

7  the software.  There is different software.

8      There are different systems that we use and have used

9  to do that, the Vision Systems that we have used.  And

10  sometimes it cannot even be done.  It depends on the model, the

11  year, the hardware in the car, the firmware, the software.

12      THE COURT:  And who does this?

13      MS. CRUZ:  Tesla in-house.

14      THE COURT:  And so they can download video and they

15  run it through their computer system.

16      MS. CRUZ:  It is not a computer.  It is a Vision

17  System.  It's called a Visual System.  It's the specific

18  software that do this thing.  It is called a Vision System.

19      THE COURT:  And it can only be contemporaneously with

20  the video?  In other words, it has to be done at the time?

21      MS. CRUZ:  No, it doesn't have to be done at the time.

22  It is just that sometimes we can do it and sometimes we can't.

23      Another thing we don't have it.  So the answer to the

24  question, the answer to this request is, we don't have it.  And

25  I was not part of the conversation that Mr. Eaton is referring

 1  to, but we probably said if we have it, if we did that back

 2  then, like we did in this other case called the *Banner* case we

 3  did that the week after the crash.

 4          THE COURT:  Okay.

 5          MS. CRUZ:  So we produced that in that case.

 6          THE COURT:  Okay.

 7          MS. CRUZ:  We said, yeah, we did it.  We made an

 8  augmented video and here it is and we produced that in that

 9  case.  We don't have that here.  So the simple answer is we

10  don't have it.

11          THE COURT:  Okay.

12          MS. CRUZ:  We didn't do it and we don't have it.

13          THE COURT:  Okay.  So they say it doesn't exist for

14  purposes of this case.

15          MR. EATON:  But it does because it is a combination of

16  the video plus the data that they do have.  And so it is a

17  matter of plugging -- pressing the software button and

18  generating it as you mentioned and discussed previously.

19           So it is not forcing them to create something.  It is

20  taking -- and I've got a case on this, Your Honor, but I think

21  you know the law.  We are not asking them to create data.  The

22  data is there and the video is there.

23          THE COURT:  I take it you have the data?

24          MR. EATON:  Correct.  But the data -- this is an

25  entirely new issue because you are seeing the accident with the

1    data running and it is giving you information about the car in

2    realtime as it is occurring.

3        THE COURT:  Okay.

4        MR. EATON:  Which is obviously much more useful than

5    looking at a piece of paper that says, oh, at this second this

6    was happening and at that second this was happening.  You are

7    seeing everything that is going with the car while the car is

8    going towards the accident.

9        THE COURT:  Okay.

10       MR. EATON:  And they can create that with no problem.

11           She never said they couldn't do it.  They said

12   sometimes we do it and sometimes we don't.  They didn't say we

13   couldn't do it.

14           She said sometimes we do it and sometimes we don't.

15   They didn't say we couldn't do it.  They have the capability of

16   doing it and they have done so on other cases.  So the data is

17   there and we want them to generate that video.

18       THE COURT:  So why am I not then compelling them to

19   generate a trial exhibit for you?  Because if you have an

20   expert that knows how to read that data, he can put together a

21   side-to-side theme with the data and with the video, right?

22       MR. EATON:  They can do that by pressing a button,

23   Your Honor.  They have software to do that.  It is data that

24   they use to evaluate what happens in accidents.  And the fact

25   that they choose not to do it in this case shouldn't prevent us

1  from having that piece of information together in a way that

2  they use to evaluate their accidents.

3          THE COURT:  Do you want to add something?

4          MR. BOUMEL:  Yes, if I may?

5          So this is really some of the most important evidence

6  in this case and I can't understate that enough, right?

7          What it is, is they take the video and they overlay it

8  through their software.  And as you are watching this augmented

9  video, you see what the car is processing, the information it

10  is taking in and also its outputs; what it is outputting and

11  what it is telling the car to do, right?

12          So as you can imagine, that is crucial, crucial

13  evidence that we are going to see why this car did not pick up

14  a stopped car in its path.  Did it see it?  Did it not see it?

15  Did it give a command to stop?  Did it not give a command to

16  stop?

17          And the only way to get that is through Tesla's

18  proprietary software.  Our experts do not have the capability

19  of doing it.  It is a highly proprietary thing.  They have

20  produced it in other cases.  We have attached them with an

21  affidavit from our expert attesting to that.

22          I was the main part of the communication process.

23  They have agreed to produce it in this case.  We had a meet and

24  confer.  There was a debate of do we give you ten minutes or do

25  we give you five minutes?  We first asked for ten.  They said

 1  we will only give you five.

 2          I e-mailed them back the next day.  You know what?  We

 3  will take five with no prejudice to us requesting more if it is

 4  deemed necessary.  We got an e-mail back saying we are

 5  confirmed as to that.

 6          And then, two weeks later or three weeks later they

 7  come back to us and say we changed our mind.  We are no longer

 8  giving it to you.  It doesn't exist.

 9          Now implicit in that representation is we may not have

10  created it yet, but they can do it with a push of a button.  It

11  is the most important evidence in this case and we have no

12  other means of obtaining it.

13          MR. POSES:  And Your Honor, if I might?

14          THE COURT:  Because you do have the data?

15          MR. POSES:  Can I readdress that?

16          THE COURT:  What is this, the Three Stooges?  We have

17  three people.

18          MS. CRUZ:  Yeah.

19          MR. POSES:  Obviously we (inaudible).

20          THE COURT:  (Laughing).  All right.  Well, he gets

21  credit for no (inaudible).  So go ahead.  I will hear from you.

22          MR. POSES:  So, Judge, the data does not reflect three

23  dimensionally what the car is doing and seeing.  So to

24  extrapolate the data on a map as it relates to what the car is

25  doing in realtime, this is the most important thing.

1          So having the data and being able to use it are two

2   different things.  So you must have this video to be able to

3   understand the data that has been provided.

4          MR. EATON:  And Your Honor, again --

5          MR. POSES:  And so it is an example.  It is almost

6   like a video game.  If you are going through a -- if it sees

7   something it is going to be able to identify what that specific

8   thing is and you can see it identifying it object by object.

9   And so you can't do that based on the data that is provided,

10  but you can do it through the program that they have and only

11  they have.

12         THE COURT:  Had somebody ordered this before?

13         MR. POSES:  Yes.

14         THE COURT:  Is there a case or do you have a --

15         MR. POSES:  Yes.  Let's see here.

16         THE COURT:  What is the legal basis upon which I can

17  do that?

18         MR. EATON:  Well, Rule 34, Your Honor, and let me

19  address that first because the Advisory Committee notes to Rule

20  34 say that:

21         "When the data can, as a practical matter, be made

22  useable by the discovering party only in response to devices,

23  respondent may be required to use its devices to transfer the

24  data into useable form.  In many instances this means the

25  respondent will have to supply a printout of the computer

1  data."

2         And that is from 1970.  So it is the same type of

3  thing here.

4         THE COURT:  But you have that.  In other words, you

5  have the data?

6         MR. EATON:  Right.  But the supply is obviously to

7  this video as well.  We can't create the video that they would

8  have to interpret this accident because we don't have the

9  proprietary software that they could generate this in a matter

10  of minutes because they have the data and the program in the

11  software and it attaches to the video.  So this is generated

12  and then we have it.  We can't create it any other way because

13  we don't have the proprietary software.

14         In the *McLaughlin v. Tesla* case --

15         THE COURT:  Is it correct that you agreed to do it and

16  then you backed out because you were mad at them or something?

17         MS. CRUZ:  No, Your Honor.  There are so many

18  inconsistencies.  I was just waiting for all -- next time also

19  I'm bringing three lawyers.

20         THE COURT:  You are doing fine, too.  Go ahead.

21         MS. CRUZ:  No, I'm kidding.  I don't need three

22  lawyers.

23         There are so many misconceptions here.  This idea that

24  it is so easy.  Number one, like the Court said they have the

25  data.  In every case that I have ever been involved in because

1   I only work on autopilot cases from my home since I have been a

2   law clerk.  You have both sides create different 3-D models.

3   You don't even need a side-by-side.

4        We are so advanced now -- not us, but these experts

5   are so advanced they overlay -- you see it in every single car

6   crash trial I have ever been in you see it.  They overlay the

7   data.

8        So I know that they want maybe what we do.  What we

9   can do sometimes.  So that is the first issue.  This notion

10  that it is so easy and you just push a button that's not the

11  case.  That is not the case.

12       Number two, again, their expert has seen it because it

13  was already created.  That is where they have seen it.  And to

14  my knowledge, I am not familiar with a Court that has ordered

15  us to do that and I spoke with the client about this.

16       I am not saying that he said for sure that this is

17  what happened, but we have produced annotated videos in other

18  cases where they exist, but they don't always exist.  We don't

19  create them as a matter of course.  We don't create them for

20  business purposes.

21       Sometimes after a crash, or after other events, they

22  might use the VIS software to run it back through and it is

23  certainly true that they have the data.

24       The other point is that I did ask the client -- and I

25  think I mentioned this earlier, which is that they use -- it

1  depends on the vehicle, the date of the crash, the firmware on

2  that vehicle, on the subject vehicle, the hardware, the

3  software in the VIS System.

4        I asked the client if we could take the video of the

5  crash that they already had and make this if you were to order

6  this and for what they can tell we can't do it.  It is not as

7  simple as they make it seem.

8        This isn't take a tape and pop it in the VCR.  This is

9  not that.  These systems are so highly technical and, again,

10 Plaintiffs like to just take autopilot and ADAS Systems and

11 paint with this broad brush.

12       I understand that they really want the video.  I get

13 that, but in this case it does not exist.  It does not exist.

14 And if now we are going to go, oh, well, Tesla can do this and

15 Tesla can do that and go and create this and go and create this

16 spreadsheet and create this video.  No, that is not the way

17 this works.

18       Oh, I wanted to respond to your comment about that

19 conversation.  My understanding -- I wasn't part of it with

20 Mr. Boumel.  My conversation was it was during a meet and

21 confer.

22       So we were saying let's narrow this down and if it

23 exists, these would be the terms that we can agree with.  They

24 wanted ten minutes and we said five minutes.

25       What happened was when we went to the client -- and

1  the client does not know and we don't know and we have never

2  seen it.  And a lot of times, too, that helps us and I will get

3  to that point in a second.

4       They act like this is something that hurts us and we

5  are trying to hide it.  I can tell you why that certainly

6  wouldn't be the case.  I would love to have a video in this

7  case, but when we went to the client it does not exist.

8       So, yes, the first thing we are going to do is meet

9  and confer with them and say you see our objections.  It is too

10 broad.  It is unlimited in scope.  What can we do to narrow and

11 let's see if we think something is reasonable and we will

12 recommend this to the client.

13      When we went and we spoke to the client, I don't know

14 how else to say it.  We can put it in an affidavit if you want.

15 They can ask the corporate rep if they want and we will give

16 sworn testimony that there is no annotated video.

17      The other thing is they say they needed to know what

18 the car was doing.  There is no dispute that the car did not

19 stop.  That is why we are here.  So we know that the autopilot

20 system, what was it doing?  Did it detect a light?  No, of

21 course it didn't.  It wasn't designed to.

22      In fact, that is what they are saying is, well, it

23 should have, but it didn't do that.  So I am not really sure

24 what is the burning thing that they need to know.  It didn't

25 stop for the traffic light.  We know that.  They don't need any

1  video to demonstrate that.

2          It didn't see the parked car.  The Tesla ran right

3  into the parked car.  It did not see that.  You don't need an

4  annotated video.  They don't need an annotated video to prove

5  these things that they are talking about.  They are not in

6  dispute.  So this whole big deal is being made about this

7  video.  We don't have it and they don't need it anyway.

8          MR. EATON:  Your Honor, may I approach with the

9  affidavit of our expert?

10         THE COURT:  Sure.

11         MR. EATON:  Which is sworn and we don't have anything

12  sworn from Tesla.

13         MS. CRUZ:  I am in that case.  She has -- Missy

14  Cummings, it is in her affidavit.  She has the video from the

15  *Banner* case because we created it at the time of the accident

16  and then we created another video later on.

17         THE COURT:  Are you saying that just because you

18  created a video in one case doesn't mean you can't in another

19  case based upon the nature of the data?

20         MS. CRUZ:  Well, number one, I am saying we shouldn't

21  have to.  But, number two, you can't just always go back in

22  time.

23         Like, when we created the video there that was soon

24  after the crash.  Like the week after the crash.  For a fact, I

25  can tell you that if you ordered us to go and create a video of

1    every crash I can tell you -- I don't know what the percentage

2    is -- there are going to be crashes for which we cannot go and

3    create video because our software -- the VIS System has

4    changed.

5         The Vision System that we used to create the annotated

6    video has changed over time and it has to interact.  And they

7    are welcome to ask the corporate rep about this and he can

8    explain in better detail than I can how it works, but this

9    isn't just take your VCR and can play any VCR tape from five

10   years ago, or 25, or 40 years ago.  This is not that.

11        There are all these different things that need to work

12   together to even allow you -- and I can represent as an officer

13   of the Court that from what the client can see it does not --

14   and the issue is with the firmware.  They don't think that we

15   would even be able to create it.

16        Now they can go to the ends of the earth to find but

17   then, again, that just goes to show that it's not as easy as

18   they said it is.  It is just not that easy but, you know, I

19   don't know what else to say.

20        THE COURT:  All right.

21        MR. EATON:  What our expert says is that they can

22   create it with ease and she has been down this road before here

23   and that there is no other means requiring (inaudible) except

24   Tesla's proprietary software.

25        To answer your question with the data we have can we

1  create this?  Our expert says, no, you cannot do that.  And so

2  that's why I handed you that Harcourt case and the reference to

3  Rule 34, which is that there are no other means they can be

4  compelled to produce their data in a format that we are asking

5  for here.  We don't have --

6          THE COURT:  We don't normally compel one party to

7  produce a trial exhibit for another party.  So I can't do it on

8  that basis.

9          MR. EATON:  For trial it is the way that they analyze

10 these accidents and it is the combination of their data in the

11 form in which it is expressed.

12         THE COURT:  That's a trial exhibit, right?  You are

13 trying to use --

14         MR. EATON:  All documents are trial exhibits.

15         THE COURT:  But you have the data.  The data that was

16 picked up you have, right?

17         MR. EATON:  Well, but it is not delivered to them.

18         They don't sit there and pour over the data when they

19 are analyzing these accidents.  They look at the AP VIS of the

20 accidents and make a determination.

21         THE COURT:  Well, that's a different issue.

22         In other words, what you are saying is that suggests

23 that they did that here and they are not producing it.

24         MR. EATON:  Whether they did it here or not, we don't

25 have any representation that it doesn't exist.

 1          All I hear is they can't do it.  They never said they

 2   can't do it under oath, right?

 3          THE COURT:  That's fine.  I will let you probe on that

 4   issue.

 5          MR. EATON:  We need to, you know, dig into it.

 6          THE COURT:  Yes, I will let you dig into it.

 7          And I will table it for purposes of the discovery

 8   cutoff because I am denying it based on their representation.

 9   If you find something else out that undermines that, I will

10   consider it even after the cutoff date.

11          MR. EATON:  Okay.

12          THE COURT:  So I will deny it without prejudice, I

13   guess.

14          MR. EATON:  Now that leads us to basically our last

15   problem, which is the data itself that we have been provided,

16   which they are representing allows us to -- it's a substitute

17   for this AP VIS document.

18          THE COURT:  Right.

19          MR. EATON:  So we have been provided an index, Bates

20   number 1244, which they have not confirmed -- I am going to

21   give you a copy of it so you know what I am talking about.

22          THE COURT:  Okay.

23          MS. CRUZ:  Which request is this?

24          MR. EATON:  This is the log.  It is footnote request

25   for production 1 and 7 and 8 from request for production 2,

1   numbers 1, 7, and 8.

2           MS. CRUZ:  Thank you.

3           THE COURT:  Second request?

4           MR. EATON:  Second request, yes.

5           THE COURT:  Of the car log data?

6           MR. EATON:  There is one page here.  It is about seven

7   pages.

8           THE COURT:  Okay.

9           MR. EATON:  And there are a lot of codes and then

10  there are explanations of what those codes mean.

11          THE COURT:  Okay.

12          MR. EATON:  What we have been provided with this

13  document and what we have been told that it is not so

14  applicable to our car in our accident.  And if you look at the

15  codes that were generated in logs for our car, there are a lot

16  of them that don't show up in the glossary.

17           So we need two things.  We know that there are over

18  2,000 codes; 1,700 to 2,000 codes that are specific to that the

19  car is always generating.

20          THE COURT:  Okay.

21          MR. EATON:  We have been provided with documents that

22  include like 80 or 90.  And most of them are irrelevant like

23  what is going on with the a.m. radio and the air conditioning

24  and things like that.

25          THE COURT:  Okay.

```
 1          MR. EATON:  We need a glossary that applies to our car
 2   so that when we look at the code and we turn through the
 3   glossary, we will be able to find one in there and see what it
 4   means.
 5          THE COURT:  Okay.
 6          MR. EATON:  And we need the codes that are relevant to
 7   this accident.
 8          THE COURT:  And what is the technical name of this
 9   document?
10          MR. POSES:  There is no technical name, Your Honor.
11          MR. EATON:  There is a Bates number and it is --
12          MS. CRUZ:  What is this?  Because you gave me one
13   piece of paper.
14          THE COURT:  Did that come from Tesla, though?
15          MR. EATON:  Yes, it is 1244.
16          MR. POSES:  Bates 1244.
17          MR. EATON:  Bates 1244.
18          THE COURT:  But it seems to be a printout of codes.
19          MR. EATON:  Correct.
20          THE COURT:  They must have a name for it, right?
21          MR. POSES:  They haven't told us that.
22          THE COURT:  Okay.  So what you are saying is you don't
23   think you have all the codes that are relevant to this vehicle?
24          MR. EATON:  We don't know if that glossary -- based on
25   what we have been provided there are codes on the actual data
```

1  for the car that are not in that 76 pages of codes.  So that

2  glossary may not be applicable.  And they have not said, by the

3  way, that this glossary is applicable to the codes that were

4  provided in the logs; in the data logs.

5          THE COURT:  I see.

6          MR. EATON:  So I need a glossary that actually

7  addresses the data log for this car at the time of the

8  accident.

9          THE COURT:  Okay.

10          MR. EATON:  That's step one.

11           Step two we have provided -- there are, again, 2,000

12  codes that are not relevant and we don't need all of them, but

13  we gave them specific codes and we gave them categories of

14  codes that we wanted produced and those have not been produced

15  yet.

16          THE COURT:  And you did that based upon your review of

17  the data?

18          MR. EATON:  We did that based on our review of that

19  glossary.  For example, there are things that talk about

20  obstacle detection.  What is happening with the accelerator

21  peddle.  All of these factors that are in there.

22          THE COURT:  Okay.

23          MR. EATON:  And so we created a list of categories and

24  so we want all the codes related to these.

25          THE COURT:  Okay.

1          MR. EATON:  We don't need a.m. radio, or air

2   conditioning, or anything like that.

3          THE COURT:  Oh, I see.

4          MR. EATON:  77 out of 80 --

5          THE COURT:  I see.

6          MR. EATON:  -- that were produced to us that aren't

7   relevant.

8          THE COURT:  So what you gave them was a list of

9   components that you --

10          MR. EATON:  We gave them the things that we felt are

11   relevant and necessary that we want for this accident.

12          THE COURT:  And you want them to identify the code as

13   relevant to that component?

14          MR. EATON:  We want the data for that code.

15          THE COURT:  I thought you have the data.

16          MR. EATON:  No, they gave us logs that contain mostly

17   irrelevant information and so we want a log that has the

18   relevant information.

19          THE COURT:  Okay.  I guess I am missing it.

20          MR. EATON:  They gave us a log with 80 codes, okay,

21   out of 2,000.

22          THE COURT:  Okay.

23          MR. EATON:  70 something of those were irrelevant to

24   the accident.  They were what's going on with the a.m. radio.

25   What's going on with the air conditioning.  We don't care about

 1  those.

 2          THE COURT:  Right.

 3          MR. EATON:  It is junk.  It is garbage.  It is

 4  irrelevant.  We don't want all 2,000 codes for the car because

 5  most of it is irrelevant, but we want the relevant codes.

 6          THE COURT:  Because you need to match up the codes to

 7  the data that you have?

 8          MR. EATON:  No, the codes are the data.

 9          THE COURT:  Oh, the codes are the data?

10          MR. EATON:  Yes, the codes say the --

11          THE COURT:  How does --

12          MR. EATON:  It gives you the name of the code and then

13  it gives you the number related to it.

14          THE COURT:  How does that help you?  Don't you need to

15  know --

16          MR. EATON:  That's what the glossary is for.  It

17  explains what the code is.  So we need the glossary that

18  defines the code.

19          THE COURT:  Okay.

20          MR. EATON:  We need the code and we need the data

21  related to that code.

22          THE COURT:  Okay.

23          MR. EATON:  So, for example, it is this obstacle thing

24  and it gives you a value for that code, right?

25          THE COURT:  Got you.

1          MR. EATON:  And so they gave us values for a bunch of

2   codes we don't need.  They gave us a glossary that does not

3   line up with the logs that they did provide.  So we don't know

4   what half the codes mean.

5          THE COURT:  So there is a disconnect there?

6          MR. EATON:  Yes.  We need a glossary that applies to

7   us and we need all the data for the specific codes that we

8   asked for that are related to the accident.

9          THE COURT:  Miss Cruz, that seems reasonable.

10  Especially since I am not compelling the trial exhibits.

11         MS. CRUZ:  Well, just with all due respect, there is

12  just a huge lack of understanding on their part for

13  misrepresentation on purpose.  I hope not.  I don't know.

14         There are two separate issues, which I think was

15  confusing for the Court because of the way they explained it.

16  The first issue deals with what is called diagnostic log data.

17         Okay.  They asked for diagnostic log data is data that

18  the vehicle's computer records.  There are thousands and

19  thousands of signals that the computer records every day.

20         Like it is mind-boggling.  In fact, there is no human

21  at Tesla that could tell you about all the different signals

22  because different signals were created and added by different

23  departments.

24         So the people who work on windshield wipers they want

25  to know -- because there are automatic windshield wipers.  I

1  have a Tesla, too.  Not as long as Doug.

2          So there are automatic wipers.  So the people that

3  work and the engineers that work in the windshield wiper

4  department, they probably want to know are auto windshields

5  working?  Are they too sensitive?  Are they not sensitive

6  enough?

7          There are codes that are generated every single time

8  you open the door.  There are codes that are generated every

9  single time that you change the gear.  When I tell you that

10 there are thousands and thousands of codes, no one even knows

11 all the codes.

12         THE COURT:  And these codes there is no time log for

13 this?

14         MS. CRUZ:  No.  Well, first of all --

15         THE COURT:  In other words, I can't ask you to produce

16 for, like, Tesla -- say I am just curious -- I want all the

17 codes generated between 12:00 and 12:30.

18         MS. CRUZ:  Yes.  And in fact, they asked -- so what

19 that would be, what you would ask for they asked for in this

20 case, but instead they made it so broad.

21         They wanted we call it the customer friendly set of

22 data, or signals, or codes.  They wanted it for the life of the

23 vehicle and we agreed to give them that and we gave them that.

24         That's why I need to dispel this misunderstanding that

25 you are right.  You said, well, isn't that reasonable, Miss

1  Cruz?  Yeah, it's reasonable that we would give them the data

2  that you just mentioned.

3       Not only did we give them the customer friendly data

4  for the time of the crash, not only did we give them the

5  customer friendly data for the entire day of the crash, we have

6  given them the customer friendly data since the day the driver

7  bought the car.

8       In addition to that, there is a set of engineering

9  data.  And what that is, is it is a set of signals that Tesla

10  engineers came up with.  And they say, okay, these are all the

11  signals that are important to look at whenever there is a crash

12  because we typically don't need to know if the passenger rear

13  door was open.

14       Maybe for a certain crash we would and then we would

15  have to go outside, but these are engineering signals that we

16  think are important.  Not for this case.

17       THE COURT:  In general.

18       MS. CRUZ:  In general.  We gave them the engineering

19  data for this crash.  Within that is all the engineering data

20  that relates to autopilot.

21       So they have more data than is even reasonable.  We've

22  been bending over backwards to try to get the -- in my opinion

23  we should have never even given them the customer friendly

24  data.

25       For four months, this guy owned the car four months

1  before the crash.  We gave them data.  I don't even know how

2  many pages.  I haven't looked at it.  These spreadsheets, I

3  haven't looked at the ones for this case, but I looked at ones

4  for other cases.  I bet you that it is hundreds and hundreds

5  and hundreds if not thousands.

6         These columns, there are like hundreds of columns.

7  You can't even understand this.  You have to put it -- you have

8  to write a computer program and put it into a system to even

9  understand it because there is so much data.

10        So we have given them so much data.  What I feel like

11 they want is every single signal that this car ever sent for

12 any time ever, ever, ever.  That's not reasonable.  They

13 continue to want to expand the scope well beyond what is in

14 their complaint.  We are so far afield of that and we have

15 given them so much.

16        Now, to the other case which is this glossary, there

17 is no such thing.  So the answer to that is simple.  It doesn't

18 exist.  We didn't give it to you because it doesn't exist.  We

19 also don't think we should have to, but it doesn't exist.

20        Plaintiffs' counsel, previous to asking for this, we

21 referenced in our response and we attached it to the response.

22 They have a sworn affidavit explaining:

23        Signals have changed over time.  Signals have been

24 added and deprecated with firmware updates which occur

25 approximately every month and hardware changes and some differ

86

1   between our vehicles.  I understand this is part of the reason

2   Tesla does not maintain some comprehensive list or current

3   dictionary of signals.

4          So we have already told them this in a sworn affidavit

5   that we don't have this and they just keep asking for it.  I

6   don't know what else could we possibly -- it doesn't exist.

7          And when they take the corporate rep's deposition, he

8   is the one who made this affidavit.  They can ask him.  They

9   can ask him again and they will have double sworn testimony.

10         There is no glossary and dictionary.  I know they want

11  there to be one and they are welcome to take the data that we

12  have given them and ask him what is this signal?  What is this

13  for and what is this for?

14         I have seen that done actually with this witness in

15  another case.  I mean, they didn't ask for every single signal

16  because there are so many, but they are welcome.

17         And in fact, that is one of the topics that we didn't

18  object to.  There is a whole topic in here about the diagnostic

19  log data and that is what we are talking about.  And we did not

20  object to them asking the witness what all these signals are,

21  but there is no glossary, or dictionary, or key that we can

22  give them that identifies, but they are welcome to ask the

23  witness and he can explain it to them if he knows.

24         THE COURT:  Well, let me step back one second.

25         This document that he is showing me where did this

1  come from?

2      MS. CRUZ:  I believe it looks to be this person at

3  Tesla ran and obtained a set of data for this vehicle.  And

4  this is a set of log data that he pulled for this vehicle or

5  this is a list, it looks like, of some signals and what the

6  signal means.  Maybe he created this.  I don't know.

7      THE COURT:  But isn't that what he is asking for?

8      MS. CRUZ:  But just because Zuo Wang created this list

9  of signals, I don't know if he created this, but I can just

10 tell you that there is no master list.  There is no glossary.

11 There is no key that engineers can go to and say, okay, like

12 what is signal -- I don't know what it is called.  Camera Feed

13 Good; let me go and look at it.

14     THE COURT:  It seems odd, though, that they would have

15 created the signal based upon a certain software for a

16 particular time and then not kept a record of what signals they

17 generated?  That makes no sense, right?

18     MS. CRUZ:  Well, I can only tell you it doesn't exist.

19     This is what I assume just from -- I am not making a

20 representation that this is how it works, but what I think is

21 different departments asked to add signals at different times

22 because they are looking for different things.

23     So they write the code to look for bugs on the

24 windshield.  So maybe yesterday the windshield guys and gals

25 said we want to know if there are bugs on the windshield that

1   is going to stop the windshield.  So they write a code and they

2   add that signal.  Now the windshield guys know what that is.

3          THE COURT:  But I am only interested in the code that

4   was in effect on the date of the accident.

5          MS. CRUZ:  Right.  And what I am saying is, if they

6   want to go through the codes with this witness, he is very

7   familiar with autopilot and he is very familiar at analyzing

8   crashes because that is part of what he does.

9          So he can tell them what the codes mean, but he is

10  going to tell you if I want to know what a code means and I

11  don't know, he can tell you about how he does it.

12         I assume he tries to figure out where it could be from

13  and then he goes and asks somebody who might know because he

14  has told you in an affidavit that there is no master list.

15         So it is just like I can't guarantee that he is going

16  to be able to explain every single code that is in the data.

17         THE COURT:  Well, I wouldn't expect somebody to

18  necessarily do that off the top of their head, but it is hard

19  to imagine that there is not a record based upon the -- this is

20  all based on software.  They know what software version of the

21  car was in place on the date of the accident.  So that's not a

22  mistery, right?

23         MS. CRUZ:  No, of course not.

24         THE COURT:  And so, therefore --

25         MS. CRUZ:  Absolutely.

```
 1              THE COURT:  So, therefore, it is hard to believe that
 2    the engineers don't have a contemporaneous record of the codes
 3    that you used in this version of the software.  I don't
 4    understand.
 5              MS. CRUZ:  You know why also --
 6              THE COURT:  That part, of course, I understand.  It
 7    could just be my ignorance, but on the other hand --
 8              MS. CRUZ:  This actually goes to your point and I
 9    think he explains why that does not happen.  The signals change
10    all the time.  The signals have been added and deprecated with
11    firmware updates, which occur approximately every month.
12              So if the signals change every month --
13              THE COURT:  But how does the company not have a record
14    of what is in effect at the time?
15              MS. CRUZ:  But why would they?
16              THE COURT:  Well --
17              MS. CRUZ:  Like if they don't need to -- I mean, now
18    we are just hypothetically speaking.
19              THE COURT:  Why wouldn't they because they created it?
20    In other words --
21              MS. CRUZ:  But they don't need it.  Why would they go
22    and generate --
23              THE COURT:  Why would they get rid of it?  They had to
24    have a record of it at the time they generated it.
25              MS. CRUZ:  No way.
```

1          THE COURT:  It is just going to be Mr. Wang's head and

2    if Mr. Wang gets run over by Tesla there goes the data; is that

3    what you are saying?

4          MS. CRUZ:  No, no, no.

5          THE COURT:  That's impossible to believe, right?

6          MS. CRUZ:  I think you are misunderstanding what the

7    signal is.  The signal tells you what specific things in the

8    car were happening.  And that might not always be possible or

9    might no longer be possible as the firmware changes which is

10   every month.

11          So you know how there is a dictionary and words just

12   keep getting added to it.  Words don't --

13          THE COURT:  But they don't get rid of the old

14   dictionaries when words get added, right?

15          MS. CRUZ:  And what I am saying is --

16          THE COURT:  Right?

17          MS. CRUZ:  -- things are taken out and things are

18   changed and so I can't explain all of this.  I mean, I would

19   encourage them if they want, they can go and talk to this

20   witness, to talk to the 30(b)(6) witness and understand it

21   better.

22          But what I am saying is it is not like a dictionary

23   where these signals, you know, the words exist and then we add

24   words.  So you can go back and see what words were in existence

25   on this date ten years ago.

```
1              THE COURT:  Right.

2              MS. CRUZ:  Right?  What he is saying is the signals

3    change every month.  They are added and deprecated with

4    firmware updates which occur every month.

5              So that means the signals are changing, being added,

6    and being taken away.

7              THE COURT:  I am following you.  I get you.

8              MS. CRUZ:  So if that changes every day how could you

9    ever have a list if it is changing every single day?

10             THE COURT:  But this is a sophisticated company and

11   they must generate a record of what code was in effect for a

12   certain version of the software.

13             MS. CRUZ:  I have never heard of anything like that.

14   And based on what I know, I see no reason why they would do

15   that.

16             THE COURT:  Well --

17             MS. CRUZ:  And I can only just tell you --

18             THE COURT:  With all due respect, we in this room,

19   this is way above our heads.  The only thing I --

20             MS. CRUZ:  That's true.

21             THE COURT:  The only thing that I do know is I am

22   going to compel it because that way you to go back to them and

23   explain to them why this idiot Judge has granted the motion,

24   right?

25             Because he doesn't understand how you could not have a
```

1    contemporaneous record of the codes that were in existence at a

2    particular time and I don't want to know when the car was

3    bought.  I'm talking about the hour before the accident and

4    after the accident, right?

5         So I am compelling that.  Now if you come back with an

6    affidavit and you say, Judge, this is Mr. Wang and this is what

7    it means and this is why your order cannot be complied with,

8    that is fine and then he can take that to the deposition.

9         But I am going to compel it because it is hard for me

10   to believe that -- and I believe you.  I believe you that you

11   don't think this is memorialized.  But when you go back to them

12   and you say, well, we have been ordered to produce it, maybe it

13   will generate a different response possibly or at the very

14   least, it could generate a more informed response that he would

15   then have at the deposition.

16        So that way, like, for example, how would this

17   engineer that you are prepared to produce necessarily know the

18   code that was in existence in 2020 at 12:00 on the date of that

19   accident?

20        If you are telling me that this code is generated in

21   realtime and deleted in realtime how would he know?

22        MS. CRUZ:  Because we have already given them the data

23   for the crash and they are going to show him the data and they

24   can go through all the signals.  The data isn't gone.  We have

25   already given them the data.

1        THE COURT:  Right.

2        MS. CRUZ:  So it looks like --

3        THE COURT:  See, he is telling me -- maybe that's the

4   problem.  He is telling me that the data that you have given

5   them on the day of the crash, there are data points that are in

6   there that are not glossaried.

7        That is what he is saying to me that the data points

8   and the data that he has, some of which he understands and some

9   of which he has no clue what it means because it is not

10  intuitive and he needs the glossary.

11       MS. CRUZ:  And he can ask the witness every single

12  thing he wants to go through.

13       THE COURT:  What I am saying that this witness could

14  not possibly know that off the top of his head.

15       MS. CRUZ:  He's not going to know all of them.  He's

16  going to know some of them.

17       THE COURT:  So if I put a gun to his head to find this

18  information, what would he do?

19       MS. CRUZ:  I assume that he is going to go and say I

20  don't know.  I have to go asking around to different types of

21  engineers to find out what this is.  I think maybe it is

22  related to the wiper.  Let me go to the wiper engineers and ask

23  them.

24       Listen, there is this code fish eye cam -- I know what

25  the fish eye camera is, but what is this code?  Oh, yeah, we

1    wrote that and that means this.

2            THE COURT:  Okay.

3            MS. CRUZ:  So I am agreeing with you there is so much

4    more information in there than what they need.

5            THE COURT:  All right.

6            MS. CRUZ:  And there is going to be stuff that this

7    witness does not know.  This is what I can tell the Court --

8            THE COURT:  In fairness, one of the things that he is

9    saying is that he tried to isolate the codes that he was really

10   interested in because he was trying to isolate the parameters

11   in the car that may be relevant to the case and that he gave

12   you that information.

13           Is this incorrect?

14           MS. CRUZ:  This is where the disconnect is.

15           We are happy for him to go through the stuff that we

16   believe is relevant.  I don't have the list in front of me --

17   and have the witness tell them what they mean.  What we cannot

18   give him because it does not exist is the dictionary, this

19   glossary, because it does not exist.

20           THE COURT:  Okay.

21           MS. CRUZ:  We can't give them something that does not

22   exist, but he can ask the witness.

23           THE COURT:  So we have a disconnect, then, right?

24           So that is the word of the day for this hearing,

25   disconnect.  I am going to compel that because I can't imagine

1  that in order to get that information from Tesla's business

2  purposes they just have to go around, did you know what this

3  means three years ago.  It is just hard to believe.

4       Now, on the other hand, maybe it is true in which

5  case, then, okay, well, that's just the way they do things,

6  right, but at least I have compelled it.  You have an order.

7  You are going to go back to the client and say the Judge --

8       MS. CRUZ:  Check again.

9       THE COURT:  I told them and the Judge didn't believe

10  me.  Say that.  Okay.  The Judge could not believe that we

11  don't have a record of the contemporaneous time.  I am only

12  talking about the date of the accident, just so we are clear --

13       MS. CRUZ:  Right.

14       THE COURT:  -- that identifies in case one of our

15  engineers dies what that code meant in 2020.

16       MS. CRUZ:  Right.  The order is glossary of codes that

17  existed during the one hour before and one hour -- why would it

18  be after the crash?

19       THE COURT:  Well, whatever.

20       MS. CRUZ:  So one hour before the crash and that's

21  what I will tell them.

22       THE COURT:  Yes.  And now imagine if they actually

23  don't put that in writing in some form, such that you can just

24  go and refer to it as you are suggesting that they just do this

25  off the top of their head, well, then alright, then.  He is

 1 | just going to have to go around and try and fill it in.  If
 2 | there are people working there, there are people working there.
 3 |      So it seems to me that it would be in the normal
 4 | course -- I don't compel things that are in the normal course a
 5 | Defendant doesn't have, right?  It is just so hard for me to
 6 | believe that the Defendant doesn't have some way of maintaining
 7 | this and that is why I am compelling it and then let's see what
 8 | they come back with.
 9 |      MS. CRUZ:  Yes.  And I think maybe, you know, the
10 | witness is going to be able to explain this better than me.
11 |      THE COURT:  Maybe.
12 |      MS. CRUZ:  No, he will.
13 |      THE COURT:  Right.
14 |      MS. CRUZ:  Because he deals a lot with diagnostic log
15 | data.
16 |      THE COURT:  Right.
17 |      MS. CRUZ:  He's one of -- I believe that he is one of
18 | the most knowledgeable people.
19 |      THE COURT:  It sounds to me that he is the right
20 | person to comply with my discovery order, then.
21 |      MS. CRUZ:  Well, but he is also the person that
22 | already made the affidavit in the other case where this was
23 | asked for.
24 |      THE COURT:  And what did he say?
25 |      MS. CRUZ:  I read it to you.  Maybe that wasn't clear.

```
 1              THE COURT:  Okay.

 2              MS. CRUZ:  I was reading to you from his sworn

 3    affidavit.

 4              THE COURT:  Okay.

 5              MS. CRUZ:  This isn't just believe what Whitney says.

 6              THE COURT:  Right.  And so he said in that affidavit

 7    that it could not possibly be recreated?

 8              MS. CRUZ:  In addition, signals, yes.

 9              I mean, I can read the whole thing to you.  They

10    wanted us to translate every single signal on a set of

11    engineering log data in this case and they also wanted the

12    glossary of signals.  I believe it was the same Plaintiffs'

13    attorney that was asking for it.

14              THE COURT:  Okay.

15              MS. CRUZ:  So it is not like there has been

16    inconsistent information out there.  He said translation of the

17    entirety of the log data on the subject vehicle.  Including

18    more than 2,000 data signals and the description of all the

19    signals would be extremely time-consuming.

20              And in my experience I would estimate that it would

21    take upwards of several weeks, if not months.

22              THE COURT:  Now he didn't want 2,000.  How many did

23    you want?

24              MR. EATON:  So that says they could do it.

25              MS. CRUZ:  Well, wait.  Let me --
```

```
 1              THE COURT:  How many do you want?
 2              MR. EATON:  The list that we provided -- give me a
 3    second.
 4              MS. CRUZ:  Can I read the rest of his affidavit?
 5              THE COURT:  You can file it if you want.
 6              MS. CRUZ:  It is already filed.
 7              THE COURT:  Oh, perfect.
 8              MS. CRUZ:  I just want to --
 9              THE COURT:  You know what?  I hear what you are
10    saying.
11              MR. EATON:  So --
12              THE COURT:  How many are there?
13              MR. EATON:  So there are six or seven pages of signals
14    here.  I've got to say maybe a 100, 120 signals, maybe.
15              THE COURT:  Now obviously some of them you know, but
16    some of them you don't know.
17              MR. EATON:  Right.  But here's the thing.
18              She said we want this broad brush.  No, we want less.
19    We don't want any irrelevant signals.  We want only relevant
20    signals and they gave us a bunch of irrelevant signals.  We
21    wanted relevant signals.  We want the peddle.  There are
22    signals related to the accelerator peddle.  There are signals
23    related to the brake.  There are signals related to the seating
24    if he is leaning to the right.
25              THE COURT:  If we go back and try to comply with the
```

```
 1  order and it turns out, then maybe we should try to use this
 2  (inaudible) as an alternative that's fine with me, too.  In
 3  other words, it just seems to me --
 4          MS. CRUZ:  That is completely --
 5          THE COURT:  Different data.
 6          MS. CRUZ:  Unrelated.
 7          THE COURT:  Got it.
 8          MS. CRUZ:  When I was reading to you that the signals
 9  -- it says in addition signals have changed over time.  Signals
10  have been added and deprecated with firmware updates which
11  occur approximately every month and hardware changes and some
12  differ between our vehicles.  Models 3XSY.  I understand that
13  this is part of the reason that Tesla does not maintain some
14  comprehensive list or current dictionary of signals.
15          THE COURT:  Okay.
16          MR. EATON:  I don't --
17          THE COURT:  I'm going to compel it and then let's see
18  what happens.
19          MS. CRUZ:  Okay.
20          MR. EATON:  And we just want the signals relevant --
21          THE COURT:  I just don't believe that they don't have
22  contemporaneous data recorded.
23          MS. CRUZ:  I will get you an answer.
24          MR. EATON:  And Your Honor, if you also compel -- we
25  gave them a list of what we wanted of this car one hour before
```

1  the accident.  That's it.

2          THE COURT:  That's all I will compel.

3          MR. EATON:  And that is the subject matter.  We gave

4  them a list of on these topics.  The only things that are

5  relevant.  Please give us those and --

6          THE COURT:  So we need to put this in a way that

7  translates to engineering speak.

8          MR. EATON:  I have a one-page document literally.  I

9  will give you some of the topics.  Autopilot and it has several

10  subheadings.

11          THE COURT:  No.  In other words, put it in the order

12  that -- in other words, memorialize what I am doing.  I am

13  granting your request for leave, but memorialize it in a way

14  that would be understandable.

15          MR. EATON:  We will put it in these topics that we

16  gave them --

17          MS. CRUZ:  Well, wait a second.  What are the topics

18  because --

19          THE COURT:  He iis going to give it to you.

20          MS. CRUZ:  I know, but now it is going to be in an

21  order and they definitely -- I could tell you just in the

22  history, I don't know what he is talking about, but it is

23  nowhere in the history of the case.  He's asking for signals

24  that are not relevant.

25          What I understood the order was of the glossary of

 1    codes that existed one hour before the crash.

 2              Are you ordering something else besides that?

 3         MR. EATON:  Yes, we are asking you to order the actual

 4    data.

 5         THE COURT:  And the production of the data.

 6         MS. CRUZ:  What data?

 7         MR. EATON:  All of the relevant signals for the hour

 8    before the crash.

 9         MS. CRUZ:  Right.  We have done that already.

10         MR. EATON:  No, they have not.

11         MS. CRUZ:  So we will just refer to what we have

12    already done.

13         MR. EATON:  They provided us with a bunch of

14    irrelevant signals that have nothing to do with any of these

15    issues and they gave us 90 signals.  Remember there are 2,000.

16         THE COURT:  Right.

17         MR. EATON:  Okay.  80 of them we don't need.  We just

18    needed ten and then we want another hundred that they didn't

19    provide us.  We want the hundred.

20         THE COURT:  Now, I am not suggesting that there may

21    not be a truthful answer that they don't know what those

22    signals are anymore.  It's possible.

23         MR. EATON:  But the data --

24         THE COURT:  It's hard --

25         MR. EATON:  -- of the accident --

```
 1              THE COURT:  It's hard for me to believe that they
 2   don't have it.  So that's why I am compelling it.  So I am
 3   compelling that.
 4              MR. EATON:  Yes.
 5              THE COURT:  And I am compelling the glossary.
 6              MS. CRUZ:  I am confused about what -- we have already
 7   produced two sets of engineering data and that includes
 8   everything that is relevant to a crash.
 9              So I can't even make a -- it is unfair for them for
10   that to be granted when -- where is the piece of paper that
11   tells me what the signals are?  He is referring to something
12   that you don't have in front of you and I don't have in front
13   of me.
14              THE COURT:  Well, he is going to put it in the order.
15              MR. EATON:  We provided this to them.
16              MS. CRUZ:  But we haven't had a chance to argue about
17   it.  Like I haven't --
18              THE COURT:  I am compelling it.
19              MR. EATON:  Thank you.
20              THE COURT:  So put it in the order.
21              And then, obviously, the reason he is asking for it is
22   he doesn't understand what they are, right?
23              MS. CRUZ:  No.
24              THE COURT:  Because, obviously, if he understood what
25   the signal meant, then they wouldn't be asking for it.
```

1          MS. CRUZ:  No, I don't think that's what he is saying.

2          He thinks that there are signals about I don't know

3    what.  He hasn't told you and he hasn't told me and it is not

4    in the papers.  And now he is going to specify what that is in

5    a court order that we're required.  Where is the list?  I just

6    want to see a list.

7          MR. EATON:  We provided them a list.

8          THE COURT:  Okay.

9          MR. EATON:  A while back is when we asked for it.

10   Second off, I did tell you some of the examples of the things,

11   of the topics that we were looking for; accelerator peddle, the

12   seating, the camera calibration, the obstacle.  There were all

13   these data that were not provided.

14         THE COURT:  Now, by the way, I would need to break,

15   but I assume your expert has already taken a look at the data

16   that you have?

17         MR. EATON:  Yes.

18         THE COURT:  Correct?

19         MR. EATON:  Correct.

20         THE COURT:  And he has done this in other cases, I

21   take it?

22         MR. EATON:  Yes, Your Honor.

23         THE COURT:  And in that review with the expert, did he

24   explain to you why he doesn't understand what those signals

25   mean?  In other words, did you verify what you are telling me

1  with your expert?

2          MR. EATON:  Yes.

3          THE COURT:  Okay.

4          MR. EATON:  And Your Honor, again, it goes beyond

5  that.  It goes not just to the glossary, but also critical data

6  that we have not been provided.

7          MR. POSES:  That's what he is ordering.  He is

8  ordering the data.

9          THE COURT:  So I am going to go ahead and grant it.

10          Now if you want to -- comply with the order.  To the

11  extent that you can't comply with the order, right, then

12  obviously you will have a sworn answer to give at the

13  deposition with the engineer and then we will deal with the

14  repercussions of it.

15          Now what I am envisioning is that if, in fact, I am

16  wrong and they don't have any documentary way of verifying the

17  signals that he is asking about, well, then maybe then somebody

18  is going to have to figure out what they are to the extent they

19  can, right?

20          Unless somebody left and went to work for Buick, in

21  which case you don't have access to that person.  But to the

22  extent you can, as it relates to these missing codes from his

23  perspective, then you do the best you can.

24          MS. CRUZ:  The unidentified missing codes.

25          THE COURT:  Yes.  So that is what I think it is a

 1  reasonable request to compel.

 2          MR. EATON:  Your Honor, I want to say one thing before

 3  we wrap up, Your Honor.  You asked me whether a court had

 4  ordered compelled the creation of an AP VIS and the answer is,

 5  yes.  And that is the *McLaughlin v. Tesla* case and I can send a

 6  copy of the order to you.

 7          THE COURT:  Okay.

 8          MR. EATON:  I understand that you are not ruling on it

 9  today.

10          THE COURT:  Right.

11          MR. EATON:  Not to oppose them, but I just wanted to

12  say that they have, in fact, another Court has said go make

13  one.  Go make this AP VIS and let the Plaintiff view it.

14          THE COURT:  Okay.

15          MR. EATON:  So I will save that to when we come back

16  and talk about it some more and you will have that.

17          THE COURT:  Okay.  So far I am not compelling that.

18          MR. EATON:  I understand.

19          THE COURT:  But, obviously, you can submit whatever

20  you would like.

21          MR. EATON:  Okay.

22          THE COURT:  Okay.  So we will need to memorialize that

23  part of it in the order.  And then, obviously, you will have --

24  here's another thing.

25              To the extent that when he gives you the proposed

 1    order, if you want to annotate that with a footnote of why I am

 2    completely off feel free and, then, I will consider it.  But

 3    based upon the description that he has given me, it seems

 4    reasonable to me.

 5         MS. CRUZ:  Okay.  So we will include any objections

 6    that we have to the list of signals that I haven't yet seen.

 7         THE COURT:  Right.  Well, he claims that you have.  So

 8    that's the problem.  We have a disconnect.

 9         MS. CRUZ:  Why wouldn't they be included in, like,

10    this is going to be discussed today and then I would have been

11    ready.

12         THE COURT:  He claims that he sent you a list of those

13    things.

14         MS. CRUZ:  But these are the papers.

15         THE COURT:  Right.

16         MS. CRUZ:  That's the problem.

17         THE COURT:  What you are saying is he never sent that

18    to you at all?

19         MS. CRUZ:  No.  I am sure at some point in time there

20    were conversations about that.  There were conversations about

21    a lot of things.  Did I know that he was going to come in here

22    today and ask you to compel all the log data for this specific

23    list?

24         It is not in this discovery.  This morning it wasn't

25    even clear what the issues were going to be for today.  So this

1  morning they sent me an e-mail and said these are the numbers

2  at issue.

3        THE COURT:  I hear you.  On the other hand, there is a

4  month left in discovery.  So to some extent if there is

5  something manifestly unjust by what I am ordering, which I

6  don't think there is, you will let me know but --

7        MS. CRUZ:  I will have to see the signals.  I

8  understand your ruling.

9        THE COURT:  Let's see what the signals are.

10       MS. CRUZ:  We'll see what they are and then make the

11  objection.  I understand.

12       THE COURT:  And obviously, talk to your person and

13  then you can communicate.  I told Torres everything that you

14  told me to tell him and he doesn't believe me.

15       MS. CRUZ:  I will.

16       THE COURT:  He can't imagine that there is not some

17  way of cross-referencing data code for a specific version of

18  the software.  That is basically where I am coming down from.

19       MS. CRUZ:  But you are certainly not ordering us to go

20  around and pull everybody at Tesla and ask and send out a mass

21  e-mail and say do you guys know if this exits.  You are talking

22  about something that creates this that we can pull down with a

23  list, a glossary of signals that were applicable to this

24  vehicle for the one hour before the crash?

25       THE COURT:  Right.

1           MS. CRUZ:  You're asking --

2           THE COURT:  No.  I am not asking that you basically

3    shut down the factory to have a whole of safety meetings where

4    you all sit down and talk about the Benavides case.  No, I am

5    not doing that, but I am compelling the data.  So to the extent

6    that it is accessible, right?

7           MS. CRUZ:  I understand.

8           THE COURT:  Then produce it.  To the extent it is not,

9    then you are going to have to defend that position.

10          MS. CRUZ:  I understand.

11           THE COURT:  Okay.

12          MR. EATON:  To be helpful I don't need an index for

13   irrelevant stuff, too.

14           THE COURT:  Correct.

15           MR. EASTON:  I want the data.

16          THE COURT:  Put it in the order.

17          MR. EATON:  Then the index of the data.  That's it.

18           And I do want to say for the record that she said we

19   were not aware of this.  Literally 5-A says Tesla's failure to

20   produce all relevant car log data for the drive cycle at issue;

21           5-B, Tesla's false representation that it did not

22   possess or continue in failure to provide a full and complete

23   glossary or index of log signals.

24           They are right there.  I mean, I don't understand why

25   this is a surprise that we were going to do this today.  It is

1  the first page of our hearing notice.

2        THE COURT:  I am compelling it.

3        MR. EATON:  Thank you.

4        THE COURT:  So put it in the order.  All right.

5        MR. EATON:  Thank you for your time, Your Honor.

6        MS. CRUZ:  Your Honor --

7        THE COURT:  That is as much disconnect as we can have

8  in one day.

9        MS. CRUZ:  Your Honor, there is one other issue

10  because I feel like this is probably going to keep coming up in

11  this case, unfortunately, for you.

12        There are in the past three months Plaintiffs have

13  served literally -- I am not exaggerating -- hundreds of

14  discovery requests and we are responding almost every week.

15        One that we have met and conferred on is a request for

16  admissions that has, I think, 140 or 150 requests in it.  We

17  talked about having a hearing on that.  We told them that we

18  were available next Thursday.  They have not yet noticed the

19  hearing.

20        What I am afraid is going to --

21        THE COURT:  You argue that because, frankly, when you

22  said 150, I thought you were about to say 150,000 because I

23  would have believed you but --

24        MS. CRUZ:  150,000 requests?

25        THE COURT:  Yes.  As it is 150 I'm not --

1        MS. CRUZ:  What?

2        THE COURT:  Is that outrageous?  In other words, given

3   the nature of this case I don't know.

4        MS. CRUZ:  I have literally never seen that ever and

5   I've been doing --

6        THE COURT:  You must be young.

7        MS. CRUZ:  No, in these cases.  I mean, in these

8   cases, for what you need in these cases.

9        THE COURT:  Right.

10       MS. CRUZ:  But I have worked on auto product cases for

11  18 years.

12       THE COURT:  Right.

13       MS. CRUZ:  And I have never even seen half that many.

14       So in terms of this request for admissions, the scope.

15  So they haven't yet set the hearing.

16       So what I am concerned about is they pop up with a

17  notice four days before the hearing.  We are setting 100 and

18  then, the problem is we need to brief something like that.  And

19  so --

20       THE COURT:  You're not briefing.

21       Judge Bloom would not have you briefing on that.  We

22  don't need to brief it.  The only issue is the number of

23  admissions as far as I am concerned.

24       MS. CRUZ:  What do you mean when you say that?

25       THE COURT:  And so we don't do objections on

1  admissions because if it is something that you don't know the

2  answer to, the answer is I don't know.  If it is something that

3  is completely irrelevant and it is true, then you admit it and

4  be done with it.

5          If it is something that is wrong and improperly

6  stated, or it is misleading, state it and you deny it.  You

7  take the admission as it is.  Can you admit it?  No.  Denied.

8  So you are at liberty to deny based upon the wording of the

9  admission.

10         The consequence of that is if it is something that

11  should have been admitted you have to pay fees on.  That's the

12  consequence of the admission, but I don't think 150 in a case

13  like this is that onerous.  You are talking about somebody who

14  served 20,000 admissions on one case.

15         MS. CRUZ:  My God.  No, I am not saying --

16         THE COURT:  So that is why when you said 150, I said

17  oh, that's ridiculous.

18         MS. CRUZ:  I meant it's a lot for you to go through

19  and I also have not seen -- but I mean, we are going to sit

20  here and go through 150 request for admissions.

21         The other thing is it gets abusive at some point when

22  things are so far outside the scope.  Why would we have to

23  answer that?

24         THE COURT:  If you think it is grossly irrelevant and

25  the answer is we don't want to figure it out because it is

1   irrelevant, then deny it.  In other words, the consequence is

2   if it is relevant and you should have admitted it, it is a fee

3   and they have to prove it.  They get their fees, right?

4           But they only get their fees if it is relevant, right?

5   So that is what I am saying with you.  If the wording of it is

6   done that is either misleading, or grossly irrelevant, then

7   deny it unless it is true, right?

8           Tesla has thousands of accidents in the month of

9   March.  That is not relevant to --

10          MS. CRUZ:  Well, let me be clear.  We are already --

11          THE COURT:  -- to answer it.

12          MS. CRUZ:  No.  Let me be clear.  We already answered.

13  Now I am just.

14          THE COURT:  Oh, you have already answered it.

15          MS. CRUZ:  Now I am just trying to understand how you

16  think and what your views are.  I am just letting you talk so I

17  can understand.

18          THE COURT:  But if you already answered what is the

19  problem?

20          MS. CRUZ:  My issue is this that they are going to

21  notice something up.

22          THE COURT:  She answered it.

23          MS. CRUZ:  Yeah.

24          MR. EATON:  She answered it and we sat down in the

25  process of setting down and we mutually cleared the date for --

1        THE COURT:  Oh, you want to compel a better answer?

2        MS. CRUZ:  Yes.  And so --

3        MR. EATON:  (Inaudible).

4        THE COURT:  You should have made that clear at the

5   beginning.  I thought you didn't want to answer 150 admissions.

6        MS. CRUZ:  No, no, no.  My concern was on the fly it's

7   like I don't even know whether the hearing is happening.  Now

8   it is Thursday at 5:00 and I don't know whether they are going

9   to set a hearing for next Thursday.

10        THE COURT:  Well, after listening to me now they may

11   not.

12        MS. CRUZ:  I doubt that.  I mean, that last ruling was

13   pretty good for them.  So I think they will be back.

14        THE COURT:  I don't think so.

15        MS. CRUZ:  I think they will be back.

16        THE COURT:  I don't think so.  In other words --

17        MS. CRUZ:  The issues --

18        THE COURT:  Let me ask it since this is what I am

19   going to give you another ten minutes if I don't see you next

20   week.  Did you object and not answer?

21        MS. CRUZ:  Some of them -- I don't know.  I don't have

22   them in front of me.  I can't say.  Sometimes we --

23        THE COURT:  How many did they --

24        MR. EATON:  I can't give you a number but there were a

25   large amount of --

114

```
 1              THE COURT:  And that is why you wanted to compel?
 2         MR. EATON:  Exactly.
 3         THE COURT:  Okay.  Go back --
 4         MS. CRUZ:  I have to go look.
 5         THE COURT:  Find an associate that has no work.  Tell
 6  him or her to pull up that document and say subject to that
 7  waiving this objection the answer is -- whatever the answer is.
 8  There is no objecting.  You can preserve it.  I have no problem
 9  with you preserving it.  I did a million preservations of
10  admissions.
11              However, answer the question directly.  If the
12  question is misleading you can deny it because it is misleading
13  on its face and, therefore, you can't admit it.  You can't
14  admit something that is misleading on its face, right?
15              If the answer is completely irrelevant, how many cars
16  would Tesla have a thousand accidents in March, right?  You
17  know the answer to that is true.  It is completely irrelevant
18  to the case, then admit it.  It doesn't matter, right?
19              So go ahead and do that.  That would solve their
20  problem and that would solve my problem and any objection that
21  you would have is preserved.
22              Does that make sense?
23         MS. CRUZ:  I hear what you are saying.
24         THE COURT:  Okay.  Good.
25         MS. CRUZ:  No comment.
```

1           THE COURT:  Good.

2           MS. CRUZ:  And I hear --

3           THE COURT:  I don't do objections to admissions.

4    There is no objection to admissions.  You answer it.  Admit,

5    deny, or we have no idea.  That is the answer.

6           MS. CRUZ:  So you are basically giving them carte

7    blanche to go and serve 300 more and we have to answer.

8           THE COURT:  No, I think they reached their limit.

9           So they have 150 and they are entitled to an answer.

10   And if you want to preserve, you don't have to recreate the

11   document.  Just add a line subject to this, admit it, denied,

12   or whatever it is.

13          MS. CRUZ:  So if that's what the Court -- basically if

14   that's where we are --

15          THE COURT:  Yes.

16          MS. CRUZ:  Like Mr. Boumel said, I think there are

17   probably a lot that we objected and didn't answer.  I haven't

18   looked at it lately.

19          THE COURT:  Okay.

20          MS. CRUZ:  If we --

21          THE COURT:  I will give you two weeks.  You don't have

22   to do it tomorrow.  You don't have to do it.  Find an associate

23   with no work.  I'm telling you that is exactly what they are

24   for.

25          MS. CRUZ:  That's not the issue.  The issue is no one

1   knows these things besides the client.

2          THE COURT:  Okay.

3          MS. CRUZ:  An associate, I wish an associate could do

4   this stuff, but they can't.  The client is the one that has to

5   answer this stuff.

6          THE COURT:  That's fine.

7          MS. CRUZ:  So --

8          THE COURT:  Pick your smartest engineer and if he

9   doesn't know the answer -- if he doesn't know the answer, then

10  I am confident that when you say we have no idea, then you are

11  good, right?

12         Do you see what I'm saying?  That is how you do it and

13  you don't have to call up Mr. Musk and say it is one of these

14  admissions.  You pick the person with the most knowledge on

15  this topic and, obviously, it sounds like it is that engineer

16  and since we would like to admit this, can we?  And he will

17  say, no, you can't admit that, then deny it.

18         MS. CRUZ:  The whole problem is --

19         THE COURT:  Deny it.  When in doubt.

20         MS. CRUZ:  Listen, some of those requests for sure are

21  admit that Elon Musk said X.

22         THE COURT:  How would you know that?

23         MS. CRUZ:  I don't know.

24         THE COURT:  So deny it.

25         MS. CRUZ:  Do you think I am going to ask him?  Well,

1  he is the CEO of Tesla.

2        THE COURT:  But you see my point.

3        MS. CRUZ:  Okay.  But that's fine.

4        THE COURT:  But on the other hand, if it is something

5  that your communication department knows he said, then he has

6  to answer it.  You have to do a reasonable investigation.  You

7  don't have to send the admissions request to everybody in

8  Tesla.

9        MS. CRUZ:  But it is like did he say this in 2015 on

10 April 18th at a press conference.  Now we have to go -- it is

11 not that easy.  It is not does the autopilot work at

12 60 miles-an-hour?  Yeah, that is something the Legal Department

13 can answer, but this is the --

14        MR. EATON:  Provide links to a lot of --

15        MS. CRUZ:  The absurdity of what they are asking --

16        THE COURT:  Then answer it.  You are answering.  You

17 are saying out loud what I am telling you to do.  If it is so

18 absurd --

19        MS. CRUZ:  Try to look for that news article to see if

20 he was quoted in that news article and what he said in the

21 article.

22        THE COURT:  If he attaches the news article.

23        MR. EATON:  We provided those things in the request,

24 Your Honor, to the article.

25        MS. CRUZ:  So does the article quote him as saying X?

1 I mean, but also the article says what it says.

2          MR. EATON:  It is hearsay unless they say -- because

3 he is denying saying that previously.

4          THE COURT:  Bottom line is you have to answer the

5 admissions request.  If you deny something and it is relevant

6 and should have been answered and they have to prove it in

7 trial, your fees.  If the question was grossly misleading, or

8 grossly irrelevant, you don't owe any fees by denying it.

9          Does that make sense?

10          MS. CRUZ:  Yes.

11          THE COURT:  Okay.  So you have your marching orders

12 and, obviously, you don't have to call Mr. Musk.

13          MS. CRUZ:  Yes.

14          THE COURT:  The Communication Department and the

15 Engineering Department sounds like the people that you need to

16 call.  If they don't know the answer, they don't know the

17 answer.  If they know the answer, then put the answer down.

18 That's all.

19          MR. EATON:  A few things, Your Honor.

20          THE COURT:  I am not going to go and review the

21 article and figure out, oh, is this relevant or not.  We all do

22 that.  Just don't answer it.  The consequences is your fees.

23          So if you think that it is a relevant topic, right?

24 For example, say hypothetically Mr. Musk said it in an

25 interview that he is citing the article this is what the

1  technology does, right?

2       And it is basically consistent with their theory that

3  while they marketed these devices in all the brake cars.  I

4  don't know that to be true, but I am just saying

5  hypothetically, right?

6       MS. CRUZ:  Right.

7       THE COURT:  And he said the words X and your

8  Communication Department says he didn't say that, then admit

9  it.  It is irrelevant from your point of view, correct?  That

10 objection is preserved and you can preserve it if you want it

11 specifically.  Do you see my point?

12      I don't need to get into a debate about whether or not

13 his statement is really going to be admissible or not.  That is

14 not the purpose of the exercise.  The purpose for the request

15 for admissions is to reduce the issues in dispute, right?

16      MS. CRUZ:  It has to be proportional to the needs of

17 the case.

18      THE COURT:  Well, I think --

19      MR. EATON:  There is a reason behind the (inaudible),

20 Your Honor.

21      MS. CRUZ:  I mean, also --

22      THE COURT:  I issued over 20,000 discovery requests.

23      MS. CRUZ:  What kind of case is it?

24      THE COURT:  It was a massive fraud case, but it did

25 not involve somebody dying.  I will tell you that.  So for 150

1  admissions, I swear I thought you were going to say 150,000 and

2  I was saying, oh, my God.

3       MS. CRUZ:  Oh, my God.

4       THE COURT:  150 and you just have to answer them.

5       MR. EATON:  Mr. Musk --

6       THE COURT:  And you just have to good faith basis for

7  the answer.  And so if you deny it that's fine with me.  I will

8  not compel you, right?  As long as you have a good faith basis

9  to deny it and if the answer is admit it, then admit it.

10      If he is on video, for example, what if they cite to

11  you a YouTube interview or a Ted Talk and in the Ted Talk he

12  says the words blank.  You are going to say, well, what

13  difference does it make.  It has nothing to do with --

14      MS. CRUZ:  (Inaudible) perspective statement.

15      THE COURT:  Exactly.

16      MS. CRUZ:  But they want to take everything out of

17  context and say these words.

18      THE COURT:  Object.  It is inadmissible.  Cite Rule

19  403 if you want to, to every single one.

20      MS. CRUZ:  Yes.

21      THE COURT:  But admit it.  In other words, do you see

22  what I'm saying?  The fact is true.

23      MS. CRUZ:  We will deal with it down the road.

24      THE COURT:  Exactly.  And then that is the consequence

25  and that is why I don't do this because you could imagine in a

1  complex commercial case where you have a thousand of these

2  things, I am not going to --

3       MS. CRUZ:  That is why I said I foresee us being here

4  and spending a lot of time together.

5       THE COURT:  I don't.  Have a good evening.  We're

6  done.

7       MR. CRUZ:  Thank you, Your Honor.

8       MR. EATON:  I have one last question, Your Honor.

9       THE COURT:  Go ahead, Mr. Eaton.

10      MR. EATON:  Is this an order compelling or to answer

11 them?

12      THE COURT:  Oh, yes.

13      MR. EATON:  Okay.  So we'll do an order on that.  It

14 is hard to explain why --

15      THE COURT:  You don't need to.  It's 5:00.

16      MS. CRUZ:  Just to make sure it is not overruling any

17 objections.

18      THE COURT:  I'm not ruling on any objections.  I am

19 compelling you to answer the admissions.

20      THE COURTROOM DEPUTY:  Court is now adjourned.

21          (Thereupon, the proceedings concluded.)

22

23

24

25

CERTIFICATE

     I hereby certify that the foregoing transcript is an

accurate transcript of the audiotape recorded proceedings in

the above-entitled matter.

05/02/24                    Bonnie Joy Lewis,
                  Registered Professional Reporter
                     CASE LAW REPORTING, INC.
                      7001 Southwest 13 Street,
                     Pembroke Pines, Florida 33023
                          954-985-8875