UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-21940-BLOOM/Torres

NEIMA BENAVIDES, as Personal
Representative of the Estate of Naibel
Benavides Leon, deceased,

    Plaintiff,

v.

TESLA, INC., a/k/a Tesla Florida, Inc.,

    Defendant.
_____/

DILLON ANGULO,

    Plaintiff,

v.

TESLA, INC. a/k/a Tesla Florida, Inc.,

    Defendant.
_____/

Case No. 22-22607-KMM

## TESLA INC.'S STATUS REPORT REGARDING D.E. 287

Tesla, Inc. ("Tesla"), by and through undersigned counsel, submits the following Status Report related to its Compliance with D.E. 287:

At the outset, Tesla believes the following paragraphs make clear three things: **First**, the data at issue is complex and dense and understanding transmission, storage, processing and the like requires a substantial investment of time and energy—especially for a non-software engineer. **Second**, we believe it is clear there was no bad faith on Tesla's part in this case. And, **third**, we understand Plaintiffs' and the Court's frustration with Tesla's response to date to its production

31099314v1

obligations and its inability to provide a clear explanation of why that has been the case, and we hope the following addresses that, in part, in advance of filing Tesla's response to Plaintiffs' Rule 37 Motion.  For the Court's benefit, Tesla has already agreed to reimburse Plaintiffs for the costs associated with their consultant's work and the attorneys' fees incurred filing this Motion for this reason.

### Tesla received the snapshot data in 2019 but was not able to locate it until now.

In responding to discovery in this case, Tesla has always believed that it did not receive, over-the-air (OTA), a "snapshot" file from the vehicle's Autopilot ECU. That is because when Tesla searched for the snapshot file from this crash, Tesla looked in the place where this data received over-the-air from vehicles would be stored and it was not there.  The presumptive explanation was that Tesla did not receive snapshot data from the subject crash. Not receiving an OTA transmission of snapshot data is not unusual, particularly after significant crashes like the subject crash.  However, what we now know, based on the data provided by Plaintiffs' consultant and based on Tesla's subsequent extensive investigation, is that the data most likely was received by Tesla following the crash but was not located on the server where it was supposed to be stored when Tesla searched for the snapshot file during this litigation.

### Data from the November Autopilot ECU inspection provided the means to locate data that Tesla did not have previously.

We would like to explain how it is Tesla now located data and have completed our production of the data we found.  Plaintiffs' consultant provided Tesla engineers with two *new* and critical pieces of information: (1) confirmation that the vehicle had, in fact, attempted to transmit the data to Tesla, including the timestamp, and (2) an ID within that data that enabled engineers to locate the data Tesla received over-the-air in 2019. These two new pieces of information, as well

as research into software used at the time of the crash, allowed Tesla to locate the snapshot data. Again, the data was not where Tesla looked before and was not where it was supposed to be, but rather it had been broken up into numerous files and stored in different locations on the server where it could not reasonably have been located without these new pieces of information.

As we indicated at the status conference on December 12 (12/12 conference), the data was collected in the vehicle in a Tape Archive File (TAR file), a file format that combines multiple files into one archive like a "zip" file. For the Court's understanding, there is nothing proprietary about the TAR file format that Tesla uses to transmit data; the format is widely used for compressing data for transmission or storage, much like a .zip file. Like a .zip file, the contents of a TAR file may be extracted using software that comes on both Windows and Apple computers.

After it is created, the TAR file (the snapshot file) was transmitted over-the-air to Tesla. When a TAR file is received at Tesla, Tesla's system processes the snapshot data by untarring the file (*i.e.*, unzipping it) and distributing the files within the TAR file onto a server. That data is automatically indexed. Those index entries include the unique ID of the Autopilot ECU from the vehicle. Tesla uses this index to locate files on its servers that have been transmitted over-the-air.

As we reported to the Court in the 12/12 conference, in responding to Plaintiffs' discovery requests for the snapshot data, Tesla searched for and could find no indication that it received the TAR file, as discussed above. Tesla also queried the index and the index contained no entry for data associated with this vehicle's Autopilot ECU ID. Tesla's discovery responses and representations to the Court that it had not located data previously were based on its initial search that located nothing: the search where the TAR file should have been received and the search of the index that should have indicated that data from the snapshot was stored on Tesla's servers.

The *new* information *critical* to locating data on Tesla's servers was the specific ID that is stored on the vehicle's Autopilot ECU, which could only have been determined through access to the ECU itself. The parties have known the Florida Highway Patrol took possession of the ECU since the litigation's inception but data from the ECU was not extracted directly from ECU until October 30, 2024. Plaintiffs' ECU download provided this ID information to Tesla and thus provided Tesla with an alternative method to search its data in ways that heretofore had not been part of Tesla's regular search practices and, indeed, was previously unavailable to Tesla. Using that ID, and hours of research and investigation by Tesla's software engineers, Tesla was able to locate the data that had been within the original snapshot TAR file and subsequently automatically separated (untarred) and distributed across Tesla's servers. Today, Tesla is producing this untarred data. In addition, Tesla reassembled the data back into the original snapshot TAR file that it would have received in 2019 and is producing that TAR file as well.

**Tesla has produced what it found and has combined what it found into the original snapshot file it received from the vehicle in 2019. Some of the data, however, is not in a human readable format.**

As explained, Tesla is producing all the data that was in the original snapshot file. Tesla has also combined that data into a TAR file to mirror the original snapshot file Tesla now believes it received in 2019. Tesla believes this complies with the Court's Order with respect to the snapshot data with the caveat that not all of this data is "human readable." Some of the files are human readable including a file containing the same ID Tesla located in the data provided by Plaintiffs' consultant. Others are not.

When discussing this data during the conference on December 12, Tesla's Counsel misunderstood from Tesla the state of the data that was located on its servers—and believed that all of this data was in a human readable format. That was and is not the case. Since 12/12, Tesla

has confirmed that additional processing would be required to translate all data into human readable form and performing that processing and producing the resulting processed data would reveal incredibly commercially sensitive and proprietary information that Tesla protects from disclosure since disclosure to the public or other competitors would provide substantial insights into Tesla's intellectual property underlying Autopilot development and deployment and place Tesla at a significant competitive disadvantage. In this regard, Tesla has informed us that a disclosure of this nature would reveal enough of its Autopilot data and development that it would be tantamount to a disclosure of its source code. Disclosure of source code in this case warrants a heightened level of data protection and security that was not contemplated by the parties when the Confidentiality Protective Order (D.E. 126) was entered and source code is not addressed in that Order.

However, Tesla understands Plaintiffs' consultant, Mr. Drokin, did not have the snapshot TAR file and so he scoured the ECU chip for data that might comprise the snapshot TAR file, and with Tesla's production today he now has confirmation of what goes into the TAR and whether his efforts missed anything, which Tesla believes is of value to his efforts.

In addition to the snapshot TAR file, and the untarred data file, a third component of Tesla's production today is additional data known as parsed Controller Area Network (CAN) data that Tesla located with the missing snapshot data. Parsed CAN data *is* in "human-readable" format; this is also the type of data that Tesla engineers would have used to investigate this crash when it occurred.  It is also data, though more exhaustive in some ways, that the parties have already had in their possession throughout the litigation by virtue of Tesla's production of "carlog" data.

A fourth component of Tesla's production today is the 16 videos Tesla located as part of this search and retrieval using the same identifying information from Plaintiffs' consultant. Tesla

previously produced the forward-facing camera video that has been relied on by the experts on both sides.

> **Tesla does not have an augmented vision video from this crash and does not have the software to generate one; however, Tesla's engineers are working to create the augmented video for production to Plaintiffs.**

Finally, Tesla searched again for the augmented vision video clips from this crash that Tesla would expect to have been generated if the system had properly processed the data when received in 2019. None have been located, so Tesla continues to believe that data received in 2019 was not processed to generate the augmented videos. To be clear, Tesla is not aware of anyone in the company who was involved in investigating this crash or searching for data in this litigation who has seen augmented videos for this crash on Tesla's servers.

Since 2019, the software to generate augmented videos has been deprecated and is not in use at Tesla. Instead, Tesla now uses a different and more advanced visualization software (ApViz). Nonetheless, even though Tesla does not have the augmented videos or the software to generate them, Tesla's engineers are working to recreate software akin to that which was previously used in 2019 to create augmented videos to produce in this case. Significant engineering time is required for this endeavor, taking people off their "day job" of design and development, and they are working hard to get this completed.

Additionally, whether Tesla is able to generate an augmented video or not, Tesla will produce a set of the data from the snapshot file that would have populated or been represented in the augmented video had the data been processed and the video been generated in 2019 when the crash happened.

*  *  *

With Tesla's Response to Plaintiffs' Motion for Sanctions, it will provide Declarations of Tesla witnesses to provide support for the representations we have made here and other factual support for its Response. We have provided Plaintiffs' counsel with dates for depositions of Tesla's Declarants consistent with the Court's schedule. We are optimistic Tesla will be able to produce the augmented video, and assuming so, it will be done before those depositions. If that changes, we will promptly apprise Plaintiffs and the Court.

Although we and Tesla disagree with Plaintiffs' characterization of Tesla's discovery conduct (i.e., an intentional plan to deceive or mislead), we and Tesla deeply regret the delay and frustration this situation has caused the Court and Plaintiffs' Counsel. Tesla recognizes that it has been able to locate this data as a result of the work by Plaintiffs' consultant who—unlike Tesla's engineers—is a career data forensics specialist, adept at cracking into computers and codes. As a result, Tesla has agreed to reimburse Plaintiffs' consultant's fees and costs associated with his efforts which led to discovering the ID that made this production possible, as well as reasonable attorneys' fees in connection with their filing this Motion.

Date: December 20, 2024                          Respectfully submitted,

                                                                                            *s/ Whitney V. Cruz*

**WHITNEY V. CRUZ**
Florida Bar No. 800821
**BOWMAN AND BROOKE LLP**
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134
Tel. 305-995-5600 / Fax: 305-995-6100
whitney.cruz@bowmanandbrooke.com

**THOMAS P. BRANIGAN**
*(Admitted Pro Hac Vice)*
**DREW P. BRANIGAN**
*(Admitted Pro Hac Vice)*
**BOWMAN AND BROOKE LLP**
101 W. Big Beaver Road, Suite 1100
Troy, MI 48084
Tel. 248-205-3300 / Fax: 248-205-3399
thomas.branigan@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com

**JOEL SMITH**
*(Admitted Pro Hac Vice)*
**BOWMAN AND BROOKE LLP**
1441 Main Street, Suite 1200
Columbia, SC 2920
Tel. 803-726-7420 / Fax: 803.726.7421
Joel.Smith@bowmanandbrooke.com

*Attorneys for Defendant TESLA, Inc.*

31099314v1

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2024, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

**Adam T. Boumel, Esq.**
Florida Bar No. 0110727
THE ROUSSO, BOUMEL LAW FIRM, PLLC
9350 South Dixie Highway
Suite 1520
Miami, FL 33156
Tel. 305-670-6669
adam@roussolawfirm.com
assistant@roussolawfirm.com
pleadings@roussolawfirm.com

*Attorneys for Plaintiff Dillon Angulo*

**Todd Poses, Esq.**
Florida Bar No. 0075922
POSES & POSES, P.A.
Alfred I. Dupont Building
169 East Flagler Street, Suite 1600
Miami, FL 33131
Tel. 305-577-0200
Fax: 305-371-3550
tposes@posesandposes.com
maria@posesandposes.com

*Attorneys for Plaintiff Neima Benavides*

**Brett Schreiber, Esq.**
Admitted *Pro Hac Vice*
**Satyarinivas "Srinivas" Hanumadass, Esq.**
Admitted *Pro Hac Vice*
**Carmela Birnbaum, Esq.**
Admitted *Pro Hac Vice*
SINGLETON SCHRIEBER
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Tel. 619-771-3473
bschreiber@singletonschreiber.com
vas@singletonschreiber.com
cbirnbaum@singletonschreiber.com
jjusto@singletonschreiber.com
eelms@singletonschreiber.com
service@singletonschreiber.com

*Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides*

**Douglas F. Eaton, Esq.**
Florida Bar No. 0129577
EATON & WOLK PL
2665 South Bayshore Drive, Suite 609
Miami, FL 33133
Tel. 305-249-1640
Fax: 786-350-3079
deaton@eatonwolk.com
cgarcia@eatonwolk.com
lhuete@eatonwolk.com

*Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides*

　

s/ *Whitney V. Cruz*
Whitney V. Cruz