Transcript of Robert L. Sumwalt, III
Conducted on July 9, 2024

| | | |
|---|---|---|
| 1 | MR. BRANIGAN:  Thank you, sir.  I don't | 03:00:18 |
| 2 | have anything further. | 03:00:19 |
| 3 | THE WITNESS:  Thanks. | 03:00:21 |
| 4 | Gentlemen, before we go off the record, I | 03:00:22 |
| 5 | do want to get those follow-ups, whether it's on the | 03:00:23 |
| 6 | record or off the record. | 03:00:25 |
| 7 | So, Mr. Branigan -- | 03:00:28 |
| 8 | MR. SCHREIBER:  We'll do it off the record | 03:00:29 |
| 9 | so Madam Reporter doesn't have to keep typing. | 03:00:30 |
| 10 | THE WITNESS:  It's all on -- | 03:00:34 |
| 11 | MR. BRANIGAN:  Actually -- | 03:00:36 |
| 12 | THE WITNESS:  It's not on -- | 03:00:36 |
| 13 | MR. BRANIGAN:  Actually, I think it would | 03:00:36 |
| 14 | benefit everybody if we -- and sorry, Madam Court | 03:00:38 |
| 15 | Reporter -- if we made a quick record of that.  That | 03:00:41 |
| 16 | way, there's no mistake, no confusion about what | 03:00:44 |
| 17 | Mr. Sumwalt agreed to provide. | 03:00:48 |
| 18 | THE WITNESS:  Yeah, I'm ready. | 03:00:49 |
| 19 | MR. BRANIGAN:  Go ahead, sir. | 03:00:51 |
| 20 | THE WITNESS:  I show all of my computer | 03:00:52 |
| 21 | files, which are maybe six computer files related to | 03:00:54 |
| 22 | this testimony. | 03:00:58 |
| 23 | MR. SCHREIBER:  Yep. | 03:01:01 |
| 24 | THE WITNESS:  The paper I wrote for the | 03:01:01 |
| 25 | TRB -- what'd they call it? -- like, "AIR21" [sic] | 03:01:03 |

Transcript of Robert L. Sumwalt, III
Conducted on July 9, 2024                          251

| | | |
|---|---|---|
| 1 | or something like that.  I'll send that.  And that's | 03:01:08 |
| 2 | all that I can recall.  What else? | 03:01:11 |
| 3 | MR. BRANIGAN:  You said your time sheet. | 03:01:14 |
| 4 | THE WITNESS:  Yeah.  That's part of all the | 03:01:16 |
| 5 | computer files.  That's right, yeah. | 03:01:17 |
| 6 | MR. SCHREIBER:  Yep. | 03:01:19 |
| 7 | MR. BRANIGAN:  And whatever e-mails you've | 03:01:19 |
| 8 | got from the lawyers that communicated with you | 03:01:21 |
| 9 | about this deposition, please. | 03:01:23 |
| 10 | THE WITNESS:  Yeah, I'll look for those | 03:01:25 |
| 11 | again.  I think it could be the only e-mail I got | 03:01:26 |
| 12 | from Mr. Slavik was the one he wrote me Saturday | 03:01:30 |
| 13 | night or Sunday to say -- no, he wrote it Saturday | 03:01:33 |
| 14 | to say, "Hey, okay, I'll call you on Saturday."  But | 03:01:36 |
| 15 | I'll track down all of those. | 03:01:40 |
| 16 | And would that include all -- yeah, I guess | 03:01:43 |
| 17 | it would include all of the ones that I've received | 03:01:45 |
| 18 | from whoever's sending them out, like links to this | 03:01:48 |
| 19 | meeting?  Is that right? | 03:01:52 |
| 20 | MR. BRANIGAN:  If you don't mind. | 03:01:54 |
| 21 | THE WITNESS:  Yeah. | 03:01:56 |
| 22 | MR. BRANIGAN:  That way, we know we have it | 03:01:56 |
| 23 | all. | 03:01:58 |
| 24 | THE WITNESS:  Sure.  All right. | 03:01:59 |
| 25 | MR. SCHREIBER:  And, just to make that | 03:02:00 |

Transcript of Robert L. Sumwalt, III
Conducted on July 9, 2024                                  252

| | | |
|---|---|---|
| 1 | easier for you, if you just search for "Elms," | 03:02:01 |
| 2 | E-l-m-s -- that's my assistant.  She's the one who | 03:02:03 |
| 3 | served you with the subpoena. | 03:02:06 |
| 4 | THE WITNESS:  Okay. | 03:02:08 |
| 5 | MR. SCHREIBER:  I think there's three: | 03:02:08 |
| 6 | subpoena, depo notice, and probably Zoom link. | 03:02:09 |
| 7 | THE WITNESS:  Okay.  Good.  I'll look for | 03:02:12 |
| 8 | all that.  And how shall I get it into the record or | 03:02:14 |
| 9 | to Mr. Branigan or whatever? | 03:02:17 |
| 10 | MR. BRANIGAN:  You could -- | 03:02:18 |
| 11 | MR. SCHREIBER:  I was just going to say you | 03:02:21 |
| 12 | have my e-mail now.  Send it to me, and I will be | 03:02:22 |
| 13 | sure to forward it along to everyone as I just did | 03:02:25 |
| 14 | all the other exhibits. | 03:02:28 |
| 15 | MR. BRANIGAN:  Yes. | 03:02:30 |
| 16 | THE WITNESS:  Okay.  Would it be -- I can | 03:02:32 |
| 17 | get it to you Thursday or Friday.  Is that okay? | 03:02:36 |
| 18 | MR. SCHREIBER:  That's fine. | 03:02:40 |
| 19 | THE WITNESS:  Great.  Sounds good. | 03:02:41 |
| 20 | MR. SCHREIBER:  Thank you, sir. | 03:02:44 |
| 21 | MR. BRANIGAN:  All right.  Now, I think -- | 03:02:45 |
| 22 | with counsel's permission, I think we can go off the | 03:02:46 |
| 23 | record. | 03:02:49 |
| 24 | And there was one last thing I asked you. | 03:02:50 |
| 25 | And this is going to be off the record.  I asked you | 03:02:52 |

Transcript of Robert L. Sumwalt, III
Conducted on July 9, 2024                          253

| | | |
|---|---|---|
| 1 | how we might get ahold of you if we needed to -- | 03:02:56 |
| 2 | THE COURT REPORTER:  You might want to wait | 03:03:00 |
| 3 | for the videographer to go off the record. | 03:03:00 |
| 4 | MR. SCHREIBER:  Yeah, let -- | 03:03:02 |
| 5 | MR. BRANIGAN:  Yeah, sorry. | 03:03:03 |
| 6 | THE WITNESS:  Sure. | 03:03:04 |
| 7 | THE VIDEOGRAPHER:  This marks the end of | 03:03:05 |
| 8 | the deposition of Robert Sumwalt.  We are going off | 03:03:06 |
| 9 | the record at 15:03. | 03:03:08 |
| 10 | (The following is on the stenographic | 03:03:09 |
| 11 | record only.) | 03:03:09 |
| 12 | MR. SCHREIBER:  So we'll mark that, then, | 03:03:50 |
| 13 | as -- what is your last exhibit, Tom? | 03:03:50 |
| 14 | MR. BRANIGAN:  My last exhibit, I think, | 03:03:50 |
| 15 | was 12. | 03:03:50 |
| 16 | MR. SCHREIBER:  That's what I thought.  So | 03:03:50 |
| 17 | lucky No. 13. | 03:03:50 |
| 18 | (Deposition Exhibit 13 was marked for | |
| 19 | identification.) | |
| 20 | (Discussion off the record.) | 03:05:14 |
| 21 | THE VIDEOGRAPHER:  Would you like a copy of | 03:05:32 |
| 22 | the video as well? | 03:05:33 |
| 23 | MR. SCHREIBER:  Oh, of course.  Yeah.  I'm | 03:05:33 |
| 24 | going to want the whole enchilada, synced and | 03:05:34 |
| 25 | everything when we get the final.  But, obviously, I | 03:05:37 |

Transcript of Robert L. Sumwalt, III
Conducted on July 9, 2024

254

| | | |
|---|---|---|
| 1 | don't need a rough version of the video. | 03:05:40 |
| 2 | THE VIDEOGRAPHER: Copy that. | 03:05:44 |
| 3 | Mr. Branigan, would you like a copy of the video? | 03:05:45 |
| 4 | MR. BRANIGAN: Don't need it now, so I'm | 03:05:48 |
| 5 | going to pass now. | 03:05:49 |
| 6 | But we'll definitely take a copy of the | 03:05:50 |
| 7 | transcript. | 03:05:55 |
| 8 | THE COURT REPORTER: And do you need a | 03:05:55 |
| 9 | rough draft? | 03:05:57 |
| 10 | MR. BRANIGAN: If Mr. Schreiber has ordered | 03:05:57 |
| 11 | one, we'll take one. | 03:05:59 |
| 12 | - - - | |
| 13 | (Signature having not been reserved, the | |
| 14 | deposition of ROBERT L. SUMWALT, III, | |
| 15 | concluded at 3:05 p.m. PDT) | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Transcript of Robert L. Sumwalt, III
Conducted on July 9, 2024                    255

```
 1                    WITNESS CERTIFICATION

 2

 3    NEIMA BENAVIDES, as Personal Representative of the

 4    Estate of Naibel Benavides Leon, deceased vs. TESLA,

 5    INC., a/k/a Tesla Florida, Inc.

 6    WITNESS:  ROBERT L. SUMWALT, III

 7    DATE:  July 9, 2024

 8    JOB NO.:  54762

 9

10       I, ROBERT L. SUMWALT, III, having remotely

11    appeared for my deposition on July 9, 2024, hereby

12    certify under penalty of perjury under the laws of

13    the United States of America that the foregoing is

14    true and correct.

15       IN WITNESS WHEREOF, I have hereunto subscribed

16    my name this _____ day of _____ 201___, at

17    _____, _____.

18       (city)                    (state)

19

20

21

22            _____

23                 ROBERT L. SUMWALT, III

24

25
```

1    CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2              I, Marla Sharp, a certified stenographic
     reporter licensed in California, Oregon, and
3    Washington, hereby certify:
               That the foregoing video-recorded
4    videoconference deposition of ROBERT L. SUMWALT,
     III, was taken before me on July 9, 2024, at the
5    time therein set forth, at which time the witness
     was duly sworn by me;
6              That the testimony of the witness and all
     colloquy and objections made at the time of the
7    deposition were recorded remotely stenographically
     by me and thereafter transcribed, said transcript
8    being a true copy of my shorthand notes thereof;
               That review of the transcript was requested
9    before completion of the deposition; that the
     witness has failed or refused to approve the
10   transcript.
               I further certify I am neither financially
11   interested in the action nor a relative or employee
     of any attorney of any of the parties.
12             In witness whereof, I have subscribed my
     name and signature this date, July 18, 2024.

13

14   _Marla Sharp_

15   _____

16   Marla Sharp, RPR, CLR, CCRR,

17   OR CSR 17-0446, CA CSR 11924, WA CSR 3408

18

19

20

21

22

23

24

25

```
1                 E R R A T A   S H E E T

2    CASE:   NEIMA BENAVIDES, as Personal Representative

3    of the Estate of Naibel Benavides Leon, deceased vs.

4    TESLA, INC., a/k/a Tesla Florida, Inc.

5    WITNESS:   ROBERT L. SUMWALT, III

6    DATE:   July 9, 2024

7    JOB NO.:   54762

8    PAGE   LINE   CORRECTION AND REASON

9    _____ ____ _____

10   _____ ____ _____

11   _____ ____ _____

12   _____ ____ _____

13   _____ ____ _____

14   _____ ____ _____

15   _____ ____ _____

16   _____ ____ _____

17   _____ ____ _____

18   _____ ____ _____

19   _____ ____ _____

20   _____ ____ _____

21   _____ ____ _____

22   _____ ____ _____

23   _____ ____ _____

24   _____    _____

25        (DATE)                  (SIGNATURE)
```

Transcript of Robert L. Sumwalt, III
Conducted on July 9, 2024                    258

```
 1        E R R A T A   S H E E T   C O N T I N U E D

 2    CASE:   NEIMA BENAVIDES, as Personal Representative

 3    of the Estate of Naibel Benavides Leon, deceased vs.

 4    TESLA, INC., a/k/a Tesla Florida, Inc.

 5    WITNESS:   ROBERT L. SUMWALT, III

 6    DATE:   July 9, 2024

 7    JOB NO.:   54762

 8    PAGE  LINE  CORRECTION AND REASON

 9    _____ ____ _____

10    _____ ____ _____

11    _____ ____ _____

12    _____ ____ _____

13    _____ ____ _____

14    _____ ____ _____

15    _____ ____ _____

16    _____ ____ _____

17    _____ ____ _____

18    _____ ____ _____

19    _____ ____ _____

20    _____ ____ _____

21    _____ ____ _____

22    _____ ____ _____

23    _____ ____ _____

24    _____    _____

25        (DATE)                  (SIGNATURE)
```

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 21-cv-21940-BLOOM/Torres

NEIMA BENAVIDES, as Personal
Representative of the Estate of Naibel
Benavides Leon, deceased,

      Plaintiff,

v.

TESLA, INC., a/k/a Tesla Florida, Inc.,

      Defendant.

_____/

DILLON ANGULO,                     Case No. 22-22607-KMM

      Plaintiff,

v.

TESLA, INC. a/k/a Tesla Florida, Inc.,

      Defendant.

_____/

## AMENDED NOTICE OF TAKING REMOTE DEPOSITION

**PLEASE TAKE NOTICE** that the undersigned attorneys will take the remote

deposition of the following individual:

| DEPONENT | DATE/TIME | LOCATION |
|---|---|---|
| **Robert Sumwalt** | **Tuesday, July 9, 2024 at 12:00 p.m. (EST)** | **Virtual Deposition Video Conference** |



Exhibit #

Sumwalt 1

7/9/2024

| | | (A link to appear remotely will be provided via email prior to the deposition) |
| --- | --- | --- |

The deposition will take place upon examination before Planet Depos, Notary Public or officer authorized by law to take depositions in the State of Florida. Counsel for the parties will be participating from various, separate locations. This deposition will be conducted in accordance with the Federal Rules of Civil Procedure including, but not limited to, Rules 26 and 30 and the Federal Rules of Evidence. The deposition transcript, once completed, may be used for all purposes permitted by law. This deposition will begin at the time stated above and continue until completed.

Prior to the deposition, the Court Reporting agency will provide the necessary information to access the remote electronic platform.

Notice is hereby given that the video is intended for use at trial.


Respectfully submitted,

Dated: June 18, 2024         SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Tel: (619) 771-3473
*/s/ **Brett J. Schreiber, Esq.***
Brett J. Schreiber, Esq.
California Bar No. 239707
(Admitted *Pro Hac Vice 05/07/2024*)
*Attorney for Plaintiff Benavides*

bschreiber@singletonschreiber.com
SERVICE EMAILS:
bschreiber@singletonschreiber.com
vas@singletonschreiber.com
cbirnbaum@singletonschreiber.com
jjusto@singletonschreiber.com
eelms@singletonschreiber.com


**/s/Todd Poses_____**
Todd Poses
FBN: 75922
POSES LAW GROUP, P.A.
169 East Flagler Street, Suite 1600
Miami, Florida 33131
Tel: (305) 577-0200
tposes@poseslawgroup.com
maria@poseslawgroup.com
shelly@poseslawgroup.com
*Attorney for Plaintiff Benavides*


THE ROUSSO, BOUMEL LAW FIRM, PLLC.
9350 South Dixie Highway
Suite 1520
Miami, Florida 33156
Tel: (305) 670-6669
**/s/ Adam T. Boumel, Esq.**
Adam T. Boumel, Esq.
Florida Bar No.: 0110727
Adam@roussolawfirm.com
SERVICE EMAILS:
pleadings@roussolawfirm.com (primary)
assistant@roussolawfirm.com
*Attorney for Plaintiff Angulo*

## <u>CERTIFICATE OF SERVICE</u>

We hereby certify that on June 18, 2024, the foregoing document was served electronically to all counsel of record listed as follows:

| | |
|---|---|
| **Adam T. Boumel, Esq.**<br>Florida Bar No. 0110727<br>**Darren J. Rousso, Esq.**<br>Florida Bar No. 97410<br>THE ROUSSO, BOUMEL<br>LAW FIRM, PLLC<br>9350 South Dixie<br>Highway Suite 1520<br>Miami, FL 33156<br>Tel. 305-670-6669<br>Adam@roussolawfirm.com<br>darren@roussolawfirm.com<br>pleadings@roussolawfirm.com<br>*Attorneys for Plaintiff Dillon Angulo* | **Todd Poses, Esq.**<br>Florida Bar No.<br>0075922 POSES<br>& POSES, P.A.<br>Alfred I. Dupont Building<br>169 East Flagler Street, Suite<br>1600<br>Miami, FL 33131<br>Tel.  305-577-0200<br>Fax: 305-371-3550<br>tposes@posesandposes.com<br>maria@posesandposes.com<br>*Attorneys for Plaintiff Neima*<br>*Benavides* |
| **Whitney V. Cruz, Esq.**<br>Florida Bar No. 800821<br>**BOWMAN AND BROOKE LLP**<br>Two Alhambra Plaza, Suite 800<br>Coral Gables, FL 33134<br>Tel. 305-995-5600 / Fax: 305-995-6100<br>whitney.cruz@bowmanandbrooke.com<br>*Attorneys for Defendant Tesla, Inc.* | **Douglas F. Eaton,**<br>**Esq.** Florida Bar<br>No. 0129577<br>EATON &<br>WOLK PL<br>2665 South Bayshore Drive, Suite<br>609<br>Miami, FL 33133<br>Tel. 305-249-1640<br>Fax: 786-350-3079<br>deaton@eatonwolk.com<br>cgarcia@eatonwolk.com<br>lhuete@eatonwolk.com<br>*Co-Counsel for Plaintiffs Dillon*<br>*Angulo and Neima Benavides* |

|   |   |
|---|---|
| **THOMAS P. BRANIGAN** <br> (Admitted *Pro Hac Vice*) <br> **DREW P. BRANIGAN** <br> (Admitted *Pro Hac Vice*) <br> **BOWMAN AND BROOKE LLP** <br> 101 W. Big Beaver Road, Suite 1100 <br> Troy, MI 48084 <br> Tel. 248-205-3300 / Fax: 248-205-3399 <br> thomas.branigan@bowmanandbrooke.com <br> drew.branigan@bowmanandbrooke.com <br> <br> *Attorneys for Defendant* <br> *Tesla, Inc.* |   |

/s/ Ericka Elms
Ericka Elms



**SINGLETON SCHREIBER**

FEARLESS ADVOCACY

Carmela Birnbaum, Esq.
Counsel

591 Camino de la Reina, Suite 1025, San Diego, CA 92108
(619) 771-3473 | cbirnbaum@singletonschreiber.com

**Via FedEx**

Mr. William Thomas McMurry, Jr.
General Counsel
National Transportation Safety Board
490 L'Enfant Plaza, S.W.
Washington D.C. 20594

  **Re:**  **Notice of Deposition of Former Employee**

Dear Mr. McMurray:

  Please accept this letter as notice of the deposition of Mr. Robert Sumwalt, former Chairman of the National Transportation Safety Board (NTSB), on or before June 28, 2024.

  Mr. Sumwalt's testimony is relevant to a case that we are currently litigating against Tesla in United States District Court in the Southern District of Florida, *Benavides v. Tesla Inc.*, Case No. 22-22607-KMM. In *Benavides*, a Tesla vehicle operating on Autopilot and driven by a defendant in the case crashed into a Chevrolet Tahoe parked off-road at the end of T-intersection, causing the death of Naibel Benavides Leon and catastrophically injuring Dillon Angulo. The young couple was standing outside of their vehicle at the time of the collision. The incident occurred on April 25, 2019. Our office, along with co-counsel, represent Neima Benavides, as the personal representative of the estate of Naibel Benavides Leon, and Dillon Angulo. Mr. Angulo's case, *Dillon Angulo v. Tesla, Inc.*, Case No. 22-22607-KMM, has been consolidated with the *Benavides* case.

  In a recent hearing in *Benaavides*, the court directed us to notify NTSB of Mr. Sumwalt's deposition to allow NTSB to intervene should NTSB find it necessary to do so. In efforts to comply with the court's guidelines, we have reached out to notify NTSB of the pending deposition. However, NTSB intervention is not necessary as we are seeking testimony of a former Board employee. Under 49 CFR §835.7, "[i]t is not necessary to request Board approval of a former Board employee, nor is testimony limited to depositions."

  We certainly seek to comply with the applicable provisions of the governing regulations, so please do not hesitate to contact us with any questions.

    Sincerely,

    */s/ **Carmela Birnbaum, Esq.***
    Carmela Birnbaum Esq.
    California Bar No. 190495
    (Admitted *Pro Hac Vice 05/07/2024*)
    SINGLETON SCHREIBER, LLP
    *Attorneys for Plaintiffs Neima Benavides and Dillon Angul*

CALIFORNIA | NEW MEXICO | OREGON | WASHINGTON | UTAH | COLORADO | TEXAS | MISSOURI | HAWAII

**Exhibit #**

**Sumwalt 2**

7/9/2024

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Tel: (619) 771-3473
*/s/ Brett J. Schreiber, Esq.*
Brett J. Schreiber, Esq.
California Bar No. 239707
(Admitted *Pro Hac Vice 05/07/2024*)
*Attorney for Plaintiff Benavides*
bschreiber@singletonschreiber.com
SERVICE EMAILS:
bschreiber@singletonschreiber.com
vas@singletonschreiber.com
cbirnbaum@singletonschreiber.com
eelms@singletonschreiber.com


*/s/Todd Poses*
Todd Poses
FBN: 75922
POSES LAW GROUP, P.A.
169 East Flagler Street, Suite 1600
Miami, Florida 33131
Tel: (305) 577-0200
tposes@poseslawgroup.com
maria@poseslawgroup.com
shelly@poseslawgroup.com
*Attorney for Plaintiff Benavides*

THE ROUSSO, BOUMEL LAW FIRM, PLLC.
9350 South Dixie Highway
Suite 1520
Miami, Florida 33156
Tel: (305) 670-6669
*/s/ Adam T. Boumel, Esq.*
Adam T. Boumel, Esq.
Florida Bar No.: 0110727
Adam@roussolawfirm.com
SERVICE EMAILS:
pleadings@roussolawfirm.com (primary)
assistant@roussolawfirm.com
*Attorney for Plaintiff Angulo*

CC: via email
      Adam T. Boumel, Esq.
      Todd Poses, Esq.
      Whitney V. Cruz, Esq.
      Thomas P. Branigan, Esq.
      Drew P. Branigan, Esq.
      Douglas F. Eaton, Esq.

**Bowman and Brooke** LLP

*Attorneys at Law*

101 West Big Beaver Road, Suite 1100
Troy, MI  48084
Phone: 248.205.3300
Fax: 248.205.3399

Thomas P. Branigan, Esq
Direct: 248.205.3316
Email: thomas.branigan@bowmanandbrooke.com
Admitted in Illinois, Michigan and Ohio

June 17, 2024                                                          *VIA FEDERAL EXPRESS*

Mr. William Thomas McMurry, Jr.
General Counsel
National Transportation Safety Board
490 L'Enfant Plaza, S.W.
Washington, DC  20594

      Re:    *Benavides et al. v. Tesla, Inc., USDC SD Florida, Case: 22-22607-KMM*
                *Monet et al. v. Tesla, Inc., USDC SD Indiana, Case: 2:24-CV-00107-JPH-MKK*

Dear Mr. McMurray:

      We represent Tesla in the matters identified above and I write in response to the letter sent to you by Plaintiffs' Counsel Carmela Birnbaum in the *Benavides* case on June 10, 2024 with their "notice of the deposition of Mr. Robert Sumwalt, former Chairman of the National Transportation Safety Board (NTSB), on or before June 28, 2024." O June 13, 2024, Mr. Sumwalt's deposition was noticed in *Monet v. Tesla*. In short, Tesla objects to Plaintiffs' request for Mr. Sumwalt's deposition.

      Contrary to Plaintiffs' Counsel's claims in both cases, Mr. Sumwalt's testimony is not relevant. To our knowledge, the NTSB and Mr. Sumwalt did not investigate either the April 25, 2019 *Benavides* incident or the December 29, 2019 *Monet* incident and Mr. Sumwalt is not a witness to any facts related to these incidents. Instead, Plaintiffs' request appears to be part of a recent and coordinated effort to depose Mr. Sumwalt in product liability litigation against Tesla so that he may have the opportunity to disclose through his testimony opinions he or the NTSB may have shared with Tesla about unrelated incidents with Tesla vehicles that were actually investigated by the NTSB. In fact, Plaintiffs' Counsel have told us that they intend to question Mr. Sumwalt about opinions he shared during conversations with Elon Musk and others at Tesla after the NTSB's investigations of other unrelated incidents, several years ago. In an unrelated case, *Ochoa v. Tesla,*[1] Plaintiff's request to depose Mr. Sumwalt was denied by the trial court on June 12, 2024 because, like the incidents in *Benavides* and *Monet,* the incident in *Ochoa* was not investigated by the NTSB.

      The cause of the *Benavides* incident was "careless" and "aggressive" driving by the Tesla driver. In fact, the Tesla driver admitted that he caused the crash to investigating Police at the scene of the crash. He was charged with careless and aggressive driving by the Florida Highway Patrol and later settled negligence claims made against him by these Plaintiffs without blaming or attributing fault to Tesla for the crash or his negligence.  Similarly, Mr. Monet was asleep at the wheel after driving for nearly two days straight with breaks only to charge the vehicle's battery.  He knew his vehicle required service and that

---

[1] Pending in the Superior Court for the State of California for the County of Los Angels, Case 20STCV08423.

Mr. William Thomas McMurry, Jr.
June 17, 2024
Page 2

there were issues with the Autopilot camera functionality on his Model 3, yet he continued using Autopilot and ultimately crashed into a fire engine that would have been completely visible to an attentive driver, resulting in injuries to himself and the death of his wife.

It is Tesla's position that Plaintiffs' request for Mr. Sumwalt's deposition is purely an effort to grab headlines by making the testimony public—as they have done repeatedly in other cases—and to create misimpressions about Tesla based on Mr. Sumwalt's former position and the suggestion he might speak for the Board.  In short, it is contrary to law. As you know, testimony by current and former NTSB employees is governed by the NTSB's Touhy regulations found at 49 CFR Part 835, which carry the force of law. These regulations are implicated when the employee's testimony is (1) offered in an official capacity and (2) arises out of or is related to the NTSB's accident investigation. The scope of permissible testimony is controlled by section 835.3, which states, in part, that "Board employees may only testify as to the factual information they obtained during the course of an investigation … they shall decline to testify regarding matters beyond the scope of their investigation, and they shall not provide any expert or opinion testimony." (49 CFR § 835.3(b).) Additionally, while section 835.4 allows an employee to use their factual accident reports as a testimonial aid and to refresh recollection, the employee is precluded from identifying or otherwise using an NTSB final accident report for any purpose during the testimony. (49 CFR § 835.4(b).) Of course, there are no NTSB accident reports here because it is our understanding that neither of these incidents was investigated by the NTSB, thus, Mr. Sumwalt's testimony is not relevant here.

Second, even if the NTSB investigated these incidents – we are not aware of any such investigation - Mr. Sumwalt would be prohibited from offering any analytical or opinion testimony relating to that investigation or testimony that is beyond the scope of the relevant investigation. This prohibition extends to testimony about the NTSB's analysis of the relevant accident, including the findings, probable cause, and recommendations contained in the NTSB's final accident report. Mr. Sumwalt would only be authorized to provide firsthand factual information learned through his involvement in the applicable investigation. His level of "firsthand factual information," if any, is likely to limited given that: (1) there was no NTSB investigation into these crashes; and (2) Board Members are not investigators and are purposely firewalled off from the intricacies of the investigations until the final report has been drafted. In short, Mr. Sumwalt would have no personal knowledge of any investigation and would be unable to provide any analysis or opinion regarding any investigation (again, no investigation occurred) or the facts about these crashes. Further, Mr. Sumwalt is not a retained or disclosed expert in these cases. Therefore, he would also be unable to provide opinions on Tesla's Autopilot feature or the related technology. Because Mr. Sumwalt would have no relevant testimony regarding Plaintiffs' claims in these cases, Plaintiffs' attempt to depose him is an improper attempt to circumvent the law, and a waste of time and resources.  We expect Plaintiffs to inquire about conversations involving Mr. Sumwalt, others within the NTSB, and Tesla's CEO Mr. Musk; none of these conversations were related to the crashes giving rise to these cases.  Mr. Sumawalt's testimony should it be given will be irrelevant, and simply invites plaintiffs in other cases to pursue Mr. Sumwalt or other NTSB officials in case after case if his contribution amounts to no more than giving his opinions about Tesla or Autopilot with the weight of his former position within NTSB.

Plaintiffs' Counsel is correct in stating that in a recent hearing in *Benavides*, the court directed them to notify the NTSB of Plaintiffs' request to depose Mr. Sumwalt to allow the NTSB to intervene in response to their request. We are responding to Plaintiffs' request so that you are aware of Tesla's objections.

Mr. William Thomas McMurry, Jr.
June 17, 2024
Page 3


Please let me know if you have any questions. We certainly seek to comply with the applicable provisions of the governing regulations, so please do not hesitate to contact us with any questions.

Very truly yours,

Thomas P. Branigan
Executive Managing Partner

TPB/pmg
cc via email:
Carmela Birnbaum, Esq.
Brett Schreiber, Esq.
Adam T. Boumel, Esq.
Todd Poses, Esq.
Douglas F. Eaton, Esq.
Whitney V. Cruz, Esq.
Drew P. Branigan, Esq.

# National Transportation Safety Board

Office of the General Counsel
Washington, DC 20594

July 8, 2024

Via e-mail to: cbirnbaum@singletonschreiber.com
Carmela Birnbaum, Esq.
Singleton Schreiber, LLP
591 Camino de la Reina, Suite 1025
San Diego, CA 92108

Re: Notice of Deposition of Former Employee

Dear Ms. Birnbaum,

This letter responds to your correspondence of June 10, 2024, to the National Transportation Safety Board (NTSB), seeking to notify the NTSB of deposition of Robert Sumwalt, former Chairman of the National Transportation Safety Board, in a civil case *Benavides v. Tesla, Inc.*, Case No. 22-22607-KMM in the U.S. District Court in the Southern District of Florida arising from an April 25, 2019 accident where a Tesla vehicle operating on Autopilot crashed into a Chevrolet Tahoe parked off-road at the end of a T-intersection, resulting in loss of life.

Information regarding the accidents the NTSB investigates is posted on the public docket, which is searchable by the public on the NTSB's website.[1] Our records show that the NTSB did not investigate a crash involving a Tesla and a Chevrolet Tahoe on April 25, 2019. In fact, our records show no highway accident occurring on that date was ever investigated by the NTSB.

While it is correct 49 C.F.R. § 835.7 does not require NTSB approval of testimony of a former Board employee, § 835.7 indicates that such testimony is nevertheless constrained by the limitations set forth in §§ 835.3 and 835.4. In short, these limitations indicate that a former board employee may not give expert or opinion testimony and may only testify as to the factual information he or she obtained during the course of an investigation.

Your correspondence indicates that Mr. Sumwalt is planned to be deposed in his capacity as former Chairman of the NTSB, a position he held at the time of the noted accident. However, because the NTSB did not investigate this accident, there is no factual information that Mr. Sumwalt could possess relative to the accident. Thus,

---

[1] https://data.ntsb.gov/Docket/Forms/searchdocket

the only possible testimony would be of expert or opinion nature, which is prohibited by 49 C.F.R. § 835.3.

Please do not hesitate to contact Daria Glagoleva within the Office of General Counsel at 202-314-6080 should you have any questions.

Sincerely,

WILLIAM
MCMURRY        Digitally signed by WILLIAM
               MCMURRY
               Date: 2024.07.08 19:05:26 -04'00'

William T. McMurry, Jr.
General Counsel

# Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida

May 7, 2016



## Accident Report

NTSB/HAR-17/02
PB2017-102600



**National Transportation Safety Board**



Exhibit #

**Sumwalt 3**

7/9/2024

NTSB/HAR-17/02
PB2017-102600
Notation 56955
Adopted September 12, 2017

# Highway Accident Report

Collision Between a Car Operating With Automated Vehicle
Control Systems and a Tractor-Semitrailer Truck
Near Williston, Florida
May 7, 2016



National
Transportation
Safety Board

490 L'Enfant Plaza, S.W.
Washington, D.C. 20594

**National Transportation Safety Board. 2017.** *Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016.* **Highway Accident Report NTSB/HAR-17/02. Washington, DC.**

**Abstract:** At 4:36 p.m. eastern daylight time on Saturday, May 7, 2016, a 2015 Tesla Model S 70D car, traveling eastbound on US Highway 27A (US-27A), west of Williston, Florida, struck a refrigerated semitrailer powered by a 2014 Freightliner Cascadia truck-tractor. At the time of the collision, the truck was making a left turn from westbound US-27A across the two eastbound travel lanes onto NE 140th Court, a local paved road. The car struck the right side of the semitrailer, crossed underneath it, and then went off the right roadside at a shallow angle. The impact with the underside of the semitrailer sheared off the roof of the car. After leaving the roadway, the car continued through a drainage culvert and two wire fences. It then struck and broke a utility pole, rotated counterclockwise, and came to rest perpendicular to the highway in the front yard of a private residence. Meanwhile, the truck continued across the intersection and came to a stop on NE 140th Court, south of a retail business located on the intersection corner. The driver and sole occupant of the car died in the crash; the commercial truck driver was not injured. System performance data downloaded from the car indicated that the driver was operating it using the Traffic-Aware Cruise Control and Autosteer lane-keeping systems, which are automated vehicle control systems within Tesla's Autopilot suite. The crash investigation focused on the following safety issues: operational design domains for SAE International Level 2 vehicle automation, surrogate means of determining the automated vehicle driver's degree of engagement, event data recorders for automated vehicles, safety metrics and exposure data for automated vehicles, and connected vehicle technology and vehicle-to-vehicle requirements. The NTSB made safety recommendations to the US Department of Transportation, the National Highway Traffic Safety Administration (NHTSA), manufacturers of vehicles equipped with Level 2 vehicle automation systems, the Alliance of Automobile Manufacturers, and the Association of Global Automakers. The NTSB also reiterated safety recommendations to NHTSA.

The National Transportation Safety Board (NTSB) is an independent federal agency dedicated to promoting aviation, railroad, highway, marine, and pipeline safety. Established in 1967, the agency is mandated by Congress through the Independent Safety Board Act of 1974 to investigate transportation accidents, determine the probable causes of the accidents, issue safety recommendations, study transportation safety issues, and evaluate the safety effectiveness of government agencies involved in transportation. The NTSB makes public its actions and decisions through accident reports, safety studies, special investigation reports, safety recommendations, and statistical reviews.

The NTSB does not assign fault or blame for an accident or incident; rather, as specified by NTSB regulation, "accident/incident investigations are fact-finding proceedings with no formal issues and no adverse parties … and are not conducted for the purpose of determining the rights or liabilities of any person." 49 C.F.R. § 831.4. Assignment of fault or legal liability is not relevant to the NTSB's statutory mission to improve transportation safety by investigating accidents and incidents and issuing safety recommendations. In addition, statutory language prohibits the admission into evidence or use of any part of an NTSB report related to an accident in a civil action for damages resulting from a matter mentioned in the report. 49 U.S.C. § 1154(b).

For more detailed background information on this report, visit NTSB investigations website and search for NTSB accident ID HWY16FH018. Recent publications are available in their entirety on the Internet at NTSB website. Other information about available publications also may be obtained from the website or by contacting:

**National Transportation Safety Board, Records Management Division, CIO-40, 490 L'Enfant Plaza SW, Washington, DC 20594, (800) 877-6799 or (202) 314-6551**

Copies of NTSB publications may be purchased from the National Technical Information Service. To purchase this publication, order product number PB2017-102600 from:

**National Technical Information Service, 5301 Shawnee Rd., Alexandria, VA 22312, (800) 553-6847 or (703) 605-6000 (see NTIS website)**

This report was reissued on October 12, 2017, with corrections to pages vii and 43.

# Contents

Figures .......................................................................................................................... iii

Acronyms and Abbreviations ..................................................................................... iv

Executive Summary ..................................................................................................... vi

1 Factual Information ....................................................................................................1
1.1 The Crash ..................................................................................................................1
    1.1.1 Crash Events .......................................................................................................1
    1.1.2 Crash Scene .........................................................................................................2
    1.1.3 Occupant Protection and Injuries .......................................................................5
1.2 Vehicle Damage ........................................................................................................5
    1.2.1 Tesla Model S 70D Car .......................................................................................5
    1.2.2 Utility Semitrailer ...............................................................................................6
1.3 Tesla Model S 70D Car .............................................................................................8
    1.3.1 Mechanical Inspections .......................................................................................8
    1.3.2 Automated Vehicle Control Systems ..................................................................8
    1.3.3 Autopilot Description ..........................................................................................9
    1.3.4 Autopilot Availability and Constraints .............................................................10
    1.3.5 Tesla-Recorded Performance Data ...................................................................14
    1.3.6 Postcrash Changes to Autopilot .......................................................................16
1.4 Car Driver Information ...........................................................................................16
    1.4.1 Precrash Activities ............................................................................................17
    1.4.2 Health ................................................................................................................17
    1.4.3 Portable Electronic Devices ..............................................................................17
1.5 Truck Driver, Motor Carrier, and Truck Information .............................................18
    1.5.1 Truck Driver ......................................................................................................18
    1.5.2 Motor Carrier Operations .................................................................................20
    1.5.3 Postcrash Inspection of the Truck-Tractor and Semitrailer ..............................20
1.6 Highway Factors ......................................................................................................21
    1.6.1 Road Description and Characteristics ...............................................................21
    1.6.2 Road Geometry and Traffic Volume ................................................................22
    1.6.3 Road Classification ...........................................................................................22
1.7 Regulation and Policy Concerning Automated Vehicles .......................................23
    1.7.1 Levels of Automation ........................................................................................23
    1.7.2 Federal Automated Vehicles Policy ..................................................................24
1.8 NHTSA Defect Investigation ..................................................................................25

2 Analysis ......................................................................................................................27
2.1 Introduction .............................................................................................................27
    2.1.1 Automated Vehicle Control Systems ................................................................27
    2.1.2 Structure of the Analysis ..................................................................................27

NTSB                                                                 Highway Accident Report

2.2 Factors Not Affecting the Crash ....................................................................................28
    2.2.1 Driver, Vehicle, and Highway Factors ...................................................................28
    2.2.2 Sight Distance ........................................................................................................29
    2.2.3 Side Underride Protection .....................................................................................30
    2.2.4 Forward Collision Warning and Automatic Emergency Braking ...........................30
2.3 Truck Driver Drug Use ..............................................................................................31
2.4 Operational Design Domains for Level 2 Vehicle Automation .....................................32
2.5 Surrogate Means of Determining the Automated Vehicle Driver's Degree
    of Engagement .........................................................................................................34
2.6 EDRs for Automated Vehicles .....................................................................................36
2.7 Safety Metrics and Exposure Data for Automated Vehicles ........................................38
2.8 Connected Vehicle Technology and V2V Requirements ...............................................38

**3 Conclusions** ..................................................................................................................**41**
3.1 Findings .....................................................................................................................41
3.2 Probable Cause ...........................................................................................................42

**4 Recommendations** .........................................................................................................**43**
4.1 New Recommendations ...............................................................................................43
4.2 Reiterated Recommendations ......................................................................................44

**Board Member Statement** ............................................................................................**45**

**Appendix A. Investigation** .............................................................................................**47**

**Appendix B. Tesla's Automated Vehicle Control Systems and Subsystems** ...................**48**

**Appendix C. Alert Timing Sequence for Tesla Autopilot Version 8** .............................**50**

**References** .......................................................................................................................**51**

# Figures

**Figure 1.** Overhead view of the crash intersection, showing the route of the eastbound car traveling toward the crash location with a straight arrow, and the route of the westbound truck, turning south, with a curved arrow .................................................................................2

**Figure 2.** Diagram of the crash intersection, showing US-27A and NE 140th Court ....................3

**Figure 3.** Approach to the crash scene from the US-27A westbound left turn lane, looking west as viewed from the truck's route of travel ..................................................................4

**Figure 4.** Approach to the crash scene from US-27A eastbound, looking east as viewed from the car's route in the righthand travel lane ....................................................................4

**Figure 5.** Damaged car .................................................................................................6

**Figure 6.** Damaged right side of the Utility semitrailer ...................................................7

**Figure 7.** Closeup view of impact damage to the right side of the Utility semitrailer ...................7

**Figure 8.** Tesla instrument panel ..................................................................................10

**Figure 9.** Autopilot system alert timing; top portion of figure provides timing of initial visual alert and bottom portion provides timing of auditory alerts .........................................12

**Figure 10.** Route of the Williston car driver's final trip ................................................13

**Figure 11.** Chart showing how much time during the 41-minute crash trip that, while Autopilot was active, the driver had his hands on the steering wheel ............................................15

**Figure 12.** Summary of SAE taxonomy and definitions for terms related to driving automation systems for on-road motor vehicles ..................................................................24

**Figure C-1.** Autopilot system alert timing sequence for version 8 ........................................50

# Acronyms and Abbreviations

| | |
|---|---|
| AASHTO | American Association of State Highway and Transportation Officials |
| AdaptIVe | Automated Driving Applications and Technologies for Intelligent Vehicles |
| AEB | automatic emergency braking |
| AV Policy | Federal Automated Vehicles Policy (NHTSA) |
| AVR | Automated Vehicle Research |
| BASIC | Behavior Analysis and Safety Improvement Category |
| BMI | body mass index |
| CAMI | Civil Aerospace Medical Institute (FAA) |
| CAMP | Crash Avoidance Metrics Partnership |
| CDL | commercial driver's license |
| CDLIS | Commercial Driver's License Information System |
| *CFR* | *Code of Federal Regulations* |
| DDEC | Detroit Diesel Electronic Controller |
| DOT | US Department of Transportation |
| ECU | electronic control unit |
| EDR | event data recorder |
| FAA | Federal Aviation Administration |
| FCW | forward collision warning |
| FDOT | Florida Department of Transportation |
| FHP | Florida Highway Patrol |
| FHWA | Federal Highway Administration |
| FMCSA | Federal Motor Carrier Safety Administration |
| *FMVSSs* | *Federal Motor Vehicle Safety Standards* |
| GPS | global positioning system |

| HAV | highly automated vehicle |
| HOS | hours-of-service |
| I-ADAS | intersection advanced driver assist systems |
| MCMIS | Motor Carrier Management Information System |
| mL | milliliter |
| MY | model year |
| ng | nanogram |
| NHTSA | National Highway Traffic Safety Administration |
| NTSB | National Transportation Safety Board |
| ODD | operational design domain |
| ODI | Office of Defects Investigation (NHTSA) |
| OOS | out-of-service |
| SAE | SAE International |
| SD | secure digital |
| SR-24 | State Road 24 |
| TACC | Traffic-Aware Cruise Control |
| THC | tetrahydrocannabinol |
| THC-COOH | tetrahydrocannabinol carboxylic acid |
| US-27A | US Highway 27A |
| V2V | vehicle-to-vehicle |
| VTTI | Virginia Tech Transportation Institute |

# Executive Summary

## Investigation Synopsis

At 4:36 p.m. eastern daylight time on Saturday, May 7, 2016, a 2015 Tesla Model S 70D car, traveling eastbound on US Highway 27A (US-27A), west of Williston, Florida, struck a refrigerated semitrailer powered by a 2014 Freightliner Cascadia truck-tractor. At the time of the collision, the truck was making a left turn from westbound US-27A across the two eastbound travel lanes onto NE 140th Court, a local paved road. The car struck the right side of the semitrailer, crossed underneath it, and then went off the right roadside at a shallow angle. The impact with the underside of the semitrailer sheared off the roof of the car.

After leaving the roadway, the car continued through a drainage culvert and two wire fences. It then struck and broke a utility pole, rotated counterclockwise, and came to rest perpendicular to the highway in the front yard of a private residence. Meanwhile, the truck continued across the intersection and came to a stop on NE 140th Court, south of a retail business located on the intersection corner.

The driver and sole occupant of the car died in the crash; the commercial truck driver was not injured.

System performance data downloaded from the car indicated that the driver was operating it using the Traffic-Aware Cruise Control and Autosteer lane-keeping systems, which are automated vehicle control systems within Tesla's Autopilot suite.

The National Transportation Safety Board (NTSB) became aware of the circumstances of the crash when the National Highway Traffic Safety Administration (NHTSA) began a defect investigation on June 28, 2016, which focused on the automatic emergency braking and Autopilot systems of the Tesla Models S and X, for model years 2014–2016. On learning of the May 7, 2016, Williston crash that prompted the NHTSA investigation, the NTSB initiated our investigation, which focused on the use of the Autopilot system.

## Probable Cause

The National Transportation Safety Board determines that the probable cause of the Williston, Florida, crash was the truck driver's failure to yield the right of way to the car, combined with the car driver's inattention due to overreliance on vehicle automation, which resulted in the car driver's lack of reaction to the presence of the truck. Contributing to the car driver's overreliance on the vehicle automation was its operational design, which permitted his prolonged disengagement from the driving task and his use of the automation in ways inconsistent with guidance and warnings from the manufacturer.

## Safety Issues

The crash investigation focused on the following safety issues:

- Operational design domains for SAE International Level 2 vehicle automation,

- Surrogate means of determining the automated vehicle driver's degree of engagement,

- Event data recorders for automated vehicles,

- Safety metrics and exposure data for automated vehicles, and

- Connected vehicle technology and vehicle-to-vehicle (V2V) requirements.

## Recommendations

As a result of this crash investigation, the NTSB makes safety recommendations to the US Department of Transportation, NHTSA, manufacturers of vehicles equipped with Level 2 vehicle automation systems (Volkswagen Group of America, BMW of North America, Nissan Group of North America, Mercedes-Benz USA, Tesla Inc., and Volvo Car USA), the Alliance of Automobile Manufacturers, and the Association of Global Automakers. The NTSB also reiterates Safety Recommendations H-13-30 and -31 to NHTSA.

CORRECTED COPY

# 1 Factual Information

## 1.1 The Crash

### 1.1.1 Crash Events

At 4:36 p.m. eastern daylight time on Saturday, May 7, 2016, a 2015 Tesla Model S 70D car, traveling eastbound on US Highway 27A (US-27A) near mile marker 29 in Levy County, west of Williston, Florida, struck the right side of a 2003 Utility 3000R refrigerated semitrailer, which was being towed by a 2014 Freightliner Cascadia truck-tractor.[1] At the time of the collision, the truck was making a left turn from westbound US-27A across the two eastbound travel lanes onto NE 140th Court, a local paved road.[2] After the car struck the right side of the semitrailer, it crossed underneath the semitrailer and went off the right roadside at a shallow angle. The impact with the underside of the semitrailer sheared off the car's roof.

After leaving the roadway, the car continued through a drainage culvert and two wire fences. It then struck and broke a utility pole, rotated counterclockwise, and came to rest perpendicular to the highway in the front yard of a private residence. Overall, the car traveled about 910 feet after striking the semitrailer. The driver and sole occupant of the car died in the crash.

System performance data downloaded from the Tesla indicated that the driver was operating the car using features of its Autopilot suite: Traffic-Aware Cruise Control (TACC) and the Autosteer lane-keeping system. "Autopilot" is a proprietary name used by Tesla for a combination of vehicle automation systems that provide driver assistance. The car was also equipped with a forward collision warning (FCW) system and automatic emergency braking (AEB), but those systems did not activate. System performance data indicated that the vehicle speed just before impact with the semitrailer was 74 mph. The highway has a posted speed limit of 65 mph.

Following the crash, the truck continued across the intersection and came to a stop on NE 140th Court, south of a retail business on the intersection corner. The truck-tractor towing the semitrailer was undamaged, and the semitrailer experienced minimal impact damage. The truck driver was uninjured.

Ten days after the crash, the Florida Highway Patrol (FHP) recorded an interview with a driver who had been traveling behind the truck on westbound US-27A at an estimated speed of 60 mph. In July 2016, National Transportation Safety Board (NTSB) investigators also interviewed this witness. He said that when he first saw the truck, it was in the left turn lane at the intersection; he could not discern whether the truck was stopped or moving very slowly. He said he saw the Tesla on US-27A eastbound before the truck began to turn through the median, with no other traffic in the area. He described seeing the car crest the grade before the truck began its

---

[1] Unless otherwise indicated, all times in this report are eastern daylight time.

[2] In this report, the vehicle consisting of the truck-tractor in combination with the semitrailer is referred to generically as the "truck"; the truck-tractor and semitrailer components may also be referred to separately.

left turn and crossed the median. He said that he saw the Tesla for several seconds before his view was blocked by the semitrailer. He said he thought the car would need to slow down to avoid a collision with the truck. As the truck entered the eastbound lanes, the witness lost sight of the car, which was then on the far side of the truck. He reported that as he approached the location of the westbound left turn lane for the intersection, he heard the crash and saw the car emerge from underneath the semitrailer, continue traveling eastward, and leave the roadway.

The witness said he made a U-turn at the intersection and followed the Tesla to its stopped location near a residential driveway. The witness stated that there were no obstructions to the lines of sight for the two vehicles, and that sun glare was not a problem at the time of the crash.

The FHP cited the truck driver for failure to yield right of way.[3]

### 1.1.2 Crash Scene

The crash occurred in the righthand eastbound travel lane of US-27A near mile marker 29, approximately 5 miles west of Williston in Levy County, Florida. Figure 1 provides an overhead view of the crash location.



**Figure 1.** Overhead view of the crash intersection, showing the route of the eastbound car traveling toward the crash location with a straight arrow, and the route of the westbound truck, turning south, with a curved arrow. (Source: Google Earth [modified])

---

[3] In December 2016, the FHP investigation of the truck driver resulted in the issuance of a commercial uniform traffic citation for a noncriminal traffic violation.

At the crash location, US-27A is a four-lane divided highway with two through lanes in each direction separated by a 60-foot-wide paved median. Turn lanes extend for a length of approximately 550 feet in both the east- and westbound directions. The local road NE 140th Court runs due south, intersecting US-27A at a 109-degree angle. The intersection has a median crossover area between the two directions of travel on US-27A; the crossover area is about 130 feet long. The horizontal alignment of US-27A is straight both east and west of the intersection; the vertical alignment involves a descending grade in the eastbound direction. Figure 2 is a diagram of the scene. Figures 3 and 4 show the crash intersection as approached from the east- and westbound routes.



**Figure 2.** Diagram of the crash intersection, showing US-27A and NE 140th Court extending south (down toward the bottom of the diagram). The initial point of impact is on the south side of the intersection. After traveling off the highway, the Tesla struck a utility pole and came to rest near a residential driveway.



**Figure 3.** Approach to the crash scene from the US-27A westbound left turn lane, looking west as viewed from the truck's route of travel.



**Figure 4.** Approach to the crash scene from US-27A eastbound, looking east as viewed from the car's route in the righthand travel lane. (Based on the known length of the left turn lane, the distance to the intersection in this view is approximately 750 feet.)

The impact occurred within the intersection in the righthand lane of eastbound US-27A. Postcrash, debris from the car, including the exterior and interior roof panel structure, was located on the southwest corner of the intersection and in the travel lanes of NE 140th Court. Other debris trailed eastward from the area of impact along the car's path of travel. Investigators found no evidence of precollision roadway marks for the eastbound car or the truck crossing the intersection.

The collision occurred during daylight hours, the weather was clear, and the road was dry.[4] At the time of the crash, the sun would have been high in the sky, behind the car as it headed east.

### 1.1.3 Occupant Protection and Injuries

The 40-year-old male car driver was seated in the driver's seat and was restrained with a lap/shoulder belt at the time of the crash.[5] The driver sustained fatal blunt force trauma injuries to the head consistent with contact from the car's roof structure as it was displaced rearward or with contact from both the car's roof structure and the structure of the semitrailer.

According to the data recorded by the car, the airbags did not deploy when the car struck and passed under the semitrailer, most likely due to the car's low change in velocity during this portion of the crash. About 8.4 seconds after the initial impact with the semitrailer, the car's airbags deployed when it collided with the utility pole.

The truck driver, who was wearing his lap/shoulder seat belt, was not injured.

## 1.2 Vehicle Damage

### 1.2.1 Tesla Model S 70D Car

Damage to the car, as shown in figure 5, included separation of the roof panel, which exhibited fore-to-aft accordion-like compression. The forward-facing surfaces of the car's A-pillars were separated and deformed just below where the roof met the pillars. Additional impact evidence consisted of scrapes to the trailing edge of the hood just forward of the windshield. The scrapes were about 5 inches long and were located on the driver's side of the hood, about 5 inches from its longitudinal centerline (see figure 5, yellow arrow). The scrape widths were consistent with the length of the semitrailer's center side-marker lamp, which had been mounted below the side rail on the right side of the semitrailer. The static height of the trailing end of the hood was about 3 feet. Postcollision measurements indicated that the car's seatback headrests were at least 3.5 inches taller than the bottom edge of the semitrailer. The driver and front passenger seats were deformed rearward.

---

[4] This information is based on FHP and Ocala International Airport records. The airport is 25.3 miles southeast of the crash site.

[5] Investigators determined that the driver used the three-point continuous loop lap/shoulder restraint based on postcrash photographs showing the driver properly belted; the data recorded by the vehicle; and the postcrash inspection of the vehicle, which showed the belt cut by first responders but still latched.

The damage to the car from the impact with the utility pole was centered 12.4 inches inboard of the left side in front of the wheel well. The impact of the front of the car with the utility pole displaced the left front fender and chassis structures (see figure 5, red arrow). Postcrash, the left (driver's) side wheelbase measured about 4 inches shorter than the right side. The battery pack of the electric car, located aft of the front axle, was not damaged.



**Figure 5.** Damaged car. Scrapes from the semitrailer's center side-marker lamp are indicated by the yellow arrow. Impact damage associated with the utility pole is indicated by the red arrow. (Source: Florida Highway Patrol)

### 1.2.2 Utility Semitrailer

Investigators examined the involved semitrailer, which was a 2003 Utility VS2RA 3000R refrigerated van-body trailer. The investigators' comparison of the semitrailer with the photographs the FHP took at the crash scene showed that the external condition and appearance of the semitrailer had not changed since the crash. Collision evidence consisted of minor impact damage to the lower sidewall rails on both sides of the semitrailer and the undercarriage between the opposing damaged rails. Damage to the passenger (right) side exhibited inward intrusion, while damage on the driver (left) side exhibited outward deformation. The damage on both sides exhibited two distinct areas of contact. The undercarriage damage consisted of a displaced transverse floor support rail between the damaged areas on the two sides.[6] A segment of windshield

---

[6] The overall length of the combination vehicle was 71 feet 7 inches, based on as-built data provided by Freightliner, the truck-tractor manufacturer. Based on the semitrailer's overall calculated length, the impact would have been centered about 45 feet 5 inches rearward from the front of the truck-tractor at the time of the collision.

trim from the car was found entangled within the forward-most area of contact damage on the semitrailer. Figure 6 shows a postcrash photograph of the semitrailer, and figure 7 focuses on the damage to the semitrailer.



**Figure 6.** Damaged right side of the Utility semitrailer.



**Figure 7.** Closeup view of impact damage to the right side of the Utility semitrailer. The arrow indicates a segment of front windshield trim from the Tesla entrapped in the forward-most area of damage.

## 1.3 Tesla Model S 70D Car

This section first discusses the mechanical inspection of the car and then focuses on its automated vehicle control systems. The section also presents the recorded data that provided information about those systems and the car's operation.

### 1.3.1 Mechanical Inspections

Investigators examined the major mechanical systems on the car, which included the powertrain, steering, braking, and suspension systems. They identified no anomalies within the major vehicle systems.

The Tesla was equipped with electric power-assisted rack-and-pinion steering gear; all the steering arm linkages remained intact and connected. It was possible to rotate the steering gear from stop to stop by turning the steering wheel. All ball joint connections remained intact and showed no evidence of excessive wear or play.

The vehicle was equipped with two independent suspension systems. On the front steering axle, the mounting bolt for the forward lower control arm ball joint was broken at the steering knuckle in a manner consistent with impact damage. Investigators noted no other damage to the suspension system, including to the suspension components of the rear axle.

Both axles had disc brake assemblies. The brake calipers on either side of the disc were rigidly mounted with four pistons each. A functional check verified that the brakes were capable of working. When the brake master cylinder was actuated, all brake assemblies locked from hand rotation and released when the brake master cylinder was released.

### 1.3.2 Automated Vehicle Control Systems

The basic function of automated vehicle systems is to aid a driver in performing driving tasks. Some automated systems are safety systems that alert a driver to a potentially hazardous situation, such as FCW, or that take momentary control of vehicle functions, such as AEB. Other automated systems may be considered convenience systems, which supplement or fully control driving tasks.

In general, automated vehicle control systems consist of three main subsystems: (a) a sensor suite (optical, radar, LIDAR, and/or ultrasonic) designed to assess the nearby environment, (b) a data-processing suite designed to collect input data from the sensors and compute instructions, and (c) a servo suite designed to provide control inputs to the vehicle. These three subsystems provide performance monitoring, processing, and control. Information travels between subsystems using multiple controller area network busses.[7] The performance data associated with automated vehicle control systems are stored in the vehicle's memory and may be communicated through an over-the-air network to the manufacturer's central computer network.

---

[7] A series of core SAE J1939 standards addresses vehicle networks.

NTSB                                                                                    Highway Accident Report

The Tesla Model S was equipped with the following automated vehicle control systems: Autopilot (comprising TACC, Autosteer, and Auto Lane Change systems), Forward Collision Avoidance (comprising FCW and AEB), Speed Assist, Lane Assist, and Autopark.[8]

### 1.3.3 Autopilot Description

Although Tesla's Autopilot suite is a combination of three systems, when discussing Autopilot in this report, we primarily refer to the combined activation of two systems—TACC and Autosteer. (The driver may also activate Auto Lane Change to automatically move the car into a lane.) TACC is an adaptive cruise control system that maintains the set cruise speed, applies brakes to preserve a predetermined following distance when approaching a slower-moving vehicle ahead of the Tesla, and accelerates to the set cruising speed when the area in front of the Tesla is no longer obstructed. Autosteer automatically steers the car to keep it within its lane of travel. In short, TACC provides longitudinal control (acceleration and deceleration) and Autosteer provides lateral control (steering) of the car within the lane, making the Tesla Autopilot consistent with an SAE International (SAE) Level 2 automated vehicle system. (The SAE classification of automated vehicle technologies is discussed in section 1.7.1.)

When Autopilot is active, the system (1) monitors the traveling path, (2) maintains the set cruise speed, (3) maintains the Tesla's position in the traveling lane, (4) brakes when it detects slower-moving vehicles ahead of the Tesla, and (5) decelerates and follows a slower-moving vehicle in front of the Tesla at the predetermined following distance. Figure 8 shows a view of the Tesla instrument panel. This view represents to the driver that TACC is active, which is indicated by a blue-colored speedometer icon at the top left of the display; the operator-established cruising speed appears in numerals under the speedometer icon. The actual vehicle speed appears in large numerals in the top/center of the instrument panel display. When Autosteer is active, the driver sees an icon depicting a blue steering wheel in the upper right of the instrument panel display. When this icon is gray-colored rather than blue, it indicates that Autosteer is not active but is available.

---

[8] (a) See appendix B for information on these automated systems and their capabilities. (b) The systems are discussed in the Human Performance Supplemental Report—Driver Assistance Systems in the NTSB public docket case file HWY16FH018.



**Figure 8.** Tesla instrument panel. The blue speed dial at the top left indicates that TACC is active, and the blue steering wheel at the top right indicates that Autosteer is active. (Source: Owner's Manual for 2016 Tesla Model S [Tesla 2016])

### 1.3.4 Autopilot Availability and Constraints

On the Tesla, TACC is available only when traveling above 18 mph.[9] Once TACC is activated, Autosteer is available whenever the system detects lane markings. A driver can activate TACC by itself but can activate Autosteer only after activating TACC; that is, Autosteer is not available without TACC. In addition, Tesla imposes two types of constraints on the driver's use of Autopilot: these are (1) hard constraints that the system imposes automatically, and (2) soft constraints that Tesla provides as cautions to the driver through the instrument screen and instructions in the vehicle owner's manual.

**Hard Constraints.** System-imposed constraints on driver use of Autopilot include (1) setting an upper limit on lateral acceleration that affects the system alert sequence; (2) limiting the maximum cruising speed, depending on the detection of the speed limit on a restricted road; and (3) measuring the level of driver engagement and deactivating Autopilot if the level is

---

[9] TACC can be activated at speeds lower than 18 mph, if a vehicle is detected in front of the Tesla.

insufficient.[10] In addition, as a general hard constraint, the driver can activate Autopilot only if the driver's seat belt is latched.

With respect to constraint (1), Autopilot has a lateral acceleration limit used to qualify "straight" roads that affects the timing duration of hands-off operation of Autopilot.[11] For constraint (2), when Autopilot cannot detect the speed limit, it allows a maximum cruise speed in TACC of 45 mph. When this occurs, the instrument panel displays the following message: "Driving on a Restricted Road." In such circumstances, the driver can manually accelerate to exceed the limited TACC speed, but when the driver releases the accelerator pedal, TACC slows the vehicle to the 45-mph cruise speed. With respect to constraint (3), Autopilot assesses the driver's level of engagement by monitoring driver interaction with the steering wheel through changes in steering wheel torque.[12] The system uses the driver's interactions with the wheel as a surrogate means of determining the driver's degree of engagement with the tasks of monitoring the road environment and the Autopilot system's performance.

Autopilot uses a sequence of warnings to encourage the driver to interact with the steering wheel. The first alert is a visual warning, which appears in the instrument panel display and reads "Hold Steering Wheel." If the system does not detect driver-applied torque on the steering wheel after this visual warning, it sounds an auditory chime. If there is again no driver interaction with the steering wheel, the system sounds a second, louder chime. If the driver still does not apply detectable torque to the steering wheel, the system presents a final visual warning in the instrument panel display, which reads "To Maintain Set Speed Place Hands On Steering Wheel." If the driver does not respond to the final visual warning, Autopilot decelerates the Tesla to a full stop in the current travel lane and activates the car's hazard flashers.[13] (This situation would likely occur only in the event of an incapacitated or completely unresponsive driver.)

On the crash-involved car, the timing for the initial visual warning ranged from 1 to 5 minutes when traveling above 45 mph, depending on the system conditions. However, when traveling 45 mph and below, the warning for hands-off driving would not occur, unless the car exceeded the lateral acceleration threshold, such as when traveling on certain curves. When traveling above 45 mph, the initial warning would occur earlier when another vehicle was not detected ahead of the Tesla—and later when following another vehicle. The timing of the visual warning did not depend on the type of roadway being traveled. (See figure 9 for a graphic indicating the warning conditions and alert timing sequences for the Autopilot system firmware that was running on the Tesla at the time of the crash [firmware version 7.1].)

---

[10] With respect to constraint (1), vehicles experience lateral acceleration when going around curves. Under lateral acceleration, drivers experience a feeling of being pulled to the outside of the curve. Autopilot uses lateral acceleration as an indication of the degree of curvature in the travel route.

[11] The lateral acceleration thresholds for Autopilot are linearly interpolated over a range of speeds.

[12] Torque is force applied to an object (in this case, the steering wheel) to make it rotate about an axis (the steering column). The weight of the hands on the steering wheel is sufficient to register as driver interaction.

[13] In the Autopilot system in use on the crash Tesla, this sequence could be repeatedly restarted by engaging with the steering wheel.





**Figure 9.** Autopilot system alert timing; top portion of figure provides timing of initial visual alert and bottom portion provides timing of auditory alerts. Following a visual alert, if the driver does not interact with the steering wheel, the Autopilot system proceeds to the auditory alert sequence as shown in the bottom portion of the figure (Tesla firmware version 7.1).

On the day of the crash, the Tesla driver was traveling from Cedar Key toward Ocala, Florida. (See figure 10 for route information.) He traveled along State Road 24 (SR-24) before turning eastbound onto US-27A, where the crash occurred.[14] SR-24 is a two-lane roadway without a center divider, and it is not a limited-access roadway.[15] Because it lacks a center divider, the Tesla's automation system considered SR-24 a "non-preferred" roadway for the use of Autopilot. The system allowed the Tesla to travel 5 mph above the speed limit while on SR-24; the speed limit on SR-24 is 60 mph. The roadway on which the crash occurred, US-27A, is a four-lane road with an earthen center median, but it is not a limited-access roadway.[16]

---

[14] Tesla could not provide data to the NTSB on the car's route of travel. Investigators determined that the Tesla traveled on SR-24 based on the originating location, the limited options for the route of travel, the speed of travel, and turning information.

[15] Access control is a key factor in the functional classification of roads. All interstates are "limited-access" roadways, providing no access to abutting land users. Travelers use high-speed entrance and exit ramps to access limited-access roadways (Federal Highway Administration 2013, p. 14).

[16] Tesla uses a functional road classification system based on the HERE open location platform as the data source (accessed September 7, 2017). Road classification is discussed in section 1.6.3.



**Figure 10.** Route of the Williston car driver's final trip.

The Tesla's automation system considered US-27A a "preferred roadway"; consequently, the system would have allowed the Tesla to travel at speeds up to 90 mph while on US-27. According to vehicle data, about 2 minutes before the crash, while traveling on US-27A, the Tesla driver set the cruise speed to 74 mph. Because the Tesla was traveling on preferred roadway US-27A at that time, the vehicle's actual velocity matched the driver-set cruise speed, which was 9 mph over the posted speed limit of 65 mph.

**Soft Constraints.** As a soft constraint to Autopilot use, Tesla provided written instructions in its owner's manual about those types of roads on which Autopilot should and should not be used (Tesla 2016). The *Tesla Model S Owner's Manual* stated that "Traffic-Aware Cruise Control is primarily intended for driving on dry, straight roads, such as highways and freeways" (p. 68). The manual also provided the following statement: "Warning: Do not use Traffic-Aware Cruise Control on city streets or on roads where traffic conditions are constantly changing and where bicycles and pedestrians are present" (p. 68). Similarly, with respect to the Autosteer system, the manual stated, "Warning: Autosteer is intended for use only on highways and limited-access roads with a fully attentive driver" (p. 74). In discussing restricted roads, the manual stated that "Autosteer is intended for use on freeways and highways where access is limited by entry and exit ramps" (p. 75). The manual also stated that "Autosteer is a hands-on feature. You must keep your hands on the steering wheel at all times" (p. 74).[17]

---

[17] The 10-page-long section in the owner's manual concerning driver assistance, which addresses TACC and Autosteer, contains 16 items designated as warnings and 4 items designated as cautions.

Highway Accident Report

## 1.3.5 Tesla-Recorded Performance Data

The Tesla Model S stores data in nonvolatile memory using a removable secure digital (SD) card installed within the vehicle's electronic control unit (ECU). Parameter data are written continually to the ECU while the car is on. Typical parameters of vehicle system performance include steering angle, accelerator pedal position, driver-applied brake pedal application, vehicle speed, automated system states, and lead vehicle distance, among others. Some of these parameters are recorded continuously at a set sample rate; others are recorded only when the state of a system changes. All parameter data are timestamped using a global positioning system (GPS)-derived clock time as they arrive at the ECU.

The SD card typically maintains a complete record of all stored data for the vehicle's lifetime. Data from the SD card are episodically data-linked to Tesla using a virtual private network connection established via Wi-Fi or the vehicle's data-download capabilities. Any data stored since the last auto-upload event will exist only on the vehicle itself and must be recovered by the following means: (1) forcing an over-the-air upload, (2) using maintenance download equipment to connect directly to the vehicle, or (3) directly accessing the SD card after removing it from the dash-mounted electronics.

Tesla downloaded and provided to the NTSB parameter data for 53 distinct variables and text-based information related to 42 distinct error messages, covering a 42-hour period before the crash. In addition, image data from the vehicle's camera were recovered from the SD card.[18] However, the recovered image data did not contain information related to the crash.[19]

Figure 11 illustrates the periods of time during the crash trip when the driver interacted with the steering wheel. Vehicle performance data showed that for the 41-minute trip from Cedar Key, Autopilot was active for 37 minutes. During the trip, while Autopilot was in use, the system detected driver-applied torque on the steering wheel on seven different occasions for a total of 25 seconds. The longest period between alerts during which Autopilot did not detect the driver's hands on the steering wheel was nearly 6 minutes. For the entire trip, Autopilot was in some form of warning mode for a total of approximately 2 minutes.[20]

Vehicle-recorded data for the trip that originated in Cedar Key showed that the system displayed the initial visual warning to the driver seven times (displaying the text message "Hold Steering Wheel" on the instrument panel). The system progressed to the initial auditory warning (alert chime 1) six times during the trip. Progression to the second auditory warning (alert chime 2) did not occur during the trip, nor did the system initiate the Autosteer deactivation protocol.

---

[18] By design, these data do not contain timestamp information.

[19] The stored images were consistent with an unrelated, noncrash event that preceded the crash.

[20] For more information about the recorded data, see the Driver Assistance System—Factual Report in the NTSB public docket case file HWY16FH018.



**Figure 11.** Chart showing how much time during the 41-minute crash trip that, while Autopilot was active, the driver had his hands on the steering wheel. Visual and auditory warnings are also indicated. (Timing provided is based on vehicle data and is approximate and relative.)

**System Performance Data.** The vehicle performance data revealed the following:

- The crash-involved Tesla's last trip began at 3:55:23 p.m. The car was stopped or nearly stopped about 4:19 p.m. and again about 4:30 p.m. The collision with the truck occurred at 4:36:12.7, as indicated by fault codes and system disruptions.

- The last driver input before the crash was to increase the TACC speed to 74 mph at 4:34:21, which was 1 minute 51 seconds before the crash. After that input, there was no driver interaction with Autopilot, no change in steering angle, and no brake lamp switch activation until the collision.

- During the last trip, TACC detected a vehicle ahead of the Tesla seven times. For the final 1 minute 35 seconds preceding the crash, TACC detected no lead vehicle in front of the Tesla.

- About 9.7 seconds before the collision, the motor torque demand steadily decreased (indicating that the vehicle was on a descending grade). The reported torque demand dropped to zero at the time of the first fault report.

- No brakes were applied before or during the collision.

- Vehicle headlights were not on at the time of the collision.

- The driver was wearing his seat belt during the trip.

- Throughout the approach to the collision with the truck, the electronic power assist steering exhibited no substantial changes in steering angle.

- There was no record indicating that the Tesla's automation system identified the truck that was crossing in the car's path or that it recognized the impending crash. Because the system did not detect the combination vehicle—either as a moving hazard or as a stationary object—Autopilot did not reduce the vehicle's speed, the FCW did not

provide an alert, and the AEB did not activate. All recorded data were consistent with the FCW and AEB systems being enabled when the crash occurred.[21]

**Crash Event Data Recorder.** The Tesla Model S involved in this crash did not have, nor was it required to have, an event data recorder (EDR).[22] As noted, it did have an ECU that recorded many vehicle performance parameters. Because there is no commercially available tool for retrieval and review of the ECU data, NTSB investigators had to rely on Tesla and its proprietary software to retrieve and interpret the data.

### 1.3.6 Postcrash Changes to Autopilot

Following the crash, Tesla made design changes to version 7.1 of its Autopilot firmware and hardware. On September 23, 2016, Tesla made a fleetwide firmware update to version 8. The firmware update affected the driver interface and warning logic.

Firmware version 8 reduced the period of time that the Autopilot system allows a driver to have hands off the steering wheel before being warned/alerted. Version 8 also provides that if the driver is warned on three separate occasions by alerts, Autosteer will deactivate and be unavailable for an hour or until an ignition restart. That firmware change also added a preferred road constraint to the alert timing sequence. In version 8, on preferred roads, no alerts are made when the vehicle is traveling below 8 mph; at speeds 8–45 mph, the first alert displays after 10 minutes of hands off the steering wheel; at speeds above 45 mph, the first alert timing for hands off the steering wheel depends on whether the system detects a vehicle ahead of the Tesla (alert displays in 3 minutes if there is a lead vehicle, but in 2 minutes if there is not). See appendix C for the alert timing sequence for Autopilot version 8.

## 1.4 Car Driver Information

The driver of the car was a 40-year-old male. Due to the requirements of his job, he traveled frequently. He had purchased the Tesla Model S new in 2015.

At the time of the crash, the driver held an Ohio Class D driver's license with motorcycle endorsement and no restrictions.[23] His license was renewed in February 2015 and had an expiration date in January 2019. Ohio Motor Vehicles records indicated that the driver had nine traffic violations between July 2010 and September 2015. Eight of those violations were for speeding, and one was for failing to obey a traffic signal.[24] The records indicated that the driver had not been involved in a reportable crash, and his license had not been suspended, revoked, or denied.

---

[21] Although these systems can be deactivated by the driver, vehicle data indicated that they were enabled.

[22] An EDR is a device or function that records the vehicle's dynamic time-series data during the time just before a crash event (for example, vehicle speed versus time) or during a crash event (for example, delta–V versus time), intended for retrieval after the crash event. Title 14 *Code of Federal Regulations* Part 563 details the requirements for EDRs.

[23] Ohio Class A, B, and C licenses are commercial licenses. A Class D license is a noncommercial passenger class license; it can have a motorcycle endorsement or be a motorcycle-only license.

[24] The driver's last speeding ticket was issued in September 2015; he was ticketed for traveling 64 mph in a 35-mph zone.

### 1.4.1 Precrash Activities

The driver spent the week before the crash—May 1 to 7—with family members in Orlando, Florida. Family members reported that the driver had slept well throughout the vacation and appeared relaxed. They also stated that he left Orlando about 10:00 a.m. on May 7, headed to a job scheduled for later that day in Cedar Key, Florida. En route, he stopped in Ocala, Florida, to charge his electric car. After completing the job in Cedar Key, the driver sent his sister a text message to inform her that he was leaving to travel to the next job site, which was in Swamp Fox, North Carolina.

Postcrash review of the data from the Tesla showed that the car slowed to a near stop 6.4 minutes before the crash, at which point the driver assumed manual control of the vehicle. Autosteer was activated about 6.2 minutes before the crash. The reported average vehicle speed over this period indicates that Autosteer was activated about 6.7 miles before the crash, which would place the vehicle near the intersection with SR-24 in Bronson, Florida. US-27A through the intersection with SR-24 in Bronson is not configured as a divided highway. US-27A became a divided highway approximately 1.0 mile east of that intersection.

### 1.4.2 Health

According to his driver's license, the car driver was 5 feet 9 inches tall and weighed 190 pounds.[25] The driver's family stated that he did not drink alcohol or smoke and was in excellent health overall. The driver did not have a regular personal physician. Insurance records did not indicate that he had been prescribed any medications, and pharmacies near the driver's residence revealed no records of medications. At the NTSB's request, the Federal Aviation Administration (FAA) Civil Aerospace Medical Institute (CAMI) Bioaeronautical Sciences Research Laboratory performed a postcrash toxicological analysis of the driver's blood. The results were negative for alcohol and other drugs.[26]

### 1.4.3 Portable Electronic Devices

NTSB investigators located the car driver's cell phone, two laptop computers, and several other Internet-connected devices associated with his employment.[27] Investigators did not uncover evidence that any of the devices had been in use at the time of the crash. Due to damage, however, examination results were inconclusive for the cell phone and one laptop.

A review of the driver's cell phone records indicated that his first outgoing phone activity on May 7, 2016—the day of the crash—took place at 5:15 a.m. That morning, he had sent and received about 40 text messages by 10:00 a.m., the approximate time of his departure from Orlando. No phone activity took place between 10:00 a.m. and 1:00 p.m. The driver's phone

---

[25] These data indicate he had a body mass index (BMI) of 29.8 (kg/m$^2$). An adult with a BMI over 25 is considered overweight; one with a BMI greater than or equal to 30 is considered obese.

[26] Analyses conducted by the laboratory detect amphetamines, opiates, marijuana, cocaine, phencyclidine, benzodiazepines, barbiturates, antidepressants, antihistamines, and commonly used prescription drugs.

[27] The cell phone and one laptop were found in the vehicle when it was inspected; a second laptop that had been returned to the family was provided to NTSB investigators.

records indicate that he received and sent text messages between 1:00 p.m. and 2:00 p.m., about the time he was completing the work at Cedar Key.

The driver's sister reported that she received a text message from the driver at 4:03 p.m. on the day of the crash, but investigators could not identify a device or time associated with that message. The driver's cell phone records do not indicate phone use for conversation or texting near the time of the crash.

## 1.5 Truck Driver, Motor Carrier, and Truck Information

This section addresses the commercial truck driver and his owner-operator trucking business.

### 1.5.1 Truck Driver

**Background.** The truck driver was a 62-year-old male, who was 5 feet 8 inches tall and weighed 246 pounds.[28] The truck driver refused interview requests from NTSB investigators, but his attorney provided some documentation. According to his attorney, for the 6 years preceding the crash, the truck driver had been the owner and sole operator of the motor carrier Okemah Express LLC.[29]

At the time of the crash, the truck driver had a Florida Class A commercial driver's license (CDL) without any endorsements or restrictions.[30] His CDL was renewed in November 2012 and had an expiration date in January 2021. His medical certificate was valid for 2 years, until September 28, 2017. According to the documentation of the September 18, 2015, medical examination he underwent for recertification for commercial driver fitness, the driver did not report having any medical conditions or using any medications.

An inquiry using the Commercial Driver's License Information System (CDLIS) revealed that the truck driver had three traffic violations while driving commercial motor vehicles—two from 2013 for failure to obey traffic control devices and one from 2015 for an improper lane change.[31] Additionally, the CDLIS report showed that his commercial driving privilege had been

---

[28] NTSB investigators took the truck driver's height and weight data from his medical certification information. These data indicate that he had a BMI of 37.4 (kg/m$^2$). The FHP crash report indicates that the driver was 5 feet 10 inches tall and that he weighed 245 pounds, corresponding to a BMI of 35.2. An adult with a BMI over 25 is considered overweight; one with a BMI greater than or equal to 30 is considered obese.

[29] Motor carrier records indicate that the carrier operated under a different name from 2002 to 2005 with a principal place of business in Okemah, Oklahoma. In 2005, the carrier changed its name and corporate structure to Okemah Express LLC.

[30] A Class A CDL permits the driver to operate a tractor-trailer combination vehicle that has an actual weight, declared weight, or gross vehicle weight rating of 26,001 pounds or more, provided that the towed vehicle weighs more than 10,000 pounds.

[31] CDLIS is a nationwide computer system that enables state driver licensing agencies to ensure that each commercial driver has only one driver's license and one complete driver record. State driver licensing agencies use CDLIS to complete various procedures, including (1) transmitting out-of-state convictions and withdrawals, (2) transferring the driver's record when a CDL holder moves to another state, and (3) responding to requests for driver status and history.

withdrawn on five separate occasions since 1984.[32] His motor vehicle records indicated that he had not been involved in any other reportable crash.

A review of the truck driver's roadside inspection history showed that he had undergone 18 inspections in 10 state jurisdictions; 11 inspections found hours-of-service (HOS) violations. HOS violations for the carrier resulted in its being in HOS alert status from November 2010 to September 2011 and again from July 2012 until April 2015.[33] Based on this HOS alert history, the Federal Motor Carrier Safety Administration (FMCSA) issued the carrier a warning letter, dated March 25, 2011. The carrier's record-of-duty status for the 6 months before the crash indicated a continuing issue of noncompliance with the HOS requirements at 49 *Code of Federal Regulations* (*CFR*) Part 395.[34]

**Precrash Activities.** NTSB investigators used the truck driver's logbooks and cell phone records obtained through subpoena to reconstruct his activities before the crash. On the 3 days before the crash (Wednesday, May 4, through Friday, May 6), his phone activity began about 10:00 a.m. each morning and ended about 9:00 p.m., 4:00 p.m., and midnight, respectively.[35]

On the day of the crash, Saturday, May 7, the truck driver's logbooks show that he slept in the truck's sleeper berth from midnight to 8:00 a.m. During the day, the driver was involved in 31 phone calls and 4 text messages. By cross-referencing his logbook information with cell phone records, investigators determined that, while on duty and driving that day, the truck driver conducted 15 phone conversations and received 2 inbound text messages. His phone records do not show activity at the time of the crash.[36]

**Postcrash Toxicology.** The truck driver remained on scene, interacting with FHP officers and first responders, for more than 90 minutes following the crash. The FHP did not record any behavioral evidence of impairment. At FHP direction, a blood sample was obtained from the truck driver. According to the FHP Blood Withdrawal/Fatal Traffic Crash Checklist, on-scene paramedics drew blood from the truck driver approximately 1.5 hours after the crash (at 6:11 p.m. and 6:12 p.m. for two tubes). A portion of the sample was sent for toxicological analysis to the Florida Department of Law Enforcement laboratory. It tested positive for tetrahydrocannabinol (THC) and its metabolites, and negative for nine other common classes of abuse drugs. The laboratory's analysis of THC was considered by the State's Attorney, but the FHP Case Closing Report, dated December 18, 2016, resulted in a noncriminal traffic violation.

---

[32] Violations for speeding or failure to comply with traffic control signage or devices occurred in 1984, 1991 (two violations), 2005, and 2013.

[33] To quantify operator performance, the Federal Motor Carrier Safety Administration Safety Measurement System uses data on a motor carrier based on roadside inspections (including all safety-based violations), state-reported crashes, and Federal Motor Carrier Census information. Unsafe carriers, which exceed the designated thresholds in the Behavior Analysis and Safety Improvement Categories (BASICs), are noted by alerts. For the two cited periods, the carrier had a BASIC alert in the HOS category.

[34] (a) The driver did not maintain any of the required documents mandated by the *Federal Motor Carrier Safety Regulations*. (b) Several months after the crash (in February 2017), the carrier received an FMCSA warning letter for an alert in the "Unsafe Driving" BASIC.

[35] See NTSB public docket case file HWY16FH018, HP Factual Report Attachment 7: Truck driver's motor vehicle records, and Attachment 8: Truck driver's cell phone records.

[36] The driver concluded a call at 4:11 p.m., about 25 minutes before the crash occurred.

That record of the investigation documented four FHP officers on scene and stated that the trooper responsible for overseeing the blood draw "did not observe any signs of impairment" in the truck driver.

NTSB investigators sent a portion of the blood sample to the FAA CAMI laboratory for further analysis. The laboratory identified 3.1 nanograms/milliliter (ng/mL) of THC and 66.2 ng/mL of tetrahydrocannabinol carboxylic acid (THC-COOH) in the sample. THC is the main psychoactive compound in marijuana; THC-COOH is its primary (inactive) metabolite. (The truck driver's drug use will be discussed further in section 2.3 of this report.)

Following the crash, US Department of Transportation (DOT) postcrash drug and alcohol testing was not performed. DOT regulations require a carrier to submit the crash-involved truck driver for drug and alcohol screening following certain types of crashes, including those that involve a fatality. The carrier did not comply with this regulation.[37]

## 1.5.2 Motor Carrier Operations

Okemah Express LLC was a "for-hire" carrier of general freight, fresh produce, grain, meat, and refrigerated food that operated with one vehicle and one driver. The company's primary place of business was Palm Harbor, Florida.

Okemah Express had six roadside or terminal inspections during the year preceding the crash (from May 2015 to May 2016). Those six inspections resulted in one driver out-of-service (OOS) violation and no vehicle OOS violations. The Motor Carrier Management Information System (MCMIS) profile indicated that the carrier had no DOT-reportable crashes in 2015.

At the time of the crash, the carrier's Safety Measurement System profile displayed no BASIC alerts. The carrier provided no driver qualification file and did not have records indicating that it maintained a drug testing program, as required by 49 *CFR* Parts 40 and 382.

The FMCSA did not perform a postcrash compliance review of Okemah Express.

## 1.5.3 Postcrash Inspection of the Truck-Tractor and Semitrailer

The FHP postcrash inspection of the 2014 Freightliner Cascadia truck-tractor did not reveal any mechanical issues. The truck-tractor was not damaged in the crash, and the FHP released it following postcrash inspection. By the time the NTSB investigation began, the truck-tractor was back in service and was not examined by NTSB investigators.

The engine of the 2014 Freightliner was managed by a Detroit Diesel Electronic Controller (DDEC) that could record certain data associated with vehicle operation. The FHP provided NTSB investigators with a copy of a report of a May 10, 2016, data download conducted

---

[37] Title 49 *CFR* 382.303 details the requirements for postaccident drug and alcohol testing. Under this part, carriers who employ drivers who operate CDL-required commercial motor vehicles are subject to six testing procedures. Title 49 *CFR* 382.303(g)(1) and (2) allow a carrier to fulfill this requirement by obtaining the results of the tests conducted by federal, state, or local officials. The carrier did not receive any test results and did not qualify for exemption from the postaccident drug test requirement.

by a third party that accessed the DDEC control module. The report indicated that postcrash movement of the truck-tractor on May 8, 2016, made certain data associated with vehicle operation at the time of the May 7, 2016, crash event unavailable.

The FHP conducted a postcrash mechanical inspection of the 2003 Utility 3000R refrigerated semitrailer on May 12, 2016. That inspection identified missing and broken frame crossmembers and inoperable intermediate marker lamps. It also found an air leak at a connection between axles 4 and 5. No brakes were found to be out of adjustment.

NTSB investigators located the semitrailer, which Okemah Express had sold to a salvage yard following the crash, and inspected it on July 14, 2016. The inspection included visually examining its brake linings, air lines, and foundation brake components. All brake linings exceeded the minimum requirements of 0.25 inch. The thermoplastic emergency brake air line attached to the right side of the axle was worn through to the inner (second) color layer; this is an OOS condition, according to North American Standard Out-of-Service Criteria. The emergency brake hose, forward of the front axle, contained a non-DOT approved fitting. The semitrailer's suspension consisted of air springs, shock absorbers, cantilever arms, and solid axles; investigators identified no damage to the suspension.

The semitrailer did not have, nor was it required to have, side underride protection guards. In the United States, standards for side underride protection guards for trailers do not exist. European Union regulations address the performance of side guards on trailers; they are designed to protect vulnerable road users, such as pedestrians and bicyclists, from falling under the trailer and being caught in the wheels (United Nations Economic Commission for Europe 2004).

## 1.6 Highway Factors

### 1.6.1 Road Description and Characteristics

US-27A at the crash location is a rural four-lane road divided by a grassy median.[38] Travel lanes are 12 feet wide, and the median is approximately 60 feet wide. The left and right shoulders are about 2 and 5 feet wide, respectively. US-27A is not a limited-access roadway because it has intersections, business access, and private driveway access.[39]

According to the Florida Department of Transportation (FDOT), in the past 5 years, 84 crashes took place in the 10-mile segment of US-27A that centers on the intersection of US-27A and NE 140th Court; of those, 4 were fatal crashes involving 7 fatalities. Property-damage-only crashes accounted for 37 percent of the crashes. Seven nonfatal crashes occurred in close proximity to the intersection of US-27A and NE 140th Court; three of the seven crashes were designated as taking place at the intersection.

---

[38] A median is the portion of the highway separating opposing directions of the travelway. Median width is expressed as the dimension between the edges of the traveled way, including the width of the shoulders, if any.

[39] A limited-access roadway has on-ramps and off-ramps to control the flow onto and off the roadway. On-ramps and off-ramps enable vehicles to merge into the traffic flow while traveling in the same direction as the main traffic flow. There is no crossing traffic on a limited-access roadway.

## 1.6.2 Road Geometry and Traffic Volume

The eastbound approach to the intersection exhibits a descending grade of about 2.15 percent. Based on highway profile plans from FDOT, the height of the grade crests approximately 1,132 feet west of the center of the NE 140th Court intersection. The grade descends for about 1,459 feet, leveling off about 327 feet east of the intersection. Farther east, the highway appears essentially level, although the profile plans indicate a very slight (0.08 percent) descending grade for at least another 2,400 feet. Other than the vertical curve, the highway is essentially straight for several miles east and west of the intersection.[40]

The average daily traffic for 2015 on US-27A was about 8,800 vehicles with a slightly higher percentage of traffic (about 5 percent more) traveling westbound. A speed study conducted on August 24, 2016, on US-27A for both east- and westbound traffic near the intersection with NE 140th Court found that the 85th percentile speed was 69 mph.[41] In 2003, this section of the roadway was reconstructed from a two-lane to a four-lane configuration with a design speed of 68 mph. It was resurfaced in 2013 to a design speed of 70 mph.[42] At the time of the crash, the posted speed limit was 65 mph.

A signal warrant analysis considered the traffic volume, turning movements, and pedestrian use of the crash intersection. With respect to whether US-27A at NE 140th Court should have been a signalized intersection, conditions at this location met none of the five applicable signal warrants in the *Manual on Uniform Traffic Control Devices for Streets and Highways* (Federal Highway Administration [FHWA] 2009).

## 1.6.3 Road Classification

FDOT functionally classifies US-27A at the crash location as "rural principal arterial other," which is a classification comparable to the American Association of State Highway and Transportation Officials (AASHTO) designation of "other principal arterial" (AASHTO 2011). This class of roadway provides direct access to cities and larger towns. According to AASHTO, the principal arterial system is stratified into three classifications: (1) interstate highways, (2) other freeways and expressways, and (3) other principal arterials. On rural arterial roadways, access to abutting land can be provided by driveways to specific parcels and at-grade intersections with other roadways (AASHTO 2011, pp. 1–9).

The functional classification of a roadway characterizes its design, including its expected speed and capacity. The six AASHTO categories are as follows: interstates, other freeways and expressways, other principal arterials, minor arterials, collectors, and local roads. Each classification can be subcategorized as urban or rural. The FHWA summarizes the relationship between the design concepts and the three broad categories of functional classification (FHWA 2013). With respect to traffic access, the first three AASHTO categories are described as follows:

---

[40] The GPS coordinates for the crash area are 29.4106 N / -82.53979 W for the location of impact and 29.409516 N / -82.537291 W for the location of the car at rest.

[41] The 85th percentile speed is the speed at which 85 percent of the vehicle traffic is traveling either at or below.

[42] See FDOT State Project 34010-3539.

interstates—fully controlled; freeways and expressways—fully/partially controlled; and other principal arterials—partially uncontrolled.

The Tesla owner's manual included numerous statements that drivers should use Autopilot on highways and limited-access roads (as discussed in section 1.3.4). But the firmware's logic did not restrict the system's use based on functional road classification; the system had no hard constraint concerning road classification.

## 1.7 Regulation and Policy Concerning Automated Vehicles

Individual states are responsible for registering motor vehicles and regulating the operation of motor vehicles on public roads in their states. The National Highway Traffic Safety Administration (NHTSA) is responsible for setting safety standards for vehicle systems; however, many vehicle aspects are not covered by a Federal Motor Vehicle Safety Standard (FMVSS).[43] For new and developing technologies, manufacturers design and test new systems and determine when they will be added to the fleet. As a technology matures and enters fleet production, NHTSA may define an FMVSS for the system on new vehicles. For example, electronic stability control systems, which reduce loss of wheel traction, were first developed in the late 1980s and began to appear on new cars in the 1990s. After the systems had been demonstrated to be effective in reducing crashes, NHTSA established FMVSS 126 for electronic stability control systems for light vehicles, which required these systems for all such vehicles, effective September 1, 2011.[44]

### 1.7.1 Levels of Automation

The SAE has an On-Road Automated Driving Committee. In September 2016, that committee issued a revised *Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles*.[45] The revision incorporated lessons learned from both industry and government research groups, including the Automated Driving Applications and Technologies for Intelligent Vehicles (AdaptIVe) Consortium, the Crash Avoidance Metrics Partnership (CAMP), and the Automated Vehicle Research (AVR) Consortium (CAMP 2016).[46]

---

[43] The *Federal Motor Vehicle Safety Standards* (*FMVSSs*) are regulations specifying the design, construction, performance, and durability requirements for motor vehicles and regulated automobile safety-related components, systems, and design features. The requirements are specified in such a manner "that the public is protected against unreasonable risk of accidents occurring as a result of the design, construction, or performance of motor vehicles and is also protected against unreasonable risk of death or injury in the event accidents do occur." (See P.L. 89–563, 80 Stat. 718: National Traffic and Motor Vehicle Safety Act of 1966.)

[44] See 72 *Federal Register* 17236 (April 6, 2007), final rule amending 49 *CFR* Parts 571 and 585, *Federal Motor Vehicle Safety Standards*, "Electronic Stability Control Systems," docket no. NHTSA-2007-27662.

[45] See Surface Vehicle Recommended Practice J3016. The SAE first published SAE J3016, which was developed by the SAE On-Road Automated Driving Committee, on January 16, 2014. That 12-page standard provided detailed definitions only for the three highest levels of automation. The revised 30-page standard released on September 30, 2016, provided a taxonomy for all six levels of driving automation.

[46] (a) AdaptIVe is a consortium of 28 partners from 8 countries that was formed in 2014 and is supported by the European Union and the European Council for Automotive R&D EUCAR. See AdaptIVe project, accessed September 7, 2017. (b) CAMP originated as a partnership formed in 1995 between vehicle manufacturers Ford and General Motors to accelerate the implementation of crash avoidance countermeasures in cars. The consortium has since expanded to include Mercedes-Benz, Nissan, Toyota, and Volkswagen.

The revised taxonomy included definitions for six levels or degrees of driving automation, as shown in figure 12.

| SAE level | Name | Narrative Definition | Execution of Steering and Acceleration/ Deceleration | Monitoring of Driving Environment | Fallback Performance of Dynamic Driving Task | System Capability (Driving Modes) |
|---|---|---|---|---|---|---|
| *Human driver* monitors the driving environment | | | | | | |
| 0 | No Automation | the full-time performance by the *human driver* of all aspects of the *dynamic driving task*, even when enhanced by warning or intervention systems | Human driver | Human driver | Human driver | n/a |
| 1 | Driver Assistance | the *driving mode*-specific execution by a driver assistance system of either steering or acceleration/deceleration using information about the driving environment and with the expectation that the *human driver* perform all remaining aspects of the *dynamic driving task* | Human driver and system | Human driver | Human driver | Some driving modes |
| 2 | Partial Automation | the *driving mode*-specific execution by one or more driver assistance systems of both steering and acceleration/ deceleration using information about the driving environment and with the expectation that the *human driver* perform all remaining aspects of the *dynamic driving task* | System | Human driver | Human driver | Some driving modes |
| *Automated driving system* ("*system*") monitors the driving environment | | | | | | |
| 3 | Conditional Automation | the *driving mode*-specific performance by an *automated driving system* of all aspects of the dynamic driving task with the expectation that the *human driver* will respond appropriately to a *request to intervene* | System | System | Human driver | Some driving modes |
| 4 | High Automation | the *driving mode*-specific performance by an automated driving system of all aspects of the *dynamic driving task*, even if a *human driver* does not respond appropriately to a *request to intervene* | System | System | System | Some driving modes |
| 5 | Full Automation | the full-time performance by an *automated driving system* of all aspects of the *dynamic driving task* under all roadway and environmental conditions that can be managed by a *human driver* | System | System | System | All driving modes |

Copyright © 2014 SAE International. The summary table may be freely copied and distributed provided SAE International and J3016 are acknowledged as the source and must be reproduced AS-IS.

**Figure 12.** Summary of SAE taxonomy and definitions for terms related to driving automation systems for on-road motor vehicles. (Source: SAE International J3016 [SAE International 2016])

According to these definitions, the Tesla car involved in the Williston crash was equipped with a Level 2 automated driving system. Level 2 systems provide lateral control (lane-keeping or steering) and longitudinal control (adaptive cruise control or acceleration/deceleration). When operating a Level 2 vehicle, the driver is responsible for monitoring the driving environment.

## 1.7.2 Federal Automated Vehicles Policy

In September 2016, NHTSA issued its Federal Automated Vehicles Policy (AV Policy) as agency guidance (NHTSA 2016). The policy specifically incorporated the SAE's six-level taxonomy described above for levels of automation. Using the SAE levels, NHTSA drew a distinction between Levels 0–2 and Levels 3–5 based on whether the human operator or the automated system is primarily responsible for monitoring the driving environment. Vehicles in the second group (Levels 3–5) are referred to as highly automated vehicles (HAV).

For the purposes of this investigation, the following summary points characterize NHTSA's AV Policy (NHTSA 2016):

- The AV Policy principally addresses HAVs—those vehicles in Levels 3–5—rather than focusing on those in Levels 0–2.

- Lower-level systems primarily rely on the human driver when active and operating; HAV systems do not. However, this distinction does not restrict manufacturers and other entities from applying the AV Policy guidance to the development, testing, and deployment of lower-level systems.

- HAV manufacturers should have a documented process for testing, validating, and collecting data from events, incidents, and crashes to record malfunctions, degradations, and failures in a way that can be used to understand and improve system performance.

  o For crash reconstruction purposes, the data should be stored, maintained, and readily available for retrieval by the manufacturer and NHTSA.

  o Enhanced EDRs would enable NHTSA to reconstruct the circumstances of crashes and gain an understanding of how an automated vehicle involved in a crash or incident sensed and responded to its driving environment immediately before and during the crash or near-crash event.

## 1.8 NHTSA Defect Investigation

On June 28, 2016, in response to the May 7, 2016, Williston crash, NHTSA's Office of Defects Investigation (ODI) opened an investigation (PE 16-007) to consider whether the AEB and Autopilot systems on the Tesla Model S and Model X functioned as designed. The ODI examined the following: (1) AEB design and performance in Tesla vehicles and peer vehicles, (2) human-machine interface issues related to the Autopilot operating mode, (3) data from crash incidents related to Autopilot and AEB, and (4) postcrash changes that Tesla made to its Autopilot version 8 and AEB systems. On January 19, 2017, NHTSA issued an ODI Resume report stating that the preliminary evaluation was closed. The report stated, "NHTSA's examination did not identify any defects in design or performance of the AEB or Autopilot systems of the subject vehicles [2014–2016 Tesla Model S and Model X] nor any incidents in which the systems did not perform as designed." The report further stated that "AEB systems used in the automotive industry through MY 2016 [model year 2016] are rear-end collision avoidance technologies that are not designed to reliably perform in all crash modes, including crossing path collisions." (NHTSA 2017, p. 1)

The ODI report also referenced past NHTSA research. Beginning in 2007, NHTSA began to develop test methods for assessing the effectiveness of crash-imminent braking systems (Carpenter and others 2011). The four-phase project (1) used crash reports to identify crash scenarios to develop preliminary functional requirements; (2) developed system and component performance capabilities and identified target systems for testing; (3) developed, demonstrated, and validated tests; and (4) developed benefits estimations. The project identified eight

Highway Accident Report

vehicle-to-vehicle (V2V) crash types. The project could not demonstrate and validate two types of scenarios—straight crossing path events and left turn across path events; these two scenarios are the crash types most closely associated with the Williston crash sequence. The ODI investigation surveyed a dozen automated system manufacturers and several suppliers; none indicated that their AEB systems through model year 2016 were designed to brake for crossing path collisions (NHTSA 2017, p. 3).

# 2 Analysis

## 2.1 Introduction

### 2.1.1 Automated Vehicle Control Systems

For mass market vehicles in diverse driving environments, it has proven difficult to automate the full range of driving tasks. Automated vehicle control systems must be designed to handle both the common, expected control tasks encountered by human drivers and the unexpected and unusual tasks as well. Functionally, automated vehicle control systems detect and respond to objects and events, but the current systems have operating limitations with respect to the types of situations they can handle reliably and well. Such limitations are associated with the conditions in which the automated system is intended to operate.

Level 2 automated systems simultaneously control lateral lane-keeping movements and longitudinal vehicle following distances.[47] Level 2 systems can execute steering and acceleration/deceleration tasks, but the degree of automation is, by definition, partial.

Automated vehicle control systems can operate a vehicle on the road, but in certain situations, the existing systems have significant limitations that require driver intervention. Although system designers understand the limits of partial automation, the driving public may not.[48] Eventually, as highway vehicles progress through increasing degrees of automation and incorporate additional technological advances, vehicle engineers will shift the driving responsibility from the human driver to a fully autonomous system. But until automated vehicle systems mature, driver engagement remains integral to the automated driving system.

### 2.1.2 Structure of the Analysis

The Analysis begins with an account of several factors that did not affect the crash (section 2.2). A section discussing the truck driver's use of drugs follows this material (section 2.3). Then, the Analysis discusses the safety issues identified in this investigation, organized into sections as follows:

- Operational design domains for SAE Level 2 vehicle automation (section 2.4),

- Surrogate means of determining the automated vehicle driver's degree of engagement (section 2.5),

- EDRs for automated vehicles (section 2.6),

---

[47] Intelligent cruise control systems in recent vehicle models provide Level 1 driver assistance capability.

[48] *Consumer Reports* reviewed 280 model year 2017 vehicles and included an "Alert" for 14 models, stating that "This vehicle can be outfitted with a semiautonomous driving package. *Consumer Reports* believes automakers should take stronger steps to ensure that vehicles with these systems are designed, developed, and marketed safely. Please heed all warnings and keep your hands on the wheel" (*Consumer Reports* 2017).

- Safety metrics and exposure data for automated vehicles (section 2.7), and

- Connected vehicle technology and V2V requirements (section 2.8).

## 2.2 Factors Not Affecting the Crash

### 2.2.1 Driver, Vehicle, and Highway Factors

The following bulleted statements relate to the drivers:

- Based on cell phone records, work schedules, and witness accounts, investigators found no evidence of fatigue for either driver.

- Although the truck driver had engaged in numerous cell phone conversations while driving in the hours before the crash, investigators discovered no evidence that he was distracted by cell phone use at the time of the crash.

- Both drivers held valid driver's licenses, and the truck driver had a current medical certificate.

- Based on toxicological analysis, the car driver was not impaired by alcohol or other drugs.

The following bulleted statements relate to the vehicles involved in the crash and the roadway they were on at the time of the crash:

- Investigators found no mechanical problems that would have affected either vehicle's handling or stopping performance.

- Investigators found no evidence of precollision roadway marks, such as would be associated with evasive maneuver by the eastbound Tesla; moreover, no record in the Tesla's performance data indicated that the vehicle systems or the driver initiated braking or steering input immediately before the crash.

- Investigators conducted a signal warrant analysis of the crash intersection. Neither the road design of nor the levels of traffic on US-27A at the intersection of NE 140th Court warranted a traffic signal.

The NTSB concludes that no investigative evidence indicates that either driver was fatigued, that cell phone use distracted the truck driver, that the car driver was impaired by alcohol or other drugs, that any mechanical system on either vehicle failed, or that the highway design was inappropriate; consequently, these were not factors in the crash.

## 2.2.2 Sight Distance

**Highway Features.** The highway had a heading that was straight, but the line of sight available to opposing drivers operating near the intersection was affected by a vertical crest in the road west of the intersection.[49] Using highway profile data provided by FDOT and applicable AASHTO intersection sight distance calculation methodology, the sight distance for the truck driver was calculated at 1,132 feet, as measured from the area of impact (AASHTO 2011).[50] Based on the Tesla's 74-mph approach speed and the calculated line-of-sight distance, both drivers could potentially have had up to 10.4 seconds to observe and respond to one another.[51]

According to FDOT, the highway design speed was 70 mph. For left-turning combination vehicles, AASHTO guidelines recommend intersection sight distances of 781 and 842 feet for highway design speeds of 65 and 70 mph, respectively. Those distances are based on a minimum gap time of 8.2 seconds (7.5 seconds for a combination vehicle plus 0.7 second for crossing the additional through lane).[52] Therefore, the calculated sight distance of 1,132 feet for the truck driver exceeded the minimum sight distance that AASHTO recommends for a roadway of this design speed.

The median crossover associated with the intersection had an opening along the distance of the travelway that provided sufficient area to safely "store" the 72-foot-long combination vehicle.[53] The highway configuration should not have influenced the truck driver to hurry through the turn.

**Witness Account.** A witness who had been traveling westbound on US-27A behind the crash-involved truck said that he saw the truck in the left turn lane at the intersection. The witness described seeing the eastbound Tesla crest the grade before the truck began its left turn. He said he saw the Tesla for several seconds before the semitrailer blocked his view of the car.

The witness described reaching the westbound left turn lane for the intersection after the impact occurred. The witness said he was traveling about 60 mph. The fact that the witness had time to slow his speed, make a U-turn at the intersection, and follow the Tesla on its postimpact route suggests that he was traveling about 0.25 mile behind the truck, which could explain why he could not be sure whether the truck only slowed or came to a full stop in the turn lane before

---

[49] The eastbound approach to the intersection has a descending grade of approximately 2.15 percent.

[50] AASHTO guidelines recommend an average eye height of 7.6 feet for truck drivers. A target height of 3.5 feet is recommended for passing and intersection sight distances.

[51] Two additional line-of-sight distances were considered. The truck driver began his turn from the westbound turn lane from an estimated position that would have involved a slightly longer sight distance. The Tesla driver's sight distance would have been slightly shorter because his height was lesser. Because of the known travel time for the Tesla along the eastbound roadway, and because that was a median of the possible calculations, the discussion used that distance to impact. The choice of calculation had no appreciable effect on the calculated response time of 10.4 seconds.

[52] See AASHTO 2011, table 9-13, "Gap Time for Left Turn from Major Road."

[53] Dimensions are based on 3D scanning of the highway. The median left turn lane is an auxiliary lane for left-turning vehicles. The median, left turn lane, and shoulders totaled 78 feet in width. (See AASHTO 2011, section 9.8.2, for minimum designs for median openings.)

turning through the intersection. The witness saw no obstructions to the lines of sight for the two vehicle drivers and said that sun glare was not a problem.

Based on the foregoing information concerning the car speed, the highway features and design, and the witness's report of the vehicles' locations and movements preceding the crash, the NTSB concludes that there was sufficient sight distance to afford time for either the truck driver or the car driver to have acted to prevent the crash.

In the context of right of way, the truck driver had the duty to yield to the Tesla.[54] Following the crash, the FHP cited him for failure to yield.

### 2.2.3 Side Underride Protection

The semitrailer of this truck did not have, nor was it required to have, side underride protection guards. European regulations concerning underride protection do not address impact by a vehicle. Thus, even if the semitrailer had been equipped with side underride guards designed to the European regulations, they would not have significantly mitigated the severity of the crash. Although research into the potential benefits of trailer side guards designed for vehicle impacts has indicated some benefit achieved by their reducing the incompatibility between passenger cars and trailers (Brumbelow 2012), guards designed to prevent passenger vehicle underride are typically tested at 56 kilometers per hour (35 mph). Given that the Tesla struck the semitrailer at 74 mph—more than double the test speed—it is unlikely that the injury outcome of the crash would have been significantly improved by side underride guards on the semitrailer.

### 2.2.4 Forward Collision Warning and Automatic Emergency Braking

On the 2015 Tesla Model S, the FCW/AEB system uses vehicle-resident camera and radar sensors and computer processing to provide warnings to the driver and to activate braking to prevent or mitigate an imminent crash. The system is designed to recognize and detect slow, stopped, and decelerating vehicles when they are traveling ahead of the Tesla in the same lane. TACC, when enabled, incorporates an AEB feature that can respond to an object that the camera system detects in the Tesla's path but cannot classify as a vehicle. Such an unclassified object in the path of the Tesla must be detected by both the camera and the radar for the AEB to activate.

A postcrash review of the Tesla's performance data determined that no status messages indicated that AEB or FCW was disabled during the last trip segment. The recorded data showed no indication of an FCW event, an AEB event, or any other event indicating detection of a vehicle or an object at or just before the time of the crash. The NTSB concludes that the Tesla's automated vehicle control system was not designed to, and did not, identify the truck crossing the car's path or recognize the impending crash; consequently, the Autopilot system did not reduce the car's velocity, the FCW system did not provide an alert, and the AEB did not activate.

Current Level 2 vehicle automation technologies cannot reliably identify and respond to crossing vehicle traffic. NHTSA's ODI report on the Tesla Models S and X, which was prompted by the Williston crash, states: "None of the companies contacted by ODI indicated that AEB

---

[54] See Florida State Statute 316.123—"Vehicle Entering Stop or Yield Intersection," accessed September 7, 2017.

systems used in their products through MY 2016 production were designed to brake for crossing path collisions" (NHTSA 2017, p. 3). As part of its defect investigation, NHTSA conducted a series of test-track-based AEB evaluations on the Tesla Model S, as well as a peer vehicle system.[55] The testing confirmed that the Tesla AEB system avoided crashes for the majority of rear-end scenarios, and its TACC generally provided enough braking to avoid rear-end crash scenarios; but neither test vehicle effectively responded to "target vehicles" in straight crossing path or left turn across path scenarios. NHTSA concluded that there was no defect in the design of the Tesla crash avoidance and mitigation systems.

## 2.3 Truck Driver Drug Use

The FHP had a blood sample taken from the truck driver following the crash. Law enforcement's toxicological analysis of the sample was positive for THC, the active ingredient in marijuana. A portion of that blood draw was also sent to the FAA CAMI laboratory for analysis; it also tested positive for THC, at 3.1 ng/mL.

According to 21 *United States Code* Section 812, marijuana is a Schedule I controlled substance. Although some states and the District of Columbia permit its use for medicinal and recreational purposes, it is unacceptable for any safety-sensitive employee subject to DOT drug regulations to use marijuana.[56] Florida has no current statute regarding the level of THC that indicates impairment.[57]

THC has mood-altering effects that may include euphoria, relaxation of inhibitions, disorientation, time/image distortion, and psychosis. Significant performance impairments are usually observed for at least 1–2 hours following marijuana use, and residual effects have been reported for up to 24 hours.[58] Blood THC levels peak during the act of smoking and then decline rapidly as the drug is distributed into highly vascular tissues, including the brain. The rate of decline then slows as THC is absorbed into adipose tissue. In one study, peak THC plasma levels in six volunteers averaged 84 ng/mL (range 50–129 ng/mL) at an average of 8.4 minutes after beginning to smoke a cigarette containing 15.8 milligrams of THC (the volunteers were allowed 11 minutes to smoke the cigarette). By 3.0 hours after beginning to smoke, volunteers' THC levels averaged 1.2 ng/mL (Huestis, Henningfield, and Cone 1992).

THC metabolism varies among individuals and is also influenced by the chronicity of its use. Terminal half-life, a measure of the amount of time for half of a drug to be eliminated after the initial rapid distribution is complete, ranges from 20–57 hours for infrequent users and from 3–13 days for regular users after smoking (Wall and Perez-Reyes 1981, Agurell and others 1986). Part of the reason for this disparity is that THC and its metabolites accumulate in adipose tissue and are then released slowly back into the bloodstream. Chronic marijuana-using volunteers

---

[55] The peer vehicle was the 2015 Mercedes C300 4Matic.

[56] See DOT "Medical Marijuana" Notice and DOT "Recreational Marijuana" Notice, both accessed September 7, 2017.

[57] See Governors Highway Safety Association webpage on drug-impaired driving laws by state, accessed September 7, 2017. (Website is updated when states report changes.)

[58] See NHTSA factsheet on marijuana, accessed September 7, 2017.

confined to a secure facility to ensure abstinence have been found to have THC levels as high as 2 ng/mL after as many as 7 days of abstinence (Bergamaschi and others 2013).

Using a single determination of THC level following a crash to extrapolate back to a smoker's THC level at the time of the crash is difficult, unless the timing of the last dose is known. The task is particularly complex when the tested level is below 5 ng/mL, as was the case with the Williston truck driver (Hartman and others 2016). In addition, most studies have been performed with drivers who have been smoking marijuana rather than ingesting it. The variation in absorption from the gut, as well as differences in metabolism for ingested marijuana, make extrapolating backward even more difficult for users who have ingested, rather than smoked, the drug. In the case of the Williston truck driver, the NTSB does not know how he used marijuana or when he last did so before the crash. The truck driver did not exhibit impaired behavior to FHP officers or other first responders following the crash. The FHP Case Closing Report for this crash stated that the trooper overseeing the blood draw "did not observe any signs of impairment" in the truck driver. Therefore, the NTSB concludes that, although the results of postcrash drug testing established that the truck driver had used marijuana before the crash, his level of impairment, if any, at the time of the crash could not be determined from the available evidence.

## 2.4 Operational Design Domains for Level 2 Vehicle Automation

In September 2016, NHTSA released its AV Policy, which characterizes how it will address increasing levels of vehicle automation, focusing on HAVs in the SAE categories defined as Level 3, Conditional Automation; Level 4, High Automation; and Level 5, Full Automation (NHTSA 2016).[59] Manufacturers are not required to follow the vehicle performance guidance in the AV Policy, but it provides a framework for operation, testing, and safety assessment of vehicle automation.

With respect to vehicles with no or limited automation (Levels 0–2), the AV Policy gives some guidelines for Level 3–5 systems that could apply to Level 2 systems, but it does not provide vehicle performance guidance explicitly for Level 2 systems, such as those on the Tesla involved in the Williston crash. Regarding the features and qualities necessary for all vehicle automation systems, the AV Policy states—

> Most of the Guidance elements and considerations specified under the cross-cutting areas of Vehicle Performance Guidance for HAVs, such as "Data Recording and Sharing," "Privacy," "System Safety," "Vehicle Cybersecurity," "Human Machine Interface," "Crashworthiness," and "Consumer Education and Training" should generally apply to the full spectrum of automated vehicle systems.

Addressing the need for driver involvement in vehicle automation systems, the AV Policy states—

> There is a clear technical distinction between HAV systems (those classified as SAE Level 3, Level 4, and Level 5) and lower levels of automation (SAE Levels 2

---

[59] See AV Policy, accessed August 21, 2017. Also, see figure 12 of this report for the SAE automation levels.

and below) based on whether the automation system relies on the human driver when engaged and operating.

The AV Policy includes within its framework guidance specific to HAV systems. It states that "The Operational Design Domain (ODD) concept, Object and Event Detection and Response (OEDR) and associated tests and validation methods discussed in this Guidance are primarily focused on HAV systems (those classified as SAE Level 3, Level 4 and Level 5)."

The ODD refers to the conditions in which the automated system is intended to operate. Examples of such conditions include roadway type, geographic location, clear roadway markings, weather condition, speed range, lighting condition, and other manufacturer-defined system performance criteria or constraints. In the case of an automated lateral control system that cannot detect crossing-path traffic, such as Autopilot, the manufacturer may establish an ODD for limited-access roadways and design the system so that the vehicle will not permit activation of the automated control system unless that ODD is met.

The ODD concept is as important for Level 2 vehicle automation as it is for the HAVs in Levels 3–5. That is, Level 2 automated systems have more operational design limitations than HAVs do and so should also limit system operation to the manufacturer's designated ODDs. The Insurance Institute for Highway Safety recognized the importance of ODDs in its comments on the AV Policy, as follows: "Driving automation systems should self-enforce their use within the operational design domain rather than relying on users to do so" (Kidd 2016).

As detailed in section 1.3.4 of this report, Tesla constrained Autopilot operation based on seat belt use, speed, and the presence of a lead vehicle. The owner's manual stated that Autopilot should only be used in preferred road environments, but Tesla did not automatically restrict the availability of Autopilot based on road classification. The driver of the Tesla involved in the Williston crash was able to activate Autopilot on portions of SR-24, which is not a divided road, and on both SR-24 and US-27A, which are not limited-access roadways.[60] Simply stated, the driver could use the Autopilot system on roads for which it was not intended to be used.

Tesla's manufacture of cars equipped with Autopilot preceded NHTSA's issuance of its AV Policy, and that policy applies to SAE Levels 3–5 rather than Level 2 automated vehicles, but Tesla clearly understands the ODD concept and advised drivers to use the Autopilot systems only on limited-access roadways. Following the crash, Tesla modified its Autopilot firmware to add a preferred road usage constraint, which affects the timing of the hands-off driving alert. But despite these modifications, a Tesla driver can still operate Autopilot on any roads with adequate lane markings.

Today's vehicle automation systems can assess the vehicle's route and determine whether it is appropriate to the system's ODD.[61] But Tesla's Autopilot remains available to the driver, even

---

[60] Postcrash data show that the driver had the cruise speed set to 70 mph for almost 29 minutes before he turned off non-preferred roadway SR-24 onto US-27A. Moreover, he activated Autosteer about 6.18 minutes before the crash event, which, based on speed and distance data, would have placed the car on a portion of US-27A that is not configured as a divided highway.

[61] Tesla's Autopilot system uses vehicle GPS data, commercially available road data, and camera recognition of speed signs to determine the type of road and the speed limit of the roadway on which the vehicle travels.

under some conditions that do not meet its ODD. This situation allows the driver to activate automated systems in locations and circumstances for which their use is not appropriate or safe. The NTSB concludes that if automated vehicle control systems do not automatically restrict their own operation to those conditions for which they were designed and are appropriate, the risk of driver misuse remains. Therefore, the NTSB recommends that manufacturers of vehicles equipped with Level 2 vehicle automation systems incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed. The NTSB further recommends that NHTSA develop a method to verify that manufacturers of vehicles equipped with Level 2 vehicle automation systems incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed. Finally, to ensure that vehicle manufacturers that do not currently produce vehicles equipped with Level 2 automation but may do so in the future are aware of the significance of this issue, the NTSB recommends that the Alliance of Automobile Manufacturers and the Association of Global Automakers notify their members of the importance of incorporating system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed.

## 2.5 Surrogate Means of Determining the Automated Vehicle Driver's Degree of Engagement

Based on system design, in an SAE-defined Level 2 automated vehicle, it is the driver's responsibility to monitor the automation, maintain situation awareness of traffic conditions, understand the limitations of the automation, and be available to intervene and take over for the system at any time. In practice, however, human drivers have cognitive limitations that make fulfilling this responsibility difficult because people are poor at monitoring automation and do not perform well on tasks requiring passive vigilance (Parasuraman, Molloy, and Singh 1993; Parasuraman and Riley 1997; Moray and Inagaki 2000; and Parasuraman and Manzey 2010). Moreover, there is evidence that drivers lack a complete understanding of advanced automation systems, including their functionality and limitations (McDonald and others 2016).

Manufacturers try to make systems safer by encouraging driver engagement through the incorporation of design solutions that monitor driver behavior and issue warnings when engagement seems lacking. Several vehicle models with Level 2 automated systems use steering wheel torque to monitor driver engagement.[62] However, driving is a highly visual task, so the driver's touching the steering wheel may not accurately indicate that he or she is fully engaged with the driving task. Simply checking whether the driver has placed a hand on the steering wheel gives little indication of where the driver is focusing his or her attention.[63] The NTSB concludes that because driving is an inherently visual task and a driver may touch the steering wheel without visually assessing the roadway, traffic conditions, or vehicle control system performance,

---

[62] Examples of such vehicles with Level 2 automation other than Teslas include the Infiniti Q50, Mercedes-Benz S65, BMW 50i, Audi A7, and Volvo XC60.

[63] In the event of an incapacitated driver, the system slows the vehicle to a stop in its travel lane and activates the hazard flashers. We anticipate that more advanced future systems will remove the vehicle from the travel lane before stopping it.

monitoring steering wheel torque provides a poor surrogate means of determining the automated vehicle driver's degree of engagement with the driving task.

On-road driver behavior has been the subject of substantial naturalistic driving research. Currently, the Virginia Tech Transportation Institute (VTTI) is conducting a naturalistic driving study using vehicles with Level 2 automation capabilities from five different manufacturers.[64] Data from both forward- and driver-facing cameras are being collected to better understand driver behavior. A similar study, conducted by Volvo, is underway in Sweden.[65] These longer-term naturalistic studies are essential to understanding drivers' interactions with automated systems and the extent to which they may misuse them. These studies also address different approaches to system monitoring, such as the use of eye-tracking cameras, which have long been used in driving simulation research. Toyota has deployed an eye-tracking system on its Lexus brand vehicles, and Volvo has announced plans to use eye-tracking technology in its Driver State Estimation system. The Driver Attention System on the 2018 Cadillac CT6 Super Cruise vehicle uses a small camera located at the top of the steering column; the camera focuses exclusively on the driver and uses infrared light to track the driver's head position.

The time intervals permitted before an automated system issues an alert are a vital component of the monitoring system. Although the operational design of the Tesla Autopilot requires an attentive driver as an integral system element, the Autopilot on the Williston crash vehicle allowed the driver to operate in the automated control mode for almost 6 minutes, during which the system did not detect the driver's hands on the steering wheel.[66] In fact, of the 37 minutes in which the Tesla driver operated the vehicle in the automated control mode during the crash trip, the system detected his hands on the steering wheel for only 25 seconds. Investigators found no indication in recorded vehicle data that the Tesla driver attempted to take any action (by braking or steering) to prevent crashing into the semitrailer or that he was even aware of the impending crash.

The hands-off warning interval has been under consideration elsewhere in the world, particularly in Europe. The United Nations Economic Commission for Europe adopted a new regulation pertaining to hands-off warning time in lane-keeping systems. This regulation, which is expected to go into effect in the first quarter of 2018, would require lane-keeping systems to provide an initial visual warning after 15 seconds of hands-off driving and deactivate in a controlled manner after 1 minute of hands-off driving.

To summarize the discussion of the Williston crash driver's actions before the crash, he used the Autopilot system on roadways for which it was not designed (section 2.4) and had extended periods of hands-off driving and other indications of lack of engagement/awareness before the crash (section 2.5). Both driver behaviors strongly indicate that, although the Tesla

---

[64] (a) In 2005, the VTTI *100-Car Naturalistic Driving Study* was completed. The study was sponsored by NHTSA, Virginia Tech, the Virginia Department of Transportation, and the Virginia Transportation Research Council. (b) The current naturalistic driving project is the *VTTI Center for Automated Vehicle Systems Study of Level 2 Automation*.

[65] In January 2017, Volvo began recruiting volunteers to participate in this study. Additional information can be found at Volvo driving project, accessed June 19, 2017.

[66] Firmware changes to the Autopilot system issued in September 2016 shortened the alert timeframe and altered the alert sequence. The postcrash changes are discussed in appendix C.

owner's manual provided information and warnings on these subjects, the driver either did not know of or did not heed the guidance in the manual. Therefore, the NTSB concludes that the Tesla driver's pattern of use of the Autopilot system indicates an overreliance on the automation and a lack of understanding of system limitations. Also, the NTSB concludes that the Tesla driver was not attentive to the driving task, but investigators could not determine from the available evidence the reason for his inattention.

Based on the lack of response from the Tesla's driver before the impact with the truck and data indicating extended periods of hands-off driving, the NTSB further concludes that the way that the Tesla Autopilot system monitored and responded to the driver's interaction with the steering wheel was not an effective method of ensuring driver engagement. Therefore, the NTSB recommends that manufacturers of vehicles equipped with Level 2 vehicle automation systems develop applications to more effectively sense the driver's level of engagement and alert the driver when engagement is lacking while automated vehicle control systems are in use.

## 2.6 EDRs for Automated Vehicles

The final rule on EDRs (49 *CFR* Part 563) published in August 2006 sets forth requirements for data elements, data capture and format, data retrieval, and data crash survivability for EDRs installed in light vehicles manufactured on or after September 1, 2012.[67] The regulation does not mandate the installation of EDRs in light vehicles; rather, if the vehicle manufacturer chooses to install an EDR, the regulation defines the format and specifies the requirements for providing commercially available tools and/or the methods for retrieving data from the EDR in the event of a crash.

NHTSA estimated that as of vehicle model year 2010, about 92 percent of light vehicles had EDRs that met the regulatory standard.[68] Since then, many vehicle manufacturers have begun to design and develop automated control systems that have special data collection capabilities that do not necessarily comply with EDR requirements. Because of these innovations, the proportion of light vehicles not equipped with EDRs meeting the specifications of 49 *CFR* Part 563 has been increasing.

Vehicle manufacturers have a robust proprietary interest in capturing and maintaining their own fleet data so that the information can be used to improve the active safety systems and designs of future vehicle control systems. But even if current and future models of HAVs record the 15 data parameters defined more than a decade ago in 49 *CFR* Part 563, those data now are inadequate to comprehend even the simplest questions of who/what controlled an automated vehicle at the time of a crash.

For example, the Tesla Model S involved in this crash recorded substantial parameter data, but the methodology by which the car recorded that data did not meet, nor was it required to meet, the Part 563 definition of an EDR. As a result, the data recorded by the ECU on the Tesla could

---

[67] The EDR requirements apply to "light vehicles" required to have frontal airbags—those with a gross vehicle weight rating of 3,855 kilograms (8,500 pounds) or less and an unloaded vehicle weight of 2,495 kilograms (5,500 pounds) or less.

[68] See 77 *Federal Register* 74146.

be retrieved only by Tesla; there is no commercially available tool for retrieval and review of these Tesla data. Other manufacturers of vehicles with automated systems similarly control access to the postcrash proprietary information associated with their vehicles. The NTSB concludes that, without the manufacturer's involvement, vehicle performance data associated with highly automated systems on vehicles involved in crashes cannot be independently analyzed or verified.

As more manufacturers deploy automated systems on their vehicles, to improve system safety, it will be necessary to develop detailed information about how the active safety systems performed during, and how drivers responded to, a crash sequence. Manufacturers, regulators, and crash investigators all need specific data in the event of a system malfunction or crash. Recorded data can be used to improve the automated systems and to understand situations that may not have been considered in the original designs. Further, data are needed to distinguish between automated control actions and driver control actions. All these crucial data must be reflected in the required recording parameters.

NHTSA's recently issued AV Policy recognizes the need for enhanced EDRs. The policy states that "When HAVs experience incidents or crashes, records and reports about those problems and manufacturer response actions would facilitate identification of problem causes" (NHTSA 2016). It also says that "When crashes or near crashes occur, the best source of information for learning the underlying causes will be the vehicle itself." The policy further states that—

> NHTSA believes enhanced event data recorders would be useful to allow the Agency to reconstruct the circumstances of crashes and to gain an understanding of how a vehicle involved in a crash or incident sensed and responded to its driving environment immediately before and during the crash or near crash.

NHTSA's AV Policy calls for automated vehicle control systems to be equipped with the tools needed to provide the data necessary for external safety oversight—recordkeeping/reporting and enhanced data collection tools. The NTSB also needs access to such data to perform our investigative work. The NTSB concludes that a standardized set of retrievable data is needed to enable independent assessment of automated vehicle safety and to foster automation system improvements.

The NTSB, NHTSA, the Institute of Electrical and Electronics Engineers, and the SAE have long histories of working on standards and regulations for EDRs on light vehicles, heavy vehicles, and buses.[69] Over time, the associated crash data that have been collected from state-of-the-art EDRs have provided manufacturers, researchers, and regulators with science-based means of understanding vehicle crashes. Automated vehicle control systems introduce new ways for drivers to interact with their vehicles and for vehicles to interact with the environment. Consequently, the types of crashes or near-crashes that an automated vehicle experiences may differ from those involving traditional vehicles. To understand these events, data standards different from those currently in 49 *CFR* Part 563 will be required.

---

[69] The NTSB has a recommendation history concerning EDRs in the highway mode that is two decades old, beginning with Safety Recommendation H-97-18, which called for recorder requirements for light vehicles.

A technical advisory committee will be required to consider the types of data-recording requirements needed for automated vehicles that are equipped with active safety systems and automated control systems. Therefore, the NTSB recommends that the DOT define the data parameters needed to understand the automated vehicle control systems involved in a crash. The parameters must reflect the vehicle's control status and the frequency and duration of control actions to adequately characterize driver and vehicle performance before and during a crash.

NTSB investigators need effective event data to conduct valid and productive investigations involving vehicles using automated vehicle control systems. Such data are also vital to identifying emerging problems in this swiftly evolving area of highway technology. Regulators such as NHTSA will have to rely on such data when developing and conducting regulatory activities—including defect investigations—in this area. Therefore, the NTSB also recommends that NHTSA use the data parameters defined by the DOT in response to Safety Recommendation H-17-37 as a benchmark for new vehicles equipped with automated vehicle control systems so that they capture data that reflect the vehicle's control status and the frequency and duration of control actions needed to adequately characterize driver and vehicle performance before and during a crash; the captured data should be readily available to, at a minimum, NTSB investigators and NHTSA regulators.

## 2.7 Safety Metrics and Exposure Data for Automated Vehicles

Improved data collection could greatly enhance our ability to evaluate the safety benefits provided by automated safety systems. In assessing these relatively new systems, industry members, manufacturers, researchers, and regulators need reliable data about the availability and use of automated safety systems on vehicles in the fleet and involved in crashes. NHTSA's AV Policy includes a section on "Data Recording and Sharing." The Governors Highway Safety Association has called for including the vehicle's automation level in vehicle registration, driver licensing, and crash information systems, beginning with vehicles equipped with Level 3 automation (Hedlund 2017, p. 12). NHTSA has an opportunity to collect exposure metrics for automated vehicle control systems (such as miles driven using these systems) from manufacturers. A standard system of reporting is needed to facilitate aggregation and comparison of data across all manufacturers and fleet operators. The NTSB concludes that to determine the safety effects from the use of automated vehicle control systems and to analyze the benefit–cost outcomes of these systems, reliable information is needed on the types of systems deployed and the numbers of miles driven using them. Therefore, to evaluate the safety effects of automated vehicle control systems, the NTSB recommends that NHTSA define a standard format for reporting automated vehicle control systems data, and require manufacturers of vehicles equipped with automated vehicle control systems to report incidents, crashes, and vehicle miles operated with such systems enabled.

## 2.8 Connected Vehicle Technology and V2V Requirements

V2V systems transmit warnings and basic safety information (speed, position, heading, brake status, etc.) among vehicles. Intersection crashes, such as occurred in this case, are among the most frequent and fatal of crash types, accounting for 36 percent of all crashes (Choi 2010, p. v). For years, NHTSA has encouraged the development of connected vehicle technology and crash avoidance systems that could improve intersection safety. In a 2014 evaluation report,

NHTSA announced plans for deploying V2V technology on heavy vehicles (Harding and others 2014, p. 10).

For V2V systems to function properly, all vehicles on the roads must be equipped with on-board communication capabilities. Also, the communication spectrum frequency for Dedicated Short Range Communication Services must be allocated to intelligent vehicle technologies.[70] In 1995, based on the investigation of a heavy truck crash that took place in Menifee, Arkansas, the NTSB recommended that the Federal Communications Commission allocate frequencies that would enhance collision warning systems (NTSB 1995).[71] A 2015 NTSB Special Investigation Report includes a summary of the many recommendations concerning crash avoidance systems that the NTSB issued to NHTSA in the years following the Menifee investigation (NTSB 2015, p. 11), including V2V systems.

In 2014, researchers categorized the precrash scenarios involving heavy trucks that could be addressed by V2V systems. Of the 37 scenarios considered, 17 were evaluated. The researchers found that a fully mature V2V system could potentially prevent about 267,000 police-reported crashes involving heavy trucks each year. The annual comprehensive costs of those crashes were estimated at $24.7 billion. Of the 17 scenarios evaluated, "straight crossing path at non-signalized intersection" (like the Williston crash) ranked second in terms of cost, accounting for over 15 percent of the total costs ($3.8 billion) (Toma and others 2014). A more recent simulation study for all types of vehicles estimated that 19–35 percent of straight crossing path intersection crashes could be prevented if both vehicles were equipped with intersection advanced driver assist systems (I-ADAS), a V2V technology designed for intersections (Scanlon, Sherony, and Gabler 2017).

In July 2016, NHTSA released a report addressing V2V for heavy vehicles (Chang 2016). That report summarized research that began in the 1990s and covered the development of systems for integrated truck and retrofit V2V systems, including real-world evaluations (Safety Pilot Model Deployment) and test track experience. The report also addressed the safety benefits provided by V2V systems. The report stated that—

> Analysis of the potential safety benefits associated with heavy-vehicle V2V systems has shown good promise based on initial results. In 2013 there were 3,964 people killed and 95,000 people injured in crashes involving at least one large truck. Based on data from police-reported crashes, 70 percent of crashes involving trucks occurred in scenarios that could potentially be addressed by V2V systems.

In early 2017, NHTSA proposed rulemaking on a new FMVSS for V2V communication technology.[72] However, NHTSA's proposed FMVSS 150 does not address V2V applications or requirements for heavy commercial vehicles. These vehicles travel more miles than light vehicles and are over-represented in fatal crashes; consequently, the omission of heavy commercial vehicles

---

[70] See 47 *CFR* Parts 90 and 95.

[71] Safety Recommendation H-95-46 to the Federal Communications Commission was classified "Closed—Acceptable Action" in 1999.

[72] See Notice of Proposed Rulemaking, "Federal Motor Vehicle Safety Standards (FMVSS); Vehicle-to-Vehicle (V2V) Communications," published at 82 *Federal Register* 3854, January 12, 2017.

from FMVSS 150 is a missed opportunity to significantly improve highway safety. As the NTSB's response to the proposed rule stated, "Widespread use throughout the vehicle fleet—including all heavy vehicles and motorcycles—is required to capitalize on the full lifesaving benefits of V2V technology" (NTSB 2017).

Fusing V2V communication-based technology with vehicle-resident systems can enhance the safety benefits of vehicle automation systems. Such technology might have affected the outcome of the Williston crash. Increasing implementation of crash avoidance technologies is one of the NTSB's Most Wanted Transportation Safety Improvements for 2017–2018. V2V technology could address potential crash situations (that is, intersection and left turn scenarios) that are challenging for current vehicle-resident safety systems (FCW and AEB) and other automated technologies. Moreover, V2V communications will provide a complementary source of information to vehicle-resident systems, improve the reliability and accuracy of data, extend the range of threat detection, and detect crash risks that are outside of a vehicle-resident sensor's field of observation. The NTSB concludes that connected vehicle technology will be most effective when all vehicles traveling on our roadways are equipped with the technology, and that is particularly important with respect to large, heavy trucks that pose the highest risk of injury to occupants of other vehicles.

Following an investigation into a 2012 collision between a school bus and a heavy truck near Chesterfield, New Jersey, the NTSB issued Safety Recommendations H-13-30 and -31 to NHTSA, which read as follows (NTSB 2013):

H-13-30

Develop minimum performance standards for connected vehicle technology for all highway vehicles.

H-13-31

Once minimum performance standards for connected vehicle technology are developed, require this technology to be installed on all newly manufactured highway vehicles.

The status of these two recommendations is "Open—Initial Response Received."

It has been 4 years since the NTSB issued these recommendations. The Williston crash serves as a reminder of how the installation of V2V technology on heavy trucks could improve the safety of traffic on our nation's roadways. Because NHTSA's recent rulemaking on proposed FMVSS 150 does not address these heavy vehicles, the NTSB reiterates Safety Recommendations H-13-30 and -31.

# 3 Conclusions

## 3.1 Findings

1. No investigative evidence indicates that either driver was fatigued, that cell phone use distracted the truck driver, that the car driver was impaired by alcohol or other drugs, that any mechanical system on either vehicle failed, or that the highway design was inappropriate; consequently, these were not factors in the crash.

2. There was sufficient sight distance to afford time for either the truck driver or the car driver to have acted to prevent the crash.

3. The Tesla's automated vehicle control system was not designed to, and did not, identify the truck crossing the car's path or recognize the impending crash; consequently, the Autopilot system did not reduce the car's velocity, the forward collision warning system did not provide an alert, and the automatic emergency braking did not activate.

4. Although the results of postcrash drug testing established that the truck driver had used marijuana before the crash, his level of impairment, if any, at the time of the crash could not be determined from the available evidence.

5. If automated vehicle control systems do not automatically restrict their own operation to those conditions for which they were designed and are appropriate, the risk of driver misuse remains.

6. Because driving is an inherently visual task and a driver may touch the steering wheel without visually assessing the roadway, traffic conditions, or vehicle control system performance, monitoring steering wheel torque provides a poor surrogate means of determining the automated vehicle driver's degree of engagement with the driving task.

7. The Tesla driver's pattern of use of the Autopilot system indicates an overreliance on the automation and a lack of understanding of system limitations.

8. The Tesla driver was not attentive to the driving task, but investigators could not determine from the available evidence the reason for his inattention.

9. The way that the Tesla Autopilot system monitored and responded to the driver's interaction with the steering wheel was not an effective method of ensuring driver engagement.

10. Without the manufacturer's involvement, vehicle performance data associated with highly automated systems on vehicles involved in crashes cannot be independently analyzed or verified.

11. A standardized set of retrievable data is needed to enable independent assessment of automated vehicle safety and to foster automation system improvements.

12. To determine the safety effects from the use of automated vehicle control systems and to analyze the benefit–cost outcomes of these systems, reliable information is needed on the types of systems deployed and the numbers of miles driven using them.

13. Connected vehicle technology will be most effective when all vehicles traveling on our roadways are equipped with the technology, and that is particularly important with respect to large, heavy trucks that pose the highest risk of injury to occupants of other vehicles.

## 3.2 Probable Cause

The National Transportation Safety Board determines that the probable cause of the Williston, Florida, crash was the truck driver's failure to yield the right of way to the car, combined with the car driver's inattention due to overreliance on vehicle automation, which resulted in the car driver's lack of reaction to the presence of the truck. Contributing to the car driver's overreliance on the vehicle automation was its operational design, which permitted his prolonged disengagement from the driving task and his use of the automation in ways inconsistent with guidance and warnings from the manufacturer.

# 4 Recommendations

## 4.1 New Recommendations

As a result of its investigation, the National Transportation Safety Board makes the following new safety recommendations:

**To the US Department of Transportation:**

Define the data parameters needed to understand the automated vehicle control systems involved in a crash. The parameters must reflect the vehicle's control status and the frequency and duration of control actions to adequately characterize driver and vehicle performance before and during a crash. (H-17-37)

**To the National Highway Traffic Safety Administration:**

Develop a method to verify that manufacturers of vehicles equipped with Level 2 vehicle automation systems incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed. (H-17-38)

Use the data parameters defined by the US Department of Transportation in response to Safety Recommendation H-17-37 as a benchmark for new vehicles equipped with automated vehicle control systems so that they capture data that reflect the vehicle's control status and the frequency and duration of control actions needed to adequately characterize driver and vehicle performance before and during a crash; the captured data should be readily available to, at a minimum, National Transportation Safety Board investigators and National Highway Traffic Safety Administration regulators. (H-17-39)

Define a standard format for reporting automated vehicle control systems data, and require manufacturers of vehicles equipped with automated vehicle control systems to report incidents, crashes, and vehicle miles operated with such systems enabled. (H-17-40)

**To manufacturers of vehicles equipped with Level 2 vehicle automation systems (Volkswagen Group of America, BMW of North America, Nissan Group of North America, Mercedes-Benz USA, Tesla Inc., and Volvo Car USA):**

Incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed. (H-17-41)

Develop applications to more effectively sense the driver's level of engagement and alert the driver when engagement is lacking while automated vehicle control systems are in use. (H-17-42)

                                                      CORRECTED COPY

**To the Alliance of Automobile Manufacturers and to the Association of Global Automakers:**

> Notify your members of the importance of incorporating system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed. (H-17-43)

## 4.2 Reiterated Recommendations

As a result of its investigation, the National Transportation Safety Board reiterates the following safety recommendations:

**To the National Highway Traffic Safety Administration:**

> Develop minimum performance standards for connected vehicle technology for all highway vehicles. (H-13-30)

> Once minimum performance standards for connected vehicle technology are developed, require this technology to be installed on all newly manufactured highway vehicles. (H-13-31)

## BY THE NATIONAL TRANSPORTATION SAFETY BOARD

**ROBERT L. SUMWALT, III**
Chairman

**EARL F. WEENER**
Member

**CHRISTOPHER A. HART**
Member

**T. BELLA DINH-ZARR**
Member

**Adopted: September 12, 2017**

**Member Hart filed the following concurring statement on September 14, 2017.**

# Board Member Statement

**Notation 56955:** *Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck, Near Williston, Florida, May 7, 2016 (HWY16FH018)*

### Member Christopher A. Hart, Concurring

I concur with the report and its findings, probable cause, and recommendations, and I would like to add some additional comments.

Because more than 90% of motor vehicle crashes are attributed to driver error, automation in cars offers significant potential to save tens of thousands of lives every year by eventually replacing the driver. However, introducing automation into such a complex and unstructured environment will be very challenging and must be pursued thoughtfully and with considerable caution.

Early automation history in aviation includes many examples in which automation was introduced because the industry had the technological capability to do it. They learned from experience that automation "because we can" does not necessarily make the human-automation system work better. That resulted in an evolution toward "human-centric" automation, in which the objective was improving the overall performance of the human-automation system. This crash is an example of what can happen when automation is introduced "because we can" without adequate consideration of the human element.

The human element was not adequately considered in several ways. First, the owner's manual warns that the Autopilot mode, the automation mode that was being used when this crash occurred, should be used "only on highways and limited access roads." Aside from the ambiguity of this warning – route US-27A, on which this crash occurred, is arguably a highway – it fails to consider the human reality that very few owners, and even fewer non-owner drivers, read the manual. Some may look at it only twice a year, to reset the clock when daylight savings time begins and ends.

Second, even if the owner or non-owner driver reads the manual, he or she may not remember it or follow it. Moreover, many owners who are impressed with the amazing things that their car can do may experiment to find out how far they can stretch the boundaries of what it can do.

Adding to the problem is the moniker "Autopilot." In aviation, airline pilots know that even when the autopilot is controlling their airplane, the pilots still play a crucial role. Joe and Suzy Public, on the other hand, may conclude from the name "autopilot" that they need not pay any attention to the driving task because the autopilot is doing everything.

This crash demonstrates that not all owners will read and follow the owner's manual, so the automated systems must be designed to function only in circumstances for which they were designed rather than leaving that decision up to the driver.

The system that monitors and responds to lack of driver engagement also reflects inadequate consideration of the human element. First, the mere fact that the driver touches and moves the steering wheel from time to time does not necessarily indicate that the driver is engaged in the driving task. Designing the system to stop the car in the travel lane after a certain number of warnings about nonresponsiveness, as some automakers are doing, is also very troubling because stopping in a travel lane on a high-speed road greatly increases the likelihood of serious collisions.

More specifically, we have investigated many crashes on interstate highways – limited access roads – involving crashes into cars that were slowed or stopped, often for construction. Most of those crashes occurred despite the existence of numerous conspicuous warning signs in the mile or two leading up to the construction. There will be no warning signs leading up to a stopped vehicle, and without those warning signs, the likelihood of such a crash will obviously be much greater. Although it is clearly undesirable to have a car with an unresponsive driver traveling at high speed, query which is worse -- the collision of a high-speed car with an unresponsive driver into whatever happens to be in the way, or the potential chain collision of one or more high-speed cars and trucks into a stopped car. The anticipated safety benefits of automation are obviously considerable, but if there is no "graceful exit" from the scenario if something does not go as designed, query whether the entire scenario should be avoided.

In aviation, although automation has generated substantial safety, efficiency, and other benefits, we will not see airliners without pilots any time soon because no graceful exit has yet been developed from that scenario (a) if the automation encounters a situation that was not contemplated by the designer, such as in Sioux City, Iowa, in 1989, when an uncontained engine explosion resulted in the loss of all three of the airplane's hydraulic systems, or in New York City in 2009 when both of the airplane's engines were damaged beyond operability by ingesting birds; or (b) if the automation fails.

The potential benefits of automation on our streets and highways are truly phenomenal, but they must be pursued carefully and thoughtfully, and hopefully the automakers will inform the process with automation lessons learned from aviation and elsewhere.

**Chairman Robert L. Sumwalt, III, joined this statement.**

# Appendix A. Investigation

The National Transportation Safety Board (NTSB) became aware of the Williston, Florida, crash after Tesla notified the National Highway Traffic Safety Administration (NHTSA) of the event and after NHTSA opened a defect investigation of the Tesla Autopilot and automatic emergency braking systems. Tesla sent representatives to Ocala, Florida, to assist the Florida Highway Patrol in downloading data from the vehicle. The crash occurred on May 7, 2016; the NTSB dispatched an investigative team on July 13, 2016. Due to the delayed launch, the NTSB took the case as a field investigation. Once on scene, investigators determined that a complete investigation, including crash reconstruction, could be accomplished. The NTSB established groups to investigate human performance, data recorders, motor carrier operations, traumatology, highway factors, and vehicle factors.

Parties to the investigation were Tesla Inc. and the Florida Highway Patrol.

# Appendix B. Tesla's Automated Vehicle Control Systems and Subsystems

| Automation System | Subsystem | Functional Description |
|---|---|---|
| AUTOPARK | n/a | *Autopark* is a convenience feature that provides assistance when parking. It offers two different functionalities that differ in the level of assistance: (1) the system can provide partially autonomous parallel and perpendicular parking on demand when the driver is in the Tesla, and (2) the system can autonomously park and retrieve the Tesla from a designated parked location without a driver being in the vehicle. |
| SPEED ASSIST | n/a | *Speed Assist* is a safety feature that provides a warning when the driver exceeds the speed limit. Speed limit information is derived from the camera system and the Tesla's GPS mapping information. |
| LANE ASSIST | Side Collision Warning | *Side Collision Warning* is a crash avoidance system that provides a graded warning (visual warning only for least urgent, visual and auditory warning for most urgent) when another vehicle enters the Tesla's blind spot or travels too close to its side. |
|  | Lane Departure Warning | *Lane Departure Warning* is a crash avoidance system that provides a haptic warning when the vehicle's front wheel crosses a lane marking and the associated turn signal is not active. The haptic warning is presented as a vibration of the steering wheel. This vibration does not result in any steering corrections; it is intended only to orient the driver's attention to the lane departure. |
|  | Autonomous Steering Intervention | *Autonomous Steering Intervention* is a crash avoidance system that provides automated corrective steering intervention when the Tesla drifts into or close to an adjacent lane in which another vehicle is detected. The automated steering correction brings the Tesla back to the center of its own traveling lane. Concurrent to the steering correction, a visual warning is presented on the instrument panel. The system is disabled if Autosteer is activated. |
| *(Table continues on next page)* | | |

| Automation System | Subsystem | Functional Description |
|---|---|---|
| FORWARD COLLISION AVOIDANCE | Forward Collision Warning (FCW) | **FCW** is a crash avoidance system that provides a visual and auditory warning regarding a potential forward collision (rear-end crash). The visual warning appears on the Tesla's instrument panel and consists of an icon of a red vehicle in front of the Tesla vehicle icon. The auditory warning consists of a chime. The warnings remain until the driver brakes or steers away from the forward hazard. |
| | Automatic Emergency Braking (AEB) | **AEB** is a crash avoidance system that automatically applies brakes when it determines that a frontal collision is unavoidable. The system is designed to mitigate the severity of the crash, although in some cases it may even prevent the collision. The braking is automatic. When the system automatically applies brakes, it also presents visual and auditory alerts. The visual warning consists of a rectangular bar in the instrument panel with lettering that reads "Emergency Braking in Progress." The auditory warning consists of a chime. |
| AUTOPILOT | Traffic-Aware Cruise Control (TACC) | **TACC** is a convenience feature. After the driver activates TACC and selects a cruising speed, the system (1) maintains the set cruise speed as long as the forward area is not obstructed, (2) decelerates the Tesla when it detects a vehicle ahead and then maintains a set following distance, and (3) resumes the set cruise speed when the forward area is no longer obstructed. When necessary to maintain a set following distance, TACC applies braking force that results in deceleration of up to 0.5G. The driver can select the following distance—how closely to follow a leading vehicle. TACC has an Overtake Acceleration function that, in conjunction with Auto Lane Change, will automatically accelerate the Tesla to the set cruising speed once it is in a passing lane. |
| | Autosteer | **Autosteer** is a convenience feature that automatically steers the Tesla and keeps it within the traveling lane. Autosteer can be activated only after activating TACC; Autosteer cannot operate without TACC. When Autopilot (TACC and Autosteer) is activated, the system (1) monitors the environment on the travel path, (2) maintains the set cruise velocity, (3) maintains the Tesla's position in the traveling lane, (4) brakes when it detects a slower-moving vehicle or an obstacle ahead, and (5) decelerates and follows a leading slower-moving vehicle at the predetermined following distance. Autosteer detects lane markings and the presence of other vehicles and objects ahead, to maintain the Tesla within the lane. When Autosteer is activated, an icon of a blue steering wheel appears on the instrument panel. |
| | Auto Lane Change | With Autosteer activated, **Auto Lane Change** moves the Tesla into an adjacent travel turn lane as indicated by an activated turn signal. Auto Lane Change can only operate in conjunction with Autosteer and when the Lane Assist system does not detect another vehicle in the blind spot. |

# Appendix C. Alert Timing Sequence for Tesla Autopilot Version 8



**Figure C-1.** Autopilot system alert timing sequence for version 8.

Since the crash, Tesla has implemented several changes to the Autopilot system, including reducing the allowed driver hands-off time. In addition, the timing of the initial visual warning is now dependent on the type of road and the speed at which the vehicle is traveling.

If the driver is driving on an unrestricted road—with a center divider or limited access—with maximum cruise speed of 90 mph, the initial visual warning for hands-off operation would occur after 3 minutes. If the driver does not place hands on the steering wheel within 15 seconds of the initial warning, an auditory warning sounds, followed by another auditory warning of greater intensity. If the driver does not place hands on the steering wheel within 5 seconds of the second auditory warning, the system initiates controlled deceleration of the vehicle. Furthermore, at that time, the system disables the use of Autopilot for the rest of that ignition cycle.

Tesla also added another constraint to Autopilot 8; Tesla referred to this as a "three strikes and you're out" rule. If any three warnings occur during a single trip, that sequence will cause Autopilot to be disabled for the remainder of the trip.

# References

AASHTO (American Association of State Highway and Transportation Officials). 2011. *A Policy on Geometric Design of Highways and Streets,* 6th edition. Washington, DC: AASHTO.

Agurell, S., M. Halldin, J.E. Lindgren, A. Ohlsson, M. Widman, H. Gillespie, and L. Hollister. 1986. "Pharmacokinetics and Metabolism of Delta 1-Tetrahydrocannabinol and Other Cannabinoids with Emphasis on Man." *Pharmacological Reviews* 38(1): 21–43.

Bergamaschi, M., E. Karschner, R. Goodwin, K. Scheidweiler, J. Hirvonen, R. Queiroz, and M. Huestis. 2013. "Impact of Prolonged Cannabinoid Excretion in Chronic Daily Cannabis Smokers' Blood on Per Se Drugged Driving Laws." *Clinical Chemistry* 59(3): 519–526.

Brumbelow, M.L. 2012. "Potential Benefits of Underride Guards in Large Truck Crashes." *Traffic Injury Prevention* 13: 592–599.

Carpenter, Michael G., Michael Feldmann, Thomas M. Fornari, M. Todd Moury, Christopher D. Walker, Timothy D. Zwicky, and Steven M. Kiger. 2011. *Objective Tests for Automatic Crash Imminent Braking (CIB) Systems Final Report*. Vol. 1 of 2. DOT HS 811 521, Washington, DC: NHTSA.

Chang, James. 2016. *Summary of NHTSA Heavy-Vehicle Vehicle-to-Vehicle Safety Communications Research*. DOT HS 812 300. Washington, DC: NHTSA.

Choi, Eun-Ha. 2010. *Crash Factors in Intersection-Related Crashes: An On-Scene Perspective*. DOT HS 811 366. Washington, DC: NHTSA.

*Consumer Reports* magazine. 2017. April 2017 (Annual Auto Issue). Vol. 82, No. 4. Consumers Union.

CAMP (Crash Avoidance Metrics Partnership). 2016. *AVR Project Final Report*. NHTSA Docket No. 2014-0070.

FHWA (Federal Highway Administration). 2009. *Manual on Uniform Traffic Control Devices for Streets and Highways*. Washington, DC: FHWA.

——. 2013. *Highway Functional Classification: Concepts, Criteria and Procedures*. Washington, DC: FHWA.

Harding, John, Gregory Powell, Rebecca Yoon, Joshua Fikentscher, Charlene Doyle, Dana Sade, Mike Lukuc, Jim Simons, and Jing Wang. 2014. *Vehicle-to-Vehicle Communication: Readiness of V2V Technology for Application*. DOT HS 812 014. Washington, DC: NHTSA.

Hartman, R.L., T.L. Brown, G. Milavetz, A. Spurgin, D.A. Gorelick, G.R. Gaffney, M.A. Huestis. 2016. "Effect of Blood Collection Time on Measured Δ9-Tetrahydrocannabinol Concentrations: Implications for Driving Interpretation and Drug Policy." *Clinical Chemistry* 62(2): 367–377.

Hedlund, James. 2017. *Autonomous Vehicles Meet Human Drivers: Traffic Safety Issues for States*. Washington, DC: Governors Highway Safety Association.

Huestis, M.A., J.E. Henningfield, and E.J. Cone. 1992. "Blood Cannabinoids I. Absorption of THC and Formation of 11-OH-THC and THCCOOH During and After Smoking Marijuana." *Journal of Analytical Toxicology* 16: 276–282.

Kidd, David. 2016. Comments on behalf of the Insurance Institute for Highway Safety at the DOT Public Meeting on Federal Automated Policy, November 10, 2016.

McDonald, Ashley B., Daniel V. McGehee, Susan T. Chrysler, Natoshia M. Askelson, Linda S. Angell, and Bobbie D. Seppelt. 2016. "National Survey Identifying Gaps in Consumer Knowledge of Advanced Vehicle Safety Systems." *Transportation Research Record* 2559.

Moray, N., and T. Inagaki. 2000. "Attention and Complacency." *Theoretical Issues in Ergonomics Science* 1: 354–365.

NHTSA (National Highway Traffic Safety Administration). 2016. *Federal Automated Vehicles Policy—Accelerating the Next Revolution in Roadway Safety*. NHTSA docket 2016-0090. Washington, DC: NHTSA. (See AV Policy.)

——. 2017. ODI Resume report from NHTSA Office of Defects Investigation on Investigation PE 16-007 concerning Tesla automatic vehicle control systems. (See ODI report.)

NTSB (National Transportation Safety Board). 1995. *Multiple Vehicle Collision With Fire During Fog Near Milepost 118 on Interstate 40, Menifee, Arkansas, January 9, 1995*. Highway Accident Report NTSB/HAR-95/03. Washington, DC: NTSB.

——. 2013. *School Bus and Truck Collision at Intersection Near Chesterfield, New Jersey, February 16, 2012*. Highway Accident Report NTSB/HAR-13/01. Washington, DC: NTSB.

——. 2015. *The Use of Forward Collision Avoidance Systems to Prevent and Mitigate Rear-End Crashes*. Special Investigation Report NTSB/SIR-15/01. Washington, DC: NTSB.

——. 2017. NTSB memorandum to NHTSA regarding docket no. NHTSA-2016-0126, dated March 29, 2017.

Parasuraman, R., and D.H. Manzey. 2010. "Complacency and Bias in Human Use of Automation: An Attentional Integration." *Human Factors* 52(3): 381–410.

Parasuraman, R., R. Molloy, and I.L. Singh. 1993. "Performance Consequences of Automation-Induced 'Complacency'." *International Journal of Aviation Psychology* 3: 1–23.

Parasuraman, R., and V. Riley. 1997. "Humans and Automation: Use, Misuse, Disuse, Abuse." *Human Factors* 39(2): 230–253.

SAE International. 2016. *Surface Vehicle Recommended Practice J3016—Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles*. See SAE Standards webpage.

Scanlon, J.M., R. Sherony, and H.C. Gabler. 2017. "Injury Mitigation Estimates for an Intersection Driver Assistance System in Straight Crossing Path Crashes in the U.S." *Traffic Injury Prevention*. Published online March 21, 2017.

Tesla Inc. 2016. *Tesla Model S Owner's Manual*.

Toma, Samuel, Elizabeth Swanson, John D. Smith, and Wassim G. Najm. 2014. *Heavy Truck Pre-Crash Scenarios for Safety Applications Based on Vehicle-to-Vehicle Communications*. DOT HS 812 023. Washington, DC: NHTSA.

United Nations Economic Commission for Europe. 2004. *Official Journal of the European Union*, Regulation 73: "Uniform provisions concerning the approval of goods vehicles, trailers and semi-trailers with regard to their lateral protection" (March 31, 2004).

Wall, M.E., and M. Perez-Reyes. 1981. "The Metabolism of Delta 9-Tetrahydrocannabinol and Related Cannabinoids in Man." *Journal of Clinical Pharmacology* 21 (8-9 Suppl.): 178S–189S.

New Safety Recommendations

| Safety Recommendation Number | Safety Recommendation Recipient | Safety Recommendation Text |
|---|---|---|
| H-17-037 | United States Department of Transportation | Define the data parameters needed to understand the automated vehicle control systems involved in a crash. The parameters must reflect the vehicle's control status and the frequency and duration of control actions to adequately characterize driver and vehicle performance before and during a crash. |
| H-17-038 | National Highway Traffic Safety Administration | Develop a method to verify that manufacturers of vehicles equipped with Level 2 vehicle automation systems incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed. |
| H-17-039 | National Highway Traffic Safety Administration | Use the data parameters defined by the US Department of Transportation in response to Safety Recommendation H-17-37 as a benchmark for new vehicles equipped with automated vehicle control systems so that they capture data that reflect the vehicle's control status and the frequency and duration of control actions needed to adequately characterize driver and vehicle performance before and during a crash; the captured data should be readily available to, at a minimum, National Transportation Safety Board investigators and National Highway Traffic Safety Administration regulators. |



Exhibit #

Sumwalt 4

7/9/2024

| Safety Recommendation Number | Safety Recommendation Recipient | Safety Recommendation Text |
|---|---|---|
| H-17-040 | National Highway Traffic Safety Administration | Define a standard format for reporting automated vehicle control systems data, and require manufacturers of vehicles equipped with automated vehicle control systems to report incidents, crashes, and vehicle miles operated with such systems enabled. |
| H-17-041 | Manufacturers of vehicles equipped with Level 2 vehicle automation systems (Volkswagen Group of America, BMW of North America, Nissan Group of North America, Mercedes-Benz USA, Tesla Inc., and Volvo Group North America) | Incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed. |
| H-17-042 | Manufacturers of vehicles equipped with Level 2 vehicle automation systems (Volkswagen Group of America, BMW of North America, Nissan Group of North America, Mercedes-Benz USA, Tesla Inc., and Volvo Group North America) | Develop applications to more effectively sense the driver's level of engagement and alert the driver when engagement is lacking while automated vehicle control systems are in use. |
| H-17-043 | Alliance of Automobile Manufacturers and to the Association of Global Automakers | Notify your members of the importance of incorporating system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed. |

Reiterated Safety Recommendations

| Safety Recommendation Number | Safety Recommendation Recipient | Safety Recommendation Text |
|---|---|---|
| H-13-030 | National Highway Traffic Safety Administration | Develop minimum performance standards for |

| Safety Recommendation Number | Safety Recommendation Recipient | Safety Recommendation Text |
|---|---|---|
| | | connected vehicle technology for all highway vehicles. |
| H-13-031 | National Highway Traffic Safety Administration | Once minimum performance standards for connected vehicle technology are developed, require this technology to be installed on all newly manufactured highway vehicles. |

September 28, 2017

The Honorable Secretary Elaine L. Chao
Secretary of Transportation
US Department of Transportation

On September 12, 2017, the NTSB adopted its report *Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016,* NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations is one issued to the US Department of Transportation, which can be found on page 43 of the report.

The NTSB is vitally interested in this recommendation because it is designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement this recommendation. When replying, please refer to the safety recommendation by number. We encourage you to submit your response to correspondence@ntsb.gov. If it exceeds 10 megabytes, including attachments, please e-mail us at the same address for instructions. Please do not submit both an electronic copy and a hard copy of the same response.



September 28, 2017

Mr. Jack Danielson

Acting Deputy Administrator
National Highway Traffic Safety Administration

On September 12, 2017, the NTSB adopted its report *Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016,* NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are three new recommendations and two reiterated recommendations issued to the National Highway Traffic Safety Administration, which can be found on pages 43 and 44 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number. We encourage you to submit your response to correspondence@ntsb.gov. If it exceeds 10 megabytes, including attachments, please e-mail us at the same address for instructions. Please do not submit both an electronic copy and a hard copy of the same response.



September 28, 2017

Mr. Thomas Zorn
General Manager, Safety Affairs and Vehicle Testing
Volkswagen Group of America

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report *Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016,* NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to Volkswagen Group of America, which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number. We encourage you to submit your response to correspondence@ntsb.gov. If it exceeds 10 megabytes, including attachments, please e-mail us at the same address for instructions. Please do not submit both an electronic copy and a hard copy of the same response.



September 28, 2017

Mr. Bryan Jacobs
Vice President, Government and External Affairs
BMW of North America

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report *Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016,* NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to BMW of North America, which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number. We encourage you to submit your response to correspondence@ntsb.gov. If it exceeds 10 megabytes, including attachments, please e-mail us at the same address for instructions. Please do not submit both an electronic copy and a hard copy of the same response.



September 28, 2017

Ms. Tracy Woodard

Director, Government Affairs
Nissan Group of North America

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report *Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016*, NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to Nissan Group of North America, which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number. We encourage you to submit your response to correspondence@ntsb.gov. If it exceeds 10 megabytes, including attachments, please e-mail us at the same address for instructions. Please do not submit both an electronic copy and a hard copy of the same response.



September 28, 2017

Mr. David Tait

General Manager, Engineering Services
Mercedes-Benz USA

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report *Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016,* NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to Mercedes-Benz USA, which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number. We encourage you to submit your response to correspondence@ntsb.gov. If it exceeds 10 megabytes, including attachments, please e-mail us at the same address for instructions. Please do not submit both an electronic copy and a hard copy of the same response.



September 28, 2017

Mr. Diarmuid O'Connell

Vice President of Business Development
Tesla Inc.

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report *Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016,* NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to Tesla Inc., which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number. We encourage you to submit your response to correspondence@ntsb.gov. If it exceeds 10 megabytes, including attachments, please e-mail us at the same address for instructions. Please do not submit both an electronic copy and a hard copy of the same response.



September 28, 2017

Mr. Timothy L. Lafon

Vice President, Regulatory Affairs
Volvo Group North America

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report *Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016*, NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to Volvo Group North America, which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number. We encourage you to submit your response to correspondence@ntsb.gov. If it exceeds 10 megabytes, including attachments, please e-mail us at the same address for instructions. Please do not submit both an electronic copy and a hard copy of the same response.



September 28, 2017

Mr. David Schwietert
Executive Vice President, Federal and Government Relations and Public Policy
Alliance of Automobile Manufacturers

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report *Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016,* NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations is one issued to the Alliance of Automobile Manufacturers, which can be found on page 44 of the report.

The NTSB is vitally interested in this recommendation because it is designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement this recommendation. When replying, please refer to the safety recommendation by number. We encourage you to submit your response to correspondence@ntsb.gov. If it exceeds 10 megabytes, including attachments, please e-mail us at the same address for instructions. Please do not submit both an electronic copy and a hard copy of the same response.



September 28, 2017

Mr. Steve Gehring
Vice President, Vehicle Safety and Connected Automation

Association of Global Automakers

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report *Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016*, NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations is one issued to the Association of Global Automakers, which can be found on page 44 of the report.

The NTSB is vitally interested in this recommendation because it is designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement this recommendation. When replying, please refer to the safety recommendation by number. We encourage you to submit your response to correspondence@ntsb.gov. If it exceeds 10 megabytes, including attachments, please e-mail us at the same address for instructions. Please do not submit both an electronic copy and a hard copy of the same response.



September 28, 2017

Mr. Jack Danielson

Acting Deputy Administrator
National Highway Traffic Safety Administration

On September 12, 2017, the NTSB adopted its report *Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016,* NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are three new recommendations and two reiterated recommendations issued to the National Highway Traffic Safety Administration, which can be found on pages 43 and 44 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number. We encourage you to submit your response to correspondence@ntsb.gov. If it exceeds 10 megabytes, including attachments, please e-mail us at the same address for instructions. Please do not submit both an electronic copy and a hard copy of the same response.



Safety Recommendation Reiteration List

| SR Number | Reiteration Number | Report Number | Report Date | Accident Description | Accident City | Accident State | Accident Date |
|---|---|---|---|---|---|---|---|
| H-17-037 | 1 | HAR-20-01 | 3/19/2020 | Collision Between a Sport Utility Vehicle Operating With Partial Driving Automation and a Crash Attenuator Mountain View, California March 23, 2018 | Mountain View | CA | 3/23/2018 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Safety Recommendation Reiteration List

| SR Number | Reiteration Number | Report Number | Report Date | Accident Description | Accident City | Accident State | Accident Date |
|---|---|---|---|---|---|---|---|
| H-17-038 | 1 | HAR-20-01 | 3/19/2020 | Collision Between a Sport Utility Vehicle Operating With Partial Driving Automation and a Crash Attenuator Mountain View, California March 23, 2018 | Mountain View | CA | 3/23/2018 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Safety Recommendation Reiteration List

| SR Number | Reiteration Number | Report Number | Report Date | Accident Description | Accident City | Accident State | Accident Date |
|---|---|---|---|---|---|---|---|
| H-17-039 | 1 | HAR-20-01 | 3/19/2020 | Collision Between a Sport Utility Vehicle Operating With Partial Driving Automation and a Crash Attenuator Mountain View, California March 23, 2018 | Mountain View | CA | 3/23/2018 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Safety Recommendation Reiteration List

| SR Number | Reiteration Number | Report Number | Report Date | Accident Description | Accident City | Accident State | Accident Date |
|---|---|---|---|---|---|---|---|
| H-17-040 | 1 | HAR-20-01 | 3/19/2020 | Collision Between a Sport Utility Vehicle Operating With Partial Driving Automation and a Crash Attenuator Mountain View, California March 23, 2018 | Mountain View | CA | 3/23/2018 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Safety Recommendation Reiteration List

| SR Number | Reiteration Number | Report Number | Report Date | Accident Description | Accident City | Accident State | Accident Date |
|---|---|---|---|---|---|---|---|
| H-17-041 | 1 | HAR-20-01 | 3/19/2020 | Collision Between a Sport Utility Vehicle Operating With Partial Driving Automation and a Crash Attenuator Mountain View, California March 23, 2018 | Mountain View | CA | 3/23/2018 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Safety Recommendation Reiteration List

| SR Number | Reiteration Number | Report Number | Report Date | Accident Description | Accident City | Accident State | Accident Date |
|---|---|---|---|---|---|---|---|
| H-17-042 | 1 | HAR-20-01 | 3/19/2020 | Collision Between a Sport Utility Vehicle Operating With Partial Driving Automation and a Crash Attenuator Mountain View, California March 23, 2018 | Mountain View | CA | 3/23/2018 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

# Safety Recommendation H-17-041

TO THE MANUFACTURERS OF VEHICLES EQUIPPED WITH LEVEL 2 VEHICLE AUTOMATION SYSTEMS (VOLKSWAGEN GROUP OF AMERICA, BMW OF NORTH AMERICA, NISSAN GROUP OF NORTH AMERICA, MERCEDES-BENZ USA, TESLA INC., AND VOLVO GROUP NORTH AMERICA): Incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed.

# Recommendation Details

📄 Original recommendation transmittal letter

| | |
|---|---|
| Overall status | ✅ Open - Acceptable Response |
| Mode | 🚗 Highway |
| On Most Wanted List | No |
| Priority level | Non-urgent |
| Times reiterated | 1 |
| Is hazmat | No |
| Is NPRM | Yes |
| SR coding | |
| Date issued | 09/28/2017 |
| Overall date closed | |



Exhibit #

Sumwalt 5

7/9/2024

# Event Details - HWY16FH018

At 4:36 p.m. eastern daylight time on Saturday, May 7, 2016, a 2015 Tesla Model S 70D car, traveling eastbound on US Highway 27A (US-27A) west of Williston, Florida, struck a semitrailer powered by a 2014 Freightliner Cascadia truck tractor. At the time of the collision, the truck was making a left turn from westbound US 27A across the two eastbound travel lanes onto NE 140th Court, a local paved road. The car struck the right side of the semitrailer, crossed underneath it, and then went off the right roadside at a shallow angle. Impact with the underside of the semitrailer sheared off the roof of the car.

After leaving the roadway, the car continued through a drainage culvert and two wire fences. It

then struck and broke a utility pole, rotated counterclockwise, and came to rest perpendicular to the highway in the front yard of a private residence. Meanwhile, the truck continued across the intersection and came to a stop on NE 140th Court, south of a retail business located on the intersection corner.

The driver and sole occupant of the car died in the crash; the commercial truck driver was not injured.

| | |
|---|---|
| Location | Williston, USA |
| Accident date | 05/08/2016 |
| Accident # | HWY16FH018 |
| Report # | HAR-17-02 |

# Addressee Details

✅ Volkswagen Group of America, Inc. - Open - Acceptable Response ⌄

✅ BMW North America, LLC - Open - Acceptable Response ⌄

✅ Nissan Group of North America, Inc. - Open - Acceptable Response ⌄

✅ Mercedes-Benz USA, LLC - Open - Acceptable Response ⌄

🔷 Tesla Motors - Open - Unacceptable Response ⌃

| | |
|---|---|
| Name | Tesla Motors |
| Acronym | |
| Category | Private Industry |
| Addressee status | Open - Unacceptable Response |

| | |
|---|---|
| From | NTSB |
| To | Tesla Motors |
| Date | 10/25/2021 |
| Type | Official Correspondence |
| Response | |

The National Transportation Safety Board (NTSB) appreciates the productive and professional cooperation extended by Tesla's technical staff to our investigators over the course of our various crash and incident investigations, such as our recent work in Spring, Texas, and Coral Gables, Florida.

I am deeply concerned, however, that Tesla's action—or rather, inaction—to

implement critical NTSB safety recommendations has not demonstrated the same productivity or professionalism. Four years ago, on September 28, 2017, we issued Safety Recommendations H 17 41 and -42 to Tesla based on our investigation of the 2016 collision between a Tesla Model S operating with an engaged Level 2 automation system and a tractor semitrailer truck in Williston, Florida.

H-17-41

Incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed.

H-17-42

Develop applications to more effectively sense the driver's level of engagement and alert the driver when engagement is lacking while automated vehicle control systems are in use.

Our investigation of the Williston crash found that the driver used the Autopilot system outside of its operational design domain (ODD)—on roadways for which it was neither designed nor safe—and went extended periods of time without hands-on driving. We also found other indications of the driver's lack of engagement and awareness before the crash, and, accordingly,
determined that Tesla's Autopilot system did not effectively monitor and respond to the driver's interaction with the steering wheel to ensure driver engagement.

The NTSB issued Safety Recommendation H-17-42 to Tesla and five other manufacturers of vehicles equipped with SAE Level 2 driving automation systems. The other five manufacturers responded to us, describing the actions they planned to take, or were taking, to better monitor a driver's level of engagement. Tesla is the only manufacturer that did not officially respond to us about the recommendation.

While we were awaiting a response from Tesla, in 2019, a crash nearly identical to that in Williston occurred in Delray Beach, Florida. The Delray Beach highway operating environment, like the cross-traffic conditions in Williston, was clearly outside the Autopilot system's ODD. The highway did not have limited access and had 34 intersecting roadways and private driveways in the 5-mile region encompassing the crash location. As we concluded after the Williston crash, if

automated control systems are not automatically restricted to operating in those conditions for which they were designed and are appropriate, the risk of driver misuse remains.

During our subsequent investigation of a fatal 2018 crash in Mountain View, California, Tesla stated the following:

Under the SAE J3016, operational design domain limits are not applicable for Level 2 driver assist systems, such as Autopilot, because the driver determines the acceptable operating environment. Autopilot can be safely used on divided and undivided roads as long as the driver remains attentive and ready to take control.

However, our crash investigations involving your company's vehicles have clearly shown that the potential for misuse requires a system design change to ensure safety. In the Delray Beach crash, a contributing factor in the crash was the operational design of Tesla's partial automation system, which permitted disengagement by the driver, and the company's failure to limit the use of the system to the conditions for which it was designed. Our investigation of the Mountain View crash found tragically similar evidence of driver disengagement and ineffective driver monitoring, and our report stated the following:

Despite communicating . . . operating conditions and limitations to owners and drivers, Tesla Autopilot firmware does not restrict the system's use based on functional road classification. The system can essentially be used on any roads where it can detect lane markings, which allows drivers to activate driving automation systems at locations and under circumstances for which their use is not appropriate or safe, such as on roadways with cross traffic or in areas that do not consistently meet the ODD, such as roadways with inconsistent lane markings.

Therefore, we reiterated Safety Recommendations H-17-41 and -42: that Tesla and other manufacturers of Level 2 automation incorporate system safeguards that limit use of automated vehicle control systems to those conditions for which they were designed. Tesla has still not officially responded to the NTSB regarding these safety recommendations.

You have stated that "safety is always the primary design requirement for a Tesla." Now that statement is undercut by the announcement that Tesla drivers can request access to "Full Self Driving Beta technology," operational on both

highways and city streets, without just addressing the very design shortcomings that allowed the fatal Williston, Delray Beach, and Mountain View crashes to occur.

If you are serious about putting safety front and center in Tesla vehicle design, I invite you to complete action on the safety recommendations we issued to you four years ago.

The NTSB has long advocated for implementation of myriad technologies to prevent tragedies and injuries and save lives on our nation's roads, but it's crucial that such technology is implemented with the safety of all road users foremost in mind. I look forward to receiving an update on our safety recommendations.

| | |
|---|---|
| From | NTSB |
| To | Tesla Motors |
| Date | 02/01/2021 |
| Type | NPRM Response |
| Response | |

The National Transportation Safety Board (NTSB) has reviewed the National Highway Traffic Safety Administration (NHTSA) advance notice of proposed rulemaking (ANPRM) titled "Framework for Automated Driving System Safety," published at 85 Federal Register 78058 on December 3, 2020. In its notice, NHTSA requests comments on the development of a framework for automated driving system (ADS) safety. ADS, as defined by SAE International and as used in the ANPRM, refers to driving automation levels 3, 4, and 5. An ADS is the hardware and software that are, collectively, capable of performing the entire dynamic driving task on a sustained basis, regardless of whether it is limited to a specific operational design domain. Specifically, the agency seeks input on its role in facilitating ADS risk management through guidance, regulation, or both. NHTSA also requests guidance on how it should select and design the structure of a safety framework and the appropriate administrative mechanisms for improving safety, mitigating risk, and enabling the development and introduction of innovative safety technology.

This recommendation was listed in the related safety recommendations list attached to this NPRM response.

From        NTSB
To          Tesla Motors
Date        03/19/2020
Type        Reiteration
Response

Reiterated in the report "Collision Between a Sport Utility Vehicle Operating With Partial Driving Automation and a Crash Attenuator Mountain View, California March 23, 2018" Accident Report NTSB/HAR-20/01, PB2020-100112, Published on March 19, 2020

From        NTSB
To          Tesla Motors
Date        03/19/2020
Type        Report Reclassification
Response

From "Collision Between a Sport Utility Vehicle Operating With Partial Driving Automation and a Crash Attenuator Mountain View, California March 23, 2018" Accident Report NTSB/HAR-20/01, PB2020-100112, Published on March 19, 2020: 2.3.2 Risk Assessment Pertaining to Operational Design Domain

SAE J3016 discusses the need for manufacturers to accurately describe ADAS features and clearly define the level of driving automation and its capabilities, but also its operational design domain (ODD)?the conditions in which the driving automation system is intended to operate.73 Examples of such conditions include roadway type, geographic location, clear roadway markings, weather conditions, speed range, lighting conditions, and other manufacturer-defined system performance criteria or constraints. As shown in appendix C and summarized below, Tesla has outlined many operating conditions and limitations based on the Autopilot system design:
• • Designed for use on highways with a center divider,
• • Designed for areas with no cross-traffic and clear lane markings,
• • Not for use on city streets or where traffic conditions are constantly changing,
• • Not for use on winding roads with sharp curves, and
• • Not for use in inclement weather conditions with poor visibility.

Despite communicating these operating conditions and limitations to owners and

drivers, Tesla Autopilot firmware does not restrict the system's use based on functional road classification. The system can essentially be used on any roads where it can detect lane markings, which allows drivers to activate driving automation systems at locations and under circumstances for which their use is not appropriate or safe, such as on roadways with cross traffic or in areas that do not consistently meet the ODD, such as roadways with inconsistent lane markings. The Mountain View crash occurred in a challenging multi-lane operational environment with exit ramps on both sides of the highway and faded roadway lane markings. To characterize and evaluate the performance of Level 2 systems on public highways and in naturalistic environments, the American Automobile Association (AAA) conducted testing, which found that Level 2 systems performed best on open freeways but were challenged on freeways with moderate traffic and in areas of transitions (AAA 2018).74 Most Level 2 systems were incapable of staying in their lane on curved portions of freeways, including in freeway transition areas.

SAE J3016 considers the ODD for Level 2 systems to be limited (see table 1). Today's Level 2 systems can assess a vehicle's location and the current roadway type/classification and determine whether the roadway is appropriate for the system's ODD. Despite this capability, Tesla has chosen to permit operation of Autopilot under conditions that do not meet its ODD. Tesla has informed the NTSB that its "operational design domain limits are not applicable for Level 2 driver assist systems, such as Autopilot, because the driver determines the acceptable operating environment." Moreover, Tesla has advised the NTSB that "Autopilot can be safely used on divided and undivided roads as long as the driver remains attentive and ready to take control."

The Williston, Florida, crash involved a 2015 Tesla Model S that collided with a tractor trailer combination crossing an uncontrolled intersection on a nonlimited-access highway.75 Partial automated vehicle operation on nonlimited-access highways presents challenges in detecting cross-path intrusions, pedestrian and bicycle traffic, and signage at intersections. Additionally, cross-path collisions are challenging for collision avoidance systems. The NTSB concluded in the investigation of the Williston crash that if automated vehicle control systems do not automatically restrict their own operation to those conditions for which they were designed and are appropriate, the risk of driver misuse remains. The NTSB recommended that Tesla and other manufacturers of Level 2 automation take the following action:

H-17-41

Incorporate system safeguards that limit the use of automated vehicle control

systems to those conditions for which they were designed.

Five automobile manufacturers responded to this recommendation with steps they were taking to address the issue. Tesla, however, has not responded. As mentioned previously, Tesla has stated that it does not believe ODD limits are applicable to the Autopilot system as long as the driver remains attentive. During the Mountain View investigation, Tesla was queried regarding plans to implement ODD restrictions and indicated that the driver was solely responsible for choosing when to use the SAE Level 2 system. However, Tesla vehicles continue to be involved in crashes where Autopilot is activated and operating outside the intended geographic ODD. In March 2019, in Delray Beach, Florida, a fatal crash involving a 2018 Tesla Model 3 occurred under circumstances very similar to the Williston crash. In the Delray Beach crash, a truck-tractor in combination with a semitrailer was traveling eastbound in a private driveway belonging to an agricultural facility on the west side of US-441. The combination vehicle entered the highway without stopping and was subsequently struck by the southbound Tesla. At the time of the crash, the Autopilot system was active, and the Tesla was traveling at 68 mph in a 55-mph posted speed limit area. The Autopilot system and collision avoidance systems did not classify the crossing truck as a hazard, did not attempt to slow the vehicle, and did not provide a warning to the driver of the approaching crossing truck. Further, the driver did not take evasive action in response to the crossing truck. At the crash location, the highway was not limited-access and had more than 34 roadways and private driveways intersecting US-441 within the immediate 5-mile area.

The Delray Beach highway operating environment, like the cross-traffic conditions in Williston, was clearly outside the Tesla Autopilot system's ODD. Tesla, however, fails to provide system safeguards to limit the use of Autopilot for the operating conditions for which it was designed. By placing full reliance on the success of its partial automation system on the premise that drivers will be attentive at all times and will be sufficiently knowledgeable to make proper decisions regarding where to operate the system, Tesla has created a system designed to fail because of the foreseeable misuse of the system. The NTSB concludes that if Tesla Inc. does not incorporate system safeguards that limit the use of the Autopilot system to those conditions for which it was designed, continued use of the system beyond its ODD is foreseeable and the risk for future crashes will remain. Therefore, the NTSB reiterates Safety Recommendation H-17-41 to Tesla and reclassifies the recommendation from "Open-Await Response" to OPEN--UNACCEPTABLE RESPONSE.

Without more rigorous standards or guidelines to manufacturers regarding Level 2

emerging automation technology, safeguards will be insufficient to prevent use of Level 2 systems in nondesigned ways. After the Williston crash, the NTSB recommended that NHTSA address this vital safety concern, as follows:

H-17-38

Develop a method to verify that manufacturers of vehicles equipped with Level 2 vehicle automation systems incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed.

In response to Safety Recommendation H-17-38, NHTSA stated the following:

The agency has no current plans to develop a specific method to verify manufacturers of vehicles equipped with Level 2 systems incorporate safeguards limiting the use of automated vehicle control systems to those conditions for which they were designed. Instead, if NHTSA identifies a safety-related defect trend in design or performance of a system, or identifies through its research or other

| From | NTSB |
|------|------|
| To | Tesla Motors |
| Date | 11/13/2017 |
| Type | NPRM Response |
| Response | |

The National Transportation Safety Board (NTSB) has reviewed the National Highway Traffic Safety Administration (NHTSA) notice of public availability and request for comments concerning the guidance document "Automated Driving Systems: A Vision for Safety," published at 82 Federal Register 178, September 15, 2017.

As a result of the Williston crash investigation, the NTSB issued multiple safety recommendations addressing the need to incorporate system safeguards to limit the use of automated vehicle control systems to those conditions for which they were designed. The NTSB also recommended that both the US Department of Transportation and NHTSA define the data parameters that must be recorded by vehicles operating with automated control systems of any level. We further recommended the establishment of reporting requirements for automated vehicles addressing incidents, crashes, and vehicle miles traveled with automated systems enabled. Finally, the NTSB recommended that manufacturers of Level 2 automated vehicle systems incorporate safeguards to limit system operations to

their intended domains, and develop more effective applications to sense the
driver's degree of engagement with the driving task.

| | |
|---|---|
| From | NTSB |
| To | Tesla Motors |
| Date | 09/28/2017 |
| Type | Transmittal Letter |
| Response | |

The National Transportation Safety Board (NTSB) is an independent federal
agency charged by Congress with investigating every civil aviation accident in the
United States and significant accidents in other modes of transportation—railroad,
highway, marine, and pipeline. We determine the probable cause of the accidents
and issue safety recommendations aimed at preventing future accidents. In
addition, we carry out special studies concerning transportation safety and
coordinate the resources of the federal government and other organizations to
provide assistance to victims and their family members affected by major
transportation disasters.

On September 12, 2017, the NTSB adopted its report Collision Between a Car
Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer
Truck Near Williston, Florida, May 7, 2016, NTSB/HAR-17/02. The details of this
accident investigation and the resulting safety recommendations may be found in
the attached report, which can also be accessed at http://www.ntsb.gov.
Among the Safety Recommendations are two issued to Tesla Inc., which can be
found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are
designed to prevent accidents and save lives. We would appreciate a response
within 90 days, detailing the actions you have taken or intend to take to implement
these recommendations. When replying, please refer to the safety
recommendations by number.

✅ Volvo Cars of North America, Inc. - Open - Acceptable Response  ⌄

1:12

## New Message          Cancel

To: **Elon Musk**

iMessage
Feb 25, 2020 at 2:57 PM





Exhibit #

**Sumwalt 6**

7/9/2024

exhibitsticker.com



# Safety Recommendation H-17-042

TO THE MANUFACTURERS OF VEHICLES EQUIPPED WITH LEVEL 2 VEHICLE AUTOMATION SYSTEMS (VOLKSWAGEN GROUP OF AMERICA, BMW OF NORTH AMERICA, NISSAN GROUP OF NORTH AMERICA, MERCEDES-BENZ USA, TESLA INC., AND VOLVO GROUP NORTH AMERICA): Develop applications to more effectively sense the driver's level of engagement and alert the driver when engagement is lacking while automated vehicle control systems are in use.

# Recommendation Details

📄 Original recommendation transmittal letter

| | |
|---|---|
| Overall status | ✅ Open - Acceptable Response |
| Mode | 🚗 Highway |
| On Most Wanted List | No |
| Priority level | Non-urgent |
| Times reiterated | 1 |
| Is hazmat | No |
| Is NPRM | Yes |
| SR coding | |
| Date issued | 09/28/2017 |
| Overall date closed | |



# Event Details - HWY16FH018

At 4:36 p.m. eastern daylight time on Saturday, May 7, 2016, a 2015 Tesla Model S 70D car, traveling eastbound on US Highway 27A (US-27A) west of Williston, Florida, struck a semitrailer powered by a 2014 Freightliner Cascadia truck tractor. At the time of the collision, the truck was making a left turn from westbound US 27A across the two eastbound travel lanes onto NE 140th Court, a local paved road. The car struck the right side of the semitrailer, crossed underneath it, and then went off the right roadside at a shallow angle. Impact with the underside of the semitrailer sheared off the roof of the car.

After leaving the roadway, the car continued through a drainage culvert and two wire fences. It

then struck and broke a utility pole, rotated counterclockwise, and came to rest perpendicular to the highway in the front yard of a private residence. Meanwhile, the truck continued across the intersection and came to a stop on NE 140th Court, south of a retail business located on the intersection corner.

The driver and sole occupant of the car died in the crash; the commercial truck driver was not injured.

| | |
|---|---|
| Location | Williston, USA |
| Accident date | 05/08/2016 |
| Accident # | HWY16FH018 |
| Report # | HAR-17-02 |

# Addressee Details

✅ Volkswagen Group of America, Inc. - Open - Acceptable Response ⌄

✅ BMW North America, LLC - Open - Acceptable Response ⌄

✅ Nissan Group of North America, Inc. - Open - Acceptable Response ⌄

✅ Mercedes-Benz USA, LLC - Open - Acceptable Response ⌄

ℹ️ Tesla Motors - Open - Unacceptable Response ⌃

| | |
|---|---|
| Name | Tesla Motors |
| Acronym | |
| Category | Private Industry |
| Addressee status | Open - Unacceptable Response |

| | |
|---|---|
| From | NTSB |
| To | Tesla Motors |
| Date | 10/25/2021 |
| Type | Official Correspondence |
| Response | |

The National Transportation Safety Board (NTSB) appreciates the productive and professional cooperation extended by Tesla's technical staff to our investigators over the course of our various crash and incident investigations, such as our recent work in Spring, Texas, and Coral Gables, Florida.

I am deeply concerned, however, that Tesla's action—or rather, inaction—to

implement critical NTSB safety recommendations has not demonstrated the same productivity or professionalism. Four years ago, on September 28, 2017, we issued Safety Recommendations H 17 41 and -42 to Tesla based on our investigation of the 2016 collision between a Tesla Model S operating with an engaged Level 2 automation system and a tractor semitrailer truck in Williston, Florida.

H-17-41

Incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed.

H-17-42

Develop applications to more effectively sense the driver's level of engagement and alert the driver when engagement is lacking while automated vehicle control systems are in use.

Our investigation of the Williston crash found that the driver used the Autopilot system outside of its operational design domain (ODD)—on roadways for which it was neither designed nor safe—and went extended periods of time without hands-on driving. We also found other indications of the driver's lack of engagement and awareness before the crash, and, accordingly,
determined that Tesla's Autopilot system did not effectively monitor and respond to the driver's interaction with the steering wheel to ensure driver engagement.

The NTSB issued Safety Recommendation H-17-42 to Tesla and five other manufacturers of vehicles equipped with SAE Level 2 driving automation systems. The other five manufacturers responded to us, describing the actions they planned to take, or were taking, to better monitor a driver's level of engagement. Tesla is the only manufacturer that did not officially respond to us about the recommendation.

While we were awaiting a response from Tesla, in 2019, a crash nearly identical to that in Williston occurred in Delray Beach, Florida. The Delray Beach highway operating environment, like the cross-traffic conditions in Williston, was clearly outside the Autopilot system's ODD. The highway did not have limited access and had 34 intersecting roadways and private driveways in the 5-mile region encompassing the crash location. As we concluded after the Williston crash, if

automated control systems are not automatically restricted to operating in those conditions for which they were designed and are appropriate, the risk of driver misuse remains.

During our subsequent investigation of a fatal 2018 crash in Mountain View, California, Tesla stated the following:

Under the SAE J3016, operational design domain limits are not applicable for Level 2 driver assist systems, such as Autopilot, because the driver determines the acceptable operating environment. Autopilot can be safely used on divided and undivided roads as long as the driver remains attentive and ready to take control.

However, our crash investigations involving your company's vehicles have clearly shown that the potential for misuse requires a system design change to ensure safety. In the Delray Beach crash, a contributing factor in the crash was the operational design of Tesla's partial automation system, which permitted disengagement by the driver, and the company's failure to limit the use of the system to the conditions for which it was designed. Our investigation of the Mountain View crash found tragically similar evidence of driver disengagement and ineffective driver monitoring, and our report stated the following:

Despite communicating . . . operating conditions and limitations to owners and drivers, Tesla Autopilot firmware does not restrict the system's use based on functional road classification. The system can essentially be used on any roads where it can detect lane markings, which allows drivers to activate driving automation systems at locations and under circumstances for which their use is not appropriate or safe, such as on roadways with cross traffic or in areas that do not consistently meet the ODD, such as roadways with inconsistent lane markings.

Therefore, we reiterated Safety Recommendations H-17-41 and -42: that Tesla and other manufacturers of Level 2 automation incorporate system safeguards that limit use of automated vehicle control systems to those conditions for which they were designed. Tesla has still not officially responded to the NTSB regarding these safety recommendations.

You have stated that "safety is always the primary design requirement for a Tesla." Now that statement is undercut by the announcement that Tesla drivers can request access to "Full Self Driving Beta technology," operational on both

highways and city streets, without first addressing the very design shortcomings that allowed the fatal Williston, Delray Beach, and Mountain View crashes to occur.

If you are serious about putting safety front and center in Tesla vehicle design, I invite you to complete action on the safety recommendations we issued to you four years ago.

The NTSB has long advocated for implementation of myriad technologies to prevent tragedies and injuries and save lives on our nation's roads, but it's crucial that such technology is implemented with the safety of all road users foremost in mind. I look forward to receiving an update on our safety recommendations.

| | |
|---|---|
| From | NTSB |
| To | Tesla Motors |
| Date | 02/01/2021 |
| Type Response | NPRM Response |

The National Transportation Safety Board (NTSB) has reviewed the National Highway Traffic Safety Administration (NHTSA) advance notice of proposed rulemaking (ANPRM) titled "Framework for Automated Driving System Safety," published at 85 Federal Register 78058 on December 3, 2020. In its notice, NHTSA requests comments on the development of a framework for automated driving system (ADS) safety. ADS, as defined by SAE International and as used in the ANPRM, refers to driving automation levels 3, 4, and 5. An ADS is the hardware and software that are, collectively, capable of performing the entire dynamic driving task on a sustained basis, regardless of whether it is limited to a specific operational design domain. Specifically, the agency seeks input on its role in facilitating ADS risk management through guidance, regulation, or both. NHTSA also requests guidance on how it should select and design the structure of a safety framework and the appropriate administrative mechanisms for improving safety, mitigating risk, and enabling the development and introduction of innovative safety technology.

This recommendation was listed in the related safety recommendations list attached to this NPRM response.

From        NTSB
To          Tesla Motors
Date        03/19/2020
Type        Reiteration
Response

Reiterated in the report "Collision Between a Sport Utility Vehicle Operating With Partial Driving Automation and a Crash Attenuator Mountain View, California March 23, 2018" Accident Report NTSB/HAR-20/01, PB2020-100112, Published on March 19, 2020

From        NTSB
To          Tesla Motors
Date        03/19/2020
Type        Report Reclassification
Response

From "Collision Between a Sport Utility Vehicle Operating With Partial Driving Automation and a Crash Attenuator Mountain View, California March 23, 2018" Accident Report NTSB/HAR-20/01, PB2020-100112, Published on March 19, 2020:

2.3.1 Risk Mitigation Pertaining to Monitoring Driver Engagement
2.3.1.1 Tesla Driver Monitoring System.

Based on system design, in an SAE-defined Level 2 partial driving automation system, it is the driver's responsibility to monitor the automation, maintain situational awareness of traffic conditions, understand the limitations of the automation, and be available to intervene and take over for the driving automation system at all times. In practice, however, drivers are poor at monitoring automation and do not perform well on tasks requiring passive vigilance (Parasuraman and Riley 1997; Moray and Inagaki 2000; and Parasuraman and Manzey 2010). Research shows that drivers often become disengaged from the driving task for both momentary and prolonged periods during automated phases of driving (Banks and others, 2018).
Driver disengagement from supervising Autopilot's partial automation was a critical factor in the four Tesla crashes the NTSB investigated.68 In the Mountain View and Culver City crashes, the drivers were found to be distracted and not supervising Autopilot's performance or monitoring the driving environment

(detecting and recognizing roadway hazards) leading up to the crash. Likewise, in the Williston and Delray Beach crashes, the drivers were inattentive and did not take any evasive action in response to semitrailer vehicles crossing the paths of their cars. Autopilot assesses a driver's level of engagement by monitoring his or her interaction with the steering wheel through changes in steering wheel torque. However, because driving is a highly visual task, a driver's touch or torque on the steering wheel is an ineffective method to determine whether he or she is fully engaged with the driving task. Simply checking whether the driver has placed a hand on the steering wheel gives little indication of where the driver is focusing his or her attention.

Following the investigation of the Williston crash, the NTSB concluded that the way the Tesla Autopilot system monitored and responded to the driver's interaction with the steering wheel was not an effective method of ensuring driver engagement. As a result, the NTSB recommended that six manufacturers of vehicles equipped with Level 2 driving automation systems take the following action:

H-17-42

Develop applications to more effectively sense the driver's level of engagement and alert the driver when engagement is lacking while automated vehicle control systems are in use.

Of the six automakers, Tesla was the only company that has not officially responded to Safety Recommendation H-17-42.69 The NTSB continues to maintain that the operational design of Tesla's automated vehicle control systems requires an attentive driver as an integral system element. Therefore, the NTSB reiterates Safety Recommendation H-17-42 to Tesla and reclassifies the recommendation from "Open-Await Response" to OPEN-UNACCEPTABLE RESPONSE.


| From | NTSB |
| --- | --- |
| To | Tesla Motors |
| Date | 09/28/2017 |
| Type | Transmittal Letter |
| Response | |

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad,

highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016, NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to Tesla Inc., which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number.

✅ Volvo Cars of North America, Inc. - Open - Acceptable Response   ⌄

(c) *Release of information.* Parties are prohibited from releasing information obtained during an investigation at any time prior to the NTSB's public release of information unless the release is consistent with the following criteria:

(1) Information released at the scene of a marine casualty or major marine casualty:

(i) Is limited to factual developments concerning the accident and the investigation released in coordination with the IIC; and

(ii) Will be made by the Board Member present at the scene as the official spokesperson for the NTSB. If no Board Member is present, information will be released by a representative of the NTSB's Office of Media Relations or the IIC. To the maximum extent practicable, the NTSB will inform the USCG of its planned releases of information before the release occurs.

(2) The release of information described in paragraph (a)(1) of this section by the NTSB at the scene of a marine casualty or major marine casualty does not authorize any party to the investigation to comment publicly on the information during the course of the investigation. Any dissemination of factual information by a party may be made only as provided in this section.

(3) A party may disseminate information related to an investigation to those individuals within its organization who have a need to know for the purpose of addressing a safety issue, including preventive or remedial actions. If such internal release of information results in a planned safety improvement, the party must inform the IIC of such planned improvement in a timely manner before it is implemented.

(4) Any other release of factual information related to the investigation must be approved by the IIC prior to release, including:

(i) Dissemination within a party organization, for a purpose not described in paragraph (b)(3) of this section;

(ii) Documents that provide information concerning the investigation, such as written directives or informational updates for release to employees or customers of a party; and

(iii) Information related to the investigation released to an organization or person that is not a party to the investigation.

(d) The release of recordings or transcripts from certain recorders may be made only in accordance with the statutory limitations of 49 U.S.C. 1114(c), 1114(d), and 1154(a).

### §831.64  Proposed findings.

(a) *General.* Any party to an investigation designated under §831.61 may submit to the NTSB written proposed findings to be drawn from the evidence produced during the course of the investigation, a proposed probable cause, and/or proposed safety recommendation(s) designed to prevent future major marine casualties and marine casualties.

(b) *Timing of submissions.* The IIC will inform parties when submissions are due. All written submissions must be received by the due date. If there is a Board meeting, the due date will be set prior to the date the matter is published in the FEDERAL REGISTER.

## PART 835—TESTIMONY OF BOARD EMPLOYEES

Sec.
835.1  Purpose.
835.2  Definitions.
835.3  Scope of permissible testimony.
835.4  Use of reports.
835.5  Manner in which testimony is given in civil litigation.
835.6  Request for testimony in civil litigation.
835.7  Testimony of former Board employees.
835.8  Testimony by current Board employees regarding prior activity.
835.9  Procedure in the event of a subpoena in civil litigation.
835.10  Testimony in Federal, State, or local criminal investigations and other proceedings.
835.11  Obtaining Board accident reports, factual accident reports, and supporting information.

AUTHORITY: 5 U.S.C. 301; Independent Safety Board Act of 1974, as amended (49 U.S.C. 1101 *et seq.*).

### §835.1  Purpose.

This part prescribes policies and procedures regarding the testimony of employees of the National Transportation Safety Board (Board) in suits or actions for damages and criminal proceedings arising out of transportation


Exhibit #

Sumwalt 8

7/9/2024

accidents when such testimony is in an official capacity and arises out of or is related to accident investigation. The purpose of this part is to ensure that the time of Board employees is used only for official purposes, to avoid embroiling the Board in controversial issues that are not related to its duties, to avoid spending public funds for non-Board purposes, to preserve the impartiality of the Board, and to prohibit the discovery of opinion testimony.

[63 FR 71607, Dec. 29, 1998]

**§ 835.2 Definitions.**

*Accident,* for purposes of this part includes "incident."

*Board accident report* means the report containing the Board's determinations, including the probable cause of an accident, issued either as a narrative report or in a computer format ("briefs" of accidents). Pursuant to section 701(e) of the Federal Aviation Act of 1958 (FA Act), and section 304(c) of the Independent Safety Board Act of 1974 (49 U.S.C. 1154(b)) (Safety Act), no part of a Board accident report may be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such reports.

*Factual accident report* means the report containing the results of the investigator's investigation of the accident. The Board does not object to, and there is no statutory bar to, admission in litigation of factual accident reports. In the case of a major investigation, group chairman factual reports are factual accident reports.

[63 FR 71607, Dec. 29, 1998, as amended at 64 FR 5622, Feb. 4, 1999]

**§ 835.3 Scope of permissible testimony.**

(a) Section 701(e) of the FA Act and section 304(c) of the Safety Act preclude the use or admission into evidence of Board accident reports in any suit or action for damages arising from accidents. These sections reflect Congress' "strong * * * desire to keep the Board free of the entanglement of such suits." Rep. No. 93–1192, 93d Cong., 2d Sess., 44 (1974), and serve to ensure that the Board does not exert an undue influence on litigation. The purposes of

these sections would be defeated if expert opinion testimony of Board employees, which may be reflected in the views of the Board expressed in its reports, were admitted in evidence or used in litigation arising out of an accident. The Board relies heavily upon its investigators' opinions in its deliberations. Furthermore, the use of Board employees as experts to give opinion testimony would impose a significant administrative burden on the Board's investigative staff. Litigants must obtain their expert witnesses from other sources.

(b) For the reasons stated in paragraph (a) of this section and § 835.1, Board employees may only testify as to the factual information they obtained during the course of an investigation, including factual evaluations embodied in their factual accident reports. However, they shall decline to testify regarding matters beyond the scope of their investigation, and they shall not give any expert or opinion testimony.

(c) Board employees may testify about the firsthand information they obtained during an investigation that is not reasonably available elsewhere, including observations recorded in their own factual accident reports. Consistent with the principles cited in § 835.1 and this section, current Board employees are not authorized to testify regarding other employee's reports, or other types of Board documents, including but not limited to safety recommendations, safety studies, safety proposals, safety accomplishments, reports labeled studies, and analysis reports, as they contain staff analysis and/or Board conclusions.

(d) Briefs of accidents may be released in conjunction with factual accident reports. Nevertheless, they are not part of those reports and are not to be admitted in evidence or used in a deposition approved under this part.

(e) Not all material in a factual accident report may be the subject of testimony. The purpose of the factual accident report, in great part, is to inform the public at large, and as a result the factual accident report may contain information and conclusions for which testimony is prohibited by this part.

(f) No employee may testify in any matter absent advance approval by the

**National Transportation Safety Board** §835.6

General Counsel as provided in this part.

[55 FR 41541, Oct. 12, 1990, as amended at 63 FR 71607, Dec. 29, 1998; 64 FR 5622, Feb. 4, 1999]

### §835.4  Use of reports.

(a) As a testimonial aid and to refresh their memories, Board employees may use copies of the factual accident report they prepared, and may refer to and cite from that report during testimony.

(b) Consistent with section 701(e) of the FA Act and section 304(c) of the Safety Act, a Board employee may not use the Board's accident report for any purpose during his testimony.

[55 FR 41541, Oct. 12, 1990, as amended at 63 FR 71607, Dec. 29, 1998]

### §835.5  Manner in which testimony is given in civil litigation.

(a) Testimony of Board employees with unique, firsthand information may be made available for use in civil actions or civil suits for damages arising out of accidents through depositions or written interrogatories. Board employees are not permitted to appear and testify in court in such actions.

(b) Normally, depositions will be taken and interrogatories answered at the Board's office to which the employee is assigned, and at a time arranged with the employee reasonably fixed to avoid substantial interference with the performance of his duties.

(c) Board employees are authorized to testify only once in connection with any investigation they have made of an accident. Consequently, when more than one civil lawsuit arises as a result of an accident, it shall be the duty of counsel seeking the employee's deposition to ascertain the identity of all parties to the multiple lawsuits and their counsel, and to advise them of the fact that a deposition has been granted, so that all interested parties may be afforded the opportunity to participate therein.

(d) Upon completion of the deposition of a Board employee, the original of the transcript will be provided the deponent for signature and correction, which the Board does not waive. A copy of the transcript of the testimony and any videotape shall be furnished,

at the expense of the party requesting the deposition, to the Board's General Counsel at Washington, DC headquarters for the Board's files.

[55 FR 41541, Oct. 12, 1990, as amended at 63 FR 71607, Dec. 29, 1998]

### §835.6  Request for testimony in civil litigation.

(a) A written request for testimony by deposition or interrogatories of a Board employee relating to an accident shall be addressed to the General Counsel, who may approve or deny the request consistent with this part. Such request shall set forth the title of the civil case, the court, the type of accident (aviation, railroad, etc.), the date and place of the accident, the reasons for desiring the testimony, and a showing that the information desired is not reasonably available from other sources.

(b) Where testimony is sought in connection with civil litigation, the General Counsel shall not approve it until the factual accident report is issued (*i.e.*, in the public docket). In the case of major accident investigations where there are multiple factual reports issued and testimony of group chairmen is sought, the General Counsel may approve depositions regarding completed group factual reports at any time after incorporation of the report in the public docket. However, no deposition will be approved prior to the Board's public hearing, where one is scheduled or contemplated. The General Counsel may approve a deposition in the absence of a factual accident report when such a report will not be issued but all staff fact-finding is complete.

(c) The General Counsel shall attach to the approval of any deposition such reasonable conditions as may be deemed appropriate in order that the testimony will be consistent with §835.1, will be limited to the matters delineated in §835.3, will not interfere with the performance of the duties of the employee as set forth in §835.5, and will otherwise conform to the policies of this part.

(d) A subpoena shall not be served upon a Board employee in connection

729

with the taking of a deposition in civil litigation.

[63 FR 71607, Dec. 29, 1998]

### § 835.7 Testimony of former Board employees.

It is not necessary to request Board approval for testimony of a former Board employee, nor is testimony limited to depositions. However, the scope of permissible testimony continues to be constrained by all the limitations set forth in § 835.3 and § 835.4.

[63 FR 71608, Dec. 29, 1998]

### § 835.8 Testimony by current Board employees regarding prior activity.

Any testimony regarding any accident within the Board's jurisdiction, or any expert testimony arising from employment prior to Board service is prohibited absent approval by the General Counsel. Approval shall only be given if testimony will not violate § 835.1 and § 835.3, and is subject to whatever conditions the General Counsel finds necessary to promote the purposes of this part as set forth in § 835.1 and § 835.3.

[63 FR 71608, Dec. 29, 1998]

### § 835.9 Procedure in the event of a subpoena in civil litigation.

(a) If the Board employee has received a subpoena to appear and testify in connection with civil litigation, a request for his deposition shall not be approved until the subpoena has been withdrawn.

(b) Upon receipt of a subpoena, the employee shall immediately notify the General Counsel and provide all information requested by the General Counsel.

(c) The General Counsel shall determine the course of action to be taken and will so advise the employee.

[63 FR 71608, Dec. 29, 1998]

### § 835.10 Testimony in Federal, State, or local criminal investigations and other proceedings.

(a) As with civil litigation, the Board prefers that testimony be taken by deposition if court rules permit, and that testimony await the issuance of the factual accident report. The Board recognizes, however, that in the case of coroner's inquests and grand jury proceedings this may not be possible. The Board encourages those seeking testimony of Board employees to contact the General Counsel as soon as such testimony is being considered. Whenever the intent to seek such testimony is communicated to the employee, he shall immediately notify the General Counsel.

(b) In any case, Board employees are prohibited from testifying in any civil, criminal, or other matter, either in person or by deposition or interrogatories, absent advance approval of the General Counsel. The Board discourages the serving of a subpoena for testimony but, if issued, it should be served on the General Counsel, rather than the employee.

(c) If permission to testify by deposition or in person is granted, testimony shall be limited as set forth in § 835.3. Only factual testimony is authorized; no expert or opinion testimony shall be given.

[63 FR 71608, Dec. 29, 1998]

### § 835.11 Obtaining Board accident reports, factual accident reports, and supporting information.

It is the responsibility of the individual requesting testimony to obtain desired documents. There are a number of ways to obtain Board accident reports, factual accident reports, and accompanying accident docket files. Our rules at parts 801 and 837 of this chapter explain our procedures, as will our web site, at *www.ntsb.gov*. Or, you may call our Public Inquiries Branch, at (800) 877–6799. Documents will not be supplied by witnesses at depositions, nor will copying services be provided by deponents.

[63 FR 71608, Dec. 29, 1998]

## PART 837—PRODUCTION OF RECORDS IN LEGAL PROCEEDINGS

Sec.
837.1  Purpose and scope.
837.2  Applicability.
837.3  Published reports, material contained in the public accident investigation dockets, and accident database data.
837.4  Other material.

AUTHORITY: 49 U.S.C. 1101 *et seq.*; 40101 *et seq.*; 5 U.S.C. 301.

Text boxed in red relates to NTSB's Tempe, AZ crash investigation and is subject to change pending the Board's adoption of the final report on 11/19/19.



*Testimony of*

The Honorable Robert L. Sumwalt, III
Chairman
National Transportation Safety Board

*Before the*

Committee on Commerce, Science, and Transportation
United States Senate

*— On —*

Highly Automated Vehicles: Federal Perspectives
on the Deployment of Safety Technology

—

Washington, DC • November 20, 2019



*An Independent Federal Agency*



**DRAFT** Text boxed in red relates to NTSB's Tempe, AZ crash investigation and is subject to change pending the Board's adoption of the final report on 11/19/19.

THIS PAGE INTENTIONALLY BLANK

**DRAFT**

Text boxed in red relates to NTSB's Tempe, AZ crash investigation and is subject to change pending the Board's adoption of the final report on 11/19/19.

Good morning Chairman Wicker, Ranking Member Cantwell, and Members of the Committee. Thank you for inviting the National Transportation Safety Board (NTSB) to testify before you today.

The NTSB is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—highway, rail, marine, and pipeline. We determine the probable cause of the accidents we investigate, and we issue safety recommendations aimed at preventing future accidents. In addition, we conduct special transportation safety studies and special investigations and coordinate the resources of the federal government and other organizations to assist victims and their family members who have been impacted by major transportation disasters. The NTSB is not a regulatory agency—we do not promulgate operating standards, nor do we certificate organizations, individuals, or equipment. The goal of our work is to foster safety improvements, through safety recommendations, for the traveling public.

Motor vehicle crashes are a leading cause of death and injuries in the United States. In 2018, 36,560 people lost their lives in crashes on our nation's highways.[1] The large majority of these tragedies can be directly linked to human error. Humans make mistakes and bad decisions, such as driving while they are impaired, distracted, or fatigued. Automated vehicle (AV) and collision avoidance technology have the potential to reduce the number of crashes, injuries, and fatalities significantly.

Today I will discuss some of the lessons learned from NTSB crash investigations and recommendations regarding the safe testing and deployment of highly automated vehicles. A focus of my testimony will be an overview of the findings and recommendations of our recently completed investigation of a developmental automated driving system (ADS) that collided with, and killed, a pedestrian in Tempe, Arizona, on March 18, 2018.

While there is often a desire to jump directly to the end of the technological spectrum—highly automated "self-driving" vehicles—it is imperative that regulators and policy makers do not ignore the risks associated with partial driving automation systems currently being operated on our highways. I will provide an overview of NTSB crash investigations involving Tesla model vehicles operating with partial automation and related recommendations addressing the safe deployment of automated control systems.

**Automated Driving Systems**

The use of AV controls and systems is accelerating rapidly in all modes of transportation. We have monitored AV development and have a long history of calling for systems to assist the operator in performing the driving task. One of the main sources of confusion in discussions about AVs is the language used in the industry, and by researchers and regulators, compared to that used by the general public. Industry, regulators, and academics frequently use the six-level SAE automation taxonomy as a reference point when discussing vehicle capabilities and operator

---

[1] NHTSA Traffic Safety Facts, 2018, Fatal Motor Vehicle Crashes Overview, DOT Hs 812 826, October 2019.

DRAFT Case 1:21-cv-21940-BB  Document 320-8  Entered on FLSD Docket 01/27/2025  Page 135 of 209

Text boxed in red relates to NTSB's Tempe, AZ crash investigation and is subject to change pending the Board's adoption of the final report on 11/19/19.

responsibilities.[2] However, the SAE automation levels may not be easily relatable to the general public. At the same time, the terms used by vehicle manufacturers to market their partial driving automation systems (SAE level 2) such as ProPilot (Nissan), Pilot Assist (Volvo), and Autopilot (Tesla)—can add to public confusion about the degree of automation in the production-level vehicles now available. Although the general public frequently uses "self-driving vehicle" to describe currently available vehicles, it is an incorrect portrayal of the capabilities of vehicles on the roads in the United States today.

In describing highly automated vehicles (SAE levels 3 to 5), SAE recommends the term "automated driving system." The defining characteristic of an ADS is that the system takes full control of all aspects of the driving task. Although a geographical area, environmental conditions, or a human occupant's availability may limit the domain where an ADS is operational, the system is responsible for controlling the vehicle and avoiding hazards in that domain. We recently completed our investigation of a fatal crash in Tempe, Arizona, involving an ADS-equipped vehicle and made recommendations regarding the testing and deployment of these systems.

**Tempe, Arizona, Crash Investigation**

On March 18, 2018, at 9:58 p.m., an automated test vehicle, based on a modified 2017 Volvo XC90 sport utility vehicle (SUV), struck a pedestrian walking midblock across North Mill Avenue in Tempe, Arizona. The SUV was operated by the Advanced Technologies Group (ATG) of Uber Technologies, Inc., which had modified the vehicle with a proprietary developmental ADS. An operator occupied the driver's seat of the SUV, which was being controlled by the ADS. As a result of the crash, the pedestrian sustained fatal injuries.

We determined that the probable cause of the crash was the failure of the vehicle operator to monitor the driving environment and the operation of the ADS because she was visually distracted throughout the trip by her personal cell phone. Contributing to the crash were the Uber ATG's (1) inadequate safety risk-assessment procedures, (2) ineffective oversight of the vehicle operator, and (3) lack of adequate mechanisms for addressing the operator's automation complacency—all a consequence of inadequate safety culture. Further factors contributing to the crash were (1) the impaired pedestrian's crossing of North Mill Avenue outside a crosswalk, and (2) the Arizona Department of Transportation's insufficient oversight of AV testing.

At the time of the crash, the Uber ATG had an inadequate safety culture, exhibited by inadequate safety risk-management procedures and safety policies, lack of oversight of vehicle operators, and lack of personnel with backgrounds in safety management systems. For example, we concluded that the Uber ATG's deactivation of the Volvo forward collision warning and automatic emergency braking systems without replacing their full capabilities removed a layer of safety redundancy and increased the risks associated with testing ADSs on public roads.

---

[2] SAE International Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles, Recommended Practice J3016, June 2018.

Text boxed in red relates to NTSB's Tempe, AZ crash investigation and is subject to change pending the Board's adoption of the final report on 11/19/19.

Although the ATG has made safety improvements in organizational, operational, and technical areas, we remain concerned regarding the safety culture of the numerous other ADS developers who are conducting similar testing.

Furthermore, a manufacturer is not the only entity with a role in ensuring the safe testing of AVs on public roads. To establish a robust safety framework, it is necessary to involve federal agencies, which can establish and mandate ADS performance standards, and the states, which traditionally regulate drivers and vehicle operation on public roads. During our review of the role of federal and state oversight, we identified the need for improved safety risk-management requirements for testing ADS on public roads.

**Federal Oversight**

We see enormous potential in the ability of ADS to mitigate or prevent crashes on our roadways. A promise of the upcoming ADSs is that such systems will be safer than a human driver. Until that promise is realized, the testing of developmental ADS—with all its expected failures and limitations—requires appropriate safeguards when conducted on public roads. Unfortunately, there has been an absence of safety regulations and federal guidance regarding how to adequately evaluate an ADS, which has prompted some states to develop their own requirements for AV testing.

Although the National Highway Traffic Safety Administration (NHTSA) has published three iterations of AV guidance, it provides insufficient instructions on how ADS developers should accomplish the safety goals of the 12 ADS safety elements—for example, training vehicle operators, ensuring oversight, and evaluating whether an ADS has reached a level of safety functionality.[3] More limiting aspects of the policy pertain to (1) the absence of a NHTSA process for evaluating the adequacy of a safety self-assessment report, and (2) the lack of a mandatory submission requirement.

The shortcomings of the policy are exacerbated by the lack of assessment procedures and the difficulties in their development. For example, one of the 12 safety areas is "object and event detection and response," pertaining to the capability of an ADS to detect, classify, and respond to objects and events in the environment. In this regard, we understand the difficulties in developing a "vision test" or standardized metric for assessing the perception of an ADS. In another of the 12 safety elements of its automated vehicle policy, human-machine interface, NHTSA addresses the need for monitoring driver engagement. NHTSA guidelines states, "entities are encouraged to consider whether it is reasonable and appropriate to incorporate driver engagement monitoring." Because of the complexity of assessing all the relevant safety elements, to determine if sufficient

---

[3] See NHTSA 2016 Federal Automated Vehicle Policy—Accelerating the Next Revolution in Roadway Safety; NHTSA 2017 Automated Driving System 2.0: A Vision for Safety; and NHTSA 2018 Preparing for the Future of Transportation: Automated Vehicles 3.0. The 12 safety elements described in ADS 2.0 are: system safety, operational design domain, object event detection and response, fallback (minimal risk condition), validation methods, human-machine interface, vehicle cybersecurity, crashworthiness, post-crash ADS behavior, data recording, consumer education and training, and federal/state/local laws.

**DRAFT**
Text boxed in red relates to NTSB's Tempe, AZ crash investigation and is subject to change pending the Board's adoption of the final report on 11/19/19.

safeguards exist for the testing and deployment of ADSs, a holistic assessment is needed, particularly when performance metrics may not exist.

The traditional division of oversight, in which NHTSA controls vehicle safety and the states monitor drivers, may not be easily applicable to developmental automated test vehicles. It might not be immediately apparent who controls the vehicle, or whether vehicle control and supervision is shared between the computer (the vehicle) and the human operator. A lack of appropriate policy from NHTSA and the states leaves the public vulnerable to potentially unsafe testing practices. To ensure that testing of AVs on public roads is conducted with minimal safety risk, meaningful action from both NHTSA and the states is critical.

If the process of submission of safety self-assessment reports were mandatory and included a process for the ongoing evaluation by NHTSA, it could serve as a criterion for judging whether a manufacturer's approach to ADS development and testing met the minimal intent of the 12 ADS safety elements. NHTSA's evaluation of a safety plan could also provide a minimum safeguard for the testing of developmental ADSs on public roads. Furthermore, assessment by NHTSA would provide important support to states when evaluating the appropriateness of a developer's approach to the testing AVs.

As an outcome of the Tempe, Arizona, investigation, we recommended that NHTSA require entities who are testing or who intend to test a developmental ADS on public roads to submit a safety self-assessment report to the agency. We also recommended that NHTSA establish a process for evaluating the safety self-assessment report and determine whether the plans include appropriate safeguards for testing a developmental ADS on public roads, including adequate monitoring of vehicle operator engagement, if applicable.

### State Oversight and Legislation

In the absence of federal ADS safety standards or specific ADS assessment protocols, many states have begun legislating requirements for AV testing. The development of state-based requirements could be attributed to the concerns of many states about the safety risk of introducing ADS-equipped vehicles on public roads. The requirements vary. Some states, such as Arizona, impose minimal restrictions. Other states have established requirements that include a more in-depth application and review process. In the Tempe crash investigation, we determined that Arizona's lack of a safety-focused application-approval process for ADS testing at the time of the crash, and its inaction in developing such a process following the crash, demonstrate the state's shortcomings in improving the safety of ADS testing and safeguarding the public.

Currently, 21 states lack regulations pertaining to ADS testing. Although 29 states have some type of ADS-related policy, the requirements for testing vary considerably. Furthermore, the existence of a regulation is not a sure indication of a comprehensive and safety-driven ADS testing policy. In fact, Arizona was one of the 29 states that had some form of regulation pertaining to ADS testing, but, as stated previously, the safety application approval process was lacking.

States that have no, or only minimal, requirements related to AV testing can improve the safety of such testing by implementing a thorough application and review process before granting

Text boxed in red relates to NTSB's Tempe, AZ crash investigation and is subject to change pending the Board's adoption of the final report on 11/19/19.

testing permits. The American Association of Motor Vehicle Administrators (AAMVA) has developed numerous model programs for motor vehicle administration, law enforcement, and highway safety in general. In May 2018, AAMVA published *Jurisdictional Guidelines for the Safe Testing and Deployment of Highly Automated Vehicles*. Although the guidance contains elements of ADS testing, the AAMVA document lacked specific guidance for developers on how to accomplish the included recommendations. The guidance did include a very important element—the need for jurisdictions to identify a lead agency and establish an AV committee to develop strategies for addressing AV testing. However, the guidance does not include recommendations requiring ADS developers to submit a safety plan and for the state's AV committee to review and approve such a plan.

Because states would benefit from adopting regulations that require a thorough review of ADS developers' safety plans, including methods of risk management, we recommended that AAMVA encourage states to (1) require developers to submit an application for testing ADS-equipped vehicles that, at a minimum, details a plan to manage the risk associated with crashes and operator inattentiveness and establish countermeasures to prevent crashes or mitigate crash severity within the ADS testing parameters, and (2) establish a task group of experts to evaluate the application before granting a testing permit. Similar recommendations were also issued to the state of Arizona.

**Partial Driving Automation System Safety**

Although much attention and federal effort has been focused on highly automated SAE Level 3–5 vehicles, of equal and more immediate concern should be the current deployment of partial driving automation systems on our nation's highways. Between May 2016 and March 2019, we investigated four crashes—three resulting in fatal injuries—involving Tesla model vehicles with Autopilot engaged.[4] When Autopilot is activated and multiple subsystems, like traffic aware cruise control (TACC) and Autosteer, are combined to provide both lateral and longitudinal vehicle motion control, the system is considered an SAE Level 2 partial driving automation system. These Level 2 systems are considered by NHTSA to be advanced driver assistance systems.

Following our investigation of the March 2016 fatal crash involving a Tesla Model S 70D in Williston, Florida, we issued several safety recommendations aimed at preventing similar crashes involving vehicles operating with partial driving automation systems.[5] A few important safety issues identified in the Williston crash investigation included (1) limiting the operational design domains for partial driving automation systems, (2) monitoring an AV driver's level of engagement, and (3) the need for more robust event data recorders for AVs.

---

[4] Investigations into two of the fatal crashes occurring in Delray Beach, Florida, and Mountain View, California, are ongoing, with final reports scheduled to be released in early 2020.

[5] *Collision Between a Car Operating with Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016,* NTSB/HAR-17/02.

Text boxed in red relates to NTSB's Tempe, AZ crash investigation and is subject to change pending the Board's adoption of the final report on 11/19/19.

*Operational Design Domain Restrictions*

SAE J3016 discusses the need for manufacturers to accurately describe AV features and clearly define the level of driving automation and its capabilities, but also its operational design domain—the conditions in which the driving automation system is intended to operate. Examples of such conditions include roadway type, geographic location, clear roadway markings, weather conditions, speed range, lighting conditions, and other manufacturer-defined system performance criteria or constraints. Tesla, for example outlined many operating conditions and limitations based upon the Autopilot partial automation system design, such as that it is (1) designed for use on highways with a center divider, (2) designed for areas with no cross traffic and clear lane markings, (3) not for use on city streets or where traffic conditions are constantly changing, (4) not for use on winding roads with sharp curves, and (5) not for use in inclement weather conditions with poor visibility.

Despite communicating to owners and drivers these operating conditions and limitations, Tesla Autopilot firmware does not restrict the system's use based on functional road classification. Essentially, the system can be used on any roads with adequate lane markings. This situation allows a driver to activate driving automation systems at locations and under circumstances for which their use is not appropriate or safe, such as roadways with cross traffic. The Tesla Model S in the Williston, Florida, crash collided with a tractor-trailer combination vehicle crossing an uncontrolled intersection on a nonlimited access highway. Partial AV operation on nonlimited access highways presents challenges with the detection of crossing vehicles, pedestrian and bicycle traffic, and traffic controls at intersections, such as red traffic lights. As a result, we concluded that, if AV control systems do not automatically restrict their own operation to those conditions for which they were designed and are appropriate, the risk of driver misuse remains. We recommended that Tesla and other manufacturers of Level 2 automation:

Incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed. (H-17-41)

Five automobile manufacturers responded to this recommendation with steps they were taking to mitigate operation under conditions for which they were designed. Tesla, however, advised us that operational design limits are not applicable to Level 2 driver assist systems, such as Autopilot, because the driver determines the acceptable operating environment.[6]

Tesla vehicles continue to be involved in crashes with Autopilot engaged in operating areas outside the intended roadway operational design domain. In March 2019, in Delray Beach, Florida, a fatal crash involving a 2019 Tesla Model 3 occurred under circumstances very similar to the Williston, Florida, crash.[7] The Delray Beach highway operating environment, like the cross-traffic conditions in Williston, was outside the Tesla Autopilot system's operational design domain.

Today's Level 2 partial driving automation systems can assess the vehicle's location and current roadway type or classification, and determine whether the roadway is appropriate to the

---

[6] Tesla provided this response during NTSB's ongoing investigation of the Mountain View, CA crash.

[7] See Delray Beach Highway Preliminary Report (HWY19FH008)

Text boxed in red relates to NTSB's Tempe, AZ crash investigation and is subject to change pending the Board's adoption of the final report on 11/19/19.

system's operational design domain. Following the Williston crash, we made a recommendation to NHTSA to address this vital safety concern. We recommended that NHTSA:

> Develop a method to verify that manufacturers of vehicles equipped with Level 2 vehicle automation systems incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed. (H-17-38)

In response to Safety Recommendation H-17-38, NHTSA wrote the following:

> The agency has no current plans to develop a specific method to verify manufacturers of vehicles equipped with Level 2 systems incorporate safeguards limiting the use of automated vehicle control systems to those conditions for which they were designed. Instead, if NHTSA identifies a safety-related defect trend in design or performance of a system, or identifies through its research or otherwise, any incidents in which a system did not perform as designed, it would exercise its authority as appropriate.

The current status of this safety recommendation is "Open—Unacceptable Response." We believe that NHTSA's reactive, rather than proactive, safety position is misguided, and the agency should take immediate action to verify that manufacturers are incorporating operational domain design safeguards into their systems.

### *Monitoring an AV Driver's Level of Engagement*

Based on system design, in an SAE-defined Level 2 partial automation system, it is the driver's responsibility to monitor the automation, maintain situational awareness of traffic conditions, understand the limitations of the automation, and be available to intervene and take over for the partial automation system at any time. In practice, however, drivers are poor at monitoring automation and do not perform well on tasks requiring passive vigilance. Research shows that drivers often become disengaged from the driving task, both for momentary and prolonged periods during automated phases of driving.

In the Williston, Florida, crash, we found that the driver was disengaged from supervising the Autopilot partial automation. Tesla assesses the driver's level of engagement by monitoring driver interaction with the steering wheel through changes in steering wheel torque. In the Williston accident, when Autopilot was active prior to the crash, the system detected that the driver applied steering wheel torque only 2 percent of the time. Because Tesla uses steering wheel torque as a metric of driver engagement, the low percentage of driver applied torque in the Williston crash indicated a highly disengaged driver. This measure of driver engagement, however, is misleading. Because driving is a highly visual task, a driver's touch or torque of the steering wheel may not accurately indicate that he or she is fully engaged with the driving task. Simply checking whether the driver has placed a hand on the steering wheel gives little indication of where the driver is focusing his or her attention.

Following our Williston, investigation, we concluded that the way the Tesla Autopilot system monitored and responded to the driver's interaction with the steering wheel was not an

Text boxed in red relates to NTSB's Tempe, AZ crash investigation and is subject to change pending the Board's adoption of the final report on 11/19/19.

effective method of ensuring driver engagement. As a result, we recommended that six manufacturers of vehicles equipped with Level 2 driving automation systems:

> Develop applications to more effectively sense the driver's level of engagement and alert the driver when engagement is lacking while automated vehicle control systems are in use. (H-17-42)

In response to Safety Recommendation H-17-42, five of the six manufacturers responded with actions they were taking to monitor a driver's level of engagement. Tesla was the only manufacturer that did not officially respond. Because the operational design of partial driving automation systems requires an attentive driver as an integral system element, we will continue to advocate for manufacturers' improved monitoring of driver's level of engagement while supervising automation.

### *Event Data Recorders for Automated Vehicles*

Title 49 *CFR* Part 563 sets forth requirements for data elements, data capture and format, data retrieval, and data crash survivability for event data recorders (EDRs) installed in light vehicles manufactured on or after September 1, 2012.[8] The regulation did not mandate the installation of EDRs in light vehicles; rather, if the vehicle manufacturer chose to install an EDR, the regulation defines the format and specifies the requirements for providing commercially available tools and the methods for retrieving data from the EDR in the event of a crash.

On December 13, 2012, NHTSA issued a notice of proposed rulemaking (NPRM) that proposed a new Federal Motor Vehicle Safety Standard (FMVSS) mandating that an EDR that meets 49 *CFR* Part 563 requirements be installed on most light vehicles. On February 8, 2019, NHTSA withdrew the NPRM because the agency determined that a mandate was not necessary. NHTSA's internal analysis showed that, for model year 2017, 99.6 percent of new light vehicles sold were equipped with EDRs that met Part 563 requirements. NHTSA added that, given the near universal installation of EDRs in light vehicles, it no longer believed that the safety benefits of mandating EDRs justified the expenditure of limited agency resources.

In withdrawing the final rule, NHTSA said that it would continue its efforts to modernize and improve EDR regulations, including fulfilling the agency's statutory mandate to promulgate regulations establishing an appropriate recording duration for EDR data to "provide accident investigators with vehicle-related information pertinent to crashes involving such motor vehicles."[9] Because 49 *CFR* 563 data recording requirements codified more than a decade ago are very limited (only 15 data elements require reporting), NHTSA stated that it is actively investigating whether the agency should consider revising the data elements covered by Part 563 to account for advanced safety features.

---

[8] The EDR requirements apply to "light vehicles" required to have frontal airbags—those with a gross vehicle weight rating of 3,855 kilograms (8,500 pounds) or less and an unloaded vehicle weight of 2,495 kilograms (5,500 pounds) or less.

[9] See the Fixing America's Surface Transportation (FAST) Act Public Law 114-94 (Dec. 4, 2015) section 24303.

Text boxed in red relates to NTSB's Tempe, AZ crash investigation and is subject to change pending the Board's adoption of the final report on 11/19/19.

In recent Tesla crash investigations, we were able to retrieve data from the EDR, but the EDR data recorded did not address the partial driving automation system's activation or engagement. As a result, we used other proprietary manufacturer data to interpret the automation system's functionality, but this type of data is not available on many vehicles operating with these systems today. Further, there are currently no commercially available tools for an independently retrieving and reviewing any non-EDR vehicle data, and other manufacturers of vehicles with driving automation systems control access to the postcrash proprietary information associated with their vehicles.

As more manufacturers deploy driving automation systems on their vehicles, to improve system safety, it will be necessary to develop detailed information about how the active safety systems performed during, and how drivers responded to, a crash sequence. Manufacturers, regulators, and crash investigators all need specific data in the event of a system malfunction or crash. Recorded data can be used to improve the automated systems and to understand situations that may not have been considered in the original designs. NTSB investigators need effective event data to conduct valid and productive investigations involving vehicles using AV control systems. Further, data are needed to distinguish between automated control actions and driver control actions.

Following the Williston crash, we made a recommendation to the US Department of Transportation (DOT) regarding the need to define data parameters necessary to understand AV control systems and two recommendations to NHTSA to define a standard reporting format and to require manufacturers equipped with driving automation systems to report incidents, crashes, and vehicle miles operated with the systems enabled.[10]

To the DOT:

Define the data parameters needed to understand the automated vehicle control systems involved in a crash. The parameters must reflect the vehicle's control status and the frequency and duration of control actions to adequately characterize driver and vehicle performance before and during a crash. (H-17-37)

To NHTSA:

Use the data parameters defined by the U.S. Department of Transportation in response to Safety Recommendation H-17-37 as a benchmark for new vehicles equipped with automated vehicle control systems so that they capture data that reflect the vehicle's control status and the frequency and duration of control actions needed to adequately characterize driver and vehicle performance before and during a crash; the captured data should be readily available to, at a minimum, National Transportation Safety Board investigators and National Highway Traffic Safety Administration regulators. (H-17-39)

---

[10] The current status of safety recommendation H-17-37 is "Open—Initial Response Received." H-17-39 and -40 are both classified "Open—Acceptable Response."

Text boxed in red relates to NTSB's Tempe, AZ crash investigation and is subject to change pending the Board's adoption of the final report on 11/19/19.

Define a standard format for reporting automated vehicle control data and require manufacturers of vehicles equipped with automated vehicle control systems to report incidents, crashes, and vehicle miles operated with such systems enabled. (H-17-40)

In response to these recommendations, NHTSA has communicated with SAE International about developing industry standards, but explained the following:

Manufacturers are not currently required to enable vehicles to record data from usage of driving automation systems (SAE levels 1-2) or operation of such systems during crash triggered events. The ability for traditional vehicle manufacturers and other stakeholders to report on automated technology system use and its operation during incidents and crashes is highly dependent on each vehicle's specific recording and downloading technology.

Additionally, NHTSA stated that it believes developing recording requirements is best accomplished through voluntary compliance until industry consensus on standard data elements can be established.[11]

It is unlikely that crash investigators and regulators will fully understand the causal factors in a crash without easily accessible data from driving automation systems; therefore, we will continue to advocate action on these safety recommendations.

**Conclusion**

Thank you again for the opportunity to be here today to discuss highly automated vehicles and some initial steps that can be taken by the DOT and states to advance the safe testing and deployment of automated driving systems. I will be happy to answer any questions.

---

[11] NTSB experience with crashes involving different levels of driving automation shows that the amount and availability of recorded data varies widely among manufacturers.

X                                        Autosteer (Beta)

Autosteer feature is currently in Beta:

Autosteer is an assist feature that requires you to keep your hands on the steering wheel at all times. It is designed for use on highways that have a center divider and clear lane markings. It is also appropriate in slow-moving traffic. It should not be used on highways that have very sharp turns or lane markings that are absent, faded, or ambiguous. Similar to the autopilot function in airplanes, you need to maintain control and responsibility for your vehicle while enjoying the convenience of Autosteer.

Autosteer performance may vary during the initial phases of rollout on the new hardware platform. Please enable it only if you are willing to pay close attention to the road and be prepared to override it at any time. Those interested in a more robust Autosteer experience should wait as fleet learning refines Autosteer performance over hundreds of millions of miles.

Do you want to enable Autosteer while it is in the beta phase? To be clear, when we say "beta", we do so to encourage a higher level of vigilance. If this were PC desktop or mobile software, we would not refer to it as such. It is simply that we believe the standard for the term should be considerably higher for control of a vehicle.

To reiterate, if you are at all uncertain about activating the new Autopilot hardware and software, we recommend waiting until at least a few hundred million miles or more have been accumulated.

Please refer to the Owner's Manual for more detailed information about this feature,

Do you want to enable Autosteer while it is in Beta?

                        NO        YES

Exhibit #

Sumwalt 10

7/9/2024

exhibitsticker.com



# MODEL S OWNER'S MANUAL



2018.48.12
December 17, 2018



**Exhibit #**

**Sumwalt 11**

7/9/2024

BENAVIDES-00001795

## Traffic-Aware Cruise Control





To set the cruising speed to the speed limit plus any offset you've specified using Speed Assist, pull the cruise control lever toward you. If you are already driving faster than the speed limit, the set speed does not adjust to the speed limit—it adjusts to your current driving speed. If you move the cruise control level up or down after setting Traffic-Aware Cruise Control to cruise at the speed limit, your set speed becomes your current driving speed.



After setting the cruising speed, release the accelerator pedal to allow Traffic-Aware Cruise Control to maintain your set speed.

  When the cruising speed is set, the speedometer icon on the instrument panel turns blue and displays the set speed.

**Note:** Double-pulling the cruise control lever toward you engages Autosteer (assuming it has been enabled as described in Autosteer on page 89). In this case, if you are not already cruising at a set speed, the cruising speed is set to either your current driving speed or the speed limit (plus any specified offset), whichever is greater.

⚠ **Warning:** When you adjust the cruising speed based on the speed limit, the set speed does not change when the speed limit changes. You must pull the cruise

control lever again to cruise at the new speed limit. You can also manually adjust your cruising speed at any time (see Changing the Set Speed on page 84).

⚠ **Warning:** Do not rely on Traffic-Aware Cruise Control or Speed Assist to determine an accurate or appropriate cruising speed. Always cruise at a safe speed based on road conditions and applicable speed limits.

### Cruising at the set speed

Traffic-Aware Cruise Control maintains your set cruising speed whenever a vehicle is not detected in front of Model S. When cruising behind a detected vehicle, Traffic-Aware Cruise Control accelerates and decelerates Model S as needed to maintains a chosen following distance (see Adjust your following distance on page 85), up to the set speed.

Traffic-Aware Cruise Control also adjusts the cruising speed when entering and exiting curves.

You can manually accelerate at any time when cruising at a set speed, but when you release the accelerator, Traffic-Aware Cruise Control resumes cruising at the set speed.

**Note:** When Traffic-Aware Cruise Control is actively slowing down Model S to maintain the selected distance from the vehicle ahead, brake lights turn on to alert other road users that you are slowing down. You may notice slight movement of the brake pedal. However, when Traffic-Aware Cruise Control is accelerating Model S, the accelerator pedal does not move.

⚠ **Warning:** Traffic-Aware Cruise Control may occasionally cause Model S to brake when not required or when you are not expecting it. This can be caused by closely following a vehicle ahead, detecting vehicles or objects in adjacent lanes (especially on curves), etc.

⚠ **Warning:** Due to limitations inherent in the onboard GPS (Global Positioning System), you may experience situations in which Traffic-Aware Cruise Control slows down the vehicle, especially near highway exits where a curve is detected and/or you are actively navigating to a destination and not following the route.

⚠ **Warning:** Traffic-Aware Cruise Control cannot detect all objects and, especially in situations when you are driving over 50 mph (80 km/h), may not brake/

BENAVIDES-00001878

Traffic-Aware Cruise Control

decelerate when a vehicle or object is only partially in the driving lane or when a vehicle you are following moves out of your driving path and a stationary or slow-moving vehicle or object is in front of you. Always pay attention to the road ahead and stay prepared to take immediate corrective action. Depending on Traffic-Aware Cruise Control to avoid a collision can result in serious injury or death. In addition, Traffic-Aware Cruise Control may react to vehicles or objects that either do not exist or are not in the lane of travel, causing Model S to slow down unnecessarily or inappropriately.

⚠️ **Warning:** Traffic-Aware Cruise Control may be unable to provide adequate speed control because of limited braking capability and hills. It can also misjudge the distance from a vehicle ahead. Driving downhill can increase driving speed, causing Model S to exceed your set speed (and potentially the road's speed limit). Never depend on Traffic-Aware Cruise Control to slow down the vehicle enough to prevent a collision. Always keep your eyes on the road when driving and be prepared to take corrective action as needed. Depending on Traffic-Aware Cruise Control to slow the vehicle down enough to prevent a collision can result in serious injury or death.

## Changing the Set Speed

To change the set speed while using Traffic-Aware Cruise Control, move the cruise control lever up (increase) or down (decrease) until your desired set speed is displayed.



To increase/decrease speed by 1 mph (1 km/h), move the lever up or down to the first position and release. To increase/decrease speed to the closest 5 mph (5 km/h) increment, move the lever up/down to the second position and release. For example, if you are traveling at 57 mph and you move the lever up to the second position and release, the speed increases to 60 mph. You can also increase/decrease speed by holding the lever in the full up/down position and releasing when the desired speed displays below the cruise control icon.

**Note:** It may take a few seconds for Model S to reach the new cruising speed, assuming Model S does not detect a vehicle ahead driving slower than your set speed.

BENAVIDES-00001879



**Traffic-Aware Cruise Control**

that may interfere with proper operation of Traffic-Aware Cruise Control.

BENAVIDES-00001883



**Note:** Autosteer is a BETA feature.

If your Model S is equipped with Autopilot components (see About Autopilot on page 79), and you have purchased the optional Enhanced Autopilot or Full Self-Driving Capability packages, you can use Autosteer to manage steering and speed under certain circumstances. Autosteer builds upon Traffic-Aware Cruise Control (see Traffic-Aware Cruise Control on page 82), intelligently keeping Model S in its driving lane when cruising at a set speed. Autosteer also allows you to use the turn signals to move Model S into an adjacent lane (see Auto Lane Change on page 91). Using the vehicle's camera(s), the radar sensor, and the ultrasonic sensors, Autosteer detects lane markings and the presence of vehicles and objects for steering Model S.

⚠️ **Warning:** Autosteer is a hands-on feature. You must keep your hands on the steering wheel at all times.

⚠️ **Warning:** Autosteer is intended for use only on highways and limited-access roads with a fully attentive driver. When using Autosteer, hold the steering wheel and be mindful of road conditions and surrounding traffic. Do not use Autosteer on city streets, in construction zones, or in areas where bicyclists or pedestrians may be present. Never depend on Autosteer to determine an appropriate driving path. Always be prepared to take immediate action. Failure to follow these instructions could cause damage, serious injury or death.

## Operating Autosteer

Before you can operate Autosteer, you must enable it by touching **Controls > Autopilot > Autosteer (Beta)**.

 To indicate that Autosteer is available (but not actively steering Model S), the instrument panel displays a gray Autosteer icon on the right side of the driving speed.

To initiate Autosteer, pull the cruise control lever toward you twice in quick succession.



Autosteer briefly displays a message on the instrument panel reminding you to pay attention to the road and be ready to take over at any time. To indicate that Autosteer is now actively steering Model S, the instrument panel displays the Autosteer icon in blue. When Autosteer is able to detect lane markings, it also displays the driving lane in blue.



**Note:** To initiate Autosteer when there is no vehicle in front of you, you must be driving at least 18 mph (30 km/h) on a roadway with visible lane markings. If a vehicle is detected ahead of you, you can initiate Autosteer at any speed under 90 mph (150 km/h), even when stationary (if you are at least 5 feet (150 cm) away from the vehicle).

The instrument panel displays a message indicating that Autosteer is temporarily unavailable if you attempted to engage Autosteer when driving at a speed that is not within the speed required for Autosteer to operate. Autosteer may also be unavailable if it is not receiving adequate data from the camera(s) or sensors.

BENAVIDES-00001884

 Autosteer

If Autosteer is unable to detect lane markings, the driving lane is determined based on the vehicle you are following.

In most cases, Autosteer attempts to center Model S in the driving lane. However, if the sensors detect the presence of an obstacle (such as a vehicle or guard rail), Autosteer may steer Model S in a driving path that is offset from the center of the lane.

⚠ **Warning:** Autosteer is not designed to, and will not, steer Model S around objects partially or completely in the driving lane. Always watch the road in front of you and stay prepared to take appropriate action. It is the driver's responsibility to be in control of Model S at all times.

### Restricted Speed

Autosteer is intended for use only by a fully attentive driver on freeways and highways where access is limited by entry and exit ramps. If you choose to use Autosteer on residential roads, a road without a center divider, or a road where access is not limited, Autosteer may limit the maximum allowed cruising speed. The maximum allowed cruising speed on such roads is calculated based on the detected speed limit including a Speed Assist offset of up to +5 mph (10 km/h). Any Speed Assist offset above +5 mph (10 km/h) is rounded down to +5 mph (10 km/h). However, you can select a more restrictive cruising speed by reducing the speed limit offset (see Controlling Speed Assist on page 105) or by adjusting the cruise control lever.

In situations where the speed limit cannot be detected when Autosteer is engaged, Autosteer reduces your driving speed and limits the set speed to 45 mph (70 km/h). Although you can manually accelerate to exceed the limited speed, Model S may not brake for detected obstacles. Autosteer will slow down to the limited speed when you release the accelerator pedal. When you leave the road, or disengage Autosteer by using the steering wheel, you can increase your set speed again, if desired.

### Hold Steering Wheel

Autosteer uses data from the camera(s), sensors, and GPS to determine how best to steer Model S. When active, Autosteer requires you to hold the steering wheel. If it does not detect your hands on the steering wheel for a period of time, a flashing white light appears along the top of the instrument panel and the following message displays:

 Apply light force to steering wheel

Autosteer detects your hands by recognizing light resistance as the steering wheel turns, or from you manually turning the steering wheel very lightly (without enough force to retake control). Engaging a turn signal, using the cruise control lever to adjust the cruise speed or follow distance, or using any steering wheel button or scroll wheel also qualifies for your hands being detected by Autosteer.

**Note:** When your hands are detected, the message disappears and Autosteer resumes normal operation.

**Note:** Autosteer may also sound a chime at the same time that the message is initially displayed.

Autosteer requires that you pay attention to your surroundings and remain prepared to take control at any time. If Autosteer still does not detect your hands on the steering wheel, the request escalates by sounding chimes that increase in frequency.

If you repeatedly ignore hands-on prompts, Autosteer displays the following message and is disabled for the rest of the drive. If you don't resume manual steering, Autosteer sounds a continuous chime, turns on the warning flashers, and slows the vehicle to a complete stop.

 Autosteer Unavailable for the Rest of This Drive
Hold Steering Wheel to Drive Manually

For the rest of the drive, you must steer manually. Autosteer is available again after you stop and shift the vehicle into Park.

### Take Over Immediately

In situations where Autosteer is unable to steer Model S, Autosteer sounds a warning chime and displays the following message on the instrument panel:

 Take Over Immediately

When you see this message, **TAKE OVER STEERING IMMEDIATELY.**

### Canceling Autosteer

Autosteer cancels when:

BENAVIDES-00001885



- You start steering manually.
- You press the brake pedal.
- You push the cruise control lever away from you.
- The maximum speed that Autosteer supports–90 mph (150 km/h)–is exceeded.
- You shift into a different gear.
- A door is opened.
- An Automatic Emergency Braking event occurs (see Collision Avoidance Assist on page 102).

When Autosteer cancels, it sounds chimes and the Autosteer icon either turns gray to indicate that Autosteer is no longer active, or disappears to indicate that it is not currently available.

**Note:** If Autosteer cancels because you started steering manually, Traffic-Aware Cruise Control remains active and the set speed, if higher than your driving speed, is automatically changed to your driving speed. Disengage Traffic-Aware Cruise Control as you normally would, by briefly pushing the cruise control lever away from you or pressing the brake pedal.

To disable Autosteer so it is no longer available, touch **Controls > Autopilot > Autosteer (Beta)**.

## Auto Lane Change

When Autosteer is active, you can use the turn signals to move Model S into an adjacent lane without moving the steering wheel (which would cancel Autosteer).

⚠️ **Warning:** It is the driver's responsibility to determine whether a lane change is safe and appropriate. Therefore, before initiating a lane change, always check blind spots, lane markings, and the surrounding roadway to confirm it is safe and appropriate to move into the target lane.

⚠️ **Warning:** Never depend on Auto Lane Change to determine an appropriate driving path. Drive attentively by watching the road and traffic ahead of you, checking the surrounding area, and monitoring the instrument panel for warnings. Always be prepared to take immediate action.

⚠️ **Warning:** Do not use Auto Lane Change on city streets or on roads where traffic conditions are constantly changing and where bicycles and pedestrians are present.

⚠️ **Warning:** The performance of Auto Lane Change depends on the ability of the camera(s) to recognize lane markings.

⚠️ **Warning:** Do not use Auto Lane Change on winding roads with sharp curves, on icy or slippery roads, or when weather conditions (such as heavy rain, snow, fog, etc.) may be obstructing the view from the camera(s) or sensors.

⚠️ **Warning:** Failure to follow all warnings and instructions can result in property damage, serious injury or death.

### Operating Auto Lane Change

Auto Lane Change is available whenever Autosteer is active. To change lanes using Auto Lane Change:

1. Perform visual checks to make sure it is safe and appropriate to move into the target lane.
2. Engage the appropriate turn signal.
3. Disengage the turn signal after you are in the target lane.

Auto Lane Change moves Model S into the adjacent lane in the direction indicated by the turn signal, provided the following conditions are met:

- The turn signal is engaged.
- The ultrasonic sensors and Autopilot cameras do not detect a vehicle or obstacle up to the center of the target lane.
- The lane markings indicate that a lane change is permitted.
- The view of the camera(s) is not obstructed.
- Your vehicle does not detect another vehicle in its blind spot.
- Midway through the lane change, Auto Lane Change can detect the outside lane marking of the target lane.
- Driving speed is at least 30 mph (45 km/h).

BENAVIDES-00001886

Autosteer

As the lane change is in progress, Overtake Acceleration is activated, allowing Model S to accelerate closer to a vehicle in front (see Overtake Acceleration on page 86). Midway through the lane change, Auto Lane Change must be able to detect the target lane's outside lane marking. If this lane marking cannot be detected, the lane change is aborted and Model S returns to its original driving lane.

**Note:** Auto Lane Change moves Model S one lane at a time. Moving into an additional lane requires you to engage the turn signal a second time after the first lane change is complete.

When using Auto Lane Change, it is important to monitor its performance by watching the driving path in front of you and the surrounding area. Stay prepared to take over steering at any time. As you are crossing over into the adjacent lane, the instrument panel displays the lane marking as a dashed blue line. Once in your new lane, lane markings are displayed as solid blue lines again.

In situations where Auto Lane Change is unable to operate at optimal performance, or cannot operate due to inadequate data, the instrument panel displays a series of warnings. Therefore, when using Auto Lane Change, always pay attention to the instrument panel and be prepared to manually steer Model S.

## Navigate on Autopilot

**Note:** Navigate on Autopilot is a BETA feature, available only in the United States while driving on roads located in the United States.

When using Autosteer on a controlled-access road (such as a highway or freeway), Navigate on Autopilot automatically exits at off-ramps and interchanges based on your navigation route. Along the highway portion of a navigation route, Navigate on Autopilot also changes lanes to prepare for exits and to minimize the driving time to your destination.

⚠ **Warning:** Navigate on Autopilot does not make driving autonomous. You must pay attention to the road, keep your hands on the steering wheel at all times, and remain aware of your navigation route.

⚠ **Warning:** As is the case with normal driving, be extra careful around blind corners, highway interchanges, and exits because obstacles can appear quickly and at any time.

⚠ **Warning:** Navigate on Autopilot may not recognize or detect oncoming vehicles, stationary objects, and special-use lanes such as those used exclusively for bikes, carpools, emergency vehicles, etc. Remain alert at all times and be prepared to take immediate action. Failure to do so can cause damage, injury or death.

### Enabling and Customizing Navigate on Autopilot

To enable Navigate on Autopilot, touch **Controls > Autopilot > Navigate on Autopilot (Beta)**. Then, to customize how you want Navigate on Autopilot to operate, touch **CUSTOMIZE NAVIGATE ON AUTOPILOT:**

**Speed Based Lane Changes:** Navigate on Autopilot is designed to perform both route-based and speed-based lane changes. Route-based lane changes are designed to keep you on your navigation route (for example, moving you into an adjacent lane to prepare for an upcoming off-ramp) whereas speed-based lane changes are designed to maintain a driving speed (not to exceed your cruising speed) that allows you to minimize the time it takes to reach your destination (for example, moving into an adjacent lane to pass a vehicle in front of you). Speed-based lanes changes are optional. You can use this setting to disable speed-based lane changes or to specify how aggressively you want Navigate on Autopilot to change lanes to achieve the set cruising speed. The **MILD** setting is more conservative about lane changes and may result in a slightly longer driving time whereas **MAD MAX** is designed to allow you to reach your destination in the shortest driving time possible, but will only change lanes when safe to do so.

**Note:** The touchscreen displays route-based lane changes at the top of the map's turn-by-turn direction list to notify you that an upcoming lane changes is needed to stay on the navigation route.

### Operating Navigate on Autopilot

Once enabled, the Navigate on Autopilot button appears on the map's turn-by-turn direction list whenever a navigation route is active and the route includes at least one controlled-access road. Touch this button to allow Navigate on Autopilot to assist you on your journey. The turn-by-turn direction will then display the Autosteer icon next to maneuvers (such as freeway exits) that Navigate on Autopilot will handle.

BENAVIDES-00001887



When the instrument panel displays a message asking you to confirm the lane change, pull the Autopilot stalk toward you or engage the appropriate turn signal. If you do not confirm the lane change within three seconds, a chime sounds to remind you that Navigate on Autopilot requires your confirmation to change lanes.

**Note:** If you ignore a route-based lane change suggestion (for example, you are driving in the left lane while approaching an off-ramp on the right side of the highway), Navigate on Autopilot will be unable to maneuver onto the off-ramp. In this case, the navigation system re-routes you to your destination.

 **Warning:** Navigate on Autopilot may not always attempt to exit at an off-ramp or change lanes, even when an exit or lane change is determined by the navigation route. Always remain alert and be prepared to manually steer onto an off-ramp, or make a lane change to prepare for, or to exit at, an off-ramp or interchange.

### Be Ready to Assist

When attempting to change lanes or maneuver Model S, or when approaching construction zones, Navigate on Autopilot may be unable to determine the appropriate driving lane (for example, complex clover leafs and multi-lane off-ramps) and the instrument panel displays a alert indicating that Navigate on Autopilot is trying to maneuver and may require assistance. When you see the message, be prepared to take immediate action to ensure that it is safe and appropriate to complete the lane change or maneuver.

## Limitations

Autosteer and its associated functions are particularly unlikely to operate as intended when:

- Autosteer is unable to accurately determine lane markings. For example, lane markings are excessively worn, have visible previous markings, have been adjusted due to road construction, are changing quickly (lanes branching off, crossing over, or merging), objects or landscape features are casting strong shadows on the lane markings, or the road surface contains pavement seams or other high-contrast lines.
- Visibility is poor (heavy rain, snow, fog, etc.) or weather conditions are interfering with sensor operation.
- A camera(s) or sensor(s) is obstructed, covered, or damaged.
- Driving on hills.
- Approaching a toll booth.
- Driving on a road that has sharp curves or is excessively rough.
- Bright light (such as direct sunlight) is interfering with the view of the camera(s).
- The sensors are affected by other electrical equipment or devices that generate ultrasonic waves.
- Model S is being driven very close to a vehicle in front of it, which is blocking the view of the camera(s).

 **Warning:** Many unforeseen circumstances can impair the operation of Autosteer. Always keep this in mind and remember that as a result, Autosteer may not steer Model S appropriately. Always drive attentively and be prepared to take immediate action.

BENAVIDES-00001889



If your Model S is equipped with Autopilot components (see About Autopilot on page 79), and you have purchased the optional Enhanced Autopilot or Full Self-Driving Capability package, Autopark uses data from the ultrasonic sensors and GPS to:

- Simplify parking on public roads by maneuvering Model S into parallel and perpendicular parking spaces. See Parking on Public Roads on page 95.
- Automatically park and retrieve Model S from outside the vehicle on private property. See Using Summon on page 97.

⚠️ **Warning:** Summon is a BETA feature. Please use this feature with caution, staying prepared to take immediate action at any time.

⚠️ **Warning:** Autopark's performance depends on the ability of the ultrasonic sensors to determine the vehicle's proximity to curbs, objects, and other vehicles.

## Parking on Public Roads

When driving, follow these steps to allow Autopark to maneuver Model S into a parking space:

1. When driving slowly on a public road, monitor the instrument panel to determine when Autopark has detected a parking space. When Autopark detects a potential parking space, the instrument panel displays a parking icon. Autopark detects parallel parking locations when driving below 15 mph (24 km/h) and perpendicular parking locations when driving below 10 mph (16 km/h).



**Note:** The parking icon appears only if the vehicle's position and/or the circumstances of the surrounding area are such that Autopark can determine an appropriate driving path. If Autopark cannot determine an appropriate path (for example, when driving on a narrow street where moving into the parking space causes the front of the vehicle to extend into the adjacent lane), you can either reposition the vehicle, find a different parking space, or park manually.

2. Check to determine if the detected parking space is appropriate and safe. If so, pull forward and stop approximately a car length ahead of the parking space (as you normally would when parallel parking or when backing into a perpendicular parking space).

3. Release the steering wheel, shift Model S into Reverse, then touch **Start Autopark** on the touchscreen.

4. When parking is complete, Autopark displays the "Complete" message.

In situations where Autopark cannot operate due to inadequate sensor data, the instrument panel displays a message indicating that you must manually park Model S.

**Note:** If you press the brake when Autopark is actively parking Model S, the parking process pauses until you touch **Resume** on the touchscreen.

**Note:** Autopark detects potential perpendicular parking spaces that are at least 9.5 feet (2.9 meters) wide with a vehicle parked on each side. Autopark detects parallel parking spaces that are at least 20 feet (6 meters), but less than 30 feet (9 meters) long. Autopark does not operate on angled parking spaces.

BENAVIDES-00001890

MANUFACTURER RESPONSES TO NTSB SAFETY RECOMENDATION H-17-41:

"Incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed."



Exhibit #

Sumwalt 12

7/9/2024

7/8/24, 8:32 AM    Case 1:21-cv-21940-BB    Document 320-8    Entered on FLSD Docket 01/27/2025    Page 156 of
209
data.ntsb.gov/carol-main-public/sr-details/H-17-041

# Safety Recommendation H-17-041

TO THE MANUFACTURERS OF VEHICLES EQUIPPED WITH LEVEL 2 VEHICLE AUTOMATION
SYSTEMS (VOLKSWAGEN GROUP OF AMERICA, BMW OF NORTH AMERICA, NISSAN GROUP OF
NORTH AMERICA, MERCEDES-BENZ USA, TESLA INC., AND VOLVO GROUP NORTH AMERICA):
Incorporate system safeguards that limit the use of automated vehicle control systems to those
conditions for which they were designed.

# Recommendation Details

📄 Original recommendation transmittal letter

| | |
|---|---|
| Overall status | ✅ Open - Acceptable Response |
| Mode | 🚗 Highway |
| On Most Wanted List | No |
| Priority level | Non-urgent |
| Times reiterated | 1 |
| Is hazmat | No |
| Is NPRM | Yes |
| SR coding | Equipment / Facilities, Safety equipment |
| | Procedures / Regulations, Vehicle design standards/requirements |
| Date issued | 09/28/2017 |
| Overall date closed | |

# Event Details - HWY16FH018

At 4:36 p.m. eastern daylight time on Saturday, May 7, 2016, a 2015 Tesla Model S 70D car, traveling
eastbound on US Highway 27A (US-27A) west of Williston, Florida, struck a semitrailer powered by a
2014 Freightliner Cascadia truck tractor. At the time of the collision, the truck was making a left turn
from westbound US 27A across the two eastbound travel lanes onto NE 140th Court, a local paved
road. The car struck the right side of the semitrailer, crossed underneath it, and then went off the
right roadside at a shallow angle. Impact with the underside of the semitrailer sheared off the roof of
the car.
After leaving the roadway, the car continued through a drainage culvert and two wire fences. It then
struck and broke a utility pole, rotated counterclockwise, and came to rest perpendicular to the
highway in the front yard of a private residence. Meanwhile, the truck continued across the

7/8/24, 1:25 AM
Case 1:21-cv-21940-BB   Document 320-8   Entered on FLSD Docket 01/27/2025   Page 157 of 209
data.ntsb.gov/carol-main-public/sr-details/H-17-041

intersection and came to a stop on NE 140th Court, south of a retail business located on the intersection corner.

The driver and sole occupant of the car died in the crash; the commercial truck driver was not injured.

| | |
|---|---|
| Location | Williston, FL |
| Event date | 05/08/2016 |
| NTSB # | HWY16FH018 |
| Report # | [HAR-17-02](HAR-17-02) |

✅ Volkswagen Group of America, Inc. - Open - Acceptable Response  ⌃

| | |
|---|---|
| Name | Volkswagen Group of America, Inc. |
| Acronym | |
| Category | Private Industry |
| Addressee status | Open - Acceptable Response |

| From     | NTSB                             |
|----------|----------------------------------|
| To       | Volkswagen Group of America, Inc.|
| Date     | 05/29/2018                       |
| Type     | Official Correspondence          |
| Response |                                  |

We recognize that our Williston investigation involved a Level-2 system vehicle, and that manufacturers' development work is now focused on more advanced functionality. We also recognize that the upcoming vehicles with higher levels of automation are likely to retain the functionality of a Level-2 automated system. However, until Level-5 automation systems are fully developed, humans will need to assume multiple roles, either as active drivers, passive monitors of automated driving systems, or available drivers prepared to intervene when requested by the automation. Our intent in issuing these recommendations is to make you aware of the evidence we found that a driver is willing to engage automated systems in situations beyond their design envelope.

We appreciate your detailed description of the Volkswagen Group's automation features that constrain driver operations and monitor driver engagement. As you move forward in developing your automated vehicles, we encourage you to address an important issue that we found in our Williston investigation by limiting the use of automated vehicle control systems to only those conditions for which they were designed, which are defined by you, the manufacturer. Examples of such conditions include roadway type, geographic location, clear roadway markings, weather conditions, speed range, lighting condition, and other manufacturer-defined system performance criteria or constraints. Further, we encourage you to explore driver monitoring systems beyond those measuring steering wheel torque to capture where a driver is focusing his or her attention, or, if relying solely on torque, to describe how this method provides the appropriate level of driver engagement. We look forward to receiving periodic updates from you on your efforts to incorporate these safeguards into your automated systems. Until such actions are complete, Safety Recommendations H-17-41 and -42 are classified OPEN--ACCEPTABLE RESPONSE.

Thank you for your ongoing efforts to improve vehicle safety.

| From | Volkswagen Group of America, Inc. |
|------|-----------------------------------|
| To   | NTSB                              |
| Date | 12/18/2017                        |

Type
Response

Official Correspondence

-From Thomas Zorn, Senior Director, Safety Affairs and Advanced Research: Currently Volkswagen Group of America offers Level 2 Partially automated systems in select Audi models. These models offer a system called Audi Traffic Jam Assist (TJA). TJA assists the driver by providing lateral and longitudinal controls in certain congested environments below 40 mph. In addition to the TJA, these vehicles have two separate Level 1 systems that, when used in combination with each other, also constitute as a level 2 system; Audi Active Lane Assist (AALA) and Adaptive Cruise Control (ACC).

Provided that lane markings are visible and detected by the system AALA works by supporting the driver in keeping their lane by providing torque input into the steering wheel as the vehicle approaches the edges of the lane. AALA can also assist the driver by actively centering the vehicle in the current lane. ACC maintains the set cruise speed, applies the brakes to preserve a predetermined following distance when approaching a slower-moving vehicle, and accelerates to the set cruising speed when the area in front of the vehicle is no longer obstructed by other vehicles. ACC and AALA combined operate between 40 mph and 95 mph. TJA, ACC and AALA are not hands free systems or replacement systems for the driver and require driver engagement at all times.

The TJA system has safeguards in place to ensure the system is being used in those conditions for which it was designed and to significantly reduce the possibility of driver complacency and overreliance on the driver assistant systems for the reasons described below. For TJA to be activated, various criteria must be met:
- ACC active;
- AALA enabled;
- TJA activated in Multi-Media Interface (MMI);
- Driver must be buckled up;
- Speed to be between 0 and 40 mph
- Estimated available lane width is sufficient (at least 2.4 m);
- Estimated lane can be scanned far enough ahead (at least 16 m);
- Distance between the vehicle and the edge of the estimated lane is sufficiently large;
- Estimated lane has a radius of less than 150 m
- Either 2 vehicles ahead or 1 vehicle ahead and 1 vehicle in adjacent lane detected
- Hands on the steering wheel

If the above criteria are not met, then TJA will not engage. If the criteria is no longer

met while TJA is active, then the system will deactivate and inform the driver that it is no longer available.

| | |
|---|---|
| From | NTSB |
| To | Volkswagen Group of America, Inc. |
| Date | 11/13/2017 |
| Type | NPRM Response |
| Response | |

The National Transportation Safety Board (NTSB) has reviewed the National Highway Traffic Safety Administration (NHTSA) notice of public availability and request for comments concerning the guidance document "Automated Driving Systems: A Vision for Safety," published at 82 Federal Register 178, September 15, 2017.
As a result of the Williston crash investigation, the NTSB issued multiple safety recommendations addressing the need to incorporate system safeguards to limit the use of automated vehicle control systems to those conditions for which they were designed. The NTSB also recommended that both the US Department of Transportation and NHTSA define the data parameters that must be recorded by vehicles operating with automated control systems of any level. We further recommended the establishment of reporting requirements for automated vehicles addressing incidents, crashes, and vehicle miles traveled with automated systems enabled. Finally, the NTSB recommended that manufacturers of Level 2 automated vehicle systems incorporate safeguards to limit system operations to their intended domains, and develop more effective applications to sense the driver's degree of engagement with the driving task.

| | |
|---|---|
| From | NTSB |
| To | Volkswagen Group of America, Inc. |
| Date | 09/28/2017 |
| Type | Transmittal Letter |
| Response | |

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and

their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016, NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to Volkswagen Group of America, which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number.

✅ BMW North America, LLC - Open - Acceptable Response ⌃

| | |
|---|---|
| Name | BMW North America, LLC |
| Acronym | BMW |
| Category | Private Industry |
| Addressee status | Open - Acceptable Response |

This recommendation was listed in the related safety recommendations list attached to this NPRM response.

| | |
|---|---|
| From | NTSB |
| To | BMW North America, LLC |
| Date | 05/15/2018 |
| Type | Official Correspondence |
| Response | |

We recognize that our Williston investigation involved a Level-2 system vehicle, and that manufacturers' development work is now focused on more advanced functionality. We also recognize that the upcoming vehicles with higher levels of automation are likely to retain the functionality of a Level-2 automated system. However, until Level-5 automation systems are fully developed, humans will need to assume multiple roles, either as active drivers, passive monitors of automated driving systems, or available drivers prepared to intervene when requested by the automation. Our intent in issuing these recommendations is to make you aware of the evidence we found that a driver is willing to engage automated systems in situations beyond their design envelope.

We appreciate your detailed description of the BMW Group's automation features that constrain driver operatons and monitor driver engagement. As you move forward in developing your automated vehicles, we encourage you to address an important issue that we found in our Williston investigation by limiting the use of automated vehicle control systems to only those conditions for which they were designed, which are defined by you, the manufacturer. Examples of such conditions include roadway type, geographic location, clear roadway markings, weather conditions, speed range, lighting condition, and other manufacturer-defined system performance criteria or constraints. Further, we encourage you to explore driver monitoring systems beyond those measuring steering wheel torque to capture where a driver is focusing his or her attention, or, if relying solely on torque, to describe why this method provides the appropriate level of driver engagement. We look forward to receiving periodic updates from you on your efforts to incorporate these safeguards into your automated systems. Until such actions are complete, Safety Recommendations H-17-41 and -42 are classified OPEN-ACCEPTABLE RESPONSE.

Thank you for your ongoing efforts to improve vehicle safety.

| | |
|---|---|
| From | BMW North America, LLC |

To          NTSB
Date        12/19/2017
Type        Official Correspondence
Response

-From Samuel Campbell, Department Head for Safety Engineering and ITS, BMW
Group: SAE standard J3016, Taxonomy and Definitions for Terms Related to Driving
Automation Systems for On-Road Motor Vehicles, in part defines levels of driving
automation in Level 0 through Level 5.

Level 2 driving automation, the basis of the NTSB recommendation, is defined as
"Partial" Driving Automation" where the sustained execution of both the lateral and
longitudinal vehicle motion control portions of the dynamic driving task (DDT) can be
accomplished by the automated driving systems within a limited and defined
operational design domain (ODD).

Situations where the system can be enabled must correspond to the functional
strategy and the safety concept of the system. Limitation of the system may be
required in certain operational design domains even when the functional strategy of a
Level 2 system includes the driver. Nevertheless, Level 2 systems such as BMW's
current Steering and Lane Control Assistant is capable of being activated on many
types of roadways as the system was designed to address possible risks of those
different domains. This includes safeguards to keep the driver in the loop.

To transparently communicate the driver's responsibility, BMW implemented
measures such as soft lateral support, limited torque input to the steering system,
and cooperative steering to reduce misuse of the system and to keep the driver
engaged. Cooperative steering combines steering inputs of the system and the driver
to encourage mutual vehicle guidance. This effectively reminds the driver to remain
involved in the driving task and it precludes misinterpretations of the system's
capability.

As a supplemental measure, BMW incorporates a hands off detection (HOD) system
that is based on a capacitive sensor mat fitted on the steering wheel collar. This
system functions by measuring and evaluating the change in capacitance of the
sensor mat which is caused by touching the steering wheel. Above walking speeds,
the system tolerates a brief period of significantly less than a minute if the driver
takes his/her hands off the steering wheel.

After this brief period, if the system detects the driver's hands are not on the steering
wheel, the system will initiate a visual Hands-On Request (HOR) in the instrument

cluster. If the driver does not respond to the HOR, a Take-Over Request (TOR) will be initiated with an audible warning and a visual warning in the instrument cluster. If the driver continues not to respond, the system will deactivate.

BMW also recognizes the importance of consumer education regarding the functionality and usage of automated driving systems in our vehicles. On a practical level, BMW provides to consumers a detailed description of its Level 2 system, Steering and Lane Control Assistant, in owner's manuals including: 1) guiding principles of the system; 2) the functionality of the system; 3) functional limitations of the system; and 4) safety warnings. Excerpts of this information from the owner's manual are included in the Appendix to this letter.

| From | NTSB |
|------|------|
| To | BMW North America, LLC |
| Date | 11/13/2017 |
| Type | NPRM Response |
| Response | |

The National Transportation Safety Board (NTSB) has reviewed the National Highway Traffic Safety Administration (NHTSA) notice of public availability and request for comments concerning the guidance document "Automated Driving Systems: A Vision for Safety," published at 82 Federal Register 178, September 15, 2017.
As a result of the Williston crash investigation, the NTSB issued multiple safety recommendations addressing the need to incorporate system safeguards to limit the use of automated vehicle control systems to those conditions for which they were designed. The NTSB also recommended that both the US Department of Transportation and NHTSA define the data parameters that must be recorded by vehicles operating with automated control systems of any level. We further recommended the establishment of reporting requirements for automated vehicles addressing incidents, crashes, and vehicle miles traveled with automated systems enabled. Finally, the NTSB recommended that manufacturers of Level 2 automated vehicle systems incorporate safeguards to limit system operations to their intended domains, and develop more effective applications to sense the driver's degree of engagement with the driving task.

| From | NTSB |
|------|------|
| To | BMW North America, LLC |
| Date | 09/28/2017 |
| Type | Transmittal Letter |

Response

The National Transportation Safety Board (NTSB) is an independent federal agency
charged by Congress with investigating every civil aviation accident in the United
States and significant accidents in other modes of transportation—railroad, highway,
marine, and pipeline. We determine the probable cause of the accidents and issue
safety recommendations aimed at preventing future accidents. In addition, we carry
out special studies concerning transportation safety and coordinate the resources of
the federal government and other organizations to provide assistance to victims and
their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report Collision Between a Car
Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck
Near Williston, Florida, May 7, 2016, NTSB/HAR-17/02. The details of this accident
investigation and the resulting safety recommendations may be found in the
attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to BMW of North America,
which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed
to prevent accidents and save lives. We would appreciate a response within 90 days,
detailing the actions you have taken or intend to take to implement these
recommendations. When replying, please refer to the safety recommendations by
number.

✅ Nissan Group of North America, Inc. - Open - Acceptable Response ⌃

| | |
|---|---|
| Name | Nissan Group of North America, Inc. |
| Acronym | |
| Category | Private Industry |
| Addressee status | Open - Acceptable Response |

| | |
|---|---|
| From | NTSB |
| To | Nissan Group of North America, Inc. |
| Date | 08/22/2018 |
| Type | Official Correspondence |
| Response | |

We recognize that our Williston investigation involved a Level-2 system vehicle, and that manufacturers' development work is now focused on more advanced functionality. We also recognize that the upcoming vehicles with higher levels of automation are likely to retain the functionality of a Level-2 automated system. However, until Level-5 automation systems are fully developed, humans will need to assume multiple roles, either as active drivers, passive monitors of automated driving systems, or available drivers prepared to intervene when requested by the automation. Our intent in issuing these recommendations is to make you aware of the evidence we found that a driver is willing to engage automated systems in situations beyond their design envelope.

We appreciate your detailed description of Nissan's automation features that constrain driver operations and monitor driver engagement. As you move forward in developing your automated vehicles, we encourage you to address an important issue that we found in our Williston investigation by limiting the use of automated vehicle control systems to only those conditions for which they were designed, which are defined by you, the manufacturer. Examples of such conditions include roadway type, geographic location, clear roadway markings, weather conditions, speed range, lighting condition, and other manufacturer-defined system performance criteria or constraints. Further, we encourage you to explore driver monitoring systems beyond those measuring steering wheel torque to capture where a driver is focusing his or her attention, or, if relying solely on torque, to describe why this method provides the appropriate level of driver engagement. We look forward to receiving periodic

updates from you on your efforts to incorporate these safeguards into your
automated systems. Until such actions are complete, Safety Recommendations H-
17-41 and -42 are classified OPEN--ACCEPTABLE RESPONSE.

Thank you for your ongoing efforts to improve vehicle safety.

| | |
|---|---|
| From | Nissan Group of North America, Inc. |
| To | NTSB |
| Date | 06/01/2018 |
| Type | Official Correspondence |
| Response | |

-From Selim Hammoud, Director, NNA Safety Officer, Product Safety, Environmental,
FQA, Nissan North America, Inc.: On behalf of Nissan Group of North America, Inc.
and Nissan Motor Company, Ltd., of Yokohama, Japan, (Nissan), I am responding to
recommendations H-17-41 and H-17-42 (recommendations) to manufacturers of
vehicles equipped with SAE Level 2 driving automation systems (Level 2 driving
automation).

We note that the recommendations were issued before Nissan began offering Level 2
driving automation systems for sale in the United States.1 However, since that time
Nissan introduced Level 2 driving automation technology called ProPILOT Assist as
an optional feature for the 2018 Nissan Rogue, 2018 Nissan LEAF, and the 2019
Infiniti QX50. Nissan recently announced that ProPILOT Assist will also be available
on the 2019 Nissan Altima.

ProPILOT Assist combines a steering assist function with intelligent cruise control to
help drivers stay centered in the lane, navigate stop-and-go traffic, maintain a set
vehicle speed and maintain a set distance to the vehicle ahead. The system is
designed to help ease driver workload by reducing the amount of driver acceleration,
steering and braking input under certain driving conditions. Throughout its operation,
the system gives priority to the driver's control input.

The system uses a front camera installed behind the windshield and a radar sensor
located on the front of the vehicle to measure the distance to the vehicle ahead in the
same lane and to monitor the lane markers. If the vehicle detects a slower moving
vehicle ahead, the system can reduce the vehicle speed so that the vehicle follows
the vehicle in front at the selected distance. The system will also help keep the
vehicle centered in the traveling lane when clear lane markings are detected.

7/8/24, 1:32 AM                    CAROL main-public-document-and-sr-details
Case 1:21-cv-21940-BB    Document 320-8 Entered on FLSD Docket 01/27/2025    Page 171 of
209

Importantly, ProPILOT Assist is a strictly hands-on-the-wheel technology and Nissan very clearly communicates this to our customers through responsible communications, through training of dealership sales personnel, and clear Owner's Manual instructions. In fact, Nissan was very deliberate in including the word "Assist" in naming this technology, and always includes the word "Assist" when referring to the feature; Nissan believes this helps customers better appreciate its intended function whenever they see the technology mentioned. ProPILOT Assist also utilizes a robust hands-on detection system described in greater detail in our responses to the recommendations.

As with other SAE Level 2 technologies, ProPILOT Assist is designed to operate cooperatively with the driver and requires the driver to remain engaged and ready to immediately respond to traffic around the vehicle and maintain lane position. The driver's operation of the system is supported by the design of the vehicle information display and the hands-on detection system.

The vehicle information display located in the meter panel in front of the driver visually depicts the system status during operation. Through a combination of icons, the driver can monitor the on/off status of ProPILOT Assist, whether the system detects the lane markers on either side of the vehicle, whether or not a vehicle ahead is detected, the selected following distance, the set traveling speed, and the on/off status of the steering assist function.

Once ProPILOT Assist is turned on, the intelligent cruise control is engaged, and both the right-hand and left-hand lane markers are consistently detected, steering assist engages and the steering wheel/lane marker icons on the instrument panel turn green. Both right and left-hand markers need to be detected by the front camera before steering assist will engage. If the camera subsequently cannot detect either lane marker, the system will disengage and alert the driver through changes in the vehicle information display and with an audible alert. When there is no vehicle ahead, steering assist is not available at speeds under 37 mph (60 km/h). (i.e. low speed steering assist only works while in traffic)

There are additional limitations to the operation of the ProPILOT Assist system; the system does not function in all driving, traffic, weather, and road conditions. These limitations are explained in the vehicle's Owner's Manual 2, alongside other information describing the normal operation of the system. If the system's operational requirements are not satisfied, the driver is not able to engage the system. If a system limitation is encountered during operation, the ProPILOT Assist

system will disengage and alert the driver through changes in the vehicle information display and with an audible alert.

The system characteristics and limitations are communicated to the customer in a number of ways:
• Nissan selected the name for ProPILOT Assist to clearly identify the system as an advanced driver assistance technology;
• The operation of the system and its limitations are described in detail in the vehicle owner's manual;
• A quick reference guide is provided to the customer at the point of sale which includes an overview of the system and its limitations;
• Nissan provides information online in the form of electronic Quick Reference Guides and YouTube videos which explain system function;
• In its efforts to launch ProPILOT Assist, Nissan clearly communicated the proper use of the system to media and other analysts beginning in July (well ahead of launch) through press releases, infographics, videos, and in-person briefings to ensure that third-party reporting of ProPILOT Assist would accurately reflect the system's capabilities and limitations.


| | |
|---|---|
| From | NTSB |
| To | Nissan Group of North America, Inc. |
| Date | 11/13/2017 |
| Type | NPRM Response |
| Response | |

The National Transportation Safety Board (NTSB) has reviewed the National Highway Traffic Safety Administration (NHTSA) notice of public availability and request for comments concerning the guidance document "Automated Driving Systems: A Vision for Safety," published at 82 Federal Register 178, September 15, 2017.

As a result of the Williston crash investigation, the NTSB issued multiple safety recommendations addressing the need to incorporate system safeguards to limit the use of automated vehicle control systems to those conditions for which they were designed. The NTSB also recommended that both the US Department of Transportation and NHTSA define the data parameters that must be recorded by vehicles operating with automated control systems of any level. We further recommended the establishment of reporting requirements for automated vehicles addressing incidents, crashes, and vehicle miles traveled with automated systems enabled. Finally, the NTSB recommended that manufacturers of Level 2 automated vehicle systems incorporate safeguards to limit system operations to their intended

domains, and develop more effective applications to sense the driver's degree of engagement with the driving task.

| | |
|---|---|
| From | NTSB |
| To | Nissan Group of North America, Inc. |
| Date | 09/28/2017 |
| Type | Transmittal Letter |
| Response | |

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016, NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to Nissan Group of North America, which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number.

Mercedes-Benz USA, LLC - Open - Acceptable Response ⌃

| | |
|---|---|
| Name | Mercedes-Benz USA, LLC |
| Acronym | |
| Category | Private Industry |
| Addressee status | Open - Acceptable Response |

7/8/24, 1:08 PM    Case 1:21-cv-21940-BB    Document 320-8   Entered on FLSD Docket 01/27/2025    Page 175 of
data.ntsb.gov/carol-main-public/sr-details/H-17-041
Response
209

From        NTSB
To          Mercedes-Benz USA, LLC
Date        03/05/2018
Type        Official Correspondence
Response

We recognize that our Williston investigation involved a Level-2 system vehicle, and
that manufacturers' development work is now focused on more advanced
functionality. We also recognize that the upcoming vehicles with higher levels of
automation are likely to retain the functionality of a Level-2 automated system.
However, until Level-5 automation systems are fully developed, humans will need to
assume multiple roles, either as active drivers, passive monitors of automated driving
systems, or available drivers prepared to intervene when requested by the
automation. Our intent in issuing these recommendations is to make you aware of the
evidence we found that a driver is willing to engage automated systems in situations
beyond their design envelope. We believe that these recommendations will remain
relevant even as we move beyond Level 2 automated systems.

We appreciate your description of MBUSA's automation features that monitor driver
engagement. As you move forward in developing your automated vehicles, we
encourage you to include control systems that automatically restrict automated
operations to the conditions for which they were designed. Further, we encourage you

to explore monitoring systems beyond those measuring steering wheel torque to capture where a driver is focusing his or her attention. We look forward to receiving periodic updates from you on your efforts to incorporate these safeguards into your automated systems. Until such actions are complete, Safety Recommendations H-17-41 and -42 are classified OPEN--ACCEPTABLE RESPONSE.

| | |
|---|---|
| From | Mercedes-Benz USA, LLC |
| To | NTSB |
| Date | 12/08/2017 |
| Type | Official Correspondence |
| Response | |

-From David S. Tait, General Manager, Engineering Services, Mercedes-Benz, USA, LLC: As Level 2 driving automation features require the driver to remain engaged in the driving task at all times while the features are activated, MBUSA systems are designed to utilize a cooperative steering philosophy, whereby the driver steers but receives support from the systems. If the systems detect that the driver is not fulfilling his/her responsibility of engaging in the driving task, an escalating cascade of visual and audible warnings precedes a controlled full deceleration of the vehicle if no corrective action is taken by the driver. This full deceleration is designed to increase road safety by bringing the vehicle to a controlled stop, applying the parking brake, and activating the hazard warning lights in the event that a driver becomes medically incapable of performing the driving task, or otherwise refuses to do so.

Additionally, if the driver responds to the feature's warnings by simply applying the throttle via the accelerator pedal, the system that can assist in steering the vehicle will still deactivate, as throttle input alone is not considered a reengagement by the driver for the steering requirements of the driving task.

| | |
|---|---|
| From | NTSB |
| To | Mercedes-Benz USA, LLC |
| Date | 11/13/2017 |
| Type | NPRM Response |
| Response | |

The National Transportation Safety Board (NTSB) has reviewed the National Highway Traffic Safety Administration (NHTSA) notice of public availability and request for comments concerning the guidance document "Automated Driving Systems: A Vision for Safety," published at 82 Federal Register 178, September 15, 2017.

As a result of the Williston crash investigation, the NTSB issued multiple safety recommendations addressing the need to incorporate system safeguards to limit the use of automated vehicle control systems to those conditions for which they were designed. The NTSB also recommended that both the US Department of Transportation and NHTSA define the data parameters that must be recorded by vehicles operating with automated control systems of any level. We further recommended the establishment of reporting requirements for automated vehicles addressing incidents, crashes, and vehicle miles traveled with automated systems enabled. Finally, the NTSB recommended that manufacturers of Level 2 automated vehicle systems incorporate safeguards to limit system operations to their intended domains, and develop more effective applications to sense the driver's degree of engagement with the driving task.

| | |
|---|---|
| From | NTSB |
| To | Mercedes-Benz USA, LLC |
| Date | 09/28/2017 |
| Type | Transmittal Letter |
| Response | |

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016, NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to Mercedes-Benz USA, which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number.

7/8/24, 1:52 AM
data.ntsb.gov/carol-main-public/sr-details/H-17-041
Case 1:21-cv-21940-BB   Document 320-8   Entered on FLSD Docket 01/27/2025   Page 178 of
209

attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to Tesla Inc., which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number.

✅ Volvo Cars of North America, Inc. - Open - Acceptable Response ⌃

| | |
|---|---|
| Name | Volvo Cars of North America, Inc. |
| Acronym | |
| Category | Private Industry |
| Addressee status | Open - Acceptable Response |

| To | Volvo Cars of North America, Inc. |
| Date | 05/15/2018 |
| Type | Official Correspondence |
| Response | |

We recognize that our Williston investigation involved a Level-2 system vehicle, and that manufacturers' development work is now focused on more advanced functionality. We also recognize that the upcoming vehicles with higher levels of automation are likely to retain the functionality of a Level-2 automated system. However, until Level-5 automation systems are fully developed, humans will need to assume multiple roles, either as active drivers, passive monitors of automated driving systems, or available drivers prepared to intervene when requested by the automation. Our intent in issuing these recommendations is to make you aware of the evidence we found that a driver is willing to engage automated systems in situations beyond their design envelope.

We appreciate your description of Volvo Car's automation features that constrain driver operations and monitor driver engagement. As you move forward in developing your automated vehicles, we encourage you to address an important issue that we found in our Williston investigation by limiting the use of automated vehicle control systems to only those conditions for which they were designed, which are defined by you, the manufacturer. Examples of such conditions include roadway type, geographic location, clear roadway markings, weather conditions, speed range, lighting condition, and other manufacturer-defined system performance criteria or constraints. Further, we encourage you to explore driver monitoring systems beyond those measuring steering wheel torque to capture where a driver is focusing his or her attention, or, if relying solely on torque, to describe how this method provides the appropriate level of driver engagement. We look forward to receiving periodic updates from you on your efforts to incorporate these safeguards into your automated systems. Until such actions are complete, Safety Recommendations H-17-41 and -42 are classified OPEN--ACCEPTABLE RESPONSE.

Thank you for your ongoing efforts to improve vehicle safety.

| From | Volvo Cars of North America, Inc. |
| To | NTSB |
| Date | 12/27/2017 |
| Type | Official Correspondence |
| Response | |

-From Katherine Yehl, Vice President Government Affairs the Americas, Volvo Car

Corporation: Thank you for your letter regarding Report 17-02, PB2017 — 102600 and
the National Transportation Safety Board (NTSB) recommendations for vehicle
manufacturers equipped with Level 2 automation systems.

Safety is a founding principle of Volvo Car Corporation (VCC) and VCC works hard to
stay at the forefront of the industry by taking an overall approach to safety, which has
proven effective in real world traffic situations. VCC invented the three point lap and
shoulder safety belt and then gave away the global patent in order to save lives. It has
been estimated that this one act could have saved over 1m lives globally.

According to the latest US crash causation study, 94% of all crashes are due to
human error. In 2016, traffic fatalities remain at epidemic levels. At VCC, we are
appalled that 1.2 million people around the world are killed in traffic crashes annually
— with over 35,000 of those deaths occurring in the U.S. alone. Crash avoidance and
active safety technologies will be essential to substantially reduce this number and to
eventually completely avoid crashes in the future.

In 2007, VCC launched Vision 2020. This Vision states that no one should be killed or
seriously injured in a new Volvo by 2020. Crash avoidance and active safety
technologies are essential to reach our goal. These features which include systems
that assist the driver or automatically act in order to prevent or mitigate crashes
(such as automatic emergency braking systems, lane departure warning systems,
pedestrian detection, and braking systems) are the precursors for self-driving cars.

Numerous studies of real-world crash performance data in the US and abroad show
the effectiveness of these active safety systems in reducing injuries and fatalities.
These technologies will continue to be developed and they will become even more
effective over time. So VCC strongly supports the NTSB June, 2015, recommendation
that the US New Car Assessment Program (NCAP) include crash avoidance
technologies in the 5-star safety rating scale.

The USA is way behind all other major countries who already include these life-saving
technologies in the overall consumer rating.

With regard to the two NTSB recommendations for manufacturers of vehicles with
level 2 vehicle automation systems, Volvo Cars supports the intent of these
recommendations. See below:
1) Incorporate system safeguards that limit the use of automated vehicle control
systems to those conditions for which they were designed. (H-17-41). Volvo Cars
pilot assist adheres to this recommendation and the system only perform in the

conditions for which they were designed.

2) Develop applications to more effectively sense the driver's level of engagement and alert the driver when engagement is lacking while automated vehicle control systems are in use. (H-17-42) Volvo Cars pilot assist adheres to this recommendation and our systems alert the driver when engagement is lacking.

VCC would like to clarify how our pilot assist system works and would like to invite the NTSB to demo the system. The VCC pilot assist system is an active safety support function that combines steering with Adaptive Cruise Control and braking. Simply put it is lane centering support plus adaptive cruise control. It is very important to note that the system is designed as an assistance system.

The driver is in control and the system gives assistance and complimentary support to the driver. It helps the operator keep within his lane and stay a safe distance and speed from the vehicle in front of it. However, the driver is expected to actively participate in the driving and remains responsible for monitoring and supervision over the entire operation of the vehicle. It also is important to emphasize that VCC systems are restricted in how much acceleration, braking and steering force can be applied. The driver is always responsible for maintaining their hands on the wheel and eyes on the road when using these features. If a driver's hands are not on the steering wheel, a warning is given to the driver to grasp the steering wheel. If the driver does not respond to the warning, an additional warning is provided with an audible alert.

If the driver still does not respond, the system disengages. This functionality is specifically designed to prevent the driver from becoming overly reliant on the system.

VCC's ambition is to provide our customers accurate, descriptive and easy-tounderstand information of driver support functionality to increase the driver's understanding and acceptance of function behavior & performance, function limitations, and driver responsibilities. If you have any additional questions or need further assistance, please do not hesitate contact us.

| | |
|---|---|
| From | NTSB |
| To | Volvo Cars of North America, Inc. |
| Date | 11/13/2017 |
| Type | NPRM Response |

Response

The National Transportation Safety Board (NTSB) has reviewed the National Highway Traffic Safety Administration (NHTSA) notice of public availability and request for comments concerning the guidance document "Automated Driving Systems: A Vision for Safety," published at 82 Federal Register 178, September 15, 2017.

As a result of the Williston crash investigation, the NTSB issued multiple safety recommendations addressing the need to incorporate system safeguards to limit the use of automated vehicle control systems to those conditions for which they were designed. The NTSB also recommended that both the US Department of Transportation and NHTSA define the data parameters that must be recorded by vehicles operating with automated control systems of any level. We further recommended the establishment of reporting requirements for automated vehicles addressing incidents, crashes, and vehicle miles traveled with automated systems enabled. Finally, the NTSB recommended that manufacturers of Level 2 automated vehicle systems incorporate safeguards to limit system operations to their intended domains, and develop more effective applications to sense the driver's degree of engagement with the driving task.

| | |
|---|---|
| From | NTSB |
| To | Volvo Cars of North America, Inc. |
| Date | 09/28/2017 |
| Type | Transmittal Letter |
| Response | |

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016, NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to Volvo Group North America, which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number.

MANUFACTURER RESPONSES TO NTSB SAFETY RECOMENDATION
H-17-42:

"Develop applications to more effectively sense the drivers level of engagement and
alert the driver when engagement is lacking while automated vehicle control systems
are in use."

7/8/24, 11:35 AM    Case 1:21-cv-21940-BB    Document 320-8    Entered on FLSD Docket 01/27/2025    Page 186 of
209
data.ntsb.gov/carol-main-public/sr-details/H-17-042

# Safety Recommendation H-17-042

TO THE MANUFACTURERS OF VEHICLES EQUIPPED WITH LEVEL 2 VEHICLE AUTOMATION
SYSTEMS (VOLKSWAGEN GROUP OF AMERICA, BMW OF NORTH AMERICA, NISSAN GROUP OF
NORTH AMERICA, MERCEDES-BENZ USA, TESLA INC., AND VOLVO GROUP NORTH AMERICA):
Develop applications to more effectively sense the driver's level of engagement and alert the driver
when engagement is lacking while automated vehicle control systems are in use.

# Recommendation Details

📄 Original recommendation transmittal letter

| | |
|---|---|
| Overall status | ✅ Open - Acceptable Response |
| Mode | 🚗 Highway |
| On Most Wanted List | No |
| Priority level | Non-urgent |
| Times reiterated | 1 |
| Is hazmat | No |
| Is NPRM | Yes |
| SR coding | Equipment / Facilities, Safety equipment |
| | Personnel, Medical / Human Factors |
| | Procedures / Regulations, Vehicle design standards/requirements |
| Date issued | 09/28/2017 |
| Overall date closed | |

7/8/24, 3:05 AM
Case 1:21-cv-21940-BB   Document 320-8   Entered on FLSD Docket 01/27/2025   Page 187 of 209
data.ntsb.gov/carol-main-public/sr-details/H-17-041

intersection and came to a stop on NE 140th Court, south of a retail business located on the intersection corner.

The driver and sole occupant of the car died in the crash; the commercial truck driver was not injured.

Location    Williston, FL
Event date  05/08/2016
NTSB #      HWY16FH018
Report #    [HAR-17-02](#)

| From | NTSB |
|------|------|
| To | Volkswagen Group of America, Inc. |
| Date | 05/29/2018 |
| Type | Official Correspondence |
| Response | |

We recognize that our Williston investigation involved a Level-2 system vehicle, and that manufacturers' development work is now focused on more advanced functionality. We also recognize that the upcoming vehicles with higher levels of automation are likely to retain the functionality of a Level-2 automated system. However, until Level-5 automation systems are fully developed, humans will need to assume multiple roles, either as active drivers, passive monitors of automated driving systems, or available drivers prepared to intervene when requested by the automation. Our intent in issuing these recommendations is to make you aware of the evidence we found that a driver is willing to engage automated systems in situations beyond their design envelope.

We appreciate your detailed description of the Volkswagen Group's automation features that constrain driver operations and monitor driver engagement. As you move forward in developing your automated vehicles, we encourage you to address an important issue that we found in our Williston investigation by limiting the use of automated vehicle control systems to only those conditions for which they were designed, which are defined by you, the manufacturer. Examples of such conditions include roadway type, geographic location, clear roadway markings, weather conditions, speed range, lighting condition, and other manufacturer-defined system performance criteria or constraints. Further, we encourage you to explore driver monitoring systems beyond those measuring steering wheel torque to capture where a driver is focusing his or her attention, or, if relying solely on torque, to describe how this method provides the appropriate level of driver engagement. We look forward to receiving periodic updates from you on your efforts to incorporate these safeguards

7/8/24, 1:45 AM    Case 1:21-cv-21940-BB    Document 320-8    Entered on FLSD Docket 01/27/2025    Page 189 of
209
data.ntsb.gov/carol-main-public/sr-details/H-17-042

into your automated systems. Until such actions are complete, Safety
Recommendations H-17-41 and -42 are classified OPEN--ACCEPTABLE RESPONSE.

Thank you for your ongoing efforts to improve vehicle safety.

| From | Volkswagen Group of America, Inc. |
|------|-----------------------------------|
| To | NTSB |
| Date | 12/18/2017 |
| Type | Official Correspondence |
| Response | |

-From Thomas Zorn, Senior Director, Safety Affairs and Advanced Research: Currently
Volkswagen Group of America offers Level 2 Partially automated systems in select
Audi models. These models offer a system called Audi Traffic Jam Assist (TJA). TJA
assists the driver by providing lateral and longitudinal controls in certain congested
environments below 40 mph. In addition to the TJA, these vehicles have two separate
Level 1 systems that, when used in combination with each other, also constitute as a
level 2 system; Audi Active Lane Assist (AALA) and Adaptive Cruise Control (ACC).

Provided that lane markings are visible and detected by the system AALA works by
supporting the driver in keeping their lane by providing torque input into the steering
wheel as the vehicle approaches the edges of the lane. AALA can also assist the
driver by actively centering the vehicle in the current lane. ACC maintains the set
cruise speed, applies the brakes to preserve a predetermined following distance
when approaching a slower-moving vehicle, and accelerates to the set cruising speed
when the area in front of the vehicle is no longer obstructed by other vehicles. ACC
and AALA combined operate between 40 mph and 95 mph. TJA, ACC and AALA are
not hands free systems or replacement systems for the driver and require driver
engagement at all times.

We have taken numerous steps to ensure that the driver does not become reliant on
the system, complacent while utilizing the system and confused about its
capabilities. First, TJA is specifically named as an Assist system and not a Pilot
system. Second, the TJA capabilities and limitations are specifically noted in
advertisements as well as owner manuals. Third, TJA system currently considers
multiple factors to determine driver engagement:
1. One way in which driver attention is measured is by the torque sensor in the
electric power steering. Simply touching the steering wheel is not sufficient for driver
recognition; there must be a steering "effort" by the driver (approximately 0.4 Nm).
2. Warning strategies messaging and timing of TJA: A take-over request is issued by

7/8/24, 11:38 AM    Case 1:21-cv-21940-BB    Document 320-8    Entered on FLSD Docket 04/27/2025    Page 190 of
209
data.ntsb.gov/carol-main-public/sr-details/H-17-042

the system if no steering input is detected for approximately 10 to 15 seconds. If the driver ignores the visual and audible warnings, the system will bring the vehicle to a controlled stop. The 10 to 15 seconds hands-off time limit is in line with the United Nations Economic Commission for Europe regulation regarding lane-keeping systems slated to go into effect in 2018.

a. If AALA is being used outside of the TJA mode, it similarly has a 10 to 15 second handsoff time limit. If the driver ignores the AALA warning outside of the TJA mode, the AALA function will simply immediately disengage but not slow down the vehicle. 3. The driver seatbelt buckle is monitored. If the driver seatbelt is not buckled, the TJA function is deactivated.

These driver monitoring methods coupled with the TJA functionality engagement criteria provides assurance that the driver will not become complacent and/or too reliant on the system. Given that the definition of level 2 systems require the driver to supervise the driving task at all times, the above measures ensure that the driver is supervising the performance of the driving task when the system is active. We believe that the TJA design significantly reduces the possibility of driver complacency and overreliance on the assistance systems or otherwise preoccupied from monitoring the performance of the driving task.

It is important to note that as systems evolve and as new Level 2 functions are developed to accommodate new use cases, additional safeguards will be considered to ensure proper utilization of the systems by the human driver. Regulations, guidelines and best practices might also play a similar role for future system requirements and deployment.

| | |
|---|---|
| From | NTSB |
| To | Volkswagen Group of America, Inc. |
| Date | 09/28/2017 |
| Type | Transmittal Letter |
| Response | |

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and

7/8/24, 1:08 AM
Case 1:21-cv-21940-BB   Document 320-8   Entered on FLSD Docket 04/27/2025   Page 191 of
209
data.ntsb.gov/carol-main-public/sr-details/H-17-042

their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016, NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to Volkswagen Group of America, which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number.

| From | NTSB |
|---|---|
| To | BMW North America, LLC |
| Date | 05/15/2018 |
| Type | Official Correspondence |
| Response | |

We recognize that our Williston investigation involved a Level-2 system vehicle, and that manufacturers' development work is now focused on more advanced functionality. We also recognize that the upcoming vehicles with higher levels of automation are likely to retain the functionality of a Level-2 automated system. However, until Level-5 automation systems are fully developed, humans will need to assume multiple roles, either as active drivers, passive monitors of automated driving systems, or available drivers prepared to intervene when requested by the automation. Our intent in issuing these recommendations is to make you aware of the evidence we found that a driver is willing to engage automated systems in situations beyond their design envelope.

We appreciate your detailed description of the BMW Group's automation features that constrain driver operatons and monitor driver engagement. As you move forward in developing your automated vehicles, we encourage you to address an important issue that we found in our Williston investigation by limiting the use of automated vehicle control systems to only those conditions for which they were designed, which are defined by you, the manufacturer. Examples of such conditions include roadway type, geographic location, clear roadway markings, weather conditions, speed range, lighting condition, and other manufacturer-defined system performance criteria or constraints. Further, we encourage you to explore driver monitoring systems beyond those measuring steering wheel torque to capture where a driver is focusing his or her attention, or, if relying solely on torque, to describe why this method provides the appropriate level of driver engagement. We look forward to receiving periodic

✅ BMW North America, LLC - Open - Acceptable Response ⌃

| | |
|---|---|
| Name | BMW North America, LLC |
| Acronym | BMW |
| Category | Private Industry |
| Addressee status | Open - Acceptable Response |

Case 1:21-cv-21940-BB   Document 320-8   Entered on FLSD Docket 01/27/2025   Page 194 of 209

updates from you on your efforts to incorporate these safeguards into your
automated systems. Until such actions are complete, Safety Recommendations H-
17-41 and -42 are classified OPEN-ACCEPTABLE RESPONSE.

Thank you for your ongoing efforts to improve vehicle safety.


| | |
|---|---|
| From | BMW North America, LLC |
| To | NTSB |
| Date | 12/19/2017 |
| Type | Official Correspondence |
| Response | |

-From Samuel Campbell, Department Head for Safety Engineering and ITS, BMW
Group: BMW's Level 2 system is designed to communicate to the driver both the
limitations of the automated driving system and the responsibilities of the driver
while the automated driving system is active.

To transparently communicate the driver's responsibility, BMW implemented
measures such as soft lateral support, limited torque input to the steering system,
and cooperative steering to reduce misuse of the system and to keep the driver
engaged. Cooperative steering combines steering inputs of the system and the driver
to encourage mutual vehicle guidance. This effectively reminds the driver to remain
involved in the driving task and it precludes misinterpretations of the system's
capability.

As a supplemental measure, BMW incorporates a hands on detection (HOD) system
that is based on measuring capacitance via a capacitive sensor mat fitted on the
steering wheel collar. This system functions by measuring and evaluating the change
in capacitance of the sensor mat which is caused by touching the steering wheel.
Above walking speeds, the system tolerates a brief period of significantly less than a
minute if the driver takes his/her hands off the steering wheel. After this brief period,
if the system detects the driver's hands are not on the steering wheel, the system will
initiate a visual Hands-On Request (HOR) in the instrument cluster. If the driver does
not respond to the HOR, a Take-Over Request (TOR) will be initiated with an audible
warning and a visual warning in the instrument cluster.

If the driver continues not to respond, the system will deactivate. Future
considerations are to use enhanced driver monitoring techniques (such as
biometrics) to assess the driver's engagement. Nonetheless, some studies have
shown that it is more effective to actively engage the driver than to monitor and

discipline misuse of the system.

Hopefully the information provided addresses the concerns in your safety recommendations regarding safety in automated vehicles.


From        NTSB
To          BMW North America, LLC
Date        09/28/2017
Type        Transmittal Letter
Response

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016, NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to BMW of North America, which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number.

✅ Nissan Group of North America, Inc. - Open - Acceptable Response ⌃

| | |
|---|---|
| Name | Nissan Group of North America, Inc. |
| Acronym | |
| Category | Private Industry |
| Addressee status | Open - Acceptable Response |

7/8/24, 2:05 PM    Case 1:21-cv-21940-BB    Document 320-8 Entered on FLSD Docket 01/27/2025    Page 197 of
carol-main-public/sr-details/H-17-042
209

|  |  |
|---|---|
| From | NTSB |
| To | Nissan Group of North America, Inc. |
| Date | 08/22/2018 |
| Type | Official Correspondence |
| Response |  |

We recognize that our Williston investigation involved a Level-2 system vehicle, and that manufacturers' development work is now focused on more advanced functionality. We also recognize that the upcoming vehicles with higher levels of automation are likely to retain the functionality of a Level-2 automated system.

However until evel- automation systems are fully developed humans will need to assume multiple roles either as active drivers passive monitors of automated driving systems or availa le drivers prepared to intervene when re uested y the automation. Our intent in issuing these recommendations is to make you aware of the evidence we found that a driver is willing to engage automated systems in situations eyond their design envelope.

e appreciate your detailed description of Nissan s automation features that constrain driver operations and monitor driver engagement. As you move forward in developing your automated vehicles we encourage you to address an important issue that we found in our

illiston investigation y limiting the use of automated vehicle control systems to only those conditions for which they were designed which are dened y you the manufacturer. E amples of such conditions include roadway type geographic location clear roadway markings weather conditions speed range lighting condition and other manufacturer-dened system performance criteria or constraints. Further we encourage you to e plore driver monitoring systems eyond those measuring steering wheel tor ue to capture where a driver is focusing his or her attention or if relying solely on tor ue to descri e why this method provides the appropriate level of driver engagement. e look forward to receiving periodic updates from you on your efforts to incorporate these safeguards into your automated systems. Until such actions are complete Safety Recommendations H-17-41 and -42 are classied OPEN--ACCEPTAB E RESPONSE.

Thank you for your ongoing efforts to improve vehicle safety

| From | Nissan Group of North America, Inc. |
| --- | --- |
| To | NTSB |
| Date | 06/01/2018 |
| Type | Official Correspondence |
| Response | |

-From Selim Hammoud, Director, NNA Safety Officer, Product Safety, Environmental, FQA, Nissan North America, Inc.: On behalf of Nissan Group of North America, Inc. and Nissan Motor Company, Ltd., of Yokohama, Japan, (Nissan), I am responding to recommendations H-17-41 and H-17-42 (recommendations) to manufacturers of vehicles equipped with SAE Level 2 driving automation systems (Level 2 driving automation).

We note that the recommendations were issued before Nissan began offering Level 2 driving automation systems for sale in the United States.1 However, since that time

Nissan introduced Level 2 driving automation technology called ProPILOT Assist as an optional feature for the 2018 Nissan Rogue, 2018 Nissan LEAF, and the 2019 Infiniti QX50. Nissan recently announced that ProPILOT Assist will also be available on the 2019 Nissan Altima.

ProPILOT Assist combines a steering assist function with intelligent cruise control to help drivers stay centered in the lane, navigate stop-and-go traffic, maintain a set vehicle speed and maintain a set distance to the vehicle ahead. The system is designed to help ease driver workload by reducing the amount of driver acceleration, steering and braking input under certain driving conditions. Throughout its operation, the system gives priority to the driver's control input.

The system uses a front camera installed behind the windshield and a radar sensor located on the front of the vehicle to measure the distance to the vehicle ahead in the same lane and to monitor the lane markers. If the vehicle detects a slower moving vehicle ahead, the system can reduce the vehicle speed so that the vehicle follows the vehicle in front at the selected distance. The system will also help keep the vehicle centered in the traveling lane when clear lane markings are detected.

Importantly, ProPILOT Assist is a strictly hands-on-the-wheel technology and Nissan very clearly communicates this to our customers through responsible communications, through training of dealership sales personnel, and clear Owner's Manual instructions. In fact, Nissan was very deliberate in including the word "Assist" in naming this technology, and always includes the word "Assist" when referring to the feature; Nissan believes this helps customers better appreciate its intended function whenever they see the technology mentioned. ProPILOT Assist also utilizes a robust hands-on detection system described in greater detail in our responses to the recommendations.

The ProPILOT Assist hands-on detection system uses a torque sensor to detect the small amount of resistance from the driver holding the steering wheel as the system is making steering adjustments. If the steering wheel is not operated or the driver takes his/her hands off the steering wheel, a visual warning is typically 3 provided within 5-10 seconds. If the driver does not operate the steering wheel after the warning has been displayed, an audible alert sounds and a warning flashes in the vehicle information display, followed by a haptic alert in the form of a quick application of the brakes to request the driver to take control of the vehicle. If the driver still does not respond, ProPILOT Assist slows the vehicle to a complete stop and activates the hazard lights. The driver can cancel the deceleration at any time by steering, braking, accelerating, or operating the ProPILOT Assist switch.

7/8/24, 1:08 AM    Case 1:21-cv-21940-BB    Document 320-8    Entered on FLSD Docket 01/27/2025    Page 200 of
data.ntsb.gov/carol-main-public/sr-details/H-17-042
209

In addition to hands-on detection safeguards, Nissan continues to research
opportunities to enhance the performance of our advanced driving technologies,
including ProPILOT Assist, and the experience of our customers. Nissan is engaging
not only in our own research, but also with other partners such as academic
institutions and government stakeholders.

In conclusion, Nissan is committed to the safe and responsible deployment of
autonomous driving technologies. We would be happy to meet with the NTSB to
discuss ProPILOT Assist in more detail.

| | |
|---|---|
| From | NTSB |
| To | Nissan Group of North America, Inc. |
| Date | 09/28/2017 |
| Type | Transmittal Letter |
| Response | |

The National Transportation Safety Board (NTSB) is an independent federal agency
charged by Congress with investigating every civil aviation accident in the United
States and significant accidents in other modes of transportation—railroad, highway,
marine, and pipeline. We determine the probable cause of the accidents and issue
safety recommendations aimed at preventing future accidents. In addition, we carry
out special studies concerning transportation safety and coordinate the resources of
the federal government and other organizations to provide assistance to victims and
their family members affected by major transportation disasters.
On September 12, 2017, the NTSB adopted its report Collision Between a Car
Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck
Near Williston, Florida, May 7, 2016, NTSB/HAR-17/02. The details of this accident
investigation and the resulting safety recommendations may be found in the
attached report, which can also be accessed at http://www.ntsb.gov.
Among the Safety Recommendations are two issued to Nissan Group of North
America, which can be found on page 43 of the report.
The NTSB is vitally interested in these recommendations because they are designed
to prevent accidents and save lives. We would appreciate a response within 90 days,
detailing the actions you have taken or intend to take to implement these
recommendations. When replying, please refer to the safety recommendations by
number.

✅ Mercedes-Benz USA, LLC - Open - Acceptable Response ⌃

| | |
|---|---|
| Name | Mercedes-Benz USA, LLC |
| Acronym | |
| Category | Private Industry |
| Addressee status | Open - Acceptable Response |

| | |
|---|---|
| From | NTSB |
| To | Mercedes-Benz USA, LLC |
| Date | 03/08/2018 |
| Type | Official Correspondence |
| Response | |

We recognize that our Williston investigation involved a Level-2 system vehicle, and that manufacturers' development work is now focused on more advanced functionality. We also recognize that the upcoming vehicles with higher levels of automation are likely to retain the functionality of a Level-2 automated system. However, until Level-5 automation systems are fully developed, humans will need to assume multiple roles, either as active drivers, passive monitors of automated driving systems, or available drivers prepared to intervene when requested by the automation. Our intent in issuing these recommendations is to make you aware of the evidence we found that a driver is willing to engage automated systems in situations beyond their design envelope. We believe that these recommendations will remain relevant even as we move beyond Level 2 automated systems.

We appreciate your description of MBUSA's automation features that monitor driver engagement. As you move forward in developing your automated vehicles, we encourage you to include control systems that automatically restrict automated operations to the conditions for which they were designed. Further, we encourage you to explore monitoring systems beyond those measuring steering wheel torque to capture where a driver is focusing his or her attention. We look forward to receiving periodic updates from you on your efforts to incorporate these safeguards into your automated systems. Until such actions are complete, Safety Recommendations H-17-41 and -42 are classified OPEN--ACCEPTABLE RESPONSE.

| | |
|---|---|
| From | Mercedes-Benz USA, LLC |
| To | NTSB |
| Date | 12/08/2017 |
| Type | Official Correspondence |
| Response | |

-From David S. Tait, General Manager, Engineering Services, Mercedes-Benz, USA, LLC: MBUSA Level 2 driving automatic in features monitor driver engagement by assessing steering torque input and operation of the buttons mounted on the steering wheel, including touch control. If the steering wheel torque is too small and there is no detected operation of the steering wheel buttons or touch control, an escalating cascade of visual and audible warnings is initiated, culminating in full deceleration as described above if the driver fails to resume steering. MB USA believes in continually improving vehicle safety, and our Advanced Driver Assistance Systems are no exception. We continue to study the most effective ways of monitoring driver engagement with the goal of delivering safe, usable technological advancements.

We would be happy to make ourselves available for a more in-depth discussion on any of these topics. In the meantime, should you have any questions or require further information, please feel free to contact R. Thomas Brunner, of my staff.

| | |
|---|---|
| From | NTSB |
| To | Mercedes-Benz USA, LLC |
| Date | 09/28/2017 |
| Type | Transmittal Letter |
| Response | |

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016, NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to Mercedes-Benz USA, which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number.

✅ Volvo Cars of North America, Inc. - Open - Acceptable Response ⌃

| | |
|---|---|
| Name | Volvo Cars of North America, Inc. |
| Acronym | |
| Category | Private Industry |
| Addressee status | Open - Acceptable Response |

| From | NTSB |
|------|------|
| To | Volvo Cars of North America, Inc. |
| Date | 05/15/2018 |
| Type | Official Correspondence |
| Response | |

We recognize that our Williston investigation involved a Level-2 system vehicle, and that manufacturers' development work is now focused on more advanced functionality. We also recognize that the upcoming vehicles with higher levels of automation are likely to retain the functionality of a Level-2 automated system. However, until Level-5 automation systems are fully developed, humans will need to assume multiple roles, either as active drivers, passive monitors of automated driving systems, or available drivers prepared to intervene when requested by the automation. Our intent in issuing these recommendations is to make you aware of the evidence we found that a driver is willing to engage automated systems in situations beyond their design envelope.

We appreciate your description of Volvo Car's automation features that constrain driver operations and monitor driver engagement. As you move forward in developing your automated vehicles, we encourage you to address an important issue that we found in our Williston investigation by limiting the use of automated vehicle control systems to only those conditions for which they were designed, which are defined by you, the manufacturer. Examples of such conditions include roadway type, geographic location, clear roadway markings, weather conditions, speed range, lighting condition, and other manufacturer-defined system performance criteria or constraints. Further, we encourage you to explore driver monitoring systems beyond those measuring steering wheel torque to capture where a driver is focusing his or

her attention, or, if relying solely on torque, to describe how this method provides the
appropriate level of driver engagement. We look forward to receiving periodic
updates from you on your efforts to incorporate these safeguards into your
automated systems. Until such actions are complete, Safety Recommendations H-
17-41 and -42 are classified OPEN--ACCEPTABLE RESPONSE.

Thank you for your ongoing efforts to improve vehicle safety.

| | |
|---|---|
| From | Volvo Cars of North America, Inc. |
| To | NTSB |
| Date | 12/27/2017 |
| Type | Official Correspondence |
| Response | |

-From Katherine Yehl, Vice President Government Affairs the Americas, Volvo Car
Corporation: Thank you for your letter regarding Report 17-02, PB2017 — 102600 and
the National Transportation Safety Board (NTSB) recommendations for vehicle
manufacturers equipped with Level 2 automation systems.

Safety is a founding principle of Volvo Car Corporation (VCC) and VCC works hard to
stay at the forefront of the industry by taking an overall approach to safety, which has
proven effective in real world traffic situations. VCC invented the three point lap and
shoulder safety belt and then gave away the global patent in order to save lives. It has
been estimated that this one act could have saved over 1m lives globally.

According to the latest US crash causation study, 94% of all crashes are due to
human error. In 2016, traffic fatalities remain at epidemic levels. At VCC, we are
appalled that 1.2 million people around the world are killed in traffic crashes annually
— with over 35,000 of those deaths occurring in the U.S. alone. Crash avoidance and
active safety technologies will be essential to substantially reduce this number and to
eventually completely avoid crashes in the future.

In 2007, VCC launched Vision 2020. This Vision states that no one should be killed or
seriously injured in a new Volvo by 2020. Crash avoidance and active safety
technologies are essential to reach our goal. These features which include systems
that assist the driver or automatically act in order to prevent or mitigate crashes
(such as automatic emergency braking systems, lane departure warning systems,
pedestrian detection, and braking systems) are the precursors for self-driving cars.

Numerous studies of real-world crash performance data in the US and abroad show

the effectiveness of these active safety systems in reducing injuries and fatalities. These technologies will continue to be developed and they will become even more effective over time. So VCC strongly supports the NTSB June, 2015, recommendation that the US New Car Assessment Program (NCAP) include crash avoidance technologies in the 5-star safety rating scale.

The USA is way behind all other major countries who already include these life-saving technologies in the overall consumer rating.

With regard to the two NTSB recommendations for manufacturers of vehicles with level 2 vehicle automation systems, Volvo Cars supports the intent of these recommendations. See below:
1) Incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed. (H-17-41). Volvo Cars pilot assist adheres to this recommendation and the system only perform in the conditions for which they were designed.
2) Develop applications to more effectively sense the driver's level of engagement and alert the driver when engagement is lacking while automated vehicle control systems are in use. (H-17-42) Volvo Cars pilot assist adheres to this recommendation and our systems alert the driver when engagement is lacking.

VCC would like to clarify how our pilot assist system works and would like to invite the NTSB to demo the system. The VCC pilot assist system is an active safety support function that combines steering with Adaptive Cruise Control and braking. Simply put it is lane centering support plus adaptive cruise control. It is very important to note that the system is designed as an assistance system.

The driver is in control and the system gives assistance and complimentary support to the driver. It helps the operator keep within his lane and stay a safe distance and speed from the vehicle in front of it. However, the driver is expected to actively participate in the driving and remains responsible for monitoring and supervision over the entire operation of the vehicle. It also is important to emphasize that VCC systems are restricted in how much acceleration, braking and steering force can be applied. The driver is always responsible for maintaining their hands on the wheel and eyes on the road when using these features. If a driver's hands are not on the steering wheel, a warning is given to the driver to grasp the steering wheel. If the driver does not respond to the warning, an additional warning is provided with an audible alert.

If the driver still does not respond, the system disengages. This functionality is

specifically designed to prevent the driver from becoming overly reliant on the system.

VCC's ambition is to provide our customers accurate, descriptive and easy-tounderstand information of driver support functionality to increase the driver's understanding and acceptance of function behavior & performance, function limitations, and driver responsibilities. If you have any additional questions or need further assistance, please do not hesitate contact us.

| | |
|---|---|
| From | NTSB |
| To | Volvo Cars of North America, Inc. |
| Date | 09/28/2017 |
| Type | Transmittal Letter |
| Response | |

The National Transportation Safety Board (NTSB) is an independent federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in other modes of transportation—railroad, highway, marine, and pipeline. We determine the probable cause of the accidents and issue safety recommendations aimed at preventing future accidents. In addition, we carry out special studies concerning transportation safety and coordinate the resources of the federal government and other organizations to provide assistance to victims and their family members affected by major transportation disasters.

On September 12, 2017, the NTSB adopted its report Collision Between a Car Operating With Automated Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016, NTSB/HAR-17/02. The details of this accident investigation and the resulting safety recommendations may be found in the attached report, which can also be accessed at http://www.ntsb.gov.

Among the Safety Recommendations are two issued to Volvo Group North America, which can be found on page 43 of the report.

The NTSB is vitally interested in these recommendations because they are designed to prevent accidents and save lives. We would appreciate a response within 90 days, detailing the actions you have taken or intend to take to implement these recommendations. When replying, please refer to the safety recommendations by number.