UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-21940-BLOOM/Torres

NEIMA BENAVIDES, as Personal
Representative of the Estate of Naibel
Benavides Leon, deceased,

    Plaintiff,

v.

TESLA, INC., a/k/a Tesla Florida, Inc.,

    Defendant.
_____/

DILLON ANGULO,

    Plaintiff,

v.

TESLA, INC. a/k/a Tesla Florida, Inc.,

    Defendant.
_____/

Case No. 22-22607-KMM

**PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTING AND TESTIMONY OF TESLA EXPERT RYAN HARRINGTON**

I.    INTRODUCTION

Plaintiffs, Neima Benavides and Dillon Angulo, by and through undersigned counsel, respectfully submit this Memorandum of Points and Authorities in support of their motion to exclude the testing and expert testimony of Tesla's expert Ryan Harrington. Mr. Harrington's testing (and testimony regarding the same) fails to meet the admissibility standards set forth under Federal Rule of Evidence 702 and should be further excluded under Florida substantive law for Mr. Harrington's failure to conduct testing that is substantially similar to the conditions involved in the underlying collision.

1

## II. FACTUAL BACKGROUND

As this Court well knows, Plaintiffs' strict product liability claims against Tesla arise from the tragic and preventable collision of April 25, 2019 where Mr. McGee's Tesla, while on Autopilot, drove directly through a stop sign, flashing red light and t-intersection at Card Sound Road and County Road 905 slamming into the parked Chevrolet Tahoe that Dylan Angulo and Naimel Benavides were standing outside of.  Naimel was killed and Dylan seriously injured.

The subject Tesla, operating on Autopilot, appreciated the end of the roadway/driveable space, the approaching intersection limit line, the plaintiff's vehicle across the intersection, the plaintiff outside of the vehicle, and the caution signs across the intersection and rather than slowing or warning the driver the Tesla collided with the Tahoe at full speed.

For years, Tesla has touted the safety and efficacy of its Autopilot system, claiming it was superior to all other vehicle manufacturers in its autonomous features.  Approximately three years before the subject crash, Tesla CEO Elon Musk stated: "The exciting thing is that even if the vision system doesn't recognize what the object is because it could be a very strange- looking vehicle, it could be a multi-car pileup, it could be a truck crossing the road, it really could be anything – an alien spaceship, a pile of junk metal that fell off the back of a truck. It actually doesn't matter what the object is, it just knows that there's something dense that it is going to hit – and it should not hit that." (Docket Entry 205 - Consolidated First Amended Complaint at ¶40). However, Tesla has long known that its automatic emergency braking systems and forward collision warning systems had many limitations; none of which were communicated to drivers in any meaningful way.

Plaintiffs' expert, Dr. Missy Cummings, takes issue with Tesla's failure to warn about these limitations. The AEB warning in the Tesla owner's manual makes no mention of these limitations nor are such warnings communicated to the driver in any form through the on-board user interface screen:

"Warning: Several factors can affect the performance of Automatic Emergency Braking, causing either no braking or inappropriate or untimely braking. It is the driver's responsibility to

2

drive safely and remain in control of the vehicle at all times. Never depend on Automatic Emergency Braking to avoid or reduce the impact of a collision."

Dr. Cummings opines that the warning is vague at best and the lack of a more specific warning that AEB is degraded at night and/or in the presence of pedestrians contributes to false driver mental models. This is consistent with the testimony of the Tesla driver, Mr. McGee: "it didn't detect the vehicle or automatically emergency brake. So those were my beliefs at the time that those things did not work properly." (McGee Dep. 136:13-16.) Dr. Cummings further questions why Tesla engineers, knowing full well the limitations of its braking systems, did not specifically communicate those limitations to drivers, like McGee, in any way?

Nevertheless, in some apparent attempt to show that *other* peer vehicle manufacturers had similarly poor and ineffective systems at the time, Tesla's expert Ryan Harrington was tasked with performing extensive crash testing. As outlined in more detail below Mr. Harrington's testing – while carrying a hefty price tag and some superficial appeal - has no bearing on any relevant issues at trial and completely lacked substantial similarity to the subject crash. Accordingly, his testing and testimony regarding the same must be excluded at trial.

### III.   LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony, directing that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if ( 1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Under Rule 702, a district court must conduct a two-step "gatekeeping" analysis to determine the admissibility of expert opinions. *Kumho Tire., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993)); *Milne v. USA Cycling, Inc.*, 575 F.3d 1120, 1134 (10th Cir. 2009). First, a court must assess whether the expert

3

is "qualified," by ascertaining their "knowledge, skill, experience, training, or education." *Life Wise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (citing Fed. R. Evid. 702). For an expert to be deemed qualified under the Federal Rules, their testimony must be "relevant" to the issues before the court. *Daubert*, 509 U.S. at 591.

Evidence is considered "relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *United States v. Ibarra-Diaz*, 805 F.3d 908, 928-29 (10th Cir. 2015). If evidence is not relevant, it is inadmissible. *United States v. Guardia*, 135 F.3d 1326, 1328 (10th Cir. 1998) (quoting Fed. R. Evid. 402).

Second, a court must determine whether the expert's opinion is "reliable." *Daubert*, 509 U.S. at 593-94. An expert's opinion must be both relevant and reliable to be admissible. *Milne*, 575 F.3d at 1134. The Eleventh Circuit Court of Appeals has cautioned courts "not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles." *Hendrix v. Evenflo Co.* 609 F.3d 1183, 1194 (internal marks omitted). Put another way, while experts commonly extrapolate data, their opinions should not be admitted, when as here, "'there is simply too great an analytical gap between the data and the opinion proffered.'" *Id*. (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Here, in a case against Tesla, with an expert hired by Tesla, involving allegations of a defect in Tesla's Autopilot system, Tesla's expert Mr. Harrington performed testing with completely dissimilar vehicles: a Volvo, Subaru and Mercedes Benz. Considering Tesla has continuously claimed to be a leader in autonomous driving technology why didn't Mr. Harrington perform testing on a Tesla? Its anticipated Tesla will argue that Mr. Harrington's testing was designed to compare peer vehicle capabilities to a Tesla; namely whether peer vehicles would appreciate and warn a driver of an approaching collision in a vaguely similar circumstance to the subject crash.

However, from the time of Mr. Harrington's testing to today Plaintiffs have obtained the data to show that the Plaintiff's vehicle and the approaching intersection were continuously

identified by the Autopilot system for 350 feet before impact. Mr. Harrington's testing involving dissimilar vehicles, with dissimilar systems that failed to appreciate the intersection or approaching vehicle is truly of no consequence. The Volvo, Subaru and Mercedes Benz involved in Harrington's testing did not use the same radar/camera fusion system as the Tesla nor apply the same thresholds and algorithms that Tesla's system does. Moreover, showing that those vehicles did not issue a warning to the driver or slow those vehicles in any way has no relevance to a crash where it can be proven the Autopilot system appreciated the potential collision for over 350 feet and did nothing. *See Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021) (citing *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful")).

Secondarily, and more importantly, the 11th Circuit has consistently emphasized that tests must be conducted under conditions substantially similar to those existing at the time of the alleged incident. In *Tran v. Toyota Motor Corp.*, 420 F.3d 1310 (11th Cir. 2005), the court held that "[a] failure to ensure substantial similarity mandates exclusion of the tests and the resulting data." Mr. Harrington's testing – performed with dissimilar vehicles with dissimilar features under dissimilar environmental conditions – bears no meaningful relation to the real world where this crash occurred. Because Florida law requires that "[t]esting conditions in an experiment must be substantially the same as those at the time of the occurrence for evidence of the experiment to be admitted" Harrington's testing must be excluded. *American Motors Cop v. Ellis* 403 So.2d 458, 468 (Fla. 5th DCA 1981); *see also Goodyear Tire & Rubber Co. v. Ross* 660 So.2d 1109, 1111(Fla. 4th DCA 1995); *Husky Industry v. Black* 434 So.2d 988, 993 (Fla 4th DCA 1983).

IV. **ARGUMENT**

    a. **Failure to Meet Substantial Similarity Standard**

It is undisputed that the subject collision involved Mr. McGee operating his Tesla on Autopilot. As McGee approached the intersection of Card Sound Road and County Road 905 his Tesla was being controlled longitudinally by Traffic Aware Cruise Control (TACC) and laterally by Autosteer. TACC is similar to traditional cruise control in that it operates at set speed but its

traffic aware component means that it slows or speeds up depending upon surrounding traffic. Autosteer, on the other hand, is Tesla's glorified lane assist feature that ensures the vehicle is controlled laterally, stays in its lane of travel and is able to change lanes, and exit on-ramps/off-ramps with little to no driver input. The two pictures below – the left is taken from McGee's Tesla in the moments before impact and the right is a daytime view taken at a 2024 inspection – show McGee's approach on Card Sound Road and County Road 905.



Despite expressly acknowledging in his expert report that "[n]one of the tests/demonstrations performed by Exponent and described in this section were designed to completely recreate the subject crash in all respects," Harrington's testing did not attempt to *slightly* recreate the subject crash in *any* material respect. (Harrington Report at p. 60, fn. 217.) Rather than crash test Tesla vehicles operating on Autopilot, Mr. Harrington ran three series of three different test scenarios with a 2019 Mercedes Benz S560, a 2019 Subaru Legacy and a 2019 Volvo S60. The purpose of these tests was to evaluate the performance of Forward Collision Warning (FCW) and Automatic Emergency Braking (AEB) in both daytime and nighttime conditions in dissimilar vehicles.

       The testing diverges from the facts of this case in several significant ways that warrant its exclusion:

      i.   **Environmental conditions:**

      1.   **Inconsistent roadway layout**

Harrington's first inconsistency is the geometry and layout of the roadway. Despite a limitless budget[1] and unfettered access to Exponent's testing facility Mr. Harrington did not  perform his testing at a t-intersection; in fact, there was no cross street at all in the testing configuration. (Harrington Dep. 60:23-61:3.) Further, the approaching roadway lacked guardrails on both sides, had no limit line or road markings suggesting an end of the travel way and lacked the presence of a stop sign. (Harrington Dep. 58:18-23; 62:3-13; 72:5-73:5.) Again, it is undisputed this crash occurred on a two-lane road, at a t-intersection, with guardrails on both sides of the road, a stop sign, a limit line, five yellow caution/warning signs across the intersection and a flashing light above. The Court may wonder, why does this matter? The reason is because AEB and FCW monitor a series of internal vehicle signals (speed, acceleration, steering angle, etc.) *and* external signals received from cameras and radar sensors to monitor the surrounding environment and accurately detect, classify, predict and control for collisions. (Harrington Report at p. 57.) Here, we now know that McGee's Tesla *did* detect numerous environmental conditions: the plaintiff's vehicle parked across the intersection, the stop sign limit line, the presence of a pedestrian outside the vehicle, the approaching signage and the end of the roadway/driveable space. Failing to include these environmental factors – namely an intersection and/or an end to the roadway/driveable space – would essentially 'trick' the test vehicles into sensing the road went on for miles ahead and therefore not warn the driver of pending calamity. Not surprisingly, Mr.

---

[1] When asked about the financial limitations on conducting tests for this case, Mr. Harrington responded that "[t]ypically there aren't budgets." (Harrington Dep. 23:9-15.)

Harrington's sleight of hand worked in this regard and his test vehicles did not issue a warning to the driver.

### 2. Inconsistent signage

Additionally, when comparing the caution road sign height during his testing to the actual size of the caution road signs on-scene, Mr. Harrington's testing missed the mark by orders of magnitude.[2] It's anticipated that Tesla will attempt to explain this discrepancy away by claiming – as Mr. Harrington did – that the 4' signs he used in his testing would more likely be observed by an approaching vehicle than the 8' signs that were present on scene. When challenged Mr. Harrington acknowledges that he has no data to support this position which comes as no surprise since it defies common sense.[3] Afterall, you don't need an engineering degree to understand that an approaching vehicle traveling 60 mph from 500 feet away is more likely to perceive and respond to an 8 foot object than 4 foot object.

This is another example of Mr. Harrington's sleight of hand warranting exclusion. Since we now know the subject Tesla did have a radar lock on the Plaintiff's vehicle for 350 feet before impact and the signage in front of the vehicle in the moments before impact Mr. Harrington's use of smaller, less conspicuous signage reduced the test vehicle's ability to perceive the approaching caution signs.

A court is not required "to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005). As a result, a court "may conclude that there is simply too great an analytical gap between the data [or lack thereof] and the opinion proffered." *Id*. Here, Mr. Harrington's attempt to explain

---

[2] A. "So it looks like our road signs are four to five feet." Q. "And what were the height of the actual road signs on scene?" A. "[I]t's column eight to ten feet." Q. "So you were off with a magnitude of about forty percent. Why?" A. "That is something that I did notice after the testing was conducted." (Harrington Dep. 66:2-11.)
[3] Mr. Harrington stated, "I don't have any data" when asked to support his conclusion that the test vehicles would have appreciated the signs later if they had been at their actual on-scene height. (Harrington Dep. 70:24-72:3.)

away this material difference in road sign height is precisely the "*ipse dixit* of the expert" warranting exclusion.

    ii.    **Operational Conditions**

        1.    **Daylight FCW and AEB testing:**

It is undisputed that this collision occurred at nighttime and that Tesla acknowledges that the efficacy of FCW and AEB degrades in low light conditions (Rubio Dep. 140:10-22.) It appears that Mr. Harrington performed his daylight testing of the Mercedes, Volvo and Subaru vehicles for 'benchmark' purposes to compare the test vehicle's performance to NHTSA's AEB testing in 2022. Obviously, this testing is of no material consequence since it involves a straight in-line vehicle approach at 25 mph in day light conditions[4]. (Harrington Report at p. 70.) Again, re-stating the obvious, the subject crash occurred at night, with a broadside vehicle collision at 60 mph. Nevertheless, like his nighttime testing discussed below, Mr. Harrington's daylight testing involves dissimilar vehicles operating with no autonomous features activated "with just the driver providing input." (Harrington Dep. 104:12-105:9.)

        2.    **Nighttime FCW and AEB testing:**

For his nighttime testing of the dissimilar vehicles Mr. Harrington ran three separate scenarios followed by a crash test. In the first scenario, the dissimilar vehicles approach a Global Vehicle Target (GVT) which is essentially a small, sensor wrapped sedan. The next two scenarios involved the dissimilar vehicles approaching a broadside Tahoe with and without road signage.

Despite the McGee vehicle operating under Autopilot with both longitudinal and lateral controls none of the dissimilar vehicles were operating under an Autopilot equivalent or with any meaningful driving assistance features activated. For instance, despite the Mercedes Benz vehicle having numerous autonomous features like "attention assist," "speed limit assist," "active steer control," and "night view assist," none of these features were activated during any of Harrington's testing. (Harrington Dep. 32:5-33:24.)

---

[4] For whatever its worth, in day time testing the dissimilar vehicles at lower speeds did provide warnings to the driver of pending collision.

9

In the second nighttime scenario, the dissimilar vehicles were driven straight toward a broadside Tahoe positioned along the dissimilar environment. Again, there were no autonomous features activated in the three dissimilar vehicles for this scenario. (Harrington Dep. 111:20-112:3.) Even worse, despite producing a 100-page report and hundreds of gigabytes of data in his expert file, Mr. Harrington failed to produce the actual data which purportedly shows that no FCW alerts were given. (Harrington Dep. 112:12-114:5.)

In the third nighttime scenario the dissimilar vehicles were again driven straight toward a broadside Tahoe but this time the dissimilar signs were placed in front of the Tahoe. (*See* i.b. above re: sign heights.) Again, the dissimilarity in conditions to the subject crash are striking: Harrington uses dissimilar vehicles, in a dissimilar environment with drivers told to swerve, without utilizing any lateral or longitudinal automation features. (Harrington Dep. 114:17-115:10.)

Finally, Harrington chose to crash two of the dissimilar vehicles (Subaru and Mercedes) with a robot driver. He excluded the Volvo from this scenario.  Here, where no safety concerns to human drivers were implicated, he chose – yet again – to not operate the vehicles under lateral or longitudinal automation controls and instead had it controlled by a test driver using a VR headset. (Harrington Dep. 126:7-127:1.)

At risk of repeating the obvious, Mr. Harrington knew full well that this crash involved a 2019 Tesla operating under lateral (AutoSteer) and longitudinal (TACC) control.  Yet he chose to perform crash testing that included none of those operational elements.  He then doubled down on those dissimilarities by testing those vehicles in environmental conditions that failed to recreate the conditions of actual crash site.  As this Court knows Tesla has gone to great lengths to limit discovery in this case to 2019 Tesla Model S vehicles with similar hardware systems.  It cannot therefore now plausibly argue that Harrington's testing, conducted on vehicles from different platforms, by three different and competing automobile manufacturers, under entirely different conditions, bears the requisite "substantial similarity" required for admissibility.  Harrington's report itself disclaims any such possibility.

## V.     CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court exclude the expert testing and related testimony of Ryan Harrington due to the failure to meet the standards of substantial similarity and reliable methodology as articulated by the 11th Circuit.

Respectfully submitted,

Dated: January 27, 2025

**SINGLETON SCHREIBER, LLP**
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Tel: (619) 771-3473
*/s/ Brett J. Schreiber, Esq.*
**Brett J. Schreiber, Esq.**
**California Bar No. 239707**
 (Admitted Pro Hac Vice 05/07/2024)
Attorney for Plaintiff Benavides
bschreiber@singletonschreiber.com
SERVICE EMAILS:
bschreiber@singletonschreiber.com
vas@singletonschreiber.com
cbirnbaum@singletonschreiber.com
eelms@singletonschreiber.com

**POSES LAW GROUP, P.A.**
169 East Flagler Street, Suite 1600
Miami, Florida 33131
Tel: (305) 577-0200
*/s/Todd Poses*
**Todd Poses**
**Florida Bar No.: 75922**
tposes@poseslawgroup.com
maria@poseslawgroup.com
shelly@poseslawgroup.com
*Attorney for Plaintiff Benavides*

**THE ROUSSO, BOUMEL LAW FIRM, PLLC.**
9350 South Dixie Highway, Suite 1520
Miami, Florida 33156
Tel: (305) 670-6669
*/s/ Adam T. Boumel, Esq.*
**Adam T. Boumel, Esq.**
**Florida Bar No.: 0110727**
Adam@roussolawfirm.com

SERVICE EMAILS:
pleadings@roussolawfirm.com  *(primary)*
haiyang@roussolawfirm.com
*Attorney for Plaintiff Angulo*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of January, 2025, the foregoing document was filed with the Clerk of Court using CM/ECF which will send notices of electronic submission to all parties on the attached service list.

/s/ *Adam T. Boumel, Esq.*
Adam T. Boumel, Esq.
Florida Bar No.: 0110727

## SERVICE LIST

**Bowman and Brooke LLP**
41000 Woodward Ave., Suite 200E
Bloomfield Hills, Michigan 48304
**Attn: Joel Smith Esq.**
**Attn:Thomas P. Branigan, Esq.**
**Attn: Whitney Cruz, Esq.**
**Attn: Drew P. Branigan, Esq.**
**Attn: Wendy F. Lumish, Esq.**
Joel.smith@bowmanandbrooke.com
thomas.branigan@bowmanandbrooke.com
whitney.cruz@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com
Wendy.Lumish@bowmanandbrooke.com
*Counsel for Defendant*

**Singleton Schreiber, LLP**
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Tel: (619) 771-3473
**Attn: Brett J. Schreiber, Esq.**
bschreiber@singletonschreiber.com
bschreiber@singletonschreiber.com
vas@singletonschreiber.com
cbirnbaum@singletonschreiber.com
eelms@singletonschreiber.com
*Counsel for Plaintiffs*

**Poses & Poses, P.A.**
169 East Flagler Street, Suite 1600
Miami, Florida 33156
**Attn: Todd Poses, Esq.**
tposes@posesandposes.com
Maria@posesandposes.com
*Counsel for Plaintiffs*

**Eaton & Wolk PL**
2665 South Bayshore Dr., Suite 609
Miami, FL 33133
**Attn: Doug Eaton, Esq.**
deaton@eatonwolk.com
*Counsel for Plaintiffs*