UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-21940-BLOOM/Torres

NEIMA BENAVIDES, as Personal
Representative of the Estate of Naibel
Benavides Leon, deceased,

    Plaintiff,
v.

TESLA, INC., a/k/a Tesla Florida, Inc.,

    Defendant.
_____/

DILLON ANGULO,

    Plaintiff,
v.

TESLA, INC. a/k/a Tesla Florida, Inc.,

    Defendant.
_____/

Case No. 22-22607-KMM

**TESLA, INC.'S STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Tesla, Inc. ("Tesla"), incorrectly identified as Tesla Florida, Inc., pursuant to Florida Rule of Civil Procedure 1.510 (c), submits this Statement Of Undisputed Facts (SOUF) in support of its Motion for Summary Judgment and Memorandum of Law separately filed simultaneously with this Statement. In support, Tesla states the following:

**UNDISPUTED FACTS**

**The Incident**

1. The Subject Incident occurred on April 25, 2019, at a "T" intersection on Card Sound Road in Key Largo Florida. (*See* ECF 205 at ¶11).

2. Card Sound Road was just a few miles from non-party George McGee's home and he traveled on it regularly for work. (ECF 318-9 at 148:7-22, 153:18-154:22).

3. As McGee approached the intersection, he had Traffic Aware Cruise Control ("TACC") activated, which restricted the vehicle's speed to 45 miles per hour. (ECF 318-9 at 217). (Ex. A - Harrington Report at 10). McGee overrode TACC's restricted speed in the 30 seconds leading up to the crash by pressing the accelerator to achieve a speed of 62 miles per hour. (ECF 318-2 at 96:6-21; ECF 318-3 at 117:10-14; Ex. B, Log Data (Benavides-00000006)).

4. As he approached the "T" intersection, McGee bent down to pick up his dropped cellphone. (ECF 205 at ¶14).

5. At the end of the "T" intersection there were multiple traffic control devices, including a visible stop sign, an overhead red flashing light, and multiple road end signs. (Ex. C, at 2:12-14, 5:4-9, 8:1-18; ECF 318-9 at 148:23-151:18, 212:5-24).

6. McGee drove through the intersection and struck the side of a Chevrolet Tahoe parked perpendicular to the intersection, which in turn was pushed into two pedestrians – Decedent, Nabel Benavides Leon and Plaintiff Dillon Angulo. (ECF 205 at ¶¶15-18).

7. As a result of the crash, Naibel Benavides died and Dillon Angulo was injured. (Compl. ECF 205 at ¶¶15-18).

8. In a 911 call moments after the crash, McGee admitted:

> "Oh my God, I wasn't looking," "I don't know what happened. I ended up missing the turn. I was looking down," and "I looked down…I dropped my phone. Oh my God."

(Ex. D, 911 call at 2:17-19, 4:5-6, 6:21-7:2).

9. When officers arrived, McGee admitted the following on a body cam video:

- "I was driving. I dropped my phone and looked down and I ran the stop sign

and hit the guy's car." (Ex. C at 2:12-14).

- "I dropped my phone. I was trying to call. We're flying out for a funeral tomorrow morning and I was trying to call to get my wife's stuff ready at the airline." (*Id.* at 5:4-8).

- "And I looked down and ran right through here and hit the guy's car." (*Id.* at 5:8-9).

- "It was actually because I was driving on. I looked down and I've been using cruise control and I looked down, I didn't realize (INAUDIBLE) and then I was sat up. The minute I sat up I hit the brakes and saw his truck." (*Id.* at 8:2-6).

- "No, I didn't [stop at the stop sign], sir. I don't think. I honestly don't know. I looked down. I didn't know how close I was to the intersection. And I was driving on cruise going for – and I looked down and – to get the phone I dropped. I was on with the airline for my wife for tomorrow's funeral I'm going to. And I reached down. I didn't see it. And then when I popped up and looked, I saw a black truck. It just happened so fast." (*Id.* at 8:90-18).

10. McGee testified there was nothing that prevented him from acting to prevent the crash. (ECF 318-9 at 145:3-147:5).

11. McGee testified the signs were visible if he had looked up. (ECF 318-9 at 241:14-242:5).

12. Moore testified that, had he been watching the road, McGee had a clear and unobstructed view of the "T" intersection for a "long distance"—at least 1,000 feet. (ECF 318-2 at 89:18-91:12).

3

**The 2019 Tesla Model S ("Subject Vehicle")**

13. The Subject Vehicle is equipped with a set of driver assist features collectively known as "Autopilot," which includes (a) TACC, an adaptive cruise control system that helps drivers maintain a safe distance behind a detected vehicle in the same lane—to maintain the posted speed limit; (b) Autosteer, which provides lane centering; (c) Forward Collision Warning (FCW) and (d) Automatic Emergency Braking (AEB). (ECF 318-10 at 00001875, 00001877, 00001884, 00001897); (ECF 318-2 at 33:16-23).

14. The Autopilot suite of features is designated by the Society of Automotive Engineers (SAE) as a Level 2 ADAS system.  (ECF 318-1 at 3-4).

15. According to SAE Guidance, a Level 2 system requires the driver to be in control at all times. *See* Society of Automotive Engineers, *Standard J3016 Levels of Driving Automation* (May 3, 2021), https://www.sae.org/blog/sae-j3016-update (last visited January 27, 2025); (ECF 318-2 at 24:11-20).

16. According to SAE Guidance, the driver of a Level 2 system can and must still brake, accelerate, and steer just as if the system is not engaged, and retains responsibility to always keep his hands on the wheel and his eyes on the road. (*See* Society of Automotive Engineers, *Standard J3016 Levels of Driving Automation* (May 3, 2021), https://www.sae.org/blog/sae-j3016-update (January 27, 2025).

17. Before using Autosteer for the first time, the driver must, while parked, enable the feature on the center touchscreen. (ECF 318-10 at BENAVIDES-00001884).

18. When they do that, a message appears alerting the user to limitations of the feature and explaining that the feature is still in Beta—meaning its software has certain limitations. (Ex. -- Autosteer Beta User Agreement).

19. Among other limitations, the message advises that the user should only enable

4

Autosteer "if you are willing to pay close attention to the road and be prepared to override it at any time," and to use it under certain specified driving conditions. (*Id*).

20. The user is required to click "yes" to agree to its terms before Autosteer can be used while driving. (*Id*).

21. Thereafter, each time a user engages Autosteer, the vehicle displays a message instructing him to keep his hands on the steering wheel and to remain prepared to take over. (ECF 318-9 at 245:22-247:12); (ECF 318-10 at BENAVIDES-00001884).

22. The owner's manual is available electronically through the vehicle's touchscreen. (ECF 318-10 at BENAVIDES-00001802).

23. McGee testified that he was aware that the Model S had an owner's manual. (ECF 318-9 at 35:21-36:3).

24. McGee testified that he never read the owner's manual. (ECF 318-9 at 35:21-36:16).

25. After reading several of the warnings contained in the owner's manual at his deposition, McGee testified he would have disregarded them anyway because he viewed them as boilerplate disclosures to protect Tesla from liability. (ECF 318-9 at 141:2-24).

26. The Owner's Manual contains several pages of warnings about the capabilities and limitations of the Autopilot features. (ECF 318-10 at BENAVIDES-00001801, 1875-89,1895-1899).

27. The Owner's Manual includes several warnings concerning Autosteer, including:

> Warning: Autosteer is intended for use only on highways and limited-access roads with a fully attentive driver. When using Autosteer, hold the steering wheel and be mindful of road conditions and surrounding traffic…. Never depend on Autosteer to determine an appropriate driving path. Always be prepared to take immediate action. Failure to follow these instructions could cause serious property damage, injury or death.

(*Id.* at BENAVIDES-00001884).

28. When a driver overrides Traffic Aware Cruise Control, a visible alert is issued when after six seconds of override on the dash that TACC will not brake. (Ex. E, PE21-020 at BENAVIDES-00003148).

29. McGee did not purchase a package that would have provided hardware compatible with future software development which may enable the vehicle to be "self-driving." (Ex. F, Tesla Model S Features).

**McGee's Knowledge of Autopilot**

30. McGee testified that he understood that Autopilot did not make the car "self-driving" (ECF 318-9 at 73:16-74:2).

31. McGee testified that he understood that it was his "responsibility as the driver of the vehicle – even with Autopilot activated – to drive safely and be in control of the vehicle at all times." (*Id* at 93:3-20; *see also id* at 240:15-241:13).

32. McGee admitted that "I was highly aware that [it] was still my responsibility to operate the vehicle safely." (*Id* at 111:11-13).

33. McGee testified he understood before the crash that it was his job – not the vehicle's job – to detect and to react properly to a stop sign or red flashing light. (*Id* at 113:8-15).

34. McGee testified he knew it was his responsibility to be aware of his surroundings and things in front of him. (*Id*. at 111:10-22).

35. McGee testified he that it was his responsibility to be aware of the speed limit and to detect traffic control devices. (*Id.* at 111:23-112:17).

36. McGee testified he understood the vehicle would not be able to stop under all circumstances regardless of speed and distance. (*Id.* at 109:13-110:21).

6

37. McGee testified he understood he had to manage the technology. (*Id.* at 111:10-16).

38. McGee testified he knew before the crash that the vehicle would not detect or stop at sign signs and stoplights, and that it was his job to do these things. (*Id.* at 112:18-113:15).

39. McGee testified he never heard or read anything from Elon Musk about the Subject Vehicle's capabilities or limitations and it had no affect on his purchase or use of the vehicle. (*Id.* at 233:9-234-12).

**Plaintiffs' Lawsuits and Claims against Tesla**

40. Neima Benavides, as Personal Representative of the Estate of her sister, Naibel Benavides Leon, and Dillon Angulo sued McGee in state court for allegations of negligence and careless driving and settled those claims. (Ex. G, Plaintiff Angulo's Responses to Interrogatories 17 and 21 of Tesla's First Interrogatories; Ex. H, Angulo's Deposition at 15:20-22; (*See also* Ex. I, Benavides Complaint against McGee at ¶¶7- 12); (*See also* Ex. J, Angulo Complaint against McGee at ¶¶12-14).

41. Plaintiffs filed the instant case against Tesla for strict liability related to a suite of advanced driver assistance features which Tesla calls "Autopilot," negligent misrepresentation, and a claim for punitive damages. (ECF 205 at ¶¶114-156,164-186).

**Causation**

42. Moore testified that he does not have an opinion that Autosteer caused the crash. (ECF 318-2 at 83:2-9, 85:14-86:12).

43. Plaintiffs' expert Moore testified that with a Level 2 vehicle, like the 2019 Model S, "the operator of the vehicle is in control of the vehicle and responsible for what occurs in the vehicle." (ECF 318-2 at 24:11-20).

44. Cummings testified that the driver of Level 2 vehicles, like the Model S, is legally obligated to drive the vehicle and obey all traffic laws. (ECF 318-6 at 26:4-18).

45. Cummings testified that McGee was in control of the vehicle – including braking, steering, and acceleration. (ECF 318-6 at 45:13-24, 276:11-16).

46. Moore testified that this accident was avoidable by an attentive driver. (ECF 318-2 at 97:13-24).

47. Cummings opined that this accident could have been avoided or mitigated if the McGee had seen the stop sign and road edge. (Ex. K, Cummings Dec. 2, 2024 Second Supplemental Opinion at 3).

48. Moore testified that McGee did not fulfill his role as a Level 2 driver in supervising the driving automation system and intervening to maintain safe operation of the vehicle. (ECF 318-2 at 110:2-7).

49. Cummings testified that McGee had a delayed reaction to prevent the crash and failed to observe the traffic light, stop sign, and Chevrolet Tahoe (ECF 318-6 at 47:9-48:6).

50. Moore testified that in the "[i]n the last five seconds, McGee was in a better point [than Tesla] to avoid the crash." (ECF 318-2 at 214:15-18).

51. Moore testified that drivers get distracted using cell phones all the time. (ECF 318-2 at 129:25-130:7).

52. Moore testified that driving while using a cellphone is not limited to Tesla drivers who use Autopilot. (ECF 318-2 at 130:8-12).

53. Moore testified that using cell phones or taking one's eyes off the road while driving occurred before Autopilot. (ECF 318-2 at 131:2-17).

54.     Moore testified that people crash and run the stop sign at the Card Sound Road intersection without Autopilot. (ECF 318-2 at 189:23-190:8).

55.     Moore testified that McGee could still have been distracted by his phone and crashed into the Tahoe if Autopilot was unavailable. (ECF 318-2 at 53:19-54:4).

56.     Moore testified that McGee could cause a number of different crashes if Autopilot was not engaged. (ECF 318-2 at 145:4-9).

57.     Moore testified that disabling Autopilot or designing Autopilot to not engage outside of its ODD would not have prevented McGee from accelerating the vehicle. (ECF 318-2 at 193:7-22).

58.     Cummings testified that Autopilot's design made McGee complacent and confused as to Autopilot's capabilities and that such complacency and confusion resulted in the accident. (ECF 318-6 at 42:19-43:1, 253:6-8).

59.     Cummings agreed that you do not need to be driving a Tesla with Autopilot engaged in order to drop a cell phone. (ECF 318-6 at 10:15-19).

60.     Cummings testified that available research by the National Highway Traffic Safety Administration on the topic of distracted driving identifies cell phone use as a source of distraction for *all* drivers regardless of ADAS technology. (ECF 318-6 at 252:2-7).

61.     Cummings testified McGee could have been using his cellphone or engaged in other distracted behavior even if Autopilot was not available to him on the night of the crash. (ECF 318-6 at 253:9-20).

62.     Cummings testified she is not aware of any study that shows that drivers of Teslas with Autopilot engaged look away from the road and reach for dropped items with a greater

9

frequency compared to drivers of vehicles without ADAS. (ECF 318-6 at 15:14-19; 252:2-253:20).

63. Cummings testified it was speculative to opine whether McGee would have used his cell phone or otherwise been distracted while approaching the intersection without Autopilot available. (ECF 318-6 at 245:9-16, 253:16-24).

64. Cummings testified McGee never testified that because he had Autopilot, he felt like he could use a handheld cellphone. (ECF 318-6 at 247:16-21).

65. Cummings testified that McGee never testified that if Autopilot was not available on his Model S on the night of the crash, that he would not have used his cell phone. (ECF 318-6 at 247:25-248:15).

66. Cummings testified that McGee "thinks this car is gonna pick up his slack. That's what copilot is. And he feels like there's – he drops his phone, what's the big deal? My car's got it," but agreed that McGee never testified as such (ECF 318-6 at 246:21-247:1, 247:16-248:15).

67. Cummings opined that Tesla's Recall 23-838 "recall remedy" would "probably" have prevented the accident because McGee would "probably" have been suspended from using Autopilot on the day of the crash. (ECF 318-6 at 244:22-245:16).

68. Cummings agreed that she had no scientific study, empirical data supporting the conclusion that Tesla's Autosteer Beta message was confusing to users. (ECF 318-6 at 206:17-207:20).

69. Cummings agreed that she had no scientific study or empirical data supporting the conclusion that Tesla's use of the term Autopilot was confusing to users. (ECF 318-6 at 209:8-212:3).

70. To research what training Tesla provides its customers, Cummings testified that she "talked to several people that I know have Teslas or have recently purchased Teslas to ask them whether or not they are getting any additional training or if anything has even been offered. (ECF 318-6 Cummings July 23, 2024 Depo. at 204:4-12).

**Plaintiff's Defect Claims**

71. Moore acknowledged that guidance issued by the Society of Automotive Engineers ("SAE") in place at the time of the Model S' manufacture dictated that, for Level 2 vehicles (like the Model S), the driver alone should determine when to use what features. (ECF 318-2 at 76:23-77:5).

72. Cummings testified that she disagrees with guidance issued by the Society of Automotive Engineers ("SAE") in place at the time of the Model S' manufacture dictating that, for Level 2 vehicles (like the Model S), the driver alone should determine when to use what features. (ECF 318-6 at 159:21-160:19).

73. Moore testified that guidance issued by the Society of Automotive Engineers ("SAE") in place at the time of the Model S' manufacture dictated the driver of a vehicle equipped with a Level 2 system is expected to monitor the roadway and respond to hazards. (ECF 318-2 at 33:8-15, 76:5 -77:5).

74. Cummings testified that drivers are responsible to make decisions consistent with their obligation to drive safely on the roadways even when ADAS features are engaged. (ECF 318-6 at 17:10-13, 26:4-18).

75. AEB was designed to prevent a collision with a lead vehicle traveling in front of and in the same lane as the Tesla, not to detect and prevent collisions with the side profile of a stationary vehicle like the instant crash. (Ex. L, Tesla's Response to Request 62 of Plaintiff Angulo's Eleventh Request for Production); (ECF 318-10 at BENAVIDES-00001897).

11

76. Moore testified, "I don't believe anywhere in my work have I opined that automatic emergency braking should have triggered in this case." (ECF 318-3 at 108:15-110:12); (*see also* ECF 318-2 at 246:23-247:6).

77. Cummings testified that she had never offered an opinion that AEB was defective. (ECF 318-8 at 69:7-70:7); (*See also* ECF 318-6 at 80:19-81:10).

78. Moore testified that he did not prepare opinions on what steps are necessary for the Model S to command braking or a warning after detection. (ECF 318-2 at 36:15-39:3).

79. When asked whether he had an understanding of what needs to occur before Autopilot will command an action, Moore testified "there's quite a bit – quite a few things that can occur… again, that's the majority of the field of autonomy is: What happens after you get a detection? It's not a small task or a simple answer." (ECF 318-2 at 39:14-20).

80. Cummings testified that she did have information as to why the vehicle did not brake or issue a warning. (ECF 318-8 at 55:12-20, 61:16-62:13, 63:18-64:3).

81. When asked about whether a specific variable should have been part of the decision-making process, Cummings responded, "it could be, but maybe you should ask [Tesla's engineer] Rubio Blanco this. I mean these are all questions that the Tesla engineers would have the answer to." (ECF 318-8 at 53:1-8).

**Punitive Damages/The Recall**

82. Plaintiffs' expert Moore testified that he does not rely on the recall. (ECF 318-2 at 146:1-148:20).

Date:  January 27, 2025

Respectfully submitted,

*s/ Wendy F. Lumish*
**WHITNEY V. CRUZ**
Florida Bar No. 800821
**WENDY F. LUMISH**
Florida Bar No. 334332
**BOWMAN AND BROOKE LLP**
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134
Tel. 305-995-5600 / Fax: 305-995-6100
whitney.cruz@bowmanandbrooke.com
wendy.lumish@bowmanandbrooke.com

**THOMAS P. BRANIGAN**
(Admitted *Pro Hac Vice*)
**DREW P. BRANIGAN**
(Admitted *Pro Hac Vice*)
**BOWMAN AND BROOKE LLP**
101 W. Big Beaver Road, Suite 1100
Troy, MI 48084
Tel. 248-205-3300 / Fax: 248-205-3399
thomas.branigan@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com

**JOEL SMITH**
(Admitted *Pro Hac Vice*)
**BOWMAN AND BROOKE LLP**
1441 Main Street, Suite 1200
Columbia, SC 29201
Tel. 803-726-7420 / Fax: 803-726-7421
joel.smith@bowmanandbrooke.com

*Attorneys for Defendant TESLA, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 27, 2025, the foregoing was filed using the Court's CM/ECF system, which will send electronic notice of the same to all interested parties.

| | |
|---|---|
| **Adam T. Boumel, Esq.**<br>Florida Bar No. 0110727<br>THE ROUSSO, BOUMEL LAW FIRM, PLLC<br>9350 South Dixie Highway<br>Suite 1520<br>Miami, FL 33156<br>Tel. 305-670-6669<br>adam@roussolawfirm.com<br>assistant@roussolawfirm.com<br>pleadings@roussolawfirm.com<br><br>*Attorneys for Plaintiff Dillon Angulo* | **Todd Poses, Esq.**<br>Florida Bar No. 0075922<br>POSES & POSES, P.A.<br>Alfred I. Dupont Building<br>169 East Flagler Street, Suite 1600<br>Miami, FL 33131<br>Tel. 305-577-0200<br>Fax: 305-371-3550<br>tposes@posesandposes.com<br>maria@posesandposes.com<br><br>*Attorneys for Plaintiff Neima Benavides* |
| **Brett Schreiber, Esq.**<br>Admitted *Pro Hac Vice*<br>**Satyarinivas "Srinivas" Hanumadass, Esq.**<br>Admitted *Pro Hac Vice*<br>**Carmela Birnbaum, Esq.**<br>Admitted *Pro Hac Vice*<br>SINGLETON SCHRIEBER<br>591 Camino de la Reina, Suite 1025<br>San Diego, CA 92108<br>bschreiber@singletonschreiber.com<br>vas@singletonschreiber.com<br>cbirnbaum@singletonschreiber.com<br>jjusto@singletonschreiber.com<br>eelms@singletonschreiber.com<br>service@singletonschreiber.com<br><br>*Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides* | **Douglas F. Eaton, Esq.**<br>Florida Bar No. 0129577<br>EATON & WOLK PL<br>2665 South Bayshore Drive, Suite 609<br>Miami, FL 33133<br>Tel. 305-249-1640<br>Fax: 786-350-3079<br>deaton@eatonwolk.com<br>cgarcia@eatonwolk.com<br>lhuete@eatonwolk.com<br><br>*Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides* |

*s/ Wendy F. Lumish*
Wendy F. Lumish