UNITED STATES DISTRICT
COURT SOUTHERN DISTRICT OF
FLORIDA

Case No. 21-cv-21940-BLOOM/Otazo-Reyes

NEIMA BENAVIDES, *as Personal Representative of the Estate of Naibel Benavides Leon, deceased*,

    Plaintiff,

v.

TESLA, INC., *a/k/a. Tesla Florida, Inc.*,

    Defendant.
_____/

Case No. 22-cv-22607-BLOOM

DILLON ANGULO,

    Plaintiff,

v.

TESLA, INC., *a/k/a/ Tesla Florida, Inc.*,

    Defendants.
_____/

**DILLON ANGULO'S MOTION TO LIMIT AND EXCLUDE CERTAIN OPINIONS OF TESLA'S NEUROPSYCHOLOGIST, DR. BARRY CROWN**

Dillon Angulo, by and through his undersigned attorney and in accordance with this Honorable Court's Order granting leave to file this Motion (DE 336), hereby files this Motion to limit and exclude certain opinions of Tesla's expert neuropsychologist, Dr. Barry Crown, and states as follows:

1

**FACTUAL BACKGROUND**

In the immediate aftermath of this crash, Dillon Angulo was in dire condition. When police officers arrived at the scene and attended to Angulo, they noted that Angulo was "agonal", referring to a pattern of labored, gasping breaths that indicates a life-threatening situation where the brain is not receiving enough oxygen. Body worn camera footage from the scene certainly leaves no doubt as to the life-threatening severity of the injuries suffered by Angulo. See:



Ultimately, Angulo was air-lifted to Jackson's Trauma Center, where during the air-transfer paramedics noted that Angulo was completely unresponsive, with a Glasgow Coma Score of 3 (the worst possible score). Thankfully, at Jackson, attending doctors were able to stabilize Angulo. The records from Jackson reflect that over his first several days in the trauma ICU, Angulo remained in varying degrees of a comatose state secondary to his brain injury[1]. Imaging ultimately revealed that he sustained an intraparenchymal hemorrhage, where the brain tissue itself is

---

[1] In addition to his traumatic brain injury, Angulo suffered substantial orthopedic polytrauma and other internal injuries.

bleeding; a life-threating injury known to cause significant neurological deficits.

Today, almost six years after the crash, and after a long and arduous path to recovery including numerous surgeries, rehab through Baptist Health's Intensive Brain Injury Program, and substantial continuing medical care, Angulo still suffers from neuropsychological disturbances secondary to his brain injury and PTSD. These disturbances include diminished executive functions, impaired memory and concentration, and emotional dysregulation, among others.

To contest the extent of the continuing brain damage and neurocognitive deficits suffered by Angulo as a result of this crash, Tesla has retained Dr. Barry Crown, a neuropsychologist. Dr. Crown acknowledged that Angulo's medical records reflect that he suffered a "severe" [2] traumatic brain injury. (Ex. A, Dr. Crown Depo at 32; 86). Dr. Crown also conducted an interview with Angulo and administered a neuropsychological testing battery. The end result of that testing is that Dr. Crown found, unsurprisingly, that Angulo does have continuing neuropsychological disturbances secondary to his brain injury. (Ex. A, Dr. Crown Depo at 35; 49). More specifically, Dr. Crown's testing demonstrated substantial neurocognitive disturbances in Angulo's (1) general reasoning ability, (2) immediate memory, (3) constructional ability, (4) language ability, (5) attention, and (6) delayed memory, among others. (Ex. A, Dr. Crown Depo at 44-45). Additionally, Dr. Crown acknowledged that Angulo continues to suffer from PTSD, secondary to his own injuries as well as the death of Naibel Benavides. (Ex. A, Dr. Crown Depo at 106; 146).

Notwithstanding these findings, at his deposition, Dr. Crown made it clear that it is his intent at trial to testify as to a host of irrelevant and prejudicial matters in an attempt to deflect from the real issues. Plaintiff challenges those opinions as follows:

---

[2] The Glasgow coma scale has three categorizations for traumatic brain injuries; mild, moderate and severe.

3

I. **The extent and specifics of Angulo's former drug use.**

Angulo developed an addiction to Xanax in high school. Thereafter, he gradually began using more substances including marijuana, and for a very short period, cocaine and crack cocaine. Very shortly after using crack cocaine for the first time, Angulo voluntarily checked himself in – on his own accord – to an inpatient drug rehabilitation program. The unrefuted facts establish that following his admission to this rehab facility, approximately one year prior to this incident, Angulo never used any illicit substances ever again. Indeed, it is unrefuted that even after his discharge from the hospital following this crash, when he was completely wheelchair bound, had an external fixator, and was in horrible physical pain, not only did Angulo remain clean and not relapse, but he even refused to take any medication (such as narcotic pain medication) which could have led to a relapse.

While Dr. Crown does agree that Angulo's traumatic brain injury, PTSD, and chronic pain resulting from this crash are all contributory towards Angulo's continuing neurocognitive deficits, Dr. Crown also opines that Angulo's pre-morbid issues of (1) drug use, (2) ADHD, and (3) depression are also contributing to his current deficits. (Ex. A, Dr. Crown Depo at 34-35). And, Dr. Crown has made it clear that he intends to lay out the sordid details of these pre-morbid issues for purposes of causing juror prejudice. For example, Dr. Crown's Report contains the following details of Angulo's medical history:

> On December 15, 2014, Mr. Angulo was seen in the emergency room of Baptist Hospital after having a seizure at a workplace. He was transported by ambulance. Medical records indicate that he had been taking one to two 2mg Xanax (alprazolam) tablets a day and had abruptly stopped two days prior to the seizure. Medical screening was positive for cannabis and benzodiazepines.
>
> In June of 2018, Mr. Angulo voluntarily entered a program for substance abuse and addiction at the Beachcomber Center in South Florida. He tested positive for cannabis, benzodiazepines, and cocaine. He was taking 2 to 4 milligrams of Xanax (alprazolam) per day and using cocaine in powder and crack form. He also

complained of and was treated for depression. He was prescribed Wellbutrin for depression. Issues of sex addiction and love addiction emerged during treatment. When challenged in group counseling, he left the program against medical and clinical advice. His primary therapist noted that he was at high risk for relapse.

(Exhibit B, Crown Report at 6)

While in § II below, Plaintiff challenges the scientific basis for Dr. Crown's opinion that these pre-morbid issues and drug use contributed to Angulo's neurocognitive disturbances, here Plaintiff challenges the need for Dr. Crown (or any other Tesla expert or lawyer) to go into the details of Angulo's prior drug use should this Court allow presentation of same. More specifically, to the extent that this Court finds that Angulo's pre-crash drug use relevant and admissible, Plaintiffs request that only the minimum possible information be introduced. Certainly, Dr. Crown and Tesla's other lawyers and experts can make any points they need by simply referring to "prior drug use" or other similar terminology. Details as to the specifics of that drug use, such as the fact that Angulo used cocaine or crack cocaine, or the fact that he had a seizure as a result from Xanax withdrawal, are completely irrelevant and highly prejudicial, and thus should be excluded under a Rule 403 analysis.

## II. That Angulo's former drug use, ADHD, and depression are contributors to his current neurocognitive deficits.

In the preceding section, Plaintiff argues that Dr. Crown (and, more broadly, Tesla) should not be allowed to introduce the sordid details of Angulo's pre-morbid drug use. Before the Court even gets to that question, however, it must answer a first question – is that pre-morbid drug use even relevant and should it come in at all? Dr. Crown's testimony makes it clear that the answer to that question should be no.

As discussed in the factual background section above, Dr. Crown's opinion is that while this incident did cause Angulo to suffer a traumatic brain injury and resulting neurocognitive

disfunction, Angulo's pre-morbid drug use, ADHD, and depression were also contributing factors. However, Dr. Crown's opinions on this matter are not based on sufficient facts or data, and are not the product of reliable methodology, and thus should be excluded.

More specifically, from a factual standpoint, Dr. Crown acknowledges that there is no medical evidence of any kind to show that Angulo had any pre-existing neurocognitive disorders or brain damage as a result of his pre-morbid drug use, ADHD, or depression. (Ex. A, Dr. Crown Depo at 54-55).

Without any base-line evidence to establish that Angulo had such pre-existing brain damage or neurocognitive disfunction, Dr. Crown asserts baldly that Angulo must have had such pre-morbid deficits because "95 percent of former benzodiazepine users will suffer from continuing neuropsychological disturbances". (Id. at 39). Obviously, such a statistical opinion requires an empirical study, yet when pressed, Dr. Crown was unable to cite to any scientific literature or peer-reviewed studies to support same (Id.). Of course, Plaintiff did notice Dr. Crown's deposition duces tecum and specifically requested that he bring any and all studies and literature which supported his opinions. (Ex. C, Crown Deposition Notice at ¶ 4). Dr. Crown did not bring any such materials even though he acknowledged that "[he's] familiar with them by memory" and that it would take him approximately five to six hours to compile them. (Ex. A, Dr. Crown Depo at 8-11). Instead of producing such literature for Plaintiff's review, Dr. Crown asserts that Plaintiff should accept these statistics and opinions without verification. (Id. at 39).

Staying on the subject of pre-morbid drug use, Dr. Crown's own testimony causes substantial doubts as to the reliability of his opinions. First, he acknowledges that he can only say that such pre-morbid drug use would have caused "one or more" (but not necessarily all) of

6

Angulo's continuing neurocognitive impairments. (Id. at 39). Next, he even acknowledged that he could not be certain as to the contribution of same. See:

> Q: Okay. By your own logic are you sure that the drug use and the depression treatment contributed to his neuropsychological disturbance?
>
> A: It very well may have. Again, I can't tell you for certainty.
>
> (Id. at 34-35).

Accordingly, with regards to the former drug use issue, it is clear that Dr. Crown has not based his opinion on sufficient facts or reliable data. Without any medical evidence of pre-morbid brain injury or neurocognitive disfunction, he asserts that Angulo must have had same due to the fact that 95% of former benzodiazepine ("benzo") abusers have such brain damage, but can't and wouldn't cite to any research or studies to support that opinion, and couldn't state which of Angulo's neurocognitive deficits were caused by the pre-morbid drug use vs. the traumatic brain injury (or his PTSD for that matter).

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), an expert's report must contain the facts or data considered by the witness in forming his or her opinions. If a party fails to comply with this rule, his opinions may be excluded unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1); see *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 825 (11th Cir. 2009) (affirming order striking expert because failure to disclose scientific basis for expert's opinions obstructed opposing party's right to discovery under Fed. R. Civ. P. 26). By failing to provide this information, Dr. Crown renders his opinion impermissibly conclusory and speculative. See e.g. *Haggerty*, 950 F. Supp. At 1167 ("an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'"); see also *McDowell*, 392 F.3d at 1299

("an expert's self-serving assertion that his conclusions were 'derived by the scientific method' [cannot] be deemed conclusive").

As it relates to ADHD, Dr. Crown's opinion is equally speculative. First, Dr. Crown again didn't provide any studies or literature to support his opinions on ADHD despite specifically referencing one such study in his testimony (Ex. A, Dr. Crown Depo at 37). More importantly, Dr. Crown acknowledged that ADHD would only be a contributing factor towards Angulo's neuropsychological disfunction if Angulo suffered from ADHD "after the adolescent growth spurt." (Id. at 40-41). Yet, on questioning, Dr. Crown could not point to any medical evidence to show that Angulo did in fact suffer from ADHD after reaching adulthood. (Id. at 41). Instead, Dr. Crown opined that Angulo must have suffered from ADHD after reaching adulthood based solely on his interview with Angulo, where Angulo was never asked nor indicated that he had ADHD in adulthood. (Id. at 41-42). Instead, Dr. Crown assumes that Angulo must have had ADHD as an adult because he "called himself a knucklehead" and because "he didn't do well in school". (Id.). The speculative nature of Dr. Crown's basis here was best exemplified by his acknowledgement that "I don't *think* that his ADHD resolved in his childhood.". (Id at 42)(emphasis added). This type of speculation lacks reliability and should not be allowed.

III.     **That Angulo is Malingering.**

In his testing of Angulo, Dr. Crown administered three (3) separate malingering tests. Those tests are "specifically designed to tell if he's giving his best effort without letting him know that he's being tested for his best effort". (Ex. A, Dr. Crown Depo at 112-113). Angulo passed two of the three tests. (Id. at 113). The one malingering test that Angulo did not pass flagged him as potentially malingering for answering affirmatively that he was suffering from symptoms of depression, PTSD, and substance abuse. (Id. at 113-115). Obviously, it would make sense that

8

Angulo endorsed these items, as he is or was previously suffering from them. Ultimately, Dr. Crown acknowledged that based on the testing results he could not testify within a reasonable degree of neuropsychological probability that Angulo was malingering or exaggerating. (Id. at 116). Accordingly, Dr. Crown should be completely prohibited from expressing or suggesting in any manner that Angulo is malingering or exaggerating his injuries and neuropsychological deficits.

### IV.     The use of the MCMI-III personality factors.

On page 10 and 11 of his report, Dr. Crown has a "Personality Factor" section that frankly makes Angulo sound like a sociopath. Excerpts from that section include:

> Notable may be tendencies to intimidate and exploit others and to expect special recognition and consideration without assuming reciprocal responsibility. Actions are likely to be present that raise questions about personal integrity, such as a *ruthless indifference to the rights of others*. These may indicate a pervasively deficient social conscience, a disdain of traditional ideals, and a contemptuousness of conventional values.
>
> . . .
>
> Antisocial behavior, alcoholism, or drug problems would not be inconsistent with this clinical picture. When his life is under control, he may be *skillful in exploiting the goodwill of others*. More characteristically, he will be envious of others and wary of their motives.
>
> . . .
>
> Deficient in deep feelings of loyalty and displaying an occasional *indifference to truth*, he may successfully *scheme beneath his veneer of civility*.
>
> . . .
>
> There are further indicators of borderline personality disorder with *antisocial and sadistic features*.
>
> (Ex. B, Dr. Crown Report at 10-11)(emphasis added).

9

In deposition, it was revealed however that these "personality factors" are not the opinions of Dr. Crown, but instead are a verbatim copy and paste of a printout from the MCMI-III test administered by Dr. Crown. More specifically, the MCMI-III test consisted of 175 true or false questions. (Ex. A, Dr. Crown Depo at 61-62). Dr. Crown fed Angulo's answers into a computer program and the program generated the description of the personality factors. (Id.) Dr. Crown copied and pasted that summary into his report, and did not contribute to or editorialize it in any way. (Id.). On questioning, Dr. Crown was unable to identify the type of questions that Angulo would have endorsed to produce the result generated by the software. (Id. at 63-64). Dr. Crown further acknowledged that (1) none of the opinions or conclusions reflected in the "personality factors" were reached independently by Dr. Crown, and (2) none of the personality factors were even complained of by Angulo or at issue in Angulo's claims (Id. at 64-70).

Federal case law is clear that Dr. Crown cannot simply copy and paste information generated by a software program before the jury and disguise it as his own opinion. *See Schoen v. State Farm Fire & Cas. Co.*, 638 F. Supp. 3d 1323, 1336–37 (S.D. Ala. 2022) (holding that expert was "free to rely on information and data from an expert in formulating *his* opinions. However, at the end of the day, it is imperative that [the expert] apply *his knowledge* to the facts and form *his own opinion*." (Emphasis supplied). *See also United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003) (although an expert was permitted to "rely on hearsay evidence for the purposes of rendering an opinion based on his experience," in this case the government's expert was merely "repeating hearsay evidence without applying any expertise whatsoever, thereby enabling the government to circumvent the rules prohibiting hearsay"); *United States v. O'Keefe*, 825 F.2d 314, 319 (11th Cir. 1987) (affirming district court's restriction of testimony of plaintiff's second tax expert which was "nothing more than a personal vouching of one expert for another expert."); *American Key Corp.*,

762 F.2d at 1580 ("Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not."); *Grayson v. No Labels, Inc.*, No. 6:20-CV-1824-PGB-LHP, 599 F.Supp.3d 1184, 1193 (M.D. Fla. Apr. 25, 2022) ("An expert may not blindly rely on the conclusion of another expert and still meet the reliability requirements of Rule 702 and *Daubert*."); *Mchale v. Crown Equip. Corp.*, No. 8:19-CV-707-T-27SPF, 2021 WL 289346, at *3 (M.D. Fla. Jan. 28, 2021), *aff'd*, No. 21-14005, 2022 WL 4350702 (11th Cir. Sept. 20, 2022) ("Inappropriate parroting occurs when an expert adopts another expert's opinion wholesale, without reaching independent conclusions in reliance on that opinion.") (quoting *Fox v. Gen. Motors LLC*, No. 1:17-CV-209-MHC, 2019 WL 3483171, at *26 (N.D. Ga. Feb. 4, 2019)); *Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273, 1292 (S.D. Ga. 2018) ("An expert 'may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon.'") (quoting *Hernandez v. Crown Equip. Corp.*, 92 F. Supp. 3d 1325, 1352 (M.D. Ga. 2015)).

Moreover, as acknowledged by Dr. Crown, the personality factors identified in this computer-generated profile (e.g. "ruthless indifference to the rights of others", "skillful in exploiting the goodwill others" and "antisocial and sadistic features") are not even complained of by Angulo in any manner nor are they at issue in this case. Accordingly, they lack any probative value and of course would be extremely prejudicial, and thus must be excluded under Rule 403.

**V.  That childhood corporal punishment received at the hands of his mother contributed to Angulo's PTSD.**

There is debatable record evidence showing that, as a child, Angulo was the victim of corporal punishment wherein his mother would hit his hand with a spoon at times. (Ex. A, Dr. Crown Depo at 146-147). Dr. Crown did not offer any opinions related to same in his report. (Ex. B., Dr. Crown

11

Report). Notwithstanding, in deposition Dr. Crown opined that this corporal punishment was a contributing factor to Angulo's PTSD, along side the death of Naibel Benavides and Angulo's own injuries suffered in the crash. (Ex. A, Dr. Crown Depo at 146-147).

PTSD is diagnosed through DSM (Diagnostic and Statistical Manual of Mental Disorders) criteria. (Ex. A, Dr. Crown Depo at 147). Dr. Crown admits that he never went through a PTSD DSM analysis with Angulo. (Id.) The DSM criteria for PTSD requires "exposure to actual or threatened death, serious injury, or sexual violence."[3] Clearly, being the victim of a car crash that killed his girlfriend and sent Angulo to the trauma center in life threatening condition satisfies that DSM criteria. Conversely, being hit with a wooden spoon as corporal punishment obviously falls far short. Accordingly, because Dr. Crown did not go through a DSM analysis, and because the criteria for PTSD clearly does not allow for it, Dr. Crown's opinion that this childhood corporal punishment contributed to Angulo's PTSD is a product of both insufficient data and unreliable methodology, and must not be allowed. Moreover, it was surprise testimony in that it was not included in Dr. Crown's report.

In reality, Tesla and Dr. Crown's intent here is crystal clear; they intend to introduce prejudicial information about Angulo's mother to cause juror prejudice for if and when she is called to testify on her son's behalf regarding his physical, mental and emotional condition as a result of this crash. For this reason, any reference by any of Tesla's experts or lawyers to this corporal punishment should be excluded under a Rule 403 analysis.

---

[3] see, https://www.ncbi.nlm.nih.gov/books/NBK207191/box/part1_ch3.box16/

12

**VI.     Any testimony that Dr. Crown has provided testimony or guidance to the government or governmental agencies.**

To bolster his statistical opinion that 95% of former benzo abusers will have continuing and permanent neuropsychological disturbances, instead of citing actual research to support his opinion, Dr. Crown pointed to the fact that he has previously provided similar unsworn opinions to the National Institute of Drug Abuse. (Ex. A, Dr. Crown Depo at 39-40; 47-49). More specifically, Dr. Crown served as a consultant on a committee that reviewed and granted federal contracts and grants. (Id. at 47). Of course, Dr. Crown couldn't confirm that the opinions he gave in that role mirrored the statistical opinions regarding former benzo abuse that he offers here. (Id. at 48-49).  Either way, the law of the land is clear – it is impermissible to "place[] the government's prestige behind the witness to bolster the witnesses' credibility." *Sok v. Romanowski*, 619 F. Supp. 2d 334, 359 (W.D. Mich. 2008).

**VII.    That Angulo has a love or sex addition, that he left rehab against medical advice, that he suffered a seizure as a result of benzodiazepine withdrawal, or any other evidence or arguments related to character or prior bad acts of Angulo.**

As has been made clear by Tesla, in light of the obvious nature of the severe and life altering damages suffered by Angulo, its strategy at trial will be to lob as many collateral attacks as possible in hopes that same causes juror prejudice against Angulo. This Honorable Court should not allow same by Dr. Crown or by any other member of Tesla's expert or legal team.

In his report, Dr. Crown notes that during his pre-crash self-imposed rehab admission, "[i]ssues of sex addiction and love addiction emerged during treatment". (Ex. B, Dr. Crown Report at 6). Likewise, Dr. Crown points out that Angulo "left the program against medical and clinical advice. His primary therapist noted that he was at a high risk for relapse." (Id.) Dr. Crown also notes that in 2014, five years before this crash, Angulo had a seizure as a result of benzo

withdrawal. (Id.).  None of these facts are at issue in this case. Besides the fact that he continues to deeply mourn the loss of Naibel Benavides, Angulo has not made any claims that can be even remotely related to issues of love or sex addiction. Likewise, the unrefuted evidence in this case shows that Angulo never relapsed after leaving rehab, including after this crash when he had every excuse and reason in the world to relapse. Lastly, as discussed in detail above, there is no evidence whatsoever to show that the one seizure that Angulo had from benzo withdrawal caused any type of neurological injury. The only reason to introduce these items and others like it at trial is to cause juror confusion and prejudice. Nothing more.

Generally, character evidence and evidence of prior bad acts – i.e. "other crimes, wrongs or acts" – may be introduced <u>only</u> in limited circumstances and <u>only</u> then to prove a material fact in issue.  Fla. Evid. Code § 90.404(2).  Such material facts include proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.  The rules curtail the use of unrelated prior bad act evidence because it "tends to distract the trier of fact from the primary issues of the case."  Eleaszer and Weissenberger, FLORIDA EVIDENCE, 1999 ed., at 170.

Even otherwise admissible prior bad acts or character evidence is subject to the dictates of Rule 403, which precludes admission of even relevant evidence whose probative value is substantially outweighed by its unfairly prejudicial effect. *Perper v. Edell*, 44 So. 2d 78, 80 (Fla. 1949); Fla. Stat. § 90.401-403.  Where evidence is unfairly prejudicial, tends to mislead jurors, or confuse the issues, the Court should exclude it notwithstanding relevance.  Fla. Evid. Code § 90.403.

WHEREFORE, Plaintiff prays this Honorable Court grant this instant Motion, and enter an order prohibiting Dr. Crown and all other Tesla experts and lawyers from introducing

testimony, argument or evidence related to the matters set forth above.

## CERTIFICATE OF CONFERRING WITH COUNSEL PURSUANT TO RULE 7.1(a)(3)

Pursuant to Local Rule 7.1 (a)(3), the undersigned counsel for Plaintiff conferred with Whitney Cruz, counsel for Tesla, who indicated that Tesla objects to the relief sought herein.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of February, 2025, I electronically filed the foregoing document with the Clerk of Court using CM/ECF and will serve a copy via e-mail to all parties on the attached service list.

> THE ROUSSO, BOUMEL LAW FIRM, PLLC.
> 9350 South Dixie Highway
> Suite 1520
> Miami, Florida 33156
> (305) 670-6669
>
> By:   /s/ *Adam T. Boumel, Esq.*
> Adam T. Boumel, Esq.
> Florida Bar No.: 0110727
> Direct email: adam@roussolawfirm.com
> Service emails:
> pleadings@roussolawfirm.com
> haiyang@roussolawfirm.com

**SERVICE LIST**

**Bowman and Brooke LLP**
41000 Woodward Ave., Suite 200E
Bloomfield Hills, Michigan 48304
**Attn: Joel Smith Esq.**
**Attn:Thomas P. Branigan, Esq.**
**Attn: Whitney, Cruz, Esq.**
**Attn: Drew P. Branigan, Esq.**
Joel.smith@bowmanandbrooke.com
thomas.branigan@bowmanandbrooke.com
whitney.cruz@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com
*Counsel for Defendant*

**Singleton Schreiber, LLP**
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Tel: (619) 771-3473
**Attn: Brett J. Schreiber, Esq.**
bschreiber@singletonschreiber.com
bschreiber@singletonschreiber.com
vas@singletonschreiber.com
cbirnbaum@singletonschreiber.com
eelms@singletonschreiber.com
*Counsel for Plaintiffs*

**Poses & Poses, P.A.**
169 East Flagler Street, Suite 1600
Miami, Florida 33156
**Attn: Todd Poses, Esq.**
tposes@posesandposes.com
Maria@posesandposes.com
*Counsel for Plaintiffs*


**Eaton & Wolk PL**
2665 South Bayshore Dr., Suite 609
Miami, FL 33133
**Attn: Doug Eaton, Esq.**
deaton@eatonwolk.com
*Counsel for Plaintiffs*