**Barry Crown**

**Vol. 1**

**02/04/2025**

```
 1              UNITED STATES DISTRICT COURT FOR THE
                   SOUTHERN DISTRICT OF FLORIDA
 2
                  CASE NO. 21-cv-21940-BLOOM/Otazo-Reyes
 3

 4   NEIMA BENAVIDES, as Personal
     Representatives of the Estate of
 5   Naibel Benavides Leon, deceased,

 6           Plaintiff,
     -vs-
 7
     TESLA, INC., a/k/a Tesla Florida, Inc.,
 8
             Defendant.
 9   _____

10              CASE NO. 22-cv-22607-BLOOM

11   DILLON ANGULO,

12           Plaintiff,
     -vs-
13
     TESLA, INC. a/k/a Tesla Florida, Inc.,
14
             Defendants.
15   _____

16     VIDEO-RECORDED ZOOM DEPOSITION OF: DR. BARRY CROWN

17

18   DATE TAKEN: February 4, 2025

19   TIME:  1:03 p.m. - 5:16 p.m.

20   PLACE: All Parties Appeared Remotely via Zoom Conference

21

22   Stenographically Reported Remotely By:

23   Sharon Ambersley, FPR
     Notary Public, State of Florida
24   U.S. Legal & Support

25                        -  -  -
```

```
 1      APPEARANCES:

 2      On behalf of the Plaintiffs:

 3          ADAM T. BOUMEL, ESQUIRE
            THE ROUSSO BOUMEL LAW FIRM
 4          9350 S Dixie Highway
            Suite 1520
 5          Miami, FL 33156
            adam@roussolawfirm.com
 6
            TODD POSES, ESQUIRE
 7          POSES LAW GROUP, P.A.
            169 East Flagler Street
 8          Suite 1600
            Miami, FL 33156
 9          tposes@posesandposes.com

10

11      On behalf of the Defendant:

12          WHITNEY CRUZ, ESQUIRE
            DREW P. BRANIGAN,ESQUIRE
13          BOWMAN AND BROOKE, LLP
            41000 Woodward Avenue
14          Suite 200E
            Bloomfield Hills, MI 48304
15          whitney.cruz@bowmanandbrooke.com

16

17      ALSO PRESENT:
18
            CHERYL LOPEZ, THE VIDEOGRAPHER
19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3    WITNESS:

 4    Dr. Barry Crown

 5       Direct Examination By Mr. Boumel         5

 6

 7                     -  -  -
 8            E X H I B I T S   M A R K E D
                       -  -  -
 9
```

```
      PLAINTIFFS' EXHIBIT 1 Notice of deposition      7
10    PLAINTIFFS' EXHIBIT 2 Complete file            11
      PLAINTIFFS' EXHIBIT 3 Chart                    85
11    PLAINTIFFS' EXHIBIT 4 Fire rescue report       87
      PLAINTIFFS' EXHIBIT 5 Medical records          93
```

```
12

13    Exhibits retained by Mr. Boumel.

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S
 2                       -  -  -
 3         Deposition taken remotely before Sharon Ambersley,
 4    Florida Professional Reporter and Notary Public in and
 5    for the State of Florida at Large, in the above cause.
 6                       -  -  -
 7              THE VIDEOGAPHER:  Okay.  All right.  So we are
 8         now on the record.  The time is 1:03 p.m.,
 9         February 4, 2025.  This begins the video-recorded
10         deposition of Dr. Barry Crown taken in the matter
11         of Neima Benavides, Estate of Naibel Benavides Leon
12         versus Tesla Incorporated.  I'm the court reporter,
13         Cheryl Lopez -- I mean, the videographer, Cheryl
14         Lopez.  The court reporter is Sharon Ambersley.
15         Counsel will state their appearances for the record
16         after which the court reporter will swear in the
17         witness.  Counsel?
18              MR. BOUMEL:  Good afternoon, everybody.  Adam
19         Boumel on behalf of the plaintiffs.
20              MS. CRUZ:  Whitney Cruz on behalf of Tesla.
21              THE COURT REPORTER:  Can you raise your right
22         hand, please?  Do you swear or affirm that the
23         testimony you're about to give will be the truth,
24         the whole truth, and nothing but the truth?
25              THE WITNESS:  I do.
```

```
 1                THE COURT REPORTER:  Thank you.

 2   Thereupon,

 3                     Dr. Barry Crown,

 4        having been first duly sworn, was examined

 5             and testified under oath as follows:

 6                     DIRECT EXAMINATION

 7   BY MR. BOUMEL:

 8        Q    All right.  Doc, good afternoon.  How are you

 9   today?

10        A    Good.  How are you?

11        Q    I am fantastic.  Thank you for asking.  I know

12   we're all jazzed up to be here today.  Quick

13   housekeeping before we go forward.  I know you charged

14   me for a two-hour minimum.  Do we have a hard stop in

15   two hours or can we keep going after that?

16        A    You're welcome to go up to -- at the moment

17   I'm on central time, 4:00 p.m. central which is

18   5:00 p.m.

19        Q    Okay.  I think at 5:00 p.m. eastern, I think

20   that should give us more than enough time.  In the very

21   unlikely scenario that we need more, we'll deal with it,

22   but I think four hours will be more than enough and

23   Whitney will be yelling at me that I'm taking that long.

24   She's very efficient, by the way.  All right. Let us --

25   there's Todd Poses coming in.  He's also representing
```

1    the plaintiffs, looking handsome as ever.

2          All right.  So, Doc, you've done this once or

3    twice before.  Yes?

4          A    What's that?

5          Q    You've done this once or twice before.  Yes?

6          A    Yes.

7          Q    All right.  How many times have you testified

8    in total would you approximate?

9          A    I have no idea.  It would be a guesstimate and

10   it would be well over a hundred.  I was part of the

11   panel in the 11th Circuit so that required testimony

12   once or twice a week in criminal proceedings so --

13         Q    Understood.

14         A    I have been around.

15         Q    And how long has it been that you've been

16   serving as an expert witness in court cases?

17         A    Since the mid-1970s.

18         Q    And you have been doing it on a consistent

19   basis since then?

20         A    Yes.

21         Q    And we are going to mark as -- well, strike

22   that.  I'm assuming we don't need to go over any

23   instructions.  You've done this more times than I have,

24   right?  You're good?  It's a question.  Are you good?

25   Do you need me to explain about the process?

```
 1        A     That's fine.  If I have a question, I'll ask.

 2              (Plaintiffs' Exhibit No. 1 was marked for

 3        identification.)

 4   BY MR. BOUMEL:

 5        Q     Perfect.  All right.  We're going to mark as

 6   Plaintiffs' 1 your notice of taking deposition.  I'll

 7   put it up on the screen.  And have you seen this

 8   document before, Doc?

 9        A     I have it in front of me.  Yes.

10        Q     Okay.  Perfect.  And there's a Schedule A

11   duces tecum request.  Have you produced everything

12   responsive to these nine items?

13        A     Yes.

14        Q     Okay.  I have your -- I have your file.  I'm

15   going to go through it in a minute and I've seen

16   documents responsive to --

17              MS. CRUZ:  Adam?  Adam?

18              MR. BOUMEL:  Yep.

19              MS. CRUZ:  I can't -- you guys are frozen for

20        me.  You were frozen for me.  So if we can take a

21        break.  I'm sorry to interrupt you.  Let me see if

22        I can connect from my phone because for some

23        reason --

24              MR. BOUMEL:  Let's go off.

25              MS. CRUZ:  You guys aren't having issues,
```

```
 1        right?  It's on my end.

 2             MR. BOUMEL:  Let's go off the record while

 3        Ms. Cruz handles her IT stuff.

 4             MR. POSES:  Yeah.  I hear you loud and clear.

 5             THE VIDEOGAPHER:  We're off the record at

 6        1:07.

 7             (Thereupon, a brief recess was taken.)

 8             THE VIDEOGAPHER:  Okay.  We are back on the

 9        record at 1:11 p.m.

10   BY MR. BOUMEL:

11        Q    All right.  Thank you, Doctor, for your

12   patience as we got the IT stuff handled.  I'm going to

13   pull back up Plaintiffs' 1 which is the notice of taking

14   deposition and I will tell you, I went through the file

15   that was produced to us by Tesla's counsel and I believe

16   I have everything.  I think everything was produced

17   other than items responsive to four and five, so let's

18   start with four.  Books, articles, literature, films,

19   experiments or other materials which support your

20   opinions, have you produced anything of that nature?

21        A    I didn't look at anything.  There are no

22   books, articles or what have you.  I did no research.

23        Q    Okay.  Certainly there are peer-reviewed

24   articles that you rely on for your practice, correct?

25        A    Yes.  And I'm familiar with them by memory,
```

1    but I didn't do a search with regard to this matter.

2         Q    Okay.  And if you were to do that search, how

3    long would it take you?

4              MS. CRUZ:  Object to form.

5              THE WITNESS:  If I would do a search?  I don't

6         believe I need to do a search.

7    BY MR. BOUMEL:

8         Q    Well, we were --

9         A    If I were to start from scratch it would

10   probably take five or six hours, but I don't know why I

11   would.

12        Q    Okay.  Other than the fact that we requested

13   it.  So five or six hours and you would be able to

14   produce all the peer-reviewed articles and other

15   literature relied on for your opinions today?

16        A    Well, I didn't do --

17             MS. CRUZ:  Object to the form.  Dr. Crown.

18        Dr. Crown, give me a second.

19             THE WITNESS:  Certainly.

20             MS. CRUZ:  Object to form.  Mischaracterizes

21        the testimony.  Go ahead.  Sorry, Dr. Crown.

22             THE WITNESS:  Yes.  I didn't do a particular

23        search.  The information that I utilized I'm aware

24        of and know from memory.

25

```
 1    BY MR. BOUMEL:

 2         Q    And that I understand that.  And my question

 3    to you is because I obviously don't know what you know

 4    and I'm not, you know, I haven't been doing what you've

 5    been doing for the decades that you have been doing it,

 6    so it appears from what you told me that it would take

 7    you about five or six hours to put together all the

 8    different articles, peer-reviewed articles and

 9    literature used and relied upon in coming to your

10    opinions in this case; is that accurate?

11              MS. CRUZ:  Object to form.  Object to form.

12         Dr. Crown, give me a second.  Object to form.

13         Mischaracterizes the testimony.  That's not what he

14         said.

15              THE WITNESS:  I haven't relied on them.  It's

16         part of my general fund of knowledge.

17    BY MR. BOUMEL:

18         Q    And to accumulate the general fund of your

19    knowledge utilized in reaching your opinions in this

20    case, I believe you indicated that it would take you

21    about five or six hours to compile those peer-reviewed

22    articles and literature; is that accurate?

23              MS. CRUZ:  Object to form.

24              THE WITNESS:  That's a speculative

25         pronouncement since I didn't do a search and I
```

```
 1          don't know what that search would consist of.

 2    BY MR. BOUMEL:

 3          Q    Okay.  Do you have a better estimate than

 4    five -- the five or six hours came from you, so is there

 5    a better estimate as you sit here and think about it

 6    some more?

 7          A    No.

 8               (Plaintiffs' Exhibit No. 2 was marked for

 9          identification.)

10    BY MR. BOUMEL:

11          Q    Okay.  All right.  That's Plaintiffs' 1.

12    We're going to mark your entire file as Plaintiffs' 2

13    and I just want to go through the file real quick.

14    You've only issued one singular report, correct?

15          A    That is correct.

16          Q    Okay.  And then we have docs sent by local --

17    I'm just going to read the different file names that

18    were sent to me.  It was docs sent by local counsel,

19    crash report, depositions, education, employment and tax

20    info, expert report files, invoices, medical and then

21    there's your case list, your CV, your fee schedule and

22    the notice of taking deposition and your report.  Is

23    that a full summation of everything that's in your file?

24          A    It is.

25          Q    And you've only issued one report, correct?
```

```
 1          A     That is correct.

 2          Q     Okay.  Who hired you in this case?

 3          A     I was originally retained by the Cole Scott

 4   Kissane firm.

 5          Q     And I understand --

 6          A     Henry Salas, I believe.

 7          Q     That was going to be my next question.  I

 8   understand it was Henry Salas.  How many times other

 9   than this case have you been retained by Mr. Salas or

10   the Cole Scott Kissane firm?

11          A     Zero.  Only time.

12          Q     Okay.  Have you ever been retained by Bowman

13   and Brooke before?

14          A     No.

15          Q     Okay.  And let's see.  Just for clarity, in

16   the docs sent by local counsel you have imaging studies,

17   you have medical records, and you have the police

18   report, correct?

19          A     Correct.

20          Q     Okay.  I noticed in your file you have some

21   deposition transcripts from Mary Cummings.  Do you see

22   that?

23          A     Yes.

24          Q     Did you review those in conjunction with your

25   expert --
```

1   A   I looked at that.  She's a human factors

2   engineering expert.  It was interesting but unrelated to

3   really what I do.

4   Q   That was going to be my next question.  Was

5   there anything in there that you relied upon for your

6   scope of work in this action?

7   A   No.

8   Q   All right.  Looks like we have two invoices to

9   date.  We have one for 16,000 dated February 28, 2024,

10  and one for 78 -- $7,800.75 dated July 5th, 2024.  Is

11  that the sum total of all your invoices other than for

12  this deposition which I'm paying for?

13  A   No.  I haven't submitted an invoice since

14  July.  There are about 35 hours in addition to that.

15  Q   Okay.

16  A   Which accounts for rereview and review of

17  documents that I received after July 5th as I recall.

18  Q   And so 35 hours at what hourly rate?

19  A   It would have been my 2024 rate and then for

20  those things that were done in 2025, the rate was $100

21  more.  So the bulk was 450 an hour and there would have

22  been some that were 550.

23  Q   Any way that we can apportion the 35 hours,

24  how much of it was billed at 450 and how much at 550?

25  A   Thirty-five and ten at 550 and 25 at 450.

1      Q    All right.  So let me just do some quick math

2    here.  So looks like you have probably about $16,750 in

3    pending charges on top of the current charges?

4      A    That sounds about right.

5      Q    So total charges on the file to date, other

6    than this deposition which I am paying for, over

7    $40,000?

8      A    Correct.

9           MS. CRUZ:  Adam, could I just interrupt.

10          There's one invoice that you didn't mention that

11          was sent to you.  I'm looking at the same folder

12          that we sent to you.  There's three invoices in

13          there.  I didn't hear you say -- the dates are

14          February 2024, January 2025 and July, whatever the

15          July --

16   BY MR. BOUMEL:

17     Q    Yes.  So the third deposition is the

18   December 30th, which is the invoice for this deposition,

19   correct?

20     A    Correct.

21          MR. BOUMEL:  Are you referencing something

22          else, Whitney?

23          MS. CRUZ:  You just said there were two

24          invoices and there are three different invoice --

25          MR. BOUMEL:  Right.  And, Whitney, you're

```
 1           breaking up pretty badly.  You're breaking up

 2           pretty badly, Whitney.

 3                MS. CRUZ:  I see what you're saying.  One is

 4           the depo invoice from you all?

 5                MR. BOUMEL:  Yes.

 6                MS. CRUZ:  Um-hmm.  Okay.  Then --

 7                MR. BOUMEL:  I don't know if you want to

 8           call -- do you want to call in on, like, a landline

 9           or your cellphone or something.  Let's go back off

10           the record while Ms. Cruz handles her IT stuff.

11                THE VIDEOGAPHER:  We're off the record at

12           1:21 p.m.

13                (Thereupon, a brief recess was taken.)

14                THE VIDEOGAPHER:  We are back on the record at

15           1:24 p.m.

16      BY MR. BOUMEL:

17           Q    Okay, Doc.  We just went through your file.  I

18      want to ask you a question, has your testimony ever been

19      stricken or limited by any court for any reason?

20           A    Yes.

21           Q    On how many occasions?

22           A    One significant one as I recall -- two, two.

23           Q    Okay.  Tell me about those.

24           A    One was a criminal matter in federal court.

25      Neither the neurologist or I were able to date stamp
```

1   when a particular impairment occurred and the second was

2   the Florida Supreme Court determined that

3   neuropsychologists or psychologists as a group could not

4   testify as to medical causation.

5        Q    The -- I know the Grenitz v. Tomlian Supreme

6   Court case.  What was the federal court case that you're

7   referencing?

8        A    I don't recall.  It's been quite some time.

9   It was a determination by the magistrate judge and the

10  magistrate judge excluded the testimony -- my testimony

11  and the testimony of the neurologist.

12       Q    Have you had a court submit a court order

13  stating that it did not find your opinions credible?

14       A    Not that I'm aware of.

15       Q    Have you ever had a court submit a court order

16  stating that you presented as a go-to witness for

17  defendants in capital cases in need of mental health

18  mitigation?

19       A    Not that I'm aware of.

20       Q    Okay.  Let's talk about your practice.  So I

21  understand you have -- let's do this.  Let's pull up

22  your resume.  You have your resume in front of you,

23  right?

24       A    Yes.

25       Q    Okay.  First of all I see on your report you

```
1    have your practice name listed as Barry M. Crown, Ph.D

2    and Associates, PA?

3         A    Yes.

4         Q    Do you have any associates that work for your

5    office?

6         A    Not at this time.

7         Q    And how many people work for your practice?

8         A    It's a solo practice.  Only me.

9         Q    Just you.  Okay.  And you are the sole owner

10   of that practice?

11        A    I am.

12        Q    And you have, looks like, two offices, one in

13   Miami, one in Pensacola, correct?

14        A    Correct.

15        Q    What do you do out of the Pensacola office

16   that's different from your Miami office?

17        A    No difference.

18        Q    Okay.  You have a Ph.D from Florida State

19   University, correct?

20        A    Correct.

21        Q    What's your Ph.D. in?

22        A    Counseling.

23        Q    What it's specifically in?

24        A    Counseling.

25        Q    It's a counseling Ph.D.?
```

```
 1        A    Yes.

 2        Q    That's what it says on the certificate.  And

 3   what about your --

 4        A    I think it says counselor education.

 5        Q    Counselor of education?

 6        A    Counselor education.  The department then

 7   changed its name to school psychology.

 8        Q    Okay.  And your undergraduate degree was in

 9   what?

10        A    Psychology.

11        Q    Okay.  And your master's degree was in what?

12        A    Human behavior.

13        Q    Okay.  And you did not get a degree from

14   Harvard Medical School, correct?

15        A    That's correct.

16        Q    You also didn't list on your CV that you went

17   to law school, correct?

18        A    Correct.

19        Q    Your practice is a forensic practice only,

20   correct?

21        A    No.

22        Q    Okay.  Clarify please.

23        A    I also see people with various psychological

24   and neuropsychological disorders.  I served as a

25   consultant to various professional organizations.  I do
```

```
 1   academic work.

 2        Q    Do you offer patients any type of treatment?

 3        A    I stopped doing psychotherapy one or two

 4   decades ago.  I have a diagnostic assessment practice.

 5        Q    Basically --

 6        A    I occasionally will do crisis intervention

 7   types of work, three or four sessions.

 8        Q    Okay.  So generally speaking in your practice

 9   you are a diagnostic assessment practice, meaning that

10   you test people to see what's going on with them from a

11   psychological standpoint, correct?

12        A    From a psychological and neuropsychological

13   standpoint, yes.

14        Q    I understand.  I see -- I saw somewhere, I

15   think it's on your CV, that you are a diplomat of the

16   American Academy of Pain Management?

17        A    Yes.

18        Q    Tell me about that work that you do in regards

19   to the American Academy of Pain Management?

20        A    I took a test and passed it, written test,

21   three hours.  I recall taking it.  It was in Las Vegas,

22   Nevada.

23        Q    I'm just a little curious frankly because you

24   don't normally think of, you know, pain management and a

25   psychologist in the same sentence, so what's the
```

1    interplay between those two things?

2         A    The organization credentialed physicians and

3    psychologists and other healthcare professionals.

4         Q    And what does that credential mean to you in

5    terms of its practical or clinical use?

6         A    I have seen and do see people who are

7    experiencing or complaining of pain.

8         Q    Okay.  And what is the interplay between pain

9    and either a psychological disorder or

10   neuropsychological disorder?

11        A    May have been an impact on psychological

12   behavior and on neuropsychological behavior.

13        Q    What type of impact may it have?

14        A    It may decrease performance.  It may conflict

15   with adequate performance.

16        Q    And when you say performance, what's the

17   context of the performance that you're speaking of?

18        A    How they do in a testing environment and how

19   they do in life.

20        Q    Okay.  So if I understand you correctly, if a

21   patient is a chronic pain patient, number one, when they

22   are testing with you their tests might be skewed because

23   of that chronic pain; is that accurate?

24        A    It's possible.

25             MS. CRUZ:  Object to form.

```
 1               THE WITNESS:  Yes.

 2               MS. CRUZ:  Did you get my objection?  Did you

 3          get my objection?  I just want to make sure --

 4               MR. BOUMEL:  We can hear you.

 5               MS. CRUZ:  Okay.

 6   BY MR. BOUMEL:

 7      Q    And then number two, you're saying that when

 8   somebody is a chronic pain patient on top of any

 9   psychological or neuropsychological disorders, then it

10   can create an increased likelihood that they will not

11   perform well in life?

12               MS. CRUZ:  Object to form.  Mischaracterizes

13          the testimony.

14               THE WITNESS:  It's possible.

15   BY MR. BOUMEL:

16      Q    We got to figure out a way that you guys

17   aren't talking over each other.  Doc, if you want to

18   just give a pause in between your answers just to --

19      A    Certainly.

20      Q    -- let Ms. Cruz give an objection.

21               And is there any difference in the interplay

22   between a chronic pain patient and a regular -- a

23   non-neuropsychological disorder, you know, just a

24   standard psychological disorder versus a

25   neuropsychological disorder?
```

```
1        A    I don't understand your question.

2             MS. CRUZ:  Object to form.

3   BY MR. BOUMEL:

4        Q    Sure.  So --

5             MS. CRUZ:  Object to form.

6   BY MR. BOUMEL:

7        Q    So --

8             MS. CRUZ:  Dr. Crown, if you can just try to

9        get a little pause.  Thank you.

10  BY MR. BOUMEL:

11       Q    So the previous question I lumped in

12  psychological and neuropsychological disorders into the

13  same question and you gave your answer based on that.

14  Now what I'm trying to say, is there any difference in

15  the impact that chronic pain plays in a

16  neuropsychological patient versus a general

17  psychological impaired patient?

18       A    Not necessarily, no.

19             MS. CRUZ:  Object to form.

20             MR. BOUMEL:  What's wrong with the form,

21        Ms. Cruz?

22             MS. CRUZ:  I don't even understand the

23        question.

24  BY MR. BOUMEL:

25       Q    Okay.  Doc, you understood the question,
```

```
 1    right?

 2         A    I believe I understood.

 3              MS. CRUZ:  It mischaracterizes what he said

 4         earlier when it seems like you're building on a

 5         foundation that doesn't exist.  So it's lack of

 6         foundation.  Mischaracterizes the testimony and I

 7         don't understand the question.

 8    BY MR. BOUMEL:

 9         Q    Okay.  Doc, you understand it, right?

10         A    I believe I did.

11         Q    Okay.  How many people -- how many patients do

12    you see a week for forensic purposes?

13         A    On average, two.

14         Q    And when you say two, are you including

15    forensic -- so let's take a step back.  In your forensic

16    practice, you see patients both on behalf of plaintiffs

17    and on behalf of defendants, correct?

18         A    Correct.

19         Q    Okay.  When you say two patients per week,

20    does that include both patients that you're seeing for

21    plaintiffs and defendants?

22         A    Yes.

23         Q    Okay.  Are your charges generally the same for

24    each case?

25         A    Yes.
```

```
1        Q    Okay.  How do you advertise or market your

2   forensic practice?

3        A    I don't.

4        Q    Have you ever given any presentations to

5   defense firms?

6        A    Criminal defense, yes.

7        Q    When was that?

8        A    The 1980s and 1990s.

9        Q    Do you still have any materials from your

10  presentations?

11       A    No.

12       Q    What was the presentation on?  What was the

13  subject matter of the presentation?

14       A    Use of expert witnesses.

15       Q    It's a very broad category.  Anything more

16  specific?

17       A    No.

18       Q    Have you ever given any presentations to any

19  insurance companies?

20       A    No.

21       Q    Okay.  Have you authored any articles or

22  studies?

23       A    I authored a chapter on conflicts of interest

24  in the Handbook of Forensic Neuropsychology, first and

25  second editions.
```

```
 1        Q     And give me a two-sentence synopsis of what

 2   that was about?

 3        A     It was about conflicts of interest.

 4        Q     Well, that's the title of it, but what was the

 5   subject matter?

 6        A     The subject matter was ethical

 7   responsibilities, not to engage in situations that

 8   foster dual relationships and other forms of

 9   relationships outside of what you were being asked to

10   do.  I authored it with two attorneys.

11        Q     Understood.  All right.  Moving forward to

12   then instant matter before us.  You were hired by the

13   defense in this case obviously to perform a compulsory

14   medical evaluation from a neuropsychological standpoint

15   on Dillon Angulo, correct?

16        A     Yes.

17        Q     Can you talk me through the process of your

18   neuro-psychic -- neuropsychological evaluation from

19   start to finish?

20        A     I reviewed records.  I saw him.  I conducted a

21   clinical interview and administered some

22   neuropsychological and psychological tests.

23        Q     Okay.

24        A     Prepared a report.

25        Q     So if I understand three main components,
```

1    review of medical records, number one; number two, a

2    interview with Mr. Angulo; and then, number three, a

3    neuropsychological testing, correct?

4         A    Correct.

5         Q    Medical records, why are they important to

6    your opinions that you derived in the case?

7         A    They provide the background information,

8    particularly in the sense of litigation about why

9    Mr. Angulo was presenting himself.  It tells me the

10   background history of what happened.

11        Q    And part of your opinions are based on the

12   medical records to the extent that when medical records

13   show injuries to the brain, those are important for your

14   opinions from a neuropsychological standpoint, correct?

15             MS. CRUZ:  Object to form.

16             THE WITNESS:  -- things, yes.

17   BY MR. BOUMEL:

18        Q    Okay.  And you would agree with me that it's

19   important to be accurate in incorporating the medical

20   records into your opinion, correct?

21        A    Generally, yes.

22             MS. CRUZ:  Objection to form.

23   BY MR. BOUMEL:

24        Q    And why is that?

25        A    It provides the backdrop for the person I'm

```
 1    seeing.

 2         Q    Okay.  And if the backdrop is wrong, then your

 3    ultimate opinion could be wrong, correct?

 4         A    Possibly.

 5         Q    What about the interview?  Why is that

 6    important?

 7         A    Gives the individual an opportunity to explain

 8    his life and complaints.

 9         Q    And you would agree that the explanation that

10    the person explaining their complaints is an important

11    part of the interview process, right?

12         A    Generally, yes.

13         Q    Because you as the neuropsychologist need to

14    understand what the person is complaining of in order to

15    then evaluate those complaints, correct?

16         A    Generally, yes.

17         Q    Okay.  And then testing, why is that

18    important?

19         A    That's an objective way and an objective

20    measure to look at the performance of the individual.

21         Q    Okay.  And you said the word objective twice

22    in there.  Is there any subjectivity when it comes to

23    testing?

24         A    No.

25         Q    Okay.  Is there any subjectivity when it comes
```

1    to the battery or tests that are selected?

2        A    There are 4,000 neuropsychological tests

3    roughly.  Selecting the tests will always be subjective.

4        Q    And you would agree with me that the results

5    that are ultimately -- the results of any battery can be

6    impacted by the tests that were selected to be in the

7    battery?

8        A    There's always that possibility.

9        Q    Okay.  And what about in scoring and in

10   interpreting the tests?  Is there any subjectivity in

11   that?

12       A    It's according to the scoring provisions of

13   the test manuals.

14       Q    Is there any type of interpretation or

15   subjectivity in interpreting and scoring the tests?

16       A    I don't believe so.

17       Q    Well, for instance, as a scorer, you can

18   decide to disregard certain tests as outliers, right?

19       A    Possible.

20       Q    Okay.  So you as the test administrator and

21   scorer do have some subjective influence on the test

22   results, correct?

23       A    Possibly, yes.

24            MS. CRUZ:  Object to form.

25

```
 1   BY MR. BOUMEL:

 2        Q     And in fact that does happen sometimes,

 3   correct?

 4        A     It's possible.

 5              MS. CRUZ:  Object to form.

 6   BY MR. BOUMEL:

 7        Q     Okay.  Let us go to your ultimate opinions in

 8   this case and I just want to make sure I understand them

 9   before we dig in.  So when we go to page 11 of your

10   report under impressions, you state that -- the first

11   sentence:  There is mild brain function,

12   neuropsychological disturbance which appears to be

13   exaggerated in this evaluation with no baseline

14   pre-accident comparative basis.  First of all, did I

15   read that accurately?

16        A     Yes.

17        Q     Okay.  Second of all, do I understand what

18   you're saying there is that Mr. Angulo does have some

19   sort of continuing brain impairment as a result of this

20   accident?

21        A     He has some continuing brain --

22              MS. CRUZ:  Object to form.

23              THE WITNESS:  He has some continuing brain

24        impairment.  I didn't say that it was as a result

25        of that -- the incident in question, the 2019
```

1          incident.

2     BY MR. BOUMEL:

3          Q     Okay.  Well, let's take a step back then.

4     Let's just talk about the 2019 incident broadly.  You

5     agree that Mr. Angulo did suffer a traumatic brain

6     injury, correct?

7          A     Yes.

8          Q     Okay.  And how would you categorize or

9     describe the traumatic brain injury that he suffered?

10         A     Mild.

11         Q     Okay.  And what do you base that off of?

12         A     Glasgow Coma Scale, 13.

13         Q     And where did you get Glasgow Coma Scale of

14    13?

15         A     It's in the hospital records.  Jackson South.

16         Q     When we're looking at Glasgow Coma Scales, is

17    it important to consider all Glasgow Coma Scales even in

18    the initial presentation?

19         A     It was eight and improving and maintained

20    itself at 13.  There was eight at onset.

21         Q     Okay.  And my question was when you're

22    considering -- so you yourself have classified the

23    traumatic brain injury that Mr. Angulo suffered as mild

24    and you told me that it's because of his Glasgow Coma

25    Scale.  So my follow-up question to that, and I'm trying

1    to be very specific here, is do we have to consider all

2    Glasgow Coma Scales from the presentation or do we just

3    pick it up as to when it improves and stabilizes?

4         A    No.  You need to look at the sequence.

5         Q    Okay.  So if somebody starts with a very low

6    Glasgow Coma Scale, that needs to be accounted for in

7    how we categorize a traumatic brain injury, correct?

8         A    No.  The actual diagnosis is an end diagnosis,

9    not a entry diagnosis.

10        Q    Okay.  So you're saying let's say, for

11   instance, that if somebody was struck as a pedestrian by

12   a car and got airlifted to the hospital with a Glasgow

13   Coma Scale of three and presented at the hospital with a

14   similar Glasgow Coma Scale and then ultimately over

15   several days stabilized to a 12, then we're going to --

16   we're going to only consider the stabilized 12 Glasgow

17   Coma Scale and we're not going to consider the initial

18   presentation of a three?

19        A    We're going to consider the earlier Glasgow

20   Coma Scales hypothetically, but the diagnosis is based

21   on the end result.  There's a gentleman in your

22   building, an attorney, who had a Glasgow Coma Scale of

23   seven and is practicing law in your building.

24             MR. BOUMEL:  Okay.  I'm going to move to

25        strike that.

1   BY MR. BOUMEL:

2        Q    And I want to focus on the hypothetical that I

3   asked you.  So if I understand you correctly, we do have

4   to consider the initial presentation of what the Glasgow

5   Coma Scale is in rendering an opinion as to the severity

6   of a brain injury; is that accurate?

7             MS. CRUZ:  Objection.  Asked and answered a

8        few times now.

9   BY MR. BOUMEL:

10       Q    I'm sorry, Doctor.  Can you answer?

11       A    No.  It's a matter of history.

12       Q    Okay.  And it's your testimony that

13   Mr. Angulo's lowest Glasgow Coma Scale was an eight,

14   correct?

15       A    As I recall, yes.

16       Q    And eight is a severe traumatic brain injury,

17   correct?

18       A    An eight is an indicator of a brain injury,

19   yes.

20       Q    An eight is categorized as a severe traumatic

21   brain injury under the Glasgow Coma Scale rating,

22   correct?

23       A    Yes.

24       Q    So going back to your impressions.  You opine

25   that he does have mild brain function,

1    neuropsychological disturbance, but you did not

2    attribute a cause to it.  Is that how I understand your

3    opinion to be?

4         A    Well, I went on and indicated some other

5    aspects of Mr. Angulo that were contributory.

6         Q    Okay.  And I understand that.  But you didn't

7    in your impressions anywhere list this incident where he

8    was struck by a car as a pedestrian and airlifted to the

9    hospital, correct?

10        A    Correct.

11        Q    Okay.  Is there any reason that you left that

12   out of your opinions in this case?

13             MS. CRUZ:  Object to form.

14             THE WITNESS:  Under impressions I was

15             reporting my findings.  I don't know for certainty

16             when I saw him in 2024 that what I was seeing was

17             the direct result of that incident and not

18             compounded by other factors.

19   BY MR. BOUMEL:

20        Q    So if I understand you correctly, when you

21   wrote this impression, you just weren't sure that this

22   incident where he was airlifted to the hospital with, as

23   you say, a Glasgow Coma Scale of eight, you weren't sure

24   if that was contributing to his neuropsychological

25   dysfunction so you didn't include that in your

1    impressions.  Do I understand that correctly?

2            MS. CRUZ:  Objection to form.

3        Mischaracterizes his testimony.

4    BY MR. BOUMEL:

5        Q    That's why I --

6        A    No.  I was simply reporting my findings and I

7    just don't know and I don't know now.  He had a brain

8    injury.  People recover from brain injuries.

9        Q    Do people recover from former drug use?

10       A    Do people recover from drug use?  Some do and

11   some don't.

12       Q    Okay.  Do people recover from having ADHD?

13       A    Some do and some don't.  There was an

14   interesting article that just came out in the last two

15   weeks that suggested that was not the case and referred

16   to it as a neurodevelopmental disorder.

17       Q    Now going back to your impressions, though.

18   So you gave this impression that he's suffering from

19   neuropsychological disturbances, but you did not -- you

20   did not list this collision where he was airlifted to

21   the hospital with a brain bleed, but you did list that

22   he had substance abuse problems and depression

23   treatment, correct?

24       A    Yes.

25       Q    Okay.  By your own logic are you sure that the

1    drug use and the depression treatment contributed to his

2    neuropsychological disturbance?

3         A    It very well may have.  Again, I can't tell

4    you for certainty.

5         Q    So just --

6         A    Certainly is contributory.

7         Q    So just so we're crystal clear on what your

8    opinions are here.  This is a gentleman who was struck

9    by a car as a pedestrian, airlifted to the hospital with

10   a Glasgow Coma Score of a severe eight with a brain

11   bleed, and it's your testimony as we sit here today that

12   while he does have neuropsychological disturbances, you

13   can't be sure that that incident contributed to his

14   neuropsychological disturbance, but you're pretty sure

15   that his former drug use and his depression treatment

16   did contribute to it.  Do I understand you correctly?

17        A    That's incorrect.

18        Q    Okay.  Please --

19        A    They are all contributory.  I can't apportion

20   them.

21        Q    So the brain -- so this incident is

22   contributory to -- this incident and the injuries he

23   suffered is contributory to his neuropsychological

24   disturbance?

25        A    Yes.

1      Q     Okay.  You didn't say that before.

2      A     I can't apportion it.

3            MS. CRUZ:  What's the question?  I mean, there

4      is no question there.  You didn't ask him that.

5      That's not what you asked.  So he's answering the

6      question that you asked.  So, Dr. Crown, I would

7      ask you to just respond when there's a question

8      pending, not just a statement.

9  BY MR. BOUMEL:

10     Q     He's doing great.

11           What science or records or other materials are

12  you relying on to opine that the drug use and the

13  depression treatment were contributory to his

14  neuropsychological disturbances?

15     A     Well, we know the neurocognitive effects of

16  benzodiazepines which, in a habitual user, create

17  permanent brain dysfunctions.  ADHD also contributes to

18  problems.  Brain science in the last ten years has gone

19  further in indicating that in fact this is the case.

20  There is the multiple demand network.  There is the

21  central executive network that are both impaired by both

22  ADHD and by other circumstances, particularly substance

23  use.  Use of benzodiazepines create situations in which

24  there are problems with attention, concentration,

25  memory, focus.  ADHD creates problems with focus and

Page 36

1    attention.  I can't apportion it.  They contribute to

2    the same set of problems and he never had the type of

3    imaging that might have further clarified this.

4        Q    And I thank you for that last point.  So what

5    I'm trying to understand is it sounds like you just gave

6    me a host of reasons as to why those conditions could

7    potentially cause neurocognitive disorders, correct, or

8    neurocognitive disturbances?

9        A    Well, they do.  They very simply do.

10       Q    Okay.  They do, but we're looking -- that's in

11   a general population, right?

12       A    That most recent study that came out two weeks

13   ago involved 30,000 people so --

14       Q    Okay.  And are you saying --

15       A    -- a significant number with the same

16   findings, yes.

17       Q    Are you saying that all 30,000 people in those

18   studies who took Xanax, they all had neurocognitive

19   disturbances?

20       A    No.  This is ADHD, not Xanax.

21       Q    So are you saying --

22       A    The vast majority of people who abuse

23   benzodiazepines experience some new cognitive problems

24   which are lifelong.

25       Q    According to -- name the studies that you're

```
1    relying on for all of these issues?

2            MS. CRUZ:  Object to form.

3    BY MR. BOUMEL:

4        Q    I would like to know the studies that you're

5    relying on to say that the use of benzo -- what's the

6    name of the classification of the drug?  I'm sorry.

7        A    Benzodiazepines.

8        Q    Benzodiazepines.  What's the name of the

9    articles of the materials that you're relying on to --

10   excuse me -- Doctor, I'm speaking --

11       A    I'm not.

12       Q    -- to testify that benzodiazepines result in

13   neuropsychological disturbances?

14       A    I'm not.  It's based on my experience.  I have

15   seen thousands of benzodiazepine abusers.

16       Q    Do all former benzodiazepine abusers suffer

17   from neurocognitive disturbances?

18       A    Some form.

19           MS. CRUZ:  Objection.  Asked and answered.

20   BY MR. BOUMEL:

21       Q    Okay.  What form?  So if I understand you

22   correctly, 100 out of 100 former benzodiazepine users

23   will suffer from some form of neuropsychological

24   disturbances?

25           MS. CRUZ:  Object to form.
```

```
 1              THE WITNESS:  There are obviously some

 2         outliers who don't.  Our best estimate as

 3         psychologists, we strive for a 95 percent rate.

 4    BY MR. BOUMEL:

 5         Q    So you're saying that 95 percent of former

 6    benzodiazepine users will suffer from neuro --

 7    continuing neuropsychological disturbances?

 8         A    That's my opinion, yes.

 9         Q    And you have no articles, literature that you

10    can point us to to support that opinion, correct?

11         A    No.  That's the information I have given to

12    the National Institute of Drug Abuse as a consultant.

13         Q    Okay.  And you said they will have some form

14    of neuropsychological disturbance, what does that mean

15    when you say some form, what do you mean?

16         A    Possible problems with concentration, or

17    attention, or memory, or focus or information

18    processing.

19         Q    And is your testimony today that 95 percent of

20    former benzodiazepine users suffer from all of those

21    deficits?

22         A    No.

23         Q    Okay.

24         A    One or more, and I'm referring to abusers, not

25    users.
```

1      Q     And I'm referring to former users, former

2    abusers, however you want to call it.  Is everything

3    that you just said still applicable when somebody has

4    quit their addiction and no longer takes the drug?

5      A     Yes.

6            MS. CRUZ:  Object to form.

7    BY MR. BOUMEL:

8      Q     And you said that you gave some sort of

9    testimony to some organization; can you repeat that,

10   please?

11     A     United States Government National Institute of

12   Health.

13     Q     Okay.  And how did you present your testimony

14   to them or your opinions?

15     A     In committee meetings or direct meetings.

16     Q     Are there --

17     A     If you look at my CV, my qualifications in

18   addiction is stated there.

19     Q     Are there any writings or any type of written

20   form of those opinions?

21     A     No.

22     Q     So we just have to rely on your testimony

23   here?

24     A     As they did.  Yes.

25     Q     Okay.  We also -- switching now to ADHD

1    because we talked about that.  Is it your testimony that

2    everybody with childhood ADHD will suffer from some form

3    of neuropsychological disturbance?

4         A    Neurocognitive disturbance, yes.

5         Q    And that's 100 out of 100.  Everybody with

6    childhood ADHD is going to show testing as an adult with

7    neurocognitive disturbances?

8         A    No.  Referring to those who have ADHD after

9    the adolescent growth spurt.

10        Q    Okay.  Did Mr. Angulo have his ADHD before or

11   after his adolescent growth spurt?

12        A    He has it before and it continued after.

13        Q    What are you relying on to say that it

14   continued after?

15        A    What he said.  Of course he called himself a

16   knucklehead, but not unusual for ADHD.

17        Q    So based -- you're basing your opinion that

18   Mr. Angulo suffered from post-adolescent ADHD based

19   solely on what he told you in an interview?

20        A    If he was being honest.

21        Q    Okay.  I just -- I'm going to look into your

22   interview session.  Please tell me why he said he has

23   continuing ADHD after reaching the age of adolescence?

24        A    He didn't specifically say it, but he

25   certainly exhibits the pattern in terms of his

1    schooling, in terms of his education, in terms of his

2    work history.  I don't know that anyone has a better

3    explanation.

4        Q    Okay.

5        A    I don't think that his ADHD resolved in his

6    childhood.

7        Q    But I asked you to state where you got that

8    information from and you told me you were told that by

9    Mr. Angulo and it was from your interview with him so --

10       A    Well, he called -- he called himself a

11   knucklehead, but the records reflect that he didn't do

12   well in school.  He had difficulty with focus.  He

13   continued to have difficulty with focus even through his

14   program at the community college.

15       Q    Does everybody with bad grades have ADHD?

16       A    No.

17       Q    Okay.  Did Mr. Angulo tell you that he

18   suffered from ADHD as an adult or after the age of

19   adolescence?

20       A    I don't know that he was sophisticated enough

21   to be able to diagnose himself.

22       Q    So the answer is no, he never said that?

23       A    He didn't use the term ADHD.  No.

24       Q    Okay.  He used the term -- he said he was a

25   knucklehead and you interpreted that as having ADHD?

```
 1              MS. CRUZ:  Objection.  Form.

 2              THE WITNESS:  Along with --

 3              MS. CRUZ:  Mischaracterizes his testimony.

 4   BY MR. BOUMEL:

 5       Q    Let's talk about the neuro -- the

 6   neurocognitive disorders which you did find.  What

 7   neurocognitive disturbances does Mr. Angulo have?

 8       A    Reflected in my report.

 9       Q    So I'm asking you, sir.

10       A    But I would start with looking at the first

11   neuropsychological evaluation that he had with

12   Dr. Hamilton.  Dr. Hamilton found some problems.

13       Q    Dr. Crown, let me interrupt you please.  I'm

14   not asking you what doctor -- for Dr. Hamilton's

15   findings.  I have Dr. Hamilton's report in front of me.

16   In your own --

17              MS. CRUZ:  Adam, Adam.  Let him finish his

18         answer.  He hasn't answered.

19              MR. BOUMEL:  He's answering the question --

20              MS. CRUZ:  You can't cut him off in the

21         middle --

22              MR. BOUMEL:  He's answering the question.

23              MS. CRUZ:  That's his answer.  So let him -- I

24         would ask that you not cut him off.  Let him

25         finish.
```

1              MR. BOUMEL:  Let me respectfully --

2         respectfully, I'm going to take the deposition as I

3         see fit.  Doctor --

4              MS. CRUZ:  We're going to go to the court if

5         you don't let him finish his answer.

6              MR. BOUMEL:  Because he's asking a question --

7         he's asking a question -- he's answering a question

8         that I haven't asked.

9    BY MR. BOUMEL:

10        Q    I did not ask about Dr. Crown's findings.  I'm

11   asking about your own findings -- I'm sorry.

12             I did not ask about Dr. Hamilton's findings.

13   I'm asking about your own findings, Dr. Crown.  In your

14   own impression you wrote there's mild brain function

15   neuropsychological disturbance.  We've already said that

16   based on -- that's based on your testing, correct?

17        A    Correct.

18        Q    Okay.  So based on your testing, what

19   neurocognitive disorders does Mr. Angulo have?

20        A    The test of general reasoning ability has a

21   standard score of 70 which placed him at the second

22   percentile that would mean that 98 out of 100 people in

23   his age group could perform better in terms of reasoning

24   and judgment.  Immediate memory, he was at the 13th

25   percentile.  What does that mean?  It means that 87 out

```
 1    of 100 people have better memory function.  His

 2    constructional ability was at the 30th percentile.  That

 3    would mean that 70 out of 100 people would have better

 4    visual spatial knowledge.  His language ability was at

 5    the eighth percentile so his ability to use language, 92

 6    out of 100 people would do it better.  His attention was

 7    at the fifth percentile which would mean that 95 out of

 8    100 people would be better at paying attention.  His

 9    delayed memory was 21st percentile, which would mean

10    that 79 out of 100 people would be able to recall things

11    better than Mr. Angulo.  That left a composite index

12    score at the eighth percentile, which would mean that in

13    his age group 92 out of 100 people standing in a line

14    would be ahead of him.

15        Q    So --

16        A    Going -- let me go further.

17        Q    Sure.

18        A    In terms of initiation and maintenance of set

19    trails one, he was high average, then he dropped to

20    average then to mild and moderate impairment.  And

21    leading to inhibitory constructs, average.  Set

22    shifting, mild to moderate impairment and total at the

23    19th percentile which would indicate that 71 out of

24    100 people would be able to perform better at his age

25    level.
```

```
 1        Q    Okay.  And I'm not asking you to recite all

 2    the scores from your test.  What I'm simply asking you,

 3    which I believe you answered, is in your impression you

 4    stated he has neuropsychological or neurocognitive

 5    disturbance and I wanted to understand what the

 6    neurocognitive disturbances that you found and you told

 7    me it's his general reasoning ability, his immediate

 8    memory, his constructional ability, his language

 9    ability, his attention, his delay and his delayed

10    memory, correct?

11        A    Yes.  Except let me go further.  When we talk

12    about language in terms of verbal and conceptualization

13    and fluency he was at the 50th percentile and whether

14    naming was at the 50th percentile, 46 percentile.

15        Q    Okay.

16             MS. CRUZ:  Adam, can we take a break?  We've

17        been going for an hour.  If we take a break

18        whenever.  Doesn't have to be this moment, but --

19             MR. BOUMEL:  Yeah.  How long do you need?

20        Five?

21             MS. CRUZ:  Five minutes is fine.

22             MR. BOUMEL:  Cool.  Off for five.  Back at

23        2:13.  Thank you.

24             THE VIDEOGAPHER:  We're off the record at

25        2:08.
```

```
 1                (Thereupon, a brief recess was taken.)

 2                THE VIDEOGAPHER:  We are back on the record at

 3         2:15 p.m.

 4    BY MR. BOUMEL:

 5         Q    Doc, going back a couple -- and I hate to ask

 6    this of you again.  You said you gave testimony to some

 7    sort of governmental entity.  I didn't write it down so

 8    I'm going to write down this time.

 9         A    National Institute of Drug Abuse.

10         Q    When you say you -- did you give testimony or

11    you just spoke at a committee meeting?

12         A    No.  These were committees to review and grant

13    contracts and grants.

14         Q    And did you give sworn testimony or was it

15    just you gave a speaking opinion?

16         A    It was considered confidential advisatory to

17    the government, meaning that we were security cleared

18    and there was security guards at the door and the rooms

19    were swept for detection instruments.

20         Q    Were you sworn in before you spoke?

21         A    No.

22         Q    Were there any audio recordings made of you

23    speaking?

24         A    No.

25         Q    Do you know if the government acted on your
```

```
1    opinions that you offered?

2         A    Yes.

3         Q    Okay.  What actions did the government take in

4    response --

5         A    They engaged in contracts or they didn't.

6         Q    Contracts with what type of entities?

7         A    Academic entities, research entities.

8         Q    And your opinions that you offered

9    specifically related to the continuing neurocognitive

10   disturbances that can be expected after somebody has

11   abused benzos?

12        A    Well, it related to benzodiazepines.  It

13   related to other drugs, cocaine and the cocaine kindling

14   phenomena.

15        Q    Okay.  Do you need me to repeat my question?

16        A    What's that?

17        Q    Did you need me to repeat my question?

18        A    Go ahead.

19        Q    Okay.  The opinions that you offered to the

20   National Institute of Drug Abuse, did that specifically

21   include an opinion that you offered that 95 percent of

22   former benzo users suffered from continuing

23   neurocognitive deficits?

24        A    I don't know that I used a percentage.

25        Q    Okay.  So then what did you use?
```

1        A     You know, that was some time ago.  I don't

2     recall.

3        Q     Okay.  So going back to the impression

4     section, are you -- is it your position or your opinion

5     that the trauma from this incident where Mr. Angulo was

6     struck by a car as a pedestrian is not a significant

7     contributor to his current neurocognitive disturbances?

8        A     I didn't say that.  I don't know.  There are

9     multiple factors involved and certainly that accident is

10    one of those factors.

11       Q     Okay.  And you just can't say that it was

12    whether it was a substantial contributing factor or not.

13    It was a contributing factor, you're just not willing to

14    say it was a substantial contributing factor.  Is that

15    what we're saying?

16       A     That's correct.

17       Q     Okay.  So how do you differentiate between the

18    cognitive psychological effects caused by this incident

19    versus those caused by premorbid conditions such as drug

20    abuse or ADHD?

21       A     There is no way to apportion it.  They

22    overlap.

23       Q     Okay.  Do you agree that traumatic brain

24    injury related cognitive and emotional issues differ

25    significantly from those associated with addiction

```
1   history?

2        A    To the extent that they create brain

3   impairments and functional impairments, no.

4        Q    Okay.  So we expect a former user of benzos to

5   have the same type of impairments as somebody who gets

6   hit by a car as a pedestrian and is airlifted to the

7   hospital with a brain bleed?

8        A    Neurocognitively or neuropsychologically,

9   those people in those categories can have the same kinds

10  of problems under neuropsychological testing or

11  assessment, problems with attention, problems with

12  concentration, problems with the ability to form

13  memories, to retain information, to problem solve.

14  There's no way to apportion it.

15       Q    And as a practitioner doing this for -- what,

16  about 50 years now?

17       A    Close.

18       Q    You're saying that there is no differences in

19  the presentation of expected symptoms or expected

20  deficits between somebody who is a former drug user and

21  somebody who is airlifted to the hospital with a brain

22  bleed?

23            MS. CRUZ:  Objection to form.

24            THE WITNESS:  It's a compound set of

25        circumstances and there's no way to apportion the
```

1          difference.

2     BY MR. BOUMEL:

3          Q     I'm not -- and this question isn't asking you

4     to apportion the difference.  This is you've been a

5     clinical neuropsychologist for 50 years and you have

6     seen trauma patients and you've seen drug addicts,

7     right?

8          A     Yes.

9          Q     Do they generally present with the same

10    issues?

11         A     Not during their rehabilitation.  The course

12    of their rehabilitation obviously might be different

13    because of the physical injuries that are associated

14    with a motor vehicle accident, for example, as opposed

15    to just popping a bunch of pills.

16         Q     So -- but I'm asking you from a neurocognitive

17    standpoint.  My question is neurocognitively you have a

18    patient who comes into your office with severe head

19    trauma with a diagnosed brain bleed and you have another

20    patient come into your office that is a recovered benzo

21    user and no longer uses it.  You expect, based on your

22    clinical experience, for those patients to have the same

23    type and severity of deficits?

24         A     It would depend on where I was seeing them and

25    the time between the incident and the time that I was

1    seeing them and they very well would all present with

2    problems with attention, concentration, ability to form

3    memory, problem solve, judgment.

4         Q    So you expect them --

5         A    They would be similar.  The only difference

6    would be in the history of why or how they got there.

7         Q    Okay.  So they would be the same.  They would

8    present the same, same severity of issues, same type of

9    issues?

10        A    They certainly --

11             MS. CRUZ:  Objection to form.

12             THE WITNESS:  -- could have those they

13        attention problems, focusing problems and so on and

14        I've seen any number of drug abusers who insist

15        they are not using when they really are continuing.

16   BY MR. BOUMEL:

17        Q    Since you mentioned that, let's talk about

18   that for a second.  Any indication that you can tell

19   that Mr. Angulo ever used any type of benzos or other

20   elicit narcotics following the time that he left rehab?

21        A    I have no idea.

22        Q    Okay.  Well, you sat with the gentleman for an

23   interview.  You sat at a table and you spoke with him.

24   Any reason to think that he was on any type of narcotics

25   then?

1     A     That's not an accurate way of making the

2    assessment.  Had I had the opportunity, I would have

3    sent him for a urine test and a blood -- and hair

4    analysis.

5     Q     Okay.  Is there anything in all of the records

6    that you've reviewed or in any of the tests that you

7    administered or any of the work that you have done in

8    this case that you can sit here and say I think

9    Mr. Angulo has used any type of narcotic, a single --

10   even a single time following his leaving rehab?

11    A     No, but he was never tested.

12    Q     Okay.  Do you agree that modern studies on

13   neuroplasty (as spoken) show that the brain has the

14   capacity to recover from substance abuse?

15    A     Plasticity suggest that other parts of the

16   brain will takeover and the individual will be able to

17   function adequately or normally.  But again, he didn't

18   have the contemporary imaging studies that might have

19   demonstrated that.

20    Q     And I'm -- thank you for bringing that up.  So

21   you're not aware of any medical studies demonstrating

22   that Mr. Angulo had any type of neurocognitive disorders

23   as a result of his former drug use, correct?

24    A     The last scan I'm aware of was in 2023 and it

25   was read as normal or no acute problems.

1     Q    Mr. Crown -- Dr. Crown, we're going to be here

2     for a long time if we don't get answers to the questions

3     I'm asking you.  I'm asking you very specific questions

4     and you're answering with something else.  My question

5     to you is very specific.  I'm going to repeat it.

6            Are you aware of any studies, including

7     imaging studies, that show that Mr. Angulo was suffering

8     from neurocognitive disorders or brain damage as a

9     result of his former use of benzos or other drugs?

10    A    Former use, no.

11    Q    Okay.  Are you aware of any type of studies or

12    medical records showing that -- other than your testing

13    showing that Mr. Angulo -- well, strike that.

14           Are you aware of any medical testing showing

15    that Mr. Angulo had any type of brain injury or brain

16    dysfunction as a result of his drug use?

17    A    No.  That type of assessment was never done.

18    Q    Okay.  Are you aware of any study -- medical

19    studies showing that Mr. Angulo had any type of brain

20    damage or drain dysfunction as a result of his earlier

21    history of ADHD?

22    A    No.  Those studies were never done.

23    Q    Are you aware of any medical studies showing

24    that Mr. Angulo had any type of brain damage or

25    cognitive dysfunction as a result of his premorbid

1    depression?

2        A    No, not aware of that.

3        Q    Okay.  Now staying on your opinion page, you

4    list several premorbid conditions which you have already

5    opined you believe were contributors to his current

6    neurocognitive disturbance and those are the early

7    history of ADHD, the history of substance abuse, and

8    depression, correct?

9        A    Yes.

10       Q    Do those conditions make him more or less

11   resilient to trauma?

12       A    Likely less resilient.

13       Q    Okay.  So basically what we're saying is if

14   we're taking the same person, all bio and genetic

15   markers the same, and we take one of them and we clone

16   that person and one of them has early history of ADHD, a

17   history of substance abuse and a history of depression

18   and the other doesn't have any of those issues, we

19   subject them to the same trauma, we expect the one who

20   has those premorbid conditions to do much worse as a

21   result of the trauma, correct?

22       A    They would be less resilient.

23       Q    And that means they are going to do worse,

24   right?  Their outcome is going to be worse?

25       A    Or take longer.

1       Q     Okay.  You agree that somebody with -- I'm

2   going to have to go back there.  You would agree that a

3   right-hand dominant person will recover more slowly from

4   traumatic brain injury, correct?

5       A     Not necessarily.

6       Q     Have you ever --

7       A     That would be dependent.  Left-handed people

8   have more cross connections through the corpus callosum,

9   for example, than right-handed people.  But 90 percent

10  of the population, which is where most of our

11  understanding comes from, is right handed.

12      Q     Have you ever testified that you believe a

13  left-handed person will recover more quickly than a

14  right-handed person from traumatic brain injury?

15      A     They tend to because of the cross connection.

16  But again, our findings are based on 90 percent of the

17  population so that may be skewed.

18      Q     Okay.  But you've testified before that a

19  left-hand person is going to recover more quickly, so it

20  stands to hold that a right-handed person is going to

21  recover slower, correct?

22      A     Yes.

23      Q     Okay.

24      A     If something happens to you, you're better off

25  if you're left handed.

1        Q     Would you agree with the statement that trauma

2   tends to make a person's -- strike that.

3              Would you agree with the statement that brain

4   trauma tends to make a person's worse characteristics

5   worse?

6        A     I have said that before.  Yes.

7        Q     I know you have.  Would you agree me that

8   having an initial brain injury increases the potential

9   damage that can occur in subsequent concussions?

10       A     Possible, yes.

11       Q     So we went through the different disfunctions

12   that you believe Mr. Angulo suffered from as a result of

13   both the trauma and his premorbid conditions, correct?

14       A     Yes.

15       Q     Okay.  What type of real life issues do we

16   expect from each of these dysfunctions?  So let's start

17   one by one.  You said general reasoning ability.  What

18   type of real world dysfunction do we expect to see in

19   somebody who's got in the second percentile of general

20   reasoning ability?

21       A     They would be intellectually disabled and be

22   in a sheltered home.

23       Q     And you say intellectually disabled;

24   specifically I want to know what type of dysfunction we

25   expect to see in that person?

1      A    They would have difficulty reasoning,

2   exercising in judgment, focusing on things, paying

3   attention.  They would be unable to drive a vehicle.

4   They would be unable to shop in a grocery store.  They

5   would be unable to manage their money.

6      Q    Why would a person with general reasoning

7   ability be unable to drive a vehicle?

8      A    That requires orientation.  It requires

9   judgment in adjusting speed.  It requires sensory motor

10   feedback in terms of hands on steering wheel, foot on

11   accelerator or brake.  It depends on looking at the

12   periphery, all of those things would be extremely

13   difficult if not impossible for a person who had

14   significant problems.

15      Q    What type of real word deficits would we

16   expect to see in somebody who is in the seventh

17   percentile of immediate memory?

18      A    They would obviously be extremely forgetful,

19   not be able to find themselves and orient themselves

20   from one place to another and not recognize faces, not

21   recognize streets, not being able to make decisions

22   based on information that they might have had stored.

23      Q    What type of real world deficits would we

24   expect from somebody who has deficits in their

25   constructional ability?

```
 1        A     Well, it's visual constructional so that would

 2   make them a hazard in terms of driving because that does

 3   require visual input obviously.  They would also have

 4   difficulty in distinguishing people's facial expression

 5   being able to match their -- or understand someone's

 6   facial behavior and be able to match it, be able to

 7   assess whether someone was angry or sad or liked them or

 8   not.  That's visual memory.

 9        Q     And what type of real world deficits would we

10   expect in somebody who has deficits in their language

11   ability?

12        A     They would be confused in communication.  They

13   would have difficulty putting a sentence together.  They

14   would have difficulty reading.  They would have

15   difficulty comprehending what they might hear on the

16   radio or see on TV.

17        Q     What type of real world deficits would we

18   expect in somebody with -- who tests as having a deficit

19   in their attention?

20        A     I didn't hear the last part.

21        Q     Attention.

22        A     Attention.  If you can't pay attention, you

23   can't put anything into memory.  Memory requires

24   attention first in order to insert something into

25   memory.  They would be involved in situations where they
```

1    might be asked to do A, B, and C.  They would remember A

2    and remember C and not remember and guess at B.

3        Q    And what type of real world deficits would we

4    expect to see in somebody who has delayed memory

5    deficits?

6        A    The delayed memory is recall.  So they would

7    have difficulty recalling information that was given to

8    them.

9        Q    Lastly, in your impressions you said that pain

10   perception may also cloud the presentation.  What did

11   you mean by that?

12       A    I mean, that someone could be preoccupied with

13   pain and discomfort and not be able to respond

14   appropriately.  It might hamper their concentration,

15   might hamper their attention, might hamper their focus

16   ability.

17       Q    I think that's kind of what we spoke about at

18   the start of this deposition, that if somebody has

19   chronic pain their testing scores may be impacted as a

20   result, correct?

21       A    May.  May.

22       Q    Okay.  And in fact you said that that may be a

23   possibility here?

24       A    Possible.

25       Q    Okay.  Let's turn to your personality

```
 1    profile -- personality factor starting on page ten.  Now

 2    first of all, is this like -- so I understand that

 3    this -- this personality factor section was derived from

 4    the MCMI-3, correct?

 5         A    Correct.

 6         Q    Okay.  In terms of nuts and bolts of how these

 7    words get on the paper, is this all your writing or is

 8    it a printout from the MCMI-3 or how does that work?

 9         A    Significant portions are from the data

10    analysis that was put together by Dr. Millon and his

11    group.

12         Q    Okay.  And who is Dr. Millon?

13         A    He was the originator of the MCMI.  It's the

14    Millon Clinical Multiaxial Inventory.

15         Q    So just take me through, like, the X's and O's

16    of how Mr. Angulo took the MCMI-3 and how these words

17    got on this paper in this personality factor section.

18         A    He answered a series of 175 true/false

19    questions and that was fed into a computer and the

20    computer developed a profile from that.

21         Q    Okay.  And did you contribute at all to that

22    profile or did you just take it and put in your report

23    and that's what we're looking at?

24         A    I believe it's essentially the printout.

25         Q    Okay.  So this is a printed -- so all the
```

```
 1    personality factors are just a printout from the

 2    computer after you logged in 175 true or false questions

 3    that Mr. Angulo answered, fair?

 4         A    Yes.

 5         Q    Okay.  Now there's some pretty kind of strong

 6    words in here, to say the least, in terms of the

 7    personality factors.  One of the things says he may be

 8    skillful in exploiting the goodwill of others.  That's

 9    the second paragraph.  Do you see that?

10         A    Yes.

11              MS. CRUZ:  Objection to form.

12    BY MR. BOUMEL:

13         Q    Is it your opinion that Mr. Angulo is skillful

14    in exploiting the goodwill of others?

15         A    I haven't seen him in varying circumstances so

16    I can't make that assessment.  It's essentially what he

17    said about himself.

18         Q    Okay.  He said that he was skillful in

19    exploiting the goodwill of others?

20         A    That's what his pattern of responses

21    indicates.

22         Q    Tell me specifically what questions he

23    answered that would -- that translated to this notion

24    that he is skillful at exploiting the goodwill of

25    others?
```

```
 1        A    I can't tell you that.  That's based on

 2   Dr. Millon's algorithms.

 3        Q    Do you have the testing questions in front of

 4   you?

 5        A    No.

 6        Q    Do you have the raw test data in front of you?

 7        A    No.  I have a printout.

 8        Q    Why not?

 9        A    I have his answer sheet, but that's

10   meaningless.  It's just T's and F's.

11        Q    Well, I specifically -- if you're going to

12   come in and say that Mr. Angulo's -- that there is an

13   opinion that Mr. Angulo is skillful in exploiting the

14   goodwill of others, I want to know exactly what that's

15   based off of?

16        A    It's based on the Millon Group's analysis of

17   the MCMI using a commercially available program.

18        Q    Do you know what questions -- what type of

19   questions were asked of him?  Were there any questions

20   in that 175 questions that asked about how he likes to

21   exploit people?

22        A    Not specifically, no.  It's a pattern.

23        Q    Okay.  Enlighten me.  What type of pattern

24   leads to the ultimate conclusion that Mr. Angulo is

25   skillful in exploiting the goodwill of others?
```

```
 1        A    I can't tell you specifically.  I don't have

 2    the test questions.

 3        Q    Okay.  And certainly that's not an opinion

 4    that you intend to offer at trial, is it?

 5             MS. CRUZ:  Object to form.

 6             THE WITNESS:  I don't know that I'm

 7        specifically going to relate to that.  I don't

 8        think it's really central to this

 9        neuropsychological assessment.

10    BY MR. BOUMEL:

11        Q    Well, Doc, today is my day and --

12             MS. CRUZ:  I'm just going to -- let me just

13        clarify so it's crystal clear.  Adam, he may or may

14        not, but he may offer opinions about anything

15        that's in his report.  So whatever it is that you

16        want to ask about in the report, now would be the

17        time to do that.

18    BY MR. BOUMEL:

19        Q    Okay.  So, Doctor, with that soliloquy, I'm

20    going to ask you are you going to come in to trial and

21    offer the opinion that Mr. Angulo is skillful in

22    exploiting the goodwill of others?

23             MS. CRUZ:  Objection.

24             THE WITNESS:  That's a sentence and not a

25        diagnosis.
```

1    BY MR. BOUMEL:

2        Q    And my question remains the same.  Are you

3    going to offer that opinion?

4        A    I will -- if asked, I will read it.  Yes.

5        Q    Okay.  You intend to read that opinion that

6    you didn't actually -- that's -- you would agree with me

7    that's not your opinion, correct?

8             MS. CRUZ:  Objection.  Form.

9             THE WITNESS:  I have no way of making that

10            assessment.  That was an assessment he made of

11            himself.

12   BY MR. BOUMEL:

13       Q    So you would agree with me that you personally

14   have no opinion based on anything that Mr. Angulo told

15   you or anything that you've seen of him that he may be

16   skillful in exploiting the goodwill of others?

17            MS. CRUZ:  Objection to form.

18       Mischaracterizes --

19            THE WITNESS:  I didn't follow him around so I

20       don't know.

21            MS. CRUZ:  Objection.  Form.  Mischaracterizes

22       the testimony and mischaracterizes the evidence and

23       it's a confusing question.

24   BY MR. BOUMEL:

25       Q    Okay.  I'm going to ask it to you again

```
 1    because we're having trouble getting a clear answer,

 2    Dr. Crown.  Are you going to -- is it your opinion based

 3    on your own work in this case that Mr. Angulo is

 4    skillful in exploiting the goodwill of others?

 5            MS. CRUZ:  Same objection as to the last

 6        question and adding asked and answered about, I

 7        think, three times now.

 8            THE WITNESS:  I would only comment on that to

 9        the extent that I would say that this is what he

10        said about himself.  It is not my opinion.

11    BY MR. BOUMEL:

12        Q    So now your testimony is that Mr. Angulo said

13    that he may be these skillful in exploiting the goodwill

14    of others.  Those words came out of his mouth?

15        A    No.

16            MS. CRUZ:  Objection to form.

17        Mischaracterizes the testimony.  Asked and

18        answered.  Borderline badgering the witness.  Not

19        really sure how many times he can answer the same

20        question.

21            MR. BOUMEL:  Whitney.  Your objection to

22        form --

23            MS. CRUZ:  This is what the tests showed, this

24        is what his answers were.

25            MR. BOUMEL:  Whitney, you --
```

```
1              MS. CRUZ:  I'm not going to let you badger

2         him.

3              MR. BOUMEL:  Your objection to form is noted.

4              THE COURT REPORTER:  Okay.  And it has to be

5         one at time.

6              MR. BOUMEL:  When we're making objections, we

7         say object to form and we move on.

8    BY MR. BOUMEL:

9         Q    Dr. Crown, you can answer the question.

10             MS. CRUZ:  Adam, you don't tell me what to do.

11        Leave that for your kids, but thanks.  I appreciate

12        it.  When I feel the need to object, I will object.

13             MR. BOUMEL:  You can object as much as you

14        want, but you know the rules are very clear that

15        the proper objection is an objection to form

16        without a speaking objection and I'm asking you to

17        stop the speaking objections.

18   BY MR. BOUMEL:

19        Q    Dr. Crown, you can answer.

20             MS. CRUZ:  What's the question?  Or ask the

21        court reporter to read it back because I don't know

22        what it was.

23             MR. BOUMEL:  Ms. Court Reporter, can you read

24        it back?

25             (The record was read as requested.)
```

1          "Q    So now your testimony is that

2          Mr. Angulo said that he may be these skillful

3          in exploiting the goodwill of others.  Those

4          words came out of his mouth?

5          "A    No."

6    BY MR. BOUMEL:

7          Q    Okay.  So he answered that question.  Thank

8    you.  Doc, let's go to -- so let's say the third

9    paragraph.  He may successfully scheme beneath his

10   veneer of civility.  See where we are?

11         A    Yes.

12         Q    That's copied and pasted from the MCMI-3

13   results, correct?

14         A    Correct.

15         Q    That's not an opinion that you reached

16   independently, correct?

17         A    That is correct.

18         Q    And do you have any independent basis other

19   than what the MCMI printout told you that Mr. Angelo may

20   successfully scheme beneath the veneer of civility?

21         A    No.

22         Q    Okay.  And those questions would be true for

23   everything in this personality factor, right?

24   Everything that's listed in this personality factor

25   section, including the second to last paragraph stating

1    that he has antisocial and sadistic features, all of

2    this is based solely on an MCMI printout, correct?

3         A    Correct.

4         Q    None of it was reached independently by you,

5    correct?

6         A    Correct.

7         Q    None of it was stated by Mr. Angulo, correct?

8         A    Correct.

9         Q    And in fact Mr. Angulo does not complain of

10   any of these issues, correct?

11        A    Complain?

12        Q    Let me ask you a more specific question.  Does

13   Mr. Angulo state that because -- is there any complaint

14   or statement by Mr. Angulo suggesting that because of

15   this incident he is skillful and he seems to find

16   himself exploiting the goodwill of others?

17        A    No.

18        Q    Is there any claim or statement by Mr. Angulo

19   to suggest that because of this incident and his

20   injuries suffered that he finds himself scheming beneath

21   the veneer of civility?

22        A    No.

23        Q    Is there any statement or claim Mr. Angulo

24   that because of the injuries suffered in this incident

25   that he is suffering from antisocial and sadistic

1    features?

2         A    No.

3         Q    And those same questions would be true to the

4    rest of the statements in this personality factors,

5    correct?

6         A    Yes.

7              MR. BOUMEL:  All right.  With that, let's take

8         a five, everybody.

9              THE VIDEOGAPHER:  We're off the record at

10        2:51.

11             (Thereupon, a brief recess was taken.)

12             THE VIDEOGAPHER:  Okay.  We are back on the

13        record at 2:56 p.m.

14   BY MR. BOUMEL:

15        Q    All right.  Doc, how are you doing?

16        A    Good.

17        Q    All right.  Perfect.  Let's keep it rocking.

18   We got a couple of easier, more gentle subjects coming

19   up so me and Whitney can friends again.  Okay.

20             MS. CRUZ:  We are not not friends.

21             MR. BOUMEL:  You know, we had a 30-second

22        period where we weren't and now we are again.

23        That's what I'm saying.

24   BY MR. BOUMEL:

25        Q    All right.  Let's talk about brain injuries

1    generally speaking.  So you would agree with me that

2    brain damage is a problem in the brain where it is not

3    operating at full capacity, correct?

4         A    Generally speaking, yes.

5         Q    And you've testified to that before.  I don't

6    think I'm splitting hairs here.  That's a true

7    statement, correct?

8         A    Yes.  That's a general statement.  Yes.

9         Q    Okay.  And brain damage is an organic problem,

10   correct?

11        A    Yes.

12        Q    What does that mean?  Can you explain that a

13   little bit?

14        A    As an organic problem it means that there is

15   some kind of physical impact.  Now that's been expanded

16   in the last ten years because of the new findings in

17   functional neuroanatomy, but it still holds for the most

18   part.

19        Q    Meaning brain damage is actually damage to the

20   tissue of the brain?

21        A    Well, tissue or tracts or fibers.  How

22   specific do you want to be?

23        Q    You're -- you got the Ph.D., not me, so give

24   us an education.

25        A    Well, it's a matter of the chemical

```
 1    composition as well as the anatomic composition.  For

 2    example, there's some chemicals that can in effect

 3    pickle the brain without ripping out parts of it.

 4         Q    Got it.  So you can -- because it's a living

 5    tissue, you can poison it with chemicals or you can

 6    destroy it through physical trauma, correct?

 7         A    Yes.

 8         Q    Okay.  You would agree with me that -- and

 9    again, I'm using your own words here -- you would agree

10    that brain injury gives people little reserve, meaning

11    that they have very little to fall back on, correct?

12              MS. CRUZ:  It sounds like you're reading --

13         give me a second, Doctor.  It sounds like you're

14         reading from something, a direct quote.  Can you

15         show him what you're reading from if you're asking

16         him something based on a direct quote --

17              MR. BOUMEL:  I don't have it in front of me.

18              MS. CRUZ:  -- that he allegedly made.

19              MR. BOUMEL:  I can't.  I mean, I'm asking him

20         if he agrees with it and if he doesn't then we'll

21         move on.

22    BY MR. BOUMEL:

23         Q    So you would agree with me that brain injury

24    and cognitive dysfunction gives people little reserve

25    meaning that they have very little to fall back on,
```

```
 1    correct?

 2        A    It may certainly --

 3             MS. CRUZ:  I'm just going to object --

 4        Dr. Crown, give one second.  I'm just going to

 5        object to this line of questions.  As you've

 6        already indicated you're reading this from

 7        somewhere and that he allegedly said, I don't know

 8        if it's a deposition transcript or an article, and

 9        you're not giving him the entire context of his

10        statement.  I'm just going to object on that basis.

11   BY MR. BOUMEL:

12        Q    Dr. Crown, you can answer.

13        A    It can reserve -- it can deplete cognitive

14   reserve.  It doesn't have to necessarily.  It may or may

15   not.

16        Q    And what is cognitive reserve?

17        A    Cognitive reserve is the abilities and

18   capacities that you have to rely on in problem solving

19   and decision making.

20        Q    Okay.  And you would agree that somebody with

21   cognitive dysfunction has very little to fall back on

22   because of their depleted reserves, right?

23        A    That may be the situation.

24        Q    What we talk about somebody having very little

25   to fall back on, what does that mean?
```

1        A     It means that they don't have a substantial

2    amount of information and history that they can draw

3    back on to make decisions and to interact with others.

4        Q     And you would agree that people with

5    neurocognitive dysfunction following traumatic brain

6    injury tend to misconstrue things?

7        A     I can't hear you.

8        Q     You would agree with me that people with

9    neurocognitive deficits following traumatic brain injury

10   tend to misconstrue things?

11       A     They may.

12       Q     You would agree with me that people with

13   traumatic brain injuries and subsequent neurocognitive

14   disability or deficits that can impact emotional

15   responsiveness?

16       A     It may.

17       Q     Let's -- you know what, let's -- instead of

18   asking these questions generally, let's focus on

19   Mr. Angulo.  Okay.  It is your opinion that he has

20   neurocognitive deficits, correct?

21       A     Yes.

22       Q     Okay.  The neurocognitive deficits that

23   Mr. Angulo has, could that lead to him having little

24   reserve?

25       A     It could be.

```
 1        Q    Okay.  And why could it or why could it not?

 2        A    He has damage to parts of his brain.  Those

 3   parts are generally unknown.

 4        Q    It's unknown what parts of his brain he has

 5   damage to?

 6        A    Yes.

 7        Q    Give me one second.  Isn't it true, Dr. Crown,

 8   that as a neuropsychologist the testing that you provide

 9   is designed to detect what parts of the brain might be

10   damaged in any given individual?

11        A    No.  That's the old wives' tale.  That's the

12   old school neuropsychology that was developed and used

13   before the advent of CT scans, MRI scans, PET scans.

14   That's no longer the direction and focus of

15   neuropsychology.

16        Q    Well, you would agree with me that the brain

17   has different areas like the temporal lobe, the frontal

18   lobe, the cortex, right.  They are different areas of

19   the brain, correct?

20        A    Yes, of course.  That's the old school way of

21   looking at the brain.  It doesn't take into account the

22   central executive network, the multiple demand network,

23   and the networks and fiber tracts that we know exist.

24        Q    So it's your testimony and then -- I'm just

25   trying to understand you here.  My understanding, and
```

```
 1    you're going to correct me, is that neurocognitive

 2    testing is designed to find impairments like executive

 3    function impairment and if we find an executive function

 4    impairment we can deduce that there's trauma to a

 5    specific type of the brain.  You're saying that's no

 6    longer true?

 7         A    No.

 8              MS. CRUZ:  Object to form.

 9              THE WITNESS:  That's not necessarily true.

10         That was based on our understanding of the brain

11         that included broken networks.  But now we know,

12         using more moderate and contemporary imaging, that

13         there are fiber tract networks that are far

14         different from those.  For example, we now know

15         that executive function which used to be known as

16         frontal lobe behavior actually has a component in

17         the parietal lobes at the very opposite end of the

18         brain.  The fiber tracts tell us that.  The

19         neuropsych testing has never told us that.

20              Neuropsych testing used to be used before

21         imaging was available because it was the next best

22         thing to opening up the brain and picking around,

23         but we now have noninvasive techniques that tell us

24         much more.  So neuropsych testing tells us now

25         about function and the old school methods just
```

```
1          don't work.

2     BY MR. BOUMEL:

3          Q    Okay.  So if I understand you correctly,

4     neuropsych testing is completely unusable for detecting

5     what parts of the brain are damaged?

6          A    It's not our best way of doing it.

7          Q    Okay.  Well, my question was different.  Is it

8     used at all or can it be used at all to determine what

9     parts of the brain are damaged?

10         A    It could be, but it may be inaccurate.

11         Q    Okay.  And I understand you saying that scans

12    are more accurate, correct?

13         A    Yes.

14         Q    And in this case --

15         A    Particular types of scans.

16         Q    Okay.  Well, elaborate.

17         A    There are various forms of brain scans that

18    have been developed in the last ten years that are far

19    more accurate in making assessments of which areas of

20    the brain are impaired than others.  They are a

21    methodology that was first used by neurosurgeons and is

22    now being used elsewhere that looks at single individual

23    behavior rather than aggregate behavior.

24         Q    Okay.  What are the names of the different

25    scans you're referring to, sir?
```

```
 1        A    I think you can go to your own expert to get

 2   that information.  I don't think I have to educate your

 3   expert.

 4        Q    We're in a deposition.  This is discovery.

 5   You do have to answer my questions.  You're the one --

 6        A    Well, I will because probably I haven't seen

 7   it mentioned so your people may not know.  Resting state

 8   MRI would be one example.

 9        Q    What are the other examples?

10        A    Complex functional MRI.

11        Q    Okay.

12        A    Various forms of PET scan using

13   neuro-radioactive tracers.

14        Q    And these are all scans that can show, per

15   what you're saying, continuing cognitive or

16   neuropsychological cognitive deficits?

17        A    Yes.

18        Q    Okay.

19        A    I use them.

20        Q    Okay.  You prescribe them?

21        A    Yes.

22        Q    Okay.  And what's their -- what's their

23   effective rate or what's their accuracy rate?

24        A    Going back to my use of single positive

25   emission, computerized technology in order to assess
```

1   malingering, the rate has been close to 100 percent in

2   terms of accuracy.

3        Q     Where does one go to get one of these scans

4   done?

5        A     They are done at Baptist Hospital in Miami

6   would be one place.

7        Q     Any other locations in Miami that you're aware

8   of?

9        A     University of Miami Medical School.

10       Q     Any outpatient facilities?

11       A     As long as they have an agreement with the --

12   with one of the companies that does the data analysis,

13   yes.

14       Q     What about DTI MRI?  What's your take on that?

15       A     DTI MRI's reliant aggregate behavior,

16   plaintiffs' lawyers have been sold a bill of goods.

17   Resting state is much more accurate.  DTI relies on

18   aggregate behavior where you take a person and try to

19   fit them into a set of normative standards whereas

20   resting state relies on that person alone.

21       Q     All right.  So thank you for that.  I

22   appreciate the free education.  Now we're going to go

23   back to the pertinent questioning.  You did say that you

24   did not know where the damage to Mr. Angulo's brain was,

25   but you do have the imaging studies from the CT scans

1    performed in the hospital, correct?

2        A    Yes.

3        Q    Okay.  And have you independently reviewed

4    those?

5        A    I looked at it, yes.  I'm not a

6    neuroradiologist.

7        Q    No.  But you have testified in the past that

8    you do -- that you are able to read and interpret brain

9    imaging results, correct?

10       A    Correct.

11       Q    And so what did you see when you read and

12   interpreted Mr. Angulo's CT scan taken from

13   Jackson Memorial Hospital?

14       A    He had minor or small mild impingements, as I

15   recall, in the posterior portion of his brain.

16       Q    Okay.  And your report, page five, second

17   paragraph, you would agree with me that the CAT scan of

18   his brain identified -- intra -- and I'm going to --

19   help me out with the pronunciation of this,

20   intraparenchymal?

21       A    That's pretty close.  That's good enough for a

22   lawyer.

23       Q    Okay.  How do we say it for a non-lawyer?

24       A    Intraparenchymal.

25       Q    All right.  Intraparenchymal --

```
1    intraparenchymal.  I'm just going to call it an IP

2    hemorrhage --

3         A    That's fine.

4         Q    -- in the left parietal lobe, correct?

5         A    Correct.

6         Q    Okay.  And you don't disagree with that,

7    correct?

8         A    No.  That was a finding on imaging at that

9    time.

10        Q    Okay.  Going back to Mr. Angulo, is it -- and

11   we've already established that you do believe that he

12   has cognitive -- neurocognitive deficits.  Is it

13   possible that his neurocognitive deficits impact his

14   emotional responsiveness?

15        A    It's possible, but again, there are other

16   factors that could be involved.  Pain, for example.

17        Q    Okay.  Focusing -- laser focused on Mr. Angulo

18   and what he has, is it possible that his neurocognitive

19   impairment could impair his impulse control?

20        A    It's possible, but there are other factors

21   that could equally create that problem.

22        Q    Such as?

23        A    PTSD.

24        Q    Okay.  We're going to talk about that in a

25   second.  I'm going to try and keep us on track here.
```

1    Possible that Mr. Angulo's neurocognitive deficits could

2    have a significant impact on his reasoning and judgment?

3         A    Yes, possible.

4         Q    Same questioning for his mental flexibility?

5         A    Yes, possible.

6         Q    Same question for his ability to measure

7    future consequences?

8         A    Yes, possible.

9         Q    Same question for the ability to control his

10   behavior and to understand the consequences of his

11   behavior?  Let's end it there.

12        A    Well, understanding the long-term consequences

13   of immediate behavior is something that's associated

14   with the left frontal lobe.  I don't know that there are

15   any indications that that was damaged, but it would

16   certainly be possible just because of frustration and

17   personality problems.  But again, once again, we don't

18   know because he didn't have the imaging to show it.

19        Q    You would agree with me that polytrauma

20   increases the likelihood of long-term cognitive

21   dysfunction with TBI?

22        A    Polytrauma is a broad, broad term.  I don't

23   know how to respond to that.  I don't know.

24        Q    A patient with a TBI and polytrauma increases

25   the likelihood of long-term cognitive dysfunction versus

1    a patient with just TBI, correct?

2         A    It's possible.  Yes.

3         Q    And Mr. Angulo did have polytrauma, correct?

4         A    Yes.  He had orthopedic injuries, yes.

5         Q    Let's go to the Glasgow Coma Scale.  What is

6    the Glasgow Coma Scale?

7         A    It was a scale developed in Glasgow,

8    Scotland -- that's where it got it's name, Glasgow

9    General Hospital -- to assess and categorize people who

10   arrived in coma or difficulties with awareness.

11        Q    Okay.  And what's the use and purpose of the

12   Glasgow Coma Scale?

13        A    It's to make an assessment and categorize

14   people as to problems and possible prognosis.

15        Q    Okay.  And you would agree with me that a

16   Glasgow Coma Scale does impact the prognosis for a

17   specific patient?

18        A    It may, yes.

19        Q    Okay.  For instance, if they come in with a

20   Glasgow Coma Scale or if they present -- strike that.

21             If a patient presents with a Glasgow Coma

22   Scale of 15, which is the highest, then you would expect

23   virtually no cognitive impairment, no neurocognitive

24   impairment versus if somebody presents with a Glasgow

25   Coma Scale of three, which is the lowest, you would

1    expect that person's prognosis to be much worse,

2    correct?

3         A    I would expect them to be dead.

4         Q    Okay.  You would expect somebody with a

5    Glasgow Coma Scale of three to be dead?

6         A    Yes.

7         Q    Why is that?

8         A    Going below six, the survival rate is

9    extremely poor.  Poor to none.

10        Q    Okay.  And what's the prognosis of somebody

11   with a initial Glasgow Coma Scale of three?

12        A    Of three?

13        Q    Yep.

14        A    They are likely going to die.

15        Q    And if they don't die, if they survive, what

16   would be --

17        A    They are going to be -- a vegetable case is

18   also likely.

19        Q    Okay.  People can recover from Glasgow Coma

20   Scales of three, right?  They can come back?

21        A    Very rarely.

22        Q    How rare?

23        A    I can't tell you.

24             (Plaintiffs' Exhibit No. 3 was marked for

25        identification.)

```
 1   BY MR. BOUMEL:

 2        Q    Okay.  Let's mark Exhibit 3.  All right.  Is

 3   this chart a fair and accurate chart for what the

 4   Glasgow Coma Scale is?

 5        A    Yes.

 6        Q    Okay.  And basically we have three different

 7   responses, eye opening, verbal response and motor

 8   response, scored from one to four, correct?

 9        A    Correct.

10        Q    Or actually that's not true.  It's one to four

11   on eye opening, one to five on verbal and one to six on

12   motor, correct?

13        A    Right, for a total of 15.

14        Q    And anything eight or below -- well, strike

15   that.  Three is the lowest, correct?

16        A    Correct.

17        Q    And anything from three to eight indicates a

18   severe brain injury, correct?

19        A    Yes.

20        Q    Okay.  And then anything from nine to 12 is a

21   moderate brain injury, correct?

22        A    Yes.

23        Q    And per your own testimony when Mr. Angulo

24   presented, he initially had a Glasgow Coma Scale of

25   eight, correct?
```

```
 1        A    Correct.

 2        Q    And that puts him into the severe brain injury

 3   category, correct?

 4        A    Correct.

 5        Q    Would you agree with me that a Glasgow Coma

 6   Scale of three to eight is associated with poor

 7   functional outcome such as long-term cognitive deficits,

 8   personality changes, and social reintegration

 9   difficulties?

10        A    It may.

11        Q    Okay.  And are you aware that Mr. Angulo had a

12   Glasgow Coma Scale of three when he was airlifted from

13   the scene to Jackson Hospital?

14        A    I don't recall that.

15        Q    Okay.  Do you think that that would be

16   important to include in your notes and reports that he

17   had initial scale of three and not eight?

18        A    If I was aware of that, but I don't believe I

19   was.

20        Q    Okay.  Well, going to your records, you did

21   have the -- I'm looking at page four of your record

22   review and you have Miami-Dade Fire Rescue listed as

23   some of the records that you reviewed in this case,

24   correct?

25        A    Yes.
```

```
 1                (Plaintiffs' Exhibit No. 4 was marked for

 2         identification.)

 3  BY MR. BOUMEL:

 4         Q     Okay.  Let's look at Miami-Dade Fire Rescue

 5  report.  This will be Exhibit 4.  Have you seen this

 6  before, Dr. Crown?

 7         A     Yes.

 8         Q     Okay.  And you're telling me that you

 9  didn't -- you didn't realize that they listed for

10  Mr. Angulo as he was being airlifted from the scene to

11  Jackson that he had no eye movement, no verbal response,

12  no motor response for a Glasgow Coma Scale of three?

13         A     Thanks for refreshing me.  It's been some time

14  since I saw that.

15         Q     Okay.

16         A     And obviously if someone is unconscious

17  because of any type of injury, they are going to get a

18  score of three because they are unresponsive.

19         Q     Because he was unresponsive?

20         A     Whether it's a football player on the field

21  who gets the wind knocked out or a child who fell out of

22  a tree, if you're unconscious you're going to wind up

23  with a three, but where the unconsciousness came from

24  may be another question.

25         Q     Where did the unconsciousness come from?
```

```
 1      A    Being battered, orthopedic injuries,

 2  overwhelming pain, being knocked unconscious.  You could

 3  be knocked unconscious without --

 4           MS. CRUZ:  I'm going to object to the

 5           extent -- I'm just going to object.  This is way

 6           outside of -- he is not here as a medical doctor to

 7           talk about the medical injuries and what resulted

 8           in a Glasgow Coma Score.  He's not an MD.  That's

 9           not what he's here to talk about.  So we're going

10           way far afield.  You can ask him, you know, what

11           Glasgow Coma score did you see, but now you're

12           asking him for what he told you that the Supreme

13           Court has said he's not allowed to give.  He cannot

14           give medical causation opinions.  So he can't about

15           this was the score and this is why.  That's not

16           what he's here to do.  This is just completely

17           irrelevant.

18  BY MR. BOUMEL:

19      Q    So, Dr. Crown --

20           MS. CRUZ:  Ask an MD about this, not him.

21  BY MR. BOUMEL:

22      Q    So, Dr. Crown, as a neuropsychologist who has

23  been retained to give expert opinions at trial in this

24  matter, it's your opinion that Mr. Angulo's Glasgow Coma

25  Scale of three is irrelevant and it's the same as if we
```

```
 1    were on a football field and somebody had the wind

 2    knocked out of them?

 3         A    I have no comment on that.

 4              MS. CRUZ:  Objection to form and

 5         mischaracterizes the testimony.

 6    BY MR. BOUMEL:

 7         Q    What do you mean you have no comment?

 8         A    I'm not a physician.  That's a medical issue.

 9         Q    Does the fact that Mr. Angulo had a Glasgow

10    Coma Scale of three change any of the opinions that

11    you've offered?

12         A    No.

13         Q    Why not?

14         A    Because a short time later he had a Glasgow

15    Coma Scale of 13.

16         Q    When did he have a Glasgow Coma Scale of 13?

17         A    At Jackson South.

18         Q    Okay.  And did his -- did his Glasgow Coma

19    Scale at Jackson South go back down at all or did it

20    remain 13?

21         A    It vacillated and that may be dependent on

22    other circumstances that he was involved in, but I'm not

23    a treating doctor.  I can't help you.

24         Q    Okay.  But Glasgow Coma Scales are relied upon

25    by you in reaching your opinions in this case, correct?
```

```
 1        A    It's historical information, but it doesn't

 2   affect my opinion.  A neuropsychological evaluation is

 3   always a static status evaluation.

 4        Q    Well, all of the history that you obtained

 5   from the medical records impacts your opinions.  You

 6   told us that at the very beginning of this deposition,

 7   correct?

 8        A    Yes.  It places things in context.

 9        Q    Okay.  And it's important to place in context

10   the severity of Mr. Angulo's symptoms when he first

11   presented in the air ambulance and at Jackson Hospital,

12   correct?

13        A    Yes.

14        Q    Okay.  And you've already testified that you

15   did not -- you did not include or incorporate

16   Mr. Angulo's presentation in the air ambulance into your

17   opinions, correct?

18             MS. CRUZ:  Object to form.  Mischaracterizes

19        the testimony.

20             THE WITNESS:  No.  It's not mentioned.

21   BY MR. BOUMEL:

22        Q    Okay.  And did you also mention or incorporate

23   the fact that Mr. Angulo had vacillating Glasgow Coma

24   Scales at the time that he presented to Jackson?

25        A    No.
```

```
 1                 MS. CRUZ:  Objection to form.  He said that
 2         earlier in the deposition.
 3    BY MR. BOUMEL:
 4         Q    And why not?  Why didn't you incorporate it,
 5    Doc, if it's important?
 6         A    There was no reason to.  As I said, a
 7    neuropsychological is always a status evaluation and I
 8    knew that in 2023 he had a clear CT scan.
 9         Q    Okay.  But you didn't consider the severity of
10    his initial condition, accurate?
11                 MS. CRUZ:  Object to form.
12                 THE WITNESS:  Not in terms of the Glasgow Coma
13         Scale.
14    BY MR. BOUMEL:
15         Q    What about in -- what about in -- forget about
16    the number, what about the notations of the nurses as to
17    his mental cognition in the day or two following his
18    admission to Jackson; did you incorporate any of that
19    into your opinion?
20         A    No.  I incorporated it into my knowledge of
21    Mr. Angulo.
22         Q    Okay.  Would it be important for a
23    neuropsychologist giving opinions as to whether or not
24    somebody has continuing neurocognitive deficits to
25    understand exactly how severe those neurocognitive
```

1   deficits were after that person is admitted to a

2   hospital?

3       A    As I said, a neuropsychological examination is

4   a status examination at the time that the person is

5   seen.  So the history is interesting, but the focus of a

6   neuropsychological evaluation is how well is the person

7   functioning at the time that you see him, not how he was

8   four years earlier.

9       Q    But as you so eloquently put it at the

10  beginning of this deposition, you have to have the

11  backdrop.  Without the backdrop you can't form accurate

12  opinions, right?

13      A    Yes.  So Mr. Angulo has made a wonderful

14  recovery.  He's gone from brain damage identified on the

15  CT scan in 2019 to a clear CT scan in 2023.

16      Q    And just because he has a clear CT scan

17  doesn't mean that he has no neurocognitive dysfunction;

18  you would agree with that?

19      A    I found neurocognitive dysfunction when I saw

20  him.

21      Q    Okay.  And I'm going to repeat my question.

22  Just because he has no brain damage appreciable on a

23  continuing brain damage seen on a CT scan, doesn't mean

24  that there is not neurocognitive dysfunction, correct?

25      A    That's correct.

```
 1                MS. CRUZ:  Objection.  Form.  Asked and

 2        answered.

 3   BY MR. BOUMEL:

 4        Q    Okay.  How low did his Glasgow Coma Scale

 5   vacillate to when he was in Jackson?

 6        A    I'm not sure; 11 or 12.

 7                (Plaintiffs' Exhibit No. 5 was marked for

 8        identification.)

 9   BY MR. BOUMEL:

10        Q    Show you what we'll mark as Plaintiffs' 5,

11   4,987 pages, Jackson admission, April 25, 2019.  I

12   probably will only admit -- I'll admit the first 100

13   pages.  So we're starting at the beginning from his

14   initial presentation.  Fair to say he was not oriented

15   to the situation?

16                MS. CRUZ:  I'm just going to object to the

17        form.  The record says what it says.  You want him

18        to read what the record says?

19                MR. BOUMEL:  I'm asking if he disagrees.

20                THE WITNESS:  No.  Those are medical

21        decisions.

22   BY MR. BOUMEL:

23        Q    Okay.  I think we're going to get out of this.

24   What is a diffuse axonal injury?

25        A    I can't hear you.
```

```
 1          Q     What is a diffuse axonal injury?

 2          A     Diffuse abdominal injuries?

 3          Q     Axonal.

 4          A     Oh, diffuse injury axons.  Axons are large

 5     connecting segments of the brain.

 6          Q     Did Mr. Angulo have that?

 7          A     Yes.

 8          Q     Okay.  How do we know that?

 9          A     Imaging.

10          Q     Okay.  And you would agree with me, wouldn't

11     you, that diffuse axonal injuries with a Glasgow Coma

12     Scale of eight or below is a brain injury that can

13     produce the equivalent of Swiss cheese in the brain?

14          A     Possible.

15          Q     Okay.  And you would agree with me that

16     someone with diffuse axonal injury Glasgow Coma Scale of

17     eight and under are very likely to have very severe

18     problems and not be able to function?

19          A     Some people, yes.  If you want to be specific

20     to Mr. Angulo, apparently no.

21          Q     Okay.  Well, just because he's functioning

22     pretty well doesn't mean that he doesn't have issues,

23     correct?

24          A     Correct.

25                MS. CRUZ:  Object to form.
```

```
 1   BY MR. BOUMEL:

 2       Q    And you've testified to both of those things

 3   in the past.  That somebody with a diffuse axonal injury

 4   and a Glasgow Coma Scale of eight or below is somebody

 5   who you would believe would have Swiss cheese, the

 6   equivalent of Swiss cheese in the brain?

 7       A    They could, yes.

 8       Q    Okay.  Let's talk some more.  An

 9   intraparenchymal -- how am I doing on that?

10       A    Not bad.

11       Q    An intraparenchymal hemorrhage is a

12   hemorrhagic cerebral contusion, correct?

13       A    Correct.  A bleed.

14       Q    A hemorrhagic cerebral contusion is one of the

15   most severe forms of traumatic brain injury, correct?

16       A    A brain bleed is a problem.  Yes.

17       Q    And it's one of the most severe forms of

18   traumatic brain injury that there is, correct?

19       A    A bleed is, yes.

20       Q    And you would agree that they are closely

21   related to death and disability if they result in a

22   coma?

23       A    Yes.

24       Q    And you would agree with me that Mr. Angulo

25   was comatose for a period?
```

```
 1        A     He was unconscious.  Yes.

 2        Q     And he had -- he fell on the severe side of

 3   the Glasgow Coma Scale, correct?

 4        A     Yes.

 5        Q     Okay.  You would agree with me that nearly

 6   half of hospitalized survivors of traumatic brain injury

 7   experience long-term disabilities?

 8        A     I'm not aware of the percentage.

 9        Q     Okay.  Have you ever testified in the past

10   that nearly half of hospitalized survivors of TBI

11   experience long-term disabilities?

12        A     I don't know.  I would agree that a

13   significant number of people who sustained traumatic

14   injuries have continuing problems.

15        Q     You would agree with me that traumatic brain

16   injury increases the likelihood of early onset dementia?

17        A     Yes.

18        Q     This is going to be wordy.  I'm apologizing to

19   everybody in advance, especially Ms. Sharon.  Would you

20   agree with me that in patients with traumatic brain

21   injury involving intraparenchymal hemorrhage long-term

22   issues such as executive dysfunction, impulsivity and

23   emotional dysregulation are common?

24        A     It would depend on the extent of the bleed and

25   whether it required neurosurgical intervention.
```

1      Q    Okay.  Would you agree with me that in

2    patients involving traumatic brain injury with

3    intraparenchymal hemorrhage that they can suffer

4    impairments including affecting relationships, career

5    opportunities, and overall life satisfaction?

6      A    It would depend on where the bleed was.

7      Q    Okay.  How about --

8      A    Yes.

9      Q    How about for Mr. Angulo?  Let's keep it to

10   Mr. Angulo.

11     A    That was in the parietal lobe.  The parietal

12   lobes have nothing to do with establishing

13   relationships.

14     Q    Okay.  Let's -- we're going to start the whole

15   process over and we're going to make it Mr. Angulo

16   focused.  With regards to Mr. Angulo's traumatic brain

17   injury involving an intraparenchymal hemorrhage --

18   Whitney, can you say that three times fast?

19     A    Intraparen --

20          MS. CRUZ:  No.

21          THE WITNESS:  Now you got me doing it.  Let's

22        just call it IP.

23   BY MR. BOUMEL:

24     Q    All right.  IP.  IP.  In patients -- sorry,

25   not in patients.  In regards to Mr. Angulo's traumatic

```
 1    brain injury involving an IP hemorrhage, is it true that

 2    he would be expected to suffer from long-term issues

 3    such as executive dysfunction, impulsivity and emotional

 4    dysregulation?

 5         A    It would be possible but improbable because it

 6    didn't require neurosurgical intervention.

 7         Q    Okay.  So your testimony is that as long as

 8    you don't require neurosurgical intervention then you're

 9    not going to suffer from any of these consequences?

10         A    In all likelihood, but now you're asking me

11    medical questions.

12         Q    No.  You're a neuropsych.  These are on board

13    for you.  Fair to say that --

14              MS. CRUZ:  They are not.  They are not.  Adam,

15         he's told you that this is outside of his

16         expertise, so he testified within his expertise and

17         he is not offering opinions about that in this

18         case.

19    BY MR. BOUMEL:

20         Q    Okay.  Dr. Crown --

21              MS. CRUZ:  So I'm not really sure -- this is

22         taking a lot longer not because he's not answering

23         your questions because you're asking him all these

24         medical questions.  He's not an MD.  He is not an

25         MD.  He is not holding him out -- holding himself
```

```
 1           to be an MD.  Tesla has a neurologist.  You could

 2           have asked all these questions of the neurologist.

 3               MR. BOUMEL:  Okay.

 4               MS. CRUZ:  His opinions are based on his

 5           testing, his testing.  So I don't know how much

 6           longer we're going to be here with all of these

 7           medical questions that don't relate to his opinion.

 8   BY MR. BOUMEL:

 9       Q    Dr. Crown, would you agree that a traumatic

10   brain injury with -- involving an IP hemorrhage can

11   significantly affect relationships, career

12   opportunities, and overall life satisfaction?

13       A    May.  Depending on the location of the IP.

14       Q    Okay.  Would you agree that for Mr. Angulo

15   with his TBI and his IP hemorrhage that the recovery

16   trajectory for him is going to be protracted and even

17   after initial improvement, he may report enduring

18   deficits affecting his overall quality of life?

19               MS. CRUZ:  Object to form.

20               THE WITNESS:  Possible, but I would defer to a

21           neurologist.

22   BY MR. BOUMEL:

23       Q    Would you agree with me that studies show that

24   patients with IP hemorrhages have higher rates of

25   unemployment, social withdrawal, and dependency on
```

```
 1   family or caregivers, indicating that their life

 2   satisfaction is profoundly impacted?

 3       A    I would defer to a medical doctor.  That's a

 4   determination that would be based on the size of the IP

 5   and possible interventions.

 6       Q    I'm not asking for a medical opinion.  I'm

 7   asking for a psych -- for a neuropsychological opinion

 8   as to the person's expected -- expected psychological

 9   impact.

10           MS. CRUZ:  He gave you his answer, Adam.  His

11           answer is his answer.

12   BY MR. BOUMEL:

13       Q    Okay.  And what's your answer, Doc?

14       A    My answer --

15           MS. CRUZ:  He just stated --

16           THE WITNESS:  -- is ask a neurologist.

17           MS. CRUZ:  Court Reporter, can you read it?

18           Hold on, Dr. Crown. Court Reporter, can you read

19           the answer --

20           MR. BOUMEL:  Whitney, Whitney.

21           MS. CRUZ:  -- to the last question?

22           MR. BOUMEL:  Whitney, can you please just keep

23           your objections to form.  I'm not trying to be rude

24           here.  You can't tell him how to answer and what to

25           answer.  I'm the one asking the questions.
```

```
 1   BY MR. BOUMEL:

 2        Q    Dr. Crown, please answer the question.

 3             MS. CRUZ:  I'm not going to let you go outside

 4        of his opinions.  He literally just told you, I

 5        can't answer that.  That's out of my expertise.

 6        You would have to ask a neurologist.  He can't

 7        answer that.  So if you want to tell the jury that

 8        he wouldn't answer it because it's outside of his

 9        expertise, you can.  You can't make him -- he told

10        you, I can't answer it.  Have the court reporter

11        read the last question.  I can't answer means I

12        don't have an opinion.  I'm not going to let you

13        sit here and keep ask him and ask him and ask him.

14        He said, I don't have an opinion on that.  I can't

15        answer it.

16   BY MR. BOUMEL:

17        Q    Okay.  Is it a medical opinion that people

18   with IP hemorrhages and TBI have higher rates of

19   unemployment, social withdrawal, and dependence on

20   family or caregivers?  It's your testimony, Dr. Crown,

21   that that's a medical opinion?

22             MS. CRUZ:  Objection to form.

23             THE WITNESS:  That's a physiatrist opinion.

24        That's a medical doctor.

25
```

```
 1   BY MR. BOUMEL:

 2       Q    Okay.  And you, as a neuropsychologist, are

 3   not qualified to give an answer as to that question?

 4       A    I don't answer questions about employment.

 5   I'm not an employment specialist.  I'm not a

 6   rehabilitation specialist.

 7       Q    Okay.  You are a psychologist and the question

 8   also incorporated social withdrawal.  Is social

 9   withdrawal within the course of your area of expertise?

10       A    Social withdrawal, yes.

11       Q    Okay.  So let's talk about social withdrawal.

12   Would you expect that a person suffering from an IP

13   hemorrhage with TBI would have social withdrawal?

14       A    They may.  But being specific to Mr. Angulo,

15   he made several trips to Colombia.  He was at the Indy

16   500.  He made trips to New York that's with a

17   girlfriend.  That doesn't sound like social withdrawal

18   to me.  That sounds like having a good time.

19       Q    So Mr. Angulo is having a good time?

20       A    Based on the making several trips to Colombia,

21   having a girlfriend, going to the Indy 500, taking trips

22   to New York, he wasn't going for treatment.

23       Q    Okay.  And in the brain -- in your own

24   clinical practice where you treated patients with severe

25   trauma, that's -- you treated plenty of patients with
```

```
1    severe trauma in your practice, correct?

2        A    Yes.

3        Q    Okay.  Is it uncommon for those patients to

4    take trips and activities to try to get themselves back

5    to a place of feeling better about themselves?

6        A    No.

7        Q    It's not uncommon or it is uncommon?

8        A    It's uncommon.

9        Q    It's uncommon.  Okay.

10            MS. CRUZ:  Adam, we've been going for, like,

11        an hour.  I don't know if it's time to stop, but

12        sometime soon can we get a break?

13            MR. BOUMEL:  Yeah.  Let's take it now.

14            THE VIDEOGRAPHER:  We're off the record at

15        3:42 p.m.

16            (Thereupon, a brief recess was taken.)

17            THE VIDEOGRAPHER:  We are back on the record at

18        3:50 p.m.

19    BY MR. BOUMEL:

20        Q    All right.  Doc, we are going to switch gears.

21    Let's talk about PTSD.  You would agree with me that

22    PTSD is a cognitive disorder, correct?

23        A    Yes.

24        Q    Okay.  And can you explain for us what means?

25        A    I didn't hear you.
```

1      Q     Can you explain what that means, that PTSD is

2   a cognitive disorder?

3      A     It means that it affects thinking, feeling,

4   and action.

5      Q     What is the interplay between PTSD and

6   neurocognitive dysfunction?

7      A     They mimic one another.  It's extremely

8   difficult to tell the difference between one or the

9   other in terms of the effect it may have.

10      Q     Do they exacerbate each other?

11      A     They may exacerbate one another or they may

12   mimic in behavior or in cognition, so it's unknown.

13   It's very difficult to differentiate.

14      Q     And just so we're talking the same language

15   here, you're agreeing that they do exacerbate each

16   other.  And so for our jury what that means is if one --

17   if a person has PTSD with neurocognitive dysfunction,

18   the PTSD can make the neurocognitive function worse and

19   the neurocognitive dysfunction can also make the PTSD

20   worse; is that accurate?

21      A     That's possible or they could display the very

22   same symptoms, making it almost impossible to discern

23   what's neurocognitive and what's PTSD.

24      Q     Would you agree with me that individuals with

25   PTSD often experience significant decline in their

1    quality of life?

2         A    Yes.

3         Q    Would you agree with me that individuals

4    suffering from PTSD suffer symptoms such as intrusive

5    thoughts, hyperarousal and emotional numbness which not

6    only affects their daily functioning, but also impairs

7    their social relationships and overall life

8    satisfaction?

9         A    Yes.

10        Q    Would you agree with me that long-term PTSD

11   can have a devastating effect on an individual's

12   functioning and quality of life?

13        A    Yes.

14        Q    Would you agree with me that even with

15   treatment many individuals with PTSD report persistent

16   deficits and emotional regulation, interpersonal

17   relationships and work performance?

18        A    Some do, with inadequate treatment, yes.

19        Q    And sometimes people with PTSD have suicidal

20   ideations, correct?

21        A    Yes.

22        Q    What's the interplay between chronic pain and

23   PTSD?

24        A    The interplay, one may exacerbate the other.

25        Q    Okay.  And same thing with chronic pain and

1    neurocognitive disorder, one may exacerbate the other?

2       A    Yes.

3       Q    Okay.  What about in somebody with all three,

4    chronic pain, PTSD, and neurocognitive disorders?  Does

5    that -- do they all exacerbate each other?

6       A    They may, yes.

7       Q    Have you -- I know in your file you have the

8    deposition transcripts and report of Dr. Korman,

9    correct?

10      A    Yes.

11      Q    Do you disagree with his opinions at all?

12      A    No.

13      Q    Okay.  Dr. Korman diagnosed -- opined that he

14   believes that Mr. Angulo does have PTSD.  Are you aware

15   of that?

16      A    Yes.

17      Q    Okay.  Do you believe that Mr. Angulo has

18   PTSD?

19      A    Yes.

20      Q    Okay.  How come in your report you stated

21   otherwise?

22      A    No.  I stated or meant to say that

23   psychometrically on the Mollin Clinical Multiaxial

24   Inventory, which has a special category for PTSD, he did

25   not indicate PTSD, but I believe that he has it.

```
1        Q     Okay.  So you do believe he has it?

2        A     Yes.

3        Q     Okay.  Continuing, correct?

4        A     Yes.

5        Q     Okay.  Let's go to your interview with

6   Mr. Angulo.  Did you -- do you believe he lied or

7   exaggerated to you in any way in your interview setting?

8        A     That he lied to me, not that I'm aware of.

9        Q     Was he exaggerating to you in your interview?

10        A     I don't believe so, but I don't know.  I

11   didn't have independent ways of tracking his daily

12   activities.

13        Q     I guess what I'm trying to get at is based on

14   your interview with Mr. Angulo, did you have any reason

15   or concern to believe or concern that he was not being

16   honest and forthright with you?

17        A     No.

18        Q     Okay.  Let's go to your testing selection.  It

19   seems as though you administered three tests for

20   malingering and then -- which would be the Rey 15 and

21   the B test and then the Structured Inventory of

22   Malingered Symptomology [sic] test, correct?

23        A     Yes.

24        Q     Those three tests were all specifically for

25   malingering, correct?
```

1       A       Performance validity, malingering,

2   exaggeration, they are compounded.

3       Q       And then other than the three performance

4   validity tests and malingering test, you did four other

5   tests, correct?

6       A       Yes.

7       Q       Okay.  How did you chose the tests that you

8   ultimately gave?

9       A       I felt that those were the tests that would

10  tap his behaviors and answer the question that I was

11  asked to address, whether he had brain damage or not.

12      Q       And do you choose the same battery for each

13  patient that you're testing?

14      A       I may add or subtract.

15      Q       Do you choose the same battery regardless if

16  you're being called by the defense or testifying on

17  behalf of a plaintiff?

18      A       Generally.

19      Q       Okay.  Always?

20      A       Well, it's hard to say always.  Sometimes I

21  may add something.  Sometimes I may subtract something.

22  Sometimes there's a new test that I might want to see

23  how it works.

24      Q       Well, talk me through your decision-making

25  process.  How do we determine in any given scenario what

```
1   test we're administering?

2        A    That's based on an individual basis.  There's

3   individual behavior.  I knew that I was dealing with or

4   going to see Mr. Angulo.  I knew that he had a history

5   of attentional problems.  I knew that he had a history

6   of pain problems.  I knew that I probably couldn't keep

7   him seated for long periods of time.  I wanted to be

8   relatively quick in what I did.  Modern

9   neuropsychological testing runs somewhere between two

10  and four hours.  I wanted to be on the lower end rather

11  than the higher end in order to ensure that I was

12  getting his best behavior rather than worn out behavior

13  or complaining behavior.

14       Q    Did you get any worn out or complaining

15  behavior?

16       A    Yes.

17       Q    You did?

18       A    No.

19       Q    Just -- okay.  We're clear you did not get any

20  worn out or complaining behavior, correct?

21       A    That's correct.  I did not.

22       Q    Okay.  What's the difference between a fixed

23  battery versus a flexible battery?

24       A    A fixed battery is the same tests given at the

25  same time and a flexible battery involves choosing tests
```

1    to meet situational demands.

2        Q    You would agree with me that fixed batteries

3    have been scientifically validated through peer-reviewed

4    studies whereas flexible batteries have not been,

5    correct?

6        A    That's an old wives' tale.  There is a study

7    by -- an important study by Rohling that says there's no

8    difference.  There's an article by Larrabee and there's

9    a New Hampshire Supreme Court opinion that put

10   everything to rest in Baxter v. Temple so by 2009 it was

11   a myth.

12       Q    And I'm assuming it would be just taking a

13   moment of seconds or minutes to pull those studies?

14       A    I could.

15       Q    Please do so.

16       A    But you can probably obtain them from your own

17   expert.

18       Q    Please pull them and provide them to Tesla's

19   counsel.  We're requesting copies of them.  Flexible

20   batteries are not co-normed, correct?

21       A    That's correct.

22       Q    What does that mean?

23       A    That means that they weren't taken as a group

24   and norm together.  That's another myth that relates to

25   your concatenated versus hierarchal theories when you

```
 1    want to get down to the basis of them.  The two articles

 2    that I mentioned and the New Hampshire Supreme Court

 3    opinion all say that it's unnecessary and makes no

 4    difference.  In addition, there's a formula if you want

 5    to co-norm, there's a simple statistical formula that

 6    can be used to do that, but there's no reason.  I think

 7    you're dealing with old neuropsychological tales.

 8         Q    If you use --

 9         A    And I understand where you got them.

10         Q    I'll let her know you said hi.  If you're

11    dealing with a validated fixed battery you would be able

12    to provide a global impairment index, correct?

13         A    If that were one of the figures.  It doesn't

14    mean that you can apply.  It just so happens that there

15    are -- there is a battery that allows for that, but it's

16    not available with every fixed battery.

17         Q    Okay.  But it is available in fixed batteries

18    and it's not available in flexible batteries, correct?

19         A    An impairment index?

20         Q    A global --

21         A    I gave you a composite index from the

22    repeatable battery.

23         Q    What I'm asking for is a global impairment

24    index?

25         A    That's correct.  It's available in only one
```

```
 1    old instrument.

 2         Q    Okay.  And it's not available in the battery

 3    that you choose, correct?

 4         A    Correct.

 5         Q    And if you choose a validated fixed battery,

 6    you can provide a probability of brain damage index,

 7    correct?

 8         A    You could.

 9         Q    Okay.  And that's not available in the battery

10    that you chose, correct?

11         A    The probability -- the probability is that

12    Mr. Angulo is brain damaged.

13         Q    Let's talk about malingering.  You gave three

14    test scores, correct?

15         A    Yes.

16         Q    He passed two, correct?

17         A    He passed two and one was suspect.

18         Q    Okay.  And when we say that one was suspect,

19    let's deal with that one.  First of all, the two that he

20    passed, do we know what his scores were?

21         A    They were within normal limits.  I don't know

22    that there would be a particular reference.  Your expert

23    would have a raw data and would know.

24         Q    And just so we're on the same page, these

25    malingering tests, Mr. Angulo didn't know what tests
```

1    were testing for what, correct?

2         A    Correct.

3         Q    So he's just taking all of these tests and the

4    malingering tests are specifically designed to tell if

5    he's giving his best effort without letting him know

6    that he's being tested for his best effort, correct?

7         A    Correct.

8         Q    And two of three he passed, correct?

9         A    And one was suspect, yes.

10        Q    And one was suspect.  Now the one that was

11   suspect, first of all it has five different sections,

12   correct?

13        A    Correct.

14        Q    And he passed two of the five, correct?

15        A    I believe so.

16        Q    And you didn't put that in your report,

17   correct?

18        A    I didn't put in what he passed and -- what he

19   passed, no.  That's not the function of the test.  A

20   person who is not exaggerating or -- should pass

21   everything.  The test should be clear and clean.

22        Q    So let's talk about -- so we're talking about

23   the SIMS test, right, S-I-M-S?

24        A    Yes.

25        Q    Okay.  And that is comprised of 75 questions,

```
 1    true or false questions with no room for explanation,

 2    correct?

 3         A    Correct.

 4         Q    Okay.  And basically it ask a question true or

 5    false and if he answers true it adds a point, correct?

 6         A    Yes.

 7         Q    And if he gets enough points then it flags his

 8    responses as being potentially malingering, correct?

 9         A    Questionable, yes.

10         Q    Okay.  And some of those -- so he flagged as

11    questionable on three things including neurological

12    impairment, effective disorders, and low intelligence,

13    correct?

14         A    Yes.

15         Q    So if he answered a question in the positive

16    stating it was true that he's suffering from some sort

17    of effects of neurological impairment, then he gets a

18    point added towards potentially malingering, correct?

19         A    Yes.

20         Q    But what if he is suffering from neurological

21    impairment?

22         A    Well, the test is designed to deal with people

23    who have these problems.  It only triggers a problematic

24    area when they over-endorse, not that they endorse; we

25    expect people to endorse.  It's a question of
```

1    over-endorsing.

2        Q    Okay.  And is it true that most of his

3    endorsements on the SIMS were for complaints of

4    depression, PTSD, and substance abuse?

5        A    No.  It was neurologic impairment, effective

6    disorder, and low intelligence.

7        Q    Those are the categories, but within those

8    categories there are subsets of questions dealing with

9    depression, PTSD, and substance abuse, correct?

10       A    Yes.  That's correct.

11       Q    And those are the questions that he answered

12   in the affirmative, correct?

13       A    Yes.  He over-endorsed.

14       Q    So he over-endorsed substance abuse, is that

15   what you're --

16       A    Yes.

17       Q    Okay.  And that flagged him for potentially

18   malingering?

19       A    Or exaggeration, yes.

20       Q    Okay.  Give me one second.  And if he endorsed

21   issues related to PTSD, that also under the SIMS flagged

22   him for potential exaggeration, correct?

23       A    Correct.

24       Q    Even though he has PTSD, correct?

25       A    Correct.

1      Q    Okay.  Now you said potential exaggeration,

2  what did you mean?

3      A    It may or may not be.

4      Q    Okay.  Within a reasonable --

5      A    That was my conclusion that it was possible,

6  but again if something is possible it's also might be

7  not possible.

8      Q    So fair to say you cannot testify that within

9  a reasonable degree of medical probability or

10 neuropsychological probability that Mr. Angulo was

11 malingering or exaggerating?

12     A    Yes.  That's what I intended to express.

13     Q    Okay.  That's not an opinion that you're going

14 to offer at trial?

15     A    Correct.

16     Q    Just to be clear, you do not intend to come to

17 trial and tell our jury that you believe that it's

18 possible that Mr. Angulo may be malingering or

19 exaggerating his symptoms?

20     A    Well, he may be exaggerating, you know.  One

21 of the ways to look at that is look at his language

22 score which is at the eighth percentile, but then in

23 another language test he was at the 50th percentile.

24 How could that be?

25     Q    Okay.

```
 1        A     And then on a test that was administered after

 2   I saw him, he scored well above the 50th percentile on

 3   the test given by another neuropsychologist.

 4        Q     Same test or different test?

 5        A     Different test, but language is language.

 6        Q     But different test is a different test,

 7   correct?

 8        A     Yes.

 9        Q     You stated in under behavioral observations,

10   his level of disclosure was variable and possibly

11   incomplete.  What did you mean?

12        A     I meant that he was hesitant to answer at

13   times.

14        Q     What question was he hesitant to answer?

15        A     About his life, about his substance use, about

16   how he spends his days.

17        Q     Okay.  What information did he not give you

18   about he spends his days?

19        A     I don't know.  I don't know what information

20   he didn't give me because I have no way to check on

21   that.  It's merely an observation.  It's not a

22   measurement.

23        Q     What question were you asking him where you

24   believe he did not give you a full response as to how --

25   as to how he spends his days?
```

```
1       A    I don't know whether he gave me a full

2    response or whether he was just absent.  I asked him how

3    do you spend your day.

4       Q    What did he say?

5       A    He said I just hang out.

6       Q    That's the question and answer?

7       A    And then I go to doctor's.

8       Q    Okay.  And that's your testimony as to how

9    that conversation went?

10      A    Yes.

11      Q    You know we have it on video, right?

12      A    Yes.

13      Q    Okay.  Let's go to the TOGRA test, T-O-G-R-A.

14   What is that testing measuring?

15      A    General reasoning ability.

16      Q    How is the test constructed?

17      A    Person has examples of -- well, an example is

18   a bird and a nest and then the spider and a question

19   mark and then there are five things to choose from to

20   complete the pattern; bird, nest, spider, and one of the

21   choices is web.  That would be an example.

22      Q    Is that an example of, like, the easiest

23   question on that test or --

24      A    That's the example.

25      Q    Okay.  And how long does that test take?
```

```
 1        A    Sixteen minutes.

 2        Q    Okay.  And for -- on the TOGRA test,

 3   Mr. Angulo presented at the second percentile, correct?

 4        A    Correct.

 5        Q    And in your report you said this is below

 6   expectancy levels given his education, history, and

 7   self-sufficiency, correct?

 8        A    Correct.

 9        Q    First of all, you did no type of testing to

10   determine what his premorbid functioning was, correct?

11        A    Correct.

12        Q    And there are tests that approximate that,

13   correct?

14        A    Not in the contemporary tests.

15        Q    Okay.  And what does that mean?

16        A    That means that there are old tests that may

17   still be used by some people, but they are old.

18        Q    Given his education, history, and

19   self-sufficiency, what did you mean by his history?

20        A    His history of completing an AA degree at a

21   community college, his having a high school diploma.

22        Q    Well, that would be his education.  You said

23   his score is below expectancy levels given his

24   education, history and self-sufficiency.  I understand

25   what you're saying about education.  I'm asking about
```

```
1    history.

2         A    He lives alone in the Keys.  He manages a

3    household.  He drives.

4         Q    Did you consider in the history section that

5    he suffered traumatic brain injury and was airlifted to

6    a trauma center with a Glasgow Coma Scale of three?

7         A    I took that into account, but the second

8    percentile -- and by the way the -- that correlates with

9    IQ, the TOGRA does correlate with IQ.  That would place

10   him one point above intellectually disabled.  That

11   didn't make sense to me.  Perhaps it makes sense to you.

12        Q    When you say self-sufficiency, what do you

13   mean?  How is Mr. Angulo self-sufficient?

14        A    He's able to rely on himself.  He's able to

15   get about.  He is able to shop for things.  He maintains

16   a household.

17        Q    Okay.  Let's go to the RBANS, which I believe

18   is your next test.

19        A    Yes.  I believe we already spoke about that

20   and I gave you the percentile.

21        Q    I don't think we did.

22        A    Well, I know we did.

23        Q    Okay.  Remind me.  You gave --

24             MS. CRUZ:  What's the question?

25
```

```
1    BY MR. BOUMEL:

2        Q    Yes.  So you gave me the percentile, but now

3    we need to speak a little bit more detail.  You went

4    over what the testing results were, correct?

5        A    Yes.

6        Q    Okay.  Now let's talk about what is the RBANS

7    test -- I'm sorry, what is the RBANS test measuring?

8        A    Measuring immediate memory, delayed memory,

9    visual, spacial and constructional abilities, language

10   and attention and then produces a composite score in

11   addition to those single domain scores.

12       Q    How is that test constructed?

13       A    How is it constructed?  The immediate memory

14   begins with reading a list of -- reading him a list of

15   ten words and asking him to repeat back as many as he

16   can remember, doing that four times and asking him to

17   repeat back as many as he can remember each time.

18       Q    What about the remainder of the sections?

19       A    I beg your pardon?

20       Q    What about the remainder of the sections of

21   that test?  How are they -- there are different sections

22   of --

23       A    Visual, spacial involves copying a complex

24   figure, and pattern recognition, language involves --

25   mentioning -- listing all the fruits and vegetables that
```

```
1   you can think of and also coding representing symbols,

2   numbers and symbols and correlating numbers and symbols.

3   Attention relates to recalling numbers in sequence.

4   Delayed memory is a follow-up to the list of ten words

5   about how many are remembered and then there is a series

6   of words that the person has to acknowledge whether they

7   have seen them or not, whether they have heard them or

8   not, and then also they are asked to recall a story

9   about a fire that was read to them earlier.

10        Q    Did we go through everything on the RBANS?

11        A    Yes.

12        Q    How long does that test take?

13        A    About 45 minutes.

14        Q    Okay.

15        A    Forty minutes.

16        Q    And Mr. Angulo's testing results were

17   consistent with him having neurocognitive dysfunction,

18   correct?

19        A    Yes.

20        Q    And same thing for the TOGRA; his test

21   findings were consistent with him having neurocognitive

22   dysfunction, correct?

23        A    Or some kind of problem.  Yes.

24        Q    Potentially compounded by PTSD and chronic

25   pain, correct?
```

```
1        A      Possibly.

2        Q      Okay.  The Comprehensive Trail Making Test --

3   hold on.  Let's stay on -- let's stay on the RBANS.  Say

4   the RBANS profile reflects performance that is

5   inconsistent with trauma-related neuropsychological

6   disturbance.  What did you mean by that?

7        A      I mean, it doesn't seem to represent a trauma

8   profile.  For example, if his immediate memory is a

9   13 percent but then 20 minutes later he's able to

10  remember 21 percent, that's suspect.

11       Q      Okay.

12       A      And in addition his language was at the eighth

13  percentile, but certainly he was conversant, able to use

14  language, and on another test of language he was at the

15  50th percentile and then reinforced by his better

16  performance with Dr. Hamilton and then if I compare it

17  to another test that was done after I saw him, it

18  doesn't make sense.

19       Q      Okay.  Is it possible that his scores are

20  impacted by his PTSD and chronic pain?

21       A      It's possible.  But you're also telling me

22  that somehow he got worse after he saw Dr. Hamilton and

23  then he got better after he saw me.

24       Q      Well, let's talk about that.  Did Dr. Hamilton

25  give the RBANS test?
```

```
 1        A     No.

 2        Q     So again, you're comparing completely

 3   different tests to each other?

 4        A     The brain remains the same.  I'm testing brain

 5   function behavior.  It doesn't make any difference --

 6        Q     Compare --

 7        A     -- what kind of test I use.  If someone has a

 8   Littmann stethoscope versus a DGI stethoscope, it's

 9   still a stethoscope.

10        Q     Well, the results from one test can be

11   different from the results from another test, right?

12        A     Possibly within a standard error of

13   measurement, but not dramatically.  Not between the 55th

14   percentile and the second.

15        Q     Dr. Crown, you've been doing this for 50

16   years, you're telling me that you never had a patient

17   where you gave them one test and on the same area of the

18   brain it showed a much different result than from

19   another test?

20        A     Yes --

21              MS. CRUZ:  Object to form.

22              THE WITNESS:  -- and that's why it was

23        suspect.  But I'm talking now about results

24        betweens three different people testing the same

25        person's brain function.
```

```
1    BY MR. BOUMEL:

2         Q    But all with different tests, correct?

3         A    But all with different tests.

4         Q    And in your own practice you see that

5    variability when you're using different tests, correct?

6         A    It can happen.

7         Q    Comprehensive Trail Making Testing, Second

8    Edition, talk to us about that.  What is that test

9    measuring?  How is it conducted?  How long does it take?

10        A    It's a connect-the-dot test.  It stems from

11   the inadequacies of the original Halstead-Reitan test,

12   which only has two forms.  This has five.  It's more

13   comprehensive.  It has age-based norms.  He scored a

14   high average on the first, then average, average, mild

15   to moderate impairment for a total below average.

16        Q    And the tests get consecutively harder; one is

17   the easiest, five is the hardest, correct?

18        A    Correct.

19        Q    So we would expect somebody to start doing

20   better and then get worse, correct?

21        A    Yes.

22        Q    Okay.  And his results are consistent with

23   somebody who has neurocognitive trauma, correct?

24        A    Possibly.  But going from the 79th percentile

25   to the second is unusual.
```

```
 1        Q    Okay.  Seventy-nine being -- he scored a 79

 2   percentile on the easiest test and second percentile on

 3   the hardest test, correct?

 4        A    Correct.

 5        Q    Okay.  And overall total profile, this is

 6   consistent with somebody who suffered neurocognitive

 7   dysfunction, correct?

 8        A    Possibly, yes.

 9        Q    It's also consistent with somebody who

10   suffered neurocognitive dysfunction compounded with PTSD

11   and chronic pain, correct?

12        A    Possibly.  Or it could simply be a function of

13   pain or it simply could be a function of PTSD or it

14   could be a function of not doing your best.

15        Q    Okay.  But you don't have any evidence that he

16   didn't do his best, correct?

17        A    No.

18        Q    Am I incorrect or do you have evidence -- do

19   you have evidence or do you not have evidence?

20        A    I do not.

21        Q    You do not?

22        A    No.

23        Q    So you don't intend to offer that opinion at

24   trial, correct?

25        A    I don't have evidence.
```

```
 1        Q    Okay.  So you're not going to tell the jury

 2   that he may not have been doing his best because you

 3   don't have evidence to support it, correct?

 4        A    No.  What I can --

 5             MS. CRUZ:  Objection to the form.

 6             THE WITNESS:  -- is that there is a

 7        discrepancy between 79 and two.

 8   BY MR. BOUMEL:

 9        Q    Okay.  The Test of Verbal Conceptualization

10   and Fluency.  Talk to us about that.  What's it

11   measuring?  How is it constructed?  How long does it

12   take?

13        A    Categorical fluency involves things such as

14   tell me all the things that go in a house, tell me all

15   the things that you wear, tell me all of the foods that

16   you eat, tell me all the different animals that you can

17   think of, goes along those lines.

18        Q    Okay.  And --

19        A    And letter naming is I'm going to say a letter

20   of the alphabet, I'd like you to tell me all the words

21   that you can think of that begin with that particular

22   letter of the alphabet.

23        Q    And what's that test measuring?

24        A    Verbal conceptualization and fluency,

25   languaged based, essentially frontal lobe behaviors.
```

1      Q    And how long does it take to administer?

2      A    You're allowed 60 seconds per category.

3      Q    And how many categories are there?

4      A    Ten, I believe.

5      Q    Okay.  And Mr. Angulo's results are consistent

6   with somebody with neurocognitive dysfunction, correct?

7      A    No, they are average.

8           MR. BOUMEL:  Okay.  Let's take five and then

9      hopefully we can wrap up before 5:00.

10          THE VIDEOGAPHER:  We're off the record at

11     4:26.

12          (Thereupon, a brief recess was taken.)

13          THE VIDEOGAPHER:  All right.  We're back on

14     the record at 4:34 p.m.

15   BY MR. BOUMEL:

16     Q    All right.  Doc, you have read the

17   neuropsychological examination and report of Dr. Sally

18   Russell Kolitz, [sic] correct?

19     A    Yes.

20     Q    And I know you made some comments directed

21   towards Ms. -- Dr. Kolitz throughout this deposition.  I

22   would ask you about -- do you have comments on her

23   methodology?

24     A    She uses an antique methodology, an old --

25   probably the old school.  She's a Russellian.

```
 1        Q     A Russellian?  And what is that?

 2        A     That's how we refer to people that follow

 3   Bert's methodology.

 4        Q     And Bert being?

 5        A     Bert Russell, her husband.

 6        Q     Okay.  And aside from the fact that her

 7   testing battery is old, is it -- are there any other

 8   comments that you have on the testing battery that she

 9   uses?

10        A     No.  She's very familiar with it.  She uses

11   it.  She uses old tests.  For example, she used the

12   WAIS-3, there's a WAIS-5.  There's also a WAIS for a

13   neuropsychological impairment.  She uses the old tests

14   because those were the last test that, Dr. Russell, her

15   husband used, so they go back to the early '90s.

16        Q     Okay.  Give me a second.  You said something

17   that I need to track down.

18        A     But she's certainly entitled to use whatever

19   tests she wants to use.

20        Q     Are the tests that she gave in any way invalid

21   or inferior?

22        A     Well, when you're using a WAIS-3 and there's a

23   WAIS-5 that actually has neuropsychological components

24   to it, you know, maybe that would have been a better

25   choice.  Dr. Russell doesn't use something called the
```

1   Flynn effect in his calculations.  The Flynn effect adds

2   3.3 points to an IQ score for every decade.

3       Q   Okay.  Anything else that -- other than the

4   fact that there were more -- here we go.  So you would

5   agree with me that you administered the MCMI-3, correct?

6       A   Correct.

7       Q   There is an MCMI-4, correct?

8       A   Yes.  However, there's a difference.  The

9   MCMI-3 is based on the DSM.  Whereas the DSM4 is based

10  on Dr. Millon's own theory of the personality.  As a

11  result, it's not accepted by some of the major

12  organizations that require testing.  For example, the

13  Federal Aviation Administration finds it unacceptable.

14      Q   Okay.  Do you disagree with Dr. Russell's

15  ultimate findings and opinions?

16      A   I agree with her findings.  I don't agree with

17  her opinions.  She doesn't consider the multi-factorial

18  apportionment issues between all of his -- Mr. Angulo's

19  problems so she focuses everything on neurocognitive

20  issues and doesn't seem to consider pain and PTSD as

21  contributors.

22      Q   Okay.  So basically you -- what about -- okay.

23  Well, on her summary and I'm looking specifically, not

24  in her rebuttal report, but at her neuropsychological

25  evaluation dated 11/8/24.  On the summary page she says:

1    Evaluation of Mr. Angulo is consistent with mild to

2    moderate cognitive impairment as well as significant

3    emotional distress consistent with posttraumatic stress

4    disorder.  You agree with that, right?

5              MS. CRUZ:  Adam, where are you reading from?

6         You were going so fast.  I'm trying to follow.

7              MR. BOUMEL:  Yeah.  Page 15 of Dr. Russell's

8         second report.

9              MS. CRUZ:  Fifteen of the second.  So that's

10        the November report?

11             MR. BOUMEL:  Yes.

12             MS. CRUZ:  Okay.  If you can just give

13        Dr. Crown a chance to get to it.

14   BY MR. BOUMEL:

15        Q    Sure.  I think he was there, but --

16        A    I am there.

17        Q    Okay.  Dr. Crown, did you see where I read

18   that and you agree with that, right?

19        A    Yes.

20        Q    Okay.  Last paragraph on the same page, page

21   15.  Multiple tests throughout the course of examination

22   demonstrate consistent evidence of mild to moderate

23   impairment, particularly in the areas of frontal lobe,

24   processing speed and executive function.  First of all,

25   do you see where I'm reading from?

1      A    Yes.

2      Q    You agree with that, correct?

3      A    I think that our modern understanding of the

4   brain doesn't talk about the frontal lobe.  It talks

5   about the multiple demand network which is much more

6   inclusive since we now their frontal lobe behavior maybe

7   moderated by fibers and tracts in the parietal lobe, so

8   I'm not sure about that.  Processing speed, yes.  But

9   processing speed is also something that's found in ADHD,

10  and executive functions, I'm not sure.  And I'm also not

11  sure that he ever was identified as having frontal lobe

12  organic brain damage.  The IP bleed was in the back of

13  the brain.

14     Q    Okay.  In general though, take the frontal

15  lobe out of it.  We understand your opinions with the

16  frontal lobe and take processing speed out of it because

17  I understand the ADHD comment.  You would agree that the

18  test results are consistent with mild to moderate

19  impairment of executive functioning, correct?

20     A    Again, that's now known and moderated through

21  the central executive network which includes some areas

22  beyond the -- what we used to call the executive

23  function area, so we're talking about old school

24  language here.

25     Q    And how would you phrase it?

```
1        A     How would I phrase it?

2        Q     Yep.

3        A     I don't know that --

4              MS. CRUZ:  Object to form.

5              THE WITNESS:  -- that his executive function

6        problems come from neurocognitive issues or whether

7        they come from personality issues.  I can't

8        apportion it.

9    BY MR. BOUMEL:

10       Q     Well, you know that they come partially from

11   neurocognitive issues, correct?

12       A     Likely or possibly.

13       Q     Likely or possibly.  So if I understand your

14   ultimate opinions, we can imagine that there are four

15   different buckets going on that are contributing to

16   Mr. Angulo's issues.  Number one, he's got a traumatic

17   brain injury with an IP hemorrhage resulting in a

18   Glasgow Coma Scale of three as he's being airlifted to

19   the trauma center.  Number two, he's got PTSD as a

20   result of both going through that experience himself as

21   well as seeing his girlfriend killed before his eyes.

22   Number -- I think that was -- I said number three, I

23   meant number two.  Number three, he's got chronic pain

24   as a result of his injuries.  And then number four, he

25   had some premorbid issues with substance abuse which he
```

```
1    recovered from before this incident.  Do I have that

2    pretty much accurate as far as all the contributing

3    factors?

4         A    He had preexisting --

5              MS. CRUZ:  Objection to form.  Hold on,

6         Dr. Crown.  Objection to form.  Mischaracterizes

7         the testimony and the facts.

8    BY MR. BOUMEL:

9         Q    Is that an accurate summarization of the

10   different contributing that may be at play in terms of

11   the neurocognitive deficits that Mr. Angulo is suffering

12   from?

13        A    No.  You would have to add his ADHD,

14   depression, and his history of substance abuse which

15   also included the seizure.

16        Q    Okay.  So for completeness, let's do it again.

17   Maybe I'll even bust out a Word doc.

18             MS. CRUZ:  Adam, this is improper.  I don't

19        know what you're doing here.  We're not going to

20        start writing down things and ask him to agree.

21        This is a question and answer.  Verbal question and

22        an answer.

23             MR. BOUMEL:  I appreciate --

24             MS. CRUZ:  So if you have a verbal question,

25        ask him a verbal question.
```

```
1              MR. BOUMEL:  I appreciate you telling me how

2         to ask my questions and how to be a lawyer.  I will

3         definitely take that under consideration.

4              MS. CRUZ:  I just won't let him answer if

5         you're going to do it improperly.  It's real

6         simple.  So I'm letting you know what my objection

7         is so when I tell him not to answer you'll know.

8         I'm just trying to do you a favor and speed this up

9         here.  In fact, let's go on a break before you

10        start this whole writing down of the Word document.

11        Let's take a five-minute break.

12             THE VIDEOGAPHER:  Okay.  We are off the record

13        at 4:45 p.m.

14             (Thereupon, a brief recess was taken.)s

15             THE VIDEOGAPHER:  We are back on the record at

16        4:54 p.m.

17   BY MR. BOUMEL:

18        Q    Dr. Crown, over the break you had a chance to

19   speak with Tesla's counsel, correct?

20        A    Yes.

21             MS. CRUZ:  Objection to form.  That's not --

22        you're not entitled to know that, but if you want

23        to know, yes, we talked on the break and I

24        explained to him and we discussed the same things

25        that I objected -- that I just objected to which is
```

```
 1        this line of questioning.  How you're going about

 2        it is improper.

 3   BY MR. BOUMEL:

 4        Q    Did she give you any instructions on how to

 5   testify?

 6        A    No.

 7        Q    What did you guys talk about?

 8        A    What?

 9        Q    What did you guys talk about?

10        MS. CRUZ:  I'm objecting to this whole line of

11        questioning.

12   BY MR. BOUMEL:

13        Q    Dr. Crown, you can answer.

14        A    We talked about how we were coming to a

15   conclusion, that I should be careful in what my

16   responses are, and did I have any time to go beyond 5:00

17   eastern because she may have a lot of things to discuss

18   or question me about.

19        Q    Okay.  I'm going to show you what I'm going to

20   pull up my screen.  We may mark it as an exhibit, we may

21   not.  I need ask you some questions about it.  All

22   right.  Little homemade chart.  We're going to go word

23   by word and discuss it.  First of all, contributing

24   factors for Dillon Angulo's neurocognitive dysfunction.

25   You agree that he has neurocognitive dysfunction and the
```

```
 1    dispute as to what is contributing to it, correct?

 2          MS. CRUZ:  I'm objecting to all of the

 3          questions as I said before in this document that

 4          you created, Adam, in which you've tried to form

 5          his opinions into using the words that you want to

 6          use and crafting the words that you want to use.

 7          You've been talking to him for over four hours,

 8          over four hours about his opinions.  There is not

 9          one word on this piece of paper that he has not

10          already given his opinion about.

11          MR. BOUMEL:  Okay.

12          MS. CRUZ:  His opinions are his opinions.

13          MR. BOUMEL:  Thanks, Whitney.

14          MS. CRUZ:  They are his opinions.  So take his

15          opinions and compare them to this document that you

16          you've created.

17          MR. BOUMEL:  Thanks, Whitney.

18    BY MR. BOUMEL:

19       Q    Dr. Crown, do you remember the question or do

20    you need me to read it back?

21       A    No.  Give me the question.

22       Q    The question is at the end of this day you

23    agree that Mr. Angulo suffers from neurocognitive

24    dysfunction, you just question what the contributing

25    factors for that are, correct?
```

```
 1              MS. CRUZ:  Objection to form.

 2        Mischaracterizes the testimony and same objection

 3        as to the last question.

 4              THE WITNESS:  I have testified for almost four

 5        hours.  I don't think you can reduce it to this

 6        document nor can you ask me now what I said three

 7        and a half hours ago.

 8   BY MR. BOUMEL:

 9        Q    Okay.  You agree that Mr. Angulo has

10   neurocognitive dysfunction, correct?

11        A    He has neuropsychological impairments.  Yes.

12        Q    And your testimony is that you just can't be

13   sure where it's coming from, whether it's the brain

14   injury he suffered, the PTSD, the chronic pain or his

15   premorbid conditions, correct?

16        A    And in addition --

17              MS. CRUZ:  Objection to form.

18        Mischaracterizes the testimony.

19              THE WITNESS:  And in addition, I can't

20        apportion it and I must take into account his

21        history of ADHD, depression, and substance use

22        which included a seizure.

23   BY MR. BOUMEL:

24        Q    So as you will note, I have all those

25   premorbid conditions down in this bucket number four
```

```
 1   here.  Is there anything else, other premorbid

 2   conditions which you believe may have contributed to his

 3   neurocognitive dysfunction other than his former drug

 4   use, which included a seizure, his ADHD, and his

 5   depression?

 6        A    Those items including the ADHD and depression,

 7   and substance abuse, including a seizure disorder.

 8        Q    That's right here.

 9        A    Yes.

10        Q    Got it.

11        A    I disagree with number one.

12        Q    Okay.

13        A    The initial Glasgow Coma Scale was three to

14   eight, but in assessing a Glasgow Coma Scale, you have

15   to take into account whether that Glasgow Coma Scale

16   number is sustained or whether it changes and in

17   Mr. Angulo's case it changed and rose up to a 13.

18        Q    Well --

19        A    And you're being imprecise in making the

20   suggestion that that was a static number when in fact it

21   wasn't.

22        Q    Okay.  And if the record showed that he had a

23   sustained Glasgow Coma Scale of nine for over a day,

24   would you disagree with that?

25        A    The most important element is that he rose to
```

```
1    13.

2         Q    Okay.  Well, so the fact that he had an

3    initial Glasgow Coma Scale of three, then it rose to

4    nine, you're going to -- that's irrelevant?  We're not

5    going to --

6         A    And then it rose to 13.  I need to know the

7    progression and I need to advocate for the progression.

8    The progression is very important.  In recovery and

9    rehabilitation and treatment, what we're looking for is

10   a static number versus a changing number.

11        Q    Okay.  Would this be more accurate that it

12   started as a three, then it went to an eight and then it

13   was at a nine and then a 13?

14        A    That would be more accurate.

15             MS. CRUZ:  Objection to form.

16   BY MR. BOUMEL:

17        Q    Okay.  And he had a brain bleed in the

18   hospital, correct?

19        A    That did not require neurosurgical

20   intervention.

21        Q    Okay.

22        A    In which case I would characterize that as

23   mild.

24        Q    Okay.  So even with a sustained Glasgow Coma

25   Scale of nine, you're going to say it's a mild traumatic
```

```
 1   brain injury?

 2       A    It's a mild --

 3            MS. CRUZ:  Objection.  Adam, at some point we

 4       have to stop.  You have asked this same question

 5       honestly at least ten times.  You've asked the same

 6       question ten times.  He said the word mild, let's

 7       have the court reporter go look and see how many

 8       times he said the word mild to describe the

 9       traumatic brain injury.  We're going back to hour

10       one.  Like, what are we doing?

11   BY MR. BOUMEL:

12       Q    Go ahead, Doc.

13            MS. CRUZ:  What was the question?

14            MR. BOUMEL:  I don't know because you're --

15            THE WITNESS:  My answer was that it's a mild

16       bleed that did not require neurosurgical

17       intervention.

18   BY MR. BOUMEL:

19       Q    Okay.  And you would agree that the

20   classification of the initial traumatic brain injury was

21   moderate to severe, correct?

22       A    Based on the initial Glasgow Coma Scale.

23       Q    Okay.  So now --

24       A    But that can occur at any situation where a

25   person is unconscious and being unconscious is not being
```

```
 1    in a coma.

 2         Q    So I have your -- I corrected your Glasgow

 3    Coma Scale notation here.  I corrected the fact that

 4    there's no surgery here.  Any other corrections to make

 5    point number one accurate?

 6              MS. CRUZ:  Objection.  These are Adam Boumel's

 7              opinions.  These are not Dr. Crown's opinions.  He

 8              has given opinions regarding neurocognitive

 9              dysfunction, traumatic brain injury, Glasgow Coma,

10              brain bleed, chronic pain, the ortho injuries,

11              PTSD, premorbid conditions, drug use, ADHD,

12              depression for the past over four hours.

13    BY MR. BOUMEL:

14         Q    Doc?

15         A    You can defer to a neurologist or

16    neurosurgeon.

17         Q    Okay.

18         A    You're asking me essentially to offer a

19    medical opinion about the medical records.

20         Q    No.  What we're trying to do here is we're

21    trying to understand the different contributing factors

22    that have all played a role potentially in Mr. Angulo's

23    neurocognitive dysfunction and we need to look at them

24    all together because you're saying you can't apportion

25    them, so what I'm trying to do is put them all on the
```

```
1    table so we can look at everything at the same time and

2    figure out if there is any way for you to apportion

3    them.  So trying to put the buckets in front of you,

4    bucket number one is his brain injury.  You've already

5    given me several corrections.  Do you have any other

6    corrections that you need to make on this?

7              MS. CRUZ:  Objection to form to the way that

8         you're doing this questioning.  The fact that these

9         are your opinions and this has been asked and

10        answered ad nauseam and it's getting abusive and

11        you're mischaracterizing the testimony.  He

12        literally just told you, for example, that it's

13        mild.  He's been telling you that for four hours

14        yet you leave moderate to severe in this document.

15             MR. BOUMEL:  That's not true.  You're

16        mischaracterizing the evidence or the testimony,

17        but that's okay.

18   BY MR. BOUMEL:

19        Q    Doc, any other corrections that you need for

20   this?  And, Whitney, I understand that you don't want me

21   to do this.  I get it.

22             MS. CRUZ:  It's not that I don't want you

23        to --

24             MR. BOUMEL:  I wouldn't me to do it if I were

25        you --
```

```
 1                  (Indiscernible crosstalk.)

 2             THE COURT REPORTER:  Okay.  I cannot.

 3             MR. BOUMEL:  I wouldn't want you to do it --

 4        me to do it if I were you either, but here's the

 5        deal, it's going to take five minutes.  Either it

 6        comes in or it doesn't.  That will be a ruling for

 7        the court.  I'm going to do it.  So please stop

 8        giving speaking objections which you know are

 9        improper, otherwise just terminate the deposition

10        if you feel like the need to.  It's your choice.

11   BY MR. BOUMEL:

12        Q    So, Doctor, I'm asking you, any other

13   corrections that you need to make to point number one

14   here?

15        A    Yes.  It's moderate to severe --

16             MS. CRUZ:  Objection to form --

17             THE WITNESS:  -- traumatic --

18             MS. CRUZ:  -- mischaracterizes.  Let me --

19        Dr. Crown, please.  I'm sorry.  I know this is

20        frustrating, trust me.  I know.  But you got to let

21        me object here so that the record is clear.  Again

22        I will refer -- Adam, do you want to give me a

23        standing objection to every single question that

24        relates to this?

25             MR. BOUMEL:  Yes.  Absolutely.  You want a
```

```
 1        standing objection to this, absolutely.  Happy to

 2        give it.  Maybe you're right, Whitney, maybe this

 3        doesn't come in.  We'll see.

 4            THE WITNESS:  Do you have a question?

 5   BY MR. BOUMEL:

 6        Q    Any other corrections?  I corrected --

 7        A    Oh, yes.  It should be moderate to severe

 8   traumatic brain injury leading to a mild brain injury.

 9        Q    Okay.  Anything else for point number one?

10        A    Yes.  You have no surgery, no neurosurgical

11   intervention.

12        Q    No --

13        A    And it must be that language.

14        Q    Okay.  And then -- all right.  Bucket number

15   one is done, correct?

16        A    Yes.  Although it relies and requires a

17   medical opinion which I'm not qualified to render.

18        Q    Bucket number two is chronic pain subsequent

19   to, you know, I listed several of his injuries.  If

20   there's anything you would like me to change on this,

21   I'm happy to.

22        A    Those are medical opinions based on his

23   treatment.  I'm not qualified to respond to any of that.

24        Q    Well, we're not talking -- okay.  But you

25   agree that he is dealing with chronic pain subsequent to
```

```
 1   his polytrauma, correct?

 2        A    He has chronic pain now managed by, I last

 3   read, one or two Advil.

 4        Q    Okay.  And it's your understanding as a

 5   diplomat of the American Board of Pain -- what's that?

 6   I got to go back.  You are a diplomat of the American

 7   Academy of Pain Management, correct?

 8        A    Correct.

 9        Q    And it's your understanding that this

10   gentleman does suffer from chronic pain subsequent to

11   his polytrauma, correct?

12        A    Chronic pain now managed with over-the-counter

13   Advil.

14        Q    And did he tell you why he only takes Advil?

15        A    He's afraid of becoming addicted.

16        Q    Okay.  Let's just -- let's take all that --

17   the other words out there.  Let's leave chronic pain.

18   And then he has PTSD as a result of both his own

19   injuries and the death of Naibel, correct?

20        A    Correct.  Although there were other factors

21   involved.  For example, abuse as a child and

22   adolescence.

23        Q    What type of abuse did he suffer?

24        A    Both physical and emotional.

25        Q    What type of physical abuse did he suffer?
```

```
 1        A     He was beaten with a spoon and other household

 2   objects.

 3        Q     How often and how severe?

 4        A     Daily.

 5        Q     How severe?

 6        A     Sufficient enough that he finally had the

 7   strength and was big enough to grab his mother's hand in

 8   order to prevent him from being beaten.

 9        Q     Okay.  And you think his PTSD is from that?

10        A     It's contributory.

11        Q     Okay.  What's causing his PTSD?

12        A     The death of his girlfriend of two weeks.

13   It's unclear whether he witnessed it, however, but you

14   don't have to witness it to have PTSD.  In addition, his

15   own injuries and recovery and his earlier history of

16   physical and emotional abuse.

17        Q     Okay.  Was he -- there's a DSM diagnostic

18   criteria for PTSD, correct?

19        A     Yes.

20        Q     And you never went through that criteria with

21   him, correct?

22        A     No, but he would need it.  Under the new

23   criteria, particularly for complex PTSD, someone could

24   just tell you what happened and you could have PTSD.

25   You no longer have to directly witness it.
```

1        Q     Okay.

2        A     So I don't see that you've added that, so that

3   category is incomplete and I can't endorse it.  So

4   number three I can't endorse.

5        Q     Yeah.  You know what, I'm going to abandon it.

6   We're not marking it.  It was a fun idea.

7        A     By the way, we're over the 5:00 limit.

8        Q     Yeah.  Just one last -- one last question.

9        A     The meter is running and you'll be getting

10  another bill.

11       Q     One last question.  Did you even ask

12  Mr. Angulo what his complaints were?

13       A     As I recall, I did.  Yes.

14       Q     Where is that in your report?

15       A     He shied away from it.

16       Q     He shied away from it?

17       A     Well, he didn't respond and I didn't press it

18  because, again, my job was not to do a psychological

19  historical evaluation.  It was to do a status

20  evaluation.

21       Q     Okay.  But at the beginning of this deposition

22  some four hours ago now, we stated that getting the

23  person's complaints is an integral part of your

24  examination because you need to understand what you're

25  measuring and what everything is about, right?  Do you

1    remember that testimony?

2        A    Yes.  And I also said that he wasn't

3    sophisticated enough to diagnose himself.  He's not

4    sophisticated enough to know what components of history

5    he needs to recite unless he has been coached by

6    someone.

7        Q    Are you suggesting that he was coached by

8    someone?

9        A    I don't know.

10       Q    Do you have any evidence or any evidence to

11   suggest that he was coached by someone?

12       A    No.

13       Q    Okay.  You keep throwing things out there

14   without having evidence, Doc.

15       A    It's a matter what evidence --

16            (Indiscernible crosstalk.)

17            MS. CRUZ:  Wait, wait, wait.  Dr. Crown,

18       there's no -- Dr. Crown.

19            THE WITNESS:  So if you want to look at a bit

20       more on evidence or the federal rules of

21       evidence --

22            MS. CRUZ:  There's no question pending.  So,

23       Adam, I don't know, these gratuitous statements are

24       like -- I'm not sure where we're going with this.

25

```
 1   BY MR. BOUMEL:

 2        Q    So again one last question.  Did you ever ask

 3   him what his complaints were, what he's suffering from

 4   as a result of everything that he's gone through?

 5        A    Yes.

 6        Q    What he's complaining of?

 7        A    Yes.

 8        Q    You did.  What did he say?

 9        A    That he has pain, that he has emotional

10   responses, that he doesn't think he's getting enough

11   treatment.

12        Q    Where in your interview do you have any of

13   that -- take away pain because you did ask him about

14   pain.  Where did you ask him about any neurocognitive

15   dysfunction, any of it?

16        A    I didn't.  I didn't want to prime him.

17        Q    So in a neuropsychological evaluation you did

18   not ask him about any neuropsychological dysfunction?

19        A    No.  I tested him and found it.

20             MR. BOUMEL:  Okay.  Thanks, Doc.  No more

21        questions.

22             MS. CRUZ:  Nothing from me.  We'll read.

23             MR. BOUMEL:  We'll order.

24             THE WITNESS:  Read.

25             THE VIDEOGAPHER:  Is it possible that before
```

```
1          we go off the record I can get e-mail addresses in

2          the chat?

3               MR. BOUMEL:  Of course.

4               MS. CRUZ:  Yes.  I can put mine now.

5               THE WITNESS:  Let me just give you mine now.

6          I'm in a hurry.  Bmcrown, B as in boy, M as in

7          Michael, bmcrown@yahoo.com.

8               THE VIDEOGAPHER:  Thank you.  So everybody

9          wants a copy of the video?

10              MR. BOUMEL:  Yes.  Oh, no.  I'm fine on the

11         video for how.  I'm just going to take the

12         transcript for now.

13              THE VIDEOGAPHER:  Okay.

14              MS. CRUZ:  Also, Madam Court Reporter, I gave

15         you two e-mail addresses.  I'm going to give you a

16         third one too just to make sure -- because these

17         people can better help with you with the transcript

18         than I can.

19              MR. BOUMEL:  Whitney, I'm going to retain the

20         exhibits just because, you know, I don't know how,

21         frankly, to get an entire file over to the court

22         reporter, so I will just send you a Dropbox of the

23         exhibits if that's okay with you.

24              MS. CRUZ:  Yes, that's fine.

25              MR. BOUMEL:  I will do that tomorrow.  Madam
```

```
 1          Court Reporter, do you need spellings?  I know

 2          there's some difficult ones.

 3                THE COURT REPORTER:  I'll e-mail you if I run

 4          into it.  Ms. Cruz, do you want a copy of the

 5          transcript?

 6                MS. CRUZ:  Yes, please.

 7                THE VIDEOGAPHER:  I'm sorry.  Ms. Cruz, did

 8          you want a copy of the video also?

 9                MS. CRUZ:  Yes, please.

10                THE VIDEOGAPHER:  Okay.

11                MR. BOUMEL:  I'm not ordering the video right

12          now.

13                THE VIDEOGAPHER:  Okay.

14                MR. BOUMEL:  Just to be clear.  All right.

15          Thanks, everybody.

16                THE VIDEOGAPHER:  Okay.

17                MS. CRUZ:  Thank you.  Bye-bye.  Have a good

18          day.

19                              -  -  -

20                (Thereupon, the deposition was concluded and

21          reading and signing was not waived.)

22

23

24

25
```

```
 1                    CERTIFICATE OF REPORTER

 2   THE STATE OF FLORIDA)
     COUNTY OF ST. LUCIE)
 3

 4

 5        I, Sharon Ambersley, FPR, do hereby certify that I

 6   was authorized to and did stenographically report the

 7   foregoing video-recorded deposition of Dr. Barry Crown;

 8   that a review of the transcript, was requested; and that

 9   the foregoing transcript, pages 1 through 156, is a true

10   record of my stenographic notes.

11        I FURTHER CERTIFY that I am not a relative,

12   employee, attorney or counsel of any of the parties'

13   attorneys or counsel connected with the action, nor am I

14   financially interested in the action.

15

16             Dated this 13th day of February 2025, at St.

17   Lucie County, Florida.

18

19

20   _____
     Sharon Ambersley, FPR
21   Notary Public - State of Florida
     My Commission:  HH511304
22   My Commission Expires:  07/06/28

23

24

25
```

```
1                    CERTIFICATE OF OATH

2     STATE OF FLORIDA)

3     COUNTY OF ST. LUCIE )

4

5     I, Sharon Ambersley, Florida Professional Reporter,

6     Notary Public, State of Florida, certify that the

7     witness, DR. BARRY CROWN, personally appeared before me

8     on the 4th day of February 2025 and was duly sworn.

9

10

11

12            WITNESS my hand and official seal this 13th

13         day of February 2025.

14

15

16

17

18     _____
19     Sharon Ambersley, FPR
       Notary Public - State of Florida
20     My Commission:  HH511304
       My Commission Expires:  07/06/28
21

22

23

24

25
```

```
 1              E R R A T A   S H E E T

 2   IN RE:  NEIMA BENA VIDES, AS PERSONAL REPRESENTATIVE OF

 3   THE ESTATE OF NAIBEL BENAVIDES LEON, DECEASED, VS.

 4   TESLA, INC.,

 5   DEPOSITION OF: DR. BARRY CROWN

 6   TAKEN: February 4, 2025

 7       DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

 8   PAGE #  LINE #   CHANGE              REASON

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   Please forward the original signed errata sheet to this
     office so that copies may be distributed to all parties.
20
     Under penalty of perjury, I declare that I have read my
21   deposition and that it is true and correct subject to
     any changes in form or substance entered here.
22

23   DATE: _____

24

25   SIGNATURE OF DEPONENT:_____
```

```
 1    DATE: February 13, 2025

 2
      TO:   WHITNEY CRUZ, ESQUIRE
 3          c/o Dr. Barry Crown
            41000 Woodward Avenue
 4          Suite 200 E
            Bloomfield Hills, MI 48304
 5          U.S.  Legal Job#: 6790496-001

 6    IN RE: NEIMA BENA VIDES, AS PERSONAL REPRESENTATIVE OF
      THE ESTATE OF NAIBEL BENAVIDES LEON, DECEASED, VS.
 7    TESLA, INC.,

 8    IN RE: Dear : Ms. Cruz

 9    This letter is to advise you that the transcript of your
      client, DR. BARRY CROWN, taken in the above-styled case
10    on February 4, 2025, has been completed and is awaiting
      his/her reading and signing.
11
      Please have him/her contact our office at (754) 201-2346
12    to make arrangements to read and sign the deposition
      transcript. Our office hours are 9:00 a.m. to 5:00 p.m.,
13    Monday through Friday.

14    If the transcript is not signed by the witness within 30
      days after this letter has been furnished, we will then
15    process the transcript without a signed errata page. If
      your client wishes to waive their signature, please have
16    him/her sign his name at the bottom of this letter and
      return it to our office @ U.S. Legal Support, 16825
17    Northchase Drive, Suite 900, Houston, TX 77060-6004.

18    Your prompt attention to this matter is appreciated.
      Sincerely,
19

20    _____
      Sharon Ambersley
21
      I do hereby waive my signature:
22

23    _____
      DR. BARRY CROWN
24    cc via transcript:            Adam Boumel, Esq.
                                    Whitney Cruz, Esq.
25                                  Todd Poses, Esq.
```