UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 21-cv-21940-BLOOM/TORRES

NEIMA BENAVIDES, as Personal
Representative of the Estate of
NAIBEL BENAVIDES LEON, deceased,

    Plaintiff,

v.

TESLA, INC. a/k/a TESLA FLORIDA,
INC.,

    Defendant.
_____/

**PLAINTIFFS' RESPONSE TO TESLA'S
MOTION IN LIMINE AND MEMORANDUM OF LAW**

Plaintiffs Neima Benavides and Dillon Angulo, by and through undersigned attorneys, respectfully file their response to Defendant's Omnibus Motion in Limine and state as follows:

### I.    FACTUAL OVERVIEW

Needless to say, Plaintiffs disagree with Defendant's summary of facts. Rather than reprint Plaintiff's summary of the evidence here, we will rely on the summaries included in our responses to Tesla's *Daubert* motion and Summary Judgment motion.

### II.    REFERENCES TO OTHER INCIDENTS

Plaintiffs claim that Tesla's Autopilot system was defective, in part, because it contained an inadequate driver monitoring system that allowed drivers to completely disengage from the act of driving, without consequence, sometimes to disastrous effects. One of the ways that Plaintiff can prove that drivers' misuse of the system was foreseeable is by proving that Tesla had actual notice that drivers were misusing the Autopilot, yet failed to take any action to address this foreseeable misuse. We intend to do this by demonstrating that, prior to the accident in this case,

Tesla was aware of numerous accidents in which an inattentive driver was driving with Autopilot engaged

As Tesla correctly notes, in order to submit evidence of similar accidents to the jury, Plaintiff must prove that the incidents were substantially similar. However, as explained in in a case that Tesla cited, *Davis v. Little Giant Ladder Sys., LLC*, No. 2:19-CV-780-SPC-NPM, 2022 WL 3924144, (M.D. Fla. Aug. 31, 2022):

> The 'substantial similarity' doctrine does not require identical circumstances, and allows for some play in the joints depending on the scenario presented and the desired use of the evidence." *Sorrels v. NCL (Bah.) Ltd.*, 796 F.3d 1275, 1287 (11th Cir. 2015). Instead, the central question is if "the two incidents were similar enough to allow the jury to draw a reasonable inference" defendant has the "ability to foresee this type of" incident. *Borden, Inc. v. Fla. E. Coast Ry.*, 772 F.2d 750, 755 (11th Cir. 1985).

*Davis* at *2.

### A. THE ACCIDENTS ARE SUBSTANTIALLY SIMILAR.

In its motion, Tesla attempts to narrowly define what could be considered substantially similar by suggesting that the accidents must have occurred in a "Tesla Model S with [the same] hardware and software versions of Autopilot." (Mot. at 3-4) This is incorrect. The defect in this case is not limited to Tesla Model S's built in 2019 with the same hardware and software versions of Autopilot. We know this from Tesla's own recall letter sent to its drivers, in which Tesla stated, "Tesla has determined that a defect, which relates to motor vehicle safety exists in certain Model Year 2012-2023 Model S, 2016-2023 Model X, 2017-2023 Model 3, and 2020-2023 Model Y vehicles." (Ex. 1) This is consistent with NHTSA's finding that a defect existed in 100% of Tesla's cars that were equipped with Autopilot. The defect existed regardless of model, year, hardware or software version. Tesla acknowledged the existence of the defect and vowed to fix it in *all* of its cars.

For the removal of any doubt, Plaintiffs rely on NHTSA's findings from its DA22002 investigation, which involved 211 "collisions in which the frontal plane of the Tesla struck another vehicle or obstacle in adequate time from an attentive to driver to respond to avoid or mitigate the crash." (ECF 252-3) NHTSA's conclusions were applicable to all of Tesla's models:

- "ODI's analysis of crash data indicates that, prior to Recall 23V838, Autopilot's design was not sufficient to maintain drivers' engagement."

- In its review of 956 Autopilot crashes "ODI observed a trend of avoidable crashed involving hazards that would have been visible to an attentive driver".

- "When a driver is disengaged with the Tesla vehicle operating in Autopilot and the vehicle encounters a circumstance outside of Autopilot's object or event detection response capabilities (e.g., obstacle detection and/or forward path planning), crash outcomes are often severe because neither the system nor the driver reacts appropriately, resulting in high-speed differential and high energy crash outcomes."

- "Drivers either did not brake or braked less than one second prior to the crash in 82 percent of the incidents, and either did not steer or steered less than one second prior to impact in 78 percent of the incidents."

- "This analysis, conducted before Recall 23V838, indicated that drivers involved in the crashes were not sufficiently engaged in the driving task and that the warnings provided by Autopilot when Autosteer was engaged did not adequately ensure that drivers maintained their attention on the driving task. The drivers were involved in crashes while using Autopilot despite fulfilling Tesla's pre-recall driver engagement monitoring criteria. Crashes with no or late evasive action attempted by the driver were found across all Tesla hardware versions and crash circumstances."

- "Gaps in Tesla's telematic data create uncertainty regarding the actual rate at which vehicles operating with Autopilot engaged are involved in crashes. Tesla is not aware of every crash involving Autopilot even for severe crashes because of gaps in telematic reporting. Tesla receives telematic data from its vehicles, when appropriate cellular connectivity exists and the antenna is not damaged during a crash, that support both crash notification and aggregation of fleet vehicle mileage. Tesla largely receives data for crashes only with pyrotechnic deployment (e.g. deployment of airbags, seat belt pretensioners or pedestrian impact mitigation features in the hood) which are a minority of police reported crashes. A review of NHTSA's 2021 FARS and Crash Report Sampling System (CRSS) finds that only 18 percent of police-reported crashes include airbag deployments."

- "A comparison of Tesla's design choices to those of L2 peers (other Level 2 autonomous system auto manufacturers) identified Tesla as an industry outlier in its approach to L2 technology by mismatching a weak driver engagement system with Autopilot's permissive operating capabilities."

- "Notably, the term "Autopilot" does not imply an L2 assistance feature, but rather elicits the idea of drivers not being in control. This terminology may lead drivers to believe that the automation has greater capabilities than it does and invite drivers to overly trust the automation. Peer vehicles generally use more conservative terminology like "assist," "sense," or "team" to imply that the driver and automation are intended to work together, with the driver supervising the automation."

(ECF 252-3)

NHTSA elaborated that "[d]rivers involved in the crashes were not sufficiently engaged in the driving task and [ ] the warnings provided by Autopilot when Autosteer was engaged did not adequately ensure that drivers maintained their attention on the driving task." (ECF 252-3 at 6)  As a result, "[c]rashes with no or late evasive action attempted by the driver were found across all Tesla hardware versions and crash circumstances." *Id*.

Finally, of the 55 other Autopilot collisions identified by Plaintiffs in their Consolidated Complaint and in their Request for Admissions to Tesla, Tesla has admitted that at least 18 of those other collisions occurred when an "inattentive driver was driving with Autosteer engaged". (Tesla's Supplemental Response to Plaintiffs' Request for Admissions at ¶¶ 88, 89, 91, 95, 96, 97, 98, 99, 101, 105, 109, 111, 113, 114, 119, 123, 129, 134).

The substantial similarity between each of these accidents is that in each one, Autopilot was engaged, Autopilot failed to avoid the accident, and the driver was inattentive and thus unable to react to the Autopilot's failure.  Each of these accidents place Tesla on notice that its driver monitoring system was inadequate to prevent its drivers from becoming disengaged and too reliant on the Autopilot system.  They are thus substantially similar for the purposes of which Plaintiffs intend to utilize the evidence.

## B. THIS EVIDENCE IS NOT HEARSAY.

First, as noted above, Tesla has admitted that of the 55 accidents identified in Plaintiffs' Complaint, at least 18 were as a result of an inattentive driver operating with Autopilot engaged. That is sufficient to establish the necessary similarity to act as notice to Tesla of the defect at issue in this case.

Next the NHTSA reports, while hearsay, are admissible subject to the public records exception.

> FRE 803(8) allows for the admissibility of government reports under the public records exception:
> (8) Public Records. A record or statement of a public office if:
>   (A) it sets out:
>     (i) the office's activities;
>     (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>     (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
>   (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8)

There is ample federal case law which supports the admission of NHTSA reports and documents, both for Plaintiffs and Defendants. See, e.g., *Jones v. Ford Motor Co.*, 204 Fed. Appx. 280, 283-85 (4th Cir. 2006) (affirming admission of NHTSA report under Rule 803(8) in support of Ford's defense); *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 49, 53 (2nd Cir. 2002) (Sotomayor, J.) (same and stating: "[t]he weight given to conclusions in the NHTSA report ... was a matter for the jury to decide"); *Seese v. Volkswagenwerk A.G.*, 648 F.2d 833, 846 (3rd Cir. 1981) (admitting NHTSA's Fatal Accident Reporting System data in support of Plaintiff's claims); *Estate of Edward W. Knoster v. Ford Motor Co.*, 200 Fed. Appx. 106, 111 (3d Cir. 2006), (Approving admission of NHTSA report in support of Ford's defense); *Guild v. Gen. Motors Corp.*, 53 F. Supp. 2d 363, 365 (W.D.N.Y. 1999); (Allowing GM "to introduce a certified copy of the NHTSA as evidence of non-

defect."); *Castaldi v. Land Rover N Am.*, No. 06-CV-1008 (JG), 2007 WL 4165283, *2, 11 (E.D.N.Y. Nov. 21, 2007) (admitting NHTSA report under Rule 803(8) in support of Plaintiff's claim); *Miller v. Ford Motor Co.*, No. 2:0l-CV-545-FTM-29DNF, 2004 WL4054843, *5 (M.D. Fla. July 22, 2004) (admitting NHTSA report under Rule 803(8) in support of Ford's defense).

Florida courts have also approved the admission of NHTSA documents and investigative reports of other federal agencies. In *American Motors Corp. v. Ellis*, 403 So. 2d 459 (Fla. 5th DCA 1981), the court affirmed the trial court's admission of a NHTSA report on a study of the severity of crashes. The court held that "[t]he report is admissible under the public record exception to the hearsay rule." Id. at 468. More recently, the Fourth District approved the admission of a report by the federal agency charged with supervision of public safety in railroads, the Federal Railroad Administration ("FRA"), in a similar case involving train accidents. *CSX Transp., Inc. v. Palank*, 743 So. 2d 556, 560 (Fla. 4th DCA 1999). Even though the agency's report addressed a different division of the defendant company, "[t]he evidence regarding the audit showed prior knowledge of dangerous similar conditions within the [CSX] system," so the report "was relevant to demonstrate that CSX had actual prior knowledge that its practices in the Hamlet Division did not meet the FRA standards." Id. at 561.

NHTSA records may also be admitted to show notice. Even if they were inadmissible for the truth of the matter asserted, the documents may be admitted for a non-hearsay purpose, in which case admissibility would not turn on the public records exception. The NHTSA documents from 2016-2019 would thus be relevant to show that Tesla was placed on notice of a potential defect in its autopilot system prior to the instant accident. At least one Florida court has admitted a federal government safety investigation to show that the defendant had notice before an accident of a potential safety hazard. See *CSX Transp., Inc. v. Palank*, 743 So. 2d 556,561 (Fla. 4th DCA 1999).

Defendant's reliance on *ADT LLC v. Vivint Smart Home, Inc.,* No. 20-CV-23391, 2023 WL 3568117, at *11 (S.D. Fla. May 19, 2023), is inapposite. In *ADT LLC,* plaintiff was seeking to admit evidence of "myriad *unproven* allegations" which were hearsay, not subject to exception, unlike the *findings* of NHTSA, which are subject to the public records exception.

Evidence of similar accidents occurring after the instant accident is relevant to Plaintiffs' claim for punitive damages, arising from Tesla's failure to act to rectify this defect until NHTSA essentially forced them into their "voluntary" recall in December 2023, and even then Tesla's actions were inadequate.

As a final note, we do not believe that the question of substantial similarity is appropriate to resolve at the motion *in limine* stage. In *Ford Motor Co. v. Hall-Edwards*, 971 So. 2d 854 (Fla. 3d DCA 2007), the court described the process engaged in by another court to address questions of substantial similarity. That court, "devoted an entire day to hearing argument and testimony related to the other incidents" *Hall-Edwards* at 860. That court denied admission of some of the proffered evidence due to a lack of substantial similarity, but admitted other evidence under limited circumstances and with a limiting instruction. If the Court is not inclined to deny the motion outright, which we believe it should given the limited scope of the evidence that we seek to introduce, it should reserve ruling on the admissibility of these Autopilot accidents until trial.

### III. REFERENCES TO SUBSEQUENT REMEDIAL MEASURES/RECALL.

While Tesla's recall can be considered a subsequent remedial measure, it is nevertheless admissible under the feasibility exemption to Rule 407. As noted in Tesla's motion, evidence of a subsequent remedial measure may be admitted to prove the "feasibility of the cautionary measures." In *Ellis, supra,* the Fifth District adopted the following description of the law with respect to the feasibility exception:

> In products liability cases, the law in Illinois for some time now has permitted the introduction of evidence which consists of alternate design feasibility or post-

> accident design changes. The evidence is admissible if the design alternative or design alteration was available at the time the defendant's product was manufactured and sold. ... The products liability cases cited above and pursued on a theory of strict liability all held that evidence of design alternatives and post-accident design changes is admissible to show what was feasible and what the defendant knew or should have known.

*Ellis* at 465-466. Because Tesla's recall was nothing more than an over the air software update, Plaintiffs are entitled to show that Tesla could have implemented these changes much earlier than December of 2023.

Further, because Tesla's reaction (or lack thereof) to the notice of the defect is a factor a jury may consider when awarding punitive damages, under *Owens-Corning Fiberglas Corp. v. Ballard*, 749 So.2d 483, 484-85 (1999), the inadequacy of the recall, as documented by NHTSA, also supports the claim for punitive damages. According to NHTSA, even though Tesla had the capability to force the changes onto each car, they allowed the owner to both opt in and to reverse the changes, thus rendering the recall changes ineffective with respect to such drivers.

Further, as a case cited by Tesla, *Davis v. Little Giant Ladder Sys., LLC, supra* at *5*, explains, "evidence touching on the recall cannot be categorically excluded [if] some of it is needed to explain the plaintiff's theory." In *Davis,* the district court partially denied a motion in limine that sought to exclude any reference to a recall, stating that it could not "grant a blanket exclusion of all evidence touching on the recall because some of that evidence is inextricably intertwined with the remaining claims." *Id.* The district court indicated that the defendant would need to object when necessary at trial. *Id*. The Court should take the same approach here.

IV.     **REFERENCES TO GOVERNMENT INVESTIGATIONS.**

This heading appears to be a bit of a misnomer as we read it as applying to one government investigation in particular. We presume that Tesla is referring to NHTSA investigation ID #PE24031-01 regarding the potential failure of Tesla's full self-driving to perform in specific situations. The November 5, 2024 letter opening the investigation included a May 14, 2024 email

from NHTSA to Tesla regarding Tesla's messaging concerning driving engagement with FSD-Supervised.

Presuming Tesla wishes to exclude reference to this ongoing investigation into Tesla's full self-driving capability, Plaintiffs state they do not intend to proffer such evidence to the jury. However, Plaintiffs do intend to offer evidence of NHTSA's *completed* investigations into Tesla's Autopilot system, and intend to offer evidence of Tesla's misrepresentations to the public which are relevant both to influencing consumer expectations at issue in our products liability claims, and to our negligent misrepresentation claim, which we contend should be allowed to proceed.

V. **REFERENCES TO THIRD-PARTY REPORTS CONCERNING THE FUNCTIONING, MALFUNCTIONS, OR MISUSE OF AUTOPILOT.**

Plaintiffs' complaint does contain reference to third-party media reports that Plaintiffs may seek to introduce at trial, not for the truth of matter asserted, but as proof of notice to Tesla of the defect in its Autopilot system. One of the central issues in this case, with respect to the issues of foreseeable misuse and punitive damages, is when Tesla became aware that its customers were misusing Autopilot and causing accidents as a result, and what Tesla did in response to such notice.

In *City of S. Miami v. Desantis,* No. 19-CV-22927, 2020 WL 7074644 (S.D. Fla. Dec. 3, 2020), this Court held that a defendant's broad request to exclude any third-party sources was "premature and speculative at this stage." *City of S. Miami* at *15. This Court recognized that "because these third party sources could be admissible if offered for certain purposes other than establishing the truth of their contents, the Court will not exclude them in the abstract." *Id*. at *16. Among the "other purposes" this Court identified was "to show [a] party had notice of allegations in [the] article," citing to *Est. of O'Connor v. United States*, No. 8:12-cv-02070-T-27MA, 2013 WL 1295925, at *2 n.8 (M.D. Fla. Mar. 28, 2013). This Court concluded that "defendants may raise proper objections to specific pieces of evidence introduced at trial, where appropriate." *Id*. at

*15.  We would request that the Court issue the same ruling here on this aspect of Defendant's motion *in limine*.

### VI. REFERENCES TO MR. MUSK'S PUBLIC STATEMENTS REGARDING FULL SELF-DRIVING (FSD) CAPABILITY

We believe the Court should deny this section of the motion *in limine* for the same reason. First, Mr. Musk has made a number of representations regarding both full self-driving and Autopilot, and he has been less than careful in his statements in delineating between which system he is discussing.  Second, depending on the actual language of the statement, while Mr. Musk may have been intending to speak about full self-driving, an ordinary consumer may not have understood which system was being discussed, and therefore the statement may still have influenced consumer expectations with respect to the use of Tesla's Autopilot system.

Because it is the expectation of the ordinary consumer that is at issue in our products liability claims, there is no requirement that we prove that McGee heard any statement in order to prevail on same.  Additionally, pursuant to *Prentice v. R.J. Reynolds Tobacco Co.*, 338 So. 3d 831 (Fla. 2022), a plaintiff is not required to prove that McGee heard any specific statements from Mr. Musk or Tesla regarding Autopilot, only that he received messages from Tesla that he relied on to his detriment regarding the capabilities of Autopilot. For a more thorough discussion this topic, we would refer the Court to our response to Defendant's Motion for Summary Judgment with respect to Plaintiffs' negligent misrepresentation count.

Finally, the Court cannot resolve whether a particular statement was "forward looking, [and] aspirational" without actually reviewing the statement in question to determine what effect it could have had on consumer expectations.  Therefore, a blanket ruling that forward looking statements are inadmissible would be premature at this time.

10

EATON & WOLK PL

VII. USE OF INCORRECT AND MISLEADING TERMINOLOGY AND REFERENCES TO EVIDENCE CONCERNING MATERIALS RELATED TO FUTURE PRODUCTS

Plaintiffs do not intend to mischaracterize of the capabilities of *McGee's* Tesla Model S. However, Plaintiffs do intend to offer evidence of Tesla's own statements that exaggerated or overpromised as to their capabilities of Tesla's auto pilot system.

VIII. REFERENCES TO PROMOTIONAL VIDEOS

Tesla's "paint it black" video is indisputably relevant to the expectations of the ordinary consumer. Created in 2016, three years prior to this accident, the video shows a Model S, like McGee's, driving itself around Palo Alto. Nowhere in the video does it explain that this is FSD technology and not Autopilot technology, or that this technology was unavailable on cars in 2016, let alone three years later.

What is undisputed is that this was a marketing video that misrepresented the car's capabilities in an effort to induce consumers to purchase the car. The video makes it appear if the car drives from the owner's home to Tesla's office in one smooth continuous trip, when in fact, it took dozens of attempts, and the car was actually involved in an accident during filming. Tesla's deceptive efforts to influence consumer expectations are relevant to both the products liability claims and Plaintiff's claim for punitive damages. The Court should review the video, and any similar content Plaintiffs intend to introduce it at trial before making any ruling with respect to it.

IX. TESTIMONY FROM ROBERT SUMWALT

Robert Sumwalt is a fact witness. We do not intend to offer any expert opinion testimony from him and as a result, his testimony is not precluded by 49 CFR § 835.3.

As a starting point, we would note that Tesla does not present an accurate summary of the regulation applicable to Mr. Sumwalt's testimony. First, Tesla writes "they (meaning board employees) 'are not authorized to testify regarding other employees reports or other types of board documents . . .'" (Mot. at 16-17) But Tesla omits the most important part of this quote, which

11
EATON & WOLK PL

reads, in full "**Current** board employees are not authorized to testify regarding other employees reports . . ." § 835.3(c). Mr. Sumwalt is not a "current employee," but a former employee, and therefore this limitation does not apply to him.

This fact also renders Tesla's citation to § 835.3(f), which prohibits **current** employees from testifying without advance approval from the general counsel, irrelevant. Instead, pursuant to § 835.7, "it is not necessary to request board approval for testimony of a former board employee."

Case law interpreting this regulation demonstrates that the limitations are not as draconian as they sound. In *Murphy v. Colorado Aviation, Inc.,* 41 Colo.App. 237 (1978), the Court explained:

> This section most recently has been interpreted narrowly by both state and federal courts, which have held that air safety investigators may give their opinions, as well as relate factual evidence, so long as they do not testify to their own or the Board's ultimate conclusion concerning the probable cause of the accident or the negligence of the defendant. See *American Airline, Inc. v. United States*, 418 F.2d 180 (5th Cir. 1969); *Kline v. Martin*, 345 F.Supp. 31 (E.D.Va.1972); *Beech Aircraft Corp. v. Harvey*, 558 P.2d 879 (Alaska 1976); *Todd v. Weikle*, 36 Md.App. 663, 376 A.2d 104 (1977); *See also* 49 U.S.C. s 1903(c). *But see Israel v. United States, 247 F.2d 426 (2d Cir. 1957)*; *Fidelity & Casualty Co. v. Fran*k, 227 F.Supp. 948 (D.C.Conn.1964).

In *Murphy*, the Defendant argued that the trial court erroneously allowed a former NTSB official to offer testimony that violated § 835.3(c), which require a new trial. Specifically, after reviewing part of the NTSB accident report that he had participated in but not drafted, the former NTSB employee offered testimony that included an opinion "that only an IFR pilot should fly in clouds, that there was safe alternate route for VFR pilots, and that the prevailing weather conditions in the area at the time of crash, only an IFR pilot could have been flying properly at the altitude at which the crash occurred." The *Murphy* court held that this testimony "fell within the guidelines of this regulation" because it did not include an opinion that "the accident was caused by the negligence of the pilot." *Murphy* at 243.

Here, we intend to offer testimony from Mr. Sumwalt explaining that NTSB's safety recommendations, (admissible under the public record hearsay exception) were transmitted to Tesla and other car companies, but that Tesla was the only company that failed to respond to the recommendations. Mr. Sumwalt will further testify that during one of his conversations with Mr. Musk, Mr. Musk simply hung up on him, evidencing Mr. Musk's disdain for safety regulators that persists to this day in his new role as the head of DOGE, which has been busy shutting down investigations into his various companies. This is factual testimony fully authorized under the regulation.

In any event, this is another item that the Court should, at a minimum, defer ruling on until it is presented at trial.

XI.   **MEDICAL BILLS**

Plaintiffs agree to limit introduction of evidence of medical expenses to amounts that are owed or have been paid.

X.   **ARGUMENTS RELATED TO PUNITIVE DAMAGES**

   A. **EVIDENCE OF OUT OF STATE CONDUCT IS ADMISSIBLE TO PROVE REPREHENSIBILITY**

Tesla misapprehends the U.S. Supreme Court's holdings in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 532 U.S. 408, 409 (2003) and *Philip Morris USA v. Williams*, 549 U.S. 346 (2007). Taken together, these cases establish that a plaintiff may present evidence of out of state conduct and harm to others to establish **entitlement** to punitive damages, but a jury may not punish the defendant by awarding punitive damages for such conduct. Florida has standard jury instruction that advises juries of this distinction.

*Williams* explains this distinction as follows:

> Respondent argues that she is free to show harm to other victims because it is relevant to a different part of the punitive damages constitutional equation, namely, reprehensibility. That is to say, harm to others shows more reprehensible conduct.

> Philip Morris, in turn, does not deny that a plaintiff may show harm to others in order to demonstrate reprehensibility. Nor do we. Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible—although counsel may argue in a particular case that conduct resulting in no harm to others nonetheless posed a grave risk to the public, or the converse. Yet for the reasons given above, a jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties.

*Williams* at 355.

Prior to *Williams*, a jury could actually punish a defendant by awarding punitive damages for harm caused to others in the same state. *See Campbell* at 421. After *Williams,* a jury may only punish a defendant for the harm caused to the plaintiffs. But neither *Williams* nor *Campbell* limits the evidence a Plaintiff can present of harm to others resulting from the tortious acts of Tesla **across the country** in proving entitlement to punitive damages. The word "lawful," as used in the excerpt that Tesla quotes from *Campbell* simply means "non-tortious." *Campbell* actually holds that evidence of conduct that is non-tortious in other states can still be admissible to prove entitlement. *See Campbell* at 422. ("Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff.")

Neither Campbell or Williams place any geographic limitation on the evidence Plaintiff can present of Tesla's tortious conduct related to its defective autopilot system.

### B. PLAINTIFF MAY ESTABLISH TESLA'S NET WORTH AS A BASIS FOR PUNITIVE DAMAGES.

Florida law is clear that "evidence of a defendant's net worth (i.e., that amount by which assets exceed liabilities) is admissible and may be considered by the jury in its assessment of punitive damages." *Brooks v. Rios,* 707 So. 2d 374 (Fla. 3d DCA 1998). Indeed, without such evidence in the record, "an appellate court cannot say that an award is excessive." *Id.* That a jury

14
EATON & WOLK PL

may consider a Defendant's net worth in determining the amount of punitive damages is part of the Florida standard jury instruction. *See Wransky v. Dalfo*, 801 So. 2d 239 (Fla. 4th DCA 2001).

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Plaintiffs also request oral argument on Telsa's motion.. Plaintiffs agree with Tesla's estimate that 90 minutes will be sufficient to hear argument from the parties.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **24th** day of **February 2025.** I electronically filed the foregoing document with the Clerk of Court using CM/ECF and served a copy via e-mail to all parties on the attached service list.

        THE ROUSSO, BOUMEL LAW FIRM, PLLC.
        9350 South Dixie Highway
        Suite 1520
        Miami, Florida 33156
        (305) 670-6669

        By: /s/ *Adam T. Boumel, Esq.*
          Adam T. Boumel, Esq.
          Florida Bar No.: 0110727
          Direct email: adam@roussolawfirm.com
          Service emails:
          Pleadings@roussolawfirm.com
          assistant@roussolawfirm.com

        By: */s/  Douglas F. Eaton*
          DOUGLAS F. EATON
          FBN: 129577
          **EATON & WOLK, PL**
          *Co-counsel for Plaintiff*
          2665 S. Bayshore Drive, Suite 609
          Miami, Florida 33133
          Telephone: 305-249-1640
          Email: deaton@eatonwolk.com
            cgarcia@eatonwolk.com

## SERVICE LIST

**Bowman and Brooke LLP**
41000 Woodward Ave., Suite 200E
Bloomfield Hills, Michigan 48304
**Attn: Thomas P. Branigan, Esq.**
**Attn: Whitney, Cruz, Esq.**
**Attn: Drew P. Branigan, Esq.**
thomas.branigan@bowmanandbrooke.com
whitney.cruz@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com
*Counsel for Defendant*

**Singleton Schreiber, LLP**
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Tel: (619) 771-3473
**Attn: Brett J. Schreiber, Esq.**
bschreiber@singletonschreiber.com
bschreiber@singletonschreiber.com
vas@singletonschreiber.com
cbirnbaum@singletonschreiber.com
eelms@singletonschreiber.com
*Counsel for Plaintiffs*

**Poses & Poses, P.A.**
169 East Flagler Street, Suite 1600
Miami, Florida 33156
**Attn: Todd Poses, Esq.**
tposes@posesandposes.com
Maria@posesandposes.com
*Counsel for Plaintiffs*

**Eaton & Wolk PL**
2665 South Bayshore Dr., Suite 609
Miami, FL 33133
**Attn: Doug Eaton, Esq.**
deaton@eatonwolk.com
*Counsel for Plaintiffs*