**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-cv-21940-BLOOM/Torres**

NEIMA BENAVIDES, as Personal
Representative of the Estate of Naibel
Benavides Leon, deceased,

      Plaintiff,

v.

TESLA, INC., a/k/a Tesla Florida, Inc.,

      Defendant.

_____/

DILLON ANGULO,

      Plaintiff,

v.

TESLA, INC. a/k/a Tesla Florida, Inc.,

      Defendant.

_____/

Case No. 22-22607-KMM

**TESLA, INC.'S RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT**
**TESTING AND TESTIMONY OF TESLA EXPERT RYAN HARRINGTON**

      Tesla, Inc., ("Tesla"), incorrectly identified as Tesla Florida, Inc., files its response in

opposition to Plaintiffs' Motion to Exclude Expert Testing and Testimony of Tesla Expert Ryan

Harrington. [ECF 322]. For the reasons set forth below, Plaintiffs' Motion should be **DENIED**.

**INTRODUCTION**

      Plaintiffs claim that crash avoidance and crash mitigation systems in the 2019 Tesla model

S were defective in failing to prevent or mitigate the crash. Two systems in the 2019 Model S are

designed to assist drivers in forward collision crash prevention and mitigation—Forward Collision

Warning (FCW) and Automatic Emergency Braking (AEB).  Tesla will show that, in 2019, no

Model Year 2019 vehicle made by any manufacturer was equipped with forward collision prevention or mitigation systems that would have prevented this crash by stopping or slowing a 61 mile-per-hour passenger car before it broadsided a black SUV in the dark. Such technology simply did not exist. This is supported by the National Highway Traffic Safety Administration (NHTSA), who in March 2019, the month before this crash, published research to establish the target crash populations for five categories of crash avoidance systems.[1] NHTSA stated that "[t]here are eight ***rear-end crash scenarios*** that potentially can be affected by FCW and [AEB]." (Ex. A at 21) (Emphasis added). Rear-end crashes are those where a vehicle crashes into the rear of another vehicle ahead of it in the same lane or path of travel. The eight rear-end crashes are described in Appendix D of the research. (*Id.* at D-14).

Tesla's stated position is consistent with the NHTSA report. The Model S's AEB and FCW systems were designed to detect and prevent collisions with a lead vehicle traveling in front of and in the same lane as the Tesla (subject to some limitations stated in the Owner's Manual), but they were not designed to detect and prevent collisions with the side profile of a stationary vehicle like in this crash. (Ex. B, Tesla's Resp. to Req. 62 of Plaintiff Angulo's 11th RFP); (ECF 318-10 at BENAVIDES-00001897).[2] Plaintiffs' entire crash prevention defect claim is that this 2019 Model S should have been equipped with technology that did not exist to prevent crashes no technology prevented at the time the 2019 Model S was manufactured.

Although Plaintiffs' experts know that in 2019 the technology had not yet been developed to react in this crash scenario—across the industry—they continue to allege that Tesla's crash

---

[1] Target Crash Populations for Crash Avoidance Technologies in Passenger Vehicles, DOT HS 812 653, March 2019, attached as Ex. A.

[2] Neither of Plaintiffs' experts opine that AEB should have deployed in this crash. (ECF 318-3 at 108:15-110:12; ECF 318-2 at 246:23-247:6; ECF 318-8 at 69:7-70:7; ECF 318-6 at 80:19-81:10).

avoidance technology systems should have reacted in this crash. However, Plaintiffs point to no system in any vehicle anywhere in the world that would have mitigated this crash. As further proof of its contention that no FCW or AEB system would affect the outcome of this crash, Tesla's design expert Ryan Harrington selected and tested 2019 vehicles to demonstrate that the technology did not exist. In one category of Harrington's tests, one of a Subaru and another of a Mercedes, at night at 62 miles-per-hour using similar signage and the side of a Black Tahoe, there was no braking provided by the peer vehicles' AEB systems.

Plaintiffs seek to exclude the testing and Harrington's testimony about the performance of the state-of-the-art 2019 FCW and AEB systems in three vehicles. Plaintiffs argue that, under the "substantial similarity" doctrine, the testing is irrelevant because it involved vehicles and circumstances that differed from what happened in this crash. (ECF 322 at 1). Plaintiffs' Motion misstates the law, misstates the standards for admissibility of expert witness information, and should be denied.

In analyzing the admissibility of testing, courts look to the purpose for which the testing is being offered. Where the evidence is being offered to recreate the circumstances under which an injury occurred, the substantial similarity doctrine applies. In contrast, where the testing is offered for some other purpose, such as demonstrating a scientific principle or establishing what technologically was in existence at the time, the test is simply whether the evidence is relevant to the purpose for which it is being offered.

Here, Harrington's testing can be broken into three categories of tests. The first two categories are not being offered to recreate or show how the crash occurred in this case. Rather, the testing is being offered to prove what NHTSA said one month before this crash: that the state of the art of FCW and AEB features at the time the 2019 Tesla Model S was manufactured was

that such features would not reliably activate in this crash. The third category of tests added characteristics from the subject crash and demonstrated that the test vehicles would not have prevented the crash.   The testing shows the limitations of what the federal government considered to be the best systems on the market at the time, and it directly contradicts Plaintiffs' claim that the Model S' FCW and AEB were defectively designed because they did not issue warnings or stop the vehicle in this crash. This material is directly relevant to Harrington's analysis and evaluation of the design of Tesla's features, including FCW and AEB, and it is appropriate for him to rely on it and offer opinions on it.   Plaintiffs are free to confirm with Harrington on cross-examination the differences in the vehicles involved and any criticism of the set up. The Motion should be denied.

## **FACTUAL BACKGROUND**

George McGee was driving his Model S on the night of this crash. He told the Deputy Sheriff at the scene "I looked down to get the phone I dropped. I reached down, I didn't see it. And when I popped up and looked, I saw a black truck. It just happened so fast." (ECF 325-3 at 2:12-14, 5:5-9, 6:16-17, and 8:9-18).

He drove through a stop sign and a flashing red light, through a "T" intersection, and hit the side of a Chevy Tahoe that was parked perpendicular to the "T" intersection. The Tahoe was pushed into Naibel Benavides, who was killed, and Dillon Angulo, who was injured.

The 2019 Tesla Model S was configured with a suite of advanced driver assistance features. These features, which Tesla calls "Autopilot," include (a) Traffic-Aware Cruise Control (TACC), which is an adaptive cruise control system that helps drivers maintain a safe distance behind a detected vehicle in the same lane; and (b) Autosteer, which is lane-centering. (ECF 318-10 at 80). The vehicle also had FCW and AEB systems for active safety. (*Id.* at 102).

Relevant to this Motion, Plaintiffs claim that the Model S's AEB should have slowed or stopped the vehicle prior to the crash, or that the FCW system should have issued a warning before the crash. (ECF 322). Tesla denies Plaintiffs' claims.

As the Department of Transportation observed in 2019, "FCW, CIB, and DBS[3] have all been designed for assisting front-to-rear (i.e., rear-end) crashes." (Ex. C, Harrington June 24, 2024 report at 37).[4] Indeed, the automotive industry at large has struggled with detection and avoidance involving side profiles of vehicles, especially during high-speed nighttime crashes. (*Id.* at 37-38).

Importantly, and as explained by Harrington and observed in his testing, detection is only the first step in crash mitigation or avoidance. (*Id.* at 47). FCW must account for —among other things—the vehicle state and driver's actions before deciding whether an alert is necessary. *Id.* AEB will account for the same factors before deciding to deploy braking to prevent or mitigate a collision. Consistent with guidance from NHTSA, AEB and FCW system performance is also heavily informed by the persistence and confidence of object detection to, among other things, reduce nuisance alerts. (Ex. D, Harrington Second Rebuttal Report at 3-4).[5] Specifically, AEB and FCW systems will deploy only after an object has been continuously present for a specified minimum time. *Id.*

---

[3] NHTSA defines the combination of Crash Imminent Braking and Dynamic Braking Support (DBS) as Automatic Emergency Braking (AEB). (Ex. A at 21).

[4] NHTSA similarly observed that "[w]hile [these systems] are effective at addressing some of the lower speed rear-end crashes, they are less effective at fully addressing the safety need." (*Id.* at 38).   In 2014, NHTSA advised that the technology should only be expected to address collisions with lead vehicles stopped or going straight in the same lane and direction as the tailing vehicle. *Id.*

[5] NHTSA observed in its 2016 recommendations to ADAS developers that "[e]xcessive false/nuisance alerts and false brake activations can lead to driver distraction and distrust in ADAS leading to potential disbenefits; thus, requiring high confidence in the detection and classification of objects before providing a warning or brake activation is consistent with the recommendations in the 2016 report." *Id.*

A.   **Harrington's Testing**

Tesla retained Ryan Harrington to provide opinions about the design of Tesla's Autopilot system, including active safety features such as FCW and AEB. As part of his work, Harrington conducted a series of demonstrations to evaluate the performance of FCW and AEB systems available within the industry at the time the 2019 Model S was designed.[6] (Ex. C at 60-63).

Harrington's demonstrations included an evaluation of how these systems behaved in certain conditions that were present in this crash. This testing was conducted to confirm the following relevant principles:

1.   State of the art FCW and AEB systems cannot mitigate all crashes and perform differently even under similar conditions. (*Id.*).

2.   At the time of the 2019 Model S' design and manufacture, FCW and AEB systems were designed to address front-to-rear collisions with same lane vehicles at low closing speeds. (*Id.* at 37-38, 86).

3.   High speed collisions, broadside collisions, and nighttime collisions were known to be challenging for FCW and AEB systems for the entire industry in 2019. (*Id.* at 86).

---

[6] Unsurprisingly, Plaintiffs do not attack Harrington's qualifications. Harrington is overwhelmingly qualified to conduct testing of FCW and AEB to evaluate and compare performance across different vehicles. He has more than twenty years of experience in mechanical and automotive engineering, including employment in the automotive industry and federal government. (Ex. C at 4). Harrington spent ten years at the Department of Transportation, where he developed test track and on-road test procedures to assess the performance and nuisance alert rates of advanced driver assistance systems (ADAS) and served as the DOT's evaluator of all test track and on-road testing for an ADAS field operational test. (*Id.* at 5). Harrington has also evaluated ADAS design and deployment considerations across numerous vehicle platforms. He has authored multiple papers and delivered numerous presentations on issues related to emerging transportation technologies, including ADAS and AV technologies. (*Id.* at 4).

4.      Available FCW and AEB systems in 2019 could not be expected to operate in a manner that would have reliably avoided or substantially mitigated broadside nighttime collisions at high speeds. (*Id.* at 58).

To support his opinions, Harrington evaluated the performance of FCW and AEB collision avoidance systems installed on three vehicles: (1) 2019 Mercedes-Benz S class; (2) 2019 Subaru Legacy; and (3) 2019 Volvo S60. (*Id.* at 60). These vehicles were selected primarily because they were the highest performers during NHTSA's multiple assessments of FCW and AEB systems in recent years. (*See id.* at 61-63). Each of these vehicles also have AEB and FCW systems that, just like the Model S's systems, had performance limitations at night, at high speeds, and encountering side profiles of vehicles. (*Id.* at 64-65, 67-69).

Harrington's testing can be organized into three categories: (a) daylight nominal FCW and AEB demonstrations; (b) nighttime FCW demonstration with broadside targets; and (c) nighttime FCW and AEB collision demonstrations. The first two categories of Harrington's testing were not specific to Tesla's AEB or FCW, and they were intentionally ***not*** conducted to completely recreate McGee's crash in all aspects. (*Id.* at 60, n. 217).

### (a)      Daytime Testing

As Plaintiffs note, Harrington's daytime testing was simply used to 'benchmark' each test vehicle's performance against their performance in NHTSA's testing. (ECF 322 at 9).[7] Daytime testing was *not* conducted to compare these vehicles to the Model S's performance or to reenact this crash. Although these vehicle models were identified as having good forward collision avoidance system performance, the individual test vehicles were tested in daylight to assure that

---

[7] Notably, in establishing parameters for this testing, NHTSA evaluated performance in front end crashes with lead vehicles. (Ex. A at 38).

the test vehicles performed consistently with the overall model performance. These demonstrations can be understood as a calibration to ensure each vehicle's FCW and AEB systems operated at optimal performance during Harrington's subsequent testing. (Ex. C at 69-72).[8]

### (b) Nighttime Demonstrations With Broadside Targets

Harrington devised nighttime test scenarios to evaluate and show how three aspects of this crash were challenging for the entire automotive industry in 2019. (Ex. E, Harrington Dep. at 107-108). Specifically, he devised scenarios to evaluate FCW performance involving: (1) nighttime lighting; (2) a side profile target; and (3) a high speed (60 mph) approach. (Ex. C at 74).

Then, Harrington devised three test scenarios, and in each one, a driver would approach the target and steer away at approximately 141 feet or 1.6 seconds to collision. (*Id.* at 74). Each scenario was run multiple times to evaluate the reliability of FCW performance.

- In the first test, Harrington evaluated each vehicle under these conditions as it approached a Global Vehicle Target (defined by NHTSA). (*Id.* at 62-63).

- In the second test, Harrington used a 2010 Chevrolet Tahoe (the same vehicle involved in this crash) as the target. (*Id.* at 75-76).

- In his final test, Harrington partially occluded the Chevrolet Tahoe by road end signs in an orientation consistent with reconstruction conducted by Tesla's Accident Reconstruction expert. (*Id.* at 76-77).

The results of these runs demonstrated that ***the highest performing FCW systems in 2019 would not reliably issue alerts under these circumstances***. (*Id.* at 77). Similarly, none of the vehicle's AEB systems deployed in any of these test runs, reinforcing the principle that these

---

[8] For these reasons, Harrington's daytime testing comported with NHTSA's New Car Assessment Program performance testing for Crash Imminent Brake Systems. (Ex. C at 60).

scenarios were challenging for FCW and AEB systems throughout the industry in 2019. (*Id.* at 74-77).

(c) <b>Nighttime Collision Scenario Demonstrations</b>

In his final demonstration, Harrington incorporated additional characteristics from this crash to demonstrate the performance of FCW and AEB in the test vehicles. For example, the test used a 2010 Chevrolet Tahoe with the same black paint as Angulo's truck in the same orientation and position Angulo's Tahoe was positioned in at the time of the crash, and incorporated the orientation of the traffic light and the various road signs, and sequence of the flashing traffic light to be consistent with Tesla's accident reconstructionist's reconstruction of this crash. (*Id.* at 79-80). Finally, the approach speed of the test vehicle was 57-61 mph, consistent with McGee's speed prior to manually braking. (*Id.* at 82, n. 258).

Importantly, however, no manual evasive maneuver was commanded, which created an opportunity for AEB deployment as late as the time of collision. (Ex. C at 82, 84).

In each of these collision tests, ***AEB did not deploy***, supporting Harrington's opinion that aspects of this crash posed challenges for the industry at large in 2019. (*Id.* at 83, 85). Specifically, "FCW and AEB systems available on light passenger vehicles in 2019 would not be expected to engage braking when traveling at approximately 61 mph and coming upon a stationary broadside vehicle at night." (*Id.*). As a result of this testing, Harrington was able to conclude that none of these vehicles would have prevented the subject crash. (Ex. C at 82 and 85).

<b><u>ARGUMENT</u></b>

**I.    HARRINGTON'S TESTS ARE RELEVANT AND ADMISSIBLE**

Plaintiffs' argument that Harrington's tests are inadmissible under the "substantial similarity" doctrine misconstrues the law and the relevance of Harrington's testing.

**A.    <u>The "Substantial Similarity" Doctrine</u>**

9

The admissibility of evidence necessarily depends upon the purpose for which it is being offered. *Tran v. Toyota Motor Corp.*, 420 F.3d 1310, 1316 (11th Cir. 2005). As the Eleventh Circuit has repeatedly explained, the substantial similarity doctrine applies in product liability cases where the evidence ***is offered to recreate an accident***, and does not apply where the evidence ***is offered to demonstrate certain relevant principles*** about the product or the crash.

For example, in *Heath v. Suzuki Motor Corp.*, 126 F.3d 1391, 1397 (11th Cir. 1997), the plaintiff argued that a Suzuki Samurai was defectively designed because of its risk of rolling over. The Eleventh Circuit was tasked with evaluating the admissibility of rollover incidents involving three dissimilar vehicles (a Chevrolet Suburban, a Ford Escort, and a Jeep Wrangler), which were offered for the "purpose of illustrating the mechanics of how lateral forces acting on tires can cause a motor vehicle to roll over." *Id.* at n. 8. The plaintiff objected that the rollover incidents involving dissimilar vehicles were not substantially similar and therefore were inadmissible. *Id.* at 1396. The court held that the substantial similarity doctrine did not apply:

> The evidence involving rollovers of three dissimilar vehicles was offered by Suzuki to explain how rollovers occur. ***The introduction into evidence of these three dissimilar incidents for the purposes of illustrating the physical principles behind rollover accidents was not unduly confusing to the jury or prejudicial to the plaintiff.*** The evidence was not offered to reenact the accident; in fact, the vehicles involved, a Chevrolet Suburban, a Ford Escort, and a Jeep Wrangler, were pointedly dissimilar from the vehicle at issue here, a Suzuki Samurai.

*Id.* at 1396-97 (emphasis added).

Likewise, in *Tran*, 420 F.3d at 1316, the court reaffirmed this principle and held that a study of other accidents involving dissimilar peer vehicles did not trigger the requirements of "substantial similarity." *Id*. At issue was a Toyota study examining other accidents involving a vehicle's restraint system, which was offered to "demonstrate the system's overall effectiveness in a wide array of accidents." The plaintiff objected to the study because Toyota did not prove that the accidents in the study were substantially similar to hers. *Id*. But the court held that the

10

substantial similarity requirement did not apply because the evidence was ***"pointedly dissimilar"*** and ***"not offered to reenact the accident." Id.*** (emphasis added).

More recently, the Eleventh Circuit refused to exclude videos of product testing simply because they were dissimilar to the accident at issue in the case. *McHale v. Crown Equip. Corp.*, No. 21-14005, 2022 WL 4350702, at *2 (11th Cir. Sept. 20, 2022). In *McHale*, the videos depicted various scenarios showing the risk of staying in a forklift (the product at issue) during a rollover, and further showed that the manufacturer's decision not to include a door on the forklift was choice worthy. *Id.* The court explained that "[t]he substantial similarity test ***applies to out-of-court recreations of the accident at issue***," and did not apply to "intentionally dissimilar" testing. *Id.*

### B. The First Two Categories of Testing Are Not Offered To Reenact The Crash And Are Relevant To Rebut Plaintiffs' Design Defect Theory

Applying the 11th Circuit's settled law here, the substantial similarity doctrine simply does not apply because Harrington's tests are not being offered to reenact the crash. Rather, they are being offered to provide highly relevant "state of the art" and "industry custom" evidence. These topics are indisputably relevant in a design defect case. *See* § 768.1257, Fla. Stat. (in a design defect case, "the finder of fact shall consider the state of the art of scientific and technical knowledge and other circumstances that existed at the time of manufacture, not at the time of loss or injury."); *Jimenez v. Gulf & Western Mfg. Co.*, 458 So. 2d 58, 59 (Fla. 3d DCA 1984) ("Trade custom at the time of a product's manufacture is a valid defense in a products liability suit."); *Jackson v. H.L. Bouton Co.*, 630 So. 2d 1173, 1175 (Fla. 1st DCA 1994) (compliance with industry standards is evidence that a product was not defective).

Specifically, Plaintiffs' theory is that the 2019 Model S was defective because its FCW system should have issued a warning and its AEB system should have stopped the vehicle, which was traveling at high speed, from hitting the side profile of a parked vehicle at night. Accordingly,

the jury is required to consider whether, according to industry standards and the "state of the art" technology in 2019, FCW and AEB systems were capable of reliably issuing a warning or stopping a vehicle that was traveling at high speed towards the side profile of a parked vehicle at night.  And that is the purpose for which Harrington's first two categories of tests are being offered. These tests were designed to show how "state of the art" AEB and FCW in 2019 simply could not do what Plaintiffs suggest. As discussed in detail above, the three highest performing FCW and AEB technologies in peer vehicles in 2019, according to the NHTSA, would not have been able to reliably stop the vehicle or issue a warning when traveling towards the side profile of a vehicle at night at a high closing speed. (Ex. C at 37-38, 86).

Additionally, just like the evidence in *Heath*, *Tran*, and *McHale*, Harrington's tests involved "pointedly dissimilar" vehicles. The tests were intentionally designed to assess different versions of AEB and FCW, which the governing regulatory agency considered to be the best at the time, to see how they function at night, at a high closing speed, and interacting with a side profile of another vehicle. Using peer vehicles to understand fundamental principles in a crash is relevant and proper. *Heath*, 126 F.3d at 1396-97.

**C.    Harrington's Nighttime Collision Test Is Sufficiently Similar In Relevant Respects**

The only part of Harrington's test that arguably would be required to meet the requirements of substantial similarity is the nighttime collision testing, and that is only because Harrington incorporated additional characteristics from this crash into the collision testing and concluded that such vehicles would not have prevented the subject crash. But that is precisely why his collision testing more than meets the threshold of substantial similarity.

For example, the test vehicle's speed, roadway obstruction, and lighting conditions were all substantially similar. During the collision testing, a 2010 Chevrolet Tahoe with the same black

12

paint as Angulo's truck was positioned approximately in the center of the travel lane. *Id.* at 79. An overhead flashing red traffic light was suspended across the travel lane, and five road signs were placed across the travel lane. *Id.* at 79-80. The relative position and orientation of the Chevrolet Tahoe, the traffic light, and the various road signs were consistent with Tesla's accident reconstructionist's reconstruction of this crash. *Id.* Video footage recorded by the subject Tesla's onboard forward-facing cameras was analyzed to determine the timing of the traffic light flashes. *Id.* This timing was replicated in Harrington's nighttime collision scenario demonstrations. *Id.* Finally, the approach speed of the test vehicle was 57-61 mph, consistent with McGee's speed prior to manually braking. *Id.* at 82, n. 258.

Thus, Harringtons nighttime collision testing was sufficiently similar in the ways that mattered. *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 588 (N.D. Fla. 2009), aff'd, 609 F.3d 1183 (11th Cir. 2010) ("on the whole" testing was substantially similar; distinctions in the set up between the incident and the airbag tests, such as passenger seat placement, related to potential cross examination about the outcome of the test, and not its admissibility).

In their Motion, Plaintiffs point to a list of differences between Harrington's testing and this crash that are inconsequential. For example, they complain that:

- The test vehicles did not have lateral and longitudinal control features activated;

- The stop sign in the test was a different height than the one in this crash;

- The test did not occur at a T-intersection, like the one in this crash;

- The line markings and guard rails were different in this crash;

(ECF 322 at 7-10).

Plaintiffs' list of factual distinctions is immaterial. *See generally Gen. Motors Corp. v. McGee*, 837 So. 2d 1010, 1039 (Fla. 4th DCA 2002) (noting that testing does not need to be (and rarely ever could be) made "under the exact conditions present when the prior event occurred").

The lateral control of the vehicle is irrelevant to the comparison. Although Autopilot's Autosteer feature was engaged leading up to McGee's crash, there was no turning movement prompted by Autosteer since the vehicle was traveling essentially straight. (Ex. C at 6, 57-58); *see also* ECF 318-2 at 84-85 (Autosteer did not contribute to crash). This matches the steering inputs of the robot that was being used to drive the test vehicles. Thus, the steering in the crash was matched to the crash testing and was appropriate for comparison, and there was no point in running tests with steer inputs from the robot that would or could reduce visibility of the targets ahead.

The disengagement of the longitudinal feature of Autopilot (TACC) was also appropriately matched in the crash testing. In the crash, TACC was in "override" mode for the 75 seconds leading up to the crash because McGee was pressing the accelerator to increase his speed over the 45 mile-per-hour preset cruising speed.[9] (ECF 318-2 at 96; ECF 318-1 at 10). As with all cruise control systems, pressing the accelerator returns all longitudinal control (above the set speed) to the driver. In fact, in the Model S, when the driver presses the accelerator while TACC (or Autopilot) is engaged, an alert is published to the driver that "Cruise control will not brake; Accelerator pedal is currently pressed." (ECF 325-5 at BENAVIDES-00003148). For those last 75 seconds of travel, McGee's pressing of the accelerator pedal effectively turned the TACC feature off, and he kept his foot on the accelerator notwithstanding receiving the alert quoted above. In the crash testing, the test vehicles' cruise control systems were not engaged and the speed was controlled by pressing

---

[9] When operating on Autopilot, the maximum preset cruise speed that could be set on Card Sound Road was 45 MPH. (Ex. C at 10).

the accelerator pedal, again using a robot. In this way the peer vehicle testing matched McGee's driver inputs leading up to the crash. (*See* Ex. E at 36, 126).

Similarly, the differences in road sign height in the testing and the crash do not affect the validity of the test. The series of road signs in front of the Tahoe are *lower* than the Card Sound Road signs. This difference if anything would make the signs *more* detectable to systems, the field of detection for which are in front of the car.  (Ex. E at 66-67) (explaining that FCW had more detections in test runs with stop sign than without). Plaintiffs point out this difference but do not provide a basis for claiming that somehow this negatively affected the detection of the test vehicles.

Differences in road configuration (i.e., T-intersection) and line markings are similarly irrelevant. Plaintiffs can point to no FCW or AEB system in 2019, including the Tesla, that responded to those features.[10] To the extent that Plaintiffs allege that this would affect Autopilot's limitation of drivable space, longitudinal control of drivable space ***is not a FCW or AEB function***. Autopilot's longitudinal feature, TACC, was off in both the crash and the testing so no road markings or road configurations are relevant to this comparison and would not react to the limit of drivable space.

Notably, apart from pointing out differences between the tests and this crash, Plaintiffs offer no criticism of the scientific methodology Harrington employed to test the functionality of FCW and AEB systems in 2019 at night, at a high closing speed, or when faced with a side profile

---

[10] Additionally, and as explained *infra* at 5, detection of objections *in some* frames is not considered a confident or "persistent" detection, and – according to NHTSA – should **not** prompt evasive action.  Thus Plaintiffs' reliance on the vehicle's detection of certain environmental conditions in limited frames, in support of this criticism is misguided. *See* Ex. F, Harrington January 6, 2025 Depo at 157-58, 165-66, 168-69, 185-86 (discussing significance of inconsistent detection displayed in "augmented video" produced by Plaintiffs' consultant).

of a vehicle. Plaintiffs' loose allusion to the requirements of Rule 702, without actually attacking Harrington's scientific methodology, is unavailing.

Ultimately, Plaintiffs simply present what will surely be their attempt at cross-examination. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) (explaining that the traditional and appropriate way for a party to attack what they perceive to be "shaky" expert evidence is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof"). But that says nothing about the admissibility of Harrington's testing.

In short, these tests and Harrington's testimony about them are highly probative and admissible, and nothing about them is unduly confusing to the jury or prejudicial to Plaintiffs.

## CONCLUSION

WHEREFORE, Defendant Tesla, Inc. requests that this Court **DENY** Plaintiffs' Motion [ECF 322] in its entirety.

Respectfully submitted,

*s/ Whitney V. Cruz*
**WHITNEY V. CRUZ**
Florida Bar No. 800821
**WENDY F. LUMISH**
Florida Bar No. 334332
**BOWMAN AND BROOKE LLP**
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134
Tel. 305-995-5600 / Fax: 305-995-6100
whitney.cruz@bowmanandbrooke.com
wendy.lumish@bowmanandbrooke.com

**THOMAS P. BRANIGAN**
(Admitted *Pro Hac Vice*)
**DREW P. BRANIGAN**
(Admitted *Pro Hac Vice*)
**BOWMAN AND BROOKE LLP**
101 W. Big Beaver Road, Suite 1100
Troy, MI 48084
Tel. 248-205-3300 / Fax: 248-205-3399
thomas.branigan@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com

**JOEL SMITH**
(Admitted *Pro Hac Vice*)
**BOWMAN AND BROOKE LLP**
1441 Main Street, Suite 1200
Columbia, SC 29201
Tel. 803-726-7420 / Fax: 803-726-7421
joel.smith@bowmanandbrooke.com

**HILARIE BASS**
Florida Bar No. 334243
**HILARIE BASS, ESQUIRE LLC**
2821 Bayshore Drive, UPH-B
Miami, FL 33133
Tel. 305-505-8777
bassh@bassinstitute.org

*Attorneys for Defendant TESLA, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 24, 2025, the foregoing was filed using

the Court's CM/ECF system, which will send electronic notice of the same to all interested parties.

**Adam T. Boumel, Esq.**
Florida Bar No. 0110727
THE ROUSSO, BOUMEL LAW FIRM, PLLC
9350 South Dixie Highway
Suite 1520
Miami, FL 33156
Tel. 305-670-6669
adam@roussolawfirm.com
assistant@roussolawfirm.com
pleadings@roussolawfirm.com

*Attorneys for Plaintiff Dillon Angulo*

**Brett Schreiber, Esq.**
Admitted *Pro Hac Vice*
**Satyarinivas "Srinivas" Hanumadass, Esq.**
Admitted *Pro Hac Vice*
**Carmela Birnbaum, Esq.**
Admitted *Pro Hac Vice*
SINGLETON SCHRIEBER
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
bschreiber@singletonschreiber.com
vas@singletonschreiber.com
cbirnbaum@singletonschreiber.com
jjusto@singletonschreiber.com
eelms@singletonschreiber.com
service@singletonschreiber.com

*Co-Counsel for Plaintiffs Dillon Angulo and
Neima Benavides*

**Todd Poses, Esq.**
Florida Bar No. 0075922
POSES & POSES, P.A.
Alfred I. Dupont Building
169 East Flagler Street, Suite 1600
Miami, FL 33131
Tel.  305-577-0200
Fax: 305-371-3550
tposes@posesandposes.com
maria@posesandposes.com

*Attorneys for Plaintiff Neima Benavides*

**Douglas F. Eaton, Esq.**
Florida Bar No. 0129577
EATON & WOLK PL
2665 South Bayshore Drive, Suite 609
Miami, FL 33133
Tel. 305-249-1640
Fax: 786-350-3079
deaton@eatonwolk.com
cgarcia@eatonwolk.com
lhuete@eatonwolk.com

*Co-Counsel for Plaintiffs Dillon Angulo and
Neima Benavides*

*s/* Whitney V. Cruz
WHITNEY V. CRUZ