# EXHIBIT D



E$^x$ponent®

**Second Rebuttal Report of
Ryan Harrington**

*Benavides v. Tesla*

# Second Rebuttal Report of Ryan Harrington

## *Benavides v. Tesla*

*Prepared for*

**Thomas P. Branigan, Esq.**
**Bowman and Brooke LLP**
**101 W Big Beaver Rd**
**Suite 1100**
**Troy, MI 48084**

*Prepared by*

**Ryan Harrington**
**Exponent**
**1075 Worcester Street**
**Natick, MA 01760**

**December 23, 2024**

**© Exponent, Inc.**

# Contents

**Page**

**Scope and Limitations**  1

**Response to Plaintiff's Experts' Reports**  2

Cummings Report  2

Dr. Cummings failed to acknowledge the uncertainty in the detection and classification of the stationary objects.  2

Dr. Cummings mischaracterized the functionality of the subject Tesla Model S.  4

Dr. Cummings misrepresented the warnings found in the 2019 Tesla Model S owner's manual.  6

Moore Report  7

Mr. Moore indicated the subject Tesla Model S should have issued a warning in response to the stop line although this capability was not available on the subject vehicle at the time of the incident.  7

Mr. Moore incorrectly indicated the Tesla Model S maintained longitudinal control in the time leading to the subject collision even though Mr. McGee was overriding the system and maintained longitudinal control of the vehicle.  8

Mr. Moore failed to acknowledge the impact of the uncertainty in detecting and classifying the Chevrolet Tahoe and pedestrian.  9

Mr. Moore speculated about the design of the hands-on detection algorithm for the Tesla Model S, which led to unsubstantiated conclusions regarding the system's understanding of the driver's hand position leading up to the subject collision.  12

Mr. Moore indicated concerns with Exponent's demonstration due to an automotive radar "rejection threshold," which is unsupported and disproven by the results of the demonstration.  12



# Scope and Limitations

Exponent, Inc. (Exponent) was retained for my services by counsel for Tesla, Inc. (Tesla) in *Benavides v. Tesla*, to provide expert testimony in this matter and to review and respond to certain assertions made in Plaintiff's experts' reports.

My opinions are based on my education, training, and experience in mechanical and automotive engineering; my automotive industry and federal government experience; my experience developing advanced driver assistance systems (ADAS) test procedures and analyzing ADAS performance; and my review of materials and analyses performed in this case. I hold each of my opinions expressed in this report to a reasonable degree of engineering and scientific certainty.

This report is a supplement to my opening report on this matter dated June 24, 2024, and my first rebuttal report dated July 8, 2024. The data, analysis, and conclusions included in this report are based on ongoing review of documents and other materials available to me. If additional information becomes available, this report may be amended or supplemented. At present, final exhibits have not yet been completed for deposition or trial. Exhibits may include, but not be limited to, this report, materials listed in the body, or provided in the attached appendices, photographs, and results from my analysis described herein. Additional demonstrative exhibits may be prepared when necessary to adequately illustrate and explain technical details of the analysis, findings, or opinions to the jury.

My opinions as presented in my reports of June 24, 2024, and July 8, 2024, remain unchanged. Several of the opinions and bases presented in my reports of June 24, 2024, and July 8, 2024, directly contradict the opinions presented in the expert reports of Dr. Mary Cummings and Mr.  Alan Moore. For these opinions, I intend to testify consistent with my previously produced report. This report is intended to rebut and address claims and comments by Dr. Cummings and Mr. Moore that go beyond the scope of my reports of June 24, 2024, and July 8, 2024.

In 2024, Exponent charges $600 per hour for my time. My compensation does not depend upon the contents of this report, any testimony I may provide, or the ultimate outcome of the case. A copy of my curriculum vitae, which provides additional details of my professional background, is attached as Appendix A to this report. Appendix B contains a list of materials I relied on in the development of this report.



# Response to Plaintiff's Experts' Reports

## Cummings Report

Dr. Mary "Missy" Cummings issued a supplemental report[1] and a declaration[2] on December 2, 2024, after reviewing additional data retrieved from the subject vehicle.

### Dr. Cummings failed to acknowledge the uncertainty in the detection and classification of the stationary objects.

Upon reviewing the augmented video generated by Mr. Oleg Drokin, Dr. Cummings stated in her declaration that "new data illustrates the Autopilot system successfully detected: [t]he road's edge and the stop sign at 61.16 m, including confirming the stop line, [a] cluster of objects between 57.1 m and 52.7 m, [a] pedestrian at 35.6 m, [and a] vehicle (minivan) at 31.7 m."[3] While these observations regarding the produced augmented video by Mr. Drokin may be accurate,[4] Dr. Cummings failed to address the uncertainty of these detections and classifications. Reviewing the data from the same augmented video, variability in the detection and classification of the broadside Chevrolet Tahoe and pedestrian was observed. This variability is illustrated in Figure 1, demonstrating the objects were never classified consistently for more than 0.25 seconds in the time leading up to the collision. While Dr. Cummings indicated "[t]he Tesla also detected possible obstacles,"[5] she did not address the variability in the objects' classifications, in addition to the uncertainty of the objects' locations with "Lane: Unknown" identified throughout the duration of any object detection shown in the augmented video frames. The MY 2019 Tesla Model S owner's manual warns, "never depend on Forward Collision Warning to warn you of a potential collision. Several factors can reduce or impair performance, causing either unnecessary, invalid, inaccurate, or missed warnings."[6] The owner's manual also states:

> Several factors can affect the performance of Automatic Emergency Braking, causing either no braking or inappropriate or untimely braking, such as when a vehicle is partially in the path of travel or there is road debris. It is the driver's responsibility to drive safely and remain in control of the vehicle at all times. Never

---

[1]   Expert Report of Dr. Mary Cummings, December 2, 2024, hereafter the "Cummings Supplemental Report."

[2]   Declaration of Dr. Mary Cummings, December 2, 2024, hereafter the "Cummings Declaration."

[3]   Cummings Declaration, p. 2.

[4]   Exponent has not validated that the video produced by Mr. Drokin is an accurate representation of the subject incident. Mr. Drokin has not been deposed, and we understand he will not be deposed so we cannot inquire about the methodology he employed in his analysis to assist or facilitate validation / invalidation of his work.

[5]   Cummings Declaration, p. 2.

[6]   2019 Tesla Model S owner's manual, 2018.48.12 (December 17, 2018), p. 102.



depend on Automatic Emergency Braking to avoid or reduce the impact of a collision."[7]

Dr. Cummings discussed the confusion of the subject Tesla Model S in the time leading up to the collision stating "[t]he Tesla was confused as to whether the obstacle was a vehicle or a cycle and this uncertainty about the nature of the object lasted for .81 s until it updated the detection as a minivan."[8] In her testimony, she further confirmed the challenges of the Tesla Model S stating, "it is clear as you watch the video that the computer vision system is having significant difficulty because it rotates through the label so [quickly]."[9] While Dr. Cummings acknowledged the difficulty of the subject Tesla's vision system in detecting and classifying the objects, she misconstrued the outputs of the augmented video by stating "[t]he system knew it was approaching a stop sign, a pedestrian and a vehicle at a high speed."[10] Consistent classification and detection are both important aspects when determining vehicle response. Even though Dr. Cummings acknowledged the challenges the Tesla faces in this scenario, she failed to acknowledge the impact of the inconsistent detections and classifications on Autopilot and Collision Avoidance Assist operation nor did she acknowledge the impact of the unknown location of the detected objects in relation to the lane of travel of the subject Tesla Model S.



Figure 1:    Perception system object classifications represented in the augmented video produced by Mr. Drokin using approximate time to collision (TTC) based on the observed collision time.

The inconsistencies in object detections and classifications in addition to the unknown positions relative to the subject Tesla's lane of travel are important considerations related to development of these systems to prevent excessive false / nuisance alerts and false positive activations. Studies have been conducted to analyze the importance of considering false / nuisance alerts and false positive activations to optimize safety benefits since excessive alerts and activations can

---

[7]    2019 Tesla Model S owner's manual, 2018.48.12 (December 17, 2018), p. 103.

[8]    Cummings Supplemental Report, p. 3.

[9]    Second deposition of Dr. Mary Cummings, December 13, 2024, hereafter "Cummings Second Deposition," p. 27.

[10]    Cummings Declaration, p. 2.

lead to reduced driver acceptance and use of these systems. A 2016 report sponsored by the National Highway Traffic Safety Administration (NHTSA), an agency of the U.S. Department of Transportation, provided recommendations for ADAS developers to consider related to nuisance alarm rates, presenting warnings only after an object has been continuously present for a specified minimum time noting, "[t]he longer and more continuous an object is present within the sensors' fields of view can yield higher confidence levels for detection and classification of objects."[11] Excessive false / nuisance alerts and false brake activations can lead to driver distraction and distrust in ADAS leading to potential disbenefits; thus, requiring high confidence in the detection and classification of objects before providing a warning or brake activation is consistent with the recommendations in the 2016 report.

## Dr. Cummings mischaracterized the functionality of the subject Tesla Model S.

Dr. Cummings stated, "[t]he system knew it was approaching a stop sign, a pedestrian and a vehicle at high speed and did not initiate any braking, evasive steering or warnings to the driver."[12] In her deposition, Dr. Cummings confirmed that it is her opinion that "because this stop line was detected, that the vehicle should have either imposed a forward collision warning (FCW) or applied the brakes through the automatic emergency braking system."[13] The location of the stop line generated by the Tesla was variable upon the approach, including placement of a stop line more than approximately 45 feet in front of the vehicle even after it passed the stop sign location. As it relates to red lights and stop sign detection, Tesla introduced the Autosteer Stop Light Warning feature in March 2019,[14] which was available on Hardware (HW) 2.0 or higher. The release notes for the feature noted that "[y]our car may warn you in some cases if it detects that you are about to run a red light while Autosteer is in use. This is not a substitute for an attentive driver and will not stop the car."[15] As noted in a later version of the Tesla Model S owner's manual (than the subject vehicle), "Stop Light Warning does not apply the brakes or decelerate Model S, does not detect stop signs, and may not detect all stop lights."[16] It further notes that "Stop Light Warning is designed to only warn you when approaching a solid red or later portion of a yellow traffic light; it may not issue warnings at intersections with flashing lights. Additionally, Stop Light Warning does not warn you of an approaching stop light if you are pressing the accelerator pedal or brake pedal (which disables Autosteer)."[17]

---

[11] Campbell, J., Brown, J., Graving, J., Richard, C., Lichty, M., Sanquist, T., Bacon, P., Woods, R., Li, H., Williams, D., and Morgan, J., "Human Factors Design Guidance for Driver-Vehicle Interfaces," Battelle Memorial Institute, DOT HS 812 360, December 2016.

[12] Cummings Declaration, p. 2.

[13] Cummings Second Deposition, p. 18.

[14] "Tesla rolls out AutoSteer Stop Light Warning for Autopilot in latest software update," Available at: https://www.teslarati.com/tesla-autopilot-autosteer-stop-light-warning/

[15] https://www.notateslaapp.com/software-updates/version/2019.8.4/release-notes

[16] 2019 Tesla Model S owner's manual, 2019.16.2 (May 16, 2019), p. 92.

[17] Ibid.

The subject Tesla Model S was equipped with HW2.5 but was not getting all firmware updates. As noted in the declaration of Mr. Drokin, "connectivity settings indicating the car owner had never setup WIFI access."[18] Firmware build 2019.8.4, which included the Autosteer Stop Light Warning feature, was pushed to the fleet via an over-the-air (OTA) update but this was not completed successfully on the subject vehicle.[19] Tesla later introduced the Traffic Light and Stop Sign Control feature, which was the first commercially available system to provide braking in response to traffic lights and stop signs. It was released to the wider fleet in April 2020.[20] This feature is only available on HW3.0 and HW4.0, not HW2.5, which was the hardware version for the subject vehicle.[21] Therefore, the subject Tesla Model S at the time of the subject incident did not have the capability to warn or respond to stop light or sign detections, regardless of the stop line indicator in the produced augmented video, and thus this feature is not relevant to the subject incident.

Dr. Cummings further stated "[t]he Tesla also detected possible obstacles from 172.9 ft – 187.3ft (1.9s –2.06s to impact) but sounded no warning, despite the claim in the Owner's Manual that control will revert to the driver if an obstacle is detected at or less than 525 ft."[22] This is a mischaracterization of the system by Dr. Cummings in that the Tesla Model S owner's manual states "[t]he camera(s) and sensors associated with Forward Collision Warning are designed to monitor an approximate area of up to 525 feet (160 meters) in your driving path,"[23] but this does not imply a warning will be issued for any obstacle within this range. Furthermore, Dr. Cummings does not acknowledge the list of limitations stating, "Forward Collision Warning can be adversely affected by road and weather conditions,"[24] and with regard to Autopilot, "[n]ever depend on these components to keep you safe. It is the driver's responsibility to stay alert, drive safely, and be in control of the vehicle at all times."[25]

Dr. Cummings indicated, "the vehicle knew where the edge of the road was, and successfully detected both the road's edge and a stop sign 61.16m in front of it"[26] and claimed the system was defective because "Autopilot allowed it to detect the road's edge and relevant objects but take no action or warn the driver, even when it was obvious that the car would depart driveable [*sic*] space and people in and out of the car could be seriously injured or killed."[27] Dr. Cummings oversimplified the scenario as the uncertainty in detection and classification previously explained

---

18   Declaration of Mr. Oleg Drokin, December 2, 2024, hereafter the "Drokin Declaration."

19   BENAVIDES-00002093.pdf.

20   https://electrek.co/2020/04/24/tesla-autopilot-traffic-light-and-stop-sign-control-feature/.

21   BENAVIDES-00003114.

22   Cummings Declaration, p. 2.

23   2019 Tesla Model S owner's manual, 2018.48.12 (December 17, 2018), p. 102.

24   Ibid.

25   Ibid., p. 80.

26   Cummings Supplemental Report, p. 3.

27   Ibid., p. 4.



demonstrates this scenario was not "obvious" to the subject Tesla Model S. She added "a chime is supposed to sound approaching the end of driveable [*sic*] space."[28] According to Mr. Akshay Phatak, issuing of the warning chime while approaching the end of drivable space was dependent on the driver's hands not being detected on the wheel for the last 5 seconds.[29] Mr. Moore's analysis of the hands on CAN data indicated there was no period during the last 24 seconds leading up to the collision during which Mr. McGee's hands were consistently detected off the steering wheel for a 5 second period. Furthermore, Mr. McGee maintained longitudinal control of the vehicle during this period of time as demonstrated by the ACC: OFF (PedalOverride) indicator status.[30] Dr. Cummings has mischaracterized the Tesla Model S Autopilot system in that it would not be expected to issue a chime since Mr. McGee's hands were not detected to be off the steering wheel for the required 5 second interval and he maintained longitudinal control by overriding the TACC speed through the application of the accelerator pedal for the 76 seconds leading up to the subject collision.

## Dr. Cummings misrepresented the warnings found in the 2019 Tesla Model S owner's manual.

Dr. Cummings stated, "it is not clear why the computer vision system's detection of the pedestrian or vehicle was not communicated to the AEB system"[31] calling the limitation warnings "vague" and questioning why the engineers' understanding of the limitations "were not specifically communicated to drivers."[32] However, Dr. Cummings again failed to recognize that the location of the detected objects were not observed by the subject Tesla Model S to be within its lane of travel according to the augmented video indicating Lane: Unknown for the intermittently detected objects. In addition to the limitations discussed above, the Tesla Model S owner's manual clearly warns FCW is "not a substitute for attentive driving and sound judgement" and "[d]epending on Automatic Emergency Braking to avoid a collision can result in serious injury or death."[33] Furthermore, it is clear Mr. McGee understood his responsibilities to the extent that he confirmed, "I don't think I really assumed that it would stop at stop signs and stoplights and those sorts of things, no."[34] Therefore, while Dr. Cummings suggested the limitations warning in the Tesla owner's manual to be "vague" and cited "Mr. McGee's confusion with Autopilot's capabilities is very clear,"[35] Mr. McGee testified to understanding the limitation of his vehicle requiring him to stop for stop signs and traffic signals which would have prevented the subject collision from occurring.

---

[28]   Ibid.

[29]   Deposition of Mr. Akshay Phatak, p. 170.

[30]   Drokin Declaration, Exhibit B.

[31]   Cummings Supplemental Report, p. 4.

[32]   Ibid.

[33]   2019 Tesla Model S owner's manual, 2018.48.12 (December 17, 2018), p. 102.

[34]   Deposition of Mr. George McGee, p. 113.

[35]   Cummings Supplemental Report, p. 4.



## Moore Report

Mr. Alan Moore issued a declaration on December 2, 2024,[36] and a supplemental declaration on December 12, 2024,[37] after reviewing additional data retrieved from the subject vehicle.

**Mr. Moore indicated the subject Tesla Model S should have issued a warning in response to the stop line although this capability was not available on the subject vehicle at the time of the incident.**

Following review of the augmented video generated by Mr. Oleg Drokin, Mr. Moore noted that "Autopilot had information on the stop line position and could have determined if the vehicle's speed was not consistent with stopping at the stop bar."[38] However, Mr. Moore noted that there is "variability in the Autopilot's estimation of the stop bar position. Some error in the estimation is expected."[39] Mr. Moore also admitted that he was not aware of any production vehicle in April 2019 with the capability to detect a stop line and command the vehicle to decelerate on the subject road.[40] Consistent with Mr. Moore's testimony, I am not aware of any MY 2019 vehicle with stop line, sign, or signal detection and braking capability.

Mr. Moore referenced Tesla product literature which describes "[w]hen driving on Autosteer and the vehicle is expected to travel through a stop sign or red light, the driver will be alerted on the UI and via a chime to take over control."[41] Mr. Moore admitted that this product literature describes the functionality of "a newer software version than what Mr. McGee had at the time of the accident."[42] The rollout of the Autosteer Stop Light Warning feature and the fact that it was not on the subject Tesla Model S is discussed above. Furthermore, Mr. McGee understood that it was his responsibility to detect and react appropriately to stop signs and red flashing lights and stated "I don't think I really assumed that it would stop at stop signs and stoplights and those sorts of things, no."[43]

---

[36]   Declaration of Mr. Alan Moore, December 2, 2024, hereafter the "Moore Declaration."

[37]   Supplemental Declaration of Mr. Alan Moore, December 12, 2024, hereafter the "Moore Supplemental Declaration."

[38]   Moore Declaration, p. 5.

[39]   Ibid., p. 18.

[40]   Second deposition of Mr. Alan Moore, December 13, 2024, hereafter "Moore Second Deposition," pp. 152-153.

[41]   BENAVIDES-00003099.

[42]   Moore Second Deposition, p. 147.

[43]   McGee Deposition, p. 113.



**Mr. Moore incorrectly indicated the Tesla Model S maintained longitudinal control in the time leading to the subject collision even though Mr. McGee was overriding the system and maintained longitudinal control of the vehicle.**

Notwithstanding the fact that the subject vehicle did not have the capability to respond to traffic lights or stop signs / lines, Mr. McGee was providing all longitudinal motion control for the entire duration that a stop line was identified in the augmented video. Autopilot, specifically Traffic Aware Cruise Control (TACC), was not providing longitudinal motion control during this period, as indicated by the ACC status OFF (PedalOverride) shown in Figure 2. Regarding the operation of TACC, Mr. Moore asserted:

> Autopilot had information that it was approaching the end of drivable space approximately 2.2 seconds prior to impact, based on stationary objects forming the drivable space boundary and shortening of the drivable space boundary (see video frame below). According to Benavides 3240, it should have accounted for stationary objects, escalated 'to Chime 1 when approaching end of drivable space' and applied 'maximum braking within ACC limit.' The vehicle did neither; it did not provide a 'Chime 1' nor did it apply any braking.[44]

However, Mr. Moore acknowledged that the driver was controlling the longitudinal motion of the vehicle while this ACC status was OFF (PedalOverride), but incorrectly opined that "ACC is also controlling it."[45] TACC is "in the override state whenever the driver's accelerator pedal torque exceeds the torque computed for the given Autopilot commands" and drivers will get an "[a]lert indicating that Traffic Control Cruise [*sic*] will not brake will show up on persistent acceleration pedal override for 10s."[46] Car log data indicates that Mr. McGee received this warning approximately 1m 06s prior to the crash.[47] In other words, if the driver commands more acceleration than the system would otherwise have provided, the accelerator pedal actuation causes TACC to relinquish its role in controlling speed and following distance. Whether or not the TACC will resume control at a later time if the driver stops providing these control inputs does not change the fact that the driver alone has control authority while they are overriding the system, as was the case leading up to the subject collision. Given that TACC was being overridden by Mr. McGee at the time of the subject incident, Mr. Moore's assertion that TACC should have provided a Chime 1 and applied the brakes is incorrect and he has no basis for this assertion.

[44] Moore Declaration, p. 5.
[45] Moore Second Deposition, p. 116.
[46] BENAVIDES-00003148.
[47] 2019-04-26 SUBJECT TO PROTECTIVE ORDER.xlsx





Figure 2.     ACC Status and Stop Line Detection represented in the augmented video produced by Mr. Drokin.

NHTSA has commented on Level 2 ADAS noting that drivers "must remain engaged and alert at all times when using these systems, as they are not designed and not able to perform critical operating components of the driving task."[48] For Level 0 through Level 2 systems, it is fully the responsibility of the driver to monitor the driving environment and execute an appropriate response in an ADAS-equipped vehicle and is no different from that of a driver in a vehicle without ADAS technology,[49] consistent with warnings throughout the 2019 Tesla Model S owner's manual identifying the responsibility of the driver to maintain awareness and respond as necessary.[50]

## Mr. Moore failed to acknowledge the impact of the uncertainty in detecting and classifying the Chevrolet Tahoe and pedestrian.

Mr. Moore claimed that "Autopilot identified specific targets at the accident site and labeled them as a vehicle and a pedestrian."[51] He further noted that "[t]he Autopilot's vision system first identified the SUV as a vehicle approximately 210 feet from impact. If a warning were issued at that time, a driver or vehicle could have responded with full braking and slowed to approximately 23 mph before impact, reducing the severity of the impact."[52] As discussed above

---

48   "NHTSA Orders Crash Reporting for Vehicles Equipped with Advanced Driver Assistance Systems and Automated Driving Systems," NHTSA, 2021. Available at: https://www.nhtsa.gov/press-releases/nhtsa-orders-crash-reporting-vehicles-equipped-advanced-driver-assistance-systems, accessed in December 2024.

49   "Automated Vehicles for Safety," NHTSA, Available at: https://www.nhtsa.gov/vehicle-safety/automated-vehicles-safety, accessed in December 2024.

50   2019 Tesla Model S owner's manual, 2018.48.12 (December 17, 2018).

51   Moore Declaration, p. 3.

52   Ibid., p. 5.

Ex™

numerous studies have been conducted to analyze the impacts of false / nuisance alerts and false positive activations in the context of ADAS development to optimize the realized safety benefits of these systems. Additionally, the 2016 report sponsored by NHTSA provided recommendations for ADAS developers  to present warnings only after an object has been continuously presented for a specified minimum time, in order to minimize the impact of nuisance alarms.[53] Mr. Moore was apparently aware that there were periods of time immediately prior to impact where "there's [*sic*] no bounding boxes,"[54] and thus, "[t]here's [*sic*] no targets identified."[55] Mr. Moore opined that this "indicates a level of uncertainty at times of the vision system of what it's detecting."[56] Furthermore, when asked about the inconsistent nature of object classifications observed in the augmented video, Mr. Moore theorized that this inconsistency might be due, among other things, to the fact that "it's hard to see the SUV" and that "this is not a simple daylight detection."[57] Additionally, Mr. Moore agreed that "it's a complicated setting."[58] The inconsistent nature of object detections and classifications is represented in Figure 3. Given current technological limitations, system developers must work to balance and optimize the factors impacting warning and activation sensitivity, including intermittent object detection and classification and in-path vs. out-of-path determinations (e.g., lane determinations). Excessive false / nuisance alerts and false brake activations can lead to driver distraction and distrust in ADAS and false AEB activations.

---

[53]  Campbell, J., Brown, J., Graving, J., Richard, C., Lichty, M., Sanquist, T., Bacon, P., Woods, R., Li, H., Williams, D., and Morgan, J., "Human Factors Design Guidance for Driver-Vehicle Interfaces," Battelle Memorial Institute, DOT HS 812 360, December 2016.

[54]  Moore Second Deposition, p. 160.

[55]  Ibid.

[56]  Ibid., p. 161.

[57]  Ibid., p. 159.

[58]  Ibid., p. 160.





Figure 3: Perception System Object Classifications represented in the augmented video produced by Mr. Drokin using approximate TTC based on the observed collision time.

Mr. Moore stated that according to the Tesla Model S owner's manual, "the Forward Collision Warning system's sensors are designed to monitor up to 525 feet forward of the vehicle."[59] He claimed that "[t]he Manual does not indicate that night travel reduces the sensing distance,"[60] and that "[i]f a Forward Collision Warning was issued earlier in the claimed range of the system, a driver or vehicle could have responded with full braking and stopped completely."[61] However, Mr. Moore failed to notice or mention that the owner's manual also states:

> The area being monitored by Forward Collision Warning can be adversely affected by road and weather conditions. Use appropriate caution when driving.[62]

The owner's manual also notes that the limitations "do not represent an exhaustive list of situations that may interfere with proper operation of Collision Avoidance Assist features."[63] Additionally, Mr. Moore testified "[a]nd this is one of those times where there's a stop line and a vehicle speed not consistent with stopping at that stop line, and there is a pedestrian located in the same lane in front of the vehicle."[64] However, it is clear from the augmented video frames referenced by Mr. Moore that the detected objects, for the entire duration leading up to the subject incident, were indicated as Lane: Unknown.[65] Therefore, the system's understanding of the location of the detected objects is inconsistent with Mr. Moore's description of the location,

---

[59] Moore Declaration, p. 5.

[60] Ibid.

[61] Ibid., p. 6.

[62] 2019 Tesla Model S owner's manual, 2018.48.12 (December 17, 2018), p. 102.

[63] Ibid., p. 104.

[64] Moore Second Deposition, pp. 110-111.

[65] Drokin Declaration, Exhibit B.



given the vehicle and pedestrian were located beyond the intersection which was not considered within the lane of the subject Tesla Model S.

### Mr. Moore speculated about the design of the hands-on detection algorithm for the Tesla Model S, which led to unsubstantiated conclusions regarding the system's understanding of the driver's hand position leading up to the subject collision.

Mr. Moore represented that the CAN data also included "electric power steering data which revealed that the driver did not have his hands on the wheel for approximately 50% of the time during the final 24 seconds before the collision."[66] He further noted that "if you look at the torque data, we should be able to infer hands-on detection or not and compare that to the actual hands-on detection that's recorded and try to compare the two."[67] Despite observing that this comparison was "not as clean as [he'd] like to see,"[68] Mr. Moore concluded that it was "clear that there's two different algorithms."[69] This is speculation on his part and ignores the possibility that steering torque data are filtered before they are used by the algorithm for hands-on detection.

### Mr. Moore indicated concerns with Exponent's demonstration due to an automotive radar "rejection threshold," which is unsupported and disproven by the results of the demonstration.

Mr. Moore claimed that the CAN data included "radar data for two minutes before the crash, which demonstrated that the Tesla was detecting a stationary vehicle, Mr. Angulo's truck, directly in its path from over 350 feet away."[70] Additionally, Mr. Moore claimed the produced radar data in some way affirmed his earlier criticism of Exponent's demonstrations stating, "[i]t does reaffirm my concern about the sign height in [Exponent's] testing because it looks like the sign height was not correct which sounds like kind of, you know, a minor point, except that it looks like the sign height is near a rejection threshold for automotive radar."[71] It is unclear why Mr. Moore believes the Exponent demonstration is invalidated by the difference in sign height between the subject incident location and the conducted demonstration. Mr. Moore is correct in identifying the existence of filtering to avoid false positive detections for roadway and roadside infrastructure such as overhead signs and bridges; however, it is unclear where Mr. Moore's reference of a 4-foot rejection threshold comes from. Review of Continental radar sensor datasheets indicated a field of view in azimuth of ±45° and ±9° for near range and far range

---

[66]  Moore Supplemental Declaration.

[67]  Moore Second Deposition, pp. 119-120.

[68]  Ibid., p. 120

[69]  Ibid.

[70]  Moore Supplemental Declaration.

[71]  Moore Second Deposition, p. 219.



scans, respectively, and a field of view in elevation of 18°.[72] Given that the sign heights used in the Exponent demonstration were lower than the signs at the subject location it is likely that Mr. Moore's 4-foot rejection threshold would only serve to make the scenario easier for the tested systems by increasing the chance of the signs being detected and not filtered out as, for example, an overhead sign. Therefore, Exponent's test was likely conservative as it relates to the height of the signs used.

Furthermore, as part of the Exponent demonstration, the vehicles under test first approached the broadside, exemplar Chevrolet Tahoe at a speed of 60 mph without the signs present, then again with the signs present, partially occluding the exemplar Chevrolet Tahoe. The test vehicles included a 2019 Mercedes Benz S-Class, 2019 Subaru Legacy, and 2019 Volvo S60. In both FCW test scenarios, a driver-initiated steering maneuver occurred at 1.6 s TTC to avoid impact with the broadside, exemplar Chevrolet Tahoe. Figure 4 depicts Scenario 2 of the Exponent demonstration in which the broadside Chevrolet Tahoe was approached without signs present. Figure 5 depicts Scenario 3 of the Exponent demonstration adding signs in front of the broadside Chevrolet Tahoe.



Figure 4.    Figure 30 in the original expert report of Mr. Ryan Harrington depicting the orientation of Chevrolet Tahoe relative to the travel lane (left) and test procedure (right) without signs present.[73]

---

[72]   Continental ARS4-B Advanced Radar Sensor datasheet.

[73]   Expert report of Mr. Ryan Harrington, p. 76.





Figure 5.    Figure 31 in the original expert report of Mr. Ryan Harrington depicting the orientation of the Chevrolet Tahoe and road signs relative to the travel lane (left) and test procedure (right).[74]

In the scenario without the signs present (Scenario 2), no FCWs were issued by any of the test vehicles. When the signs were added (Scenario 3), partially occluding the broadside exemplar Chevrolet Tahoe, FCWs were issued in two of the three test runs for both the Mercedes Benz S-Class and the Subaru Legacy vehicles with the low beam headlight configuration. The lack of FCWs without the signs present and FCWs during some of the runs with the signs present indicates the presence of the signs in the Exponent demonstration increased the likelihood of the FCW/AEB systems issuing a warning. This directly contradicts Mr. Moore's opinion that the presence of signs shorter than the subject incident signs may have exceeded some radar "rejection threshold" and negatively impacted performance of the FCW/AEB systems during the Exponent demonstration.

Ryan J. Harrington
Principal - Vehicle Engineering Practice

---

[74]   Ibid., p. 77.





# E*x*ponent®
Engineering & Scientific Consulting

## Ryan Harrington, M.E.

Principal | Vehicle Engineering
Natick
+1-508-652-8543 | rharrington@exponent.com

## Professional Profile

Mr. Harrington brings a unique perspective to his clients having worked in the automotive and emerging transportation technology industries and the federal government. He specializes in the analysis of complex technical and policy issues related to the development, testing, failure analysis, and deployment of emerging technologies, including automated vehicles (AVs), advanced driver assistance systems (ADAS), electric vehicles, vehicle-to-vehicle (V2V) communications, and fuel economy and emissions related technologies, while fostering collaboration between industry executives, senior government officials, and engineers.

During his decades of industry and federal government experience, Mr. Harrington has developed and assessed automated vehicle safety cases and safety management systems (SMSs). He has developed ADAS test procedures and conducted testing on a wide variety of ADAS technologies, on numerous vehicle platforms, to assess their performance and nuisance alert rates under diverse operating conditions. Mr. Harrington has analyzed and developed federal regulations, policies, and standards related to fuel economy and emissions rulemakings and motor vehicle safety standards. He has also analyzed failure data and conducted root cause analyses for gasoline and diesel engines and automotive components; supported defect and recall investigations, developed prototype electric power steering (EPS) systems; performed noise, vibration, and harshness (NVH) investigations and customer acceptance evaluations; led fuel economy studies; conducted fuel efficient driver training; and assessed hybrid electric vehicle (HEV) driving range.

As the Vice President of Safety at Motional, Mr. Harrington led a team of safety professionals focused on the development, implementation, and oversight of Motional's AV product, operational, and organizational safety program. He and his team were responsible for developing Motional's safety case and SMS; conducting functional safety, Safety of the Intended Functionality (SOTIF), and industry best practice assessments; analyzing test results and data; and leading safety investigations.

During his time at the U.S. Department of Transportation (DOT), Mr. Harrington served as the Chief of the Technology Innovation and Policy Division at the Volpe National Transportation Systems Center (Volpe Center). He led a cross-functional team of scientists, engineers, and analysts focused on emerging transportation technologies including automated vehicles, connected vehicles, connected/smart cities, and big data. Mr. Harrington and his team assessed alternative policy approaches to overcome technical and policy barriers impacting the deployment of advanced transportation technologies at the local, regional, and national level. He and his team also conducted a scan of Federal Motor Vehicle Safety Standards (FMVSS) to identify potential conflicts with the certification of automated vehicles; reviewed comments submitted in response to the Federal Automated Vehicles Policy (FAVP); and supported automated vehicle research and safety regulation analyses for passenger cars, commercial motor vehicles (CMV), and transit vehicles. Mr. Harrington was invited to the White House Office of Science and

Technology Policy's (OSTP) Executive Leadership Retreat at Camp David to identify key priorities and challenges related to the deployment of automated vehicles.

In his prior work at the Volpe Center, as a Senior Engineer, Mr. Harrington led a team that performed engineering analyses and developed fuel-savings, cost, deployment rates and applicability assumptions for light-duty and heavy-duty vehicle technologies, which were incorporated into the National Highway Traffic Safety Administration's (NHTSA) Corporate Average Fuel Economy (CAFE) standard setting compliance and effects modeling. He presented technology analyses at senior level briefings for the White House Office of Management and Budget (OMB), the DOT, the Environmental Protection Agency (EPA), the California Air Resources Board (CARB), and the National Academy of Sciences (NAS). He represented the DOT and participated in executive level meetings with vehicle manufacturers; engine, transmission, and component suppliers; and industry trade associations. Mr. Harrington was personally congratulated and recognized by the President in the Oval Office for his technical contributions to the development of the model years 2017-2025 CAFE standards. Additionally in his role as a Senior Engineer, Mr. Harrington developed performance specifications, test track and on-road test procedures, and pass/fail criteria to assess the performance and nuisance alert rates of ADAS technologies. He also served as the U.S. DOT/NHTSA's test evaluator for the Integrated Vehicle-Based Safety Systems (IVBSS) crash avoidance program, which evaluated the independent and integrated performance of forward collision, lane departure, lane change/merge, and curve speed warnings.

As a Technical Support Manager at Cummins Inc., Mr. Harrington led Six Sigma fuel economy improvement projects, analyzed customer requirements, and proposed diesel engine/drivetrain changes to improve the fuel efficiency of long-haul trucks. He analyzed failure data and conducted field investigations to identify the root cause of diesel engine failures and brought resolution to customer product issues. In his role as a Vehicle Test Operations Manager at Environmental Testing Corporation, Mr. Harrington coordinated Federal Test Procedure (FTP) dynamometer emissions testing by interfacing with customer engineers and managing technicians. While working at Delphi Automotive Systems, as a Product Development Engineer, Mr. Harrington led the design and integration of prototype EPS systems into customer developmental vehicles. Using Shainin® Red X methodologies, he performed NVH identification and consumer acceptance evaluations of EPS systems at customer and Delphi facilities in Poland, Italy, and Germany.

Mr. Harrington's passion for motor vehicles and automotive engineering extends beyond his professional career. He is a volunteer design judge for the Formula Hybrid Competition, which is part of the SAE International Collegiate Design Series. Mr. Harrington continues to develop his vehicle dynamics knowledge and driving skills by competing in Sports Car Club of America (SCCA) and Porsche Club of America (PCA) autocross racing.

## Academic Credentials & Professional Honors

M.E., Automotive Engineering, University of Michigan, Ann Arbor, 2004

B.S., Mechanical Engineering, University of Nebraska, 1999

Recipient of the U.S. DOT Secretary's Gold Medal Award (DOT's highest award), 2008

## Prior Experience

Vice President of Safety, Motional, 2022-2023

Principal, Exponent, 2017-2022

Division Chief, U.S. DOT Volpe National Transportation Systems Center, 2012–2017

Senior Engineer, U.S. DOT Volpe National Transportation Systems Center, 2007–2012

Technical Support Manager, Cummins Inc., 2004–2007

Vehicle Test Operations Manager, Environmental Testing Corporation, 2004

Product Development Engineer, Delphi Automotive Systems, 2000–2004

Engineering Intern, Goodyear Tire & Rubber Company, 1998–1999

## Professional Affiliations

SAE International

## Publications

Scully I, Scally S, Clark R, Carey M, Cades D, Harrington R. Safety and Regulatory Considerations of Advanced Driver Assistance Systems (ADAS). American Bar Association – Tort Trial and Insurance Practice Section's Committee News; Fall 2020.

Krake A, Jonas R, Hoyos C, Crump C, Lester B, Cades D, Harrington R. Effects of Training on Learning and Use of an Adaptive Cruise Control System. SAE Technical Paper 2020-01-1033, April 2020.

Harrington R. Government Keeps Foot Off Gas on AV Regulations. Automotive News, February 2020.

Cades D, Senatore C, Campbell J, Harrington R, Wood D. Automated and Assistive Vehicle Technology: Opportunities and Challenges. American Bar Association – The Brief, Volume 49, Number 1, Fall 2019.

Harrington R, Senatore C. The Road Toward Automated Vehicles. Connecticut Defense Lawyers Association – The DEFENSE, Volume 31, Number 1, Spring 2019.

Harrington R, Senatore C, Scanlon J, Yee R. The Role of Infrastructure in an Automated Vehicle Future. National Academy of Engineering – The BRIDGE, Volume 48, Number 2, Summer 2018.

Lange R, Kelly S, Senatore C, Wilson J, Yee R, Harrington R. Data Requirements for Post-Crash Analyses of Collisions Involving Collison Avoidance Technology Equipped, Automated, and Connected Vehicles. ESV 2017 Paper Number 17-0338, June 2017.

Kim A, Perlman D, Bogard D, Harrington R. Review of Federal Motor Vehicle Safety Standards (FMVSS) for Automated Vehicles: Identifying potential barriers and challenges for the certification of automated vehicles using existing FMVSS. DOT VNTSC OSTR 16 03, March 2016.

Bettisworth C, Burt M, Chachich A, Harrington R, Hassol J, Kim A, Lamoureux K, LaFrance-Linden D, Maloney C, Perlman D, Ritter G, Sloan S, Wallischeck E. Status of the Dedicated Short-Range Communications Technology and Applications: Report to Congress. FHWA JPO 15 218, July 2015.

Shaulov M, Green K, Harrington R, Mergel J, Pickrell D, Keefe R, Van Schalkwyk J. 2017 - 2025 Corporate Average Fuel Economy Compliance and Effects Modeling System Documentation. DOT HS 811 670, August 2012.

Van Schalkwyk J, Green K, Pickrell D, Harrington R, Shaulov M. 2012 - 2016 Corporate Average Fuel Economy Compliance and Effects Modeling System Documentation. DOT HS 811 301, March 2010.

Harrington R, Lam A, Nodine E, Ference J, Najm W. Integrated Vehicle-Based Safety Systems Light-Vehicle On-Road Test Report. DOT HS 811 020, August 2008.

Harrington R, Lam A, Nodine E, Ference J, Najm W. Integrated Vehicle-Based Safety Systems Heavy-Truck On-Road Test Report. DOT HS 811 021, August 2008.

**Selected Invited Presentations**

Harrington R. Latest Technological Advancements and their Legal, Regulatory, and Compliance Challenges Part II: The Legal and Regulatory Dynamics in Autonomous Vehicle Technology. Presenter and panelist, American Conference Institute (ACI) – Legal, Regulatory, and Compliance Forum for the Automotive Industry, Chicago, IL, March 6, 2024.

Harrington R. Latest Technological Advancements and their Legal, Regulatory, and Compliance Challenges Part II: The Legal and Regulatory Dynamics in Autonomous Vehicle Technology. Presenter and panelist, American Conference Institute (ACI) – Legal, Regulatory, and Compliance Forum for the Automotive Industry, Chicago, IL, March 6, 2024.

Harrington R. Autonomous Vehicles: How Safe Is Safe Enough? Panelist, Massachusetts Institute of Technology (MIT) – Mobility Vision Day: Setting a Research Agenda for the Future of Transportation, Cambridge, MA, November 3, 2022.

Harrington R. An Inside Look at Policy-Making for Automated Vehicles – Understanding the Federal Policy Landscape. Presenter and panelist, Transportation Research Board (TRB) – Automated Road Transportation Symposium 2021 (ARTS21), July 12-15, 2021.

Harrington R. Efficiency Town Hall: AV Fuel Economy & Efficiency Regulations and Technologies. Presenter and panelist, Transportation Research Board (TRB) – Automated Road Transportation Symposium 2021 (ARTS21), July 12-15, 2021

Harrington R. Legal & Liability. Panelist, Center for Connected and Automated Transportation (CCAT) at the University of Michigan - Global Symposium on Connected and Automated Transportation Webinar, April 14, 2020.

Harrington R. Overview of the Technologies - Levels of Automation - Federal Policies and Regulations. Presenter, ADAS & AV Legal Issues & Liabilities World Congress, Novi, MI, October 22, 2019.

Harrington R. Automated/Autonomous Driving Systems (ADS) 101: A Guide for Automotive Practitioners. Presenter and panelist, American Conference Institute (ACI) - Automotive Product Liability Litigation Conference, Chicago, IL, July 17, 2019.

Harrington R. Changing Landscapes of the Transportation Environment - What Attorneys Need to Know. Panelist, Product Liability Advisory Council (PLAC) - OEM/Supplier Legal Summit, Detroit, MI, February 28, 2019.

Harrington R. Advanced Driver Assistance Systems. Presenter and panelist, Product Liability Advisory Council (PLAC) - Fall Conference, Dana Point, CA, November 1-2, 2018.

Harrington R. Autonomous Vehicles: The Good, The Bad, & The Ugly. Presenter and panelist, American Bar Association - Webinar, October 2, 2018.

Harrington R. The Changing Nature of Driving: Implications of Advanced Driver Assistance Systems (ADAS) and Highly Automated Vehicles (HAV). Presenter and panelist, The Bar Association of San Francisco - Webcast, San Francisco, CA, July 11, 2018.

Harrington R. An AV Crash Occurs: What Happens Next?. Panelist, Automated Vehicles Symposium 2018, San Francisco, CA, July 9-12, 2018.

Harrington R. Paving the Road to ADAS & Automated Driving with Embedded Systems. Panelist,

Embedded Systems Conference 2018, Boston, MA, April 18-19, 2018.

Harrington R. The Passenger Cabin of the Future: Alternative Cabin Layouts for Autonomous Vehicles. Presenter and panelist, American Bar Association - 2018 Emerging Issues in Motor Vehicle Liability Litigation Conference, Phoenix, AZ, April 5-6, 2018.

Harrington R. An Automated Vehicle Crashes: What Happens Next?. Panelist, Automated Vehicles Symposium 2017, San Francisco, CA, July 11-13, 2017.

Harrington R. Societal Perspectives on Safety Assurance. Presenter and panelist, Automated Vehicles Symposium 2017, San Francisco, CA, July 11-13, 2017.

Harrington R. The Future of Vehicle Fuel Efficiency & Emissions Policies. Panelist, Motor & Equipment Manufacturers Association (MEMA) - 2017 Legislative Summit, Washington, DC, May 16-18, 2017.

Harrington R. Automated Vehicles: The Evolving Landscape and Product Litigation Considerations. Presenter and panelist, American Bar Association - 2017 Emerging Issues in Motor Vehicle Liability Litigation Conference, Phoenix, AZ, April 6-7, 2017.

Harrington R. Exploring Autonomous Technology within Greater Boston. Panelist, Association for Unmanned Vehicle System International (AUVSI) New England - Autonomous Vehicles Summit 2017, Cambridge, MA, March 2, 2017.

Harrington R. Automated and Connected Vehicles: Overview and USDOT Role. Eighth Annual Autonomous Guidance, Navigation and Control (AGN&C) Symposium, Draper Laboratories, Cambridge, MA, November 3, 2016.

Harrington R. Automated and Connected Vehicles: Overview and USDOT Role. American Council of Engineering Companies (ACEC) 2016 Fall Conference, Colorado Springs, CO, October 21, 2016.

Harrington R. CAFE Compliance and Effects Modeling System - Overview. National Academy of Sciences Committee Meeting - Assessment of Technologies for Improving Fuel Economy of Light-Duty Vehicles - Phase 2, Washington, DC, June 20-21, 2012.

Harrington R. Passenger Car and Light Truck CAFE Analysis and Technology Inputs. National Academy of Sciences Committee Meeting - Committee to Assess Fuel Economy Technologies for Medium- and Heavy-Duty Vehicles, Ann Arbor, MI, June 18-19, 2009.

Harrington R. Light Vehicle and Heavy Truck Test Track Verification Test Results. Integrated Vehicle-Based Safety Systems 2008 Public Annual Meeting, Ypsilanti, MI, April 10-11, 2008.

## Additional Education & Training

Emissions Analytics – Portable Emissions Measurement System (PEMS) Training, 2021

kVA and SGS-TÜV Saar – Automotive Function Safety Professional (AFSP) Certification (ISO 26262), 2019

SAE International – Powertrain Selection for Fuel Economy and Acceleration Performance and Turbocharging for Fuel Economy and Emissions, 2009

Bosch VP44 Diesel Fuel Injection System Training, 2006

Six Sigma Green Belt Training, 2005

Shainin® Red X Problem Solving Training, 2003

General Motors Advanced Driver Training, 2001

## Peer Reviews

Served as a peer reviewer at the Department of Energy's (DOE) Annual Merit Review (AMR)

Benavides v. Tesla, Inc. RH
2111593.001 - 8183                                                                                                   1

## List of Materials

Since the issuance of my rebuttal report dated July 8, 2024, I have received the following
additional materials:

- Expert Reports
  - Cades, David Rebuttal Report (2024-07-08)
  - Cummings, Mary Cummings Updated Opinion (2024-07-20)
  - Cummings, Mary Supplemental Report (2024-08-20)
  - Cummings, Mary Supplemental Report (2024-12-02)
  - Cummings, Mary Declaration (2024-12-02)
  - Moore, Alan Rebuttal Report (2024-07-08)
  - Moore, Alan Supplemental Report (2024-08-20)
  - Moore, Alan Declaration (2024-12-02)
    - Drokin, Oleg Declaration (2024-12-02)
    - Lewis, Jason Affidavit (2024-11-05)
    - Videos (3 .mp4)
    - Main Frame by Frame (1 .pdf)
  - Moore, Alan Supplemental Declaration (2024-12-12)
- Expert Files
  - Cummings Expert File (2024-07-22)
  - Moore, Alan Expert File (2024-07-01)
  - Moore, Alan Expert File (2024-12-12)
- Depositions and Exhibits
  - Cades, David Deposition with Exhibits (2024-07-26)
  - Cummings, Mary Deposition with Exhibits (2024-07-23)
  - Cummings, Mary Deposition with Exhibits (2024-12-13)
  - Harrington, Ryan Deposition (2024-08-01)
  - Moore, Alan Deposition (2024-07-02)
  - Moore, Alan Deposition with Exhibits (2024-12-13)
  - Phatak, Akshay Deposition with Exhibits (2023-07-20)
  - Rubio Blanco, Eloy Deposition with Exhibits (2024-05-31)
  - Russell, Sally Deposition with Exhibits (2024-11-26)
  - Sumwalt, Robert Deposition with Exhibits (2023-07-09)
  - Walker, James Deposition with Exhibits (2023-07-16)
- Tesla Production 009 [BENAVIDES-]
  - NHTSA PE21-020: Question 5b [00003119]
  - NHTSA PE21-020: Question 5.c. [00003125]
  - NHTSA PE21-020: Question 5.d. [00003135]
  - NHSTA PE21-020: Question 5.e. [00003148]
  - NHSTA PE21-020: Question 5.f. [00003150]
  - Hardware 3 [00003157]
  - Tesla Letter to Paul Hemmerbaugh [00003163]
  - Video [00003186]
  - Video [00003187]
  - Telsa Quarterly Report March 27, 2019 [00003188]

Benavides v. Tesla, Inc. RH
2111593.001 - 8183                                                                 2

- Video [00003223]
  - Certificate in Support of Request for Confidentiality [00003224]
  - Tesla Letter to Jonathan Morrison [00003225]
  - Tesla Quarterly Update June 15, 2018 [00003228]
  - Certificate in Support of Request for Confidentiality [00003261]
  - Tesla Letter to Jonathan Morrison [00003262]
- BENAVIDES-00002093
- Driver Assistance System - Model S – HW2.5 [00003048]
- DLD 3.30-8.40pm from MCU chip [00003264]
- DSAR aka customer friendly log data and log signals [00003350]
- BENAVIDES-00003447-00007495
- 2019 Tesla Model S owner's manual, 2019.16.2 (May 16, 2019)

**Other Reliance Materials**

- Campbell, J., Brown, J., Graving, J., Richard, C., Lichty, M., Sanquist, T., Bacon, P., Woods, R., Li, H., Williams, D., and Morgan, J., "Human Factors Design Guidance for Driver-Vehicle Interfaces," Battelle Memorial Institute, DOT HS 812 360, December 2016.
- Continental ARS4-B Advanced Radar Sensor datasheet.
- "Tesla rolls out AutoSteer Stop Light Warning for Autopilot in latest software update," Available at: https://www.teslarati.com/tesla-autopilot-autosteer-stop-light-warning/
- https://www.notateslaapp.com/software-updates/version/2019.8.4/release-notes
- https://electrek.co/2020/04/24/tesla-autopilot-traffic-light-and-stop-sign-control-feature/
- "NHTSA Orders Crash Reporting for Vehicles Equipped with Advanced Driver Assistance Systems and Automated Driving Systems," NHTSA, 2021. Available at: https://www.nhtsa.gov/press-releases/nhtsa-orders-crash-reporting-vehicles-equipped-advanced-driver-assistance-systems, accessed in December 2024.
- "Automated Vehicles for Safety," NHTSA, Available at: https://www.nhtsa.gov/vehicle-safety/automated-vehicles-safety, accessed in December 2024.