# EXHIBIT E

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF FLORIDA

3    _____

4    NEIMA BENAVIDES, AS PERSONAL          )
     REPRESENTATIVE OF THE ESTATE OF       )
5    NAIBEL BENAVIDES LEON, DECEASED,      )
                        PLAINTIFF,         )
6        VS.                               )  CASE NO.
     TESLA, INC., A/K/A TESLA FLORIDA,     )  21-cv-21940-
7    INC.,                                 )  BLOOM/Torres
                        DEFENDANT.         )
8    _____)

9    DILLON ANGULO,                        )
                        PLAINTIFF,         )
10       VS.                               )  CASE NO.
     TESLA, INC., A/K/A TESLA FLORIDA,     )  22-22607-KMM
11   INC.,                                 )
                        DEFENDANT.         )
12   _____)

13

14          REMOTE VIDEOTAPED DEPOSITION

15                 RYAN HARRINGTON

16           THURSDAY, AUGUST 1, 2024

17                   7:06 A.M.

18           LOS ANGELES, CALIFORNIA

19

20

21

22

23   PAGES 1 - 142

24   REPORTED BY MICHAEL CAGLIATA

25   CSR #14491, RPR

```
1                 A P P E A R A N C E S

2

3   For the Plaintiff:

4           SINGLETON SCHREIBER, LLP

5           BY:  BRETT J. SCHREIBER, ESQ.

6           591 CAMINO DE LA REINA

7           SUITE 1025

8           SAN DIEGO, CALIFORNIA 92108

9           619-771-3473

10

11  For the Defendant:

12          BOWMAN AND BROOKE, LLP

13          THOMAS P. BRANIGAN, ESQ.

14          101 WEST BIG BEAVER ROAD

15          SUITE 1100

16          TROY, MICHIGAN 48084

17          248-205-3300

18

19

20

21

22

23

24

25
```

Transcript of Ryan Harrington
Conducted on August 1, 2024                                      36

1    auto steer may have been operating in the background

2    but the vehicle was being operated as a level one

3    system because Mr. McGee was providing the

4    longitudinal control of the vehicle.

5         Q.   And so according to you, the vehicle is

6    operating as a level 1 autonomous vehicle through the

7    last 67 seconds including up until impact?

8         A.   Yes.  So TAC and auto steer may have both

9    been engaged for that last 75 seconds.  Mr. McGee had

10   overridden TACC and so he was providing the

11   continuous control in the longitudinal corrections.

12   So the system is was only providing L1 support.

13        Q.   All right.  So in the last

14   second-and-a-half when auto steer and TACC are

15   aborting and aborted, is it your testimony that the

16   vehicle was operating at level 0 autonomy?

17        A.   So as--

18             MR. BRANIGAN:  Object to the form of the

19   question as it mischaracterizes the data from the

20   vehicle, but go ahead.

21             THE WITNESS:  Could you restate the

22   question?

23        Q.   Sure.  You would agree that auto steer

24   began aborting at 1.354 seconds before impact.  This

25   is taken out of page 10 of your report.  It's a

1          MR. SCHREIBER:  Yes, sir.

2          THE WITNESS:  So it looks like our road

3     signs are four to five feet.  Something like that.

4          Q.   And what were the height of the actual road

5     signs on scene?

6          A.   So I don't have the exact number, but it's

7     column eight to 10 feet.

8          Q.   So you were off with a magnitude of about

9     40 percent.  Why?

10         A.   That is something that I did notice after

11     the testing was conducted.  However, if you look at

12     the data, without the signage, the systems weren't

13     observing the side profile of the vehicle.  It seems

14     like the Subaru and the Mercedes were actually

15     reacting to the signage.

16          So looking at it, if we actually would have

17     raised the sign height, it would have likely caused

18     either no FCW alert, or even later than we had.  So

19     from a conservative perspective, having the road

20     signs being lower likely resulted in a higher

21     likelihood of FCW alerts for even earlier alerts than

22     having put them even higher, which I think is what

23     Mr. Moore was trying to highlight.  That the signage,

24     if you would have put it higher, it would have been

25     at the edge of where the radar may not have perceived

1    them.  So if we would have put them up there, my

2    anticipation is we would have gotten alerts even

3    later or not at all.

4         Q.   But you don't know that because you didn't

5    actually do any testing with heights that were

6    substantially similar to the road sign heights on

7    scene; true?

8         A.   I don't know that.  But using my

9    engineering judgment and considering the text results

10   for that where it was just the Tahoe and there were

11   no alerts, putting the signage seemed like the

12   systems were responding to the signs.  So putting

13   them even higher and up and out of the way would

14   likely cause the systems to react, you know, less

15   aggressively to them.

16        Q.   Point to me the data in your file which

17   shows that the Subaru and the Mercedes were reacting

18   to the signs as opposed to the placement of the

19   vehicle before they provided forward collision

20   warnings or AEB activation?

21        A.   So if you go to page 76 of my report --

22        Q.   You're talking about your main report?

23        A.   My main report, yes.  If you look at

24   page 76, just above -- so it's Section 9.3.2.  It's

25   in 2 broadside Chevrolet Tahoe.

1    call out things like side profiles, high closing

2    rates, things like that.  Those challenging scenarios

3    are limitations in these systems.

4        Q.    Yeah.  It goes on to say that when a

5    vehicle is viewed from the side, when the difference

6    between the subject vehicle speed and the speed of

7    the vehicle in front of it is more than 30 miles an

8    hour, then the detected object is something other

9    than a motorcycle, bicycle, or pedestrian, and it's

10   at night, these are all limitations where eyesight in

11   its pre-collision braking system are not designed to

12   work; true?

13       A.    So the limitations define where they are

14   expected to work.  It doesn't mean that it's not

15   possible for them to work there, but that's not where

16   they're designed and validated.

17       Q.    So you knew going into this testing that

18   Subaru's eyesight system would not work based upon

19   under these similar -- under a similar scenario as

20   the subject incident; true?

21       A.    I think you said would not work?  So the

22   expectation based on that limitation language is that

23   it may not work and, that's across the board for

24   model 2019.  The subject incident was near the

25   limitations of most systems, however, we picked the

1    best systems that we could find at the time that

2    NHTSA tested.  So did I understand that this was a

3    challenging scenario based on that language?  Yes.

4    But it was for just about for every system out there.

5    That's the state of the art at the time.

6        Q.   Okay.  So saying with the Volvo S60 T6 that

7    used for at least one of your tests, you knew going

8    in that the limitations of its collision mitigation

9    system were unlikely to work in this scenario; true?

10        A.   Correct.  I had a similar understanding

11    that Mr. Moore did, that it was a challenging

12    scenario.  We found the best systems out there to

13    show that even the best systems at the time, the

14    state of the art, that this was a challenging

15    scenario.

16        Q.   Okay.  Scenario 1.  You run all three

17    vehicles through their paces.  How many runs did you

18    take for each vehicle in scenario 1?

19        A.   Scenario 1, you're saying the ones listed

20    on tables --

21        Q.   I'm looking at Table 10 which summarizes

22    your test results of scenario 1.  Broadside global

23    vehicle target.

24        A.   So that would have been six tests for each

25    system.

1      Q.   Okay.  Just looking out for you Branigan?

2           MR. BRANIGAN:  The question is whether we

3    get a -- some money from the plaintiffs now that we

4    know that they're not really interest needy their FCW

5    and AEB claim, contrary to multiple allegations in

6    the amended and consolidated complaint.

7      Q.   All right.  So let's go ahead and talk

8    about the crashing.  Same thing.  No -- well, the

9    Subaru -- let's start with the Mercedes.  We're going

10   to get to my page.  So when you crash the Mercedes,

11   you have a robot driver?  Or you have a robot in the

12   vehicle?  Is that a yes?

13     A.   Correct.

14     Q.   And how was the vehicle being controlled?

15     A.   By the robot driver.

16     Q.   Okay.  And there are no lateral automation

17   features being used?

18     A.   Correct.  The control functions come from a

19   test driver using the VR headset and controls into

20   the robot driver, and so all lateral and longitudinal

21   control is provided by the test driver via the robot.

22   The vehicle is not providing lateral or longitudinal

23   control.

24     Q.   Okay.  And that's the same for the Subaru

25   as well?

```
1    STATE OF CALIFORNIA      )
                              )
2    COUNTY OF LOS ANGELES    )

3

4         I, Michael Cagliata, Certified

5    Shorthand Reporter No. 14491, do hereby

6    Certify:

7         That prior to being examined, the witness

8    named in the foregoing deposition was by me duly

9    sworn to testify the truth, the whole truth, and

10   nothing but the truth;

11        That said deposition was taken down by me

12   in shorthand and thereafter reduced to print by

13   means of computer-aided transcription; and the same

14   is a true, correct, and complete transcript of said

15   proceedings.

16        I further certify that I am not

17   interested In the outcome of the action.

18        Witness my hand this 1st day of August, 2024.

19

20

21   _____

22   Michael Cagliata, CSR #14491, RPR

23   Certified Shorthand Reporter

24   In and for the State of California

25
```