## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| NEIMA BENAVIDES, as Personal Representative of the Estate of Naibel Benavides Leon, deceased,<br><br>      Plaintiff,<br><br>v.<br><br>TESLA, INC., a/k/a Tesla Florida, Inc.,<br><br>      Defendant. | Case No. 21-cv-21940-BLOOM/Torres |
| DILLON ANGULO,<br><br>      Plaintiff,<br><br>v.<br><br>TESLA, INC. a/k/a Tesla Florida, Inc.,<br><br>      Defendant. | Case No. 22-22607-KMM |

## PLAINTIFFS' OPPOSITION TO TESLA, INC.'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Neima Benavides and Dillon Angulo, by and through undersigned counsel, hereby file this Memorandum of Law in Opposition to Tesla's Motion for Summary Judgment.

### INTRODUCTION

On April 25, 2019, George McGee was driving his 2019 Tesla Model S car on a poorly lit road in the Florida Keys. The car was equipped with Autopilot, the suite of advanced driver-assist features that Tesla founder Elon Musk insists will eventually lead to fully autonomous cars.

McGee bought his Tesla because he thought the car's Autopilot would "help [him] stop or turn or avoid [a] crash or someone that stopped ahead, it would slow down and stop, so it

wouldn't have a collision.  Plaintiffs' Counter Statement to Tesla's Undisputed Material Fact ("PCS SUMF") ¶ 104.

But McGee's faith in his Tesla was badly misplaced. While driving home that night in March, McGee crashed into a car parked on the side of the road, striking two pedestrians: Naibel Benavides Leon and Dillon Angulo.  As a result of the crash, Dillon was seriously injured and Naibel died. *Id*. ¶¶ 15-18.

Crashes like this one are all too common with Tesla vehicles.  ECF 205 ¶ 83 (listing 55 Tesla crashes caused by Autopilot defects from 2016-2022).  In a recent study, the National Highway Traffic Safety Administration ("NHTSA") found that Tesla's "Autopilot controls [do] not sufficiently ensure driver attention and appropriate use" and "invite greater driver confidence via its higher control authority and ease of engagement."  PCS SUMF ¶ 90.  NHTSA concluded that "[t]his mismatch of weak usage controls and high control authority was evident in these crash categories, which included indications of driver disengagement from the driving task."  *Id*.

Those words could have been written about this case.  Like many other Tesla drivers, McGee was lulled into a false sense of security by Tesla's Autopilot features.  Predictably complacent in the belief that Autopilot would prevent any crash, McGee took his eyes off the road at precisely the wrong moment, with tragic consequences for Plaintiffs.

In a lawsuit filed against him by Ms. Leon's sister Neima, McGee blamed Tesla for the crash.  He testified at his deposition that he thought that the Vehicle, when on Autopilot, "would stop regardless of any car…. [If] there was a parked car, it would stop and not hit it."  ECF 318-9 at 108:15-23.  In an interrogatory response, he stated that "defendant's vehicle's autopilot's system, automatic emergency braking system, and front collision warning malfunctioned at the time of the incident."  *Id.* at ¶ 119.

Plaintiffs' liability experts here—Mary Cummings and Alan Moore—have confirmed that Tesla's misconduct was the principal cause of the crash.  *See* ECF 347.  They assert, among other things, that Autopilot is defective because it can be used outside of its Operational Design Domain ("ODD") and that the Driver Monitoring System ("DMS") that is supposed to monitor driver awareness while using Autopilot is insufficient.  *See* PCS SUMF ¶¶ 130-165. Plaintiffs' experts also opine that Autopilot, having detected obstacles in McGee's path, should have issued a warning or applied the brakes, and yet did neither. Id. ¶¶ 141, 156-165.  Just as NHTSA concluded, moreover, Plaintiffs' experts opine that Autopilot results in drivers becoming

complacent and/or confused as to Autopilot's capabilities and limitations. In fact, the very term "Autopilot" has invoked so much overconfidence that "an entire set of countries have banned its use" by Tesla.  PCS SUMF ¶ 93.

Despite the foregoing, Tesla asks this Court to grant summary judgment on all Plaintiffs' claims on the ground that McGee's negligence was the sole proximate cause of the crash.  Tesla also seeks summary judgment on Plaintiffs' claims for design defect, failure to warn, manufacturing defect, and negligent misrepresentation claim for reasons unrelated to causation. And it asks this Court to reject Plaintiffs' claim for punitive damages on the ground that Plaintiffs have failed to present clear and convincing evidence that Tesla engaged in intentional misconduct or gross negligence.

As explained below, none of Tesla's arguments withstands scrutiny, because proximate causation is not an issue and this case presents a host of disputed factual issues that must be decided by a jury, not this Court.

## STATEMENT OF FACTS

### A.  <u>The NTSB's Investigation of the Williston Crash.</u>

The federal government has long understood that Tesla's cars pose a serious threat to public safety.  In 2016, the National Transportation Safety Board ("NTSB") launched an investigation into a crash near Williston, Florida, involving a 2015 Tesla Model S 70D car (a precursor to the model at issue here).  PCS SUMF ¶ 83. The driver was using automated vehicle control systems within Tesla's Autopilot suite.  *Id.*

The NTSB determined that the crash was caused by "the truck driver's failure to yield the right of way to the car, *combined with the car drive's inattention due to overreliance on vehicle automation*, which resulted in the car driver's lack of reaction to the presence of the truck."  *Id.* at ¶ 84 (emphasis added).  The NTSB added that "[c]ontributing to the car driver's overreliance on the vehicle automation was its operational design, which permitted his prolonged disengagement from the driving task and his use of the automation in ways inconsistent with guidance and warnings from the manufacturer."  *Id.*

The agency recommended, among other things, that manufacturers of vehicles equipped with Level 2 automation systems:

> Incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed….[; and]

> Develop applications to more effectively sense the driver's level of engagement and alert the driver when engagement is lacking while automated vehicle control systems are in use. [ ]

*Id*. at ¶ 85.

At the time this report was issued, the NTSB was chaired by Robert L. Sumwalt, III, an expert in automated systems. At his deposition in this case, Sumwalt testified that highly automated systems can lead to operator or driver complacency due to the perception of high reliability. *Id*. at ¶ 86. He further testified that the foregoing recommendations were sent to six car makers, including Tesla—but Tesla never responded. *Id*. at ¶ 87.

**B. NHTSA's Investigation of Tesla's Autopilot System.**[1]

NHTSA, like the NTSB, began investigating failures of Tesla's autopilot system as a result of the 2016 Williston crash. *Id*. at ¶ 88. On June 8, 2022, NHTSA expanded its investigation to include autopilot collisions in general. *Id*. at ¶ 89. The expanded investigation, which covers all Tesla Models S, X, 3, and Y vehicles released from 2014 through 2021, explore the degree to which Autopilot and associated Tesla systems "may exacerbate human factors or behavioral safety risks by undermining the effectiveness of the driver's supervision." *Id*. at ¶ 89.

In a summary of its investigation issued on April 25, 2024, NHTSA concluded that "Autopilot controls did not sufficiently ensure driver attention and appropriate use." *Id*. at ¶ 90. "At the same time," NHTSA said, "Autopilot invited greater driver confidence via its higher control authority and ease of engagement." *Id*.

NHTSA further concluded that "[t]his *mismatch of weak usage controls and high control authority was evident in these crash categories, which included indications of driver disengagement from the driving task*." *Id*. at ¶ 91 (emphasis added).

NHTSA elaborated that "[d]rivers involved in the crashes were not sufficiently engaged in the driving task and [ ] the warnings provided by Autopilot when Autosteer was engaged did not adequately ensure that drivers maintained their attention on the driving task." ECF 252-3 at 6. As a result, "[c]rashes with no or late evasive action attempted by the driver were found across all Tesla hardware versions and crash circumstances." *Id*. at ¶ 92.

---

[1] The admissibility of evidence related to NHTSA is addressed in Plaintiffs' Opposition to Tesla's Omnibus Motion *in Limine*.

NHTSA observed that the use of the term "Autopilot" is itself misleading, because it "elicits the idea of drivers not being in control." ECF 252-3 at 7. "This terminology," NHTSA wrote, "may lead drivers to believe that the automation has greater capabilities than it does and invite drivers to overly trust the automation." *Id*. at ¶ 93. NHTSA explained that non-TESLA vehicles using similar technology "generally use more conservative terminology like 'assist' … to imply that the driver and automation are intended to work together, with the driver supervising the automation." *Id.*

**C. The Voluntary Recall.**

On December 5, 2023, in the midst of NHTSA's investigation into the 2016 Williston crash, Tesla decided to voluntarily provide an over-the-air software update to its cars to provide additional warnings when Autopilot senses driver inattention. *Id*. at ¶ 94. The voluntary recall was in response to NHTSA's finding that, "[i]n certain circumstances when Autosteer is engaged, the prominence and scope of the feature's controls may not be sufficient to prevent driver misuse of the SAE Level 2 advanced driver-assistance feature." *Id*. at ¶ 95.

Despite the recall, Tesla refused to restrict, or "geofence," Autopilot and Autosteer to the kind of roads on which the technology was designed to operate—i.e., highways and limited access roads. *Id*. at ¶ 96.

Unsurprisingly, NHTSA was not satisfied with Tesla's recall. PCS SUMF ¶ 97. On May 6, 2024, NHTSA opened a new investigation to "Evaluate the adequacy of Recall 23V838, including the prominence and scope of Autopilot controls to address misuse, mode confusion, or usage in environments the system is not designed for." *Id.* In a related letter to Tesla, NHTSA's Office of Defect Investigation ("ODI") noted that there had been 20 post recall crashes, 14 of which involved the front end crashes or inadvertent disengagement relevant to the instant case. *Id.*

**D. George McGee and his Tesla.**

George McGee purchased his 2019 Model S Tesla (the "Vehicle") because he thought it would assist in his 100-mile commute from Boca Raton to Key Largo. *Id.* ¶ 98. He chose that model because he understood it to be equipped with the "highest package" in terms of levels of autonomous driving. *Id.* ¶ 99.

McGee's Tesla was equipped with Level 2 driving assistance, designated "Autopilot," as described by Society of Automotive Engineers J3016 (2018).  Id. ¶ 100.  Level 2 provides both lateral and longitudinal control of the vehicle to assist the driver.  *Id.*

Autopilot consists of two features: Traffic-Aware Cruise Control ("TACC") and Autosteer.  *Id.* The Vehicle was also equipped with Forward Collision Warning and Automatic Emergency Braking ("AEB").  *Id.* ¶ 101.

McGee believed that the Vehicle's Autopilot features would "keep [him] in the lane, avoid crashes, and direct [him] to where [he] needed to go."  *Id.* at ¶ 103.  McGee thought the Vehicle's Autopilot features would help him see any ongoing traffic and would help him stop or turn or avoid collisions.  *Id.* at ¶ 104.  He testified that when the Vehicle was on Autopilot, he thought it "would stop regardless of any car…. [If] there was a parked car, it would stop and not hit it." *Id.* ¶ 105.

McGee's faith in his car is consistent with Tesla's own representations.  In 2016, for example, Tesla aired a now-infamous ad (commonly referred to as the "Paint It Black" commercial) which said that "The person in the driver's seat is only there for legal reasons. He is not doing anything. The car is driving itself."  *Id.* ¶ 109; *see also* ECF 205 ¶ 41.  A Tesla engineer testified in another case that many segments of the commercial were staged and indeed, one Tesla crashed in the making of this video.  PCS SUMF ¶ 105; *see also* ECF 205 ¶ 42.

Despite that, in 2017 Elon Musk stated in a TED talk that, in about two years, Tesla owners could actually sleep while their cars drove themselves.  PCS SUMF ¶ 111.

In keeping with these statements, McGee had total faith that his Tesla would prevent any accidents—and his driving record prior to the accident bears that out.  As Moore explained in his initial report, ECF 318-1 at 10, McGee was a serial abuser of Autopilot: during his three-month ownership of his Tesla, McGee experienced 23 "strikeouts" due to inattentive driving—many less than 10 minutes apart.  PCS SUMF ¶ 107.[2]  When Mr. McGee received a strikeout, he frequently pulled over, placed the vehicle in Park and back into Drive, then continued the trip with Autopilot back in use.  *Id.* at ¶ 108.  McGee's persistent reinstatement of Autopilot evidences his faith in, and reliance on, that technology to keep him safe.

---

[2] A strikeout occurs when a Tesla's Autopilot system forcefully disengages for the remainder of a trip after the driver receives several audio and visual warnings for inattentiveness. ECF 318-1 at 7.

Because McGee was able to override his Tesla's strikeouts and re-engage Autopilot, he operated the vehicle under Autopilot on the date of the crash—with tragic consequences, as explained below.[3]

**E.  The Crash and the Resulting Lawsuits.**

On  the night of April 25, 2019, Dillon Angulo and Naibel Benavides Leon were standing by a 2010 Chevrolet Tahoe, parked on the shoulder of County Road 905 at the end of Card Sound Road in Monroe County, Florida.  *Id.* ¶¶ 112, 117.

Card Sound Road is a two-lane undivided rural road, approximately 16 miles long. *Id.* ¶ 112.  The shoulders are unpaved and in many places exhibit edge drop-offs from the asphalt surface.  *Id.*  There are frequently vehicles stopped on the roadside, and the road is used by bicyclists and pedestrians.  *Id.* There is no roadside lighting for most of the road.  *Id.*

According to the Owner's Manual for the Vehicle, Autopilot should not be used outside its Operational Design Domain ("ODD"), yet the Vehicle did not prevent drivers from using Autopilot outside the Vehicle's ODD. *Id.* ¶ 115.[4]

Tesla's ODD for Autopilot is limited to "straight roads, such as highways and freeways." *Id.* ¶ 114. Card Sound Road is outside of Autopilot's Operational Design Domain ("ODD").  *Id.* ¶ 116.

Despite that, McGee had Autopilot engaged while traveling on Card Sound Road on the night of the collision. *Id.* ¶ 117.  McGee drove past a stop sign and collided with the Tahoe, which then struck the two individuals standing beside it—killing Naibel Benavides Leon and injuring Dillon Angulo.  *Id.*

In their consolidated lawsuits against Tesla, Plaintiffs allege that the crash was caused by defects in the Vehicle's Autopilot suite of technology, which failed to adequately monitor and determine driver engagement and failed to adequately detect and respond to obstacles in the Vehicle's path of travel.  *See generally* ECF 205.

**F.  Tesla's Discovery Abuse.**

---

[3] On the final drive cycle, on which the accident occurred, McGee had already received one strikeout and a total of five audible warnings. Pulling over to reset the strikeout delayed his trip by 25 seconds. He was 1 chime away from another strikeout prior to impact.  PCS SUMF ¶ 107.

[4] An ODD is the "operating conditions under which a given driving automation system or feature thereof is specifically designed to function, including, but not limited to, environmental, geographical, and time-of-day restrictions, and/or the requisite presence or absence of certain traffic roadway characteristics." *Id.* ¶ 113.

Tesla fought tooth and nail throughout the case to prevent Plaintiffs from learning the truth about the defects in McGee's Vehicle. The story of Tesla's deception is recounted in Plaintiffs' Pending Motion for Sanctions and Corrected Reply in Support thereof, ECF 285 and 307, and will not be repeated here, except to state that Tesla intentionally withheld key information highly damaging to its defense—and directly supportive of Plaintiffs' experts' opinions.

Among other things, the new documents revealed what Tesla has long sought to hide: that Autopilot detected the stop sign, the traffic signal, the end of the roadway, a pedestrian (Dillon Angulo), *and* Dillon Angulo's parked Chevy Tahoe, ***yet failed to take any action as a result (not even a warning)***, resulting in the fatal crash. PSUMF ¶¶ 125-129, 141, 158-65.

For ***four years*** prior to the discovery of this evidence, Tesla flatly denied that the Vehicle's Autopilot was capable of detecting the presence of the Chevy Tahoe by the side of the Road. The new evidence rebuts that contention, revealing the full extent of Autopilot's defective design.

### SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate where there are "no genuine issues of material fact *and* the movant is entitled to judgment as a matter of law." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (emphasis added). "An issue is genuine if 'a reasonable trier of fact could return judgment for the nonmoving party.'" *Riley v. Tesla, Inc.*, 603 F. Supp. 3d 1259, 1285 (S.D. Fla. 2022), *on reconsideration*, No. 20-CV-60517, 2022 WL 2341165 (S.D. Fla. June 29, 2022) (citations omitted). Material facts are those that "might affect the outcome of the suit under the governing law." *Id.* (citations omitted).

The moving party carries the initial burden of establishing the absence of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). "If the moving party meets this burden, 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'" *Id.* (citation omitted). However, "all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party." *Riley*, 603 F. Supp. 3d at 1285.

### ARGUMENT

I.   **A REASONABLE JURY COULD FIND THAT TESLA WAS A PROXIMATE CAUSE OF THE CRASH.**

Tesla seeks to dismiss Plaintiffs' strict liability claims for design defect and failure to warn on proximate causation grounds.  ECF 326 at 6–16.  Tesla's arguments on this point fail as a matter of law and fact.

**A.  Plaintiffs' expert testimony is admissible to establish defect and causation.**

Tesla first argues that causation cannot be established here based on the absence of expert testimony to prove a design defect.  For reasons set forth in Plaintiffs' Opposition to Tesla's Motion to Exclude Plaintiffs' Experts Moore, Cummings, and Pettingill under Federal Rules of Evidence 702, 401 and 203 ("*Daubert* Opposition") (ECF 347), Plaintiffs' expert testimony establishing defect and causation is admissible. This argument therefore necessarily fails.

**B.  McGee's negligence does not support Tesla's motion because proximate causation is a question for the jury.**

Tesla next argues that McGee's negligence was the sole proximate cause of Plaintiffs' injuries, thereby absolving Tesla of liability.  In so arguing, Tesla ignores governing case law regarding proximate causation.

As stated by the Florida Supreme Court, "the law does not require an act to be the exclusive or even the primary cause of an injury in order for that act to be considered the proximate cause of the injury: rather, *it need only be a substantial cause of the injury*."  *Ruiz v. Tenet Hialeah Healthsystem, Inc*., 260 So.3d 977, 982 (Fla. 2018) (emphasis added); *see also Zinn v. United Stat*es, 835 F. Supp. 2d 1280, 1326 (S.D. Fla. 2011) (noting that, under Florida law, a defendant's "negligence may be a legal cause of damage even though it operates in combination with the act of another . . . if the negligence contributes substantially to producing such damage").

The existence of an intervening cause does not absolve the original tortfeasor of liability so long as the intervening cause was foreseeable.  *Worthington v. United States*, 21 F.3d 399, 405–07 (11th Cir. 1994).  "The dispositive test is 'whether the harm that occurred was within the scope of danger attributable to the defendant's negligent conduct.'" *Zinn*, 835 F. Supp. 2d at 1318 (citation omitted).

Stated differently, manufacturers have a duty to guard against foreseeable carelessness even where the injured party's own fault contributed to the cause of his injury. *See Auburn Machine Works Co., Inc. v. Jones*, 366 So.2d 1167 (Fla. 1979) (holding that manufacturer of trench

digging device can be held liable for defective design even though the product's danger was obvious and plaintiff's negligence contributed to the accident).

In *Auburn*, the Florida Supreme Court explained:

> If the injured person's conduct is a proximate cause of the injuries, the defendant would have the right to a charge on comparative negligence in an action for breach of implied warranty. If the injured person failed to use that degree of care which a reasonably careful person would use under like circumstances then he is guilty of some negligence. If this negligence was a proximate contributing cause of the injuries, the defendant would be entitled to raise the defense of contributory or comparative negligence. In other words, lack of ordinary due care could constitute such a defense.

*Id.* at 1172.

Under *Auburn*, Tesla can seek a charge on comparative negligence with respect to McGee.  What Tesla *cannot* do is avoid liability entirely on the ground that McGee's negligence broke the causal chain between Tesla and Plaintiffs.

*Moyer v. Martin Marietta Corp.,* 481 F.2d 585 (5th Cir. 1973), *abrogated on other grounds by Baldassaro v. United States,* 64 F.3d 206 (5th Cir. 1995), is instructive on this point.[5]

There, the widow of a deceased pilot filed suit against the United States, the manufacturer of the subject aircraft, and the manufacturer of the pilot's ejection seat after the ejection seat triggered while the aircraft was still on the ground, killing the pilot.  481 F.2d at 586.  Prior to the fatal accident, a repair company sought to install a new trigger guard for the ejection seat mechanism in accordance with a technical order.  *Id.* at 587.  Unfortunately, the repair caused the seat to trigger when the pilot pulled the armrest.  *Id.*  The widow claimed the manufacturers negligently designed and manufactured the seat.  *Id.* at 589.

The district court granted a direct verdict for the manufacturers on the ground that the pilot's negligence was the sole proximate cause of his injuries.  *Id.* at 590.  On appeal, the Fifth Circuit reversed the trial court and remanded for new trial.  *Id.* at 594–95.  Applying Florida law, the Fifth Circuit held that contributory negligence, foreseeability, and proximate cause are factual issues for the jury.  *Id.* at 595.

In so ruling, the Court observed that, under Florida law, "the intervention of independent intervening causes does not break causal connection *if the intervention of such forces was itself*

---

[5] The decisions of the United States Court of Appeals for the Fifth Circuit as of September 30, 1981, are binding precedent in the Eleventh Circuit.  *Armstrong v. The Cadle Co.,* 239 F.R.D. 688, 692 (S.D. Fla. 2007) (citing *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc)).

*probable or foreseeable*." *Id*. at 592 (emphasis added; quoting 23 Fla. Jur. Negligence, Sec. 39, page 282).

Here, Plaintiffs' experts have opined that McGee's negligence was the foreseeable product of Tesla's defective Vehicle—the creation of Tesla's Dr. Frankenstein.  This is amply supported by the record, as explained at length in Plaintiffs' *Daubert* Opposition.  *See* ECF 347. As set forth above, moreover, both the NTSB and NHTSA have determined that Tesla's Autopilot system makes drivers unduly complacent.  On these facts, a reasonable jury certainly could conclude that McGee's negligence was foreseeable to Tesla.

*Zinn v. United States*, 835 F. Supp. 2d at 1326, is similarly instructive.  There, the decedent (a pilot) was killed when his aircraft crashed after encountering severe weather.  *Id*. at 1284.  The pilot's estate filed suit against the United States, alleging that Federal Aviation Administration ("FAA") employees failed to provide timely, complete, and accurate weather information to the decedent so that he could avoid the dangerous weather.  *Id*. at 1311–17.  The United States argued that the employees' failure to warn the decedent was not the proximate cause of his injury, claiming instead that the pilot's own negligence caused the crash.  *Id*. at 1318.

The district court acknowledged the pilot's negligence but held that it "was not an intervening or superseding event to cut off liability against the FAA."  *Id*. at 1319.  Indeed, the court observed, "[a]n actor's negligence may be a legal cause of damage even though it operates in combination with the act of another, some natural cause, or some other cause if such other cause occurs at the same time as the negligence and if the negligence contributes substantially to producing such damage."  *Id*. (quoting *Abrisch v. United States*, 359 F. Supp. 2d 1214, 1230 (M.D. Fla. 2004)).

As in *Zinn*, McGee's negligence cannot reasonably be said to be an intervening cause that negates Tesla's liability.  Summary judgment would only be warranted on this point if McGee's reliance on Tesla's Autopilot, which made him complacent in his driving and ultimately led to the subject collision, was so "highly usual, extraordinary, [or] bizarre" that as a matter of fairness and policy it should relieve Tesla of all liability without the issue ever reaching the jury. *Worthington*, 21 F.3d at 406 (quoting *Department of Transp. v. Anglin*, 502 So.2d 896 (Fla. 1987)).  The facts at hand require this Court to answer such question in the negative, because there was nothing unforeseeable about McGee's negligence; to the contrary, it was induced by

Autopilot's defective design, and by 2019, Tesla was well aware that its customers were misusing autopilot and that such misuse was leading to accidents.

Nothing that Tesla says permits a different result.

Tesla starts off by citing cases distinguishable from this lawsuit. In *Kroon v. Beech Aircraft Corp.*, 628 F.2d 891, 893 (5th Cir. 1980), for example, the Court found that a pilot's egregious carelessness absolved the airplane's manufacturer for liability where the pilot's negligence was so extreme that the district court likened the circumstances of the accident "to a situation in which the pilot takes off with only a gallon of fuel in his tanks." *Id*. at 893. Under those "remote condition[s]," the court held, the pilot's carelessness broke the chain of causation. In this case, in contrast, the driver of the defective vehicle—McGee—predictably was lulled into a false sense of complacency by Tesla's own conduct. There is nothing "remote" about these circumstances; to the contrary, as explained above, Plaintiffs' experts have opined that Tesla actually caused McGee's negligence.[6]

Likewise, in *Kohler v. Medline Indus., Inc.*, 453 So.2d 908, 908 (Fla. Dist. Ct. App. 1984), the court declined to hold the manufacturer of a urine bag liable for strict liability in design where a trained nurse's aide who "knew that she should close [the] urine bag . . . simply neglected to do so with the inevitable result that its contents spilled onto the floor." Plainly, that is a far cry from this case. But even on those facts, one judge dissented on the ground that, under Florida law, the jury should have been allowed to decide whether "the intervening act of the nurse's aide in forgetting to close the bag [was] foreseeable by the manufacturer . . . in light of the bag's peculiar design." *Id*. at 910 (Walden, J., dissenting). So here, too, the jury must be allowed to decide whether McGee's negligence was foreseeable to Tesla in light of the Vehicle's complacency-inducing design. *Id*.

In arguing to the contrary, Tesla misrepresents the record both with regard to McGee and Plaintiffs' experts. Regarding McGee, Tesla argues that he "admitted, time and time again, that he caused the crash." ECF 326 at 9. In reality, although McGee accepted responsibility for his

---

[6] *Kroon*, notably, inspired a strong dissent, arguing that even under those extreme facts, the issue of proximate cause should have gone to the jury because, under Florida law, "a manufacturer may be liable for an injury resulting from its failure to guard against foreseeable carelessness, even though the victim's own carelessness (fault) in encountering the undue risk thereby created is a contributory cause of the accident (thereby reducing the damages awarded, but not defeating recovery)." *Id*. at 894 (Tate, J., dissenting) (citing *Auburn Machine Works Co., Inc.*, 366 So.2d 1167.)

contribution to the crash, he also blamed Tesla for the Vehicle's defective design.  *See* PCS SUMF ¶¶ 118-19.  Tesla does not even acknowledge this important fact in its brief.

As to the experts, Tesla points to Moore's statement that, "[i]n the last five seconds, McGee was in a better position [than Tesla] to avoid the crash," ECF 326 at 10, without acknowledging Moore's overarching opinion in the case: that the crash was caused by Tesla's failure to do even one of a number of things that would have prevented this crash, including (but not limited to):

- "[J]ust disabling Autosteer for a week after … three forced disengagements."  PCS SUMF ¶ 140;

- "Not telling the driver in the owner's manual how to defeat this. Don't tell the driver that they can pull over, put it in park and back in drive and be on their way again."  *Id*.;

- "[J]ust limiting the ODD, you know, at which point driver monitoring on this road wouldn't matter at all."  *Id*.;

- "[F]or every disengagement, provide a training interval for the driver. Explain to the driver why it disengaged rather than simply [saying] 'Autosteer unavailable for the rest of this drive. Hold steering to drive manually.' That provides zero information to the driver on why the disengagement happened. It has zero ability to change that driver's behavior.  *Id*.

Moore opined that if Tesla had done even *one* of these things in the months or years leading up to the crash, this crash never would have happened  (ECF 318-2 at 189:15-22)—yet Tesla failed to do any of them.

Thus, as in *Moyer*, where the Fifth Circuit held that a manufacturer could be held liable for design defect even though the pilot's negligence contributed to the crash, 481 F.2d at 595, Moore's testimony that McGee was in a better position than Tesla to avoid the crash "in the last five seconds" does not break the causal chain or absolve Tesla of its liability for Plaintiffs' injuries.

Moore testimony that action taken by autopilot would have prevented crash.

**C. Plaintiffs Have Presented Ample Evidence that the Vehicle's Design  Defects and Tesla's Failure to Warn Caused this Crash**.

In a final bid for summary judgment on proximate causation, Tesla argues that "Plaintiffs' experts rely on impermissible speculation and 'what if' to demonstrate causation.'" ECF 326 at 11.  Tesla makes this identical argument in its *Daubert* Motion, ECF 318 at 9-11,

13

and it fails for all the reasons stated in Plaintiffs' Opposition thereto, including that Tesla's argument  misstates the law on both *Daubert* and proximate causation, neither of which requires an expert to prove that a defendant was the exclusive cause of a plaintiff's injuries. *See* ECF 347 at Point I(A).  Plaintiffs' experts have proffered well-supported opinions that, notwithstanding McGee's negligence, Tesla's defectively designed Vehicle was the principal cause of this tragic crash.

Tesla's motion for summary judgment on proximate causation grounds should accordingly be rejected.

## II.     PLAINTIFFS' DESIGN DEFECT CLAIM CANNOT BE RESOLVED ON SUMMARY JUDGMENT BECAUSE IT IS WELL SUPPORTED BY THE EVIDENCE.

Tesla also argues that Plaintiffs "failed to establish a defect" in the Vehicle's design. Here, too, Tesla is improperly seeking summary judgment on an issue as to which there are myriad material disputed issues of fact.  And here again, Tesla misrepresents both the law and the facts.

### A. Tesla Misrepresents the Law Governing Design Defect Claims.

Under Florida law, a plaintiff asserting a design defect claim is not required provide proof of a reasonable alternative design; instead, the only question is whether the product failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by the manufacturer—and McGee's Tesla clearly did not.  *See Aubin v. Union Carbide Corp.*, 177 So.3d 489 (Fla. 2015) (adopting consumer-expectation test); *see also Patt v. Volkswagen Grp. of Am., Inc*., No. 22-CV-21585, 2024 WL 1675301, at *6 (S.D. Fla. Apr. 18, 2024) (holding that "Plaintiff may rely on the consumer-expectation test to demonstrate that the pre sense® rear technology [for seat belt design] is defective.").

Tesla nonetheless argues in its summary judgment motion (ECF 326 at 17) that Florida law is "unsettled" on this issue, suggesting that case is governed by the "risk utility" test, which requires proof of a reasonable alternative design.  That is incorrect.  The only exception to the consumer-expectation test is where the product as issue "was never marketed to ordinary consumers."  *Patt*, 2024 WL 1675301, at *6.  *Patt* makes clear that this exception does not apply in auto defect cases.  *Id*.

Notably, *Patt* went on to hold that Volkswagen's "owner's manual and marketing

materials can support a finding that [it] created the consumer expectation that the technology will exclusively activate either when a rear-end collision is about to occur, or when the technology detects a sufficiently high risk of a rear-end collision." *Id*. at *8.[7]

So here too, Plaintiffs allege, and intend to prove, that Tesla "created the consumer expectation" that Autopilot would protect them from the consequences of careless driving. For all the reasons explained in Plaintiffs' *Daubert* Opposition, there is ample evidence to support that contention—and for that reason alone (among many others, as discussed below) summary judgment is improper.

### B. Plaintiffs Have Sufficient Evidence to Support their Claim that Autopilot Should Not Have Been Available Outside of its Operational Design Domain ("ODD").

Tesla's contention that its decision to not restrict Autopilot's use outside of its ODD was "consistent with the state of the art" in 2019 blatantly misstates the record. ECF 326 at 18. At this first deposition, Tesla's counsel asked Plaintiffs' expert Alan Moore: "And are you aware of any other Level 2 vehicles in 2019 that could be used outside of their ODD?" ECF 318-2 at 110: 8-10; *see also* PCS SUMF ¶ 121. Moore responded: "*There is a Cadillac Super Cruise that had a very strict ODD. It could not be used outside of it at all*." ECF 318-2 at 110:11-18 (emphasis added); *see also* PCS SUMF ¶ 121. Tesla then asked: "Okay. So it's your opinion that Cadillac Super Cruise could not be used outside of its ODD as of 2019?" ECF 318-2 at 110:22-24; *see also* PCS SUMF ¶ 121. Moore responded: "That's correct." ECF 318-2 at 110:25; *see also* PCS SUMF ¶ 121.

Plaintiffs' expert Missy Cummings likewise testified that, at the time of the NTSB's 2016 investigation discussed above, General Motors "was geofencing"—meaning that their SuperCruise technology could not be used outside of its ODD. ECF 318-6 at 164:10-12; *see also* PCS SUMF ¶ 121.

Finally, no less an authority than the NTSB recommended in *2017—two years before McGee's Vehicle* was manufactured—that Tesla and other OEMs "[i]ncorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed (H-17-41)." ECF 347-5, NTSB at 43; *see also* PCS SUMF ¶ 85.

Obviously, the NTSB would not have made this recommendation if it had not been

---

[7] Patt ultimately granted summary judgment on the design defect claim on grounds not relevant here: namely, that Plaintiffs failed to present adequate "medical expert causation testimony." *Id*. at *12.

technically feasible. The agency goes on to confirm that exact fact, stating that

> ***Today's vehicle automation systems can assess the vehicle's route and determine
> whether it is appropriate to the system's ODD.*** But Tesla's Autopilot remains available
> to the driver, even under some conditions that do not meet its ODD. ***This situation
> allows the driver to activate automated systems in locations and circumstances for
> which their use is not appropriate or safe.***

ECF 347-5, NTSB at 33–34 (emphasis added); *see also* PCS SUMF ¶ 121. The NTSB
concluded "that if automated vehicle control systems do not automatically restrict their own
operation to those conditions for which they were designed and are appropriate, the risk of
driver misuse remains." ECF 347-5, NTSB at 34.

In light of the foregoing, Tesla's contention that its decision not to restrict Autopilot's
use to its ODD was consistent with the "state of the art" is not worthy of any consideration.[8]

**C. Plaintiffs Have Sufficient Evidence to Support their Challenge to the Vehicle's
Inadequate Driver Monitoring System ("DMS").**

Tesla's only basis for seeking summary judgment on Plaintiffs' DMS-related argument is
that its contention that their experts seek to make it an "error tolerant system," in violation of the
prohibition against turning car manufacturers into insurers. ECF 326 at 19. For the reasons set
forth in Plaintiffs' *Daubert* Opposition (at Point I(B)(6)) (ECF 347) that is simply untrue.
Neither expert says Tesla should have designed a perfect car; they simply opine that it easily
could have made a far less deadly one.

Tesla's cited case—*Voynar v. Butler*, 463 So. 2d 409, 412 (Fla. Dist. Ct. App. 1985)—
merely holds that "if a manufacturer permissibly chooses a 'safe' product rather than a 'safer'
product, hindsight should not be employed to retroactively recharacterize this into a choice
between a 'safe' product and an 'unsafe' product." 463 So.2d at 412. Moore's testimony fits
that standard perfectly: he isn't arguing that Tesla's Vehicle was safe but should have been safer;
rather, he opines that the Vehicle was not the least bit safe, and that Tesla easily could have made
the Vehicle safer in any number of ways, including by "just disabling Autosteer for a week after

---

[8] Tesla's argument that Plaintiffs' experts "both acknowledged" that their "ODD defect opinions contradict
guidance by the Society of Automotive Engineers ("SAE") at the time of the Vehicle's manufacture" is also
incorrect. *See* PCS SUMF at ¶¶ 71–72. In reality, Plaintiffs' claims are consistent with the SAE, which
recommends that car makers define ODDs for automated technology like Autopilot. As Moore stated in his report,
SAE J3016 (2018)—which is the version in effect at the time of the crash—"indicates that only Level 5 operation is
possible without ODD limitation." ECF 318-1 at 5–6. In addition, compliance *vel non* with industry standards is
not determinative of design defect claims; indeed, even compliance with NHTSA's safety regulations does not
immunize a manufacturer from liability for defectively designed cars. *See* 15 U.S.C. § 1397(k).

… three forced disengagements." PCS SUMF ¶ 134. Tesla's effort to take this issue from the jury should accordingly be rejected.

**D.   Plaintiffs Have Sufficient Evidence to Support the Claim Related to the Vehicle's Automatic Emergency Braking and Forward Collision Warning Technology.**

Tesla also seeks summary judgment on Plaintiffs' claim that the Vehicle's Forward Collision Warning ("FCW") and Automatic Emergency Braking ("AEB") technology was defective, arguing that  that "neither of Plaintiffs' experts opine that AEB or FCW are defective." ECF 326 at 20.  This argument misstates the expert testimony in this case, which makes clear that there is a factual dispute on whether the crash was *exclusively* caused by Autopilot (which undoubtedly failed here) or whether it was caused by the *interplay* between Autopilot, AEB, and FCW.  *See* PCS SUMF ¶¶ 77–78.

Plaintiffs' expert Missy Cummings testified at length on this precise issue during her second deposition, where she was asked her opinion as to whether the "forward collision warning and automatic braking – automatic emergency braking systems in the Tesla Model S were defective."  ECF 318-8 at 8:1-5; *see also id* at 33:2-8; *see also* PCS SUMF ¶¶ 125–131. She responded that, based on the augmented video, it was clear that the Vehicle malfunctioned: "the system is quite clear on drivable space.  So it knows where the end of the road is.  It correctly detected it, but then no decision-making happened and no actuation happened in response . . ."  ECF 318-8 at 50:14-19; *see also* PCS SUMF ¶¶ 125–131.  In other words, "the car knew it was coming to the end of the road, and the driver was never alerted despite what the owner's manual says it will do."  ECF 318-8 at 51:4-6; *see also* PCS SUMF ¶¶ 125–131.

Tesla's lawyer then asked whether Cummings was "finding fault with the AEB system," ECF 318-8 at 60:25-61:1, or whether she was exclusively finding fault with Autopilot.  *See id* at 56: 3-4; 61:18-19.  In response, she explained "So I'm not saying that . . .  AEB didn't fire.  I cannot tell you whether or not it was—is the problem that AEB was flawed, or is the problem some kind of hand-off decision from Autopilot to AEB.  I cannot say that because I can't parse that out from the data I've seen."  *Id*. at 61:20-62:1.  But, she emphasized, "[w]hether or not it's the Autopilot or the AEB, no decision-making happened and no actuation happened."  *Id*. at 62:11-12; *see also* PCS SUMF ¶¶ 125–131.  In other words, it wasn't clear whether "Autopilot was suppressing the control" or AEB failed independently of Autopilot.  ECF 318-8at 64:1-3; s*ee also id.* at 71:20-72:2; *see also* PCS SUMF ¶¶ 125–131.

This testimony reflects that Autopilot, AEB, and ACW are highly interdependent yet the relationship between these features is opaque because the system is run by complex algorithms. As a result, Cummings could not—and would not—say that the crash was exclusively caused by Autopilot or by some combination of failures by Autopilot and AEB/FCW. What she *could*— and did—say is that the Vehicle failed to either warn of the impending crash or take any evasive measures to avoid it—and that this failure was due to a defect in the Vehicle's design. *See* PCS SUMF ¶¶ 125–131.

In short, Tesla's request for summary judgment ignores a very real factual dispute as to whether a defective in the Vehicle's AEB feature contributed to the crash. *Id.* Given this dispute, Tesla's motion on this point should be denied.

Ultimately, this dispute may prove to be immaterial because, as explained above, a plaintiff asserting a design defect claim under Florida law is not required to prove the existence of a reasonable alternative design; instead, the only question is whether the product failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by the manufacturer—and McGee's Tesla clearly did not. *See Patt*, 2024 WL 1675301, at *6. As a result, the fact that Cummings could not identify the precise origins of the system's failure does not matter, because we know beyond a shadow of a doubt that it failed.

**E. Plaintiffs Have Sufficient Evidence to Support their Claims Related to Autopilot.**

Finally, Tesla seeks summary judgment on Plaintiffs' claims regarding Autopilot, arguing that because McGee pressed the accelerator prior to the crash, he "overrode" Autopilot and thus Autopilot did not cause the crash. ECF 326 at 21. As Plaintiffs explain in their Daubert Opposition (ECF 347, this argument ignores that Autopilot was still controlling the vehicle's movement despite McGee's acceleration. *See* PCS SUMF ¶ 116, 139; *see also* Plaintiffs' Response to Tesla's Undisputed Fact 3 (disputing any implication that McGee's depression of the accelerator pedal disengaged Autopilot or caused the vehicle to operate in a Society of Automotive Engineers (SAE) Level 1 ADAS system as opposed to SAE Level 2 and citing ECF 318-2 at 33:14-15; *see also* ECF 318-10 1878 (noting that a driver may manually accelerate when using TACC but that once the accelerator is released, TACC resumes cruising at set speed); ECF 318-3 at 111:21-114:15. Moore repeats this point again and again during this deposition, *see, e.g*., ECF 318-3 at 113:13-18, 115:24-116:21, 209:16-18, and Tesla simply disagrees.

At bottom, this boils down to a factual dispute about whether Autopilot was overridden (or not) under the circumstances presented here.  That's a disputed issue of fact for the jury.  *See Riley*, 603 F. Supp. 3d at 1277 (S.D. Fla. 2022) ("[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence.").  Accordingly, summary judgment should be denied on this point as well.

## III.    THE COURT SHOULD DENY SUMMARY JUDGMENT AS TO PLAINTIFFS' MANUFACTURING DEFECT CLAIM.

Tesla seeks summary judgment on Plaintiffs' manufacturing defect claim on the ground that the evidence in this case does not suggest that "some component of the Model S was different from its intended design."  ECF 326 at 25. Plaintiffs urge the Court to reserve judgment on that issue in light of the complex and cutting-edge nature of the technology at issue in this case.

As Cummings explained in her deposition, "[w]e are not used to talking about artificial technology in manufacturing terms"  ECF 318-6:3-5.  But, she said, the Vehicle's Level 2 system "could be considered a manufacturing defect because the design of the AI did not meet safety specifications at what we might call the manufacturing stage."  ECF 318-6 at 258:3-11.  She further explained that experts in this field simply "haven't figured out whether to call … software development mistakes. . . a manufacturing problem . . .  or a design problem." *see also id*. at 260:16-19. Cummings ultimately "le[ft] the door open" on the whether this case presents a manufacturing defect because "this is an area that will probably come up against in the next few trials about what it means to manufacture AI." *Id*. at 259:9-14.

In light of this testimony, Plaintiffs urge the Court to reject Tesla's motion and reserve judgment on this issue until hearing the evidence at trial.

## IV.    PLAINTIFFS' FAILURE TO WARN CLAIM CANNOT BE RESOLVED ON SUMMMARY JUDGMENT BECAUSE IT IS WELL SUPPORTED BY THE EVIDENCE.

Tesla also seeks summary judgment on Plaintiffs' failure to warn claim, arguing that (1) (2) it had no duty to warn Plaintiffs of the Vehicle's "obvious" defects; (2) its warnings were adequate as a matter of law: and (3) the alleged failure to warn was not the proximate cause of Plaintiffs' injuries.  ECF 326 at 21–25.  Here again, Tesla's argument is defeated by the law and by disputed facts on this issue.

**A. The dangers associated with Autopilot are not open and obvious.**

First, notwithstanding Tesla's contention to the contrary, there's nothing "obvious" about the risks posed by the automated technology in the Vehicle.  Indeed, as Cummings explained, the term "Autopilot" has actually been *banned* in a host of countries.  ECF 318-6 at 223:15-17; *see also* PCS SUMF ¶ 93. Tesla's arguments about Autopilot's "obvious" risks are also contradicted by Tesla's own marketing of the cars as miracles of modern technology.  *See* ECF 347-2, Cummings 12-2-24 Sup R. at 6–7, ¶ 3.  In reality, there's nothing "obvious" about the Vehicle's risks—indeed, that's precisely partly what makes it so defective.

Furthermore, Tesla conveniently omits any reference to McGee's own confusion regarding Autopilot.  As set forth above, McGee purchased the "highest package" available thinking it would "keep [him] in the lane, avoid crashes, and direct [him] to where [he] needed to go."  PCS SUMF ¶¶ 99, 103–105.  McGee's statements further support that the risks associated with Autopilot are not obvious and known.

Tesla's citations to *Butler v. Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1150 (10th Cir. 2023), and *Youngberg v. Gen. Motors LLC*, No. 20-339-JWB, 2022 WL 3925272 (E.D. Okla. Aug. 24, 2022), *aff'd*, No. 22-7047, 2023 WL 7126422 (10th Cir. Oct. 30, 2023), do not help its cause.  First, neither case pertains to Autopilot or Autopilot's interplay with AEB and FCW.  Second, both cases involve plaintiffs who sought to be warned of the risks associated with purchasing vehicles without AEB and FCW systems.  Here, in contrast, McGee seeks a warning related to a system he purchased—Autopilot.

In short, Tesla's assertion that the dangers associated with Autopilot are obvious is not supported by the evidence in this case.  At best, this boils down a factual dispute for the jury.

**A. Tesla has made no showing that its warnings are adequate.**

Tesla also argues that its warnings are "accurate, clear, and unambiguous" as a matter of law, warranting summary judgment.  ECF 326 at 23.  But Tesla makes no attempt to actually prove this point, let alone demonstrate the absence of any material facts on this issue.

Whether a manufacturers' warnings are sufficient and reasonable are factual questions for the jury "unless such warnings are 'accurate, clear, and unambiguous.'"  *Brito v. Cnty. of Palm Beach*, 753 So. 2d 109, 112 (Fla. Dist. Ct. App. 1998).  It follows that where a plaintiff produces evidence tending to show warnings are not "accurate, clear, and unambiguous," summary

judgment is inappropriate. *Adams v. G.D. Searle & Co.*, 576 So. 2d 728, 731 (Fla. Dist. Ct. App. 1991).

A manufacturer ordinarily has "a duty to take reasonable precautions to avoid reasonably foreseeable injuries to those who might use the commodity" and, by placing an inherently dangerous commodity in the streams of commerce, "assumes the duty of conveying to those who might use the product a fair and adequate warning of its dangerous potentialities to the end that the user by the exercise of reasonable care on his own part shall have **\*249** a fair and adequate notice of the possible consequences of use or even misuse." *Tampa Drug Co. v. Wait,* 103 So.2d 603, 607 (Fla.1958). Furthermore, "implicit in the duty to warn is the duty to warn with a degree of intensity that would cause a reasonable man to exercise for his own safety the caution commensurate with the potential danger." *Id.* at 609. Simply stated, "The user should be protected from unreasonably dangerous products or from a product fraught with *unexpected* dangers." *Copeland v. Celotex Corp.,* 447 So.2d 908, 912 (Fla. 3d DCA 1984), quoting from *West v. Caterpillar Tractor Co.,* 336 So.2d 80, 86–87 (Fla.1976).

Johns-Manville Sales Corp. v. Janssens, 463 So. 2d 242, 248–49 (Fla. 1st DCA 1984)

Here, the evidence shows that Tesla failed to warn McGee in three respects. ***First***, Tesla failed adequately to warn that the Vehicle had an Autopilot system that was still in Beta, meaning it was not fully tested for safety, see PCS SUMF ¶ 102, and, further, the system was not designed to be used on roadways with cross-traffic or intersections. *Id.* ¶¶115, 150. ***Second***, the warnings provided in Tesla's owner's manual were inadequate due to their inaccessibility to consumers. ECF 347-2, Cummings 12-2-24 report at ¶ 1; ECF 318-6 at 196:12-15, 197:3-21; *see also* PCS SUMF ¶¶ 128–130, 132. And ***third***, the Vehicle's DMS failed to provide sufficient warnings to ensure driver attentiveness. PCS SUMF ¶¶ 153-165. Each of these theories is well supported by expert testimony from Mary Cummings, a former NHTSA employee with expertise in the field of warnings. ECF 318-6 at Ex. 2; *see also* PCS SUMF ¶¶ 22, 128, 130, 132–133, 149-165.

Tesla doesn't even attempt to say what's wrong with these opinions. Instead, Tesla simply asserts that its warnings were adequate. *See* ECF 326 at 24. Quite obviously, the

adequacy of Tesla's warnings presents a question for the jury, not for the Court—and Tesla does not make any real effort to argue to the contrary.

**B. Tesla's Proximate Causation Argument Does Not Warrant Summary Judgment.**

Tesla fared no better with its contention that "proximate causation cannot be established where the Plaintiff admitted that he did not read existing warnings." ECF 326 at 25. On its face, this argument only applies to the Owners' Manual, which McGee could not recall having read. ECF 318-9 at 36:10–16.

But even on that point, Tesla's motion is inadequate, because McGee's failure to read the Owner's Manual is not dispositive. Indeed, "[a] warning may be defective not only by virtue of inadequate wording, but as a result of its location and the manner in which the warning conveyed." *Brown v. Glade & Grove Supply, Inc.*, 647 So. 2d 1033, 1035 (Fla. Dist. Ct. App. 1994).

Here, Cummings testified that the Owner's Manual (which was only provided in electronic format) was extremely difficult to access and that there is no way to ensure drivers obtain the information based upon how it is conveyed. ECF 347-2, Cummings 12-2-24 report at 1, ¶ 1; ECF 318-6 at 196:12-15, 197:3-21; *see also* PCS SUMF ¶¶ 128–130, 132.

Tesla also argues that there's no causation here because McGee said he would have disregarded any written warnings. Of course, this argument has no bearing on Cummings' opinions regarding the "beta" warning and the Vehicle's failure to warn of the impending collision, which she covers at great length both in writing and during her testimony.

Even as to the manual, Tesla's argument must be rejected both as a legal and factual matter.

Legally speaking, there is a presumption in failure-to-warn cases that an adequate warning would be heeded by the user.

Indeed, Florida law is clear that Plaintiff does not need to prove what McGee would or would not have done had the Tesla functioned differently. Even if McGee had said nothing that Tesla could have done would have changed the outcome, such testimony would not have been a bar to liability.

This principle is best summarized by the Third District in *Sta-Rite Indus., Inc. v. Levey*, 909 So. 2d 901, 905-906 (Fla. 3d DCA 2004), where the court explained:

> As we have previously held in *Munoz v. South Miami Hospital, Inc.*, 764 So.2d 854 (Fla. 3d DCA 2000), review denied, 789 So.2d 348 (Fla.2001), one who does not warn with the urgency and intensity deemed required under the circumstances

cannot say that failure would have made no difference. *Accord Goolsby v. Qazi,* 847 So.2d 1001 (Fla. 5th DCA 2003), review denied, 859 So.2d 515 (Fla.2003). This is the case even when, as in *Munoz* the person to be warned—there, a physician who should have been informed by hospital employees of his newborn patient's dangerous condition—specifically claims that such a warning would not have affected his conduct.

…

It must be assumed that a sufficiently emphatic warning would have made the difference.

*See Grieco v. Daiho Sangyo, Inc*., 344 So. 3d 11, 21 (Fla. Dist, Ct. App. 2022).   This is true *even when* evidence strongly suggests the warning would have been ignored.  *See Scheman-Gonzalez v. Saber Mfg. Co*., 816 So. 2d 1133, 1140 (Fla. Dist. Ct. App. 2002) ("[W]hile the evidence strongly suggested that no warning would have stopped the decedent from placing the dangerous wheels on his Jeep, an issue of fact remained as to the failure to warn claim and, as such, the plaintiff was entitled to present the jury with that possibility.").

 As to the facts, Tesla's argument misconstrues McGee's testimony regarding the Owner's Manual.  McGee testified, after reviewing the warnings contained in the Owner's manual, that he would have had the same expectation on the night of the collision—an expectation that the Tesla would brake to avoid a collision.  ECF 318-9 at 141:2-25.  This testimony—read in context—creates a genuine dispute of material fact.

Furthermore, Tesla again fails to acknowledge and address how the inadequate Beta warning and in-service warnings negate proximate cause.  As such, Tesla has not met its burden of proof on summary judgment as to any of Plaintiffs' warning claims.  Tesla's motion as to Plaintiffs' failure to warn claim should be denied.

## V.  A REASONABLE JURY COULD FIND TESLA LIABLE FOR NEGLIGENT MISREPRESENTATION

Tesla is correct that this Court did not allow Plaintiffs to amend their complaint to add additional misrepresentation claims based on its conclusion that misrepresentations can only be actionable if they are made to the injured party.  We would respectfully request that the Court reconsider that ruling.

We are unaware of, and Tesla has not cited to, any Florida state caselaw that specifically answers the question presented by this claim – can only those who rely on the misrepresentation can suffer a legally cognizable injury? The single case cited by Tesla, *Levine v. Wyeth Inc.,* 684 F.

Supp. 2d 1338 (M.D. Fla. 2010) does not answer this question. In *Levine*, the defendants did not manufacture the drugs ingested by the plaintiff, and had no control over the representations made by the companies that did. As a result, the district court concluded that "Defendants did not owe a duty of care to Plaintiff." *Levine* at 1347. Tesla was the manufacturer of the defective car, and under Florida products liability law, "[t]he manufacturer's liability also extends to bystanders who are injured by the defective product." *Jennings v. BIC Corp.*, 181 F.3d 1250, 1255 (11th Cir. 1999)

Absent Florida law on this question, the Court should look to Federal law and persuasive authority from other jurisdictions. In *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), the Supreme Court recognized the viability of Plaintiffs' negligent misrepresentation claim. In *Bridge,* the defendants argued, as Tesla does here, that "[u]nder well-settled common-law principles, proximate cause is established for fraud claims only where the plaintiff can demonstrate that he relied on the misrepresentation." *Bridge* at 655. The defendants suggested that as a result, "a plaintiff asserting a civil RICO claim predicated on mail fraud cannot satisfy the proximate cause requirement unless he can establish that his injuries resulted from his reliance on the defendant's fraudulent misrepresentation." *Id.*

The Supreme Court rejected this argument for two independent reasons, the second of which is applicable here. First, it held that reliance was not an element of a civil RICO claim based on mail fraud. *Id*. Second, the Court held that:

> While it may be that first-party reliance is an element of a common-law fraud claim, there is no general common-law principle holding that a fraudulent misrepresentation can cause legal injury only to those who rely on it. The Restatement provision cited by petitioners certainly does not support that proposition. It provides only that the plaintiff's loss must be a foreseeable result of *someone's* reliance on the misrepresentation. It does not say that only those who rely on the misrepresentation can suffer a legally cognizable injury. And any such notion would be contradicted by the long line of cases in which courts have permitted a plaintiff directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation. Indeed, so well established is the defendant's liability in such circumstances that the *Restatement (Second) of Torts* sets forth as a "[g]eneral [p]rinciple" that "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances." § 870.

> As an illustration, the Restatement provides the example of a defendant who "seeks to promote his own interests by telling a known falsehood to *or about* the plaintiff or his product." *Id.,* Comment *h* (emphasis added). And the Restatement

specifically recognizes "a cause of action" in favor of the injured party where the defendant "defrauds another for the purpose of causing pecuniary harm to a third person." *Id.*, § 435A, Comment *a*. Petitioners' contention that proximate cause has traditionally incorporated a first-party reliance requirement for claims based on fraud cannot be reconciled with these authorities.

Nor is first-party reliance necessary to ensure that there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury to satisfy the proximate-cause principles articulated in *Holmes* and *Anza*. Again, this is a case in point. Respondents' alleged injury—the loss of valuable liens—is the direct result of petitioners' fraud. It was a foreseeable and natural consequence of petitioners' scheme to obtain more liens for themselves that other bidders would obtain fewer liens. And here, unlike in *Holmes* and *Anza,* there are no independent factors that account for respondents' injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue.

*Bridge* at 655-658.

The two footnotes to this excerpted section provide additional support for our argument. First, the Court responded to defendants' invocation of Comment *a* to 3 *Restatement (Second) of Torts* § 548A (1976), which provided that "[c]ausation, in relation to losses incurred by reason of a misrepresentation, is a matter of the recipient's reliance in fact upon the misrepresentation in taking some action or in refraining from it." The Court responded that the comment did "not support [defendant's] argument," explaining "of course, a misrepresentation can cause harm only if a recipient of the misrepresentation relies on it. But that does not mean that the only injuries proximately caused by the misrepresentation are those suffered by the recipient." *Bridge* at 656, FN6.

The Court further responded to the defendants' dismissal of the "long line of cases" referenced in the excerpt in which courts allowed a plaintiff injured by fraudulent misrepresentation to recover even though it was a third party who relied on the misrepresentation. *Bridge* at 656. The Court explained that these cases were "not cited as evidence that common law fraud can be established without showing first party reliance." *Bridge* at 657, FN7. Instead, they "show that a fraudulent misrepresentation can proximately cause actionable *injury even to those who do not rely on the misrepresentation*." *Id.* (emphasis supplied)

*Bridge* is not an outlier. Several jurisdictions have recognized a cause of action for negligent misrepresentation that causes harm to third parties. In *Randi W. v. Muroc Joint Unified Sch. Dist.*, 929 P.2d 582, 588 (Cal. 1997), the California Supreme Court recognized the cause of

action, which it based on Section 311 of the Restatement Second of Torts, which provided that: "(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results [¶] (a) to the other, or [¶] (b) to such third persons as the actor should expect to be put in peril by the action taken. [¶] (2) Such negligence may consist of failure to exercise reasonable care [¶] (a) in ascertaining the accuracy of the information, or [¶] (b) in the manner in which it is communicated."

Recognizing this was a case of first impression, *Randi W.* sought to determine whether "one who intentionally or negligently provides false information to another owes a duty of care *to a third person* who did not receive the information and who has no special relationship with the provider." *Randi W.* at 588. The Court pointed to the "the general rule [] that all persons have a duty to use ordinary care to prevent others from being injured as the result of their conduct." *Id.* The Court then asked if "defendants reasonably have foreseen that the representations and omissions in their reference letters would result in physical injury to someone?" and concluded that the injury was reasonably foreseeable. *Id.* at 589. In *Dillard v. Victoria M. Morton Enterprises, Inc.*, No. 08-1339 FCD/GGH, 2008 WL 11388472, at *6 (E.D. Cal. Oct. 8, 2008), the district court applied *Randi W.'s* holding in the context of a products liability case. Here, not only was it reasonably foreseeable that misuse of the autopilot system could lead to physical harm for drivers, passengers, and bystanders, by the date of this accident, Tesla had actual notice of such accidents and injuries.

Numerous Courts have recognized this cause of action. *See In re Neurontin Mktg., Sales Practices & Products Liab. Litig.,* 618 F. Supp. 2d 96, 110 (D. Mass. 2009) ("a consumer injured by a fraudulent misrepresentation to his doctor has a claim based on third party reliance."); and *In re Orthopedic Bone Screw Liab. Litig.,* 159 F.3d 817, 828–29 (3d Cir. 1998), *rev'd on other grounds, Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341 (2001) ("As we have earlier noted, § 310 of the *Restatement (Second) of Torts* suggests that when someone makes a fraudulent misrepresentation for the purpose of inducing action by A which, if taken by A, will involve an unreasonable risk of injury to B, B may recover for resulting physical injury even though he was unaware of the fraudulent misrepresentation."); *Gutzan v. Altair Airlines, Inc.,* 766 F.2d 135, 140 (3d Cir.1985) (interpreting Pennsylvania law and recognizing a cause of action for negligent misrepresentation, citing to the Restatement, *supra,* §§ 311, 324A); *Golden Spread Council, Inc.*

*v. Akins,* 926 S.W.2d 287, 291 (Tex.1996) (recognizing a cause of action for negligent misrepresentation causing physical harm to a third party, citing to the Restatement, *supra,* § 302(B), when local Boy Scout Council recommended a scout master the Council knew or should have known was a sexual deviant); *Davis v. Bd. of Cnty. Com'rs of Dona Ana Cnty.,* 987 P.2d 1172, 1178 (N.M. Ct. App. 1999); *D.S.A., Inc. v. Hillsboro Ind. Sch. Dist.,* 973 S.W.2d 662, 664 (Tex.1998); *Brogan v. Mitchell Int'l, Inc.,* 181 Ill.2d 178, 229 Ill.Dec. 503, 692 N.E.2d 276, 278 (Ill.1998); *Sassak v. City of Park Ridge*, 431 F. Supp. 2d 810, 818-19 (N.D. Ill. 2006); *Bailey v. Huggins Diagnostic & Rehab. Center, Inc.,* 952 P.2d 768, 772 (Colo.App.1997); *State v. Purdue Pharma L.P.,* No. PC-2018-4555, 2019 WL 3991963, 2019 R.I. Super. LEXIS 95, at *42 (Super. Ct. Aug. 16, 2019);*Univ. Sys. Of N.H. v. United States Gypsum Co.*, 756 F. Supp. 640, 650 (D.N.H. 1991); and *Bardes v. Mass. Mut. Life Ins. Co*., 932 F. Supp. 2d 636, 640 (M.D.N.C. 2013).

Florida law protects not just purchasers of defective products, but bystanders who are injured by it. There is no logical reason that bystanders should not also be protected from injuries caused by that product as a result of misrepresentations made to the purchaser of the product, and there is no Florida case law that holds that they do not have a claim under such circumstances. This Court should follow the Restatement and allow the claim to proceed.

Should the Court agree that the claim is legally permissible, there is sufficient evidence to create a question of fact requiring resolution by the jury. The same statements of Tesla Plaintiff will use to show how Tesla molded consumer expectations of its products provide the basis for negligent misrepresentation claim. Under Florida law, a plaintiff need only prove that McGee relied on "statements that, while not necessarily false on their face, are misleading because they conceal or omit other material information." *Prentice v. R.J. Reynolds Tobacco Co.,* 338 So. 3d 831, 837 (Fla. 2022) Plaintiff need not prove McGee relied on a specific statement. Instead, "reliance on 'a statement' can include 'a category of statements addressing a particular topic.'" *Id.* Here, McGee testified that he believed that auto pilot would help "keep [him] in the lane, …would help [him] stop or turn or avoid that crash or someone that stopped ahead, it would slow down and stop, so it wouldn't have a collision." [McGee Depo at 44-45] His belief was based on "information that I absorbed looking at information on the vehicle." [McGee Depo at 45]

The Court should deny summary judgment on Count 4.

## VI. **A REASONABLE JURY COULD FIND TESLA LIABLE FOR PUNITIVE DAMAGES.**

### A. THE PUNITIVE DAMAGE STANDARD.

Tesla sets forth the correct punitive damage standard under Florida Statute § 768.72 but fails to note that the standard has been in place only since 1999.  Tesla cites to a number of cases that pre-date the revised standard, some of which contain language consistent with the standard, others that suggest the standard is higher than it actually is.  For example, Tesla cites to language from *Chrysler Corp. v. Wolmer,* 499 So. 2d 823 (Fla. 1986), stating that the standard requires "reckless disregard for disregard for human life equivalent to manslaughter." (Mot. at 28) Tesla cites language from *Jeep Corp. v. Walker*, 528 So. 2d 1203 (Fla. 4th DCA 1988), suggesting that plaintiff needed to present evidence that "Jeep was deliberately attempting to main or kill [the plaintiff]." (Id.) This language form *Walker* was careless, at best.  It suggests a standard equivalent to attempted homicide, not manslaughter.  As a result, wasn't the standard prior to 1999, and it is certainly not the standard now.

At least three cases have specifically held that the 1999 amendment to the statute supersedes earlier case law like *Walker.*  In *In re Fosamax Products Liab. Litig.,* 647 F. Supp. 2d 265 (S.D.N.Y. 2009), the court noted that *Walker* and *Wolmer* predated the 1999 Amendment to § 768.72.  The district court then stated, "Some courts have concluded that the 1999 amendment superseded the earlier case law," *citing to City of St. Petersburg v. Total Containment, Inc.,* No. 06–20953–civ., 2008 WL 5428179, *24–26 (S.D.Fla. Oct. 10, 2008); and *IBP, Inc. v. Hady Enters., Inc.,* 267 F.Supp.2d 1148, 1170 (N.D.Fla.2002) (disregarding cases "decided before the Florida legislature's amendment of Section 768.72").  In light of these cases, the district court found "that the statute, as amended in 1999, is clear enough on its face to be applied without turning to potentially superseded case law for interpretive assistance."  *In re Fosamax* at 283.

### B. PLAINTIFF'S EVIDENCE IS CONSISTENT WITH EVIDENCE IN OTHER CASES SUPPORTING PUNITIVE DAMAGES AGAINST PRODUCT MANUFACTURERS.

"A legal basis for punitive damages is established in products liability cases where the manufacturer is shown to have knowledge that its product is inherently dangerous to persons or property and that its continued use is likely to cause injury or death, but nevertheless continues to market the product without making feasible modifications to eliminate the danger or making adequate disclosure and warning of such danger." *Johns-Manville Sales Corp. v. Janssens*, 463

So. 2d 242 (Fla. 1st DCA 1984). "Especially is this so when the evidence is susceptible to the inference that the manufacturer not only refused to warn for the user's protection, but intentionally took steps to cover up the known danger in order to protect continued marketing of the product for its own economic advantage." *Id.*

In its motion, Tesla suggests that *Wolmer* disapproved *Janssens'* "broad liability language to the extent that the standard was applied to the automotive context." (Mot. at 31) This is not entirely accurate. To be sure, the *Wolmer* Supreme Court was less than clear as to what it was trying to say regarding *Janssens*. Fortunately, we have subsequent case law which sheds some light on what it did not do. First, in *King v. Eastern. Airlines, Inc.,* 536 So. 2d 1023 (Fla. 3d DCA 1987), Eastern cited to *Wolmer* for its argument against its liability for punitive damages. The Third District stated, "*Wolmer* is inapposite; it turns on lack of actual knowledge." Of course, the evidence here shows that Tesla had actual knowledge as early as 2016 that drivers were misusing Autopilot, yet failed to take steps to ameliorate. Tesla may be found liable for punitive damages under the *Janssens* standard as a result.

We know this further from *Gen. Motors Corp. v. McGee,* 837 So. 2d 1010 (Fla. 4th DCA 2002), *as modified on clarification* (Mar. 5, 2003), which cited to language from *Janssens* that it made clear was still good law:

> The plaintiffs presented testimony that GM was aware of the fuel tank's design deficiencies but concealed them. To subordinate human life to corporate profit is reprehensible conduct. The plaintiffs were entitled to argue that GM had concealed the significance of the Ivey report for a number of years. Evidence of **"concealment of offensive conduct after it initially occurred is indicative of malice or evil intent sufficient to support punitive damages."** *Johns–Manville Sales Corp. v. Janssens,* 463 So2d 242, 256 (Fla. 1st DCA 1984), *disapproved on other grounds, Chrysler Corp. v. Wolmer,* 499 So.2d 823, 826 (Fla.1986); *see also Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 21–22, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *Orkin Exterminating Co. v. Jeter,* 832 So.2d 25, 41–42 (Ala.2001); *State v. Moorhead State Univ.,* 455 N.W.2d 79, 85 (Minn.Ct.App.1990) (defendant's encouragement of witnesses to fabricate testimony and to cover up discrimination sufficient to support award of punitive damages).

One of the earliest cases to affirm an award of punitive damages against an auto maker in Florida was *Am. Motors Corp. v. Ellis*, 403 So. 2d 459 (Fla. 5th DCA 1981). In *Ellis*, the Fifth District held that, "where the plaintiff is able to show that the manufacturer knew that its product was defectively designed and that injuries and deaths had resulted from the design defect, but

continued to market the product in reckless disregard of the public safety, punitive damages could be awarded." *Ellis* at 467.

> The Fifth District detailed the specific evidence supporting punitive damages as follows:
>
> In the present case, there was evidence adduced from which the jury could have found that AMC was aware of the catastrophic results of fuel tank fires in its vehicles from its own crash tests, and that AMC chose not to implement the recommendation of its engineers to relocate the fuel tank in order to maximize profits. The jury also could reasonably believe that unless and until compelled to do so by the federal government, AMC failed to conduct further crash tests or experiments to determine feasible alternatives despite its knowledge that its present design could not survive crash tests at relatively low speeds.

*Ellis* at 467. *See also Dorsey v. Honda Motor Co. Ltd.*, 655 F.2d 650 (5th Cir. 1981) (Punitive Damages are warranted against a "product manufacturer who knowingly ignores safety deficiencies in its product that may endanger human life."); and *Toyota Motor Co., Ltd. v. Moll,* 438 So. 2d 192 (Fla. 4th DCA 1983) (same).

Punitive damages have been awarded in cases outside the automotive context based on the same theory of liability. In *Holmes v. Bridgestone/Firestone, Inc.,* 891 So. 2d 1188 (Fla. 4th DCA 2005), among the evidence that the court listed as the basis for punitive damages was evidence of *Firestone's* longstanding knowledge of its tire separation problem:

> The chronology purports to describe the content of Ford and Firestone memos and letters, as well as actions taken by governmental agencies, which showed that Firestone knew about the tread separation problem long before the tires were recalled. Ford and Firestone were experiencing problems with these tires in other countries with warm climates during the 1990's. The first lawsuit alleging a tread separation of this tire on an Explorer was filed in 1992. In 1996 there were memos from two different state agencies in Arizona warning state employees that these tires were suffering tread separations. One of the memos indicated that Firestone was aware of the problem and was replacing the tires. State employees were warned not to drive at highway speeds until their tires were evaluated.

*Holmes* at 1190.

The Court concluded that based on this evidence, "it could be found that Firestone knew about the tread separation, but delayed warning the public in order to protect its own financial interests" and "such a finding would support punitive damages." *Holmes* at 1191-92. *See also Otey v. Florida Power & Light Co.,* 400 So. 2d 1289 (Fla. 5th DCA 1981) (Evidence of five prior incidents over four years is sufficient to establish that FP&L was "guilty of gross negligence or

acted with a wanton disregard of another's rights in failing to protect from a known hazard over which it had control.")

Tesla claims the only evidence we rely on to support the punitive damage claim is the recall. This couldn't be less accurate. The recall is admissible under the feasibility exception, as we discuss in our response to Tesla's motion in limine and incorporate here by reference, but it is only piece of a much larger puzzle.

Here, Tesla was on notice as early as 2016 that there were problems with Autopilot. The Brown accident placed Tesla on notice that driver inattention while using Autopilot was causing accidents. PCS SUMF ¶ 179. After NTSB investigated the Brown accident, it warned Tesla that its product should not been allowed to be used outside of its ODD, including on surface streets like the one involved in the instant accident. PCS SUMF ¶ 173,174. The jury could reasonably infer that Tesla refused to geo fence Autopilot because it wanted to collet data from its customers that it needed to improve its software. PCS SUMF ¶ 171 Tesla thus knowingly exposed its customers to the dangers associated with use of Autopilot on surface streets to obtain data to improve their product so that it could sell more Teslas. This is the classic paradigm of putting profits over safety. Tesla knew that its systems to detect driver inattention were inadequate yet Tesla did not conduct research and testing to determining the efficacy of monitoring drivers with a camera, and allowed the volume of driver alerts to be determined by Elon Musk's preference. PCS SUMF ¶ 178,179.

While Tesla was refusing to address its driver inattention problem, Tesla was misrepresenting the capabilities of Autopilot, warping consumer expectations of its capabilities. PCS SUMF ¶ 188-196. Tesla knew that the videos it was using to create consumers expectations as to the efficacy of its self-driving systems were faked. PCS SUMF ¶ 109,110. It published a deceptive Vehicle safety report on its website that in no way represented the true rate of accidents that Tesla's on autopilot experienced as compared to standard automobiles. PCS SUMF ¶ 200-203. Meanwhile, Tesla pushed back against regulators charged with ensuring its products wouldn't harm its customers and innocent bystanders like the Plaintiffs. It was the only car company that failed to respond the NTSB's safety recommendations regarding monitoring driver engagement. PCS SUMF ¶ 86-87. Despite being warned, Tesla violated the rules regarding confidentiality that applied to parties to the NTSB investigation, and was removed as a party as a result, resulting in a phone call where Elon Musk hung op on the head of the NTSB. PCS SUMF ¶ 87.

Like the defendant in *Ellis*, until NHTSA expanding its scope of its investigation in 2022 to cover all Autopilot accidents, Tesla failed to update their software despite its knowledge that taking no action would lead to additional injuries and fatalities. Tesla had the capability to address each of the Autopilot defects with software, as it demonstrated when it pushed the December 2023 software update to increase driver inattention warnings and monitoring. But it did not do anything about these defects until NHTSA forced its hand. This was four years too late for the Plaintiffs in this case.

In *Owens-Corning Fiberglas Corp. v. Ballard*, 749 So. 2d 483 (1999), the Florida Supreme Court listed ten factors the jury may consider in determining entitlement to punitive damages. Amongst those factors would be Tesla's awareness of the hazard, and any efforts to conceal the hazard from the public. *See also Gen. Motors Corp. v. McGee, supra,* at 1035. (General Motors' efforts to conceal its knowledge of design deficiencies was evidence of "malice or evil intent sufficient to support punitive damages.") Here, we have evidence that Tesla went to great lengths to conceal the Autopilot data from this accident. While Tesla's discovery violations, as set forth in our motion for sanctions, may ultimately not be admissible at trial, Tesla's successful efforts to prevent the Florida Highway Patrol from obtaining the Autopilot data from this crash will be admissible. Tesla's general counsel Ryan McCarthy, inserted himself into the investigation of this accident and took a number of steps, including telling FHP to request a list of data that omitted the Autopilot data, to sending a tech that had no idea as to how to download the data to the meeting with FHP.[9] This evidence of concealment supports claim for punitive damages.

---

[9] Indeed, *McGee* goes further and suggests that evidence of Tesla's discovery misconduct could be submitted to the jury to support Plaintiffs' punitive damage claims:

In the related context of Title VII litigation, a plaintiff may "establish that the defendant acted with reckless disregard for his federally protected rights by showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions." *Bruso v. United Airlines, Inc.,* 239 F.3d 848, 858 (7th Cir.2001); *see also Davis v. Rennie,* 264 F.3d 86, 115 (1st Cir.2001) (where court observed that "a punitive damages award may be 'justified not only by defendants' actions on [the **\*1036** date in question] but also by their subsequent behavior' ") (quoting *Hall v. Ochs,* 817 F.2d 920, 927 (1st Cir.1987)); *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 516 (9th Cir.2000); *E.E.O.C. v. Wal–Mart Stores, Inc.,* 35 Fed. Appx. 543, 545–46, 2002 WL 1003133 (9th Cir.2002); *Vasquez v. Atrium, Inc.,* 2002 WL 818066, at \*8 (D.Ct.Ariz.2002).

This case is distinguishable from *Amlan, Inc. v. Detroit Diesel Corp.,* 651 So.2d 701(Fla. 4th DCA 1995), relied upon by GM. In *Amlan,* we wrote that the general rule is that "[e]vidence related to the history of pretrial discovery conduct should *normally* not be a matter submitted for the jury's consideration on the issues of liability." *Id.* at 703 (emphasis added); *see also Kawamata Farms, Inc. v. United Agri Prods.,* 86 Hawai'i 214, 948 P.2d 1055, 1082–84 (1997) (holding that circuit court abused its discretion by instructing jury that it could consider discovery misconduct by a pesticide manufacturer in considering the merits of a products liability case, because "the power to sanction for discovery misconduct is within the exclusive province of the circuit court, not the jury"). Unlike this case, *Amlan*

The evidence that Plaintiffs have marshalled is clear and convincing and would entitle the jury to find that punitive damages should be awarded against Tesla.

**VII. CONCLUSION.**

For the reasons set forth above, the Plaintiffs respectfully request that the Court deny Tesla's motion for summary judgment in its entirety.

Respectfully submitted,

Date: February 24, 2025

**THE ROUSSO, BOUMEL LAW FIRM, PLLC**
9350 South Dixie Highway
Suite 1520
Miami, Florida 33156
(305) 670-6669

By:    /s/ *Adam T. Boumel, Esq.*
Adam T. Boumel, Esq.
Florida Bar No.: 0110727
Direct email: adam@roussolawfirm.com
Service emails:
Pleadings@roussolawfirm.com
assistant@roussolawfirm.com

By:    /s/ *Douglas F. Eaton*
DOUGLAS F. EATON
FBN: 129577
**EATON & WOLK, PL**
*Co-counsel for Plaintiff*
2665 S. Bayshore Drive, Suite 609
Miami, Florida 33133
Telephone: 305-249-1640
Email: deaton@eatonwolk.com
cgarcia@eatonwolk.com

---

was not a case involving punitive damages; the plaintiff there sought to use the defendant's discovery abuse to prove the defendant's liability in a case involving breach of contract and fraud.  *McGee* at 1035-1036.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 24th day of February 2025, I electronically filed the

foregoing document with the Clerk of Court using CM/ECF.

**THE ROUSSO, BOUMEL LAW FIRM, PLLC**
9350 South Dixie Highway
Suite 1520
Miami, Florida 33156
(305) 670-6669

By:    /s/ *Adam T. Boumel, Esq.*
Adam T. Boumel, Esq.
Florida Bar No.: 0110727
Direct email: adam@roussolawfirm.com
Service emails:
Pleadings@roussolawfirm.com
assistant@roussolawfirm.com

By:    /s/ *Douglas F. Eaton*
DOUGLAS F. EATON
FBN: 129577
**EATON & WOLK, PL**
*Co-counsel for Plaintiff*
2665 S. Bayshore Drive, Suite 609
Miami, Florida 33133
Telephone: 305-249-1640
Email: deaton@eatonwolk.com
cgarcia@eatonwolk.com