**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-cv-21940-BLOOM/Torres**

NEIMA BENAVIDES, as Personal
Representative of the Estate of Naibel
Benavides Leon, deceased,

      Plaintiff,

v.

TESLA, INC., a/k/a Tesla Florida, Inc.,

      Defendant.

_____/

DILLON ANGULO,                                   Case No. 22-22607-KMM

      Plaintiff,

v.

TESLA, INC. a/k/a Tesla Florida, Inc.,

      Defendant.

_____/

**TESLA, INC.'S RESPONSE**
**TO PLAINTIFFS' OMNIBUS MOTION *IN LIMINE*  [ECF 329]**

      Tesla, Inc., ("Tesla") incorrectly identified as Tesla Florida, Inc., files its Response in Opposition to Plaintiffs' Omnibus Motion *in Limine*. [DE 329].  In support of its Response, Tesla states the following:

      The Parties have reached a stipulation as to Plaintiffs' Motions 1, 3, 4, 6, 8 (in part; *see infra;* MIL 8 below), 13, 14, 15, and 21, and will file a proposed agreed order on those Motions.[1] For the reasons stated herein, Plaintiffs' remaining Motions *in Limine* should be **DENIED**.

_____

[1] Plaintiffs' MIL 21 was withdrawn and consolidated into Plaintiffs' Motion to Exclude Opinions of Dr. Crown. [ECF 344]. Tesla will address the issues raised in that motion in its forthcoming

## I.  **MIL 2 - COLLATERAL SOURCES**

Plaintiffs' Motion seeks to exclude any references that medical bills were paid by insurance or a collateral source. As set forth in Tesla's Omnibus Motion in *Limine*, paragraph IX, which Tesla adopts here, Plaintiffs should be limited to introducing only the medical expenses that ***Plaintiffs*** owe or that ***Plaintiffs*** have paid. [ECF 320 at 18-19] (citing caselaw limiting the admissibility of medical bills to those that an individual is obligated to pay). Plaintiffs appear to agree with Tesla's Motion in *Limine*. *See* [ECF 348 at 13] ("Plaintiffs agree to limit introduction of evidence of medical expenses to amounts that are owed or have been paid."). Based on that agreement, Plaintiffs' Motion to exclude evidence of collateral source payments is moot.[2]

## II.  **MIL 5 - IMPROPER COMMENTS ABOUT RECOVERY**

Plaintiffs cite state law that is not controlling and ask the Court to preclude argument that Plaintiffs' recovery will not be subject to taxation. Even if applicable, Plaintiffs' cited authority recognizes that a decision to instruct the jury on the taxability of Plaintiff's recovery ***is discretionary.*** *Good Samaritan Hosp. Ass'n, Inc. v. Saylor*, 495 So. 2d 782, 783 (Fla. DCA 1986); *see also Ageloff v. Delta Airlines Inc.*, 860 F.2d 379, 390 (11th Cir. 1988) (citing *Poirier v. Shireman*, 129 So.2d 439 (Fla. Dist. Ct. App. 1961)) (Florida law permits an instruction that a damage award will not be subject to federal income taxation).

References to the taxability of Plaintiffs' recovery are relevant to assessment of damages and helpful to prevent the jury from awarding Plaintiff an improper windfall recovery. As the United States Supreme Court observed in *Norfolk & W. Ry. Co. v. Liepelt*, "giving such an instruction can do no harm, and it can certainly help by preventing the jury from inflating the award

---

response.

[2] Plaintiffs reserve the right to raise any issue associated with the amount of the medical bills and any potential set offs if the need arises based on the evidence presented at trial.

and thus overcompensating the plaintiff on the basis of an erroneous assumption that the judgment will be taxable."  444 U.S. 490, 498 (1980) (internal quotations omitted).[3]

For these reasons, Plaintiffs' Motion should be **DENIED**.

### III.   MIL 7 - ARGUMENT THAT A VERDICT WILL HARM TESLA, ITS EMPLOYEES OR STAKEHOLDERS

Without any supporting authority, Plaintiffs seek to exclude any reference or comments that any verdict rendered will financially harm Tesla, the people whom it employs, or its Stakeholders, as well as comments as to the number of people employed by Tesla.

Plaintiffs have failed their burden to demonstrate that such evidence is inadmissible on any relevant ground, and the Court should reserve ruling on such evidence until the issue is raised by objection at trial. *See U.S. v. Gonzalez*, 718 F. Supp.2d 1341, 1345 (S.D. Fla. 2010) (internal quotations omitted) ("In fairness to the parties and their ability to put on their case, a court should exclude evidence *in limine* only when it is clearly inadmissible on all potential grounds").

For these reasons, Plaintiffs' Motion should be **DENIED**.

### IV.   MIL 8 - MR. ANGULO'S MOTIVATION FOR SUING TESLA (PART OF MOTION RE SELECTION OF COUNSEL)

Plaintiffs seek to preclude – among other things – Tesla from making any reference to Plaintiff Angulo's motivation for filing a lawsuit against Tesla.

Mr. Angulo's motivation for suing Tesla touches on several relevant issues to be tried. For example, it is within the province of the jury to assess the credibility of Mr. Angulo and the merits of his case. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (credibility

---

[3] While *Norfolk* implicated claims under federal law, other federal circuits have applied this reasoning to diversity actions when consistent with state public policy. *See In re Air Crash Disaster Near Chicago, Ill.*, On May 25, 1979, 803 F.2d 304, 313 (7th Cir. 1986) (The rationale for the federal rule is that, although most jurors are acutely aware of the effect of income taxes, few jurors appreciate that the amount of damages received on account of personal injuries is not taxable income).

determinations, weighing of the evidence, and drawing legitimate inferences from the facts are jury functions); *see also* 11th Cir. Pattern Jury Instructions (Civil) 1.1 (instructing the jury to determine credibility based on "interest the witness has in the outcome of the case" and "any bias or prejudice the witness may have"). This includes consideration of evidence that Mr. Angulo has fabricated or exaggerated his injuries for further financial gain. (*See* ECF 329 at 5 (noting the existence of such admissions in Mr. Angulo's medical records)).[4] Similarly, in addressing Mr. Angulo's reduced earning capacity claim, a jury is entitled to consider evidence that he is unemployed because **he does not need to work** rather than because he is unable to do so as a result of his injuries. *See W.R. Grace & Co.-Conn. v. Pyke*, 661 So. 2d 1301, 1302 (Fla. Dist. Ct. App. 1995) (plaintiff must show loss of earning capacity *by virtue of* any impairment found, and the jury assesses damages based on all relevant factors including age, health, habits, occupation, surroundings, and earnings before and after the injury); *see also Truelove v. Blount*, 954 So.2d 1284, 1288 (Fla. Dist. Ct. App. 2007) (it is more difficult for a plaintiff to make a requisite showing of reduced earning capacity if he is earning as much or more post-injury).

By asking this Court to exclude **any** reference to Mr. Angulo's motivation for suing, Plaintiffs' Motion vaguely and broadly applies to a variety of comments or evidence which may or may not be raised at trial. Because Plaintiffs cannot show that such evidence has *no* permissible use, a total exclusion of such evidence prior to trial would be premature. *See Rushing v. Wells Fargo Bank, N.A.*, No. 8:10-cv-1572, 2012 WL 3155790, at *1 (M.D. Fla. Aug. 3, 2012) (without knowing specific evidence objected to, court cannot rule prior to trial); *see Gonzalez,* 718 F. Supp.2d at 1345.

---

[4] It is Tesla's position that Dylan Angulo is financially better off now than before the crash.  *See MCI Worldcom Network Servs., Inc. v. Mastec, Inc.*, 995 So. 2d 221, 224 (Fla. 2008) (the purpose of compensatory damages is to compensate, not to bestow a windfall on plaintiffs).

"Unless evidence meets this high standard, evidentiary rulings should be deferred until trial

so that questions of foundation, relevancy, and potential prejudice may be resolved in proper

context." *In re Seroquel Prods. Liab. Litig.*, Nos. 6:06-md-1769-Orl-22DAB, 6:07-cv-15733-Orl-

22DAB, 2009 WL 260989, at *1 (M.D. Fla. Feb. 4, 2009). Accordingly, the Court should reserve

ruling on such references until each issue is actually raised.

For these reasons, Plaintiffs' Motion should be **DENIED**.

## V.   <u>MIL 9 - USE OF COMPLAINT</u>

Plaintiffs seek to exclude: (1) reference to their Complaint, including previous versions of

their Complaint in this case. In addition, while not clearly articulated in their Motion, it appears

based on the Parties' meet and confer that Plaintiffs intend to seek exclusion of references to

lawsuits filed by Plaintiffs in state court against McGee. Both are admissible.

### A.   <u>Operative Complaint And Prior Complaints In This Case</u>

Plaintiffs base their argument on state law when, in fact, this is an evidentiary issue

controlled by federal law. The 11th Circuit has held that a party's pleading are admissions by that

party to the facts alleged therein. *Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.*,

713 F.2d 618, 621 (11th Cir. 1983); *see also Taxinet Corp. v. Leon*, 114 F.4th 1212, 1227 (11th

Cir. 2024).[5]  This includes allegations which have been superseded by amendment.  *Id*; *see also*

---

[5] Plaintiffs cite federal cases addressing the state caselaw but those cases clarify that there is a
limited exception to the general rule admitting prior pleadings "in the case of complicated joinder
situation involving *contingent* liability of third parties *Cont'l Ins. Co. of New York v. Sherman,* 439
F.2d 1294, 1298 (5th Cir. 1971*)*(applying exception where pleader's indemnification claim forced
it to take a position inconsistent with its defense); *see also Nichols v. Barwick*, 792 F.2d 1520,
1523 (11th Cir. 1986) (adopting the 5th Circuit's general rule of admissibility). Specifically,
inconsistent pleadings are inadmissible only when they negate each other. *See Inversiones YV3343,
C.A. v. Lynx FBO Fort Lauderdale, LLC*, No. 21-CV-60197, 2024 WL 2938805, at *7 (S.D. Fla.
June 11, 2024).  There is no such contingent liability issue in this case, nor was there in Plaintiffs'
actions against McGee. Plaintiffs' allegations do not "negate" each other because: (1) Plaintiffs
settled their lawsuits against McGee and (2) Plaintiffs' causes of action against each defendant
(negligence against McGee and design defect and negligence against Tesla) are not inherently

*Carroll v. TheStreet.com, Inc.*, No. 11-CV-81173, 2012 WL 13134547, at *5 n. 6 (S.D. Fla. May 25, 2012) (observing the absurdity of preventing a party from admitting evidence of complaint amendments which amounted to gamesmanship). Thus, Plaintiffs' lawsuit allegations are admissible and treated as a party admission.

### B.     Lawsuits Filed By Plaintiffs Against McGee

Prior to suing Tesla, each Plaintiff filed and settled separate actions against non-party and Tesla driver George McGee for his fault in causing the incident. [*See* ECF 325-9 and 325-10]. Tesla intends to offer Plaintiffs' allegations from those lawsuits concerning McGee's fault. In addition to finding that the complaint in a pending lawsuit is admissible, the Eleventh Circuit has also held that allegations made by a party in another lawsuit arising out of the same incident are admissible. *Arch v. Specialty Insurance Company v. Balzebre,* No. 10-23775-CIV, 2013 WL 12065533, at *3 (S.D. Fla. Jan. 16, 2013).  These non-hearsay party admissions are clearly relevant to the issues in this case (including causation, Plaintiffs' product liability and negligence claims, and the fault of *Fabre* defendant McGee), and therefore should not be excluded.

Finally, allegations in Plaintiffs' Complaint or complaints against McGee are also admissible to the extent Plaintiffs open the door to impeachment at trial. *Gutierrez v. Galiano v. Enters. of Miami, Corp.*, No. 17-24081, 2019 WL 3302325, at *3-4 (S.D. Fla. July 23, 2019) (denying motion to exclude litigation documents from other lawsuit arising out of the same hurricane damage, citing general rule of admissibility of party statements in other actions). Of course, that determination cannot be made until the trial unfolds. *See Rushing*, 2012 WL 3155790, at *1; *see Gonzalez*, 718 F. Supp. 2d at 1345 ("In fairness to the parties and their ability to put on

---

mutually exclusive.  Thus, this exception to the general rule in favor of admissibility cannot apply.

their case, a court should exclude evidence *in limine* only when [the moving party demonstrates

that] it is clearly inadmissible on all potential grounds"); *see also In re Seroquel Prods. Liab. Litig.*,

2009 WL 260989, at *1.

    For these reasons, Plaintiffs' Motion should be **DENIED**.

## VI.   **MIL 10 - PRIOR SETTLEMENT**

    Once again, instead of citing controlling federal law, Plaintiffs cite state law and

evidentiary statutes, in an attempt to exclude any reference to Plaintiffs' involvement in or

settlement of a separate lawsuit with Tesla driver McGee. *See Agan v. Katzman & Korr, P.A.*, 328

F. Supp. 2d 1363, 1370 n. 4 (S.D. Fla. 2004) (noting that both federal and state versions of Rule

408 would warrant the same result, but observing that federal evidentiary rules govern

admissibility of settlement discussions in a diversity action); *see also NXP B.V. v. BlackBerry,

Ltd., No. 6:12-CV-00498-YK*, 2014 WL 12791873, at *1 (M.D. Fla. Mar. 26, 2014) (applying Fed.

R. Evid. 408, to permit evidence settlement discussions to refute statements made by defense

counsel during opening and testimony of defense expert). Under the Federal Rules, evidence of

settlement negotiation is admissible when it is presented for a reason other than demonstrating

liability, including but not limited to proving bias, prejudice of a witness, and undue delay. *Agan*,

328 F. Supp. 2d at 1371 (S.D. Fla. 2004).[6]

    It is premature at this stage to grant Plaintiffs' Motion where Plaintiffs' settlement

agreements may still be admissible to the extent Plaintiffs or a trial witness open the door to certain

issues, including but not limited to proving bias or prejudice of a witness. *See Gonzalez*, 718 F.

Supp. 2d at 1345 (S.D. Fla. 2010) ("In fairness to the parties and their ability to put on their case,

a court should exclude evidence *in limine* only when [the moving party demonstrates that] it is

---

[6] §768.041(3) Fla. Stat., which dictates the admissibility of references to settlement or a party's dismissal, is also an evidentiary rule which should not be considered in this federal diversity case.

clearly inadmissible on all potential grounds"); *see* Fed. R. Evid. 408(b); *see also Peklun v. Tierra Del Mar Condo. Ass'n, Inc.*, No. 15-CV-80801, 2016 WL 4250693, at *3 (S.D. Fla. June 1, 2016) (denying motion to exclude settlement agreement in part, observing that such evidence is admissible outside of enumerated exclusions in Rule 408). Again, because the Court and Tesla do not yet know what issues will arise at trial, it is premature to exclude evidence of Plaintiffs' involvement in a settlement with McGee at this stage.

For these reasons, Plaintiffs' Motion should be **DENIED**.

## VII.   MIL 11- FINANCIAL STATUS OF PLAINTIFFS

Plaintiffs seek to exclude any reference to Mr. Angulo's wealth as a result of the settlement or use of the settlement funds. Evidence of Plaintiffs' wealth can be admitted where it proves or disproves a fact at issue as it arises at trial.  *See State Farm Mut. Auto. Ins. Co. v. Complete Care Centers*, LLC, No. 6:20-CV-1240-WWB-EJK, 2023 WL 4854725, at *6 (M.D. Fla. Jan. 10, 2023) (citing *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1179 (11th Cir. 2002) (evidence of wealth is otherwise admissible when it is probative to one or more issues in the case); *see also Nichols v. Fannin*, No. 1:16-CV-4700-JSA, 2018 WL 2220872, at *10 (N.D. Ga. Apr. 16, 2018) (party's financial condition is admissible if an issue of ability to obtain treatment is raised); *see also Lopez v. Costco Wholesale Corp.*, No. 21-21670-CIV, 2022 WL 19331090, at *1 (S.D. Fla. June 23, 2022) (plaintiffs put financial ability at issue when claiming lost wages or lost future earning capacity).  In the instant case – for example – Mr. Angulo has claimed that he cannot seek various treatment because it is too expensive.  (*See* Ex. A, Angulo June 6, 2024 Dep. at 27:3-20; 34:19-25).  Therefore, it would be premature for the Court to preemptively exclude all use of such evidence at this time. *See Rushing*, 2012 WL 3155790, at *1; *Gonzalez,* 718 F. Supp. 2d at 1345)*.

For these reasons, Plaintiffs' Motion should be **DENIED**.

## VIII.   MIL 12- SECONDARY GAIN

Plaintiffs' Motion appears to seek exclusion of Mr. Angulo's own admissions concerning the merits of his case. The cases cited by Plaintiffs do not provide a basis for exclusion of comments by *Mr. Angulo* concerning the lawsuit or his own admitted malingering. Instead, it concerns improper statements of personal opinions **made by opposing counsel and his expert which are unsupported by the record.** *See  Gen. Telephone Co. v. Wallace,* 417 So. 2d 1022, 1023 (Fla. Dist. Ct. App. 1982). It is within the jury's province to assess the credibility of Mr. Angulo, including his alleged injuries and subjective complaints of pain. *Strickland*, 692 F.3d at 1154 (credibility determinations, weighing of the evidence, and drawing  legitimate inferences from the facts are jury functions); *see also* 11th Cir. Pattern Jury Instructions (Civil) 1.1 (instructing the jury to determine credibility based on, among other things,  "any evidence that contradicts the witness's testimony" and "any bias or prejudice the witness may have").

Here, Plaintiffs seemingly concede the existence of admissions that Mr. Angulo has malingered or is driven by secondary gain. Such statements are admissible on multiple grounds. *See, e.g.* Fed. Evid. 801(d)(1-2) (prior inconsistent statements and statements of a party are admissible to prove the truth of the matter asserted). They are also clearly relevant to Tesla's defenses.[7] Finally, it is disingenuous to argue that Plaintiff would be unfairly prejudiced by ***his own relevant admissions***. *See United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011) (Rule 403 is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility).

---

[7] Evidence of Mr. Angulo's failure to treat or follow treater's recommendations is also relevant to Tesla's defenses that Mr. Angulo caused or failed to mitigate his injuries. *See* Tesla's Affirmative Defenses 2 and 6 [ECF 259]; *Martin-Viana v. Royal Caribbean Cruises Ltd.*, 733 F. Supp. 3d 1308, 1347 (S.D. Fla. 2024), reconsideration denied, No. 23-CV-21171, 2024 WL 3160676 (S.D. Fla. June 24, 2024) (dismissing affirmative defense for lack of evidence that Plaintiff refused to follow doctor's orders).

The Southern District also recognizes that physicians routinely offer admissible opinions as to whether a patient is "malingering." *See e.g. Smith v. Carnival Corporation & PLC*, No. 22-CV-22853, 2023 WL 8370478, at *9 (S.D. Fla. Dec. 4, 2023). Tesla's neuropsychology expert Dr. Crown specifically observed that Angulo's examination and testing were "suggestive of malingering or exaggeration related to neurologic complaints, affect, and intelligence." (Ex. B, Crown Expert Report at 7). Courts deem such opinions especially proper where – as here – Dr. Crown is qualified to render the opinion and timely disclosed his opinions in advance of trial. *Smith*, No. 22-CV-22853, 2023 WL 8370478, at *9 (S.D. Fla. Dec. 4, 2023).

For these reasons, Plaintiffs' Motion should be **DENIED**.

## IX.   **MIL 16 - NO LEARNED TREATISE REFERENCES**

Plaintiffs' Motion seeks to exclude any references to learned treatises, such as studies, tests, or other authoritative texts.

Plaintiffs cite to Florida law, but it is inapplicable. Florida addresses learned treatises in Section 90.706, Fla. Stat. which provides that opinions contained in a treatises may only be used in cross examination and only if deemed authoritative. The use of learned treatises on direct examination is prohibited in state court. *See, e.g.*, *Philip Morris USA, Inc. v. Pollari*, 228 So. 3d 115, 129 (Fla. 4th DCA 2017) (stating that § 90.706, Fla. Stat. does not allow learned treatises to be used substantively because they are hearsay, and explaining related Florida law prohibiting bolstering expert opinions with learned treatises).

By contrast, federal law recognizes the learned treatise exception to the hearsay rule. *See* Fed. R. Evid. 803(18). Since federal law on the admissibility of evidence applies, *Heath v. Suzuki*

*Motor Corp.*, 126 F.3d 1391, 1396 (11th Cir. 1997)[8], as long as the elements of Rule 803(18) are satisfied, learned treatises can properly be referenced at trial.

For these reasons, Plaintiffs' Motion should be **DENIED**.

## X.     MIL 17-IMPROPER EXPERT TESTIMONY

Plaintiffs' Motion seeks to preclude experts from expressing opinions based on inadmissible evidence or to comment on inadmissible medical records.

Under both federal and Florida law, Plaintiffs' argument is incorrect. In federal court, experts may rely upon inadmissible material in forming opinions and may reference the inadmissible materials at trial:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. ***If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.*** But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703 (emphasis added).[9]

Plaintiffs also argue that an expert "should not be permitted to comment on what other doctors may think or consultation with colleagues or any other evidence not reasonably relied upon by similar experts." [ECF 329 at 7]. Plaintiffs' Motion is not yet ripe because it is unclear what specific of evidence or testimony Plaintiffs have in mind with this argument so Tesla reserves the

---

[8] In *Heath*, the court, rejected the argument that Georgia law applied to the admissibility of evidence; holding that "[u]nder this circuit's controlling precedent regarding diversity jurisdiction cases, the admissibility of evidence is a procedural issue, and therefore is governed by the Federal Rules of Evidence.").

[9] Florida has a statute similar to Federal Rule 703 in this respect. *See* § 90.704, Fla. Stat. And according to the very caselaw they cite, Plaintiffs are incorrect to suggest that the law in Florida disallows expert opinions based on inadmissible evidence. *See Linn v. Fossum*, 946 So. 2d 1032, 1036 (Fla. 2006) ("experts can rely on 'facts or data' not admissible in evidence in forming their opinions.").

right to address any specific objection Plaintiffs raise at the appropriate time. Generally, Tesla

agrees that all parties should follow the law governing expert testimony at trial.

For these reasons, Plaintiffs' Motion should be **DENIED**.

## XI.     MIL 18 - IMPROPER EXPERT OPINIONS ON CREDIBILITY

Plaintiffs seek to exclude Tesla's experts from offering personal opinions about the

Plaintiff. At the meet and confer, Tesla offered to agree to this Motion if it applied reciprocally.

However, Plaintiffs refused, insisting that Plaintiffs' expert be permitted to lodge attacks against

Tesla CEO Elon Musk. Tesla remains willing to stipulate to a reciprocal order on Plaintiffs' Motion

*in Limine* 18.  However, Plaintiffs' refusal to agree to hold their own experts to this standard is

fundamentally unfair and improper for all the reasons stated within their Motion.  [*See* ECF 329

at 7] (it is error to state personal opinions about the merits of the case or credibility of the plaintiff).

For these reasons, Plaintiffs' Motion should be **DENIED**.

## XII.    MIL 20 - MOTION TO EXCLUDE ANY TESTIMONY, REFERENCE OR ADMISSION OF THE TRAFFIC CRASH REPORT OR TRAFFIC HOMICIDE REPORT

Plaintiffs' Motion to exclude any testimony, reference or admission of the traffic crash

report or traffic homicide report seeks to exclude a broad spectrum of testimony and documentary

evidence, including a crash report; a homicide report; and ***any conversations*** that the driver of the

subject vehicle, McGee, had with either the Officer Joel Torres or with FHP Corporal David Riso.

Plaintiffs' Motion should be **DENIED**.

In support, Plaintiffs raise a single argument—that the Florida Accident Report Privilege,

§ 316.066(4), bars such evidence. Plaintiffs are incorrect.

At the outset, the Florida Accident Report Privilege does not apply in federal court. In

diversity jurisdiction cases, federal courts do not apply state law governing the admissibility of

evidence—they apply federal law. *Heath,* 126 F.3d at 1396. As the court made clear in *Anderson*

*v. Mitchell*, 300 So. 3d 693, 697 (Fla. Dist. Ct. App. 2019), "the current version of Section 316.066(4) does not create a true privilege . . . . Instead, ***it is a law of admissibility.***" *Id.* (emphasis added). Accordingly, because Florida law governing the admissibility of evidence do not apply, Tesla's position is that section 316.066(4) has no application in this case.[10]

Even if the statute could be applied in federal court, section 316.066(4) is much more limited than Plaintiffs suggest, and it is inapplicable to the evidence Tesla would seek to offer.

### A.   Crash Report And Homicide Report

If the Court finds that section 316.066(4) is not applicable in federal court, then Tesla reserves the right to introduce the crash report and homicide report into evidence. But even if the Court finds that the statute is applicable in federal court, that would not preclude the officers who completed the reports from testifying as to their observations; *See Brackin v. Boles*, 452 So. 2d 540, 454 (Fla. 1984) (exclusion under section 316.066(4) does not apply to tangible evidence or non-statements found in reports, including location of accident, skid marks, or any other observations by investigating officer); *see also Thomas v. Gottlieb*, 520 So.2d 622, 623 (Fla. Dist. Ct. App. 1988) (no error in permitting officer to rely on accident report to testify about injuries because information was based solely on his observations); *see also Cardona v. Mason & Dixon Lines,* Inc., 737 F. App'x 978 (11th Cir. 2018) (affirming trial court's admission of information from accident report not based on statements made by those involved in the crash).

---

[10]   Tesla acknowledges that some federal courts have considered the applicability of section 316.066(4) in diversity cases. *See, e.g.*, *Dewit v. UPS Ground Freight, Inc.*, No. 1:16CV36-MW/CAS, 2017 WL 4863279, at *2 (N.D. Fla. Aug. 22, 2017); *In re Jacoub*, No. 6:23-AP-00008-LVV, 2024 WL 4355564, at *5 (Bankr. M.D. Fla. Sept. 30, 2024). Neither *Dewit* nor *Jacoub*, discussed this choice of law analysis, and therefore are not controlling on this issue. Other cases like *Cardona v. Mason & Dixon Lines,* Inc., 737 F. App'x 978 (11th Cir. 2018), assume that the statute creates a privilege, and thus state law applies. But based on *Anderson*, that analysis is incorrect.

### B.    McGee's Statements To Corporal Riso

Corporal Riso is the Florida Highway Patrol officer who investigated the incident after the crash and prepared a homicide report. (Ex. C, Corp. Riso Dep. at 26-29). McGee's conversations with Corporal Riso took place months after the crash and had nothing to do with the crash report. (*Id*. at 62-63). As such, the statute plainly does not apply to any of their conversations. *See State v. Blocker*, 360 So. 3d 742, 746-747 (Fla. Dist. Ct. App. 2023) (noting that section 316.066(4) does not apply to statements made during a criminal investigation); *see also In re Jacoub*, No. 6:23-AP-00008-LVV, 2024 WL 4355564, at *5 (Bankr. M.D. Fla. Sept. 30, 2024) (Section 316.066(4) did not apply where the officers were not investigating the crash).

### C.    McGee's Conversations With Officer Torres

Officer Torres was the responding officer dispatched to the crash scene by the Monroe County Sheriff.  (Ex. C at 46).

The Accident Report Privilege does not preclude evidence of "***any***" conversations McGee had with Officer Torres. Rather, it is only those conversations made "***for the purpose of completing a crash report***." § 316.066(4); *Brackin*, 452 So. 2d at 544 ("[T]he purpose of the statute is to clothe with statutory immunity only such statements and communications as the driver, owner, or occupant of a vehicle is compelled to make in order to comply with his or her statutory duty . . . ."). Accordingly, when he first arrived on the scene, Officer Torres was not preparing a crash report or interviewing McGee for the purpose of creating a crash report. Rather, he was assessing the ongoing danger of the situation of an active crash scene. Statements made by McGee spontaneously during that time period were not offered pursuant to his legal duty to fill out a crash report under Florida law, and they are not barred by Section 316.066(4). (*See* Ex. C at 64-65 (stating his belief that McGee's statements to police on the night of the crash were spontaneous));

14

*Perez v. State*, 630 So. 2d 1231 (Fla. Dist. Ct. App. 1994) (spontaneous utterance by driver that "I'm a deputy sheriff and I [f***ed] up." was not precluded by accident report privilege).

While Plaintiffs have not specifically identified Officer Torres's body camera footage as the subject of their Motion, to the extent Plaintiffs intend their Motion to include that footage, it would not be precluded by the statute for the reasons set forth above—it contained spontaneous utterances.[11] Moreover, many of McGee's comments were not even made directly to the officer, but were made to other first responders or persons at the scene. [*See, e.g.*, ECF 325-3 at 5] (Ex. D Body Cam Footage) ("I dropped my phone. I was trying to call. We're flying out for a funeral tomorrow morning and I was trying to call to get my wife's stuff ready at the airline. And I looked down and ran right through here and hit the guy's car."). Such statements are not covered by Section 316.066(4)'s exclusion.

Indeed, Section 316.066(4) expressly only precludes comments McGee made "***to a law enforcement officer***." *See, e.g.*, *Brown v. Fla. Dep't of Corr.*, No. 3:20-CV-1377-LC/MJF, 2021 WL 6198040, at *8 (N.D. Fla. Dec. 6, 2021) (statement to paramedic and EMT did not trigger Section 316.066(4) because "[t]he clear and plain language of the statute states unambiguously that the privilege applies to statements made to a law enforcement officer"), report and recommendation adopted, 2021 WL 6197094 (N.D. Fla. Dec. 30, 2021). Thus, McGee's statements to persons other than Officer Torres on the night of the crash could never be excluded by Section 316.066(4).

For these reasons, Plaintiffs' Motion should be **DENIED**.

---

[11] To the extent Plaintiffs seek to exclude the body camera footage as part of their broadly stated argument, Tesla would request the opportunity to address the statements in the footage on a line-by-line basis.

### XIII.   MIL 22 - PRECLUDE REFERENCE TO THE SAE J3016 TAXONOMY

Plaintiffs seek to exclude references to the Society of Automotive Engineers (SAE) J3016 Surface Vehicle Recommended Practice related to driving automation systems for on road vehicles.  This universally accepted classification of the levels of driving automation is adopted by NHTSA and is used throughout the industry.  Plaintiffs claim it is irrelevant, somehow "misleading," or unduly prejudicial. Plaintiffs' arguments are misplaced and should be rejected.

### A.   <u>Introduction And Background</u>

SAE J3016, is the authoritative classification of driving automation systems used by developers of driver assistance technology. The Recommended Practice is designed to clarify the respective roles of the human driver and the automation system when such a system is engaged. SAE J3016 identifies six levels of automation. Those levels range from Level 0 (the driver performs all driving functions and the system provides only momentary interventions and alerts) to Level 5 (full driving automation / driver performs no driving tasks). The greater the automation, the less the driver's role.

SAE Levels 1 and 2 contain driver support features that can provide continuous <u>assistance to</u> the driver. The driver, however, must still maintain control and responsibility for all driving tasks. (Ex. E, Moore July 12, 2024 Dep. at 23-25). In other words, the driver must constantly supervise these driver support features and steer, brake, or accelerate as needed to maintain safety. (*See* Ex. F, SAE, *J3016 Levels of Driving Automation* (2016) at 19,)*.* The subject 2019 Model S was a Level 2 vehicle as defined by SAE J3016; *see also* Ex. G, SAE, *J3016 Levels of Driving Automation* (2021) at 28).

The classification of driving automation levels in SAE J3016 has been adopted by the National Highway Traffic Safety Administration ("NHTSA"). (Ex. H, NHTSA, *Automated*

*Driving Systems 2.0: A Vision for Safety* (Sept. 2017) at p. 2).[12] SAE standard J3016 is the industry's most-cited source for automated vehicle capabilities, and the use of this classification system is ubiquitous within the industry. As such, Tesla employees regularly use these classification terms internally. (*See, e.g.* Ex. I, Benavides-00003148, Tesla's Response to NHTSA PE21-020 IR 5.e, in terms of SAE level 2 technology). Plaintiffs' own experts acknowledge SAE J3016's importance in understanding driver assistance technology. For example, Plaintiffs' expert Moore routinely relied on J3016 to discuss Level 2 systems like the 2019 Model S. (*See* Ex. E at 22-24, 76).

Of course, Tesla has not used the same technical engineering language for the role of an L2 driver in J3016 in its marketing and owner communications. SAE J3016 is a technical standard written by engineers for engineers – its target audience is developers and regulators of driver assistance technology. (*See* Ex. F at 1) (intent of standard is to – among other things - "provid[e] a useful framework for *specifications and technical requirements*); *see also* (See Ex. G at 2) ("This document is published to advance the state of *technical and engineering sciences*"). Consequently, SAE defines the role of the driver and the system in *technical* terms:

---

[12] In 2016, NHTSA stated: "There are multiple definitions for various levels of automation and for some time there has been need for standardization to aid clarity and consistency. Therefore, this Policy adopts the SAE International definitions for levels of automation." (*Id.*; see also Ex. H at p. 1) ("For overall awareness and to ensure consistent in taxonomy usage, NHTSA adopted SAE International's Levels of Automation and other applicable terminology.")). NHTSA further pointed out that "[t]he SAE definitions divide vehicles into levels based on 'who does what, when.'" (*Id.*). *See also* Ex. J, NHTSA, Automated Vehicle's for Safety.

| Level of *Driving Automation* | Role of *User* | Role of *Driving Automation System* |
|---|---|---|
| **Level 2 - *Partial Driving Automation*** | *Driver* (at all times):<br>• Performs the remainder of the *DDT* not performed by the *driving automation system*<br>• Supervises the *driving automation system* and intervenes as necessary to maintain safe *operation* of the *vehicle*<br>• Determines whether/when engagement and disengagement of the *driving automation system* is appropriate<br>• Immediately performs the entire *DDT* whenever required or desired | *Driving Automation System* (while engaged):<br>• Performs part of the *DDT* by executing both the *lateral* **and** the *longitudinal vehicle motion control* subtasks<br>• Disengages immediately upon *driver* request |

(Ex. F at 19).

Although this language clearly communicates that the driver must always stay alert and be prepared to take over complete control, Tesla uses more consumer-friendly language to convey the same driver role:

> It is your responsibility to stay alert, drive safely, and be in control of the vehicle at all times. Never depend on Traffic-Aware Cruise Control to adequately slow down Model S. Always watch the road in front of you and be prepared to take corrective action at all times. Failure to do so can result in serious injury or death.

>     \*     \*     \*     \*     \*

> Always pay attention to the road ahead and stay prepared to take immediate corrective action. Depending on Traffic-Aware Cruise Control to avoid a collision can result in serious injury or death. In addition, Traffic-Aware Cruise Control may react to vehicles or objects that either do not exist or are not in the lane of travel, causing Model S to slow down unnecessarily or inappropriately.

>     \*     \*     \*     \*     \*

> Never depend on these [driver assistance] components to keep you safe. It is the driver's responsibility to stay alert, drive safely, and be in control of the vehicle at all times.

(*See, e.g*., Ex. K, Tesla Model S Owner's Manual at 80, 82-84).[13] Tesla included these and many other similar warnings in the Owner's Manual precisely because the subject 2019 Model S was a Level 2 vehicle and required constant driver supervision. (*See id* at 82-94, 100-104).

**B.    Argument**

  **1.    SAE J3016 Is Relevant As A Governmentally Imposed Guideline Widely Used Within Tesla And The Industry**

  Evidence relating to SAE J3016 levels is relevant because (1) NHTSA has adopted SAE J3016 and directs its use within the automotive industry; (2) the use of SAE terminology is pervasive across the automotive industry and within Tesla and appears throughout the deposition testimony and documents at issue in this case; and (3) the subject 2019 Model S was an SAE Level 2 vehicle and Tesla provided warnings and instructions to its customers, including McGee, consistent with the SAE Level 2 classification. Fed. R. Evid. 401.

  **(a)    NHTSA Adopted SAE J3016 And Directs Its Use Within The Industry**

  Plaintiffs' Motion tries to minimize the entire rubric of automation classification, arguing that "SAE J3016 is not an industry or safety standard, let alone a government standard." [ECF 329 at 14]. This is patently incorrect.

  The National Highway Traffic Safety Administration (NHTSA), the agency charged with vehicle safety has ***expressly adopted SAE J3016***. (Ex. L, NHTSA, *Federal Auto. Vehicles Policy*, (Sept. 2016)).  In fact, NHTSA includes graphical representations of SAE's Automation levels in its publications and on its website:[14]

---

[13] Similarly, SAE J3016 also provides: "You are driving whenever these driver support features are engaged – even if your feet are off the pedals and you are not steering. You must constantly supervise these support features; you must steer, brake or accelerate as needed to maintain safety." (See Ex. M, SAE Levels of Driving Automation Refined for Clarity and International Audience Levels of Driving Automation at 3).

[14] *see also* Ex. J, NHTSA, *Automated Vehicle's for Safety*.



(Ex. N, Excerpt from NHTSA Levels of Automation).

And by 2017, NHTSA took it a step further by directing: "It is an entity's responsibility to determine its system's automation level *in conformity with SAE International's published definitions*." (Ex. H at p. 2 (emphasis added). Thus, not only has NHTSA adopted SAE J3016, but it also now instructs manufacturers to use J3016 as the standard for uniformity.

Accordingly, it is entirely appropriate  for Tesla to cite and rely upon this standard.

> **(b)** **Both The Automotive Industry And Tesla Use SAE Terminology Pervasively – And It Even Appears In Plaintiffs' Trial Exhibits**

This standard is also widely used within the automotive industry.

*First,* SAE J3016 was published by the Society of Automotive Engineers – the SAE. The SAE is and has been recognized as the leading industry organization that develops and publishes standards and guidelines followed by the automotive industry.[15] Compliance with an industry

---

[15] *See* Ex. O, SAE Standards Development.

standard, custom or practice is relevant and admissible to the strict product liability inquiry in this trial, including the jury's evaluation of whether the product's design is unreasonably dangerous. *See* Fla. Stat. § 768.1256 (2024) (rebuttable presumption of no defect when product complied with relevant regulations or standards at the time of sale).

**Second,** Plaintiffs' assertion that none of Tesla's experts or employees will testify about the connection between Autopilot and SAE J3016 categorization, [ECF 329 at 18], is contradicted by the record. The depositions of Tesla engineers make clear that their understanding of vehicle autonomy is based on the SAE J3016 classifications. (*See* Ex. P, Eloy Rubio Blanco Dep. at 106 (Autopilot is designed around the definition of Level 2 assistance systems); (*id.* at 39-40, 41-42, 68-69, 85-86, 91) (discussing Autopilot using phraseology from SAE J3016 levels of autonomy); Ex. Q, Akshay Phatak 7/20/23 Dep. at 79-80) (Level 2 terminology as used by Tesla is defined by SAE); (Ex. Ryan Harrington 6/24/24 Report at 30-34) (discussing NHTSA testing and recommendations to ADAS developers like Tesla based on SAE levels of automations).

**Third,** Plaintiffs' own witnesses and Consolidated Complaint refer to and rely on SAE J3016 levels of autonomy. (*See* Ex. E at 22-24, 76); ECF 205 (Plaintiffs' Consolidated Complaint) at ¶¶ 28-29, 75-79 87, 111, 180(h) (exclusively using SAE levels of automation in allegations concerning design defect). Plaintiffs also used SAE J3016 terminology throughout their Response to Tesla's Motion for Summary Judgment, which was filed *after* asking the Court to exclude the same terminology. [*See* ECF 352 at 5, 16 n. 8, and 18].

> **(c)    Tesla's Warnings And Instructions Align With The SAE J3016 Definition Of A Level 2 Vehicle**

Tesla does not include the technical terms of SAE J3016 level classifications in its marketing to consumers. It would be irresponsible not to convert these statements about the role of the driver into more consumer-friendly language. Manufacturers often do not include technical

terminology in communications with laypersons, but that does not mean the source documents using the more technical terminology inadmissible at trial. For instance, certain prescription medications are classified into five distinct categories or "schedules" (Schedules I through V), as recognized by the government. And while pharmaceutical manufacturers may not market a particular medication as "Schedule II," that classification is meaningful within the relevant industries, and can assist a lay juror in understanding important differences in medication types. This type of categorization, like the SAE levels categorization, is well within the understanding of a juror.[16]

Tesla did not use the phrase "Level 2" in its marketing materials, but it conveys the import of SAE J3016 "Level 2" guidelines to its customers. *See supra* at 17-19. It is instructive that NHTSA when communicating with consumers also converts the engineering language describing the Level 2 into more consumer-friendly language. (See Ex. N) (Describing the role of driver when system is engaged using similar language to the language in Tesla's Owner's Manual).

> ### (d)    Tesla's References To This Standard Would Not Usurp The Jury's Role In Deciding Drivers Duties

Plaintiff argues that referring to SAE J3016 would usurp the jury's right to decide an ultimate issue of fact about the driver's duty under Florida law. [ECF 329 at 17-18]. But referring to a vehicle as Level 2 does not go to the ultimate issue of the case, as Plaintiffs contend. The SAE Level 2 designation describes the capabilities and limitations of the subject 2019 Tesla Model S vehicle and will help the jury understand the same. It does not describe "the ultimate issue" of McGee's duty to operate his vehicle as Plaintiffs argue. Rather, that duty is found in the ordinary principles of negligence, along with McGee's legal obligation to follow all traffic laws.

---

[16] Additionally, Plaintiffs and Tesla both retained their own design engineers for the purpose of explaining the technical aspects of this case to a lay juror. Thus, the jury will be adequately informed and will understand SAE J3016.

§316.1925(1), Fla. Stat. ("Any person operating a vehicle upon the streets or highways within the state shall drive the same in a careful and prudent manner… so as not to endanger the life, limb, or property of any person. Failure to drive in such manner shall constitute careless driving and a violation of this section."); § 316.192, Fla. Stat. (it is unlawful to drive any vehicle in willful or wanton disregard for the safety of persons or property).

### 2.     Plaintiffs Are Not Unduly Prejudiced By Reference To SAE J3016

Finally, Plaintiffs also argue that reference to SAE J3016 should be prohibited because of the danger of undue prejudice. Of course, the test is whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

As detailed above, SAE J3026 is directly relevant to issues in this case. Balanced against that relevance, reference to SAE driver automation levels will not inflame the jury's emotions, causing them to unfairly punish Plaintiffs or reward Tesla. To the contrary, its use at trial will aid the jury in understanding the capabilities and limitations of both the Model S and peer vehicles based on the technology available at the time of manufacture. *See* § 768.1257 Fla. Stat. (the jury shall consider the state of the art of scientific and technical knowledge and other circumstances at the time of manufacture). It is also crucial to explaining the understanding and expectations of the Tesla engineers in connection with the design and release of the vehicle, which Plaintiffs allege was defective. *See supra* at Section A(2).  Finally, it will allow witnesses to use the proper industry terminology, as recognized and directed by NHTSA, to describe the Autopilot technology on the subject 2019 Tesla Model S. As such, this evidence is more probative than prejudicial.

For these reasons Plaintiffs' Motion to Preclude Reference to the SAE J3016 "Taxonomy" should be denied.

## CONCLUSION

**WHEREFORE**, for the reasons discussed herein, Plaintiffs' Motions *in limine* 2, 5, 7, 8, 9, 10, 11, 12, 16, 17, 18, 20, 22 should be **DENIED** in their entirety.

Date:  February 28, 2025                                 Respectfully submitted,

<u>s/</u> Whitney V. Cruz
**WHITNEY V. CRUZ**
Florida Bar No. 800821
**WENDY F. LUMISH**
Florida Bar. No. 334332
**BOWMAN AND BROOKE LLP**
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134
Tel. 305-995-5600 / Fax: 305-995-6100
whitney.cruz@bowmanandbrooke.com

**THOMAS P. BRANIGAN**
*(Admitted Pro Hac Vice)*
**DREW P. BRANIGAN**
*(Admitted Pro Hac Vice)*
**BOWMAN AND BROOKE LLP**
101 W. Big Beaver Road, Suite 1100
Troy, MI 48084
Tel. 248-205-3300 / Fax: 248-205-3399
thomas.branigan@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com

**JOEL SMITH**
*(Admitted Pro Hac Vice)*
**BOWMAN AND BROOKE LLP**
1441 Main Street, Suite 1200
Columbia, SC 2920
Tel. 803-726-7420 / Fax: 803.726.7421
Joel.Smith@bowmanandbrooke.com

**HILARIE BASS**
Florida Bar No. 334243
**HILARIE BASS, ESQUIRE LLC**
2821 Bayshore Drive, UPH-B
Miami, FL 33133
Tel. 305-505-8777
bassh@bassinstitute.org

*Attorneys for Defendant TESLA, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 28, 2025, the foregoing was filed using

the Court's CM/ECF system, which will send electronic notice of the same to all interested parties.

**Adam T. Boumel, Esq.**
Florida Bar No. 0110727
THE ROUSSO, BOUMEL LAW FIRM, PLLC
9350 South Dixie Highway
Suite 1520
Miami, FL 33156
Tel. 305-670-6669
adam@roussolawfirm.com
assistant@roussolawfirm.com
pleadings@roussolawfirm.com

*Attorneys for Plaintiff Dillon Angulo*

**Brett Schreiber, Esq.**
Admitted *Pro Hac Vice*
**Satyarinivas "Srinivas" Hanumadass, Esq.**
Admitted *Pro Hac Vice*
**Carmela Birnbaum, Esq.**
Admitted *Pro Hac Vice*
SINGLETON SCHRIEBER
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
bschreiber@singletonschreiber.com
vas@singletonschreiber.com
cbirnbaum@singletonschreiber.com
jjusto@singletonschreiber.com
eelms@singletonschreiber.com
service@singletonschreiber.com

*Co-Counsel for Plaintiffs Dillon Angulo and
Neima Benavides*

**Todd Poses, Esq.**
Florida Bar No. 0075922
POSES & POSES, P.A.
Alfred I. Dupont Building
169 East Flagler Street, Suite 1600
Miami, FL 33131
Tel.  305-577-0200
Fax: 305-371-3550
tposes@posesandposes.com
maria@posesandposes.com

*Attorneys for Plaintiff Neima Benavides*

**Douglas F. Eaton, Esq.**
Florida Bar No. 0129577
EATON & WOLK PL
2665 South Bayshore Drive, Suite 609
Miami, FL 33133
Tel. 305-249-1640
Fax: 786-350-3079
deaton@eatonwolk.com
cgarcia@eatonwolk.com
lhuete@eatonwolk.com

*Co-Counsel for Plaintiffs Dillon Angulo and
Neima Benavides*

*s/ Whitney V. Cruz*
WHITNEY V. CRUZ