# EXHIBIT C

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA (MIAMI)

Civil Case No. 21-cv-21940-BLOOM/Otazo-Reyes

NEIMA BENAVIDES, as Personal Representative of the Estate of Naibel Benavides Leon, deceased,

　　　Plaintiff,

vs.

TESLA, INC., a/k/a Tesla Florida, Inc.,

　　　Defendant.
_____/

DEPOSITION OF

CORPORAL DAVID RISO
Friday, January 21, 2022

APPEARING REMOTELY FROM
MIAMI-DADE COUNTY, FLORIDA

Reported by:
Margaret Lowe, RPR
Job No. 204447

1                REMOTE APPEARANCES

2

3  On behalf of the Plaintiff:

4    Poses and Poses
     169 East Flagler Street
5    Miami, FL 33131
     BY: Todd Poses, Esq.
6

7

8
   On behalf of the Defendant:
9
     Bowman and Brooke
10    41000 Woodward Avenue
     Bloomfield Hills, MI 48304
11    BY: Thomas Branigan, Esq.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 26

1           Riso

2   the amount of time you spent preparing for today's

3   deposition by reviewing the file?

4       A.   There was hours of reviewing some things or

5   reading over some items.  I didn't read over the entire

6   case because this case was very fresh in my memory, if

7   you understand, because it literally wasn't even more

8   than just, like, two years ago.

9       Q.   Did you have any conversations with anyone

10  specifically to prepare for this deposition today?

11      A.   Just myself.  I'm the primary investigator on

12  this case.  I was the lead on it, and after a while I

13  was the only corporal working on it.  My supervisor did

14  review it before it got approved and signed off so he

15  did see it, but I didn't talk to him about it.  I might

16  have mentioned I had a depo on this, and that's another

17  reason why my partner left the office because,

18  originally, he didn't want to be inside there when I was

19  -- because I needed to be by myself inside the depo.

20      Q.   All right.  The file that you have been

21  referring to when you identified contents of the file,

22  how long is that going to be preserved for, if you know?

23      A.   The file at the Miami station, I'm thinking

24  they hold on to them.  I'm not sure the numbers.  It's

25  like five, 10 -- I think it's 10 years if I recall.  I

Page 27

1           Riso

2   don't think it's shorter than 10 years, but they hold on

3   to a file for -- they actually hold on to it for a very

4   long time.  So it's gonna be there for a while.  I can't

5   remember the retention period on those, but I think it's

6   10 years.  I don't know if that answered your question.

7      Q.  It does.  Thank you, sir.  All right.  I'm

8   going to stop sharing this for a moment.  You mentioned

9   that you were the lead investigator for the crash that

10  we're talking about today, correct?

11     A.  Yes.

12     Q.  This next question may reveal some of my

13  ignorance about the scope of your work, and if you

14  haven't noticed by now, I'm not from Florida.  Despite

15  the background that you see behind me, I'm sitting in

16  Michigan where it's currently 12 degrees.  I wish I was

17  in Florida, but I'm not.  But let me get to the

18  question.

19         When you say you were the investigator, can you

20  tell us as the investigator of this incident what were

21  your responsibilities?

22     A.  Just to start off, one thing, I wasn't assigned

23  the lead investigator in the case until about a month

24  after it happened.  But I was on the scene that night

25  when it happened, not immediately, but I did get there

Page 28

1          Riso

2   after the fact because I was training a new corporal.

3   So once I got started getting phone calls and e-mails

4   from the NTSB, that's when my supervisor decided maybe

5   we should be taking on this case, meaning the FLAIR

6   team, the advanced team.  So that's when I basically got

7   it all, but I had a hand in a lot of things initially

8   which I'm glad I did.

9          But as far as investigating the crash,

10  documents, you know, witness statements, EDR downloads,

11  evidence, like, it could be things from the scene,

12  things from the cars in question, determine whether

13  there's -- you know, who's at fault, the dynamics of how

14  it happened, speed if I can get a speed on the vehicles.

15  I tried to, and in not all cases can I actually

16  calculate speed based on the evidence.

17          Bottom line, basically, you're the

18  investigator, you collect all documents, evidence, you

19  see if there's charges, criminal charges, who may be at

20  fault if somebody is at fault, and you figure out the

21  dynamics, basically, of how it happened, travel times

22  before.  There's a lot of detail in that all the way to

23  the end until you polish it up.  And when I say --

24  meaning, make sure you cross your t's, dot your i's,

25  label things correctly like street names, proper, you

Page 29

1        Riso

2   know, grammar, and you put the final product in together

3   which I'm gonna say that you-all probably got a copy of

4   my traffic homicide investigative report and field note

5   packet.  So you'll have all those, and that's ultimately

6   the finished product along with the other evidence like

7   pictures and interviews and stuff like that that are

8   saved on CDs at the station and other supporting

9   documents.

10       Q.  So we focused our attention on the date of the

11  incident, April 25, 2019.  You were on the job that day,

12  correct?

13       A.  Yeah.  I was called out that night.

14       Q.  How was it that you were notified of the

15  incident so that you could respond to it?

16       A.  They called the local -- if I recall correctly,

17  I believe they called the local corporals, and one of

18  them was a new corporal assigned in the Keys, meaning

19  he's still in training and I was training him.  So I

20  went to the scene with them, and I watched and

21  monitored.  And, you know, as they measured the scene,

22  and I remember the new corporal, he wasn't trained on

23  the Leica station which is a very detailed measurement

24  of the -- you know, detailed, to-scale measurement of

25  the scene.  But he was way on it and I let him go and I

Page 46

1                    Riso
2  why he put "completed."  As you look in line -- you'll
3  see, like, County Code 3841, Monroe, right?  You see
4  that?  County of crash.
5      Q.  Yes, sir.
6      A.  Look below Monroe.  You see "completed"?
7      Q.  Yes, I do.
8      A.  And I know that I would not have marked it
9  completed.  I always tell the trooper who's working the
10  crash report to put no, and the reason to the right
11  would be pending THI investigation.  So I don't know --
12      Q.  What does that mean?
13      A.  Traffic homicide investigation which is what I
14  am.  So I don't know why that is completed out.
15      Q.  All right.  If we go to the last page of
16  Exhibit 4, this indicates that the reporting officer is
17  Joel Torres, and there's also a sergeant that is
18  referred to there.  Do you know who those officers are?
19      A.  Oh, are these like incident reports?  Yeah,
20  yeah.  Joel Torres is the one and only deputy from
21  Monroe County who was on scene.  And Sergeant Alvarez,
22  Orlando Alvarez, who I know, he's the sergeant, the
23  supervisor who approved it.
24      Q.  So this also indicates at the top of this
25  section of Exhibit 4 that it's from the Monroe County

Page 62

1            Riso

2      Q.  Corporal, in the next section of your

3   investigative report, you have a discussion about the

4   vehicles starting with Vehicle 1.  And as I understand

5   from your report, Vehicle 1 refers to the 2019 Tesla

6   Model S, correct?

7      A.  Yes.

8      Q.  And you also make reference to the driver as

9   D1, and D1, Driver 1, was the driver of the Tesla,

10  correct?

11     A.  Yes, correct.

12     Q.  Would that be Mr. McGee?

13     A.  Yes, sir.

14     Q.  All right.  When you arrived on scene, did you

15  individually meet and speak with Mr. McGee, the Tesla

16  driver?

17     A.  No, sir.

18     Q.  Did you ever speak with Mr. McGee while you

19  were on scene?

20     A.  No, sir.

21     Q.  Have you ever spoken with Mr. McGee?

22     A.  Yes, sir.

23     Q.  Can you tell us when you first spoke to

24  Mr. McGee in connection with this incident?

25     A.  I believe it was when him and his attorney met

Page 63

1        Riso

2   me at my office here for him to sign and accept his

3   traffic citation for the cause and crash.

4       Q.  Do you recall when that was?  And if you need

5   to look at your report to refresh your memory, that's

6   fine.

7       A.  Let me look here.

8           MR. POSES:  I'm just going to object to the

9       form as it relates to the citation but, Corporal,

10      please go ahead.

11          THE WITNESS:  I'm reading.  Hold release, hold

12      release.  Okay.  He basically came on October 28,

13      2019, the day before I turned in the report.

14  BY MR. BRANIGAN:

15      Q.  Did you take a statement from Mr. McGee then?

16      A.  I believe he invoked his rights.  I believe he

17  did.

18      Q.  So he invoked his Fifth Amendment right and as

19  a result, did not give a statement?

20          MR. POSES:  Object to the form.

21      A.  I normally ask, and if I do ask, I go through

22  counsel.  If they're represented by counsel, I always go

23  -- and that's my policy.  I'll go through counsel.  I

24  don't bypass that.

25  BY MR. BRANIGAN:

Page 64

1            Riso

2     Q.   Is it correct, is it not, though, sir, that
3  while he was at the incident scene, after the crash,
4  Mr. McGee made statements about the incident, correct?
5     A.   Statements to people who were at the scene that
6  he was around, and these statements, I believe, were
7  recorded by body cam video that was on the deputy there,
8  Joel Torres, um-hmm.
9     Q.   So that would be the deputy from -- forgive me,
10  is it Monroe or Montgomery County?
11     A.   Monroe County.
12     Q.   Monroe County?
13     A.   Yes.  And he was the only deputy who was on
14  scene.
15     Q.   From Monroe County?
16     A.   Yes.
17     Q.   The body cam video and audio that Deputy
18  Torres's body cam technology recorded, have you
19  personally listened to that and watched it?
20     A.   Yes, I have.
21     Q.   Did you do that in connection with preparing
22  the report?
23     A.   Yes, I did.
24     Q.   And based on your listening to and review of
25  that body cam information, is it your understanding that

Page 65

```
 1                    Riso
 2   Mr. McGee made spontaneous statements to the police
 3   about what he thinks occurred?
 4      A.   Yes.
 5      Q.   And is it your understanding that, first of
 6   all, he -- he was familiar with this incident -- excuse
 7   me -- the area where the incident occurred?
 8      A.   Was he familiar with the area where the
 9   incident occurred, correct?
10      Q.   Yes.
11      A.   Yes, he was.
12      Q.   Do you know -- is it correct that he lived in
13   the area where the incident occurred?
14      A.   Well, north of the intersection, from the
15   intersection on 905, it eventually ends about, I'm gonna
16   guess, a mile down the road at the entrance into an area
17   called Ocean Reef.  It's a gated community, monitored
18   24-hours gate, and he had a place of residence inside
19   there.
20      Q.   Did you confirm that through your
21   investigation?
22      A.   Yes, I did.
23      Q.   And do you happen to know how frequently he
24   would travel through this intersection where the crash
25   occurred to get to Ocean Reef before the incident
```

Page 145

1        CERTIFICATE OF REPORTER

2

3  STATE OF FLORIDA

4  COUNTY OF ORANGE

5

6       I, Margaret Lowe, Registered Professional

7  Reporter, certify that I was authorized to and did

8  stenographically report the deposition of CORPORAL DAVID

9  RISO; that a review of the transcript was not requested;

10 and that the foregoing transcript, pages 4 through 143,

11 is a true and complete record of my stenographic notes.

12      I further certify that I am not a relative,

13 employee, attorney, or counsel of any of the parties,

14 nor am I a relative or employee of any of the parties'

15 attorneys or counsel connected with the action, nor am I

16 financially interested in the action.

17      DATED this 2nd day of February, 2022.

18

19

20        _____
          Margaret Lowe, RPR
21

22

23

24

25