## 2. Incidence

Crash costs are driven by the incidence of fatalities, injuries, and damaged vehicles that result from motor vehicle crashes. Most serious crashes are reported in police records within individual States and jurisdictions, but many crashes that are less serious are either not reported to police, or are reported but not recorded because their severity falls below a local reporting threshold. In this section we estimate the incidence of both the police-reported and unreported crashes that occur annually on our roadways.

### Fatalities

The incidence of fatalities that result from motor vehicle crashes is derived from the FARS, an annual census of all fatal roadway crashes. FARS collects data on all fatal traffic crashes within the 50 States, the District of Columbia, and Puerto Rico. To be included in FARS, a crash must involve a motor vehicle travelling on a roadway customarily open to the public and result in the death of a person (occupant of a vehicle or a nonoccupant) within 30 days of the crash.

FARS collects information on over 100 different coded data elements that characterize the crash, the vehicle, and the people involved.

In 2019 there were 36,500 fatalities in motor vehicle crashes. Table 2-1 and Figure 2-A illustrate the trend in fatalities over the past 70 years, along with the trend in the fatality rates. Over this period fatality rates have exhibited steady decline, but fatality counts rose during the 1960s in response to rapid increase in the driving population associated at least in part by the demographic shift of the baby boom generation into the driving cohort. From 1999 to 2019 fatal crashes and fatality rates declined due to a variety of factors including safer vehicles, safer roadways, improved driver behavior such as increased seat belt use and decreased impaired driving, increased congestion, which reduces travel speeds, more use of mass transit, and, during recovery from the 2007 recession, reduced economic activity. In 2010, when NHTSA last examined this issue, there were roughly 33,000 fatalities from motor vehicle crashes, a 21 percent decline from the 2000 total of roughly 42,000 fatalities. Fatalities remained relatively stable near this level through 2014 as the economy reached full recovery from the recession, but then rose to roughly 37,000 in 2015 and hovered at that level through 2019, stabilizing at roughly 5,000 fewer fatalities than the pre-recession level. This is an encouraging trend, and is even more impressive in light of the increased population and generally rising rates of travel over time. Some aspects of this decline are likely to remain and even accelerate as the older on-road fleet is replaced by more modern vehicles with advanced safety features such as automatic emergency braking and other advanced crash avoidance systems. Also, 2019 was the last pre-COVID year, and initial indications are that COVIDs impacts were complex, reducing travel due to the economic shutdown, but enabling more speeding due to less traffic congestion. These impacts may be temporary, but the long-term impact of COVID on workplace habits, specifically by normalizing telecommuting, may have more significant implications for traffic crashes in future years.

*Table 2-1. Fatalities and Fatality Rates, 1949-2019*

| Year | Fatalities | Fatality Rate per 100M VMT | | Year | Fatalities | Fatality Rate per 100M VMT |
|------|-----------|------|---|------|-----------|------|
| 1949 | 30,246 | 7.13 | | 1985 | 43,825 | 2.47 |
| 1950 | 33,186 | 7.24 | | 1986 | 46,087 | 2.51 |
| 1951 | 35,309 | 7.19 | | 1987 | 46,390 | 2.41 |
| 1952 | 36,088 | 7.03 | | 1988 | 47,087 | 2.32 |
| 1953 | 36,190 | 6.65 | | 1989 | 45,582 | 2.17 |
| 1954 | 33,890 | 6.03 | | 1990 | 44,599 | 2.08 |
| 1955 | 36,688 | 6.06 | | 1991 | 41,508 | 1.91 |
| 1956 | 37,965 | 6.05 | | 1992 | 39,250 | 1.75 |
| 1957 | 36,932 | 5.71 | | 1993 | 40,150 | 1.75 |
| 1958 | 35,331 | 5.32 | | 1994 | 40,716 | 1.73 |
| 1959 | 36,223 | 5.17 | | 1995 | 41,817 | 1.73 |
| 1960 | 36,399 | 5.06 | | 1996 | 42,065 | 1.69 |
| 1961 | 36,285 | 4.92 | | 1997 | 42,013 | 1.64 |
| 1962 | 38,980 | 5.08 | | 1998 | 41,501 | 1.58 |
| 1963 | 41,723 | 5.18 | | 1999 | 41,717 | 1.55 |
| 1964 | 45,645 | 5.39 | | 2000 | 41,945 | 1.53 |
| 1965 | 47,089 | 5.30 | | 2001 | 42,196 | 1.51 |
| 1966 | 50,894 | 5.50 | | 2002 | 43,005 | 1.51 |
| 1967 | 50,724 | 5.26 | | 2003 | 42,884 | 1.48 |
| 1968 | 52,725 | 5.19 | | 2004 | 42,836 | 1.44 |
| 1969 | 53,543 | 5.04 | | 2005 | 43,510 | 1.46 |
| 1970 | 52,627 | 4.74 | | 2006 | 42,708 | 1.42 |
| 1971 | 52,542 | 4.46 | | 2007 | 41,259 | 1.36 |
| 1972 | 54,589 | 4.33 | | 2008 | 37,423 | 1.26 |
| 1973 | 54,052 | 4.12 | | 2009 | 33,883 | 1.15 |
| 1974 | 45,196 | 3.53 | | 2010 | 32,999 | 1.11 |
| 1975 | 44,525 | 3.35 | | 2011 | 32,479 | 1.10 |
| 1976 | 45,523 | 3.25 | | 2012 | 33,782 | 1.14 |
| 1977 | 47,878 | 3.26 | | 2013 | 32,893 | 1.10 |
| 1978 | 50,331 | 3.26 | | 2014 | 32,744 | 1.08 |
| 1979 | 51,093 | 3.34 | | 2015 | 35,484 | 1.15 |
| 1980 | 51,091 | 3.35 | | 2016 | 37,806 | 1.19 |
| 1981 | 49,301 | 3.17 | | 2017 | 37,473 | 1.17 |
| 1982 | 43,945 | 2.76 | | 2018 | 36,835 | 1.13 |
| 1983 | 42,589 | 2.58 | | 2019 | 36,355 | 1.11 |
| 1984 | 44,257 | 2.57 | | | | |



Figure 2-A. Fatalities and Fatality Rates, by Year

### Fatalities Beyond 30 Days

The vast majority of all fatalities from fatal crashes occur within 30 days of the crashes. However, some injuries such as traumatic brain injury (TBI) can result in long-term unconsciousness with life support that ultimately ends in death. These types of injuries can extend beyond the 30-day criteria collected in FARS. In addition, some deaths occur due to complications that occur over time such as Infections associated with subsequent operations or treatments, and some occur years later as patients' health declines due to injuries sustained in crashes.

Vital Statistics Multiple Cause of Death (MCOD) data are compiled by the National Center for Health Statistics (NCHS), which is part of the Centers for Disease Control and Prevention (CDC). They are the U.S. Government's official counts of deaths in the United States. The file captures all death certificates for deaths in the United States during the year, including both the certificate as written by the death registrars and edited by the State, as well as a second version of causation that NCHS creates by editing to uniformity and reorganizing from the State submissions. Each death in the file records a cause. For disease, the cause is a diagnosis, but for injury, it is an external cause that identifies mechanism and intent (e.g., accidental death of a pedestrian hit by a motor vehicle on a public road). At least during 2015 to 2019, MCOD did not

record any homicides or suicides by MV crash; all crash deaths were "accidental" in the terminology of the police crash reports (PCRs).[3]

The death certificate lists many contributing factors, but it also clearly indicates the "Underlying Cause of Death." Rather than the death certifier's determination of underlying cause, we used the final underlying cause death registrar's determination of principal cause, as recoded by NCHS using its TRANSAX system. CDC's WISQARS and WONDER systems exclusively provide death counts based on that recoded cause. We analyzed these data and found that 26 percent of the non-FARS deaths occurred in hospitals. In 2019 there were 145 crash deaths during initial hospital visits with a length of stay greater than 30 days. The diagnosis distribution of these cases was 48 percent TBI (e.g., long-term unconsciousness with life support), 14 percent SCI, 31 percent internal organ injury, and 7 percent lower-limb Injury. In addition, 80 deaths occurred during follow-up hospital stays (readmissions during the acute phase of injury, e.g., for sepsis or further surgery) and 270 deaths occurred during admissions for injury sequelae (e.g., bed-bound TBI and SCI patients discharged to home or to nursing homes who developed medical complications over time). Each year's sequelae deaths may well be from crashes in prior years. In addition, motor vehicle crashes were indicated as underlying cause of death for 437 hospice deaths, 337 deaths at home, 300 deaths in nursing homes, 27 deaths during follow-up and sequelae visits to emergency departments, and 282 deaths with details unclear.

All MAIS injuries have some probability of death, and nonfatal injury totals used in this report represent only cases designated as survivors. Fatality cases detected in either CISS or CRSS are ignored since all fatality cases are derived from FARS. However, since CISS analysts code from hospital discharge records, we believe that the 145 hospitalized people who died after 30 days would have been correctly noted by CISS analysts as deaths. By contrast, the other categories of fatalities are more likely to have occurred after initial hospital discharge, in some cases even a year or more after discharge. These deaths would not be detected by CISS analysts and would instead be coded as MAIS survivors, with most probably coded as the more serious MAIS cases. Hypothetically, they would already be accounted for in our incidence profile as nonfatal injuries, and so will not be added to the fatality total for purposes of this report. However, the 145 cases who died more than 30 days after the crash during initial hospitalization represent additional injured people that must be accounted for by adding to the fatality total, giving a total of 36,500 fatalities due to motor vehicle crashes in 2019. Table 2-2 below summarizes these cases.

---

[3] The older term was "police accident report," PAR, but NHTSA now uses "police crash report," PCR. The two terms are used interchangeably. PAR may appear in older reports.

*Table 2-2. Summary of 2019 Deaths Associated With Motor Vehicle Crashes*

| Type | | | | Fatalities |
|---|---|---|---|---:|
| FARS cases* | | | | 36,355 |
| >30 days hospitalized | | | | 145 |
| Readmissions for sepsis or further surgery | | | | 80 |
| Readmissions TBI and SCI patients from sequelae | | | | 270 |
| Deaths in hospice | | | | 437 |
| Deaths at home | | | | 337 |
| Deaths in nursing home | | | | 300 |
| Follow up and sequelae deaths in ED | | | | 27 |
| Unknown status | | | | 282 |
| Subtotal MCOD non-FARS | | | | 1,878 |
| Total MV underlying cause | | | | 38,233 |
| Long-term fatalities accounted for by MAIS | | | | 1,733 |
| Total unique Fatalities | | | | 36,500 |

*Final revised FARS total as of March 2022. Earlier annual report file (ARF) estimates listed 36,096 FARS fatalities. The additional 259 cases involved prosecution for criminal or civil litigation related to the crashes. NHTSA could not access these records until the litigation was completed.

## Nonfatal Police-Reported Injuries

While FARS provides a dependable census of all fatal crashes, there is no equivalent data source for nonfatal injuries. Nonfatal injuries have been estimated in several NHTSA databases. The National Automotive Sampling System (NASS) was established in the 1970s to support vehicle/highway safety research, policy making, and regulation program development. NASS is comprised of two nested probability sampling systems – the General Estimates System (GES) and the Crashworthiness Data System (CDS). The GES collected general information of the traffic crashes from police crash reports only. The CDS collected detailed information from the crashes involving passenger vehicles to better understand the crashworthiness of vehicles and consequences to occupants in crashes. NHTSA developed and implemented CDS in the 1980s. The CDS was a nationally representative sample of roughly 5,000 crashes annually. CDS contains detailed information on police-reported injuries incurred by passengers of towed passenger vehicles. CDS employs trained crash investigators to obtain data from police-reported crash sites, studying evidence such as skid marks, fluid spills, broken glass, and bent guard rails. They locate the vehicles involved, photograph them, measure the crash damage, and identify interior locations that were struck by the occupants. These researchers follow up on their on-site investigations by interviewing crash victims and reviewing medical records to determine the nature and severity of injuries. This lets researchers properly categorize injury severity based on the AIS, the basis for stratifying injury severity in this report. Crashes covered by the CDS represented about 62 percent of all police-reported injuries and typically involve the most serious injuries to vehicle occupants.

CDS was based upon a three-stage, stratified, random sample of primary sampling units (PSUs), police jurisdictions (PJs), and police crash reports (PCRs). The CDS 24-PSU sample is a subsample of the GES 60-PSU sample. The same PSU and PJ samples have been used for CDS data collection since 1989.

Over the past two decades, however, the general population, vehicles, and highway safety measures have changed dramatically, so that crash characteristics and distributions have changed over the PSU and PJ frame. In addition, the research interest of the transportation community has expanded to topics such as driver performance, crash avoidance, and the effects of new technologies on crash amelioration.

NHTSA recognized the need to undertake a redesign of NASS to better support its own and stakeholders' data needs.  In 2012 NHTSA undertook a significant effort to re-design and modernize its crash data collection system (GovTrack.us, 2022). NHTSA identified three major areas for improvement – re-designing the survey sample, modernizing the information technology infrastructure, and revamping its data collection protocols and technology.

The redesign started in January 2012. Most of the work was in the formation of conceptual research designs, establishment of sampling frames, selection of data collection locations and sources, and documentation of protocol and results for the new surveys. During this process, two new national, probability-based crash sampling systems were designed – the Crash Report Sampling System (CRSS) and Crash Investigation Sampling System (CISS) - to replace GES and CDS.

After its assessment of research objectives and operational considerations, NHTSA decided to design the CISS independently from CRSS in order to optimize both CISS and CRSS. Therefore, unlike the current NASS, the formation and selection of the CISS PSUs were independent of the CRSS PSU formation and selection.

CISS has a stratified, three-stage sample design similar to CDS: PSU, PJ, and PCR. The CISS PSUs were formed so that a minimum number of severe crashes could be selected from as many PSUs as possible. To keep travel time for data technicians under control, different driving distance constraints were imposed to rural PSUs and urban PSUs. The PSUs are deeply stratified and selected with probability proportional to the expected number of severe crash counts based on previous experience. In addition, the CISS PSU sample has been designed to be scalable to accommodate future budgetary fluctuation without completely reselecting the PSU sample.

Pareto sampling (Rosén, 1997) was used for both PJ and PCR sample selection. The Pareto sampling method produces overlapping samples when new samples are selected. This reduces the changes to the existing sample when a new sample needs to be selected. For PJ sample selection, Pareto sampling produces a PJ sample with selection probabilities approximately proportional to the PJ's crash counts. Pareto sampling makes it easier to handle PJ frame changes such as the creation, closure, or splitting of PJs. For PCR sample selection, Pareto sampling not only allows cases of high interest to be selected with larger selection probability but also allows the PCR sample to be expanded to effectively replace non-responding cases (i.e., crashes with key vehicle information missing) with additionally sampled cases.

 An optimization technique was applied to find an approximately optimal sample allocation: the best combination of PSU, PJ, and PCR sample sizes that minimize anticipated variance under a fixed budget. The optimization results indicate when budget is available the most effective way to reduce the standard error of an estimate is to increase the PSU sample size while maintaining the number of PJs per PSU and the number of PCRs per PJ at certain levels.

 In summary, the CISS has been designed as a stratified, multi-stage and multi-phase sampling with unequal selection probabilities. The scalability designed into PSU sample and the Pareto

sampling used in PJ and PCR sample selection provide options to adjust for uncertainties such as future budgetary fluctuations, administrative changes in the police jurisdictions or replacing cases that are missing critical information that will enable NHTSA to monitor and react to achieve desired sample allocations.

Injuries that occur in non-tow-away crashes, to occupants of large trucks, buses, motorcycles, bicyclists, or to pedestrians, are not included in CDS or the CISS system that replaced it. The incidence of these injuries historically was derived from the GES. Data for GES came from a nationally representative sample of police-reported motor vehicle crashes of all severity and vehicle types. For a crash to be eligible for the GES sample a police crash report (PCR) must be completed, it must involve at least one motor vehicle traveling on a traffic way, and it must have resulted in property damage, injury, or death.

These crash reports were chosen from 60 areas that reflected the geography, roadway mileage, population, and traffic density of the GES data collectors make weekly visits to approximately 400 police jurisdictions in the 60 areas across the United States, where they randomly sample about 50,000 PCRs each year. No other data were collected beyond the selected PCRs. As a result, the only severity stratification in GES was that obtained from the PCR. In most States this is typically based on what is commonly known as the KABCO system. Police at the scene of the crash make their best determination of the status of each involved driver or occupant or pedestrian and categorize it as either killed (K), incapacitating injury (A), non-incapacitating injury (B), possible injury (C), or uninjured (O). Unlike the AIS severity stratification that can be obtained from CDS or CISS, which is derived from medical records, these designations reflect only the initial opinion of responders who are not medical specialists. The KABCO results from GES thus provided only vague and sometimes inaccurate information regarding injury severity.

NHTSA replaced the GES system in 2016 with the CRSS, which builds on the previous system. CRSS is a sample of police-reported crashes involving all types of motor vehicles, pedestrians, and cyclists, ranging from property-damage-only crashes to those that result in fatalities. CRSS is used to estimate the overall crash picture, identify highway safety problem areas, measure trends, drive consumer information initiatives, and form the basis for cost and benefit analyses of highway safety initiatives and regulations. However, like its GES predecessor, CRSS stratifies injury severity based on PCRs, which reflect the vague designations that are characteristic of the KABCO system.

To address this problem, "translators" have been developed to convert KABCO ratings into specific MAIS ratings. Previous versions these translators were developed from 1982-1986 data from the NASS, the primary injury data system used by NHTSA through 1986. It was replaced in 1989 by the GES and CDS systems. Both NASS and CDS contain severity designations on MAIS and KABCO bases, which allows for an examination of the actual injury severity levels that are contained in each KABCO category.

Since the last version of this report, which was published in 2015 (Blincoe et al., 2015), there have been notable changes in NHTSA's databases involving a significant redesign of the systems, with CISS and CRSS replacing CDS and GES, and a shift to the newest version of the AIS. Due to these changes, revised translators have been developed based on the CISS data bases. We examined alternate methods of developing KABCO-to-MAIS translators based on 2000-2015 CDS and on 2017-2019 CISS. These translators were designed to control for significant changes in CDS over the years and for changes in design from CDS to CISS. These

changes included revisions to the AIS and changes to the scope of injury reporting. CDS reported two versions of AIS: the AIS 1990 version/updated in 1998 (noted as MAIS1998 for translators) from 2000-2015 and the AIS 2005 version/updated 2008 (noted as MAIS2008) from 2010 onward. Other than the AIS revision, CDS implemented injury reporting scope changes in 2009 by limiting the injury reporting to occupants in passenger vehicles aged less than 11 years old when crash occurred. CISS is a modernized version of CDS but with a completely different sampling design. Its crash sample included cases where at least one-passenger vehicle was towed and not "towed due to damage" as imposed in CDS. With this, CISS would contain relatively more less severe crashes than would CDS. In addition, CISS injury reporting is applicable to all involved vehicles and without the age constraint that was implemented in 2009-2015 CDS. Furthermore, CISS recorded only MAIS2015. Therefore, CDS and CISS are treated as two totally different data sources. Table 1 presents the table indexes for the current and five new translators, along with its corresponding MAIS version, years of data, and the data sources. As shown, Translators 1-3 are for MAIS1998 separately for 2000-2008 CDS (Old CDS), 2009-2015 CDS (New CDS), and 2000-2015 CDS (All CDS). Translator 4 is for MAIS2008 based on 2010-2015 CDS. Translator 5 is for MAIS2015 from CISS.

*Table 2-3. KABCO-to-MAIS Translators by MAIS Version and Data Source*

| Translators | MAIS Versions | Years of Data | Data Sources |
|---|---|---|---|
| Current | Mixed MAIS1990 and older versions | 1982 − 1984<br>2000 - 2008 | Old NASS CDS |
| 1 | MAIS1990 | 2000 - 2008 | CDS |
| 2 | (Updated 1998) | 2009 - 2015 | CDS |
| 3 | | 2000 - 2015 | CDS |
| 4 | MAIS2005 (Updated 2008) | 2000 - 2015 | CDS |
| 5 | MAIS2015 | 2017 − 2019 | CISS |

We considered the two most updated versions of these translators for this study. Translator 1-3 were rejected because their MAIS basis (MAIS1990) were considered out of date with current data bases. Translator 4, while more current than translators 1-3, is still not consistent with the MAIS2015 basis for current NHTSA databases Translator 5 is based on MAIS2015, which defines the injury profile for NHTSA's CISS data bases. To be consistent with the serious injury definitions used in CISS, we chose Translator 5 as the basis for this study. The development of this translator is documented by Wang (in press). The selected translators used in this report are summarized in Appendix C, which also presents two broader translators that can be applied to all CISS equivalent cases or to all injuries combined.

An example of these translators is shown in Table 2-4 for Non-CISS cases involving nonoccupants and motorcyclists. The results indicate the importance of expressing injuries on an MAIS basis rather than relying on the KABCO ratings from PCRs. About 26 percent of the cases that police coded as uninjured were actually injured. Eleven percent of the cases coded as possible injury (C level injuries) were actually uninjured, as were 2.2 percent of cases coded Non-incapacitating (B level injuries), 0.6 percent of those coded as incapacitating (A level

injuries), and 2.5 percent of those coded Injured Severity Unknown (ISU) were uninjured. There are also significant differences in the distribution of severities among those who are injured. Thirty-two percent of cases coded as incapacitating, the most severe injury category under the KABCO system, actually experienced only a minor injury (MAIS1) and another 31 percent only experienced a moderate injury (MAIS2).

*Table 2-4. KABCO/MAIS Translator, Nonoccupants and Motorcyclists*

| MAIS | O<br>No<br>Injury | C<br>Possible<br>Injury | B<br>Non-incapacitating<br>Injury | A<br>Incapacitating<br>Injury | Injured<br>Severity<br>Unknown |
|---|---|---|---|---|---|
| 0 | 0.7370 | 0.1057 | 0.0221 | 0.0060 | 0.0254 |
| 1 | 0.2359 | 0.7397 | 0.7456 | 0.3196 | 0.6788 |
| 2 | 0.0220 | 0.1185 | 0.1685 | 0.3144 | 0.2167 |
| 3 | 0.0048 | 0.0319 | 0.0598 | 0.2861 | 0.0572 |
| 4 | 0.0004 | 0.0032 | 0.0027 | 0.0349 | 0.0029 |
| 5 | 0.0000 | 0.0010 | 0.0005 | 0.0259 | 0.0026 |
| Fatal | 0.0000 | 0.0000 | 0.0008 | 0.0132 | 0.0165 |
| Total | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 |

Although CISS contains the more accurate MAIS injury severity estimates, its smaller sample size makes it a less reliable indicator of aggregate incidence. To derive a national nonfatal injury profile for 2019, CISS was used to establish an initial incidence and distribution for cases fitting the CISS profile – crashes each involving at least one towed passenger vehicle. These cases were then increased by the ratio of CISS equivalent injury cases from the CRSS to the CISS total. This normalization process acknowledges the smaller standard error that results from the more robust sample that CRSS uses.

A different approach was used for occupant cases not covered by CISS. These include occupants in non-towaway crashes, nonoccupants, and motorcyclists. Non-CDS cases were isolated from the 2017-2019 CRSS files and split according to their seat belt status. Belt status was examined separately because belts have a significant impact on injury profiles and belt use changes over time. Three separate categories were examined: belted occupants, unbelted occupants, and nonoccupants including motorcyclists.[4] A separate translator was developed for each of these categories. These translators were applied to their corresponding annual average non-CISS equivalent cases from the 2017-2019 CRSS files to estimate non-CISS equivalent injuries by MAIS level. This 3-year annual average was used to represent 2019 nonfatal injuries in order to minimize the impact of sample variation, especially on estimates of more severe injuries, which are rare in these databases.

---

[4] Occupants with unknown belt status were proportionately distributed among cases with known belt status prior to application of the belt specific translators.

For nonoccupants including motorcyclists, pedestrians, and bicyclists, we retained the original translators derived from 1982-86 NASS data (shown above in Table 2-4). This was done because CISS does not inform KABCO/MAIS relationships for nonoccupant cases. Further, we believe the substantial improvements made in motor vehicle crash protection over the past decade would distort KABCO/MAIS ratios for nonoccupants (who remain as vulnerable to crash impacts).

The combined CISS and non-CISS cases represent police-reported injuries as estimated in these systems. While the data systems noted previously estimate national level totals of injuries based on samples, individual States collect police-reported injury totals from the various jurisdictions within that State. State data systems thus provide a potential census of all crashes for which a police report was filed. At one time these data were gathered and published by the Federal Highway Administration (FHWA), however, FHWA no longer compiles these data so they must be obtained from other sources.

Since the early 1980s NHTSA has been obtaining from various States computer data files coded from data recorded on PCRs. A PCR is completed by a police officer at a motor vehicle traffic crash scene and contains information describing characteristics of the crash, the vehicles, and the people involved. The data recorded on these forms are computerized into a central crash data file at the State level. Information will vary from State to State because each State has different data collection and reporting standards. NHTSA refers to the collection of these computerized State crash data files as the State Data System (SDS).

The State crash data files are requested annually from the State agencies that maintain the files. In most instances, this agency is the State police, the State Highway Safety Department, or the State Department of Transportation. The data are received in various formats and converted to Statistical Analysis System (SAS) data files. The SAS files are placed on NHTSA's local area network, where they are available for

the analytical needs of the NHTSA staff. The State crash data files in SDS are not available for research outside NHTSA unless permission has been granted from the State to release the crash data. The State crash data files are obtained to support NHTSA's efforts to identify traffic safety problems, to help develop and implement vehicle and driver countermeasures, to evaluate motor vehicle standards, and to study crash avoidance issues, crashworthiness issues, and regulations.

Because only 34 States participate in this system, SDS data were supplemented by directly contacting or accessing the websites of non-participating States. Previous analysis comparing State police reports to GES counts have found that actual police-reported injuries exceed those accounted for in the GES by 10 to 15 percent (Blincoe & Faigin, 1992, Blincoe et al., 2002). These previous analyses have focused on the difference in State injury counts and GES estimates.

A similar attempt was made to examine these counts for the 2015 analysis, however, it was found that State injury reporting practices had become too dissimilar and fragmented to produce a reliable injury count for this comparison. For example, definitions of specific injury levels often overlap between States, hospital follow-up requirements vary by jurisdiction, and use of the "Unknown" severity appears to vary by jurisdiction as well. Instead, for that report, a comparison was made between total police-reported crashes in all States to those derived from GES. The ratio of State to GES crashes was found to be 1.107, implying that GES understated total crashes by 10.7 percent. This was consistent with past estimates based on injury counts,

39

which were in the 10- to 15-percent range. In that report our final estimate of police-reported injuries was derived by inflating the nonfatal injury profile by this 1.107 factor.

For this current report we revisited this issue by again examining State crash totals and comparing them to CRSS crash counts. State data are now available from several sources, including NHTSA's Electronic Data Transfer (EDT) system. EDT collects data directly from State crash databases. However, we found that EDT results often disagree with official State counts obtained directly from official State data bases. The reasons for these differences vary, but reflect issues with timing of files, definitions injury, police-reporting practices within each State, etc. We note that these differences also occur across non-EDT States, thus adding to the uncertainty of using these sources as a nationwide injury total. We were thus unable to isolate an accurate estimate for many of the States. Given these caveats, we examined the ratio of each State's total to the CRSS total under a number of different scenarios. These include the following.

- State DOT default, which consists of all State DOT totals
- EDT default, which uses EDT total for the 18 EDT States, but State DOT totals for all other States
- Lowest total, which accepts the lowest total for the 18 States that have both EDT and DOT crash counts
- Highest total, which accepts the highest total for the 18 States with both EDT and DOT crash counts
- Mixed total, which uses information from some States to judgmentally pick a most likely estimate for the 18 EDT States

Table 2-5 summarizes the results of these analyses. The large 10- to 15 percent differentials that existed prior to the establishment of the new CISS and CRSS data systems are no longer apparent. Instead, the new CRSS totals match up well with State DOT totals in all but the worst-case scenario, where the highest totals were derived from among the data bases, and even in this case, the difference has been cut in half. Given the large uncertainty inherent in these data sources across different States, it is difficult to conclude that the State data provide a more precise basis for estimating the incidence of crashes than CRSS. It is likely that the improvements inherent in the CRSS sample design have mitigated the causes of the differences noted in previous studies. We also note that the State DOT scenario most closely matches the basis for our previous findings of a 10- to 15-percent undercount, and it now indicates only an insignificant third decimal place difference from CRSS. We therefore did not make a further adjustment to the CRSS injury totals to reflect the minor differences with State data totals noted below.

*Table 2-5. Analysis of State DOT/CRSS Crash Counts*

| Scenario | Ratio/CRSS |
|---|---|
| State Default | 1.004 |
| EDT Default | 1.041 |
| Lowest Total | 0.967 |
| Highest Total | 1.077 |
| Mix | 1.026 |

40

Unadjusted CRSS data (the sum of A, B, and C police-reported injury designations) indicate an estimated 2.74 million injuries were documented in police reports in 2019. This is an increase from the 2.25 million estimated from GES in 2010. This trend is illustrated in Figure 2-B. Note however that Figure B only reflects the raw injury counts from the GES and CRSS systems. It does not reflect adjustments for MAIS injury translation or non-police reported injuries. The trendline through 2015 is based on GES data and reflects a variety of factors including safer vehicles, safer roads, increased belt use, increased enforcement of alcohol countermeasures, and, after 2007, an economic slowdown that reduced driving and exposure. The trendline from 2016 forward reflects the higher (and more accurate) injury counts found in the new CRSS system, rather than a sudden increase in the incidence of nonfatal injury.[5] Adjusting for this, nonfatal injury totals have been relatively stable for the past decade.

*Figure 2-B. People Injured and Injury Rate, by Year*



*Source: General Estimates System 1988-2015, Crash Investigation Sampling System 2016-2019*

Table 2-6 below summarizes the results of our current analysis, including translating KABCO injuries from non-CISS cases to MAIS equivalents. This analysis indicates that an estimated total of 3.03 million injuries occurred in 2019, with over 70 percent of them occurring in the more serious towaway crashes measured in CISS.

---

[5] The spike in incidence indicated in 2016 is considered an artifact of start-up issues associated with the initiation of the new CRSS system. Subsequent adjustments corrected this and produced the relatively flat trendline noted for 2017-2019.

*Table 2-6. Police-Reported Nonfatal Injuries*

| Severity | CDS | Non-CDS Unbelted | Non-CDS Belted | GES Non-Occupant | Total |
|---|---|---|---|---|---|
| MAIS0 | 1,246,228 | 17,619 | 1,079,966 | 5,389 | 2,349,202 |
| MAIS1 | 1,759,384 | 23,490 | 634,349 | 144,731 | 2,561,954 |
| MAIS2 | 247,014 | 3,900 | 21,306 | 38,628 | 310,848 |
| MAIS3 | 96,439 | 1,185 | 14,362 | 20,237 | 132,222 |
| MAIS4 | 16,262 | 246 | 787 | 1,990 | 19,285 |
| MAIS5 | 5,844 | 112 | 0 | 1,232 | 7,187 |
| | | | | | |
| Total | 3,371,170 | 46,552 | 1,750,769 | 212,207 | 5,380,698 |
| Total Injuries | 2,124,942 | 28,933 | 670,804 | 206,817 | 3,031,496 |
| % Total | 70.10% | 0.95% | 22.13% | 6.82% | 100.00% |

## Unreported Crashes and Injuries

The primary basis for incidence estimates used in this report are databases maintained by NHTSA that examine police-reported crashes. As discussed above, FARS is a census of all fatal crashes, while CRSS and CISS sample a broader set of police-reported crashes, including nonfatal crashes as well. These sources provide a basis for estimating the incidence of all police-reported crashes nationwide. However, a significant number of crashes are not reported to police.

In a previous NHTSA analysis of this issue (Blincoe & Faigin, 1992), unreported injury crashes were estimated from data derived from Rice et al. (1989), and Miller et al. (1991) from the National Health Interview Survey (NHIS), while unreported property damage crashes were estimated based on a comparison of insurance claims data to national estimates of police-reported PDOs (Blincoe & Faigin, 1992) . In subsequent NHTSA analysis, (Blincoe, 1996, Blincoe et al., 2002), the unreported PDO estimate was retained but the unreported injury basis was derived from a study by Greenblatt et al. (1981). The switch in the unreported injury basis occurred because the Department of Health and Human Services announced that it had discovered a programming error that affected all motor vehicle injury estimates in the NHIS from 1982 through 1994. The most recent estimates of unreported crashes were thus based on injury survey data that are currently over 30 years old, and PDO insurance data that are over 20 years old. NHTSA was concerned that changes in police reporting practices, insurance coverage, vehicle costs, litigation practices, real incomes, and the proliferation of cell phones may have shifted the unreported crash proportion over the past two to three decades. To address this concern, NHTSA contracted with M. Davis and Company (MDAC) to conduct a comprehensive nationally representative survey of households to determine the relative incidence of reported and unreported crashes (NHTSA, 2011c). In late 2009 and the first half of 2010, MDAC conducted interviews with roughly 2,300 households where the respondent had experienced a motor vehicle crash during the previous 12 months. The interviews addressed the rate of reporting to police, the rate of reporting to insurance agencies, the severity of the crash, the location of vehicle damage, the types of injuries experienced in the crash, the cost of medical care, vehicle repair costs, the reasons why the crash was not reported, the crash location, and the

number of vehicles involved in the crash. Most data elements were stratified separately for injury crashes and PDO crashes.

In Blincoe et al. (2015) unreported crashes were estimated based on the MDAC survey as well as other sources including NHTSA police reported data bases, State police reports, the National Health Interview Survey (NHIS), and the National Electronic Injury Surveillance System (NEISS) (Consumer Product Safety Commission, n.d.).

For this current analysis, we adopt the unreported crash and injury rates derived in Blincoe et al. (2015), with an adjustment to reflect injuries not captured in the original interviews conducted by MDAC. The MDAC survey (NHTSA, 2011c) contained detailed information regarding injuries for each respondent, and this was used to develop an injury profile for unreported injuries. However, there was no injury profile for injuries to non-respondent occupants so the 2015 report reflected unreported injuries from survey respondents but did not include an estimate for other vehicle occupants who may have been injured. For this update we will include an estimate for these cases. To adjust for these cases, we accessed responses to questions Q2f and Q3f from that survey, which specified whether there were others in the vehicle who were also injured. We added positive responses from these questions to the injury totals based on respondents to determine an estimate of total vehicle occupant injuries and computed a ratio of the revised total to the total from respondents. This ratio, 1.51, was used to adjust the original unreported rates derived in Blincoe et al. to compute a revised unreported rate. Since there were no details provided regarding the nature of injuries for these non-respondents, we assumed the same injury profile as established for respondents.

## Property-Damage-Only Crashes

While crashes that involve death or injury produce the most serious consequences, they are relatively rare events. The vast majority of crashes are low-speed crashes that damage vehicles but leave vehicle occupants unharmed. Although these crashes impose a lower unit cost on society, their frequency makes this the most costly single type of crash overall. Although police records include a large number of property-damage-only (PDO) crashes, they tend to be significantly undercounted in police records due to a variety of factors including relatively high reporting thresholds in various States, as well as the failure of drivers to report them to police. A full analysis of PDOs must therefore address not only police records but other sources as well.

The starting point for our estimate of PDOs are police reports. Because injury is not involved, the primary cost from a PDO crash is damage to the vehicle. Therefore, PDOs are analyzed on a per-damaged vehicle basis. Blincoe et al. (2015) adjusted police-reported PDOs using State data to account for undercounting of police reports in the GES data base. As noted in previous discussion, revisions implemented in the new CRSS data base that replaced GES have negated the need to make this adjustment, so our police-reported PDO estimate is calculated directly from CRSS data. To allow for sample variation, it reflects the annual average number of cases during the 2017-2019 period.

Data from the CRSS for 2017 to 2019 indicate that there were an average of 9,734,004 vehicles damaged without injury caused to either the vehicle occupants or to pedestrians. Of these, 8,346,974 occurred in crashes where nobody was injured, while 1,387,029 occurred in crashes where injury occurred, but not to vehicle occupants. These later cases are classified in this current report as MAIS0 injuries so they will not be addressed as PDOs. The PDO category thus

will ultimately represent only vehicles damaged in PDO crashes. However, of the 8.3 million vehicles that were damaged in PDO crashes, some portion were incorrectly identified as PDOs. We thus applied the revised all cases translator for MAIS0 cases to this total to adjust for incorrect police reports. This reduces the total to 93 percent of initial reported PDOs or 7,773,120 vehicles in police-reported crashes.

Reporting a crash to police does not assure that a PCR will actually be filed. Individual police jurisdictions typically have reporting thresholds, especially for crashes that only involve property damage. A person may report a crash, but if police determine that the crash does not meet the damage threshold, police may not file a crash report. Reporting thresholds vary by State and sometimes by jurisdiction. Table 2-7 lists damage reporting thresholds by State.

*Table 2-7. State PDO Reporting Thresholds*

| State | PDO Reporting Thresholds | State | PDO Reporting Thresholds |
|---|---:|---|---:|
| Alabama | $500 | Missouri | $500 |
| Alaska | $2,000 | Montana | $1,000 |
| Arizona | $300 | Nebraska | $1,000 |
| Arkansas | $1,000 | Nevada | $750 |
| California | $1,000 | New Hampshire | $1,000 |
| Colorado | Not Required | New Jersey | $500 |
| Connecticut | $1,000 | New Mexico | $500 |
| Delaware | $500 | New York | $1,500 |
| D.C. | Not Required | North Carolina | $1,000 |
| Florida | $500 | North Dakota | $1,000 |
| Georgia | $500 | Ohio | $1,000 |
| Hawaii | $3,000 | Oklahoma | $500 |
| Idaho | $1,500 | Oregon | $2,500 |
| Illinois | $1,500 | Pennsylvania | Towed Vehicle |
| Indiana | Not Required | Rhode Island | $1,000 |
| Iowa | $1,500 | South Carolina | $1,000 |
| Kansas | $1,000 | South Dakota | $1,000 |
| Kentucky | $500 | Tennessee | $1,500 |
| Louisiana | $500 | Texas | $1,000 |
| Maine | $1,000 | Utah | $2,500 |
| Maryland | Not Required | Vermont | $3,000 |
| Massachusetts | $1,000 | Virginia | $1,500 |
| Michigan | $1,000 | Washington | $1,000 |
| Minnesota | $1,000 | West Virginia | $1,000 |
| Mississippi | $500 | Wisconsin | $1,000 |
| | | Wyoming | $1,000 |

*Source: State DOTs*

To estimate unreported PDOs, we adopt the rates derived in Blincoe et al. (2015). In that report the authors examined results from a number of alternate sources to estimate unreported PDO crashes. The first source considered in Blincoe et al. was the previously discussed MDAC survey (NHTSA, 2011c), which gathered data on police and insurance reporting for both injuries and for damaged vehicles. Based on 2010 crashes, MDAC found a total of 9.1 million vehicles damaged in crashes in which the driver or occupant of that vehicle wasn't injured that were reported to police, and an additional 5.1 million that were not reported to police. MDAC also reported that of these 14.2 million cases, 11.2 million were reported to insurance companies and 3.0 million were not. MDAC published a table illustrating the interaction of these cases. Table 2-8 reproduces this table, which indicates that 64.2 percent of all cases were reported to police while 78.8 percent were reported to insurance and 58.4 percent were reported to both police and insurance.

*Table 2-8. Reproducing Table 3.2b in MDAC Report*

| | | **PDO Reported to Police?** | | |
|---|---|---|---|---|
| | | **Yes** | **No** | **Total** |
| Reported to Insurance? | Yes | 58.4% | 20.4% | 78.8% |
| | No | 5.8% | 15.3% | 21.2% |
| | Total | 64.2% | 35.8% | 100.0% |

The second source considered in the 2015 report was insurance data. These data indicated that there were significantly more vehicle claims in crashes where the vehicle owners were not injured than were reflected in either GES data or the MDAC survey. Because these data were gleaned from actual insurance records, they were considered to be a more accurate estimate of insurance reported PDOs than the survey-based totals from GES and MDAC.

We thus applied the same methods established in Blincoe et al. (2015) to the current PDO counts modified to represent 2017-2019 annual average counts of PDO vehicles and proportions of these vehicles in PDO crashes versus injury crashes. The results are summarized in Table 2-9. These data indicates that roughly 7.8 million PDO vehicles were documented in police reports, but another 11.5 million occurred that were not reflected in police reports, for a total of 19.3 million PDO vehicles. Only about 40 percent of all PDO vehicles are thus reflected in police reports. A combination of factors previously discussed, including crashes unreported by drivers and high damage reporting thresholds within police jurisdictions, are responsible for this low reporting rate.

Table 2-9 and Figure 2-C summarize our estimates of injury, vehicle, and crash incidence. In 2019 there were 36,500 people killed in motor vehicle crashes. Another 3.1 million were injured in police-reported crashes, with an additional 1.4 million incurring injuries, mostly minor, that were not reported to the police. About 19.3 million vehicles were damaged in PDO crashes, with only 40 percent of those reported to police. Unreported cases make up a significant portion of PDOs and uninjured occupants, as well as minor, moderate, and serious injuries (MAIS levels 1-3).

*Table 2-9. Incidence Summary, 2019*

| Severity | Police-Reported | Not Police-Reported | Total | Percentage Unreported |
|---|---|---|---|---|
| **Vehicles** | | | | |
| Injury Vehicles | 2,424,916 | 1,136,998 | 3,561,914 | 31.9% |
| PDO Vehicles | 7,773,120 | 11,515,019 | 19,288,139 | 59.7% |
| *Total Vehicles* | *10,198,036* | *12,652,017* | *22,850,053* | *55.4%* |
| **People in Injury Crashes** | | | | |
| MAIS0 | 2,349,202 | 2,176,700 | 4,525,901 | 48.1% |
| MAIS1 | 2,561,954 | 1,313,311 | 3,875,265 | 33.9% |
| MAIS2 | 310,848 | 116,271 | 427,119 | 27.2% |
| MAIS3 | 132,222 | 8,945 | 141,167 | 6.3% |
| MAIS4 | 19,285 | 0 | 19,285 | 0.0% |
| MAIS5 | 7,187 | 0 | 7,187 | 0.0% |
| Fatals | 36,500 | 0 | 36,500 | 0.0% |
| *Total* | *5,417,198* | *3,615,226* | *9,032,424* | *40.0%* |
| *Total Injuries* | *3,067,996* | *1,438,526* | *4,506,523* | *31.9%* |
| **Crashes** | | | | |
| PDO | 4,390,169 | 6,503,550 | 10,893,719 | 59.7% |
| Injury | 2,223,724 | 1,042,663 | 3,266,387 | 31.9% |
| Fatal | 33,621 | 0 | 33,621 | 0.0% |
| *Total Crashes* | *6,647,514* | *7,546,213* | *14,193,727* | *53.2%* |



*Figure 2-C. Distribution of Police Reported/Unreported Injuries*

## 3. Human Capital Costs

Human capital costs are defined as economic impacts that result from motor vehicle crashes, including the costs for goods and services that are required to treat injury, repair damage, or address the legal or administrative consequences of the crash, as well as productive opportunities such as lost wages or other productive activities that are forgone due to injury or delay that results from the crash.

Categories of human capital costs include the following:

**Congestion Costs**: The value of travel time delay for people who are not involved in traffic crashes, but who are delayed in the resulting traffic congestion from these crashes, as well as the value of excess fuel consumed, greenhouse gases, and criteria pollutants emitted due to traffic congestion caused by the crash.

**Emergency Services**: Police and fire department response costs.

**Household Productivity**: The present value of lost productive household activity, valued at the market price for hiring a person to accomplish the same tasks.

**Insurance Administration**: The administrative costs associated with processing insurance claims resulting from motor vehicle crashes and defense attorney costs.

**Legal Costs**: The legal fees and court costs associated with civil litigation resulting from traffic crashes.

**Market Productivity**: The present discounted value (using a 3-percent discount rate) of the lost wages and benefits over the victim's remaining life span.

**Medical Care**: The cost of all medical treatment associated with motor vehicle injuries including that given during ambulance transport. Medical costs include emergency room and inpatient costs, follow-up visits, physical therapy, rehabilitation, prescriptions, prosthetic devices, and home modifications.

**Property Damage**: The value of vehicles, cargo, roadway features, and other items damaged in traffic crashes.

**Vocational Rehabilitation**: The cost of job or career retraining required due to disability caused by motor vehicle injuries. These costs are grouped with medical costs in this report.

**Workplace Costs**: The costs of workplace disruption that is due to the loss or absence of an employee. This includes the cost of retraining new employees, overtime required to accomplish work of the injured employee, and the administrative costs of processing personnel changes.

Estimating crash costs requires estimates of the number of people and vehicles involved in a crash, the severity of each person's injuries, and the costs of those injuries. The first section of this chapter describes the methods used to estimate the incidence and severity of motor vehicle crashes. The succeeding sections explain how the unit costs of injuries were estimated and present those estimates.

## Crash Data and Severity Estimation

Police reports, which usually provide the basis for crash databases, often do not accurately describe the severity of motor vehicle crashes. Accordingly, we made several adjustments to more accurately reflect the severity of crashes. To estimate injury incidence and severity, we followed procedures developed by Miller and Blincoe (1994) and Miller, Galbraith, et al. (1995) and later applied in Blincoe (1996); Miller, Levy, et al. (1998); Miller, Lestina, and Spicer (1998); Miller, Spicer, et al. (1999); Blincoe et al. (2002); Zaloshnja et al. (2004); Blincoe et al. (2015), and Zaloshnja et al. (2016). Below we summarize the procedures and describe the adjustments.

NHTSA's Crash Report Sampling System (CRSS) provides a sample of U.S. crashes by police-reported severity for all crash types. CRSS records injury severity by crash victim on the KABCO scale (National Safety Council, 1990) from police crash reports. Police reports in almost every State use KABCO to classify crash victims as K–killed, A–disabling injury, B–evident non-disabling injury, C–possible injury, or O–no apparent injury.

KABCO ratings are coarse and inconsistently coded between States and over time. The codes are selected by police officers without medical training, typically without benefit of a hands-on examination. Some victims are transported from the scene before the police officer who completes the crash report even arrives. Miller, Viner, et al. (1991) and Blincoe and Faigin (1992) documented the great diversity in KABCO coding across cases. O'Day (1993) more carefully quantified the wide variability in use of the A-injury code between States. Viner and Conley (1994) explained the contribution to this variability of differing State definitions A-injury. Miller, Whiting, et al. (1987) found that police-reported injury counts by KABCO severity systematically varied between States because of differing State crash reporting thresholds (the rules governing which crashes should be reported to the police). Miller and Blincoe (1994) found that State reporting thresholds often changed over time.

Thus, police reporting does not accurately describe injuries medically. To minimize the effects of variability in severity definitions by State, reporting threshold, and police perception of injury severity, we turned to NHTSA Crash Investigation Sampling System (CISS) data sets that included both police-reported KABCO and medical descriptions injury in the Occupant Injury Coding system (OIC; AAAM, 1990, 1985, 2008, 2015). OIC codes in CISS include AIS severity score coded in the 2015 Edition of AIS, body region, and more detailed injury descriptors.

## Unit Cost Estimates

The second step required to estimate average crash costs was to generate costs per crash victim by maximum AIS (MAIS), body part, and whether the victim suffered a fracture. A 41-level body part descriptor was created based on information provided by the NASS/CDS variables describing the body region, system/organ, lesion, and aspect of each injury. Burns were classified as a separate category due to the lack of location information for burn injuries.

The sections that follow describe unit medical costs, work loss costs, the value of quality of life loss (QoL), and selected ancillary costs. In addition, Appendix E describes the costing methods. Medical and work loss costs cover three mutually exclusive categories that reflect injury severity: (1) injuries resulting in death, including post-injury deaths in a healthcare setting; (2) injuries resulting in hospitalization with survival to discharge; and (3) injuries requiring an ED visit not resulting in hospitalization (ED-treated injuries). To estimate mean costs across all

surviving crash victims, we needed to add costs for cases treated only in physicians' offices or outpatient departments to the cost for cases treated in hospital emergency departments or admitted to hospitals. To estimate these additional costs, we multiplied unit costs for ED-treated injuries by body part and nature of injury (as per the Barell injury-diagnosis matrix) times ratios of ED-treated injuries versus injuries treated only in doctor's offices or outpatient departments found in Finkelstein et al. (2006). We then took averages across treatment settings. We computed costs from a societal perspective, which means we included all costs regardless of who paid for them.

We estimated mean costs per surviving victim by maximum AIS (MAIS), body part, and fracture involvement from combined Healthcare Cost and Utilization Project (HCUP), Nationwide Inpatient Sample (NIS), and Nationwide Emergency Department Sample (NEDS) files. (For descriptions these files, see Appendix E.) We used software developed by the AAAM Injury Scaling Committee to attach an AIS2008 score to each injury of each road crash patient in the HCUP NIS and NEDS files. The AAAM coding provides scores by International Classification of Disease, 9th Edition,- Clinical Modification (ICD-9-CM) diagnosis code (CDC, 2022). The Maximum AIS (MAIS) is the highest AIS score among a patient's injuries. In descriptive analysis we found that this method identified almost no injury patients as MAIS4, although CISS identified many MAIS4 brain injuries. AAAM trainers suggested that this resulted because single ICD9-CM codes are too coarse to identify definitive AIS scores for brain injuries. Their convention is to code down when in doubt. Therefore, we turned to older artificial intelligence software data (Clark et al., 2018) to AIS-score the brain injuries. The Clark MAIS was generated in RStudio v. 1.3.1056 and R v. 4.0.2. We estimated standard errors of means with the SURVEYMEANS command in SAS 9.4, which accounts for sample stratification.

### Unit Costs of Medical Care, Work Loss, and Quality-of-Life Loss

Table 3-1 presents HCUP crash costs per surviving victim at a 3 percent discount rate by MAIS. The mean and standard error (SE) for work loss, medical care costs, monetized quality-of-life (Qol) and the unmonetized QALYs that Qol values in dollars, as well as annual inpatient and ED incidence were generated from the 2013-2014 NIS and NEDS databases. The 2018 incidence counts from the NIS and NEDS are presented for comparison. Using the procedures described at the end of Appendix E, the MAIS1 costs were reduced to account for injuries that were treated only in physicians' offices/clinics or were not treated by a medical professional except possibly at the crash scene. The NIS and NEDS Medical Costs data in Table 3-1 involves a slightly different calculation than the other three costs.[6] Among cases with missing MAIS, fewer cases are missing medical costs than the other three costs, resulting in different Inpatient and ED annual counts.

---

[6] For more detail on these procedures see Appendix E of this report.

*Table 3-1. Medical Costs, Work Loss, Monetized Quality-of-Life (QoL), and Unmonetized Quality-Adjusted Life Years (QALYs) for Survivors Injured in Road Crashes and Treated in Hospitals by MAIS (2019 dollars, 3 percent discount rate)*

| MAIS | Cost Category | Mean | Standard Deviation | 2013-14 Inpatient Count per Year | 2013-14 ED Count per Year | 2018 Inpatient Count | 2018 ED Count |
|---|---|---|---|---|---|---|---|
| 1 | Medical | 2,860 | 33 | 16,733 | 1,967,582 | 19,265 | 1,769,053 |
| 1 | Household | 1,019 | 18 | 16,730 | 1,965,170 | | |
| 1 | Wages | 2,775 | 64 | 16,730 | 1,965,170 | | |
| 1 | Qol 3% | 0.11 | 0 | 16,730 | 1,965,170 | | |
| 1 | QALY 3% | 56,833 | 1,779 | 16,730 | 1,965,170 | | |
| 2 | Medical | 13,145 | 193 | 87,653 | 227,110 | 95,215 | 253,266 |
| 2 | Household | 9,010 | 71 | 87,640 | 226,997 | | |
| 2 | Wages | 23,161 | 219 | 87,640 | 226,997 | | |
| 2 | Qol 3% | 0.84 | 0 | 87,640 | 226,997 | | |
| 2 | QALY 3% | 420,371 | 4,836 | 87,640 | 226,997 | | |
| 3 | Medical | 69,075 | 998 | 78,375 | 18,039 | 59,875 | 12,558 |
| 3 | Household | 39,050 | 310 | 78,445 | 18,024 | | |
| 3 | Wages | 92,829 | 886 | 78,445 | 18,024 | | |
| 3 | Qol 3% | 3.93 | 0 | 78,445 | 18,024 | | |
| 3 | QALY 3% | 1,965,673 | 17,734 | 78,445 | 18,024 | | |
| 4 | Medical | 188,295 | 3,752 | 13,048 | 227 | 13,635 | 185 |
| 4 | Household | 116,493 | 968 | 13,055 | 227 | | |
| 4 | Wages | 230,165 | 3,268 | 13,055 | 227 | | |
| 4 | Qol 3% | 6.46 | 0 | 13,055 | 227 | | |
| 4 | QALY 3% | 3,233,202 | 50,653 | 13,055 | 227 | | |
| 5 | Medical | 341,516 | 11,180 | 3,960 | | 24,105 | 957 |
| 5 | Household | 122,194 | 2,344 | 3,955 | | | |
| 5 | Wages | 288,796 | 8,654 | 3,955 | | | |
| 5 | Qol 3% | 12.03 | 0 | 3,955 | | | |
| 5 | QALY 3% | 6,018,877 | 166,611 | 3,955 | | | |
| 6 | Medical | 1,279,308 | 60,070 | 93 | | 115 | 8 |
| 6 | Household | 357,332 | 19,158 | 93 | | | |
| 6 | Wages | 1,028,210 | 43,788 | 93 | | | |
| 6 | Qol 3% | 27.56 | 2 | 93 | | | |
| 6 | QALY 3% | 13,789,314 | 1012,666 | 93 | | | |
| 5 & 6 | Medical | 362,922 | 11,933 | 4,053 | | 24,220 | 963 |
| 5 & 6 | Household | 127,568 | 2,571 | 4,048 | | | |
| 5 & 6 | Wages | 305,694 | 9,106 | 4,048 | | | |
| 5 & 6 | Qol 3% | 12.39 | 0 | 4,048 | | | |

| MAIS | Cost Category | Mean | Standard Deviation | 2013-14 Inpatient Count per Year | 2013-14 ED Count per Year | 2018 Inpatient Count | 2018 ED Count |
|---|---|---|---|---|---|---|---|
| 5 & 6 | QALY 3% | 6,196,459 | 173409 | 4,048 | | | |
| Any | Medical | 7,314 | 225 | 209,125 | 2,883,449 | 215,390 | 2,241,853 |
| Any | Household | 4,117 | 71.0 | 202,417 | 2,475,229 | | |
| Any | Wages | 10,071 | 190.0 | 202,417 | 2,475,229 | | |
| Any | Qol 3% | 225,204 | 4,217 | 202,417 | 2,475,229 | | |
| Any | QALY 3% | 0.45 | 0.01 | 202,417 | 2,475,229 | | |
| Fatal | Medical | 17,289 | 137.3 | N/A | N/A | N/A | N/A |
| Fatal | Work Loss | 1,378,118 | 775,629 | | | | |
| Fatal | Qol 3% | 9,521,882 | 3,274,332 | | | | |
| Fatal | QALY 3% | 19.91 | 6.85 | | | | |

Note: The missing standard errors for MAIS cases resulted from too few cases across strata to allow for error calculation in the SURVEYMEANS procedure.

All costs in Table 3-1 are modeled, as described in Appendix E. The models parallel and refine those used in Miller et al. (1991) and Blincoe et al. (2006, 2015). The medical costs start from facility charges provided by HCUP, apply a HCUP-provided cost-to-charge ratio,[7] then multiply times factors to add professional fees associated with the hospital visit, and any follow-up medical care needed across the patient's lifespan. The data on follow-up care needs and costs are amalgamed from varied data sets and publications. Work loss costs include temporary wage and household work losses during acute recovery from injury and lifetime losses in the event of death or permanent disability. These costs were calculated from Worker's Compensation and Medical Expenditure Panel Survey data. Quality-of-life losses build on trauma system data and expert assessments of clinicians to estimate functional capacity losses resulting from the injury over time. Those losses are valued based on published systematic reviews of how people value functional losses relative to perfect health and what they routinely pay or say they would pay for small reductions in their probability of death or disabling injury.

Table 3-2 breaks down the costs per injured crash survivor from Table 3-1 by body region, fracture involvement, and MAIS. Its Minor Injury category consists of MAIS1 contusions and lacerations.

---

[7] Charges always exceed costs in the U.S. medical system, and the billers only expect partial payment, with the percentage paid varying from payer to payer. HCUP provides cost-to-charge ratios for use with the HCUP files. They build the ratios from mandatory hospital cost reporting to CMS. The cost-to-charge ratios tend to be in the 25 percent to 40 percent range.

Table 3-2. Medical Costs, Earnings Loss, and Household Production Loss per Survivor Treated at Hospital, by Body Region, Fracture Involvement, and MAIS (2019 $, 3% discount rate)

| Body Region | Fracture | MAIS | Mean Medical | SD Medical | Mean Household | SD Household | Mean Wages | SD Wages |
|---|---|---|---|---|---|---|---|---|
| TBI | N/A | 1 | $2,625 | $173 | $1,503 | $259 | $4,269 | $794 |
| TBI | N/A | 2 | $14,948 | $625 | $16,060 | $539 | $42,945 | $1,661 |
| TBI | N/A | 3 | $119,734 | $2,865 | $90,576 | $765 | $215,375 | $2,650 |
| TBI | N/A | 4 | $190,091 | $4,372 | $134,196 | $841 | $262,931 | $3,892 |
| TBI | N/A | 5 or 6 | $500,438 | $47,471 | $181,832 | $4,944 | $426,387 | $18,212 |
| Spinal Cord | No | 1 | | | | | | |
| Spinal Cord | No | 2 | | | | | | |
| Spinal Cord | No | 3 | $428,095 | | $134,675 | | $339,997 | |
| Spinal Cord | No | 4 | $614,745 | | $170,150 | | $319,932 | |
| Spinal Cord | No | 5 or 6 | $738,984 | $23,776 | $209,305 | $5,035 | $550,891 | $19,711 |
| Other Head/Neck | No | 1 | $2,703 | $60 | $1,150 | $57 | $3,481 | $214 |
| Other Head/Neck | No | 2 | $5,019 | $328 | $3,426 | $324 | $10,048 | $1,121 |
| Other Head/Neck | No | 3 | $15,443 | $1,542 | $17,726 | $1,445 | $46,676 | $4,733 |
| Other Head/Neck | No | 4 | | | | | | |
| Other Head/Neck | No | 5 or 6 | $57,084 | $16,138 | $104,975 | $5,830 | $276,038 | $31,431 |
| Other Head/Neck | Yes | 1 | $6,072 | $184 | $1,838 | $205 | $5,583 | $681 |
| Other Head/Neck | Yes | 2 | $15,529 | $651 | $7,961 | $497 | $22,538 | $1,572 |
| Other Head/Neck | Yes | 3 | $27,833 | $1,159 | $22,918 | $850 | $61,889 | $2,587 |
| Other Head/Neck | Yes | 4 | $54,034 | | $58,244 | | $128,966 | |
| Other Head/Neck | Yes | 5 or 6 | $94,812 | $12,039 | $102,714 | $5,639 | $255,737 | $20,929 |

53

| Body Region | Fracture | MAIS | Mean Medical | SD Medical | Mean Household | SD Household | Mean Wages | SD Wages |
|---|---|---|---|---|---|---|---|---|
| Trunk | No | 1 | $2,500 | $80 | $1,356 | $39 | $3,601 | $143 |
| Trunk | No | 2 | $17,548 | $502 | $6,620 | $178 | $16,865 | $493 |
| Trunk | No | 3 | $41,033 | $974 | $17,691 | $497 | $39,323 | $1,065 |
| Trunk | No | 4 | $102,420 | $5,596 | $35,362 | $2,302 | $71,434 | $4,863 |
| Trunk | No | 5 or 6 | $90,098 | $6,005 | $48,479 | $2,985 | $97,043 | $6,424 |
| Trunk | Yes | 1 | $3,935 | $240 | $1,724 | $56 | $4,227 | $333 |
| Trunk | Yes | 2 | $18,041 | $431 | $12,766 | $191 | $29,231 | $586 |
| Trunk | Yes | 3 | $35,564 | $805 | $19,289 | $339 | $41,242 | $823 |
| Trunk | Yes | 4 | $105,249 | $6,270 | $46,242 | $2,288 | $102,981 | $4,790 |
| Trunk | Yes | 5 or 6 | $115,673 | $8,754 | $83,791 | $4,935 | $156,201 | $9,702 |
| Upper Extremity | No | 1 | $3,681 | $110 | $1,059 | $59 | $2,962 | $183 |
| Upper Extremity | No | 2 | $4,785 | $332 | $1,813 | $146 | $5,584 | $477 |
| Upper Extremity | No | 3 | $37,884 | $3,302 | $25,162 | $1,732 | $58,793 | $3,804 |
| Upper Extremity | No | 4 | $96,417 | | $91,191 | | $250,230 | |
| Upper Extremity | No | 5 or 6 | | | | | | |
| Upper Extremity | Yes | 1 | $2,655 | $448 | $2,079 | $93 | $5,920 | $502 |
| Upper Extremity | Yes | 2 | $9,891 | $210 | $7,284 | $67 | $19,466 | $284 |
| Upper Extremity | Yes | 3 | $54,601 | $1,305 | $37,336 | $654 | $92,252 | $1,604 |
| Upper Extremity | Yes | 4 | $96,625 | | $55,036 | | $144,208 | |
| Upper Extremity | Yes | 5 or 6 | $85,516 | $13,280 | $91,657 | $4,836 | $154,934 | $11,720 |
| Lower Extremity | No | 1 | $1,736 | $86 | $786 | $60 | $2,199 | $238 |
| Lower Extremity | No | 2 | $6,614 | $404 | $2,757 | $118 | $7,810 | $380 |

54

| Body Region | Fracture | MAIS | Mean Medical | SD Medical | Mean Household | SD Household | Mean Wages | SD Wages |
|---|---|---|---|---|---|---|---|---|
| Lower Extremity | No | 3 | $79,135 | $4,078 | $34,132 | $1,668 | $92,117 | $4,834 |
| Lower Extremity | No | 4 | $121,357 | | $70,007 | | $215,069 | |
| Lower Extremity | No | 5 or 6 | | | | | | |
| Lower Extremity | Yes | 1 | $2,135 | $196 | $1,170 | $89 | $3,337 | $268 |
| Lower Extremity | Yes | 2 | $21,703 | $373 | $14,121 | $71 | $36,993 | $313 |
| Lower Extremity | Yes | 3 | $81,281 | $1,153 | $27,105 | $255 | $68,533 | $568 |
| Lower Extremity | Yes | 4 | $167,619 | | $51,375 | | $100,998 | |
| Lower Extremity | Yes | 5 or 6 | $151,417 | $11,143 | $81,849 | $3,248 | $140,854 | $7,530 |
| Burns | N/A | 1 | $1,827 | $195 | $1,144 | $36 | $3,058 | $238 |
| Burns | N/A | 2 | $6,645 | $935 | $2,586 | $117 | $7,468 | $412 |
| Burns | N/A | 3 | $59,537 | $10,743 | $15,913 | $2,701 | $37,866 | $6,207 |
| Burns | N/A | 4 | | | | | | |
| Burns | N/A | 5 or 6 | $276,728 | $30,436 | $23,000 | $2,472 | $49,372 | $6,182 |
| Minor Injury | N/A | 1 | $1,665 | $32 | $333 | $9 | $820 | $29 |

55

Appendix B provides variants of Table 3-2 at different discount rates for earnings and household productivity loss. Table 3-3 breaks out injury costs by person-type. The nonfatal victim counts in this table are weighted counts of 2018 HCUP data cases coded as initial visits for injuries in motor vehicle crashes on public roads. The counts for motorcyclists, pedestrians, and pedalcyclists greatly exceed the police-reported estimates from CRSS.

The costs per injured pedestrian or motorcyclist are roughly three times the costs per injured occupant. Pedalcyclist costs are elevated to a lesser extent. As Table 3-3 shows, this pattern results from a higher fatality rate and a higher hospital admission rate among nonfatal injuries.

*Table 3-3. Fatality Rate and Nonfatal Hospital Admission Rate of People Injured in Motor Vehicle Crashes by Person Type*

|  | % Fatal | % Admitted of Nonfatal |
|---|---|---|
| Occupant | 1.0% | 5.1% |
| Motorcyclist | 3.3% | 23.5% |
| Pedestrian | 5.5% | 18.9% |
| Pedalcyclist | 1.0% | 9.8% |

A major limitation of the costs presented is that some cost components are unavoidably quite old. No recent source exists for the percentage of lifetime medical costs that is incurred more than 18 months post-injury, probabilities of permanent disability by detailed diagnosis and whether hospital admitted, or the ratio of household workdays lost to wage workdays lost.

Table 3-4. Number of People Injured and Injury Costs Per Person in Road Crashes by Person Type, 2018 (in 2019 $)

| Occupant | All | Admitted | ED only | Medical | Wages & Fringe | Household Work | Quality-of-life | Legal | Insurance Administration | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| MAIS1 | 2,056,736 | 11,449 | 2,045,287 | 2,890 | 2,759 | 1,037 | 55,104 | 923 | 1,100 | 63,812 |
| MAIS2 | 292,604 | 62,765 | 229,839 | 13,078 | 21,671 | 9,333 | 448,268 | 6,084 | 7,256 | 505,691 |
| MAIS3 | 52,098 | 40,791 | 11,307 | 62,490 | 83,942 | 37,460 | 1,938,534 | 25,382 | 30,269 | 2,178,077 |
| MAIS4 | 2,057 | 2,057 |  | 178,544 | 216,902 | 116,527 | 3,156,475 | 70,665 | 41,891 | 3,781,003 |
| MAIS5 | 6,327 | 6,327 |  | 394,888 | 321,950 | 139,095 | 6,590,076 | 118,140 | 41,891 | 7,606,041 |
| Fatal | 24,332 |  |  | 15,000 | 990,638 | 359,764 | 9,455,112 | 138,025 | 41,891 | 11,000,430 |
| *All* | *2,434,154* | *123,389* | *2,286,433* | *6,678* | *17,655* | *6,856* | *256,246* | *3,801* | *3,013* | *294,249* |

| Motorcyclist | All | Admitted | ED only | Medical | Wages & Fringe | Household Work | Quality-of-life | Legal | Insurance Administration | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| MAIS1 | 71,198 | 1,890 | 69,308 | 2,727 | 3,294 | 853 | 76,147 | 949 | 1,131 | 85,100 |
| MAIS2 | 54,856 | 16,904 | 37,952 | 12,972 | 27,074 | 7,643 | 374,859 | 6,582 | 7,850 | 436,981 |
| MAIS3 | 15,816 | 13,876 | 1,940 | 74,701 | 108,405 | 38,386 | 2,131,391 | 30,571 | 36,458 | 2,419,911 |
| MAIS4 | 795 | 795 |  | 209,447 | 281,374 | 114,962 | 4,170,479 | 83,613 | 41,891 | 4,901,765 |
| MAIS5 | 1,541 | 1,541 |  | 303,732 | 266,955 | 96,780 | 5,933,787 | 92,127 | 41,891 | 6,735,272 |
| Fatal | 4,985 |  |  | 20,061 | 1,144,402 | 415,606 | 9,821,407 | 138,025 | 41,891 | 11,581,392 |
| *All* | *149,192* | *35,006* | *109,201* | *18,913* | *65,514* | *22,786* | *811,797* | *12,123* | *9,347* | *940,480* |

| Pedestrian | All | Admitted | ED only | Medical | Wages & Fringe | Household Work | Quality-of-life | Legal | Insurance Administration | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| MAIS1 | 70,049 | 1,393 | 68,656 | 2,596 | 2,428 | 827 | 92,933 | 808 | 963 | 100,554 |
| MAIS2 | 29,760 | 10,339 | 19,421 | 18,662 | 30,507 | 12,365 | 594,130 | 8,493 | 10,129 | 674,287 |
| MAIS3 | 10,518 | 9,203 | 1,315 | 104,143 | 113,244 | 51,133 | 2,553,670 | 37,062 | 41,891 | 2,901,143 |
| MAIS4 | 457 | 457 | | 224,884 | 242,222 | 118,849 | 3,357,360 | 80,876 | 41,891 | 4,066,082 |
| MAIS5 | 899 | 899 | | 311,719 | 307,125 | 123,523 | 6,766,275 | 102,465 | 41,891 | 7,652,997 |
| Fatal | 6,471 | | | 23,045 | 917,340 | 333,145 | 9,059,972 | 138,025 | 41,891 | 10,513,418 |
| *All* | *118,154* | *22,291* | *89,392* | *20,014* | *72,718* | *27,802* | *992,726* | *14,569* | *9,626* | *1,137,455* |

| Pedalcyclist | All | Admitted | ED only | Medical | Wages & Fringe | Household Work | Quality-of-life | Legal | Insurance Administration | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| MAIS1 | 54,981 | 799 | 54,182 | 2,522 | 2,738 | 691 | 80,778 | 821 | 980 | 88,530 |
| MAIS2 | 26,792 | 4,050 | 22,743 | 11,062 | 24,786 | 7,651 | 374,593 | 6,004 | 7,160 | 431,256 |
| MAIS3 | 3,957 | 3,266 | 690.3209 | 76,751 | 121,826 | 43,787 | 2,127,780 | 33,452 | 39,894 | 2,443,490 |
| MAIS4 | 128 | 128 | | 170,345 | 253,710 | 117,064 | 3,594,655 | 74,688 | 41,891 | 4,252,354 |
| MAIS5 | 314 | 315 | | 587,810 | 377,490 | 123,887 | 7,473,032 | 138,025 | 41,891 | 8,742,135 |
| Fatal | 883 | | | 26,474 | 918,975 | 333,739 | 8,923,911 | 250,954 | 41,891 | 10,495,944 |
| *All* | *87,055* | *8,557* | *77,615* | *11,127* | *25,951* | *8,786* | *385,788* | *7,040* | *5,273* | *443,965* |

*Source: Nonfatal case counts 2018 NIS and NEDS; fatal and CRSS counts, Traffic Safety Facts 2018, Table 54, with unknown non-motorist allocated in proportion to knowns. Costs were tabulated from costed 2013-2014 NIS and NEDS files and 2019 Multiple Cause of Death File.*

58

## Property Damage, Insurance, and Legal Costs

Some crash costs are most easily estimated from insurance data. These include not only insurance claims processing and legal costs but also costs of property damage. Insurance data also are a critical input when analyzing who pays the costs of crashes.

To analyze the insurance-related costs, we purchased data from the Insurance Services Office, a data-pooling organization that aggregates claims data from a large cross-section of auto insurers. We bought data that detailed insurance premiums collected and claims paid by selected insurers in 2018. We used those data in conjunction with national insurance statistics and crash data to analyze (1) property damage costs per vehicle, (2) numbers of people receiving insurance claims payments due to crash injury, and (3) transaction costs of compensation through the insurance and legal systems. This chapter describes the data we purchased, our analyses of them, and what they showed.

## Auto Insurance Data Description and Loss Cost Computations

Insurance Services Office structured its data report around a spreadsheet developed by the Motorcycle Insurance Committee of the National Association of Independent Insurers (NAII, Miller & Lawrence, 2003). ISO was able to break out data only by motorcycle versus other personal auto versus commercial auto, with commercial auto decomposed by vehicle type. They provided data on seven categories of insurance coverage:

1. Bodily injury liability (coverage if the policyholder's vehicle injures someone; mandatory in most States; in no-fault insurance States this coverage compensates losses that exceed the no-fault threshold). For motorcycles, some companies separated passenger liability coverage from other bodily injury coverage.
2. Property damage liability (coverage if the policyholder's vehicle damages or destroys someone else's property; mandatory in many States).
3. Own medical payments (coverage for the policyholder's own injury treatment costs up to a modest ceiling, typically $1,000; often mandatory in States without no-fault insurance).
4. Personal injury protection (no-fault coverage for the policyholder's own losses up to a modest ceiling, typically $15,000–$25,000; mandatory in some States).
5. Collision (coverage for damage to the policyholder's vehicle when the policyholder is at fault in the crash or no one is; typically required by the lender if vehicle purchase was financed).
6. Comprehensive (coverage for theft or non-crash damage to the policyholder's vehicle; typically required by the lender if vehicle purchase was financed).
7. Uninsured and underinsured motorist (coverage for injuries to the policyholder and other occupants of the policyholder's vehicle, as well as the policyholder's property damage when a driver without insurance is at fault or when the at-fault driver has too little insurance to fully compensate the policyholder's losses; mandatory in many States).

For each category we obtained four data items for policies written in 2018. Coverage in a policy is for a maximum of one year:

- Earned exposure (the number of vehicles covered by insurance for this risk).
- Earned premiums (how much policyholders paid for this coverage, net of any dividends or rebates to policyholders).
- Incurred losses (the amount paid or reserved for future payment of claims against the policies, including amounts that will be paid by reinsurers).
- Incurred claim count (the number of damage claims that the insurance paid for or anticipates paying for as lawsuits and other disputes are resolved).

From the data collected, by vehicle and coverage type, we computed:

- Claims per 1,000 covers (incurred claim count divided by earned exposure, i.e., the number of claims filed per 1,000 policies that offer the specific coverage).
- Claim severity (incurred losses divided by incurred claim count, i.e., the average payments per claim paid).
- Average loss cost (incurred losses divided by earned exposure, a measure influenced by both the frequency of claims and claim severity, i.e., losses per cover).
- Percentage of total losses (by vehicle type, incurred losses for each coverage divided by total incurred losses for all coverages).
- Loss ratio (the ratio of incurred losses to earned premiums, i.e., the percentage of premiums that is paid to settle claims).

We used national data on premiums written and loss ratios (Glenn, 2010) to estimate coverage and representativeness of Insurance Services Office data and to factor up ISO data to national estimates. As Table 3-5 shows, ISO data include 26.3 percent of private passenger auto premiums and 23.8 percent of commercial auto premiums. Like Miller and Lawrence (2000) found in 1998–1999, losses in Insurance Services Office data were typical of all auto policies.

Table 3-6 summarizes premiums and exposures earned and policy results.

## Property Damage Costs

Across commercial and personal lines, property damage payments averaged $3,551 per liability claim for damage to other vehicles and $4,321 per collision claim for damage to the insured's vehicle, with an overall average of $3,960. For personally owned or leased passenger vehicles, the means are $3,450, $4,202, and $3,855, compared to $4,817, $6,943, and $5,663 for commercial vehicles. Collision claims are a combination of single vehicle crashes and multi-vehicle crashes. In general, collision coverage for the policyholder's vehicle is subject to a deductible but liability is first-dollar coverage, meaning it has no deductible. Note that the average insurance payment for both personal and commercial policies is higher for claims on the insured's vehicle than for other vehicles. This is because people do not file small damage claims for their own vehicles due to fear of increased insurance rates, or when a claim amount is below their deductible.

We estimated how often people do not file a claim for property damage. Ratioing number of earned car-years of exposure from Table 3-6 indicates that 75 percent of insured drivers carry collision coverage with minimal variation between personal and commercial lines. About one-third of crashes are single vehicle, with most of the rest involving two vehicles. So, if all crashes