with meaningful damage led to claims, we would expect to see *1.5* (2×0.75) times as many own-vehicle claims as liability claims. Indeed, this multiplier could be even higher since drivers share fault in some crashes. The actual ratio in the Insurance Services Office data is *1.130*. The remaining 0.37 (1.50 – 1.130) smaller claims are not filed. That means claims are not filed for 24.67 percent of damaged vehicles (0.37/1.50 = 24.67%), presumably because the damage is near or below the deductible.

Among claims for damage to one's own vehicle, the Insurance Services Office data show the amount claimed averages $4,321 plus deductible (see table 3-6). We adjusted that amount by adding the deductible. A website that specializes in insurance quotes (www.carinsurance.com/what-is-collision-coverage-insurance) states that insurance professionals suggest collision policies carry a $500 deductible. Similarly, in Insurance Services Office data on commercial passenger vehicles, the mean deductible was $584 in 2018. With a $500 deductible, the total vehicle damages where a claim is filed for damage to one's own vehicle would average $4,821 ($4,321 + $500).

Insurance Services Office reports liability claims for damage to someone else's vehicle average $3,552 with no deductible.

Across all vehicles with property damage compensated by insurers in the Insurance Services Office data, damage costs per vehicle would average $4,225 ($4,821 * 2,958,906 own-vehicle claims + $3,552 * 2,618,123 liability claims)/(2,958,906 + 2,618,906)). That average is our best estimate of the damage per vehicle in a police-reported crash.

We next computed the average loss for the 27.66 percent of damaged vehicles where the insured chose not to file a claim under their collision coverage. To do so, we assume that the $3,551 average cost that Insurance Services Office reports for liability claims for damage to someone else's vehicle should mirror the average cost of damage to one's own vehicle. Then for the remaining 24.67 percent of damaged vehicles, costs would average $369 ([$3,552 average liability claim − $4,225 average own-vehicle claim plus deductible × (1-0.2766)]/0.2766). That lower property damage cost is our best estimate of the average property damage per vehicle in unreported crashes without injury.

### Property Damage Cost per Vehicle and per Crash by MAIS Severity

As the next-to-last row in Table 3-5 shows, insurance compensated $83.1 billion in crash damage in 2018. This section decomposes those costs and the associated costs of uncompensated damage into property damage per vehicle and per crash by MAIS severity.

Decomposing the costs requires estimating the number of crashes and vehicles by MAIS severity. That task is challenging. NHTSA last collected crashes by MAIS and vehicles per crash-by-crash MAIS in 2006 for crashes included in the Crashworthiness Data System and in 1984-86 NASS for other crashes. Table 3-7 shows a matrix that Blincoe et al. (2015) developed from those data for use in computing the number of crashes by crash MAIS from the MAIS distribution of injured people. To illustrate how this matrix is used, the number of MAIS5 crashes is computed as (8,010 MAIS5 survivors – 33,919 fatal crashes * 0.032998 MAIS5 survivors per fatal crash)/(1.017526 MAIS5 survivors per MAIS5 nonfatal crash) = 6,772 MAIS5 nonfatal crashes.

Table 3-8 shows the computed crash counts as well as property damage per vehicle and per crash-by-crash MAIS, expressed in 2018 dollars. To estimate the costs, we multiplied ratios from

Blincoe and Luchter (1983) times the $4,225 average property damage in reported crashes to estimate damage per vehicle by MAIS crash severity. Table 3-8 shows those ratios and the estimated property damage per vehicle by MAIS crash severity. Table 3-8 also shows vehicle counts by crash MAIS computed from 1984-86 NASS data, which were the last to collect vehicle per crash by MAIS for all crash types. In this table, rather than applying the Blincoe and Luchter ratio to compute vehicles in PDO crashes, we computed vehicles in insurer-reported PDO crashes as (vehicles with claims in Insurance Services Office divided by the percentage of property damage claims costs in Insurance Services Office) minus (vehicles where someone had an injury reported in CRSS).

To break the property damage costs down into cost per person involved in a crash by injury severity, we followed the method used by Miller, Viner, Rossman, et al. (1991) and Blincoe et al. (2015). Using a combination of 2010 CDS and reweighted 1984-86 NASS data, Blincoe et al. (2015) first cross-tabulated the number of people in a crash by the AIS severity of their maximum injury (MAIS) and by the maximum MAIS of anyone in the crash (AIS). Second, they used that cross-tabulation to iteratively estimate costs by MAIS. We divided the cost for a PDO crash by the uninjured people involved in a PDO crash to get a cost per uninjured person. Next, they used that cost per uninjured person to compute the cost of an MAIS1 crash net of the costs associated with uninjured people. Dividing by the number of MAIS1 injury victims in a crash then yields the cost per MAIS1 victim. This process was repeated sequentially to compute the costs shown in Table 3-4 for all MAIS levels.

Table 3-9 shows that 2017-2019 CRSS and 2009 GES estimates of vehicles per crash by police-reported KABCO severity are virtually identical to the 1984–1986 NASS estimates. These ratios have remained remarkably stable over time, so it seems likely that the NASS ratios we used by MAIS also are stable. For unknown reasons, the GES/NASS ratio for fatal crashes of 1.63–1.66 is much higher than the ratio of 1.54 for 2018 from FARS. We used the FARS ratio.

### Number of People Who Auto Insurance Compensates for Injury

Insurance Services Office includes 5,577,029 property damage claims (Table 3-6). By line of business, the percentage of property damage premiums covered by Insurance Services Office insurers varies only slightly from the percentage of claims paid (Table 3). Thus, drivers covered by these insurers either (1) have slightly lower crash risks than other insureds, (2) suffer slightly less damage per crash, or (3) buy slightly more costly insurance. Depending on which of these possibilities is correct, insurers paid for damage to 18.3 to 18.8 million crashed vehicles in 2018. Similarly, exclusive of uninsured motorist coverage, auto insurers paid 4.62 to 5.14 million injury claims in 2018. We computed these ranges as Insurance Services Office claims incurred divided by percentage of premiums or claims payments in Insurance Services Office.

Some own-medical claims and no-fault claims, however, are for injuries that also generate bodily injury claims, resulting in some injured people making claims under several policies. Roughly one-third of crashes involve a single vehicle. Thus, at most one-third of drivers (half of drivers in multi-vehicle crashes) might be in crashes where another driver was at fault. Those drivers generally would receive bodily injury compensation as their insurer recovered own-medical losses from the at-fault driver's insurance. Because some bodily injury claims are for recovery above no-fault limits, we assume 10 percent of no-fault claims also involve a bodily injury claim. Removing those overlaps by reducing own-medical claims by one-third and no-fault claims by

10 percent suggests liability insurance compensated 5,383,000 injured people in 2018. This estimate accounts for insured drivers, but not the uninsured.

Despite preponderant State laws mandating liability coverage, an estimated 12.6 percent of U.S. drivers were uninsured in 2018 (Insurance Information Institute, 2022). Uninsured/underinsured motorist coverage compensates bodily injury and in some States, either by mandate or at buyer option, property damage. A single claim can capture both categories of losses. This coverage is not mandatory everywhere; only 86.7 percent of personal auto liability insurance buyers purchased it in 2018. We estimate that it compensated another 296,000 injury claims for insured drivers (86.7% with coverage × 12.6% of drivers uninsured × 680,553 Insurance Services Office bodily injury claims against insured drivers/25.1 percent of all bodily injury claims in the Insurance Services Office data). That brings the total number of auto insurance compensation claims for injury in 2018 to 5,679,000.

If uninsured drivers had average crash risks, then 6,211,000 people would have been injured in 2018 (5,679,000/86.7% insured).

### *Comparison to Other Crash Injury Counts*

How does this number compare with estimates from NHTSA data systems and health care administrative system? Using NHTSA data systems and surveys, Chapter 2 estimated that 4,507,000 people were injured in crashes in 2019, including 3,068,000 injured in police-reported crashes. Table 3-10 summarizes the estimates. It also uses the cost estimates in Table 3-1 to estimate total cost of these injuries. Like in the 2015 report, our insurance-based estimate is far higher.

HCUP NIS and NEDS offer a further estimate of nonfatal crash injury incidence. They indicate that 3,034,524 people were treated and released for crash injuries and 238,085 crash survivors were admitted to hospital in 2018. Adding 400,368 survivors treated only in physician offices and clinics based on factors from Finkelstein et al. (2006), we estimate 3.7 million crash survivors were medically treated annually in 2018. The comparable totals were 4.2 million in 2000 and 3.6 million in 2008.

### *Portion of Injury Costs Compensated and Payments for Fraudulent Claims*

Blincoe et al. (2002, 2015) adopted estimates from Miller et al. (1991) that auto liability policy limits averaged $100,000 per person injured in 1988 ($254,500 inflated to $2019 and that 55 percent of those suffering moderate (MAIS2) to fatal injuries made a claim. Blincoe et al. (2015) concluded the 55 percent rate also applied to MAIS1 injuries. Since States have not been shifting liability regimes (e.g., changing to no-fault insurance or raising minimum liability coverage requirements), we assume that these factors are unchanged. Among the remaining 45 percent, following Miller (1989), Miller et al. (1989) and Blincoe et al. (2015), roughly half are covered by no-fault coverage up to an average of roughly $25,000 and 90 percent of the remaining 22.5 percent by an average of roughly $3,500 in own-medical coverage.

Shifting to 2019 dollars, the insurance data reported $73.8 billion in insurance compensation for bodily injury (inflated from the $72.5 billion in Table 3-4). Combining the coverage factors in the preceding paragraph with the cost and incidence data in earlier chapters, we compute that insurance compensated $66.7 billion in legitimate crash injury medical and work losses (Table 3-10), or 90.3 percent of total compensation (66.7/73.8). The remaining $7.1 billion (9.7%) pays

for fraudulent and built up or inflated claims. Consistent with that estimate, a 2015 Insurance Research Council study estimated fraud and build-up losses were $6.2-$8.6 billion in 2012 (inflated to 2019 $).

Overall, Table 3-10 shows that motor vehicle insurance compensated an estimated 39 percent of the injury costs including 76 percent of the medical costs and 35 percent of the work losses.

## Auto Insurance Administration and Legal Costs per Person

The last two rows of Table 3-10 show the motor vehicle insurance administration and legal costs per claim. Insurance administration costs cover defense, cost containment, adjusting, and other claim-specific expenses. Insurance Services Office and Insurance Information Institute (2022) data indicate they add 16.46 percent to the loss costs shown above. This includes 4.27 percent for defense and cost containment, plus 12.19 percent for adjusting. We estimated legal costs from medical and work losses using the same formula as Blincoe et al. (2015). Specifically, by MAIS, legal cost exclusive of defense costs (which instead are included in insurance administration) equal the medical and work loss costs X the percentage of costs compensated by insurance X 58 percent of claimers hire attorneys (Hensler et al., 1991) X 29 percent of losses equal plaintiff's attorney fees (Hensler et al., 1991) X 1.492 ratio of total legal costs net of defense attorney fees to plaintiff attorney fees.

*Table 3-5. Policyholders in 2018 Pooled, Multi-Insurer Insurance Services Office Data as a Percentage of Insured Vehicles, and Representativeness of Loss Ratios in ISO Data*

| Coverage | Premiums Written | | % of Premiums in ISO Data | Loss Ratio | | % of Losses in ISO Data | Losses compensated nationally in 2018 |
|---|---|---|---|---|---|---|---|
| | Nationally | In ISO Data | | Nationally | In ISO Data | | |
| Private Passenger Auto Liability | $144,438,315,000 | $39,703,320,768 | 27.5% | 63.5% | 58.4% | 25.3% | $91,726,649,000 |
| Private Passenger Property Damage* | $96,469,904,000 | $23,653,236,957 | 24.5% | 60.9% | 69.4% | 27.9% | $58,763,318,000 |
| Total Private Passenger | $240,908,219,000 | $63,356,557,725 | 26.3% | 62.5% | 62.5% | 26.3% | $150,489,967,000 |
| Commercial Auto Liability | $26,952,071,000 | $6,312,155,737 | 23.4% | 65.9% | 67.4% | 23.9% | $17,774,673,000 |
| Commercial Property Damage* | $8,778,794,000 | $2,177,718,274 | 24.8% | 56.9% | 57.5% | 25.1% | $4,993,846,000 |
| Total Commercial | $35,730,865,000 | $8,489,874,011 | 23.8% | 63.7% | 64.9% | 24.2% | $22,768,519,000 |
| All Auto Liability | $171,390,386,000 | $46,015,476,505 | 26.8% | 63.9% | 59.6% | 25.0% | $109,501,322,000 |
| All Own Property Damage* | $105,248,698,000 | $25,830,955,231 | 24.5% | 60.6% | 68.4% | 27.7% | $63,757,164,000 |
| Grand Total | $276,639,084,000 | $71,846,431,736 | 26.0% | 62.6% | 62.8% | 26.0% | $173,258,486,000 |
| | | | | | | | $0 |
| All Bodily Injury/ Uninsured Motorist** | $124,165,516,368 | $31,821,795,070 | 25.6% | 58.4% | 57.3% | 25.1% | $72,471,411,822 |
| All Property Damage** | $132,030,284,766 | $32,847,651,820 | 24.9% | 63.0% | 67.3% | 26.6% | $83,148,063,377 |
| All Comprehensive | $30,236,364,866 | $7,176,984,846 | 23.7% | 58.3% | 66.6% | 27.1% | $17,639,010,801 |

* Includes comprehensive (non-crash) coverage but excludes State high-risk funds

** Includes State high-risk funds but excludes comprehensive. National liability insurance was split between bodily injury and property damage in proportion to the Insurance Services Office split. State funds = Direct premiums written − Net premiums written.

National data from Insurance Information Institute (2020), Insurance Services Office data from unpublished tables produced by the Insurance Services Office.

*Table 3-6. Earned Premiums, Exposures, Claims, and Losses by Auto Insurance Line and Coverage in 2018 Pooled, Multi-Insurer Insurance Services Office (ISO) Data*

| | Earned Premiums | Earned Car Years | Incurred Claims | Claims/ 1,000 Covers | Incurred Losses | Cost/Claim | % of Total Losses | Loss ratio |
|---|---|---|---|---|---|---|---|---|
| **PERSONAL LIABILITY** | | | | | | | | |
| Bodily Injury | $15,783,827,986 | 62,286,282 | 680,945 | 10.9 | $8,857,714,919 | $13,008 | 38.1% | 56.1% |
| Property Damage | $12,813,885,505 | 62,955,733 | 2,424,596 | 38.5 | $8,365,843,583 | $3,450 | 36.0% | 65.3% |
| Personal Injury Protection | $5,256,907,111 | 26,471,639 | 556,403 | 21.0 | $3,295,596,331 | $5,923 | 14.2% | 62.7% |
| Medical Payments | $884,658,213 | 26,723,971 | 197,520 | 7.4 | $582,777,243 | $2,950 | 2.5% | 65.9% |
| Uninsured/Under-insured Motorist | $4,961,115,371 | 53,816,303 | 190,709 | 3.5 | $2,163,456,737 | $11,344 | 9.3% | 43.6% |
| Total | $39,700,394,187 | 228,836,324 | 4,050,173 | 17.7 | $23,265,388,813 | $5,744 | 100.0% | 58.6% |
| **PERSONAL AUTO PHYSICAL DAMAGE** | | | | | | | | |
| Collision | $16,839,623,247 | 47,317,758 | 2,830,127 | 59.8 | $11,892,596,611 | $4,202 | 72.4% | 70.6% |
| Comprehensive | $6,572,906,680 | 55,748,603 | 3,177,341 | 57.0 | $4,530,119,777 | $1,426 | 27.6% | 68.9% |
| Total | $23,412,529,927 | 103,066,361 | 6,007,468 | 58.3 | $16,422,716,388 | $2,734 | 100.0% | 70.1% |
| **COMMERCIAL LIABILITY & NO FAULT** | | | | | | | | |
| Liability | $6,164,063,396 | 7,376,587 | 256,577 | 34.8 | $4,188,948,154 | $16,326 | 98.4% | 68.0% |
| Bodily Injury* | $4,784,267,465 | 7,376,587 | 61,905 | 8.4 | $3,251,272,266 | $52,520 | 76.4% | 68.0% |
| Property Damage* | $1,379,795,931 | 7,376,587 | 194,672 | 26.4 | $937,675,886 | $4,817 | 22.0% | 68.0% |
| No Fault | $148,092,341 | 2,384,658 | 8,565 | 3.6 | $67,560,194 | $7,888 | 1.6% | 45.6% |
| Total | $6,312,155,737 | 9,761,245 | 265,142 | 27.2 | $4,256,508,348 | $16,054 | 100.0% | 67.4% |
| **COMMERCIAL AUTO PHYSICAL DAMAGE** | | | | | | | | |
| Collision | $1,573,640,108 | 5,403,157 | 128,779 | 23.8 | $894,176,497 | $6,943 | 71.4% | 56.8% |
| Comprehensive | $604,078,166 | 5,389,310 | 119,334 | 22.1 | $358,003,860 | $3,000 | 28.6% | 59.3% |
| Total | $2,177,718,274 | 10,792,467 | 248,113 | 23.0 | $1,252,180,357 | $5,047 | 100.0% | 57.5% |
| **ALL POLICIES EXCEPT UNINSURED MOTORIST AND COMPREHENSIVE** | | | | | | | | |
| Property Damage | $32,606,944,790 | 123,053,235 | 5,578,174 | 45.3 | $22,090,292,577 | $3,960 | 57.9% | 67.7% |
| Liability | $14,193,681,435 | 70,332,320 | 2,619,268 | 37.2 | $9,303,519,469 | $3,552 | 24.4% | 65.5% |
| Own (Deductible) | $18,413,263,355 | 52,720,915 | 2,958,906 | 56.1 | $12,786,773,108 | $4,321 | 33.5% | 69.4% |
| Bodily Injury/No Fault/Medical Only | $26,857,753,117 | 125,243,137 | 1,505,338 | 12.0 | $16,054,920,953 | $10,665 | 42.1% | 59.8% |

* Premiums distributed in proportion to losses. Personal lines coverages include private passenger vehicles and motorcycles.

66

Table 3-7. By Crash Severity, Injured People Involved by MAIS Injury Severity, Based on 2006 CDS and Reweighted 1984-1986 NASS Data on Non-CRSS Strata, With fatalities per fatal Crash from 2019 FARS

|  | Fatal Crash | MAIS5 Crash | MAIS4 Crash | MAIS3 Crash | MAIS2 Crash | MAIS1 Crash |
|---|---|---|---|---|---|---|
| MAIS1 Survivors |  |  |  |  |  | 1.378038 |
| MAIS2 Survivors |  |  |  |  | 1.107458 | 0.733569 |
| MAIS3 Survivors |  |  |  | 1.095094 | 0.165856 | 0.737777 |
| MAIS4 Survivors |  |  | 1.004974 | 0.064920 | 0.184264 | 0.695304 |
| MAIS5 Survivors |  | 1.017526 | 0.031973 | 0.058288 | 0.281744 | 0.799106 |
| Fatalities | 1.06418 | 0.032998 | 0.053140 | 0.127011 | 0.260838 | 0.525004 |

Table 3-8. Property Damage and Its Compensation in Crashes by Maximum AIS in the Vehicle, 2018, in 2018 Dollars*

| Vehicle Max AIS | Fraction of Mean Cost | Property Damage/ Vehicle With Compensation | Vehicles With Property Damage Coverage | Total Compensated Damage | Property Damage/ Vehicle | Total Damaged Vehicles | Total Property Damage | Crashes | Property Damage/ Crash | Property Damage/ Person |
|---|---|---|---|---|---|---|---|---|---|---|
| PDO | 0.6540 | $2,773 | 15,868,196 | $40,992,083,264 | $2,583 | 19,181,537 | $53,189,451,088 | 11,887,478 | $4,474 | $1,790 |
| 1 | 1.9172 | $7,573 | 4,332,913 | $32,812,936,271 | $7,573 | 4,659,122 | $35,283,304,272 | 2,532,132 | $13,934 | $9,311 |
| 2 | 2.2420 | $8,856 | 570,988 | $5,056,618,668 | $8,856 | 613,975 | $5,437,313,308 | 354,899 | $15,321 | $9,278 |
| 3 | 3.5032 | $13,838 | 195,562 | $2,706,124,306 | $13,838 | 210,285 | $2,909,858,675 | 123,697 | $23,524 | $17,229 |
| 4 | 4.7898 | $18,920 | 26,285 | $497,312,613 | $18,920 | 28,264 | $534,753,492 | 17,234 | $31,028 | $19,870 |
| 5 | 4.7898 | $18,920 | 8,899 | $168,371,061 | $18,920 | 9,569 | $181,047,113 | 5,981 | $30,272 | $22,452 |
| Fatal | 4.7898 | $18,920 | 48,625 | $919,975,695 | $18,920 | 52,286 | $989,237,357 | 33,378 | $29,637 | $14,655 |
| 1-Fatal | 2.0593 | $8,134 | 5,183,273 | $42,161,338,614 | $8,134 | 5,573,503 | $45,335,514,217 | 3,067,321 | $14,780 | $5,697 |
| All | 1.0000 | $3,552 | 21,051,469 | $83,153,421,878 | $3,950 | 24,755,040 | $98,524,965,305 | 14,954,799 | $6,588 | $3,148 |

* Excludes comprehensive (non-crash) coverage. Includes damage to own vehicle if the insured did not have collision coverage. Computed from percentage of claims payments in Insurance Services Office. Among 14,126,304 vehicles damaged in crashes involving an insurance claim, 13,176,522 generated property damage compensation.

67

*Table 3-9. Vehicles per Crash by Police-Reported Crash Severity*

| Crash Severity | CRSS 2017-19 | GES 2009 | NASS 1982-86 |
|---|---|---|---|
| O – Property Damage Only | 1.79 | 1.75 | 1.75 |
| C – Possible Injury | 1.95 | 1.94 | 1.93 |
| B – Non-incapacitating Injury | 1.77 | 1.76 | 1.75 |
| A – Incapacitating Injury | 1.64 | 1.71 | 1.74 |
| K – Fatal Injury | 1.54 | 1.66 | 1.63 |
| All | 1.79 | 1.78 | 1.76 |

*Table 3-10. People Injured in Crashes by Injury Severity, Their Medical and Work Loss Costs, and the Percentage Compensated by Auto Insurance (2019 $) See ISO Compensation File*

| MAIS | 1 | 2 | 3 | 4 | 5&6 | Fatal | Total |
|---|---|---|---|---|---|---|---|
| Cases Adjusted for Under-reporting | 3,875,265 | 427,119 | 141,167 | 19,285 | 7,187 | 36,500 | 4,506,523 |
| Medical per Case | 2,195 | 13,145 | 69,075 | 188,295 | 362,922 | 17,289 | 6,822 |
| Work Loss per Case | 3,165 | 32,171 | 131,879 | 346,658 | 433,262 | 1,378,118 | 23,238 |
| Total Liability Medical (millions) | 4,678 | 3,088 | 5,363 | 1,997 | 1,006 | 347 | 16,480 |
| Total Liability Work Loss (millions) | 6,746 | 7,557 | 10,239 | 702 | 0 | 5,354 | 30,599 |
| No-Fault Medical (millions) | 1,914 | 1,263 | 794 | 108 | 40 | 142 | 4,262 |
| No-Fault Work Loss (millions) | 2,760 | 1,139 | 0 | 0 | 0 | 63 | 3,962 |
| Uninsured Motorist Medical (millions) | 1,723 | 303 | 100 | 14 | 5 | 26 | 2,170 |
| Total Medical (millions) | 8,315 | 4,654 | 6,257 | 2,119 | 1,052 | 515 | 22,912 |
| % of Medical Compensated | 98% | 83% | 64% | 58% | 40% | 82% | 75% |
| Total Work Loss (millions) | 9,506 | 8,697 | 10,239 | 702 | 0 | 5,418 | 34,561 |
| % of Work Loss Compensated | 78% | 63% | 55% | 11% | 0% | 11% | 33% |
| Auto Insurance Paid (millions) | 17,820 | 13,351 | 16,497 | 2,822 | 1,052 | 5,932 | 57,473 |
| % of Injury Costs Compensated | 86% | 69% | 58% | 27% | 18% | 12% | 42% |
| Insurance Claims Administration per Case | 755 | 5,135 | 19,196 | 24,033 | 24,033 | 26,699 | 2,095 |
| Legal Cost per Case | 740 | 6,255 | 27,737 | 73,837 | 109,893 | 138,025 | 3,707 |

**Miscellaneous Costs**

In this chapter we examine various costs not covered in the previous chapters, including those incurred by State and local governments, such as crash-related damage to public property and public services like police and fire department attendance at crash sites.

### Adding Roadside Furniture Damage to Property Damage

The insurance data suggest property damage averages $3,032 per crash-involved vehicle damaged seriously enough to prompt an insurance claim, with 18.3 to 18.8 million vehicles damaged that extensively in 2009. These estimates exclude most costs of damage to signs, lampposts, guardrails, and other roadside furniture. State and local governments absorb the roadside furniture costs not covered by insurance.

Estimated costs of roadside furniture damage by crash severity came from 1,462 crashes in 2008 tracked by the Missouri Claims Recovery Department. The data excluded costs not recovered from at-fault drivers and their insurers. As Table 9 shows, in 2019 dollars, the costs average $89 per fatal crash and $44 per injury crash. These results, based on a single year in a single State, should be treated with caution, as explained below.

### Public Services

Public services costs are paid almost entirely by State and local government. Using the data underlying the crash cost estimates (Miller et al., 1991), we separated out EMS, police, fire, vocational rehabilitation, and court costs.

Missouri and Washington provided average incident management costs that Miller et al. (2011) analyzed. Inflated to 2019 dollars, they estimated mean cost per crash attendance was $98 for 315 crashes in Missouri and $149 for 3,880 crashes in Washington. As they recommended, we adopted Washington State's estimate because the Missouri data were missing costs for many crashes that involved incident response. Using data on the percentage of crashes attended, we broke the estimate down by police-reported crash severity.

To break the costs of incident management and of roadside furniture damage down into cost per person involved in a crash by injury severity, we followed the same method that we used above to break down property damage.

Table 3-12 shows the resulting estimated costs per person injured by MAIS severity, as well as estimates for police, fire department, vocational rehabilitation, and workplace costs inflated from prior NHTSA crash cost studies. These factors are small, but the limited geographic coverage of the data underpinning them and the age of some of them mean their uncertainty is wide. A recent National Cooperative Highway Research Program project charged with updating most of these costs was unable to obtain data from additional jurisdictions.

*Table 3-11. Crashes by Severity, Portion Involving Roadside Furniture Damage,*
*Costs per Crash With Costs and Cost per Crash, Missouri, 2008 (2019 $)*

| Severity | Crashes | With Furniture Damage | $/Crash  With Costs | Cost/Crash |
|---|---|---|---|---|
| Fatal | 619 | 102 | $539 | $89 |
| Injury | 21,055 | 2,178 | $424 | $44 |

*Table 3-12. Selected Ancillary Crash Costs per Person by MAIS (2019 $)*

| MAIS | Roadside Furniture | Incident Management | Police | Fire Department | Vocational Rehabilitation | Workplace |
|------|--------------------|--------------------|--------|-----------------|---------------------------|-----------|
| 0 | $14 | $2 | $14 | $8 | $0 | $76 |
| 1 | $26 | $2 | $93 | $11 | $20 | $56 |
| 2 | $26 | $1 | $116 | $111 | $124 | $418 |
| 3 | $26 | $92 | $127 | $267 | $270 | $3,240 |
| 4 | $26 | $88 | $138 | $750 | $331 | $7,077 |
| 5 | $26 | $88 | $147 | $764 | $307 | $7,794 |
| Fatal | $37 | $133 | $290 | $637 | $0 | $13,589 |

Motor vehicle crashes also result in added societal costs due to congestion and workplace disruption. Congestion costs, which include travel delay, excess fuel consumption, and added greenhouse gases and criteria pollutants are examined in chapter 4 of this report. Workplace costs were estimated by adjusting the workplace costs from Blincoe et al., 2002 to 2010 levels using the employment cost index for total compensation published by the Bureau of Labor Statistics (BLS).

## Unit Cost Summary

Table 3-13 summarizes the unit costs by injury severity and cost component for 2019. All injury unit costs are expressed on a per person injured basis. The costs for PDO's are expressed on a per-damaged-vehicle basis. Note that Medical costs include both medical care from Table 3-2 and vocational rehabilitation costs from Table 3-12. Property damage costs include both vehicle damage and roadside furniture from Table 3-12. Emergency services includes incident management, fire department, and police from Table 3-12. Market and household productivity are from Table 3-2. Legal and insurance administration costs are from Table 3-10.

Each fatality results in economic impacts of roughly $1.6 million, due primarily to lost productivity and legal costs. MAIS5 injuries are also very costly at nearly $1 million. The most costly impact for these most serious of survivor injuries is the cost of medical care, but there are also significant costs from lost productivity, legal costs, and insurance administrative costs. For all cost categories, injury costs gradually decline as severity decreases.

*Table 3-13. Summary of Unit Costs, Police-Reported and Unreported Crashes, 3% Discount Rate (2019 $)*

|  | PDO | MAIS0 | MAIS1 | MAIS2 | MAIS3 | MAIS4 | MAIS5 | Fatal |
|---|---|---|---|---|---|---|---|---|
| Medical | $0 | $0 | $2,210 | $13,269 | $69,345 | $188,626 | $363,229 | $17,289 |
| EMS | $31 | $24 | $106 | $228 | $486 | $976 | $999 | $1,060 |
| Market | $0 | $0 | $2,315 | $23,096 | $92,716 | $229,903 | $306,236 | $1,010,970 |
| Household | $71 | $55 | $848 | $8,990 | $39,001 | $116,482 | $127,886 | $367,148 |
| Insurance | $523 | $225 | $2,212 | $8,220 | $28,698 | $36,485 | $38,081 | $36,245 |
| Workplace | $99 | $76 | $56 | $418 | $3,240 | $7,077 | $7,794 | $13,589 |
| Legal Costs | $0 | $0 | $740 | $6,243 | $27,714 | $73,799 | $110,012 | $138,025 |
| Subtotal | $724 | $380 | $8,487 | $60,464 | $261,200 | $653,348 | $954,237 | $1,584,326 |
| Congestion | $1,327 | $1,008 | $1,207 | $1,339 | $1,691 | $1,814 | $1,857 | $7,133 |
| Prop. Damage | $3,200 | $1,864 | $9,650 | $9,616 | $17,835 | $20,565 | $23,234 | $15,185 |
| Subtotal | $4,527 | $2,872 | $10,857 | $10,955 | $19,526 | $22,379 | $25,091 | $22,318 |
| Total | $5,251 | $3,252 | $19,344 | $71,419 | $280,726 | $675,727 | $979,328 | $1,606,644 |

Note: Unit costs are expressed on a per-person basis for all injury levels. PDO costs are expressed on a per-damaged-vehicle basis.

## Police-Reported Versus Unreported Crash Costs

As noted in Chapter 2, nearly 60 percent of all PDO crashes and about a 30 percent of all nonfatal injury crashes are not reported to police. However, analyses of safety countermeasures frequently rely only on police-reported incidence data. Crashes that get reported to police are likely to be more severe than unreported crashes because vehicles are more likely to require towing and occupants are more likely to require hospitalization or emergency services. These crashes are typically also likely to require more time to investigate and clear from roadways than unreported crashes. Analysis based solely on police-reported crashes should thus be based on unit costs that are specific to police-reported crashes. For injury-related costs, this is more or less automatically accounted for by the shift in the injury severity profile. Unreported crashes have a lower average severity profile than do reported crashes. However, for non-injury-related cost components – property damage and congestion costs – there is no difference in profile. In addition, emergency services have higher involvement rates for police-reported crashes.

A separate set of costs was developed in Chapter 4 for police-reported and unreported congestion costs. To estimate separate costs for property damage, we used property damage cost data from the MDAC survey. Data were derived separately for reported and unreported crashes. Table 3-14 lists the results. The mean property damage cost of a crashed vehicle in the MDAC survey was $4,476. However, the mean property damage cost for vehicles in crashes reported to the police was $5,607, and the mean cost for a vehicle in crashes not reported to the police was $1,907. To estimate separate unit costs for vehicles in reported and unreported crashes, we took the ratio of each of these two crash types to the mean overall cost and applied these factors to the average property damage cost previously derived from insurance data. Since these ratios were derived independently from both the main incidence and property damage analyses, a further adjustment was made to normalize the unit costs so that the sum of reported and unreported crashes matched

71

the overall totals.[8] A similar approach was used for emergency services. Emergency services consists of separate police, fire, and incident management components. Each component was distributed assuming that unit costs per case were identical for both reported and unreported cases of a specific severity for any case for which police, fire, or incident management teams actually responded. The difference in unit costs for reported and unreported cases is thus a function of differing response rates. For police-reported cases, response rates are assumed to be 100 percent by definition. This is confirmed by the 100 percent rates reported in the MDAC survey for police-reported cases. For unreported cases, MDAC survey police response rates were reported to be 100 percent for all injury cases MAIS3 and greater. Police response rates for unreported MAIS0, MAIS1, MAIS2, and PDO cases were reported to be 17.1 percent, 29.2 percent, 37.8 percent, 11.5 percent respectively.

Fire response is assumed to be a subset of police response cases. Fire response rates derived from Blincoe et al. (1992) were thus assumed for police-reported cases, and were further modified by the relative unreported/reported police response rate in the MDAC survey for unreported cases.

Incident management response rates were estimated based on data from Washington State cited in NCHRP Working Paper 4 (Bahar & Miller, 2010), which indicate response rates of 23.2 percent for K and A injuries, 2.3 percent for B and C injuries, and 5.9 percent for O injuries. In order to translate these into equivalent MAIS levels, a KABCO/MAIS injury matrix was established. In order to reflect the fact that within each KABCO level, incident response rates were likely to be more heavily weighted toward the more serious crashes, the initial incidence matrix was modified by applying the relative Fire Department response rates across MAIS severities as a model proxy. For each MAIS category, relative weights were then computed across the 5 KABCO categories, and these weights were applied to the corresponding average incident management response rates and then summed to calculate an average response rate by MAIS severity level. These rates were assumed to represent police-reported cases. As with Fire response, they were further modified using the relative unreported/reported police response rate from the MDAC survey to estimate incident management response rates for unreported cases. Table 3-15 summarizes the inputs and results of this process for each EMS component.

The results of this analysis for congestion, property damage, and emergency services are presented in Tables 3-16for police-reported crashes and 3-17 for unreported crashes, together with the other cost components that did not vary by reporting status. The differences seem negligible at the more severe injury levels due to the overwhelming costs of factors such as lost productivity and medical care that do not vary by reporting status, except through the shift in injury profiles. However, at lower severity levels the unit costs are significant. For PDO vehicles and MAIS0s, police-reported crashes have costs that are three times those of unreported crashes. For minor (MAIS1) injuries, reported crashes cost 79 percent more than unreported crashes. These ratios decline as injury severity increases to only 17 percent for MAIS2 injuries and 7 percent for MAIS3 injuries. Note that for MAIS4s, MAIS5s, and Fatalities, property damage costs are identical under both reported and unreported cases. All injuries at these levels are

---

[8] This consisted of calculating a simple normalizing factor by comparing the results of the main analysis to the sum of the separately calculated reported and unreported analyses. This factor was then applied back to the unit costs. This process maintains the relative differences found in the MDAC analysis, while remaining consistent with the original unit costs and incidence totals, which were derived from a more robust data set.

believed to be reported to police, and the original property damage cost estimate is thus assumed to represent police-reported cases. These same costs are thus listed under both scenarios.

*Table 3-14. Per-Vehicle Property Damage in MDAC Survey*

| Statistic | All Crashes | | |
|---|---|---|---|
| | All | Reported | Unreported |
| Number | 1847 | 1256 | 591 |
| Mean | $4,476 | $5,607 | $1,907 |
| Median | $1,698 | $2,000 | $762 |
| SE of Mean | $846 | $1,200 | $408 |
| 95% LCL of Mean | $2,816 | $3,251 | $1,107 |
| 95% UCL of Mean | $6,136 | $7,962 | $2,708 |
| Minimum | $0 | $0 | $0 |
| 25th Percentile | $576 | $884 | $241 |
| 75th Percentile | $3,685 | $4,265 | $1,755 |
| Maximum | $310,000 | $310,000 | $300,000 |
| Mean Ratio to All | 1.000 | 1.253 | 0.426 |

*Table 3-15. Summary of Police-Reported and Unreported Emergency Services Unit Costs*

| | Response Rates | | | | Unit Costs | |
|---|---|---|---|---|---|---|
| | Reported Crashes | Unreported Crashes | Average Unit Cost | Percent Unreported | Reported Crashes | Unreported Crashes |
| **Police Response** | | | | | | |
| Fatal | 100.00% | 100.00% | $247.00 | 0.00% | $247.00 | $247.00 |
| MAIS0 | 100.00% | 17.16% | $12.00 | 53.14% | $21.44 | $3.68 |
| MAIS1 | 100.00% | 29.17% | $79.00 | 25.45% | $96.37 | $28.11 |
| MAIS2 | 100.00% | 37.84% | $99.00 | 19.95% | $113.01 | $42.76 |
| MAIS3 | 100.00% | 100.00% | $108.00 | 4.31% | $108.00 | $108.00 |
| MAIS4 | 100.00% | 100.00% | $118.00 | 0.00% | $118.00 | $118.00 |
| MAIS5 | 100.00% | 100.00% | $126.00 | 0.00% | $126.00 | $126.00 |
| PDO | 100.00% | 11.54% | $17.00 | 59.72% | $36.04 | $4.16 |
| **Fire Department Response** | | | | | | |
| Fatal | 95.00% | 95.00% | $543.00 | 0.00% | $543.00 | $543.00 |
| MAIS0 | 1.00% | 0.17% | $7.00 | 53.14% | $12.50 | $2.15 |
| MAIS1 | 1.00% | 0.29% | $9.00 | 25.45% | $10.98 | $3.20 |
| MAIS2 | 15.00% | 5.68% | $95.00 | 19.95% | $108.45 | $41.04 |
| MAIS3 | 35.00% | 35.00% | $227.00 | 4.31% | $227.00 | $227.00 |
| MAIS4 | 90.00% | 90.00% | $639.00 | 0.00% | $639.00 | $639.00 |
| MAIS5 | 95.00% | 95.00% | $651.00 | 0.00% | $651.00 | $651.00 |
| PDO | 1.00% | 0.12% | $9.00 | 59.72% | $19.08 | $2.20 |

|  | Response Rates | | Average Unit Cost | Percent Unreported | Unit Costs | |
|---|---|---|---|---|---|---|
|  | Reported Crashes | Unreported Crashes |  |  | Reported Crashes | Unreported Crashes |
| Incident Management Response | | | | | | |
| Fatal | 22.45% | 22.45% | $112.00 | 0.00% | $112.00 | $112.00 |
| MAIS0 | 5.80% | 1.00% | $2.00 | 53.14% | $3.57 | $0.61 |
| MAIS1 | 5.65% | 1.65% | $1.00 | 25.45% | $1.22 | $0.36 |
| MAIS2 | 9.78% | 3.70% | $0.00 | 19.95% | $0.00 | $0.00 |
| MAIS3 | 15.67% | 15.67% | $81.00 | 4.31% | $81.00 | $81.00 |
| MAIS4 | 17.85% | 17.85% | $81.00 | 0.00% | $81.00 | $81.00 |
| MAIS5 | 20.49% | 20.49% | $78.00 | 0.00% | $78.00 | $78.00 |
| PDO | 5.80% | 0.67% | $2.00 | 59.72% | $4.24 | $0.49 |
| Total Emergency Services | | | | | | |
| Fatal | | | $902.00 | 0.00% | $902.00 | $902.00 |
| MAIS0 | | | $21.00 | 53.14% | $37.51 | $6.44 |
| MAIS1 | | | $89.00 | 25.45% | $108.57 | $31.67 |
| MAIS2 | | | $194.00 | 19.95% | $221.46 | $83.80 |
| MAIS3 | | | $416.00 | 4.31% | $416.00 | $416.00 |
| MAIS4 | | | $838.00 | 0.00% | $838.00 | $838.00 |
| MAIS5 | | | $855.00 | 0.00% | $855.00 | $855.00 |
| PDO | | | $28.00 | 59.72% | $59.36 | $6.85 |

*Table 3-16. Summary of Unit Costs, Police-Reported Crashes, 3% Discount Rate (2019 $)*

|  | PDO | MAIS0 | MAIS1 | MAIS2 | MAIS3 | MAIS4 | MAIS5 | Fatal |
|---|---|---|---|---|---|---|---|---|
| Medical | $0 | $0 | $2,210 | $13,269 | $69,345 | $188,626 | $363,229 | $17,289 |
| EMS | $72 | $40 | $139 | $274 | $486 | $976 | $999 | $1,060 |
| Market | $0 | $0 | $2,315 | $23,096 | $92,716 | $229,903 | $306,236 | $1,010,970 |
| Household | $71 | $55 | $848 | $8,990 | $39,001 | $116,482 | $127,886 | $367,148 |
| Insurance | $523 | $225 | $2,212 | $8,220 | $28,698 | $36,485 | $38,081 | $36,245 |
| Workplace | $99 | $76 | $56 | $418 | $3,240 | $7,077 | $7,794 | $13,589 |
| Legal Costs | $0 | $0 | $740 | $6,243 | $27,714 | $73,799 | $110,012 | $138,025 |
| Subtotal | $765 | $396 | $8,520 | $60,510 | $261,200 | $653,348 | $954,237 | $1,584,326 |
| Congestion | $2,591 | $1,739 | $1,713 | $1,758 | $1,790 | $1,814 | $1,857 | $7,133 |
| Prop. Damage | $4,556 | $2,654 | $13,741 | $13,692 | $25,395 | $20,565 | $23,234 | $15,185 |
| Subtotal | $7,147 | $4,393 | $15,454 | $15,450 | $27,185 | $22,379 | $25,091 | $22,318 |
| Total | $7,913 | $4,789 | $23,974 | $75,961 | $288,385 | $675,727 | $979,328 | $1,606,644 |

Note: Unit costs are expressed on a per-person basis for all injury levels. PDO costs are expressed on a per-damaged-vehicle basis.

*Table 3-17. Summary of Unit Costs, Unreported Crashes, 3% Discount Rate (2019 $)*

|  | PDO | MAIS0 | MAIS1 | MAIS2 | MAIS3 | MAIS4 | MAIS5 | Fatal |
|---|---|---|---|---|---|---|---|---|
| Medical | $0 | $0 | $2,210 | $13,269 | $69,345 | $188,626 | $363,229 | $17,289 |
| EMS | $8 | $7 | $41 | $104 | $486 | $976 | $999 | $1,060 |
| Market | $0 | $0 | $2,315 | $23,096 | $92,716 | $229,903 | $306,236 | $1,010,970 |
| Household | $71 | $55 | $848 | $8,990 | $39,001 | $116,482 | $127,886 | $367,148 |
| Insurance | $523 | $225 | $2,212 | $8,220 | $28,698 | $36,485 | $38,081 | $36,245 |
| Workplace | $99 | $76 | $56 | $418 | $3,240 | $7,077 | $7,794 | $13,589 |
| Legal Costs | $0 | $0 | $740 | $6,243 | $27,714 | $73,799 | $110,012 | $138,025 |
| Subtotal | $701 | $363 | $8,422 | $60,340 | $261,200 | $653,348 | $954,237 | $1,584,326 |
| Congestion | $473 | $220 | $220 | $220 | $220 | $220 | $220 | $571 |
| Prop. Damage | $1,550 | $903 | $4,674 | $4,657 | $8,638 | $20,565 | $23,234 | $15,185 |
| Subtotal | $2,023 | $1,123 | $4,894 | $4,877 | $8,858 | $20,785 | $23,454 | $15,756 |
| Total | $2,724 | $1,486 | $13,315 | $65,217 | $270,058 | $674,133 | $977,691 | $1,600,082 |

Note: Unit costs are expressed on a per-person basis for all injury levels. PDO costs are expressed on a per-damaged-vehicle basis.

## 4.  Congestion Impacts

Motor vehicle crashes result in significant time delays to other motorists who are inconvenienced by lane closures, police, fire, or emergency services activity, detours, and general traffic slowdowns resulting from rubbernecking and chain reaction braking. This results in a significant time penalty for those affected, which can be valued based on wage rates and the value people place on their free time. It also results in wasted fuel, increased greenhouse gas production, and increased pollution as engines idle while drivers are caught in traffic jams and slowdowns. These impacts affect drivers' transportation costs and negatively impact the health and economic welfare of the Nation.

Assessing congestion costs is difficult because virtually every crash occurs under unique circumstances. Differences in crash severity, vehicle involvement, roadway type, time of day, traffic density, emergency services response time, weather, hazardous material spillage, lane configurations, driver behavior, and other variables can influence the extent of congestion and the resulting societal impacts. While there are a number of studies that document the impact of crashes on roadway congestion, most focus very narrowly on impacts for a specific roadway, and in most cases, these roadways are urban interstates.

A few studies have attempted to project congestion impacts from crashes at a higher level. Chin et al. (2004), used traffic engineering modeling methods to derive estimates of delay impacts. Nationally for freeways and principal arterials. Zaloshnja et al. (2000) used relative traffic density data to scale results from a study of urban interstates in Minneapolis- St.Paul to estimate the delay hours for police-reported crashes involving trucks and buses with a gross vehicle weight rating over 10,000 pounds across six different urban and rural roadway categories.

The Federal Motor Carrier Safety Administration (FMCSA) contracted the U.S. DOT/Volpe Center to produce a simulation-based estimate of the per-crash impacts of congestion from commercial vehicle crashes (Hagemann et al., 2013). This study involved traffic simulation measurements using TSIS-CORSIM, a micro-simulation tool developed by the University of Florida McTrans Center. TSIS-CORSIM simulates traffic responses to specific roadway and crash scenarios and produces estimates of aggregate vehicle delay hours and added fuel consumption. The authors of the study then linked the TSIS-CORSIM results to the Environmental Protection Agency's Motor Vehicle Emission Simulator (MOVES) model to produce estimates of greenhouse gas and criteria pollutant emissions. The estimation process involved Monte Carlo simulations 77 different crash scenarios in order to capture the variety of possible outcomes across numerous sets of crash circumstances. These results were then weighted based on nationwide crash incidence, producing average impacts for crashes on 5 different categories of roadways varying by three different crash severities (fatal crashes, injury crashes, property-damage-only crashes). While any simulation process is subject to uncertainty, the FMCSA study is arguably the most sophisticated attempt thus far to estimate nationwide congestion costs from crashes. However, the FMCSA study's focus on commercial vehicle crashes limited its applicability to the larger crash problem, which involves all motor vehicle crashes.

Commercial vehicle crashes make up only about 5 percent of all police-reported crashes nationwide. More importantly, they typically have more serious congestion consequences than other crashes. This results from several factors, most notably, that they are more likely to involve lane closings, that they take longer to clear from the roadway (especially in the case of

hazardous waste or cargo spillage), and that they are more likely to occur during normal weekday hours, when traffic density is highest, and less likely to occur on weekends and at night when traffic density is lighter.

For the previous societal cost of crashes report (Blincoe et al., 2015) NHTSA normalized the FMCSA model to reflect all motor vehicle crashes. The approach taken in that study involved a synthesis of past approaches. It used empirical data derived from both current data sources and previous literature to develop a basic congestion model. This model estimated the congestion impacts from lane closings, rubbernecking, and subsequent traffic dispersal across the same roadway categories examined in the FMCSA study. The model was run once with data and assumptions appropriate for the universe of all crashes, and then again with data appropriate for commercial vehicle crashes. The results of these two sets of outputs were then used to compute normalizing factors that were applied to the FMCSA results for commercial vehicle crashes, to derive an estimate that is more representative of the overall universe of traffic crashes. This linkage to the FMCSA report was motivated by the ability of its simulation methods to capture several aspects that are not easily estimated using more conventional approaches. These include the impact of detours, and more importantly, the ability to capture non-linear impacts that cause disproportionate congestion under extreme circumstances that cannot be reflected using average input values.

For this 2019 report we adopt the per-crash unit impact estimates that were derived in the 2015 report on the 2010 costs (Blincoe et al., 2015). Unit values in that report were stratified according to motor vehicle crash severity, i.e., fatal crashes, injury crashes, and PDO crashes, and were specific to 5 different roadway types including urban interstate expressways, urban arterials urban other, rural interstate/principle arterials, and rural other. These were essentially measures of lost time, added fuel, increased greenhouse gases, and increases in criteria pollutants associate with an average fatal, injury, or property damage crash within each roadway type. These were measured in terms of lost manhours, gallons of fuel, and short tons of tailpipe vehicle and upstream pollutants. We believe it is reasonable to assume that per-crash unit impacts will not have shifted significantly over the past 9 years (DeSilver, 2021).[9] We apply these unit impacts to 2019 incidence data by crash type, and we update the unit costs of lost time, fuel, and pollutants to be consistent with more current and relevant values.

## Added Criteria Pollutant Costs

We updated the unit cost values of criteria pollutants to be consistent with the data sources adopted by NHTSA for use in its Preliminary Regulatory Impact Analysis (PRIA) supporting the Notice of Proposed Rulemaking for model year 2021-2026 light duty CAFE standards, with some modifications. For tailpipe emissions, these values were derived from a study by Wolfe et al. (2019), which in turn was based on separate studies by Krewski et al. (2009) and Lepeule et al. (2012). Krewski and Lepeule's groups advocated significantly different values for criteria

---

[9] We note that the increased prevalence of electric vehicles will, over time, modify these results. Currently, a combination of all-electric and hybrid electric vehicles make up only about 2 percent of new U.S. vehicle sales and only a tiny portion of the on-road fleet currently consists of such vehicles (DeSilver, 2021).

pollutants based on different findings regarding mortality from emissions concentrations. In the NPRM, NHTSA used a simple average of the two studies to measure societal impacts in its CAFE PRIA. However, prior to the final rule, EPA recommended reliance solely on the Krewski study, which is the more conservative estimate. For this study, we adopt the Krewski study with minor adjustments Starting with unrounded unit values from Krewski, we adjust these values, which were derived in 2015 economics, to 2019 dollars using the GDP deflator. The Wolf et al. paper reflects values from Krewski that are expected for calendar year 2025. To estimate values for CY 2019, we used a 2018 EPA Technical Support Document that estimated the value of NOx, Sox, and PM2.5 for 2016, 2020, 2025, and 2030 (U.S. EPA, 2018). Using these data, we interpolated intervening years and calculated an adjustment factor to convert the 2025 values into 2019 values. We then rounded the resulting values to remove any suggestion of over-precision. The results of this process are summarized in Table 4-1 below.

For upstream emissions, we adopted the refinery values included in the 2018 EPA technical support document (U.S. EPA, 2018). In that document the authors provided values for CY 2016, 2020, 2025, and 2030 from both Krewski et al. (2009) and Lepeule et al. (2012). As with tailpipe emissions, we adopted the Krewski values and interpolated intervening years to estimate the values for 2019. We then adjusted the TSD values from 2015 dollars to 2019 dollars using the GDP deflator, and rounded the results to avoid the unwarranted appearance of precision.

## Added Greenhouse Gas Costs

As with criteria pollutants, we adopt greenhouse gas values consistent with those used in NHTSA's MY 2021-2026 light vehicle CAFE PRIA. The value used consistent with the 3 percent discount rate used in this study was $50 in 2018 dollars. We adjust this value to 2019 dollars using the GDP deflator. We then adjust it to convert from metric tons to short tons to be consistent with the measurements that were used in the TSIS-CORSIM model developed by FHWA (Hagemann, 2013), which provided the basis for unit calculations. The results are shown in Table 4-1 below, which summarizes unit costs for all tailpipe and upstream emissions analyzed for this analysis.

*Table 4-1. Criteria Pollutant and GHG 2019 Values/Short Ton*

|                        | NOx    | SOx      | PM2.5     | CO2   |
|------------------------|--------|----------|-----------|-------|
| **Tailpipe Emissions** |        |          |           |       |
| Light Vehicles         | $7,000 | $120,000 | $700,000  | $46   |
| Heavy Vehicles         | $6,000 | $190,000 | $460,000  | $46   |
| All Vehicles           | $7,000 | $130,000 | $600,000  | $46   |
|                        |        |          |           |       |
| **Upstream Emissions** | $8,000 | $80,000  | $380,000  | $46   |

## Added Fuel Consumption Costs

The unit cost per-crash estimates that were derived in the 2010 report are expressed in gallons of fuel consumed per crash. These gallons are valued using the average price per gallon of gasoline, minus Federal and State taxes, which are transfer payments from one segment of society to another, and are thus not counted as a societal cost. Based on data from the U.S.

Energy Information Administration (2022), the average cost per gallon of gasoline excluding taxes in 2019 was $2.245. We apply this value to the total number of gallons consumed due to congestion in traffic crashes to estimate the value of added fuel consumption in these crashes. This is a function of the total number of crashes and the fuel used/crash by roadway type.

## Value of Travel Time

The added time spent by vehicle occupants stuck in or detouring around traffic at a crash site is an opportunity cost that represents a real cost to society. While the ability to travel is a valued asset that improves quality-of-life, consumers generally seek to minimize the time spent travelling because it reduces their opportunities to engage in more lucrative or enjoyable pursuits. Time spent travelling could instead be dedicated to production, which would yield monetary benefits to the travelers, their employers, or both. Alternately, it could be spent in recreation or other activities that the traveler would preferably choose to engage in. Finally, the conditions associated with traffic congestion and delay can cause frustration and tension that in themselves have a negative impact on vehicle occupants.

The U.S.DOT (2016) has issued general guidance regarding valuing travel time. This guidance lays out guidelines for valuing travel time under various surface modes, and for both business and personal travel. Generally, business travel is valued using wage rates while personal travel is valued using a variable percentage of wage rates, depending on mode and on whether travel is local or intercity. Based on this guidance and updated wage data from the BLS, FMCSA derived average values of travel time by roadway type for their commercial vehicle study. These values were weighted according to the prevalence of vehicle types on the roadway as well as average occupancy and are thus applicable for this study as well. These results were presented in 2010 values in the previous 2010 cost report. We used Average Hourly earnings data from BLS to express 2019 values for each roadway and injury severity category (Bureau of Labor Statistics, 2022). The results are shown in Table 4-2.

*Table 4-2. Value of Travel Time/Crash, All Crash Types (2019 $)*

| | Urban Interstate/ Expressways | Urban Arterials | Urban Other | Interstate/ Principal Rural Arterials | Rural Other | Average All Roadway Types |
|---|---|---|---|---|---|---|
| VOT/ Vehicle Hour | $30.25 | $29.79 | $29.76 | $32.46 | $30.88 | $24.34 |
| **Fatal Crashes** | | | | | | |
| Vehicle Hours/ Crash | 4032.45 | 290.13 | 43.19 | 250.73 | 16.81 | 527.01 |
| Total Cost/ Crash | $121,998 | $8,644 | $1,285 | $8,139 | $519 | $16,018 |
| **Injury Crashes** | | | | | | |
| Vehicle Hours/ Crash | 851.85 | 64.48 | 18.94 | 46.41 | 4.32 | 140.45 |

| | Urban Interstate/ Expressways | Urban Arterials | Urban Other | Interstate/ Principal Rural Arterials | Rural Other | Average All Roadway Types |
|---|---|---|---|---|---|---|
| Total Cost/Crash | $25,772 | $1,921 | $564 | $1,507 | $134 | $4,248 |
| **PDO Crashes** | | | | | | |
| Vehicle Hours/ Crash | 724.71 | 39.05 | 11.38 | 47.13 | 3.57 | 138.77 |
| Total Cost/Crash | $21,925 | $1,163 | $339 | $1,530 | $110 | $4,207 |

## Congestion Cost Summary

Table 4-3 summarizes the various costs that are estimated to result from congestion caused by police-reported motor vehicle crashes. Total costs range from $17,642 for fatal crashes to $4,587 for PDO crashes. The largest loss results from the opportunity cost of delay for vehicle occupants, but there are also significant impacts due to wasted fuel and greenhouse gases and criteria pollutants.

*Table 4-3. Summary of Congestion Costs/Crash Due to Time Delay, Excess Fuel Burned, and Pollution Police-Reported Crashes (2019 $)*

| | | Urban Interstate/ Expressways | Urban Arterial | Urban Other | Interstate/ Principal Rural Arterials | Rural Other | Average All Roadway Types |
|---|---|---|---|---|---|---|---|
| **Fatal Crashes** | CO2 | $1,193 | $308 | $24 | $179 | $22 | $230 |
| | CO | $0 | $0 | $0 | $0 | $0 | $0 |
| | NOx | $298 | $76 | $6 | $89 | $9 | $67 |
| | PM10 | $0 | $0 | $0 | $0 | $0 | $0 |
| | PM2.5 | $2,031 | $298 | $20 | $408 | $40 | $360 |
| | SO2 | $223 | $57 | $4 | $32 | $4 | $43 |
| | VOC | $5 | $1 | $0 | $1 | $0 | $1 |
| | *Total Emissions* | *$3,750* | *$740* | *$54* | *$709* | *$76* | *$700* |
| | Excess Fuel Burned | $4,796 | $1,238 | $95 | $722 | $90 | $924 |
| | Value of Time | $121,998 | $8,644 | $1,285 | $8,139 | $519 | $16,018 |
| | *Total Congestion Costs* | *$130,543* | *$10,621* | *$1,434* | *$9,570* | *$684* | *$17,642* |
| **Injury Crashes** | CO2 | $252 | $68 | $10 | $33 | $6 | $63 |
| | CO | $0 | $0 | $0 | $0 | $0 | $0 |
| | NOx | $63 | $17 | $3 | $16 | $2 | $17 |
| | PM10 | $0 | $0 | $0 | $0 | $0 | $0 |
| | PM2.5 | $429 | $65 | $8 | $75 | $10 | $90 |

| | | Urban Interstate/ Expressways | Urban Arterial | Urban Other | Interstate/ Principal Rural Arterials | Rural Other | Average All Roadway Types |
|---|---|---|---|---|---|---|---|
| **Injury Crashes** | SO2 | $47 | $13 | $2 | $6 | $1 | $12 |
| | VOC | $1 | $0 | $0 | $0 | $0 | $0 |
| | *Total Emissions* | *$792* | *$163* | *$23* | *$131* | *$19* | *$182* |
| | Excess Fuel Burned | $1,013 | $275 | $42 | $133 | $23 | $255 |
| | Value of Time | $25,772 | $1,921 | $564 | $1,507 | $134 | $4,248 |
| | *Total Congestion Costs* | *$27,577* | *$2,358* | *$628* | *$1,771* | *$175* | *$4,686* |
| **PDO Crashes** | CO2 | $214 | $41 | $6 | $34 | $5 | $54 |
| | CO | $0 | $0 | $0 | $0 | $0 | $0 |
| | NOx | $53 | $10 | $2 | $17 | $2 | $15 |
| | PM10 | $0 | $0 | $0 | $0 | $0 | $0 |
| | PM2.5 | $364 | $41 | $5 | $76 | $8 | $85 |
| | SO2 | $40 | $8 | $1 | $6 | $1 | $10 |
| | VOC | $1 | $0 | $0 | $0 | $0 | $0 |
| | *Total Emissions* | *$673* | *$100* | *$14* | *$133* | *$16* | *$163* |
| | Excess Fuel Burned | $862 | $166 | $25 | $135 | $19 | $217 |
| | Value of Time | $21,925 | $1,163 | $339 | $1,530 | $110 | $4,207 |
| | *Total Congestion Costs* | *$23,460* | *$1,430* | *$378* | *$1,798* | *$145* | *$4,587* |

Congestion costs have been estimated separately for fatal, injury, and PDO crashes. However, this report is primarily stratified according to injury severity for all injury crashes. As discussed previously, within injury crashes there are 5 nonfatal categories. For any given crash, congestion costs are a function of crash circumstances rather than injury severity. This implies an equal distribution of congestion costs among all crash involved parties, regardless of whether they died, were injured or were uninjured. To distribute costs among crash involved people for fatal crashes, the average cost/crash for fatal crash was divided by the average number of involved people per fatal crash. These data were obtained by examining FARS data for 2017 to 2019. From these data, the KABCO injury profile was obtained and run through an MAIS translator to reveal the average MAIS profile among fatal crashes. By definition, all fatalities occur in fatal crashes, so the average congestion cost per fatality was taken directly from the analysis of FARS crashes. The same approach was also applied to injury crashes. However, nonfatal injuries occur in both fatal and nonfatal injury crashes. The two nonfatal injury profiles were therefore weighted together based on the relative incidence of each injury severity in fatal or injury crashes. Since fatal crashes are relatively rare, the nonfatal injury crash estimate was heavily weighted toward the costs from injury crashes. Table 4-4 lists the weights, injuries per crash, and resulting congestion costs per injury for each injury severity for both fatal and injury crashes.

*Table 4-4. Allocation of Congestion Costs Across Involved People in Fatal and Injury Crashes (2019 $)*

| MAIS | Fatal Crashes | | | Injury Crashes | | |
| | % of All Injuries | Injuries/Crash | Cost/Person | % of All Injuries | MAIS/Crash | Cost/Person |
|---|---|---|---|---|---|---|
| 0 | 0.0102 | 0.7279 | $7,133 | 0.9898 | 1.2152 | $1,684 |
| 1 | 0.0053 | 0.4135 | $7,133 | 0.9947 | 1.3252 | $1,684 |
| 2 | 0.0136 | 0.1287 | $7,133 | 0.9864 | 0.1608 | $1,684 |
| 3 | 0.0196 | 0.0795 | $7,133 | 0.9804 | 0.0684 | $1,684 |
| 4 | 0.0240 | 0.0143 | $7,133 | 0.9760 | 0.0100 | $1,684 |
| 5 | 0.0319 | 0.0071 | $7,133 | 0.9681 | 0.0037 | $1,684 |
| Killed | 1.0000 | 1.1022 | $7,133 | 0.0000 | 0.0000 | $1,684 |
| Total | 0.0151 | 2.4732 | $17,642 | 0.9849 | 2.7833 | $4,686 |

PDO crashes are expressed on a per damaged vehicle basis. Therefore, the unit cost for PDO crashes was divided by the average number of vehicles damaged in PDO crashes. Again, these data were derived from 20017-2019 CRSS records, which indicated an average of 1.77 vehicles/PDO crash. The results are summarized in Table 4-5. The nonfatal injury MAIS levels (MAIS0 to 5) are the weighted average of these costs from fatal and injury crashes noted in the previous table. Congestion costs for nonfatal injuries decline gradually as injury severity decreases because a larger portion of less severe injuries occur in injury crashes, resulting in more weight being given to the less costly injury crashes. Note that the PDO unit cost is higher than nonfatal injury costs, but they are not directly comparable because it is expressed on a per vehicle basis. If it were adjusted for vehicle occupants in PDOs (2.30 occupants per crash), it would decline to $2,019/person, still slightly more than all nonfatal injured/person costs. However, there are more people/crash in injury crashes 2.69 vs 2.30 for PDOs. Adjusting for this, injury crashes are more costly than PDO crashes.

*Table 4-5. Final Congestion Cost/Severity Unit (2019 $), Police-Reported Crashes*

| MAIS | Cost/Crash |
|---|---|
| MAIS0 | $1,739 |
| MAIS1 | $1,713 |
| MAIS2 | $1,758 |
| MAIS3 | $1,790 |
| MAIS4 | $1,814 |
| MAIS5 | $1,857 |
| Fatal | $7,133 |
| PDO | $2,591 |

Note: All injury costs are per person injured. PDO costs are per damaged vehicle.

## Unreported Crashes

Most crashes that involve either serious injury or significant roadway blockage are reported to police, by either the involved parties or passing motorists. Police reports are filed in those cases where police respond to the crash and the crash severity passes a certain threshold, usually a specific amount of property damage, which varies by State. However, because they typically do not involve police or emergency vehicle presence, unreported crashes, even of the same nominal severity category, are unlikely to cause the same congestion impacts as police-reported crashes. Unfortunately, we were unable to find any research that directly addresses the issue of congestion caused by unreported crashes. To estimate these impacts, we assume that unreported crashes would have only half the probability of a lane being blocked and would be present on the roadway (crash duration) for only half as long as a police-reported crash. In addition, we assume that the proportion of roadway blockage and probability of opposite direction rubbernecking is only half that of police-reported crashes.[10] These assumptions are based on the likelihood that any formal lane closing would require police presence and any significant informal lane closing (due to vehicle obstruction) would draw police attention and thus could become a reported crash. Nonetheless, unreported crashes would likely involve at least some level of temporary lane blockage and would cause rubbernecking until the vehicles are removed or driven away. An example might be a low-speed crash in which one vehicle rear-ends another at a stoplight. If the damage is minor, the two drivers may contact their insurance companies, exchange insurance information and then drive away, but during the period they were examining their vehicles for damage and exchanging information the vehicles would have blocked the lane they were in. Alternately, this same crash might draw police attention, but, if the damage is minor, police may not file a formal report, and it would thus be an unreported crash. We note that all fatal and serious injury crashes are reported to the police. Therefore, only the minor injury and PDO congestion estimates are relevant to this estimate. The impact of these assumptions is noted in Table 4-6. These assumptions imply that on average, unreported injury crashes result in congestion impacts that are roughly 13 percent of the impacts that occur in police-reported injury crashes, and unreported PDO crashes produce congestion impacts that are roughly 18 percent of the impacts that occur in police-reported PDO crashes.

---

[10] We acknowledge that the selection of "half" as a factor to reflect the nature off unreported crashes is somewhat arbitrary. However, lacking specific data, we are hesitant to select values that imply that unreported crashes would have impacts that are more nearly like those of police-reported crashes or closer to zero. We view half as the best way to minimize potential error. Directionally, we only know unreported crashes would cause some level of congestion but that it is less than reported crashes.

*Table 4-6. Summary of Congestion Costs/Crash Due to Time Delay, Excess Fuel Burned, and Pollution Unreported Crashes*

| | | Urban Interstates/ Expressways | Urban Arterials | Urban Other | Rural Interstate/ Principal Arterials | Rural Other | Average All Roadway Types |
|---|---|---|---|---|---|---|---|
| **Fatal Crashes** | CO2 | $98 | $22 | $1 | $14 | $2 | $18 |
| | CO | $0 | $0 | $0 | $0 | $0 | $0 |
| | NOx | $25 | $5 | $0 | $7 | $1 | $5 |
| | PM10 | $0 | $0 | $0 | $0 | $0 | $0 |
| | PM2.5 | $168 | $21 | $1 | $31 | $3 | $28 |
| | SO2 | $18 | $4 | $0 | $2 | $0 | $3 |
| | VOC | $0 | $0 | $0 | $0 | $0 | $0 |
| | *Total Emissions* | *$309* | *$53* | *$3* | *$53* | *$5* | *$55* |
| | Excess Fuel Burned | $396 | $89 | $5 | $54 | $6 | $72 |
| | Value of Time | $10,065 | $622 | $73 | $613 | $37 | $1,285 |
| | *Total Congestion Costs* | *$10,770* | *$764* | *$82* | *$721* | *$49* | *$1,412* |
| **Injury Crashes** | CO2 | $32 | $10 | $1 | $5 | $1 | $9 |
| | CO | $0 | $0 | $0 | $0 | $0 | $0 |
| | NOx | $8 | $2 | $0 | $2 | $0 | $2 |
| | PM10 | $0 | $0 | $0 | $0 | $0 | $0 |
| | PM2.5 | $54 | $9 | $1 | $11 | $1 | $12 |
| | SO2 | $6 | $2 | $0 | $1 | $0 | $2 |
| | VOC | $0 | $0 | $0 | $0 | $0 | $0 |
| | *Total Emissions* | *$100* | *$24* | *$3* | *$19* | *$3* | *$25* |
| | Excess Fuel Burned | $127 | $40 | $6 | $19 | $3 | $35 |
| | Value of Time | $3,240 | $281 | $75 | $217 | $20 | $553 |
| | *Total Congestion Costs* | *$3,467* | *$345* | *$84* | *$255* | *$26* | *$612* |
| **PDO Crashes** | CO2 | $39 | $7 | $1 | $7 | $1 | $10 |
| | CO | $0 | $0 | $0 | $0 | $0 | $0 |
| | NOx | $10 | $2 | $0 | $3 | $0 | $3 |
| | PM10 | $0 | $0 | $0 | $0 | $0 | $0 |
| | PM2.5 | $66 | $7 | $1 | $16 | $2 | $16 |
| | SO2 | $7 | $1 | $0 | $1 | $0 | $2 |
| | VOC | $0 | $0 | $0 | $0 | $0 | $0 |
| | *Total Emissions* | *$123* | *$18* | *$2* | *$27* | *$3* | *$30* |
| | Excess Fuel Burned | $157 | $29 | $4 | $28 | $4 | $40 |
| | Value of Time | $3,996 | $203 | $59 | $312 | $20 | $768 |
| | *Total Congestion Costs* | *$4,276* | *$250* | *$66* | *$366* | *$27* | *$838* |

The final MAIS distribution for unreported crashes, which is summarized in Table 4-7, is based on the average person involvement rates from police-reported crashes. As discussed, it is possible that unreported crashes have lower person involvement rates than reported crashes, since the presence of more than one driver is likely to increase the chances of the crash being reported. We do not have data on involvement rates for unreported crashes, but it is likely that basing these unit costs on police-reported rates produces a conservative estimate of these costs for unreported crashes. Note that there is no need to average congestion costs from both fatal and nonfatal crashes when allocating nonfatal injury costs because all fatal crashes are reported to police. Although costs are shown for each injury category, virtually all unreported crashes involve either minor injury or property damage only.

*Table 4-7. Final Congestion Cost/Severity Unit (2019 $), Unreported Crashes*

|       | Cost/Crash | MAIS/Crash | Cost/MAIS |
|-------|-----------|-----------|-----------|
| MAIS0 | $612      | 2.78      | $220      |
| MAIS1 | $612      | 2.78      | $220      |
| MAIS2 | $612      | 2.78      | $220      |
| MAIS3 | $612      | 2.78      | $220      |
| MAIS4 | $612      | 2.78      | $220      |
| MAIS5 | $612      | 2.78      | $220      |
| Fatal | $1,412    | 2.47      | $571      |
| PDO   | $838      | 1.77      | $473      |

## Average and Total Congestion Costs, Reported and Unreported Crashes

The average cost/crash across both police-reported and unreported crashes was calculated by weighting each category's costs according to the relative incidence within each severity category. For all injury categories this was based on the incidence of injured people. For PDOs, it is based on the incidence of damaged vehicles. These definitions are consistent with the stratification used throughout this report. Incidence was derived from the incidence chapter of this report. Table 4-8 summarizes this process and its results. Table 4-9 summarizes the total costs of congestion. In 2019, motor vehicle crashes are estimated to have caused $36 billion in travel delay, excess fuel consumption, and health and other economic impacts from added criteria pollutants and greenhouse gases.

*Table 4-8. Average Congestion Costs for All Crashes, 2019*

| MAIS | Incidence | | | Unit Costs (2019 $) | | | |
|---|---|---|---|---|---|---|---|
| | Police-Reported | Unreported | Total | % Police-Reported | Police-Reported | Unreported | Combined |
| 0 | 2,349,202 | 2,176,700 | 4,525,902 | 0.519057 | $1,739 | $220 | $1,008 |
| 1 | 2,561,954 | 1,313,311 | 3,875,265 | 0.661104 | $1,713 | $220 | $1,207 |
| 2 | 310,848 | 116,271 | 427,119 | 0.727778 | $1,758 | $220 | $1,339 |
| 3 | 132,222 | 8,945 | 141,167 | 0.936635 | $1,790 | $220 | $1,691 |
| 4 | 19,285 | 0 | 19,285 | 1 | $1,814 | $220 | $1,814 |
| 5 | 7,187 | 0 | 7,187 | 1 | $1,857 | $220 | $1,857 |
| Fatal | 36,500 | 0 | 36,500 | 1 | $7,133 | $571 | $7,133 |
| PDO | 7,773,120 | 11,515,019 | 19,288,139 | 0.403 | $2,591 | $473 | $1,327 |

*Table 4-9. Total Congestion Costs, 2019*

| MAIS | Police-Reported | Unreported | Combined |
|---|---|---|---|
| 0 | $4,085,988,218 | $478,959,072 | $4,564,947,290 |
| 1 | $4,389,407,738 | $288,979,781 | $4,678,387,518 |
| 2 | $546,568,109 | $25,584,091 | $572,152,199 |
| 3 | $236,720,194 | $1,968,171 | $238,688,365 |
| 4 | $34,988,555 | $0 | $34,988,555 |
| 5 | $13,349,262 | $0 | $13,349,262 |
| Fatal | $260,400,806 | $0 | $260,400,806 |
| PDO | $20,143,735,965 | $5,447,572,678 | $25,591,308,642 |
| Total | $29,711,158,846 | $6,243,063,791 | $35,954,222,637 |

## 5.  Lost Quality-of-Life

The human capital costs documented in the first chapter represent the tangible losses that result from motor vehicle crashes. They define the value of resources that are used or that would be required to restore crash victims, to the extent possible, to their pre-crash physical and financial status. These are resources have been diverted from other more productive uses to merely maintain the status quo. These costs, which can be estimated through empirical measurements, include medical care, lost productivity, legal and court costs, insurance administrative costs, workplace costs, congestion impacts (travel delay, excess fuel consumption and pollution), and property damage.

However, in cases of serious injury or death, medical care cannot fully restore victims to their pre-crash status and human capital costs fail to capture the intangible value of lost quality-of-life that results from these injuries. In the case of death, victims are deprived of their entire remaining lifespan. In the case of serious injury, the impact on the lives of crash victims can involve acute or extended physical pain or lifelong impairment, which can interfere with or prevent even the most basic living functions. These more intangible effects can be valued using studies that examine the willingness of consumers to pay to avoid risk of death or injury. Assessing the value of these impacts provides a more complete basis for quantifying the harmful impacts of motor vehicle crashes on society.

### Value of a Statistical Life

The value of a statistical life (VSL) is a measure of consumer's implied willingness to pay to avoid the risk of death. A wide range of estimates of the value of VSL have been derived from numerous studies conducted over the past three decades. These "willingness to pay" studies (WTP) are most frequently based on wage rate differentials for risky jobs, or on studies of the prices consumers pay for products that reduce their risk of being fatally injured. The individual studies are too numerous to document here, but a number of authors have attempted to evaluate these studies as a group through systematic reviews or meta-analysis, which applies normalizing parameters and statistical weighting techniques to draw conclusions from related studies.

In 1990 Miller conducted a systematic review of 67 of these studies. In this study, Miller selected 47 studies that were the most methodologically sound, adjusted them to a common discount rate, and made adjustments for errors in perceived risk levels. The VSLs found in these 47 studies had both a mean and median value of $2.2 million in 1988 dollars with a standard deviation of $0.65 million. In 2000 Miller published another meta-analysis examining VSL estimates across differing countries. In this study he examined 68 studies, including the original 47 he had examined in 1990. Based on this study, Miller estimated the VSL in the United States to be $3.67 million in 1995 dollars.

Viscusi has also published a number of WTP reviews. In 1993 Viscusi found that most VSL estimates are clustered in the $3 million to $7 million range. In 2003 Viscusi and Aldy published a worldwide review of VSL studies and estimated a median value of $7 million in 2000 dollars. In 2004 Viscusi published his own estimate of WTP based on wage-risk premiums resulting in a $5 million VSL (using 2000 dollars). Other reviews include those by Mrozek and Taylor (2002), who found VSL estimates ranging from $1.5 million to $2.5 million in 1998 dollars, and a 2003 meta-analysis by Kochi et al. (2006), which produced a mean VSL estimate of $5.4 million in 2000 dollars.

It is apparent that there are a wide range of estimates regarding the implied VSL from WTP studies. This range is reflected in guidance supplied by the Office of Management and Budget in Circular A-4, issued on September 17, 2003, which recommended values between $1 million and $10 million be used by government agencies when evaluating the impacts of proposed regulations that affect fatality risk. In recent years, government agencies such as NHTSA, the FDA, EPA, the Consumer Product Safety Commission, the Department of Agriculture, and the Occupational Safety and Health Administration have used values ranging from $5 to $10 million in evaluating their regulations.

In February 2008, based on a review of the studies cited above, the Office of the Secretary of the Department of Transportation issued guidance setting a VSL of $5.8 million for use in Departmental regulatory programs (U.S. DOT, 2008). This value was subsequently updated for inflation twice, most recently in July 2011 to a value of $6.2 million (U.S. DOT, 2011).

In March 2013 U.S. DOT again updated its VSL guidance to a value of $9.1 million in 2012 dollars (U.S. DOT, 2013). The 2013 update was based exclusively on studies that used the Census of Fatal Occupational Injuries, a complete census of occupational fatalities conducted by the BLS (see Bureau of Labor Statistics, 2020, for an updated version of the earlier censuses). For a variety of reasons outlined in that guidance, U.S. DOT considered studies based on these data to be superior to those that used other sources.

Subsequent U.S. DOT VSL guidance updates based on the literature and methods established in the 2013 guidance memorandum, with the values being updated to reflect changes in income and prices (U.S. DOT, 2021a). This guidance found a 2021 value of $11.8 million. The corresponding values for other base years are shown in Table 5-1 below.

*Table 5-1. Current and Prior Year VSL*

| Value (million $) | Base Year |
|---|---|
| 11.8 | 2021 |
| 11.6 | 2020 |
| 10.9 | 2019 |
| 10.5 | 2018 |
| 10.2 | 2017 |
| 9.9 | 2016 |
| 9.6 | 2015 |
| 9.4 | 2014 |
| 9.2 | 2013 |
| 9.1 | 2012 |

This study adopts this current guidance for assessing the monetary value of fatalities caused by motor vehicle crashes. Since this study examines 2019 in detail, we adopt the 2019 VSL of $10.9 million for a fatality. This value will be used in this report. However, the literature on VSL estimates indicates a wide range of measured estimates of VSLs – some as low as a few million

dollars, some as high as over $30 million. The U.S. DOT guidance memorandum (U.S. DOT, 2008), discusses a feasible range of VSLs for sensitivity analysis from $5.2 million to $12.9 million. The 2021 guidance memorandum (U.S. DOT, 2021b) recommends sensitivity analysis examining VSLs that are 40 percent above and below the central VSL value. Appendix A of this report provides a sensitivity analysis consistent with this range.

## Lost Quality-of-Life for Nonfatal Injuries

While WTP studies can be used to value loss of life, nonfatal injuries, which are a far more prevalent occurrence in motor vehicle crashes, require a more complex examination to reflect the diversity of possible outcomes. When a life is lost prematurely in a motor vehicle crash, the victim loses all of his remaining life, and this can be quantified in terms of life years by comparing the victim's age at death to expected remaining lifespan. However, when the victim is injured but survives, the loss to the victim is a direct function of the extent to which the victim is disabled or made to suffer through physical pain or emotional distress, as well as the duration through which these impacts occur.

As noted previously, the metric commonly used to value these nonfatal injury losses is the quality adjusted life year or QALY, a health outcome measure that assigns a value of 1 to a year of perfect health and a value of 0 to death (Gold et al., 1996). QALY loss is determined by the duration and severity of the health problem, with a full year of QALY loss being equivalent to the loss of a full year of life in perfect health. QALYs are used in evaluating the outcomes of clinical trials of medical interventions, in approval of pharmaceuticals, and in studies of the return on investment in preventive health and safety measures (Miller, 2000). NHTSA routinely uses QALY based valuations to determine the relative value of nonfatal injuries when measuring the cost effectiveness of regulatory alternatives. The QALY valuations used by NHTSA were originally derived from work by Miller et al. (1995). These values were adopted for the report on the cost of crashes issued by NHTSA (Blincoe et al.) in 2002,and incorporated in subsequent regulatory evaluations conducted by NHTSA. Miller et al. (1995), based their QALY valuations on the Injury Impairment Index (III).

The III is based on physician estimates of impairment across six functional dimensions (cognitive, mobility, bending/grasping/lifting, sensory, pain, and cosmetic), originally developed for physician use by Hirsh et al. (1983), but subsequently enhanced to include permanent total and partial work-related disability by Miller et al. (1995). The physicians separately rated the average impairment for each injury diagnosis of AIS2 and above in the 1985 edition of the AIS. By diagnosis and broad age group, on each of the six dimensions functioning, their ratings showed the typical impairment level at hospital inpatient or ED discharge and its duration post-discharge. They then showed impairment changes by week/month in the first year post-injury, as well as the average impairment levels in years 2-5 and in years 6 to death on each of the six dimensions functioning. The III used the short-term work loss and permanent work-related disability data used in the productivity loss calculations described above.

The impairments were converted to QALY losses using weights from 0 percent to 100 percent on loss within dimension and on the relative contribution of the different dimensions to lifetime utility. Miller et al. (1995) derived those weights from a systematic review of the literature. When NHTSA conducted its last cost study (for 2010, published in 2015), it had been 15 years since the 1995 study. NHTSA was concerned that subsequent studies with better methods could have shifted the relative values of the functional losses within and between dimensions.

Therefore, NHTSA contracted with the Pacific Institute for Research and Evaluation to update the III injury preference weights based on a meta-analysis of literature. The resulting studies by Spicer and Miller (2010), and Spicer et al. (2011), provided the basis for the nonfatal injury QALY values used in the 2015 report. The report found slightly different QALY values for all injury levels, reflecting both the revised preference weights and the larger and more recent database examined.

Over the past decade, on projects for the Consumer Product Safety Commission (CPSC), PIRE further developed its III-based QALY estimates. It produced more detailed QALY estimates for hospital-admitted burns (Miller et al., 2013), for submersion and certain types of poisoning (Miller & Bhattacharya, 2013), and for electrical injuries, ED-treated burns, and methanol poisoning (Lawrence & Miller, 2020). The latter study also introduced a more precise mapping to ICD-9-CM from the 1980 revision of AIS, which was used by Hirsch et al. (1983). Lawrence and Miller (1988) provide a thorough, up-to-date description of the III-based QALY estimates that NHTSA has used heretofore.

However, the Hirsch impairment ratings at the heart of the III are now 40 years old. Therefore, PIRE investigated an alternative source of QALY estimates on a recent CDC project (2022). The Validating and Improving Injury Burden Estimates Study (VIBES) provides empirically derived disability ratings based on six relatively recent injury outcome studies in five countries with advanced healthcare systems, including the United States (Gabbe et al., 2016). At least two of the six studies that VIBES pooled included patients who were not hospital-admitted. Therefore, VIBES, which is based on recent patient data rather than the decades-old expert opinion of the III, and that differentiates between patient outcomes in ED and inpatient settings, can potentially serve as a basis for evaluating and updating the III estimates. The primary weakness of VIBES is its small sample sizes, particularly for ED-treated injuries, which allow for only limited differentiation by diagnosis and demographics.

While the VIBES estimates are broken into 97 ICD-10 diagnosis groups for inpatient injuries, they cover only 17 groups for non-admitted injuries, with roughly half of non-admitted injuries falling into just two diagnosis groups. PIRE concluded that the VIBES impairment estimates for non-admitted injuries would not meet the needs of this project because of the small sample size and lack of diagnosis detail, and therefore retained the III estimates as updated for CPSC for non-admitted cases. The VIBES inpatient estimates, although less problematic than the non-admitted estimates, are too coarse to support the breakdown by AIS, body part, and fracture involvement that is required to produce NHTSA's required estimates for crash injuries by AIS.

To solve that problem, PIRE used the VIBES estimates as control totals by diagnosis group for the III estimates. This preserved the detailed severity pattern of the III, while substituting the means of VIBES by diagnosis group. So, for example, if one III diagnosis within a VIBES diagnosis group has twice the impairment of a second, so will the imputed VIBES-III hybrid estimates.

Although the VIBES-III hybrid estimates are affected by the limitations each of their parent ratings, their complementary strengths weaken those limitations. VIBES is recent and is based on observed functional loss rather than physician judgement. The III adds the diagnostic detail that is lacking in the otherwise robust VIBES measurements. However, VIBES has data on too few non-admitted injuries to support construction of a hybrid non-admitted injury measure. In the future, it would be desirable to adapt the VIBES-III hybrid methodology to more recent hospital-

admitted injury incidence data coded in ICD10-CM. Doing so will require mapping the III to ICD10-CM, which will be challenging. VIBES already is coded by ICD10 diagnosis group.

To estimate QALY based values for use in this report, we selected motor vehicle traffic injuries from the 2013-2014 HCUP NIS (the most recent data coded in the ICD9-CM diagnosis coding system that has been mapped to the III). We merged on both sets of impairment fractions—III and VIBES—by diagnosis and computed QALYs both ways for each case. Then, for each VIBES diagnosis group, we computed the ratio of the mean VIBES-based QALY to the mean III-based QALY. Next, we merged this ratio back onto the NIS and multiplied it times the III-based QALY to compute the final hybrid QALY. In a few instances, this process produced QALYs that exceeded remaining life expectancy – implying fates worse than death. While we acknowledge that some individuals might value the avoidance of severe, enduring impairment and pain more highly than avoiding mortality risk, we did not believe that the mechanics of this methodology were sufficient to apply such judgment to these estimates. To avoid assigning values that exceed complete loss of life, we constrained the maximum QALY loss to equal life expectancy. We performed all of these computations using discount rates of 0 percent, 2 percent, 3 percent, 4 percent, and 7 percent. Table 5-2 shows the QALY loss by discount rate for crashes by MAIS level.

*Table 5-2. QALY Values for Injured Survivors by Discount Rate and MAIS (Percentage of QALY Lost per Fatality Lost per Person Injured)*

| Discount Rate | 0% | 2% | 3% | 4% | 7% |
|---|---|---|---|---|---|
| **Injury Severity** | | | | | |
| **MAIS1** | 0.35% | 0.40% | 0.43% | 0.49% | 0.54% |
| **MAIS2** | 3.86% | 4.09% | 4.17% | 4.34% | 4.51% |
| **MAIS3** | 16.79% | 18.16% | 18.28% | 18.58% | 18.72% |
| **MAIS4** | 22.78% | 30.32% | 30.44% | 30.44% | 30.71% |
| **MAIS5** | 54.99% | 53.28% | 52.52% | 51.60% | 50.10% |

To monetize these QALY values—i.e., convert them from years to dollars—we used costs per QALY based on a value of statistical life of $10.9 million in 2019 dollars.

QALY values for the most serious injuries (MAIS5) are thus roughly 52 percent of a full remaining life, while minor injuries (MAIS1) are valued at less than 1 percent of a full remaining life. QALYs rise progressively with the severity of the injury. This reflects both the severity and longevity of injury consequences at each severity level. For example, serious brain injury, spinal cord injury, and other injuries likely to involve long term debilitation are typically classified in the higher MAIS categories while less debilitating injuries with shorter recovery times tend to be classified in the lower MAIS categories. Note that the impact of discount rates on QALY values is relatively limited. Shifts in discount rates affect both the MAIS levels and the full life values, which minimizes the relative impact on QALYs.

Although the impact of discount rates on QALYs is minor, a single value must still be adopted for this analysis. Ideally, QALY values would reflect the discount rate implicit in consumer valuations used to measure the VSL, which these QALYs will be applied to. Estimates of this rate vary as widely as estimates for the VSL. Aldy and Viscusi (2007) cite a range of implicit

discount rates of from 1 to 17 percent across five different studies that examined VSLs or VSLYs.[11] Hartwick (2008) derived implicit discount rates of between 3 percent and 4 percent for people who die from ages 30 to 40 with a VSL of $6.3 million. Based on 2007-2009 FARS data, the median age of a person killed in a motor vehicle crash is 38. On this basis, either a 3-percent or a 4-percent discount rate appears to be appropriate, and the difference in QALYs between these two rates is extremely small. The U.S.DOT's VSL guidance provides scaling factors for value injuries from MAIS1 to MAIS5 based on QALYs estimated using a 4-percent discount rate as an intermediate value between the 3-percent and 7-percent rates recommended by OMB (2003) for use in regulatory analyses and evaluations (U.S. DOT, 2011b). Since this report is based on a 3-percent discount rate, we use the 3 percent values to retain consistency with the rest of the report. A separate table consistent with the U.S. DOT recommendation (i.e., with nonfatal injury QALYs based on a 4-percent discount rate), or with other discount rates can be derived using Table 5-2 above.

## Comprehensive Costs

The VSL and QALY measures discussed in the previous section represent an average valuation of the lost quality-of-life that would be lost to crash victims. However, it does not include the economic costs that result from an unexpected event such as death or injury resulting from a motor vehicle crash. Those costs, which include medical care, legal costs, emergency services, insurance administrative costs, workplace costs, congestion impacts, and property damage, were previously estimated in Chapters 3 and 4 of this study. The full societal impact of crashes includes both the intangible impacts represented by VSL and QALY estimates, and the economic impacts that result directly from the crash. Combining these impacts – the direct economic costs that result from the crash and the value of lost quality-of-life experienced by injured crash victims, results in a measure of the comprehensive cost to society from death or injury.

The economic cost estimates developed previously include lost market and household productivity. WTP based valuations life, which encompass the entire expected life experience of consumers, theoretically encompass after-tax wages (the portion of wages actually received by the employee) and household productivity. Since these measures are hypothetically already included under WTP valuations, combining measures of economic costs and lost quality-of-life requires an adjustment to avoid double counting these components. In Table 5-2 below, the components that make up comprehensive costs are listed in the left column. These consist of the various economic cost components with an additional line for QALYs. Because lost after- tax market and household productivity are separate line items that are implicitly included in QALYs, the QALY values are reduced by these values so that the separate components can be added to produce the total comprehensive cost for each injury severity level.[12]

Comprehensive costs have been used by NHTSA and other agencies to evaluate regulatory programs for several decades. They provide a convenient basis for measuring the full societal benefits of regulations against their costs, and they are the appropriate basis for valuing benefits

---

[11] VSLY is the value of a statistical life year – a single year of remaining statistical life rather than the full value of all remaining life years as measured by VSL.

[12] After-tax market productivity is inherent to VSLs because it determines the individual's valuation of their potential material consumption. Household productivity is inherent to VSLs because it is a routine activity that is part of life experience. Both aspects are potentially threatened by behaviors that increase risk, and are thus inherently already reflected in the VSL.

in a cost-benefit context where societal impacts are the overriding concern. However, in some circumstances, users may wish to measure only the tangible economic value of goods and services lost and out of pocket expenses incurred that result of motor vehicle crashes. Economic impacts are commonly considered by policymakers and public interest groups when safety issues are being debated. These more tangible economic costs are both more easily understood and more reliably measured than lost quality-of-life, which, as noted previously, is subject to a wide range of estimates and the uncertainty implicit in this range. This report provides estimates of impacts under both bases to facilitate either approach.

Table 5-2 summarizes the total unit cost of crashes stratified by injury level and cost category, and Figure 5-A illustrates the relative contribution of economic costs and quality-of-life to the total comprehensive cost for each injury severity level. The total comprehensive cost for a fatality is $11.3 million. Roughly 82 percent of this is due to components that influence the VSL (QALY and lost productivity), with roughly 75 percent coming from lost quality-of-life alone. The portion of total comprehensive costs represented by economic costs decreases as the severity of the injury increases. Economic costs represent 14 percent of fatal comprehensive costs, 14-19 percent of the more serious nonfatal injury costs, 32 percent of minor injury costs, and 100 percent of MAIS0 and PDO costs. This reflects the relatively small values for lost quality-of-life found for less severe injuries. The "Subtotal" line represents components associated with injuries (both fatal and nonfatal). Costs on this line are thus useful in analyzing the economic cost savings of safety countermeasures that prevent injury in the event of a crash. The "Total" line is useful for estimating the economic benefits from countermeasures that prevent crashes from occurring. To examine the total societal harm prevented by either countermeasure type, the value on the QALY line should be added to the appropriate economic values, giving the comprehensive impacts of crashes on society.

Over half of all PDO crashes and about a quarter of all nonfatal injury crashes are not reported to police. However, analyses of safety countermeasures frequently rely only on police-reported incidence data. Crashes that get reported to police are likely to be more severe than unreported crashes because vehicles are more likely to require towing and occupants are more likely to require hospitalization or emergency services. These crashes are typically also likely to require more time to investigate and clear from roadways than unreported crashes. Analysis based solely on police-reported crashes should thus be based on unit costs that are specific to police-reported crashes. For injury-related costs, this is automatically accounted for by the shift in the injury severity profile. Unreported crashes have a lower average severity profile than do reported crashes. However, for non-injury-related cost components – property damage and congestion costs – there is no profile to shift. In addition, emergency services have higher involvement rates for police-reported crashes.

For this report, costs specific to police-reported and unreported crashes have been developed. The changes in unit costs are all due to economic cost factors and these are discussed in detail in the Human Capital chapter. The results of this analysis on comprehensive costs are presented in Tables 5-4 and 5-5. The differences seem negligible at the more severe injury levels due to the overwhelming costs of factors such as lost productivity and medical care that do not vary by reporting status, except through the shift in injury profiles. However, at lower severity levels the unit cost differences are significant. For PDO vehicles and MAIS0s, police-reported crashes have costs that are three times those of unreported crashes. For minor (MAIS1) injuries, reported crashes cost 24 percent more than unreported crashes. These ratios decline as injury severity

increases. Note that for MAIS4s, MAIS5s, and Fatalities, property damage costs are identical under both reported and unreported cases. All injuries at these levels are believed to be reported to police, and the original property damage cost estimate is thus assumed to represent police-reported cases. These same costs are thus listed under both scenarios.