*Table 5-3. Comprehensive Unit Costs, Reported and Unreported Crashes (2019 $)*

| | PDO | MAIS0 | MAIS1 | MAIS2 | MAIS3 | MAIS4 | MAIS5 | Fatal |
|---|---|---|---|---|---|---|---|---|
| **Medical** | $0 | $0 | $2,210 | $13,269 | $69,345 | $188,626 | $363,229 | $17,289 |
| **EMS** | $31 | $24 | $106 | $228 | $486 | $976 | $999 | $1,060 |
| **Market** | $0 | $0 | $2,315 | $23,096 | $92,716 | $229,903 | $306,236 | $1,010,970 |
| **Household** | $71 | $55 | $848 | $8,990 | $39,001 | $116,482 | $127,886 | $367,148 |
| **Insurance** | $523 | $225 | $2,212 | $8,220 | $28,698 | $36,485 | $38,081 | $36,245 |
| **Workplace** | $99 | $76 | $56 | $418 | $3,240 | $7,077 | $7,794 | $13,589 |
| **Legal Costs** | $0 | $0 | $740 | $6,243 | $27,714 | $73,799 | $110,012 | $138,025 |
| **Subtotal** | $724 | $380 | $8,487 | $60,464 | $261,200 | $653,348 | $954,237 | $1,584,326 |
| **Congestion** | $1,327 | $1,008 | $1,207 | $1,339 | $1,691 | $1,814 | $1,857 | $7,133 |
| **Prop. Damage** | $3,200 | $1,864 | $9,650 | $9,616 | $17,835 | $20,565 | $23,234 | $15,185 |
| **Subtotal** | $4,527 | $2,872 | $10,857 | $10,955 | $19,526 | $22,379 | $25,091 | $22,318 |
| **Total** | $5,251 | $3,252 | $19,344 | $71,419 | $280,726 | $675,727 | $979,328 | $1,606,644 |
| **QALYs** | $0 | $0 | $41,112 | $402,341 | $1,763,881 | $2,938,008 | $5,068,923 | $9,651,851 |
| **Comp.Total** | $5,251 | $3,252 | $60,456 | $473,760 | $2,044,607 | $3,613,735 | $6,048,251 | $11,258,495 |

95

Figure 5-A. Relative Distribution of Comprehensive Costs

96

Table 5-4. Comprehensive Unit Costs, Police-Reported Crashes (2019 $)

| | PDO | MAIS0 | MAIS1 | MAIS2 | MAIS3 | MAIS4 | MAIS5 | Fatal |
|---|---|---|---|---|---|---|---|---|
| **Medical** | $0 | $0 | $2,210 | $13,269 | $69,345 | $188,626 | $363,229 | $17,289 |
| **EMS** | $72 | $40 | $139 | $274 | $486 | $976 | $999 | $1,060 |
| **Market** | $0 | $0 | $2,315 | $23,096 | $92,716 | $229,903 | $306,236 | $1,010,970 |
| **Household** | $71 | $55 | $848 | $8,990 | $39,001 | $116,482 | $127,886 | $367,148 |
| **Insurance** | $523 | $225 | $2,212 | $8,220 | $28,698 | $36,485 | $38,081 | $36,245 |
| **Workplace** | $99 | $76 | $56 | $418 | $3,240 | $7,077 | $7,794 | $13,589 |
| **Legal Costs** | $0 | $0 | $740 | $6,243 | $27,714 | $73,799 | $110,012 | $138,025 |
| **Subtotal** | $765 | $396 | $8,520 | $60,510 | $261,200 | $653,348 | $954,237 | $1,584,326 |
| **Congestion** | $2,591 | $1,739 | $1,713 | $1,758 | $1,790 | $1,814 | $1,857 | $7,133 |
| **Prop. Damage** | $4,556 | $2,654 | $13,741 | $13,692 | $25,395 | $20,565 | $23,234 | $15,185 |
| **Subtotal** | $7,147 | $4,393 | $15,454 | $15,450 | $27,185 | $22,379 | $25,091 | $22,318 |
| **Total** | $7,913 | $4,789 | $23,974 | $75,961 | $288,385 | $675,727 | $979,328 | $1,606,644 |
| **QALYs** | $0 | $0 | $41,112 | $402,341 | $1,763,881 | $2,938,008 | $5,068,923 | $9,651,851 |
| **Total** | $7,913 | $4,789 | $65,086 | $478,302 | $2,052,266 | $3,613,735 | $6,048,251 | $11,258,495 |

Table 5-5. Comprehensive Unit Costs, Unreported Crashes (2019 $)

| | PDO | MAIS0 | MAIS1 | MAIS2 | MAIS3 | MAIS4 | MAIS5 | Fatal |
|---|---|---|---|---|---|---|---|---|
| **Medical** | $0 | $0 | $2,210 | $13,269 | $69,345 | $188,626 | $363,229 | $17,289 |
| **EMS** | $8 | $7 | $41 | $104 | $486 | $976 | $999 | $1,060 |
| **Market** | $0 | $0 | $2,315 | $23,096 | $92,716 | $229,903 | $306,236 | $1,010,970 |
| **Household** | $71 | $55 | $848 | $8,990 | $39,001 | $116,482 | $127,886 | $367,148 |
| **Insurance** | $523 | $225 | $2,212 | $8,220 | $28,698 | $36,485 | $38,081 | $36,245 |
| **Workplace** | $99 | $76 | $56 | $418 | $3,240 | $7,077 | $7,794 | $13,589 |
| **Legal Costs** | $0 | $0 | $740 | $6,243 | $27,714 | $73,799 | $110,012 | $138,025 |
| **Subtotal** | $701 | $363 | $8,422 | $60,340 | $261,200 | $653,348 | $954,237 | $1,584,326 |
| **Congestion** | $473 | $220 | $220 | $220 | $220 | $220 | $220 | $571 |
| **Prop. Damage** | $1,550 | $903 | $4,674 | $4,657 | $8,638 | $20,565 | $23,234 | $15,185 |
| **Subtotal** | $2,023 | $1,123 | $4,894 | $4,877 | $8,858 | $20,785 | $23,454 | $15,756 |
| **Total** | $2,724 | $1,486 | $13,315 | $65,217 | $270,058 | $674,133 | $977,691 | $1,600,082 |
| **QALYs** | $0 | $0 | $41,112 | $402,341 | $1,763,881 | $2,938,008 | $5,068,923 | $9,651,851 |
| **Comp. Total** | $2,724 | $1,486 | $54,427 | $467,558 | $2,033,939 | $3,612,141 | $6,046,614 | $11,251,933 |

97

## 6. State Costs

States are directly involved in establishing and enforcing laws related to motor vehicle safety, such as seat belt laws, motorcycle helmet laws, speed limits, and impaired or distracted driving laws. In addition, they are directly involved in decisions to justify funding safety-related infrastructure expenditures. They are encouraged and assisted in this effort through Federal legislation enacted to promote highway safety such as The Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU) that was enacted in 2005 and that provided one- time grants to States that enacted and are enforcing a conforming primary seat belt law for all passenger motor vehicles. SAFETEA-LU authorized $770 million in grant money over a 6-year period to address roadway and driver behavioral safety activities, especially those designed to increase belt use. MAP-21, which was enacted in 2012, provided $1.3 billion for highway safety grant programs. MAP-21 restructured existing grant programs administered by NHTSA. It specified a single application deadline for all highway safety grants and required that all States have a performance-based highway safety program. In December 2015 the Fixing America's Surface Transportation Act, or "FAST Act," was signed into law. It was the first law enacted in more than 10 years that provided long-term funding certainty for surface transportation, meaning States and local governments could move forward with critical transportation projects, like new highways and transit lines, with the confidence that they will have a Federal partner over the long term. The FAST Act authorized $2.7 billion in funding for the Section 402 Highway Safety Programs and Section 405 National Priority Safety Programs for fiscal years 2016 to 2020. More recently, NHTSA announced the release of nearly $260 million in highway safety grants, part of the funding included in the Bipartisan Infrastructure Law, distributed to Highway Safety Offices in all 50 States, the District of Columbia, United States territories, and the Bureau of Indian Affairs. The funds will help address the traffic safety crisis on America's roads by helping States and territories support a broad array of traffic safety priorities. When full-year distributions are completed, the Bipartisan Infrastructure Law will increase the funding available for these vital life-saving programs by 31 percent over the previous fiscal year's levels.

State legislators are often interested in the societal and economic cost of motor vehicle injury as they consider new traffic safety laws, changes to existing laws and funding for enforcement of the laws, as well as for transportation infrastructure improvements. This information can assist them in making the case to their constituencies as to the relevance of the laws designed to make the population safer.

A State-specific distribution of total economic costs has been prepared as follows:

The year 2019 fatalities were obtained by State from FARS. The portion of total national fatalities in each State was then applied directly to the total fatality cost ($58.6 billion). Crash incidence data were obtained from individual States for 2019. In cases where data were not available, a factor based on the trend in fatalities within the State was used to estimate crashes from the last years for which complete data were available. The portion of total national crashes in each State was applied to the total cost of all nonfatal injuries, PDOs, and uninjured occupants ($281.2 billion).

The total costs for each State were then adjusted to reflect locality cost differences based on the ratio of costs in each State to the national total. Medical costs were adjusted based on data obtained from the C2ER State Medical Cost Index (Council for Community and Economic

Research, n.d.) cited by Miller and Galbraith (1995) with updates provided by Miller (personal communication). Lost productivity, travel delay and workplace costs were adjusted based on 2019 per-capita income (Bureau of Economic Analysis, n.d.). Insurance administration and legal costs were adjusted using a combination of these two inflators weighted according to the relative weight of medical and lost productivity administrative costs. All other cost categories were adjusted using a composite index developed by CCER (also provided by Miller).

These four adjustment factors were applied separately to the fatal and nonfatal costs for each State.

Weights to combine each factor were derived separately from the relative importance of each cost category to nationwide fatal and nonfatal total costs. The sum of fatal and nonfatal costs for each State was then adjusted to force the sum of all States' costs to equal the national total.

The results of this analysis are depicted in Table 6-1. There is considerable variation in costs among the States with New York, for example, having costs that are 17 times higher than those for Idaho. This is primarily due to the higher incidence of death and injury in New York (a function of population), but also to the higher cost levels in that State. However, as noted by Miller and Galbraith (1995), cost comparisons between States that are based on State injury totals can be misleading because injury totals do not capture differences in nonfatal injury severity between States. This would tend to understate costs in rural States relative to urban States, which typically have lower average speeds and consequently less severe injuries. Ideally, State costs would be based on individual State injury profiles, but these are not available for many States.

Differences between States may also result from different reporting practices that result in more or less complete recording of injuries from State to State. Differences in roadway characteristics and state of repair may account for some of this discrepancy, though it seems likely that variation in injury reporting is also a contributing factor. Finally, the impact of crash costs must be viewed in the context of each State's economy. Smaller, less populated States may have lower absolute costs, but they may also have fewer resources available to address these costs. A significant portion of these costs is borne by the general public through State and local revenue, or through private insurance plans. The per capita costs for each State vary from roughly $400 to $2,000 compared to the nationwide average of $1,035. These costs represent s 0.7 to 3.6 percent of the per-capita income for each State, with an overall average of 1.8 percent.

*Table 6-1. Estimated 2019 Economic Costs Due to Motor Vehicle Crashes by State*

| State | (Millions 2019 $) | % Total | Cost Per Capita | % Per Capita Personal Income |
|---|---|---|---|---|
| Alabama | $6,437 | 1.9% | $1,313 | 3.0% |
| Alaska | $627 | 0.2% | $856 | 1.4% |
| Arizona | $5,946 | 1.7% | $817 | 1.8% |
| Arkansas | $3,142 | 0.9% | $1,041 | 2.3% |
| California | $29,098 | 8.6% | $736 | 1.1% |
| Colorado | $6,028 | 1.8% | $1,047 | 1.7% |
| Connecticut | $6,104 | 1.8% | $1,712 | 2.3% |
| Delaware | $1,478 | 0.4% | $1,518 | 2.8% |
| Dist. of Col. | $832 | 0.2% | $1,178 | 1.5% |
| Florida | $20,019 | 5.9% | $932 | 1.8% |
| Georgia | $18,697 | 5.5% | $1,761 | 3.6% |
| Hawaii | $580 | 0.2% | $410 | 0.7% |
| Idaho | $1,355 | 0.4% | $758 | 1.7% |
| Illinois | $13,977 | 4.1% | $1,103 | 1.9% |
| Indiana | $8,540 | 2.5% | $1,269 | 2.6% |
| Iowa | $2,794 | 0.8% | $885 | 1.8% |
| Kansas | $2,984 | 0.9% | $1,024 | 1.9% |
| Kentucky | $6,157 | 1.8% | $1,378 | 3.1% |
| Louisiana | $6,570 | 1.9% | $1,413 | 3.0% |
| Maine | $1,876 | 0.6% | $1,396 | 2.8% |
| Maryland | $5,910 | 1.7% | $977 | 1.6% |
| Massachusetts | $7,389 | 2.2% | $1,072 | 1.5% |
| Michigan | $12,305 | 3.6% | $1,232 | 2.5% |
| Minnesota | $3,803 | 1.1% | $674 | 1.2% |
| Mississippi | $2,533 | 0.7% | $851 | 2.2% |
| Missouri | $6,778 | 2.0% | $1,104 | 2.3% |
| Montana | $1,095 | 0.3% | $1,024 | 2.0% |
| Nebraska | $1,726 | 0.5% | $892 | 1.7% |
| Nevada | $2,645 | 0.8% | $859 | 1.7% |
| New Hampshire | $1,664 | 0.5% | $1,223 | 1.9% |
| New Jersey | $14,008 | 4.1% | $1,577 | 2.3% |
| New Mexico | $2,173 | 0.6% | $1,036 | 2.4% |
| New York | $23,616 | 6.9% | $1,214 | 1.7% |
| North Carolina | $12,039 | 3.5% | $1,148 | 2.4% |

| State | (Millions 2019 $) | % Total | Cost Per Capita | % Per Capita Personal Income |
|---|---|---|---|---|
| **North Dakota** | $735 | 0.2% | $965 | 1.7% |
| **Ohio** | $12,108 | 3.6% | $1,036 | 2.1% |
| **Oklahoma** | $3,420 | 1.0% | $864 | 1.8% |
| **Oregon** | $2,822 | 0.8% | $669 | 1.3% |
| **Pennsylvania** | $6,663 | 2.0% | $520 | 0.9% |
| **Rhode Island** | $2,105 | 0.6% | $1,987 | 3.5% |
| **South Carolina** | $6,269 | 1.8% | $1,218 | 2.7% |
| **South Dakota** | $941 | 0.3% | $1,063 | 1.9% |
| **Tennessee** | $10,050 | 3.0% | $1,472 | 3.0% |
| **Texas** | $28,939 | 8.5% | $998 | 1.9% |
| **Utah** | $2,803 | 0.8% | $874 | 1.8% |
| **Vermont** | $625 | 0.2% | $1,001 | 1.8% |
| **Virginia** | $6,455 | 1.9% | $756 | 1.3% |
| **Washington** | $6,337 | 1.9% | $832 | 1.3% |
| **West Virginia** | $1,460 | 0.4% | $815 | 1.9% |
| **Wisconsin** | $6,310 | 1.9% | $1,084 | 2.0% |
| **Wyoming** | $844 | 0.2% | $1,457 | 2.4% |
| **Total** | $339,809 | 100.0% | $1,035 | 1.8% |

## 7.  Alcohol-Involved Crash Costs

Alcohol consumption is a major cause of motor vehicle crashes and injury. In the 1980s and early 1990s alcohol was involved in more than 50 percent of all fatal crashes. Of these cases, about 85 percent involved a level of alcohol consumption that met the current typical legal definition for impairment, a BAC of .08 g/dL or higher. Over time, there has been an increased awareness of the problems caused by impaired driving. Many groups including NHTSA, Mothers Against Drunk Driving (MADD), Students Against Destructive Decisions (SADD), and State and local agencies, have promoted the enactment of laws and implemented public awareness campaigns to assist in combating this problem. Legal measures such as administrative license revocation/suspension have been enacted in numerous States. As a result, there has been a marked decrease in the number of fatalities resulting from alcohol-involved crashes. Over the past three decades, about 40 percent of all motor vehicle fatalities occurred in crashes in which a driver or nonoccupant had consumed alcohol prior to the crash. Table 7-1 displays the share of fatalities associated with various levels of alcohol involvement (BAC>.01 g/dL) and the current definition of legal impairment (.08 g/dL in all States except Utah) since 1982. Alcohol involvement in fatal crashes has declined from 60 percent of all fatalities in 1982 to roughly 39 percent in 2019, while legal intoxication (defined as a BAC of .08 g/dL or greater) has declined from 53 percent to 33 percent over the same period. While these declines are encouraging, alcohol still remains a significant factor in motor vehicle crashes.

All but one of the 50 States, the District of Columbia, and Puerto Rico define legal impairment, the level at which DWI convictions can be made, as having a BAC of .08 or higher. Utah sets a lower threshold of .05. FARS data indicates that fatalities involving legally impaired drivers or nonoccupants (defined as .08 g/dL or greater) account for 85 percent of the fatalities arising from all levels of alcohol involvement.

### Fatalities

FARS provides detailed information about all traffic fatalities that occur within 30 days of a crash on a public road. Each case is investigated and documentation regarding alcohol involvement is included. Alcohol involvement can be indicated either by the judgment of the investigating police officers or by the results of administered BAC tests. Cases where either of these factors is positive are taken as alcohol-involved and any fatalities that result from these crashes are considered to be alcohol-involved fatalities. In addition, there are a large number of cases where alcohol involvement is unknown. In 1986 NHTSA's National Center for Statistics and Analysis (NCSA) developed an algorithm based on discriminant analysis of crash characteristics that estimates the BAC level for these cases (Klein, 1986). In 1998 NHTSA developed a more sophisticated technique to accomplish these estimates using imputation (Rubin et al., 1998), and substituted this method beginning with the 2001 FARS file. NHTSA has recomputed previous FARS files using this method and alcohol involvement rates based on the new method are routinely published by NHTSA and used in this report. The total number of alcohol-involved fatalities by BAC is shown in Table 7-1 from 1982 through 2019. In 2019 about 85 percent of all fatalities that occurred in alcohol-involved crashes were in cases where each had a driver or pedestrian with a BAC of .08 or higher.

102

*Table 7-1. Alcohol-Involved Traffic Fatalities, Highest BAC in Crash*

| Year | Total | | BAC=.00 | | BAC=.01-.07 | | BAC=.08+ | | BAC=.01+ | |
|------|-------|------|---------|------|-------------|------|----------|------|----------|------|
| | Number | % | Number | % | Number | % | Number | % | Number | % |
| **1982** | 43,945 | 100% | 17,773 | 40% | 2,927 | 7% | 23,246 | 53% | 26,173 | 60% |
| **1983** | 42,589 | 100% | 17,955 | 42% | 2,594 | 6% | 22,041 | 52% | 24,635 | 58% |
| **1984** | 44,257 | 100% | 19,496 | 44% | 3,046 | 7% | 21,715 | 49% | 24,762 | 56% |
| **1985** | 43,825 | 100% | 20,659 | 47% | 3,081 | 7% | 20,086 | 46% | 23,167 | 53% |
| **1986** | 46,087 | 100% | 21,070 | 46% | 3,546 | 8% | 21,471 | 47% | 25,017 | 54% |
| **1987** | 46,390 | 100% | 22,297 | 48% | 3,398 | 7% | 20,696 | 45% | 24,094 | 52% |
| **1988** | 47,087 | 100% | 23,254 | 49% | 3,234 | 7% | 20,599 | 44% | 23,833 | 51% |
| **1989** | 45,582 | 100% | 23,159 | 51% | 2,893 | 6% | 19,531 | 43% | 22,424 | 49% |
| **1990** | 44,599 | 100% | 22,012 | 49% | 2,980 | 7% | 19,607 | 44% | 22,587 | 51% |
| **1991** | 41,508 | 100% | 21,349 | 51% | 2,560 | 6% | 17,599 | 42% | 20,159 | 49% |
| **1992** | 39,250 | 100% | 20,960 | 53% | 2,443 | 6% | 15,847 | 40% | 18,290 | 47% |
| **1993** | 40,150 | 100% | 22,242 | 55% | 2,361 | 6% | 15,547 | 39% | 17,908 | 45% |
| **1994** | 40,716 | 100% | 23,409 | 57% | 2,322 | 6% | 14,985 | 37% | 17,308 | 43% |
| **1995** | 41,817 | 100% | 24,085 | 58% | 2,490 | 6% | 15,242 | 36% | 17,732 | 42% |
| **1996** | 42,065 | 100% | 24,316 | 58% | 2,486 | 6% | 15,263 | 36% | 17,749 | 42% |
| **1997** | 42,013 | 100% | 25,302 | 60% | 2,290 | 5% | 14,421 | 34% | 16,711 | 40% |
| **1998** | 41,501 | 100% | 24,828 | 60% | 2,465 | 6% | 14,207 | 34% | 16,673 | 40% |
| **1999** | 41,717 | 100% | 25,145 | 60% | 2,321 | 6% | 14,250 | 34% | 16,572 | 40% |
| **2000** | 41,945 | 100% | 24,565 | 59% | 2,511 | 6% | 14,870 | 35% | 17,380 | 41% |
| **2001** | 42,196 | 100% | 24,796 | 59% | 2,542 | 6% | 14,858 | 35% | 17,400 | 41% |
| **2002** | 43,005 | 100% | 25,481 | 59% | 2,432 | 6% | 15,093 | 35% | 17,524 | 41% |
| **2003** | 42,884 | 100% | 25,779 | 60% | 2,427 | 6% | 14,678 | 34% | 17,105 | 40% |
| **2004** | 42,836 | 100% | 25,918 | 61% | 2,325 | 5% | 14,593 | 34% | 16,919 | 39% |
| **2005** | 43,510 | 100% | 25,920 | 60% | 2,489 | 6% | 15,102 | 35% | 17,590 | 40% |
| **2006** | 42,708 | 100% | 24,970 | 58% | 2,594 | 6% | 15,144 | 35% | 17,738 | 42% |
| **2007** | 41,259 | 100% | 24,101 | 58% | 2,554 | 6% | 14,603 | 35% | 17,158 | 42% |
| **2008** | 37,423 | 100% | 21,974 | 59% | 2,191 | 6% | 13,258 | 35% | 15,449 | 41% |
| **2009** | 33,883 | 100% | 19,704 | 58% | 2,031 | 6% | 12,149 | 36% | 14,179 | 42% |
| **2010** | 32,999 | 100% | 19,676 | 60% | 1,861 | 6% | 11,462 | 35% | 13,323 | 40% |
| **2011** | 32,367 | 100% | 19,212 | 59% | 1,758 | 5% | 11,397 | 35% | 13,155 | 41% |
| **2012** | 33,782 | 100% | 19,903 | 59% | 1,920 | 6% | 11,960 | 35% | 13,879 | 41% |
| **2013** | 32,893 | 100% | 19,325 | 59% | 1,938 | 6% | 11,631 | 35% | 13,569 | 41% |
| **2014** | 32,744 | 100% | 19,356 | 59% | 1,873 | 6% | 11,515 | 35% | 13,388 | 41% |
| **2015** | 35,484 | 100% | 21,360 | 60% | 2,044 | 6% | 12,081 | 34% | 14,125 | 40% |
| **2016** | 37,806 | 100% | 22,820 | 60% | 2,113 | 6% | 12,872 | 34% | 14,986 | 40% |
| **2017** | 37,473 | 100% | 22,764 | 61% | 2,046 | 5% | 12,663 | 34% | 14,709 | 39% |
| **2018** | 36,835 | 100% | 22,251 | 60% | 2,035 | 6% | 12,549 | 34% | 14,584 | 40% |
| **2019** | 36,355 | 100% | 22,192 | 61% | 2,054 | 6% | 12,109 | 33% | 14,163 | 39% |

Alcohol use by drivers is the focus of most behavioral programs and State laws. Drivers are involved in the vast majority of alcohol-involved traffic crashes, but a significant number of crashes occur where pedestrians or bicyclist alcohol use was indicated, while driver alcohol use

was not. Table 7-2 summarizes the incidence of alcohol-involved crashes based on driver BAC, while Table 7-3 shows the incidence of fatalities where pedestrians or bicyclists were using alcohol, but not drivers. In 2019 some 85 percent of all fatalities that occurred in alcohol-involved crashes were each in case where a driver had a BAC of .08 or higher. About 6 percent of all alcohol-related traffic fatalities involve alcohol use by pedestrians or bicyclists rather than motor vehicle drivers. Of these cases, 90 percent involve alcohol impairment (BAC = .08 or higher) on the part of the pedestrian or bicyclist.

*Table 7-2. Alcohol-Involved Traffic Fatalities, Highest Driver BAC*

| Year | Total* | | BAC=.00 | | BAC=.01-.07 | | BAC=.08+ | | BAC=.01+ | |
|------|--------|---|---------|---|-------------|---|----------|---|----------|---|
| | Number | % | Number | % | Number | % | Number | % | Number | % |
| 1982 | 43,945 | 100% | 19,771 | 45% | 2,912 | 7% | 21,113 | 48% | 24,025 | 55% |
| 1983 | 42,589 | 100% | 19,787 | 46% | 2,588 | 6% | 20,051 | 47% | 22,639 | 53% |
| 1984 | 44,257 | 100% | 21,429 | 48% | 3,007 | 7% | 19,638 | 44% | 22,645 | 51% |
| 1985 | 43,825 | 100% | 22,589 | 52% | 2,974 | 7% | 18,125 | 41% | 21,098 | 48% |
| 1986 | 46,087 | 100% | 22,896 | 50% | 3,487 | 8% | 19,554 | 42% | 23,041 | 50% |
| 1987 | 46,390 | 100% | 24,186 | 52% | 3,238 | 7% | 18,813 | 41% | 22,051 | 48% |
| 1988 | 47,087 | 100% | 25,164 | 53% | 3,156 | 7% | 18,611 | 40% | 21,767 | 46% |
| 1989 | 45,582 | 100% | 25,152 | 55% | 2,793 | 6% | 17,521 | 38% | 20,314 | 45% |
| 1990 | 44,599 | 100% | 23,823 | 53% | 2,901 | 7% | 17,705 | 40% | 20,607 | 46% |
| 1991 | 41,508 | 100% | 23,025 | 55% | 2,480 | 6% | 15,827 | 38% | 18,307 | 44% |
| 1992 | 39,250 | 100% | 22,726 | 58% | 2,352 | 6% | 14,049 | 36% | 16,401 | 42% |
| 1993 | 40,150 | 100% | 23,979 | 60% | 2,300 | 6% | 13,739 | 34% | 16,039 | 40% |
| 1994 | 40,716 | 100% | 24,948 | 61% | 2,236 | 5% | 13,390 | 33% | 15,626 | 38% |
| 1995 | 41,817 | 100% | 25,768 | 62% | 2,416 | 6% | 13,478 | 32% | 15,893 | 38% |
| 1996 | 42,065 | 100% | 26,052 | 62% | 2,415 | 6% | 13,451 | 32% | 15,866 | 38% |
| 1997 | 42,013 | 100% | 26,902 | 64% | 2,216 | 5% | 12,757 | 30% | 14,973 | 36% |
| 1998 | 41,501 | 100% | 26,477 | 64% | 2,353 | 6% | 12,546 | 30% | 14,899 | 36% |
| 1999 | 41,717 | 100% | 26,798 | 64% | 2,235 | 5% | 12,555 | 30% | 14,790 | 35% |
| 2000 | 41,945 | 100% | 26,082 | 62% | 2,422 | 6% | 13,324 | 32% | 15,746 | 38% |
| 2001 | 42,196 | 100% | 26,334 | 62% | 2,441 | 6% | 13,290 | 31% | 15,731 | 37% |
| 2002 | 43,005 | 100% | 27,080 | 63% | 2,321 | 5% | 13,472 | 31% | 15,793 | 37% |
| 2003 | 42,884 | 100% | 27,328 | 64% | 2,327 | 5% | 13,096 | 31% | 15,423 | 36% |
| 2004 | 42,836 | 100% | 27,413 | 64% | 2,212 | 5% | 13,099 | 31% | 15,311 | 36% |
| 2005 | 43,510 | 100% | 27,423 | 63% | 2,404 | 6% | 13,582 | 31% | 15,985 | 37% |
| 2006 | 42,708 | 100% | 26,633 | 62% | 2,479 | 6% | 13,491 | 32% | 15,970 | 37% |
| 2007 | 41,259 | 100% | 25,611 | 62% | 2,494 | 6% | 13,041 | 32% | 15,534 | 38% |
| 2008 | 37,423 | 100% | 23,499 | 63% | 2,115 | 6% | 11,711 | 31% | 13,826 | 37% |
| 2009 | 33,883 | 100% | 21,051 | 62% | 1,972 | 6% | 10,759 | 32% | 12,731 | 38% |
| 2010 | 32,999 | 100% | 21,005 | 64% | 1,771 | 5% | 10,136 | 31% | 11,906 | 36% |
| 2011 | 32,367 | 100% | 20,752 | 64% | 1,633 | 5% | 9,878 | 31% | 11,510 | 36% |
| 2012 | 33,782 | 100% | 21,563 | 64% | 1,782 | 5% | 10,336 | 31% | 12,118 | 36% |
| 2013 | 32,893 | 100% | 20,865 | 63% | 1,834 | 6% | 10,084 | 31% | 11,918 | 36% |
| 2014 | 32,744 | 100% | 20,913 | 64% | 1,800 | 5% | 9,943 | 30% | 11,743 | 36% |
| 2015 | 35,484 | 100% | 23,165 | 65% | 1,930 | 5% | 10,280 | 29% | 12,210 | 34% |
| 2016 | 37,806 | 100% | 24,762 | 65% | 1,984 | 5% | 10,967 | 29% | 12,951 | 34% |

| Year | Total* | | BAC=.00 | | BAC=.01-.07 | | BAC=.08+ | | BAC=.01+ | |
|------|--------|------|---------|------|-------------|------|----------|------|----------|------|
| | Number | % | Number | % | Number | % | Number | % | Number | % |
| 2017 | 37,473 | 100% | 24,589 | 66% | 1,895 | 5% | 10,880 | 29% | 12,775 | 34% |
| 2018 | 36,835 | 100% | 24,186 | 66% | 1,850 | 5% | 10,710 | 29% | 12,560 | 34% |
| 2019 | 36,355 | 100% | 24,251 | 67% | 1,834 | 5% | 10,196 | 28% | 12,029 | 33% |

*Table 7-3. Nonoccupant (Pedestrian and Bicyclist) Alcohol Use-Related Traffic Fatalities*

| Year | Total Including Occupants | | Nonoccupant BAC=.01-.07 | | Nonoccupant BAC=.08+ | | Nonoccupant BAC=.01+ | |
|------|---------------------------|---------|--------------------------|---------|------------------------|---------|------------------------|---------|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| 1982 | 43,945 | 100% | 15 | 0.0% | 2,133 | 5% | 2,148 | 5% |
| 1983 | 42,589 | 100% | 6 | 0.0% | 1,990 | 5% | 1,996 | 5% |
| 1984 | 44,257 | 100% | 39 | 0.1% | 2,077 | 5% | 2,117 | 5% |
| 1985 | 43,825 | 100% | 107 | 0.2% | 1,961 | 4% | 2,069 | 5% |
| 1986 | 46,087 | 100% | 59 | 0.1% | 1,917 | 4% | 1,976 | 4% |
| 1987 | 46,390 | 100% | 160 | 0.3% | 1,883 | 4% | 2,043 | 4% |
| 1988 | 47,087 | 100% | 78 | 0.2% | 1,988 | 4% | 2,066 | 4% |
| 1989 | 45,582 | 100% | 100 | 0.2% | 2,010 | 4% | 2,110 | 5% |
| 1990 | 44,599 | 100% | 79 | 0.2% | 1,902 | 4% | 1,980 | 4% |
| 1991 | 41,508 | 100% | 80 | 0.2% | 1,772 | 4% | 1,852 | 4% |
| 1992 | 39,250 | 100% | 91 | 0.2% | 1,798 | 5% | 1,889 | 5% |
| 1993 | 40,150 | 100% | 61 | 0.2% | 1,808 | 5% | 1,869 | 5% |
| 1994 | 40,716 | 100% | 86 | 0.2% | 1,595 | 4% | 1,682 | 4% |
| 1995 | 41,817 | 100% | 74 | 0.2% | 1,764 | 4% | 1,839 | 4% |
| 1996 | 42,065 | 100% | 71 | 0.2% | 1,812 | 4% | 1,883 | 4% |
| 1997 | 42,013 | 100% | 74 | 0.2% | 1,664 | 4% | 1,738 | 4% |
| 1998 | 41,501 | 100% | 112 | 0.3% | 1,661 | 4% | 1,774 | 4% |
| 1999 | 41,717 | 100% | 86 | 0.2% | 1,695 | 4% | 1,782 | 4% |
| 2000 | 41,945 | 100% | 89 | 0.2% | 1,546 | 4% | 1,634 | 4% |
| 2001 | 42,196 | 100% | 101 | 0.2% | 1,568 | 4% | 1,669 | 4% |
| 2002 | 43,005 | 100% | 111 | 0.3% | 1,621 | 4% | 1,731 | 4% |
| 2003 | 42,884 | 100% | 100 | 0.2% | 1,582 | 4% | 1,682 | 4% |
| 2004 | 42,836 | 100% | 113 | 0.3% | 1,494 | 3% | 1,608 | 4% |
| 2005 | 43,510 | 100% | 85 | 0.2% | 1,520 | 3% | 1,605 | 4% |
| 2006 | 42,708 | 100% | 115 | 0.3% | 1,653 | 4% | 1,768 | 4% |
| 2007 | 41,259 | 100% | 60 | 0.1% | 1,562 | 4% | 1,624 | 4% |
| 2008 | 37,423 | 100% | 76 | 0.2% | 1,547 | 4% | 1,623 | 4% |
| 2009 | 33,883 | 100% | 59 | 0.2% | 1,390 | 4% | 1,448 | 4% |
| 2010 | 32,999 | 100% | 90 | 0.3% | 1,326 | 4% | 1,417 | 4% |
| 2011 | 32,367 | 100% | 125 | 0.4% | 1,519 | 5% | 1,645 | 5% |
| 2012 | 33,782 | 100% | 138 | 0.4% | 1,624 | 5% | 1,761 | 5% |
| 2013 | 32,893 | 100% | 104 | 0.3% | 1,547 | 5% | 1,651 | 5% |
| 2014 | 32,744 | 100% | 73 | 0.2% | 1,572 | 5% | 1,645 | 5% |
| 2015 | 35,484 | 100% | 114 | 0.3% | 1,801 | 5% | 1,915 | 5% |
| 2016 | 37,806 | 100% | 129 | 0.3% | 1,905 | 5% | 2,035 | 5% |

| Year | Total Including Occupants | | Nonoccupant BAC=.01-.07 | | Nonoccupant BAC=.08+ | | Nonoccupant BAC=.01+ | |
|------|--------|---------|--------|---------|--------|---------|--------|---------|
|  | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| **2017** | 37,473 | 100% | 151 | 0.4% | 1,783 | 5% | 1,934 | 5% |
| **2018** | 36,835 | 100% | 185 | 0.5% | 1,839 | 5% | 2,024 | 5% |
| **2019** | 36,355 | 100% | 220 | 0.6% | 1,913 | 5% | 2,134 | 6% |

Figure 7-A illustrates the historical trend of overall fatalities plotted against alcohol-related and alcohol impaired fatalities. Their general trends are similar, but there was a noticeable decline in alcohol-related fatalities as a proportion of total fatalities during the 1990s. Overall alcohol-related fatalities declined from 60 percent of total fatalities in 1982 to about 40 percent by 1997. Since that time, the proportion has remained roughly constant. A similar trend is evident for fatalities in crashes involving alcohol impairment. Alcohol impaired fatalities declined from 48 percent of all fatalities in 1982 to about 30 percent in 1997, and have since declined to 28 percent in 2019.

*Figure 7-A. Historical Trend of Fatalities, Alcohol-Involved Fatalities, and Alcohol-Impaired Fatalities*



## Nonfatal Injuries

NHTSA collects crash data though a two-tiered system redesigned in 1988 to replace the former NASS> The NASS Crashworthiness Data System and the General Estimates System comprise this new method.

The CISS is a probability sample of a subset of police-reported crashes in the United States It offers detailed data on a representative, random sample of thousands of minor, serious, and fatal crashes. The crash in question must be police-reported and must involve property damage and/or personal injury resulting from the crash in order to qualify as a CISS case. It must also include a towed passenger car or light truck or van in transport on a public road or highway. Injuries in vehicles meeting these criteria are analyzed at a level of detail not found in the broader CRSS.

In contrast, the CRSS collects data on a sample of all police-reported crashes, without a specific set of vehicle and severity criteria. Although CRSS collects data on a broader array of crashes, it collects less information on each crash, limiting possible analysis of alcohol involvement. Cases are restricted to a simple "yes," "no," or "unknown" alcohol indication on the police crash report, as observed by the reporting police office. Actual BAC test results are not available through the CRSS sample.

The CRSS provides a sample of U.S. crashes by police-reported severity for all crash types. CRSS records injury severity by person on the KABCO scale (National Safety Council, 2015) from police crash reports as discussed at the beginning of Chapter 2.

KABCO ratings are coarse and inconsistently coded between States and over time. The codes are selected by police officers without medical training, typically without benefit of a hands-on examination. Some of the injured are transported from the scene before the police officer who completes the crash report even arrives. Miller, Viner, et al. (1991), and Blincoe and Faigin (1992) documented great diversity in KABCO coding across cases. O'Day (1993) more carefully quantified variability in use of the A-injury code between States. Viner and Conley (1994) probed how differing State definitions A-injury contributed to this variability. Miller, Whiting, et al. (1987), found police-reported injury counts by KABCO severity systematically varied between States because of differing State crash reporting thresholds (rules governing which crashes should be reported to the police). Miller and Blincoe (1994) found that State reporting thresholds often changed over time.

Thus police reports inaccurately describe injuries medically and crash databases inaccurately describe motor vehicle crash severity. We adopted a widely used method to refine crash and injury severity. Developed by Miller and Blincoe (1994), numerous studies have used this method, notably in impaired-driving cost estimates in Blincoe (1996); Miller, Lestina, and Spicer (1998); Blincoe et al. (2002); and Zaloshnja and Miller (2009).

To minimize the effects of variability in severity definitions by State, reporting threshold, and police perception of injury severity, this method uses NHTSA data sets that include both police-reported KABCO and medical descriptions injury in the Occupant Injury Coding system (OIC; AAAM, 1990, 1985). OIC codes include AIS severity score and body region, plus more detailed injury descriptors. We used both 2008–2010 CDS and 1984–1986 NASS data (NASS; NHTSA, 1987). CDS describes injuries to passenger vehicle occupants involved in tow-away crashes. The 1984–1986 NASS data provides the most recent medical description available of injuries to medium/heavy truck and bus occupants, nonoccupants, and others in non-CDS crashes. The

NASS data were coded with the 1980 version of AIS, which differs slightly from the 1985 version; but NHTSA made most AIS 85 changes well before their formal adoption. CDS data were coded in AIS 90/98 with coding shifting to AIS 2005 Update 2008 in 2011. We differentiated our analysis of the two versions AIS because AIS 90/98 scores and OIC codes differ greatly from codes and scores in AIS 85, especially for brain and severe lower limb injury. Garthe et al. (1996) find that AIS scores shifted for roughly 25 percent of all OICs between AIS 85 and AIS 90/98.

We used 2008–2010 CDS and GES non-CDS weights to weight the CDS and NASS data, respectively, so that they represent estimated counts of people injured in motor vehicle crashes during 2008–2010. In applying the GES weights to old NASS, we controlled for police-reported injury severity, restraint use, alcohol involvement, and occupant type (CDS occupant, non-CDS occupant, and nonoccupant). Weighting NASS data to GES restraint use and alcohol involvement levels updates the NASS injury profile to reflect contemporary belt use and alcohol-involvement levels, although it is imperfect in terms of its representation of airbag use in non-tow-away crashes. At completion of the weighting process, we had a hybrid CDS/NASS casualty-level file—that is, we had an appropriately reweighted NASS record for each injured survivor in each non-CDS crash. Similarly, we reweighted the 2008–2010 CDS file to match GES counts in order to get appropriately weighted unit records for CDS sample strata. From this file we obtained counts of alcohol cases based on all indicators of alcohol use to obtain an initial count of alcohol-involved crashes from police-reported crashes. The results are shown in the upper part of Table 7-4 below.

*Table 7-4. Alcohol-Involvement Identified in Police-Reported Crashes*

| Alcohol-Involvement in Police-Reported Crashes Initially Derived From CDS/GES | | | |
|---|---|---|---|
| Injury Severity | Total Incidence | Alcohol-involved | Percentage Alcohol-involved |
| PDO | 6,187,743 | 410,414 | 6.63% |
| MAIS0 | 1,782,823 | 118,235 | 6.63% |
| MAIS1 | 2,204,294 | 104,230 | 4.73% |
| MAIS2 | 220,982 | 17,783 | 8.05% |
| MAIS3 | 74,235 | 8,455 | 11.39% |
| MAIS4 | 13,131 | 1,574 | 11.99% |
| MAIS5 | 3,861 | 574 | 14.86% |
| Fatal | 32,999 | 13,323 | 40.37% |
| Adjusted for GES Undercount and Unreported | | | |
| Injury Severity | Total Incidence | Alcohol-involved | Percentage Alcohol-Involved |
| PDO | 17,007,212 | 1,128,037 | 6.63% |
| MAIS0 | 4,211,513 | 279,302 | 6.63% |
| MAIS1 | 3,273,070 | 154,767 | 4.73% |
| MAIS2 | 305,594 | 24,592 | 8.05% |
| MAIS3 | 85,883 | 9,781 | 11.39% |
| MAIS4 | 14,537 | 1,742 | 11.99% |
| MAIS5 | 4,274 | 635 | 14.86% |
| Fatal | 32,999 | 13,323 | 40.37% |

As previously noted, a significant portion of crashes are not reported to police. We assume that these underreporting rates apply to alcohol-involved crashes as well as to overall crashes. We thus divided by estimated fractions reported to the police: 1.0 for people with critical to fatal injuries, (1-.063) for people with MAIS3 injuries, (1-.272) for MAIS2, (1-.339) for MAIS1, (1-.481) for uninjured people in injury crashes, and (1-.597) for crashes without injuries. [13] The results of these adjustments are shown in the lower half of Table 7-4.

## Underreported Alcohol-Involved Crashes

Although police crash reports typically include an indication of whether alcohol was involved, the nature of crash investigations ten precludes an accurate assessment of alcohol involvement at the crash site. Police underreporting of alcohol involvement has been well documented in numerous studies. Typically, studies on underreporting compare the results of BAC tests administered in medical care facilities to police reports of alcohol involvement. In a 1981 study of injured drivers, Terhune and Fell found that police correctly identified 42 percent of drivers who had been drinking. These rates of identification improved at higher BAC levels, ranging from only 18.5 percent of those with BACs of .01to .09, to 48.9 percent for those with BACs of .10 or greater. In a 1990 study Soderstrom et al. found that police correctly identified alcohol use in 71 percent of legally intoxicated, injured drivers. Earlier studies by Maull et al. in 1984 and Dischinger and Cowley in 1989, found that police correctly identified 57.1 percent and 51.7 percent of intoxicated drivers, respectively. The Dischinger and Cowley study also found a lower identification rate for "involved but not intoxicated" drivers of 28.6 percent. In a 1990 study of injured motorcycle drivers, Soderstrom et al. found that police correctly identified only half the drivers with positive alcohol measurements later identified by the hospital.

These early studies demonstrate that during the late 1980s and early 1990s, the police were identifying approximately half of all legally intoxicated drivers, and about one quarter of all drivers who were alcohol-involved, but not legally intoxicated. It is clear from the studies that police are more accurate in identifying alcohol involvement as the BAC level increases. This may reflect the more obvious nature of impaired behavior on the part of drivers who have higher BAC levels, as well as a tendency to investigate more thoroughly the more serious crashes that result from higher BACs.

In several previous versions this report (Blincoe & Faigin, 1992; Blincoe, 1996) the studies cited above were used to estimate the impact of police underreporting of alcohol involvement. In a subsequent report (Blincoe et al., 2002), more updated information was used. However, those studies were over a decade old in 2015, and when applied to then-current data, they produced results that implied a higher rate of alcohol involvement in less severe injuries than in fatalities and more severe injuries. This is both counter-intuitive and at odds with historical alcohol involvement patterns. Moreover, over the last decade Federal, State and local governments had made concerted efforts to reduce alcohol-related crashes, and this may have improved the rate of alcohol reporting during crash investigations. Data that was more recent was therefore needed to make this adjustment for 2019 data.

The Crash Outcome Data Evaluation System (CODES) linked existing crash and injury data so that specific person, vehicle, and event characteristics could be matched to their medical and

---

[13] For incidence purposes, we used only the 2010 portion of the reweighted hybrid CDS/NASS casualty-level file and the 2010 FARS file

financial outcomes. At the time of the 2002 study 25 States participated in this program and 17 of these States are part of a data network supporting NHTSA highway safety programs. Effort was made to contact all States participating in NHTSA's CODES project to determine whether data were available that could be used to estimate current alcohol reporting rates. For a variety of reasons, only one State, Maryland, had data that was properly linked to allow a comparison between alcohol assessments in police reports and actual measured BACs. The Maryland data represented 2,070 cases admitted to the R Adams CowleyShock Trauma Center between 1997 and 1999. The basis for these data were thus similar to most of the studies cited above from the late 80s and early 90s.

An analysis of these data indicated that police were correctly identifying 74 percent of all alcohol-involved cases where BACs equaled or exceeded .10 g/dL, and 46 percent of all cases where BACs were positive, but less than .10. This represented a significant improvement from the corresponding rates of only 55 percent and 27 percent that were found in the earlier studies. This was consistent with the expectation that reporting rates had improved, and, when applied to police-reported rates in the NHTSA data bases, the more recent factors produce overall estimates that are consistent with FARS rates of involvement for fatal crashes. However, although these data produced logical results, they were gathered from only one State and there were no data to confirm whether the Maryland experience was typical of the Nation. These estimates were thus subject to the caveat that these results have not been verified by broader studies from more diverse regions. One of the previous studies (Soderstrom et al., 1990) was conducted at this same facility and found a higher rate of alcohol recognition than the other studies previously discussed. A second caveat was that, because these data were collected at a trauma unit, they may reflect the more serious cases rather than a sample of all injury levels. Two different, somewhat offsetting biases could result from this. Trauma unit cases are more likely to involve emergency transport and treatment that may occur before police are able to gain access to drivers to determine alcohol involvement. This could result in police missing a larger portion of trauma unit cases. On the other hand, the severity of the crash may prompt a more thorough investigation by the police, resulting in a higher rate of correct alcohol identification. It is not clear what the net effect of these biases would be.

Given these caveats, both the 2015 paper and this current report are based on a more recent study that analyzed what portion of U.S. nonfatal crashes are alcohol-involved and how well police and hospitals detect involvement (Miller et al., 2012). In that study, a capture recapture model estimated alcohol involvement from levels detected by police and hospitals and the extent of detection overlap. The authors analyzed 550,933 Crash Outcome Data Evaluation System driver records from 20062008 police crash report censuses probabilistically linked to hospital inpatient and emergency department (ED) discharge censuses for Connecticut, Kentucky (admissions only), Maryland, Nebraska, New York, South Carolina, and Utah. They then computed national estimates from NHTSA's General Estimates System.

Nationally an estimated 7.5 percent of drivers in nonfatal crashes and 12.9 percent of nonfatal crashes were alcohol-involved. (Crashes often involve several drivers but it is rare for several drivers to have positive BACs) Police correctly identified an estimated 32 percent of alcohol-involved drivers in nonfatal crashes including 48 percent in injury crashes. Excluding Kentucky, police in the six States reported 47 percent of alcohol involvement for cases treated in EDs and released and 39 percent for admitted cases. In contrast, hospitals reported 28 percent of involvement for ED cases and 51 percent for admitted cases. Underreporting varied widely

between States. Police-reported alcohol involvement for 44 percent of those who hospitals reported were alcohol-involved, while hospitals reported alcohol involvement for 33 percent of those who police reported were alcohol-involved. Police alcohol reporting completeness rose with police-reported driver injury severity. At least one system reported 62 percent of alcohol involvement. Based on the combined results from the 6 States that had both admitted and ED data, police records account for 30 to 45 percent of total actual alcohol involvement, depending on injury severity. These rates and the resulting estimates of alcohol involvement are summarized in Table 7-5. Note that although fatalities are listed in Table 7-5, they were not examined in the capture-recapture analysis. As noted previously fatal crashes are investigated much more thoroughly than nonfatal crashes and NHTSA's FARS, through both documentation of police and medical records and through modeling for unreported cases, is believed to account for all alcohol involvement in fatal crashes.

*Table 7-5. Total Alcohol-involvement Adjusted for Unreported Cases*

| Injury Severity | Total Incidence | Percent Identified | Alcohol-involved | Percent Involved |
|---|---|---|---|---|
| PDO | 18,508,632 | 42.90% | 2,629,458 | 14.21% |
| MAIS0 | 4,583,265 | 42.90% | 651,054 | 14.21% |
| MAIS1 | 3,459,200 | 45.40% | 340,897 | 9.85% |
| MAIS2 | 338,730 | 42.60% | 57,728 | 17.04% |
| MAIS3 | 100,740 | 39.70% | 24,638 | 24.46% |
| MAIS4 | 17,086 | 40.60% | 4,292 | 25.12% |
| MAIS5 | 5,749 | 30.10% | 2,110 | 36.70% |
| Fatal | 32,999 | 100.00% | 13,323 | 40.37% |

## BAC Levels

BAC levels are difficult to determine from injury data. Although there are some indications BAC included in CISS data, the CRSS has no such indicators. To determine BACs, an initial assessment was made that virtually all police-reported BACs for nonfatal crashes represent BACs that are at the .05 level or higher. It is illegal per se in every State to drive a motor vehicle with a BAC of .08 or higher. Some State laws establish lesser included offenses at lower BAC levels (most typically at .05 BAC). Unless a crash involves a fatality, police generally do not test or use the alcohol checkbox unless they suspect the driver might be near these levels. In fact, except for fatal crashes, some States do not even allow testing unless a BAC over .08 is suspected. Low BAC levels (especially below .05) are thus unlikely to be registered in police records. An examination of available data from NHTSA's CDS and NASS data systems bears this out. For nonfatal crashes, less than half of 1 percent of nonfatal injuries were recorded as BACS being between .01 and .04 g/dL. However, this primarily represents a limitation in data gathering rather than an indication of near complete absence of crashes at these lower BAC levels. An estimate of crashes at these BAC levels was thus derived from crash probabilities.

Subcategories of BAC levels were calculated as a function of odds ratios for crashes at each specific BAC level compared to exposure at those levels. Odds ratios were derived from a study of relative crash risk conducted by Dunlap and Associates (Blomberg et al., 2005).[14] In this study

---

[14] More recently, Lacey et al. (2016, see also Compton and Bering [2015] for a summary), conducted a similar study based on over 10,000 crash and control drivers. Their resulting odds ratios were similar to the Blomberg et al.

over 2,800 crashes and nearly 15,000 drivers in Long Beach, California, and Fort Lauderdale, Florida, were sampled to determine the relative risk of crashes at different BACs. Logistic regression techniques were used to create a relative risk model that indicated a notable dose-response relationship beginning at .04 BAC and increasing exponentially at >=.10 g/dL BAC. The results of this model are summarized in Figure 7-B below.

*Figure 7-B. Relative Risk of Crash by Blood Alcohol Concentration*



Source: Blomberg et al., 2005

---

(2005) study based solely on voluntary participants. However, Blomberg's group identified a significant number of cases where the drivers either refused to participate (7% of all crash-involved drivers), or left the scene entirely (hit-and-run or HR – 12% of all drivers). For the refusals, Lacey et al. based BAC estimates on passive alcohol sensors (PAS) for participants who refused to complete the study protocol. Forty-five percent of participants who refused had PAS scores >=3 (which indicated the potential for impairment), whereas only 10 percent of participants who completed the study protocol had such scores. Lacey et al. used these results to estimate the BACs of the refusal cases. For HR cases, the researchers based BAC on measured BACs taken for drivers who were apprehended by the police within 2 hours of the crash. Not surprisingly, they found that HR drivers had BACs that were very high. Hit-and-run drivers were especially important because they made up a sizeable portion of drivers involved in crashes in both studies, and because their results were much higher than other cases. In the Lacey et al. study about 63 percent of HR drivers had BACs of .08+, while only about 10 percent of other drivers had BACs this high. So, nearly 20 percent of all cases either refused or were HR, and these cases were the ones most likely to have high BACs. This indicates that results based on voluntary compliance alone will significantly undercount high BACs. For this reason, we based our estimates on the Blomberg et al. study.

The authors found some level of added crash risk beginning at roughly .04 g/dL BAC, but this risk rose noticeably at .08 g/dL BAC and rose exponentially from .10 g/dL BAC and beyond. For example, at .04 g/dL BAC the risk of a crash is 18 percent higher than at zero BAC, but at .08 g/dL BAC the risk of a crash is 2.69 times as high and at .10 g/dL BAC it is 4.79 times as high. To determine BAC distributions, the relative risk ratios of each individual BAC category were combined with exposure data from the same study to estimate the relative risk factor for each grouped BAC category (shown in Table 7-6). These grouped relative risk factors were then combined with national exposure data from Lacey et al. (2009) to determine the distribution of each grouped BAC category as follows.

$$r_n * e_n / r_y * e_y$$

where: $r_n$ = relative risk ratio of specific BAC category

$e_n$ = exposure of specific BAC category

$r_y$ = relative risk of broader BAC category

$e_y$ = exposure of broader BAC category

The broader categories are those derived above for nonfatal injuries, which were all assumed to be BAC>=.5 g/dL, and the difference between these and the total incidence, which represent .00- to .04 g/dL BAC. Essentially, this divides alcohol BAC cases into two broad categories at the .05 g/dL level. The .08 g/dL+BAC category was then derived using the above formula from the >=.05 g/dL BAC total and the .01-.04 g/dL BAC category was derived from the <.05 g/dL BAC category.

This process produced BAC distributions based on data first examined in the 2015 report. We note that these distributions have not materially changed for fatalities over this timeframe (see Table 7-1). We assumed that distributions for nonfatal crashes have been similarly static, and thus applied ratios derived from the 2015 report to 2019 incidence to estimate the 2019 BAC distributions. The inputs used for each category and the resulting BAC distributions are shown in Table 7-6.

*Table 7-6. Incidence Stratified by Highest Driver or Nonoccupant BAC and Injury Severity*

| Injury Severity | BAC=.00 | BAC=.01-.04 | BAC=.05-.07 | BAC≥.08 | BAC≥.01 | Total |
|---|---|---|---|---|---|---|
| PDO | 16,547,940 | 355,746 | 169,431 | 2,215,022 | 2,740,199 | 19,288,139 |
| MAIS0 | 3,882,996 | 83,476 | 39,751 | 519,678 | 642,905 | 4,525,901 |
| MAIS1 | 3,493,366 | 75,100 | 21,799 | 285,000 | 381,899 | 3,875,265 |
| MAIS2 | 354,328 | 7,617 | 4,630 | 60,544 | 72,791 | 427,119 |
| MAIS3 | 106,641 | 2,293 | 2,290 | 29,943 | 34,526 | 141,167 |
| MAIS4 | 14,441 | 310 | 323 | 4,211 | 4,844 | 19,285 |
| MAIS5 | 4,549 | 98 | 180 | 2,360 | 2,638 | 7,187 |
| Fatal | 22,281 | 1,125 | 937 | 12,157 | 14,219 | 36,500 |
| Total | 24,426,542 | 525,765 | 239,341 | 3,128,915 | 3,894,021 | 28,320,563 |
| % of Crash-Involved People | 86.25% | 1.86% | 0.85% | 11.05% | 13.75% | 100% |
| % of Miles Driven | 97.18% | 1.96% | 0.39% | 0.47% | 2.82% | 100% |
| Relative Risk | 1.0000 | 1.0645 | 1.6581 | 17.9870 | 3.7568 | |

The results illustrate the disproportionate impact that high BACs have on crash incidence. Less than 1 percent of overall miles are driven by impaired drivers (.08+ g/dL BAC), but they account for over 11 percent of all vehicle crashes, and over 80 percent of all alcohol-involved crashes, including 86 percent of all alcohol-involved fatalities.

Figure 7-C illustrates the relative incidence of crashes with no alcohol, with alcohol below .08 g/dL BAC, and with alcohol above .08 g/dL BAC. Alcohol-involved crashes account for nearly 40 percent of all fatal crashes. There is a clear trend toward increased alcohol involvement as injury severity increases. This figure illustrates the fact that alcohol not only increases the likelihood of crashes, but their severity as well.

Figure 7-D illustrates the relative incidence of crashes at various BAC levels. The vast majority of all alcohol-related crashes occur at legally impaired BACs of .08 and above.

*Figure 7-C. Relative Incidence in Crashes of Alcohol BAC Levels by Injury Severity*





*Figure 7-D. Relative Incidence of BAC Levels in Alcohol-Involved Crashes by Injury Severity*



**Alcohol-Involved Crash Costs**

The costs of alcohol-involved crashes tend to exceed those of non-alcohol-involved crashes due to a variety of factors. The first is a general tendency toward greater relative severity of alcohol-involved crashes. For all crashes, fatalities are approximately 0.8 percent of injured survivors. This rate nearly quadruples for crashes involving alcohol. Similarly, the rate for critical injuries (MAIS5) triples for alcohol cases and for severe injuries (MAIS4) it more than doubles. The more severe and expensive injuries represent a much higher portion of alcohol-involved cases. A second factor is demographics. Men are disproportionately represented in alcohol-involved crashes and this makes the cost for each alcohol-involved case higher for men. This occurs because men have higher earnings and participation in the work force than women; thus, there is a higher lost productivity cost associated with these crashes. In non-alcohol-involved crashes, the gender distribution is more evenly distributed. In addition, the victims of alcohol-involved crashes tend to be of an age group where lost productivity is maximized by the discounting process.

Unit costs specific to alcohol-involved crashes were developed by extracting cases with police-reported alcohol from the previously discussed file based on 2008-2010 weights. As noted above, virtually all of these cases represent crashes with BACs of .05 or greater. Unit costs for these crashes were thus weighted by the relative incidence of .05 BAC+ cases within all positive BAC cases. The unit costs of cases with BACs of .00 to .04 were then derived as a function of the relative incidence and cost of the .05+BAC crashes and all crashes as follows:

$b=(cz-ax)/y$

where: $b$=unit cost in crashes with BAC<.05

   $c$=average unit cost of all crashes

   $z$=incidence of all crashes

   $a$ = unit cost of crashes with BAC≤.05

   $x$=incidence of crashes with BAC≤.05

   $y$ = incidence of crashes with BAC<.05

As with incidence, this process produced BAC specific unit costs based on data first examined in the 2010 report. We adopted ratios of specific BAC costs to the average costs computed for 2019 to estimate specific unit costs for each BAC level. The results of this process are shown in Tables 7-7, 7-8, and 7-9.

Table 7-7. Average Unit Costs, BAC≥.05 Injuries, and BAC >.00 Fatalities (2019 $)

| | PDO | MAIS0 | MAIS1 | MAIS2 | MAIS3 | MAIS4 | MAIS5 | Fatal |
|---|---|---|---|---|---|---|---|---|
| Medical | $0 | $0 | $2,409 | $14,162 | $73,434 | $193,058 | $370,687 | $17,289 |
| Emergency Services | $31 | $24 | $106 | $228 | $486 | $976 | $999 | $1,060 |
| Market Productivity | $0 | $0 | $2,547 | $24,229 | $98,032 | $244,665 | $314,591 | $1,010,970 |
| Household Productivity | $71 | $55 | $947 | $9,358 | $41,743 | $121,459 | $131,891 | $367,148 |
| Insurance Admin. | $523 | $225 | $2,679 | $9,783 | $30,535 | $38,612 | $38,959 | $36,245 |
| Workplace Costs | $99 | $76 | $56 | $418 | $3,240 | $7,077 | $7,794 | $13,589 |
| Legal Costs | $0 | $0 | $923 | $7,593 | $29,562 | $78,478 | $114,865 | $138,025 |
| Injury Subtotal | $724 | $380 | $9,667 | $65,771 | $277,031 | $684,326 | $979,786 | $1,584,326 |
| Congestion Costs | $1,327 | $1,008 | $1,207 | $1,339 | $1,691 | $1,814 | $1,857 | $7,133 |
| Property Damage | $3,200 | $1,864 | $9,650 | $9,616 | $17,835 | $20,565 | $23,234 | $15,185 |
| Economic Subtotal | $5,251 | $3,252 | $20,524 | $76,726 | $296,557 | $706,705 | $1,004,877 | $1,606,644 |
| QALYs | $0 | $0 | $43,679 | $430,884 | $1,904,629 | $3,053,786 | $5,529,606 | $9,651,851 |
| Comprehensive Total | $5,251 | $3,252 | $64,203 | $507,610 | $2,201,186 | $3,760,490 | $6,534,484 | $11,258,495 |

*Note: Unit costs are expressed on a per-person basis for all injury levels. PDO costs are expressed on a per-damaged-vehicle basis.

Table 7-8. Average Unit Costs, BAC=.00-.04 Injuries, and BAC .00 Fatalities (2019 $)

| | PDO | MAIS0 | MAIS1 | MAIS2 | MAIS3 | MAIS4 | MAIS5 | Fatal |
|---|---|---|---|---|---|---|---|---|
| Medical | $0 | $0 | $2,193 | $13,108 | $68,135 | $187,264 | $359,152 | $17,289 |
| Emergency Services | $31 | $24 | $106 | $228 | $486 | $976 | $999 | $1,060 |
| Market Productivity | $0 | $0 | $2,295 | $22,892 | $91,143 | $225,366 | $301,668 | $1,010,970 |
| Household Productivity | $71 | $55 | $839 | $8,924 | $38,190 | $114,952 | $125,697 | $367,148 |
| Insurance Admin. | $523 | $225 | $2,172 | $7,938 | $28,154 | $35,831 | $37,601 | $36,245 |
| Workplace Costs | $99 | $76 | $56 | $418 | $3,240 | $7,077 | $7,794 | $13,589 |
| Legal Costs | $0 | $0 | $724 | $6,000 | $27,167 | $72,361 | $107,359 | $138,025 |
| Injury Subtotal | $724 | $380 | $8,386 | $59,508 | $256,516 | $643,827 | $940,270 | $1,584,326 |
| Congestion Costs | $1,327 | $1,008 | $1,207 | $1,339 | $1,691 | $1,814 | $1,857 | $7,133 |
| Property Damage | $3,200 | $1,864 | $9,650 | $9,616 | $17,835 | $20,565 | $23,234 | $15,185 |
| Economic Subtotal | $5,251 | $3,252 | $19,243 | $70,463 | $276,042 | $666,206 | $965,361 | $1,606,644 |
| QALYs | $0 | $0 | $40,891 | $397,201 | $1,722,235 | $2,902,425 | $4,817,075 | $9,651,851 |
| Comprehensive Total | $5,251 | $3,252 | $60,134 | $467,665 | $1,998,276 | $3,568,631 | $5,782,435 | $11,258,495 |

*Note: Unit costs are expressed on a per-person basis for all injury levels. PDO costs are expressed on a per-damaged-vehicle basis.

*Table 7-9. Average Unit Costs, All Positive BAC Injuries and Fatalities (2019 $)*

| | PDO | MAIS0 | MAIS1 | MAIS2 | MAIS3 | MAIS4 | MAIS5 | Fatal |
|---|---|---|---|---|---|---|---|---|
| Medical | $0 | $0 | $2,409 | $14,162 | $73,434 | $193,058 | $370,687 | $17,289 |
| Emergency Services | $31 | $24 | $106 | $228 | $486 | $976 | $999 | $1,060 |
| Market Productivity | $0 | $0 | $2,547 | $24,229 | $98,032 | $244,665 | $314,591 | $1,010,970 |
| Household Productivity | $71 | $55 | $947 | $9,358 | $41,743 | $121,459 | $131,891 | $367,148 |
| Insurance Admin. | $523 | $225 | $2,679 | $9,783 | $30,535 | $38,612 | $38,959 | $36,245 |
| Workplace Costs | $99 | $76 | $56 | $418 | $3,240 | $7,077 | $7,794 | $13,589 |
| Legal Costs | $0 | $0 | $923 | $7,593 | $29,562 | $78,478 | $114,865 | $138,025 |
| Injury Subtotal | $724 | $380 | $9,667 | $65,771 | $277,031 | $684,326 | $979,786 | $1,584,326 |
| Congestion Costs | $1,327 | $1,008 | $1,207 | $1,339 | $1,691 | $1,814 | $1,857 | $7,133 |
| Property Damage | $3,200 | $1,864 | $9,650 | $9,616 | $17,835 | $20,565 | $23,234 | $15,185 |
| Economic Subtotal | $5,251 | $3,252 | $20,524 | $76,726 | $296,557 | $706,705 | $1,004,877 | $1,606,644 |
| QALYs | $0 | $0 | $43,679 | $430,884 | $1,904,629 | $3,053,786 | $5,529,606 | $9,651,851 |
| Comprehensive Total | $5,251 | $3,252 | $64,203 | $507,610 | $2,201,186 | $3,760,490 | $6,534,484 | $11,258,495 |

*Note: Unit costs are expressed on a per-person basis for all injury levels. PDO costs are expressed on a per-damaged-vehicle basis.

118

Table 7-10 lists the aggregate 2019 economic costs of alcohol-involved crashes, and Table 7-11 lists the proportion of total economic crash costs that each BAC level represents. Alcohol is involved in crashes that account for 14 percent of the costs of PDO crashes, 18 percent of the costs that result from nonfatal injuries and 39 percent of the costs that result from fatalities. Overall, these crashes are responsible for 20 percent of total economic costs. The impact of alcohol-involved crashes on overall costs is thus higher than would be indicated by the alcohol-involved incidence rates across all crashes. Overall, alcohol-involved crashes cost $69 billion in economic costs in 2019, with 84 percent of this or $58 billion, occurring in crashes where the highest BAC was ≥.08.

*Table 7-10. Summary of Total Economic Costs by BAC Level (Millions 2019 $)*

|  | BAC=.00 | BAC=.01-.04 | BAC=.05-.07 | BAC≥.08 | BAC≥.01+ | Total |
|---|---|---|---|---|---|---|
| PDO | $86,893 | $1,868 | $890 | $11,631 | $14,389 | $101,282 |
| MAIS0 | $12,628 | $271 | $129 | $1,690 | $2,091 | $14,718 |
| MAIS1 | $67,221 | $1,445 | $447 | $5,849 | $7,742 | $74,963 |
| MAIS2 | $24,967 | $537 | $355 | $4,645 | $5,537 | $30,504 |
| MAIS3 | $29,438 | $633 | $679 | $8,880 | $10,192 | $39,629 |
| MAIS4 | $9,620 | $207 | $228 | $2,976 | $3,411 | $13,031 |
| MAIS5 | $4,392 | $94 | $181 | $2,372 | $2,647 | $7,039 |
| Fatal | $35,797 | $1,808 | $1,505 | $19,532 | $22,846 | $58,643 |
| Total | $270,956 | $6,863 | $4,415 | $57,576 | $68,854 | $339,809 |
| % Total Alcohol Costs | NA | 9.97% | 6.41% | 83.62% | 100.00% | NA |
| % Total | 79.74% | 2.02% | 1.30% | 16.94% | 20.26% | 100.00% |

*Table 7-11. Percentage of Economic Injury Costs by BAC Level*

|  | BAC= .00 | BAC=.01-.04 | BAC=.05-.07 | BAC≥.08 | BAC≥.01+ | Total |
|---|---|---|---|---|---|---|
| PDO | 85.79% | 1.84% | 0.88% | 11.48% | 14.21% | 100.00% |
| MAIS0 | 85.79% | 1.84% | 0.88% | 11.48% | 14.21% | 100.00% |
| MAIS1 | 89.67% | 1.93% | 0.60% | 7.80% | 10.33% | 100.00% |
| MAIS2 | 81.85% | 1.76% | 1.16% | 15.23% | 18.15% | 100.00% |
| MAIS3 | 74.28% | 1.60% | 1.71% | 22.41% | 25.72% | 100.00% |
| MAIS4 | 73.82% | 1.59% | 1.75% | 22.84% | 26.18% | 100.00% |
| MAIS5 | 62.40% | 1.34% | 2.57% | 33.70% | 37.60% | 100.00% |
| Fatal | 61.04% | 3.08% | 2.57% | 33.31% | 38.96% | 100.00% |
| Total | 79.74% | 2.02% | 1.30% | 16.94% | 20.26% | 100.00% |

Table 7-12 lists the aggregate 2019 comprehensive costs of alcohol-related crashes, and Table 7-13 lists the proportion of total comprehensive crash costs that each BAC level represents. Alcohol is involved in crashes that account for 14 percent of the societal harm of PDO crashes, 20 percent of the harm that result from nonfatal injuries, and 39 percent of the harm that result from fatalities. All alcohol-involved crashes are responsible for 26 percent of total societal harm from motor vehicle crashes, but crashes with BAC≥.08 are responsible for 85 percent of this or 22 percent of total harm. The impact of alcohol-involved crashes on overall costs is thus higher than would be indicated by the alcohol-involved incidence rates across all crashes. Overall,

alcohol-involved crashes cost $348 billion in comprehensive societal costs in 2019, with 85 percent of this or $296 billion, occurring in crashes where the highest BAC was ≥.08.

*Table 7-12. Total Comprehensive Costs by BAC Level (Millions 2019 $)*

|  | BAC=.00 | BAC=.01-.04 | BAC=.05-.07 | BAC≥.08 | BAC≥.01+ | Total |
|---|---|---|---|---|---|---|
| PDO | $86,893 | $1,868 | $890 | $11,631 | $14,389 | $101,282 |
| MAIS0 | $12,628 | $271 | $129 | $1,690 | $2,091 | $14,718 |
| MAIS1 | $210,070 | $4,516 | $1,400 | $18,298 | $24,213 | $234,283 |
| MAIS2 | $165,706 | $3,562 | $2,350 | $30,733 | $36,645 | $202,352 |
| MAIS3 | $213,100 | $4,581 | $5,040 | $65,910 | $75,531 | $288,631 |
| MAIS4 | $51,532 | $1,108 | $1,214 | $15,836 | $18,157 | $69,690 |
| MAIS5 | $26,307 | $564 | $1,176 | $15,424 | $17,164 | $43,471 |
| Fatal | $250,845 | $12,671 | $10,546 | $136,873 | $160,090 | $410,935 |
| Total | $1,017,080 | $29,142 | $22,745 | $296,394 | $348,281 | $1,365,362 |
| % Total Alcohol Costs | NA | 8.37% | 6.53% | 85.10% | 100.00% | NA |
| % Total | 74.49% | 2.13% | 1.67% | 21.71% | 25.51% | 100.00% |

*Table 7-13. Percentage of Comprehensive Injury Costs by BAC Level*

|  | BAC=.00 | BAC=.01-.04 | BAC=.05-.07 | BAC≥.08 | BAC≥.01+ | Total |
|---|---|---|---|---|---|---|
| PDO | 85.79% | 1.84% | 0.88% | 11.48% | 14.21% | 100.00% |
| MAIS0 | 85.79% | 1.84% | 0.88% | 11.48% | 14.21% | 100.00% |
| MAIS1 | 89.66% | 1.93% | 0.60% | 7.81% | 10.34% | 100.00% |
| MAIS2 | 81.89% | 1.76% | 1.16% | 15.19% | 18.11% | 100.00% |
| MAIS3 | 73.83% | 1.59% | 1.75% | 22.84% | 26.17% | 100.00% |
| MAIS4 | 73.95% | 1.59% | 1.74% | 22.72% | 26.05% | 100.00% |
| MAIS5 | 60.52% | 1.30% | 2.71% | 35.48% | 39.48% | 100.00% |
| Fatal | 61.04% | 3.08% | 2.57% | 33.31% | 38.96% | 100.00% |
| Total | 74.49% | 2.13% | 1.67% | 21.71% | 25.51% | 100.00% |

**Alcohol Crash Causation**

Inebriated drivers often experience impaired perceptions that can lead to risky behavior such as speeding, reckless driving, and failure to wear seat belts. They also experience reduced reaction times, which can make it more difficult for them to perform defensive safety maneuvers. As a result, there is a general tendency to equate the presence of alcohol with crash causation. However, there are clearly some instances in which crashes would occur regardless of whether the driver had consumed alcohol. For example, if a distracted texting driver were to run into a driver with a positive BAC who was stopped at a red light, a police investigation or medical records might record that the struck driver had a positive BAC, even though that driver was not at fault. In this case, the crash would be recorded as alcohol-involved, even though alcohol was not a causative factor.

Miller, Spicer, and Levy (1999) estimated the percentages of alcohol-related crashes that are attributable to alcohol. In this study they examined the probability of crash involvement for drivers based on their BAC level and then removed the normal risk of crash involvement without

alcohol from the overall risk found for drivers with positive BACs. Their study found that 94 percent of crashes at BACs of .10 g/dl or higher, and 31 percent of crashes with positive BACs less than .10 g/dL, were actually caused by alcohol. The remaining crashes were due to bad weather, poor road conditions, non-drinking drivers, etc. Currently a BAC of .08 g/dL is considered to be the definition of "illegal per se" for alcohol impairment rather than .10. More recently, Blomberg et al. (2005) examined the relative crash risk of drinking and non-drinking drivers. The methods and results of this study were discussed previously (see Figure 7-B above). Table 7-6 displayed the relative risk for various BAC categories that were derived from Blomberg and colleagues' BAC specific risk factors. These factors can be used to estimate the incidence of crashes where alcohol consumption actually contributed to the crash occurrence across the various BAC groupings examined in this report. These proportions were estimated as the ratio of the added risk in an alcohol-involved crash to the total risk in this crash. Specifically:

y=(r-1)/r

where: y = proportion of BAC + crashes that are attributable to alcohol.

r= relative risk ratio of specific BAC category

Table 7-14 and Figures 7-E and 7-F illustrate the results of this process. The second to the last row in Table 7-14 lists the relative risk calculated from data in Blomberg et al. (2005), while the last row lists the proportion of injuries in each BAC category that are attributable to alcohol. Roughly 6 percent of BAC = .01-.04 injuries, 40 percent of BAC = .05-.07 injuries, and 94 percent of BAC≥ .08 injuries are attributable to alcohol. The increasing proportions are expected since higher BAC levels cause more inebriation, with its associated reduction in awareness and motor skills. Overall, about 79 percent of injuries from crashes recorded as alcohol-involved can be attributed to alcohol as a causative factor. This is roughly the same percentage calculated in Blincoe et al., 2002 (80.8%), which was based on the earlier Miller, Spicer, and Levy analysis. Alcohol thus appears to be a causative factor in roughly 80 percent of cases coded as alcohol-involved but is irrelevant to crash causation in the other 20 percent of cases.

*Table 7-14. Injuries Attributable to Alcohol Use by BAC Level*

| Injury Severity | BAC=.01-.04 | BAC=.05-.079 | BAC≥.08 | BAC≥.01+ |
|---|---|---|---|---|
| PDO | 21,560 | 67,246 | 2,091,877 | 2,180,683 |
| MAIS0 | 5,059 | 15,777 | 490,786 | 511,622 |
| MAIS1 | 4,551 | 8,652 | 269,155 | 282,358 |
| MAIS2 | 462 | 1,838 | 57,178 | 59,477 |
| MAIS3 | 139 | 909 | 28,278 | 29,326 |
| MAIS4 | 19 | 128 | 3,977 | 4,124 |
| MAIS5 | 6 | 71 | 2,229 | 2,306 |
| Fatal | 68 | 372 | 11,481 | 11,921 |
| Total | 31,863 | 94,993 | 2,954,962 | 3,081,819 |
| Relative Risk | 1.0645 | 1.6581 | 17.9870 | 4.7477 |
| % Attributable to Alcohol | 6.06% | 39.69% | 94.44% | 79.14% |

*Figure 7-E. Percentage of Positive BAC Crashes Attributable to Alcohol by BAC Level*



*Figure 7-F. Percentage of Injuries Attributable to Alcohol by Injury Severity Level*



To estimate the economic cost of crashes attributable to alcohol, the incidence from Table 7-14 was combined with the unit costs from Tables 7-7 and 7-8. The results, summarized in Table 7-15, indicate that alcohol causes crashes that result in roughly $57 billion in economic costs annually. This accounts for 82 percent of the crash costs associated with crashes that are considered alcohol-involved. It represents 17 percent of all crash costs (including those without

alcohol involvement), accounting for 11 percent of PDO costs, 15 percent of nonfatal injury costs, and 33 percent of fatality costs.

*Table 7-15. Economic Crash Costs (Millions 2019 $) Attributable to Alcohol Use by BAC Level and Injury Severity*

| Injury Severity | BAC=.01-.04 | BAC=.05-.079 | BAC≥.08 | BAC≥.01+ | Total |
|---|---|---|---|---|---|
| PDO | $113 | $353 | $10,984 | $11,451 | $101,282 |
| MAIS0 | $16 | $51 | $1,596 | $1,664 | $14,718 |
| MAIS1 | $88 | $178 | $5,524 | $5,789 | $74,963 |
| MAIS2 | $33 | $141 | $4,387 | $4,561 | $30,504 |
| MAIS3 | $38 | $270 | $8,386 | $8,694 | $39,629 |
| MAIS4 | $13 | $91 | $2,811 | $2,914 | $13,031 |
| MAIS5 | $6 | $72 | $2,240 | $2,318 | $7,039 |
| Fatal | $110 | $597 | $18,447 | $19,153 | $58,643 |
| Total | $416 | $1,752 | $54,375 | $56,543 | $339,809 |
| % of Total Alcohol-Involved Costs Attributable to Alcohol | 6.06% | 39.69% | 94.44% | 82.12% | |
| % of Total Costs Attributable to Alcohol | 0.12% | 0.52% | 16.00% | 16.64% | |

*Table 7-16. Percentage of Total Economic Costs Attributable to Alcohol by BAC Level and Injury Severity*

| Injury Severity | BAC=.01-.04 | BAC=.05-.079 | BAC≥.08 | BAC≥.01+ |
|---|---|---|---|---|
| PDO | 0.11% | 0.35% | 10.85% | 11.31% |
| MAIS0 | 0.11% | 0.35% | 10.84% | 11.30% |
| MAIS1 | 0.12% | 0.24% | 7.37% | 7.72% |
| MAIS2 | 0.11% | 0.46% | 14.38% | 14.95% |
| MAIS3 | 0.10% | 0.68% | 21.16% | 21.94% |
| MAIS4 | 0.10% | 0.69% | 21.57% | 22.36% |
| MAIS5 | 0.08% | 1.02% | 31.82% | 32.92% |
| Fatal | 0.19% | 1.02% | 31.46% | 32.66% |
| Total | 0.12% | 0.52% | 16.00% | 16.64% |

To estimate the comprehensive cost of crashes attributable to alcohol, the incidence from Table 7-14 was combined with the unit costs from Tables 7-7 and 7-8. The results, summarized in Table 7-17 and 7-18, indicate that alcohol causes crashes that result in roughly $287 billion in comprehensive societal costs annually. This accounts for 82 percent of the comprehensive crash costs associated with crashes that are considered alcohol-involved. It represents 21 percent of all crash costs (including those without alcohol involvement, accounting for 11 percent of societal harm from PDOs, 17 percent of harm from nonfatal injuries, and 32 percent of harm from fatalities.

*Table 7-17. Comprehensive Crash Costs (Millions 2019 $) Attributable to Alcohol Use by BAC Level and Injury Severity*

| Injury Severity | BAC=.01-.04 | BAC=.05-.079 | BAC≥.08 | BAC≥.01 | Total |
|---|---|---|---|---|---|
| PDO | $113 | $353 | $10,984 | $11,451 | $101,282 |
| MAIS0 | $16 | $51 | $1,596 | $1,664 | $14,718 |
| MAIS1 | $274 | $555 | $17,281 | $18,110 | $234,283 |
| MAIS2 | $216 | $933 | $29,024 | $30,173 | $202,352 |
| MAIS3 | $278 | $2,000 | $62,246 | $64,524 | $288,631 |
| MAIS4 | $67 | $482 | $14,955 | $15,504 | $69,690 |
| MAIS5 | $34 | $467 | $14,566 | $15,067 | $43,471 |
| Fatal | $768 | $4 | $129,263 | $130,036 | $410,935 |
| Total | $1,766 | $4,846 | $279,916 | $286,528 | $1,365,362 |
| % of Total Alcohol-Involved Costs Attributable to Alcohol | 6.06% | 21.31% | 94.44% | 82.27% | |
| % of Total Costs Attributable to Alcohol | 0.13% | 0.35% | 20.50% | 20.99% | |

*Table 7-18. Percentage of Total Comprehensive Costs Attributable to Alcohol by BAC Level and Injury Severity*

| Injury Severity | BAC=.01-.04 | BAC=.05-.079 | BAC≥.08 | BAC≥.01 |
|---|---|---|---|---|
| PDO | 0.11% | 0.35% | 10.85% | 11.31% |
| MAIS0 | 0.11% | 0.35% | 10.84% | 11.30% |
| MAIS1 | 0.12% | 0.24% | 7.38% | 7.73% |
| MAIS2 | 0.11% | 0.46% | 14.34% | 14.91% |
| MAIS3 | 0.10% | 0.69% | 21.57% | 22.36% |
| MAIS4 | 0.10% | 0.69% | 21.46% | 22.25% |
| MAIS5 | 0.08% | 1.07% | 33.51% | 34.66% |
| Fatal | 0.19% | 0.00% | 31.46% | 31.64% |
| Total | 0.13% | 0.35% | 20.50% | 20.99% |

## 8. Speeding

Excess speed can contribute to both the frequency and severity of motor vehicle crashes. At higher speeds, additional time is required to stop a vehicle and more distance is traveled before corrective maneuvers can be implemented. Speeding reduces a driver's ability to react to an emergency created by driver inattention; by unsafe maneuvers of other vehicles; by roadway hazards; by vehicle system failures (such as tire blowouts); or by hazardous weather conditions. Further, if a crash does occur, higher impact speed increases the impact force and both the probability of, and severity of injury to both occupants and nonoccupants. The fact that a vehicle was speeding does not necessarily mean that this was the cause of the crash, but the probability of avoiding the crash would likely be greater had the driver been traveling at a slower speed.

A speed-related crash is defined as any crash in which the police indicate that one or more drivers involved were exceeding the posted speed limit, driving too fast for conditions, racing, or coded as speed-related conditions unknown. In 2019 a total of 10,192 fatalities, representing 27.9 percent of all motor vehicle fatalities, occurred in speed-related crashes. This estimate was derived by applying the portion of FARS fatalities with known speed status to total 2019 fatalities.

To estimate the cost of these crashes we examined the relative incidence of each injury severity level that was represented by crashes that were speed-related. These estimates reflect the relative proportions specific injury severities that occur under each scenario. CRSS was used for each nonfatal case while FARS was used for each fatal case. Each case in FARS contained information regarding speeding status, so the proportion of fatalities that occurred under each scenario was obtained directly from the 2019 FARS database. For nonfatal injuries and PDOs, 2017-2019 CRSS data were queried to determine whether the case fell under the scenario or not. However, CRSS data are only recorded using the KABCO severity system, whereas this report is based on the AIS. To translate CRSS data to an MAIS basis, we used a variety of KABCO/MAIS translators. For CISS equivalent crashes, we used a current translator derived from 2017-2019 CISS data. Since these data are relatively recent, they reflect roughly current levels of seat belt usage. For non-CISS cases, we apply newly developed translators derived from 2017-2019 CISS and 1982-1986 NASS files. Seat belt use has increased dramatically since this time. Observed belt use during this period ranged from roughly 10-37 percent as public awareness of the importance of belt use and belt use laws were just beginning to take hold in 1986. Belt use has since risen dramatically, and has been between 80 and 85 percent since 2004, and is currently roughly 90 percent. Belt use can influence injury reporting significantly in a number of ways. It changes the nature of injuries by preventing many more visible injuries (such as head/face contact with the windshield) but replaces them with often less visible (and also typically less serious) abdominal injuries such as bruising caused by pressure from the belt across the torso. This can influence the relationship between the KABCO reported injury severity and the corresponding MAIS injury level. For this reason, separate translators were developed from the 1982-86 NASS data for non-CDS cases where the victim was belted, unbelted, and for nonoccupants/motorcyclists. These translators are presented in Tables 1-5 in Appendix C.

The 2017-2019 CRSS KABCO incidence counts were obtained both for speed-involved and uninvolved cases. Consistent with NHTSA publication practice, cases where speed involvement was unknown were grouped with the uninvolved cases. Thus, one set of incidence counts was obtained for speed involved, and another for all other crashes. Each of these data sets was run through its corresponding translator to produce a set of MAIS based injury counts. These counts

from each grouping (CISS equivalent cases, belted non-CDS cases, unbelted non-CDS cases, and nonoccupant/motorcycle cases) were added together to produce a total MAIS injury profile for each scenario. The percentage of each MAIS injury incidence that was appropriate to each scenario was then calculated as follows:

x=a/(a+b)

where x is the percentage of incidence attributable to speed-related crashes

    a = the incidence of speed-related crashes

    b = the incidence of crashes not related to speed, including those where the speed-related variable was coded unknown

The speed-attributable portion of each MAIS level was then multiplied by the total cost of all 2019 crashes for that MAIS level and the MAIS level results were summed to produce the total cost of each crash scenario. MAIS0 portions were calculated using the same procedure described elsewhere in this report for urban/rural crashes, based on the relative incidence of MAIS0 cases in injury crashes. The PDO portion was based on a direct count of PDO vehicles from each crash scenario compared to those not in that scenario.

The results of this process are summarized in Tables 8-1 and 8-2 for economic and comprehensive costs. Speed-related crashes resulted in 10,192 fatalities, nearly 500,000 nonfatal injuries, and 1.7 million PDO damaged vehicles in 2019. This represents 28 percent of all fatalities and roughly 11 percent of all nonfatal injury crashes, and 9 percent of all PDOs. Speed-related crashes caused $46 billion in economic costs and $225 billion in comprehensive costs, accounting for 14 percent of all economic costs and 16 percent of all societal harm (measured as comprehensive costs) from motor vehicle crashes.

*Table 8-1. Economic Costs of Speed-Related Crashes (Millions 2019 $)*

|  | % Speed-Related | Incidence | | Total Economic Crash Costs | | |
|---|---|---|---|---|---|---|
|  |  | Total | Speed-Related | Total | Speed-Related | Other |
| **PDO Vehicles** | 8.90% | 19,288,139 | 1,717,134 | $101,282 | $9,017 | $92,265 |
| **MAIS0** | 11.24% | 4,525,901 | 508,842 | $14,718 | $1,655 | $13,063 |
| **MAIS1** | 10.99% | 3,875,265 | 425,991 | $74,963 | $8,240 | $66,723 |
| **MAIS2** | 12.11% | 427,119 | 51,705 | $30,504 | $3,693 | $26,812 |
| **MAIS3** | 11.75% | 141,167 | 16,584 | $39,629 | $4,656 | $34,974 |
| **MAIS4** | 12.96% | 19,285 | 2,499 | $13,031 | $1,688 | $11,343 |
| **MAIS5** | 14.96% | 7,187 | 1,075 | $7,039 | $1,053 | $5,986 |
| **Fatalities** | 27.92% | 36,500 | 10,192 | $58,643 | $16,376 | $42,267 |
| **Total** | 9.65% | 28,320,563 | 2,734,023 | $339,809 | $46,377 | $293,432 |
| **Percentage of Total** |  | 100.00% | 9.65% | 100.00% | 13.65% | 86.35% |

*Table 8-2. Comprehensive Costs of Speed-Related Crashes (Millions 2019 $)*

| | % Speed-Related | Incidence | | Total Comprehensive Crash Costs | | |
|---|---|---|---|---|---|---|
| | | Total | Speed-Related | Total | Speed-Related | Other |
| **PDO Vehicles** | 8.90% | 19,288,139 | 1,717,134 | $101,282 | $9,017 | $92,265 |
| **MAIS0** | 11.24% | 4,525,901 | 508,842 | $14,718 | $1,655 | $13,063 |
| **MAIS1** | 10.99% | 3,875,265 | 425,991 | $234,283 | $25,754 | $208,529 |
| **MAIS2** | 12.11% | 427,119 | 51,705 | $202,352 | $24,496 | $177,856 |
| **MAIS3** | 11.75% | 141,167 | 16,584 | $288,631 | $33,908 | $254,723 |
| **MAIS4** | 12.96% | 19,285 | 2,499 | $69,690 | $9,029 | $60,660 |
| **MAIS5** | 14.96% | 7,187 | 1,075 | $43,471 | $6,504 | $36,967 |
| **Fatalities** | 27.92% | 36,500 | 10,192 | $410,935 | $114,751 | $296,184 |
| **Total** | 9.65% | 28,320,563 | 2,734,023 | $1,365,362 | $225,113 | $1,140,249 |
| **Percentage of Total** | | 100.00% | 9.65% | 100.00% | 16.49% | 83.51% |

One note of caution is in order when using these estimates – there is a significant overlap between alcohol involvement and speed. Many speed-related crashes involved alcohol and vice-versa. These two estimates should not be added together to account for the portion of costs that represent the combined factors of speed and alcohol. This same caveat applies to many of the other scenarios examined in this report, as several factors can be involved in any given crash.

127

## 9.  Distracted Driving

Driver error has long been recognized as a principal cause of motor vehicle crashes. In a landmark 1979 Tri-Level study by the Indiana University (Teat et al., 1999), human factors such as speeding, inattention, distraction, and performance errors were found to be a contributing factor in 92.6 percent of all crashes. The Tri-Level study found that inattention was a crash cause in roughly 9.8 percent and a probable cause in 15.0 percent of crashes. It also found that "internal distraction" (distraction caused by factors within the vehicle) was a cause in 5.7 percent of crashes and a probable cause in 9.0 percent. The National Motor Vehicle Crash Causation Survey (NMVCCS, NHTSA, 2008) sponsored by NHTSA found that driver-related factors were a principal cause in 94 percent of crashes (NHTSA, 2018). Driver factors include both performance errors and errors related to non-driving activities, which typically involve distraction, inattention, inadequate surveillance, etc. Distraction, including interior distraction, exterior distraction, and inattention, was involved in about 17.7 percent of all cases where the critical pre-crash event was attributed to drivers. With vehicles traveling and interacting with other vehicles at high speeds, even momentary distraction can result in a crash.

### Reported Distraction

For the national FARS and CRSS databases, NHTSA defines distraction to include both interior and exterior sources of distraction including inattentive driving. Types of distraction include talking on cell phones, texting, talking to other passengers, adjusting interior devices such as radios or mirrors, eating or drinking, diverting your attention to an exterior object, person, or event, or being lost in thought. All these activities can potentially distract drivers from the task of safely driving an automobile. Data from FARS and CRSS data systems (NHTSA, 2021) indicate that distracted driving plays a substantial role in motor vehicle crashes:

In 2019 about 9 percent of fatal crashes and 15 percent of injury crashes were reported as distraction-affected crashes.

In 2019, there were 3,142 people killed in crashes involving distracted drivers and an estimated additional 424,000 were injured in police-reported motor vehicle crashes involving distracted drivers.

Of those people killed in distraction-affected crashes, 422 occurred in crashes in which at least one of the drivers was using a cell phone (13 percent of fatalities in distraction-affected crashes) at the time of the crash. Use of a cell phone includes talking/listening to a cell phone, dialing/texting a cell phone, or other cell-phone-related activities.

Of those injured in distraction-affected crashes, an estimated 28,000 were injured in crashes that involved the use of cell phones at the time of the crashes (7% of injured people in distraction-affected crashes).

Nine percent of all drivers 15 to 20 years old involved in fatal crashes were reported as distracted at the time of the crashes. This age group has the largest proportion of drivers who were distracted (NHTSA, 2021).

For drivers under age 20 involved in fatal crashes, 19 percent of the distracted drivers were distracted by the use of cell phones (NHTSA, 2021).

To estimate the cost of distracted driving crashes, we examined the relative incidence of each injury severity level that was represented by distraction affected crashes. These incidence estimates reflect the relative proportions specific injury severities that occur in crashes involving distraction. FARS was used for each fatal case. For nonfatal injuries, the rate of distraction involvement is taken from CRSS and applied to the total incidence estimates previously derived. Application of these rates rather than direct counts is required to account for unreported crashes.

CRSS data are only recorded using the KABCO severity system, whereas this report is based on the AIS. To translate CRSS data to an MAIS basis, we used a variety of KABCO/MAIS translators. For CISS equivalent crashes, we used a new translator derived from 2017-2019 CISS data. Since these data are relatively recent, they reflect roughly current levels of seat belt usage. For non-CISS cases, the only available data from which to develop translators were contained in the 1982-1986 NASS files. Seat belt use has increased dramatically since this time. Observed belt use during this period ranged from roughly 10 to 37 percent as public awareness of the importance of belt use and belt use laws were just beginning to take hold in 1986. Belt use has since risen dramatically, reaching 91 percent in 2019. Belt use can influence injury reporting significantly in a number of ways. It changes the nature of injuries by preventing many more visible injuries (such as head/face contact with the windshield) but replaces them with often less visible (and also typically less serious) shoulder and abdominal injuries such as bruising caused by pressure from the belt across the torso. This can influence the relationship between the KABCO reported injury severity and the corresponding MAIS injury level. For this reason, separate translators were developed for non-CISS cases where the victim was belted, unbelted, and for nonoccupants/motorcyclists. These translators are presented in Tables 1-3 in Appendix C.

The 2019 CRSS KABCO incidence counts were obtained for each distraction status (distracted, not distracted). Cases with unknown belt use were distributed among known belt use cases proportionately. Each of these data sets was divided according to belt use and occupancy status and run through its corresponding translator to produce a set of MAIS based injury counts. These counts from each grouping (CISS equivalent cases, belted non-CISS cases, unbelted non-CISS cases, and nonoccupant/motorcycle cases) were added together to produce a total MAIS injury profile for each distraction scenario. The percentage of each MAIS injury incidence that resulted from a distraction-affected crash was then calculated as follows.

$x = a/(a+b)$

where   x = the percentage of incidence attributable to a distraction-affected crash at each injury severity level
      a = the incidence of distraction injuries
      b = the incidence of injuries that were not specifically coded as being distraction-related (includes "not distracted" and Unknown).

The distraction-detected portion of each injury severity level was then multiplied by the total cost of all 2019 crashes for that severity level and the results were summed to produce the total cost of distraction-affected crashes. MAIS0 portions were calculated using the same procedure described previously for urban/rural crashes, based on the relative incidence of MAIS0 cases in injury crashes. The PDO portion was based on a direct count of PDO vehicles from the 2019 CRSS crashes involving distraction compared to those that did not.

The results of this analysis are summarized in Tables 9-1 and 9-2 for economic and comprehensive societal costs. Distracted driving is identified within NHTSA records as a factor for roughly 9 percent of all fatalities and 13 percent of all crashes overall. In 2019 distraction-affected crashes caused $46 billion in economic costs and are responsible for roughly 14 percent of all economic impacts from motor vehicle crashes. They caused $170 billion in societal harm (as measured by comprehensive costs), representing roughly 12 percent of total harm caused by motor vehicle crashes.

These estimates are almost certainly conservative because they are based only on identified distraction cases. Police records frequently fail to identify whether distraction was involved in the crash. Roughly 13 percent of all fatal crashes and 4 percent of all nonfatal crashes were coded in CRSS as "not reported" or "unknown if distracted."[15] Although it is likely that a portion of these cases could involve distraction, none of them are distributed to distraction in this analysis.

*Table 9-1. Economic Cost of Police-Report-Identified Distraction Driving Crashes (Millions 2019 $)*

| | % Distracted | Incidence | | Total Economic Crash Costs | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Total | Distracted | Total | Distracted | Other |
| **PDO Vehicles** | 15.23% | 19,288,139 | 2,936,833 | $101,282 | $15,421 | $85,861 |
| **MAIS0** | 14.98% | 4,525,901 | 678,162 | $14,718 | $2,205 | $12,513 |
| **MAIS1** | 15.21% | 3,875,265 | 589,546 | $74,963 | $11,404 | $63,559 |
| **MAIS2** | 13.84% | 427,119 | 59,131 | $30,504 | $4,223 | $26,281 |
| **MAIS3** | 13.45% | 141,167 | 18,982 | $39,629 | $5,329 | $34,300 |
| **MAIS4** | 12.80% | 19,285 | 2,469 | $13,031 | $1,668 | $11,363 |
| **MAIS5** | 11.75% | 7,187 | 845 | $7,039 | $827 | $6,212 |
| **Fatalities** | 8.70% | 36,500 | 3,177 | $58,643 | $5,105 | $53,538 |
| **Total** | 15.14% | 28,320,563 | 4,289,145 | $339,809 | $46,183 | $293,627 |
| **Percentage of Total** | | 100.00% | 15.14% | 100.00% | 13.59% | 86.41% |

---

[15] The discrepancy between the rates for fatal and nonfatal crashes may be a function of police inability to interview survivors in fatal crashes where drivers or occupants are deceased.

*Table 9-2. Comprehensive Costs of Police-Report-Identified Distraction Crashes (Millions 2019 $)*

| | % Distracted | Incidence | | Total Comprehensive Crash Costs | | |
|---|---|---|---|---|---|---|
| | | Total | Distracted | Total | Distracted | Other |
| **PDO Vehicles** | 15.23% | 19,288,139 | 2,936,833 | $101,282 | $15,421 | $85,861 |
| **MAIS0** | 14.98% | 4,525,901 | 678,162 | $14,718 | $2,205 | $12,513 |
| **MAIS1** | 15.21% | 3,875,265 | 589,546 | $234,283 | $35,642 | $198,641 |
| **MAIS2** | 13.84% | 427,119 | 59,131 | $202,352 | $28,014 | $174,338 |
| **MAIS3** | 13.45% | 141,167 | 18,982 | $288,631 | $38,811 | $249,820 |
| **MAIS4** | 12.80% | 19,285 | 2,469 | $69,690 | $8,921 | $60,768 |
| **MAIS5** | 11.75% | 7,187 | 845 | $43,471 | $5,108 | $38,363 |
| **Fatalities** | 8.70% | 36,500 | 3,177 | $410,935 | $35,770 | $375,165 |
| **Total** | 15.14% | 28,320,563 | 4,289,145 | $1,365,362 | $169,892 | $1,195,469 |
| **Percentage of Total** | | 100.00% | 15.14% | 100.00% | 12.44% | 87.56% |

## Underreported Distraction

In previous publications NHTSA has noted that there are limitations to the collection and reporting of FARS and CRSS data regarding driver distraction (NHTSA, 2021). Mynatt and Radja (2013) found that police reported distraction rates understated distraction by a factor of 2.5 compared to more in-depth review that focused on pre-crash elements found in the NMVCCS. The data for FARS and GES are based on PCRs and investigations conducted after the crash has occurred. One significant challenge for collection of distracted driving data are the PCR itself. Police crash reports vary across jurisdictions, thus creating potential inconsistencies in reporting. Many variables on the police crash report are nearly universal, but distraction is not one of those variables. Some police crash reports identify distraction as a distinct reporting field, while others do not have such a field and identification of distraction is based upon the narrative portion of the report. The variation in reporting forms contributes to variation in the reported number of distraction-affected crashes. Any national or State count of distraction-affected crashes should be interpreted with this limitation in mind due to potential under-reporting in some States/primary sampling units and over-reporting in others.[16]

There are several potential reasons for underreporting of distraction-affected crashes. There are negative implications associated with distracted driving—especially in conjunction with a crash. Survey research shows that self-reporting of negative behavior is lower than actual occurrence of that negative behavior. There is no reason to believe that self-reporting of distracted driving to a law enforcement officer would differ. The inference is that the reported driver distraction during crashes is lower than the actual occurrence.

---

[16] Note that in the reporting of distraction-affected crashes, sometimes external distractions are identified as a distinct type of distraction. Some of the scenarios captured under external distractions might actually be related to the task of driving (e.g., looking at a street sign). However, the crash reports may not differentiate these driving-related tasks from other external distractions (looking at previous crash or billboard). Currently, the category of external distractions is included in the counts of distraction-affected crashes reported in NHTSA crash databases.

If a driver fatality occurs in the crash, law enforcement must rely on the crash investigation to determine whether driver distraction was involved. Law enforcement may not have information to indicate distraction. For example, some forms of distraction such as cognitive distraction (lost in thought) are impossible to identify. These investigations ten rely on witness account and these accounts are often not available, especially in fatal crashes.

Another concern is the speed at which technologies are changing and the difficulty in updating the PCR to accommodate these changes. Without broad-sweeping changes to the PCR to incorporate new technologies and features of technologies, it is difficult to capture the data that involve interaction with these devices.

The prevalence of distraction as a factor in crashes was examined by Dingus et al. (2016), which used results from the SHRP 2 Naturalistic Driving Study data base[17] to measure access the incidence of various distraction categories as well as impairment and driver error in crashes that resulted in injury or property damage. Naturalistic driving studies (NDS) use in-vehicle cameras and sensors to document driver behavior and other risk factors, enabling researchers to document the prevalence of these factors at the time of crashes or near crash events. The Dingus study was the first to access distraction from a NDS based solely on actual crashes rather than near crashes, which was enabled by the large sample size collected in SHRP 2, which included 905 crash events involving injury or damage.

Dingus found rates of driver distraction that exceeded those documented in police reports by a large margin, with observable distraction occurring in 68.3 percent of all crashes (compared to the much lower 15% found in 2019 CRSS or the 9% found in 2019 FARS). 54.5% of these crashes involved distraction as well as driver error. Table 9-3, taken from Dingus (2016), summarizes the findings.

*Table 9-3. Prevalence of Distraction, Driver Error, and Impairment*

| Distracted | Error | Impaired | Prevalence (%) |
|---|---|---|---|
| Yes | Yes | Yes | 3.4 |
| | | No | 51.1 |
| | No | Yes | 0.1 |
| | | No | 13.7 |
| No | Yes | Yes | 2.7 |
| | | No | 16.5 |
| | No | Yes | 0.3 |
| | | No | 12.3 |
| | | Total | 100.0 |

NDS give researchers a unique perspective into pre-crash environments and driver behavior that is not available to police or post-crash crash investigators. It is thus expected that NDS-based results would capture a more complete picture of human factors associated with crashes. In fact, from Table 9-3, distraction was detected in 68.3 percent of all crashes, a far higher rate than the roughly 9 to 15 percent documented in police reports.

---

[17] See Antin, 2011 and 2019 for further details of SHRP2 design.

Note from Table 9-3 that this includes overlap with the other two elements measured in SHRP2 – driver performance or judgment error and impairment. As with other causation estimates in this report such as speeding and alcohol, there can be significant overlap among these elements. Thus, it is difficult to assign sole <u>causation</u> to any one of these factors. Did the crash occur because the driver was speeding? Was he speeding because he was impaired? If he hadn't been distracted, might he have avoided the crash despite being impaired? If he hadn't been speeding, might he have avoided the crash if he hadn't been distracted? The relevant observation about distraction is that it may prevent the driver from detecting a safety hazard altogether, or, at a minimum, it would reduce the time available for the driver to avoid the safety hazard. Importantly though, these data indicate that distraction significantly increases the chance of driver error.

Dingus et al. found significant overlap between distraction and driver error. This complicates the question of crash causation, making it difficult to attribute the cause of the crash to either error or distraction. However, in many cases, driver error would occur because of distraction. To examine this issue, we referred to the results in Table 9-3 above, which establishes an overlap matrix for distraction, driver error, and impairment. Table 9-4 summarizes the prevalence of driver error for distraction crashes, crashes without distraction, and baseline driving from Dingus et al. These results indicate that:

- Driver error is 6.0 times more likely to occur in crashes where driver distraction is observed than in baseline (non-crash) driving;
- Driver error is 2.1 times more likely to occur in crashes where there is no observable distraction than in baseline (non-crash) driving; and
- Driver error is 2.8 times as likely to occur in crashes where driver distraction is observed than in crashes where there is no observable distraction.

*Table 9-4. Prevalence of Driver Error*

|  | % Cases Driver Error Observed |
| --- | --- |
| **Distraction Crashes** | 54.50% |
| **No Distraction Crashes** | 19.20% |
| **Baseline Prevalence** | 9.03% |

From Table 9-3, of the 68.3 percent of cases where drivers were visibly distracted, 54.5 percent also involved some form of driver error and 3.6 percent were also impaired. Only 13.7 percent had distraction without impairment or driver error. This is coincidently similar to the 15 percent found in CRSS files, but a substantial portion of the 15 percent that were distracted also had overlapping driver error or impairment as well.

Overall, this indicates that driver error is linked to distraction, implying that distraction may lead to increased probability of driver error.

**Distraction Crash Causation**

Dingus et al. (2016) calculated odds ratios to determine the relative risk of a crash caused by distraction. They found that distraction doubles the risk of a crash occurring compared to model driving, which is defined as driving alert, attentive, and sober. Dingus notes that given the 68.3 percent prevalence of distraction in crashes, this 2.0 odds ratio implies that 36 percent of all crashes could be avoided if distraction were eliminated.

There are several features of the Dingus results that limit their applicability to nationwide crash estimates. The first is that crashes from both old and young drivers were oversampled. This was done because crash risk is higher among these age groups. This was confirmed by Guo et al., who found differences in the odds ratios for crash risk caused by distraction among different age groups. The results are thus not representative of driver age prevalence on U.S. roadways. A second concern is that the odds ratios were developed against a baseline of "model driving." It thus represents a maximum impact of distraction compared to perfect driving behavior. However, Dingus et al. found distraction and driver error were common even in non-crash circumstances.

To establish estimates that were applicable to nationwide crash data, we contacted the Virginia Tech Transportation Institute and discussed revising its approach to measure risk against all characteristics found in on-road driving rather than against model driving. The authors agreed to this proposal and conducted a revised analysis based on the most current SHRP2 database that included 1,100 crashes that involved property damage or injury. The revised analysis was designed to establish specific values for a number of different metrics.

<u>Specific age groups</u> to enable adjustment of results to be nationally representative of driving ages on U.S. roadways. Separate results were derived for teens (16-19), young adults (20-29), middle-aged adults (30-64), and seniors (65+).

<u>Categories of distraction</u>, to examine whether general types of distraction were more harmful than others. These categories were cell phone use, interaction with others, interaction with in-vehicle features (other than cell phones), and all other driver distraction. The types of distraction included under each category are listed in Table 9-5.

<u>Crash severity</u>, to determine whether there were significant differences in distraction impacts across crashes of differing severity. The study analyzed three separate categories of crash severity. Level 1 crashes involved injury, air bag deployment, rollover, high delta V (>20 mph), or enough vehicle damage to require towing. Level 2 crashes involved a minimum of $1,500 property damage, or moderate crash loads (acceleration on any axis greater than +/-1.3 g, excluding curb strikes). Level 3 crashes involved physical contact with another object or roadway departure, with only minimal or no damage.

*Table 9-5. Distraction Categories*

| In Vehicle Controls, Non-Cell Phone: | Other Driver Distraction, Non-Cell Phone |
|---|---|
| Adjusting/monitoring radio | Reading |
| Adjusting/monitoring climate control | Writing |
| Adjusting/monitoring other devices integral to vehicle | Tablet device, operating |
| Inserting/retrieving CD (or similar) | Tablet device, viewing |
|  | Eating without utensils |
|  | Eating with utensils |
| **Cell Phone Use:** | Drinking from open container |
| Cell phone, talking/listening, hand-held | Drinking with lid, no straw |
| Cell phone, texting | Drinking with lid and straw |
| Cell phone, dialing hand-held | Drinking with straw no lid |
| Cell phone, dialing hand-held using quick keys | Make up |
| Cell phone, locating/reaching/answering | Combing/brushing/fixing hair |
| Cell phone, browsing | Brushing teeth |
| Cell phone, dialing hands-free using voice-activated software | Biting nails/cuticles |
| Cell phone, holding | Shaving |
| Cell phone, other | Other personal hygiene |
|  | Removing/adjusting clothing |
|  | Removing/adjusting jewelry |
| **Interaction With Others:** | Removing/inserting/ adjusting contact lenses or glasses |
| Child in rear seat - interaction | Reaching for cigar/cigarette |
| Passenger in adjacent seat - interaction | Reaching for food-related or drink-related item |
| Passenger in rear seat - interaction | Reaching for object, other (leave a note) |
| Child in adjacent seat - interaction | Reaching for personal body-related item |
| Insect in vehicle | Dancing |
| Pet in vehicle | Looking at an object external to the vehicle |
|  | Looking at pedestrian |
|  | Looking at animal |
|  | Looking at previous crash or incident |
|  | Distracted by construction |
|  | Other external distraction |
|  | Talking/singing, audience unknown |
|  | Moving object in vehicle |
|  | Lighting cigar/cigarette |
|  | Smoking cigar/cigarette |
|  | Extinguishing cigar/cigarette |
|  | Object dropped by driver |
|  | Object in vehicle, other |
|  | Other known secondary task |
|  | Other non-specific internal eye glance |
|  | Tablet device, other |
|  | Unknown |
|  | Unknown type (secondary task present) |