# EXHIBIT E

Transcript of David M. Cades, Ph.D., Volume 2

Conducted on January 3, 2025

**123**

```
1              UNITED STATES DISTRICT COURT
2            SOUTHERN DISTRICT OF FLORIDA
3
4  --------------------------X
5  NEIMA BENAVIDES, as         :
6  Personal Representative     :
7  of the Estate of Naibel     :
8  Benavides Leon, deceased,  :
9           Plaintiff, : CASE NUMBER:
10        v.        : 21-CV-21940-BLOOM/Torres
11 TESLA, INC., a/k/a/ Tesla   :
12 Florida, Inc.,              :
13          Defendant. :
14 --------------------------X
15 (Caption continued on next page)
16
17              Volume 2
18      Deposition of DAVID M. CADES, Ph.D.
19           Virtually Conducted
20         Friday, January 3, 2025
21           9:00 a.m. CT
22
23 Job No.: 566280
24 Pages 123 - 216
25 Reported by:  Cynthia Lichtman, CSR No. 14601, CVR
```

**124**

```
1  (Caption continued from previous page)
2
3  --------------------------X
4  DILLION ANGULO,         :
5           Plaintiff, :
6        v.          : CASE NUMBER
7  TESLA, INC. a/k/a           :
8  Tesla Florida, Inc.,        :
9          Defendant. :
10 --------------------------X
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**125**

```
1  Deposition of DAVID M. CADES, PH.D., held virtually:
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21 Pursuant to agreement, before Cynthia Lichtman, Notary
22 Public in and for the State of California.
23
24
25
```

**126**

```
1          A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFF:
3          TODD POSES, ESQUIRE
4          POSES LAW GROUP, P.A.
5          169 East Flagler Street, Suite 1600
6          Miami, Florida 33131
7  and
8          BRETT J. SCHREIBER, ESQUIRE
9          SINGLETON SCHREIBER, LLP
10         591 Camino de la Reina, Suite 1025
11         San Diego, California 92108
12
13 ON BEHALF OF THE DEFENDANT:
14         WHITNEY V. CRUZ, ESQUIRE
15         BOWMAN AND BROOKE LLP
16         Two Alhambra Plaza, Suite 800
17         Coral Gables, Florida 33134
18 and
19         THOMAS P. BRANIGAN, ESQUIRE
20         BOWMAN AND BROOKE LLP
21         101 West Big Beaver Road, Suite 1100
22         Troy, Michigan 48084
23
24
25
```

Transcript of David M. Cades, Ph.D., Volume 2
Conducted on January 3, 2025

127

1       C O N T E N T S
2   EXAMINATION OF DAVID M. CADES, PH.D.          PAGE
3       By Mr. Poses                              129
4
5
6           E X H I B I T S
7               (None.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

128

1           THE COURT REPORTER:  Good morning.  We are
2   going on the record on Friday, January 3rd, 2025, at
3   9:00 a.m. Central Time in the matter of Benavides/Estate
4   of Leon, et al. v. Tesla, Inc./ Angulo v. Tesla, Inc.,
5   Case Number 21-CV-21940-BLOOM/TORRES; 22-22607.
6           Today's deposition is taking place remotely
7   via Zoom videoconference.  My name is Cynthia Lichtman.
8   I am a California Certified Shorthand Reporter,
9   representing Planet Depos, and my certification number
10  is 14601.
11          Counsel, when I give you a thumbs-up, will
12  you please introduce yourselves for the record, starting
13  with the taking attorney?
14          MR. POSES:  Todd Poses, for the plaintiffs.
15          MS. CRUZ:  Whitney Cruz, on behalf of Tesla,
16  Inc.
17          MR. SMITH:  Joel Smith, on behalf of Tesla.
18          THE REPORTER:  Thank you.  I will now swear
19  in the witness.
20          P R O C E E D I N G S
21  Whereupon,
22          DAVID M. CADES PH.D.,
23  being first duly sworn or affirmed to testify to the
24  truth, the whole truth, and nothing but the truth, was
25  examined and testified as follows:

129

1           THE REPORTER:  Thank you, sir.  One moment,
2   please.
3           EXAMINATION BY COUNSEL FOR THE PLAINTIFF
4   BY MR. POSES:
5       Q   Good morning.
6       A   Good morning, Mr. Poses.
7       Q   Let's do a couple things first.  I know
8   you've been deposed plenty of times before, but if you
9   need to take a break for any reason, just tell me.  I'm
10  happy to stop for you.  I don't know how long I'll be
11  today, but I'm going to say more or less a couple of
12  hours.  But if, for any reason, you need to take a call
13  or take a break, just let me know, okay?
14      A   Yes, sir.
15      Q   All right.  Very good.  Before we get into
16  your opinions and my questions, would you just tell me
17  what you brought with you today for this deposition?
18      A   I have my entire file as it was produced to
19  you on my computer.  I've got another monitor over to my
20  left, so if you see me looking over here, I'm just
21  looking at something on my screen.  If I don't tell you
22  what I'm looking at or if I forget to, please just
23  remind me, and I'm happy to share.
24      Q   Okay.  Great.  And before we get into
25  questions that are specific to the case, can you just

130

1   tell me, or update me, as to your bill and the time that
2   you've spent since the last deposition on either
3   reviewing materials or preparing your report or
4   preparing for this deposition?
5       A   Sure.  I'm just going to pull up the --
6       Q   Sure.
7       A   -- invoices.
8           So if I'm looking at the invoices that were
9   produced, I've got one that were -- since my last
10  deposition, I've got one dated August 20th of 2024.
11  Well, that would be -- that would be for things we did
12  leading up to that deposition, so that's professional
13  services through July 26th.
14      Q   Okay.
15      A   So after that, I've got a September invoice
16  for $9,447.  That's a September 25th invoice.  I've got
17  an October 21st invoice of 2024 for $7,016.  I've got a
18  November 2024 invoice for $699.  And then I've got a
19  December 23rd invoice for $1,044.
20      Q   Okay.  In any of those invoices and for the
21  work that you did, did you ever review any of the data
22  from the Tesla vehicle at issue in this case?
23      A   I watched the augmented videos that have been
24  produced since then, but I did not do any independent
25  analyses of the data that has been produced from the

---

131

1  vehicle.
2      Q   Okay.  Did the augmented video in any way
3  change or affect any of your opinions previously that
4  you offered originally in June?
5      A   No, sir.
6      Q   Okay.  Why not?
7      A   So I didn't do any particular analysis with
8  respect to the augmented video.  That's outside the
9  scope of my expertise.  And I know Mr. Ryan Harrington
10 is going to be dealing with the, you know, analysis of
11 the video.  But as far as anything that was shown on the
12 video, it was -- it showed exactly what the videos we
13 already had showed from a human factors perspective,
14 that you had an open, flat roadway with, you know, over
15 1,000 feet of unobstructed sight lines that an alert and
16 attentive driver could see the flashing lights and the
17 stop sign and everything else that I stated in my first
18 deposition.
19     Q   Well, the augmented video isn't what the
20 driver sees, is it?
21     A   The augmented video confirms what I observed
22 at my inspection as well as what was shown on the
23 initial video.
24     Q   Well, correct me if I'm wrong, but the
25 augmented video is designed to show what that car sees

132

1  and appreciates, not the driver; isn't that right?
2      MS. CRUZ:  Object to form.  Mischaracterizes
3  the evidence.
4      A   I -- I don't have any opinions on the
5  augmented video.
6      Q   I'm not asking you about opinions regarding
7  the augmented video.  It's a simple question in that the
8  augmented video demonstrates what the car saw and
9  ultimately processed during the drive cycle; isn't that
10 right?
11     MS. CRUZ:  Objection to form.
12 Mischaracterizes the evidence.
13     A   It's outside the scope of my analysis.
14     Q   Okay.  So the fact that the car saw and
15 didn't react to certain stimulus is irrelevant to your
16 analysis?
17     MS. CRUZ:  Same objection.
18     A   That mischaracterizes my testimony.  That's
19 not what I said.
20     Q   All right.  Well --
21     THE REPORTER:  Excuse me, Ms. Cruz.  I can't
22 hear your objections.  You're echoing to a point I can't
23 understand you.
24     MS. CRUZ:  Okay.  Let me see if I can fix
25 that.

133

1      MR. POSES:  Yeah, Whitney.  I -- I had the
2  same issues, so take your time.
3      THE REPORTER:  I couldn't -- yeah, and I
4  couldn't hear what your objections were, so if you can
5  repeat them for me.
6      I'm sorry to interrupt you, sir.
7      MR. POSES:  No.  No.  It's okay.  Take your
8  time.  That's fine.
9      MS. CRUZ:  Can you hear me now?
10     MR. POSES:  It's a little -- it's a little --
11 it's -- you're kind of broken up, Whitney.
12     THE REPORTER:  Can we go off the record just
13 so I don't have to report this part?
14     MR. POSES:  Sure.
15     MS. CRUZ:  Off the record at 9:10 a.m.
16     (Whereupon, there was a discussion held off
17 the record.)
18     THE REPORTER:  We are back on the record at
19 9:11 a.m. Central Time.
20     MS. CRUZ:  So this is Whitney Cruz.  We went
21 off the record because I was having trouble with some
22 audio.  And so the court reporter has asked that I
23 clarify the objections that I made.
24     The objections to the last three questions
25 were mischaracterizes the evidence, in addition to the

134

1  very last question, mischaracterizes the testimony.
2      MR. POSES:  Okay.  All ready?  Great.
3  BY MR. POSES:
4      Q   All right.  So, Doctor, the -- just so we
5  can, you know, be on the same page about the augmented
6  video, you did review it, correct?
7      A   Yes, sir.
8      Q   And what was the purpose of your review of
9  the augmented video?
10     A   It was provided to me.
11     Q   Okay.  And what did you learn from the
12 augmented video as it relates to when the car, the
13 Tesla, understood what obstacles or end of drivable
14 space or other issues were upon it?
15     MS. CRUZ:  Objection to form.
16 Mischaracterizes the evidence.
17     A   Independently, I didn't learn anything from
18 it.  I -- that's what Mr. Harrington's analysis is for.
19     Q   I understand.  But as it relates to reaction
20 time, isn't it important as it relates to when the
21 warnings otherwise might have allowed Mr. McGee to brake
22 because of the pending issues?
23     A   So to the extent that there's any evidence
24 that a vehicle would have, could have, should have,
25 might have issued a warning, that would be information

Transcript of David M. Cades, Ph.D., Volume 2
Conducted on January 3, 2025

135

1 that I would consider relevant, and I did consider that
2 information. And as the incident, the testing that
3 Mr. Harrington did, as well as his analysis shows,
4 there -- there was no forward collision warning issued
5 in this case. There --
6      THE REPORTER: No, what? You glitched out
7 every time you say the word.
8      THE WITNESS: Forward collision warning.
9      MR. POSES: Yeah.
10     THE WITNESS: Is anyone else having trouble
11 hearing me?
12     MR. POSES: No, I'm not, Doctor.
13     MS. CRUZ: No.
14     THE WITNESS: Okay. Forward collision
15 warning.
16     I don't even remember what I was saying now.
17   Q   It's okay. I'll repeat it for you, Doctor.
18     Well, let me ask you this: What's -- what is
19 PRT?
20   A   Perception response or perception reaction
21 time.
22   Q   And when -- when does it start? Or when
23 is -- when do you start the clock on perception response
24 time?
25   A   So there are kind of two different ways to

136

1 look at when to start the clock. The first is
2 potentially when a potential hazard becomes available to
3 be perceived. The other -- and -- and basically both of
4 these have to be true. The hazard has to be available
5 to be perceived, and the perceiver has to be -- has to
6 perceive it. So it's when that first perception occurs,
7 to the extent that is knowable, is when the clock would
8 start.
9    Q   And how about the -- when does a PRT end, I
10 guess?
11   A   A PRT -- so, again, there's -- depending on
12 what specific literature you look at, and there are
13 other names -- some people call it brake reaction time
14 or other types of reaction time. But typically, it ends
15 with the beginning of the physical response.
16   Q   Okay. So is it fair to say that a PRT is the
17 appreciation of an object or hazard, and the end of that
18 PRT is when someone makes some maneuver or avoidance
19 technique to -- you know, because of that hazard?
20   A   What I would say is that whether -- you know,
21 typically broken down into three or four stages, the
22 perception response time begins with the perception,
23 the -- the noticing of something. It's followed by
24 detection and identification. So what is the something
25 followed by a decision? What do you need to do to the

137

1 something, followed by the physical action. And that
2 would encompass the entire perception response time
3 process.
4    Q   All right. And I -- in your report from
5 December 23rd, you mentioned that the PRTs that
6 Dr. Moore used range from, I think, it was 1 to
7 1.3 seconds. What were those PRTs derived from?
8    A   So what Mr. Moore did was take -- my
9 understanding of what he did was take the time between
10 when a -- an alert was given earlier in the day to
11 Mr. McGee to put his hands on the wheel, and calculated
12 the times from when the alert was given to when the
13 hands were next detected on the wheel.
14   Q   Have you independently evaluated the evidence
15 in the log data showing McGee's history of responding to
16 warnings from the vehicle on the night of the accident?
17   A   I have -- I've reviewed that data. I
18 understand that he was given various warnings and that
19 he responded to them. I've not done any quantitative
20 analysis.
21   Q   Okay. So you read Mr. Moore's report and the
22 data that he was relying on?
23   A   I'm sorry. I didn't understand you.
24   Q   You read Dr. Moore's report and relied on the
25 data that he supplied in that report?

138

1    A   Whose report?
2    Q   Dr. Moore?
3    A   I read Mr. Moore's reports.
4    Q   Okay. Well, I'm just asking -- you know, I
5 asked you if you independently evaluated the evidence in
6 the log data. Is -- the answer is yes or no?
7    A   I've already answered that question. I don't
8 have a different way to do so.
9    Q   Okay. Did Dr. Moore call them PRTs in his
10 report?
11   A   Which -- he's issued a number -- Mr. Moore
12 has issued a number of reports. Which report are you
13 speaking of?
14   Q   Well, I'm talking about the most recent
15 report that you've commented on.
16     And I'll just be more specific. In your
17 December 23rd report, you mentioned PRTs that Dr. Moore
18 used. And my question is, did he call them PRTs? Did
19 he call them perception response times?
20   A   He stated that, quote, I have a valid -- so
21 first of all, I -- I was just getting confused. I
22 didn't know. So is Dr. Moore a different person? I was
23 not aware -- I believe Mr. Moore does not have a
24 doctorate; is that correct?
25     I think he has a couple Ph.D.s, but maybe I'm

Transcript of David M. Cades, Ph.D., Volume 2
Conducted on January 3, 2025

139

1  wrong. And it doesn't matter. We can call him Alan for
2  the deposition.
3      **A  That's fine. I -- I just want to make sure**
4  **we're talking about the same person --**
5      Q  Sure.
6      **A  -- because you called him Mr. Moore earlier**
7  **and then Dr. Moore. And I didn't know if you were**
8  **talking about two different people.**
9      Q  I'm not.
10     **A  Okay. So in Mr. Moore's report dated**
11  **December 12th, 2024, on page 2, he states, quote, I have**
12  **evaluated Mr. McGee's history of responding to audible**
13  **alerts from the autopilot system. On the day of the**
14  **crash, Mr. McGee responded to four audible chimes,**
15  **requesting that he place his hands on the steering**
16  **wheel. The chimes were not an emergency alert or a**
17  **crash-imminent scenario. On average, he responded to**
18  **the chime in 1.1 seconds with a range of 1.0 to 1.3**
19  **seconds.**
20     **He then continues with that and applying it**
21  **to a -- to -- in his opinion, when a vehicle may have**
22  **issued a warning. So he's using it as a PRT later**
23  **regardless of what he calls it.**
24     Q  Okay. Well, I think he would take issue with
25  that, and so will I.

140

1      So he doesn't really call them PRTs in his
2  analysis, does he? They are not in response to an
3  immediate hazard, are they?
4      **A  So they're in response to a signal. It's**
5  **still a perception response time. It doesn't matter**
6  **what the thing you're responding to is. It is still a**
7  **PRT that he's analyzing whether he calls it that or not.**
8  **I mean, he can be wrong. That's fine.**
9      Q  Okay. So you're saying he's wrong?
10     **A  If -- if he's going -- so if you're**
11  **accurately representing his analysis and testimony,**
12  **which is not consistent with my review of his testimony**
13  **and analysis, and you are stating that he would say --**
14  **that Mr. Moore would say these are not PRTs, then that**
15  **is incorrect.**
16     Q  Okay. So what is a driver's typical response
17  time to an audible warning?
18     **A  It depends.**
19     Q  Okay. Well, what's the range?
20     **A  It can be anywhere from under a second to no**
21  **response at all.**
22     Q  All right. So it's -- it's -- and I think
23  that you testified previously it was .8 seconds or
24  longer, and it depends; is that right?
25     **A  That sounds consistent with my understanding.**

141

1      Q  All right. And you see cases where drivers
2  simply never respond to hazard like you said; isn't that
3  right?
4      **A  Many.**
5      Q  And you've also seen distracted drivers
6  respond to a warning in less than .8 seconds; isn't that
7  right?
8      **A  That is possible.**
9      Q  Okay. I mean, as a matter fact, it's true.
10  I know that you authored a report called Driver
11  Reactions in a Vehicle with Collision Warning and
12  Mitigation Technology that you authored in 2015. And,
13  in fact, there were multiple instances where, given
14  emergency scenarios, that the reaction time was, in
15  fact, less than .8 seconds; isn't that true?
16     MS. CRUZ:  Objection.
17     **A  No, sir.**
18     Q  No, sir? Well, I mean, do I need to read
19  from your report?
20     **A  You're just misinterpreting, and you don't**
21  **understand the report. I'm happy to explain it to you,**
22  **but that -- so there were timestamps and measurements**
23  **relative to a collision warning timing that you're**
24  **correctly quoting. But your interpretation of them is**
25  **wrong.**

142

1      Q  Okay. And I understand your -- your
2  testimony is, you know, today, that I don't understand
3  it, and in your report, that Missy Cummings and
4  Mr. Moore, they don't understand, I guess, the science
5  of warnings and warning communication as well as the
6  science of human behavior. That's your opinion?
7      **A  Yes, sir.**
8      Q  Okay. You recognize Dr. Cummings as a leader
9  in the field of human factors and -- as it relates to
10  robotic and automated technology?
11     **A  I recognize that Dr. Cummings works in**
12  **robotics and is credentialed in automation. She seems**
13  **to play in the human factors world. I don't see that**
14  **she is a, you know, human-factors-credentialed person.**
15  **I do see that she has an understanding of what human**
16  **factors is.**
17     **But as evidenced by her analyses in this**
18  **case, I would not say that she has an understanding of**
19  **how the science of human behavior with respect to**
20  **interaction with this type of information is.**
21     Q  So in this report that you issued in 2015 --
22  and I'll read from it -- it says, one ADAS technology
23  that has the potential to bring significant safety
24  benefits is forward collision warning and mitigation,
25  FCWM.

Transcript of David M. Cades, Ph.D., Volume 2

6 (143 to 146)

Conducted on January 3, 2025

143

1       MS. CRUZ:  Todd, I'm just going to -- I'm
2   sorry.  I didn't know if you were finished.  But if
3   you're reading from a document, can you show it to him,
4   please?
5       MR. POSES:  Absolutely.  And I apologize,
6   Whitney.  You're right.
7       And so -- and I know the doctor has it.  And
8   the -- the -- I'm sorry.  I'm terrible with sharing.  I
9   have it printed, so I'm still old school.
10      Q   But the -- the -- Doctor, do you have that
11  document?  And it's called Driver Reactions in a Vehicle
12  with Collision Warning and Mitigation Technology.  And
13  it's 2015-01-1411.  It is a published paper in April
14  of 2015 where the doctor contributed to.
15      **A   Yeah.  So I didn't produce that article as**
16  **part of my file here.  So I don't have it readily**
17  **accessible.**
18      Q   Okay.  Well --
19      MR. POSES:  And, Whitney, I'll do my best --
20  and I'll just read from it.  And I'll take as much time
21  as you need.  I can't share it.  I apologize.  But I
22  will read from the document.  I'll enter it into the
23  evidence after the fact.
24      And I think you can probably look it up.
25  It's SAE International.  And the title of the article --

144

1   again, let me give you the title.  It's Driver Reactions
2   in a Vehicle with Collision Warning and Mitigation
3   Technology.
4       MS. CRUZ:  Well, I'm just going to ask for a
5   standing objection to all these questions.  You're
6   showing him a document.  I understand he authored it.
7   He authored it, it sounds like.  Neither one of us have
8   it in front of us.  I don't, as his lawyer, and he
9   doesn't, sitting here.  We don't have it in front of us.
10  It's from ten years ago.  And you're asking about this
11  document, so if you would, Todd, just please give me a
12  standing objection to all these questions.
13      MR. POSES:  So --
14      THE WITNESS:  Can I make a suggestion as
15  well, Mr. Poses, because --
16      MR. POSES:  Sure.
17      THE WITNESS:  -- I can tell you I'm not going
18  to answer questions about something where I can't see
19  the document.  So I don't know if you want to take a
20  break and e-mail it to Ms. Cruz or something.  But --
21  you can go on, but I'm not going to be able to answer
22  questions about an entire document without being able to
23  evaluate the quotes in the context of the document.
24      MR. POSES:  I guess, then, I'll just ask you
25  general questions to see if you agree or disagree.  They

145

1   won't be specific to this document.  How about that?
2   And I know that you --
3       MS. CRUZ:  Todd, why -- Todd, why don't you
4   just send the document?
5       MR. POSES:  Listen --
6       MS. CRUZ:  Why don't you just send it to me
7   and to him?
8       MR. POSES:  I don't --
9       MS. CRUZ:  Can you do that?
10      MR. POSES:  Listen.  I can read -- I -- sure.
11  I mean, listen.  You can look it up the same way that I
12  can.  I mean, this is your document.  I don't -- I
13  printed it from the Internet.  I -- it's yours.  I'm
14  sure you have just as much access to it as I do.  But
15  here, instead of referencing the document, I'll just ask
16  you questions.  Okay?
17      THE WITNESS:  You know what, Mr. Poses?  Why
18  don't we take a quick break here, and let's see if we
19  can't resolve this so that you can ask the questions you
20  want to?
21      MR. POSES:  I mean, if you're --
22      MS. CRUZ:  Well, the other thing is --
23      MR. POSES:  I really, Doctor -- I'll just
24  answer -- I'll just ask these questions.  If Whitney has
25  a standing objection, that's fine.  I won't reference

146

1   the document at all.
2       THE WITNESS:  I'm sorry.  I'd like to take a
3   short break.
4       MR. POSES:  You'd like to take a short break?
5   We just started, and I've told you already that we don't
6   need necessarily to reference the document specifically.
7   But we'll just ask the questions generally.
8       THE WITNESS:  I believe that you stated at
9   the beginning of the deposition that if I want to take a
10  break --
11      MS. CRUZ:  Dr. Cades -- Dr. Cades, give me a
12  second.  Give me a second.  You're asking -- Todd,
13  you're asking the witness questions about the documents
14  that he doesn't have.  He's asking --
15      MR. SCHREIBER:  The document's in the chat.
16      MR. POSES:  No, I just said I'm not.  And so
17  --
18      MR. SCHREIBER:  The document's in the chat.
19  Everybody move on.  The document's in the chat.  Let's
20  all carry on.
21      MR. POSES:  Thanks, Brad.
22      MS. CRUZ:  In addition --
23      MR. POSES:  Hey, listen.  We have someone who
24  actually appreciates and understands technology now on
25  the call, so this is great.

147

1      MS. CRUZ:  In addition to that, the witness
2  -- can you guys let me finish?
3      MR. POSES:  Sure.
4      MS. CRUZ:  You guys are speaking over me.
5  Please.  I let you talk.
6      The witness has asked for a five-minute
7  break.  Todd, we'd like to take a break, five minutes,
8  and we'll be back.  Thank you.
9      MR. POSES:  Super.
10     THE REPORTER:  We are going off the record at
11  9:29 a.m. Central Time.
12     (Whereupon, there was a recess in the
13  proceedings.)
14     THE REPORTER:  We are back on the record at
15  9:35 Central Time.
16  BY MR. POSES:
17     Q    All right, Doctor.  So you didn't
18  independently evaluate the evidence in the log data
19  showing McGee's history of responding to warnings from
20  the vehicle on the night of the accident; is that right?
21     A    Not -- not beyond reviewing the data as I
22  previously testified to.
23     Q    Okay.  And why didn't you?
24     A    The circumstances of the incident were not
25  similar to anything that he had previously experienced.

149

1      Q    What -- what does largely mean?  Do you have
2  a breakdown of seconds?
3      A    I do not.
4      Q    Okay.  So what does largely mean?
5      A    Again, given the initial data that we're
6  provided -- and, you know, I defer to Mr. Harrington on
7  the specifics as to frequency of, you know, hertz and
8  detection cycles and all that stuff -- that the -- the
9  first set of signal showed that the hands were detected
10  during that time.  To the extent that there may be
11  frames or -- or more granular periods where it wasn't,
12  from what I understand and -- and what I've seen, it
13  does not change that Mr. McGee's hands were, again,
14  mostly largely on the wheel leading up to the incident.
15     Q    Okay.  Are you certain of that?
16     A    That is my current understanding based on
17  what I've seen.
18     Q    Okay.  And -- and just tell me again what
19  you've seen.
20     A    So the initial set of data that were
21  produced, which showed that the hands on the wheel --
22  that the hands were detected on the wheel in that time
23  period leading up to the incident, and, again, you know,
24  pending Mr. Harrington's, you know, testimony, but also
25  Mr. Harrington's analysis, which confirms that.

148

1  And his ability to put his hands on the wheel following
2  an alert was not relevant to the seconds leading up to
3  the incident as his hand was largely detected on the
4  wheel in the, I think it was 24 seconds leading up to
5  the incident.
6      Q    Do you know if both of his hands or one of
7  his hands or which hand was on the steering wheel at the
8  time of the accident, or leading up to the accident?
9      A    No, sir, not with -- not with any more
10  specificity than hands -- according to the system, hands
11  were detected.
12     Q    Okay.  Do you know that there is evidence in
13  the log data that hands were not detected in the seconds
14  leading up to the accident?  Are you aware of that?
15     A    Yes.
16     Q    You are aware of that?
17     A    Sorry.  I thought someone else was speaking.
18     Yes.  I am aware that, according to
19  Mr. Moore's analysis of -- I think it was some
20  additional CAN data -- that in that period of time,
21  there were moments where the system showed hands not
22  detected and then hands detected, hands not detected,
23  which is why I phrased it as the hands were largely
24  detected in that 24-second period leading up to the
25  incident.

150

1      Q    And when you say the time period leading up
2  to the accident, what time period is that?
3      A    As I've just stated, I believe it was about
4  24 seconds --
5      Q    Okay.
6      A    -- is the time that we're talking about.
7      Q    All right.  And if the evidence suggests
8  otherwise, that it wasn't largely, but less than
9  50 percent of the time that he had his hands not fully
10  on the wheel during the 24 seconds leading up to the
11  accident, would any of your opinions change?
12     MS. CRUZ:  I'm just going to object to form.
13     A    No, sir.
14     Q    Why not?
15     A    I'm looking at the opinions that I have as
16  they're listed on page 6 and 7 of my report.  And,
17  again, you know, given that the data show that his hand,
18  whether it was on, off, on, off, it was not completely
19  off for that entire time period.  So he was engaging
20  physically with the vehicle.  His foot was on the
21  accelerator.  He was driving the car.
22     So based on my analysis and the opinions I
23  have, you know, whether or not that number, the -- the
24  percentage of time over that 24 seconds was more or less
25  is not going to change my analysis or my opinions.

151

1    Q   If it's showing -- or an alert was produced
2  by the Tesla during the drive cycle leading up to the
3  accident, would that then have potentially prevented the
4  accident?
5    **A   I mean, I -- there's not enough information**
6  **there for me to fully assess that.  I'd have to have a**
7  **complete understanding of what you're talking about to**
8  **perform that analysis.**
9    Q   All right.  Well, in -- in the
10 December 23rd rebuttal report, you mentioned that the
11 PRTs were ranging between 1 and 1.3 seconds.  At least
12 you called them PRTs.  I know Mr. Moore did not.
13    So given the fact that many times during the
14 drive cycle, there was 1 second to 1.3 seconds where
15 Mr. McGee himself, during that very same drive cycle,
16 was able to react accordingly and quickly to the
17 stimulus that was provided by the vehicle, I'm asking
18 you now if, during the last 24 seconds of the drive
19 cycle, had there been a warning, could the accident have
20 been avoided?
21    **A   And, again, that's just not enough**
22 **information for me to perform that analysis over a**
23 **24-second period.  You know, I will -- will point out**
24 **that the 1 to 1.3-second response to a hands-on alert at**
25 **some other time under different conditions, when he had**

152

1  **not dropped his phone, was not looking for his phone,**
2  **was not failing to detect flashing red lights and a stop**
3  **sign for, you know, over 1,000 feet.  I mean, it's a**
4  **completely different scenario.**
5    **So the -- that he was -- that Mr. McGee was**
6  **previously able to respond to a hands-on alert in 1 to**
7  **1.3 seconds is -- is not relevant to what he was faced**
8  **with at the time of this incident.**
9    Q   Right.  So what is, then, the typical
10 response time for a driver who's on a phone call and
11 holding the phone but -- but using Bluetooth?  Do you
12 have -- is there a -- do you have any opinions about
13 that?
14    **A   It -- it depends on the specific context.**
15 **There's a lot of different variables that can influence**
16 **perception response time.**
17    Q   There are.
18    And so what's the typical response time for a
19 driver who drops his cell phone?  You don't have any
20 opinion about that?
21    **A   Well, if a driver -- well, so importantly,**
22 **when someone drops something and, you know -- so this is**
23 **shown both in this incident as well as in the individual**
24 **Florida crash records that I produced in my previous --**
25 **with my previous deposition, in that file.**

153

1    **What it shows is that when someone drops**
2  **something, depending -- you know, again, if they drop**
3  **something and they go to reach for it, they go to look**
4  **for it, you are now incurring visual, manual, and**
5  **cognitive distractions.  And to the extent that you**
6  **know, like the -- there's an example in the records that**
7  **I produced where someone, for whatever reason, they**
8  **dropped a pair of pliers.  And they were reaching down**
9  **to pick up the pliers and failed to detect -- I think --**
10 **I forget if that one was a bicyclist they hit or a**
11 **pedestrian or another car.  And it led to a fatality.**
12    **So when people are disengaging completely**
13 **from the driving task or -- or -- or in multiple -- over**
14 **multiple domains, because they are reaching down to pick**
15 **something up, then, again, that first trigger that we**
16 **talked about earlier with respect to perception response**
17 **time doesn't occur in that the -- the hazard or the**
18 **object to react to is not available to them because**
19 **their -- their head's down in the vehicle.**
20    Q   Where was Mr. McGee looking when he was
21 looking for his phone?
22    **A   There's no specific data to show where he was**
23 **looking.  However, given the available visual**
24 **information in the over 1,000 feet leading up to the**
25 **crash, it -- he was, more likely than not, not attending**

154

1  to the flashing red lights or all the other signage that
2  I detailed in my first report.
3    Q   Well, we know that.  You know, we agree that
4  he was distracted.  You know, we don't have to continue
5  to repeat it.
6    But do you have any specifics or facts as it
7  relates to either, A, where Mr. McGee was looking
8  specifically or, B, where his cell phone was in the
9  vehicle?  Do you know anything about that?
10   **A   What we know is his testimony of it.  There**
11 **is no other physical evidence that speaks to that.**
12   Q   Okay.  And so we have to rely on what we do
13 know; is that right?
14   **A   I -- I don't quite understand that question.**
15   Q   All right.  So in -- in your report, you
16 relied on a study of other drivers in other situations
17 with different facts to determine that response time is
18 more than 2.2 seconds.  Do you recall that?
19   **A   I recall citing a 2.2-second figure.  I think**
20 **your question mischaracterizes the context, but I do**
21 **cite to that figure.**
22   Q   Well, each time in this drive cycle,
23 Mr. McGee, having received a warning, responded
24 sometimes in less than 1 second and no greater than 1.3
25 seconds.  Do you agree with that?

**155**

1    A   I -- I understand that Mr. Moore has looked
2  at his previous response to hands-on warnings and found
3  that up to 1.3 seconds in his analysis. I've not done
4  any analysis to determine minimum or maximum times
5  throughout the entire drive cycle.
6    Q   Okay.  Do you have any reason to disagree
7  with the interpretation of the data that Mr. Moore
8  performed?
9    A   With respect to his -- the -- Mr. Moore's
10  looking at the -- you know, based on the data he has,
11  that he looked at the time from an alert issued to the
12  hands being detected again, I mean, I haven't gone and
13  checked the math.  But assuming that he did the math
14  correctly, that methodology generally makes sense.
15    Q   Okay.  Have you -- and let me ask you just
16  curiously.  Have you ever seen a crash before where the
17  electronic data actually measured the driver's
18  attentiveness in response to events right before a crash
19  like we have here?  Have you ever seen anything like
20  that?
21    A   Measuring attentiveness is a really tricky
22  topic.  You know, as it has been discussed in this case
23  and in, you know, many others, there are -- there are
24  proxies that can be used for human attention.  But I'm
25  not aware, this case included, of any direct measure of,

**156**

1  you know, driver attention beyond situations where we
2  know that had a driver been attentive, that an incident
3  could have been avoided.
4    Q   Can you show me any physical evidence that
5  tells you that when in time or where on the roadway,
6  this roadway specifically, that the dropped phone would
7  have prevented him from responding to a warning?
8    A   I'm sorry.  Can you repeat that one more
9  time, Mr. Poses?
10    Q   Sure.  I wrote it down.
11        Can you show me physical evidence, if you
12  can, or talk to me about what facts we know that tells
13  you when in time or where on the roadway the dropped
14  phone would have prevented McGee from responding to a
15  warning?
16        MS. CRUZ:  Object to form.
17    A   So I'm not aware of any physical evidence
18  that would, based on my understanding of your question,
19  would inform an answer to that beyond that.
20        To the extent that a hypothetical warning of
21  some kind to something was issued while someone is
22  reaching down for an object, and that warning required a
23  response involving proper driver positioning and hand
24  usage, then I would expect such a reaction to be at
25  least delayed by the act of trying to pick up a dropped

**157**

1  object to the extent that someone even responded at all
2  prior to the time period to respond running out.
3    Q   Forward collisions are important, invaluable
4  technology; you would agree?
5    A   Just to clarify on the record, you said
6  forward collisions are important?
7    Q   Forward collision warnings.
8    A   Okay.  Sorry.  You didn't say warnings.
9  That's why I was confused.
10        So I do believe that forward collision
11  warning and -- and ADAS technology in general are
12  important features and building blocks to help us as an
13  industry, an automotive industry, move towards
14  improvements and safety, among other improvements.
15    Q   What should trigger a forward collision
16  warning, what specific objects, generally?  And then
17  we'll talk specifically about this case.
18        MS. CRUZ:  Todd, I'm just going to object
19  that we're kind of going really far afield of -- of
20  Dr. Cades's opinions, which is really limited.  I mean, I
21  don't know if he even mentions the words forward
22  collision warning in his -- his supplemental report.
23  Maybe he does.  But certainly, it's -- it's not part of
24  his opinion.  So we -- we need to try to stick to this
25  supplemental report.

**158**

1        MR. POSES:  That's fair, and I am.  You know,
2  Dr. Cades did reference that he looked at the augmented
3  video.  And the augmented video provides quite a bit of
4  data, measurable data, as to what the car appreciated
5  and saw, not what the driver saw, but what the car saw
6  and did or didn't do.  And so this is just foundational
7  questions so that I can talk to him about additional
8  information about the augmented video and his opinions,
9  or lack thereof, about it.
10        MS. CRUZ:  But he's already told you that he
11  does not have -- the augmented video did not change his
12  opinions.  And he's not talking about forward collision
13  warnings at all in his supplemental report.  So it
14  sounds like you want to ask him about something, but
15  that's not something that he has an opinion about per
16  the report.
17        MR. POSES:  Okay.  So let me just try to get
18  this straight.  And, Doctor, you can -- you know, answer
19  if you can.
20    Q   But despite the fact that the car itself
21  appreciated multiple hazards in its path, you don't have
22  an opinion as it relates to human factors as to what
23  potentially could or could not have happened in this
24  accident?
25        MS. CRUZ:  Objection to form.

Transcript of David M. Cades, Ph.D., Volume 2
Conducted on January 3, 2025

159

1 Mischaracterizes the evidence and his testimony.
2       MR. POSES:  All right.
3    Q  Well, go ahead.
4    A  I don't understand that question.  What do
5 you mean?  Could or could not have happened?  I mean,
6 lots of things can and cannot happen.
7    Q  Well, I guess we'll talk, then, specifically
8 about, you know, collision avoidance, mitigating the
9 accident, or avoiding the accident altogether.
10       And having seen and reviewed the augmented
11 video, does that provide you information such that the
12 accident could have been mitigated or avoided?
13       MS. CRUZ:  Objection to form.  There were
14 some statements in there, and I'm not sure what the
15 question is.  And I think he's already answered what
16 you're trying to ask.
17       MR. POSES:  All right.
18    Q  Well, you can go ahead and try to answer.
19    A  So, again, as I've already stated, I reviewed
20 the augmented video.  I've done no analysis.  I have no
21 opinions with respect to the augmented video.  It's
22 outside the scope of my analysis, certainly outside the
23 scope of my supplemental report.  And I would defer to
24 Mr. Harrington on -- and folks at Tesla who have the
25 expertise to talk about the augmented video.

160

1    Q  Okay.  So -- okay.  Fair enough.
2       You said in your December 23rd report that
3 there was, quote, no evidence that an additional or
4 different warning would have changed the outcome of the
5 accident [sic].
6       Do you mean that you didn't find such
7 evidence or -- but that it could exist?  I was trying to
8 understand the opinion.
9    A  Sure.  So just to be clear, we're -- you're
10 talking about the last sentence of the partial paragraph
11 at the top of page 4?
12    Q  That's right.
13    A  Okay.  I'm sorry.  Now that I'm in the
14 context, can you repeat the question, please?
15    Q  Sure.  And I -- I'll restate it because I
16 wrote it down.
17       It says -- I said, you said in your December
18 23rd report that there was, quote, no evidence that an
19 additional or different warning would have changed the
20 outcome of the accident, end quote.
21       And do you really mean that you didn't find
22 such evidence or that -- but that it could exist?
23       MS. CRUZ:  Object to form.
24       MR. POSES:  That's fine.
25    A  And just to -- again, just for sanctity of

161

1 the record, the last word in the quote is incident, not
2 accident.  I just -- again, not -- not a big deal.  I
3 just don't want to, you know, have the record be
4 unclear.
5    Q  You're right.
6    A  I don't -- yeah.  Again, I have the
7 information I have.  And based on everything that I've
8 reviewed, that's my -- that is my conclusion.  That is
9 my opinion.  And the bases for that are laid out in this
10 report and my previous report.  So I can't comment on --
11 I can't comment on other -- on any information I don't
12 have.
13    Q  But that's in the augmented video, isn't it,
14 the information that would be required so that you could
15 analyze and ultimately figure out a reaction time,
16 considering the stimulus the car was receiving and
17 processing?
18       MS. CRUZ:  Objection to form.
19       I'm sorry, Todd.  Are you done?  Sorry.
20       MR. POSES:  Sure.
21       MS. CRUZ:  Objection to form.
22 Mischaracterizes his testimony and the evidence, and
23 he's already answered this question multiple times.
24       MR. POSES:  Well, I -- I haven't gotten an
25 answer yet.  I mean, we have --

162

1       MS. CRUZ:  You got an answer.  You just
2 didn't like it.
3       MR. POSES:  Well, I'm just asking -- I mean,
4 we're talking about reaction times, and that's what, you
5 know, the doctor, you know, and human factors begs and
6 determines.
7    Q  And so when we have, now, evidence as to when
8 the actual objects in the path of the Tesla were
9 appreciated by the Tesla itself, not the driver but the
10 Tesla, we agreed earlier that those very same things
11 would trigger a warning or a chime.  No?  Am I wrong?  I
12 mean, a car -- a car directly in a Tesla's path is not
13 going to trigger an alarm or -- or -- or it's not
14 supposed to do that?
15       MS. CRUZ:  Object to the form of the
16 question.  It's confusing.  I'm -- I'm -- you just made
17 a whole bunch of statements.
18       MR. POSES:  I did.  So let me --
19       MS. CRUZ:  It mischaracterizes --
20       MR. POSES:  Let me make it -- I'll make it
21 easy for you.
22       MS. CRUZ:  -- it mischaracterizes -- Todd,
23 let me --
24       MR. POSES:  I'll withdraw it.
25       MS. CRUZ:  For the record --

163

1        MR. POSES:  I'll withdraw it.
2        MS. CRUZ:  Okay.  But let me just -- go
3   ahead, then.  If you withdraw, that's fine.
4        MR. POSES:  I'll withdraw it.
5   BY MR. POSES:
6        Q    Would you agree that when the Tesla knows
7   that there's a car in its path, that a chime should
8   alert the driver?
9        MS. CRUZ:  Object to form.
10       A    Again, that's -- that's outside the scope of
11   my analysis.  It's outside the scope of what I've talked
12   about in -- you know, in this supplemental report.  The
13   algorithmic decisions is -- is outside of my expertise.
14   So there are -- there are certainly engineers and
15   scientists at Tesla, as well as Mr. Harrington, who can
16   comment on the -- on that type of analysis, Mr. Poses.
17       Q    All right.  So let's assume, then, that a
18   warning was provided to the driver at the times when
19   which the car appreciated the end of drivable space, the
20   stop bar, the car itself, and even the plaintiff, the
21   pedestrian in its path.
22            Did you do any analysis as it relates to had
23   a warning been provided, what would've happened then?
24       MS. CRUZ:  Objection to form.  The question
25   is confusing.  It's an incomplete hypothetical.  I'm not

164

1   sure if you're -- you said the car.  I don't know if
2   you're talking about what happened.  Are you trying to
3   give him a hypothetical of what could've happened?
4        MR. POSES:  Well, I mean, that's exactly what
5   it is.  And so I'll break it down and make it easier.
6        Q    Let's assume that the car was able to warn
7   the driver when the end of drivable space was
8   appreciated by the Tesla and autopilot itself.
9            Did you do any analysis as it relates to what
10   possibilities and potentials would have happened?
11       MS. CRUZ:  Object to form.
12       A    So, again -- and a lot of this is covered in
13   my first report and deposition -- the -- the totality of
14   the evidence shows that the incident vehicle, as well
15   as -- as other vehicles that Mr. Harrington evaluated,
16   did not regularly consistently or sometimes at all issue
17   any kind of alert.  So in -- in the real world, there's
18   nothing for a driver to respond to except for the
19   available visual information and the available previous
20   knowledge and experience of Mr. McGee leading up to this
21   intersection.
22            In -- in a hypothetical where there is some
23   type of alert or warning issued to a driver who has
24   failed to respond to an intersection, a stop sign, a
25   flashing red light that he had driven through many times

165

1   before, for a driver who has his foot on the accelerator
2   going, I think, about 15 miles an hour above the speed
3   limit, that is not a driver who's likely to respond to
4   any kind of warning in a -- in a -- in a timely manner.
5        Q    Well, we agreed earlier that he did on a
6   number of occasions in the same drive cycle; isn't that
7   right?
8        A    No, sir.
9        Q    No?  Well, I think Mr. Moore pointed out 11
10   times during that same drive cycle -- I think it's 11
11   times during that same drive cycle, there was a warning
12   of some kind, and the response was no greater than 1.3
13   seconds.  You agree with that, don't you?
14       A    I don't recall the specific number.  Again,
15   as I have already stated many times now, my review of
16   Mr. Moore's work shows that Mr. Moore identified that
17   Mr. McGee did respond to a hands-on alert message in 1.3
18   or sometimes less seconds.
19       Q    Okay.  And what would make you think it would
20   be different in these circumstances?
21       A    And, again, I'm happy to go through this
22   again.  I do feel like we're retreading here.  But
23   the -- the circumstances -- first of all, we don't know
24   the specific circumstances and contexts under which
25   Mr. McGee responded to those previous hands-on alert

166

1   messages.  The -- at least based on his testimony, he
2   certainly did not describe a previous instance where he
3   was on the phone with an airline and dropped his phone
4   and -- and, you know, reached to pick it up.  So there's
5   no evidence to suggest that he had experienced that.
6            There's nothing to -- there's basically
7   nothing that allows us to suggest that those previous
8   incidents are incidents of him responding to a hands-on
9   message are in any way, shape, or form similar or
10   relevant to what he -- what he was faced with and what
11   he failed to respond to at the time of the incident.
12       Q    Okay.  Do you think an audible chime would
13   have prompted McGee to do something?
14       MS. CRUZ:  Object to the form.  It's an
15   incomplete hypothetical.
16       Q    In the seconds leading up to the accident, do
17   you think an audible chime would've prompted McGee to do
18   something, something at all?
19       A    I mean, again, there's just -- there's not
20   enough --
21       Q    More likely than not.  More likely than not.
22   What do you think is more likely?
23       MS. CRUZ:  Todd, let him talk.
24       Q    Do you think he would've responded to an
25   audible chime or ignored it?

Transcript of David M. Cades, Ph.D., Volume 2
Conducted on January 3, 2025

12 (167 to 170)

---

167

1       MS. CRUZ:  Todd, please let him finish.  Now,
2  you've got a question, and then he started answering,
3  and then another question.  Maybe ask the question again
4  so the record's clear, please.
5       Q   Do you think, more likely than not, would an
6  audible chime have prompted McGee to do something?
7       MS. CRUZ:  Objection to form.  It's an
8  incomplete hypothetical.
9       A   Again, it's just not -- there are so many
10 possibilities that your question opens the door.  I
11 would expect at some point that Mr. McGee could have
12 responded to something.  However, he failed to respond
13 to sufficient visual and experiential information for
14 quite an extended time period.  I mean, over 1,000 feet
15 of driving at around 60 miles an hour leading up to the
16 crash.  So, again, you know, there are plenty of
17 examples of, again, in those Florida crash records
18 that -- that I've produced and reviewed, where I mean,
19 in daylight, in, you know, where things are visible in
20 front of drivers for, you know, upwards of -- of, you
21 know, 4, 5, 6, 7, 20 seconds, and they don't respond.
22      So it is pure -- it would be pure speculation
23 to assume that such a driver would respond to some kind
24 of chime.
25      Q   Okay.  What -- have you calculated a scenario

---

168

1  in which the vehicle could've warned the driver with
2  enough time that McGee, the driver, could've avoided the
3  accident?  Have you done that?
4       A   So, again, I -- and, again, I would hope it
5  would be clear from the report, but nowhere in -- in my
6  supplemental report or in my previous report do I talk
7  about the vehicle calculating anything or the vehicle
8  doing anything.  That is outside of my scope, and I
9  would defer to Mr. Harrington with respect to the -- the
10 vehicle processing things.
11      Q   Well, okay.  But this is more in terms of
12 reaction time and human factors.
13      And my question -- I'll just read it again --
14 it's, what scenario have you calculated in which the
15 vehicle could have warned the driver with enough time
16 that the driver could have avoided the impact?
17      If you have an answer, that's fine.  But I
18 would ask why not.
19      MS. CRUZ:  He just answered that question,
20 Todd.
21      MR. POSES:  I know.
22      Q   And I'm asking again because I don't know
23 that you did answer the question because my question is
24 why not.
25      Why haven't we at least rewound where a

---

169

1  warning would have mattered?  I know that you're saying
2  in this case, it didn't.  Okay.
3       But where -- where would it have triggered
4  where the accident could have been avoided --
5       MS. CRUZ:  Objection to form.
6       Q   -- distance --
7       MS. CRUZ:  -- objection to form.
8       MR. POSES:  That's okay.
9       Q   You can answer if you can.
10      A   I -- I -- there's, like, three different
11 questions pending, and I -- I don't understand what
12 you're asking in any of them.
13      Q   Okay.  Okay.  Well, I'll move on and go back
14 to it.
15      Tell me what -- what's HMI?
16      A   Human -- it stands generally -- well, I don't
17 know if this is the only way in the world that it's
18 used, but it stands for human machine interface in -- in
19 the context that I've seen it used.
20      Q   Would you agree that, I guess, it allows
21 communication between the driver and the automation
22 system?
23      A   It can if we are talking about an HMI for
24 some type of hypothetical automation system.
25      Q   Okay.  And -- all right.  And for HMI to

---

170

1  work, does it need to accurately communicate information
2  and data?
3       A   Not necessarily.
4       Q   Okay.  Well, tell me, when it
5  mischaracterizes information and data, where that is
6  effective?
7       A   So, again, Mr. Poses, I -- I promise I'm not
8  trying to be difficult here.  I mean, this is -- the
9  lack of context with the question makes it really
10 difficult to answer.  And also, I -- you know -- and
11 maybe you will make this clear, but this is not anything
12 that -- I don't see in either of my reports or in my
13 analysis where, you know, I'm talking about what makes
14 an effective HMI.  So I'm sorry.  I -- I just don't -- I
15 don't understand what you're asking, I guess is the best
16 way to put it.
17      Q   Well, no, you don't comment on it
18 specifically.  Instead, you suggest that the opinions of
19 both Cummings and Moore, they ignore to fail -- they
20 ignore and fail to account for Mr. McGee's knowledge,
21 experience, and actions leading up to the accident.
22      I mean, you -- you wrote that.  And you also
23 wrote prior to that that they don't understand human
24 factors, really, as good as you do, certainly, but in
25 this case, at all.  And so that's the reason why I'm

---

---

171

1 going into this area, and I would ask you -- let me ask
2 you this: Is a driver-monitoring system part of HMI?
3      **A   It can be.**
4      Q   Okay.  Well, how about in this case, in the
5 Tesla?
6      **A   The -- I would say that the output from the**
7 **driver-monitoring system I would consider to be part of**
8 **HMI.**
9      Q   All right.  In your December 23rd rebuttal
10 report, you stated that changes in the DMS aren't
11 relevant to the subject accident.  That's what you said?
12      **A   Where are you reading from just so I can see**
13 **the context?**
14      Q   I'm sorry.  I wrote it down, but in your
15 report -- I'll try to find it as well because I know
16 that you're looking for it too.
17      Well, let me just ask you generally because
18 I'm not going to quote you.  But in the -- in your
19 rebuttal report, I think you stated that changes to the
20 DMS are not relevant to this accident; is that fair?  Is
21 that what you -- that's your opinion?
22      MS. CRUZ:  Todd, are you referring to the --
23 his new sub-bullet opinion?
24      MR. POSES:  Yeah.
25      **A   Yes.  So that -- just again, you know, I know**

172

1 that report's part of the record.  But that bullet
2 **reads, in referencing Dr. Cummings and Mr. Moore, they**
3 **do not detail, describe, or explain how their proposed**
4 **alternative DMS design or alternative additional**
5 **warnings would have changed the outcome of this**
6 **incident.**
7      Q   Well, if the HMI has an error or if DMS has
8 an error, could it contribute to an accident in a level
9 two vehicle?
10      **A   Again, unrelated to this vehicle, this**
11 **incident or -- or, you know, this case at all, that's**
12 **possible.**
13      Q   Okay.  Tell me how.  Give me a scenario where
14 that's possible.
15      MS. CRUZ:  I'm just going to object to form.
16      Todd, this so outside of this supplemental
17 report.  I mean, these are questions that could have
18 been asked before if you wanted to ask him about this
19 stuff.  This is supposed to be a very limited
20 deposition.  We're going on a deposition that's lasting
21 longer than the first deposition here in a few minutes
22 about a supplemental report that has two and a half
23 lines of a new opinion.  So this isn't a chance to
24 retread all territory.
25      MR. POSES:  I think you're right.  But the

173

1 issue, really, is more of being critical of the entirety
2 of the opinions of our experts.  And so I'm trying to
3 get to the root of the criticism.  And -- and so I think
4 that these questions are relevant for that reason.  And
5 so I'll try to move on, and I didn't want to spend too
6 much time today.  I really didn't.  But I'm going to try
7 to get through this.  I'll try to get through this.
8      Q   I guess -- you stated that alternative
9 designs of driving monitoring technologies would not
10 have changed the outcome of the incident.  You stated
11 that; is that right?
12      **A   That is from my first report copied over into**
13 **this one, so that's not new information.**
14      Q   Okay.  And I guess I'm going to ask you a
15 pretty general question in that the strike outs that
16 Mr. McGee endured because of his driving during the
17 three months that he owned the accident --
18      **A   Owned the vehicle.  Sorry.  You said**
19 **accident.**
20      Q   You're right.  Owning the vehicle.
21      Would you -- how would you categorize the
22 strike outs and Mr. McGee's behavior?
23      MS. CRUZ:  Objection to form.
24      **A   What -- just to help us along here, what do**
25 **you mean by categorize?**

174

1      Q   Well, describe it.  I mean, Mr. McGee's
2 behavior as it relates to the strike outs, you know, in
3 terms of human factors, how would you characterize --
4      MR. SMITH:  I'm sorry.  I'm -- Todd, I just
5 have to say in the -- in the depositions I took of your
6 experts, you complained that I went off the reservation.
7 And here, there's nothing in this report about strike
8 outs.  You're going back and asking for -- you're trying
9 to take a deposition on material that you've had for a
10 very long time, not the new information.  This has
11 nothing to do with the subject matter of this
12 deposition.  And you're overreaching.
13      MR. POSES:  Okay.  And I appreciate it, Joel,
14 but I think that I'm going to go back to my original
15 point and -- and suggest that what the doctor has done
16 is taken issue with the opinions of our experts almost
17 entirely.  And they have a misunderstanding of human
18 factors and automated technology and -- and ignored
19 facts in this case.
20      And so my questions, really, are to challenge
21 the doctor's suggestion that any of that is really true.
22 And I understand your objection.  And I'm going to try
23 to get through this quickly because I didn't want to
24 take this long.  But I think that these questions are
25 entirely relevant considering the doctor's position as

175

1  it relates to our experts.
2          MR. SMITH:  Should have, could have done that
3  before.
4          MR. POSES:  Well, these are -- okay.
5      Q   Well, let me ask you this, then:  Do you
6  agree that --
7          MR. SMITH:  Which, by the way, was your
8  objection to me.
9          MR. POSES:  You're right.
10         MR. SMITH:  Right?  I mean, I don't know.
11 This is -- this is talking out of both sides of your
12 mouth, Todd.
13         MR. POSES:  No.  I'm saying that you're
14 right.  And I'm trying real hard to stay within the
15 confines of what you're suggesting is outside the
16 confines.  But, you know, there are opinions that both
17 Dr. Cummings and Mr. Moore offered very recently that
18 Mr. Cades-- or Dr. Cades has suggested -- or Cades has
19 suggested are a -- a  complete misunderstanding of the
20 technology.  I mean, that's what he has said.
21         You know, I find it hard to believe that
22 someone would suggest that, you know, our two experts
23 don't understand human factors in this technology, but
24 nevertheless, that's the opinion.  I'm not sure if it's
25 even admissible, and that's for a different day.

176

1          But as long as we're here, I'm going to
2  challenge that statement with what they've said and why
3  it's not qualified, according to your expert.  I'll
4  try -- I'll try to be more specific, and I'll try to
5  make it short.
6          MR. SMITH:  All I've got to say is nice try,
7  but that goes nowhere.  And you totally meet yourself
8  coming around the mountain when we read your objections
9  to the -- in the Cummings deposition.  You made this
10 specific objection that we needed to stay specifically
11 with respect to the new information in the report.  And
12 you're doing exactly what you objected to my doing.
13         And I'm not going to say any more.  I just
14 needed to interject that because I was at that
15 deposition and heard both sides of this story.
16         MR. POSES:  All right.  Well, listen, Joel.
17 I -- I disagree.  I think it's a little different, but I
18 respectfully -- I respectfully disagree.  And I'll try
19 to keep it short.  I don't have much more.  All right?
20         I'll tell you what.  Let's take two minutes,
21 Whitney.
22         MS. CRUZ:  Sure.
23         MR. POSES:  I'm going to read through a
24 couple of issues and see if I want to ask the doctor
25 more questions.  I will have a couple more questions.

177

1          MS. CRUZ:  Okay.  Let's just make it -- go
2  ahead, Todd.  I'm sorry.
3          MR. POSES:  And, Joel -- and, Joel, with
4  all -- with respect, I -- I agree with you in part.  I
5  do.  And I'm trying my best to not, you know, overtake
6  the deposition with old stuff.  But, you know, again,
7  what I said still stands.  I'm doing my best.
8          MR. SMITH:  Thanks.
9          MR. POSES:  Fair enough.
10         THE REPORTER:  I'll read us off the record.
11         We are going off the record at 10:18 a.m.
12 Central Time.
13         (Whereupon, there was a recess in the
14 proceedings.)
15         THE REPORTER:  We are back on the record at
16 10:24 a.m. Central Time.
17 BY MR. POSES:
18     Q   Okay.  And I'll try to be brief.  But let me
19 ask you, the HMI display and what was presented to
20 Mr. McGee at the time of the crash in the moments
21 leading up to the crash, are you aware of what the HMI
22 displayed to Mr. McGee?
23     A   What aspects of the HMI are you talking
24 about?
25     Q   Well, are you aware that it told him to place

178

1  his hands on the steering wheel in the moments leading
2  up to the crash as opposed to take over immediately?
3      A   I'd have to go back and look at the exact
4  sequence of that.  And, again, you know, that's
5  something that -- it's covered in my, you know, first
6  report --
7      Q   Okay.
8      A   -- to the extent that it's relevant.
9      Q   Do you think that could have contributed to
10 the crash?
11         MS. CRUZ:  Objection to form.  Again, Todd,
12 this is what we just talked about.  This has literally
13 nothing to do with his supplemental report at all.  He's
14 not -- he's not prepared to talk about things outside of
15 this supplemental report and this new data.
16         MR. POSES:  Well, I -- this is new data.  And
17 Mr. Moore has written a long, lengthy opinion and did
18 that data analysis that specifically talks about new
19 information not available to Dr. Cades during his prior
20 deposition.  And all he said in his -- in his report is
21 I disagree but not why.  And so these questions are
22 specific to those issues.  And I don't think you can say
23 that our experts don't know what they're talking about
24 and are wrong without providing an explanation.  So
25 these questions are asking for an explanation.

179

1    MS. CRUZ:  Well, I --
2    MR. POSES:  And I -- and I can't imagine a
3  scenario where that's not appropriate.
4    MS. CRUZ:  That's a dissertation that I
5  disagree with, and if you want to ask him what his
6  opinions are in a supplemental report and what the bases
7  are, maybe you would have, you know -- I mean,
8  respectfully, you can have an understanding of what his
9  bases are.  But --
10   MR. POSES:  Well --
11   MS. CRUZ:  So maybe ask him, what are your
12 new opinions and what are the bases.  And he can tell
13 you what they are.
14   MR. POSES:  Yeah.  And I'm doing that because
15 what you've said is you've discounted our experts
16 entirely and taken a narrative that doesn't give an
17 explanation.  And so I'm asking for that explanation in
18 this question.  I'll re-ask it, which is pretty
19 important, and here it is.
20   Q    That in the log, in the infotainment log, it
21 indicated that the HMI was displaying incorrect
22 information to Mr. McGee.  Do you know that?  This is
23 new information.  Are you aware that it was displaying
24 incorrect information to Mr. McGee?
25   **A    I don't have an opinion or a comment on that**

180

1  **one way or the other.**
2    Q    Okay.  So do you have -- take any issue with
3  what Mr. Moore has suggested in his report that the HMI
4  was, in fact, displaying incorrect information to
5  Mr. McGee in the moments leading up to the crash?  Do
6  you -- do you -- do you agree, disagree, or accept that?
7    **A    I don't have a comment or opinion on that one**
8  **way or the other.**
9    Q    Okay.  All right.  So you don't have an
10 opinion at all as it relates to the warnings or lack
11 thereof as it relates to Mr. McGee's drive cycle in the
12 moments leading up to the crash?
13   MS. CRUZ:  Objection to form.
14   **A    That mischaracterizes my previous answer.**
15   Q    Well, have you analyzed the incorrect
16 information displayed to him?  Have you looked at that
17 information?
18   MS. CRUZ:  Objection to form.
19   **A    I've already talked about what I've done with**
20 **respect to the new information that's been provided.  I**
21 **reviewed it.  My analysis with respect to Mr. Moore and**
22 **Dr. Cummings' supplemental analyses are -- well, from --**
23 **actually, my analysis opinions and bases with respect to**
24 **Dr. Cummings' and Mr. Moore's analyses up through July**
25 **8th are detailed in my July 8th, 2024, report.**

181

1  **Similarly, my supplemental analyses and bases for said**
2  **analyses and opinions are detailed in my December 23rd,**
3  **2024, report.**
4    Q    All right.  Well, you know, you quote in your
5  report that there is no evidence that an additional or
6  different warning would have changed the outcome.
7    But what if -- what if the car provided the
8  correct warning instead of an incorrect warning?  Would
9  that have made a difference in the driver's response?
10   MS. CRUZ:  Objection to form.
11   **A    Again -- so I don't agree with the premise of**
12 **that question.  So it makes it more challenging to**
13 **answer.  Again, the idea -- you know, the idea of**
14 **characterizing a correct versus an incorrect warning,**
15 **I'm not aware of -- of that characterization being a**
16 **matter of fact.  Certainly, it's your opinion, Mr. Poses**
17 **--**
18   Q    It's not my opinion.
19   **A    What -- what -- what I'm saying -- please.  I**
20 **apologize.**
21   Q    -- my opinion.
22   **A    Let me finish my -- Mr. Poses, please do not**
23 **interrupt me --**
24   MS. CRUZ:  Todd --
25   Q    No.  Listen.  I --

182

1    **A    I'd like to finish my answer.**
2    Q    -- saying it's my opinion.  I don't have an
3  opinion.
4    MS. CRUZ:  Todd.  Todd --
5    THE REPORTER:  I can't -- I can't get
6  everybody when you're talking at once.  I'm sorry.  The
7  record is suffering.
8    MR. POSES:  I know.
9    MS. CRUZ:  Todd, you cannot ask him a
10 question and then he's answering it, and you're
11 interrupting him and asking him more questions.  You
12 have to let him answer.
13   MR. POSES:  I'm not asking more questions.
14 What I'll do is I'll --
15   MS. CRUZ:  No.  You're interrupting him while
16 he's answering.
17   MR. POSES:  I'll re-ask the question.  I can
18 -- you can -- I'll strike the question.
19   THE WITNESS:  I'm in the middle of my answer.
20 BY MR. POSES:
21   Q    Well, I mean -- listen.  There -- there is --
22 the HMI indicated, in the moments leading up to the
23 crash, according to Mr. Moore and the data, it says,
24 place hands on steering wheel.
25   Do you -- do you know that?

183

1      MS. CRUZ:  I'm just going to -- I'm going to
2  object to the last question because you did not let
3  Dr. Cades answer.
4      MR. POSES:  I'll withdraw it.  I'll withdraw
5  it.
6      MS. CRUZ:  And I'm objecting to this question
7  on the basis of form.  It's an incomplete hypothetical.
8  It's outside of the scope, and it's been asked already.
9      MR. POSES:  It's new -- it's new data.
10  It's -- it's brand-new.  Okay?  It's brand-new.  And so
11  I'll ask it in parts so it makes it easier for the
12  doctor.
13     Q    But do you agree or disagree with Mr. Moore
14  that the HMI indicated, quote, place hands on steering
15  wheel in the moments leading up to the crash?  Do you
16  agree or disagree with that?
17     MS. CRUZ:  Object to form.  When?  What --
18  what moments leading up to the crash?  Five minutes
19  before?  Two seconds before?  What is the exact data
20  point?
21     MR. POSES:  No, within the -- within the
22  last --
23     MS. CRUZ:  Where in the report are you
24  referring to?  These questions are so general.
25     MR. POSES:  It's in the last --

184

1      MS. CRUZ:  That's part of the problem.
2      Q    It's in Mr. Moore's report, the specific
3  seconds.  But we're talking about seconds leading up to
4  the crash.  Less than 10 seconds prior to the crash, it
5  says, place hands on steering wheel.  That's what the
6  HMI indicated.
7      Do you -- that's the data.  Do you agree that
8  the data represents that scenario?  Do you agree with
9  Mr. Moore that's what the data says?
10     A    As I have stated multiple times over the past
11  hour and a half, I have not done any analysis of the
12  data that you're referring to.
13     Q    Okay.  So let's do the hypothetical, then,
14  because there's only one way to do it if you're not
15  going to agree with what Mr. Moore -- what the data
16  actually shows.
17     But if the HMI indicates, place hands on
18  steering wheel -- okay?  Place hands on steering wheel.
19  And we are talking about within five seconds and
20  500 feet within -- you know, before the collision.  And
21  it should have indicated, take over immediately.  Could
22  that have contributed to the crash, yes or no?
23     MS. CRUZ:  Objection to the form.  Outside
24  the supplemental report.  Outside Dr. Cades' human
25  factor --

185

1      MR. POSES:  It's certainly not outside of
2  his specialty.
3      MS. CRUZ:  You're asking whether a warning
4  that the car issued was correct to a human factors
5  expert.  He's already told you.  He's not analyzing what
6  the car did.  He's analyzing the human.
7      MR. POSES:  Right.
8      Q    And so I'm asking if it could have helped
9  avoid the accident.  Would the human have reacted
10  differently had he been told that there was take over
11  immediately rather than what was done, which is place
12  hands on the steering wheel.  I'm asking what the human
13  would've done had he been given the information that
14  should have been given to him.
15     Yes or no, would that have helped avoid the
16  accident?
17     MS. CRUZ:  Objection to form.
18     MR. POSES:  Okay.
19     A    So the -- the -- I mean, again, through that
20  back-and-forth, you know, Mr. Poses, you've
21  mischaracterized significant portions of my previous
22  testimony.
23     With that being said, in a hypothetical world
24  whereby some hypothetical warning or some hypothetical
25  message is or is not given, that's a -- that's a

186

1  completely separate analysis, not one that I've done.  I
2  defer to Mr. Harrington with respect to your comment as
3  to whether the vehicle should or should not have issued
4  any -- any such warning.
5      What I would say, finally, is that you've got
6  a driver in Mr. McGee who's been through this
7  intersection countless times with this vehicle,
8  according to his testimony, utilizing the autopilot
9  features.  And despite all of that experience and
10  knowledge, he was so inattentive to the environment
11  around him that he failed to detect flashing lights,
12  multiple signs, and the presence of a stop sign in an
13  intersection that he knew was there, until he drove
14  through it, which is consistent with behavior in just
15  about any vehicle as detailed in the Florida crash
16  records that I have produced previously.
17     Q    Did Tesla provide you with the information
18  that the HMI displayed incorrect information to McGee?
19  Did your -- did Tesla tell you that, yes or no?
20     A    I didn't ask that question.
21     Q    I'm asking if they told you.
22     A    And in the analysis -- in the analysis of the
23  data as to what is correct, incorrect, what should have
24  been displayed versus what's in a data log is outside
25  the scope of my analysis.

Transcript of David M. Cades, Ph.D., Volume 2
Conducted on January 3, 2025

187

1    Q   I understand it's outside the scope of your
2  analysis. It relates to the data. But you operate and
3  give opinions based on data. You need data to be able
4  to provide opinions most of the time.
5        And I'm asking if Tesla provided you with the
6  data that rather than a take over immediately warning
7  seconds before the crash was provided, instead it said,
8  place hands on steering wheel. I'm simply asking if
9  Tesla provided you that information, yes or no?
10       MS. CRUZ: Objection to form.
11   A   I don't know how to answer that question. I
12  mean, I've been provided the same data that everyone in
13  this case has been provided.
14   Q   So Tesla told you, then. We -- we -- okay.
15       Did you factor into your analysis at all that
16  the car did not say, take over immediately? Yet, you
17  saw the augmented video. You saw what was approaching.
18  You saw what the car appreciated and understood. And
19  rather than a take over immediately warning, it said,
20  place hands on steering wheel. Did you know that when
21  you authored your opinion?
22       MS. CRUZ: Objection to form. The question's
23  confusing. It mischaracterizes -- severely
24  mischaracterizes the evidence.
25       MR. POSES: It -- it -- okay. Go ahead.

188

1        THE WITNESS: Sorry. There's an echo coming
2  from somewhere.
3        MR. POSES: There is an echo. I agree with
4  you, Doctor.
5        Whitney, is that coming from you?
6        MS. CRUZ: It is. This is the only way I can
7  plug in right now. My computer is dying. So --
8        MR. POSES: All right. We'll do our best.
9  Do you -- I'll wait for your objection if you just want
10  to put it on mute.
11       THE WITNESS: Or lower the volume.
12       MR. POSES: Yep. Doctor, that's a good idea.
13       MS. CRUZ: I'll lower the volume. See if
14  that works.
15       MR. POSES: Okay.
16       THE WITNESS: As long as you can still hear
17  us, Ms. Cruz.
18       MR. POSES: Yeah.
19       MS. CRUZ: Yeah. I can hear you. Is that
20  better at all?
21       MR. POSES: It is.
22       THE WITNESS: Perfect. Thank you.
23  BY MR. POSES:
24   Q   And I'm asking the question because there's a
25  quote in your opinion paper that says, there is no

189

1  evidence that an additional or different warning would
2  have changed the outcome. That -- that is in your new
3  report.
4        And so my question is just, yes or no, were
5  you aware that the warning provided to the driver
6  seconds before the crash was, place hands on steering
7  wheel rather than, take over immediately? Were you
8  aware of that?
9        MS. CRUZ: Object to form.
10   A   I -- I don't have a comment or opinion one
11  way the other. I've -- you've asked me that question
12  multiple times. I've done my best to answer it. You
13  know, the records are going to reflect --
14   Q   I'm asking if you're aware of it. Do you
15  know?
16   A   You know, the records are going to -- the
17  records are going to --
18       THE REPORTER: I can't get two people. The
19  record is suffering.
20       MR. POSES: You're right.
21       THE WITNESS: So I'm going to finish my
22  answer now.
23       Sorry, Ms. Lichtman. I -- I'm not trying to
24  be difficult here.
25       MR. POSES: It's me who's being difficult.

190

1  I'm sorry, Doctor. It's me.
2        THE WITNESS: So, Mr. Poses -- Mr. Poses, can
3  I finish my answer now, please?
4        MR. POSES: Sure.
5    A   Thank you.
6        So the -- the records that have been produced
7  are what they are. With respect to any analysis of the
8  data and what was displayed, what should have, could
9  have been displayed, that's outside the scope of what
10  I've done. I don't have any other answer, opinion, or
11  comment on that.
12   Q   And so let's ask a human factors question.
13       Would you agree that a warning of, place
14  hands on steering wheel and a warning of, take over
15  immediately are different? Start with that -- from a
16  human factors perspective.
17   A   Yes, those are two different -- I mean, so
18  both -- so, again, outside of context, without any
19  context, those are different statements.
20   Q   Okay. And tell me, you know, what studies
21  you've done, what knowledge you have, or what experience
22  you have as it relates to the human factors in the
23  response to those two different types of issues and
24  warnings. You've got, take over immediately. You've
25  got, place your hands on the steering wheel.

Transcript of David M. Cades, Ph.D., Volume 2
Conducted on January 3, 2025

---

191

1    A    And, again, in this hypothetical, where we're
2 just talking about — outside of any context unrelated
3 to any specific product or situation, we've got two sets
4 of words that are different.   And in looking at those
5 sets of words, place hands on steering wheel versus take
6 over immediately, they would have a — just on their
7 surface, would have a different level of urgency.
8    Q    Okay.   And would the, then, response time in
9 all likelihood be different as well because of the
10 urgency that the message displays or the sound that is
11 produced because of the message?
12    A    Well, so now — now, we're layering on
13 additional variables —
14    Q    Sure.
15    A    — and, again, in — in this hypothetical
16 outside the context of any environment, any product, or
17 anything else, the — all else being equal, once one of
18 those messages would come to the attention or be
19 perceptible or able to be perceived by an observer or by
20 someone who needs to respond to them, the response would
21 be similar in action of assuming that the — assuming
22 that what the take over immediately is telling someone
23 is the same action as place hands on steering wheel,
24 they — what's important is that they're not — those —
25 those two messages, again, you know if I'm talking about

---

192

1 a just hypothetical scenario, they -- it's not comparing
2 apples to apples because they would never be issued
3 under the same circumstances.
4    Q    Agree.   And so I'll just re-ask the question
5 one more time.
6        It's just -- it's -- it's a yes or no,
7 really.   Is -- were you aware, did you know, that the
8 HMI produced a place hands on steering wheel warning
9 seconds -- moments before the crash as opposed to take
10 over immediately when you authored your December
11 23rd report?   Did you know that?
12        MS. CRUZ:   Objection.   This question has been
13 asked and answered at least three times, if not more.
14        MR. POSES:   And I haven't gotten a yes or a
15 no.
16        MS. CRUZ:   So I'll just refer to his prior
17 answer.
18        MR. POSES:   And I haven't gotten a yes or a
19 no to a very simple question, which is did you know that
20 fact, yes or no?
21    A    Again, the -- I don't have a different way of
22 answering the question.   I've already answered.   And
23 again, whether or not that's what Mr. Moore's review of
24 the data showed, whether or not Mr. Harrington or
25 in-house engineers and scientists at Tesla would have a

---

193

1 different interpretation of the same data, it certainly
2 does not make it a fact.   I don't have any opinion
3 and/or comment on — on that.   So it's not as simple as
4 a yes or no despite you wanting it to be.
5    Q    All right.   So you didn't factor that into
6 your report because you don't know whether or not it's
7 true; is that fair?
8    A    No.   I would not characterize that as fair.
9 It's a mischaracterization.   You know, I don't have a
10 different way of answering this question beyond how I've
11 answered it now, you know, at least four times.
12    Q    All right.   Then let me ask you this
13 hypothetical.
14        Let's assume that Tesla agrees with the
15 question that I've asked you on a number of occasions,
16 which is, in the seconds prior to the crash, that rather
17 than a take over immediately warning being issued that
18 it said, place your hands on the steering wheel — and
19 Tesla agrees with that premise.   I want you to assume
20 that to be true.   Would your opinions change?
21        MS. CRUZ:   Objection to form.
22    A    Would my — so just to be very clear, you're
23 asking me if my opinions would change if Tesla
24 hypothetically agrees that the — the — that a —
25 again, to the extent that anything was displayed, that

---

194

1 something different should be displayed -- that
2 something different should have been displayed?   Is --
3 is that the question?
4    Q    Well, I'm asking you something more specific,
5 and it's the same question.   And it's, if Tesla agrees
6 with the data analysis, which I assume they will because
7 there's no choice but to do so, but let's just have to
8 assume it because it hasn't happened yet.   But let's
9 assume that Tesla says you're right.   It didn't say,
10 take over immediately in the moments -- seconds before
11 the crash.   It said instead, place your hands on the
12 steering wheel.   If they agree that that is true, does
13 your opinion change?
14    A    In a hypothetical scenario whereby different
15 words were displayed, that would not, in and of itself,
16 affect my analysis.
17    Q    Okay.   So -- so, then, in this scenario,
18 saying, take over immediately rather than, placing your
19 hands on the steering wheel, that doesn't matter to you?
20 That's what you're saying?   In this case, it doesn't
21 matter to you?
22    A    No, sir.   That's not what I'm saying.
23    Q    Okay.   What are you saying?   I don't
24 understand it.
25    A    So, again, you -- and I don't know if it's

---

195

1 just, you know, overly colloquial, but it's not that it
2 doesn't matter. What you're asking is if it would
3 affect my opinions and analysis. Changing the words of
4 a message that may or may not be displayed at some
5 point, in and of itself, under the scenario -- under the
6 behaviors and the actions that Mr. McGee was engaged in,
7 the -- the words used don't affect my analysis.
8     Q   Okay. In your report, you reference a
9 driver's manual quite a bit. And let me ask you if you
10 have any knowledge as to whether or not Mr. McGee ever
11 read the manual itself.
12     A   As I cover in my initial report -- and I
13 don't recall if it was discussed in my initial
14 deposition -- but I mean, again, with -- subject to that
15 not being anything new, my recollection of Mr. McGee's
16 testimony is that he had not read the manual.
17     Q   Okay. Have you done any studies -- and
18 I'm -- I'm talking about this, and this is the last
19 section I want to cover. But it's because it's -- you
20 know, your report is -- you know, discusses quite a bit,
21 you know, the owner's manual. And so I think it's
22 important here -- and let me ask you if you've done any
23 studies as to what percentage of drivers read the
24 owner's manual.
25     A   What research shows is that more typically,

196

1 vehicle owner's manuals are used as reference sources,
2 whereby folks who want to get information on a
3 particular topic will look up that topic in the owner's
4 manual. And it is not a document that research has
5 shown is typically read cover to cover.
6     Q   Okay. And -- and what research are you
7 referring to, or what papers have you authored as it
8 relates to the interaction of drivers with owner
9 manuals, if you have any? I'm just -- I'm not
10 suggesting that there is one, but if there is something
11 specific that you're referencing, I wanted to understand
12 it.
13     A   I would direct you to my June 24th, 2024,
14 report.
15     Q   Right. Okay. Fair enough.
16         So in terms of additional documents or
17 studies or, you know, potentially things you authored
18 yourself, is there any additional information as it
19 relates to the interaction of drivers with owner
20 manuals, either generally or specifically in this case?
21     A   With respect to this case, I would refer you
22 to my June 24th, 2024, report.
23     Q   Okay. And how about more generally, typical
24 people?
25     A   There is a body of scientific literature

197

1 available.
2     Q   Sure.
3     A   And much of it is covered in that report, the
4 June 24th, 2024, report, that talks about how people --
5 how people access instructional and safety information,
6 factors that improve or deter compliance with safety
7 information. And again, that's all detailed in my first
8 report.
9     Q   So let's -- let's assume that if Tesla had
10 implemented a one-week suspension after three strike
11 outs, you know, human-factors-wise. How would that have
12 affected this crash potentially?
13     A   To a reasonable degree of scientific
14 certainty, given Mr. McGee's behaviors as well as
15 evidence that this crash type is not unique to vehicles
16 with any type of technology, I would not expect his use
17 or -- or -- or disuse of the autopilot's suite of
18 technologies to have affected this crash.
19     Q   Okay. But in terms of strike outs and
20 suspensions, do you think that is effective in
21 terms of either educating or reeducating drivers as it
22 relates to their use or misuse of autopilot?
23     A   Can you repeat that one more time, please?
24     Q   Sure.
25         MR. POSES: Can you read back the question,

198

1 Madam Court Reporter.
2         (Whereupon, the Reporter read the record as
3 follows: But in terms of strike outs and suspensions,
4 do you think that is effective in terms of either
5 educating or reeducating drivers as it relates to their
6 use or misuse of autopilot?)
7     A   It can be.
8     Q   Okay. Let's talk about Mr. McGee.
9         Do you think it would've been effective to
10 implement a one-week suspension after three strike outs
11 for Mr. McGee's behavior?
12     A   If -- I don't -- effective in terms of what?
13 I don't -- I mean, it would have -- it would have -- I
14 mean, certainly to the extent that a feature of the
15 vehicle was locked out such that he couldn't use it, he
16 wouldn't use it. But beyond that, I don't understand
17 what you're trying to get at with the -- with effective.
18     Q   Well, you read Mr. McGee's testimony. And
19 you know that Mr. McGee was not trained in any way by
20 Tesla and instead watched videos online to learn how to
21 use the vehicle. You acknowledge that, right?
22         MS. CRUZ: Objection to form.
23 Mischaracterizes the testimony and the evidence.
24         MR. POSES: Okay. Well, then this -- let's
25 go straight to it.

199

1  Q  Tell -- tell me what you recall as it relates
2  to Mr. McGee being trained in any way by Tesla.  Other
3  than the owner's manual that you reference, did Tesla
4  provide any training or -- at all to Mr. McGee?
5  **A  And, again, you know, I don't cite to -- you**
6  **know, I can double-check here, but I don't see where in**
7  **my supplemental report other than -- other than one**
8  **sentence on --**
9  Q  Right.
10 **A  -- page 4 where I'm talking about, you know,**
11 **Mr. McGee's testimony.  I certainly covered that in my**
12 **initial report.**
13 **My recollection is that Mr. McGee, like many**
14 **drivers of many cars, got his car, had access to an**
15 **owner's manual, had access to the vehicle.  I believe he**
16 **did say he watched some videos.  He specifically said he**
17 **did not listen to anything that, you know, Mr. Musk said**
18 **or put out, and that he had been driving his vehicle for**
19 **however -- excuse me -- however long he'd owned it.  And**
20 **so the additional source of training was his experience**
21 **in -- his experience in using the vehicle on -- on this**
22 **road many times prior before.**
23 **So, again, to the extent that is none of that**
24 **is new as it's covered in my June -- I believe June**
25 **report -- yeah, June 24th report, I mean, it's still**

200

1  **true now.**
2  Q  Okay.  And so, you know, I think we could
3  summarize that -- that he learned how to use the car
4  with videos, and it wasn't training.
5  And so my question, then, knowing that's the
6  case, is that human-factors-wise, if you have a
7  punishment or a sanction or something that warns and
8  educates the driver that they are misusing or not
9  understanding the technology perfectly and that they
10 have a strike out period or suspension, do you think
11 that would affect driver behavior?  Do you think that
12 would help the driver?
13 MS. CRUZ:  Objection to form.
14 Mischaracterizes the evidence and asked and answered at
15 least three times.
16 MR. POSES:  Okay.  Well, we haven't answered.
17 I'm trying real hard to just understand human factors
18 aspects as it relates to suspending a driver when they
19 have not used the autopilot in a way that Tesla -- Tesla
20 designed it.
21 Q  And so do you think that affects -- would it
22 have affected McGee, specifically?  Does it affect
23 drivers generally, that type of policy?
24 MS. CRUZ:  Objection to form.  Are you --
25 let's get the question straight.  Are you asking about

201

1  McGee?  Are you asking about --
2  Q  I'm asking about both.  It's the same
3  question.
4  And I'm asking if that's the type of human
5  factors that is suggested, required, needed so that
6  people use the technology correctly, generally, and
7  specifically with Mr. McGee.
8  MS. CRUZ:  Objection to form.  It's an
9  improper question.  It's compound.  It mischaracterizes
10 the evidence.  And both questions have been asked and
11 answered multiple times.
12 **A  So there's two important concepts from a**
13 **human factors perspective that, again, are not -- not --**
14 **this is not new information with respect to my analysis**
15 **in this case.  It's all covered in my June 24th, 2024,**
16 **report, as well as, I believe, discussed at my previous**
17 **deposition.**
18 **The two concepts are that as long as there**
19 **have been products, regardless of warnings, design, and**
20 **guarding, there are people who misuse products.**
21 **That's -- that's just part and parcel with humans**
22 **interacting with things.**
23 **With respect to safety information and**
24 **warnings, and, again, as is detailed in my June 24th,**
25 **2024, report, in order for warnings, instructions,**

202

1  **and/or safety information to be effective, there are a**
2  **number of conditions that must be met.  The information**
3  **must be present.  The information must be noticed.  The**
4  **information must be read.  The information must be**
5  **understood.  A user has to be able to comply with that**
6  **information.  And then a user has to be motivated to**
7  **comply with that information.**
8  **A failure at any of those stages will lead to**
9  **a -- will lead to that information not having the**
10 **desired effect.  So some of that is more on the**
11 **manufacturer of said product's side, but much of that is**
12 **on the user's goals, intentions, and behaviors side.**
13 Q  Okay.  Let me ask you just a couple more
14 questions.  I think we're pretty done.
15 But do you agree that attentive drivers
16 generally do not need assistance from ADAS to avoid
17 preventable conditions?
18 **A  All else being equal, alert and attentive**
19 **drivers -- and this -- this case is a great example of**
20 **it -- do not need ADAS technologies to avoid as -- what**
21 **I would characterize as preventable incidents.**
22 Q  Okay.  And so wouldn't, ADAS, A-D-A-S -- I
23 guess it's ADAS -- would make a difference in this case,
24 I mean, with Mr. McGee being known to be not attentive?
25 **A  So -- and, again, with respect to the**

203

1  relevance to my supplemental report being questionable,
2  the -- when you talk about ADAS technology, in general,
3  all else being equal, alert and attentive drivers don't
4  need it. There are certainly going to be circumstances
5  where it can be helpful. It can be facilitory --
6  facilitating. I'm not -- I'm not going to try the --
7  the first one.
8      Q   That's fair.
9      A   And the -- and then the flip side of that is
10  for inattentive drivers. And it's a bit of a misnomer
11  to characterize all inattentive drivers similarly.
12  There are different types of inattention, different
13  types of distraction, different levels, different
14  amounts, you know, not necessarily quantifiable. But
15  there are circumstances where ADAS technology can
16  support, quote/unquote, inattentive driver behavior.
17  However, ADAS cannot make up for all driver inattention.
18      Q   Of course.
19      A   And the, you know, more recent data on, for
20  example, the effectiveness of forward collision warning
21  and automatic emergency braking technologies is that
22  they've shown to be effective in reducing crashes and
23  reducing severity generally. But depending on the --
24  which report you're looking at, I mean, the numbers are
25  on the order of, you know, 20, 30, 40 percent, which

204

1  means that, you know, 60, 70, 80 percent of these
2  crashes are unaffected by the presence of the
3  technology. So it can be helpful, but still a lot of
4  circumstances where it's not going to be.
5      Q   So since your last deposition, we did learn,
6  you know, this -- and the data, you know, bears out
7  that, you know, these strike outs occurred, you know,
8  many, many times. And even the days before the
9  accident, there were 11. You know, I know that you
10  didn't look at the data, but let's assume that's true
11  because that's what the data does say.
12          Do you think that Tesla knowing that should
13  have trained Mr. McGee originally and/or suspended him
14  during that time?
15          MS. CRUZ: Todd, I'm not -- I'm not -- I'm
16  going to -- I'm going to tell him to start -- stop
17  answering these questions. That is not new data. That
18  is data we had before. That is an opinion that
19  Mr. Moore had before. And that -- Mr. Cades already
20  gave an opinion on the training and whether it was
21  sufficient. That is -- those three things are
22  absolutely true.
23          MR. POSES: I think the --
24          MS. CRUZ: So we've spent more time talking
25  about old things than we have about relevant things.

205

1  And at some point, I don't want to do this, but I have
2  to tell him to stop.
3          MR. POSES: Well, isn't -- isn't the --
4          MS. CRUZ: That specific question could
5  have -- and you probably should have -- or whoever took
6  the depo should have asked it before. But they didn't.
7  This is not a time to go back and redo what you didn't
8  do.
9          MR. POSES: Oh, I know. And I don't want to
10  have this argument with you again. I'm trying to stick
11  to the data that's new because it provides --
12          MS. CRUZ: That's not new. That is not new.
13          MR. POSES: Well --
14          MS. CRUZ: That is in Moore's -- that is in
15  Moore's old depo. If you want, I can read his --
16          MR. POSES: Well, the question's a little
17  different.
18          MS. CRUZ: -- opinion on that, and then I
19  can read David's opinion on that.
20          MR. POSES: No. Let me --
21          MS. CRUZ: I'm not going to let this keep
22  going. Joel just said you guys did the same exact
23  thing. Todd, if you read the depo -- I don't know if
24  you were there.
25          MR. POSES: I was there, and I read the depo,

206

1  okay?
2          MS. CRUZ: And I was there. I took the depo,
3  and I defended Dr. Cades. And we went over this at
4  length, and that is not new data.
5          MR. POSES: Well --
6          MS. CRUZ: Todd, come on.
7          MR. POSES: Listen. There's -- well, hold
8  on. This -- there -- I -- to me, I'm looking at the log
9  data production analysis that was done afterwards.
10  There were two days of driving that Tesla failed to
11  provide in the original log data production. And --
12  and -- so this is -- this is new, and this is post
13  Dr. Cades' original deposition. It is. And so I'm --
14  I'm asking about that only and not the rest of the other
15  strike outs. I mean, that's why I'm asking these
16  questions. This is new stuff.
17          And I -- you know, I don't really know how to
18  get through it. I'm trying to parse out the new data
19  from the old data and ask him about new data. That's
20  what I'm trying to do. And I recognize that there's
21  crossover because it's a compilation of data, but it's
22  clearly new. And so I don't know how to ask about it
23  without -- you know, I'm not trying -- I'm trying real
24  hard to talk about the two days that were missing from
25  the original log data and what happened during those two

Transcript of David M. Cades, Ph.D., Volume 2
Conducted on January 3, 2025

207

1 days. And there were 11 strike outs. And -- and that
2 wasn't part of Dr. Cades' original report or Dr. --
3      MS. CRUZ:  And you already asked him -- you
4 already asked him if any of the log data changed his
5 opinions, right?
6      MR. POSES:  Okay. Well -- okay.
7      MS. CRUZ:  Yes.
8      MR. POSES:  Well, I mean, any is --
9      MS. CRUZ:  And you already got the answer.
10 What was the answer?
11 BY MR. POSES:
12     Q   So I'll ask you, then. I'll make it simple.
13 Is the missing two days of data as it relates
14 to Mr. McGee's behavior and the use of the Tesla have
15 any effect on your opinion at all?
16     **A   No.**
17     Q   Okay. And so last questions, Mr. Moore
18 said --
19     **A   I'm sorry, Mr. Poses. Let me just -- I want**
20 **to clarify.**
21     Q   Yeah.
22     **A   No -- when you said -- you asked if it has**
23 **any effect on my opinions. It does not -- the**
24 **information contained in any of the new missing,**
25 **whatever, however you characterize it, does not change**

208

1 **any of my opinions. So I just want to make that -- I**
2 **think that's a clearer way of stating it. Sorry. I**
3 **didn't mean to interrupt. I just wanted to clarify.**
4     Q   That's okay. That's all right.
5 Does it change your analysis of those -- I
6 mean, I'm trying to understand what you're saying
7 because it's kind of a yes or no. But you're saying it
8 didn't change your opinions.
9 Is there -- does it have any effect on your
10 opinions at all, I guess, is a better question.
11     **A   In the sense that it provides additional data**
12 **to be considered, then one could argue that that, in and**
13 **of itself, is an effect. But it does not change the**
14 **outcome of my analysis, nor does it change the opinions**
15 **that I hold and have restated in my December 23rd, 2024,**
16 **report.**
17     Q   All right. And -- and I guess what you wrote
18 here is, alternative designs of driver-monitoring
19 technologies would not have changed the outcome of the
20 incident. That's -- that's your opinion?
21     **A   As it was when I issued my first report in**
22 **June -- in June of 2024.**
23     Q   Right. And then Mr. Moore then gave an
24 alternative design more recently, and so you restated
25 your opinion. But what --

209

1      THE REPORTER:  I'm sorry, sir, you glitched
2 out for me.
3      MR. POSES:  I'm sorry.
4      THE REPORTER:  That was a me thing. It
5 glitched. Could you just repeat that for me?
6      MR. POSES:  Yeah. Sure.
7      THE REPORTER:  I didn't get the clear
8 question. I apologize. Sorry.
9     Q   I'll just -- I'll start from the beginning.
10 It says, quote, alternative designs of
11 driver-monitoring technologies would not have changed
12 the outcome of this incident. And then -- end quote.
13 And then Mr. Moore authored an opinion more recently
14 that suggested otherwise. And so -- and I believe
15 Dr. Cummings did as well.
16 And so let me ask you what if Tesla made a
17 design decision to disable autopilot if the driver tried
18 to accelerate above the autopilot's speed? Would that
19 have changed the outcome of this crash?
20      MS. CRUZ:  Objection. This is outside the
21 scope. This is a question that you could have asked him
22 before. It's always been -- it's always been the
23 plaintiff's opinion that -- it's been your -- your main
24 point of the whole case is that autopilot should not
25 have been able to be used outside of the ODD. Why

210

1 you're asking him this question today makes no sense,
2 and it's outside the scope. That has been your point
3 for years --
4      MR. POSES:  Well, no --
5      MS. CRUZ:  -- that is the whole premise of
6 the plaintiff's case. That's their biggest argument.
7 That was the original argument before this data was
8 available.
9      MR. POSES:  Right. But now that it is, and
10 we -- there's --
11      MS. CRUZ:  So if you want to ask a question
12 about --
13      MR. POSES:  I'm not asking about ODD.
14      MS. CRUZ:  -- about that new data --
15      MR. POSES:  Yeah.
16      MS. CRUZ:  -- but asking him the question
17 that you just asked, that is a question that could have
18 been asked before.
19      MR. POSES:  Okay. This has nothing to do
20 with ODD. It has nothing to do with ODD. We're not --
21      MS. CRUZ:  And Dr. Cades has no opinions
22 about ODD.
23      MR. POSES:  I know, but I'm not asking about
24 it. That has nothing to do with my question. Nothing.
25 I don't know where that comes from. This is something

Transcript of David M. Cades, Ph.D., Volume 2
Conducted on January 3, 2025

23 (211 to 214)

211

1  different.  And it is --
2         MS. CRUZ:  Didn't your question start off, if
3  Tesla disabled the autopilot outside of the ODD?
4         MR. POSES:  No.  No.  I didn't say that at
5  all.  I said, if they disabled autopilot, if they went
6  above the speed that the autopilot is programmed for.
7  That's not ODD.  That's not the area where it happens.
8  That's --
9         MS. CRUZ:  Okay.  Then I misunderstood the --
10 then I misheard the question.
11        MR. POSES:  Okay.  I never said the word,
12 ODD, and I understand your objection if I had.  But I
13 didn't.
14 BY MR. POSES:
15    Q    Instead, there's a new opinion that you
16 disagree with, and I'll restate the question.
17        What if Tesla made a design decision to
18 disable autopilot if the driver tried to accelerate
19 above the autopilot speed?  How would that have affected
20 this crash?
21    A    So -- so again, I mean, to the extent that
22 **this isn't -- this isn't really new, I mean, the premise**
23 **is under -- I mean, the premise is to the extent that**
24 **autopilot would not have been available at the time of**
25 **this incident for whatever reason, whether it is on, you**

212

1  **know, hypothetical suspension or a strike out or the ODD**
2  **issue or -- or disabled or disengaged due to speeding,**
3  **as I stated in my original report, as I stated in my**
4  **previous deposition, and as I will restate today, it**
5  **would not have affected the outcome of this incident**
6  **because Mr. McGee drove his vehicle through the**
7  **intersection and struck the Chevrolet.**
8     Q    Right.  Okay.
9         MR. POSES:  All right.  Thanks, Doctor, I
10 appreciate it.
11        THE WITNESS:  Thank you, Mr. Poses.  Nice to
12 meet you.
13        MR. POSES:  Nice to meet you, too.
14        All right.  Whitney, I'll see you on Monday.
15 You know about reading or waiving, obviously.
16        MS. CRUZ:  We'll read.
17        THE WITNESS:  Read and sign, please.
18        MR. POSES:  So I was speaking -- you know, I
19 apologize.  I was doing my best, but -- you know, so
20 I -- I would say read is probably fair.
21        And -- and, Whitney, I'll see you Monday.
22        And we need -- we need the depo -- we need
23 the depo as soon as possible.
24        MS. CRUZ:  And we'll take a copy.
25        THE REPORTER:  When you say you need it as

213

1  soon as possible, I was told you want a same-day rough
2  and a regular delivery.  Do you want to change that?
3         MR. POSES:  That's right.  No, that's fine.
4         THE REPORTER:  Okay.  Same day rough for
5  both -- both sides, Ms. Cruz?
6         MS. CRUZ:  We'll just take the -- the final.
7         THE REPORTER:  Okay.  That's an eight-day
8  turnaround, eight-business day turnaround.  That's
9  acceptable?
10        MS. CRUZ:  But rush.  So you're not doing the
11 final on a rush?
12        THE REPORTER:  I was told initially, and I'm
13 asking for clarification, that this was a same-day rough
14 with an eight-day turnaround for the final.  If you'd
15 like to alter that, that's fine.
16        MR. POSES:  That's fine.
17        THE REPORTER:  That's fine for Mr. Poses.
18        What would you like, Ms. Cruz?
19        MS. CRUZ:  That's fine.
20        THE REPORTER:  Same-day rough, eight-day
21 business turnaround.
22        MR. POSES:  That's fine.
23        THE REPORTER:  Final is what I meant to say.
24 Okay.
25        THE WITNESS:  Ms. Lichtman, before we go are

214

1  there any words we can help spell for you, or --
2         THE REPORTER:  Let me read us off the record
3  now that I have the orders, please.
4         We are going off -- we are going off the
5  record at 11:12 a.m. Central Time.
6         (Off the record at 11:12 a.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

215

```
1         ACKNOWLEDGMENT OF DEPONENT
2
3        I, David Cades, Ph.D., do hereby acknowledge
4   that I have read and examined the foregoing testimony,
5   and the same is a true, correct, and complete
6   transcription of the testimony given by me and any
7   corrections appear on the attached Errata sheet signed
8   by me.
9
10
11
12
13
14  _____
15  (DATE)            (SIGNATURE)
16
17
18
19
20
21
22
23
24
25
```

216

```
1         CERTIFICATE OF REPORTER - NOTARY PUBLIC
2        I, Cynthia Lichtman, the officer before whom
3   the foregoing deposition was taken, do hereby certify
4   that the foregoing transcript is a true and correct
5   record of the testimony given; that said testimony was
6   taken by me and thereafter reduced to typewriting under
7   my direction; that reading and signing was requested;
8   and that I am neither counsel for, related to, nor
9   employed by any of the parties to this case and have no
10  interest, financial or otherwise, in its outcome.
11       IN WITNESS WHEREOF, I have hereunto set my
12  hand and affixed my notarial seal this 15th day of
13  January, 2025.
14
15  My Commission Expires:  April 7, 2026
16
17
18  Cynthia Lichtman
19  Notary Public in and for
20  the State of California
21
22
23
24
25
```