**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-cv-21940-BLOOM/Torres**

NEIMA BENAVIDES, as Personal
Representative of the Estate of Naibel
Benavides Leon, deceased,

       Plaintiff,

v.

TESLA, INC., a/k/a Tesla Florida, Inc.,

       Defendant.

_____/

DILLON ANGULO,                            Case No. 22-22607-KMM

       Plaintiff,

v.

TESLA, INC. a/k/a Tesla Florida, Inc.,

       Defendant.

_____/

**DEFENDANT'S RESPONSE TO PLAINTIFF DILLON ANGULO'S**
**MOTION TO LIMIT AND EXCLUDE CERTAIN OPINIONS OF**
**NEUROPSYCHOLOGIST, BARRY CROWN, Ph.D.**

      Defendant, Tesla, Inc. ("Tesla"), through its undersigned counsel, hereby responds in

opposition to Plaintiff Dillon Angulo's Motion To Limit And Exclude Certain Opinions Of Tesla's

Neuropsychologist, Barry Crown, Ph.D. (ECF 344) (the "Motion"). For the reasons stated below,

the Motion should be **DENIED** in its entirety:

<u>**BACKGROUND**</u>

**I.**      **THE INCIDENT AND ANGULO'S ALLEGED INJURIES**

      This case arises out of a motor vehicle collision that occurred on April 25, 2019 in Key

Largo, Florida. As a result of that incident, Plaintiff Dillon Angulo alleges that he sustained—among other things—a traumatic brain injury, post-traumatic stress disorder (PTSD), anxiety, depression, and chronic pain. (ECF 344 at 2-3). Angulo also alleges that he is unable to work now and forever in the future because of the residual "neurological deficits" from his brain injury. *Id*. Specifically, Angulo complains that he has diminished executive function, sleep issues, impaired memory and concentration, and emotional dysregulation (i.e. anger issues). *Id*.

After obtaining Angulo's medical history, however, Tesla discovered that many of the maladies Angulo claims to have sustained solely from the crash were pre-existing. These include but are not limited to (1) depression; (2) anxiety; (3) PTSD; (3) executive function and concentration issues (from his untreated ADHD); and (4) emotional dysregulation. *See* Beachcomber records at 528, attached as Exh. A (noting anxiety and trauma throughout childhood and early adulthood); (*see id* at 66 (noting ADHD and Major Depressive Disorder diagnoses left untreated); Dr. Russell Dep. at 41-42, attached as Exh. B (acknowledging impact of Angulo's childhood trauma); *see also* Dr. Nedd Dep. at 19-20), attached as Exh. C. Angulo's medical records also revealed a lengthy history of abuse of Xanax and crack cocaine – and abandoned attempts at rehabilitation just six months prior to the Subject Incident. (*See, e.g.,* Exh.  A at 62-65, 534).

Angulo's medical experts have admittedly struggled to identify which of these conditions were distinctly caused by injuries Angulo allegedly sustained during the Subject Incident, as opposed to simply being manifestations of his pre-existing issues. (Exh. B at 52-54 (Childhood trauma and substance abuse can affect executive functioning); *id* at 57-58 (Russell cannot separate childhood trauma and substance abuse from injuries Angulo sustained from crash); *id* (no evidence that Angulo resolved pre-existing emotional discontrol before or after crash); *see* Exh. C at 29 (Angulo's symptoms ***correlate*** with the parts of the brain that were injured in the crash); *see id* at

21-22 (Nedd cannot "split the baby" between what is distinctly attributed to Angulo's alleged crash injuries and what is simply a manifestation of his pre-existing conditions); *see id* at 23 (Nedd had no baseline to assess Angulo's pre-crash neurological conditions)). The overlap between Angulo's alleged injuries and his extensive pre-crash medical history is one of the reasons that Tesla retained Barry Crown, Ph.D. (Dr. Crown) to assess Angulo's alleged brain injury and to opine on the extent to which Angulo's alleged residual issues were pre-existing conditions.

## II.    TESLA'S RETENTION OF DR. CROWN

Dr. Crown is a Board-certified Neuropsychologist whose professional experience spans over thirty years. (Crown CV at 1, attached as Exh. D). He is a Diplomate (a specialist) in pain management, is certified as an Addiction Specialist by the American Academy of Health Care Providers in the Addictive Disorders, and has added qualifications in – among other things – child and adolescent neuropsychology, and neurodevelopmental disabilities (i.e. ADHD). *Id*. He has served as the Clinical Director for the National Institute of Mental Health National Drug Abuse Training Center and has studied and treated thousands of drug abuse patients. (Exh. D at 2; *see* ECF 344-1 at 38-39). Plaintiff unsurprisingly does not challenge Dr. Crown's qualifications to render any of the opinions he intends to give at trial.

Tesla retained Dr. Crown as a Rule 35 Independent Medical Examiner. His work consisted of (1) reviewing Angulo's medical and other records related to Mr. Angulo; (2) conducting an in-person examination and interview of Mr. Angulo; and (3) applying his education, training and extensive experience and knowledge to reach his findings. Specifically, Dr. Crown was tasked with providing an objective assessment of Angulo's current mental and neurocognitive state and to assess the extent to which Angulo's pre-existing conditions are attributable to his current state.

Dr. Crown administered four tests to assess Angulo's neurocognitive function. (ECF 344-1 at 108). Crown selected tests "that would tap into [Angulo's] behaviors and answer… whether

he had brain damage or not." (ECF 344-1 at 108). This "Flexible Battery" was tailored to meet situational demands based on Angulo's medical history, including attention and pain problems. (*Id.* at 109-110).[1] Dr. Crown also administered "validity" or malingering tests to assess the sincerity of Angulo's effort and determine whether he was overreporting. (ECF 344-1 at 107-08).

Based on his examination of Angulo and Angulo's records; Crown concluded that (1) Angulo's condition was suggestive of mild brain function disturbance; (2) Angulo's inconsistent testing and presentation was suggestive of exaggeration; and (3) Angulo's pre-existing medical and neurocognitive history makes it nearly impossible to attribute Angulo's condition to his alleged brain injury because of the tendency of those pre-crash conditions to cause the same neurocognitive deficits. (ECF 344-2 at 11; *see* ECF 344-1 at 123-124 (explaining inconsistent results); *see id* at 131-133 (explaining impact of personality, depression, substance abuse, seizure and ADHD on Angulo's current neurocognitive function); *id* at 49-50, 104 (explaining that Angulo's pre-existing conditions mimic the effects one would observe in the victim of a brain injury and that—assuming Angulo sustained a brain injury—this would create a compound set of circumstances with no way to medically apportion causation)).

Dr. Crown's testimony will assist the jury because his testimony is relevant and responsive to Angulo's attempt to exclusively attribute his current state to his alleged brain injury from the subject motor vehicle crash. For example, Dr. Crown explains that Angulo's Neuropsychologist Dr. Russell failed to consider the multifactorial apportionment issues between all of Angulo's pre-existing issues and current complaints of neurocognitive function, including pain and PTSD. ECF

---

[1] This Battery of testing included (1) TOGRA, to assess Angulo's general reasoning ability; (2) a Comprehensive Trail Making Test to assess attention, concentration, and cognitive flexibility; (3) Verbal Conceptualization and Fluency testing to assess Angulo's language and frontal lobe behavior; and (4) Millon Clinical Multiaxial Inventory-3 (MCMI-3) test, which assesses Angulo's psychopathological profile based on his answers to nearly 200 questions. (ECF 344-1 at 117, 125, 127, and 61-62).

344-1 at 130. As illustrated above, Plaintiff experts' inability to establish with a reasonable degree of medical certainty what causes Angulo's current complaints will be a relevant issue at trial.

## III.    PLAINTIFF'S MOTION

The Motion contains a mix of requests to exclude Dr. Crown's opinions and  requests to exclude evidence *in limine*. While Angulo does not challenge the expertise or qualification of Dr. Crown, he contends that Dr. Crown's opinions and testing concerning Angulo's alleged injuries and pre-existing conditions are irrelevant or unduly prejudicial and founded upon unreliable methodology. Angulo also attempts to exclude *in limine* certain evidence that directly refutes his damages claims as irrelevant or unduly prejudicial, including his extensive drug abuse and recent failed rehabilitation, which led to—among other things—depression and anxiety, diagnosis of Attention Deficit Hyperactivity Disorder, pre-existing PTSD from family trauma, and issues with developing emotional connections and relationships with women. (*See generally* ECF 344).

As explained below, Dr. Crown's testing and opinions are sufficiently reliable and based on scientifically valid reasoning and methodology because they are premised on (1) his extensive experience as a Board-certified Neuropsychologist; (2) his personal and meticulously tailored examination and interview of Angulo; and (3) his examination of records documenting Angulo's medical history. Dr. Crown's opinions will educate the jury about how Angulo's pre-existing issues pose serious obstacles to Angulo's attempt to attribute his alleged depression, anxiety, PTSD, and other complained of issues to the injuries he allegedly sustained from the crash.

Further, in attempting to exclude Dr. Crown's opinions, the Motion takes Dr. Crown's testimony out of context in an attempt to frame his methodology as questionable and craft

"admissions' that Dr. Crown never made.[2] However, a fair and complete reading of Crown's report and testimony and Angulo's lengthy medical history will demonstrate that these arguments and assertions should be rejected.

## **LEGAL STANDARD**

## I.   **ADMISSIBILITY OF EXPERT OPINIONS**

The admission of expert testimony is generally governed by Fed. R. Evid. 702, which may be conceptualized as encompassing three independent inquiries. The trial court must consider whether: (1) the expert is qualified; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact to understand or determine a fact in issue. *Demeritt v Wal-Mart Stores E.*, LP, No. 6:20-CV-89-PGB-GJK, 201 WL 2828755, at *1 (M.D. Fla. June 30, 2021).  The Court's gatekeeper role, however, is not intended to supplant the adversary system or the role of the jury. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999) (citing *Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579, 596, 113 S. Ct. 2786 (1993)). The Court need not determine that the expert a party seeks to offer into evidence is irrefutable or certainly correct. *Bostick v. State Farm Mut. Auto. Ins. Co.*, 321 F.R.D. 414, 417 (M.D. Fla. 2017). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Allison*, 184 F.3d at 1311 (quoting *Daubert*, 509 U.S. at 596, 113 S. Ct. 2786); *Bostick*, 321 F.R.D. 417 at 418.

The test for reliability is "flexible" and courts have "broad latitude" in determining both how and whether this requirement is met.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-

---

[2] For example, Plaintiff repeatedly asserts that Dr. Crown conceded a diagnosis of a "serious" brain injury. However, this is simply Plaintiff counsel's attempts to put words in Dr. Crown's mouth – attempts which were repeatedly rejected and corrected by Dr. Crown. (*See* 344-1 at 140-45).

42 (1999). Where – as here – an Independent Medical Examiner relies on (1) their education, training, and experience; (2) their review of the patient's records; and (3) their examination of the patient in rendering their conclusions, courts find that the methodology is sufficiently reliable *See In re 3M Combat Arms Earplug Prods. Liab. Litig., No. 3:19CV2324,* 2021 WL 8533032, at *5 (N.D. Fla. Nov. 16, 2021) (neuropsychologist's opinions are based on record review, in person evaluation, and expert's experience and expertise, "which is enough under Rule 702"); *see also id* at *4, *6 *9 (concluding the same for three other doctors under the same circumstances); *see also Kumho Tire Co.*, 526 U.S. at 156, 119 S.Ct. at 1178. (Experts are permitted to draw conclusions from a set of observations that are based on their extensive and specialized experience).

## II.   <u>EXCLUSION OF EVIDENCE *IN LIMINE*</u>

"In fairness to the parties and their ability to put on a case a court has the power to exclude evidence *in limine* only when evidence is clearly inadmissible **on all potential grounds**." *United States v. Gonzalez*, 718 F. Supp. 2d 1341, 1345 (S.D. Fla. 2010) (emphasis added) (quoting *In re Seroquel Prods. Liab. Litig.*, 2009 WL 260989, at *1 (M.D. Fla. Feb. 4, 2009)). "The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground." *Id*. "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *Id*. Relevant evidence is admissible, and evidence is relevant if it has any tendency to prove or disprove a fact of consequence. Fed. R. Evid. 401, 402. Rule 403 is an extraordinary remedy which should be invoked sparingly, and the balance should be struck in favor of admissibility." *United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011).

## <u>ARGUMENT</u>

## I.   **DR. CROWN IS QUALIFIED**

Plaintiff does not dispute that Dr. Crown is qualified to render all opinions expressed in his

report, and Dr. Crown's decorated resume demonstrates that he is indeed qualified to do so.

## II.   EVIDENCE OF ANGULO'S DRUG USE

In Section I of the Motion, Angulo vaguely requests that the Court limit Dr. Crown and Tesla's lawyers' reference to Angulo's drug abuse history to "'prior drug use' or other similar terminology," and exclude any further details of drug use under Rule 403. ECF 344 at 5.

Rule 403 may provide an extraordinary remedy that the court should invoke sparingly, and the balance should be struck in favor of admissibility. *See Lopez*, 649 F.3d at 1247. Courts should reserve ruling on evidence until the issue is raised by objection at trial unless the party seeking exclusion can show that such evidence is clearly inadmissible on all potential grounds. *See U.S. v. Gonzalez*, 718 F. Supp. 2d 1341, 1345.

The Court should reject Angulo's request to pre-emptively limit references to Angulo's drug abuse because (1) this evidence is relevant to Angulo's damages claims; (2) there is voluminous evidence that Angulo's drug abuse contributes to his alleged mental and psychological issues today; and (3) Plaintiff's requested limitations are vague and would hamstring Dr. Crown and Tesla's lawyers from adequately explaining how that drug abuse overlaps with the issues Angulo claims to be residual of the alleged brain injury. As detailed by Dr. Crown, Angulo's medical records and Angulo's own care providers, Angulo's history of drug abuse clearly assists a jury in understanding his current mental and physical state, especially where his own experts cannot distinguish between drug abuse and his alleged injuries. (*See, e.g.* Hamilton Report at 4, attached as Exh. E; [3]*see supra* at Background Section I).[4] To understand the full context of

---

[3] Dr. Hamilton also observed that Angulo's responses "suggest[ed]***with a history of drug abuse***, that he is suffering from a significant depressive experience, he is concerned and preoccupied with his physical functioning and health matters, and overall findings are consistent with the diagnosis of PTSD." *Id.*

[4] Angulo's claim that he has been "clean" since abandoning rehabilitation is dubious but one for a jury to consider against pre- and post-crash evidence. First, records from Beachcomber indicate that Angulo failed a drug test for Ativan (similar to Xanax) just six months before the crash. (Exh.  A, Beachcomber Records

Angulo's allegations, a jury must hear how Angulo's former and potentially current drug use affects his health and mental state, and whether his substance abuse is the real cause of his alleged issues. Any prejudice Angulo may be exposed to is substantially outweighed by the relevance of these facts. Therefore, Section I of Angulo's Motion should be **DENIED.**

## III.   ANGULO'S PRE-EXISTING CONDITIONS

In Section II of his Motion, Angulo argues that evidence of his pre-existing drug abuse, ADHD, depression, and anxiety should be excluded (1) because it is irrelevant; and (2) because Dr. Crown's methodology in observing the implications of these conditions is allegedly deficient. Plaintiff's arguments are inconsistent with the record, including the testimony of his own experts.

### A.   Angulo's Pre-Existing Conditions Are Relevant To Determining Causation

Angulo's pre-existing conditions are well documented in his medical records- and the experts on both sides recognize this. (*See, e.g.* Exh. B at 40-42; *see* Exh. C at 19-20). It is Plaintiff's burden to establish that the Subject Incident caused his injuries.[5] Dr. Crown's expertise and opinions educate the jury in understanding how Angulo's pre-existing conditions complicate Plaintiff's effort to establish this causation.[6] In fact, Crown is not alone in observing that Angulo's

---

at 534). When confronted, Angulo "was in complete denial" and blamed the facility for drugging him. *Id.* Angulo also reported to Beachcomber that he previously stayed clean for ten months before relapsing and checking himself into rehabilitation. (*Id* at 102). Beyond his own statements, there is no evidence that Angulo is currently using drugs. And despite making the conclusory statement that Angulo was clean (based on his own reporting), Angulo's experts did not screen him for drug use. (*See, e.g.* Exh. B at 47-48).

[5] Plaintiff must establish expert testimony, that a specific defect (or the defendant's negligence) was, ***more likely than not***, a substantial contributing factor in causing the claimed injuries. *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1020 (Fla. 1984).

[6] Importantly Plaintiff's neurology expert Dr. Nedd conceded that he merely assessed "signs and symptoms that [Angulo] has [which] correlate[] well with the findings" of a permanent brain injury. (Exh. C at 39 and 28-29). Chiefly among these symptoms are attention and concentration issues, becoming overwhelmed with multiple stimuli, issues with executive function, and an inability to regulate his emotion. (*Id* at 37-39). All of these deficits are also ***primary symptoms*** of ADHD and drug abuse. *See* ECF 344-1 at 131-132 (explaining how ADHD can affect processing speed and executive function); *see also* National Institute of Health, Attention-Deficit/Hyperactivity Disorder: What You Need to Know

alleged post-crash issues have significant overlap with his pre-existing issues. Angulo's own care provider—Dr. Hamilton—concluded that Angulo's PAI (emotional functioning) generated questionable validity and that "[Angulo's] pattern of responses **suggests with a history of drug abuse**, that he is suffering from a significant depressive experience…" (Exh. E at 4). Plaintiff's Expert Dr. Nedd conceded that he cannot say with a reasonable degree of medical certainty which issues can be distinctly attributed to the crash and which are simply manifestations of Angulo's prior conditions. (*See* Exh. C at 21-22; *see id* at 23 (Dr. Nedd had no baseline to compare Angulo's pre- and post-accident neurological conditions to determine that pre-existing conditions do not still affect Angulo); *see also supra* at Background Section I).

Against this backdrop of speculation, Dr. Crown's opinions will provide relevant context to the jury: Angulo cannot show that his alleged brain injury is a cause in fact or a proximate cause of his current condition which he alleges have been caused only by the Subject Crash.  Instead, it is as likely or more likely that his alleged issues are manifestations of his pre-existing conditions. *See Gooding*, 445 So. 2d at 1020 (Fla. 1984).

> **B.   Plaintiff's Nitpicking Of Crown's Observations Are Not A Proper Basis For Exclusion Under Rule 702.**
>
> **1.   *There Is Ample Evidence of Angulo's Pre-Existing Neurocognitive Deficits***

Angulo mischaracterizes Dr. Crown's testimony to argue that Dr. Crown had no basis to conclude that Angulo's pre-existing conditions overlapped with his alleged current issues.[7] Dr.

---

https://www.nimh.nih.gov/health/publications/attention-deficit-hyperactivity-disorder-what-you-need-to-know (last visited on March 28, 2025).

[7] The passage quoted by Angulo does not support the statement that "there is no **medical evidence of any kind**" to show that Angulo had any pre-existing neurocognitive "disorders." Indeed, in a blatant attempt to frame this issue, Plaintiff's counsel was forced to re-word his question to omit reference to medical records. (*See* ECF 344-1 at 54 (only asking Dr. Crown about medical studies or testing, and striking reference to medical records and Dr. Crown's testing)). This is precisely because Dr. Crown's review of Angulo's medical records forms a substantial basis for his observation of Angulo's pre-existing conditions; and

Crown testified that (1) the finder of fact should consider Angulo's history of ADHD, depression, and substance abuse in assessing Angulo's alleged neurological impairments due to the significant overlap in symptoms; and (2) it is not possible for anyone to conclude to a reasonable degree of medical certainty that these pre-existing issues *do not* contribute to Angulo's issues allegedly caused by the subject crash. (ECF 344-1 at 138-39). These observations are  a product of (1) Dr. Crown's review of Plaintiff's medical records and history; (2) Dr. Crown's examination of Angulo; and (3) Dr. Crown's medical expertise. *See Kumho Tire Co.*, 526 U.S. at 156, 119 S.Ct. at 1178. They are also consistent with opinions from every neurologist and neuropsychologist retained in this case. *See supra* at Background Section I.

### 2.   *Dr. Crown's Observations of Residual Effects of Angulo's Drug Abuse*

Angulo's fixation on the statistical amount of benzo users who suffer from residual effects is irrelevant. Dr. Crown testified that *all* users will experience some form of residual effects, including concentration, attention, memory, focus, or information processing issues. (ECF 344-1 at 38-39). He based this in part on his extensive treatment of benzodiazepine users and reporting information to the National Institute of Drug Abuse. *Id.* He also based it on his personal examination of Angulo's condition and analysis of Angulo's medical records, including an extensive history of drug abuse and at least one other neuropsychologist making the same observation about Angulo's drug abuse. (*See*  Exh. E at 4).  Naturally, Dr. Crown observed as others did that Angulo's presentation and complaints were consistent with issues exhibited by long term users of drugs like benzodiazepine. (*See* ECF 344-1 at 49-50). It is not required that Dr.

---

opining—based on his education, training experience,  expertise, and examination of Angulo—that these conditions would directly contribute to the symptoms Angulo complained of.  Further, Angulo appears to conflate "brain damage," which he alleges there is no pre-crash evidence of, and "neurocognitive deficits" which Crown opined is evident in Angulo's medical history.

Crown rely on cumulative statistical data in making these conclusions.[8]

### 3.     *The Extensive History of Angulo's Untreated ADHD Diagnosis*

In calling Crown's opinions concerning ADHD speculative, Angulo again ignores his own extensive medical history. (*See, e.g.* Exh.  A at 170). (Angulo was diagnosed as a child, but stopped treatment due to side effects). Attention-Deficit Hyperactivity Disorder impairs the executive function of patients, and can cause issues with memory, impulsivity, focus, and organization. (ECF 344-1 at 36-37, 130-31).  Uncoincidentally, most of these issues overlap with the issues Angulo currently complains of.  *(See* ECF 344-1 at 36-37) (explaining the effect of ADHD on neurocognitive function and how they overlap with Angulo's alleged issues). And, not all patients phase out of ADHD in adulthood. (*See* ECF 344-1 at 34). Angulo presents zero evidence— other than his own reporting and experts' conclusory statements —that his pre-existing ADHD has resolved through adulthood other than his own unqualified self-reporting. And it is irrelevant whether Angulo explicitly reported having ADHD because he is not qualified to do so. Nevertheless, Dr. Crown testified that – based on his expertise and examination of Angulo and his medical and education records, Angulo "certainly exhibits the pattern" of ADHD in terms of his schooling and work history, and added that Angulo had difficulty with focus even through his program at the community college. (ECF 344-1 at 41-42).[9] There is nothing speculative about

---

[8] Plaintiff also takes issue with Dr. Crown's unwillingness to speculate as to the likelihood or extent that each of Angulo's pre-existing conditions caused his current alleged impairments. However, these are simply not the opinions Dr. Crown intends to or is required to offer. Instead, based on ample evidence discussed within Tesla's Response, Dr. Crown observes that Angulo's pre-existing issues significantly overlap with his current alleged issues, and – therefore – Angulo and his experts cannot simply attribute these issues solely to his alleged brain injury.

[9] In pointing out Dr. Crown's purported "lack of studies," Angulo again becomes fixated on something that is not relevant to Crown's opinions.  Crown's opinion that Angulo continues to have ADHD is based on his expertise and his examination of Angulo and record review.  Crown simply referred Plaintiff's counsel to articles related to various ADHD issues in response to spontaneous questioning at his deposition.  They do not form the basis for Crown's opinions.

observing symptoms of ADHD in a patient who was previously diagnosed accordingly, and Plaintiff's argument should be rejected. *See Kumho Tire Co.*, 526 U.S. at 156, 119 S.Ct. at 1178. For these reasons, Section II of Angulo's Motion should be **DENIED**.

## IV.    RESULTS OF VALIDITY TESTING (ANGULO'S MALINGERING)

In Section III of the Motion, Angulo asks the Court to exclude the results of Dr. Crown's validity (malingering) testing. Angulo offers no legitimate critique or valid reason under Rule 702 for exclusion of Dr. Crown's opinions about malingering. Instead, Angulo attempts to refute Crown's testing by offering his own interpretation of the results. Regardless, it is well within the jury's province to weigh the evidence and interpret the meaning of Angulo's validity testing results. Excluding Dr. Crown's testing because Plaintiff merely offers a speculative explanation for the testing is an improper basis for exclusion.

In claiming that Dr. Crown's malingering opinions lack methodology or adequate bases, Plaintiff mischaracterizes Crown's testimony. Yet Dr. Crown explained during his deposition: (1) the purpose of malingering testing (ECF 344-1 at 107-08, 112, 114-15); (2) how he selected the specific battery of tests for Angulo (*id* at 107-11); and (3) why these results were ***suggestive*** of "over-endorsing" or exaggerating" symptoms. (*id* at 113- 17). Thus it is clear that Dr. Crown used his education, training, experience and knowledge of the issues to select the battery of testing most appropriate for Angulo's circumstances and administer the testing appropriately—the latter point Plaintiff does not dispute. Aside from expressing his displeasure with the results, Angulo offers no scientific standard against which Dr. Crown's methodology has supposedly failed.

Plaintiff's claim that Dr. Crown cannot confirm with certainty that Angulo was exaggerating—i.e. how Angulo was ***subjectively feeling***—is a red herring. As Crown testified—nobody can know with certainty how Angulo truly feels except for Mr. Angulo himself. (*See* ECF 344-1 at 107; *see also id* at 117). That is why Dr. Crown exercised precision in stating that the

validity testing was ***suggestive*** of malingering or exaggeration.  Indeed, Dr. Hamilton used very similar language to describe the results of Angulo's "questionable validity" testing. (*See*  Exh. E at 4). And Dr. Crown's conclusion is nevertheless supported by his observation that Angulo's results were wildly inconsistent across multiple tests when compared with previous testing and Angulo's presentation at the exam. (ECF 344-1 at 116-117, 123-24). Thus, Crown's conclusion is supported by reliable methodology and Section III of the Motion should be **DENIED**.

## V.    MCMI-III PERSONALITY

Angulo's personality as observed by Dr. Crown is – frankly – based on Angulo's own admissions and self-reporting is consistent with the same psychopathological profile observed during Angulo's treatment at the Beachcomber before the subject crash. (*See, e.g.* Exh. A at 133; *see* ECF 344-2 at 11) (personality and behavioral findings are self-reported and pre-exist the crash). The Millon Clinical Multiaxial Inventory-3 (MCMI-III) test was developed to assess a patient's psychopathological profile based on an algorithmic assessment of the patient's answers to nearly two hundred questions. (ECF 344-1 at and 61-63).[10] Notably, Angulo does not challenge the methodology of the MCMI-III testing, and for good reason. The MCMI-III has been used "in literally hundreds if not thousands of studies to assess personality functioning" and is recognized as having "excellent constructive validity, test retest reliability, as well as internal consistency." Roslan at 1-2.

These results are important to Dr. Crown's opinions concerning the underlying cause of Angulo's current state. For example, Dr. Crown testified that Angulo's inability to appreciate long-term consequences of immediate behavior (impulsivity) were indicative of Angulo's frustration

---

[10] *see also* Alareqe, Roslan, Nordin, Ahmad, and Taresh, "*Psychometric Properties of the Millon Clinical Multiaxial Inventory–III in an Arabic Clinical Sample Compared With American, Italian, and Dutch Cultures,*" National Center for Biotechnology Information (September 9, 2021) at 1: https://pmc.ncbi.nlm.nih.gov/articles/PMC8458952/ (last visited on March 28, 2025).

and personality profile *rather than damage to the left frontal lobe*. (ECF 344-1 at 80). Dr. Crown's report further details how Angulo's personality profile is suggestive of many of the concentration and emotional issues he now complains of. (*See also* ECF 344-2 at 10-11) (Angulo's personality makeup tends to result in jumpiness and hyperdistractibility); *see id* (MCMI-III results suggest Angulo is easily provoked to anger); *see also* Exh. A at 133) (observing Angulo's issues with impulsivity and antisocial behavior).

Thus, Dr. Crown is not parroting or blindly relying on "computer generated results." Instead, he is taking Angulo's *self-reporting*, using a universally accepted test to analyze that self-reporting, and subsequently applying his own expertise to opine how the results of that testing explain Angulo's current condition and alleged ailments. Finally, the high probative value of this evidence in explaining Angulo's alleged issues outweighs the prejudice to Angulo- who self-reported these facts. For these reasons, Section IV of Angulo's Motion should be **DENIED**.

## VI.    ANGULO'S PRE-EXISTING PTSD FROM FAMILY ISSUES

In Section V of the Motion, Angulo asks the Court to exclude evidence of his pre-existing post-traumatic stress. In doing so, he fights the conclusions of his own experts and attempts to take relevant evidence from the Jury. Contrary to his claims, Angulo's medical records reveal an extended history of childhood trauma—including from corporal punishment by his mother. (*See, e.g.,* Exh. A at 528) (Angulo self-reporting that mother would regularly beat him with a spoon and how "the abuse he endured all caused him to become the adult he is today"); *see* Exh. B at 41-42 (acknowledging Angulo's history of emotional and physical abuse as a child). Plaintiff's expert Dr. Russell acknowledges that this pre-crash abuse is a contributor to post-traumatic stress. *Id*. Further, the suggestion by Angulo's counsel that PTSD requires exposure to actual or threatened death, serious injury, or sexual violence was directly controverted by Dr. Crown's testimony and modern medical understanding of PTSD. (ECF 344- at 147-48) (DSM is outdated for PTSD and

patient does not need to directly experience event). Thus, Angulo's attempt to question his own self-reported and previously diagnosed PTSD should be rejected.

The pre-existing PTSD is highly relevant to understanding and assessing Angulo's alleged injuries. As Dr. Crown explained in his deposition, PTSD and neurocognitive dysfunction (which Angulo alleges he sustained from the crash) mimic one another, such that it is "extremely difficult to tell the difference between one or the other in terms of the effect it may have." (ECF 344-1 at 103-04). Plaintiff's assertion that this observation is somehow flawed because Dr. Crown did not employ a specific test on Angulo must be rejected because Angulo's self-reported childhood PTSD is an objective fact conceded by both sides. Here, Crown's expertise is useful in providing context to the jury as to why this pre-existing PTSD affects Angulo's claims of PTSD from the crash.

Angulo's unfair prejudice claim is misplaced. It cannot be unfairly prejudicial for Tesla to (1) inform the jury that this trauma pre-existed the Subject Crash; and (2) explain how this pre-existing trauma affects Angulo's ability to exclusively attribute his current condition to the Subject Crash—including a comparison of the overlap in Angulo's pre- and post-crash symptoms. This evidence of pre-exiting conditions has a strong tendency to make Angulo's claim that his current condition is solely caused by the subject crash less probable than it would be without the evidence and causation of Angulo's current condition clearly of consequence in this case. *See Lopez*, 649 F.3d at 1247 (11th Cir. 2011) (Courts must look at evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact).

Finally, these pre-crash issues that were self-reported by Angulo over the course of his life, are contained in the medical records Dr. Crown reviewed, and are facts that Plaintiff's expert conceded. Thus, Angulo's claim that Crown's observation of these issues *which were elicited by questioning from Plaintiff's Counsel* during a discovery deposition constitutes "surprise

testimony" is simply disingenuous. (*See* ECF 344-1 at 145-46). For these reasons, Section V of Angulo's Motion should be **DENIED**.

## VII.    EXPERIENCE PRESENTING ADDICTION ISSUES TO GOVERNMENT

Angulo again mischaracterizes Crown's opinions and testimony in an attempt to prevent the jury from considering these relevant conclusions. In opining that Angulo's test results suggested residual effects from his pre-existing benzodiazepine addiction, Crown relied on his expertise and examination of Angulo and his medical records. (ECF 344-2 at 11). This experience includes Crown's study and treatment of "***thousands*** of benzodiazepine abusers" and his experience reporting information to the National Institute of Health. (ECF 344-1 at 38-39). It is well within Rule 702 for Crown to rely on his experience to opine about the likelihood that Angulo will continue to experience permanent residual neuropsychological disturbances.

In an attempt to invalidate this experience, Angulo misapplies non-controlling law from Courts outside the Eleventh Circuit. *Sok* and the Sixth Circuit recognize the impropriety of a prosecutor using the prestige of government to bolster a witness' conclusions or credibility. *Sok v. Romanowski*, 619 F. Supp. 2d 334, 358 (W.D. Mich. 2008) (prosecutor telling jury that it should believe a detective solely because they were policemen was improper). But this is not the case here.  Dr. Crown's reliance on his own experience is entirely proper, and his "affiliation" with the government is no more prejudicial than Plaintiff's expert Missy Cummings touting her background at the National Highway Traffic Safety Administration in rendering her opinions. Further, the mere fact that Dr. Crown's experience includes presentations to the government is not a bases for exclusion or limitation of his opinions and Plaintiffs provides no legal support for this contention. For these reasons, Section VI of Angulo's Motion should be **DENIED**.

## VIII.   "CHARACTER EVIDENCE"

In Section VII of the Motion, Angulo seeks to exclude a collection of evidence discovered

in this case by arguing that it is irrelevant, inadmissible character evidence, or otherwise unduly prejudicial. For the reasons set forth below, the Court should reject these arguments.

A.     **Love And Sex Addiction**

Angulo's clinical issues with forming healthy romantic relationships directly refutes his depression and PTSD allegations. Angulo has repeatedly alleged—including in the Motion—that he suffers depression and PTSD as a result of losing his girlfriend in the subject crash. (*See* ECF 344 at 3) (claiming Angulo's PTSD was caused by the death of Decedent Naibel Benavides). But the voluminous evidence uncovered through discovery paints a starkly different picture. This includes: (1) the fact that Angulo knew Naibel only for a short period of time—a matter of weeks; (2) the fact that Angulo has dated multiple people—including two at the same time—before, after, and possibly at the time of the subject incident; and (3) the fact that Angulo *has admitted* to care providers that he suffers from sex and love addictions, and—in his own words, "us[es]women." (*See* Angulo 4/19/23 Dep. at 139-140, attached as Exh. F; *see* Exh. A at 522).[11] Because this evidence tends to refute claims that Angulo developed a strong enough relationship with Decedent Naibel to have suffered PTSD or depression from her loss, is it relevant and admissible. It is not character evidence because it tends to show Angulo's intent and how he viewed his relationship with Naibel and disproves his allegation that he experiences depression and PTSD after her passing. *See* Fed. R. Evid. 404(b)(2).

B.     **Left Rehab Against Medical Advice**

Angulo's failed drug addiction recovery at the Beachcomber Family Center for Addiction

---

[11] At the same time Angulo reported his alleged devastation over the loss of his girlfriend to his counselor, he was simultaneously dating two different women. (Wellspring Records at 14-15, attached as Exh. G; Angulo 6/6/24 Dep. at 14-15, attached as Exh. H) (Met Haslin in July of 2023 and "became official" in January of 2024) (*id* at 58) (dated Stephanie in 2023 until December of that year). The Court should at the very least permit Tesla to impeach Angulo based on these conflicting statements.

Recovery prior to the crash is relevant because it has a tendency to explain the real cause of his alleged anxiety, depression, sleep issues, and anger issues. Records reveal that—as of 2018—Angulo "present[ed] as *depressed, anxious, ... and angry*." (Exh. A at 62). Care providers noted that Angulo abandoned treatment after "gr[owing] more and more irritable," and "[h]e appears to be at *high risk for relapse* at this time. *Id*. The records contain a comprehensive documentation of Angulo's pre-existing issues—most of which overlap with the ailments he claims to be brand new. Angulo reported to care providers that his depression was substance related because "he does not feel depressed when sober, working, or being active." (*Id* at 66). Treaters also noted that—after prescribing Angulo with Wellbutrin, "[s]leep and appetite are good, [Angulo] has good energy and concentration… [and] [a]nxiety subsided. (*Id* at 108). Angulo denied side effects to Wellbutrin, and was even using it subsequent to the crash, but has since stopped taking it. (ECF 344-2 at 2). It is no wonder, then, why Angulo wants to prevent a jury from considering these records when attempting to convince them that these issues stem solely from the subject incident.

Further, there is *zero* evidence that Angulo is currently sober beyond his own statements. *See supra at* n. 4. Indeed Dr. Russell conceded she did not drug test him before speculatively concluding that Angulo was not using drugs. (Exh. B at 47-48). Finally, documentation of Angulo's failed rehabilitation is not character evidence because Tesla intends to use it to explain the pre-crash cause of nearly all of Angulo's alleged issues, not to show that Angulo relapsed into drug addiction. *See* Fed. R. Evid. 404(a)(1) (character evidence is inadmissible to prove that the person **acted** in accordance with that character or trait).

### C.   Seizure From Drug Abuse

Angulo's pre-crash seizures from his drug withdrawal are relevant to rebutting Angulo's anticipated claims that his need for future seizure treatment was solely caused by his alleged brain injury. (*See* Exh. A at 128, 367) (Angulo reporting that he has had *five* seizures from drug

withdrawal and that 2019 was only the most recent). Specifically, Angulo's treater Dr. Hamilton opined that Angulo's alleged brain injury puts him at risk for future seizures. (Exh. E at 5). There is no evidence that Angulo has experienced a seizure as a result of his alleged brain injury. And evidence that Angulo has previously experienced seizures in the past and that he is in dire risk of relapse due to his failure to complete rehabilitation tends to show that his alleged brain injury would not be the only likely cause of a future seizure. (*See* Exh. A at 62) (risk of relapse is high given intense cravings and lack of experience in recovery). Thus, to the extent future seizures are a factor in Angulo's calculation of future damages, it is important for the jury to consider evidence relevant to explaining the actual cause of those seizures. Further, Dr. Crown repeatedly testified that he must account for Angulo's previous seizures when analyzing the different contributing factors for Angulo's allegations that he sustained a neurocognitive deficit as a result of the crash. (*See* ECF 344-1 at 134, 138-139; *see also* ECF 344-2 at 11) (induced seizure episode may cloud Angulo's presented mild brain disturbance during examination).

Under neither of these circumstances does Tesla intend to use Angulo's seizures "to prove that on a particular occasion [Angulo] *acted* in accordance with that character or trait." Fed. R. Evid. 404. Instead, they merely explain the cause of his alleged ailments. Moreover, Angulo's involuntary medical seizures are not indicative of a character or character trait, and thus Fed. R. Evid. 404 is inapplicable. For these reasons, Section VII of Angulo's Motion should be **DENIED**.

## CONCLUSION

**WHEREFORE**, for the reasons stated herein, Plaintiff Angulo's Motion should be **DENIED** in its entirety.

Respectfully submitted,

/s/ *Whitney V. Cruz*
**WHITNEY V. CRUZ**
Florida Bar No. 800821
**WENDY F. LUMISH**
Florida Bar No. 334332
**BOWMAN AND BROOKE LLP**
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134
Tel. 305-995-5600 / Fax: 305-995-6100
whitney.cruz@bowmanandbrooke.com
wendy.lumish@bowmanandbrooke.com

**THOMAS P. BRANIGAN**
(Admitted *Pro Hac Vice*)
**DREW P. BRANIGAN**
(Admitted *Pro Hac Vice*)
**BOWMAN AND BROOKE LLP**
101 W. Big Beaver Road, Suite 1100
Troy, MI 48084
Tel. 248-205-3300 / Fax: 248-205-3399
thomas.branigan@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com

**JOEL SMITH**
(Admitted *Pro Hac Vice*)
**BOWMAN AND BROOKE LLP**
1441 Main Street, Suite 1200
Columbia, SC 29201
Tel. 803-726-7420 / Fax: 803-726-7421
joel.smith@bowmanandbrooke.com

**HILARIE BASS**
Florida Bar No. 334243
**HILARIE BASS, ESQUIRE LLC**
2821 Bayshore Drive, UPH-B Miami, FL 33133
Tel. 305-505-8777
bassh@bassinstitute.org

*Attorneys for Defendant TESLA, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 28, 2025, the foregoing was filed using the

Court's CM/ECF system, which will send electronic notice of the same to all interested parties.

**Adam T. Boumel, Esq.**
Florida Bar No. 0110727
THE ROUSSO, BOUMEL LAW FIRM, PLLC
9350 South Dixie Highway
Suite 1520
Miami, FL 33156
Tel. 305-670-6669
adam@roussolawfirm.com
assistant@roussolawfirm.com
pleadings@roussolawfirm.com

*Attorneys for Plaintiff Dillon Angulo*

**Brett Schreiber, Esq.**
Admitted *Pro Hac Vice*
**Satyarinivas "Srinivas" Hanumadass, Esq.**
Admitted *Pro Hac Vice*
**Carmela Birnbaum, Esq.**
Admitted *Pro Hac Vice*
SINGLETON SCHRIEBER
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
bschreiber@singletonschreiber.com
vas@singletonschreiber.com
cbirnbaum@singletonschreiber.com
jjusto@singletonschreiber.com
eelms@singletonschreiber.com
service@singletonschreiber.com

*Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides*

**Todd Poses, Esq.**
Florida Bar No. 0075922
POSES & POSES, P.A.
Alfred I. Dupont Building
169 East Flagler Street, Suite 1600
Miami, FL 33131
Tel.  305-577-0200
Fax: 305-371-3550
tposes@posesandposes.com
maria@posesandposes.com

*Attorneys for Plaintiff Neima Benavides*

**Douglas F. Eaton, Esq.**
Florida Bar No. 0129577
EATON & WOLK PL
2665 South Bayshore Drive, Suite 609
Miami, FL 33133
Tel. 305-249-1640
Fax: 786-350-3079
deaton@eatonwolk.com
cgarcia@eatonwolk.com
lhuete@eatonwolk.com

*Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides*

/s/ *Whitney V. Cruz*
WHITNEY V. CRUZ