# EXHIBIT B

## Page 1

```
1         UNITED STATES DISTRICT COURT
2         SOUTHERN DISTRICT OF FLORIDA
3  ----------------------------------X
4  NEIMA BENAVIDES, as Personal      :
5  Representative of the Estate of   :
6  Naibel Benavides Leon, deceased,  :
7              Plaintiff,       : Case No.
8         V                     : 22-22607-KMM
9  TESLA, INC., a/k/a Tesla of Florida, :
10             Defendant.            :
11 ----------------------------------X
12 DILLON ANGULO,                    :
13             Plaintiff,            :
14        V                          :
15 TESLA, INC., a/k/a Tesla of Florida, :
16             Defendant.            :
17 ----------------------------------X
18      Deposition of DR. SALLY L. KOLITZ RUSSELL
19              Conducted virtually
20         Wednesday, November 26, 2024
21                 1:02 p.m.
22
23 Job No.: 554040
24 Pages 1 - 64
25 Reported by:  Dianna C. Kilgalen
```

## Page 2

```
1         Deposition of DR. SALLY L. KOLITZ
2  RUSSELL, conducted virtually with all parties
3  attending remotely.
4
5
6
7
8         Pursuant to Notice, before Dianna C.
9  Kilgalen, Notary Public for the State of
10 Maryland.
```

## Page 3

```
1              A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFF DILLON ANGULO:
3         ADAM T. BOUMEL, ESQUIRE
4         THE ROUSSO BOUMEL LAW FIRM, PLLC
5         9350 South Dixie Highway
6         Suite 1520
7         Miami, Florida 33156
8         888.241.4225
9
10 ON BEHALF OF THE DEFENDANT:
11        WHITNEY V. CRUZ, ESQUIRE
12        BOWMAN AND BROOKE, LLP
13        Two Alhambra Plaza
14        Suite 800
15        Coral Gables, Florida 33134
16        305.995.5600
```

## Page 4

```
1                C O N T E N T S
2  EXAMINATION OF SALLY L. KOLITZ RUSSELL    PAGE
3  By MS. CRUZ:                               5
4
5
6                  E X H I B I T S
7            (Attached to the transcript.)
8  RUSSELL DEPOSITION EXHIBIT                PAGE
9     A    Notice of Deposition              62
```

37

1 was used in the fixed battery with the Reitan
2 normative data.
3   Q.  In your -- go ahead.
4   A.  Go ahead. I'm finished.
5   Q.  In your testing of Mr. Angulo, why did
6 you administer the Wechsler Adult Intelligence
7 Scale III?
8   A.  Because that is the only version of the
9 Wechsler IQ test that has had a significant
10 amount of research showing how it relates to
11 brain functioning. The WAIS-III, as we call it,
12 is used in the Heaton norms, is used in the
13 Reitan norms, is used in the HRNES-R norms.
14       The WAIS-IV -- and there are a number of
15 articles that I can refer you to that talk about
16 the WAIS-III is still the best test to use in
17 neuropsychology because each of the subtests,
18 there are 14 subtests, have had so much research
19 on what part of the brain they are related to and
20 neuropsychology in general.
21       So it's part of the test battery and
22 part of the other test batteries. You can't use
23 the WAIS-IV.
24   Q.  Is there also a WAIS-V, an even more
25 current version?

38

1   A.  I think it has come out. I think so. I
2 haven't seen much literature on it, but I think
3 that may be.
4   Q.  You are not really sure what the WAIS-V
5 consists of?
6   A.  No because I don't use the WAIS-V.
7   Q.  Are there statistical correlations for
8 the use and interpretation of old tests like the
9 WAIS-III?
10   A.  Unless the brain's changed, and so far,
11 people's brains have remained the same. Unless
12 something's proven invalid, it's valid. And I
13 liken it to the stethoscope that is 200 years
14 old. They have never proved it invalid and they
15 still use it.
16       And I know that is kind of a
17 different -- a different thing, but the concept
18 is the same. Never has the Halstead-Russell
19 Neuropsychological Evaluation System-Revised or
20 the Halstead-Reitan battery or the Heaton norms,
21 which are all scientific batteries, ever been
22 proven invalid. So they are still valid.
23       And when you throw a brunch of tests
24 together normed on different samples that's
25 invalid, because you don't know if a difference

39

1 in the score is a difference in the sample or a
2 difference in the test. So that's been the fight
3 in the field for 40 years, science versus
4 non-science. And so far, unfortunately,
5 non-science is winning out statistically.
6   Q.  So let's look at some of the medical
7 records and the treatment records that you
8 reviewed, and then things I guess you thought are
9 important to your analysis and your opinions, you
10 would put those in the report, right, pulling
11 from the records?
12   A.  Sorry. Could you repeat that question
13 again?
14   Q.  Sure. There are various parts of
15 medical and treatment records that are cited in
16 your report. Does that tell us that those things
17 were important and that you relied on them in
18 coming to your opinion?
19       MR. BOUMEL: Form.
20   A.  I don't rely on any records. If I
21 relied on them, I would have to do no testing. I
22 could just write a report from the records. But
23 when I read the records, it gives me a better
24 understanding of what actually happened to this
25 individual as far as diagnoses from physicians or

40

1 health centers. But as far as my opinions, they
2 are from the actual testing.
3   Q.  Okay. So according to your report on
4 page 2, you note here that nine months -- can you
5 hear me? It is saying my Internet connection
6 isn't stable.
7       MR. BOUMEL: You are good.
8       MS. CRUZ: Madam Court Reporter, are you
9 having any trouble hearing me?
10       THE REPORTER: No, I am not, but it does
11 break up every once in a while. I will interrupt
12 if I can't hear you.
13       MS. CRUZ: Let me know if it gets too
14 bad. I will dial in.
15 BY MS. CRUZ:
16   Q.  Okay. Doctor Russell, so going to the
17 report, you have pulled some excerpts from
18 medical records that you reviewed and you put
19 them into your report. One of them relates to
20 Beachcomber Outpatient Services, which is an
21 inpatient drug rehab center that Mr. Angulo
22 checked himself into, right? Is that correct?
23   A.  Yes.
24   Q.  Okay. And so according to those
25 records, nine months before the crash, Mr. Angulo

41

1 reported that he had, quote, occupational
2 problems, right?
3  A. Yes.
4  Q. And nine months before the crash,
5 Mr. Angulo reported that he had a, quote, living
6 environment deficiency, correct?
7  A. Correct.
8  Q. Nine months before the crash, Mr. Angulo
9 reported that he had family conflicts, right?
10  A. Yes.
11  Q. And nine months before the crash,
12 Mr. Angulo reported that he had anger issues,
13 correct?
14  A. Yes.
15  Q. Okay. And nine months before the crash,
16 he reported that he had a prior relapse of his
17 drug addiction, correct?
18  A. Yes.
19  Q. And he reported that he had a sex
20 addiction, correct?
21  A. Yes.
22  Q. Nine months before the crash, he
23 reported that he had a love addiction, correct?
24  A. Yes.
25  Q. Was Mr. Angulo a victim of emotional and

42

1 physical child abuse during his childhood?
2  A. Yes. As far as I read, he was.
3  Q. And is child abuse a contributor of
4 posttraumatic stress?
5  A. Well, of course, it can be, but it makes
6 someone more fragile so they suffer another
7 trauma.
8  Q. And did Mr. Angulo abuse substances
9 including Xanax, marijuana and cocaine for many,
10 many years prior to the crash?
11     MR. BOUMEL: Form.
12  A. For many years, he did. I didn't see
13 the cocaine. I knew it was the other two, but I
14 can't say it wasn't cocaine either.
15  Q. You didn't see that he had used cocaine
16 including crack cocaine?
17     MR. BOUMEL: Form.
18  A. Yes. I do see that, yes.
19  Q. Okay. Does substance abuse affect
20 neurological status including brain development?
21  A. It can. But once again, if you have
22 brain damage on top of any kind of problems that
23 you had previously, then it makes your brain more
24 fragile. I think you attorneys call it the
25 cracked vase, if I'm not making that up, and it

43

1 can.
2      But I see nothing in the records that
3 diagnosed him with any brain injury prior to the
4 accident in question.
5  Q. Fair to say you just don't know whether
6 his substance abuse affected his brain
7 development prior to the crash, correct?
8  A. No. I wouldn't -- there would be no way
9 to know that other than he was working and
10 obviously he was able to take classes and go to
11 school. But I have no previous testing
12 neuropsychologically if that's what you mean.
13  Q. He dropped out of high school, correct?
14  A. Yes, but that did not mean that he
15 necessarily didn't have the ability, but
16 psychologically he certainly wasn't interested in
17 school.
18  Q. Do you know how long he was working on
19 his associate's degree prior to the crash?
20  A. I'm not sure how long it was.
21  Q. Do you know that he was working on his
22 associate's degree for nine years prior to the
23 crash?
24  A. I know it was a long time. I didn't
25 know it was nine years.

44

1  Q. Do you know how many classes he failed
2 during those nine years before the crash when he
3 was working on his associate's degree?
4  A. No, I don't know. But then again,
5 failing classes doesn't necessarily mean you
6 don't have the ability. And that is why
7 neuropsychological testing is important to give
8 tests that we know by research are not affected
9 by brain injury unless it has been severe brain
10 injury. If you don't give any of those tests,
11 your testing is totally invalid.
12  Q. You said that you know that he was
13 working prior to the crash. What do you know
14 about his work history prior to the crash?
15  A. I don't know much of specifically what
16 he was doing in the construction area or any
17 other area.
18  Q. Do you know how long he was able to hold
19 down a job on a consistent basis prior to the
20 crash?
21  A. No. But I would assume he had problems
22 holding down jobs because of his prior history of
23 not just the substance abuse but his family
24 history and abuse history.
25  Q. So fair to say you don't really know

45

1 anything about his prior work history, right?
2  A. No. No, I don't.
3  Q. And you don't really know anything about
4 his education history prior to the crash, right,
5 other than he dropped out of high school and he
6 was working on his AA?
7  A. That's all I know specifically about his
8 work other than he said he was not motivated, and
9 I would assume he wasn't.
10  Q. Okay. So he was -- he was unmotivated
11 prior to the crash in terms of work?
12      MR. BOUMEL: Form.
13  A. Well, in terms of the schooling,
14 education.
15  Q. Okay. Was he unmotivated in terms of
16 working, holding down a job?
17  A. I don't know that.
18  Q. We were talking about -- a few minutes
19 ago before we got off on the job history, we were
20 talking about his prior drug use. Would using
21 two to four milligrams of Xanax per day create a
22 neuropsychological impairment that could be life
23 long?
24  A. Not necessarily, but I think you could
25 ask an addiction specialist about that. And also

46

1 when I did my testing, as I said, I did tests
2 that show premorbid functioning, meaning
3 preaccident functioning, for vocabulary and the
4 Wechsler test of adult reading.
5      And these hold up well with the most
6 severe brain injuries, and his intelligence was
7 far superior to what one would expect with even
8 an associate of arts degree. Even if it took him
9 nine years, at least he had a motivation to
10 finish it.
11      But you always have to know the tests
12 that are not sensitive to brain injury to
13 establish someone's preaccident functioning.
14  Q. If Mr. Angulo had at least one
15 documented seizure due to Xanax use, could this
16 impact his brain function?
17  A. I could not say that one way or the
18 other.
19  Q. And we talked about the fact that you
20 have in your report some cites from the records
21 of Beachcomber, the inpatient rehab center that
22 Mr. Angulo was at just months before the crash,
23 right?
24  A. Yes.
25  Q. Why did he leave that program?

47

1  A. Well, he left it but then he came back I
2 understand. But why he left it in the last
3 analysis, I don't know.
4  Q. Did you read in the records that he left
5 it against advice and was at risk for relapse?
6  A. Well, yes, I read that, and that is not
7 so unusual. But I also read that he left it and
8 then he came back and he himself initiated it and
9 was motivated to enter it. So I can't give any
10 opinion beyond that.
11  Q. Well, but I'm talking about the last
12 time he left just months before the crash. Do
13 you know why he left?
14  A. No, I don't know exactly why he left.
15  Q. And before I told you right now, you
16 were unaware, you haven't read the record that
17 said he left against advice and was at risk for
18 relapse, correct?
19  A. Well, I know that he did. I know on
20 12/2/18 he went from one level to a better level
21 where he needed less intervention. Why he then
22 left the other level, I don't know.
23  Q. Did you test Mr. Angulo for substance
24 abuse when you saw him?
25  A. You can't test for substance abuse.

48

1  Q. You can't give somebody a drug test to
2 see whether they have been using drugs?
3  A. I don't know any neuropsychologist that
4 ever gives a drug test for anyone. But he could
5 not have done as well as he did on some of the
6 tests if he were on drugs.
7  Q. Okay. Do you know whether he was --
8  A. Can I finish my --
9      MS. CRUZ: Sure.
10  A. -- please. Certainly in talking to
11 someone and they are following very extensive
12 directions and being motivated and being able to
13 pass tests, certain tests that are difficult, I
14 don't see how he could have been on drugs during
15 my testing.
16      I have had people that I knew were on
17 drugs during the testing. But I don't know any
18 neuropsychologist that does a drug test.
19  Q. You reference a number of studies from
20 about 20 years ago about PTSD and its effect on
21 the brain. Are these findings confirmed by a
22 resting state MRI?
23  A. They have been confirmed by functional
24 MRI and by PET scans.
25  Q. Okay. Have any of those studies been

---

**Page 61**

1 **I have said that about five times.**
2  Q.   Is it also true that there could have
3 been damage to his brain prior to the crash that
4 was undocumented?
5      MR. BOUMEL:  Form.
6  **A.   It's possible.  And again, then his**
7 **brain would be more fragile when he had the**
8 **current brain injuries.**
9      MS. CRUZ:  I don't have any other
10 questions.
11      MR. BOUMEL:  You reserved seven hours.
12 I ordered pizza to my office.  I mean, what's
13 going on here?
14      MS. CRUZ:  You guys asked when we set
15 the deposition like I don't know.  I haven't seen
16 not one word of their report.  So I have no idea.
17 If you asked me yesterday, I could have told you
18 but I don't know.
19      MR. BOUMEL:  Let's go off the record.
20 Let me review my notes.  I doubt I'm going to
21 have any follow-ups.
22      (Thereupon, there was a recess taken at
23 2:20 p.m.)
24      (Thereupon, the proceedings were resumed
25 at 2:22 p.m.)

---

**Page 62**

1      MR. BOUMEL:  I have no questions.
2      MS. CRUZ:  Doctor Russell, do you want
3 to read or waive?
4      THE WITNESS:  Read.
5      THE REPORTER:  Transcript orders please,
6 counsel.
7      MS. CRUZ:  Yes, please.
8      MR. BOUMEL:  Copy, please.
9      (Off the record at 2:22 p.m.)
10      (Whereupon, Russell Deposition Exhibit A
11 was marked for identification and attached to the
12 transcript.)

---

**Page 63**

1         ACKNOWLEDGMENT OF DEPONENT
2      I, DR. SALLY L. KOLITZ RUSSELL, do
3 hereby acknowledge that I have read and examined
4 the foregoing testimony, and the same is a true,
5 correct and complete transcription of the
6 testimony given by me, and any corrections appear
7 on the attached Errata sheet signed by me.

10 _____
11 (DATE)          (SIGNATURE)

---

**Page 64**

1      CERTIFICATE OF SHORTHAND REPORTER
2              NOTARY PUBLIC
3      I, Dianna C. Kilgalen, the officer
4 before whom the foregoing deposition was taken,
5 do hereby certify that the foregoing transcript
6 is a true and correct record of the testimony
7 given; that said testimony was taken by me
8 stenographically and thereafter reduced to
9 typewriting under my direction; that reading and
10 signing was requested; and that I am neither
11 counsel for, related to, nor employed by any of
12 the parties to this case and have no interest,
13 financial or otherwise, in its outcome.
14      IN WITNESS WHEREOF, I have hereunto set
15 my hand and affixed my notarial seal this 9th day
16 of December, 2024.
17      My commission expires June 28th, 2025.

20 _____
21 NOTARY PUBLIC
22 IN AND FOR THE STATE OF MARYLAND
23 COUNTY OF HARFORD