# EXHIBIT C

**Page 1**

```
         UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF FLORIDA
-------------------------------------x
NEIMA BENAVIDES, as Personal         :
Representative of the Estate of      :
Naibel Benavides Leon, deceased,     :
         Plaintiff,        : Case No.
v.                         : 21-cv-21940-
TESLA, INC., a/k/a Tesla Florida,    : BLOOM/Torres
Inc.,                                :
         Defendant.                  :
-------------------------------------x
DILLON ANGULO,                       :
         Plaintiff,        : Case No.
v.                         : 22-22607-KMM
TESLA, INC. A/k/a Tesla Florida,     :
Inc.,                                :
         Defendant.                  :
-------------------------------------x

         REMOTELY CONDUCTED DEPOSITION OF
                  KESTER NEDD, D.O.
               FRIDAY, JANUARY 10, 2025
                   12:19 P.M. CST
```

JOB NO.: 560897
PAGES: 1 - 52
REPORTED BY: KARISA EKENSEAIR, CCR RPR RMR

**Page 2**

DEPOSITION OF KESTER NEDD, D.O., CONDUCTED VIA ZOOM VIDEOCONFERENCE.

Pursuant to notice, before Karisa J. Ekenseair, Certified Shorthand Reporter in and for the States of Arkansas, Oklahoma, Missouri, Illinois, Tennessee, Georgia, New Mexico, Washington, and California; National Registered Professional Reporter; National Registered Merit Reporter; Notary Public.

**Page 3**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF NEIMA BENAVIDES (VIA ZOOM):

    TODD POSES, ESQUIRE
    POSES & POSES, P.A.
    ALFRED I. DUPONT BUILDING
    169 EAST FLAGLER STREET
    SUITE 1600
    MIAMI, FLORIDA 33131
    305-577-0200

ON BEHALF OF THE PLAINTIFF DILLON ANGULO (VIA ZOOM):

    ADAM T. BOUMEL, ESQUIRE
    THE ROUSSO, BOUMEL LAW FIRM, PLLC
    9350 SOUTH DIXIE HIGHWAY
    SUITE 1520
    MIAMI, FLORIDA 33156
    888-241-4225

**Page 4**

A P P E A R A N C E S  C O N T I N U E D

ON BEHALF OF DEFENDANT TESLA, INC. (VIA ZOOM):

    WHITNEY V. CRUZ, ESQUIRE
    BOWMAN AND BROOKE LLP
    TWO ALHAMBRA PLAZA
    SUITE 800
    CORAL GABLES, FLORIDA 33134
    305-995-5600

**Page 17**

1 condition has affected his ability to function.
2 So I do all of this.
3   Q  Okay. I see your report, pages 1 through
4 4, consistent of various notes that you read and
5 reported from medical records.
6     Are these -- can we assume that because
7 you included these notes from the prior medical
8 record in your report, these are the only parts of
9 the medical record you're relying on?
10      MR. POSES: Objection.
11   A  Well, let me -- at the end of my report, I
12 provided a list of all of the records that I
13 reviewed, so you can check that and that's --
14 those are the ones that I reviewed that moment in
15 time.
16   Q  Okay.
17   A  Which you have at the end.
18   Q  Okay. These -- so on page 11 where it
19 says, Medical Records Reviewed, are these all of
20 the reports that you've been provided by the
21 plaintiff's attorneys that hired you?
22   A  At the time, yes, but there are subsequent
23 reports that came.
24   Q  Okay. Have you reviewed -- is there a
25 list of those subsequent records that you've

**Page 18**

1 reviewed?
2   A  I didn't have a chance to put those
3 together to report to you, but certainly there are
4 other reports I reviewed subsequent to this.
5   Q  Okay. Is there any -- I need to know what
6 you reviewed since.
7   A  Okay. Let's see, so I reviewed report
8 from Dr. Barry M. Crown, PhD, psychology. I
9 reviewed Dr. Hamilton. I have that report I can
10 find, yeah. I reviewed Dr. Russell. I did review
11 some of the first neurology reports from Dr. Bruce
12 Kohrman. I think that's it. That's -- I think
13 the other stuff that maybe -- there may be some
14 that I didn't -- what I have in front of me, but
15 that's the ones I can give you an immediate
16 answer.
17   Q  Okay.
18   A  There may be others that I have in two big
19 binders.
20   Q  If there are other medical records for Mr.
21 Angulo, would those be important for you to review
22 to come to your opinion?
23   A  Sure. Either -- any reports, yeah.
24   Q  Okay. As far as Mr. Angulo's medical or
25 mental health history prior to the crash, did you

**Page 19**

1 review any records that relate to that?
2   A  Yes.
3   Q  Which records were those?
4   A  I have some information from him, but I
5 got from the neuropsychologist, from Dr. Russell,
6 most of them. Dr. Hamilton provided some. And
7 Dr. Crown provided some relative to this
8 pre-psychiatric or psychological history.
9   Q  But those are all reports from experts
10 that were made after the crash, right, history
11 that you just listed: Hamilton, Russell, and
12 Crown?
13   A  Well, they -- they refer to other reports
14 that they reviewed. Some of those I don't believe
15 I have, but I -- I relied on some of their
16 expressions in that.
17   Q  Have you, yourself, reviewed any mental or
18 medical health records relating to Mr. Angulo's
19 conditions prior to the crash?
20   A  No. Again, they were mentioned of other
21 reports reviewed by others.
22   Q  Do you know anything about Mr. Angulo's
23 medical history prior to the crash?
24   A  Yes.
25   Q  What do you know about his medical

**Page 20**

1 history?
2   A  He had a history of substance abuse
3 disorder. He had -- he was -- there was a
4 diagnosis floating around of -- as relates to
5 ADHD. He had a withdraw seizure when he was on
6 benzodiazepine, stopped taking it, and he got a
7 seizure and was hospitalized briefly for that,
8 went to the hospital for treatment. I think
9 that's as much as I can tell you.
10   Q  Are you aware of whether he has been
11 diagnosed with depression prior to the crash?
12   A  Yes.
13   Q  And what's your understanding of any
14 diagnosis of depression prior to the crash?
15   A  He did have a history of depression.
16   Q  Do you know whether he was diagnosed with
17 anxiety prior to the crash?
18   A  Yes. He was diagnosed with anxiety and
19 depression.
20   Q  The prior medical conditions that you just
21 went through, substance abuse, ADHD, seizures from
22 drug abuse and withdrawal, anxiety, depression,
23 could any of those result in the condition that
24 you found that existed in -- in June of 2023?
25      MR. POSES: Object to the form.

**Page 21**

1  A  Let me make sure I clarify so I understand
2  exactly what you're asking.
3      Are you saying that the problems that he
4  had, could it have cause the accident or could it
5  have resulted in the exam findings and symptoms
6  reported by the patient, to be sure?
7  Q  The latter. And I'll --
8  A  Okay.
9  Q  Any --
10 A  Okay.
11 Q  Any of the symptoms or conditions that
12 were present in any of the medical records and
13 that you noted that you found that Mr. Angulo had
14 as of June 29th, 2023, could any of those been
15 caused by any of his prior medical issues that you
16 just discussed?
17 A  Well, so let me just briefly deal with
18 this comment. So based on the data presented, he
19 had recovered from pretty much all of those
20 condition except for the depression and anxiety
21 that he had. The ADHD component, the evidence is
22 a little soft, but nevertheless, he was listed as
23 being diagnosed with, as a diagnosis.
24     However, one of the challenges we see in
25 people with trauma, especially to the degree that

**Page 22**

1  he had, people with pre-morbid pre-existing
2  injuries or experiences like he had, actually the
3  effects of traumatic brain injury being
4  logarithmic. So you had history of depression, if
5  you had a history of prior substance abuse and you
6  have a traumatic injury to the brain, you actually
7  are more likely to have neurological impairment.
8  And unfortunately we can't split the baby
9  figuratively speaking.
10     And being that I'm an expert in the field,
11 that's what I do all day long is look at people
12 like football players. They keep -- every time
13 they get an injury it becomes cumulative.
14     So clearly, it's difficult sometimes I
15 know in the legal world, try to apportion these.
16 But the fact that the person had some other
17 deficits now on top of that you have a brain
18 injury, you actually have a long -- or worse
19 outcome.
20     So yeah, the answer is that patient -- I
21 mean, there is a potential possibility that his
22 preexisting problems contributed to his -- the
23 findings that are there. But there are clear
24 neurological findings that we could identify that
25 didn't have anything to do with the injury it --

**Page 23**

1  with the prior history itself.
2      But the cumulative effect of having that
3  injury would have made the effects of that
4  condition worse. That I could say.
5  Q  Fair to say that you don't have a base
6  neurological baseline for his pre-accident
7  neurological conditions, right?
8  A  Well, even though I don't, you could
9  extrapolate from the patient's functional state
10 whether or not there would have been a
11 neurological condition that you're concerned
12 about.
13     So based on the -- based on my clinical
14 evaluation, questioning, observation, there was no
15 evidence of a structural neurological issue that
16 would have manifested itself.
17     This accident caused a structural and
18 physiological neurological injury that he didn't
19 have before. And you take those structural issues
20 and you add the effects from before, yeah, you're
21 going to get a worse situation. If that's the
22 question.
23 Q  Are you -- have you reviewed any records
24 regarding his educational history prior to the
25 crash?

**Page 24**

1  A  The -- again, I didn't have the school
2  records and so forth, but, you know, I know from
3  the other reports, you know, he did attend
4  elementary and middle school, but dropped out of
5  high school.
6  Q  Do you know anything else about his
7  educational history from the records?
8  A  He did attend Miami-Dade College and he
9  received an associate's degree in accounting in
10 2018. So clearly, to get to that point you have
11 to have some smarts.
12 Q  Are you aware of what his work history was
13 prior to the crash?
14 A  Well, I guess he was involved in some
15 family business with his family members. And he
16 had odd jobs pretty much. That was what I got,
17 gleaned from the records for that.
18 Q  You don't know exactly -- for example, do
19 you know if he'd ever held a consistent job for
20 more than three months prior to the crash?
21 A  I do not -- in the records I reviewed, I
22 did not see a note that direct -- that looked at
23 the time frame that he held employment. So I
24 mean, maybe somewhere, but I haven't seen it.
25 Q  You say on page 10, last paragraph, you

**Page 25**

say that Mr. Angulo has suffered physical, neurocognitive, and neurobehavioral diagnoses as a result of the motor vehicle accident on 4-25-19.

Other than speaking with Mr. Angulo, what is the objective evidence that you have that supports that opinion?

A Of course he had structural injury to his brain, diagnostic studies that showed he had bleeding in the brain.

Q Okay. Go ahead.

A He had actual bleeding in his brain from the structural injury. Now, and then he had injuries to various parts of his body including his spine, his pelvis, his nerves, his neck, his sacroiliac, sacrum, enough where he had lost consciousness for a very low Glasgow Coma score, which is the scale used to effect injury.

And all those are telltale signs that a significant amount of force went through his body to result in the degree of injury to the point that his girlfriend nearly died on the spot. So that speaks to the degree of force his body was subjected to.

So there's clear evidence from the evaluation history looking at his wounds and those

**Page 26**

that were repaired and the current symptoms that he's experienced that he suffered an injury to his body, including the brain.

Q Also -- I'm sorry, go ahead.

A And my clinical exam confirmed the injuries that were dated from before and that he had a sequela of those injuries that resulted in permanent signs and symptoms, signs being what you see and symptoms being what the patient describes.

So if you want, I can go through the details of it, but I'll leave that until you ask me for the question.

Q What permanent injuries did he sustain? So permanent meaning he still has those -- he still has those injuries as of today. You can only say what he has of June 2023, right? That's the last time you saw him?

A I think I -- let me see here. I didn't see him -- I had a follow-up visit with him on 6-27-2024.

So when I was --

Q Before you go on, do you have any records regarding that visit? I didn't see that as part of your file.

A There's a -- there's a -- there is a note,

**Page 27**

well, a document that we can -- we could get it to you if you want, but it's pretty much similar to this current one.

MR. BOUMEL: Wendy, that was sent to you. I know for a fact it was sent to you. I'll resend it to you again, but we did produce the supplemental report.

MS. CRUZ: Yeah, because I -- give me a second.

MR. BOUMEL: I'll re-forward it to you right now so it's at the top of your inbox, but I know for a fact it was sent to you.

MS. CRUZ: So thank you.

Q Okay. So what -- so my going back to my last question, my question was: What permanent injuries did Mr. Angulo sustain?

A Well, the first one at the top, no pun intended, he had a traumatic injury to his brain, to his head, that resulted in neurocognitive, some physical deficits, and a subsequent neurobehavioral deficit. And I can --

Q What -- what specifically was the traumatic brain injury, like specifically?

A Well, traumatic brain injury occurs when there are forces that traverse the brain that

**Page 28**

disrupt the brain organization, either physiologically or structurally, and he had both.

Q What is the specific injury in his brain that -- I mean, if we looked at a brain scan, how do we know he had -- or what tells you that he has a permanent brain injury? Where is the proof of that?

A So a permanent brain -- again, that's why you need, first of all, an expert like me to tell you if you have a permanent brain injury. Usually, that's a clinical diagnosis but we support it with, like I said, structural when we see damage. Like, in this case he had a hemorrhage. He had a hemorrhage in the occipital lobe. He had a hemorrhage in the frontal lobe. That's one of the signs of injury. You literally see blood in the brain.

Q So he has -- he had a hemorrhage of the occipital lobe and a hemorrhage of the frontal lobe?

A Frontal lobe and some parts in the parietal lobe.

Q And some of the parts of what? I'm sorry.

A The parietal lobe.

Q Okay. What other evidence is there of a

29

1 permanent brain injury in Mr. Angulo?
2     **A  The clinical neurological exam and the**
3 **physical exam that I did showed that he had**
4 **deficits that correlate with parts of the brain**
5 **that were injured.  Some of them you would not see**
6 **in a diagnostic testing but we were only -- they**
7 **become evident just from my neurological exams.**
8 **And I could go through those with you if you want**
9 **me to.**
10    Q  Any time that you have a hemorrhage in the
11 three lobes that we just discussed, the occipital
12 and the frontal and the parietal, does that mean
13 that the patient has a permanent injury?
14    **A  In the field of brain injury, permanency**
15 **is, again, a result of the clinical or clinician**
16 **determine that.  Yeah, there are people who have**
17 **brain injury and we see that they've been healed.**
18 However, the brain is a hierarchal (technical
19 disruption).
20    Q  You're frozen, Doctor?
21    **A  You can break down --**
22    Q  Doctor --
23       MR. POSES:  Wait, hold on, Doctor.
24    Q  Doctor --
25       MR. POSES:  You froze up a couple times

30

1 and you're frozen now.  Just give me one second.
2 You're still frozen.  Now you're okay, but --
3       MS. CRUZ:  I still can't see.  I don't
4 know if I can hear him but the screen is frozen.
5       MR. POSES:  Not for me.
6       MR. BOUMEL:  He's not frozen on my end at
7 all.
8       MR. POSES:  No, not now.  But he's going
9 back and forth.  There is a bad connection for the
10 doctor.
11       MS. CRUZ:  Maybe, Doctor, if we suggest,
12 can you start and the court reporter can maybe
13 read the question, and you can start over?
14 Because we all probably cut out at different
15 times?
16       MR. POSES:  Whitney, we totally agree.
17 Yeah, Doc, the connection was kind of spotty in
18 and out.  And so I know you're -- and Whitney, I
19 agree.
20       You want to read back the question court
21 reporter?
22       THE REPORTER:  One moment.
23       MR. POSES:  Thank you.
24    (Whereupon the requested question was read.)
25       THE WITNESS:  Okay.  So let me -- so

31

1 permanency in a person with a traumatic brain
2 injury is general result for a clinician looking
3 at the sum total of the circumstance and the
4 clinical findings to make that determination.
5       I started by saying that the brain is
6 hierarchically organized.  And many patients who
7 have traumatic brain injury recover to the point
8 that the average person can't tell that there is
9 an injury but for the fact that they get exposed
10 to a provocative situation and that vulnerability
11 comes out.
12       So in the old days, we used to say if you
13 didn't lose consciousness you didn't have a brain
14 injury.  But now we know better, that a lot of the
15 patients, especially the football players and
16 others that have repeated injuries to the brain,
17 they have these vulnerabilities, they go to Disney
18 World, they get on a ride and they come back and
19 they're dizzy, they have vertigo, they get
20 migraines, they can't think, they can't go to
21 class.  And this is a person that would otherwise
22 be fine.
23       So it's a kind of a moving target.  So in
24 answer to your question, the answer is that it's
25 subject to clinical judgment of a qualified

32

1 provider to decide whether a person is -- has
2 retained effects from an injury.
3    Q  So you're not saying that Mr. Angulo's
4 brain injuries is permanent just because he has
5 these hemorrhages.
6       What is it that you saw in your clinical
7 evaluation specifically that --
8    **A  Okay.**
9    Q  -- formed the -- let me finish the
10 question for the record, please, sir.
11       That forms the basis that his brain injury
12 is permanent?
13    **A  First of all, we look at the evolved time**
14 **and the trajectory of recovery because the brain**
15 **has to recover, and what residual signs and**
16 **symptoms he has since the injury and the**
17 **persistence of those systems and the ability to**
18 **provoke those systems.**
19       **Now, because the area of subspecialty is**
20 **traumatic brain injury, there is a kind of exam**
21 **that we do all day long to try and effect that,**
22 **not just for legal purposes but also to determine**
23 **how well the person can function in society.**
24       **So on the neurological side, one of his**
25 **major challenges is that he has a vulnerability to**

**Page 37**

1  I'm giving you. You asked for my opinion. I'm
2  giving you my opinion.
3  Q  No. You told me what could be done.
4     I'm asking you what specifically did you
5  find in your examination that leads you to believe
6  that -- not leads you to believe, that you're
7  giving the medical opinion that the brain injury
8  is permanent. You listed some things.
9     Is there anything else that you found in
10 your clinical evaluation?
11 A  Sure. There's many.
12 Q  Okay. What else did you find specifically
13 to Mr. Angulo that forms the basis for you to say
14 that his brain injury is permanent?
15 A  He has significant neurocognitive
16 impairment in terms of his -- there are some types
17 of attentional issues that he has. He's easily
18 distracted. He has trouble with concentration,
19 trouble switching from one cognitive set to
20 another. So I'm talking to him about a certain
21 concept and he has to rapidly shift to another
22 concept; he has trouble doing that.
23    He has trouble processing information
24 depending on how it's presented, which confirms
25 structural and physiological disorganization of

**Page 38**

1  his brain.
2     There are aspects of his memory both
3  visual and auditory memory that he has trouble
4  with. He gets overwhelmed very quickly when
5  multiple stimuli are presented to him at the same
6  time.
7     So he can't manage in an environment where
8  there's lots of activities going on at the same
9  time and that makes him overwhelmed. He
10 does -- he did report a certain amount of brain
11 fog which is usually a part of this.
12    So summarize on that, these are problems
13 of attention, processing ability, memory, and
14 something we call executive function. Those
15 resulted in some neurobehavioral effects where he
16 has some adverse reactions, what we call
17 post-traumatic stress disorder.
18    So he has multiple triggers that would put
19 him in a state where he developed phobias. He has
20 phobias, like crowds. He has trouble in crowds.
21 He has trouble in -- if he gets to an environment
22 where there's too much going on, he breaks down
23 and falls apart. He's experienced panic disorder
24 in front of me. He demonstrated the degree of
25 crying that was out of context with the situation,

**Page 39**

1  that's incongruent to the situation. He was
2  emotionally labile.
3     And based on the fact that he has damage
4  to the frontal lobe in his brain, we classify that
5  as a pseudobulbar affect. That's the term that's
6  used. So he has -- does not have the ability to
7  regulate his emotion in what way that is
8  appropriate to the situation, and that's called
9  pseudobulbar affect, so that's a form of damage to
10 the frontal lobe.
11    So a lot of the signs and symptoms that he
12 has correlates well with the findings on the
13 diagnostic studies that were initially performed.
14 So in my mind, there is no doubt that he has
15 permanent injury.
16 Q  And it's your opinion that there's no job
17 in the world that Mr. Angulo could hold, right?
18    MR. POSES: Object to the form.
19 Q  Unable to work?
20    MR. POSES: Object to the form.
21 A  So we have to assess -- I mean, I would
22 want to qualify the statement just because I only
23 could answer it in context. Is that okay?
24 Q  Sure. I'm not really sure what you mean.
25 But you can answer, and if I don't understand I'll

**Page 40**

1  ask you clarifying question. How's that?
2  A  Okay. When you say, "no job," that's a
3  very vague statement. It could mean could he
4  write his name, that could be a job. Could he
5  talk on the telephone? That could be a job. I
6  mean --
7  Q  Let me --
8  A  -- sometimes you qualify that. When you
9  say no job, is it gainful employment? Is it
10 voluntary work? Usually we like to qualify those.
11 Q  Okay. So I'll ask a better question then
12 maybe.
13    Your report says: The patient is unable
14 to participate in gainful employment.
15 A  Yeah. That -- that makes sense. So that
16 means he -- gainful employment meaning to work in
17 a competitive environment to make money, to
18 survive and provide for himself on a consistent
19 basis.
20 Q  So it's your opinion that he's unable to
21 hold any job where he would make money?
22 A  Well, again, I mean, people will do lots
23 of things for money. Doesn't mean it's either
24 legal or appropriate. So I don't want to -- and
25 again, I can't answer your question the way you

**49**

BY MS. CRUZ:
Q Doctor, how much do you charge for deposition testimony?
A Usually, it's $1,000-plus an hour. I can't give you -- I don't have the thing in front of me. Yeah.
Q And trial testimony, is that the same?
A Figure that we charge, like, a flat amount and then we go for every hour after that for the first, I think, three hours.
Q What's the flat --
A I would have to -- I get the sheet for you because I don't keep track of all of that.
Q Okay.
A Yeah.
Q And I think you gave us that sheet.
A Yeah.
Q I just don't know if I pulled those numbers on it. Okay.
    Discovery deposition. Deposition, $1,000 per hour; Video deposition, $3,000 per hour; and trial, $7,000 for up to four hours of testimony. That sound right?
    Is your fee schedule correct, I guess --
A I would say so. That's the most recent

**50**

one. Should have a date on it, the one they sent you.
Q Yeah. Just says 2024. Okay. Just let me run through my notes. I think I'm done.
    There's notes here regarding your -- in page 7 of your report, visible findings in the head. He said he had tenderness at a scar that was, looks like, on his head that he has where he had the staples put in at age 15.
    Do you know what that injury was the result of?
A Apparently he had an injury when he was a child. I didn't get enough details of the history from that.
Q So he had an injury to his head at age 15 that required staples?
A Yeah.
Q But you don't know anything about what the injury was or what the diagnosis was or what treatment he had?
A He didn't -- he was not hospitalized. He just went to the ER is what he told me, but I don't have the details about any specifics beyond that from a medical professional report.
    MS. CRUZ: I don't have any other

**51**

questions. Thank you, Doctor.
    MR. POSES: Read or waive, Doc?
    THE WITNESS: Waive.
    THE REPORTER: Can I get --
    MS. CRUZ: We'll order regular delivery.
    MR. POSES: And we'll take a copy, please.
(Whereupon the proceedings were concluded at
         1:22 p.m. CST)

**52**

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

    I, Karisa Ekenseair, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.
    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 22nd day of January, 2025.

_____
Karisa Ekenseair, CCR, RPR RMR