UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-21940-BLOOM/Torres

NEIMA BENAVIDES, as Personal Representative
of the Estate of Naibel Benavides Leon, deceased,

    Plaintiff,

v.

TESLA, INC., a/k/a Tesla Florida, Inc.,

    Defendant.
_____/

DILLON ANGULO,   Case No. 22-22607-KMM

    Plaintiff,

v.

TESLA, INC. a/k/a Tesla Florida, Inc.,

    Defendant.
_____/

**DEFENDANT, TESLA, INC. a/k/a TESLA FLORIDA, INC.'S
MEMORANDUM IN SUPPORT OF ADMISSIBILITY OF BODY CAMERA FOOTAGE
AND IN SUPPORT OF VARIOUS OBJECTIONS TO PLAINTIFFS' EXHIBITS**

Defendant, Tesla, Inc., submits this Memorandum in Support of Admissibility of Body Camera Footage and in Support of Various Objections to Plaintiffs' Exhibits as follows:

**I.   BODY CAMERA FOOTAGE**

As ordered by the Court (ECF No. 433), Tesla has concurrently submitted the relevant body-camera footage of Florida Highway Patrol Officer Joel Torres, who first responded to the crash scene. As the footage demonstrates, Mr. McGee began making voluntary, spontaneous statements about the accident shortly after Officer Torres arrived on scene, before any interview or investigation had begun. For instance, within moments of Officer Torres' arrival, McGee volunteers: "I was driving. I dropped my phone and looked down and I ran the stop sign and hit the guy's car." (ECF 320-4, at 2).

While Plaintiffs have argued that "any and all conversations" Officer Torres and Officer

Riso (who later conducted the accident investigation) had with George McGee should be excluded pursuant to the Florida Accident Report Privilege, section 316.066(4) Fla. Stat., that is simply not the law – certainly as it relates to the body-camera footage. The Accident Report Privilege does not preclude evidence of "any" conversations McGee had with Officer Torres; rather, it is only those conversations made "for the purpose of completing a crash report." § 316.066(4); *Brackin v. Boles*, 452 So. 2d 540, 544 (Fla. 1984). On the other hand, "'[w]hen a driver makes a spontaneous statement immediately following an accident, the driver does not make the statement for the purpose of complying with the duty to furnish an accident report and the statement is not privileged.'" *State v. Marshall*, 695 So. 2d 719, 722 (Fla. Dist. Ct. App. 1996), *approved*, 695 So. 2d 686 (Fla. 1997) (quoting Charles W. Ehrhardt, Florida Evidence § 501.2, at 239 (1996 ed.)); *accord Perez v. State,* 630 So. 2d 1231 (Fla. Dist. Ct. App. 1994) (spontaneous utterance by driver that "I'm a deputy sheriff and I [f***ed] up." was not precluded by accident report privilege).

Even Corporal David Riso, who investigated the crash and prepared the accident report, recognized that the initial statements McGee made to Officer Torres (as recorded by the body-cam footage) were "spontaneous":

> Q. [By Tesla's Counsel] And based on your listening to and review of that body cam information, is it your understanding that Mr. McGee made spontaneous statements to the police about what he thinks occurred?
>
> A. [By Corp. Riso] Yes.

(Riso Dep., 64:24 – 65:4, attached as Exh. A) (emphasis added).

> Q. [By Tesla's Counsel] Would you agree with me that there's no indication in your extensive report, it's over 32 pages long, that Mr. McGee made a statement like I've described, something about his brakes, something about cruise control or anything else that in his mind played a role in the crash?
>
> [objection by counsel]

2

> A. [By Corp. Riso] If he had stated it, I would have, like I said, documented it, but I don't recall hearing him say anything about it. **I just recall him *spontaneously* stating he was on the phone, he dropped his phone, he looked down, and he had, you know, ran the stop sign.**

(*Id.* at 79:25 – 80:12) (emphasis added).

Given that these statements and others by McGee clearly occurred spontaneously, voluntarily, and well before an interview or investigation, they are not covered by the Accident Report Privilege.[1]  *See Marshall*, 695 So. 2d at 722; *Perez,* 630 So. 2d at 1232.

## II. EXHIBITS AND EVIDENCE CONCERNING THE DISPUTE THAT WAS THE SUBJECT OF PLAINTIFFS' MOTION FOR SANCTIONS

As the Court will recall, Plaintiffs filed a Motion for Rule 37 Sanctions claiming Tesla had failed to produce certain data from the Model S. Tesla responded, *inter alia*, that any failure to produce or delay in production of evidence was not intentional. After full briefing, the Court found there was "insufficient evidence to conclude Tesla's conduct was intended to avoid the production of evidence or otherwise undermine the discovery process." (ECF 405 at 12). The Court further found that Tesla's conduct did not cause significant prejudice to Plaintiffs' case since Plaintiffs received all the information months before trial. (*Id.* at 13). Ultimately it concluded that Plaintiffs "have failed to establish bad faith" with respect to Tesla's conduct during discovery. (*Id.* at 14). Plaintiffs are now seeking introduce the same evidence this Court found to be "insufficient" to the jury so Plaintiffs can relitigate the issue, even going so far as asking the Court to read a jury instruction on punitive damages calling out this alleged conduct as potential grounds for such an award. This is plain wrong and would lead to an unnecessary

---

[1] As further argued in Tesla's Opposition to Plaintiffs' Motion *in Limine* (ECF No. 359) to the extent McGee's comments were directed to someone other than a law enforcement officer, they also would not be covered by Section 316.066(4)'s exclusion. *See, e.g., Brown v. Fla. Dep't of Corr.*, No. 3:20-CV-1377-LC/MJF, 2021 WL 6198040, at *8 (N.D. Fla. Dec. 6, 2021) (statement to paramedic and EMT did not trigger Section 316.066(4)), *report and recommendation adopted*, 2021 WL 6197094 (N.D. Fla. Dec. 30, 2021)).

3

and irrelevant mini trial. In short, admissibility and relitigating this issue is, in Tesla's view reversible error tainting the integrity of this entire trial.

Consistent with established law concerning the inadmissibility of evidence of discovery disputes, this Court's ruling on Plaintiffs' Motion for Sanctions should have put an end to this issue. But it has not. Apparently, Plaintiffs intend to continue pressing this issue as evidenced by the following: (a) as one of their trial exhibits, Plaintiffs identified the Declaration of David Shoemaker which Tesla filed in response to Plaintiffs' motion for sanctions. (P-93[2]); (b) Plaintiffs listed Michael Calaffel, a Tesla witness who had been involved in efforts to retrieve data from the subject Model S after the crash, (See ECF 438 at p. 7) and personally served him with a trial subpoena; and (c) Plaintiffs have included a proposed jury instruction that seeks to impose punitive damages based on Tesla's "conduct after the incident"—presumably evidence related to the subject matter of the sanction motion. (ECF No. 442).[3]

All evidence related to the Motion For Sanctions—whether through exhibits, evidence, argument or jury instructions—is inadmissible, and the jury should not be permitted to consider it for compensatory or punitive liability.

### A.     Evidence Of Discovery Disputes is Inadmissible

The law is well settled that evidence concerning discovery disputes is inadmissible because it has no bearing on any of the claims or defenses in a case, and would only serve to confuse or mislead the jury and be unfairly prejudicial. *See* Fed. R. Evid. 401, 402, 403; *Empire*

---

[2] All citations to Plaintiffs' exhibits in this memorandum are to exhibit numbers identified in Plaintiffs' as-filed Trial Exhibit List accompanying the Rule 16.1 stipulation (ECF No. 438-1).

[3] Plaintiffs' proposed instruction states:
> In considering whether to award punitive damages against Tesla, you may consider not only the conduct that gave rise to the incident itself but also Tesla's conduct after the incident. Evidence of concealment of offensive conduct after it initially occurred may indicate malice or evil intent and support an award of punitive damages.

*Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1341 (7th Cir. 1988) (affirming trial court's exclusion of evidence of discovery disputes under Rule 403 because it was "at best cumulative and probably irrelevant"); *Waters v. Genesis Health Ventures, Inc.*, 400 F. Supp. 2d 814, 818 (E.D. Pa. 2005) (excluding evidence of discovery disputes because it is "entirely irrelevant to the Plaintiff's …claim").

Florida law is in accord. *Amlan, Inc. v. Detroit Diesel Corp.*, 651 So. 2d 701, 703 (Fla. 4th DCA 1995) (noting that the general rule in Florida is that "evidence related to the history of pre-trial discovery conduct should normally not be . . . submitted for the jury's consideration on the issues of liability" and "the probative value of this collateral evidence might distract the jury from the main issues of liability); *Emerson Elec. Co. v. Garcia*, 623 So. 2d 523 (Fla. 3d DCA 1993). Indeed, "[i]t is well settled that [arguments by counsel] which accuse opposing counsel of hiding evidence and of fraudulently preventing the presentation of relevant evidence constitute reversible error." *SDG Dadeland Assocs. v. Anthony*, 979 So. 2d 997, 1001 (Fla. 3d DCA 2008) (compiling cases).

Consistent with this law, as part of the parties' meet and confer on motions *in limine*, Plaintiffs agreed that there would be no references to discovery disputes. But it appears that Plaintiffs believe the evidentiary rules are different when the discovery dispute resulted in a Motion for Sanctions. They are not.

### B. The Law Excluding Evidence of Discovery Disputes Does Not Change Because Plaintiffs Filed A Motion For Sanctions

There are multiple reasons why Plaintiffs' attempts to offer evidence and instruction related to the Motion For Sanctions must be rejected.

Most importantly, because this Court has already found that ***Tesla did not act in bad faith***, and Plaintiffs were not prejudiced because they now have the sought-after information, a

5

declaration or testimony would not prove any relevant issue.[4] And even more so, in light of the Court's ruling that there was no bad faith or intent to avoid the production of evidence, how could the jury be asked to consider whether there was "[e]vidence of concealment of offensive conduct after it initially occurred [which] may indicate malice or evil intent and support an award of punitive damages?"

Indeed, this case is unlike those cited by Plaintiffs where there is a continuing course of conduct by the defendant that resulted in harm to the plaintiff. For example, in *Johns-Manville Sales Corp., v Janssens*, 463 So. 2d 242 (Fla. 1st DCA 1984), the defendant allegedly concealed its knowledge of the hazards of asbestos exposure for years while the plaintiff continued to be exposed to its dangers. As such, there was a causal nexus between the defendants' alleged concealment and the plaintiff's injury.[5]

Here of course, that is not the case because **nothing about discovery had any impact on these Plaintiffs' injuries.** In other words, how or why data was produced, is totally irrelevant to the alleged harm suffered by Plaintiffs. *See generally*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422-23 (2003) ("[D]efendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A

---

[4] In ruling on the Motion for Sanctions, this Court concluded: "Plaintiffs have failed to establish bad faith or demonstrate how Tesla's misconduct prejudiced or otherwise prevented Plaintiffs from proving their case. Without a sufficient showing of prejudice or concrete evidence that Telsa's failure to timely turn over the snapshot evidence was willful, it is inappropriate to impose a sanction that will effectively foreclose Tesla from putting on a defense in this case." (ECF No. 405, at 14-15).

[5] In any event, Plaintiffs ignore that the Florida Supreme Court in *Chrysler v. Wolmer*, 499 So. 2d 823 (Fla. 1986), found that the standard articulated in *Janssens* was "clearly erroneous when applied to a claim that a motor vehicle was insufficiently crashworthy when precautions had been taken to insure its crashworthiness." 499 So. 2d at 826. Rather, as *Wolmer* held, the standard set forth in Janssen was limited to cases involving inherently dangerous products, such as the asbestos in Janssen. *See id*.

defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business."); *Philip Morris USA, Inc. v. Rintoul*, 342 So. 3d 656, 665 (Fla. 4th DCA 2022), *quashed on other grounds*, SC2022-1038, 2024 WL 3735894 (Fla. Aug. 9. 2024) (citing *Campbell*, concluding plaintiffs could not use e-cigarette evidence to support punitive damages because conduct that caused plaintiffs' damage was addiction to tobacco cigarettes and not e-cigarettes); *Hardin v. R.J. Reynolds Tobacco Co.*, 314 So. 3d 584 (Fla. 3d DCA 2020) (affirming directed verdict on punitive damages where no evidence linked the alleged misconduct to plaintiff's claimed injury). In their briefing on the Motion for Sanctions, Plaintiffs alleged that Tesla made a concerted effort to suppress evidence from them, police, the government, and so on. But because Plaintiffs had no evidence to support their allegation, the Court came to the right conclusion. The trial is and should be about what happened on Card Sound Road the evening of April 25, 2019. Tesla should not be forced to relitigate this decided sanctions issue, calling witnesses it otherwise has no reason to call.

This Court has previously found evidence related to a motion for sanctions—to be inadmissible. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC,* No. 13-CIV-80371, ECF Nos. 293, 335 (S.D. Fla. July 2, 2015) (granting defendant's motion in limine and excluding "evidence, arguments, and/or cross-examination pertaining to the parties' discovery disputes," including a motion for sanctions that was denied). *See also*, *RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, 445 F. Supp. 3d 1327, 1332 (D. Colo. 2020) (granting motion to exclude evidence of discovery disputes at trial because the court had previously concluded the defendants' discovery violations were not made in bad faith, and therefore were not relevant to plaintiffs' claims for exemplary damages). It should follow this precedent here.

For all of these reasons, Tesla submits that the Court should preclude Plaintiffs from

introducing any evidence (for impeachment or otherwise) as well as the jury instruction relating to Plaintiffs' Motion for Sanctions.

### III.     OTHER INCIDENT EVIDENCE

Plaintiffs' exhibit list contains a number of exhibits that raise or relate to other incidents, including but not limited to exhibits P-11, P-12, P-13 and P-77.[6]  With respect to the admissibility of other incident evidence, the Court previously ordered that "Plaintiffs must provide the Court with all the relevant facts regarding the accidents they seek to introduce at trial[, with detailed information as to each no later than July 7, 2025. (*Id.*)

As of the time of this filing, Plaintiffs had just filed their Response to DE 433 Requiring Additional Information with Respect to Prior Accidents (ECF No. 441).  That filing identifies at least three other incidents Plaintiffs seek to put at issue and is accompanied by a memorandum of law.  Tesla requests time to review and respond to Plaintiffs' submission and, if necessary, convene an evidentiary hearing in accordance with Federal Rule of Evidence 104 to assess the admissibility of this evidence.

### IV.     GOVERNMENT INVESTIGATIONS/NTSB MATERIALS

Among Plaintiffs' proposed exhibits are NTSB Reports and/or Recommendations arising from other accidents involving Tesla vehicles.  (Ex. P-77 to P-82; P-85 to P-87)[7].  However, these NTSB materials must be excluded, in accordance with Federal law, Florida state law, and the Federal Rules of Evidence.

---

[6] It is not clear—based on the exhibit descriptions provided in Plaintiffs' Exhibit List—whether additional exhibits contain other incident information. Therefore, this list is not exhaustive, and the arguments set forth herein should apply to all other incident evidence.

[7] Because at least some of these materials were exhibits to Robert Sumwalt's deposition (i.e., P-77-P-82), and the Court has ruled that Sumwalt's anticipated testimony inadmissible (ECF No. 433, at 38), Tesla submits that the deposition exhibits should also be excluded.  However, to the extent Plaintiffs seek to introduce those exhibits on some other grounds, Tesla has included those documents within the scope of this memorandum, as alternative bases for exclusion.

A.  **Federal Law Bars The Introduction Of The NTSB Reports And Related Materials Into Evidence**

By their exhibit P-77, Plaintiffs seek to introduce the NTSB Report related to a 2016 crash in Williston, Florida (hereafter the "Brown Report"). However, such reports are subject to a federal exclusionary rule. The NTSB is not a *regulator* of the automotive industry. NTSB investigates certain incidents involving airlines, railways and highway collisions, and from time to time it issues reports and recommendations, but it cannot compel any action on those recommendations. Congress has recognized the potential that NTSB reports or recommendations, with their air of "government" authority, could improperly sway a jury. Therefore, Congress has expressly prohibited the admission of NTSB reports in civil actions involving accidents therein described:

> No part of a report of the Board, related to an accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report.

49 U.S.C. § 1154(b); *Chiron Corp. & PerSeptive Biosystems, Inc. v. Nat'l Transp. Safety Bd.*, 198 F.3d 935, 940 (D.C. Cir. 1999) ("NTSB investigatory procedures are not designed to facilitate litigation, and Congress has made it clear that the Board and its reports should not be used to the advantage or disadvantage of any party in a civil lawsuit."). Because of the danger of undue influence of these reports, and in conformance with applicable Federal regulation, the Court should exclude the Brown Report and any other NTSB accident reports. *Fleming v. Robinson Aviation, Inc.*, 2020 WL 12182613, *2 (D.P.R. Oct. 7, 2020) (excluding report containing NTSB conclusions and opinions).

This exclusionary rule should extend to the related NTSB "recommendations" and similar materials Plaintiffs seek to introduce as exhibits P-78 to P-87, as the recommendations necessarily result from the Brown accident investigation as well as the investigations of other

9

incidents involving vehicles and drivers not at issue in this case. These materials are merely extensions of the reports, and their introduction would likewise violate the principle that the work of the NTSB "should not be used to the advantage or disadvantage of any party in a civil lawsuit." *Chiron Corp.*, 198 F.3d at 940. *See also Curry v. Chevron, USA*, 779 F.2d 272, 274 (affirming district court's refusal to let expert use NTSB report's opinions and conclusions to form expert opinion); *Knous v. United States*, 981 F. Supp. 2d 1365, 1367 (N.D. Ga. 2013) (excluding inferences based upon probable cause findings); *In re Crash of Aircraft N93PC on July 7, 2013, at Soldotna, Alaska*, No. 3:15-cv-0115, 2021 WL 3412552, at *3 (D. Alaska Aug. 4, 2021) (excluding studies containing investigator opinions that "reflect [] the investigators' personal weighing and analysis of the evidence" because they "walk right up to the Board's conclusion as to probable cause"). Here, Plaintiffs should not be permitted to rely on materials that would incorporate the opinions and analysis of the NTSB related to other accidents, or otherwise lift conclusions from the NTSB reports.

  **B.**   **The NTSB Materials Should Be Excluded Unless/Until The Plaintiffs Demonstrate Sufficient Similarity To This Accident**

  Besides exclusion under 49 U.S.C. § 1154(b), this Court has already noted the necessity of Plaintiffs first establishing appropriate foundation for those materials prior to their admission into evidence. Indeed, Tesla has already moved for the exclusion of these sorts of government investigations, to which the Court aptly responded: "Because the Court must first determine whether the completed government investigations involved vehicles, technology, and collisions substantially similar to the one here, the Court reserves judgment until Plaintiffs have provided the Court with the requite details to make a substantial similarity determination." (ECF No. 433, at 33). The Brown Report reflects the NTSB's investigation into a 2016 crash involving a different Autopilot hardware suite, on an interstate highway, and involving a driver watching a

movie as he crashed into a crossing tractor-trailer. It has nothing to do with the facts, circumstances or vehicle involved in this case. Plaintiffs cannot even say that if the NTSB's recommendations were followed this crash would not have happened; dropping things and reaching for them with your other hand on the steering wheel and your foot on the accelerator pedal happens, often. Thus, even if Plaintiffs can avoid the exclusionary rule provided by 49 U.S.C. § 1154(b), before using or referencing materials related to these government investigations at trial, Plaintiffs should be required to satisfy substantial similarity in accordance with Florida law. *See, e.g.*, *Ford Motor Co. v. Hall-Edwards*, 971 So. 2d 854, 859 (Fla. 3d DCA 2007) (evidence of accidents must relate to same equipment under substantially similar circumstances); *Agrofollajes, S.A. v. E.I. Du Pont De Nemours & Co., Inc.*, 48 So. 3d 976, 991-93 (Fla. 3d DCA 2010), *disapproved on other grounds, Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 520 (Fla. 2015) (trial court erred by allowing evidence of prior claims because plaintiff failed to prove substantial similarity even though claims involved the same product).

At the time of this filing, Plaintiffs had just filed supplemental briefing on other incidents, which include NTSB and NHTSA documents related to those incidents. Tesla respectfully requests an opportunity to respond to the arguments advanced by Plaintiffs.

V.     **RECALL EVIDENCE**

Among the exhibits identified on Plaintiffs' Trial Exhibit Index (ECF No. 438-1) are documents related to the December 2023 recall. (*See, e.g.,* Plfs' Ex. P-66 ("NHTSA Recall – Part 573 – 23V838-8276 – 12-23-23")).

By its Omnibus Motion in Limine, Tesla moved to preclude the December 2023 recall and related evidence under Federal Rule of Evidence 407. By its Omnibus Order on the Parties' Motions in Limine (ECF No. 433), the Court ruled that "evidence of the 2023 recall is admissible to the extent that it is offered to demonstrate the feasibility of the precautionary measures." (*Id.*

at p. 32). However, the Court also correctly recognized: "The issue of the admissibility of evidence based on feasibility appears to be a largely moot point since 'Tesla does not dispute the *feasibility* of the subsequent change[.]'" (*Id.* at n. 10).

In fact, there has never been any dispute that all of the specific countermeasures in the recall were and are feasible. The Court's ruling that the recall is admissible to the extent that the feasibility of the changes occasioned by the recall are at issue is therefore resolved. As such, Tesla requests that the Court strike Plaintiffs' Exhibit P-66 and preclude Plaintiffs from introducing any other evidence related to the 2023 recall.

## VI. PUBLIC STATEMENTS ATTRIBUTED TO ELON MUSK OR TESLA

The Court recently ruled that certain statements attributed to Elon Musk or Tesla could be "relevant to both Plaintiffs' Design Defect and Failure to Warn Claims because the statements will help the jury understand whether an ordinary consumer would have reasonably expected the Vehicle's Autopilot to warn of or avoid the subject collision." (ECF No. 433, at 34). The Court, however, also explained that "[s]hould Plaintiffs attempt to introduce statements at trial that clearly indicate the statement is forward-looking or aspirational or only applies to fully self-driving vehicles, Tesla may challenge the introduction of such statements at trial." (*Id.*).

Since that Order, Plaintiffs identified on their trial exhibit list transcripts and audio or video recordings of statements purportedly made by Mr. Musk on October 14, 2015, October 19, 2016, and September 11, 2016. (ECF No. 438-1, at Exhibits 35-42). Additionally, Plaintiffs' Exhibit List included an exhibit described as "Tesla Conference 2016—Q&A attachment 6—2016 Code (Video)." At approximately 6:00 PM ET today, Plaintiffs provided copies of these exhibits.

Tesla will meet and confer with Plaintiffs to request a complete list of the excerpts from these exhibits that they intend to play for or show to the jury. Without that information, Tesla is unable at this time to identify all of its objections to any such excerpts Plaintiffs might raise in trial. However, this evening, Plaintiffs did provide a demonstrative exhibit that contains excerpts from these exhibits that make clear that at least some portion of the statements they intend to play for or show to the jury are "forward-looking or aspirational or only appl[y] to fully self-driving vehicles[.]" *See* Exhibit B, Plaintiffs' Demonstrative Exhibit No. 110.[8]

For example, Plaintiffs' Exhibits 37 and 38 purport to be video and a corresponding transcript from a press conference held on October 19, 2016, in relation to Tesla's release of Autopilot Hardware 2.0, during which the CEO, Mr. Musk, purportedly made certain statements and then answered questions from the audience.[9] Exhibit D, Purported Transcript of 10/19/16 Musk Autopilot 2.0 Conference Call, Plaintiffs' Exhibit 38. Mr. Musk's purported statements from this event begin like this: "The, the basic news is that all Tesla vehicles exiting the factory have hardware necessary for Level 5 autonomy. So that's in terms of the, the, the cameras and compute power. It's every car we make, so on, on the order of 2,000 cars a week are shipping now with Level 5, meaning hardware ***capable of*** a full self-driving for driverless capability. ***So***

---

[8] Plaintiffs also provided a demonstrative exhibit that they describe as a "Tesla Timeline." *See* Exhibit C, Plaintiffs' Demonstrative Exhibit No. 106. This timeline is objectionable for reasons that go beyond those discussed here concerning the purported Musk statements (and that have been raised elsewhere in this Memorandum), but, for immediate purposes, the timeline is useful for demonstrating the ways in which Plaintiffs will attempt to misleadingly "contextualize" these statements by reference to other facts in this case. This, in turn, confirms the need to ensure their selective quotations are either excluded or incorporate additional language in the statements to clarify the misleading nature of their selections. *See* Fed. R. Evid. 106.

[9] As Tesla explained in its Supplemental Responses to Plaintiffs' First Requests for Admission, Tesla is unable to authenticate the video recording. As the proponent of this exhibit (and the others containing purported statements by Mr. Musk or Tesla), Plaintiffs have the burden to establish authenticity. Tesla does not waive these objections, but it focuses here on the substance of the purported statements.

13

*it'll take us some time, you know, in the future to, to complete validation of the software and, and, and obviously get the required regulatory approval. But the important thing is that the foundation is laid for the cars to be fully autonomous* at a safety level we believe to be at least twice that of a person, maybe better." *Id.* at p. 1 (emphasis added). As the quoted language indicates, the *entire* discussion concerns Mr. Musk's *aspirations* for fully self-driving vehicles in the future.

Plaintiffs' demonstrative exhibit, however, omits this context, stopping after the first above-quoted sentence and then—without any indication that they have excised important context—continuing with additional language from the statement that was made after the above-quoted context made clear that the software necessary for fully self-driving vehicles was still in development. Tesla can only assume, from the demonstrative, that Plaintiffs hope to exclude the above-quoted language because it does not serve their goal of arguing that Tesla misrepresented the technology. Of course, Mr. McGee, the driver here, said he did not see or rely on these statements (or any others) by Mr. Musk.

By way of another example, Plaintiffs' Exhibits 41 and 42 are described as an audio recording and transcript from what they identify as a "Tesla Press Conference 9-11-2016." *See* Exhibit E, Plaintiffs' Exhibit 42, Purported Transcript of "Tesla Press Conference 9-11-2016." Plaintiffs' demonstrative includes lengthy excerpts from the statements purportedly made in this press conference. *See* Exhibit B at p. 3. Plaintiffs' selective excerpts do not include Mr. Musk's first statements, which explain that, at the time, Tesla was incorporating a more prominent role for radar detection in its sensing system; he said, "I'll just give a basic overview. I think—I think the, the really exciting thing is that we're, we're making much more effective use of radar. And whereas previously, the radar system on the car was used as a supplementary system to, to

14

the vision system, essentially because we, we weren't confident that, that, that we could resolve false, false, false positives where the radar would think that it should brake, but it—but it shouldn't. But, but after a lot of analysis and, and, and getting some upgraded drivers from our supplier for the radar to expose more of the raw functionality, we now believe that we can combine that with fleet learning and almost entirely eliminate the false positives—the false braking events—and enable the car to initiate braking no matter what the object is, as long as it's not large and fluffy." Exhibit E, at p. 2.

From there, he explained how Tesla was working to incorporate more advanced radar-based sensors that would, in the future, assist with avoiding more crashes with in-road objects that might not be identifiable by the vison-based sensors. *Id.* at 2-4. The forward-looking, aspirational nature of this discussion is illustrated by the following, which Plaintiffs do not include in their excerpts: "It's—it's a lot of software and quite a complicated job to—fit that software onto the available computer on the vehicle. Really, it's our challenging software problem, but one that we are confident that we can—we can solve and—and something that really quite uniquely Tesla is able to solve because of the fact that we can use Fleet Learning to have the actually—all—all the Tesla cars out there effectively give us the geocoded locations of where false-alarms occur…as soon as a few cars pass that point, it will be geocoded into a system, via our Fleet Learning system, which is now being generalized to create a list of exceptions." *Id.* at 4-5. This language comes immediately after the second selective quotation included in Plaintiffs' demonstrative exhibit. *Compare* Exhibit B to p. 2 *to* Exhibit E at pp. 4-5.

Another example, perhaps the most egregious, illustrates how the jury will be misled if Plaintiffs are permitted to use isolated sentences or phrases from these lengthy recordings or statements. Plaintiffs have identified an October 14, 2015, press conference where Mr. Musk

was discussing the forward-facing camera installed on certain Tesla vehicles. *See* Exhibit F, Transcript of Purported 10/14/15 Press Conference. In their demonstrative exhibit, they include the following: "The forward-facing camera is able to determine where the lanes are, where the cars are ahead of it, and it's also able to read signs. It's been able to read speed signs for awhile, for example, but it's able to read pretty much any sign." *See* Exhibit B at p. 1.

Plaintiffs' demonstrative indicates they will likely attempt to use the quoted language to suggest that consumers listening to the press conference could believe it to mean the Autopilot system was then capable of recognizing and accounting for stop signs in October 2015, even though Mr. McGee knew the car would not stop at stop signs and never thought it would. But the misleading part of the quoted language is that it ignores Mr. Musk's specific comment about stop signs just one transcript page earlier, where he said, "So *this version* of—of Autopilot does not take into account stuff like stop signs and red lights, *but a future software update will*." Exhibit F, at p. 3 (emphasis added).

Of course, the use of isolated statements in a larger statement is in some contexts appropriate, but in instances like the ones quoted here, where the use of the isolated statement is patently misleading, the Court should not, in keeping with Fed. R. Evid. 403, permit such excerpts to infect the jury's understanding of the technology or what was said about it.

It is also important to note that in this interview, Mr. Musk carefully distinguished between the current and future technology. In response to a question about pedestrian detection, Mr. Musk asked, "[A]re you talking about the car today or the car in the future? There's a difference between the car today and the car in the future. Big differences. Those meetings these days. Yeah, that's why we, you know, in the beginning we really recommend that in, in fact we—the instructions to say you need to pay attention to what's on the road and you need to

be ready to take the wheel at any time.  So it's certainly—I certainly wouldn't want to say today, 'Don't worry about it.'  And I—in the long term it will be safer than a person driving for all—for all, you know, pedestrians as well as for people in the car and other cars." Exhibit F at p. 36.  That is exactly what Tesla's Instructions and Warnings in the vehicle and in the owner's manual for the 2019 Model S say.

The overall point Plaintiffs seek to make is that these isolated statements fail to represent the limitations of the Autopilot system, such that drivers would be complacent and believe the car would drive itself.  Again, that is not what Mr. McGee believed but importantly that is not, when read completely, what Mr. Musk has said either. These isolated statements must be considered in the context of the entire interview in which they are made. While Tesla recognizes the Court has ruled that statements from Mr. Musk could be relevant to determining the ordinary consumer's expectations, it would be unreasonable to conclude that the only such statements that could be relevant are those Plaintiffs have selectively quoted when, the broader context of those statements, establishes that the selective quotations are fundamentally misleading.

As with the body camera footage, the Court must have access to the full statements to determine whether they are being used in a misleading way. In addition, the specific portions of the statements being presented must be identified and Tesla's counsel must be given the opportunity to present to the court other portions of the statements that show, whether the specific comment is about then current or future technology, and whether the use of the statement is misleading given the other statements in the presentation, as in the examples above.

## **CERTIFICATE OF GOOD FAITH COMPLIANCE**

Pursuant to Local Rule 7.1(a)(3), Counsel for the parties have been discussing and exchanging exhibits since the Rule 16.1(e) stipulation was filed with exhibit lists on July 3, 2025. Counsel will have an additional meet-and-confer conference about exhibits at 9:30 AM on July 8, 2025.

Respectfully submitted,

| | |
|---|---|
| **JOEL SMITH** | *s/ Whitney V. Cruz* |
| (Admitted *Pro Hac Vice*) | **WHITNEY V. CRUZ** |
| **BOWMAN AND BROOKE LLP** | Florida Bar No. 800821 |
| 1441 Main Street, Suite 1200 | **WENDY F. LUMISH** |
| Columbia, SC 29201 | Florida Bar No. 334332 |
| Tel. 803-726-7420 / Fax: 803-726-7421 | **BOWMAN AND BROOKE LLP** |
| joel.smith@bowmanandbrooke.com | Two Alhambra Plaza, Suite 800 |
| | Coral Gables, FL 33134 |
| | Tel. 305-995-5600 / Fax: 305-995-6100 |
| **HILARIE BASS** | whitney.cruz@bowmanandbrooke.com |
| Florida Bar No. 334243 | |
| **HILARIE BASS, ESQUIRE LLC** | **THOMAS P. BRANIGAN** |
| 2821 Bayshore Drive, UPH-B | (Admitted *Pro Hac Vice*) |
| Miami, FL 33133 | **DREW P. BRANIGAN** |
| Tel. 305-505-8777 | (Admitted *Pro Hac Vice*) |
| bassh@bassinstitute.org | **BOWMAN AND BROOKE LLP** |
| | 101 W. Big Beaver Road, Suite 1100 |
| | Troy, MI 48084 |
| | Tel. 248-205-3300 / Fax: 248-205-3399 |
| | thomas.branigan@bowmanandbrooke.com |
| | drew.branigan@bowmanandbrooke.com |
| | *Attorneys for Defendant Tesla, Inc.* |

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| **Adam T. Boumel, Esq.**<br>Florida Bar No. 0110727<br>THE ROUSSO, BOUMEL LAW FIRM, PLLC<br>9350 South Dixie Highway<br>Suite 1520<br>Miami, FL 33156<br>Tel. 305-670-6669<br>adam@roussolawfirm.com<br>assistant@roussolawfirm.com<br>pleadings@roussolawfirm.com<br><br>*Attorneys for Plaintiff Dillon Angulo* | **Todd Poses, Esq.**<br>Florida Bar No. 0075922<br>POSES & POSES, P.A.<br>Alfred I. Dupont Building<br>169 East Flagler Street, Suite 1600<br>Miami, FL 33131<br>Tel. 305-577-0200<br>Fax: 305-371-3550<br>tposes@posesandposes.com<br>maria@posesandposes.com<br><br>*Attorneys for Plaintiff Neima Benavides* |
| **Brett Schreiber, Esq.**<br>Admitted *Pro Hac Vice*<br>**Satyarinivas "Srinivas" Hanumadass, Esq.**<br>Admitted *Pro Hac Vice*<br>**Carmela Birnbaum, Esq.**<br>Admitted *Pro Hac Vice*<br>SINGLETON SCHRIEBER<br>591 Camino de la Reina, Suite 1025<br>San Diego, CA 92108<br>bschreiber@singletonschreiber.com<br>vas@singletonschreiber.com<br>cbirnbaum@singletonschreiber.com<br>jjusto@singletonschreiber.com<br>eelms@singletonschreiber.com<br>service@singletonschreiber.com<br><br>*Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides* | **Douglas F. Eaton, Esq.**<br>Florida Bar No. 0129577<br>EATON & WOLK PL<br>2665 South Bayshore Drive, Suite 609<br>Miami, FL 33133<br>Tel. 305-249-1640<br>Fax: 786-350-3079<br>deaton@eatonwolk.com<br>cgarcia@eatonwolk.com<br>lhuete@eatonwolk.com<br><br>*Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides* |

*s/ Whitney V. Cruz*  
**WHITNEY V. CRUZ**