# EXHIBIT A

```
 1                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA (MIAMI)
 2
            Civil Case  No.  21-cv-21940-BLOOM/Otazo-Reyes
 3

 4

 5   NEIMA BENAVIDES, as Personal
     Representative of the Estate of
 6   Naibel Benavides Leon, deceased,

 7            Plaintiff,

 8   vs.

 9   TESLA, INC., a/k/a Tesla Florida,
     Inc.,
10
              Defendant.
11   _____/

12

13                        DEPOSITION OF
14
                    CORPORAL DAVID RISO
15                Friday, January 21, 2022

16                 APPEARING REMOTELY FROM
                 MIAMI-DADE COUNTY, FLORIDA
17

18

19

20

21

22

23

24   Reported by:
     Margaret Lowe, RPR
25   Job No. 204447
```

Page 2

```
1              January 21, 2022
2              9:02 a.m.
3
4          Deposition of CORPORAL DAVID RISO held remotely
5    from Miami-Dade County, Florida, pursuant to notice,
6    before Margaret Lowe, Registered Professional Reporter
7    and Notary Public of the State of Florida.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                    REMOTE APPEARANCES
2
3    On behalf of the Plaintiff:
4         Poses and Poses
              169 East Flagler Street
5         Miami, FL 33131
              BY:  Todd Poses, Esq.
6
7
8
9
    On behalf of the Defendant:
10
         Bowman and Brooke
10       41000 Woodward Avenue
              Bloomfield Hills, MI 48304
11       BY:  Thomas Branigan, Esq.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

INDEX OF PROCEEDINGS

```
                                                    Page
Deposition of CORPORAL DAVID RISO

  Direct Examination by Mr. Branigan            5
  Cross-examination by Mr. Poses               90
  Redirect Examination by Mr. Branigan        140
  Certificate of Oath                         144
  Certificate of Reporter                     145


                    EXHIBITS
Defendant's                                        Page
Exhibit 1   Second Amended Notice of Taking Deposition  22
Exhibit 2   Investigative Packet - 190 pages            30
Exhibit 3   Field Report Packet - 153 pages            33
Exhibit 4   Investigative Packet - 60 pages            35
Exhibit 5   Florida Traffic Crash Report               44
Exhibit 6   Photo                                      55
Exhibit 7   Photo                                      58
```

Page 5

```
1                      Riso
2                   PROCEEDINGS
3         THE COURT REPORTER:  Do you swear or affirm
4    that the testimony you are about to give is the
5    truth, the whole truth, and nothing but the truth?
6         THE WITNESS:  Yes, I do.
7    THEREUPON,
8              CORPORAL DAVID RISO,
9    having been first duly sworn, was examined and testified
10   as follows:
11                 DIRECT EXAMINATION
12   BY MR. BRANIGAN:
13        Q.   Good morning everyone.  This is Tom Branigan
14   speaking.  I represent Tesla, and this is the deposition
15   of Corporal David Riso.
16             The deposition is being taken in the case of
17   Benavides vs. Tesla, Incorporated, and it can be used
18   for all purposes permitted by law.  The deposition is
19   being taken under the notice and a subpoena and in
20   agreement of counsel on the schedule for today.
21             Sir, would you tell us your full name and a
22   business address, please?
23        A.   I'm Corporal David Nicola Riso, and that's
24   N-I-C-O-L-A for the middle name.  And my business
25   address is on FHP Post 1, 19 Mile Marker, Florida
```

Page 6

Riso

1
2  Turnpike in Miami, Florida, and I believe the ZIP code
3  is 33175.
4       Q.    Sir, just to confirm, you're able to hear us
5  all and see us on your video; is that correct?
6       A.    Yes.
7       Q.    Because we're taking this deposition with
8  virtual or video conference tools, it'll be important
9  for you to let us know at any time if you're unable to
10 hear us, and the best way to do that is give us some
11 sort of sign.  Wave at us, indicate in some way
12 nonverbally, of course, or verbally, however you can, if
13 you're unable to hear us.  If you're unable to see us,
14 speak up about that.  Hopefully, we'll be able to hear
15 you when you do that, and we'll do the same thing if
16 we're unable to hear you.  We'll get some kind of
17 message to you somehow, and we'll try to remedy the
18 problem.
19            Is there anyone present with you in the room
20 right now?
21      A.    Not here right now, no.
22      Q.    Are you at your office today, Corporal?
23      A.    Yes, I am.
24      Q.    And is that office at the same address that you
25 just gave us a few minutes ago?

Page 7

Riso

1
2       A.    Yes, sir.
3       Q.    All right.  Do you have anything with you, like
4  documents or files?
5       A.    I have it electronically.
6       Q.    Okay.  Very good.  We'll get to that in a
7  minute.  Let me just cover a couple of other preliminary
8  points.  Would it be safe for me to think that this is
9  not the first time you've given a deposition or
10 testified, Corporal?
11      A.    That's correct.
12      Q.    With that understanding, I'll keep the
13 preliminary comments brief, but just as a simple
14 reminder, again, as I mentioned, if at any time you
15 can't hear us, let us know; you can't see us, let us
16 know.  If I ask a question that is unclear to you, let
17 us know; let me know that.  If you need something
18 rephrased or repeated, let us know that; otherwise, we
19 will work under the belief that you understood the
20 question, and you're able to answer it, fair?
21      A.    Fair enough.
22      Q.    All right.  How many times have you testified
23 in the past?
24      A.    I don't know the exact number, but it's been
25 many times.

Page 8

Riso

1
2       Q.    Would it be more than 50?
3       A.    I would have to say so, seeing that I first
4  came on back in 2001.
5       Q.    Okay.  Let me just get some basic information
6  about you, sir.  What's your date of birth?
7       A.    July 13, 1965.
8       Q.    And can you tell us a little bit about your
9  education starting with high school graduation and up to
10 the current date?
11      A.    I graduated high school up in Mark T. Sheehan
12 High School in Wallingford, Connecticut back in -- I
13 think it was June 6th of 1983, June 6th.  I went to some
14 college and art school.
15      Q.    Where did you do that?
16      A.    That was up in -- I went to a university in New
17 Haven for graphic designing.  Then I went to an art
18 school, but it wasn't a university or anything.  It was
19 just an art school.  Then after I left that, I just
20 worked for the years to come in different places.  Like,
21 I worked for Home Depot for nine years, believe it or
22 not and --
23      Q.    What did you do at Home Depot and during what
24 years, please?
25      A.    1992 to 2001, nine years and, like, literally

Page 9

Riso

1
2  one day because I resigned one day after my nine years.
3  And I resigned because I went into FHP's academy.
4       Q.    What was your responsibility or things that you
5  were doing at Home Depot?  Anything in connection with
6  security or law enforcement?
7       A.    Home Depot has, like, a few different areas.
8  They have their management, but they have what they call
9  sales.  And then they have what they call -- what's the
10 word.  It's not -- it's probably like receiving,
11 delivering because I was a delivery driver, and I even
12 worked in receiving.  And then I was working getting
13 deliveries out, and then I became one of the drivers.
14 So I think I was actually not driving anymore.  I can't
15 believe -- I think I was actually just doing outside
16 receiving of deliveries and some -- I can't remember if
17 I was still driving at the time because that's how I got
18 my CDL license was through them.
19      Q.    And you changed your vocation, it sounds like,
20 in 2001; is that right?
21      A.    (Inaudible.)
22            MR. BRANIGAN:  Can you still hear us, Corporal?
23            Corporal, we're having a little bit of audio
24            problem from your end.  Can you hear us okay?
25            MR. POSES:  Yeah, Thomas.  I lost him too.

Page 10

```
Riso
1
2        (Brief interruption.)
3   BY MR. BRANIGAN:
4        Q.   My last question was focused on your change in
5   vocation, change in employment in 2001.  That happened
6   in 2001, correct?
7        A.   Yes.  But I forgot to tell you I was even in
8   the Army too.
9        Q.   Let's talk about your military service, and
10  thank you for that, sir.  How long were you in the Army?
11       A.   About eight years.  I joined that in '96 in the
12  Reserve, and I spent a tour in Bosnia when President
13  Clinton was still our president back in '97 and '98.  I
14  honorably got out in January of 2005, and I had the rank
15  of sergeant at that time.
16       Q.   What were your duties while you were in the
17  Army?
18       A.   I was a military police investigator.
19       Q.   What kind of incidents were you responsible for
20  investigating?
21       A.   I had the special training where I had to go
22  for two months -- (inaudible).
23            MR. BRANIGAN:  We're having trouble with your
24       audio, Corporal.
25            THE WITNESS:  Give me a minute.  I'll go
```

Page 11

```
Riso
1
2   outside to my car.  Just give me, like, literally two
3   minutes, and then we'll start up.  And I guarantee we
4   probably won't have any problems out there.
5            THE COURT REPORTER:  Shall we go off the
6       record, Counsel?
7            MR. BRANIGAN:  Yeah.  Let's go off the record.
8            MR. POSES:  Sure.
9            (Discussion off the record.)
10  BY MR. BRANIGAN:
11       Q.   So you were telling us about the training that
12  you received during your military service to investigate
13  something, and that's where we lost you.  So do you need
14  me to repeat?
15       A.   It was investigating crimes, burglaries, maybe,
16  you know, minor, like, I guess, you know, things with
17  maybe some murders or stabbings because I remember
18  walking into the room where we had all this evidence to
19  collect, and we had to document how we did it.  And the
20  final exam actually was a bear because I remember
21  writing multiple pages, and we were only allowed one
22  thing wrong and -- for instance, if you had forgotten to
23  dot an "i" or cross a "t," that got marked wrong.  So it
24  was a bear.  It took me about eight and a half hours to
25  complete that exam when we were at the very end.
```

Page 12

```
Riso
1
2        Q.   All right.  So your military service ended with
3   an honorable discharge in what year, Corporal?
4        A.   2005 is when I officially, as we call it, got
5   my walking papers.
6        Q.   And in 2001, I think I understood you to say
7   that you entered the Florida Highway Patrol Academy.
8   Did I hear that correctly?
9        A.   Correct.
10       Q.   All right.  How long were you there in the
11  academy?
12       A.   It was about six months long.
13       Q.   And you graduated from the academy in 2001; is
14  that right?
15       A.   In August -- it ran from February 26, 2001, to
16  like -- I think it was August 17th.  If I was in my
17  office, I could tell you -- I have the graduation
18  picture up on the wall -- and tell you the dates.
19       Q.   A month and a year is perfectly fine for us
20  right now, Corporal.  Thank you.
21            During your time at the academy, did you
22  receive any training for motor vehicle crash or accident
23  investigation?
24       A.   We went through, you know, a course, if you
25  want to call it, training and, you know, crashes because
```

Page 13

```
Riso
1
2   that was one of our primary jobs was working traffic
3   crashes and working traffic.
4        Q.   Since graduating from the academy, have you had
5   any continuing education related to investigation of
6   motor vehicle incidents, crashes, and the like?
7        A.   I had further training mainly for traffic
8   homicide investigation, basically, a crash where
9   somebody passes away as a result.
10       Q.   Now, in the law enforcement community in the
11  state of Florida, do you have law enforcement officers
12  who are specially trained to reconstruct motor vehicle
13  collisions?
14       A.   Yes.
15       Q.   And have you been through that training
16  yourself, sir?
17       A.   Yes, I have.
18       Q.   Are there various levels of training that you
19  can go through to reach different levels of accident
20  reconstruction, qualification, or expertise?
21       A.   There's many different classes.  With the
22  Florida Highway Patrol, the minimum class you need --
23  and you have to pass it -- to start working your own
24  traffic fatalities is traffic homicide.  Basic homicide
25  is what they call it.  It's the first stage, and it's a
```

```
               Riso
1
2  two-week course, 80 hours, and you have to pass that on
3  our end and then pass the training from another corporal
4  before you basically start working your own cases out on
5  your own.  But since that course, there are multiple,
6  like you said, levels, and I've had many of them.
7       Q.   Can you give us your best estimate as to the
8  number of those classes that you have successfully
9  completed that are related to accident reconstruction or
10 traffic homicide reconstruction or investigation?
11      A.   It could be 14, 15.  There's a lot.  I can
12 rattle them off the top of my head right now if you want
13 it.  Actually, in my office I even have all the
14 certificates.  It's many courses.
15      Q.   When did you go through your last course
16 related to motor vehicle accident reconstruction or
17 motor vehicle accident homicide reconstruction?
18      A.   I went to the third traffic -- there's your
19 basic traffic homicide, there's your advanced traffic
20 homicide, and then there's reconstruction traffic
21 homicide.  They're all two-week courses, and there was
22 even a motor vehicle traffic homicide two-week course I
23 took.  The reconstruction which is like the third level,
24 that one was in the summer, like, August, I believe, of
25 2015 but among those three courses and then the
```

```
               Riso
1
2  commercial.  There was also a weeklong pedestrian
3  traffic homicide course.  There was a also a weeklong
4  motorcycle traffic homicide course.  All these I passed.
5           And there was also photogrammetry which I've
6  taken it twice, and the only reason why I took it a
7  second time is to help me learn the camera, the camera
8  that we got.  But that was a way of measuring the scene
9  using markers that we place out there, but we don't use
10 that anymore.  We use what we call a total station now
11 so, basically, it's obsolete.
12           There was also advanced energy.  It was a
13 weeklong course.  There was also occupant kinematics,
14 another weeklong course.  I've taken a Leica robotic
15 total station, measuring the scene.  I've also taken a
16 computer-aided diagram with crash where you take the
17 data, and you can draw these scenes inside a certain
18 program.  I know I'm missing -- oh, EDR.  Basically, the
19 air bag control module/event data recorders, taken that,
20 you know, to hook up, and the download course and -- I'm
21 trying to think.  It's making me think that I'm missing
22 something, but I might have missed something.  But those
23 are a lot as you can see.
24      Q.   Thank you for all that, Corporal.  And you
25 successfully completed, passed all of those classes; is
```

```
               Riso
1
2  that correct?
3       A.   Yes.
4       Q.   So with all of that specialized training, are
5  you characterized by the Florida Highway Patrol as like
6  an accident reconstruction specialist Level 1, 2, 3?
7  I'm just giving you these as examples to try to
8  understand how that might apply to you.
9       A.   Well, there's no actual level.  You're a
10 traffic homicide investigator, and that's why I have the
11 rank of corporal.  I'm not promoted into a supervisor
12 position.  It's a specialty position where we just work
13 traffic fatality accidents.
14           As far as being on a different level, I got
15 accepted onto this team that the colonel wanted to start
16 approximately five years ago where it's called the FLAIR
17 team.  It stands for Florida Advanced Investigation and
18 Reconstruction.  So I've been on that team ever since
19 Day One.  So I've been on it for going on -- it'll be
20 five years in June that I've been on this advanced team
21 to handle what they consider high-profile cases.  And
22 since I've been on, the requirements for what qualifies
23 for the high-profile cases has changed, you know.  So I
24 am now as you were asking, I am on an advanced team of
25 investigators.  And they're all requirements.  There was
```

```
               Riso
1
2  requirements to get on the team, and I got accepted on
3  it.
4       Q.   When did you first become qualified as a
5  traffic homicide investigator?
6       A.   I took the test, passed, you know, the
7  corporal's test to get put on the promotion list back in
8  December of 2012, and then I officially got promoted to
9  corporal in April of 2013.
10      Q.   Okay.  And can you give us your best estimate
11 as to the number of multivehicle crashes that you've
12 investigated over the life of your career as a law
13 enforcement officer?
14      A.   Now, you said crashes, not fatal crashes,
15 correct?
16      Q.   Yeah.  I'm going to start with crashes.
17      A.   It's gotta be thousands.  I remember one year I
18 kind of looked at the crashes when I was working up in
19 the Gainesville, University of Florida area.  I remember
20 I was estimating, like, 20 crashes a month that I was
21 working.  Now, it could be single vehicle, it could be,
22 you know, two-, three-car crashes, but it was roughly
23 around 20 crashes a month.  And I was up there for three
24 years so if that's 20 crashes a month, that's basically,
25 like, 300 crashes a year.  And I was up there for three
```

Riso

1
2  years.  So when I say thousands, I'm sure it was.
3      Q.   Let's turn your attention now to your best
4  estimate as to the number of motor vehicle accidents
5  involving fatalities that you have investigated.
6      A.   It's probably around a hundred, give or take a
7  little bit more, but I've also assisted on many other
8  fatal crashes.  So the ones that I have done all the way
9  to the end I can actually probably find a number if I
10  wanted in -- like I said, it's an estimate.  It could be
11  around a hundred, give or take, but I've had my hands on
12  many other ones assisting.
13      Q.   Have you been found qualified by state court
14  judges in Florida to give testimony as an expert witness
15  in any field?
16      A.   I remember it was a case of mine down in Key
17  West, and I'm pretty sure that I was listed as an expert
18  witness so I can testify about the evidence that I
19  collected on that fatality.  And that, I think, was back
20  in 2014 or '15 when I was in a case that happened down
21  there.
22      Q.   Has any court ever found that you were not
23  qualified to testify as an expert?
24      A.   I can't recall.
25      Q.   Have you testified about your work in both

Riso

1
2  state and federal courts or just state court?
3      A.   I know it wasn't federal court because I don't
4  ever believe being in a federal court in one of these.
5  And as far as the state courts, down in Florida they
6  have judicial districts, and there's like -- in Miami
7  it's the Eleventh Judicial District, and that's
8  Miami-Dade County.  So all the courts are Eleventh, and
9  Monroe County is the Sixteenth Judicial District.  And I
10  believe they're circuit courts or county courts, but I
11  don't believe they're state courts.
12      Q.   Very good.  I read somewhere or perhaps my
13  colleague, which is another way of saying my son Drew,
14  my associate who is working on the case with me, may
15  have shared with me that you may be getting ready to
16  retire; is that correct, sir?
17      A.   Yes, I am.  Sometime this year.
18      Q.   All right.  And do you have plans to relocate,
19  sir?
20      A.   Yes, I do.
21      Q.   Okay.  We may -- any one of the lawyers
22  involved in this case may need to reach you in the
23  future.  Do you have a date in mind where we're going to
24  need to use other means to reach you, different phone
25  number, different e-mail address?

Riso

1
2      A.   Phone number I won't know but, obviously, I'll
3  keep my e-mail.  And I say my American e-mail because
4  I'm actually relocating to Southern Italy, and I've
5  already put a down payment on a home and signed a
6  contract on a home in Southern Italy.
7      Q.   Congratulations.  Beautiful place.
8      A.   Thank you.  I received my dual citizenship
9  approval, so I have dual citizenship now in Italy and
10  the United States.
11      Q.   All right.  Sounds like that's -- forgive me if
12  you said this and I missed it.  That's something that's
13  going to happen later this year in the summer?  Is that
14  what you're suggesting?
15      A.   I believe it's gonna happen sooner.  I haven't
16  given any official word, but it could happen as soon as
17  April.
18      Q.   Understood.  When is your official retirement
19  date, your last date on the job there at the FHP?
20      A.   Well, that's what I'm saying.  I haven't
21  written the official letter yet.
22      Q.   I see.
23      A.   So I have a date in my mind, but I'm just
24  holding off to see how things go.  So that's why I said
25  it could be April.  It could be a little bit longer.  It

Riso

1
2  depends on certain things that I need and documents I
3  need from the Italian consulate in Miami.
4      Q.   Understood.  All right.  Thank you for that,
5  sir.  Before today, did you receive a subpoena and a
6  notice for this deposition?
7      A.   Yes, I have.  Well, I received the notice,
8  yeah.  I received the notice, and I did receive the
9  subpoena.
10      Q.   Let me -- this is going to be a first test here
11  of our technology to see if you're able to see a
12  document.  I'm going to share my screen with you.
13      A.   You do have a second David Riso on, correct?
14      Q.   I'm sorry?
15      A.   You do have a second David Riso in there.  Oh,
16  wait, something just popped up on my computer.  Ah,
17  thank you.  I got it.
18      Q.   Great.  So what I'm showing is what we're gonna
19  have marked as Deposition Exhibit No. 1, and it's
20  identified as the second amended notice of taking duces
21  tecum video teleconference deposition of Corporal David
22  Riso.  And you can see that; is that right?
23      A.   Yes, I can.  I can actually see it on my phone
24  too.
25          (Exhibit 1, Second Amended Notice of Taking

Page 22

```
1                    Riso
2       Deposition, marked for identification.)
3  BY MR. BRANIGAN:
4       Q.   Excellent.  Is this what you were referring to
5  moments ago when you said that you had received a notice
6  before today?
7       A.   Yes.
8       Q.   All right.  Did you have an opportunity to
9  review this before today, sir, and actually read the
10 document?
11      A.   Yes.  Because I believe I even questioned
12 about, you know, certain documents and bringing them up,
13 and I -- because the concern was we submit all the
14 files, and they get filed at the FHP station in Miami,
15 especially in this case.  And there are certain
16 documents, and I don't tell them -- basically, to get
17 copies, you'll have to contact them.
18      And then there are certain documents that I
19 have to put in what we call a confidential file, and I
20 had a concern about that because certain things like
21 companies or other police, whatever it is, were supplied
22 to me.  But I can't really, like, post them.  I put them
23 in a confidential file which tells the clerk at the
24 Miami station, you know, the homicide clerk, not to sell
25 those, but they are stored, if you know what I mean,
```

Page 23

```
1                    Riso
2  with the case.
3       Q.   All right.  I'm going to scroll down to what is
4  referred to as Schedule A, and Schedule A, I'm going to
5  summarize it in the interest of time right now.
6  Schedule A basically asked you to bring with you to the
7  deposition the file related to the investigation of the
8  motor vehicle incident that you investigated and that
9  occurred on April 25, 2019, in the area of Key Largo.
10      Did you bring anything with you to the
11 deposition today that would be responsive to the request
12 in Schedule A?
13      A.   Yes, I did.  Electronic file.
14      Q.   All right.  Can you tell us what is in the
15 electronic file, please?
16      A.   Hold on.  Well, there's the field note packet
17 which has all the documents that were put up, and if
18 anybody privileged to that ordered a copy, they can get
19 a copy of it.  I have copies of e-mails which I cannot
20 post because, you know, they're e-mails, the complete
21 investigative packet which is what you got a copy of,
22 and all supporting documents to help me fill out, like,
23 the pages in the investigative packet, communication
24 between the NHTSA, communications between other
25 attorneys.
```

Page 24

```
1                    Riso
2       I guess there was a prior attorney that
3  represented one of the victims, you know.  I have
4  pictures which the pictures are submitted up onto the
5  server to Tallahassee, and that's for people who want to
6  get a copy of those pictures can get copies.  They have
7  to order them through Tallahassee, what we call our
8  photo lab.
9       I have memos.  I have reviews of the case, you
10 know, where some things needed to be changed.  Other
11 things could be like the EDR download which is the data
12 I collected from within the vehicle.  There was some
13 communication from a Mr. -- documents that were supplied
14 from Mr. McCarthy to me from the Tesla corporation.  I
15 kept those.  Pretty sure I kept those in a confidential
16 file too, but there's many documents, many documents.  I
17 don't know where to stop or begin, if you know what I
18 mean.
19      Q.   Are all of the documents that you just
20 generally identified, are they all part of the Florida
21 Highway Patrol's official file for this incident or this
22 crash?
23      A.   Some of the e-mails that I saved for my
24 benefit, they may not be in that file at the station
25 because they're e-mails.  But then, again, my e-mails
```

Page 25

```
1                    Riso
2  are, you know, public information, and we all know that.
3  But in some cases, I won't print up and post e-mails.
4  It depends on what's going on or what's ordered, you
5  know, so I do save those in a file.  I won't print
6  those.  I save those for referral, but I do have a copy
7  of them.
8       Q.   Can you give us an estimate of the number of
9  e-mails that you're referring to?
10      A.   In one case I'm looking at, I opened up the
11 file, I've got, like, 23 e-mails.  I print them up into
12 a PDF, if you know what I mean, and you highlight the
13 page.  And you hit print and you print it in PDF and
14 then I got it in PDF form.  So in one case I opened up a
15 file now, and I've got 23 e-mails.  And then there's a
16 bunch of e-mails from the former attorney, I believe,
17 for one of the victims.  There's, like, 15 e-mails.
18 Then there's -- I think that's it for the e-mails.  I'm
19 not sure if I kept any from -- but there's also the
20 archives on my e-mails.  I can find old e-mails.
21 There's an archive folder.
22      Q.   All right.  Did you review the file in
23 preparation for this deposition today?
24      A.   Yes, I have.
25      Q.   And can you give us your best estimate as to
```

Riso

1  the amount of time you spent preparing for today's
2  deposition by reviewing the file?
3
4      A.   There was hours of reviewing some things or
5  reading over some items.  I didn't read over the entire
6  case because this case was very fresh in my memory, if
7  you understand, because it literally wasn't even more
8  than just, like, two years ago.
9      Q.   Did you have any conversations with anyone
10 specifically to prepare for this deposition today?
11     A.   Just myself.  I'm the primary investigator on
12 this case.  I was the lead on it, and after a while I
13 was the only corporal working on it.  My supervisor did
14 review it before it got approved and signed off so he
15 did see it, but I didn't talk to him about it.  I might
16 have mentioned I had a depo on this, and that's another
17 reason why my partner left the office because,
18 originally, he didn't want to be inside there when I was
19 -- because I needed to be by myself inside the depo.
20     Q.   All right.  The file that you have been
21 referring to when you identified contents of the file,
22 how long is that going to be preserved for, if you know?
23     A.   The file at the Miami station, I'm thinking
24 they hold on to them.  I'm not sure the numbers.  It's
25 like five, 10 -- I think it's 10 years if I recall.  I

Riso

1  don't think it's shorter than 10 years, but they hold on
2  to a file for -- they actually hold on to it for a very
3  long time.  So it's gonna be there for a while.  I can't
4  remember the retention period on those, but I think it's
5  10 years.  I don't know if that answered your question.
6      Q.   It does.  Thank you, sir.  All right.  I'm
7  going to stop sharing this for a moment.  You mentioned
8  that you were the lead investigator for the crash that
9  we're talking about today, correct?
10     A.   Yes.
11     Q.   This next question may reveal some of my
12 ignorance about the scope of your work, and if you
13 haven't noticed by now, I'm not from Florida.  Despite
14 the background that you see behind me, I'm sitting in
15 Michigan where it's currently 12 degrees.  I wish I was
16 in Florida, but I'm not.  But let me get to the
17 question.
18     When you say you were the investigator, can you
19 tell us as the investigator of this incident what were
20 your responsibilities?
21     A.   Just to start off, one thing, I wasn't assigned
22 the lead investigator in the case until about a month
23 after it happened.  But I was on the scene that night
24 when it happened, not immediately, but I did get there
25

Riso

1  after the fact because I was training a new corporal.
2  So once I got started getting phone calls and e-mails
3  from the NTSB, that's when my supervisor decided maybe
4  we should be taking on this case, meaning the FLAIR
5  team, the advanced team.  So that's when I basically got
6  it all, but I had a hand in a lot of things initially
7  which I'm glad I did.
8
9      But as far as investigating the crash,
10 documents, you know, witness statements, EDR downloads,
11 evidence, like, it could be things from the scene,
12 things from the cars in question, determine whether
13 there's -- you know, who's at fault, the dynamics of how
14 it happened, speed if I can get a speed on the vehicles.
15 I tried to, and in not all cases can I actually
16 calculate speed based on the evidence.
17
18     Bottom line, basically, you're the
19 investigator, you collect all documents, evidence, you
20 see if there's charges, criminal charges, who may be at
21 fault if somebody is at fault, and you figure out the
22 dynamics, basically, of how it happened, travel times
23 before.  There's a lot of detail in that all the way to
24 the end until you polish it up.  And when I say --
25 meaning, make sure you cross your t's, dot your i's,
26 label things correctly like street names, proper, you

Riso

1  know, grammar, and you put the final product in together
2  which I'm gonna say that you-all probably got a copy of
3  my traffic homicide investigative report and field note
4  packet.  So you'll have all those, and that's ultimately
5  the finished product along with the other evidence like
6  pictures and interviews and stuff like that that are
7  saved on CDs at the station and other supporting
8  documents.
9      Q.   So we focused our attention on the date of the
10 incident, April 25, 2019.  You were on the job that day,
11 correct?
12     A.   Yeah.  I was called out that night.
13     Q.   How was it that you were notified of the
14 incident so that you could respond to it?
15     A.   They called the local -- if I recall correctly,
16 I believe they called the local corporals, and one of
17 them was a new corporal assigned in the Keys, meaning
18 he's still in training and I was training him.  So I
19 went to the scene with them, and I watched and
20 monitored.  And, you know, as they measured the scene,
21 and I remember the new corporal, he wasn't trained on
22 the Leica station which is a very detailed measurement
23 of the -- you know, detailed, to-scale measurement of
24 the scene.  But he was way on it and I let him go and I

Page 30

Riso

1 interacted with some of the other officers.  Like, there
2 was an officer from Monroe County and the fire rescue.
3 And then with the severity of what had happened, I even
4 made the phone call to help out to the state attorney's
5 and called the on-call state attorney down in Monroe
6 County.
7
8     Q.   I'm going to show you a document that we're
9 going to have marked as Exhibit 2.  Bear with me for a
10 minute as I get it up on my screen.  Let me know when
11 you're able to see my screen, sir.
12     A.   I see it.
13         (Exhibit 2, investigation packet, 90 pages,
14         marked for identification.)
15 BY MR. BRANIGAN:
16     Q.   This is going to be marked as Exhibit 2.  Can
17 you tell us what we're looking at here, sir?
18     A.   It looks like it's the -- it looks like it's
19 the cover sheet for the investigative packet.
20     Q.   Am I correct that this is the Florida Highway
21 Patrol traffic homicide investigation packet for the
22 incident that you investigated that occurred on
23 April 25, 2019, at the intersection of County Road 905A
24 and Road 905; is that correct?
25     A.   Yes.

Page 31

Riso

1     Q.   If you need this enlarged at all, please let us
2 know, okay?
3     A.   Sure.
4     Q.   Okay.  I have a number of documents right now.
5 I just want to have you identify them and tell us what
6 they are before we get into the details.
7         This document is in the form that we received
8 it in response to a subpoena to the FHP.  It's in a PDF,
9 and the PDF is 190 pages long.  This is the first page,
10 and we see your name here as the investigator, Corporal
11 David N. Riso.  And it's signed by some supervising and
12 approving personnel, correct?
13     A.   Yeah.  Sergeant Baker, and then the signature
14 below is Lieutenant Thomas O'Donnell.  They're my chain
15 of command.
16     Q.   All right.  As you can see, I'm scrolling down
17 now.  This is the second page.
18     A.   This one was 190 pages?
19     Q.   Yeah.  Can you see here -- maybe you can see my
20 cursor.
21     A.   Okay, yeah.
22     Q.   The PDF says it's 190 pages.  If I go all the
23 way to the bottom --
24     A.   No, do me a favor.

Page 32

Riso

1
2     Q.   Yes, sir.
3     A.   Go back up to page No. 2.  That right there,
4 that one, table of contents.  Go down to -- no, the next
5 one, page 3, page 3, I'm sorry.  Okay.  What you've got
6 is you've got everything combined together.  That's why
7 it's 196 pages.  As you can see there, this is the start
8 of the investigative packet.  It ends on page 60.  So
9 page 60 of this should be the end of the investigation,
10 and I bet you page 61 is probably the start of the field
11 note packet.
12     Q.   Let's take a look.
13     A.   Oh, wow, I did do some calculations.  Yeah, see
14 that right there.  The field note packet starts right
15 there at -- oh, why does it start on page 39?
16     Q.   I can't answer that, but the last page before
17 that page is identified as page 38.  And it's a diagram.
18     A.   Yeah.  Maybe some things didn't get scanned
19 properly, but as you can see on that table of contents,
20 your investigative report should be 55 pages.  And then
21 the field note packet, if you go down, it'll tell you
22 how many pages are in that too.  So once you see the
23 field note packet cover, let's go to the -- yeah, see
24 that?  Go to the next one.  See that table of contents?
25 Let's go down to the bottom.  153 total pages there.

Page 33

Riso

1
2     Q.   Yes.
3     A.   So all in all, you should have about 208 pages
4 if my math is correct.
5         (Exhibit 3, field note packet, marked for
6         identification.)
7 BY MR. BRANIGAN:
8     Q.   Yes.  So we have another document.  What we're
9 looking at now has been identified as Exhibit 2.  I'm
10 going to show you what I marked as Exhibit 3, and I want
11 to show it to you for identification purposes so bear
12 with me.
13         So what you should see on the screen now is
14 what we're going to mark as Exhibit 3, and this is
15 actually -- this is 153 pages.
16     A.   So there's your field note packet.
17     Q.   Right.  All right.  So generally speaking, how
18 does the field note packet differ from the first
19 document that we looked at that's identified as the
20 Florida Highway Patrol traffic homicide investigation
21 report?
22     A.   Some of the documents are duplicate.  Some of
23 them are, okay?  And when I fill these packets out, I go
24 by those to make sure I get everything.  I go by first
25 that table of contents which, to me, acts like a

Page 34

Riso

1   checklist to make sure. And when I do train them -- by
2   the way, yes, I do train other corporals, new corporals.
3   I make sure you get all the documents that you need.
4   And then as you can see at the bottom of the
5   investigative packet, at the bottom of the table of
6   contents, there's additional lines. So I'll add in,
7   like, the crash report or charging documents like the
8   citation, you know, or maybe an arrest affidavit. Those
9   will get added in.
10      Now, as far as the field note packet, some of
11  the documents -- now, also -- sorry, I'm going back and
12  forth. One of the things I know of that's duplicated in
13  both is the witness list, okay? And a witness list may
14  not be just people who saw things. They may be people
15  who were on scene. It may be people I dealt with during
16  the investigation. Maybe it could be the coroner, you
17  know, the ME's office, or it could be the state
18  attorney, whatever. It all depends on what they did if
19  I need to put them on the witness list. Now, those two
20  documents are identical inside both packets because I
21  fill it out once. And because when you look at the
22  checklist for the field note packet, I put the same
23  identical witness list in the field note packet,
24  basically, so I don't have to write it twice, okay?

Page 35

Riso

1       And then in the field note packet, you'll see,
2   like, measurements. You'll see a field sketch in there.
3   You'll see, like, maybe calculations. You know, if
4   there are, you'll see post-collision inspection reports
5   where I go and I photograph the car after and I do my
6   processing of the vehicle after. In the field note
7   packet, you'll probably see subpoenas if there are any
8   or -- not subpoenas but, I'm sorry, search warrants,
9   maybe arrest documents, the weather report, maybe
10  letters I've written to the families, you know.
11      And throughout the years, there are certain
12  documents that I've realized that maybe we should just put
13  them in, like I said, the confidential file because
14  they're not really public record. They need to order
15  them. And that's a discussion that I would have with my
16  supervisor to say, you know, what about this, what about
17  that. But, basically, there is some difference, and
18  there's some overlapping between them.
19      (Exhibit 4, investigation packet, 60 pages,
20      marked for identification.)
21  BY MR. BRANIGAN:
22      Q. Thank you. I'm going to show you a different
23  document now so you'll see the screen go black for a
24  minute. I'm going to show you what we've marked as

Page 36

Riso

1   Exhibit 4. Let me know when you can see that.
2       A. That looks like the investigative packet, but
3   now it looks like you have 60 pages in that one.
4       Q. Right, yes, which is --
5       A. Something doesn't seem right.
6       Q. -- thus my question -- yeah. I'll tell you I
7   don't know if it's because of the way that we -- I don't
8   know if this is exactly how we received these documents
9   from the FHP, or perhaps they were broken up by people
10  in my office. But it's the reason I'm asking you just
11  to identify what we're looking at to make sure I
12  understand how you document the investigation and what
13  we have here because this is 60 pages, and if you look
14  at the second page of Exhibit 4, it looks like --
15  you know, it's the same second page of what we looked at
16  earlier.
17      A. Sure, it is. Now, one thing I forgot to
18  mention, one of the big differences between the
19  investigative packet and the field note packet, the
20  investigative packet will actually have the report which
21  always starts on page 4. And you'll see it. Right
22  there, that's it, assignment. That's the start of my
23  report, basically, documenting everything I've done.
24  And as you can see, it's how I got called out, and then

Page 37

Riso

1   I go into the investigation. And, basically, everything
2   that I've written inside here would be supported by the
3   other documents that you may find in the field note
4   packet or on the CDs that's stored at the Florida
5   Highway Patrol station in Miami. And everything that I
6   put in there would be supported by, you know, what's on
7   the file over there. This is the one that tells you the
8   story about everything.
9       Q. The investigative report, is this authored
10  solely by you, sir? Or was it authored solely by you,
11  sir?
12      A. It's authored by me, and it's reviewed by
13  Sergeant Baker who you saw on that signature and then
14  Lieutenant O'Donnell. And they go through it.
15      Q. This investigative report concludes with a
16  summary that -- it's at the end here. It starts right
17  here towards the bottom of page 31. You see that?
18      A. Okay. Yes, sir.
19      Q. And the summary concludes either at the bottom
20  of page 32 or the top of page 33. Is the summary all of
21  your work?
22      A. It's my work and, like I said, reviewed and
23  things I was told to change, whatever, are correct. It
24  could be the wording, how I named a street. They might

Riso

1
2    not have stood out, things like that or -- you know,
3    that's why my sergeant would look at it, and then my
4    lieutenant would look at it.  And then, finally, it gets
5    to the point where they say everything looks good now.
6        Q.    Thank you.
7        A.    But, basically, the content is mine.
8        Q.    So if we go back to the beginning of this
9    investigative report on page 4, when did you prepare
10   this in connection with this incident that occurred on
11   April 25, 2019?
12       A.    When did I prepare this report?
13       Q.    Yes.  When did you start preparing it?  Let me
14   rephrase the question to ask you that.  When did you
15   start?
16       A.    Every homicide -- most homicide investigators
17   start things differently.  Some start writing a little
18   bit at a time from the beginning.  I generally go
19   through and collect all evidence, interviews, get
20   everything ready that I know I need for a field note
21   packet, for investigative packet, collect whatever
22   evidence, get everything.  Then, I don't know, maybe a
23   month into it, a month and a half I'll start writing
24   little by little because writing does take quite some
25   time in my perspective.  I don't know exactly when I

Riso

1
2    started writing it but, eventually, I did.  But,
3    remember, I didn't get this case until a month after so
4    I know it's been -- it was at least more than a month
5    before I started writing this narrative.
6        Q.    So on that point, who was the -- was there a
7    different investigating officer before you were assigned
8    as the investigator?  So in other words, on the night
9    this incident happened, was there an officer in charge,
10   if I could put it that way, or in the role of
11   investigating officer before you took on the role?
12       A.    I'm pretty sure it was Corporal Rosario.  He
13   should be on that witness list.  He was initially
14   assigned.  He was the one I was training.  He's the one
15   that did those measurements that were handwritten in the
16   field note packet.  You'll see handwritten across,
17   measurements, and I was watching him, guiding him, and
18   like I said, yeah, he should have been the initial
19   officer assigned to it.
20       Q.    If we look at the first page of this exhibit,
21   it's got the signatures of the reviewing supervisor and
22   the approving supervisor, and they're dated or dates are
23   shown there as August 28, '20, which I'm interpreting to
24   mean 2020.
25       A.    Yes, it is.  It took a long time.  We had many

Riso

1
2    cases, and they had many cases to review.  Mine weren't
3    the only ones for my sergeant to review.  He has four of
4    us on this advanced team, and then the lieutenant has
5    three teams underneath him of at least four people on.
6    So what I'm trying to say is they have other, you know,
7    documents so when they review it and say these changes
8    need to be made, then send them back to me.  And I work
9    on them, I get them done, and then I send them back up.
10   When it eventually gets signed off -- you know, like I
11   said, this one in this case is probably about -- looks
12   like -- yeah, literally, about what?  A year and maybe
13   four months later.
14       Q.    Can you tell us when you completed your report
15   so that it would've been available for them to review,
16   understanding what you just said about the process that
17   led to this being signed off as indicated in August
18   2020.  When did you finish your work?
19       A.    I'll give you that answer here in a second.
20   Okay.  If you look at page No. 5 of that field note
21   packet -- now you're looking at the investigative
22   packet.  If you look at page -- yeah, the one that's 153
23   pages.
24       Q.    Let me switch to that.  Did the document switch
25   on your screen?  Are you now seeing the field note

Riso

1
2    packet?
3        A.    Yeah.  I see what you're pointing because I can
4    see it on my phone and the computer, but what I'm doing
5    is I'm actually looking at what I turned in on my
6    computer.  So I see it on the phone, but I'm looking at
7    what I gave, you know, to the Florida Highway Patrol on
8    my computer.
9        Q.    So for the benefit of our record so it's not a
10   mess, now what I'm showing you is Exhibit 3 which is
11   called the traffic homicide field note packet.  And you
12   said if I go to page 5 of this?
13       A.    Go to page 5.  You'll see on the bottom.  Now
14   look at the very bottom line of that case activity
15   summary.  See the date of October 29, 2019, case turned
16   in?
17       Q.    Yes, sir.  All right.  So does that mean that's
18   when you completed your report and turned it in for
19   others to review?
20       A.    Yes.  For the supervisors, yes.
21       Q.    All right.  Sticking with this Exhibit 3 and
22   this case activity summary, if I scroll up to page 3, I
23   see a note here in the activity, it says I arrived on
24   scene of the crash.
25            That's a reference to you; is that correct,

Riso

1                           Riso
2  sir?
3       A.   It says I arrived on scene of the crash.  Oh,
4  yeah, yeah, that's me because it's me.  I'm the one who
5  authored.
6       Q.   So are you indicating that you arrived on the
7  scene of this crash at 10:23 p.m., April 25, 2019?
8       A.   That's correct.  I can verify with the field
9  note.  I mean, there's CAD notes because I call in that
10  I'm on scene, and that's usually what I will put in as
11  the time.
12       Q.   And if we look at the very first line of this
13  activity summary, does that first line tell us the date
14  and the time that the crash occurred or that -- well,
15  let me ask the question just that way.
16       A.   I put that in, generally speaking, so you know
17  when the crash occurred.  And as you can see, I
18  documented it as occurring, meaning from whether it's
19  from the Monroe County Sheriff's Office CAD notes or our
20  CAD notes or a 911 call or who put it in the CAD.  Now,
21  a 911 call was made, what, two minutes later so I most
22  likely put it as 9:14 because by the time somebody makes
23  a 911 call or calls it in, usually, in my experience,
24  it's a minute or two before that sometimes, most of the
25  time.  It's not immediately.

1                           Riso
2       Q.   Okay.  And this indicates that George McGee,
3  Driver No. 1, made the 911 call?
4       A.   Yes.
5       Q.   So generally speaking, this investigator's case
6  activity that we see beginning on page 3 of Exhibit 3,
7  does this document all of the activity that you and
8  others involved in the investigation engaged in or
9  performed from first notice of the crash until you
10  turned your report in?
11       A.   It documents -- and understand why I say
12  this -- the majority of what I did.  There are other
13  things here and there where I sit down and do some
14  writing.  I don't write down every little bit, if you
15  know what I mean.  So I try to put in -- if you
16  understand why I say it this way -- the important items.
17  I'm not saying nothing else is unimportant, but I'm
18  saying so people can see some of the things I did and
19  when and dates and how I made contact, how I did this,
20  and to show that I made sure that I did certain things.
21       Q.   Would you agree with me that according to this
22  case activity summary, you were involved in significant
23  activities on this case from the date of the incident,
24  April 25, 2019, until the date you turned the report in
25  in October of 2019?

1                           Riso
2       A.   Like I said, originally, it was going to be
3  Mr. Rosario's, but I did keep an active connection to
4  it, if you know what I mean, involvement.  And that's
5  why I document a lot of things, especially if you look
6  at page 4, and then eventually we all decided.  And
7  that's why I put in some things.  Here, I'm getting
8  phone calls, e-mails, and then it became mine.  I talked
9  to Sergeant Baker, and he said we probably should be
10  taking this case.  I said okay.  And I was glad that I
11  did have an actual involvement throughout.
12       Q.   All right.  I want to show you a different
13  document, sir.  Bear with me one moment as I change
14  documents here.
15            What we're going to be looking at now is
16  Exhibit 5.  Can you tell us what we're seeing on the
17  screen now identified as Exhibit 5, please?
18       A.   It looks like it's a long-form crash report.
19       (Exhibit 5, Florida traffic crash report,
20       marked for identification.)
21  BY MR. BRANIGAN:
22       Q.   This is from a PDF, and the PDF is indicating
23  that it's six pages long, correct?
24       A.   Yes.
25       Q.   Can you tell by -- and if you need me to scroll

1                           Riso
2  down so that you can see any of this six-page document,
3  can you tell me if you prepared this or participated in
4  its preparation?
5       A.   Scroll down a little bit more.  Go to, like,
6  the second to last page.  Okay.  Hold on a second.  It
7  was Trooper S. Martin.  Okay.  Which -- homicide Carlos
8  Rosario.  I assisted by looking over, but as you can see
9  in that narrative, when you ordered this copy -- and I
10  can tell that you ordered it, you know, through the
11  proper channels because it doesn't look like my PDF
12  printed version.
13            But as you can see in that narrative, there,
14  look in those little -- you'll see about what happened,
15  like the long paragraph.  Then below it, you'll see some
16  other things.  You'll see pronounced by Oscar Pinzon,
17  whatever, Rescue 123.  Then you'll see traffic homicide
18  investigator, Corporal Carlos Rosario-Flores.  So I
19  might have helped him look at it, but something tells me
20  it most likely probably was more Carlos Rosario because,
21  at the time, they have about -- I believe it's 10 days
22  to get the basic traffic crash out, report out for
23  people to order, to people who deserve a copy.
24            So at the very top, if you go to page 1,
25  please, of that.  Now stop right there.  I'm not sure

Riso

1
2  why he put "completed."  As you look in line -- you'll
3  see, like, County Code 3841, Monroe, right?  You see
4  that?  County of crash.
5      Q.  Yes, sir.
6      A.  Look below Monroe.  You see "completed"?
7      Q.  Yes, I do.
8      A.  And I know that I would not have marked it
9  completed.  I always tell the trooper who's working the
10 crash report to put no, and the reason to the right
11 would be pending THI investigation.  So I don't know --
12     Q.  What does that mean?
13     A.  Traffic homicide investigation which is what I
14 am.  So I don't know why that is completed out.
15     Q.  All right.  If we go to the last page of
16 Exhibit 4, this indicates that the reporting officer is
17 Joel Torres, and there's also a sergeant that is
18 referred to there.  Do you know who those officers are?
19     A.  Oh, are these like incident reports?  Yeah,
20 yeah.  Joel Torres is the one and only deputy from
21 Monroe County who was on scene.  And Sergeant Alvarez,
22 Orlando Alvarez, who I know, he's the sergeant, the
23 supervisor who approved it.
24     Q.  So this also indicates at the top of this
25 section of Exhibit 4 that it's from the Monroe County

Riso

1
2  Sheriff's Office.  So is this entire report that we're
3  looking at from the FHP or the Monroe County Sheriff's
4  Office?
5      A.  It's from Monroe County Sheriff's Office who
6  wrote his -- it looks like it's an offense report,
7  incident report, and I asked Officer Torres for it.
8      Q.  Okay.  Very good.  And, Corporal, if it isn't
9  obvious, I'm taking all your time on this, sir, just so
10 that I can understand clearly the differences between
11 these reports.  And forgive me, and I apologize to
12 everybody that we're taking so much time on this.  But
13 the way that we received the reports, there was
14 duplication, and at least for us up here in Michigan, a
15 little bit of uncertainty about what is what and who
16 prepared what.  So I apologize, but that's the reason
17 for doing this.
18     A.  No, no worries.
19     Q.  I'm going to show you another report.  Hang on
20 just one moment, please.
21         All right.  So we're back looking at what I
22 identified earlier as Exhibit 4, and I'm going to go to
23 the end of this 60-page document in this next series of
24 questions.
25     A.  Oh, wow, it is 60 pages.

Riso

1
2      Q.  Yes, it is.  And, sir, I want to start with
3  this part of Exhibit 4 which is identified at the bottom
4  as page 67.  I misspoke.  Page 57, five seven, and this
5  is identified at the top of page 57 as the Florida
6  traffic crash report?
7      A.  Yes.
8      Q.  I'll enlarge that a little bit for you.  When I
9  scroll down to the bottom of this report, I see that
10 you're identified as the reporting officer, correct?
11     A.  Yes.
12     Q.  Is that because this is the traffic crash
13 report that you prepared on behalf of the Florida
14 Highway Patrol as distinguished from the county level
15 report that we just looked at a few minutes ago?
16     A.  No.  The reason why my name is at the bottom of
17 this report, as you can see, the stuff above from the
18 other one you had, kind of mirrors what you see there.
19 What has happened was I had pulled it out of the server
20 to supplement it.  And because what happened was, if I'm
21 positive about this, the trooper who was working this
22 crash had promoted to corporal up into the Panhandle,
23 not too far from Tallahassee, literally, about 500 miles
24 away so I didn't have him anymore.
25         So, normally, I don't do this.  I used to do it

Riso

1
2  but, then, I told the sergeant -- I would tell the
3  trooper you need to pull this out and update it, right,
4  you know, the crash report because sometimes they need
5  updated.  So, basically, when I pulled it out to
6  supplement, it puts my name down at the bottom, and now
7  I'm the one who's gonna finish it off again or add the
8  supplement.  That's why you see my name.  As you notice
9  above it, you'll see my name a second time.  Then above
10 that, you'll see Carlos Rosario as doing an update, but
11 then, eventually, I had to pull it out.
12     Q.  Understood.  All right.  Well, thank you for
13 that.  All right.  So I want to go back to this.  This
14 is what we marked earlier as Exhibit 2, and this you
15 explained has your investigative report that you
16 prepared, correct?
17     A.  Yes.
18     Q.  All right.  This section of the report is
19 broken up into subparts starting with the assignments,
20 correct?
21     A.  Yes.
22     Q.  And then if I scroll down, I see a description
23 of the roadway, correct?
24     A.  Yes.
25     Q.  And, again, this is your work product; is that

Riso

1
2    right, Corporal?
3        A.   Yes, it is.
4        Q.   And I take it this is based on a -- this
5    description of the roadway is based on a combination of
6    your presence at the scene on the night of the incident
7    and your general familiarity with this particular
8    intersection where the accident happened from past
9    experiences; is that fair?
10       A.   Yeah.  You're right about it's fair that I'm
11   very familiar with the intersection.  I do know it very
12   well, but we also try to be very specific about road
13   details.  So I would have to go back and look at it.  I
14   would have to look at measurements to measure, to
15   describe the width of a lane or certain things, you
16   know, but, yes, based on experience and actual
17   measurements made at the scene and photographs.  And
18   when I say measurements, sometimes I'll go out with a
19   wheel, but that Leica total station which you'll -- that
20   diagram you see is actually to scale.  One inch equals
21   20 feet.
22       Q.   Who actually completed the Leica total station
23   survey of the scene, do you know?
24       A.   That would've -- well, he's not a corporal
25   anymore.  He stepped down.  He's a trooper, but he's

Riso

1
2    still down in the Keys.  That would be -- why am I
3    having a --
4        Q.   If you need to refer to the report --
5        A.   It's David Kitchen --
6        Q.   -- to refresh your memory, that's fine.
7        A.   -- David Kitchen.  He actually did the
8    measurements.  He actually, I believe, went back a few
9    days later and brought the Leica total station and
10   measured the scene which I'm glad he did.
11       Q.   The roadway here, we're dealing with two roads,
12   correct, for this incident?
13       A.   Yes.
14       Q.   We're dealing with what is referred to as Card
15   Sound Road that runs in an east and westerly direction,
16   correct?
17       A.   Hold on, hold on.  Actually, I believe it's
18   Card Sound Road which is County Road 905A.  I believe
19   that one goes north to south direction, and it's County
20   Road 905 which goes -- you know what?  Sorry.  Let me --
21   bear with me a second.  Let me just make sure.  Okay,
22   yeah.  It's actually -- yeah, you're right.  Card Sound
23   Road goes in an east, westerly direction, and it's
24   County Road 905 that's north and south.
25       Q.   Yes.  And just focusing on County Road 905,

Riso

1
2    also identified in the report as Card Sound Road, in the
3    area of this crash, let's say within a half a mile of
4    the crash, if we're looking from the west and looking
5    east toward the ocean, would you agree with me that this
6    road is flat and straight?
7        MR. POSES:  Object to the form.  Go ahead,
8    Corporal.  I'm just objecting to the form of the
9    question.
10       A.   Okay.  I understand what you're saying,
11   Mr. Poses.
12       The general area of this, if you want to call
13   it flat, yes, but there's some, what we call, elevations
14   of the roadway, meaning the roads in Florida are, like,
15   slightly arced so water could run down to the side.  But
16   generally speaking --
17   BY MR. BRANIGAN:
18       Q.   If you have a crown, correct?
19       A.   A crown, yeah.  A crown effect so water will
20   drain to the side because there's no sewer.  So for a
21   road to have a zero super elevation in Florida is very
22   hard, meaning, you know, if you go from the center out
23   so water will drain down.  But generally speaking, in
24   the direction of travel, usually, they are flat.  In
25   this area where this happened, the roads are flat other

Riso

1
2    than the crowning at the edges of the road.  And if you
3    go further up the roads, there are some curves.
4        Q.   Which direction?
5        A.   Well, if you go up Card Sound Road, 905A, which
6    is the road at the top of the diagram, it does have a
7    curve in it maybe -- I can't remember -- about
8    four-tenths of a mile or so from the crash scene.  And
9    if you go south on County Road 905 away from the scene,
10   it does have a curve in the road about a half a mile
11   down.
12       Q.   County Road 905 is a two-lane road, right?
13       A.   Yes.  Meaning you have one lane in each
14   direction.
15       Q.   Yes, exactly.  And one of the lanes is in the
16   direction heading east, and the opposite or other lane
17   is heading west, correct?
18       A.   And you're talking about Card Sound Road,
19   correct?
20       Q.   Yes.
21       A.   Yes.  Yes, it does.
22       Q.   And Card Sound Road in this area that we're
23   talking about intersects with County Road 905 which runs
24   in a north-south direction, correct, generally speaking,
25   at the intersection?

Riso

1
2     A.   Generally speaking, yes.
3     Q.   And that intersection is controlled by a
4   traffic control device or devices, plural, correct?
5     A.   Yes.  Specifically, there's a single flashing
6   red light mounted at the center of the intersection that
7   points, you know, in all directions.  Now, remember,
8   this is a T-intersection so it doesn't point toward that
9   area off on the shoulder.  And there's also three-way
10  stop signs with the painted stop bars which you're
11  supposed to stop behind.
12    Q.   Yes.  Now, if we look at the narrative towards
13  the bottom of page 5, there is a description of what you
14  just said, correct, in terms of the flashing red signal?
15    A.   Yes.
16    Q.   And I want to show you something else here so
17  bear with me just a minute.  Let me know when you can
18  see my screen, Corporal.
19    A.   I see it.
20    Q.   This is what we're going to identify as
21  Exhibit 5.  Do you recognize what's depicted in this
22  photograph?
23    A.   This picture is somebody standing on Card Sound
24  Road facing -- hold on a second here.  Let me go back to
25  my diagram, I guess.  It looks like it's somebody facing

Riso

1   east, facing towards the T-intersection with County Road
2   905.
3
4         THE COURT REPORTER:  Pardon me, Counsel.  I
5     believe this is Exhibit 6.  Five should be the
6     six-page --
7         MR. BRANIGAN:  You're exactly right, Madam
8     Court Reporter.  Thank you for the correction.  Six.
9         (Exhibit 6, photo, marked for identification.)
10  BY MR. BRANIGAN:
11    Q.   So in Exhibit 6, which is a photograph, we're
12  looking towards the east as if we're standing in the
13  eastbound lane of Card Sound Road, correct?
14    A.   Yes.  We're on Card Sound Road, yes, facing
15  east.
16    Q.   And we can see that red flashing light in this
17  photograph, correct?
18    A.   That's correct.
19    Q.   It's illuminated so that we can see that it's
20  red, correct?
21    A.   Correct.
22    Q.   Would you agree with me that we can also see
23  what appears to be a stop sign on the right side of the
24  road?
25    A.   That's correct.

Riso

1
2     Q.   And if you look at the right side of the photo
3   towards the top, would you agree with me that there
4   appears to be part of another sign?  I don't know if you
5   can see my cursor, but I'm pointing to it now.
6     A.   Yes.  There is some triangle-shaped sign, a
7   diamond, what we, I guess, call a diamond-shaped sign.
8     Q.   What does that diamond-shaped sign signify?
9   What does it mean?
10    A.   Right now, judging by the picture, I can't tell
11  what's on it.  It might say there's a stop ahead or a
12  traffic light.  I'm not positive unless I look at that
13  sign.
14    Q.   All right.  In the investigative report
15  describing the roadway, it indicates that the eastbound
16  lane of Card Sound Road also has a stop sign and a
17  flashing red signal above the intersection that is
18  clearly visible at night four-tenths of a mile west of
19  the intersection, correct?
20    A.   Correct, yes.
21    Q.   Did you make the determination that the red
22  flashing signal above the intersection is clearly
23  visible at night four-tenths of a mile west of the
24  intersection?
25    A.   Yes, I did.

Riso

1
2     Q.   How did you go about doing that, Corporal?
3     A.   I physically drove through those things and
4   looked at them to make sure because I even went through
5   and even measured it too, the four-tenths of a mile, to
6   make sure.
7     Q.   The red flashing light under Florida state
8   traffic laws, what does that require a driver to do?
9     A.   To come to a stop.
10    Q.   A complete stop?
11    A.   Yes.  It's not what you would consider working
12  traffic lights which are green, yellow, and red, but
13  it's a flashing to help warn.  Now, if it was a flashing
14  yellow, I believe it says -- the statute, it should say
15  you need to reduce speed and proceed through with
16  caution.  So in this case, I can't second-guess why DOT
17  did it that way or not, but you have a stop sign.  And
18  you have the stop bar, and you have a flashing red light
19  to help draw your attention to the fact that you need to
20  stop.
21    Q.   So since you mentioned the stop sign, the stop
22  sign in Florida, what does that require a driver to do
23  under Florida state traffic laws?
24    A.   Come to a complete, and in the definition of
25  stop, complete cessation of movement.  And if Madam

Riso

1    Reporter wants to know how to spell it, I believe it's
2    C-E-S-S-A-T-I-O-N, cessation of movement which
3    essentially means you come to a complete stop.
4        Q.   You also mentioned that there's a stop bar on
5    -- I think you were referring to something on the
6    pavement; is that right?
7        A.   That's correct.
8        Q.   Does the eastbound lane of Card Sound Road have
9    a stop bar associated with the stop sign?
10       A.   Yes, it does.
11       Q.   What does the stop bar require a driver to do
12   under Florida traffic laws?
13       A.   Traffic laws, you're supposed to stop prior to
14   it and, basically, not be over it or across it.
15       Q.   I'm going to show you another photo so bear
16   with me as I switch photos.  This is going to be
17   Exhibit 7.  Are you able to see the photo, sir?
18       A.   Yes.
19            (Exhibit 7, photo, marked for identification.)
20   BY MR. BRANIGAN:
21       Q.   So what are we looking at, if you know, in
22   Exhibit 7 which is a photograph?
23       A.   That looks like it's the stop bar for the
24   southbound side of County Road 905.
25

Riso

1        Q.   So am I correct that as we look into this
2    photograph, we're still looking towards the east?
3        A.   Yes.
4        Q.   So if a driver was traveling in the eastbound
5    lane of Card Sound Road approaching this intersection,
6    this is what the driver who was paying attention to
7    things ahead would see; is that fair?
8        A.   That's fair.
9        Q.   The traffic signs that we can see, the yellow
10   signs, what are those indicating?
11       A.   They are warning signs to help -- I'm gonna
12   guess that, you know, basically, a warning sign to stop.
13   You can't go any further.  And the center one is the
14   arrow left or right, basically meaning you can only go
15   right or left and not straight.  And as far as the
16   diamond-shaped reflective warning signs, there was also
17   a fourth one, the one to the right.  There wasn't just
18   three.  There was originally four standing.
19       Q.   Yes.  Now, did you make a determination about
20   these signs and how far back away from them they would
21   have been visible like you did for the red flashing
22   stoplight?
23       A.   Well, I believe in that other picture you
24   showed where we're way back on the county road, you can
25

Riso

1    see those reflective signs.  When you illuminate with
2    the light, you can clearly see something being reflected
3    off which would be blocking the path of travel, you
4    know, warning.  They're like warning signs.
5        Q.   Is it your belief based on your investigation
6    in which you included driving through the scene, looking
7    at measurements, taking measurements, that the signs
8    that we can see in Exhibit 7, the yellow signs, could
9    also be visible at least four-tenths of a mile before or
10   -- excuse me -- away from where they're at?
11       A.   They can be visible.  You can see them.  You
12   can see something that's reflected off.  You just may
13   not be able to see the outer edges of them because
14   they're not so big, but you can see something getting
15   reflected off.  As long as the light is on it, if you
16   know what I mean, they are reflective in nature.
17       Q.   Very good.  I want to talk a little bit more
18   about the roadway.  At the time of this incident, is it
19   correct that the roads were dry and clear of any visible
20   defects?
21       A.   I believe it was.  I believe I would have said
22   that in my report.
23       Q.   Is it also true that in the area where this
24   incident occurred, where the crash occurred, there were
25

Riso

1    no visible obstructions to a driver?
2        A.   None that I was aware of.
3        Q.   And the speed limit on Card Sound Road, was it
4    45 miles an hour as a driver would approach the stop
5    sign?
6        A.   I was just going to bring that up.  It is 45
7    miles an hour as you approach this intersection on both
8    roads except for the one -- if you're coming from -- if
9    I'm looking -- if you're coming from the north headed
10   south approaching the intersection, I believe the speed
11   limit is different over there.
12            MR. BRANIGAN:  All right.  We've been at it for
13       about an hour and 40 minutes.  And if it's okay with
14       you, Corporal, I'd like to take a short break.  Would
15       that be okay with you, sir?
16            THE WITNESS:  That's okay because I was gonna
17       ask for a little needed break, if you know what I
18       mean.
19            MR. BRANIGAN:  I do; I understand.  Why don't
20       we take about 10 minutes?  Is that okay with
21       everyone?
22            MR. POSES:  That's good, Thomas.
23            (Break was taken.)
24   BY MR. BRANIGAN:
25

Riso

1
2    Q.   Corporal, in the next section of your
3  investigative report, you have a discussion about the
4  vehicles starting with Vehicle 1.  And as I understand
5  from your report, Vehicle 1 refers to the 2019 Tesla
6  Model S, correct?
7    A.   Yes.
8    Q.   And you also make reference to the driver as
9  D1, and D1, Driver 1, was the driver of the Tesla,
10 correct?
11   A.   Yes, correct.
12   Q.   Would that be Mr. McGee?
13   A.   Yes, sir.
14   Q.   All right.  When you arrived on scene, did you
15 individually meet and speak with Mr. McGee, the Tesla
16 driver?
17   A.   No, sir.
18   Q.   Did you ever speak with Mr. McGee while you
19 were on scene?
20   A.   No, sir.
21   Q.   Have you ever spoken with Mr. McGee?
22   A.   Yes, sir.
23   Q.   Can you tell us when you first spoke to
24 Mr. McGee in connection with this incident?
25   A.   I believe it was when him and his attorney met

Riso

1
2  me at my office here for him to sign and accept his
3  traffic citation for the cause and crash.
4    Q.   Do you recall when that was?  And if you need
5  to look at your report to refresh your memory, that's
6  fine.
7    A.   Let me look here.
8        MR. POSES:  I'm just going to object to the
9        form as it relates to the citation but, Corporal,
10       please go ahead.
11       THE WITNESS:  I'm reading.  Hold release, hold
12       release.  Okay.  He basically came on October 28,
13       2019, the day before I turned in the report.
14 BY MR. BRANIGAN:
15   Q.   Did you take a statement from Mr. McGee then?
16   A.   I believe he invoked his rights.  I believe he
17 did.
18   Q.   So he invoked his Fifth Amendment right and as
19 a result, did not give a statement?
20       MR. POSES:  Object to the form.
21   A.   I normally ask, and if I do ask, I go through
22 counsel.  If they're represented by counsel, I always go
23 -- and that's my policy.  I'll go through counsel.  I
24 don't bypass that.
25 BY MR. BRANIGAN:

Riso

1
2    Q.   Is it correct, is it not, though, sir, that
3  while he was at the incident scene, after the crash,
4  Mr. McGee made statements about the incident, correct?
5    A.   Statements to people who were at the scene that
6  he was around, and these statements, I believe, were
7  recorded by body cam video that was on the deputy there,
8  Joel Torres, um-hmm.
9    Q.   So that would be the deputy from -- forgive me,
10 is it Monroe or Montgomery County?
11   A.   Monroe County.
12   Q.   Monroe County?
13   A.   Yes.  And he was the only deputy who was on
14 scene.
15   Q.   From Monroe County?
16   A.   Yes.
17   Q.   The body cam video and audio that Deputy
18 Torres's body cam technology recorded, have you
19 personally listened to that and watched it?
20   A.   Yes, I have.
21   Q.   Did you do that in connection with preparing
22 the report?
23   A.   Yes, I did.
24   Q.   And based on your listening to and review of
25 that body cam information, is it your understanding that

Riso

1
2  Mr. McGee made spontaneous statements to the police
3  about what he thinks occurred?
4    A.   Yes.
5    Q.   And is it your understanding that, first of
6  all, he -- he was familiar with this incident -- excuse
7  me -- the area where the incident occurred?
8    A.   Was familiar with the area where the
9  incident occurred, correct?
10   Q.   Yes.
11   A.   Yes, he was.
12   Q.   Do you know -- is it correct that he lived in
13 the area where the incident occurred?
14   A.   Well, north of the intersection, from the
15 intersection on 905, it eventually ends about, I'm gonna
16 guess, a mile down the road at the entrance into an area
17 called Ocean Reef.  It's a gated community, monitored
18 24-hours gate, and he had a place of residence inside
19 there.
20   Q.   Did you confirm that through your
21 investigation?
22   A.   Yes, I did.
23   Q.   And do you happen to know how frequently he
24 would travel through this intersection where the crash
25 occurred to get to Ocean Reef before the incident

Riso

1  occurred?
2
3      A.  That one, that specific detail I couldn't
4  confirm.  What I believe I confirmed was at the time of
5  this incident, the date, I don't believe he was there
6  more than a year earlier.  It might have been less that
7  he had bought that place.  I do remember that.  I wasn't
8  able to review that fact, but I do remember that detail
9  how it wasn't about -- I think it was a year or just
10  under a year that he had bought that house.
11      Q.  In the course of your investigation including
12  listening to and analyzing that body cam video that we
13  just referred to that recorded Mr. McGee's statements,
14  did you learn from any of this evidence that he claimed
15  that he was not familiar with the area where the crash
16  occurred?
17      A.  Honestly, I don't remember or recall him saying
18  that.
19      Q.  If there would've been evidence of that, either
20  because he said it or through some other means, would
21  you have documented that in your report?
22      A.  If I remember, recall hearing it or saying it,
23  I would have documented what he said.
24      Q.  Including him saying, if he actually had said
25  it, I just wasn't familiar with the area, it's the first

Riso

1  time I've been through it, something like that?
2
3      A.  I would have made note of it and documented it.
4      Q.  Now, even if someone said that, you know, a
5  driver involved in a crash like this said that, that
6  doesn't relieve them of their responsibilities to obey
7  the travel control devices at this intersection,
8  correct?
9      A.  That's correct.
10      Q.  Is it your understanding from the investigation
11  that you completed that Mr. McGee stated numerous times
12  to different people including to Officer Torres that he
13  was driving using his phone, his cell phone, while
14  driving and that he dropped his phone and that he looked
15  down and then ran the stop sign?
16      MR. POSES:  Object to the form.
17      A.  He admitted that he was on the phone and, yes,
18  he did say that he dropped it.  And, yeah, I do
19  recall -- yeah, I do recall he ran the stop sign too.
20  BY MR. BRANIGAN:
21      Q.  And is it your recollection that he admitted
22  that he failed to stop for the stop sign and the
23  flashing red light?
24      A.  Yes, he did.
25      Q.  Did you subpoena phone records for Mr. McGee's

Riso

1  phone, cell phone?
2
3      A.  I believe that I did.
4      Q.  And did you receive records from the phone
5  service provider in response to the subpoena?
6      A.  I believe I did, but hold on a second.  Hold on
7  a second here.  Yeah.  T-Mobile.  I believe it was
8  T-Mobile phone records, yes, and AT&T.  There was two
9  different phone records I found out.  Yes, I do have
10  them, um-hmm.
11      Q.  Were you able to confirm by looking at the data
12  produced in response to that subpoena from the phone
13  service provider that Mr. McGee was, in fact, on his
14  cell phone before the crash occurred just seconds
15  before?
16      A.  Yes.  I was able to confirm.
17      Q.  Were you able to confirm that during the crash
18  he was still on the phone?
19      A.  Yes, I was.
20      Q.  In the state of Florida, is there, to your
21  knowledge, Officer, a statute that relates to distracted
22  driving?
23      A.  There is something that relates to distracted
24  driving and cell phones, but I can't remember that --
25  but it was more pertaining to texting and driving.  But

Riso

1  that is what they consider a secondary violation which
2  means I cannot just pull you over for texting and
3  driving.  I have to have another reason to stop you.
4      Q.  All right.  I want to turn your attention to a
5  different topic now.  You or someone working at your
6  direction obtained data from the Tesla's event data
7  recorder, correct?  Sometimes it's referred to as an
8  EDR?
9      A.  Yes.
10      Q.  Did you do it personally, or did someone do it
11  under your direction?
12      A.  If I recall, I couldn't image it myself because
13  I am certified to image that data.  I believe I had to
14  bring it to somebody who was certified who had a program
15  to image the data contained in the Tesla.  Let me look
16  at the report here.  I believe I probably would have
17  wrote that here.  Just bear with me a second, okay?
18      Q.  Yes, sir.  Corporal, can I make a suggestion?
19      A.  Yes.  I got it.
20      Q.  On page 31 of your report, the very top, the
21  first sentence starts out the ACM, backslash, EDR for
22  both Vehicle 1 and Vehicle 2 did record events.
23      A.  Yes.  And I was actually looking at page 4 of
24  the field note packet.  And at the very top, it says on

1                              Riso
2   May 10, 2019, at 1:51 p.m. the EDR download of data
3   conducted by Officer Eric Dominguez of the Miami Beach
4   Police Department.
5        So, basically, I did not have the program to
6   image the event data recorder inside the Tesla.
7        Q.   Did you rely on the data that Officer Dominguez
8   extracted or imaged from the Tesla's EDR in completing
9   the investigation?
10       A.   It was evidence that I wrote about.  I didn't
11  totally, as you worded it, rely on it because I did
12  conduct some speed calculations.
13       Q.   All right.  We'll get to those in a minute.
14  Thank you for that clarification.  Starting with the
15  data from the EDR that is discussed in your report at
16  page 31, let me know when you're there.  In fact --
17       A.   That's the investigative report, correct?
18       Q.   Yeah.  I'm gonna put it up on the screen.  One
19  moment, please.  You should be able to see it now.
20       A.   Yes, sir.
21       Q.   This is from what I marked as Exhibit 2,
22  page 31 of the investigative report.  If we look at the
23  first line, we can see a reference to the ACM,
24  backslash, EDR, ACM sometimes meaning air bag control
25  module, and EDR event data recorder from Vehicle 1, the

1                              Riso
2   Tesla, Vehicle 2, the SUV, correct?
3        A.   That's correct.
4        Q.   All right.  Focusing your attention on the data
5   that you are writing about concerning the speed of
6   Vehicle 1, according to the EDR data, the speed of
7   Vehicle 1 five seconds before impact was 97 kilometers,
8   correct?
9        A.   That's correct.
10       Q.   And you converted that into miles per hour a
11  little bit lower in this section, and that converts to
12  60.23 miles per hour, correct?
13       A.   That's correct.
14       Q.   And that was 5 seconds before impact, right?
15       A.   Speed was 97 kilometers per hour five seconds
16  prior to impact, yes, sir.
17       Q.   Right.  And if Mr. McGee was traveling at a
18  rate of speed of slightly more than 60 miles per hour on
19  the road that we know he was traveling on, he was
20  breaking the speed law, correct?
21            MR. POSES:  Object to the form.  Go ahead,
22  please.
23            THE WITNESS:  I can answer, right?  Okay.
24            MR. BRANIGAN:  Yes, sir.
25       A.   He was in violation of the posted speed limit.

1                              Riso
2   BY MR. BRANIGAN:
3        Q.   And he was exceeding the posted speed limit by
4   more than 15 miles per hour five seconds before impact,
5   correct?
6        A.   That's correct.
7        Q.   Your report goes on to talk about his speed a
8   half a second prior to impact as well, correct?
9        A.   Yes.
10       Q.   What was his speed in miles per hour as
11  indicated by the EDR for the Tesla a half a second prior
12  to impact?
13       A.   Well, I would have to look at the reading
14  because what I wrote was he applied his brakes a half a
15  second before which is going to reduce that speed.  Now,
16  the sense adapter said his speed at impact which is
17  zero, zero seconds, was 84 kilometers per hour and the
18  brakes were applied.  So his speed did go down from 97
19  down to 84 miles per hour which was at the impact, 84
20  kilometers per hour.
21       Q.   And then you have in the last line of that
22  paragraph, last sentence, you state Vehicle 1's minimum
23  speed at impact was calculated 47.41 miles per hour with
24  a maximum speed calculated at 56.84 miles per hour,
25  correct?

1                              Riso
2        A.   Yes.
3        Q.   So at impact, according to the EDR data and
4   what you wrote here, he was speeding, correct?
5        A.   Yes, he was.
6        Q.   Now, you mentioned that you did some speed
7   calculations, right?
8        A.   Yes.
9        Q.   Did your speed calculations confirm the data
10  that you're discussing here that was obtained from the
11  EDR about the Tesla's speed?
12       A.   The speed calculations that I was able to do, I
13  believe, were after the impact.  So hold on a second
14  here.  Hold on.  Just give me a second.
15       Q.   Take your time, sir.
16       A.   I'm gonna look right at them because I know I
17  hand wrote them.
18       Q.   When you get to that, would you tell us what
19  page you're looking at?
20       A.   Now, this is the field note packet.  Field note
21  packet, page 14.
22       Q.   I'm there.
23       A.   Okay.  And you'll see I put a one with a circle
24  underneath the top of the page where it says calculation
25  sheet.  Now, these basically were -- this basically was

Page 74

Riso

1
2 calculations to get a total delta-v combined, you know,
3 because I took the data collected from V-2, and I got a
4 total delta-v. And now that's why you get a range of 56
5 all the way, you know, to, like, what, 41.53 or
6 something. But those are calculated based upon the
7 impact and delta-v, and you'll see that it's all right
8 there on those sheets right there from 14 through 17.
9     Q.   Yes. If I understand your analysis, you did a
10 conservation of momentum analysis; is that correct?
11    A.   Yes. You can see that, can't you?
12    Q.   I can. And so as part of that, you determined
13 speeds, and you determined longitudinal changes in
14 velocity, delta-v, correct, for the Tesla?
15    A.   Yes. And you'll see that I gave a range
16 because we tried to give a little bit of range to
17 clarify. So, basically, he was between 54, it looks
18 like, and 56.1 at impact. And so I did a range for that
19 one.
20    Q.   So whether we rely on your analysis that we see
21 in the field note packet at pages 14 and 15 or the data
22 from the Tesla's event data recorder, in either case,
23 you believe that Mr. McGee was speeding, violating the
24 speed law at the moment of impact, correct?
25    A.   That's correct. And the reason why I also did

Page 75

Riso

1
2 these calculations was we try not to totally rely on the
3 EDR air bag control module image data. And if I can do
4 the math, I will, and there are some cases where you
5 can't. But as you can see the result, I believe he said
6 it was -- the readout said it was 84 kilometers at zero
7 which comes out to be what. I'm trying to do it in my
8 head right now because it's multiplication of 0.61 --
9 it's something like 52ish miles per hour, give or take,
10 and I'm calculating -- based on my calculations, I'm
11 getting, what, a range, a little bit higher. So I think
12 we're in the ballpark. Yes, my calculations were at 54
13 when I look at the data.
14    Q.   Yes, correct. Thank you. All right. We can
15 go back to your investigative report which we still have
16 on the screen. On page 31, we see the beginning of your
17 summary discussion, correct?
18    A.   Yes, sir.
19    Q.   And you indicate on page 32 in reference to
20 Tesla Vehicle 1 that Mr. McGee failed to slow down or
21 stop for the traffic control device for the road that he
22 was traveling on, eastbound State Road 905A, correct?
23    A.   Yes.
24    Q.   Let me ask you something, Corporal. Did you
25 actually inspect the Tesla?

Page 76

Riso

1
2    A.   You know what, I'm trying to remember if I did.
3 Hold on, hold on. I'll find out because if I did, I
4 would've signed what we call our vehicle inspection
5 which will be part of the field note packet. So hold
6 on, and I will tell you what page it's on. No.
7 Actually, no, I did not. That was inspected by Corporal
8 Carlos Rosario. And you go to page 37. Or no, I'm
9 sorry -- okay. Yeah, go to page 37.
10    Q.   Yes. One moment, please. Well, perhaps that's
11 page 37 in your field notes?
12    A.   I know what you're saying but, basically,
13 Carlos signed it. It'll say post-collision inspection
14 Sheet No. 2 at the very top, and at the bottom he signed
15 it. I released the hold on it. You'll see I signed two
16 lines on that, meaning I released the hold, and then I
17 did a download, EDR download. I copied and retained it
18 for the file. I signed those, but he signed -- he
19 photographed, and he inspected it back on May 15th. And
20 when did we -- this was what. Probably around
21 April 30th, was it again?
22    Q.   The date of the crash?
23    A.   Yes.
24    Q.   The date of the crash was April 25.
25    A.   April 25. I'm sorry. I apologize. So, like I

Page 77

Riso

1
2 said, he inspected it because he's supposed to do it in
3 a certain amount of days. That's why he did the
4 inspection.
5    Q.   When the inspection is done, is the officer
6 who's doing the inspection of the vehicle involved in
7 the crash, in this case the Tesla, is the officer
8 looking for evidence that there may have been some type
9 of malfunction of the vehicle?
10    A.   Part of the things we inspect would be like we
11 check off brakes, lights are working, headlights,
12 taillights, turn signals, seat belts, whether they work
13 properly, tire tread depth, you know, how much tire
14 pressure there is. We'll write down the umber on each
15 tire. We do a pretty good inspection, but as far as the
16 mechanics, the exact mechanics, other than the brakes
17 and documenting the damage and whether the brakes are
18 working among other things, I wouldn't go in detail as
19 far as the mechanics of whatever it is, a Tesla in this
20 case, or let's say it was a Chevy or a Ford.
21    Q.   Do you consider the results of that inspection
22 when you're preparing this investigative report?
23    A.   I will write about it. You know, some of us --
24 I will write about the inspection, you know, to a point.
25 I will write that on this date, and I believe it's in

Riso

1   there.  Corporal Carlos Rosario on this date and time
2   conducted a vehicle inspection post-collision inspection
3   of V-1 at.  And if I recall, the vehicle was towed to
4   the Miami FHP impound yard.
5       Q.  If it had been noted that Corporal Rosario's
6   inspection of the Tesla that he believed or found
7   evidence to suggest that the brakes of the Tesla were
8   not functioning correctly, would you have noted that in
9   your report?
10      A.  Yes, I would have.
11      Q.  And would you agree with me that there is no
12  such notation about the brakes not performing correctly
13  or any other type of malfunction with the Tesla?
14      A.  I'm going to look at it right now.  He wrote
15  down the front and the rearward disc, and he put power
16  assistance so there's nothing to tell me that something
17  was malfunctioning.
18      Q.  If the driver of the Tesla, specifically in
19  this case, Mr. McGee, had made a statement to the effect
20  that something malfunctioned in the vehicle that caused
21  me to be unable to stop or caused me to be unable to
22  control the vehicle with steering, caused me to be
23  unable to avoid the crash, would you have noted that in
24  your report about what happened here?

Riso

1       MR. POSES:  Object to the form.
2       THE WITNESS:  May I answer?  Just curious.
3       MR. BRANIGAN:  Yes, sir, you may.
4       THE WITNESS:  Oh, okay, okay.  I just wanted to
5   make sure.
6       MR. POSES:  Corporal, when I just object to the
7   form and just for continued use, it's just to note
8   the objection.  You can always answer.
9       THE WITNESS:  Okay.  Very good.  Thank you,
10  Mr. Poses.
11      A.  I would have noted it, and me being the
12  investigator, if he said the brakes failed, I would have
13  worked it out to get an inspection done.
14  BY MR. BRANIGAN:
15      Q.  If he would have said something like my cruise
16  control malfunctioned and that's what prevented me from
17  stopping, would you have made a note of that?
18      MR. POSES:  Object to the form.
19      A.  Yes.  If I didn't make a note of it or if I was
20  aware of it and I didn't make a note of it and I didn't
21  try to get it inspected or have it inspected, then I
22  would consider myself not doing my job.
23  BY MR. BRANIGAN:
24      Q.  Would you agree with me that there's no

Riso

1   indication in your extensive report, it's over 32 pages
2   long, that Mr. McGee made a statement like I've
3   described, something about his brakes, something about
4   cruise control or anything else that in his mind played
5   a role in the crash?
6       MR. POSES:  Object to the form.
7       A.  If he had stated it, I would have, like I said,
8   documented it, but I don't recall hearing him say
9   anything about it.  I just recall him spontaneously
10  stating he was on the phone, he dropped his phone, he
11  looked down, and he had, you know, ran the stop sign.
12  BY MR. BRANIGAN:
13      Q.  At the bottom of page 32, you have in bold font
14  a reference to what I believe is a Florida state traffic
15  code Section 316.1925(1), quote, careless driving; is
16  that correct?
17      A.  Yes, sir.  I'm looking right at it.
18      MR. POSES:  Object to the form.
19  BY MR. BRANIGAN:
20      Q.  Why did you include that in your report there,
21  Corporal?
22      A.  Because that's what he was ultimately charged
23  with at the very end.
24      Q.  And there's actually a copy of the citation

Riso

1   that's attached to your report, correct, sir?
2       A.  That's correct.  Should be.
3       Q.  In fact, you made reference to the fact that
4   Mr. McGee presented himself to the police station with
5   his counsel to pick up a copy of that citation; is that
6   right?
7       A.  That's right.  And that's his signature right
8   there.  He signed it in front of me.
9       MR. POSES:  Corporal, I'm going to just do it
10  once, and I apologize, Corporal.  As it relates to
11  the citation and references to it, I'm just going to
12  have a standing objection so I don't want to
13  interrupt you or Thomas again about it, all right?
14      MR. BRANIGAN:  Yes.  Thank you, Todd.  I
15  appreciate that.
16      MR. POSES:  Thanks, Thomas.
17  BY MR. BRANIGAN:
18      Q.  So based on your investigation, you issued a
19  citation to Mr. McGee for careless driving, correct?
20      A.  That's correct.
21      Q.  And I take it that your conclusion about the
22  cause of this crash based on your investigation and all
23  of the evidence that you analyzed as part of your
24  investigation is Mr. McGee's careless driving; is that

Riso

1    correct?
2        MR. POSES:  Object to the form.
3        A.    That's correct.
4    BY MR. BRANIGAN:
5        Q.    If you would have believed that the condition
6    or operation of the Tesla was the cause or a cause of
7    the crash, would you have included something about that
8    in your report?
9        A.    Yes, I would have.
10       Q.    Did you believe that something about the Tesla
11   was a cause of the crash?
12       MR. POSES:  Object to the form.
13       A.    Nothing from my investigation gave me any
14   reason to believe that the car had any factor in the
15   causation of the crash.
16   BY MR. BRANIGAN:
17       Q.    Now, the 2019 Tesla Model S, I know that you
18   told us earlier that you obtained some information about
19   the vehicle, and I'm not talking about the EDR data.  I
20   mean information about the type of driver-assist
21   technology the vehicle was equipped with, correct?
22       A.    Yes, I did.
23       Q.    Where did you obtain that information from,
24   Corporal?

Riso

1        A.    I obtained it from Mr. Ryan McCarthy, general
2    counsel in Tesla from his -- he was in California.
3        Q.    Did you or someone else working on the
4    investigation reach out to, if I can use that
5    vernacular, to Tesla to ask about information, or did
6    Tesla contact you or someone working with you on the
7    investigation?
8        A.    Initially, how I got involved with Tesla is,
9    like I said, initially, the NTSB contacted me.  Then we
10   made the decision that I'll take on the case, and then I
11   needed some more information.  And I was referred to --
12   I believe there was a Mr. Al Prescott and then a
13   Mr. Ryan McCarthy which I made contact with.  And then I
14   eventually made contact with Mr. Ryan McCarthy and
15   talked to him on the phone.  On the field note packet --
16   so they didn't reach out to me.  I actually reached out
17   to them.  Now, on the field note packet, if you look at
18   page 85, the field note packet, not the investigative
19   packet --
20       Q.    Yes.  I have it.
21       A.    Do you see that letter where it says at the top
22   Florida, State of Florida, the Division of Florida
23   Highway Patrol --
24       Q.    Yes.

Riso

1        A.    In order to properly order the proper
2    information when I talked to Mr. -- you know, I said
3    I'll write the official letter requesting information.
4    Mr. Ryan McCarthy told me, no, this is -- you know,
5    write this down because that's what I need because this
6    is the first time I've ever dealt with a Tesla, the
7    vehicle.  So I didn't know what information it does
8    record.  I had learned a lot, how it records
9    information, pre-crash data, and stuff.  So I asked,
10   well, what am I looking for.  He says write me an
11   official letter requesting this, and he said he would
12   get me the data.
13       Q.    It sounds like you had more than one
14   conversation or communication with Mr. McCarthy from
15   Tesla; is that correct?
16       A.    I would definitely say it was more than one.
17   How many, I'm not too sure.
18       Q.    In any of those conversations, did you feel as
19   though Mr. McCarthy was trying to direct your
20   investigation or influence your conclusions?
21       A.    No.
22       Q.    The information that Tesla provided to you in
23   response to your official request included data from the
24   vehicle, correct?

Riso

1        A.    Yes.  Yes, it did, and -- yes, it did.  And
2    because -- and, actually, it is inside the field note
3    packet.  It begins on page 97.
4        Q.    You also received video that was recorded by a
5    camera in the Tesla; is that fair?  Is that correct?
6        A.    Yes, sir.
7        Q.    And I believe you also received a copy of the
8    owner's manual for the 2019 Model S?
9        A.    Yes, I did.
10       Q.    All right.  Did you come to learn through your
11   investigation and perhaps communication with Tesla that
12   the Tesla involved in this crash is equipped with
13   technology that is sometimes referred to as autopilot?
14       A.    I'm not too sure if it was called autopilot,
15   and there was -- I don't want to say the wrong thing on
16   this if you can understand.  It had some -- when you
17   look at the top of the data, it will give a list of some
18   of the things that I guess it can do.  Like, it can
19   detect when your hands are off the steering wheel and
20   on, it'll chime.  And then there's certain things you
21   can program it to do.  Like, is there a self-driving?
22   Yes.  Is it fully autonomous?  From my investigation, I
23   would say no, but that's my investigation because I had
24   discussion with some of my people, meaning, you know,

Riso

1   like my supervisor.

3        And I think it's not fully autonomous because
4   what I found out through my investigation is that this
5   technology is only supposed to be used on, if I recall,
6   limited access facilities because it has to detect the
7   white lines and the dashed white lines, the
8   reflectiveness of it.  But, like I said, I'm not an
9   expert, but this is all new to me, and this is what I
10  learned through my investigation.  And I found that it's
11  only supposed to be used on those certain types of
12  locations and roadways.

13       Q.   Did you or any other officer involved in the
14  investigation look at what I'm going to refer to as an
15  exemplar Model S, in other words, not the one involved
16  in this crash but another 2019 Model S, to do any
17  evaluation of the vehicle and its features?

18       A.   I actually did bring the contents of this crash
19  over to the Tesla building in Coral Gables.  I guess
20  it's a vehicle maintenance shop, and they told me to
21  bring it over there to try and get the data that was
22  collected inside the onboard computer which I took via
23  search warrant.  So what we had to do was bring -- and,
24  initially, I got there, and I had to go back and get
25  another part because it needed two parts.  It needed the

Riso

2   computer and this other module that mounts, I believe,
3   underneath the dash.  So what they did was they picked
4   up an exemplar vehicle, took those parts out, and then
5   put the parts in that I brought.  And then they gave me
6   the data, but I couldn't do anything with the data that
7   it recorded because it needed a certain program.

8        Q.   Did you at any time drive the exemplar?
9        A.   No, I did not.
10       Q.   Did anyone working on the investigation with
11  you drive an exemplar 2019 Model S?
12       A.   Not that I'm aware of.
13       Q.   Okay.  Are you familiar with the different
14  levels of autonomous driving that has been established
15  by the Society of Automotive Engineers and also the
16  National Highway Traffic Safety Administration?
17       A.   I'm not fully aware, but I am aware there are
18  some fully autonomous vehicles.  And I even saw one
19  video of a tractor-trailer that was fully autonomous
20  where the guy set it in mode, went in the back sleeper
21  and started sleeping, and it just scared me seeing that
22  because nobody was in the -- and he was going down a
23  highway right between the white dashed lines.  And I'm
24  like -- my eyes went like -- but I did actually see that
25  video and that display of that.  So am I fully aware to

Riso

2   answer your question, not fully, but I'm aware of newer
3   features or updated features.

4        Q.   If I described the 2019 Model S as a vehicle
5   that has Level 2 advanced driver assistance technology,
6   would you understand what I'm referring to?

7        A.   Not exactly.  I just know that there are
8   certain levels and certain things each one can do.  I
9   did learn that there are different, like you said, Level
10  2, Level 1, and I was made aware that this one wasn't
11  fully autonomous.

12       Q.   Based on your investigation and all the things
13  that you've learned about the Tesla, was it your
14  understanding at the time that you completed your
15  investigation that, just as you said, the Tesla involved
16  in this crash was not fully autonomous or a vehicle that
17  could drive itself fully?

18       MR. POSES:  Object to the form.
19       A.   Yes.  I became aware that it was not fully
20  autonomous.
21  BY MR. BRANIGAN:
22       Q.   Was it your understanding at the time you were
23  completing your investigation that because of that,
24  Mr. McGee as the driver, was fully responsible for
25  executing the tasks of a driver?

Riso

2        MR. POSES:  Object to the form.
3        A.   The location where this vehicle was driven and
4   the crash happened, he was supposed to be fully driving
5   the vehicle.
6   BY MR. BRANIGAN:
7        Q.   And that would include paying attention to
8   things ahead, correct?
9        A.   Correct.
10       Q.   Being prepared to stop in response to traffic
11  control devices like a stop sign or a flashing red
12  light, correct?
13       A.   Correct.
14       Q.   Maintaining his lane, correct?
15       A.   Correct.
16       Q.   Taking steps to avoid impacting another vehicle
17  or pedestrian, correct?
18       A.   That's correct.
19       Q.   Those were all his legal responsibilities under
20  the state laws of Florida at the time of the crash,
21  correct?
22       A.   That's correct.
23       Q.   He was also responsible for knowing and
24  complying with the speed limit on the road that he was
25  traveling on, correct?

Riso

1
2      A.   That's correct.
3      Q.   And I take it in your opinion based on all of
4   your investigation, analysis of the evidence including
5   things that Mr. McGee was recorded to have said, you
6   concluded that he failed to do the things that I just
7   identified; is that fair?
8           MR. POSES:  Object to the form.
9      A.   That's correct.
10          MR. BRANIGAN:  Corporal Riso, I don't have any
11      other questions at this time, and I appreciate all of
12      your time today and patience.  Mr. Poses may have
13      some questions, and if he does, I may have some
14      follow-up questions.  But for now, I'm going to rest
15      and turn it over to Mr. Poses.
16          MR. POSES:  Thank you.
17                  CROSS-EXAMINATION
18   BY MR. POSES:
19      Q.   Corporal, how are you?
20      A.   Mr. Poses, how are you, sir?
21      Q.   Very good.  Thank you.  All right.  I do have
22   some questions and, again, I think Thomas probably will
23   have some questions about this after the fact.  Is it
24   okay to start now, or do you want to take a break for
25   five or 10 minutes?

Riso

1
2      A.   We're good.  We're good to go.
3      Q.   All right.  I want to talk about what we know
4   about the route and time that Mr. McGee took that day.
5   Do you have any information in your report about the
6   start in terms of the place and time where Mr. McGee
7   drove from before the accident happened?
8      A.   Yes.  I do have something.  I even have in the
9   field note packet how he had went through some poles, I
10   believe.  I saw that when I was looking through it
11   earlier.  I did get that.  Let me see here if I can --
12   do you have the same exhibits, Mr. Poses?
13      Q.   I do.
14      A.   Okay.  I even scrolled through it here.  I saw
15   pictures.  Okay.  If you go through page -- it's going
16   to be page 87 of the field note packet through page 89.
17   You'll see something, and this is some -- I'm pretty
18   sure it was some stuff that was collected by Corporal
19   Rosario and then handed over to me.
20      Q.   Okay.  And in terms of what Corporal Rosario
21   collected and your understanding, where was it that
22   Mr. McGee was driving from, and if there's a start time
23   as to where his trip began that day?
24      A.   If I recall, this is going off of memory, I
25   believe he was coming from Boca Raton.  I believe he had

Riso

1
an office up there, and he was heading down to that home
2
3   in Ocean Reef.
4      Q.   Were you able to independently confirm that
5   either by speaking to either Mr. McGee or any data that
6   you were able to receive from the electronic download?
7      A.   I actually -- like I said, now it brings to my
8   memory.  I remember talking to somebody and giving him
9   the location that his transponder had gone through, and
10  so it verified it.  Actually, some of the transponders
11  were not too far from where his business point was.  He
12  was coming from Boca Raton.  And then I did quickly what
13  we call an average, like, speed, how long it would take
14  and see how fast from this point to that point.  And I
15  believe his overall speed over that whole distance was
16  60ish, but it was just something I did just to see, you
17  know, how fast he was driving from Point A down to Point
18  B which is where the crash was.
19     Q.   And were you able to determine whether or not
20  during the time that he drove from Boca Raton until our
21  crash happened as to whether or not he stopped at all?
22  I know you mentioned tolls but whether, in fact, he
23  actually stopped his vehicle.
24     A.   I believe -- and I'm going off from memory, but
25  I believe he did stop one time because I think the data

Riso

1
2   revealed that he got off, I think, when I was talking to
3   somebody and he got right back on.  It's almost like he
4   got off an exit maybe to go to a gas station or
5   something and then come back on.  Not positive, but I
6   believe he did make one stop.
7      Q.   Okay.  I know that your belief, and I think
8   that we -- is there anything that you have specific to
9   indicate that stop and where that might have been?
10     A.   If anything, it would be the data from the
11  pages I told you because all of those are -- you'll see,
12  like, plate-type standards, plate, and it gives the
13  plate of his car, okay?  And then if you look at the
14  plaza, that's the actual -- and if I recall correctly
15  what she said, that's basically the overhead thing that
16  they go by to register his SunPass.  So it's somewhere
17  -- it'll be somewhere there because -- and I don't know
18  how far these transponders are.  I was just trying to
19  see by looking at the data maybe let's see how fast he
20  was coming.  But, like I said, the overall general --
21  because he stopped one time, that speed is really not
22  valid.  I just wanted to see if he was trying to speed,
23  you know, real fast or whatever, and to me, it wasn't
24  apparent.  It was about the average speed coming down.
25     Q.   All right.  Do you know how long -- where he

Page 94

Riso

1    stopped, do you know how long he did stop for?

2        A.   I can't remember.

3        Q.   Is there anything that indicates how long it

4    was that he did stop when he did?

5        A.   Well, like I said, you would have to look at

6    the dates and the time and I guess determine how far

7    those transponders are in between because I'm not sure

8    -- I think the one he got off, I'm not sure if he has --

9    like when you get off the exit, you'll go underneath the

10   transponder.  And then when you get back on, you might

11   go under another one to pay a toll to get back on.  That

12   would probably tell you if that was present but -- you

13   know, I looked into it, but then I said it didn't show

14   anything to help what I was attempting to get at.

15       Q.   And what were you -- I know that you were

16   trying to do a complete investigation, but when you're

17   looking at the trip that Mr. McGee was taking, what is

18   it that you're looking for other than the data itself?

19       A.   Initially, at the time, and I was attempting to

20   see if I had enough for a reckless driving charge, in

21   this case, reckless driving which would cause a death

22   which is basically vehicular homicide if I had enough.

23       Q.   And so what type of information would lead you

24   to a charge of reckless driving that you were looking

Page 95

Riso

1    for?

2        A.   In this case, it would be multiple factors.

3    You can't just rely on speed alone.  You have to have

4    multiple factors like speed, maybe a few more violations

5    like, hence, running a stop sign, running a traffic

6    light, speeding in excess.  Those all help go to

7    contribute.  Not a certain group of these will

8    determine.  You have to get a totality of them and then

9    see if it would be enough for a reckless driving.

10       Q.   And we know and admit, and Mr. Branigan was

11   able to discuss with you that Mr. McGee, of course, did,

12   in fact, run a stop sign and a stoplight at the time of

13   the accident.  But in terms of going backwards and

14   looking at the trip that Mr. McGee had taken, what

15   specifically were you looking for during the trip prior

16   to the crash that would lead to a potential charge of

17   reckless driving?

18       A.   I believe I was trying to look to see how fast

19   he traveled from Point A to B, okay?  And like you said,

20   he had stopped at one point.  So the time and distance

21   calculation would not work because he had stopped.  It's

22   gonna throw off your speed.  So one thing I was able to

23   determine is he went through the toll right at the very

24   end which is Marker 9, Mile Marker 9, I believe, or 10

Page 96

Riso

1    on the Florida Turnpike.  And then he went through the

2    toll on Card Sound Road which should be about four miles

3    from where the crash happened.  And so between those two

4    points, I did a quick time and distance because you

5    remember when you get off the turnpike, he could've hit

6    a traffic light there.  There's a working traffic light

7    right once you get off, so he could've stopped.

8        So, overall, the average speed I remember

9    leaving -- you know, and I was just working this, like,

10   on the top of my head, and I looking at this -- was

11   right around 60 miles per hour.  So from that point all

12   the way down to that toll -- and it is 55 on that road,

13   Card Sound Road.  Yes, he's five miles over, but by

14   Florida statute, you cannot write a citation for zero to

15   five miles over the speed limit unless it's through a

16   school zone.

17       Q.   Okay.  All right.  So it's your understanding

18   that during the time in which he was traveling Card

19   Sound Road, the estimated speed was about the same from

20   beginning to near the end; is that fair?

21       A.   That's fair.

22       Q.   All right.  And during the time that he was

23   traveling on Card Sound Road, are you aware as to

24   whether or not Mr. McGee was using any of the features

Page 97

Riso

1    of autopilot and the suite of autopilot while he was

2    traveling?

3        A.   From the data, it appeared that he had

4    something engaged because -- yes.

5        Q.   And do you know what that something was?

6        A.   I gotta zoom in because this is real small so

7    hold on.  Do you remember the pages that data was on?

8    Oh, here it is, here it is.  Now, another thing you-all

9    should be -- oh, wow, it's all blurry on the side and

10   everything, but I'm trying to zoom in on it.  The times

11   on these, if I recall, was off.  It's in Pacific time, I

12   believe.  So even though it happened in Florida, it was

13   converted into Pacific time so you had to add the time

14   and see.  I remember that so let me look at this a

15   different way so hold on.  Bear with me, gentlemen.  I'm

16   sorry, but I know I was able to look at it as a matter

17   of increasing the PDF to where I can read it.  Here we

18   go.  Is this it?  No, that's the -- okay.  I believe

19   this is it.  Oh, yeah, I got it; I got it.

20       So the time of the crash was, what, 9:14, if I

21   recall, was it?  So that would be toward the end of this

22   sheet of -- okay.  So 9:14, and this has a six or seven

23   so, basically, right now it should be, like, 6:14.  So

24   by the data so -- it looks like traffic aware cruise

Riso

1 control CSR state stand by.  I don't want to say one
2 thing or another by looking at this data.  It's my
3 understanding that if it shows into the file, then at
4 that point it should be engaged.  It looks like a
5 traffic aware cruise control state, and then it says at
6 the top autopilot.  And it states at one point here at
7 6:13:15 p.m., which is right around the crash, it says
8 aborting, and then a few seconds later it says aborted.
9 But if I read this correctly, it looks like -- it sounds
10 like he had that engaged at one point prior to the
11 crash.
12     Q.  All right.  Are you able to determine based on
13 your notes or your investigation or any of the data that
14 you collected as to when and where the autopilot suite
15 was engaged or any part of it was engaged and when it
16 aborted as you've noted?
17     A.  I'd have to go back and look through all the
18 times because these time stamps, some of them, they're
19 like every second, and some of them are listed multiple
20 times.  So hold on.  Let's see here.
21     Q.  And as you're looking, Corporal Riso, I'm just
22 going to ask you a couple of questions about the data
23 that you do have.  The data that you're looking at to
24 determine the answer to my question, where is that data

Riso

1 from?
2     A.  It's from Mr. Ryan McCarthy, the Tesla
3 corporation.
4     Q.  Is the data that you're relying on exclusively
5 provided by Mr. McCarthy?
6     A.  I requested this data.
7     Q.  I understand.
8     A.  I sent him the letter.
9     Q.  I understand.  I'm just asking you if the data
10 that you're relying on was exclusively provided by
11 Mr. McCarthy or Tesla, you know, the Defendant in the
12 case.
13         MR. BRANIGAN:  Objection to form.
14     A.  It wasn't provided by the Defendant, no.  It
15 was actually sent to me from Mr. McCarthy.
16 BY MR. POSES:
17     Q.  Okay.  Mr. McCarthy, you understand, is a Tesla
18 employee?
19     A.  Yes.
20     Q.  Okay.  And so the reason why I'm asking this
21 question is in other vehicles, I know that you're
22 trained and have taken measures to download and then
23 look at data for vehicles other than Teslas in your
24 practice; isn't that right?

Riso

1     A.  Yes, correct.
2     Q.  And when you download the information from
3 other vehicles exclusive of Teslas but any other
4 vehicle, are you able to then look at that data
5 yourself, and you're able to it without any
6 interpretation?
7     A.  That's correct.
8     Q.  All right.  So is it Tesla exclusively that
9 you're unable to do that and that Tesla provides you the
10 data as opposed to you taking it from the car and
11 reading it yourself?
12         MR. BRANIGAN:  Objection; form.
13         MR. POSES:  Go ahead.
14     A.  Not Tesla itself.  There are some other
15 vehicles that we could not image.
16 BY MR. POSES:
17     Q.  Okay.  What kind of vehicles are those?
18     A.  Okay.  I'm not sure.  I would have to look at
19 our computer to see which ones we can and we can't do.
20 I know at that time Tesla was one of them.  I'm not too
21 sure if Boss software has updated their program for it.
22 I'm not sure.  I would have to look in the computer, and
23 that's how we base can we image the vehicle or not.
24 I'll look in the computer, I will get the model, year,

Riso

1 model, and make and then that computer will let me know
2 if I can image it which we use the Boss software.  I
3 just know that there's some that we cannot image.
4     Q.  All right.  And the only one you can think of
5 at this point as we're speaking is Tesla, but there are
6 other auto manufacturers where it is difficult or
7 downloading the data cannot be achieved with your
8 computer?
9     A.  Well, with our program, yes.
10     Q.  All right.  In this case, I know that you got
11 someone from the City of Miami Beach who ultimately
12 became involved in downloading the data for your
13 investigation; is that fair?
14     A.  That's fair.
15     Q.  Was it his training or equipment or both which
16 required for him to be able to achieve the download of
17 the data?
18     A.  It was his equipment.
19     Q.  Okay.  What type of equipment did the City of
20 Miami Beach police officer have that you did not have?
21     A.  He had the program, and I believe it was, if I
22 recall, was from Tesla.  I don't know how he got the
23 program, but he had the program or his license,
24 whatever.  He just had a program that I didn't have that

Riso

1
2  was able to image the data.
3      Q.   And before this investigation, you had not been
4  involved in the downloading of data from Tesla previous;
5  is that fair?
6      A.   Yeah.  That's fair.  I've never -- I've stated
7  before this is the first time I ever dealt with a Tesla
8  crash.  No, I stand corrected.  There was one car back
9  in 2014 where I didn't have to image the data.  It
10  wasn't a fatal crash, and it was the first time ever I
11  realized, oh, fully electric?  But that was back in 2014
12  if I recall.  It was part of my case, but it was a minor
13  crash that happened just before involving one of the
14  vehicles.  And that was the first time I ever knew Tesla
15  corporation ever existed.
16      Q.   All right.  And I apologize.  I know that
17  you've said his name before.  The City of Miami Beach
18  police officer, his name again is?
19      A.   I believe I said Eric Dominguez.  You'll see it
20  in the case summary on this field note packet.
21      Q.   All right.  I'll just refer him -- I didn't
22  want to continue to refer to him as City of Miami Beach
23  police officer.  Let's just call Officer Dominguez.
24          Directly from the download of the data, was he
25  able to either read, talk to you, or discuss and provide

Riso

1
2  the data itself, or did he have to send it to Tesla for
3  it to be interpreted?
4      A.   Hold on.  Let me see something here.  I have it
5  right here, and it actually comes into it.  It says
6  Tesla EDR report, and it's printed in very readable and
7  easy, you know, fashion to understand.  So he basically
8  gave me the data.  I secured it, I took it, and I read
9  it from there.
10      Q.   Okay.  Very good.  So what was the data, then,
11  that Mr. McCarthy provided different from what Officer
12  Dominguez provided?
13      A.   This data gives -- should give -- usually, most
14  of these EDR downloads will give -- it'll give basically
15  the same -- a lot of the same information like delta-vs,
16  negative delta-vs, you know, speed, safety belt, all the
17  same information.  Now, in comparison to data, at least
18  from Mr. McCarthy, that was data specifically about the
19  stuff that I had requested.  That's on that page
20  80-something or other.  I wrote a letter requesting
21  certain stuff to be sent to me, and that's all the data
22  that you would not get that data in an EDR download
23  because that is specifically -- because it's a semi or
24  partially autonomous vehicle.
25      Q.   Do you have the letter that you wrote to Tesla?

Riso

1
2      A.   Yes.
3      Q.   And tell me the date of the letter and who it
4  was authored to.
5      A.   Bear with me.  Oh, wait, I'm in the wrong one.
6  Hold on.
7      Q.   That's okay.
8      A.   Okay.  The date it was authored was May 23,
9  2019, and it was to Tesla corporation, attention Ryan
10  McCarthy, managing counsel.  It's on page 85 of the
11  field note packet.
12      Q.   All right.  And just read into the record,
13  please, if you would, what is it that you -- tell me
14  what you wrote to Mr. McCarthy.
15      A.   From me, subject 2019 Tesla Model S, VIN, and I
16  put the VIN.  And I said a fatal traffic crash occurred
17  on April 25, 2019, at approximately 9:14 p.m. Eastern
18  Standard Time.  This crash occurred at the intersection
19  of County Road 905A, Card Sound Road, and County Road
20  905 in Monroe County, Florida.  I'm assisting.  At the
21  time, it was not mine.  So I'm assisting with the
22  investigation of the incident, and I respectfully
23  request information from the 2019 Model Tesla S VIN.
24          And then I said once again, the date of crash
25  was, time stamp, approximately 9:14 Eastern.  I'm

Riso

1
2  requesting the following data for the relevant device
3  cycle leading to the collision.  And vehicle speed,
4  accelerator pedal position, brake pedal, steering wheel
5  angle, steering torque, head lamp status, autopilot
6  state, traffic aware cruise control state, hands-on
7  state, EDR status/crash algorithm wake up, images,
8  slash, video capture of the incident.
9      Q.   And did you receive all of that data from
10  Mr. McCarthy?
11      A.   I got the video, and I got this data that we're
12  looking at that had the -- now, I don't know if I should
13  say I received all the data or not because I looked at
14  it and, quite frankly, you know, at first when I looked
15  at it, it was quite confusing.  And I had to really look
16  at it and study it to understand it.
17      Q.   Did you have anybody that you consulted with to
18  help you understand the data, or did you do that on your
19  own?
20      A.   I did ask somebody to help me out with it.  I'm
21  not too sure if it was -- and it wasn't somebody
22  locally.  It was either -- I don't know if it was -- and
23  I don't know if it was Mr. McCarthy or somebody else.  I
24  can't remember but somebody who knew about the data or
25  knew how to read the data talk to me about it so I can

Page 106

Riso

1    understand what I was reading.

2        Q.   Did you talk to Mr. McCarthy about the data

3    while you were attempting to understand and interpret

4    it?

5        A.   I might have.  That's what I'm saying,

6    Mr. Posey.  I'm not positive.  I think it was him, but

7    that part I cannot remember.

8        Q.   Okay.  Is there any indication in your report

9    as to any person other than Mr. McCarthy who you might

10   have spoken to about your understanding and

11   interpretation of the data?

12       A.   I can't remember if I wrote that in the report.

13       Q.   Okay.  In your report, on page 22 in the third

14   paragraph, I'm going to read it to you, and I just want

15   you to try to refresh your recollection and understand

16   what happened here.

17           MR. BRANIGAN:  Counsel, sorry to interrupt.

18       Which report are you looking at?

19           MR. POSES:  Thomas, that's okay.  So this is

20       from the investigative report, and it's page 22.

21           MR. BRANIGAN:  Thank you.

22           MR. POSES:  And I'm just reading from the third

23       paragraph.

24   BY MR. POSES:

Page 107

Riso

1        Q.   Corporal, I'm just going to read it real

2    quickly, and then I'll ask you a couple of questions

3    about it.

4        A.   Okay.

5        Q.   It says on May 23, 2019, I contacted Ryan

6    McCarthy, managing counsel, at the Tesla corporation in

7    California.  Mr. McCarthy has assisted with my

8    investigation in this case and provided me with

9    important evidence.  He provided me with the video of

10   the crash which was uploaded to their headquarters in

11   California immediately from the scene of the crash.

12   Mr. McCarthy provided me with the infotainment data

13   uploaded from Vehicle 1 from the scene.

14           So let me just ask you first.  When you say Mr.

15   -- and this is you writing this, I know, but --

16       A.   Yes.

17       Q.   Okay.  And when you said that he assisted you

18   with your investigation, can you tell me more

19   specifically other than what's written here as to what

20   he did to assist you?

21       A.   Basically, you know, I contacted him because I

22   had heard that -- like I said initially, I did not know

23   anything about a Tesla vehicle, and I had to learn a lot

24   from this investigation.  So that's why I sought out

Page 108

Riso

1    them to help me understand what the vehicle can do, and

2    when I say assisted, they were more than helpful.  I

3    even offered, you know, for a subpoena to send out, but

4    they said just write the official letter requesting the

5    information.  And that's what I mean by assisted.  I

6    mean, they didn't assist throughout the whole

7    investigation, just what I basically contacted them,

8    whether it was the data, the video, or some other

9    things.  Other than that, determine later on and after

10   and -- no, that was me, but as far as data and stuff

11   that I needed about the vehicle and stuff like that,

12   they assisted me.

13       Q.   Had you or Officer Rodriguez from Miami Beach

14   made any determinations or had any beliefs as to what

15   happened here and that after speaking to Mr. McCarthy

16   that those beliefs or opinions changed?

17       A.   After getting the download from Mr. Dominguez,

18   that basically ended his part in the investigation so

19   anything after that would be all on me.

20       Q.   Okay.  And I apologize.  I think I said

21   Rodriguez.  I meant Officer Dominguez.

22       A.   Dominguez, yes.

23       Q.   All right.  So after receiving the information

24   from Officer Dominguez and having done your own

Page 109

Riso

1    investigation, you know, we've established now that

2    Mr. McCarthy assisted after that fact.  And did

3    Mr. McCarthy in speaking to him or receiving any

4    information from him, did any of your opinions or

5    observations change after those conversations?

6        A.   None of my opinions changed as to -- well, how

7    do I word this.  It didn't change my opinions about the

8    vehicle.  It just made me understand what the vehicle

9    can do and what it was doing and whatever program or

10   whatever it was set to.  So as far as results -- I don't

11   know where you're going with this, and tell me if I'm

12   answering this correctly, Mr. Poses, it did not change

13   my opinion as to why the crash happened after.

14       Q.   Understand, understand.  How about as it

15   relates to the pedal position of the accelerator?  Is

16   that something that you discussed with Mr. McCarthy?

17       A.   I would be lying to you if I said yes.  I don't

18   remember.  I don't know -- if I did, I don't know why.

19   I just don't remember if I ever talked to him about it.

20       Q.   Okay.  And when I say pedal position, is it

21   fair -- I mean, you understand that we're talking about

22   the accelerator and the position it was in at the time,

23   certain times during the driving that Mr. McGee was

24   doing?

25   doing?

Riso

1
2    A.   Yeah.  I'm trying to see -- I know it was
3 requested in that letter, but now I'm looking at the EDR
4 report.  And generally speaking, my normal EDR downloads
5 will give me a pedal percentage.  So I'm trying to see
6 if it did.  It actually did.  The Tesla data did give me
7 an accelerator pedal percentage.
8    Q.   All right.  And what did that --
9    A.   And the data did.  Now I remember.  Looking at
10 that list of data, I noticed the accelerator pedal
11 position.  I did notice that.
12    Q.   Okay.  And did you put that in your report?
13    A.   I might have, I might have, so hold on.  Do you
14 see it somewhere?
15    Q.   I do, but I'd like you to -- I'm not sure if
16 I'm going to point you exactly in the place that is
17 where you might look.  So let me just ask --
18    A.   I'm trying to --
19    Q.   That's okay, Corporal.  We have time.
20        My question is:  After your review of the data,
21 did you make note of and do you have any information of
22 the pedal position prior to speaking to Mr. McCarthy?
23    A.   Well, here's the thing.  The EDR download, when
24 I look at the data, had an accelerator pedal percentage
25 of 20 percent, meaning he only had to basically push

Riso

1 down 20 percent.  Now I'm looking right now at the EDR
2 data which I have a copy of it here in my computer, but
3 it should be in the field note packet.  Now, if you look
4 on page -- Mr. Branigan and Mr. Poses, look on page 23
5 of the investigative report packet.  You'll see in the
6 middle paragraph I did bring up the accelerator pedal
7 position inside that paragraph.
8    Q.   And I see that here.
9    A.   And I mentioned that it was in auto steer
10 motion too so I must have determined -- I would not have
11 put it in and if I determined based on what was given to
12 me.  I never write something without backing it up.
13    Q.   Okay.  Very good.  Of course.  And so in terms
14 of the pedal position here as referenced on page 23 of
15 the investigative report, you made an indication here as
16 to the pedal percentage was up to 20.8 percent; is that
17 right?
18    A.   That's correct.
19    Q.   And my question is:  Was that something you
20 were able to independently determine from the data that
21 was downloaded by Officer Dominguez, or is that
22 something that was done after Mr. McCarthy assisted you?
23    A.   That 24.8 percent is actually on the data that
24 Mr. McCarthy gave me.  But, like I said, it's 20.8, but

Riso

1 yet the EDR download had it at 20.  So I think that's
2 pretty close and pretty consistent.  It's just off by a
3 point 8.
4    Q.   Okay.  Do you know whether or not the pedal
5 position can automatically move either up or down with
6 the software of the Tesla, or is that required that the
7 driver actually use and engage the pedal with his foot?
8        MR. BRANIGAN:  Objection; lack of foundation.
9        THE WITNESS:  I can answer, right?
10       MR. BRANIGAN:  Yes.
11    A.   I don't know if the Tesla has that capability.
12 If I refer to another vehicle if I may, I just know that
13 in cars that I have, I can have it in what we call
14 cruise control.  And then I can hit a little button, and
15 it will just increase when I put my foot off the pedal.
16 The gas accelerates.  Now, I don't know if that
17 depresses the pedal or not.  I don't know.  And as far
18 as the Tesla, I'm not sure if it has that capability or
19 not.
20 BY MR. POSES:
21    Q.   Okay.  Now, how was it that you were able to
22 determine that Mr. McGee was using the autopilot
23 features while he was on Card Sound Road and immediately
24 before this crash?

Riso

1        MR. BRANIGAN:  Objection; form, but go ahead.
2    A.   It actually says that on the data supplied to
3 me from the vehicle, and it actually says maybe about --
4 looks like it's about 5:56:19 p.m. -- I hope I don't get
5 the time wrong, but it says 5:56 which to me would be
6 8:56 so it looks like it was about 14 -- I don't know
7 how many -- I don't want to make a quick assessment of
8 time and get it wrong because it's in Pacific time, but
9 it did say active restricted.  And then in the right
10 column, it says left time hands on required, not
11 detected.  So he hadn't taken his hands off or at least one
12 hand off.
13 BY MR. POSES:
14    Q.   What happened after that?
15    A.   Every once in a while, that time would go off,
16 I guess, saying about hands on, hands off because the
17 steering wheel on some cases I've had experience with
18 other cars that had that feature where it can detect
19 your hands being on the steering wheel or not.  So I
20 don't want to assume, but it looks like, apparently,
21 like, maybe they had the same feature.  And then down at
22 about April 29th at 5:56:55 p.m., it says active normal
23 for the auto steer.
24    Q.   Do you know what that means?

Riso

1
2    A.   Actually, no.  I'm guessing that it was applied
3  on.
4         MR. BRANIGAN:  Objection; lack of foundation.
5  BY MR. POSES:
6    Q.   What else?
7    A.   It looks like there was nothing in any of the
8  columns on the next page.  So it looks like it was --
9  and if I recall -- do I know what that means?  I'm
10 assuming that it means that the auto steer was on or the
11 cruise control.  So it doesn't look like any -- it looks
12 like every once in a while he keeps taking his hands off
13 the steering wheel because it keeps detecting it.  I'm
14 going down the data, nothing in the auto steer state
15 until we get an active restricted at 6:02:10 p.m. which
16 why it's restricted, like I said, I'm not a Tesla
17 expert.
18         But now we look at -- now it goes back to
19 active nominal.  Is that what I meant?  Maybe I said
20 normal before, but it says nominal.  And that's at 6:02
21 so now we're approximately 12 minutes before the crash
22 which I can't remember how long Card Sound Road is once
23 you get on it.  But, generally, that stretch, it could
24 be 10 miles or longer all the way down, maybe 15 down to
25 the toll, so my estimation is somewhere around, getting

Riso

1
2  onto Card Sound and setting it going down that stretch.
3  But every once in a while, you keep seeing his left hand
4  on required, not detected, so his steering wheel is not
5  detecting his hands at some point.
6         And then it says active restricted again and
7  active nominal at 6:05:29.  Then it goes back to active
8  restricted and then active nominal.  Why it keeps doing
9  that within a couple of seconds, I'm not positive.  And
10 that active nominal is 9:06.
11        And then we have -- then it says for some
12 reason unavailable, and that's -- and it says -- there
13 was an off applying in the brake application, on and
14 then off, like, within a split second.  And that's at
15 right around 6:08:17 p.m.  And as far as the hands on
16 the steering wheel, it says unavailable, available,
17 unavailable, available.  And that last available was at
18 6:08:22 p.m.  Now we're approximately what, five and a
19 half minutes from the crash.
20   Q.   That's right.
21   A.   So now, then next, you know, is -- then it says
22 available.  I'm not sure if that means it was on or not,
23 but then it says left hand on the car.  So now it's
24 detecting his hand is not being on the wheel here and
25 there, so he must keep taking it off whether he -- and

Riso

1
2  I'm not making assumptions.  I'm not here to make
3  assumptions.  I don't.
4    Q.   Thank you.  I appreciate that.
5    A.   I'm not in the car with him, you know, and I
6  did inquire whether the vehicle did have a recorder
7  inside the vehicle which it did not.  I did inquire
8  about that.  Now we're back to active restricted.
9    Q.   Let me stop you for a second, and I want to ask
10 you if at any point in time that we've been discussing
11 that there's any measure of speed that you can tell me
12 either specifically or even a range, and I understand
13 that we went back and measured how long the Card Sound
14 Road was and tried to do an approximation, but can we go
15 to points in time and look at speed other than
16 immediately before the accident?
17   A.   Yeah.  And this data, it tells you about 6:08
18 where it's six minutes before the crash, and so let's
19 say at 60 miles per hour -- I wish I had a calculator.
20 But at 60 miles per hour, I can tell you how many feet
21 per second he's gonna drive.  But it looks as if he's
22 approximately maybe -- like I said, he's about six,
23 maybe six miles from the crash so he's not even at the
24 toll yet --
25   Q.   Let me stop you there.

Riso

1
2    A.   -- is my estimation.
3    Q.   I think I asked you a bad question.  Let me ask
4  you a better question, and I don't want you to
5  approximate based on 60 miles an hour as what was
6  indicated immediately before the crash in terms of his
7  miles per hour but, rather, what I want you to do is
8  look at the data.  And if you can tell me during the
9  times when -- and you're about five or six minutes
10 before the crash.  Can you tell me approximately how
11 fast he was going then with any of the data, not any
12 assumptions but in the data?
13   A.   Yeah.  The data has a range of 64 down to maybe
14 57, 58 depending on where you're at or how far back you
15 are.  There is even a point where he's at 44.  Then all
16 of a sudden for some reason, it doesn't record any
17 speed.  And then it has it pop back up 44, 44, and then
18 50, and then it goes up.  But the data does tell the
19 speed.
20   Q.   Okay.  So there are times in which he's
21 traveling on Card Sound Road that he's going 44 miles an
22 hour?
23   A.   Judging by the time and the time of the crash,
24 he's gotta be on Card Sound Road at that point six
25 minutes before.  He has to be.  And he is down at 44 at

                              Riso

1 some point.
2     Q.   All right.  Looking at the data or in
3 discussing with Mr. McCarthy, do you know why it is that
4 his speed was going up and down while he was traveling
5 on Card Sound Road?
6     A.   At 6:08:15, he's right around 40, 44.  It's
7 almost identical.  Actually, I'm looking at a bunch,
8 yeah, with 1.1 difference at one point, and that's for a
9 few seconds.  Then, eventually, I guess it speeds up.
10 Why that happened, I don't know.
11     Q.   When eventually did it speed up?
12     A.   It looks about six minutes before the crash it
13 starts speeding up.
14     Q.   What does it speed up to?
15     A.   Well, at one point, it was 57.  The highest it
16 went to, it looks like 64 and changed to 65, I'm seeing.
17 And it's fluctuated, 65, and then it goes down into the
18 50s and then back right around 60.3, 60.5, right in the
19 60 range.
20     Q.   And are you able to determine looking at that
21 data as to whether or not that was Mr. McGee
22 manipulating speed and driving, or was it the car
23 itself?
24          MR. BRANIGAN:  Objection; lack of foundation.

                              Riso

1     A.   I cannot tell by looking at it.  I can see, you
2 know, his speed.  I can see his pedal percentage.  I can
3 see if there was CBS.  There is something here that says
4 CBS state override which I don't want to assume.  I
5 would have to ask somebody what that means and somebody
6 from the corporation, somebody who's fluent with this
7 data.
8 BY MR. POSES:
9     Q.   Okay.  You mentioned in Mr. Branigan's
10 questions that your understanding is that this
11 technology, the autopilot technology was to be used on
12 limited access roads; is that fair?
13     A.   I didn't learn that from Mr. McCarthy.  I
14 learned it from the policy manual on the vehicle.
15     Q.   Okay.  And tell me what that means to you
16 specifically.
17     A.   That specifically means to me that in this area
18 of the road, and I might have said it in my report, this
19 vehicle was not supposed to be driven in that state on
20 this type of road.  I believe it says like -- I believe
21 I stated earlier, Mr. Poses, that it's supposed to be
22 driven on a limited access facility so it can recognize
23 the lines in order to drive itself.
24     Q.   Okay.  And is that something that you discussed

                              Riso

1 with Mr. McCarthy?
2     A.   I believe I asked him about it, and he said it
3 was in the manual.  And I found it over there on -- I
4 don't know if it was page 80-something, I believe.  I
5 just -- you know, from what I was doing and you were --
6 I was in contact with you during the investigation, and
7 I was trying to -- you know, I believe it was necessary
8 to evaluate that because of the charges that I was
9 trying to get on it.  I was trying to see that he was
10 driving -- I was trying to prove that he was driving
11 recklessly to see if there was enough for the charges.
12     Q.   I know ultimately you did not file reckless
13 charges.  Let me just go through a couple of questions
14 with you about that, and we'll go back to this other
15 issue.  Was there any indication that Mr. McGee was
16 under the influence of alcohol or drugs?
17     A.   It was brought up.  Some people thought, but
18 there was no indication whatsoever.  There was no --
19 nobody detected any alcohol; nobody could detect
20 anything.  Yeah.  There was no indication of alcohol.
21     Q.   Okay.  And was there any indication of him
22 being intoxicated or otherwise?
23     A.   No, none that I was aware of.
24     Q.   Did you take a look at the medical records when

                              Riso

1 Mr. McGee was taken to the hospital to see if there was
2 any indication of alcohol or blood alcohol level that
3 would suggest that he was under the influence?
4     A.   We always try for policy for every driver.
5 We're supposed to ask whether we have enough for a
6 search warrant.  And if we're not, we always ask if
7 they'll give us permission for a voluntary blood draw.
8 We're supposed to.  Let me check something here.  Just
9 bear with me a second.
10          Okay.  If you look at page 14, the
11 investigative report, you'll see second paragraph down,
12 obviously, you can see I never had contact with D-1,
13 Mr. McGee.  That's D-1 at the scene.  I contacted the
14 MRCC which is Miami Regional Communication Center,
15 basically, my dispatch to have a trooper go to Jackson
16 South Hospital and contact Mr. McGee.  Trooper Odel
17 Mosquera was dispatched at 10:45 p.m. and arrived at
18 South Jackson Hospital 11:09.  The trooper then
19 contacted Mr. McGee and stated he did not observe any
20 indicators of impairment, and I have to trust him on
21 that.  Odor of alcoholic beverage from his person.
22          Trooper then contacted me via cellular phone
23 and relayed the information that D-1 was not impaired.
24 I requested Trooper Mosquera to ask Mr. McGee -- it says

Page 122

Riso

1  here D-1, but I'm gonna say Mr. McGee -- if he would
2  submit to a consensual blood draw.  D-1, Mr. McGee,
3  stated that he did not want to talk or submit to a blood
4  test.  D-1 then stated he is not saying anything without
5  a lawyer.  Per my request, Trooper Mosquera made the
6  request to the nurses to place a hold on any blood drawn
7  from D-1, which is Mr. McGee.
8
9         Now, in reference to more of that, Mr. Poses
10  and Mr. Branigan, we did not have enough for a search
11  warrant so I knew I was not gonna be able to get it from
12  the hospital.  Wait a minute.  I had to prove certain
13  factors in order to get it so if I was able to -- I'm
14  not too sure if I submitted a request or not, but I
15  could not get that unless I had a search warrant.
16     Q.  Okay.  And for a search warrant, there needs to
17  be indication, and I guess your testimony is there
18  wasn't any.
19     A.  Yeah.  And you know it; it would be a search
20  warrant for his blood, and without any probable cause
21  that he had been drinking or consumed any alcohol, I was
22  not going to be able to get it.
23     Q.  Sure.  So let's go back to this question.  And
24  we digressed into a different area, but I want to know
25  if you talked to Mr. McCarthy about the fact that the

Page 123

Riso

1  autopilot, as you understand it, was being used and was
2  on, on Card Sound Road and that that is something that I
3  think that you said in the manual is either you
4  shouldn't do or not advised.  I don't know what you said
5  specifically, and I'm sure it's in the manual.  I would
6  defer to the manual, but tell me if you talked to
7  Mr. McCarthy about the autopilot used on Card Sound
8  Road.
9     A.  I don't remember or recall if I specifically
10  asked him about the autopilot usage, and I believe it
11  was Mr. McCarthy.  I can't remember if it was somebody
12  else that helped me interpret the data because,
13  initially, I didn't know what I was looking at when he
14  gave me that data.  That was, you know, through the
15  infotainment system or whatever system he recorded it.
16  And you said the autopilot, whatever, you said that I
17  asked him about?  Was that your question?
18     Q.  I'll tell you what, Corporal.  I'll re-ask it
19  for you.  I wanted to know -- well, I want to reference
20  back, and then I'll ask you the question.  I know that
21  you had mentioned previously both to Thomas and to me in
22  our questions about the use of autopilot on a road like
23  Card Sound.
24
25         And my question is:  Did you speak to

Page 124

Riso

1  Mr. McCarthy about the fact that the Tesla that
2  Mr. McGee was driving was, in fact, the autopilot was in
3  use on a road like Card Sound?  Did you speak about that
4  with him?
5     A.  I don't recall because once he helped me
6  interpret the data and gave me the data, I made the
7  request to talk to him.  And he gave me the data I
8  requested and helped me understand some of it.  I don't
9  recall if I ever contacted him again about that after.
10    Q.  Okay.  Did you ever speak to Mr. McGee about
11  the fact that he was using his autopilot on Card Sound
12  Road?
13    A.  I never got to talk to him.  He invoked his
14  rights.  He wasn't doing anything, especially after the
15  -- I was always in contact with his attorney, but I
16  believe I might have asked if I could question through
17  his attorney just to cover bases and, obviously, he
18  invoked his right.  It was before I had conversations
19  with his attorney.
20    Q.  Okay.  I want to go in a couple of different
21  areas right now real quickly because I think we can --
22  these are ministerial things, but can you tell me about
23  the lighting at the intersection of Card Sound Road and
24  905, the intersection that is at issue here?

Page 125

Riso

1
2         MR. BRANIGAN:  Objection; form.
3     A.  Hold on.  Bear with me a second.  Because I
4  know it's something I always bring up in these reports
5  too so we do check on lighting.  So hold on.  Here we
6  go.
7  BY MR. POSES:
8     Q.  And, Corporal, while you're looking for it,
9  I'll just ask you a couple questions about some
10  experience.  You've been in Monroe County now for a long
11  time as an FHP officer?
12    A.  I initially came down there in 2001.
13    Q.  Okay.  And Card Sound Road, you're familiar
14  with that road?
15    A.  Very much so.
16    Q.  Can you tell Mr. Branigan and I just, you know,
17  your opinion about Card Sound Road, just generally the
18  type of road that it is and whether or not it's -- well,
19  tell me what's your thought on Card Sound Road.
20    A.  Now, you're bringing up Card Sound Road.  To
21  me, Card Sound Road I'll once in a while drive it but
22  not that often but, generally speaking, I mean, it's a
23  dangerous road.  And there's no center concrete median;
24  there's no wide enough curbs.  It's basically -- to me,
25  it's a dangerous road, and it is generally 55 miles an

Riso

1  hour with hardly any shoulders and some areas where cars
2  pull off to go fishing.  And there's definitely a lot of
3  passing zones.  There have been some bad crashes out
4  there, but we as Florida Highway Patrol don't handle
5  everything on Card Sound Road from Florida City down to
6  just before the toll.  Now, from the toll is the Monroe
7  County line.  Then we handle things on Card Sound all
8  the way up to this intersection.  It's kind of a
9  dangerous road.
10     Now, your other question.  Page 7, gentlemen,
11 you'll see second paragraph or the first full paragraph.
12 You ready?
13     Q.   Yes.
14     A.   You'll see it there.  It says the roadways are
15 dry.  Your question was --
16     MR. BRANIGAN:  One second --
17     THE WITNESS:  Did you get it, Mr. Branigan?
18     MR. BRANIGAN:  I'm there.  Thank you, sir, yes.
19     THE WITNESS:  Okay.  In that paragraph, it says
20     there are no overhead street lights to illuminate the
21     intersection.  There were none.  And there's hardly
22     any street lamps on that road except for certain
23     areas and certain locations, but at this particular
24     intersection, there was not.

Riso

1  BY MR. POSES:
2     Q.   Is it fair to say that the only light at the
3  intersection when it's dark outside like it was here is
4  the flashing red light and whatever reflection you might
5  get from your headlights onto the road signs that are in
6  front?
7     A.   Or even moonlight, and then I would say yes.
8     Q.   Okay.  Thank you.  How about beyond -- and so
9  as you approach this T-intersection, we saw previously
10 that there was a center sign that there were additional
11 signs to its left and right with the one that's most
12 right, the fourth one knocked down.  Beyond those signs,
13 is there any lighting at all?
14     A.   When you say "beyond," you mean into that area
15 where the pedestrians were and the cars --
16     Q.   As you travel --
17     A.   -- there's no lighting over there, yes.
18     Q.   Okay.  Other than the moonlight and perhaps the
19 headlights from the vehicle, there's no light at all in
20 that area --
21     A.   No --
22     Q.   -- is that right?
23     A.   -- no, sir.
24     Q.   All right.  So going back -- and I apologize if

Riso

1  I'm going over something again.  I think that, and just
2  correct me if I'm wrong, is your answer that whether or
3  not you discussed with Mr. McCarthy the use of autopilot
4  on a road like Card Sound, you did not discuss that with
5  him at all; that was not something you engaged in
6  conversation with him?
7     A.   This is probably going back, what, almost three
8  years?
9     Q.   Yeah.
10     A.   I don't recall discussing them, and I'm being
11 truthful and honest.
12     Q.   Sure.
13     A.   I know I called and contacted him to help me
14 get this information that I wanted and how I could get
15 it because I didn't even learn that -- I couldn't
16 believe the information that this vehicle had.  So I
17 didn't know how I could get it, and that's why,
18 eventually, I got directed -- I think it was maybe
19 Mr. Al Prescott that directly called and contacted
20 Mr. McCarthy about it.  And I would be lying to you and
21 Mr. Branigan if I didn't know how to interpret this
22 information without asking for assistance, what I was
23 looking at.
24     So understanding what each column was or vice

Riso

1  versa, I mean, the far left, I can understand the time
2  stamp.  That's a given.  Okay.  What do these features
3  do, whatever.  I honestly can't remember the total
4  context, but I did contact him.  Even after I got the
5  data, I might ask him what does this mean or something
6  like that to help me decipher it because I truthfully
7  did not know.
8     And I was also forwarded the policy manual, and
9  I believe I didn't put that in my packet because I think
10 the thing was over 200 pages.  Not the policy, I mean
11 the manual on the car.  It was too much to include in
12 that.  So I believe it's included on a CD or something
13 at the station, but it was -- so in reference to your
14 thing, what you said about -- I don't remember the
15 context of it.  I just remembered that he helped me
16 understand the information that was on there and thank
17 you.
18     And any further contact with him after, the
19 only thing I can recall about was I was also trying to
20 see if there was any data contained actually in the
21 onboard computer and, hence, the reason why we had to
22 take those parts down to the Coral Gables center and put
23 it in an exemplar car.
24     Q.   All right.  Was it required of you or Officer

Riso

1  Dominguez or anyone who was involved in the
2  investigation to provide data or your reports or any
3  information at all to any governmental agencies, either
4  federal agencies or state agencies?
5     A.  I don't know about Eric Dominguez, and as far
6  as I'm concerned, initially, the NTSB had contacted me.
7  And I honestly don't remember, and I don't believe they
8  had too much more contact after that.  They had a vested
9  interest because it involved an electric vehicle, and
10 that's why I was, like, what's going on here.  And
11 that's why I brought it to the attention of my
12 supervisor.  But as far as after, I don't believe there
13 was too much more after.  I can't remember.  I'd have to
14 look at my e-mails or something like that.
15    Q.  And are your e-mails, and you may have some
16 from me in there or my office so that we could meet and
17 discuss the case, but are all of your e-mails contained
18 within the documents that you have today pursuant to
19 Mr. Branigan's subpoena?
20    A.  I don't normally print and save, you know,
21 e-mails.  Sometimes I do, depending on the situation.  I
22 don't, but I just do know that I try to be careful with
23 everything.  And they are public information.
24    Q.  Okay.  I would ask -- and I'm sure Thomas

Riso

1  agrees but, Thomas, I'd like to ask the corporal after
2  this deposition to send us both a copy of the e-mails
3  that he has on his computer in reference to this case.
4     Corporal, would that be okay?
5     A.  I'd have to pass it through our legal to see if
6  you are authorized to and the certain e-mails I was
7  referring to that I have stored here.  Hold on.  Let me
8  look here.  Let me look to see which ones they are
9  first.  Hold on.
10    MR. BRANIGAN:  I join in the request.  Thanks
11 for making it.
12 BY MR. POSES:
13    Q.  And Corporal, Thomas and I both are interested,
14 and I know we can do a public records request.  But if
15 it's something that's at your fingertips, perhaps it's
16 something that we can accomplish today.
17    A.  Not too sure if we can get it accomplished
18 today because I have to talk to my supervisor now and
19 see what the criteria is for this because you want
20 e-mails that I stored just for my benefit and my
21 investigation, and now you're asking for these e-mails.
22 So I have to see what our legal system says about it.  I
23 highly doubt that it will be offered today.
24    Q.  All right.  With coordination with Thomas's

Riso

1  office, what we'll do is we'll write to you, and it will
2  be for our benefit, both parties.  And we will try to
3  get those from you in whatever the best channel is.  You
4  don't have to work on it now.  Thomas and I will do it
5  together, okay?
6     A.  Yeah.  Just bear with me a second because I'm
7  trying to find the file here.  Hold on.  Okay.  The
8  e-mails I'm talking about might be confidential because
9  they're with the state attorney.
10    Q.  Fair enough.  I think that --
11    A.  And one of them is with the attorney for --
12 they're both from the attorneys.  Remember the issue
13 that I was going with, with the other attorney.  These
14 were e-mails I saved in case.  So because they're with
15 attorneys and state attorneys, I'm not too sure if
16 you're able to get them.
17    Q.  All right.  Let me be fair to Thomas now.  So
18 Thomas, Corporal Riso is referring originally to e-mails
19 that were putting pressure on him from the -- not my
20 clients or I but, rather, the injured, Dillon Angulo's
21 prior attorney, who was demanding and asking for further
22 investigation and a prosecution.  You know, I don't care
23 about those e-mails, and if that's an issue, I don't
24 want them nor do I care.

Riso

1     I'm more interested in the e-mails, and I think
2  Thomas is too, about the Tesla itself and any inquiries
3  that you made with Tesla or NHTSA or any governmental
4  agency and them to you and you to them.  So I think
5  that's what we're interested in?
6     A.  Well, that's what I'm saying.  Like I said,
7  everybody knows our e-mails are public information so
8  there's somewhere in the archives contacts with, you
9  know, the NTSB, Mr. Pellier (phonetic), and I believe
10 Mr. Al Prescott, I believe.  I even mentioned their
11 names in the reports, but they're somewhere in there.  I
12 didn't -- like I said, these files I have, and you
13 understood why I kept these files because they were
14 trying to, like you said, put pressure on me.  And they
15 even complained.  They even -- a letter went up -- I
16 guess what they did.  You know what happened, Mr. Poses.
17    Q.  I do --
18    A.  And I saved these files --
19    Q.  Okay.  Let me stop you for a second.  I think
20 Mr. Branigan, Thomas, deserves the education as to what
21 happened just so we're not talking about something he's
22 unaware of.  Why don't you tell us very briefly and put
23 on the record what it was that did happen just so Thomas
24 is educated.

Riso

1
2     A.   Of course, I tried to get the criminal charges
3   on it so I saved my e-mails with the state attorney
4   because I strongly believe we had him.  And then the
5   attorney for -- the original attorney, because I believe
6   he was fired eventually by the client, eventually had
7   written a letter up to -- I don't know if it was major
8   or not and it trickled down and it did not go over too
9   well, did not make me too happy.  And I believe you were
10  down in Marathon, Mr. Poses, at that time when that
11  happened.  I was not very happy about it.
12    Q.   That's right.
13    A.   So I basically saved all the e-mails to help
14  back me up, and that's why.  And they're from the
15  attorney, and that's privileged.  And then I saved the
16  e-mails from the state attorney, but it was just for
17  personal use in case.  So that's why.  Now ...
18        MR. POSES:  That's fine.  I just wanted Thomas
19    to get a flavor of and understand better what it is,
20    you know, that there's categories of e-mails and the
21    ones that likely are inadmissible but, nevertheless,
22    are probably discoverable.  And so Thomas and I will
23    write to you about that together and try to get them,
24    all right?
25        MR. BRANIGAN:  Thank you.  I appreciate that

Riso

1
2   background, and I agree with Counsel.
3   BY MR. POSES:
4     Q.   Okay.  All right.  Corporal, let's move on to
5   just a couple more issues, and Thomas likely will have
6   questions and follow up, but let me ask you about the
7   collision avoidance system.  Are you aware of what that
8   is in a Tesla?
9     A.   Not necessarily.
10    Q.   Okay.  Did you have any conversations with
11  Mr. McCarthy about the collision avoidance system or the
12  automatic braking system that the Tesla has?
13    A.   No.  I don't recall -- I don't remember; I'm
14  being honest -- if I had that with them.
15    Q.   And both Thomas and I know that you're being
16  honest.  I think it's called collision avoidance assist
17  so let me just -- and I'll just re-ask the question just
18  so it's clear for the record.
19        Collision avoidance assist, are you aware of
20  what that is or it's part of the autopilot suite in a
21  Tesla?
22    A.   Not totally aware of it.  I might have heard
23  about it.
24    Q.   In your notes or in your investigation, do you
25  have anything to indicate that the collision avoidance

Riso

1
2   assist was either engaged, in use, you know, was
3   employed at the time in any way?
4     A.   I just closed that one out.  Hold on.  I would
5   have to study it, Mr. Poses, to look at it.  Offhand, I
6   don't remember.  I don't know if it tells me that.  I'm
7   being honest.  I would have to look at it.
8     Q.   All right.  Let me ask you, then, generally.
9   Did you have a conversation with Mr. McCarthy about
10  either why or why not the Tesla and its autopilot suite
11  either could or should have done anything to potentially
12  mitigate or avoid this accident?
13    A.   Not that I'm aware of.
14    Q.   All right.  Did he offer any information about
15  autopilot's features and discuss with you, you know,
16  what the autopilot features and collision avoidance
17  assist specifically is capable of in a situation like
18  this?
19        MR. BRANIGAN:  Objection; form.
20    A.   I honestly don't recall.  But, like I said
21  again, Mr. Poses, I'm probably gonna say the same thing,
22  I do remember talking to him about that.  I just don't
23  remember all the specifics about it.
24  BY MR. POSES:
25    Q.   Other than what you provided today, your report

Riso

1
2   and everything in response to Thomas's subpoena, are
3   there any other documents, either your field notes or
4   perhaps text messages or any conversations that might
5   also be responsive to Thomas's subpoena?
6     A.   I don't understand your question.
7     Q.   And I'll be very specific, and then I'll move
8   on.  Do you have any notes or documentation as it
9   relates to your conversations with Mr. McCarthy other
10  than what you've already disclosed in your report?
11    A.   Let me see here.  I do have some notes here,
12  but they, once again, are e-mails.  Whatever it is I'm
13  looking at is about when the phone call began and ended.
14  So he gave me information about the phone call that was,
15  I guess, recorded through the system.  He gave me the
16  time it started and the phone number, and I called the
17  number.
18    Q.   It was American Airlines, right?
19    A.   Yes, it was.  And, honestly, Mr. -- I'm
20  forgetting his name right now.
21    Q.   McGee.
22    A.   Mr. McGee, he was truthful.  He was on the
23  phone with American Airlines, and even via the subpoena
24  when I called that number saying what phone number he
25  was on, guess what, welcome to American Airlines.  So he

Page 138

Riso

1 didn't lie about it.  It verified, yeah, he was truthful
2 about he was on the phone.
3    Q.  All right.  Just a couple of follow-ups.  I'm
4 almost done.  Did you ever learn where Mr. McGee's phone
5 was in the vehicle when he was, you know, he says,
6 looking for it?
7    A.  You know, you brought that up, and I honestly
8 can't remember because -- and I say this, the reason why
9 is at the very beginning of this, I wasn't the lead
10 investigator.  I was just monitoring what they were
11 doing.  I was actually watching from afar and a little
12 bit interacting especially, like I said, with the state
13 attorney from the scene.  And then I made the call to go
14 for the blood just to help out while they did what
15 they're supposed to do at the scene.  So it wasn't mine,
16 but I did help out a little bit.  So I can't remember
17 anything about the phone.
18       MR. POSES:  Okay.  All right.  Corporal, I'm
19    very happy we're able to take your deposition today.
20    I know Thomas might have some follow-up questions,
21    but I was supposed to be in trial.  It didn't happen.
22    Thomas understands.  As we get ready a lot, and
23    sometimes they don't go.
24       THE WITNESS:  Just for the record, and you were

Page 139

Riso

1 inquiring about my e-mails, sometimes I save them and
2 sometimes I don't.  But I try to be careful about
3 what I include and what I don't include, you know,
4 because of what the contexts of e-mails are and stuff
5 like that.  And I'll inquire about the e-mails
6 because you did say between the Tesla corporation,
7 right, and the NTSB.  Well, there was the NHTSA,
8 National Highway Transportation Association, and
9 there's e-mails from them too.
10       MR. POSES:  Right.  I understand.
11       THE WITNESS:  So I'm very concerned about
12    giving up the e-mails that I saved for other
13    purposes, but I'm just letting you know that I did
14    have contact with some people from the NHTSA which
15    they are part of the NTSB, I guess.  Maybe I said
16    that wrong, the NTSB, but I think it was the NHTSA or
17    something so ...
18       MR. POSES:  Corporal, I'll tell you what.  I'll
19    save you the trouble.  Thomas and I really are gonna
20    -- I think we're, as a matter of law, entitled to
21    them, but if there's any issue or objection that
22    perhaps the attorney for the FHP has, we'll deal with
23    it.  But I think those e-mails are relevant to our
24    case, and we're not asking for them today.  We're

Page 140

Riso

1 going to figure out the best way to get them from
2 you, and we can share them amongst the parties, okay?
3       THE WITNESS:  Okay.  I will inquire with our
4    legal about giving up some, you know, information
5    but, like I said before, I just do know they're
6    public and you can get them.  It's just a matter of
7    whether you can get them from me.
8 BY MR. POSES:
9    Q.  I understand.  All right.  This is the last
10 question, I promise.  Where in Italy are you moving?
11    A.  Far away from the United States.
12       MR. POSES:  That's all of Italy.
13       THE WITNESS:  No, Southern Italy.
14       MR. POSES:  I went to law school for a semester
15    in Florence, and I traveled a lot there.
16       THE WITNESS:  No, Calabria.
17       MR. POSES:  You're going to Calabria.  Very
18 cool.
19       Thomas, go ahead.
20            REDIRECT EXAMINATION
21 BY MR. BRANIGAN:
22    Q.  Corporal, you said that Card Sound Road is a
23 dangerous road based on your personal experience and
24 professional experience.  And you also said that in the

Page 141

Riso

1 general area around the intersection of Card Sound Road
2 and County Road 905, there are very few street lights.
3 Would you agree that those are reasons that a driver
4 like Mr. McGee should be paying careful attention while
5 driving down this road at night?
6       MR. POSES:  Object to the form.
7    A.  Personally and professionally, you should pay
8 attention when you're driving on that road because its
9 visibility is limited.  There are a lot of bumps and
10 divots in the road, and there are areas, like even prior
11 to the crash, there's a curve in the road where speed is
12 supposed to be reduced.  So I would say, yes, you should
13 pay attention and, I guess, drive in a prudent manner.
14 BY MR. BRANIGAN:
15    Q.  And while you say visibility is limited, you
16 still made note in your report that the red flashing
17 light alerting drivers paying attention that they need
18 to stop was visible for four-tenths of a mile, correct?
19    A.  That's correct.  And when I say visibility is
20 limited, you said Card Sound Road, not the area of the
21 crash.  And I made note of that because I even drove
22 through there to see about the visibility at night.  And
23 then when you look at the video that was downloaded from
24 the car, you can clearly see it because it was -- was it

Page 142

Riso

1
2   six seconds before I think it recorded?  Not five.  I
3   think it was six seconds.
4        Q.    Five.
5        A.    Was it five seconds?
6        Q.    I believe it was five.
7        A.    Five seconds prior to the crash.  You could
8   clearly see that flashing light and the stop sign.
9        Q.    Four-tenths of a mile, that's over 2,000 feet,
10  correct?
11       A.    Yeah.  Right around there.
12            MR. BRANIGAN:  Thank you, Corporal.  I know
13       Mr. Poses and I both really appreciate your time
14       today.  I don't have anything further for you.
15            MR. POSES:  Thanks.  Thomas, since it's your
16       depo, you want to explain read and waive?
17            MR. BRANIGAN:  Yes, I will.
18            So Corporal, as you know, I'm sure from prior
19       testimony, a copy of the deposition can be provided
20       to you, and you can read it and sign the transcript
21       and complete an errata sheet if there's any
22       typographical errors that need to be corrected.  Or
23       you can waive signature if you prefer not to go
24       through that process.  It's up to you.
25            THE WITNESS:  Can I ask you this?  Is there any

Page 143

Riso

1
2   necessity for me to have this down the road, if you
3   know what I mean, because if I read it, I would read
4   it so I can have a copy.
5            MR. POSES:  We'll give you a copy.  Thomas?
6            MR. BRANIGAN:  We'll be glad to give you a copy
7   of it now or any time in the future should there be a
8   need for you to have it.
9            THE WITNESS:  Okay.  Then just provide me when
10  I need it, and I guess I'll waive.  But down the road
11  we'll see if I need it.
12            MR. BRANIGAN:  Very good. 12:59:43
13            THE COURT REPORTER:  Mr. Branigan, standing 12:59:49
14  order? 12:59:59
15            MR. BRANIGAN:  Yes.  And I will e-mail you, or 13:00:01
16  my assistant will e-mail you the exhibits.
17            THE COURT REPORTER:  And Mr. Poses, I assume
18  you're needing a copy?
19            MR. POSES:  Yes, please.
20            (Time noted:  1:00 p.m.)
21                      - - - - -
22
23
24
25

Page 144

1                   CERTIFICATE OF OATH
2
3   STATE OF FLORIDA
4   COUNTY OF ORANGE
5
6        I, Margaret Lowe, Registered Professional
7   Reporter, Notary Public, State of Florida, certify that
8   CORPORAL DAVID RISO appeared remotely and was duly sworn
9   on the 21st day of January, 2022.
10       SIGNED this 2nd day of February, 2022.
11
12
13
                        _____
14                      Margaret Lowe, RPR
                        Notary Public - State of Florida
15                      Commission No.:  GG923815
                        Commission Expires:  11/01/2023
16
17
18
19
20
21
22
23
24
25

Page 145

1                 CERTIFICATE OF REPORTER
2
3   STATE OF FLORIDA
4   COUNTY OF ORANGE
5
6        I, Margaret Lowe, Registered Professional
7   Reporter, certify that I was authorized to and did
8   stenographically report the deposition of CORPORAL DAVID
9   RISO; that a review of the transcript was not requested;
10  and that the foregoing transcript, pages 4 through 143,
11  is a true and complete record of my stenographic notes.
12       I further certify that I am not a relative,
13  employee, attorney, or counsel of any of the parties,
14  nor am I a relative or employee of any of the parties'
15  attorneys or counsel connected with the action, nor am I
16  financially interested in the action.
17       DATED this 2nd day of February, 2022.
18
19
20       *Margaret Lowe*
                        _____
21                      Margaret Lowe, RPR
22
23
24
25

Page 146

```
1                J U R A T
2
3   I,          , do hereby certify under
4   penalty of perjury that I have read the foregoing
5   transcript of my deposition taken on        ;
6   that I have made such corrections as appear noted
7   herein in ink, initialed by me; that my testimony as
8   contained herein, as corrected, is true and correct.
9
10  DATED this ____ day of _____, 22  ,
11  at _____,        .
12
13
14
15
16
17  _____
18          SIGNATURE OF WITNESS
19
20
21
22
23
24
25
```

Page 147

```
1                ERRATA SHEET
2   Case Name:
3   Deposition Date:
4   Deponent:
5   Pg.  No. Now Reads    Should Read  Reason
6   ___  ___ _____    _____    _____
7   ___  ___ _____    _____    _____
8   ___  ___ _____    _____    _____
9   ___  ___ _____    _____    _____
10  ___  ___ _____    _____    _____
11  ___  ___ _____    _____    _____
12  ___  ___ _____    _____    _____
13  ___  ___ _____    _____    _____
14  ___  ___ _____    _____    _____
15  ___  ___ _____    _____    _____
16  ___  ___ _____    _____    _____
17  ___  ___ _____    _____    _____
18  ___  ___ _____    _____    _____
19  ___  ___ _____    _____    _____
20
                   _____
21                      Signature of Deponent
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2022.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____
```

**0**

**0.61** 75:8

**1**

**1** 5:25 16:6 21:19,25
43:3 45:24 62:4,5,9
69:23 70:25 71:6,7
75:20 88:10 107:14

**1's** 72:22

**1.1** 118:9

**10** 26:25 27:2,6 45:21
61:21 70:2 90:25
95:25 114:24

**10:23** 42:7

**10:45** 121:18

**11:09** 121:19

**12** 27:16 114:21

**123** 45:17

**12:59:43** 143:12

**12:59:49** 143:13

**12:59:59** 143:14

**13** 8:7

**13:00:01** 143:15

**14** 14:11 73:21 74:8,
21 113:7 121:11

**15** 14:11 18:20 25:17
72:4 74:21 114:24

**153** 32:25 33:15
40:22

**15th** 76:19

**17** 74:8

**17th** 12:16

**19** 5:25

**190** 31:10,19,23

**196** 32:7

**1965** 8:7

**1983** 8:13

**1992** 8:25

**1:00** 143:20

**1:51** 70:2

**2**

**2** 16:6 30:9,13,16 32:3
33:9 49:14 69:23
70:21 71:2 76:14
88:5,10

**2,000** 142:9

**20** 17:20,23,24 39:23
50:21 110:25 111:2
112:2

**20.8** 111:17,25

**200** 129:11

**2001** 8:4,25 9:20
10:5,6 12:6,13,15
125:12

**2005** 10:14 12:4

**2012** 17:8

**2013** 17:9

**2014** 18:20 102:9,11

**2015** 14:25

**2019** 23:9 29:11
30:23 38:11 41:15
42:7 43:24,25 62:5
63:13 70:2 82:18
85:9 86:16 87:11
88:4 104:9,15,17,23
107:6

**2020** 39:24 40:18

**208** 33:3

**22** 106:14,21

**23** 25:11,15 104:8
107:6 111:5,15

**24-hours** 65:18

**24.8** 111:24

**25** 23:9 29:11 30:23
38:11 42:7 43:24
76:24,25 104:17

**26** 12:15

**28** 39:23 63:12

**29** 41:15

**29th** 113:23

**3**

**3** 16:6 32:5 33:5,10,14
41:10,21,22 43:6

**300** 17:25

**30th** 76:21

**31** 37:18 69:21 70:16,
22 75:16

**316.1925(1)** 80:16

**32** 37:21 75:19 80:2,
14

**33** 37:21

**33175** 6:3

**37** 76:8,9,11

**38** 32:17

**3841** 46:3

**39** 32:15

**4**

**4** 35:20 36:2,15,22
38:9 44:6 46:16,25
47:22 48:3 69:24

**40** 61:14 118:7

**41.53** 74:5

**44** 117:15,17,21,25
118:7

**45** 61:5,7

**47.41** 72:23

**5**

**5** 40:20 41:12,13
44:16,17,19 54:13,21
71:14

**50** 8:2 117:18

**500** 48:23

**50s** 118:19

**52ish** 75:9

**54** 74:17 75:12

**55** 32:20 96:13
125:25

**56** 74:4

**56.1** 74:18

**56.84** 72:24

**57** 48:4,5 117:14
118:16

**58** 117:14

**5:56** 113:6

**5:56:19** 113:5

**5:56:55** 113:23

**6**

**6** 55:5,9,11

**60** 32:8,9 35:20 36:4,
14 47:25 71:18 96:12
116:19,20 117:5
118:20

**60-page** 47:23

**60.23** 71:12

**60.3** 118:19

**60.5** 118:19

**60ish** 92:16

**61** 32:10

**64** 117:13 118:17

**65** 118:17,18

**67** 48:4

**6:02** 114:20

**6:02:10** 114:15

**6:05:29** 115:7

**6:08** 116:17

**6:08:15** 118:7

**6:08:17** 115:15

**6:08:22** 115:18

**6:13:15** 98:8

**6:14** 97:24

**6th** 8:13

**7**

**7** 58:18,20,23 60:9
126:11

**8**

**8** 112:4

**80** 14:2

**80-something**
103:20 120:5

**84** 72:17,19 75:6

**85** 83:19 104:10

**87** 91:16

**89** 91:16

**8:56** 113:7

**9**

**9** 95:25

**90** 30:13

**905** 30:24 51:20,24,
25 53:9,12,23 55:3
58:25 65:15 104:20
124:25 141:3

**905A** 30:23 51:18
53:5 75:22 104:19

**911** 42:20,21,23 43:3

**96** 10:11

**97** 10:13 71:7,15
72:18 85:4

**98** 10:13

**9:06** 115:10

**9:14** 42:22 97:21,23
104:17,25

**A**

**aborted** 98:9,17

**aborting** 98:9

**academy** 9:3 12:7,
11,13,21 13:4

**accelerates** 112:17

**accelerator** 105:4 109:16,23 110:7,10, 24 111:7

**accept** 63:2

**accepted** 16:15 17:2

**access** 86:6 119:13, 23

**accident** 12:22 13:19 14:9,16,17 16:6 50:8 91:7 95:14 116:16 136:12

**accidents** 16:13 18:4

**accomplish** 131:17

**accomplished** 131:18

**achieve** 101:17

**achieved** 101:8

**ACM** 69:22 70:23,24

**active** 44:3 113:10, 23 114:15,19 115:6, 7,8,10 116:8

**activities** 43:23

**activity** 41:14,22,23 42:13 43:6,7,22

**acts** 33:25

**actual** 16:9 44:11 50:16 93:14

**adapter** 72:16

**add** 34:7 49:7 97:14

**added** 34:10

**additional** 34:7 127:11

**address** 5:22,25 6:24 19:25

**Administration** 87:16

**admit** 95:11

**admitted** 67:17,21

**advanced** 14:19 15:12 16:17,20,24 28:6 40:4 88:5

**advised** 123:5

**afar** 138:12

**affidavit** 34:9

**affirm** 5:3

**agencies** 130:4,5

**agency** 133:5

**agree** 43:21 52:5 55:22 56:3 78:12 79:25 135:2 141:4

**agreement** 5:20

**agrees** 131:2

**ahead** 52:7 56:11 59:8 63:10 71:21 89:8 100:14 113:2 140:20

**air** 15:19 70:24 75:3

**Airlines** 137:18,23, 25

**alcohol** 120:17,20,21 121:3 122:21

**alcoholic** 121:22

**alerting** 141:18

**algorithm** 105:7

**allowed** 11:21

**Alvarez** 46:21,22

**amended** 21:20,25

**Amendment** 63:18

**American** 20:3 137:18,23,25

**amount** 26:2 77:3

**analysis** 74:9,10,20 90:4

**analyzed** 81:24

**analyzing** 66:12

**angle** 105:5

**Angulo's** 132:21

**answering** 109:13

**anymore** 9:14 15:10 48:24 50:25

**apologize** 47:11,16 76:25 81:11 102:16

108:21 127:25

**apparent** 93:24

**apparently** 113:21

**appeared** 97:4

**appears** 55:23 56:4

**application** 115:13

**applied** 72:14,18 114:2

**apply** 16:8

**applying** 115:13

**approach** 61:5,8 127:10

**approaching** 59:6 61:11

**approval** 20:9

**approved** 26:14 46:23

**approving** 31:13 39:22

**approximate** 117:5

**approximately** 16:16 104:17,25 114:21 115:18 116:22 117:10

**approximation** 116:14

**April** 17:9 20:17,25 23:9 29:11 30:23 38:11 42:7 43:24 76:21,24,25 104:17 113:23

**arced** 52:15

**archive** 25:21

**archives** 25:20 133:9

**area** 17:19 23:9 52:3, 12,25 53:22 54:9 60:24 65:7,8,13,16 66:15,25 119:18 122:24 127:15,21 141:2,21

**areas** 9:7 124:22 126:2,24 141:11

**Army** 10:8,10,17

**arrest** 34:9 35:10

**arrived** 41:23 42:3,6 62:14 121:18

**arrow** 59:15

**art** 8:14,17,19

**assessment** 113:8

**assigned** 27:22 29:18 39:7,14,19

**assignment** 36:23

**assignments** 49:19

**assist** 107:21 108:7 135:16,19 136:2,17

**assistance** 78:17 88:5 128:23

**assistant** 143:16

**assisted** 18:7 45:8 107:8,18 108:3,6,13 109:3 111:23

**assisting** 18:12 104:20,21

**associate** 19:14

**Association** 139:9

**assume** 113:21 119:5 143:17

**assuming** 114:10

**assumptions** 116:2, 3 117:12

**AT&T** 68:8

**attached** 81:2

**attempting** 94:15,20 106:4

**attention** 18:3 29:10 57:19 59:7 69:5 71:4 89:7 104:9 130:12 141:5,9,14,18

**attorney** 24:2 25:16 30:6 34:19 62:25 124:16,18,20 132:10, 12,14,22 134:3,5,15, 16 138:14 139:23

**attorney's** 30:5

**attorneys** 23:25 132:13,16

**audio** 9:23 10:24 64:17

**August** 12:15,16 14:24 39:23 40:17

**authored** 37:10,11, 13 42:5 104:4,8

**authorized** 131:7

**auto** 101:7 111:10 113:24 114:10,14

**automatic** 135:12

**automatically** 112:6

**Automotive** 87:15

**autonomous** 85:23 86:3 87:14,18,19 88:11,16,20 103:24

**autopilot** 85:14,15 97:2 98:7,15 105:5 112:23 119:12 123:2, 8,11,17,23 124:3,12 128:4 135:20 136:10, 16

**autopilot's** 136:15

**average** 92:13 93:24 96:9

**avoid** 78:24 89:16 136:12

**avoidance** 135:7,11, 16,19,25 136:16

**aware** 61:3 79:21 87:12,17,25 88:2,10, 19 96:24 97:25 98:6 105:6 120:24 135:7, 19,22 136:13

---

**B**

**back** 8:4,12 10:13 17:7 18:19 32:3 34:12 38:8 40:8,9 47:21 49:13 50:13 51:8 54:24 59:21,25 75:15 76:19 86:24 87:20 93:3,5 94:11, 12 98:18 102:8,11 114:18 115:7 116:8, 13 117:14,17 118:19 120:15 122:23 123:21 127:25 128:8

134:14

**background** 27:15
135:2

**backing** 111:13

**backslash** 69:22
70:24

**backwards** 95:14

**bad** 117:3 126:4

**bag** 15:19 70:24 75:3

**Baker** 31:14 37:14
44:9

**ballpark** 75:12

**bar** 57:18 58:5,10,12,
24

**bars** 54:10

**base** 100:24

**based** 28:16 50:4,5,
16 60:6 64:24 74:6
75:10 81:19,23 88:12
90:3 98:13 111:12
117:5 140:24

**bases** 124:18

**basic** 8:5 13:24 14:19
45:22

**basically** 13:8 14:4
15:11,18 17:24 22:16
23:6 28:6,17,21
34:25 35:18 36:24
37:2 38:7 49:5 58:15
59:13,15 63:12 70:5
73:25 74:17 76:12
93:15 94:23 97:24
103:7,14 107:22
108:8,19 110:25
121:16 125:24
134:13

**Beach** 70:3 101:12,
21 102:17,22 108:14

**bear** 11:20,24 30:9
33:11 44:13 51:21
54:17 58:16 69:18
97:16 104:5 121:10
125:3 132:7

**Beautiful** 20:7

**began** 91:23 137:13

**begin** 24:17

**beginning** 38:8,18
43:6 75:16 96:21
138:10

**begins** 85:4

**behalf** 48:13

**belief** 7:19 60:6 93:7

**beliefs** 108:15,17

**believed** 78:7 82:6

**belt** 103:16

**belts** 77:12

**Benavides** 5:17

**benefit** 24:24 41:9
131:21 132:3

**bet** 32:10

**beverage** 121:22

**big** 36:19 60:15

**birth** 8:6

**bit** 8:8 9:23 18:7
20:25 38:18 43:14
45:5 47:15 48:8
60:18 71:11 74:16
75:11 138:13,17

**black** 35:24

**blocking** 60:4

**blood** 121:3,8 122:3,
4,7,20 138:15

**blurry** 97:10

**Boca** 91:25 92:12,20

**body** 64:7,17,18,25
66:12

**bold** 80:14

**Bosnia** 10:12

**Boss** 100:22 101:3

**bottom** 28:17 31:24
32:25 34:5,6 37:18,
20 41:13,14 48:3,9,
16 49:6 54:13 76:14
80:14

**bought** 66:7,10

**brake** 105:4 115:13

**brakes** 72:14,18
77:11,16,17 78:8,13
79:13 80:4

**braking** 135:12

**Branigan** 5:12,13
9:22 10:3,23 11:7,10
22:3 30:15 33:7
35:22 44:21 52:17
55:7,10 58:21 61:13,
20,25 63:14,25 67:20
71:24 72:2 79:4,15,
24 80:13,20 81:15,18
82:5,17 88:21 89:6
90:10 95:11 99:14
100:13 106:18,22
111:5 112:9,11 113:2
114:4 118:25 122:10
125:2,16 126:17,18,
19 128:22 131:11
133:21 134:25
136:19 140:22
141:15 142:12,17
143:6,12,13,15

**Branigan's** 119:10
130:20

**break** 61:15,18,24
90:24

**breaking** 71:20

**briefly** 133:23

**bring** 23:6,10 61:7
69:15 86:18,21,23
111:7 125:4

**bringing** 22:12
125:20

**brings** 92:7

**broken** 36:10 49:19

**brought** 51:9 87:5
120:18 130:12 138:8

**building** 86:19

**bumps** 141:10

**bunch** 25:16 118:8

**burglaries** 11:15

**business** 5:22,24
92:11

**button** 112:15

**bypass** 63:24

## C

**C-E-S-S-A-T-I-O-N**
58:3

**CAD** 42:9,19,20

**Calabria** 140:17,18

**calculate** 28:16

**calculated** 72:23,24
74:6

**calculating** 75:10

**calculation** 73:24
95:22

**calculations** 32:13
35:4 70:12 73:7,9,12
74:2 75:2,10,12

**calculator** 116:19

**California** 83:3
107:8,12

**call** 9:8,9 12:4,25
13:25 15:10 22:19
24:7 30:5 42:9,20,21,
23 43:3 52:12,13
56:7 76:4 92:13
102:23 112:14
137:13,14 138:14

**called** 16:16 29:13,
16,17 30:6 36:25
41:11 65:17 85:15
128:14,20 135:16
137:16,24

**calls** 28:3 42:23 44:8

**cam** 64:7,17,18,25
66:12

**camera** 15:7 85:6

**capability** 112:12,19

**capable** 136:17

**capture** 105:8

**car** 11:2 35:6 82:15
93:13 100:11 102:8
115:23 116:5 118:23
129:12,24 141:25

**Card** 51:14,18,22
52:2 53:5,18,22
54:23 55:13,14 56:16
58:9 59:6 61:4 96:3,

14,19,24 104:19
112:24 114:22 115:2
116:13 117:21,24
118:6 123:3,8,24
124:4,12,24 125:13,
17,19,20,21 126:6,8
128:5 140:23 141:2,
21

**care** 132:23,25

**career** 17:12

**careful** 130:23 139:3
141:5

**careless** 80:16
81:20,25

**Carlos** 45:7,18,20
49:10 76:8,13 78:2

**cars** 28:12 112:14
113:19 126:2 127:16

**case** 5:16 18:16,20
19:14,22 22:15 23:2
24:9 25:10,14 26:6,
12 27:23 28:5 39:3
40:11 41:14,15,22
43:5,22,23 44:10
57:16 74:22 77:7,20
78:20 83:11 94:22
95:3 99:13 101:11
102:12,20 107:9
130:18 131:4 132:15
134:17 139:25

**cases** 14:4 16:21,23
25:3 28:15 40:2 75:4
113:18

**categories** 134:20

**causation** 82:16

**caused** 78:21,22,23

**caution** 57:16

**CBS** 119:4,5

**CD** 129:13

**CDL** 9:18

**CDS** 29:8 37:5

**cell** 67:13 68:2,14,24

**cellular** 121:23

**center** 52:22 54:6
59:14 121:15 125:23
127:11 129:23

**certificates** 14:14

**certified** 69:14,15

**cessation** 57:25 58:3

**chain** 31:15

**change** 10:4,5 37:24 44:13 109:6,8,13

**changed** 9:19 16:23 24:10 108:17 109:7 118:17

**channel** 132:4

**channels** 45:11

**characterized** 16:5

**charge** 39:9 94:21,25 95:17

**charged** 80:23

**charges** 28:19 120:9,12,14 134:2

**charging** 34:8

**check** 77:11 121:9 125:5

**checklist** 34:2,23

**Chevy** 77:20

**chime** 85:21

**circle** 73:23

**circuit** 19:10

**citation** 34:9 63:3,9 80:25 81:6,12,20 96:15

**citizenship** 20:8,9

**City** 101:12,20 102:17,22 126:6

**claimed** 66:14

**clarification** 70:14

**clarify** 74:17

**class** 13:22

**classes** 13:21 14:8 15:25

**clear** 60:20 135:18

**clerk** 22:23,24

**client** 134:6

**clients** 132:21

**Clinton** 10:13

**close** 112:3

**closed** 136:4

**code** 6:2 46:3 80:16

**colleague** 19:13

**collect** 11:19 28:18 38:19,21

**collected** 18:19 24:12 74:3 86:22 91:18,21 98:15

**college** 8:14

**collision** 105:3 135:7,11,16,19,25 136:16

**collisions** 13:13

**colonel** 16:15

**column** 113:11 128:25

**columns** 114:8

**combination** 50:5

**combined** 32:6 74:2

**command** 31:16

**comments** 7:13

**commercial** 15:2

**communication** 23:23 24:13 84:15 85:12 121:15

**communications** 23:24

**community** 13:10 65:17

**companies** 22:21

**comparison** 103:17

**complained** 133:16

**complete** 11:25 23:20 57:10,24,25 58:4 94:17 142:21

**completed** 14:9 15:25 40:14 41:18 46:2,6,9,14 50:22

67:11 88:14

**completing** 70:8 88:23

**complying** 89:24

**computer** 21:16 41:4,6,8 86:22 87:2 100:20,23,25 101:2,9 111:3 129:22 131:4

**computer-aided** 15:16

**concern** 22:13,20

**concerned** 130:7 139:12

**concluded** 90:6

**concludes** 37:16,20

**conclusion** 81:22

**conclusions** 84:21

**concrete** 125:23

**condition** 82:6

**conduct** 70:12

**conducted** 70:3 78:3

**conference** 6:8

**confidential** 22:19, 23 24:15 35:14 132:9

**confirm** 6:4 65:20 66:4 68:11,16,17 73:9 92:4

**confirmed** 66:4

**confusing** 105:15

**Congratulations** 20:7

**Connecticut** 8:12

**connection** 9:5 38:10 44:3 62:24 64:21

**consensual** 122:3

**conservation** 74:10

**consistent** 112:3

**consulate** 21:3

**consulted** 105:17

**consumed** 122:21

**contact** 22:17 43:19 83:7,14,15 120:7 121:13,17 124:16 129:5,19 130:9 139:15

**contacted** 83:10 107:6,22 108:8 121:14,20,23 124:10 128:14,20 130:7

**contacts** 133:9

**contained** 69:16 129:21 130:18

**content** 38:7

**contents** 26:21 32:4, 19,24 33:25 34:7 86:18

**context** 129:5,16

**contexts** 139:5

**continue** 102:22

**continued** 79:8

**continuing** 13:5

**contract** 20:6

**contribute** 95:8

**control** 15:19 54:4 67:7 70:24 75:3,21 78:23 79:17 80:5 89:11 98:2,6 105:6 112:15 114:11

**controlled** 54:3

**conversation** 84:15 128:7 136:9

**conversations** 26:9 84:19 109:6 124:19 135:10 137:4,9

**converted** 71:10 97:14

**converts** 71:11

**cool** 140:19

**coordination** 131:25

**copied** 76:17

**copies** 22:17 23:19 24:6

**copy** 23:18,19,21 24:6 25:6 29:3 45:9,

23 80:25 81:6 85:8 111:3 131:3 142:19 143:4,5,6,18

**Coral** 86:19 129:23

**coroner** 34:17

**corporal** 5:8,15,23 6:22 7:10 9:22,23 10:24 12:3,20 14:3 15:24 16:11 17:9 21:21 26:13 28:2 29:18,22 31:11 39:12 45:18 47:8 48:22 50:2,24 52:8 54:18 57:2 61:15 62:2 63:9 69:19 75:24 76:7 78:2,6 79:7 80:22 81:10,11 82:25 90:10,19 91:18,20 98:22 107:2 110:19 123:19 125:8 131:2, 5,14 132:19 135:4 138:19 139:19 140:23 142:12,18

**corporal's** 17:7

**corporals** 29:17 34:3

**corporation** 24:14 99:4 102:15 104:9 107:7 119:7 139:7

**correct** 6:5 7:11 10:6 12:9 16:2 17:15 19:16 21:13 27:10 29:12 30:20,24 31:13 33:4 37:24 41:25 42:8 44:23 48:10 49:16,20,23 51:12,16 52:18 53:17,19,24 54:4,14 55:13,17,18, 20,21,25 56:19,20 58:8 59:2 60:20 62:6, 10,11 64:2,4 65:9,12 67:8,9 69:8 70:17 71:2,3,8,9,12,13,20 72:5,6,8,25 73:4 74:10,14,24,25 75:14,17,22 80:17 81:2,3,20,21 82:2,4, 22 84:16,25 85:6 89:8,9,12,13,14,15, 17,18,21,22,25 90:2, 9 100:2,8 111:19 128:3 141:19,20 142:10

**corrected** 102:8 142:22

**correction** 55:8

**correctly** 12:8 28:25 29:16 78:9,13 93:14 98:10 109:13

**could've** 96:6,8

**counsel** 5:20 11:6 55:4 63:22,23 81:6 83:3 104:10 106:18 107:7 135:2

**county** 19:8,9,10 30:3,7,23 42:19 46:3, 4,21,25 47:3,5 48:14 51:18,19,24,25 53:9, 12,23 55:2 58:25 59:25 64:10,11,12,15 104:19,20 125:10 126:8 141:3

**couple** 7:7 98:23 107:3 115:9 120:14 124:21 125:9 135:5 138:4

**courses** 14:14,21,25

**court** 5:3 11:5 18:13, 22 19:2,3,4 55:4,8 143:13,17

**courts** 19:2,5,8,10,11

**cover** 7:7 30:19 32:23 124:18

**crash** 12:22 13:8 15:16 24:22 27:9 28:9 34:8 41:24 42:3, 7,14,17 43:9 44:18, 19 45:22 46:4,10 48:6,12,22 49:4 52:3, 4 53:8 60:25 63:3 64:3 65:24 66:15 67:5 68:14,17 76:22, 24 77:7 78:24 80:6 81:23 82:8,12,16 85:13 86:16,18 88:16 89:4,20 92:18,21 95:17 96:4 97:21 98:8,12 102:8,10,13 104:16,18,24 107:11, 12 109:14 112:25 114:21 115:19 116:18,23 117:6,10, 23 118:13 141:12,22

**crashes** 12:25 13:3,6 17:11,14,16,18,20, 22,23,24,25 18:8 126:4

**crimes** 11:15

**criminal** 28:19 134:2

**criteria** 131:20

**cross** 11:23 28:24

**CROSS-EXAMINATION** 90:17

**crown** 52:18,19

**crowning** 53:2

**cruise** 79:16 80:5 97:25 98:6 105:6 112:15 114:11

**CSR** 98:2

**curbs** 125:24

**curious** 79:3

**current** 8:10

**cursor** 31:21 56:5

**curve** 53:7,10 141:12

**curves** 53:3

**cycle** 105:3

**D**

**D-1** 121:13,14,24 122:2,3,5,8

**D1** 62:9

**damage** 77:17

**dangerous** 125:23, 25 126:10 140:24

**dark** 127:4

**dash** 87:3

**dashed** 86:7 87:23

**data** 15:17,19 24:11 68:11 69:7,14,16 70:2,6,7,15,25 71:4,6 73:3,9 74:3,21,22 75:3,13 82:20 84:10, 13,24 85:18 86:21

**delivering** 9:11

**delivery** 9:11

**delta-v** 74:2,4,7,14

**delta-vs** 103:15,16

**demanding** 132:22

**Department** 70:4

**depending** 117:14 130:22

**depends** 21:2 25:4 34:19

**depicted** 54:21

**depo** 26:16,19 142:16

**deposition** 5:14,16, 18 6:7 7:9 21:6,19,21 22:2 23:7,11 25:23 26:3,10 131:3 138:20 142:19

**Depot** 8:21,23 9:5,7

**depresses** 112:18

**depth** 77:13

**deputy** 46:20 64:7,9, 13,17

**describe** 50:15

**describing** 56:15

**description** 49:22 50:5 54:13

**deserve** 45:23

**deserves** 133:21

**designing** 8:17

**detail** 28:22 66:3,8 77:18

**detailed** 29:23,24

**details** 31:7 50:13

**detect** 85:20 86:6 113:19 120:20

**detected** 113:12 115:4 120:20

**detecting** 114:13 115:5,24

**determination** 56:21 59:20

87:6 92:5,25 93:10, 19 94:19 97:4,8,25 98:3,14,23,24,25 99:5,7,10,24 100:5, 11 101:8,13,18 102:2,4,9,24 103:2,8, 10,13,17,18,21,22 105:2,9,11,13,18,24, 25 106:3,12 107:13 108:9,11 110:6,9,10, 20,24 111:3,21,24 113:3 114:14 116:17 117:8,11,12,13,18 118:3,22 119:8 123:13,15 124:7,8 129:6,21 130:3

**date** 8:6,10 19:23 20:19,23 29:10 41:15 42:13 43:23,24 66:5 76:22,24 77:25 78:2 104:3,8,24

**dated** 39:22

**dates** 12:18 39:22 43:19 94:7

**David** 5:8,15,23 21:13,15,21 31:12 51:5,7

**day** 9:2 16:19 29:11 63:13 91:4,23

**days** 45:21 51:9 77:3

**deal** 139:23

**dealing** 51:11,14

**dealt** 34:16 84:7 102:7

**death** 94:22

**December** 17:8

**decided** 28:4 44:6

**decipher** 129:7

**decision** 83:11

**defects** 60:21

**Defendant** 99:12,15

**defer** 123:7

**definition** 57:24

**degrees** 27:16

**deliveries** 9:13,16

**determinations** 108:15

**determine** 28:12 92:19 94:7 95:9,24 98:13,25 108:10 111:21 112:23 118:21

**determined** 74:12, 13 111:11,12

**device** 54:4 75:21 105:2

**devices** 54:4 67:7 89:11

**diagram** 15:16 32:17 50:20 53:6 54:25

**diamond** 56:7

**diamond-shaped** 56:7,8 59:17

**differ** 33:18

**difference** 35:18 118:9

**differences** 36:19 47:10

**differently** 38:7

**difficult** 101:7

**digressed** 122:24

**Dillon** 132:21

**direct** 5:11 84:20

**directed** 128:19

**direction** 51:15,19, 23 52:24 53:4,14,16, 24 69:7,12

**directions** 54:7

**directly** 102:24 128:20

**disc** 78:16

**discharge** 12:3

**disclosed** 137:10

**discoverable** 134:22

**discuss** 95:12 102:25 128:5 130:18 136:15

**discussed** 70:15
109:17 119:25 128:4

**discussing** 73:10
116:10 118:4 128:11

**discussion** 11:9
35:16 62:3 75:17
85:25

**dispatch** 121:16

**dispatched** 121:18

**display** 87:25

**distance** 92:15 95:21
96:5

**distinguished** 48:14

**distracted** 68:21,23

**District** 19:7,9

**districts** 19:6

**Division** 83:23

**divots** 141:11

**document** 11:19
21:12 22:10 30:8
31:8 33:8,19 35:24
36:13 40:24 43:7
44:5,13 45:2 47:23

**documentation**
137:8

**documented** 42:18
66:21,23 67:3 80:9

**documenting** 36:24
77:17

**documents** 7:4 21:2
22:12,16,18 23:17,22
24:13,16,19 28:10,18
29:9 31:5 33:22 34:4,
8,12,21 35:10,13
36:9 37:4 40:7 43:11
44:14 130:19 137:3

**Dominguez** 70:3,7
102:19,23 103:12
108:18,22,23,25
111:22 130:2,6

**dot** 11:23 28:24 57:16

**doubt** 131:24

**download** 15:20
24:11 70:2 76:17
92:6 99:23 100:3

101:17 102:24
103:22 108:18
110:23 112:2

**downloaded** 111:22
141:24

**downloading** 101:8,
13 102:4

**downloads** 28:10
103:14 110:4

**drain** 52:20,23

**draw** 15:17 57:19
121:8 122:3

**drawn** 122:7

**Drew** 19:13

**drinking** 122:21

**drive** 87:8,11 88:17
116:21 119:24
125:21 141:14

**driven** 89:3 119:20,
23

**driver** 9:11 43:3 57:8,
22 58:12 59:5,7 61:2,
5 62:8,9,16 67:5
78:19 88:5,24,25
112:8 121:5 141:4

**driver-assist** 82:21

**drivers** 9:13 141:18

**driving** 9:14,17 60:7
67:13,14 68:22,24,25
69:4 80:16 81:20,25
87:14 89:4 91:22
92:17 94:21,22,25
95:10,18 109:24
118:23 120:11 124:3
141:6,9

**dropped** 67:14,18
80:11

**drove** 57:3 91:7
92:20 141:22

**drugs** 120:17

**dry** 60:20 126:16

**dual** 20:8,9

**duces** 21:20

**duly** 5:9

**duplicate** 33:22

**duplicated** 34:13

**duplication** 47:14

**duties** 10:16

**dynamics** 28:13,21

—————————

**E**

**e-mail** 19:25 20:3
143:15,16

**e-mails** 23:19,20
24:23,25 25:3,9,11,
15,16,17,18,20 28:3
44:8 130:15,16,18,22
131:3,7,21,22 132:9,
15,19,24 133:2,8
134:3,13,16,20
137:12 139:2,5,6,10,
13,24

**earlier** 36:17 47:22
49:14 66:6 82:19
91:11 119:22

**east** 51:15,23 52:5
53:16 55:2,12,15
59:3

**eastbound** 55:13
56:15 58:9 59:5
75:22

**Eastern** 104:17,25

**easy** 103:7

**edges** 53:2 60:14

**EDR** 15:18 24:11
28:10 69:9,22 70:2,8,
15,24,25 71:6 72:11
73:3,11 75:3 76:17
82:20 103:6,14,22
105:7 110:3,4,23
111:2 112:2

**educated** 133:25

**education** 8:9 13:5
133:21

**effect** 52:19 78:20

**electric** 102:11
130:10

**electronic** 23:13,15
92:6

**electronically** 7:5

**elevation** 52:21

**elevations** 52:13

**Eleventh** 19:7,8

**employed** 136:3

**employee** 99:19

**employment** 10:5

**end** 9:24 11:25 14:3
18:9 28:23 32:9
37:17 47:23 80:24
95:25 96:21 97:22

**ended** 12:2 108:19
137:13

**ends** 32:8 65:15

**energy** 15:12

**enforcement** 9:6
13:10,11 17:13

**engage** 112:8

**engaged** 43:8 97:5
98:5,11,16 128:6
136:2

**Engineers** 87:15

**enlarge** 48:8

**enlarged** 31:2

**entered** 12:7

**entire** 26:5 47:2

**entitled** 139:21

**entrance** 65:16

**equals** 50:20

**equipment** 101:16,
19,20

**equipped** 82:22
85:13

**Eric** 70:3 102:19
130:6

**errata** 142:21

**errors** 142:22

**essentially** 58:4

**established** 87:14
109:2

**estimate** 14:7 17:10
18:4,10 25:8,25

**estimated** 96:20

**estimating** 17:20

**estimation** 114:25
117:2

**evaluate** 120:9

**evaluation** 86:17

**event** 69:7 70:6,25
74:22

**events** 69:23

**eventually** 39:2
40:10 44:6 49:11
65:15 83:15 118:10,
12 128:19 134:6

**evidence** 11:18
18:18 28:11,16,18
29:6 38:19,22 66:14,
19 70:10 77:8 78:8
81:24 90:4 107:10

**exact** 7:24 77:16

**exam** 11:20,25

**EXAMINATION** 5:11
140:21

**examined** 5:9

**examples** 16:7

**exceeding** 72:3

**Excellent** 22:4

**excess** 95:7

**exclusive** 100:4

**exclusively** 99:5,11
100:9

**excuse** 60:11 65:6

**executing** 88:25

**exemplar** 86:15
87:4,8,11 129:24

**exhibit** 21:19,25
30:9,13,16 33:5,9,10,
14 35:20 36:2,15
39:20 41:10,21 43:6
44:16,17,19 46:16,25
47:22 48:3 49:14
54:21 55:5,9,11
58:18,20,23 60:9

70:21

**exhibits** 91:12 143:16

**existed** 102:15

**exit** 93:4 94:10

**experience** 42:23 50:16 113:18 125:10 140:24,25

**experiences** 50:9

**expert** 18:14,17,23 86:9 114:17

**expertise** 13:20

**explain** 142:16

**explained** 49:15

**extensive** 80:2

**extracted** 70:8

**eyes** 87:24

---

**F**

**facilities** 86:6

**facility** 119:23

**facing** 54:24,25 55:2, 14

**fact** 28:2 57:19 66:8 68:13 70:16 81:4 90:23 92:22 95:13 109:3 122:25 124:2, 3,12

**factor** 82:15

**factors** 95:3,5 122:13

**failed** 67:22 75:20 79:13 90:6

**fair** 7:20,21 50:9,10 59:8,9 85:6 90:7 96:21,22 101:14,15 102:5,6 109:22 119:13 127:3 132:11, 18

**familiar** 50:11 65:6,8 66:15,25 87:13 125:13

**familiarity** 50:7

**families** 35:11

**fashion** 103:7

**fast** 92:14,17 93:19, 23 95:19 117:11

**fatal** 17:14 18:8 102:10 104:16

**fatalities** 13:24 18:5

**fatality** 16:13 18:19

**fault** 28:13,20

**favor** 31:25

**feature** 113:19,22

**features** 86:17 88:3 96:25 112:24 129:3 136:15,16

**February** 12:15

**federal** 19:2,3,4 130:5

**feel** 84:19

**feet** 50:21 116:20 142:9

**FHP** 5:25 20:19 22:14 31:9 36:10 47:3 78:5 125:11 139:23

**FHP's** 9:3

**field** 18:15 23:16 29:4 32:10,14,21,23 33:5, 16,18 34:11,23,24 35:2,3,7 36:20 37:4 38:20 39:16 40:20,25 41:11 42:8 69:25 73:20 74:21 76:5,11 83:16,18,19 85:3 91:9,16 102:20 104:11 111:4 137:3

**figure** 28:20 140:2

**file** 22:19,23 23:7,13, 15 24:16,21,24 25:5, 11,15,22 26:3,20,21, 23 27:3 35:14 37:8 76:18 98:4 120:13 132:8

**filed** 22:14

**files** 7:4 22:14 133:13,14,19

**fill** 23:22 33:23 34:22

**final** 11:20 29:2

**finally** 38:4

**find** 18:9 25:20 37:4 76:3 132:8

**fine** 12:19 51:6 63:6 134:18

**fingertips** 131:16

**finish** 40:18 49:7

**finished** 29:6

**fire** 30:3

**fired** 134:6

**fishing** 126:3

**FLAIR** 16:16 28:5

**flashing** 54:5,14 55:16 56:17,22 57:7, 13,18 59:22 67:23 89:11 127:5 141:17 142:8

**flat** 52:6,13,24,25

**flavor** 134:19

**Florence** 140:16

**Florida** 5:25 6:2 12:7 13:11,22 16:5,17 17:19 18:14 19:5 24:20 27:14,17 30:20 33:20 37:5 41:7 44:19 48:5,13 52:14, 21 57:7,22,23 58:13 68:20 80:15 83:23 89:20 96:2,15 97:13 104:20 126:5,6

**fluctuated** 118:18

**fluent** 119:7

**focused** 10:4 29:10

**focusing** 51:25 71:4

**folder** 25:21

**follow** 135:6

**follow-up** 90:14 138:21

**follow-ups** 138:4

**font** 80:14

**foot** 112:8,16

**Ford** 77:20

**forgetting** 137:20

**forgive** 20:11 47:11 64:9

**forgot** 10:7 36:18

**forgotten** 11:22

**form** 25:14 31:8 52:7, 8 63:9,20 67:16 71:21 79:2,8,19 80:7, 19 82:3,13 88:18 89:2 90:8 99:14 100:13 113:2 125:2 136:19 141:7

**forwarded** 129:9

**found** 18:13,22 68:9 78:7 86:4,10 120:4

**foundation** 112:9 114:4 118:25

**four-tenths** 53:8 56:18,23 57:5 60:10 141:19 142:9

**fourth** 59:18 127:13

**frankly** 105:14

**frequently** 65:23

**fresh** 26:6

**front** 78:16 81:9 127:7

**full** 5:21 126:12

**fully** 85:23 86:3 87:17,18,19,25 88:2, 11,16,17,19,24 89:4 102:11

**functioning** 78:9

**future** 19:23 143:7

---

**G**

**Gables** 86:19 129:23

**Gainesville** 17:19

**gas** 93:4 112:17

**gate** 65:18

**gated** 65:17

**gave** 6:25 41:7 74:15

82:14 87:5 103:8 111:25 123:15 124:7, 8 137:14,15

**general** 50:7 52:12 83:2 93:20 141:2

**generally** 24:20 33:17 38:18 42:16 43:5 52:16,23 53:24 54:2 110:4 114:23 125:17,22,25 136:8

**gentlemen** 97:16 126:11

**George** 43:2

**get all** 34:4

**give** 5:4 6:10 10:25 11:2 14:7 17:10 18:6, 11,14 25:8,25 40:19 63:19 73:14 74:16 75:9 85:18 103:13,14 110:5,6 121:8 143:5, 6

**giving** 16:7 92:8 139:13 140:5

**glad** 28:8 44:10 51:10 143:6

**good** 5:13 7:6 19:12 38:5 47:8 60:18 61:23 77:15 79:10 90:21 91:2 103:10 111:14 143:12

**gotta** 17:17 97:7 117:24

**governmental** 130:4 133:4

**graduated** 8:11 12:13

**graduating** 13:4

**graduation** 8:9 12:17

**grammar** 29:2

**graphic** 8:17

**Great** 21:18

**green** 57:12

**group** 95:8

**guarantee** 11:3

**guess** 11:16 24:2 54:25 56:7 59:13 65:16 85:19 86:19 94:7 113:17 118:10 122:17 133:17 137:15,25 139:16 141:14 143:10

**guessing** 114:2

**guiding** 39:17

**guy** 87:20

**H**

**half** 11:24 38:23 52:3 53:10 72:8,11,14 115:19

**hand** 28:7 73:17 113:13 115:3,23,24

**handed** 91:19

**handle** 16:21 126:5,8

**hands** 18:11 85:20 113:11,12,17,20 114:12 115:5,15

**hands-on** 105:6

**handwritten** 39:15, 16

**Hang** 47:19

**happen** 20:13,15,16 65:23 133:24 138:22

**happened** 10:5 18:20 27:24,25 28:14,21 30:4 39:9 45:14 48:19,20 50:8 52:25 78:25 89:4 91:7 92:21 96:4 97:13 102:13 106:17 108:16 109:14 113:15 118:11 133:17,22 134:11

**happy** 134:9,11 138:20

**hard** 52:22

**Haven** 8:17

**head** 14:12 75:8 96:11 105:5

**headed** 61:10

**heading** 53:16,17 92:2

**headlights** 77:11 127:6,20

**headquarters** 107:11

**hear** 6:4,10,13,14,16 7:15 9:22,24 12:8

**heard** 107:23 135:22

**hearing** 66:22 80:9

**helped** 45:19 123:13 124:6,9 129:16

**helpful** 108:3

**high** 8:9,11,12

**high-profile** 16:21, 23

**higher** 75:11

**highest** 118:16

**highlight** 25:12

**highly** 131:24

**highway** 12:7 13:22 16:5 24:21 30:20 33:20 37:6 41:7 48:14 83:24 87:16,23 126:5 139:9

**hit** 25:13 96:6 112:15

**hold** 23:16 26:24 27:2,3 45:6 51:17 54:24 63:11 68:6 73:13,14 76:3,5,15, 16 97:8,16 98:21 103:4 104:6 110:13 122:7 125:3,5 131:8, 10 132:8 136:4

**holding** 20:24

**home** 8:21,23 9:5,7 20:5,6 92:2

**homicide** 13:8,24 14:10,17,19,20,21,22 15:3,4 16:10 17:5 22:24 29:4 30:21 33:20 38:16 41:11 45:7,17 46:13 94:23

**honest** 128:12 135:14,16 136:7

**honestly** 66:17 129:4 130:8 136:20 137:19 138:8

**honorable** 12:3

**honorably** 10:14

**hook** 15:20

**hope** 113:5

**hospital** 121:2,17,19 122:12

**hour** 61:5,8,14 71:10, 12,15,18 72:4,10,17, 19,20,23,24 75:9 96:12 116:19,20 117:5,7,22 126:2

**hours** 11:24 14:2 26:4

**house** 66:10

**hundred** 18:6,11

**I**

**i's** 28:24

**identical** 34:21,24 118:8

**identification** 22:2 30:14 33:6,11 35:21 44:20 55:9 58:20

**identified** 21:20 24:20 26:21 32:17 33:9,19 44:17 47:22 48:3,5,10 52:2 90:7

**identify** 31:6 36:12 54:20

**ignorance** 27:13

**illuminate** 60:2 126:21

**illuminated** 55:19

**image** 69:13,14,16 70:6 75:3 100:16,24 101:3,4 102:2,9

**imaged** 70:8

**images** 105:7

**immediately** 27:25 42:25 107:12 112:24 116:16 117:6

**impact** 71:7,14,16 72:4,8,12,16,19,23 73:3,13 74:7,18,24

**impacting** 89:16

**impaired** 121:24

**impairment** 121:21

**important** 6:8 43:16 107:10

**impound** 78:5

**inadmissible** 134:21

**inaudible** 9:21 10:22

**inch** 50:20

**incident** 23:8 24:21 27:20 29:11,15 30:22 38:10 39:9 43:23 46:19 47:7 50:6 51:12 60:19,25 62:24 64:3,4 65:6,7,9,13,25 66:5 104:22 105:8

**incidents** 10:19 13:6

**include** 80:21 89:7 129:12 139:4

**included** 60:7 82:8 84:24 129:13

**including** 66:11,24 67:12 90:4

**Incorporated** 5:17

**increase** 112:16

**increasing** 97:18

**independently** 92:4 111:21

**indicating** 42:6 44:22 59:11

**indication** 80:2 106:9 111:16 120:16, 19,21,22 121:3 122:17

**indicators** 121:21

**individually** 62:15

**influence** 84:21 120:17 121:4

**information** 8:5 25:2 64:25 82:19,21,24 83:6,12 84:3,4,8,10,

23 91:5 94:24 100:3 103:15,17 104:23 108:6,24 109:5 110:21 121:24 128:15,17,23 129:17 130:4,24 133:8 136:14 137:14 140:5

**infotainment** 107:13 123:16

**initial** 39:18

**initially** 28:7 39:13 83:9,10 86:24 94:20 107:23 123:14 125:12 130:7

**injured** 132:21

**inquire** 116:6,7 139:6 140:4

**inquiries** 133:3

**inquiring** 139:2

**inside** 15:17 26:18, 19 34:21 37:3 65:18 70:6 85:3 86:22 111:8 116:7

**inspect** 75:25 77:10

**inspected** 76:7,19 77:2 79:22

**inspection** 35:5 76:4,13 77:4,5,6,15, 21,24 78:3,7 79:14

**instance** 11:22

**interacted** 30:2

**interacting** 138:13

**interest** 23:5 130:10

**interested** 131:14 133:2,6

**interpret** 106:4 123:13 124:7 128:22

**interpretation** 100:7 106:12

**interpreted** 103:3

**interpreting** 39:23

**interrupt** 81:14 106:18

**interruption** 10:2

**intersection** 30:23
50:8,11 53:25 54:3,6
56:17,19,22,24 59:6
61:8,11 65:14,15,24
67:7 104:18 124:24,
25 126:9,22,25 127:4
141:2

**intersects** 53:23

**interviews** 29:7
38:19

**intoxicated** 120:23

**investigate** 11:12

**investigated** 17:12
18:5 23:8 30:22

**investigating** 10:20
11:15 28:9 39:7,11

**investigation** 12:23
13:5,8 14:10 16:17
23:7 30:13,21 32:9
33:20 34:17 35:20
36:13 37:2 43:8
46:11,13 60:6 65:21
66:11 67:10 70:9
81:19,23,25 82:14
83:5,8 84:21 85:12,
23,24 86:4,10,14
87:10 88:12,15,23
90:4 94:17 98:14
101:14 102:3 104:22
107:9,19,25 108:8,19
109:2 120:7 130:3
131:22 132:23
135:24

**investigative** 23:21,
23 29:4 30:19 32:8,
20 34:6 36:3,20,21
37:10,16 38:9,21
40:21 49:15 56:14
62:3 70:17,22 75:15
77:22 83:19 106:21
111:6,16 121:12

**investigator** 10:18
16:10 17:5 26:11
27:9,19,20,23 28:18
31:11 39:8 45:18
79:13 138:11

**investigator's** 43:5

**investigators** 16:25
38:16

**invoked** 63:16,18
124:14,19

**involved** 19:22 43:8,
22 67:5 77:6 83:9
85:13 86:13,15 88:15
101:13 102:4 130:2,
10

**involvement** 44:4,
11

**involving** 18:5
102:13

**issue** 120:16 124:25
132:13,24 139:22

**issued** 81:19

**issues** 135:5

**Italian** 21:3

**Italy** 20:4,6,9 140:11,
13,14

**items** 26:5 43:16


**J**

**Jackson** 121:16,19

**January** 10:14

**job** 20:19 29:11 79:23

**jobs** 13:2

**Joel** 46:17,20 64:8

**join** 131:11

**joined** 10:11

**judges** 18:14

**judging** 56:10
117:23

**judicial** 19:6,7,9

**July** 8:7

**June** 8:13 16:20


**K**

**Key** 18:16 23:9

**Keys** 29:18 51:2

**kilometers** 71:7,15
72:17,20 75:6

**kind** 6:16 10:19 17:18
48:18 100:18 126:9

**kinematics** 15:13

**Kitchen** 51:5,7

**knew** 102:14 105:24,
25 122:11

**knocked** 127:13

**knowing** 89:23

**knowledge** 68:21


**L**

**lab** 24:8

**label** 28:25

**lack** 112:9 114:4
118:25

**lamp** 105:5

**lamps** 126:23

**lane** 50:15 53:13,16
55:13 56:16 58:9
59:6 89:14

**lanes** 53:15

**Largo** 23:9

**law** 5:18 9:6 13:10,11
17:12 71:20 74:24
139:21 140:15

**laws** 57:8,23 58:13,
14 89:20

**lawyer** 122:6

**lawyers** 19:21

**lead** 26:12 27:9,23
94:24 95:17 138:10

**leading** 105:3

**learn** 15:7 66:14
85:11 88:9 107:24
119:14 128:16 138:5

**learned** 84:9 86:10
88:13 119:15

**leaving** 96:10

**led** 40:17

**left** 8:19 26:17 59:15,
16 113:11 115:3,23
127:12 129:2

**legal** 89:19 131:6,23
140:5

**Leica** 15:14 29:23
50:19,22 51:9

**letter** 20:21 83:22
84:4,12 99:9 103:20,
25 104:3 108:5 110:3
133:16 134:7

**letters** 35:11

**letting** 139:14

**level** 14:23 16:6,9,14
48:14 88:5,9,10
121:3

**levels** 13:18,19 14:6
87:14 88:8

**license** 9:18 101:24

**lie** 138:2

**lieutenant** 31:15
37:15 38:4 40:4

**life** 17:12

**light** 54:6 55:16
56:12 57:7,18 60:3,
16 67:23 89:12 95:7
96:7 127:3,5,20
141:18 142:8

**lighting** 124:24
125:5 127:14,18

**lights** 57:12 77:11
126:21 141:3

**limit** 61:4,12 71:25
72:3 89:24 96:16

**limited** 86:6 119:13,
23 141:10,16,21

**lines** 34:7 76:16 86:7
87:23 119:24

**list** 17:7 34:14,20,24
39:13 85:18 110:10

**listed** 18:17 98:20

**listened** 64:19

**listening** 64:24
66:12

**literally** 8:25 11:2
26:7 40:12 48:23

**lived** 65:12

**local** 29:16,17

**locally** 105:22

**location** 89:3 92:9

**locations** 86:12
126:24

**long** 10:10 12:10,12
26:22 27:4 31:10
39:25 44:23 45:15
60:16 80:3 92:13
93:25 94:2,4 114:22
116:13 125:10

**long-form** 44:18

**longer** 20:25 114:24

**longitudinal** 74:13

**looked** 17:18 33:19
36:16 48:15 57:4
67:14 80:12 94:14
105:13,14

**lost** 9:25 11:13

**lot** 14:11 15:23 28:7,
22 44:5 84:9 103:15
107:24 126:3 138:23
140:16 141:10

**lower** 71:11

**lying** 109:18 128:21


**M**

**Madam** 55:7 57:25

**made** 30:5 40:8
42:21 43:3,19,20
50:17 64:4 65:2 67:3
78:20 79:18 80:3
81:4 83:11,14,15
88:10 108:15 109:9
111:16 122:6 124:7
133:4 138:14 141:17,
22

**Maintaining** 89:14

**maintenance** 86:20

**major** 134:7

**majority** 43:12

**make** 28:24 33:24
34:2,4 36:12 51:21
56:21 57:4,6 59:20
62:8 69:19 79:6,20,

Index: makes..normal

21 93:6 101:2 110:21
113:8 116:2 134:9

**makes** 42:22

**making** 15:21 116:2
131:12

**malfunction** 77:9
78:14

**malfunctioned**
78:21 79:17

**malfunctioning**
78:18

**management** 9:8

**managing** 104:10
107:7

**manipulating**
118:23

**manner** 141:14

**manual** 85:9 119:15
120:4 123:4,6,7
129:9,12

**manufacturers**
101:7

**Marathon** 134:10

**mark** 8:11 33:14

**marked** 11:23 21:19
22:2 30:9,14,16 33:5,
10 35:21,25 44:20
46:8 49:14 55:9
58:20 70:21

**Marker** 5:25 95:25

**markers** 15:9

**Martin** 45:7

**math** 33:4 75:4

**matter** 97:17 139:21
140:7

**maximum** 72:24

**Mccarthy** 24:14
83:2,14,15 84:5,15,
20 99:3,6,12,16,18
103:11,18 104:10,14
105:10,23 106:3,10
107:7,8,13 108:16
109:3,4,17 110:22
111:23,25 118:4
119:14 120:2 122:25

123:8,12 124:2
128:4,21 135:11
136:9 137:9

**Mcgee** 43:2 62:12,
15,18,21,24 63:15
64:4 65:2 67:11
68:13 71:17 74:23
75:20 78:20 80:3
81:5,20 88:24 90:5
91:4,6,22 92:5 94:18
95:12,15 96:25
109:24 112:23
118:22 120:16 121:2,
14,17,20,25 122:2,3,
8 124:3,11 137:21,22
141:5

**Mcgee's** 66:13 67:25
81:25 138:5

**ME's** 34:18

**meaning** 28:5,24
29:18 42:18 52:14,22
53:13 59:15 70:24
76:16 85:25 110:25

**means** 19:24 58:4
66:20 69:3 113:25
114:9,10 115:22
119:6,16,18

**meant** 108:22 114:19

**measure** 50:14
116:11

**measured** 29:21
51:10 57:5 116:13

**measurement**
29:23,24

**measurements** 35:3
39:15,17 50:14,17,18
51:8 60:8

**measures** 99:23

**measuring** 15:8,15

**mechanics** 77:16,19

**median** 125:23

**medical** 120:25

**meet** 62:15 130:17

**memory** 26:6 51:6
63:5 91:24 92:8,24

**memos** 24:9

**mention** 36:19

**mentioned** 7:14
26:16 27:8 57:21
58:5 73:6 92:22
111:10 119:10
123:22 133:11

**mess** 41:10

**message** 6:17

**messages** 137:4

**met** 62:25

**Miami** 6:2 19:6 21:3
22:14,24 26:23 37:6
70:3 78:5 101:12,21
102:17,22 108:14
121:15

**Miami-dade** 19:8

**Michigan** 27:16
47:14

**middle** 5:24 111:7

**mile** 5:25 52:3 53:8,
10 56:18,23 57:5
60:10 65:16 95:25
141:19 142:9

**miles** 48:23 61:5,8
71:10,12,18 72:4,10,
19,23,24 75:9 96:3,
12,14,16 114:24
116:19,20,23 117:5,
7,21 125:25

**military** 10:9,18
11:12 12:2

**mind** 19:23 20:23
80:5

**mine** 18:16 38:7 40:2
44:8 104:21 138:16

**minimum** 13:22
72:22

**ministerial** 124:23

**minor** 11:16 102:12

**minute** 7:7 10:25
30:10 35:25 42:24
54:17 70:13 122:12

**minutes** 6:25 11:3
42:21 48:15 61:14,21
90:25 114:21 115:19
116:18 117:9,25

118:13

**mirrors** 48:18

**missed** 15:22 20:12

**missing** 15:18,21

**misspoke** 48:4

**mitigate** 136:12

**mode** 87:20

**model** 62:6 82:18
85:9 86:15,16 87:11
88:4 100:25 101:2
104:15,23

**module** 70:25 75:3
87:2

**module/event** 15:19

**moment** 27:8 44:13
47:20 70:19 74:24
76:10

**moments** 22:5

**momentum** 74:10

**monitored** 29:21
65:17

**monitoring** 138:11

**Monroe** 19:9 30:3,6
42:19 46:3,6,21,25
47:3,5 64:10,11,12,
15 104:20 125:10
126:7

**Montgomery** 64:10

**month** 12:19 17:20,
23,24 27:23 38:23
39:3,4

**months** 10:22 12:12
40:13

**moonlight** 127:8,19

**morning** 5:13

**Mosquera** 121:18,25
122:6

**motion** 111:11

**motor** 12:22 13:6,12
14:16,17,22 18:4
23:8

**motorcycle** 15:4

**mounted** 54:6

**mounts** 87:2

**move** 112:6 135:4
137:7

**movement** 57:25
58:3

**moving** 140:11

**MRCC** 121:15

**multiple** 11:21 14:5
95:3,5 98:20

**multiplication** 75:8

**multivehicle** 17:11

**murders** 11:17

---

**N**

---

**N-I-C-O-L-A** 5:24

**named** 37:25

**names** 28:25 133:12

**narrative** 39:5 45:9,
13 54:12

**National** 87:16 139:9

**nature** 60:17

**necessarily** 135:9

**necessity** 143:2

**needed** 24:10 26:19
61:18 83:12 86:25
87:7 108:12

**needing** 143:18

**negative** 103:16

**newer** 88:2

**NHTSA** 23:24 133:4
139:8,15,17

**Nicola** 5:23

**night** 27:24 29:13
39:8 50:6 56:18,23
141:6,23

**nominal** 114:19,20
115:7,8,10

**nonverbally** 6:12

**normal** 110:4 113:23
114:20

**north** 51:19,24 61:10 65:14

**north-south** 53:24

**notation** 78:13

**note** 23:16 29:4 32:11,14,21,23 33:5, 16,18 34:11,23,24 35:2,7 36:20 37:4 38:20 39:16 40:20,25 41:11,23 42:9 67:3 69:25 73:20 74:21 76:5 79:8,18,20,21 83:16,18,19 85:3 91:9,16 102:20 104:11 110:21 111:4 141:17,22

**noted** 78:6,9,24 79:12 98:17 143:20

**notes** 42:9,19,20 76:11 98:14 135:24 137:3,8,11

**notice** 5:19 21:6,7,8, 20,25 22:5 43:9 49:8 110:11

**noticed** 27:14 110:10

**notified** 29:14

**NTSB** 28:4 83:10 130:7 133:10 139:8, 16,17

**number** 7:24 14:8 17:11 18:4,9 19:25 20:2 25:8 31:5 137:16,17,24

**numbers** 26:24

**numerous** 67:11

**nurses** 122:7

---

**O**

**O'DONNELL** 31:15 37:15

**obey** 67:6

**object** 52:7 63:8,20 67:16 71:21 79:2,7, 19 80:7,19 82:3,13 88:18 89:2 90:8 141:7

**objecting** 52:8

**objection** 79:9 81:13 99:14 100:13 112:9 113:2 114:4 118:25 125:2 136:19 139:22

**observations** 109:6

**observe** 121:20

**obsolete** 15:11

**obstructions** 61:2

**obtain** 82:24

**obtained** 69:7 73:10 82:19 83:2

**obvious** 47:9

**occupant** 15:13

**occurred** 23:9 30:22 38:10 42:14,17 60:25 65:3,7,9,13,25 66:2, 16 68:14 104:16,18

**occurring** 42:18

**ocean** 52:5 65:17,25 92:3

**October** 41:15 43:25 63:12

**Odel** 121:17

**Odor** 121:22

**offense** 47:6

**offer** 136:14

**offered** 108:4 131:24

**Offhand** 136:5

**office** 6:22,24 12:17 14:13 26:17 34:18 36:11 42:19 47:2,4,5 63:2 92:2 130:17 132:2

**officer** 17:13 30:3 39:7,9,11,19 46:16 47:7 48:10 67:12 68:21 70:3,7 77:5,7 86:13 101:21 102:18, 23 103:11 108:14,22, 25 111:22 125:11 129:25

**officers** 13:11 30:2 46:18

**official** 20:16,18,21 24:21 84:4,12,24 108:5

**officially** 12:4 17:8

**on-call** 30:6

**onboard** 86:22 129:22

**opened** 25:10,14

**operation** 82:7

**opinion** 90:3 109:14 125:17

**opinions** 108:17 109:5,7,8

**opportunity** 22:8

**opposed** 100:11

**opposite** 53:16

**order** 24:7 35:15 45:23 84:2 119:24 122:13 143:14

**ordered** 23:18 25:4 45:9,10

**original** 134:5

**originally** 26:18 44:2 59:19 132:19

**Orlando** 46:22

**Oscar** 45:16

**outer** 60:14

**overhead** 93:15 126:21

**overlapping** 35:19

**override** 119:5

**owner's** 85:9

---

**P**

**p.m.** 42:7 70:2 98:8 104:17 113:5,23 114:15 115:15,18 121:18 143:20

**Pacific** 97:12,14 113:9

**packet** 23:16,21,23 29:5 30:13,19,21

32:8,11,14,21,23 33:5,16,18 34:6,11, 23,24 35:2,8,20 36:3, 20,21 37:5 38:21 39:16 40:21,22 41:2, 11 69:25 73:20,21 74:21 76:5 83:16,18, 19,20 85:4 91:9,16 102:20 104:11 111:4, 6 129:10

**packets** 33:23 34:21

**pages** 11:21 23:23 30:13 31:10,19,23 32:7,20,22,25 33:3, 15 35:20 36:4,14 40:23 44:23 47:25 74:21 80:2 93:11 97:8 129:11

**painted** 54:10

**Panhandle** 48:22

**papers** 12:5

**paragraph** 45:15 72:22 106:15,24 111:7,8 121:12 126:12,20

**Pardon** 55:4

**part** 24:20 48:3 56:4 74:12 76:5 77:10 81:24 86:25 98:16 102:12 106:8 108:19 135:20 139:16

**partially** 103:24

**participated** 45:3

**parties** 132:3 140:3

**partner** 26:17

**parts** 86:25 87:4,5 129:23

**pass** 13:23 14:2,3 131:6

**passed** 15:4,25 17:6

**passes** 13:9

**passing** 126:4

**past** 7:23 50:8

**path** 60:4

**patience** 90:12

**Patrol** 12:7 13:22 16:5 30:21 33:20 37:6 41:7 48:14 83:24 126:5

**Patrol's** 24:21

**pavement** 58:7

**pay** 94:12 141:8,14

**paying** 59:7 89:7 141:5,18

**payment** 20:5

**PDF** 25:12,13,14 31:9,10,23 44:22 45:11 97:18

**pedal** 105:4 109:16, 21 110:5,7,10,22,24 111:7,15,17 112:5,8, 16,18 119:3

**pedestrian** 15:2 89:17

**pedestrians** 127:16

**Pellier** 133:10

**pending** 46:11

**people** 24:5 34:15,16 36:10 40:5 43:18 45:23 64:5 67:12 85:25 120:18 139:15

**percent** 110:25 111:2,17,24

**percentage** 110:5,7, 24 111:17 119:3

**perfectly** 12:19

**performed** 43:9

**performing** 78:13

**period** 27:5

**permission** 121:8

**permitted** 5:18

**person** 106:10 121:22

**personal** 134:17 140:24

**personally** 64:19 69:11 141:8

**personnel** 31:13

Index: perspective..range

**perspective** 38:25

**pertaining** 68:25

**phone** 19:24 20:2 21:23 28:3 30:5 41:4, 6 44:8 67:13,14,17, 25 68:2,4,8,9,12,14, 18 80:11 83:16 121:23 137:13,14,16, 23,24 138:3,5,18

**phones** 68:24

**phonetic** 133:10

**photo** 24:8 55:9 56:2 58:16,18,20

**photogrammetry** 15:5

**photograph** 35:6 54:22 55:11,17 58:23 59:3

**photographed** 76:19

**photographs** 50:17

**photos** 58:17

**physically** 57:3

**pick** 81:6

**picked** 87:3

**picture** 12:18 54:23 56:10 59:24

**pictures** 24:4,6 29:7 91:15

**Pinzon** 45:16

**place** 15:9 20:7 65:18 66:7 91:6 110:16 122:7

**places** 8:20

**plans** 19:18

**plate** 93:12,13

**plate-type** 93:12

**played** 80:5

**plaza** 93:14

**plural** 54:4

**point** 38:5 39:6 54:8 77:24 92:11,14,17 95:20,21 96:12 98:5,

**7,11** 101:6 110:16 112:4 115:5 116:10 117:15,24 118:2,9,16

**pointing** 41:3 56:5

**points** 7:8 54:7 96:5 116:15

**poles** 91:9

**police** 10:18 22:21 65:2 70:4 81:5 101:21 102:18,23

**policy** 63:23 119:15 121:5 129:9,11

**polish** 28:23

**pop** 117:17

**popped** 21:16

**Poses** 9:25 11:8 52:7,11 61:23 63:8, 20 67:16 71:21 79:2, 7,11,19 80:7,19 81:10,17 82:3,13 88:18 89:2 90:8,12, 15,16,18,20 91:12 99:17 100:14,17 106:20,23,25 109:13 111:5 112:21 113:14 114:5 119:9,22 122:9 125:7 127:2 131:13 133:17 134:10,18 135:3 136:5,21,24 138:19 139:11,19 140:9,13,15,18 141:7 142:13,15 143:5,17, 19

**Posey** 106:7

**position** 16:12 105:4 109:16,21,23 110:11, 22 111:8,15 112:6

**positive** 48:21 56:12 93:5 106:7 115:9

**post** 5:25 22:22 23:20 25:3

**post-collision** 35:5 76:13 78:3

**posted** 71:25 72:3

**potential** 95:17

**potentially** 136:11

**power** 78:16

**practice** 99:25

**pre-crash** 84:10

**prefer** 142:23

**preliminary** 7:7,13

**preparation** 25:23 45:4

**prepare** 26:10 38:9, 12

**prepared** 45:3 47:16 48:13 49:16 89:10

**preparing** 26:2 38:13 64:21 77:22

**Prescott** 83:13 128:20 133:11

**presence** 50:6

**present** 6:19 94:13

**presented** 81:5

**preserved** 26:22

**president** 10:12,13

**pressure** 77:14 132:20 133:15

**pretty** 18:17 24:15 39:12 77:15 91:17 112:3

**prevented** 79:17

**previous** 102:4

**previously** 123:22 127:10

**primary** 13:2 26:11

**print** 25:3,5,11,13 130:21

**printed** 45:12 103:6

**prior** 24:2 58:14 71:16 72:8,11 95:16 98:11 110:22 132:22 141:11 142:7,18

**privileged** 23:18 134:15

**probable** 122:20

**problem** 6:18 9:24

**problems** 11:4

**proceed** 57:15

**PROCEEDINGS** 5:2

**process** 40:16 142:24

**processing** 35:7

**produced** 68:12

**product** 29:2,6 49:25

**professional** 140:25

**professionally** 141:8

**program** 15:18 69:15 70:5 85:22 87:7 100:22 101:10,22,24, 25 109:10

**promise** 140:11

**promoted** 16:11 17:8 48:22

**promotion** 17:7

**pronounced** 45:16

**proper** 28:25 45:11 84:2

**properly** 32:19 77:13 84:2

**prosecution** 132:23

**prove** 120:11 122:12

**provide** 102:25 130:3 143:9

**provided** 84:23 99:6, 11,15 103:11,12 107:9,10,13 136:25 142:19

**provider** 68:5,13

**prudent** 141:14

**public** 25:2 35:15 130:24 131:15 133:8 140:7

**pull** 49:3,11 69:3 126:3

**pulled** 48:19 49:5

**purposes** 5:18 33:11 139:14

**pursuant** 130:19

**push** 110:25

**put** 17:7 20:5 22:19, 22 23:17 29:2 34:20, 23 35:13 37:7 39:10 42:10,16,20,22 43:15 44:7 46:2,10 70:18 73:23 78:16 87:5 104:16 110:12 111:12 112:16 129:10,23 133:15,23

**puts** 49:6

**putting** 132:20

**Q**

**qualification** 13:20

**qualified** 17:4 18:13, 23

**qualifies** 16:22

**question** 7:16,20 10:4 27:6,12,18 28:12 36:7 38:14 42:15 52:9 88:2 98:25 99:22 110:20 111:20 117:3,4 122:23 123:18,21,25 124:17 126:11,16 135:17 137:6 140:11

**questioned** 22:11

**questions** 47:24 90:11,13,14,22,23 98:23 107:3 119:11 120:14 123:23 125:9 135:6 138:21

**quick** 96:5 113:8

**quickly** 92:12 107:3 124:22

**quote** 80:16

**R**

**ran** 12:15 67:15,19 80:12

**range** 74:4,15,16,18 75:11 116:12 117:13 118:20

**rank** 10:14 16:11

**rate** 71:18

**Raton** 91:25 92:12, 20

**rattle** 14:12

**re-ask** 123:19 135:17

**reach** 13:19 19:22,24 83:5,17

**reached** 83:17

**read** 19:12 22:9 26:5 97:18 98:10 102:25 103:8 104:12 105:25 106:15 107:2 142:16, 20 143:3

**readable** 103:6

**reading** 26:5 63:11 72:13 100:12 106:2, 23

**readout** 75:6

**ready** 19:15 38:20 126:13 138:23

**real** 93:23 97:7 107:2 124:22

**realized** 35:13 102:11

**rearward** 78:16

**reason** 15:6 26:17 36:11 46:10 47:16 48:16 69:4 74:25 82:15 99:21 115:12 117:16 129:22 138:9

**reasons** 141:4

**recall** 18:24 26:25 29:16 63:4 66:17,22 67:19 69:13 78:4 80:9,10 86:5 91:24 93:14 97:12,22 101:23 102:12 114:9 123:10 124:6,10 128:11 129:20 135:13 136:20

**receive** 12:22 21:5,8 68:4 92:6 105:9

**received** 11:12 20:8 21:7,8 22:5 31:8 36:9 47:13 85:5,8 105:13

**receiving** 9:10,12,16 108:24 109:4

**reckless** 94:21,22,25 95:10,18 120:13

**recklessly** 120:12

**recognize** 54:21 119:23

**recollection** 67:21 106:16

**reconstruct** 13:12

**reconstruction** 13:20 14:9,10,16,17, 20,23 16:6,18

**record** 11:6,7,9 35:15 41:9 69:23 84:9 104:12 117:16 133:24 135:18 138:25

**recorded** 64:7,18 66:13 85:5 87:7 90:5 123:16 137:15 142:2

**recorder** 69:8 70:6, 25 74:22 116:6

**recorders** 15:19

**records** 67:25 68:4, 8,9 84:9 120:25 131:15

**red** 54:6,14 55:16,20 56:17,21 57:7,12,18 59:22 67:23 89:11 127:5 141:17

**REDIRECT** 140:21

**reduce** 57:15 72:15

**reduced** 141:13

**Reef** 65:17,25 92:3

**refer** 51:4 86:14 102:21,22 112:13

**reference** 41:25 62:8 70:23 75:19 80:15 81:4 122:9 123:20 129:14 131:4

**referenced** 111:15

**references** 81:12

**referral** 25:6

**referred** 23:4 46:18 51:14 66:13 69:8 83:12 85:14

**referring** 22:4 25:9 26:21 58:6 88:6 131:8 132:19

**refers** 62:5

**reflected** 60:3,13,16

**reflection** 127:5

**reflective** 59:17 60:2,17

**reflectiveness** 86:8

**refresh** 51:6 63:5 106:16

**Regional** 121:15

**register** 93:16

**related** 13:5 14:9,16 23:7

**relates** 63:9 68:21,23 81:11 109:16 137:9

**relayed** 121:24

**release** 63:11,12

**released** 76:15,16

**relevant** 105:2 139:24

**relieve** 67:6

**relocate** 19:18

**relocating** 20:4

**rely** 70:7,11 74:20 75:2 95:4

**relying** 99:5,11

**remedy** 6:17

**remember** 9:16 11:17,20 17:17,19 18:16 27:5 29:22 39:3 53:7 54:7 66:7, 8,17,22 68:24 76:2 92:8 94:3 96:6,9 97:8,15 105:24 106:8,13 109:19,20 110:9 114:22 123:10, 12 129:4,15 130:8,14 132:13 135:13 136:6, 22,23 138:9,17

**remembered** 129:16

**reminder** 7:14

**repeat** 11:14

**repeated** 7:18

**rephrase** 38:14

**rephrased** 7:18

**report** 29:4 32:20 33:21 34:8 35:10 36:21,24 37:10,16 38:9,12 40:14 41:18 43:10,24 44:18,19 45:22 46:10 47:2,6,7, 19 48:6,9,13,15,17 49:4,15,18 51:4 52:2 56:14 60:23 62:3,5 63:5,13 64:22 66:21 69:17,21 70:15,17,22 72:7 75:15 77:22 78:10,25 80:2,21 81:2 82:9 91:5 103:6 106:9,13,14,19,21 110:4,12 111:6,16 119:19 121:12 136:25 137:10 141:17

**Reporter** 5:3 11:5 55:4,8 58:2 143:13, 17

**reporting** 46:16 48:10

**reports** 35:5 46:19 47:11,13 125:4 130:3 133:12

**represent** 5:14

**represented** 24:3 63:22

**request** 23:11 84:24 104:23 122:6,7,14 124:8 131:11,15

**requested** 99:7 103:19 110:3 121:25 124:9

**requesting** 84:4,12 103:20 105:2 108:5

**require** 57:8,22 58:12

**required** 101:17 112:7 113:11 115:4

**remembered** 129:25

**requirements** 16:22,25 17:2

**rescue** 30:3 45:17

**Reserve** 10:12

**residence** 65:18

**resigned** 9:2,3

**respectfully** 104:22

**respond** 29:15

**response** 31:9 68:5, 12 84:24 89:10 137:2

**responsibilities** 27:21 67:6 89:19

**responsibility** 9:4

**responsible** 10:19 88:24 89:23

**responsive** 23:11 137:5

**rest** 90:14

**restricted** 113:10 114:15,16 115:6,8 116:8

**result** 13:9 63:19 75:5

**results** 77:21 109:11

**retained** 76:17

**retention** 27:5

**retire** 19:16

**retirement** 20:18

**reveal** 27:12

**revealed** 93:2

**review** 22:9 25:22 26:14 40:2,3,7,15 41:19 64:24 66:8 110:20

**reviewed** 37:13,23

**reviewing** 26:3,4 39:21

**reviews** 24:9

**rights** 63:16 124:15

**Riso** 5:1,8,15,23 6:1

7:1 8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1,13,15,22
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1,12 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1,10 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1,22
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1,19 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1

**road** 30:23,24 50:12
51:15,18,20,23,24,25
52:2,6,21 53:2,5,6,9,
10,12,18,22,23 54:24
55:2,13,14,24 56:16
58:9,25 59:6,25 61:4
65:16 71:19 75:21,22
89:24 96:3,13,14,20,
24 104:19 112:24
114:22 116:14
117:21,24 118:6
119:19,21 123:3,9,23
124:4,13,24 125:13,
14,17,18,19,20,21,
23,25 126:6,10,23
127:6 128:5 140:23,
24 141:2,3,6,9,11,12,

21 143:2,10

**roads** 51:11 52:14,25
53:3 60:20 61:9
119:13

**roadway** 49:23 50:5
51:11 52:14 56:15
60:19

**roadways** 86:12
126:15

**robotic** 15:14

**Rodriguez** 108:14,
22

**role** 39:10,11 80:6

**room** 6:19 11:18

**Rosario** 39:12 45:8,
20 49:10 76:8 78:2
91:19,20

**Rosario's** 44:3 78:6

**Rosario-flores**
45:18

**roughly** 17:22

**route** 91:4

**run** 52:15 95:13

**running** 95:6

**runs** 51:15 53:23

**Ryan** 83:2,14,15 84:5
99:3 104:9 107:6

_____

S

_____

**safe** 7:8

**safety** 87:16 103:16

**sales** 9:9

**save** 25:5,6 130:21
139:2,20

**saved** 24:23 29:8
132:15 133:19 134:3,
13,15 139:13

**scale** 50:20

**scanned** 32:18

**scared** 87:21

**scene** 15:8,15 27:24
28:11 29:20,21,25

34:16 41:24 42:3,7,
10 46:21 50:6,17,23
51:10 53:8,9 60:7
62:14,19 64:3,5,14
107:12,14 121:14
138:14,16

**scenes** 15:17

**schedule** 5:20 23:4,
6,12

**school** 8:9,11,12,14,
18,19 96:17 140:15

**scope** 27:13

**screen** 21:12 30:10,
11 33:13 35:24 40:25
44:17 54:18 70:18
75:16

**scroll** 23:3 41:22
44:25 45:5 48:9
49:22

**scrolled** 91:14

**scrolling** 31:17

**search** 35:9 86:23
121:7 122:10,15,16,
19

**seat** 77:12

**second-guess**
57:16

**secondary** 69:2

**seconds** 68:14 71:7,
14,15 72:4,17 98:9
115:9 118:10 142:2,
3,5,7

**section** 46:25 49:18
62:2 71:11 80:16

**secured** 103:8

**security** 9:6

**self-driving** 85:22

**sell** 22:24

**semester** 140:15

**semi** 103:23

**send** 40:8,9 103:2
108:4 131:3

**sense** 72:16

**sentence** 69:22
72:22

**sergeant** 10:15
31:14 37:14 38:3
40:3 44:9 46:17,21,
22 49:2

**series** 47:23

**server** 24:5 48:19

**service** 10:9 11:12
12:2 68:5,13

**set** 87:20 109:11

**setting** 115:2

**severity** 30:4

**sewer** 52:20

**share** 21:12 140:3

**shared** 19:15

**sharing** 27:8

**Sheehan** 8:11

**sheet** 30:19 73:25
76:14 97:23 142:21

**sheets** 74:8

**Sheriff's** 42:19 47:2,
3,5

**shop** 86:20

**short** 61:15

**shorter** 27:2

**shoulder** 54:9

**shoulders** 126:2

**show** 30:8 33:10,11
35:23,25 43:20 44:12
47:19 54:16 58:16
94:14

**showed** 59:25

**showing** 21:18 41:10

**shown** 39:23

**shows** 98:4

**side** 52:15,20 55:23
56:2 58:25 97:10

**sign** 6:11 55:23 56:4,
6,7,8,13,16 57:17,21,
22 58:10 59:13 61:6
63:2 67:15,19,22

80:12 89:11 95:6,13
127:11 142:8,20

**signal** 54:14 56:17,
22

**signals** 77:12

**signature** 31:14
37:14 81:8 142:23

**signatures** 39:21

**signed** 20:5 26:14
31:12 40:10,17 76:4,
13,14,15,18 81:9

**significant** 43:22

**signify** 56:8

**signs** 54:10 59:10,
11,12,17,21 60:2,5,8,
9 127:6,12,13

**simple** 7:13

**single** 17:21 54:5

**sir** 5:21 6:4 7:2 8:6
10:10 13:16 19:16,19
21:5 22:9 27:7 30:11,
17 32:2 37:11,12,19
41:17 42:2 44:13
46:5 47:9 48:2 58:18
61:16 62:13,17,20,22
64:2 69:19 70:20
71:16,24 73:15 75:18
79:4 80:18 81:2 85:7
90:20 126:19 127:24

**sit** 43:13

**sitting** 27:15

**situation** 130:22
136:17

**six-page** 45:2 55:6

**Sixteenth** 19:9

**sketch** 35:3

**slash** 105:8

**sleeper** 87:20

**sleeping** 87:21

**slightly** 52:15 71:18

**slow** 75:20

**small** 97:7

**Society** 87:15

**software** 100:22
101:3 112:7

**solely** 37:11

**son** 19:13

**sooner** 20:15

**sort** 6:11

**sought** 107:25

**Sound** 51:15,18,22
52:2 53:5,18,22
54:23 55:13,14 56:16
58:9 59:6 61:4 96:3,
14,20,24 104:19
112:24 114:22 115:2
116:13 117:21,24
118:6 123:3,8,24
124:4,12,24 125:13,
17,19,20,21 126:6,8
128:5 140:23 141:2,
21

**sounds** 9:19 20:11
84:14 98:10

**south** 51:19,24 53:9
61:11 121:17,19

**southbound** 58:25

**Southern** 20:4,6
140:14

**speak** 6:14 62:15,18
123:25 124:4,11

**speaking** 5:14 33:17
42:16 43:5 52:16,23
53:24 54:2 92:5
101:6 108:16 109:4
110:4,22 125:22

**special** 10:21

**specialist** 16:6

**specialized** 16:4

**specially** 13:12

**specialty** 16:12

**specific** 50:12 66:3
93:8 137:7

**specifically** 26:10
54:5 78:19 95:16
103:18,23 107:20
116:12 119:17,18
123:6,10 136:17

**specifics** 136:23

**speed** 28:14,16
57:15 61:4,11 70:12
71:5,6,15,18,20,25
72:3,7,10,15,16,18,
23,24 73:6,9,11,12
74:24 89:24 92:13,15
93:21,22,24 95:4,5,
23 96:9,16,20 103:16
105:3 116:11,15
117:17,19 118:5,12,
15,23 119:3 141:12

**speeding** 73:4 74:23
95:7 118:14

**speeds** 74:13 118:10

**spell** 58:2

**spent** 10:12 26:2

**split** 115:14

**spoke** 62:23

**spoken** 62:21 106:11

**spontaneous** 65:2

**spontaneously**
80:10

**stabbings** 11:17

**stage** 13:25

**stamp** 104:25 129:3

**stamps** 98:19

**stand** 98:2 102:8

**Standard** 104:18

**standards** 93:12

**standing** 54:23
55:12 59:19 81:13
143:13

**stands** 16:17

**start** 11:3 13:23 14:4
16:15 17:16 27:22
32:7,10,15 36:23
38:13,15,17,23 48:2
90:24 91:6,22

**started** 28:3 39:2,5
87:21 137:16

**starting** 8:9 49:19
62:4 70:14

**starts** 32:14 36:22
37:17 69:22 118:14

**state** 13:11 18:13
19:2,5,11 30:5,6
34:18 57:7,23 68:20
72:22 75:22 80:15
83:23 89:20 98:2,6
105:6,7 114:14
119:5,20 130:5
132:10,16 134:3,16
138:13

**stated** 67:11 80:8
102:6 119:22 121:20
122:4,5

**statement** 63:15,19
78:20 80:3

**statements** 28:10
64:4,5,6 65:2 66:13

**states** 20:10 98:7
140:12

**stating** 80:11

**station** 15:10,15
22:14,24 24:24 26:23
29:8,23 37:6 50:19,
22 51:9 81:5 93:4
129:14

**status** 105:5

**status/crash** 105:7

**statute** 57:14 68:21
96:15

**steer** 111:10 113:24
114:10,14

**steering** 78:23 85:20
105:4,5 113:18,20
114:13 115:4,16

**stepped** 50:25

**steps** 89:16

**Sticking** 41:21

**stood** 38:2

**stop** 24:17 27:8
45:25 54:10,11 55:23
56:11,16 57:9,10,17,
18,20,21,25 58:4,5,
10,12,14,24 59:13
61:5 67:15,19,22
69:4 75:21 78:22
80:12 89:10,11 92:25

**starts** 93:6,9 94:2,5 95:6,13
116:9,25 133:20
141:19 142:8

**stoplight** 59:23
95:13

**stopped** 92:21,23
93:21 94:2 95:21,22
96:8

**stopping** 79:18

**stored** 22:25 37:5
131:8,21

**story** 37:9

**straight** 52:6 59:16

**street** 28:25 37:25
126:21,23 141:3

**stretch** 114:23 115:2

**strongly** 134:4

**study** 105:16 136:5

**stuff** 29:7 48:17
84:10 91:18 103:19,
21 108:11,12 139:5

**subject** 104:15

**submit** 22:13 122:3,4

**submitted** 24:4
122:14

**subparts** 49:19

**subpoena** 5:19 21:5,
9 31:9 67:25 68:5,12
108:4 130:20 137:2,
5,23

**subpoenas** 35:8,9

**successfully** 14:8
15:25

**sudden** 117:16

**suggest** 78:8 121:4

**suggesting** 20:14

**suggestion** 69:19

**suite** 97:2 98:15
135:20 136:10

**summarize** 23:5

**summary** 37:17,20,
21 41:15,22 42:13
43:22 75:17 102:20

**summer** 14:24 20:13

**Sunpass** 93:16

**super** 52:21

**supervising** 31:12

**supervisor** 16:11
26:13 28:4 35:17
39:21,22 46:23 86:2
130:13 131:19

**supervisors** 41:20

**supplement** 48:20
49:6,8

**supplied** 22:21
24:13 113:3

**supported** 37:3,7

**supporting** 23:22
29:8

**supposed** 54:11
58:14 77:2 86:5,11
89:4 119:20,22
121:6,9 138:16,22
141:13

**survey** 50:23

**SUV** 71:2

**swear** 5:3

**switch** 40:24 58:17

**sworn** 5:9

**system** 123:16
131:23 135:7,11,12
137:15

---

**T**

**T-INTERSECTION**
54:8 55:2 127:10

**T-MOBILE** 68:7,8

**table** 32:4,19,24
33:25 34:6

**taillights** 77:12

**taking** 6:7 21:20,25
28:5 44:10 47:9,12
60:8 89:16 94:18
100:11 114:12
115:25

**talk** 10:9 26:15 60:18

72:7 91:3 102:25
105:25 106:3 122:4
124:8,14 131:19

**talked** 44:8 83:16
84:3 109:20 122:25
123:7

**talking** 27:10 53:18,
23 82:20 92:8 93:2
109:22 132:9 133:22
136:22

**Tallahassee** 24:5,7
48:23

**tasks** 88:25

**team** 16:15,17,18,20,
24 17:2 28:6 40:4

**teams** 40:5

**technology** 21:11
64:18 82:22 85:14
86:5 88:5 119:12

**tecum** 21:21

**teleconference**
21:21

**telling** 11:11

**tells** 22:23 37:8 45:19
116:17 136:6

**terms** 54:14 91:6,20
95:14 111:14 117:6

**Tesla** 5:14,17 24:14
62:5,9,15 69:16 70:6
71:2 72:11 74:14
75:20,25 77:7,19
78:7,8,14,19 82:7,11,
18 83:3,6,7,9 84:7,
16,23 85:6,12,13
86:19 88:13,15 99:3,
12,18 100:9,10,15,21
101:6,23 102:4,7,14
103:2,6,25 104:9,15,
23 107:7,24 110:6
112:7,12,19 114:16
124:2 133:3,4 135:8,
12,21 136:10 139:7

**Tesla's** 69:7 70:8
73:11 74:22

**Teslas** 99:24 100:4

**test** 17:6,7 21:10
122:5

**testified** 5:9 7:10,22
18:25

**testify** 18:18,23

**testimony** 5:4 18:14
122:17 142:19

**text** 137:4

**texting** 68:25 69:3

**THI** 46:11

**thing** 6:15 11:22
27:22 36:18 85:16
93:15 95:23 97:9
98:3 110:23 129:11,
15,20 136:21

**things** 9:4 11:16
20:24 21:2 22:20
24:10,11 26:4 28:7,
11,12,25 32:18
34:13,15 37:24 38:2,
17 43:13,18,20 44:5,
7 45:16 50:15 57:3
59:8 77:10,18 85:19,
21 88:8,12 89:8 90:5,
6 108:10 124:23
126:8

**thinking** 26:23

**thinks** 65:3

**Thomas** 9:25 31:15
61:23 81:14,17 90:22
106:20 123:22
130:25 131:2,14
132:5,18,19 133:3,
21,24 134:18,22
135:5,15 138:21,23
139:20 140:20
142:15 143:5

**Thomas's** 131:25
137:2,5

**thought** 120:18
125:19

**thousands** 17:17
18:2

**three-car** 17:22

**three-way** 54:9

**throw** 95:23

**time** 6:9 7:9,14 9:17
10:15 12:21 15:7
23:5 26:2 27:4 38:18,

25 39:25 42:11,14,
22,25 45:21 47:9,12
49:9 60:19 66:4 67:2
73:15 78:2 84:7 87:8
88:14,22 89:20
90:11,12 91:4,6,22
92:20,25 93:21 94:7,
20 95:13,21 96:5,19,
23 97:12,14,21 98:19
100:21 102:7,10,14
104:18,21,25 109:23
110:19 113:6,9,11,16
116:10,15 117:23
125:11 129:2 134:10
136:3 137:16 142:13
143:7,20

**times** 7:22,25 28:21
67:11 97:11 98:19,21
109:24 117:9,20

**tire** 77:13,15

**to-scale** 29:24

**today** 5:20 6:22 21:5
22:6,9 23:11 25:23
26:10 27:10 90:12
130:19 131:17,19,24
136:25 138:20
139:25 142:14

**today's** 26:2

**Todd** 81:15

**told** 37:24 49:2 82:19
84:5 86:20 93:11

**toll** 94:12 95:24 96:3,
13 114:25 116:24
126:7

**tolls** 92:22

**Tom** 5:13

**tools** 6:8

**top** 14:12 37:21 45:24
46:24 48:5 53:6 56:3
69:21,25 73:24 76:14
83:22 85:18 96:11
98:7

**topic** 69:6

**torque** 105:5

**Torres** 46:17,20 47:7
64:8 67:12

**Torres's** 64:18

**total** 15:10,15 32:25
50:19,22 51:9 74:2,4
129:4

**totality** 95:9

**totally** 70:11 75:2
135:22

**tour** 10:12

**towed** 78:4

**tractor-trailer** 87:19

**traffic** 13:2,3,7,24
14:10,18,19,20,22
15:3,4 16:10,13 17:5
29:4 30:21 33:20
41:11 44:19 45:17,22
46:13 48:6,12 54:4
56:12 57:8,12,23
58:13,14 59:10 63:3
75:21 80:15 87:16
89:10 95:6 96:7
97:25 98:6 104:16
105:6

**train** 34:2,3

**trained** 13:12 29:22
99:23

**training** 10:21 11:11
12:22,25 13:7,15,18
14:3 16:4 28:2 29:19
39:14 101:16

**transcript** 142:20

**transponder** 92:9
94:11

**transponders** 92:10
93:18 94:8

**Transportation**
139:9

**travel** 28:21 52:24
60:4 65:24 67:7
127:17

**traveled** 95:20
140:16

**traveling** 59:5 71:17,
19 75:22 89:25
96:19,24 97:3 117:21
118:5

**tread** 77:13

**trial** 138:22

**triangle-shaped**
56:6

**trickled** 134:8

**trip** 91:23 94:18
95:15,16

**trooper** 45:7 46:9
48:21 49:3 50:25
121:16,17,19,23,25
122:6

**trouble** 10:23 139:20

**true** 60:24

**trust** 121:21

**truth** 5:5

**truthful** 128:12
137:22 138:2

**truthfully** 129:7

**turn** 18:3 69:5 77:12
90:15

**turned** 41:5,15,18
43:10,24 63:13

**turnpike** 6:2 96:2,6

**two-** 17:22

**two-lane** 53:12

**two-week** 14:2,21,22

**type** 77:8 78:14 82:21
94:24 101:20 119:21
125:18

**types** 86:11

**typographical**
142:22

---

**U**

**ultimately** 29:5
80:23 101:12 120:13

**um-hmm** 64:8 68:10

**umber** 77:14

**unable** 6:9,13,16
78:22,24 100:10

**unavailable** 115:12,
16,17

**unaware** 133:23

**uncertainty** 47:15

**unclear** 7:16

**underneath** 40:5
73:24 87:3 94:10

**understand** 16:8
26:7 36:13 43:11,16
47:10 52:10 61:20
62:4 74:9 85:17 88:6
99:8,10,18 103:7
105:16,18 106:2,4,16
108:2 109:9,15,22
116:12 123:2 124:9
129:2,17 134:19
137:6 139:11 140:10

**understanding** 7:12
40:16 64:25 65:5
67:10 88:14,22 91:21
96:18 98:4 106:11
119:11 128:25

**understands** 138:23

**understood** 7:19
12:6 20:18 21:4
49:12 133:14

**unimportant** 43:17

**United** 20:10 140:12

**university** 8:16,18
17:19

**update** 49:3,10

**updated** 49:5 88:3
100:22

**uploaded** 107:11,14

**usage** 123:11

---

**V**

**V-1** 78:4

**V-2** 74:3

**valid** 93:22

**vehicle** 12:22 13:6,
12 14:16,17,22 17:21
18:4 23:8 24:12 35:7
62:4,5 69:23 70:25
71:2,6,7 72:22 75:20
76:4 77:6,9 78:3,4,
21,23 82:20,22 84:8,
25 86:17,20 87:4
88:4,16 89:3,5,16

**92:23** 100:5,24
103:24 105:3 107:14,
24 108:2,12 109:9
112:13 113:4 116:6,7
119:15,20 127:20
128:17 130:10 138:6

**vehicles** 28:14 62:4
87:18 99:22,24
100:4,16,18 102:14

**vehicular** 94:23

**velocity** 74:14

**verbally** 6:12

**verified** 92:10 138:2

**verify** 42:8

**vernacular** 83:6

**versa** 129:2

**version** 45:12

**vested** 130:9

**vice** 128:25

**victims** 24:3 25:17

**video** 6:5,8 21:21
64:7,17 66:12 85:5
87:19,25 105:8,11
107:10 108:9 141:24

**VIN** 104:15,16,23

**violating** 74:23

**violation** 69:2 71:25

**violations** 95:5

**virtual** 6:8

**visibility** 141:10,16,
20,23

**visible** 56:18,23
59:22 60:10,12,20
61:2 141:19

**vocation** 9:19 10:5

**voluntary** 121:8

---

**W**

**wait** 21:16 104:5
122:12

**waive** 142:16,23
143:10

**wake** 105:7

**walking** 11:18 12:5

**wall** 12:18

**Wallingford** 8:12

**wanted** 16:15 18:10
79:5 93:22 123:20
128:15 134:18

**warn** 57:13

**warning** 59:12,13,17
60:5

**warrant** 86:23 121:7
122:11,15,16,20

**warrants** 35:9

**watched** 29:20 64:19

**watching** 39:17
138:12

**water** 52:15,19,23

**Wave** 6:11

**weather** 35:10

**weeklong** 15:2,3,13,
14

**west** 18:17 52:4
53:17 56:18,23

**westerly** 51:15,23

**whatsoever** 120:19

**wheel** 50:19 85:20
105:4 113:18,20
114:13 115:4,16,24

**white** 86:7 87:23

**wide** 125:24

**width** 50:15

**word** 9:10 20:16
109:8

**worded** 70:11

**wording** 37:25

**words** 39:8 86:15

**work** 7:19 16:12
18:25 27:13 37:22,23
40:8,18 49:25 77:12
95:22 132:5

**worked** 8:20,21 9:12
79:14

**working** 9:12 13:2,3,
23 14:4 17:18,21
19:14 26:13 46:9
48:21 57:11 69:6
77:11,18 83:4,7
87:10 96:7,10

**worries** 47:18

**would've** 40:15
50:24 66:19 76:4

**wow** 32:13 47:25
97:10

**write** 34:25 43:14
77:14,23,24,25 84:4,
6,11 96:15 108:5
111:13 132:2 134:23

**writing** 11:21 38:17,
23,24 39:2,5 43:14
71:5 107:16

**written** 20:21 35:11
37:3 107:20 134:7

**wrong** 11:22,23
85:16 104:5 113:6,9
128:3 139:17

**wrote** 47:6 69:18
70:10 72:14 73:4,17
78:15 103:20,25
104:14 106:13

---

**Y**

**yard** 78:5

**year** 12:3,19 17:17,25
19:17 20:13 40:12
66:6,9,10 100:25

**years** 8:20,21,24,25
9:2 10:11 16:16,20
17:24 18:2 26:8,25
27:2,6 35:12 128:9

**yellow** 57:12,14
59:10 60:9

**you-all** 29:3 97:9

---

**Z**

**ZIP** 6:2

**zone** 96:17

**zones** 126:4

**zoom** 97:7,11