UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-21940-BLOOM/Torres

NEIMA BENAVIDES, as Personal
Representative of the Estate of Naibel
Benavides Leon, deceased,

    Plaintiff,

v.

TESLA, INC., a/k/a Tesla Florida, Inc.,

    Defendant.
_____/

DILLON ANGULO,

    Plaintiff,

v.

TESLA, INC. a/k/a Tesla Florida, Inc.,

    Defendant.
_____/

Case No. 22-22607-KMM

### TESLA, INC.'S MOTION FOR AN ORDER SETTING A PROCEDURE FOR REQUESTING CERTAIN LIMITATIONS ON PUBLIC ACCESS TO CONFIDENTIAL INFORMATION THAT IS LIKELY TO BE PRESENTED DURING TRIAL

Based upon the Parties' lists of trial exhibits, deposition designations, information produced in discovery, and, more generally, the issues involved in this case, Tesla, Inc. ("Tesla") anticipates there is a very significant likelihood that portions of the trial—whether in live testimony, designated deposition testimony, and/or trial exhibits—will involve the disclosure of its valuable trade secrets. As such, Tesla respectfully moves the Court to enter an order establishing a procedure whereby it, prior to such disclosures, can move the Court for certain limited and appropriate restrictions on public access to such trade secret information.

## INTRODUCTION

Autonomous vehicle technology is in a period of extraordinary growth, with some estimates indicating a fivefold increase in global market value over the next five years.[1] Tesla is frequently acknowledged to be the global leader in this market due to its innovative, adaptive, and commercially successful approach to Advanced Driver Assistance Systems (ADAS) and autonomy.[2] In 2024, as actual and would-be competitors either lost a significant amount of money on each vehicle sale[3] or shuttered their autonomous vehicle development efforts altogether[4][5], Tesla reported over $72 billion in annual automotive sales revenue.[6]

Tesla's success has been hard-earned. Its position as the market leader is the result of years of innovative and ambitious research and development, diligent testing, and substantial capital reinvestment. Yet despite its present competitive advantage, Tesla recognizes that a significant and growing number of established and new automobile manufacturers have entered, or are reported to have plans to enter, the market for electric and other alternative fuel vehicles, as well as the market for self-driving technology and other vehicle applications and software platforms.[7]

Tesla further recognizes the substantial value of its intellectual property, the threat posed by intentional or inadvertent disclosure, and the damage that would result if its proprietary information was compromised: "Although we make reasonable efforts to maintain the confidentiality of our proprietary information, we cannot guarantee that these actions will deter or

---

[1] https://www.fortunebusinessinsights.com/autonomous-vehicle-market-109045
[2] https://finance.yahoo.com/news/nvidia-ceo-says-tesla-far-ahead-in-self-driving-tech-as-autonomous-driving-efforts-boost-chip-demand-181126677.html
[3] https://www.investors.com/news/rivian-stock-q3-earnings-2/
[4] https://www.reuters.com/business/autos-transportation/general-motors-drop-development-cruise-robotaxi-2024-12-10/
[5] https://www.cnbc.com/2024/02/27/apple-car-project-canceled-report.html
[6] https://www.sec.gov/Archives/edgar/data/1318605/000162828025003063/tsla-20241231.htm
[7] Ibid.

prevent misappropriation of our intellectual property. The theft or unauthorized use or publication of our trade secrets and confidential information could affect our competitive position."[8] In the face of this threat, Tesla has implemented robust information technology measures designed to protect against intellectual property theft, data breaches, sabotage and other external or internal cyber-attacks or misappropriation.[9]

The threat of compromise or disclosure of proprietary information related to its ongoing development efforts is not hypothetical: "While we have implemented security measures intended to prevent unauthorized access to our information technology networks, our products and their systems, malicious entities have reportedly attempted, and may attempt in the future, to gain unauthorized access to modify, alter and use such networks, products and systems to gain control of, or to change, our products' functionality, user interface and performance characteristics or to gain access to data stored in or generated by our products."[10]

In making this Motion, Tesla certainly recognizes the country's long-standing tradition of an open court system and that the public has certain rights to information presented in open court. At the same time, however, the exhibits and trial testimony in this case will, in some instances, involve detailed discussion of Tesla trade secrets concerning how its Autopilot and other advanced driver assistance systems were developed and operate, the disclosure of which would irreparably harm Tesla due to their commercial sensitivity. Although this crash occurred in 2019, and the vehicle (and its software) were from 2018, the potential for competitors to seek to recreate Tesla's roadmap remains real. Tesla just recently piloted its "Robotaxi" ride-sharing service, plus a Tesla vehicle drove itself off the manufacturing line and all the way to the purchaser's doorstep, all

---

[8] Ibid.
[9] https://www.sec.gov/Archives/edgar/data/1318605/000162828025003063/tsla-20241231.htm.
[10] Ibid.

autonomously. Even if others could be where Tesla was in 2019, it would get them closer to autonomy than they are today. And, some of the same software operating the vehicle in 2019 remains in Tesla's fleet today; this case and the anticipated documents and testimony are not dealing with some shelved or discontinued product.

In circumstances such as these, the Supreme Court and the 11th Circuit have recognized that trial courts can close the courtroom, seal the record, and/or provide other limitations on public access to trial proceedings, exhibits, and transcripts if doing so is the least restrictive means of achieving an overriding interest in protecting against the disclosure of valuable, commercially sensitive information. Rather than requesting any sort of wholesale restrictions at this time, Tesla instead requests only that the Court create a procedure whereby it can be heard and a record made of the Court balancing the need for public access against Tesla's stated proprietary interests in its trade secret, before testimony or exhibits that will contain trade secrets are offered in open court.

## I.   LEGAL STANDARD FOR RESTRICTING ACCESS TO TRIAL INFORMATION AND RELATED PROCEDURAL CONCERNS

In *Newman v. Graddick*, the 11th Circuit noted that, due to their similarities in certain respects to criminal trials, there is a presumption of openness to the public in civil trials that "pertain to the release or incarceration of prisoners and the conditions of their confinement," but it refrained from determining whether this presumption of openness extends to all types of civil trials. *See Newman v. Graddick*, 696 F.2d 796, 801 (11th. Cir. 1983). Despite this presumption of openness in at least some civil contexts, the *Newman* court explained:

> We do not hold that every hearing, deposition, conference or even trial in a case of this kind must be open to the public. We do hold that where, as in the present case, the court attempts to deny access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest.

*Id.* at 802 (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606, 102 S.Ct. 2613, 2620 (1982)). See also, *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.,* 263 F.3d 1304 (11th Cir. 2001) (the court may protect a party from annoyance, oppression, etc., for good cause, pursuant to Fed. R. of Civ. P. 26(c)(1)). A few years later, the 11th Circuit again considered the question of confidentiality in civil trial proceedings, at which time it found that although there is a common law right of public access to civil proceedings, this right is not absolute. *Wilson v. American Motors Corp.*, 759 F.2d 1568, 1570 (11th Cir. 1985).[11] The *Wilson* court noted that the former Fifth Circuit had rejected "the overpowering presumption of access" that prevailed in some other circuits and noted that, instead, "a number of factors may militate against public access" in this circuit. *Id.* at 1568 (citing *Belo Broadcasting Corp. v. Clark*, 654 F.2d 423 (5th Cir. 1981)). It then considered case law from other appellate circuits, including the Sixth, which it noted seemed to have created a very limited list of reasons that could justify "total closure of public records" that nevertheless included protection of trade secrets. *Id.* at 1570-71 (citing *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 423 (6th Cir. 1983)).

Ultimately, the *Wilson* court applied the above-quoted standard from *Newman*, though it was careful to note it was not formally adopting the Sixth Circuit's short list of potential bases for limiting public access to court records. Though *Wilson* did not specifically concern trade secrets, its description of the Sixth Circuit's list, along with its refusal to adopt that list as exclusive, leaves no doubt that the protection of trade secrets is a legitimate reason for courts in the 11th Circuit to

---

[11] *Wilson* specifically concerned a post-trial effort by a third-party intervenor that sought trial records including pleadings, orders, affidavits, depositions, transcripts, court reporter's notes, and trial exhibits. *Id.* at 1569. The underlying case had been tried in open court—there is no indication that courtroom closure or other restrictions had been sought—but had settled after the jury had responded to special interrogatories. *Id.* The trial record had been sealed as part of the settlement, which had been "reached with the 'encouragement and assistance of the trial judge.'" *Id.*

consider restricted the baseline right of public access to court proceedings. This is confirmed by reference to the *Newman* standard itself, which notes that such consideration requires there be a balance of the competing interests of the parties where "the issue must be squarely confronted and those with various interests must be given the opportunity to be heard." *Newman* at 696 F.2d 802.

The most direct evidence that there is a compelling governmental interest in protecting trade secrets is the fact that Congress has enacted the Defend Trade Secrets Act of 2016. *See* 18 U.S.C. § 1831, *et. seq*. The Defend Trade Secrets Act made it a crime to steal or receive trade secrets, created a civil right of action for owners of trade secrets to pursue relief for misappropriated trade secrets, and includes provisions requiring courts to "enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets[.]" *See* 18 U.S.C. §§ 1832, 1835, and 1836.

The need to close the courtroom in order to protect trade secrets has been recognized by federal courts across the country. *See e.g. In re the Iowa Freedom of Information Council*, 727 F.2d 658 (8th Cir. 1984) (denying petition for writ of mandamus regarding order closing courtroom to all non-parties during portion of trial where defendants' trade secrets were to be the subject of testimony and also sealing those portions of the transcript); *Woven Electronics Corp. v. Advance Group, Inc.*, 930 F.2d 913 (table) (4th Cir. 1991) (holding that the courtroom should have been closed "during the times when trade secrets were to be exposed," and requiring district court to seal parts of the record containing trade secrets); *Brown Prods. V. Home Box Office, Inc.*, 26 F.Supp.2d 606, 612 (S.D.N.Y. 1998) ("Potential damage from release of trade secrets is a legitimate basis for sealing documents and restricting public access during trial."). The Defend Trade Secrets Act defines a "trade secret" as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices,

>formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
>>(A) the owner thereof has taken reasonable measures to keep such information secret; and
>
>>(B) the information derives independent economic value, actual or potential, from not being generally know to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

The Supreme Court has explained that (in criminal cases, where greater rights of public access to court proceedings have been identified), "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure was properly entered." *Waller v. Georgia*, 467 U.S. 39, 45, 104 S.Ct. 2210, 2215 (1984) (quoting *Press-Enterprise Co. v. Superior Court of CA, Riverside County*, 464 U.S. 501, 510 (1984)).

The Supreme Court further explained that "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id.* at 48, 104 S.Ct. at 2216. The 11th Circuit has refused to require a specific procedure for the consideration of whether to close proceedings or seal records, but it has explained "that the issue of closure must be squarely confronted and those with various interest must be given the opportunity to be heard." *See U.S. v.*

*Valenti*, 987 F.2d 708, 715 (11th Cir. 1993) (quoting *Newman*, 696 F.2d at 802).[12] Accordingly, this Court must balance any asserted right of access against Tesla's interest in keeping this information confidential.

II. **THERE IS A REASONABLE BASIS FOR CONCLUDING AT THIS TIME THAT TESLA MAY NEED TO SEEK LIMITED RESTRICTIONS ON PUBLIC ACCESS TO TRIAL PROCEEDINGS, TRANSCRIPTS, AND EXHIBITS**

In the course of preparing the L.R. 16.1 pretrial stipulation, which as of this writing has not been finalized, the parties identified a significant number of exhibits that may be offered at trial that contain information Tesla has identified as Confidential or Highly Confidential under the Confidentiality Protective Order that was entered in this case. *See* Exhibit A, Plaintiff's Exhibit List; Exhibit B, Tesla's Exhibit List[13]; *see also* (D.E. 126) Confidentiality Protective Order.[14] Similarly, portions of the deposition testimony of Tesla employees Akshay Phatak, Eloy Rubio-Blanco, and David Shoemaker (and Tesla's counter-designations) discuss trade secret information that Tesla has identified as Confidential or Highly Confidential during discovery. Likewise, the depositions of other witnesses, and the analyses of experts retained by both parties', contained

---

[12] As discussed in more detail below, Tesla does not at this time request trial proceedings be closed to the public, or specific portions of testimony or trial exhibits be sealed. However, it presents this Motion now to inform the Court, and any potentially interested observers, that, during the trial, when it becomes clearer which exhibits will be offered and what information or material will be the subject of testimony, it may make specific, narrowly tailored requests for such protections. This is consistent with the guidance offered by the 11th Circuit regarding the necessity of providing notice that courtroom closure or other restrictions on access to trial information may be considered. *See Newman*, 696 F.2d at 802; *Valenti*, 987 F.2d at 715.

[13] Blue highlights have been applied to the items listed in Exhibits A and B that were marked as Confidential or Highly Confidential under the Confidentiality Protective Order.

[14] To the extent Plaintiffs oppose this Motion, Tesla notes that Plaintiffs agreed in the Stipulated Protective Order to "take reasonable steps to maintain the confidentiality of any Covered Information at any hearing or upon trial of this matter…" (Dkt. 126 at p. 13, ¶ 26). Plaintiffs should be joining this Motion, or at minimum supporting Tesla's position, as it was in part their representation that they would protect Tesla's trade secrets that encouraged Tesla to produce the material in this case.

8

detailed discussion of Tesla's trade secret information. More generally, of course, this case involves the design, development, and operation of Tesla's proprietary Autopilot and other advanced driver assistance systems.

Thus, it is clear that portions of this trial will almost certainly involve disclosure and discussion of Tesla's trade secrets. However, Tesla has identified objections to some of the exhibits and designated deposition testimony that, if granted, could obviate or limit the scope of trade secret-containing information that will be presented at trial.[15] Similarly, context-specific strategic considerations could cause the parties to choose not to call certain witnesses or offer certain exhibits. Understanding this, and in recognition of the careful consideration the Court must conduct before granting restrictions on public access to certain information, it would be premature—for Tesla to ask for any sort of wholesale set of restrictions on public access because of all of the testimony or exhibits that *might* be offered.[16] Conversely, a blanket order stating all testimony or exhibits the Court allows into trial will be part of the public record as well incentivizes Plaintiffs to introduce more than they might otherwise simply to eviscerate Tesla's protection over those materials and make them more available for other litigation.

Instead, Tesla asks the Court to enter in an order that will provide a procedure whereby it, and Plaintiff, can be heard before any session of trial that appears likely from context will involve the disclosure of its trade secrets. For instance, in one case involving a criminal prosecution

---

[15] At this time, Tesla does not know what objections Plaintiff may make to the exhibits on its list, or its deposition counter-designations, but, of course, the same is true for those.

[16] Note also that the former Fifth Circuit, relying on Supreme Court precedent, has held that the public's right of access to trial exhibits and other material published in open court, or copies thereof, is more limited than is its right of access to attend a trial in real time. *See Belo Broadcasting Corp. v. Clark*, 654 F.2d 423, 427 (5th Cir. 1981). Thus, Tesla also recognizes the Court may need to consider differing levels of public access depending on what specific material is at issue.

regarding trade secrets, the court, after it had been given notice of the potential for trade secret revelation, permitted the party seeking protection to identify with specificity what was most likely to involve disclosure of trade secrets, and then gave the parties an opportunity to be heard on why the public should be restricted from access to that information. *See U.S. v. Aleynikov*, No. 10-CR-96, 2010 WL 5158125 (S.D.N.Y. 2010). That court then created a procedure whereby, before the courtroom would be closed to the public, it would be cleared outside the presence of the jury. *Id.* at *1. That court, recognizing the need to present the trade secret-containing information in context, on occasion took more testimony in a closed courtroom "than was strictly necessary," but the court resolved this concern by permitting the parties to submit proposals after the trial for the portions of the transcripts of the closed testimony that could be unsealed. *Id.*

Although Tesla is not asserting that precisely these procedures are the only ones that could be appropriate here, it offers this case as an example of the sorts of case-specific, narrowly-tailored restrictions that could achieve an appropriate balance between the compelling need to protect trade secrets and the baseline presumption of an open courtroom during trial. *See also Newman*, 696 F.2d at 802 ("We doubt that a universal standard for closure applicable in all cases can be developed and we do not intend to do so here.").

### III.   CONCLUSION

Tesla agrees the interest in an open court system that permits public access to trial proceedings is significant. At the same time, however, there can be no doubt that there is a well-understood and long-recognized competing interest in ensuring a party like Tesla is not irreparably harmed by the disclosure of its valuable trade secrets. Clearly there is a tension between these interests, but there is binding precedent that provides a standard for the balancing of these considerations that also permits this Court to establish procedures for conducting such balancing.

Short of that amounts to this Court's decision that Tesla's materials no longer warrant trade secret protection and Tesla's continued efforts to protect this information from the public are no longer necessary or are in vain.

Recognizing the challenge involved in this task, Tesla asks at this time that the Court enter an Order that establishes a procedure whereby, when the specific trade secrets that are most likely to be presented during trial can be more precisely identified, Tesla be permitted to present its need for certain limited restrictions with sufficient specificity to permit the Court to determine what narrowly-tailored protections, if any, are appropriate. The Court has indicated it intends to discuss the parties' trial exhibit and witness lists in the upcoming hearing on July 8. Tesla, therefore, requests the Court also consider this issue in detail during that hearing.

Date:  July 7, 2025                                    Respectfully submitted,

                                                                *s/ Whitney V. Cruz*
**WHITNEY V. CRUZ**
Florida Bar No. 800821
**WENDY F. LUMISH**
Florida Bar No. 334332
**Bowman and Brooke LLP**
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134
Tel. 305-995-5600 / Fax: 305-995-6100
whitney.cruz@bowmanandbrooke.com
wendy.lumish@bowmanandbrooke.com

**THOMAS P. BRANIGAN**
*(Admitted Pro Hac Vice)*
**DREW P. BRANIGAN**
*(Admitted Pro Hac Vice)*
**BOWMAN AND BROOKE LLP**
101 W. Big Beaver Road, Suite 1100
Troy, MI 48084
Tel. 248-205-3300 / Fax: 248-205-3399
thomas.branigan@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com

**JOEL SMITH**
*(Admitted Pro Hac Vice)*
**BOWMAN AND BROOKE LLP**
1441 Main Street, Suite 1200
Columbia, SC 2920
Tel. 803-726-7420 / Fax: 803.726.7421
Joel.Smith@bowmanandbrooke.com

**HILARIE BASS**
Florida Bar No. 334243
**HILARIE BASS, ESQUIRE LLC**
2821 Bayshore Drive, UPH-B
Miami, FL 33133
Tel. 305-505-8777
bassh@bassinstitute.org

*Attorneys for Defendant TESLA, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on **July 7, 2025**, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

**Adam T. Boumel, Esq.**
Florida Bar No. 0110727
THE ROUSSO, BOUMEL LAW FIRM, PLLC
9350 South Dixie Highway
Suite 1520
Miami, FL 33156
Tel. 305-670-6669
adam@roussolawfirm.com
assistant@roussolawfirm.com
pleadings@roussolawfirm.com

*Attorneys for Plaintiff Dillon Angulo*

**Todd Poses, Esq.**
Florida Bar No. 0075922
POSES & POSES, P.A.
Alfred I. Dupont Building
169 East Flagler Street, Suite 1600
Miami, FL 33131
Tel.  305-577-0200
Fax: 305-371-3550
tposes@posesandposes.com
maria@posesandposes.com

*Attorneys for Plaintiff Neima Benavides*

**Brett Schreiber, Esq.**
Admitted *Pro Hac Vice*
**Satyarinivas "Srinivas" Hanumadass, Esq.**
Admitted *Pro Hac Vice*
**Carmela Birnbaum, Esq.**
Admitted *Pro Hac Vice*
SINGLETON SCHRIEBER
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Tel. 619-771-3473
bschreiber@singletonschreiber.com
vas@singletonschreiber.com
cbirnbaum@singletonschreiber.com
jjusto@singletonschreiber.com
eelms@singletonschreiber.com
service@singletonschreiber.com

*Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides*

**Douglas F. Eaton, Esq.**
Florida Bar No. 0129577
EATON & WOLK PL
2665 South Bayshore Drive, Suite 609
Miami, FL 33133
Tel. 305-249-1640
Fax: 786-350-3079
deaton@eatonwolk.com
cgarcia@eatonwolk.com
lhuete@eatonwolk.com

*Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides*

s/ *Whitney V. Cruz*
Whitney V. Cruz