## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| NEIMA BENAVIDES, as Personal Representative of the Estate of Naibel Benavides Leon, deceased, | Case No. 21-cv-21940-BLOOM/Torres |
|     Plaintiff, | |
| v. | |
| TESLA, INC., a/k/a Tesla Florida, Inc., | |
|     Defendant. | |
| DILLON ANGULO, | Case No. 22-22607-KMM |
|     Plaintiff, | |
| v. | |
| TESLA, INC. a/k/a Tesla Florida, Inc., | |
|     Defendant. | |

## PLAINTIFFS' RESPONSE TO TESLA'S MEMORANDUM OF LAW
## IN SUPPORT OF THEIR OBJECTIONS TO PLAINTIFFS' EXHIBITS

Plaintiffs Neima Benavides and Dillon Angulo, by and through undersigned counsel, hereby file this their Response to Defendant's Memorandum of Law in Support of their Objections to Plaintiffs' Exhibits, and in support thereof state:

**I.   EVIDENCE OF TESLA'S EFFORTS TO OBSTRUCT THE INVESTIGATION INTO THIS ACCIDENT ARE ADMISSIBLE.**

    **A.   THE JURY MAY CONSIDER TESLA'S POST-ACCIDENT CONDUCT IN DETERMINING ENTITLEMENT TO PUNITIVE DAMAGES**

In this section of Tesla's memo, Tesla lumps two distinct sets of actions under the single umbrella of "discovery disputes."  This is inaccurate.  The first set of evidence the Plaintiffs seek

to introduce is related to Tesla's acts that, as this Court described them, "prevented Florida Highway Patrol from obtaining the autopilot data in this case." (DE428 at 94-95) The second set of evidence is related to Tesla's actions after suit was filed. While both sets of evidence are relevant to Plaintiffs' claim for punitive damages, it's important to highlight the distinction between the presuit conduct and the post suit conduct. Only the latter can be characterized as a "discovery dispute."

Tesla relies primarily on four cases, none of which are analogous, because none involve a case with a punitive damage claim.[1] The Florida Supreme Court has made it clear that, when considering entitlement to punitive damages, a jury may consider Tesla's post-accident actions that could be viewed as an attempted cover-up:

> (2) the degree of reprehensibility of Owens–Corning's conduct, the duration of that harmful conduct, Owens–Corning's awareness, any concealment and the existence and frequency of similar past conduct; … (7) the seriousness of the hazard to the public, the attitude and conduct of Owens–Corning upon discovery of the misconduct; (8) the degree of Owens–Corning's awareness of the hazard and of its excessiveness; (9) the number and level of employees involved in causing or covering up the marketing misconduct; (10) the duration of both the improper marketing behavior and its cover-up.

*Owens-Corning Fiberglas Corp. v. Ballard*, 749 So.2d 483, 484-85 (1999).

Here, Tesla's actions immediately after the accident are undisputed. Despite FHP making it clear that it wanted the autopilot data, Tesla's general counsel volunteered to provide a list of

---

[1] Tesla's cases are distinguishable on other grounds. In *Empire Gas Corp. v. Am. Bakeries Co.,* 840 F.2d 1333, 1341 (7th Cir. 1988), the court noted that the discovery evidence was properly excluded because "the evidence was at best cumulative and probably irrelevant." In *Waters v. Genesis Health Ventures, Inc.,* 400 F. Supp. 2d 814, 818 (E.D. Pa. 2005), the plaintiff sought to introduce "evidence of [defense] counsel's hostility or disputes surrounding production of documents." The evidence Plaintiffs seek to introduce here has nothing to do with the actions of Tesla's defense counsel. In *Emerson Elec. Co. v. Garcia,* 623 So. 2d 523, 525 (Fla. 3d DCA 1993), unlike the instant case, there was "no pretrial discovery violation [] ever established." Finally, *Amlan, Inc. v. Detroit Diesel Corp.,* 651 So. 2d 701, 703 (Fla. 4th DCA 1995), specifically distinguished its fact pattern from "cases in which the misconduct alleged is the destruction or unexplained disappearance of crucial evidence."

data to request that, unbeknownst to FHP, specifically excluded the autopilot data. Then, Tesla sent a technician, Michael Calaffel, to download the data who had never downloaded autopilot data before and had no idea how to do so, thus ensuring that FHP could not access the data demonstrating the role the autopilot's failure played in the accident.

During the lawsuit, Tesla's 30(b)(6) witness testified that Tesla sometimes received partial "snapshot" files from over the air transmissions after an accident, and that Tesla had provided everything that they had received. This testimony was false, and Tesla knew it was false, as established by the witness Tesla produced in response to the sanctions motion, David Shoemaker. Shoemaker made it clear that the snaphshot file was a single file, and if they had received all of the video clips, then they would have known that they had necessarily received the rest of the snapshot data. He confirmed that that the only way the index to the missing snapshot data could have been deleted was through the "affirmative action" of a Tesla employee.  The jury is entitled to consider all of this evidence when considering entitlement to punitive damages.

In *Gen. Motors Corp. v. McGee*, 837 So. 2d 1010, 1035 (Fla. 4th DCA 2002), *as modified on clarification* (Mar. 5, 2003), the Fourth District recognized that, in a case involving punitive damages, evidence of discovery misconduct could be admissible as "concealment of offensive conduct after it initially occurred."[2]

---

[2] The *McGee* Court quoted this language from *Johns–Manville Sales Corp. v. Janssens,* 463 So. 2d 242, 256 (Fla. 1st DCA 1984), noting that it was disapproved on other grounds by *Chrysler Corp. v. Wolmer,* 499 So. 2d 823 (Fla.1986).  Tesla continues to argue that *Wolmer* rendered *Janssens* inapplicable to any motor vehicle case.  (Mtn at 6, FN 5) But, as *McGee* makes clear, the principle that we are relying on here - post-accident concealment is relevant to a claim for punitive damages - remains good law after *Wolmer.*  Further, in *King v. Eastern. Airlines, Inc.,* 536 So. 2d 1023 (Fla. 3d DCA 1987), the defendant cited to *Wolmer* to argue against its liability for punitive damages.  The Third District stated, "*Wolmer* is inapposite; it turns on lack of actual knowledge." *King* at 1026. Of course, the evidence here shows that Tesla had actual knowledge as early as 2016 that drivers were misusing Autopilot, yet failed to take sufficient steps to remedy the defect.  Tesla may be found liable for punitive damages under the *Janssens* standard as a result.

In *McGee,* the counsel for GM was placed on the stand for over three days, and testified about documents that had been withheld and about conflicting interrogatory answers he had provided on behalf of GM.  The Fourth District held that "the vast majority of questions asked of [GM's counsel] were relevant to the issue of punitive damages." *McGee* at 1035. In explaining why this evidence was relevant to the jury's determination of punitive damages, the court wrote:

> In the related context of Title VII litigation, a plaintiff may "establish that the defendant acted with reckless disregard for his federally protected rights by showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions." *Bruso v. United Airlines, Inc.,* 239 F.3d 848, 858 (7th Cir.2001); *see also Davis v. Rennie,* 264 F.3d 86, 115 (1st Cir.2001) (where court observed that "a punitive damages award may be 'justified not only by defendants' actions on [the date in question] but also by their subsequent behavior' ") (quoting *Hall v. Ochs,* 817 F.2d 920, 927 (1st Cir.1987)); *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 516 (9th Cir.2000); *E.E.O.C. v. Wal–Mart Stores, Inc.,* 35 Fed. Appx. 543, 545–46, 2002 WL 1003133 (9th Cir.2002); *Vasquez v. Atrium, Inc.,* 2002 WL 818066, at *8 (D.Ct.Ariz.2002).

*McGee* at 1035-1036.

The Fourth District then specifically distinguished the primary case relied on by Tesla - *Amlan, Inc. v. Detroit Diesel Corp.,* 651 So.2d 701(Fla. 4th DCA 1995) - as follows:

> This case is distinguishable from *Amlan, Inc. v. Detroit Diesel Corp.,* 651 So.2d 701(Fla. 4th DCA 1995), relied upon by GM. In *Amlan,* we wrote that the general rule is that "[e]vidence related to the history of pretrial discovery conduct should *normally* not be a matter submitted for the jury's consideration on the issues of liability." *Id.* at 703 (emphasis added) …Unlike this case, *Amlan* was not a case involving punitive damages; the plaintiff there sought to use the defendant's discovery abuse to prove the defendant's liability in a case involving breach of contract and fraud.

*McGee* at 1036.

In addition, Courts have held that even in cases without a claim for punitive damages, evidence of an attempted cover-up may be admissible in order to demonstrate consciousness of guilt.  In *S. Union Co. v. Sw. Gas Corp.,* 281 F. Supp. 2d 1117, 1123 (D. Ariz. 2003), the district

court allowed the jury to consider evidence demonstrating that the defendant had "engaged in fabricating evidence favorable to his defense and then offering it as evidence in the trial."

The court explained the relevance of this evidence as follows:

Fabrication of evidence followed by offering it at trial because it was material to his defense is specifically relevant to whether he intentionally engaged in improper conduct, and whether he testified truthfully. *See United States v. Perkins,* 937 F.2d 1397, 1401–2 (9th Cir.1991) (false exculpatory statements may be considered by jury as evidence of consciousness of guilt); *United States v. Collins,* 90 F.3d 1420, 1428 (9th Cir.1996) (inducing witness to testify untruthfully or participating in the proffer of untruthful evidence shows consciousness of guilt) (citing *United States v. Brashier,* 548 F.2d 1315, 1325 (9th Cir.1976) (holding same)); *Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir.1993) (court has "broad discretionary power" to allow jury to draw adverse inference from destroyed or spoliated evidence); *United States v. Scheibel,* 870 F.2d 818, 822 (2nd Cir.1989) (jury may consider fabrication of exculpatory evidence as proof of consciousness of guilt); *Great Coastal Express, Inc. v. International Brotherhood of Teamsters,* 675 F.2d 1349, 1357 (4th Cir.1982) (noting that "[p]erjury and fabricated evidence are evils that can and should be exposed at trial. ").

*S. Union. Co.* at 1124. *See also Federated Univ. Police Officers' Ass'n v. Regents of Univ. of California,* 2015 WL 13273308, at *10 (C.D. Cal. July 29, 2015) (evidence of defendant's efforts to conceal their wrongful conduct can demonstrate consciousness of wrongdoing, which is relevant to prove the defendants acted intentionally.)

    **B.  THE COURT'S FINDING OF NO BAD FAITH DOES NOT PRECLUDE PLAINTIFFS FROM PRESENTING EVIDENCE OF TESLA'S ATTEMPTED COVER-UP.**

Tesla next argues that the Court's finding that Tesla did not act in bad faith precludes the jury from considering Tesla's acts or omissions related to the autopilot data. Though Tesla cites to no authority for this proposition, this is essentially a collateral estoppel argument. But for Tesla to invoke collateral estoppel, the legal question decided by the court must be identical to the legal question Tesla seeks to preclude the jury from considering.  A Plaintiff may prove entitlement to punitive damages based on either gross negligence or intentional misconduct. The Court's ruling was that Plaintiffs failed to show prejudice or "that Tesla's failure to timely turn over the snap shot

evidence was *willful*." (ECF No. 405 at 14-15) The Court did, however, sanction Tesla, after Tesla essentially admitted to its own negligence. The Court's ruling does not preclude Plaintiffs from proving that Tesla was grossly negligent in its handling of the autopilot data, a finding that does not require bad faith.

### C. PLAINTIFFS ARE NOT REQUIRED TO CAUSALLY LINK TESLA'S ATTEMPTED COVER-UP TO THEIR INJURIES.

Tesla next argues that post accident conduct cannot be relevant to punitive damages because it could not have caused the harm suffered by the Plaintiffs, citing to *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422-23 (2003). *Campbell*, however, does not support Tesla's argument because covering up the failure of the autopilot in this accident is not a "dissimilar act, independent from the acts upon which liability was premised."

*Campbell* actually provides examples of what constitute "dissimilar acts." In *Campbell*, the plaintiffs sued State Farm for improper claims handling procedures. However, the trial court allowed the plaintiffs to present evidence of other bad acts from State Farm that had nothing to do with improper claims handling:

> Although evidence of other acts need not be identical to have relevance in the calculation of punitive damages, the Utah court erred here because evidence pertaining to claims that had nothing to do with a third-party lawsuit was introduced at length. Other evidence concerning reprehensibility was even more tangential. For example, the Utah Supreme Court criticized State Farm's investigation into the personal life of one of its employees and, in a broader approach, the manner in which State Farm's policies corrupted its employees.

*Campbell* at 423-424. Covering up the very accident at issue in this case is not a "dissimilar act" as defined in *Campbell*.

Tesla's reliance on two tobacco cases in support of its argument is similarly without merit. In *Philip Morris USA, Inc. v. Rintoul*, 342 So. 3d 656 (Fla. 4th DCA 2022), the Court correctly held that evidence related to a completely unrelated product that had never been used by the smoker

could not be considered to support a claim for punitive damages. Plaintiffs readily agree that they could not present evidence related to a defect in Tesla's power wall, solar roof, or Optimus robot in order to prove punitive damages in this case.

*Hardin v. R.J. Reynolds Tobacco Co*., 314 So. 3d 584 (Fla. 3d DCA 2020) is also inapposite. First, *Hardin* was a retrial on punitive damages only. The Court noted that its holding was based on the "unique procedural posture [of] this case," specifically distinguishing it from cases, like the instant case, where "the same jury would hear the evidence pertaining to both compensatory and punitive damages." *Hardin* at 588. The outcome of *Hardin* was determined by the plaintiff's failure to meet an obligation created by a non-standard punitive damage jury instruction that the plaintiff had agreed to. *Hardin* in no way precludes consideration of Tesla's conduct postdating the accident when determining entitlement to punitive damages.

Indeed, one of the primary pieces of evidence used in every *Engle*-progeny tobacco case is the 1994 testimony of tobacco company executives before congress, in which they stated under oath that "that nicotine was not addictive" and that "it has not been proven that cigarette smoking causes cancer." *Philip Morris USA, Inc. v. Russo,* 175 So. 3d 681, 683 (Fla. 2015). Juries in these cases receive further evidence that the tobacco companies did not cease their cover-up and concealment attempts until 1999. *Id.* In order to be an *Engle* class member, the smoker must have developed a tobacco related illness by November of 1996. Thus, every *Engle* jury hears evidence of post injury conduct that could not have caused harm to the class member. This returns us to where we started. As *Owens-Corning Fiberglas Corp. v. Ballard* makes clear, Tesla's efforts to cover-up its role in this accident are relevant for punitive damages purposes.

Finally, Tesla's reliance on this Court's order in *Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC,* No. 13-CIV-80371, ECF No. 335 (S.D. Fla. July 2, 2015), is misplaced.

In *Nat'l Union*, unlike here, there was no claim for punitive damages, *and* the court denied the motion for sanctions entirely. Here, Plaintiffs have a claim for punitive damages, and the Court granted sanctions, just not the ultimate sanction.

Because Florida law holds that a jury may consider a defendant's efforts to cover-up their misconduct in determining entitlement to punitive damages, evidence of Tesla's efforts to withhold the autopilot data from the FHP and the Plaintiffs should be considered by the jury.[3]

## II.    THE NTSB REPORT IS ADMISSIBLE.[4]

Tesla argues that 49 USC § 1154(b) precludes the admission of NTSB report from the Brown accident. It does not. The statute reads as follows:

> **(b) Reports.**--No part of a report of the Board, related to an accident or an investigation of an accident, may be admitted into evidence or used in a *civil action for damages resulting from a matter mentioned in the report*.

49 U.S.C.A. § 1154 (emphasis supplied).

The statute only precludes a report's use in the lawsuit based on the accident in the report. Tesla's argument that the statute precludes its use in *any* civil action rewrites the statute and renders the phrase "resulting from a manner mentioned in the report" meaningless. If congress had intended to preclude the use of NTSB reports in any civil action for any purpose, it would have written the statute in that fashion. Instead, it limited the prohibition to its use in the lawsuit resulting from the accident addressed in the report.

---

[3] Even if the Court were to accept Tesla's argument, the cases Tesla relies on only deal with discovery disputes, which, by definition, can only arise after suit is filed. Tesla has provided no authority that would preclude the jury from considering Tesla's efforts to impede the FHP investigation.

[4] This response was drafted before the Court's ruling on the NTSB report and OSI evidence. We would respectfully request that this Court treat the arguments contained in this section as a motion for reconsideration on both issues.

Absent from Tesla's memorandum is any law applying § 1154(b) to preclude the admission of NTSB reports of *other* accidents.  Though it does not address the specific question at issue here, the Missouri Court of Appeals, in *Kastner v. Beech Aircraft Corp.,* 650 S.W.2d 312, 318–19 (Mo. Ct. App. 1983), approved the admission of NTSB reports from other accidents for many reasons that are present in the instant case.  In discussing the admissibility of the NTSB reports, the Court first noted that "49 U.S.C.A. § 1441(a) sets forth the duties of NTSB to make rules and regulations governing notification and report of accidents involving civil aircraft; to investigate accidents and report the facts, conditions, and circumstances thereof; to make recommendations to FAA as will tend to prevent similar incidents; to make the reports public; and to ascertain what will be best to reduce or eliminate the possibility of, or recurrence of, accidents by conducting special studies and investigations on matters pertaining to safety in air navigation and the prevention of accidents." *Kastner* at 319.

Plaintiff used the report to show "the stall/spin statistics for the two years for three comparable light twin-engine aircraft" - the aircraft involved in the accident and two from other manufacturers. *Kastner* at 319.  Describing these statistics, the Court wrote:  "Although the statistic shown may be the result of a gathering of various sources of aircraft accidents involving stalls/spins, and thus technically of a hearsay nature, the overriding concern of 49 U.S.C.A. § 1441, and § 490.220 [see also Fed.R.Evid., 803(8)(B), 28 U.S.C.A.], is to provide for the dissemination and consideration of these elements of public safety in the operation and proper design of aircraft." *Id.*

The Court further noted that "none of these reports concerned any of the facts of the present Kastner-McNabb accident, but were offered and received for the purpose of establishing that Beech had knowledge of the spin propensities of the Beech Baron, and official recommendations

for the avoidance of the same, which would give rise to the duty to give adequate warnings thereof." *Kastner* at 319. The Court concluded that the NTSB's study on stall/spin accidents from 1967 to 1969 was properly admitted, along with "other NTSB factual reports of accidents." *Id*.

As in *Kastner*, the Brown NTSB report does not concern the instant accident, but is offered to establish that Tesla had knowledge of the problems with its autopilot system, and the recommendations for the avoidance of further accidents. As this Court noted in its order denying summary judgment, Plaintiffs' expert Missy Cummings "explained in her report, as early as 2016, NTSB recommended in their crash investigation report that Tesla 'incorporate system safeguards that limit the use of automated vehicle control systems to those conditions for which they were designed (H-17-41).'" (ECF No. [350-1] at 6) The report and its recommendations should be admitted for the same reasons the NTSB reports were admitted in *Kastner*. [5]

In the event the Court disagrees and finds that § 1154(b) is applicable to the Brown report, we would note that the prohibition would only apply to the conclusions and opinions contained in the report, not the factual investigation. As explained in *Major v. CSX Transp.,* 278 F. Supp. 2d 597, 605 (D. Md. 2003), "[t]he portions of the NTSB Report cited by Plaintiff in her Amtrak Opposition are not excludable as references to NTSB conclusions or opinions pursuant to the Safety Act and its regulations because they are part of the factual investigation narrative of the NTSB Report rather than the analysis, findings, or recommendations sections of the Report." *See also In re Air Crash Disaster at Stapleton Intern. Airport, Denver, Colo., on Nov. 15, 1987,* 720 F. Supp. 1493, 1496 (D. Colo. 1989) (Though the report's opinions were excluded, its factual findings were admissible, holding that the purpose of the rule is "served by the exclusion of conclusions regarding the probable cause of an accident.")

---

[5] In addition to the Brown, Banner and Kanagawa crashes, the Plaintiffs seek to introduce evidence of the Huang crash of March 23, 2018. The details of this accident are provided in Exhibit 1.

None of the other NTSB documents Plaintiff seeks to introduce are reports of a specific accident, and therefore § 1154(b) is inapplicable.

### A. THE PLAINTIFFS HAVE ESTABLISHED SUBSTANTIAL SIMILARITY OF THE PROFFERED ACCIDENTS.

Tesla has objected to the use of any evidence related to other accidents in Section III of DE444, Section IV(b) of DE444, and in a subsequent memorandum of law in opposition, DE452. Because these arguments essentially cover the same ground, we will respond to all of Tesla's arguments here.

The best analogue we have located discussing the substantial similarity analysis is *In re: Gen. Motors LLC Ignition Switch Litig..*, No. 14-MD-2543 (JMF), 2016 WL 4410030 (S.D.N.Y. Aug. 18, 2016) ("*In re: Gen. Motors*"). In this order, the district court ruled on GM's motion in limine to exclude evidence of other similar incidents ("OSI"). The district court began its discussion by setting forth the principles that a court must consider in determining whether OSI is substantially similar:

> "Whether a prior accident occurred under 'substantially similar' conditions necessarily 'depends upon the underlying theory of the case, and is defined by the particular defect at issue.'" *Lidle v. Cirrus Design Corp.*, 505 Fed.Appx. 72, 74 (2d Cir. 2012) (summary order) (quoting *Guild v. Gen. Motors Corp.*, 53 F. Supp. 2d 363, 367 (W.D.N.Y. 1999)).
> Significantly, the requisite degree of similarity varies according to the purpose for which OSI evidence is offered. For example, "[e]vidence proffered to illustrate the existence of a dangerous condition necessitates a high degree of similarity because it weighs directly on the ultimate issue to be decided by the jury." *Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434, 1440 (10th Cir. 1992). Similarly, where OSI is offered to prove causation, courts tend to consider multiple factors — namely, whether "(1) the products are similar; (2) the alleged defect is similar; (3) causation related to the defect in the other incidents; and (4) exclusion of all reasonable secondary explanations for the cause of the other incidents." *Watson v. Ford Motor Co.*, 389 S.C. 434, 453 (2010); *see also* 1 McCormick on Evid. § 200 (7th ed. 2013) (noting that courts are more likely to allow OSI evidence to show causation "when the defendant contends that the alleged conduct could not possibly have caused the plaintiff's injury"). By contrast, the substantial similarity standard is "relaxed" where OSI evidence is offered to show notice; that is, "the

similarity in the circumstances of the accidents can be considerably less than that which is demanded when the same evidence is used for one of the other valid purposes." *Schmelzer*, 2007 WL 2826628, at *2. As the substantial similarity inquiry is "fact-specific," a "district court is owed considerable deference in its determination of substantial similarity." *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1126 (10th Cir.), *as clarified on reh'g*, 400 F.3d 1227 (10th Cir. 2004). If substantial similarity is established, "[a]ny differences in the accidents ... go to the weight of the evidence.

*In re: Gen. Motors* at *1-2.

As one of the factors supporting the court's decision to admit the OSI evidence, the court pointed to GM's admission to NHTSA regarding the defect in the ignition switch:

New GM has admitted to NHTSA the very proposition that Cockram seeks to argue from that evidence, so the Court is at a loss as to what rebuttal evidence New GM would seek to offer.

. . .

And, again, New GM does not even attempt to explain how the jury could "misinterpret[ ]" the evidence or why any prejudice resulting from its own admissions to NHTSA would be "unfair[ ]," Fed. R. Evid. 403. In fact, there is an equally strong, if not stronger argument, that the prejudice analysis cuts the other way — namely, that limiting OSI evidence to a small number of incidents would prevent the jury from understanding the scale, significance, and duration of Old GM's and New GM's conduct with respect to the ignition switch defect.

*In re: Gen. Motors* at *4.

In the instant case, Tesla has admitted the proposition that Plaintiffs seek to argue from the OSI evidence.  Specifically, on December 12,2023, Tesla filed a Defect Information Report (DIR) with NHTSA "applicable to all Tesla models produced and equipped with any version of its Autopilot system. Tesla's DIR described the functionality of this system, stated that the prominence and scope of the system's controls may be insufficient to prevent driver misuse, and described a remedy to improve the effectiveness of driver warnings and to reduce mode confusion." (Exhibit 2)

Next, Tesla sent a letter sent to each of its owners, stating, "Tesla has determined that a defect, which relates to motor vehicle safety exists in certain Model Year 2012-2023 Model S,

2016-2023 Model X, 2017-2023 Model 3, and 2020-2023 Model Y vehicles." (Exhibit 3) This is consistent with NHTSA's finding that a defect existed in 100% of Tesla's cars that were equipped with Autopilot. The defect existed regardless of model, year, hardware or software version. Tesla acknowledged the existence of the defect and vowed to fix it in all of its cars. In light of these admissions, excluding or limiting the OSI evidence in this case would prevent the jury from understanding the scale, significance and duration of Tesla's conduct with respect to the autopilot defect at issue in this case.

Returning to *In re: Gen. Motors*, GM attempted to rely on the district court's previous OSI ruling from an earlier bellwether trial, in which the court excluded the "grim details" of other accidents due to the risk of unfair prejudice. The court rejected that argument as follows:

> The Court did not mean to suggest, let alone hold, that Plaintiffs were barred from introducing any evidence concerning the existence or number of other suspected incidents of inadvertent ignition switch rotation and New GM's awareness (or investigation) of those incidents. Indeed, to preclude Plaintiffs from doing so (or to categorically preclude evidence tending to show the number of deaths and serious injuries attributable to the defect) would present a distorted view of the facts to the jury and thus undermine the search for truth, as New GM's own admissions make clear that it was on notice of well more than four isolated incidents involving suspected ignition switch rotation and its potential consequences. Thus, while Plaintiffs may not introduce the *particulars* of incidents other than the four previously approved by the Court (and certainly may not introduce evidence ...), they are not categorically precluded from introducing (1) information about GM employees' own experience that evidences notice regarding the switch defect; and (2) general statements referencing multiple accidents.
>
> . . .
>
> In short, there is a major difference between generally discussing the information available to New GM prior to its disclosure of the defect and presenting "the grim details of other accidents." (Docket No. 2448, at 2). Cockram's evidence with respect to the thirty-two "general" OSIs falls squarely in the former category, and thus may be admitted at trial.

*In re: Gen. Motors* at *5.

Here, Plaintiffs are seeking to admit the particulars of three other accidents, but the general details of multiple accidents reported by Tesla to NHTSA and subsequently categorized by

NHTSA as involving a collision with an object directly in the travel path of the Tesla, resulting from driver inattention while using autopilot. *In re: Gen. Motors* supports the admissibility of the general discussion of these other accidents.

At a minimum, the 18 accidents identified in the request for admissions and the general discussion of the 211 accidents identified by NHTSA are admissible under the relaxed standard the court applies for purposes of proving notice. *In re: Gen. Motors* explains why:

> [Plaintiff] seeks to admit evidence (largely in the form of documents generated by New GM) relating to fifty-six other incidents—fifty-two of which were admitted in *Cockram*—solely for purposes of proving notice. (Pl.'s OSI Br. 19-20; *see* Pl.'s OSI Discl., Rows 1-56). Again, New GM opposes the request on the ground that the vehicles in most, if not all, of those incidents were different from the ignition switch in Ward's vehicle. (Def.'s Opp'n Br. 10-15). But that argument lacks the same force under the "relaxed" standard that applies when OSI evidence is offered to prove notice. *Scheuer*, 2015 WL 9463183, at *2. That is, Ward alleges in his Amended Complaint that his ignition switch suffered from the same type of defect as the earlier admittedly defective ignition switch: insufficient torque that enabled the switch to inadvertently move from the "run" position to the "off" or "accessory" position, thereby disabling critical safety systems in the vehicle. (14-CV-8317, Docket No. 157, ¶¶ 19, 28). Moreover, there is evidentiary support for that allegation: Among other things, New GM itself concluded that the torque in the new switch was below specification, warned drivers of vehicles with the new switches that large keychains and jarring road conditions could result in inadvertent rotation, and ultimately extended the initial recall to include vehicles with the new switch (albeit allegedly because such vehicles might have been serviced or repaired with one of the earlier, admittedly defective switches). (Pl.'s OSI Br. 1-5). In the final analysis, New GM's arguments about the differences between the two switches go to weight rather than admissibility. *See, e.g.*, *Scheuer*, 2015 WL 9463183, at *2; *Jodoin v. Toyota Motor Corp.*, 284 F.3d 272, 280 (1st Cir. 2002) ("When the relevant elements are sufficiently similar, we further emphasize that other differences are for defendants to highlight and the jury to weigh in its deliberations."). In fact, to exclude the other incidents would arguably "prevent the jury from understanding the scale, significance, and duration of Old GM's and New GM's conduct with respect to the ignition switch defect" allegedly at issue in this case.

*In re: Gen. Motors* at *7.

As in *In re: Gen. Motors*, the recall here applied to all makes and models, as the defect existed regardless of hardware version, software version, or car model. The "fix" that Tesla came

up with for this recall was a minor tweak to the frequency of warnings given to the driver to prevent abuse the autopilot system. The fix was the same across all vehicles. Tesla is welcome to point out differences between the automobiles, but they are immaterial, and go to the weight of the evidence, rather than its admissibility. Again, to exclude the OSI evidence would prevent the jury from understanding the scale, significance, and duration of Tesla's conduct with respect to the autopilot defect at issue in this case.

For additional authority on the difference between material and immaterial differences and the context of the substantial similarity analysis, we will first turn to *Beaty v. Ford Motor Co.,* 854 Fed. Appx. 845 (9th Cir. 2021). Once again, *Beaty* reminds us that "the relevant similarities are properly defined in terms of the defects at issue." *Beaty* at 848. The *Beaty* Court held that "the plaintiff's could submit evidence of OSI because they were substantially similar," explaining why:

> Here, the Beatys presented evidence based on customer complaints that PSRs in Ford-manufactured cars were prone to shatter for no apparent reason—the specific defect at issue. The Beatys' expert in glass failure analysis opined that this defect exists in all Ford PSRs because they are built the same way by the same two manufacturers, and thus share five "common, defective design features, including their size, thickness, curvature, connection to the vehicles' unibody frames, and use of ceramic paint or frit." Ford maintains that its expert "demonstrated that there are significant differences between the Escape PSR and the PSRs in other vehicles about which customers complained," but the Beatys' expert disputes this, asserting that the differences Ford relies upon are merely cosmetic and "immaterial" to the defect at issue. Though substantial similarity means something more than similarity "[a]t a very high level of generality," *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985), the Beatys' competing expert report presented sufficient rebuttal evidence to create a triable issue of fact.

*Beaty* at 848. As in *Beaty*, the differences between the accidents in the OSI evidence are immaterial to the defect at issue.

In a case brought against the manufacturer of Tylenol for injuries sustained by alcohol drinkers, the defendant sought to preclude entry of OSI, arguing that subtantil similarity could not be proven because "the alcohol history was unknown in similar reports and the acetaminophen

dose was unknown in others." *Benedi v. McNeil-P.P.C., Inc.,* 66 F.3d 1378, 1385 (4th Cir. 1995). The defendant further argued that "most of the reports involving alcohol consumption involved chronic alcoholics, but that Benedi was not an alcoholic." *Id.* The Court rejected defendant's argument as follows:

> The dissimilarities between Benedi's situation and those reported in the DERs do not affect the admissibility of the evidence, but rather go to the weight that the jury gives to the evidence. *Kehm,* 724 F.2d at 626. McNeil explored these dissimilarities at length. Whether the dissimilarities were significant was for the jury to determine. When prior incidents are admitted to prove notice, the required similarity of the prior incidents to the case at hand is more relaxed than when prior incidents are admitted to prove negligence. The incidents need only be sufficiently similar to make the defendant aware of the dangerous situation. *Cf. Gardner v. Southern Ry. Systems,* 675 F.2d 949, 952 (7th Cir.1982); *Young v. Illinois Central Gulf R.R.,* 618 F.2d 332, 339 (5th Cir.1980).[3] Because all of the reports at issue involved liver injury associated with therapeutic doses (near or slightly above the recommended doses)[4] of Tylenol in alcohol drinkers, we find that the DERs were sufficiently similar to Benedi's case to be admissible on the issue of notice.

*Benedi* at 1385-86.

In *Seese v. Volkswagenwerk A.G.,* 648 F.2d 833, 846 (3d Cir. 1981), the defendant raised objections similar to those raised by Tesla in the instant case, pointing to immaterial differences between the accidents to argue that plaintiff failed to prove substantial similarity. The Third Circuit rejected these arguments as follows:

> VW complains that the FARS report did not reveal the speed at which the accidents occurred; whether the accidents were single vehicle accidents or accidents involving impacts with another vehicle; the "how" and in what manner the ejections occurred, as well as a number of other variables. The district court, apparently agreeing that variables did exist nevertheless admitted the FARS data in evidence, ruling that VW's objections went to the weight of the evidence and not to its admissibility.
>                                    . . .
> We have reviewed the exhibits and testimony and it is clear that the VW van in issue here was similar to the other Type II vans which are the subject of the FARS reports. Indeed VW makes no affirmative assertion and points to no proof that the window placement of the van in this case differed significantly from the vans reported in FARS. We conclude that the district court's evidentiary rulings with respect to the FARS report were proper.

*Seese* at 846. *See also Guild v. Gen. Motors Corp.,* 53 F. Supp. 2d 363, 367–68 (W.D.N.Y. 1999) (difference between crash tests plaintiff sought to admit and the actual collision "go to the weight to be accorded the test results and do not bar their admissibility.")

Tesla points to a number of potential differences between the accidents in the OSI evidence as grounds for this Court to reject Plaintiffs' claims of substantial similarity. But Tesla wholly fails to demonstrate how any of these differences are material to the defect at issue. For example, Tesla suggests that the nature of the driver's inattention is relevant. Quite clearly is not. In each of these accidents, for whatever reason, the driver was not paying attention in a manner sufficient to intervene and prevent the accident.[6] The question then becomes why did the Tesla fail to prevent the collision? In each of the cases Plaintiffs seek to introduce, the Tesla failed to trigger emergency braking and collided with a vehicle or other object directly in its path. We know from Tesla's own admission that this potential defect existed in "all Tesla models produced and equipped with any version of its autopilot system."

In the September 11, 2016, press conference regarding updates to the autopilot system, Elon Musk himself described the manner in which Tesla's autopilot and emergency braking systems were expected to prevent accidents such as the instant one:

> MR. MUSK: ·But any, any -- particularly anything large or anything metallic or anything that's dense, the, the radar system on the car, we're confident will be able to detect that and initiate a braking event.· And it'll do this when autopilot is active and when it's not active.
> · · ·Now, if autopilot is not active -- they're not activated -- it will operate in an emergency braking mode.· So in that case, it's more likely to mitigate the impact speed because if, if, if autosteer is not on, it doesn't know whether the driver is actually going to turn out of the way of an obstacle or not.· So it'll only brake at the very last second.
> · · ·If autosteer is turned on, the, the, the car computer knows what its probable path is and whether it's actually going to turn in time or not.· And so it'll be a much more

---

[6]  Whether or not the driver had his hands on the wheel is similarly immaterial. In each of the OSI accidents, the driver failed to intervene.

comfortable braking experience as opposed to sort of a last minute. · · ·And in that case, we think most likely we'll be able to brake to a complete stop instead of simply mitigating the impact velocity.· So we think probably works better with autopilot on than, than, than off.

· · ·

Great.· So, so the exciting thing is that even if the vision system doesn't recognize what, what the object is, because it could be a very strange looking vehicle, it could be a multi-car pileup, it could be a truck crossing the road, it could be -- it, it really could be anything – an alien spaceship, a, a pile of, of sort of junk, metal, it doesn't matter, you know -- that fell off the back of a truck.
· · ·It actually does -- it does not matter what the object is.· It just knows that there's something quite -- there's something dense that is going to hit and it should not hit that.· It doesn't need to know what that thing is.· Whereas a vision system really needs to know what the thing is.
· · ·So that, that, I think, will, will be really a dramatic improvement in the safety of, of the vehicle and, and done entirely via software.· So no additional sensors are needed.

(9/11/16 Autopilot Press Conference at 2-5)

Mr. Musk went so far as to say that the improvements in autopilot version 8, which came

out in 2016, three years prior to this accident, would have saved Josh Brown's life:

MR. ROY:· Obvious question I have to ask.  Would the improvements in autopilot 8 have mitigated or saved say, Josh Brown's life?

MR. MUSK:· We believe it would have.

MR. ROY:· And so the truck would have been seen by the radar only and braking would have been engaged?

MR. MUSK:· These, these things cannot be said with absolute certainty, but we believe it is very likely that yes, it would have. And the reason is that it would -- it would see -- it would see a large metal object across the road.
· · ·And knowing that there is no road sign, there's no overhead road sign in that position, this would -- this would therefore not be a whitelisted situation and impact probability would be assessed as high, and so it would brake.

(9/11/16 Autopilot Press Conference at 20-21)

The import of these statements is that all Teslas on the road by 2019 had both the hardware

and software to detect Dillon Angulo's truck and trigger braking.  Each of the OSI cars did not

stop as they were intended to, and each of the cars collided with an object directly in its path of

travel.  Each of these accidents thus served as notice to Tesla of the defect that it admitted existed in all of its cars equipped with autopilot.  And once again, "for purposes of proving other accidents in order to show defendants' awareness of a dangerous condition, the rule requiring substantial similarity of those accidents to the accident at issue should be relaxed." *Jackson v. Firestone Tire & Rubber Co.,* 788 F.2d 1070, 1083 (5th Cir. 1986).  "Any differences in the circumstances surrounding these occurrences go merely to the weight to be given the evidence." *Id.*

### B.  TESLA'S CASES ARE DISTINGUISHABLE.

Tesla relies primarily on four cases in support of its argument.  We will distinguish each in turn.  The first is *Ford Motor Co. v. Hall-Edwards*, 971 So. 2d 854 (Fla. 3d DCA 2007).  In *Hall-Edwards,* "the trial court did not require that plaintiff establish the predicate necessary to permit the admission of similar accident evidence. *Hall-Edwards* at 859.  No inquiry was made "to ensure that the other accidents were not too remote in time or that the conditions of the accidents were similar." *Id.*  Indeed, "the trial judge never inquired to the general characteristics of the other accidents." *Id.*  As a result, the Third District was "unable to determine whether the differences in condition were material or immaterial." *Id.*  Obviously, these are not the circumstances present here.

In the next case Tesla relies upon, *Godfrey v. Precision Airmotive Corp.,* 46 So. 3d 1020, 1022 (Fla. 5th DCA 2010), the plaintiff was unable to demonstrate that the same defect that caused the carbon build-up in the engine exhaust valve which led to the crash existed in the other 100 incidents that were shown to the jury.  Here, NHTSA documented that of the over 900 cases reported by Tesla to NHTSA, 211 of them involved the same accident circumstances – failure of the autopilot to intervene in a frontal plane accident when the driver was inattentive.  Tesla admitted that these accidents all resulted from the same defect in its driver monitoring system.

In *Agrofollajes, S.A. v. E.I. Du Pont De Nemours & Co., Inc.,* 48 So. 3d 976, 992 (Fla. 3d DCA 2010) the only similarity that the plaintiffs proffered between the OSI cases and the case in chief was that they involved the same product - Benlate.  Further, the theory of defect in the OSI cases was completely different from the defect theory alleged in the case in chief.  Therefore, "because the testimony introduced by the non-party growers involved a different use of Benlate and a different harm, [the Court held] that the evidence introduced by the prior claims was not relevant to the present action."  *Agrofollajes, S.A.* at 993.

Finally, Tesla states that in *Nissan Motor Co. Ltd. v. Armstrong,* 145 S.W.3d 131, 140–41 (Tex. 2004), "the Texas Supreme Court flatly rejected the contention that other incident evidence is admissible to demonstrate notice."  (DE452 at 12)  The Court did no such thing.  Instead, the Court ruled that specific hearsay evidence that was admitted at the trial level - a database of complaints about sudden acceleration - should not have been admitted.

In doing so, however, the Court distinguished the database referred to in Tesla's quoted excerpt from admissible reports from agencies like NHTSA:

> The two kinds of proof here were not the same. Data, findings, and reports from government agencies are generally not excludable as hearsay; out-of-court complaints from unknown third-parties generally are. The NHTSA report listed the numbers of reported acceleration incidents as background to indicate what and why it was investigating; Armstrong offered the database to show that ZX cars were defective. Even if the NHTSA report was admitted first, it did not hold the door open for the database.

*Armstrong* at 141.In any event, even if Tesla's interpretation of *Armstrong* had been correct, such a holding would conflict with the overwhelming majority of authority holding that not only is OSI admissible to prove notice, it is admissible under a relaxed rule of proving of substantial similarity.

The bulk of this response was written before the Court's ruling on OSI evidence this evening.  In light of the importance of this evidence to Plaintiffs' case, Plaintiffs would respectfully

ask for reconsideration of the ruling based on the authorities cited herein. We would further request the opportunity to proffer expert testimony regarding the excluded OSI evidence if the Court deems it necessary for reconsideration.

Respectfully submitted,

Date: **July 14, 2025**

**THE ROUSSO, BOUMEL LAW FIRM, PLLC**
9350 South Dixie Highway
Suite 1520
Miami, Florida 33156
(305) 670-6669

By:      /s/ *Adam T. Boumel, Esq.*
Adam T. Boumel, Esq.
Florida Bar No.: 0110727
Direct email: adam@roussolawfirm.com
Service emails:
Pleadings@roussolawfirm.com
assistant@roussolawfirm.com

By:      /s/  *Douglas F. Eaton*
DOUGLAS F. EATON
FBN: 129577
**EATON & WOLK, PL**
*Co-counsel for Plaintiff*
2665 S. Bayshore Drive, Suite 609
Miami, Florida 33133
Telephone: 305-249-1640
Email: deaton@eatonwolk.com
cgarcia@eatonwolk.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this **<u>14th</u>** day of **<u>July 2025</u>**, I electronically filed the

foregoing document with the Clerk of Court using CM/ECF.

**THE ROUSSO, BOUMEL LAW FIRM, PLLC**
9350 South Dixie Highway, Suite 1520
Miami, Florida 33156
(305) 670-6669

By:    /s/ *Adam T. Boumel, Esq.*
Adam T. Boumel, Esq.
Florida Bar No.: 0110727
Direct email: adam@roussolawfirm.com
Service emails:
Pleadings@roussolawfirm.com
assistant@roussolawfirm.com

By:    /s/  *Douglas F. Eaton*
DOUGLAS F. EATON
FBN: 129577
**EATON & WOLK, PL**
*Co-counsel for Plaintiff*
2665 S. Bayshore Drive, Suite 609
Miami, Florida 33133
Telephone: 305-249-1640
Email: deaton@eatonwolk.com
cgarcia@eatonwolk.com