**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-cv-21940-BLOOM/Torres**

NEIMA BENAVIDES, as Personal
Representative of the Estate of Naibel
Benavides Leon, deceased,

      Plaintiff,

v.

TESLA, INC., a/k/a Tesla Florida, Inc.,

      Defendant.

_____/

DILLON ANGULO,

      Plaintiff,

v.

TESLA, INC. a/k/a Tesla Florida, Inc.,

      Defendant.

_____/

## PLAINTIFFS' AMENDED NOTICE OF INTENT TO USE DEPOSITIONS AT TRIAL, COUNTER-DESIGNATIONS, AND CROSS-DESIGNATIONS

Pursuant to Federal Rules of Civil Procedure 32, et seq., Plaintiffs intend to use videotaped deposition testimony in addition to live testimony at trial, including, but not limited to, possibly introducing the following.  In an effort to focus the Court's attention on the remaining issues in dispute in these designations the parties have only identified the few designations requiring an evidentiary ruling.  Nevertheless, to provide the Court in context in its ruling – especially as it

relates to counter-designations for completeness – the parties have included a color highlighted copy of the witness's certified deposition transcript with the following coloring scheme[1]:

| | |
|---|---|
| Designations Agreed to: | Highlighted in Yellow |
| Designations of Plaintiffs Tesla Objects to: | Highlighted in Red |
| Tesla's Counter Designations that Plaintiff Objects to: | Highlighted in Green |

| Witness: ELOY RUBIO BLANCO Deposition taken on May 31, 2024 | | | | |
|---|---|---|---|---|
| Plaintiffs' Designations PAGE(S):LINE(S) | TESLA's OBJECTION | Tesla Counter-Designations PAGE(S):LINE(S) | Plaintiffs' OBJECTION | Ruling |
| | | 43:8-46:3; 46:6-47:25 | Mr. Rubio Blanco is not an unavailable witness to Tesla per FRCP 32(a)(4).  No discussion of JIRA tickets or IIHS autonomous emergency breaking was discussed or raised in any of plaintiff's | |

[1] The parties would also ask the court to disregard any references to other objections stated in red in the margins of the transcript. This document has been the subject of extensive meet and confer over the past several days, and those objections have been resolved or dealt with. The parties simply seek this court's guidance on the highlighted sections identified.

| | | | | |
|---|---|---|---|---|
| | | | designations, and thus this is not being offered for completeness or fairness. Additionally this testimony is irrelevant and a waste of time. (FRE 401, 403.) | |
| 62:9-14; 62:17-25; 64:1-25; 65:15-66:23; 79:25-80:7 | Tesla objects that this document refers to "other incidents" raised in its motion *in limine* to exclude the same. | | Exhibit 156, marked as Trial Exh. P-94 is a 22-page document that plaintiffs seek only to introduce the first two pages of.  (A copy of which is included with this filing for the Court's reference) This document identifies Tesla's analysis of collision types involving their vehicles operating under Autopilot. As set forth on the first page and similarly discussed in the witness testimony, | |

| | | | Tesla was aware of over 10,500 crashes involving vehicles operating on Autopilot. As set forth in the pie charts that follow, many of them involved Tesla's being rear-ended. However, as part of its crash labeling analysis, Tesla made a conclusion that in 6% of crashes, the Tesla operating with Autopilot (known in Tesla speak as the "Ego") was at fault for the collision.<br><br>This evidence is being offered to counter Tesla's defense that Autopilot failure is some anomalous, never-event.<br><br>Based upon their own | |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | | | data, in the subject year of this collision, they themselves determined that in approximately 6% of crashes, the Tesla vehicle operating on Autopilot was at fault. | |
| | | 220:3-221:11 | Mr. Rubio Blanco is not an unavailable witness to Tesla per FRCP 32(a)(4).  No discussion of JIRA tickets or IIHS autonomous emergency breaking was discussed or raised in any of plaintiff's designations, and thus this is not being offered for completeness or fairness. Additionally this testimony is irrelevant and a waste of time. (FRE 401, 403.) | |
| | | 228:17-229:25 | Same Objections. | |

| | | 231:17-22; 232:4-25 | Same Objections. | |
| | | 263:22-264:17 | Same Objections. | |

Date:  July 22, 2025

Respectfully submitted,


By: /s/ Brett J. Schreiber
**Brett Schreiber, Esq.**
Admitted *Pro Hac Vice*
**Satyarinivas "Srinivas" Hanumadass, Esq.**
Admitted *Pro Hac Vice*
**Carmela Birnbaum, Esq.**
Admitted *Pro Hac Vice*
SINGLETON SCHRIEBER
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
bschreiber@singletonschreiber.com
vas@singletonschreiber.com
cbirnbaum@singletonschreiber.com
jjusto@singletonschreiber.com
eelms@singletonschreiber.com
service@singletonschreiber.com
*Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides*


## CERTIFICATE OF FILING

I hereby certify that on July 22, 2025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the parties on the attached list.

Respectfully Submitted,
THE ROUSSO, BOUMEL LAW FIRM, PLLC.
9350 South Dixie Highway, Suite 1520
Miami, Florida 33156
(305) 670-6669


By:     /s/ **Adam T. Boumel, Esq.**
Adam T. Boumel, Esq.
Florida Bar No.: 0110727

## SERVICE LIST

**Singleton Schreiber, LLP**
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Tel: (619) 771-3473
**Attn: Brett J. Schreiber, Esq.**
bschreiber@singletonschreiber.com
eelms@singletonschreiber.com

**Poses Law Group**
169 East Flagler Street, Suite 1600
Miami, Florida 33156
**Attn: Todd Poses, Esq.**
tposes@posesandposes.com
Maria@posesandposes.com
*Counsel for Plaintiffs*

**Eaton & Wolk PL**
2665 South Bayshore Dr., Suite 609
Miami, FL 33133
**Attn: Doug Eaton, Esq.**
deaton@eatonwolk.com
*Counsel for Plaintiffs*

**Bowman and Brooke LLP**
41000 Woodward Ave., Suite 200E
Bloomfield Hills, Michigan 48304
**Attn: Wendy Lumish, Esq.**
**Attn: Joel Smith Esq.**
**Attn: Thomas P. Branigan, Esq.**
**Attn: Whitney, Cruz, Esq.**
**Attn: Drew P. Branigan, Esq.**
Wendy.Lumish@bowmanandbrooke.com
Joel.smith@bowmanandbrooke.com
thomas.branigan@bowmanandbrooke.com
whitney.cruz@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com

**Hilarie Bass, Esquire LLC**
2821 Bayshore Drive, UPH-B
Miami, FL 33133
**Attn: Hilarie Bass, Esq.**
bassh@bassinstitute.org
*Counsel for Tesla*

**Page 1**

```
            UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA

            Case No. 21-cv-21940-BLOOM/Otazo-Reyes

NEIMA BENAVIDES, as Personal
Representative of the Estate
of Naibel Benavides Leon,
deceased,

            Plaintiff,

v.

TESLA, INC., a/k/a Tesla
Florida, Inc.,

            Defendant
_____/

            Case No. 22-cv-22607-BLOOM

DILLON ANGULO,

            Plaintiff,

v.

TESLA, INC., a/k/a Tesla
Florida, Inc.,

            Defendant
_____/

            **** CONFIDENTIAL ****

        VIDEOTAPED ORAL DEPOSITION

            ELOY RUBIO BLANCO

    (AS CORPORATE REPRESENTATIVE FOR TESLA)

            MAY 31, 2024

          (REPORTED REMOTELY)

        Adrianne Harris, CSR
```

**Page 3**

```
                    APPEARANCES

FOR PLAINTIFFS:

    Mr. Brett Schreiber
    SINGLETON SCHREIBER
    591 Camino de la Reina
    Suite 1025
    San Diego, California  92108
    Phone: (619)771-3473
    Fax: (619)255-1515
    Email: bschreiber@singletonschreiber.com

    - and -

    Mr. Todd Poses
    POSES LAW GROUP
    169 East Flagler Street
    Suite 1600
    Miami, Florida  33131
    Phone: (305)577-0200
    Fax: (305)371-3550
    Email: tposes@poseslawgroup.com

    - and -

    Mr. Adam T. Boumel
    THE ROUSSO BOUMEL LAW FIRM
    9350 South Dixie Highway
    Suite 1520
    Miami, Florida  33156
    Phone: (305)670-6669
    Fax: (305)670-6663
    Email: adam@roussolawfirm.com

FOR DEFENDANT:

    Mr. Thomas P. Branigan
    Ms. Whitney V. Cruz
    Mr. Drew P. Branigan
    BOWMAN AND BROOKE LLP
    101 West Big Beaver Road
    Suite 1100
    Troy, Michigan  48084
    Phone: (248)205-3316
    Email: thomas.branigan@bowmanandbrooke.com
           whitney.cruz@bowmanandbrooke.com
           drew.branigan@bowmanandbrooke.com
```

**Page 2**

VIDEOTAPED ORAL DEPOSITION OF ELOY RUBIO
BLANCO, as Corporate Representative for Tesla, produced
as a witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on May 31, 2024, from 8:02 a.m. (CST) to 3:48 p.m. (CST),
before Adrianne Harris, Certified Shorthand Reporter in
and for the State of Texas, via Zoom Video Conference,
the witness located in Madrid, Spain, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

**Page 4**

ALSO PRESENT:

Mr. Ryan McCarthy

```
Mr. Jason Warner, videographer
LEGAL VIDEO GROUP
P.O. Box 830132
Richardson, Texas  75083
Phone: (214)598-5229
Email: lvg.dallas@gmail.com
```

**Page 5**

1  INDEX
2                                    PAGE
3  Appearances..................................  03
4  Agreements..................................  06
5
6  ELOY RUBIO BLANCO
7     Examination by Mr. Schreiber...........  07
8  Witness' Signature Page/Corrections........  276
9  Reporter's Certificate.....................  278
10
11                 EXHIBITS
12
13  EXHIBIT          DESCRIPTION           PAGE
14  1      Deposition notice               28
15  2      Tesla's response and objections 28
16         to depo notice
       3   Driver Assistance System -
17         Model S - HW2.5 (Benavides 3048- 122
           3118)
18  4      Garage report (Benavides 2093-   224
           2094)
19  5      Longitudinal Collision           226
           Management (Benavides 2095-2107)
20  6      AEB Testing - Autopilot -
           Confluence 5/14/15 (Benavides    230
21         2108-2110)
       7   AEB and FWC - Autopilot -
22         Confluence 10/14/22 (Benavides   237
           2111-2121)
23  8      Tesla spreadsheets               253
24
25

**Page 6**

1                 AGREEMENTS
2
3  DEPOSITION OF:  ELOY RUBIO BLANCO
4  DATE:  MAY 31, 2024
5  CASE NOS.  21-cv-21940-BLOOM and 22-cv-22607-BLOOM
6
7  TAKEN PURSUANT TO:
      (X) Notice
8     (  ) Agreement
      (  ) Court Order
9     (  ) Rules of Civil Procedure
10  ORIGINAL TO:
      (  ) Witness
11    (X) Witness's Attorney (Mr. T. Branigan)
      (  ) Producing Attorney
12    (  ) Waived
13  NUMBER OF DAYS FOR SIGNATURE:
      (  ) 20 days
14    (X) 30 days
      (  ) other:
15
16  MISCELLANEOUS:
      (  ) Any objection made by one party inures to all
17        parties.
      (X) An unsigned copy may be used at any trial or
18        hearing.
19
20
21
22
23
24
25

**Page 7**

1     THE VIDEOGRAPHER:  Today is May 31st, 2024.  The
2  time is 8:02 a.m., Central Time.  We're on the record.
3     THE REPORTER:  My name is Adrianne Harris, Texas
4  CSR No. 7967.  I'm reporting remotely by stenographic
5  means in Granbury, Texas, and the witness is located in
6  Madrid, Spain.
7               ELOY RUBIO BLANCO,
8  the said witness, having been first duly cautioned and
9  sworn to testify to the truth, the whole truth and
10  nothing but the truth, testified under oath as follows:
11                  EXAMINATION
12  BY MR. SCHREIBER:
13     Q.  Good morning, sir.
14     A.  Good morning.
15     Q.  Would you please state your full name and spell
16  your last name for the record.
17     A.  Absolutely.  So the first name is Eloy, E-L-O-Y,
18  and the last name, Rubio Blanco, R-U-B-I-O, B-L-A-N-C-O.
19     Q.  Mr. Rubio Blanco, how are you currently
20  employed?
21     A.  I am currently employed by Tesla.
22     Q.  And what is your rank and title at Tesla
23  currently?
24     A.  I am a -- a staff product support engineer.
25     Q.  What does that mean?

**Page 8**

1     A.  So I'm part of the service engineering
2  department and part of the -- what we call the incident
3  claim team, and what we do on a daily basis is
4  investigate and review customer concerns related to
5  vehicle performance.
6     Q.  And how long have you been in that position?
7     A.  I have been in that position since May 2022.
8  Before then, I was the senior product support engineer
9  with similar responsibilities.
10     Q.  And in your prior title, you said you were a
11  senior support engineer?
12     A.  Senior product support engineer.
13     Q.  Got it.  And were you still part of the incident
14  claim team?
15     A.  Correct.
16     Q.  And how is your job different today than it was
17  before May of '22?
18     A.  It was just a promotion, so the responsibilities
19  are similar.
20     Q.  Same team, so just more people maybe roll up to
21  you?
22     A.  Basically the same responsibilities.  Just based
23  on -- on performance, I was promoted.
24     Q.  Good job, sir.  How long have you been with
25  Tesla?  Remind me.

**9**

1    A.  I've been at Tesla since March 2021.
2    Q.  And when you started in March of '21, what were
3  you hired as?
4    A.  As a senior product support engineer.
5    Q.  Okay.  So that was your title until your
6  promotion in May of '22 to your current rank and title,
7  true?
8    A.  That's correct.
9    Q.  All right.  Highest level of education?
10    A.  I have two master's degrees.
11    Q.  In what, from where?
12    A.  So the first one is in industrial and mechanical
13  engineering from the Polytechnic University of Madrid,
14  Spain, and the second one is a master's of engineering in
15  mechanical and aerospace engineering from the Illinois
16  Institute of Technology in Chicago.
17    Q.  When did you obtain the first master's degree?
18    A.  Excuse me?
19    Q.  When did you obtain your first master's degree
20  from the institution in Spain?
21    A.  It was a double degree on that platform, so I --
22  I got both at the same time, basically.  I did the first
23  year in --
24    Q.  When did --
25    A.  -- Spain and the second year in -- in Chicago,

**11**

1    A.  Basically collision reconstruction.  I was a
2  forensic engineer.
3    Q.  How long were you there?
4    A.  For over two years, from November 2019 up until
5  March 2021.
6    Q.  And then you started with Tesla?
7    A.  Correct.
8    Q.  Did you ever testify in your role as a forensic
9  engineer when you worked in the collision reconstruction
10  space?
11    A.  I did not.
12    Q.  Okay.  Did you work in -- in cases, I would
13  assume, now involving -- well, I shouldn't assume.  I've
14  read a number of your depositions, and I've been involved
15  in at least one, and no one ever asked you this question;
16  so I'm asking.
17       In your role in collision reconstruction, was
18  that in a forensic nature similar to what we're talking
19  about here, where the folks you were working for were
20  offering opinion testimony in litigated settings like
21  these?
22    A.  Yeah.  So the basis of my work was to support
23  expert witnesses working on litigation cases and also
24  doing research.
25    Q.  Got it.  So you are one of the support engineers

**10**

1  and I graduated in August 2018.
2    Q.  What was your first job in the engineering field
3  as of August 2018?
4    A.  So I started working as a researcher for the
5  Armour College of Engineering as part of the Illinois
6  Institute of Technology for a few months up until I moved
7  to Los Angeles and I started working in the collision
8  reconstruction industry.
9    Q.  Who did you work for in that regard?
10    A.  Excuse me?
11    Q.  Who did you work for in the collision
12  reconstruction industry?
13    A.  I worked for the National Biomechanics Institute
14  in Los Angeles, and then I moved to a different company
15  called Axiom, A-X-I-O-M, Forensic.
16    Q.  And is the National Biomechanics Institute like
17  a nonprofit, like, think tank, or is it just a private
18  entity that someone used the name to make it sound like
19  they are a nonprofit think tank?
20    MR. T. BRANIGAN:  Objection, form.
21    A.  I don't know why they -- I don't know why they
22  selected that name, but it is a private company.
23    Q.  (By Mr. Schreiber)  Got you.  It's like The Human
24  Fund.  Got it.  All right.  And then you worked for Axiom
25  doing what?

**12**

1  for the testifiers?
2    A.  That -- that's fair, yes.
3    Q.  Okay.  How many times have you been deposed as
4  of today, sir?
5    A.  I have been deposed 13 times in -- in deposition
6  settings.
7    Q.  How many times in trial?
8    A.  Three times.
9    Q.  And those three trials were what?  What cases
10  were they?  The Hsu -- were you involved in the Hsu case,
11  H-S-U?
12    A.  Correct.
13    Q.  All right.  Then you testified in the Riverside
14  case.  The name is escaping me.  Do you recall it?
15    A.  Yes.  Molander vs. Tesla.
16    Q.  Thank you.  Yes.  And then what is the third
17  trial you testified in?
18    A.  So the other case was the -- the first prior --
19  the first trial I testified on, and that was -- the name
20  was Huang Kao, H-U-A-N-G, K-A-O.
21    Q.  Where was that venued?
22    A.  In Los Angeles, sir.
23    Q.  Was that an autopilot case?
24    A.  It was not.
25    Q.  Okay.  So you understand, having been deposed 13

**Page 13**

1  times and having testified in trial three times, even
2  though we don't have a judge or jury here, anything you
3  say carries with it the same penalty of perjury as if you
4  were testifying in front of a judge and jury, correct?
5     A.  Correct.
6     Q.  All right.  And similarly, we've done a good job
7  so far not speaking over one another.  But if you answer
8  my question as phrased, I'm going to assume that you
9  understood my question as phrased, fair?
10    A.  I understand that.
11    Q.  If at any point my question is unclear to you,
12  you don't understand it in whole or in part, it's
13  incumbent upon you as the witness to let me know that  so
14  I can attempt to rephrase it to be sure that we are
15  singing from the same hymnal.  Make sense?
16    A.  Makes sense.
17    Q.  Cool.  You understand, sir, that you have been
18  designated by Tesla in this matter as a 30(b)(6), a
19  corporate designee, to speak on behalf of the corporation
20  with respect to certain areas or -- or subject matters,
21  true?
22    A.  With respect -- with respect to certain topics
23  subject to counsel's objections, correct.
24    Q.  Okay.  And this is not the first time you have
25  been designated as a corporate designee to speak  as the

**Page 15**

1     Q.  (By Mr. Schreiber) I -- Mr. Rubio Blanco, do you
2  understand my question?
3    A.  I mean, I wouldn't be able to answer your
4  question without differentiating whether I was designated
5  as a 30(b)(6) in a federal case or -- or a state
6  corporate representative case.
7    Q.  I don't care about the distinction, sir.  Go
8  ahead and tell me how many times, generally, have you
9  been so designated to speak on behalf of Tesla.
10    A.  So in all these cases that I have relied in, in
11  the 13 matters -- or rather, 13 depositions, in -- in
12  most of those, I've been designated as a corporate
13  representative.  Now, some of those depositions or some
14  of those cases, I have been deposed twice, and the second
15  one has been as an employee with technical knowledge just
16  prior to going to trial.
17    Q.  Got it.  All right.  To prepare for your
18  deposition, you understand that a 30(b)(6) witness needs
19  to collect information through review of corporate
20  documents and interviewing sometimes current and former
21  employees so that they can be educated to speak on behalf
22  of these topics; you understand that concept generally,
23  correct --
24     MR. T. BRANIGAN:   Objection --
25     Q.  (By Mr. Schreiber) -- Mr. Rubio Blanco?

**Page 14**

1  voice of Tesla in a litigated case on certain subject
2  matters, correct?
3    A.  It is not the first time --
4     MR. T. BRANIGAN:   Objection, form.
5    A.  -- I am desig-- --
6     MR. T. BRANIGAN:   Go ahead, sir.
7    A.  It is not the first time I am designated as a
8  corporate representative in a deposition setting.
9    Q.  (By Mr. Schreiber) How many times have you been
10  designated as a corporate designee by Tesla in a
11  litigated setting, whether in a federal court proceeding
12  where we use the language 30(b)(6) or some state analog ue
13  like you as a California guy know, we call them a PMQ,
14  person most qualified, where I'm standing; how many times
15  has that happened, sir?
16     MR. T. BRANIGAN:   Let me just object to the
17  compound --
18    A.  So from the --
19     MR. T. BRANIGAN:   Hang on.  Hang on.  Let me
20  just object to the compound nature of the question.
21     Okay.  Do you want to -- want to break it up so
22  that --
23     MR. SCHREIBER:   Not really.
24     MR. T. BRANIGAN:   -- this lay -- this lay
25  witness understands how to answer it?

**Page 16**

1     MR. T. BRANIGAN:   Objection, form.  It misstates
2  the law and the requirements of the witness.
3     Go ahead, sir.
4    A.  My understanding is that I have been designated
5  as a corporate representative to speak as to these
6  topics, and I'm -- I'm ready to do so.
7    Q.  (By Mr. Schreiber) And so what I'm trying to
8  inquire, sir, is:  What have you done to so prepare
9  yourself to speak as a corporate representative on these
10  topics, other than going and turning on your Zoom camera
11  this afternoon where you're located?
12    A.  I understand.  Correct.  So in order to prepare
13  for deposition, I have reviewed a series of documents
14  from the production that includes the call log data, the
15  EDR data, the video, the D16 data file, as well as all
16  the documents from the production related to sales
17  documentation, automatic emergency braking, et cetera.
18     I have also met with counsel in -- in three
19  occasions, and I have also speak to -- to a colleague.
20  In addition to that, I also reviewed Akshay Phatak
21  deposition and my deposition on the Banner case, Banner
22  vs. Tesla.
23    Q.  All right.  So I think I got all of that.  You
24  reviewed log data, reviewed EDR data, reviewed D16
25  information, videos, sales documents, reviewed your

**17**

1  deposition.

2  Now, with respect to documents from the
3  production, does that represent essentially the
4  information that you reviewed to prepare yourself to
5  testify as Tesla's corporate representative in this
6  matter?  And I'm separating deposition testimony, which
7  I'll talk about in a moment.

8  A.  I'm not sure I understand your question.  I -- I
9  haven't reviewed the entire production of -- of
10  documents.  Just a -- a few documents that counsel
11  have -- have provided to me.

12  Q.  Well, that was going to be my next question, how
13  did you obtain the documents.  The log data, the EDR
14  data, the D16, sales documentation, that was all provided
15  to you by counsel, true?

16  A.  Correct.

17  Q.  When was it provided to you?

18  A.  That will be approximately 25 days ago, I will
19  estimate.

20  Q.  Okay.  And then you also reviewed your own
21  deposition from the Banner case, true?

22  A.  Correct.

23  MR. SCHREIBER:  Madame Reporter, that's just as
24  it typically is spelled.

25  Q.  (By Mr. Schreiber)  And then you reviewed Akshay,

**19**

1  to review, true?

2  A.  I mean, the ones I asked for that were provided
3  for me -- to me and the ones that I saw that were
4  relevant to -- to the -- to the notice.

5  Q.  Okay.  And -- and who made the determination as
6  to whether or not exhibits in Mr. Phatak's deposition
7  were relevant to the notice in this case, you?

8  A.  I mean, upon reviewing the deposition, I -- I
9  looked at the discussion, and then if there were -- if
10  there was documentation that I will like to review in
11  order to understand his testimony, I -- I requested
12  the -- the exhibit, for example.

13  Q.  Got it.  Okay.  You met with counsel a total of
14  three times, true?

15  A.  Sorry, I couldn't hear.  And I'm having -- I'm
16  having trouble to hear the first part of your question,
17  so I don't know if it's just me.

18  *(Reporter clarification.)*

19  Q.  (By Mr. Schreiber)  Well, that's what matters
20  most.  She matters the most.  You matter the second most.
21  But, again, if you don't understand anything I say at the
22  outset, do exactly as you said.

23  My question to you, sir, was:  You met with
24  counsel approximately three times to prepare for your
25  deposition, true?

T - Relevance FRE 401
and 403

**18**

1  A-K-S-H-A-Y, Phatak, P-H-A-T-A-K's, deposition in this
2  matter and the related Huang, H-U-A-N-G, case, true?

3  MR. T. BRANIGAN:  Objection, form.  The cases
4  are not related, but the deposition was cross-noticed.

5  MR. SCHREIBER:  Fair.

6  Q.  (By Mr. Schreiber)  Is that correct, Mr. Rubio
7  Blanco?

8  A.  Yes, I have reviewed those two depositions.

9  Q.  All right.  And did you also review all of the
10  exhibits to -- and I think you pronounced his last name
11  slightly different than I at least read it, having not
12  been at the deposition.  How do you pronounce Akshay's
13  last name?

14  A.  I don't know how to pronounce it appropriately,
15  so I'll -- I will just go with your pronunciation.

16  Q.  All right.  We'll go with Phatak.  It's -- after
17  all, he's not going to read this one, most likely.  And
18  if he does, it's going to be spelled right, so what does
19  he care.

20  Did you review the exhibits to Mr. Phatak's
21  deposition?

22  A.  Not all of them.  I reviewed, I think, a couple
23  of them, but -- that were provided to me, but not -- not
24  all of them, no.

25  Q.  So not all of the exhibits were provided to you

**20**

1  A.  Correct.

2  Q.  When was the most recent?

3  A.  Yesterday.

4  Q.  For how long?

5  A.  Six to seven hours.

6  Q.  I have to ask, what time was it in Madrid?

7  A.  Same as today.

8  Q.  Got you.  Because that could -- at 10:30 at
9  night, aren't you going out to dinner in Madrid?

10  A.  Yeah.  No, it didn't, like -- it lasted until
11  like 9:00 p.m.  And I didn't go out yesterday, no.

12  Q.  Got it.  I mean, I've spent time in Spain.
13  People tend to eat later.  I respect it.  Even later than
14  Miami, which is actually a place where people are known
15  to go out to dinner late.

16  All right.  And so you met with them for
17  six hours yesterday, and you met with them two times
18  prior.  When and for how long?

19  A.  It was for two hours each meeting, and one was
20  last week, and the other one was the week before then.

21  Q.  And this is the first time, at least in my
22  experience and involvement with you, which is in a few
23  cases and having read some depositions similar, where you
24  have been located in Europe.  Are you there personally,
25  or are you there professionally, if that makes sense?

**21**

1     A. Yeah, I believe it does. I relocated to -- to
2 Spain in -- in September. I'm still working for Tesla,
3 though, but from Spain.
4     Q. I see. And still doing the same work that you
5 do and have been doing since May of '22 in the incident
6 claim team while also occasionally getting drafted to be
7 the corporate representative, now you're just doing that
8 in Spain as opposed to California?
9     A. I don't know I've been drafted, but basically
10 the same duties that I held while I was in the -- in the
11 United States.
12     Q. Got you. Well, I mean, I assume you didn't just
13 raise your hand and be like, Hey, can I be the corporate
14 representative who has to sit here and talk to lawyers
15 for seven hours at a time? I assume someone requested
16 this of you as opposed to you maybe throwing yourself
17 into the game; is that fair?
18     A. That's fair.
19     Q. Yeah. I have yet to meet a corporate designee
20 who actually asked to be the corporate designee. I think
21 it is often a thankless task.
22     You told us you met with a colleague. Who,
23 when, and what did you talk about?
24     A. I met with a member of the autopilot team. That
25 was two days ago, and for -- I mean, we had a meeting

**22**

1 for, like, 20 minutes.
2     Q. And who was that member of the autopilot team?
3     A. His name is Nicklas Gustafsson.
4     Q. Why did you choose to meet -- and it's
5 N-I-K-O-L-A-S, correct?
6     A. N-I-Z- -- N-I-C-K-L-A-S, I believe.
7     Q. All right. We'll go with that. It's in
8 documents. I was just going off memory.
9     And Gustafsson, I think, is G-U-S-T-A-F-S-O-N.
10 But, again, it'll pop up on a couple of emails we'll talk
11 about, and we can correct it later --
12     A. Two Ss.
13     Q. -- if we need to. Two Ss?
14     A. I'm sorry, Counsel.
15     Q. Thank you, sir.
16     A. Yes.
17     Q. That's all good. That's all good. Saves us
18 having to go back. I appreciate the efficiency.
19     All right. Cool. What did you and
20 Mr. Gustafsson speak of?
21     A. We spoke about some topics from the notice
22 specifically about automatic emergency braking, mostly,
23 and drivable space, too.
24     Q. Okay. What did you -- and this was outside the
25 presence of counsel, correct?

**23**

1     A. It was -- I was directed to speak with
2 Mr. Gustafsson by counsel.
3     Q. Okay. You were told to talk to him, but was a
4 counsel sitting in the room with you when you spoke to
5 him?
6     A. No.
7     Q. Okay. So what did you guys talk about with
8 respect to automatic emergency braking?
9     A. We spoke about automatic emergency braking in
10 approximately the -- the second quarter of -- of 2019,
11 some conditions that are required for automatic emergency
12 braking to -- to activate, and the concept of -- of the
13 drivable space.
14     Q. What did you talk about with respect to the
15 concept of drivable space?
16     A. I was just confirming the -- the concept of --
17 or the description -- or my description of the concept of
18 drivable, whether -- whether it was accurate.
19     Q. And what was that description that you guys
20 discussed in terms of drivable space?
21     A. So drivable space is basically the -- or the
22 high level, rather. It's the part of the roadway in --
23 in which the vehicle can drive. So if the vehicle is
24 driving a paved road, that will go to the road edge.
25     Q. Does that ever include a paved shoulder?

**24**

1     A. Excuse me?
2     Q. Does the drivable space, in your experience as
3 both an engineer and based upon your conversations with
4 Gustafsson, and as the corporate representative of Tesla,
5 does drivable space include paved shoulders in any
6 circumstance?
7     A. So it depends on whether the vehicle is already
8 driving in -- in -- in that surface. So if the vehicle
9 is driving on a paved roadway such as a highway or a --
10 an asphalt road, the drivable space will be defined as
11 that asphalt road up until the road edge.
12     Now, if the vehicle is already in a gravel
13 surface or -- or in a paved shoul- -- or -- or in a --
14 in -- in a shoulder, for example, the drivable space, of
15 course, will -- will be different; and drivable space is
16 basically an -- an input from the vision system and --
17 and the -- sorry, an output from the system and an input
18 for the perception system.
19     So it depends on what the vehicle is seeing at a
20 given time and the surroundings of the vehicle in terms
21 of vehicle targets, et cetera.
22     Q. And drivable space is often sometimes -- is
23 often referred to also as free space, correct?
24     A. No. Not the same thing, no.
25     Q. Okay. You read Phatak's deposition, and do you

**25**

1  recall where he explained that free space, or drivable
2  space, in the context of autopilot programming refers to
3  the area of the roadside that is essentially drivable?
4      MR. T. BRANIGAN:   Just object to the form that
5  it misstates the -- Mr. Phatak's testimony.
6      A.  I don't remember exactly his -- his testimony,
7  but my understanding is that free space was an -- a data
8  point, or an input/output, that was used for Hardware 1
9  vehicles, and drivable space came later.
10     Q. (By Mr. Schreiber)  So free space was a
11  Hardware 1 concept, and drivable space was Hardware 2 and
12  beyond concept; is that your testimony?
13     A.  That's my understanding at this time, but,
14  again, I -- I didn't come prepared here to talk about
15  free spaces specifically.
16     Q.  Well, you understand that there was a topic,
17  it's No. 18, it's deep in the lineup, but it involved the
18  issue of drivable space, true?
19     A.  It involved the issue of drivable space, but not
20  free space, correct.
21     Q.  I understand.  You're the first person I'm
22  hearing, though, drawing a distinction between the two.
23     So do you disagree with Mr. Phatak to the
24  extent -- assume, hypothetically, his testimony was that
25  free space, or drivable space, in the context of

**26**

1  autopilot programming refers to the area of the roadside
2  that is essentially drivable.  Do you disagree with that
3  concept?
4      MR. T. BRANIGAN:   Objection to the form to the
5  extent it misstates the testimony of Mr. Phatak.
6      A.  I do not disagree.  I'm just making a
7  distinction as to when those concepts were used by -- by
8  Tesla in -- in -- in my understanding.  The concept might
9  be the same, but the -- the input that the autopilot
10  system had at a given time might not be the same, if that
11  makes sense.
12     Q. (By Mr. Schreiber)  I mean, it does from a
13  technical standpoint with respect to input, but it
14  strikes me as a distinction without a difference when
15  we're talking about the same concept, which is the area
16  of the roadway that is essentially drivable.
17     Those two things are the same under -- whether
18  we're talking free space or drivable space, correct,
19  Mr. Rubio Blanco?
20     MR. T. BRANIGAN:   Objection, form.  Vague.
21     A.  I mean, if you're -- if you're talking about the
22  general description of -- of a concept that is free space
23  and drivable space, without taking into account how the
24  driver-assistance system used it or -- or why, if you're
25  just talking purely about the definition of those

**27**

1  concepts, yeah, I agree.
2      Q. (By Mr. Schreiber)  And Mr. Phatak agrees.
3      So let's talk about the deposition notice.  I
4  will go ahead -- you've had an opportunity to review the
5  amended notice of deposition for this matter, correct,
6  sir?
7      A.  Correct.
8      Q.  All right.  Can you see that on your screen,
9  sir?
10     A.  Yes, I can.
11     Q.  Okay.  This is our amended notice of deposition.
12  I'm going to go ahead and, just for the sake of
13  completeness, I'm actually going to use your -- and by
14  "your," I'm referring to the royal you of Tesla's --
15  response so that we can walk through some of these
16  categories.
17     And Tesla's response to it confirm that you are,
18  in fact, the corporate representative on these issues and
19  we can actually get to getting some real work done.
20  Okay?
21     A.  Okay.
22     Q.  So just for purposes of our record, our notice
23  will be marked as Exhibit 1, and Tesla's -- you guys
24  called it objection and response -- response and
25  objections to, will be marked as Exhibit 2.

**28**

1      (Exhibits 1 and 2 marked.)
2      MR. T. BRANIGAN:   Counsel, can you give us the
3  date of Exhibit 1 that you've identified as Plaintiff's
4  amended dep notice, please.
5      MR. SCHREIBER:  I sure can.
6      MR. T. BRANIGAN:   Thank you.  I -- I ask
7  because --
8      MR. SCHREIBER:  Sorry for the scroll.
9      MR. T. BRANIGAN:   -- as I'm sure you know in
10  this case, we've had at least three amended notices for
11  this deposition, so just so that we understand which one
12  you're using.  Thank you.  April 23, 2024?  Thank you.
13     MR. SCHREIBER:  Yes, sir.
14     Q. (By Mr. Schreiber)  All right.  Now, let's go
15  ahead and focus on what I have marked as Exhibit 2, which
16  is your -- again, Tesla's objection and response.
17     There is a series of 18 categories.  My read of
18  the code, Federal Rules of Civil Procedure, is it
19  requires general subject matters, or categories, not
20  painstaking specificity; however, this notice, I felt,
21  had some painstaking specificity to it.  So we will go
22  through it in a little bit of detail.
23     The first area of inquiry is updates to
24  autopilot or the driver -- and/or the driver monitoring
25  system after the subject incident.  This involves a

**29**

1  recall report, 2023, software and firmware updates, et
2  cetera.
3        This was, I think, actually done also before the
4  re- -- or I know it was done before the recall review was
5  instituted, and Tesla objects because the Court has
6  determined that the recall is a subsequent remedial
7  measure and will not be producing a witness in response
8  to Topic 1.
9        Mr. Rubio Blanco, is it your understanding that
10  you are not here to speak on changes to the autopilot
11  system after April of 2019, up and through purposes of
12  today vis-a-vis the recall in '23, or the current recall
13  review that is ongoing?
14        **A.  My understanding is that I have not been**
15  **designated as a corporate representative to speak as to**
16  **Topic 1.**
17        Q.  All right.  And what is your understanding as to
18  why, if you have one?
19        MR. T. BRANIGAN:  Well, let me just object to
20  the form of the question.  The -- the reason as to why
21  relates to Tesla's defense strategies and privileged
22  communications between counsel and Tesla.
23        So I'm going to instruct the witness not to
24  answer.  It's not for him to decide why, and the reasons
25  why are, as I say, covered by privilege.

**30**

1        **Q.  (By Mr. Schreiber)** All right, sir.  Let me...
2        Now, you understand, sir, that there was a
3  recall, correct, just generally speaking?
4        **A.  Yes.**
5        Q.  And you understand that that response to that
6  recall is active and ongoing, correct?
7        MR. T. BRANIGAN:   And let me just interject to
8  be clear.  The witness can answer these questions, but
9  he's answering as a fact witness, not as a corporate
10  representative of Tesla.
11        MR. SCHREIBER:  Okay.
12        **A.  Can you repeat the question, Counsel?**
13        Q.  (By Mr. Schreiber) Yes.  You understand that a
14  recall review is ongoing, correct?
15        **A.  I'm not sure if the -- a recall review.  I know**
16  **that there's an investigation, but I -- that's as far**
17  **as -- as I know because I'm -- I am not involved.**
18        Q.  Who within the organization, to your knowledge,
19  is involved?
20        MR. T. BRANIGAN:   Is involved in -- in what?
21        Objection to form.  It's vague.
22        Q.  (By Mr. Schreiber) Involved in responding to
23  NHTSA's request for information regarding the recall
24  review, either by name, rank, title, or team.
25        **A.  Are you asking me if I am involved in -- in such**

**31**

1  matters?
2        **Q.**  No.  You just told me you are not, so I'm asking
3  who is.
4        **A.  Oh, who is?**
5        Q.  Yes.
6        **A.  Oh, okay.  So there is a -- you know, like,**
7  **there -- there's no unique person that works on this --**
8  **on these matters.  There is different teams that are**
9  **involved in collaborating with -- with the National**
10  **Highway Traffic Safety Administration.  That includes the**
11  **field quality team and the autopilot team.**
12        Q.  And is that field quality, is that run by Eddie
13  Gates?
14        **A.  He is the director of field quality at Tesla.**
15        Q.  So he is the top person in charge of field
16  quality and would be the one speaking to the federal
17  government on these issues?
18        MR. T. BRANIGAN:   Objection, form.  Misstates
19  the witness's testimony.
20        **A.  Again, I can't say if he is the sole responsible**
21  **for litigations.  I can tell you that he's the director**
22  **of field quality, he is involved in these matters, and**
23  **that's as far as I -- as I know.**
24        Q.  (By Mr. Schreiber) You understand that the ODI,
25  Office of Defect Investigation, found that gaps in

<span style="color:red">T- Subject to Tesla's MIL [DE 320] re references to government investigations and subsequent remedial measures/recall.</span>

**32**

1  Tesla's telematic data create uncertainty regarding the
2  actual rate at which vehicles operating with autopilot
3  engaged are involved in crashes, and that Tesla's not
4  aware of every crash involving autopilot, even for severe
5  crashes, because of gaps in telematic reporting?   <span style="color:red">T- same obj as above</span>
6        MR. T. BRANIGAN:  Objection, form.
7        **Q.  (By Mr. Schreiber)** Are you aware of that
8  concept, sir?
9        MR. T. BRANIGAN:  Objection, form.  Foundation.
10  It's also beyond the notice.
11        **A.  Are you asking me if I am aware of such a**
12  **statement made by a government entity?**
13        Q.  (By Mr. Schreiber) I am.   <span style="color:red">T- same obj as above</span>
14        **A.  I am not, or I was not.**
15        Q.  You would agree, and we'll talk more about this
16  later with respect to crash reporting, but that Tesla
17  largely receives data for crashes only with pyrotechnic
18  deployment, which generally means firing of airbags, seat
19  belt pretensioners, or the pedestrian mitigation feature
20  of the hood?
21        MR. T. BRANIGAN:  Objection, form.  Vague.
22        **A.  No, I can't agree with that.**
23        **Q.  (By Mr. Schreiber)** Why not?
24        **A.  Because that is not the only -- those are not**
25  **the only times in which we receive data from -- from our**

**Page 33**

1  vehicles.

2     Q.  For crashes?

3     A.  Sorry, couldn't hear that.  And for some reason,

4  like, the -- the sound doesn't come in at -- up until

5  the -- your question is halfway.  Can you repeat it?

6     Q.  Sure can.  You know, also, here.  I'm going to

7  go back to old-school volume and not have you in my ears.

8  Perhaps that helps, or perhaps that makes matters worse,

9  but you just let me know.  Okay?

10    A.  Okay.

11        MR. SCHREIBER:  And, Madame Reporter, just to be

12  clear, you have not had any problems hearing the starts

13  of my questions thus far in these proceedings, true?

14        THE REPORTER:  Correct.

15        MR. SCHREIBER:  And, Madame Reporter, if you

16  find that as a result of me going out of the earbuds and

17  just into regular speaker, that that poses a problem,

18  please speak up and let me know, and I will go back.

19        Because, obviously, as I said, I think it goes

20  without saying you are the most important person on this

21  Zoom with Mr. Rubio in a closed setting.

22     Q.  (By Mr. Schreiber) All right.  Sir, you stated

23  that you disagree with the statement that Tesla only

24  receives crash data involving its vehicles when there is

25  a pyrotechnic deployment.  Why do you disagree with that

**Page 34**

1  statement?  Tell me why it's wrong.

2     A.  Well, first of all, I'm not sure what you mean

3  by "crash data."  I can imagine that you're referring to

4  diagnostic log data.  But in -- in -- in that case, there

5  are several ways in which Tesla can receive diagnostic

6  log data from our vehicles.  It can be upon a request.

7        So a service technician or an engineer can

8  request data from a vehicle, as well as in situations in

9  which there has been a collision or -- or other

10  situations, the vehicle can trigger what's called an

11  "origin upload" that includes diagnostic log data.

12        So I can't agree that the only times that we

13  receive data is when we have pyrotechnic device

14  deployment.

15     Q.  Well, of course, a service technician can

16  require it.  I'm not talking about that.  I'm talking

17  about when Tesla receives data vis-a-vis a crash or, as

18  you're referring to it, a collision.

19        Is it your testimony that Tesla receives log

20  data and/or var- -- from various data streams, as a

21  result of a collision, that does not involve the firing

22  of an airbag, a pretensioner, or your pedestrian impact

23  mitigation thing?

24     A.  The -- the data that we received in those

25  instances is different than the data that we will receive

**Page 35**

1  in other types of -- of collisions, and that might vary

2  depending on -- on the severity of the collision and the

3  status of the -- of the vehicle.

4     Q.  All right.  That -- that was a lot of words.

5  Explain what you mean by that.

6     A.  Well, as I've explained, there are origin

7  uploads in which the vehicles are able to request data

8  upon certain circumstances, and those are not only

9  limited to an airbag or pretensioner deployment.  There

10  could be circumstances in which vehicles upload another

11  packet of data -- of data for -- for other type of --

12  of -- of events.

13     Q.  Such as?

14     A.  Such as a situation with the batteries.  Such as

15  a near deployment of the -- of the rear -- restraint

16  control module, which is a situation in which the RCM, or

17  the restraint control module, wakes up, but the severity

18  of the collision is not sufficient in order to trigger

19  a -- an airbag deployment.

20        In those situations, sometimes we're able to

21  retrieve diagnostic log data.  Now, you know, there are

22  certain files that are only designed to be triggered when

23  an airbag deployment or pyrotechnic device deployment

24  happens.

25     Q.  Okay.  You would agree that pyrotechnic

**Page 36**

1  deployment, firing of bags, pretensioners, and pedestrian

2  impact mitigation features, are a minority of police-

3  reported crashes, true?

4        MR. T. BRANIGAN:  Objection, form.  Foundation.

5     A.  I can't agree with that.  I don't have enough

6  data in order to make that conclusion.

7     Q.  (By Mr. Schreiber)  Including your several years

8  working as a forensic engineer in accident reconstruction

9  and litigated settings doing research, you have no

10  foundation or understanding as to whether or not bag

11  deployments and pretensioner deployments are a minority

12  subset of the total amount of vehicle collisions that

13  occur on American roadways on any given day; is that your

14  testimony, sir?

15        MR. T. BRANIGAN:  Same objection.  Also calls

16  for a opinion by an expert.  This witness is not here as

17  an expert.

18     A.  That's a slightly different question.  You

19  mentioned police-reported collisions, and, again, I

20  haven't performed a statistical analysis as to how many

21  police-reported collisions involve an airbag or a

22  pretensioner deployment.  So I wouldn't be able to give

23  an -- a statistical opinion with regards to that topic.

24     Q.  (By Mr. Schreiber)  Well, thankfully, for you, I

25  have, and I will represent to you that bag deployments

**37**

1   and pretensioner deployments, based upon federal traffic
2   safety studies, represent approximately 19 percent of all
3   collisions that occur.  In other words, 80 percent of
4   collisions don't involve that level of severity.  Assume
5   for me, hypothetically, that's a true statement,
6   because it is.
7        Do you believe that Tesla's telematics account
8   for the difference in crashes that involve this more
9   severe 20 percent subset versus the totality of
10  collisions that Teslas on autopilot are engaged in that
11  don't involve such severe impacts?
12       MR. T. BRANIGAN:  Same -- same objections.
13  And, Counsel, this is beyond the notice, calls
14  for a legal opin- -- excuse me, calls for an expert
15  opinion which this witness is not here to give.
16       A.  Counsel, you're saying Tesla telematics accounts
17  for.  I'm -- I'm not sure what you refer by that.  If
18  you're referring to a specific document or a specific
19  pipeline, we can talk about that.  But Tesla telematics
20  involved a lot of things, including the interaction
21  between Tesla and -- and its vehicles, and -- and so I
22  can't answer your question without knowing what you mean.
23       Q.  (By Mr. Schreiber)  So, again, you are not
24  prepared to testify as it relates to the factual findings
25  of NHTSA and the Office of Defect Investigation relative

**38**

1   to the recall in 2023 and the recall review that is
2   currently ongoing, true?
3        MR. T. BRANIGAN:  Objection, form.  It misstates
4   the witness's testimony and our objections.
5        He's not designated to testify as a corporate
6   representative on that topic.
7        A.  My answer is that I haven't been designated
8   to -- to testify as a corporate representative on -- on
9   Topic 1, and I believe the issue that you just relied
10  refers to Topic 1.
11       Q.  (By Mr. Schreiber)  Would you agree, sir, that
12  the design of the Model S and its autopilot features in
13  April of 2019 were designed in a way that they would
14  discourage driver's involvement with the driving task?
15       MR. T. BRANIGAN:  Objection, form.  Vague.
16       A.  That's a very vague question.  I -- I -- I don't
17  know how to answer it.  I mean, the design of autopilot
18  includes a driver monitoring system that is designed in
19  order to monitor whether the driver -- the driver's hands
20  are detected on the steering wheel, and it is accompanied
21  with a series of warnings and -- and information that we
22  give to our drivers in order to inform -- inform them on
23  how to use autopilot and the driver-assistance system.
24       Q.  (By Mr. Schreiber)  So your answer is no, you
25  don't believe that the design of the Model S and the

**39**

1   suite of autopilot features offered in Q1 of 2019 were
2   designed in a ways to discourage driver's involvement in
3   the driving task, true?
4        MR. T. BRANIGAN:  Objection, form.  Misstates
5   the witness's testimony.
6        A.  So the design of Tesla's driver-assistance
7   system does not discourage driver engagement.  That's my
8   answer.
9        Q.  (By Mr. Schreiber)  And I'm going to apologize
10  that you broke up, actually, in your response, in my ear,
11  when I was listening.  Can you say that again?
12       A.  Yeah.  So Tesla's driver-assistance system has
13  never been designed to discourage driver engagement.
14       Q.  Okay.  Do you agree that the term "autopilot"
15  does not imply a Level 2 assistance feature, but rather
16  suggests to the driver they are not in control of the
17  vehicle?
18       MR. T. BRANIGAN:  Objection, form.  Vague.  Also
19  calls for an expert opinion.  Foundation and beyond the
20  scope of the notice.
21       A.  Speaking as a fact witness, I disagree that --
22  or I -- could you repeat the question?  Sorry, I got
23  lost.
24       Q.  (By Mr. Schreiber)  Sure.  Do you agree that the
25  term "autopilot" does not imply a Level 2 assistance

**40**

1   feature, but rather leads drivers to believe that the
2   automation has greater capabilities than it does,
3   inviting them to overly trust the automation?
4        MR. T. BRANIGAN:  Same objections.  Also calls
5   for speculation.
6        A.  I disagree, Counsel.  And, in fact, we give a
7   lot of information to our customers as to what autopilot
8   does and how to operate it and how it is.  A driver-
9   assistance Level 2 feature, as you said, that requires
10  driver attentiveness while it's open.  It's the driver
11  responsibility to operate the vehicle while this
12  autopilot or driver-assistance features are engaged.
13       Q.  (By Mr. Schreiber)  You would agree, however,
14  that peer vehicles produced by other manufacturers in
15  this space at or near this time use more conservative
16  terminology, like "assist" or "team" or "sense," to imply
17  that the driver and the automation are intended to work
18  together with the driver supervising that automation?
19       MR. T. BRANIGAN:  Objection, form.
20  Foundation -- hang on, sir.  Let me get my objection out.
21  Sorry.  Calls for an expert opinion.  Beyond the scope of
22  the notice.
23       Counsel, can you show us where in the notice
24  this topic falls, the comparison of Tesla -- Tesla's
25  autopilot system to peer vehicles.

41

1    MR. SCHREIBER:  Well, I mean --
2    MR. T. BRANIGAN:  Or are you -- or -- or are you
3    just fishing at -- and -- and that's okay because it's
4    your time.  If you want to do that, go ahead.  But the
5    witness will answer to the extent he can as a fact
6    witness, not as a corporate representative.
7    MR. SCHREIBER:  That's fine.  Well, because
8    you've objected to him answering to some of these
9    questions as a corporate representative.  So I'm asking a
10   few of them, spending a few of my very precious moments
11   that I get today asking him as a fact witness on this
12   issue.
13   MR. T. BRANIGAN:  It's your time.
14   MR. SCHREIBER:  Thank you.
15   **A.  May I answer?**
16   **Q.  (By Mr. Schreiber)** Please.
17   MR. T. BRANIGAN:  As a fact witness, yes, if you
18   can.
19   **A.  So I'm not familiar with every driver-assistance**
20   **system that other vehicles had at that given time.  What**
21   **I know is, our driver-assistance system autopilot is**
22   **given to our customers with a lot of information.**
23   **That includes how to operate the system and**
24   **includes the description of what a driver-assistance**
25   **Level 2 system is, started by the owner's manual,**

42

1    **following by the user agreement that they need to sign**
2    **that clearly explains that they are responsible for the**
3    **operation of the vehicle and they actually need to pay**
4    **attention and keep their hands on the wheel; that, along**
5    **with the software release notes and the message that they**
6    **get -- or the messages that they get while they drive the**
7    **vehicles, where they're constantly reminded that they**
8    **need to keep their hands on the wheel and be ready to**
9    **take action.**
10   **Q.  (By Mr. Schreiber)** So, again, the answer is no?
11   MR. T. BRANIGAN:  Objection, form.  Misstates
12   the witness's testimony.
13   **Q.  (By Mr. Schreiber)** I'm just a simple man,
14   Mr. Rubio Blanco, just looking for a simple answer.  You
15   gave me a lot of words.
16   It's fair to say that you would agree -- or you
17   disagree that peer vehicles use a more conservative
18   technology, like "assist," "sense," or "team," implying
19   that the automation are intending to work together with
20   the driver supervising the automation, you disagree that
21   those systems are more informative to the user than
22   Tesla's autopilot suite was in the Model S in Q1 of 2019,
23   correct?
24   MR. T. BRANIGAN:  Objection, form.  Foundation.
25   Calls for an expert opinion.

43

1    Go ahead, sir, you can answer as a fact witness.
2    **A.  My -- my answer to that is that I'm not able to**
3    **provide an opinion as to the effect that the information**
4    **that is limited, name of the features that other**
5    **manufacturers gave at a given time, what effect that had**
6    **over their customers, I am not able to draw an opinion**
7    **sitting here as of right now.**
8    **Q.  (By Mr. Schreiber)** Okay.  We talked about
9    documents you reviewed.  Did you review any Jira tickets,
10   J-I-R-A?
11   **A.  I believe I saw one as part of the production.**
12   **Q.**  As the part of the production in this case or as
13   the part of a production in another matter that you were
14   given?
15   **A.  This case, I believe.**
16   **Q.**  And as you sit here now, do you have access to
17   the information that you were given to review in
18   preparation for today's deposition?
19   **A.  I do, Counsel, yes.**
20   **Q.**  And -- and how does it live?  Is it on your
21   computer?  Is it in a binder?  Explain.
22   **A.  I have a different computer here that I can use**
23   **for that.**
24   **Q.**  All right.  And does that computer allow you to
25   access the Jira ticket that you reviewed in this matter?

44

1    **A.  It includes the information that was provided to**
2    **me in the documents.  So if the Jira ticket that I'm**
3    **referring to, it's within those documents, yes, and I**
4    **believe it is.**
5    **Q.**  All right.  And in the event somebody later
6    comes back and reads this deposition and maybe doesn't
7    understand some of Tesla's nomenclature, which I'm
8    fortunately starting to learn to speak Tesla, just to be
9    clear, that if Tesla performs testing on certain systems,
10   like driver monitoring, those changes, modifications, and
11   work in that regard are detailed in relevant Jira
12   tickets, true?
13   **A.  In some occasions, they're detailed in -- in**
14   **Jira tickets; and in some occasions, they're not.**
15   **Q.**  Why would they be, in some occasions, detailed,
16   and others not?
17   **A.  Well, the use of tickets in order to track**
18   **projects have changed over the years.  Here at Tesla, we**
19   **are focused on attempting to improve the product to**
20   **assist our drivers as much as possible.**
21   **And, you know, there are situations in which we**
22   **have focused ourself on performing testing and retrieving**
23   **data from either the engineering fleet or the customer**
24   **fleet and making the changes and -- and the documentation**
25   **for those -- for those events might be limited.**

**Page 45**

1    But generally speaking, you know, we -- we see
2    Jira tickets that track modifications or changes in -- in
3    some occasions.
4         Q.   All right.  So what you're basically saying in
5    all of that is, there are occasional one-offs.  But
6    generally speaking, if there's going to be a -- a overall
7    change or evaluation of performance of systems, like
8    driver monitoring, you would anticipate, as the corporate
9    representative of Tesla, that those would be detailed in
10   relevant Jira tickets, true?
11        A.   No, that wasn't my testimony.  What I'm
12   referring to is, the -- if there are changes or -- or
13   major changes, I will expect to -- to see some Jira
14   tickets with regards to those changes.
15             But as to the evaluation of -- of a feature, or
16   as to the evaluation or testing of -- of driver
17   monitoring, those are -- are made over time and has been
18   made over time since the beginning of -- of our
19   driver-assistance system.
20             And they use data from the engineering fleet,
21   for the LAX's program fleet, and from the customer fleet;
22   and that is, you know, a -- a lot of data.  So in those
23   occasions, that data, due to privacy reasons, of course,
24   like, we might not retain it, especially for eight years
25   ago.  So that's my answer.

**Page 47**

1         Q.   Okay.  And how, if at all, did this assist you
2    in your preparations for today?
3         A.   This was one of the documents that was provided
4    for me to -- me from the -- from the production, and I
5    just reviewed it.  This tells me that -- what I knew,
6    that the automatic emergency braking was tested for IIHS.
7             And this is one of the examples of Jira tickets
8    for testing that are being generated and tracked, because
9    this testing is performed for a regulatory entity, for
10   example.  So there is a test report, and that's included
11   in this Jira ticket.
12        Q.   And this involves a station- -- stationary
13   target crash of between 20 to 40 kilometers per hour?
14        A.   It seems like those are the -- or that's the
15   description of -- of that specific testing.
16        Q.   Did you ever review the actual attachment
17   that -- made to this Jira ticket?  Do you know where that
18   is?
19        A.   I do not.
20        Q.   Did you ask for it?
21        A.   I did not.
22        Q.   Why not?
23        A.   I didn't think I needed it in order to prepare
24   to speak to the topics that are listed in the deposition
25   notice.

**Page 46**

1         Q.   Okay.  So big changes get documented in Jira
2    tickets.  Some things that are less than don't.  Is that
3    what you're saying?
4             MR. T. BRANIGAN:   Objection, form.  Misstates
5    the witness's testimony.
6         A.   Again, Counsel, I'm trying to give you my best
7    and most truthful testimony, and I stand by my answer.
8         Q.   (By Mr. Schreiber)  Okay.  Tell me the Jira
9    ticket that you reviewed in this matter.
10        A.   Bates number for it is 2135, and the name of the
11   Jira ticket is IIHS, autonomous emergency braking.
12        Q.   All right.  Sometimes it helps to go low-tech.
13             All right.  Sir, so you are referring to a one-
14   page document created August of 2019, updated September,
15   resolved appears the same day it was opened.  What do you
16   understand this Jira ticket to -- to involve?
17        A.   It looks like the Jira ticket involves a testing
18   that was performed for the international insurance for
19   highway safety with regards to automatic emergency
20   braking, our feature.
21        Q.   And this is with respect to testing done for
22   both the IH- -- IIHS as well as, I think, for NHTSA?
23        A.   I mean, this ticket seems to be specifically for
24   just on IIHS testing.  I believe the New Car Assessment
25   Program, or NCAP testing, has different criteria.

**Page 48**

1         Q.   Got it.  And how did a stationary target crash
2    test for the insurance institute involving 20- to 40-
3    kilometer-per-hour approach speeds assist you in
4    preparing to testify in this case, if at all?
5         A.   Again, just corroborating the knowledge that I
6    already had as to how we test automatic emergency braking
7    for regulatory entity such as the IIHS, but that's --
8    that's all.
9         Q.   Got it.  All right.  We're going to go back to
10   Exhibit 2.
11             MR. T. BRANIGAN:   Counsel, if you're going to
12   pivot back, can we take a five-minute break?  We've been
13   going for about an hour and change.
14             MR. SCHREIBER:   We -- we can, Mr. Branigan.  I
15   just simply say, it's a hard five, everybody.  It's a
16   hard five if --
17             MR. T. BRANIGAN:   Yep, we -- we understand.
18             MR. SCHREIBER:   All right.
19             MR. T. BRANIGAN:   Got it.  So it's -- it's
20   10:06 a.m. Eastern Time.  We'll be back in five.
21             THE VIDEOGRAPHER:   Off the record, 9:06.
22             *(Recess from 9:06 a.m. to 9:11 a.m.)*
23             THE VIDEOGRAPHER:   The time is 9:11.  We're on
24   the record.
25        Q.   (By Mr. Schreiber)  All right.  Sir, pivoting to

**49**

1  Topic 2, design and updates to the autopilot system and
2  driver monitoring system before the subject incident,
3  that's the general category; and then in painstaking
4  specificity, it breaks down various subtopics.  I'll show
5  that to you.  Back on Exhibit 2.
6         Are you prepared to speak to issues related to
7  these categories?
8         **A.  I am, Counsel.**
9         **Q.  All right.  Great.**
10        **A.  Of course, subject to the objections.**
11        **Q.  All right.  So the objections say that you will**
12  be produced on this category limited to Plaintiff's
13  defect claims and not duplicative, already obtained -- of
14  testimony already obtained.
15        Do you have an understanding, as the corporate
16  representative, of what you believe to be the defect
17  claims made by the plaintiffs in this matter are?
18        **A.  I have read the allegation as -- and I have**
19  **spoke to counsel about it.**
20        **Q.  So the answer is yes.  What is your**
21  **understanding?**
22        **A.  Again, my -- my knowledge goes to what I am**
23  **supposed to cover of these topics based on the**
24  **allegation, not the actual specificity or -- or the**
25  **specific allegations that -- that this claim involves.**

**50**

1         **Q.  I don't know what that means.  What is your**
2  understanding --
3         **A.  That means that I am --**
4         **Q.  -- with respect to the allegation, sir?**
5         **A.  That means that I am prepared to speak to those**
6  **topics subject to those objections that I have been**
7  **explained by counsel as to how to do so.**
8         **Q.  Okay.  I'm going to bring your attention to a**
9  document that was used in the deposition of Mr. Phatak.
10        MR. T. BRANIGAN:  Can you tell us which --
11  which -- which date, Counsel?
12        MR. SCHREIBER:  I don't know if I can tell you
13  which date.  I can certainly tell you by exhibit number
14  what it is, and I'm pretty sure -- actually, I take that
15  back.  I'm 90-plus percent sure this was used in the
16  first day of Mr. Phatak's testimony, which would have
17  been 7/20/23, and here we are.  Let's just go ahead.
18        Got to move a few things around.  Sometimes I
19  almost wish I had three screens.  Maybe someday.  All
20  right.  This was Exhibit 156.  Goes back to a exhibit
21  used, actually, in the prior deposition of Mr. Karpathy.
22        And I'm going to keep, obviously, the same
23  exhibit numbers that were used in that matter.  For no
24  other reason, while my Type A sensibilities love a
25  consecutive numbered series of exhibits, if we start

**51**

1  renumbering prior used exhibits from Phatak in this
2  proceeding, anyone who tries to review the two deposition
3  transcripts will be unable.
4         So barring any strenuous objection, that's how I
5  intend to roll.  Does that make sense to everybody else?
6  Because it makes sense to me.
7         MR. T. BRANIGAN:  So for purposes of
8  identification of the exhibit in this deposition, you're
9  going to refer to it as the -- as Exhibit 156 used in the
10  Phatak dep?
11        MR. SCHREIBER:  I am, and I intend, because I'm
12  lazy, to append it to this deposition, as well, for the
13  very simple purpose that when we all receive this
14  transcripts electronically, there's a nice, clean set of
15  transcript -- set of exhibits associated with this, which
16  will be different than the ones that were associated with
17  Phatak.  Make sense?
18        MR. T. BRANIGAN:  I understand.
19        MR. SCHREIBER:  Great.
20        **Q.  (By Mr. Schreiber)  So what I'd like to talk with**
21  **you about, Mr. Rubio Blanco, is -- is this document.  It**
22  **was discussed briefly in the deposition of Mr. Phatak,**
23  **and it is a look back, so now we're looking back to 2019,**
24  **before data involving crashes of Tesla vehicles in**
25  **various scenarios.  Have you seen this document before,**

**52**

1  sir?
2         **A.  I have seen this document before.  I just**
3  **haven't reviewed it in preparation for this deposition**
4  **because I don't believe it relates to any of the topics.**
5         **Q.  Well, that's fine, if -- if -- if you want to**
6  **believe that.  But I will tell you that as it relates to**
7  **the design of autopilot and the driver monitoring system**
8  **before the subject incident, one of the -- the studies,**
9  **issues, research that would be done as a part of those**
10  **development activities at Tesla would involve looking at**
11  **information involving crashes, true?**
12        **A.  If you're asking me if there is a process in**
13  **which the autopilot team will look at information from**
14  **collisions in order to make determinations as to**
15  **potential features that could be improven in order to**
16  **assist further our driver, then the answer is yes.**
17        **Q.  Yeah.  And -- and there's probably folks on**
18  something called an "incident review team" that you
19  probably know a thing or two about that is involved in
20  that process, fair?
21        **A.  No, not directly if you're referring to -- if**
22  **you're referring to our team, the -- this -- this is a**
23  **different thing.  Like, this document relies a process**
24  **for feature improvement on the autopilot side, and it was**
25  **done with the goal of evaluating which features will the**

**53**

1  team could potentially improve in order to assist the
2  drivers.  The -- the incident claim team, which is my
3  team, we -- we worked on different things.
4      Q.  Well, that's -- you said it even better than I
5  can, Mr. Rubio.  That is that Exhibit 156, and the work
6  that is done here, and the look back on crashes involving
7  vehicles, Tesla vehicles, in various circumstances, was
8  done in an effort for development improvement, true?
9      MR. T. BRANIGAN:  Objection, misstates the
10  witness's testimony.
11      A.  It was -- these efforts were performed in order
12  to evaluate which feature -- features could be improving
13  in order to assist further our drivers.
14      Q.  (By Mr. Schreiber)  Right.  So it's done to
15  improve the system?
16      A.  It's one of the steps that the autopilot team
17  followed in order to identify potential areas of
18  improvement and assist further our drivers.
19      Q.  Got it.  If you were back at the mother ship, or
20  had access to your Tesla laptop and access to all of its
21  systems, where would you find this document living?
22      MR. T. BRANIGAN:  Objection, form.  Vague.
23      A.  It looks like a Confluence page, so in
24  Confluence.
25      Q.  (By Mr. Schreiber)  Right.  And -- and then

**55**

1  performed for -- for the years before 2019 -- or 2020,
2  rather.
3      Q.  (By Mr. Schreiber)  So based upon your answer, it
4  seems that you're skeptical that, in fact, this type of
5  look back and evaluation of safety was being performed at
6  Tesla on a Confluence page like this prior to 2020; is
7  that your testimony, sir?
8      MR. T. BRANIGAN:  Objection, form.
9  Mischaracteriz- -- mischaracterizes the witness's
10  testimony.
11      A.  My testimony is that I don't know if that effort
12  or investigation was performed in the same manner as this
13  one and was documented in the same manner as what we're
14  seeing right now.
15      Q.  (By Mr. Schreiber)  Whether it was performed in
16  the precise same manner, or documented in the precise
17  same manner, it's not your testimony that Tesla only
18  began this type of analysis creating safety goals based
19  upon a prior year's history of crash data in 2020, is it?
20      MR. T. BRANIGAN:  Objection, form.
21  Mischaracterizes the witness's testimony, and the
22  question is misleading.
23      A.  No, that is not my testimony.
24      Q.  (By Mr. Schreiber)  I didn't think it was.
25      So my question for you is:  Is it your

**54**

1  within Confluence, here's your autopilot 2020 safety
2  goals, which is looking at 2019 data, true?
3      A.  It looks like the Confluence page information
4  about 2019 data.
5      Q.  And as you sit here today as the person most
6  knowledgeable -- or, excuse me, the corporate
7  representative, sorry, old habits -- testifying on behalf
8  of Tesla with respect to design, updates, improvements of
9  autopilot before the subject incident, would it be
10  possible to go and find a Confluence page on autopilot
11  2019 safety goals with a look back to 2018 data and a
12  2018 safety goals with a look back to '17 data?
13      A.  Sitting here, I'm not sure if those
14  Confluence --
15      MR. T. BRANIGAN:  Let me just --
16      A.  -- pages is --
17      MR. T. BRANIGAN:  Sorry.  Let me just -- sorry.
18  Let me just object to the form of the question.
19  It calls for speculation.  But go ahead, sir.
20      A.  Sitting here, I wouldn't be able to know whether
21  those pages that you have described exist.  I've never
22  seen them, and I've been through these Confluence pages.
23      So, you know, like, this is the Confluence page
24  that I've seen 2020 safety goals.  I do not know if there
25  was a Confluence page created for those efforts were

**56**

1  understanding, as the corporate representative of Tesla
2  on design, update, and improvement of the autopilot
3  system before the subject incident, that an analysis
4  similar to what we see in Exhibit 156 was being performed
5  annually by Tesla in the years before 2020?
6      MR. T. BRANIGAN:  Objection, form.  Cumulative.
7  The witness has already responded to the question.
8      MR. SCHREIBER:  He hasn't.
9      Q.  (By Mr. Schreiber)  Go ahead, sir.
10      A.  You see, that -- there's the problem.  You're --
11  you're saying that an analysis similar to this one, and
12  what I see here is that the -- the source of data that
13  this analysis is using is D16, which wasn't available in
14  20- -- '17, wasn't available in 2016.
15      So I'm not saying that there was no analysis.
16  What I'm saying is that there was an analysis, but it
17  wasn't performed in the same manner as this one, and it
18  was probably not documented in the same manner as this
19  one.
20      Q.  Have you seen a document in Confluence called
21  "autopilot 2019 safety goals," based upon 2018 data?
22  Because we both agree that D16 data existed in 2018.
23      MR. T. BRANIGAN:  Objection, form.  Asked and
24  answered, cumulative.  He's already answered the
25  question.

**59**

| | |
|---|---|
| 1 | MR. SCHREIBER: He hasn't. |
| 2 | Q. (By Mr. Schreiber) Go ahead. |
| 3 | A. I -- I haven't seen that document, and I already |
| 4 | answered that question. |
| 5 | Q. Have you ever looked for it? |
| 6 | MR. T. BRANIGAN: Same objection. He explained |
| 7 | to you at the beginning of this discussion that he didn't |
| 8 | look for this, so he's answered the question. But it's |
| 9 | your time. |
| 10 | MR. SCHREIBER: He didn't look for it as a part |
| 11 | of the process here. |
| 12 | Q. (By Mr. Schreiber) Have you ever looked for it |
| 13 | outside of this? |
| 14 | A. I don't believe I have, no. |
| 15 | Q. If you wanted to go and look and see if such a |
| 16 | document exists -- or not a document. It doesn't exist |
| 17 | in PDF back at Tesla, I get that. |
| 18 | If you wanted to go and find whether this |
| 19 | information exists in a same or similar fashion as we see |
| 20 | in Exhibit 156, how would you query that search and/or |
| 21 | who would you ask? |
| 22 | A. Again, you're saying a separate question. Are |
| 23 | you asking me if I will be able to find any data about |
| 24 | the autopilot team evaluating collisions prior to 2019, |
| 25 | or are you asking me about this type of analysis in 2016 |

**59** (right column)

| | |
|---|---|
| 1 | Confluence page. |
| 2 | Q. So it's your testimony that prior to 2020, when |
| 3 | Tesla's autopilot team was working on evaluating |
| 4 | collisions and identifying areas of improvement, they |
| 5 | didn't have D16 data, so they manually looked at each |
| 6 | collision one by one; is that your testimony as the |
| 7 | corporate representative of Tesla? |
| 8 | MR. T. BRANIGAN: Objection, form. |
| 9 | Mischaracterizes the witness's prior answers. |
| 10 | A. No, that's not my testimony. Even looked at |
| 11 | each collision, that's -- that's the -- the part where |
| 12 | that's not my testimony. If you've seen this document |
| 13 | where -- if -- if you look at the -- it says human- |
| 14 | labeled collisions. |
| 15 | The way the autopilot team performed those -- |
| 16 | those projects was to actually manually labeling |
| 17 | collisions from -- from -- from the start, either |
| 18 | labeling when -- when it was possible, using software |
| 19 | tools, or -- or looking at diagnostic log data. |
| 20 | And then that was a source for -- for them in |
| 21 | order to have discussions in meetings, in order to |
| 22 | evaluate what areas of improvement vehicle have been |
| 23 | performed in order to assist our drivers. |
| 24 | But my understanding is that that -- that has |
| 25 | always been done pretty much manually for -- for |

**58**

| | |
|---|---|
| 1 | and -- and this categorization? |
| 2 | Q. Both. |
| 3 | A. Okay. So I've never -- as I've testified, I've |
| 4 | never seen a similar Confluence page which -- with -- |
| 5 | with 2018 data. Now, I -- I am aware that the autopilot |
| 6 | team, in order to evaluate the areas of improvements to |
| 7 | further assist our drivers, they have -- for -- for |
| 8 | longer time than 2019, they have worked on evaluating |
| 9 | collisions and -- and identifying potential areas of |
| 10 | improvements. |
| 11 | Now, that doesn't include data like this one |
| 12 | from -- from a D16 source or -- or -- or distribution |
| 13 | of -- of collision types by manually labeling them. So |
| 14 | that's my answer. |
| 15 | Q. Now, if the autopilot team has worked on |
| 16 | evaluating collisions and identifying areas of |
| 17 | improvement relying upon certain data sources or streams |
| 18 | of data, and then labeling and categorizing it prior to |
| 19 | what we see here in 2020, where would you find it? |
| 20 | A. Well, it wouldn't be based on the streams of |
| 21 | data like this -- like this Confluence page, like D16. |
| 22 | What I'm referring to as autopilot identifying areas of |
| 23 | improvement by looking at collisions, what I'm referring |
| 24 | to is manually looking at, one by one, those collisions, |
| 25 | and those are not tracked the -- in -- or in a |

**60**

| | |
|---|---|
| 1 | improvement basis, not for reporting basis. It's a |
| 2 | different thing. |
| 3 | Q. (By Mr. Schreiber) And the -- that effort, prior |
| 4 | to 2020, when done manually, labeling collisions using |
| 5 | software tools and/or log data, as you've described, |
| 6 | would ultimately be summarized in some fashion to share |
| 7 | it with other people within either the autopilot team or |
| 8 | within the Tesla corporate structure writ large; you |
| 9 | would agree with that, true? |
| 10 | A. No, that's not the case. And the -- the reason |
| 11 | for that, is that we -- we didn't have the D16, so that |
| 12 | we didn't have a -- a -- an accurate source for -- for |
| 13 | mileage traveled with or without autopilot, right? |
| 14 | So the goal for those analysis at that time was |
| 15 | to actually perform analysis manually over a set of |
| 16 | claims, or a set of -- of collisions, rather, for them |
| 17 | prepared to -- for a meeting. That way, they will |
| 18 | discuss potential improvements. |
| 19 | It was for internal use, purely for development, |
| 20 | and never for reporting. Because in order to report |
| 21 | something, you need an accurate source of -- of mileage, |
| 22 | and we didn't have it up until we had had D16. |
| 23 | Q. So it's your testimony that prior to D16's data |
| 24 | stream -- which I understood began in, what, Q1 of 2018? |
| 25 | A. I don't think it was Q1 of -- I don't know. Q1, |

61

1  Q2, around there.

2      Q.  Around there.  Let's -- let's take the midpoint.
3  Let's call it March.  Is that okay, March of 2018?

4      A.  I mean, I can't testify on that for sure, but --

5      Q.  We'll call it Q1 and a half.  So at Q1 and a
6  half of 2018, D16 telemetry became a thing so that Tesla
7  could accurately analyze numbers of miles driven by its
8  vehicles, including vehicles driven on autopilot, true?

9      A.  That wasn't the mission for -- for that
10  telemetry stream to be created, no --

11      Q.  I didn't suggest --

12      A.  -- but it was one source.

13      Q.  -- it was, sir.  I'm just responding to your
14  statement, that prior to D16 data streams, Tesla was not
15  able to accurately estimate the number of miles driven by
16  its fleet of vehicles, whether on autopilot or not;
17  that's your testimony, true?

18      A.  Well, what I'm saying is that the accuracy of
19  that estimate wasn't nothing in order for us to report
20  it.  That's why the vehicle safety report didn't start up
21  until then.

22      Q.  Right.  So we're saying the same thing.  I'm --
23  I'm not disagreeing with you, Mr. Rubio.  Just because I
24  ask a question doesn't mean I'm looking to engage.
25  Some -- you're going to find some of these things we

63

1      In this moment, I am asking you whether, in
2  fact, Exhibit 156, based upon 2019 accurate data obtained
3  by Tesla for purposes of this reporting, included that
4  6 percent of collisions occur with autopilot on and ego,
5  meaning the Tesla vehicle itself, was at fault.

6      MR. T. BRANIGAN:  Objection, form.  The document
7  speaks for itself.  In the interest of time, we're not
8  disputing the accuracy of the document, so the question
9  is rather needless.

10      A.  If you're asking me --

11      Q.  (By Mr. Schreiber)  Do you agree with my
12  statement --

13      A.  -- the document says --

14      Q.  -- sir?

15      A.  If you're asking me the document states that,
16  correct.

17      Q.  Right.  That is an admission by Tesla, that you
18  as the corporate representative agree with, that in 2019
19  data, 6 percent of collisions occur with autopilot on and
20  the Tesla vehicle, the ego, at fault, correct?

21      A.  No, that's not --

22      MR. T. BRANIGAN:  Objection, form --

23      A.  -- the case --

24      MR. T. BRANIGAN:  -- it misstates the witness's
25  testimony.

62

1  agree on, and this is one of those points.

2      We agree that prior to the Q1 and a half of
3  2018, Tesla was unable to accurately analyze the number
4  of miles driven by its fleet of vehicles, true?

5      A.  Not the number of miles driven by each fleet of
6  vehicles.  The number of miles driven under certain
7  conditions as accurately as -- as we -- we can do now
8  with the -- with D16.

9      Q.  So it got better.  All right.  Now, you
10  understand here, from looking at the 2019 data -- and
11  this was Tesla's Confluence page internally shared about
12  their 2020 safety goals -- in a look back of 2019, they
13  discovered that 6 percent of collisions occur with
14  autopilot on and ego at fault, true?

15      MR. T. BRANIGAN:  Objection, form.  The document
16  speaks for itself.  Go ahead, sir.

17      A.  Well, we -- we need to understand first what --
18  what this document is relying and -- and what is the --
19  the mission of this document, right?

20      Q.  (By Mr. Schreiber)  Sir, I don't --

21      A.  And so it's not for --

22      Q.  -- I have limited time, Mr. Blanco.  I have
23  limited time today, and -- and I appreciate your efforts
24  to explain, and sometimes I'm going to ask you to
25  explain.  This is not one of those moments.

64

1      A.  The problem with that statement is that this
2  analysis performed by manually labeling collisions in
3  order to improve -- in order to improve certain features.
4  So when we analyze those collisions, we're focusing on
5  improvement.  We're not focusing on assigning faults.

6      We don't know what a driver is doing at a given
7  time.  We don't know if they're distracted.  We don't
8  know.  So we're only focusing on what the vehicle is
9  doing and what we're able to improve.  So there's no
10  analysis and no collision reconstruction for sure that
11  was performed in order to understand fault in this
12  project.

13      In fact, this was only used for development
14  purposes.  So if we assign that category or that bucket,
15  it's only to perform improvements to things or -- that we
16  have identified that we might be able to help further our
17  drivers.  There's no analysis as to who was at fault
18  in -- in those collisions because we wouldn't have enough
19  data in order to make that determination, Counsel.

20      Q.  (By Mr. Schreiber)  You made the determination
21  between autopilot on and ego at fault versus autopilot
22  not at fault, right?  You see this under AP collision
23  snapshots, you have 1,088 cases where Tesla concluded
24  that autopilot was not at fault, true?

25      A.  Well, those were events in which the team

65

```
1   concluded that there was nothing they can do to autopilot
2   in order to avoid that -- that specific collision.
3   Because it might be a rear-end or -- but in order to
4   assign fault, there is additional analysis that has to be
5   done, as you understand, Counsel, and this wasn't the
6   goal of this analysis.
7           It wasn't to assign fault to every collision.
8   No, that wasn't the -- that -- that wasn't what the
9   analysis did.  What the analysis did --
10      Q.  Mr. Rubio --
11      A.  -- was, Hey, let's identify which features we
12  can improve and how we can assist further our drivers,
13  and then based on that, let's look into this 635
14  collisions to see if we can improve anything.
15      Q.  Right.  These 635 collisions that Tesla, in its
16  altruistic desire to improve its product, concluded
17  internally that autopilot was at fault, correct?
18          MR. T. BRANIGAN:  Objection, form --
19      A.  No, that's not the case.
20          MR. T. BRANIGAN:  -- misstates the witness's
21  testimony.
22      A.  And first of all, there's a difference between
23  autopilot being on and the Tesla vehicle being at fault,
24  and you're describing it as if autopilot was at fault.  I
25  mean, autopilot is a driver-assistance system, and the
```

66

```
1   driver is responsible for the operation of the vehicle
2   the -- at each time.
3           If we were assigning fault, you will see there
4   how we will have, you know, like, other driver fault or
5   our driver got distracted, but we're not doing that.
6   We're focusing on the vehicle behavior in order to
7   perform improvements to our product to help our drivers.
8   We're not performing a collision reconstruction and
9   assigning fault.  We're not doing that.
10      Q.  (By Mr. Schreiber)  I didn't come up with the
11  word "fault."  Who did?  Who -- who -- who used this
12  terminology of AP engaged and ego at fault in the
13  creation of this document, sir?
14      A.  The engineers that were focusing on making
15  improvements to our cars and looking at the collisions ,
16  they were trying -- trying to improve the products.  No,
17  they were not trying to assign fault.
18      Q.  They just happen to use the word "fault;" is
19  that your testimony?
20      A.  Well, if -- if you're -- if you're looking at
21  those buckets, you're saying that they're not attempting
22  to assign fault.  They're attempting to identify
23  situations in which they could make improvements.
24      Q.  Right.  Because they're attempting to identify
25  situations where the system essentially failed in some
```

67

```
1   regard and needs to be improved, true?
2           MR. T. BRANIGAN:  Objection, form --
3       A.  No, that's --
4           MR. T. BRANIGAN:  -- misstates the witness's
5   testimony and the document.
6       A.  That's not the case.  Quite the contrary.  I
7   mean, the -- the improvement that we've made to autopilot
8   over the years hasn't been made to -- to -- to fix
9   things.  They have been made to further assist our
10  drivers.
11          So it is still a driver-assistance system, and
12  we're assisting our drivers, but it's their
13  responsibility to drive the car, right?  And it's their
14  responsibility to drive it properly and be attentive.
15          Now, there are situations in which you can have
16  the autopilot on and you can be involved in a crash if
17  you fail to react, right?  And for those situations, we
18  need a driver that takes over control.
19          But even for those situations, we're trying to
20  look at those situations and -- and be like, Hey, how can
21  we help this driver?  How can we, you know, perform --
22  even for this situation that is within the limitations of
23  the system, how can we broaden those -- those -- the
24  that operation of the system to be able to help this
25  driver, and this is what this analysis is doing.
```

68

```
1       Q.  (By Mr. Schreiber)  I understand.  You make a
2   conclusion -- and by "you," again, the royal you of
3   Tesla -- draws a conclusion when it's analyzing autopilot
4   collisions where the ego is at fault and specifically
5   calls for driver inappropriate behavior.
6           It also finds in-path stationary obs- --
7   obstacle collisions, pedal confusion, failure to control
8   for a target, poor control for cut-in.  Some of these
9   failures that are described here are at least, in part,
10  caused by the vehicle.  Would you agree with that?  Does
11  the vehicle share in some responsibility for these
12  outcomes, Mr. Rubio Blanco?
13      A.  I can't agree with that.  We're talking about a
14  driver-assistance system, which the driver is responsible
15  for the operation of the vehicle; and if you -- you're
16  seeing these buckets, we're -- we're -- we're adding
17  the -- the collisions to these buckets in order to
18  address a specific thing, which it might be an in-path --
19  an in-path vehicle or -- or something like that, that we
20  want to address, and we want to be able to assist the
21  driver.
22          But this has always been a driver-assistance
23  Level 2 system.  It has always been the driver
24  responsibility to operate the vehicle.  And, in fact, the
25  system, its capabilities are limited by the fact that we
```

**69**

1  need to -- to prioritize driver intent.  So in those
2  situations, they might be collisions with the system on.
3      Q.  This is one of those areas we'll just agree to
4  disagree.  Sir, who is this user, if you know?
5      A.  Han Zhang?
6      Q.  Yes.
7      A.  Yeah.  He was a member of the autopilot team.
8      Q.  What's his full name?  Is that his full name,
9  Han, H-A-N, and then is it Zhang, Z-H-A-N-G, or is it all
10  one name?
11      A.  No.  That's first name and last name, if I
12  recall correctly.
13      Q.  If I recall correctly, I think that is correct.
14  His -- so his -- what was his first name and last name,
15  to your knowledge, sir?
16      A.  Han, H-A-N, first name; and Zhang, Z-H-A-N-G,
17  last name.
18      Q.  And when was he a member of the autopilot team?
19      A.  I wouldn't be able to know his tenure at Tesla
20  at this time.  I'm -- I'm not sure how much time he was
21  at Tesla.  A number of years, though.
22      Q.  But based upon the way you're describing him,
23  this is formerly.  He is no longer at Tesla; is that
24  correct?
25      A.  Correct.

**71**

1  rights, if you wanted to, to go into Confluence and to
2  find this document -- or the -- it's not a document, I
3  keep calling it that because that's how it gets produced
4  to me -- find these pages?
5      A.  I'm not sure at this time.
6      Q.  How would you find out?
7      A.  Looking for it.
8      Q.  By logging in?
9      A.  That will be the first step, yeah.
10      Q.  Do you have access to your computer right now
11  that allows you to log into Confluence as we're sitting
12  here?
13      MR. T. BRANIGAN:  Yeah, we're -- we're -- we're
14  not doing that, Counsel.  That -- that's not the purpose
15  of today.  That's essentially a document request and --
16  and a rather informal expression, and that's not the
17  purpose of today.  We won't be doing that.
18      MR. SCHREIBER:  I mean, it seemed quite
19  efficient, if you ask me, Mr. Branigan.
20      Q.  (By Mr. Schreiber) All right.  So -- very well.
21      I assume you're going to follow the instructions
22  of your counsel, Mr. Rubio Blanco, and not open up that
23  laptop that's already open, sitting next to you, and
24  access the Confluence page described in Exhibit 156 to
25  see if there is a corollary from 2019, true?

**70**

1      Q.  What does he do today, to your knowledge?
2      A.  I don't know --
3      MR. T. BRANIGAN:  Objection --
4      A.  -- at this time, of his --
5      MR. T. BRANIGAN:  -- lack of foundation.
6      Q.  (By Mr. Schreiber) That's fine.
7      A.  I -- I don't know.
8      Q.  Prior to today, had you ever accessed this
9  Confluence page?
10      A.  I have seen it.  I'm not sure if I have accessed
11  it, but I have seen it in other cases.
12      Q.  So you've seen it in your role as a testifying
13  witness for Tesla, not in your role as a senior product
14  engineer doing your day-to-day job; is that correct?
15      A.  That's fair.
16      Q.  I assume Confluence pages have -- what's the
17  word -- like, administrative rights.  Like, some people
18  can see some things, and other people can see other
19  things, and not all employees are created equal;
20  therefore, not all employees have access to the same
21  Confluence data.  Is that a fair statement?
22      A.  Yes.  There are viewing and -- and editing
23  restrictions.
24      Q.  That would be the word.  Thank you.
25      Do you understand that you have the viewing

**72**

1      A.  I will follow counsel recommendations, yes.
2      Q.  All right.  With respect to the crash labeling,
3  the collision types that we were discussing before in
4  Exhibit 156, who labels them?
5      MR. T. BRANIGAN:  Objection, form.  Foundation.
6  Beyond the scope of the notice.
7      The witness can answer, if he can, as a fact
8  witness.
9      MR. SCHREIBER:  Respectfully, Counsel, he can
10  answer as a corporate representative because these
11  issues -- as he's described repeatedly, this analysis is
12  done for development improvement of the system, and one
13  of the categories within subcategories of Category 1 involved the development and
14  specificity of Category 1 involved the development and
15  improvement of the system before the incident.  So --
16      MR. T. BRANIGAN:  Yeah, we -- we're going to
17  disagree, Counsel.  So in the interest of time, because
18  you need all the time that you need, you can -- you know,
19  you and I can chat about that offline as long as we want.
20  We disagree.  So the -- the witness can answer as a fact
21  witness, if he knows.
22      A.  Who labels them when?  Like, what time frame are
23  we talking about?
24      Q.  (By Mr. Schreiber) The relevant time frame to
25  this case, 2019, 2020, 2018, and I don't care about

**Page 73**

1 today.
2     A.  Oh, it will be a --
3     MR. T. BRANIGAN:  Objection --
4     A.  -- a group of --
5     MR. T. BRANIGAN:  -- form --
6     A.  -- people --
7     MR. T. BRANIGAN:  -- vague.
8     A.  It will be a group of people within the
9 autopilot team.
10     Q.  (By Mr. Schreiber) And is there a name of that
11 team within the autopilot team, a subcommittee, if you
12 will?
13     A.  Not that I know.
14     Q.  Who leads that effort within the autopilot team
15 as of 2018, 2019, to your knowledge?
16     A.  Yeah, I wouldn't be able to pinpoint anybody on
17 that -- that effort at that given time.  I know Han was
18 involved because he's in the Confluence page mentioned,
19 but I don't -- I don't know if he was the leader of that
20 effort.
21     Q.  What about the name Peter Scheutzow,
22 S-C-H-E-U-T-Z-O-W?
23     A.  It's -- it's Pete, but -- his name.  He's a
24 program manager in the autopilot team.
25     Q.  Fine.  That's not my question.

**Page 74**

1     Was Pete -- I prefer to call him that, too --
2 involved in crash labeling for purposes of analyzing
3 crashes with vehicles operating under autopilot prior to
4 2020?
5     A.  I'm not sure if he was involved.  And his name
6 is actually Pete, not -- it's not a nickname.  His name
7 is Pete.
8     Q.  Where's the Sch-- where does that long last
9 name come from?
10     A.  Germany, I believe.
11     Q.  Oh, yeah, yeah, yeah.  No, I know.  I'm not
12 suggesting Pete was his nickname.  That's his first name.
13     And Scheutzow, or whatever it is, is his last
14 name, true?
15     A.  Correct.
16     Q.  Okay.  Again, look at that, something we agree
17 on.  Just because I ask the question doesn't always mean
18 there's an ulterior motive.  Sometimes there is, but a
19 lot of times there isn't.
20     All right.  So you don't know if Pete was
21 involved in crash labeling as a part of Tesla's analysis
22 in furtherance of its safety goals and its product
23 development in 2020, correct?
24     A.  Yeah.  I mean, I don't know if he was involved
25 at that -- at that time.

**Page 75**

1     Q.  You know that we're here talking about an
2 accident that occurred in April of 2019, true?
3     A.  True.
4     Q.  Do you know if, in fact -- and there's no
5 dispute that the vehicle was operating under some
6 features of the autopilot suite at the time of the
7 collision, true?
8     A.  At the time of the collision?  Can you define
9 that for me.
10     Q.  Five seconds before impact.
11     A.  Upon -- upon reviewing the log data, I can -- I
12 can tell that the traffic-aware cruise control and
13 autosteer were engaged five seconds prior to the crash
14 being detected by -- by the vehicle.
15     Q.  So then if we were crash labeling back at Tesla,
16 we would qualify that as a vehicle that was operating
17 under autopilot, true?
18     A.  I'm not sure how the crash labeling -- like,
19 what was the criteria to crash label at that time for --
20 for internal purposes.  I mean, we have a case here in
21 which the driver was overriding the -- the accelerator
22 pedal, so I'm not sure how that will be labeled.
23     Q.  So it's your testimony, as the corporate
24 representative of Tesla, that at the time of this
25 incident in 2019, if a vehicle was operating under

**Page 76**

1 traffic-aware cruise control and autosteer, and
2 five seconds prior to colliding with another object -- in
3 this case, the side of a vehicle -- that would not be
4 considered a vehicle operating under autopilot; is that
5 your testimony --
6     MR. T. BRANIGAN:  Objection --
7     Q.  (By Mr. Schreiber) -- Mr. Rubio Blanco?
8     MR. T. BRANIGAN:  Objection, form.  It
9 mischaracterizes the witness's testimony.  He said he was
10 unsure, and your question is very misleading.
11     A.  That's not my testimony.
12     Q.  (By Mr. Schreiber) You just don't know one way
13 or the other?
14     A.  Yeah.  I'm not part of the crash labeling or --
15 or, yeah, the process of -- of labeling and then -- and I
16 wasn't part at that time.  So for a situation like this
17 one, I wouldn't be able to -- to tell how that will be
18 labeled.
19     Q.  You know, I don't need absolute 100 percent
20 certainty.  The nature of my business, you know it,
21 because you've testified in enough courts at this point,
22 and deposition proceedings, we live in a world of
23 probabilities, right?  More likely true than not true.
24 That's what I'm always telling juries.
25     Do you believe it is more likely true than not

**77**

1  true that the vehicle involved in this incident, when
2  part of a look back of 2019 crashes, would have been
3  designated a vehicle operating under autopilot at the
4  time of the collision, yes or no?
5      MR. T. BRANIGAN:  Objection, form.  Lack of
6  foundation.  Asked and answered.  And now I think you're
7  inviting the witness to guess.  Is that what you're
8  doing, Counsel?
9      MR. SCHREIBER:  No.  I'm asking him for his best
10  estimate based upon a probability.
11     MR. T. BRANIGAN:  He's already answered your
12  question.  You don't like the answer.  So, you know, it's
13  your time, but I'm objecting because your question has
14  been asked and answered.  But go at it.  He can answer as
15  a fact witness.
16     A.  Again, I wouldn't be able to provide you a fair
17  estimate on -- on this topic due to the reasons that I
18  have relied before.  That process was performed for
19  improvement purposes and -- and to identify how to -- how
20  to assist our drivers, and how to be know how
21  that -- with that in mind, how that will be labeled; and
22  at that given time, I -- I wouldn't be able to tell one
23  way or -- or another.
24     Q.  (By Mr. Schreiber)  All right.  But Pete or Han
25  would probably know, wouldn't they?

**78**

1      MR. T. BRANIGAN:  Objection, lack of foundation.
2      A.  I mean, I don't think so.  This is years ago.
3  The criteria has probably changed, so I don't think they
4  will know how they will have labeled that back in 2018, I
5  think, yeah.
6      Q.  (By Mr. Schreiber)  Why not?  As if 2018 is such
7  a long time ago, they've forgotten?  Why would you reach
8  that conclusion, sir?
9      MR. T. BRANIGAN:  Objection --
10     A.  Well, you're asking --
11     MR. T. BRANIGAN:  -- lacks foundation.
12     Go ahead, sir.
13     A.  You're asking somebody to simulate a situation
14  in which they have received that collision back in 2018,
15  and they're labeling with the purposes that I have
16  previously explained.
17     And with a criteria that is different from today
18  as -- as well as data that is different from today, I --
19  I don't even know if they had -- if they will have had
20  sufficient data in order to -- to include this collision
21  in -- in -- in any sort of labeling.  So the answer is
22  that they will not.
23     Q.  (By Mr. Schreiber)  Was there any type of written
24  documentation guidance created as a part of that team, in
25  their labeling efforts, to your knowledge?

**79**

1      A.  I'm not sure at this time.
2      Q.  Yeah, so -- let's just go back and look.
3      And this breaks down a lot of data, but we have
4  a total of 10,513 crashes.  Are you suggesting, Mr. Rubio
5  Blanco, that the labeling team was just winging it when
6  they were making a determination as to whether the
7  vehicle was operating under autopilot or not when they
8  did this evaluation, which you have described was so
9  critically important for the safety development of the
10  system back in 2019?
11     MR. T. BRANIGAN:  Objection, form.  Foundation.
12  Beyond the notice.  Question mischaracterizes the
13  witness's prior testimony, and it's misleading.
14     A.  Yeah, it's -- it's a very convoluted question,
15  but I'm going to try to answer to the best of -- of my
16  ability --
17     Q.  (By Mr. Schreiber)  I'll try to -- I'll dilute
18  it, if you need, but you can answer.  Is this --
19     A.  Okay --
20     Q.  -- one of the moments where you don't understand
21  my question?  Because, remember, about two hours ago, I
22  said, Listen, if you don't understand my question, let me
23  know.  Is this one of those times?
24     A.  If you can repeat it, I will appreciate that.
25     Q.  Yeah, sure.  So is it your testimony, sir, that

**80**

1  Exhibit 156, which reflects 10,513 crashes reviewed by
2  Tesla, that the folks on the crash labeling team were
3  simply winging it to determine whether or not a vehicle
4  was operating under autopilot at the time and/or was at
5  fault for the collision at the time?
6      MR. T. BRANIGAN:  Same objections.
7      A.  That's -- that's not my testimony, no.
8      Q.  (By Mr. Schreiber)  Okay.  So what information,
9  to your knowledge, did the crash labeling team rely upon
10  to make a determination that a vehicle was operating
11  under autopilot and/or was at fault for the collision?
12     What did -- what data, what requirements, what
13  specifications did they rely upon to make those
14  determinations, to your knowledge?
15     MR. T. BRANIGAN:  Same objections.  This
16  question's already been asked and answered more than
17  once, and it's also beyond the scope of the notice.
18     So the witness will be answering as a fact
19  witness, if he can.
20     A.  So keeping in the mind that the purposes of
21  this, as we have previously discussed, is for
22  development, not for reporting purposes.  They were --
23  the -- the crash labeling team, my understanding is, they
24  were trained in order to identify potential areas of
25  improvement in order to categorize or -- or put that --

**81**

1  those collisions into those different categories for --
2  for them entering discussions with the rest of the team
3  and evaluating which features to operate.  Now, they were
4  trained into how to do so.
5       Q.  (By Mr. Schreiber)  And what was the criteria
6  that they were trained in, to your knowledge?
7       A.  Well, it is not as simple as a reporting, for
8  example, right?  Like, if we have the vehicle safety
9  report, that is -- that is pretty straightforward because
10  you have certain objective criteria that you need to
11  apply in order to report those -- those collisions,
12  right?  This is -- this is a different thing because the
13  focus on this was to find areas of improvement.
14       So there is no objective criteria that was
15  applied to the review of these collisions in terms of if
16  X was engaged ten seconds before the collision labeled as
17  this.  That wasn't the case because the -- the -- the
18  goal of this wasn't to report it.  It wasn't to release
19  the data.  It was for us internally, for development
20  purposes, to identify areas of improvement to assist our
21  drivers.
22       Q.  Okay.  With respect to development improvement
23  and efforts made by Tesla in the years preceding this
24  accident to make things better, make things safer, have
25  you ever reviewed any of the documents prepared by Tesla

**82**

1  in response to the NHTSA investigation and the
2  engineering analysis -- well, I think it was preliminary
3  evaluation 21-020?
4       A.  I have not.  I -- I wasn't involved in that
5  effort.
6       Q.  And have you reviewed it as a part of your
7  preparation in any litigated setting like this one?
8       A.  Not specifically with regards to a NHTSA
9  investigation, no.
10       Q.  So I want to talk about efforts made to improve
11  the system, the autopilot and the driver monitoring
12  system, prior to our crash, and I want to focus on the
13  issue of what is often referred to as the ODD, the
14  operational design domain.  You're familiar with that
15  concept, true, Mr. Rubio Blanco?
16       A.  I'm familiar with operational design domain,
17  correct.
18       Q.  Yes.  And it's your position, as corporate
19  representative for Tesla, that there is not a -- a rigid
20  set of operational design domain criteria necessary for
21  Level 2 autonomy like the versions of autopilot involved
22  in this case, correct?
23       A.  With regards to geofencing or operational design
24  domain, yes, that's Tesla's position.
25       Q.  So prior to 20- -- to the date of this incident,

**83**

1  what was the method and technology used by Tesla to
2  prevent the subject vehicle operating, the subject
3  hardware and software it was, to not be used outside of
4  the operational design domain defined by Tesla?
5       MR. T. BRANIGAN:  Objection to the form of the
6  question.  It's vague concerning ODD design by Tesla.
7       Q.  (By Mr. Schreiber)  Do you understand my
8  question, Mr. Blanco?
9       A.  I mean, I -- I don't want to try to fix the
10  question.  So if that, then I will -- keeping in mind
11  that we have defined that operational design  domain does
12  not apply to Level 2 systems, do you want to restate it?
13       Q.  No.  I -- I mean, I -- I understand your
14  position in this regard.  I think the government and
15  facts under your own internal documents disagree.
16       But, essentially, what you're going to suggest
17  is that there are preferred improvements and conditions
18  that the system is designed -- that the autopilot system
19  is designed to operate in; is that fair?
20       A.  No.  What -- what I will say with regards to in
21  order to operate autopilot or how to operate autopilot is
22  what we communicate to our customers, right?  We provide
23  them with data or with information in the owner's manual.
24       We tell them how autosteer is a feature that is
25  intended for highway and limited-access roads only, as

**84**

1  well as for other road types that might be suitable,
2  while slow-moving traffic; and we provide that
3  information in the owner's manual, in the software
4  release notes, in the user agreement that they sign,
5  and -- and along with all the information that will be
6  with them while they're -- they drive the vehicle.
7       So those are the steps that we follow to
8  communicate whoever to engage autosteer, along with the
9  fact that if you engage autosteer in -- in -- in a
10  restricted road, like in this case, autosteer will limit
11  the -- the speed that you can set it to.
12       Q.  And that's because, as of 2019, in fact, from Q1
13  and a half of 2018, Tesla always knew, at any given time,
14  the road classification that any of its vehicles were
15  operating on based upon navigation data, telemetry data,
16  and other data points available to it, true?
17       A.  Well, there -- there are certain limitations
18  that apply to -- to that.  Like, we -- we wouldn't know
19  exactly those -- those -- those terms because they --
20  the -- the identification of those topics rely on
21  external navigation provided, provides GPS, and those
22  have, of course, a series of limitations.
23       Q.  Subject to those limitations, the answer is yes?
24       A.  Well, subject to those limitations, the answer
25  is that we were able to log a road classification based

**85**

1  on the navigation system as well as the GPS of -- of
2  the -- the vehicle.
3       Q.  And Tesla has known, since far back as 2016 and
4  the original preliminary evaluation done by the federal
5  government, that drivers would often attempt to use the
6  system outside a preferred environment and conditions
7  beyond what was set forth in the owner's manual and in
8  the warnings provided by drivers, true?
9       MR. T. BRANIGAN:  Objection, form.  It's vague.
10  Lack of foundation.
11       A.  I mean, again, this is a driver-assistance
12  Level 2 system that relies on the driver not only for the
13  operation, but also for the engagement.  So we provide a
14  lot of data with regards to that engagement and with
15  regards to that operation, and we tell them where to
16  engage it and how to engage it.
17       And we tell them this might be suitable for
18  slow-moving traffic and other road classes as long as you
19  continue to pay attention, keep your hands on the wheel
20  and your eyes on the road, and be ready to take action at
21  any time; and that has been Tesla's position since 2016.
22       Q.  (By Mr. Schreiber)  And the vast majority of that
23  information is contained in the owner's manual?  Is that
24  where a lot of it is communicated?
25       A.  The vast majority, I mean, it is communicated in

**86**

1  the owner's manual, and it is displayed to the driver in
2  the user agreement in the -- in the screen, and they need
3  to agree to.  It specifically contains the verbiage that
4  I've relied.  I don't know how accurately I've relied it,
5  but approximately the same verbiage.
6       And -- and, also, autosteer performs certain
7  checks as -- as to its availability based on inputs,
8  right?  Like if we have lane lines, if we have enough or
9  sufficient input in order to engage the system, but when
10  those inputs are met, this is still a driver-assistance
11  Level 2 system that relies on the driver to evaluate its
12  engagement following the instructions that we give them,
13  of course.
14       Q.  So, again, the vast majority of the warnings
15  given to drivers about the ODD within which this system
16  should be operated are contained in the owner's manual,
17  correct?
18       MR. T. BRANIGAN:  Objection, form.  Misleadingly
19  misstates the witness's prior answer.
20       A.  I mean, I've relied all the sources of
21  information that we provide to our customers with regards
22  to that, and I would like to stand by my previous answer.
23       Q.  (By Mr. Schreiber)  And not to quibble, but I'm
24  going to quibble.  The warning about autosteer -- and
25  we'll talk about some of those warnings when we get to

**87**

1  the warning section in a little bit -- they're, like, a
2  screen or two.  The owner's manual is a -- I don't know.
3  It's produced in paper to me, but it's 180 pages.  I
4  don't know what that translates to.  Hundreds of screens.
5       So you would agree that there's more information
6  in the autopilot section of that -- and I can pull it up
7  later and we'll get there -- is far more extensive with
8  respect to warnings than what the user agreement warning
9  screen that flashes up on the user interface is; you
10  would agree with that, true, Mr. Rubio?
11       A.  I mean, there's more warnings in the -- in the
12  owner's manual than in the user agreement, but, again,
13  those warnings are redundant.  So, actually, the user
14  agreement refers to the owner's manual, too.
15       Q.  Right.  And I -- I get that.
16       Have you ever seen any statements by Mr. Musk
17  that, and I quote:  Any product that needs a manual to
18  work is broken?   **T- MIL DE 320 re Musk Public Statements**
19       MR. T. BRANIGAN:  Objection to the form of the
20  question to the extent it mischaracterizes the statement
21  by Mr. Musk.
22       A.  I have read that -- that statement in the past,
23  yes.   **T- Same as above**
24       Q.  (By Mr. Schreiber)  Do you agree with it?
25       MR. T. BRANIGAN:  Same objections.  Also beyond

**88**

1  the scope of the notice.  The witness can answer as a
2  fact witness, if he knows.   **T- MIL DE 320 re Musk Public Statements**
3       A.  Oh, well, I mean, in the general sense, we're --
4  we're talking about product, right?  Like, this is the --
5  this -- well, it's not applicable to a driver-assistance
6  system.  Now, I've -- I wouldn't be able to -- I don't
7  understand the statement enough to be able to agree or
8  disagree to it because I don't have the context.
9       Q.  (By Mr. Schreiber)  Let me give you some context.
10       Here's his statement quoted by CNN Business,
11  April 26, 2013, and it's about batteries and a new no-
12  fault warranty on batteries.  Mr. Musk says that,
13  basically, battery is covered if the owner fails to
14  follow the guidelines laid out in the owner's manual, and
15  as the CEO of Tesla says then:  Any product that needs a
16  manual to work is broken.  Do you see that?
17       A.  Yeah.  I mean, un- -- unfortunately, that
18  deals -- that's the only part that is in quotes, and I
19  don't know what he was referring to.  So I really can't
20  comment on -- on that.  I mean, this is a news article,
21  Counsel.
22       Q.  Oh, it is, but I -- I can assure you that the
23  author of that article will confirm that that was a
24  verbatim quote taken from Mr. Musk with respect to
25  discussion about whether or not customers were following

**89**

T- MIL DE 320 re Musk Public Statements

Same as above

Same as above

1 the owner's manual vis-a-vis use of their battery, to
2 which Mr. Musk responded:  Any product that needs a
3 manual to work is broken.
4          So with that in mind, does that at all
5 influence, impact, alter your reliance on the fact that
6 users of autopilot are charged with the knowledge of any
7 and all warnings contained within the owner's manual when
8 they find themselves in a litigated setting like this?
9      A.  That -- I mean, it's a very --
10          MR. T. BRANIGAN:  Excuse me --
11      A.  -- long question --
12          MR. T. BRANIGAN:  -- let me just --
13      A.  -- but that doesn't --
14          MR. T. BRANIGAN:  Sorry.  Sorry, Mr. Rubio
15 Blanco.  Just let me interpose an objection that it calls
16 for a legal conclusion and it's beyond the scope of the
17 notice and this witness's purpose for today.
18          But go ahead, sir.  You can answer as a fact
19 witness, if you know.
20      A.  That doesn't change my testimony with regards to
21 the fact that we give sufficient information to our
22 customer through several sources of information in order
23 to understand how to use the system and where to use the
24 system.
25      Q.  (By Mr. Schreiber) Have you seen --

**91**

1      Q.  (By Mr. Schreiber) But Tesla has said, and
2 you've largely parroted this in deposition, that given
3 the significant role the driver plays, a rigid set of
4 operational design domains centered around road
5 classification or geometry is not necessary or even
6 appropriate.  You would agree with that statement, would
7 you not, sir?
8      A.  I mean, I will add, or -- or subject to the fact
9 that -- that we provide a lot of information to our
10 customers as to how to engage it and -- and when to
11 engage it and where to engage it, and, you know,
12 adding -- adding the fact that this is a Level 2 system
13 that relies on the driver for -- for its operation and
14 engagement.
15      Q.  Right.  I got you.  Because according to Tesla,
16 the usage of these features is more appropriately
17 determined by the driver who is best suited to assess his
18 or her surroundings in real time and then to determine
19 whether the system can be safely and appropriately used,
20 true?
21          MR. T. BRANIGAN:  Let me just object to the form
22 to the extent it's mischaracterizing or misstating the
23 document that counsel is reading from.  Go ahead, sir.
24      A.  That's correct.  Yes.
25          MR. SCHREIBER:  And I'm going to say, if anybody

**90**

1      A.  When you get to a stop -- sorry.  When you --
2      Q.  Go ahead.
3      A.  -- get to a stop point, Counsel -- it doesn't
4 have to be now, but if you get to a good point to -- to
5 take a break...
6      Q.  Yes, sir.  It'll be another hard five, might
7 actually have to be a hard four, because I think I could
8 do this about five more times and still build that last
9 half hour in.  So let me finish this section and then we
10 can probably move and take that break.
11          I'm still focusing on the issue of operational
12 design domain, right?  Have you seen any internal Tesla
13 documents where it is evaluating crash data of Tesla
14 vehicles in any circumstance, autopilot or otherwise, and
15 as a part of that analysis, Tesla made the determination
16 as to whether or not the vehicle was, quote, in the ODD?
17      A.  Not that I can recall, Counsel.
18      Q.  Would it surprise you if Tesla did that,
19 considering it is kind of adverse to the very notion that
20 there is an ODD related to Level 2 vehicles like the ones
21 at issue here?
22          MR. T. BRANIGAN:  Objection, form.  Vague.  Lack
23 of foundation.
24      A.  I mean, I will require to see this on the -- the
25 document that I understand the context of it.

**92**

1 wants to trust but verify, Benavides 1020 is what I'm
2 reading from, second paragraph, Tesla's response to
3 PE 21-020.
4      Q.  (By Mr. Schreiber) But, sir, all that's to say
5 there isn't really a rigid ODD, and it's up to the driver
6 to determine whether it's appropriate.  Yet despite that,
7 when Tesla is analyzing accidents of vehicles involving
8 autopilot, they will make a determination as to whether
9 or not the vehicle was within the ODD or not, true?
10      A.  I can't say that's true without seeing the -- in
11 the classification that you're talking about, Counsel.
12      Q.  Cool.  Well, here it is.  So this is in response
13 to 21-020, and this is a series of Tesla autopilot
14 crashes where vehicles struck stationary emergency
15 vehicles.  This is Bates-stamped Benavides 1111, four
16 ones.
17          And it has a series of evaluations as to whether
18 or not it's in autopilot, nonresponsive.  Do you see
19 that?  And here, looking at this section, there's a
20 determination made as to whether or not the vehicle is in
21 the ODD or not.  Why would Tesla do that?
22          MR. T. BRANIGAN:  Objection, lack --
23      A.  And, Counsel --
24          MR. T. BRANIGAN:  -- of foundation.
25      A.  -- I don't know --

**93**

1    MR. T. BRANIGAN:  Go ahead, sir.
2    A.  Well, I wasn't involved, so I wouldn't be able
3 to tell.  Maybe this was subject to an assumption of
4 operational design domain as highway and limited-access
5 road for the purposes of this response, but, again, I
6 wasn't involved, so I wouldn't be able to -- to comment.
7    Q.  (By Mr. Schreiber)  You have been designated as
8 the corporate representative of Tesla to talk about
9 safety improvements of this system, and that includes how
10 it operates, driver monitoring; and the definition of
11 driver monitoring includes not just the consumer-facing
12 warnings, but also the confines, the locations, the
13 conditions under which the system should operate.
14    So with that understanding, what you're saying
15 is, Tesla does not have an explanation as to why, when it
16 is evaluating vehicles crashing into emergency -- Tesla
17 vehicles crashing into emergency vehicles, doesn't know
18 why it's determining whether those vehicles were in the
19 ODD at the time of impact or not --
20    MR. T. BRANIGAN:  And --
21    Q.  (By Mr. Schreiber)  -- correct?
22    MR. T. BRANIGAN:  -- before you answer, sir, let
23 me just object that -- that we disagree with counsel's
24 representation or mischaracterization of whether you have
25 been designated to talk about this concept.  We disagree.

**95**

1 ability to access something for it to be available to me.
2 This thing of water is available to me, so is this pen,
3 because it's within my reach.  I can use it now.
4    So with that understanding in mind, do you have,
5 as the corporate representative for Tesla, any
6 understanding as to why Tesla would be analyzing
7 autopilot-involved crashes and determining whether or not
8 the vehicles were within the ODD if, in fact, as you've
9 testified, Tesla doesn't believe that an ODD applies to
10 Level 2 autonomy?
11    MR. T. BRANIGAN:  And, Counsel, if you're done
12 with your question --
13    MR. SCHREIBER:  I am.
14    MR. T. BRANIGAN:  -- my objection is that this
15 is not part of the notice.  The acronym ODD, the phrase
16 "operational design domain," is nowhere to be found in
17 your notice, any of your various notices.  We object to
18 the form of the notice on this topic because it's vague
19 and overly broad.
20    And so that's a long way of saying this -- this
21 gentleman is -- has not been designated to talk about
22 this very finite item that you have identified.  So he
23 can answer as a fact witness, but he's not answering as a
24 corporate rep.
25    A.  I'll repeat myself.  I have been designated, as

**94**

1    And so he's not answering your question, which
2 is frankly quite misleading as a corporate
3 representative.  He can answer as a fact witness.
4    MR. SCHREIBER:  Oh, we'll have to agree to
5 disagree on that one, Mr. Branigan.
6    A.  So it was a quite long question, but my -- my
7 answer will be that I have been designated to speak as to
8 the topic included in the notice which is related to
9 geofencing.  I have not been designated to explain
10 documentation that was submitted to a government entity
11 at a given time with regards to -- to anything, really.
12    I have explained what the geo- -- or the
13 geofencing -- -fencing matter and how -- how our
14 vehicles are -- are designed to operate, which is what I
15 have been des- -- designated to testify on.  Now you're
16 asking me to comment another one that I have never seen,
17 and that is not a part of -- of -- of this topic.
18    Q.  (By Mr. Schreiber)  Well, sir, I didn't draft the
19 objection.  Your lawyers did.  We went over in Exhibit 2,
20 and we are looking for someone to testify about studies,
21 testing, experiment, research and development activities
22 relied upon in deciding to make autopilot and its
23 functions available for use.
24    By "available for use," basic understanding of
25 the word "available" in the English language, is my

**96**

1 you said -- as you mentioned, I have been designated to
2 talk about the improvements, testing, and design, not
3 about the responses to a specific investigation.
4    And what you're showing me and you're asking me
5 to comment on is one of those responses that I -- I
6 haven't been designated to -- to testify on, and I
7 haven't seen.
8    Q.  (By Mr. Schreiber)  So you just can't say one way
9 or the other, either as a senior project support engineer
10 or as a corporate representative, as to why Tesla would
11 do this when evaluating accident history, correct?
12    MR. T. BRANIGAN:  Objection, form.  Asked and
13 answered, cumulative.  Go ahead, sir.
14    A.  Again, I wouldn't be able to comment because I
15 wasn't involved in the response to that specific
16 investigation at that specific time.
17    Q.  (By Mr. Schreiber)  So what you're saying is, if
18 I really want to get someone who is responsive to those
19 issues and who understands those issues, I should be
20 sending a further 30(b)(6) request to my friends at Tesla
21 asking for someone to speak to those issues; is that your
22 testimony, Mr. Blanco?
23    MR. T. BRANIGAN:  That's crafty, Counsel, crafty
24 and misleading.  He's not saying that.  You can do
25 whatever you want.

1    MR. SCHREIBER:   Are you saying that, Counsel?
2        MR. T. BRANIGAN:   No.  I'm telling you that you
3    should spend your -- your time asking fair and legitimate
4    questions of Mr. Rubio Blanco, and that question is not
5    one of them, and you know it's not.  But it's your -- but
6    it's your time, so, you know, go at it.
7        MR. SCHREIBER:   Thank you, sir.
8        **A.  I mean, like I said, I'm not an attorney, and I**
9    **don't know how would be the process for  -- for requesting**
10   **somebody to -- to answer that question, but I can tell**
11   **you that I haven't been designated to answer on responses**
12   **to -- to regulatory bodies)**
13       **Q. (By Mr. Schreiber)** Were you surprised to see a
14   Tesla document analyzing autopilot crashes and that one
15   of the values, one of the labels that was used, was
16   determination of the vehicle being in the ODD?
17       **A.  No.  No, not really.  And my understanding is**
18   **that during those investigations, the -- the columns that**
19   **are generated for -- for each field are described by the**
20   **National Highway Traffic Safety Administration rather**
21   **than Tesla.  So, you know, they could have added that**
22   **column and explained that column to -- to us in order to**
23   **fill that column, so it's -- yeah.  I'm not surprised,**
24   **but I don't know.**
25       **Q.** As a part -- I'm going to go for, like, five

98

1    more minutes and then we're going to -- we're going to
2    take that -- that potty break for everybody, or a leg
3    stretch and break or -- whatever kind of break.  It's
4    going to be your five minutes.  You do with it what you
5    will.
6        As Tesla's corporate representative on
7    improvements to the system, development updates to the
8    autopilot and driver monitoring system before the subject
9    incident, you would agree, sir, that Tesla not only
10   expects scrutiny from NHTSA and the NTSB, but they
11   embrace it, true?
12       MR. T. BRANIGAN:   Objection, form.  Foundation.
13       **A.  No, I -- I can't agree with that.  I mean -- I**
14   **mean, can't agree or disagree.  I -- I just don't have an**
15   **opinion with regards to that topic.**
16       **Q. (By Mr. Schreiber)** This is a letter dated
17   November 21st, 2021 from Tesla to Greg Magno, M-A-G-N-O,
18   at the Office of Defect Investigation.
19       And therein, he says:  Since our very first
20   production of the Roadster, we have engaged with NHTSA
21   and have benefited from the agency's experience and
22   feedback.  We will continue to be proactive in our
23   interactions with NHTSA to keep the agency informed about
24   our approach to both active and passive safety.
25       Did I read that correctly, Mr. Rubio Blanco?

1        **A.  Yes, you did.  Correct.**
2        **Q.** Do you agree with that statement?
3        **A.  Yes.**
4        **Q.** And it goes on to say that Tesla not only
5    expects scrutiny from the agency, but embraces it because
6    Tesla knows that new technology and developments bring
7    new regulatory approaches and research.
8        You agree with that concept, as well, do you
9    not, Mr. Rubio Blanco?
10       **A.  Correct.**
11       **Q.** And Tesla represents then, which would be just
12   as true in the years preceding this incident, that its
13   team of engineers is highly motivated to design software
14   and hardware to save lives and prevent injuries, and that
15   motivation is reflected in its iterative process and
16   products.  You would agree with that?
17       **A.  Correct.**
18       **Q.** In fact, when Tesla acknowledges, at this time,
19   some of the changes that it has made to its systems, some
20   of the improvements made to its systems, its autopilot
21   and driver monitoring systems, they make a point of
22   stating that it's not a recall.  It's a safety-enhancing
23   update.  Do you see that?
24       **A.  I see that, Counsel.**
25       **Q.** Yeah.  So the responses up to this point by

100

1    Tesla in the improvements of its system up until 2019
2    were safety-enhancing updates, you would agree?
3        **A.  I mean, not -- not all the changes and**
4    **improvements were safety enhancing.  Meaning, like,**
5    **their -- their improvements to the MCU, there are other**
6    **types of software updates that the vehicles have**
7    **received.  But, I mean, generally speaking, that's what**
8    **the letter says.**
9        **Q.** Right.  The important stuff.  I don't care about
10   your MCU or how well the air-conditioning works.
11       The improvements that we're talking about with
12   respect to driver monitoring, driver-facing warnings,
13   improvement of the autopilot suite of features, those
14   were safety-enhancing updates up until the time of this
15   crash, true?
16       **A.  Yeah.  We've always taken safety very seriously.**
17   **In fact, we have --**
18       MR. T. BRANIGAN:   Wait, let me -- excuse me.
19   Let me just object to the form of the question as vague
20   relative to up to the date of this crash.
21       MR. SCHREIBER:   Okay.
22       **A.  Yeah.  So my answer is that, you know, safety**
23   **has always been very important for Tesla, and we have**
24   **received the best ratings for occupant protection as well**
25   **as safe assist; and we have released driver-assistance**

Eloy Rubio Blanco - May 31, 2024 - CONFIDENTIAL
Case 1:21-cv-21940-BB   Document 496   Entered on FLSD Docket 07/22/2025   Page 33 of 80

101

103

**101**

1  technology that is assisting our drivers not only in
2  terms of convenience, but also reducing their -- their
3  probability of being engaged in a crash.
4          So, sure, I mean, we're -- we're constantly
5  improving. We're constantly updating our driver-
6  assistance features as well as our occupant protection
7  and our passive safety components in order to -- to
8  improve and protect further and assist further our
9  drivers.
10         Q. (By Mr. Schreiber) And so that's what you were
11 doing up and then through the time of this incident, as
12 stated in your response to preliminary evaluation 21-020
13 and prior investigations by the federal government,
14 correct?
15         A. I mean, up until this day, I will say.
16         Q. Well, that's where we're going to have a
17 difference of opinion, Mr. Rubio Blanco. Because at
18 which point that you ultimately issued a recall on your
19 autopilot suite vis-a-vis autosteer, Tesla was then
20 recognized that its vehicles, every one ever manufactured
21 since the dawn of the first Roadster that rolled off the
22 line, contained defects related to motor vehicle safety
23 or that did not comply with motor vehicle safety
24 standards, and that's why it issued a recall as of
25 December of 2023; isn't that true, Mr. Rubio Blanco?

**103**

1  situations, but there was no defect, and Tesla's position
2  has always been that there was no defect in these
3  vehicles; and that's also included in the report.
4          Q. (By Mr. Schreiber) And so Tesla issued a recall
5  on every vehicle it's ever manufactured since the first
6  one that ever rolled off the line, out of the kindness of
7  its heart, out of just a matter of true altruism, or
8  because it ultimately did so recognizing its product
9  violated NHTSA and the safety act and applicable motor
10 vehicle standards?
11         MR. T. BRANIGAN:   Objection, form.
12 Mischaracterizes the witness's testimony.
13         A. None of those -- none of those options. We
14 issued that recall to address a safety risk that arises
15 when drivers misuse our system and drivers are
16 inatten-- -- and in order to assist those drivers, we
17 perform several changes.
18         And we issued the recall in order to be able to
19 close an investigation that the National Highway Traffic
20 Safety Administration had ongoing at that -- at that
21 given time, as stated in the report.
22         Q. (By Mr. Schreiber) Concluding that drivers
23 involved in crashes were not sufficiently engaged in the
24 driving task and that the warnings provided by autopilot
25 when autosteer was engaged did not adequately ensure that

**102**

1          MR. T. BRANIGAN:   Let me just object --
2          A. No, that's not correct.
3          MR. T. BRANIGAN:   -- that the witness is
4  answering as a fact witness and not as a corporate
5  representative on that.  But go ahead, sir.
6          A. That's not correct, Counsel. Tesla's position
7  has been that there is no defect on these vehicles.
8          Q. (By Mr. Schreiber) Yet it ordered a recall
9  which, by definition under 49 U.S.C. 30119 exec,
10 establishes that when you issue a recall on your vehicles
11 per NHTSA, per the safety act, you are acknowledging that
12 the vehicle does not comply with applicable motor vehicle
13 safety standards, true?
14         MR. T. BRANIGAN:   Objection --
15         A. I mean, if you read the --
16         MR. T. BRANIGAN:   -- same objections.  Also
17 object to the extent the question calls for a legal
18 conclusion or interpretation of a federal regulation by
19 this lay witness, but go ahead.
20         A. If you read the -- the report, it's pretty
21 straightforward and it -- it states that those changes
22 were focused on situations in which there was a driver
23 misuse of the system, and there was a safety risk that
24 arised for that -- from that driver misuse of the system.
25         And those changes were targeted to those

**104**

1  drivers maintained their attention on the driving task --
2          MR. T. BRANIGAN:   Same -- same --
3          Q. (By Mr. Schreiber) -- correct?
4          MR. T. BRANIGAN:   -- objections, and the witness
5  is not answering as a corporate representative.
6          Go ahead, sir, if you can.
7          A. Well, we're talking about the safety risk of
8  operating a vehicle, and we're talking about the safety
9  risk of operating or misusing a vehicle, and we
10 identified that risk that happens in every vehicle.
11         And we are making changes to assist further
12 those drivers and attempting to making changes to their
13 driver monitoring system after addressing that situation
14 that only arises when the driver is misusing the system.
15         Q. (By Mr. Schreiber) Yet, sir, that is absolutely
16 flying in the face of the conclusion that drivers -- this
17 is part of Tesla's determination in issuing this recall,
18 that drivers were involved in crashes while using
19 autopilot despite fulfilling Tesla's driver engagement
20 criteria. You're aware of that, are you not, Mr. Rubio
21 Blanco?
22         A. That doesn't mean -- I mean, are you asking me
23 if there are collisions with autopilot? Then, yes.  I
24 mean, autopilot is great for convenience and great in
25 terms of reducing your probability of a crash, but it

**105**

1   does not prevent all crashes, and we've never said that
2   it will prevent all crashes.
3        So if the driver is inattentive and it fails to
4   react to a situation in which would need their
5   engagement, that could lead into a collision, right?
6   And, also, if the driver is misusing -- purposely
7   misusing the system, that could also lead to a collision,
8   which is the situation that we're talking about in this
9   report, as explained in this specific report.
10     Q.  It's everybody else's fault except for Tesla's,
11   is that what you're saying, Mr. Rubio Blanco?
12        MR. T. BRANIGAN:  Objection, form.  The question
13   is misleadingly mischaracterizing the witness's prior
14   testimony.
15     A.  I don't know how to answer that question,
16   Counsel.  Applied to what, in that context, I -- yeah, I
17   don't have an answer for you.
18     Q.  (By Mr. Schreiber) Last question and then we'll
19   break.  What's the prime directive?
20     A.  What is the prime directive?  Of what?
21     Q.  Have you heard of the concept at Tesla known as
22   the prime directive with respect to the development of
23   autopilot and the use of autopilot?
24     A.  I'm not sure if we had, like, a prime directive.
25   I mean, that has been the same over time.  But in the

**106**

1   general sense, the -- the director -- the directive on
2   the use of autopilot is to assist our driver to -- our
3   drivers to operate their vehicles.
4        And it is great not only for convenience, but
5   also for reducing their probability of being involved
6   in -- in a collision, and that has been what we've been
7   showing over these years.
8     Q.  Mr. Rubio Blanco, have you heard Elon Musk refer
9   to the prime directive for autopilot as being do not
10   collide?
11     A.  No, I can't recall that specific statement,
12   Counsel, but --
13     Q.  Have you --
14     A.  -- I mean, I can tell you --
15     Q.  Go ahead.
16     A.  Yeah.  No, I can tell you that it's a driver-
17   assistance Level 2 system that -- that means that, by
18   definition, it is required to prioritize driver intent.
19        So it is designed to do so, and that limits
20   sometimes the operation of autosteer as to how fast it
21   can turn, how far it can turn, because it needs to -- to
22   be ready for driver engagement.  So considering that...
23     Q.  Prior to this incidence, the incident involving
24   the plaintiffs in this matter, and as a part of the
25   development and improvement of the autopilot system

**107**

1   before 2019, have you heard Elon Musk refer to the prime
2   directive as do not smash or do not crash?
3        MR. T. BRANIGAN:  Objection, form, to the extent
4   it mischaracterizes or takes out of context the
5   statements attributed to Mr. Musk.
6        Yeah, the witness -- and this witness is not
7   answering as a corporate representative about the
8   statements.  Go ahead.
9     A.  I don't believe I have, no.
10        MR. T. BRANIGAN:  Are we at the point in time
11   where our witness can take his break that he requested?
12        MR. SCHREIBER:  One, two more -- yes, we're
13   within 60 seconds of that.
14     Q.  (By Mr. Schreiber) So assume Mr. Musk said that
15   the prime directive is for the vehicle to not collide
16   with people, objects, or vehicles when autopilot has
17   control of the Tesla.  Are you with me?
18     A.  Yes.
19     Q.  As the corporate representative of Tesla, with
20   respect to safety improvements of the system prior to
21   2019, do you believe that that has been the north star
22   that has guided the development of the system during that
23   time?
24        MR. T. BRANIGAN:  Same objections.
25     A.  Again, Counsel, I -- I can't answer that -- that

**108**

1   question.  There has been a lot of things that has driven
2   the development that I have mentioned.  The main one is
3   to further assist our -- our drivers.
4        So that -- that will be what we have been trying
5   to -- to do all over these years.  Now, that is subject
6   to the limitations of the technology at a given time and
7   subject to this being a Level 2 system that requires
8   driver engagement.
9     Q.  (By Mr. Schreiber) Have you seen testimony from
10   Pete, who we've talked about earlier, that says that the
11   prime directive, as he understood it, was do not hit
12   objects, a golden rule, a fundamental rule of autopilot,
13   was not to hit objects, to which he characterizes, yes,
14   that is our north star?  Are you aware of
15     A.  Again, I -- I don't know --
16        MR. T. BRANIGAN:  Let -- hang on, sir.  Let me
17   just object to the form of the question to the extent
18   that it's mischaracterizing or taking out of context the
19   statement of Mr. Scheutzow.
20     Q.  (By Mr. Schreiber) Go ahead.
21     A.  Again, I -- I don't know without having the
22   context of -- of that testimony.  If he -- if he was
23   referring to a specific situation, specific scenario,
24   I -- yeah, I can't answer.
25     Q.  Have you ever heard in meetings, or heard

1    about -- well, have you personally ever been in a meeting
2    on Zoom or in person with Elon Musk?
3        **A. I have, yes.**
4        Q. And have you ever heard him at any point in
5    those meetings, or heard from others who were in meetings
6    back prior to your tenure at Tesla, where he discussed
7    the prime directive, meaning the aspirational goal of
8    autopilot technology, is to elimin-- -- is to limit or
9    minimize the number of crashes, collisions, fatalities,
10   and injuries?
11       MR. T. BRANIGAN:   Same objections --
12       **A. I have not.**
13       MR. T. BRANIGAN:   -- in terms of
14   mischaracterizing or taking out of context the statements
15   attributed to Mr. Musk.
16       **A. I have not.**
17       Q. (By Mr. Schreiber) Or simply, have you ever
18   heard him -- or have someone within Tesla relayed to you
19   that the prime directive is don't smash?
20       **A. I don't believe I have, Counsel, no.**
21       MR. SCHREIBER:   All right.  Hard five.
22       THE VIDEOGRAPHER:   Off the record, 10:44.
23          (Recess from 10:44 a.m. to 10:51 p.m.)
24       THE VIDEOGRAPHER:   On the record, 10:51.
25       Q. (By Mr. Schreiber) Mr. Blanco, I'm going to move

1        Q. (By Mr. Schreiber) All right.  Question No. 3,
2    Topic No. 3, is beta, and I'm going to throw it up for
3    you so that we're singing again from the same hymnal.
4        Beta testing, and statements in the owner's
5    manual regarding autosteer, reasons why it's available,
6    blah, blah, blah.  And, yeah, Tesla agreed to put up a
7    witness.  Unfortunately for you, that's you, Mr. Blanco,
8    on this issue, for issues not duplicative.  I'm going to
9    be quick.
10       Tesla claims in this response that this is the
11   warning that folks would have received.  As the corporate
12   representative on this issue, is it your understanding,
13   Mr. Rubio Blanco, that this is the actual warning
14   verbatim that was shared with consumers when they
15   initiated autosteer in Q1 of 2019?
16       **A. That's my understanding.  I mean, that -- that**
17   **verbiage has changed slightly over the years, and I**
18   **believe this is the correct one.  But, yeah, those**
19   **changes has been -- have been pretty minimal, and I**
20   **believe this is the correct one.**
21       Q. Subject vehicle ran Hardware 2.5, correct?
22       **A. Correct.**
23       Q. When did Hardware 2.5 come out?
24       **A. August 2017.**
25       Q. I'm going to share with you a document -- oh,

1    on.  Some of these topics we're going to move through
2    pretty quickly, this next one being one of them.  This is
3    Topic 3.  Hold on.
4        MR. T. BRANIGAN:   Did we lose Mr. Rubio Blanco?
5        MR. SCHREIBER:   No, he's there.
6        THE WITNESS:   Oh, I'm here.
7        MR. T. BRANIGAN:   Okay.
8        MR. SCHREIBER:   All depends on --
9        MR. T. BRANIGAN:   I got you.
10       MR. SCHREIBER:   Yeah --
11       MR. T. BRANIGAN:   Yeah, you --
12       MR. SCHREIBER:   -- sometimes I minimize --
13       MR. T. BRANIGAN:   -- you just moved --
14       MR. SCHREIBER:   -- too much.  Yeah.
15       MR. T. BRANIGAN:   You -- you just moved location
16   on my screen, that's all.
17       MR. SCHREIBER:   Yeah.  It's only been four
18   years, Branigan.  You'll figure out this whole Zoom thing
19   sooner or later.
20       MR. T. BRANIGAN:   We're ready to go.
21       MR. SCHREIBER:   My favorite is that I -- I mean,
22   we all still screw up the mute button.  At some point,
23   we've got to work on that.  Maybe we can get some Tesla
24   engineers to find ways to improve the efficacy of that
25   system.

1    I'm already sharing.  Oh, no, I'm not.  Shoot.  Let me
2    stop share there.  The one box was right next to the
3    other, and the green line was around it, so it was a
4    little bit of a bait and switch to my eyeballs.
5        Here you go, Exhibit 271.  Do you see that,
6    Mr. Rubio Blanco?
7        **A. Yes, I do see that.**
8        Q. What is this, to your knowledge?  And I can
9    scroll through it.
10       **A. If I'm not mistaken, this is some sort of**
11   **description of the systems that relates to European**
12   **regulations, if I -- if I'm not mistaken.**
13       Q. What makes you think this -- this relates to
14   European regulations?
15       **A. On the first text, EC- -- the title, I believe**
16   **that that relates to European, ECE R73 --**
17       Q. ECE R79?
18       **A. R79, sorry, of -- but, yeah, I'm not sure.  But**
19   **I believe so.**
20       Q. What makes you believe those words, that
21   acronym, has anything to do with European regulations?
22       **A. I believe I've seen it in the past related to**
23   **the -- and related to European regulations, but -- but,**
24   **again, I'm not positive.**
25       Q. Do you know what Annex 6 complex electrical

**Page 113**

1  control systems mean?

2  A.  Not as this -- as it applies to this specific

3  download document.  It seems to be like an -- part of a

4  submission or -- yeah, I'm not sure.

5  Q.  Okay.  Goes on to describe autosteer.  This is

6  Exhibit 271.  We'll append it to your deposition so that,

7  again, we have a parallel series of exhibits in both

8  30(b)(6), or I guess that was PMQ, depositions related to

9  this matter.

10  Do you see here it's a description of autosteer

11  and it describes activation, and that first, under

12  driver-assistance, you turn it on, and then user action

13  two -- oh, and for the purposes of the record, that was a

14  little sloppy of me.  This is on Bates stamp 85344.  Now

15  that I realize, I've probably been a little sloppy with

16  some of the other exhibits in that regard.

17  Do you see that, sir?

18  A.  I do, yes.

19  Q.  Do you believe that this warning here was the

20  warning that Mr. McGee, in his 2019 Model S, would have

21  received in Q1 of 2019 when activating autosteer?

22  A.  No, I don't believe so.  This is the first time

23  I see this warning, which makes -- makes me think that

24  it's either for Europe or for older vehicles.  So, yeah,

25  I'm more familiar with the warning that you displayed

**Page 115**

1  one in Exhibit 217 -- or 271.

2  Q.  But as a part of your effort to testify as the

3  corporate representative in this matter, you have not had

4  the occasion to verify that, correct?

5  A.  I have not.

6  Q.  And if you wanted to do that, sir, how would you

7  do so?

8  A.  I'm not sure.  I believe the legal team might

9  have access to the different warnings that were given

10  over time, or either them or the content team, but, yeah,

11  so- -- somebody will be able to -- tell -- to tell us

12  the actual warning for that time frame.

13  Q.  So who's on --

14  A.  Most likely.

15  Q.  Who's on the content team?  Who's the -- who

16  was -- well, who is currently on the content team who --

17  who leads it, and who was on the content team back in

18  2019?

19  A.  I'm not sure, and in 2019, I -- I don't know;

20  and right now, I wouldn't be able to remember the -- the

21  actual names of -- of the people involved in that team

22  now.

23  Q.  If you wanted to find out who's currently on the

24  content team, where would you look?

25  A.  I actually attend a meeting with them sometimes,

**Page 114**

1  before, which is the -- the one that -- that is

2  displayed, to my knowledge, in the U.S.

3  Q.  Well, we would agree -- so you think that the

4  warning given in Europe is actually less robust than the

5  warning given in the United States?

6  MR. T. BRANIGAN:  Objection, form.

7  Mischaracterizes the witness's testimony.

8  A.  I do not know.  I'm not sure.

9  Q.  (By Mr. Schreiber)  So with respect to Tesla's

10  statement in the owner's manual of the subject vehicle,

11  that autosteer is a beta feature, is it your testimony

12  that a consumer in Q1 of 2019 would have received a

13  warning like this or more like the warning -- and by

14  "this," I'm referring to Exhibit 271, Page 3 -- or the

15  warning that is contained in the objection to the

16  deposition notice that I've marked as Exhibit 2?  And

17  that would be found on Page 7 of that document.

18  A.  My -- my understanding is that it will be

19  similar to the one presented in Exhibit 2.

20  Q.  What do you base that on?

21  A.  The fact that I see the -- the other wording and

22  I've been involved in different cases in which we're --

23  we have been able to query the -- the actual warning

24  for -- for that time frame, or similar time lines, and it

25  looks similar to the one in Exhibit 2, not similar to the

**Page 116**

1  so, yeah, I will be able to -- to find out.

2  Q.  You have meetings with them on some regularity?

3  A.  Just -- well, once in a while.

4  Q.  When was the last time?

5  A.  I'm not sure.  Probably a month ago.

6  Q.  Who was there on behalf of the content --

7  A.  That's --

8  Q.  -- team?  Give me one name.

9  A.  Okay.  That -- that's the issue, I don't

10  remember the names of -- of the people that are from the

11  content team from that meeting.

12  Q.  All right.  But the content team would most

13  likely be the people who would store prior iterations of

14  warnings that were placed on the user interface, true?

15  A.  They might have access to -- to those, or to

16  those changes at least.

17  Q.  If you were in Las Vegas and you had to put

18  50 bucks on a bet as to whether or not the content team

19  would have the prior iterations of warnings placed on the

20  user interface, would you place that bet, yes or no?

21  MR. T. BRANIGAN:  Objection, form.  Calls for

22  speculation, asked and answered.

23  MR. SCHREIBER:  Well, he said "might."  That

24  doesn't mean much.

25  MR. T. BRANIGAN:  Yeah --

1    A.  Yeah, I wouldn't be able --
2        MR. T. BRANIGAN:   -- yeah, it -- what it -- what
3    it conveys is that there's a lack of foundation for him
4    to answer, and now you're asking him to put a bet on it,
5    which is inviting him to speculate.  So I object to the
6    question for that reason.
7        But go ahead, sir, if you can answer, you can.
8    A.  It might not be the content team, but sitting
9    here, I'm thinking it is likely possible to find out
10   which specific user agreement was used at -- at that
11   time.
12   Q.  (By Mr. Schreiber)  Okay.  And you would clarify
13   this as the user agreement when that -- that would be
14   true, whether it's for autosteer or traffic-aware cruise
15   control or navigate on autopilot, correct?
16   A.  That shows up when you -- you activate or enable
17   autosteer or navigate on autopilot, not traffic-aware
18   cruise control.
19   Q.  Got it.  Okay.  All right.  Moving right along.
20       The next topic covered in Exhibit 2 -- oh, I got
21   ahead of myself.  It's Topic No. 4.  And this is
22   autopilot use restrictions, including but not limited to
23   geofencing of autosteer, and it goes on to talk about
24   autopilot use restrictions during operations and roads,
25   locations outside the place where Tesla intended it to be

1    Q.  What would you call it, transmission of data at
2    various intervals back to Tesla?
3    A.  I mean, they -- yeah.  They were tools in order
4    to query that information from our vehicles remotely, or
5    that's my understanding, but...
6    Q.  Okay.  See this document, sir?
7    A.  Yes.
8    Q.  I'm sorry?
9    A.  I was coughing.  Did you ask if I'm familiar
10   with the document?
11   Q.  Yes.  Well, I don't know if I did ask, but
12   that's what I was going to ask.  So are you familiar with
13   it?
14   A.  Yes, I am.
15   Q.  What is it?
16   A.  This is the theory of operation for Model S
17   Hardware 2 driver-assistance system.
18   Q.  You broke up, but I think I know what you said.
19       It's the theory of operation for Model S
20   Hardware 2 systems, correct?
21   A.  Yes, the driver-assistance system page.
22   Q.  And there is a theory of operations for each of
23   the various models and the hardware systems that came out
24   with them, going back in time and up until the present?
25   A.  I believe it is -- that there is.  Sorry.  I

118

1    used.  Some of the standards, best practices.
2        It references to some other cases.  A whole
3    bunch of objections.  And it says that Tesla will not
4    agree to produce a witness to testify about sub (f)
5    through (i), but will produce someone above and below.
6        So just so we're clear, that is (a), (b), (c),
7    (d), and (e), and identification of warnings and
8    instructions, and the basis thereof, including warnings
9    and instructions given to McGee.  Are you with me?
10   A.  Yes.
11   Q.  So we covered this previously.  I'm -- I'm
12   hearing myself back through someone else's speakers,
13   which is a bit annoying.  What's probably worse than
14   hearing me once is hearing me twice.
15       All right.  This issue of -- of design domain.
16   But Hardware 2.5 vehicles utilized a -- a GPS or a GNSS-
17   based system that streamed that information at various
18   intervals back to Tesla, true?
19   A.  It used such system.  But as to the -- the
20   streaming of information back to Tesla, yeah, I'm not --
21   I'm not sure.  I don't think so.
22   Q.  You seem to quibble with the notion of
23   streaming.  Is that because you take that as real-time
24   constant?
25   A.  Correct.

120

1    believe there is.  I'm not sure if specifically for the
2    Model S will be a distinction as to the driver-assistance
3    system, but I -- I believe there is, yes.
4    Q.  And would they generally be the same with
5    respect to Ss and Xs, and then 3s and Ys?
6    A.  Are you talking about the actual --
7    Q.  With respect to --
8    A.  -- systems or --
9    Q.  -- driver assistance.
10   A.  No, they wouldn't be the same with regards to
11   the equipment and -- or the -- the hardware location
12   and -- and things like that.  Generally --
13   Q.  Well --
14   A.  -- speaking, the --
15   Q.  I'm sorry.  Go ahead.
16   A.  Yeah.  I mean, generally speaking, the
17   availability of the driver-assistance system will be
18   similar for -- for all vehicles that are running the same
19   hardware.  But that's generally speaking, that there
20   might be certain exceptions.
21   Q.  Oh, okay.  So generally speaking, with respect
22   to driver-assistance systems and hardware, they're
23   actually similar across hardware regardless of model,
24   whether it's an S, a 3, an X, or a Y; is that true, sir?
25   A.  The feature availability -- the driver-

**121**

1  assistance feature availability, yes.  I mean, except for
2  certain portions of time when we released a new vehicle
3  and things like that, that's generally the case.
4       For the hardware that is equipped in the -- in
5  the vehicles, that that could vary, or the position of
6  the sensors, of course, if it's different geometries.
7       Q.  So the features and functionality of the systems
8  are not that variable, are -- are -- are very similar, is
9  what you're saying, with respect to driver-assistance
10  systems in any model year across hardware, true?
11       MR. T. BRANIGAN:  Objection, form.  That
12  mischaracterizes what he just said.  You left out the
13  word "availability."
14       MR. SCHREIBER:  Oh, okay.
15       Q.  (By Mr. Schreiber) Go ahead and answer my
16  question as best you can, Mr. Rubio.
17       A.  Yeah.  So during that period of time, vehicles
18  running in -- in hardware -- or a similar hardware
19  version had the features -- similar features available,
20  or that's my understanding at that -- at that time.
21       Q.  Okay, whatever.  So with respect to driver
22  assistance in Model S and any vehicle, I notice this, it
23  says Hardware 2.  Is there a second theory of operation
24  that comes out for Hardware 2.5, or does 2.0 cover the
25  next iteration before you get to 3?

**122**

1       A.  No.  There -- there is Hardware 2.5, I believe.
2       Q.  All righty.  Sorry, my search function doesn't
3  want to work, so I'm having to pull it up.
4       Aha.  All right.  Let me pull up what has been
5  Bates-stamped as Benavides 3048, which is the theory of
6  operation for Model S Hardware 2.5.
7       MR. T. BRANIGAN:  Oh, I -- Counsel, just for
8  recordkeeping purposes, did you mark the theory of
9  operation for 2-point- -- Hardware 2.0 as an exhibit to
10  this dep?
11       MR. SCHREIBER:  I didn't.  I didn't.  I'll
12  just -- it -- it's Benavides -- starts at Benavides 2980,
13  but I don't think I need to include it for our purposes,
14  at least we all know what it was.  We looked at the front
15  page of it, and now we're going to focus more of our
16  attention on 2.5.
17       MR. T. BRANIGAN:  Okay.  Are you marking 2.5 as
18  an exhibit?
19       MR. SCHREIBER:  I am.  And that will be, then, I
20  guess, my Exhibit 3.
21       MR. T. BRANIGAN:  Yeah.
22            (Exhibit 3 marked.)
23       MR. SCHREIBER:  Or our Exhibit 3.  And that will
24  be Bates-stamped 3048 -- we'll just throw the whole damn
25  thing in there -- through -- wait for it -- I think it's

**123**

1  the end of your production.  It is.  3048 through 3118.
2       MR. T. BRANIGAN:  Thank you.
3       MR. SCHREIBER:  Uh-huh.  Documents that were
4  kindly produced on 5/29/24.
5       Q.  (By Mr. Schreiber) All right, sir.
6       MR. SCHREIBER:  All right.  Bear with me for one
7  moment, everybody.  The version that I have is, for some
8  reason, not OCR'd, and that matters because we were going
9  to focus on the discussion of GPS and GNSS, and it was a
10  lot easier to just use "find" than to actually go through
11  and highlight every time it showed up.  We may have to
12  come back to this and have somebody work on it in the
13  absence.
14       And then technology comes through.  Got to love
15  it when that happens.  All right.  So -- oh, I have it as
16  a separate production, too.  So, yeah, 3048 to 3118 will
17  be Exhibit 3.  I'm going to share my screen.  While I'm
18  thinking about it, I'm going to drop a download because
19  Madame Reporter's going to want this.
20       Q.  (By Mr. Schreiber) All right.  So, Mr. Blanco,
21  on this issue, Topic 4, use restrictions, we recognize
22  that Model S is on 2-point- -- running Hardware 2.5, had
23  a GNSS receiver.  What is that?
24       A.  So my understanding is that that receiver
25  provides GPS readings to the -- to the vehicle.

**124**

1       Q.  Okay.  And you have the secondary processor that
2  does something about a heater grid, an ethernet switch,
3  and a GNSS receiver.  That's far more technical than my
4  little brain can handle, so we'll move past that.
5       Okay.  And the GNSS is linked to this GPS
6  antenna and module, which essentially is an antenna
7  beneath the top left corner of the liftgate ga- -- the
8  liftgate glass, which hubs the vehicle to receive GPS
9  data so it knows where in space and time it is, true?
10       A.  Correct.
11       Q.  And in addition to that helping you with maps,
12  the GNSS receiver, the Global Navigation Satellite
13  System, is integrated in the driver's assistance ECU or
14  the driver-assistance computer, true?
15       A.  That seems to be the case.
16       Q.  It seems to be the case or it is the case?
17       A.  I mean, I -- I don't know -- I don't know this
18  off the top of my head, but just reading the document, it
19  relies that information that you're telling us.
20       Q.  Well, I'm not telling you.  It's your documents
21  telling us.  I'm just reading them.
22       So it uses Global Navigation Satellite Systems
23  and essentially allows for the vehicle to know at any
24  given point where it is in space and time, correct?
25       A.  I mean, subject to the limitation of the G- --

1  GNSS and GPS technology, right?
2     Q.  Uh-huh.  And whether we use GPS or GNSS, those
3  terms or interchangeable, correct?
4     A.  Yes.
5     Q.  And the only times that there can be problems,
6  points of failure, is if there's problems with the wiring
7  or the antenna, or there can be a problem with the
8  driver-assistance ECU, correct, that's what we're talking
9  about here?
10    A.  Yeah.  That's referring to hardware failures.
11    Q.  Right.
12    A.  So, yes.
13    Q.  And if there's a problem with it, then it
14 actually sends an alert through the driver-assistance
15 computer to let y'all know that, Hey -- let the driver
16 know, Hey, your GPS isn't working, correct?
17    A.  Yeah.  I'm not sure if that alert will come from
18 the driver-assistance ECU, but generally speaking, that
19 will most likely trigger an alert.
20    Q.  Well, it says an alert will be set by the
21 driver-assistance ECU.  I don't know this stuff.
22 I'm just reading.
23    A.  Correct.
24    Q.  And it says that the receiver receives satellite
25 measurements -- satellite measurement observations to the

1     Q.  And this process produces a solution that is
2  more accurate than generated by GPS measurements alone
3  and can continue to track the vehicle even when the GPS
4  signals are not available for a short time, like, for
5  instance, if it's going through a tunnel or it's in an
6  area where it loses signal; is that true, Mr. Blanco?
7     A.  Yes.
8     Q.  Unfortunately, for all of us, this word shows up
9  55 times.  So let me go a little further.  Here we go.
10        So traffic-aware cruise control utilizes
11 navigation and GPS for purposes of positioning road class
12 and curvature, true?
13    A.  Correct.
14    Q.  This is Page 3089.  It's also used for fleet
15 speed data, correct?
16    A.  Correct.
17    Q.  And fleet speed data is information utilized as
18 a part of traffic-aware cruise control where a vehicle
19 exiting or on-ramping onto a controlled highway, or
20 freeway, as we like to call it in the left coast, would
21 actually lower the speed of the vehicle similar to that
22 of other Teslas in the fleet in that area; is that a fair
23 estimate of what the fleet speed data does and is?
24    A.  Yeah.  I mean, not limited to that, but that's
25 one of the uses of fleet speed, yes.

1  driver-assistance computer, which uses a software
2  positioning engine to estimate the location of the
3  vehicle using the carrier phase measurements generated by
4  the receiver.  What does that mean?
5     A.  I mean, basically how it works is, the -- the
6  vehicle receives the GPS location, and the driver-
7  assistance system with the navigation system assigns a
8  road class to the specific location of the vehicle at a
9  given time.
10    Q.  Yeah.  And -- and that process known as -- and
11 I'm reading, for anyone looking at this transcript later,
12 from Page 38 of this document, also Bates-stamped 3085 .
13        And it says, through a process known as sensor
14 fusion, the positioning engine combines data from the GPS
15 system, the IMU -- which is the mother computer -- and
16 the wheel speed sensors to track the position of the
17 vehicle, correct?
18    A.  Yes.
19    Q.  What is IMU?
20    A.  Inertial measurement unit.
21    Q.  Okay.
22    A.  Basically --
23    Q.  What's that?
24    A.  -- the triaxial accelerate -- triaxial
25 accelerometer and gyrometer.

1     Q.  It's one of the primary uses of fleet speed,
2  true?
3     A.  True.
4     Q.  Are there others?
5     A.  It's -- as I understand it, it's not limited to
6  on-ramps and off-ramps.  It could be in any other road
7  classes or -- or road configurations.
8     Q.  Okay.  And similarly, autosteer -- oh, this is
9  passing lane assist.  But passing lane assist, another
10 feature, utilizes map data and GPS location systems,
11 correct?
12    A.  That's for autosteer, I believe.
13    Q.  I thought it was, too -- oh, I'm sorry.  You're
14 right.  When I first read it, I thought that, and then I
15 confused myself by scrolling up.  Thank you for the
16 clarification.
17        And so, therefore, let me restate that question,
18 reading from Page 3094.  The autosteer feature of
19 autopilot utilizes map data and GPS location systems to
20 notice -- to know where the vehicle is located in space
21 and time at any point, true?
22    A.  I mean, for the uses that are listed that were
23 there, road class, road curvature, lanes.
24    Q.  Right.  And for purposes of the collision
25 avoidance assistance technology, map data and GPS data is

**Page 129**

1   used for purposes of evaluating road class and telemetry.
2   Telemetry just being generically describing as, what, the
3   transmission of data back to the mother ship?
4       A.   Yeah, that's fair.
5       Q.   Okay.  And speed assist similarly uses GPS and
6   navigation data to determine the speed limit of a
7   particular road that a vehicle on autopilot might be
8   operating on, true?
9       A.   Yes.  Along with the camera readings.
10      Q.   I recognize that.  Sure.  And 3117, the second
11  to last page of the document that I've marked as
12  Exhibit 3, talks about the GNSS antenna and systems and
13  the way it has kind of evolved over Gen 1, 2, 2.5, and 3,
14  correct?
15      A.   Correct.
16      Q.   Okay.  So the vehicle, when under autopilot --
17  we're talking about Model S running 2.5 -- has the
18  ability to know, and therefore for Tesla to know, based
19  upon telemetry data, whether or not it is operating
20  outside of the ODD specified to the customer by Tesla,
21  true?
22          MR. T. BRANIGAN:   Objection, form.
23      A.   You're using the term "ODD," so I'm not sure how
24  to answer that question.  You're -- are you referring to
25  the road classes that are detected by the vehicle?  Is it

**Page 131**

1   from -- from our mother ship, like you called it.
2       Q.   Fair enough.  But you do know road
3   classifications, true, based upon D16?
4       A.   Well, D16 is triggered in an event of a
5   collision; otherwise, it's anonymized.  So --
6       Q.   Right.  No, no.  And that -- that's my question.
7   I'm sorry.  To the extent I was -- you interpreted it or
8   assumed I was asking about a specific vehicle, I was not
9   I understand that D16 data is anonymized.
10          And so is it fair that at pretty much -- you
11  know, at any given point, any hour of the day, Tesla is
12  receiving D16 telemetry streams from its vehicles that
13  tell it whether or not autopilot was engaged and the road
14  types that it was engaged upon?
15      A.   If the vehicle is able to send the D16 subject
16  to connectivity, we will have information as to the road
17  class that the vehicle traveled through as well as the
18  autopilot use.
19      Q.   And that's at every turn of every drive cycle?
20      A.   It's designed to trigger at the end of every
21  drive cycle.
22      Q.   Right.  In addition to accidents.  Okay.
23          So as of 2019, Tesla was well aware based upon
24  data it was receiving on the regular -- and I'm, notice,
25  using "on the regular" as opposed to "streamed" -- it was

P-
Witness
is not
unavail
able to
Tesla
per
FCRP
32(a)(4)
and this
is not
for
complet
eness

**Page 130**

1   your question is if Tesla is able to detect road classes?
2       Q.   (By Mr. Schreiber)  Mr. Rubio, you know that's
3   not my question, sir.  I qualified the term "ODD" because
4   I know that Tesla is allergic to it, so I qualified it to
5   refer to the design domain -- I've been standing for a
6   few hours.  It's time to sit.
7           I qualified it to refer to the ODD recommended
8   by Tesla -- specified to customers by Tesla, and now I've
9   lost my train of thought.  So my question, more
10  fundamentally, is:  You would agree that Tesla knows, at
11  any point in time, that the road classification and the
12  actual location of its vehicles, its fleet, based upon
13  the telemetry data that it receives through both the GPS
14  and other related systems and streams of data?
15      A.   No, I can't agree with that.
16      Q.   Why not?
17      A.   Because GPS location is not shared in real time
18  with -- with Tesla.
19      Q.   Okay.  How often is it shared, if at all?
20      A.   In an event of a collision, I believe, if -- if
21  the collision has a -- an airbag deployment or a
22  pyrotechnic device deployment or a pretensioner, in that
23  situation, GPS location is shared and -- yeah, I'm not --
24  I'm not sure if there are any others, but we -- we do not
25  have the location of our vehicles in real time from --

P- Witness
is not unavailable
to Tesla per
FCRP 32(a)(4)
and this is not
for
completeness.

**Page 132**

1   receiving data on the regular about whether or not its
2   vehicles on autopilot were being used on controlled-
3   access highways versus surface streets versus any of the
4   other number of, I believe, six classes of roadway that
5   Tesla utilizes as a part of this analysis, true?
6       A.   We received information as to the road classes
7   in which the vehicle traveled, yes.
8       Q.   And there are six classes, correct?
9       A.   That's my understanding.
10      Q.   Walk us through them.  What are they, 1 through
11  6?
12      A.   If I remember correctly, there is Road Class 1,
13  which is a major highway; Road Class 2, which is
14  considered a minor highway.  Road Class 3 is a main
15  street or a -- basically a main street that go along
16  between cities or through cities --
17      Q.   I'm sorry, say that one again.  I apol- -- I
18  didn't mean to interrupt you, sir.  I just didn't
19  understand what you said.
20      A.   Yeah.  So it's -- it's a main street that can be
21  either --
22      Q.   A main street?
23      A.   -- an inner ci- -- main street, yeah.
24      Q.   Okay.
25      A.   Then we have Road Class 4 that connects,

**133**

1  basically, main streets.  Road Class 5 will be considered
2  **a residential road, and Road Class 6 will be considered**
3  **a -- a restricted road, such as a parking lot.**
4      Q.  And so based upon these data streams in 2019,
5  Tesla was receiving, in regular and consistent intervals,
6  data as to the use of its vehicles on autopilot in all
7  six classes of roadway, day in, day out, 365 days a year,
8  true?
9      **A.  I mean, I'm not sure the bulk of the data that**
10  **we were retrieving or processing for -- for that purpose,**
11  **but generally speaking, we were able to retrieve**
12  **information related to road class.**
13      Q.  Describe for me -- and in fairness,
14  autopilot running Hardware 2.5 on a Model S, and I'm
15  talking about autosteer, traffic-aware cruise control,
16  frontal collision warning, you name it -- the -- the
17  the autopilot suite on the subject vehicle, okay, let's
18  just -- just use that as an example.
19      It was specified to consumers at that time that
20  it should generally be used in highway settings, Class 1,
21  maybe Class 2; is that true?
22      **A.  As well as being suitable for other road types,**
23  **while slow-moving traffic, as it is mentioned in the user**
24  **agreement that we have visited.  While being attentive,**
25  **of course, that's an important part.**

**135**

1  that what pops up for autosteer?
2      A.  Correct.
3      Q.  Okay.  Did Tesla, prior to 2019, have any
4  ability to restrict or modify the subject systems'
5  operational characteristics if it found that it was
6  operating on a main street, a connector street, or a
7  residential road that was not, in fact, slow-moving
8  traffic; in other words, being operated outside of the
9  recommended road classification?
10      **A.  Well, there's no restrictions that -- there's no**
11  **restrictions based on geofencing for -- for autosteer**
12  **to -- to -- to be engaged.  There are restrictions**
13  **related to the inputs that the vehicle can have.  So if**
14  **you're in a parking lot, most likely you're not going to**
15  **have lane lines or enough -- or sufficient vehicle inputs**
16  **to engage autosteer.**
17      **But as to geofencing restrictions, no.  This is**
18  **a Level 2 that relies on the driver for -- for the**
19  **engagement.  We do tell them, a lot of times and**
20  **repetitively, that it's intended for highway and limited-**
21  **access roads as well as slow-moving traffic.  But**
22  **generally speaking, it's -- it's -- it's their**
23  **responsibility to engage it because it's a Level 2**
24  **system.**
25      Q.  Would, prior to 2019, there be additional driver

P- Witness is not unavailable to Tesla per FCRP 32(a)(4) and
this is not offered for completeness.

**134**

1      Q.  So it was recommended, specified that it should
2  only be used on Class 1 or Class 2 roadways, but you're
3  saying it could be used on 3 through 6 in slow traffic;
4  that's what the user agreement said?
5      A.  Well, again, there's --
6      MR. T. BRANIGAN:  Let me just --
7      A.  -- no --
8      MR. T. BRANIGAN:  Let me --
9      A.  -- limitation --
10      MR. T. BRANIGAN:  Sorry, sir.  Objection to
11  form.  It mischaracterizes the witness's earlier
12  testimony and user agreement reference.  But go ahead,
13  sir.
14      **A.  Well, the user agreement says that it is**
15  **intended for use in highway and limited-access road --**
16  **roads, and it might be suitable also to be used on**
17  **slow- -- during slow-moving traffic and other types of**
18  **roads.**
19      Q.  (By Mr. Schreiber) And that's the user agreement
20  for which feature?
21      **A.  The one that we have read just a bit ago.**
22      Q.  For --
23      **A.  Exhibit --**
24      Q.  -- for -- yeah, for -- that's for -- you hit
25  driver-assistance features and then you hit autosteer, is

**136**

1  warnings or any adjustment to the way the driver engages
2  with the system had they attempted to use autosteer on
3  something other than a Class 1 roadway?
4      **A.  Well, as stated in the owner's manual, if you**
5  **decide to use autosteer in -- in highways or -- or**
6  **non- -- non-divided highways or other streets, if the**
7  **vehicle's able to detect that that is a restricted speed**
8  **area, it will restri- -- restrict the speed of the -- of**
9  **the -- of the autosteer feature or the set speed of the**
10  **autosteer feature, and we actually see that in the**
11  **diagnostic log data for -- for this vehicle on the day --**
12  **or the drive cycle of the -- of the incident.**
13      Q.  That's a good segue.  So what was the class of
14  roadway that this accident happened upon?
15      **A.  As detected by the vehicle?**
16      Q.  Yes.
17      **A.  I believe it was Class 5.**
18      Q.  Is there any reason why, prior to 2019, there
19  was not a line of code written within autosteer that
20  prevented it from being used on a Class 5 roadway?
21      **A.  The reason is because autosteer is a driver-**
22  **assistance Level 2 system that relies on driver for its**
23  **engagement and operation, Counsel.**
24      Q.  And so that was a choice made by Tesla that it
25  did not restrict the use of autosteer on a Level 5 or

**137**

1 Type 5 roadway before April of 2019, correct?
2 A. I mean, sitting here, I wouldn't be able to
3 evaluate the feasibility of -- of adding that restriction
4 to the engagement of autosteer because, as -- as you have
5 read, there are certain limitations that apply to GPS as
6 well as the information that navigation systems provide.
7 So I -- I wouldn't be able to evaluate the
8 feasibility of adding that -- that additional
9 restriction, but, again, we are talking about that it's
10 the drivers responsible for -- for engaging it.
11 Q. So, again, it's the driver's fault, correct?
12 MR. T. BRANIGAN: Objection, form.
13 Mischaracterizes the testimony.
14 A. What is the -- the driver's fault? I mean --
15 Q. (By Mr. Schreiber) Using the --
16 A. -- we have a lot of driving.
17 Q. Using autopilot on a road classification that it
18 was not designed for, that is a decision that the driver
19 is allowed to make and was allowed to make in 2019,
20 correct?
21 A. The driver is responsible and was -- in 2019,
22 was responsible for making a decision to attempt to
23 engage autosteer; and if the inputs were there, the lane
24 lines were there, and the vehicle had sufficient inputs
25 to engage, the driver will be able to engage autosteer

**138**

1 and will be instructed to keep the hands on the wheel and
2 be attentive.
3 Q. Okay. Hold on. Well, you know what, we'll skip
4 that. I forgot we have this as a later topic. All
5 right. Let's move forward. We'll move on to Topic 5.
6 Oh, one question I forgot to ask you earlier,
7 just going to jump back. This was on -- I believe it was
8 Exhibit 156. Give me a moment. Is there any way -- I'm
9 just going to ask the question while I'm pulling it up.
10 But if you want to look at the document, just say when.
11 That's no problem.
12 When Tesla was doing the analysis of the
13 autopilot at-fault cases, that was done, you said, by
14 human labeling, right?
15 MR. T. BRANIGAN: Objection, form. I think that
16 mischaracterizes the earlier testimony on the issue.
17 Go ahead, sir.
18 Q. (By Mr. Schreiber) I'm just looking at it here,
19 sir. I was -- I'm not trying to misrepresent or -- or
20 mischaracterize anything. It just said AP at-fault
21 collisions human labeled, 635. Do you see that?
22 A. That my understanding is that those were
23 manually labeled.
24 Q. Right. And so what data sources were they using
25 to -- to make that? That would have been telemetry data,

**139**

1 video clips --
2 A. That -- that will depend on the data that will
3 be available for each of those collisions, I -- I
4 believe.
5 Q. Is there a way to go back and actually identify,
6 was all of that data anonymized, to your knowledge?
7 A. I'm not sure, but I can try -- I'm not sure.
8 Most likely was anonymized, but I -- I'm -- I'm not sure,
9 actually. I can't answer. I can't answer that.
10 Q. Okay. But Han and Pete, who were involved in
11 this, would probably be the ones who might know?
12 MR. T. BRANIGAN: Objection, calls for
13 speculation. Lack of foundation.
14 A. I'm not sure they will know.
15 Q. (By Mr. Schreiber) Well, if you wanted to find
16 out, who would you call or email or text or Slack?
17 A. If I wanted to find out whether data from those
18 colli- -- or those collision -- like, data from those
19 collisions -- or what data from those collisions is
20 available nowadays?
21 Q. Yeah, and how they went about labeling and how
22 they made the determination of fault, and all that stuff.
23 All the stuff we talked about an hour or so ago.
24 A. If I wanted to look for data for a specific VIN,
25 or a collision that happened at that time, I would do

**140**

1 that myself and -- you know, otherwise, I will ask the
2 autopilot team.
3 Q. Who on the autopilot team today would you ask?
4 A. About specifically labeling or back in 2019?
5 Q. All the things I just asked you about, sir.
6 A. I'm not sure. It's -- it's -- it's a lot of
7 topics. I'm not sure. I will try to find out who -- who
8 was involved at that time and -- and try to find out, but
9 I don't know at this time.
10 Q. As it relates to the various road
11 classifications, would it be your expectation that
12 autopilot's efficacy and function and safety would be
13 reduced as you went from a Classification 1, major
14 highway, down to a residential road or a parking lot at
15 Levels 5 and 6?
16 MR. T. BRANIGAN: Objection, form. Vague,
17 compound.
18 A. I -- I can't make that determination just based
19 on -- on what you're saying. It de- -- it completely
20 depends on the exposure that the vehicle will have for
21 the given time, the surroundings, the -- the inputs, et
22 cetera, et cetera.
23 Q. (By Mr. Schreiber) Based upon your work on the
24 incident review team, have you discovered that autopilot
25 failures resulting in collisions are higher on

1 Classification 4 through 6 roads as opposed to 1 through
2 3 roads?
3     MR. T. BRANIGAN:   Same objections.  Vague,
4 compound.
5     **A.   Autopilot failures, or -- or faults, rather,**
6 **they -- when there is a fault on the -- on the autopilot**
7 **computer, or even any of the sensors, the vehicle is**
8 **designed to detect that fault and make autopilot**
9 **unavailable at that time, triggering a -- a TOI, an**
10 **intervention for the driver.  So, yeah, I don't see that**
11 **scenario happening.**
12     **Q.  (By Mr. Schreiber)** That doesn't answer my
13 question, but I'll take your nonanswer and roll it back
14 up and toss it back to you.
15     Have you found, in your experience reviewing
16 data for the incident review team, that there are more
17 TOIs -- which, again, anyone who's reading this later,
18 "take over immediately," right, that's what that means?
19     **A.  Correct.**
20     **Q.** Are there more TOIs that occur on
21 Classification 1 and 2 roadways as opposed to 4 and 5, or
22 how would you characterize it?
23     MR. T. BRANIGAN:   Objection to form -- sorry,
24 sir.  With respect to what aspect of autopilot?  Any
25 aspect of autopilot which, as you know, involves a

1 variety of different features that can work independent
2 from each other?
3     MR. SCHREIBER:   Yes, any variety of them
4 triggering a driver warning to take over immediately.
5     **Q.  (By Mr. Schreiber)** Does that happen more on
6 major highways or connector streets and residential
7 roads?
8     **A.  I don't have an answer for you as you're sitting**
9 **here.  I wouldn't be able to -- to tell you.  But when**
10 **I -- when I review incident claims, I usually don't look**
11 **at the specific road class, so -- so, yeah, I wouldn't be**
12 **able to tell.**
13     **Q.** But you are sitting here as the corporate
14 representative of Tesla on autopilot use restrictions
15 with respect to where in time and space the system can be
16 used.  So as a part of that effort, did you -- as a part
17 of that role, did you not engage in any effort to
18 determine whether or not certain road classifications
19 have greater frequency of TOIs than other road
20 classifications?
21     MR. T. BRANIGAN:   Objection to form.  It's
22 beyond the scope of the notice, not called out as an
23 issue for the witness to be a corporate representative
24 on, so I object to the question in that regard.
25     The witness can answer as a fact witness.

1     **A.   That's correct, Counsel, I did not do the --**
2 **the -- I did not run a project that will -- that will**
3 **include the analysis of an entire fleet of data over an**
4 **entire period of time to evaluate whether we have more**
5 **"take over immediately -- immediately" in certain road**
6 **classes.  I haven't done that work in preparation for**
7 **this deposition.**
8     **Q.  (By Mr. Schreiber)** But you could do it, correct?
9     **A.  Excuse me?**
10     **Q.** It could be done, true?
11     **A.  I'm not sure how feasible will that be.  The**
12 **data nowadays is -- is anonymized, or we don't preserve**
13 **data for longer -- longest -- longer -- long periods of**
14 **time due to privacy reasons.  So if we are looking back**
15 **at 2018, 2019, 2020, I doubt that we'll -- we'll have**
16 **sufficient data in order to perform an analysis, and it**
17 **will for sure require a big amount of work.**
18     **Q.** Okay.  Let's move on to Topic 5, driver
19 monitoring systems.
20     **A.  When you get the chance, Counsel, another five**
21 **or ten will be great.**
22     **Q.** I'd -- Mr. Blanco, I'd love to give you ten.
23 I -- you weren't on the email exchange yesterday.  I am
24 not usually this type of harsh taskmaster.  I'm routinely
25 willing to give people whatever they want and need, and

1 that includes both the witness and the reporter.
2     But I've been told I have to finish at 4:30
3 Eastern because that's 10:30 wherever you are in the
4 world.  So we've done two five-minutes.  I can give you
5 one more five-minute.  It is 9:56, or 12:56 Eastern Time.
6 Can we be back in five?
7     **A.  Okay.**
8     MR. SCHREIBER:   And unless y'all -- unless y'all
9 want to give me a little more wiggle, I'll -- I'll take
10 it.  And I'm not looking to run this thing long.  I'm
11 just saying, if we want to give people some reasonable
12 bathroom breaks, stretch their legs, I'm willing to do it
13 if that means we run over an extra 15 minutes.
14     But if that's not something that Tesla doesn't
15 want to bend on, then I just want you to be clear,
16 Mr. Blanco, don't blame me.
17     MR. T. BRANIGAN:   It's 12:57.  We'll be back in
18 five.
19     MR. SCHREIBER:   Thanks.
20     THE VIDEOGRAPHER:   Off the record at 11:57
21 Central.
22     *(Recess from 11:57 a.m. to 12:05 p.m.)*
23     THE VIDEOGRAPHER:   On the record, 12:05 p.m.
24     **Q.  (By Mr. Schreiber)** All right.  Mr. Blanco -- and
25 is it okay if I sometimes call you Mr. Blanco as opposed

**145**

1  to Rubio Blanco?  Is that, like, offensive to you or
2  anything, sir?
3      **A.  I rather go by Mr. Rubio just because it's my**
4  **first last name, so...**
5      Q.  Okay.  That -- oh, we'd rather go by Rubio as
6  opposed to Blanco.  That's why I ask the question.  I
7  don't like -- I don't like butchering people's names.
8      **A.  No problem.**
9      Q.  I don't like calling people by the wrong name.
10  I just think that's just a common decency, whether we're
11  in life or in law.  So as a fallback, then, I apologize.
12  I've been calling you Mr. Blanco, going with the last
13  last name, under my, you know, Americanized thing.
14      But all -- if I don't call you Rubio Blanco,
15  I'll call you Rubio.  All right, Mr. Rubio?
16      **A.  That sounds good.**
17      Q.  Thank you, sir.
18      **A.  Thank you.**
19      Q.  All right.  Topic 5, driver monitoring systems
20  development of autopilot and autosteer not otherwise
21  covered in Mr. Phatak's deposition.  And rather than,
22  again, general categories, there is painstaking
23  specificity and a series of letters and -- and
24  romanettes.  Got to love Slavik and his use of the
25  romanette.

**146**

1      And a Tesla response.  I'm not showing it to
2  you, am I?  No.  That's one of those moments.  Bear with
3  me.  Oh, wrong one.  Waah, waah.  Those are the things
4  I'm going to talk to you about.  You probably could have
5  predicted most of them, though.
6      Adobe, that's it.  All right.  So what this
7  tells me -- sorry.  So this is (a) through (p), driver
8  monitoring systems, basically everything that's keeping
9  an eye on the driver and things that they're telling you
10  vis-a-vis the autopilot suite, including autosteer; why
11  you have certain detection systems, why you don't, which
12  evaluated, blah, blah, blah.
13      I understand that Tesla's claiming it will not
14  produce a witness -- oh, let me get to your response --
15  will not produce a witness regarding the recall nor on
16  topics (h) through (n), which were relative to the NTSB
17  investigation, at least (k) is, and some other stuff.
18      But will produce one with respect to driver
19  man- -- the driver monitoring system of the subject
20  vehicle, alternative methods evaluated, dates and details
21  of changes, knowledge that warnings can be ignored, and
22  warnings and instructions given.
23      Okay.  I'm going to draw your attention, sir --
24  ah, there we go.  Now I can see.  I draw your attention
25  to what was previously marked -- oh, here's 233.  Okay.

**147**

1      So this is probably a spot where Branigan and I are going
2  to have to do the thing, and so I'm previewing for you.
3  But with respect to --
4      MR. SCHREIBER:  I've -- I've read your
5  objection, obviously, Counsel, and I've shared it, marked
6  it as an exhibit.  Exhibit 233 is the safety
7  recommendation 17-041.  It also discusses 17-042, which
8  is a driver monitoring issue.
9      In fairness, you all have objected to this.
10  Obviously, as it relates to both design domain issues,
11  whether those be specified by Tesla or kind of just the
12  more standard understanding of that issue, or as it
13  relates to driver monitoring, I think it is directly
14  relevant to the issues at stake and at play in this case.
15      But I also recognize, Mr. Branigan, that you all
16  have objected to us inquiring and are presumably going to
17  tell me that this witness is not here to testify about
18  these issues based upon those objections.
19      MR. T. BRANIGAN:  Right.  And I'm only seeing a
20  portion of the total document that you're scrolling
21  through, but I don't -- and what I'm seeing is that --
22  oh -- okay, here we go.
23      MR. SCHREIBER:  Yeah.
24      MR. T. BRANIGAN:  Earlier, I was not seeing a
25  reference to the NTSB recommendations that are referred

**148**

1  to in the notice.  Now I see them, so...
2      So we stand on our objections.  The witness can
3  answer questions about the parts of this topic, Topic 5,
4  that we objected to as a fact witness, if he can, but his
5  wit- -- his testimony would not be represent- --
6  represe- -- as a representative of Tesla.  Sorry.
7      MR. SCHREIBER:  Well, he did also -- and -- and
8  I -- I didn't go into this then.  I -- I had thought
9  about going into it at each time, but I wasn't going to
10  beat a dead horse.  So I dropped it down in my
11  preparations.
12      It would also have been relevant and, I think,
13  was called out in Topic 1, which you have objected to
14  writ large, and also in Topic 2, as it related to the
15  development of updates of autopilot and kind of use
16  restrictions prior to our incident.  I think it also
17  would have actually been responsive to Topic 4, as it
18  relates to this issue of design domain.
19      All that is to say, these recommendations which
20  involve the limiting of the use of autonomous -- of
21  autopilot for the conditions upon which they were
22  designed, and developing applications to more effectively
23  sense the driver's level of engagement and to alert them
24  when they are lacking, are both central tenets to the
25  design defect areas alleged in this litigation; and they

149

1  clearly predate this litigation and this incident by
2  several years.
3      So I share that to say, I'll ask the witness
4  questions about it to the extent you give me some leeway
5  as a person, but I need to know Tesla's position relative
6  to that, and I understand you all have objected to our
7  ability to do that as of today.
8      MR. T. BRANIGAN:  Well, we've objected for the
9  reasons stated in the notice.  But knowing Tesla's
10  position concerning NTSB recommendations H-17-41 and 42
11  is something you don't need a witness for, because
12  Tesla's position about those recommendations really is --
13  is publicly available.
14      So Tesla's positions about those things have
15  been ma- -- have been said before in public.  They are
16  what they are.  Mr. Rubio Blanco can answer questions as
17  a fact witness about these recommendations that -- as far
18  as Topic 5 goes, or subpart (k), but we object to him
19  answering questions as a corporate rep.
20      And in the interest of time, I -- I -- I don't
21  have anything more to say beyond what I've said, and --
22      MR. SCHREIBER:  Fair.  Well, I just -- number
23  one, just so I don't forget it, I just ask Madame
24  Reporter if we could just mark the transcript because
25  this will be my mental note to come back to this section.

150

1      Secondarily, Mr. Branigan, I struggle with the
2  notion that we don't need a witness and that Tesla's
3  responses exist in the public domain as if I can just
4  simply open up a binder and -- and pop out a document
5  that's on Tesla letterhead and hand it to the jury to
6  consider, right?  You -- you and I both know well enough
7  that that is not what the rules of evidence, either the
8  federal rules or the rules in any other state, would
9  allow us to do.
10      So, invariably, I do respectfully disagree with
11  the -- the statement that, Well, documents speak for
12  themselves.  If documents spoke for themselves, then
13  there wouldn't be a need for guys like you and I, or
14  Ms. Cruz or Mr. Poses.  We would just hand the binder of
15  stuff, all the exhibits to the jury and say, Y'all figure
16  it out and let us know what you think.
17      So I'm actually going to go really quick through
18  this because I do believe we are entitled and should
19  receive a corporate representative on this issue.  I
20  understand, but disagree with the position, fair?  And I
21  don't want to cut you off, Mr. Branigan, if you have
22  anything else you want to add to this issue for purposes
23  of this record.
24      MR. T. BRANIGAN:  I don't have anything else to
25  add.  I think we've said what we need to say.

151

1      MR. SCHREIBER:  Fair enough.
2      Q.  (By Mr. Schreiber) So you are aware, Mr. Blanco,
3  as a senior product engineer, you didn't even show up on
4  the scene, however.  You -- you -- you were still
5  obtaining your master's degree in engineering when these
6  recommendations were issued in 2017, correct?
7      A.  I was not -- I was not at Tesla when these
8  recommendations were issued, correct.
9      Q.  You weren't even a licensed engineer in the
10  state of California at that time, were you?
11      A.  I was not.
12      Q.  So you understand that the government, through
13  the NTSB, was investigating Tesla and evaluating whether
14  or not they incorporated appropriate system safeguards to
15  limit the use of aut- -- automated vehicle control
16  systems for the conditions upon which they were designed.
17      That's -- that's 17-41.  And similarly, under
18  17-42, were being investigated as to development of
19  applications to more effectively sense driver engagement
20  and to alert them when that engagement was lacking during
21  autonomous use; do you understand that?
22      MR. T. BRANIGAN:  Objection to form.  It
23  misstates the -- the question misstates the scope of the
24  NTSB investigation.  Go ahead, sir, you can answer as a
25  fact witness, if you know.

152

1      A.  I mean, as I understand this to be, this was a
2  recommendation that was issued as a result of an
3  investigation due to a collision that occurred.  At that
4  time, there wasn't an investigation of autopilot systems
5  or -- or anything like that, like you -- like you
6  mentioned, but the investigation for -- of those events
7  triggered a series of -- of -- of recommendations by the
8  NTSB.
9      Q.  (By Mr. Schreiber) All right.  And -- and that
10  was the investigation from the Banner case which happened
11  in Florida, true?
12      A.  Correct.  That's my understanding.
13      Q.  And you testified as the corporate
14  representative for Tesla in Banner, true?
15      A.  In a series of topics, of course, yes.
16      Q.  Did any of the topics that you testified to in
17  Banner have anything to do with the NTSB investigation
18  17-41 or 17-42?
19      A.  Not specifically about the investigation, I
20  don't think.  No.
21      Q.  What about government investigations regarding
22  autopilot failures at all with respect to Banner?
23      MR. T. BRANIGAN:  Object to the form of the
24  question.  Vague.
25      A.  I mean, that -- that wasn't a topic as you -- as

**153**

1  you have named it.  I -- I can't recall the deposition
2  notice at this time.
3      Q.  (By Mr. Schreiber)  Well, you reviewed the
4  deposition that you gave in Banner, to prepare for your
5  deposition today, true?
6      A.  Yeah.  I reviewed portions of it, but I don't
7  remember discussing these -- the safety recommendations,
8  no.
9      Q.  What portions of it did you review and why?
10     A.  Oh, I just scrolled through the transcript,
11  frankly, so...
12     Q.  So did you just gloss over it, or did you read
13  it in any detail?
14     A.  Not -- not in detail.  I just reviewed it -- or
15  reviewed the transcript, and, again, I did not read
16  anything about safety recommendations.  I -- I don't
17  think we discussed it when -- during that deposition.
18     Q.  So you skimmed it?
19     A.  I'm not sure how to classify it, but, yeah,
20  that's what --
21     Q.  How would you classify it?
22     A.  Yeah.  Like a -- like -- like a review, but
23  not -- I didn't read every line of -- of the deposition.
24  But as I -- as I remember it, I didn't talk about the
25  NTSB recommendations, if I remember correctly.

**155**

1  have testified as a corporate representative previously
2  with respect to the safety recommendations made by
3  NHTSA -- excuse me, with respect to the NTSB, made by the
4  NTSB, relative to SAE Level 2 autonomous driving systems
5  that were directed at Tesla and other manufacturers at
6  the time, true?
7     A.  I am aware of the recommendations, yes.
8     Q.  And in response to those recommendations, you
9  are aware they were made to Tesla and five other
10  manufacturers that were developing Level 2 driving
11  automation systems, and that the other five manufacturers
12  responded, describing the actions they plan to take to
13  better monitor a driver's level of engagement; and Tesla
14  is the only manufacturer that did not officially respond
15  about this recommendation.  Are you aware of that, sir?
16     A.  Yes, I am.
17     Q.  And that while awaiting that response, a crash
18  nearly identical to the Banner crash occurred in Delray
19  Beach, Florida, where a vehicle did not appreciate cross
20  traffic, was operating outside of autopilot's ODD, and a
21  crash occurred; you're aware of that?
22     A.  I can't agree that the -- the -- the crash that
23  you're describing is nearly identical to -- to the other
24  crash.
25     Q.  It ain't my words.  A crash nearly identical,

**154**

1     Q.  You do recall that you testified in that
2  proceeding about NHTSA's investigation of the Williston,
3  Florida crash, true?
4     A.  The NTSB investigation, if I -- if I recall
5  correctly, that was the -- the topic that I -- that I
6  discussed.
7     Q.  Oh, so the NTSB investigation which was done and
8  ultimately became a part of 17-041 and 17-042, correct?
9     A.  My testimony was limited to the NTSB
10  investigation, if I recall correctly, and that's what
11  I -- what I had reviewed at that time, both NTSB's
12  investigation for -- related to those events.
13     Q.  Right.  But the Banner crash was one of the
14  foundational investigations that became part of the NTSB
15  investigation known -- and their safety recommendations
16  known as 17-41 and 17-42, right?
17     A.  I don't know that, Counsel.  I mean, again, I --
18  my -- my involvement was limited to reviewing the NTSB
19  investigation of the crash.
20     Q.  And you're sure that your testimony in Banner
21  had to do with Tesla's response and determination of
22  cause relative to the NTSB and not NHTSA?
23     A.  That's as I recall it, Counsel.  I'm not sure at
24  this time.
25     Q.  So let's go back.  So you are then aware and

**156**

1  that's the NTSB's words.  Do you disagree with the NTSB
2  and their conclusion that while awaiting for Tesla's
3  nonresponse, a crash nearly identical to Banner occurred
4  in Delray Beach, Florida in 2019?
5     A.  Yes, I -- I have to disagree, because those
6  crashes weren't identical or nearly identical.  They were
7  different vehicles running different hardware, different
8  software, and different autopilot versions.
9     Q.  And they were on different roads and they were
10  probably a different color, and the drivers were
11  different humans and there was probably different
12  weather.  And yet despite that, the federal government,
13  through the NTSB, refers to them as nearly identical, but
14  you disagree with that; isn't that --
15     MR. T. BRANIGAN:  You just -- Counsel, you know,
16  this is one of the reasons that we're taking as much time
17  as we're taking, because you keep asking questions that
18  he's answered.  He's answered that he -- he disagrees,
19  and he told you why.  So why ask him again --
20     MR. SCHREIBER:  And I --
21     MR. T. BRANIGAN:  Counsel, it's your time,
22  but -- you know, you complained about the constraints in
23  your time, and yet you ask the same question that's been
24  answered.  So I object to -- to the repetitive nature of
25  your questions.  It's -- it's -- it -- it gets to a point

1  where it's just abusive to the witness and the process.
2         MR. SCHREIBER:   Thank you for the speech,
3  Mr. Branigan.  Respectfully disagree.  I'm asking follow-
4  up questions and challenging some of the assumptions and
5  statements made.  I've also found that through the course
6  of this proceeding, every one of your speaking objections
7  is a lovely wink, nod, and cue to Mr. Blanco, who's
8  probably going to now tell me, you know, I've already
9  answered that question.
10        So why don't we go ahead, I'll do my best to
11  keep my questions short, si- -- succinct, and precise,
12  and you go ahead and turn down the speaking objections,
13  and we'll still get this puppy done by 4:35 Eastern
14  Standard Time.  Deal?
15        MR. T. BRANIGAN:   If you -- if you would do what
16  you just committed to do, I probably won't need to make
17  objections of any sort.
18        Q.  (By Mr. Schreiber)  There was a question that was
19  so damn long ago, it's probably -- I'm not -- I'm not
20  going to ask --
21        A.  I remember.
22        Q.  -- to repeat it back because it was, like,
23  five pages ago.  Do you remember it, Mr. Blanco?
24        A.  Yes.  I mean, you were basically asking me if --
25  if I disagree or -- and why.  And, I mean, I don't know

1  roadways with inconsistent lane markings.
2         That is the conclusion of the National
3  Transportation Safety Board as of 2017 when it issued
4  this initial recommendation; is that true, Mr. Blanco?
5         A.  That seems to be the conclusion that you're
6  reading off the document.
7         Q.  And then, just like today, Tesla stated that
8  safety is always the primary design requirement.  You
9  would agree with that, would you not, sir, that was as
10  true then as it is now?
11        A.  I mean, safety is very important for -- for
12  Tesla and has been always one of our -- if not the main
13  priority.  But, again, this line of questioning, I'm --
14  I'm speaking as -- as -- as myself, not -- not as a
15  corporate representative.  This is the first time I -- I
16  see this document, Counsel.
17        Q.  That's not true, sir.  You reviewed this
18  document in Volume 2 of your deposition that you gave in
19  the Banner case in 2022.
20        A.  And I don't remember that to be -- to be the
21  case.  But if you tell me that's true, I -- it's possible
22  that I don't recall that document.
23        Q.  Yeah.  If you go back -- I know you only perused
24  it -- or not perused it, because I've learned that's one
25  of those words used in their brief.  Peruse means to read

1  what their criteria is in order to determine that two
2  collisions are nearly identical, but in this case, the
3  vehicles were different.
4         The driver engagement was completely different
5  in both cases.  The hardware that the vehicles were
6  running was different, software-wise is different, too.
7  So in my -- in my criteria, I wouldn't be able to
8  consider those collisions identical or nearly identical,
9  no.
10        Q.  It goes on to say that despite communicating
11  operating conditions and limitations to owners and
12  drivers, Tesla's autopilot firmware does not restrict the
13  system's use based upon functional road classification.
14  Do you see that?
15        A.  I see that.
16        Q.  You would agree with that statement was true
17  prior to this incident, correct?
18        A.  I agree that the autopilot software did not
19  restrict the system based on road classification.
20        Q.  So the system can essentially be used on any
21  road where it can detect lane markings, which allows the
22  drivers to activate the automation system at locations
23  and under circumstances for which the use is not
24  appropriate or safe, such as roadways with cross traffic,
25  or areas that do not consistently meet the ODD such as

1  with exacting detail.  You skimmed it.  But if you go
2  back and skim Page 209, Line 1 through 13, it's where you
3  discuss your familiarity with the NTSB recommendations,
4  including 17-41 and 17-42.
5         Now that I've said that, does that remind you --
6  does that refresh your recollection that, in fact, this
7  ain't the first time you've seen this document?  In fact,
8  you've seen it and were questioned about it for what was
9  probably quite a bit of time back on 11/29/22.
10        A.  If I -- if I remember correctly, those
11  recommendations were part of the NTSB reports that --
12  that related to the collisions, not -- not the actual
13  document that you're showing me.  That's what I was
14  referring to, that I -- I don't believe I've seen before;
15  and if I have, I -- I don't remember.
16        But those safety recommendations are part of
17  other documents, and that is exactly -- like, that is
18  specifically a document that includes other information
19  that I -- I don't believe I -- I have seen before.
20        Q.  Okay.
21        A.  I -- I haven't seen before, these responses, so
22  I -- I don't think -- yeah.
23        Q.  And you didn't see this in your review of Akshay
24  Phatak's deposition, either, or any reference to it?
25        A.  I know there were some discussion about the

**161**

1    recommendations, but I didn't see this -- this exhibit
2    or -- or this document.
3        Q.  Have you ever had any discussions with anybody
4    within Tesla, when we're talking about the development of
5    its driver monitoring systems, to determine whether or
6    not NTSB felt that when it opened this investigation in
7    2017 regarding driver monitoring and appropriate
8    limitations or design domain restrictions on the use of
9    this technology, that as between Volkswagen , BMW, Nissan,
10   Mercedes, and Tesla, the only one who was deemed to
11   provide an unacceptable response was your employer , Tesla
12   Motors; are you aware of that?
13       A.  I believe that was discussed during Akshay's
14   deposition, and that will be the only source of
15   information I have followed, and conversations with --
16   with counsel.
17       Q.  Are any of the engineers on the autopilot team
18   who are involved in responding to the NTSB safety
19   recommendations, or evaluating those recommendations in
20   2017 through 2021, still employed at Tesla today?
21       A.  I don't know who was involved in that process,
22   Counsel, so I wouldn't be able to -- to tell that.
23       Q.  All right.  And we will append Exhibit 233 as an
24   exhibit to your deposition, as well.
25           At the time of this crash in 2019, do you know

**163**

1    be appending 320, and I believe we have already have
2    agreed to append 271.  Let me go back to share.  I knew
3    it was somewhere.  Thanks for the assist, Counsel.
4        Q.  (By Mr. Schreiber)  There you go.  That's easier
5    to see just because those boxes, when photocopied, are
6    harder to read.  Is this, to your knowledge, the time for
7    hands-on warning that was in effect with respect to the
8    driver monitoring system in place on the subject vehicle
9    at the time of the subject incident?
10       A.  No, I don't believe it is.  This is for a prior
11   software version, or that's my understanding, and
12   there -- as stated there, those are all the triggers or
13   conditions that will change or reduce the -- the time
14   conditions, so -- so, yeah.
15           I -- I don't -- I don't believe these ones will
16   be part of the subject vehicle and -- I mean -- and the
17   hands and then also the -- and -- I mean, these are for
18   situations in which the hands of the driver are not
19   detected on the steering wheel ; and upon reviewing the
20   data, we see that the hands of the driver are detected on
21   the steering wheel for approximately 24 seconds prior to
22   the crash being detected by the vehicle.
23       Q.  Okay.  So, wait, say -- say that again.  I --
24   you lost me.  You were talking about the --
25       A.  Yeah.

**162**

1    what the hands-on alert timing was for autosteer on the
2    subject vehicle?  And what I mean by that is the
3    temporal, time between visual cue to audible chimes
4    and/or eventual slowdown.
5        A.  My understanding is that that will depend on --
6    on the inputs that the vehicle have at -- at a given
7    time, as well as speed, road class, and -- other
8    targets that are surrounding the vehicle, so -- yeah.
9    That's my answer.
10       Q.  Okay.  I know it exists elsewhere, but I'm just
11   going to use it here because it's the one at my
12   fingertips.  I have a color version of this, but I don't
13   at the moment.
14           MR. T. BRANIGAN:  So we're on Exhibit 271?
15           MR. SCHREIBER:   This, sir, is from Exhibit 320,
16   and it's copyrighted 2016.  And the -- the one that
17   you've probably seen, that I've seen elsewhere and I just
18   can't remember, has -- this is often in blue, at least
19   these boxes are.  Maybe that rings some bells.  With the
20   assistance --
21           MR. T. BRANIGAN:   I think it's in color in 271,
22   if you want to see it in color.
23           MR. SCHREIBER:  I think it is, too, but I
24   couldn't find it.  Hang on.  Oh, yeah, we were already in
25   271.  That's right.  Yeah.  So that is fine, we will not

**164**

1        Q.  -- limitations, and then you threw in, I think,
2    some data about our crash -- say that again.  I -- you --
3    you lost me.
4        A.  Yeah, no.  But I'm -- I'm just wondering about
5    relevancy since, you know, like, twen- -- 24 seconds
6    prior to the crash -- from 24 seconds prior to the crash,
7    that the hands were detected on -- on the steering wheel
8    in -- in our event.  So if --
9        Q.  Were --
10       A.  -- if we're --
11       Q.  -- were --
12       A.  -- referring to --
13       Q.  I'm sorry.  Were detected or were not detected?
14       A.  They were, yes.
15       Q.  Okay.  That's what I thought.  Just wanted to be
16   sure.
17       A.  Yes.
18       Q.  My question, though, however, is -- and this
19   seems to show speeds and accelerations that, at least at
20   this time, prior to a visual warning, someone could have
21   their hands off the steering wheel for 45 seconds if they
22   were traveling above 45 miles an hour?
23       A.  I mean, depending on the other triggers and
24   conditions that -- that are listed on -- on the right
25   of -- of that page.

1  Q.  All right.  But it's 45 seconds in the U.S. and
2  EU, 25 seconds in HK.  What's that?
3  A.  I'm not sure what that is and where, yeah.
4  Yeah, I'm not sure.
5  Q.  Is it China?  Is it Hong Kong?  I mean, I don't
6  know, were you guys rolling out there back then?  I don't
7  remember.  Who cares, doesn't matter.  It doesn't matter.
8  Going greater than 45 miles an hour, you got
9  45 seconds before you received a visual, true?
10  A.  Depending on the -- the other inputs that the
11  vehicle uses in order to determine the time sequence,
12  Counsel, which are related to inputs, road class, et
13  cetera, et cetera.
14  Q.  And what does this part mean with respect to
15  lead vehicle present, you can go to two to three minutes?
16  What is -- what is that -- what are those circumstances
17  that would allow for a vehicle -- excuse me, for a driver
18  to have their hands off for two to three minutes, whether
19  a lead vehicle was present or not?  Describe.
20  A.  I mean, for -- for this specific software
21  version of our autopilot software, it's -- this document
22  describes that if there are -- if there -- if the vehicle
23  is not over the lateral acceleration limit and is
24  traveling through a road with that central divider, and
25  depending on whether the -- there is a lead vehicle

1  so, yeah.
2  Q.  This was not --
3  A.  Actually, you're muted.
4  Q.  -- clear to me -- yeah, yeah.  This was not --
5  I'll get the mute button eventually.
6  I'm going to refer you to Exhibit 318.  It's a
7  series of emails in 2016, and there's a discussion, there
8  was some graphic -- it was probably some screenshot that
9  was not included -- but a discussion about 15 seconds
10  between hands-on; and what we were just talking about
11  there is the time difference from the visual warning
12  until the time of the first audible chime, correct?
13  A.  I mean, that's usually the case.
14  Q.  Right.
15  A.  The time between hands-on that -- that's usually
16  the case that -- yeah, it refers to that.
17  Q.  And what we were looking at a moment ago with
18  respect to Hardware 2.5, at least in the 2017 time frame,
19  was a 15-second distinction between visual and audible.
20  And in this email exchange between Mr. Musk and
21  Sterling Anderson, he suggests trying 20 seconds, and in
22  response three minutes later, Mr. Anderson tells somebody
23  to change the timing to 20 seconds between visual and
24  Chime 1.  Do you see that?
25  A.  Yes, I see that.  I believe you represented that

166
168

1  present, that the timing sequence will -- will vary
2  between -- or will -- will be up to two and three
3  minute -- two to three minutes, depending also on several
4  other triggers and conditions that apply to the time
5  sequence, which are related to driver input, which are
6  related to vehicle inputs, targets, environment, road
7  class, et cetera.
8  Q.  So all things being equal, without any other
9  input from other systems, you could, at this point, drive
10  for two to three minutes with a lead vehicle in front of
11  you and your hands off the steering wheel while operating
12  under autosteer, true?
13  A.  At that point in time, yes.
14  Q.  How has that changed between this time --
15  A.  I mean, that has changed --
16  Q.  Let me -- let me pause.  How has that changed
17  from the time of this document's creation in 2016 or 2017
18  up and until the time of this accident in 2019?
19  A.  The time sequence has progressively changed and
20  added -- by adding more inputs and changing -- or
21  adapting the -- the time sequence to -- to the presence
22  of -- of those inputs, so that has been progressively
23  changing.  I believe Akshay covered all the progression
24  for -- for -- for that hands-on sequence, and he actually
25  had notes with him that -- that listed the changes, so --

1  the prior time that we visited was for software version
2  that is relevant to the subject vehicle, and I don't
3  believe it is, so I -- I --
4  Q.  You're saying "software version."  Okay.
5  What -- what software version were they running
6  back then, to your knowledge, roughly, in this time
7  period?
8  A.  I believe the first document that you showed me
9  stated that that -- that that was Autopilot 7.1.
10  Q.  There's your depo.  We can come back to that.
11  Here, let's pull that up.  I don't think it did.
12  I think it was...
13  A.  It was actually a document that you didn't mark
14  as an exhibit, but, yeah, same.
15  Q.  Oh, that was the one -- right.  Well -- well,
16  because at the, I think, appropriate suggestion of
17  counsel, I pulled this up, which had to do with
18  Hardware 2.5.  So it seemed to me that this was actually
19  more relevant in time.
20  And so this is what I was trying to understand,
21  the difference between this recommendation as a part of
22  Hardware 2.5, that there's a 15-second separation between
23  visual and audible chime, and that is contained in
24  Exhibit 271, Page 4, or Bates 85345, and Mr. Musk's
25  statement in 318 to change it to 20 seconds.  Which one

**169**

1  was it as of 2019?
2      A.  I'm not sure.  I don't have an answer right now.
3      But it seems like in this situation, they're --
4  they're just testing or -- or trying in -- in the
5  early -- in -- in the engineering fleet as to the visual
6  warning timing, so...
7      Q.  So that was just a discussion within the
8  engineering fleet, and then they would try it out there
9  as essentially a little kind of project, see how it works
10  amongst them, and then slowly begin the -- the
11  development, or the rollout or the pushout, if it turns
12  out to be something that they find is an appropriate kind
13  of development?
14      A.  Yeah.  I mean, there's -- there's other steps
15  towards releasing any feature to the fleet, and --
16      Q.  I -- I know those steps.  I don't need to --
17      A.  -- one of them --
18      Q.  -- I mean, I've read them.  I don't need you to
19  rephrase them.  Okay.  I'm going to show you now
20  Exhibit 319.  Do you see that?
21      A.  I see that.
22      Q.  This has to do with the three strikes and
23  audible sound warnings.  Do you see that, sir?
24      A.  Yeah, I'm -- I'm reading through.
25      Q.  Yeah, please take your time.

**170**

1      A.  Okay.
2      Q.  It starts at the bottom talking about a summary
3  of EAP2 feedback on autopilot.  What does that stand for?
4  What is that acronym?
5      A.  Early access program.
6      Q.  So it's the early access people, right?
7  These are people outside of the engineering and basically
8  kind of your -- your, like, "ride or dies," your -- your
9  kind of beta testers, people who sign up to have
10  access -- early access because they're dyed-in-the-wool
11  Tesla drivers, fair?
12      MR. T. BRANIGAN:   Objection, form.
13  Mischaracterizes --
14      A.  I -- I wouldn't --
15      MR. T. BRANIGAN:  Okay.  Go ahead.
16      A.  I wouldn't describe them as this -- as that.
17  There are people that drive our vehicles, and, you know,
18  most of them are actually ex-employees or -- or
19  employees, that they're driving our vehicles; and they
20  get access to software releases before the -- the entire
21  fleet does, and they provide feedback on -- on those --
22  on those releases.
23      Q.  (By Mr. Schreiber)  Is it your testimony that
24  people who are in the early access program are
25  exclusively made up of Tesla employees and former

**171**

1  employees?
2      MR. T. BRANIGAN:   Objection, form --
3      A.  Not --
4      MR. T. BRANIGAN:   -- misleadingly
5  mischaracterizes what the witness just said.
6      MR. SCHREIBER:   That's why I'm clarifying.
7      A.  Not exclusively.  I didn't say exclusively.  No,
8  it's not exclusively.
9      Q.  (By Mr. Schreiber)  Okay.  What percentage of the
10  early access folks back in, say, two years before this
11  incident were former Tesla or current Tesla employees
12  versus non-Tesla affiliated?
13      A.  I don't have that information, Counsel.
14      Q.  Okay.  And this goes on to discuss this -- the
15  three strikes.  What -- what was the three strikes with
16  respect to the cancellation of autosteer and -- or the
17  deactivation of autosteer due to three strikes by a
18  driver operating under autopilot using that feature?
19      A.  Upon receiving the three strikes, which are the
20  audible warnings, the autosteer will become unavailable.
21      Q.  And had you found occasions before, in
22  situations like this, where if Mr. Musk found that the
23  autosteer chime volumes were too high, that the
24  engineering team would promptly respond by turning down
25  the chimes in response to his request?

**172**

1      MR. T. BRANIGAN:   Objection to the form.  It
2  mischaracterizes the -- it takes out of context the
3  discussions between Mr. Musk and others in the emails
4  that are presented.  Go ahead, sir.
5      A.  What you described is not what's -- what's
6  covered in here, and they're -- they're -- they're
7  just -- Mr. Musk here is clearly is proposing some --
8  some changes, and the engineering team is just testing
9  those changes.  So, you know, that's -- that's how it
10  works, right?  We have a group of engineers.  There are
11  discussions, there are tests, and then all this happens
12  before anything is released to the -- to the fleet.
13      Q.  (By Mr. Schreiber)  And it also looks like there
14  was an issue where they were too aggressive to slow down
15  on cut-ins.  What does that mean?
16      A.  I -- I mean, I can tell you what I interpret,
17  which is, you know, when -- when a vehicle -- cut-in is
18  generally when the vehicle -- when there's a vehicle
19  cutting into the -- the lane right in front of the lead
20  vehicle, or the Tesla vehicle, and in those occasions, it
21  seems like he was considering that we were decelerating
22  at a high rate.
23      Q.  At any point from, let's say, 2017 to the time
24  of this incident in Q1 of 2019, was there any change or
25  development in the "take over immediately" warnings

issued to drivers when a roadway departure was imminent?

A. I mean, the "take over immediately" message, as I -- as I -- if I recall correctly, has always been consistent, so -- so, yeah. I believe there wasn't.

If you're referring purely to the message. I mean, if you're referring to the time sequence up until the "take over immediately," that -- that might have varied over time, of course, as I explained.

Q. Well, I was. So was there any change initiated in terms of the frequency or the timing of the TOI when a roadway departure was imminent, let's say, in the year before this incident?

A. Oh, you're -- you're referring that the -- the "take over immediately" for autopilot aborting, which are road departure, right? But I -- I was referring to the time sequence for hands-off warning, which is a different thing, so...

Q. And I -- I apologize, sir, I did pivot on you, but it all kind of falls under the umbrella. I went off of hands-off, and I was focusing now on other driver monitoring systems kind of writ large, which is the Topic 5 that we're on. So I apologize that I wasn't clear about that pivot.

So with that in mind, could you please answer.

A. Yeah. So that "take over immediately" is not

A. True.

Q. Do you know where he is today?

A. I don't know.

Q. Okay. And what is Autoliv, A-U-T-O-L-I-V?

A. Just reading off the document, it seems to be a company that Nicklas worked for in the past.

Q. And just based upon your experience and training as a product engineer at Tesla, are you -- are you familiar with the business of Autoliv in any way, shape, or form?

A. I am not.

Q. Okay. As a part of your preparation for today, did you have any discussions with Mr. Gustafsson about his prior experience in developing driver monitoring systems for another technology company?

A. I did not.

Q. Okay. And he gives a -- a very high-level summary about the systems that were used, eyes on road, eyelid opening, driver inattentiveness, driver sleepiness, and then talks about, in a semiautonomous state, ways to improve driver reaction for active safety systems. Do you see that?

A. I -- I see that, yeah.

Q. Did you have any conversations with Mr. Gustafsson about these issues and these ideas to

---

174

triggered by a -- a driver monitoring event or -- or the hands of the driver not being in -- in -- in the steering wheel. It is triggered by the vehicle departing the lane.

Q. Got it. We'll talk about drivable space later and kind of how that implicates here.

Oh, you told me at the jump that you met with Nicklas Gustafsson to prepare for your deposition, true?

A. Correct.

Q. And I mentioned then that I had reviewed some documents, and while we're on the subject, we might as well talk about them, which is Exhibit 321, which we will append to your deposition; and you were correct, this is -- Nicklas is spelled N-I-C-K-L-A-S, Gustafsson, G-U-S-T-A-F-S-S-O-N. I think you corrected me on that at the beginning.

And Mr. Gustafsson used to lead an R&D project for driver monitoring at Autoliv, and he chimes into this conversation with Sterling Anderson about this issue. Do you see that?

A. I see that.

Q. Who was Sterling Anderson at the time -- or who is Sterling Anderson? That's a stupid question.

A. I believe he was part of the autopilot team.

Q. No longer part of the autopilot team, true?

176

prepare for your deposition today?

A. I did not.

Q. Are you aware, or are you reading now for the first time, that Mr. Gustafsson, back in 2016, was recommending better -- well, when he was outlining his kind of ideas -- better specificity and sensitivity to longitudinal collision systems triggering AEB or collision warnings earlier if the driver is looking away or has built a sufficiently large inattention buffer; do you see that?

A. I see that, but, I mean, we need to consider that in the context of the email. This is an engineering discussion that he is just, like, providing findings or -- or information about the technology, so not specifically talking about our vehicles.

Q. No. He's talking about a best practice and what was successful at another company as they were developing driver monitoring systems, and so my question for you is: Do you know whether or not Mr. Gustafsson's ideas about triggering AEB and collision warnings earlier if a driver is otherwise looking away or has built in this inattention buffer, was that ever implemented in Tesla's later iterative designs of autopilot and autosteer?

MR. T. BRANIGAN: Objection, form, to the extent it mischaracterizes the true nature of the discussion by

**Page 177**

1  Mr. Gustafsson in the emails.
2      Q.  To answer your question, cabin -- cabin camera
3  wasn't in use for -- for driver monitoring systems up
4  until 2021.  So without the cabin camera that is enabled
5  in order to gauge whether the -- as -- as it states in
6  the email, whether the driver is looking away, you
7  wouldn't be able to implement those -- those things.
8      Q.  (By Mr. Schreiber) Yeah.  But you -- you ignore
9  the "or," which is "or has built a sufficiently large
10 inattention buffer."  Your warning systems, whether it be
11 hands-on or -- or any of the others associated with the
12 autopilot suite that is looking back at the driver -- and
13 when I say "looking back," I mean that in a figurative
14 and not literal sense -- monitoring the driver's
15 behavior, would provide Tesla with information and data
16 to determine if a sufficiently large inattention buffer
17 existed and whether or not it should fire AEB or
18 collision warnings earlier, correct?
19         MR. T. BRANIGAN:  Objection, form.  Vague and
20 completely hypothetical.
21     A.  My understanding is that the activation of
22 forward collision warning or automatic emergency braking
23 were nondependent of the driver monitoring system at that
24 time.
25     Q.  (By Mr. Schreiber) And that was true as of 2019,

**Page 179**

1  situation.
2      Q.  What type of targets was a -- the subject
3  vehicle able to identify when operating under autopilot
4  traveling on the Class 5 roadway it was traveling upon in
5  the 30 seconds prior to this collision?
6         MR. T. BRANIGAN:  I'm sorry.  Can you -- can you
7  restate that from the beginning?  I -- I -- I -- you were
8  a little -- dropped off at the start.  I didn't hear the
9  whole question.  Excuse me.
10        MR. SCHREIBER:  Madame Reporter, did you hear
11 it, and can you read it back?
12        THE REPORTER:  Yes.
13             (The record was read as requested.)
14        MR. T. BRANIGAN:  Type of targets for what
15 purpose; AEB, FCW?
16        MR. SCHREIBER:  All of the above.
17     A.  I wouldn't be able to know.  We have -- we don't
18 have sufficient data in order to evaluate what the
19 vehicle was seeing 30 seconds prior to the intersection,
20 so I wouldn't be able to know what targets the vehicle
21 had.
22     Q.  (By Mr. Schreiber) What information would you
23 need so that you could make that evaluation?
24     A.  I mean, I wouldn't -- I wouldn't be able to --
25 to know that because that's the vehicle -- like, the

**Page 178**

1  as well?
2      A.  That's my understanding.
3      Q.  Is that still true today?
4      A.  Oh, I'm not sure.
5      Q.  Has Tesla changed its driver monitoring system
6  with respect to eye tracking since 2018?
7      A.  Yes.
8      Q.  Why?
9      A.  Cabin camera technology's introduced for driver
10 monitoring in -- I believe it's May 2021.
11     Q.  And do you know whether that driver monitoring,
12 which includes eye tracking, now has any connection with
13 the triggering of AEB or forward collision warnings based
14 upon whether or not the driver is looking towards the
15 road or away, as Mr. Gustafsson discussed back in 2016?
16     A.  No, I don't, Counsel.  I don't come prepared to
17 speak as to those systems running currently, no.
18     Q.  How did the autopilot system, in Q1 of 2019 and
19 a Model S running Hardware 2.5, identify that a roadway
20 departure was imminent?
21     A.  I mean, there's no simple answer to that
22 question.  There's a lot of inputs that goes into the
23 autopilot computer to make that determination, and those
24 start by lane lines, vehicle inputs, targets, et cetera,
25 et cetera.  So it depends on -- on the specific

**Page 180**

1  vehicle systems were running at that time; and in an
2  event of a collision, we're able to retrieve a portion of
3  that data that is relevant for just a few seconds prior
4  to the collision, and it includes limited data that do
5  not include all the targets that the vehicle was
6  detecting.
7      Q.  If you had -- we'll talk more when we get to
8  data, and log data, in a little bit.  But if you had
9  longer video clips, longer than the five or seven seconds
10 that has been produced by Tesla, would you be able to
11 analyze through augmented visual overlay what the vehicle
12 was seeing, what targets it was identifying in, let's
13 say, the 10 or 20 or 30 seconds before this incident?
14        MR. T. BRANIGAN:  Objection, form.  Incomplete
15 hypothetical.
16     A.  My understanding is that that will not be
17 possible.
18     Q.  (By Mr. Schreiber) Why and what do you base that
19 understanding on?
20     A.  Well, in order to run an augmented video or
21 simulation, the -- the system requires to have a series
22 of -- of -- of data from the actual vehicle that -- that
23 wasn't received by Tesla in this -- in this collision.
24     Q.  What data is that?
25     A.  That data is part of the -- the snapshots or --

**181**

1   or the videos that the -- that the vehicle uploads, and
2   sometimes those kind of complement with real-time data
3   values, or activities, as we call it; and -- and with
4   those, the system is able to run an augmented video clip.
5   But in this case, that -- that -- that upload didn't
6   happen.
7      Q.  Video was uploaded, however, true?
8      A.  Correct. And we were able to find the video,
9   but no augmented video.
10     Q.  Well, wait, augmented video doesn't upload. The
11   data points to create augmented video are uploaded, true?
12     A.  Correct. But in our server, we were unable to
13   find augmented video due to the lack of the data that
14   you're referring to.
15     Q.  Right. So you received videos, correct, from
16   this crash?
17     A.  Correct.
18     Q.  You received log data from this crash, correct?
19     A.  Correct.
20     Q.  You had received and were able to obtain D16 log
21   data, or telemetry data, for this drive cycle, correct?
22     A.  D16, yes.
23     Q.  What additional specific type or label of data
24   would have been required to have been uploaded as a part
25   of that snapshot so that an augmented video of this crash

**183**

1   know what the video -- or the data will show in this
2   situation. It depends on the availability of the data or
3   if -- if -- if all the data uploads, or a portion of the
4   data uploads, we will see different things. We will have
5   more information as to what the vision system was -- was
6   able to detect, so...
7     Q.  How is real-time data values, RTDVs, transmitted
8   to Tesla? Is it -- is it in a form similar to log data?
9   Is it a form similar to D16 data? How -- how is it
10   packaged and sent back to the mother ship?
11     A.  So it's packaged with the snapshots, so with the
12   videos, or that's my understanding. And then, you know,
13   over the years, you see that we have collisions in which
14   we receive video, we only receive RTDVs, or we receive
15   both; and that depends on what is the damage to the
16   vehicle, what is the vehicle connectivity status, what
17   the autopilot computer was running at a given time, et
18   cetera, et cetera.
19     Q.  What was it about -- was the damage to this
20   vehicle such that you were unable to upload or receive
21   the snapshot videos?
22     A.  It will not be possible for me to now identify a
23   cause for -- for the -- the lack of that upload. I -- I
24   wouldn't be able to tell. Looking back, there's no data
25   point that will tell me why the -- that upload wasn't --

**182**

1   could be created? Please be very specific, sir.
2     A.  The real-time data values, the RTDVs.
3         MR. T. BRANIGAN: Counsel, it's 2:10 in the
4   east. We've been going for a little more than an hour.
5         MR. SCHREIBER: We're going to finish this one
6   and then we can go ahead and take that break. Is that
7   okay, Mr. Branigan?
8         MR. T. BRANIGAN: Well, let -- let's ask
9   Mr. Rubio Blanco. Is that okay with you, sir --
10        THE WITNESS: That's okay.
11        MR. T. BRANIGAN: -- or do you need to take an
12   earlier break?
13        MR. SCHREIBER: No, he's good.
14     Q.  (By Mr. Schreiber) All right. So --
15        MR. T. BRANIGAN: Are you -- are you good, sir?
16        MR. SCHREIBER: He just said he was.
17        THE WITNESS: Yeah, I'm okay.
18        MR. T. BRANIGAN: Okay.
19     Q.  (By Mr. Schreiber) Real-time data values, that
20   was the missing piece of data that, if you had it, you
21   would be able to overlay on top of the video through
22   Tclips so that we can identify what the vision system saw
23   in the moments before this crash; is that correct?
24     A.  I'm not sure if you will be able to -- to
25   analyze what you -- what you just said. I -- I don't

**184**

1   wasn't performed at that time.
2     Q.  But it was -- the damage to the vehicle, the
3   connectivity, and the autopilot computer that was running
4   at the time was sufficient to upload videos of the crash,
5   true, from the various cameras?
6     A.  Correct. That's -- that's the case.
7     Q.  The damage to the vehicle, connectivity, and the
8   autopilot computers that were running were also
9   sufficient such that log data and telemetry data were
10   able to be uploaded to Tesla, true?
11        MR. T. BRANIGAN: Objection, asked and answered.
12        He's already told you we've got log data, we've
13   got video, we've got a D16 report, but it's your time.
14     A.  Correct, we received log data and the D16.
15     Q.  (By Mr. Schreiber) Have you, in your experience,
16   discovered that real-time data values can also be saved
17   on the vehicle's SD card?
18     A.  No. That's not my understanding, no.
19     Q.  Longer clips of videos can and often are saved
20   on the vehicle's SD card, true?
21     A.  Only if you have the dashcam feature enabled,
22   and it will only be the video from the frontal camera.
23     Q.  Only the video from the frontal camera?
24     A.  Yes.
25     Q.  In 2019?

**185**

1  A. If you're talking about a longer video, like a
2  minute-long video, that -- that's done through the
3  dashcam feature and it requires for you to have a USB
4  drive, and then it saves the data into that USB drive.
5  The -- the SD card does not contain videos.
6  Q. What do you mean -- wait. It doesn't contain
7  videos? I don't understand.
8  A. Yeah. The SD card in which the log data files
9  are saved does not contain videos.
10  Q. Okay. Longer videos contained through dashcam,
11  if turned on by the user, where are those saved to?
12  A. In the USB drive that the user will put in the
13  slot.
14  Q. But they don't usually put a US-- I mean --
15  oh, okay. But -- so -- so any kind of external memory
16  source that they put in there would save that
17  information. But the SD card in the media control unit
18  will also receive a copy of log data, true?
19  A. It doesn't receive a copy of log data. It's
20  actually the -- the opposite. So log data is saved onto
21  the SD card of the vehicle, a portion -- so log data gets
22  generated by the vehicle controllers, right, and -- when
23  they communicate; and a portion of that communication
24  gets saved into the SD card. And now, when a collision
25  occurs, the vehicle attempts to perform an urgent upload

**186**

1  that includes a portion of the data that is in the SD
2  card.
3  Q. And a portion of the data that can be uploaded
4  in an urgent upload is the RTDV, the real-time data
5  values, correct?
6  MR. T. BRANIGAN: Uploaded to what --
7  A. No, this is --
8  MR. T. BRANIGAN: -- Counsel? You -- uploaded
9  to the SD card?
10  MR. SCHREIBER: No, no, no. From the vehicle,
11  uploaded to the air, back to the mother ship.
12  MR. T. BRANIGAN: Okay. Just want to be clear.
13  Because we've been talking about the SD card, and now
14  you're just switching --
15  MR. SCHREIBER: Sorry.
16  MR. T. BRANIGAN: -- to...
17  MR. SCHREIBER: He was describing -- and I'm
18  sorry. I was trying to logically take his last answer,
19  which was data was put onto the SD card, then in the event
20  of a crash, urgent upload occurs and it goes up into the
21  sky -- and I'm using that term for your and my benefit,
22  Mr. Branigan, because I'm sure -- I don't even know
23  exactly how a light switch works. It's a miracle every
24  time you flip it and the light comes on.
25  Q. (By Mr. Schreiber) It's your understanding,

**187**

1  Mr. Blanco, that that data which is processed and put
2  onto the SD card, a portion of it gets pushed into the
3  cloud to Tesla servers, true?
4  A. And that's a different question. That's true,
5  but those are the diagnostic log files or the CAN log's
6  files. That is not the RTDVs, the real-time data -- data
7  values.
8  Q. Right. So diagnostic log files get pushed out.
9  The RTDVs, would they still live on the SD card?
10  A. The RTDVs are never on the SD card.
11  Q. How do you know that?
12  A. I mean, that I understand what the RTDVs are,
13  and they're in the -- they're run in the autopilot
14  computer. There's -- it's information that is generated
15  by the autopilot computer tasks as they -- as they -- as
16  they process the information; and then there's a buffer
17  that, in an event of a collision, attempts to upload
18  along with the autopilot clips, but it doesn't go into
19  the SD card of the vehicle.
20  Q. So, to the extent RTDVs still exist on this
21  vehicle, they would exist within the autopilot computer
22  contained in the vehicle, true?
23  A. I don't think that will be the case. I -- I
24  haven't heard of any instance in which Tesla has been
25  able to go back and retrieve RTDVs from the autopilot

**188**

1  computer directly. Because this works as a buffer, that
2  in -- in an event of a collision, it tries to be
3  uploaded, but then it lose -- it -- it loses power.
4  So, you know, I don't -- you know, I'm not sure,
5  but I haven't heard of an instance that -- that would
6  have been able to retrieve clips or RTDVs from the
7  autopilot computer.
8  Q. Do you know if it's ever been tried?
9  A. I believe so.
10  Q. When and where and by whom?
11  A. All the information that I have with regards to
12  that, Counsel, comes from Tesla legal team, so I'm not
13  sure I can disclose it.
14  Q. I'm not asking for any strategy or information
15  lawyers told you, but I'm asking for foundational facts.
16  Do you have any foundational facts outside of
17  information you've learned from lawyers that, in fact,
18  RTDVs and clips that lived at one point on the autopilot
19  computer, not uploaded in an urgent upload post-crash,
20  were able to later be retrieved when the autopilot
21  computer was reenergized?
22  A. My understanding is that that hasn't been
23  possible. It hasn't been possible. And if you ask me if
24  that has been tried and when and -- and all those
25  questions, the answer to those questions will come

**189**

1  from -- from legal counsel, and they're related to other
2  matters; so I wouldn't be able to share them with you.
3      Q.  But it's your understanding that -- was that
4  effort ever engaged in this case?
5      A.  I don't believe it was.  As I've said, I --
6  Tesla set the standard, and my understanding is that
7  that's -- it's not possible to retrieve clips and RTDVs
8  from -- from the autopilot computer when it's powered
9  down.  That's as far as I understand it.
10     Q.  I need you to define when you use the word
11 "clips."  What do you mean?
12     A.  Videos.
13     Q.  So you've got the clips here, but you didn't get
14 the RTDVs, fair?
15     A.  That's my understanding.
16         MR. SCHREIBER:  Hard five.  Thank you, sir.
17         THE VIDEOGRAPHER:   Off the record, 1:21 Central.
18         (Recess from 1:21 a.m to 1:30 p.m.)
19         THE VIDEOGRAPHER:   The time is 1:30 Central.
20 We're on the record.
21     Q.  (By Mr. Schreiber)  All right.  Mr. Rubio, going
22 back, we're on Topic 5, which is the driver monitoring
23 system and development of autopilot and autosteer.  We
24 were talking a lot about urgent uploads.  I want to
25 change our focus.

**190**

1      We talked earlier about, and have been talking a
2  lot and -- but we kind of danced around it, this concept
3  of driver monitoring.  And inherent in that concept is
4  the notion of driver engagement, and I want to talk with
5  you about some of the challenges that partial automation
6  creates and this idea of a silent failure.  Have you ever
7  heard of that term, sir?
8      A.  I'm not sure.  A silent failure, you said?
9      Q.  Yes, sir.
10     A.  Do you mean an undetected fault?
11     Q.  Oh.  Yeah, essentially, I guess a silent failure
12 might be an -- an undetected fault.  This comes up in
13 the -- in the notion of a driver may be unclear when a
14 silent failure occurs or when intervention is necessary,
15 and -- and part of the limitations of these partially
16 automated system is obviously that the driver's expected
17 to -- to supervise.  What I'm curious about -- and this
18 was covered fairly extensively in Akshay Phatak, so I'm
19 not -- not going to -- to replow that field.
20     You just want to get your understanding as the
21 corporate representative in -- in this case on driver
22 monitoring prior to this incident and -- and as a part of
23 its development, whether this idea that -- well, I think
24 it's -- I'm reading to you here, and this is from the
25 production in this case -- want to get your understanding

**191**

1  of this concept, or agreement with it, is what they call
2  one of the ironies of automation; and it's that the
3  automatic control system has been put in because it can
4  do the job better than the operator, but, yet, the
5  operator is being asked to monitor that it is working
6  effectively.
7      And, really, there is no way in which the human
8  operator can check in, in real time, that these complex
9  computer systems are, in fact, operating correctly; and
10 so one can only expect the operator to -- to monitor it
11 at some high level, but is largely given an impossible
12 task.
13     And this is words and -- by others and -- and
14 human factors and -- and the engineering world is
15 associated with people's interaction with partial
16 automation.  As the corporate representative of Tesla on
17 this issue, what do you have to say to that?
18         MR. T. BRANIGAN:   Objection, form.  It's vague,
19 convoluted, and I don't think it covers a topic that he's
20 been designated to speak to as a corporate
21 representative.  So his testimony in response, if he
22 gives any, will be as a fact witness.
23         MR. SCHREIBER:   Well, Counsel, respectfully,
24 Topic 5 has to do with the development of driver
25 monitoring system during autopilot and autosteer, and

**192**

1  this was not an issue -- not covered in Akshay Phatak.
2      And this issue of complacency, driver
3  monitoring, driver responsiveness, and this kind of
4  impossible task is right in the wheelhouse of that topic.
5  So, to the extent he answers, I would submit that it is
6  speaking on behalf of Tesla in this regard.
7          MR. T. BRANIGAN:   I disagree.  Our objections
8  are very clear.  We delineated the subparts of Topic 5
9  that we say we're not producing a witness on and those
10 that we said we would produce a witness on.
11     To the extent that I can make sense -- and I
12 don't mean any disrespect to you, sir.  But to the extent
13 that I could follow that lengthy question, I think it
14 would fall within one or more of the topics that we said
15 we would not present a corporate representative to speak
16 to.
17     Q.  (By Mr. Schreiber)  Mr. Rubio, my question was
18 probably two minutes old now.  Do you remember it?
19     A.  I mean, you were asking me to comment on that
20 entire text.  I can tell you, overall, I do not consider
21 that it's impossible to supervise the driver-assistance
22 Level 2 system.  I think we provide a lot of information
23 to our drivers, and we put the control always on -- on
24 the driver.
25     So it takes for them, you know, just, like,

**193**

1 newton meter to 3 newton meters of force to take
control over the -- the -- the autopilot system as well
as through the brake system -- for a braking system to
press the brakes.  So I do not consider that an
impossible task.
        The text was also comparing the performance of
the system and the -- the human driver, but -- but
talking about a partial automated system in -- in
which -- we're talking about the performance of the
driver-assistance system while it is being supervised by
drivers.  So the system and the driver are one.  There's
no system vers- -- system versus driver.
        Q.  As the corporate representative on driver
monitoring system and the development for autopilot and
autosteer, how do you reconcile the fact that Tesla's
owner's manual describes autopilot as a set of
convenience features designed to reduce driver workload
while, at the same time, advising drivers that they are
tasked to stay alert, drive safely, and be control -- be
in control of their vehicle at all times?
        MR. T. BRANIGAN:  Same objections, and the
testimony will not be provided as the corporate rep.
This is beyond the scope of topics we said he would speak
to as a corporate rep.
        A.  I --

**194**

        MR. T. BRANIGAN:  Also --
        A.  -- I believe those --
        MR. T. BRANIGAN:  It also calls for an expert
opinion.  But go ahead, Mr. Rubio Blanco.
        THE WITNESS:  Yeah.
        A.  So I -- I believe those to be compatible.
        Q.  (By Mr. Schreiber)  You believe that it is
compatible --
        MR. SCHREIBER:  And, again, Counsel, with
respect to topic -- subtopics (o) through (q), warnings
and instructions given to drivers regarding attentiveness
and driver complacency, I believe the answer to this
question would fall squarely in his role as corporate
representative.
        Q.  (By Mr. Schreiber)  That said, you believe that
the Tesla owner's manual describing autopilot as a set
of, quote, convenience features designed to reduce driver
workload, close quo- -- close quote, while at the same
time, tasking drivers to, quote, stay alert, drive
safely, and be in control of their vehicle at all time is
completely compatible, correct?
        A.  Yes, Counsel.  The -- the autopilot, or driver-
assist- -- autopilot set of driver-assistance features,
that is great for convenience, and it reduces the
workload of -- of a driver, and that can also happen

**195**

while you remain attentive.
        Q.  You would agree that Tesla is asking drivers to
perform a vigilance task, true?
        A.  A vi- -- vigilance task?  I mean, what we ask
our drivers to do is to remain attentive, keep their
hands on the wheel, their eyes on the road, and be ready
to take action, as stated in the owner's manual.
        Q.  A vigilance task requires someone to focus their
attention and to remain alert to stimuli over a long
period of time; you would agree with that?
        MR. T. BRANIGAN:  Same objections, beyond the
scope of the notice.  His answer will be as a fact
witness.
        MR. SCHREIBER:  Respectfully disagree.
        Q.  (By Mr. Schreiber)  Go ahead.
        A.  No, I just don't have an understanding of the
description of -- of the concept that you're -- that
you're relying.  If you're reading off a document and you
want me to read that document, maybe with context, I can
comment on it; but, as of right now, I don't have enough
information to -- to provide you with a description of --
of that concept.
        Q.  Well, sir, you're here to testify as a corporate
representative on warnings and instructions given to
drivers regarding attentiveness and driver complacency,

**196**

and attentiveness and driver complacency falls squarely
into the question as to whether or not what Tesla is
expecting of its drivers is a vigilance task.
        And my working definition, for our purposes
here, is that a vigilance task is something that focuses
one's attention, requiring them to remain alert to
stimuli over a prolonged period of time.  Are you with
me?
        MR. T. BRANIGAN:  And, Counsel, that
misrepresents what your warning asked us to provide a
witness to address as the corporate representative.  You
are going well beyond.  You are asking for an expert
opinion on human factors and issues that is not covered
by 5(o).  Look at 5(o) and compare that to what you're
asking this witness to do.
        So I'm not instructing him not to answer.  I'm
merely saying that what you're representing is not
accurate.  It's misleading to the witness because it's
not what your -- your notice asks for, and it's not what
he's here to respond to as a corporate representative.
        MR. SCHREIBER:  He talks about the reason and
purpose for all of the warnings, and there's been a lot
of talk about warnings and things that were provided; and
one of the reasons and purposes is evaluating the
efficacy and how they came to it.

Eloy Rubio Blanco - May 31, 2024 - CONFIDENTIAL
Case 1:21-cv-21940-BB   Document 496   Entered on FLSD Docket 07/22/2025   Page 57 of 80

197                                                                199

1   And I am trying to get a sense of whether or not
2   there is any human factors engineering understanding or
3   foundation or underpinning to the warnings, or lack
4   thereof, given to drivers during this vigilant task of
5   monitoring their vehicle.
6       MR. T. BRANIGAN:   Yeah, I -- I understand what
7   you're trying to do.  You've served us with a notice that
8   was very specific, very particular.  We responded very
9   specifically, and it's no surprise that you are spending
10  lots of time going well off the notice.  I mean --
11      MR. SCHREIBER:   Okay.
12      MR. T. BRANIGAN:   -- it's -- that's --
13      MR. SCHREIBER:   I'm --
14      MR. T. BRANIGAN:   -- pretty clear --
15      MR. SCHREIBER:   -- I'm --
16          (Simultaneous speaking.)
17      MR. SCHREIBER:   -- time, Counsel.  I -- your --
18  your objection's noted.
19      Q.  (By Mr. Schreiber)  Mr. Rubio, let me ask you if
20  you agree with this concept, that contrary to the
21  assumption that vigilant tasks are benign and
22  undemanding, there is a body of research in the last half
23  century suggesting that vigilance tasks require hard
24  mental work and are stressful for the party engaged in
25  that task.  Do you agree or disagree?

1   perception- reaction time research, either performed
2   internally or externally, that documents the slower
3   perception-reaction time of someone monitoring a Level 2
4   automation system as to someone -- as opposed to someone
5   driving a conventional vehicle?
6       MR. T. BRANIGAN:   Same objections.
7       **A.   You're -- you're presuming the -- the result**
8   **of -- of -- of a testing and then -- and then presenting**
9   **as with -- with a specific testing.  What I can tell you**
10  **is that we have used fleet data in order to gauge or**
11  **evaluate our driver monitoring system, and rather than**
12  **relying on -- on an external research paper, we actually**
13  **look at how drivers interact with our vehicles.**
14      **We use that -- or we do that via the**
15  **engineering.  We do that via QA testers.  We do that via**
16  **the customer fleet.  We're also able to deploy different**
17  **versions in -- in shadow mode, in which those features**
18  **are not even activated, but we're gaining data from our**
19  **cars, which is the most important thing, how the drivers**
20  **interact with our vehicles, rather than relying on a --**
21  **on -- on a research paper.**
22      Q.  (By Mr. Schreiber)  Are you familiar with any
23  internal discussions or documents at Tesla that address
24  the issue of automation complacency as it relates to your
25  development of your driver monitoring systems?

198                                                                200

1       MR. T. BRANIGAN:   Objection, lack of foundation.
2   Calls for an expert opinion.  Beyond the scope of this
3   witness's designation for this deposition notice, beyond
4   the scope of the notice.
5       The witness can answer as a fact witness.
6       **A.   I am not familiar with that specific body of**
7   **research, Counsel, so I wouldn't be able to draw an**
8   **opinion based on the description of the visual vigilant**
9   **task that you have presented us with.**
10      Q.  (By Mr. Schreiber)  Are you aware of any body of
11  research or literature that has been reviewed or relied
12  upon internally at Tesla in the development of warnings
13  that talks about the slower perception-reaction time that
14  results from someone monitoring a partially autonomous
15  driving system than someone not?
16      MR. T. BRANIGAN:   Same objections.
17      **A.   Counsel, I'm here to testify on how we develop**
18  **the driver monitoring system, and I can go through the**
19  **process of implementing it, testing, and validating.  As**
20  **to specific research that is outside of -- of -- of the**
21  **company, I cannot comment on that.**
22      Q.  (By Mr. Schreiber)  Well, as a part of the
23  testing and validation of the driver monitoring system
24  warnings, was there ever any review or inclusion in that
25  iterative process that you talk about by Tesla of

1       MR. T. BRANIGAN:   Same objections.
2       **A.   Again, Counsel, you're bringing up a concept**
3   **that is based on external research.  How we deploy and**
4   **how we develop our driver monitoring system is based on**
5   **data from our actual fleet, performing our own test based**
6   **on the data that we retrieve from our fleet, and we use**
7   **that data in order to improve our features.**
8       Q.  (By Mr. Schreiber)  So it's your testimony that
9   Tesla has not considered -- you described the notion of
10  automation complacency as being some kind of an external
11  concept to Tesla; is that -- is that what you said?  I
12  don't want to misspeak --
13      MR. T. BRANIGAN:   Objection -- objection.  It
14  mischaracterizes what the witness just said.
15      MR. SCHREIBER:   Trying to clarify it, Counsel.
16      Q.  (By Mr. Schreiber)  Go ahead.
17      **A.   What I'm saying is that rather than studying a**
18  **specific description or a specific concept, what we're**
19  **doing is actually looking at how drivers interact with**
20  **our vehicles, how they take over, when they take over, in**
21  **order to make determinations as to how to improve our**
22  **driver monitoring system.  Our timing sequence, we're**
23  **getting feedback from the actual fleet rather than**
24  **studying a concept.**
25      Q.   Do you know if naive participants were ever used

Eloy Rubio Blanco - May 31, 2024 - CONFIDENTIAL
Case 1:21-cv-21940-BB   Document 496   Entered on FLSD Docket 07/22/2025   Page 58 of 80

201                                              203

1    to develop the effectiveness of Tesla's hands-on
2    detection schemes in maintaining the operator attention
3    while on autopilot?
4         MR. T. BRANIGAN:   Same objection.  It's beyond
5    the scope.
6         A.  I'm not sure at this time if naive parci- --
7    participants, if -- do the naive participants has no
8    contact with this vehicle at all?  Because, if so, I
9    mean, what's relevant is the customers that are driving
10   our vehicles, that before they drive our vehicles, they
11   receive the owner's manual and they receive all the
12   warnings and notifications, including the user agreement,
13   which is the pool of -- of customers that -- that
14   actually drive our vehicles.
15        Q.  (By Mr. Schreiber)  No.  What I'm talking about
16   is someone who, all things being equal, is familiar with
17   the vehicle and has received the warning and the user
18   agreement, but is otherwise unaware of the nature or
19   purpose of the fact that, for instance, the hands-on
20   detection scheme is -- is being monitored.
21        Was there ever a kind of -- that kind of blind
22   testing performed, to your knowledge, by Tesla in the
23   development of its driver monitoring systems?
24        A.  And I can't see how that situation is possible
25   when you're driving a vehicle, that if you get all those

1    But as far as I know, that's what we're interested in,
2    how drivers interact with our vehicles.
3         Q.  So I'll call that a definite maybe.  Okay.
4         So I understand from the testimony of Mr. Phatak
5    that there's an assumed amount of time that Tesla
6    believes will be sufficient for a driver to take over in
7    any scenario and to avoid a collision, and that that
8    forms the basis of all system limitations put in place.
9    Do you agree with that?
10        MR. T. BRANIGAN:   Let me just object to the
11   extent it mischaracterizes Mr. Phatak's deposition
12   testimony on the issue.
13        A.  No, that's not my understanding.
14        Q.  (By Mr. Schreiber) So you disagree with
15   Mr. Phatak, assuming that, hypothetically, what I said is
16   correct?
17        MR. T. BRANIGAN:   Same objections.
18        Q.  (By Mr. Schreiber) You disagree with Mr. Phatak
19   in that regard?
20        A.  I do not disagree with him.  I think he was
21   referring to the steering limitations that are
22   implemented into the autosteer controller in order to
23   account for the driver to be able to take over control
24   from the vehicle before departing the -- the lane.
25        That doesn't have to do with perception-reaction

202                                              204

1    notification -- notifications and warnings tell you, you
2    need to keep your hands on the wheel, and upon releasing
3    the hands of the wheel, you're going to receive messages
4    that tell you; so I -- I don't see how such research will
5    be relevant to our customer fleet.
6         Q.  A central assumption of Tesla's autopilot is
7    that the operator's capable of taking over control of the
8    vehicle at any point in time; you would agree with that?
9         A.  Autosteer is designed so that the driver is able
10   to take control of the -- of the vehicle at any time,
11   correct.
12        Q.  Has Tesla ever studied the perception-reaction
13   time of Tesla drivers, with respect to taking over
14   control of the vehicle, from traditional drivers of
15   vehicles that are not Teslas?
16        A.  I mean, we're -- we're not focusing on
17   traditional vehicles, and we're not focusing on other --
18   other vehicles.  We are studying the data from our fleet.
19   That includes how drivers react to situations.  That
20   includes how driver interact with our vehicles.  That
21   includes how driver takes o- -- they -- drivers take
22   over.  So that's the data we're interested in.
23        Q.  Okay.  So the answer is no?
24        A.  I mean, I wouldn't be able to know every piece
25   of -- of research that has been done with -- or testing.

1    time with regards to a collision.  We're talking about a
2    lane departure.  And -- and for that, there are limits
3    that are implemented onto the autosteering controller for
4    how far the steering wheel can be turned and how fast the
5    steering wheel can be turned, depending on the speed of
6    the vehicle.
7         Q.  What makes you think Mr. Phatak's statements in
8    that regard were limited to autosteer and the limitations
9    you just described?  Where did you come up with that
10   from?
11        A.  I mean, I've -- I've read the deposition, and
12   that's how I interpret his -- his -- his statement to be.
13        Q.  Okay.  Well, I don't interpret it that way.  I
14   interpret it to him saying that there is a sufficient
15   amount of time -- that there is an assumed amount of time
16   that Tesla believes will be sufficient for a driver to
17   take over in any scenario and avoid a collision and that
18   that foundationally forms the basis of many of the system
19   limitations put in place in autopilot.
20        My question for you is:  Based upon that, do you
21   have any information?  Have you seen any studies?  Have
22   you reviewed a Confluence page or a Jira ticket that
23   addresses that assumption?
24        MR. T. BRANIGAN:   Objection to the extent that
25   the question mischaracterizes Mr. Phatak's testimony on

P- Based upon Pl's Amend Notice DE 456, this line is not
offered for completeness as the preceeding pages were
withdrawn

**205**

1  the issue.

2      A.  Yes, I am familiar with those -- which are

3  steering and the steering rate limits, or limitations,

4  depending on the speed, and those are implemented so the

5  vehicle departs the lane within a period of time so the

6  driver can take over.

7      Q.  (By Mr. Schreiber)  And what do you base that on?

8      A.  That's my understanding on -- of the system.

9      Q.  Are there specific studies that Tesla has

10  performed in that regard to -- to bolster or support your

11  statement, if you know?

12      A.  Yes, I believe there are.

13      Q.  And what are those -- what are those studies?

14  Where would we find them?

15      A.  I mean, there are certain studies that have been

16  targeted to calculate the lateral acceleration in order to

17  implement the limits to autosteer in -- for situations in

18  which -- in which there is a turn or -- or a curve,

19  right?  And those studies were the basis of -- of setting

20  those limits for the steering and the steering rate.

21      Q.  Do you know, as you sit here today, whether or

22  not there were any human factors engineers on the

23  autopilot team from 2018 to 2019?

24      MR. T. BRANIGAN:  Objection, form.  Vague,

**206**

1  concerning "human factors engineers."

2      A.  I mean, Counsel, human factors is a science that

3  has a lot of disciplines, right?  We have a human-machine

4  interface.  We have user interface.  We have ergonomics.

5  We have biology, anthropology.  So, specifically, the

6  areas that are relevant for human factors into the -- or

7  autopilot, will be the human-machine interface.

8      This is what we evaluate by looking at the fleet

9  data and seeing how humans interact with our vehicles,

10  and there are also the user interface team that -- that

11  performs or -- or sets those -- those warnings for -- for

12  the driver; and, of course, we have people that are

13  dedicated to that.

14      Q.  (By Mr. Schreiber)  So it's your testimony that,

15  yes, there were human factors engineers on the autopilot

16  team in 2018 and 2019?

17      MR. T. BRANIGAN:  Same objection, and the

18  question mischaracterizes his testimony.

19      A.  Again, we -- we don't call them human factor

20  engineers because what we're interested in is human-

21  machine interface.  So there were engineers dedicated to

22  HMI, to human-machine interface, as well as user

23  experience, which -- which would involve UX team; and --

24  and they were the ones that figure out the warnings on

25  the display, so -- so, yeah.

**207**

1      And -- and we use data, again, from our own

2  fleet in order to evaluate those factors which are

3  related to human-machine interface, which is a discipline

4  within human factors.

5      Q.  (By Mr. Schreiber)  Are you aware of any

6  assumptions made by Tesla when it released autopilot --

7  let's just call it the 2018/2019 vintage on

8  Hardware 2.5 -- and its impact on customer situational

9  awareness?

10      MR. T. BRANIGAN:  Objection, form.  Overly

11  broad.  Any assumptions, that was the question?

12      MR. SCHREIBER:  Yeah.

13      A.  I'm not sure --

14      MR. T. BRANIGAN:  I also think it's beyond the

15  scope of the notice.  So the witness can answer not as a

16  corporate rep, but as a fact witness.  Go ahead, sir.

17      A.  I don't have any information with that regard.

18      Q.  (By Mr. Schreiber)  Neither did Mr. Phatak.

19  That's why I asked the question.

20      I'm going to show you -- so as a part of the

21  driver monitoring system, changes have been made with

22  respect to warnings given, signals, things of that sort,

23  as the technology and the software has evolved, true?

24  You would agree with that broad scope statement?

25      A.  I will agree with that.

**208**

1      Q.  Okay.  So I have what was previously marked as

2  Exhibit 314.  We'll show you, we'll append.  And this

3  document is an Appendix A, which is a table of autopilot

4  software changes, and it talks about various hardware and

5  software changes and kind of the description of the

6  change and the reasons for it.  Do you see that?

7      A.  I see this, yeah.

8      Q.  Have you seen this document before?

9      A.  Not sure this specific document, and I'm not

10  sure if I've seen it.

11      Q.  All right.  It goes back in time from here.  I'm

12  just going to -- sorry for the scroll.  But it goes back

13  to October of 2015, which was the general release of

14  autopilot functionality for the U.S., California, and

15  Canada -- or I assume Canada, but who cares.  Whatever CN

16  stands for.

17      MR. T. BRANIGAN:  Tesla -- excuse me -- excuse

18  me -- Counsel, excuse me, is it your testimony that this

19  was produced to plaintiffs in Benavides?

20      MR. SCHREIBER:  No.

21      MR. T. BRANIGAN:  And do you know which case

22  this was produced by Tesla in?

23      MR. SCHREIBER:  Yeah.  I believe this was

24  produced in Huang.  Actually, I'm 99.9 percent sure it

25  was produced in Huang.

**209**

1    MR. T. BRANIGAN:   And are you -- did you sign
2  the protective order for the Huang case?
3    MR. SCHREIBER:   Long, long ago.  Yes, sir.
4  And -- and Banner, as well.
5    MR. T. BRANIGAN:   I know you signed it in
6  Banner.  We don't get the --
7        (Simultaneous speaking.)
8    MR. T. BRANIGAN:   -- certificates -- we don't
9  get Exhibit A in Huang, which is why I'm asking.
10    MR. SCHREIBER:   I can assure you we're
11  copacetic.
12    MR. T. BRANIGAN:   Thank you.
13    MR. SCHREIBER:   Yeah.
14    Q.  (By Mr. Schreiber)  Where was I?  Oh, do you know
15  where this document comes from, Mr. Rubio?  It's
16  Appendix A to something.
17    A.  I do not.
18    Q.  Do you know if some document similar to it has
19  continued to be updated over time, documenting a table of
20  autopilot software changes, since 2016, let's say,
21  through April of 2019?
22    A.  Not that I'm aware of in this format, no.
23    Q.  In what format are you aware of existing, to the
24  extent it exists?
25    A.  I mean, there are the software release notes

**211**

1  summary of the change we do, which is in each firmware
2  version; and different things that were reason for
3  change, I've never seen something like that, in my
4  experience.  So, yeah, that's my answer.
5    Q.  Yeah.  But it's like when you get your phone
6  updated, or you get an app updated on your phone, it's
7  like, Hey, we're updating it for these five reasons,
8  fixing this bug, doing this thing, changing this thing.
9    You've had that experience just as a human
10  interacting in the world, correct?
11    A.  I have -- yeah, I have updated my phone before.
12    Q.  Yeah.  And do you have any reason to believe
13  that Tesla does not, like every other technology company
14  since the dawn of the modern era, also track when it
15  comes out with new software or firmware, the changes that
16  it's making and the general reason for those changes, and
17  then shares that information with its customer base?
18    A.  Yeah.  I mean, we have the software release
19  notes, that they do exactly that, yeah.
20    Q.  Right.  And they probably take those software
21  release notes and they're someplace, either on a
22  Confluence page or some internal document or place, that
23  summarizes all of those things.
24    So that if someone wanted to go and see, Hey,
25  how many releases have we done and what have the changes

**210**

1  that, for every software, they include information as to
2  changes, and those are communicated to our customers.
3    Q.  They are.  But are you suggesting that there's
4  not some form of data, some -- some place in -- in the
5  universe of Tesla where a document identifying the
6  release date, the software package version, the
7  description of changes, and the reason for changes still
8  exists?
9    A.  The description of changes and the reason for
10  changes, I'm not familiar with any document relying those
11  two things specifically, no.
12    Q.  Well, you see they were doing it through 2016.
13  Do you have any reason to think they stopped, "they"
14  being Tesla?
15    A.  I mean, it seems like this is an appendix, and
16  maybe this was done for a specific reason.
17    Q.  But you don't know one way or the other?
18    A.  Correct.
19    Q.  It's fair to say, however, that describing
20  changes in firmware and describing changes in software
21  over time is not impossible for Tesla to do.  In fact,
22  they actually maintain this data and this information
23  with each iteration and update, true?
24    A.  I mean, one thing is the description or -- or
25  the changes are a small -- like -- like this, like a

**212**

1  been, somebody within Tesla has already engaged that
2  effort for the purposes of that summary, just like they
3  did there in Exhibit 314, correct?
4    MR. T. BRANIGAN:   Objection, lack of foundation.
5  Sir, if you know and you can answer as a fact
6  witness, go ahead.
7    A.  I mean, those were all the reports.  But you're
8  asking me if software release notes are available for
9  software that got released in the past, I -- I believe
10  they are.
11    Q.  (By Mr. Schreiber)  Right.  So -- but it's fair
12  to say that describing the different firmware changes
13  and -- and the reasons for those changes in the software
14  notes and the release notes, it's not impossible for
15  Tesla to come up with that information, true?  They have
16  it readily available to them, right?
17    MR. T. BRANIGAN:   Objection -- objection, lack
18  of foundation.  You can answer as a fact witness, sir.
19    A.  I'm sorry, Counsel, I don't think I'm
20  understanding you.  You're -- you're -- you're asking me
21  about the software release notes that came out with a
22  specific software at a specific time, if we're able to
23  retrieve them?  Is that the question?
24    Q.  (By Mr. Schreiber)  Let me cut to the chase.
25  Tesla's lawyers in this litigation have described that

**213**

1  obtaining information about firmware and updates to the
2  software, and how it has changed, is, quote, impossible.
3         My statement for you, sir, is:  It's far from
4  impossible.  It's entirely possible because Tesla tracks
5  in its notes its software updates, what it's changing and
6  why it's changing it, and sometimes it even summarizes it
7  in a clean little table like they did in Exhibit 314,
8  true?
9         MR. T. BRANIGAN:  Well, hang on.  Since
10 you're -- you're telling this witness what I or my
11 colleagues said --
12        MR. SCHREIBER:  It wasn't you --
13        MR. T. BRANIGAN:  -- why don't -- why don't you
14 pull up the document, the writing, the statement from me
15 or my colleagues, in fairness to the witness, and let him
16 answer that.  Because I'm -- I'm expecting that whatever
17 we said on the topic was contextual and in response to a
18 question posed by plaintiff's counsel.
19        And so rather than mischaracterizing what we
20 said, why don't you be fair, show the witness what we
21 actually said in response to what plaintiff's counsel
22 asked for, and then let him answer that.  Because you've
23 made the broad statement that we said something is
24 impossible.
25        MR. SCHREIBER:  Well, you did.  You --

**214**

1         MR. T. BRANIGAN:  Show it to us.  Show it to us.
2  Go ahead.  Haul off and prove it.  You're a lawyer, prove
3  it up.
4         MR. SCHREIBER:  All right.  You know what, I'm
5  not going to burn my time.  But when we're done here, I'm
6  going to make a note, and I'm going to show it to you
7  afterwards.
8         MR. T. BRANIGAN:  That'd be great.
9         MR. SCHREIBER:  All right.  Describing
10 impossible.  I have it.  I just didn't bother pulling
11 that piece of it up.  All right.  Describing firmware,
12 impossible.
13        And I would assume, Mr. Branigan, it probably
14 wasn't you because I have a feeling you're not spending
15 too much time responding to written discovery these days,
16 but maybe I'm wrong.
17        Q.  (By Mr. Schreiber)  All right.  Let's go to
18 Exhibit 313.  And let's see, what's my time?  All right.
19 Got about an hour and 30-ish.  I'm going to start moving
20 right along.
21        Okay.  Sir, I'm showing you what was marked and
22 will be appended to your deposition as Exhibit 313.  This
23 is a Confluence page related to Autopilot 1.0.  The same
24 Confluence pages could be located for Autopilot 2.0 or
25 7.0 or any point-0, right?  There are later iterations of

**215**

1  these, to your knowledge, correct?
2         A.  I mean, not for all of these topics that are
3  listed.  I mean --
4         Q.  Not suggesting that there --
5         A.  -- this 1.0 --
6         Q.  Uh-huh.
7         A.  Yeah, this 1.0 is for -- refers -- it's not
8  software.  It's actually hardware.  So --
9         Q.  That's what I meant.
10        A.  -- we're talking about, yeah --
11        Q.  Yeah.
12        A.  -- Monocam.
13        Q.  Right.  So Monocam, also known as Gnat Brain.
14        Why was it called that?
15        A.  I mean, Monocam, because it was based on a
16 single frontal camera.  Gnat Brain, I'm -- I don't know.
17        Q.  Does it have the brain of a gnat?
18        A.  And I -- I don't know -- I mean, it's the first
19 time I hear this.
20        Q.  Okay.  And so then they have one -- a Confluence
21 page like this for 2.0 and 2.5, fair?
22        A.  I mean, there will be some information for --
23 for 2.0 and 2.5 in Confluence.
24        Q.  All right.  Okay.  So what I'd like to ask you
25 about is -- this is Bates stamp 56075.

**216**

1         MR. T. BRANIGAN:  Is this still Exhibit 313?
2         MR. SCHREIBER:  Yes, sir.  It's Page 265 of the
3  615-page document.
4         Q.  (By Mr. Schreiber)  Sir, do you know if, in 2018
5  and 2019, Tesla was still monitoring the feedback
6  received on teslamotorsclub.com?
7         A.  I do not know.  I -- I don't believe so, but I
8  do not know.
9         Q.  What makes you believe they were not?
10        A.  Because this is for Hardware 1 autopilot, and
11 this -- this was done as -- as to -- in order to
12 understand the first feedback from the customer when
13 they -- when they received autopilot.  By -- by
14 Hardware 2.5, autopilot had been released for a number of
15 years already.
16        Q.  Understood.  And it was not important for Tesla
17 at that point to still receive feedback from its customer
18 base outside of its early adapter program?
19        A.  Sure, it was, but the feedback that we receive
20 were directly from our vehicles because we were able to
21 develop a telemetry pipeline that allowed us to get data
22 directly from the -- from the customer fleet rather than
23 relying on the searches.
24        Q.  So as a result of the development and data
25 streams, Tesla was able to -- by 2018 and beyond, to

Eloy Rubio Blanco - May 31, 2024 - CONFIDENTIAL
Case 1:21-cv-21940-BB Document 496 Entered on FLSD Docket 07/22/2025 Page 62 of 80

**217**

1 actually get the data directly from the vehicles as
2 opposed to counting on what people were blogging or
3 posting on the Internet; is that correct?
4    A. That's fair.
5    Q. Okay.
6    A. And I'm not sure how this relates to any of the
7 topics, Counsel, like feedback from Autopilot 1.0.
8    Q. We're talking about the development of your
9 driver monitoring program and your driver monitoring
10 systems, including the development of autopilot and
11 autosteer, and so this is some of the early iteration.
12      If somebody had produced a document responsive
13 that dealt with Hardware 2.0 and 2.5, we would be
14 focusing on that. We have not received the benefit of
15 that production. So, you know, sometimes you get what
16 you get with me.
17      All right. So -- oh, shoot. I didn't mean to
18 hit "X." Hold on. It's a long -- this is a big
19 document. It takes a moment to load. I've only got a
20 couple more questions and we'll move on.
21      In 7.0, what -- what time frame are we talking
22 about here, if you know?
23    A. I don't remember right now what time frame will
24 be 7.0.
25    Q. 2015, 2016?

**218**

1    A. Probably around that ballpark. Maybe even 2017.
2    Q. Okay. Discussion on the first comment on
3 autosteer, 2016, 2017, whatever, a couple of years prior
4 to us, in an early iteration using Hardware 1.0, there's
5 a discussion about the use of autosteer on surface
6 streets.
7      So Tesla knew from the jump that vehicles were
8 being used on autopilot on surface streets despite the
9 recommendations in the owner's manual and in the user
10 agreement not to so use the system on those surface
11 streets, true?
12      MR. T. BRANIGAN: Objection, form.
13 Mischaracterizes the user agreement and other autopilot-
14 related communications. But go ahead, sir.
15    A. What the user agreement states is that it's
16 intended for using highway and limited-access roads, as
17 well as in other roads, while slow-moving traffic, and
18 always, always while paying attention to the road and be
19 ready -- being ready to take action. So I don't think
20 that's not compatible with this.
21    Q. (By Mr. Schreiber) And Tesla was being told, in
22 the 2016/2017 prior, that autosteer on surface streets
23 drives like a 16-year-old drunk driver swerving back and
24 forth to stay in the middle of the lane. Do you see
25 that?

T- Hearsay
FRE 802

**219**

1    A. So this is a statement from somebody in the --
2    A. A user --
3    A. -- forum, Counsel?
4    Q. A -- a user apparently on Tesla Motor Club that
5 Tesla found sufficient to add to its Confluence page,
6 true?
7    A. I mean, it's -- it's a comment from a person in
8 a forum, so it's -- so are -- if you're asking me if we
9 were aware of that comment, well, it's in the Confluence
10 page, so I'm -- I'm -- I'm guessing somebody added it
11 to -- to it --
12    Q. Right.
13    A. -- but that's as far I can comment.
14    Q. Okay. All right. Let's move on to Topic 6.
15 Topic 6 is automatic emergency braking. It says that you
16 object to -- oh, here, so we're all on the same page...
17      Why AEB failed to stop or slow, the decision-
18 making process with respect to its design, evaluation of
19 fleet data, all actions taken in respect to the NTSB, and
20 all actions in response to the Brown and Huang matters --
21 oh, and Banner. Excuse me.
22      In fairness, I know you've objected -- your
23 lawyers have objected to most, but did indicate that it
24 would produce you to at least speak to these three topics
25 on the decision-making process, the evaluation, and

**220**

1 research relied upon, correct?
2    A. Correct.
3    Q. All right. We're going to get to this in the
4 log data in a minute, but did AEB ever fire in this
5 instance, in this collision?
6    A. Automatic emergency braking did not activate.
7    Q. Why not?
8    A. Because it isn't a scenario in which automatic
9 emergency braking -- it is not designed to activate.
10    Q. Why not?
11    A. Well, automatic emergency braking, first of all,
12 is a collision mitigation feature that is designed to
13 mitigate front-to-end collisions with vehicles. So there
14 are certain conditions for it to -- to activate.
15      One of those conditions is the identification --
16 or the vehicle identification as -- as a target for
17 automatic emergency braking. That, generally speaking,
18 is a vehicle that is traveling in front of the Tesla
19 vehicle. Second of all, it is required that that vehicle
20 is detected as part -- or assigned to the lane of travel
21 of the -- of the Tesla. In this case, the lane of travel
22 ends at the start of the intersection.
23      And then automatic emergency braking only
24 activates for targets that are in the roadway, not
25 outside of the roadway. So for all those three reasons,

P- Witness is not unavailable to Tesla per FRCP 32(a)(4) and
this is not for completeness. Pls withdrew 221:12-24 in
amended notice of designation.

Julia Whaley & Associates
214-668-5578  JulieTXCSR@gmail.com

**221**

1  this -- this scenario will fall into -- into outside
2  of -- of what automatic emergency braking was designed to
3  do at that time.
4        Q.  And you said a moment ago that the vehicle must
5  be a target generally in front of the ego --
6        A.  Traveling.
7        Q.  -- are you suggesting -- I'm sorry?
8        A.  Yeah, traveling in front of the vehicle, which
9  means --
10       Q.  Right.
11       A.  -- in the general direction of the vehicle.
12       Q.  So is it your statement that -- your testimony
13  that as of 2019, automatic emergency braking would not
14  fire in the scenario of a T-intersection collision where
15  there is cross traffic, a crossing vehicle in front of
16  the path of travel of the Tesla vehicle, AEB would not
17  fire because that is not a vehicle that is directly in
18  front of the lane of travel?
19       MR. T. BRANIGAN:   Objection, form.
20  Mischaracterizes the witness's testimony.
21       A.  I -- I wouldn't be able to make that
22  determination.  That will depend on a lot of factors, but
23  cross traffic was one of the limitations of automatic
24  emergency braking at that time.
25       Q.  (By Mr. Schreiber) And that was one of the

**223**

1  aren't producing you for those reasons, so half of them
2  are not covered, and then I've got some stuff on drivable
3  space in a PowerPoint.  So we'll -- we'll knock this
4  thing out an hour and change, but we're going to go a
5  little bit, just a smidge, past 4:30 Eastern Time.
6        MR. SCHREIBER:   Is that cool, Mr. Branigan?
7        MR. T. BRANIGAN:   I think we'll be able to work
8  it out --
9        MR. SCHREIBER:   I trust --
10       MR. T. BRANIGAN:   -- depending on -- depending
11  on what "just a smidge" means.  May- -- maybe if we can
12  find the questions to the topics, we can actually finish
13  before 4:30.
14       MR. SCHREIBER:   Wouldn't that be -- wouldn't
15  that be something, you know.  Hope springs eternal.
16       MR. T. BRANIGAN:   All right.  We're going to
17  take a hard five.
18       MR. SCHREIBER:   Hard five, 12:21 --
19  3:21 Eastern.  I'll see you back there at 3:26.
20       THE VIDEOGRAPHER:   Off the record, 2:21 Central.
21       (Recess from 2:21 p.m. to 2:30 p.m.)
22       THE VIDEOGRAPHER:   The time is 2:30 Central.
23  We're on the record.
24       Q.  (By Mr. Schreiber) Okay.  I'm going to go ahead
25  and mark as Exhibit, I think, 4.

**222**

1  issues that was addressed in the NTSB recommendations and
2  safety recommendations going back to 2017 from the Banner
3  case, true?
4        A.  Well, I mean, as far as I recall, and the -- the
5  National Highway Traffic Safety Administration performed
6  an investigation in which they concluded that there was
7  no -- no fault in the design of automatic emergency
8  braking.
9        Q.  Back then, but you -- well, we won't quibble
10  about what's happened since.  Let's get to some documents
11  that were just produced and I just happen to look at last
12  night.  Aha, I have an old-school hard copy, but I'm not
13  going to be that guy who tries to shove it in a Zoom
14  camera.  I just have to wait for this 900-page document
15  to open.
16       A.  Shall we take the last break before the last
17  sprint?
18       Q.  If you'd like to, while this is -- it's like
19  90 percent there, but this is a good time, and then we
20  can -- we can boat race through it.  Because I'll just
21  give you a heads-up, it came up -- we're going to cover
22  this.  I've got about 10, 15 minutes on log data.  I'm
23  going to show you a few things.  You're going to talk
24  through it.  I get most of it.
25       Then the next, 11, 12, 13, 15, 16, 17, you guys

**224**

1        MR. SCHREIBER:   Tom, are you tracking these?
2        MR. T. BRANIGAN:   I think it is 4.
3        THE REPORTER:   I think so, too.
4        MR. SCHREIBER:   Okay.  Good.  Yeah, that's --
5  matters more what you think, Adrianne, not what Tom
6  thinks.  Let me just find it.  Here we go, Benavides 2093
7  and 2094.  Let me find it.  There it is.  Bada bing.
8        (Exhibit 4 marked.)
9        Q.  (By Mr. Schreiber) This is a page from Garage.
10  What is Garage, sir?
11       A.  Garage is a software for internal use, that it's
12  used to query vehicle vitals and also track for firmware
13  versions that are sent to vehicles.
14       Q.  And so you can query that by VIN or how?
15       A.  Yeah, by VIN.
16       Q.  What are we looking at here?
17       A.  This is the software rollout history from the
18  subject vehicle, I believe.
19       Q.  And this tells us the various updates that
20  either were or were not received?
21       A.  Correct.
22       Q.  Okay.  So help me understand it.  Last updated,
23  abandoned, failed.  What -- just -- just tell -- walk me
24  through Line 1 and explain to me what I'm looking at.
25       A.  Yeah.  So those are firmware updates that were

**225**

1  attempted to send to the vehicle, but two years ago, the
2  vehicle wasn't able to -- to receive it.  So they weren't
3  downloaded or installed by the vehicle.  That's why
4  they -- they show it at -- as hammered.  If you scroll
5  down, you'll find the firmware version that was actually
6  running in the vehicle, which is 2018.48.12.1.
7       Q.  Got it.  And that was the last most updated
8  version of it that was on the vehicle at the time of the
9  impact, correct?
10      A.  At -- at -- at the time of the incident,
11  correct.
12      Q.  And the vehicle has been nonoperational since
13  that time, ergo none of these later updates would have
14  actually pushed through, true?
15      A.  There were certain updates that were deployed in
16  the period of time before the -- the collision, but they
17  weren't installed by the customer.
18      Q.  Okay.  So these other ones that have five years
19  ago on them, these 2019s, these later iterations, 2018.50.7
20  and 2019.8, that's the eighth week of 2019, right?  Is
21  that how that works?
22      A.  Yes.  But that is not for the rollout date.
23  It's just for the development notation.  I can tell you
24  that the 2019.8.5 was released, I believe, in April 17th.
25  So that will be the last one that, if the customer had

**226**

1  downloaded and installed it, would have gone into the
2  vehicle.
3       Q.  And how do you know that?  Because that's
4  obviously a very precise date, and I assume it's not the
5  day you were born or the day you got married or the day
6  you have a kid's birthday.  So some reason, that date
7  sticks out in your head.
8       A.  No.  It's -- I mean, I've -- I've -- if you --
9  in the -- in the Garage website, or in the Garage
10  software, if you put the cursor over the five years ago,
11  it tells you the -- date in which that goes -- sent
12  to the subject vehicle.
13      Q.  Got it.  Thank you.
14      A.  Thank you.
15      Q.  I'm going to show you Exhibit 5.  It's
16  Benavides 2095.
17           (Exhibit 5 marked.)
18      Q.  (By Mr. Schreiber) This appears to be a
19  Confluence page on longitudinal collision management; is
20  that correct?
21      A.  I do not think that is a Confluence page.  I
22  think that's a summary of that specific topic.
23      Q.  Where would --
24      A.  That doesn't look --
25      Q.  -- this live --

**227**

1       A.  -- like Confluence.
2       Q.  That's fine.  Where -- where would this live at
3  Tesla?
4       A.  As an attachment to a Confluence page, most
5  likely.
6       Q.  So you're on a Confluence page on some subject
7  and then you click through and then you get to this?
8       A.  Most likely.  I mean, I -- I'm not sure, but
9  most likely.
10      Q.  Okay.  As someone who has spent more time in
11  Confluence than I have, considering I've never been in
12  Confluence -- I've just heard about it, read about it,
13  talked about it -- what would you anticipate a attachment
14  like this is, that is approximately 13 pages covering
15  things like longitudinal collision management, forward
16  collision warning, AEB, pedestrian AEB -- what would this
17  be attached to in Confluence?
18      A.  A Confluence page created in order to attach
19  this related to longitudinal collision management.
20      Q.  So there would be a page on that, and then you
21  click through and you find this, is that essentially what
22  you're describing?
23      A.  I mean, I'm -- I'm not sure, but that's most
24  likely the case if -- or maybe it's an export from --
25  from an actual Confluence page.  I'm not sure at this

**228**

1  time.
2       Q.  How would you know?
3       A.  No, I don't think it is.  I think it's actually
4  a PDF describing the longitudinal collision management.
5       Q.  Well, everything that I get is in a PDF.  I
6  don't -- I don't have the benefit of -- of logging into
7  the mother ship.  They wouldn't -- they wouldn't let me
8  do that.  I've tried in a couple of cases.
9           The -- does it exist, when you see it, as a PDF
10 in Confluence, or you're looking at something that is a
11 more live interactive, like, dynamic site, if that makes
12 sense?
13      A.  I -- I wouldn't know for -- for this specific
14 document.  But as I -- as you scroll through it, it looks
15 like just a PDF that was created in order to summarize
16 the operation of the longitudinal collision management.
17      Q.  So I want to ask you about this section here on
18 Page 2099, the ability to override AEB, and it derives
19 override conditions for AEB based upon steering wheel
20 angle, angle rate, accelerator pedal, brake pedal.
21           What does that mean?  I don't actually care
22 about -- well, I don't really care about wheel angle.
23 What is it about accelerator or brake pedal application
24 that would cause AEB to disengage or to be overridden at
25 any given time?

P- Witness is not unavailable to Tesla per FCRP 32(a)(4) and
this is not for completeness.

**229**

1  A.  So if automatic emergency braking is actuating
2  at a given time and you press the brake pedal and release
3  the brake pedal, automatic emergency braking will stop
4  its operation.  Similarly for the accelerator pedal -- if
5  I'm not mistaken, it might -- that might have changed
6  over the years -- the threshold is 90 percent.
7         So if automatic emergency braking is active and
8  operating at a given time, when you press the accelerator
9  pedal to over 90 percent, I believe, or some -- some
10  percentage, that will disengage the automatic emergency
11  braking.
12         Q.  Was there any indication, based upon your review
13  of log data, that the accelerator pedal was put at
14  90 percent or greater in the five seconds preceding this
15  crash?
16         A.  There was not.  And also, as we have discussed,
17  the automatic emergency braking didn't -- didn't
18  activate.
19         Q.  Correct.  It didn't activate because the --
20  there weren't sufficient triggers to cause it to
21  activate, or it didn't because the driver's input
22  overrid -- overrode its application?
23         A.  The first one, because of the reasons that we
24  have discussed, that is in a scenario in which automatic
25  emergency braking is not designed to activate.

*P- Witness is not unavailable to Tesla per FCRP 32(a)(4) and this is not for completeness.*

**231**

1  March of 2015; is that accurate?  Am I reading this
2  correctly?
3         A.  I mean, this is specific testing that was
4  performed at that time -- or this document relies testing
5  that was performed at that -- during that period of time.
6  That's according to this --
7         Q.  I was curious --
8         A.  -- report, yeah.
9         Q.  Hold on.  But it's on a Confluence page entitled
10  Autopilot Validation, AEB Testing, and it looks like it
11  was pulled in some way, shape, or form in 2022.  So I've
12  got to assume, just a caveman here, that if, in fact,
13  additional testing was done from 2015 to 2022, it would
14  live on this Confluence page, fair?
15         A.  That's not the ca- -- that's not the case,
16  Counsel.
17         Q.  Okay.  Where would the testing that validates
18  the efficacy and -- of -- of autopilot, where would it
19  live -- the validation testing or improvement testing or
20  any testing relative to AEB on autopilot, where would
21  that live, if not on the "AEB Testing - Autopilot -
22  Confluence" page?
23         MR. T. BRANIGAN:   For what model year, Counsel?
24         MR. SCHREIBER:   Anything after 2015 up until
25  what appears to be 20- --

*P- Same Obj. as Pg. 229*

**230**

1         Q.  Got it.  Moving right along, I'm going to mark,
2  as Exhibit 6, Benavides 2108.
3             (Exhibit 6 marked.)
4         Q.  (By Mr. Schreiber)  And this is AEB testing.  I
5  have the testing performed, as well, the actual testing
6  data.  This is apparently a Confluence page, correct?
7         A.  Correct.
8         Q.  And it says "Confluence."  And it discusses AEB
9  testing that was done in a parking lot in Sunnyvale in
10  2015, and something in Alameda -- oh, sorry about that.
11  Whoa, whoa.  Whoa, let me -- let me get control of my
12  magnifier.
13         My question for you, sir, is:  The last I see
14  here, is -- so it's March of 2015 through February of
15  2015.  To your knowledge, is the testing that was
16  performed on AEB, does it only exist from this 30-day
17  period in 2015?  I mean -- because I notice this
18  document -- and let me, here, contextualize.
19         The document is dated 12/21/22 at 9:40 a.m.  I
20  don't know what that is.  I don't know if that's the date
21  it was found, the date it was printed, the date it was
22  pulled down, whatever.
23         But it seems to me, and correct me if I'm wrong,
24  that the information, if it was pulled in 2022, about
25  testing of AEB by Tesla begins and ends in February and

**232**

1         A.  Yeah.  So --
2         MR. T. BRANIGAN:   Okay.  Go -- go ahead,
3  Mr. Rubio Blanco.
4         A.  And please allow me to explain.  So in order to
5  test or validate automatic emergency braking, whenever
6  there is a major change or a major release, there is --
7  and the steps that are -- a series of steps that are
8  followed starting by software, following by a snapshot
9  testing or regression testing, which is -- basically you
10  run different scenarios over different software suites,
11  or software releases, to see or evaluate where there's a
12  regression.
13         And there is a lot of testing performed, QA
14  testing.  It goes into the engineering fleet.  It goes
15  into the early access program, and then it goes into the
16  customer release fleet.  So every step of the way, we're
17  evaluating the performance.  Now, you're referring to one
18  specific test -- or you're showing me one specific test
19  that was done in 2015.
20         Of course, there have been other tests that have
21  been run over the years, including the IIHS test that we
22  have discussed before that is included in the Jira
23  ticket, and including tests for the National Highway
24  Traffic Safety Administration, the New Car Assessment
25  Program, et cetera, et cetera.

*P - Same Obj. as Pg. 229*

**233**

1      **Q. (By Mr. Schreiber)** Okay. But where does that

2 information live? It doesn't live on the Confluence page

3 about autopilot AEB testing?

4      MR. T. BRANIGAN: Objection --

5      **A. Depends on --**

6      MR. T. BRANIGAN: -- form. Mischaracterizes the

7 witness's testimony. Go ahead, sir.

8      **A. It depends on what information you're referring**

9 **to. I mean, if you're referring to specifically the NCAP**

10 **testing or the IIHS testing, those are testing -- test**

11 **reports that are -- that -- that might live in different**

12 **Confluence pages.**

13      **The -- the regression testing, if -- if -- if it**

14 **was -- since -- since it uses, in occasion, customer**

15 **fleet, might be -- there -- there might be a Jira ticket**

16 **for a specific regression testing at a given time.**

17      **So, yeah, I mean, that is not the only space in**

18 **which AEB testing will -- will live. And the Confluence**

19 **page, that was created for the purpose of that specific**

20 **testing during that period of time, which is two months.**

21      **Q. (By Mr. Schreiber)** Okay. So we sent a request

22 for AEB testing in terms of validation of the system and

23 the work that was done prior to this incident, and I'm

24 given this. Now you're telling me there's all sorts of

25 other testing out there.

**234**

1      What do I, as a simple caveman, do to inquire of

2 Tesla so that I can get my hands on any additional

3 testing? I have the IHSS [sic] in 2017. I appreciate

4 that. But you're making it out like you guys are just

5 testing this thing left and right. It's like pop quiz

6 every other Thursday. It was like my seventh grade math

7 class.

8      MR. T. BRANIGAN: It's funny, I didn't hear any

9 of that in his answer to your question. So I object to

10 your statement because I think it mischaracterizes what

11 he's been trying to explain to you.

12      **Q. (By Mr. Schreiber)** Okay. And simple man here.

13 There's this testing that's described in 2015, there's

14 the IHSS testing, and then there was a lot of word salad

15 about other tests. My question is: Where are those

16 other tests, Mr. Ru- -- Mr. Rubio, and how do I get my

17 hands on them?

18      **A. Yeah. So there might be documentation about**

19 **other tests. Now, as you may understand, the -- the bulk**

20 **of our testing suites is performed via shadow modes or a**

21 **snapshot testing using customer fleet; and for privacy**

22 **reasons, we -- we don't keep that -- that -- that**

23 **specific -- or those specific data points.**

24      **But to answer your question, I believe that**

25 **there might be other -- other documents relying -- or**

**235**

1 presenting AEB testing. I mean, for the entire life

2 of -- of Tesla, you're asking?

3      **Q.** No. Just until April of 2019, on Hardware 2.0,

4 2-point- --

5      MR. T. BRANIGAN: And -- and I need to interpose

6 an objection here. Because the -- the insinuation is

7 that you served us with a discovery request about AEB

8 testing and that we didn't provide everything that we

9 said we would provide, and -- and I don't -- you know, in

10 fairness to the witness, because you're asking him to

11 comment on that, why don't you show the witness the

12 discovery request at issue, and our response, and ask him

13 is there more than what Tesla said it would produce

14 concerning this vehicle.

15      MR. SCHREIBER: Well, Mr. Branigan, I'm not

16 going to sit here and engage in a discovery meet-and-

17 confer with your witness, but I will just simply tell you

18 that --

19      MR. T. BRANIGAN: That's exactly what you're

20 doing. Because you're -- you're -- you're -- excuse me.

21 I'm sorry, but that's exactly what you're doing. You --

22 you are using his testimony and -- and twisting it around

23 to suggest that you asked for A through Z and we only

24 gave you A through F --

25      MR. SCHREIBER: Well, the problem --

**236**

1      MR. T. BRANIGAN: -- said that we would give you

2 A through Z.

3      MR. SCHREIBER: The -- the issue that I have,

4 which I raised, and I'm not going to belabor it here, is

5 that there is this great propensity -- at least in this

6 case, from what I've seen reviewing a few thousand

7 pages -- of just sending a random letter saying, Here is

8 our ninth production of documents, good luck, without

9 actually complying with the Federal Rules of Civil

10 Procedure identifying what, in some way, shape, or form,

11 it's responsive to. I'm going to leave that here. I've

12 raised it in writing. I don't need to waste my --

13      MR. T. BRANIGAN: We've responded. We've said

14 we would -- we would respond to that and provide you with

15 the inde- -- index or indices that you are entitled to

16 under the rules, but that's a different matter from

17 saying, Well, it sounds like there's a lot more testing

18 that was done than was produced to me.

19      So what I'm saying, Counsel, is show us the

20 discovery request that you're alluding to, and let the

21 witness see it, and ask him questions about that or let

22 him comment on it instead of making this -- this overly

23 broad insinuation that we have failed to produce testing

24 to you that he described or that you asked for.

25      MR. SCHREIBER: Okay. Again, I'm not going to

1  engage in further meet-and-confer in discovery on this
2  issue with your -- with your witness right now.
3       Q. (By Mr. Schreiber) What I will ask you, however,
4  sir, is what I'm going to mark as Exhibit 7, and then I'm
5  going to jump into log data and then we're going to grind
6  out the last 30 or 40 on this thing.  Let me see here,
7  share screen.
8       (Exhibit 7 marked.)
9       Q. (By Mr. Schreiber) Okay.  This also has a
10  similar date of 12/21 of '22, appears to be a Confluence
11  page on AEB and forward collision warning.  Do you see
12  that?  And I know it's --
13      A. I see that.
14      Q. -- pretty small because of the landscaped way it
15  was produced to me.  And it describes various hardware
16  provisions.  I assume the designer who we speak of here,
17  Nicklas, is Mr. Gustafsson?
18      A. Correct.
19      Q. And did you speak with Mr. Gustafsson about
20  these documents or any of -- of the work with respect to
21  Hardware 2 revisions, reasons why things were revised,
22  changes made, as it related to AEB or forward collision
23  warning?
24      A. Not specifically about this, no.
25      Q. Okay.  What am I seeing here?  I -- explain this

238

1  to me.  So it looks like there are changes, there are
2  some follow-ups, different reasons why.  What is an NCAP
3  update or follow-up?
4       A. I mean, specifically NCAP, I'm -- I'm not sure,
5  but this document includes different software releases
6  and the changes or improvements that were made to forward
7  collision warning and automatic emergency braking.
8       Q. Oh, I understand.  That -- I -- I get that
9  generally.  I was asking specifically, you don't know
10  what the acronym NCAP stands for?
11      A. At -- at the -- at this time, no.
12      Q. That makes two of us --
13      A. I feel I should, though.  I -- I feel like I --
14  but I don't remember.
15      Q. I have an entire glossary of Tesla acronyms, but
16  this was not in it, so --
17      MR. T. BRANIGAN:  And, Counsel, I'll help you
18  out.  It's not a Tesla acronym.  NCAP, within the
19  automotive industry, stands for New Car Assessment
20  Program.
21      MR. SCHREIBER:  Ah.
22      THE WITNESS:  Oh, NCAP --
23      MR. SCHREIBER:  I think --
24      THE WITNESS:  -- yeah.
25      MR. SCHREIBER:  -- I've heard of that.  Thank

239

1  you.  All right.  I'm going to write that down.  All
2  right.  Cool.
3       Q. (By Mr. Schreiber) And then it looks like this
4  stops as of 2022, but it's not because the actual
5  Confluence page with respect to AEB and forward collision
6  stopped functioning in 2022.
7       It's that, for whatever reason, this was, I
8  guess, printed, obtained, whatever, from that date; and I
9  assume, in real time, if we were to go onto this actual
10  dynamic Confluence page -- dot, teslamotors.com, blah,
11  blah, blah, with all those letters -- we would see
12  additional updates and improvements made, fair?
13      A. I mean, assuming that this page was continued,
14  that will be the case.
15      Q. Sure.  All right.  And these are some of the
16  things that remain kind of in the works as of that time,
17  intersection crossing, striking the motorcycles, things
18  of that sort; is that --
19      A. I mean --
20      Q. -- correct?
21      A. -- the page includes information as to projects
22  that the team was working on.
23      Q. Including things like activation in a cross
24  traffic situation and striking a motorcycle, with respect
25  to setting, you know, parameters for AEB to fire,

240

1  correct?
2       A. I'm not sure of parameters, but, yeah, work done
3  towards the -- addressing those situations.
4       Q. All right.  And then it can -- it's getting long
5  in the day, Mr. Rubio.  I'm not going to mince words you
6  over whether it's parameters or not.
7       All right.  Fair enough.  Let me go through
8  this.  Let me see if there's anything else that I wanted
9  to cover.  I wanted to get that stuff in.  Oh, hold on.
10  Ah, here we go.  Sorry, I wasn't -- I wasn't pausing for,
11  like, effect.  I was just looking for something.
12      This is still in Exhibit 7.  This is Page 2120,
13  Bates 2120.  I swear to God I had it a second ago.  Oh,
14  there we go.  It does say that AEB events generate video
15  snapshots and CAN data.  Do you see that?
16      A. I see that.
17      Q. And so in this case, because we're going to now
18  parlay this into log data, even though AEB did not
19  trigger, you still received an urgent upload of video
20  clips and CAN data, true?
21      A. Correct, as a result of the RCM detecting a
22  collision.
23      Q. Right.  And do you think if AEB would have
24  triggered, would you have received any additional data
25  sets including those RTDVs, or is that separate and

1  apart?
2      A.  I mean, I'm -- I will be speculating.  I -- I
3  don't know.
4      Q.  You just don't know.  Okay.
5      Okay.  Topic 7 was McGee's car delivery.  You
6  guys objected and said, Well, refer to the sales
7  documents.  Fair.  What was not clear from the sales
8  documents, as someone who's actually read them, was
9  whether or not he received any training by Tesla
10  representatives on the use of autopilot at the point of
11  sale.
12      It's my understanding that in the 2018/2019
13  vintage, Tesla did not, in fact, provide kind of hands-on
14  training or, you know, kind of -- what's the word --
15  test-drive training with people who purchased the
16  vehicle, and its use of autopilot, but do so today; is
17  that your understanding, sir?
18      A.  My understanding is that upon delivery, a
19  delivery specialist will go through the details of the --
20  of the vehicle, including the location of the owner's
21  manual.  There was training individuals in order to
22  follow this process, and they will be there to answer any
23  questions that the customer have.  If they request a
24  test-drive, they will get a test-drive done.
25      Q.  And that was -- that's true today, but that is

1  owner manual is in the vehicle, and they will also be
2  there to answer any questions that the customer has.
3      Q.  Okay.  Topic 8 was warnings received by
4  Mr. McGee and instructions given to him.  At some point,
5  the hands-on warning initially used to say "hold the
6  wheel," and then it was later changed to "apply light
7  force to steering wheel."  Do you know anything about the
8  etiology of that change?
9      A.  No, I don't know the ideology of that change,
10  but I'm aware that that change ha- -- happened.
11      Q.  Do you know if there was any studies or analysis
12  done by folks on the user interface team with respect to
13  changing that language from "hold the wheel" to "apply
14  light force to the steering wheel"?
15      A.  I mean, that will follow the process that we
16  have discussed, going through the engineering fleet,
17  going through the early access program, receiving
18  feedback from those drivers.
19      Q.  Okay.  Do you know if a forward collision
20  warning was ever issued to Mr. McGee in the five seconds
21  or less prior to impact in this case?
22      A.  My understanding is it was not.
23      Q.  Why not?
24      A.  I mean, the -- the inputs for forward collision
25  warnings are similar to automatic emergency braking.  So

1  not true back in 2018 and 2019, correct?
2      A.  No, I don't understand that to be the case.  My
3  understanding is that we have always provided if -- or we
4  have always provided resources for our customers to
5  understand the -- the -- the vehicle, and we're there in
6  order to answer the questions.
7      Q.  So as the person most qualified or -- or
8  corporate representative for Tesla -- well, no, you're
9  not.  You guys said you weren't producing someone on this
10  issue.
11      Let me ask you this:  Do you have any
12  information, as a part of your preparation for these
13  proceedings, as to what training, if any, Mr. McGee was
14  given by Tesla representatives at the point of sale?
15      A.  No.  I can tell you what the practices were
16  around that time frame.  But generally what he actually
17  received, I -- I wasn't there, so...
18      Q.  And tell me what the practices were in Q1 of
19  2019 at the point of sale of a Model S, let's say, in
20  South Florida.
21      A.  My understanding is that there was a delivery
22  specialist that will be there to deliver the vehicle, and
23  then he will go -- they will go through a checklist in
24  order to provide the relevant information to our
25  customers.  Then they will show them where -- where the

1  similarly to AEB, forward colli- -- collision warning is
2  not designed or was not designed to trigger in that
3  situation.
4      Q.  But the user was warned or is told in the
5  owner's manual that cameras and sensors associated with
6  forward collision warnings are designed to monitor an
7  approximate area of up to 525 feet in your driving path;
8  you would agree with that?
9      A.  To monitor, yeah -- I mean, yeah, the cameras
10  and -- and -- and the radar is assigned to monitor that.
11  That doesn't mean that a forward collision warning needs
12  to be triggered every time something is in that area,
13  right?
14      Q.  No, of course not.  But that's part of what,
15  kind of, drivable space is, too, is it's always looking
16  forward at least about 500 feet, depending on the speed
17  of the vehicle, of what is drivable space in front of the
18  vehicle, true?
19      A.  No, I don't agree with that.  Drivable space
20  will be the surface in which the vehicle is driving,
21  which is the asphalt road.
22      Q.  All right.  And the forward collision warning
23  system is looking 500 feet forward to ensure that there
24  is a continuation of drivable road in front of the
25  vehicle, right?

245

1   **A.  Well, the forward collision warning is not**
2   **looking everywhere.  It's triggering under a set of**
3   **conditions.**
4       Q.  It's looking forward, sir, right, to avoid a
5   collision?  That's why you call it forward collision
6   warning, right?
7       MR. T. BRANIGAN:  Objection --
8   **A.  No --**
9       MR. T. BRANIGAN:  -- form --
10  **A.  -- not to avoid --**
11      MR. T. BRANIGAN:  -- mis- --
12  **A.  -- a collision.**
13      MR. T. BRANIGAN:  Mischaracterizes forward
14  collision warning and the information provided about it
15  by Tesla.  Go ahead.
16  **A.  No.  Forward collision warning is not designed**
17  **to avoid collisions.  If there -- it's designed to**
18  **mitigate collisions, and it's a system that the drivers**
19  **should not rely on in order prevent a collision, and it**
20  **says that in the owner's manual.**
21      **Now, it triggers in a series of conditions, and**
22  **one those of those conditions it's -- I mean, those**
23  **conditions are similar to automatic emergency braking.**
24  **Automatic emergency braking just needs further**
25  **confirmation of -- of a potential collision, right?**

246

1       **And one of those conditions is that the**
2   **colliding object, or potential colliding object, is in**
3   **the drivable space of the vehicle which is in the**
4   **roadway.  As we understand, we cannot trigger forward**
5   **collision warning and automatic emergency braking for**
6   **things that are outside of -- of the roadway, because you**
7   **will be getting unexpected activations as you drive**
8   **through any roadway, right?**
9       Q.  (By Mr. Schreiber)  So it's your testimony that
10  forward collision warning and automatic emergency braking
11  in 2019 were not designed to anticipate a T-intersection
12  and the possibility of either a roadway departure or some
13  sort of obstacle or vehicle off of the paved surface?
14      MR. T. BRANIGAN:  Objection, form.  Incomplete
15  hypothetical.
16  **A.  My understanding is that forward collision**
17  **warning and automatic emergency braking required a**
18  **vehicle identification that is consistent with a vehicle**
19  **that is traveling in the general same direction as the**
20  **Tesla vehicle, as well as assigned to the lane of travel**
21  **of the Tesla, as well as in the roadway in the drivable**
22  **space, and those conditions were met.**
23      Q.  (By Mr. Schreiber)  So it just kept on keeping
24  on, correct?
25      MR. T. BRANIGAN:  I'm sorry.  Is that question

247

1   for the witness?
2       MR. SCHREIBER:  Yeah.
3       Q.  (By Mr. Schreiber)  So the vehicle just kept on
4   keeping on straight through the intersection, straight
5   off of the -- it departed the roadway, and the collision
6   occurred without any --
7       MR. T. BRANIGAN:  Objection --
8       Q.  (By Mr. Schreiber)  -- activation of AEB or
9   forward collision warning; and it was operating as
10  designed, as intended, in April of 2019.  Is that your
11  testimony, Mr. Rubio?
12      MR. T. BRANIGAN:  Objection, form --
13  **A.  Vehicle --**
14      MR. T. BRANIGAN:  -- vague.  It also
15  mischaracterizes the witness's testimony.  Go ahead.
16  **A.  Counsel, I haven't reconstructed the crash, but**
17  **I -- I can tell you that the vehicle responded to driver**
18  **inputs as the driver was commanding the acceleration for**
19  **the vehicle to enter the intersection at that speed,**
20  **overriding traffic-aware cruise control and actually**
21  **receiving a number of messages during the drive that told**
22  **the driver eight times cruise control will not brake**
23  **through pressing the accelerator pedal.**
24      Q.  (By Mr. Schreiber)  Was Mr. McGee ever given a
25  take-over-immediate warning at any point in the

248

1   90 seconds before this crash?
2       **A.  There's a portion of the data within one second**
3   **of the crash sequence, the autopilot system goes to**
4   **aborting -- from aborting to aborted.  Now, that is a**
5   **very small window of -- of time because it only happens**
6   **while the -- or up until the hands of the driver are**
7   **actually detected and there's a driver input, and then**
8   **within that period of time, "take over immediately" will**
9   **have been displayed to the driver.**
10      **Now, you know, it's a very short period of time,**
11  **so we -- we cannot confirm that that actually occurred.**
12      Q.  Was Mr. McGee ever given a take-over-immediate
13  war- -- a ma- -- "take over immediately" warning from the
14  vehicle at any point five seconds before the crash?
15      **A.  Again, as -- as I have said, there is a sequence**
16  **that goes from aborting to aborted, in which "take over**
17  **immediately" is displayed, and -- but it's a few**
18  **milliseconds in this case.**
19      Q.  So milliseconds before the crash occurred and
20  the impact occurred, Mr. McGee was given the "take over
21  immediately" warning by his vehicle; is that your
22  testimony, sir?
23      **A.  No, it wasn't milliseconds before the crash.  It**
24  **was -- I mean, I haven't -- I'm not able to -- to -- I**
25  **haven't reconstructed the crash, so I don't know in what**

1  point of time.  But what I can tell you is that the
2  autopilot state shows that if -- a sequency that goes
3  from aborting to aborted, and the vehicle will display a
4  "take over immediately" in between those times.
5      Q.  And having reviewed the log data, which we're
6  going to go into now, what was the time frame relative to
7  impact and the -- the sensor that a crash went out
8  between aborted -- aborting and aborted prior to, let's
9  say, the bag popping?
10     A.  I mean, off the top of my head, I wouldn't be
11 able to -- to tell.
12     Q.  We'll look at it in a second and maybe -- but
13 it's less than a second; you would agree with that?
14     A.  I don't -- I -- I don't remember --
15     Q.  All right.
16     A.  -- and I haven't memorized the data.
17     Q.  Well, then I won't comment.
18         Okay.  Log data.  So I'm going to show you what
19 was produced as Benavides 1.  Let me also open up 3.
20         All right.  All right, sir.  What do you call
21 this document, sir?
22     A.  This is the diagnostic log data from the subject
23 vehicle for April 25th, 2019.
24         MR. T. BRANIGAN:   Counsel, can you give us a
25 Bates number on that one, please.

1  file that was generated in order to provide data to a
2  regulatory entity.
3      Q.  That -- that was going to be my question.
4          This is the stuff that you guys give to the
5  feds, right?  When it looks like this, this is usually
6  the things that go to NHTSA or NTSB or cops?
7      A.  I mean, this data was generated based on an --
8  an NHTSA request, or that's my understanding.
9      Q.  Yeah.  That's my understanding, too.
10         Oh, and here, we went from aborting to aborted
11 in one second, and the crash happened in the same second.
12 Do you see that?
13     A.  I see that.
14     Q.  So the "take over immediately" signal that
15 Mr. McGee was given in the actual se- -- last second
16 of the crash, at the moment the vehicle was detecting
17 that it was smashing into a stationary object, correct?
18     A.  I mean, the aborting sequence starts --
19     Q.  One second --
20     A.  -- approximately one second.  I mean, I will
21 have to look at the milliseconds in there, but --
22     Q.  Well, we're really splitting hairs if we're
23 talking milliseconds.  We're talking about blinks of an
24 eye, sir.  Between 6:13:16 and 6:13:15, you went from
25 aborting to aborted, and that's the same second that the

250                                                                                    252

1          MR. SCHREIBER:   Yes, sir.  This is -- this one
2  is easy to remember, 001.
3          MR. T. BRANIGAN:   Thank you.
4      Q.  (By Mr. Schreiber) And that's our moment of
5  crash, correct?
6      A.  Correct.  I mean, when the vehicle detected the
7  crash.
8      Q.  Yes, sir.  Okay.  And there are a series of
9  fields that are identified, or signals that are
10 identified, here.  Who sets these parameters when this is
11 produced?
12         MR. T. BRANIGAN:   Objection, form.
13         What do you mean, who -- who sets the signals
14 or -- what do you mean by "parameters"?
15     Q.  (By Mr. Schreiber) There's a series of signals
16 and -- identified in the various columns running from C
17 through F that I have -- will tell you, having received
18 this data in multiple cases, it's not consistent.
19         So who makes the decision as to what columns are
20 relevant to produce when it comes to this type of log
21 data?
22     A.  So, I mean, it depends on the file that
23 you're -- that you're using.  I believe there are
24 different files for -- for this date that include
25 different signals, and in this case, we're looking at a

1  crash occurred, agreed?
2      A.  I mean, it's between one and two seconds before
3  the crash occurred.
4      Q.  All right.  And I'm -- I'm not a good math guy,
5  but how is it two seconds if it's 6:13:15 and then
6  6:13:16?  Last time I did subtraction, 16 minus 15 is 1.
7  How is that two seconds --
8      A.  Yeah, but that -- well, that 15 has been -- as
9  you can see, it's cropped.  So you will have to go to the
10 other file that actually includes the milliseconds, which
11 are important in order to determine whether it's closer
12 to a second or two seconds.
13     Q.  Got it.  That's fine.  All right.  We know that
14 this happened at night, so what standard time is -- log
15 data time zone is it tied to?  Not the time zone --
16     A.  This specific file --
17     Q.  -- that it's in.
18     A.  This specific file is in Pacific as -- you know,
19 if you go to Column B, or Cell B2, it states that, U.S.
20 Pacific.
21     Q.  And does that change?  Because here, let's go
22 ahead -- let me see.  Sometimes the flip works, and
23 sometimes I lose you.  Are we still sharing?  No --
24         MR. T. BRANIGAN:   Yes.
25     Q.  (By Mr. Schreiber) -- sharing is paused, it

1  says.
2      A.  You're sharing the same document.
3      Q.  Okay.  I'm looking at a different one, so let me
4  re-up my share.  And just while I'm on the subject, now
5  we're at Benavides 2, and this is -- 1 and 2 will be and
6  appended together as Exhibit 8.
7      And I think -- I apologize, I lied.  Two was --
8  ended earlier.  I wanted, actually, 3.  So Benavides 001
9  and 003 are going to be appended together to create
10  Exhibit 8.
11          (Exhibit 8 marked.)
12      Q.  (By Mr. Schreiber)  Okay.  Sir, let's look at
13  some stuff so that we can talk about it.  First of all,
14  when you review log data, do you review it in Excel
15  spreadsheets, or do you review it in Periscope or -- or
16  some other Tesla system or program?
17      A.  Most of the time in -- in Excel.
18      Q.  What about some of the other time?
19      A.  I mean, if I need to check for something quickly
20  in the data that's available in Periscope to query, I
21  will use Periscope, but --
22      Q.  And what is Periscope?
23      A.  -- most of it -- Periscope is a tool that is
24  within Toolbox, and it is used in order to query data
25  that is available from vehicles.

1          MR. SCHREIBER:  Oh, is it five hours from
2  Eastern?
3          MR. T. BRANIGAN:  I think -- I think it is,
4  yeah.
5          MR. SCHREIBER:  Then I guess maybe it's the
6  time --
7      A.  It's -- it's either four or five, depending
8  on --
9          (Simultaneous speaking.)
10          MR. T. BRANIGAN:  Right.
11      Q.  (By Mr. Schreiber)  All right.  So here, we go
12  from C to, like, triple -- yeah, CP, so about
13  100 columns.  What would you call this data set?
14      A.  This data set includes signals that are relevant
15  to -- or subject to access request and are consistent
16  with what we provide to customers when they request data,
17  and it is related to interactions with a vehicle from
18  driver.
19      Q.  So these are signals that are subject to access
20  request.  What does that mean?
21      A.  So from, apparently, 2020 or late 2019, as part
22  of the California Consumer Privaty -- Privacy Act, Tesla
23  started sharing data with their customers; and that data,
24  the data that we share, is related to the interactions
25  with the vehicle, and this is -- this data set is

254

1      Q.  What's your preferred column width?
2      A.  It's a great question.  I -- I don't use
3  numbers.  I just wing it.
4      Q.  You're an engineer, man.  Come on.  I thought
5  you'd be like, I like it at 26.423.
6      All right.  I'm going to give you 22.  All
7  right.  And then we're going to shut down a bunch of the
8  crap that we don't care about.  Okay?  Well, let me
9  rephrase, that I don't care about.  But before I get
10  there -- so now I'm looking at log data from the same
11  day.  UTC, remind me, univer- -- what is that?
12      A.  Universal Time Coordinated.
13      Q.  Right.  That's -- I forgot what it stood for,
14  but I understand it.  And where is that based out of?
15  What are we -- what are we using when we come up with UTC
16  time?  How would we adjust this to Eastern Standard Time?
17      A.  Eastern Standard Time -- seven hours and
18  four hours -- if I'm not mistaken, it's four hours ahead.
19      Q.  I think that's --
20      A.  But if -- if you go to the collision alert, we
21  might be able to figure it out, because I don't want to
22  misspeak.
23      Q.  I think that's about right.  We'll get there.
24          MR. T. BRANIGAN:  I think it's -- I think it's
25  five hours, just --

256

1  consistent with -- with the data set that we -- that we
2  provide in those situations.  It has the signal names,
3  the user-friendly signal names.
4      Q.  And who makes the determination as to what
5  signals involve user interaction or driving --
6      A.  Um --
7      Q.  How is that determined?
8      A.  That is determined by our privacy team along
9  with the help of engineers.
10      Q.  Okay.  And does that consistently produce the
11  same signals and data set with the user-friendly signal
12  names every time a customer requests their log file, or
13  does it change?
14      A.  No.  That will depend on the availa- -- that
15  will depend on the availability of the data, of course.
16  So you see how their signal's related to the key fob.  If
17  you don't use the key fob, the vehicle is not going to
18  log a signal relevant to the key fob, so that signal
19  wouldn't be there.
20      Q.  The universe of signals, is it the same?  And
21  then I understand some signal data is tracked in real
22  time.  In other words, there's a constant perpetual
23  update of it, and then other signal data is logged based
24  upon use like the key fob.  If you ain't using the key
25  fob, well, then obviously, it's not meant to be leaving

1 any signals or any data relevant to it.
2     Does the -- so the numerator changes. The
3 denominator of signals, is that the same for all
4 customers when it comes to the body of information that
5 could be collected, but in some instances is not because
6 of use?
7     A.  Specifically for data subject to access request,
8 you're referring to, right?
9     Q.  Yes.
10     A.  Yes.  Generally speaking, yes.  I mean, it might
11 have been modified over the years when I have added a
12 couple of signals or removed a couple of signals, but
13 generally speaking, similar.
14     Q.  Okay.  And you referred to -- you drew a
15 distinction between data access signals.  Is there
16 another family or type of signals that is available?
17     A.  In the production?
18     Q.  Yes, that is produced.  In --
19     A.  Yes.
20     Q.  In litigated cases, for instance.
21     A.  Yes.  I mean, for this case, it's -- there is an
22 additional data set that has been produced.
23     Q.  And what do you call that?
24     A.  The -- the -- the other data set will be the
25 engineering output that includes the signals that are

1 every couple of weeks, depending on the vehicle version,
2 software releases.  The signal might be live for a short
3 period of time while we're developing a specific feature,
4 then it might go away.
5     So we do not maintain a specific list of
6 signals.  I mean, you might be able to find a list of
7 signals in Confluence that was created for a specific
8 purpose for a specific vehicle for a firmware version,
9 but as those change with firmware versions, we -- we do
10 not maintain such a list.
11     Q.  Well, the Confluence pages would still exist,
12 and they would just be updated consistent with the latest
13 firmware versions, would they not?
14     A.  Yeah.  That's -- that's my point, we -- we are
15 not maintaining a Confluence page with that purpose.
16     Q.  All right.  So -- well, let's finish this and
17 we'll come back to that.  So here, I -- I hid a bunch of
18 stuff.  Cruise control, steering angle.  We'll keep
19 accelerations.  We know he's buckled, so we don't really
20 care about that.  He wasn't in park.  We know what gear
21 he's in.  Let's shut that down.
22     I don't care if his air-conditioning was on or
23 off.  I don't care about his user interface battery life,
24 what his odometer said, what his radio was doing, or
25 whether his charger to his phone was connected.  That

258
260

1 relevant to an incident investigation.
2     Q.  And who makes the determination of the signals
3 relevant to an incident investigation?
4     A.  That will be a collaboration between our team
5 and -- and different teams that actually use those
6 signals or those data sets.
7     Q.  Other than the incident review team, who else is
8 involved?
9     A.  The field quality team.
10     Q.  Led by Mr. Gates?
11     A.  I mean, not him personally, but...
12     Q.  Right.  The team is led by him, fair?
13     A.  Correct.
14     Q.  And that doesn't typically have -- it has
15 similar data, but oftentimes more of it does not have the
16 user-friendly signal names, or does it?
17     A.  The engineering output does not have the user-
18 friendly signal names.  It has the actual signal names.
19     Q.  Yeah.  And is there a series of Confluence pages
20 where various types of signals are described in terms of
21 what their signal name is and then kind of their user-
22 friendly explanation of what they do or what information
23 they receive or transmit?
24     A.  No, we do not maintain a -- a description of
25 signals.  As you may understand, Counsel, signals change

1 takes me through Column CD.  Go ahead and hide those bad
2 boys.
3     A.  Not the phone -- not the phone, Counsel.  That's
4 the actual charger of the Tesla.
5     Q.  Whatever.  Charging something.  Who cares.
6     For instance, if you were doing this as a part
7 of your incident review, you would probably not care
8 about that column, either; is that fair?
9     A.  I mean, it depends on what the claim is --
10     Q.  On this case.  On this case.  This isn't a --
11 this isn't a -- somebody gave me the wrong dongle to
12 stick in my charger.
13     All right.  So we'll talk about pedal position
14 and vehicle -- vehicle speed.  All right.  Now, let's
15 head on down.  Sorry, there's only about 8,000 rows, so
16 it's just going to take a moment.
17     All right.  We're getting closer.  What did we
18 say on the other one, we were at -- oh, shoot.
19     A.  Are you -- are you trying to find the collision,
20 Counsel?
21     Q.  Yeah.  Our time, yes.
22     A.  Okay.  So this is Universal Time Coordinated,
23 and so the collision will fall into the next day.  So
24 it's a different file, if I'm not mistaken.
25     Q.  Oh, that's -- oh, that's right.  That's this

**261**

1  one.  Hold on.  No, I think --
2      **A.  Or it might -- it might be here.**
3      **Q.**  I think it's here.  No, no, that's why I think I
4  skipped to this one.  You're right.  Because it's
5  Universal flow, so it's going to show the 9:00 collision
6  at, like, 01 on the 26th?
7      **A.  01:16, I think, or something.**
8      **Q.**  Yeah.  Oh, maybe I misspoke, all that -- all
9  that lead-in.  Damn it, I did have it in backwards.  We
10  got to hide columns and do all that.  Hang on, let's see.
11      No.  Yeah, this one is the one from the 24th.
12  Yeah, no, Benavides 2 is the one from the 24th...
13      Here we go, the reproduced version.  Okay.
14  Mr. Rubio, when you were reviewing this -- so now I'm
15  looking back at this later reproduced one that was redone
16  as 006.  I'm going to show it to you.
17      This -- are we looking at the same document?
18  Are you looking at one with -- that appears more similar
19  to the first one we looked at, which is akin to what you
20  guys produce to enforcement agencies; is this what you
21  reviewed?
22      **A.  Sorry, it's too small.  What I will do?**
23      **Q.**  I said, is this what you reviewed?  I'm just
24  trying to understand the universal log data that you
25  reviewed as a part of your work in preparation for today.

**262**

1      **A.  No, not this one.  I mean, I've seen this one,**
2  **but I used the engineering output that has also been**
3  **produced.**
4      **Q.**  Okay.  And do you know, off the top, which of
5  the multitudes of log data that has been produced in this
6  case that that one was that you relied upon in preparing
7  for today?
8      **A.  I do not -- I don't have a Bates number for it.**
9      MR. SCHREIBER:  Mr. Branigan, do you want to
10  help pinpoint which one he reviewed?  Or, otherwise, we
11  can sit here and do this.  It's just going to burn more
12  time.
13      MR. T. BRANIGAN:  If I knew such that I could
14  help you, I would.  I -- I wasn't involved in that, so
15  you'll have to keep at -- you'll have to ask the witness.
16      **Q. (By Mr. Schreiber)** Well, let me ask you this,
17  sir:  As it relates to these two different sets of log
18  data that is, I think, you initially referred to as --
19  let's see.  Whatever you guys called this.  Not the
20  engineering output, but the -- the shared data output
21  with user-friendly signal names.  How is this different
22  from the first document we reviewed, if you know?
23      **A.  I believe this is consistent with the first**
24  **document, which is the output for NHTSA.  I mean, it has**
25  **the same format.**

**263**

1      **Q.**  Uh-huh.  And is this NHTSA's format, or is this
2  Tesla's?
3      **A.  I mean, we -- when they request data, we work**
4  **with them, and based on the -- on their data request,**
5  **we -- we -- this is what they usually request from us.**
6      **Q.**  Sure.  Fair.  I'm going to get to the crash
7  eventually.  Let's see, where are we at here?  01:16,
8  we're getting there.
9      MR. T. BRANIGAN:  Counsel, just as an FYI, based
10  on our calculations, seven hours is up in ten minutes.
11      MR. SCHREIBER:  Plus or minus.  I mean, we've
12  got some -- we had some hard stops that didn't quite work
13  out, but...
14      MR. T. BRANIGAN:  Well, we're at 4:32 Eastern
15  Time, and we calculated the extra time because of the
16  longer breaks to give you ten more minutes on the record.
17      MR. SCHREIBER:  That was kind of you.  Okay.
18  Well, I'm going to move as fast as I can and cover as
19  much as I can, and I understand where you guys are at.  I
20  also understand that, you know, there's a few issues we
21  may have to discuss after.
22      **Q. (By Mr. Schreiber)** Sir, one question I want to
23  know from you, based upon the log data here, whether it's
24  engineering or otherwise that you have reviewed, was
25  there any reason or did you have any indication that

P- Witness is not unavailable to Tesla per FCRP 32(a)(4) and this
is not for completeness.

**264**

1  Mr. McGee, in the time prior and this last drive cycle,
2  ever reached sufficient hands-on warnings that would have
3  resulted in any kind of strikeout?
4      **A.  During the drive cycle that ended up in the**
5  **collision?**
6      **Q.**  Yes.
7      **A.  He did not.  During that drive cycle, he did**
8  **not.**                       P - Same obj as above
9      **Q.**  Okay.
10      **A.  If he will have a strikeout, he wouldn't be able**
11  **to engage autosteer.**
12      **Q.**  And his use of the accelerator pedal in the
13  moments before this incident, whether you're reviewing
14  this log data or engineering data, was not the cause of
15  AEB not firing, true?  It did not override or otherwise
16  disqualify AEB from activating, correct?
17      **A.  That's my understanding.**
18      **Q.**  Did you have, in any of the engineering sets of
19  data, anything -- any data related to forward radar
20  obstacle detection?
21      **A.  I'm not sure if -- if that was retrieved from**
22  **the subject vehicle.  There is a signal for desired**
23  **target, I believe it's called that signal, but that is**
24  **for specifically the -- the following distance to the**
25  **vehicle in front of the Tesla vehicle, when that vehicle**

1    is traveling in front of it for a period of time, right,
2    for traffic-aware cruise control.
3        Q.   And what is the name of that signal, the desired
4    target signal?
5        A.   I want to say CH, underscore, DAS, underscore,
6    desired target, underscore, DX, something -- or -- or
7    something similar.
8        Q.   And there are an entire family of DAS signals
9    that all involve the driver-assistance system, true?
10       A.   I mean, the driver-assistance system is -- is
11   one of the computers, that it's running and generating
12   information in the vehicle, and it -- it provides a
13   series of -- of signals.
14       Q.   And so when we're looking at this document which
15   was previously marked and -- well, it was produced in our
16   case, too.  We'll just refer to it here.  It's
17   Benavides 1244.  Do you see this document, sir?
18       A.   I do, yes.
19       Q.   And this is signals subject to customer data
20   access?
21       A.   That is the Confluence page from which this
22   document was downloaded.
23       Q.   Right.  And so this is a place where -- and I
24   think there's approximately, like, 1,700 signals over the
25   course of 76 pages.  These are the signals that customers

1    what they relate and respond to?
2        A.   My testimony --
3             MR. T. BRANIGAN:   Let me just object --
4        A.   -- was that --
5             MR. T. BRANIGAN:   -- to the form of the
6    question.  I think that mischaracterizes his testimony
7    about this document, and it's also overly broad
8    concerning the issue.
9        A.   And my testimony was, that there's not a list
10   that we maintain with all the descriptions for all the
11   signals that the vehicle can log at a given time.  What
12   we're seeing here is an effort that was performed for a
13   specific period of time; in this case, for a Model 3, in
14   which they were attempting to determine whether signals
15   were suitable for access request.
16            And that was done pretty much manually in order
17   to perform that -- that investigation and -- and evaluate
18   whether to add those signals to -- to these or not, but
19   there's not a list that we maintain with what you're
20   describing, that I'm aware of.
21       Q.   (By Mr. Schreiber)  I -- I appreciate your
22   answer, but that wasn't my question.  My question was,
23   are there Confluence pages or other resources that define
24   various categories of signals, like autopilot primary and
25   autopilot secondary and driver-assistance systems, and

266                                                        268

1    can receive.  These are -- I would -- that's what the
2    term "customer access --" -- "customer data access"
3    means?
4        A.   No.  That's -- that's not the case.  This was a
5    project that was performed at a specific time in order to
6    evaluate whether the signals that were available from
7    vehicles at that given time were meeting the requirements
8    for signals to -- to -- subject to access request.  So --
9    and these signals are actually for a Model 3.
10       Q.   Okay.  And the various acronyms, like APP --
11   what does APP stand for?
12       A.   Autopilot primary.
13       Q.   All right.  And so you --
14       A.   And, again, for a Model 3.
15       Q.   And then APS, what does APS acronym stand for?
16       A.   Autopilot secondary.
17       Q.   What about BMS?
18       A.   Battery management system.
19       Q.   Okay.  So I thought it had something to do with
20   battery, because that's what they are talking about
21   there.  And then DAS is driver assistance, correct?
22       A.   DAS, driver-assistance system.
23       Q.   And so is it your testimony that Confluence
24   pages or other types of resources do not exist within
25   Tesla to explain the various categories of signals and

1    then describe what those signals are and the information
2    that they send or receive.
3        A.   Again, that will depend on the specific signal
4    that we are discussing and what is the firmware version
5    of the vehicle, whether it's the specific signal or not.
6             You know, if -- if you have questions about a
7    specific signal, you might be able to find information
8    about that specific signal in Toolbox if somebody's
9    ha-- had -- from service has -- had talked about it or
10   added that description to that specific signal for --
11   for -- for a case or a -- an event, but that will be --
12   yeah, that will be the case.
13       Q.   Okay.  Last questions, as it relates to the
14   videos -- well, let me ask you this:  Have you had the
15   occasion in other cases where the target signal for radar
16   obstacle detection was not received when all of these
17   other signals were?
18       A.   Yeah.  I mean, we've had cases in which we -- we
19   haven't received a set of signals or we have received
20   some portion of signals or -- or not, so...
21       Q.   All right.  A few more here.  And I just
22   identified 1243.  I'm not going to make it an exhibit,
23   just in case anybody cared.
24            So this is one of the videos, all about
25   four seconds long, five seconds long, that was

269

1   received -- this was one of the clips that was received
2   over an urgent upload, correct?
3       **A.  That's my understanding.**
4       Q.  Who edits this to include a viewer discretion
5   warning for the first two seconds?
6           MR. T. BRANIGAN:   Sorry.  Did you say --
7               (Simultaneous speaking.)
8           MR. T. BRANIGAN:   -- who edited it?
9           MR. SCHREIBER:   Yes.
10      Q.  (By Mr. Schreiber) I mean, it doesn't come to
11  you urgently uploaded with a "viewer discretion advised"
12  landing page, true?
13      **A.  Well, it -- as -- as far as I understand it,**
14  **it's an automatic process.**
15      Q.  Oh.  So you're saying that on the urgent upload
16  side, you receive this viewer discretion?
17      **A.  No.  You receive the VIN and the recording date,**
18  **and then the viewer discretion is added to every video**
19  **that -- that is shared with customers.**
20      Q.  And this was shared with -- you said shared with
21  the customer?
22      **A.  No.  But, like, when those videos are exported,**
23  **they -- the viewer discretion is added, or that's my**
24  **understanding.**
25      Q.  Okay.  And so what we have here from second 3,

271

1           MR. SCHREIBER:   And I got here at 6:00 a.m., you
2   know.  This is -- and if this shit was easy, anybody
3   could do it.  Hey, so -- all right.  Real-time data
4   values, you're not producing anybody on --
5           MR. T. BRANIGAN:   Well, he -- we -- not as a
6   corporate rep, but he's answered a number of questions
7   about real-time data val-- values today, that's for
8   sure.
9           MR. SCHREIBER:   He has.  And real-time data
10  values also include GPS coordinates, right?
11      Q.  (By Mr. Schreiber) So you did receive the GPS
12  coordinates of this crash.  So in some ways, you received
13  real-time data values on this crash; is that true, sir?
14      **A.  We received the GPS coordinates as part of the**
15  **D16 upload.**
16      Q.  Okay.  But you didn't receive real-time data
17  value GPS coordinates?  Isn't that one of the RTDVs that
18  you receive when a crash occurs?
19      **A.  As far as I understand, we -- we received the**
20  **GPS via the -- the D16.  We did not receive real-time**
21  **data values, or that's -- that's my understanding.**
22      Q.  It is your understanding, though, that real-time
23  data values for GPS are urgently uploaded in some
24  circumstances, true?
25      **A.  That's -- it's one of the values that will be**

270

1   and there is a bit of a lag, through impact is about
2   seven seconds of the actual lead-up.
3           Have you asked anyone or are you aware of
4   whether or not there was any additional clips other than
5   the six seven-second videos that were obtained from the
6   various cameras right before impact?
7       **A.  My understanding is that these videos are all we**
8   **have with regards to --**
9       Q.  And --
10              (Simultaneous speaking.)
11      **A.  -- to the videos from this collision.**
12      Q.  (By Mr. Schreiber) And have you made any efforts
13  to determine whether or not any videos live on the SD
14  card?
15      **A.  Again, Counsel, videos do not live in the SD**
16  **card of vehicles.**
17      Q.  Okay.  All right.
18          MR. T. BRANIGAN:   We're at 4:42 Eastern,
19  Counsel.
20          MR. SCHREIBER:   I appreciate that.  Let's see
21  here.  You're not producing anybody -- let's go -- give
22  me about three minutes.  You got -- you got three minutes
23  to spare?  Make it 4:45, make it an even -- even 15?
24          MR. T. BRANIGAN:   Give you two minutes.  I've
25  got a witness who's approaching 11:00 p.m. local time.

272

1   uploaded in -- in some circumstances.
2       Q.  Okay.  Just looking at this segment of the
3   roadway, on the issue of drivable space.  How would the
4   vehicle, as it is approaching this intersection,
5   understand or calculate the drivable space in front of
6   it?
7       **A.  I mean, first of all, we wouldn't be able to**
8   **know what the vehicle was detecting at -- at that time**
9   **because we don't have sufficient data in order to perform**
10  **that -- that evaluation.  But in the general concept**
11  **of -- of drivable space, I can tell you that that is**
12  **generally the -- the asphalt road.**
13      Q.  And --
14          MR. T. BRANIGAN:   Counsel, it's now 4:45.
15          MR. SCHREIBER:   And this is my last question,
16  and I appreciate the courtesy.
17      Q.  (By Mr. Schreiber) And so in the last
18  2 1/2 seconds before this vehicle exited the roadway, is
19  it your testimony, as the corporate representative for
20  Tesla on drivable space, that this vehicle was unable to
21  appreciate that the drivable space or the asphalt of this
22  roadway on this T-intersection was going to end in less
23  than 2 1/2 seconds?   T- Calls for expert opinion by fact witness
24          MR. T. BRANIGAN:   And, Counsel, the witness has
25  already told you he didn't reconstruct this -- this

**273**

1  crash.  That question calls for an expert opinion, which
2  he's not here to give.  So if he -- if he answers, he's
3  answers that -- answering as a fact witness, not as a
4  corporate rep.
5      MR. SCHREIBER:  We'll agree to disagree.
6      Q.  (By Mr. Schreiber)  Mr. Rubio, go ahead, sir.
7      A.  That's not my testimony, Counsel.  I didn't say
8  that.
9      Q.  I asked you a question, sir, which was:  Based
10  upon what we see here, knowing that this vehicle exit
11  this roadway in less than 2 1/2 seconds, as a corporate
12  representative on drivable space, was this vehicle at
13  this time, based upon the GPS coordinates, based upon the
14  fact that it have navigation, the fact that it's on a
15  map, the fact that it knows it's approaching a T-
16  intersection -- was this vehicle incapable at this time
17  of recognizing that the drivable space was going to end
18  in less than 500 feet or in less than 2 1/2 seconds?
19      MR. T. BRANIGAN:  Same objections.
20      A.  Again, I can't answer the question because I'm
21  not able to simulate in my head what the vehicle was
22  seeing at that time, and we have insufficient data in
23  order to perform that evaluation at this time.
24      Q.  (By Mr. Schreiber)  So Tesla is unable to answer
25  that question?

T- Calls for
expert opinion
by fact witness

**275**

1  statement about the record while we're still on the
2  record.  This deposition is covered by the protective
3  order in this case.  We will, pursuant to the terms of
4  the protective order, review the transcript and make
5  confidentiality designations.
6      Until that time, I think the entire transcript
7  is to be treated as confidential and not releasable to
8  the public.  Thank you.
9      MR. SCHREIBER:  So stipulated.
10      THE VIDEOGRAPHER:  Anybody else?
11      The time is 3:48.  We're off the record.
12      *(Proceedings adjourned at 3:48 p.m. CST.)*

**274**

1      MR. T. BRANIGAN:  And that -- Counsel, that's
2  it.  We're -- we're now at 4:47 p.m.  I think the --
3      MR. SCHREIBER:  And I appreciate the extra
4  time --
5      *(Simultaneous speaking.)*
6      MR. SCHREIBER:  -- Mr. Branigan, and I thank you
7  for it.
8      Mr. Rubio, thank you, sir, for your time.  We'll
9  go ahead and cut you loose.  I've made my record on some
10  of these other issues.  I may or may not see you again in
11  this case.  I know I will see you in the Maldonado one in
12  the not too distant future.  It was nice to see you.
13  Enjoy the rest of your evening, and I appreciate you
14  putting up with me till 10:47 local time.
15      THE WITNESS:  Thank you, and --
16      MR. T. BRANIGAN:  Thank you, Mr. Blanco --
17      THE WITNESS:  -- have a good day.
18      MR. T. BRANIGAN:  -- we will provide --
19  Mr. Rubio Blanco, sorry.  We'll provide a copy of the
20  transcript to you, so that you can read and prepare an
21  errata sheet, if necessary, and that will happen once we
22  have the transcript.  Thank you, sir.
23      THE WITNESS:  Thank you very much.  Have a
24  good --
25      MR. T. BRANIGAN:  And I just want to make a

**276**

|  | CHANGES AND SIGNATURE | | |
|---|---|---|---|
| PAGE | LINE | CHANGE | REASON |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 277**

1  I, ELOY RUBIO BLANCO, having read the
2  foregoing deposition and hereby affix my signature that
3  same is true and correct, except as noted above.
4
5  _____
6  ELOY RUBIO BLANCO
7  STATE OF _____)
8  COUNTY OF _____)
9
10  Before me, _____, on this
11  day personally appeared ELOY RUBIO BLANCO, known to me
12  (or proved to me under oath or through
13  _____)(description of identity card or
14  other document) to be the person whose name is subscribed
15  to the foregoing instrument and acknowledged to me that
16  he/she executed the same for the purpose and
17  consideration therein expressed.
18  Given under my hand and seal of office on this
19  _____ day of _____, _____.
20
21  _____
22  NOTARY PUBLIC IN AND FOR
23  THE STATE OF _____
24
25  My Commission Expires: _____

**Page 279**

1  I, Adrianne Harris, Certified Shorthand
2  Reporter in and for the State of Texas, hereby certify to
3  the following:
4  That the witness, ELOY RUBIO BLANCO, was duly
5  sworn by the officer and that the transcript of the
6  deposition is a true record of the testimony given by the
7  witness;
8  That the deposition transcript was duly
9  submitted on _____ to Mr. Thomas P.
10  Branigan, the attorney for the witness/Defendant, for
11  examination, signature, and return to me by
12  _____.
13  That pursuant to information given to the
14  deposition officer at the time said testimony was taken,
15  the following includes all parties of record and the
16  amount of time used by each party at the time of the
17  deposition:
18  Mr. Brett Schreiber (07h07m)
    Mr. Thomas P. Branigan (00h00m)
19
20  FOR PLAINTIFFS:
21  Mr. Brett Schreiber
22  SINGLETON SCHREIBER
    591 Camino de la Reina
23  Suite 1025
    San Diego, California  92108
24  Phone: (619)771-3473
    Fax: (619)255-1515
25  Email: bschreiber@singletonschreiber.com
    - and -

**Page 278**

1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF FLORIDA
3  Case No. 21-cv-21940-BLOOM/Otazo-Reyes
4  NEIMA BENAVIDES, as Personal
   Representative of the Estate
   of Naibel Benavides Leon,
5  deceased,
6  Plaintiff,
7  v.
8  TESLA, INC., a/k/a Tesla
   Florida, Inc.,
9
10  Defendant.
   _____/
11  Case No. 22-cv-22607-BLOOM
12  DILLON ANGULO,
13  Plaintiff,
14  v.
15  TESLA, INC., a/k/a Tesla
   Florida, Inc.,
16
17  Defendant.
   _____/
18
19  REPORTER'S CERTIFICATE
20  VIDEOTAPED ORAL DEPOSITION OF ELOY RUBIO BLANCO
21  (AS CORPORATE REPRESENTATIVE FOR TESLA)
22  MAY 31, 2024
23
24  (REPORTED REMOTELY)
25

**Page 280**

1  Mr. Todd Poses
2  POSES LAW GROUP
   169 East Flagler Street
3  Suite 1600
   Miami, Florida  33131
4  Phone: (305)577-0200
   Fax: (305)371-3550
5  Email: tposes@poseslawgroup.com
6  - and -
   Mr. Adam T. Boumel
7  THE ROUSSO BOUMEL LAW FIRM
   9350 South Dixie Highway
8  Suite 1520
   Miami, Florida  33156
9  Phone: (305)670-6669
   Fax: (305)670-6663
10  Email: adam@roussolawfirm.com
11  FOR DEFENDANT:
12  Mr. Thomas P. Branigan
   Ms. Whitney V. Cruz
13  Mr. Drew P. Branigan
   BOWMAN AND BROOKE LLP
14  101 West Big Beaver Road
   Suite 1100
15  Troy, Michigan  48084
   Phone: (248)205-3316
16  Email: thomas.branigan@bowmanandbrooke.com
   whitney.cruz@bowmanandbrooke.com
17  drew.branigan@bowmanandbrooke.com
18
19  That $_____ is the deposition officer's
20  charges to the Plaintiff for preparing the original
21  deposition transcript and any copies of exhibits;
22  I further certify that I am neither counsel
23  for, related to, nor employed by any of the parties in
24  the action in which this proceeding was taken, and,
25  further that I am not financially or otherwise interested

1    in the outcome of this action.

2         Certified to by me on this _____ day of

3    _____, _____.

4

5

6         _____
            ADRIANNE HARRIS, CSR
7           CSR Certificate No. 7967
            Expiration Date:  10-31-24
8           Julia Whaley & Associates
            Firm Registration No. 436
9           2012 Vista Crest Drive
            Carrollton, Texas  75007-1640
10          (214)668-5578/Fax: (972)236-6666

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pages / Home ✈ 13 Jira links

## AP 2020 Safety Goals

Created by Priyanka Sekhar, last modified by Chris Payne on Jul 02, 2020

2019 Data   2020 Q1   2020 Q2   Project Field Results   Planned Features

### 2019 Data: @Unknown User (hanzhang)

- ~6% of collisions occur with AP on and Ego at Fault



- **Failure types for all collisions**



- **How many AP Engaged and Ego at Fault collisions**
  - AP collision types:

P-94-0001



- AP collision types where Ego at fault:



- **Customers drive ~20M/day → ~19% using AP/NOA**