**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| NEIMA BENAVIDES, as Personal Representative of the Estate of Naibel Benavides Leon, deceased, | Case No. 21-cv-21940-BLOOM/Torres |
| Plaintiff, | |
| v. | |
| TESLA, INC., a/k/a Tesla Florida, Inc., | |
| Defendant. | |
| DILLON ANGULO, | Case No. 22-22607-KMM |
| Plaintiff, | |
| v. | |
| TESLA, INC. a/k/a Tesla Florida, Inc., | |
| Defendant. | |

**PLAINTIFFS' RESPONSE TO TESLA'S MOTION FOR RELIEF**

Plaintiffs Neima Benavides and Dillon Angulo, by and through undersigned counsel, hereby file this Response to Defendant's Motion for Relief, and state as follows:

Plaintiffs categorially deny Defendant's accusation that they have been "offering evidence in the presence of the jury that the Court has excluded." (DE487 at 1)  In offering the NTSB safety recommendations, Plaintiffs, relied in good faith on the Court's Order with respect to the NTSB Board Report.  With respect to the NHTSA ODI resume (Plaintiffs Exhibit 61), Plaintiffs' redactions fully complied with the Court's ruling regarding subsequential remedial measures.  Tesla's motion is without merit and should be denied in its entirety.

1

I.    PLAINTIFFS DID NOT VIOLATE THE COURT'S ORDER IN LIMINE WITH RESPECT TO
      THE NTSB SAFETY RECOMMENDATIONS.

Though Tesla moved in limine to exclude the testimony of former NTSB commissioner Robert Sumwalt, Tesla waited until one week before trial, on July 7th, to object to the use of NTSB documents at trial. (DE444) In this motion, Tesla specifically moved to exclude Plaintiffs' Exhibit 77, the Brown Board Report.  Tesla then separately argued that other NTSB exhibits should also be excluded:

> This exclusionary rule should extend to the related NTSB "recommendations" and similar materials Plaintiffs seek to introduce as exhibits P-78 to P-87, as the recommendations necessarily result from the Brown accident investigation as well as the investigations of other incidents involving vehicles and drivers not at issue in this case. These materials are merely extensions of the reports, and their introduction would likewise violate the principle that the work of the NTSB "should not be used to the advantage or disadvantage of any party in a civil lawsuit."

(DE444 at 9-10) Tesla thus necessarily recognized a distinction between the Brown Board Report and the separate NTSB Safety Recommendations and transmittal letters.

The Court's Order specifically precluded Plaintiffs' from using the Brown Board Report, but made no mention of the Safety Recommendations, and did not reference any exhibits by number: "Accordingly, while Plaintiffs may utilize the NTSB investigator's factual accident reports, Plaintiffs 'are precluded from referencing the NTSB Board's Accident Reports, the legal conclusions, opinions, or probable cause determinations of the NTSB before the jury.'"  (DE466 at 13)

Because the Court's Order did not mention the separate Safety Recommendations and transmittal letters that existed outside of the Brown Board Report, Plaintiffs' counsel reasonably believed that those documents had not been excluded by the Court's ruling.  That belief was reinforced on several occasions during trial, when the Court overruled Tesla's objections regarding the use of the Safety Recommendations and transmittal letters.

Eventually, Tesla prevailed in its argument that the Safety Recommendations, despite being separate documents transmitted to Tesla, deserved to be treated in the same manner as the Brown Board Report.  At that point, as the Court explained in its subsequent Order Denying Plaintiffs' Motion for Reconsideration, "the Court has since clarified that its prohibition on the use of NTSB Board Reports also extends to NTSB Safety Recommendations."  (DE486 at 4) Since that clarification, Plaintiffs have not used or referred to the NTSB Safety Recommendations.  It is unreasonable to suggest that the Plaintiffs were intentionally violating the Court's Order relating to the NTSB Board Report when the Court itself did not believe that this was the case.  Plaintiffs' use of the Safety Recommendations, prior to the Court's clarification, does not provide a basis for any further relief to Tesla.

## II.    PLAINTIFFS DID NOT VIOLATE THE COURT'S ORDER IN LIMINE WITH RESPECT TO SUBSEQUENT REMEDIAL MEASURES.

### A.    THE RECALL CHANGES ARE NOT SUBSEQUENT REMEDIAL MEASURES UNDER RULE 407.

In seeking relief in this motion, Tesla inadvertently makes the case for admissibility of the entire recall.  Tesla takes the position that its remedial measures would not have made a difference in the outcome of this accident.  If true, then they are not subject to exclusion under Fed.R.Evid. 407.

Rule 407 states, in pertinent part:  "When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, *would have made the injury or harm less likely to occur*, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction." (emphasis supplied)

In its motion, Tesla writes "[n]one of these countermeasures would have made a difference in this case, where Mr. McGee had his hand on the wheel and his foot on the accelerator pedal." (DE487 at 13) Tesla then includes a table in which it "summarizes the countermeasures and the reasons they would not have made a difference here." (Id. At 13-14)

In *In re Mentor Corp. ObTape Transobturator Sling Products Liab. Litig*., No. 3:07-CV-00101, 2010 WL 2015146 (M.D. Ga. May 20, 2010), the district court explained that if the remedial measure sought to be excluded would not have made a difference in the outcome of the accident, then it is not subject to exclusion under Rule 407:

> Mentor contends that its introduction of Aris, a different suburethral sling product, constitutes a subsequent remedial measure under Rule 407 and that all references to Aris should thus be excluded. As noted above, a subsequent remedial measure is a measure that, if taken prior to an injury, would have made the injury less likely to occur. Fed.R.Evid. 407. Here, the evidence suggests that Mentor introduced Aris in March 2005 and continued to market ObTape until March 2006. Thus, though the two products competed for market share among urologists and urogynecologists, the introduction of Aris, standing alone, was not a measure that would have made an injury caused by ObTape less likely to occur because Mentor continued actively marketing ObTape after the launch of Aris. The introduction of Aris would only be a subsequent remedial measure under Rule 407 if its launch coincided with Mentor's withdrawal of ObTape from the market. Accordingly, the Court finds that evidence regarding the introduction of Aris should not be excluded under Rule 407.

*In re Mentor Corp.* at *2.

Because Tesla admits to the inadequacy of its remedy, in that it would not have made any difference to the Plaintiffs, Tesla has necessarily conceded the inapplicability of Rule 407. The Court should therefore admit a fully unredacted Exhibit 61, as well as the full Part 573 Safety Recall Report. (DE487-8), and NHTSA's subsequent recall query containing its concerns about the adequacy of the recall to address the defect. (Exhibit 1)

### B.   TESLA WAIVED ITS OBJECTION TO PLAINTIFFS' EXHIBIT 61.

In the next section, we will explain why Plaintiffs' redactions of Exhibit 61 complied with the Court's ruling related to subsequent remedial measures. But before we address the merits, we need to respond to Tesla's suggestion that Plaintiffs' counsel "were engaged in an effort to circumvent the Court's exclusion recall." (DE487 at 13) This accusation is baseless, and frankly, offensive. But even if the accusation was true, Tesla fails to explain how Plaintiffs' counsel prevented Tesla's counsel from doing their job to review proposed exhibits, and, if necessary, object to objectionable material contained therein.

As Tesla concedes, we presented the redacted Exhibit 61 to them for introduction in evidence at the end of the day on July 17, 2025. The version of Exhibit 61 submitted to Tesla for approval at that time was identical to Tesla's Exhibit E, with the exception of the number of frontal plane accidents – 211. (DE487-5) Tesla's only objection to the document at the end of the day was to the inclusion of the number of frontal plane accidents. (7/16/25 PM rough draft Trial Transcript at pp. 86-87) Given the entire evening to review Exhibit 61 in its redacted and unredacted forms, Tesla lodged no new objection the following morning. (7/17/25 AM rough draft Trial Transcript at pp. 3-13) Almost immediately after taking the stand that morning, Dr. Cummings was asked about the Defect Information Report referenced in Exhibit 61, and Tesla's admission of defect. (7/17/25 AM rough draft Trail Transcript at pp. 14-15) Tesla did not object to any of these questions. In the afternoon session, Plaintiffs' counsel asked Dr. Cummings whether any other manufacturer had "filed a defect information report applicable to all models they had ever produced, equipped with any version of their level 2 autonomous features." (7/17/25 PM, rough draft Trial Transcript at p. 27) Tesla did not object.

If this evidence was objectionable, and it was not, Tesla repeatedly failed to raise an objection to either the statements contained in Exhibit 61 or Dr. Cummings' references to those statements. As a result, even a valid objection to Tesla's admission would have been waived.

### C. PLAINTIFFS DID NOT INTRODUCE ANY EVIDENCE OF SUBSEQUENT REMEDIAL MEASURES.

Tesla writes "Plaintiffs introduced a Defect Information Report ("DIR") that clearly describes subsequent remedial measures taken by Tesla following a series of unrelated accidents." (DE487 at 14) This is simply not true. Plaintiffs' Exhibit 61 is NHTSA's ODI Resume. Plaintiffs' Exhibit 66, which Plaintiffs did not seek to admit, is the Part 573 Safety Recall Report, also referred to as the DIR. (DE487-8) Plaintiffs' Exhibit 61 contains a reference to the DIR report, and Tesla's admission of defect. All references to "subsequent remedial measures taken by Tesla" were redacted.

We return to the language of Rule 407. The rule excludes evidence of subsequent remedial measures. It does not prohibit the admission of any statements contained in a Part 573 Safety Recall Report. It does not prohibit admission of investigative reports and conclusions that are derived therefrom. The law on this is clear.

In *Westmoreland v. CBS Inc.,* 601 F. Supp. 66 (S.D.N.Y. 1984), General William Westmoreland sued CBS for libel claiming that its reporting about him was inaccurate. CBS commissioned an investigation of its own reporting on Westmoreland and argued that the report of that investigation should be excluded under Rule 407 as it was analogous to a subsequent remedial measure. The district court rejected the argument, explaining as follows:

> CBS contends that receipt of the Report is barred by Rule 407, Fed.R.Evid. and judge-made doctrine to the effect that subsequent remedial measures may not be received as an admission of prior culpable conduct. The doctrine, however, does not go as far as CBS would push it. The fact that subsequent remedial measures are excluded as admissions of fault does not mean that competent evidence resulting

from an internal investigation of a mishap must also be excluded. CBS argues: (1) honest self-examination and self-policing should be encouraged; (2) a rule permitting the discovery and the use in evidence of reports of such self-investigations will discourage potential defendants from doing it; therefore, (3) the rule of law should exclude such evidence. The logic of the argument parallels that which underlies Rule 407. See Advisory Committee Note.

The fault of the argument is not in its logic but in that it goes too far and fails to credit the social value of making available for trial what is often the best source of information. CBS' argument really goes beyond the issue of the admissibility of the investigative report; its logic addresses as well the admissibility of the facts uncovered by the investigation. If the internal investigator uncovered the "smoking gun," it is often a cosmetic matter whether this evidence is received as a part of the investigative report or in some other manner. The question of social policy raised by CBS is whether in order to encourage such investigations, their fruits should be shielded from use by adverse claimants. There is, however, no such doctrine either as to the internal investigative report or as to facts revealed by it. In industrial and railroad accident litigation, for example, it is commonplace that such reports, or at least the facts revealed by them, are used by the injured to establish the liability of the company that conducted the investigation in spite of CBS' arguments. To establish a rule forbidding such use would deprive injured claimants of one of the best and most accurate sources of evidence and information.

*Westmoreland* at 66-67.

While *Westmoreland* did not involve an actual subsequent remedial measure, *Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron, a Div. of Textron, Inc.,* 805 F.2d 907, 918 (10th Cir. 1986) did. In *Rocky Mountain Helicopters*, the district court admitted a post-accident investigative report regarding the cause of an accident, but redacted all references to the subsequent re-design of the faulty part. *Rocky Mountain Helicopters* at 918. Relying on *Westmoreland*, the Tenth Circuit declined to find any error in the admission of the report:

We hold that the district court did not err in admitting evidence from the Photoelastic Study. It would strain the spirit of the remedial measure prohibition in Rule 407 to extend its shield to evidence contained in post-event tests or reports. It might be possible in rare situations to characterize such reports as "measures" which, if conducted previously, would reduce the likelihood of the occurrence. Yet it is usually sounder to recognize that such tests are conducted for the purpose of investigating the occurrence to discover what might have gone wrong or right. Remedial measures are those actions taken to remedy any flaws or failures indicated by the test. In this case, the remedial measure was not the Photoelastic

Study of the trunnion but rather the subsequent redesign of the trunnion. As noted above, references to redesign were excluded at trial.

We believe that the policy considerations that underlie Rule 407, such as encouraging remedial measures, are not as vigorously implicated where investigative tests and reports are concerned. To the extent that such policy concerns are implicated, they are outweighed by what the *Westmoreland* court referred to as the danger of depriving "injured claimants of one of the best and most accurate sources of evidence and information." 601 F.Supp. at 68.

*Rocky Mountain Helicopters* at 918-919.[1]

There is a second reason why the policy considerations behind Rule 407 are inapplicable to Tesla's admissions in Exhibit 61. Tesla's issuance of the Part 537 DIR was not done "out of a sense of social responsibility," but rather to fulfill its statutory obligations. *See Underwriters at Lloyd's London v. OSCA, Inc.,* No. 03-20398, 2006 WL 941794, at *6 (5th Cir. Apr. 12, 2006). In *OSCA, Inc.,* the Fifth Circuit affirmed the district court's decision to admit OSCA's internal investigative

---

[1] Cases affirming this principle are legion. *See e.g. Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 431 (5th Cir. 2006) (declining to extend FRE 407 to investigations "which by themselves do not make the accident less likely to occur"); *Benitez-Allende v. Alcan Aluminio do Brasil, S.A.*, 857 F.2d 26, 33 (1st Cir. 1988) (holding that report at issue was " 'internal investigatory report' of the sort not protected by Rule 407"); *J.M. v. City of Milwaukee*, 249 F.Supp.3d 920, 932 (E.D. Wisc. 2017) (holding that the investigation leading to the remedial act of employee discipline did not fall within scope of FRE 407); *Aranda v. City of McMinnville*, 942 F.Supp.2d 1096, 1103 (D. Or. 2013); ("By it [sic] terms, [FRE 407] is limited to measures that would have made the harm less likely to occur; it does not extend to post-incident investigations into what *did* occur."); *Bullock v. BNSF Ry. Co.*, 306 Kan. 916, 399 P.3d 148, 158 (2017) ("[I]t is not unusual for some evidence to include information that is permissible, such as investigative conclusions, and information that is impermissible, such as [the recommended remedial measure of] employee discipline."); *City of Bethel v. Peters*, 97 P.3d 822, 827 (Alaska 2004) (holding that post-incident report, with "corrective action" section redacted, was admissible); *Fox v. Kramer*, 22 Cal.4th 531, 93 Cal.Rptr.2d 497, 994 P.2d 343, 352 (2000) (noting that the majority of courts "distinguish between an investigation and actual steps taken to correct a problem; post event investigations do not themselves constitute remedial measures, although they might provide the basis for such measures"); *J.B. Hunt Transp., Inc. v. Guardianship of Zak*, 58 N.E.3d 956, 966 (Ind. Ct. App. 2016) ("The majority of jurisdictions agree that a post-incident investigation and report of the investigation do not constitute inadmissible subsequent remedial measures."); and *Prentiss & Carlisle Co., Inc. v. Koehring-Waterous Div. of Timberjack, Inc.*, 972 F.2d 6, 10 (1st Cir. 1992) ("The fact that the analysis may often result in remedial measures being taken (as occurred here) does not mean that evidence of the analysis may not be admitted.")

report over OSCA's Rule 407 objection, because the report was produced as a result of an obligation. The *OSCA* Court relied on the Fifth Circuit's previous opinion in *Rozier v. Ford Motor Co.,* 573 F.2d 1332 (5th Cir. 1978), which held that the policy behind Rule 407 does not apply in the circumstances present in the instant case:  "Invoking this policy to justify exclusion here is particularly inappropriate since the estimate was prepared not out of a sense of social responsibility but because the remedial measure was to be required in any event by a superior authority, the National Highway Traffic Safety Administration." *Rozier* at 1343.

Tesla's obligations to create and submit the Part 573 Safety Recall Report are codified in 49 CFR 573.6, which contains the following applicable sub-sections:

(a) Each manufacturer shall furnish a report to the NHTSA for each defect in his vehicles or in his items of original or replacement equipment that he or the Administrator determines to be related to motor vehicle safety, and for each noncompliance with a motor vehicle safety standard in such vehicles or items of equipment which either he or the Administrator determines to exist.

(b) Each report shall be submitted not more than 5 working days after a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist. At a minimum, information required by paragraphs (c)(1), (2), and (5) of this section shall be submitted in the initial report.

(c) Each manufacturer shall include in each report the information specified below:

(5) A description of the defect or noncompliance, including both a brief summary and a detailed description, with graphic aids as necessary, of the nature and physical location (if applicable) of the defect or noncompliance. In addition, the manufacturer shall identify and describe the risk to motor vehicle safety reasonably related to the defect or noncompliance consistent with its evaluation of risk required by 49 CFR 577.5(f).

Because 49 CFR 573.6 required Tesla to identify the defect, the policy considerations behind Rule 407 are simply inapplicable. Tesla's admissions of defect, and Dr. Cummings' testimony regarding same, were properly admitted.

**D.  TESLA SHOULD BE PRECLUDED FROM ADMITTING STATEMENTS CONTRADICTING ITS ADMISSION OF DEFECT.  IF IT IS ADMITTED, PLAINTIFFS SHOULD BE ENTITLED TO OFFER NHTSA'S RESPONSE TO THE RECALL.**

Tesla writes that Plaintiffs' "elicited the testimony from their expert which misstated Tesla's response to the NHTSA's investigation."  (DE487 at 14) This is also false.  Dr. Cummings' testimony was a direct quote of Tesla's voluntary admission of defect.  Tesla makes this argument because Dr. Cummings did not mention Tesla's statement in the Part 537 Safety Recall Report "that it did not concur with NHTSA's belief that autopilot was defective."  (DE487 at 14-15) Tesla's statement to that effect, however, is meaningless.  Tesla was not required to agree to a finding of defect or to conduct a recall.  It could have contested NHTSA's findings.  As noted in Tesla's Exhibit 487-7 at 10, if the manufacturer declines to participate in a recall, "NHTSA also has the statutory authority to make a formal decision that a vehicle or equipment contains a safety-related defect and can order a manufacturer to conduct a recall."  If a manufacturer remains intransigent, "the Department of Justice may also file an action in Federal court to compel the manufacturer to conduct a recall." (Id.)

Additionally, 49 CFR 573.6(c)(8)(iii) provides a mechanism for Tesla to admit to a defect but contest the need for a recall.  Tesla could have filed a petition "for an exemption from the recall requirements of the Act on the basis that a defect or noncompliance is inconsequential as it relates to motor vehicle safety."  Tesla neither contested the recall, nor sought an exemption from the recall requirements.  In meeting its obligations under the statute, Tesla admitted to a defect.  It cannot undo the effect of that admission by pointing to language that it "disagreed" with NHTSA's conclusions.

If the Court is inclined to let Tesla present that statement from the recall notice, this would invariably open the door to allow the Plaintiffs to present evidence of NHTSA's Recall Query 24009. (Exhibit 1)  In this Recall Query, NHTSA notes that accidents of the type identified in ODI's original

investigation continued to occur even after the remedy had been installed.  (Exhibit 1 at 2) NHTSA is therefore investigating the effectiveness, or lack thereof, of the remedy.  Plaintiffs had not previously sought to introduce the Recall Query into evidence based on the Court's ruling, but believe that if Tesla is allowed to admit its statement of disagreement,  the jury should be entitled to see the full picture of the recall.

### III.   ALL 211 ACCIDENTS REFERENCED IN THE NHTSA ODI RESUME REPORT SHOULD BE ADMISSIBLE.

Since we are addressing redactions to the ODI Resume Report, we thought this would be an appropriate place to respond to the Court's request for additional law on the admissibility of the frontal plane accidents occurring after the instant accident. (7/17/25 AM rough draft Trial Transcript at pp. 3)  As a starting point, we believe that all 211 accidents are admissible based on this Court's prior ruling.  In the Court's Order on the parties' motions in limine, the Court ruled as follows:

> As for evidence of other changes, alterations, and improvements to Autopilot following the subject collision, the Court agrees with Tesla that such evidence constitutes subsequent remedial measures that may not be introduced to prove Tesla's culpability. However, to the extent that Plaintiffs are seeking to introduce evidence that Tesla was on notice of a defect and failed to make subsequent changes to prove punitive damages, such evidence is admissible so long as the evidence establishing notice complies with the substantial similarity doctrine. *See Reid v. BMW of N. Am.*, 464 F. Supp. 2d 1267, 1271 (N.D. Ga. 2006) (permitting evidence of substantially similar incidents as well as evidence of defendant's failure to correct problems or warn others to prove punitive damages); *see also In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, No. 3:07-CV-00101, 2010 WL 2015146, at *2 (M.D. Ga. May 20, 2010) (Rule 407 only applies to a subsequent remedial measure which is a "measure that, if taken prior to an injury, would have made the injury less likely to occur.")

(DE433 at 32)   In the Court's recent ruling, the Court held that the "evidence establishing notice [with respect to the frontal plane crashes] complied with the substantial similarity doctrine." (DE486)

We note that in *Reid v. BMW of N. Am.,* 464 F. Supp. 2d 1267, 1269 (N.D. Ga. 2006), the case the Court cited in support of its ruling, the accident at issue occurred on July 3, 2002. *Reid* at 1269. In *Reid*, the plaintiff sought to present evidence of 75 quality control information sheets detailing similar incidents dating from April 1992 through January 2003. The district court deemed the reports admissible and this Court cited *Reid* with approval.

Because Plaintiffs have a punitive damages claim, Tesla's notice of substantially similar accidents following the subject collision is relevant to show both Tesla's continuing conduct and harm to others. The Florida Supreme Court has made it clear that, when considering entitlement to punitive damages, a jury may consider Tesla's post-accident actions:

> (2) the degree of reprehensibility of Owens–Corning's conduct, the duration of that harmful conduct, Owens–Corning's awareness, any concealment and the existence and frequency of similar past conduct; … (7) the seriousness of the hazard to the public, the attitude and conduct of Owens–Corning upon discovery of the misconduct; (8) the degree of Owens–Corning's awareness of the hazard and of its excessiveness; (9) the number and level of employees involved in causing or covering up the marketing misconduct; (10) the duration of both the improper marketing behavior and its cover-up.

*Owens-Corning Fiberglas Corp. v. Ballard*, 749 So.2d 483, 484-85 (1999). Each similar accident increased Tesla's awareness of the hazard, yet Tesla waited an additional four and a half years before agreeing to the recall. That delay is significant and relevant to the issue of entitlement.

Also relevant to the issue of entitlement is the fact that people continued to be harmed in frontal plane accidents following the subject collision. As explained in *Philip Morris USA v. Williams*, 549 U.S. 346, 355 (2007):

> Respondent argues that she is free to show harm to other victims because it is relevant to a different part of the punitive damages constitutional equation, namely, reprehensibility. That is to say, harm to others shows more reprehensible conduct. Philip Morris, in turn, does not deny that a plaintiff may show harm to others in order to demonstrate reprehensibility. Nor do we. Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible.

*Williams* at 355.

Tesla seeks to sanitize the record in this case, preventing the jury from hearing about actionable conduct occurring after the subject collision. Tesla should not be permitted to do so. As the Court in *In re Gen. Motors LLC Ignition Switch Litig*., No. 14-MD-2543 (JMF), 2017 WL 2493143, at *7 (S.D.N.Y. June 9, 2017), explained, "to exclude the other incidents would arguably 'prevent the jury from understanding the scale, significance, and duration of [Defendants'] conduct with respect to the [] defect' allegedly at issue in this case."

In support of its argument to preclude the admission of post-accident conduct Tesla cited to *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422-23 (2003).[2] *Campbell*, however, does not support Tesla's argument, because failing to take remedial action to address the ongoing series of similar frontal plane accidents for the four and a half years after this accident is not a "dissimilar act, independent from the acts upon which liability was premised." Indeed, Tesla's post-accident failure to act is the **same** failure upon which liability is premised.

*Campbell* actually provides examples of what constitute "dissimilar acts." In *Campbell,* the plaintiffs sued State Farm for improper claims handling procedures. However, the trial court allowed the plaintiffs to present evidence of other bad acts from State Farm that had nothing to do with improper claims handling:

> Although evidence of other acts need not be identical to have relevance in the calculation of punitive damages, the Utah court erred here because evidence pertaining to claims that had nothing to do with a third-party lawsuit was introduced at length. Other evidence concerning reprehensibility was even more tangential. For example, the Utah Supreme Court criticized State Farm's investigation into the

---

[2] To be clear, Tesla cited to *Campbell* and the other cases we distinguish in opposition to the introduction of evidence of the data recovery issues, not to evidence of similar post-collision accidents. However, Tesla's over-arching argument was that no post-collision conduct was admissible, because it could not have caused harm to the Plaintiffs, so we address that argument here.

> personal life of one of its employees and, in a broader approach, the manner in which
> State Farm's policies corrupted its employees.

*Campbell* at 423-424. Again, Tesla's failure to address its inadequate driver monitoring system is not a "dissimilar act" as defined in *Campbell*.

Tesla's reliance on two tobacco cases in support of its argument is similarly without merit. In *Philip Morris USA, Inc. v. Rintoul*, 342 So. 3d 656 (Fla. 4th DCA 2022), the Court correctly held that evidence related to a completely unrelated product that had never been used by the smoker could not be considered to support a claim for punitive damages. Plaintiffs readily agree that they could not present evidence related to a defect in Tesla's power wall, solar roof, or Optimus robot in order to prove punitive damages in this case.

*Hardin v. R.J. Reynolds Tobacco Co*., 314 So. 3d 584 (Fla. 3d DCA 2020) is also inapposite. First, *Hardin* was a retrial on punitive damages only. The Court noted that its holding was based on the "unique procedural posture [of] this case," specifically distinguishing it from cases, like the instant case, where "the same jury would hear the evidence pertaining to both compensatory and punitive damages." *Hardin* at 588. The outcome of *Hardin* was determined by the plaintiff's failure to meet an obligation created by a non-standard punitive damage jury instruction that the plaintiff had agreed to. *Hardin* in no way precludes consideration of Tesla's failures postdating the accident when determining entitlement to punitive damages.

Indeed, one of the primary pieces of evidence used in every *Engle*-progeny tobacco case is the 1994 testimony of tobacco company executives before congress, in which they stated under oath that "that nicotine was not addictive" and that "it has not been proven that cigarette smoking causes cancer." *Philip Morris USA, Inc. v. Russo,* 175 So. 3d 681, 683 (Fla. 2015). Juries in these cases receive further evidence that the tobacco companies did not cease their cover-up and concealment attempts until 1999. *Id.* In order to be an *Engle* class member, the smoker must have developed a

tobacco related illness by November of 1996. Thus, <u>every</u> *Engle* jury hears evidence of post injury conduct that could not have caused harm to the class member. This returns us to where we started. As *Owens-Corning Fiberglas Corp. v. Ballard* makes clear, Tesla's notice of frontal plane accidents prost dating the subject collision is relevant to contrast Tesla's increasing awareness of the hazard to the public with Tesla's failure to act in response to this awareness.  As a result, the jury should be entitled to see an Exhibit 61 that does not redact the total number of frontal pane accidents cited therein.

WHEREFORE, Plaintiffs respectfully request that the Court deny Tesla's Motion for Relief, and further allow Plaintiffs to use the total number of frontal plane crashes cited in Exhibit 61 through the remainder of the trial.

Date: **July 23, 2025**                    Respectfully submitted,

By:     */s/  Douglas F. Eaton*
DOUGLAS F. EATON
FBN: 129577
**EATON & WOLK, PL**
*Co-counsel for Plaintiff*
2665 S. Bayshore Drive, Suite 609
Miami, Florida 33133
Telephone: 305-249-1640
Email: deaton@eatonwolk.com
cgarcia@eatonwolk.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this **23rd** day of **July 2025**, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.


By:   */s/  Douglas F. Eaton*

DOUGLAS F. EATON
FBN: 129577
**EATON & WOLK, PL**
*Co-counsel for Plaintiff*
2665 S. Bayshore Drive, Suite 609
Miami, Florida 33133
Telephone: 305-249-1640
Email: deaton@eatonwolk.com
           cgarcia@eatonwolk.com



U.S. Department of Transportation
**National Highway Traffic Safety
Administration**



May 6, 2024

**VIA EMAIL**

Eddie Gates
Director, Field Quality
Tesla, Inc.
45500 Fremont Blvd
Fremont, CA 94538

Subject: Information Request ID RQ24009

Dear Mr. Gates:

This letter is to inform you that the Office of Defects Investigation (ODI) of the National
Highway Traffic Safety Administration (NHTSA) has opened a Recall Query (RQ24009) to
investigate the remedy effectiveness of Recall 23V838.

**EA22002 and Recall 23V838 Timeline**

In a series of meetings beginning on October 16, 2023, NHTSA reviewed observations and
concerns regarding investigation EA22002, Autopilot[1] System Driver Controls, with Tesla. After
continued meetings between Tesla and NHTSA, Tesla submitted a recall to NHTSA on
December 12, 2023. In describing the safety defect, Tesla's Defect Information Report (DIR)
explained that "the prominence and scope of the system's controls may be insufficient to prevent
driver misuse," and Tesla committed to the deployment of a multipart remedy aimed at
improving system controls and engagement controls and reducing mode confusion. Tesla's five-
part remedy involved changes to the system or introduction of new features.

1. Item 1: Mode confusion
   *Remedy:* Add a single-pull activation option for the activation of Autopilot. Enablement
   of this optional function causes inadvertent steering overrides to disengage both
   Autosteer and TACC leading to a more pronounced slowdown to alert the driver that
   Autosteer has been canceled and they must resume immediate control of the vehicle. This
   function is not default on vehicles who received the remedy in the field and can readily
   be enabled and disabled by consumers.

2. Item 2: Autopilot can be engaged off-highway

---

[1] The simultaneous engagement of Tesla's Traffic-Aware Cruise Control (TACC) and Autosteer.

Exhibit 1

*Remedy:* Increase strictness of driver attentiveness requirements when approaching traffic controls off-highway.

3. <u>Item 3: Immediate Driver disengagement upon Autopilot activation</u>
   *Remedy:* Increase driver monitoring in the moments following Autopilot engagement.

4. <u>Item 4: Drivers may disengage from task</u>
   *Remedy:* Introduction of a one-week suspension of Autopilot for drivers who receive three or five forced Autopilot disengagements (depending on cabin camera availability), also called a strikeout. A strikeout occurs after three strikes, which result after an alert escalation or receiving frequent warnings for inattention, however other factors may be required to receive a strike.

5. <u>Item 5: Prominence and size of alerts</u>
   *Remedy:* Enlarge attentiveness notification font and move the alert higher on center screen closer to the driver's range of vision (Model 3 and Model Y only).

**<u>Remedy Concerns</u>**
ODI has identified several concerns regarding the 23V838 remedy:

<u>Crash circumstances:</u>
The preliminary analysis shows that crashes occurred in vehicles with the remedy installed across all three crash types identified in ODI's investigation number EA22002. These crash types are discussed in the document "Additional Information Regarding EA22002" which is available in the investigation file for that investigation. ODI plans to evaluate the impact of the recall remedy on these crash types as well as whether the remedy resolved the defect identified in Safety Recall Report 23V838.

| Crash Type | Total |
|---|---|
| Frontal Plane Struck Vehicle / Object / Person in travel path | 9 |
| Yaw / Spin / Understeer (Low traction environment) | 6 |
| Inadvertent Steering Override (Cancel Autosteer, keep TACC) | 5 |
| ***Total*** | ***20*** |

*Table 1: Preliminary Crash Analysis of Vehicles with the Remedy Installed at the Time of the Incident, Conducted by NHTSA*

<u>VRTC Testing:</u>
NHTSA completed preliminary testing at its Vehicle Research and Test Center (VRTC) . In its evaluation of the remedy, VRTC was unable to identify a difference in the initiation of the driver warning cascade between pre-remedy and post-remedy (camera obscured) conditions. ODI will evaluate the adequacy of recall remedy warnings as part of this investigation.

<u>Remedy Permanence:</u>
Tesla changed the sensitivity and sample window of the increased driver attentiveness requirements after Autopilot engagement (Item 3). ODI will evaluate this change and any other changes in the 23V838 remedy along with their reasons and effects.

Notably, Item 1 of the recall (single pull activation of Autopilot) is not the default setting on vehicles that received the remedy in the field. For those vehicles, the consumer must navigate to a menu and enable the feature. Additionally, the feature can readily be enabled and disabled by the driver. VRTC testing also showed it was possible to make this change while driving.

<u>Non-Remedy Updates:</u>
Tesla has released non-remedy updates related to conditions investigated in EA22002 and identified by NHTSA to Tesla prior to 23V838. The known released non-remedy updates include:

1. Update to reduce Hydroplane (Yaw) Crashes
2. Update to reduce High Speed Captive Turn Lane Collisions

ODI will assess the timing and driving factors behind these updates, their impacts on subject vehicle field performance, and Tesla's basis for not including them in 23V838.


**Information Request**
To support this continued work, we request updated and additional information from Tesla.

Unless otherwise stated in the text, the following definitions apply to this information request:

- **OEDR:** Object and event detection and response or the subtasks of the dynamic driving task (DDT)[2] that include monitoring the driving environment (detecting, recognizing, and classifying objects and events and preparing to respond as needed) and executing an appropriate response to such objects and events (i.e., as needed to complete the DDT and/or DDT fallback).[3]

- **Subject System:** Suite of software, hardware, data, and any other related systems on or off the vehicle that contribute to the conferral of any vehicle capabilities that Tesla labels Level 2 or above, including but not limited to the various "Autopilot" packages, but not including Full-Self Driving Supervised/Beta.

- **Subject Vehicles:** All Tesla vehicles, model years 2014 - 2024, equipped with the subject system at any time, manufactured for sale or lease in the United States, including, but not limited to, the District of Columbia, and current U.S. territories and possessions.

---

[2] "DDT" means the same as and is coterminous with the definition of "Dynamic Driving Task" in SAE J3016, Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles § 3.13 (April 2021).
[3] "OEDR" means the same as and is coterminous with the definition of "Object and Event Detection and Response" in SAE J3016, Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles § 3.20 (April 2021).

- **<u>Subject Crashes</u>:** Incidents in which subject vehicles experience a crash in the United States (including any of its territories) with the subject system engaged at any time during the period beginning 30 seconds immediately prior to the commencement of the crash.

- **<u>Non-remedy Update</u>:** any update by Tesla to the subject system on or after September 1, 2023 (regardless of delivery method) that relate to or may relate to the subject crashes, including any such update that is currently under development.

- **<u>Tesla</u>:** Tesla, Inc., all of its past and present officers and employees, whether assigned to its principal offices or any of its field or other locations, including all of its divisions, subsidiaries (whether or not incorporated) and affiliated enterprises and all of their headquarters, regional, zone and other offices and their employees, and all agents, contractors, consultants, attorneys and law firms and other persons engaged directly or indirectly (e.g., employee of a consultant) by or under the control of Tesla (including all business units and persons previously referred to), who are or were involved in any way as of January 1, 2011 with any of the following related to the subject crashes and/or the subject system in the subject vehicles:

  a. Design, engineering, analysis, modification or production (e.g., quality control);
  b. Testing, assessment or evaluation;
  c. Consideration or recognition of potential or actual defects, reporting, record-keeping and information management (e.g., complaints, field reports, warranty information, part sales), analysis, claims, investigations, inquiries, lawsuits or arbitrations; or
  d. Communication to, from, or intended for zone representatives, fleets, dealers, or other field locations, including but not limited to persons who have the capacity to obtain information from dealers.

- **<u>Document</u>:** "Document" is used in the broadest sense of the word and shall mean all original written, printed, typed, recorded, or graphic matter whatsoever, however produced or reproduced, of every kind, nature, and description, and all non-identical copies of both sides thereof, including, but not limited to, papers, letters, memoranda, correspondence, communications, electronic mail (e-mail) messages (existing in hard copy and/or in electronic storage), faxes, mailgrams, telegrams, cables, telex messages, notes, annotations, working papers, drafts, minutes, records, audio and video recordings, data, databases, other information bases, summaries, charts, tables, graphics, other visual displays, photographs, statements, interviews, opinions, reports, newspaper articles, studies, analyses, evaluations, interpretations, contracts, agreements, jottings, agendas, bulletins, notices, announcements, instructions, blueprints, drawings, as-builts, changes, manuals, publications, work schedules, journals, statistical data, desk, portable and computer calendars, appointment books, diaries, travel reports, lists, tabulations, computer printouts, data processing program libraries, data processing inputs and outputs, microfilms, microfiches, statements for services, resolutions, financial statements, governmental records, business records, personnel records, work orders, pleadings, discovery in any form, affidavits, motions, responses to discovery, all transcripts, administrative filings and all mechanical, magnetic, photographic and electronic records or recordings of any kind, including any storage media associated with computers,

including, but not limited to, information on hard drives, floppy disks, backup tapes, and zip drives, electronic communications, including but not limited to, the Internet and shall include any drafts or revisions pertaining to any of the foregoing, all other things similar to any of the foregoing, however denominated by Tesla, any other data compilations from which information can be obtained, translated if necessary, into a usable form and any other documents. For purposes of this request, any document which contains any note, comment, addition, deletion, insertion, annotation, or otherwise comprises a non-identical copy of another document shall be treated as a separate document subject to production. In all cases where original and any non-identical copies are not available, "document" also means any identical copies of the original and all non-identical copies thereof. Any document, record, graph, chart, film or photograph originally produced in color must be provided in color. Furnish all documents whether verified by Tesla or not. If a document is not in the English language, provide both the original document and an English translation of the document.

- **Other Terms:**  To the extent that they are used in these information requests, the terms "claim," "consumer complaint," "dealer field report," "field report," "fire," "fleet," "good will," "make," "model," "model year," "notice," "property damage," "property damage claim," "rollover," "type," "warranty," "warranty adjustment," and "warranty claim," whether used in singular or in plural form, have the same meaning as found in 49 C.F.R. § 579.4.

For my staff to evaluate the 23V838 recall remedy and related matters, certain information is required. Pursuant to 49 U.S.C. § 30166, please provide numbered responses to the following information requests. When documents are produced, the documents shall be produced in an identified, organized manner that corresponds with the organization of this information request letter (including all individual requests and subparts). When documents are produced and the documents would not, standing alone, be self-explanatory, the production of documents shall be supplemented and accompanied by explanation.

Responses to these questions should reply wholly to the request without referencing previously submitted documents.

Please repeat the applicable request verbatim above each response. After Tesla's response to each request, identify the source of the information and indicate the last date the information was gathered.

1. State, by model and model year, the number of subject vehicles Tesla has manufactured for sale or lease in the United States. Separately, for each subject vehicle manufactured to date by Tesla, state the following:
   a. Vehicle identification number (VIN);
   b. Model;
   c. Model Year;
   d. Subject component trade/trim name, part number and design version installed as original equipment, including:
      i. Software version;

      ii.  Firmware version;

      iii.  Hardware version;

      iv.  Cabin Camera installed (yes/no);

e. Date of manufacture;

f. Date warranty coverage commenced;

g. Date subject recall was sent to the vehicle;

h. Date subject recall was installed on the vehicle;

i. The number of strikes the vehicle has received related to Autopilot;

j. The date(s) of the strikes;

k. The number of strikeouts the vehicle has received related to Autopilot;

l. The date(s) of the strikeouts;

m. The number of suspensions the vehicle has received related to Autopilot;

n. The date(s) of the suspensions;

o. Date and mileage of Cabin Camera Data Sharing enabled;

p. The state or territory in the United States where the vehicle was originally sold or leased (or delivered for sale or lease);

q. Latest known vehicle mileage and commensurate date;

r. Subject component trade/trim name, part number and design version installed as an aftersales customer-requested upgrade; including:

      i.  Software version;

      ii.  Firmware version;

      iii.  Hardware version;

      iv.  Cabin Camera installed (yes/no);

s. Whether the vehicle ever had Full-Self Driving Supervised/Beta including free trials;

      i.  Start date of Full-Self Driving enrollment Supervised/Beta;

      ii.  End date of Full-Self Driving Supervised/Beta enrollment;

t. Date and identities of the most recent software, firmware, and hardware updates, including but not limited to all such updates related to the subject recall.

Provide the table in Microsoft Access 2010, or a compatible format, entitled "PRODUCTION DATA."

2. Provide the cumulative mileage covered by Model/Model Year and HW (Autopilot hardware) version in the following categories:

a. January 2021 through December 12, 2023 by month starting on the first of the month;

      i.  With the subject system in use; and

      ii.  Without the subject system in use.

b. Post December 12, 2023 by week, with a week defined as seven days starting on Sunday;

      i.  With the subject system in use and the subject recall remedy installed;

      ii.  With the subject system in use and without the subject recall remedy installed; and

      iii.  Without the subject system in use.

A pre-formatted data collection file, which provides further details regarding this submission, will be provided to you.

3. Describe in detail the process (including supporting engineering and safety assessment evidence and any other relevant information) by which Tesla decided to file the Part 573 Safety Recall Report assigned No. 23V838.

   Provide copies of all documents related to Tesla's decision, regardless of whether the documents are in interim, draft, or final form.

4. Describe in detail, separately for each non-remedy update relating to the subject system, the process used to formulate and deploy that update (including supporting engineering and safety assessment, evidence and any other information) including but not limited to:
   a.   The reasoning regarding why the update was not included in Recall 23V838;
   b.   How the update relates to crash types investigated in EA22002;
   c.   How the problem/issue was identified;
   d.   The expected crash reduction related to the update;
   e.   The actual crash reduction related to the update;
   f.   Tesla's assessment regarding the safety implications of the update; and
   g.   State whether Tesla intends to file a safety recall pursuant to 49 U.S.C. § 30118 covering
        this update. If not, please furnish Tesla's technical and/or legal basis for declining to do so.

   Provide copies of all documents related to these updates, regardless of whether the documents are in interim, draft, or final form.

5. Furnish a count of Hands-on-Wheel warnings displayed by the subject system by Model/Model Year and HW version in the following categories:
   a.   January 2021 through December 12, 2023 by month starting on the first of the month;
   b.   Post December 12, 2023 by week, with a week defined as seven days starting on Sunday;
        i.   With the subject recall remedy installed; and
        ii.  Without the subject recall remedy installed.

6. Explain and describe in detail the process, engineering and safety explanation, evidence, and information used for design decisions regarding Tesla's decision to implement a single-pull activation option for the activation of Autopilot as part of the remedy for recall 23V838, including but not limited to:
   a.   Explain how this aspect of the remedy addresses the defect;
   b.   All reasoning, engineering rationale, and all relevant information used to design this feature;
   c.   What human factors[4] considerations and principles were used when designing this feature;

───────────────────

[4] *See, e.g.*, https://www.hfes.org/About-HFES/What-is-Human-Factors-and-Ergonomics.

      i. Explain how the design was validated using human factors (including, but not limited to human participant evaluations);

      ii. Identify the identifier in part e of this Request;

d. State whether Tesla calculated a predicted effectiveness percentage concerning crashes addressed by this feature.

      i. If so, provide this value;

      ii. Explain in detail how this value was calculated including where the analysis variables originated;

e. Describe all assessments, analyses, tests, test results, studies, surveys, simulations, investigations, inquiries and/or evaluations (collectively, "actions") that relate to, or may relate to, this item in the subject recall in the subject vehicles that have been conducted, are being conducted, are planned, or are being planned by, or for, Tesla. For each such action, provide the following information:

      i. Action title or identifier;

      ii. The actual or planned start date;

      iii. The actual or expected end date;

      iv. Brief summary of the subject and objective of the action;

      v. Engineering group(s)/supplier(s) responsible for designing and for conducting the action;

      vi. A brief summary of the findings and/or conclusions resulting from the action;

      f. For all deployed modification/changes to this item, provide separately:

      i. The identifier/title related to this item in Request 15;

      ii. Explain in detail the reasons for this modification/change;

      iii. Explain how this modification/change impacts the effectiveness of this feature;

g. Explain the reasoning, engineering rationale, and all relevant information used regarding the decision to allow vehicle owners to revert the single pull feature to the prior double pull activation setting;

h. Explain the reasoning, engineering rationale, and all relevant information used regarding the decision for the single pull activation setting not to be the default activation setting on vehicles subject to recall 23V838;

i. Describe the consumer facing notifications and communications regarding the single pull activation setting, including but not limited to feature description and feature enablement. Provide dates that all consumer facing notifications and communications were first issued or appeared in vehicles; and

j. Provide the number of vehicles with the single pull feature active and inactive by week and model/model year, with a week defined as seven days starting on Sunday, since the introduction of the recall remedy.

Provide copies of all documents related to the action, regardless of whether the documents are in interim, draft, or final form. Organize the documents by parts a - j.

7. Explain and describe in detail the process, engineering and safety explanation, and evidence for design decisions regarding Tesla's decision to increase the strictness of driver attentiveness requirements when approaching traffic controls off-highway as part of the remedy for recall 23V838, including but not limited to:

    a. Explain how this item of the remedy addresses the defect;

    b.     All reasoning, engineering rationale and all relevant information used to design this

    feature;

    c.     What human factors considerations and principles were used when designing this feature;

       i. Explain how the design was validated using human factors (including, but not limited to human participant evaluations);

      ii. Identify the identifier in part e of this Request;

    d. State whether Tesla calculated a predicted effectiveness percentage concerning crashes addressed by this feature.

       i. If so, provide this value;

      ii. Explain in detail how this value was calculated including where the analysis variables originated;

    e. Describe all assessments, analyses, tests, test results, studies, surveys, simulations, investigations, inquiries and/or evaluations (collectively, "actions") that relate to, or may relate to, this item in the subject recall in the subject vehicles that have been conducted, are being conducted, are planned, or are being planned by, or for, Tesla. For each such action, provide the following information:

       i. Action title or identifier;

      ii. The actual or planned start date;

      iii. The actual or expected end date;

      iv. Brief summary of the subject and objective of the action;

      v. Engineering group(s)/supplier(s) responsible for designing and for conducting the action;

      vi. A brief summary of the findings and/or conclusions resulting from the action;

    f.     For all deployed modification/changes to this item, provide separately:

       i. The identifier/title related to this item in Request 15;

      ii. Explain in detail the motivation for this modification/change;

      iii. Explain how this modification/change impacts the effectiveness of this feature;

    g. Explain the triggering criteria for increased monitoring of this feature;

    h. Explain in detail the requirements for a driver to receive alerts under this item; and

    i. The number of Hands-on-Wheel Warnings by week with a week defined as seven days starting on Sunday, by Model and HW version, displayed by the subject system related to this aspect of the remedy.

Provide copies of all documents related to the action, regardless of whether the documents are in interim, draft, or final form. Organize the documents by parts a - i.

8. Explain and describe in detail the process, engineering and safety explanation, and evidence for design decisions regarding Tesla's decision to increase driver monitoring in the moments following Autopilot engagement as part of the remedy for recall 23V838, including but not limited to:

    a. Explain how this item of the remedy addresses the defect;

b. All reasoning, engineering rationale and all relevant information used to design this feature;

c. What human factors considerations and principles were used when designing this feature;

    i. Explain how the design was validated using human factors (including, but not limited to human participant evaluations);

    ii. Identify the identifier in part e of this Request;

d. State whether Tesla calculated a predicted effectiveness percentage concerning crashes addressed by this feature.

    i. If so, provide this value;

    ii. Explain in detail how this value was calculated including where the analysis variables originated;

e. Describe all assessments, analyses, tests, test results, studies, surveys, simulations, investigations, inquiries and/or evaluations (collectively, "actions") that relate to, or may relate to, this item the subject recall in the subject vehicles that have been conducted, are being conducted, are planned, or are being planned by, or for, Tesla. For each such action, provide the following information:

    i. Action title or identifier;

    ii. The actual or planned start date;

    iii. The actual or expected end date;

    iv. Brief summary of the subject and objective of the action;

    v. Engineering group(s)/supplier(s) responsible for designing and for conducting the action;

    vi. A brief summary of the findings and/or conclusions resulting from the action;

f. For all deployed modification/changes to this item, provide separately:

    i. The identifier/title related to this item in Request 15;

    ii. Explain in detail the motivation for this modification/change;

    iii. Explain how this modification/change impacts the effectiveness of this feature ;

g. Explain the triggering criteria for increased driver monitoring of this item;

h. Explain in detail the requirements for a driver to receive alerts under this item; and

i. Provide the number of Hands on Wheel Warnings by week with a week defined as seven days starting on Sunday, by Model, Model Year and HW version, displayed by the subject system related to this feature of the remedy.

Provide copies of all documents related to the action, regardless of whether the documents are in interim, draft, or final form. Organize the documents by parts a - i.

9. Explain and describe in detail the process, engineering and safety explanation and evidence for design decisions regarding Tesla's decision to implement a one-week suspension policy based on accumulated strikeouts as part of the remedy for recall 23V838, including but not limited to:

    a. Explain how this item of the remedy addresses the defect;

    b. All reasoning, engineering rationale, and all relevant information used to design this feature;

    c. What human factors considerations and principles were used when designing this

feature;

    i. Explain how the design was validated using human factors (including, but not limited to human participant evaluations);

    ii. Identify the identifier in part e of this Request;

d. State whether Tesla calculated a predicted effectiveness percentage concerning crashes addressed by this feature.

    i. If so, provide this value;

    ii. Explain in detail how this value was calculated including where the analysis variables originated;

e. Describe all assessments, analyses, tests, test results, studies, surveys, simulations, investigations, inquiries and/or evaluations (collectively, "actions") that relate to, or may relate to, this item in the subject recall in the subject vehicles that have been conducted, are being conducted, are planned, or are being planned by, or for, Tesla. For each such action, provide the following information:

    i. Action title or identifier;

    ii. The actual or planned start date;

    iii. The actual or expected end date;

    iv. Brief summary of the subject and objective of the action;

    v. Engineering group(s)/supplier(s) responsible for designing and for conducting the action;

    vi. A brief summary of the findings and/or conclusions resulting from the action;

f. For all deployed modifications/changes to this item provide separately:

    i. The identifier/title related to this item in Request 15;

    ii. Explain in detail the motivation of this modification/change;

    iii. Explain how this modification/change impact the effectiveness of this feature;

g. Explain in detail the requirements for a driver to receive strikes under this item; and

h. The number of strikes, strikeouts, and suspensions incurred through use of the subject system by week with a week defined as seven days starting on Sunday and by Model, Model Year and HW.

Provide copies of all documents related to the action, regardless of whether the documents are in interim, draft, or final form. Organize the documents by parts a - h.

10. Explain and describe in detail the process, engineering and safety explanation and evidence for design decisions regarding Tesla's decision to increase the size and prominence of driver facing alerts and warnings as part of the remedy for recall 23V838, including but not limited to:

a. Explain how this item of the remedy addresses the defect;

b. All reasoning, engineering rationale and all relevant information used to design this feature;

c. What human factors considerations and principles were used when designing this feature;

    i. Explain how the design was validated using human factors (including, but not limited to human participant evaluations);

    ii. Identify the identifier in part e of this Request;

d. State whether Tesla calculated a predicted effectiveness percentage concerning crashes addressed by this feature.
    i. If so, provide this value;
    ii. Explain in detail how this value was calculated including where the analysis variables originated;
e. Describe all assessments, analyses, tests, test results, studies, surveys, simulations, investigations, inquiries and/or evaluations (collectively, "actions") that relate to, or may relate to, this item in the subject recall in the subject vehicles that have been conducted, are being conducted, are planned, or are being planned by, or for, Tesla. For each such action, provide the following information:
    i. Action title or identifier;
    ii. The actual or planned start date;
    iii. The actual or expected end date;
    iv. Brief summary of the subject and objective of the action;
    v. Engineering group(s)/supplier(s) responsible for designing and for conducting the action;
    vi. A brief summary of the findings and/or conclusions resulting from the action.
f. For all deployed modifications/changes to this item provide separately:
    i. The identifier/title related to this item in Request 15;
    ii. Explain in detail the motivation of this modification/change;
    iii. Explain how this modification/change impact the effectiveness of this feature.

Provide copies of all documents related to the action, regardless of whether the documents are in interim, draft, or final form. Organize the documents by parts a - f.

11. Describe Tesla's use of human factor science in its design and sustainment of the subject system, including but not limited to:
a. Tesla's design process as it relates to human factors;
b. Tesla's assessment of the importance of human factors;
c. The human factors validation of the subject system;
d. Identify each and every job or position title related to human factors involving the design and development of the subject system since the inception of the subject system:
    i. Identify the role;
    ii. Number of employees that hold this role currently (noting vacancies);
    iii. Role creation date;
    iv. Typical prior experience historically;
    v. Typical education historically;
    vi. Required prior human factors experience historically;
    vii. State whether this position still exists;
        (1) If not, provide the end date of the position and explain why this position no longer exists.

Provide copies of all documents related to the action, regardless of whether the documents are in interim, draft, or final form. Organize the documents.

12. Describe the role that the cabin camera plays in the enforcement of driver engagement / attentiveness and the manner in which its inputs are factored into the subject system's operation prior to, and after, December 12, 2023, including but not limited to:
    a. Whether changes relating to the cabin camera were incorporated into the remedy for recall 23V838;
    b. The impact of any changes on driver engagement alert types and timing and how those changes integrate with the existing engagement strategy;
    c. Recoverable data elements pointing to the cabin camera's influence either via telemetry or from the vehicle's onboard storage; and
    d. The cabin camera's impact on driver alerting and recoverable data if the driver does not opt to share data from the camera with Tesla.


13. Explain in detail the process Tesla uses to learn of/identify crashes reportable under NHTSA's Standing General Order 2021-01 ("the SGO") including but not limited to current and previously used sources.


14. Explain in detail for each source identified in Question 13 the following:
    a. The start date of the source's use;
    b. The end date of the source's use;
    c. Whether Tesla receives information from this source by notification or whether Tesla actively searches this source;
        i. If the source is searched, how often is a search performed;
    d. The number of crashes initially identified (prior to qualification by Tesla) by this source by month;
    e. All search and system constraints of the source;
    f. Enabling criteria which would result in Tesla being aware of a reportable crash;
    g. All changes and modifications to the source or in the search method of the source since Tesla was first served with the SGO including but not limited to any changes in c – f :
        i. The date or approximate date on which the modification or change was incorporated;
        ii. A detailed description of the modification or change;
        iii. The reason(s) for the modification or change; and
        iv. How the modification or change effects Tesla's reporting pursuant to the SGO.

    Provide copies of all policies, procedures, and documents referenced in response to a-g.


15. For each trade name/trim level of the subject system available in the subject vehicles, describe all modifications or changes made by, or on behalf of, Tesla in the design, material composition, manufacture, quality control, supply, function, or installation of the subject system that relate to, or may relate to, driver engagement/attentiveness and OEDR by the subject system in the subject vehicles since July 1, 2023. For each such modification or change, provide the following information:

a. Action title or identifier;
b. The date or approximate date on which the modification or change was incorporated into vehicle production;
c. A detailed description of the modification or change;
d. The reason(s) for the modification or change;
e. If the change is related to the remedy for recall 23V838;
   i. What aspects(s)of the remedy is affected;
f. The hardware, firmware, and software names and numbers of the original version;
g. The hardware, firmware, and software names and numbers of the modified version;
h. Primary distribution method of related firmware and software updates (over the air or in-person service); and
i. When the modified version / update was made available as a service component.

Also, provide the above information for any modification or change that Tesla is aware of which may be incorporated into vehicle production or pushed to subject vehicles in the field within the next 120 days.

A pre-formatted data collection file, which provides further details regarding this submission, will be provided to you.


16. For all subject crashes of which Tesla is aware, including but not limited to crashes previously reported pursuant to the SGO after December 12, 2023, provide the following:
   a. VIN;
   b. Incident date and time;
   c. Location of the crash;
   d. Road class type;
   e. SGO number;
   f. Driving mode;
   g. Remedy on vehicle at the time of incident;
   h. Related remedy items;
   i. Firmware at the time of incident;
   j. Number of Hands on Wheel Alerts in the incident drive cycle;
      i. Visual
      ii. Audible
      iii. Visual + Audible
   k. Time interval between last Hands on Wheel alert and collision;
   l. Last Hands on Wheel Alert Type (visual, audible, visual + audible)
   m. Strikes at time of incident;
   n. Strikeouts at time of incident;
   o. Speed at impact; and
   p. List the available documents related to this incident including but not limited to:
      i. Time interval between last Hands-on-Wheel alert and collision;
      ii. EDR
      iii. CAN logs
      iv. Video/imagery

v.  PAR

Provide copies of all documents referenced in response to Request 16 part p.

A pre-formatted data collection file, which provides further details regarding this submission, will be provided to you.

17. Furnish copies of all internal and external communications that are related to or may relate to the subject recall and subject non-remedy updates, including but not limited to communications that are related to or may relate to the following:
   a.  Tesla's safety defect determination decision making;
   b.  Issue investigation;
   c.  Action design including human factors considerations (initial and modifications); and
   d.  Testing.

Organize response documents in chronological order and identify the following: sender, receiver(s), subject, and date sent.


## Legal Authority for This Request

This letter is being sent to Tesla pursuant to 49 U.S.C. § 30166, which authorizes NHTSA to conduct any investigation that may be necessary to enforce Chapter 301 of Title 49 and to request reports. It constitutes a new request for information.

## Civil Penalties

Tesla's failure to respond promptly and fully to this letter could subject Tesla to civil penalties pursuant to 49 U.S.C. § 30165 or lead to an action for injunctive relief pursuant to 49 U.S.C. § 30163. (Other remedies and sanctions are available as well.) The Vehicle Safety Act, 49 U.S.C. § 30165(a)(3), provides for civil penalties of up to $27,168 per violation per day, with a maximum of $135,828,178 for a related series of daily violations, for failing or refusing to perform an act required under 49 U.S.C. § 30166. *See* 49 C.F.R. § 578.6(a)(3). Such violations include failing to respond completely, accurately, or in a timely manner to ODI information requests.

If Tesla cannot respond to any specific request or subpart(s) thereof, please state the reason why it is unable to do so. If on the basis of attorney-client privilege, attorney work product protection, or other privilege or protection, Tesla does not submit one or more requested documents or items of information in response to this information request, Tesla must provide a privilege log identifying each document or item withheld, and stating the date, subject or title, the name and position of the person(s) from, and the person(s) to whom it was sent, and the name and position of any other recipient (to include all carbon copies or blind carbon copies), the nature of that information or material, and the basis for the claim of privilege and why that privilege applies.

## Confidential Business Information

If Tesla's response contains any information that you claim is confidential business information (CBI), Tesla must request two secure electronic file transfer links from Alexa Ardron at alexa.ardron@dot.gov. One secure electronic file transfer link is for your request for confidential treatment. Please see enclosure 1 for additional instructions on submitting a request for confidential treatment that is compliant with 49 C.F.R. Part 512 (specifically, a request for confidential treatment must include the four required parts that are discussed in enclosure 1). The second secure electronic file transfer link is for your non-confidential response to this letter. Do not submit any confidential business information in your non-confidential submission. Please refer to RQ24009 in Tesla's response to this letter and in a request for confidential treatment that Tesla may submit.

In addition to submitting your request for confidential treatment and any files containing CBI through the secure electronic file transfer link, as a CBI Portal Pilot participant, you will also need to submit your request and files containing CBI to NHTSA's Office of the Chief Counsel via the CBI Portal. If you do not submit your request and files containing CBI to NHTSA's Office of the Chief Counsel via the CBI Portal, you must notify the investigator referenced in this IR to ensure that the secure file transfer link for your request for confidential treatment is directed to the Office of the Chief Counsel accordingly.

**<u>Due Date</u>**

Tesla's response to this letter must be submitted to this office by July 1, 2024. If Tesla finds that it is unable to provide all of the information requested within the time allotted, Tesla must request an extension from me at gregory.magno@dot.gov no later than five business days before the response due date. If Tesla is unable to provide all of the information requested by the original deadline, it must submit a partial response by the original deadline with whatever information Tesla then has available, even if an extension has been granted.

If you have any technical questions concerning this matter, please contact Alexa Ardron of my staff at alexa.ardron@dot.gov.

Sincerely,

# Gregory Magno

Gregory Magno, Chief
Vehicle Defects Division - D
Office of Defects Investigation

Enclosure 1, Information for Requests for Confidential Treatment.

All pre-formatted data collection files will be provided after a meeting regarding these requests.

ENCLOSURE 1 – INFORMATION FOR REQUESTS FOR CONFIDENTIAL TREATMENT

If you believe that your response contains any material that you claim is confidential business information, submit these materials to NHTSA's Office of the Chief Counsel in accordance with 49 C.F.R. Part 512. **All requests for confidential treatment must be submitted directly to the Office of the Chief Counsel. Upon request, ODI will provide you with a secure file transfer link for your submission to the Office of the Chief Counsel.**

**In addition, as a CBI Portal Pilot participant, you will also need to submit your request and files containing CBI to NHTSA's Office of the Chief Counsel via the Confidential Business Information Portal. If you are not currently registered for the CBI Portal, please send a registration request to <u>cbi-helpdesk@dot.gov</u>.**

Requests for confidential treatment are governed by Part 512. A current version of this regulation is available on the internet at https://www.ecfr.gov/current/title-49/subtitle-B/chapter-V/part-512.

How to request confidential treatment:

NHTSA is currently treating electronic submission as an acceptable method for submitting confidential business information to the agency under Part 512. If you claim that any of the information or documents provided in your response constitutes confidential business information within the meaning of 5 U.S.C. § 552(b)(4) or are protected from disclosure pursuant to 18 U.S.C. § 1905, you must request a secure file transfer link from the ODI contact listed in your Information Request. ODI will copy a representative from the Office of the Chief Counsel on the secure file transfer link for your request for confidential treatment. You must submit supporting information together with the materials that are the subject of the confidentiality request, in accordance with Part 512, to the Office of the Chief Counsel. Do not send a hard copy of a request for confidential treatment to NHTSA's headquarters.

Your request must include a request letter that contains supporting information, pursuant to Part 512.8. Your request must also include a certificate, pursuant to Part 512.4(b) and Part 512, Appendix A.

You are required to submit one unredacted "confidential version" of the information for which you are seeking confidential treatment. Pursuant to Part 512.6, the words "ENTIRE PAGE CONFIDENTIAL BUSINESS INFORMATION" or "CONFIDENTIAL BUSINESS INFORMATION CONTAINED WITHIN BRACKETS" (as applicable) <u>must</u> appear at the top of each page containing information claimed to be confidential. Where not all information on a page is claimed to be confidential, identify each item of information for which confidentiality is requested within brackets: "[   ]."

You are also required to submit one redacted "public version" of the information for which you are seeking confidential treatment. Pursuant to Part 512.5(a)(2), the redacted "public version" should include redactions of any information for which you are seeking confidential treatment (i.e., the only information that should be unredacted is information for which you are **not** seeking confidential treatment).

For questions about a request for confidential treatment, please contact Dan Rabinovitz in the

Office of the Chief Counsel at Daniel.Rabinovitz@dot.gov or (202) 366-8534.