## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 21-cv-21940-BLOOM/Torres

NEIMA BENAVIDES, as Personal Representative
of the Estate of Naibel Benavides Leon, deceased,

        Plaintiff,

v.

TESLA, INC., a/k/a Tesla Florida, Inc.,

        Defendant.

_____/

DILLON ANGULO,                            Case No. 22-22607-KMM

        Plaintiff,

v.

TESLA, INC. a/k/a Tesla Florida, Inc.,

        Defendant.

_____/

### DEFENDANT TESLA, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW AS TO COMPENSATORY LIABILITY AND MEMORANDUM OF LAW[1]

Pursuant to Rule 50(a), Defendant Tesla, Inc., moves for judgment in its favor as to compensatory liability. In support of its motion, Tesla states as follows:

### INTRODUCTION

Plaintiffs seek damages against Tesla alleging that its Model S, owned and driven by non-party George McGee, was defective and caused their injuries.[2]

It is uncontradicted that George McGee crashed while driving his 2019 Tesla Model S because he dropped his phone and was momentarily distracted while searching for it. Yet Plaintiffs claim the Tesla is defective because its Autopilot suite of driver assistance features, and its separate

---

[1] Tesla has separately filed a Separate Motion under Rule 50(a) for judgment in its favor as to Plaintiffs' claim for punitive damages.

[2] In their separate Complaints against McGee, which are in evidence as Def. Exh. 78 and 79, Plaintiffs alleged that McGee negligently or recklessly operated the Tesla by (1) failing to comply with state and local traffic laws; (2) failing to maintain control of the Tesla; (3) driving at unsafe speeds; (4) failing to observe Angulo's parked Chevrolet Tahoe; and (5) ignoring controlling traffic signals.

crash prevention/mitigation features (Automatic Emergency Braking (AEB) and Forward Collision Warning (FCW)) caused the crash and failed to prevent the crash, which they have asserted are distinct theories. But the crash was not caused by Autopilot or its crash avoidance/mitigation features—not by their design or by the related warnings, instructions, or alerts. McGee, the driver, caused this crash; he was negligent and admitted his negligence—on scene to the police, in his deposition, and from the witness stand at trial. Moreover, Plaintiffs have not explained *how* Autopilot is to blame when driver distraction from a dropped cell phone can (and does) occur in any conventional vehicle.

Similarly, Plaintiffs have not explained *how* Autopilot, or AEB and FCW, failed to prevent the crash.  It is undisputed that those latter features were designed to help avoid or mitigate front-to-rear collisions with in-lane, in-line vehicles, whereas this crash involved McGee's impact into a Chevrolet Tahoe that was not in his lane and that was parked sideways, off of the roadway. McGee's distraction was the sole reason he did not prevent this crash or mitigate it by pressing his brake pedal.  Though he claimed on re-direct that he would not have reached for his phone had he not been in a Tesla with Autopilot, that testimony contradicted his other testimony that nothing prevented him from driving safely in accordance with the driving laws or from stopping at the stop sign he knew was approaching, and that he also used his cell phone when driving other cars, such as the Maserati he owned at the time.

Compounding the effect of his distraction, McGee was pressing the accelerator pedal at the time of the crash, which overrode Autopilot's speed control function (Traffic-Aware Cruise Control or TACC) and prompted the vehicle to issue a warning to him that "cruise control will not brake; Accelerator pedal is currently pressed." He knew the vehicle would not stop (or turn) at an intersection; he drove this route dozens of times in his Tesla, with Autopilot engaged, and he agreed each time he had to brake to stop the vehicle at the stop sign. Moreover, Plaintiffs fail to demonstrate how the Model S can be defective for failing to stop or alert for detected objects off

the roadway, or for a stop sign, *when it is undisputed that no vehicle in 2019 had those capabilities*.  No car in the world stops at a stop sign, or prevents this crash, when the driver is pressing the accelerator – not at the time of the crash or now.  Plaintiffs' claim is, in essence, that Tesla should be held liable for not providing technology that does not exist.

Despite this, Plaintiffs assert various alleged design defects, through their experts, Alan Moore and Missy Cummings.[3] First, they claim Autopilot is defective because it can be used outside of its Operational Design Domain (ODD). Second, Plaintiffs claim the Driver Monitoring System (DMS), which is intended to monitor driver's engagement while using Autopilot, is insufficient to maintain driver attentiveness, resulting in drivers becoming complacent and/or confused as to Autopilot's capabilities and limitations. Third, Plaintiffs contend the vehicle improperly failed to slow or stop the vehicle prior to the crash, and that the vehicle should have issued an FCW before the crash. Finally, they claim that Tesla failed to warn or train as to the proper use of Autopilot.

After Tesla filed its motion for summary judgment, the Fourth District Court of Appeal in Florida issued an opinion in another Tesla case directly bearing on the issues here. In *Tesla, Inc. v. Banner*, 2025 WL 610816 (Fla. 4th DCA Feb. 26, 2025), the driver of a 2018 Tesla Model 3 was using Autopilot when a tractor-trailer pulled out and crossed the highway in front of the Tesla. The driver did not brake or take evasive action, and struck the middle of the trailer, resulting in his death. His estate made virtually identical allegations to those here and included the argument that "despite Tesla marketing and selling the Model 3 as a 'state-of-the-art' automobile with a 'full

---

[3] In this complex case, defect and causation must be proven through expert testimony. *Patt v. Volkswagen Grp. of Am., Inc.,* No. 22-CV-21585, 2024 WL 1675301, at *8 (S.D. Fla. Apr. 18, 2024). Tesla adopts its Motion to Exclude Plaintiffs' Experts Moore and Cummings (ECF No. 318), and reiterates that absent their testimony, Plaintiffs' claims fail. *See Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 944-45 (11th Cir. 2015).  But even considering their testimony, Plaintiffs have not met their burden of proof.

self-driving capability package,' the vehicle lacked a sufficient crash avoidance system." 2025 WL 610816 at *1. The Estate further claimed:

> …the vehicle lacked a "safe and effective automatic emergency braking safety feature" that other manufacturers had included in less expensive vehicles as early as the 2015 model year. It further alleged Tesla specifically knew that its product would not properly and safely avoid collisions with other vehicles and obstacles in its path, but Tesla failed to "make appropriate changes" to fix this defect.

*Id*.

Relying on these allegations, which mirror those made here, as well as allegations that there were other similar incidents, the *Banner* plaintiff sought to amend her complaint to add a claim for punitive damages, citing (1) inadequate design, testing, and manufacture of Autopilot; (2) government investigations, recommendations, and National Transportation Safety Board and National Highway Traffic Safety Administration warnings; (3) prior incidents and accidents in which the product allegedly failed, causing catastrophic damage, and (4) allegedly misleading statements by Tesla's CEO Elon Musk. *Id.* at *2.[4]

Consistent with its arguments in this case, Tesla noted that Mr. Banner (like Mr. McGee) had declined to purchase the available optional upgrade from Enhanced Autopilot to the "Full Self-Driving Capability" package, and that he had been repeatedly warned of the limitations of the system, including through on-screen warnings. *Id.* at *2-3.

The Fourth District reversed the trial court's decision allowing the plaintiff to plead punitive damages, finding that:

> The record does not support a finding that Tesla knew, or reasonably should have known, that its SAE Level 2 driving assistance features were likely to cause death or great bodily injury. Instead, the evidence indicates Tesla's Autopilot features were "state-of-the-art" and complied with all industry and regulatory standards. Further, Tesla repeatedly warned against misuse of the features, **which was industry practice.** While the Estate's expert testified that Tesla is liable for gross negligence and intentional misconduct in "twenty ways," ***Tesla cannot be liable***

---

[4] The motion to amend in *Banner* was filed after the trial had been continued four times, when the fifth trial setting was just months away.  Though captioned as a motion to amend the complaint, fact and expert discovery had been completed at the time it was filed.

*for failing to provide technology that it did not advertise and that did not exist.* After *Chrysler*, we recognized that "[i]t would appear that the Florida Supreme Court has all but eliminated punitive damage awards in products liability cases." *Jeep Corp. v. Walker*, 528 So. 2d 1203, 1205 (Fla. 4th DCA 1988). That remains largely true today. ***In this case, the Estate did not establish Tesla knew or should have known its SAE Level 2 driving assistance features were likely to cause death or great bodily injury.*** Therefore, the circuit court's order must be reversed.

*Id.* at *4 (emphasis added).

*Banner* compels the conclusion that not only is there no basis for punitive damages here, but Plaintiffs also cannot meet their burden of proving a design defect or failure to warn when ***the Model S complied with the state-of-the-art in 2019 and there is no evidence that any other car would have prevented this crash from happening***. If Plaintiffs had such evidence, they would have presented it.

## STANDARD FOR JUDGMENT AS A MATTER OF LAW

Viewing all evidence in the light most favorable to Plaintiffs and all reasonable inferences therefrom, the evidence points so strongly and overwhelmingly in favor of Tesla that no reasonable person could arrive at a contrary verdict. *Lamb by Shepard v. Sears, Roebuck & Co.*, 1 F.3d 1184, 1191 (11th Cir. 1993) (affirming directed verdict). Moreover, Plaintiffs are not entitled to a verdict based on speculation. *Id.; Carlson v. U.S.*, 754 F.3d 1223, 1229 (11th Cir. 2014).

## LEGAL STANDARDS

### I.     BURDEN OF PROVING A DESIGN DEFECT

It is Plaintiffs' burden to prove the product is defective and unreasonably dangerous. *Patt*, 2024 WL 1675301, at *4; *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 86-87 (Fla. 1976). As this Court most recently explained, Florida recognizes both the consumer expectation and risk utility tests for design defect. (ECF No. 428). *see also,* Fla. Std. Jury Instr. (Civ.) 403.7(b). The determination as to which test is applicable has been the subject of several decisions, but remains unsettled.

Under the consumer expectation test:

a product is unreasonably dangerous because of its design if it fails to perform as safely as the ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by the manufacturer.

*Aubin v. Union Carbide Corp.*, 177 So. 3d 489 (Fla. 2015).

While the test is an objective one, which looks at the expectations of the reasonable, ordinary consumer, a reasonable and ordinary consumer cannot expect a manufacturer to make a product that is beyond the state-of-the-art or industry customs.[5] *See* § 768.1257, Fla. Stat. Further, a reasonable, ordinary consumer should expect that he must drive his vehicle in conformity with the traffic laws that require a driver to drive in a careful and prudent manner so as not to endanger the life, limb, or property of any person. § 316.1925(1), Fla. Stat.

Similarly, the reasonable, ordinary consumer should expect a vehicle to perform as described in the owners' manual and in product warnings, which, in this case, included, among many others, warnings to keep hands on the wheel and be ready to take over at any time, and warnings that when Autopilot's TACC function is overridden, the driver is in control of the

---

[5] Over Tesla's objection, the Court ruled that certain statements made by Elon Musk were relevant to "help the jury understand whether an ordinary consumer would have reasonably expected the Vehicle's Autopilot to warn of or avoid the subject collision." (ECF No. 433 at 34). As set forth in Tesla's prior briefing, (*see* ECF No. 320, 444 and 462), when the statements are placed in their proper context, it is clear they relate to predictions about the future of fully autonomous vehicles generally, and/or the future capabilities, once appropriate software is further developed, of vehicles equipped with Tesla's "Full Self-Driving Capability" hardware package – a package that Mr. McGee declined to purchase. Accordingly, they could not and did not represent an ordinary consumer's expectations with regard to the subject vehicle. But, of even greater significance, ***there is a demonstrable disconnect between the statements Plaintiffs rely upon and Mr. McGee's conduct***. Specifically, Mr. McGee testified that he did not see anything from Musk that would have influenced his decision to buy the vehicle, and more importantly, nothing Musk said influenced how he used Autopilot on his Model S. (T. 7/21 am at 82). For these reasons, Musk's statements cannot be a basis for imposing compensatory liability. Though the fact Mr. McGee did not listen to any statements from Musk (or watch the "Paint it Black" video) is not dispositive, it is certainly evidence of what the ordinary consumer relies upon pre-purchase. It is also noteworthy that McGee had driven this route dozens of times since purchasing the Tesla. An ordinary consumer's expectations are surely better informed by personal experience with the product than cherry-picked statements, and irrelevant when considered in context, a litigant argues informs expectations.

vehicle's speed.  This is consistent with the expectations of a reasonable, ordinary consumer, who should expect a vehicle to speed up when he puts his foot on the accelerator.

> Under the risk utility test, a product:

> is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe.

*Aubin*, 177 So. 3d at 505 (citing Restat. (3d) of Torts: Products Liability § 2 (1998)).

Under either test, the scope of a manufacturer's liability with respect to an alleged design defect is limited in several significant respects.  First, a manufacturer does not have a duty to make only "foolproof" products or even the "safest possible product[s]." *Voynar v. Butler*, 463 So. 2d 409, 412 (Fla. 4th DCA 1985). As this Court previously noted, "[p]roducts liability does not make the manufacturer an insurer of all foreseeable accidents which involve its products [because] [v]irtually any product is capable of producing injury when put to certain uses or misuses." ECF No. 428 at 71 (quoting *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 18-19 (Fla. 4th DCA 2022)). "Therefore, a manufacturer will not be liable simply because the design is not the safest design possible, so long as the design is not unreasonably dangerous." *Id.* (quoting *Greico*, 344 So. 3d at 18-19) (additional citations omitted)).

Second, "'[a] manufacturer is not under a duty in strict liability to design a product which is totally incapable of injuring those who foreseeably come in contact with the product.'" *Grieco*, 344 So. 3d at 19.[6] *Grieco* arose from a vehicle accident caused by an intoxicated driver who had purposefully ingested a compressed air cleaning product while operating her vehicle. After

---

[6] *See also Husky v. Black*, 434 So. 2d 988 (Fla. 4th DCA 1983) (manufacturer is not required to design the best possible product, or one as good as others make, or a better product than the one he has, so long as it is reasonably safe); *Grunow v. Valor Corp.,* 904 So. 2d 551, 556 (Fla. 4th DCA 2005) (An "action is not maintainable in products liability merely because the design used was not the safest possible."); *Scheman-Gonzalez v. Saber Mfg. Co.*, 816 So. 2d 1133, 1141 (Fla. 4th DCA 2002).

inhaling the compressed air at a stop light, she lost control of her vehicle, drove off the road, and hit two parked cars and a pedestrian. The plaintiff pedestrian brought suit against the product manufacturer, alleging the product was defective because it could be inhaled and cause intoxication. *Id.* at 15-16. The trial court granted summary judgment in the defendant manufacturer's favor based on lack of proof of causation. *Id.* at 17.

The Fourth District Court of Appeal affirmed, explaining among other points that the possibility of misuse "does not create an issue of fact regarding whether the product as manufactured was unsafe for its ordinary and intended use." *Id.* at 20 (citations omitted). *See also Grunow v. Valor Corp. of Fla.*, 904 So. 2d 551, 556 (Fla. 4th DCA 2005) (finding any product can be misused and cause injury and to create liability in that scenario inappropriately makes a manufacturer or distributor an insurer of the product).

Third, a manufacturer is not an insurer that no one will be harmed while using its product. *West,* 336 So. 2d at 87. Finally, the relevant time from which to determine whether a design is defective is "the state of-the-art of scientific and technical knowledge and other circumstances that existed at the time of the product's manufacture, not at the time of the injury." *See* Fla. Std. Jury Instr. (Civ.) 403.7(b); § 768.1257, Fla. Stat.

As this case has been tried, it appears Plaintiffs are proceeding under the consumer expectations test. But whether the consumer expectation test or the risk utility test is used, Plaintiffs have not proven that there is a design defect.

## II.   PROOF OF CAUSATION

In order to proceed on any of their theories, Plaintiffs must prove that Autopilot was defective when it left the hands of Tesla and that defect was the proximate cause of Plaintiffs' injury. *West*, 336 So. 2d at 86-87; *Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1295 (11th Cir. 2005).

The test of proximate cause is as follows:

A defect in a product is a legal cause of damage if it directly and in natural and continuous sequence produces or contributes substantially to producing such damage, so that it can reasonably be said that, but for the defect, the damage would not have occurred.

Fla. Std. Jury Instr. (Civ.) 403.12.

The law is settled that "*[a] mere possibility of such causation is not enough*; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1020 (Fla. 1984)[7]; *McCasland v. Pro Guard Coatings, Inc.*, No. 8:17-cv-990-T-27AEP, 2018 WL 5786164, *2 (M.D. Fla. Nov. 5, 2018). When a plaintiff is unable to establish the product was more likely than not a substantial factor in bringing about the plaintiff's injury, judgment should be granted in favor of the defendant. *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1257 (11th Cir. 2010).

## ARGUMENT

## I.      PLAINTIFFS HAVE FAILED TO PROVE THEIR DESIGN DEFECT CLAIMS

Plaintiffs asserted three design defect theories. None should be submitted to the jury.

### A.      Plaintiffs Have No Evidence To Support A Claim That Autopilot Should Not Have Been Available Outside Of Its Operational Design Domain (ODD)

#### 1.      No Proof Of A Defect

Plaintiffs' experts both claim the Model S was defective because it failed to prevent drivers from engaging Autopilot on certain types of roads such as Card Sound Road. This has been referred to as Plaintiffs' ODD theory, and it must fail under either the consumer expectation test or the risk utility test.

The record reflects that there were 15 manufacturers with approximately 63 models that did not use geofencing, which they claim Tesla could have incorporated so that Autopilot would not operate on certain roadways they argue are outside Autopilot's ODD. (T. 7/17 am at 80).  The only vehicle Plaintiffs identified with a Level 2 ADAS system that incorporated geofencing for such a purpose in 2019 was the 2019 Cadillac CT-6, but that is a hands-free system, meaning it does not require the driver to keep his or her hands on the wheel while the Level 2 system is

---

[7] All emphasis is supplied unless noted.

engaged. (T. am 7/16 at 50-51; 7/17 am at 80-83).  As such, its design considerations were too different to compare with the Subject Vehicle, primary amongst them being that a driver that does not have his hands on the wheel requires more time to react to changing traffic and road conditions.

Moreover, Plaintiffs' ODD defect theory is premised upon the incorrect proposition, contradicted by the undisputed evidence, that the ODD for a Level 2 system is a static area or set of roadway conditions that can or should be set by the system designer such that the system will be disabled on certain roads and driver can have no role in determining whether the system is appropriate to use in any given circumstance on those roads.  In other words, Plaintiffs' ODD defect theory ignores that a Level 2 system's ODD is dynamic and best determined by an attentive driver that is aware of the roadway conditions when he or she makes the choice of whether to use the system.

This fundamental characteristic of the ODD for a Level 2 system has been explained by way of guidance from the Society of Automotive Engineers (SAE), which has provided autonomous vehicle guidelines that have been adopted by the National Highway Traffic Safety Administration. (Def. Exh. 176(A) at 19 ("[User] [d]etermines whether/when engagement and disengagement of the driving automation system is appropriate")).   SAE has ***repeatedly*** stated over successive versions of its guidelines that – for Level 2 vehicles – the ***driver alone*** must determine when to use what features. (*See* T. 7/17 am at 74-79). Plaintiffs' expert Cummings cannot change or trump the industry norm, adopted and supported by the federal regulator, for purposes of claiming a design defect related to the ODD.

Plaintiffs' ODD defect opinion boils down to an argument that Autopilot is defective because it does not prevent drivers from being irresponsible. Under such logic, all vehicles would be defective because they could be operated at speeds in excess of a posted speed limit, despite warnings about the risk of doing so. This is flatly inconsistent with the applicable standard for design defect.  It also ignores the reality that (1) Tesla advises drivers what circumstances are

appropriate for Autopilot use; and (2) by his own admissions, McGee had an understanding of his responsibility as the driver when using Autopilot. Since Plaintiffs' experts' opinions fly in the face of the established law and the case facts, they cannot support Plaintiffs' burden of establishing design defect.

In its order on summary judgment, the Court relied on Plaintiffs' argument concerning this defect theory that the NTSB recommended changes related to the ODD, but as the Court has now clarified, that evidence is inadmissible.

### 2.      No Proof of Causation

The design's lack of geofencing for purposes of disallowing Autopilot on roadways like Card Sound Road did not cause this crash.  McGee knew the road he was on – he traveled it "several times a week." (T. 7/21 am at 29-30). As detailed herein, he knew it was his responsibility to pay attention, and yet he decided to override TACC so as to drive faster than the preset 45 MPH TACC maximum for this stretch of Card Sound Road, and he did so at the same time he was looking down to pick up his dropped cell phone.

Although Plaintiffs' expert Moore ultimately opines that this crash would not have happened had Autopilot not been available for use on Card Sound Road, this is nothing more than speculation. Indeed, his concessions about the facts of this case demonstrate that the opinion is not only speculative but also directly contradicted by the evidence.

Specifically, he acknowledged (a) that driver distraction from cell phones is a problem that preexists and is not unique to Autopilot (T. 7/21 am at 38); (b) nothing about Autopilot prevented McGee from seeing and stopping at the stop sign (T. 7/21 at 63); (c) no vehicle at the time had a Level 2 ADAS could, on its own, stop for stop signs (T. 7/21 pm at 42); (d) that pressing the accelerator overrides the maximum speed set for TACC (T. 7/21 pm at 39); and (e) that Autopilot issues an alert that says TACC will not brake when the driver presses the accelerator with TACC.

When Plaintiffs' expert Moore's concessions are read together, it is evident his causation

opinion is nothing more than conjecture. If disabling Autopilot on Card Sound Road could ***not*** have prevented McGee from looking away from the road to find his phone, and could ***not*** have prevented McGee from crashing, and could ***not*** have prevented McGee from controlling vehicle speed by pressing the accelerator, then it stands to reason that the use of Autopilot was ***not*** a substantial factor in causing Plaintiffs' injuries.  Stated differently, Moore's concessions demonstrate that this crash occurred because of driver behavior that can, and does, occur in ***any and every*** vehicle, which is to say Autopilot's design that permitted its use on Card Sound Road had nothing to do with causing the crash.

Indeed, Moore's opinions boil down to an impermissible series of "what ifs." *Halliburton Co. v. Eastern Cement Corp.*, 672 So. 2d 844, 847 (Fla. 4th DCA 1996).  Yet he ignores the most significant "what if," the only one with an answer that has factual support: what if McGee had taken the same actions in any other vehicle?  The answer, of course, is the outcome would have been exactly the same.  Similarly, McGee's testimony that he "doesn't believe" he would have looked for his phone is speculative, on its own terms, and is contradicted by his other, non-speculative testimony.

**B.**    **Plaintiffs Have No Evidence To Support A Design Defect Claim Related To The Driver Monitoring System (DMS)**

Plaintiffs' second design defect claim focuses on the subject vehicle's DMS. Plaintiffs' experts claim the DMS is insufficient to adequately monitor and ensure driver awareness when using Autopilot. This claim fails under either the consumer expectation test or the risk utility test.

**1.**    **No Proof of Defect**

To start, for model year 2019 vehicles, it was the state of the art and industry custom to use a steering wheel-based system for driver monitoring. (T. 7/17 am at 80-83). GM had one MY 2019 vehicle, the Cadillac CT-6, that used a camera-based driver monitoring system, but GM had designed and advertised its system as "hands free," which necessarily required a DMS that did not

depend on steering wheel interaction.  (T. 7/17 am at 80-83).  Thus, GM's use of a camera-based DMS is entirely irrelevant to this case, which involves a "hands on" system.

BMW also sold certain MY 2019 vehicles that used a camera-based DMS, but it sold other MY 2019 vehicles that utilized a steering wheel-based DMS.  (T. 7/17 am at 82-83).  Thus, no reasonable juror could conclude that BMW's use of a camera-based DMS in some vehicles set the industry standard when, at the very same time, BMW was selling other vehicles that did not use such a DMS.  On the other hand, Acura, Ford, Genesis, Honda, Infinity, Jaguar, Kia, Land Rover, Lexus, Lincoln, Maserati, Mercedes, Nissan, Toyota, and Volvo all exclusively used steering wheel-based DMS designs in their MY 2019 vehicles, just as Tesla did.  A product design should not be found defective when it complies with the industry standard.  (T. 7/17 am at 82)

 Once again, this theory of liability would place a manufacturer in the position of being an insurer of the safety of its product, contrary to Florida law. *See Voynar,* 463 So. 2d at 412 and cases cited *supra*. Because Plaintiffs' expert's DMS opinion would require the jury to impose liability based on a standard contrary to what the law requires, it does not satisfy Plaintiffs' burden of proof of design defect under either the risk utility or consumer expectation test.

Plaintiffs will likely argue that Cummings testified that it was "grossly negligent" for Tesla not to track instances of drivers ignoring DMS-generated alerts to determine whether software updates related to the DMS were effective, and that she also testified that Tesla agreed its DMS cannot prevent driver misuse[8], and that NHTSA identified Tesla as an outlier in regard to the extent to which its DMS did not adequately prevent drivers from becoming complacent when using Autopilot.

But this evidence (including the improperly admitted testimony concerning the recall) is irrelevant because it is all related to *driver complacency*. This case, it bears repeating, does not

---

[8] Tesla maintains its position that this evidence should not have been admitted because it refers to the recall that the Court excluded as a subsequent remedial measure.

involve a complacent driver, but instead an engaged one that was aggressively controlling the vehicle when he momentarily looked away from the road to find his dropped cell phone.[9]

Plaintiffs are likely to point to the three admitted other incidents as proof of a defect with Autopilot. However, Plaintiffs introduced no evidence that could support a finding that the drivers involved in those incidents had their hands on the wheel, were pressing the accelerator pedal, or had momentarily looked away from the road to retrieve a dropped object. As such, they are irrelevant to the evidence here, which has shown that Mr. McGee was not complacent, but instead was actively driving the vehicle with his hands on the wheel and his foot on the accelerator when he momentarily looked away from the road to search for his dropped cell phone.

### 2. No Proof of Causation

Even if there was proof that the DMS design was defective, that defect was not a legal cause of Plaintiffs' injury. Stated simply, Plaintiffs cannot establish that but for the absence of a camera-based DMS, this accident would not have happened because McGee could have just as easily looked away for a moment to find his phone in such a vehicle (or in a vehicle that did not have a Level 2 ADAS system at all).

Plaintiffs' theory assumes that the driver was complacent and did not know he was responsible for remaining responsible for the driving task when using Autopilot. But the evidence shows McGee was not a complacent driver—he was an aggressive driver with his hands on the wheel while he was overriding TACC by pressing the accelerator. And McGee admitted during his testimony that he knew he had to pay attention and be alert when using Autopilot. (7/21 am at

---

[9] The same is true in regard to the other incidents studied by NHTSA that the Court admitted, over Tesla's objection, under the more relaxed standard for substantial similarity the Court found applies when other incidents are offered for the limited purpose of establishing notice. Because NHTSA studied and referenced those incidents in association with its investigation into whether Autopilot's DMS is appropriately effective for reducing the risk of driver complacency, the only notice they could have provided Tesla is of a potential risk of that type of driver misuse. The evidence has shown that is an entirely different phenomenon from McGee's momentary distraction caused by his dropped cell phone.

55).  Moreover, he was telling the vehicle that he was paying attention by keeping his hand on the wheel, which would have sent the same message to the dozens of other vehicles that utilized a steering wheel-based DMS.

While Plaintiffs focus on how often he got warnings and pulled over because he "struck out" from using Autopilot due to the repeated warnings, that evidence simply establishes that he was aware of what he should be doing and was responsive to the alerts issued by the subject DMS. He simply chose to momentarily ignore his acknowledged responsibility when he looked away from the road to find his dropped phone.

This evidence also demonstrates that Cummings' complacency opinion is not based on any scientific evidence, nor on the facts of this case. And just like Moore, Cummings could not say, without speculation, that McGee's behaviors would have been different had Autopilot ***not*** been engaged.  Cummings attempted to overcome this deficiency by suggesting that the software updates to the DMS Tesla provided as a part of its recall would have prevented this crash.  First, this testimony should be disregarded because it violated the Court's exclusion of the recall. Regardless, her opinion cannot support a finding that Autopilot was defective because it did not incorporate the recall-related software updates—which the jury has now heard in the form of the stipulation that was read to them concerning the feasibility of those countermeasures—because the facts of this case establish those countermeasures would not have made a difference.  The table provided below summarizes those countermeasures and the evidence that proves they are irrelevant.

| Countermeasure | Why Countermeasure Is Irrelevant |
|---|---|
| Additional hands-on reminders within moments of engaging Autopilot | Mr. McGee's hands were detected as on the wheel so he would not get hands-on reminders. |
| Change in location on the touch screen of hands-on reminders in the Model 3 and Model Y | Mr. McGee was driving a Model S. |

| Countermeasure | Why Countermeasure Is Irrelevant |
|---|---|
| Change in method of activating Autopilot from two pulls on the activating stalk to just one pull | Mr. McGee had engaged Autopilot prior to the crash |
| Hands-on reminders issues more frequently when vehicles are off-highway and approaching stop signs | Mr. McGee's hands were detected as on the wheel so he would not get hands-on reminders.  Also, stop sign detection technology had not yet been released at the time of the crash (this remedy followed introduction of traffic control detection in 2020) |
| Eventual suspension of Autopilot when a driver repeatedly fails to demonstrate continuous and sustained responsibility when Autopilot is engaged | Mr. McGee's was driving the care. His hands were detected as on the wheel, and he was pressing the accelerator.  It is pure speculation to suggest he would have been suspended from using Autopilot at the time of the crash. |

Thus, the absence of these features did not cause Plaintiffs' injuries.

**C.**   **Plaintiffs Have No Evidence To Support A Claim That The Subject Tesla Was Defective For Failing To Prevent This Crash**

**1.**   **No Proof of Defect**

The evidence Plaintiffs have presented regarding the subject vehicle's collision prevention or mitigation features (AEB and FCW) establishes that these features were designed to activate in response to vehicles that are traveling on the road, in front of the and in the same lane as the Tesla (in-lane, in-line vehicles) and that it was not designed to respond to vehicles that are not on the road or to pedestrians.  (T. 7/16 am at 33-34). Thus, the evidence is that these features were not designed to activate in response to an SUV that was parked sideways, off of the roadway.  The evidence has also shown that these features, and the limitations associated therewith, were state of the art and consistent with the industry standard, which was to assist with avoiding front-to-rear collisions with in-lane, in-line vehicles.  (T. 7/17 am at 66; Ex. D-610).  Thus, just as the Fourth District found in the case discussed above, "Tesla cannot be liable for failing to provide technology that it did not advertise and that did not exist."  *Banner*, 2025 WL 610816, at *4.

Plaintiffs, through their experts, have also suggested that the subject vehicle was defective because it detected, but did not respond to, a stop sign.  However, Cummings acknowledged that this stop sign was detected by the vehicle's "shadow mode," which she further acknowledged is a commonly used developmental tool whereby features that are still in development record what they detect and what responsive action they would take, but the features are disconnected from any vehicle control function.  (T. 7/17 pm at 9 and 37; T. 7/17 am at 53-54, 57-59).  This permits designers to assess the capability of these systems so that they can be further developed until such time as they become reliable enough to be connected to a vehicle control function.  Thus, the stop sign detection by shadow mode is irrelevant because it was not connected to a vehicle control function.

Finally, Plaintiffs, through their experts, have asserted that the subject vehicle detected the "end of drivable space" (i.e. the end of the roadway at the T-intersection in this instance), but improperly failed to stop or slow for it.  However, Plaintiffs offered no evidence to support the conclusion that AEB should respond to the end of drivable space when the driver is pressing the accelerator pedal.[10]

Thus, the detection of the end of drivable space is irrelevant to Plaintiffs' defect theory concerning alleged deficiencies with AEB and FCW.  Just as significantly, as described above, McGee had overridden TACC by pressing the accelerator pedal.  For this reason, the detection of the end of drivable space is irrelevant to all of Plaintiffs' defect theories because he, not TACC, was controlling the vehicle's speed.

## 2.  No Proof of Causation

There is no factual support for the allegation that Tesla's crash avoidance features—AEB and FCW—were designed for situations like this.  And, as shown, the end of drivable space

---

[10] In fact, the vehicle's detection of drivable space was associated with its TACC function, which McGee had overridden by pressing the pedal.

detection was associated with TACC, which McGee had overridden. Similarly, the stop sign detection is irrelevant because it was detected by shadow mode, a tool used to develop a stop sign-related control function that was still in development and that no other vehicle had at the time of the crash. As the Court held in *Banner*, Tesla cannot be liable for failing to include technology that is beyond the state of the art.

Finally, it is uncontested that McGee did receive a visual and audible alert when TACC was disabled at 1.65 seconds before the crash. (T. 7/17 pm at 13). Cummings conceded the alert was issued and acknowledged that McGee did brake after receiving this alert. (T. 7/17 pm at 13-21). Thus, despite her criticism that FCW did not issue an alert, the evidence shows that an alert was issued during the time she opined an alert from FCW should have triggered and would have made a difference. The evidence also shows that this alert did not prevent the crash, which proves her assertion is simply speculation that is contradicted by the evidence.

## II.   PLAINTIFFS HAVE FAILED TO ESTABLISH THE ELEMENTS OF THEIR FAILURE TO WARN CLAIM

To prevail on their failure to warn claim, Plaintiffs must show Tesla failed to **adequately** warn of a particular risk that was known or knowable at the time of manufacture and distribution, **and** that the inadequacy of the warnings proximately caused their injuries. *See Hoffmann-La Roche Inc. v. Mason*, 27 So. 3d 75, 77 (Fla. 1st DCA 2009). Plaintiffs have failed to establish each of these elements, and thus, Plaintiffs' have not made a case that should be submitted to the jury.

### A.   Tesla Has No Duty To Warn Of An Open and Obvious Danger

The "purpose in placing a duty to warn on the manufacturer is to familiarize the user with **dangers of which he may be unaware**." *See Reynolds v. Bridgestone/Firestone*, 989 F.2d 465, 471 (11th Cir. 1993). "[W]arning labels are necessary to advise only those consumers who might be unaware of the danger involved." *Grieco,* 344 So. 3d at 21 (affirming summary judgment where plaintiff knew of danger of inhaling a dusting spray). Thus, a failure to warn claim fails as a matter

of law where the plaintiff is aware or should have been aware of the danger. *Perez v. Nat'l Presto Indus., Inc.*, 431 So. 2d 667, 669 (Fla. 3d DCA 1983) (manufacturer is not required to warn knowledgeable purchasers of the dangers of which the buyer either knows or should be aware). Similarly, "there is no duty to warn of an obvious danger." *Cohen v. Gen. Motors Corp., Cadillac Div.*, 427 So. 2d 389, 391 (Fla. 4th DCA 1983) (no duty to warn of obvious danger of manually releasing emergency brake while the car was running and in gear).[11]

Every driver of an automobile is charged with the responsibility of maintaining control of his vehicle, and every licensed driver knows that there is no more fundamental requirement for the safe and lawful operation of a vehicle than to watch the road ahead to avoid the risk of serious injury or death.  There is no ADAS or Tesla or Autopilot exception to this legal requirement. Advanced driver assistance systems like TACC or Autosteer are, by definition, designed to assist with driving the vehicle—they do not replace the basic requirement that the driver should exercise common sense control over the vehicle.

### B.    The Warnings Were Adequate As A Matter Of Law

Notwithstanding Tesla's lack of duty to warn McGee of open and obvious dangers, where warnings are "accurate, clear, and unambiguous," their adequacy can be resolved as a matter of law on summary judgment. *Farias v. Mr. Heater, Inc.*, 684 F.3d 1231, 1233 (11th Cir. 2012) (affirming summary judgment where warnings adequately notified consumers of the potential harmful consequences of using a propane gas heater indoors).

Here, Tesla did provide extensive warnings, which itself defeats Plaintiffs' claim. *Talquin Elec. Co-op., Inc. v. Amchem Prods., Inc.*, 427 So. 2d 1032, 1033 (Fla. 1st DCA 1983) (holding that adequacy of the warning is immaterial when a plaintiff is in fact warned by the label and that

---

[11] *See also Insua v. JD/BBJ, LLC*, 913 So. 2d 1262, 1264 (Fla. 4th DCA 2005) (no duty to warn about obvious danger of electrocution when working with electrical wires); *Rodriguez v. New Holland N. Am., Inc*., 767 So. 2d 543, 544–45 (Fla. 3d DCA 2000) (danger of coming into contact with "boom" of an industrial compact loader was open and obvious).

summary judgment appropriate where the uncontroverted evidence is that a plaintiff is aware of the danger).

The first time McGee used Autosteer, he was required to acknowledge and indicate acceptance of its limitations. This included agreeing to only enable Autosteer "if you are willing to pay close attention to the road and be prepared to override it at any time," and under specific driving conditions. Each time McGee engaged Autosteer, the vehicle displayed a message telling him to keep his hands on the steering wheel and to remain prepared to take over. He admitted that he did not need an owners' manual to tell him he had to remain alert when Autopilot was engaged.

## C. Plaintiffs Have Presented No Evidence That An Inadequate Warning Proximately Caused Their Injuries

Finally, to prevail on a failure to warn claim, Plaintiffs must also prove any alleged failure to warn was a proximate cause of the Plaintiffs' injuries. *See Gooding,* 445 So. 2d at 1018. Here, Plaintiffs have presented no such evidence of proximate causation.

It is well settled Florida law that proximate cause cannot be established where the plaintiff admitted he did not read existing warnings. *Patt,* 2024 WL 1675301, at *13. McGee was aware that the Model S had an owner's manual, but he admitted he never read it, even though it was available to him electronically through the vehicle's touch-screen. (Tr. 7/21 at 47-48). Had he done so, he would have read the plethora of warnings contained therein concerning the capabilities and limitations of the vehicle's Autopilot driver assistance features and its crash prevention/mitigation features. (P-53). Because McGee failed to read existing warnings, Plaintiffs cannot proceed on any failure to warn claims as a matter of law. *See Patt,* 2024 WL 1675301 at *13; *Pinchinat v. Graco Children's Prod., Inc.*, 390 F. Supp. 2d 1141, 1147-48 (M.D. Fla. 2005).

Additionally, there is no evidence that any particular warning would have affected McGee, and no evidence that additional or modified warnings would have made any difference. *See Gooding*, 445 So. 2d at 1018; *Realauction.com, LLC v. Grant St. Grp., Inc*., 82 So. 3d 1056, 1059

(Fla. 4th DCA 2011) ("Speculative testimony is not competent substantial evidence.").[12] To the contrary—after reading several of the warnings contained in the owner's manual at his deposition, McGee testified he would have disregarded them anyway because he viewed them as boilerplate disclosures to protect Tesla from liability.

## III.   MCGEE'S ADMITTED NEGLIGENCE WAS THE SOLE PROXIMATE CAUSE OF THE CRASH

Although proximate cause is generally for the jury, judgment as a matter of law is proper where the sole proximate cause of injury was the negligence of someone other than the defendant. The undisputed facts demonstrate McGee's negligence was the sole proximate cause of the accident and Plaintiffs' injuries.

Mr. McGee admitted he was negligent. His testimony clearly establishes he was familiar with Card Sound Road, having routinely driven it to and from home and work. He was aware of the risks of operating his vehicle while Autopilot was engaged and acknowledged his responsibility for driving the car. Despite his knowledge and familiarity, McGee made the conscious and deliberate decision to fish for his dropped phone while manually operating his vehicle. In doing so, he abandoned the responsibilities he had as a driver, and this was the sole proximate cause of this crash. Redesigning Autopilot would have had no bearing here as McGee still would have been in control of the vehicle and nothing would have prevented him from using his phone.

In *Kroon v. Beech Aircraft Corp.*, 628 F.2d 891, 893 (5th Cir. 1980), the plaintiff-pilot alleged an aircraft engine was defectively designed because the engine rendered the plane inoperable when certain controls were locked. Id. at 892-93. Yet, plaintiff had also admitted that his own negligence contributed to the accident, and his that he knew of the dangers associated with

---

[12] Indeed, there can be no proximate causation where the plaintiff ignored the allegedly inadequate warning. *See Landi v. Home Depot USA, Inc.*, No. 2:17-cv-701-FtM-38MRM, 2019 WL 4644243, at *6 (M.D. Fla., Sept. 24, 2019) (summary judgment on a failure to warn claim is proper where undisputed evidence shows the plaintiff ignored the allegedly inadequate warning).

operating the aircraft when the controls were locked. Id. at 893. Under these circumstances, the court granted summary judgment in favor of the aircraft manufacturer, finding the sole proximate cause of the crash was the pilot's own negligence. Id. at 894. Just as the plaintiff-pilot in Kroon admitted that his own negligence contributed to the accident, so too here, McGee admitted his negligence was the proximate cause of the crash.

Likewise, in *Kohler v. Medline*, 453 So. 2d 908, 908-910 (Fla. 4th DCA 1984), the plaintiff slipped and fell when the contents of a urine bag spilled on the floor. She sued the manufacturer of the urine bag, claiming its design was negligent. The appellate court affirmed summary judgment in favor of the manufacturer finding the sole proximate cause of the plaintiff's injury was her own negligence in failing to seal the bag. It explained:

> This case is but a demonstration of human failing, and attempting to compensate therefor would be as futile as an attempt to reverse the seasons. McClellan's tardiness and Burnside's clumsiness at Antietam enabled Lee to hold. Redesign of the urine bag would have been no more relevant to the mental lapse of the nurse's aide here than improving those leaders' curriculum at West Point would have been to the outcome of that battle.

*Id.* at 910.

This case warrants the same result since the undisputed material facts demonstrate McGee's negligence was the sole proximate cause of the accident. Judgment in Tesla's favor should be granted on all of Plaintiffs' claims for lack of proximate cause.

## **CONCLUSION**

Tesla requests that this Court grant judgment in Tesla's favor on liability.

Respectfully submitted,

*S/ Wendy. F. Lumish*
**WHITNEY V. CRUZ**
Florida Bar No. 800821
**WENDY F. LUMISH**
Florida Bar No. 334332
**BOWMAN AND BROOKE LLP**
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134
Tel. 305-995-5600 / Fax: 305-995-6100
whitney.cruz@bowmanandbrooke.com
wendy.lumish@bowmanandbrooke.com

**THOMAS P. BRANIGAN**
(Admitted *Pro Hac Vice*)
**DREW P. BRANIGAN**
(Admitted *Pro Hac Vice*)
**BOWMAN AND BROOKE LLP**
101 W. Big Beaver Road, Suite 1100
Troy, MI 48084
Tel. 248-205-3300 / Fax: 248-205-3399
thomas.branigan@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com

**JOEL SMITH**
(Admitted *Pro Hac Vice*)
**BOWMAN AND BROOKE LLP**
1441 Main Street, Suite 1200
Columbia, SC 29201
Tel. 803-726-7420 / Fax: 803-726-7421
joel.smith@bowmanandbrooke.com

**HILARIE BASS**
Florida Bar No. 334243
**HILARIE BASS, ESQUIRE LLC**
2821 Bayshore Drive, UPH-B
Miami, FL 33133
Tel. 305-505-8777
bassh@bassinstitute.org

*Attorneys for Defendant TESLA, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 25, 2025, the foregoing was filed using the

Court's CM/ECF system, which will send electronic notice of the same to all interested parties.

**Adam T. Boumel, Esq.**
Florida Bar No. 0110727
THE ROUSSO, BOUMEL LAW FIRM, PLLC
9350 South Dixie Highway
Suite 1520
Miami, FL 33156
Tel. 305-670-6669
adam@roussolawfirm.com
assistant@roussolawfirm.com
pleadings@roussolawfirm.com

*Attorneys for Plaintiff Dillon Angulo*

**Brett Schreiber, Esq.**
Admitted *Pro Hac Vice*
**Satyarinivas "Srinivas" Hanumadass, Esq.**
Admitted *Pro Hac Vice*
**Carmela Birnbaum, Esq.**
Admitted *Pro Hac Vice*
SINGLETON SCHRIEBER
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
bschreiber@singletonschreiber.com
vas@singletonschreiber.com
cbirnbaum@singletonschreiber.com
jjusto@singletonschreiber.com
eelms@singletonschreiber.com
service@singletonschreiber.com

*Co-Counsel for Plaintiffs Dillon Angulo and
Neima Benavides*

**Todd Poses, Esq.**
Florida Bar No. 0075922
POSES & POSES, P.A.
Alfred I. Dupont Building
169 East Flagler Street, Suite 1600
Miami, FL 33131
Tel.  305-577-0200
Fax: 305-371-3550
tposes@posesandposes.com
maria@posesandposes.com

*Attorneys for Plaintiff Neima Benavides*

**Douglas F. Eaton, Esq.**
Florida Bar No. 0129577
EATON & WOLK PL
2665 South Bayshore Drive, Suite 609
Miami, FL 33133
Tel. 305-249-1640
Fax: 786-350-3079
deaton@eatonwolk.com
cgarcia@eatonwolk.com
lhuete@eatonwolk.com

*Co-Counsel for Plaintiffs Dillon Angulo and
Neima Benavides*


/s/Wendy F. Lumish
WENDY F. LUMISH