**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

NEIMA BENAVIDES, as Personal Representative
of the Estate of Naibel Benavides Leon, deceased,

        Plaintiff,

v.

TESLA, INC., a/k/a Tesla Florida, Inc.,

        Defendant.

Case No. 21-cv-21940-
BLOOM/Torres

       /

DILLON ANGULO,

        Plaintiff,

v.

TESLA, INC. a/k/a Tesla Florida, Inc.,

        Defendant.

Case No. 22-22607-KMM

       /

**DEFENDANT TESLA, INC.'S**
**MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE ISSUE OF PUNITIVE**
**DAMAGES AND MEMORANDUM OF LAW**

     Defendant Tesla, Inc. by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 50 (a) moves for judgment as a matter of law on the issue of punitive damages.[1] There is no evidence to support a claim for punitive damages and the evidence presented to this jury during Plaintiffs' case-in-chief affirmatively demonstrates that Tesla is entitled to judgment as a matter of law as to this claim. Plaintiffs have failed to present clear and convincing evidence that Tesla engaged in intentional misconduct or gross negligence.

**INTRODUCTION**

     George McGee was driving aggressively on Card Sound Road. He had his hand on the steering wheel and his foot on the accelerator, going 62 mph in a 45-mph zone.  In fact, if he hadn't

---

[1] Tesla has filed a separate motion for judgment as a matter of law as to compensatory liability ("Liability JMOL") and adopts the standard for a Rule 50 (a) motion set forth therein.

1

been pressing the accelerator, the car would have maxed out at 45 mph, but he wanted to go faster. And he was on the phone. He insists he was "using Bluetooth" but somehow his cell phone ended up on the floor, and even though he knew where he was, he knew a stop sign was ahead and he needed to press the brake to stop for it, and he knew he needed to turn left at that stop sign, he stayed on the accelerator so he could control the speed—prompting the vehicle to alert him "Cruise control will not brake; Accelerator pedal is currently pressed." He took his eyes off the road to reach for that phone so he could continue his all-too-important call to with the airlines. And then, when the vehicle issued a "Take Over Immediately" alarm, he "popped up" and pressed the brake, but it was too late and his series of decisions was deadly. McGee rightly took responsibility on-scene, repeatedly admitting his fault on police bodycam footage, and Plaintiffs rightly blamed him, each filing their own lawsuit against him well before later filing separate lawsuits against Tesla. And now they insist Tesla "shares responsibility" with McGee, but, at the same time, they say it is *Tesla* whose conduct rises to the level of criminal manslaughter. No reasonable juror could conclude that, and for that reason, Tesla asks this Court to grant its Motion for Judgment to prevent the potential for a grave injustice.

Plaintiffs' liability case is weak, at best, and is more fully addressed in Tesla's accompanying Motion. In sum, they claim:

(1)    Tesla (*like every other hands-on Level 2 driver assist feature on the road at the time*) allowed the driver to decide whether to engage the cruise control and lane-centering feature on this road (this is the Operational Design Domain (ODD) argument inapplicable to Level 2 vehicles like the Model S here);

(2)    Tesla's Driver Monitoring System (DMS) used steering torque to gauge driver attention (*like every other hands-on Level 2 driver assist feature on the road at the time*);

2

(3)     Forward Collision Warning (FCW) and Automatic Emergency Braking (AEB) failed to protect Ms. Benavides and Mr. Angulo from McGee's negligence (*even though no other car in the world would have prevented this crash either*); and

(4)     Tesla didn't mandate sufficient driver education before drivers were allowed to drive their cars.

The strength of their claims is, at best, dubious, and yet Plaintiffs double-down by asserting that not only is the 2019 Model S defective, but that Tesla acted with ***actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct resulting in injury or damage, or engaged in conduct equivalent to criminal manslaughter*** with respect to the each of these defects. In doing so, they ignore that the Model S was state-of-the-art. No manufacturer of a hands-required SAE Level 2 Advanced Driver Assist System (ADAS), like Tesla's Autopilot, geofenced their feature or enforced an ODD restriction, as Plaintiffs say should have been the case here.  And, likewise, other than one car with a hands-free system, the other 70-plus SAE Level 2 ADAS vehicles on the road, from 13 manufacturers, all had substantially similar Driver Monitor Systems using steering torque to monitor attentiveness, just like Tesla. This discussion is odd, considering McGee's hand was on the wheel, and he was pressing the accelerator to override cruise control so he could make sure to keep speeding.  It is undisputed that pressing the accelerator ***hands off*** speed control to the driver until they release the pedal—***like every other car with cruise control system in the world***.

Plaintiffs offered no evidence of other cars that would have prevented this crash ***because there are none***.  No car in the world would have stopped at the stop sign or prevented this crash with the driver pressing the accelerator as he was.  No car in the world would trigger AEB for the

3

side profile of an off-road vehicle, and none would trigger an FCW with enough time to make a difference here.  In fact, Plaintiffs' expert Dr. Cummings, evidently ignorant of the warnings the car gave to McGee, insisted that an audible warning at 1.65 seconds before the crash would have helped and, in fact, Tesla gave him a rather abrasive, jarring "Take Over Immediately" alert at that time.

Plaintiffs' claim is, in essence, that Tesla engaged in conduct rising to the level warranting punitive damages for failing to provide technology that does not exist.  There is no basis in law for such an award. The reality is that McGee admits, and it is not disputed by the parties, he could and should have followed the traffic laws and paid attention, and if he had, this crash would not have happened. He didn't need Tesla to tell him what happens when you run a stop sign.  He didn't need Tesla to train him to keep his eyes on the road instead of rummaging for a phone.  He knew that information.

Plaintiffs know this. They know their liability case is weak, and their punitive case lacks merit. So, they rely on sideshows and distractions.  They tried to make this case about Tesla and Mr. Musk's representations, but the law requires a nexus to the facts of this accident and to the conduct resulting in these Plaintiffs' injuries. Plaintiffs paint with a broad brush, by relying on statements by Mr. Musk that not only were not only forward-looking and inapplicable to the features McGee purchased for his vehicle, but were statements that McGee explicitly denied ever hearing or being influenced by.[2] So too, Plaintiffs have made data collection from this crash a

---

[2] In its order denying summary judgment as to punitive damages, the Court first relied upon the NTSB recommendations related to ODD. (ECF No. 428 at 96). But the Court has since determined that those recommendations were inadmissible. The Court also pointed to public statements made by Tesla which the Court concluded "arguably misrepresented the risk and limitations of the Autopilot system and improperly suggested that issues presented in the crash were resolved. (ECF 428 at 96). But, as has now become clear, Mr. McGee never heard or relied on those statements, so they can not be the basis for punitive damages.

feature of the trial, even though the Court found Tesla did not act in bad faith or that Plaintiffs were prejudiced, and Plaintiffs' expert Moore admitted he received a "treasure trove" of data and "all he needed" for this investigation. Likewise, their data recovery expert Lewis finally had to admit that there was no evidence that Tesla's technician Calafell had corrupted any data, let alone the "snapshot" file Tesla supposedly hid. Indeed, their last witness brought a compelling conclusion to this sideshow on data, even admitting that his unidentified co-consultant "Oleg" managed to start unearthing the "treasure trove" within 15 minutes of getting their copy whilst sitting in a Starbucks down the street from the inspection. Clearly, they could have gotten access to this same, exact, data, by working with the police to get access anytime between 2019 and 2024 but somehow it is Tesla's fault they didn't. It's a red herring that went belly-up right before Plaintiffs rested their case.

Finally, when the Court denied Tesla's motion for summary judgment on the punitive damages (ECF No. 428), it turned to the decision from the Fourth District Court of Appeal in *Tesla, Inc., v. Banner,* 2025 WL 610816 (Fla. 4th DCA Feb. 26, 2025), a case with facts similar to the instant case[3]. The court began by reiterating the punitive damage standard.

> The character of negligence necessarily to sustain an award of punitive damages is the same as that required to sustain a conviction for criminal manslaughter.

2025 WL 610816 at *3.

It also specifically embraced the decision in *Jeep Corp. v. Walker,* 528 So. 2d 1203, 1206 (Fla. 4th DCA 1988) to the effect that "[i]t would appear that the Florida Supreme Court has all but eliminated punitive damage awards in products liability cases." (absent evidence that "Jeep was deliberately attempting to maim or kill [the plaintiff]," there was an insufficient basis upon

---

[3] Indeed, that crash is one of three this Court found to be "substantially similar" notwithstanding critical distinctions like McGee pressing the accelerator and having his hand on the wheel unlike in the *Banner* case.

which to award punitive damages).

Turning to the facts, the *Banner* court found:

[T]he evidence indicates Tesla's Autopilot features were 'state-of-the-art' and complied with all industry and regulatory standards. Further, ***Tesla repeatedly warned against misuse of the features, which is industry practice…Tesla cannot be liable for failing to provide technology that it did not advertise and that did not exist.***

*Id.* at \*6 (emphasis added).

The Court noted the difference in the stage of proceedings. (ECF No. 428 at 97). In fact, however, discovery was completed in *Banner*, the trial date had been continued four times, and summary judgments had been filed when Plaintiffs sought to amend their complaint to add punitive damages, so the appellate court, did in fact have a full record—primarily populated by the same Dr. Cummings this jury heard from.

Tesla submits that consistent with *Banner*, it is entitled to judgment as a matter of law on punitive damages. There is no objective basis here to conclude that a rational jury could, based on the evidence presented by Plaintiffs, conclude Tesla's conduct amounts to manslaughter.  McGee is solely responsible for the crash. Tesla cannot be subject to punishment for not allowing him to drive his car where and how he wanted. That's what the vehicle code is for and that is where his violations were addressed.

## I.      FLORIDA'S STRINGENT STANDARD FOR PUNITIVE DAMAGES

### A.      <u>Florida Requires An Extremely High Degree Of Culpability Before Punitive Damages Will Be Appropriate</u>

Florida law is well settled with respect to the standard for entitlement to an award of punitive damages. To start, a plaintiff has "no right to punitive damages." *St. Regis Paper Co. v. Watson*, 428 So. 2d 243, 247 (Fla. 1983); *see also Chrysler Corp. v. Wolmer*, 499 So. 2d 823, 825 (Fla. 1986). In recognition of this, decades ago, the Florida Supreme Court articulated the

extremely high level of misconduct necessary to support punitive damages in *Carraway v. Revell*, 116 So. 2d 16, 20 (Fla. 1959). There, the court explained that the degree of conduct necessary to sustain a claim for punitive damages:

> There is a real affinity between the character (or kind or degree) of negligence necessary to recover punitive damages or to sustain or warrant a conviction of manslaughter. Both have, as a basic purpose, the punishment of the offender. The offender in a manslaughter action may be deprived of his liberty or property by the State while the offender in an action for that kind of negligence justifying the imposition of punitive damages is deprived of his property – not as compensation to the injured party but as punishment – ergo, both are punishment and partake of public wrongs, to a greater or less degree.

*Id*. It further explained:

> The character of negligence necessary to sustain an award of punitive damages must be of a **gross** and **flagrant** character, evincing **reckless** disregard of human life, or of the safety of the persons exposed to its dangerous effects, or there is an entire **want of care** which would raise the presumption of **conscious indifference** to consequences, or which shows **wantonness** or **recklessness**, or a **grossly careless** disregard of the safety and welfare of the public, or the **reckless** indifference to the rights of others which is equivalent to an **intentional** violation of them.

*Id.* at n. 12.

Thereafter, in *White Construction Co. v. Dupont*, 455 So. 2d 1026 (Fla. 1984), *receded from on other grounds by Murphy v. International Robotic System, Inc.*, 766 So. 2d 1010, 1027-31 (Fla. 2000), the court reiterated this high standard. It found punitive damages were improper where a construction company had actual knowledge that the brakes on its 40-ton loader had not been working for some time, yet allowed its driver to operate the loader in a populated construction site where it reached top speeds striking the plaintiff. *See also Como Oil Co. v. O'Loughlin,* 466 So. 2d 1061, 1061-62 (Fla. 1985) (rejecting punitive damages where conduct was not "equivalent to criminal manslaughter" though gasoline explosion injuring plaintiff was the result of an unsafe gas truck and a driver who negligently overfilled an underground gas tank by failing to measure the gasoline in the tank before filling it, and failing to watch the tank as he was filling it).

Specifically in the product liability context, the Florida Supreme Court in *American Cyanamid Co. v. Roy*, 498 So. 2d 859, 861 (Fla. 1986), found punitive damages improper as a matter of law because the manufacturer of toxic chemicals that injured worker complied with industry guidelines, and its conduct had not reached the "willful and wanton level necessary to support an award of punitive damages." In doing so, the court noted that punitive damages are reserved for truly culpable behavior, and are intended to "express society's collective outrage at unacceptable behavior." *Id*. at 861.

In a case involving an alleged automobile product defect, the Florida Supreme Court rigorously applied this stringent standard striking down a punitive damage claim. *Wolmer*, 499 So. 2d at 825. Echoing *Carraway*, the court reiterated that the plaintiff must prove that, by designing and marketing the particular vehicle, the defendant "exhibited a reckless disregard for human life equivalent to manslaughter." (*Id.* at 825). The court carefully examined the crash test results before concluding that because some involved different crash circumstances, some potential defects were corrected, and others were found to have not affected performance, there was no evidence that Chrysler had actual knowledge that it was marketing a product that was inherently dangerous. (*Id*. at 826). As such, the court held that the punitive damages claim should not have been submitted to the jury. *Id*. *See also Jeep Corp. v. Walker*, 528 So. 2d 1203, 1206 (Fla. 4th DCA 1988) (absent evidence that "Jeep was deliberately attempting to maim or kill [the plaintiff]," there was an insufficient basis upon which to award punitive damages).

In 1999, the Florida Legislature amended section 768.72, to codify this stringent test for allowing punitive damages:

> (2) A defendant may be held liable for punitive damages only if the trier of fact, ***based on clear and convincing evidence***, finds that the defendant was personally guilty of intentional misconduct or gross negligence. As used in this section, the term:

(a) "Intentional misconduct" means that the defendant had ***actual knowledge of the wrongfulness*** of the conduct and the ***high probability that injury or damage*** to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.

(b) "Gross negligence" means that the defendant's conduct was so ***reckless or wanting*** in care that it constituted a ***conscious disregard*** or ***indifference*** to the life, safety, or rights of persons exposed to such conduct.

§ 768.72(2), Fla. Stat.

While Plaintiffs argue that the statute superseded the standard set forth in older cases like *White*, to the contrary, in 2016, the Florida Supreme Court reiterated its adherence to this heightened standard: "the required level of negligence for punitive damages is equivalent to the conduct involved in criminal manslaughter." *Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 11 (Fla. 2016). Florida District Courts of Appeal have echoed this standard, too. *See, e.g., Monsanto v. Behar*, No. 3D2024-0569, 2025 WL 1646538 (Fla. 3d DCA June 11, 2025) (reversing order allowing amendment citing *Valladares*).

These were followed by the recent *Banner* decision using the same high standard. It also specifically embraced the decision in *Jeep Corp. v. Walker,* 528 So. 2d 1203, 1206 (Fla. 4th DCA 1988) to the effect that "[i]t would appear that the Florida Supreme Court has all but eliminated punitive damage awards in products liability cases." (absent evidence that "Jeep was deliberately attempting to maim or kill [the plaintiff]," there was an insufficient basis upon which to award

### B.    <u>Proof by Clear and Convincing Evidence</u>

In addition to the stringent substantive standard, Plaintiffs must establish a right to punitive damages by clear and convincing evidence. § 768.725, Fla. Stat. Clear and convincing evidence is "considerably more rigorous" than preponderance of the evidence. *Lee Cnty. v. Sunbelt Equities, II, Ltd. P'ship*, 619 So. 2d 996, 1006 n.13 (Fla. 2d DCA 1993). It is "evidence which is positive, precise and explicit, which tends directly to establish the point to which it is adduced and is

sufficient to make out a prima facie case." *Slomowitz v. Walker*, 429 So. 2d 797, 800 (Fla. 4 th

DCA 1983) (citations omitted).

> ### C.   The Conduct Upon Which Plaintiffs' Claim for Punitive Damages Based Is Must Relate To This Plaintiff

In ruling on Tesla's Motion in Limine related to punitive damages, the Court explained

that "to ensure 'that the jury will ask the right question, and not improperly punish a defendant for

its out of state harm to others, there must be a nexus to the specific harm suffered by [t]he

[p]laintiff,'" citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003)

(consistent with the Fourteenth Amendment and due process, the conduct that forms the basis of

punitive damages "must have a nexus to the specific harm suffered by the plaintiff.") (ECF No.

433).  Then multiple times during trial, the court reiterated that Plaintiffs would not be permitted

to offer evidence of other accidents that post date this accident. (See T. 3/16 at 86-7). And it

specifically rejected Plaintiffs' argument that Tesla's conduct after the accident was "relevant to a

continuous course of conduct," stating "with regard to punitive damages, it has to bear some

relationship to this accident." (T. 7/17 am at 6; *see also* 7/25 am at 1).

This is consistent with Florida cases that have excluded evidence of conduct that did not

harm the plaintiff. *See Philip Morris USA, Inc. v. Rintoul*, 342 So. 3d 656, 665 (Fla. 4th DCA 2022)

(concluding plaintiffs could not use e-cigarette evidence to support punitive damages because

conduct that caused plaintiffs' damage was addiction to tobacco cigarettes and not e-cigarettes)

(citing *Campbell*, 538 U.S., at 423)); *Hardin v. R.J. Reynolds Tobacco Co*., 314 So. 3d 584 (Fla.

3d DCA 2020) (affirming directed verdict on punitive damages where no evidence linked the

alleged misconduct to plaintiff's claimed injury); *HRB Tax Grp., Inc. v. Fla. Investigation Bureau, Inc.,* 360 So. 3d 1159, 1162-63 (Fla. 4th DCA 2023) (reversing order permitting punitive damages

amendment because trial court improperly considered allegations and evidence not relevant to the

claim for which punitive damages were sought.).

## II.   PLAINTIFFS OFFERED NO EVIDENCE, MUCH LESS CLEAR AND CONVINCING EVIDENCE TO SUPPORT PUNITIVE DAMAGES

When the evidence is viewed through the proper prism – a high standard of ***actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage would result and, despite that knowledge, intentionally pursued that course of conduct resulting in injury or damage, or engaged in conduct equivalent to criminal manslaughter,*** the requirement of proof by clear and convincing evidence, and conduct that bears a relationship to these Plaintiffs' injuries, there should be no doubt that Tesla is entitled to judgment as a matter of law as to these punitive damage claims.

Due process requires that Tesla be aware of the conduct for which it is subject to punishment, and for that reason, Plaintiffs must articulate the basis upon which they seek punitive damages. Since a claim for punitive damages is not an independent cause of action, but "merely a remedy that must be asserted in conjunction with a substantive claim," *Philip Morris USA, Inc. v. Hallgren*, 124 So. 3d 350, 355 (Fla. 2d DCA 2013).   A review of those clams reveals they do not provide a basis for punitive damages.

### A.   Plaintiffs Have No Evidence To Support A Punitive Damage Claim Based On The Allegation That Autopilot Should Not Have Been Available Outside Of An Operational Design Domain (ODD)

Plaintiffs' experts both claim the Model S was defective because it failed to prevent drivers from engaging Autopilot on certain types of roads such as Card Sound Road.[4] As set forth in Tesla's Liability JMOL, acceptance of that claim is inconsistent with Florida law and should be

---

[4] Plaintiffs' ODD defect theory is premised upon the incorrect proposition, contradicted by the undisputed evidence, that the ODD for a Level 2 system is a static area or set of roadway conditions that can or should be set by the system designer such that the system will be disabled on certain roads and driver can have no role in determining whether the system is appropriate to use in any given circumstance on those roads.

rejected. But to then elevate it to a basis for punitive damages is completely beyond the pale.

As detailed in its Liability JMOL, the record reflects that there were 15 manufacturers with approximately 63 models that did not use geofencing. (T. 7/17 am at 80). The only vehicle Plaintiffs identified with a Level 2 ADAS system that did in 2019 was the 2019 Cadillac CT-6. But that is a hands-free system (which meant it did not require the driver to keep his or her hands on the wheel while the Level 2 system is engaged), so the design considerations were different. (T. 7/16 am at 50-51; 7/17 am at 80-83). Further, and importantly, the Society of Automotive Engineers ("SAE") has **repeatedly** stated over successive versions of its guidelines that – for Level 2 vehicles – the **driver alone** must determine when to use what features. (*See* T. 7/17 am at 74-79). Apparently, despite this, Plaintiffs' expert seeks to change the industry norm, adopted and supported by the federal regulator, for purposes of claiming a design defect related to the ODD, and seeking punitive damages.

This claim cannot pass muster. Courts recognize that a manufacturer who complies with industry standards certainly should not be exposed to punitive liability. For instance, in *American Cyanamid Co. v. Roy,* 498 So. 2d 859 (Fla. 1986), where the defendant manufacturer of toxic chemicals complied with applicable industry guidelines, its conduct had not reached the "willful and wanton level necessary to support an award of punitive damages" in a case brought by an injured worker. Similarly, in *Chrysler v. Wolmer*, 499 So. 2d 823, 825 (Fla. 1986), a wrongful death action alleging that a defect led to post-collision fire in a rearend accident, the trial court directed a verdict in favor of Chrysler on punitive damages. While the Court of Appeal reversed, the Florida Supreme Court quashed that decision and agreed with the trial court citing, among other factors, the fact that the design for the fuel tank complied with federal safety standards, which counseled against the imposition of punitive damages. *Id.; see also Harris v. Beneficial Fin. Co.*

*of Jacksonville*, 338 So. 2d 196, 200 (Fla. 1976) ("The existence of this industrywide standard of practice would ordinarily be a defense against the imposition of punitive damages . . . ."). These Florida cases are consistent with the U.S. Supreme Court decision in *BMW v. Gore*, 517 U.S. 559 (1996), which concluded that "BMW could reasonably rely on state disclosure statutes for guidance," and its compliance with these statutes provided a "good-faith basis for believing" that its conduct was lawful. *Id.* at 579-580.[5]

Additionally, Plaintiffs' ODD defect opinion boils down to an argument that Autopilot is defective because it does not prevent drivers from being irresponsible. Under such logic, all vehicles would be defective because they could be operated at speeds in excess of a posted speed limit, despite warnings about the risk of doing so. This is flatly inconsistent with the applicable standard for design defect. It also ignores the reality that (1) Tesla advises drivers what circumstances are appropriate for Autopilot use; and (2) McGee's own admissions of his pre-crash understanding of his responsibility as the driver when using Autopilot.

For all of these reasons, Tesla is entitled to an order dismissing this claim as a basis for punitive damages.

---

[5] *See also Satcher v. Honda Motor Co.,* 52 F.3d 1311, 1316-17 (5th Cir. 1995) (punitive damages for failing to provide motorcycle leg guards inappropriate where, among other factors, "the industry as a whole categorically rejects the need for leg guards"); *Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994) (citing manufacturer's compliance with federal standards in finding evidence insufficient to support finding of wantonness); *Drabik v. Stanley-Bostitch, Inc.,* 997 F.2d 496, 510 (8th Cir. 1993) ("Compliance with industry standard and custom serves to negate conscious disregard and to show that the defendant acted with a nonculpable state of mind with no knowledge of a dangerous design defect."); *Miles v. Ford Motor Co.,* 922 S.W.2d 572, 589 (Tex. Ct. App. 1996), *rev'd on other grounds*, 967 S.W.2d 337 (Tex. 1998).

**B.      Plaintiffs Have No Evidence To Support A Punitive Damage Claim Related To The Driver Monitoring System (DMS)**

Plaintiffs assert that Tesla should be liable for punitive damages because, they claim, Autopilot's Driver Monitoring System (DMS) was defective because it utilized a steering-wheel based system rather than a driver-facing-camera-based system.  Plaintiffs cannot carry their burden, which requires proof by clear and convincing evidence, on this theory for two reasons: (1) Tesla's DMS was state of the art and consistent with industry standards, and (2) McGee was aggressively driving the vehicle—he had his hands on the wheel (which informed the car that he was paying attention), and he was pressing the accelerator at the time of crash—when, immediately before the crash, he momentarily looked away from the road to find his dropped cell phone.

Plaintiffs' expert Cummings acknowledged that for Model Year 2019, Acura, Ford, Genesis, Honda, Infinity, Jaguar, Kia, Land Rover, Lexus, Lincoln, Maserati, Mercedes, Nissan, Toyota, and Volvo all, like Tesla, exclusively used a steering wheel-based DMS.  Cummings also conceded that only the 2019 Cadillac CT-6 and certain BMW vehicles used camera-based systems. The industry's heavy tilt towards steering wheel-based systems, like Tesla's, is compelling proof that such a DMS was state of the art and the industry standard.

However, it should also be noted that even the limited number of camera-based system do not support the contention a steering wheel-based DMS is defective. First, the Cadillac was marketed as a "hands-free" system, which means it had to have been designed with a DMS that did not use the steering wheel, whereas Tesla's system was designed and marketed as a hands-on system.  Thus, the design considerations for the Cadillac system are distinct from those for the Tesla system (and all other systems, at the time, which were also designed and marketed as hands on).  Second, as noted BMW sold certain MY 2019 vehicles with a steering wheel-based DMS

14

and certain other MY 2019 vehicles with a camera-based system.  Thus, no reasonable juror could find that BMW had determined that a steering wheel-based system was unreasonably dangerous. (*See* cases cited *supra*. holding that punitive damages are precluded where the product means industry custom and state of the art).

Additionally—perhaps more fundamentally—Plaintiffs cannot prove, by clear and convincing evidence that their injuries were caused by a defect in the DMS, caused their injuries because the evidence shows McGee was not complacent (the phenomenon a DMS seeks to prevent. Instead he was actively driving the vehicle and further shows that he was communicating his engagement to the vehicle by having his hands on the wheel.  Moreover, Plaintiffs offered no evidence that a camera-based DMS would have changed the outcome here, where McGee momentarily looked away from the road to find his dropped cell phone.  This would have been easy enough for Plaintiffs to have tested, but they did not do so and did not offer anything else beyond their expert's speculation.

Thus, Tesla is entitled to judgment as a matter of law  on punitive damages in regard to this defect theory.

**C.**     **Plaintiffs Have No Evidence To Support A Punitive Damage Claim Based On An Allegation That The Subject Tesla Was Defective For Failing To Prevent This Crash.**

Tesla is entitled to judgment as a matter of law on punitive damages for this defect theory first because McGee was actively driving the car: he had his hands on the wheel and was controlling the vehicle's speed by pressing the accelerator pedal at the time of this crash.  *No automobile of any kind would stop, or reasonably be expected to stop, when the driver is actively commanding it to go faster.* McGee has acknowledged that he knew he was responsible for maintaining control of the Tesla, knew that he had to command it to stop at the stop sign (and at all stop signs), and that he failed to do so because he looked away from the road to find his dropped

cell phone.

Tesla is also entitled to judgment as a matter of law because the Model S's ADAS features (Autopilot and the separate crash prevention features, AEB and FCW) were state of the art and in accord with industry standards. No vehicle at the time had a stop sign detection and control function, and the crash prevention/mitigation features were designed to assist with preventing/mitigating crashes to the rear of vehicles travelling in front of, and in the same lane as, the Tesla. Moreover, Tesla provided multiple warnings and alerts in its owner's manual (which McGee testified he did not read) and on the vehicle's instrument panel directly and Media Control Unit touchscreen also in front of the driver that appropriately explained the ADAS features, their limitations, and the driver's responsibility for remaining attentive and in control when driving the vehicle.

As the Fourth District held in *Banner*, Tesla cannot be liable for failing to include technology that is beyond the state of the art. *Banner*, 2025 WL 610816, at *4 ("[T]he evidence indicates Tesla's Autopilot features were 'state of the art' and complied with all industry and regulatory standards. Further, Tesla repeatedly warned against misuse of the features, which was industry practice…Tesla cannot be liable for failing to provide technology that it did not advertise and that did not exist."). Punitive damages would be even more inappropriate here, where McGee was pressing the accelerator, than in *Banner*, where the driver was not.

To obscure these facts, and the law regarding punitive damages, Plaintiffs will point to evidence they offered concerning four momentary *detections* that were made by the Tesla. Specifically, at various moments in time, the Tesla detected (1) the stop sign; (2) the Tahoe; (3) a pedestrian now known to be Ms. Benavides; and (4) the "end of drivable space" (essentially the end of the roadway at the T-intersection). However, this evidence is misleading, and cannot

support a punitive damage finding, because there are simple and reasonable explanations, acknowledged by Plaintiffs' experts, for why the vehicle did not stop or slow when it made these detections.

First, the "end of drivable space" detection was a function associated exclusively with TACC. The vehicle did not respond to that detection because McGee was pressing the accelerator, which meant he overrode TACC and was controlling the vehicle's speed. Reasonable, ordinary consumers, of course, expect their vehicle to go faster when they press the accelerator; that is what *every* vehicle does, whether or not it has a Level 2 system or other ADAS features. This is also consistent with SAE guidance, acknowledged by Plaintiffs' expert Moore, that vehicles with ADAS systems should be designed so as to respond to a driver's control inputs. Thus, the lack of a vehicle response to the "end of drivable space" detection cannot support an award of punitive damages.

The Tesla's detections of the Tahoe and the "pedestrian" now known to be Ms. Benevides did not generate an AEB response because that feature, consistent with the state of the art and industry standards at the time, was designed to prevent or mitigate collisions to the rear of vehicles that were in front of and in the same lane of travel as the Tesla. The Tahoe was parked off the roadway and perpendicular to the Tesla's path of travel. Thus, the lack of an AEB response to its detection, and to the detection of Ms. Benevides, is not evidence—and certainly not clear and convincing evidence—of a defect.

The Tesla's detection of the stop sign was made by the vehicle's shadow mode, which Cummings acknowledged is a design tool whereby features that are still being developed are disconnected from any vehicle control function but record their detections and the responses they would make so as to provide information to assist with the continued development of those features

until such time as they can be safely connected to a vehicle control function.  The Tesla's shadow mode was being used to develop a later-released traffic control function that could stop for stop signs.  Tesla was the first company to release such a feature, but it was still being developed at the time of this crash.  Thus, no reasonable juror could find that the Tesla's inability to stop for the stop sign cannot be clear and convincing evidence sufficient to meet Florida's high punitive damage standard.  ***No vehicle could stop for stop signs at the time of this crash***.

Finally, it is uncontested that McGee did receive a visual and audible alert when TACC was disabled at 1.65 seconds before the crash.  (T. 7/17 pm at 13).  Cummings conceded the alert was issued and acknowledged that McGee did brake after receiving this alert.  (T. 7/17 pm at 13-21).  Thus, despite her criticism that FCW did not issue an alert, the evidence shows that an alert was issued during the time she opined an alert from FCW should have triggered and would have made a difference.  The evidence also shows that this alert did not prevent the crash, which proves her assertion is simply speculation that is contradicted by the evidence.

**D.**     **Plaintiffs Have No Evidence To Support Punitive Damages Based On Their Failure To Warn Claim**

As set forth in Tesla's Liability JMOL, there is no basis to submit the issue of an alleged failure to warn to the jury. But even if it can pass over that threshold, there is no evidence sufficient to submit this to the jury as a basis for punitive damages.

Tesla did provide extensive warnings. The first time McGee used Autosteer, he was required to acknowledge and indicate acceptance of its limitations. This included agreeing to only enable Autosteer "if you are willing to pay close attention to the road and be prepared to override it at any time," and under specific driving conditions.  Each time McGee engaged Autosteer, the vehicle displayed a message telling him to keep his hands on the steering wheel and to remain prepared to take over.  He admitted that he did not need an owners' manual to tell him he had to

remain alert when Autopilot was engaged.  (T. 7/21 pm at 3). And once again, it bears noting that this was an aggressive driver who was determined to override TACC and exceed the speed limit and maintain control over his vehicle.

Moreover, in disallowing the motion to amend for punitive damages, the Court in *Banner* addressed this issue stating, "Tesla repeatedly warned against misuse of the features, ***which was industry practice.*** " *Banner,* 2025 WL 610816 at *4. Simply stated, there is nothing about the warnings that could possibly rise to the level of ***actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage would result and, despite that knowledge, intentionally pursued that course of conduct resulting in injury or damage, or engaged in conduct equivalent to criminal manslaughter.***

       **E.**       **<u>Mr. Musk's Statements, None Of Which Were Heard Or Relied Upon By Mr. McGee Have No Nexus To These Plaintiffs' Injuries And Therefore Can Not Be Considered For Punitive Damages.</u>**

Over Tesla's objection, the Court ruled that certain statements made by Elon Musk were relevant to "help the jury understand whether an ordinary consumer would have reasonably expected the Vehicle's Autopilot to warn of or avoid the subject collision." (ECF No. 433 at 34).  As set forth in Tesla's prior briefing, (*see* ECF No. 320, 444 and 462), when the statements are placed in their proper context, it is clear they relate to predictions about the future of fully autonomous vehicles generally, and/or the future capabilities, once appropriate software is further developed, of vehicles equipped with Tesla's "Full Self-Driving Capability" hardware package – a package that Mr. McGee declined to purchase. Accordingly, they could not and did not represent an ordinary consumer's expectations with regard to the subject vehicle.

While the Court focused on the relevance of this evidence to the consumer's expectation as to the vehicle's performance, that was only half the inquiry –the remaining question is whether the statements were a cause of Plaintiffs' injuries. They were not. ***There is a demonstrable and***

***clear disconnect between the statements Plaintiffs rely upon and Mr. McGee's conduct***. Specifically, Mr. McGee testified that he did not see anything from Musk that would have influenced his decision to buy the vehicle, and more importantly, nothing Musk said influenced how he used Autopilot on his Model S. (T. 7/21 am at 82). For these reasons, as discussed in the Liability JMOL, Musk's statements cannot be a basis for imposing compensatory liability.

But as to punitive damages, the break in the causal connection is likewise dispositive because, as the Court has repeated multiple times, for purposes of punitive damages, there must be there must be a nexus to the specific harm suffered by Plaintiffs. (*see e.g.* T. 7/17 am at 6). *See Campbell*, 538 U.S. at 420–24 (consistent with the Fourteenth Amendment and due process, the conduct that forms the basis of punitive damages "must have a nexus to the specific harm suffered by the plaintiff."); *see also* cases cite *supra*.

Accordingly, Mr. Musk's statements cannot be used to support punitive damages.

### F.   Plaintiffs' Reliance On Tesla's Alleged Destruction Of Crash Data From The Accident, Is Equally Specious As A Basis For Punitive Damages

In another attempt to direct the jury away from the true issues in this case, Plaintiffs have been permitted over Tesla's objection to offer evidence that Tesla did not provide "snapshot" data to Plaintiffs in a timely fashion.[6] Tesla maintains its position that this evidence is inadmissible for any purpose, but it is particularly improper as a basis to impose punitive damages.

This Court already found there was not sufficient evidence to conclude that Tesla's conduct was intended to avoid the production of evidence or otherwise undermine the discovery process (ECF No. 405 at 12). It further concluded that Plaintiffs have failed to establish bad faith or to demonstrate how Tesla's misconduct prejudiced or otherwise prevented Plaintiffs from proving

---

[6] Tesla adopts its briefing arguing why this evidence is inadmissible for any purpose. (ECF No. 444).

their case. (*Id.* at 14). That alone, should preclude the jury from being permitted to rely upon this as a basis for punitive damages.

Moreover, the evidence developed at trial, reinforced the fact that this data was not intentionally concealed, damaged or destroyed. But even more critically, Plaintiffs' own expert Moore, indicated that the data, once obtained, contained a "treasure trove" of information that he relied upon to reach his opinions in the case. So Plaintiffs were not prejudiced by the timing of the production of this data.  Then, the presumptive climax of Plaintiffs' case was their data recovery expert who—fresh off his week training law enforcement at the Secret Service training grounds— agreed that it was "impossible" that Tesla had corrupted the "snapshot" file bearing the "treasure trove", and that Plaintiffs had what they needed within as little as 15 minutes of getting their copy of the data after Plaintiffs' counsel finally efforted the inspection in 2024—though nothing stopped them from doing so in 2019, 2020, 2021, 2022 or 2023.  Yet, somehow Tesla is to blame for their delay.  As Tesla's counsel said in his Opening, and will be repeated by Tesla's experts, Tesla is happy to have this snapshot data.  It further proves what Tesla knew to be true—that the vehicle performed as designed and rightly deferred to the driver's decision to take over control of the vehicle's speed by pressing and holding the accelerator.

Ultimately then, this is another instance where Plaintiffs are offering evidence for which there is no nexus between the conduct for which punitive damages are sought and these Plaintiffs' injuries. *See Campbell*, 538 U.S. 408, 420–24, and other cases cited *supra*. This Court has already indicated emphatically and repeatedly found that with regard to punitive damages, the evidence offered has to bear some relationship to this accident. (*see e.g.* T. 7/17 am at 6). That should be the end of this issue.

Plaintiffs nonetheless characterize this issue as a "cover up," that they claim somehow

makes it relevant to this case. It is not. This was not conduct that allegedly resulted in injury to Plaintiffs. As such, it is unlike those cases cited by Plaintiffs where there is a continuing course of conduct by the defendant that resulted in harm to the plaintiff. For example, Plaintiffs relied on *Johns-Manville Sales Corp., v Janssens*, 463 So. 2d 242 (Fla. 1st DCA 1984) and *Owens-Corning Fiberglas Corp. v. Ballard*, 749 So. 2d 483 (Fla. 1999), but in both cases, the defendant allegedly concealed its knowledge of the hazards of asbestos exposure for years while the plaintiff continued to be exposed to its dangers.[7] As such, there was a causal nexus between the defendants' alleged concealment and the plaintiff's injury.[8] Here of course, that is not the case because ***nothing about discovery had any impact on these Plaintiffs' injuries***. In other words, how or why data was produced, is totally irrelevant to the alleged harm suffered by Plaintiffs.

Plaintiffs also rely on *Gen. Motors Corp. v. McGee*, 837 So. 2d 1010 (Fla. 4th DCA 2002), *as modified on clarification* (Mar. 5, 2003), arguing it stands for the proposition that "evidence of discovery misconduct could be admissible as 'concealment of offensive conduct after it initially occurred.'" [ECF No. 469 at 3]. *McGee* is not applicable here.

*McGee* involves a situation where GM allegedly failed to produce or log all requested documents to plaintiffs, despite having previously produced or logged the documents in other litigation about the same alleged defect. *Id.* at 1022-25, 1034-35. GM's alleged discovery misconduct was not discovered until midway through trial, when the court held a discovery hearing

---

[7] It bears noting that *Owens-Corning* involved an appeal from the amount of the punitive verdict; there was no challenge to the liability finding. *Owens Corning* was also decided before *State Farm*.

[8] As Tesla has repeatedly reminded the Court, Plaintiffs ignore that the Florida Supreme Court in *Chrysler v. Wolmer*, 499 So. 2d 823 (Fla. 1986), found that the standard articulated in *Janssens* was "clearly erroneous when applied to a claim that a motor vehicle was insufficiently crashworthy when precautions had been taken to insure its crashworthiness." 499 So. 2d at 826. Rather, as *Wolmer* held, the standard set forth in Janssen was limited to cases involving inherently dangerous products, such as the asbestos in Janssen. *See id*.

and a witness was questioned outside the presence of the jury. *Id.* at 1023.  Following the discovery hearing, the judge ordered certain allegedly withheld documents to be produced to the jury.  *Id.* at 1025.

In contrast, here, the snapshot data was discovered and produced many months before trial, and according to Plaintiffs' expert, Alan Moore was a "treasure trove" of information and it provided him what was required to prepare an "augmented" video that he presented to the jury. As this Court has already concluded, Plaintiffs failed to demonstrate how Tesla's misconduct prejudiced or otherwise prevented Plaintiffs from proving their case. Moreover, unlike in *McGee*, there is no evidence that Tesla knew it had the snapshot data in its possession but failed to produce it to Plaintiffs.

### G.    **Evidence of Othe Accidents Cannot Be Used To Support Punitive Damages**

The Court admitted, over Tesla's objection, evidence of other incidents that can be grouped into two categories. The first category consists of three separate incidents—referred to as the Brown, Banner, and Kanagawa crashes—that the Court found were substantially similar and, therefore, admissible.  These, however, can provide no support, much less clear and convincing support, for an award of punitive damages because Plaintiffs failed to offer any evidence that the drivers in those incidents (a) were pressing the accelerator at the time of the crash; (b) had their hands on the wheel at the time of the crash; or (c) had momentarily looked away from the road immediately before the crash (in fact, none of these was the case for any of those drivers).

These are the critical facts about the crash in this case, and Plaintiffs' failure to offer any evidence of similar facts in the three other incidents means those incidents are too distinguishable to support Plaintiffs' claim for punitive damages. *See generally Ford Motor Co. v. Hall-Edwards*, 971 So. 2d 854 (Fla. 3d DCA 2007) ("the requisite level of substantial similarity is not reduced or eliminated because the issue is punitive damages").

23

The second category involves a collection of unidentified other incidents that were studied by NHTSA and a collection of other incidents that were the subject of certain requests for admission to Tesla, the responses to which have been read to the jury.  The Court found these were admitted under a relaxed standard for substantial similarity that the Court determined applies when other incidents are offered exclusively for proving a defendant had notice of a potential defect.  (*See* ECF No. 486 at p. 13).  Since the entry of that Order, the Court has explained to Plaintiffs that these other incidents cannot be used for purposes of seeking punitive damages.  (T. 7/24 am at 3-4).

**********

In sum, because there is no evidence, much less clear and convincing evidence, to support punitive damages under Florida' stringent standard, judgment as a matter of law should be granted.

## III.   IN ALL EVENTS, PLAINTIFFS' HAVE NOT PROVIDED EVIDENCE FROM WHICH ANY AWARD COULD EXCEED THREE TIMES THE AMOUNT OF THE COMPENSATORY AWARD

Pursuant to section 768.73, Fla. Stat., punitive damages are capped at the greater of three times the compensatory award or the sum of $500,000 unless the jury makes a finding that "the wrongful conduct proven under this section was motivated solely by unreasonable financial gain and … that the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by the managing agent, director, officer, or other person responsible for making policy decisions on behalf of the defendant." In that event, any punitive damage award could not exceed the greater of four times the amount of compensatory damages awarded to each claimant or the sum of $2 million.[9]

---

[9] Plaintiffs waived their right to seek a finding that at "the time of injury the defendant had a specific intent to harm the claimant and determines that the defendant's conduct did in fact harm the claimant" in which case there would be no cap on punitive damages.

Without waiving its position that punitive damages cannot be awarded at all, at a minimum there is no evidence sufficient to support an award of four times the jury verdict.

## CONCLUSION

Defendant Tesla, Inc. requests that this Court grant Tesla's Motion for judgment as a matter of law on Plaintiffs' punitive damages claim.

Date: July 25, 2025

Respectfully submitted,

*S/ Wendy. F. Lumish*
**WHITNEY V. CRUZ**
Florida Bar No. 800821
**WENDY F. LUMISH**
Florida Bar No. 334332
**BOWMAN AND BROOKE LLP**
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134
Tel. 305-995-5600 / Fax: 305-995-6100
whitney.cruz@bowmanandbrooke.com
wendy.lumish@bowmanandbrooke.com

**THOMAS P. BRANIGAN**
(Admitted *Pro Hac Vice*)
**DREW P. BRANIGAN**
(Admitted *Pro Hac Vice*)
**BOWMAN AND BROOKE LLP**
101 W. Big Beaver Road, Suite 1100
Troy, MI 48084
Tel. 248-205-3300 / Fax: 248-205-3399
thomas.branigan@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com

**JOEL SMITH**
(Admitted *Pro Hac Vice*)
**BOWMAN AND BROOKE LLP**
1441 Main Street, Suite 1200
Columbia, SC 29201
Tel. 803-726-7420 / Fax: 803-726-7421
joel.smith@bowmanandbrooke.com

**HILARIE BASS**
Florida Bar No. 334243
**HILARIE BASS, ESQUIRE LLC**
2821 Bayshore Drive, UPH-B
Miami, FL 33133
Tel. 305-505-8777
bassh@bassinstitute.org

*Attorneys for Defendant TESLA, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 25, 2025, the foregoing was filed using the

Court's CM/ECF system, which will send electronic notice of the same to all interested parties.

**Adam T. Boumel, Esq.**
Florida Bar No. 0110727
THE ROUSSO, BOUMEL LAW FIRM, PLLC
9350 South Dixie Highway
Suite 1520
Miami, FL 33156
Tel. 305-670-6669
adam@roussolawfirm.com
assistant@roussolawfirm.com
pleadings@roussolawfirm.com

*Attorneys for Plaintiff Dillon Angulo*

**Brett Schreiber, Esq.**
Admitted *Pro Hac Vice*
**Satyarinivas "Srinivas" Hanumadass, Esq.**
Admitted *Pro Hac Vice*
**Carmela Birnbaum, Esq.**
Admitted *Pro Hac Vice*
SINGLETON SCHRIEBER
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
bschreiber@singletonschreiber.com
vas@singletonschreiber.com
cbirnbaum@singletonschreiber.com
jjusto@singletonschreiber.com
eelms@singletonschreiber.com
service@singletonschreiber.com

*Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides*

**Todd Poses, Esq.**
Florida Bar No. 0075922
POSES & POSES, P.A.
Alfred I. Dupont Building
169 East Flagler Street, Suite 1600
Miami, FL 33131
Tel.  305-577-0200
Fax: 305-371-3550
tposes@posesandposes.com
maria@posesandposes.com

*Attorneys for Plaintiff Neima Benavides*

**Douglas F. Eaton, Esq.**
Florida Bar No. 0129577
EATON & WOLK PL
2665 South Bayshore Drive, Suite 609
Miami, FL 33133
Tel. 305-249-1640
Fax: 786-350-3079
deaton@eatonwolk.com
cgarcia@eatonwolk.com
lhuete@eatonwolk.com

*Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides*

*s/ Wendy F. Lumish*
WENDY F. LUMISH