# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

NEIMA BENAVIDES, as Personal
Representative of the Estate of Naibel
Benavides Leon, deceased,

      Plaintiff,

v.

TESLA, INC., a/k/a Tesla Florida, Inc.,

      Defendant.

Case No. 21-cv-21940-BLOOM/Torres

DILLON ANGULO,

      Plaintiff,

v.

TESLA, INC. a/k/a Tesla Florida, Inc.,

      Defendant.

Case No. 22-22607-KMM

## PLAINTIFFS' OMNIBUS RESPONSE TO TESLA'S MOTIONS FOR JMOL

Plaintiffs Neima Benavides and Dillon Angulo, by and through undersigned counsel, hereby file this Omnibus Response to Defendant's Motions for JMOL, and state as follows:

Tesla's motions for JMOL are little more than a repackaging of the arguments made in its Daubert and Summary Judgment Motions, arguments that this Court properly rejected. The Court should simply stand on its prior rulings and deny both of Tesla's motions.    Below, we will demonstrate that we have submitted sufficient evidence to create a jury question on Plaintiffs' claims for design defect and punitive damages. When responding to arguments that are simply copied from

1

Tesla's motion for summary judgment, we will quote from the Court's order rejecting those arguments. Where appropriate, we will provide further responsive argument.

## I.   TESLA FAILS TO SET FORTH THE EVIDENCE IN A LIGHT MOST FAVORABLE TO THE PLAINTIFFS.

Tesla correctly sets forth the standard it must meet to obtain a JMOL: "Viewing all evidence in the light most favorable to Plaintiffs and all reasonable inferences therefrom, the evidence points so strongly and overwhelmingly in favor of Tesla that no reasonable person could arrive at a contrary verdict. *Lamb by Shepard v. Sears, Roebuck & Co.*, 1 F.3d 1184, 1191 (11th Cir. 1993)" (DE 516 at 4) Tesla then proceeds to ignore its burden under this standard, and instead provides this court with its closing argument, presenting the evidence and inferences in a light most favorable to Tesla. So that the Court can make its ruling on the proper record, below we have set forth Plaintiffs' evidence, and the reasonable inferences the jury can derive therefrom, in the proper light.

## II.   *BANNER* IS READILY DISTINGUISHABLE.

In this motion, Tesla leads with the Fourth District's decision in *Tesla, Inc. v. Banner*, 2025 WL 610816 (Fla. 4th DCA Feb. 26, 2025), claiming that its holding essentially renders Tesla immune from products liability suits, or at a minimum, claims for punitive damages. It does neither.

*Banner* listed a number of items that were absent from its record, but present here. *Banner* at \*4.  First, Tesla was aware that inadequate driver monitoring combined with the foreseeable misuse of Autopilot was leading to death and bodily injury. Second, there is evidence that Tesla's driver monitoring system were grossly inadequate when compared to those of its competitors, who did not suffer a similar rash of frontal plain collisions involving ADAS usage.  Here, the record demonstrates that Tesla overstated the capabilities of its system and did not provide technologies that did exist and would have reduced the risk to Mr. McGee and the general public.  As this Court neatly summarized these distinctions in its order denying summary judgment:  in *Banner*, "unlike

here, there appears to have been no record evidence indicating Tesla's knowledge of the known dangers, other manufacturers' demonstrated ability to avoid the purported dangers, and Tesla's own ability to have cured the alleged defect." DE 428 at 97.

### III.   DESIGN DEFECT STANDARDS

With respect to Plaintiffs' claim for strict liability based on design defect and failure to warn, Tesla's motion for JMOL simply repeats the arguments it made during its motion for summary judgment. This Court rejected those arguments before, and it should do so again, presuming the Plaintiffs submitted the same evidence at trial that they submitted in opposition to the motion for summary judgment. As we will demonstrate below, Plaintiffs did so, and the result should therefore be the same.

In its order denying summary judgment, this Court set forth the relevant product defect standards as follows:

> Florida law generally requires a plaintiff to show a product was defectively designed under the "consumer-expectation test," the "risk-utility test," or both. *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 510-11 (Fla. 2015); *see also Cates v. Zeltiq Aesthetics*, 73 F.4th 1342, 1351 (11th Cir. 2023) (explaining that "[t]wo different tests determine whether a product is defective: (1) the consumer expectations test and (2) the risk utility test."). Under the consumer-expectation test, a product is defective if "the product fails to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by the manufacturer." *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1338-39 (M.D. Fla. 2015); RESTATEMENT (SECOND) OF TORTS § 402A; *see also Aubin*, 177 So. 3d at 504 ("[U]nder the consumer-expectation theory[,] a product is defectively designed if the plaintiff is able to demonstrate that the product did not perform as safely as an ordinary consumer would expect when used in the intended or reasonably foreseeable manner."). The risk-utility test requires a plaintiff to demonstrate that "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design . . . and the omission of the design renders the product not reasonably safe." *Cates*, 73 F.4th at 1351.

DE 428 at 70-71.[1]

---

[1] Plaintiffs will cover evidence in support of the risk-utility test below.

In evaluating the expectations of an ordinary consumer, the jury considers the manner in which a manufacturer markets its product.  "[A] manufacturer plays a pivotal role in crafting the image of a product and establishing the consumers' expectations for that product, a portrayal which in turn motivates consumers to purchase that particular product." *Aubin v. Union Carbide Corp.,* 177 So. 3d 489, 511 (Fla. 2015) "The consumer expectations test thus rightly focuses on the expectations that a manufacturer creates." *Id.* In denying Tesla's motion for summary judgment on the product defect claim, this Court held: "Given Tesla's numerous representations about the capabilities of the Autopilot system, there is at least a genuine dispute as to whether it would be obvious to the average consumer not to trust Tesla's Autopilot system to largely drive itself and avoid collisions." (DE 428 at 80)

Plaintiffs submitted substantial evidence regarding the manner in which Tesla's marketing created consumer expectations. Several witnesses described how Tesla marketed autopilot in a manner that created unreasonable expectations relative to its actual capabilities.  First, Dr. Mendel Singer testified regarding Tesla's vehicle safety report, in which Tesla represented to its customers that autopilot resulted in a 40% reduction in collisions when it was used.  (T. 7/15/25 pm at 78) Dr. Singer demonstrated, however, that making a single adjustment to account for miles driven on the highway would reduce that figure to a 10% reduction in crashes.  (Id.) Dr. Singer explained that because Tesla did not provide the raw data that went into the vehicle safety report, there was no way to validate the accuracy of the figures, but it was his opinion that they grossly overstated the safety benefit of autopilot.  (Id. at 78-79)

Dr. Cummings explained that the manner in which Elon Musk and Tesla marketed autopilot promoted its abuse and misuse.  (T.7/16/25 am at 30) Dr. Cummings noted that Mr. McGee's expectations were similar to most consumers. He felt the car was his "co-pilot", "which stopped for

4

obstacles in the road, and would allow him to reach down and pick up his dropped phone because his co-pilot was driving." (Id.)

Dr. Cummings was shown several statements of Elon Musk and asked to weigh in on their veracity. In October of 2015, Musk described the car's sensor array and its ability to detect objects.[2] Dr. Cummings explained that there was no evidence to suggest that a production Tesla in October 2015 was capable of doing the things that Musk claimed it could at the time. (T.7/17/25 pm at 67) In 2016, Musk stated that, at that time, Model S could drive autonomously with greater safety than a person. (Id. at 72) Dr. Cummings replied that this statement was neither accurate then nor today. (Id. at 73) Musk explained that the 2016 Tesla's existing radar hardware, "would be able to detect anything dense in its path and initiate a braking event, both when autopilot is active and when it's not active." (Id. at 74) Musk further stated that when autosteer is on, the car knows whether an object is in its probable path or not, and the car would be able to initiate a "much more comfortable braking experience," which would allow the car "to brake to a complete stop." (Id.) Musk explained that radar complemented the car's vision system, which might not recognize what an object in the road is. The radar, however, would know that there was something in the road that it was going to hit, and that it should not hit, even in adverse conditions like night and rain. (Id.) Dr. Cummings testified that this description of Tesla's detection and braking capability was neither accurate in 2016 nor today. (Id. at 76)

---

[2] The jury can consider statements made by Elon Musk and Tesla in determining how an ordinary consumer would expect the autopilot to perform. Tesla argues that they shouldn't be considered because McGee testified he didn't see them, but McGee's awareness of those statements is irrelevant to that determination. *See Cook v. MillerCoors, LLC*, 829 F. Supp. 2d 1208, 1216 (M.D. Fla. 2011) (Plaintiff's subjective lack of awareness about the effects of an alcoholic beverage cannot support a product defect claim, because the effects are well known to an ordinary consumer, citing to *Jennings v. BIC Corp.,* 181 F.3d 1250, 1255 (11th Cir. 1999)).

Another marketing tool Tesla used to manage consumer expectations was the "paint it black" video, which Elon Musk tweeted to his followers with the accompanying message: "the person in the driver's seat is only there for legal reasons, he is not doing anything, the car is driving itself." (T.7/16/25 pm at 78) The video shows the car leaving the Tesla headquarters, driving on the highway, returning to Tesla and parking itself.  Dr. Cummings explained that a production model Tesla was not capable of performing as the video demonstrated in 2016.  (Id. at 79) Additionally, she explained that the video had been staged, and that the car in the video had gotten into an accident during its filming.  (Id. at 80)

Tesla's owner's manual was another source of information that could impact consumer expectations. For instance, Alan Moore pointed out that the manual indicates that forward collision warning works to detect objects up to 520 feet away.  (T.7/17/25 pm at 96) The owner's manual did not describe the limitations of forward collision warning, which never activated in this accident. Thus, the forward collision warning did not activate in a manner that an ordinary consumer who had read the manual would expect.  (Id.)

As we have previously noted, the Consumer expectation test is "based on an objective standard and not the viewpoint of any particular consumer." *Liggett Group, Inc. v. Davis*, 973 So. 2d 467, 475 (Fla. 4th DCA 2007), citing to *Jennings v. BIC Corp.,* 181 F.3d 1250, 1255 (11th Cir. 1999). Thus, McGee's own expectations are entirely irrelevant to the issue before the jury.  However, unsurprisingly, McGee's expectations were similar to those encouraged by Tesla's marketing. McGee believed that the car would assist him if he had a failure or made a mistake, by either warning him or applying the brakes.  (T.7/21/25 am at 56-57) McGee expected the car to perform like his Jeep and other cars in that respect, and it did not.  (Id.)  McGee further explained that he got "too comfortable" with the technology, and "trusted it too much." (Id. at 47)

It is against these expectations created by Tesla that the jury must decide whether McGee's Tesla was defective.

## IV.   SPECIFIC DESIGN DEFECTS

### A.   OPERATIONAL DESIGN DOMAIN ("ODD")

The evidence that the Tesla was defective because Tesla allowed it to operate outside of its ODD was the same as the evidence that this Court deemed sufficient to deny summary judgment. Both Dr. Cummings and Mr. Moore testified that the Autopilot was defective because Tesla allowed the car to be operated in operational domains for which it was not designed.  (T.7/16/25 am at 28, 7/17/25 pm at 64) Dr. Cummings contrasted Tesla's decision to allow drivers to access autopilot on surface streets with that of Cadillac, who geofenced their Super Cruise product to make sure that it was used only on roads that had been pre-mapped and approved for its use.  (T.7/16/25 am at 52)

Mr. Moore testified that Tesla had infinitely more knowledge about the risks of using autopilot outside of its ODD on Card Sound Road than Mr. McGee had.  (T.7/17/25 pm at 64-65) Thus, Tesla's decision to allow Autopilot use on this uniquely challenging road was a bigger contribution to the accident than Mr. McGee's decision to use Autopilot.  (Id. at 65)

Mr. Moore pointed to Cadillac and General Motors' decision to geofence Super Cruise as a reasonable design alternative.  Had Mr. McGee been driving a car that geofenced its autopilot product to its ODD, the accident would not have occurred because the system would not have engaged on the road.

From a consumer expectation standpoint, an ordinary consumer would expect that Tesla would only allow the use of Autopilot on roads it had determined to be safe for use.  From a risk-risk-utility standpoint, both experts demonstrated that the foreseeable risks of harm posed by allowing use of Autopilot outside its ODD could have been reduced or avoided by the adoption of

geofencing used by other manufacturers. Additionally, Tesla could have "provide[d] additional checks when the features are being used outside of controlled access highways and when approaching traffic controls." (T. 7/24/25 at 16)  The jury can infer the omission of these safeguards rendered Autopilot not reasonably safe.

As the Court held in its Order Denying Summary Judgment:

Moore [] may also conclude that limiting Autopilot to its ODD would have prevented the collision as well, given that both conclusions apply the same reasoning. *Simmons*, 576 F. Supp. 3d at 1146; *Schenone*, 2014 WL 9879924, at *8 ("[T]he expert's experience in conjunction with knowledge, skill, training or education alone may provide a sufficient basis to the reliability of the expert's opinion."). Because limiting Autopilot to its ODD would have disabled the system while McGee was driving on Card Sound Road, Moore reasonably concludes that McGee would have been manually driving his Vehicle on the date of the collision and, therefore, he would likely have been more engaged and more responsive to the issues that arose. *See Hendrix ex rel. G.P.*, 609 F.3d at 1198 n.10 ("*Daubert* does not require certainty; it requires only reliability."). Moore does not have to completely rebut alternative possibilities. He need only provide a sound reason for his conclusion that it is more likely than not Tesla's conduct rendered the product defective and caused Plaintiffs' injuries. *See 325 Goodrich Ave., LLC v. Sw. Water Co.*, 891 F. Supp. 2d 1364, 1381-82 (M.D. Ga. 2012) (explaining that the causation expert was not required to "definitely conclude" the cause of the damage for the opinion to be reliable, nor did he have to exclude all other "potential sources of causation"). Accordingly, based on the record evidence Moore relied upon, the Court finds that the grounds for Moore's conclusions on the ODD defect are reliable.

DE 428 at 33.

Plaintiffs argue that Cummings' opinion about the use of Autopilot outside its ODD is valid for largely the same reasons Moore's opinion is admissible—permitting use outside the Vehicle's ODD exceeded the product's stated capabilities.

DE 428 at 42.

This Court later concluded:

Plaintiffs have adequately demonstrated that autopilot design led Tesla drivers, McGee in particular, to become complacent and over rely on autopilot to operate their vehicles.  Additionally, Plaintiffs provided evidence that allowing Tesla drivers to utilize autopilot outside of its ODD and without any training was unreasonably dangerous as it increased the likelihood that Tesla owners would

> attempt to rely on autopilot in conditions where Tesla knew the technology was unlikely to succeed.  As Plaintiffs experts opined, if Tesla had eliminated or at least mitigated these foreseeable dangers, McGee would likely had been paying more attention and would have been prepared to avoid the subject collision.

DE 428 at 74. Tesla has provided no basis for this Court to change its ruling.

Tesla's argument that the accident would have happened in the absence of autopilot is based on the false premise that Mr. McGee would have behaved in the same fashion if he had not been using autopilot.  There is no evidence in this record to support such an inference. Mr. McGee himself testified that doesn't believe he would have reached for his phone if he hadn't been using autopilot. But the evidence also demonstrates that Mr. McGee had taken his eyes off the road for far longer than the time it took him to reach over to grab his phone. As noted by Tesla's counsel during cross-examination of Dr. Moore, the flashing red light marking the stop bar was visible over 2000 feet from the intersection.  (T.7/18/25 am at 33)  Yet McGee did not become aware of where he was until he had crossed the stop bar.  It takes over 20 seconds to travel the 2000 feet from the point the stop light first became visible.  McGee was clearly not paying attention to his surroundings for that entire time period.  The jury can reasonably infer that the reason he was not was because he was relying on the autopilot that he regularly abused.  The jury is free to conclude that McGee would not have been so careless had he not been relying on the autopilot.

## B.  DRIVER MONITORING SYSTEM ("DMS")

The evidence that the Tesla was defective because Tesla's driver monitoring system was inadequate to prevent dangerous misuse of the system was the same as the evidence that this Court deemed sufficient to deny summary judgment.

As a starting point, the jury heard Tesla's own admission of defect in NHTSA's ODI resume. (Plaintiffs Exhibit 61)  Tesla "stated that the prominence and scope of the system's controls maybe insufficient to prevent driver misuse."  NHTSA concluded that "Tesla's weak driving engagement

system was not appropriate for autopilot's permissive operating capabilities" and "this mismatch resulted in a critical safety gap between drivers' expectations of the L2 system's operating capability and the system's true capabilities [which] led to forceable misuse and avoidable crashes." NHTSA's conclusion "which aligns with Tesla's conclusion, [] indicated that in certain circumstances, autopilot system controls and warnings were insufficient for a driver assistance system that requires constant supervision by a human driver." (T.7/17/25 am at 14-15)

Dr. Cummings explained that in NHTSA's investigation, NHTSA reviewed videos from each accident, and in the vast majority of the crashes, the object the car collided with was in view for more than 10 seconds. (T.7/17/25 am at 27) From these videos, it became apparent that the driver was not engaged, which cued NHTSA to look at the issue of driver monitoring. (Id.) Dr. Cummings explained that when using an automated driving systems like autopilot, drivers get complacent. (Id.) Drivers "get so comfortable in the car, that they don't even glance [up] for a half second [or] look up to see what can kill them or kill other people." (Id.)

NHTSA determined that frontal plane crashes similar to the instant collision made up the highest percentage of crashes in the accident database that it studied. (T.7/17/25 am at 33) That led NHTSA to determine that Autopilot did not sufficiently ensure driver attention and appropriate use. (Id.) As part of the investigation, NHTSA obtained accident data from other companies to compare them to Tesla's data. (Id.) From that data, they determined that Tesla alone had this high number of frontal plane crashes resulting from inadequate driver monitoring. (Id.) As a result, NHTSA determined that Tesla was an industry outlier, with a substantially inferior driver engagement system given Autopilot's permissive operating capability. (Id.)

Mr. McGee was one of the drivers that obviously became complacent and relied on Autopilot so much that he did not pay attention to the road. Mr. McGee testified that he got too comfortable

with the car and "trusted the technology too much".  (T.7/21/25 am at 47) He believed that he would not have taken his eyes off the road and reached for his phone had he not been using Autopilot.  (T.7/21/25 pm at 23) We know further that the flashing red light at the intersection was visible over a quarter mile away.  (T.7/18/25 am at 33) The jury could reasonably infer that McGee was not paying attention for the over 20 seconds that it would take to cover that distance.

Both Dr. Cummings and Dr. Moore pointed to the use of in-cabin camera systems as a safer alternative design.  Specifically, in the Cadillac equipped with Super Cruise, the driver focused camera not only checks to see if the driver's head is looking straight forward, it actually reads the driver's eyes.  (T.7/16/25 am at 51) Mr. Moore explained that the camera system would only allow a driver to look away from the road for 5 or 6 seconds at a time, so it was much more restrictive than Tesla's torque base system, and would have led to a very different outcome had it been implemented on this road.  (T.71/17/25 pm at 62)

Mr. Moore explained that measuring steering wheel torque is not a good proxy for measuring driver awareness.  (T.7/17/25 pm at 36) Simply having a hand or hands on the wheel does not mean the driver is monitoring the roadway ahead.  (Id.) Tesla's monitoring system can produce false positives where the car assumes the driver is paying attention when, in fact, he is not.  (Id.) Mr. Moore testified that Tesla contributed to this accident because its driver monitoring system did not accurately reflect whether Mr. McGee was paying attention to the road and doing his part as a driver.  (T.7/17/25 pm at 64) The Jury can also reach this conclusion based on Mr. McGee's failure to take any action in the 20 seconds in which the flashing red light was visible to him.

Mr. Moore reviewed Mr. McGee's history of autopilot misuse. In the three months that he owned the car, Mr. McGee had 23 "strike outs," which occurred when he had ignored three audible alerts before the car turned off autopilot. (T.7/17/25 pm at 57) However, these strike outs proved to

be only a minor inconvenience to Mr. McGee, who simply had to pull over, park the car, and then begin driving again.  (Id. at 58) Mr. Moore faults Tesla for failing to take any action with respect to McGee's misuse of autopilot.  The strike outs were easily removable and did nothing to change to Mr. McGee's behavior or limit the use of the feature.  They were simply recorded, and Mr. McGee was allowed to continue his dangerous misuse of the product.  (Id. at 64)

Mr. Moore explained that Tesla could have told Mr. McGee that he was given a strike out because he was not paying attention.  (T.7/17/25 pm at 59) Tesla could have told him that in the future that if he kept his hands on the wheel and paid attention, he would not receive further strike outs, thus encouraging him to use the product responsibly.  (Id.) Instead, the only message the car provided at each strike out was that Autopilot was no longer available.  (Id.)

There were a number of countermeasures that Tesla stipulated were feasible to have been implemented prior to this accident, but that were not.  Specifically, Tesla could have incorporated additional controls and alerts to those already existing to encourage the driver adhere to their driving responsibilities when autopilot was engaged; includes additional controls and alerts to the driver to keep their hands on the steering wheel and pay attention to the roadway; increased the prominence of visual alerts on the user interface; provided additional checks when the features were being used outside of the ODD and when approaching traffic controls; and improved suspension of Autopilot if the driver repeatedly failed to demonstrate continuous and sustained driving responsibility when autopilot is engaged.  (T.7/24/25 at 16) The jury could reasonably infer that had Tesla taken the countermeasures that were available to it, it would have prevented Mr. McGee's misuse of the autopilot and thus this accident.

From a risk- risk-utility standpoint, the evidence demonstrated that the foreseeable risks of harm posed by Tesla's inadequate DMS could have been reduced or avoided by the adoption of the

countermeasures set forth above. The jury can infer the omission of these safeguards rendered the DMS not reasonably safe.

As the Court noted in its order denying summary judgment: "there is a reasonable basis for Moore to infer that if the strikeout earlier in the drive was accompanied by a one-week disablement of Autopilot, McGee would have been required to be more engaged during the drive, which would have meant McGee would have been more likely to be paying attention and prepared to intervene as he approached the intersection of Card Sound Road and ultimately would have avoided the crash." DE 428 at 26-27. Tesla has provided no basis for this Court to change its ruling.

### C. FAILURE TO BRAKE OR WARN

The evidence that the Tesla was defective because it did not brake or warn Mr. McGee was the same as the evidence that this Court deemed sufficient to deny summary judgment.

According to the owner's manual, the forward collision warning ("FCW") is triggered by objects as far as 520 feet in front of the Tesla's path of travel. (T.7/16/25 pm at 23-24) The forward collision warning did not provide any warning to Mr. McGee before this accident. (Id.) The owner's manual did not inform consumers of any limitations to FCW.

Dr. Cummings explained that there were two emergency breaking systems that should have been activated to avoid this accident. First, automatic emergency breaking ("AEB") is available whether or not autopilot is on. A second feature called drivable space backup breaking was introduced after the Kanagawa accident in 2018. (T.7/16/25 pm at 6-7) When the car is in autopilot and recognizes that it is approaching the limits of its drivable space, it will trigger an emergency breaking maneuver. (Id.) It is essentially a backup to the AEB when the car notes that it is about to depart drivable space. (Id.)

In this accident, neither AEB nor backup breaking engaged.  (T.7/16/25 pm at 29) Mr. McGee's foot on the pedal did not prevent AEB or drivable space backup breaking from engaging. (T.7/16/25 pm at 31) Tesla did not offer any explanation for the failure of drivable space backup breaking. (Id. at 30) Further, no warning of any type was provided to Mr. McGee, even though FCW is supposed to work at speeds up to 90 mph.  (Id. at 31)

With respect to Tesla's decision to allow autopilot to continue to be engaged when someone is overriding the cruise control outside of the ODD, Dr. Cummings indicated that this was a bad design choice.  (T.7/16/25 pm at 26) She had seen many accidents where people were just resting their foot on the pedal, and did not realize that they were slightly depressing the pedal and accelerating. If she was on Tesla's design team, she would have recommended disengaging autopilot when a driver depressed the accelerator, to avoid any mode confusion.  (Id.)

Mr. Moore confirmed Dr. Cummings opinion that drivable space backup breaking was not disabled when McGee pressed the accelerator. (T.7/17/25 pm at 76, 99) Mr. Moore had not seen any explanation as to why drivable space backup breaking did not activate here.  (T.7/17/25 pm at 99) Mr. Moore explained why, in Banner, backup breaking failed, because the drivable space extended underneath the truck's trailer, so the Tesla thought it had more room to proceed than it actually did. (T.7/18/25 pm at 79) This case presented the opposite scenario because the drivable space clearly stopped at the end of the road, presenting the opportunity for a "perfect application of this technology." (Id.) However, the technology failed.  (Id.)

As for the car's failure to provide a forward collision warning, Mr. Moore testified that the data demonstrates that the autopilot did not warn Mr. McGee of anything in the approximately 20 seconds before the crash.  (T.7/17/25 pm at 87) This is, of course, consistent with Mr. McGee's statement that he received no warning.  (T.7/21/25 am 53)

Mr. Moore presented the jury with a series of points on the timeline of the accident where the car could have braked on its own, as it had the capability to do so, or could have warned Mr. McGee.  (T.7/18/25 am at 23-24) Mr. Moore noted that car log data demonstrated that Mr. McGee exhibited a reasonable reaction time when warned. Using Mr. McGee's typical reaction time, Mr. Moore was able to determine that he would have avoided the accident completely if he had been warned at any distance greater than 200 feet from Angulo's Tahoe.  (T.71/8/25 am at 13, 7/18/25 pm at 73-74)  As the Court held in the order denying summary judgment, "No additional evidence is needed to reasonably infer that the triggering of either of these systems following the detection of the obstacles would have made it more likely than not that the collision would never have occurred." DE 428 at 34. Tesla has provided no basis for this Court to change its ruling.

## V.   FAILURE TO WARN

The evidence that the Tesla failed to adequately warn Mr. McGee of the risks associated with the use of Autopilot was the same as the evidence that this Court deemed sufficient to deny summary judgment.

Both Dr. Cummings and Mr. Moore testified that Tesla's warnings regarding the use of autopilot were insufficient to convey the risks associated with driver inattention, and further, that the in car warnings regarding driver inattention were inadequate to prevent Autopilot misuse.

Dr. Cummings explained that the initial warning given to drivers when they first activate autopilot and the warning contained in the owner's manual were insufficient to appraise drivers of the risks they are incurring in misusing the system.  First, Dr. Cummings explained that in general, the use of the phrase "Autopilot" is incongruous with instructions that a driver must keep their hands on the steering wheel at all times.  (T.7/17/25 am at 35) The term "Autopilot" misleads a driver to believe the car is actually driving for them.  (Id.) Next, Dr. Cummings pointed to the lack of any

formalized training given to drivers on Autopilot usage, as testified to by Mr. McGee.  (T.7/16/25 am at 38) Dr. Cummings explained the difficulty in accessing the owner's manual, and pointed to the fact that Mr. McGee did not review it.  (T.7/16/25 pm at 35) Dr. Cummings testified that NHTSA recognized that the autopilot warnings in the owner's manual were insufficient to ensure that drivers remained safely engaged.  (T.7/17/25 am at 16-17)

 While acknowledging that AEB has limitations, especially at night, Dr. Cummings noted that none of this information was conveyed to consumers in the owner's manual.  (T.7/16/25 pm at 32, 35) Mr. McGee believed that the Autopilot would detect and avoid any obstacles in his path.  (Id. at 35) It was clear to Dr. Cummings that Mr. McGee did not understand how the system worked.  (T.7/16/25 pm at 35)

 Dr. Cummings also offered opinions on the inadequacy of the in car warnings.  First, with respect to the hands on warning, Dr. Cummings noted that there was no audio alert accompanying it, which is "a big no-no" in the world of user design.  (T.7/16/25 pm at 21)  The cruise control is disabled warning was similarly unaccompanied by an audio alert.  (T.7/18/25 am at 12) Dr. Cummings pointed to NHTSA's conclusion that Tesla's driver monitoring system was not able to alert the driver in an appropriate way, fast enough and with enough frequency to be able to guard against consequences from misuse.  (T.7/17/25 am at 14)

 Mr. Moore opined on the inadequacy of the notification that TACC would be disabled when Mr. McGee was pressing the accelerator.  Mr. Moore first noted that the notice was only visual and was not accompanied by an audio signal.  (T.7/18/25 am at 12) Second, the message was frequently obscured by the "hands on" message. (Id. at 8)  One minute before impact, the "cruise control will not brake" message was presented, but was obscured for the first 15 seconds by the "hands on" warning.  (Id. at 11) Neither were accompanied by an audio alert.

For his part, Mr. McGee does not recall receiving any warnings prior to the collision. (T.7/21/25 am at 53) He was not given any training or tutorial when he picked up his car from Tesla. (Id. at 83) And he did not know how to access the owner's manual on the touch screen.  (Id. at 48)

> In its order denying summary judgment, this Court held:

> As Cummings points out, McGee testified that he thought the car could detect, stop, and otherwise avoid obstacles and ultimately prevent collisions. See ECF No. [350-1] at 8. McGee testified further that he expected Autopilot to operate "as a 'copilot'" stopping "regardless of any car." Id. The record supports that McGee's fundamental misunderstanding of Autopilot greatly increased the likelihood that he was overconfident in the Vehicle's capabilities, leading McGee to behave negligently, or at least more negligently than he otherwise would have if he was made aware that Autopilot was incapable of preventing the type of collision that occurred in this case.

DE 428 at 49.  Tesla has provided no basis for this Court to change its ruling.

**VI.    SOLE PROXIMATE CAUSE.**

In its conclusion, this Court summarized its ruling as follows, while also disposing of Tesla's argument that Mr. McGee was the sole proximate cause:

> The Court finds that Plaintiffs have provided evidence affording a reasonable basis to conclude that, more likely than not, a defect in the Autopilot system was a substantial factor in bringing about Plaintiffs' injuries. As the Court discussed in its Daubert analysis, Plaintiffs offer sound, competent, and reliable expert testimony from Moore and Cummings that Autopilot has several design defects (e.g., the ODD Defect, DMS Defect, and TACC Defect) that they opined were a substantial cause of the subject collision. Accordingly, the Court rejects Tesla's request for summary judgment based on the absence of expert causation testimony. The Court also rejects Tesla's argument that McGee was the indisputable sole, substantial cause of the collision such that Tesla may avoid all liability for any purported defect in Autopilot's design. While McGee conceded that he was responsible for operating the Vehicle safely and failed to do so, that does not necessarily lead to the conclusion that he alone is responsible for the resulting collision, particularly given McGee's testimony that he expected Autopilot to avoid the collision. See ECF No. [318-9] at 46:3-5, 176:7. The law is clear that there may be multiple proximate causes of a given injury so long as each is a substantial cause of the injury. *See Ruiz v. Tenet Hialeah Healthsystem, Inc.,* 260 So. 3d 977, 982 (Fla. 2018) ("[T]he law does not require an act to be the exclusive or even the primary cause of an injury in order for that act to be considered the proximate cause of the injury[.]").

As explained above, there is sufficient and reliable record evidence that both McGee and Tesla substantially contributed to the collision. Plaintiffs have adequately demonstrated that Autopilot's design led Tesla drivers, and McGee in particular, to become complacent and over rely on Autopilot to operate their vehicles. Additionally, Plaintiffs provided evidence that allowing Tesla drivers to utilize Autopilot outside of its ODD and without any training was unreasonably dangerous as it increased the likelihood that Tesla owners would attempt to rely on Autopilot in conditions where Tesla knew the technology was unlikely to succeed. As Plaintiffs experts opine, if Tesla had eliminated, or at least mitigated, these foreseeable dangers, McGee would likely have been paying more attention and would have been better prepared to avoid the subject collision. Because the Court has already determined that Plaintiffs' expert opinions as to the design defects and causation are not based on mere conjecture or speculation, the Court will not grant summary judgment on Plaintiffs' design defect claim as those issues are materially in dispute. *See Jackson v. H.L. Bouton Co*., 630 So. 2d 1173, 1175 (Fla. 1st DCA 1994).

DE 428 at 73-74. Tesla has provided no basis for this Court to change its ruling.

## VII.   PUNITIVE DAMAGES

In its motion for JMOL on Plaintiffs' punitive damage claim, Tesla once again relies heavily on the *Banner* decision. But this Court previously rejected *Banner's* applicability to the instant case at summary judgment, and Plaintiffs' trial evidence supporting punitive damages is far more robust than it was at that stage.

The Plaintiffs may establish entitlement to punitive damages by proving that Tesla was grossly negligent or engaged in intentional misconduct. Florida Statute § 768.72. To establish gross negligence, the plaintiff must show "the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." *Id*  To establish intentional misconduct, the plaintiff must show that "the defendant had actual knowledge of the wrongfulness of the conduct and [a] high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." *Id.*

There is substantial evidence supporting Plaintiffs' claim that Tesla was both grossly negligent and engaged in intentional misconduct.  Plaintiffs presented evidence that Tesla was grossly negligent during the development and evaluation phase of autopilot;  was grossly negligent in its response to fatal accidents resulting from driver inattentiveness while using autopilot; and acted with intent to deprive the Florida Highway Patrol, NHTSA, and the Plaintiffs in this case of the autopilot data that demonstrated this accident was preventable.

### A.  Tesla's development process was grossly negligent

The jury heard the testimony of Tesla's 30(b)(6) representative Akshay Phatak.  Phatak's testimony demonstrated that Tesla's development of autopilot was woefully deficient.  First, Phatak was unable to demonstrate that, during the development process, Tesla evaluated and considered data, research, and studies regarding driver compliance with automated driving systems. (T.7/16/25 pm at 38) Phatak was similarly unable to show that Tesla took into account research related to the capabilities and limitations of humans and monitoring automated systems.  (Id. at 43) Phatak could not find any documentation that Tesla took into account research relating to the concept of workload as it relates to human perception and reaction time.  (Id.) Tesla did not attempt to determine how long a driver would reasonably need to react to prevent an accident, nor did it conduct any internal studies regarding driver complacency.  (Id. at 46)

Before releasing Autopilot to the public, Tesla did not perform any studies to evaluate the impact of the use of automated driving systems on a driver's situational awareness.  (T.7/16/25 am/pm at 38-39) Instead, Tesla waited until it was receiving telemetry from cars it had already sold. When its customers became involved in "incidents," (read: collisions), Tesla would make "incremental improvements" in response to those incidents.  (Id.)  In other words, Tesla was using its customers to de-bug its software and hardware defects, sometime at the expense of their lives.

19

Mr. Moore explained why this approach was so dangerous.  Mr. Moore had never seen any other manufacturer in the automotive industry use products that had already been sold to consumers in order to conduct further product development.  (T.7/17/25 pm at 69) In his opinion, using consumer vehicles for product development negatively impacted product safety, because Tesla's approach was reactionary.  When a negative event like an accident occurred, Tesla would make changes to the product to prevent the accident from happening again, which is a fine thing to do.  However, the better approach would have been to "complete the product development process first before ever releasing the vehicle to consumers," which is typically how it is done in the automotive industry. (Id.)

Phatak acknowledged that Tesla knew, at the outset, autopilot could be misused and abused, which is why they used a torque based driver monitoring system.  (T.7/16/25 pm at 40) Phatak was shown a statement from Elon Musk demonstrating that in September 2016, Tesla was aware of that some of its customers were simply ignoring as many as 10 warnings an hour to pay attention and place their hands in the wheel.  But despite such knowledge of its customers' egregious misuse of Autopilot, at that time, Tesla did not do any evaluation to determine the effectiveness of the torque based driver monitoring system in maintaining driver attention.  (Id. at 58)  Dr. Cummings deemed Tesla's failure to do so to be grossly negligent.  (T.7/16/25 pm at 59)

Finally, Tesla did not begin to track data on the number of crashes that occurred per vehicle mile driven with Autopilot engaged prior to March 2018.  (T.7/15/25 pm at 139-141) So when Elon Musk was telling the public in 2016 that Autopilot was far safer than human driving, Tesla had no data to support those statements.

Dr. Cummings testified that Tesla failed to test the autopilot system before releasing it to the public.  Specifically, Dr. Cummings testified that the testing of the computer vision system was

inadequate to determine its efficacy in edge cases including rain or at night or on roads outside the ODD. (T.7/16/25 am at 59-60)  Dr. Cummings, having reviewed Phatak's testimony, concluded that Tesla's research and studies on complacency was, at best, woefully inadequate, and at worst, did not appear to exist.  (T.7/16/25 pm at 40)

Dr. Cummings noted that in the world of transportation, distraction is probably the most researched topic in the study of human factors.  Over the last ten years, human distraction during the use of automated driving systems is the most popular sub-topic within that subject.  As a result, there were hundreds of papers that would have answered Mr. Phatak's questions if he had any.  (Id. at 47-48) Any company that is developing technology requiring any safety critical system should absolutely have a human factors division, or, at a minimum, a human factors consultant on board. Tesla had neither.  (Id.)

### B.  Tesla's response to Autopilot failures was grossly negligent

In 2015, NHTSA had asked Telsa to describe the steps that it had taken to ensure the safe operation of its autopilot and to prevent driver misuse or abuse.  Dr. Cummings noted that, in Tesla's response, it recognized that drivers would be distracted to the point that they might fall asleep or be incapacitated, that drivers were likely to use the car outside of the ODD, and that warnings needed to be provided both in the owner's manual and in the vehicle.  (T.7/16/25 am at 47) Despite this knowledge, Tesla took no additional action to reduce the dangers associated with these admissions.

Dr. Cummings noted that, based on Elon Musk's 2016 statements about drivers repeatedly ignoring hands on warnings, Tesla was aware early on that there were big problems with its driver monitoring system. (T.7/16/25 am at 61) However, despite having several feasible options available to address this issue, Tesla took no action until late 2023.

As per the responses to requests for admission read to the jury, Tesla was also on notice as early as January, 2016, that inattentive customers using Autopilot were becoming involved in frontal plane collisions.  (T. 7/24/25 at 17-22) Because these frontal plane accidents often occurred at high speeds, several collisions resulted in injuries and fatalities.  Tesla was on notice of dozens of other similar accidents that it had reported to NHTSA between 2018 and 2019. (Exhibit 61)

Dr. Cummings reviewed three particular accidents with the jury, - Brown, Kanagawa, and Banner, and Tesla's reaction to each.  With respect to the Banner crash in 2019, Dr. Cummings explained that it was similar to the Brown crash and reinforced NHTSA's earlier conclusions that the driver monitoring system was insufficient to keep drivers engaged.  (T.7/16/25 pm at 17) The Banner crash provided yet more evidence that autopilot should not be allowed to be used on roads outside the ODD.  (Id.)

Even as late as 2019, Tesla knew internally that it still did not have enough data to conclude that cars using autopilot were safer than those driven by humans alone on surface streets like Card Sound Road.  (T.7/16/25 pm at 8-9) Yet Tesla failed to share this internal knowledge with NHTSA or the public.  (Id. at 9)

Dr. Cummings opined that Tesla chose not to geofence its Autopilot system  in in order to sell more cars.  (T.7/16/25 am at 52) Further, Dr. Cummings believed that Tesla delayed improving its driving monitoring system at an earlier point in time because of the expense to do so.  (T.7/17/25 am at 35-36) Specifically, she testified that it have would required conducting testing and a possible redesign of all the audio and visual alerts in the car, and Tesla did not want to incur the expense and delay of developing a safer system.  (Id.)

### C. Tesla intentionally attempted to destroy the autopilot data from this accident.

Prior to trial, the Court made it clear that Tesla's pre-litigation conduct with respect to the snapshot data was admissible as relevant to Plaintiffs' punitive damage claim. (T.7/14/25 at 159) However, the Court held that Tesla's conduct during the course of litigation was not admissible. (Id.) That changed when Telsa's counsel twice opened the door in back-to-back witnesses. First, during Dr. Cummings cross-examination, Tesla's counsel opened the door by asking about Tesla's voluntary production of the augmented video in the Banner case. (T.7/17/25 pm at 22-24) During the cross-examination of Mr. Moore, Tesla's counsel asked if he was aware of Plaintiffs' counsel's efforts to obtain the MCU and autopilot computer from the Florida Highway Patrol. (T.7/18/25 pm at 46) That question opened the door to allowing Plaintiffs to introduce Tesla's failure to produce the augmented video during the course of the lawsuit. (Id. at 70) Finally, the Court made it clear that its finding of no bad faith did not preclude the jury from making their own finding with respect to Tesla's actions. (T.7/24/25 at 12)

Immediately after the accident, Mr. McGee's Tesla created a snapshot file containing all of the autopilot data leading up to the accident which was transmitted and received by Tesla. (T.7/25/25 am at 27) Tesla's corporate representative, Mr. Rubio Blanco testified that Tesla had received only a partial transmission. (Id. at 27) This was Tesla's excuse for not providing the autopilot data to Plaintiffs. (Id. at 28) After Plaintiffs had obtained the autopilot data on their own, Tesla employee David Shoemaker explained that it was not possible for Tesla to have received only a partial snapshot file. (T. 7/25/25 at 28) The fact that Tesla had video from all eight cameras means that Tesla was aware that it received a complete snapshot from the accident. (Shoemaker transcript) At some point after receipt of the snapshot file, somebody at Tesla took affirmative action that resulted in a deletion of the index and the snapshot file itself. (Shoemaker transcript) The jury is entitled to infer that deletion was intentional.

In investigating this accident, Corporal David Riso contacted Tesla and spoke with Tesla's general counsel, Ryan McCarthy, explaining that he wanted the autopilot data from this accident. (T.7/15/25 pm at 60) Corporal Rizo had prepared a search warrant which specifically requested all data from the vehicle's autopilot computer, including video. (T.7/15/25 am at 46-47) Mr. McCarthy told Corporal Riso that he did not need to subpoena the data, and indicated that he would provide Corporal Riso with a list of the data that he should request from Tesla. (T.7/15/25 pm at 60) Mr. McCarthy's list did not include the autopilot data that Corporal Riso had requested in the search warrant, but he did not know that at the time. (Id.)

Having taken advantage of Corporal Riso's lack of knowledge regarding what data Tesla could produce, Tesla then selected a technician, Michael Calafell, who had never downloaded data from an autopilot ECU, and did not know how to do so. (T.7/15/25 pm at 52-53, 7/21/25 am at 6) Tesla did not tell Mr. Calafell that FHP was specifically trying to obtain autopilot data from the autopilot ECU. (T.7/21/25 am at 5) Despite not knowing what he was doing, Mr. Calafell did connect the autopilot ECU, but he took no safeguards to protect the data on either the MCU or the ECU. (T.7/21/25 am at 12) Tesla's legal team prepared a declaration for Mr. Calafell in which he swore that he had not even received the autopilot ECU on June 19, 2019. (Id. at 13-14) Mr. Calafell signed this declaration, even though it was false. (Id.)

Mr. Moore explained that in a forensic investigation, it is important to take precautions to prevent damage to electronic evidence. (T.7/18/25 am at 20) When Mr. Calafell powered up the MCU and ECU without taking any precautions, new data was automatically added to the computers, including new vision detections and forward radar objects. (Id.) Mr. Moore could not testify how significant the damage was to the existing data because that data was overwritten. The jury can infer

that it was Tesla's intention to overwrite data on the ECU to prevent Corporal Riso or Plaintiffs from obtaining access to it.

The data that Tesla eventually provided to Corporal Riso did not include the snapshot data that he had requested.  (T.7/15/25 pm at 50) Indeed, Corporal Riso could not make any sense of what he was provided, and Tesla told him that the data was corrupted.  (Id. at 49) Corporal Riso testified that had he received that data, he would have included it in his accident report and provided it to NHTSA.  (Id. at 51) Unsurprisingly, Corporal Riso concluded that Tesla was not cooperative in helping him understand the cause of the accident. (Id. at 52-53)

During the course of the lawsuit, Tesla repeatedly told the Plaintiffs that the autopilot data needed to make the augmented video simply did not exist.  (T.7/18/25 pm at 70) Plaintiffs were eventually able to locate the autopilot ECU and arranged for a download of the data from the computer.  (Id. at 70-71) Tesla was given an identical copy of the data that Plaintiffs recovered. (T.7/25/25 am at 23) Plaintiffs' experts were able to generate an augmented video from the data that they extracted from the autopilot ECU.  (Id.) Not knowing that Plaintiffs had done so, Tesla took the position that the data on the forensic copy was corrupted and they weren't able to recover any information from it.  (Id.) The jury is entitled to infer that Tesla knew this was false, and was simply hoping the Plaintiffs' consultants couldn't extract the data.

After Plaintiffs provided Tesla with the augmented video they were able to create from the data, Tesla finally produced their own augmented video and additional data which it claimed it had located on its servers as a result of Plaintiffs' efforts.  However, Mr. Moore pointed out that the data that Tesla produced had a number of problems.  First, Tesla reduced the resolution of the augmented video, making it impossible to read some of the overlaid data.  (T.7/17/25 pm at 91) In addition, Tesla produced the data in a non-searchable format so that Mr. Moore could not use it in

reconstructing the accident.  (Id. at 94) The data that Tesla produced had been modified, and was now missing important information.  (Id.) It did not come off of the computer chip in the damaged condition. The jury can once again infer that Tesla was attempting to put up roadblocks to Plaintiffs' experts use of the data.

Based on the thinner record presented at summary judgment, this Court ruled:

> Plaintiffs also point to numerous public statements Tesla made which arguably misrepresented the risk and limitations of the Autopilot system and improperly suggested that issues present in the crash were resolved. ECF No. [351] at 14, 23-26. Therefore, because Tesla refused to geo-fence the Autopilot system despite being warned of the dangers and despite record evidence indicating that Tesla was capable of curing the issue, a reasonable jury could find that Tesla acted in reckless disregard of human life for the sake of developing their product and maximizing profit. *See Gen. Motors Corp. v. McGee*, 837 So. 2d 1010, 1035 (Fla. 4th DCA 2002); *Sims v. BMW of N. Am. LLC*, No. 6:22-cv-1685-PGB-UAM, 2025 WL 724047, at *2 (M.D. Fla. Mar. 5, 2025) (citing *Bridgestone/Firestone, Inc.*, 891 So. 2d 1188, 1191–92 (Fla. 4th DCA 2005) (holding actual knowledge of a danger followed by a failure to warn of that danger supports punitive damages)).

DE 428 at 96.

This trial evidence is more than sufficient to allow the jury to determine that Tesla was both grossly negligent and engaged in intentional misconduct.  Tesla has provided no basis for this Court to change its ruling. Tesla's motion for JMOL regarding punitive damages should be denied.

**VIII.   *BANNER* PROVIDES NO BASIS TO ENTER JMOL ON PLAINTIFFS' PUNITIVE DAMAGE CLAIM.**

We began this response distinguishing the record evidence in this case from Banner's. But there are additional reasons Banner is inapposite.   First, *Banner* quotes from *Chrysler Corp. v. Wolmer,* 499 So. 2d 823, 824 (Fla. 1986), which stated, "a showing of even gross negligence, the degree of negligence that lies between ordinary negligence and willful and wanton conduct, is not enough." *Banner* at *3.   This is no longer the law. Since 1999, punitive damages have been recoverable for a defendant's gross negligence, which, as Tesla quoted in its initial motion, is defined

as "the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." (DE 326 at 27)

Second, *Banner* cites language from *Jeep Corp. v. Walker,* 528 So. 2d 1203, 1206 (Fla. 4th DCA 1988) stating that "[i]t would appear that the Florida Supreme Court has all but eliminated punitive damage awards in products liability cases." *Banner* at *3. Tesla claims that this means that *Banner* also adopted *Walker's* suggestion that the plaintiff needed to present evidence that "Jeep was deliberately attempting to main or kill [the plaintiff]," despite *Banner* not including this language in its opinion. (DE 517 at 5) This is not a manslaughter standard, but an intentional homicide standard. And *Valladares v. Bank of Am. Corp.*, 197 So. 3d 1,11 (Fla. 2016), which *Banner* cites to as "reaffirming" the manslaughter standard[3], made its definition of what constitutes "punitive conduct" crystal clear - "something more than simple negligence, but less than intent or malice."

What is also clear is that the standard for punitive damages set forth in *American Motors Corp. v. Ellis,* 403 So.2d 459, 468 (Fla. 5th DCA 1981) and *Toyota Motor Co., Ltd. v. Moll*, 438 So. 2d 192, 195 (Fla. 4th DCA 1983) - "punitive damages ... [are] allowed where the defendant had knowledge of a defect or dangerous condition and chose not to remedy the condition." - remains the standard today and district courts have had no difficulty applying that standard.

In *Deiparine v. Siemens Med. Sols. USA Inc.,* No. 6:10-CV-677-ORL, 2010 WL 5479653, at *4–5 (M.D. Fla. Dec. 2, 2010), *report and recommendation adopted*, No. 6:10-CV-677-ORL, 2011 WL 9128 (M.D. Fla. Jan. 3, 2011), the district court quoted *Johns Manville*, *Moll*, and *Ellis*:

> *The requisite evil intent may be inferred from the defendant's having pursued a course of action in wanton disregard of the consequences. Johns–Manville Sales*

---

[3] It's odd that *Banner* would quote the manslaughter jury instruction instead of the actual punitive damage instruction, but a side-by-side comparison of the language in each instruction reveals little substantive difference between the two.  Absent from both are any reference to an intent to harm.

*Corp. v. Janssens,* 463 So.2d 242, 247 (Fla. 1st DCA 1984). Accordingly, *punitive damages may be imposed when the defendant knows of the defect but chooses not to remedy the dangerous condition. Toyota Motor Co., Ltd. v. Moll,* 438 So.2d 192 (Fla. 4th DCA 1981).

(emphasis in original).

In *Estate of Miller v. Ford Motor Co., N*o. 201CV545FTM29DNF, 2004 WL 7330563, at *3 (M.D. Fla. July 22, 2004), the district court denied Ford's motion for summary judgment on punitive damages as follows:

> In Florida, "punitive damages are appropriate when a defendant engages in conduct which is fraudulent, malicious, deliberately violent or oppressive, or committed with such gross negligence as to indicate a wanton disregard for the rights and safety of others." *Owens–Corning Fiberglass Corp. v. Ballard*, 749 So. 2d 483, 486 (Fla. 1999). For actions arising after October 1, 1999, punitive damages are available only for intentional misconduct and gross negligence, as defined in Fla. Stat. Ann. § 768.736. In a products liability case, "punitive damages ... [are] allowed where the defendant had knowledge of a defective or dangerous condition and chose not to remedy the condition." *Toyota Motor Company, Ltd. v. Moll*, 438 So. 2d 192, 194 (Fla. 4th DCA 1983), *Domke v. McNeil—P.P.C., Inc.,* 939 F. Supp. 849, 852 (M.D. Fla. 1996). Plaintiff has identified a number of facts which, while contested by Ford, would support an award of punitive damages. At the summary judgment stage of the proceedings, this is sufficient. Ford's motion will be denied.

In *Sims v. BMW of N. Am. LLC*, No. 6:22-CV-1685-PGB-UAM, 2025 WL 724047, at *2 (M.D. Fla. Mar. 5, 2025), the district court recognized that there was dueling expert testimony which presented "the quintessential question of material fact relative to what the BMW Defendants knew and when they knew it versus when they told consumers."  As a result, the Court denied BMW's motion for summary judgment, explaining:

> Plaintiff bases his claim for punitive damages on Defendants' knowledge that the Takata airbags in their vehicles were defective and concealed that information from the consuming public. (Doc. 234, p. 19). As discussed in the preceding section, an issue of material fact remains concerning Defendants' knowledge of the defective Takata inflators and whether they concealed that information, thus delaying warning consumers about the danger. *See Alfeo v. I-\Flow, LLC*, No. 11-80837, 2012 WL 442981, at *2 (S.D. Fla. Feb. 10, 2012) (citing *Holmes v. Bridgestone/Firestone, Inc.,*

891 So. 2d 1188, 1191–92 (Fla. 4th DCA 2005) (holding actual knowledge of a danger followed by a failure to warn of that danger supports punitive damages)). While the bar is high for imposing punitive damages, if the jury accepts Plaintiff's evidence on Defendants' knowledge and alleged inaction, a reasonable jury could return a verdict for Plaintiff on punitive damages. Defendants' request for summary judgment on punitive damages is thus denied.

*Sims* at *2.

Contrary to *Banner's* conclusion, Plaintiffs do not seek to hold "Tesla [] liable for failing to provide technology that it did not advertise and that did not exist." *Banner* at *4.   Plaintiffs seek to hold Tesla liable for not taking any action to address the known flaws in its driver monitoring system, the flaws in its emergency braking system, or limit the use of autopilot in the areas it was designed for. Here, we know that the technology *did* exist that would have allowed this accident to be avoided. As shown on the augmented video, McGee's Tesla detected Angulo, Angulo's truck, the end of drivable space, and a stop bar, but took no action to brake or otherwise avoid the accident, actions that the autopilot system was fully capable of taking. Further, we showed that Tesla did make false representations about the capabilities of its autopilot system, frequently blurring the lines between the capabilities of autopilot and full self-driving, creating unrealistic consumer expectations about the safety of Tesla's systems.  In short, while the bar is high for imposing punitive damages, if the jury accepts Plaintiff's evidence on Defendants' knowledge and alleged inaction, a reasonable jury could return a verdict for Plaintiff on punitive damages

IX.   **TESLA MISREADS *STATE FARM V CAMPBELL*.**

Tesla claims that *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422-23 (2003) precludes the jury from considering evidence of post-accident conduct because it did not cause the plaintiff injury.  Telsa misreads *Campbell* because Tesla's efforts to prevent the FHP and the Plaintiffs from obtaining the autopilot data are not  "dissimilar acts, independent from the acts upon which liability was premised."

*Campbell* actually provides examples of what constitute "dissimilar acts."  In *Campbell,* the plaintiffs sued State Farm for improper claims handling procedures.  However, the trial court allowed the plaintiffs to present evidence of other bad acts from State Farm that had nothing to do with improper claims handling:

> Although evidence of other acts need not be identical to have relevance in the calculation of punitive damages, the Utah court erred here because evidence pertaining to claims that had nothing to do with a third-party lawsuit was introduced at length. Other evidence concerning reprehensibility was even more tangential. For example, the Utah Supreme Court criticized State Farm's investigation into the personal life of one of its employees and, in a broader approach, the manner in which State Farm's policies corrupted its employees.

*Campbell* at 423-424. Again, Tesla's failure to address its inadequate driver monitoring system is not a "dissimilar act" as defined in *Campbell*.

Tesla's reliance on two tobacco cases in support of its argument is similarly without merit. In *Philip Morris USA, Inc. v. Rintoul*, 342 So. 3d 656 (Fla. 4th DCA 2022), the Court correctly held that evidence related to a completely unrelated product that had never been used by the smoker could not be considered to support a claim for punitive damages.  Plaintiffs readily agree that they could not present evidence related to a defect in Tesla's power wall, solar roof, or Optimus robot in order to prove punitive damages in this case.

*Hardin v. R.J. Reynolds Tobacco Co*., 314 So. 3d 584 (Fla. 3d DCA 2020) is also inapposite. First, *Hardin* was a retrial on punitive damages only.  The Court noted that its holding was based on the "unique procedural posture [of] this case," specifically distinguishing it from cases, like the instant case, where "the same jury would hear the evidence pertaining to both compensatory and punitive damages." *Hardin* at 588.  The outcome of *Hardin* was determined by the plaintiff's failure to meet an obligation created by a non-standard punitive damage jury instruction that the plaintiff

had agreed to. *Hardin* in no way precludes consideration of Tesla's failures postdating the accident when determining entitlement to punitive damages.

The Florida Supreme Court has made it clear that, when considering entitlement to punitive damages, a jury may consider Tesla's post-accident actions:

> (2) the degree of reprehensibility of Owens–Corning's conduct, the duration of that harmful conduct, Owens–Corning's awareness, any concealment and the existence and frequency of similar past conduct; … (7) the seriousness of the hazard to the public, the attitude and conduct of Owens–Corning upon discovery of the misconduct; (8) the degree of Owens–Corning's awareness of the hazard and of its excessiveness; (9) the number and level of employees involved in causing or covering up the marketing misconduct; (10) the duration of both the improper marketing behavior and its cover-up.

*Owens-Corning Fiberglas Corp. v. Ballard*, 749 So.2d 483, 484-85 (1999). Prior to trial, the Court made it clear that it agreed. (T.7/14/25 at 159) Tesla has provided no basis for this Court to change its ruling.

WHEREFORE, Plaintiffs respectfully request that the Court deny Tesla's Motions for JMOL in their entirety.

Date: **July 28, 2025**                         Respectfully submitted,

By:      */s/ Douglas F. Eaton*
        DOUGLAS F. EATON
        FBN: 129577
        **EATON & WOLK, PL**
        *Co-counsel for Plaintiff*
        2665 S. Bayshore Drive, Suite 609
        Miami, Florida 33133
        Telephone: 305-249-1640
        Email: deaton@eatonwolk.com
              cgarcia@eatonwolk.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this **28th** day of **July 2025**, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.


By: **/s/ Douglas F. Eaton**
DOUGLAS F. EATON
FBN: 129577
**EATON & WOLK, PL**
*Co-counsel for Plaintiff*
2665 S. Bayshore Drive, Suite 609
Miami, Florida 33133
Telephone: 305-249-1640
Email: deaton@eatonwolk.com
cgarcia@eatonwolk.com