## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| NEIMA BENAVIDES, as Personal Representative of the Estate of Naibel Benavides Leon, deceased, | Case No. 21-cv-21940-BLOOM/Torres |
| Plaintiff, | |
| v. | |
| TESLA, INC., a/k/a Tesla Florida, Inc., | |
| Defendant. / | |
| DILLON ANGULO, | Case No. 22-22607-KMM |
| Plaintiff, | |
| v. | |
| TESLA, INC. a/k/a Tesla Florida, Inc., | |
| Defendant. / | |

### DEFENDANT TESLA, INC.'S OMNIBUS REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW AND MEMORANDUM OF LAW

Defendant Tesla, Inc. by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 50 (a) submits its Omnibus Reply In Support Of Its Motion For Judgment As A Matter Of Law.[1]

### INTRODUCTION

Plaintiffs ask the Court to simply adopt its June 26 ruling on Tesla's Motion for Summary Judgment as to punitive damages, but the Court has witnessed what evidence Plaintiffs actually have, and none of it comes close to what they represented the evidence would be, nor does it reach the extraordinarily high bar required to permit a reasonable jury to award punitive damages. The

---

[1] Tesla had submitted separate briefing on liability and punitive damages (see ECF No. 516, 517). Plaintiffs submitted an omnibus response. (ECF No 552). Tesla's Liability JMOL explained in detail why each of Plaintiffs' claims cannot be submitted to the jury, and contends that briefing fully supports the relief requested. This Reply will focus on the claim for punitive damages. As necessary, Tesla will also file (or orally argue) its renewed motion at the close of the evidence.

anticipated evidence the Court based its Order denying Tesla' Motion for Summary Judgment have not been borne out in this trial:

    (1)    <u>MSJ Basis 1</u>: The NTSB had made recommendations that Tesla did not incorporate;

            <u>Trial</u>: This evidence has been rightly *excluded*.

    (2)    <u>MSJ Basis 2</u>: Tesla made alleged misrepresentations about the risks and limitations of Autopilot;

<u>Trial</u>: While Tesla's representations may inform the ordinary consumer for purposes of determining whether the product us defective under the consumer expectation test, it does not address causation as to either compensatory or punitive damages because, ***this*** 'consumer' Mr. McGee was unequivocal in insisting he did *not* rely on any statements by Mr. Musk or even the 'Paint it Black' in purchasing or driving his Model S, and thus no alleged misrepresentation has a causal connection to this crash.

    (3)    <u>MSJ Basis 3</u>: Tesla failed to address inadequacies in the system allegedly present in the *Brown* crash;

<u>Trial</u>: Although the Court allowed in evidence the *Brown* crash as a 'substantially similar incident,' the evidence has shown *this* crash bears little resemblance to *Brown*. Unlike Mr. Brown, Mr. McGee had his hand on the steering wheel and his foot on the accelerator as he ran a stop sign and hit a vehicle parked off-road.  None of these facts were present in *Brown*, none of these facts were part of any investigation into or findings regarding *Brown*, and therefore there is no evidence of 'issues' from *Brown* that, if 'fixed' would have prevented this crash.

    (4)    <u>MSJ Basis 4</u>: Tesla "refused to geo-fence" Autopilot;

<u>Trial</u>: The SAE and NHTSA agree with Tesla that Level 2 driver assist features need not be geofenced and, indeed, of the other 74 vehicles with Level 2 hands-required systems on the

road in 2019, none of them were geofenced. Because Tesla's decision was consistent with the state of the art and industry custom, that alone should preclude any reliance on these claimed defect theories as a basis for punitive damages. *See BMW v. Gore*, 517 U.S. 559, 579 (1996) (finding that compliance with the industry standards provides a "good-faith basis for believing" that its conduct was lawful). Second, neither claimed defect is causally connected to McGee's conduct **because he was not a complacent driver**—rather, he was an aggressive driver who repeatedly told the vehicle to speed up, while it was telling him to maintain speed limits and attention.

To be clear—the record presented to the Court *now* versus at the Motion for Summary Judgment demonstrates this case is not what Plaintiffs said it would be. Mr. McGee was driving his car, it was not driving him, he knew it was not autonomous and would not stop at the stop sign that he knew was ahead of him. He rightly, and consistently, accepted responsibility for this crash at the scene, in deposition and before this jury. Even after suing him for his "reckless" vehicle operation, Plaintiffs now not only blame Tesla for not overriding what he demanded the car do— go faster—they seek to *punish* Tesla for not doing what **no other car in the world** would do in 2019, or now: "*stop*" when the driver says "*go*."

Plaintiffs spend the most time in their Opposition addressing Tesla's supposed "cover-up" of Autopilot Snapshot data. This is a sideshow that, as the Court has seen, accomplished nothing beyond taking up the Court and jury's time. **Plaintiffs' own evidence proves that TACC was "OFF", in other words, it proves Tesla's case**. Moreover, Plaintiffs' expert Mr. Moore said the data he got last year was a "treasure trove" that provided "all I need." They have made this data the centerpiece of their experts' presentations about what they think the car could have or should have done—even though their thesis runs contrary to global industry standards. The "cover-up" had zero impact on this trial. And, most importantly—and conspicuously absent from their

Opposition—is Dr. Lewis's admissions that (1) **nothing was corrupted**, (2) data on Tesla's system was **not deleted**, (3) data on the ECU was **not deleted**, (4) his co-data-inspector was able to recover the data within 15 minutes at a Starbucks, and (5) nothing prevented that inspection from happening anytime before or throughout this litigation. Their delay in pursuing the data from the Florida Highway Patrol does not mean Tesla covered up anything. In any event, this alleged conduct before and after litigation started has nothing to do with whether Tesla's conduct before the crash amounts to intentional misconduct as they claim.

The undisputed evidence in this case is driver error is the cause of 94% of crashes, and distraction is the cause of 29% of crashes. In fact, the NHTSA concluded that, in 2019, over 10,000 people died due to driver distraction. The goal and promise of driver assist features like Autopilot is to reduce these crashes and deaths, and the toll they take. Even if the Court believes there is evidence that Tesla's Autopilot may not have satisfied the ordinary consumer's minimum safety expectations, and Tesla disagrees, there is absolutely no evidence to support permitting the jury to decide the issue. The evidence is Autopilot saves lives. Punishing Tesla for doing what the driver asked the car to do when he held the accelerator, like every other car on the road, and failing to stop this crash from happening when no other car in the world would, is plain wrong and risks a grave injustice.

## I.   PLAINTIFFS OFFERED NO EVIDENCE, MUCH LESS CLEAR AND CONVINCING EVIDENCE TO SUPPORT PUNITIVE DAMAGES

When the evidence is viewed through the proper prism – a high standard of **actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage would result and, despite that knowledge, intentionally pursued that course of conduct resulting in injury or damage, or engaged in conduct equivalent to criminal manslaughter,** the requirement of proof by clear and convincing evidence, and conduct that bears a relationship to

these Plaintiffs' injuries, Tesla is entitled to judgment as a matter of law as to these punitive damage claims.

In their response, Plaintiffs claim that "Tesla was grossly negligent during the development and evaluation phase of Autopilot, was grossly negligent in its response to fatal accidents resulting from driver inattentiveness while using Autopilot, and acted with intent to deprive the Florida Highway Patrol, NHTSA and Plaintiffs of data that demonstrated this accident was preventable." They purport to distinguish *Tesla v. Banner,* 2025 WL 610816 (Fla. 4th DCA Feb. 26, 2025) despite its marked similarity to this case, and misconstrue Florida law on the standard for punitive damages.

Tesla will address each point in turn.

A.   **Plaintiff Has Not Offered Clear And Convincing Evidence That Tesla's Development Process Constituted Gross Negligence Equivalent To Criminal Manslaughter**

Plaintiffs next offer a series of arguments that misrepresent or incompletely describe the factual record as to the development of Autopilot. An accurate recitation of the record demonstrates that Plaintiffs failed to offer evidence that is anywhere near sufficient to prove, by clear and convincing evidence, that Autopilot was defective and that such purported defect caused Plaintiffs injuries. Tesla will now clarify Plaintiffs' inaccurate recitation of the record:

Plaintiffs first argue, "Phatak was unable to demonstrate that, during the development process, Tesla evaluated and considered data, research, and studies regarding driver compliance with automated driving systems." (*See* ECF 522 at p. 19).

- Tesla responds first that this argument flips the burden: Plaintiffs have the burden of proving Tesla was grossly negligent, not the other way around. Tesla further responds that the referenced deposition testimony from Phatak simply said he had not located documentation that Tesla had conducted studies using the term driver complacency.

However, Phatak went on to testify that Tesla did conduct studies related to a driver's situational awareness when using Autopilot. (Tr. 7/16 am at 38-39.

Plaintiffs next argue, "Phatak was similarly unable to show that Tesla took into account research related to the capabilities and limitations of humans and monitoring automated systems." (*See* ECF 522 at p. 19).

- Tesla responds that, once again, Plaintiffs have tried to flip the burden. Nevertheless, Phatak did testify that Tesla did consider other types of driver-monitoring systems and explained why they were not chosen. (Tr. 7/16 am at 39-40 and Phatak Deposition Designations Played at trial at 43-53). Moreover, Plaintiffs' argument fails to identify the "research" they are referring to or that it would tend to prove that a different DMS would have led to a different outcome.

Plaintiffs next argue that Tesla did not research how much time a driver would need to avoid an accident. (ECF No. 522 at 19).

- Tesla responds first that this argument ignores that Tesla marketed and sold Autopilot as a "hands-on" system that required driver's to remain attentive and responsible for the driving task at all times. Additionally, the designated Phatak testimony did include discussion of the time necessary to react and that a hands-on system allowed for shorter reaction times. (Tr. 7/16 pm at 46).

Plaintiffs next argue that Tesla did not research the effect an automated driving system has on a driver's situations awareness. (ECF No. 522 at 19).

- Tesla responds that Plaintiffs ignore the information contained in Exhibit P-21 that rebuts this argument and that Phatak's designated testimony was not that Tesla did not study this but, instead, that, although he did not find a specific document related to its study, the fact

that Autopilot included a DMS from the very beginning demonstrates Tesla considered it.

Plaintiffs next argue that Tesla was aware, as shown by statements from Elon Musk in September 2016, that some customers were ignoring multiple "hands-on wheel" warnings, but that Tesla did nothing about that.

- Tesla responds that the referenced statement from Mr. Musk, which was offered as Exhibit P-42, indicated that Mr. Musk was discussing an earlier version of the DMS that did not have the "strike out" system that McGee's version had and further makes clear that the concern Plaintiffs reference is the reason Tesla updated the DMS.

Plaintiffs next argue that Elon Musk had no basis for "telling the public in 2016 that Autopilot was far safer than human driving" because Tesla "did not begin to track data on the number of crashes that occurred per vehicle mile driven with Autopilot engaged prior to March 2018."

- Tesla responds that Plaintiffs fail to identify the purported statements by Elon Musk they are referencing, but, in any event, all of the statements from Mr. Musk that have been shown to the jury have included context that shows he was discussing future Autopilot capabilities.[2]

Plaintiffs next argue that Cummings testified that Tesla had not adequately tested AEB for "edge cases including rain or at night or outside the ODD."

- Tesla responds that Cummings referenced Exhibit P-21 when she made these statements, but that documents says nothing of the sort. Additionally, Tesla's owner's manual lists AEB "limitations" as including scenarios where visibility is poor, such as heavy rain, and

---

[2] And in all events, as Tesla has repeatedly argued, Mr. Musk's statements are not relevant to punitive damages because they were not heard by Mr. McGee.

Cummings acknowledged that nighttime is challenging for all AEB systems.

Plaintiffs next argue that Cummings testified Tesla should have had a human factors division.

- Tesla responds, as noted above, by referencing the Phatak testimony that explained Tesla had considered the need for a DMS.

### B. Plaintiff Has Not Offered Clear And Convincing Evidence That Tesla's Response to Autopilot Failures Constituted Gross Negligence Equivalent To Criminal Manslaughter

Plaintiffs argue Cummings testified Tesla took no response to concerns NHTSA had raised in 2015.  Cummings was testifying about Exhibit P-21, which itself demonstrates that her testimony was inaccurate.  Moreover, none of NHTSA's concerns related to a situation where a driver was pressing the accelerator while his hands were on the wheel.

Plaintiffs next repeat their argument regarding the purported statements by Elon Musk that they claim indicate Tesla knew drivers did not always respond to alerts. As noted, this misrepresents the statement, which concerned a time before Tesla had incorporated the "strike out" feature into the DMS, which was the version of the DMS that McGee had.

Plaintiffs next argue that Tesla chose not to make feasible "changes to Autopilot until 2023. As Tesla explained in its motion for judgment notwithstanding the verdict on compensatory liability, these changes would have had no effect on the crash in this case.

Plaintiffs next refer to "dozens" of other incidents. The Court has ruled these other incidents may not be considered for punitive damages because Plaintiffs have not satisfied the standard for substantial similarity regarding other incidents for such purposes.

Plaintiffs next refer to the three other incidents that the Court found were substantially similar.  However, none of these involved a driver who was actively driving his vehicle by pressing the accelerator and had his hands on the wheel, like McGee.

C.     **Plaintiffs' Claim that Tesla Intentionally Attempted To Destroy The Autopilot Data Is Equally Specious As A Basis For Punitive Damages**

Plaintiffs continue to rely upon Tesla's failure to provide "snapshot" data to Plaintiffs in a timely fashion as a lynchpin of their punitive damage claim, asserting that Tesla "***acted with intent*** to deprive the Florida Highway Patrol, NHTSA, and the Plaintiffs of autopilot data that demonstrated the accident was preventable." (ECF No. 522 at 19). As their own expert demonstrated, there simply is no such evidence, let alone clear and convincing evidence to support this claim.

Leaving aside the fact that the Court had found there was ***not*** sufficient evidence to conclude that Tesla's conduct was intended to avoid the production of evidence or otherwise undermine the discovery process (ECF No. 405 at 12), Plaintiffs own expert, Lewis could not have been clearer. The snapshot data was recovered, and he admitted that nothing is ever deleted, (T. 7/25 am at 43); nothing was ever corrupted, (*Id.* at 49-50); Mr. Calafell did not do anything to corrupt the data (*Id.* at 50); and it was not "impossible" to get the data. (*Id.* at 51). Incredibly, in their response, Plaintiffs failed to even acknowledge this testimony. With those admissions, there is no basis upon which the Court can find clear and convincing evidence that Tesla intentionally concealed, damaged or destroyed data.

Further, they fail to acknowledge the words that their own expert, Moore used repeatedly—once obtained, the data contained a "treasure trove" of information that he relied upon to reach his opinions in the case. Likewise, Lewis acknowledged that prior to efforts to find the snapshot file, Tesla had in fact, produced a lot of material, data, to the police and to Plaintiffs here. (*Id.* at 31). This included speeds, pedal applications, braking, the state of Autopilot at any given time, sometimes even for the life of the vehicle that data was produced. (*Id.* at 32). And they did not explain why Plaintiffs did not have Lewis gather this data sooner, as they always had the ability to

do. So Plaintiffs were not prejudiced by the timing of the production of this data.

Worse, Plaintiffs create the false narrative that the "autopilot data …demonstrated the accident was preventable." Where is that proof? It does not exist. To the contrary, as set forth in Tesla's Liability JMOL, the data demonstrated that each of the features performed as intended.

To start, it showed conclusively that *TACC was "OFF," in other words, it proves Tesla's case*. As described above, McGee had overridden TACC by pressing the accelerator pedal. For this reason, the detection of the end of drivable space is irrelevant to all of Plaintiffs' defect theories because he, not TACC, was controlling the vehicle's speed.

Likewise, AEB and FCW were designed to activate in response to vehicles that are traveling on the road, in front of the and in the same lane as the Tesla (in-lane, in-line vehicles) and it was not designed to respond to vehicles that are not on the road or to pedestrians. And while Cummings used the augmented video to argue the vehicle was defective because it detected, but did not respond to, a stop sign, she acknowledged that the stop sign was detected by the vehicle's "shadow mode," which she further acknowledged is a commonly used developmental tool whereby features that are still in development record what they detect and what responsive action they would take, *but the features are disconnected from any vehicle control function.* (T. 7/17 pm at 9 and 37; T. 7/17 am at 53-54, 57-59). Thus, detection by shadow mode does not equal defect.

Ultimately then, this is another instance where Plaintiffs are offering evidence for which there is no nexus between the conduct for which punitive damages are sought and these Plaintiffs' injuries. *See Campbell*, 538 U.S. 408, 420–24, and other cases cited *supra*. Plaintiffs attempt to distinguish these cases, but this Court has already indicated emphatically and repeatedly that with regard to punitive damages, the evidence offered has to bear some relationship to this accident.

(*see e.g.* ECF No. 433) ("to ensure 'that the jury will ask the right question, and not improperly punish a defendant for its out of state harm to others, ***there must be a nexus to the specific harm suffered by [t]he [p]laintiff***,'" *citing State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) (consistent with the Fourteenth Amendment and due process, the conduct that forms the basis of punitive damages "must have a nexus to the specific harm suffered by the plaintiff."); T. 7/17 am at 6 (rejecting Plaintiffs' argument that Tesla's conduct after the accident was "relevant to a continuous course of conduct," stating "with regard to punitive damages, it has to bear some relationship to this accident."; (T. 7/25 am at 1) (reading from the standard jury instruction "Punitive damages are warranted against Tesla if you find by clear and convincing evidence that Tesla was guilty of intentional misconduct or gross negligence, which was a substantial cause of damage to Plaintiffs.")).

## II.   PLAINTIFFS' EFFORTS TO DISTANCE THIS CASE FROM *BANNER* FAIL; NOR DO THE OTHER CASES THEY CITE SUPPORT THEIR POSITION

Understandable, Plaintiffs try to distance themselves from *Tesla, Inc., v. Banner,* 2025 WL 610816 (Fla. 4th DCA Feb. 26, 2025), but they cannot.[3] The *Banner* court found:

> [T]he evidence indicates Tesla's Autopilot features were 'state-of-the-art' and complied with all industry and regulatory standards. Further, ***Tesla repeatedly warned against misuse of the features, which is industry practice…Tesla cannot be liable for failing to provide technology that it did not advertise and that did not exist.***

*Id.* at \*6 (emphasis added).

That was true in *Banner,* and it is true here. And even more so because the distinctions Plaintiffs try to make—all focus on a driver who was complacent and that was not McGee. McGee is solely responsible for the crash. Tesla cannot be subject to punishment for not allowing him to

---

[3]  Indeed, that crash is one of three this Court found to be "substantially similar" notwithstanding critical distinctions like McGee pressing the accelerator and having his hand on the wheel unlike in the *Banner* case.

drive his car where and how he wanted. Consistent with *Banner*, Tesla is entitled to judgment as a matter of law on punitive damages.

Plaintiffs also claim the *Banner* decision misstates Florida law as to the meaning of gross negligence, arguing that any cases decided prior to 1999 have been superseded by section 768.72. Plaintiffs are just wrong.  Before the statute was adopted, the Florida Supreme Court in *Carraway v. Revell*, 116 So. 2d 16, 20 (Fla. 1959), and *Chrysler Corp. v. Wolmer*, 499 So. 2d 823, 825 (Fla. 1986), articulated the standard of proof for gross negligence as requiring conduct equivalent to criminal manslaughter. And in 2016, the Florida Supreme Court reiterated its adherence to this heightened standard: "the required level of negligence for punitive damages is equivalent to the conduct involved in criminal manslaughter." *Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 11 (Fla. 2016). Plaintiffs have not met that bar by clear and convincing evidence.

Plaintiff cites *Toyota Motor Co. v. Moll*, 438 So. 2d 192 (Fla. 4th DCA 1983), and *American Motors Corp. v. Ellis*, 403 So. 2d 459 (Fla. 5th DCA 1981), to support the assertion that punitive damages are recoverable in this case.  Plaintiff's reliance on these cases is unavailing for numerous reasons.  First, these cases were decided by *district courts* of *appeal prior* to the supreme court's decisions in *White Construction Co. v. Dupont*, 455 So. 2d 1026 (Fla. 1984), *receded from on other grounds by Murphy v. International Robotic System, Inc.*, 766 So. 2d 1010, 1027-31 (Fla. 2000), *Chrysler Corp. v. Wolmer*, 499 So. 2d 823, 825 (Fla. 1986), and *American Cyanamid Co. v. Roy*, 498 So. 2d 859, 861 (Fla. 1986), and critically, it was ***prior to the requirement that plaintiff prove this wrongdoing by clear and convincing evidence***. Similar to *Moll* and *Ellis*, *Wolmer* involved a plaintiff seeking punitive damages for the design of a vehicle fuel tank.  The Florida Supreme Court in *Wolmer* held that the evidence did not support actual knowledge by the defendant that they were marketing an inherently dangerous vehicle.  *Id*. at 826.  As a result, an

award of punitive damages would be unjustified and was denied. *Id.* Moreover, in *Ellis*, there was evidence that AMC was aware of the catastrophic results of fuel tank fires in its vehicles from its own crash tests, and that AMC chose not to implement the recommendation of its engineers to relocate the fuel tank in order to maximize profits. 403 So. 2d at 467. There is no such evidence here.

Plaintiff' reliance on *Estate of Miller v. Ford*, 2004 WL 7330563, at *3 (M.D. Fla. July 22, 2004), is unhelpful because it simply cites the statute and states there were facts supporting an award of punitive damages without detailing those facts. Plaintiffs rely on *Deiparine v. Siemens Medical Solutions,* 2010 WL 5479653 (M.D. Fla. Dec. 2, 2010), a federal case deciding a motion to amend. Sims v. BMW, 2025 WL 724047 (M.D. Fla. Mar. 5, 2025) involves Takata airbags which were admittedly defect unlike this case.

**********

In sum, because there is no evidence, much less clear and convincing evidence, to support punitive damages under Florida' stringent standard, judgment as a matter of law should be granted.

## III.  IN ALL EVENTS, PLAINTIFFS' HAVE NOT PROVIDED EVIDENCE FROM WHICH ANY AWARD COULD EXCEED THREE TIMES THE AMOUNT OF THE COMPENSATORY AWARD

Plaintiffs did not respond on Tesla' final point that in all events, Plaintiffs have offered no evidence that "the wrongful conduct proven under this section was motivated solely by unreasonable financial gain and … that the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by the managing agent, director, officer, or other person responsible for making policy decisions on behalf of the defendant." Accordingly, without waiving its position that punitive damages cannot be awarded at all, at a minimum there is no evidence sufficient to support an award of four times the jury verdict.

## CONCLUSION

Defendant Tesla, Inc. requests that this Court grant Tesla's Motion For Judgment As A Matter Of Law.

Date: July 29, 2025

Respectfully submitted,

*S/ Wendy. F. Lumish*

**WHITNEY V. CRUZ**
Florida Bar No. 800821
**WENDY F. LUMISH**
Florida Bar No. 334332
**BOWMAN AND BROOKE LLP**
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134
Tel. 305-995-5600 / Fax: 305-995-6100
whitney.cruz@bowmanandbrooke.com
wendy.lumish@bowmanandbrooke.com

**THOMAS P. BRANIGAN**
(Admitted *Pro Hac Vice*)
**DREW P. BRANIGAN**
(Admitted *Pro Hac Vice*)
**BOWMAN AND BROOKE LLP**
101 W. Big Beaver Road, Suite 1100
Troy, MI 48084
Tel. 248-205-3300 / Fax: 248-205-3399
thomas.branigan@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com

**JOEL SMITH**
(Admitted *Pro Hac Vice*)
**BOWMAN AND BROOKE LLP**
1441 Main Street, Suite 1200
Columbia, SC 29201
Tel. 803-726-7420 / Fax: 803-726-7421
joel.smith@bowmanandbrooke.com

**HILARIE BASS**
Florida Bar No. 334243
**HILARIE BASS, ESQUIRE LLC**
2821 Bayshore Drive, UPH-B
Miami, FL 33133
Tel. 305-505-8777
bassh@bassinstitute.org

*Attorneys for Defendant TESLA, Inc.*

14

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 29, 2025, the foregoing was filed using the

Court's CM/ECF system, which will send electronic notice of the same to all interested parties.

**Adam T. Boumel, Esq.**
Florida Bar No. 0110727
THE ROUSSO, BOUMEL LAW FIRM, PLLC
9350 South Dixie Highway
Suite 1520
Miami, FL 33156
Tel. 305-670-6669
adam@roussolawfirm.com
assistant@roussolawfirm.com
pleadings@roussolawfirm.com

*Attorneys for Plaintiff Dillon Angulo*

**Brett Schreiber, Esq.**
Admitted *Pro Hac Vice*
**Satyarinivas "Srinivas" Hanumadass, Esq.**
Admitted *Pro Hac Vice*
**Carmela Birnbaum, Esq.**
Admitted *Pro Hac Vice*
SINGLETON SCHREIBER
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
bschreiber@singletonschreiber.com
vas@singletonschreiber.com
cbirnbaum@singletonschreiber.com
jjusto@singletonschreiber.com
eelms@singletonschreiber.com
service@singletonschreiber.com

*Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides*

**Todd Poses, Esq.**
Florida Bar No. 0075922
POSES & POSES, P.A.
Alfred I. Dupont Building
169 East Flagler Street, Suite 1600
Miami, FL 33131
Tel.  305-577-0200
Fax: 305-371-3550
tposes@posesandposes.com
maria@posesandposes.com

*Attorneys for Plaintiff Neima Benavides*

**Douglas F. Eaton, Esq.**
Florida Bar No. 0129577
EATON & WOLK PL
2665 South Bayshore Drive, Suite 609
Miami, FL 33133
Tel. 305-249-1640
Fax: 786-350-3079
deaton@eatonwolk.com
cgarcia@eatonwolk.com
lhuete@eatonwolk.com

*Co-Counsel for Plaintiffs Dillon Angulo and Neima Benavides*

*s/ Wendy F. Lumish*
WENDY F. LUMISH