**CONFIDENTIAL BUSINESS INFORMATION**



45500 Fremont Blvd.
Fremont, CA 94538

October 22, 2021

**VIA SECURE ELECTRONIC TRANSFER**

Gregory Magno
Chief, VDD-D Division
Office of Defects Investigation
National Highway Traffic Safety Administration
1200 New Jersey Avenue, S.E.
Washington, D.C. 20590

RE: Preliminary Evaluation (PE) 21-020 – Response to Request for Information

Dear Mr. Magno,

This letter and its accompanying attachments respond in part to the information request (IR) dated August 31, 2021, wherein the National Highway Traffic Safety Administration ("NHTSA" or the "Agency") seeks information in connection with Preliminary Evaluation (PE) 21-020. As explained in our October 6, 2021 email, we have included complete responses to Questions 1, 2, 5, and 7-10, and partial responses to Questions 6 and 11. We will produce supplemental responses to these requests, as well as responses to Questions 3-4, on a rolling basis. Thank you for the opportunity to respond.

1. *State, by model and model year, the number of subject vehicles Tesla has manufactured for sale or lease or operation in the United States. Separately, for each subject vehicle manufactured to date by Tesla, state the following:*
   a. *Vehicle identification number (VIN);*
   b. *Model;*
   c. *Model Year;*
   d. *Subject component trade / trim name, part number and design version installed as original equipment; including:*
      i) *Software version;*
      ii) *Firmware version;*
      iii) *Hardware version;*
   e. *Date of manufacture;*
   f. *Date warranty coverage commenced;*
   g. *Date and mileage at which the "Full Self Driving" (FSD) option was enabled;*
   h. *The State in the United States where the vehicle was originally sold or leased (or delivered for sale or lease);*
   i. *Latest known vehicle mileage and commensurate date;*
   j. *Cumulative mileage covered with the subject system engaged; and*
   k. *Date and identities of the most recent software, firmware, and hardware updates.*

   *Provide the table in Microsoft Access 2010, or a compatible format, entitled "PRODUCTION DATA."*

**CONFIDENTIAL BUSINESS INFORMATION**

Page 2

Please see the attached Excel file titled "CBI_PE21-020_ProductionData.xlsx" in the accompanying folder marked for Question 1.

Please note that for Question 1(g), we do not collect or maintain such mileage information. As for the date the FSD Capability package was enabled, if the package was purchased with the vehicle, then we have included the date of delivery. If the package was purchased after delivery or by subscription, then we have provided the date of purchase/subscription. There are circumstances, however, where we may not collect or maintain such date, *e.g.*, where the package was part of a goodwill arrangement or where the vehicle has been sold and/or the package was enabled or disabled multiple times.

Please note that for Question 1(j), Tesla does not collect or maintain the requested information on an individual vehicle basis. Based upon available data, cumulative mileage from June 10, 2018, through October 20, 2021, includes:

- 2,118,529,105.84358 miles with only Traffic Aware Cruise Control ("TACC") engaged;
- 3,497,859,570.95444 miles with Autopilot (Autosteer plus TACC) engaged; and
- 1,049,679,493.0418 miles with Navigate on Autopilot engaged

For a total of 6,666,068,169.84 cumulative miles (inclusive of TACC miles, Autopilot miles, and Navigate on Autopilot miles).

2. ***State the number of each of the following, received by Tesla, or of which Tesla is otherwise aware, which relate to, or may relate to the subject system or subject crashes in the subject vehicles:***
   a. ***Consumer Complaints;***
   b. ***Field Reports;***
   c. ***Reports involving a crash, injury or fatality;***
   d. ***Property damage claims;***
   e. ***Third-party arbitration proceedings where Tesla is or was a party to the arbitration; and***
   f. ***Lawsuits, both pending and closed, in which Tesla is or was a defendant or codefendant.***

   ***For subparts "a" through "f" state the total number of each item (e.g., consumer complaints, field reports, etc.) separately. Multiple incidents involving the same vehicle are to be counted separately. Multiple reports of the same incident are also to be counted separately (i.e., a consumer complaint and a field report involving the same incident in which a crash occurred are to be counted as a crash report, a field report and a consumer complaint).***

   ***In addition, for items "e" and "f", provide a summary description of the alleged problem and causal and contributing factors and Tesla's assessment of the problem, with a summary of the significant underlying facts and evidence. For items "e" and "f," identify the parties to the action, as well as the caption, court, docket number, and date on which the complaint or other document initiating the action was filed.***

**CONFIDENTIAL BUSINESS INFORMATION**

Page 3

Tesla objects to this request on the basis that it is overly broad and unduly burdensome. Items that "may relate to the subject system" is not sufficiently specific to allow us to reasonably respond to this request. We discussed this concern with you on October 1, 2021, and we followed up with an alternative proposal on October 6, 2021. While we appreciate that NHTSA tried to narrow the scope in its October 19, 2021 response by explaining that they are interested in items that "implicate" the subject system, this clarification does not sufficiently narrow the request. The definition of "subject system" itself remains so overly broad that it could lead to the inclusion of claims that are not reasonably related to the investigation, *e.g.*, it could include claims alleging the unavailability of Autosteer and/or Traffic Aware Cruise Control due to a sensor fault, but nevertheless may still "implicate" the system.

In addition, during our discussion and in our email, we proposed to narrow the scope of responsive items to May 1, 2018. The basis for this proposal was, in large part, the unavailability of data before that time. NHTSA has nevertheless requested that we go back as far as January 19, 2017, the date the Agency closed PE16-007. However, because the response to Question 2 forms the basis for the information to be provided in Questions 3-4, we propose that once the Agency has had the opportunity to review this response, we discuss a reasonable path forward for those responses.

That said, please see the following number of responsive items between early January 2017 and mid-October 2021:

| Category | # of responsive items |
|---|---|
| a. Consumer complaints, including those from fleet operators; | 893 |
| b. Field reports, including dealer field reports; | 249 |
| c. Reports involving a crash, injury, or fatality, based on claims against the manufacturer involving a death or injury, notices received by the manufacturer alleging or proving that a death or injury was caused by a possible defect in a subject vehicle, property damage claims, consumer complaints, or field reports; | -- |
| d. Property damage claims; | 0 |
| e. Third-party arbitration proceedings where Tesla is or was a party to the arbitration; and | 1 |
| f. Lawsuits, both pending and closed, in which Tesla is or was a defendant or codefendant. | 26 |

To arrive at the numbers responsive to Question 2(a), we started with our entire customer complaint and service visit databases, which are tagged to more than 3,000 symptoms. We reviewed the symptom list for any that might reasonably be related to Autopilot or FSD Capability, or their underlying hardware and software, resulting in about 132 discrete symptoms. When we filtered by that symptom subset, the result was still too voluminous to reasonably review for relevancy because it would require manual review of the complaint narratives. However, in spot checking these results, we were able to confirm that many

**CONFIDENTIAL BUSINESS INFORMATION**

Page 4

complaints either were not relevant to the investigation or did not reasonably "implicate" the subject system, so we further concluded that this result set was not the appropriate one to provide. As examples, this initial filtering included results like the following:

Example 1:

- Complaint Narrative (stated by Customer): "Customer states that TACC is not working at all."
- Technician Narrative (stated by Service tech): "Condensation in left hand repeater caused malfunction in repeater camera, which caused fault in TACC. Replacement of repeater on line 3 resolved this concern."

Example 2:

- Complaint Narrative (stated by Customer): "#VSC [FastLane] Concern 1: Autopilot is no longer working - needs radar calibration Tech Notes: Perform a radar calibration and verify correct operation of the autopilot system."
- Technician Narrative (stated by Service tech): "Push latest firmware to customer vehicle. Check camera calibration. Test autopilot on several roads and highways. Verify proper operation after repairs."

Example 3:

- Complaint Narrative (stated by Customer): "#VSC Client states the auto park feature is not operational. The "blue box" for auto parking rarely lit up."
- Technician Narrative (stated by Service tech): "2019-05-05 20:29:16 Confirmed auto park feature works. performed front and rear parking sensor test and confirmed working as design. no problem found with autopark feature.  2019-05-05 20:25:38 Function tested all parking sensors and confirmed all sensors are communicating. Road tested vehicle and tested auto-park feature. Able to enable the auto-park feature in parallel and perpendicular parking situation. The vehicle must complete certain criteria (see owners manual) in order to enable the option to use the auto-park feature."

In an attempt to filter some of this "noise," we ran a query against the narratives in the initial results, looking broadly for anything that may have involved a potential safety impact. Our search included terms such as "accident," "crash," "colli," "hit," "injur," "hurt," "death," and "property damage." This query led us to more than 6,000 results, which we then manually reviewed to see whether the text narratives "implicated" the subject system by alleging that a crash occurred and that the subject systems was the cause of the concern. Based upon this review, we were able to determine the approximately 900 items reasonably responsive to subpart (a).

HIGHLY CONFIDENTIAL

**CONFIDENTIAL BUSINESS INFORMATION**

Page 5

As for subparts (b) through (f), because these databases are significantly more manageable, we included any responsive items that included allegations related in any way to the subject system in a subject vehicle.

5. **For each trade name / trim level of the subject system available in the subject vehicles, state its name and designation including:**
   a. **Describe the ODD specified to the customer by Tesla for the intended use of the system, including but not limited to:**
      i) **Types of roads, road marking, weather conditions, etc. the system is intended to be used on and the types of roads the system should not be used;**
      ii) **List the methods and technologies used to prevent subject system usage outside the ODD specified to the customer by Tesla; and**
      iii) **If the subject system can be engaged (or remain engaged) outside of the ODD specified to the customer by Tesla, state the reasons for this capability and describe any performance restrictions or modifications to the subject system's operational characteristics in such an environment (e.g. slower maximum speeds or control authority, additional driver warnings, adjustments to the driver engagement system).**

Autopilot and FSD Capability are SAE Level 2 driving automation system features designed solely to support and assist – and not to replace – the driver in performing the driving task. As driver support features, Autopilot and FSD Capability are currently capable of performing only part of the driving task (*i.e.*, longitudinal and lateral vehicle motion control and *some* object and event detection and recognition), while the driver is required to perform the remaining tasks, supervise system performance, and respond to inappropriate actions taken by the system. Under the SAE Level 2 taxonomy, the driver's role also includes "[d]etermin[ing] whether/when engagement and disengagement of the driving automation system is appropriate." *See* SAE J3016, Table 2 (Apr. 2021).

Given the significant role that the driver plays, a rigid set of operational design domains centered around road classification or geometry is not necessary or even appropriate. The world is a complex, often-changing environment and drivers of vehicles equipped with SAE Level 2 driving automation system features – like the subject systems – may find themselves in a wide variety of scenarios. As a result, the usage of such features is more appropriately determined by the driver, who is best suited to assess his or her surroundings in real time and determine whether the system can be safely and appropriately used.

That said, there are limits to the currently available technological capabilities of the subject systems (including object and event detection and recognition) and there are preferred environments and conditions the subject systems are designed to be operated in, which could be loosely construed as an operational design domain. In some cases, where conditions may be inadequate to provide optimal performance, we opt to limit availability of features. For example, Autosteer performance may be limited in certain conditions, such as when visibility is poor (*e.g.*, heavy rain, snow, fog, etc.), weather conditions are interfering with sensor operation (*e.g.*, ice or snow), or when bright light (*e.g.*, direct sunlight) is interfering with the view of the camera(s). To mitigate these scenarios, Autopilot's vision system will

<div style="text-align:center">**CONFIDENTIAL BUSINESS INFORMATION**</div>

Page 6

attempt to detect when the forward-facing cameras are occluded and issue a "take over immediately" alert to the driver.

Similarly, we may limit the availability of features based upon the presence or absence of certain road characteristics. For example, Autosteer may be restricted if the system detects the presence of a gore area or infeasible path, or the absence of lane lines. We may also restrict the use of some features to specific road types, such as is the case for Smart Summon. We may further limit the ability of the driver to set the cruising speed above a certain threshold on some roads based on road class or detected road speed restrictions.

As SAE Level 2 driving automation system features, the subject systems attempt reasonable, but not complete, control for undesirable conditions and adverse scenarios; hence the role of the driver as the supervisor. As we've previously explained in connection with PE16-007, we considered the possibility that drivers may attempt to use the system outside of preferred environments and conditions and in circumstances that the subject system does not control for. To curb such use, we developed extensive warnings in the owner's manual; additional in-vehicle warnings both when enabling Autosteer functionality for the first time and every subsequent time Autosteer is engaged; a user interface that displays the system's detection of lanes and surrounding vehicles; and roadway-dependent speed restrictions.

For a more fulsome description of Autopilot and FSD Capability features, including how to engage and operate the system, intended use and limitations, and warnings provided to customers, please see the "Autopilot" section of the owner's manual for each vehicle model, available at: https://www.tesla.com/ownersmanual. (To access the owner's manual, select a vehicle model, then select English (United States/Canada) under the North America heading, and then select the Autopilot drop-down.) For the FSD Capability City Streets (Beta) feature, owner's manual content is only available in-vehicle for those customers that are part of the pilot. A copy of this section is attached in the accompanying folder marked for Question 5.

    b. **Describe the subject system's maximum control authority over steering (steering angle (degrees), rate (degrees / sec), lateral acceleration (g)), braking (g), and acceleration (g) functions during routine and crash-imminent operations. Separately include any additional conditions and control authority values that Tesla deems appropriate.**

Please see the attached file titled "CBI_Question 5b.pdf" in the accompanying folder marked for Question 5.

    c. **List and describe the information, system status, alerts, warnings, and graphics communicated by the subject vehicle to its driver during the DDT (e.g., warning lights,**

**CONFIDENTIAL BUSINESS INFORMATION**

Page 7

> *instrument panel animations, aural warnings, haptic warnings) during the following subject system operational conditions:*
> *i) Routine subject system operation;*
> *ii) Scenarios where the vehicle requires driver intervention (e.g., driver engagement needed, imminent ODD exit, system fault); and*
> *iii) When the subject vehicle detects that a crash is imminent.*

Please see the attached file titled "CBI_Question 5c.pdf" in the accompanying folder marked for Question 5.

> d. *Furnish an overview of Tesla's approach to the enforcement of driver engagement / attentiveness during the subject system's operation in the subject vehicles. Include a description of all means of detecting (both through direct measurement and inference) / monitoring driver engagement / attentiveness including:*
> *i) The technological means and related logic (including direct measurement or inference) used to sense driver engagement / attentiveness;*
> *ii) Minimum contact or detected engagement duration and time between contact / detected engagement required to satisfy the driver engagement / attentiveness logic including changes based on variations in driving conditions such as vehicle speed or presence of a lead vehicle;*
> *iii) Describe any warning strategies or messaging and timing associated with each system identified above in subpart (ii) (include pictures/videos of all audible & visual warnings/alerts); and*
> *iv) Describe any escalation or lockout strategies used to address either unresponsive drivers or repeated engagement warnings in any given drive cycle.*

Driver distraction and inattentiveness in manual driving is a long-standing cause of a significant percentage of crashes and injuries on U.S. roadways each year. As we explained in our prior response in PE16-007, reducing the risk of such occurrences is one of the most important benefits of Autopilot and FSD Capability. However, just as countless drivers fail to pay attention during manual driving, Tesla engineers considered that a driver might also fail to pay attention while using Autopilot. To that end, we have made several design implementations in driver engagement and monitoring, both to prevent distraction and mitigate attempts to abuse the monitoring system. As the fleet grows and we gain billions of more miles of experience, we learn more and more about driver usage and rare corner cases and will continue to make improvements and updates as needed to maximize overall vehicle safety.

We use a combination of sensors to measure driver engagement, including a steering torque sensor, steering wheel stalks, scroll wheels and buttons, an interior camera, seatbelt buckle sensors, seat occupancy sensors, and exterior cameras that detect road conditions (*e.g.*, poor weather, emergency lights, construction zones, tollbooths). Our approach does not rely on any single source of information, but rather a combination of inputs from available sensors, vehicle conditions, roadway scenarios, and patterns of driver interaction with the system that together increase the system's confidence in driver attentiveness. While the introduction of new signals (such as the recent introduction of cabin cameras) can help to catch more cases of distraction, ultimately existing signals such as steering wheel torque are

HIGHLY CONFIDENTIAL

still needed to provide holistic assessments of attention and engagement. For an SAE Level 2 driving automation system feature where the driver is responsible to supervise system performance and respond to inappropriate actions taken by the system, periodically requesting torque on the steering wheel can also minimize latency, should the driver need to intervene.

If a driver is determined to be inattentive or unresponsive, the vehicle will issue audible, visual, and/or haptic warnings (*e.g.*, steering wheel vibration for an LDW or for lane change confirmation) to indicate that the driver needs to engage with the system. In issuing such warnings, we err on the side of caution. In some cases, the system may issue these attentiveness alerts or require confirmation to take certain actions even when the driver is fully attentive. The frequency and timing of these warnings may vary depending on vehicle speed, road conditions, and the presence of other vehicles. If the driver does not provide confirmation of attentiveness, Autopilot functions are made unavailable. Our approach accounts for sensor variation, measurement noise inherent in nominal driving, and patterns that emerge in different roadway scenarios. We also go beyond simple monitoring, including implementing changes that mitigate effectiveness of defeat devices and attempts to trick seat sensors or interfere with the interior camera. Implementation details are outlined below.

Driver monitoring is one of many important considerations in Tesla's approach to increasing overall vehicle safety, and the success of these combined efforts is best reflected by a lower overall collision rate compared to manual driving when Autopilot is engaged (as reported in our Quarterly Safety Reports available at https://www.tesla.com/VehicleSafetyReport).

For further detail, please see the attached file titled "CBI_Question 5d.pdf" in the accompanying folder marked for Question 5.

  e. **Describe subject system responses to driver control inputs that could cancel or override one or more of its Level 2 functions. For each driver input, include:**
    i) **Driver input description and minimum threshold (e.g., minimum steering angle or rate);**
    ii) **List the Level 2 functions disabled and permitted to continue operation following a driver override;**
    iii) **Describe / illustrate warnings and messages to the driver concerning the system status following a driver override; and**
    iv) **Explain which, if any, of the disabled Level 2 functions resume operation in their own after the override input and under what conditions.**

Please see the attached file titled "CBI_Question 5e.pdf" in the accompanying folder marked for Question 5.

  f. **List the conditions / events / alerts that may prompt an operating subject system to require a "take-over" by the driver. For each such condition, list:**
    i) **Sequence of events and timing for each; and**

**CONFIDENTIAL BUSINESS INFORMATION**

Page 9

> *ii) Intended vehicle behavior in the instance where a driver take-over is not detected.*

Please see the attached file titled "CBI_Question 5f.pdf" in the accompanying folder marked for Question 5.

> **g. Describe the subject system OEDR capabilities within the ODD specified to the customer by Tesla. List the objects and events that the system is designed to detect (e.g., particular vehicle aspects, pedestrians, road signs, drivable space limitations, environmental (weather / road surface / lighting) conditions, path predictions, object classifications). For each item, list:**
> *i) Subject system behavior;*
> *ii) Limitations on detection; and*
> *iii) Subject system interaction with crash avoidance technologies.*

The subject systems use information from the camera and/or the radar to form "control relevant tracks." Each control relevant track can be a combination of vision detections and radar detections or may be composed of detections from only one sensor depending upon vehicle equipment and circumstance. If the track is consistent, we model realistic boundaries and use them to determine how the vehicle should interact with the object detected. For example, the vision system takes camera images and runs them through a set of neural networks to generate detections of objects, and then classifies them into "types" including: Bicyclist, Motorbike, Pedestrian, Animal, Vehicle.

There are a number of signals used to generate tracks (*e.g.*, for objects) or to otherwise perceive the environment (*e.g.*, visibility) or determine driveable regions within the field of view (*e.g.*, lane lines). Each signal has a large set of attributes that undergo threshold tuning based on factors such as precision/recall and qualitative inspection. Heuristics are implemented to account for detection limitations that may occur, *e.g.*, false positives, occlusions, rare object types, or visually challenging conditions. The exact set of signals running at any given point may depend on several factors such as road conditions, hardware configuration (*e.g.*, radar equipped, HW3, etc.), and release version. Because vision signals are used as one factor among many to determine crash avoidance behavior, the interaction of these signals with crash avoidance technologies is a function of several environmental and road scenario specific factors.

For a list of signals broken down by vehicles equipped with radar and those built without, please see the attached file titled "CBI_Question 5g_Vision Signals.pdf." For further detail on the relationship between vision signals and crash avoidance features, please see the attached file titled "CBI_Question 5g_Autopilot_Functional_Requirements_Longinatudinal_Collision_Management.pdf." Both files are included in the accompanying folder marked for Question 5.

> **6. Produce copies of all instructional, service, warranty, marketing, and other documents that relate to, or may relate to, the operation of each trade name / trim level of the subject system in the subject vehicles, that Tesla has issued to any customers, dealers, regional or zone**

**CONFIDENTIAL BUSINESS INFORMATION**

Page 10

> offices, field offices, fleet purchasers, or other entities. This includes, but is not limited to, bulletins, advisories, informational documents, training documents, digital messages on a subject vehicle display, or other documents or communications, with the exception of standard shop manuals. Also, include the latest draft copy of any communication that Tesla is planning to issue within the next 120 days.

Please see the attached files in the accompanying folder marked for Question 6, which includes the results of our preliminary search for responsive documents. Specifically included are service communications, bulletins, Toolbox articles, and other service-related information, as well as some digital messages on a subject vehicle display. Please note that for service communications and announcements, as explained during our October 1, 2021 discussion and in our October 6, 2021 email, we migrated to a new database in or about November 2019. Not all historic documentation migrated over and, as a result, some documentation may not have been preserved. For service materials that pre-date the migration, we have identified an unrelated legal production that may contain responsive materials. We are reviewing those records and will supplement our response as necessary once that review is complete.

We are continuing to search for marketing materials and other customer facing communications and will supplement this response once that review is complete. In the meantime, we direct your attention to our Autopilot webpage (tesla.com/autopilot), company blog posts (tesla.com/blog), and social media accounts (@Tesla on Twitter, LinkedIn, YouTube, and Vimeo, and @Teslamotors on Instagram).

7. *For each trade name / trim level of the subject system available in the subject vehicles, describe all modifications or changes made by, or on behalf of, Tesla in the design, material composition, manufacture, quality control, supply, function, or installation of the subject system, from the start of production to date, which relate to, or may relate to driver engagement / attentiveness and OEDR by the subject system in the subject vehicles. For each such modification or change, provide the following information:*
   a. *The date or approximate date on which the modification or change was incorporated into vehicle production;*
   b. *A detailed description of the modification or change;*
   c. *The reason(s) for the modification or change;*
   d. *The hardware, firmware, and software names and numbers of the original version;*
   e. *The hardware, firmware, and software names and numbers of the modified version;*
   f. *Primary distribution method of related firmware and software updates (over the air or in person service); and*
   g. *When the modified version / update was made available as a service component.*

   *Also, provide the above information for any modification or change that Tesla is aware of which may be incorporated into vehicle production or pushed to subject vehicles in the field within the next 120 days.*

Please see the attached file titled "CBI_Question 7.pdf" in the accompanying folder marked for Question 7. Based upon a reasonable inquiry, the file contains a chronology of FW releases that included a

material or otherwise significant update or improvement to driver state monitoring or object and event detection and recognition.

8. **Describe Tesla's strategies for detecting and responding to the presence of first responder / law enforcement vehicles and incident scene management tactics whether in or out of the roadway during subject system operation in the subject vehicles. Include:**
   a. **Incident scene detection (particularly flashing lights, road flares, cones / barrels, reflectorized vests on personnel, vehicles parked at an angle "fend-off" position");**
   b. **Explain the effects of low light conditions on these strategies; and**
   c. **List subject system behaviors (e.g., driver warnings, control interventions).**

In general, the subject systems do not differentiate emergency vehicles with activated caution lights from other vehicles on the road, regardless of whether it's day or night. For vehicles not running Tesla Vision, the current vision system is based on single frames, so it sees each moment of time individually and tries to detect a vehicle in each frame using only that frame. In the case of flashing lights, the frames will alternate between extremely saturated (*i.e.*, bright, blinding light washing out the camera) and extremely dark (*i.e.*, no light in the scene). A human interprets this rapidly oscillating light intensity as a source of caution whereas the current Autopilot system sees frames that are either very dark or very bright, which may lead to missed detections.

Because the subject systems are SAE Level 2 driver support features, they are not currently designed to be responsible for complete object and event detection and recognition. The driver therefore maintains dual responsibility for this part of the driving task. He or she is responsible for supervising system performance and responding to inappropriate actions taken by the system, including where the system is unable to detect an object in the vehicle's path. The owner's manual clearly explains that Autopilot "may not recognize or detect oncoming vehicles, stationary objects, and special-use lanes such as those used exclusively for bikes, carpools, emergency vehicles, etc." It further instructs the driver: "Remain alert at all times and be prepared to take immediate action. Failure to do so can cause damage, injury or death." (*See* owner's manuals linked in Question 5.a. above).

Notwithstanding the above, in an effort to continuously improve the customer experience and enhance our customers' overall safety, last month, we deployed a software update to certain vehicles equipped with HW3 to enhance system detectability for activated caution lights. We previously discussed this improvement with NHTSA beginning on March 19, 2021, followed by a revisit on July 16, 2021, and most recently a deeper dive on September 22, 2021.[1]

---

[1] Copies of the presentation materials for all discussions were submitted to NHTSA Chief Counsel under a request for confidential treatment.

**CONFIDENTIAL BUSINESS INFORMATION**

Page 12

For further information on the subject systems' OEDR capabilities with respect to caution lights, please see the attached file titled "CBI_Question 8.pdf" in the accompanying folder marked for Question 8.

With respect to incident scene detection of cones/barrels, where there is a series of cones adjacent to the ego vehicle's lane, the system will perform an uncommanded lane change in the opposite direction of the cones if safe and available to do so. For further information, please see the "Lane Change Away from Cones" information provided in our response to Question 7.

9. *Describe any processes, procedures, or policies governing the extent of testing and validation required prior to the release of the subject system or an in-field update to the subject system, including hardware and software components of such systems, identifying, in particular:*
   a. *The extent of field testing or vehicle validation miles required prior to the release of such a system or feature;*
   b. *The extent of any computer simulations or training data sets required to be conducted prior to the release of such a system or feature and the degree to which any such simulations are relied upon for testing and validation in lieu of field testing;*
   c. *The extent to which the processes, procedures, or policies for the testing and validation identified above differ, if at all, for updates to a subject system or feature (e.g. software updates) compared to the first release of the system or feature;*
   d. *The length of time that the processes, procedures, or policies for the testing and validation identified above have been in place; and*
   e. *Any processes, procedures, or policies in place to compare the performance of a subject system or feature in the field after a release with the design intent for the system or feature.*

During the past five years, Tesla provided NHTSA with information on our development, validation, and testing process on numerous occasions; including, but not limited to, our December 30, 2016, response to the Special Order issued in PE16-007, our voluntary Quarterly Updates to ODI on June 15, 2018, and March 27, 2019, and most recently during our May 12, 2021, meeting with NHTSA leadership.[2] While the processes and procedures have grown and matured organically over time, they have largely followed the same pattern, employing both internal development and validation activities, as well as in-field evaluation, as the significant investment, overhead, and time required to do this well is essential to unlocking quick iteration and high-quality software improvements.

At a high level, the development process begins at inception, *i.e.*, the point at which we have the idea to pursue an update or feature. We regularly review real world use of the subject systems and constantly learn from the fleet about our customers' interaction with these features. This data allows us to identify opportunities for continuous improvement, introduce new features, and highlight additional areas for research.

---

[2] Copies of the presentation materials for all discussions were submitted to NHTSA Chief Counsel under a request for confidential treatment.

**CONFIDENTIAL BUSINESS INFORMATION**

Page 13

After defining specifications and requirements for these software updates, we develop and validate the software using industry best practices. Validation includes initial software functional development, simulation, hardware and software in-the-loop testing, system-level and regression testing, and test track and on-road engineering testing. Multiple departments perform cross-functional reviews of the entire process. Their reviews may include demonstrations of the specifications, risk management and mitigation, development and validation results, compliance reviews, and failure modes and effects analysis.

After validation and reviews are complete, we often release a feature to our Early Access customer program and other small stage rollouts to gauge initial feedback and identify any unforeseen challenges with implementation. We make more refinements as necessary, and only after we are fully satisfied with performance, integrity, and safety do we finally push the feature or improvement to the entire customer fleet as part of an OTA software update.

The graphic below further illustrates the current process at a high level:



NEW FEATURE DEVELOPMENT AND VALIDATION

While this graphic illustrates the general activities in the validation process, the extent to which we use any one activity may vary by individual update, as does the amount of time that may be spent on each activity. Also, this process is not strictly linear. If at any point in the process, further development or validation appears necessary or appropriate, the update will go back through the cycle.

The key activities in this process can be further described as follows:

**CONFIDENTIAL BUSINESS INFORMATION**

Page 14

**Internal Development**

- Vision Network Evaluation – Each neural network undergoes quantitative review (*e.g.*, precision/recall), and models are selected based on their detection performance on extensive test sets of real-world scenarios. Our vision network test sets currently include nearly 200,000 images and more than 20,000 video clips that have been hand-picked for the evaluation set.

- Hardware in-the-Loop Simulation – Changes are tested against computer simulated scenarios to ensure edge cases, or scenarios that are infrequent during real world driving, are properly tested. Our simulation sets are parameterized to ensure a wide range of vehicle (*e.g.*, vehicle speed) and environmental (*e.g.*, road congestion) situations are represented. Our simulation set includes approximately 680,000 scenarios that are tested every week.

- Regression Evaluation – Before every release, a full regression test is performed using historical data. This evaluation includes approximately 17,500 clips curated over the past 3 years that are tested regularly and used to sign off all new software releases. This evaluation dataset has been extracted from roughly 29 billion total miles or 6.7 billion TACC/AP/NoA miles of driving from the fleet as well as internal testing.

- QA Vehicle Testing – Candidate builds are driven by trained operators who provide qualitative (*e.g.*, discomfort approaching curbs) and quantitative (*e.g.*, number of interventions) feedback on the software. The testing fleet includes more than 300 vehicles across more than 10 U.S. cities, including approximately 50 test routes executed each week and more than 2,000 test miles per day on latest software:



- Track Testing – Closed loop tests with pedestrian and vehicle dummies are performed to ensure compliance with regulatory standards and confirm expected behavior in real world, safety critical

**CONFIDENTIAL BUSINESS INFORMATION**

Page 15

scenarios. We have capabilities to run 30+ vehicle and 15+ pedestrian/bike tests in-house. Tests are usually run multiple times a month, depending on the frequency of major changes.

<u>**In-Field Evaluation**</u>

- Shadow Mode – Once a feature has undergone sufficient internal testing and we are ready to evaluate its performance in a scaled environment, we typically introduce it inertly into customer vehicles to observe how it performs across millions of real-world miles. When operating in this mode, the feature does not control the car. The software silently operates in the background, logging and analyzing the action it would have performed had it been active while transmitting anonymized data back to our development team for evaluation. From this data, we assess things like true-positive performance rates, false-positive performance rates or disagreements between what the driver did and what the feature did. This data is fed back into engineering development to build out evaluations and improve the feature until the Shadow Mode results confirm a feature's performance metrics are sufficient for it to be enabled for control in a production environment. Shadow Mode is primarily used as a tool for measuring performance at scale, since it operates in an open-loop environment (which means the feature's performance is dependent on how the customer drives). For some features, it is also helpful to measure closed-loop behavior (where the feature's action at *t+1* is dependent on its action at *t* rather than the driver's action at *t*). This is why the Early Access Program and the Phased Release evaluations are also useful (see below).

- Early Access Program ("EAP") – Once a feature has undergone sufficient internal testing and/or Shadow Mode, we are ready to evaluate the subjective customer experience and closed-loop behavior in a wider audience. We release it to a small subset of customers who have volunteered to test new features and provide feedback. During this phase of the development process, a feature typically undergoes evaluation by up to approximately 2,000 customers including up to one million miles of driving, depending on the need. We collect data and drive-reports from these testers, feed that back into the engineering development loop to build out evaluations and make iterative improvements to the feature, often releasing several new software versions to the EAP group before exploring a Phased Release.

- Phased Release and Continuous Improvement – Only after features make it through our validation procedures in Shadow Mode and/or Early Access do we begin to roll it out to the entire customer base, in a gradual manner consisting of increasingly large waves of customers. General customers who are not in the Early Access Program can request to be part of the 'early waves' of a wide release, which gives us another opportunity to learn more about the new feature, in a controlled manner, as it begins to scale. As waves are released, and as data quickly

accumulates, we continue to monitor key performance indicators of the new feature to ensure it scales safely and as expected.

We also make ongoing improvements as more mileage is accumulated over time with the feature enabled. These ongoing improvements, depending on their size, may only require a subset of the development/validation procedures described above.

10. **Describe Tesla's processes for identifying and investigating the subject crashes in the subject vehicles with the subject system in operation including:**
    a. **Vehicle's Data collection/logging capabilities including vehicle's ability to wirelessly transmit data including:**
       i) **Any limitations on such transmittal (e.g. poor wireless connectivity, etc.)**
       ii) **Countermeasures / alternate retrieval options when transmittal limitations apply;**
    b. **Procedures for investigating customer concerns or safety incidents; and**
    c. **Metrics used to assess safety performance.**

During the past five years, Tesla provided NHTSA with information on our vehicle data collection and logging capabilities and our process for identifying and investigating crashes on numerous occasions; including, but not limited to our voluntary Quarterly Update to ODI on June 15, 2018, and our recent May 26, 2021, meeting with NHTSA leadership.[3]

**Vehicle Data Collection/Logging Capabilities**

Our principal collision data collection and logging capabilities can be summarized as follows:



---

[3] Copies of the presentation materials for all discussions were submitted to NHTSA Chief Counsel under a request for confidential treatment.

**CONFIDENTIAL BUSINESS INFORMATION**

Page 17

Specific sources of collision data include:

- UI Telemetry/D16 – Varying data of interest based on internal needs (may include data regarding AP, charging, UI interactions, etc.); closest to "streaming" telemetry, these files are the smallest, and have the highest chance of upload.

- Event Data Recorder ("EDR") – Following a crash, an urgent alert is immediately transmitted; the alert is a small file that contains crash notification, timestamp, and VIN; and depending on model, may also include vehicle speed, steering angle, pedal applications, and seatbelt status.

- Carlogs – Data regarding vehicle state (*e.g.*, speed, gear, alerts); periodically transmitted pseudonomously, but may be uploaded by VIN via cellular for urgent events (*e.g.*, crash); contains more than 10,000 distinct signals.

- Autopilot Clips (formerly, Snapshots) – Data regarding Autopilot performance (may include video (~30s), CAN traces, and other vital information); collected based on certain trigger conditions (*e.g.*, AEB events, crashes, other topics of interest).

- Other Data Sources:

    o Autopilot Syslogs – Text logs that provide diagnostic information about how the AP computer is functioning.

    o "Triplogs" – Text file uploaded by the Autopilot computer at the end of each trip (*i.e.*, when the vehicle shifts to park); anonymized and contains a very high-level overview of what happened in the trip (*e.g.*, the number of miles driven, the percent of time that the driver was using different functions, at what speeds the car was travelling, how many lane changes were made, etc.).

Remote upload of data (*i.e.*, via cellular or wi-fi networks) greatly depends on vehicle connectivity, cellular reception, vehicle damage, state of power, and crash severity. Upload can range from full to partial to no data sets. The default method for transmitting data is largely determined by urgency and cost. Examples of urgent items that may be transmitted over cellular networks (LTE) include collision data and Early Access Program information. Example of low-cost items that may be transmitted by LTE include small telemetry files (*e.g.*, D16) and triplogs. Everything else is generally transmitted over wi-fi. If there is a collision and the vehicle cannot connect to a wi-fi network, then any data that has a wi-fi-only upload policy (*e.g.*, carlogs) will not be uploaded until the vehicle can again connect to a wi-fi network. If we do not receive data wirelessly, we may be able to retrieve it physically from the vehicle (*e.g.*, by retrieving the EDR module or SD card). There also may be instances where a crash is so severe that physical retrieval does not yield any readable data.

**CONFIDENTIAL BUSINESS INFORMATION**

Page 18

**Procedures for Investigating Customer Concerns or Specific Incidents**

Tesla collects information regarding potential customer concerns primarily from Tesla service technicians (who are also employees of the Company). Tesla service staff and technicians monitor potential vehicle malfunctions, issues, or complaints from their customers and report this information to field technical specialists, service management, and service engineering through Toolbox.[4] A Tesla service technician may create a Toolbox session for a particular issue involving a specific vehicle or they may report issues appearing on multiple vehicles. The Toolbox session is then the forum for determining the appropriate resolution and escalating topics to service engineering staff, such as where there have been repeat visits for the same issue, an issue that is not covered by existing repair procedures or other service documentation, or an issue that is novel, complex, or otherwise appropriate for escalation based on the service technician's judgment.

Tesla may also learn of potential vehicle malfunctions, issues, and complaints in the field through vehicle telematics, NHTSA VOQs, customer service contacts, social media postings, media reports, and government inquiries.

As items are escalated, they are fed into a twice-weekly forum of responsible engineering leaders, subject matter experts, field quality personnel, and legal staff. The team assesses the issue, determines appropriate actions regarding investigation, data collection, and failure analysis, evaluates root cause, and makes recommendations on appropriate field action if necessary.

In addition, Tesla has implemented a robust, automated process for receiving vehicle crash data that may identify incidents responsive to NHTSA Standing General Order 2021-01, which we explained to NHTSA on August 24 and September 17, 2021[5]. As we explained, through this process, we receive D16 crash records and run a process to check them against EDR and available tow data to determine whether they are responsive to the SGO criteria. Incidents meeting the criteria of the SGO are then reported within 1 day. We also review all reportable events received within a given week at the end of the week to evaluate whether we have received any new information.

---

[4] Toolbox is a proprietary Tesla platform that enables service technicians to capture vehicle details, including photographs, videos, and log data, as well as tag regional leads who may in turn tag subject matter experts and responsible service engineers for assistance diagnosing or repairing a vehicle.

[5] Copies of the September 17, 2021 presentation materials were submitted to NHTSA Chief Counsel under a request for confidential treatment.

<p style="color:red; text-align:center;">**CONFIDENTIAL BUSINESS INFORMATION**</p>

Page 19

> **11. Furnish Tesla's assessment of the impact of the subject system on the subject crashes in the subject vehicle, including:**
>    **a. The causal or contributory factor(s);**
>    **b. The failure mechanism(s);**
>    **c. The failure mode(s);**
>    **d. The risk to motor vehicle safety that they pose; and**
>    **e. The crashes referenced by this inquiry.**

For our assessment of the 12 crashes identified in the IR letter, please see the Excel file titled, "CBI_PE21-020_Incident List" in the accompanying folder marked for Question 11. As explained during our October 1, 2021 discussion and in our October 6, 2021 email, the full response to Question 11 is dependent upon the response to Question 3, for which we have proposed a rolling submission. To that end, we intend to add an "assessment" column to the responsive spreadsheet for Question 3, similar to what we did for the rolling productions in response to the April 19, 2021 Autopilot IR.

Included in the attached Excel file are Tesla's assessments for each of the 12 incidents. As explained during our October 1, 2021 discussion and in our October 6, 2021 email, the information provided for the 12 incidents in this response is generally duplicative of the information provided in our responses to prior requests from NHTSA about these 12 incidents. Specifically, information about the incidents (available data logs, EDR, clips, and/or answering specific questions or requests from NHTSA, etc.) was previously submitted to the Agency on the following dates:

| Incident Reference | Information Submitted to NHTSA in Response to Agency Requests |
|---|---|
| Charlotte, NC – Aug. 2020 | Feb 5, 2021; May 19, 2021 (duplicative) |
| Cloverdale, IN – Dec. 2020 | Jan 2, 2020; Feb 14, 2020; May 19, 2021 (duplicative) |
| Culver City, CA – Jan 2018 | May 18, 2018 |
| Laguna Beach, CA – May 2018 | Aug. 12, 2019; May 19, 2021 (duplicative) |
| Lansing, MI – March 2021 | March 17, 2021; March 25, 2021; May 19, 2021 (duplicative) |
| Miami, FL – May 2021 | May 29, 2021 |
| Montgomery (Splendora), TX – Feb 2021 | March 7, 2021; May 19, 2021 (duplicative) |
| Norwalk, CT – Dec. 2019 | Dec. 18, 2019; May 19, 2021 (duplicative) |
| Orlando, FL – Aug. 2021 | Aug. 29, 2021; Aug. 30, 2021 (SGO-duplicative) |
| San Diego, CA – July 2021 | July 12, 2021 |
| Tucson, AZ – July 2020 | Sep. 3, 2020; May 19, 2021 (duplicative) |
| W. Bridgewater, MA – Dec. 2019 | Jan. 31, 2020; May 19, 2021 (duplicative) |

As a courtesy, we are providing the same information for the 12 incidents again in the accompanying sub-folders titled by incident location and date in the folder marked for Question 11.

<p style="text-align:center;">* * *</p>

**CONFIDENTIAL BUSINESS INFORMATION**

Page 20

Thank you for your consideration. If you have any questions, please contact me at <u>egates@tesla.com</u>.

Sincerely,

*[signature]*

Eddie Gates
Director, Field Quality