```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF FLORIDA
                              MIAMI DIVISION
                      CASE NO.  1:21-cv-21940-BB


NEIMA BENAVIDES, as Personal
Representative of the Estate of
Naibel Benavides Leon, deceased,

          Plaintiff,                        July 14, 2025
                                            9:14 a.m.
               vs.

TESLA, INC., a/k/a Tesla Florida, Inc.,

          Defendant.                        Pages 1 THROUGH 239
_____

DILLON ANGULO,

          Plaintiff,

               vs.

TESLA, INC., a/k/a Tesla Florida, Inc.,

          Defendant.
_____


                     TRANSCRIPT OF TRIAL DAY 1
                 BEFORE THE HONORABLE BETH BLOOM
                   UNITED STATES DISTRICT JUDGE
                         And a Jury of 9

Appearances:

FOR THE PLAINTIFFS: SINGLETON SCHREIBER
                    BRETT SCHREIBER, ESQ.
                    591 Camino De La Reina, Suite 1025
                    San Diego, California 92108

                    POSES LAW GROUP, PA
                    TODD POSES, ESQ.
                    169 East Flagler Street, Suite 1600
                    Miami, Florida 33131
```

APPEARANCES CONTINUED:

FOR THE PLAINTIFFS: EATON & WOLK, PL
DOUGLAS F. EATON, ESQ.
2665 South Bayshore Drive, Suite 609
Miami, Florida 33133

THE ROUSSO BOUMEL LAW FIRM
ADAM T. BOUMEL, ESQ.
9350 South Dixie Highway, Suite 1520
Miami, Florida 33156


FOR THE DEFENDANT:  BOWMAN AND BROOKE, LLP
JOEL H. SMITH, ESQ.
1441 Main Street, Suite 1200
Columbia, South Carolina 29201

BOWMAN AND BROOKE, LLP
THOMAS P. BRANIGAN, ESQ.
101 West Big Beaver Road, Suite 1100
Troy, Michigan 48084

BOWMAN AND BROOKE, LLP
WHITNEY V. CRUZ, ESQ.
WENDY F. LUMISH, ESQ.
Two Alhambra Plaza, Suite 800
Coral Gables, Florida 33134

GREENBERG TRAURIG
HILARIE BASS, ESQ.
333 Southeast 2nd Avenue, Suite 4400
Miami, Florida 33131


COURT REPORTER:     Yvette Hernandez
U.S. District Court
400 North Miami Avenue, Room 10-2
Miami, Florida 33128
yvette_hernandez@flsd.uscourts.gov


ALSO PRESENT:       Neima Benavides
Dillon Angulo
George Mayleben
William Scandella

3

**I N D E X**

Certificate....................................... 239

Voir Dire ....................................... 20

Jury Sworn ...................................... 154

Preliminary Jury Instructions .................. 155

Plaintiff Opening Statement .................... 173

Defendant Opening Statement .................... 201

Yvette Hernandez, Official Court Reporter
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698

(Call to order of the Court, 9:14 a.m.)

COURTROOM DEPUTY: Calling Civil Case Number 21-21940, Neima Benavides, as Personal Representative of the Estate of Naibel Benavides Leon, Deceased, and Dillon Angulo, Plaintiffs, v. Tesla, Incorporated, Defendant.

Counsel, please state your appearances, beginning with Plaintiffs' counsel.

MR. SCHREIBER: Good morning. Brett Schreiber on behalf of the Plaintiffs.

MR. POSES: Good morning. Todd Poses for the Plaintiffs.

MR. EATON: Good morning, Your Honor. Douglas Eaton on behalf of the Plaintiffs.

MR. BOUMEL: Good morning, Your Honor. Adam Boumel on behalf of the Plaintiffs.

MR. HANUMADASS: Good morning, Your Honor. Srinivas Hanumadass for the Plaintiffs.

MR. NAVARRO: Good morning, Your Honor. Xavier Navarro on behalf of the Plaintiffs.

THE COURT: There are two other individuals that are seated at counsel table.

MR. LAZARUS: Ed Lazarus, not counsel.

MR. SCANDELLA: William Scandella, not counsel.

THE COURT: Hi. Good morning to each of you.

On behalf of the Defendant?

MR. SMITH: Good morning, Your Honor. Joel Smith on behalf of Tesla.

MR. BRANIGAN: Good morning, Your Honor. May it please the Court, Tom Branigan for Tesla, Incorporated.

MS. BASS: Good morning, Your Honor. Hilarie Bass for Tesla, Inc.

MS. CRUZ: Whitney Cruz on behalf of Tesla.

MS. LUMISH: Wendy Lumish on behalf of Tesla.

MR. JAZAERI: Good morning, Your Honor. Brian Jazaeri on behalf of Tesla.

MR. MCCARTHY: (Inaudible.)

(Court reporter interruption.)

MR. MCCARTHY: Ryan McCarthy.

MR. MAYLEBEN: Good morning, Your Honor. George Mayleben.

THE COURT: I would just request that you speak through a microphone. There should be a microphone that can be shared and we have lavaliers here.

MR. MAYLEBEN: Good morning, Your Honor. George Mayleben, non-counsel.

MS. MARGO: Good morning, Your Honor. Sara Margo, paralegal for Tesla.

THE COURT: All right. Good morning to everyone.

Since there are large trial teams, I do want to make sure that at the time that you introduce yourselves as counsel

for the respective party, that you also introduce yourselves, or introduce the other individuals, or have them introduce themselves, so the jurors can gauge their familiarity with everybody that is part of the trial team.

All right. I understand that you were working very hard this weekend. We were as well. There remains one issue to be resolved, and that -- we just received a response today, so we will certainly address that issue with regard to the motion to quash the subpoena. But are there any matters that we need to address at this time?

On behalf of the Plaintiffs?

MS. BASS: Your Honor?

MR. SCHREIBER: Your Honor -- oh. I'm sorry. For the Plaintiffs, there was a filing -- we received the Court's order with respect to the other similar incidents and there was a supplemental filing that Mr. Eaton prepared, admittedly, late last night. It may, depending on how the Court wishes to consider it or not, impact something that may or may not be said in opening statement. So I'm just flagging that. I see it more of an afternoon issue, but that would be the only thing that we have.

And then to the extent we still don't know exactly what the jury questionnaire and Court's voir dire is actually going to look like, we had proposals. We had some objections from either side. It would just, I think, be helpful to both

sides just to understand what the universe of that inquiry is going to look like.

THE COURT: All right. Well, with regard to the first issue -- and I suspect that's with regard to the NTSB reports, that can be resolved following jury selection.

Secondly, with regard to the Court's questions to the prospective panel, I will be asking those questions. And as I stated, I will give each side a very short period of time in which to follow up. I have also incorporated the requested questions in the jury questionnaire.

And Liz, do we have copies of the completed questionnaires to provide to the parties?

COURTROOM DEPUTY: They're still finishing copies.

THE COURT: All right. So we're making copies for you, and you should have the answers by the prospective panel to each of those questions.

MR. SCHREIBER: And then, the last question on voir dire, because there was a little confusion before we started amongst us, where is the panel going to be seated, and how are they going to be seated, just so we can --

THE COURT: All right. Logistically, I was going to address that because there are many individuals in the gallery. It's an open courtroom; however, those jurors that we are bringing in to select need to be seated. And as I understand from the seating chart, we will need four rows.

8

So for those of you that are here observing jury selection, I'm going to ask that you step outside of the fourth row. And if you can fit into the last row, that's fine. If not, we need that room for the jurors. I would ask that those of you that are on the trial team -- you can turn your chairs around so you're facing the prospective panel. You're not offending me by having your back to me. It's important that you get situated and feel comfortable, since you will be looking at the prospective panel.

As you know, we are bringing in 40 potential jurors. There are 20 on each side. I'm not certain if my courtroom deputy gave you a seating chart to assist you with questioning the jurors. So you should know where they are going to be seated.

So I would ask at this time that you turn your chairs around. And I would ask those individuals that are seated on both sides -- if the court security officer can assist me -- if you will move into the last row and leave space on the first four rows for the potential jurors. So we need the first four rows.

Once again, on the right and left, we need the first four rows.

MR. SMITH: Your Honor, we did have one thing to raise with the Court. Again, it's something that can be addressed after --

THE COURT:  All right.  Let me -- let me give you an opportunity to move your chairs around.  Why don't you do that at this time.

And I would just ask that any time that you're addressing the Court or a witness, that you just use a microphone.  We have lavaliers here and we have microphones at the counsel table for you.

(Pause in proceedings.)

COURT SECURITY OFFICER:  They were asking which way --

THE COURT:  Okay.  So one starts to my right.  And then starting on my left will be Juror Number 21, Guzman.

MR. SCHREIBER:  And they'll be in the chair or the row?

(Court reporter interruption.)

MR. SCHREIBER:  I'm so sorry.

They'll be in the chair or the row?

THE COURT:  Okay.  Let me -- I can't see because the gentleman is standing.  Is there a chair there?

MR. POSES:  At the end.

THE COURT:  I'm not sure why we put that chair there.  I think we might have done it for an intern program.

Do we need that chair over there?

I mean, we have six -- we have six individuals.  I'm not certain why we needed that chair.  It might have been for an intern program.

So whoever is the -- whether they use the chair or they use the bench, I don't want to have the court security officer start moving it because we may need it for an intern program.

And that reminds me.  Let me make sure that it's understood in terms of the schedule.  We have a very large intern program that we oversee, and this week I think I told you at noon here in this courtroom we do have a presentation.  So we've going to take a break right at noon, from noon to one.  My hope is that we can select the jury before that time.  And then, I'm not certain if I did tell you that today we're going to end at four.

MR. SCHREIBER:  Correct.  You told us, Your Honor.

THE COURT:  All right.

MR. SCHREIBER:  One additional seating configuration.  It looks like we now have three full rows, but your chart accounts for two jurors on each side --

THE COURT:  On row four.

MR. SCHREIBER:  Right.  So we'll need to move some folks, because I think everyone in the courtroom tried to squeeze into row four.

THE COURT:  Yeah, we can't -- we need a place for jurors.  That's just the way it is.  The courtroom is just only so large.

MR. SCHREIBER:  Is it possible, Your Honor, to fit --

I mean, we have the extra chairs in the middle.  It seems like that's plenty of seating for six.  I'm just wondering, can we make up those extra two seats on each side by perhaps going seven across in each of the three rows.

THE COURT:  Are there two chairs that we can place on the right, Asare and Mowris, as well as Garcia?  And I believe it's Juror Number 40, being Cade.

MR. SCHREIBER:  Again, I don't know what the typical Court comfort level is for personal space.  But it seems to me that six in each of the pews --

THE COURT:  Well, if there's an extra seat --

MR. SCHREIBER:  In a chair.

THE COURT:  Yes.  If there's an extra chair on the third row...

MR. SCHREIBER:  There's an extra chair in each row on both sides.

THE COURT:  Right.  So right now we can place Asare on -- I don't want to renumber them.  They're numbered the way they are.  So they're going to come in and they're going to be seated the way they are.  So I don't want to start confusing them and confusing us.  So we're going to need the fourth row.  So if there are two chairs that are extra, then once we seat the jurors, then any member of the public can have access to those chairs.

Okay.  All right.  Any other issues that we need to

address?

MR. POSES:  One quick one, Judge.  I assume when I ask if we're -- I assume we're not calling witnesses today.

THE COURT:  I don't know that.  If we pick the jury this morning, and both sides have requested a certain amount of time for opening statements, why wouldn't we be able to put on witnesses?  So I don't know about that assumption.  That's yours but not mine.

MR. POSES:  Okay.  That's why I'm asking.  So I know that we'll probably each have an hour.  I figured we'd start up again at one o'clock.  And I have a -- Corporal Riso and people from out of town.  And a lot of the witnesses are from out of town.  And so I wanted to bring to the Court's attention that we will finish our proffer of evidence by next Thursday, maybe sooner.  But at the end of the day to fill in may be difficult for us.  But we'll have the whole thing scheduled pretty well, and through Thursday.

THE COURT:  All right.

MR. POSES:  Thank you.

THE COURT:  So the order that you have provided to the Court -- and that is your Joint Updated Trial Witness List, ECF 400, is that the order in which we're calling the witnesses?

MR. POSES:  (Inaudible.)

THE COURT:  All right.  So who would be your witnesses this afternoon?

MR. POSES:  That's the thing.  We don't -- if we had the witness this afternoon, it would be --

MR. BOUMEL:  It would be an EMS personnel --

(Court reporter interruption.)

THE COURT:  Okay.  You need to be at a microphone.

MR. BOUMEL:  Sorry.

MR. POSES:  So Jonathan Saldana is an EMS.  He's on call.  He took off tomorrow morning as our first witness.  And then Corporal Riso is next, and he's here from Italy with his family and he is scheduled for tomorrow after the EMS tech.

THE COURT:  All right.  So for today, would you be calling those two witnesses that were expected to testify tomorrow?

MR. POSES:  That's what we intend to do tomorrow morning.

THE COURT:  Okay.  All right, then.

Tomorrow morning?

MR. POSES:  Yeah.

THE COURT:  So back to my original question, Mr. Poses --

MR. POSES:  I know.

THE COURT:  -- and that is this afternoon -- only because I don't want to spend time away from this jury over here at a side bar when we can address issues ahead of time with regard to these witnesses.  So who is going to be

testifying this afternoon to the extent that we select a jury and we have time to present witnesses?

MR. POSES:  I think we'll discuss and let you know.

THE COURT:  All right.  So you'll let me know at the noon hour?

MR. POSES:  Yes, we will.

THE COURT:  All right, then.

MR. POSES:  Thank you.

THE COURT:  All right.  It is my understanding that the parties are going to be using their own equipment to publish exhibits, and I just want to ensure that before an exhibit is published that there is a representation that the other side has reviewed that exhibit and in fact that is the exhibit that was represented.  Because I don't want to have an issue where you're using your own equipment, now it's before the jury, and now we have an issue with something included within that exhibit that was not to be included.  So I'm emphasizing that the parties should be reviewing each other's exhibits and making that representation at the time that it's introduced into evidence.

MR. SMITH:  And Your Honor, of course we have already reviewed each other's exhibits, and we'll confirm with our technical folks that they can be displayed to each other before they are displayed to the jury through the equipment that we have.

15

THE COURT: All right, then. Thank you.

MR. SCHREIBER: And Your Honor, we've also shared, Mr. Smith and I, the exhibits we intend to use in opening statement, and I believe we have no meaningful objection that needs to be addressed, I don't think beforehand, but I'll defer to Mr. Smith.

MR. SMITH: Your Honor, there will be one or two things based on rulings that the Court has made or that the Court may make between now and then, and we'll talk about that. We won't delay the jury selection to ask the Court to deal with that.

THE COURT: All right, then.

Were the parties provided with the juror questionnaires?

MR. SCHREIBER: We just received them, Your Honor.

THE COURT: All right, then.

(Pause in proceedings.)

THE COURT: All right. I am alerting everyone that I'm going to request the courtroom deputy to bring up the prospective jurors so we can bring them in, in about 10 or 15 minutes, so just to give you that opportunity. To the extent that you do need -- and we all take a comfort break, I am going to ask that -- we have some restrooms through the jury room that I will ask that the trial team use so that you don't have any contact with the prospective panel.

(Pause in proceedings.)

THE COURT: And just as a reminder to counsel, that I am going to ask that you set forth the names and a little bit of the background of the witnesses that you intend to call to trial, so if you'll be prepared.

MR. SMITH: Thank you, Your Honor.

(Pause in proceedings.)

THE COURT: Ladies and Gentlemen -- I apologize for those of you in the gallery -- we need the space for the jurors. I need to have space for two jurors in the back. And I don't want the jurors looking at what you're looking at. And I'm not certain what it is you're looking at, but quite frankly we want to protect our prospective jurors from any issues related to what you may be looking at on your laptop or whatever you may have with you. And my concern is preserving these jurors so the information that they've provided is something that we can work with and we can select fair and impartial jurors.

So I apologize that you may not be able to observe the proceedings in terms of the actual jury selection. But we have a procedure here in the Southern District that if we knew that we needed the extra space, particularly for jury selection, we could have worked on a feed. But that was not provided to us, at least not as of last night, so arrangements could not have been made with our Clerk of Courts or Administrative Office.

17

So I apologize, but those of you that are seated -- especially those of you that are crunched in there, you've got to allow space for our jurors. So I would ask that you stand up and, quite frankly, just step outside because the jurors are going to start walking in and you're going to be in their way. So I'm not closing the courtroom, but I'm limiting the use for jury selection, and that's my biggest concern.

So if you'll please step outside, for those of you -- there should be like three or four, maybe five at most, depending upon the size of the individual. But I've got to allow the court security officers to do their job.

MR. POSES:  Judge, we have clients -- and I just wanted to make sure that they were here for jury selection. There's five people we'd like to stay, if that's okay.

THE COURT:  All right. So do you have the personal representative, as well as Mr. Angulo?

MR. POSES:  That's right.

THE COURT:  All right. So you can certainly bring them over -- they can come through the well or sit in the well with you. They're -- especially individuals that are part of the trial.

MR. POSES:  Sure.

And I would ask that the decedent's parents also be able to sit during jury selection, if that's okay with Your Honor.

THE COURT: So again, I know you've got a lot of individuals at your table. If you can place them in the well so that they're away from the jurors, then certainly; they're family members that are part of the trial.

MR. POSES: Thank you.

THE COURT: As well as, let me say, with Tesla, any of the corporate representatives or individuals. But --

MR. POSES: We understand.

MR. SMITH: Your Honor, we appreciate the logistics that you're trying to deal with here. I just have one question.

THE COURT: Of course.

MR. SMITH: On the back corners, is it all right if there are like four or five people --

THE COURT: Well, that's what I said, I think, four or five, depending upon the size of the individual. I just don't want the jurors to, number one, be distracted by someone writing or on a laptop. And secondly, the jurors being given information that may not be appropriate.

MR. SMITH: Completely understand that, Your Honor. And that's -- that is good -- so Chrissy, you and Michael can stay, but don't open your laptop over there.

Okay. Is that fair, Your Honor?

THE COURT: Thank you. That's very fair.

So we can certainly fit four, maybe five, at the last

row, but please leave some room for the two jurors.

MR. SMITH: Your Honor, we're grabbing chairs from the meeting room. We're rearranging your furniture without asking. I'm sorry.

THE COURT: Well, let me say that the conference rooms outside of the vestibule -- there's one on the right, one on the left -- you can have use for the full three weeks.

MR. SMITH: Thank you. And we'll rearrange the furniture the way you had it before we got here.

THE COURT: Thank you.

(Pause in proceedings.)

THE COURT: Liz, we ready to proceed?

COURTROOM DEPUTY: Yes, Judge.

THE COURT: All right.

MR. SMITH: Do you like for lawyers to stand when the jury enters and leaves? I usually do.

THE COURT: Of course.

MR. SMITH: Okay. I was in a trial a month ago, and the Judge said: "Please don't do that." I just want to make sure we were --

THE COURT: All right. Thank you.

All right. Liz, we ready to go?

COURTROOM DEPUTY: Yes, ma'am.

THE COURT: All right. Let's bring in the jurors.

COURT SECURITY OFFICER: All rise for the jury.

(Before the panel, 10:00 a.m.)

THE COURT:  Good morning, Ladies and Gentlemen.

If I may ask each of you to stand, raise your right hand to be placed under oath.

(Panel sworn, 10:02 a.m.)

THE COURT:  Welcome.

Please be seated, everyone.

Thank you for your patience.

Good morning, Ladies and Gentlemen.

I know that you were summoned very early this morning. Each of you filled out questionnaires.  I want to thank you for your time and attention.

My name is Beth Bloom.  I am a United States district judge here in the Southern District of Florida.  And on behalf of my colleagues, I want to welcome you to the Wilkie D. Ferguson, Jr. Federal Courthouse.

Just with a show of hands, how many of you have served on a jury, either in a federal, state, even on a grand jury?

Okay.  Not too many of you.

Well, we certainly appreciate your presence.  And we are fully aware that many of you have had to juggle your personal and professional lives, and you've had to put aside some scheduling matters in order to serve as a juror here in federal court.

Jury service is not always convenient, but I hope that

you realize that, other than military service, service on a jury is the most important service you can provide to your country.

When I say:  "Other than military service," I want to recognize Juror Number 9, Officer Kenneth Tracy -- Officer Tracy, if you'll stand at this time -- who has served in the United States Marine Corps.

Thank you for your service, Officer Tracy.

And as I stated, that certainly jury service in time of peace is the most important service you can provide to your country.  The right to a trial by jury is one of our most treasured and cherished constitutional rights.  And whether it's a criminal case, where one is accused of committing a crime, or a civil case where there is a dispute between the parties, we each have a right to have the case heard and decided by a completely impartial group of our fellow citizens willing to serve as a jury.

That duty is just as sacred when the trial involves a civil case, such as the one here today.  And I do hope that if you are selected that you will have an interesting, challenging, and informative experience, as well as the satisfaction that comes from a job well done.

So I want to give you a brief overview of the jury selection process.  Each of you have been found to have the requisite qualifications to serve as a Member of the Jury of

this Court.  No one should avoid fulfilling this obligation, except for the most pressing of circumstances.  The demand upon your time will not be unreasonable or unduly prolonged.  Every effort will be made to see that your time is not wasted.

You have been placed in a random order, and there are 40 of you who've been seated in the gallery.  And you have been placed under oath and you will be asked a series of questions as to your qualifications to serve as a juror in this particular case.

Voir dire means "to speak the truth."  And under your oath as a prospective juror, you agree to truthfully answer questions concerning your qualifications.  But I want you to understand that this questioning is not for the purpose of prying into your personal affairs.

Each of us walks into this courtroom not as a newborn baby but with life's experiences.  And it's based on the experiences that we may have had, the relationships that we may have formed, and the opinions that we may hold, that may have an effect on your ability to serve as a fair and impartial juror in this case.  You may be well-suited to serve as a juror in another case.  And that's our job, is to get to know you to select individuals who will impartially try the issues in this case, upon the evidence and the law presented in this courtroom, without being influenced by other factors.

Now, there will be a certain number of jurors that

23

will be excused.  If you are excused, don't be offended or feel that your honesty or integrity is questioned.  It certainly is not.  It's simply part of the jury selection process.

Now, some of you were kind enough -- actually, all of you because we do have copies of your questionnaires.  All of you took the time not only to advise us that you are available during this three-week period -- and that's why we summoned those individuals to know that we will be in trial until July 31st.  We anticipate that this case will be tried during that period of time, and you've already advised the Court that you have the ability.

You have also taken the time to fill out the juror questionnaires.  I do want to let you know that these questionnaires do not become part of a public record; however, we have copies.  I have a copy and the attorneys have a copy. And it allows us to expedite the jury selection process.  I may ask you some questions based on your answers that you have given, and the attorneys may also ask you some questions.

So you may not have realized when you completed these questionnaires that we would be relying upon your complete and truthful answers.  So I'm going to ask at this time that you take out the questionnaire; take it out of your pocket, your purse, your wallet, wherever it may be.  If you'll look at the questions, look at your answer, and just raise your hand if anyone would like to change your answer.

And we have some court security officers that are here.  So I'm going to ask the court security officer to actually bring the microphone over.  And I would ask you two things.  Number one, wait for the microphone because everything has to be of record.  And then, second, if I don't recognize you by name, if you will restate your name before you respond to a question or provide information.

So let me first ask:  Is there anyone that would like to change any of the answers that you have given to the questions or you would like to complete an answer?  If so, please raise your hand.

Just take the time to review and let me know if anyone would like to change any of the answers that you have given.

(Pause in proceedings.)

THE COURT:  Okay.  Let me ask one more time.  Anybody want to change any of your answers?

All right.  Seeing no hands raised.

So that you will know the court personnel with whom you'll be working with, and their respective duties, I'd like to introduce them to you at this time.  The courtroom deputy, Elizabeth Gariazzo, brought you into the courtroom, and she serves as the Court's administrator here in the courtroom.

The court reporter is Yvette Hernandez.  She transcribes and takes down everything that's said in the courtroom, including the statements that I'm now making, the

questions that will be asked of you, and your answers, and all other matters in this case.  So it's important that you not respond with a nod or a shake of the head, but you respond verbally, and you also use the microphone if you're asked a direct question, so that Yvette is able to take down what is said and we have an accurate record.

We are privileged to have two court security officers, Officer Joseph Castro and Officer Will Sanders.  And they will enforce the Court's orders and be in charge of you, the jury, while you are away from the courtroom.  If there is a matter that needs to be brought to my attention, please let Officer Castro and Officer Sanders know so that you can be heard on those matters.

Do any of you know me or any of the court personnel?  If so, please raise your hand.

Seeing no hands raised.

All right.  At this time, I'd like to officially call the case and ask the attorneys to introduce themselves and everyone at counsel table.  This is a civil case.  Neima Benavides, as Personal Representative of the Estate of Naibel Benavides Leon, Deceased, and Dillon Angulo, Plaintiffs v. Tesla, Incorporated, also known as Tesla Florida, Incorporated, Defendant.

Let me first ask the Plaintiffs if counsel will introduce themselves and everyone at counsel table.

Thank you.

MR. SCHREIBER:  Thank you, Your Honor.

(Court reporter interruption.)

MR. SCHREIBER:  Better?

Good morning, Ladies and Gentlemen.  My name is Brett Schreiber, and along with my co-counsel, Todd Poses, Adam Boumel, Doug Eaton, Mr. Srinivas Hanumadass, we are the lawyers for the Benavides and Angulo families, who are sitting behind us.  We thank you all for being here.

We also have Mr. Lazarus, Mr. Scandella.  And Javi -- Mr. Navarro.  I only knew his first name -- who will be helping us out at various points throughout the trial.  We appreciate you all very much for being here, and we thank you for your service.

THE COURT:  Thank you, Mr. Schreiber.

On behalf of the Defendant?

MR. BRANIGAN:  Good morning, Your Honor, Counsel.

Ladies and Gentlemen, my name is Tom Branigan, and I'm here representing Tesla, Incorporated.  And with me here is my partner Mr. Joel Smith, Hilarie Bass, Whitney Cruz, Brian Jazaeri from Tesla legal staff, Ryan McCarthy from Tesla, Wendy Lumish, my law partner.  We have two gentlemen in the front seats here, Ray and Rick Fuentes, our assistants.  And moving back towards the back of the table is Mr. Mayleben.  Mr. Mayleben is a technician who helps us with our exhibits

during the trial.

Seated next to Mr. Mayleben is our wonderful legal assistant Sara Margo. Behind Sara is our second wonderful legal assistant Chrissy Cyr. Seated next to Chrissy is Mr. Wonderful, Michael Kloss from Tesla. Seated next to Michael is Tess Gedhardt from Tesla. And seated next to Tess is Alexis.

And Ladies and Gentlemen, we, too, thank you and greatly appreciate the fact that you've come in today, that you're here to serve as jurors. It's very important to all of us involved. Thank you very much.

THE COURT: Thank you, Mr. Branigan.

And let me ask, on behalf of the Plaintiffs, are the Plaintiffs ready to proceed to trial?

MR. SCHREIBER: Yes, Your Honor.

THE COURT: And -- thank you.

And is the Defendant ready to proceed to trial?

MR. SMITH: We are, Your Honor.

THE COURT: Thank you.

Now, Ladies and Gentlemen, you were introduced to the attorneys and those at counsel table. Do any of you know any of them? If so, please raise your hand.

Seeing no hands raised.

I know you spent some time on the fifth floor before you were brought up here to the tenth floor. There are 40 of

you seated here today.  Does anyone know anyone else on the panel?  If so, please raise your hand.

Just look around, in the event that you haven't seen each other.

Okay.  So there is a hand raised.  If we can bring a microphone, please, to that gentleman.

And is that Mr. Gonzalez?

PROSPECTIVE JUROR:  Yes, it is.

THE COURT:  Yes.  Mr. Gonzalez?

PROSPECTIVE JUROR:  I used to work with Cynthia.

THE COURT:  When you say:  "Cynthia," is that Ms. Baghdoian?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Now, how long for -- a period of time, Mr. Gonzalez, did you work with Ms. Baghdoian?

PROSPECTIVE JUROR:  Twelve years.

THE COURT:  All right.  Now, if you were selected, Mr. Gonzalez, to serve on the jury, and Ms. Baghdoian was selected as well, and you disagreed with each other, would that make you feel a little uncomfortable because of the relationship that you have with her?

PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  All right.  Do you believe that you could fairly and impartially listen to the evidence in this case, and if you disagreed with Ms. Baghdoian, you would respect her

opinion but you would also obviously voice your opinion?

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you, Mr. Gonzalez.

And Ms. Baghdoian, I'm going to ask the same question to you.  You've known each other for quite some time, and have you known each other on a social level?

Ms. Baghdoian?

PROSPECTIVE JUROR:  Yes.  I'm not sure about that.  I mean --

THE COURT:  Well, have you gone out to dinner, or lunch, or breakfast, or coffee?

PROSPECTIVE JUROR:  We were friendly, but I don't think that we've like -- outside of work done anything.

THE COURT:  Okay.  Now, do you believe that if you were selected on the jury, and you disagreed with Mr. Gonzalez's opinion -- do you believe that that might make you feel a little uncomfortable?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Would you hold firm to your opinion and voice it even though Mr. Gonzalez might be selected as well on the panel?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Thank you, Ms. Baghdoian.

Anyone else, Ladies and Gentlemen, that knows anyone else on the panel?

COURT SECURITY OFFICER: Judge?

THE COURT: Yes. Ms. Baghdoian?

PROSPECTIVE JUROR: All right. So I was going to talk -- she told me -- the woman who brought us in here told me that I had the option to tell you. I have like a slight medical issue that I wanted to -- I don't know.

THE COURT: Of course. Is that medical issue affecting you right now, Ms. Baghdoian?

PROSPECTIVE JUROR: Well, I think I might have an eye infection or an eyelid infection. And the doctor is not there until ten a.m. till three p.m. So I don't know if he's going to say: "Oh, no big deal. I'll call in a prescription" or if he's going to say: "I need to see you."

THE COURT: All right. So you just want the opportunity to call the doctor during the break?

PROSPECTIVE JUROR: Yeah.

THE COURT: All right. Of course.

Thank you, Ms. Baghdoian.

Anyone else that may know anyone else on the panel? If so, please raise your hand.

All right. Now, Ladies and Gentlemen, this is a civil case, as I stated. And before the attorneys read the list of the witnesses that may be testifying at this trial, I want to give you a description of the case.

Plaintiff Neima Benavides, as Personal Representative

of the Estate of Naibel Benavides Leon, Deceased, and Dillon Angulo have brought a civil action against Defendant Tesla, Incorporated, doing business as Tesla Florida, Incorporated.

This case arises from a motor vehicle crash that occurred on April 25th, 2019, at approximately 9:30 p.m., on Card Sound Road in Monroe County, Florida.

At that time, George McGee was operating a 2019 Tesla Model S, when the vehicle traveling [sic] through a T-intersection and off the roadway striking a parked Chevrolet Tahoe.  Naibel Benavides and Dillon Angulo were standing near the Tahoe at the time.  Ms. Benavides was killed and Mr. Angulo sustained serious injuries.

The Tesla Model S was equipped with Autopilot, an advanced driver-assistance system.  Autopilot was engaged at the time of the incident.  Plaintiffs allege that the Tesla vehicle and its Autopilot system were defectively designed, Tesla failed to adequately warn about the dangers associated with the system, and these issues were a legal cause of the crash.

Plaintiffs also seek punitive damages, alleging that Tesla was guilty of intentional misconduct or gross negligence that was a substantial cause of Mr. Angulo's injuries and the death of Ms. Benavides.

Tesla denies that the Model S was defective, that any alleged defect caused the crash or Plaintiffs' damages, and

that there was any failure to warn contributing to cause the crash.

Tesla also denies Plaintiffs' claim that its conduct rose to the level of intentional misconduct or gross negligence.  Tesla further asserts that George McGee was the sole cause of the crash and Plaintiffs' alleged injuries and damages.

Now, Ladies and Gentlemen, do any of you know anything about this case, either through your own personal knowledge, or by a discussion with anyone, or by reading or hearing about it in any of the news media?  If so, please raise your hand.

Seeing no hands raised.

COURT SECURITY OFFICER:  Judge, you have one hand.

THE COURT:  All right.  If we can bring the microphone to that gentleman.  And that's in the third row.

Is that Mr. Carballido?

PROSPECTIVE JUROR:  Yes, ma'am.

THE COURT:  Yes, sir.  How did you hear about it, sir?

PROSPECTIVE JUROR:  I read about it on the news that the trial was starting today or jury selection for a Tesla-related issue was starting today.

THE COURT:  All right.  And is that the extent of what you've, I guess, read or heard?

PROSPECTIVE JUROR:  Well, I read about the --
generally about the case, not -- yeah.

THE COURT:  All right.  So let me ask you this, Mr. Carballido:  Do you feel that you can eliminate and disregard everything you may have heard or read pertaining to this case and render a fair and impartial verdict based solely on the evidence and the law presented in this courtroom?

PROSPECTIVE JUROR:  Certainly.  Yeah.

THE COURT:  Is there any hesitation on your part, sir?

PROSPECTIVE JUROR:  In terms of?

THE COURT:  Whether you can fairly and impartially consider the evidence and testimony in this case, and disregard and eliminate everything that you may have heard or read pertaining to the case.

PROSPECTIVE JUROR:  Well, the knowledge is always going to be there, Your Honor.  I mean, I could try, but the knowledge is always going to be there.  I follow news related to data, data signs, Autopilot, and stuff like that.

THE COURT:  Okay.  So Mr. Carballido, let me ask the question again because we want a juror selected that is fair and impartial.  So do you feel that you can eliminate and disregard everything that you have heard or read pertaining to this case and render a fair and impartial verdict based solely on the evidence and testimony in this case?

PROSPECTIVE JUROR:  I can certainly try, Your Honor.

THE COURT:  Okay.  Is there some hesitation on your part?

PROSPECTIVE JUROR:  There's always a bias, Your Honor.

THE COURT:  Okay.  When you say:  "There's always a bias," we need to know about that bias.

PROSPECTIVE JUROR:  Well, a bias in the sense that there's preconceived notions and understandings of how certain systems work and --

THE COURT:  So do you have those preconceived notions or bias?

PROSPECTIVE JUROR:  I believe I do, yes.

THE COURT:  Okay.  So can you set aside those preconceived notions or bias and render a decision based solely on the evidence and testimony presented in this courtroom?

PROSPECTIVE JUROR:  I can certainly try, Your Honor.

THE COURT:  Okay.  But do you have some hesitation, sir?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Thank you, sir.

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Now, is there anything about the nature of this case -- now, the Court has read the description of the case -- that would in any way prevent any of you from acting fairly and impartially?  Anything at all?  If so, please raise your hand.

Seeing no hands raised.

Ladies and Gentlemen, there will be witnesses that

will be coming to testify, and I want to make sure that we gauge your familiarity with those witnesses.  So I've asked the attorneys to set forth the names and a little bit of a description of those witnesses.  I'm going to ask that you listen closely and carefully.  And after they have provided the list, if you'll let me know if you know any of those individuals.

First, on behalf of the Plaintiffs.

MR. POSES:  Good morning.

Lilia Leon Jimenez is the mother of the Decedent, her daughter Naibel Benavides Leon.

Sitting next to her is Neima Benavides, who is Naibel's older sister.  She's the personal representative of the estate of her sister.

And Guillermo Benavides was Naibel's father.  And he is here as well.

Sitting next to Guillermo is Dillon Angulo, who was Naibel's boyfriend at the time, and he is a Plaintiff in this case.  His parents will also be testifying.  Their names are Dawn Angulo and Victor Angulo.  They are married and live here in Miami, Florida.

George McGee will be testifying.  He's the driver of the Tesla at the time of the accident.  He lives in Boca Raton, Florida.

Corporal David Riso was the traffic homicide

investigator for the Florida Highway Patrol, investigated the accident. He lives in Italy now, and he will be testifying in this case.

We're also calling some witnesses that work for Tesla. The first is Akshay Phatak. He's an engineering manager at Tesla, and he is also a corporate representative of Tesla. He lives in California.

Mr. Eloy Rubio Blanco is also a corporate representative of Tesla. We'll be calling him in our case. He is a staff product support engineer at Tesla. And again, he's a corporate representative, and he lives in Spain.

David Shoemaker is also a Tesla employee. We will be calling him in our case. He is a software engineer and data specialist. He's employed by Tesla in their Autopilot telemetry team, and he lives in California.

Mike Calafell, also a Tesla employee we'll be calling in our case. He is a field technical specialist. He lives here in Miami.

Alan Moore is an expert witness. We will be calling him in our case. He's a mechanical and forensic engineer, and he's an accident reconstructionist. And he's the principal of AB Moore Forensic Engineering. He currently lives in Orlando.

Mary Cummings, Ph.D. She's a professor and director of autonomy and robotics at the Center at George Mason University, and she currently lives in Virginia.

Mendel Singer is an expert witness, again, we will be calling. He's the associate professor and vice chair for education in the Department of Population and Quantitative Health Sciences at Case Western Reserve University of Medicine, and he's the director of research for the university's Jewish Community Health Initiative. Dr. Singer resides in Ohio.

We'll be calling Jason Lewis, also an expert witness. He is a forensic data specialist and he lives in Tampa.

Be calling Jonathan Saldana. He is an EMS person that came to the scene of the accident and took care of Dillon.

Dr. Louis Pizano will be testifying by Zoom. We've taken his testimony already, so we'll play it for you. He is a trauma and critical care surgeon at Jackson Ryder. He was Dillon's attending critical care and trauma physician at Jackson.

Be calling Bill Reader. He's a physical therapist, and he's been taking care of Dillon for a long time. He lives here in Miami and works at his practice at Elite Physical Therapy.

Be calling Dr. Danielle Horn. She is an associate professor of clinical anesthesiology at the University of Miami Miller School of Medicine, and she is the program director for interventional pain medicine, fellowship at Jackson Memorial Hospital. Dr. Horn serves as Dillon Angulo's interventional pain management physician -- treating physician.

Dr. Kester Nedd.  He's a neurologist and neurological rehabilitation specialist.  He's here in Miami Lakes, Florida. Currently practices at the Design Neuroscience Center, and he serves as a voluntary associate professor of neurology at the University of Miami Miller School of Medicine.

Dr. Sally Kolitz Russell -- Russell Kolitz.  She's a neuropsychologist, and she will be testifying in this case.

Dr. Carlos Plasencia is the treating psychologist for Dillon.  He's a licensed mental health counselor and he practices in Pembroke Pines.

Monica Snyder is a licensed marriage and physical therapist based in Miami, Florida, and will testify about post-traumatic stress.

And Dr. Craig Lichtblau is a physical medicine and rehabilitation doctor based in North Miami Beach -- or North Palm Beach, Florida, and he'll be talking about Dillon's future.

Thank you.

THE COURT:  Thank you, Mr. Poses.

Ladies and Gentlemen, do any of you know any of those individuals?  If so, please raise your hand.

All right.  We do have one hand that is raised.  And is that Ms. Rodriguez?

PROSPECTIVE JUROR:  Yes, it is, Your Honor.

THE COURT:  Good morning.  Who do you know?

PROSPECTIVE JUROR: I know Dr. Nestor -- Kedd, Nestor, neurologist from Jackson Health System. I worked there for about eight and a half years. I've been gone from Jackson Health since 2016. But he's a well-known physician, so his name stood out.

THE COURT: All right. Now, Dr. Nestor may testify in this trial. Would you give more weight to his testimony than it may otherwise deserve because you know him through working there?

PROSPECTIVE JUROR: Not necessarily.

THE COURT: Okay. When you say: "Not necessarily," I just want to make sure that you as a juror -- if you're selected, you're going to determine the credibility or lack of credibility of the witnesses. And the Court will give you some guidance as to what to look to. But my question to you, Ms. Rodriguez, is: Based on the fact that you've worked with him, that you know him, would you give more weight to his testimony than it may otherwise deserve because of your working relationship with him? And I know that it ended some time ago.

PROSPECTIVE JUROR: Yes. No, I would not. I would give credibility to the fact that he's a physician, but it could very well be another physician and it would be the same weight.

THE COURT: All right. Thank you, Ms. Rodriguez.

PROSPECTIVE JUROR: You're welcome.

THE COURT: Anyone else that may know any -- or have heard or otherwise acquainted with any of the witnesses that are named?

Okay. On behalf of the Defendant, if you'll list your witnesses.

MR. BRANIGAN: Thank you, Your Honor.

(Court reporter interruption.)

THE COURT: Yeah. Let me just ask that you just move up the lavalier perhaps to your lapel because we're not able to catch everything you're saying. Thank you, sir.

MR. BRANIGAN: Better?

Some of those names you've heard already, but to be complete, we're going to be calling Mr. Eloy Rubio Blanco. Mr. Blanco is an engineer at Tesla. And as indicated, he is a resident of Spain, but we will be bringing him over to testify in our case as well.

We will be calling Dr. David Cades. Dr. David Cades is a Ph.D. He's an expert witness from Chicago. He is a consulting engineer with a firm called Exponent, and he's what we call a human factors expert.

We're going to be calling Ryan Harrington. Mr. Harrington is also an expert witness. Mr. Harrington is also from the Exponent firm. He's from Massachusetts, and he is what we refer to as a design expert, and he's a mechanical engineer by background. And he'll be coming in in our case to

talk about some of the design issues in the case.

James Walker, another expert witness.  Mr. Walker is what we refer to as an accident reconstruction expert.  He will be coming in from Houston, Texas, and he's with a firm called Carr Engineering.

We'll be calling Officer Joel Torres.  Officer Torres I believe may no longer be with Monroe County Sheriff's Office, but at the time of the crash in April of 2019, he was an officer with the Monroe County Sheriff's Office, and he was one of the officers who responded to the crash on the night of the crash.

Dr. Barry Crown, MD.  He's one of our experts. Dr. Crown is a licensed psychologist and clinical neuropsychologist from Miami.

We'll be calling a paramedic by the name of Alejandro Del Rio.  And Mr. Del Rio is a paramedic with the Ocean Reef Fire Department in Key Largo.  He resides in Homestead.

We'll be calling another expert, Dr. Rafael Fernandez. Dr. Fernandez is an MD.  He's an orthopedic surgeon, and he's going to be coming in from Baptist -- Doctors Hospital and Baptist Health in Miami.

We'll be calling another paramedic by the name of David Hulse.  Mr. Hulse is with the Ocean Reef Fire Department in Key Largo.

We'll be calling another expert, Dr. Bruce Kohrman.

Dr. Kohrman is a neurologist, and he's with South Miami Neurology.

We'll be calling a Florida Highway Patrol officer by the name of Trooper Odel Mosquera.  And -- excuse me -- Officer Mosquera is, as I said, with the Florida Highway Patrol and resides in Florida.  We don't know exactly where he resides today.

We'll be calling possibly another Tesla engineer by the name of Christopher Payne.  Mr. Payne is an engineer at Tesla who works on Autopilot design and technology, and he resides in California.

We'll be calling a paramedic by the name of Oscar Pinzon, who resides in Miami, and he's with the Key Largo rescue squad.

We'll be calling Corporal Rosario-Flores, and he is a former highway patrol officer with the Florida Highway Patrol.

We'll be calling Karen Elizabeth Saldina Santibanez. She is with the Ocean Reef Organization, and she resides in Homestead.

And finally -- and you've heard reference to Mr. Shoemaker.  We may call Mr. Shoemaker in our case.  David Shoemaker is an engineer at Tesla who works on Autopilot technology issues, and he resides in California.

THE COURT:  Thank you, Mr. Branigan.

Ladies and Gentlemen, do any of you know any of those

individuals?  If so, please raise your hand.

Okay.  We have one hand that is raised.  And I believe -- I want to make sure.  Is that Ms. Morales?

PROSPECTIVE JUROR:  Yes, it is.

THE COURT:  Yes.  Good morning.

PROSPECTIVE JUROR:  I'm -- I know Dr. Kohrman.  He's my father's physician.

THE COURT:  All right.  I'm going to ask the same question that I asked of Ms. Rodriguez.  The fact that you know him, and he is your father's physician, would you tend to give more weight to his testimony than it may otherwise deserve because --

PROSPECTIVE JUROR:  Not at all.

THE COURT:  -- he's your father's doctor?

PROSPECTIVE JUROR:  No, not at all.

THE COURT:  All right.  Thank you.

Anyone else, Ladies and Gentlemen?

All right.  I'm going to need to ask you some basic questions.  And that is:  Does anyone here have a Florida driver's license but you have since moved out of Dade County?  That is, you no longer live in Miami-Dade County, you live in another county or another state.  If so, please raise your hand -- or even out of the country.  If so, please raise your hand.

Seeing no hands raised.

Is there anyone that has difficulty with the English language, such that you believe you could not effectively serve as a juror?  If so, please raise your hand.

Okay.  We have one individual.

And is that Ms. Cerda?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Ms. Cerda, have you understood everything that I have said so far?

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  And I understand that you raised your hand.  Do you have some concern that perhaps in the future there may be some words that you don't understand?

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Let's have an agreement, Ms. Cerda, that between now and the rest of the jury selection, if there's a word or phrase that is said that you do not understand, that you'll raise your hand.

PROSPECTIVE JUROR:  Okay.

THE COURT:  But can we have an agreement, Ms. Cerda, that if we go through the entire jury selection process, and you have understood everything that's said, and your hand hasn't been raised, that you can understand everything so far?

PROSPECTIVE JUROR:  I understand, but sometimes no.

THE COURT:  Okay.  And when you say:  "Sometimes no," have you understood a hundred percent of what I have said?

PROSPECTIVE JUROR:  Eighty-five percent.

THE COURT:  Eighty-five.  All right.  So there's a little bit that you haven't understood.  All right.  Thank you, Ms. Cerda.

Anyone else, Ladies and Gentlemen?

All right.  Is anybody taking any medication that may make you sleepy or groggy?  If so, please raise your hand.

Seeing no hands raised.

Is there -- oh, yes.  There is a hand raised.

That's Juror Number 1.  If we could bring the microphone to Mr. Cereijo.

PROSPECTIVE JUROR:  I'm taking some painkillers and diuretics for the high blood pressure.

THE COURT:  All right.  So let's talk about the painkiller.  Is that the one that -- have you been taking the -- you said diuretics or diabetic?

PROSPECTIVE JUROR:  Diuretic.

THE COURT:  Okay.  Which drug is having some effect on your ability to remain alert?  Is it the painkiller?

PROSPECTIVE JUROR:  It's the painkiller, pero I only take it at night.

THE COURT:  Okay.  So you didn't take it this morning?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  So right now, are you taking any medication that is making you sleepy or groggy?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Thank you, sir.

Anyone else, Ladies and Gentlemen, that's taking medication that right now is making you sleepy or groggy or you anticipate that during the course of the case it may make you sleepy or groggy?

Seeing no hands raised.

Does anyone have any physical impairment that we would certainly want to accommodate?  For example, a hearing deficit, or you have maybe some issues with the neck, the back, or the legs that will affect you for sitting for long periods of time.  And let me say we're not going to sit for hours on end.  We will take appropriate comfort breaks.  But is there anyone here that has an impairment that we would want to make sure that we accommodate?  If so, please raise your hand.

The gentleman here.  And that's in the third row.  Is that Mr. Crosby -- no.  My apologies.  That's Mr. Velez.

Yes, sir?

PROSPECTIVE JUROR:  I don't think it's so much an impediment.  It's just I have -- I don't have that many kidneys left, but I do need to use the restroom like a little bit more often than the normal person.

THE COURT:  Of course.  And Mr. Velez, if you are selected as a juror, and you otherwise need to take a comfort break, just raise your hand and let the Court know.  All right,

sir?

PROSPECTIVE JUROR:  Thank you.

THE COURT:  Thank you, Mr. Velez.

Anyone else, Ladies and Gentlemen?

Okay.  The gentleman here.  Is that Mr. Richter?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Yes.

PROSPECTIVE JUROR:  I wear hearing aids.

THE COURT:  Are you able to hear through the amplification system?

PROSPECTIVE JUROR:  I have heard everything today.

THE COURT:  Okay.

PROSPECTIVE JUROR:  And I -- occasionally, I have to take my phone out because it's on Bluetooth.  So I have to adjust it depending on what room I am in, because sometimes noise is noisier somewhere else.  So I can adjust it.

THE COURT:  Of course, sir.  And we'll make sure that if you are selected that you have your phone with you so you can make those adjustments.

Thank you, sir.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  Anyone else, Ladies and Gentlemen?

Seeing no other hands raised.

All right.  All right.  Now, in the following questions, I will be using the terms -- oh.  There is someone

else?

COURT SECURITY OFFICER: No, ma'am.

THE COURT: Okay. I'll be using the terms "family," "close friend," and "anyone with whom you have a significant personal relationship." So the term "anyone with whom you have a significant personal relationship" means a domestic partner, a life partner, a former spouse, or anyone with whom you have an influential or intimate relationship that you would characterize as important.

So the first question is: Have you or to your knowledge has any member of your family, a close friend, or anyone with whom you've had a significant personal relationship ever had any connection with or dealings with Tesla? If so, please raise your hand.

Okay. And the gentleman here, is that Mr. Apolinario?

PROSPECTIVE JUROR: That's correct.

THE COURT: Yes, sir.

PROSPECTIVE JUROR: My girlfriend, she owns a Tesla.

THE COURT: Okay. So is that the extent of your girlfriend's dealings, is she owns a Tesla?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Any other dealings other than she owns a Tesla?

PROSPECTIVE JUROR: No.

THE COURT: All right. Now, the fact that your

girlfriend owns a Tesla, would that have any effect on your ability to serve as a fair and impartial juror in this case?

PROSPECTIVE JUROR: No, Your Honor.

THE COURT: All right. Thank you, sir.

Ladies and Gentlemen, are any of you related to any officer, director, or employee of Tesla, to your knowledge? If so, please raise your hand.

Seeing no hands raised.

Do you, or any member of your family, a close friend, or anyone with whom you have a significant personal relationship owns any stock or other interest in Tesla to your knowledge? If so, please raise your hand.

Okay. We have a hand over here -- two hands. The second row. First, let's go first to Ms. -- is it Paguaga De Choiseul?

PROSPECTIVE JUROR: Yes.

THE COURT: Yes?

PROSPECTIVE JUROR: I believe all my kids have stock.

THE COURT: Okay. Do you own the stock as well?

PROSPECTIVE JUROR: Well, my husband --

THE COURT: Okay. So your husband owns -- so you by virtue of your husband having stock, and your children.

Now, the fact that your husband, you, and your children own stock in Tesla, would that cause you to be partial to Tesla, to maybe view their evidence in a different way than

50

someone who maybe doesn't own stock in Tesla?

PROSPECTIVE JUROR: I don't think so.

THE COURT: Well, when you say: "I don't think so," we as human beings speak in conditional terms. So I want to make sure that there isn't any hesitation on your part. And I want to give you an example. If we were all to board a plane at Miami International Airport, and we went -- we passed the pilot as we were going to our seat, and we asked the pilot: "Can you get us to New York safely," and the pilot said: "I think so," we would not have much confidence.

PROSPECTIVE JUROR: I would --

THE COURT: So I want to ask the question again because --

PROSPECTIVE JUROR: Actually, I find that a realistic answer. He cannot tell me a hundred percent.

THE COURT: He can't tell you a hundred percent. That's right. But the question is: Right now, do you, Ms. Paguaga De Choiseul, because you have an interest in Tesla, your husband purchased stock, your children have stock, and by virtue of your husband you have stock -- do you believe that that would have an effect on your ability --

PROSPECTIVE JUROR: No.

THE COURT: -- to serve as a fair and impartial juror?

PROSPECTIVE JUROR: No.

THE COURT: Is there hesitation on your part?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Thank you.

And I think there was also Ms. Ruiz.

PROSPECTIVE JUROR:  Yes.  And my answer is the same.

THE COURT:  Okay.  Well, hold on.  First of all, do you own stock?

PROSPECTIVE JUROR:  Through my husband, yes.  My husband and I.

THE COURT:  All right.  So do you believe that the ownership of stock may cause you to be partial to Tesla?

PROSPECTIVE JUROR:  No.

THE COURT:  Is there any hesitation on your part?

PROSPECTIVE JUROR:  Not because of that.  No.

THE COURT:  Okay.  When you say:  "Not because of that"...

PROSPECTIVE JUROR:  I don't like electrical.

THE COURT:  Okay.  When you say:  "I don't like electrical"...

PROSPECTIVE JUROR:  Vehicles.

THE COURT:  Okay.  So I take it because you don't like electrical vehicles, you don't own electrical vehicles.

PROSPECTIVE JUROR:  I do not.

THE COURT:  Okay.  But the fact that you have that opinion, "I don't like electrical vehicles," would that somehow have an effect on your ability to serve as a fair and impartial

52

juror?

PROSPECTIVE JUROR:  I think so.

THE COURT:  Okay.  So you think that that may cause you to perhaps give more weight to a witness's testimony than it may otherwise deserve, because you don't like electrical vehicles?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  And thank you for your candor, Ms. Ruiz.

All right.  Is there anyone else that owns stock -- you, a close friend or family member own stock in Tesla?  Let me complete the question.

All right.  Seeing no hands raised.

Is there anyone here that's ever owned or operated a business or a company?  If so, please raise your hand.

Okay.  If we can -- Juror Number 3.  That's Ms. Pantoja.

PROSPECTIVE JUROR:  I'm not sure if it applies.  It's an LLC for real estate.

THE COURT:  Okay.  And do you own it?

PROSPECTIVE JUROR:  My husband and I.

THE COURT:  Okay.  Thank you.

Anyone else?

PROSPECTIVE JUROR:  My husband and I own Miami Beach Bicycle Center.

53

THE COURT: Okay. And this is Ms. Ruiz?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Thank you.

Anyone else, Ladies and Gentlemen?

PROSPECTIVE JUROR: Good morning. I owned an ice cream store in Charlottesville, Virginia years ago, and I am partners in a puppy nanny service.

THE COURT: Oh. Thank you. What a great business.

MR. BRANIGAN: Excuse me, Your Honor. May we have that witness -- that juror's name, please.

THE COURT: Yes. And thank you, Mr. Branigan. That is Ms. Palou, Juror Number 13.

PROSPECTIVE JUROR: Yes. Yes.

THE COURT: Thank you.

PROSPECTIVE JUROR: Thank you.

THE COURT: Okay. Anyone else to my right?

Yes. And this gentleman?

PROSPECTIVE JUROR: John Mowris. I've been a manager and a president of several companies throughout the years.

THE COURT: What companies, Mr. Mowris?

PROSPECTIVE JUROR: Seafood company in Washington, DC for about 14 years, and I'm an administrator for some companies in South America.

THE COURT: Thank you, sir.

Anyone else to my right? Otherwise we'll move to the

54

left.

Okay. Over to the left.

PROSPECTIVE JUROR: Hello. I'm Garret Davidson. My wife owns a small retail optical and is a doctor of optometry where she practices.

THE COURT: Thank you, Mr. Davidson.

Anyone else, Ladies and Gentlemen?

All right. The fact that a corporation is a party in this case must not affect your deliberations or your verdict if you are selected as a juror. Do any of you have any beliefs or feelings for or against corporations or companies that might prevent you from serving as a fair and impartial juror in this case? If so, please raise your hand.

Seeing no hands raised.

Have you, or a close friend or family member, or anyone with whom you've had a significant personal relationship had any training in the following: Counseling; social work; social services; automotive design; automotive mechanics; accident construction; autonomous vehicle technology, including radar, camera, or LiDAR; medicine; software engineering; or coding; or law? If so, please raise your hand.

Okay. And if you can just identify the special training and who it is.

PROSPECTIVE JUROR: Let me try to remember all the --

THE COURT: Okay. Well, I can repeat them.

And I just want to make sure this is Ms. Paguaga De Choiseul.

PROSPECTIVE JUROR: Yeah. You said something about cars, engineering.

THE COURT: Yes. Automotive mechanics, automotive design, accident reconstruction, autonomous vehicle technology.

PROSPECTIVE JUROR: Okay. One of my kids is a mechanical in aerospace engineering for McLaren Automotives in UK. The other one is a statistician. And my daughter is in AI and automation. And my husband works in that field and another one of my kids. What else?

THE COURT: Medicine, software engineering, coding, and law.

PROSPECTIVE JUROR: Software engineering, yes. My youngest, pure mathematic software engineering and quantitative analyst. And then medical and counseling, myself.

THE COURT: All right. Thank you.

Anyone else, Ladies and Gentlemen?

PROSPECTIVE JUROR: Aleida Ruiz.

Medical. I was a laboratory technologist, medical laboratory technologist.

THE COURT: Okay. Thank you, Ms. Ruiz.

Anyone else, Ladies and Gentlemen?

I think -- if you can pass the microphone to the gentleman, Mr. Smith.

PROSPECTIVE JUROR: I have a JD, but I never practiced law.

THE COURT: Okay.

PROSPECTIVE JUROR: So that's about it. It shouldn't affect anything here.

THE COURT: Thank you, sir.

Anyone else, Ladies and Gentlemen?

I think there's a woman in the back in the third row.

PROSPECTIVE JUROR: My name is Carla. I'm a medical assistant --

THE COURT: I'm sorry. Carla, your last name is?

PROSPECTIVE JUROR: Crosby.

THE COURT: Crosby. All right. Thank you.

PROSPECTIVE JUROR: I'm a medical assistant and a recent RN grad, so that's it.

THE COURT: Okay. Thank you.

Anyone else to the left before we move over to the right?

PROSPECTIVE JUROR: My oldest son is a software engineer --

THE COURT: And this is?

PROSPECTIVE JUROR: John Mowris.

THE COURT: Thank you, Mr. Mowris.

PROSPECTIVE JUROR: My oldest son is a software engineer, and my second son works for a drone manufacturer.

He's an electrical technician.

(Court reporter interruption.)

PROSPECTIVE JUROR:  Drone.  Drones and drone hangars.

THE COURT:  Thank you, sir.

I think there's one other individual.

PROSPECTIVE JUROR:  Hi.  My sister --

THE COURT:  And your name is?

Is this Ms. --

PROSPECTIVE JUROR:  Ngo.

THE COURT:  Okay.

PROSPECTIVE JUROR:  My sister is a medical -- biomedical engineer.  And my brother, he's an IT.

THE COURT:  Thank you, Ms. Ngo.

Anyone else to my left before we move over to the right?

All right.  Seeing no hands.

Let's move to the right.  Anyone to the right? Counseling, social work, automotive design, mechanics, accident reconstruction, autonomous vehicle technology, medicine, software engineering, or coding, or law.

PROSPECTIVE JUROR:  I used to code.  I --

THE COURT:  Is this Ms. Pantoja?

PROSPECTIVE JUROR:  Baghdoian.

THE COURT:  I'm sorry.  My apologies.  Yes, Ms. Baghdoian.

58

PROSPECTIVE JUROR:  Yes.  So I majored in computer science and I used to code a long time ago.  And my brother-in-law is a physician.

THE COURT:  Okay.  Thank you.

Anyone else, Ladies and Gentlemen?

PROSPECTIVE JUROR:  My mom is a nurse practitioner.

THE COURT:  Ms. Gaspar?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  And I study nursing.  But right now I'm studying for the boards.

THE COURT:  Thank you, Ms. Gaspar.

Anyone else?

PROSPECTIVE JUROR:  Your Honor, my nurse -- my daughter is a preop surgical nurse at Jackson Health System.

THE COURT:  Is this Ms. Rodriguez?

PROSPECTIVE JUROR:  Yes, it is.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Mr. Apolinario.  Currently a lead software developer for a few years now, majored in computer science.

(Court reporter interruption.)

PROSPECTIVE JUROR:  Software developer -- lead software developer, majored in computer science.

THE COURT:  Thank you, sir.

Anyone else?

Okay.  In the back.

PROSPECTIVE JUROR:  I'm Garret Davidson.  I'm not a lawyer.  I'm a CPA.  But I am experienced in tax law.

THE COURT:  Thank you, sir.

PROSPECTIVE JUROR:  Mr. Gutierrez.  My family and I have a non-profit organization for social work.  And my brother-in-law works as a network manager for a law firm.

THE COURT:  Thank you, sir.

PROSPECTIVE JUROR:  My name is Maria Sanchez.  And I am currently employed at a law firm.

THE COURT:  Okay.  Thank you, Ms. Sanchez.

PROSPECTIVE JUROR:  Dalia Morales.  And I'm a paralegal, legal assistant.

THE COURT:  All right.  Thank you, Ms. Morales.

Anyone else?

PROSPECTIVE JUROR:  Hi.  Pablo Carballido.  I work in software engineering with a concentration in data analytics and data science.

THE COURT:  Thank you, sir.

PROSPECTIVE JUROR:  Good morning.  Estela Garcia McDougal.  My -- four of five of my close cousins are doctors, not all of them in Florida.  My -- one of my best friends is a counselor, although she works as a teacher now.  And I am a medical technologist, and my sister is an MRI tech.  She does a

60

lot of brains and injuries. And my brother was a mechanic. He now does just body shop.

THE COURT: Thank you, Ms. Garcia McDougal. Thank you.

Anyone else, Ladies and Gentlemen?

All right. Is there anyone here that has any deeply held beliefs that would not allow you to sit in judgment of others in this civil case? If so, please raise your hand.

Okay. If we could bring the microphone over to this gentleman.

Is this Mr. Gutierrez?

PROSPECTIVE JUROR: Gutierrez. Yes.

I just -- I'm very -- like, I'm a devout Christian man. I believe in the Bible and what it says religiously, like to the point -- like every -- word for word. And I do believe my faith -- my strong faith could, you know, interfere with some of the decisions that could arise from trial.

THE COURT: Now, Mr. Gutierrez, I just want to explain that your role, if you are selected as a juror, is the judges of facts. You're going to determine what the facts of this case are, and I'm going to instruct you on the law that you should apply to those facts. So understanding your role as a juror, do you believe that your religious beliefs would have an effect on your ability to serve as a judge of the facts?

PROSPECTIVE JUROR: If they interfere with my faith,

then I would have a hard time, you know, accepting just with like my conscience and my beliefs.

THE COURT:  Right.  But can you think of a reason how your faith would affect your ability to determine what the facts of this case are?

PROSPECTIVE JUROR:  I mean, not at the moment, but I -- but I mean, I would try to be as -- you know, with the facts, I would try to be as -- you know, as factual as possible.  Like if -- but I do believe that it could interfere with some -- like, if it does interfere directly with my personal beliefs and religious beliefs, then yes, it could affect my decision.

THE COURT:  Okay.  Well, I just want to parse through that, Mr. Gutierrez.  Because my question is whether you have deeply held beliefs that would not allow you to sit in judgment of others.

PROSPECTIVE JUROR:  Okay.

THE COURT:  In other words, you would determine the credibility or lack of credibility of the witnesses.  Can you think of a religious reason that would have an impact or an effect on that credibility making that you would have as a juror?

PROSPECTIVE JUROR:  Yeah.  I mean, I just believe very strongly in forgiveness and redemption and grace.  So that's something very dear to my heart very strongly.  That's it.

Maybe that would be something that...

THE COURT: So do you believe that that would have an effect on your ability to judge the credibility or lack of credibility of the witnesses?

PROSPECTIVE JUROR: Yes.

THE COURT: You believe it would?

PROSPECTIVE JUROR: I would believe -- yes, I would believe it would.

THE COURT: All right, sir. Thank you.

Now, Ladies and Gentlemen -- anyone else, Ladies and Gentlemen?

Are there any of you who would not seek treatment or care from a medical doctor? That is, you would refuse to seek any treatment or care from a medical doctor? If so, please raise your hand.

Seeing no hands raised.

Have you, or any member of your family, a close friend, or anyone with whom you've had a significant personal relationship ever been in an accident that resulted in someone involved in the accident making a claim for personal injuries or for substantial property damage, regardless of whether a lawsuit was filed? If so, please raise your hand.

PROSPECTIVE JUROR: Sandra Pantoja.

Could you repeat the question one more time?

THE COURT: Yes. Have you, a close friend, or family

member, or someone you have -- a significant personal relationship ever been in an accident that resulted in someone involved in the accident making a claim for personal injuries or substantial property damage, regardless of whether a lawsuit was filed?

PROSPECTIVE JUROR:  This is a vehicle accident?

THE COURT:  Yes.

PROSPECTIVE JUROR:  When I was a teenager, someone crashed into me and put a claim against my insurance.

THE COURT:  All right.  Would that have any effect on your ability to serve as a fair and impartial juror in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.  Thank you, Ms. Pantoja.

Can we go to the next person.

PROSPECTIVE JUROR:  My name is Carla Crosby.  I think I had an accident in 2015.

THE COURT:  Did you make a claim for personal injury or substantial property damage?

PROSPECTIVE JUROR:  Yes.  I had to make a claim on somebody else because they hit me in the back.

THE COURT:  Now, would that have any effect on your ability to serve as a fair and impartial juror in this case?

PROSPECTIVE JUROR:  No.

THE COURT: All right. Thank you.

Anyone else, Ladies and Gentlemen?

PROSPECTIVE JUROR: Rene Velez.

My son just recently got sued by a gentleman that -- he hit a gentleman in the back. And then, I would say in like 2016, my brother got hit in the middle of the turnpike because he got out of his car, and he did the claim.

THE COURT: All right. Would those incidents have any effect on your ability to serve as a fair and impartial juror in this case?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, sir.

And I think one other individual.

PROSPECTIVE JUROR: Hello. Ronald Reyes.

My twin brother was in a car accident in the early 2000s.

THE COURT: And would that -- and did your twin brother make a claim?

PROSPECTIVE JUROR: He did.

THE COURT: All right. Would that have any effect on your ability to serve as a fair and impartial juror?

PROSPECTIVE JUROR: It might possibly.

THE COURT: Okay. And why do you think it might possibly?

PROSPECTIVE JUROR: Just because I saw the strain it

took on our family.  It was a severe car accident, and it --

THE COURT:  Okay.  So could you set aside that experience or you think that experience would be part of this case for you?

PROSPECTIVE JUROR:  I think that experience would be part of this case for me.

THE COURT:  All right, sir.  Thank you.

Anyone else, Ladies and Gentlemen?

PROSPECTIVE JUROR:  Good morning.  My name is Lien Estevez, Juror Number 14.

I have been involved in multiple accidents where I have put a claim and someone had put a claim on my insurance, both ways.  I don't think this would affect my judgment of the circumstances.

THE COURT:  Okay.  Ms. Estevez, I'm going to ask the question again, because when you say:  "I don't think," I don't know if that means you have some hesitation or you don't.  So you've been involved in many accidents, you've made claims, other people have made claims.  Do you believe any of those incidents would have any effect on your ability to serve as a fair and impartial juror?

PROSPECTIVE JUROR:  I don't believe so.

THE COURT:  Okay.  When you say:  "I don't believe so," is there any hesitation on your part?

PROSPECTIVE JUROR:  No.

THE COURT: All right. Thank you.

Anyone else to my left -- or my right, and then we're going to move over to the left.

Okay. If we can bring the microphone. If you can have your hand raised so we know who else has been involved -- or you or a close friend or family member has been involved in an accident and has made a claim.

PROSPECTIVE JUROR: Ms. Gaspar.

My father's girlfriend, she got into a car accident by an Uber driver, and right now she's doing a claim.

THE COURT: Okay. Would that have any effect on your ability to serve as a fair and impartial juror?

PROSPECTIVE JUROR: No.

THE COURT: All right. Thank you, Ms. Gaspar.

Anyone else? Any other hands?

Okay. Ms. Rodriguez.

PROSPECTIVE JUROR: Your Honor, my father was in a very bad car accident. He was hit crossing a street many years ago. There was a claim out of it. Nothing came out. I also had an accident as a teenager. So I won't tell you how many years ago that was. And I put -- there was a claim that I put in. Neither one of these scenarios would influence how I handle this case, as it is a completely separate --

THE COURT: Okay.

PROSPECTIVE JUROR: -- on its own.

THE COURT:  So would these incidents have any effect at all on your ability to serve as a fair and impartial juror?

PROSPECTIVE JUROR:  None whatsoever.  I just felt the need to tell you, since you asked.

THE COURT:  Of course.  Thank you, Ms. Rodriguez.  I appreciate you providing the information.

Anyone else, Ladies and Gentlemen?

All right.  We're going to move on to the next question.  And that is:  Have you or has any member of your family, a close friend, or anyone with whom you've had a significant personal relationship suffered from a traumatic brain injury, complex regional pain syndrome, or some other similar injury?  If so, please raise your hand.

Ms. Pantoja?

PROSPECTIVE JUROR:  Sandra Pantoja.

My husband had a traumatic brain injury due to a stroke.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR:  Stacey Weintraub.

In 2006, I had to have brain surgery because I had hydrocephalous emergency surgery.  But that's all for now.

And then I wanted to ask you something personally.

THE COURT:  Of course.  And we can ask that at the appropriate break.  But Ms. Weintraub, are you doing okay?

PROSPECTIVE JUROR:  Thank God.

THE COURT:  All right.  So let me ask you -- and maybe I'll return it to Ms. Pantoja -- because I've given you a summary of this case.  The fact that you suffered, and Ms. Pantoja, obviously, she had a family member that suffered, would that have any effect on your ability to serve as a fair and impartial juror in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  And if I can ask Ms. Pantoja the question.

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

Anyone else that you or someone you know, a significant personal relationship, close friend, member of your family, suffered from a traumatic brain injury, complex regional pain syndrome, or some other similar injury?

Okay.  I think we've got some hands over here to --

PROSPECTIVE JUROR:  Estela McDougal.

My mother fell from stairs, and she had a brain injury.  She was in ICU for over a month.  And then she had -- this is 1980s, the late 1980s.  But she did have quite a substantial brain injury.

THE COURT:  Sorry to hear that.

Ms. McDougal, would that have any effect --

PROSPECTIVE JUROR:  No, not now.

THE COURT:  -- on your ability to be a fair and impartial juror in this case?

PROSPECTIVE JUROR:  Not now.

THE COURT:  All right.  Thank you.

And I think it's Mr. Brady.

PROSPECTIVE JUROR:  Yes, Your Honor.  Good morning.

My cousin, many years ago, suffered a motorcycle accident and he was in a coma and had bleeding in his brain. He has since recovered fully.

THE COURT:  Glad to hear that.  Mr. Brady, would that have any effect on your ability to serve as a fair and impartial juror?

PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  All right.  Thank you, sir.

Anyone else, Ladies and Gentlemen?

All right.  I hate to ask this question, but I do need to ask it.  And that is:  Is there anyone here who's suffered from the loss of a child?  If so, please raise your hand.

All right.  Seeing no hands raised.

There will be evidence, including medical testimony, and likely some photographs of the deceased and the Plaintiff Dillon Angulo.  Will you be able to handle the medical testimony, perhaps some photographs that may show some injury? I just want to make sure.  Is there anyone here that would have a problem with that?  If so, please raise your hand.

Seeing no hands raised.

The fact that the Plaintiffs went through this

terrible experience will naturally cause you to feel sympathy for them or for their loved ones. If you are instructed by the Court -- and you will be instructed that you cannot base your decision in this case on sympathy for or prejudice against anyone, so I want to make sure. Is there anyone here that will not follow the Court's instructions that sympathy and prejudice have no part in a trial? Is there anyone that -- if you cannot follow my instructions on the law, we would need to know that. If so, please raise your hand.

All right. Seeing no hands raised.

Now, Ladies and Gentlemen, is there anyone here that has any reason, any moral, religious, philosophical reason, any reason at all that you have not provided to the Court as to why you believe you cannot serve as a fair and impartial juror in this case? If so, please raise your hand.

Seeing no hands raised.

All right. Some of you have answered: "It will depend on the circumstances of the case." So I want to make sure -- and the question that I have asked: "Is there anything in your background or personal feelings that might affect your ability to be fair and impartial to both sides?" Is there anyone here that has any reason why you cannot be fair and impartial to both sides in this case? If so, please raise your hand.

Okay. We have a hand raised. If we can bring the

microphone.

PROSPECTIVE JUROR: Caroline Sanchez.

I guess this is my very personal opinion. It's my concept about the company Tesla and their ethics. I know it's been on the news, I mean, the same ownership. So quite frankly, I believe I -- that can have an impact because of my own opinion of the company. Yeah.

THE COURT: Okay. So you have an opinion about Tesla as a company?

PROSPECTIVE JUROR: Yeah. Due to their ethics and the ownership. And -- but many of us know about the news of, you know, the company being now with the government and the research. I mean, I have -- I mean, what I have read on the news and what I have read, you know, in the media, that may have, you know, an impact on how -- how I judge the company. I'm sorry. I have to be honest.

THE COURT: No. And Ms. Sanchez, we appreciate your honesty. So you yourself have a personal opinion --

PROSPECTIVE JUROR: A personal opinion of the company. Correct.

THE COURT: -- about the company. Right. So you've held that opinion before you walked into this courtroom. So let me ask the question, Ms. Sanchez. The fact that you hold this personal opinion -- can you set aside that personal opinion and render a decision based solely on the evidence and

testimony presented in this courtroom, and the law that the Court will instruct you that you must apply to those facts?

PROSPECTIVE JUROR:  It will be hard because I have my preconceived opinion.

THE COURT:  Okay.

PROSPECTIVE JUROR:  I have to be honest.  I'm sorry.

THE COURT:  So you can't -- so are you able to set aside that opinion?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Thank you, Ms. Sanchez.

We have a hand over here.

PROSPECTIVE JUROR:  Yes.  Yen Ngo.

After 30 years of auditing the big corporate companies, I had my fair share of corporate greed and harassment.  So I'm not sure if I can have a good judgment with Tesla.

THE COURT:  All right.  So is it Tesla in general or any company?

PROSPECTIVE JUROR:  Just any company.

THE COURT:  All right.  And you understand that the company sits before this court like any individual and must be treated the same way.  So my question to you, Ms. Ngo, is: Because you have that feeling about big corporate companies, after serving 30 years of auditing them, and you have this opinion about corporate greed and harassment -- I just want to

make sure. That's an opinion that you hold. But can you set aside that opinion and render a decision based solely on the evidence and testimony and the law that the Court instructs you on?

PROSPECTIVE JUROR: I believe I can.

THE COURT: Okay. When you say: "I believe I can" -- because you hold an opinion. You've audited companies for 30 years. The question is whether you can set aside that opinion and make a decision not based on that opinion but based solely on the evidence and testimony in this case.

PROSPECTIVE JUROR: Yes. Because I believe the legal system.

THE COURT: Okay. So my question again is: Would the fact that you believe that there are companies that have greed -- I don't want to misstate your words. But you've audited companies for 30 years. Do you believe that those opinions will come into this trial for you?

PROSPECTIVE JUROR: No.

THE COURT: All right. Is there any hesitation on your part?

PROSPECTIVE JUROR: No.

THE COURT: All right. Thank you.

Anyone else, Ladies and Gentlemen?

PROSPECTIVE JUROR: Your Honor?

THE COURT: I just want to get to the right because

the poor court security officers are running around with the microphone.

All right.  Now let's move to the left.  I know there's somebody here that raised their hand.

Okay?

PROSPECTIVE JUROR:  Carlos Adese.

I also have a strong negative opinion about Tesla, in particular about the owner, Elon Musk.

THE COURT:  Okay.  So you hold an opinion about Tesla and about Elon Musk?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you believe that you could set aside that opinion and render a decision based solely on the testimony and evidence?

PROSPECTIVE JUROR:  Anything that involves Elon Musk is very hard for me to have an --

THE COURT:  Okay.  So can you set aside that opinion, Mr. Adese?

PROSPECTIVE JUROR:  Very hard.  Anything that relates to that man.

THE COURT:  All right.  Thank you, sir.  And we need to know that.

Anyone else?

Okay.  There's a hand back here.

PROSPECTIVE JUROR:  Hi.  Estela McDougal again.

I -- I don't know.  You keep mentioning hesitation, and the more hesitation I feel.  Because although my heart bleeds for the family that's lost the loved one, I have nothing against Tesla, except that I seem to think -- and I apologize for this -- but it's always the best lawyer wins at the end. And I have a concern that the facts will not present all the evidence.  Maybe that's because I've gone to Dade County court and that was the case.  Half of the evidence was thrown out of court.  So I'm very hesitant to say that I can fully agree with one side or the other based on evidence.  So --

THE COURT:  So you're questioning the evidence, Ms. Garcia McDougal, before it's even presented?

PROSPECTIVE JUROR:  Based on my prior experience, yes. But not necessarily evidence but the way -- because one side will present one side and the other side will present a different side.

I do have a problem with Tesla automobiles.  And I think that the person driving it or buying it has a lot of the responsibility.  I'm sure there is something in the plan where Tesla has put the person driving needs to do this, and this, and this, and maybe that person didn't do it.  And that may be part of the facts that you're presenting.  But in my head I'm hesitating on the fact that I would love to not have the family gone through that, what they went through.  But at the same time, the driver probably has a lot of the responsibility.

THE COURT: Okay. Ms. McDougal, I'm going to stop you. Because you're kind of -- your thoughts are just continuing, but it's based on nothing more than what you think.

PROSPECTIVE JUROR: Right.

THE COURT: The trial hasn't begun. But you did say with obviously your experience in state court, that experience where you believe that the facts have not been presented. You also stated that you have a problem with Tesla. So that's what I want to focus on. Because Tesla is one of the parties in this action.

So do you have a problem with Tesla that would have an impact and affect your ability to be fair and impartial?

PROSPECTIVE JUROR: No, not with the company itself.

THE COURT: Okay. So you've made some claims and concerns. And let me say, Ms. Garcia McDougal, the trial has not yet begun. All of these attorneys are excellent attorneys. But your job as a juror, if you are selected, is to judge the facts. You determine what the facts of this case are based on what's presented here in this courtroom. That's it. That's your job. And then you apply those facts to the law that I instruct you. That's your job.

Your job is not to bring in the state case, not to bring in any other feelings. But I need to know that. Because if you, as you say, quote, have a problem with Tesla, I need to know whether that problem is going to affect your ability to be

fair and impartial.  If you believe, and you have in your mind, that all the facts may not be presented, I need to know if that's a feeling that you have before this trial begins because that's going to affect your ability to be fair and impartial.

So with those statements that you've made, Ms. Garcia McDougal, is that going to have an effect on your ability to be fair and impartial?

PROSPECTIVE JUROR:  It may.  I'm not sure.  I'm hesitant.

THE COURT:  And we need to know that.  And I appreciate your candor.

Okay.  Thank you, Ms. Garcia McDougal.

Anyone else, Ladies and Gentlemen?

All right.  So before I turn -- I did give the attorneys -- I told them they have a short opportunity to get to know you.  Is there any other individual that has any feeling that you have not expressed as to why you believe you could not serve as a fair and impartial juror in this case if you are selected?

Okay.  Let's turn the questioning over to the lawyers, who will have a limited opportunity to get to know you.

On behalf of the Plaintiff.

MR. SCHREIBER:  Thank you, Your Honor.

Is there any chance we would -- are we doing a comfort break this morning?

THE COURT:  No.  We're doing a comfort break after you've had your short period of time to get to know the jury.

MR. SCHREIBER:  Okay.  I was going to use that to organize my thoughts, but we'll go ahead and go.

Good morning, everyone.

Let me get you all situated here.  And as Her Honor pointed out, I get a short time to talk to 40 people.  So I'm given about 30 minutes to talk to 40 people.  So as you can imagine, we're not really going to get to know each other at a very deep level, but I'm going to try my best based upon the answers that you have provided us so far.

Now, what I want to start out talking about is what the purpose of this process is.  And it's really for us to get to understand what biases we may have.  Now, where I come from, every year, July 4th, there's a chili cookoff, and people are asked to come and judge the chili.  I couldn't be a fair judge at a chili cookoff because I hate chili.  And I think it's a -- repulsive that they serve it on July 4th when it's so hot.  So a lot of people think that bias is a bad thing, right, there's something negative about it.  But that's really what we're trying to get at here.

Now, Ms. Pantoja, do you feel -- I'm trying to get to -- find out if you have some chili that might impact your ability to be the most fair version of yourself in this case.  Is there anything that you have heard in the time that we've

been together this morning that you're holding onto maybe even just a little bit that thinks perhaps you might not be able to be the most fair version of yourself in this case?

PROSPECTIVE JUROR:  Are you asking me because of what I wrote in the questionnaire?

MR. SCHREIBER:  Well --

PROSPECTIVE JUROR:  Or what -- or --

MR. SCHREIBER:  We could do either one.  I can tell you I did have a follow-up on your questionnaire, which was -- it was something to the effect of -- about lawsuits and concerns about lawsuits, but that you're okay with them if -- I think your comment was:  "If negligence can be shown."

PROSPECTIVE JUROR:  Right.

MR. SCHREIBER:  Tell me about that.

PROSPECTIVE JUROR:  It asked if I had experience with it, and I do.  It doesn't affect my ability to judge, as long as -- I'm not biased in any way.  If negligence is shown, it's shown, and it doesn't bias me in any way.

MR. SCHREIBER:  Understood.  I appreciate that.

Ms. Castro -- Mr. Castro.  Excuse me, sir.  Sir, I understand that there was a family member of yours that was hurt in a car accident.

PROSPECTIVE JUROR:  Yes, sir.

MR. SCHREIBER:  And is there anything about that experience that you think may hold you back to be the most fair

80

version of yourself in this case?

PROSPECTIVE JUROR:  I don't think so.  A drunk driver.
What are you going to do?  Ten thousand dollars insurance.
That was it.

MR. SCHREIBER:  Okay.  Well, we're here suing Tesla
over their Autopilot system.  And you'll learn that the driver
in this case of our clients, as Her Honor has already
indicated, was distracted.  Now, some people would think that
that's all his fault and no matter what the manufacturer can't
have responsibility.  How do you feel about that, sir?

PROSPECTIVE JUROR:  It's technology.  It's where we're
going.  Nothing we could do, really.

MR. SCHREIBER:  Tell me more.  What do you mean?

PROSPECTIVE JUROR:  I have coworkers that have Teslas.
They all brag, you know, how they -- as long as they are paying
attention to the road, they don't have to be touching the
steering wheel.  Personally, I think it's a little crazy, a
little insane, but I'm old-fashioned in that sense.  I like the
old cars, the old muscle cars.  Will I have a Tesla?  No, not
really.  Any -- Tesla, no.  Any electric car, not really.

MR. SCHREIBER:  Okay.  I appreciate that, sir.  Thank
you for your response.

I'm going to focus maybe just on the folks in the
first couple of rows here.  You heard my question about we're
suing Tesla over their Autopilot system.  And there are some

people like Mr. Castro who are kind of more old school about it. Does anybody -- let's focus on this half. That's how we'll split it up. Does anyone on this half of the courtroom have similar feelings about this concept that using Autopilot or lane assist -- y'all filled out the questionnaire -- is a little crazy, isn't something you should do?

All right. I'm getting some nods of heads.

I know, Ms. Ruiz, you've shared with us a lot of feelings. And so you have strong feelings about this, correct?

PROSPECTIVE JUROR: Well, they're honest feelings. Yeah.

MR. SCHREIBER: And that's the whole point, right? This -- Ladies and Gentlemen, I want to be clear about something. This is the job interview. Right? And it's a numbers game. There's 40 of you in here. There's only going to be 10 seats in there. So we understand when you-all show up that 30 of you are not the right applicant for this job.

Is it fair to say, Ms. Ruiz, based upon the comments you've given us so far this morning that you think maybe this is not the case where you can be the most fair version of yourself?

PROSPECTIVE JUROR: Well, the fact I don't like electric vehicles and that I believe -- I think a lot of us believe that people should be paying attention to the road, especially here in Miami, is -- you know, it's a -- I think

82

it's a common feeling of a lot of people.  And I would have to hear the facts of the accident.

Again, I don't have that information.  But the fact that I don't like electric doesn't mean I hate Tesla.  I just don't like any electric.  I -- you know, in the past administration, when they were pushing it, I said to my husband one day:  "I'll never drive an electric vehicle," and I never will.  I'll ride a bicycle instead.

MR. SCHREIBER:  Understood.

PROSPECTIVE JUROR:  And I can do that.  So...

MR. SCHREIBER:  And I've picked enough jurors to know that a lot of people will give me the response you just did about:  "I need to hear the facts first."

PROSPECTIVE JUROR:  Yeah.

MR. SCHREIBER:  And I totally get that.  But it is not my opportunity -- now is not the time for me to give you five facts and have you make up your mind about the case, any more than it's your time to go back into the back room and start deliberating.  Right?  That's the job.  We're still at the interview.

PROSPECTIVE JUROR:  I understand.

MR. SCHREIBER:  So how difficult, if not impossible, would it be for you to set aside those feelings for purposes of this case?

PROSPECTIVE JUROR:  No.  I can set them aside.

MR. SCHREIBER:  Okay.  Who else on the right side of the room?

Mr. Betancourt.  It's an easy handoff on the -- the gentleman to your right.

PROSPECTIVE JUROR:  Oh.

PROSPECTIVE JUROR:  Good morning.

MR. SCHREIBER:  Good morning, sir.  I see from your responses that you have used various automation -- what we call drive assistance features, lane centering, cruise control, those sort of things, pretty regularly.

PROSPECTIVE JUROR:  That is correct.

MR. SCHREIBER:  All right.  Anything about that experience that you think that you bring to bear that may impact your ability to be the most fair version of yourself in this case, sir?

PROSPECTIVE JUROR:  No, sir.

MR. SCHREIBER:  All right.  Anything that I was saying earlier about us suing the manufacturer when there's also a distracted driver involved -- does that bring up anything inside of you?

PROSPECTIVE JUROR:  No, sir.

MR. SCHREIBER:  All right.  Anybody on this side of the room, anything about that concept of suing an auto manufacturer with respect to a claim of their system and there's also a distracted driver?

It's like school.  If you don't raise your hand, I will pick on you.

All right.  I was told that Ms. Ngo had her hand up. I don't know to what of my questions you raised your hand.

PROSPECTIVE JUROR:  Yeah.  I just think that people nowadays are using too much technology and they get lazy.

MR. SCHREIBER:  And they what?

PROSPECTIVE JUROR:  They get lazy.

MR. SCHREIBER:  Tell me more about that.

PROSPECTIVE JUROR:  Let's say, for example, AI.  The students, they use AI to write their essay instead of writing it on their own.  And I don't believe in auto driving either, because you need to pay attention on the road because driving is a responsibility.

MR. SCHREIBER:  And so understand, ma'am, what we're looking for here -- and this is one of the few times I think I can probably fairly speak for Tesla, as well as the Plaintiff. If this case was a foot race, all we are looking for is for folks to sit in that jury box who all start at the same starting line.  We don't want either side, Plaintiff or Defense, starting a couple steps ahead or a couple steps behind.  And I can't really interpret your answer to tell me that -- could that be a situation where either the Plaintiffs or Tesla is starting a couple steps ahead or a couple steps behind.

PROSPECTIVE JUROR:  I do think technology is good, but sometimes people just misapply it and take advantage of it.

MR. SCHREIBER:  Okay.  Thank you, ma'am.

PROSPECTIVE JUROR:  You're welcome.

MR. SCHREIBER:  I got to talk to folks who -- again, I don't have a ton of time, so I got to keep moving here.

Let's see -- and also sometimes when you look away that makes me want to ask you questions more, just so you know.

Mr. Fernandez Molina, you have experience with Autopilot, I think, or automotive driver assist features.  Explain.

Sorry.  I just got shorthand.

PROSPECTIVE JUROR:  I love this drive assistance, actually.  I have a Ford Explorer, and I love that technology.  That technology is to be safe.  I mean, we believe in that.  When I drive with my family, I activate it and I believe in that.  I hope that give me security.  Okay?

MR. SCHREIBER:  You trust the technology.

PROSPECTIVE JUROR:  Yes.  I trust.  But anyway, as I said before, I trust that that technology give me a security.

MR. SCHREIBER:  Okay.  Thank you, sir.

PROSPECTIVE JUROR:  But sometimes when you drive, the road is -- has -- I don't know.  The line is not clear and the system start to fail.  That happen too.

MR. SCHREIBER:  Tell me about that.

PROSPECTIVE JUROR: Okay.

MR. SCHREIBER: Tell me more about that, if you could, sir.

PROSPECTIVE JUROR: Well, I have experience in driving to Orlando. The road was like some maintenance or something like that, construction, new construction, and the lines was like a -- was not straight. And suddenly the car -- (indicating) -- did some movement, rapid movement, and I take the control. And I think that as drivers I have to be a -- trust, but controlled. You know?

MR. SCHREIBER: Understood.

Sir, while I have you -- and I'll ask this also to the panel and for anybody who has had experience using -- whether it's Autopilot, or lane centering, or what they call kind of Traffic-Aware Cruise Control, that gets your vehicle going forward and back -- and because you have the mic in your hands, did you read the owner's manual as part of your vehicle before you used those features?

PROSPECTIVE JUROR: No. I mean, no.

MR. SCHREIBER: All right. Thank you, sir.

Mr. Crosby -- oh. Ms. Crosby.

There you go. I'm sorry.

Ms. Crosby, did you have experience -- oh. I'm sorry. No, you did not have experience with Tesla. Correct?

PROSPECTIVE JUROR: No.

MR. SCHREIBER:  All right.  Well, let me ask you this:  You drive a vehicle?

PROSPECTIVE JUROR:  Yes.

MR. SCHREIBER:  Have you ever read the owner's manual?

PROSPECTIVE JUROR:  No.

MR. SCHREIBER:  Okay.  Who here has read the owner's manual on their vehicle?  Across the room, show of hands.

All right.  I got a little wave, a little something something.

Mr. Smith, you read it from like cover to cover, like it's a book, or you just -- you read bits and pieces when you need it.  Talk to me.

PROSPECTIVE JUROR:  Well -- good morning.  When I buy a new car, I do look through certain parts of it.  I don't read it cover to cover, but I focus on the important parts of it.

MR. SCHREIBER:  Understood.

And who else?  Who raised their hand on this side of the room?  Let's get to some folks who we haven't spoken to yet.

That would be -- is it Ms. Palou?

PROSPECTIVE JUROR:  Yes.

MR. SCHREIBER:  Ms. Palou, talk to us.  I also had a note on here that you had strong feelings about Tesla.

PROSPECTIVE JUROR:  Just about the owner, but it doesn't affect my feelings about the case.

MR. SCHREIBER:  Okay.  Tell me about your experience with an owner's manual.

PROSPECTIVE JUROR:  I go through mine pretty frequently.

MR. SCHREIBER:  All right.

PROSPECTIVE JUROR:  I have a newer car.  So whenever something goes astray, that's the first thing I do, is pull up my owner's manual.  And I still have one.

MR. SCHREIBER:  Okay.  Now, what do you think about whether or not a vehicle manufacturer -- so owners should follow the manual.  Is that your feeling?

PROSPECTIVE JUROR:  Yes.  If you have questions, to look it up.

MR. SCHREIBER:  Okay.  What about the concept of vehicle manufacturers following industry practices and industry standards?  Ever thought about that?  And you may not have ever thought about that question --

PROSPECTIVE JUROR:  No, I haven't.

MR. SCHREIBER:  -- because most people wouldn't have.

PROSPECTIVE JUROR:  No, I haven't.

MR. SCHREIBER:  All right.  Let's go to Mr. Tracy.

Mr. Tracy, you had told us you used your driver-assistance features pretty regularly, correct, sir?

PROSPECTIVE JUROR:  Yes, sir.

MR. SCHREIBER:  And were you one of the folks who

raised their hands and said that you read your owner's manual?

PROSPECTIVE JUROR:  I only read it when I need to. When something goes astray, then I'll read it and see how to make it work.

MR. SCHREIBER:  Do you have an actual owner's manual in your car?

PROSPECTIVE JUROR:  Yes.

I do have a problem with blaming an industry or something that a person has to activate to make it work.

MR. SCHREIBER:  Tell me about that.

PROSPECTIVE JUROR:  If I could use the analogy of a gun.  If you put a loaded gun on the table, it doesn't shoot anybody.  But if you pull the trigger, it will shoot everybody. And I feel the same way with this -- using this analogy for Tesla as well.  They do have self-automated features, and you can't blame the features if you're not reading how to work them, or you're unfamiliar, or you're not paying attention.

MR. SCHREIBER:  All right.  So can you even imagine a circumstance where it might be legitimate to hold a manufacturer of technology like Autopilot responsible for a crash that occurred when someone was distracted?

PROSPECTIVE JUROR:  If a hundred people are doing this same thing, and it breaks a hundred percent of the time for those hundred people, then yes.

MR. SCHREIBER:  Okay.  But unless a hundred people are

doing the same thing, and it breaks a hundred percent of the time, that is a deeply held belief that you have that you would not be able to separate if you were to be picked to be a juror in this case.  Fair?

PROSPECTIVE JUROR:  Fair.

MR. SCHREIBER:  Is it fair to say that based upon these deeply held beliefs that you didn't just -- they didn't just happen in the last two hours, that you walked into here with your life experience, that it might be that the Plaintiffs in this case, because of the type of claim we're bringing, we might start a step or two behind that starting line than Tesla does?

PROSPECTIVE JUROR:  I don't know how to answer that.

MR. SCHREIBER:  Okay.  That's all right.

All right.  Now, there was a few nods of heads -- thank you very much, Mr. Tracy.  And also, sir, thank you for your service.  That was nice of the Court to recognize that at the beginning.

I got a few other head nods -- and Your Honor, I'm sorry.  I did not look at the clock when I started.  How much time do I have?

THE COURT:  It was 11:15.  You have until 11:45.

MR. SCHREIBER:  Thank you very much.

There was a few other -- let me just open it up.  Who else feels similarly to Mr. Tracy when it comes to this idea of

holding the autonomous vehicle manufacturer responsible for the acts of a bad driver?

Okay. I'm going to start over here, and then I'm going to come over here. Who else -- I think there were a couple of nods. Perhaps -- was it Mr. Smith? Did you kind of nod your head along with that?

PROSPECTIVE JUROR: I don't recall.

MR. SCHREIBER: Okay. Well -- or Mr. Castro or Ms. Weintraub? Anybody have a feeling about that one way or the other?

And look, we're looking for every little like twitch that y'all do. So it might not have actually been a thing.

PROSPECTIVE JUROR: I just -- what he was saying about the gun, I think, yeah, is true.

MR. SCHREIBER: Now -- okay. Now, if it's Remington -- that's a gun manufacturer, right? Yeah -- you know, Colt or something was sitting on this side of the room, that would be a different case. We're not here talking about that. Is that concept of shared responsibility -- is that something that you struggle with, Mr. Castro?

PROSPECTIVE JUROR: No.

MR. SCHREIBER: Okay. All right. Guys, I have 11 minutes. So I am -- apologies, Ms. McDougal -- not going to come back to you right now because I have a number of other topics that I need to cover with you.

(Pause in proceedings.)

MR. SCHREIBER:  Focusing on this half of the room, we represent a family who is here tragically suing over the death of a loved one.  Their 22-year-old daughter was killed in this collision.  And some people see that as a parent trying to profit off of the death of their child.  I've had prospective jurors share things like that with me before.

Is there anybody who sees it that way and thinks that bringing a case like this is inappropriate for those reasons?

And I know it is really hard to answer this affirmatively with them standing right behind me right now.  I get it.  But I implore you all to have the courage of your convictions, that if you feel that even just a little bit you got to share it with us now.

Anybody?

Who thinks the opposite?

Ms. Estevez -- who thinks it's appropriate to bring a claim -- how do you land on this?

PROSPECTIVE JUROR:  If I feel that the maker of the car has a feature that had some interference in the way the driver was driving, I will hold them responsible.  I would try to make them accountable.

MR. SCHREIBER:  Thank you, ma'am.

All right.  I got eight minutes, and I have to talk about damages.  This will be opened up to everybody.  Who here

feels that it's appropriate that there be caps on damages; in other words, amounts of money that just simply say that you're not allowed to receive -- or you shouldn't receive more than some amount of money if you were the complaining party, the plaintiff in a lawsuit?  And again, I know this is probably something people don't think about.  But I usually get a hand or two in the room.

And again.  It's like school; if you don't raise your hand, I will ask.  Let's go to Mr. Reyes -- oh.  I had -- yeah.  Go ahead.  Talk to me about your feelings about caps on damages.

PROSPECTIVE JUROR:  Well, I think if they are low, I don't think they should be low, but I also don't think they should be to a point where the company may go bankrupt.  You see a lot of these cases go for extraordinary amounts of money.

MR. SCHREIBER:  And is there some amount that no matter what the facts and evidence show that in your view is simply too much?

PROSPECTIVE JUROR:  Can you put a price on life?

MR. SCHREIBER:  Well, that's a fair point.  And maybe that was a better -- thank you.  Maybe that's a better way of framing it.

Who feels that there are certain things that just money is such a crude object, it's such a blunt object to try to use to fill a void that it's just not even worth doing.

Because, after all, you can't put a price on life. You can't put a price on pain.

Talk to me about that. What does that bring up inside of you?

PROSPECTIVE JUROR: I mean, it brings up feelings definitely, especially after what happened with my brother.

MR. SCHREIBER: Right. And so, as a result of that, do you think that those feelings that you understandably bring with you into this courtroom -- I guess, how hard, if not impossible, would it be for you to set that aside in this case, as opposed to maybe being a juror in another case where you didn't have to deal with those issues?

PROSPECTIVE JUROR: I mean, it would definitely be hard for me to take that out.

MR. SCHREIBER: Understood.

Going back to you, Mr. Tracy -- or I guess Officer Tracy -- sir, is it fair to say that those deeply held beliefs that you had, that maybe to be the most fair version of yourself would be hard in this case? Whereas, if it was another case, in some other courtroom, involving some other set of issues, you could be that most fair version of yourself that you would struggle with being in this courtroom?

PROSPECTIVE JUROR: I'm not even sure how to answer that question. It's hard to say that somebody would blame something or -- I don't even know how to put it into words. I

just think it's hard for somebody to say: "Oh. It's just only the manufacturer that's to blame," or "It was only this one feature," and that was the whole reason why we're in court today.

As far as like damages, I don't even know about damages. I don't think that, you know, somebody should get like a billion dollars for something. But they should have enough to cover all their medical and everything, so that they can at least live out the rest of their life fair.

MR. SCHREIBER: Fair enough, sir. I appreciate that.

And let me be clear about something. We're talking about shared responsibility. As jurors in this case, there will be two cups and one pitcher of blame to pour into; a cup for the driver and a cup for Tesla.

Who else has an issue, if at all -- let me talk to some folks that I have not talked to. Ms. -- and I'm sorry. My handwriting is terrible sometimes -- Paguaga De Choiseul.

PROSPECTIVE JUROR: When you looked at the name three times, I knew it was going to be me.

MR. SCHREIBER: Fair enough.

PROSPECTIVE JUROR: What was the question?

MR. SCHREIBER: That's a good question. I don't remember.

PROSPECTIVE JUROR: See?

MR. SCHREIBER: Shared responsibility. Thank you.

PROSPECTIVE JUROR: I believe that that would be the fairest way to go about it. I mean, it's not just one or the other. I like technology. I think it helps. But it's in our hands regardless. I mean, we have choices. If you're going to use a nanny, like my husband calls it, you still have to be aware of your -- you know, what's going on in your surroundings. You're still the driver.

But at the same time, why put out a product that has not been tested enough? Why give away cars almost and have the people be the test subjects to this product?

MR. SCHREIBER: Thank you.

PROSPECTIVE JUROR: So --

MR. SCHREIBER: That's actually a good follow-up. I have a couple more -- and I know I'm short on time.

Mr. Apolinario, you're a software developer. Sir, what's a beta test?

PROSPECTIVE JUROR: Pretty much give the software or the -- whatever it is that you're releasing to a small group of people, and they test it out for you.

MR. SCHREIBER: Okay. And as someone in the software development industry, it's when the product's not quite fully finished, correct?

PROSPECTIVE JUROR: It's almost done, but it may have some kinks in it.

MR. SCHREIBER: And then you want to send it out to

people to get feedback before it's in final form to make sure it works properly, correct?

PROSPECTIVE JUROR: That's correct.

MR. SCHREIBER: Okay. I don't think anyone said that they actually signed up to be a beta tester. Is that true? I think I went through every questionnaire and did not see one affirmative response to that question. I just wanted to touch on that.

Thank you, sir. Thank you for sharing that with us.

Ms. -- Juror 17, Mr. Reyes -- Mr. Velez. Sorry, sir. Thank you.

Mr. Velez, I read in your questionnaire that you love Tesla.

PROSPECTIVE JUROR: I love the technology.

MR. SCHREIBER: Okay.

PROSPECTIVE JUROR: By saying: "Love Tesla," I think it's more love, you know, the way we're moving forward in the world. I'm not scared of it, but I know there is setbacks to it.

MR. SCHREIBER: All right. And is there anything about that experience or that deeply held belief that you believe would impact your ability -- I guess would it be hard, if not impossible, for you to set that aside?

PROSPECTIVE JUROR: Absolutely not.

MR. SCHREIBER: All right. Fair enough.

Who here -- Mr. Mowris?

PROSPECTIVE JUROR:  Yes.

MR. SCHREIBER:  Mr. Mowris, do you feel that punitive damages can serve a valid purpose to hold corporations accountable?

PROSPECTIVE JUROR:  Yes.

MR. SCHREIBER:  Tell me more.

PROSPECTIVE JUROR:  If you can prove there was some sort of irresponsibility or -- I'd like to say like intention to save money or cut corners, then, yeah, there should be some extra burden.

MR. SCHREIBER:  Okay.  Who here agrees with Mr. Mowris on that on this side of the room?  Raise your hand.

Who here feels the opposite of Mr. Mowris and feels that punitive damages don't serve a purpose to hold corporations accountable?

I got five hands that went up, but there's about 16 other people out there -- or maybe you just don't have a feeling one way or the other.

Ms. Largaespada.

PROSPECTIVE JUROR:  Well, yes.  I'm agreed what he said.  I think that there's responsibility -- if it's a responsibility on the manufacturer, you know, it's only fair to honor, or whatever, you know, after like reviewing all the facts and everything that happened.

MR. SCHREIBER: Okay. Your Honor, I have one more witness -- one more juror, and --

THE COURT: All right. All right. Certainly.

MR. SCHREIBER: Ninety seconds probably.

Ms. Guzman Rodriguez, you had some very strong feelings that you shared in your questionnaire response about lawsuits, about lawyers, about a lot of things. And I guess my question is for you: How hard would it be for you to be a juror in a case like this involving what limited issues you understand this case to be about? Because understand, we're trying to find the right people who have the least amount of impediments and obstacles, so that they can be the most fair version of themselves. Do you think you could do that here?

PROSPECTIVE JUROR: I don't have any difficulties in making a decision in any case, in making judgment.

MR. SCHREIBER: Could you hold the mic up so the court reporter can hear. Thank you.

PROSPECTIVE JUROR: I forgot the question.

MR. SCHREIBER: Yeah. It's just -- you talked about we have a lot of careless drivers, we've got too much lawyer advertising -- I would agree. It's all about the money, money, money.

PROSPECTIVE JUROR: Uh-huh. Yes.

MR. SCHREIBER: Talk to me about that.

PROSPECTIVE JUROR: Okay. It's the fact that we have

a lot of careless drivers here in Dade County.  I experience that all the time.  People really don't care about the next person.  They just want to get there.  And we don't have enough, let's say, lawmakers telling us what to do or what not to do on the street, if you do this or if you do that.  And then you have a lot of lawyers just advertising:  "Oh.  We are going to give you $300,000, a million."  What is that?

MR. SCHREIBER:  Yeah.

PROSPECTIVE JUROR:  Take responsibility.  We have to take responsibility.  This is our life.

And what was the other part of the question?

MR. SCHREIBER:  Well, I think that covers it.  I mean, do you think -- do you think -- these are deeply held beliefs, ma'am.  You didn't just turn these on in the last three hours.  And so do you think that would prevent you -- create an obstacle and impediment --

PROSPECTIVE JUROR:  No.

MR. SCHREIBER:  -- even just a little bit to be the most fair version of yourself in this case?

PROSPECTIVE JUROR:  I'm going to be really fair.

MR. SCHREIBER:  Okay.  Last two questions, and they're super quick.

THE COURT:  Mr. Schreiber, you'll ask one last question, sir.

MR. SCHREIBER:  One last question, and it's going to

be really quick.  Does anyone here actually want to be on this jury?

PROSPECTIVE JUROR:  Yes.

MR. SCHREIBER:  Raise your hand.

Okay.  All right.  We got a few.

All right.  As long as I got a few.

THE COURT:  All right.  Thank you, Mr. Schreiber.

Ladies and Gentlemen, at this point, because we do need to do some items in the courtroom, we're going to take a 15-minute recess.  We're going to line you up in the same manner we brought you in.  So I'll see -- the restrooms are across the hall.  And I'll see you back here in 15 minutes.

COURT SECURITY OFFICER:  All rise for the jury.

(Panel not present, 11:48 a.m.)

THE COURT:  Liz, I need one court security officer to help me with letting them use the restroom.

COURTROOM DEPUTY:  Yes.

THE COURT:  If one court security officer could be in charge of the jury, one court security officer stays here.  All right?

All right.  For the trial teams, if you do need to use the restroom, the court security officer is going to direct you to the restrooms for their use.  We need to take out some of the equipment -- the electronic equipment.  We're going to have our program for the interns in the next courtroom, in Judge

102

Martinez's, so we can continue with the jury selection.

All right.  So we're on a 15-minute recess.

MR. SMITH:  Thank you, Your Honor.

(Recess from 11:50 a.m. to 11:59 a.m.)

THE COURT:  Back on the record.

We have made arrangements for the program to be in Judge Martinez's courtroom, so we can continue to use the courtroom to select our jury.

So if the parties will have a seat.

MR. SMITH:  There's still quite a line.

THE COURT:  Is there quite a line?

MR. SMITH:  Six deep, including me.  Sorry.

THE COURT:  Okay.

MR. BOUMEL:  And Your Honor, quick logistical thing. I hesitate to ask Your Honor because I heard you loud and clear before.  I know we are ending court at four o'clock today.  Our first witness is the EMS personnel, Mr. Saldana.  He indicates that he is still working.  His station is very short-staffed. So he can come today or tomorrow, but he's going to have a very difficult time coming here both and being on standby and having to come back tomorrow --

THE COURT:  Do you want to call him first?

MR. BOUMEL:  We are going to call him first, but it doesn't seem time-wise that we're going to get to him today, and we're just trying to forecast that.  Because he can be here

today, but he doesn't want to drive all this way -- he lives pretty far away -- sit, and then come back tomorrow.

THE COURT:  How long do you estimate his testimony is?

MR. BOUMEL:  No more than 45 minutes, and that's probably a long estimate.

THE COURT:  Okay.  So if we pick this jury by one o'clock, we take a lunch recess till two, and that gives us two hours, does that give you enough -- or how much time do you need for your opening statements?

MR. BOUMEL:  I think we have 60 minutes each, Your Honor.

THE COURT:  So then it may be that we can't introduce any testimony today.

MR. BOUMEL:  Thank you, Your Honor.

THE COURT:  All right.

MR. SCHREIBER:  Because, Your Honor, the tentative schedule right now is Tesla will go for half an hour, and then are you going to break all of them?

THE COURT:  We're going to excuse them, we're going to pick the jury, and then we're going to bring them back and swear in the ones that were selected.  Then I'll give them --

MR. SCHREIBER:  The hour?

THE COURT:  Then I'll give them preliminary instructions, then the lunch recess, and then we'll proceed to opening statements.

MR. SCHREIBER: Okay. So they go till 12:30. I'm just trying to get a sense --

THE COURT: They go to 12:30. The jury goes out. We'll select the jury. I anticipate that we should be done hopefully by one o'clock. We'll swear in the jury. The jury will take a lunch break until about two. And then both sides will have an opportunity to make their opening statements.

MR. SCHREIBER: Okay. And then that will land us right around four.

THE COURT: It appears, based upon the fact that it's twelve o'clock.

How many more do we have left?

(Pause in proceedings.)

THE COURT: For those of you that are coming in as interns, the program is going to be in Judge Martinez's courtroom.

(Pause in proceedings.)

THE COURT: Everybody accounted for?

All right.

(Pause in proceedings.)

THE COURT: Everybody accounted for?

Okay. Now can you help with the jurors, please.

Thank you.

(Pause in proceedings.)

MR. SMITH: Your Honor, we have a hard stop at four,

right?

THE COURT:  We have a hard stop -- well, let's see.  I don't want to break up the end of an opening statement.

MR. SMITH:  Right.  Right.  Right.

(Pause in proceedings.)

THE COURT:  We have the jurors lined up and ready to go?

COURT SECURITY OFFICER:  Yes.

THE COURT:  Okay.  And we have those individuals outside -- I want to make sure that -- the individuals that are seated in these chairs, you need to please step outside to allow the jury to come in.

All right.  All rise for the jury.

Okay.  Let's bring them in by rows, please.

(Before the panel, 12:06 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated.

And beginning with the questioning on behalf of the Defendant.

MR. BRANIGAN:  May I proceed, Your Honor?

THE COURT:  Yes, you may.

MR. BRANIGAN:  Well, welcome back.

Good afternoon, everyone.  Again, I'm Tom Branigan, and I represent Tesla.  And first of all, I want to thank you

all again.  As you can probably tell from the size of the group on both sides, this is an important case for both sides, and we greatly appreciate your time.

And Plaintiffs' counsel, Mr. Schreiber, gave you an analogy about starting a race.  And all of the lawyers and the parties in this case wanting to know that if you're the participants in this race, and it's sort of a race, you're all starting from the same starting line.  And I agree with that analogy.  It's a good analogy.  And that's really what we're interested in determining in this process.  Are you all starting from the same starting line or do some of you have a view favoring Tesla or in favor of the Plaintiff that cause you to be already 10 feet beyond the starting line?  That's what it's about.

The other thing that is important about this process is whatever your opinion is, whatever your view is, that's your view, and it's okay to have that view.  And so there's no like right or wrong opinion.  We just need to know what it is.  Okay?

So let me start with a couple of just general points. Given what you've heard in this case, you know that obviously Tesla's my client, and Tesla's been sued by the Plaintiffs, and there's a Tesla vehicle -- it's a 2019 Model S vehicle involved in the crash.  Does anybody think, just hearing that and the other things that you've heard thus far today, that the Tesla

vehicle is a self-driving vehicle, it drives all by itself, the driver doesn't have to do anything, the car just drives itself? Anybody believe that coming into this right now?

If you do, would you please raise your right hand.

Thank you.  I see no hands.

Let me talk about another point.  There's a man that I'm sure everybody in this room has heard of before.  His name is Elon Musk.  And it's hard to hear the name Elon Musk -- Mr. Musk -- and not to have a view positive or negative.  And this case -- this case really isn't about Mr. Musk personally, but Mr. Musk is connected to the company.  And what I need to know is whether any of you have such a strong feeling about Mr. Musk that you just think because of that feeling you can't put it aside and you can't be fair as a juror in this case because Tesla and Mr. Musk are involved.

If that is how you feel, if that's your state of mind right now, for or against, could you please raise your hand.

Sir, could you stand and let us know your name, please, and your juror number.

PROSPECTIVE JUROR:  Ronald Reyes.  I believe it's 18.

MR. BRANIGAN:  Thank you, Mr. Reyes.

And first of all, I appreciate your willingness to stand up.  Can you tell us -- do you have such a view about Mr. Musk that you can't put it aside and be fair to both sides in this case, which means make a decision about this case just

based on the evidence that you hear in the courtroom and based on the law that Judge Bloom provides to the jurors in this case that you would be sworn to follow if you were on the jury?

PROSPECTIVE JUROR:  It would be hard for me personally.  I have really strong feelings against Elon Musk and where our democracy is heading and -- because of the things that he's done.  And I understand that it isn't Tesla, but the reality is he's very tied to the Tesla name and the Tesla brand.  I'm sorry.

MR. BRANIGAN:  Would it be fair to say -- I'm sorry -- Mr. Reyes, would it be fair to say that when you say:  "It would be hard," it would be difficult, and you don't think you could -- you could put those feelings aside to be fair to both sides, and in particular my client Tesla?

PROSPECTIVE JUROR:  I'm not sure I can.  That's what I'm saying.

MR. BRANIGAN:  All right.  Thank you, sir.

There was a hand up on the other side of the room. Forgive me, ma'am.  I'm sorry to have you stand up.  You were very candid with us earlier today.  So we heard you, and I don't want --

PROSPECTIVE JUROR:  Yes.  So you don't want to hear me again?  Okay.

MR. BRANIGAN:  I'm willing to hear whatever you would like to say, but I've got very limited time --

PROSPECTIVE JUROR:  No.  No.  I understand.  I stand for what I said before.  So...

MR. BRANIGAN:  You're not changing your view?

PROSPECTIVE JUROR:  I'm definitely not changing.

MR. SCHREIBER:  All right.  And that's a negative view towards Mr. Musk and Tesla, correct?

PROSPECTIVE JUROR:  Correct.  Yes, sir.

MR. BRANIGAN:  Thank you for your candor, ma'am.  I appreciate it.

PROSPECTIVE JUROR:  The same for me.

MR. BRANIGAN:  And nothing that you've heard since you've said what you said has changed your view; is that right?

PROSPECTIVE JUROR:  No.  No.  Everything that relate to that -- to that man, it's a -- I have a big issue.  And I don't say this about -- like a naive way.  I work for a corporation.  I am a head of corporate affairs.  I work for a multinational with 87,000 employees around the world.  I'm not naive about this.  But this specific person I have an issue for everything, related to vaccines in Africa, to his daughter, to the way he raise kids all over the world, everything about this man.  Everything.  Everything.

MR. BRANIGAN:  Thank you, sir.  I appreciate your candor in that regard.  That's obviously, to my ear, a very strong held belief.  And it sounds like regardless of what the law is in the court, given to you by Judge Bloom, you can't put

110

those feelings aside.  Is that fair, sir?

PROSPECTIVE JUROR:  (No verbal response.)

MR. BRANIGAN:  Your answer is yes?

PROSPECTIVE JUROR:  Yes.

MR. BRANIGAN:  Thank you, sir.

Mr. Smith, on this side of the room, Juror Number 6.

PROSPECTIVE JUROR:  Hello.

MR. BRANIGAN:  How are you, sir?

PROSPECTIVE JUROR:  I'm great.  And you?

MR. BRANIGAN:  I'm well.  Thank you.  And thank you for completing your questionnaire.

Question for you:  In your questionnaire, on Page 3, in response to Question 18, had you read anything or heard anything in the media about Tesla vehicles, you provided some information that you heard related to the performance of Tesla vehicles and also information concerning Mr. Musk.  Is it your stated of mind that because of what you've heard, and what you wrote down on your questionnaire in response to that question, that you already have an opinion about Tesla vehicles and Tesla in this case?

PROSPECTIVE JUROR:  I do not have an opinion about Tesla vehicles.  I just remember reading a lot on the news about, you know, accidents, not knowing exactly what caused them.  But I'm looking forward to hearing the facts of this case and being able to judge exactly what happened.  I'm still

a little bit not clear what happened.  But it wouldn't affect how I feel about Tesla at this point.

MR. BRANIGAN:  How about the comment that you have about information against Mr. Elon Musk?  That's another part of your answer to 18.

PROSPECTIVE JUROR:  It wouldn't affect me because it's different.  This is not Elon Musk that's on trial.  It's a company that he had.  So I could separate any feelings I have about him from this case.

MR. BRANIGAN:  All right.  So you're telling me and my clients sitting at the table here that if you're on this jury, that they can feel comfortable knowing that you'll be a fair and impartial juror to both sides, even with the information that you put in your form?

PROSPECTIVE JUROR:  Yeah.  I think so.  I don't think I said anything negative about Elon Musk in my questionnaire. It was more if I heard anything about him.  But again, as I said, this case is more about what happened, and hearing the facts, and deciding who's at fault.  So I think I'm pretty independent here in terms of my feelings.

MR. BRANIGAN:  And in the beginning of the morning, Judge Bloom read a very high-level, I'd call it, description of the case, which included a statement about how it's Tesla's position that the person responsible for this entire crash and, in terms of how we talk in the law, liable for the consequences

is the driver of the Tesla.  And are you willing to put --
consider that as -- if you were a juror in this case, are you
willing to consider his liability and reach a verdict including
whether he's liable or not?

PROSPECTIVE JUROR:  I don't really know what happened.
I don't know much about the self-drive function or component to
the car.  So I think that I can be impartial to hear the
evidence on both sides.  As a driver myself, I'm very aware of
what's going on.  And I know that, you know, sometimes the car
can do things, and I have to kind of manage it and monitor it.

So I think I just have to hear exactly what happened
and hear the -- more information on what this component does,
and what the driver did, and how the accident came about before
I come to a conclusion as to who was at fault.

MR. BRANIGAN:  Thank you, sir.  I appreciate that.

Moving on to Mr. Molina Fernandez.

PROSPECTIVE JUROR:  Yes, sir.

MR. BRANIGAN:  Sir, we heard your comments about the
vehicles that you own, and appreciate your candor in that
regards and your experience with some of the technology that's
referred to as advanced driver-assistance system technology.

In your questionnaire, though, you have -- in response
to Question 18, you have a comment that you heard something
about Tesla's software malfunctions.  Did I get that right?

PROSPECTIVE JUROR:  Malfunction?

113

MR. BRANIGAN:  Yes.

PROSPECTIVE JUROR:  No.  I don't think so.

MR. BRANIGAN:  All right.

PROSPECTIVE JUROR:  I mean, in my question I said that my cousin bought a Tesla and show me the Autopilot, and I say: "Oh, interesting.  It's very nice."  But that is the thing that I put.  No -- but I said before that in my particular experience with driving with my Ford Explorer that has driver assistance, I love that technology, but sometimes has issues because the road has issues.  So we need to be attent on that -- something like that.

MR. BRANIGAN:  All right.

PROSPECTIVE JUROR:  But -- I'm sorry.  But another thing.  You ask about the -- if the Tesla is totally autonomy car.  But from my point of view, that is depend of the seller.  Because sometimes when you go to the dealer, the seller say: "This is totally autonomous," and you buy that car thinking that the car is autonomous.  That also happen.  And that is -- I mean, it's my suggestion.

MR. BRANIGAN:  Does that cause you to have a view about the way this case should be decided, what you just said?

PROSPECTIVE JUROR:  No.  No.  No.  I'm sorry.  Could you repeat the question?

MR. BRANIGAN:  Yes.  What you just said about sometimes if you go to a dealership they might tell you

something about the vehicle.  What I'm needing to know now: Has that caused you to form an opinion about the way this case should be decided, who should win or who should lose?

PROSPECTIVE JUROR:  Well, depend of the facts.  I don't know.

MR. BRANIGAN:  All right.  Can you listen to the evidence that is presented just in this case, and put those thoughts aside, be fair to both sides, apply the law that Judge Bloom provides to you as a juror to that law, and return a fair verdict for both sides, just based on what you hear in the courtroom?

PROSPECTIVE JUROR:  Everything depend of the facts.

MR. BRANIGAN:  Agreed.  But can you limit your role as a juror, and decision-making as a juror, to just what you hear within the four walls of this courtroom, or do you think what you just said about what you've heard, you know, that might happen at a dealership, that's not part of this case -- do you think that would affect your ability to be a fair juror here?

PROSPECTIVE JUROR:  Well, I don't think so.

MR. BRANIGAN:  All right.  Thank you, sir.  Appreciate your candor.

Mr. Tracy, first of all, sir, thank you for your service.

PROSPECTIVE JUROR:  Thank you.

MR. BRANIGAN:  And sir, you've had some questions

asked to you, and I want to follow up on the questions -- really the answers that you gave.  And I really want to start it this way:  I heard you say that you're a marine, and it was a very nice thing that Judge Bloom did to recognize that.  How long were you in the Marines?

PROSPECTIVE JUROR:  Four years.

MR. BRANIGAN:  And when you became a marine, you took an oath, correct?

PROSPECTIVE JUROR:  Yes.

MR. BRANIGAN:  And I take it you followed that oath, correct?

PROSPECTIVE JUROR:  Yes.

MR. BRANIGAN:  And you didn't have any trouble following that oath as a marine; is that fair?

PROSPECTIVE JUROR:  That's fair.

MR. BRANIGAN:  Now, we started the morning with all the jurors taking -- or prospective jurors -- You're all prospective jurors -- taking another oath.  Remember that?  It was the first thing you did when you came in and you raised your right hand.

PROSPECTIVE JUROR:  Yes.

MR. BRANIGAN:  Have you been following that oath?

PROSPECTIVE JUROR:  I believe so.

MR. BRANIGAN:  If you were sworn in as a juror in this case, could you follow the oath to have this case tried before

you decided by you just based on what you hear in this courtroom and based on the law that's provided to you by Judge Bloom?

PROSPECTIVE JUROR:  Yes.  Yes.

MR. BRANIGAN:  Do you think you would have any trouble doing that, sir?

PROSPECTIVE JUROR:  No.

MR. BRANIGAN:  To follow that oath to be a juror like I described?

PROSPECTIVE JUROR:  Yes.

MR. BRANIGAN:  You do think you would have a problem?

PROSPECTIVE JUROR:  No.  I don't have any trouble.

MR. BRANIGAN:  Do you think you could be fair to both sides following that oath?

PROSPECTIVE JUROR:  Yes.

MR. BRANIGAN:  Thank you, sir.

Juror Number 10.  And ma'am, forgive me.  How about if I ask you if you would please pronounce your name for us.

PROSPECTIVE JUROR:  Marcia Lucila Paguaga De Choiseul.

MR. BRANIGAN:  Beautiful.  Thank you, ma'am.

PROSPECTIVE JUROR:  A mouthful.

MR. BRANIGAN:  I'm not going to try to repeat that. I'm from Detroit, and that would come out --

PROSPECTIVE JUROR:  No.  No.  No.  Just call me Mary Smith.  Just call me Mary Smith.

MR. BRANIGAN:  Mary Smith.  Ma'am, thank you.  You filled out your questionnaire.  And in response to Question Number 22 about whether you had any strong feelings or attitudes positive or negative about Tesla or Tesla vehicles, you had quite a few things that you wrote down there.

PROSPECTIVE JUROR:  Yeah.  I ran out of paper.

MR. BRANIGAN:  You ran out of paper, yeah.  You went onto the back side.  And I would say, just for the sake of brevity, what you said was not positive for my client.  Would you agree with that?

PROSPECTIVE JUROR:  Yeah.  I agree.

MR. BRANIGAN:  Right.  And earlier today I heard you responding to the questions from Plaintiffs' counsel, and you had some rather negative things to say about Tesla at that point in time, correct?

PROSPECTIVE JUROR:  Yes.

MR. BRANIGAN:  Ma'am, is it your state of mind that because of the opinions that you already had before you walked into the courthouse today, and that are reflected in your response to Question 22 about Tesla, that you can't put those feelings aside, those negative feelings about Tesla aside to be fair in this case?

PROSPECTIVE JUROR:  No.  I can be objective.

MR. BRANIGAN:  You think you can put those --

PROSPECTIVE JUROR:  Examine the facts and expert

witness statements and technical analysis and statistics.

MR. BRANIGAN:  Well, if I may, ma'am, for example, you said you don't feel the company, as many, has the people's best interest in mind.

PROSPECTIVE JUROR:  Uh-huh.

MR. BRANIGAN:  You think the company basically gives the cars -- gives away the cars.  And you don't think -- you think they need improvement.  And I'm sorry.  I can't read some of your handwriting, but --

PROSPECTIVE JUROR:  Yeah.  Pretty much what I feel is it's a big company.  Profit is -- the bottom line is their main objective, like any successful company anywhere in the world, and I understand that.  But I think that when they push a product before it's good enough for my standards or for -- if I'm going to give it to one of my kids to drive, I think they put us in a spot of testers.  You know, they're:  "Let's put it out there.  And any little, you know, problem, yeah, we'll fix it and, you know, make them happy, give them a new car."  And then -- you know, and that's how they eliminate problems.  That's my theory.  But it's a theory.  It's an opinion.

MR. BRANIGAN:  Well, that's an opinion that you already have formed, and it sounds like it's a very strong opinion; is that fair?

PROSPECTIVE JUROR:  Yes.  I have very strong opinions on many things.  I'm very opinionated, as I've heard.

MR. BRANIGAN:  And you include Tesla when you say companies put their products on the road and use their companies as testers.  Is that your strong opinion about Tesla?

PROSPECTIVE JUROR:  Yes.  Uh-huh.  Yes.

MR. BRANIGAN:  And I take it you -- that's so strong an opinion that you're not just leaving it at the doorstop if you become a juror in this case; is that fair?

PROSPECTIVE JUROR:  Well, I can't leave my convictions and my beliefs at any doorstop.  I mean, they are part of me.  But at the same time, I believe I'm smart enough to take in facts and make educated decisions.

MR. BRANIGAN:  But it sounds like those facts will be viewed through the lens that you just described; is that fair?

PROSPECTIVE JUROR:  Fair.  Because they usually are.  That's how humans...

MR. BRANIGAN:  Thank you.  Thank you, ma'am.  I appreciate your very candid responses.  Thank you.

PROSPECTIVE JUROR:  You're welcome.

MR. BRANIGAN:  Juror Number 12, Mr. Betancourt, how are you, sir?

PROSPECTIVE JUROR:  Good.  And yourself?

MR. BRANIGAN:  Good.

Sir, in response to the questionnaire that you filled out -- thank you for doing that -- on Page 3, Question 18, you wrote:  "Teslas are expensive to maintain and unsafe to drive."

120

PROSPECTIVE JUROR:  That's correct.

MR. BRANIGAN:  Right.

PROSPECTIVE JUROR:  Many of my neighbors -- especially in the news, whether it's social media or news stations, newspapers, there's a lot of articles about how Teslas are expensive to maintain or to fix.  And there's been a lot of articles about self-driving and Autopilot, how it can be defective and not detect a lot of changes on the road, whether the road is under maintenance, or if there's any vehicles switching, or any colors that are hard to distinguish or see.  But that's based on what I've seen so far, and that's how I based the answer.

MR. BRANIGAN:  All right.  And that sounds like a view that you hold very firmly, based on the way you described it; is that fair?

PROSPECTIVE JUROR:  Yes.

MR. BRANIGAN:  And it also strikes me that, like your fellow prospective juror sitting a couple seats down from you, the evidence in this case is going to be viewed by you through that lens, correct?

PROSPECTIVE JUROR:  Correct.

MR. BRANIGAN:  All right.  And would you agree with me, sir, that that's going to affect your ability to be fair to my clients, Tesla?

PROSPECTIVE JUROR:  No.

MR. BRANIGAN:  You don't think that's going to affect your ability to be fair?

PROSPECTIVE JUROR:  No.

MR. BRANIGAN:  Sir, you also said you wanted to be -- the question -- the general question was:  "Does anybody really want to be a juror in this case?"  And my memory is you raised your hand that you really wanted to be a juror in this case; is that right?

PROSPECTIVE JUROR:  Yes.

MR. BRANIGAN:  Why is that?

PROSPECTIVE JUROR:  I like to see the facts.  I like to be objectively fair to both parties.  Because I don't know what happened, or what just occurred in that accident, or what caused the car to behave that way, but I like to see facts.

MR. BRANIGAN:  Understood.  But when you see those facts, based on what you've already told us, it strikes me that you're going to have in your mind the things that you have read about Tesla that you just described for us moments ago, and what you hear in the courtroom will be viewed through the lens or the filter of what you've heard from outside the courtroom about Tesla and about Tesla Autopilot technology; is that fair?

PROSPECTIVE JUROR:  No.

MR. BRANIGAN:  No, it's not?  You think you can just put that aside and ignore all of that?

PROSPECTIVE JUROR:  Yes.  Because most of those

articles, they don't present facts.  They just provide opinions.  And most of them, they don't provide factual opinions as to what caused the car -- and what caused them to get that statement out there.

MR. BRANIGAN:  Thank you, sir.  Appreciate your candor.

Ms. Palou?

PROSPECTIVE JUROR:  Yes.

MR. BRANIGAN:  Number 13.

In response to Question 22 on the questionnaire, which is about whether you have feelings positive or negative about Tesla or Tesla vehicles, you answered:  "Yes," correct?

PROSPECTIVE JUROR:  I did.

MR. BRANIGAN:  All right.  And you wrote, I guess, an explanation, if I can call it that, or you provided us some driven detail about that.  Thank you for doing that.  And you said:  "A non-political, non-qualified individual making decisions and advising a president."  I think that refers to Mr. Musk.

PROSPECTIVE JUROR:  Correct.

MR. BRANIGAN:  That's a guess on that, but I think I'm right.

PROSPECTIVE JUROR:  Yep.

MR. BRANIGAN:  Are you able to put those feelings aside?  They seem like pretty strong views.  Because not only

did you answer yes, but you took the time to write those down here this morning.  Are you able to put those negative views about Mr. Musk aside and be fair to Tesla in this case?

PROSPECTIVE JUROR:  Absolutely.

MR. BRANIGAN:  Thank you.  Appreciate that, ma'am.

Ms. Crosby, Juror Number 16, how are you, ma'am?

PROSPECTIVE JUROR:  I'm all right.

MR. BRANIGAN:  Congratulations on your recent graduation.

PROSPECTIVE JUROR:  Thank you.

MR. BRANIGAN:  You answered yes, you want to be a juror in this case too.  Why is that, ma'am?

PROSPECTIVE JUROR:  I like jury duty.  That's my basic thing.  I like jury duty.

MR. BRANIGAN:  I'm sorry?

PROSPECTIVE JUROR:  I like jury duty.

MR. BRANIGAN:  Have you been a juror before?

PROSPECTIVE JUROR:  Yes.  I think 2008, or '09, or '10.  It was one of them.

MR. BRANIGAN:  What kind of case was it?

PROSPECTIVE JUROR:  It was a mortgage fraud case.  It was my first jury duty in the fed courts.

MR. BRANIGAN:  Did you reach a verdict?

PROSPECTIVE JUROR:  Yes.

MR. BRANIGAN:  Who did you find for?

PROSPECTIVE JUROR:  Actually, we followed the law and it was for the defendant.

MR. BRANIGAN:  Thank you, ma'am.

PROSPECTIVE JUROR:  Okay.

MR. BRANIGAN:  Appreciate your candor.

General question for everybody now:  Is there anybody here who would have a problem if the facts in this case, the facts and the evidence supported it -- would have a problem based on what you have heard thus far putting all of the fault on the driver of the Tesla Model S that was involved in this crash?  Would anybody have a problem doing that if that's what the evidence in this courtroom supported?

MR. SCHREIBER:  I'm sorry, Mr. Branigan.  Your Honor, I believe that goes a little far --

THE COURT:  Sustained.

MR. BRANIGAN:  Thank you, Your Honor.

(Pause in proceedings.)

MR. BRANIGAN:  Ms. Ruiz, Number 11, you told us -- thank you, ma'am -- you told us that you don't like electric vehicles.

PROSPECTIVE JUROR:  Correct.

MR. BRANIGAN:  All right.  There's no question that my client's a manufacturer of electric vehicles, Tesla.  And there's also no question the car in this case, the 2019 Model S, is an electric vehicle.  But I think one thing that the

parties agree on is that the electrification of the vehicle, the fact that it had a battery, a rechargeable battery, it's an electric vehicle, has nothing to do with the case.  It has nothing to do -- the Plaintiffs are not claiming there's a defect in the battery.  The car happens to be powered by electricity.

With that understanding, do you think you could be fair to both parties in this case?

PROSPECTIVE JUROR:  Absolutely.

MR. BRANIGAN:  Thank you, ma'am.

Juror Number 15, Ms. Ngo.

PROSPECTIVE JUROR:  Yes.

MR. BRANIGAN:  Did I pronounce that correctly?

PROSPECTIVE JUROR:  It's Ngo.

MR. BRANIGAN:  Ngo.  I'm sorry.

PROSPECTIVE JUROR:  That's okay.

MR. BRANIGAN:  Sorry.  You told us about some of your views that you have about companies based on the fact that you were an auditor for a long time.

PROSPECTIVE JUROR:  Yes.

MR. BRANIGAN:  Can you put those views aside and be fair to both sides in this case?

PROSPECTIVE JUROR:  Yes, I can.

MR. BRANIGAN:  Do you have any feelings, negative feelings, about Tesla or Elon Musk?

PROSPECTIVE JUROR:  Not -- well, not about Tesla, but more about Musk.

MR. BRANIGAN:  And are those views that you have about Elon Musk so strong that you couldn't put them aside and decide this case just based on the evidence that comes into the courtroom in a way that would be fair to both sides?

PROSPECTIVE JUROR:  No.  I just sympathize for his employees.

MR. BRANIGAN:  Got it.  Thank you.  Thank you, ma'am.

THE COURT:  I just want to make sure, Mr. Branigan, that -- the answer is a little unclear.  Your question was: "Are those views that you have about Elon Musk so strong that you couldn't put them aside and decide this case?"  So if I can just follow up with Ms. Ngo.

Ms. Ngo, I'm looking at your questionnaire.  You have stated you have strong feelings.  I want to understand -- and you have also spoken about corporate greed, and I asked you about that.  Do you have a strong feeling that you cannot put aside in this case?

PROSPECTIVE JUROR:  No.  I think I can be a juror for this case.

THE COURT:  Can you be fair and impartial, even though you have an opinion about the corporations that you audited and you have a strong opinion about Mr. Musk?

PROSPECTIVE JUROR:  Yes, I can.

THE COURT:  Is there any hesitation on your part?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

MR. BRANIGAN:  May I continue, Your Honor?

THE COURT:  Of course.

MR. BRANIGAN:  Thank you.

(Pause in proceedings.)

MR. BRANIGAN:  Mr. Mowris?

PROSPECTIVE JUROR:  Yes.

MR. BRANIGAN:  Number 19.

Hello, sir.

PROSPECTIVE JUROR:  Hello.

MR. BRANIGAN:  In response to our questionnaire about whether you -- to the best of your knowledge, you've ever participated in a software beta test or have you heard anything about Tesla vehicles -- it's really that question:  "Have you heard anything about Tesla vehicles" -- you said yes.  And you said in your explanation that a man died when a Tesla caught fire and the doors didn't open.

First of all, I want to be clear, there's no claim like that in this case.  This isn't about a fire.  This isn't about doors on the Tesla or any vehicle that wouldn't open.  So that doesn't apply here.  But -- and then you've also got something about self-driving crashes that you wrote.  Correct?

PROSPECTIVE JUROR:  Yeah.

MR. BRANIGAN: Do you have some information that you're aware of before today about Tesla and self-driving Tesla crashes, as you put it, that --

PROSPECTIVE JUROR: They were mentioned in the newspaper, and I think somebody else also mentioned it. Some people like don't pay attention when they're driving. They just let the car do everything or they fall asleep even. So all I know is certain stories appeared in the news.

MR. BRANIGAN: All right. Can you put that information aside and be a juror in this case, if you're sworn in as a juror, and reach a verdict just based on the evidence presented in this case within the four walls of this courtroom?

PROSPECTIVE JUROR: Yes, sir.

MR. BRANIGAN: And apply the law given to you by Judge Bloom?

PROSPECTIVE JUROR: I believe so.

MR. BRANIGAN: Thank you, sir.

Juror Number 7, Mr. Perez.

PROSPECTIVE JUROR: Morning.

MR. BRANIGAN: Good morning, sir -- good afternoon, actually.

PROSPECTIVE JUROR: Oh.

MR. BRANIGAN: That's okay.

Have you heard something before today about software malfunctions in Teslas?

PROSPECTIVE JUROR:  From videos that the car's been driving and then suddenly just moves to the side and crash. But I mean, that's about it.

MR. BRANIGAN:  Has that caused you to form an opinion about the way Tesla vehicles perform because of what you saw related to the software issues?

PROSPECTIVE JUROR:  No.  It's technology.  You know, it might malfunction, you know, like computers, cell phones. It happens, you know, but it not necessarily has to be like an ongoing issue.  You know, like things happens and they fix it. But it won't affect me in this case if I'm chosen.

MR. BRANIGAN:  You're going to be able to put whatever you heard outside of the courtroom about software issues that you just described aside and listen to the evidence in this case, which will include evidence about, from our perspective, the fault of the driver who was driving the vehicle at the time of the crash?  You can do that?

PROSPECTIVE JUROR:  Yeah.

MR. BRANIGAN:  And decide whether this crash was entirely his fault or whether Tesla had some fault?

PROSPECTIVE JUROR:  Yeah.

MR. BRANIGAN:  You're able to do that?

PROSPECTIVE JUROR:  Yeah.

MR. BRANIGAN:  Thank you, sir.

PROSPECTIVE JUROR:  You're welcome.

130

THE COURT:  All right.  Mr. Branigan, that would be time, sir.

MR. BRANIGAN:  I'm sorry?

THE COURT:  That would be time.

MR. BRANIGAN:  All right.  Thank you, Your Honor.

May I ask one last question, Your Honor?

THE COURT:  All right.  One last question.

MR. BRANIGAN:  Is there anyone who would have trouble returning to this courtroom and returning a verdict in favor of Tesla if you concluded that the Plaintiffs hadn't met their burden of proof in this case -- this is a civil case.  So the burden of proof is what we call a preponderance of the evidence.  That means that they have to prove all of their claims with evidence that reaches a standard of more likely than not.

Is there anyone here that would have trouble returning to the courtroom if you decided they hadn't proved their case to that level and returning -- and giving Tesla a -- what we call a defense verdict and awarding these Plaintiffs nothing?  Would anyone have trouble doing that if the evidence supported it?

THE COURT:  All right.  Seeing no hands raised.

Thank you, Mr. Branigan.

Oh.  We do have one hand.  My apologies.  That is Juror Number 38.

PROSPECTIVE JUROR:  I would have an issue with that, yes.

MR. BRANIGAN:  You couldn't do that, sir?

PROSPECTIVE JUROR:  I don't believe I could, no.  It's just money at the end.

MR. BRANIGAN:  That's your strongly held belief?

PROSPECTIVE JUROR:  It's just money at the end, and yeah.

MR. BRANIGAN:  Thank you, sir.

THE COURT:  Okay.  Is there anyone else, Ladies and Gentlemen?  If so, please raise your hand.

Seeing no further hands raised.

Actually, there is one hand from this gentleman.  If we could bring the microphone over on the third row.

PROSPECTIVE JUROR:  Yes.  Same.  I mean, you know, facts are facts.  But I -- I just couldn't bear to just not give anything, any award, you know, obviously considering that there is somebody that was deceased.

THE COURT:  Is this Mr. Gutierrez?

PROSPECTIVE JUROR:  Yes.  Yes, ma'am.

THE COURT:  Thank you, sir.

MR. BRANIGAN:  So your state of mind is that the family should get something even if they don't bring evidence into the court that meets their burden of proof; is that right, sir?

PROSPECTIVE JUROR:  Yes, sir.

MR. BRANIGAN:  Thank you, sir.  I appreciate your candor.

THE COURT:  All right.  Anyone else, Ladies and Gentlemen?

All right.  Now, Ladies and Gentlemen, is there anything about what the attorneys may have asked you that made you develop some strong feelings for or against any of the attorneys or their respective cases?  If so, please raise your hand.

Seeing no hands raised.

Throughout your questionnaires, there are many of you that have said you have certain feelings about Tesla, either positive or negative.  And I want to make sure.  Is there anyone that has not already advised us -- is there anyone at all that has a feeling either positive or negative about Tesla that would affect your ability to serve as a fair and impartial juror?  If so, please raise your hand.

All right.  Seeing no further hands raised.

Juror Number 17 -- if we could bring the microphone to Juror Number 17, Mr. Velez.

Mr. Velez, you stated in Question 16 that:  "Maybe my son's background, or my son's lawsuit, would have an effect on your ability to be fair and impartial."  Is that still true, sir?

PROSPECTIVE JUROR:  I don't think so.  I think I've heard enough to say that I can absolutely be partial [sic].

THE COURT:  Would your son's lawsuit have any effect on your ability to serve as a fair and impartial juror in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, sir.

PROSPECTIVE JUROR:  I do have a question, though.

THE COURT:  Yes, sir.

PROSPECTIVE JUROR:  I didn't understand the last part about a certain level of -- of deniability.  What was that?  I'm sorry.  To be able to come with a decision --

THE COURT:  Mr. Branigan's question was:  "Is there anyone here that if, in fact, Tesla shows" -- "or the Plaintiff fails to present its claims and proves those claims" -- and the Court will give you instructions on what their burden is -- but is there anyone here that could not find in favor of the Defendant.

PROSPECTIVE JUROR:  No.  That's not the one I was looking for.

THE COURT:  What was the question?

PROSPECTIVE JUROR:  The one that says:  "Oh.  I can prove to here," and just proving to here is enough for Tesla to be okay.  You know what I'm saying?  Like, not a hundred percent:  "Oh, this is" -- I don't know if I'm making myself --

I think --

THE COURT: Mr. Branigan, what was the question?

PROSPECTIVE JUROR: Can you guys help me out, please?

MR. BRANIGAN: It was with reference to the burden of proof. And what I was explaining is that this is a civil case, and so the burden of proof is what we call a preponderance of the evidence. And in human terms, not lawyer terms, that means that the Plaintiffs have the burden of proving all of their claims to a level of more likely than not.

PROSPECTIVE JUROR: Got it. Okay. I understand. Thank you.

THE COURT: All right. So that is the burden with regard to the Plaintiffs' claims. And the Court will instruct you on the burden of proof that the Plaintiff has with regard to certain claims. Did that answer your question, sir?

PROSPECTIVE JUROR: Yes, ma'am. Thank you.

THE COURT: All right. Thank you, sir.

PROSPECTIVE JUROR: I apologize.

THE COURT: Now, I just want to make sure, because I did ask the jury as a whole, but let's -- if we can give the microphone to Juror Number 18. Mr. Reyes.

PROSPECTIVE JUROR: Yes, Your Honor.

THE COURT: Mr. Reyes -- no, you answered. And my apologies.

Juror Number 19, Mr. Mowris. Mr. Mowris, you were

asked the question as to whether your opinions about Tesla would have any effect on your ability to be fair and impartial. And you stated that it does not, correct?

PROSPECTIVE JUROR:  Correct.

THE COURT:  You also advised that you have a doctor's appointment tomorrow.  Are you able to reschedule that appointment?

PROSPECTIVE JUROR:  I could.  I just need to be clear. It's actually Wednesday.

THE COURT:  Wednesday.  All right.  Is there anything that the Court would need to know as to why you could not serve as a fair and impartial juror?

PROSPECTIVE JUROR:  I don't think so.

THE COURT:  All right.  Thank you, sir.

Juror Number 24 -- so we're moving on to my left side. Juror Number 24, Ms. Baghdoian, you stated that you had some strong feelings both yes and no.  I want to ensure -- is there anything about your feelings, positive or negative, about Tesla that would have an effect on your ability to serve as a fair and impartial juror?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

Juror Number 28.  And that is Mr. Adese.

PROSPECTIVE JUROR:  Yes.

THE COURT:  Mr. Adese, you said you needed to learn

136

more about both sides, on Question 16, if there was anything about your background or personal feelings.  Is there anything that the Court would need to know as to why you could not serve as a fair and impartial juror?

PROSPECTIVE JUROR:  Just to understand what was the both sides.  I didn't know it was about Tesla.  Now --

THE COURT:  All right, sir.  Is there anything at ail about your personal feelings, anything about your background that would affect your ability to be fair and impartial to both sides?

PROSPECTIVE JUROR:  No.  Just what I state about the owner of Tesla and --

THE COURT:  All right.  It's very hard to set aside that opinion?

PROSPECTIVE JUROR:  The whole thing.

THE COURT:  All right.  Thank you, sir.

Juror Number 30.

PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  And let me make sure.  Is there anything at all, Mr. Apolinario, about your opinion about Tesla that would have any effect on your ability to be fair and impartial to both sides?

PROSPECTIVE JUROR:  Not at all.

THE COURT:  All right.  Thank you.

And finally, Juror Number 34.

Okay. Ms. Sanchez, thank you. I think you have already answered that question.

Ladies and Gentlemen, I want to thank you for time and attention that you have given to the Court. It is now quarter to one. We are going to take a 30-minute recess. I know that some of you may be hungry. I ask that you be patient with us, since our job right now is to select fair and impartial jurors. So if you'll step outside and I'll see you back here at 1:15.

COURT SECURITY OFFICER: All rise for the jury.

(Panel not present, 12:47 p.m.)

THE COURT: All right. If the court security officer can bring in Juror Number 4. Ms. Weintraub, please.

For the trial team, we're bringing back Ms. Weintraub.

(Panel Member Number 4 enters the courtroom.)

THE COURT: All right. Ms. Weintraub, thank you for returning to the courtroom. And you can stay out in the gallery. You stated that there was something that you needed to let the jury know. Can you share that with the Court.

PROSPECTIVE JUROR: (Inaudible.)

(Court reporter interruption.)

THE COURT: Yes. If you can share that with the -- it is required that it be on the record.

PROSPECTIVE JUROR: So not only do I have a pacemaker, but I have to go to the oncologist on Friday.

THE COURT: All right. So obviously you cannot

138

reschedule that.

PROSPECTIVE JUROR:  Not really.  I'm also a teacher.  So it's -- you know, I go back soon.  So I wanted to go right away.

THE COURT:  Okay.  What time is your appointment on Friday?

PROSPECTIVE JUROR:  It's at twelve.

THE COURT:  At twelve noon.  All right.  Thank you, Ms. Weintraub.

(Panel Member Number 4 exits the courtroom.)

THE COURT:  All right.  Let me ask that you reposition your chairs, give you a few minutes to confer, so we can begin to select our jury.

(Pause in proceedings.)

MR. SCHREIBER:  Your Honor, may I briefly inquire as all sides are conferring?

THE COURT:  Yes.  The parties can go ahead and have a seat.

Yes?

MR. SCHREIBER:  Just to clarify, it's been some time since we discussed the striking and challenge phase.  Wanted to get a sense -- obviously, I know the Court will probably address cause claims first.  But before we get to those, I understand we are picking six jurors but four alternates --

THE COURT:  No.  We're not picking alternates.  We're

139

picking 10 jurors.

MR. SCHREIBER:  We're just a straight 10.

THE COURT:  And to the extent that we have all 10, they will all go back to deliberate.

MR. SCHREIBER:  Okay.  And that's what I thought the Court had said.  But I also wanted to be sure that those three peremptories that each side gets just applies to the 10-pack.

THE COURT:  That's correct.

MR. SCHREIBER:  Okay.  Just wanted to be sure.

THE COURT:  All right.  Go ahead and have a seat.

Let's begin to select our jurors, taking any for-cause challenges first.  I will address, looking at the panel as a whole, any for-cause challenges.  We can start with the Plaintiff.  And if there's no objection by the Defendant, there's no need to proceed with any argument.

On behalf of the Plaintiff, any for-cause challenges?

MR. SCHREIBER:  Yes, Your Honor.  The first cause challenge the Plaintiff would propose would be Juror Number 7, Mr. Melendez Perez.  That is based upon primarily his answer to Jury Questionnaire Question 12 that said that he could not award damages.

THE COURT:  Any objection?

MR. BRANIGAN:  Yes.  Your Honor, I questioned Mr. Melendez, and he said he could be fair and impartial.  And I think he also said similar things in response to counsel --

excuse me -- questions from Plaintiffs' counsel.

And Your Honor, I apologize.  Is it okay if we address Your Honor seated?

THE COURT:  Yes.  Of course.

MR. BRANIGAN:  Thank you.

(Pause in proceedings.)

MR. BRANIGAN:  If I may add, Your Honor, I think Plaintiffs also failed to follow up on that question in the questionnaire when they questioned Mr. Melendez to establish that he really holds that as a bias.  So I think what we're left with is Mr. Melendez telling us that he could be fair.

THE COURT:  Well -- but at the same time, the parties were very specific as far as the questions that they wanted to ask the jurors.  And in fact, I asked the jurors to look at their questionnaires to see whether their answers were accurate.  And the answer to Question 12 of Juror Number 7 is: "If the law allows it, and the evidence supports it, would you as a juror be able to award damages," and the answer is:  "No."

Based on the questions posed, the response given, the Court believes this juror cannot follow the law, and the challenge for cause is granted.

Any further for-cause challenges?

MR. SCHREIBER:  Thank you, Your Honor.

Yes.  At this time, the Plaintiffs would also challenge for cause Juror Number 9, Mr. Tracy.  Shared with --

and I'll just paraphrase, basically some deeply held beliefs about not believing in this concept of shared responsibility, and that -- when asked the questions that I inquired about, vis-a-vis the -- does anyone think there could be a circumstance where the car could be responsible for a crash when there's a distracted driver, he affirmatively responded that he could not.

THE COURT:  Response?

MR. BRANIGAN:  Yes, Your Honor.

MR. SCHREIBER:  Yeah.  And I'm sorry.  He was also the one that said -- right -- the only standard that he could find a manufacturer responsible is if one hundred people using it one hundred percent of the time had one hundred percent of the failure.  So that also suggests his inability to follow the law.

MR. BRANIGAN:  Your Honor, if I may respond.

THE COURT:  Yes.

MR. BRANIGAN:  We're talking Juror Number 9, Mr. Tracy, the retired or former marine.  And I think Mr. Tracy fully rehabilitated himself.  I started my questions by asking him about the oaths that he's taken as a marine, as a prospective juror today.  He said he followed his oath as a marine, and he's been following his oath today, and he would follow his oath as a juror in this case.

THE COURT:  All right.  Well, this juror said under

oath that he had deeply held beliefs, and if one hundred people are doing the same thing and it breaks one hundred times.

Based on the questions posed, the response given, the Court has a reasonable doubt as to whether this juror can be fair and impartial.  The challenge for cause is granted.

Any further for-cause challenges?

MR. SCHREIBER:  Yes, Your Honor.

This would be with respect to Juror Number 17, Ms. Velez.

THE COURT:  Any objection?

MR. SCHREIBER:  It's Juror Questionnaire 12 -- Question 12 again, no damages, amongst others.

MR. BRANIGAN:  Your Honor, I think the same applies for Ms. Velez as I raised with Mr. Melendez.  They didn't, you know, further develop that she -- she couldn't be fair.  And I think that's the ultimate question here.

THE COURT:  And once again, the Court included these questions because the parties requested it, and the answer is to Question 12:  "No."

Based on the question posed, the response given, the Court has a reasonable doubt as to whether she could be fair and impartial, and that juror is stricken.  This is Juror Number 17.

MR. SCHREIBER:  I believe that actually might be Mr. Velez.

THE COURT: Mr. Velez. My apologies.

Any further for-cause challenges?

(Pause in proceedings.)

MR. SCHREIBER: The same request goes for Juror Number 25 -- you asked for the whole panel, correct, Your Honor? Because I have a few more for the folks --

THE COURT: The whole panel.

MR. SCHREIBER: Yes, ma'am.

Juror Number 25 also -- well, if you like, I can tell you Juror Number 25, Juror Number 21, and Juror 31 all answered in response to Question 12 that they were incapable of being -- awarding damages.

MR. BRANIGAN: I'm sorry. Can I have the numbers again. I heard 25 and 31.

MR. SCHREIBER: Yes. I threw off the numbers. It's 21, 25, 31, and 39.

(Pause in proceedings.)

MR. BRANIGAN: Can I help the Court with one easy one?

THE COURT: Well, I think we all agree on 39.

MR. BRANIGAN: Yes. That's the easy one.

THE COURT: But with regard to 25, 21, and 31, is there any argument in response?

MR. BRANIGAN: In response to Prospective Juror 21, we disagree.

THE COURT: All right. Let's look at her

144

questionnaire.  Did she -- is that an inaccurate statement?
She said:  "No."

MR. SCHREIBER:  Correct.

MR. BRANIGAN:  We acknowledge that, Your Honor.  But in response to the questions from Plaintiffs' counsel about whether she could be fair, she said she could be completely fair.

THE COURT:  It's very clear.  "Would you as a juror be able to award damages?"  The answer is:  "No."

Based on the questions posed, the response given, Juror Numbers 21, 25, 31, and 25 are stricken for cause.

Any further for-cause challenges?

MR. SCHREIBER:  One moment, Your Honor.

(Pause in proceedings.)

THE COURT:  On behalf of the Plaintiffs?

MR. SCHREIBER:  Yes, Your Honor.

This would be our last one for cause, which is Juror 35.  It was obvious that he has some very deeply held religious beliefs --

THE COURT:  Any objection?

MR. BRANIGAN:  None.

THE COURT:  The juror is stricken.

MR. SCHREIBER:  Okay.

THE COURT:  All right.  On behalf of the Defendant?

MR. BRANIGAN:  Thank you, Your Honor.

Starting with Number 10, this is the woman who I asked if she would please pronounce her name for me because I didn't want to screw it up.  And she wrote extensively in response to Question 22 that she has negative views about Tesla.  She explained what those negative views are in her extensive handwritten response.  And then she told me that she believed that Tesla is one of the companies that has a problem ethically because they use their customers as testers, and she told me she could not put that aside and just make a decision on this case based on the evidence that is presented in the case.

THE COURT:  Response?

MR. EATON:  Your Honor, that's -- she did not say she could not set that aside.  That was not -- in fact, she rebuffed all of Mr. Branigan's attempts to get her to commit to that.  Her belief -- first off, that's going to be the evidence in this case, is that -- so believing that Tesla was using people as beta testers is accurate, and you cannot strike a juror for believing something that's accurate that they're going to hear in this case.

THE COURT:  As opposed to Question 12, to which the jurors were clear in their answers, both sides addressed Paguaga De Choiseul's responses.  And she stated while she does not have a positive view about Tesla -- and she owns stock -- that she can be objective and fair and impartial.

So based on her direct responses, the Court has no

reasonable doubt, believes this juror can be fair and impartial.  The challenge for cause to Ms. Paguaga De Choiseul is denied.

Any further for-cause challenges?

MR. BRANIGAN:  Yes, Your Honor.  Number 18.

THE COURT:  Any objection?

This is the brother's accident?

MR. BRANIGAN:  Yes.

THE COURT:  Any objection?

MR. SCHREIBER:  Yes, Your Honor.

In the same way I recall Mr. Reyes, Juror Number 18, saying that while he would struggle with doing so he would be able to and similarly would not commit that he couldn't be fair.

THE COURT:  No.  Mr. Reyes said that it would possibly affect -- his twin brother's accident.

Based on the questions posed, the response given, the Court has a reasonable doubt as to whether this juror can be fair and impartial.  The challenge for cause is granted.

MR. SCHREIBER:  He had said he's not sure.  That was written in the margin.  Fair enough.

THE COURT:  "Possibly twin brother accident," and he has some hesitation.  That's enough for the Court.

MR. SCHREIBER:  Understood.

THE COURT:  Any further for-cause challenges?

MR. BRANIGAN: Yes. I'm sorry. I'm taking a number out of order, Your Honor. But Number 12, Mr. Betancourt, in response to the questionnaire about Tesla vehicles or Tesla, he wrote that he believes they're unsafe to drive.

THE COURT: Response?

MR. EATON: It's the same issue with Juror 11, Your Honor -- Juror 10. He answered unequivocally no, that it would not be a problem, he would be able to set it aside, and it would not impact his view over and over and over again, despite Mr. Branigan's attempts --

THE COURT: Mr. Betancourt was very clear. It will not affect his ability to be fair and impartial.

Based on the questions posed, the response given, the Court does not have a doubt, believes this juror can be fair and impartial. The challenge to Mr. Betancourt for cause is denied.

Any further for-cause challenges?

MR. BRANIGAN: Yes, Your Honor. But just as a matter of procedure and order, I'm handling voir dire for my client, and we've got two lawyers going back and forth on the Plaintiffs' side.

THE COURT: I agree with you. There should be one lawyer arguing.

MR. SCHREIBER: Fair enough.

THE COURT: So who is doing it?

MR. EATON:  My apologies, Your Honor.

MR. SCHREIBER:  I will be handling it, Your Honor.

THE COURT:  All right.  Let's continue.

Any for-cause challenges?

MR. BRANIGAN:  Yes.  Twenty-eight.

THE COURT:  Any objection?

MR. SCHREIBER:  No objection.

THE COURT:  The juror is stricken.  I agree.

MR. BRANIGAN:  Thirty-four.

MR. SCHREIBER:  No objection.

THE COURT:  I agree.  The juror is stricken.

MR. BRANIGAN:  Thirty-five.

MR. SCHREIBER:  He's already gone.

THE COURT:  Thirty-five is stricken.

MR. BRANIGAN:  Yes.  Thirty-eight.

MR. SCHREIBER:  Yeah.  No objection.

THE COURT:  The juror is stricken.

MR. BRANIGAN:  And last one was 39, but we have an agreement on 39 for cause.

THE COURT:  Right.  Okay.  All right.  Let's look at the first 10, and then we'll alternate with regard to peremptories.

Cereijo, Largaespada, Pantoja, Weintraub, Castro, Smith, Molina, Paguaga, Ruiz, Betancourt.  Those are the first 10.

On behalf of the Plaintiff?

MR. SCHREIBER:  We're just doing one peremptory right now?

THE COURT:  We're alternating.

MR. SCHREIBER:  Okay.  The Plaintiffs would thank and excuse Juror Number 5, Mr. Castro.

THE COURT:  All right.  Mary Palou joins the panel.

On behalf of the Defendant?

MR. BRANIGAN:  Juror Number 6, Your Honor, we'd like to thank and excuse him.

THE COURT:  Lien Estevez joins the panel.

On behalf of the Plaintiff?

MR. SCHREIBER:  Your Honor, is the Court going to consider Ms. Weintraub a hardship or is she going to stay on the panel for now?

THE COURT:  Well, she has an appointment on Friday. We were planning on being in court from ten to three.  To the extent that we would need to accommodate her, we wouldn't be in session.

MR. SCHREIBER:  It's fine.

THE COURT:  It doesn't make sense to bring in the jury from ten to twelve.  If the parties are in agreement with regard to Stacey Weintraub, Juror Number 4, then we can strike her for cause.

MR. SCHREIBER:  No.  We were not suggesting she be

150

stricken for cause.  I was just asking if the Court was going to rule, so that we could --

THE COURT:  Well, we would have to accommodate her.

MR. SCHREIBER:  Understood.

THE COURT:  Would the parties be amenable to striking Ms. Weintraub --

MR. BRANIGAN:  The Defense will.

THE COURT:  -- so that we can use the Friday?  Because I do want to let you know we have to finish this case by July 31st.

MR. BRANIGAN:  We have no objection, Your Honor, for the Defense.

MR. SCHREIBER:  Your Honor, we would -- we are not interested in agreeing to strike Ms. Weintraub.  I think we could accommodate her if necessary.

THE COURT:  Okay.  So we will have no court in this case on Friday.

All right.  On behalf of the Plaintiffs?

MR. SCHREIBER:  All right.  On behalf of the Plaintiffs...

(Pause in proceedings.)

THE COURT:  Any peremptory challenges?

MR. SCHREIBER:  Yes, Your Honor.  May I just have a few more seconds to confer?

(Pause in proceedings.)

MR. SCHREIBER:  The Plaintiffs would thank and excuse Juror Number 2, Ms. Largaespada.

THE COURT:  Yen Ngo joins the panel.

On behalf of the Defendant?

MR. BRANIGAN:  Your Honor, the Defense would thank and excuse Juror Number 10.

THE COURT:  Carla Crosby joins the panel.

On behalf of the Plaintiffs?

(Pause in proceedings.)

MR. SCHREIBER:  Plaintiffs will use their final peremptory to thank and excuse Juror Number 1, Mr. Cereijo.

THE COURT:  John Mowris joins the panel.

On behalf of the Defendant?

MR. BRANIGAN:  Your Honor, the Defense would thank and excuse Number 12, Mr. Betancourt, for our third.

THE COURT:  All right.  Then Jocelyn Asare joins the panel.

So the jury will consist of the following individuals: Juror Number 3, Juror Number 4, Juror Number 8, Juror Number 11, Juror Number 13, Juror Number 14, Juror Number 15, Juror Number 16, Juror Number 19, and Juror Number 20.

MR. BRANIGAN:  Your Honor, may I raise an issue?

THE COURT:  Yes, sir.

MR. BRANIGAN:  Your Honor denied the Defense's motion for cause to strike Juror Number 10, requiring me to exercise a

peremptory on Number 10.  And we would ask that we be granted another peremptory in light of that, particularly when given the nature of her equivocal responses.

THE COURT:  I'll grant it, Mr. Branigan.

MR. BRANIGAN:  Thank you.

May we have 10 seconds?

(Pause in proceedings.)

MR. BRANIGAN:  Thank you, Your Honor.

We would like to thank and excuse Prospective Juror Number 13.

THE COURT:  All right.  Camila [sic] Campaneria joins the panel.

Are there any matters that we need to address before we bring in the jurors and swear in the panel of 10?

On behalf of the Plaintiffs?

MR. SCHREIBER:  Not at this time, Your Honor.

THE COURT:  On behalf of the Defendant?

MR. BRANIGAN:  Not at this time.  Thank you.

THE COURT:  All right.  If we can just have the gallery -- if you'll just allow the jurors to have their seats, so that would be the first four rows, and let's line up the jury and bring them back in.

(Pause in proceedings.)

THE COURT:  All right.  As we're waiting for the jury, I want to ensure -- both sides have asked for an hour for

opening statement.  To that extent -- and it is 1:15 -- I'll feel a little more comfortable giving some preliminary instructions before we send them to a late lunch.  So would the parties be amenable -- we'll adjust our schedule from the four to five and reschedule what we had at four -- to staying until five o'clock and present both opening statements?

MR. SMITH:  That works for us, Your Honor.

MR. SCHREIBER:  That's fine for the Plaintiffs, Your Honor.

(Pause in proceedings.)

COURTROOM DEPUTY:  We're still waiting on one juror.

THE COURT:  Okay.  Thank you.

(Pause in proceedings.)

COURT SECURITY OFFICER:  All rise for the jury.

(Before the panel, 1:15 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

Thank you for your patience.

We have selected a jury to try the case of Neima Benavides, as Personal Representative of the Estate of Naibel Benavides Leon, Deceased, and Dillon Angulo, Plaintiffs, versus Tesla, Incorporated, also known as Tesla Florida, Incorporated, Defendant.

I'm going to ask the following individuals, who have

been selected, to make your way here to the jury box, and you will be sworn in collectively as Members of the Jury:

Sandra Pantoja, Stacey Weintraub -- yes. If you'll make your way now. Thank you.

Juror Number 8, Molina Fernandez; Aleida Cecilia Ruiz; Lien Estevez; Yen Ngoc Ngo; Carla Crosby; John Andrew Mowris; Jocelyn Sarita Asare; and Camilo Campaneria.

COURTROOM DEPUTY: If you would all rise and raise your right hand for me.

(Jury sworn, 1:19 p.m.)

THE COURT: All answering in the affirmative.

Thank you, Ladies and Gentlemen.

Please be seated.

With the exception of the Members of the Jury that have been sworn and selected, I'm going to be able to excuse the rest of you. I want to thank you for your patience, giving us an opportunity to get to know you. I wish I could excuse you from the courthouse, but I am excusing you from the courtroom. I would ask that you make your way back to the fifth floor, and the jury pool will give you further instructions.

Have a nice afternoon.

(Panel excused, 1:21 p.m.)

THE COURT: All right. Welcome back, Ladies and Gentlemen of the Jury.

Please have a seat.

I have some short instructions for you, and then we are going to take our late recess for lunch.  I do want to let you know that the Constitution Cafe downstairs will be open for the full hour that we will have our lunch break.

Members of the Jury:

Now that you have been sworn, I do need to explain some basic principles about a civil trial and your duty as jurors.  These are preliminary instructions.  I will give you more detailed instructions at the end of the trial.

It is your duty to listen to the evidence, decide what happened, and apply the law to the facts.  It's my job to provide you with the law you must apply.  And you must follow the law even if you disagree with it.

You must decide the case only on the evidence presented in the courtroom.

Evidence comes in many forms.  It can be testimony about what someone saw, heard, or smelled.  It can be an exhibit or a photograph, and it can be someone's opinion.

Some evidence may prove a fact indirectly.  Let's say a witness saw wet grass outside and people walking into the courthouse carrying wet umbrellas.  This may be indirect evidence that it rained, even though the witness did not personally see it rain.

Indirect evidence like this is also called

circumstantial evidence, simply a chain of circumstances that likely proves a fact.

As far as the law is concerned, it makes no difference whether the evidence is direct or indirect. You may choose to believe or disbelieve either kind. And your job is to give each piece of evidence whatever weight you think it deserves.

During the trial, you will hear things that are not evidence and you must not consider them.

First, the lawyers' statements and arguments are not evidence. In their opening statements and closing arguments, the lawyers will discuss the case, and their remarks may help you follow each side's arguments and presentation of the evidence, but the remarks themselves are not evidence and should not play a role in your deliberations.

Second, the lawyers' questions and objections are not evidence. Only the witnesses' answers are evidence.

Do not decide that something is true just because a lawyer's question suggests that it is. For example, a lawyer may ask a question: "You saw Mr. Jones hit his sister, didn't you?" That question is not evidence of what the witness saw or what Mr. Jones did, unless the witness agrees with it.

There are rules of evidence that control what the Court can receive into evidence. When the lawyer asks a question, or presents an exhibit, the opposing lawyer may object if he or she thinks the rules of evidence do not permit

it.

If I overrule the objection, then the witness may answer the question or the Court may receive the exhibit.  If I sustain the objection, then the witness cannot answer the question and the Court cannot receive the exhibit.

When I sustain an objection to a question, you must ignore the question and not guess what the answer might have been.

And sometimes I may disallow evidence -- that's called striking evidence -- and order that you disregard or ignore it. That means you must not consider that evidence when you are deciding this case.

I may allow some evidence only for a limited purpose. When I instruct you that I have admitted an item of evidence for a limited purpose, you must consider it only for that purpose and no other.

To reach a verdict, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, part of it, or none of it.

When considering a witness's testimony you may take into account the witness's opportunity and ability to see, hear, or know the things the witness is testifying about, the witness's memory, the witness's manner while testifying, any interest the witness may have in the outcome of the case, any

bias or prejudice the witness may have, any other evidence that contradicts the witness's testimony, and the reasonableness of the testimony in light of all the evidence and any other factor that affects believability.  At the end of the trial, I will give you additional guidelines for determining credibility.

As I advised you previously, this is a civil case.  To help you follow the evidence, I will once again summarize the parties' positions.

The Plaintiff, Neima Benavides, as Personal Representative of the Estate of Naibel Benavides Leon, Deceased, and Dillon Angulo, have brought a civil action against Defendant Tesla, Incorporated, doing business as Tesla Florida, Incorporated.

This case arises from a motor vehicle crash that occurred on April 29th, 2019, at approximately 9:30 p.m., on Card Sound Road in Monroe County, Florida.  At that time, George McGee was operating a 2019 Tesla Model S, when the vehicle traveling [sic] through the T-intersection and off the roadway striking a parked Chevrolet Tahoe.

Naibel Benavides and Dillon Angulo were standing near the Tahoe at the time.  Ms. Benavides was killed and Mr. Angulo sustained serious injuries.

The Tesla Model S was equipped with Autopilot, an advanced driver-assistance system.  Autopilot was engaged at the time of the incident.  Plaintiffs allege that the Tesla

vehicle and its Autopilot system were defectively designed, and Tesla failed to adequately warn about the dangers associated with the system, and these issues were a legal cause of the crash.

Plaintiff also seeks punitive damages alleging that Tesla was guilty of intentional misconduct or gross negligence that was a substantial cause of Mr. Angulo's injuries and the death of Ms. Benavides.

Tesla denies that the Model S is defective, that the alleged defect caused the crash or Plaintiffs' damages, and denies that there was a failure to warn that caused or contributed to the crash.  Tesla asserts that the driver, George McGee, was the sole cause of the crash and Plaintiffs' alleged injuries and damages.  Tesla also denies Plaintiffs' claim that its conduct rose to the level of intentional misconduct or gross negligence.

Plaintiff has the burden of proving their claims by what the law calls a preponderance of the evidence.  That means the Plaintiffs must prove that in light of all the evidence what they claim is more likely true than not true.  So if you could put the evidence favoring the Plaintiffs and the evidence favoring Tesla on opposite sides of balancing scales, Plaintiffs need to make the scales tip to their side.  If Plaintiff fails to meet this burden, you must find in favor of Tesla.

To decide whether any fact has been proved by a preponderance of the evidence, you may, unless I instruct you otherwise, consider the testimony of all witnesses, regardless of who called them, and all exhibits that the Court allowed, regardless of who produced them.

After considering all the evidence, if you decide a claim or fact is more likely true than not, then the claim or fact has been proved by a preponderance of the evidence.

On certain issues, called affirmative defenses, Tesla has the burden of proving the elements beyond -- of a defense by a preponderance of the evidence.  I'll instruct you on the facts Tesla must prove for any affirmative defense.  And after considering all the evidence, if you decide that Tesla has successfully proven that the required facts are more likely true than not true, the affirmative defense is proven.

The Plaintiffs have the burden of proving their claim for punitive damages by clear and convincing evidence.  This is a higher standard proof than proof beyond -- or proof by a preponderance of the evidence.  It means the evidence must persuade you that the claim or defense is highly probable or reasonably certain.  And I will instruct you on the burdens at the end of the trial.

While serving on a jury, you may not talk with anyone about anything related to this case.  You may tell people that you are a juror, and give them information about when you must

be in court, but you must not discuss anything about the case itself with anyone. You should not even talk about the case with each other until you begin your deliberations. You want to make sure you have heard everything, all the evidence, the lawyers' closing arguments, and my instructions on the law, before you begin deliberating.

You should keep an open mind until the end of the trial. Premature discussions may lead to a premature decision.

And in this age of technology, I want to emphasize to each of you that, in addition to not talking face to face with anyone about this case, you must not communicate with anyone about the case by any other means. That includes emails, text messages, phone calls, the Internet. That includes all social networking websites and apps, such as Facebook, Instagram, YouTube, X. You may not use any similar technology of social media, even if I have not specifically mentioned it here.

You must not provide any information about the case to anyone by any means whatsoever. That includes posting information about the case, or what you're doing in the case, on any device or Internet site, including blogs, chat rooms, social websites, or any other means. You should also not Google or search online or offline for any information about the case, the parties, or the law.

Do not read or listen to the news about the case, visit any places related to the case, or research any fact,

issue, or law related to the case.

The law forbids jurors to talk with anyone about the case and forbids anyone to talk to you about it. It's very important that you understand why these rules exist and why they are so important.

You must base your decision only on the testimony and other evidence presented in the courtroom. It is not fair for the parties if you base your decision in any way on information you acquire outside of the courtroom. For example, the law often uses words and phrases in special ways. So it's important that any definitions you hear come only from me and not from any other source.

Only you as jurors can decide a verdict in this case, and the law sees only you as fair. And only you have promised to be fair. No one else is so qualified.

Now, if you notice, we gave you a note pad and pen, if you do wish to take notes to help you remember what the witnesses said. If you do take notes, please do not share them with anyone until you go to the jury room to decide the case. Do not let note-taking distract you from carefully listening to and observing the witnesses.

When you leave the courtroom, you should leave your notes hidden from view in the jury room.

Whether or not you take notes, you should rely on your own memory of the witnesses. Your notes are there only to help

your memory.  They are not entitled to any greater weight than your memory or impressions about the testimony.

Now, it is 1:30.  We are going to take our one-hour recess for lunch.  It is very important that you be mindful that all of you need to be back before we're able to begin.  So I would ask that you be in the jury room, ready to come into the courtroom, and at that point in time we will proceed with opening statements.

I know that you have in your questionnaire before you came here today -- as part of your summons, you agreed to be here for a three-week period.  I'm going to give you the schedule now.  We are accommodating one juror and we will not be in court on Friday.  But if you'll take your notebooks, so I can give you the schedule for this week.  If it does change, I will let you know.

Today we'll proceed to five p.m.  Tomorrow, we will begin at 9:30 a.m. and we'll end at five p.m.  On Wednesday we'll begin at 9:30 a.m. and we will end at four.  On Thursday we'll begin at 9:30 and we'll end at five.  And on Friday we will not be in session.

Next week, which is Monday, July 21st, we will start at 9:30, and it will be till five.  On Tuesday, from 9:30 until five.  On Wednesday, 9:30, and we will end early at noon.  On Thursday we will begin late at 10:30 and end at five.  And then the last week, if we need to use that last week -- that is July

164

28th, 29th, 30, and 31st -- we will proceed from nine to five.

Each day I will give you the schedule for the next day.  But for today, we will proceed until close to five to allow the parties to present their opening statements.

So I have given you the schedule.  I do want to advise you of the comforts of home in the jury room.  We do have a coffee maker.  There's tea.  There's a refrigerator.  There's a microwave.  You do not need to go out for lunch, but you are free to do so.  I would just ask that you be mindful of the time and be back in time.  You also can make use and -- bring snacks or bring your lunch.  You don't have to remain in the jury room.  You can certainly go outside.

Now, to that extent, if you do go about the courthouse, and you're outside, you may see some of the attorneys and those related to the trial teams, including the parties, and you may notice that they are not having any communication with you.  Please don't be offended.  They are under a direct court order not to have any communication with you.  So they will not be exchanging any pleasantries, but please don't be offended by that.

So as you can see, it's a little after 1:30.  It's 1:35.  So how about if I see you back here at 2:35.  We'll take a one-hour recess for lunch.

I know not all of you have received the schedule, and I promise you that I will give you the schedule once again this

afternoon so that you're able to share that with your employer and your family members.

So have a pleasant lunch, and I'll see you back here at 2:35.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 1:35 p.m.)

THE COURT:  All right.  Go ahead and have a seat for a moment.

Are there any items that we need to address before we take our one-hour recess for lunch?

On behalf of the Plaintiffs?

MR. SCHREIBER:  One thing, Your Honor, is we were under the impression that if Ms. Weintraub made the jury that we would accommodate her.  I didn't understand that we would actually be dark all day Friday, and that could just pose a scheduling conflict for one witness who gave us Friday morning --

THE COURT:  And again, her appointment is at noon.

MR. SCHREIBER:  Right.

THE COURT:  The schedule was going to be from ten to three.

MR. SCHREIBER:  Correct.

THE COURT:  So I can bring the jury in from ten, but I don't know what time she needs to leave to make her appointment at noon.

MR. SCHREIBER:  We could be done with that witness in an hour.  I mean, he's a 45-minute direct witness.  He's just -- it's Dr. Jason Lewis --

THE COURT:  All right.  I'll ask the courtroom deputy to find out what time Ms. Weintraub would need to leave on Friday.

MR. SCHREIBER:  Yes.  And I'm sorry to the extent that that was unclear on our end.  We understood that she would be accommodated, but didn't know that that would mean the day was dark, and that poses an issue for Dr. Lewis.

THE COURT:  Okay.  And again, let's see what time she would need to leave in order to make her appointment.  Okay?

MR. SCHREIBER:  Understood.  Understood, Your Honor.

THE COURT:  Any other issues before we recess for lunch?

On behalf of the Plaintiffs?

MR. SCHREIBER:  Yes, Your Honor.  The issue would be addressed in a brief that was filed by Mr. Eaton late last night, is this issue of the NHTSA statistics on the 2011 frontal plane collisions.  I understand the Court's ruling. There was some supplemental briefing.  I think maybe it was fashioned a reconsideration motion, based upon the timing of when the order dropped.

The point of that is just simply that would potentially impact what I would or would not say in opening

statement, and was hoped to be heard on that before we got to opening.

THE COURT: And again, the Court's trying to work as quickly as -- you know, it's like Whac-A-Mole. I mean, you've been filing a lot of motions after the motion deadline. So the Court's trying to address those motions. But the Court set forth the law. To the extent that there's a motion for reconsideration, I haven't looked at it. I've been here busy. So I haven't looked at what the filing was.

So it's opening statement, it's not the evidence, and I would leave it to you, Mr. Schreiber, as to what you want to do. Because right now there is an order, and the Court was very clear with regard to references to those accidents that are not substantially similar.

MR. SCHREIBER: Message received.

THE COURT: Okay. Anything on behalf of the Defendant?

MS. BASS: Your Honor, just that you had mentioned earlier that you had a motion with reference to the quashing of subpoena of Mr. Calafell. And I raise it only because it's the larger context of evidence of the prior motion for sanctions, which Your Honor ruled against. And because it may come up in opening, I thought perhaps it would be helpful if you could give us some guidance.

THE COURT: Well, let me give you the guidance -- and

I'm happy to confirm that the law agrees with the guidance. But I certainly believe that any discovery issues in this case, and the Court's decisions with regard to discovery matters in this case, are not admissible at trial, but any prelitigation conduct is certainly admissible.

So to that extent, I would use that as guidance.  I understand that there are two areas.  One is during the course of the litigation, and that resulted in the Rule 11 sanctions order.  And one is before the litigation began.  And I don't see any reason why the prelitigation conduct is not admissible. So I hope that gave some guidance.

MR. SCHREIBER:  Thank you, Your Honor.

THE COURT:  All right.  Have a pleasant lunch, and I'll -- yes?

MR. SMITH:  One last thing, and that was --

(Court reporter interruption.)

THE COURT:  If you could just use a microphone, sir.

MR. SMITH:  Your Honor, we included in one of our motions a request that issues related to Mr. Musk's statements not be raised in the opening because the Court has to -- as the Court indicated, we could raise the issue of whether or not these were forward-looking, and we provided a brief on that, and just felt like -- and one of the things we asked was -- well, we asked that they not be admitted, but certainly not in the opening, because the Court has to filter those, as you

indicated in the motion in limine order.

THE COURT:  Mr. Schreiber or Mr. Poses?

MR. SCHREIBER:  I would just say that I wasn't planning on actually playing any of Mr. Musk's statements during opening statements.  If, for no other reason, I have 60 minutes and they fill up too much time.  I'm going to paraphrase what the evidence will show, but I'm not going to play them.

THE COURT:  It's what the parties believe the evidence will show.

MR. SCHREIBER:  Thank you, Your Honor.

MR. SMITH:  Thank you, Your Honor.

THE COURT:  Okay.  Have a pleasant lunch.  And I'll see you back here at 2:35.

COURT SECURITY OFFICER:  All rise.

(Recess from 1:45 p.m. to 2:35 p.m.)

THE COURT:  All right.  Welcome back.

I trust everyone had a pleasant lunch.

Go ahead and have a seat.

We have an issue with Juror Number 4 [sic], who was distraught and asked the courtroom deputy if she could be excused.  And I did ask her to come into the courtroom so she could speak with us.

So if we can bring in Juror Number 4.

(Juror Number 2 enters the courtroom.)

THE COURT:  All right.  Good afternoon.

Go ahead and have a seat.

If we could provide...

I understand that you are obviously distraught.  You spoke with the courtroom deputy, and I did ask you to come into the courtroom.  What I would request is just to protect your privacy -- it will be on the record -- I'm going to ask if an attorney for both the Plaintiffs and the Defendant will come sidebar, and if the court security officer could bring the juror sidebar.

Come on forward.

(At sidebar on the record.)

THE COURT:  I'm just going to give each of you a microphone.

MR. SMITH:  Thank you, Your Honor.

THE COURT:  I know that you wanted to share what's going on.  Could you tell us what's going on.

I need you to speak with the microphone.

JUROR NUMBER 2:  For my mental health and physical health this is not a good -- there's no words what to say.  I wish the best for both parties.  But I had open heart surgery.  I had brain surgery.  I have cancer.

MR. POSES:  Can I speak for --

(Court reporter interruption.)

MR. POSES:  Bye.  Good luck.

MR. SMITH:  Your Honor, we'd be delighted if you would excuse this juror.  I thought we should have done it earlier.

MR. POSES:  We realize the gravity and we understand.

THE COURT:  All right.  The courtroom deputy will follow you in, and you will be excused.

JUROR NUMBER 2:  Thank you.

THE COURT:  Thank you so much.  Take good care.

Bring her back.  She's excused.

(End of discussion at sidebar.)

THE COURT:  All right.  And once Juror 4 is excused, if you'll let me know when we're ready to bring the other nine in.

(Juror Number 2 excused.)

THE COURT:  Both sides ready to proceed?

On behalf of the Plaintiffs, both sides ready to proceed?

MR. SCHREIBER:  Yes, Your Honor.

MR. SMITH:  Yes, Your Honor.

THE COURT:  All right, then.

(Pause in proceedings.)

THE COURT:  We have the other nine ready to go?

We're ready.

COURT SECURITY OFFICER:  Okay.  All rise for the jury.

(Before the Jury, 2:40 p.m.)

THE COURT:  And Ladies and Gentlemen, there's no

particular order.  Wherever you feel comfortable.  Wherever you feel comfortable sitting.

All right.  Welcome back.

Please be seated.

Welcome back, Ladies and Gentlemen.

I trust that you had a pleasant lunch and ready to get to work.

So let's now walk through the trial.  First, each side will make an opening statement, but they don't have to. Remember, an opening statement is not evidence and it is not supposed to be argumentative.  It is just an outline of what that party intends to prove.

Next, the Plaintiff will present their witnesses and ask them questions.  After the Plaintiff questions the witness, Tesla may ask the witness questions.  That's called cross-examining the witness.  Then the Defendant will present its witnesses, and Plaintiffs may cross-examine them.

You should base your decision on all of the evidence, regardless of which party presented it.

And after all of the evidence is in, the parties' lawyers will present their closing arguments to summarize and interpret the evidence for you, and then I will give you instructions on the law.  You will then go to the jury room to deliberate.

At this point in time, we will begin with opening

173

statements.

First, on behalf of the Plaintiffs.

MR. SCHREIBER:  May it please the Court.

Permission to use the well, Your Honor?

THE COURT:  Yes.  Of course.

MR. SCHREIBER:  Ladies and Gentlemen, good afternoon.

We are here because Neima Benavides and Dillon Angulo were made part of a beta test that they never signed up for. Tesla chose to put its Enhanced Autopilot technology on the roadways of this community, knowing full well that the leading government agencies for transportation safety in this country, NHTSA, the National Highway Traffic Safety Administration, and the NTSB, the National Transportation Safety Board -- don't worry, there's going to be an acronym chart -- they had been telling Tesla for years to make its product safer.

MR. SMITH:  Your Honor, could we --

MR. SCHREIBER:  But the evidence will show --

MR. SMITH:  Your order last night deals with --

THE COURT:  Hold on.  What's the objection?

MR. SMITH:  Your Honor, the NTSB issue --

THE COURT:  Okay.  The objection is overruled.  This is opening statement.  This is what each party expects the evidence to show.

You may continue.

MR. SCHREIBER:  Thank you, Your Honor.

But the evidence will show that for years before this crash, and for years after this crash, Tesla ignored those warnings.  And as jurors in this case, you will hear evidence about those motivations and make a determination as to why Tesla did what they did.  Was it hubris, that they knew more than everything else?  Was it that Silicon Valley ethos of moving fast and breaking things, or was it simply profit-driven greed?  That is going to be the determination for you to make.

What's not in dispute in this case is that the driver of the Tesla Model S that crashed at the end of Card Sound Road, killing Ms. Benavides, who was 22 years old at the time, and forever injuring Dillon Angulo, who was 26 -- he was careless.  He was distracted.  He was on his phone over Bluetooth, and he looked down as he dropped his phone to grab it, holding onto the wheel, as he approached the end of a T-intersection.  And he plowed into my clients at approximately 60 miles an hour.  I think we can all agree that not paying attention, reaching over to pick up your phone while driving, is wrong.

Neither he nor the Tesla operating on Enhanced Autopilot ever slowed down.  And it will be up to you, based upon the evidence presented, to decide the shared responsibility, what I talked about in voir dire; two cups, one pitcher of blame, between Mr. McGee, the driver, and Tesla.

And you will hear us talk throughout this trial that

this is a case about shared responsibility.  But Tesla will make the position throughout this trial that they have no responsibility for this crash.  They will take no responsibility for the failures of their Autopilot system or for the fact that they set the stage for drivers just like Mr. McGee to be involved in crashes just like this one.

Again, we do not run from the fact that Mr. McGee was a bad actor.  But the evidence in this case will show that every actor needs a stage, and Tesla set the stage for the preventable tragedy that brings us all here.

I hate when people ask someone else to advance slides, and I swear this worked 30 seconds ago.  Can you just take a look.

I might be hanging a little closer over here.  It might be a range issue.

There we go.

You all should be seeing this on your screens now.

Does everyone see things on their screens?

THE COURT:  Rowdy, if we could put up the screens for the jurors.

Thank you.

Ladies and Gentlemen, raise your hand if your screen is not working.

All right.

MR. SCHREIBER:  You should see...

176

THE COURT: Is everyone's screen working?

All right, then.

MR. SCHREIBER: Okay.

That, Ladies and Gentlemen, is a 2019 Tesla Model S, the same make and model of vehicle that was driven by Mr. McGee, in a slightly different paint color. And the evidence will show that in December of 2018, for this accident which occurred in April of '19 -- excuse me -- in January 1st -- January 8th of 2019, Mr. McGee purchased his Tesla brand new. And as a part of it he paid for the $5,000 upgrade that is Enhanced Autopilot.

Now, let's talk a little bit about what Autopilot actually is. How does it work? What the evidence will show is that there's a series of eight cameras, three in the front, two in the sides, two in the back, one in the rear, perpetually recording what's going on, the eyes, essentially, the vision system of the vehicle.

In addition, that top left picture shows you that's the GPS antenna. It tells you where the vehicle is in the world at any given time. It's how its maps and its navigation system works. The picture on the top right with the blue, those are ultrasonic sensors. That's the stuff that's looking around in close proximity to the vehicle.

And that bottom picture, there's -- Figure Number 6, I believe, is just showing the location of the radar system.

That's baked in the front left bumper, and that is projecting out hundreds of feet into the forward-facing of the Tesla, monitoring the world in front of it and what might be coming upon it.

And so Enhanced Autopilot is essentially two features, TACC -- again, sorry, another acronym -- Traffic-Aware Cruise Control. But you'll hear people often refer to it as TACC. T-A-C-C. You pull the stalk once, Traffic-Aware Cruise Control sets on. It's like your old cruise control, but it speeds up and slows down based upon what's going on in front of it. Pull the stalk twice, now you get Autosteer. Autosteer is lane centering. That's the one that keeps you in the lane. So TACC keeps you going forward and back. Autosteer keeps you going laterally left and right. There are some other features, but for our purposes Autopilot is TACC and Autosteer.

Now, as I told you, there's cameras on this vehicle. And approximately five seconds before the impact on the night of April 25th, 2019, this video was captured.

Mr. McGee had engaged Autopilot for his drive home from his office in Boca to his home just around the corner from where this is. As I said, you'll learn that his hands were on the wheel as he reached down for his phone. He had his foot on the accelerator, going over the set speed of cruise control. He was traveling around 60 miles an hour.

Mr. Angulo's Chevy Tahoe was parked lawfully, legally,

on the other side of those signs you see off in the distance. He and Ms. Benavides were just hanging out, having gone fishing in that area before sunset.

(Video played, no sound.)

MR. SCHREIBER:  And while watching that video may be somewhat difficult because you understand the human tragedy involved, what that video doesn't show you is what Autopilot knew, what Tesla knew, what it knew in the moments before this crash, and what it knew in the moments after this crash.  And so, to truly understand that story, we need to go back in time.

Back in 2015, Tesla had been producing cars for a couple of years, and they roll out Autopilot.  And there's going to be a lot of evidence in this trial from Mr. Musk and the statements that he made describing what the technology could and couldn't do -- and I don't have to play them all for you in opening statement, but during the course of this trial you will hear them -- at various press conferences and public proclamations.

So going back to October of 2015, Mr. Musk is publicly touting -- four years before this crash -- that the vehicle has superhuman sensors with its radar, it can see through fog, it can see through rain, it can see through snow.  He describes how it can see most signs.  He says back then it can't see a stop sign, but it can see all types of signs, it knows all these types of things.

179

You're going to learn that shortly thereafter, in May of 2016, there was a crash. It was one of the first Autopilot fatalities. You might be asking yourself: "Well, why are we talking about other crashes? We're here talking about this one." Because these other crashes involve similar issues, and they all involved Autopilot's poor driver monitoring and being allowed to use it in places where it wasn't safe to use it.

And so, back in 2016, there was a fatal crash that occurred involving a man by the name of Joshua Brown. Mr. Brown was a Tesla enthusiast. He was one of those people who posts videos of him in his Tesla. He believed in it, believed in the company, the brand, the technology. And he gets in his car, and he turns it on Autopilot, and as he's operating it on State Route 27, he goes ahead -- and a truck crosses in front. And whether a combination of being distracted, complacent, we'll never really know. His truck -- excuse me -- his Tesla underrode the truck, and he was fatally killed in that collision.

And within weeks of that crash, in June of 2016, Mr. Musk is now once again publicly at a conference -- you'll see the entire video. You'll see his statements, where he says, in 2016, three years before this crash: "Autonomous driving is a solved problem. The Model S and Model X" -- two of their brands of sedans -- "are safer than a human today."

180

You will learn that with so many of Mr. Musk's statements, they were as untrue the day he said them as they remain untrue today.  And as jurors you get to be the judge of those facts.

You'll learn that within weeks of the Brown crash, NHTSA -- the National Highway Traffic Safety Administration is the government agency that is charged with keeping your public roadways safe.  They, along with the NTSB, National Transportation Safety Board -- that's the independent federal agency considered by most to be the leader in major accident investigations in the world.  If it's a plane, if it's a train, if it's a railroad, or it's an autonomous vehicle, the NTSB are oftentimes the leading experts who get involved.  They opened an investigation into Autopilot.

Yet again, within weeks, Mr. Musk is also publicly talking about a new release.  He's talking about how the vehicle can stop for anything.  He says:  "It doesn't even matter.  If there's something metallic, it could be anything -- it knows that there's something metallic.  Right?  Those cameras, those radars, all that tech, it knows that there's something dense and metallic.  It could be a pile of junk," he says.  "It could be an alien spaceship.  The car knows it shouldn't hit that."

And remember, that's what Mr. McGee paid for.  He paid for an Enhanced Autopilot technology that three years before

Mr. Musk is saying:  "If it's dense, it's metallic, it's in the road, we're going to stop."  You get to hear his statements, be the judge of those facts.

He doubles down again and proceeds to say, in October of 2016, that every Tesla that was leaving the factory is capable of Level 5 autonomy.  You're going to learn Level 5 autonomy means no driver.  Right?  Means it doesn't even need a steering wheel, no humans involved.  Says:  "Every vehicle leaving the factory today has the hardware capable of full autonomy."

Again, you will learn, and the evidence in this case will show, his statements were as untrue the day he made them as they remain untrue today nine years later.

Everyone at Tesla knew that Autopilot couldn't do what Mr. Musk claimed.  And it still can't do many of the things that he said it could do at the time of this crash in 2019, nor as we sit here today.

And just a day later, on October 20th, he releases -- and you will see the full video -- this tweet:  "Tesla, driving by itself, no human input at all, through urban streets, to highways, to streets, then finds its own parking spot."

You'll hear this thing, it's called the "Paint it Black" video.  It is a video because it is set to the Rolling Stones song "Paint it Black."  It's catchy, it's sparkly, it looks really cool, and it starts with telling you that there is

no humans involved.  And again, it wasn't true and they knew it.  The vehicle couldn't do those things.  Some of the things in that video, still the vehicles can't do today.

And so on the heels of this, the government investigators conclude that Tesla failed to adequately consider the human element, and they issued safety recommendations.  Right?  And really, what we're talking about here, and what the evidence will show, is that this is what happens when you introduce automation because you can, rather than because you should.

And you'll learn -- it's Court's Exhibit -- or Plaintiffs' Exhibit 79 and 81.  There are two safety recommendations that are issued.  And the first talks about the importance of improving driver monitoring.  The safety Recommendation Number 117041 -- a lot of acronyms, a lot of numbers.  It's the government.  I didn't come up with it -- they talk about the importance of improving driver monitoring.

The other safety recommendation is that they need to limit the use of Autopilot -- another acronym for you -- limit it to its operational design domain.  ODD is how it's often referred.  Just think about it -- it's geofencing.  Ever heard of the concept of geofencing?  Sometimes your phone doesn't work or an app doesn't work in a certain location.  That's what we're talking about.  When they say ODD, what they are talking about is geofencing.

183

Put limits on the safe operation of this technology. That's what Tesla is told to do.  Tesla -- and to be fair, four other major auto manufacturers who were producing this type of technology at the time were all told:  "Hey, y'all need to be sure" -- "we've been looking at this stuff for a while. You-all need to be sure that you're doing things to maintain driver monitoring, keep drivers engaged in the driving task." Right?  Because we don't want the person in the driver's seat to be so checked out they are basically like a passenger. Right?  And you'll hear evidence about that, this idea of complacency.  Right?  And then we also need to be sure that this stuff is geofenced, and that means it's limited as to where you can turn it on.  And we'll talk about why that's important.

They reiterate -- the government -- to Tesla: "Please" -- in November of 2017 -- "there is an urgent need for you, Tesla, to create clearer limits on the use of your technology."

And then, in April of 2018, another fatal collision occurs of a Tesla on Autopilot, this time in Kanagawa, Japan. Here, the Tesla on Autopilot had what's called a cutout.  A vehicle pulled out of a lane, there's a motorcycle, a pedestrian, number of things in front of it.  Autopilot didn't appreciate any of those things.  Thought the lane was clear because the vehicle it was following was gone.  So it's like:

184

"Oh, I'm good," kept on keeping on, crashed into the motorcycle, man lost his life.

In December of 2017, Q4 -- they started rolling out in October. The end of 2017, GM introduced Super Cruise. Super Cruise had essentially its own adaptive cruise control, TACC, and its own steering, Autosteer, lane centering. But you know what? They did two things different. Number one, they knew that if you wanted to properly engage drivers, and to be sure that they were engaged, you needed an infrared camera. You needed a camera looking back so you could see where their head was, you could see where their eyes were. Right? And if they weren't following it, then the warnings and the bells and whistles and all that pops up.

And number two, they geofenced it. They geofenced it because they knew that this stuff wasn't fully baked. It wasn't ready for prime time, to be used on rural two-lane roads in the dark at night. It wasn't ready to be used outside really of freeways, right, highways, where there are concrete dividers and clear lane lines and good road markings. 2017, that's what responsible manufacturers were doing.

And six weeks before we come here, another crash involving Jeremy Banner, just up the street in Delray, traveling along State Route 7. Same thing. Was he distracted? Was he complacent? Was it a combination of the two? We'll never know because a truck crossed in front of him, vehicle's

engaged in Autopilot, just like Brown three years before, he underrides it, loses his life in the process.

Six weeks later, this crash happens.  April 25th, 2019, fatal crash involving Naibel Benavides and life-altering injuries to Dillon Angulo, along Card Sound Road, a road that other manufactures like GM's vehicle would never be allowed to operate on Autopilot on.

And so, finally, in early 2020, that's in March -- this is part of those same Exhibits 79 and 81.  That's that safety recommendation:  "Improve your monitoring and geofence." It's 900 days later.  The other manufacturers, Volkswagen, BMW, Mercedes, Nissan, they all provided the government responses and said:  "Yep, we're on it."  Only one manufacturer said nothing and just ignored the government.  And it's the folks sitting right here at this table.

Again, you get to decide based upon the evidence:  Why did they refuse to respond to the federal government's efforts to make driver monitoring and geofencing?  Hubris?  Arrogance? Greed?  The choice will be yours.

By February, we're now after this crash, the NTSB is continuing to tell Tesla that there are ongoing risks with the design of their system and its continued unrestricted use, and it continues on, and it continues on.  And you're going to hear evidence crashes continue to happen, Tesla continues to report them, and that ultimately NHTSA, who joined in some of those

early investigations, issued its own conclusions and findings. And they found that Tesla's branding of Autopilot was misleading. They said that it elicits the idea of the driver not being in control.

Other peer makers, auto manufacturers, called it things like, you know, copilot and assist. Right? The idea that you're working with it, not that it's taking over. "And this invites drivers to overly trust the automation." That is the federal government's words. That is not ours.

NHTSA also concluded that Tesla was an industry outlier. They are the only ones out there doing this, mismatching weak driver engagement. Right? Because you'll learn all they were using at the time was with torque, basically steering wheel torque. If your hands were on the steering wheel, if you touched the steering wheel, that would tell the system, oh, you're paying attention.

Well, what you'll also hear is statements from Mr. Musk and from Tesla's corporate representative that they knew years before this crash that people were ignoring these warnings six, 10-plus times an hour. And all they do, they get the beep and then they touch it, and then they get the beep and then they touch it. And otherwise they're just riding around hands free. And Tesla knew this. They are nothing if not a technology company. They are nothing if not a data company. They knew this information. And they chose, unlike everybody

187

else, to not do anything about it.

And so the federal government -- NHTSA finds that they mismatched weak driver engagement with overly permissive operating capabilities.  That means you're allowing this to be used outside of the safe domain, that ODD.  Could really just be shorthand as the SD, the safe domain.

And thirdly, they found that in many crashes hazards were available in front of drivers for five to 10 seconds, that Autopilot's design was insufficient to maintain driver engagement.  In all of those crashes we talked about, including this one, the evidence was that the obstacle, the thing, was in the driver's face.  So why didn't they see it?  Why didn't they react to it?  Well, one of the reasons is because they were not paying attention.  But you have to ask yourself why.  It's like what I said.  There's always a bad actor, but every actor needs a stage.

And so this is the backdrop, all of these statements, all of these crashes, all of these efforts by the federal government to get Tesla to be better.  And so with that lens in place, we then need to look at this crash through the eyes of what Autopilot knew.  Right?

Now, this is a slightly different version of the video that I showed you from the beginning.  That was just a raw video from the camera.  This, you will learn, is what's called an augmented video or augmented visual overlay.  Let me set the

stage.  You see the blue line that goes around the edge? That's what's called drivable space.  Okay?  So you take all these sensors, and this other data that the car gets, and you superimpose it onto the video, and now that tells you what the car was actually predicting, perceiving, and responding to.

So this is the Autopilot system seeing the drivable space.  It has where the lane lines are.  The orange is that path of travel.  Down on the bottom, that little blue circle, that tells you that Autopilot's on, tells you the vehicle's going 62 miles an hour in a 45-mile-an-hour zone.

On the left it tells you that ACC, which is Traffic-Aware Cruise Control, is with pedal overridden.  But, as I said, if he takes his foot off the pedal, just like with cruise control, it takes back over.  He had engaged it, and that Autopilot is on.

Now, what you're also going to learn, as you watch this in a slowed-down fashion, is it appreciates the stop line. Those images you're seeing right now, which I'll show them to you slower, is the car -- the Enhanced Autopilot appreciating that there's a car, that there's a van, that it -- drivable space is ending.  This is another version of that same video, same concept, same technology that Tesla created.  And you'll hear as to why there's two versions of them, but they essentially show the same thing.  And in Tesla's version, you'll see that the vehicle appreciates the stop line.  You'll

see there they don't use the full words.  It just toggles through C and V and other things.  But let me just show it to you in a static image.

This is Exhibit -- I can't see the exhibit number, Billy, if you can see it on the bottom right.

You can't either?  It's okay.

This will be presented with one of our experts.  It's a demonstrative on time to collision.  And what you can see here is that at four and a half seconds from impact, over 350 feet away, the Tesla knew that there was an object in its path.  At three seconds -- three and a half seconds before impact, it recognizes that there's a stop line.  At three seconds, it notes another in-path object.  Under three seconds, it sees that there's an SUV.  Then it detects the pedestrian.  That's Mr. Angulo.  It sees that there's a pedestrian coming or in its path.

Then it goes through this process where it believes that it might be a car, it might be a cycle, it might be a van.  It's not sure.  It has different prioritization as to what it thinks it is.  But it continuously, for the last two and a half seconds, knows that it's going to contact something.

And this, Ladies and Gentlemen, is why we consider this a case of sharing responsibility.  Because there's no question that the driver was distracted but Mr. McGee was predictable.  And there is similarly no question what the Tesla

190

predicted, perceived, and chose not to respond to; to any of the dangers.  Should the driver have been paying better attention?  Sure.  But so should have Autopilot.  And the evidence will show that all Autopilot did with approximately one second before impact is to abort.

This is the second page -- that was Exhibit 107.  The second page of Exhibit 107 is a similar concept, but you see those red hash lines.  Again, that's that idea -- that's just another graphic display.  It's our demonstrative version of it. So we created that -- just showing that the vehicle knows that drivable space is ending.  And it knows -- based upon that GPS antenna that I showed you at the beginning, it knows where it is in the world.  It knows it's coming to the end of a T-intersection.

And you'll also hear evidence that it's supposed -- with that radar, it's supposed to be detecting 525 feet out in front of it at all times.  Enhanced Autopilot didn't slow. Enhanced Autopilot didn't warn.  Enhanced Autopilot did nothing.  It just gave up.

And so that's what the vehicle knew.  We're going to talk for a minute about what Tesla knew.  This crash happened six years ago, yet you're going to hear evidence that the data necessary to create that augmented video was obtained from the car's computer six months ago.  And what you're going to learn is the reason why that matters, why that information was

important, is that we had those raw videos, and we had some data that Tesla had given about time, when things happened in time. But you'll hear the experts talk about this idea of ground truth.

To truly understand the ground truth, really, the truth of what happens, you need to understand time, but you also need to understand space. Space and time, that's how you're able to fully conceptualize what Autopilot did and what it didn't do.

And so we were able to get this information that Tesla had denied -- long before this lawsuit ever happened, they denied ever having it. They denied that they ever received it. And you'll hear about the efforts that had to be taken to find it.

So let me explain a little bit about how vehicles collect data at Tesla. Data is being sent back to the Tesla mothership all the time. Like I said, they are nothing if not a technology company. All right? And when a crash is imminent, the Autopilot system knows how to create what's called a snapshot, a collision snapshot.

And basically what happens is there's various streams of data. There's something called a D16 you'll learn about later. It's a packet of information, tells you about was Autopilot on and off. It's basic stuff. You got the videos, right, from those eight cameras. It's a short clip. If it

knows a crash is about to occur, it takes like the last eight seconds because it's constantly overriding itself. And it packs that up.

Takes some of the event data recorder -- ever heard of a black box? EDR, event data recorder, same kind of thing. Data -- when did they hit the brakes, how fast were they going, was their seat belt on.

And then it takes what's called a CAN data. And CAN data is all the ways computers are talking to each other. Something called -- sorry -- another acronym, real-time data values, RTDVs. But just think about it this way: It takes all this information and creates kind of a zip file. Ever heard of a zip file where you just zip a bunch of stuff together? It's kind of like that, like whenever you get a zip email someone sent to you.

So it takes all that data and it creates this snapshot. And what happens is -- I got to get closer -- the crash occurs. And when the crash occurs, the Tesla doesn't know if it's going to have cell phone coverage. Right? Could be a big crash. It could be a fire. It could end up in a lake. So it doesn't know if it's going to have cell phone coverage. So what it does is it creates that file, that zip file, and it downloads it. It downloads it directly onto the Autopilot computer.

And then, like your email refreshing itself, it

checks:  "Do I have cell coverage?  Do I have cell coverage?  Oh.  I got cell coverage.  Beep, beep, beep, beep, beep."  And then it involves what's called an urgent upload.  They call it an urgent upload, but it's really a download before it uploads.  It's smart.  It's actually well-designed.

And then, for those of you old enough to remember fax machines, you get that:  "Transmission successful."  Tesla, the car itself, gets a line of code that says:  "Received.  We got this."

And so, after this crash, Tesla received this collision snapshot.  Yet, they denied ever having it.  And in fact, they denied for years that they had it.  And you'll learn that after this crash, but before this lawsuit, they deleted that snapshot file from their servers, the file that gives us the ground truth about what actually happens.  But the Autopilot computer, much like my laptop or my iPad, you'll find nothing is ever actually deleted.  And so we were able to find it and share it with you, and you will be asked to evaluate that evidence.

Why did Tesla delete it?  Why did they claim that they didn't have it when they were served with legal papers by law enforcement to produce it?  The evidence will show they had that snapshot file before the cops even arrived on the scene.  The dust was still in the air from the crash, and yet they denied ever having it.

Now, tomorrow you're going to hear from Corporal David Riso. He is the investigating officer -- lead investigating officer of the crash. He's now retired. He spent years investigating traffic collisions like this one. And when he started investigating crashes, he'll explain you looked at the driver. It was always the driver's fault, right? Every once in a while, somebody's brakes failed, tire explodes, but more often than not it was the driver's fault.

And so Corporal Riso will testify that when he learned Mr. McGee's vehicle was operating on Autopilot, he reached out. He reached out to the subject matter experts at NHTSA and the NTSB. And he'll tell you about the efforts that he made to get this information, and they told him what to look for. He's a cop that's been doing this for decades. He didn't know anything about Autopilot, but he knew who would know. And so he was told what to request, including those collision snapshot files.

And he'll tell you how Tesla told him they didn't have it. And he'll also testify that how, if he had it, he would have taken that information to the subject matter experts at the federal level to better understand how and why this crash happened. But they deprived him -- they deprived him of that opportunity.

And later this week you'll hear from Dr. Jason Lewis, on Friday. He is a forensic data extraction specialist. He

trains the highest levels of law enforcement and government agencies in how to obtain data like this. And he'll describe the efforts that had to be made to find this data, and how he validated it, and can explain how what we received years later was an identical copy of the data that Tesla had and deleted years before this lawsuit ever started.

Now, as you can imagine, it's going to take a little while to put on all of this evidence. And as the Judge properly instructed you before I got up here, what I say, what Tesla says, in opening statement is not evidence. But I do expect each and every one of you to hold us accountable to this evidence when we get back up here in a few weeks for a closing argument.

Now, I would love to be able to give you this story like a typical contents of a book, chapter 1 all the way to the last chapter, and that little "About the Author" that they always do at the end, but I can't. What oftentimes happens in a trial is that we start at chapter 5, and then chapter 1, then chapter 13. And that's why we give you this opening statement, right, is so that when you receive this evidence -- because it's not all going to come in as smoothly -- because guess what? We all know we don't live in a perfect world. People's schedules do not perfectly align; yours, the Court's, ours, all the experts. But I want to give you this arc of the narrative so you understand where all of this information fits, and so

when you hear it you'll go:  "Oh, yeah.  Yeah.  Yeah.  That's the data guy, and that's the cop," and whatever.

Now, you're going to hear from a lot of experts.  And you heard a whole laundry list of names earlier today.  And one of those is Dr. Mary Cummings.  She is the head of human-machine interaction at George Mason.  She is former NHTSA.  She has testified before Congress on automation issues.  She was one of the United States Navy's first-ever female jet fighter pilot; call sign Shrew.  She is a tough lady, and she's brilliant.  And she will discuss the government investigations.  She'll discuss the systemic failures of Autopilot and the impact of Mr. Musk overhyping the technology over and over, and how that influences markets and behavior.

Tomorrow afternoon you'll hear from Dr. Mendel Singer.  And not only does he have a very impressive beard -- which, as a bearded man, I appreciate -- he also has a very impressive resume studying large quantities of data.  He is a quantitative public health and statistics experts.  And he's going to talk about something known as the Vehicle Safety Report.  Because I can assure you at some point Tesla will get up and say:  "Cars drive safer under Autopilot.  We've got billions of miles to prove it."

And what Dr. Singer is going to do is, he's going to come in and he's going to explain that this Vehicle Safety Report, which has been put out on Tesla's website since before

this accident, going back to about 2018 -- it's one of the ways that Tesla claims publicly that their vehicles are safer on Autopilot than conventional driving.  Dr. Singer will make it very clear there is no math and there is no science behind Tesla's Vehicle Safety Report.  His testimony will establish that the Vehicle Safety Report is just another mischaracterization and half-truth peddled by Tesla, as untrue when they started publishing it as it remains today.  And yes, that is a theme.

You're going to hear towards the end of this week from Alan Moore.  He's a professional engineer.  He's an accident reconstructionist with particular expertise in advanced driver-assistance systems, and he's going to explain to you the technology and why and how it failed.

And then you'll hear from some Tesla witnesses through videotaped deposition testimony.  We'll be calling two of their corporate representatives, Mr. Akshay Phatak and Mr. Eloy Rubio Blanco.  Understand, a corporate representative, unlike the gentleman who was sitting in the courtroom for Tesla today, they speak for Tesla.  Corporations can't speak, so they appoint people to speak on their behalf.  Mr. Phatak and Mr. Blanco are such people.

And you're going to hear, as we'll play clips of their videotaped deposition testimony -- and I understand Tesla is going to call Mr. Blanco live in their case as well.  And

they're going to talk about the things that Tesla did and oftentimes didn't do, and didn't consider, in the development of this technology.

And you'll also hear through video the testimony of Mr. Shoemaker. He's an Autopilot infrastructure guy. He basically works on the back end, the back end of how they manage data. He's the one that's going to tell you that they received the snapshot while the dust was still in the air, and that the only way it could be off of their system and off of their servers is if someone at Tesla affirmatively deleted it.

And then, of course, after telling you the story of how this happened and why this happened, we're going to talk about the third part of that trilogy, which is the aftermath. Naibel Benavides and Dillon Angulo, 22 years and 26 years old, respectively. They were kids by any reasonable definition, doing nothing wrong, other than sitting in their car -- standing by it, after a night of hanging out and fishing.

I don't believe Tesla's going to have much to say about the damages in this case. Because after all, how could they? Whether it's the mental pain and suffering of the Benavides family for the loss of their daughter -- you'll hear from dad Guillermo, mom Lilia, sister Neima. Mom and Dad will talk to you about what they would do -- what they would do if they only had one more day, one more phone call, one more trip to the beach, or one more shared meal.

In one word, Dillon Angulo's injuries were catastrophic.  He suffered a brain bleed and a traumatic brain injury.  His jawbone was fractured in multiple locations.  He suffered a broken back, a broken hip, a broken pelvis, significant internal trauma.  And he carries with him both the physical and emotional scars of this day, and will carry them forward for as long as he is on this earth.  You'll hear testimony next week from a number of his physicians about what he's gone through and what he will go through forever.

But let me be very clear about something, Ladies and Gentlemen.  We are not here for your sympathy.  Sympathy comes from the Greek words "to suffer with."  These folks have suffered enough.  We are here, however, and the evidence will show, that we are entitled to full accountability.  And when I get back up here in a few weeks' time, after we present all of this evidence, after we have proven our case, we intend to not only ask you to find that Tesla's Autopilot system was defective, but we intend to ask you to help this community. And if you find, based upon the evidence presented and the law provided to you, that Tesla's conduct was grossly negligent or intentional, then we're going to also ask you to award punitive damages against them.  Doing so not only protects our community from further wrongdoing, but it sets an example for other companies to see and learn from.

Now, I realize it's a little early in the case to be

talking about making our community better by awarding punitive damages, but I need to mention this to you now in opening statement so you can expect what is coming.  By arming you now, I hope you'll be better prepared to view the evidence in this context.  And then after it's in it will hopefully make more sense when we talk about how your findings in this case has the unique power to influence the way Tesla will conduct business in the future, and how your verdict in this case can serve as a deterrent to Tesla and other companies out there doing business in these communities so they act better.

Now, I am not suggesting that you make up your mind now, since you have not even received the very first piece of evidence.  That would be improper.  But I ask that you hold space for it.  Because you, Ladies and Gentlemen, as jurors sworn in this case, will represent and do represent the conscience of your community.  And just as I asked you, and as we talked about in voir dire, if the facts and evidence support it, and the law allows it, when we get back up here in closing argument, we are going to ask you to return a verdict for hundreds of millions of dollars against Tesla to hold them fully accountable for all of the harms and losses that they have caused in this case.

So on behalf of myself, on behalf of my co-counsel, most importantly on behalf of the Benavides and Angulo families, we thank you for your time, we thank you for your

attention, but above all we thank you for your service.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Schreiber.

Mr. Branigan?

MR. SMITH:  May it please the Court.

THE COURT:  Yes.  Of course.

MR. SMITH:  If I can just make sure this is working.

THE COURT:  Of course.

MR. SMITH:  Three important facts in this case.  The three most important facts in this case are:  One, a dropped cell phone; two, a pressed accelerator pedal; and three, a car that in 2019 did not exist.

Mr. McGee -- and you will see -- got out of his car, and a police officer was there, Trooper Torres.  Trooper Torres had on a body camera.  And four different times he said:  "I dropped my phone.  I was trying to call.  We were flying out for a funeral tomorrow, and I was trying to get my wife's stuff ready with the airline.  I looked down, and I ran right through there, and I hit this guy's car."

He was on a phone call, we know, for 13 minutes beforehand with customer service.  This wasn't a phone call with a family member, or a phone call with even work, but this was one of those phone calls we've all had trying to arrange something with customer service.  It takes a lot of work and decision-making.  And he dropped his phone on Card Sound, in

the dark, and he's rummaging around for his phone and runs through this -- this light -- and runs through this light and stop sign.

And he does so, like many, many other people have done, by using their cell phone when they're driving, but also by doing something that is amazingly dangerous, one of the most dangerous things you can do, which is reach for and look for something you have dropped.  And you'll see that this can happen in any car, at any time.  This is not about Autopilot.  This is about a driver who was looking for his phone.

But he was also pressing the accelerator pedal.  This piece of evidence, this reconstructed video that puts on there what the computer can see is one of the best pieces of evidence for Tesla in this case.  We would never think about hiding it.  We don't hide this information.  We didn't think we had it, and we found out we did.  And thankfully, we did, because this is an amazingly helpful piece of information.

Because you can see in this little box right here some of the information we know.  It says:  "ACC OFF."  That means the adaptive cruise control is off.  It tells you why it's off, because the pedal override is occurring.  That means the pedal is being pressed 20 percent of its stroke.  And what does it do?  It speeds up this vehicle from the preset speed of 45 miles an hour to 62 miles an hour.  This is not a complacent driver.  This is an aggressive driver -- aggressive -- driving

this vehicle.

I wrote something down that Plaintiffs' counsel said. He said that Tesla and Mr. McGee never slowed down. Do you know why? Because I don't care what kind of car any of us in this courthouse have. If you push the accelerator pedal, it's not going to slow down. He drove this 17 miles an hour over the speed limit through a stop sign and crashed.

And what does that do? It turns off the longitudinal control of Autopilot. Autopilot, as was explained, is both lane-centering technology that helps a driver stay in the middle of the lane, and what's called adaptive cruise control, that assists the driver -- maybe some of you have had that, where it assists the driver in maintaining a safe distance from the vehicle in front of you. It used to be cruise control. You would set it at a set speed, and it would just keep going at that set speed. This actually -- if the vehicle in front of you -- lead vehicle in front of you slows down, it slows down with you and helps you maintain a safe distance. It's great, it saves lives, but it was off. It can't stop you if it's off.

So this case is about a dropped cell phone, it's about a pressed accelerator pedal, and it's about a car that didn't exist. What do I mean? The car that doesn't exist is the one that was just described to you by Plaintiffs' counsel, one that would stop at this stop sign under these circumstances. I will promise you that if they had a car that would stop at this stop

sign, one that had technology that would stop at this stop sign, you would already know about it because they would have told you.  But the technology at the time didn't exist.

These detections we're going to talk about; the detection of the pedestrian, the detection of the car, the detection of the end of drivable space, and the detection of the stop sign.  That detection of the stop sign shows you just what Tesla's interested in.  It's interested in saving lives and preventing crashes.  And I'll show you that in just a minute.

But the circumstances -- the technology that is in the vehicle is two kinds of technology, two very separate things.  One is the Traffic-Aware Cruise Control, or adaptive cruise control, that was off.  The other is something called AEB, which is automatic emergency braking, also forward collision warning.  Those are things that we use to slow the vehicle down or stop it when there is a lead vehicle in front of it in its lane.  And we know in 2019 that that's all this system did in any car.  And lots of cars have it.  Lots of cars had it in 2019.  You may have driven a vehicle that you feel this little shudder, or brake, or something that helps you stop when you get too close to something; that's it.  But the something you're getting too close to is a lead vehicle in the lane in front of you.  The vehicle that would stop at this stop sign in 2019 doesn't exist or you'd have already heard about it.

So one of my favorite writers is a guy named Frederick Douglass, who was an orator and a great American in around the Civil War.  Frederick Douglass said our freedom -- our freedom, everybody's here -- stands on a foundation of two boxes.  They're both in the Constitution, he said.  They are the ballot box.  We elect the people who run our government.  And it doesn't matter what side of the political spectrum you're on, you believe today that that ballot box is so important.

And the other one is this one, the jury box.  We come here -- no one can take from us our life, our liberty, our property without coming here first.

And what on earth makes this work that way?  It's the most important words said in a courtroom.  And those most important words said in a courtroom are being said today.  You said them today.  They are being said in Michigan, in Alabama, in California, my home state of South Carolina.  They are being said in New York by people in the box just like you.  They're words that aren't said by lawyers.  They're words that aren't said by witnesses.  And with all respect, not even by the Judge.  They are words said by you; your oath.  "I will well and truly try this case and a true verdict rendered based on" what?  Whose lawyer you like the best?  No.  Based on sympathy?  You actually said no, you wouldn't do that.  Based on how you feel about Elon Musk?  No.  That's not it.

What you said is:  "I will well and truly try this

case and a true verdict rendered based on the law and the evidence." Simple. Brilliant. It's what keeps us free. Our respect for what you do is what keeps us free. And your pledge to follow that oath, along with people you're arm in arm with all over the country today, is more important than anything in that service that Her Honor told you was the greatest service you can render to your country in peacetime.

So I want to tell you it's not going to be easy. Because it's going to be emotion in this case. What happened in the aftermath of this is going to be shown to you on a video, a body-cam video, and it's horrible and it's very emotional. And the sympathy you're going to feel for this family, it's going to be hard to put that aside because we're all humans. So I'm telling you it's going to be hard. But you're here to do something hard. Right? You're here to follow that oath.

So let's talk for a minute -- just for a minute about what the law is and then we'll talk about what the evidence is.

The Judge is the boss on the law. She is going to tell you in a detailed instruction what the law is, but I'm just going to give you a few little words that you're going to hear in that. But you listen to what the Judge says about the law.

The Plaintiff has the burden of proof. You've already heard a little bit about that. And in order to recover, the

Plaintiff has to prove that the Model S was defective.  That doesn't mean that it can cause a crash, can be in a crash, doesn't mean that people have gotten injured.  It means that it is unreasonably dangerous.  And that defect, that unreasonable danger, has to be what caused the injuries that the Plaintiff is trying to recover.

In order to examine and understand what -- what unreasonably dangerous products look like, the Court will charge you about something called the consumer's expectation.  And that means that unreasonably dangerous means a failure -- the product fails to perform as safely as the ordinary consumer would expect, except for one thing.  If the ordinary consumer expects this car to fly, that's not a reasonable expectation.  We don't have, at this point, flying cars.  Some day we might.  Might be The Jetsons.  But we don't.  That's not part of what's called the state of the art today.  That is the state of science.  So the Court's going to tell you that you're to consider what the technology was available in 2019.  And six years ago, technology was a lot different than it is today.

So as we look at this, let's look at what the evidence is.  And before we talk about those three pieces of evidence that I was telling you about, what I'd like to do is to catch you up on two things.  One, a little bit about the crash.  And two, what is Autopilot.  Okay?

So let's talk about what is Autopilot.  Autopilot is

what's called an ADAS system, advanced driver-assistance system.  It is not an automated vehicle.  The government, the National Highway Traffic Safety Administration, along with the Society of Automotive Engineers, have come up with descriptions of six levels of automation.  And they go from Level 0, which is -- actually has some automation, to -- but the driver is always in control, to Level 5, which is no driver at all.  You're essentially a passenger in a moving car.  We can't buy, any of us in this room, a Level 5 vehicle.  About all we can get is 0, 1, and 2.  And 0, 1, and 2 are ADAS, which is driver assistance.  Three through 5 are automated vehicles.

So let's look at what 0 is.  Zero is momentary driver assistance -- why am I not advancing?  There we go -- momentary driver assistance, meaning like alerts like the automatic emergency braking, the forward collision warning, lane-keeping technology that happened based on what's happening in your car, but it's just momentary.

Level 2 -- Level 1 and Level 2 are a little different.  Both of them require the driver to be fully responsible, but they're continuous.  So Level 1 is a situation where they are continuous.  And either of the systems -- either the one that deals with acceleration and braking, which is adaptive cruise control, or the one that is controlling or assisting the driver and controlling the side-to-side movement, which is the lane centering.  But only one of them can work at a time.  So if

you're just driving on cruise control, that is Level 1.  Level 2 is when you can use them both together.  So Autopilot is Level 2.

By 2019, 14 manufacturers made 76 vehicle models with Level 2 systems.  So there are a lot of these out there in 2019.  In fact, Tesla wasn't the first.  Honda and Mercedes started in 2014, Tesla in 2015.  In 2016, BMW and Volvo, and Toyota through Lexus, Audi in 2017.  And then, in 2018 and 2019, a lot of other vehicles, including the Cadillac CTS that you heard a little bit about, and Ford vehicles.

So what does Tesla do to help the consumer understand how the system works, to set the consumer's expectation?  So the first time you get in your new Tesla, and you want to use the Autopilot system, you have to engage it.  You have to activate it.  And to do that, this is what you do -- this is a little video.

(Video played, no sound.)

MR. SMITH:  So he presses "Autopilot."  He presses "Autosteer Beta," and he gets this message.  He reads this message, and then he presses "yes."

What does the message say?  It says:  "Autosteer is a driver-assistance feature and does not make your vehicle autonomous."  First thing it says, right up front, is you got to drive this.  "Please use it only if you will pay attention to the road, keep your hands on the steering wheel, and be

prepared to take over at any time."

And then it says something that these lawyers think is so terrible. It says: "Autosteer is currently in beta, which is to say" -- "is to encourage you" -- "to encourage a higher level of vigilance." Tesla did not release something beta into the world. It called it beta so that people would pay attention. And that's what it says, and that's -- all these statements that you've heard about Mr. Musk, he says exactly that, that it's not beta. It's a -- it's -- we called it that to make people be less complacent.

And it says: "Please refer to the Owner's Manual for more detailed information about this feature." So let's look at the Owner's Manual and see what it says. This is the Autopilot warning. It says: "Never depend on these components to keep you safe. It is the driver's responsibility to stay alert, drive safely, and be in control of the vehicle at all times."

For adaptive cruise control, it says the same thing. It's your responsibility to stay alert, drive safely, and be in control of the vehicle at all times. "Never depend on Traffic-Aware Cruise Control to adequately slow the Model S. Always watch the road in front of you and be prepared to take corrective action at all times. Failure to do so can result in serious injury and death." Tesla is telling its drivers this.

For the Autosteer, it says the same thing: "Never

depend on Autosteer to determine an appropriate driving path. Always be prepared to take immediate action.  Failure to follow these instructions could cause damage or serious injury or death."

And then, every time you turn it on, every single time you turn it on, it displays a message reminding you to pay attention.  Here it is:  "Please keep your hands on the wheel. Be prepared to take over at any time."  This is to avoid that complacency that the Plaintiffs' lawyer was just telling you about.  But remember, we don't have a complacent driver.  We've got an aggressive driver.  We have got somebody with their foot on the pedal going 62 miles an hour.

Tesla also gives alerts when people don't have their hands on the wheel, to tell them to put their hands back on the wheel, to make contact with the wheel.  And if they don't, after a series of alerts, it strikes you out.  So you have to -- you can't use this vehicle -- you can't Autosteer on this trip again.

So what does Tesla do to inform its drivers?  First thing, right off the bat, it does that beta message and gives them a choice of whether to engage the system or not.  Second, it gives a full description of the capabilities of the system and what you -- not just the capabilities, but the limitations of the system.  And Tesla gives the driver a reminder every time you turn it on and gives a warning when you don't comply.

So what about automatic emergency braking and forward collision warning?  What does it do to set the consumer's expectations for that?  "Forward collision warning is for guidance purposes only.  Depending on forward collision to warn you of a potential collision can result in serious injury or death."

For automatic emergency braking, the same thing.  "It is the driver's responsibility to drive safely and remain in control of the vehicle at all times.  Never depend on automatic emergency braking to avoid or reduce the impact of a collision."

All of this information is being provided to the customer in the way that car companies have provided this information for years and years and years, for decades, for almost a century, in an Owner's Manual.

So how do we know that this system, this AEB, is only for in-lane, in-line traffic rear-end crashes?  Well, the government, NHTSA, did sort of a schedule of what kinds of crashes come -- or can be affected by certain types of electronic crash avoidance systems.  And it said that: "Forward collision prevention technologies generally include safety systems like forward collision warning, crash-imminent braking and dynamic brake support," which are called CIB and DBS.  And he says -- and the government says:  "This is what's called automatic emergency braking."

So we're talking about automatic emergency braking and the crash populations that those systems are designed to help prevent.  And the important thing to realize is this report is one month before the crash.

If we're looking at what the state of the art was at the time of this crash, you've got this telling you these are the crashes that can be affected by this technology.  There are eight rear-end crash scenarios that potentially can be affected by those technologies.  And here they are.  Look at them. "Rear-end, lead vehicle, rear-end lead vehicle slower, rear-end lead vehicle decelerating, rear-end possible in-lane vehicle stopped, in-lane vehicle slower."  This is what this technology is designed to do.  You didn't hear that.  You heard:  "Hey, look what the vehicle detected.  It should have stopped."  This system doesn't even deal with vehicles that are off the road. It's for rear crashes with in-lane lead vehicles only.

What you heard, Mr. Musk made all these misrepresentations about the technology.  Well, he didn't. You'll be able to see not just the phrases that the lawyers have picked out.  You'll be able to see the whole things that he has said, that are very clear about the state of the technology at the time he was making those.

But what happened here just a little while ago was a misrepresentation of the technology.  Because that's what the technology was in 2019, not something that would stop.  And

like I said, if there was something that would stop here, if there was a car that would stop here, you would have heard about it already.  I wouldn't have to tell you that it's not available anywhere in 2019, because if there was one you'd already know about it.

This is the crash configuration.  This is how -- that is a reconstruction that was done by our engineer, who you'll hear from in about a week and a half.

But let's talk about how we got here.  Mr. McGee was at work in Boca and took this route down to Ocean Reef, where he lived.  He takes this about three times a week.  He'd done this route in the Tesla -- he'd done this route many times, but he'd done it in the Tesla about 50 times.

So what do we know about this 71-mile trip?  It took him 73 minutes until he got to the crash.  Mr. McGee drove 71 miles, averaging 58 miles an hour.  His speeds ranged from 30 to 90 miles an hour, the highest being 92. This is not a complacent driver.  This is an aggressive driver.

He utilized Autopilot.  Sometimes it would -- he'd override it by pressing the accelerator pedal.  And we know he was on his phone for 13 minutes and 13 seconds before the crash.

We also know that the speed limit on Card Sound Road is 45 miles an hour.  Tesla limits the speed at which you can set Autopilot on Card Sound Road to 45 miles an hour.  So if

you set Autopilot, you set the adaptive cruise control, it won't go faster than 45 miles an hour, unless you aggressively push that gas pedal -- oops.  It's not a gas pedal -- push that accelerator pedal and go faster.  And that's what he did, and he exceeded the 45-mile-an-hour speed limit, he exceeded his preset speed of 45 miles an hour, and he exceeded Tesla's preset restriction of 45 miles per hour.

In the last 20 seconds, he had his hands on the wheel the entire time.  He drove the Model S through the stop sign at 61 miles per hour.  This is not a complacent driver.  This is somebody who is driving the car.  And within five seconds of the crash, he recognized this.  He got on the brake, steered to the right, and crashed.  But he couldn't avoid the crash.

Here it is.  This is our accident reconstruction.  You can see he's still speeding at 61 miles an hour with the brake off when he's crossing the stop line.

So in the 75 seconds before the crash, which was the time period when he was pressing the accelerator pedal, he pressed the accelerator pedal to about 20 percent, and the Model S -- it caused the Model S to exceed the preset speed limit, exceed Tesla's restriction of 45 miles an hour, and exceed the speed limit on the highway, on Card Sound Road, of 45 miles an hour.  And it caused the Model S to travel between 59 and 62 miles an hour as it approached and entered the intersection.  That's this crash.

So here's the question:  Was Mr. McGee -- was he distracted?  We all agree he was distracted.  Was he distracted because of a dropped -- trying to retrieve a dropped cell phone?  Well, that is an undisputed fact.  All three of these facts are undisputed.  But this is what's called a stipulation that the parties have agreed on.  The parties have agreed that Mr. McGee was distracted from the driving path in the moments before impact, having dropped his cell phone.

And it had to be agreed to because this is what he said.  He said:  "I was driving.  I dropped my phone.  I looked down.  I ran the stop sign.  I hit the guy's car."  In another place, he's trying to explain what happened to the police while this horrible scene is going on in front of him, and he says: "I dropped my cell phone.  I was trying to call -- we're flying out to a funeral tomorrow, and I was trying to get my wife's stuff ready for the airline.  And I looked down, and I ran through here, and I hit the guy's car."  He said:  "It was actually because I was driving and I looked down.  And I had been using the cruise control and I looked down.  I didn't realize, and I sat up.  And the minute I sat up, I hit the brakes and saw the truck."

Well, we know he wasn't using the cruise control.  The cruise control was off.  He was pressing the accelerator pedal, and he wasn't telling the police that.

"Did you stop at the stop sign," the police officer

asked.  "No, I didn't, sir, I don't think.  I honestly don't know.  I looked down.  I didn't know how close I was to the intersection.  I was driving on cruise and going for -- I looked down and I get the phone I dropped -- to get the phone I dropped.  I was on with the airline for my wife for tomorrow's funeral that I'm going to, and I reached down.  I didn't see it.  And then when I popped up, and I looked, I saw a black truck.  It just happened so fast."  That happens in any car.

Here is a part of the body-cam.  Oh.  We don't have sound.

(Video played, no sound.)

MR. SMITH:  Well, we'll look at that later.  You'll get to see that, plenty of it.

But let's go by the numbers here about dropped cell phones.  Twenty-nine percent.  Twenty-nine percent of all crashes in 2019 were from distracted drivers.  6.1 percent.  6.1 percent of all crashes were from distractions due to cell phone use.  Cell phone use is a tremendous, tremendous danger in automobiles.

Three hundred percent.  That's the increase in risk from manual cell phone use, but 700 percent is the increased risk from reaching for an object.  It's a very dangerous thing, and it happens in any car.  This is based on 2019 statistics for all cars, not for Teslas, not for other Level 2 vehicles, not for those 76 other cars.  But this happens in all cars.

Reaching for and picking up a dropped object is one of the highest crash risks of driver distractions that have been studied. That's what happened here.

So every 10 years NHTSA looks at -- or government, our Department of Transportation, looks at traffic data. And they happened to pick 2019, the year of this crash, to look at this. And this is what they said: 29 percent of crashes are attributable to distance. They said that means 10,546 fatalities. Driver distraction is the number one cause of crashes.

Twenty-two hundred crashes are a result of the 60 -- 6.1 percent of crashes attributable to cell phones. And look at this: They even give you the categories that they used for driver distraction reaching for a cell phone. And one that has its own category: Object dropped by driver. This is a serious issue.

And look at this: This shows the increase in crash risk. The one on the left is for cell phone use. The one on the right is for reaching for an object; 300 percent, 700 percent.

But Mr. McGee safely traveled through this same intersection almost 50 times in the same Model S. What changed? The route didn't change. Time of day didn't change. He left after work. And it was dark. Because he bought this vehicle in January, and this was in April, and this was in the

dark. It wasn't lighter earlier. The intersection didn't change, the lane markings didn't change, the road didn't change, the road signs didn't change, the driver didn't change, the driver's understanding of the vehicle didn't change, the vehicle and the software didn't change. The only thing that changed was this driver's behavior. He dropped something and was trying to pick it up. Otherwise, he safely navigated through there. He didn't think for a minute that this car would stop at this stop sign.

So was Mr. McGee distracted because he was using the Autopilot feature that he used all the time on those 50 trips? No. He was distracted because he was looking for his dropped cell phone.

So now let's talk about one other thing, this thing that the Plaintiffs' lawyer said: "It never slowed down. Why didn't it slow down? Should Tesla's technology have prevented this crash?" And first we have to look at the Traffic-Aware Cruise Control. Right? But we know it was off. Why was it off? Because in the NHTSA guideline that it adopted from the SAE, from the Society of Automotive Engineers, it says this about Level 1 and Level 2: "It must disengage immediately upon driver request." When you push the accelerator pedal, it must disengage because the controls of the vehicle, the steering wheel, the brake, and the accelerator pedal, have to always be available to the human driver under these partial systems.

So let's look at what happened.  A hundred and 87 seconds before this crash, the cruise control state was enabled.  And it was enabled at 45, which was as much as it could be on Card Sound Road.  The cruise control then was overridden 75 seconds before this crash.  And here you can see the purple is the state of the cruise control, and the blue is the accelerator pedal being pressed.  And at 187 seconds before the crash, ACC is set at 45 miles an hour.

Seventy-five seconds before the crash the accelerator pedal is pressed.  And 75 seconds before the crash, the cruise control turns off.  And you can see here at 75 seconds before the crash, where the pedal is pressed, the speed goes up.  And what happens next, 10 seconds later, after the speeds goes up, after the pedal's been pressed, the driver gets this.  The driver gets an alert, and that alert says:  "Cruise control will not brake accelerator.  Pedal is currently pressed." That's on the screen, and it stays on the screen until you take your foot off the accelerator pedal.

The Model S gave Mr. McGee this message five times in the 10 miles before this crash, and it turned on 65 seconds before this crash and stayed on all the way through.  So we know that the accelerator pedal -- that the accelerator pedal was being pressed, that it was overriding the longitudinal control of Autopilot.

So should Tesla's technology have prevented this

crash?  Traffic-Aware Cruise Control did not stop the Model S because it was off, and it didn't stop neither -- it didn't stop because that pedal continued to be pressed.  And every one of us knows, if we have ever driven on cruise control, that when you press that accelerator pedal you have to have control.  The car doesn't know whether you're trying to avoid something in front of you.  There are lots of times that you might have to drive outside the drivable space for your own safety.  Cruise control is not going to stop you in that circumstance, particularly when it's off.

So next question:  Should Tesla's technology in 2019 -- should it have prevented this crash?  And let's look at the other technology that was available.  Automatic emergency braking and forward collision warning.  Why didn't it stop?  Because there are detections, right?  You saw those detections.  Well, we know that it's only in-line, in-lane rear crashes.  So what do we know from the augmented video that is really helpful -- and I wish we'd have had it a long time ago.  What do we know from that augmented video about this technology?

We know that the detections shows lane unknown.  Why lane unknown?  Because it's not in a lane.  It's off the road.  The vehicle is outside of the drivable space.  That's not going to be something that anyone, automatic emergency braking or forward collision warning, reacts to.

And here are the other detections -- some of the other

detections that are described. Again, they all say: "Lane unknown," "lane unknown," "lane unknown." Why lane unknown? Because it's not in a lane and it's not in a place where AEB or forward collision warning are designed to, and did in 2019, react to. That vehicle that you just heard that should have stopped this didn't exist in 2019.

So what's the criticism here of Tesla's Autopilot? One of the things we have to look at here -- you heard all of these statements of Mr. Musk -- and the good thing is you're going to get to see more than just the little snippets that were read to you in the opening.

But here's a really interesting question: Why are we talking about this? Because Mr. McGee testified, and will testify here, he never paid any attention to anything Elon Musk said. He never looked at any videos online. He said, in fact, when one of their lawyers asked him in his deposition, he said -- he was asked: "So did what Elon Musk say have anything to do with your purchase of the vehicle?"

"No."

"Did what Elon Musk say have anything to do with your use of the vehicle?"

Answer: "No."

You just heard a whole timeline of stuff that Mr. McGee never heard. You've been told something to distract you from the fact of what actually happened on Card Sound Road.

And what actually happened on Card Sound Road didn't have anything to do with that.  And Mr. McGee will testify to that from right there.  He said it had no effect.

And he also said he knew his car would not stop at a stop sign.  He knew it about 49 times because he stopped at the same stop sign all those times.  He knew it wouldn't stop at a stop sign.

So Plaintiffs also say:  "Hey, you ought to use this only in one location, on the freeway.  General Motors does that."  That's what they told you.  Do you know why they didn't tell you that everybody else does that -- everybody but Tesla does that?  Because only in 2019 did Ford and GM restrict where they could use it.  And you know what else Ford and GM did?  They told you you can take your hands off the wheel.  All of the others said:  "Keep your hands on the wheel," and they allowed use outside of the freeway.

And the government adopted this Society of Automotive Engineers guideline which says Level 2 vehicles -- this is a Level 2 vehicle -- the driver determines when engagement and disengagement of the driving automation system is appropriate.  That's what the government says.  That's what it says.  And NHTSA has never changed that.  It's only at Level 3, which is automation where you don't have to have as much active driving, that permits engagement -- that only allows it to be used on freeways.

Plaintiffs claim that Tesla's driver monitoring system is not adequate and not state of the art.  Well, you have 13 manufacturers and 72 models in 2019 that use steering wheel driver monitoring.  The camera-based model, it's got that Cadillac up there, and he's got some BMWs.  But BMW is not saying you shouldn't use steering wheel based because they're on the other list as well.  The state of the art was what Tesla was using.

Now, I want to talk for a minute about this Model S not detecting the stop sign because that's what's really incredible here.  In 2019, in April of 2019, no vehicle anywhere in the world could stop for a stop sign.  None.  But Tesla was working on it.  And how did they do that?  This is where the AI comes in, the intelligence that a machine has to have machine learning.  It's called a neural network.  And what that neural network does is you feed this information in video labeled with:  "Here's a stop sign.  Here's a stop sign."  And the machine -- the software actually learns what a stop sign is.  And then you take that and you connect it to brakes and steering wheels, et cetera, and you have a neural network that helps you detect and predict danger, and then apply the brakes or the accelerator pedal.

But every good company that does artificial intelligence for automobiles does something that's called shadow mode.  What it does is it puts the neural network in the

car, but doesn't attach it to the brakes, and the accelerators, and the steering wheel.  It just runs.  It runs, and runs, and runs, for millions and hundreds of millions of miles.  And when it does, it makes these detections and it makes predictions. But nothing happens because the engineers are monitoring what's going on and trying to get this thing mature enough so that it can go in your car and attach to this.

And what you see here, that stop sign detection, is cutting-edge effort to come up with yet another safety feature in a Tesla that would stop a vehicle at a stop sign, or warn a customer at a stop sign.  This is the incredible efforts that every day Tesla engineers go to work and say:  "What crash can I be working on that will prevent more deaths, make a safer roadway, so that people will be safer in a Tesla, people will be safer near a Tesla," and that's what this is.

And anybody who comes to that witness stand and tells you:  "Well, they detected it.  They should have been able to stop" doesn't have a clue about what that means in shadow mode, about how responsible -- how incredibly ingenious and responsible it is to develop this.  And in December of 2019, Tesla released the first stop sign detection for any automobile company anywhere in the world.  Our roads are safer because of that.

So that's the stop bar.  Look at this.  After all of the internal development, shadow mode is done.  This is an

internal Tesla document.  We didn't make this up. One-million-vehicle fleet, two to five times -- two to five releases per feature.  So two to five times they do a shadow mode release for each feature.  And, each one is 60 million miles.  That's 120 million to 300 million miles of shadow mode, of evaluating what's happening in real customers' cars before releasing this into the public and attaching it to vehicle controls.

So this case, it's about -- it's not about a defective vehicle.  It's about a driver.  It's about an aggressive driver, not a complacent driver, a distracted driver who was fumbling around for his cell phone.  And it's about a driver pressing an accelerator pedal and driving straight through an intersection.  It has nothing to do with Autopilot.  That feature of Autopilot, the forward and rear feature, was off.

And listen, as much as Tesla would love to have been able to stop this vehicle in this crash, to prevent this crash or any other crash, it just -- the technology just didn't exist.  It was not state of the art at the time.  And for that reason, when we get a chance to come back up here, we're going to ask you to return a verdict in favor of Tesla.

Thank you so much.

THE COURT:  Thank you, Mr. Smith.

Ladies and Gentlemen, at this point in time, since it is 4:30, we are going to adjourn for the evening, but let me

share with you the schedule.  And I understand that Liz was going to place it on the board for you, but let's turn to the schedule for this week.

Tomorrow we will begin precisely at 9:30.  I would ask that you make your way into the courthouse, into the jury room, so you're ready to come into the courtroom at 9:30.  It will be a full day from 9:30 to five.  We will break 15 minutes early for lunch at 11:45, and then we'll come back at one o'clock.  We obviously will take comfort breaks in the morning and afternoon.  That's Tuesday.

On Wednesday, July 16th, will be from 9:30 to four p.m.  We will end early that day.  On Thursday, July 17th, will be from 9:30 until five o'clock p.m.  On Friday, July 18th, we'll proceed at ten o'clock until three p.m.  We do have -- the reason I'm adjusting the schedule is we have some other matters that we'll need to attend to in the courtroom.  So Friday will be from ten to three.  That will be the first week.

I will give you the schedule tomorrow -- I want to talk to the attorneys -- with regard to week two.  And of course, if we need to get into week three, what that schedule will be.

Now, when you come into the courtroom, I do want you to be comfortable.  As you can see, I bring in water and tea. You are free to bring in a beverage so that you are comfortable.  As well, we will take comfort breaks -- I know

our schedule is a little different today because you were selected so late in the day.  But we will take a comfort break in the morning, as well as the afternoon.

Please remember that as you leave the courtroom you are not to discuss this case with anyone, nor permit anyone to speak with you.  Everything learned about the case is learned in this courtroom.

I would ask that you place your juror notes in the jury room, which will remain locked until tomorrow morning. The court security officer will open up the jury room.

Have a pleasant evening.  And I'll see you tomorrow morning at 9:30.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 4:31 p.m.)

THE COURT:  All right.  Go ahead and have a seat.

And let us discuss tomorrow's presentation.

Mr. Schreiber?

MR. SCHREIBER:  Yes, Your Honor.  We had already shared this schedule with Tesla on I think Friday of last week. But our first witness will be EMS, Jonathan Saldana.  We will follow with Corporal David Riso.

Depending upon how long those take, we had asked -- and that's why we had submitted, I think, revised notices of designation of the clips of Akshay Phatak, Tesla's corporate representative.  I would just say, certainly for the benefit of

Mr. Candela [sic], who sits at the end of this table, we have clipped everything, so both our designations and Tesla's. It should be an act of removing based upon the Court's objection [sic]. But I would assume Mr. Scandella needs some magnitude of hours to just finalize that, just to be sure it's a clean run. So again, depending on where the Court goes.

And our other live witness for the day would be Dr. Mendel Singer, who will be testifying about the Vehicle Safety Report.

THE COURT: All right. So other than Ashley [sic] Phatak, which you have some objections that the Court needs to rule upon this evening, are there any other issues with any other witnesses?

MR. SCHREIBER: No, Your Honor.

And while I have you, Dr. Mary Cummings will be testifying on Wednesday. In light of the sheer volume of exhibits that I now intend to introduce through her, whether it's government investigations and Mr. Musk's statements, I anticipate -- and I shared this also with Tesla last week -- probably two to three hours for her direct exam. So that will take up most of the morning. And I think with a similar time frame of cross-exam, she is most likely going to be the day, based upon both sides' estimates at this point.

So there are no other witnesses planned. And again, I'll just share it with you for your own purposes, Mr. McGee we

intend to call on Thursday, along with our accident reconstructionist Mr. Moore.  And again, with those, we could probably fill a day as well.

To the extent the Court rules on the deposition clips -- right now the Phatak clips run approximately one and a half hours.  So I have run times on all of these.  So I can, like I said, use it as filler as needed.  I'm also going to play some of it with some of the other witnesses.

To the extent the Court rules in the next day or two on the Rubio Blanco clips, and the David Shoemaker clips, we can use those to add or subtract on a given day.

THE COURT:  All right.  But the one that you need for tomorrow is --

MR. SCHREIBER:  Is Mr. Phatak.

THE COURT:  -- Ms. Phatak [sic]?

MR. SCHREIBER:  Yes.  And as I mentioned to the Court, when we were discussing Juror Number 4 -- again, shared with Tesla last week -- Dr. Jason Lewis was a witness who is the forensic data extraction specialist, and he was only available on Friday morning.

THE COURT:  All right.  So now he --

MR. SCHREIBER:  So now he can be here.  Yeah.  And so Friday -- and again, we've got to talk about Mr. Calafell and some other issues, but that's pretty much our week.

THE COURT:  Okay.  Are there any issues that we need

to address other than the Court needs to rule on Ms. Phatak before tomorrow and then obviously Blanco and Shoemaker with regard to later in the week?

MR. SMITH:  Your Honor, the only thing I wanted is just a clarification.  I objected during counsel's opening, which I really don't like to do.  I thought -- and we did get an order from the Court that indicated that the NTSB Report and Recommendation was inadmissible.  And the reason I objected was because the Plaintiffs' counsel was discussing what was in the Report and Recommendation.  And now that's before the jury, although the Court ruled yesterday that it was inadmissible, and that was my reason.

And Your Honor, I'm just -- I don't mean to -- Mr. Schreiber and I get along quite famously.  I just hated to object to his position, but I thought that was a very clear overstep of the motion in limine.

MR. SCHREIBER:  And just to respond, Your Honor, I respectfully disagree.  What the Court ruled was that the NTSB report, i.e. the board's report per the CFR, or whatever the regulatory scheme is, was inadmissible as evidence in this case.

The factual investigation, to the extent that comes in relative to the facts of those cases, is certainly admissible. And the safety recommendations themselves, they live outside of the board report.  As I shared and showed the jury, Exhibit 79

and 81 -- which Tesla full well knew since Friday or Saturday morning what exhibits I intended to use -- those are not contained within the board's reports.

There was nothing that we read of this Court's order that sanitized this trial of the NTSB's safety recommendations. What the Court did was rule that under the various regulatory scheme about the admissibility of board reports, that the board report itself would not be received into evidence. And we certainly did not, nor will we, obviously, run afoul of that. But by no means did we interpret that to suggest that the safety recommendations, which live outside of the board report, were somehow excluded from this trial.

THE COURT: I'd like to point you to Page 12 of the Court's order that's very clear. And the Court said that only NTSB factual accident reports are admissible at trial.

MR. SMITH: Right.

THE COURT: Mr. Schreiber's statement to the jury is completely proper, given that if there's a reliance on the NTSB factual accident reports, then certainly he can rely upon them.

MR. SMITH: And Your Honor, I agree completely with that. But what we relied on was their Report and Recommendations, which on Page 12 you said was not admissible. Those recommendations are what he referred to to the jury. That's my understanding. And, you know, Your Honor, let's allow us to have a chat about it and we can raise it in the

morning if we have any issues.

THE COURT: Well, as you're making objections, and as you're filing motions, I am ruling on them.

MR. SMITH: You are.

THE COURT: So the Court has addressed that issue. And to the extent that you are relying upon the NTSB factual accident report, then, as the Court said, and the law supports, it's admissible at trial.

So to the extent, Mr. Schreiber, that you reference that, and not the Report and Recommendation, then that's proper. So I think perhaps it might be helpful -- I understand you're going to confer, but it may be helpful to perhaps educate the Court as to specifically what exhibit you're relying upon.

MR. SMITH: And Your Honor, I think the thing to do for us is to identify the reports that are described differently in the law, and of course in your order, correctly, I believe. But I believe that what Mr. Schreiber was doing was not referring to the factual report but referring to the -- certainly referring to recommendations of the board. So we will address that.

THE COURT: All right. Thank you.

Is there anything further that we need to address?

On behalf of the Plaintiffs?

MR. SCHREIBER: Not at this time, Your Honor.

THE COURT:  On behalf of the Defendant?

MR. BRANIGAN:  Yes, Your Honor.

This relates to the testimony of Mr. Phatak, the Tesla engineer whose testimony is deposition.  Mr. Phatak's testimony has been designated as, in many parts, highly confidential.  And so it raises the confidentiality order that we received from Your Honor on Friday.

We had a very clear -- very clear guidance from you as to how we would handle the first day, today.  And we let Your Honor know yesterday, pursuant to the terms of that order, that there wouldn't be an issue with the witnesses today or evidence today.  But now we've got Mr. Phatak coming tomorrow, and so I wanted to raise that with the Court.

THE COURT:  Mr. Schreiber, are you in agreement that the exhibits referred to by Akshay Phatak are trade secrets?

MR. SCHREIBER:  Not at all, Your Honor.  And in fact, I would just simply recommend that when the Court reviews the handful of objections to the various designations, I think the Court will be able to see for themselves that, much as the Court has described previously, so much of Mr. Phatak's testimony involves things that Tesla didn't do, like not considering particular studies, not considering or analyzing complacency, not even knowing what an operational design domain was.

I recognize that Mr. Phatak's testimony is absolutely

embarrassing in many respects for Tesla, but that does not make it a trade secret.  I know they want to keep it secret, but that doesn't give them a basis to claim that it's a trade secret.

THE COURT:  All right.  Well, the objections are preserved.  Let me look at the deposition and look at what is objected to.  And to the extent that they are trade secrets, then the Court can advise you tomorrow morning before the deposition is presented.

MR. SCHREIBER:  And to that end, Your Honor, because the Court indicated that would be handled at the end of the day, what I'm going to tell Dr. Singer is to be available at one o'clock, assuming that's when we would be coming back from lunch, or whatever time the Court tells me.  But I can just have him basically hanging in the hallway.  And if we have to address Phatak, and do him after Singer, we can shuffle that accordingly.

THE COURT:  All right.

MR. BRANIGAN:  May I just add, Your Honor, hopefully for your benefit?  The objections that you have been asked to rule on really don't touch the confidentiality issue.  This case, as you know, has had a confidentiality protective order in place that covers depositions for two or three years, since the earliest stages of discovery.  And part of that confidentiality protective order set out the procedure for

designating deposition testimony as confidential, and it also set out a procedure for the Plaintiffs to challenge that testimony as otherwise.  And they --

THE COURT:  Let me just put this to bed.  Because the Court entered an order specifically because there was a concern on the part of Tesla that there was a disclosure of trade secrets.  Your agreement to find that certain exhibits are confidential during the course of discovery is very different from this Court finding that there are trade secrets.

I've told you from the beginning this is going to be an open trial.  My order was very clear, so let me emphasize it again.  To ensure that Tesla is able to provide sufficient justification for any potential courtroom closures, any filings regarding a request to close the courtroom may be filed under seal.

Additionally, all proceedings regarding a request to close the courtroom shall be closed to the public.  However, you need to advise the Court what specific portions of Akshay Phatak's testimony are true trade secrets.  The mere fact that you filed a deposition under seal does not support what the Court is requiring.  So you can file that with the Court.  You can file it under seal.  But it is Tesla's burden to show the Court that it is, in fact, a trade secret.

MR. BRANIGAN:  Your Honor, we agree with that.  We accept that.  I just wanted to give you the history of how this

deposition was designated confidential pursuant to a protective order, how the Plaintiffs until just now have never said they didn't think it was confidential.  I thought it would be helpful for the Court to know that.

And we will do what Your Honor has instructed us to do.  We will submit it tonight so that you know from us the specific portions of that deposition that we think are covered by your confidentiality protective order that was entered last Friday.

THE COURT:  So there are two layers.  One are the objections that were already filed.  To the extent that those objections do not refer to trade secrets, and there are additional portions of Akshay Phatak's depositions that Tesla believes are trade secrets, then you need to file it under seal so the Court can review specifically what portions you're referring to that were not objected to.

MR. BRANIGAN:  Understood.  Thank you.

THE COURT:  All right.  Let me let the parties know that the conference rooms outside of the vestibule are for your use.  So any of the items here, you can place them in the conference room, and the court security officer will be locking the courtroom.

Okay.  Have a pleasant evening, and I'll see you tomorrow at 9:30.

COURTROOM DEPUTY:  All rise.

(Proceedings adjourned at 4:45 p.m.)

Yvette Hernandez, Official Court Reporter
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698

UNITED STATES OF AMERICA        )

ss:

SOUTHERN DISTRICT OF FLORIDA  )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 14th day of July, 2025, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 239.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 10th day of September, 2025.

/s/Yvette Hernandez
Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698
yvette_hernandez@flsd.uscourts.gov