IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.  1:21-cv-21940-BB


NEIMA BENAVIDES, as Personal
Representative of the Estate of
Naibel Benavides Leon, deceased,

         Plaintiff,                    July 15, 2025
                                       9:32 a.m.
              vs.

TESLA, INC., a/k/a Tesla Florida, Inc.,

         Defendant.                    Pages 1 THROUGH 256
_____

DILLON ANGULO,

         Plaintiff,

              vs.

TESLA, INC., a/k/a Tesla Florida, Inc.,

         Defendant.
_____


                    TRANSCRIPT OF TRIAL DAY 2
                 BEFORE THE HONORABLE BETH BLOOM
                  UNITED STATES DISTRICT JUDGE
                       And a Jury of 9

Appearances:

FOR THE PLAINTIFFS: SINGLETON SCHREIBER
                    BRETT SCHREIBER, ESQ.
                    591 Camino De La Reina, Suite 1025
                    San Diego, California 92108

                    POSES LAW GROUP, PA
                    TODD POSES, ESQ.
                    169 East Flagler Street, Suite 1600
                    Miami, Florida 33131

APPEARANCES CONTINUED:

FOR THE PLAINTIFFS: EATON & WOLK, PL
DOUGLAS F. EATON, ESQ.
2665 South Bayshore Drive, Suite 609
Miami, Florida 33133

THE ROUSSO BOUMEL LAW FIRM
ADAM T. BOUMEL, ESQ.
9350 South Dixie Highway, Suite 1520
Miami, Florida 33156

FOR THE DEFENDANT: BOWMAN AND BROOKE, LLP
JOEL H. SMITH, ESQ.
1441 Main Street, Suite 1200
Columbia, South Carolina 29201

BOWMAN AND BROOKE, LLP
THOMAS P. BRANIGAN, ESQ.
101 West Big Beaver Road, Suite 1100
Troy, Michigan 48084

BOWMAN AND BROOKE, LLP
WHITNEY V. CRUZ, ESQ.
WENDY F. LUMISH, ESQ.
Two Alhambra Plaza, Suite 800
Coral Gables, Florida 33134

GREENBERG TRAURIG
HILARIE BASS, ESQ.
333 Southeast 2nd Avenue, Suite 4400
Miami, Florida 33131

COURT REPORTER:       Yvette Hernandez
U.S. District Court
400 North Miami Avenue, Room 10-2
Miami, Florida 33128
yvette_hernandez@flsd.uscourts.gov

ALSO PRESENT:         Neima Benavides
Dillon Angulo
George Mayleben
William Scandella

3

**I N D E X**

Certificate...................................     256


**W I T N E S S**

**ON BEHALF OF THE PLAINTIFFS:**                                    PAGE

LIEUTENANT JONATHAN SALDANA
DIRECT EXAMINATION BY MR. BOUMEL                                    18
CROSS-EXAMINATION BY MS. CRUZ                                       32

CORPORAL DAVID RISO
DIRECT EXAMINATION BY MR. POSES                                    42
CROSS-EXAMINATION BY MR. BRANIGAN                                  74
REDIRECT EXAMINATION BY MR. POSES                                 148

DR. MENDEL SINGER
DIRECT EXAMINATION BY MR. SCHREIBER                               169
CROSS-EXAMINATION BY MR. SMITH                                    196
REDIRECT EXAMINATION BY MR. SCHREIBER                             232

AKSHAY PHATAK
via video deposition taken 7/20/23                               239


**E X H I B I T S**

| PLAINTIFFS' EX. NO.: | OFFERED | ADMITTED |
|---|---|---|
| P-69 | 49 | 49 |
| P-53, Pages 1,2, 3, 80, 81, 103, 104, 105 | 100 | 101 |
| P-68, Pages 1, 2, 3, 22 | 113 | 113 |
| P-69, Pages 59-63, 77, 78, 85, 86, 97 | 113 | 114 |
| P-5 | 137 | 138 |

| DEFENDANT'S EX. NO.: | OFFERED | ADMITTED |
|---|---|---|
| D-29.001 | 118 | 118 |
| D-526a | 131 | 131 |
| D-12.0020 | 134 | 134 |

4

(Call to order of the Court, 9:32 a.m.)

THE COURT:  Go ahead and have a seat.

How is everyone this morning?

MR. SMITH:  Good.

MR. SCHREIBER:  Good.

THE COURT:  All right.  Good to hear.

And let me make sure -- as I advised the jury -- actually, two things I want to discuss with you.  I advised the jury that they may bring in drinks during the course of the day to be comfortable.  I also want to let the trial teams know you may, of course, so that you're comfortable.

I'm always concerned about the jury, and we will take an appropriate comfort break this morning.  But to the extent that your comfort break doesn't align with the jurors, if you'll just let me know.  It's not a problem.  We'll take a break.

Are there any matters that we need to address this morning?

On behalf of the Plaintiffs?

MR. SCHREIBER:  No, Your Honor.

We received the Court's order last night on the designations.  There were objections to the counter-designations that I don't think made it to the Court's purview, but I don't care at this point.  I'm just going to let them all run.  Because we provided, per Mr. Smith's

recommendation, a highlighted transcript, and then we put objections in the margin, but the version that the Court went off of was the boxes.

THE COURT: Yes.

MR. SCHREIBER: Which I totally understand why you did that. And so all of my counter-designation objections I just don't think were considered by the Court.

THE COURT: All right. If you'll do me a favor with regard to the remaining witnesses that are testifying videotaped deposition. Just refer me to the docket entry if there are additional objections that the Court needs to rule upon.

MR. SCHREIBER: We'll do that. With respect to Mr. Rubio Blanco, I think there were fewer of them. I read -- it's just going to make Mr. Phatak's testimony run a little longer. But you know, I think our run time is now about just under two hours. So that's the only, what I would say, downside. But I'm not going to ask the Court to go look at those because there's a built-in lag time in updating video. So we're just going to call that done for our purposes.

So we will have Mr. Saldana and Officer -- Corporal Riso, and then some video, and Dr. Singer. And we've also, consistent with our stipulation with Tesla, shared the PowerPoint that we intend to introduce for demonstrative and illustrative purposes with Dr. Singer, and sent that over last

night.

THE COURT:  All right.  And just for purposes of timing, today we will need to take a break precisely at 11:45. We do have a program in this courtroom for the interns that will be from twelve to one, and then we'll pick up at one o'clock.

MR. SMITH:  Your Honor, we do have one item.

THE COURT:  Yes.

MR. SMITH:  And it relates to the same issues in your order and the issue that we raised yesterday with respect to what particular documents are covered by the orders on Page -- the rulings on Page 12 of your order.  We believe that there are a couple more parts of the Phatak deposition that are -- should be covered based on your order and wanted to have an opportunity -- we don't have to do it right now.  But before that video is played, we'd like to have a minute to talk to you about that.

And Your Honor, to provide -- I think you asked us to provide you with the documents that were, one, the Report and Recommendation, and the other the factual report, so that there would be some clarity about what is and is not included in the Court's order.  And we have those available for the Court at the Court's pleasure in terms of what time to do that.

THE COURT:  You're referring to the NTSB, not trade secrets.

MR. SMITH:  Correct.  Correct, Your Honor.

THE COURT:  All right.

MR. SMITH:  Correct.

THE COURT:  So perhaps -- Mr. Schreiber, could you alert the Court what documents you're going to be relying upon?

MR. SCHREIBER:  Yes, Your Honor.  I don't know if our monitors are connected to yours.  I don't know how I can show you the exhibits.

THE COURT:  They are.

MR. SCHREIBER:  Okay.  If Mr. Scandella can pull up P-77.

MR. SMITH:  And Your Honor, just -- I was not arguing that.  I was just letting the Court know that that was an issue we had to argue.  Ms. Lumish is prepared to argue that.  I didn't mean to take on the argument.

THE COURT:  Well, I don't want to break up the Phatak deposition, if we can address it now.

MR. SMITH:  She's here to argue it.

THE COURT:  Okay.  Of course.

MR. SMITH:  I just didn't want you to think I was taking over the argument that somebody else was --

THE COURT:  Of course.

(Pause in proceedings.)

MR. SCHREIBER:  We are not getting anything projected on our end.

THE COURT: Liz, is their monitor on?

Yeah?

Okay. You want to check your cable real quick?

Oh. There we go.

(Pause in proceedings.)

MR. SCHREIBER: No pressure, Mr. Candela [sic]. It's not like the entire courtroom is staring at you right now, as the beads of sweat build on his brow.

MR. SMITH: Your Honor -- and just so you know, I don't think this will happen before the morning comfort break, if we have technical issues that -- oh. There we go.

MR. SCHREIBER: That's interesting. These two monitors are not getting it -- oh. And we're here. Okay.

MS. CRUZ: We're not here.

MR. SCHREIBER: So Your Honor, I'll just be brief -- and I know counsel's aware of this. This is the NTSB accident report. And this is a report that -- if I'm really being honest, I think what we're looking at is probably something that might be even considered a hybrid report. It's a 70-something-page document, which includes -- and if we can just scroll through a little bit. I don't know if the Court has the ability to scroll through and see it on its own screen.

THE COURT: No. You're controlling it.

MR. SCHREIBER: Okay. We're controlling it.

So if you'll go down a few pages, Mr. Candela, you'll

see there's a factual -- oh. You were just there. This is just a summary. There's a factual information and analysis, which is, I believe, really the factual investigation. And so I think what we're probably dealing with is kind of a hybrid scenario. And then you go down and then there are board -- oh. Go back one page, 77-05 -- there are board findings and recommendations. And I believe that is where the Court, appropriately following the regulations, concludes that that is inadmissible.

Now, I think the argument goes that it's inadmissible in the Brown case, as opposed to some other case. And we cited a number of decisional authorities that address that point. But neither here nor there, because then I would just like to bring the Court's attention to Exhibit P-79. And at the end of this document, it contains a number of safety recommendations, including ones like this.

Now, Exhibit 79 is the official communication from the NTSB to all of these various manufacturers, five OEMs, including Tesla. And this is where they go through -- and if you recall in my opening yesterday, I had this timeline and I included times when communications -- and if you go to the end of this document, Mr. Candela, it's in reverse chronological order. And you will see this is from the NTSB to Tesla in September -- and if you scroll up a couple of pages -- and saying: "We understand there are these accidents. You need to

10

make these safety recommendations."

And the dates and times and snippets that I included yesterday, and also intend to discuss -- that is discussed in the deposition of Mr. Phatak -- is Tesla's response to these safety recommendations.  And so what I'm suggesting is -- and then if we go to Exhibit 81, this is the other safety recommendation.  And just to use NTSB speak, it's 17041, which is the safety recommendation regarding geofencing or the ODD, right, the operational design domain.  And then 17042, which is:  "Develop Ways to More Effectively Sense Driver Engagement," and that is P-81.

And similarly, if we go to the last page of Exhibit 81 in reverse chronological order, kind of going backwards, to maybe go to the seventh page -- yeah -- there are these official communications.  They are similar to the other safety recommendation, where the NTSB is reaching out to Tesla and saying:  "You need to do something about this.  Crashes are continuing to happen."  Happens in '17, happens in '18, '19, '20, '21, so on.

And so we understand the Court's ruling, and one hundred percent intend to comply with it with respect to the admissibility of the NTSB Board Report section specifically. But these official communications had nothing to do with the board's probable cause analysis of the Brown cash and everything to do with safety recommendations that went out to

all of these manufacturers, four of whom responded timely, one of whom chose not to.  And that one just happens to be the one sitting in this courtroom.

So I wanted to give the Court that context and texture to understand what I believe the Court's ruling was and what it's not.  And our read, which I believe is a fair read, but am open to the Court's counsel, is that Exhibit 79 and 81, the official communications from the NTSB to the manufacturers, including Tesla, are official government records under the Federal Rules of Evidence and statements made to Tesla, to which Tesla did not respond.

And so, we do absolutely intend to introduce 79 and 81.  And we don't believe that there is anything about the Court's ruling that sanitizes this trial from discussion of these two critical safety recommendations about improved driver monitoring and geofencing; create a safe domain.

If the Court has any questions about that, I'm happy to address them.

THE COURT:  All right.  Response?

MS. LUMISH:  Thank you, Your Honor.

We're not attempting to sanitize the trial.  We're attempting to have the Court -- or to have Plaintiff act in accordance with what Your Honor has ruled.  And Your Honor knows what she said.  The Report and Recommendation from the Brown crash is out.

What Plaintiff showed you -- and maybe you can put it back up.  I don't know if you have the actual slide from yesterday or I can hand a copy to the Court.  What Plaintiff did was they took that particular exhibit --

MR. SMITH:  Your Honor, may I approach to hand the Court a paper copy?

THE COURT:  Oh, you're not going to put it back on?

All right.  Of course.  Thank you.

MR. SCHREIBER:  Oh.  These are from my slides.

MR. SMITH:  Yeah.

MR. SCHREIBER:  That's fine.

(Pause in proceedings.)

THE COURT:  Okay.

MS. LUMISH:  The first two are the -- what Mr. Schreiber showed on the screen this morning.  And the next document is actually the slides that he used yesterday, which is the first page of those same reports.

If you look at those, at the bottom, they're talking about the crash in Williston, which is the Brown crash.  It is the Brown crash.  It is the recommendation from the Brown Report and Recommendation that we understand Your Honor had excluded.  And quite frankly, we were a bit surprised because when we got the order we emailed to Mr. Schreiber and said: "We assume that you are going to comply with this order."  So we did not expect there to be anything on the NTSB yesterday.

Or certainly to ask permission, not for counsel to decide what he thinks Your Honor meant.

If there was any lack of clarity about it, when Your Honor ruled on the deposition last night, you excluded testimony on this exact same topic.  In other words, all of this is the Brown Report and Recommendations that Your Honor ruled out that is now just being placed in a different form and Plaintiff is trying to argue that it's admissible.

The whole purpose of the exclusion of the NTSB reports, and why it's in the statute, is because the NTSB is not intending to get involved in civil litigation, and it's not an intent for a finding by the NTSB to turn into a determination by a jury.

So there's nothing that I see that changed what Your Honor ruled.  You ruled that the Report and Recommendation was out.  The document that counsel showed you, the -- what they showed to the Court yesterday is that Report and Recommendation put in a -- put on a different piece of paper, and it's still the same Report and Recommendation that's inadmissible.

And we can do the designations later, but there's more of the deposition designations that relate to the same issue.

So we believe Your Honor has ruled, this is all excluded, and we shouldn't be continuing to revisit what Your Honor has previously decided.

THE COURT:  Anything further, Mr. Schreiber?

MR. SCHREIBER:  Very briefly, Your Honor.

As it relates to the Court's ruling last night, there was one page and line objection vis-a-vis the NTSB, and that was at Page 134.  And that proceeded from Line 9 through Page 135, Line 8.  And the Court said it would be excluded from Mr. Phatak to the extent it didn't comply with the Court's order on the exclusion of the board report.

And so, what I have done, consistent with the Court's order, is I have removed reference to the board reports.  But for all the reasons I said to you at the beginning, I have not excluded reference to the safety recommendations themselves.  Because, again, they live outside of the board report.  And I of course made reference to the Brown crash because the Court had ruled that that was one of the other similar incidents like Banner, and like Kanagawa, Japan, that were in play during this trial.

THE COURT:  Okay.

MR. SCHREIBER:  Thank you.

THE COURT:  All right.  I don't want to regurgitate the Court's ruling, but the Court's ruling has not changed.  And to be clear, the Court's ruling in its order does not preclude the Plaintiff from relying on the NHTSA reports, only the NTSB board reports.  As the Court made clear, only NTSB factual accident reports are admissible at trial.  And the Plaintiff may utilize the NTSB investigator's factual accident

reports but are precluded from referencing the NTSB board's accident reports, the legal conclusions, opinions, or probable cause determinations.

Now, certainly that doesn't preclude the Plaintiff from asking any witness regarding Tesla's response.  The Court has made clear its ruling, and it has not changed.

MR. SCHREIBER:  Thank you, Your Honor.

THE COURT:  All right.  We have the jury ready to go?

We have the witness ready to go?

MR. SCHREIBER:  I'm sorry.

THE COURT:  Is this -- are we proceeding with the video?

MR. EATON:  No, Your Honor.  There's one more item before Corporal Riso comes on.

THE COURT:  Okay.  What's the item, sir?

MR. EATON:  Yes.  So reviewing the Court's motion in limine on -- ruling on our motion in limine regarding the opinions of the officer, it does not appear that Tesla objected to that.  We -- they had moved to exclude the accident report and the opinions, and the ruling actually doesn't address the issue of opinions.

THE COURT:  Well, was it raised?

MR. EATON:  We raised it, and it's referenced in the motion in limine order, but then the ruling doesn't specify what the ruling was with respect --

THE COURT:  All right.  So what is the -- certainly. What is it that you're going to be eliciting by --

MR. EATON:  We moved to exclude the opinions of Corporal Riso, and I don't believe that Tesla responded on that point.  And so I wanted to make sure that that's not going to happen during this cross-examination today.

THE COURT:  Who's handling Corporal Riso?

MR. BRANIGAN:  Good morning, Your Honor.  Tom Branigan for Tesla.  I'll be handling Corporal Riso's examination from our side.

THE COURT:  Are you seeking to elicit testimony regarding the conclusions?

MR. BRANIGAN:  Well, there are conclusions about a number of things that I will be asking him, but they're conclusions that relate to his factual investigation.  I don't intend to ask him to give an opinion about fault or, you know, I -- but clearly he made a number of conclusions about facts at the scene, about what happened and how it happened, and I think those are fair game for cross-examination.

MR. EATON:  I think the factual observations are in play, and that's the law.  But his conclusions as to fault and responsibility are not.

THE COURT:  Yes.  Of course.  And I wouldn't permit that.

And Mr. Branigan, I don't believe that you're

eliciting that opinion, correct?

MR. BRANIGAN:  Correct.  To be clear, I don't intend to ask Corporal Riso:  "Do you have an opinion about whether this crash" -- you know, "Mr. McGee is at fault for causing the crash?"  But there are a number of facts that relate to fault that are facts that -- to be just very clear, I think those are points that are proper for cross-examination.

MR. POSES:  We're not asking for the exclusion of any facts about this accident.

THE COURT:  Okay.  Then I think we're all on the same page.  Are we ready to proceed?

MR. SCHREIBER:  We are.

THE COURT:  All right.  Let's bring in the jury, please.

COURT SECURITY OFFICER:  All rise for the jury.

(Before the Jury, 9:52 a.m.)

THE COURT:  All right.  Good morning, Ladies and Gentlemen.

Please be seated, everyone.

It's good to see each of you this morning.

Thank you for being so prompt.  I apologize for the delay.  The fault is all mine and we are ready to proceed.

If the Plaintiff will call its first witness, please.

MR. BOUMEL:  Your Honor, Plaintiff calls Lieutenant Jonathan Saldana.

(Pause in proceedings.)

THE COURT:  Good morning, Lieutenant.

Let me ask, sir, that you step forward.  Remain standing.  Raise your right hand to be placed under oath.

LIEUTENANT JONATHAN SALDANA, PLAINTIFF WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.  You can have a seat.

Would you please state your name and also spell it for the record.

THE WITNESS:  My name is Jonathan Saldana. J-O-N-A-T-H-A-N S-A-L-D-A-N-A.

COURTROOM DEPUTY:  Thank you.

MR. BOUMEL:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BOUMEL:

Q.  Good morning, Lieutenant.  How are you today?

A.  Good.  Good.  And yourself?

Q.  I'm fantastic.  Thank you.

Can you please introduce yourself to the jury.

A.  I'm Jonathan Saldana.  I work at Ocean Reef Fire Rescue. I've been there since 2012.  I volunteered for about three and a half years -- or, correction, two and a half years.  And I have been a full-time fireman there for 11 and a half years.

Q.  Thank you, Mr. Saldana.

And it's my understanding that you were one of the fire rescue emergency personnel that responded to the scene of this

crash; is that accurate?

A.   That's correct.  I was actually the lead paramedic on the scene.

Q.   Perfect.  And just going back, I understand you recently got a promotion?

A.   Yes, sir.

Q.   And when was that promotion?

A.   That promotion was May of this year.

Q.   And what was the promotion to?

A.   It was a promotion to become a lieutenant.

Q.   Congratulations, sir.

A.   Thank you.  Thank you.

Q.   All right.

        MR. BOUMEL:  If we can pull up P-114, the aerial overview of the intersection.

        Your Honor, do we have permission to publish this to the jury?  It has been agreed upon.

        THE COURT:  All right.  It has been agreed upon.  Of course, you may publish.

        MR. BOUMEL:  Thank you, Your Honor.

BY MR. BOUMEL:

Q.   Mr. Saldana, can you explain to us what we're looking at in this photograph.

A.   You're looking at the intersection between 905 and Card Sound Road.  That's the T fork, that -- where the incident

actually happened.

Q.   Okay.  And it's my understanding that this intersection is actually very close to the Ocean Reef community where you work; is that accurate?

A.   That's correct.

Q.   And I understand that you drive by this intersection every single day on your way to work; is that accurate?

A.   Every day, going and coming from work.

Q.   And just so we can orient the jury, we're looking at the T-intersection.  And then on the top side of the T is what used to be a road but is now a clearing; is that accurate?

A.   That's correct.

Q.   And do people park there on a regular basis as you drive by every day?

A.   People -- not only do they park there, they wait.  Truckers or even workers tend to park there and attempt to come in and out of the reef.  Bystanders park there.  Everyone parks there.

Q.   Thank you.

      MR. BOUMEL:  And we can take that down, Mr. Scandella.

BY MR. BOUMEL:

Q.   So Mr. Saldana -- or Lieutenant Saldana -- I'm sorry -- can I -- can you run me through -- I know you have your report in front of you.  Can you run me through basically your initial response to the scene and what you came upon.

A.   Yes, sir.  So get the call at 21:21.  The call was

received.  And what was dispatched to us was a motor vehicle accident with a -- with two victims.  That's how it came out.

We went ahead and left our station, and we were at the location by 21:23.  From that point on, we were approached by the Monroe County sheriff that we have a patient that was critical on the floor, that approached him and collapsed.  From that time on, I had myself, my captain, my lieutenant, and a couple coworkers lead me directly to the victim, and then we basically got to work.

My lieutenant immediately grabbed a C-spine --

(Court reporter interruption.)

THE WITNESS:  -- C-spine -- which immobilized his neck, while checking his pupils and checking to see if his airway was patent, which means was there anything obstructing.  Immediately, they noticed that he had four broken teeth.  And upon turning to open his airway with his hands, they noticed that his jaw was broken immediately.

BY MR. BOUMEL:

Q.  Okay.

MR. BOUMEL:  And I'm going to ask that we pull up D-16, Clip Number 1.

And for those who haven't seen this before, this is a little tough to watch.  So we apologize.

THE COURT:  Admitted into evidence by agreement?

MR. BOUMEL:  It is, Your Honor.

THE COURT: Thank you.

MR. BOUMEL: Thank you, Your Honor.

(Video played, no sound.)

MR. BOUMEL: Do we have sound, Mr. Scandella?

(Video:)

"GEORGE MCGEE: This poor guy. This poor guy. Hey, babe, I have to call you back.

"UNKNOWN OFFICER: Boss?

"GEORGE MCGEE: Say hi to the kids.

"UNKNOWN OFFICER: Boss?

"UNKNOWN FEMALE: I just don't want him to move his face. His eyes are (inaudible).

"UNKNOWN OFFICER: You -- what car were you in?

"GEORGE MCGEE: I was in the Tesla --

"UNKNOWN OFFICER: Hey, guys.

"GEORGE MCGEE: -- and I looked down. I didn't --

"UNKNOWN OFFICER: Guys, what's going on? This guy's agonal.

"UNKNOWN SPEAKER: These guys --

"UNKNOWN SPEAKER: You were -- you were in the vehicle as well?

"UNKNOWN SPEAKER: Go get the airway bag.

"GEORGE MCGEE: I'm fine. Don't worry about me. Just take care of the guy.

"UNKNOWN SPEAKER: Hey, look at me. What happened?

23

"UNKNOWN OFFICER:  71-11.  This is a trauma alert.

"UNKNOWN SPEAKER:  Don't touch.  Don't touch."

(End of video.)

BY MR. BOUMEL:

Q.  All right.  And Lieutenant, I want to ask you just some questions about what we just saw and also what your immediate findings were in terms of evaluating the victim.

And first of all, when we say:  "The victim," we're talking about Mr. Dillon Angulo, correct?

A.  Correct.

Q.  And we heard on that video that somebody said:  "He's agonal."  What does that mean?

A.  Agonal breathing is a term used as a person that's not breathing proficiently.  He's gasping for air, but he can be breathing between five or six times a minute, which is very bad.

Q.  Thank you.

And you were, I guess, the lead on Mr. Angulo's critical care that evening; is that accurate?

A.  That's correct.

Q.  And can you take us through your review of symptoms, and your review of injuries, and what you guys found when you did your assessment.

A.  So immediately, as I said before, we did a quick head-to-toe.  We immediately noticed that he was missing teeth.

His jaw was broken. As we went further down -- let me see -- we realized that his left upper quadrant had discoloration, and abdomen, which that tells me that there's definitely internal bleeding. His right side was unremarkable. His lung sounds were clear.

When I went down to grab his pelvis, basically, my hands completely touched, which means his pelvis was like shattered. He basically had an unstable pelvis, and there was also a discoloration. Lower extremities were still good.

At that point, you know, basically what we tried to do from that point on is get him onto a backboard, secure him with a neck brace. That way -- that way we can get him into the back of the truck and get to work.

Q. Thank you.

And just still staying on your assessment of Mr. Angulo, did you provide an assessment of his mental status?

A. His mental status, we didn't. He was only able to respond to pain. He wasn't responding -- as you saw in the beginning of the video, when my lieutenant at the time -- which is a captain now -- was trying to speak to Mr. Angulo, he was completely unresponsive. He was only responsive to painful stimuli.

Another thing that I did notice as well, now that I remember, is when we tried to open his airway to put something -- to correct his airway in a more aggressive manner,

he had trismus, which means his jaw was clenched.  That normally happens in a traumatic call if the trauma is severe enough.  That's just one of the body's natural responses.

Q.  And did you perform an assessment of the Glasgow Coma Scale?

A.  I did.

Q.  And what was the finding on that?

A.  The Glasgow Coma Scale was nine.

Q.  And what is the range of the Glascow Coma Scale, and what does a nine mean?

A.  So a normal range is between 14, 15.  Fifteen is obviously a perfect patient.  You have eye, motor, and verbal.  Once you start removing points, obviously the Glasgow starts going down.  He was only responsible to -- responsive to pain.  When you gave him painful stimuli, and you asked him questions, he just kind of -- he just kind of moaned.  So in layman's terms, he was definitely a trauma alert.  Which means you have -- from the time of the accident and the time you get there, you have an hour to basically get this patient into a trauma center to save his life.

MR. BOUMEL:  Thank you, Mr. Saldana.

And if we can play D-16, Clip Number 2.

And Your Honor, again, all the D-16s have been agreed upon.

THE COURT:  All right.  Thank you.

(Video:)

"UNKNOWN SPEAKER:  Whoa.  Whoa.  Whoa.  Let me get this up.

"UNKNOWN SPEAKER:  (inaudible) paramedic.  She's a nurse (inaudible) if you guys need anything.

"UNKNOWN SPEAKER:  Definitely internal hemorrhaging.

"UNKNOWN FEMALE:  Are you okay?

"UNKNOWN SPEAKER:  No.  We're good right now.  We got more crews coming.

"UNKNOWN OFFICER:  Listen, boss, I need you to stand right over there.  Just hang on tight.  All right?

"UNKNOWN FEMALE:  Clear the airway, load, and go.

"UNKNOWN SPEAKER:  Yep.  Yep.

"UNKNOWN SPEAKER:  You all right?

"GEORGE MCGEE:  Yeah.

"UNKNOWN SPEAKER:  He -- he's --

"UNKNOWN OFFICER:  Let's go guys, come on.

"UNKNOWN SPEAKER:  He's got like a head injury there.

"UNKNOWN SPEAKER:  Yeah.  We're going to have to check him out too.

"UNKNOWN SPEAKER.  Got some shit.

"UNKNOWN SPEAKER:  Was anyone else in that vehicle with this guy?

"UNKNOWN SPEAKER:  No.  Just him.

"UNKNOWN SPEAKER:  Engine 26, you en route?

"UNKNOWN SPEAKER:  Hey, can you look at me?  Look at me.

"UNKNOWN SPEAKER:  You guys got any suction?

"UNKNOWN FEMALE:  (inaudible) in the car too?

"GEORGE MCGEE:  Yes, ma'am.  I (inaudible) dropped my phone.  I reached down (inaudible).

"UNKNOWN SPEAKER:  Okay.  Guys, does he have a gag reflex?

"UNKNOWN SPEAKER:  Yeah.  I got a gag reflex.

"UNKNOWN SPEAKER:  Okay.  Okay.  Let's get the suction.  Let's put him in the backboard, get him in the truck, and suction him.  Come on.  Fast.

"UNKNOWN SPEAKER:  Hey, we got any --

"UNKNOWN SPEAKER:  Guys, neck brace, airway.  Let's go.  Come on.

"UNKNOWN SPEAKER:  Yeah.  Yeah.  Yeah.

"UNKNOWN OFFICER:  We got to go, bro.  Let's go.  Come on.  Come on.  Come on.

"UNKNOWN SPEAKER:  Easy.  Start taking reports.

"UNKNOWN SPEAKER:  Okay.  Hold the C-spine right there.

"UNKNOWN SPEAKER:  I got it.

"UNKNOWN SPEAKER:  Okay.  Check his back.  Check his back.

"UNKNOWN OFFICER:  Jesus Christ.

"UNKNOWN FEMALE:  Okay."

(End of video.)

BY MR. BOUMEL:

Q.  Can you tell us what we were seeing in that clip, Mr. --

A.  So basically what you were seeing was my captain -- my lieutenant at the time -- my captain at the time, simultaneously, while we were assessing the patient, and we're trying to get him backboarded, and -- he was also -- if you saw him, when he was cuing up on the radio, he was trying to call air rescue to see if air rescue was even available to pick him up, which he was.  And we were basically doing a rescue directly from the floor, backboarding of this patient, stabilizing -- immobilizing him so there's no further -- there's no more further injury.  And we're going to do everything in the back of the truck, which we did.

Q.  And are there any other -- are there any other, I guess, treatment measures that you guys provided --

A.  Yes, sir.  So from that point on, when we were in the back of the rescue -- I mean, we already -- by that point, we already C-spined him, which immobilized his neck and his back. We checked his back before we even placed him on the backboard.

We ended up getting a line in one of his arms and inserting a line also in his leg.  We gave him a thousand ccs of fluid, you know, to keep his blood pressure up, simultaneously while we were checking his vitals every five minutes.  Excuse me.

We did both manual and -- manual, and we used a monitor to get vitals. We also did a four-lead to make sure this patient wasn't going into any type of cardiac arrest or anything of that sort.

Let me see. We -- obviously, we did not give him any type of pain medication, just because of the mechanism of injury. And by the time we looked up, air rescue was already there. So we were able to immobilize him. We were able to check out all his injuries, because we did a detailed head-to-toe in the back of the rescue. We were able to get two lines in him and a 12 -- I mean -- I'm sorry -- a four-lead to check his heart. So -- and we gave oral report to air rescue, which transferred him to Jackson South.

Q. Okay. And he was able to be successfully transferred via the helicopter?

A. Correct.

Q. And in the clip we just saw, we saw the driver of the Tesla, George McGee. Did you have any contact with Mr. McGee or any interaction with him whatsoever?

A. In reality, besides passing by him, not really because he wasn't my patient. I went to -- me being one of the senior medics -- paramedics in Ocean Reef, I went directly to the most critical patient that we had at the time.

Q. And I assume once you started attending to Mr. Angulo that was where your laser focus was. Correct?

A.   Correct.  I had nothing to do with the other patient from that point on.

Q.   In the clips we just played, Mr. Angulo, to your knowledge, was the only patient or victim that had been struck; is that accurate?

A.   That's correct.  At that point -- excuse me -- being the type of night, and everything not clearly visible, the only two patients that were available was the driver of the Tesla and Mr. Angulo.

Q.   And so the whole time that you were providing critical care to Mr. Angulo, he was the only person that you knew to be actually struck by the vehicle, correct?

A.   Correct.

        MS. CRUZ:  Objection to form, Your Honor.  These are leading questions.

        THE COURT:  Overruled.  I'll allow it.

BY MR. BOUMEL:

Q.   After you delivered Mr. Angulo to the air rescue, did you come back to the scene?

A.   After we were -- we -- that's correct.  We did -- once we cleared that call, my captain got the call and called this over the radio, or -- actually, I don't remember if it was over the radio or directly my own cell phone -- that there was another patient because one of the other firemen ended up seeing sandals near the car.  So they searched the air extra, and they

actually -- there was a third patient.  So we ended up coming back to the scene, due to us being such a small department that we -- we don't have the extra manpower to keep a truck out of service.

MR. BOUMEL:  And can we play D-16, Clip Number 3, please.

(Video:)

"UNKNOWN SPEAKER:  There's no one else here, is there?

"UNKNOWN FEMALE:  Okay.  Wait a minute, though. There's a lady's flip-flops under the car.

"UNKNOWN OFFICER:  Yeah, but it was (inaudible) when it spun.

"UNKNOWN SPEAKER:  There's ladies' flip-flops under the car.

"UNKNOWN SPEAKER:  When it spun.

"UNKNOWN OFFICER:  I don't know.

"UNKNOWN FEMALE:  There's a pair of ladies' flip-flops.

"MR. MCGEE:  Please tell me no.  Please tell me this --

"UNKNOWN OFFICER:  Get back.

"MR. MCGEE:  Shit.  I'm sorry.

"UNKNOWN FEMALE:  Ladies' flip-flops under there.

"UNKNOWN SPEAKER:  No.  There's -- there's -- there's no one.

"UNKNOWN SPEAKER: Looking in the front --

"UNKNOWN FEMALE: Yeah. That side. He was ejected.

"UNKNOWN SPEAKER: He was ejected out that side. Anyone in the back seat?

"UNKNOWN SPEAKER: Hello?

"UNKNOWN FEMALE: Okay. She's right there, right there in the bushes.

"UNKNOWN OFFICER: 71-11."

(End of video.)

BY MR. BOUMEL:

Q. And Lieutenant, can you -- did you become aware of what the status was of the patient that was in the bushes, which was Ms. Benavides?

A. So once -- once I actually came back to the scene, yes, I became aware that the patient was expired.

Q. Thank you so much for everything that you did.

MR. BOUMEL: No further questions, Your Honor.

THE COURT: All right. Cross-examination.

CROSS-EXAMINATION

BY MS. CRUZ:

Q. Good morning, Lieutenant.

A. Good morning.

(Court reporter interruption.)

THE COURT: Would you like another one if it's not working?

MS. CRUZ: Can you hear me here? Yeah. Just let me know if it's -- yeah. It's just blinking red and green.

THE COURT: Yeah. Let's go ahead and charge that for you. We have another one here as well.

MS. CRUZ: Okay. Sure.

BY MS. CRUZ:

Q. Good morning, Lieutenant Saldana.

A. Good morning.

Q. You were shown a few minutes ago some portions of the police body-cam video. I'd like to show you some portions that were not shown.

MS. CRUZ: If we can please have Defendant's Exhibit 16-A.

MR. BOUMEL: Your Honor, we're going to object. Mr. Saldana already testified that he had no interaction with Mr. McGee.

THE COURT: Well, why don't we show the video and we can establish that fact.

MS. CRUZ: Your Honor, and just so it's clear, the question on direct examination was: "Did you have direct contact with the driver," not did you hear any statements that the --

THE COURT: I'm permitting it. Let's see if the witness had direct contact.

MS. CRUZ: Thank you, Your Honor.

34

(Video:)

"UNKNOWN OFFICER:  71-11.  We have no road closure. Vehicles are off on the side of the road.

"UNKNOWN FEMALE:  You need me to move my car?

"UNKNOWN OFFICER:  Is that your car?

"UNKNOWN FEMALE:  I can move my car.  I just don't want to leave him here by himself.

"UNKNOWN OFFICER:  Who else is involved?

"UNKNOWN FEMALE:  From what I understand, just them. He was driving that car, and he was here.

"GEORGE MCGEE:  I was driving. I dropped my phone and looked down, and I ran a stop sign and hit the guy's car."

"UNKNOWN OFFICER:  Sir, which car are you driving?

"GEORGE MCGEE:  This car, the Tesla right there."

(End of video.)

BY MS. CRUZ:

Q.  Lieutenant Saldana, on the scene of the crash, did you hear the statement that the driver of the Tesla just made in the body-cam video that we heard, in which he said:  "I was driving.  I dropped my phone and looked down, and I ran a stop sign and hit the guy's car"?

A.  I did not hear it directly from him.  I heard that later on from one of my captains or lieutenant.

Q.  I'd like to show you what's been marked as Defendant's Exhibit 16-B.

(Video:)

"UNKNOWN SPEAKER:  Are you okay?

"GEORGE MCGEE:  Yes, sir.  I was heading to Ocean Reef, and I --

"UNKNOWN SPEAKER:  Okay.  What happened?

"GEORGE MCGEE:  I dropped my phone.  I was trying to call.  We're flying out for a funeral tomorrow morning, and I was trying to call to get my wife's stuff ready at the airline. And I looked down and ran right through here, and I hit the guy's car.

"UNKNOWN SPEAKER:  You hit this car?

"GEORGE MCGEE:  Yeah.  I slammed on my brakes when I saw it."

(End of video.)

BY MS. CRUZ:

Q.  Lieutenant Saldana, on the night of the crash at the scene, did you hear the statement that we all just heard on the body-cam video, when the driver said:  "I dropped my phone.  I was trying to call.  We're flying out for a funeral tomorrow morning, and I was trying to call to get my wife's stuff ready at the airline, and I looked down, I ran right through here, and I hit the guy's car"?

A.  I didn't hear it.  I was focused on my patient.

Q.  I'd like to show you now what's marked as Defendant's Exhibit 16-C.

MS. CRUZ:  And if we could -- can we freeze that right there, Mr. Mayleben.  Can we go back just a second or two, where you can see the individuals.

BY MS. CRUZ:

Q.  Officer Saldana, is that you with the hat on attending to the patient?

A.  That is not me.

Q.  Do you see yourself in this video?

A.  That's -- I'm the bald one over the backboard.

Q.  Okay.  So you're standing to the right of the backboard?

A.  Correct.

Q.  The yellow backboard.  Okay.

And in regards to the two clips that you were just shown, 16-A and 16-B, did you also see yourself in that video?

A.  I would have to re-see it.  I'm sorry.  Because now I'm getting confused on which body-cams you're showing.

Q.  Okay.  Sure.

MS. CRUZ:  So let's go back to 16-A, please.

(Video:)

"UNKNOWN FEMALE:  You need me to move my car?

"UNKNOWN OFFICER:  Is that your car?

"UNKNOWN FEMALE:  I can move my car.  I just don't want to leave him here by himself.

"UNKNOWN OFFICER:  Who else is involved?

"UNKNOWN FEMALE:  From what I understand, just them.

He was driving that car, and he was here.

"GEORGE MCGEE:  I was driving.  I dropped my phone and looked down, and I ran a stop sign and hit the guy's car.

"UNKNOWN OFFICER:  Sir, which car are you driving?

"GEORGE MCGEE:  This car, the Tesla right there."

(End of video.)

BY MS. CRUZ:

Q.  So it looks like you're not depicted in 16-A, correct?

A.  Correct.

Q.  Okay.

MS. CRUZ:  Can we please look at 16-B again.

(Video:)

"UNKNOWN SPEAKER:  Are you okay?

"GEORGE MCGEE:  Yes, sir.  I was heading to Ocean Reef, and I --

"UNKNOWN SPEAKER:  Okay.  What happened?

"GEORGE MCGEE:  I dropped my phone.  I was trying to call.  We're flying out for a funeral tomorrow morning, and I was trying to call to get my wife's stuff ready at the airline. And I looked down and ran right through here, and I hit the guy's car.

"UNKNOWN SPEAKER:  You hit this car?

"GEORGE MCGEE:  Yeah.  I slammed on my brakes when I saw it."

(End of video.)

BY MS. CRUZ:

Q. And was that you depicted in 16-C [sic], as you said, the bald one?

A. Yes. The bald one, correct.

MS. CRUZ: And let's look at 16-C, please.

(Video:)

"UNKNOWN SPEAKER: Was anyone else in that vehicle with this guy?

"UNKNOWN SPEAKER: No. Just him.

"UNKNOWN SPEAKER: Engine 26, you en route?

"UNKNOWN SPEAKER: Hey, can you look at me? Look at me.

"UNKNOWN SPEAKER: You guys got any suction?

"UNKNOWN FEMALE: (inaudible) in the car too?

"GEORGE MCGEE: Yes, ma'am. I (inaudible) dropped my phone. I reached down (inaudible).

"UNKNOWN SPEAKER: Okay. Guys, does he have a gag reflex?

"UNKNOWN SPEAKER: Yeah. I got a gag reflex."

(End of video.)

BY MS. CRUZ:

Q. And are you depicted in 16-C?

A. That's me. Correct.

Q. And is that you standing next to the backboard?

A. Correct.

Q.   Okay.  Did you hear the driver of the Tesla make the statement that we heard in that body-cam video in which he says:  "I dropped my phone, I reached down"?

A.   To be honest with you, I don't remember.

MS. CRUZ:  Let's now look at 16-D, please.

(Video played, no sound.)

MR. BOUMEL:  Your Honor, we're going to object that this is cumulative at this point.

THE COURT:  Is this the -- are we going over the same --

MS. CRUZ:  No, Your Honor.  They're all separate statements that -- and only a portion of the body-cam video was shown in direct --

THE COURT:  All right.  And the parties have agreed that this is admissible into evidence?

MS. CRUZ:  Yes, Your Honor.

MR. BOUMEL:  Yeah.

THE COURT:  Overruled.

(Video:)

"UNKNOWN OFFICER:  Boss, how much have you had to drink tonight?

"GEORGE MCGEE:  None.  Zero.  I just left my office in Boca.  I'm a hundred percent sure.

"No.  It was actually because I was driving on -- I looked down.  And I had been using the cruise control and I

looked down. I didn't realize (inaudible) and I sat up. The minute I sat up, I hit the brakes and saw his truck."

(End of video.)

BY MS. CRUZ:

Q. Lieutenant Saldana, did you hear the driver of the Tesla make the statement that we just heard in the police body-cam video, in which he says: "I looked down. And I had been using the cruise control and I looked down. I didn't realize and I sat up. The minute I sat up, I hit the brakes and saw his truck"?

A. If you're asking me if I heard that right now, yes. Back then, I didn't hear that till a lot later on.

Q. I'd like to show you now what's been marked as Defendant's Exhibit 16-E.

(Video:)

"UNKNOWN OFFICER: Did you stop at the stop sign?

"GEORGE MCGEE: No, I didn't, sir, I don't think. I honestly don't know. I looked down. I didn't know how close I was to the intersection. And I was driving on cruise, going for -- and I looked down and -- to get the phone I dropped. I was on with the airline for my wife for tomorrow's funeral I'm going to, and I reached down. I didn't see it. And when I popped up and looked, I saw a black truck. It just happened so fast."

(End of video.)

BY MS. CRUZ:

Q.   On the scene of the crash that night did you hear the driver of the Tesla make the statement that we all just heard in that police body-cam video, in which he says -- in which he's asked whether -- the question was:  "Did you stop at the stop sign," and his statement was:  "No, I didn't, sir, I don't think.  I honestly don't know.  I looked down.  I didn't know how close I was to the intersection, and I was driving on cruise, going for -- and I looked down to get the phone I dropped.  I was on with the airline for my wife for tomorrow's funeral I'm going to, and I reached down.  I didn't see it. And then when I popped back up and looked I saw a black truck. It just happened so fast"?

A.   You playing the video, I just heard it right now.

Q.   And did you hear it at the scene?

A.   I did not hear it at the scene.  And if I did, I don't remember.

MS. CRUZ:  No further questions.  Thank you, sir.

THE COURT:  Is there any redirect?

MR. BOUMEL:  No redirect.

THE COURT:  All right.  Thank you, sir.

Is the lieutenant excused?

MR. BOUMEL:  He is, Your Honor.  Thank you.

THE COURT:  All right.  Thank you, Lieutenant Saldana. You are excused.

(Witness excused.)

THE COURT:  And the Plaintiffs' next witness, please.

MR. POSES:  Plaintiffs call Corporal David Riso.

(Pause in proceedings.)

THE COURT:  Hi.  Good morning, Corporal Riso.

THE WITNESS:  Good morning, Your Honor.

THE COURT:  Let me give you a moment to place your binder down.  And if you'll remain standing, raise your right hand to be placed under oath.

CORPORAL DAVID RISO, PLAINTIFF WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

DIRECT EXAMINATION

BY MR. POSES:

Q.  Good morning, Corporal.

COURTROOM DEPUTY:  Would you please state your name and also spell it for the record.

THE WITNESS:  My name is David Nicola Riso.

COURTROOM DEPUTY:  Please spell it for us.

THE WITNESS:  David.  And Nicola is N-I-C-O-L-A.  Last name is R-I-S-O.

COURTROOM DEPUTY:  Thank you.

BY MR. POSES:

Q.  Corporal, good morning.

A.  Good morning.

Q.  Please introduce yourself to the jury and tell the jury

43

where you live now.

A. My name is David Nicola Riso, and I live in the country of Italy.

Q. Where in Italy do you live?

A. Excuse me?

Q. Where in Italy do you live?

A. I live in the southern region of Calabria.

Q. When did you move there?

A. I moved there on April 14th of 2022.

Q. Why did you come back to the United States this week?

A. For this trial.

Q. Who asked you to come here?

A. You did.

Q. Who paid for you to come here?

A. The family did.

Q. Okay. Corporal, you have a notebook or binder in front of you. Can you tell the jury, please, what you have with you today.

A. I have a binder that contains the homicide report that I wrote, Field Note Packet that I wrote, a copy of the deposition I gave, the affidavit I gave, and a letter to my current employer. And there's also a thumb drive that contains photographs, a video.

Q. Did you get a chance to review those materials while you were here in the United States?

A.   Yes.

Q.   And you got a chance to meet with me about it in my office?

A.   Yes.

Q.   Okay.  Before we go into those materials, Corporal, will you tell us about your experience as a Florida Highway Patrol person.

A.   When I was first hired, I was hired as a regular patrolman. And I had worked the road, working multiple crashes and monitoring traffic.  And then I had desire to promote.  So I took a promotion exam for corporal, passed it, got on the promotion list.  Then, in order to take a promotion and work traffic homicide cases, I had to pass an 80-hour traffic homicide investigation course.

Q.   And I understand prior to your service as a patrol person with Florida Highway Patrol you were in the United States Army?

A.   Yes, I was.

Q.   What was your role?

A.   I was a military police investigator.

Q.   Okay.  What was your role as a corporal or homicide investigator?

A.   When you're promoted to the rank of corporal, you're not promoted into a supervisory role; you're actually promoted into a specialty position, where your primary duty is to address traffic crashes that involved fatalities.

Q.   What is the FLAIR team?

45

A. The FLAIR team is an advanced team of traffic homicide investigators that our colonel at the time wanted to put together. He had saw other states had advanced teams of homicide -- you know, traffic homicide corporals. And so he desired to put one together.

Q. Were you on the FLAIR team?

A. Yes, I was.

Q. Did the FLAIR team respond to the accident that we're here to talk about today?

A. Yes, I did.

Q. Okay. You did?

A. Yes.

Q. Other Florida Highway Patrol persons also responded to the scene?

A. Yes, they did.

Q. Do you recall who they were?

A. There was a Corporal Kitchen. There's a Trooper Martin, a few other personnel. There was also Deputy Joel Torres of the Monroe County Sheriff's Department.

Q. Is Deputy Torres the one who was wearing the camera on his body?

A. Yes.

Q. You had an opportunity then and this week to review that same footage; is that right?

A. Yes.

Q.   Okay.  Who is Rosario?

A.   Oh.  Corporal Carlos Rosario, he was -- at the time, he responded to the scene.  He was a newly promoted corporal, but he was not officially released yet to work it by himself.  I was actually his trainer because I'm a field training officer for corporals.

Q.   All right.  And so, when you got to the scene, was Mr. McGee there?

A.   No.

Q.   Was Mr. Angulo there?

A.   No.

Q.   Was Naibel Benavides there?

A.   Yes.

Q.   Okay.  You stayed at the scene for some time.  What is it that you did?

A.   I basically monitored, because this was Corporal Rosario's scene.  He was going to work the case, and I was there monitoring because I was training him.

Q.   When did you leave the scene of the accident, more or less?

A.   I believe it was in the early hours of the morning.  Because when I left the scene, I was heading to the Benavides family's home.

Q.   Okay.  Did you go there alone?

A.   No.  I asked a -- I asked dispatch to have a Spanish-speaking trooper accompany me because I do not speak

any fluent Spanish.  And I knew the family was Spanish, and I didn't know if they spoke any English.

Q.  What time did you get there more or less?

A.  I believe it was around 5:30 a.m.

Q.  What happened?

A.  I introduced myself, and I gave them the details about what happened, and told them that their loved one had passed away, and gave them the case number and other information.  And I waited there with them, you know, for a little bit.  I didn't just leave.

Q.  Is this part of your job, to have to --

A.  At times it is.

Q.  Okay.  Had you ever, prior to this incident, investigated any accidents involving Tesla and its Autopilot features?

A.  There was one crash that I had worked that involved a Tesla, but I didn't investigate it for the Autopilot features.

Q.  When was that?

A.  It was back in -- I believe it was 2014.  And it was a minor crash, meaning there's no injuries.  And one of the vehicles involved was a Tesla.  And I never even knew Tesla existed at that time.

Q.  So in that crash, did you request snapshot data?

A.  No.

Q.  Did you have a search warrant for the Autopilot or snapshot data?

A.   At that crash, no.

Q.   Any subpoenas?

A.   No.

Q.   Talk to Tesla?

A.   No.

Q.   Okay.  After you notified the Benavides family, what next did you do in your investigation in this accident?

A.   I believe it was a few days later I had contacted Ron Wheeler.  He was a technician with the Monroe County Sheriff's Department.  His office is in Marathon.  And he's a technician that can basically acquire copies of body-cam footage, and that's what I requested.  He said --

MR. BRANIGAN:  Your Honor, objection to hearsay.

(Court reporter interruption.)

MR. BRANIGAN:  Sorry.  Tom Branigan for Tesla.  Sorry.

THE COURT:  Sustained.

BY MR. POSES:

Q.   Okay.  Did you pick up or review any evidence after you had notified the Benavides family later in the week?

A.   I picked up a copy of the body-cam video footage.

Q.   Did you review it?

A.   Yes, I did.

Q.   What did you learn?

A.   I learned in the video footage that he stated that he was using cruise control.

Q. What did you learn cruise control specifically to be?

A. It was part of the autonomous features.

Q. Okay. What did you do next?

MR. POSES: And Mr. Candela [sic], can you please pull up -- this is agreed to, Your Honor -- Plaintiffs' 69, Pages 59 to 62.

MR. BRANIGAN: Counsel, can you give me just one moment so I can grab my copy of that.

THE COURT: All right. Plaintiffs' 69 is agreed upon?

MR. BRANIGAN: Yes, Your Honor.

THE COURT: All right. Admitted into evidence.

(Plaintiffs' Exhibit P-69 received into evidence.)

MR. POSES: Your Honor, can I consult with Mr. Branigan for a second?

THE COURT: Yes. Of course.

(Pause in proceedings.)

MR. BRANIGAN: Counsel, can I just...

(Pause in proceedings.)

THE COURT: Yes? Do we need to use the restroom?

UNIDENTIFIED JUROR: No. I just need to get my nasal spray.

THE COURT: Okay. Why don't we do this, because I don't want you to leave the courtroom. So Ladies and Gentlemen, let's go ahead and take a 10-minute recess, please.

COURT SECURITY OFFICER: All rise for the jury.

THE COURT:  Okay.  We're going to take a comfort break.  We'll see you back here in 10 minutes.

(Jury not present, 10:35 a.m.)

THE COURT:  All right.  We're on a 10-minute recess.

(Recess from 10:36 a.m. to 10:50 a.m.)

THE COURT:  All right.  Welcome back.

We want to make sure all the jurors are ready.

COURT SECURITY OFFICER:  They are ready.

THE COURT:  They are?

COURT SECURITY OFFICER:  Yes, ma'am.

THE COURT:  Okay.  Both sides ready to continue?

MR. BRANIGAN:  We are, Your Honor, for the Defense.

MR. POSES:  Yes, Judge.

THE COURT:  Okay.  Bring in the jury.

COURT SECURITY OFFICER:  All rise for the jury.

(Before the Jury, 10:51 a.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

And we'll continue with the direct examination.

MR. POSES:  Thank you, Judge.

BY MR. POSES:

Q.  Corporal, we were discussing that you had reviewed the body-worn camera footage.  About when was that in time?

A.  Excuse me?

Q. The body-worn camera footage --

A. Yes.

Q. -- you had reviewed that during your investigation. About when was that?

A. Not long after I received it. I pretty much reviewed it almost immediately.

Q. Okay. I want to talk to you about Mr. McGee. And we're not going to play you the body-worn camera footage. Our jury got to watch it a couple times this morning. But I want to ask you first about Mr. McGee, and then we'll talk about what he revealed in that footage.

Who called 911?

A. Mr. McGee.

Q. From the body-worn camera footage, did you learn that Mr. McGee admitted running the stop sign?

A. Yes.

Q. Did he admit on the body-worn camera footage that he was looking for his phone at the time of the accident?

A. Yes.

Q. Did he admit on that body-worn camera footage that he pressed on the brakes just before the accident?

A. Yes.

Q. Did he tell -- did he admit on the body-worn camera footage that he was on the phone?

A. Yes.

Q.   Do you remember who he had called?

A.   It was American Airlines.

Q.   Did you confirm that?

A.   Yes, I did.

Q.   What did you do to confirm it?

A.   After receiving infotainment material, which had the phone number, via the computer that was in the car -- it had this number -- I also had issued A subpoena for his phone records, and the same identical phone number came up.  And when I called it, it said:  "American Airlines."  So I confirmed that he was on the phone with them.

Q.   Was everything that Mr. McGee said on the body-worn camera footage accurate?

A.   Yes.

Q.   And you were able to independently confirm all of those same issues?

A.   Yes.

Q.   Did you do it also with the electronic data from the accident?

A.   Yes.

Q.   Okay.  What else did you learn on the body-worn camera footage about this accident and what Mr. McGee said?

A.   Mr. McGee stated that he was using cruise control.

Q.   What did you learn that to be?

A.   It was part of the Autopilot component of the vehicle.

53

Q. All right. Before we broke, we were going to talk about what you did next.

MR. POSES: Counsel, we stipulated to the publishing of all of the exhibits that we're going to use now.

THE COURT: All right. Thank you. Then you may publish them.

MR. POSES: Thank you, Judge.

BY MR. POSES:

Q. Is this your search warrant?

A. Yes.

Q. Did you author it?

A. Yes, I did.

MR. POSES: Can you please, Mr. Candela, turn to Page 2 of the search warrant.

BY MR. POSES:

Q. So I'm not going to go through the entirety of the search warrant, but what was typical in the search warrant that you were pursuing in terms of the evidence you were seeking?

A. For this case?

Q. Typical, period.

A. Typical material that I would request for a search warrant might be any type of evidence that might prove who the driver was, like DNA evidence. Like, in this case, I requested -- I knew that the airbags had DNA evidence. So I listed it in the search warrant. Other items that might be able to help me with

my investigation, prove who it was or what happened.

And also -- there's also a -- inside all these vehicles, there's also a ACM/EDR, which is an airbag control module/event data recorder.

Q. Let me just ask you real quickly.  Is that typical in all cars?

A. Yes.

Q. Okay.  Does the Tesla Model S have one of those?

A. They do.  But in this case, it's called a PCM.

Q. What is that, if you know?

A. Passive control module.  I'm not sure exactly what it means.  But I just knew it was the same -- it held the same data that an ACM/EDR did.

Q. All right.  You said before that you had never investigated a Tesla accident involving Autopilot, and I want to turn your attention to the property that you sought in Numbers 2 and 3. First let me ask you how you knew to specifically ask for these items.

A. I had done some research.

Q. Tell us more.

A. I had done some research and discovered that it had Autopilot features and snapshot data.

MR. POSES:  Judge, may I approach?

THE COURT:  You may.

BY MR. POSES:

Q.   Corporal, can you tell us in the search warrant, in Item Number 2, what it was you were seeking?

A.   In Item Number 2:  "Any data contained within touchscreen computer tablet that's mounted in the center of the vehicle's dashboard.  This includes some or all of the following:  The activity of devices attached to it via Bluetooth or by USB connection; navigation records, including GPS coordinates and specific times which would enable computation of speed; video recorded via onboard interior and exterior cameras; historical data which records driver's responses to repeatedly taking the same route, which would tend to establish a driving pattern; and/or information that would determine if this vehicle was in auto drive mode or cruise control."

Q.   Corporal, is this what Item Number 2 refers to in your search warrant?

A.   Yes.

Q.   Did you actually pull this out of the Tesla vehicle?

A.   I was the one who issued the search warrant on the Tesla.

Q.   Okay.  But was it you who physically pulled this out of the vehicle?

A.   Yes, I did.  Yes, I did.

Q.   Tell us about Item Number 3.

A.   Number 3:  "Any data contained in the vehicle's Autopilot unit.  This data includes a snapshot of five to six and a half

seconds of video recorded by onboard interior and exterior cameras leading up to the actual deployment of the airbags."

Q. Is this what you were seeking?

A. Yes.

Q. Did you yourself pull this out of the car?

A. Yes, I did.

Q. Okay. Thank you.

Now, in Number 3, you used the term "snapshot." What did that mean to you at the time that you authored this search warrant?

A. The snapshot video had -- it's basically about data that pertains to its autonomous features.

Q. It's the Autopilot computer?

A. Yes.

Q. Okay. Now, what did you do --

MR. POSES: And Mr. Candela, can we please turn to Page 77 and 78 in Plaintiffs' 69.

BY MR. POSES:

Q. Corporal, on your screen, are you able to see --

A. Yes.

Q. -- that document?

A. Yes.

Q. What is that?

A. That's a evidence chain of custody sheet.

Q. What does that mean?

A.  That means basically -- after any evidence in any case, you need to submit it in to -- in to our evidence custodian.  And this is the sheet that I authored and created to initiate the chain of custody on these items.

Q.  Can you describe specifically in what is Plaintiffs' 69, Page 77 of that report, what it is that you --

MR. POSES:  And it's on the top of the page, Mr. Candela, if you can make that larger.

BY MR. POSES:

Q.  What is it that you pulled out of the car?

A.  A flat, silver, metal box with multicolored video cable connections and other colored connections taken from 2019 Tesla S, VIN of 5YJSA1E24KF302997.

Q.  Is that the VIN number of the Tesla involved in this accident?

A.  Yes, it is.  Yes.

Q.  Is this what we're talking about?

A.  Yes.

Q.  Okay.

MR. POSES:  Can we turn to 78.

BY MR. POSES:

Q.  What is it that you pulled out of the car there?

A.  Model touchscreen.  And the serial number, which is FCCID and YZPRBHPB216C, a touchscreen computer with silver metal casing behind it.  Computer was taken out of the center of the

dash from inside of a 2019 Tesla S.

Q.  On the chain of custody -- well, first let me ask you: What does chain of custody mean?

A.  Well, chain of custody is basically first it's put into evidence.  And then if it ever needs to be taken out, it has to be signed out.  And we basically mark the date and time that we sign it out, and then it comes into your possession.

Q.  Did you sign these two pieces into evidence?

A.  Yes, I did.

Q.  And I understand -- and I'm not going to belabor our jury, but you pulled out other pieces of evidence as well, and those also were signed into evidence?

A.  Yes.  On the same day.

Q.  All right.

MR. POSES:  Can we pull up 105 -- I apologize -- 63, please.  Plaintiffs' 69 and 63.

MR. BRANIGAN:  Give me just one second, Counsel, so I can switch.

MR. POSES:  Yeah, no problem.

(Pause in proceedings.)

MR. BRANIGAN:  You're still on Exhibit 69?  I'm with you.  You're on Page 63 of 69.

MR. POSES:  Correct.  I said it wrong.

MR. BRANIGAN:  Got it.  Okay.  Thank you for the clarification.

BY MR. POSES:

Q.   Corporal, can you see this document on your screen?

A.   Yes, I do.

Q.   What is it?

A.   It's a Return of Inventory.

Q.   What does that mean?

A.   When you issue your search warrant, after you issue a search warrant you have 10 days to do a return of service and record the documents or the items that you have taken with the courthouse.

          MR. POSES:  Can you scroll down, Mr. Candela.

BY MR. POSES:

Q.   Are the items that we discussed here part of your Return of Inventory?

A.   Yes, it is.

Q.   Which items are they?

A.   Item Number 1 is:  "Touchscreen computer with silver metal casing behind it," and I list the serial number after.  The second one is:  "Passive safety restraint control module."

Q.   What's that?

A.   That is the ACM/EDR.

Q.   And Number 3?

A.   And a flat, silver, metal box with multicolored video cable connections and other connections, and the serial number.

Q.   All right.  Were you able to on your own achieve any of the

snapshot data that you were looking for from these components?

A.   No.

Q.   What did you do?

A.   I contacted a -- I called the NTSB.  I contacted --

Q.   I'm going to stop you for a second.

A.   Yes.

Q.   You called?

A.   The NTSB, which is National Transportation Safety Board, in Washington.

Q.   Did you speak to anyone there?

A.   Yes.  A Mark Bagnard.

Q.   Who is he?

A.   He's chief of investigation of crashes, incidents.

Q.   What did you learn?

        MR. BRANIGAN:  Objection to the hearsay, Your Honor.

        THE COURT:  Sustained.

BY MR. POSES:

Q.   Okay.  What did you learn from the conversation that you had with the NTSB?

        MR. BRANIGAN:  Same objection.

        THE COURT:  Sustained.

BY MR. POSES:

Q.   All right.  What did you do next?

A.   I then called the Tesla Corporation and talked to a Mr. Al Prescott.  He was an attorney with Tesla.  And I asked him how

I can get any of this autonomous data from that -- what should have been uploaded from the scene to Tesla.

Q. What happened next?

A. He then gave me contact information for another attorney at Tesla, a Ryan McCarthy, and asked me to call him. Then after that, the same day, I called Mr. McCarthy and explained to him that I'm trying to get the autonomous data from this that might have been uploaded. And I asked him if he required a search warrant, and he said no, but he asked me to write him a letter and he gave me specific items to put in the letter.

Q. Did you tell him that you were investigating a fatality?

A. Yes, I did.

Q. Did you tell him you were looking for snapshot data?

A. Yes.

Q. Did you tell him that you were looking for the Autopilot data?

A. Yes.

Q. And so, in turn, you spoke to him and authored a letter following the conversation?

A. Yes.

Q. All right.

MR. POSES: Can we pull that letter up. That is 85 and 86 of Plaintiffs' 69.

BY MR. POSES:

Q. Did you author this letter?

62

A.   Yes, I did.

Q.   Who was it to?

A.   It was to Ryan McCarthy, managing counsel, Tesla Corporation.

Q.   In any of the 11 items in this letter does it say: "Snapshot data"?

A.   No.

Q.   Why not?

A.   I specifically wrote down what the attorney at Tesla told me to write down in the letter.

Q.   Did he -- did you learn about, from your conversation, the augmented video?

A.   No.

Q.   He didn't tell you about an augmented video?

A.   No.

Q.   So you wrote this and dictated this based on what he told you?

A.   Yes.

Q.   And I'm looking at the letter, and it identifies a fatal crash on April 25th, 2019.  What day did you author this letter?

A.   It's the same day I talked to him, May 23rd.

Q.   Okay.  What happened next?

A.   I emailed him the letter, and he received it.  And then I basically just waited for an email from him with the data.

Q.   Okay.  What happened the next day?

A.   On the next day, on the 24th, I had received a phone call to my work cellular telephone.  And it was from a 202 area code, which I did not recognize.  And then I just -- I didn't answer.  And then I waited, and shortly thereafter I got an email from a Mr. John Brophy.

Mr. Brophy -- so then I called Mr. Brophy.  He had the same phone number -- same -- and so I called him.  And he was from the United States Department of Transportation, inquiring about my crash involving the Tesla.

Q.   What did you learn?

MR. BRANIGAN:  Objection to hearsay.

THE COURT:  Sustained.

BY MR. POSES:

Q.   Okay.  After your conversation, what is it that you decided to pursue?

A.   After that, after my conversation, I was trying to figure out how I can get the data off of the computer components that I had extracted from the vehicle.

Q.   Did Tesla tell you that the data streamed directly from the accident scene to California, where their company was located at that time?

A.   Tesla did not tell me.  I had to --

Q.   Did they tell you it didn't?

A.   No, they didn't.

Q. Did you learn from Tesla that the data that you were seeking actually was in the very computers that you pulled out of the vehicle?

A. They didn't tell me.

Q. Who told you that?

MR. BRANIGAN: Objection to hearsay.

THE COURT: Overruled. I'll allow that answer.

THE WITNESS: Mr. John Brophy, the one who emailed and called me. He told me that it was uploaded from the scene, and it would also be stored on the computer components I took out of the vehicle per the search warrant.

BY MR. POSES:

Q. So now you know that it was streamed from the location of the accident to Tesla and it lived on the computers. What did you -- what happened next?

A. I had contacted Mr. McCarthy and asked him how I can get this data off of the computer components. And then he said that he would coordinate me meeting with a technician at their service center, the Tesla service center in Coral Gables.

Q. Did you do that?

A. Yes, I did.

Q. Who arranged it?

A. Mr. -- the lawyer from Tesla, Ryan McCarthy.

Q. Okay.

MR. POSES: Can we please pull up Plaintiffs' 77 and

78 again.

MR. SCHREIBER:  From Exhibit 69.

MR. POSES:  From Plaintiffs' 69.

Thank you.

BY MR. POSES:

Q.  What day did you go to Tesla?

A.  It was on the 19th of June.

Q.  What did you bring with you?

A.  I brought the center tablet, the computer tablet, and the flat, silver box with the multicolored connections.

Q.  These two?

A.  Yes.

Q.  How do you know?

A.  I was told to bring those two components.

Q.  And is it in the chain of custody document that's sitting in front of you?

A.  Yes, it is.

Q.  Can you take a look at 77 first and identify where it is that you, in fact, did take these components to Tesla that day.

A.  Well, it's kind of toward the top.  You'll see that -- you'll see that the evidence technician signed it saying: "Received from," and my signature:  "By," which is me, and it was on the 19th of -- June 19th, 2019.

MR. POSES:  All right.  Can we go to the next page.

BY MR. POSES:

Q.   Same?

A.   Yes, it is.  Uh-huh.

Q.   Who did you meet at Tesla?

A.   I met a technician by the name of Mike Calafell.

Q.   Who is Mike Calafell?

A.   He's a technician with the Tesla service center in Coral Gables.

Q.   Did you speak to anybody else when you went there?

A.   No.

Q.   What happened?

A.   I met with Mr. Calafell.  And then we went inside the building and we proceeded to get on this huge elevator that was probably one quarter the size of this room.  And then I realized that cars drive on it.  And then we went up to the second floor and we got off.  And at the second floor, there was Tesla vehicles there, but there was no -- there was no 2019 Tesla Model S.

Mr. Calafell proceeded to tell me that we could use an exemplar car, which basically is a similar vehicle.  And what he had to do was take the computer components out of that vehicle and then put the ones that I brought in.  And then, after that, he wheeled over this big cart with a computer on it.  And then he proceeded to hook up to the car and proceeded to download the data.  And during all this, I watched him the

whole time.

Q. Why?

A. Because the evidence is actually in my custody, and I had to stay with it the whole time. I could not let it out of my sight.

Q. So did you let it out of your sight?

A. No.

Q. Did he download the data?

A. He did.

Q. More or less, how long did it take?

A. About 30 or 40 minutes, I believe.

Q. What did you get back from him?

A. Toward the end of it, Mr. Calafell told me that the file was corrupted.

Q. What file?

A. The file that he attempted to download.

Q. Did you know what Mr. Calafell's qualifications were when he tried -- or was told what to do to get this evidence?

A. No. I just -- the only thing I knew, he was a technician with the Tesla Corporation.

Q. I asked you also to review certain documents when you came to the United States. Do you recall reviewing Mr. Calafell's affidavit?

A. Yes.

Q. Signed about six months ago, sworn under oath. Did you

review that affidavit?

A.   Yes, I did.

Q.   Did you read his testimony?

A.   Yes, I did.

Q.   Do you take issue with anything that he said that happened this day?

A.   Yes, I did.

Q.   Tell us about that.

A.   Inside Mr. Calafell's sworn affidavit, he --

MR. BRANIGAN:  Your Honor -- Your Honor, I have an objection.

THE COURT:  Okay.  And the basis of the objection is?

MR. BRANIGAN:  The basis of the objection is that I think this is covered by your order on -- related to the discovery issues that we've raised with the Court before now.

THE COURT:  This isn't a statement of a party opponent?

MR. BRANIGAN:  It is, but it relates to those discovery issues, Your Honor.  The declaration that counsel is referring to was part of the filings with the Court.

THE COURT:  Based on the question asked, the objection is overruled.

MR. BRANIGAN:  Thank you.

THE WITNESS:  So I may answer, Your Honor?

Okay.  Inside Mr. Calafell's statement, he stated that

69

I met him at the service center, I only brought one of the two parts, I stayed downstairs in the lobby while he went upstairs and attempted to perform the download of the data, and that I did not remain with the evidence the whole time, which was untrue.

BY MR. POSES:

Q.  Thank you.

So after June 19th, what did you receive from Tesla in total?

A.  I believe it was on July 1st.  I did receive some more data from the attorney, Ryan McCarthy, from Tesla.  And it was infotainment data, and that basically had data that was streamed through the computer like the phone number, the same identical phone number I got via search warrant that I issued for his phone records.  And it was the phone number for the American Airlines.

Q.  Had you received the data that you were seeking, would you have included that in your report?

A.  Yes, I would.

Q.  What else would you have done with it?

A.  I would -- well, I would have incorporated it in my report. I also would have contacted the NTSB and USDOT, who were inquiring about the crash.  I would have talked to my supervisor first and let him know.  And then -- you know, so I can the give the data to the government agency that wanted it.

70

Q.   You now know that we have that data, right?

A.   From what I understood, yes.

Q.   Would you have incorporated the augmented video in your report had you had it?

A.   Yes, I would.

Q.   And would you have done the same thing and given it to the NTSB, and NHTSA, the Department of Transportation?

A.   As long as I had approval from my sergeant, yes.

Q.   Would there be any issue with the approval from your sergeant as to whether or not you could give that information to these two federal agencies?

A.   I do not believe so.

Q.   What else did Tesla give you?

A.   They gave me -- along with some of the information they emailed me, they emailed me a copy of the vehicle's Owner's Manual.

Q.   Did they point to anything specific?

A.   Yes.  I was directed to a Page 90 in my notes.  And this was while I was speaking to the attorney from Tesla, Mr. Ryan McCarthy.

Q.   Did you faithfully record everything Mr. McCarthy asked you to and put it in your report?

A.   When I was talking to him, I was writing down these notes about this time, when I was talking to him about the data I received, because I needed to decipher the data, you know, and

understand it, and he was explaining it to me and I was writing down what he was saying.

Q.   Okay.   So did you review the remainder of the Owner's Manual?   How big is the Owner's Manual?

A.   Excuse me?

Q.   How big is the Owner's Manual?   How many pages more or less?

A.   It's over 200 pages.

Q.   Okay.   And you wrote down a piece from one page?

A.   Yes.   About a paragraph worth, and that's it.

Q.   All right.   Did he point to you -- with -- any data or information from the Owner's Manual as it relates to forward collision warning?

A.   No.

Q.   Did Mr. McCarthy make you aware, or did you learn, that from 525 feet away the Owner's Manual says that it's going to see things in its path and provide a warning to drivers?

A.   No.

Q.   Did he point you to anything as it relates to automatic emergency braking?

A.   No.

Q.   Did he point you to anything other than the section that he pointed you to?

A.   No.

Q.   And independently, you did not place anything into your

report.  You simply listened to what Tesla's lawyer offered to you?

A.  Yes.

Q.  Mr. Calafell's training -- when you went to Tesla, and you gave Mr. Calafell these parts, did you have any assumptions about his qualifications?

A.  I believe --

MR. BRANIGAN:  I'm sorry.  Was the question did he make any assumptions?

MR. POSES:  Yeah.

MR. BRANIGAN:  Thank you.

THE WITNESS:  I believed that I was dealing with somebody -- when they said:  "Technician," I thought it was somebody that would be able to download the data that I needed.

BY MR. POSES:

Q.  Did you know then that he had never done this before, and did you know then or now that he's never done it since?

A.  No.

Q.  If you knew that when you brought these component parts to Tesla to get snapshot data, would you have given it to him?

A.  No.  I would have asked for somebody else who was more qualified and had done it before.

Q.  If the augmented video shows that the Tesla from hundreds of feet away saw the vehicle in front of it with certainty, would you have put that in your report?

A.   Yes, I would have.

Q.   Would you have reported that to NHTSA and the NTSB?

A.   Yes.

Q.   If the augmented video showed that it appreciated the end of drivable space, that it knew where it was in time and space, it knew the end of the road was coming, and nevertheless we know what happened, would you have included that in your report?

A.   Yes, I would have.

Q.   And would you have told the NTSB and NHTSA?

A.   Yes.

Q.   And if the Tesla appreciated, understood, and identified the Decedent, Naibel Benavides, and said:  "Pedestrian," and Mr. Angulo, who has left for today, would you have incorporated that in your report?

A.   Yes, I would have.

Q.   And would you have told NHTSA and the NTSB?

A.   Yes, I would have.

Q.   Why did you come here today?

A.   I was the lead investigator on this case.  And if I'm needed to testify in a case I work, I will come.

          MR. POSES:  Thank you.

          MR. BRANIGAN:  I'm sorry.  Does that complete counsel's direct?

          THE COURT:  Have you completed your direct

examination?

MR. POSES: Yes.

THE COURT: All right. Cross-examination.

MR. BRANIGAN: Thank you.

Your Honor, I need 30 seconds just to pull together some documents and walk up there.

THE COURT: All right. Certainly.

(Pause in proceedings.)

MR. BRANIGAN: May I approach, Your Honor?

THE COURT: Certainly.

MR. BRANIGAN: Good morning, everyone.

CROSS-EXAMINATION

BY MR. BRANIGAN:

Q. Corporal Riso, how are you, sir?

A. Yes, sir. Good. Thank you.

Q. I wouldn't expect you to remember this, but my name is Tom Branigan and I took your deposition.

A. Back in January of 2022. And you were in Michigan.

Q. Yes. I'm from Detroit. And of course you're originally from Florida.

A. Yes.

Q. And my memory is at the time of the deposition that we did it via Zoom because it was still COVID. And it was unique because as I recall it you were in your patrol car at the time.

A. Well, we had a bad signal at my office. My office was at

the -- well, at that time my office was at the Snapper Creek Plaza at the 19 mile mark of the Turnpike. And because of the -- I actually had to go outside because we kept losing the signal. I remember that.

Q. Yes. I do too.

A. And I actually had to sit in the car to finish the Zoom.

Q. Right. But we got it done. And thank you. And appreciate you coming.

Let me start with just a couple of follow-up questions to what I thought I heard during your discussion with Plaintiffs' counsel on direct. You're not here under a subpoena, correct?

A. No.

Q. All right. And you -- after you retired from the Florida Highway Patrol -- and thank you for your service over all these years -- you moved to Italy with your family; is that right?

A. Yes, I did.

Q. And so, at the request of the Benavides family, you agreed to travel from your home in Italy. Did you bring your entire family?

A. Yes. The entire family came.

Q. Okay. And they're here with you now, correct?

A. Yes.

Q. And you agreed to do that with no subpoena, correct?

A. Yes.

Q. And I think I heard you say that the family has paid for

your travel expenses to be here; is that right?

A. That's correct.

Q. Does that include your family's travel expenses as well?

A. Yes.

Q. All right. And I also think I heard you -- and correct me if I misheard you, but you've spent some time with the Plaintiffs' lawyer who just did your direct examination before coming here today; is that right?

A. Yes.

Q. Did you go to his office and talk with him?

A. Yes, I did.

Q. And for how many days did you have conversations with him before today?

A. A few days.

Q. A few days. Was that just in the like last week or has it continued on to this week, maybe even to last evening?

A. Well, I didn't get here until -- I didn't get here until Friday. So it was only just a few days.

Q. Okay. And are they paying you for your time as well?

A. No.

Q. All right. And they have given you a binder of information to review before today, right?

A. Well, the binder they gave me was the Field Note Packet, investigative packet. Because I never would keep a copy. I turned it all in.

Q.  And that included your deposition, the one that you and I --

A.  Yes.

Q.  -- were together for in January of 2022, correct?  And I -- right?

A.  Yes.

Q.  Thank you.

I take it you've had an opportunity to read all of that information, correct?

A.  Yes.

Q.  All right.  Well, first turning to the substance here -- oh, by the way, you and I have never met before.  Even though I took your deposition, this is the first time we're in the same -- physically in the same room before, correct?

A.  Yes.  I was actually wondering if you would be the attorney coming for Tesla.

Q.  Sorry if you're disappointed.

A.  No.  No.  No.  I didn't know if you would be the one representing them here today.

Q.  It's me.  And so, in between the time of your deposition January '22 and today, we've never had any conversations -- any follow-up conversations, right?

A.  No.

Q.  But Mr. Poses, the gentleman who just finished your examination, he was at the deposition, just to set the stage

78

for all this, right?

A.  Yes.

Q.  So he had a chance to talk to you while you were under oath in the deposition?

A.  Yes.

Q.  Along with me?

A.  Yes.

Q.  And then he's continued a conversation with you about these issues since then, right?

A.  Well, he had contacted me in January.  I had gotten a message from FHP that he was trying to get ahold of me.  And then I got ahold of him.  And that's when he asked me to review the deposition of Mike Calafell.

Q.  Very good.  Thank you, sir.

Let me turn your attention now to the affidavit that you were shown a few minutes ago.  That's an affidavit that you prepared to obtain a search warrant, correct?

A.  You're talking about the search warrant that I wrote, right?

Q.  Yes, sir.

A.  Yes.

Q.  And I believe that affidavit and the search warrant itself is from May of 2019.  So a matter of days after the date of this crash that occurred in April -- on April 25, 2019, to be precise, correct?

A.  Yes.

MR. BRANIGAN:  And Mr. Mayleben, can you pull that up. It was the Plaintiffs' last exhibit.  The exhibit, I believe, was 69.

MR. POSES:  It is 69, yeah.

And are you looking for the search warrant, Tom?

MR. BRANIGAN:  Yes, sir, I am.

MR. POSES:  Okay.  It's Pages 59 to 62.

MR. BRANIGAN:  Thank you.  I appreciate that.

BY MR. BRANIGAN:

Q.  All right.  So what we're looking at now --

MR. BRANIGAN:  Can everybody see this on the screens?

Great.

BY MR. BRANIGAN:

Q.  What we're looking at now is the search warrant that you prepared.

MR. BRANIGAN:  And if we can enlarge, Mr. Mayleben, the middle of that page that says:  "Description of premises to be searched."

There we go.

BY MR. BRANIGAN:

Q.  So this search warrant -- so everybody's understanding what you were intending to search -- was of the vehicle itself that Mr. McGee was driving, this 2019 Tesla Model S, correct?

A.  Yes.

80

Q. And this was not a search warrant that you or -- or excuse me -- or this is the search warrant, but you were not searching -- seeking a search warrant, requesting a search warrant for documents or information at Tesla, the corporation located in California, correct?

A. No.

Q. Right. And in this search warrant, we can see the various items that you wanted to obtain from the vehicle itself, correct?

A. That's correct. Right.

Q. And am I right, sir -- Corporal, that you did not provide a copy of this search warrant to Mr. McCarthy or anyone else at Tesla when you communicated with Tesla --

A. No.

Q. -- about your interest in information? Correct?

A. No.

Q. I'm not right, or I am right and you did not do that?

A. No. I did not supply him with a copy of the search warrant.

Q. All right. Ultimately, a local judge here in Miami signed this and turned it into an enforceable search warrant, correct?

A. Yes.

Q. I think it was Judge Glick, right?

A. Yes.

Q. And once you had that search warrant, then you could go to

Mr. McGee's Model S, and you could obtain the items that we can see in front of the jury that were brought into the courtroom today, correct?

A.   That's correct.

Q.   That included the --

MR. BRANIGAN:  If I may approach the box, Your Honor?

THE COURT:  You may.

BY MR. BRANIGAN:

Q.   -- this that we refer to as the media control unit.  This has got the big display on it, correct?

A.   Yes.

Q.   It includes what you called the silver box, correct?

A.   Yes.

Q.   And finally, this item here, which is -- looks like a motherboard from a computer?

A.   Yes.

Q.   And that's as far as I'm going to take it because I'm a lawyer.  I'm not a software engineer.  You agree with that, though?

A.   Well, that part I didn't take out of the car.

Q.   Who took this out of the car?

A.   I don't know.

Q.   All right.

A.   Well, nobody took it out of the car is what I'm saying. Those two parts, the first two parts you showed me, I took out

82

of the car.  The other part is a motherboard.  I don't know where it came from.

Q.  Okay.  Eventually, after getting the search warrant and removing those components from the vehicle, the two that you identified that you took out, you then contacted Tesla, correct?

A.  Yes.

Q.  And that contact was in late May of 2019, correct?

A.  Yes.

Q.  And you actually received a contact for someone at Tesla through the research that you were doing, including communicating with the National Transportation Safety Board person, correct?

A.  Yes.

Q.  And the first person you talked to was Mr. Al Prescott, correct?

A.  At Tesla, yes.

Q.  Forgive me.  At Tesla.  Mr. Prescott at that time was a lawyer at Tesla, correct?

A.  Yes.

Q.  And did Mr. Prescott tell you that Tesla wasn't going to cooperate with you and that you weren't going to be provided with information or someone to talk to?

A.  No.  He just gave me the phone number.  I explained why I called him.  And he gave me the phone number, contact

information for Ryan McCarthy, another attorney with Tesla.

Q. Right. And you contacted Mr. Ryan McCarthy the same day that you talked to Mr. Prescott, correct?

A. Yes.

Q. And Mr. McCarthy answered your call, right?

A. Yes, he did.

Q. And Mr. McCarthy spent whatever time you needed to talk to him on the telephone about what you were interested in, in terms of data or information about the vehicle, video from the vehicle; is that fair?

A. Yes.

Q. And you didn't have just one conversation with Mr. McCarthy. You had a number of conversations with Mr. McCarthy, where you asked him questions about, you know, the vehicle and the video. And he answered those questions for you, didn't he, sir?

A. Yes, he did.

Q. All right. And you also exchanged a number of emails with Mr. McCarthy, didn't you, sir?

A. Yes.

Q. And when you emailed Mr. McCarthy, Mr. McCarthy properly responded to you, answering your questions; is that fair?

A. I would say it's fair.

Q. All right. Now, when you communicated with Mr. McCarthy on May 23, 2019, you asked him for information that you wanted

about the vehicle and from the vehicle, correct?

A.   Yes.

Q.   And Mr. McCarthy told you that it wasn't necessary for you as a law enforcement officer from the Florida Highway Patrol to even send them a subpoena because Tesla would cooperatively agree to provide you with the information you wanted, correct?

A.   Well, he -- I asked him if he required a subpoena.  He said it's not necessary.  And that's when he told me:  "Here, write me a letter, and I'll tell you what to put in the letter."

Q.   Right.  Let's take a look at that letter.

MR. BRANIGAN:  That letter is also in Exhibit 69.  But Mr. Mayleben, it may be easier if you just pull up our exhibit that I identified as -- well, it's still Plaintiffs' Exhibit 69.0085.  Can you pull that up, Mr. Mayleben, please.

BY MR. BRANIGAN:

Q.   All right.  So this is a letter that's on the Florida Highway Safety and Motor Vehicle, Florida Highway Patrol letterhead, correct?

A.   Yes.

Q.   And if we look at the very top --

MR. BRANIGAN:  Mr. Mayleben, can you blow up the portion that shows:  "Division of."

BY MR. BRANIGAN:

Q.   Indicates that this is dated May 23, 2019, correct?

A.   Yes.

85

Q. And that would have been the first day that you and Mr. McCarthy had a conversation, right?

A. Yes.

Q. All right.

MR. BRANIGAN: Can we zoom out, Mr. Mayleben.

Thank you.

BY MR. BRANIGAN:

Q. And you've addressed it to Tesla Corporation, Attention Ryan A. McCarthy, managing counsel, right?

A. Correct.

Q. Obviously it's from you, and the subject is: "Mr. McGee's 2019 Tesla Model S," right?

A. Correct.

Q. And then there's a reference to the VIN. And I think you and I know what that is, but let's bring the jury into this. That means vehicle identification number, correct?

A. Yes.

Q. And -- sorry.

A. No. No. Go ahead.

Q. And you know from your very lengthy experience as a Florida Highway Patrolman that every motor vehicle in the United States has one of these vehicle identification numbers, right?

A. That's correct.

Q. It's a long alphanumeric set of characters that --

A. Seventeen to be exact.

Q.   Seventeen to be exact.  And one of the nice things about that string of letters and numbers is that you can say:  "All right.  I'm going to look at that and I'm going to match that up" -- I'm going to look at that on this page here that we can all see, and I'm going to match that up with what sometimes is referred to as the VIN plate on the vehicle itself, so you know that we're talking about the right vehicle, right?

A.   Correct.

Q.   So there's no uncertainty here.  That VIN, vehicle identification number, matches up with Mr. McGee's Model S, the one that was in this crash?

A.   Yes.  That's correct.

Q.   All right.

         MR. BRANIGAN:  We can zoom out now, Mr. Mayleben, please.

BY MR. BRANIGAN:

Q.   Now, the second half of the letter tells everybody reading it now precisely what you asked from Mr. McCarthy, correct?

A.   From what I understand, that's what Mr. McCarthy told me to write in the letter.  I actually wanted -- now, if this is what I requested for at the time, I thought it did.  I mean, I wanted the Autopilot data that I learned that this vehicle had.

Q.   You understand -- by the way, you have made reference to autonomous and Autopilot.  You understand from the research that you have done, and maybe the conversations that you have

had with Plaintiffs' counsel over the last several days, that the 2019 Model S, Tesla Model S, is not a fully self-driving, fully autonomous vehicle.  You understood that, correct?

A.  Yes, I did.

Q.  Right.  So even though you're using "autonomous," we can all agree that that vehicle wasn't completely self-driving, right?

A.  My understanding during the investigation was semi-autonomous.

Q.  The phrasing that's been used in the courtroom here to describe it by my partner, Mr. Smith, is that it is an SAE, which stands for Society of Automotive Engineers, Level 2, ADAS, A-D-A-S -- lots of acronyms in this trial -- ADAS means advanced driver-assistance system.  So it has advanced driver's assistance features to help the driver drive, but it doesn't drive itself.  Is that your understanding, sir?

A.  Partially.

Q.  All right.  What else do you think?

A.  I can't speak about what I think.  I just learned that it had some type of Autopilot data, some type of snapshot.  And I just -- in this case, I wanted all the data about these features that I could get.  And I wanted to incorporate them in my report, and that's what I was trying to do.

Q.  Got it.  Got it.  I understand the importance of that. We're going to talk more about that.

So turning back to your letter, what we see here is the information that you asked Tesla to provide you after the conversation that you had with Mr. McCarthy, correct?

A. Yes.

Q. And I understand you're saying that Mr. McCarthy explained to you what you could ask for. And you put that in your letter, correct?

A. That's correct.

Q. Let me ask you, though: As a law enforcement official, you could have asked for more, right?

A. Quite possibly, yes.

Q. Yeah. And if after getting the information -- by the way, everything that's listed here -- and there's a second page.

MR. BRANIGAN: And Mr. Mayleben, if you go to the second page, we can see the rest of it.

BY MR. BRANIGAN:

Q. Just you saying: "I appreciate your assistance," right?

A. Yes.

Q. But everything that's listed on the first page, those 11 items, that was provided to you by Mr. McCarthy and Tesla, correct?

A. I'm not positive.

Q. Well, over the last many days that you have spent with Plaintiffs' counsel, didn't you go back over this to see if these items that you asked for were provided?

A.   Well, he provided me -- it's in the Field Note Packet, the items that were provided me.  And then after they were sent to me via the email, I did talk to Mr. McCarthy about these items to understand them.

Q.   So you obtained this from Tesla.  And because you had some questions, you contacted Mr. McCarthy again?

A.   Yes.

Q.   And Mr. McCarthy took your call and spoke with you about these items, correct?

A.   That's correct.

Q.   Did he give you a chance to ask whatever questions you wanted?

A.   Yes.

Q.   Did he do -- as far as you could tell, was he doing his best to respond to you?

A.   Yes.

Q.   Were you satisfied with the answers that he gave you?

A.   Yes.  I even was scribing them down when I was talking to him.

Q.   Would it be fair for me to say, Corporal, that over the course of your numerous conversations with Ryan McCarthy, Tesla lawyer, that it was not your impression that he was trying to direct or influence your investigation?

A.   He was cooperative with me.

Q.   He wasn't trying to influence or direct your investigation

was he, sir?

A.   That, I do not know.

Q.   Well, you have a copy of your deposition up there with you?

A.   Was it the one that -- that we did back in '22?

Q.   It is.

A.   Okay.

Q.   I may have a copy with me.  And, in fact, I do.

MR. BRANIGAN:  And Your Honor, if I may -- may I approach the witness to see what he has, Your Honor?

THE COURT:  Certainly.

MR. POSES:  Tom.

MR. BRANIGAN:  Thank you.  Appreciate it.

BY MR. BRANIGAN:

Q.   Corporal, I'm going to show you what counsel has just handed me --

MR. BRANIGAN:  Thank you, Counsel.

BY MR. BRANIGAN:

Q.   Is that what you have here?

A.   Okay.  This is the deposition, yes.

Q.   All right.  Would you turn to that -- open that up in your binder, and I'm going to ask you to read a page.  Actually, I'm going to need that one back.  If you have that, I'd ask you to take a look at yours.  Do you have a copy of your deposition in your binder?

A.   Hold on a second.

Q. Thank you, sir.

A. Okay. Yes, I do.

Q. There you go.

And just by way of orientation, if you would flip your page -- you have what we lawyers call the mini version. I'm sure you have seen these before. Have you seen this before?

A. Yes.

Q. It's got four pages on a page?

A. Uh-huh.

Q. Lawyers trying to save a buck.

So what I'd like you to do, Corporal, is take a look at Page 84. And I direct your attention to Line 19 through 22, and I'd like you to read that to yourself, please.

A. Nineteen to 22?

Q. One second. Let me just double-check that.

Yes, sir. Line 19 to 22. Would you read that to yourself, please.

A. Yes.

Q. Let me know when you're finished.

A. I'm done.

Q. Does that refresh your memory about whether you felt, over the course of the many conversations that you had with Mr. McCarthy, that he was trying to direct or influence your investigation or your conclusions?

A. No, he was not.

Q. Thank you, sir.

After you had this conversation with Mr. McCarthy about the items that are shown in this letter that you wrote on May 23, 2019, you then had another conversation with him about having the media control unit and the silver -- what you called the silver box further -- my words -- interrogated, if you will, or reviewed to see if there was data on them, correct?

A. Yes.

Q. And Mr. McCarthy cooperatively made arrangements for you to go to a Tesla technical service center in Coral Gables, Florida for that process, correct?

A. That's correct. He said he would coordinate.

Q. And in fact, he did that, didn't he?

A. Yes, he did.

Q. And he provided you with the name of a person to communicate with directly so that you could talk to that person there, a gentleman by the name of Joshua Turner at the technical center. Remember that?

A. Joshua Turner I do not remember.

Q. All right. Well, in any event, Mr. McCarthy made arrangements for you to talk directly to the technical service center so that you could take those components there to see if data could be extracted from them, correct?

A. That's correct.

Q. And it was set up at your convenience, so that you could go

there when it was convenient for you and the service center, right?

A. Correct.

Q. And you eventually did that, correct?

A. Yes.

Q. And you met this gentleman, Mr. Michael Calafell, who you had not met before, right?

A. That's correct.

Q. Ultimately. And Mr. Calafell went about a process to see if additional data could be obtained from those devices, correct?

A. That's correct.

Q. And he downloaded some data, and it was put onto a thumb drive, and that thumb drive was provided to you, correct?

A. Well, I provided the thumb drive.

Q. Ah. Excuse me. That's a very important correction. You had a thumb drive and he put the data on the thumb drive that you provided?

A. Correct.

Q. Okay. And then, when you opened the thumb drive, it's my understanding that you were not able to read the data, correct?

A. Yes. He told me it was corrupted even before he handed the thumb drive back to me.

Q. Okay. So after that happened, did you call Mr. McCarthy and say: "Hey, Ryan, you know, this is really important to me.

I wanted this data, and what I got is not what I want"?

A.   No.  I didn't contact him again about it.

Q.   That was certainly something you could have done as a law enforcement official investigating this crash, correct?

A.   I could have done it.

THE COURT:  Mr. Branigan, just let me know when it might be a good time for us to break.  Recall that we were going to break at 11:45.

MR. BRANIGAN:  This is perfect.

THE COURT:  All right, then.  Ladies and Gentlemen, we're going to take our one-hour recess.  And I'll see you back here at one o'clock.

Have a pleasant lunch.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 11:46 a.m.)

THE COURT:  Corporal Riso, as you are on the witness stand, let me remind you you are not to discuss your anticipated testimony, the testimony of any individual, or any aspect of the case.  And I'll see you back here at one o'clock.

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  Have a pleasant lunch.

Recall that we are having an intern event.  So if you would be kind enough just to place your items to the side so the interns can have the use of the area in front.

Have a pleasant lunch.

MR. SCHREIBER:  Your Honor, do we need to remove everything?

THE COURT:  No.  No.  Not at all.  You can actually -- just your loose items.  Maybe just put them to the side.

MR. SCHREIBER:  We'll tighten it.

THE COURT:  All right.  Thank you.

COURT SECURITY OFFICER:  All rise in the courtroom, please.

(Recess from 11:47 a.m. to 1:02 p.m.)

THE COURT:  All right.  Welcome back to everybody.

Go ahead and have a seat.

Are there any matters we need to address while we're waiting for the jury?

Could we just check and see if they're there.

Thank you.

MR. SCHREIBER:  Not for the Plaintiffs, Your Honor.

MR. SMITH:  Your Honor, we do have one thing.  And we just want to make sure the record is clear on this NTSB issue.  And Your Honor, I apologize, but I have a document that I think actually clears up the difference between what the factual, non-excluded evidence is and what the analysis, conclusions, and recommendations are.  If I could hand that up.

THE COURT:  Okay.  The Court already entered its order.  I don't think I need any more clarification.

MR. SMITH:  Your Honor, what I believe is that we need

clarification because --

THE COURT: So you have the Court's order for clarification. Are you concerned that there's an exhibit that the Plaintiff may introduce that is -- that is in derogation of the Court's order? If so, then why don't we address the exhibit.

MR. SMITH: That's exactly what I'm saying, Your Honor.

THE COURT: All right. Well, what is the exhibit?

MR. SMITH: Your Honor, it is the report.

THE COURT: What exhibit number is this?

MS. CRUZ: Seventy-seven.

MR. SMITH: Exhibit 77, Plaintiffs' Exhibit 77, Your Honor.

Your Honor, is it okay if I stand here?

THE COURT: All right. Is the Plaintiff seeking to introduce this report?

MR. EATON: Seventy-seven, Your Honor? No.

THE COURT: Yes.

MR. SCHREIBER: Yeah. I'm going to have Mr. Eaton handle this, as he handled the briefing on this issue, Your Honor, if that's okay.

MR. EATON: No, Your Honor.

THE COURT: Okay. So can you give this back to the gentleman.

And let's make sure we have the jury.

Are we ready to go?

COURT SECURITY OFFICER: Yes, ma'am.

THE COURT: Okay. Both sides ready to proceed?

On behalf of the Plaintiffs?

MR. SCHREIBER: Yes, Your Honor.

THE COURT: On behalf of the Defendant?

MR. BRANIGAN: Yes, Your Honor.

THE COURT: All right. Then let's bring the jury in.

COURT SECURITY OFFICER: All rise for the jury.

MR. BRANIGAN: Your Honor, may I step up to the podium?

THE COURT: Yes. Of course.

(Before the Jury, 1:05 p.m.)

THE COURT: All right. Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

I trust that you had a pleasant lunch and ready to get back to work.

And we are right on schedule, and we will continue the cross-examination of Corporal Riso.

MR. BRANIGAN: I just need the lavalier.

THE COURT: Could we provide the lavalier.

Thank you.

(Pause in proceedings.)

MR. BRANIGAN:  Good afternoon, everyone.

BY MR. BRANIGAN:

Q.  Corporal Riso, good afternoon.

A.  Good afternoon.

Q.  I want to continue with some of the things that you reviewed that you received from Mr. McCarthy and Tesla, and I want to start with the Owner's Manual.  I remember you saying before lunch, or earlier this morning, that you got the Owner's Manual, and it was 200 pages long, and that Mr. McCarthy directed you to like a single page.  Is that what your testimony is, sir?

A.  Well, in my notes, he gave me a page number, and I researched around those page numbers.

Q.  Okay.  And you have a copy of the Owner's Manual up there, do you not?

A.  I'm not sure.

Q.  I'll help you out here.  It's --

A.  No, I do not.

Q.  You do not?

A.  No.  I don't think so.

Q.  Well, it's Plaintiffs' Exhibit 53, and you'll know it because it looks like this --

MR. BRANIGAN:  And Your Honor, this is an agreed-upon exhibit for display.

THE COURT:  All right.  Admitted into evidence?

MR. BRANIGAN: I would move it in. Yes.

THE COURT: Yes.

MR. SCHREIBER: The entirety? No. That's not --

THE COURT: I thought the representation is the parties had agreed.

MR. SCHREIBER: We had not agreed to the totality of Exhibit 53.

MR. BRANIGAN: That's fair. I'm going to get to the specific page, as I overstated a little bit when I said the whole thing. We're going to offer Exhibit 53 and select pages that I'm going to talk to the witness about.

THE COURT: Okay. Have we identified the pages that the parties have agreed are admissible and those pages that the parties have not agreed are admissible?

MR. SCHREIBER: Not specifically, because we don't know what he's offering with this witness.

MR. BRANIGAN: Counsel, I can tell you that -- can I show this to counsel, Your Honor?

THE COURT: Yes. Of course.

MR. BRANIGAN: First of all, the first page.

MR. SCHREIBER: Okay. So stipulated.

MR. BRANIGAN: The second page, which is the Table of Contents. Page 79, which addresses Autopilot. And then Pages 102 --

THE COURT: And it doesn't need to be on the record,

100

Mr. Branigan.  If you'll just show Mr. Poses --

MR. BRANIGAN:  Sorry.

THE COURT:  -- or Mr. Schreiber.

(Pause in proceedings.)

MR. BRANIGAN:  Do we have an agreement, Counsel?

MR. POSES:  Yes.  I'm sorry.  Yes.

THE COURT:  All right.  So Exhibit 53 in its entirety is admitted into evidence by agreement?

MR. BRANIGAN:  No.  Sorry, Your Honor.  It will be Exhibit 53.  And each page has Exhibit 53 and then 001 is the first page.  So Page 1, Page 2, Page 78 -- oh.  I apologize, Your Honor.

Let me start again, because the Owner's Manual itself has native page numbers, which I just gave you.  And for the record I want to give you the page numbers that the Plaintiffs branded on the document.

THE COURT:  Okay.  Just give me the Bates stamp numbers.

MR. BRANIGAN:  So Page 1, Page 2, Page 80.

MR. SCHREIBER:  Why don't we go with Page 3 while we're at it.

MR. BRANIGAN:  Sure.

Page 81, Page 103, 104 and 105.

MR. POSES:  Tom.

MR. BRANIGAN:  Let me show you 105, because you're

101

right. It's just a continuation of that section.

MR. POSES: I just want to make sure.

MR. BRANIGAN: Thank you, Counsel.

THE COURT: Okay. Each admitted into evidence. You may continue.

(Plaintiffs' Exhibit P-53, Pages 1, 2, 3, 80, 81, 103, 104, and 105 received into evidence.)

BY MR. BRANIGAN:

Q. All right. Sorry about that delay, Corporal.

MR. BRANIGAN: Mr. Mayleben, can you put up Page 1 of Plaintiffs' Exhibit 53, which is now in evidence.

BY MR. BRANIGAN:

Q. So this is the first page of the Owner's Manual that was provided to you by Tesla, correct, sir?

A. Yes, sir.

Q. Right. And you made the point that this thing's 200 pages long, right?

A. Yes, sir.

Q. But if we go to Page 2, there's a Table of Contents, right?

A. Yes.

Q. And if we look at the Table of Contents on the left-hand side, we can see that there's a subheading for Autopilot, correct?

A. Yes.

Q. Right.

102

MR. BRANIGAN:  And this has been enlarged now by Mr. Mayleben for everyone's benefit.

BY MR. BRANIGAN:

Q.  And then under Autopilot there are additional subparts including one -- well, let's just go through them so we go through them all.  There's a piece that is entitled "About Autopilot."  Next is "Traffic-Aware Cruise Control."  And are you aware, Corporal Riso, that Traffic-Aware Cruise Control is the cruise control also referred to as the adaptive cruise control feature in the 2019 Model S and part of the Autopilot system?

A.  No.

Q.  Did you read that when you got this in 2000 --

A.  No.

Q.  -- '20 -- excuse me -- '19?

A.  No.  I didn't read it.

Q.  Have you read it since you've been back in Florida talking to the Plaintiffs' lawyers?

A.  No.

Q.  Then there's a section called "Autosteer," right?  Do you see that in the Table of Contents?

A.  Uh-huh.

Q.  Then we have "Autopark," "Lane Assist," "Collision Avoidance Assist," correct?

A.  Yes.

103

MR. BRANIGAN:  Let's turn to, Mr. Mayleben, Page 103 -- sorry.  Let's turn to Page 81 of Plaintiffs' 53.

BY MR. BRANIGAN:

Q.   And this is the textual portion that provides information about Autopilot, correct?  That's what we're looking at, Corporal?

A.   Yes.

Q.   And it lists the features of Autopilot right in the upper left-hand corner, correct?

A.   Yes.

Q.   And it identifies some things that we saw -- at least one thing that we saw, two things that we saw in the Table of Contents, right on Page 2, including Lane Assist, Collision Avoidance Assist, right?

A.   Yes.

Q.   And did you know that if you then went to the page that's identified as 102, in connection with Collision Avoidance Assist, you could see information about what's been referred to as automatic emergency braking?

A.   No.  I didn't know.

Q.   Okay.  Earlier today, when you were being questioned by Plaintiffs' counsel, he asked you if Mr. McCarthy told you that this vehicle had automatic emergency braking.  Remember that?

A.   Yeah.  He told me that.

Q.   Right.  Mr. McCarthy told you that?

A.   No.   No.   You said he mentioned that earlier.

Q.   I said Plaintiffs' counsel asked you if Mr. McCarthy mentioned that to you when you talked to him back in 2019.

A.   No.

Q.   Well, the Owner's Manual that Mr. McCarthy gave you provides information about Collision Avoidance Assistance at Page 102.   And if we go to what's marked in the Plaintiffs' Exhibit as Page 103 --

          MR. BRANIGAN:   Let's go there now, Mr. Mayleben, and enlarge the left-hand side, please.

BY MR. BRANIGAN:

Q.   Under the discussion of Collision Avoidance Assistance in the Autopilot section, would you read those first two subtitles that are bolded for those first two bullet points?

A.   "Forward collision warning provides visual and audible warnings in situations when the Model S detects that there's a high risk of frontal collision."   And then its says:   "See Forward Collision Warning on Page 102."

     And then:   "Automatic energy [sic] braking automatically applies braking to reduce the impact of a frontal collision. See automatic emergency braking on Page 103."

Q.   And if we just go back to the normal size of the document, this page has additional information on the right-hand side about forward collision warning, correct, sir?

A.   Yes.

Q.   And if we go to the next page, on -- again, on the right-hand side, we see even more information about -- and on the left side, both sides of the page -- more information about automatic emergency braking, correct?

A.   Yes.

Q.   So if Mr. McCarthy gave you this Owner's Manual back in 2019, when you were asking him for information, he provided you with information through the Owner's Manual about automatic emergency braking and forward collision warning, correct, in this vehicle?

A.   Yes.

Q.   By the way, sir, did you know that in 2019 at the time of this crash, this technology that's been referred to as automatic emergency braking wasn't designed to detect the side of a parked vehicle?

A.   No.

Q.   I think you also told us this morning that even though you wanted data concerning Autopilot from the vehicle itself, you didn't get any from Tesla.  Was that your testimony, sir?

A.   I didn't get what I wanted.

Q.   Well, I think you're referring to the snapshot points, and we have covered that.  I want to cover something else, though, that relates to data about Autopilot.  Do you have a copy of what's identified as Plaintiffs' Exhibit 68 up there in your binder that was provided to you by Plaintiffs' counsel?

A.   I don't know what 68 is.

Q.   Let me help you out.   It's identified as the Florida Highway Patrol Traffic Homicide Investigation Release.   That's what it says in the subject line.

A.   Investigation what?

MR. SCHREIBER:   It's Exhibit 4 to Corporal Riso's --

MR. BRANIGAN:   One second.

BY MR. BRANIGAN:

Q.   Sorry, Corporal Riso.   I got a little ahead of myself. What I really need you to look at is what's got a sticker on it that says:   "Exhibit 3."   And at the bottom it says:   "P-69." The title page itself says:   "Florida Highway Patrol Traffic Homicide Field Note Packet."   Do you have that up there with you?

A.   I have the Field Note Packet, yes.

Q.   All right.   First of all, just by way of orientation, this is a document that you prepared, correct?

A.   Yes.

Q.   In fact, we can see your name on the first page, right?

A.   Yes.

Q.   And then it was reviewed by Sergeant John Baker, right?

A.   Yes.

Q.   And this Traffic Homicide Field Note Packet is your -- part of your report based on your investigation of this crash involving the Tesla and the parked Tahoe, correct?

A.   Yes.

Q.   And it is a -- my words -- it is a very comprehensive, voluminous document.  It's over a hundred pages long, correct?

A.   Yes.

Q.   And the point that I want to address is the point that you made about not getting data concerning Autopilot from the vehicle.  I'd ask you to turn to Page 97 of your report.

A.   I have it.

Q.   You see the spreadsheet that's there?

A.   Yes, I do.

MR. BRANIGAN:  Your Honor, can we put up 90 -- excuse me -- Exhibit 69, Page 97.

THE COURT:  And the parties have agreed that that's in evidence, correct?

MR. POSES:  Yes.

THE COURT:  Sixty-nine.  Thank you.

Okay.  We can publish that for the jurors.

MR. BRANIGAN:  Actually, this -- if you could turn this so -- there we go.

BY MR. BRANIGAN:

Q.   So that is -- do you know what this is, Corporal Riso?

A.   This is data that Mr. McCarthy sent me.

Q.   Do you know where this data comes from?

A.   It came from the vehicle that was uploaded.

Q.   Do you know what this data is referred to?

108

A.   Not exactly.

Q.   If I said that data is referred to as diagnostic log data, that includes data about the functioning of the Autopilot system and its features --

A.   That, I don't know.

Q.   -- do you have any reason to disagree with me?

A.   No.

Q.   Can you tell the jury how many pages of this -- first of all, that is like an Excel spreadsheet.

         MR. BRANIGAN:  And I apologize to everyone for the quality of the image.  This is a photocopy, and that's why it's difficult to read.

BY MR. BRANIGAN:

Q.   But would you agree with me, sir, that this has many columns of data and many, many rows of data, just this single page that we're looking at?

A.   Yes.  That's correct.

Q.   And how many pages of this diagnostic log data, that includes data about the functionality of the Autopilot system, did you get from Mr. McCarthy and attach to your reports?

A.   I'd have to count them right now.

Q.   Would you do that for us, please.

A.   (Witness complies.)

     Looks like approximately 11 pages.

Q.   And each page, format-wise, looks like the page the jury is

looking at now, correct?  Each of those 11 pages?

A.  Yes.

Q.  So when I say:  "Format-wise," I mean it looks like an Excel spreadsheet filled with data on these various rows and across the various columns, correct?

A.  Yes.

Q.  Now, this was provided to you by Mr. McCarthy back in June of 2019, correct?

A.  Yes.

Q.  And did you call him up and ask him to explain any of this to you?

A.  Yes, I did.

Q.  And he did that, didn't he?

A.  Yes, he did.

Q.  Okay.  Ultimately, you prepared another report that is referred to as Plaintiffs' Exhibit 68.  And in your packet it might have an exhibit sticker that says:  "4" on it.  But it's titled "Florida Highway Patrol Traffic Homicide Investigation Release."  Do you have that with you, sir?

A.  Release?

Q.  Yes.  That's what it says.  I have a copy that I can present to you, if you don't have it.

A.  No.  No.  No.

    Okay.  Yes.

        MR. BRANIGAN:  And Your, Honor we'd like to publish

110

the first page of this.  This is Exhibit -- Plaintiffs' Exhibit 68.

THE COURT:  All right.  And the parties have agreed that this is in evidence?

MR. POSES:  Yes.

THE COURT:  All right.  Then you may certainly publish.

BY MR. BRANIGAN:

Q.  So this is another part of your investigation report, correct, sir?

A.  Yes.

Q.  Would this be like a final portion of your report, given the date, August 28, 2021, that's signed?

A.  Yes.

Q.  So this is now more than a year after you started the investigation and more than a year after you had your initial conversation with Mr. McCarthy at Tesla, correct?

A.  Yes.

Q.  And we could see -- if we go to the second page of this -- excuse me.  Forgive me -- the third page of this, there's a Table of Contents, right?

A.  Yes.

Q.  And we can see that you signed this as the investigation -- as the person who -- the officer who conducted the investigation, correct?

A.   Yes.

Q.   And you dated it August 2020, correct?

A.   Yes.

MR. POSES:  Judge --

MR. BRANIGAN:  Sorry.

MR. POSES:  Just object.  And let me talk to Mr. Branigan for one minute about this specific page.  We hadn't agreed to this page.

THE COURT:  Isn't that part of Exhibit 68?

MR. POSES:  It is a composite.  It wouldn't go in entirely.  It's page by page.

THE COURT:  Okay.  The parties just need to be very clear with regard to if there's only portions of the exhibit as opposed to the entire exhibit.

So Mr. Branigan, if you'll show Mr. Poses that page.

MR. BRANIGAN:  Sure.

(Pause in proceedings.)

MR. BRANIGAN:  Mr. Mayleben, can you take that down while we're discussing it.

Thank you.

(Pause in proceedings.)

MR. BRANIGAN:  May I proceed?

THE COURT:  You may.  Is there an agreement with regard to this exhibit?

MR. POSES:  Yes.

112

THE COURT: All right, then.

MR. BRANIGAN: Thank you, Counsel. Thank you, Your Honor.

BY MR. BRANIGAN:

Q. So this document is something that you signed back in August of 2020, correct?

A. Yes.

Q. All right.

MR. BRANIGAN: Now I'd like -- Mr. Mayleben, if you would, please, put up Page 22 of P-68.

BY MR. BRANIGAN:

Q. This is the section of your report that's referred to as the investigative report, correct?

A. Yes.

Q. And this is -- all the text that we can see here is part of a piece of the report that is about 30 pages long, correct?

A. Yes.

Q. And you wrote it, right?

A. Yes.

Q. These are your words, correct?

A. Yes.

Q. And if we zoom in on the middle of the page that says: "On May 23," we can see what you wrote about your contact with Ryan McCarthy over a year after you had that initial contact with him, correct?

A.  Yes.  I wrote this.  Yeah.

Q.  Right.  And the -- one of the last things that you said here -- excuse me -- in the second sentence, what you said is: "Mr. McCarthy has assisted with my investigation in this case and provided me with important evidence," correct?

A.  Yes.

MR. BRANIGAN:  So Your Honor, we would move for the admission of 68, Page 1, and the page that we're looking at now, which is Page 22 of 68.

MR. SCHREIBER:  It's Page 1, Page 2, Page 3, and Page 22 of Exhibit P-68.

THE COURT:  All right.  By agreement, those pages are admitted into evidence as Plaintiffs' 68.

MR. BRANIGAN:  Thank you.

(Plaintiffs' Exhibit P-68, Pages 1, 2, 3, and 22 received into evidence.)

MR. SCHREIBER:  And while we're talking about agreement, just because this wasn't previously admitted, P-69, Pages 59 to 62, 63, 77 to 78, 85 to 86, and 97 have already been identified and published and need to be received by the Court, subject to agreement.

MR. BRANIGAN:  Agreed.

THE COURT:  All right.

MR. BRANIGAN:  Thank you.

THE COURT:  By agreement, that's Exhibit 69.

(Plaintiffs' Exhibit P-69, Pages 59 through 62, 63, 77, 78, 85, 86, and 97 received into evidence.)

MR. BRANIGAN:  Mr. Mayleben, we can take this down.

BY MR. BRANIGAN:

Q.  I'm going to move to a few other topics with you, Corporal. Corporal, I've heard you say a number of times today that you were interested in getting what's been referred to as snapshot data from the Tesla, correct?

A.  Yes.

Q.  And since you have been with the Plaintiffs' lawyers, talking to them over the last many days here before coming to trial, did the Plaintiffs' lawyers show you the product of the snapshot data --

A.  No.

Q.  -- that has been referred to as an augmented video?

A.  No.

Q.  They didn't show you that?

A.  No.

Q.  That they had their expert, after they received the snapshot data, create?

A.  I have not seen it.

Q.  Let me put something up to see if you recognize this as what I'm talking about.

MR. BRANIGAN:  And this is Plaintiffs' Exhibit 47.0005.

And I just need you to blow up the photograph, please, Mr. Mayleben.

BY MR. BRANIGAN:

Q.   Have you seen this before today?

A.   No.

Q.   So you have no idea what this is?

A.   No.

Q.   Well, I will represent to you that that is a still shot from the so-called augmented video that was prepared by one of the Plaintiffs' experts, Alan Moore.

A.   Okay.

Q.   And a little while ago I asked you if you knew what adaptive cruise control is.

A.   And I didn't know what it was.

Q.   And you don't know what it is?

A.   Yes.

Q.   All right.  Well -- so if we look at this -- first of all, do you recognize that this is the intersection of Card Sound Road and County Road 905?

A.   Yes.

Q.   Do you recognize there's a stop sign on the right?

A.   Yes.

Q.   And do you recognize that there are signs visible in the distance in the photograph that are sometimes referred to as road end signs?

A.   Yes.

Q.   And you're familiar with those, correct?

A.   Yes.

Q.   And this is basically just what the scene looked like on the night of the crash before the impact, correct?

A.   Yes.

Q.   And frankly, even after the impact.  The scene wasn't changed, right?

A.   No.

Q.   Right.  And if we look toward the lower left, there's a little box.

A.   Okay.

Q.   See that little box that says:  "ACC"?

A.   Yes.

Q.   And ACC, I will represent to you -- I'd like you assume means adaptive cruise control.

A.   Okay.

Q.   And what does it say after adaptive cruise control?

A.   "Off."

Q.   "Off."  You know what off means, correct?

A.   Yes.  Uh-huh.

Q.   And then there's another entry below adaptive cruise control that says:  "Pedal 20 percent."  Do you see that?

A.   Yes.

Q.   Now, you looked at the EDR data, the event data recorder

data from Mr. McGee's 2019 Model S, correct?

A.  Yes.

Q.  And you actually went to the police in Miami Beach with the event data recorder and had the police in Miami Beach download that data so that you could have a copy of it, correct?

A.  That's correct.

Q.  And it gets printed out into a report, correct?

A.  Yes.  I printed it out.

Q.  Yes.  Do you have a copy of that with you?

A.  I believe it would be inside the Field Note Packet.

Yes.  I actually do.  Yes.

Q.  And I think we can actually put up pieces of that report so everyone can see.  And this is Defense Exhibit 29.001.

MR. BRANIGAN:  And if we could put that up now, Mr. Mayleben.

BY MR. BRANIGAN:

Q.  That looks like the first page of the Tesla EDR report that you have in your packet, correct?

A.  Hold on.  I got the wrong one.  Hold on.

MR. POSES:  Tom.

MR. BRANIGAN:  Yes?

THE WITNESS:  Yes.  That's the first page, yes.

MR. POSES:  I just want to know what you're using.

THE WITNESS:  Actually...

THE COURT:  Have the parties agreed that this is

admissible in evidence?

MR. POSES:  We have, Judge.

THE COURT:  All right.  Admitted.

MR. POSES:  Well --

MR. SCHREIBER:  In the pages identified.

MR. POSES:  In the pages -- yeah.

THE COURT:  Yes. 001.

(Defendant's Exhibit D-29.001 received into evidence.)

THE WITNESS:  Actually, this one has the wrong data on it, in the one I have in the report.  On this:  "Ignition cycle at retrieval," yours, on this first page, says:  "NA."  Mine I'm looking at says:  "544."

BY MR. BRANIGAN:

Q.  Well, we've got a vehicle identification number at the top of this report, correct?

A.  Yes.

Q.  And if you look at that vehicle identification number, it should match up with the vehicle identification number that's in the May 23, 2019 letter that you sent to Mr. McCarthy, correct?

A.  Yes.  This is the same VIN number, yes.

Q.  So this is the report that you obtained for that vehicle under that VIN, correct?

A.  Outside of the technical area here, yes.

Q.  And there's a report date, correct?

A.   Retrieval date is April 26th, 2019.

Q.   Right.

A.   And this one here says:  "May 10th, 2019."

Q.   Could be because it's been downloaded more than once, correct?

A.   Possibly, yes.

Q.   I'd like to turn your attention now to the next page, which is the page that says:  "Event data for Event 1."

MR. BRANIGAN:  Mr. Mayleben, let me show you what that looks like.  And I'll show counsel first.

BY MR. BRANIGAN:

Q.   You have the EDR download report in your field packet, right?

A.   Yes.

Q.   And I think it's identified as Page --

A.   135.

Q.   -- 139.

A.   135 is the first page of the Field Note Packet.

Q.   135, yeah.  So let's look at -- well...

A.   See, on this page it doesn't have any of the users.  On mine it has Officer Eric Dominguez.  And he put:  "Authority via search warrant."  Doesn't have this on the one you have up on my page here on the computer screen.

Q.   One second, corporal.

MR. BRANIGAN:  Your Honor, may I approach the witness?

THE COURT:  Certainly.

BY MR. BRANIGAN:

Q.  So, sir, I'm going to show you what I have here that is part of your Field Note Packet.

A.  Yes.

Q.  Are you looking at the same thing now?

A.  Yes, I am.

Q.  All right.  And is it your testimony that this is the correct download report --

A.  Yes.

Q.  -- from the download that you did?

A.  Yes.

Q.  Okay.  Very good.  So just by way of orientation to try to speed this up, I'm going to talk to you about this page --

MR. POSES:  Tom.

BY MR. BRANIGAN:

Q.  -- which is Page 135 --

MR. BRANIGAN:  Yes?

MR. POSES:  Will you please tell us the page.

MR. BRANIGAN:  Page 135.

MR. POSES:  135 of the Field Note Packet?

MR. BRANIGAN:  Yes.

MR. POSES:  Plaintiffs' 69?

MR. BRANIGAN:  Yes.

MR. POSES:  Thank you.

MR. BRANIGAN:  And 141.

THE WITNESS:  Okay.

BY MR. BRANIGAN:

Q.  Okay?  Got it?

A.  Yes.

Q.  Thank you.

Now let's just talk about something that you said a minute ago.  You pointed out correctly that the EDR has been downloaded more than once.  Downloaded is a way of extracting the data from the EDR.  You noticed that in some of the documentation that you're looking at, correct, because it has different download dates?

A.  There are two different dates, yes.

Q.  And I take it you know from all of your experience in dealing with EDRs that downloading the EDR more than once is not an uncommon event, correct?

A.  No.  No.

Q.  No, it's not or --

A.  It's not.  I mean, it can be done more than once.

Q.  Right.  And unless something really unusual happens, a second or even a third download doesn't change the data inside the event data recorder.  Fair?

A.  It should not.

Q.  Correct.  So we're looking now at the report from the download that you did with the assistance of another police

122

officer in Miami Beach?

A.   Correct.

          MR. BRANIGAN:  And Mr. Mayleben, that will be Page 135 of Plaintiffs' Exhibit 69.  Can you put that up, please.

          And can you enlarge that, Mr. Mayleben.

BY MR. BRANIGAN:

Q.   All right.  So we know now, looking at this, that we've got the right report.  And it references the VIN number for Mr. McGee's Model S, correct?

A.   Yes.

Q.   And you know from -- just a little bit of background for everybody here about EDR -- as you know, from your experience in dealing with EDRs, that in this time frame, 2019, the event data recorder in a motor vehicle in the United States was required to capture five -- what we call five seconds of pre-crash data, correct?

A.   Yes.  But in some vehicles it could be a little bit longer.

Q.   Right.  But I said "required" because there's a federal regulation that says -- to the motor vehicle manufacturers in this time frame --

A.   Yes.

Q.   -- if you're going to put an EDR in a vehicle, it must record at least five seconds of pre-crash data?

A.   That's correct.

Q.   Right.  So when we're talking about pre-crash data, what

123

we're talking about is, in this particular EDR, vehicle speed five seconds before time zero.  And time zero is the crash, correct?

A.  Yes.

Q.  And --

A.  Yeah.  Impact.

Q.  Yes.  And the other data point that is recorded, if the recorder is working, is brake data, whether the driver is applying the service brake with his or her foot, correct?

A.  Yes.

Q.  The other data point that is recorded is the percentage of the accelerator pedal depression or percentage of throttle applied, correct?

A.  Yes.

Q.  The other data point that is collected relates to steering, correct?

A.  Steering wheel angle, yes.

Q.  Yes.  So we know if the driver, within five seconds of the impact, turned the steering wheel one way or the other, correct?

A.  He -- it was pretty straight, right until about a half second before.

Q.  Yeah.  I'm sorry.  I didn't mean specifically concerning Mr. McGee.  I mean in general the data will tell us whether the driver turned right or left in that five-second time period

124

before impact?

A. It will tell the angle, yes.

Q. Yes. So now if we go to --

MR. BRANIGAN: If we go to Page 141 in Exhibit 69, Mr. Mayleben.

BY MR. BRANIGAN:

Q. Now we can see the table of data that's in the report from your download of the EDR in Mr. McGee's Model S that shows the data that we've been talking about generally, correct?

A. Well, just remember about this download, I didn't perform it.

Q. Yeah.

A. Yeah. It was Officer Eric Dominguez, but I was present.

Q. And he did it at your request?

A. Yes.

Q. Yes. So thank you for that clarification, Corporal.

So what we're seeing now is the actual data that's been extracted from the event data recorder for the five seconds pre-crash for vehicle speed, right?

A. Yes.

Q. Accelerator pedal percentage, correct?

A. Yes.

Q. The RPM of the motor, correct?

A. Yes.

Q. Whether the service brake -- which is the brake that is

applied by the driver's foot by pressing the pedal, correct?

A.   Yes.

Q.   Whether it's off or on, correct?

A.   Yes.

Q.   We can see the steering wheel angle in degrees, correct?

A.   Yes.

Q.   We can see whether the vehicle's electronic stability control system is on or off, right?

A.   Yes.

Q.   Moving along from left to right on this.  And then, finally, all the way to the right, we can see if the antilock braking system activity is registered as either on or off, correct?

A.   Yes.

Q.   All right.  With that background, I want to focus our attention on the speed of Mr. McGee's Model S in the five seconds before the crash.

A.   Okay.

Q.   With me?

A.   Yes.

Q.   Okay.  Now, this particular data set records the speed in KPH, kilometers per hour?

A.   Yes.

Q.   But you did a conversion in your work --

A.   Yes.

Q.   -- to convert KPH into miles per hour, correct?

A.   Yes, I did.

Q.   And you know from doing that work that 97 kilometers per hour is converted into approximately 60 miles per hour, correct?

A.   Give or take, yes.

Q.   Yes.  And so that -- we can see that five seconds before the crash Mr. McGee was going about 60 miles an hour, correct?

A.   Yes.

Q.   And you know from your investigation of this matter that in the approximately one-mile stretch of Card Sound Road heading east toward the intersection the speed limit was 45 miles an hour, correct?

A.   Yes.

Q.   Now, back in the time frame, and even today, the posted speed limit in Florida is not a suggestion, right?

A.   No.  It's not a suggestion.

Q.   It's the law, right?

A.   Only time it's a suggestion is when the sign is yellow.

Q.   That wasn't the case for Mr. McGee, correct?

A.   No.

Q.   So five seconds before the crash, Mr. McGee was speeding and exceeding the posted speed limit by at least 15 miles an hour, correct?

A.   Yes.  Correct.

Q.   And then we can see at each second after the beginning here, five seconds -- it's actually a half second -- four and a half, four, three, all the way down to time zero, which is the speed at impact, we can see what his speed at impact was as recorded by the event data recorder in his vehicle, correct?

A.   Yes.

Q.   And his speed at impact was registered as 84 KPH, correct?

A.   Yes.

Q.   Which converts -- you know from the math you did, the conversion work -- into about 52 miles an hour, right?

A.   Okay.   Yes.   Yes.

Q.   And we can then move to the next column to the right, and we can see the accelerator pedal percentage, correct?

A.   Yes.

Q.   And we can see that all the way from five seconds pre-crash to one second pre-crash he was applying his foot to the accelerator and causing the accelerator pedal percentage or percentage of throttle to be 20 percent, correct?

A.   Yes.

Q.   And if you remember that screenshot that we looked at a few minutes ago from the augmented video, it also said that his foot was on the accelerator and depressing it to 20 percent throttle, correct?

A.   Yes.

Q.   And then, finally, we can look at service brake and we can

see that the event data recorder is indicating that Mr. McGee was not applying the brake at five seconds, or four seconds, and not until a half second before the collision, correct?

A.   Correct.

Q.   Now, even if a driver in 2019 was driving their vehicle with cruise control on, they still had a responsibility under Florida law to obey the traffic control devices on a road, right?

A.   Correct.

Q.   And that would mean, specifically here for Mr. McGee, he had a legal responsibility to -- even though he had cruise control on -- to observe what was in front of him, including an overhead stoplight, flashing red light, or a stop sign at an intersection, and to bring his vehicle to a complete stop at the stop sign for that intersection, correct?

A.   Yes.  Correct.

Q.   It doesn't matter whether he had cruise control on, or Autopilot on, or not, that was his legal responsibility, correct, sir?

A.   That's correct.

        MR. BRANIGAN:  We can take that down now, Mr. Mayleben.

        Thank you.

BY MR. BRANIGAN:

Q.   Mr. -- forgive me.  Corporal.  I don't mean any disrespect,

129

sir.  I'm sorry.  Corporal Riso.

A.  Riso.

Q.  Riso.  I'm sorry, sir.

You started with the Florida Highway Patrol in 2011?

A.  2001.

Q.  2001.  Sorry.

So at the time of this crash, you had been investigating crashes for like 20 years as a highway patrol officer, correct?

A.  Pretty much, yes.

Q.  And I take it that over that 20-year span you've investigated hundreds, if not maybe more than a thousand, motor vehicle crashes, and maybe I'm lowballing it -- and I don't mean to underestimate your -- so you correct -- why don't you tell me.

A.  It's in the thousands.

Q.  Thousands?

A.  Yes.

Q.  I take it that, based on your experience investigating thousands of motor vehicle crashes, you wouldn't disagree with me if I said that around the time of this crash in April of 2019 about 30 percent of motor vehicle crashes occurred because of driver distraction?

A.  I don't know the percentage, but a lot of it's occurred from that, yes.

Q.  And I take it that you also wouldn't disagree with me if I

130

said in the same time frame that the risk of a motor vehicle crash is increased exponentially by about 700 percent when a driver reaches for a dropped object, like a cell phone?

MR. POSES:  Judge, we object.  This calls for opinion.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  I don't know the percentage, Mr. Branigan.  I don't.  But it does distract them and take away from their vision of the road.

BY MR. BRANIGAN:

Q.  And it does increase the risk of a motor vehicle crash substantially, doesn't it, that reaching for an object while the driver is supposed to be driving?

A.  It would increase the possibilities, yes.

Q.  All right.  I want to just cover a few more points about this road with you, if you would bear with me.

MR. BRANIGAN:  Mr. Mayleben, can you put up Exhibit D-526a.  And before you put it up, let me show it to counsel.

(Pause in proceedings.)

MR. BRANIGAN:  Thank you, Counsel.

Your Honor, I have advised counsel that...

(Pause in proceedings.)

MR. BRANIGAN:  Your Honor, with counsel's agreement, we'd like to present Defense Exhibit D-526a.

THE COURT:  All right.  In its entirety?

MR. BRANIGAN:  Yeah.

And Mr. Mayleben, before you put it up let me just --

THE COURT:  Hold on.  Is there an agreement that that is admissible and should be admitted into evidence, Mr. Poses?

MR. POSES:  No objection.

THE COURT:  All right, then.

MR. BRANIGAN:  All right.

THE COURT:  In evidence.  You may publish.

MR. BRANIGAN:  Thank you.

(Defendant's Exhibit D-526a received into evidence.)

(Pause in proceedings.)

BY MR. BRANIGAN:

Q.  All right.  Do you recognize what we're looking at here, sir?

A.  It's an aerial view of the intersection of the crash.

Q.  Right.  And it's as if we're in a drone, or a plane, or at least in the air with a bird's-eye view, looking from east to west now towards Card Sound Road, correct?

A.  Yes.

Q.  So Card Sound Road is eventually going to intersect with County Road 905, which is at the bottom of the photograph, correct?

A.  Yes.

Q.  All right.  And Card Sound Road, for those who may not be familiar with it, is a road that runs east and west.  And it's a two-lane road, right?

A.   Yes.  Yes.

Q.   And County Road 905 is another two-lane road that runs north and south, right?

A.   Yes.

Q.   At least in the area of interest here shown on the photograph, correct?

A.   Correct.

Q.   All right.

        MR. BRANIGAN:  Now, let's put up D-526b, please, Mr. Mayleben.

BY MR. BRANIGAN:

Q.   And I'll let you know, Mr. -- forgive me -- Corporal.  I apologize to you, sir -- Corporal, that this is a rendering that was made by one of our experts just to give a clear shot of what the intersection looks like, the intersection of Card Sound Road and County Road 905.  Does that look correct to you, sir?

A.   Yes.

Q.   So again, we can see here -- and this is depicted in the daylight.  We can see the -- a couple of the traffic control devices that control the eastbound lane of Card Sound Road at the intersection, correct?

A.   Yes.

Q.   And we've got an overhead red flashing light that you can see in the upper part of the photograph above the trees,

133

correct?

A.   Yes.

Q.   That's hanging down there.  We can see the stop sign, correct?

A.   Yes.

Q.   And then on the pavement itself, we can see that the word "Stop" is on the pavement, right?

A.   Yes.

Q.   And we can also see that ahead of "stop," beyond "stop", before you enter County Road 905, we can see a white stop bar, correct, on the pavement?

A.   Yes.  Correct.

Q.   Is that accurate nomenclature for me to refer to that as a stop bar?

A.   Stop bar.  Yes.

Q.   So those are there to alert the driver that they're required under Florida law to stop -- to bring their vehicle to a complete stop at this intersection, correct?

A.   Yes.

Q.   Right.  Now let's take a look at -- by the way, I know this is depicted in daytime in 526b, but this is what the scene looked like at this intersection at the time of the crash on April 25th, 2019, correct?

A.   Yes.

Q.   Now, let's look at Exhibit D-12.

MR. BRANIGAN:  Mr. Mayleben, can you pull that up, please.  D, hyphen or dash, 12.

Right here.

MR. SCHREIBER:  There's 102 photographs identified in D-12.  Which one?

MR. BRANIGAN:  .0020, 20.

MR. SCHREIBER:  Got it.

THE COURT:  Are you seeking to admit them piecemeal?

MR. BRANIGAN:  Yes, Your Honor.

THE COURT:  Then D-12, is there any objection to 0020?

MR. POSES:  No.

THE COURT:  All right.  Admitted into evidence.

(Defendant's Exhibit D-12.0020 received into evidence.)

BY MR. BRANIGAN:

Q.  So you know that your colleagues who are out responding to this crash from the Florida Highway Patrol, and Deputy Torres from the McComb -- excuse me -- the Monroe County Sheriff's Department, they photographed the scene, correct?

A.  Yes.

Q.  And they took literally hundreds of photographs of the scene at night after the crash was over, correct?

A.  Yes.

Q.  And as part of your investigation, you analyzed some, if not all, of those photographs, correct?

135

A. Yes.

Q. And you recognize what we see here in this photograph?

A. Yes.

Q. And what we can see is, in darkness now, what we were looking at a few minutes ago, the same intersection, correct?

A. Yes.

Q. And I want to draw your attention to the red dot that we see in the upper part of the photograph. You see that?

A. Yes.

Q. That's the overhead red flashing light that is there to alert a driver heading eastbound on Card Sound Road -- which would be Mr. McGee in this case -- that there's an intersection and you need to stop for it, come to a complete stop, correct?

A. Yes.

Q. Right. And this is Card Sound Road. The pavement that we're looking at is the eastbound lane of Card Sound Road and a portion of the westbound lane separated by the double yellow line, correct?

A. Yes.

Q. And you actually determined how far away one could be and be able to see that red flashing light, didn't you, sir -- Corporal?

A. Yes, I did.

Q. And you and I talked about that in the deposition that we had together in January of 2022. And my recollection is that

you told me then that the overhead red flashing light was visible to a driver coming from the west heading east four-tenths of a mile west of the intersection with County Road 905; is that right?

A.   Correct.

Q.   And if we convert four-tenths of a mile into feet, that would be about 2,100 feet?

A.   I -- four-tenths, you said, right?

Q.   Yes, sir.

A.   Probably about 2,100, yes.

Q.   So if you're driving like Mr. McGee, and you're paying attention, and you're looking through the windshield and paying attention, and you're driving on eastbound Card Sound Road towards County Road 905, you should be able to see that red flashing light 2,000 -- approximately 2,100 feet before you get to it, right?

A.   Correct.

Q.   Now, there's another traffic control device for the eastbound lane of Card Sound Road that was out there on the night of the crash, and I'm not talking about the stop sign or the red flashing light.  I'm talking about what you called in the deposition that we had a yellow diamond sign.

     And I'm going to show you a photograph of that.  And that's Plaintiffs' Exhibit P-05.  And this is a still shot that we made from P-05, which is actually a video from -- the video was

actually from Mr. McGee's car.

MR. BRANIGAN:  Could we put that up, Mr. Mayleben.

BY MR. BRANIGAN:

Q.  So do you see that diamond yellow sign there?

A.  Yes.

Q.  That actually says:  "Stop sign ahead," if we could actually read it, if it was a clear image, correct?

A.  Yes.

Q.  So that's alerting the driver that there's a stop sign ahead that he needs to stop for well before they get to the stop sign, correct?

A.  It's before it, but it's -- yes, it's before the stop sign.

MR. BRANIGAN:  Final photograph, Mr. Mayleben, is --

MR. SCHREIBER:  So Counsel, is that separately marked from P-5 or are we just moving all of P-5 in and we'll call that P-5a?

MR. BRANIGAN:  I'm happy to separately mark it.  Right now, because it's a Plaintiffs' exhibit, I just referred to it as P-5, but I'm happy to refer to it as P-5a.

MR. SCHREIBER:  That will be P-5a.  And then we'll have an agreement that P-5 is also going to be admitted.

MR. BRANIGAN:  No objection.

THE COURT:  All Right.  So P-5, in its entirety, admitted into evidence.

MR. SCHREIBER:  Thank you, Your Honor.

(Plaintiffs' Exhibit P-5 received into evidence.)

MR. BRANIGAN:  This next photograph comes from P-5. So for identification purposes, I propose we call it P-5b, as in boy.

Mr. Mayleben, can we put that up, please.

BY MR. BRANIGAN:

Q.  This, again, was taken from the video on Mr. McGee's Model S as he was traveling towards the intersection.

A.  Uh-huh.

Q.  And this shows us the end of road signs, correct?

A.  Yes, it does.

Q.  Now, these end of road signs, they're yellow and one of them is taller than the other four, and that one has sort of a multi-pointed arrow on it, correct?

A.  Yes.

Q.  And the purpose of that sign is to tell the driver that when you're at the stop sign for this intersection you can either turn right or left.  You can't keep going straight because your road has ended, correct?

A.  Yes.

Q.  And these signs, when a headlight shines on them in the dark, they are reflective so they can be seen to the driver, correct?

A.  Yes.

Q.  And that's why we can see them now in this photograph that

was taken in the dark, correct?

A.  Well, this was part of that video, correct?

Q.  Yes.

A.  The video.  Yeah, you can see them.

Q.  Yes.  Yes.

All right.  New topic, sir.  I know you didn't talk to Mr. McGee.  He wasn't at the scene when you got to the scene, correct?

A.  No.

Q.  But you did listen and watch the video that was recorded on Officer Torres's body cam, correct?

A.  Yes.

Q.  You did that as part of your investigation in the case, correct?

A.  Yes.

Q.  And you did that back in April or May of 2019, correct?

A.  Yes.

Q.  Have you done it again since then, since you have been back here and talking to the Plaintiffs' lawyers?

A.  No.

Q.  You know from watching that video that Mr. McGee made some statements that during our deposition you called spontaneous statements.  You remember that?

A.  Yes.

Q.  So when you say:  "Spontaneous statements," you're

140

conveying to us that he wasn't being questioned.  He

volunteered the information, correct?

A.   That is correct.

Q.   All right.

        MR. BRANIGAN:  Mr. Mayleben, I'd like to put up --

play Defense Exhibit D-16, which is D-16-A from the body-cam

video.

        (Video played, no sound.)

BY MR. BRANIGAN:

Q.   Now, let's just pause it there for a moment.  Couple

things.  First, there's a little bit of a delay the way the

system in the courtroom syncs up.  So the sound may not come on

right away, but it will come on.  But the first thing I want to

do is just ask you, sir, if you would orient us to what we're

looking at here.  And let me see if I can ask a question to get

to it.  What we're looking at -- tell me if I'm right or

wrong -- is the inside of -- is it Deputy Torres or Corporal

Torres?

A.   Deputy.

Q.   -- Deputy Torres' scout car before he gets out, right?

A.   His patrol car.

Q.   His patrol car.  So his body cam is running.  He is on the

scene.  And before he gets out, there's a little bit of footage

that's recorded from inside his patrol car, correct?

A.   Yes.

141

Q.  All right.

MR. BRANIGAN:  Mr. Mayleben, let's run this now.  And I'm going to tell you to stop in a moment, but let's run it.

(Video played, no sound.)

MR. BRANIGAN:  Are we going to get the sound?

(Video:)

"UNKNOWN FEMALE:  You need me to move my car?"

(End of video.)

BY MR. BRANIGAN:

Q.  So Deputy Torres is running towards the area where the Tahoe was parked but eventually hit, correct?

A.  It looks like he's running toward an open area.

MR. BRANIGAN:  Let's play a little bit more video for Corporal Riso.

(Video played, no sound.)

THE WITNESS:  Okay.  I see the Tahoe.

BY MR. BRANIGAN:

Q.  If we stop here, we can actually see Mr. Angulo on the ground, correct?

A.  Yes.

Q.  And we can see some -- at least one other gentleman behind him, correct?

A.  Yes.

Q.  Do you recognize who that gentleman is?

A.  I believe that's Mr. McGee.

Q. And of course Mr. McGee was the driver of the 2019 Model S?

A. Yes.

Q. Right?

A. Yes.

Q. Right. Let's roll this video, please.

(Video played, no sound.)

MR. BRANIGAN: I think you're going to have to pull it back so we get the sound.

(Video:)

"UNKNOWN FEMALE: You need me to move my car?

"UNKNOWN OFFICER: Is that your car?

"UNKNOWN FEMALE: I can move my car. I just don't want to leave him here by himself.

"UNKNOWN OFFICER: Who else is involved?

"UNKNOWN FEMALE: From what I understand, just them. He was driving that car, and he was here.

"GEORGE MCGEE: I was driving. I dropped my phone and looked down, and I ran a stop sign and hit the guy's car."

"UNKNOWN OFFICER: Sir, which car are you driving?

"GEORGE MCGEE: This car, the Tesla right there."

(End of video.)

BY MR. BRANIGAN:

Q. So that gentleman talking, that's Mr. McGee, correct?

A. Yes.

Q. No doubt about it, right?

A.   Yes.

Q.   And in fact, while he's talking to Deputy Torres, he's still on his cell phone, right?

A.   Yes.

Q.   Do you know who he was talking to at that point?

A.   I thought he was talking to 911.

Q.   All right.

     MR. BRANIGAN:  Let's continue running this clip.

     All right.  Then let's play Defense Exhibit D-16-B, please.

     (Video:)

     "UNKNOWN SPEAKER:  Are you okay?

     "GEORGE MCGEE:  Yes, sir.  I was heading to Ocean Reef, and I --

     "UNKNOWN SPEAKER:  Okay.  What happened?

     "GEORGE MCGEE:  I dropped my phone.  I was trying to call.  We're flying out for a funeral tomorrow morning, and I was trying to call to get my wife's stuff ready at the airline.  And I looked down and ran right through here, and I hit the guy's car.

     "UNKNOWN SPEAKER:  You hit this car?

     "GEORGE MCGEE:  Yeah.  I slammed on my brakes when I saw it."

     (End of video.)

BY MR. BRANIGAN:

Q.  All right.  Again, that's Mr. McGee talking, talking about what happened, correct?

A.  Yes.

Q.  In his mind, correct?

A.  Yes.

Q.  All right.

MR. BRANIGAN:  Let's go to the next clip.

(Video:)

"UNKNOWN SPEAKER:  Was anyone else in that vehicle with this guy?

"UNKNOWN SPEAKER:  No.  Just him.

"UNKNOWN SPEAKER:  Engine 26, you en route?

"UNKNOWN SPEAKER:  Hey, can you look at me?  Look at me.

"UNKNOWN SPEAKER:  You guys got any suction?

"UNKNOWN FEMALE:  (inaudible) in the car too?

"GEORGE MCGEE:  Yes, ma'am.  I (inaudible) dropped my phone.  I reached down (inaudible).

"UNKNOWN SPEAKER:  Okay.  Guys, does he have a gag reflex?

"UNKNOWN SPEAKER:  Yeah.  I got a gag reflex.

(End of video.)

MR. BRANIGAN:  Let's play the next clip of D-16, please.  I think that will be D -- D-16.

(Video:)

"UNKNOWN OFFICER:  Boss, how much have you had to drink tonight?"

(End of video.)

MR. BRANIGAN:  Stop, please.

BY MR. BRANIGAN:

Q.  Now we see Mr. McGee again, and he's still talking to Deputy Torres, correct?

A.  Yes.

Q.  He's the gentleman with the open shirt, correct?

A.  Yes.

Q.  All right.

MR. BRANIGAN:  Let's roll that, please.

(Video:)

"GEORGE MCGEE:  -- I just left my office in Boca.  I'm a hundred percent sure.

"No.  It was actually because I was driving on -- I looked down.  And I had been using the cruise control and I looked down.  I didn't realize (inaudible) and I sat up.  The minute I sat up, I hit the brakes and saw his truck."

(End of video.)

MR. BRANIGAN:  And then let's run the final clip, please, Mr. Mayleben.

(Video:)

"UNKNOWN OFFICER:  Did you stop at the stop sign?

146

"GEORGE MCGEE:  No, I didn't, sir, I don't think.  I honestly don't know.  I looked down.  I didn't know how close I was to the intersection.  And I was driving on cruise, going for -- and I looked down and -- to get the phone I dropped.  I was on with the airline for my wife for tomorrow's funeral I'm going to, and I reached down.  I didn't see it.  And when I popped up and looked, I saw a black truck.  It just happened so fast."

(End of video.)

BY MR. BRANIGAN:

Q.  Did you hear Mr. McGee say to the officer that he did not know how far away he was from the intersection?

A.  Yes.

Q.  As a driver of a motor vehicle in the state of Florida in 2019, it's the driver's responsibility to know how far they are from an intersection that has a stop sign.  Would you agree, Officer?

A.  Yes.

Q.  You listened to these clips that we just played now today in the courtroom, and you have listened to them probably many times before today as part of the investigation, correct?

A.  Yes.

Q.  I'm sorry.  Did you say yes?

A.  Yes.  Yes.  Uh-huh.

Q.  Did you hear Mr. McGee say ever on that body-cam that you

have listened to here in the courtroom, that you listened to before now, that he thought the crash happened because his brakes weren't working?

A. No.

Q. Or he thought his cruise control was going to stop the car automatically and that didn't happen?

A. No.

Q. Or because some other malfunction occurred in his vehicle that prevented him from applying the brakes or controlling the vehicle?

A. No.

Q. If he had said anything like those things that I just said, would you have put a note about those statements from Mr. McGee in your reports?

A. Yes.

Q. Based on your -- the fact that you wrote the reports, and you have read them over the last few days to prepare for today, did you find any indication in your report that he said anything like that and you documented it?

A. Like I said, I wrote it years ago, and I had never heard it then.

Q. Now, I know you weren't on the scene, but you talked to your fellow officers for information that could go into your report, correct?

A. Yes.

Q.  So in the course of gathering all the information that you gathered that gets put into the report, you didn't learn from any source that Mr. McGee said:  "Hey" -- right at the scene or even after:  "Man, I thought my car was going to stop by itself to prevent this, and that didn't happen."  Because if you would have heard that, you would have put that in your report, wouldn't you, Corporal?

A.  Yes, I would have.

Q.  And it's not in your report, is it?

A.  No.

MR. BRANIGAN:  Give me one moment, sir.

(Pause in proceedings.)

MR. BRANIGAN:  Corporal, I've taken a lot of your day. I appreciate your time.  I don't have any other questions for you right now.

THE COURT:  All right.  Any redirect?

MR. BRANIGAN:  Have a safe trip back to Italy.  Thank you, sir.

MR. POSES:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. POSES:

Q.  Officer Riso, good afternoon.

A.  Yes.  Yes, sir.

Q.  Mr. Branigan spent a lot of time with you about the facts of this case.  But during our direct examination was any of

149

that in dispute?

A.   No.

Q.   The speed of the car, the pedal compression, what Mr. McGee did, is there any dispute from even Mr. McGee about the specifics of what happened in this accident?

A.   No.

Q.   Why we brought you here is because what is in dispute.  And I want to go back to the Autopilot computer that you brought to Tesla back in June 2019.  Do you recall that?

A.   Yes.

Q.   All right.  You watched and put this in the exemplar vehicle?

A.   Yes.

Q.   And the data was corrupted?

A.   That's what they told me.

Q.   Do you know who corrupted it?

A.   Don't know.

Q.   Do you know why it was corrupted?

A.   No.

Q.   Do you know how?

A.   Excuse me?

Q.   Do you know how it was corrupted?

A.   No.

Q.   Do you know if anyone directed its corruption?

A.   No.

Q.   When Mr. Calafell testified that you did not bring that computer, we went over your notes specifically showing that you actually checked it out of evidence, and you have an independent recollection of bringing it there and describing the very area where this happened, didn't you?

A.   Yes.

Q.   And you then checked it back into evidence after you received the thumb drive that you brought, and you yourself were able to confirm that the data itself was corrupted; is that right?

A.   Yes.  I couldn't open it.

Q.   Okay.  Mr. Branigan spent time talking about all this evidence that Tesla afforded you, that they sent to you after you had requested what you did.  Was any of it the snapshot data that you were requesting?

A.   No.

Q.   Was any of it related to the augmented video that would have shown you what the car was seeing, and processing, and understanding, and either doing or not doing when the accident happened?

A.   No.

Q.   Why did you want it?

A.   Because I heard it would have it or should have it.

Q.   And again, you would have included that in your report?

A.   Yes, I would have.

Q.   And so there's no dispute about what Mr. McGee did, even by Mr. McGee.  But the issue that we're here to talk about is what the Autopilot did, and that is what you were seeking when you issued your search warrant, and you spoke to Mr. McCarthy and you wrote to Mr. McCarthy, and you went to Tesla and brought the equipment that you needed?

A.   Yes.

Q.   And they told you:  "I'm sorry.  This is all we got"?

A.   That's correct.

Q.   Mr. McCarthy -- or Mr. Branigan suggested that Mr. McCarthy was cooperative in your investigation.  And in your deposition in 2022, January, you testified at that time that you thought that he was; is that right?

A.   Yes.

Q.   If the data from the scene of the accident actually streamed from the car, and was at Tesla that same night, and they didn't give it to you, the very information you were seeking per your search warrant, and what you were after all along, you think that's cooperative?

A.   No.

Q.   If you take the Autopilot computer, and you bring it to Tesla, and Tesla says:  "Go to this guy and he'll take care of it for you," and that guy's never done it before and you get corrupted data, is that cooperative?

A.   No.

Q.   You testified earlier that if you knew that the person had never done this before that you would have never let him do it; is that right?

A.   Correct.

Q.   If you knew then that the data that you were seeking actually was on that computer, it was in it, and it was corrupted during the process in which Mr. Calafell was involved in, do you think that Tesla was being cooperative to provide it to you?

A.   No.

Q.   I understand that back in January 2022 there were a lot of things that you didn't know.  There were a lot of things that we didn't know.  And so understanding that, back in 2022, you did believe that they were being cooperative; is that fair?

A.   Yes.

Q.   And you don't believe that now?

         MR. BRANIGAN:  Objection.  Leading.

         THE COURT:  Sustained.

BY MR. POSES:

Q.   Do you believe that Tesla was cooperative during your investigation?

A.   At this time, no.

Q.   Mr. Branigan showed you the time when -- which you spoke to Mr. McCarthy, and that he, on May 23rd, provided you some guidance as to the -- you know, what was in the Owner's Manual.

153

And you wrote some of that down, didn't you?

A.   Yes.

Q.   Okay.

MR. POSES:  Can we pull that up.  That is 22, Plaintiffs' 69.

MR. BRANIGAN:  It's Page 22 of 69.

THE COURT:  Okay.  So it's Exhibit 69, Page 22?

MR. POSES:  That's right.

THE COURT:  All right.

MR. POSES:  Judge, may I have a moment?

THE COURT:  Certainly.

MR. BRANIGAN:  Oh.  I'm sorry.  I know what you're referring to.  Different exhibit, Counsel.  Here, I have it.

MR. POSES:  Thank you.

MR. BRANIGAN:  So you're talking about Exhibit 68.

MR. POSES:  Sixty-eight, Page 22.

I apologize.  Plaintiffs' 68, Page 22.

BY MR. POSES:

Q.   Mr. McCarthy, on May 23rd, told you that the Autosteer should only be used on divided highways and limited access road.  Do you remember that?

A.   Yes.

Q.   You put it in your report.

A.   Yes.

Q.   Did you know at the time that two years prior the NTSB told

Tesla the safety recommendation that people shouldn't use it on roads just like Card Sound Road?

MR. BRANIGAN:  Your Honor, objection.  Reference to the recommendation that the Court has already ordered is excluded.

THE COURT:  Mr. Poses, is this the distinction that we spoke about?

MR. SCHREIBER:  Yes, Your Honor.

MR. BRANIGAN:  Your Honor, I disagree.  What was referenced is the recommendation.  And your order --

THE COURT:  All right.  Hold on.  Hold on.  Let's do this outside the presence of the jury.  Let me see what you're referring to.  Come on forward.

MR. BRANIGAN:  Do you want us to come up, Your Honor?

THE COURT:  Yes.  Come sidebar, please.

(At sidebar on the record.)

THE COURT:  Hold on.  If you'll just each use a microphone.

I need somebody from Plaintiffs' team.

Okay.  If each of you will have a microphone.

Give one to Mr. Schreiber.

Okay.  All right.  You just referenced an NTSB recommendation.

MR. BRANIGAN:  Correct.

THE COURT:  And the Court specifically stated that the

reports and recommendations are not admissible.  So why is this not a backdoor way of introducing it?

(Court reporter interruption.)

MR. SMITH:  You have to introduce yourself.

MR. SCHREIBER:  I'm sorry.  Brett Schreiber.

The board recommendation, the board report, which is -- the Court has ruled is inadmissible, is a separate entity from the host of recommendations, which was Exhibit 79 and 81, that are separate official communications from the NTSB to all of the various OEMs, and this is what I was describing.  What the Court ruled, and what the NTSB regulations relate to, is the board report.

Now, I think the regulations also speak to only utilizing or excluding the board report in that particular case.  In other words, you don't want the NTSB's probable cause recommendations coming in in the Brown case any more than you want Officer Riso's conclusion about the cause of the crash, or any officer coming in and offering their opinion as to the cause of the crash to invade the province of the jury.

But separate and apart, these recommendations exist -- these are official communications from the NTSB.  These aren't of the board.  They are the official communications of the NTSB to all of these entities.  And all of these official communications, which are --

THE COURT:  Right.  But those communications contain

the board's recommendations.

MR. SCHREIBER:  The board's probable cause determination is one thing.  But the safety recommendations live outside of just the board report.  The board report is what the Court ruled, which is Exhibit 77, that would be excluded.  And we understand that.

Now again, what I was describing previously, you have the investigation, the who, the what, the when, the where, which I think these reports have really grown into kind of hybrid entities because they have their probable cause determination at the end.  But recall these safety recommendations, while they start from the Brown case, which we understand is admissible as another similar incident -- that these safety recommendations are going to be separately admissible as information communicated by the NTSB to all of the OEMs, including Tesla, about the need to geofence this technology and the need to improve driver monitoring.

THE COURT:  All right.  Response?

MR. SMITH:  Your Honor, this is Joel Smith.

I think you have absolutely identified this as a backdoor trip.  And Your Honor, the only thing -- the only clear way to look at this is look at the report.  And just in the Table of Contents -- I'm trying not to shuffle paper for the court reporter.

But just in the Table of Contents look what it

provides.  This is the factual information, and there's a section there.  Then there's analysis, conclusions, and recommendations, which is what the Court, on Page 12 of your order, excluded.

Now let's turn to Page 43 of this same document.  And when you turn to Page 43, we get to the recommendation section.  And the recommendation section says:  "As a result of its investigation."  This is -- these are the recommendations from the investigation.  "The National Transportation Safety Board makes the following new safety recommendations as a result of the investigation."

If you go down here, you'll see 81741 is one of them and 81742 is another.  These are the two documents, 41 and 42, that the Plaintiff is using to -- these are the recommendations from the report.

And -- and Your Honor, he says this is a -- these are communications to other manufacturers.  But look at what the recommendation says right here:  "To manufactures of vehicles equipped with L2 vehicle automation systems," VW, BMW, Nissan, Mercedes, Tesla.  This is this right here.  And just because it exists on another piece of paper doesn't make it outside of the Court's order.  And that's the point we've been making.

THE COURT:  Okay.  All right.

MR. SCHREIBER:  I think it precisely does make it outside of the Court's order because, again, the Court's ruling

relative to the NTSB report is that they don't want the NTSB reports to be introduced in a civil case, particularly the Brown case, or the Banner case, or any other, and invade the province of the jury.  It's set forth in the regulations that talk about the admissibility or inadmissibility of those reports.  It's specific to those cases.

And I understand why those recommendations and probable cause determinations should be kept out.  But these -- they made a series of recommendations.  They make recommendations to NHTSA.  They make recommendations to all of these various entities about how to improve Level 2 autonomous safety.  And there was nothing about this Court's ruling in that regard that I believe sanitized this trial from the reality of the fact that these recommendations were perpetually put forward, re-communicated, and the only manufacturer in the world to not respond to them was Tesla.

THE COURT:  Okay.  The Court's order is clear, and nothing that has been presented is going to change it, Mr. Schreiber.  You have referred to a recommendation.  And the only -- only matter that is admissible is the NTSB investigator's factual accident reports, and you're precluded from using those reports and recommendations.  So to the extent that you embodied that Report and Recommendation in your question, the objection is sustained.

Let's continue.

(End of discussion at sidebar.)

THE COURT:  All right.  Let's continue with the redirect, please.

BY MR. POSES:

Q.  Corporal, a couple more questions.  In that portion of the Field Note Packet that Mr. Branigan referenced where Mr. McCarthy assisted in your investigation and provided you important information, do you still believe that?

A.  No.

Q.  When you wrote the letter to him -- let me back up for a second.  You had talked to Mr. McCarthy about issuing a subpoena, correct?

A.  Yes.

Q.  And the subpoena, I assume, would have been the same information that you were seeking when you issued your search warrant that was signed by Judge Glick, who --

A.  Yes.  And he told me I did not need one.

Q.  You didn't need one?

A.  Yes.

Q.  And so the information that you were going to put in your subpoena was going to be the information you were seeking in your search warrant, which specifically referenced snapshot data, Autopilot data.  And you told Tesla that, and Tesla said: "I don't need a subpoena.  Just write me exactly what I tell you and I'll take care of it"?

160

A.  That is correct.

MR. BRANIGAN:  Objection.  Leading.

THE COURT:  Sustained.

MR. POSES:  Rephrase, please.

BY MR. POSES:

Q.  You tell me what happened.

A.  When I talked to Mr. McCarthy, I told him I wanted this data from the vehicle, if he could help me out with it.  And I said:  "I'll write up the subpoena," if he need be.  And he said:  "It's not needed," and he told me specifically:  "Just write down what I tell you.  And forward me a letter, and I'll see about acquiring the data."

Q.  And I know we did this in direct, but it's important. Among the 11 things that he told you to write down, which you did, did any of them include the data that you were seeking?

A.  No.

Q.  Did you know that at the time?

A.  No.

Q.  Is your first and last Autopilot investigation this case?

A.  Yes.

Q.  You didn't know?

A.  No.

MR. BRANIGAN:  Objection.  Leading, Your Honor -- I'll withdraw it.  It's fine.

THE COURT:  All right.

161

BY MR. POSES:

Q. Corporal, thank you for coming to Miami.

THE COURT:  All right.  Is Corporal Riso excused?

MR. POSES:  Yes, he is.

MR. BRANIGAN:  Yes, Your Honor.  Thank you.

THE COURT:  All right, then.

Thank you, sir.  You are excused.

(Witness excused.)

THE COURT:  This might be a good time.  Let's go ahead and take a 15-minute recess.  All right?

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 2:30 p.m.)

THE COURT:  All right.  We're on a 15-minute recess.

Safe travels.

THE WITNESS:  Thank you, Your Honor.

MR. BRANIGAN:  Your Honor, may I approach the witness to wish him well.

THE COURT:  Yes.  Of course.

(Recess from 2:31 p.m. to 2:48 p.m.)

THE COURT:  We're still waiting for some members of the trial team?

MR. SCHREIBER:  Probably.

THE COURT:  Okay.  Not a problem.

MR. SCHREIBER:  Your Honor, while we are, I just want to let you know that, as it relates to the testimony of

Mr. Phatak, we have pulled Pages 134, Line 9 through Page 150-something, line-something --

MR. SMITH:  Sixteen.

MR. SCHREIBER:  -- Line 16, as it relates -- because he was a 30(b)(6) on the issue of the safety recommendations. So I have pulled that.  Although again, would just simply reiterate -- and we will be filing a further motion for reconsideration on this issue -- we believe that the case law that was cited in our response was pretty clear on this point. And of course, my computer doesn't want to let me give you the actual citation.  Let me just see.

MR. SMITH:  It's in your briefs.

MR. SCHREIBER:  I know.  The brief is living here electronically and does not want to open up for me.

THE COURT:  All right.  Well, go ahead and have a seat while we're addressing this.

MR. SCHREIBER:  Anyway, to that end, we obviously had that conversation at sidebar.  And again, I think our response was also maybe filed late over the weekend.  And I don't know if the Court had the opportunity, you know, to look at it and all the cases that we cited.  But the primary bases for Tesla to exclude the board report is 49 USC 1154(b), which precludes the admission of the NTSB report from the Brown accident.

The statute reads at (b):  "Reports.  No part of the report of the board related to an accident, or an investigation

163

of an accident, may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report."  Thus, the statute precludes the report's use in the lawsuit based on the accident in the report.

Tesla's argument that the statute precludes its use in any action rewrites the statute and renders the phrase "resulting from a manner mentioned in the report" meaningless. If they had intended to preclude the use of NTSB reports in any civil action, for any purpose, it would have been written into the statute.

And so, again, this is obviously our position on this. I understood -- and I understood the Court's ruling with respect to hashing factual reports from board reports, but I also pointed out again that these other communications existed outside of the board report, which, again, I just want to be very clear, had no interest, intention, to be running afoul of the Court's order in that regard because I fundamentally read the Court's order to be limited to the actual exhibit, which was Plaintiffs' Exhibit P-77, the Brown board report.

So we can file further briefing.  There's a ton of decision -- not a ton.  There's a smattering of decisional authority from across the country that have addressed this --

THE COURT:  So which decision -- Mr. Schreiber, just to carry this argument through --

MR. SCHREIBER:  Yes, ma'am.

164

THE COURT:  -- which decision tells this Court that an NTSB Report and Recommendation is admissible in another action but not the action that pertains to the precise investigation?

MR. SCHREIBER:  49 USC 1154(b), as in bravo, tells you that no part of the board's report is admitted in a civil action for damages resulting from a matter mentioned in the report.

THE COURT:  Is that what it says:  "From a matter mentioned in the report"?

MR. SCHREIBER:  Correct.  And that is at 49 USC 1154, Subparagraph (b).

THE COURT:  All right.  So what issue does the Court need to address at this moment in time?

MR. SCHREIBER:  For -- again, nothing --

THE COURT:  All right, then.

MR. SCHREIBER:  -- other than I've heard the Court's ruling.  Mr. Poses did not ask follow-up questions based upon the Court's ruling at sidebar.  I'm making modifications to the testimony of Mr. Phatak that we intended to play, which also included those recommendations.

So in recognizing that -- and we will be filing a motion for reconsideration for the Court to view this issue because we do believe that it invites error and we want to have a very clear record on that front.

THE COURT:  Okay.  And taking the statutory

construction of 49 USC 1154, that states specifically that: "No part of a report of the board related to an accident, or an investigation of an accident, may be admitted into evidence or used in a civil action or damages resulting from a matter mentioned in the report," what case interprets that statute to permit an NTSB investigation or a report and recommendation to be introduced in another case -- for example, with regard to the Brown case or any other case -- that would permit in a subsequent proceeding the introduction of that report?

MR. SCHREIBER: Well, if you look at -- starting on Page 8 of our response -- this was Docket Entry -- and I'm so sorry that I'm not looking at the docket entry version. This is our response to Defendant's motion in support of various objections to Plaintiffs' exhibit -- and I apologize. I have the date here of July 12th. And I'll have to get you the docket entry. And I apologize.

But starting at Page 8 of our moving papers, we do discuss a few decisional authorities that have addressed it. While there is nothing necessarily directly on point, it does -- and we say that, this does not address the specific question at issue. We do have a case involving a Missouri Court of Appeals where it approved the admission of an NTSB report from other accidents for a number of reasons.

And again, as I pointed out at sidebar, the NTSB report would be -- about the Brown case would be excluded in

the Brown action, in the same way the Banner NTSB report should be excluded in the Banner v. Tesla matter, just like the traffic collision report by FHP would be excluded in the Benavides crash in the Benavides trial.  Right?  That's, I believe, what that statutory scheme is largely looking at.

And it would be Docket Entry 469 -- thank you -- would be our response, starting at Page 8.

(Pause in proceedings.)

THE COURT:  All right.  Not taking time from the jury, let me look at the sole Missouri Appellate Court decision that you've relied upon.

MR. SCHREIBER:  Thank you, Your Honor.

THE COURT:  All right.  We ready to proceed?

MR. SCHREIBER:  We are.

MR. SMITH:  We are.  And just for purposes of the record, we agree on the excised portions 134 to 150.  I just wanted to make sure that the Court understood that we agree that those are the appropriate portions to be excised.

THE COURT:  All right.  Two matters.  The parties have taken one exhibit and have parsed it out into individual pages. I just want to state that -- very clearly that it is the Plaintiffs' responsibility to maintain an accurate record of exhibits admitted into evidence.  Because at the close of evidence, and before the jury goes back to deliberate, I will specifically ask, number one, whether all of the uploaded

exhibits on the computer that the Plaintiff will provide are the exhibits admitted into evidence, and the Plaintiff must prepare a written exhibit list that sets forth all of the exhibits that were admitted at trial.  So I would ask that the parties be mindful of that, since you have introduced individual pages within one exhibit.

MR. SMITH:  And Your Honor, our usual practice is to confer each day with each other, and then with the deputy clerk, the courtroom clerk, to make sure that our lists sync up on a daily basis, so that at the end of the trial we will have a good list.

THE COURT:  Okay.  But I want to make sure that it's clear.  This is not state court, and the courtroom deputy does not maintain the exhibits for the parties.

MR. SMITH:  I understand that.  I understand that.

THE COURT:  It is the parties' responsibility to ensure, as we move through this trial, an accurate record of all of the exhibits that have been admitted into evidence.

MR. SMITH:  Thank you, Your Honor.

THE COURT:  And another item I do want to raise is the courtroom deputy did ask the jury.  The jury is available to come earlier on Friday.  And we have reset one of the hearings on Friday, so we could begin at 9:30, if that would be acceptable to the parties.

MR. SMITH:  It certainly is, Your Honor.  So that's

168

9:30 until --

THE COURT:  Until three p.m.

Okay.  Any other matters before we bring the jury back in?

MR. SCHREIBER:  No, Your Honor.

THE COURT:  Do the Plaintiffs have the next witness ready to go?

MR. SCHREIBER:  Yes, Your Honor.

THE COURT:  Okay.  Let's bring the jury in.

COURT SECURITY OFFICER:  All rise for the jury.

(Before the Jury, 2:59 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

And the Plaintiffs' next witness, please.

MR. SCHREIBER:  Thank you.  Your Honor.

At this time the Plaintiffs would like to call Dr. Mendel Singer.

(Pause in proceedings.)

THE COURT:  Hi.  Good afternoon.

THE WITNESS:  Good afternoon.

THE COURT:  Dr. Singer, let me ask that you step forward, sir.

You can place your items down.

If you'll remain standing, I'll place you under oath.

DR. MENDEL SINGER, PLAINTIFF WITNESS, SWORN

THE COURT:  Thank you, sir.

And once you're seated, if you will state your name clearly in the microphone, spelling your first and last name, please.

THE WITNESS:  Hi.  My legal name is Ethan, E-T-H-A-N, Singer, S-I-N-G-E-R.  But I am known professionally and to almost all the world, except my mother, as Mendel --

(Court reporter interruption.)

THE WITNESS:  Oh.  Okay.

My legal name is Ethan, E-T-H-A-N, Singer, S-I-N-G-E-R.  But I am known professionally in the world, except for my mother, as Mendel, M-E-N-D-E-L, Singer.

DIRECT EXAMINATION

BY MR. SCHREIBER:

Q.  Dr. Singer, what do you do for a living, sir?

A.  I'm a professor at Case Western Reserve University and School of Medicine.

Q.  And what do you do there?

A.  Teach, research, mentor.  Started off doing just, so to speak, statistics for studies, health studies, many of them funded by National Institutes of Health, foundations, other non-profits, but also by pharmaceutical companies.

In addition to statistics, I also do benefit cost analyses and some other research.

Q.   What were you asked to do in this case, sir?

A.   In this case, I was asked specifically to assess the statistical validity of the online Tesla Vehicle Safety Report that appears on the Tesla website.

Q.   Okay.  And we'll get into what the Vehicle Safety Report is.  What did you do to prepare for your testimony here today?

A.   So I reviewed some literature that's related, the Vehicle Safety Report on the Tesla website, and some other related documents that were maybe pointed to, say, on the website because they quote some sources -- so I had to go check those out -- such as reports from different agencies with the Department of Transportation.  But I wasn't reviewing expert reports, depositions, any other kinds of matters.

Q.   You're not here to reconstruct the crash?

A.   No.

Q.   You didn't review any Autopilot data?

A.   No.

Q.   All right.  You didn't want to review any government investigations?

A.   No.

Q.   All right.  So describe generally for us, what is the Vehicle Safety Report?

A.   Sure.  The Tesla Vehicle Safety Report is updated every quarter.  And what it purports to do is to compare crash risks for Tesla vehicles with Autopilot on, Tesla vehicles with

171

Autopilot off, and other vehicles made by others besides Tesla.

Q.   Okay.  Before we talk more about it, let's just talk briefly about your qualifications.  Sir, tell us about your educational background from college forward.

A.   Sure.  I have a bachelor's in math from Rutgers University.  I have a master's and a Ph.D. in a field called operations research, which nobody seems to have heard of, but it's applied math, and a lot of people like myself focused on statistics.  I also later got a master's in public health.

Q.   All right.  And you also obtained your doctorate in -- oh.  That was your operations research.  Got it.

Tell us about your professional experience.  What have you done professionally since obtaining your doctorate?  Where do you teach, what do you do?

A.   Sure.  So I've been at Case as full-time faculty for 30 years.  It will be 30 years in November.  And during that time, I generally taught courses in statistics to various audiences, graduate students, master's, Ph.D. students, medical students, physician assistant students, as well as courses in design of healthcare studies.

I have mentored students at the master's and Ph.D. level, and also engaged in research.  As I mentioned before, the first half of my career was mostly funded research, grant research.  About 70 to 80 percent of my time was funded by grants.  And since then, I do a lot of more educational work,

172

administration.  I ran a master's program in what's known as biostatistics, which is statistics but for health.  So I ran that for nine years.

I have helped run other graduate programs in the department for many years as vice chair for education for 10 years, overseeing three Ph.D. programs, four master's programs, an undergraduate minor, and a couple of graduate certificate programs.

Q.  And sounds like, according to your CV, you find some time to publish in your area of expertise as well; is that true, Doctor?

A.  So yeah, I'm kind of expected -- so I have over 70 papers published in what's known as peer-reviewed journals.  And when we say:  "Peer-reviewed journal," what it means is that there's a professional journal, and when you submit to be published there -- so they get a couple of experts in the field to review the work, decide whether it's good enough and important enough to be published, and there's often a little bit of back-and-forth making some improvements along the way before it gets published in the journal.  So I have over 70 in scholarly journals that are peer reviewed.

Q.  And direct examination is not a time to be modest.  So can you tell us about any awards or honors you have received as part of your professional work.

A.  Yeah.  So -- well, in teaching, I got an award for the

professor of the year in the school of -- for all the graduate school at the university. Also, my team got an award from the Health Policy Institute of Ohio for the best policy research of the year. And I've had some other nice experiences in some work I did, some groundbreaking work and --

Q. Well, that's --

A. Okay. Okay. Yeah. That's good.

Q. Your humility, you lead with that, and I appreciate it.

You talked about comparing effectiveness research, which I understand, having spent some time and learned from you, that's looking at the effectiveness of various systems. Is that a fair lay description?

A. Yeah. It's usually there's like two different choices, and it's based on real-world data and trying to decide, you know, is this healthcare -- whether it's medical treatment -- is this better than some other treatment, or are vehicles with this safety system more safe than vehicles without that safety system, whatever kind of comparison. But it's focused on real-world data and making sure you're doing a comparison that's unbiased.

Q. And what do you mean when you say: "Unbiased"?

A. So sometimes you want to do a study and look at the data, but there may be reasons why one group is automatically different than the other. In the medical area, maybe it's the people who are the sickest got the really expensive new

medicine.  And so, they may have worse outcomes because they themselves, the patients getting that treatment, were much worse.  And same thing comes up in automotive, which will come up in this report.

Q.  And we're going to talk about that in one moment.  You were involved in some pretty important research with respect to treating pneumonia that changed how it was treated.  Tell us just briefly about that.

A.  Sure.  You know, there's a couple moments you get in your career when things work out particularly well in terms of having impact.  At the time, there was -- it was -- it was not clear whether when a person shows up in the emergency room how important it was to get them an oral antibiotic quickly if they're suspected of having pneumonia.  And it takes -- unfortunately, it can take a long time in the emergency room to get a proper diagnosis of pneumonia.  And we used to think that there was no difference between getting it within four hours versus eight hours.  And what I found was the research that had been published all had a common fault.  And that when you do the analyses properly, it really made a big difference to get them the antibiotic quicker.

And after I gave the talk at the conference in infectious diseases, the head of the guidelines committee for US and Canada for pneumonia came up to me and said that the committee had been deadlocked on this issue, asked me to send them the

report, and do one additional analysis.  And as a result, they changed and made the standard of getting antibiotics within four hours, which they estimated saves five to 10,000 lives a year.

Q.  Very nice.

Dr. Singer, you prepared a PowerPoint marked as P-103, which will assist the jury in understanding the opinions and testimony you intend to offer today?

A.  Yes.  Thank you.

MR. SCHREIBER:  By stipulation, for demonstrative purposes only, we would like to now publish Exhibit P-103.

MR. SMITH:  Your Honor, there's no objection to use as demonstrative evidence.

THE COURT:  All right.  For demonstrative purposes only.

MR. SCHREIBER:  Thank you.

BY MR. SCHREIBER:

Q.  Because I learned during opening statement yesterday that the clicker has a certain range, and it's not as far as where you are sitting, I will be the controller.  But obviously, Dr. Singer, this sets forth who you are.  I'm going to move on to the second slide.

Describe for us the task that you were asked to do.

A.  Yes.  I was asked basically to assess the statistical validity of the Tesla Vehicle Safety Report.  I'm looking at:

Is the data accurate, are the analyses done fairly and correctly, are the conclusions accurate or are they misleading. These are the questions that I needed to address.

Q.   And you touched on this briefly.  But for everybody who hasn't spent time on Tesla's website, hasn't reviewed the Vehicle Safety Report, tell us a little bit about it.

A.   It's been on the website and updated every quarter since, I think, October of 2018.  It compares crashes for -- essentially, there's three groups:  Teslas with Autopilot, Teslas without Autopilot, and non-Teslas, and updated quarterly.

Q.   All right.  You mentioned that word "bias."  Tell us about what we're talking about here and why you found that there was a bias in favor of Autopilot.

A.   Sure.  So a good thing to keep in mind is I'm talking about Autopilot based on the car, when it was manufactured, purchased, when the accident occurred.  We're going back into like 2019, and maybe even that the manufacturing started for that 2019 vehicle in late 2018.  So I'm not talking about how Autopilot is used today, which would be a very different system.  And so I'm not commenting on that.

But so, first of all, highway driving has about half the crash rate per miles driven.  So for every, you know, a thousand miles you drive on a highway, on average you have about half as many accidents as a thousand miles that's driven

not on the highway.  And in the time periods we're talking about, most Autopilot driving was on highways.  It's actually also in the Tesla Owner's Manual that it's intended only for situations where consistent speeds can be maintained.  It's recommended that it's being used on highways.  It's not supposed to be used like in urban traffic.

But because of this huge difference in crash risk, what it means is that if Autopilot provided no benefit or no harm, just was the same, just because of the more favorable driving conditions, would have a crash rate that would end up being nearly 40 percent lower just because of these other factors that have nothing to do with the system.

Autopilot -- there was a study published in 2019 -- is used less in bad weather or in any traffic, which fits with the Owner's Manual again.  It says also about not using in bad weather, like when the roads are wet or in snow, fog.  And -- but the users follow their advice and they tend not to use it in bad weather.  Also, there's a lot less use of Autopilot than -- in any traffic, which makes sense again.  Like, the manual is saying, being able to maintain a consistent speed, which is hard to do in traffic.  And those are situations where there might also be more crash risk.  But Autopilot doesn't tend to be used then.

The Vehicle Safety Report doesn't mention any of this, and they don't account for this or try to say:  "Well, let's make

some adjustments to the analysis.  Let's try to take into account these differences."

Q.  Anything else about this slide or the Goodall studies that you would like to address?

A.  Yeah.  So the Goodall study, which was published in a peer-reviewed journal in 2023, and -- they go through and compare.  And they use the data from the Tesla website and compare with Autopilot versus Autopilot off to -- Autopilot on versus Autopilot off.  They use the data from the -- that was on the Tesla website.  And then -- and it calculates to see how much -- what's the difference between having Autopilot and not, and what's the benefit in reducing crashes.

But it does it -- not just using the numbers from Tesla, but it then makes the adjustment saying:  "Based on what we know about highway miles," that they have fewer crashes per mile, "we can make an adjustment in those numbers, take that into account so that we get a more fair comparison of more" -- "of similar crash risk."

So what they found was, if you go straight by the data from the Tesla website -- and this is going back.  You know, this data is -- later on, we'll talk about later Tesla changed all the numbers retroactively and went back and changed them all. We're talking before that.  So what a consumer would be looking at on the website in late 2018, early 2019, what they would have seen.  Right?  They would have seen benefits of Autopilot

being portrayed as being like over a 40 percent reduction in crashes.

According -- after you make the highway miles adjustment, the Goodall study found the difference was about 10 percent. So what you'd see on the website would be about four times the benefit that the Goodall study found when you make the contribution for the kind of driving that they're doing.

Q.   And that was just related to highway driving.  And what about use in better weather --

A.   There was no other adjustment.  So that was -- so if it's 10 percent better based just on the highway adjustment -- but they wouldn't have had any way to know about how much -- about bad weather in traffic.  They would have had to have the raw data from Tesla to be able to do that and make further adjustments.  So it may not be 10 percent.  It may be much less than that, but I don't know.

Q.   And have you ever been given the raw data -- or has anyone -- let me rephrase.  Are you aware of anyone having ever received the raw data that Tesla relies upon to support its conclusions in the Vehicle Safety Report?

A.   I mean, I wouldn't know what goes on between Tesla and the government for things.  But I am not aware of any published study, any reports that are done by independent, say, researchers or whatever, where they actually had raw data and could validate it to see:  Does it seem to make sense, do the

miles they drive match up with what we know about how much Tesla is driven, are the crashes that they're reporting -- are they missing a lot of crashes that we have police reports for, like all these kinds of things. I don't know of any of this being done.

Q. And we're going to talk about that in a moment. But why is it, as someone who has spent the better part of several decades studying large quantities of statistical information -- why is it important to validate your data?

A. So the first reason is you work a lot with a lot of data, somebody can make mistakes. So whenever you work with data, you got to be really careful. But there's all kinds of checks that you do. So you want to do validations; does this make sense. First of all, does everything look right on the surface.

And when I do it, what's the average miles per vehicle. If it comes back and says that they're driving 40,000 miles a year on Teslas, I know that's wrong. So something's got to be wrong in the data. You got to have some comparisons. How many miles do we know they drove versus what's happening in my data as I'm ready to analyze it; what's showing up there.

But you're always trying to do confirmations and find ways to make sure that not only is the original data correct, but everything you do with the data afterwards as you're trying to work with it and analyze it and so forth, that mistakes haven't

181

crept in along the way.

Q.  Let's talk about some of those mistakes.  The undercounting of Tesla crashes.  Describe for us what your opinions are in that regard, Dr. Singer.

A.  Sure.  So as I mentioned, in the report, you've got Tesla with Autopilot, Tesla without Autopilot.  But you also have non-Teslas.  So when it comes to Tesla, the crashes they count are the ones that the car's computer reports back to Tesla.  It reports it if an airbag is deployed, if a safety belt pretensioned, or they tighten the seat belts.  If that's deployed, it means there was some kind of crash of a sufficient severity so that what they call an active safety restraint gets turned on, gets used, gets deployed.

Q.  And so just so that everyone understands, the pretensioner, that's that thing where your seat belt locks up, right?

A.  Yes.

Q.  So is it fair to say, then, that if a Tesla operating on Autopilot blasts through an intersection, hitting a toddler, who then just goes flying, but the pretensioner doesn't fire, or the airbag doesn't deploy, under Tesla's crash counts, that's not a crash?

A.  That's correct.

Q.  Okay.  Tell us about --

A.  So Teslas only -- can only count the -- they're only using the crashes that get reported by the computer.  So anything

that their car's computer doesn't compute -- it doesn't like have a camera looking at an angry driver and saying:  "Oh, boy. There was an accident."  You know, so it's just what -- it reports just the safety belts or airbag deployment.  Right?

But for non-Teslas, they use a totally different data source because other cars aren't reporting data to Tesla.  So they use nationally available reports that there are based on police crash reports.  For the non-Teslas, any crash that gets reported to the police gets counted, regardless of whether an airbag was deployed, the safety belt locked.  Doesn't matter. All the crashes.  If it's a police report, it gets counted.

And in that data, I found that more than three-fourths, more than three in every four, did not have a safety belt pretensioner get tightened up.  It didn't have an air bag deployed.  So the vast majority of the crashes for non-Teslas that they are counting are crashes that they wouldn't count in a Tesla.

Q.  Tesla's counting apples.  Everyone else is counting oranges?

MR. SMITH:  Objection, Your Honor.  That's leading and editorial.

BY MR. SCHREIBER:

Q.  Simple?

THE COURT:  Sustained.  Sustained.

183

BY MR. SCHREIBER:

Q.   Different kinds of vehicles -- tell us about how that implicates Tesla's counts of crashes and the validity of the Vehicle Safety Report's data.

A.   Yes.  So all the data we're talking about was before the Cybertruck.  So we're talking about passenger cars and SUVs.  Looked through model year 2019.  They're also going to be a lot of very young, newish vehicles.  Nearly 90 percent -- through model year 2019, close to 90 percent of Teslas were model year 2016 or newer.  So they were pretty young cars.

Q.   And why does that matter?

A.   So it may be that older vehicles have higher crash rates.  But also, the older vehicle didn't have any of the safety systems that started to get introduced.  When I say:  "Safety systems," the one in particular that's shown to reduce rear-end crashes by about half is the system they call forward collision mitigation, which means if you're overrunning the car in front of you, if you're going too fast, and you're catching up to them too fast, it will issue a warning.  But if you continue, and the risk of hitting them is too high, the car will automatically brake for you.

    So it has a huge impact.  It said it reduces rear-end crashes by about half.  Rear-end crashes make up about 30 percent of the police-reported crashes.  So that's a big impact overall.  So they got introduced in vehicles over time.  In

more recent years, it's become standard.  So -- but in Tesla starting I think 2015, they were standard in the Tesla vehicles.

Q.   Now, what is the bias --

A.   I'm sorry.  The last slide.

Q.   I apologize.  On the last slide.  I didn't realize there was something more.  Go ahead, sir.

A.   The non-Teslas.  The non-Teslas, they incorrectly state on the website that they're only counting crashes with what they call light vehicles, vehicles under 10,000 pounds.  But anyway, basically more passenger vehicles.  But that's actually not true.

If you actually do the math from the reports, they actually use the miles and crashes for all vehicles on the road. Whether it's a car, an SUV, whether it's a bus, whether it's a semitruck, whether it's a motorcycle, it's just all lumped together.  So again, it's like -- it's not all similar.  It's not a fair -- it's not a reasonable comparison.  It's not a question of whether it makes it better or worse.  It's just the wrong comparison.  Why are we comparing it to vehicles that includes semi-trucks?

Q.   Right.  That are traveling hundreds of thousands of miles a year?

A.   Yeah.  So -- and I'm getting -- you know, which way the bias works, I didn't get there.  I'm just -- I wasn't trying to

get to what's the truth because the data -- what they're showing is so wrong, I can't get there from here.

Q.   Got it.   Anything else on this slide?

A.   No.

Q.   Thank you, sir.

Now, tell us about your opinions relative to whether these are safer cars or safer driving.

A.   So in the Goodall study I mentioned before that was peer reviewed and published, they mention that Tesla owners tend to have fewer Tesla owners in the youngest age groups, the really young drivers, and the really old drivers, which tend to have the most crashes.   And so they suggested that Tesla may have an 11 percent benefit due to just having drivers of -- you know, safer drivers that way.

Also, Tesla owners tend to have high income, good credit scores.   Insurance companies use credit scores to figure out how much you pay in premiums, because -- and Allstate, for example, actually has it on their website -- people with higher credit reports have fewer crashes, fewer claims, and it costs them less.   So if you're comparing Teslas to non-Teslas, again, there's also an issue that the drivers may be drivers who tend to have fewer crashes, and that's not mentioned or accounted for in these analyses.

Yeah.   Next slide is fine.

Q.   Very well.

186

Now, Tesla eventually offered some corrections to the Vehicle Safety Report.  Tell us about that.

A.   Yeah.  Starting January 2023, on the Vehicle Safety Report, in the details at the bottom, they say that they found some mistakes.  And they said that, well, there were certain events where there wasn't an air bag or active restraint deployed, and it shouldn't have counted those.  And then there were single events that were counted more than once.

And there were also some reports of invalid or duplicated mileage records.  So they're saying:  "Oh, okay.  There were some things that were done that weren't classified right.  There were some mistakes."  So on the website they just -- they don't have the old numbers on the website.  They just changed all the numbers going back to update it so that these corrections are made, and all the data they're saying is now -- correct now, but was wrong for the last four years.

So the language there makes it sound like they're only making very small changes, there's some mistakes here and there.  And if you look at the crashes with Autopilot on, that's what happens.  There's -- it's not exactly the same, but it's very close.  So whatever errors there were, they were small.  But for Autopilot off --

Q.   Well, let's pause right there.  They have a table that you have put in your slides on Autopilot on, correct?

A.   Yeah.  It's also in the pictures.

So with Autopilot on -- and I'm not -- I know you all probably would love for me to talk about nothing but numbers for an hour because math and statistics is everybody's favorite subject, but I'm actually going to talk very little about the actual numbers. It's really just qualitatively what we're speaking about. But you see before and after the changes it's about the same when you're dealing with Autopilot on.

Q. What about Autopilot off?

A. Autopilot off changes dramatically. Suddenly, the crash rate goes up by half. So there's a very large change in Autopilot off but not Autopilot on.

So Autopilot on, minimal change. It's almost identical. Autopilot off, crash rate increases by half. The Vehicle Safety Report doesn't say that there were any major changes made. There's no explanation. You know, why was the data so wrong for four years? And there's no explanation given why the data was so wrong for Autopilot off but not for Autopilot on.

Q. Fair. All right. And you have a couple of slides that address this. That we can kind of walk through.

A. So if you look at the crash rate, it's just the number of crashes over some volume of driving. The crash rate for Autopilot off changed to about 50 percent higher.

So how can that happen? Either there were a large number of crashes that had been missed or the miles driven were overestimated, like they said, some duplicated mileage. So

188

maybe there was like -- just a moment.

Q.   You want me to go back?

A.   Yeah.  That there may have been -- they counted way too many miles.  They made it seem like -- those accidents happened over a lot more driving and really it should have been much less driving or both.  But it's -- why would -- the question is:  Why would many crashes be missed, so many, but only for Autopilot off?  But Autopilot on, it wasn't really missing the crashes.  I mean, whether it has the crash, if an airbag gets deployed, and it reports it, what difference does it make whether Autopilot is on or off?  So why is it that the data is so wrong for Autopilot off but was right for Autopilot on?

So if you look at the total miles, this is as hard math as we get.  There's addition here.  When you drive, you can drive with Autopilot on or with Autopilot off.  It's one or the other.  So if you add up Autopilot on miles, Autopilot off miles, that gives you the total miles.

So the question is:  How could you get the Autopilot off miles wrong but the others right?  I mean, if there's less miles with Autopilot off, shouldn't that mean more miles with it on?  I mean, they should know the total number of miles.  That's tracked by the vehicle.  I mean, that's been tracked in vehicles with mechanical odometers at least from the '50s, if not earlier.  So something is very wrong here.  How can you be wrong with just one and not the other?

Okay. So the question is then -- gets back to validating data. So if the total miles are wrong, why didn't they validate it and check: "Let's add up the miles Autopilot off and on. Add it up. Does that equal the total miles?" Wouldn't they have checked that? And why is it that it can be wrong -- you know, so wrong?

Q. And let me just ask you something hypothetically. Did you see anything in any of the work you performed in this case, or review of any of the data, that when someone had engaged TACC, Traffic-Aware Cruise Control, and Autosteer, the lane centering, the two things that make Autopilot -- that if someone had their foot on the accelerator, that Tesla considered that to be Autopilot off?

A. I don't know. It's certainly not described -- there's remarkably little description in the Vehicle Safety Report. And I understand if it's consumer-facing, so they spared everybody the details --

Q. Sure.

A. -- but it does mean that it's hard to evaluate what they're doing.

Q. Understood. But nowhere in the data you did see did anyone suggest: "Oh, if TACC is engaged but your foot's on the accelerator, we're counting that as off"?

A. I don't recall.

Q. Fair enough.

Okay.  Now, here we have Autopilot on and off in 2019.  Walk us through this.  And we're almost home.

A.  Sure.  So crashes during the first half of 2019, I looked at:  Well, let's adjust for highway miles.  The original report, the data totally changes in 2023.  So we have, again, the Autopilot off was so much better, the crash rate.  And then suddenly it changes and it's so much worse.  So what are we supposed to believe?  You know, which is the right number, or maybe they're both wrong.

Q.  And so what happened when you try to correct the analysis?

A.  Yes.  I tried to correct the analysis with the things that we know about.  I looked at:  This is the crashes during the first half of 2019.  But then now for non-Teslas, to make it the same kind of crashes, I didn't count crashes where no airbag -- you know, no airbag was deployed and the seat belts didn't lock.  So -- just to make it so we're defining crashes the same way for the Teslas and non-Teslas.  I adjusted for highway miles, age, credit score.  After all the corrections, non-Tesla has a lower crash rate than Tesla.  Doesn't matter whether you're comparing it to Autopilot on or off.  And it's true if you're not adjusting for age and credit score.

Now, I'm doing that just to show that these things that aren't accounted for have a big impact.  I'm not trying to say these are the actual right numbers to compare because they're not even comparing similar vehicles or aged vehicles.  It's

like -- it's just -- you can't get to the right numbers from there. If I was trying to do that, I would have to use a whole different approach. I'm just trying to show that these biases, there's real impact, that it really changes the results.

Q. As someone who's been published in over 70 peer-reviewed journals, sat as a peer reviewer, built comparing effectiveness research looking at the effectiveness of systems, if Tesla had presented to you the Vehicle Safety Report, and tried to get it into a journal that you were an editor on, what would you tell them?

A. That would have been a really quick and easy rejection. We wouldn't give a chance for them to make any changes to see if they can change it to be -- you know, get up to muster. You know.

Q. And so, these are your examples of showing the lower crash rates when you did these adjustments for non-Tesla vehicles versus Tesla on and off?

A. Yeah. In December of 2022 -- this thing is like prior to the January 2023 corrections. So if we look at non-Tesla, Tesla Autopilot on and off, so before the so-called corrections, non-Tesla is a lot lower than the others. But Autopilot on/off, they are almost exactly the same. Autopilot off, you know, a hair better. That's nothing. They're basically about the same.

And then, when you look after the corrections -- and again,

192

this is after the adjustments I made trying to take into account these sources's bias. So non-Tesla is still lower, but now suddenly Tesla with Autopilot on is much better than Tesla with Autopilot off, whereas before they were about the same.

So there's some limitations here. One, I have to rely on -- the only data I have for Tesla is from Tesla. I don't know of it being verified, validated, anything. I know there's been big mistakes. We already talked about that. So I have just to rely on it. That's the only numbers I have to use. And the Tesla-to-non-Tesla comparisons were so bad that, even the adjustments I tried, I can't get to the right answer. There's no way. They're just way too -- everything's just way too different.

Q. All right. And other limitations?

A. Yeah. So accidents that are not reported to the police, they tend to be minor damage, no injury, you know, sometimes with injuries, minor injuries. But they tend to be much less likely to have an airbag deployed. If an airbag's deployed, it's pretty much hard to hide it, you know? So -- because the vehicle's not drivable.

Now, these accidents are not counted for non-Teslas because non-Tesla we only counted if it's reported to the police. But they would be counted for Tesla if the impact was bad enough for the airbag or the safety belts to react. So it's probably a small number, but I don't know what that number is. So there

are some crashes that Tesla would report that wouldn't be in a police report.  Again, there's just -- things are so different, the data sources are getting data from such different places, done in such different ways, you know, it's like how do you get to a fair comparison.

It's also not clear when they change the names of categories and the website whether -- would it change -- there's an interim report where they change the language saying not using Autopilot.  What happened to the older vehicles that didn't have the safety systems, they didn't have Autopilot, and they didn't have safety systems?  Were they still included or not?  But it doesn't make much of a difference because there wasn't so few of them.

Big thing is that Tesla's production from 2017 to model year 2018 went up by -- it was four times as great.  So there was like under 50,000 produced model year 2017 and almost 200,000 in 2018.  So when you get back to those old vehicles, 2012, 2014, where they didn't have safety systems, it's just a very, very small number.  It's less than one in 10 that would have been on the road in 2019.  So whether it's included or not, it's not going to have much of an impact.

Q.  Got it.  So, in summary, we have crashes obviously without airbags and pretensioners deployed; comparing Teslas to all other vehicles, including tractors and buses and motorcycles; you got new cars versus old cars; and no adjustment for the

194

populations.  Fair?

A.  Correct.

Q.  And ultimately, no adjustments made for highway miles.  And at the end of the day, as you summarize here, different kinds of crashes, vehicles, different ages, and different driving conditions?

A.  Yes.

Q.  And ultimately, even when they made these changes, you have these very large errors in Tesla's data.  And what did you ultimately conclude in that regard, Dr. Singer?

A.  Yeah.  So maybe just go on to the next slide.

Q.  Sure.

A.  So ultimately, first of all, we have things being compared that aren't at all alike.  We've been through that already a few times.  I don't need to tell you yet again.  So there's no similarity.

But then the question is:  Is the data reliable?  So data quality is important.  Is the data complete?  Is it accurate, consistent?  Were there any validation checks?  Did they make any effort to say:  "We have these reports of Tesla accidents with airbags deployed.  Do we look up in police-reported crashes -- do we find those reported there," or vice versa, "Do we have any police reports that an airbag was deployed but it's not showing up in the Tesla-reported crashes?"

So there's no validation checks being done.  And if the

data is so wrong that they changed it by about half in the Autopilot off, how is such a big mistake -- how did it go undetected for four years? Why is it wrong for only Autopilot off? And whatever was done that made the mistake, was that process fixed? I mean, of course none of that is revealed.

But I'd like to conclude this with an analogy to help understand this. If I hire somebody to do my taxes, he's doing my taxes every year, and I'm very happy not to be doing them. And then he tells me: "Oh, you know, for the last four years I made a mistake, and you really owe 50 percent more in taxes. I made a mistake and I've been making it the whole time," I'm not going to be too happy, of course. But one question is: If he made that mistake, what other mistakes did he make? Now I'm nervous about all my taxes for those years. What other mistakes were made, and can I really trust him moving forward?

I mean, I'd have to know a lot more to feel comfortable with that tax accountant anymore. So I think that's the question here. Once you see the data could be so wrong, and be wrong for four years, what else is wrong? I don't know what to believe.

Q. Fair enough. Dr. Singer, were all the opinions you've offered here today offered to a reasonable degree of certainty in your field?

A. Yes.

MR. SCHREIBER: Thank you, sir. I have nothing

further.

THE COURT:  Okay.  Cross-examination.

MR. SMITH:  May it please the Court, Your Honor.

THE COURT:  Certainly.

CROSS-EXAMINATION

BY MR. SMITH:

Q.  Good afternoon, Dr. Singer.

A.  Good afternoon.

Q.  I just want to clear one thing up first.  You don't have any information that Mr. McGee, who was the driver of this vehicle, ever saw a Vehicle Safety Report, do you?

A.  No.  I have no knowledge of that.

Q.  And you wouldn't know, then, whether or not Mr. McGee's purchase of his Model S in 2019 had anything to do with the Vehicle Safety Report?

MR. SCHREIBER:  Objection, Your Honor.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I wouldn't know.

BY MR. SMITH:

Q.  And you don't know whether the Vehicle Safety Report had any impact on how he used or drove this vehicle?

A.  Correct.  I wouldn't know that.

Q.  All right.  Dr. Singer, your work in this case -- you mentioned, I think, the tasks you were asked to do, right?

A.  Yes.

Q.   Those tasks that you were asked to do, you were asked by Plaintiffs' counsel to do, right?

A.   That's correct.

Q.   And that's the way it works.  You have a scope of work that you do, and you don't do work outside of that scope?

A.   Yes.

Q.   And the scope of work that you did, and that you were requested to do, did not include evaluating crash risk of cell phone use in conventional vehicles versus vehicles using Level 2 or Autopilot systems, right?

A.   That's correct.

Q.   And nothing in your work that you were asked to do was to evaluate the crash risk of a driver picking up an object in a conventional vehicle versus an Autopilot or L2 kind of vehicle?

A.   That's correct.

Q.   Okay.  You started testifying as a plaintiffs' expert when a lawyer suing a car company asked you to testify, correct?

         MR. SCHREIBER:  Objection, Your Honor.  It's argumentative.

         THE COURT:  Sustained.  Rephrase, please.

BY MR. SMITH:

Q.   Well, let me ask you this:  Didn't a lawyer ask you to start -- well, during your career -- let me just -- let me start with this:  During your career as a statistician -- and a very distinguished career, I should say -- you never did any

work in automotive statistics, correct?

A. My automotive work would have been involved in about 70 different cases in litigation. That's distinct from my research career as a professor, in that I haven't been doing research and publishing research related to automotives.

Q. It's all been in the medical and health and pharmaceutical fields, right?

A. Yeah. That -- mostly that and a little bit in criminology and psychology.

Q. But since you started testifying on behalf of plaintiffs' lawyers suing automobile companies, you have worked just in the last four years in cases against Toyota?

A. Yes.

Q. Nissan?

A. Yes.

Q. Honda?

A. Yes.

Q. What we used to call Chrysler but is now called FCA?

A. Yes.

Q. General Motors?

A. Yes.

Q. Mercedes?

A. Yes.

Q. BMW?

A. Yes.

Q.   And of course tesla?

A.   Yes.

Q.   And you said 70 cases?

A.   I've been retained in close to that, yeah.  Somewhere around that.  I really -- I mean, I don't track them exactly.  So...

Q.   What's your hourly rate for doing this work?

A.   My usual rate is $400 an hour.

Q.   And is that what you're charging here?

A.   For trial-related -- I'm sorry -- testimony-related work, it's $500 an hour.

Q.   Okay.  You have an extensive list of grants.  I think I counted 46 grants that you, during your career, were a part of, right?

A.   I have no idea.  But thank you.

Q.   That --

A.   I believe it.  I just -- I really didn't track it.

Q.   None of those had anything to do with Tesla's Autopilot?

A.   That's correct.

Q.   None of them had anything to do with Level 2 automation systems?

A.   That's correct.

Q.   And you understand what we're talking about with a Level 2 automation system?

A.   Yes.

Q. Right. And that is a system that allows lane-centering technology to operate to give the driver assistance in the lateral control of the vehicle and an adaptive cruise control that works at the same time together to allow assistance in keeping a safe distance from the vehicle in front, right?

A. Yes.

Q. Okay. And none of your grants had anything to do with L2 systems?

A. That's correct.

Q. Or any kind of automation?

A. Correct.

Q. Or any kind of automobiles?

A. Correct.

Q. You published 68 scholarly articles, I counted. Probably more, though, right?

A. Yeah. The CV is just a little old. So now it's around 72, 73.

Q. And you did 32 scholarly talks?

A. Yeah. There's others probably. I don't track them very well. But I keep track for a while, but then professionally it doesn't really matter when you have more after a certain point.

Q. None about Teslas?

A. That's correct.

Q. None about L2 systems?

A. Correct.

Q.   None about the risk of any kind of car feature?

A.   Correct.

Q.   Nothing you did in your entire career, other than testifying in cases where you've been hired by lawyers suing car companies, has anything to do with car crashes?

A.   No.  Methods are similar in statistical analyses.  But in terms of application area, correct, there was nothing in automotive before.

Q.   You're a member of a number of professional societies?

A.   Yes.

Q.   American Medical Informatics Association?

A.   Yes.

Q.   American Public Health Association?

A.   Yeah.  There's a lot of things in my CV over different periods of my career for a lot of professional societies.

Q.   So you understand that when we get an expert's curriculum vitae, right -- that's a CV -- it's really a resume or a list of sort of your qualifications and accomplishments, right?

A.   Correct.

Q.   So what we do is we look at those to see if there are things in that that are relevant to the testimony in the case. And that's what I'm doing.  I'm going through -- you know, I'm going through your list of accomplishments and your career that you list as the things that you are -- that you have done to see if they have anything to do with automotive.  And that's

why I'm asking you about these associations.  They're on your CV, right?

A.   Yes.

Q.   Okay.  So the International Society of Pharmacokinetics [sic] and Outcome Research.

A.   That's pharmacoeconomics.  But yes.

Q.   American Society of Microbiology [sic]?

A.   Yes.

Q.   Society of Medical Decision Making [sic]?

A.   Yes.

Q.   International Society of Infectious Diseases [sic]?

A.   Yes.

Q.   None of those have anything to do with cars?

A.   No.

Q.   But you were contacted, I think you said, in June of 2022 about this case, right?

A.   No.  No.  It was much later than that.

Q.   Oh.  I'm sorry.  You were contacted -- well, anyway --

A.   I don't remember.  I think it was --

Q.   Time's not important to this question.  Sorry.

You are now a member of the Society of Automotive Engineers?

A.   Yes.

Q.   And you joined the Society of Automotive Engineers after you started testifying against car companies?

A.  Yes.

Q.  You don't serve on any committees of the SAE?

A.  No.  I didn't find one that was relevant to my skill set.

Q.  You have not published any articles through the Society of Automotive Engineers?

A.  That's correct.

Q.  You're not an automotive engineer?

A.  No.

Q.  You're not an engineer?

A.  Correct.

Q.  And there are engineers who devote their entire careers to analyzing risk associated with vehicles?

A.  That's correct.

Q.  You mentioned something, though, about cars a minute ago, and I wanted to explore that a little bit.  You talked about reduction in rear crashes, right?

A.  Correct.

Q.  By a technology that's called forward collision warning or automatic emergency braking, right?

A.  Yes.

Q.  And this is a system that is designed to assist the driver in avoiding a crash into the back of a vehicle in front of it, right?

A.  Well, it can be a vehicle -- depending also on the version, it could be a stationary object, or even a person, just

depending, but that's the idea, is that -- prevent a collision with something in front that you're -- so yeah.

Q.   In the lane in front of you?

A.   Yeah.  Yeah.

Q.   Okay.  And the -- you said that safety system had reduced crashes by 50 percent?

A.   There's multiple studies on it, and they're all at least close to or at about 50 percent.

Q.   Okay.

A.   Yeah.

Q.   And you also said something about the data that you looked at, and you said newer cars have updated safety systems, right?

A.   Yeah.  So what I'm saying is that if you look at the percentage of cars that have the systems, the newer the vehicles, the more likely it is that it has those systems. Depending on the manufacturer, they are rolled out at different rates over time.

Q.   And as those systems are rolled out at different rates over time, and get better and better, we see a wider and wider safety benefit, right?

A.   Well, the problem is a lot of things change every year.  So there could be other changes affecting crash rates and so forth, but that's the idea.

Q.   Okay.  But we are seeing simultaneously reduction in crash rates as more and more vehicles get these safety systems?

A. At least --

MR. SCHREIBER: I'll just object. It's a tad bit overbroad and incomplete hypothetical.

MR. SMITH: Your Honor, the witness --

THE COURT: Overruled.

THE WITNESS: In terms of this specific type of crash, I mean --

BY MR. SMITH:

Q. Yeah.

A. -- we're talking -- I mean, it's not going to change your chances of, you know, other types of crashes or hitting things off to the side.

Q. Or like somebody running into you?

A. Right.

Q. Right. Somebody who crashes into you. That doesn't change that kind of a crash. But it's giving drivers the ability to rely on these systems to reduce things like driver distraction, right?

A. Yes.

Q. Okay. Now, as now someone who does automotive engineering analysis, or automotive statistical analysis, you have become familiar with the databases, the government databases about crashes. You talked about some of them just a minute ago, right? One of them is called the Fatal Accident Reporting System [sic], right?

206

A.   Yes.

Q.   And that's called for short FARS, right?  But they're all fatalities in there, right?

A.   Yes.  It is a census of all crashes in which somebody died.

Q.   And the way that that system is built, is that accident reports that are done by police officers, like Corporal Riso, are filed with the federal government in a way that those accidents can be coded and identified for the causes of accident, what the consequences are, what the injuries are, right?

A.   Yeah.  But that dataset -- there's some additional investigation and checking of medical records, also some medical reports.  But that's the basic idea.

Q.   The source data is accident reports?

A.   That's the way it starts.

Q.   And you could actually look at FARS data to make a determination about whether or not -- well, let me back up for a second.

One of the distraction codes in the FARS data is a dropped object, right -- driver reaching for dropped object, right?

A.   I believe that's correct.

Q.   So it's possible for you to go look in the FARS data and some up with an analysis that would give you some ability to compare the crash rate for different vehicles based on that particular distraction, right?

A. Yeah. I mean, depending on what you're comparing -- or groups you're comparing, you would have to -- is it a sufficient number to analyze, but correct. I'm also not sure -- when it comes to the reasons for the distraction, I'm not sure exactly how accurate they are. I mean, they do a great job and everything, but I'm not sure -- I think they may be, you know, off by somewhat.

Q. Well, I'm not asking you to do a report, so you don't have to validate it.

A. Whew.

Q. But let me just ask you this: You could actually go and get some of those accident reports, couldn't you? I mean, by finding out through FARS, the Fatal Accident Reporting System, you could go get those accident reports, look at them, and determine examples of crashes that have occurred because people have dropped objects?

A. Yes.

Q. And that would be a reliable way to do that, wouldn't it?

A. It would be time consuming. But yeah, it would be a reliable way of doing it, specifically, again, for crashes in which somebody died.

Q. Yeah. Okay. Where somebody died because someone had dropped an object and wasn't paying attention to the road ahead of them?

A. Well, that's not necessarily true. Because when you say

208

that there's a driver distraction --

Q. Yes.

A. -- that doesn't necessarily mean that's the cause of the accident. So for example, they may be starting to reach but, you know, some object flies onto their windshield. Then whether they were reaching through their car or not, the rock through the windshield, you know, caused the accident. So I'm just saying you could look at higher and lower rates of fatal crashes with this coded, but it may not be exactly one to one with the cause of the accident.

Q. But you could look at the accident report, and if there was no rock flying through the windshield, there would be an ability to say: "Hey, here's one that shows somebody dropped a cigarette, or somebody dropped a cell phone, or somebody dropped a cigarette lighter, or somebody dropped a pair of pliers, and they ran off the side of the road, or they crossed the center line, or they ran through an intersection," and that would be --

MR. SCHREIBER: I'm just going to object. Go ahead.

THE COURT: I'm sorry. What's the basis?

MR. SCHREIBER: Well, he hasn't finished his question. It was clearly compound, but I was also going to object that -- with that windup, but I was also objecting, at this point, we are far afield beyond the scope of direct.

THE COURT: On the second point, it's overruled. On

the first point, let's break this question down, please.

MR. SMITH:  Thank you, Your Honor.

BY MR. SMITH:

Q.  Well, you heard the examples I was giving.  Let me isolate one.  Right?  You would be able to look and see if somebody was driving, dropped something, and the cause of the crash in the accident report could be identified as:  "Driver was reaching over, wasn't paying attention," and it would be coded as inattention, and it would be coded secondarily as the driver was reaching for a dropped object?

MR. SCHREIBER:  Remains compound.

THE COURT:  Overruled.

THE WITNESS:  So I think that's essentially correct.  And again, as I'm saying, that each individual case -- it's not just rocks through the windshield, but it could be an act that wasn't their fault at all.  Just -- they could be reaching for a cell phone and somebody else crashes into them or other things.  But if going -- going through the police crash report, and going through it in detail, then you could probably be able to pull out the cases where a dropped cell phone appeared to be the cause of the accident.

BY MR. SMITH:

Q.  Right.  And then you could look and see if the vehicle had a Level 2 system or Autopilot -- if it was a Tesla with Autopilot, or some other vehicle with a Level 2 system.  And

210

then you would know whether crashes happened because -- well, let me break this down.  Because I don't want to ask too many questions at once, because I have been doing that -- you would be able to tell from the accident reports what the vehicle was?

A.  Yeah.  You would know the make, model, year.  You would have the vehicle identification number.

Q.  So if it was a 1998 Dodge Ram, for example, you would know that doesn't have any technology.  It's not an L2 system, right?

A.  Right.

Q.  Because that's too old for -- that didn't exist at that time, right?

A.  That's right.

Q.  So you would able to know:  Here's a case -- by looking at the accident report:  Here's a case where, number one, I can tell the driver dropped an object and that is the attributed cause, which would be why it was coded that way in FARS in the first place, right?

A.  That's right.

Q.  And then I could look at the -- the make and model of the vehicle and determine whether or not an L2 system had anything to do with this, because if it didn't have an L2 system it couldn't have anything to do with this?

A.  So that's actually very difficult to do so.  I mean, there are year, make, model that -- some vehicles where you know they

didn't have it.  And then you have some where it was a standard feature, and you'd know that they would have it.  It gets really difficult when these are optional features to be able to tell from the report and the identification of the vehicle. It's very hard to know whether those -- in those cases, whether or not they had it.  And that's separate from just not knowing whether it was actually engaged.

Q.  That's a very good point.  But that point would not be in effect until like 2016 because -- well, 2015, because there was no L2 systems before 2015, right?  So anything prior to 2015, you wouldn't have to guess whether or not there was an L2 system in it.

A.  I was not under the impression that that was the first year that they had the combination of lane keep assist and adaptive cruise control.  I believe -- I thought there was some models that may have had it before.  It would have been a very small number.

Q.  Yeah.  Okay.  Well, you'd still -- if it was -- my example was a 1998 Dodge Ram pickup truck.

A.  Right.

Q.  Right.  You don't have to guess about that one.

A.  So there are cases where you know they didn't have it and it wasn't available, and other cases where you know it was standard so you know they had it.  And then there's all the ones in between.

Q.  Let's talk a little bit about your analysis or your questioning of the Vehicle Safety Report.  Because you don't really have a lot of opinions about it.  You just have a lot of questions about it; is that fair?

A.  No.  I'd say I definitely have opinions that the wrong things are being compared, and I've gone into a lot of detail about what things were wrong and that errors were made.  You know, I think by opinions you might mean something else, though.  But I'm not sure what you mean.

Q.  Well, let me go back to the peer-reviewed published articles that you -- you told us what a peer-reviewed published article was, right?

A.  (No verbal response.)

Q.  And that's where you submit something to a magazine, or a periodical, a professional periodical, or a book that -- like a book chapter, and it gets reviewed by other professionals in your area, right?

A.  Yes.

Q.  And you haven't written any peer-reviewed published articles on anything related to automotive risk?

A.  No.

Q.  So you relied on Noah Goodall's article -- peer-reviewed and published article about the -- about normalizing and adjusting for the kind of biases that you were talking about, right?

213

A.   For -- that's strictly within Teslas for the Autopilot --

Q.   Right.

A.   -- on versus the Autopilot off.

Q.   Right.  So he was comparing apples and apples.  He was comparing Teslas to Teslas, right?

I'm sorry.  Let me just -- let me make that a better question.  And I didn't mean to cut you off.  And I won't cut you off when I've asked a good question, I promise.  But that wasn't a good one.

He's comparing data from the Vehicle Safety Report that you questioned, but he's comparing the Teslas operating without Autopilot on and operating with Autopilot on, right?

A.   Yeah.  No.  The adjustment he makes for miles, I mean, that was based on other studies that have shown highway miles, you know, being associated with fewer -- lower crash risks and how much highway driving is done.  So he's relying on -- also on other expert reports and --

Q.   I'm sorry.  But the comparison is Tesla with Autopilot, Tesla without Autopilot, right?

A.   Right.  Because he's starting with the data from the Vehicle Safety Report because he doesn't actually have data from Tesla.

Q.   Right.  So what I'm asking you, though, is:  When he's comparing, he's comparing Teslas, the same vehicles when Autopilot is not being used and when Autopilot is being used,

right?

A.   Yes.

Q.   And you know of a very well-respected automotive engineer statistician whose name is Lawrence Blincoe, right?

A.   Yes.

Q.   And he works at the -- with the government, right?

A.   Yes.

Q.   And is one of the people who all of our safety agencies rely upon, right?

A.   Yes.

Q.   And you know that he did a report about 2019 crashes, right?

A.   Yes.

Q.   And he said that 36,500 people died -- actually, 36,500 on not just the round number.  That's the precise number.  It just happened to end on 500 -- 36,500 people died in crashes in 2019.

MR. SCHREIBER:  Objection, Your Honor.  It's an improper use of a learned treatise.

THE COURT:  Overruled.

THE WITNESS:  So that's about right.  I don't remember the numbers every year, but that's definitely -- that sounds right.

BY MR. SMITH:

Q.   All right.  So Noah Goodall, who you relied upon --

A.   Yes.

Q.   -- after adjusting this crash data, concluded that Tesla didn't have a 43 percent safety benefit, but it reduced crashes by 10 percent?

A.   Without accounting for the lower driving in bad weather or in traffic for Autopilot, but just based on the one correction based on the highway use that's what he found.  That's correct.

Q.   In a peer-reviewed published article, right?  Right?

A.   Yes.

Q.   And you know that Mr. Goodall also testifies in cases like you do against Tesla, right?

A.   No.  I don't know that.

Q.   Well --

A.   I believe you.  I just don't know that.

Q.   Let me ask you this:  If there's a 10 percent safety benefit, and 36,500 people die, what's 10 percent of 36,500?

A.   So the problem -- that's not how it's done, though. Because when you're looking at reduction in the number of crashes, that doesn't mean that that's the reduction in the number of severe injury crashes or fatalities and so forth. That's just a very round -- a number just taken for -- you know, for crashes in which -- this is Tesla data -- crashes in which an active safety restraint was deployed.  So you can't actually apply that correctly.

Q.   Doesn't Dr. Blincoe's study show that 29 percent of crashes

are attributable to distracted driving?

A.  I don't recall.  But that's not necessarily the same thing --

Q.  No.  No.  No.

A.  I'm not following.  Is it -- what's the question?  I'm sorry.

Q.  Yeah.  Let's do better here.

In Dr. Blincoe's study, he says that 29 percent of crashes in 2019 are attributable to distracted driving.  And then he applies that to the 36,500 fatalities and writes out that 10,500 fatalities are attributable to distracted driving, right?  He does that math.

MR. SCHREIBER:  Objection, Your Honor.  It assumes facts not in evidence.

THE COURT:  Sustained.

BY MR. SMITH:

Q.  All right.  Let's move on, then.

So in this peer-reviewed article, he found a 10 percent benefit -- 10 percent safety benefit?

A.  Again, using the Vehicle Safety Report data.

Q.  Whatever.  In his peer-reviewed, published article he still found 10 percent?

MR. SCHREIBER:  Just to be clear, Counsel, you're referring now back to the Goodall article, correct?

MR. SMITH:  I think we all understand that.  Yeah.

MR. SCHREIBER:  Oh.  Well, you just said Blincoe a second ago.

THE WITNESS:  Yeah.  I followed that it was about Goodall.

So I think what's important is the Goodall studies -- the primary purpose, in which he says very clearly both in the title and inside that -- and the value of the report was not in assessing whether Autopilot is more safe, or how much more safe it is, you know, than not having Autopilot.  I mean, it's very clear from the title normalizing -- he's saying:  "Here's a method to adjust for the highway mileage so that when these numbers are reported we could make the adjustment."

It is not vouching in any way, shape, or form for the validity -- the accuracy of the Tesla data.  The point of the article is not to try to make that claim about 43 and 10 percent.  Their article is trying to say:  "Look at this.  When you adjust for highway miles, it would change a 43 percent number to a 10 percent number," though they could all -- those numbers might very well be wrong.

BY MR. SMITH:

Q.  But he does still, with his adjustment, come up with a 10 percent safety benefit?

A.  Again --

Q.  That's what he said, isn't it?

A.  -- he is demonstrating the purpose that it will go down

218

from 43 to 10 percent according to the way Tesla reports the data.  It is -- therefore, it is an example -- and that's what he says that he's doing.  Here's an example of how we can take data reported for different kinds of driving and try to get it so that it's a more fair comparison.  That's his conclusion.

The numbers were an example in which he has no clue whether that data is reliable or not and whether those numbers would end up being the right numbers.  Merely, this is how greatly those numbers change just by counting for the highways.

Q.  You adjusted farther than Mr. Goodall did in his -- you made additional adjustments other than the ones Mr. Goodall made in his article, right?

A.  So the Goodall paper was only comparing within Tesla vehicles.

Q.  Right.

A.  And so the adjustments that I made were -- other adjustments I made were comparing -- specifically for comparing to non-Tesla vehicles.  So Goodall didn't look at that.  That would have nothing to do with the purpose of his paper.  So I had to make some other adjustments.

Q.  And the other adjustments that you made included people's credit scores, right?

A.  That's correct.

Q.  So your assumption is, is that people who have lower credit scores are higher risk of a crash?

A.   So that's been established.  Like I said, not only Allstate says it on their website, but there was -- the Federal Trade Commission did an exhaustive research.  And basically, if you're in around the seventy-fifth percentile, so just barely into the top quarter, you have about 20 percent benefit and fewer crashes.  So I mean, that's a known number.  I mean, that has this impact.

However, I did the analyses, as I mentioned, also without the adjustment for credit score, without the adjustment for age, just based on counting active safety restraint deployed.  But it all comes down to the numbers where you're starting from from Tesla.  They're not comparing anything vaguely similar.  And so what the exact numbers are doesn't really matter.  They're all wrong.  The data is so wrong from the website, you can't get to the right numbers.

Q.   Okay.  Let's -- I'm going to ask you about your credit score adjustment.  The reason you adjusted for credit scores is because you believe that drivers of Teslas have a higher -- have a better credit score and are wealthier, right?

A.   There's data to that effect.  Yes.

Q.   Okay.  And the other adjustment -- one of the other adjustments, including by Noah Goodall, is one of reduction or adjustment for non-highway driving?

A.   Correct.

Q.   So -- and when I say:  "Non-highway," I really mean

non-freeway.  Right?  But you know that Level 2 partial automated systems reduce crash rates on lower-speed roads, don't you?

A.  Okay.  So there is -- now you're referring to something -- a whole different report that I don't know if I'm allowed to talk about here.

Q.  Well, you -- you need to be talking to me, not him.

A.  Okay.  I should be looking at the jury.  But go ahead.

Q.  So you provided a report to us, didn't you, that's part of your reliance materials.  And that report is a report from the Insurance Institute of Highway Safety, right?

A.  So I am not testifying about that today.  That's not part of my testimony.  That's very complex.  But it does -- you're right that it does show that there's no benefit to automation.  And it's very complicated to understand that correctly.  So if you're going to pull some sentence out of it or something, we have to go through the whole document to be able to show that.

Q.  Look what I've got right here.

A.  You may have it, but I haven't just been looking at that report because it's not part of my testimony.

Q.  I got it from you.  You gave --

A.  That's nice.  But since I didn't testify -- I haven't reviewed it and I can't show you right now where it says things.

MR. SMITH:  May I approach, Your Honor, to give the

witness --

THE COURT:  You may.

MR. SCHREIBER:  And clearly, it goes far beyond the scope of direct examination.

THE COURT:  Overruled.

BY MR. SMITH:

Q.  So let's just realize for everybody here that I took your deposition in July of 2024.  Right?

A.  I don't remember.  I assume you're right, but I really don't remember the dates of the depositions.

MR. SMITH:  Your Honor, may I approach the witness again?

THE COURT:  You may.

MR. SMITH:  I'm going to hand you a copy of your deposition.

THE WITNESS:  Thank you.

BY MR. SMITH:

Q.  And what's the date on that deposition?

A.  July 22nd, 2024.

Q.  And what is the date on the article that I have handed you, which is Defendant's 605?

MR. SMITH:  Your Honor, for impeachment, I've marked it as 605.

Do you have a copy?

MR. SCHREIBER:  I don't.

THE COURT:  Defendant's 605 is the witness's report?

MR. SMITH:  No, Your Honor.  I'm going to -- I'm going to -- I just was letting you know what the number was.  I'm going to establish a foundation.

BY MR. SMITH:

Q.  This is the report from the Insurance Institute of Highway Safety that you provided to me before your deposition as supplemental material to support your deposition, correct?

A.  Yes.  That's correct.

Q.  Okay.

MR. SMITH:  So Your Honor, I'm going to -- I don't think this needs to be entered in evidence, but I do want to show some charts and graphs from it for cross-examination purposes.

THE COURT:  For demonstrative purposes or just to show the witness?

MR. SMITH:  Demonstrative purposes.  I want to be able to --

THE COURT:  All right.  Is there any objection to that?

MR. SCHREIBER:  Well, Your Honor, generally, the report, learned treatise, is not received into evidence.

THE COURT:  It's not going to be received into evidence.  The request is for demonstrative purposes only.

MR. SCHREIBER:  I find sometimes that's a distinction

without a difference.  So --

THE COURT:  Well, it certainly is a difference because it doesn't go back as part of the evidence.  Is there any objection for purposes of demonstrative evidence to allow the jury to review the pages that Mr. Smith is going to be referring to?

MR. SCHREIBER:  Yes, Your Honor.  I would object.  It's an improper use of a treatise or a periodical and a violation of 803(18).

THE COURT:  All right.  This was a -- and I wasn't at the deposition, but this was provided at the deposition.  So lay the foundation before we use this report.

MR. SMITH:  Your Honor, let me just -- all right.  Let me do that.

BY MR. SMITH:

Q.  Dr. Singer, as part of your preparation for your deposition, we -- well, let me back up, then.

You had to provide your file and your reliance materials for your opinions before your deposition to your counsel so they could be provided to me five days in advance so I could prepare, correct?

A.  That sounds right.

Q.  And you did that.  But just a day or so before your deposition, you provided this as a supplement to that, correct?

A.  Right.  It had just been released.  That's correct.

Q. Right. It had just been released and you provided it to us. And I asked you questions about it at your deposition?

A. Yes.

Q. All right.

MR. SMITH: So Your Honor, for that reason, I'd like to -- these are his reliance materials. I'd like to be able to --

THE COURT: And you may question him about the document that he relied upon. But for purposes of showing individual pages, I do agree that there's an objection and it should be properly sustained.

MR. SMITH: Okay. Thank you, Your Honor.

BY MR. SMITH:

Q. The data that the IIHS used to analyze this was data about driving of Nissan Rogues and BMWs -- BMWs and Minis, right?

A. That sounds right, yes.

Q. Okay. And it was 2017 to '19 Nissan Rogues and 2013 to '17 BMWs and Minis?

A. I don't remember. The report's in 2024, but I'm not sure when the model years are from.

Q. And what the -- as the title of the article suggests, it says: "Convenience or Safety Systems," question mark, "Crash Rates of Vehicles Equipped with Partial Driving Automation," right?

A. Yes.

Q.   And for the Nissan -- and if you'll turn to Page 24, for the Nissan, Table 1 there shows four different categories of -- four different levels of technology, right?

A.   Yes.

Q.   And the first level of technology is no technology at all, right?

A.   Correct.

Q.   No advanced driver-assistance systems?

A.   Right.  So no automation, no forward collision mitigation.

Q.   Right.  So the second level says:  "FCW and AEB."  That's the very effective method of preventing rear-end crashes, right?

A.   Yes.

Q.   But they are momentary.  That's Level 0 in the SAE, Society of Automotive Engineers, rubric, right?

A.   Yes.

Q.   And then the third category is Level 1.  It's the Level 0 technology plus adaptive cruise control?

A.   Yes.

Q.   That'd be Level 1.  And then the fourth category is partial driving automation, and that would be like Autopilot.  It would be Nissan's system, which I think is called PILOT Assist [sic].

A.   Sounds familiar.

Q.   Right.  And then, for each one of those four categories, the researchers, who are really automotive researchers, did an

analysis of limited access roads, which would be freeways, and the crash rates on freeways for each of those four categories. And then for low-speed roads, which would be roads like Card Sound Road, right?

MR. SCHREIBER: Objection. Assumes facts in evidence. And also, Your Honor --

THE COURT: Overruled.

MR. SCHREIBER: -- this report was never identified in Tesla's exhibit list.

THE COURT: The report that the witness provided in his deposition?

MR. SCHREIBER: Correct. They're saying it's being produced for impeachment. And obviously it was not authored for that purpose, so it's also procedurally improper the way it's being used.

THE COURT: The objection is overruled. You may continue.

MR. SMITH: Thank you, Your Honor.

BY MR. SMITH:

Q. So let's look at -- and what this does in Table 1 is -- it shows Nissan Rogue rear-end crash rates per million miles -- vehicle miles traveled by equipment with vehicle technology and road type. So what we're talking about is the crash rate for rear-end crashes, Nissan Rogues on the highway, off the highway, and with these four categories of technology, right?

A.   Yeah.   Like I said, I'm looking at this now.   I haven't seen it because I didn't rely on it for my testimony today.  But what you see in this report, it says there's still no clear evidence that partial driving automation --

Q.   How about stick to my question.   You can read all of it you want to the jury.   I'm fine.   But we're on Page 24 right now.  Okay?

A.   Twenty-four.   Okay.

Q.   So Limited Access Roads.   It says:  "The crash rate for limited access roads where there is no technology is 15.9 crashes per one hundred million miles driven," right?

A.   Yes.

Q.   In a Nissan Rogue?

A.   Yes.

Q.   And then, when you add FCW and AEB, the crash rate for Nissan Rogues on freeways goes down from 15.9 to 11.7 crashes per million miles driven -- hundred million miles driven, right?

A.   Yes.

Q.   And then, when we look at the addition of adaptive cruise control, it goes down from 11.7 to 10.7.

A.   Yes.

Q.   That's the safety benefit that's shown right there.   And then, when you add partial -- partial driving automation, like an Autopilot system, it goes down to 8.9 percent, doesn't it?

A.   Yes.

Q.   And then we look at the benefit off of the freeway, and it shows low-speed roads with no crashes -- with no technology are higher than on freeways, at 18.1 percent, right?

A.   Yeah.  Just to be clear, I think we're talking about the vehicles -- I don't think -- there's not knowledge of whether or not the system is engaged or not.  I just want to be clear what we're talking about here.

Q.   This says -- this is telling us Nissan rear-end crashes crash rates per one hundred million miles by equipment with vehicle technology and road type, right?

A.   So it means whether the equipment is on it, not necessarily whether -- when and where it's used.

Q.   Right.

A.   I'm just being clear that that's what we're talking about.

Q.   Right.  But my question was about one of the particular entries on here, not about that.  My question is:  This is on low-speed roads, and the crash rate when there's no technology is 18.1 percent.  Add FCW and AEB, which is Level 0, and it goes down to 12 percent.

A.   No, not percent.

Q.   I'm sorry.  I keep doing that.

A.   Yeah.

Q.   It goes from 18.1 crashes per million miles to 12 crashes per million miles, right?

A. That's right.

Q. And then when we look at the adaptive cruise control, it doesn't go down. It actually goes to adding -- when it goes to Level 2 -- I mean level 1, it's 12.1 percent, right -- I'm sorry. The rate is 12.1, right?

A. Yes.

Q. But look what happens when you add a system like Autopilot. It goes from 12.1 percent to 6.6 percent. That is a rate drop of 45 percent, right?

A. So it's a rate, not a percent. But the numbers are correct.

Q. Yeah. Well, it's actually -- I did say that right. It is -- 6.6 is 45 --

A. The 45 percent was right. The 12.1 and 6.6, when you said percent again, I know what you mean. It was clear.

Q. Right. So -- and that's on -- not on the freeway, right?

A. Yes. That's right.

Q. And these are Nissan Rogues, which are nice cars, but they aren't that expensive, right?

A. I don't think so.

Q. So you don't have to figure out what people's credit scores are here, do you?

A. I'm not sure about -- I'm sorry. I'm just not an expert in costs of vehicles and options to have these features or whether there were versions that would cost more when you have the

features.  I just -- I don't know.

Q.  All right.  Let's look at Table 3 because that's a different kind of crash, right?  Table 3 is for lane departure crashes, not rear-end crashes.  And the same thing is true here --

A.  Yes.

Q.  -- for limited access roads, freeways.  It goes from no system, no technology, no ADAS, at 10 crashes per hundred million miles to 8.5 crashes when you add an Autopilot-like system, right?

A.  Yes.

Q.  And then, when you look at low-speed roads, lane departure crashes go from 10.6 crashes per one hundred million miles down to 7.8 when you add Autopilot types of systems, right?

A.  Yeah.  Which is surprising since lane departure systems don't work in low speeds.

Q.  Well -- and here's the interesting thing to me:  These authors found that those were statistically significant reductions, didn't they?  They looked at these and found statistical significance for the Nissan -- not for the BMW.  They didn't find any statistical significance there.

A.  So that would be misleading to just answer that yes or no.  I'm sorry.  What they found -- right, because in their conclusion they're saying they don't see a benefit because, one, the benefit we just talked about, low speeds, is happening

231

in a speed when the system doesn't work.  It's not activated at those low speeds.  And they attribute those differences, even though statistically significant, to other features that are on the car, nothing to do with automation.

Q.   You sent me this, right?

A.   Yeah.

Q.   And the data that it shows there for each of those two kinds of crashes, on each of those two kinds of roads --

A.   Right.

Q.   -- the more technology there was, the lower the crash rate was?

A.   And there were other features that are not mentioned that also came along in the same packages, to which the authors are attributing benefit on these -- in these low speeds.  So again, you can't just say, "Well, here's a statistically significant" -- but it's not actually for the difference just between automation and not automation, because there were other safety systems -- there were other systems in place at the same time.  And they used that to explain why.  In Nissan, they found an effect because there were other systems, nothing to do with automation.  BMW they don't find that.

Q.   The authors found the Nissan data and analysis significant. They used the word "significant," right?

A.   And they say that it's not attributable to the automation.

Q.   Can you --

A.  I'm just saying, if you just say it's significant, and claim it's about one thing, and the authors say the opposite, that's not fair.

Q.  Can you answer my question and then you can explain.  I asked you:  Did --

A.  And I believe I answered.  The result is significant, which they attribute to other causes.

Q.  All right.  So they said it was significant?

A.  Yes.

Q.  And they said that the data analysis that they did, that showed a reduction -- they said the reduction is significant?

A.  In Nissan, yes.

Q.  Thank you.

        MR. SMITH:  No further questions, Your Honor.

        THE COURT:  All right.  Any redirect?

        MR. SCHREIBER:  Yes.  Just briefly.

                    REDIRECT EXAMINATION

BY MR. SCHREIBER:

Q.  You came here to testify about Tesla, right, Dr. Singer?

A.  Yes.

Q.  Yeah.  And we just spent a whole lot of time on Exhibit 605 and comparing crashes of whole years -- many, many years of Nissan vehicles, right, from -- he gave some year -- multiyear range, true?

A.  Yes.

233

Q. And it didn't make any distinction about the type of hardware over those many years of Nissans, correct?

A. Right.

Q. And there was no distinction about the type of software that was used in those Nissans for many years, correct?

A. Correct.

Q. And when they talked about different types of crashes, they called it rear-end, but we don't know if it was a broadside sometimes, or why someone went off the lane, correct?

A. Correct.

Q. Those things were not considered in any of the discussion and the data that was just shown to you and talked to you about for 25 minutes, correct?

A. Correct.

Q. All right. And in fact, as you did say, this study, at Page 18, in its conclusion, found that it would be easy to conclude that Nissan Rouge's partial driving automation system was reducing crashes if performance only -- if performance was only on limited access roads, correct?

A. I'm trying to find that.

Q. Oh. I'm sorry. Second line of the second paragraph on Page 18.

A. Yes. I see it now. Thank you.

Q. And going towards the end of that paragraph, if you're going to examine the crash effects of partial driving

automation, it requires careful attention to the environments where it's used.  The crashes is -- that it -- could be conceivably prevented, correct?

A.  Yes.

Q.  And that this research, the very research that they pulled out of their impeachment file, says:  "To date, including this study," has not reported conclusive evidence that partial driving auto makes is a crash prevention system.  In other words, like the title says, is it really even doing anything.  Correct?

A.  That's right.  That's what it says in this report.  So as of July 2024, based on the review of studies and literature, including this study, there was still no evidence that partial automation confers any safety benefit at all.

Q.  And that goes to the whole point of the Vehicle Safety Report and why you take issue and have criticism with it.  Because that may influence the ordinary consumer --

MR. SMITH:  Your Honor, this is leading.

THE COURT:  The objection to leading is sustained.  Rephrase.

BY MR. SCHREIBER:

Q.  Describe for us how, in light of all of this body of research, and the work you did looking at the Vehicle Safety Report -- how that can influence the ordinary consumer's perception of whether or not Tesla vehicles on Autopilot are

actually safer.

A.  I'm sorry.  Could you repeat the question?

Q.  I will try and make it shorter.

Describe for us, based upon the work you performed in this case, how the Vehicle Safety Report influences the ordinary consumer.

MR. SMITH:  Your Honor, I would object to that as being beyond the scope of this witness's testimony.  He's here to testify about statistics.

THE COURT:  I understand.  Is it related to the document that the witness was questioned about in cross-examination?

MR. SCHREIBER:  Well, of course, because that concludes about how --

THE COURT:  And if it is related, then the objection is overruled.

BY MR. SCHREIBER:

Q.  Please proceed.

THE COURT:  You may answer the question.

THE WITNESS:  So if consumers were to look at the Tesla website, and look at the Vehicle Safety Report, then they would have been seeing -- and this would have been true back to 2018 when they initiated, and in 2019 when -- when in this case the subject vehicle was purchased -- if they're looking at the website and the Vehicle Safety Report, they would see numbers

that are grossly wrong, comparisons of things that aren't at all similar, as I have explained at length, and numbers that were then later changed and shown.  So we don't even know if those numbers were at all accurate.

But we know merely with the highway adjustment, if that's all they looked at, they would have overstated the benefits by four to one.  And that's without counting for, as I said, Autopilot not being used, and not used in traffic and bad weather, and other adjustments, and so forth.  In which case, there might not have been any benefit which align with this July 2024 report that we just spent a lot of time on.

MR. SCHREIBER:  Thank you, Dr. Singer.  Nothing further.

THE COURT:  All right.  Is Dr. Singer excused?

MR. SCHREIBER:  He is, Your Honor.

MR. SMITH:  As far as I'm concerned, Your Honor.

THE COURT:  All right.  Thank you, sir.  You are excused.

(Witness excused.)

THE COURT:  We have time for another witness?

MR. SCHREIBER:  Yes, Your Honor.  If it would be okay, we could play approximately 20 minutes of Akshay Phatak, Tesla's corporate representative.

THE COURT:  All right.

MR. SCHREIBER:  Would the Court be inclined to just

give a brief description -- I know it's in the instructions --
on what a deposition is?

THE COURT:  Yes.  Of course.  Of course.

Are you ready to -- do we need a little comfort break?

Not a problem.

So why don't we just take a short stretch break, and
we'll see you back here in five minutes, okay?

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 4:38 p.m.)

THE COURT:  All right.  We're on a five-minute stretch
break.  Go ahead and have a seat.

(Recess from 4:38 p.m. to 4:44 p.m.)

THE COURT:  Are we ready to return?  Are we waiting
for anybody or are we ready to continue?

MR. SMITH:  Your Honor, I think you can bring the jury
in when you're ready.

THE COURT:  Can you see if they are all back.  They
might have gone to the restroom.

Thank you so much.

(Pause in proceedings.)

COURT SECURITY OFFICER:  Your Honor, they're all
there.

THE COURT:  Okay.  We can bring them in.

Thank you.

COURT SECURITY OFFICER:  All rise for the jury.

(Before the Jury, 4:45 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

Are we ready to proceed?

All right.  Ladies and Gentlemen, a deposition is a witness's sworn testimony that is taken before the trial. During a deposition, the witness is under oath and swears to tell the truth, and the lawyers for each party may ask questions.  A court reporter is present and records the questions and the answers.

The Deposition of Akshay Phatak, taken on July 20th, 2023, and August 2nd, 2023, is about to be presented to you via a videotape.  Deposition testimony is entitled to the same consideration as live testimony, and you must judge it in the same way as if the witness was testifying in court.

Okay.  Let us proceed.

MR. SCHREIBER:  And just for the record, Your Honor, the report of the currently agreed-upon clips -- and if there are any additions made later -- will just be marked for the record as P-102.  Obviously, not to be received into evidence, but to the extent there's ever anyone looking back, it's always good to know what the video clips --

THE COURT:  Of course.  Thank you, Mr. Schreiber.

MR. SCHREIBER:  Thank you.

239

(Deposition of Akshay Phatak, July 20, 2023, as played:)

"DIRECT EXAMINATION

"BY MR. MCDEVITT:

"Q. Who do you currently work for?

"A. Tesla.

"Q. How long have you worked for Tesla?

"A. About nine years.

"Q. What is your current job title?

"A. Senior staff software engineer.

"Q. My first question is:  Do you understand that your role was to testify today on behalf of Tesla with respect to driver monitoring and hands-on detection for Autopilot?

"A. Yes.

"Q. What is your educational background?

"A. So I did engineer -- both bachelor's and master's in engineering.

"Q. In what field of engineering?

"A. The bachelor was in electronics.  The master's was in robotics.

"Q. When you first started at Tesla, what was your job title?

"A. I started as an intern.

"Q. Okay.  Can you just walk us through the different job positions you've held at Tesla and then tell us the years you held each position.

"A. I may not be able to remember the exact years, but I will try my best. I joined as an intern in 2014. Joined as software -- it may have been firmware or software engineer.

"COURT REPORTER: It may have been -- it may have been what?

"THE WITNESS: Firmware.

"UNIDENTIFIED SPEAKER: F-I-R-M-ware.

"COURT REPORTER: Firmware. Thank you.

"UNIDENTIFIED SPEAKER: Yeah.

"THE WITNESS: When I joined full-time, my title was either firmware engineer or software engineer. I don't exactly remember. That was in 2015. Then, over the period, I got through -- like I got promoted to like senior -- senior firmware engineer, staff firmware engineer, and now senior staff software engineer.

"BY MR. MCDEVITT:

"Q. All right. During the time that you've been employed with Tesla, have you had any role in the development of the Autopilot car package?

"A. Yes.

"Q. And describe for us your role with respect to the development of Autopilot over the years.

"A. So when I joined as an intern, I was mostly involved in hardware bring-up. So that was before we launched any Autopilot hardware. Then, when I joined as full-time, I have

been involved in like various capacities.  Hardware bring-up for like subsequent generation of hardware has been one of the roles.

"Bring-up Autopilot -- like bring-up and integration of Autopilot in the new car models have been one of my roles.  I have helped with like various like smaller, like, control projects.  Also with some of the telemetry side code -- on like the vehicle side telemetry code.

"COURT REPORTER:  I'm sorry.  Like the what -- something I couldn't understand.

"BY MR. MCDEVITT:

"Q. Vehicle side telemetry code, correct?

"A. Yeah.  And I have helped with car monitoring, camera bring-up, and -- yeah.  Those are some of the examples that I remember off the top.

"Q. During what period of time were you involved in development of driver monitoring for Tesla Autopilot?

"A. So I got involved in driver monitoring during bring-up of Autopilot for the first Model X.  And then I've been involved on and off depending on the requirements of the team.

"Q. Is there any document that you are aware of that provides an overview of any testing that Tesla performed relating to driver monitoring?

"A. I mean, we -- we do testing for every incremental change.  And all of that -- like, those details would be documented in

the relevant Jira tickets.

"COURT REPORTER:  Documented in?

"THE WITNESS:  The relevant Jira tickets.

"MR. MCDEVITT:  Relevant Jira tickets.

"COURT REPORTER:  Thank you.

"BY MR. MCDEVITT:

"Q. And did you look through relevant Jira tickets to prepare yourself for today's deposition?

"A. Yes.

"Q. Prior to March of 2018, did Tesla perform analysis of crashes involving vehicles with Autopilot engaged?

"A. If we got the telemetry, we did look at the snapshot or clip, and we did analyze that.

"Q. And who specifically did that?

"A. So like this -- this is the part where he didn't have like specific documentation.  But from my understanding, it would have been -- Huan Zhang and CJ Moore would have been involved with that analysis.

"Q. What form of documentation exists that reflects the crash statistics of Tesla vehicles prior to March of 2018, under the condition of when Autopilot was engaged versus not?

"A. I'm not aware of any such documentation.

"Q. Okay.  So let me just be clear.  There's no documentation prior to March of 2018 from which anybody at Tesla could say there are less crashes with Autopilot engaged than without?

"A. That there is -- yeah, that is my understanding.

"Q. All right.  And there's no documentation prior to March of 2018 from which anybody at Tesla could say it's safer to use a Tesla with Autopilot engaged than without?

"A. Yeah.  So, I mean, I would answer like the documentation part of your question.  I'm not aware of the documentation.  I won't be able to comment on like safety -- the safety part of the question.

"Q. Prior to March of 2018, did Tesla maintain any records for the purpose of evaluating whether it was safer to use a Tesla with Autopilot engaged than without?

"A. I'm not sure how you define 'safer.'

"Q. If you were to define safer by safer meaning that you're less likely to get into a crash with Autopilot engaged than without Autopilot engaged.

"A. Yeah.  We did not have a specific documentation for crashes, yes.

"Q. Okay.  Regardless of whether there was specific documentation, did Tesla maintain any documentation that would allow anybody to comment as to whether Tesla vehicles were less likely to be engaged -- involved in a crash with Autopilot activated than without?

"A. Not to my knowledge.

"Q. Did Tesla have any documentation specifically that reached a conclusion that Autopilot was two times, three times, four

times, or five times safer than a human driver prior to March of '18 -- 2018?

"A. I'm not sure what's the difference between the earlier question and this question.

"Q. Was your answer the same?

"A. Yeah.

"Q. Okay.  So there was no documentation or data that Tesla maintained to support an assertion that Autopilot was some number of times safer than a human driver prior to March of 2018.  True?

"A. I would say there is not -- no, like, conclusive, like, documentation, no.

"Q. Prior to March --

        "COURT REPORTER:  I'm sorry.  No what kind of documentation?

        "THE WITNESS:  Conclusive.

        "COURT REPORTER:  Conclusive.  Thank you.

"BY MR. MCDEVITT:

"Q. Prior to March of 2018, did Tesla maintain any records or data that kept track of the number of crashes that occurred per vehicle mile driven with Autopilot engaged?

"A. No."

        (End of video.)

        MR. SCHREIBER:  Your Honor, we thought that would be a good breaking point --

THE COURT:  All right.  Certainly.

Okay.  Ladies and Gentlemen, at this point in time, we will adjourn for the evening.  Recall -- and I want to thank you ahead of time for accommodating Friday, that you're willing to come in early.  So tomorrow will be from -- and if I didn't say, it's 9:30 to four p.m.  Thursday will be 9:30 to 4:30 p.m. And then -- thank you -- on Friday will be 9:30 to three p.m.

And I know that Liz is putting it on the board.  I've signed some letters for some of you that needed the letters for your employment.  But I do wish you a good evening.

Let me first make sure that you know that you are not to discuss this case with anyone nor permit anyone to speak with you.  Everything learned about the case is learned in this courtroom.

Have a pleasant evening.

If you'll place your juror notebooks in the jury room. And I'll see you tomorrow morning at 9:30 a.m.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 4:59 p.m.)

THE COURT:  Okay.  Go ahead and have a seat.

And let's talk about tomorrow.

Mr. Schreiber?

MR. SCHREIBER:  Yes, Your Honor.

Tomorrow, the Plaintiffs intend to put Dr. Mary Cummings on the stand.  We may play a little more of Mr. Phatak

before.  I also have a few clips that were agreed upon that are not in the in lieu of live section that are relevant to Dr. Cummings's opinions which she offered in deposition.  So there will be a few clips of Mr. Phatak.  He'll be making appearances, I should say, during her direct testimony.

THE COURT:  All right.

MR. SCHREIBER:  But beyond that, I think that's probably going to be our day because I know my direct of her is going to be at least two, probably three hours.  And I have a feeling her cross will take up the balance of the day.

THE COURT:  All right.  Are there any issues related to Dr. Cummings?

MR. SCHREIBER:  The only one, Your Honor, would be as it relates to the safety recommendations --

MR. EATON:  There's more.

MR. SCHREIBER:  I'm sorry?  Yeah.  Well, the safety recommendations will be one issue, and we will be filing some supplemental briefing.  I also defer to Mr. Eaton, should the Court wish to entertain any other argument or hear anything more from us on that, and I believe there may be some other issues.

MR. EATON:  So Your Honor, Docket Entry 469 was a supplemental memorandum we filed related to the objections that were raised, including the NTSB report.  You issued an order late Sunday.  This was already written.  And so, in that, I

dropped a footnote that said consider this a motion for reconsideration on that.

THE COURT:  That's right.

MR. EATON:  And I don't think you've had an opportunity to review that yet.  So I would ask if you would take a chance tonight and take a look at that.

So it deals not only with the NTSB report, and what we consider to be not part of the NTSB report.  And I do want to make clear, earlier, when I said we're not putting in the report -- that was Exhibit 77 -- that was based on your ruling. And I do think that, when you read my argument, you're going to see that really I only believe that that statute applies to the Brown case itself and not any other case.

So I don't want to waive anything by saying -- at that point, the way the Court had ruled, it was okay for us because we had the documents that were outside the report, which was really what we're seeking to use, not the report itself.  So that's why I didn't make a fuss about it.  But now the Court's saying:  "Okay.  All of this stuff is part of the report."  So to that end, I'll revert back to my original argument, which is that 1154 only applies to the Brown case itself, which you'll see in my response.

THE COURT:  Okay.  And that's preserved in your response, what you're asking the Court to consider as a motion for reconsideration.

MR. EATON:  Correct, Your Honor.

The second issue before Dr. Cummings gets on the stand is the substantial similarity issue.  There are two buckets of cases here.  The Court -- so we can discuss -- there were three specific cases, the Banner, the Brown, and the -- I'm not even going to try it -- the Japan case, that used the words "substantially similar," but we did not provide certain information with respect to other cases.

And the information that you're requesting -- and let me quote it so that I don't get it wrong -- "The year and model of the vehicles, whether the accidents occurred before or after the subject collision or the date of the accident, what changes have been made to the Autopilot design, the nature of the accident, what kind of object the vehicle collided with, or any other circumstances of the accident."

The first thing I want to address are the accidents identified in the Request for Admissions.  There were 18 Requests for Admission that contained that level of detail.  And those were attached to our initial memorandum on substantial similarity.  They had the date of the accident, they had what it ran into, they had links to the accident.  And so we ask that with respect to those --

THE COURT:  So the Defendant conceded that those were substantially similar accidents?

MR. EATON:  The Defendant said these accidents were

rear-end accidents with an inattentive driver with Autopilot engaged. And those -- the requests themselves have the actual details of the accidents in them.

So with respect to the ones that we've identified -- the numbers that were identified in there, some before and after this accident, we believe we've met the standard that the Court set forth in your order, and we would ask that you reconsider the admissibility of those accidents in order to discuss them with Dr. Cummings.

THE COURT: So has that been admitted by the Defendant that those accidents are substantially similar?

MR. SMITH: Absolutely not, Your Honor.

MR. EATON: I'm sorry. The admission didn't say: Are these substantially similar? The admission was: "Admit that this was an Autopilot accident with a distracted driver." And they said: "Yes, it is."

We actually provided the request and the answers as an exhibit to our initial substantial similarity memo. So that's in there. I can get you the docket entry, if you'd like.

MR. SMITH: And Your Honor, we addressed that in the memo that Your Honor directed us to do before trial. And I think it was on the 7th that we provided that, and our response is there. And we did not admit to substantial similarity, and we identified specific reasons in our response as to why the 18 and any others should not be admitted, and Your Honor ruled.

250

THE COURT:  Mr. Eaton, you said that there was an exhibit attached with regard to admissions?

MR. EATON:  Yes.  Our initial -- can we get the docket entry for what we filed.  It was filed on Monday, the 10th -- the 7th.

THE COURT:  Yeah.  I don't see a document attached.  But most important, Mr. Eaton, when this Court entered its order on the parties' competing motions in limine, the Court was very clear on Page 40 of the Court's order:  "No later than July 7th, 2025, the Plaintiff shall file a notice regarding other accidents."  And the Court set forth specifically those eight criteria to assist the Court in determining whether those accidents were substantially similar.

At no time did the Court receive any other information about any other accidents other than those three to which the Plaintiff had represented that it believed were substantially similar.

MR. EATON:  No, Your Honor.  Those were included in our response on the 7th.  We specifically identified the 18 accidents in the Request for Admissions and attached the Request for Admissions to that.  That was in the response.  And rather than cut and paste, we just attached the admissions as an exhibit.

THE COURT:  So these were the Defendant's admissions?

MR. EATON:  That's correct.

251

THE COURT:  I'm not --

MR. EATON:  It said --

THE COURT:  Yeah.  Can you just point to the ECF. Because I'm looking at 441, and within 441 you have identified the Benavides, the Brown, the Kanagawa, and the Banner.  And that is specifically on Page 5.  And you have answered the Court's questions.  And as the Court was required to do, it entered an order finding that they were substantially similar. I don't see, Mr. Eaton, within this document, ECF 441, filed on July 7th, that you attached anything else for the Court's consideration.

So to the extent that the Defendant has admitted that they're substantially similar, then I'm happy to consider those admissions, and you may certainly introduce them.

MR. EATON:  It was on Page 9, Tesla's responses to Plaintiffs' Request for Admission or Statements of Opponent under FRE 801(2).  That's not hearsay.  Plaintiff --

(Court reporter interruption.)

THE COURT:  Okay.  Hold on.

MR. EATON:  I'm sorry, Your Honor.  It's on Page 9.

THE COURT:  Right.  But you're referring to Tesla's response.  But you haven't -- I'm not part of your world of discovery.  I don't have the responses to the Requests for Admissions.

MR. EATON:  Yes.  They were supposed to be attached as

an exhibit.  So I'm not sure what happened there.  Let me see here.

THE COURT:  And once again, to the extent that the Defendant has admitted that those accidents are substantially similar, then certainly you can use them during the testimony of Dr. Cummings.  But short of that, the Court has already addressed all of the information that was provided for the Court to conduct an analysis relating to eight specific areas.  Okay?

MR. EATON:  Correct.  So yes -- and I actually referenced it in the very first paragraph of this:  "Plaintiffs seek to introduce the findings of NHTSA from its review of Autopilot collisions, as well as Tesla's admissions that at least 18 of the accidents identified in Plaintiffs' complaints Tesla was aware they involved inattentive driver that was driving with Autosteer engaged."

So I'm sorry if the admissions were not attached, but that was referenced in the first paragraph and later on.  So I'm happy to file those again.  I apologize.  I don't know why they weren't attached.

But the other issue, Your Honor, is that with respect to the 211 -- the NHTSA findings regarding 211, the detail in there -- we explain why, because they're only for notice, there's a relaxed standard of substantial similarity.  And that's in the brief 469.  So I simply ask the Court to review

469 with that in mind, and especially in light of the fact we just spent 20 minutes talking about Nissan Rogue accidents over our objection, you know, and as well as another -- a number of FARS that were put forth in opening statement.

This kind of aggregate data that we have here -- what we have here for this aggregate data are 211 accidents that occurred with distracted drivers driving into another object directly in front of it while Autopilot is engaged.  So we know that those factors are all there.  And the cases that I cited in my response detail the admissibility of this kind of compendium of crashes in the aggregate.  And that's what we're saying, is that there were several accidents -- and by the way, these were all reported by Tesla to NHTSA.  So Tesla's aware of these.  They're required by law to report these accidents.

NHTSA said:  "Tesla has reported these.  We've reviewed them."  This subset of these accidents are the same type of accidents that we have in this case.  And so all we're simply saying is that we just want to explain to the jury that, in fact, as part of this NHTSA report there have been a number of accidents, well more than Banner -- we don't need to go into the details, only because we don't have them, because we weren't provided that by NHTSA or Tesla --

THE COURT:  Mr. Eaton, you're merely rearguing what was already contained within the briefing.  The Court has ruled on the items that you gave to the Court for consideration.

Once again, if you have asked the Defendant for substantially similar prior accidents that may have given a response, request for admissions are admissible, they are statements of a party opponent, so you can certainly introduce those. But to the extent that any of the other accidents are not substantially similar, I've set forth the law and I'm going to follow it. And it requires that there be a substantial similarity. And I've done the analysis of the information that you provided on July 7th. So that's where I am. What's before the Court is a motion for reconsideration, and I'll properly address that motion.

MR. EATON: That's all -- I'm just giving a prequel to that, Your Honor --

THE COURT: All right. Is there anything further that we need to address this evening?

MR. SMITH: Your Honor, the only thing that I would raise with the Court -- and not for decision tonight, but just briefly to say, is that Dr. Cummings is probably going to talk about Musk's statements, and we have some objections to those, and we need to figure out in the morning how we might deal with those as they're coming up. Either the Rule of Completeness or whether or not, as the Court identified, if they are forward-looking, et cetera, they shouldn't -- I mean, that's our objection. The Court didn't say they wouldn't come in.

THE COURT: I believe the Rule of Completeness would

apply.  So to the extent that the Plaintiff seeks to introduce a statement from Elon Musk that is a partial statement and is out of context, then the Rule of Completeness would allow you to ask the Plaintiff to continue to read certain portions that give a context.

MR. SMITH:  And Your Honor, we will try to be as prepared as possible on that as they are coming up.  We have sort of a chart of what we think needs to be added for completeness and we will try to be prepared for that.

Thank you.  I didn't mean to take time.  Thanks.

THE COURT:  Not a problem.  Have a nice evening.

I'll see you tomorrow morning at 9:30.

COURT SECURITY OFFICER:  All rise.

(Proceedings adjourned at 5:13 p.m.)

Yvette Hernandez, Official Court Reporter
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-

256

UNITED STATES OF AMERICA       )

ss:

SOUTHERN DISTRICT OF FLORIDA   )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 15th day of July, 2025, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 – 256.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 10th day of September, 2025.


                        /s/Yvette Hernandez
                        _____
                        Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
                        400 North Miami Avenue, 10-2
                        Miami, Florida 33128
                        (305) 523-5698
                        yvette_hernandez@flsd.uscourts.gov