# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| NEIMA BENAVIDES, as Personal Representative of the Estate of Naibel Benavides Leon, deceased, | Case No. 21-cv-21940-BLOOM/Torres |
| Plaintiff, | |
| v. | |
| TESLA, INC., a/k/a/ Tesla Florida, Inc., | |
| Defendant. | |
| DILLON ANGULO, | Case No. 22-22607-KMM |
| Plaintiff, | |
| v. | |
| TESLA, INC., a/k/a/ Tesla Florida, Inc., | |
| Defendant. | IN-PERSON HEARING REQUESTED |

## DEFENDANT TESLA, INC.'S AMENDED RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR A NEW TRIAL OR TO AMEND THE JUDGMENT

Wendy F. Lumish
Florida Bar No. 334332
BOWMAN AND BROOKE LLP
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134

Theodore J. Boutrous, Jr. (*admitted pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071

Paul D. Clement (*admitted pro hac vice*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314

*Attorneys for Defendant TESLA, Inc.*
(*Additional Attorneys in Signature Block*)

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

LEGAL STANDARDS ...................................................................................................... 6

ARGUMENT ..................................................................................................................... 7

I.    Tesla Is Entitled to Judgment as a Matter of Law (or at Least a New Trial) on
Liability................................................................................................................... 7

    A.    The Verdict Is Unsupported by Reliable Expert Evidence. .................................. 7

    B.    Plaintiffs' Design-Defect Theories Fail as a Matter of Law.................................. 9

        1.    Tesla's 2019 Model S Was Not Defective................................................. 10

        2.    McGee Was the Sole Cause of Plaintiffs' Injuries. ................................... 18

    C.    The Failure-to-Warn Claim Fails as a Matter of Law........................................... 23

        1.    Tesla Had No Duty to Warn. .................................................................... 23

        2.    Tesla Provided Extensive Warnings. ....................................................... 24

        3.    The Asserted Failure to Warn Didn't Cause the Crash............................. 27

    D.    Tesla Is Entitled to a New Trial If the Record Cannot Sustain the Verdict as
to Any Theory on Which the Jury Was Instructed. ................................................ 27

II.    Highly Prejudicial Evidentiary Errors Warrant a New Trial on All Issues. .................... 28

    A.    The Improper Admission of Data-Related Evidence Prejudiced Tesla. ............... 28

    B.    The Improper Admission of Elon Musk's Statements Prejudiced Tesla. ............. 32

    C.    The Improper Admission of Dissimilar Accidents Prejudiced Tesla. .................. 34

III.    This Court Should Grant Tesla Judgment as a Matter of Law on Punitive Damages or
at Least Significantly Reduce Punitive Damages. ........................................................... 39

    A.    Florida Law Prohibits the Imposition of Any Punitive Damages in This Case.... 40

    B.    Florida Law Caps Punitive Damages at Three Times the Compensatory
Damages Actually Awarded Against Tesla. .......................................................... 49

    C.    The Due Process Clause Limits Punitive Damages Here to No More Than the
Net Award of Compensatory Damages. ................................................................ 51

        1.    Tesla's Conduct Was Not Reprehensible. ................................................ 52

ii

2.      A Substantial Disparity Exists Between the $200 Million Award of
        Punitive Damages and the $42.3 Million Award of Compensatory
        Damages..................................................................................................... 53

3.      Comparable Civil Penalties Do Not Justify the Punitive-Damages
        Award........................................................................................................... 55

IV.  This Court Should Reduce the Grossly Excessive Award of Compensatory Damages
     to No More Than $69 Million............................................................................ 57

CONCLUSION.......................................................................................................... 60

REQUEST FOR HEARING......................................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abel v. Dubberly*,
210 F.3d 1334 (11th Cir. 2000) ................................................................6

*Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*,
37 F.3d 1460 (11th Cir. 1994) .................................................31, 34, 38

*Aetna Cas. & Sur. Co. v. Gosdin*,
803 F.2d 1153 (11th Cir. 1986) ................................................31, 32

*Alderman v. Wysong & Miles Co.*,
486 So. 2d 673 (Fla. Dist. Ct. App. 1986) ...............................................12

*Alevromagiros v. Hechinger Co.*,
993 F.2d 417 (4th Cir. 1993) ..................................................................13

*Allstate Life Ins. Co. v. Miller*,
424 F.3d 1113 (11th Cir. 2005) ........................................................41, 44

*Am. Cyanamid Co. v. Roy*,
498 So. 2d 859 (Fla. 1986).............................................................44, 46

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................6

*Aubin v. Union Carbide Corp.*,
177 So. 3d 489 (Fla. 2015)................................................................10

*Banister v. Davis*,
590 U.S. 504 (2020)..........................................................................7

*BMW of N. Am. v. Gore*,
517 U.S. 559 (1996)............................................5, 38, 40, 45, 51, 52, 55, 57

*Bonnell v. Carnival Corp.*,
2014 WL 12580433 (S.D. Fla. Oct. 23, 2014)...........................................38

*Bonner v. City of Prichard*,
661 F.2d 1206 (11th Cir. 1981) ..............................................................22

*Bravo v. United States*,
532 F.3d 1154 (11th Cir. 2008) ...............................................................7

*Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*,
492 U.S. 257 (1989)......................................................................45, 46

*Carraway v. Revell,*
 116 So. 2d 16 (Fla. 1959) ................................................................................41

*Cates v. Zeltiq Aesthetics, Inc.,*
 73 F.4th 1342 (11th Cir. 2023) ..................................................................17, 18

*Christopher v. Cutter Lab'ys,*
 53 F.3d 1184 (11th Cir. 1995) .........................................................................49

*Chrysler Corp. v. Wolmer,*
 499 So. 2d 823 (Fla. 1986) ..........................................................4, 41, 44, 48

*Clark v. Chrysler Corp.,*
 436 F.3d 594 (6th Cir. 2006) .....................................................................55, 56

*Coates v. R.J. Reynolds Tobacco Co.,*
 375 So. 3d 168 (Fla. 2023) ..............................................................................50

*Cohen v. Gen. Motors Corp., Cadillac Div.,*
 427 So. 2d 389 (Fla. Dist. Ct. App. 1983) ................................................23, 24

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.,*
 532 U.S. 424 (2001) .........................................................................................51

*Cote v. Philip Morris USA, Inc.,*
 985 F.3d 840 (11th Cir. 2021) .........................................................................53

*Cronin v. Wash. Nat. Ins. Co.,*
 980 F.2d 663 (11th Cir. 1993) .........................................................................28

*Daubert v. Merrell Dow Pharms., Inc.,*
 509 U.S. 579 (1993) ...........................................................................................9

*Dawe v. Corrs. USA,*
 506 F. App'x 657 (9th Cir. 2013) ....................................................................55

*Drabik v. Stanley-Bostitch, Inc.,*
 997 F.2d 496 (8th Cir. 1993) ...........................................................................45

*DZE Corp. v. Vickers,*
 299 So. 3d 538 (Fla. Dist. Ct. App. 2020) ................................................19, 20

*Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.,*
 980 F.3d 1117 (7th Cir. 2020) .........................................................................55

*Erie Railroad Co. v. Tompkins,*
 304 U.S. 64 (1938) ...........................................................................................39

*Felix v. Hoffmann-LaRoche, Inc.*,
    540 So. 2d 102 (Fla. 1989).................................................................................................24

*Fla. Power & Light Co. v. Goldberg*,
    856 So. 2d 1011 (Fla. Dist. Ct. App. 2002) .....................................................................59

*Gasperini v. Ctr. for Humanities, Inc.*,
    518 U.S. 415 (1996)..........................................................................................................57

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)........................................................................................................8, 9

*Glabman v. De La Cruz*,
    954 So. 2d 60 (Fla. Dist. Ct. App. 2007) ..........................................................................59

*Gooding v. Univ. Hosp. Bldg., Inc.*,
    445 So. 2d 1015 (Fla. 1984).............................................................................................19

*Grabinski v. Blue Springs Ford Sales, Inc.*,
    203 F.3d 1024 (8th Cir. 2000) ..........................................................................................55

*Grant v. Preferred Rsch., Inc.*,
    885 F.2d 795 (11th Cir. 1989) ..........................................................................................28

*Grieco v. Daiho Sangyo, Inc.*,
    344 So. 3d 11 (Fla. Dist. Ct. App. 2022) ..................................................19, 21, 22, 23, 24, 30

*Guerrero v. Apple Computer, Inc.*,
    2019 WL 1333735 (S.D. Fla. Feb. 12, 2019) ...................................................................37

*Henderson v. Ford Motor Co.*,
    72 F.4th 1237 (11th Cir. 2023) ...............................................................................35, 36, 37

*Hendrix v. Raybestos-Manhattan, Inc.*,
    776 F.2d 1492 (11th Cir. 1985) ........................................................................................30

*Hendry v. Zelaya*,
    841 So. 2d 572 (Fla. Dist. Ct. App. 2003) ........................................................................59

*Hewitt v. B.F. Goodrich Co.*,
    732 F.2d 1554 (11th Cir. 1984) ..........................................................................................6

*Honda Motor Co. v. Oberg*,
    512 U.S. 415 (1994)....................................................................................................57, 58

*Hughes v. Kia Motors Corp.*,
    766 F.3d 1317 (11th Cir. 2014) ..........................................................................................8

*Husky Indus., Inc. v. Black*,
    434 So. 2d 988 (Fla. Dist. Ct. App. 1983) .......................................................................11, 13

*Jeep Corp. v. Walker*,
    528 So. 2d 1203 (Fla. Dist. Ct. App. 1988) ....................................................................39, 45

*Jimenez v. DaimlerChrysler Corp.*,
    269 F.3d 439 (4th Cir. 2001) ...........................................................................................46

*Johnson v. FFE Transp. Servs., Inc.*,
    227 F. App'x 780 (11th Cir. 2007) ..................................................................................23

*Jones v. Otis Elevator Co.*,
    861 F.2d 655 (11th Cir. 1988) .....................................................................................36, 37

*Jones v. United Parcel Serv., Inc.*,
    674 F.3d 1187 (10th Cir. 2012) .......................................................................................54

*Kerrivan v. R.J. Reynolds Tobacco Co.*,
    953 F.3d 1196 (11th Cir. 2020) .......................................................................................55

*Kilpatrick v. Breg, Inc.*,
    613 F.3d 1329 (11th Cir. 2010) .........................................................................................7

*Kohler v. Medline Indus., Inc.*,
    453 So. 2d 908 (Fla. Dist. Ct. App. 1984) ......................................................................21

*Kotteakos v. United States*,
    328 U.S. 750 (1946)..........................................................................................................32

*Kroon v. Beech Aircraft Corp.*,
    628 F.2d 891 (5th Cir. 1980) .............................................................................19, 21, 22

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)............................................................................................................9

*Landi v. Home Depot USA, Inc.*,
    2019 WL 4644243 (M.D. Fla. Sept. 24, 2019)..............................................................27

*Lassitter v. Int'l Union of Operating Eng'rs*,
    349 So. 2d 622 (Fla. 1976)...............................................................................................58

*Leoncio v. Louisville Ladder, Inc.*,
    2014 WL 11429056 (S.D. Fla. Apr. 8, 2014) ................................................................27

*Leoncio v. Louisville Ladder, Inc.*,
    601 F. App'x 932 (11th Cir. 2015) ..................................................................................27

*Lesnik v. Duval Ford, LLC,*
   185 So. 3d 577 (Fla. Dist. Ct. App. 2016) ................................................................7, 9, 30

*Lompe v. Sunridge Partners,*
   LLC, 818 F.3d 1041 (10th Cir. 2016) .......................................................................54, 55

*Lopez v. S. Coatings, Inc.,*
   580 So. 2d 864 (Fla. Dist. Ct. App. 1991) .......................................................................27

*Mamani v. Sánchez Bustamante,*
   968 F.3d 1216 (11th Cir. 2020) .......................................................................................31

*McGinnis v. Am. Home Mortg. Servicing, Inc.,*
   817 F.3d 1241 (11th Cir. 2016) .........................................................................................6

*McGriff v. Minn. Mut. Life Ins. Co.,*
   127 F.3d 1410 (11th Cir. 1997) ...................................................................................6, 28

*Mercury Motors Exp., Inc. v. Smith,*
   393 So. 2d 545 (Fla. 1981)...............................................................................................57

*Morgan v. N.Y. Life Ins. Co.,*
   559 F.3d 425 (6th Cir. 2009) ...........................................................................................55

*Myers v. Cent. Fla. Inv., Inc.,*
   592 F.3d 1201 (11th Cir. 2010) .................................................................................50, 57

*Nachtsheim v. Beech Aircraft Corp.,*
   847 F.2d. 1261 (7th Cir. 1988) ........................................................................................37

*In re NFL "Sunday Ticket" Antitrust Litig.,*
   2024 WL 3628118 (C.D. Cal. Aug. 1, 2024)....................................................................9

*Odom v. R.J. Reynolds Tobacco Co.,*
   254 So. 3d 268 (Fla. 2018)...............................................................................................57

*Patt v. Volkswagen Grp. of Am., Inc.,*
   2024 WL 1675301 (S.D. Fla. Apr. 18, 2024) ..............................................................9, 27

*Peat, Inc. v. Vanguard Rsch., Inc.,*
   378 F.3d 1154 (11th Cir. 2004) .......................................................................................30

*Peoples Gas Sys. v. Posen Constr., Inc.,*
   322 So. 3d 604 (Fla. 2021)...............................................................................................18

*Peter v. Nantkwest, Inc.,*
   589 U.S. 23 (2019)...........................................................................................................43

*Philip Morris USA v. Williams*,
   549 U.S. 346 (2007)................................................................................................56

*Pierard v. Aerospatiale Helicopter Corp.*,
   689 So. 2d 1099 (Fla. Dist. Ct. App. 1997) ...........................................................58

*Proctor v. Fluor Enters., Inc.*,
   494 F.3d 1337 (11th Cir. 2007) .........................................................................34, 38

*R.J. Reynolds Tobacco, Inc. v. Robinson*,
   216 So. 3d 674 (Fla. Dist. Ct. App. 2017) .............................................................58

*Ree v. Royal Caribbean Cruises Ltd.*,
   315 F.R.D. 682 (S.D. Fla. 2016).............................................................................37

*Republic of Ecuador v. Hinchee*,
   741 F.3d 1185 (11th Cir. 2013) ..............................................................................37

*Richards v. Michelin Tire Corp.*,
   21 F.3d 1048 (11th Cir. 1994) ................................................................................46

*Roberts v. Sea-Land Servs., Inc.*,
   566 U.S. 93 (2012)..................................................................................................50

*Royal v. Black & Decker Mfg. Co.*,
   205 So. 2d 307 (Fla. Dist. Ct. App. 1967) .............................................................14

*Scheman-Gonzalez v. Saber Mfg. Co.*,
   816 So. 2d 1133 (Fla. Dist. Ct. App. 2002) ...........................................................18

*Soffer v. R.J. Reynolds Tobacco Co.*,
   187 So. 3d 1219 (Fla. 2016)....................................................................................29

*Sorrels v. NCL (Bahamas) Ltd.*,
   796 F.3d 1275 (11th Cir. 2015) ..............................................................................36

*St. Regis Paper Co. v. Watson*,
   428 So. 2d 243 (Fla. 1983)......................................................................................40

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408 (2003)......................................................5, 33, 34, 40, 51, 52, 53, 54, 57

*State Farm Mut. Auto. Ins. Co. v. Duckworth*,
   648 F.3d 1216 (11th Cir. 2011) ...........................................................................4, 41

*Steger v. Gen. Elec. Co.*,
   318 F.3d 1066 (11th Cir. 2003) ..............................................................................28

*Stoner v. N.Y. Life Ins. Co.*,
    311 U.S. 464 (1940) ..................................................................................41

*Tesla, Inc. v. Banner*,
    411 So. 3d 1 (Fla. Dist. Ct. App. 2025) ...........................................4, 15, 25, 39, 40, 42, 43, 44

*U.S. Steel, LLC, v. Tieco, Inc.*,
    261 F.3d 1275 (11th Cir. 2001) ........................................................30, 32

*United States v. McGregor*,
    960 F.3d 1319 (11th Cir. 2020) ..........................................................36

*Valladares v. Bank of Am. Corp.*,
    197 So. 3d 1 (Fla. 2016) ...............................................................39, 45

*Voynar v. Butler Mfg. Co.*,
    463 So. 2d 409 (Fla. Dist. Ct. App. 1985) ......................................13, 15

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000) ...................................................................6, 8, 9

*West v. Caterpillar Tractor Co.*,
    336 So. 2d 80 (Fla. 1976) ...........................................................11, 15, 45

*White Constr. Co. v. Dupont*,
    455 So. 2d 1026 (Fla. 1984) .............................................................41

*Williams v. First Advantage LNS Screening Solutions Inc.*,
    947 F.3d 735 (11th Cir. 2020) ...........................................................54

**Constitutional Provisions**

U.S. Const. Amend. V .............................................................................1

U.S. Const. Amend. XIV, § 1, cl. 3 .........................................................1

**Statutes**

49 U.S.C. § 30165(a) ..........................................................................56

Fla. Stat. § 768.72(1) .........................................................................42

Fla. Stat. § 768.72(2) .......................................................40, 42, 45, 53

Fla. Stat. § 768.73(1) ....................................................................49, 50

Fla. Stat. § 768.74(1) .........................................................................57

Fla. Stat. § 768.74(3) .........................................................................57

Fla. Stat. § 768.74(5)..............................................................................................57

Fla. Stat. § 768.1257 ...............................................................................11, 17, 32, 46

**Rules**

Fed. R. Civ. P. 36..................................................................................................36

Fed. R. Civ. P. 50(a) ...............................................................................................6

Fed. R. Civ. P. 50(b) ...................................................................................1, 6, 60

Fed. R. Civ. P. 59(a) ...............................................................................................6

Fed. R. Civ. P. 59(e) ...............................................................................................7

Fed. R. Evid. 403 ..................................................................................................30

Fed. R. Evid. 702 ....................................................................................................7

## INTRODUCTION

Defendant Tesla, Inc. respectfully requests judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or, in the alternative, a new trial or remittitur, or amendment of the judgment, under Federal Rule of Civil Procedure 59.

The accident on Card Sound Road was a tragedy. But it was a tragedy that was entirely the doing of a driver who was reckless in the extreme by ignoring or overriding every safety feature in his car. In 2019, no vehicle—anywhere in the world—could have prevented the tragic consequences of George McGee's extraordinary recklessness. He exceeded the speed limit in the dark while talking on his phone, pressing the accelerator to override the Model S's cruise control. And when he dropped his phone, he started rummaging around for it with one hand while the other held the steering wheel and his foot remained pressing the accelerator as he sped through a stop sign. No other car in existence would have stopped when the driver was telling it to "go."

The $243 million judgment against Tesla flies in the face of basic Florida tort law, the Due Process Clause, and common sense. Auto manufacturers do not insure the world against harms caused by reckless drivers. For as long as there have been cars, there have been reckless, self-absorbed drivers like McGee. Those drivers should face every legal consequence for their wrongful conduct. But because no car can be foolproof, product-liability law penalizes only manufacturers whose cars perform in ways that dangerously defy ordinary consumers' expectations or are unreasonably dangerous, considering the risks that necessarily inhere in driving. That is not this case—not in the slightest. Tesla employed state-of-the-art safety technology to assist drivers, meeting or exceeding all industry standards. Imposing liability under these circumstances will only deter innovation, confound consumer expectations, and lead manufacturers to abandon safety enhancements for fear of being subjected to large punishments when a driver misuses their product—creating all the wrong incentives for manufacturers.

The jury's verdict is unsustainable under Florida law and the Due Process Clause. But it is explainable: Plaintiffs' counsel ensured that this trial was never actually about the 2019 Tesla Model S or the accident caused by McGee's reckless driving. Instead, they overwhelmed this jury with a flood of highly prejudicial but irrelevant evidence—about data preservation, Elon Musk, and dissimilar accidents—that had nothing to do with the accident on Card Sound Road. This Court rejected much of that evidence when offered to support punitive damages, and tried to cabin its use for liability. But again and again, Plaintiffs' counsel crossed boundaries and led the jury astray, taking aim at passion-inducing targets that had nothing to do with the governing law or the basic, undisputed facts in this case of confessed reckless driving.

This Court should set things right. It should hold that Plaintiffs failed to present legally sufficient evidence of a design defect, and that no reasonable jury could find liability based on the relevant, admissible evidence here. If the Court does not, it should at least order a new trial on Plaintiffs' actual design-defect claim and its alleged impact on the accident on Card Sound Road—instead of a trial about Elon Musk or purported data destruction or any other unfounded, prejudicial sideshow. At the very least, the Court should hold that Florida law and the Due Process Clause do not allow an award of punitive damages in any amount, let alone in the amount of the jury's $200 million punitive-damages verdict, and should reduce the compensatory damages award that surpassed even Plaintiffs' own requests.

**First**, this Court should grant Tesla judgment as a matter of law, or at least a new trial, as to liability. Plaintiffs' entire case falls apart because their experts' speculative and unreliable testimony does not meet the standards of Federal Rule of Evidence 702 and cannot support the verdict. Plaintiffs' experts faulted Tesla for not designing the 2019 Model S to brake automatically for off-road, out-of-lane objects when no car in the world at the time could have done so, and they

offered only *ipse dixit* that other features of the Model S's design caused the crash.  But even with the experts' flawed testimony, the design-defect and failure-to-warn claims still fail as a matter of law.  Tesla manufactured a state-of-the-art vehicle that was carefully designed and fully compliant with leading industry standards endorsed by the relevant federal regulator.  Tesla provided clear, plain, repeated, and readily accessible warnings about the capabilities—and limits—of its Model S, which the driver, McGee, neither read nor followed.  And the record could not establish causation for any claim because McGee alone caused the crash when he failed to watch the road, reached down for his phone, and blew past a stop-sign intersection with his hands on the wheel and his foot on the accelerator—overriding Tesla's safety features.  For as long as drivers remain at the wheel, any safety feature may embolden a few reckless drivers while enhancing safety for countless others.  Holding Tesla liable for providing drivers with advanced safety features just because a reckless driver overrode them cannot be reconciled with Florida law.  That rule would impede the development of safety features, deter progress, and cost lives now and in the long run.

**Second**, the erroneous admission of three categories of irrelevant evidence warrants a new trial on all issues.  The admission of this evidence and its improper exploitation by Plaintiffs' counsel were deeply prejudicial, tainted the entire trial, and explain the jury's invalid and excessive verdict on liability, punitive damages, and compensatory damages.  Even though this Court rejected Plaintiffs' argument that Tesla had withheld or destroyed evidence in bad faith and found no prejudice to Plaintiffs, Dkt. 405 at 12–13, Plaintiffs' counsel was nonetheless allowed to put on a sideshow attempting to impugn Tesla's handling of the data from McGee's vehicle after the accident.  This evidence was irrelevant—as this Court ultimately recognized as to punitive damages—and especially prejudicial, allowing Plaintiffs' counsel to inflame the jury through a false narrative of a deliberate coverup evincing "consciousness of guilt."  Plaintiffs' counsel also

misdirected the jury away from the then-*present* state of the art by hammering Elon Musk's forward-looking statements about the *future* capabilities of autonomous vehicles.  And Plaintiffs' counsel ignited the jury's passions with irrelevant evidence of other accidents dissimilar to the accident caused by McGee's extreme recklessness.  Each of these errors warrants a new trial on all issues, and they cumulatively leave no doubt that the verdict cannot stand.

**Third**, this Court should eliminate the punitive-damages award altogether, or significantly reduce it to comport with Florida law and the federal Constitution.  The Court should enter judgment as a matter of law for Tesla on punitive damages because Plaintiffs failed to satisfy Florida law's demanding requirements for imposing such punishment, which require clear and convincing evidence of "egregious wrongdoing" where the manufacturer "exhibited a reckless disregard for human life equivalent to manslaughter." *Chrysler Corp. v. Wolmer*, 499 So. 2d 823, 825 (Fla. 1986).  Tesla's design and warnings, and Plaintiffs' proof, came nowhere near establishing that extraordinary level of culpability.  The Florida District Court of Appeal so held earlier this year on a materially identical punitive-damages record in *Tesla, Inc. v. Banner*, 411 So. 3d 1 (Fla. Dist. Ct. App. 2025).  Because federal courts sitting in diversity must reach the same results as state courts applying state law to "essentially indistinguishable" facts, *State Farm Mut. Auto. Ins. Co. v. Duckworth*, 648 F.3d 1216, 1224 (11th Cir. 2011), *Banner* is controlling and forecloses any punitive-damages award here.  That conclusion has become only clearer since summary judgment because the cornerstones of Plaintiffs' argument for punitive damages (a National Transportation Safety Board (NTSB) report, the false accusation of a data coverup, and Musk's statements) all crumbled away at trial, leaving only the same theory about development and response to accidents that *Banner* rejected.  And after eliminating the punitive-damages award, the Court should also order a new trial on liability because evidence Plaintiffs

introduced exclusively for punitive damages infected the entire trial.

At a minimum, this Court should significantly reduce the punitive-damages award as a matter of both Florida law and bedrock federal due process principles. Florida's statutory cap cuts down the $200 million award to three times the compensatory damages awarded to Plaintiffs after reductions for comparative fault. And the federal Due Process Clause independently requires a further reduction in the punitive-damages award to no more than the amount of net compensatory damages. The Supreme Court has repeatedly emphasized that punitive damages "'have a devastating potential for harm'" through "grossly excessive" awards that serve "no legitimate purpose" and "pose an acute danger of arbitrary deprivation of property." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). Under the due-process guideposts established by *State Farm*, Tesla did not act reprehensibly in any way; the purely noneconomic compensatory award is "substantial" and already contains a "punitive element"; and the punitive-damages award is almost 10,000 times larger than the comparable per-vehicle civil penalty of $21,000. *Id.* at 425–28. As the Supreme Court has declared, "elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Id.* at 417 (quoting *BMW of N. Am. v. Gore*, 517 U.S. 559, 574 (1996)). Tesla received neither form of fair notice here. The jury's punitive-damages verdict cannot stand.

**Fourth**, the compensatory-damages verdict was excessive. The jury's determination that Angulo had $70 million in damages exceeds even the $54 million that Plaintiffs themselves requested and far exceeds amounts for comparable injuries in other Florida cases, which show that Angulo's damages should be no more than $15 million before reductions for comparative fault. The jury's calculation of damages for Leon ($35 million) likewise exceeded Plaintiffs' request

($30 million).  The Court should therefore remit total compensatory damages to no more than $69 million, which would result in a $23 million award against Tesla after comparative-fault reductions if it sustains the verdict on liability.

## LEGAL STANDARDS

Judgment as a matter of law should be granted when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1)(B); *see* Fed. R. Civ. P. 50(b). The basic question is whether "the facts are sufficiently clear that the law requires a particular result." *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000).  Although evidence is reviewed "in the light most favorable to the non-moving party, the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000).  The record must be sufficient to meet the applicable standard of proof, so the sufficiency standard is more demanding when, for example, a plaintiff had the burden to prove an issue by clear and convincing evidence. *E.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A new trial is appropriate when "'the verdict is against the weight of the evidence,'" "'the damages are excessive,'" "'for other reasons, the trial was not fair,'" or there are "'questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.'" *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016); *see* Fed. R. Civ. P. 59(a)(1)(A).  If even one of multiple theories submitted to the jury lacks a legally sufficient evidentiary basis, Tesla is entitled to a new trial. *McGriff v. Minn. Mut. Life Ins. Co.*, 127 F.3d 1410, 1416 (11th Cir. 1997).  This Court should also grant a new trial if "the verdict is against the clear weight of the evidence or will result in a miscarriage of justice." *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984) (cleaned up).

A motion to alter or amend a judgment "gives a district court the chance 'to rectify its own

mistakes in the period immediately following' its decision." *Banister v. Davis*, 590 U.S. 504, 508 (2020); *see* Fed. R. Civ. P. 59(e).  Rule 59(e) allows this Court to reduce damages awards that are excessive as a matter of law.  *Bravo v. United States*, 532 F.3d 1154, 1158 (11th Cir. 2008).

## ARGUMENT

**I.     Tesla Is Entitled to Judgment as a Matter of Law (or at Least a New Trial) on Liability.**

For Tesla to be liable in any amount for this tragic accident, Plaintiffs were required to prove both that Tesla's 2019 Model S was defective in some way and that the defective design or warnings caused McGee to blow through a stop sign and crash his car into an SUV that was parked well off the road when he was pushing the accelerator while fishing around for his phone.  *Lesnik v. Duval Ford, LLC*, 185 So. 3d 577, 581 (Fla. Dist. Ct. App. 2016).  Plaintiffs' liability case hinges on two experts whose testimony did not meet the standards established by Federal Rule of Evidence 702.  Especially without their testimony, the record cannot sustain the verdict.  But even with their testimony, Plaintiffs failed as a matter of law to establish that the 2019 Model S—which provided a carefully engineered system and offered extensive warnings on its breakthrough Autopilot system—was defective or caused the injuries that Plaintiffs suffered after McGee crashed into Benavides and Angulo.  The Court should grant judgment as a matter of law in Tesla's favor on liability or, at a minimum, a new trial.

### A.     The Verdict Is Unsupported by Reliable Expert Evidence.

A Rule 50 motion is the proper way to revisit the admissibility of expert testimony.  Courts fulfill a critical gatekeeping function in preventing "speculative, unreliable expert testimony" from "reach[ing] the jury."  *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010); *see* Fed. R. Evid. 702 Advisory Committee Note to 2023 Amendments (courts may not sidestep defects in methodology by calling them "questions of weight and not admissibility").  Expert evidence

cannot establish Plaintiffs' case if opinions on defects or causation are "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see, e.g.*, *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1330 (11th Cir. 2014).  Even when the jury hears speculative expert opinions, that error is not set in stone.  Because "[i]nadmissible evidence contributes nothing to a 'legally sufficient evidentiary basis'" for the judgment, courts should enter judgment as a matter of law when, after "excision of testimony erroneously admitted, there remains insufficient evidence to support the jury's verdict." *Weisgram v. Marley Co.*, 528 U.S. 440, 453, 457 (2000). *Weisgram* is dispositive of this case because the opinions of Plaintiffs' experts, Alan Moore and Mary Cummings, were riddled with rank speculation, and because the verdict lacks any other support.

Start with their assertions that a defect existed.  Despite gesturing at hypothetical features that Tesla should have supposedly incorporated into its Autopilot system, Moore and Cummings never identified a comparable car in 2019 that incorporated all of those features.  They didn't because they can't—no such car existed.  Testing of the most advanced 2019 vehicles showed none could have avoided a crash at McGee's speed.  Dkt. 586 (Tr. Day 13), at 128:18–37:19. Indeed, while on the stand, Moore volunteered that he drives a Model S and considers it "the best car [he's] ever owned."  Dkt. 578 (Tr. Day 5), at 92:6.  Moore and Cummings faulted the 2019 Model S for lacking several features—geofencing to restrict Autopilot use, camera-based driver monitoring, and automatic braking for not-in-lane hazards—but they did not establish that such features were industry custom or necessary for a reasonably safe car.  Dkt. 576 (Tr. Day 3), at 58:3–7; Dkt. 577 (Tr. Day 4), at 158:22–59:3; Dkt. 578 (Tr. Day 5), at 150:12–14.  Without any concrete basis or real-world example to explain why the 2019 Model S was not reasonably safe without the myriad design elements they recommended, Moore's and Cummings's testimony was

precisely the sort of "*ipse dixit*" the Supreme Court has repeatedly rejected.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) (quoting *Joiner*, 522 U.S. at 146).

Moore's and Cummings's opinions about causation were equally speculative.  Everyone agrees that McGee was speeding, distracted, and looking down to fumble for his phone when he accelerated through a stop sign and crashed into Benavides and Angulo's parked car.  McGee himself admitted that "this crash would not have happened and none of us would be here today" had he paid attention while driving.  Dkt. 579 (Tr. Day 6), at 112:9–10.  Yet Moore and Cummings nevertheless opined that Tesla could have prevented the crash with the Autopilot design changes and warnings they imagined.  *See, e.g.*, Dkt. 577 (Tr. Day 4), at 148:21–49:2.  Moore and Cummings put forth no reason beyond their own "subjective belief [and] unsupported speculation" to think that any of the changes they recommended would have altered the outlier behavior causing the crash:  McGee's reckless speeding and willingness to prioritize finding his phone over keeping his eyes on the road.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993).

The Court should thus disregard Moore's and Cummings's testimony and enter judgment for Tesla because, without their experts, Plaintiffs' case collapses as a matter of law.  *Weisgram*, 528 U.S. at 457; *see Patt v. Volkswagen Grp. of Am., Inc.*, 2024 WL 1675301, at *8–12 (S.D. Fla. Apr. 18, 2024) (finding that plaintiffs' "absence of expert . . . testimony" was "fatal to [the] design-defect claims"); *see also, e.g.*, *In re NFL "Sunday Ticket" Antitrust Litig.*, 2024 WL 3628118, at *3 (C.D. Cal. Aug. 1, 2024) (eliminating $4.7 billion verdict under *Weisgram*).

### B.    Plaintiffs' Design-Defect Theories Fail as a Matter of Law.

With or without expert evidence, Plaintiffs failed to prove either that "'a defect was present'" in the 2019 Model S's design or that any asserted defect "'caused the injuries complained of.'"  *Lesnik*, 185 So. 3d at 581.  Plaintiffs asserted that Tesla's Autopilot system was defective for three reasons:  McGee was able to use the system on Card Sound Road (no geofencing), McGee

wasn't forced to pay enough attention while driving using the system (driver monitoring through hands on wheel), and McGee wasn't stopped from crashing into Benavides and Angulo's SUV that was parked off the road (automatic emergency braking only for in-line and in-lane objects). But each of the design-defect theories fails for two fundamental reasons. First, Tesla's system was not defective. Each of the design features that Plaintiffs target here in Tesla's vehicle was carefully engineered, and either met (or exceeded) industry standards or was state of the art at the time. Holding Tesla liable for those features would flip product-design law on its head, discouraging manufacturers from adopting new, life-saving safety enhancements simply because they may embolden a handful of reckless drivers. Second, none of the asserted defects was a cause of Plaintiffs' injuries. McGee sped through a stop sign in the dark with his foot on the accelerator while looking down and fumbling around for his phone, ultimately crashing into a parked offroad vehicle. No safety features existing at the time of design could have prevented such grossly reckless driving or the resulting tragic injuries. And if the verdict is allowed to stand, it will chill innovation, harm road safety, and invite future juries to punish manufacturers who bring new safety features to market with sweeping and unpredictable tort liability.

### 1.    Tesla's 2019 Model S Was Not Defective.

The record cannot sustain the first element of any design-defect claim: a defective design. Florida law uses both the consumer-expectation test and the risk-utility test. *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 512 (Fla. 2015). The consumer-expectation test "considers whether a product is unreasonably dangerous in design because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner." *Id.* at 503. The risk-utility test asks whether "'the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design . . . and the omission of the alternative design renders the product not reasonably safe.'" *Id.* at 505. In

assessing a potential defect, the jury "*shall* consider the state of the art of scientific and technical knowledge and other circumstances that existed *at the time of manufacture*, not at the time of injury."  Fla. Stat. § 768.1257 (emphases added).  Florida law recognizes this defense because juries may be tempted to judge 2019 technology by current standards, especially in an industry that has evolved so quickly.

Plaintiffs failed to introduce legally sufficient evidence that Tesla's industry-leading, state-of-the-art vehicle was defective.  A product's design is not defective merely because it presents some risks or opportunities for misuse.  The risk of an accident exists for any car on any road anywhere, no matter how well designed.  Virtually any safety feature, from the seatbelt on up, may embolden a sufficiently reckless driver to engage in risky, reckless behavior, even as the feature enhances the safety of the vast majority of more responsible drivers who obey stop signs and keep their eyes on the road.  A manufacturer is not a risk-free insurer and cannot be required to make its products literally fool-proof.  *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 90 (Fla. 1976); *Husky Indus., Inc. v. Black*, 434 So. 2d 988, 991 (Fla. Dist. Ct. App. 1983).  The consumer-expectation test cannot require the production of a car that doesn't exist and thus one with features no reasonable person would expect, the risk-utility test cannot require the production of a car that would be less useful or more unsafe for most drivers, and Florida's state-of-the-art rule protects Tesla's cutting-edge technology.  Manufacturers would otherwise face overwhelming disincentives to adopt new safety improvements, as they would risk crushing liability whenever those features are alleged to have emboldened a particularly reckless driver to cause an accident.  Because Plaintiffs' attacks on the Tesla design features fall short individually and collectively as a matter of law, Tesla should be granted judgment as to all three theories of design defect.

***Operational Design Domain.***  Plaintiffs claimed that the 2019 Model S should have

employed geofencing to prevent McGee from using Autopilot on Card Sound Road, outside its Operational Design Domain (ODD).  But Autopilot was designed to allow McGee and other drivers to exercise ultimate control over their own car and to take ultimate responsibility for their driving.  Plaintiffs also couldn't point to any car at the time that employed geofencing to limit the use (and usefulness) of driver-assistance features other than a lone distinct hands-free system. Neither Florida law nor industry standards recommended, much less mandated, geofencing in 2019.  To the contrary, the industry embraced the opposite approach.

Plaintiffs presented no evidence that an ordinary consumer would have expected that geofencing would limit where the driver could use Autopilot's driver-assistance features for his own car.  Making driver-assistance safety features available outside a more limited geofenced zone was consistent with industry standards at the time in this rapidly developing technological field. *See Alderman v. Wysong & Miles Co.*, 486 So. 2d 673, 679 (Fla. Dist. Ct. App. 1986) (compliance with published industry standards can disprove the existence of a design defect).  The Society of Automotive Engineers (SAE) published industry guidance maintaining that drivers should have ultimate autonomy (and ultimate responsibility) for deciding (consistent with the law) whether, when, and where to utilize a Level 2 Advanced Driver Assistance System like Autopilot, including to override the system when necessary in the driver's judgment.  Dkt. 584 (Tr. Day 11), at 156:8– 18.  Consistent with that guidance, over 70 different models had driver-assistance systems across numerous manufacturers, including Audi, BMW, Genesis, Honda, Infiniti, Jaguar, Land Rover, Lexus, Lincoln, Maserati, Mercedes, Nissan, Toyota, and Volvo, and only a single car in 2019 (the Cadillac CT-6) had geofencing.  Dkt. 577 (Tr. Day 4), at 88:16–89:6.  Tesla's product was in lockstep with or superior to the vast majority of its peers' products—and the "single" outlier cited by Plaintiffs among dozens of popular options cannot establish the "standard for the industry."

*Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 422 (4th Cir. 1993). It is implausible to suggest that almost every driver-assistance model available in 2019 was defective under Florida law.

Uncontroverted evidence also established that the Cadillac CT-6 was different in kind, not a relevant comparator to McGee's 2019 Model S. *Husky Indus.*, 434 So. 2d at 992–93 (rejecting argument that product was defective based on comparison to a "totally dissimilar" product). Unlike the 2019 Model S, the Cadillac CT-6 was designed and advertised as a "hands-free system," meaning that Cadillac intended for drivers "to take their hands off the wheel" entirely within the geofenced area. Dkt. 585 (Tr. Day 12), at 234:16, 235:6–7. As one of Tesla's experts explained, a hands-free system was "different technology" from Tesla's and required Cadillac to carefully determine the areas in which it could support hands-free driving. *Id.* at 234:17, 235:8–14; *see* Dkt. 576 (Tr. Day 3), at 56:2–20; Dkt. 577 (Tr. Day 4), at 88:16–90:4. Cadillac diverged from Tesla—and every other car manufacturer—not because it had discovered some technological improvement in driver-assistance technology, but because it offered hands-free driving—a radically different approach than Tesla's hands-on-wheel Autopilot. Plaintiffs introduced no evidence that an ordinary consumer could have reasonably believed that Tesla's hands-on-wheel system would come with a geofencing limitation that accompanied only a lone hands-free system.

Nor did Plaintiffs establish that the use of geofencing in the 2019 Model S was necessary for a reasonably safe product under the risk-utility test. Plaintiffs never established that geofencing would yield overall safety improvements and simply speculated that geofencing would have helped McGee. *See* Dkt. 577 (Tr. Day 4), at 161:22–24. Florida courts have rejected such "hindsight" bias as a basis to "retroactively recharacterize [product design] into a choice between a 'safe' product and an 'unsafe' product." *Voynar v. Butler Mfg. Co.*, 463 So. 2d 409, 412 (Fla. Dist. Ct. App. 1985). And Tesla had good reason to stick to its dynamic approach rather than a

static, map-based approach.  While geofencing might be necessary to restrict map-based cars to map-based roads, Tesla's system was entirely different.  Tesla's system was "not map-based" and instead depended on "clearly marked lane lines" for its camera-based system to follow.  Dkt. 579 (Tr. Day 6), at 154:25, 155:1.  Geofencing would have little utility for Tesla's flexible, camera-based system because that system was designed for dynamic driving conditions, allowing the driver to work in tandem with it to account for changing weather, traffic, and other variables in deciding whether and how to use driver-assistance features.  Dkt. 584 (Tr. Day 11), at 154:20–55:7.  So while any safety benefits from geofencing were speculative at best, limiting the availability of Autopilot would have undercut driver autonomy and safety (by limiting where drivers could use the safety-enhancing system) and hampered future safety improvements (by limiting Autopilot data gathering to a handful of already-approved roads).  Allowing drivers to use Autopilot free from geofencing was a reasonable design choice, not a defect.

*Driver Monitoring System.*  Plaintiffs also asserted that the 2019 Model S's Driver Monitoring System (DMS) was defective because the DMS did not ensure that McGee paid attention to his driving rather than fishing around for the phone he dropped.  But because the then-prevailing best industry practice was to use a hands-on-wheel detection system to monitor driver engagement with a hands-on driver-assistance system, an ordinary consumer would not have expected a system that used a camera.  Dkt. 585 (Tr. Day 12), at 234:10–17 (77 out of 88 surveyed vehicles across 12 manufacturers used hands-on-wheel detection).  Only four cars at the time used Plaintiffs' driver-facing cameras to monitor driver awareness.  *Id.*; *see Royal v. Black & Decker Mfg. Co.*, 205 So. 2d 307, 310 (Fla. Dist. Ct. App. 1967) (no design defect where plaintiff failed to show "any deviation from the norm" or that the product "did not meet industry standards").  The risk-utility test did not require Tesla to choose this less common alternative.  Because camera-

14

based monitoring systems were an outlier option at the time—and every driver-assistance technology presents tradeoffs—Tesla could "permissibly choose[ ]" among reasonably safe designs. *Voynar*, 463 So. 2d at 412. Tesla did not violate Florida law by introducing a driver-assistance feature that improved the vehicle's safety without eliminating the baseline threat that reckless drivers have posed to the public for as long as automobiles have existed.

Although Plaintiffs faulted Tesla's DMS for ineffectively encouraging "complacent drivers" to stay focused (an incorrect description of McGee's aggressive and reckless driving) and pointed to McGee's pattern of "strikeouts" that previously locked him out of Tesla's system for not keeping his hands on the wheel (even though McGee was holding the wheel for at least 20 seconds leading up to the crash), none of that supports a finding of defect here. Tesla was working in this rapidly evolving field to tackle new problems. Plaintiffs also never pointed to any regulation on driver monitoring with which Tesla failed to comply. To be sure, some "additional" safety features might have been "feasible"—but that does not mean Florida law required them. Dkt. 529 at 5. Plaintiffs' argument is that Tesla should be a guarantor or insurer against every conceivable misuse of its product, yet that is not the law. *See West*, 336 So. 2d at 90.

Plaintiffs also could not prove a contemporaneous DMS defect through the investigation by the National Highway Traffic Safety Administration (NHTSA) of Tesla's driver-assistance technology that did not relate to or result in this accident. NHTSA opined five years after the accident that there was a "mismatch[ ]" between a purportedly "weak driver engagement system" and "Autopilot's permissive operating capabilities" that "did not adequately ensure that drivers maintained their attention." Dkt. 542-12 at 6. And Tesla's DMS was cutting-edge, safety-enhancing technology that complied with industry standards at the time. *Tesla, Inc. v. Banner*, 411 So. 3d 1, 5 (Fla. Dist. Ct. App. 2025). The fact that some reckless drivers may abuse or

15

circumvent advanced safety features cannot create tort liability for manufacturers who *improve* safety for the vast majority of drivers by adopting those features.

***Automatic Emergency Braking and Forward Collision Warning.*** Plaintiffs speculated that the 2019 Model S's Automatic Emergency Braking (AEB) and Forward Collision Warning (FCW) systems were defective for failing to prevent McGee from speeding through the intersection and crashing into a vehicle parked off the road. But that supposition cannot be reconciled with the state of the art at the time. After Tesla challenged Plaintiffs at the trial's start to identify a car that could have stopped at the intersection, Dkt. 574 (Tr. Day 1), at 203:22–04:3, Plaintiffs never even tried to prove that *any* car could have stopped under those conditions. The record instead demonstrates that, as of 2019, AEB and FCW systems had never been designed to react to anything but the rear of an in-line and in-lane vehicle—hence no car in 2019 could have prevented the crash at the speed at which McGee was driving, with his foot on the accelerator. So if the 2019 Tesla Model S was defective because it could not prevent McGee's accident, then every other car on the road with driver-assistance features at the time was defective too. That can't be right. Such a rule would deter manufacturers from introducing new safety features just because no feature can eliminate every cause (such as reckless driving) of every accident.

Tesla satisfied the then-prevailing industry standards for driver-assistance technology. In 2019, industry standards for both AEB and FCW focused on mitigating front-to-rear, in-line collisions occurring in the lane in which the car was traveling. In testing these systems at the time, NHTSA was explicit that a car was "not supposed to warn if there's a vehicle outside the lane" because that was outside the feature's workable scope. Dkt. 586 (Tr. Day 13), at 109:16–17. The best practice was to limit these systems to in-line and in-lane collisions because of the risk of "false positives"—that the car would automatically brake for phantom threats, potentially causing a

collision with, for example, a trailing car.  Dkt. 585 (Tr. Day 12), at 160:4.  Under NHTSA testing standards, crashes at high speed, crashes in the dark, and crashes into parts of the vehicle other than the rear fell "outside of . . . the expected performance of these systems"—"especially in the 2019 time frame."  Dkt. 586 (Tr. Day 13), at 110:10–11.  All of those factors were present when McGee crashed off-road into the side of a parked SUV because he sped through a stop sign in the dark while looking down and reaching around for his phone.  The Model S detected the parked SUV outside the road as "lane unknown."  *Id.* at 149:22.  The AEB and FCW features could not reasonably be expected to have reacted to this detection in 2019.

Again, critically, McGee was actively pressing the accelerator.  Plaintiffs assert that McGee's car nonetheless should have braked on its own before the collision.  But that theory that the car was defective for not stopping when the driver was telling it to "go" runs headlong into dispositive problems under both tests as well as Tesla's state-of-the-art defense.

First, no ordinary consumer could have expected the 2019 Model S to have stopped when the driver was commanding the vehicle to do the opposite by pressing down the accelerator and when none of NHTSA's best-performing cars with driver-assistance technology in 2019 could have avoided crashing under the same conditions.  Dkt. 586 (Tr. Day 13), at 128:18–37:19; *see Cates v. Zeltiq Aesthetics, Inc.*, 73 F.4th 1342, 1353 (11th Cir. 2023) (rejecting claim because ordinary consumer would have been aware of risk).  Plaintiffs failed to prove that Tesla's AEB and FCW did not reflect "the state of the art of scientific and technical knowledge and other circumstances that existed at the time of manufacture," as required to establish liability under Florida law.  Fla. Stat. § 768.1257.  After all, an ordinary consumer would not *expect* his car to do something that no other car in existence could do.

Second, the risk-utility test did not require the expansion of AEB given countervailing

17

risks.  Plaintiffs argued that the Model S should have stopped because it detected the out-of-lane hazards.  But that detection occurred only because Model S employed a forward-looking "shadow mode" that, unconnected to the car's operation, gathered data to assist with *future* feature development—a critical component of ensuring that features are reasonably safe *before* they become operational.  Dkt. 586 (Tr. Day 13), at 188:12.  Shadow mode was "not connected to the controls" and could neither brake nor steer.  *Id.* at 146:15.  And no evidence contradicted Tesla's evidence that requiring vehicles to brake automatically for not-in-lane objects would have *increased* the risk of the car taking action for nonexistent phantom threats, thereby risking *more* accidents and causing drivers to tune out warnings.  *See id.* at 116:16–17:1.  Even Plaintiffs' experts did not claim to the contrary.  *See Cates*, 73 F.4th at 1352 (rejecting claim where plaintiff lacked "evidence of an alternative design" that would have reduced risk).  In any event, "[w]here a product is reasonably safe, the fact that there may be a better alternative design is not grounds for product liability."  *Scheman-Gonzalez v. Saber Mfg. Co.*, 816 So. 2d 1133, 1141 (Fla. Dist. Ct. App. 2002).  Manufacturers should not be subjected to massive liability for reckless actions that no safety feature could prevent.  Otherwise, life-saving innovation will be chilled—key safety features will not be developed that would save countless drivers from preventable accidents caused by reckless drivers such as McGee or even by merely negligent ones.  Reasonable vehicle design choices should be overseen by engineers and safety regulators, not punished through the tort system.

### 2.      McGee Was the Sole Cause of Plaintiffs' Injuries.

Judgment as a matter of law for Tesla should also be granted because Plaintiffs failed to establish that any purported defect in Tesla's 2019 Model S—rather than McGee's confessed blatant recklessness—was the cause of Plaintiffs' injuries.  "[O]ne of the most basic principles of tort law" is that a defendant's wrongful conduct must be the but-for *and* "proximate cause" of the plaintiff's injuries.  *Peoples Gas Sys. v. Posen Constr., Inc.*, 322 So. 3d 604, 613 (Fla. 2021); *see*

*Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 23 (Fla. Dist. Ct. App. 2022).  Florida law does not permit a finding of liability, even assuming a defect, if a nonparty (like McGee) was the "sole proximate cause" of an accident.  *DZE Corp. v. Vickers*, 299 So. 3d 538, 540 (Fla. Dist. Ct. App. 2020); *see, e.g.*, *Kroon v. Beech Aircraft Corp.*, 628 F.2d 891, 894 (5th Cir. 1980) (applying Florida law).  Because a "mere possibility of such causation is not enough," "when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984).

The trial record confirms that McGee was the sole cause of the accident.  No one disputes that McGee was driving recklessly.  Unrebutted evidence established that "McGee was not alert and attentive and his excessive speed contributed to the crash," whereas "an alert and attentive driver had sufficient cues and time to avoid the incident."  Dkt. 585 (Tr. Day 12), at 186:1–4. McGee conceded that his reckless driving resulted in the crash because (instead of paying attention to the road) he was "fishing for [his] phone" and ran a stop sign before crashing into a parked car. Dkt. 579 (Tr. Day 6), at 56:9.  McGee admitted that had he paid attention, observed the stop sign, and applied the brakes, "this crash would not have happened and none of us would be here today." *Id.* at 112:9–10.  Yet McGee did the exact opposite, recklessly causing a tragic accident.

Nothing about the fact that McGee was driving a Tesla (versus any other vehicle) diminishes McGee's responsibility or transforms any aspect of Tesla's Autopilot into a but-for, let alone proximate, cause of the accident.  "Because virtually any product can be misused, a manufacturer cannot be held responsible and liable for every possible, creative misuse that consumers can conceive"—that is why "[p]roducts liability does not make the manufacturer an insurer of all foreseeable accidents which involve its product." *Grieco*, 344 So. 3d at 18 (cleaned

up).  None of the purported design features targeted here—the lack of geofencing, the driver-monitoring system, or the automatic emergency braking system—caused the injuries that Plaintiffs suffered after McGee accelerated past the stop sign and crashed into a parked SUV.

*Operational Design Domain.*  McGee's reckless driving would have caused the crash, whether or not Autopilot had a geofence.  McGee was familiar with Card Sound Road.  He traveled it "several times a week."  Dkt. 579 (Tr. Day 6), at 34:11.  He knew that he was "[a]bsolutely" responsible for maintaining control of his car.  *Id.* at 59:25.  He knew that he had to apply the brakes and stop at the intersection, as he had dozens of times before at this stop sign.  *Id.* at 73:3–11.  And he knew that diligent driving and careful vigilance were all the more critical on Card Sound Road, a route that Tesla had flagged for reduced speed, because his Autopilot attempted to restrict his speed.  *Id.* at 107:12–23; Dkt. 578 (Tr. Day 5), at 108:11–19.  Yet McGee still chose to drive dangerously.  He accelerated the car (above Tesla's maximum recommended speed and the road's posted speed limit), failed to watch the road (against Tesla's warning) while groping around for his dropped phone, and ultimately blew past the stop sign and crashed into a parked car.  Dkt. 579 (Tr. Day 6), at 55:7–56:17.  He knew the stop sign was there as he had traveled this road along his commute dozens of times, and each time, he agreed, the car stopped at that stop sign only because he applied the brake pedal.  *Id.* at 73:3–11.  Plaintiffs offered nothing but speculation to suggest that the crash would have been averted with geofencing to disable Autopilot on Card Sound Road.  The source of danger that night was McGee, not Tesla's 2019 Model S.  "Florida law does not permit a jury to consider proximate cause where a person responsible for the injury," as here, "intentionally misuses a product."  *DZE*, 299 So. 3d at 541.

*Driver Monitoring System.*  Tesla's DMS did not cause the crash either.  For at least twenty seconds before the crash (over one third of a mile at McGee's excessive speed), McGee had

"overridden the electronic controls":   "[W]ith his hands on the steering wheel," McGee "was actively driving that vehicle without assistance from the Traffic-Aware Cruise Control," so "right before the crash, [McGee] was driving the car.  The car wasn't driving the car for him."  Dkt. 583 (Tr. Day 10), at 105:11–20; *see id.* at 182:4–6 ("[C]ontinuously for the last twenty seconds before the crash the data shows his hands were detected as being on the wheel.").  By keeping his hands on the wheel before and throughout the crash, McGee told Tesla's system that he was in control— and in fact asserted control over the car.  *Id.* at 105:9–106:6.  And Plaintiffs offered only what-if supposition that camera-based monitoring would have led McGee to watch the road instead of fishing around for his phone while pushing the accelerator.  *See* Dkt. 578 (Tr. Day 5), at 26:4–14. Additional features to counter *complacent* drivers would have had no effect on *reckless* drivers like McGee.  In the end, McGee crashed the car because he was reaching down for his phone while accelerating the car at excessive speeds in the dark through a stop sign and off the road.  Florida law does not permit Tesla to be held liable simply because its Autopilot system supposedly "furnished [McGee] with the opportunity to be careless."  *Kohler v. Medline Indus., Inc.*, 453 So. 2d 908, 909 (Fla. Dist. Ct. App. 1984); *accord Kroon*, 628 F.2d at 894; *Grieco*, 344 So. 3d at 18.

  ***Automatic Emergency Braking and Forward Collision Warning.***  McGee's decision to speed through a stop sign and off the road while groping for his phone at night took his last-resort safety systems far outside their designed use.  Tesla designed its AEB and FCW systems to address only front-to-rear collisions occurring in the lane in which the car was traveling, consistent with industry practice.  Dkt. 586 (Tr. Day 13), at 109:14–24.  At the time, NHTSA guidance also cautioned that these safety systems were not designed to handle crashes in the dark, at high speed, or into out-of-lane hazards.  *Id.* at 110:6–11.  The limited scope of these features was critical to ensure that the Model S did not do more harm than good by alerting and braking for nonexistent

hazards.  Dkt. 583 (Tr. Day 12), at 160:3–10.

Yet McGee hurtled through the dark while speeding until he careened past a stop sign, through an intersection, off the road, and into the side of a parked car.  Tesla's testing of the top-rated 2019 cars with driver-assistance features showed that *none* could have avoided a collision under those circumstances.  Dkt. 586 (Tr. Day 13), at 128:18–137:19.  And even Plaintiffs' own expert recognized that in 2019 no car with Level 2 driver-assistance features could have stopped at the stop sign on its own.  Dkt. 578 (Tr. Day 5), at 117:17–22.  In short, McGee recklessly drove his car into an accident that no safety system was designed to prevent.  That was his fault, not the system's.  *E.g.*, *Grieco*, 344 So. 3d at 23.  He alone caused the crash.

Taking a step back and looking at the full picture only confirms that McGee—not Autopilot—was the sole but-for and proximate cause.  McGee kept his hands on the wheel (telling Tesla's safety features he was in control), accelerated through the intersection (heedless of out-of-lane hazards for which no car could have automatically braked), and crashed into Benavides and Angulo's parked car (driving recklessly and dangerously).  No decision applying Florida law recognizes a product's design as a but-for and proximate cause of an accident deriving from such extremely irresponsible product misuse.  In *Kroon*, for example, the Fifth Circuit held that an airplane's design was not the cause under Florida law of a plane accident where the pilot was careless in the pre-flight check and misused the instruments.  628 F.2d at 894; *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting all Fifth Circuit decisions as of September 30, 1981).  So too here:  Tesla cannot, as a matter of law, be deemed liable for causing the accident merely because its product failed to stop McGee from misusing the vehicle by driving so recklessly.  *See Kroon*, 628 F.2d at 894.

In short, the sole cause of the crash was McGee's reckless driving, not Tesla's design.

Tesla is entitled to judgment as a matter of law for this reason alone.  But even if this Court were to conclude that the record could support the assignment of *some* fault to Tesla, a new trial would still be required.  Courts should "grant a new trial if the percentages of fault found by the jury are against the manifest weight of the evidence."  *Johnson v. FFE Transp. Servs., Inc.*, 227 F. App'x 780, 782 n.4 (11th Cir. 2007).  Here, the jury's allocation of 33% of the fault to Tesla was manifestly against the weight of the evidence establishing that McGee's reckless driving was the sole cause of the accident or at least much closer to 100% than 67%.

### C.    The Failure-to-Warn Claim Fails as a Matter of Law.

The record also cannot sustain the failure-to-warn claim.  To succeed on that claim, Plaintiffs needed to establish that Tesla had a duty to warn, that Tesla provided inadequate warnings, and that the warnings' inadequacy caused McGee to crash into Benavides and Angulo's parked car.  *See, e.g.*, *Grieco*, 344 So. 3d at 20–24.  Plaintiffs fell short on every element.  First, Tesla had no duty to warn of the open and obvious risk of reckless and distracted driving.  Second, Tesla gave repeated and extensive warnings that satisfied any such duty.  And third, Tesla's warnings did not cause Plaintiffs' injuries.  McGee admitted that he failed to read (let alone follow) Tesla's warnings—ruling out any failure-to-warn claim here three times over.

### 1.    Tesla Had No Duty to Warn.

Tesla had no duty to warn about the open and obvious risk that speeding through a stop sign in the dark while looking down and fumbling for a lost phone could cause an accident.  The duty to warn extends only to dangers that are neither "obvious" nor "known."  *Grieco*, 344 So. 3d at 20.  Florida law does not create any duty to warn about risks of which the user is actually aware or should have been aware.  *See Cohen v. Gen. Motors Corp., Cadillac Div.*, 427 So. 2d 389, 391 (Fla. Dist. Ct. App. 1983) (obvious danger); *Grieco*, 344 So. 3d at 21 (known danger).  Tesla had no such duty here because the risk—that extraordinarily reckless driving, in the form of speeding

through a stop sign in the dark while looking down for a lost phone, could cause a serious crash—was an open and obvious danger of which McGee was actually aware and of which any reasonable driver should have been aware.

McGee admitted he knew that it was "[a]bsolutely" his responsibility to control the vehicle and pay attention to the road even when he was using Autopilot mode.  Dkt. 579 (Tr. Day 6), at 59:25.  And McGee acknowledged that, if he had paid even minimal attention to his driving, heeded the stop sign, and controlled his car, "this crash would not have happened and none of us would be here today."  *Id.* at 112:9–10.  Such actual knowledge—and admitted recognition—of the risks precludes liability because "'[t]here [was] no duty to warn [McGee] of a danger that he [was] aware of.'"  *Grieco*, 344 So. 3d at 21 (quotation marks omitted).

Even apart from McGee's actual knowledge of the risks, the dangers here were obvious and apparent.  Every driver knows—from the first day of driver's education through daily commutes—that he or she is ultimately responsible for his or her car:  for watching the road, maintaining control of the vehicle, and avoiding crashing into others.  And every driver likewise knows that speeding through a stop sign in the dark while looking down for a lost phone is incredibly dangerous.  Florida law does not expose manufacturers to liability for not telling drivers what they do or should already know.  *Grieco*, 344 So. 3d at 20–22 (ingesting intoxicating drugs before driving was an "obvious danger"); *Cohen*, 427 So. 2d at 391 (manually releasing emergency brake while car was running was an "obvious danger").

### 2.    Tesla Provided Extensive Warnings.

Even if it had a duty to warn, Tesla satisfied it as a matter of law.  Florida law requires "warnings [that] are 'accurate, clear, and unambiguous.'"  *Grieco*, 344 So. 3d at 21 (emphasis omitted) (citing *Felix v. Hoffmann-LaRoche, Inc.*, 540 So. 2d 102, 104 (Fla. 1989)).  And Tesla "repeatedly warned against misuse" of its "state-of-the-art" Autopilot system—"which was

industry practice." *Banner*, 411 So. 3d at 5. These warnings cautioned McGee against engaging in the reckless conduct that caused the accident here.

The owner's manual provided extensive warnings on the risks, limitations, and responsibilities of Tesla's driver-assistance system. Tesla warned users to watch the road, maintain control over the vehicle, and be prepared to take over at any time. *E.g.*, Dkt. 584 (Tr. Day 11), at 120:5–25 (Autopilot warnings); Dkt. 585 (Tr. Day 12), at 162:22–63:19 (AEB warnings); *id.* at 227:3–16 (FCW and AEB warnings). These warnings made clear that Autopilot would not prevent accidents caused by reckless driving such as McGee's. The car would not apply its cruise-control braking if McGee was accelerating. Dkt. 578 (Tr. Day 5), at 116:3–13. Nor would it "detect and stop for a stop sign." Dkt. 579 (Tr. Day 6), at 71:8. And AEB was limited to in-line and in-lane hazards, not out-of-lane objects like Angulo and Benavides's parked car. Dkt. 585 (Tr. Day 12), at 162:22–63:19. Tesla's warnings were plain and clear and manifold.

The 2019 Model S also provided a series of additional real-time visual and audio reminders warning drivers to drive responsibly and to be aware of the Tesla system's limits. The first time McGee wanted to use Autosteer, he had to toggle the feature on from the center touchscreen (while parked) and was then required to acknowledge and accept its limitations. McGee was warned to use the system only if he was willing to pay close attention to the road and "be prepared to take over at any time." Dkt. 579 (Tr. Day 6), at 98:15–16. Each subsequent time McGee used Autopilot, his car displayed a message warning him to keep his hands on the steering wheel, pay attention to the road, and be prepared to take over at any time. Dkt. 584 (Tr. Day 11), at 120:21–25. And on the night of the crash, the car alerted McGee—repeatedly—to watch the road and maintain control of his vehicle. *Id.* at 116:15–21, 119:9–15 (audible alert to put hands on wheel and "four different [visual] warnings" to watch the road in the 75 seconds before impact). One

such warning was that the car would not apply cruise-control braking because McGee's foot was pressing the accelerator.  Dkt. 578 (Tr. Day 5), at 116:3–13.

All of Plaintiffs' challenges to Tesla's warnings fall short.  First, Plaintiffs assert that the Owner's Manual warnings were inadequate because they were only available electronically and supposedly difficult to access.  But most people nowadays get information electronically.  The Owner's Manual was readily accessible to drivers at the touch of a button.  Dkt. 584 (Tr. Day 11), at 94:13–24.  And the paper/electronic distinction could not have made a difference in this case because McGee testified that he never read the hard-copy manuals for his other cars.  Dkt. 579 (Tr. Day 6), at 52:25–53:2.  Second, Plaintiffs assert that Tesla's DMS failed to provide sufficient warnings to ensure driver attentiveness.  But these real-time warnings—including the consistent reminders every time McGee stepped into his car—were more than sufficient.  While Plaintiffs complain that Tesla should have warned McGee that failing to follow the instructions for driving his car could result in an accident, Plaintiffs cannot bootstrap themselves into a failure-to-warn claim by arguing that Tesla needed to provide an *additional* warning to follow its warnings, especially when it is beyond obvious that failing to follow vehicle instructions—and the rules of the road—can result in serious and fatal consequences.  Third, Plaintiffs asserted that statements from Tesla CEO Elon Musk praising Tesla's vehicles and previewing Tesla's future plans failed to adequately warn McGee about the 2019 Model S's limitations.  Dkt. 428 at 80.  Such statements, which McGee admittedly did not hear or read, are irrelevant here.  Musk never said that Teslas had the capabilities that Plaintiffs speculate consumers expected here—in fact, Musk warned (consistent with the specific warnings the 2019 Model S provided) that Teslas would not stop on their own (let alone override reckless drivers like McGee).  Dkt. 576 (Tr. Day 3), at 137:6–8.  Any references to hypothetical "complete autonomy" were about future capabilities that could not have

negated Tesla's warnings about the limits of the then-current state of the art.  *Id.* at 147:17–48:7.

### 3.     The Asserted Failure to Warn Didn't Cause the Crash.

Tesla's warnings also were not a proximate cause of the accident because McGee did not

read or follow Tesla's warnings, adequate or not.  Under longstanding Florida precedent, when a

party "has not read the [warning], an inadequate warning cannot be the proximate cause of the

plaintiff's injuries."  *Lopez v. S. Coatings, Inc.*, 580 So. 2d 864, 865 (Fla. Dist. Ct. App. 1991).

The record forecloses proximate causation for two reasons.

First, McGee never read Tesla's warnings in the owner's manual.  McGee admitted that he

knew that his 2019 Model S had an owner's manual (which was readily accessible on the

touchscreen), but that he never read the owner's manual or its many warnings.  Dkt. 579 (Tr. Day

6), at 52:1–3.  Because McGee did "not read" the warning, any allegedly "inadequate warning

cannot be the proximate cause of the [Plaintiffs'] injuries."  *Lopez*, 580 So. 2d at 865; *accord*

*Leoncio v. Louisville Ladder, Inc.*, 601 F. App'x 932, 933 (11th Cir. 2015); *Patt v. Volkswagen*

*Grp. of Am., Inc.*, 2024 WL 1675301, at *13 (S.D. Fla. Apr. 18, 2024).

Second, McGee disregarded the alerts that his vehicle provided on the night of the crash.

A user who "disregarded or ignored an allegedly inadequate warning" defeats any conclusion that

"an ineffective warning was the proximate cause of [the] injuries."  *Leoncio v. Louisville Ladder,*

*Inc.*, 2014 WL 11429056, at *4 (S.D. Fla. Apr. 8, 2014); *accord Landi v. Home Depot USA, Inc.*,

2019 WL 4644243, at *5 (M.D. Fla. Sept. 24, 2019) (same).

### D.     Tesla Is Entitled to a New Trial If the Record Cannot Sustain the Verdict as to Any Theory on Which the Jury Was Instructed.

The jury's verdict cannot be sustained on any of Plaintiffs' claims, but the Court should at

least grant a new trial if it agrees that Plaintiffs failed to meet their evidentiary burden as to any of

Plaintiffs' theories (ODD, DMS, AEB/FCW, and failure to warn).  The Eleventh Circuit has long

held that "a party seeking a new trial need only show that the evidence is insufficient to support one of the plaintiff's theories of liability." *Cronin v. Wash. Nat. Ins. Co.*, 980 F.2d 663, 669 n.7 (11th Cir. 1993); *see, e.g.*, *Grant v. Preferred Rsch., Inc.*, 885 F.2d 795, 800 (11th Cir. 1989). So when (as here) a court has "no evidence upon which to determine the basis of the verdict reached by the jury, the verdict must be set aside" if even a single theory was not supported by sufficient evidence. *McGriff v. Minn. Mut. Life Ins. Co.*, 127 F.3d 1410, 1416 (11th Cir. 1997).

## II.    Highly Prejudicial Evidentiary Errors Warrant a New Trial on All Issues.

Setting the stage for the legally deficient verdict and outsized awards of punitive and compensatory damages, three evidentiary issues (and Plaintiffs' counsel's misuse of the Court's rulings on them) tainted every aspect of the case and call for a new trial on all issues. Each of these errors independently warrants a new trial because the evidence was "not relevant" and "excludable" given that "its probative value [was] substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003). And together, their effect was undeniable: Several witnesses, dozens of trial hours, and prime real estate in Plaintiffs' opening statement and closing argument were devoted to this highly inflammatory and, at best, minimally relevant evidence.

### A.    The Improper Admission of Data-Related Evidence Prejudiced Tesla.

The most egregious problem with the trial relates to Plaintiffs' arguments that Tesla engaged in a coverup because it knew it was guilty—allowing Plaintiffs to plant in the jurors' minds the old saw that the coverup is worse than the crime, even though there was no crime and (as this Court found) no coverup. Plaintiffs' counsel focused extensively at trial on the irrelevant issue of Tesla's "handling of critical vehicle data during the post-accident investigation," Dkt. 586 (Tr. Day 13), at 211:21–22, even though their own experts confirmed that the relevant data had not actually been deleted or corrupted, Dkt. 583 (Tr. Day 10), at 47:3–6, 53:3–56:14, and in fact

had provided them with a "treasure trove," Dkt. 577 (Tr. Day 4), at 189:6.  Plaintiffs paraded in three witnesses to testify exclusively about this topic and examined a number of other witnesses extensively on this topic.  And Plaintiffs were clear that they did so for punitive damages only: Their leitmotif throughout trial was that Tesla's purported "cover-up" scheme proves their "entitlement to punitive damages."  Dkt. 469 at 1–2; Dkt. 574 (Tr. Day 1), at 191:10–93:25.  As late as the charge conference, Plaintiffs insisted that "punitive damages" is "all [the data-related evidence is] relevant to.  *It's not relevant to any of the liability claims in this case.*"  Dkt. 586 (Tr. Day 13), at 254:24–25 (emphasis added).

After the jury heard all this inflammatory evidence, this Court rightly held that the data issue was, in fact, irrelevant to Tesla's liability for punitive damages.  Dkt. 586 (Tr. Day 13), at 270:5–10, 273:9–14; *see Soffer v. R.J. Reynolds Tobacco Co.*, 187 So. 3d 1219, 1222 (Fla. 2016); Fla. Std. Jury Instr. (Civ.) 503.2(b)(1).  That should have been the end of the matter:  Plaintiffs had introduced the evidence solely for punitive damages, and the Court held it was inadmissible for that purpose.  Although Tesla requested a curative instruction, Dkt. 530 at 4, Plaintiffs' counsel opposed it on the ground that "tell[ing] the jury" to disregard "all this stuff they heard" about data handling would prejudice Plaintiffs, who had "waste[d]" hours with the jury on that issue.  Dkt. 587 (Tr. Day 14), at 13:3–5.  Plaintiffs' desire to keep the ill-gotten gains of irrelevant and deeply prejudicial evidence only confirms that a new trial is needed.  *See id.* at 10:14–12:7 (Tesla moving for mistrial because Plaintiffs made the data issue "a pervasive theme of this case").  Plaintiffs' counsel did not even follow this Court's decision that the evidence was relevant only to liability, *id.* at 14:10–15:4, arguing in closing that the data-related evidence proved Tesla's "consciousness of guilt of the defect," language that unmistakably refers to punitive damages, *id.* at 51:9–10.

As even Plaintiffs' counsel conceded during the charge conference, evidence of Tesla's

29

data handling was irrelevant to the elements of Plaintiffs' strict-liability claims for design defect and failure to warn. "Strict liability is not concerned with the reasonableness of a manufacturer's conduct," but rather "focus[es] . . . on the product itself and the reasonable expectations of the consumer." *Grieco*, 344 So. 3d at 18. Because the data-related evidence pertained to Tesla's supposed conduct and mental state *after* the accident, it also could not make it more likely "that a defect was present" in the car, that a defect "caused the injuries complained of," or "that it existed at the time the retailer or supplier parted possession with the product." *Lesnik*, 185 So. 3d at 581 (listing the elements of a design-defect claim). Post-design conduct also has no bearing on the objective inquiry into whether a product is as safe "as an ordinary consumer would expect" or "the risk of danger in the design outweighs the benefits." Fla. Std. Jury Instr. (Civ.) 403.7(b). Nor could this evidence bear on any duty to warn, the adequacy of Tesla's warnings, or the causal link between any failures to warn and the accident here. That is why Plaintiffs themselves claimed that it was relevant only to punitive damages, a use this Court correctly foreclosed. Dkt. 586 (Tr. Day 13), at 254:24–25, 270:5–10, 273:9–14.

Even if Tesla's post-accident data handling were somehow "marginally relevant" to liability, it still should have been excluded under Rule 403 because "its probative value was substantially outweighed by the danger of unfair prejudice." *Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1502 (11th Cir. 1985). Plaintiffs lobbed repeated "accusations" that Tesla had deliberately hid data to malign Tesla as a "willful and malicious" bad actor. *Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1162–63 (11th Cir. 2004). This was not a one-off attempt at inflaming the jury: Plaintiffs referred to their data-based theory "throughout the trial"—"[m]ost notably, during closing argument." *U.S. Steel, LLC, v. Tieco, Inc.*, 261 F.3d 1275, 1288 (11th Cir. 2001); *see, e.g.*, Dkt. 574 (Tr. Day 1), at 193:10–25 (opening statement); Dkt. 578 (Tr. Day 5), at

22:1–25:4 (testimony about deleted or missing data); Dkt. 581 (Tr. Day 8), at 199:20–21 (testimony that "somebody at Tesla" may have taken "an affirmative action" to delete data); Dkt. 587 (Tr. Day 14), at 48:25–52:3 (closing argument).  They also asked "key witness[es]" about the issue time and time again.  *Aetna Cas. & Sur. Co. v. Gosdin*, 803 F.2d 1153, 1160 (11th Cir. 1986).

Flouting this Court's ruling that the evidence was irrelevant to punitive damages, Plaintiffs repeatedly trumpeted the term "consciousness of guilt," a highly incendiary phrase rooted in criminal law with no possible bearing on liability for Plaintiffs' defect claims.  Dkt. 587 (Tr. Day 14), at 51:1–10, 75:15–76:19.  Plaintiffs' primary expert on liability, Cummings, even confirmed to the press that the evidence in fact undergirded the jury's decision to return the $200 million punitive-damages verdict:  "I also think that the jury understood the punitive damages were due to Tesla's cover up of a lot of the data," which she said "bordered on criminal."  Ex. A (Declaration of Julian W. Poon), Ex. 1 at 3–4.

The improper admission of the data-related evidence calls for a new trial on all issues.  Plaintiffs' post-hoc rationalization that data handling could suggest the existence of a design defect was "a sharp departure from their explanation of this evidence to the jury" throughout trial, which focused on using the data destruction and coverup theme to whip up the jury's passion to inflict a massive punishment against Tesla for engaging in egregious intentional misconduct.  *Mamani v. Sánchez Bustamante*, 968 F.3d 1216, 1244 (11th Cir. 2020) (ordering new trial where party focused on inadmissible evidence to prove intent during closing argument); *see* Dkt. 587 (Tr. Day 14), at 75:15–76:19.  A new trial is necessary when "the evidence was highly prejudicial, no correcting instructions were given, and the inadmissible evidence was not only intentionally elicited but also emphasized in closing argument."  *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1465 (11th Cir. 1994).  That was precisely the situation

created by Plaintiffs' unjustified and inflammatory references to the data issue "throughout the trial." *U.S. Steel*, 261 F.3d at 1288.  The saturation of the trial record with this issue combined with the inflammatory nature of the accusations makes it impossible to "'say, with fair assurance, . . . that the judgment was not substantially swayed by the error.'" *Gosdin*, 803 F.2d at 1159 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

      **B.**     **The Improper Admission of Elon Musk's Statements Prejudiced Tesla.**

      The trial was also tainted by Plaintiffs' misuse of numerous irrelevant and prejudicial statements by Elon Musk, Tesla's CEO.  Dkt. 320 at 13–14.  The Court ruled that statements that are clearly "forward-looking or aspirational or only appl[y] to fully self-driving vehicles" would not be admissible, but allowed statements that "discuss[ ] Autopilot generally" on the ground that they would "help the jury understand whether an ordinary consumer would have reasonably expected the Vehicle's Autopilot to warn of or avoid the subject collision."  Dkt. 433 at 34. Plaintiffs blew past this limit again and again, introducing forward-looking statements about "complete autonomy" that expressly discussed *future* capabilities and could *not* have shaped consumer expectations about the then-*current* state of the art.  Dkt. 576 (Tr. Day 3), at 147:17–18, 148:5–7 (stating that complete autonomy is "technically possible" but has yet "to happen"); *see* Dkt. 585 (Tr. Day 12), at 125:22–27:4, 129:24–31:18; *see also* Fla. Stat. § 768.1257.  Allowing these forward-looking statements to form the basis of product-liability claims was erroneous and would disincentivize companies from making visionary projections about anticipated technological breakthroughs.  Nothing in Florida's product-liability law justifies chilling such speech or innovation.

      None of the statements was relevant to the defects that Plaintiffs tried to prove at trial. Musk never suggested that Autopilot had a geofence, that Tesla used a camera-based DMS, or that the cars on the road in 2019 would stop for out-of-lane objects or stop signs—the three purported

design defects asserted by Plaintiffs.  In fact, Musk cautioned that the AEB function could not ensure "perfect safety" and that Autopilot did not "take into account stop signs and red lights." Dkt. 576 (Tr. Day 3), at 137:6–8, 151:22–23.  None of the statements promised a feature that the 2019 Model S lacked, or tricked McGee into thinking he was driving a car that didn't exist.  At the close of evidence, the Court concluded that Musk's statements were irrelevant to punitive damages because the statements—which McGee never heard, Dkt. 579 (Tr. Day 6), at 88:7–91:16—did not cause the accident and thus lacked any nexus to Plaintiffs' harm, Dkt. 586 (Tr. Day 13), at 262:1–9; *see State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003).

Plaintiffs took advantage of the erroneous admission of Musk's statements by distorting them from the beginning of their closing argument.  Plaintiffs' counsel said they "talked a lot about Mr. Musk's statements" because those were "[Tesla's] choices and . . . [Tesla's] words." Dkt. 587 (Tr. Day 14), at 36:21–22, 37:2.  Plaintiffs pointed to Musk's words as evidence of a company-wide "misinformation campaign." *Id.* at 48:23.  Plaintiffs argued this purported campaign was "all orchestrated from the top"—"[t]hat's where the rot begins." *Id.* at 53:22–23.  Plaintiffs blamed Tesla and Musk for "consistently and intentionally us[ing] language to promise things that weren't there and describe things that didn't exist," *id.* at 43:14–15—asserting that Musk "knew drivers would ignore 10 [Autopilot] warnings an hour" yet "still did nothing" about it, and that Musk was "out there telling everybody . . . that this is the safest system ever made," despite knowing that "Autopilot was being used and misused and abused," *id.* at 69:13–18.  Plaintiffs concluded by exhorting the jury to "send a message" to Tesla through their "punitive damages award" "to get [Tesla] to change their choices and their words going forward." *Id.* at 72:15–24.

The Court should order a new trial because the erroneous and highly prejudicial admission of Musk's statements clearly affected Tesla's substantial rights as to both liability and damages.

*Ad-Vantage*, 37 F.3d at 1465.  Plaintiffs said that "the ordinary consumer expectation is based upon the way [Tesla] marketed their vehicles," which is why Plaintiffs "spent so much time talking about Mr. Musk and how they market to regular people," Dkt. 587 (Tr. Day 14), at 37:3–6, but they did not offer any evidence that ordinary consumers would have made their purchasing decisions based on Musk's statements, that his statements would have led them to believe that McGee's Tesla would be equipped with a combination of features no other vehicle in history has ever included, or that the vehicle's capabilities would have relieved them from their responsibilities to drive safely.  The only actual consumer evidence came from McGee, who knew his vehicle "was not a fully self-driving vehicle," would not "stop for a stop sign," and did not allow him to "take [his] eyes off the road." Dkt. 579 (Tr. Day 6), at 70:11–71:9.  Musk's statements thus constituted precisely the kind of "evidence that is tangential [and] only inflammatory," with "little bearing as to the amount of punitive damages that should be awarded." *State Farm*, 538 U.S. at 418.  Yet Plaintiffs' counsel used them to whip up the jury to "send a message" to Tesla through "[t]he punitive damages award" "to get [Tesla] to change their choices and their words." Dkt. 587 (Tr. Day 14), at 72:15–24.  Because the erroneous admission of this evidence "probably had a substantial influence on the jury's verdict," this error warrants a new trial. *Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1352 (11th Cir. 2007) (quotation marks omitted).

### C.    The Improper Admission of Dissimilar Accidents Prejudiced Tesla.

In product-liability cases, evidence of other accidents poses a serious risk of unfair prejudice.  Such evidence often has zero relevance to the case at hand but can have outsized sway with a jury, which may view those other accidents as confirming that the product is defective and that the manufacturer had notice of the defect.  To guard against that risk, courts must exclude evidence of past accidents unless they are "substantially similar" to the accident involved in the case—that is, "similar enough to the present incident 'to allow the jury to draw a reasonable

34

inference' regarding the defendant's knowledge or ability to foresee the incident at issue." *Henderson v. Ford Motor Co.*, 72 F.4th 1237, 1243 (11th Cir. 2023).

That standard was misapplied here.  Plaintiffs sought to introduce evidence of three categories of past accidents that they asserted showed both Tesla's notice of defects and harm to nonparties: (1) three recent accidents, (2) eight accidents mentioned in Tesla's discovery responses, and (3) an unspecified number of accidents referenced in an NHTSA report.  Initially, the Court admitted the three accidents over Tesla's objections, but excluded the other two categories of accidents because Plaintiffs failed to prove they were substantially similar to the collision at issue.  Dkt. 466 at 13–15.  But the Court later changed course:  It admitted the eight accidents mentioned in Tesla's discovery responses, finding they were facts "'conclusively established,'" despite recognizing that "Plaintiffs failed to satisfy their burden of establishing substantial similarity."  Dkt. 486 at 13; *see* Dkt. 582 (Tr. Day 9), at 20:2–25:10.  Applying a "more relaxed" version of the substantial-similarity test, it also admitted the accidents in the NHTSA report "for the limited purpose of showing [Tesla's] notice"—but not the existence—of any purported defect.  *Id.* at 13–16.

First, the Court erred in admitting evidence of the three recent accidents because they were not substantially similar to the accident in this case.  Plaintiffs argued that these accidents suggested that the DMS was inadequate to keep the drivers engaged and that Autopilot was not designed to be used outside the ODD.  Dkt. 576 (Tr. Day 3), at 88:13–21.  But none of these incidents involved a driver who, like McGee, was pressing the accelerator and overriding Tesla's safety features or looking away from the road to search around for his dropped phone.

Second, admitting the eight accidents mentioned in Tesla's discovery responses on the theory that they were "'conclusively established'" admissions—without applying *any* substantial-

similarity test at all—was also erroneous. Dkt. 486 at 13 (quoting Fed. R. Civ. P. 36). Tesla admitted it was aware of eight other accidents involving an inattentive driver in a vehicle with Autosteer activated in the moments leading up to a collision. Dkt. 452 at 13–14; Dkt. 582 (Tr. Day 9), at 20:9–25:10. But the "starting place for evidentiary admissibility is relevance." *United States v. McGregor*, 960 F.3d 1319, 1323 (11th Cir. 2020). The fact that those accidents occurred says nothing about their relevance or the risk of unfair prejudice they would cause—what the substantial-similarity test acts as a screen for. The Court itself concluded that those accidents did not satisfy the substantial-similarity test. Dkt. 486 at 13. Under Eleventh Circuit precedent, the Court should have excluded those accidents given their prejudicial impact in inflaming the jury to impose massive damages based on incendiary allegations having nothing to do with the facts of this case. *See Henderson*, 72 F.4th at 1243.

Third, the Court likewise erred in admitting the NHTSA reports of accidents under a relaxed version of the substantial-similarity test. The Eleventh Circuit has not endorsed a relaxed version of the substantial-similarity test for purposes of showing notice. To the contrary, it has applied the substantial-similarity test, without any relaxation, to the "defendant's knowledge or ability to foresee the incident at issue." *Henderson*, 72 F.4th at 1243; *see, e.g., Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1287–88 (11th Cir. 2015) (same substantial-similarity test governs the admission of past accidents to prove the defendant's "knowledge" of the slippery surface on board cruise ship); *Jones v. Otis Elevator Co.*, 861 F.2d 655, 661–62 (11th Cir. 1988) (same substantial-similarity test applies to past accidents offered to prove "constructive notice"). Here, Plaintiffs vaguely gestured at the "general details" of the accidents they sought to introduce, trying to assimilate them all into "a collision with an object directly in the travel path of the Tesla, resulting from driver inattention while using [A]utopilot." Dkt. 469 at 13–14. Plaintiffs' generic

36

description did not show how the collision happened, let alone whether the collision was caused by any purported design defects at issue here. Indeed, that description was entirely devoid of any details relevant to the eight factors the Court previously recognized needed to be considered to establish substantial similarity. Dkt. 433 at 31. Those barebones details did not suffice to establish "conditions substantially similar to the occurrence in question." *Jones*, 861 F.2d at 661–62.

This Court relied on two sets of authorities to justify its application of a relaxed version of the substantial-similarity test, but neither is on point. First, the Court invoked inapt district-court decisions that relaxed the standard for making past accidents *discoverable*—not admissible. Dkt. 486 at 13–14 (citing *Guerrero v. Apple Computer, Inc.,* 2019 WL 1333735, at *2 (S.D. Fla. Feb. 12, 2019); *Ree v. Royal Caribbean Cruises Ltd.*, 315 F.R.D. 682, 686 (S.D. Fla. 2016)). Discoverability is a lower threshold than admissibility; even inadmissible information can be discoverable if it is "reasonably calculated to lead to the discovery of admissible evidence." *Republic of Ecuador v. Hinchee*, 741 F.3d 1185, 1189 (11th Cir. 2013) (quotation marks omitted). But Eleventh Circuit precedent makes clear that this watered-down standard does not suffice when it comes to the higher threshold of admissibility. *See Henderson*, 72 F.4th at 1243. Second, this Court relied on out-of-circuit decisions that had adopted a relaxed standard for notice issues. Dkt. 486 at 14 (citing, *e.g.*, *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1269 n.9 (7th Cir. 1988)). But the Eleventh Circuit has reached the opposite conclusion, so out-of-circuit precedent is irrelevant. *See supra*, at 36.

In addition, Plaintiffs argued that punitive damages were warranted because "Tesla was on notice of dozens of other similar accidents that it had reported to NHTSA between 2018 and 2019," and because that was "more than sufficient to allow the jury to determine that Tesla was both grossly negligent and engaged in intentional misconduct." Dkt. 522 at 22, 26. But only a rigorous

application of the substantial-similarity test could ensure that Tesla had the requisite "fair notice" of what conduct could subject it to punishment. *BMW of N. Am. v. Gore*, 517 U.S. 559, 574 (1996); *see, e.g.*, *Bonnell v. Carnival Corp.*, 2014 WL 12580433, at *4 (S.D. Fla. Oct. 23, 2014) (excluding incidents that were not substantially similar for "punitive damages").

The Court instructed the jury that it was "not to conclude or infer from [the prior incidents] that any of those incidents were caused by a defect or involved incidents that were substantially similar to the circumstances of this case" and that the prior accidents were "only being offered to show that Tesla was aware of these accidents." Dkt. 577 (Tr. Day 4), at 24:11–17. But Plaintiffs were still permitted to urge the jury to impose punitive damages on the ground that Tesla had supposedly ignored a string of similar accidents in "[p]rioritizing expansion and market share . . . at the expense of more people being injured and killed." Dkt. 587 (Tr. Day 14), at 47:6–8. It is highly "'probabl[e]'" that the erroneous admission of evidence of prior accidents motivated the jury to impose its legally deficient and wildly unconstitutional $200 million punitive-damages award and also its excessive compensatory-damages award. *Proctor*, 494 F.3d at 1352. That error calls for a new trial.

\*     \*     \*

Each one of these errors, standing alone, is serious enough to call for a new trial on liability and damages. Their cumulative effect demands one. Because the cumulative impact of errors may be greater than the sum of each individual error, courts evaluate the "number of errors" and the "prejudicial effect of the evidence" in order to determine whether there can be "fair assurance that the verdict was not substantially swayed" by such improper evidence. *Ad-Vantage*, 37 F.3d at 1465. The collective effect of these errors in inflaming the jury to punish Tesla tainted the entire trial and cries out for a new trial on all issues.

38

III.   **This Court Should Grant Tesla Judgment as a Matter of Law on Punitive Damages or at Least Significantly Reduce Punitive Damages.**

Plaintiffs' inflammatory evidence not only was erroneously admitted, but also resulted in a staggering punitive-damages award far greater than the law allows. The Florida courts and Legislature impose strict requirements sharply limiting the recovery of punitive damages, especially in product-liability cases. Indeed, "the Florida Supreme Court has all but eliminated punitive damage awards in products liability cases." *Jeep Corp. v. Walker*, 528 So. 2d 1203, 1205 (Fla. Dist. Ct. App. 1988); *see Banner*, 411 So. 3d at 5 (noting that this observation "remains largely true" in 2025. And the Florida Legislature's 1986 enactment and 1999 amendment of § 768.72 have reinforced that punitive damages are, as a matter of law, available only in extraordinarily rare circumstances. *See, e.g.*, *Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 11 (Fla. 2016).

Florida law forecloses punitive damages here as a matter of law because Plaintiffs failed to establish by clear and convincing evidence that Tesla engaged in intentional misconduct or acted with gross negligence equivalent to the *mens rea* for criminal manslaughter. The Florida District Court of Appeal recently held in *Banner* on materially identical arguments and allegations that Tesla lacked the requisite culpability for punitive damages because its state-of-the-art car complied with applicable industry and regulatory standards. Any other conclusion here would disregard the framework of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), contradict settled Florida law, and dampen innovation. The $200 million award also violates Florida's statutory cap, which limits punitive damages to three times the compensatory damages that the judgment actually *awarded* Plaintiffs after reductions for comparative fault.

If Florida law allowed any award, the Due Process Clause would sharply limit the maximum amount. "[E]lementary notions of fairness enshrined in our constitutional jurisprudence

dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *State Farm*, 538 U.S. at 417 (quoting *Gore*, 517 U.S. at 574). Thus, "it is well established that there are procedural and substantive constitutional limitations on these awards," including the Due Process Clause's prohibition against "imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Id.* at 416. The punitive-damages award violates the Due Process Clause, which on this record allows no more than a 1:1 ratio to the compensatory damages attributable to Tesla's conduct.

A.     **Florida Law Prohibits the Imposition of Any Punitive Damages in This Case.**

The most straightforward way to address the punitive-damages award and avoid any federal constitutional questions is to simply apply Florida law, as the Florida courts did in *Banner* for Tesla's state-of-the-art car. A plaintiff never has a "right to punitive damages." *St. Regis Paper Co. v. Watson*, 428 So. 2d 243, 247 (Fla. 1983). To the contrary, the Florida Legislature has chosen to combat the risks of extreme and arbitrary awards by allowing punitive damages only when a plaintiff makes a heightened showing of wrongdoing (that the defendant "was personally guilty of intentional misconduct or gross negligence") under a heightened standard of proof ("clear and convincing evidence"). Fla. Stat. § 768.72(2). " 'Intentional misconduct' " requires proof that the defendant "intentionally pursued [a] course of conduct" despite "actual knowledge of the wrongfulness of the conduct *and* the high probability" of "injury or damage to the claimant," while " '[g]ross negligence' means that the defendant's conduct was so reckless or wanting in care that it constitute[s] a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." *Id.* § 768.72(2)(a)–(b) (emphasis added). These standards are so stringent that Florida courts have recognized that punitive damages are almost never appropriate in product-liability cases. *See Banner*, 411 So. 3d at 5.

The Florida Legislature enacted § 768.72 against the backdrop of judicial precedents that

were just as demanding as the current statutory text.  In *Carraway v. Revell*, 116 So. 2d 16 (Fla. 1959), the Florida Supreme Court held that because punitive damages aim at "the punishment of the offender," the degree of negligence required "to sustain a recovery for punitive damages" is "the same as" that required to "sustain a conviction for manslaughter." *Id.* at 18–20.  Mere evidence that the defendant is "aware" of a danger is "not sufficient, as a matter of law, to submit the issue of punitive damages to the jury." *White Constr. Co. v. Dupont*, 455 So. 2d 1026, 1028–29 (Fla. 1984).  In *Chrysler Corp. v. Wolmer*, 499 So. 2d 823 (Fla. 1986), for example, the high court eliminated a punitive-damages award against a car manufacturer, explaining that "punitive damages are warranted only" for "egregious wrongdoing" where the manufacturer has "exhibited a reckless disregard for human life equivalent to manslaughter." *Id.* at 825.

Plaintiffs failed as a matter of law to clear the extraordinarily high bar of proving by clear and convincing evidence "reckless disregard of life" equivalent to manslaughter, as required to obtain punitive damages in Florida.  *Dupont*, 455 So. 2d at 1028–29.  Bedrock *Erie* principles require federal courts sitting in diversity "to adhere to the decisions of the Florida appellate courts absent some persuasive indication that the Florida Supreme Court would decide the issue otherwise." *Allstate Life Ins. Co. v. Miller*, 424 F.3d 1113, 1116 (11th Cir. 2005); *see Stoner v. N.Y. Life Ins. Co.*, 311 U.S. 464, 467 (1940).  The obligation to follow state law includes applying law to fact in the same way that state courts would on "facts essentially indistinguishable from the facts at hand." *State Farm Mut. Auto. Ins. Co. v. Duckworth*, 648 F.3d 1216, 1224 (11th Cir. 2011).  That principle resolves Tesla's motion:  *Banner* held—on a full, materially indistinguishable record—that Tesla's design of its Autopilot features could not support any award of punitive damages.

This case is on all fours with *Banner* when it comes to punitive damages.  There, as here,

the decedent's estate filed suit following an accident involving a Tesla vehicle with Autopilot's "'Level 2' self-driving features"—a 2018 Model 3.  411 So. 3d at 3.  There, as here, the plaintiff claimed that the vehicle was unsafe because Tesla should have "restrict[ed] a driver's ability to engage Enhanced Autopilot features to limited-access highways without cross traffic" (ODD theory), used a camera instead of "steering wheel torque" to "monitor driver inattentiveness" (DMS theory), "misrepresent[ed] this technology in advertising" (collision-prevention theory), and "fail[ed] to adequately warn of the inability to detect cross traffic" (failure-to-warn theory). *Id.* at 4.  The trial court allowed the plaintiff to amend its complaint to seek punitive damages on these theories.  *Id.*  But the District Court of Appeal reversed because the plaintiff could not establish "Tesla knew or should have known its SAE Level 2 driving assistance features were likely to cause death or great bodily injury."  *Id.* at 5.  Florida law prevented the imposition of punitive damages for "Autopilot features [that] were 'state-of-the-art' and complied with all industry and regulatory standards" or for a supposed failure to warn when "Tesla repeatedly warned against misuse of the features, which was industry practice."  *Id.*  Florida law simply does not allow Tesla to be punished "for failing to provide technology that it did not advertise and that did not exist."  *Id.*

At the summary-judgment stage, this Court sought to distinguish *Banner* on the theory that *Banner* was decided at the pleadings stage.  Dkt. 428 at 97.  But that procedural distinction actually cuts in Tesla's favor here.  *Banner* held, on materially identical facts, that the plaintiff could not even *plead* punitive damages.  411 So. 3d at 5; *see* Fla. Stat. § 768.72(1).  Yet to *prove* an entitlement to punitive damages, Plaintiffs needed to follow through with "clear and convincing evidence" of Tesla's "intentional misconduct or gross negligence."  Fla. Stat. § 768.72(2). Evidence that falls short at the pleadings stage necessarily falls short at trial.

42

This Court also stated at the summary-judgment stage that, "unlike here, there appears to have been no record evidence [in *Banner*] indicating Tesla's knowledge of the known dangers, other manufacturers' demonstrated ability to avoid the purported dangers, and Tesla's own ability to have cured the alleged defect." Dkt. 428 at 97.  But the *Banner* plaintiff moved to add a request for punitive damages *after* discovery and summary-judgment briefing that included a "record" of "evidence," not mere allegations.  *Banner*, 411 So. 3d at 5; *see* Initial Br. of Appellant, *Tesla, Inc. v. Banner*, No. 4D23-3034, 2024 WL 304945, at *19 (Fla. Dist. Ct. App. Jan. 16, 2024).  The evidence cited by the *Banner* plaintiff, like the evidence Plaintiffs adduced here, purported to show that Tesla "(i) 'knew the vehicle at issue had a defective autopilot system and allowed the vehicle with the system to be driven on roads not suitable for said technology'; (ii) 'despite knowing these deficiencies, marketed the vehicle in a way that greatly overestimated its capabilities and hid its deficiencies'; [and] (iii) 'having knowledge of a substantially similar accident involving similar circumstances, made no efforts to correct the defective product.'"  Initial Br. of Appellant, *Banner*, 2024 WL 304945, at *23 (quoting trial court order); *see* Appellee's Answer Br., *Tesla, Inc. v. Banner*, No. 4D23-3034, 2024 WL 1291846, at *3–12 (Fla. Dist. Ct. App. Mar. 15, 2024) (describing plaintiff's evidence); *see also, e.g.*, *Peter v. Nantkwest, Inc.*, 589 U.S. 23, 29 (2019) (considering arguments made in briefing when analyzing scope of earlier decision).  In all the ways that matter for punitive damages, the record here was indistinguishable from the record in *Banner*.

Moreover, Plaintiffs' summary-judgment defense of the availability of punitive damages eroded before and during trial because any evidence by which they could have tried to distinguish *Banner* wound up being inadmissible for that purpose.  Plaintiffs invoked a 2016 NTSB report and recommendation as evidence that Tesla knew Autopilot was defective, Dkt. 352 at 30–31, but this Court rightly precluded evidence of the NTSB's "'legal conclusions, opinions, or probable cause

determinations'" in the report, Dkt. 466 at 13.  Plaintiffs also relied heavily on Tesla's alleged "conceal[ment]" of Autopilot data, Dkt. 352 at 31–32, but this Court correctly concluded that post-accident data handling lacks the requisite nexus to Plaintiffs' injuries, Dkt. 586 (Tr. Day 13), at 270:5–10.  Similarly, Plaintiffs opposed summary judgment by pointing to Tesla's allegedly deceptive marketing (*i.e.*, Musk's statements), Dkt. 352 at 31, but this Court ultimately agreed with Tesla that its marketing was not relevant to punitive damages based on Tesla's argument that the marketing was unrelated to Plaintiffs' injuries, Dkt. 586 (Tr. Day 13), at 262:7–9.  Without those three linchpins from the summary-judgment stage, Plaintiffs' basis for punitive damages—Tesla's "development of Autopilot and its response to its knowledge of accidents occurring while Autopilot was in use," Dkt. 536 at 11—is even more squarely covered by *Banner*, which rejected a materially identical theory based on the "inadequate design, testing, and manufacture of Autopilot" and "numerous prior incidents and accidents" involving Autopilot.  411 So. 3d at 3.

There is also no "persuasive indication that the Florida Supreme Court would decide the issue otherwise" than the District Court of Appeal did in *Banner*.  *Allstate*, 424 F.3d at 1116.  For decades, the Florida Supreme Court has led the charge in restricting punitive damages to cases of "extreme wrongdoing"—a standard that shields manufacturers of products that comply with all applicable industry standards.  *Chrysler*, 499 So. 2d at 825.  *Chrysler*, for example, rejected any award of punitive damages chiefly because Chrysler's vehicle satisfied the U.S. Secretary of Transportation's "performance standards during its compliance test."  *Id.* at 826.  In *American Cyanamid Co. v. Roy*, 498 So. 2d 859 (Fla. 1986), the high court again held that the defendant's "compliance with industry guidelines" invalidated the jury's finding that the defendant's behavior represented "such an extreme departure from accepted standards of care as to justify punitive damages."  *Id.* at 862–63.  The Florida Supreme Court has never retreated from those decisions.

*See, e.g.*, *Valladares*, 197 So. 3d at 11.  As a result, Florida courts have recognized that almost no product-liability case will meet the high threshold for punitive damages—even in much more compelling cases where, for example, a vehicle is an outlier with a known "high propensity to roll over." *Jeep*, 528 So. 2d at 1206.

This rule—compliance with industry standards and custom forecloses punitive damages—flows from Florida's demanding culpability requirements for punitive damages.  Florida law requires not just awareness of a risk of injury but also "actual knowledge of the *wrongfulness* of the conduct*," or conduct that is "so reckless or wanting in care that it constitute[s] a *conscious disregard or indifference* to" life or safety.  Fla. Stat. § 768.72(2)(a)–(b) (emphasis added).  *Every* product—certainly every car—entails risk/benefit and risk/risk tradeoffs.  Because no one can make an accident-proof car, and because so-called solutions to supposed defects often inject their own risks, the liability question is whether the design is "reasonably" safe.  *West*, 336 So. 2d at 86.  The question for punitive damages is even more demanding: whether the manufacturer "deliberately" chose an unreasonably safe design.  *Jeep*, 528 So. 2d at 1206.  And in answering that question, "[c]ompliance with industry standard and custom serves to negate conscious disregard and to show that the defendant acted with a nonculpable state of mind."  *Drabik v. Stanley-Bostitch, Inc.*, 997 F.2d 496, 510 (8th Cir. 1993) (applying similar Missouri law).

Only that conclusion provides the "fair notice" that constitutional and statutory restrictions alike guarantee for punitive damages.  *Gore*, 517 U.S. at 574.  Companies "reasonably rely on" industry standards "for guidance," so compliance with those standards gives companies a "good-faith basis for believing" they have made permissible design decisions.  *Id.* at 579–80.  And Florida had good reason to erect guardrails on punitive damages when the "threat of such enormous awards has a detrimental effect on the research and development of new products."  *Browning-Ferris*

*Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 282 (1989) (O'Connor, J., concurring in part and dissenting in part).  "[D]esigners of airplanes and motor vehicles have been forced to abandon new projects for fear of lawsuits that can often lead to awards of punitive damages."  *Id.* In line with that concern, Florida consciously enacted a "[s]tate-of-the-art defense for products liability," which requires juries to "consider the state of the art of scientific and technical knowledge and other circumstances that existed at the time of [a product's] manufacture."  Fla. Stat. § 768.1257; *see Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994) (explaining that "compliance with both federal regulations and industry practices," as well as warnings of "potential danger," can defeat punitive damages under Alabama's similar "wantonness" standard).

The record confirms that the 2019 Tesla Model S complied with all existing, applicable industry standards in allowing drivers to use Autopilot outside its ODD, employing a hands-on-wheel DMS, and designing its AEB function only for in-line and in-lane detection of objects.  *See supra*, at 10–18.  Tesla's "compliance with industry guidelines" forecloses as a matter of law any finding that the 2019 Model S represents "such an extreme departure from accepted standards of care as to justify punitive damages."  *Am. Cyanamid*, 498 So. 2d at 862–63.  The absence of deliberate wrongdoing or gross negligence is even clearer here because the federal regulator, NHTSA, had endorsed SAE's industry standards.  Dkt. 586 (Tr. Day 13), at 70:16–21.  Because no car had the collection of features Plaintiffs proposed, their specious theory would mean that *every* manufacturer of a Level 2 system acted with a criminal *mens rea* sufficient to convict them for manslaughter.  That theory would not fly in any State—and certainly not in Florida.  *See Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450–51 (4th Cir. 2001) (vacating $250 million punitive-damages award in automotive product-liability case under South Carolina law and

ordering judgment as a matter of law on punitive damages where there was no evidence that "any engineer in the industry" recognized that a car's design "could create a safety problem").

Plaintiffs never proved by clear and convincing evidence that Tesla violated industry standards and regulations in 2019, much less that it engaged in the kind of egregious misconduct needed for punitive damages under Florida law. They instead sought to justify punitive damages based on (1) Tesla's development process and (2) Tesla's response to claimed Autopilot failures. Dkt. 522 at 18–22. But Tesla's compliance with all industry standards independently forecloses punitive damages under Florida law. *See supra*, at 45–46. And even on Plaintiffs' own terms, each asserted basis for punitive damages falls flat.

First, Plaintiffs did not prove by clear and convincing evidence that Tesla engaged in intentional misconduct or gross negligence in designing the 2019 Model S. They stressed the testimony of Tesla's corporate representative, Akshay Phatak, in arguing that Tesla failed during Autopilot's design process to study, among other things, "driver compliance with automated driving systems," human reaction times needed to avoid accidents, and Autopilot's ability to handle poor road conditions. Dkt. 522 at 19–21; *see* Dkt. 579 (Tr. Day 6), at 135:7–20. But Phatak confirmed that Tesla *did* conduct studies related to a driver's situational awareness when using Autopilot, Dkt. 579 (Tr. Day 6), at 127:15–18 (referencing "evaluations" of driver warnings by "employees of Tesla"), and the effectiveness of the Model S's DMS, *id.* at 143:2–8 (testifying there were "internal studies" evaluating the DMS). The corporate witness who testified at trial, Eloy Rubio Blanco, further confirmed that Tesla conducted multi-step internal testing "prior to the deployment of Autopilot" and in response to data from customer use. Dkt. 584 (Tr. Day 11), at 124:2–17; *see id.* at 149:16–24, 174:19–76:21. While Tesla was "researching and developing Autopilot features, Tesla engineers considered the possibility that drivers could misuse the system

47

in a variety of ways"—including that drivers might "fail to pay attention . . . while using Autopilot," "use Autopilot features on roadways outside the recommended environment," or use it "in conditions beyond the system's specified design intent." Dkt. 542-5 at 3. Tesla also studied "the impact of Autopilot on driver behavior" through "extensive internal validation during its development" and purposefully "designed Autopilot to address each of these examples"— including by improving its "hands-on-wheel detection" and "warning[s]." *Id.* at 3–5. Plaintiffs introduced no evidence disproving that Tesla took those steps to test Autopilot. Even if Tesla knew that some drivers were ignoring warnings—as supposedly shown from Elon Musk's 2016 statements, Dkt. 522 at 21—the evidence shows that Tesla did not just ignore those concerns. At most, Plaintiffs proved that some experts disagree as to whether Tesla did enough, which comes nowhere close to gross negligence.

Second, Plaintiffs did not prove by clear and convincing evidence that Tesla engaged in intentional misconduct or gross negligence by failing to respond to reports of accidents involving Autopilot. None of the accidents Plaintiffs cited at trial involved a driver like McGee who was not remotely complacent but was actively, aggressively, and recklessly driving his vehicle by keeping his hand on the wheel and pressing the accelerator while looking down and taking his eyes off the road. Dkt. 523 at 8. The record also establishes that Tesla "continually reviews Autopilot data . . . to improve the safety of the features," and "introduced significant product enhancements to deter and mitigate the effects of driver misuse" prior to Plaintiffs' accident. Dkt. 542-5 at 11, 17. In August 2016, for example, Tesla implemented a "three strikes" rule that disables Autopilot "to ensure driver attention when [A]utopilot is active." *Id.* at 18. This record cannot support— clearly and convincingly—that Tesla intentionally designed a defective vehicle or acted with a "wanton disregard for life equivalent to manslaughter." *Wolmer*, 499 So. 2d at 826.

Tesla is therefore entitled to judgment as a matter of law on punitive damages.  After eliminating the punitive-damages award, this Court should also order a new trial on liability because evidence that came in exclusively for punitive damages—reports of past accidents, Dkt. 529 at 11, and Tesla's wealth, *id.* at 13—infected the entire trial by inflaming the passion of the jury.  *E.g.*, Dkt. 587 (Tr. Day 14), at 47:1–8 (Tesla made the "conscious decision" to "[p]rioritiz[e] expansion and market share . . . at the expense of more people being injured and killed" "when all these crashes keep happening, and all the notice keeps going back to Tesla."); *id.* at 71:24–72:6 (arguing Tesla earned "$33.7 million per day" since the accident).  But even if this Court finds that Florida law could allow punitive damages on this record, the Court at minimum should grant a new trial because of the error in declining to give Tesla's requested jury instructions, which would have made clear that compliance with industry standards forecloses any award of punitive damages under Florida law.  Dkt. 442 at 56–57.  Tesla had a right to instruct the jury on its defense to the availability of punitive damages.  *See Christopher v. Cutter Lab'ys*, 53 F.3d 1184, 1195 (11th Cir. 1995).

### B.   Florida Law Caps Punitive Damages at Three Times the Compensatory Damages Actually Awarded Against Tesla.

Even if Plaintiffs had introduced legally sufficient evidence to support any punitive-damages award, Florida law provides that "an award of punitive damages may not exceed . . . [t]hree times the amount of compensatory damages awarded to each claimant entitled thereto." Fla. Stat. § 768.73(1)(a).  Plaintiffs waived any attempt to prove that a higher statutory cap applies. Dkt. 517 at 24 n.9; Dkt. 586 (Tr. Day 13), at 214:22–15:4.  And the judgment shows that the present compensatory-damages award to Plaintiffs totals $42,570,000: $11,550,000 to Leon, $7,920,000 to Benavides, and $23,100,000 to Angulo.  Dkt. 538 at 1–2.  This Court should, at a minimum, alter the judgment to reduce the punitive-damages award to no more than $127,710,000,

and should reduce it further if the Court reduces compensatory damages, as it should. *Myers v. Cent. Fla. Inv., Inc.*, 592 F.3d 1201, 1217–18 (11th Cir. 2010); *see infra*, at 57–60.

Plaintiffs cannot evade the statutory cap based on the amount of money that the jury assessed *before* any reduction for comparative fault. The cap applies to "the amount of compensatory damages *awarded* to each claimant *entitled thereto*." Fla. Stat. § 768.73(1)(a) (emphases added). Here, the amount that Plaintiffs were "awarded" in the judgment is not the total damages of $129 million on the verdict form, but rather the *reduced* amount in the *judgment* that reflected the jury's determination of comparative fault. The jury verdict, until approved and entered as a judgment, does not "award" anything. *See Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012) ("In ordinary usage, 'award' most often means 'give by judicial decree' or 'assign after careful judgment.'"). Plaintiffs also obviously are not "entitled" to damages before comparative-fault reductions—only to the net award. And the judgment here said that because the jury "found Tesla thirty-three percent (33%) responsible for Plaintiffs' injuries," Plaintiffs were "*entitled to* compensatory damages . . . from Tesla" equal to 33% of the total damages they suffered. Dkt. 538 at 1–2 (emphasis added). The plain text of Fla. Stat. § 768.73(1)(a) therefore caps punitive damages at three times the amount of compensatory damages that Plaintiffs are actually awarded after the Court's comparative-fault reductions.

The Florida Supreme Court, without expressly resolving the statutory cap's interpretation, has strongly suggested that post-fault-reduction compensatory damages set the baseline for the assessment of punitive damages. In *Coates v. R.J. Reynolds Tobacco Co.*, 375 So. 3d 168 (Fla. 2023), the court held that a punitive-damages award was disproportionate to "the $150,000 *net compensatory damages award*"—an award that had been reduced from $300,000 based on comparative fault. *Id.* at 171, 176 (emphasis added). That analysis clearly indicates that the post-

fault-reduction compensatory amount is the proper baseline.  And that approach makes sense.  If the statutory cap were based on pre-fault-reduction damages, a defendant who is only 1% responsible for damages of $300,000 could face punitive damages of up to $900,000, even though the defendant's share of the compensatory damages is only $3,000—a 300:1 ratio.

In short, if this Court does not eliminate punitive damages altogether, it should at least alter the judgment to comply with the statutory cap on punitive damages of three times the compensatory damages awarded—*i.e.*, $127,710,000, subject to any further reductions in compensatory damages.

### C.    The Due Process Clause Limits Punitive Damages Here to No More Than the Net Award of Compensatory Damages.

The Constitution imposes more stringent restraints than Florida's statutory cap does here. The $200 million punitive-damages award was "grossly excessive" in violation of the Due Process Clause's guarantee of "fair notice . . . of the severity of the penalty that a State may impose." *Gore*, 517 U.S. at 574–75.  The Supreme Court has instructed courts to consider three "guideposts" in determining whether a punitive damages award is unconstitutionally excessive:  "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418.  Because "the jury's award of punitive damages does not constitute a finding of 'fact,'" this Court reviews the guideposts de novo without deferring to the jury's award.  *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436–37 (2001). All three guideposts leave no doubt that the award of punitive damages in this case was grossly excessive.  This Court should remit the award of punitive damages to at most the net amount of compensatory damages—$42,570,000, subject to any reductions to compensatory damages.

### 1.    Tesla's Conduct Was Not Reprehensible.

The record forecloses any finding of reprehensibility under the five factors set forth in *State Farm*. First, McGee's reckless misuse of his car, not "[Tesla's] conduct," inflicted the physical harm in this case. 538 U.S. at 419. Indeed, the jury itself attributed the lion's share of the fault to McGee. Second, Tesla did not act with any "indifference" or "reckless disregard" for safety. *Id.* To the contrary, Tesla sought to improve safety (and did improve safety for countless drivers who were not as radically reckless as McGee) while "reasonably rely[ing] on" developing industry standards for cutting-edge technology, such that its "good-faith" compliance forecloses punitive damages. *Gore*, 517 U.S. at 579–80; *see supra*, at 45–46. Third, Tesla did not exploit a "financial[ly] vulnerab[le]" victim. *State Farm*, 538 U.S. at 419. Fourth, Tesla did not "repeatedly engage[ ] in prohibited conduct while knowing or suspecting that it was unlawful." *Gore*, 538 U.S. at 576. And fifth, the record does not support any conclusion that Tesla engaged in "intentional malice, trickery, or deceit." *State Farm*, 538 U.S. at 419.

Plaintiffs argued for reprehensibility based on Tesla's data handling, but this Court properly concluded that this evidence is irrelevant to punitive damages because it lacks any nexus to the accident here. Yet Plaintiffs continually used this "inflammatory" but irrelevant evidence as an impermissible substitute for reprehensibility. *State Farm*, 538 U.S. at 418. Again, they tried to inflate punitive damages by fixating on alleged (but nonexistent) data tampering that bore no relation to the harms asserted in this case or Tesla's purported reprehensibility. *See supra*, at 30–31. How Tesla handled data requests *after* the accident plainly could not have affected Plaintiffs' physical or emotional injuries *from* the accident. After allowing this evidence and argument throughout the trial, this Court agreed and admonished Plaintiffs that "any claim that Tesla deleted or corrupted data relating to the crash" is "not pertinent to the issue of punitive damages." Dkt. 587 (Tr. Day 14), at 14:10–13; *accord id.* at 51:4–7. That admonishment came only after the damage

was already done.  During closing argument, Plaintiffs' counsel repeatedly harped on the issue to drive home Tesla's supposed "consciousness of guilt," which was not an element of any theory of liability.  *Id.* at 51:2.  That argument instead was couched in the language of punitive damages, which turn on whether the defendant was "personally guilty of intentional misconduct."  Fla. Stat. § 768.72(2).  Plaintiffs thus flouted both *State Farm*'s command to limit punishment to acts related to the relevant injuries as well as this Court's orders to enforce that command.

"'[R]eprehensibility grows more likely as more factors are present.'"  *Cote v. Philip Morris USA, Inc.*, 985 F.3d 840, 847 (11th Cir. 2021).  But zero factors are present here.  Plaintiffs' physical harm was not the product of *any* deliberate wrongdoing by Tesla, but rather of McGee's reckless misuse of his vehicle.  And due-process "concerns are heightened when," as here, "the decisionmaker is presented . . . with evidence that has little bearing as to the amount of punitive damages that should be awarded."  *State Farm*, 538 U.S. at 418.  This Court should hold that Tesla's conduct reflects no or low reprehensibility, much less than the egregious reprehensibility that the Constitution requires to justify a $200 million punishment on these facts.

> **2.    A Substantial Disparity Exists Between the $200 Million Award of Punitive Damages and the $42.3 Million Award of Compensatory Damages.**

The judgment ordered Tesla to pay $200 million in punitive damages and a total of $42.57 million in compensatory damages to Plaintiffs—a 4.7:1 ratio.  Where "compensatory damages are substantial, then a lesser ratio, perhaps *only equal to compensatory damages*, can reach the outermost limit of the due process guarantee."  *State Farm*, 538 U.S. at 426 (emphasis added).  Compensatory damages here were substantial, so the Due Process Clause limits the punitive damages to the amount of the awarded compensatory damages—$42.57 million—if that.

To begin with, a compensatory-damages award of more than $40 million is "substantial" by any measure.  *State Farm*, 538 U.S. at 426 (holding that $1 million in compensatory damages

was substantial).  Courts have recognized compensatory damages as "'substantial' when they are over $1,000,000," and in "many cases," even when they are "less than $1,000,000."  *Lompe v. Sunridge Partners*, LLC, 818 F.3d 1041, 1069 (10th Cir. 2016); *see, e.g.*, *Williams v. First Advantage LNS Screening Solutions Inc.*, 947 F.3d 735, 766–67 (11th Cir. 2020) (calling "well reasoned" a decision that a $582,000 compensatory award was "substantial"); *Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1195, 1208 (10th Cir. 2012) (reducing punitive-damages award of $2,000,000 to a 1:1 ratio with the "substantial" compensatory damages of $630,307).  Courts also "presume[ ] a plaintiff has been made whole for his injuries by compensatory damages."  *State Farm*, 538 U.S. at 419.

Moreover, Plaintiffs sought non-economic damages, which "already contain [a] punitive element" of moral condemnation that is then "duplicated in the punitive award."  *State Farm*, 538 U.S. at 426.  The Eleventh Circuit has credited a defendant's argument under *State Farm* that a "goodly portion" of an award of non-economic damages could "be considered as intended to punish the defendant."  *Williams*, 947 F.3d at 765 n.23.  So too here:  The substantial size of the compensatory-damages award, which itself already imposes a "goodly portion" of punishment, coupled with the low degree of reprehensibility, means that due process limits punitive damages here to no more than the amount of the compensatory award.  The Eleventh Circuit has recognized that when the "plaintiff has received a substantial compensatory damages award, then a lesser ratio as low as 1:1 may reach the outer limits of the due process guarantee and a punitive damages award that exceeds that ratio will be suspect."  *Id.* at 754–55, 765 n.23.

Runaway verdicts like the $200 million punitive-damages award here are even more suspect.  The Seventh Circuit recently observed that no court "has upheld a 2:1-or-higher ratio resulting in over $200 million in punitive damages," and courts instead impose "a 1:1 ratio based

on significantly lower compensatory awards." *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1143–44 (7th Cir. 2020) (reducing $280 million award to $140 million, a 1:1 ratio); *see, e.g.*, *Morgan v. N.Y. Life Ins. Co.*, 559 F.3d 425, 442–43 (6th Cir. 2009) (1:1 ratio maximum allowable for compensatory damages of $10 million, where reprehensibility was low); *Dawe v. Corrs. USA*, 506 F. App'x 657, 660 (9th Cir. 2013) (1:1 ratio proper for compensatory damages of about $2.5 million, even where some reprehensibility factors tilted toward plaintiffs). The $200 million award in this case, at a 4.7:1 ratio to compensatory damages, is an extreme outlier.

Imposing a 1:1 ratio between punitive and compensatory damages would yield an award of no more than $42,570,000, pending any reductions to compensatory damages. That amount, not the unreduced compensatory-damages amount of $129 million, is the proper comparator when determining the due-process limits on punitive damages. Calculating "a ratio based on the full compensatory award would improperly punish [Tesla] for conduct that the jury determined to be the fault of [McGee]." *Clark v. Chrysler Corp.*, 436 F.3d 594, 606 n.16 (6th Cir. 2006); *accord Lompe*, 818 F.3d at 1068; *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1026 (8th Cir. 2000); *see also Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196, 1210 (11th Cir. 2020) (assuming without deciding that the correct ratio depends on "the amount of compensatory and punitive damages awarded against each defendant"). If the constitutionality of punitive damages were measured based on the *total* compensatory damages award before reduction for comparative fault, those damages would punish defendants for harm caused not by their own "offense[s]" but by others', in violation of the Due Process Clause. *Gore*, 517 U.S. at 575.

### 3. Comparable Civil Penalties Do Not Justify the Punitive-Damages Award.

Civil penalties for comparable conduct did not put Tesla on fair notice of "the severity of the penalty that a State may impose." *Gore*, 517 U.S. at 574. Here, the $200 million punitive-

damages award dwarfs the civil penalties that the Secretary of Transportation can impose on vehicle manufacturers for violations of the National Traffic and Motor Vehicle Safety Act, which empowers the federal government to create safety standards for motor vehicles.  The maximum penalty that can be imposed on car manufacturers who violate the Act is $21,000 per violation per vehicle.  49 U.S.C. § 30165(a).  Because the Due Process Clause forbids imposing punitive damages to punish Tesla for supposed defects in vehicles *other than* McGee's or for harm to non-parties, *Philip Morris USA v. Williams*, 549 U.S. 346, 354 (2007), the comparable per-vehicle penalty here is $21,000.  And the $200 million award is more than 9,500 times larger than that $21,000 penalty.  *See Clark*, 436 F.3d at 608 (deeming $3 million award excessive in light of earlier version of § 30165(a) that authorized a $1,000 per-vehicle penalty).  The Due Process Clause does not allow such an extreme punishment—particularly when Tesla *complied* with all applicable federal regulations that could have supported such a civil penalty.  *See supra*, at 46.

*       *       *

Every guidepost points in the same direction.  On the jury's own account, Tesla played at most a secondary causal role in the accident caused by a recklessly aggressive driver.  Tesla did not do anything reprehensible or quasi-criminal in providing state-of-the-art technology that improved safety for almost all drivers.  There is no precedent for a $200 million award of punitive damages above a 1:1 ratio, and the non-economic compensatory award here is both substantial and largely punitive.  And the comparable civil penalty of $21,000 exposes the jury's verdict as the extreme, unconstitutional outlier that it is.

Plaintiffs themselves recognized that the *State Farm* guideposts could not support a large award of punitive damages.  During closing, Plaintiffs' counsel instead invited the jury to base its award on Tesla's "net worth" of "$77.3 billion," which supposedly amounted to $33.7 million per

day since the accident.  Dkt. 587 (Tr. Day 14), at 72:2–6.  They told the jury that $236 million was "a rounding error" for Tesla and asked it to "send a message" by awarding a "meaningful" amount of punitive damages.  *Id.* at 72:15–73:3.  This abuse "'of evidence of a defendant's net worth'" exacerbated "'the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences.'"  *State Farm*, 538 U.S. at 417 (quoting *Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994)).  For that reason, "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award."  *Id.* at 427.  A "large corporation" is no less "entitle[d] to fair notice" of the penalties for its conduct.  *Gore*, 517 U.S. at 585.  This Court should therefore remit the punitive-damages award to no more than a 1:1 ratio to compensatory damages, which themselves should be reduced.

## IV.  This Court Should Reduce the Grossly Excessive Award of Compensatory Damages to No More Than $69 Million.

The jury's $129,000,000 compensatory-damages verdict exceeds what was needed "to make the injured part[ies] whole to the extent that it is possible to measure [their] injury in terms of money."  *Mercury Motors Exp., Inc. v. Smith*, 393 So. 2d 545, 547 (Fla. 1981).  Tellingly, the awards exceed even the amounts that Plaintiffs requested.  This Court "determine[s] whether the jury's verdict is within the confines set by state law" and then, "by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered."  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 435 (1996).  Florida law requires the Court to give "close scrutiny" to all damages awards under a five-factor test to ensure that they are "adequate and not excessive."  Fla. Stat. § 768.74(3); *see Odom v. R.J. Reynolds Tobacco Co.*, 254 So. 3d 268, 276 (Fla. 2018) (quoting Fla. Stat. § 768.74(1)); *see Myers*, 592 F.3d at 1212 (quoting factors in Fla. Stat. § 768.74(5)).  Here, that close scrutiny supports remitting Angulo's damages down to no more than $15 million and Leon's damages down to what she requested ($30 million), thus

reducing the total amount down to $69 million before reduction for comparative fault.

McGee's reckless abandon while driving is what caused this tragedy and harm to Plaintiffs. No one seeks to minimize the consequences of his actions. But even (or especially) in cases involving physical injuries or emotional suffering from the loss of a loved one, post-judgment excessiveness review is an important guardrail to keep outsized damages in check. The sheer magnitude of the $129 million in compensatory damages alone suggests that the jury overshot the limits of Florida law. Throughout history, "[j]udges [have] infer[red] passion, prejudice, or partiality from the size" of damages awards. *Honda Motor*, 512 U.S. at 425–26. And the Florida Supreme Court has long warned that an award may be "so great" that it "indicate[s] that the jury must have found it while under the influence of passion, prejudice, or gross mistake." *Lassitter v. Int'l Union of Operating Eng'rs*, 349 So. 2d 622, 627 (Fla. 1976); *see also R.J. Reynolds Tobacco, Inc. v. Robinson*, 216 So. 3d 674, 683–84 (Fla. Dist. Ct. App. 2017).

A comparison with awards involving comparable injuries confirms that the $70 million in damages that the jury calculated for Angulo is "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate" in cases like this one. *Lassitter*, 349 So. 2d at 627. Plaintiffs' experts testified that Angulo's injuries have resulted in "mild or moderate cognitive or brain damage," Dkt. 581 (Tr. Day 8), at 61:13–14, as well as chronic pain and PTSD, Dkt. 579 (Tr. Day 6), at 184:20–85:23. Angulo never asked for McGee to crash into his SUV—and he had every right to full compensation from McGee. But despite the senseless accident and harm caused by McGee, Angulo is still able to walk, drive, and move around, and by his own expert's account will "have a good life." Dkt. 581 (Tr. Day 8), at 49:15; *see* Dkt. 580 (Tr. Day 7), at 71:21–25. The jury's determination that he suffered $70 million in damages far overshoots comparable cases involving more severe injuries. *E.g.*, *Pierard v.*

*Aerospatiale Helicopter Corp.*, 689 So. 2d 1099, 1100 (Fla. Dist. Ct. App. 1997) ($13.5 million in today's money for victim of plane crash who "lost all bladder and bowel control, and all sexual function," faced "accelerated degenerative changes in the spinal column and eventually will not be able to walk unaided," and "suffer[ed] from constant pain and muscle spasms, depression, and posttraumatic stress disorder"); *Hendry v. Zelaya*, 841 So. 2d 572, 574 (Fla. Dist. Ct. App. 2003) (awarding only $8 million in today's money for pain and suffering associated with "permanent brain damage resulting in diminished cognitive functions such as memory loss and the inability to process information"). Ordering a remittitur to no more than $15 million would ensure that passion, prejudice, or speculation did not inflate the award.

Perhaps the most obvious sign of the excessiveness of the compensatory damages here is that the jury's unreduced damages award was $20 million "more than what plaintiffs' counsel argued to the jury during closing would be a reasonable award"—further demonstrating that the damages awarded were "so excessive that they could only have been a product of passion and emotion." *Glabman v. De La Cruz*, 954 So. 2d 60, 62–63 (Fla. Dist. Ct. App. 2007). The introduction of "highly emotional testimony" often suggests that the jury's award above the plaintiffs' own request was "based on . . . emotional testimony rather than the result of the record presented." *Id.* (reversing $8 million award that exceeded plaintiffs' request by $2 million with instructions to order a conditional remittitur); *cf. Fla. Power & Light Co. v. Goldberg*, 856 So. 2d 1011, 1025, 1028–29 (Fla. Dist. Ct. App. 2002) (remitting damages to the amount "trial counsel argued to the jury" in a "very emotional case"), *quashed on other grounds*, 899 So. 2d 1105 (Fla. 2005). Here, the jury calculated Plaintiffs' damages as $129 million in total (before assessment of Tesla's comparative fault) even though Plaintiffs requested only $109 million in closing argument: $30 million for Leon, $25 million for Benavides, and $54 million for Angulo. Dkt. 587 (Tr. Day

14), at 61:20–62:8, 67:6–22.  That the jury verdict surpassed Plaintiffs' own request by $20 million could only have been the product of the emotionally charged trial testimony that was supercharged by evidence calculated to stoke the jury's passion and prejudice, such as Tesla's supposed destruction of data and Elon Musk's statements concerning the capabilities of future Tesla products.  *See supra*, at 30–31, 33.

In sum, the Court should reduce the compensatory damages to bring Angulo's in line with comparable Florida cases (no more than $15 million) and Leon's in line with what she requested (from $35 million to $30 million).  This reduction would yield $69 million in total compensatory damages, with $23 million against Tesla after comparative-fault reductions.  This reduced compensatory-damages award would lower the maximum punitive-damages award under the Due Process Clause to $23 million and lower the statutory cap on punitive damages to no more than three times that figure, or $69 million.  At a minimum, this Court should reduce the total compensatory damages to no more than the amount Plaintiffs requested ($109 million), for $36.3 million awarded against Tesla and corresponding reductions in punitive damages.

## CONCLUSION

Tesla respectfully submits that the Court should enter judgment as a matter of law under Fed. R. Civ. P. 50(b) or, in the alternative, a new trial or remittitur, or amendment of the judgment, under Fed. R. Civ. P. 59.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Tesla requests oral argument on this motion.  Tesla submits that oral argument will aid the Court due to the complexity of the issues presented in the motion.  Tesla estimates that one hour will be sufficient to hear argument from the parties.

Dated:  September 15, 2025                    Respectfully submitted,


/s/ *Wendy F. Lumish*
Whitney V. Cruz (Florida Bar No. 800821)
Wendy F. Lumish (Florida Bar No. 334332)
BOWMAN AND BROOKE LLP
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134
(305) 995-5600
whitney.cruz@bowmanandbrooke.com
wendy.lumish@bowmanandbrooke.com

Thomas P. Branigan (*admitted pro hac vice*)
Drew P. Branigan (*admitted pro hac vice*)
BOWMAN AND BROOKE LLP
101 W. Big Beaver Road, Suite 1100
Troy, MI 48084
(248) 205-3300
thomas.branigan@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com

Joel Smith (*admitted pro hac vice*)
BOWMAN AND BROOKE LLP
1441 Main Street, Suite 1200
Columbia, SC 29201
(803) 726-7420
joel.smith@bowmanandbrooke.com

Theodore J. Boutrous, Jr. (*admitted pro hac vice*)
Julian W. Poon (*admitted pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000
tboutrous@gibsondunn.com
jpoon@gibsondunn.com

Miguel A. Estrada (*admitted pro hac vice*)
Thomas H. Dupree, Jr. (*admitted pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com
tdupree@gibsondunn.com

Paul D. Clement (*admitted pro hac vice*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paulclement@clementmurphy.com