## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| NEIMA BENAVIDES, as Personal Representative of the Estate of Naibel Benavides Leon, deceased, | Case No. 21-cv-21940-BLOOM/Torres |
| Plaintiff, | |
| v. | |
| TESLA, INC., a/k/a Tesla Florida, Inc., | |
| Defendant. | |
| DILLON ANGULO, | Case No. 22-22607-KMM |
| Plaintiff, | |
| v. | |
| TESLA, INC. a/k/a Tesla Florida, Inc., | |
| Defendant. | |

### PLAINTIFFS' RESPONSE TO TESLA'S AMENDED MOTION
### FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY,
### MOTION FOR NEW TRIAL OR TO AMEND THE JUDGMENT

EATON & WOLK, PL
BY: DOUGLAS F. EATON
FBN #:0129577
*Attorneys for Plaintiffs*
2665 S. Bayshore Dr., Suite 609
Miami, Florida 33133
Telephone: (305) 249-1640
Telecopier: (786) 350-3079
Email: deaton@eatonwolk.com

## TABLE OF CONTENTS

Page

Table of Contents ................................................................................................................. i

Table of Citations ............................................................................................................. iii

I.      INTRODUCTION ................................................................................................. 1

II.     LEGAL STANDARDS ........................................................................................ 2

III.    ARGUMENT ........................................................................................................ 3

        A.   TESLA IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW (OR EVEN
             A NEW TRIAL) ON LIABILITY ............................................................................. 3

             1.   The verdict is supported by reliable expert evidence ................................... 3

             2.   Plaintiffs' design-defect theories are supported by substantial competent
                  evidence ...................................................................................................... 4

                  a.   Tesla's 2019 Model S was defective .................................................. 4

                       i.   Tesla set consumer expectations beyond the capabilities of its
                            car ............................................................................................. 7

                       ii.  Specific design defects ............................................................. 9

                  b.   Mr. McGee was not the sole proximate cause of Plaintiffs' injuries ........ 18

                  c.   The failure-to-warn claim is supported by substantial competent
                       evidence ........................................................................................... 21

                       i.   Tesla had a duty to warn ......................................................... 21

                       ii.  Tesla's warnings were inadequate ........................................... 22

                       iii. Tesla's inadequate warnings were a legal cause of the crash ........ 24

        B.   THIS COURT DID NOT ERR IN ADMITTING THE COMPLAINED-OF EVIDENCE ........... 25

             1.   Tesla's efforts to destroy the autopilot data were properly admitted ........... 25

             2.   Elon Musk's statements were properly admitted .......................................... 31

3.  Evidence of similar accidents was properly admitted......................................32

C.  THIS COURT SHOULD NOT DISTURB THE PUNITIVE DAMAGE AWARD ......................35

1.  Florida law permits the imposition of punitive damages in this case .............35

a.  Tesla's development process was grossly negligent..................................39

b.  Tesla's response to Autopilot failures was grossly negligent...................41

2.  In examining the ratio between the compensatory and punitive award, the gross compensatory award is used, not the net .................................................42

3.  Whether the punitive damage award is compared to the gross or net compensatory award, the ratio is constitutionally permissible .......................45

a.  Tesla's conduct was reprehensible.............................................................45

b.  The ratio between the actual harm suffered by the plaintiffs and the punitive damages award comports with due process .................................46

c.  Comparable punitive damages awards justify the jury's award ...............51

D.  THIS COURT SHOULD NOT DISTURB THE COMPENSATORY DAMAGE AWARDS ..........52

IV.  CONCLUSION ........................................................................................................59

EATON & WOLK

# TABLE OF CITATIONS

Page

*Action Marine, Inc. v. Cont'l Carbon Inc.*,
481 F.3d 1302 (11th Cir. 2007) ................................................49

*Alderman v. Wysong & Miles Co.*,
486 So. 2d 673 (Fla. Dist. Ct. App. 1986) ........................12, 38

*Alevromagiros v. Hechinger Co.*,
993 F.2d 417 (4th Cir. 1993) ..............................................6, 12

*Am. Cyanamid Co. v. Roy*,
498 So. 2d 859 (Fla. 1986).......................................................38

*Am. Nat'l Prop. & Cas. Co. v. Felix*,
2018 WL 10247022 (W.D. Pa. Nov. 21, 2018) ......................27

*Angrand v. Key,*
657 So. 2d 1146 (Fla. 1995) ...................................................53

*Arab Termite & Pest control v. Jenkins,*
409 So. 2d 1039 (Fla. 1982)....................................................35

*Aubin v. Union Carbide Corp.,*
177 So. 3d 489 (Fla. 2015).............................................4, 5, 31

*Auburn Mach. Works Co., Inc. v. Jones,*
366 So. 2d 1167 (Fla. 1979)....................................................18

*Auburn Machine. Mosher v. Speedstar Div. of AMCA Intern., Inc.,*
979 F.2d 823 (11th Cir. 1992) ..........................................18, 19

*Bahena v. Kennedy,*
2021 WL 8153974 (N.D. Ill. Oct. 25, 2021)...........................27

*Barrow v. Bristol Meyers Squibb,*
190 F.3d 541 (11th Cir. 1999) ...................................................6

*Benitez v. Standard Havens Products, Inc.*,
7 F.3d 1561 (11th Cir. 1993) ...................................................18

*Blundell v. R. J. Reynolds Tobacco Co.,*
324 So. 3d 1014 (Fla. 1st DCA 2021) .....................................30

*BMW of N. Am., Inc. v. Gore,*
  517 U.S. 559 (1996)..................................................................................45

*Bogle v. McClure,*
  332 F.3d 1347 (11th Cir. 2003) ..........................................................29, 48

*Bould v. Touchette,*
  349 So. 2d 1181 (Fla. 1977)......................................................................53

*Bowden v. Caldor, Inc.,*
  350 Md. 4, 29, 710 A.2d 267 (1998) .......................................................30

*Braddock v. Seaboard Air Line Railroad Co.,*
  80 So. 2d 662 (Fla. 1955) ....................................................................53, 56

*Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A.,* Inc.,
  801 F.3d 347 (3d Cir. 2015).......................................................................51

*Brown v. Glade & Grove Supply, Inc.,*
  647 So. 2d 1033 (Fla. 4th DCA 1994) ......................................................24

*Cates v. Zeltiq Aesthetics, Inc.,*
  73 F.4th 1342 (11th Cir. 2023) .......................................................4, 5, 8, 9, 53

*CGB Occupational Therapy, Inc. v. RHA Health Services, Inc.,*
  499 F.3d 184 (3d Cir. 2007).......................................................................51

*Chrysler Corp. v. Wolmer,*
  499 So. 2d 823 (Fla. 1986)...................................................................35, 38

*Citrus County v. McQuillin,*
  840 So. 2d 343 (Fla. 5th DCA 2003) ...........................................53, 55, 56

*Clark v. Chrysler Corp.,*
  436 F.3d 594 (6th Cir. 2006) .....................................................................44

*Clear-View Techs., Inc. v. Rasnick,*
  2015 WL 3453529 (N.D. Cal. May 29, 2015) ..........................................27

*Cloroben Chem. Corp. v. Comegys*,
  464 A.2d 887 (Del. 1983) .................................................................................30

*Coates v. R.J. Reynolds Tobacco Co.*,
  375 So. 3d 168 (Fla. 2023)...............................................................................43

*Cohen v. Gen. Motors Corp., Cadillac Div.*,
  427 So. 2d 389 (Fla. 4th DCA 1983) ...............................................................21

*Cont'l Trend Res., Inc. v. OXY USA Inc.*,
  101 F.3d 634 (10th Cir. 1996) ..........................................................................51

*Cote v. Philip Morris USA, Inc.*,
  985 F.3d 840 (11th Cir. 2021) ..........................................................................49

*Darden v. City of Chicago*,
  2017 WL 4921787 ( Ill. Cir. Ct. 2017) .............................................................58

*Deiparine v. Siemens Med. Sols. USA Inc.*,
  2010 WL 5479653 (M.D. Fla. Dec. 2, 2010) ....................................................36

*DiTeresi v. Stamford Health Sys., Inc.*,
  2010 WL 5493514 (Conn. Super. Ct. Dec. 14, 2010) .......................................27

*DZE Corp. v. Vickers*,
  299 So. 3d 538 (Fla. 1st DCA 2020) ................................................................19

*E.E.O.C. v. Wal-Mart Stores, Inc.*,
  35 Fed. Appx. 543 (9th Cir. 2002)....................................................................29

*Eghnayem v. Boston Sci. Corp*,
  2016 WL 4051311 (S.D. Fla. Mar. 17, 2016), *aff'd*, 873 F.3d 1304 (11th Cir. 2017)...................6

*Epic Sys. Corp. v. Tata Consultancy Services Ltd.*,
  980 F.3d 1117 (7th Cir. 2020) ..........................................................................49

*Estate of Miller v. Ford Motor Co.*,
  2004 WL 7330563 (M.D. Fla. July 22, 2004) ...................................................36

*Evans v. Dean Witter Reynolds, Inc.*,
  5 P.3d 1043 (Nev. 2000)....................................................................................45

*Evers v. R.J. Reynolds Tobacco Co.*,
  195 So. 3d 1139 (Fla. 2d DCA 2015) ...............................................................22

*Exxon Shipping Co. v. Baker*,
  554 U.S. 471 (2008) ..................................................................49

*Federated Univ. Police Officers' Ass'n v. Regents of Univ. of California*,
  2015 WL 13273308 (C.D. Cal. July 29, 2015) ...................................27

*Ferebee v. Chevron Chem. Co.*,
  552 F. Supp. 1293 (D.D.C. 1982), *aff'd*, 736 F.2d 1529 (D.C. Cir. 1984) ...........................24, 25

*First Healthcare Corp. v. Hamilton*,
  740 So. 2d 1189 (Fla. 4th DCA 1999) ..............................................29

*Gen. Motors Corp. v. McGee*,
  837 So. 2d 1010 (Fla. 4th DCA 2002) ...........................................42, 56

*Grieco v. Daiho Sangyo, Inc.*,
  344 So. 3d 11 (Fla. 4th DCA 2022) ..................................................20

*Guarantee Ins. Co. v. Heffernan Ins. Brokers, Inc.*,
  2015 WL 11216329 (S.D. Fla. Aug. 28, 2015) ...................................29

*Haemonetics Corp. v. Dupre*,
  238 B.R. 224 (D. Mass. 1999) .........................................................27

*Hall v. Ochs*,
  817 F.2d 920 (1st Cir.1987) .......................................................28, 29

*Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*,
  758 F.3d 1051 (8th Cir. 2014) .........................................................29

*Hardee v. State*,
  534 So. 2d 706 (Fla. 1988) .............................................................38

*Haskell v. Tan World, Inc.*,
  2003 WL 24054815 (Iowa Dist. Dec. 9, 2003) ..................................44

*Henderson v. Ford Motor Co.*,
  72 F.4th 1237 (11th Cir. 2023) .......................................................34

*Howell v. Greyhound Lines, Inc.*,
  2009 WL 10666051 (N.D. Ga. Apr. 3, 2009) ....................................29

*Hundley ex rel. Hundley v. Rite Aid of S.C., Inc.*,
  529 S.E.2d 45 (S.C. Ct. App. 2000) ..................................................30

EATON & WOLK

*I-Gotcha, Inc. v. Mcinnis,*
 903 S.W.2d 829 (Tex. App. 1995)................................................................45

*In re Parmalat Sec. Litig.,*
 472 F. Supp. 2d 582 (S.D.N.Y. 2007), *aff'd*, 240 Fed. Appx. 916 (2d Cir. 2007)......................27

*Inter Med. Supplies, Ltd. v. EBI Med. Sys.*, Inc.,
 181 F.3d 446 (3d Cir.1999)................................................................51

*Intramed, Inc. v. Guider,*
 93 So. 3d 503 (Fla. 4th DCA 2012)................................................................50

*Jarvis v. Carnival Corp.,*
 2017 WL 6989149 (S.D. Fla. Aug. 24, 2017)................................................................34

*Jeep Corp. v. Walker,*
 528 So. 2d 1203 (Fla. 4th DCA 1988)................................................................36

*Jennings v. BIC Corp.,*
 181 F.3d 1250 (11th Cir. 1999)................................................................9

*Johns-Manville Sales Corp. v. Janssens,*
 463 So. 2d 242 (Fla. 1st DCA 1984)................................................................36

*Johnston v. Love,*
 940 F. Supp. 738 (E.D. Pa. 1996)................................................................27

*Joler v. Scott Paper Co.,*
 65 F.3d 160 (1st Cir. 1995)................................................................26

*Jordan v. Jenkins*, Syl. Pt. 2,
 859 S.E.2d 700 (W. Va. 2021)................................................................30

*Kaufman v. Wyeth, LLC,*
 2011 WL 10483576 (S.D. Fla. Aug. 15, 2011)................................................................6, 15

*King v. Eastern. Airlines, Inc.,*
 536 So. 2d 1023 (Fla. 3d DCA 1987)................................................................35

*Kerrivan v. R.J. Reynolds Tobacco Company*,
 953 F.3d 1196 (2020)................................................................ *passim*

*Kohler v. Medline Indus., Inc.,*
 453 So. 2d 908 (Fla. 4th DCA 1984)................................................................19

*Koonce v. Commonwealth,*
412 Mass. 71 E.2d 220 (1992) ...................................................................27

*Kroon v. Beech Aircraft Corp.*,
 628 F.2d 891 (5th Cir. 1980) ....................................................................18

*Laskey v. Smith,*
 239 So. 2d 13 (Fla. 1970) ........................................................................52

*Lassiter v. Int'l Union of Operating Eng'rs,*
 349 So. 2d 622 (Fla. 1976)..................................................................43, 53

*Liggett Group, Inc. v. Davis,*
 973 So. 2d 467 (Fla. 4th DCA 2007) ..........................................................9

*Linkepic Inc. v. Vyasil, LLC,*
 2019 WL 11717093 (N.D. Ill. Oct. 15, 2019).............................................27

*Lipphardt v. Durango Steakhouse of Brandon, Inc.,*
 267 F.3d 1183 (11th Cir. 2001) ..................................................................2

*Lomangino v. Polaris Indus. Inc.*,
 2023 WL 3397411 (S.D.W. Va. May 11, 2023)..........................................29

*Lopez v. S. Coatings, Inc.*,
 580 So. 2d 864 (Fla. Dist. Ct. App. 1991 ..............................................24, 58

*Marlo v. K-Mart Corp.,*
 756 So. 2d 213 (Fla. 3d DCA 2000) ..........................................................55

*Martinez v. City of New York,*
 2023 WL 4627739 (E.D.N.Y. July 19, 2023)..............................................29

*Matter of Energetic Tank, Inc.,*
 607 F. Supp. 3d 328 369 (S.D.N.Y. 2022), *aff'd,* 110 F.4th 131 (2d Cir. 2024) .........................26

*McGinnis v. Am. Home Mortgage Servicing, Inc.,*
 817 F.3d 1241 (11th Cir. 2016) ...............................................2, 47, 48, 50

*McGriff v. Minn. Mut. Life Ins. Co.*,
 127 F.3d 1410 (11th Cir. 1997) ..................................................................2

*McKenzie v. United States Tennis Ass'n Inc.,*
 2024 WL 3849884 (M.D. Fla. Aug. 16, 2024) ......................................26, 27

*Medina as next friend for N.M. v. Izquierdo*,
 594 F. Supp. 3d 1045 (N.D. Ill. 2022) ....................................................27

*Morga v. FedEx Ground Package Sys., Inc.*,
 2022-NMSC-013, 512 P.3d 774 ............................................................57

*Nordin v. Gregory*,
 566 So. 2d 60 (Fla. 5th DCA 1990) .......................................................53

*Norton v. Snapper Power Equip., Div. of Fuqua Indus., Inc.*,
 806 F.2d 1545 (11th Cir. 1987) ...............................................................7

*Odom v. R.J. Reynolds Tobacco Co.*,
 254 So. 3d 268 (Fla. 2018)..................................................52, 56, 58

*Owens-Corning Fiberglas Corp. v. Ballard*,
 749 So. 2d 483 (1999)............................................................................30

*Passantino v. Johnson & Johnson Consumer Products, Inc.*,
 212 F.3d 493 (9th Cir. 2000) ...........................................................28, 29

*Philip Morris USA Inc. v. Cohen*,
 102 So. 3d 11 (Fla. 4th DCA 2012)........................................................43

*Philip Morris USA, Inc. v. Cuculino*,
 165 So. 3d 36 (Fla. 3d DCA 2015) ........................................................59

*Philip Morris USA v. Williams*,
 549 U.S. 346 (2007).................................................................................43

*Rety v. Green*,
 546 So. 2d 410 (Fla. 3d DCA 1989) .......................................................35

*Richards v. Michelin Tire Corp.*,
 21 F.3d 1048 (11th Cir. 1994) ..................................................................3

*Ritter v. Stanton*,
 745 N.E.2d 828 (Ind. Ct. App. 2001).....................................................57

*R.J. Reynolds Tobacco Co. v. Buonomo*,
 138 So. 3d 1049 (Fla. 4th DCA 2013) ....................................................49

*R.J. Reynolds Tobacco Co. v. Evers*,
 232 So. 3d 457 (Fla. 2d DCA 2017).......................................................49

*R.J. Reynolds Tobacco Co. v. Martin,*
  53 So. 3d 1060 (Fla. 1st DCA 2010) ............................................................48, 49

*R.J. Reynolds Tobacco Co. v. Schleider,*
  273 So. 3d 63 (Fla. 3d DCA 2018) .....................................................................59

*R.J. Reynolds Tobacco Co. v. Townsend,*
  118 So. 3d 844 (Fla. 1st DCA 2013) ..................................................................43

*Rogers v. State,*
  498 So. 2d 655 (Fla. 2006) ..................................................................................34

*Royal v. Black & Decker Mfg. Co.,*
  205 So. 2d 307 (Fla. 3d DCA 1967) ...................................................................12

*S. Union Co. v. Sw. Gas Corp.,*
  281 F. Supp. 2d 1117 (D. Ariz. 2003) ................................................................25

*Santillan v. Sharmouj,*
  289 Fed. Appx. 491 (3d Cir. 2008) .....................................................................29

*Schafer v. Wickham,*
  1999 WL 961273 (E.D. Pa. Oct. 15, 1999) ........................................................29

*Schoeff v. R.J. Reynolds Tobacco Co.,*
  232 So. 3d 294 (Fla. 2017) .............................................................................45, 49

*Scribner v. Waffle House, Inc.,*
  993 F. Supp. 976 (N.D. Tex. 1998) ....................................................................29

*SE Prop. Holdings, LLC v. Judkins,*
  822 Fed. Appx. 929 (11th Cir. 2020) ..................................................................29

*Siedlecki v. Arabia,*
  699 So. 2d 1040 (Fla. 4th DCA 1997) ................................................................35

*Sims v. BMW of N. Am. LLC,*
  2025 WL 724047 (M.D. Fla. Mar. 5, 2025) ..................................................37, 52

*Sorrels v. NCL (Bahamas) Ltd.,*
  796 F.3d 1275 (11th Cir. 2015) ......................................................................33, 34

*Standard Havens Products, Inc. v. Benitez,*
  648 So. 2d 1192 (Fla. 1994) ..........................................................................18, 19

*Stanley Indus., Inc. v. W.M. Barr & Co.*,
  784 F. Supp. 1570 (S.D. Fla. 1992) ...................................................................24

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) .............................................................................43, 54

*Tampa Elec. Co. v. Stone & Webster Eng'g Corp.*,
  367 F. Supp. 27 (M.D. Fla. 1973) ....................................................................44

*Tesla, Inc. v. Banner*,
  411 So. 3d 1 (Fla. 4th DCA 2025) .............................................................. *passim*

*Toyota Motor Co., Ltd. v. Moll*,
  438 So. 2d 192 (Fla. 4th DCA 1983) ................................................................36

*Upshaw v. Sunrise Cmty. of Tennessee, Inc.*,
  2017 IER Cases 286375 (Tenn. Ct. App. 2017) ....................................................30

*Valladares v. Bank of Am. Corp.*,
  197 So. 3d 1 (Fla. 2016) ...............................................................................36

*Voynar v. Butler Mfg. Co.*,
  463 So. 2d 409 (Fla. 4th DCA 1985) ................................................................10

*Williams v. Bumpass*,
  568 So. 2d 979 (Fla. 5th DCA 1990) ................................................................44

*Williams v. First Advantage LNS Screening Solutions Inc.*,
  947 F.3d 735 (11th Cir. 2020) ........................................................................49

*Winner v. Sharp*,
  43 So. 2d 634 (Fla.1950) ...............................................................................56

*Zambrano v. Devanesan*,
  484 So. 2d 603 (Fla. 4th DCA 1986) ...............................................................53

EATON & WOLK

## <u>Authorities</u>

Florida Statute § 768.1257 ..................................................................................................6

Florida Statute § 768.72 ....................................................................................................36

Florida Statute § 768.74 ................................................................................................53,54

I.   INTRODUCTION

Despite having been told by a jury that it selected that its product was partially responsible for the death of Naibel Benavides and the life-changing injuries sustained by Dillon Angulo, Tesla refuses to acknowledge any responsibility for this tragic accident.  Tesla's Motion for Judgment as Matter of Law or, Alternatively, Motion for New Trial or to Amend the Judgment combines its unsuccessful closing argument, rejected by the jury, and its previously raised legal arguments, rejected by this Court.

Tesla's narrative continues to ignore the fundamental question in this case: Why was Mr. McGee recklessly disengaged from driving his car in the twenty seconds before this accident? His decision to disengage from the driving task, to focus on his call, and to reach for his phone, didn't happen in a vacuum. It happened because he had become overly trusting of the autopilot system that Tesla's CEO had sold to the world as safer than a human driver. If Mr. McGee hadn't been conditioned to rely on his autopilot, this accident wouldn't have occurred. As Plaintiffs told the jury during opening, Mr. McGee was a bad actor, but every actor needs a stage, and Tesla set the stage.

As Plaintiffs proved during trial, Tesla released autopilot into the world after a deficient development process. Tesla's grandiose statements about autopilot's capabilities wildly overstated its actual performance record. When Tesla became aware that serious, often fatal, accidents were resulting from inattentive drivers delegating the entire driving task to autopilot, Tesla resisted calls to improve the glaring flaws in its system.  Despite being aware of hundreds of crashes for which it internally assigned fault to the autopilot system, Tesla avoided making common sense, feasible changes to its driver monitoring system.

Predictably, the federal agency entrusted to ensure automobile safety - NHTSA - found autopilot defective, and declared Tesla an industry outlier for the number of high energy frontal plane crashes, like the instant crash, its cars were involved in.  While Tesla did make some inadequate improvements to its driver monitoring system as part of the 2023, Tesla chose not to present evidence that it had done so, so the evidence before the jury was that Tesla had done nothing in response to NHTSA's findings, even though it had stipulated that there were a number of feasible safety measures it could have implemented.

1

The jury in this case paid close attention, took notes, engaged in a thoughtful deliberation, and issued a verdict that was supported by ample evidence. This Court should let their verdict stand in all respects.

## II.   LEGAL STANDARDS

"The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion [under 50(a) ]." *McGinnis v. Am. Home Mortgage Servicing, Inc.,* 817 F.3d 1241, 1254 (11th Cir. 2016). The question before this Court is "whether the evidence is 'legally sufficient ... to find for the party on that issue.'" *Id. "*In considering whether the verdict is supported by sufficient evidence, 'the court must evaluate all the evidence, together with any logical inferences, in the light most favorable to the [Plaintiffs].'" *Id*. "[I]t is the jury's task—not [the court's]—to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Id.*

Tesla's motion for JMOL ignores this burden, and instead provides this court with a version of its closing argument, presenting the evidence and inferences in a light most favorable to Tesla. This is plainly incorrect. Below, Plaintiffs provide the Court with a summary of the evidence, and the reasonable inferences the jury can derive therefrom, in the proper light. When viewed properly, Tesla fails to meet the standard for obtaining a JMOL.

As its fallback position, Tesla requests a new trial. But "[b]ecause it is critical that a judge does not merely substitute his judgment for that of the jury, 'new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence.'" *Lipphardt v. Durango Steakhouse of Brandon, Inc.,* 267 F.3d 1183, 1186 (11th Cir. 2001) Tesla also fails to meet this standard.

Tesla cites to *McGriff v. Minn. Mut. Life Ins. Co.*, 127 F.3d 1410, 1416 (11th Cir. 1997), for the principle that "If even one of multiple theories submitted to the jury lacks a legally sufficient evidentiary basis, Tesla is entitled to a new trial." Dkt. 591 at 6. But then Tesla inaccurately suggest that this principle means it is entitled to a new trial if "Plaintiffs failed to meet their evidentiary burden as to any of Plaintiffs' theories (ODD, DMS, AEB/FCW, and failure to warn)."

The jury in this case was instructed on only two theories of liability – design defect and failure to warn.[1] Dkt. 536 at 8.  Tesla did not ask for an alternative instruction or an itemized verdict form breaking out the three sub-theories (ODD, DMS, and AEB/FCW) incorporated in the design defect claim. So long as one of those sub-theories had a legally sufficient evidentiary basis, then Plaintiff's design defect theory had a legally sufficient evidentiary basis.  As we will demonstrate below, however, each of the design defect theories were sufficiently proven.

While Plaintiffs must show (and have shown) that both the design defect and failure to warn claims have a legally sufficient basis in order to avoid a new trial, the converse is true for Tesla's request for JMOL. Because Tesla did not request an itemized verdict form, the two issue rule applies. *Richards v. Michelin Tire Corp.,* 21 F.3d 1048, 1055 (11th Cir. 1994) As a result, "Because the jury returned a general verdict, to be entitled to JNOV on [] the [] negligence cause of action, Appellant must show that [Plaintiffs] failed to make out a case under both [their] design and warning claims." *Id*.  Tesla has failed to do so here.

### III.   ARGUMENT

#### A.   TESLA IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW (OR EVEN A NEW TRIAL) ON LIABILITY.

##### 1.   The verdict is supported by reliable expert evidence.

Tesla begins by re-arguing its previously rejected *Daubert* objections to the testimony of Missy Cummings and Alan Moore.  In doing so, Tesla suggests that their testimony failed to meet a standard not required under Florida law. This will not be the only time in its motion Tesla misstates Plaintiffs' evidentiary burdens.

Tesla misleadingly suggests that Moore and Cummings were required to identify "a comparable car in 2019 that incorporated all of" the "hypothetical features that Tesla should have

---

[1] (a) the product fails to perform as safely as an ordinary consumer would expect when used as intended or when used in a manner reasonably foreseeable by the manufacturer or the risk of danger in the design of the 2019 Tesla Model S Autopilot feature outweighs the benefits of the design, and, if so, whether that failure was a legal cause of damage to Naibel Benavides Leion and Dillon Angulo.

(b) Whether the foreseeable risks of harm from the 2019 Tesla Model S Autopilot feature could have been reduced or avoided by providing additional instructions or warnings, and the failure to provide those warnings made the product unreasonably dangerous, and if so, whether that failure was a legal cause of damage to Naibel Benavides Leion and Dillon Angulo.

supposedly incorporated into its Autopilot system." Dkt. 591 at 8. [2] This is wrong. As this Court noted in its order denying summary judgment, not only were Plaintiffs not required to point to a comparable car with such features, they were not required to point to the existence of a reasonable alternative design:

> In Florida, a Plaintiff need only satisfy the consumer expectation test to prove a design defect claim. *See Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 510-11 (Fla. 2015). Neither Plaintiffs nor their experts must establish a reasonable alternative design, so long as they demonstrate that a reasonable consumer in McGee's shoes would have expected the Vehicle to either give an audible warning of obstacles in the road or trigger the automatic brakes with sufficient time to avoid the collision. *Id.*

Dkt. 428 at 35.

This Court spent 30 pages in its prior order methodically examining the propriety of Dr. Cummings' and Mr. Moore's opinions. Dkt. 428 at 20-49. Tesla has not provided any reason for this Court to reconsider its conclusions from that order.

## 2. Plaintiffs' design-defect theories are supported by substantial competent evidence.

### a. Tesla's 2019 Model S was defective.

With respect to Plaintiffs' claim for strict liability based on design defect and failure to warn, Tesla's Rule 50(b) simply repeats the arguments it made in its motion for summary judgment and its Rule 50(a) motion. This Court has twice rejected those arguments before, and it should do so again.

In its order denying summary judgment, this Court set forth the relevant product defect standards as follows:

> Florida law generally requires a plaintiff to show a product was defectively designed under the "consumer-expectation test," the "risk-utility test," or both. *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 510-11 (Fla. 2015); *see also Cates v. Zeltiq Aesthetics*, 73 F.4th 1342, 1351 (11th Cir. 2023) (explaining that "[t]wo different tests determine whether a product is defective: (1) the consumer expectations test and (2) the risk utility test."). Under the consumer-expectation

---

[2] Tesla then states that "no such car existed," because Tesla's expert's "[t]esting of the most advanced 2019 vehicles showed none could have avoided a crash at McGee's speed." Dkt. 591 at 8. This is not true, as we will address later.

test, a product is defective if "the product fails to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by the manufacturer." *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1338-39 (M.D. Fla. 2015); RESTATEMENT (SECOND) OF TORTS § 402A; *see also Aubin*, 177 So. 3d at 504 ("[U]nder the consumer-expectation theory[,] a product is defectively designed if the plaintiff is able to demonstrate that the product did not perform as safely as an ordinary consumer would expect when used in the intended or reasonably foreseeable manner."). The risk-utility test requires a plaintiff to demonstrate that "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design . . . and the omission of the design renders the product not reasonably safe." *Cates*, 73 F.4th at 1351.

Dkt. 428 at 70-71.

In evaluating the expectations of an ordinary consumer, the jury considers the manner in which a manufacturer markets its product. "[A] manufacturer plays a pivotal role in crafting the image of a product and establishing the consumers' expectations for that product, a portrayal which in turn motivates consumers to purchase that particular product." *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 511 (Fla. 2015) "The consumer expectations test thus rightly focuses on the expectations that a manufacturer creates." *Id.* In denying Tesla's motion for summary judgment on the product defect claim, this Court held: "Given Tesla's numerous representations about the capabilities of the Autopilot system, there is at least a genuine dispute as to whether it would be obvious to the average consumer not to trust Tesla's Autopilot system to largely drive itself and avoid collisions." Dkt. 428 at 80.

Throughout its design defect argument, Tesla makes a series of misstatements as to the Plaintiffs' burden of proof. For example, Tesla suggests that compliance with industry standards precludes a design defect claim, citing *Alderman v. Wysong & Miles Co.*, 486 So. 2d 673, 679 (Fla. Dist. Ct. App. 1986). Dkt. 591 at 12. But *Alderman* simply held that while a defendant may admit evidence that its product met industry standards, such compliance is not "prima facie proof that [defendant] met the appropriate legal standard of care." *Alderman* at 678-79.

Tesla continues its misdirection by citing to *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 422 (4th Cir. 1993) for the proposition that a single manufacturer's competing product cannot establish a standard for the industry. (Dkt. 591 at 12-13) This holding is entirely irrelevant for two reasons. First, *Alevromagiros* held that it because of the principle cited by Tesla, the trial court did not in excluding evidence of a competitor product. But Tesla didn't seek to exclude evidence of

competitors' level 2 systems in this case. Second, and more importantly, "the jury in [*Alevromagiros*] did not need to see examples of competing products in order to understand the nature of the product at issue." *Alevromagiros* at 422. The same is true here. Plaintiffs needed to prove that the Tesla did not perform as safely as an ordinary consumer would expect, not that it did not meet industry standards. Such standards were simply evidence that the jury could, and did, consider in rendering their verdict.

Equally incorrect is Tesla's contention that "Plaintiffs failed to prove that Tesla's AEB and FCW did not reflect 'the state of the art of scientific and technical knowledge and other circumstances that existed at the time of manufacture,' *as required to establish liability under Florida law*. Fla. Stat. § 768.1257." Dkt. 591 at 17. (emphasis supplied) This is another misstatement of the law. As explained in *Barrow v. Bristol-Myers Squibb*, 1998 WL 812318, at *41 (M.D. Fla. Oct. 29, 1998), *aff'd sub nom. Barrow v. Bristol Meyers Squibb*, 190 F.3d 541 (11th Cir. 1999):

> A state of the art analysis is relevant to the adequacy of the design of a product under the risk-benefit/utility test. The custom of an industry can be relevant to this defense, but such custom is to be considered with other evidence and is not dispositive. *Compliance with the state of the art does not necessarily require finding in the defendant's favor*.

*Id*. (emphasis added).

Additionally, like the defendant's argument in *Eghnayem v. Boston Sci. Corp*, 2016 WL 4051311, at *4 (S.D. Fla. Mar. 17, 2016), *aff'd*, 873 F.3d 1304 (11th Cir. 2017), Tesla's "argument misunderstands the burden of proof":

> Section 768.1257 operates as a defense—it allows a manufacturer "to show that its design of the product was state-of-the-art and, therefore, not defective since it complied with the best known and available technology." *Kaufman v. Wyeth, LLC*, No. 1:02–CV–22692, 2011 WL 10483576, at *6 (S.D. Fla. Aug. 15, 2011). As with any affirmative defense, the defendant bears the burden of proof. *Ellingham v. Fla. Dep't of Children & Family Servs.*, 896 So. 2d 926, 927 (Fla. Dist. Ct. App. 2005). Triggering the state-of-the-art defense requires more than simply pointing to a deficiency in the plaintiffs' case, as BSC tries to do here.

Moreover, like the defendant's argument in *Eghnayem,* Tesla's "argument is plainly refuted by the testimony of the plaintiffs' [] design-defect expert[s], [] who testified based on scientific knowledge available at the time of the [product's] manufacture." *Eghnayem* at *4.

Here, it is undisputed that Tesla could have geo-fenced the use of its autopilot had it chosen to. In fact, Tesla stipulated that five improvements to its DMS were available to implement in 2019, had it chosen to. Dkt. 536 at 5. It is also undisputed that driver monitoring cameras were existing technology in 2019. It is undisputed that Tesla had control over the car's ability to brake or warn based on its detection of objects in its path or the end of drivable space, and undisputed that competitors' cars could and did warn under similar circumstances, as demonstrated by Tesla's accident reconstruction expert. But, as the evidence received at trial demonstrated, Tesla did none of these things.

Like the jury in *Norton v. Snapper Power Equip., Div. of Fuqua Indus., Inc.*, 806 F.2d 1545, 1549–50 (11th Cir. 1987), this "jury considered this conflicting evidence [on state of the art] and found that the [product] was defective. As long as there is some substantial evidence (i.e., more than a mere scintilla) to support this verdict, the jury's decision will stand." *See also Eghnayem* at *5 ("In short, because BSC failed to demonstrate, as a matter of law, that the Pinnacle was the state-of-the-art at the time of its manufacture, I cannot displace the jury's verdict based on the state-of-the-art defense.")

### i.   <u>Tesla set consumer expectations beyond the capabilities of its car.</u>

Tesla ignores the most important part of the consumer expectations test - the manner in which Tesla's marketing created consumer expectations. Several witnesses described how Tesla marketed autopilot in a manner that created unreasonable expectations relative to its actual capabilities. First, Dr. Mendel Singer testified regarding Tesla's vehicle safety report, in which Tesla represented to its customers that autopilot resulted in a 40% reduction in collisions when it was used. Dkt. 575 (Tr. Day 2), at 178:19–79:2. Dr. Singer demonstrated, however, that making a single adjustment to account for miles driven on the highway would reduce that figure to a 10% reduction in crashes. *Id.* at 178:5–79:7. Dr. Singer explained that because Tesla did not provide the raw data that went into the vehicle safety report, there was no way to validate the accuracy of the figures, and thus Tesla grossly overstated the safety benefit of autopilot. *Id.* at 179:10–80:5.

Dr. Cummings explained that the manner in which Elon Musk and Tesla marketed autopilot promoted its abuse and misuse. Dkt. 576 (Tr. Day 3), at 33:24–34:3. Dr. Cummings noted that Mr. McGee's expectations were similar to most consumers. *Id.* at 103:1–6. He felt the car was his "co-pilot," which "would stop for obstacles in the road" and would allow him, if he

dropped his phone, to "reach down and pick it up because [his] co-pilot was driving." *Id.* at 103:1–6.

Dr. Cummings was shown several statements of Elon Musk and asked to weigh in on their veracity. In October of 2015, Musk described the car's sensor array and its ability to detect objects. Dr. Cummings explained that there was no evidence to suggest that a production Tesla in October 2015 was capable of doing the things that Musk claimed it could at the time. *Id.* at 142:3–7. In 2016, Musk stated that, at that time, Model S could drive autonomously with greater safety than a person. *Id.* at 146:22–147:5. Dr. Cummings replied that this statement was neither accurate then nor today. *Id.* at 147:10–14. Musk explained that the 2016 Tesla's existing radar hardware would be able to detect anything "dense" in its path and "initiate a braking event," "both when Autopilot is active and when it's not active." *Id.* at 149:18–22. Musk further stated that when Autosteer is on, the car knows whether an object is in its probable path or not, and the car would be able to initiate a "much more comfortable braking experience," which would allow the car "to brake to a complete stop." *Id.* at 150:4–11. Musk explained that radar complemented the car's vision system, which might not recognize what an object in the road is. The radar, however, would know that there was something in the road that it was going to hit, and that it should not hit, even in adverse conditions like fog and rain. *Id.* at 138:6–10, 150:12–22. Dr. Cummings testified that this description of Tesla's detection and braking capability was neither accurate in 2016 nor today. *Id.* at 152:4–10.

Another marketing tool Tesla used to manage consumer expectations was the "paint it black" video, which Elon Musk tweeted to his followers with the accompanying message: "The person in the driver's seat is only there for legal reasons. He is not doing anything. The car is driving itself." *Id.* at 154:13–20. The video shows the car leaving the Tesla headquarters, driving on the highway, returning to Tesla and parking itself. Dr. Cummings explained that a production model Tesla was not capable of performing as the video demonstrated in 2016. *Id.* at 155:2–56:15. Additionally, she explained that the video had been staged, and that the car in the video had gotten into an accident during its filming. *Id.* at 156:22–57:1, Dkt. 582 at 201:4-9.

Tesla's owner's manual was another source of information that could impact consumer expectations. For instance, Alan Moore pointed out that the manual indicates that forward collision warning works to detect objects up to 525 feet away. Dkt. 577 (Tr. Day 4), at 196:15–17. The owner's manual did not describe the limitations of forward collision warning, which never

8

activated in this accident.  Thus, the forward collision warning did not activate in a manner that an ordinary consumer who had read the manual would expect.  *Id.* at 196:17–21.

As noted above, the consumer expectation test is "based on an objective standard and not the viewpoint of any particular consumer." *Liggett Group, Inc. v. Davis*, 973 So. 2d 467, 475 (Fla. 4th DCA 2007), citing to *Jennings v. BIC Corp.,* 181 F.3d 1250, 1255 (11th Cir. 1999). *See also Cates v. Zeltiq Aesthetics, Inc*., 73 F.4th 1342, 1353 (11th Cir. 2023), *cert. denied*, 144 S. Ct. 526 (2023) (same). Thus, Mr. McGee's own expectations are entirely irrelevant to the issue before the jury.  However, unsurprisingly, Mr. McGee's expectations were similar to those encouraged by Tesla's marketing. Dkt. 579 (Tr. Day 6), at 60:25–61:15.  Mr. McGee expected the car to perform like his Jeep and other cars in that respect, and it did not.  *Id.*  Mr. McGee further explained that he got "too comfortable" with the technology, and "trusted the technology too much." *Id.* at 51:15–25.

It was against these expectations created by Tesla that the jury evaluated decided that Mr. McGee's Tesla was defective.

## ii. <u>Specific design defects</u>

**OPERATIONAL DESIGN DOMAIN ("ODD")** Tesla begins its argument on the ODD defect with a straw-man argument, stating "Plaintiffs presented no evidence that an ordinary consumer would have expected that geofencing would limit where the driver could use Autopilot's driver-assistance features for his own car." Dkt. 591 at 12.  Of course, this isn't the relevant expectation. The expectation is that Tesla wouldn't allow use of Autopilot in an area unless it could be safely used there.  The Tesla did not meet that expectation.

The evidence that the Tesla was defective because Tesla allowed it to operate outside of its ODD was the same as the evidence that this Court deemed sufficient to deny summary judgment and JMOL. Both Dr. Cummings and Mr. Moore testified that the Autopilot was defective because Tesla allowed the car to be operated in operational domains for which it was not designed.  Dkt. 576 (Tr. Day 3), at 31:8–14; Dkt. 577 (Tr. Day 4), 161:19–24.  Dr. Cummings contrasted Tesla's decision to allow drivers to access autopilot on surface streets with that of Cadillac, who geofenced their Super Cruise product to make sure that it was used only on roads that had been pre-mapped and approved for its use.  Dkt. 576 (Tr. Day 3), at 57:18–24.

Mr. Moore testified that Tesla had infinitely more knowledge about the risks of using autopilot outside of its ODD on Card Sound Road than Mr. McGee had. Dkt. 577 (Tr. Day 4), 162:9–11. Thus, Tesla's decision to allow Autopilot use on this uniquely challenging road was a bigger contribution to the accident than Mr. McGee's decision to use Autopilot. *Id.* at 162:11–14.

Mr. Moore pointed to Cadillac and General Motors' decision to geofence Super Cruise as a reasonable design alternative. Had Mr. McGee been driving a car that geofenced its autopilot product to its ODD, the accident would not have occurred because the system would not have engaged on the road.

From a consumer expectation standpoint, an ordinary consumer would expect that Tesla would only allow the use of Autopilot on roads it had determined to be safe for use. From a risk-risk-utility standpoint, both experts demonstrated that the foreseeable risks of harm posed by allowing use of Autopilot outside its ODD could have been reduced or avoided by the adoption of geofencing used by other manufacturers. Additionally, Tesla could have "provide[d] additional checks when the features are being used outside of controlled access highways and when approaching traffic controls." Dkt. 582 (Tr. Day 9), at 19:7–20. The jury can infer the omission of these safeguards rendered Autopilot not reasonably safe. [3]

As the Court held in its Order Denying Summary Judgment:

> Moore [] may also conclude that limiting Autopilot to its ODD would have prevented the collision as well, given that both conclusions apply the same reasoning. *Simmons*, 576 F. Supp. 3d at 1146; *Schenone*, 2014 WL 9879924, at *8 ("[T]he expert's experience in conjunction with knowledge, skill, training or education alone may provide a sufficient basis to the reliability of the expert's opinion."). Because limiting Autopilot to its ODD would have disabled the system while McGee was driving on Card Sound Road, Moore reasonably concludes that McGee would have been manually driving his Vehicle on the date of the collision and, therefore, he would likely have been more engaged and more responsive to the issues that arose. *See Hendrix ex rel. G.P.*, 609 F.3d at 1198 n.10 ("*Daubert* does not require certainty; it requires only reliability."). Moore does not have to completely rebut alternative possibilities. He need only provide a sound reason for his conclusion that it is more likely than not Tesla's conduct rendered the product defective and caused Plaintiffs' injuries. *See 325 Goodrich*

---

[3] Tesla's citation to *Voynar v. Butler Mfg. Co.,* 463 So. 2d 409 (Fla. 4th DCA 1985) is inapposite. The language quoted by Tesla was referring the Court's approval of the trial court's decision to exclude evidence of subsequent changes to the allegedly defective product, which "would confuse and mislead the jury." *Voynar* at 412. No such evidence related to ODD was admitted here.

> *Ave., LLC v. Sw. Water Co.*, 891 F. Supp. 2d 1364, 1381-82 (M.D. Ga. 2012)
> (explaining that the causation expert was not required to "definitely conclude"
> the cause of the damage for the opinion to be reliable, nor did he have to exclude
> all other "potential sources of causation"). Accordingly, based on the record
> evidence Moore relied upon, the Court finds that the grounds for Moore's
> conclusions on the ODD defect are reliable.

Dkt. 428 at 33.

> Plaintiffs argue that Cummings' opinion about the use of Autopilot outside its
> ODD is valid for largely the same reasons Moore's opinion is admissible—
> permitting use outside the Vehicle's ODD exceeded the product's stated
> capabilities.

Dkt. 428 at 42.

> This Court later concluded:

> Plaintiffs have adequately demonstrated that autopilot design led Tesla drivers,
> McGee in particular, to become complacent and over rely on autopilot to operate
> their vehicles.  Additionally, Plaintiffs provided evidence that allowing Tesla
> drivers to utilize autopilot outside of its ODD and without any training was
> unreasonably dangerous as it increased the likelihood that Tesla owners would
> attempt to rely on autopilot in conditions where Tesla knew the technology was
> unlikely to succeed.  As Plaintiffs experts opined, if Tesla had eliminated or at
> least mitigated these foreseeable dangers, McGee would likely had been paying
> more attention and would have been prepared to avoid the subject collision.

Dkt. 428 at 74. Tesla has provided no basis for this Court to change its ruling.

**DRIVER MONITORING SYSTEM ("DMS")** The evidence that the Tesla was defective because Tesla's driver monitoring system was inadequate to prevent dangerous misuse of the system was the same as the evidence that this Court deemed sufficient to deny summary judgment and JMOL.  It was also more than sufficient to support the jury's verdict against Tesla.

As a starting point, the jury heard Tesla's own admission of defect in NHTSA's ODI resume. Pls.' Ex. 61. Tesla itself admitted "that the prominence and scope of the system's controls maybe insufficient to prevent driver misuse." Dkt. 577 (Tr. Day 4), at 19:8-12. NHTSA similarly concluded that "Tesla's weak driving engagement system was not appropriate for autopilot's permissive operating capabilities" and "this mismatch resulted in a critical safety gap between drivers' expectations of the L2 system's operating capability and the system's true capabilities [which] led to forceable misuse and avoidable crashes." Pls.' Ex. 61. NHTSA's conclusion, which aligns with Tesla's conclusion, indicated that in certain circumstances, "Autopilot's system

controls and warnings were insufficient for a driver-assistance system that requires constant supervision" by a human driver.  Dkt. 577 at 20:24–21:2.

This was supported by expert testimony at trial. Dr. Cummings explained that during its investigation, NHTSA reviewed videos from each accident, and in the vast majority of the crashes, the object the car collided with was in view for more than 10 seconds.  *Id.* at 31:14–32:5.  From these videos, it became apparent that the driver was not engaged, which cued NHTSA to look at the issue of driver monitoring.  *Id.* at 32:6–12.  Dr. Cummings explained that when using automated driving systems like autopilot, drivers get complacent.  *Id.* at 32:13–20.  Drivers "get so comfortable in the car that they don't even glance [up] for a half second [or] look up to see what can kill them or kill other people." *Id.* at 32:18–20.

Dr. Cummings further explained that NHTSA determined that frontal plane crashes similar to the instant collision made up the highest percentage of crashes in the accident database that it studied.  *Id.* at 17:11–17.  That led NHTSA to determine that Autopilot did not sufficiently ensure driver attention and appropriate use.  *Id.* at 17:18–20.  As part of the investigation, NHTSA obtained accident data from other companies to compare them to Tesla's data.  *Id.* at 17:20–25.  From that data, NHTSA determined that Tesla alone had this high number of frontal plane crashes resulting from inadequate driver monitoring.  *Id.* at 18:1–4.  As a result, NHTSA determined that Tesla was an industry outlier, with a substantially inferior driver engagement system given Autopilot's permissive operating capability. *Id.* at 38:14–20.[4]  This defect was admitted to exist in all makes and model years. *Id.* at 18:24-19:1.[5]

Plaintiffs established that Mr. McGee was one of the drivers that obviously became complacent and relied on Autopilot so much that he did not pay attention to the road.  Mr. McGee testified that he got too comfortable with the car and "trusted the technology too much." Dkt. 579 (Tr. Day 6), at 51:24–25.  He believed that he would not have taken his eyes off the road and

---

[4] Tesla cites *Royal v. Black & Decker Mfg. Co*., 205 So. 2d 307, 310 (Fla. 3d DCA 1967) in a manner once again meant to suggest that Plaintiffs were required to prove the DMS "did not meet industry standards" Dkt. 591 at 14. As with its prior citations to *Alderman* and *Alevromagiros, Royal* does not stand for such a proposition. Instead, it simply acknowledges that a deviation from industry standards (e.g. a NHTSA finding that Tesla's DMS was an "industry outlier") may be presented as evidence to support a defect claim.

[5] For this reason, Tesla's suggestion that NHTSA's defect finding was somehow irrelevant because it was issued five years after the accident (DE591 at 15) is readily dismissed.

reached for his phone had he not been using Autopilot.  *Id.* at 116:4–8.  We know further that the flashing red light at the intersection was visible over a quarter mile away.  Dkt. 578 (Tr. Day 5), at 37:13–18.  The jury could reasonably infer that Mr. McGee was not paying attention for the over 20 seconds that it would take to cover that distance.

Tesla's own expert, Dr. Cades, confirmed much of Plaintiff's expert's opinions regarding driver expectations when using autopilot. He was cross examined using an article he had written which stated that "[c]onsumers exhibit too much trust when interacting with the systems. In particular, drivers often expect that they do not need to be as vigilant when only monitoring the state of the vehicle compared to when they are actively driving the vehicle." Dkt. 584 at 20:8-15. His article further noted "drivers who are new to automated vehicle technology, tend to perform secondary tasks as much as 261 percent more frequently in self-driving vehicles, as compared to a vehicle without ADAS." *Id.* at 21:6-12. Dr. Cades agreed that Mr. McGee was engaged in a secondary task at the time of the crash. *Id.* at 21:13-18.  He additionally wrote "Another related issue in drivers with too much trust in ADAS technology is that they may operate the vehicle at its limits and assume he or she remains protected by the vehicle in this concept known as 'risk compensation." *Id.* at 2:19-24.

Dr. Cades further explained, "drivers in partially automated vehicles have sometimes been observed to drive at increased speeds with decreased headway and exhibit less control of lane position." *Id.* at 22:2-7. Dr. Cades agreed that "[d]isengagement from the driving task makes it difficult for the driver to respond in sudden emergencies because they are out of the loop," meaning that drivers like Mr. McGee "have lost awareness of their environment and the situation they're in." *Id.* at 23:24-5-24:1-3.  Finally, Dr. Cades confirmed that "[d]rivers spend less time gazing at the road ahead when utilizing adaptive cruise control, and they exhibit increased reaction times to emergent situations when various parts of the driving task are automated as compared to when they are not." *Id.* at 24:11-18.

Both Dr. Cummings and Dr. Moore pointed to the use of in-cabin camera systems as a safer alternative design to combat the driver engagement issues described by Dr. Cades. Specifically, in the Cadillac equipped with Super Cruise, the driver focused camera not only checks to see if the driver's head is looking straight forward, it actually reads the driver's eyes. Dkt. 576 (Tr. Day 3), at 56:15–57:5.  Mr. Moore explained that the camera system would only allow a driver to look away from the road for 5 or 6 seconds at a time, so it was much more

restrictive than Tesla's torque base system, and would have led to a very different outcome had it been implemented on this road.  Dkt. 577 (Tr. Day 4), at 158:19–59:11.

Mr. Moore explained that measuring steering wheel torque is not a good proxy for measuring driver awareness.  *Id.* at 133:18–20.  Simply having a hand or hands on the wheel does not mean the driver is monitoring the roadway ahead.  *Id.* at 133:20–22.  Tesla's monitoring system can produce false positives where the car assumes the driver is paying attention when, in fact, he is not.  *Id.* at 133:23–25.  Mr. Moore testified that Tesla contributed to this accident because its driver monitoring system did not accurately reflect whether Mr. McGee was paying attention to the road and doing his part as a driver.  *Id.* at 161:22–62:4.  The jury could have also reached this conclusion based on Mr. McGee's failure to take any action in the 20 seconds in which the flashing red light was visible to him.

Mr. Moore reviewed Mr. McGee's history of autopilot misuse.  In the three months that he owned the car, Mr. McGee had 23 "strike outs," which occurred when he had ignored three audible alerts before the car turned off autopilot.  *Id.* at 153:20–54:3.  However, these strike outs proved to be only a minor inconvenience to Mr. McGee, who simply had to pull over, park the car, and then begin driving again.  *Id.* at 154:23–55:21. Mr. Moore faults Tesla for failing to take any action with respect to Mr. McGee's misuse of autopilot.  The strike outs were easily removable and did nothing to change to Mr. McGee's behavior or limit the use of the feature.  They were simply recorded, and Mr. McGee was allowed to continue his dangerous misuse of the product.  *Id.* at 162:5–8.

Mr. Moore explained that Tesla could have told Mr. McGee that he was given a strike out because he was not paying attention.  *Id.* at 156:18–21.  Tesla could have told him that in the future that if he kept his hands on the wheel and paid attention, he would not receive further strike outs, thus encouraging him to use the product responsibly.  *Id.* at 156:21–22.  Instead, the only message the car provided at each strike out was that Autopilot was no longer available.  *Id.* at 156:22–24.

There were a number of countermeasures that Tesla stipulated were feasible to have been implemented prior to this accident, but that were not.  Specifically, Tesla could have incorporated additional controls and alerts to those already existing to encourage the driver adhere to their driving responsibilities when autopilot was engaged; included additional controls and alerts to the driver to keep their hands on the steering wheel and pay attention to the roadway; increased the prominence of visual alerts on the user interface; provided additional checks when the features

were being used outside of the ODD and when approaching traffic controls; and improved suspension of Autopilot if the driver repeatedly failed to demonstrate continuous and sustained driving responsibility when autopilot is engaged. Dkt. 582 (Tr. Day 9), at 19:7–23. The jury could reasonably infer that had Tesla taken the countermeasures that were available to it, it would have prevented Mr. McGee's misuse of the autopilot and thus this accident.

From a risk-utility standpoint, the evidence demonstrated that the foreseeable risks of harm posed by Tesla's inadequate DMS could have been reduced or avoided by the adoption of the countermeasures set forth above. The jury could reasonably have inferred that the omission of these safeguards rendered the DMS not reasonably safe.

As the Court noted in its order denying summary judgment: "there is a reasonable basis for Moore to infer that if the strikeout earlier in the drive was accompanied by a one-week disablement of Autopilot, Mr. McGee would have been required to be more engaged during the drive, which would have meant Mr. McGee would have been more likely to be paying attention and prepared to intervene as he approached the intersection of Card Sound Road and ultimately would have avoided the crash." Dkt. 428 at 26-27. Tesla has provided no basis for this Court to change its ruling.

**AUTOMATIC EMERGENCY BRAKING (AEB) AND FORWARD COLLISION WARNING (FCW).** The evidence that the Tesla was defective because it did not brake or warn Mr. McGee was the same as the evidence that this Court deemed sufficient to deny summary judgment and JMOL. It was more than sufficient to sustain the jury's verdict against Tesla.

Tesla begins by once again misstating Plaintiffs' burden of proof, asserting that, "Plaintiffs never even tried to prove that *any* car could have stopped under th[e] conditions [of the accident]." Dkt. 591 at 16. (emphasis in original).[6] Tesla further asserts that "an ordinary consumer would not *expect* his car to do something that no other car in existence could do." Dkt. 591 at 17. (emphasis in original). Neither contention is correct.

First, Plaintiffs were not required to prove that another car would have warned or braked under the circumstances, because the question before the jury is whether an ordinary consumer would have expected the Tesla to warn or brake under the circumstances.

---

[6] In *Kaufman v. Wyeth, LLC,* No. 1:02-CV-22692, 2011 WL 10483576, at *7 (S.D. Fla. Aug. 15, 2011), the district court described the "requirement that Plaintiff prove an alternative design" as "nonexistent."

An ordinary consumer would expect the Tesla to provide a forward collision warning ("FCW") of objects as far as 525 feet in front of the Tesla's path of travel, when traveling at speeds below 90 mph, as described in the operating manual. Dkt. 576 (Tr. Day 3), at 95:15–18, 103:18–25. The owner's manual did not inform consumers of any limitations to FCW. Exhibit 53 at 113. The forward collision warning did not provide any warning to Mr. McGee before this accident. *Id.* at 95:19–22. An ordinary consumer would expect the Tesla to stop for an object in its path, as Elon Musk described it would three years earlier. Dkt. 576 at 149:18–22. The limitations of the automatic emergency breaking ("AEB") system were not explained in the owner's manual. Id. at 105:2-6, 107:23-108:1.

Second, other cars in existence in 2019 *were* capable of warning drivers under similar conditions, as demonstrated by Tesla's own expert. Dkt. 586 (Tr. Day 13) at 181:10-182:12. Both the test cars he utilized in his reconstruction provided an FCW, even though the parked car was "outside the lane," (Dkt. 591 at 16), with the Subaru warning at a full 3.6 seconds prior to collision. *Id.* The fact that the Subaru performed better with its high beams on was irrelevant, because the Tesla's augmented video and data showed that it saw an object in its path at 352 feet, providing it plenty of time to warn Mr. McGee and prevent the accident. Dkt. 578 (Tr. Day 5) 149:19–51:8. The jury was entitled to reach the reasonable inference that the Tesla's FCW system should have, at a minimum, outperformed the Subaru's.

Turning to a consumer's expectation that the Tesla would brake, Dr. Cummings explained that there were two emergency braking systems that should have been activated to avoid this accident. First, automatic emergency breaking ("AEB") is available whether or not autopilot is on. Dkt. 576 at 103-7-13. A second feature called drivable space backup breaking was introduced after the Kanagawa accident in 2018. *Id.* at 76:20–21. When the car is in autopilot and recognizes that it is approaching the limits of its drivable space, it will trigger an emergency breaking maneuver. *Id.* at 76:24–77:2. It is essentially a backup to the AEB when the car notes that it is about to depart drivable space. *Id.* at 77:2–11.

In this accident, neither AEB nor backup breaking engaged. *Id.* at 101:25–02:3. Mr. McGee's foot on the pedal did not prevent AEB or drivable space backup breaking from engaging. *Id.* at 103:7–25. Tesla did not offer any explanation for the failure of drivable space backup breaking. *Id.* at 102:8–15.

With respect to Tesla's decision to allow autopilot to continue to be engaged when someone is overriding the cruise control outside of the ODD, Dr. Cummings indicated that this was a bad design choice. *Id.* at 97:18–25. She had seen many accidents where people were just resting their foot on the pedal, and did not realize that they were slightly depressing the pedal and accelerating. *Id.* at 97:25–98:3. If she was on Tesla's design team, she would have recommended disengaging autopilot when a driver depressed the accelerator, to avoid any mode confusion. *Id.* at 98:3–4.

Mr. Moore confirmed Dr. Cummings' opinion that drivable space backup breaking was not disabled when Mr. McGee pressed the accelerator. Dkt. 577 (Tr. Day 4), at 175:4–8. Mr. Moore had not seen any explanation as to why drivable space backup braking did not activate here. *Id.* at 199:22–200:2. Mr. Moore explained why, in *Banner*, backup breaking failed, because the drivable space extended underneath the truck's trailer, so the Tesla thought it had more room to proceed than it actually did. Dkt. 578 (Tr. Day 5), at 155:23–56:16. This case presented the opposite scenario because the drivable space clearly stopped at the end of the road, presenting the opportunity for a "perfect application of this technology." *Id.* at 156:17–20. However, the technology failed. *Id.* at 156:21–22.

As for the car's failure to provide a forward collision warning, Mr. Moore testified that the data demonstrates that the autopilot did not warn Mr. McGee of anything in the approximately 20 seconds before the crash. Dkt. 577 (Tr. Day 4), at 187:14–16. This is, of course, consistent with Mr. McGee's statement that he received no warning. Dkt. 579 (Tr. Day 6), at 58:7–12.

Mr. Moore presented the jury with a series of points on the timeline of the accident where the car could have braked on its own, as it had the capability to do, or could have warned Mr. McGee. Dkt. 578 (Tr. Day 5), at 27:7–16. Mr. Moore noted that car log data demonstrated that Mr. McGee exhibited a reasonable reaction time when warned. Using Mr. McGee's typical reaction time, Mr. Moore was able to determine that he would have avoided the accident completely if he had been warned at any distance greater than 200 feet from Angulo's Tahoe. *Id.* at 16:11–22, 149:19–52:2.

As the Court held in the order denying summary judgment, "No additional evidence is needed to reasonably infer that the triggering of either of these systems following the detection of the obstacles would have made it more likely than not that the collision would never have occurred." Dkt. 428 at 34. Tesla has provided no basis for this Court to change its ruling.

17

**b.  Mr. McGee was not the sole proximate cause of Plaintiffs' injuries.**

Tesla argues that because Mr. McGee admitted he was not paying attention, he must be the sole proximate cause of the accident. Tesla's argument is both legally and factually incorrect.

Tesla legal arguments are based on cases that either do not correctly apply Florida law or are easily factually distinguishable. We start with Tesla's reliance on *Kroon v. Beech Aircraft Corp.*, 628 F.2d 891 (5th Cir. 1980), which Tesla cites throughout its argument for the principle that misuse of the product brakes the causal chain. The majority in *Kroon* failed to properly apply Florida law, as explained by the dissent:

> Under Florida law, a manufacturer may be liable for an injury resulting from its failure to guard against foreseeable carelessness, even though the victim's own carelessness (fault) in encountering the undue risk thereby created is a contributory cause of the accident (thereby reducing the damages awarded, but not defeating recovery). *Auburn Machine Works Co., Inc. v. Jones*, 366 So.2d 1167 (Fla.1979).

*Kroon* at 894. (Tate, J., dissenting).

In *Auburn Mach. Works Co., Inc. v. Jones*, 366 So. 2d 1167, 1171–72 (Fla. 1979), the Florida Supreme Court explained the role that misuse of a product plays in a liability analysis:

> Contributory negligence of the consumer or user by unreasonable use of a product after discovery of the defect and the danger is a valid defense. . . . The defendant manufacturer may assert that the plaintiff was negligent in some specified manner other than failing to discover or guard against a defect, such as assuming the risk, or misusing the product, and that such negligence was a substantial proximate cause of the plaintiff's injuries or damages. . . . The fact that plaintiff acts or fails to act as a reasonable prudent person, and such conduct proximately contributes to his injury, constitutes a valid defense. In other words, lack of ordinary due care could constitute a defense to strict tort liability.

In 1992, the 11th Circuit reversed a district court for giving a jury instruction suggesting that product misuse is a complete bar to liability: "Florida law does not suggest that misuse will 'negate liability' as the district court instructed. Instead, misuse is simply to be considered as part of the comparative fault calculus," citing to *Auburn Machine. Mosher v. Speedstar Div. of AMCA Intern., Inc.,* 979 F.2d 823, 826 (11th Cir. 1992).

In 1993, the 11th Circuit sought additional guidance from the Florida Supreme Court on the scope of a product misuse defense under Florida law.  In *Benitez v. Standard Havens Products, Inc.*, 7 F.3d 1561, 1565 (11th Cir. 1993), the 11th Circuit certified the following question: "DOES

A PLAINTIFF'S KNOWING MISUSE OF A PRODUCT IN A MANNER NEITHER INTENDED NOR FORESEEABLE BY THE DEFENDANT MANUFACTURER BAR RECOVERY, AS A MATTER OF LAW, ON A PRODUCTS LIABILITY CLAIM SOUNDING IN NEGLIGENCE?" *Standard Havens Products, Inc. v. Benitez*, 648 So. 2d 1192, 1193 (Fla. 1994).

The Florida Supreme Court answered the question in the negative, explaining that in 1976, the Court "adopted the principles of strict liability in tort under section 402A of the Restatement (Second) of Torts and held that product misuse was simply a type of negligence that may be asserted as a defense." *Standard Havens Products, Inc.* at 1196-97. The Court further explained:

> Consistent with the comparative negligence principles espoused in *Hoffman,* and our holdings in *Blackburn, Auburn Machine Works,* and *West,* we conclude that product misuse is not an absolute bar to a products liability claim sounding in negligence. Rather, much like the earlier demise of the absolute defense of contributory negligence, product misuse merges into the defense of comparative negligence. Consequently, product misuse reduces a plaintiff's recovery in proportion to his or her own comparative fault.

*Id.* at 1197. This is the law in Florida on product misuse, not *Kroon*.[7]

Tesla also mistakenly relies on a pair of cases addressing a specific factual defense not available in the instant case – when a driver misuses a product to become voluntarily intoxicated, such an act cuts the causal chain. Tesla attempts to hide this important distinguishing fact, by disingenuously editing its quote from *DZE Corp. v. Vickers*, 299 So. 3d 538, 540 (Fla. 1st DCA 2020), omitting the italicized portion: "Florida law does not permit a jury to consider proximate cause where a person responsible for the injury *is voluntarily impaired* or intentionally misuses a product." Dkt. 591 at 20. The product at issue in *DZE* was synthetic marijuana, sold as pot-pouri. The Court's decision turned on the fact that the driver intentionally misused an intoxicating

---

[7] Tesla also relies on *Kohler v. Medline Indus., Inc.,* 453 So. 2d 908 (Fla. 4th DCA 1984). Dkt. 591 at 21. *Kohler* relied primarily on *Kroon* and is therefore of questionable precedential value. As the dissent noted, the majority failed to grapple with the question of whether "the intervening act of the nurse's aide in forgetting to close the bag foreseeable by the manufacturer in light of its failure to furnish labels and instructions as to the bag's operation (it furnished labels and instructions for other urinary bags it marketed) and in light of the bag's peculiar design?" *Kohler* at 910 (Walden, J., dissenting) The dissent answered its question, "If it was foreseeable, then the manufacturer will not be relieved of liability by the intervening act," citing to *Auburn Machine Works, Co., Inc., supra,* among others. *Id.*

product. *DZE Corp.* at 541. It further characterized this misuse as "an unforeseeable, intervening act." *Id.* at 540.

Tesla's reliance on *Grieco v. Daiho Sangyo, Inc.,* 344 So. 3d 11 (Fla. 4th DCA 2022) is similarly misplaced. *Grieco* also involved the "unintended and illegal use of a product" resulting in the "voluntary impairment" of the driver. *Grieco* cited *DZE* as the basis for its holding that: "Even though the risk of a driver simultaneously abusing a dust-removal product and consequently striking either a vehicle or person off a roadway is within the boundless realm of conceivable possibilities, it was not objectively reasonable for Merrill's criminal conduct to be foreseeable as a matter of law to establish either duty or proximate cause in the context of this product liability action." *Grieco* at 27. But Mr. McGee did not misuse the Tesla to become intoxicated. Mr. McGee's misuse was not only foreseeable, Tesla had actual knowledge of it. Mr. McGee's excessive reliance on autopilot did not render Mr. McGee the sole proximate cause. It was properly considered by the jury in finding Mr. McGee 66% at fault for the accident.

As we noted earlier, Tesla's factual argument ignores the fundamental question in this case - why was Mr. McGee disengaged from the driving process? Tesla's argument that the accident would have happened in the absence of autopilot is based on the false premise that Mr. McGee would have behaved in the same fashion if he had not been using autopilot. But there is no evidence in this record to support such an inference. Mr. McGee himself testified that he doesn't believe he would have reached for his phone if he hadn't been using autopilot. Dkt. 579 (Tr. Day 6) at 116:4-8. The evidence also demonstrates that Mr. McGee took his eyes off the road for far longer than the time it took him to reach over to grab his phone. As noted by Tesla's counsel during cross-examination of Dr. Moore, the flashing red light marking the stop bar was visible over 2000 feet from the intersection. Dkt. 578 (Tr. Day 5), at 37:13–18 (T.7/18/25 am at 33). Yet Mr. McGee did not become aware of where he was until he had crossed the stop bar. It takes over 20 seconds to travel the 2000 feet from the point the stop light first became visible. Mr. McGee was clearly not paying attention to his surroundings for that entire time period. The jury could reasonably infer that the reason he was not was because he was relying on the autopilot that he regularly abused. The jury was free to conclude that Mr. McGee would not have been so careless had he not been relying on the autopilot.

In its conclusion, this Court summarized its ruling as follows, while also disposing of Tesla's argument that Mr. McGee was the sole proximate cause:

The Court also rejects Tesla's argument that McGee was the indisputable sole, substantial cause of the collision such that Tesla may avoid all liability for any purported defect in Autopilot's design. While McGee conceded that he was responsible for operating the Vehicle safely and failed to do so, that does not necessarily lead to the conclusion that he alone is responsible for the resulting collision, particularly given McGee's testimony that he expected Autopilot to avoid the collision. See ECF No. [318-9] at 46:3-5, 176:7. The law is clear that there may be multiple proximate causes of a given injury so long as each is a substantial cause of the injury. *See Ruiz v. Tenet Hialeah Healthsystem, Inc.,* 260 So. 3d 977, 982 (Fla. 2018) ("[T]he law does not require an act to be the exclusive or even the primary cause of an injury in order for that act to be considered the proximate cause of the injury[.]").

As explained above, there is sufficient and reliable record evidence that both McGee and Tesla substantially contributed to the collision. Plaintiffs have adequately demonstrated that Autopilot's design led Tesla drivers, and McGee in particular, to become complacent and over rely on Autopilot to operate their vehicles. Additionally, Plaintiffs provided evidence that allowing Tesla drivers to utilize Autopilot outside of its ODD and without any training was unreasonably dangerous as it increased the likelihood that Tesla owners would attempt to rely on Autopilot in conditions where Tesla knew the technology was unlikely to succeed. As Plaintiffs experts opine, if Tesla had eliminated, or at least mitigated, these foreseeable dangers, McGee would likely have been paying more attention and would have been better prepared to avoid the subject collision. Because the Court has already determined that Plaintiffs' expert opinions as to the design defects and causation are not based on mere conjecture or speculation, the Court will not grant summary judgment on Plaintiffs' design defect claim as those issues are materially in dispute. *See Jackson v. H.L. Bouton Co.,* 630 So. 2d 1173, 1175 (Fla. 1st DCA 1994).

Dkt. 428 at 49; DE 428 at 73-74. Tesla has provided no basis for this Court to change its ruling. Nor has Tesla provided any basis for this Court to find that the jury's apportionment of fault was against the manifest weight of the evidence. To the contrary, it is the product of sound judgment based on a thorough evaluation of the evidence.

### c. **The failure-to-warn claim is supported by substantial competent evidence.**

#### i. **Tesla had a duty to warn.**

Tesla's suggestion that it had no duty to warn is nonsense. The reason Tesla provided warnings in the first instance is because it was aware of its duty. Per *Cohen v. Gen. Motors Corp., Cadillac Div.*, 427 So. 2d 389, 390–91 (Fla. 4th DCA 1983), "A duty to warn arises where a product is inherently dangerous or has dangerous propensities." "Further, a supplier of a product

who knows or has reason to know that the product is likely to be dangerous in normal use has a duty to warn those who may not fully appreciate the possibility of such danger." *Id.*

Tesla's duty was not, as it suggests, to warn McGee that reckless driving can lead to an accident. Dkt. 591 at 23-24. The Court previously addressed this framing in its order denying MSJ:

> The Court disagrees with Tesla's framing of the relevant question. The appropriate inquiry is not whether driving distracted is an obvious danger. Rather, the question is whether the dangers of using and relying on driver assistance technology, specifically Tesla's Autopilot system, to avoid a collision is an obvious danger or at least a danger of which McGee was already aware. *See e.g.*, *Byrnes*, 887 F. Supp. at 281 ("A corollary rule is that where the *potential danger posed by a product* is open and obvious . . . there is no duty on the part of the manufacture or distributor to warn users of said danger.") (emphasis added). The Court does not find that the danger associated with relying on the Autopilot system to avoid a collision was such an obvious danger that no reasonable minds could differ.

Dkt 428 at 79.

The fact that Mr. McGee had some knowledge of the limitations of autopilot is not a bar to Plaintiffs' failure to warn claim. It is indisputable that the state of Mr. McGee's knowledge regarding the limitations and capabilities of autopilot was not the equal of Tesla's. In *Evers v. R.J. Reynolds Tobacco Co.,* 195 So. 3d 1139, 1140–41 (Fla. 2d DCA 2015), Reynolds argued that the smoker could not have been defrauded because "there was evidence [the smoker] was aware of the health risks that the tobacco companies had concealed." The Second District rejected the argument, holding that the Tobacco company did not establish that the smoker knew as much as Reynolds did about the health effects and addictive nature of its product. *Id*. Indeed, the evidence here showed Mr. McGee believed that autopilot was more capable than it actually was. The risks of using autopilot were not obvious to him.

### ii.  Tesla's warnings were inadequate.

Tesla cites to *Tesla, Inc. v. Banner*, 411 So. 3d 1 (Fla. 4th DCA 2025)'s statement that Tesla "repeatedly warned against misuse" of autopilot. Dkt. 591 at 24-25. Again, *Banner's* statements regarding its plaintiff's evidence do not bind this Court. *Banner* doesn't describe *any* evidence offered by its plaintiff related to a failure to warn claim. As this Court noted in its order denying summary judgment, the record here is simply different. The Court cannot punish these Plaintiffs for the *Banner* plaintiff's evidentiary deficiencies.

The evidence that Tesla failed to adequately warn Mr. McGee of the risks associated with the use of autopilot was the same evidence that this Court deemed sufficient to deny summary judgment and JMOL. It was more than sufficient to sustain the jury's verdict against Tesla.

Both Dr. Cummings and Mr. Moore testified that Tesla's warnings regarding the use of autopilot were insufficient to convey the risks associated with driver inattention, and further, that the in car warnings regarding driver inattention were inadequate to prevent Autopilot misuse.

Dr. Cummings explained that the initial warning given to drivers when they first activate autopilot and the warning contained in the owner's manual were insufficient to appraise drivers of the risks they are incurring in misusing the system. First, Dr. Cummings explained that in general, the use of the phrase "Autopilot" is incongruous with instructions that a driver must keep their hands on the steering wheel at all times. Dkt. 577 (Tr. Day 4), at 40:5–22. The term "Autopilot" misleads a driver to believe the car is actually driving for them. *Id.* Next, Dr. Cummings pointed to the lack of any formalized training given to drivers on Autopilot usage, as testified to by Mr. McGee. Dkt. 576 (Tr. Day 3), at 42:24–43:3. Dr. Cummings explained the difficulty in accessing the owner's manual, and pointed to the fact that Mr. McGee did not review it. *Id.* at 38:23–42:20. Dr. Cummings testified that NHTSA recognized that the autopilot warnings in the owner's manual were insufficient to ensure that drivers remained safely engaged. Dkt. 577 (Tr. Day 4), at 20:24–21:21. The owner's manual did not inform drivers that drivable space backup braking would not function if the accelerator was depressed. Dkt. 582 at 238:12-17

While acknowledging that AEB has limitations, especially at night, Dr. Cummings noted that none of this information was conveyed to consumers in the owner's manual. Dkt. 576 (Tr. Day 3), at 105:2–6, 107:23–08:1; Dkt. 583 at 37:1-4 Mr. McGee believed that the Autopilot would detect and avoid any obstacles in his path. *Id.* at 108:2–5. It was clear to Dr. Cummings that Mr. McGee did not understand how the system worked. *See id.*

Dr. Cummings also offered opinions on the inadequacy of the in-car warnings. First, with respect to the hands on warning, Dr. Cummings noted that there was no audio alert accompanying it, which is "a big no-no" in the world of user design. *Id.* at 92:22–25. The cruise control is disabled warning was similarly unaccompanied by an audio alert. *Id.* at 94:3–6, Dkt. 578 (Tr. Day 5), at 15:2-11. Dr. Cummings pointed to NHTSA's conclusion that Tesla's driver monitoring system was not able to alert the driver in an appropriate way, fast enough and with enough

frequency to be able to guard against consequences from misuse.  Dkt. 577 (Tr. Day 4), at 18:1–14.

Mr. Moore opined on the inadequacy of the notification that TACC would be disabled when Mr. McGee was pressing the accelerator.  Mr. Moore first noted that the notice was only visual and was not accompanied by an audio signal.  Dkt. 578 (Tr. Day 5), at 15:2–11.  Second, the message was frequently obscured by the "hands on" message.  *Id.* at 11:1–23.  One minute before impact, the "cruise control will not brake" message was presented, but was obscured for the first 15 seconds by the "hands on" warning.  *Id.* at 15:2–5.  Neither were accompanied by an audio alert.  *Id.* at 15:9–11.

For his part, Mr. McGee does not recall receiving any warnings prior to the collision.  Dkt. 579 (Tr. Day 6), at 58:7–17.  He was not given any training or tutorial when he picked up his car from Tesla.  *Id.* at 89:14–25.  And he did not know how to access the owner's manual on the touch screen.  *Id.* at 52:11–13.

### iii.  <u>Tesla's inadequate warnings were a legal cause of the crash.</u>

Tesla fares no better in arguing that Mr. McGee's failure to read the owner's manual absolves it from liability for failure to warn. First, this defense would only apply to the adequacy of the warnings in the owner's manual, not to the on screen warnings in the car, which the Court ruled could not be found adequate as a matter of law, because they did not "contain some wording directed to the significant dangers arising from failure to use the product in the prescribed manner, such as the risk of serious injury or death."  Dkt. 428 at 84.

Second, as this Court held in denying summary judgment, "the mere existence of warnings in an instruction manual is not dispositive of the adequacy of the warnings . . . [given that a] warning may be defective not only by virtue of inadequate wording, but as a result of its location and the manner in which the warning was conveyed." Dkt. 428 at 84 (citing *Brown v. Glade & Grove Supply, Inc.*, 647 So. 2d 1033, 1035 (Fla. 4th DCA 1994). [8]  *See also Ferebee v. Chevron*

---

[8] This Court noted that *Stanley Indus., Inc. v. W.M. Barr & Co.*, 784 F. Supp. 1570, 1574 (S.D. Fla. 1992) criticized the holding in *Lopez v. S. Coatings, Inc.*, 580 So. 2d 864, 865 (Fla. Dist. Ct. App. 1991, on which Tesla relies, as follows: "concluding that '[t]he *Lopez* court swe[pt] too broadly in its holding that failure to read the warning label extinguishes proximate cause. A court must delve into the reasons for the failure to see if they coincide with the alleged inadequacies in the warning.'" Dkt. 428 at 87.

*Chem. Co.*, 552 F. Supp. 1293, 1302–03 (D.D.C. 1982), *aff'd*, 736 F.2d 1529 (D.C. Cir. 1984) ("the adequacy of a warning depends, not only on its content, but also on its ability to catch the eye, inducing the user to read it.") Tesla has provided no basis for this Court to change its prior ruling.

**B. THIS COURT DID NOT ERR IN ADMITTING THE COMPLAINED-OF EVIDENCE.**

**1. Tesla's efforts to destroy the autopilot data were properly admitted.**

Tesla takes great offense that its efforts to prevent FHP and the Plaintiffs from obtaining the autopilot data in this case were presented to the jury. But the law is clear that evidence about efforts to destroy evidence are admissible to show consciousness of guilt in proving liability, and (although we acknowledge the Court's disagreement) to prove entitlement to punitive damages. [9] And Tesla has no one to blame for this evidence but itself. As Plaintiffs proved at trial, Tesla admitted to taking an "an affirmative action" that deleted the snapshot and index from its internal files. Tesla sent a tech to the FHP data download meeting who had no experience downloading autopilot data, and who subsequently lied under oath on his declaration and in his deposition. And Tesla twice opened to the door during trial to allowing the jury to hear about Tesla's efforts to prevent the Plaintiffs from obtaining the data. The The Court did not err in admitting this evidence.

As we previously noted, even in cases without a claim for punitive damages, evidence of an attempted cover-up is admissible in order to demonstrate consciousness of guilt. In *S. Union Co. v. Sw. Gas Corp.,* 281 F. Supp. 2d 1117, 1123 (D. Ariz. 2003), for example, the district court allowed the jury to consider evidence demonstrating that the defendant had "engaged in fabricating evidence favorable to his defense and then offering it as evidence in the trial."

The court explained the relevance of this evidence as follows:

Fabrication of evidence followed by offering it at trial because it was material to his defense is specifically relevant to whether he intentionally engaged in improper conduct, and whether he testified truthfully. *See United States v. Perkins,* 937 F.2d 1397, 1401–2 (9th Cir.1991) (false exculpatory statements may be considered by jury as evidence of consciousness of guilt); *United States v. Collins,* 90 F.3d 1420, 1428 (9th Cir.1996) (inducing witness to testify untruthfully or participating in the proffer of untruthful evidence shows consciousness of guilt) (citing *United States*

---

[9] It is true that during the charge conference, undersigned counsel stated that the data was not relevant to the liability claims. I misspoke. Plaintiffs have maintained, both before and after the charge conference, that the evidence was also relevant to prove consciousness of guilt in proving liability. See Dkt. 469 at 4, Dkt 587 at 13. This Court agreed. Dkt. 587 at 14.

> *v. Brashier,* 548 F.2d 1315, 1325 (9th Cir.1976) (holding same)); *Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir.1993) (court has "broad discretionary power" to allow jury to draw adverse inference from destroyed or spoliated evidence); *United States v. Scheibel,* 870 F.2d 818, 822 (2nd Cir.1989) (jury may consider fabrication of exculpatory evidence as proof of consciousness of guilt); *Great Coastal Express, Inc. v. International Brotherhood of Teamsters,* 675 F.2d 1349, 1357 (4th Cir.1982) (noting that "[p]erjury and fabricated evidence are evils that can and should be exposed at trial....").

*S. Union. Co.* at 1124.

In *Matter of Energetic Tank, Inc.,* 607 F. Supp. 3d 328 369 (S.D.N.Y. 2022), *aff'd,* 110 F.4th 131 (2d Cir. 2024), the Defendant argued, as Tesla does here, that evidence of a cover-up should be excluded because it wasn't an actual cause of the accident. The Court rejected the argument as follows:

> To be sure, the creation of false logs had no causative effect on a collision that had already taken place. And the Petitioner has long since admitted the falsities, lessening their poisonous effect on the evidence presented at trial (much of which was undisputed).[24] *See* ECF No. 221 at n.4. But "although the alterations of the logbooks obviously did not 'cause' the collision, the fact of the alterations has relevance to the ultimate allocation of liability for damages." *Otal II,* 494 F.3d at 58 (cleaned up). The Second Circuit has been forceful in sanctioning this type of bad faith:
>
> > Our admiralty jurisprudence is especially sensitive to the unexplained alteration of logbooks. Where a logbook is altered, we "cannot avoid the conclusion that it had been dressed up to excuse the ship's faults." Such alterations should give rise to a presumption the logbook contained entries adverse to the vessel's contentions at trial. The inference "goes much further than merely to discredit the document itself; it is positive evidence upon the very issue" of liability.
>
> *Id.* (quoting *The Glasgow Maru*, 102 F.2d 450, 453 (2d Cir. 1939) (Learned Hand, J.)). Thus, the false statements are positive evidence of the ALNIC crew's consciousness of guilt.

*Matter of Energetic Tank, Inc.,* at 369. Similar cases affirming the relevance of conscious of guilt evidence to proving liability are legion. [10]

_____

10 While we are not typically in favor of string cites, we do think one is appropriate here to show the universal acceptance of this proposition. *See Joler v. Scott Paper Co.,* 65 F.3d 160 (1st Cir. 1995) ("Of course, a party's efforts to destroy or conceal evidence may give rise to an inference of consciousness of guilt, and this self-appraisal can be weighed with other evidence in the case"); *McKenzie v. United States Tennis Ass'n Inc.,* No. 6:22-CV-615-PGB-LHP, 2024 WL 3849884, at *12 (M.D. Fla. Aug. 16, 2024) ("Similarly, the evidence concerning the USTA's attempt to cover

Even if evidence of Tesla's cover up was inadmissible to demonstrate consciousness of guilt, its admission was harmless error because it was relevant to Plaintiffs' claim for punitive damages. We acknowledge the Court previously disagreed on this point, but we write here to expand on our previous argument.

Tesla's primary argument, which the Court accepted, was based on the language of the punitive damage jury instruction, which reads: "Punitive damages are warranted against Tesla if you find by clear and convincing evidence that Tesla was guilty of intentional misconduct or gross negligence, which was a substantial cause of damage to Plaintiffs." Dkt. 536 at 12. Tesla argued

---

up Ms. McKenzie's assault was relevant to the USTA's culture of silence and was not offered as a basis for punitive damages."); *Medina as next friend for N.M. v. Izquierdo*, 594 F. Supp. 3d 1045, 1060 (N.D. Ill. 2022) ("Defendants' alleged decision to not review the video footage after Plaintiff complained to them, combined with their refusal to allow Plaintiff to see the footage (ostensibly a cover-up showing consciousness of guilt) further supports an inference of deliberate indifference."); *Bahena v. Kennedy*, 2021 WL 8153974, at *7 (N.D. Ill. Oct. 25, 2021) ("Bahena contends that the fact that these notes were not produced is relevant to show consciousness of guilt on the part of Hillman as an attempt to cover up his own misconduct."); *Linkepic Inc. v. Vyasil, LLC*, 2019 WL 11717093, at *12 (N.D. Ill. Oct. 15, 2019) ("If the operating agreement was in fact altered, then that could suggest that Defendants tried to cover up Wittstrom's membership in Vyasil, which would be relevant to the Defendants' consciousness of guilt."); *Am. Nat'l Prop. & Cas. Co. v. Felix*, 2018 WL 10247022, at *2 (W.D. Pa. Nov. 21, 2018) (text messages showing "'consciousness of guilt,' his knowledge of the alleged fraud he perpetrated, and his plan to conceal his alleged fraud" were introduced for "a proper evidentiary purpose."); *Federated Univ. Police Officers' Ass'n v. Regents of Univ. of California*, 2015 WL 13273308, at *10 (C.D. Cal. July 29, 2015) (evidence of defendant's efforts to conceal their wrongful conduct can demonstrate consciousness of wrongdoing, which is relevant to prove the defendants acted intentionally.); *Clear-View Techs., Inc. v. Rasnick*, 2015 WL 3453529, at *2 (N.D. Cal. May 29, 2015) ("Evidence that Mr. Berg destroyed evidence regarding his conduct is undoubtedly probative of Mr. Berg's consciousness of guilt regarding the alleged conspiracy."); *DiTeresi v. Stamford Health Sys., Inc.*, 2010 WL 5493514, at *26 (Conn. Super. Ct. Dec. 14, 2010) ("The claims of delays and cover up may be admissible to demonstrate consciousness of guilt by the hospital in the plaintiff's proof of Santina Di Teresi's claims at trial for Count Three Negligent Supervision against the hospital and Count Fourteen Medical Malpractice against the hospital."); *In re Parmalat Sec. Litig.*, 472 F. Supp. 2d 582, 584–85 (S.D.N.Y. 2007), *aff'd*, 240 Fed. Appx. 916 (2d Cir. 2007); ("The destruction of evidence by the Parmalat insiders is evidence of consciousness of guilt, which is relevant to GT's liability."); *Haemonetics Corp. v. Dupre*, 238 B.R. 224, 228 (D. Mass. 1999) ("That an inference of consciousness of guilt can be drawn from the destruction of evidence is well-recognized in the law. See *Koonce v. Commonwealth,* 412 Mass. 71, 74 n. 4, 587 N.E.2d 220 (1992)"); and *Johnston v. Love*, 940 F. Supp. 738, 751 (E.D. Pa. 1996) (holding that evidence indicating a "consciousness of guilt" was offered for a proper evidentiary purpose);

that this means that only evidence of actions that caused the Plaintiffs' harm could be considered, and because the cover-up came after the accident, it could not have caused harm.

While this jury instruction can be read in this fashion, a subsequent jury instruction and the caselaw tell us otherwise. The jury was also instructed "You may consider harms that Tesla's conduct caused to persons other than Plaintiffs." Dkt. 536 at 12. That instruction contains no time frame limitation, so it necessarily allows the jury to consider post accident conduct..

There are numerous cases in Florida and other jurisdictions holding that a jury may consider efforts to cover up responsibility for the harm caused when considering entitlement to punitive damages. We have previously cited to *Gen. Motors Corp. v. McGee*, 837 So. 2d 1010, 1035 (Fla. 4th DCA 2002), *as modified on clarification* (Mar. 5, 2003), which we contend is directly on point. In *McGee*, the Fourth District recognized that, in a case involving punitive damages, evidence of discovery misconduct could be admissible as "concealment of offensive conduct after it initially occurred."

In *McGee,* the counsel for GM was placed on the stand for over three days, and testified about documents that had been withheld and about conflicting interrogatory answers he had provided on behalf of GM. The Fourth District held that "the vast majority of questions asked of [GM's counsel] were relevant to the issue of punitive damages." *McGee* at 1035. In explaining why this evidence was relevant to the jury's determination of punitive damages, the court wrote:

> In the related context of Title VII litigation, a plaintiff may "establish that the defendant acted with reckless disregard for his federally protected rights by showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions." *Bruso v. United Airlines, Inc.,* 239 F.3d 848, 858 (7th Cir.2001); *see also Davis v. Rennie,* 264 F.3d 86, 115 (1st Cir.2001) (where court observed that "a punitive damages award may be 'justified not only by defendants' actions on [the date in question] but also by their subsequent behavior' ") (quoting *Hall v. Ochs,* 817 F.2d 920, 927 (1st Cir.1987)); *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 516 (9th Cir.2000); *E.E.O.C. v. Wal–Mart Stores, Inc.,* 35 Fed. Appx. 543, 545–46, 2002 WL 1003133 (9th Cir.2002); *Vasquez v. Atrium, Inc.,* 2002 WL 818066, at *8 (D.Ct.Ariz.2002).

*McGee* at 1035-1036.  Just as there were numerous cases holding that evidence of a cover-up is relevant to prove consciousness of guilt, there are numerous cases holding the same evidence relevant to entitlement to punitive damages. [11]

---

[11] *See First Healthcare Corp. v. Hamilton*, 740 So. 2d 1189, 1200 (Fla. 4th DCA 1999) ("the corporate Defendant's awareness of the egregiousness of its misconduct is demonstrated by the fact that its administrator manufactured a fraudulent document, that attempted to cover up its total lack of care by placing blame on the decedent's widow"); *SE Prop. Holdings, LLC v. Judkins*, 822 Fed. Appx. 929, 934 (11th Cir. 2020) (Alabama Supreme Court has set forth several factors a jury may consider in awarding punitive damages, "including whether the defendant engaged in 'any concealment, or 'cover-up.'"); *Bogle v. McClure*, 332 F.3d 1347, 1361 (11th Cir. 2003) (evidence that defendant "used trickery and deceit to cover [] up [racial discrimination] under the guise of a 'reorganization'" relevant to punitive damages.); *Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC,* 758 F.3d 1051, 1060 (8th Cir. 2014) ("Massive cover up" involving "destroyed records, [and] erased computers" "demonstrates…that Clipper acted in reckless disregard of the rights of Hallmark, which suffices under Missouri law to support an award of punitive damages."); *Santillan v. Sharmouj*, 289 Fed. Appx. 491, 495 (3d Cir. 2008) ("[Defendant's] attempts to cover-up the circumstances of the accident could reasonably be considered outrageous enough to support a punitive damages award against him."); *E.E.O.C. v. Wal-Mart Stores, Inc.,* 35 Fed. Appx. 543, 545 (9th Cir. 2002) ("There is no question that the evidence of Wal–Mart's attempts to cover-up its discriminatory conduct after 1991 is relevant to a determination of punitive damages."); *Passantino v. Johnson & Johnson Consumer Products, Inc.,* 212 F.3d 493, 516 (9th Cir. 2000) (Defendant's "continuing effort to cover up their campaign against [plaintiff]" provided "sufficient evidence to submit the claim for punitive damages to the jury."); *Hall v. Ochs*, 817 F.2d 920, 927 (1st Cir.1987) (a punitive damages award may be "justified not only by defendants' actions on [the date in question] but also by their subsequent behavior."); *Guarantee Ins. Co. v. Heffernan Ins. Brokers, Inc.,* No. 13-23881-CIV, 2015 WL 11216329, at *5 (S.D. Fla. Aug. 28, 2015) (rejecting defendant's argument that punitive damages were unavailable because no harm was caused "by Defendants' alleged covering up an error and lying to Guarantee about the error for two years."); *Martinez v. City of New York,* 2023 WL 4627739, at *16 (E.D.N.Y. July 19, 2023) ("'[t]he reprehensible nature of the officers' conduct' in this action included evidence of 'steps they took to cover up their misconduct,' and the jury was entitled to consider 'a record that included ... falsified accounts ... and perjured trial testimony.'"); *Lomangino v. Polaris Indus. Inc*., 2023 WL 3397411, at *6 (S.D.W.Va. May 11, 2023) ("evidence that Polaris may have made an effort to cover up or conceal evidence favorable to the Plaintiffs" held to be part of the "sufficient evidence to permit a jury to find, by clear and convincing evidence, that punitive damages are warranted."); *Howell v. Greyhound Lines, Inc.,* 2009 WL 10666051, at *11 (N.D. Ga. Apr. 3, 2009) (Plaintiff "presents evidence from which a jury could infer that Greyhound ratified and tried to cover up Oliver's conduct, which may provide an additional ground for punitive damages."); *Schafer v. Wickham,* 1999 WL 961273, at *3 (E.D. Pa. Oct. 15, 1999) ("On the evidence submitted, a jury could find that Defendant Truck Tech discarded records relating to this accident, and that this action was willful, intentional and meant to hide data relating to the dangerous condition of the tractor trailer."); *Scribner v. Waffle House, Inc.,* 993 F. Supp. 976, 980 (N.D. Tex. 1998), *vacated due to settlement*, 62 F. Supp. 2d 1186 (N.D. Tex. 1999) ("active attempts to cover up such

29

As we have previously noted, the Florida Supreme Court has made it clear that, when considering entitlement to punitive damages, a jury may consider Tesla's post-accident actions that could be viewed as an attempted cover-up:

> (2) the degree of reprehensibility of Owens–Corning's conduct, the duration of that harmful conduct, Owens–Corning's awareness, any concealment and the existence and frequency of similar past conduct; … (7) the seriousness of the hazard to the public, the attitude and conduct of Owens–Corning upon discovery of the misconduct; (8) the degree of Owens–Corning's awareness of the hazard and of its excessiveness; (9) the number and level of employees involved in causing or covering up the marketing misconduct; (10) the duration of both the improper marketing behavior and its cover-up.

*Owens-Corning Fiberglas Corp. v. Ballard*, 749 So.2d 483, 484-85 (1999). *Owens-Corning* remains the law of this state. *See Blundell v. R. J. Reynolds Tobacco Co.,* 324 So. 3d 1014, 1017 (Fla. 1st DCA 2021) (citing these factors). In *Blundell*, the First District reversed a plaintiff's verdict because the trial court failed to admit post-injury mitigating evidence offered by Reynolds. If such evidence is relevant to the question of entitlement, there is no logical basis to preclude the consideration of post-injury aggravating evidence, such as the cover-up at issue here.

Tesla's suggestion that Plaintiffs' counsel raised consciousness of guilt during closing argument to suggest the jury award punitive damages is simply false. Plaintiffs were careful to adhere to the trial court's ruling, discussing the cover-up evidence only in the liability section of

---

conduct"… "resulting in civil liability"…"by suborning perjury"…"warrants punitive damages."); *Jordan v. Jenkins*, Syl. Pt. 2, 859 S.E.2d 700, 707 (W. Va. 2021) (In considering entitlement to punitive damages, "[t]he jury should take into account…whether [defendant] attempted to conceal or cover up his actions or the harm caused by them."); *Hundley ex rel. Hundley v. Rite Aid of S.C., Inc.*, 529 S.E.2d 45, 62 (S.C. Ct. App. 2000) (Evidence of discovery misconduct suggesting that "Rite Aid had engaged in a cover-up" relevant to prove punitive damages.); *Cloroben Chem. Corp. v. Comegys*, 464 A.2d 887, 891–92 (Del. 1983) (Evidence supporting punitive damage award included "Cloroben['s] wilfull[] fail[ure] to produce claims files regarding accidents involving Drain Snake, despite plaintiffs continued discovery efforts.); *Bowden v. Caldor, Inc.,* 350 Md. 4, 29, 710 A.2d 267, 279 (1998) ("repeated or frequent misconduct of the same nature, misconduct of long duration, attempts to conceal or cover-up the misconduct, failure to take corrective action, and similar circumstances, support the deterrence value of a significant [punitive] award."); and *Upshaw v. Sunrise Cmty. of Tennessee, Inc.,* 2017 IER Cases 286375 (Tenn. Ct. App. 2017) ("consideration of Sunrise's efforts to conceal Upshaw's internal reporting of H.G.'s overfeeding from the DIDD investigator and during discovery in these proceedings is consistent with the purposes of punitive damages.").

the argument. Dkt. 587 at 51-52. Tesla objected, but both the Court and Plaintiffs' counsel made it clear that evidence was to be considered "solely with regard to the design defect claim." Dkt. 587 at 51-52, 76-77. No mention of the cover-up was made of it when discussing punitive damages.[12]

Because case law holds that a jury may consider a defendant's efforts to cover-up their misconduct in determining consciousness of guilt to prove liability and in determining entitlement to punitive damages, admission of this evidence was not error.

### 2. Elon Musk's statements were properly admitted.

Tesla concludes its argument on this topic by once again misstating the relevant burden of proof.  Tesla suggests that in order to introduce Musk's statements, Plaintiffs had to "offer [] evidence that ordinary consumers would have made their purchasing decisions based on Musk's statements, that his statements would have led them to believe that Mr. McGee's Tesla would be equipped with a combination of features no other vehicle in history has ever included, or that the vehicle's capabilities would have relieved them from their responsibilities to drive safely." Dkt. 591 at 34. No such evidence was required.

In evaluating the expectations of an ordinary consumer, the jury considers the manner in which a manufacturer markets its product.  "[A] manufacturer plays a pivotal role in crafting the image of a product and establishing the consumers' expectations for that product, a portrayal which in turn motivates consumers to purchase that particular product." *Aubin v. Union Carbide Corp.,* 177 So. 3d 489, 511 (Fla. 2015) "The consumer expectations test thus rightly focuses on the expectations that a manufacturer creates." *Id.* In denying Tesla's motion for summary judgment on the product defect claim, this Court held: "Given Tesla's numerous representations about the capabilities of the Autopilot system, there is at least a genuine dispute as to whether it would be obvious to the average consumer not to trust Tesla's Autopilot system to largely drive itself and avoid collisions." Dkt. 428 at 80.

---

[12] Tesla's reference to a news article quoting Dr. Cummings' opinion as to the reason for the jury's verdict is not just irrelevant. Dkt. 591 at 31. It's completely inappropriate.  If citing to outside the record news articles is fair game, we would point the court to this article about Elon Musk's demand for a one trillion dollar pay package. https://electrek.co/2025/09/19/elon-musk-trapped-tesla-tsla-shareholders-give-me-1-trillion-or-i-wont-lie/ How do you deter or punish a company that wants to pay its CEO one trillion dollars?

This Court further rejected Tesla's argument that Musk's statements were all forward looking or aspirational. They were not. This Court wrote: "Musk appears to be discussing Autopilot generally, and, therefore, his statements are relevant, especially given that Tesla was regularly updating the Autopilot system in real time." Dkt. 433 at 34. Statements made in 2016 about how Teslas would perform in the immediate future were thus relevant to a car purchased in 2019.

Musk's statements were not just admissible to establish consumer expectations. They were also relevant to the punitive damages claim. In this Court's order denying MSJ, this Court referenced the following evidence in support of its denial of the punitive damages claim: "Plaintiffs also point to numerous public statements Tesla made which arguably misrepresented the risk and limitations of the Autopilot system and improperly suggested that issues present in the crash were resolved." Dkt. 428 at 96. Tesla convinced the Court that these misstatements could not be considered by the jury because Mr. McGee did not personally hear them.  But that isn't the standard. Tesla's product defect was the cause of the Plaintiffs' harm, and the product was defective because it did not perform to the expectations set by Tesla. *Ballard, supra* at 484-85, makes it clear that marketing misconduct is a factor the jury can consider in awarding punitive damages. There is no corresponding reliance requirement on behalf of a plaintiff, or, in this case, Mr. McGee.

The Court did not err in admitting this evidence, and Tesla has provided no basis to change this Court's prior rulings.

### 3.   Evidence of similar accidents was properly admitted.

Following its established pattern, Tesla's argument on this topic misstates the law of substantial similarity.  Once again, Tesla argues that because Mr. McGee's accident was not identical in all respects to the other accidents admitted at trial, such evidence was improperly admitted. This Court previously dispensed with that argument, explaining that the *material* facts of each accident were similar enough to allow their admission:

> Despite the differences identified by Tesla, the Court finds that the Brown Crash, the Kanagawa Japan Crash, and the Banner Crash are all substantially similar enough to the subject collision to be admissible. … The Court also finds the remaining dissimilarities between other accidents and the subject collision go to the weight of the evidence, not the admissibility.

Tesla points out that, unlike McGee, none of the drivers briefly looked away from the road and reached for an object on the floorboard. However, the substantial similarity doctrine does not require identical circumstances, but rather only relevantly substantially similar circumstances. In all three accidents, the Tesla drivers were distracted, notwithstanding Tesla's driver monitoring system. … The fact that all three drivers were distracted tends to show that Tesla was on notice prior to Mr. McGee's accident that its monitoring and warning system did not ensure drivers were staying sufficiently engaged when utilizing their vehicle's Autopilot system. *See Sorrels*, 796 F.3d at 1287-88 (explaining that dissimilarities are insubstantial for the purpose of notice where the similarities still make it reasonably foreseeable that the type of injury would occur) (citing *Borden*, 772 F.2d at 755). Accordingly, the fact that the accidents all involve distracted drivers is sufficiently similar to avoid exclusion.

Dkt. 466 at 9.

This Court continued:

[W]hile McGee's use of the accelerator may limit how Plaintiffs may use the evidence of these other accidents at trial, this difference does not foreclose Plaintiffs from introducing the evidence to prove the existence or notice of some other alleged defect. *See Gonzalez*, 718 F. Supp. 2d at 1345 ("The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground.").
The fact that McGee had his hands on the wheel while the other three drivers did not is similarly unpersuasive to warrant exclusion of those other accidents. The fact that all four Tesla drivers were distracted in the moments before their respective crashes, regardless of whether the Autopilot system detected their hands on the wheel, shows that the purported dissimilarity is insubstantial in determining whether it was reasonably foreseeable that Autopilot's design causes drivers to become over-reliant on assistive driving features, thereby failing to pay adequate attention to the road.

Dkt. 466 at 11-12

With respect to the evidence regarding the eight additional accidents the jury heard through Tesla's responses to requests for admission, Tesla states that "[t]he Court itself concluded that those accidents did not satisfy the substantial-similarity test." Dkt. 591 at 36, citing to Dkt. 486 at 13. While the Court did say this, that does not impact the propriety of their admission. This Court went on to state that "Tesla's answers are admissible pursuant to [FRCP] 36 ('A matter admitted under this rule is conclusively established[.]')". Dkt. 486 at 13. The Court simply held that Plaintiffs were are not permitted to go into further detail as to those other accidents" beyond what was admitted to in Tesla's responses. Tesla next argues that this Court applied the wrong standard

in admitting the evidence of frontal plane crashes from NHTSA's ODI resume.[13] Tesla argues that there is no relaxed standard in the 11th Circuit when the similar incidents are admitted for notice, citing to *Henderson v. Ford Motor Co*., 72 F.4th 1237, 1242–43 (11th Cir. 2023). Dkt. 591 at 36. But even a cursory review of *Henderson* reveals that Tesla is wrong. As this Court did, *Henderson* also quoted from *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1288, 1287 (11th Cir. 2015), which held that "The doctrine 'does not require identical circumstances, and allows for some play in the joints depending on the scenario presented and *the desired use of the evidence*.'" *Henderson* at 1243.  (emphasis supplied) While *Henderson* does not explicitly state that a relaxed standard exists for notice, it acknowledges that the standards for admissibility differ depending on the reason for the admission of the evidence.

Numerous district courts in the 11th Circuit have cited the relaxed standard when proving notice, including some that addressed admissibility, not just discoverability. *See e.g. Jarvis v. Carnival Corp.,* 2017 WL 6989149, at *3 (S.D. Fla. Aug. 24, 2017).  This principle of law, as this Court has noted, is not new or unique to one Circuit. It been recognized in cases from the 10th, 5th, 7th, 9th, 4th, and D.C. Circuit Courts.  Dkt. 486 at 12-13. This Court applied the correct standard when admitting the evidence of other frontal plane accidents.

In the interest of saving space, we would refer the Court to its own analysis in allowing the admission of this evidence. Dkt. 486 at 12-16.  This Court concluded "because Tesla and NHTSA identified a common defect present in prior accidents involving vehicles substantially similar to the subject vehicle, the Court agrees there are sufficient similarities for the purpose of placing Tesla on notice of the purported defect." Dkt. 486 at 15-16. The jury was properly instructed, at Tesla's request, on the limitations of this evidence. There was no error in admitting it. [14]

---

[13]   Rubio Blanco conceded that the instant crash was a severe, high-energy, frontal-plane crash, which was precisely the type of scenario that the ODI was investigating as a part of their analysis of crashes involving driver engagement in Teslas.  Dkt. 583 at 85:11-14.

[14] Any error in admitting this evidence would have been harmless because it was duplicative of data contained in Tesla's 2020 AP Safety goals, which demonstrated that in the second half of 2019 alone, there were 36 collisions with in path stationary objects where Tesla's internal document labeled them as being the fault of autopilot. Dkt. 585 at 97 (admission of Plaintiff's exhibit P-94). *See Rogers v. State*, 498 So. 2d 655 (Fla. 2006) (improperly admitted evidence was cumulative and corroborative of other admissible evidence and therefore could not constitute harmful error beyond a reasonable doubt.)

**C. THIS COURT SHOULD NOT DISTURB THE PUNITIVE DAMAGE AWARD.**

A jury's decision on punitive damages is entitled to great deference. *See Siedlecki v. Arabia,* 699 So. 2d 1040, 1041 (Fla. 4th DCA 1997) (trial court does not sit as a seventh juror with veto power over the jury's award of punitive damages). So long as the jury's damages award is not "out of all reasonable proportion to the malice, outrage, or wantonness of the tortious conduct," then the jury's award of punitive damages must stand. *Arab Termite & Pest control v. Jenkins,* 409 So. 2d 1039, 1042 (Fla. 1982); *Rety v. Green,* 546 So. 2d 410, 418 (Fla. 3d DCA 1989) (noting "the jury's broad discretion to fix compensatory and punitive damages"). Defendant has not carried its burden.

### 1. Florida law permits the imposition of punitive damages in this case.

Tesla repeats its previously rejected argument that punitive damages are simply unavailable in automotive defect cases. To be sure, some Florida Appellate panels have been more hostile to punitive damages than others, and Tesla has collected those cases in its motion, and *Tesla, Inc. v. Banner*, 411 So. 3d 1 (Fla. 4th DCA 2025) in particular. But as this Court pointed out, "the *Banner* decision has no greater precedential value than any other Florida appellate jurisprudence bearing on the issue." Dkt 428 at 97, n.88. This Court correctly considered the full body of Florida jurisprudence on punitive damages and determined that Plaintiffs had produced sufficient evidence to withstand summary judgment as to such damages. Tesla has provided no basis to change that ruling. And Plaintiffs submitted ample evidence to support the jury's punitive-damages verdict against Tesla.

As before, Tesla heavily relies on the *Banner* decision. But *Banner* was based on an outdated view of Florida law, and, as we will discuss further below, is distinguishable on its facts. *Banner* quotes *Chrysler Corp. v. Wolmer,* 499 So. 2d 823, 824 (Fla. 1986), for the proposition that "a showing of even gross negligence, the degree of negligence that lies between ordinary negligence and willful and wanton conduct, is not enough."[15] *Banner* at 5. This is no longer the law. Since 1999, punitive damages have been recoverable for a defendant's gross negligence,

---

[15] *Wolmer,* in addition to no longer being law, is distinguishable on its facts. As *King v. Eastern. Airlines, Inc.,* 536 So. 2d 1023, 1026 (Fla. 3d DCA 1987) explained, Wolmer "turn[ed] on lack of actual knowledge." Of course, the evidence here shows that Tesla had actual knowledge as early as 2016 that drivers were misusing Autopilot, yet failed to take sufficient steps to remedy the defect.

which, as Tesla acknowledges in its motion, is defined as "the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." Dkt. 591 at 40. *Valladares v. Bank of Am. Corp.*, 197 So. 3d 1,11 (Fla. 2016), which Tesla cites, consistent with the Fla.Stat. § 768.72, likewise defines "punitive conduct" as "something more than simple negligence, but less than intent or malice."

*Banner* also cites language, that Tesla repeats, from *Jeep Corp. v. Walker,* 528 So. 2d 1203, 1206 (Fla. 4th DCA 1988), stating that "[i]t would appear that the Florida Supreme Court has all but eliminated punitive damage awards in products liability cases." *Banner* at 5, Dkt. 591 at 39. This is simply false. Punitive damages in products liability cases remain available in Florida if the Plaintiff presents sufficient evidence to meet the standard. Dozens of such awards have been affirmed in the 37 years since *Walker*.

In its order denying Tesla's MSJ, this Court agreed that punitive damages would be available if Plaintiffs could prove that Tesla had "knowledge that its product is inherently dangerous to persons or property and that its continued use is likely to cause injury or death, but nevertheless continues to market the product without making feasible modifications to eliminate the danger or making adequate disclosure and warning of such danger," citing *Johns-Manville Sales Corp. v. Janssens*, 463 So. 2d 242 (Fla. 1st DCA 1984). *See also Toyota Motor Co., Ltd. v. Moll*, 438 So. 2d 192, 195 (Fla. 4th DCA 1983) ("punitive damages ... [are] allowed where the defendant had knowledge of a defect or dangerous condition and chose not to remedy the condition.")

This remains the standard today and district courts have had no difficulty applying that standard. In *Deiparine v. Siemens Med. Sols. USA Inc.,* 2010 WL 5479653, at *4–5 (M.D. Fla. Dec. 2, 2010), *report and recommendation adopted*, 2011 WL 9128 (M.D. Fla. Jan. 3, 2011), the district court quoted *Johns Manville*, and *Moll*:

> The requisite evil intent may be inferred from the defendant's having pursued a course of action in wanton disregard of the consequences. *Johns–Manville Sales Corp. v. Janssens,* 463 So.2d 242, 247 (Fla. 1st DCA 1984). Accordingly, *punitive damages may be imposed when the defendant knows of the defect but chooses not to remedy the dangerous condition. Toyota Motor Co., Ltd. v. Moll,* 438 So.2d 192 (Fla. 4th DCA 1981).

(emphasis in original).

In *Estate of Miller v. Ford Motor Co.,* 2004 WL 7330563, at *3 (M.D. Fla. July 22, 2004), the district court denied Ford's motion for summary judgment on punitive damages as follows:

In a products liability case, "punitive damages ... [are] allowed where the defendant had knowledge of a defective or dangerous condition and chose not to remedy the condition." *Toyota Motor Company, Ltd. v. Moll*, 438 So. 2d 192, 194 (Fla. 4th DCA 1983), *Domke v. McNeil—P.P.C., Inc.,* 939 F. Supp. 849, 852 (M.D. Fla. 1996). Plaintiff has identified a number of facts which, while contested by Ford, would support an award of punitive damages. At the summary judgment stage of the proceedings, this is sufficient. Ford's motion will be denied.

In *Sims v. BMW of N. Am. LLC*, 2025 WL 724047, at *2 (M.D. Fla. Mar. 5, 2025), the district court recognized that dueling expert testimony created "the quintessential question of material fact relative to what the BMW Defendants knew and when they knew it versus when they told consumers." As a result, the court denied BMW's motion for summary judgment, explaining:

> Plaintiff bases his claim for punitive damages on Defendants' knowledge that the Takata airbags in their vehicles were defective and concealed that information from the consuming public. (Doc. 234, p. 19). As discussed in the preceding section, an issue of material fact remains concerning Defendants' knowledge of the defective Takata inflators and whether they concealed that information, thus delaying warning consumers about the danger. *See Alfeo v. I-\Flow, LLC*, No. 11-80837, 2012 WL 442981, at *2 (S.D. Fla. Feb. 10, 2012) (citing *Holmes v. Bridgestone/Firestone, Inc.*, 891 So. 2d 1188, 1191–92 (Fla. 4th DCA 2005) (holding actual knowledge of a danger followed by a failure to warn of that danger supports punitive damages)). While the bar is high for imposing punitive damages, if the jury accepts Plaintiff's evidence on Defendants' knowledge and alleged inaction, a reasonable jury could return a verdict for Plaintiff on punitive damages. Defendants' request for summary judgment on punitive damages is thus denied.

*Sims* at *2.

In addition to relying on outdated law on punitive damages, *Banner* is distinguishable on its facts. The *Banner* plaintiff failed to establish that "Tesla knew or should have known its SAE Level 2 driving assistance features were likely to cause death or great bodily injury." *Banner* at 5. As this court previously noted, in *Banner*, "**unlike here**, there appears to have been no record evidence indicating Tesla's knowledge of the known dangers, other manufacturers' demonstrated ability to avoid the purported dangers, and Tesla's own ability to have cured the alleged defect." Dkt. 428 at 97. (emphasis added).

While *Banner* stated that the autopilot features "were 'state-of-the-art' and complied with all industry and regulatory standards," this Court previously held that it "need not accept the *Banner* court's conclusion." Dkt. 428 at 97. As discussed above, Plaintiffs presented evidence demonstrating that Tesla's autopilot was not state of the art was conflicting, and the jury was entitled to so find. Also noted above, the fact that a product meets industry standards is not "prima

facie proof that [defendant] met the appropriate legal standard of care." *Alderman, supra* at 678-79.

While *Banner* appeared to find Tesla's warnings against misuse adequate as a matter of law, there is no mention in the opinion that the plaintiff provided evidence on the inadequacy of the warnings, as Plaintiffs here did.[16]  Finally, contrary to *Banner's* conclusion, Plaintiffs did not ask the jury to hold "Tesla [] liable for failing to provide technology that it did not advertise and that did not exist." *Banner* at 5.   The jury held Tesla liable for not taking any action to address the known flaws in its driver monitoring system, the flaws in its emergency braking system, or limit the use of autopilot in the areas it was designed for. The evidence showed that the technology *did* exist that would have allowed this accident to be avoided. As shown on the augmented video, Mr. McGee's Tesla detected Angulo, Angulo's truck, the end of drivable space, and a stop bar, but took no action to brake or otherwise avoid the accident, actions that the autopilot system was fully capable of taking. Further, the evidence showed that Tesla did advertise autopilot in a manner that overstated its capabilities, creating unrealistic consumer expectations about the safety of Tesla's systems.

In Tesla's discussion of the role industry standards play in the punitive damages analysis, Tesla once again misstates the law, arguing that "compliance with industry standards and custom forecloses punitive damages." Dkt. 591 at 45. The cases Tesla cites for this proposition do not so hold. The Florida Supreme Court, in *Chrysler Corp. v. Wolmer*, 499 So. 2d 823, 826 (Fla. 1986) determined that punitive damages were unwarranted because plaintiff failed to prove "that Chrysler had actual knowledge that it was marketing an inherently dangerous automobile." The vehicle's compliance with a government standard was simply one fact it raised in support of its conclusion. *Id.* Similarly, in *Am. Cyanamid Co. v. Roy*, 498 So. 2d 859 (Fla. 1986) compliance with government standards was one of many factors that Court examined in determining punitive damages should not have been awarded. In particular, the court noted that the warnings the plaintiff's expert opined should have been given were <u>prohibited</u> by law. *Am. Cyanamid Co.* at 862. The Court did not hold that such compliance precluded punitive damages, but stated that

---

[16]  Even Tesla's citations to the *Banner* briefing, (Dkt. 591 at 43) which we believe are inappropriate, do not suggest that the *Banner* plaintiff proffered evidence on the inadequacy of the warnings. Florida law is clear that, in determining the existence of conflict jurisdiction, Courts are "limited to the facts which appear on the face of the opinion." *Hardee v. State*, 534 So. 2d 706, 708 (Fla. 1988)  We are aware of no Florida law that suggests an exception to this rule.

"such information may certainly bear on whether a party's behavior represents such an extreme departure from accepted standards of care as to justify punitive damages." *Id*. at 863.

Tesla spends its next few pages once again ignoring its burden when requesting JMOL. Dkt. 591 at 47-49. Instead of addressing the evidentiary record in the light most favorable to the Plaintiffs, Tesla cites evidence that the jury here rejected. Below we set forth the evidence that supported the jury's punitive damage award.[17]

### a. Tesla's development process was grossly negligent.

The jury's award of punitive damages was supported by the testimony of Tesla's 30(b)(6) representative Akshay Phatak, which demonstrated that Tesla's development of autopilot was woefully deficient. First, Phatak was unable to demonstrate that, during the development process, Tesla evaluated and considered data, research, and studies regarding driver compliance with automated driving systems. Dkt. 576 (Tr. Day 3), at 110:24–11:21. Phatak was similarly unable to show that Tesla took into account research related to the capabilities and limitations of humans and monitoring automated systems. *Id.* at 116:11–16. Phatak could not find any documentation that Tesla took into account research relating to the concept of workload as it relates to human perception and reaction time. *Id.* at 116:17–25. Tesla did not attempt to determine how long a driver would reasonably need to react to prevent an accident, nor did it conduct any internal studies regarding driver complacency. *Id.* at 119:16–20:10.

Before releasing Autopilot to the public, Tesla did not perform any studies to evaluate the impact of the use of automated driving systems on a driver's situational awareness. *Id.* at 111:22–12:11. Instead, Tesla waited until it was receiving telemetry from cars it had already sold. *Id.* at 112:11–20. When its customers became involved in "incidents," (read: collisions), Tesla would make "incremental improvements" in response to those incidents. *Id.* at 112:1–6. In other words, Tesla was using its customers to de-bug its software and hardware defects, sometime at the expense of their lives.

Mr. Moore explained why this approach was so dangerous. Mr. Moore had never seen any other manufacturer in the automotive industry use products that had already been sold to consumers in order to conduct further product development. Dkt. 577 (Tr. Day 4), at 167:3–8. In

---

[17] Plaintiffs maintain that evidence related to Tesla's marketing misconduct and efforts to destroy the autopilot data also supported the punitive damage award.

his opinion, using consumer vehicles for product development negatively impacted product safety, because Tesla's approach was reactionary. When a negative event like an accident occurred, Tesla would make changes to the product to prevent the accident from happening again, which is a fine thing to do. However, the better approach would have been to "complete the product development process first before ever releasing the vehicle to consumers," which is typically how it is done in the automotive industry. *Id.* at 167:9–25.

Phatak acknowledged that Tesla knew, at the outset, autopilot could be misused and abused, which is why they used a torque based driver monitoring system. Dkt. 576 (Tr. Day 3), at 112:22–13:12. Phatak was shown a statement from Elon Musk demonstrating that in September 2016, Tesla was aware of that some of its customers were simply ignoring as many as 10 warnings an hour to pay attention and place their hands in the wheel. But despite such knowledge of its customers' egregious misuse of Autopilot, at that time, Tesla did not do any evaluation to determine the effectiveness of the torque based driver monitoring system in maintaining driver attention. *Id.* at 132:20–33:3. Dr. Cummings deemed Tesla's failure to do so to be grossly negligent. *Id.* at 133:6–14.

Finally, Tesla did not begin to track data on the number of crashes that occurred per vehicle mile driven with Autopilot engaged prior to March 2018. Dkt. 575 (Tr. Day 2), at 242:19–44:22. So when Elon Musk was telling the public in 2016 that Autopilot was far safer than human driving, Tesla had no data to support those statements.

Dr. Cummings testified that Tesla failed to test the autopilot system before releasing it to the public. Specifically, Dr. Cummings testified that the testing of the computer vision system was inadequate to determine its efficacy in edge cases including rain or at night or on roads outside the ODD. Dkt. 576 (Tr. Day 3), at 66:10–67:3. Dr. Cummings, having reviewed Phatak's testimony, concluded that Tesla's research and studies on complacency was, at best, woefully inadequate, and at worst, did not appear to exist. *Id.* at 113:15–22.

Dr. Cummings noted that in the world of transportation, distraction is probably the most researched topic in the study of human factors. Over the last ten years, human distraction during the use of automated driving systems is the most popular sub-topic within that subject. As a result, there were hundreds of papers that would have answered Mr. Phatak's questions if he had any. *Id.* at 120:23–21:5. Any company that is developing technology requiring any safety critical system

should absolutely have a human factors division, or, at a minimum, a human factors consultant on board.  Tesla had neither.  *Id.* at 121:6–22:3.

### b.  Tesla's response to Autopilot failures was grossly negligent.

In 2015, NHTSA had asked Tesla to describe the steps that it had taken to ensure the safe operation of its autopilot and to prevent driver misuse or abuse.  Dr. Cummings noted that, in Tesla's response, it recognized that drivers would be distracted to the point that they might fall asleep or be incapacitated, that drivers were likely to use the car outside of the ODD, and that warnings needed to be provided both in the owner's manual and in the vehicle.  *Id.* at 52:6–53:4. Despite this knowledge, Tesla took no additional action to reduce the dangers associated with these admissions.

Dr. Cummings noted that, based on Elon Musk's 2016 statements about drivers repeatedly ignoring hands on warnings, Tesla was aware early on that there were big problems with its driver monitoring system.  *Id.* at 68:7–12.  However, despite having several feasible options available to address this issue, Tesla took no action until late 2023.

As per the responses to requests for admission read to the jury, Tesla was also on notice as early as January 2016 that inattentive customers using Autopilot were becoming involved in frontal plane collisions.  Dkt. 582 (Tr. Day 9), at 20:9–25:10.  Because these frontal plane accidents often occurred at high speeds, several collisions resulted in injuries and fatalities.  Tesla was on notice of dozens of other similar accidents that it had reported to NHTSA between 2018 and 2019.  Ex. 61.

Dr. Cummings reviewed three particular accidents with the jury—Brown, Kanagawa, and Banner—and Tesla's reaction to each.  With respect to the Banner crash in 2019, Dr. Cummings explained that it was similar to the Williston crash and reinforced NHTSA's earlier conclusions that the driver monitoring system was insufficient to keep drivers engaged.  Dkt. 576 (Tr. Day 3), at 88:6–16.  The Banner crash provided yet more evidence that autopilot should not be allowed to be used on roads outside the ODD.  *Id.* at 88:17–21.

Even as late as 2019, Tesla knew internally that it still did not have enough data to conclude that cars using autopilot were safer than those driven by humans alone on surface streets like Card Sound Road.  *Id.* at 78:4–79:2.  Yet Tesla failed to share this internal knowledge with NHTSA or the public.  *Id.* at 79:3–9.

Dr. Cummings opined that Tesla chose not to geofence its Autopilot system in order to sell more cars. *Id.* at 58:3–7. Further, Dr. Cummings believed that Tesla delayed improving its driving monitoring system at an earlier point in time because of the expense to do so. Dkt. 577 (Tr. Day 4), at 35:13–36:9. Specifically, she testified that it would have required conducting testing and a possible redesign of all the audio and visual alerts in the car, and Tesla did not want to incur the expense and delay of developing a safer system. *Id.*

> Based on the thinner record presented at summary judgment, this Court ruled:

> Plaintiffs also point to numerous public statements Tesla made which arguably misrepresented the risk and limitations of the Autopilot system and improperly suggested that issues present in the crash were resolved. ECF No. [351] at 14, 23-26. Therefore, because Tesla refused to geo-fence the Autopilot system despite being warned of the dangers and despite record evidence indicating that Tesla was capable of curing the issue, a reasonable jury could find that Tesla acted in reckless disregard of human life for the sake of developing their product and maximizing profit. *See Gen. Motors Corp. v. McGee*, 837 So. 2d 1010, 1035 (Fla. 4th DCA 2002); *Sims v. BMW of N. Am. LLC*, No. 6:22-cv-1685-PGB-UAM, 2025 WL 724047, at *2 (M.D. Fla. Mar. 5, 2025) (citing *Bridgestone/Firestone, Inc.*, 891 So. 2d 1188, 1191–92 (Fla. 4th DCA 2005) (holding actual knowledge of a danger followed by a failure to warn of that danger supports punitive damages)).

Dkt. 428 at 96. The Court subsequently denied Tesla's Rule 50(a) motion, necessarily determining that Plaintiffs had presented sufficient evidence to send the punitive damage question to the jury. Tesla has provided no basis for this Court to change its ruling. Tesla's Rule 50(b) motion for JMOL regarding punitive damages should be denied.

### 2. <u>In examining the ratio between the compensatory and punitive award, the gross compensatory award is used, not the net.</u>

The 1.4:1 ratio between the punitive damages award and the compensatory damage awards in this case is well within constitutional limitations. See infra. So Tesla begins its attack on the amount by attempting to change the ratio. Tesla cites no Florida law specifically holding that Courts must use the post apportionment compensatory damage award when determining the ratio between the compensatory damages and the punitive damages. As Tesla acknowledges, the one

Florida case it does cite, *Coates v. R.J. Reynolds Tobacco Co.*, 375 So. 3d 168, 173 (Fla. 2023) simply uses the net compensatory award without any discussion of why it was doing so. [18]

To our knowledge, only one Florida case specifically addresses this issue. In *R.J. Reynolds Tobacco Co. v. Townsend*, 118 So. 3d 844 (Fla. 1st DCA 2013), R.J. Reynolds argued that the net compensatory award, rather than the gross award, should be used in calculating the ratio. The First District disagreed, holding, "[a]s to Appellant's contention that the proper benchmark for evaluating the reasonableness of the punitive damages award was the compensatory damages award after reduction for comparative fault, this argument is contrary to [*R.J. Reynolds Tobacco Co. v. Townsend,* 90 So. 3d 307, 312 (Fla. 1st DCA 2012] which, in discussing the constitutional infirmity of the original punitive damages award, and discussing the permissible parameters of such an award, used the unreduced compensatory damages award as the proper benchmark." *Id.* at 847.

In *Kerrivan v. R.J. Reynolds Tobacco Company*, 953 F.3d 1196, 1210 (11ᵗʰ Cir. 2020), the Eleventh Circuit used the unreduced compensatory award in calculating the ratio: "Here, the punitive damages award was $25.3 million, and the compensatory damages award was $15.8 million, making the ratio of punitive damages to compensatory damages approximately 1.6:1." As it did in *Townsend*, Reynolds argued the Court should use the net compensatory award, which would bring the ratio "closer to 2:1." *Id.* The Court declined to answer the question, holding that "even assuming the Tobacco Companies are correct that [2:1 is] the relevant ratio[], the punitive damages award still would not be unreasonable." *Id.*

While this Court is bound by the single Florida decision that actually answers the question, it is nevertheless helpful to consider why using the gross compensatory award is appropriate. The gross number is appropriate because the Defendant is being punished for the harm the plaintiff suffered, not for Defendant's share of the liability for that harm. As the Supreme Court noted in *Philip Morris USA v. Williams*, 549 U.S. 346, 351 (2007), punitive damages awards should reflect "(1) the 'reprehensibility' of the defendant's conduct, [and] (2) a 'reasonable relationship' to the **harm** the plaintiff (or related victim) suffered." (emphasis supplied) The Supreme Court's holding in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) further supports this

---

[18] *But see Philip Morris USA Inc. v. Cohen,* 102 So. 3d 11, 16 (Fla. 4th DCA 2012), (Court used the gross compensatory award over the net without offering any explanation.)

interpretation as it asks this Court to review "the disparity between the **actual or potential harm suffered by the plaintiff** and the punitive damages award," not the damages awarded after reduction for a third party's share of fault. (emphasis supplied) If, as Tesla suggests, Tesla should only be punished for its share of the liability for that harm, then the punitive damage award itself would be reduced by the smoker's comparative fault.[19]

But Florida law is clear that punitive damage awards are not reduced by comparative negligence. *See Williams v. Bumpass,* 568 So. 2d 979, 982 (Fla. 5th DCA 1990) ("Where a party has inflicted an injury through negligence and his conduct in doing it was wanton or in reckless disregard of its injurious consequences, the contributory negligence of the person injured has no effect on the recovery in an action brought for that injury.") (quoting 57 Fla. Jur. 2d, Weapons § 11 (1985) (other citations omitted)); *see also Tampa Elec. Co. v. Stone & Webster Eng'g Corp.,* 367 F. Supp. 27, 38 (M.D. Fla. 1973) ("If the defendant's gross negligence will support an award of punitive damages, however, the plaintiffs comparative negligence will not be permitted to diminish the exemplary award."). To calculate the punitive damages ratio based on the verdict as reduced by comparative negligence, instead of on the full amount awarded by the jury, would do exactly that. S*ee also Clark v. Chrysler Corp.,* 436 F.3d 594, 614 (6th Cir. 2006) (Kennedy, J., concurring) ("Punishing Chrysler a lesser amount based on its level of comparative fault does not appropriately punish Chrysler for the risk that results from its unsafe design, nor does it serve the goal of deterring similar future conduct by Chrysler."); and *Haskell v. Tan World, Inc.,* No. LACV041637, 2003 WL 24054815, at *1 (Iowa Dist. Dec. 9, 2003) (holding otherwise would "legitimize willful and wanton conduct merely because the Plaintiff was negligent to some degree.").

The public policy behind punitive damages is to punish the tortfeasor and to deter the tortfeasor and others like them from future wrongful conduct. *See, e.g., Lassiter v. Int'l Union of Operating Eng'rs,* 349 So. 2d 622, 626 (Fla. 1976) (noting that the purpose of imposing punitive

---

[19] Bafflingly, Tesla writes "If the constitutionality of punitive damages were measured based on the *total* compensatory damages award before reduction for comparative fault, those damages would punish defendants for harm caused not by their own 'offense[s]' but by others', in violation of the Due Process Clause" in a manner suggesting it is paraphrasing from *Gore*, citing to 517 U.S. at 575. Dkt 591 at 55. But *Gore* says no such thing. It appears the only basis for Tesla's citation here is the fact the quoted word "offense" appears on page 575.

damages is to punish and deter).  That public policy would be directly undermined if a tortfeasor's punitive damages obligation was reduced by the decedent's comparative negligence.  Indeed, tortfeasors should not escape sanction, or have that sanction reduced, because of the actions of a third party defendant. To make such a reduction would be to water down the punishment and to undermine the deterrent effect.  Therefore, the punitive damages award is based upon the actual and full amount of the compensatory damages awarded before any reduction for comparative negligence.  *See Evans v. Dean Witter Reynolds, Inc.,* 5 P.3d 1043, 1054 (Nev. 2000); *I-Gotcha, Inc. v. Mcinnis,* 903 S.W.2d 829,841 (Tex. App. 1995).

### 3.  Whether the punitive damage award is compared to the gross or net compensatory award, the ratio is constitutionally permissible.

Defendant argues that the award of $200,000,000 in punitive damages is constitutionally excessive because it exceeds a 1-to-1 ratio with the compensatory damage award. As we will demonstrate below, there is no bright line rule that the ratio cannot exceed 1:1 for any large compensatory award.  Ratios of either 1.4:1, comparing the punitive award to the gross compensatory award, or, if the Court determines it must use the net compensatory award, 3:1, are constitutionally permissible.

The United States Supreme Court has directed courts to consider three "guideposts" when determining whether a punitive damage award is constitutionally excessive:

(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). The reprehensibility of the defendant's conduct is the most important of the three. *Schoeff*, 232 So. 3d at 307 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

### a.  Tesla's conduct was reprehensible.

In *Kerrivan, supra*, the 11th Circuit conducted an analysis of the five reprehensibility factors set forth in Campbell.  The Court wrote:

We determine the reprehensibility of a defendant by considering whether: (1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated incident; and (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Kerrivan* at 1298-09.

The Court determined that four of the five factors weighed against the Tobacco Companies. The same four factors weigh against Tesla here. The Plaintiffs' harm was physical in nature. Tesla knew that distracted drivers were becoming overly reliant on its autopilot system and getting involved in fatal accidents. Rather than taking indisputably feasible steps to improve its systems, Tesla instead chose to publicly place all of the blame on its customers, while internally acknowledging that its cars where "at fault" in over 60% of autopilot accidents. Exhibit P-94.  As this Court noted, the jury was entitled to find, on this record, "that Tesla acted in reckless disregard of human life for the sake of developing their product and maximizing profit." Dkt. 428 at 96. Tesla admits that one of the reasons it allowed the use of autopilot outside of its ODD was to gather data for future improvements. Dkt. 591 at 25. Tesla's conduct was repeated and not isolated. Tesla was aware of these issues as early as 2016, yet on the record at trial, took no ameliorative action at all despite admitting to a defective DMS in 2023. As to the fifth factor, Tesla's decision not to make feasible changes to its DMS act was, by definition, intentional. Tesla's attempt to walk back its admission of defect in the ODI resume by saying that it disagreed with it suggests a lack of remorse for the many deaths of its customers that it characterized as "incidents."

As in *Kerrivan*, "four of the five factors for evaluating reprehensibility weigh against the [Defendant]." *Kerrivan* at 1209. Kerivan noted that "While there is no requirement that a certain number of the five *State Farm* factors be present in order to support a finding of reprehensibility, reprehensibility grows more likely as more factors are present." *Id*.  In meeting four of the five factors, the 11th Circuit found the Tobacco Companies' conduct "particularly reprehensible," concluding that "the first—and most important—guidepost weigh[ed] heavily in [plaintiff's] favor. *Id*. This Court should reach the same conclusion here.

### b. The ratio between the actual harm suffered by the plaintiffs and the punitive damages award comports with due process.

The second guidepost of the *State Farm* analysis is "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." *State Farm*, 538 U.S. at 418. Here, the ratio of punitive damages to compensatory damages is approximately 1.4 to 1. Defendant argues that this ratio is excessive based on the following *dicta* from *State Farm*: "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory

damages, can reach the outermost limit of the due process guarantee." *Id.* at 425. But this quote must be considered in its full context, and in the manner other Courts have interpreted it.

> The full discussion surrounding this excerpt reads as follows:

> Turning to the second *Gore* guidepost, we have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. 517 U.S., at 582, 116 S.Ct. 1589 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award"); *TXO, supra,* at 458, 113 S.Ct. 2711. We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In *Haslip,* in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. 499 U.S., at 23–24, 111 S.Ct. 1032. We cited that 4–to–1 ratio again in *Gore.* 517 U.S., at 581, 116 S.Ct. 1589. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. *Id.,* at 581, and n. 33, 116 S.Ct. 1589. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, *id.,* at 582, 116 S.Ct. 1589, or, in this case, of 145 to 1.

> Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages." *Ibid.;* see also *ibid.* (positing that a higher ratio *might* be necessary where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine"). The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. **The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.**

*State Farm* at 424-25. (emphasis supplied)

The last line of this discussion is the most important, and the one that Courts have generally followed when considering the second guidepost. In *McGinnis v. Am. Home Mortgage Servicing, Inc.,* 901 F.3d 1282, 1290 (11th Cir. 2018), the 11th Circuit addressed the same argument Tesla makes here, as follows:

Homeward relies on dicta in *State Farm* suggesting that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* However, in that same discussion the Supreme Court made clear that its suggested ratios were intended to be "instructive" and that "[t]he precise award in any case ... must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* Further, we have upheld ratios substantially greater than 1:1 in cases with large compensatory damages awards. In *Action Marine*, we upheld a punitive damages award of $17.5 million despite a sizeable $3.2 million compensatory damages award (a ratio of nearly 5.5:1) where the defendant's conduct was "exceedingly reprehensible." 481 F.3d at 1321. Similarly, in *Goldsmith*, we upheld a ratio of 9.2:1 on the basis of particularly reprehensible behavior after the jury awarded $54,321 in compensatory damages. 513 F.3d at 1283. And in *Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir.2003), we upheld a punitive damages award of $2,000,000 where the plaintiff recovered $500,000 in compensatory damages, a ratio of 4:1.

(emphasis supplied).

The 11th Circuit reaffirmed its commitment to this principle in *Kerrivan*:

Here, the punitive damages award was $25.3 million, and the compensatory damages award was $15.8 million, making the ratio of punitive damages to compensatory damages approximately 1.6:1. This ratio is significantly lower than ratios that courts have accepted as satisfying due process. *See, e.g.*, *Bogle v. McClure*, 332 F.3d 1347, 1361-62 (11th Cir. 2003) (noting that punitive to compensatory ratio "in the neighborhood of 4:1" does not violate due process); *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1072 (Fla. Dist. Ct. App. 2010) (concluding that punitive to compensatory ratio of 7.58:1 did not "offend due process"). So, we cannot say that the 1.6:1 ratio established that the punitive damages award was excessive.

…

[E]ven assuming the [ratio was 2:1], the punitive damages award still would not be unreasonable. The Supreme Court has explained that there are "no rigid benchmarks that a punitive damages award may not surpass," but "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *State Farm*, 538 U.S. at 425, 123 S.Ct. 1513; *see Gore*, 517 U.S. at 580-81, 116 S.Ct. 1589 (discussing history of courts awarding double, treble, or quadruple damages). The multipliers here are in the low single digits. We have upheld considerably larger ratios of punitive to compensatory damages. *See McGinnis v. Am. Home Mortg. Servicing, Inc.*, 901 F.3d 1282, 1290 (11th Cir. 2018) (discussing decisions in which we upheld punitive damages awards with ratios of 5.5:1, 9.2:1, and 4:1). For these reasons, the second guidepost also weighs in Kerrivan's favor.

*Kerrivan* at 1210. *See also Cote v. Philip Morris USA, Inc.*, 985 F.3d 840, 849 (11th Cir. 2021) (rejecting Philip Morris's argument that *State Farm* required a 1-to-1 ratio where compensatory damages were $6.25 million and punitive damages were $20.7 million, "approximately a 3.3-to-1 ratio")

Florida law is in accord. *See Schoeff v. R.J. Reynolds Tobacco Co.,* 232 So. 3d 294, 307-08 (Fla. 2017) ($30 million in punitive damages satisfied the second *State Farm* guidepost (as well as the first and third guideposts) because it fell within a 3-to-1 ratio compared to the compensatory damage award of $10.5 million); *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1071-72 (Fla. 1st DCA 2010) (rejecting Reynolds's argument that the "the Supreme Court … adopted a 1 to 1 ratio" in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008)); *R.J. Reynolds Tobacco Co. v. Buonomo*, 138 So. 3d 1049, 1050, 1052 (Fla. 4th DCA 2013) (jury's punitive damage award of $25 million, nearly 4.8 times compensatory damage award of $5,235,000, was not constitutionally excessive); and *R.J. Reynolds Tobacco Co. v. Evers*, 232 So. 3d 457, 461, 465 (Fla. 2d DCA 2017) (punitive damage award of $12,360,024, nearly 4.2 times compensatory damage award of $2,950,000, "was [not] so excessive as to violate due process")

Even the case that Tesla cites, *Williams v. First Advantage LNS Screening Solutions Inc.*, 947 F.3d 735, 762 (11th Cir. 2020) recognized that, "as a practical matter, the elasticity of the guidelines means that each court's decision will be very fact-specific and that it may yield few overarching principles that can be applied to future cases." *See also Action Marine, Inc. v. Cont'l Carbon Inc*., 481 F.3d 1302, 1320 (11th Cir. 2007) (Declining defendant's "invitation to compare its actions with those of other defendants in dissimilar contexts and bas[ing] Court's] conclusion on the facts before [it] in this case alone."); *and Epic Sys. Corp. v. Tata Consultancy Services Ltd*., 980 F.3d 1117, 1145 (7th Cir. 2020) (Cautioning that "[w]hat counts as substantial depends on the facts of the case, and an award of this size (or larger) might not mandate a 1:1 ratio on another set of facts.")

Tesla errs when it argues that this Court should consider any part of the compensatory damage award to be punitive, in part because it consisted of damages for emotional distress.[20] Dkt.

---

[20] In the case Tesla cites for this proposition, *Williams v. First Advantage LNS Screening Sols. Inc,* 947 F.3d 735, 742 (11th Cir. 2020the plaintiff lost two job opportunities and suffered emotional distress as a result of a background check falsely tagging him as a criminal. These damages are hardly analogous to the damages sustained by the Plaintiffs' here.

591 at 54. This would conflict with both 11th Circuit and Florida law. In *McGinnis, supra*, at 1290, the 11th Circuit explained why emotional distress damages should not be treated differently than economic damages or considered to have included a punitive component:

> Homeward argues that we must discount emotional distress damages when conducting the ratio analysis, but our case law has held otherwise. In *Bogle*, we upheld a substantial punitive damages award of $2,000,000 even though the $500,000 in compensatory damages award was based entirely on emotional distress. *Id.* at 1359, 1362. Similarly, in *Goldsmith*, we made no distinction between economic and emotional distress damages when upholding a punitive damages award of $500,000 based on a $54,321 award, half of which consisted of damages for emotional distress. 513 F.3d at 1275, 1283. Further, Homeward's assertion that the damages for emotional distress contained a punitive element in this case is unfounded because the trial court instructed the jury to base its compensatory damages award only on its determination of the appropriate amount to compensate McGinnis for her injury.

The jury here was properly instructed on this point. Dkt. 536 at 9-11.

Asking a jury to send a message or punish a defendant with a compensatory award entitles them to a new trial. In *Intramed, Inc. v. Guider,* 93 So. 3d 503, 507 (Fla. 4th DCA 2012), the Fourth District reversed a plaintiff's verdict because "[t]he closing argument shifted the focus of the case from compensating the plaintiff to punishing the defendant."  The Court continued, "[t]he purpose of damages here was to compensate, not to make the defendant care, 'take responsibility,' or say it was sorry." It concluded that "[c]ounsel's arguments improperly suggested that the defendant should be punished for contesting damages at trial and that its defense of the claim in court was improper." *State Farm* itself highlights this distinction, stating that "[c]ompensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct,'" but "punitive damages serve a broader function; they are aimed at deterrence and retribution." *State Farm* at 416. (internal citation omitted). In light of this, how then can a Court hold that a compensatory award contains a punitive component?

Clearly, the 1.4 to 1 ratio here is permissible under both state and federal law. The Court should find the disparity between the actual harm suffered by the Plaintiff sand the punitive damages award satisfies due process considerations.  And even if the Court uses the reduced compensatory award to calculate the ratio, (which would require reduction of the punitive award to $127,710,000) the resulting ratio of 3 to 1 is still constitutionally permissible.

### c.  **Comparable punitive damage awards justify the jury's award.**

Tesla neglects to inform the Court that in cases, such as this one, that involve only common-law tort claims, Courts have generally deemed the third guidepost as "unhelpful." *See, e.g., Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A.*, Inc., 801 F.3d 347, 363 (3d Cir. 2015) ("The District Court did not, and we will not, address the third consideration, as it would be unhelpful because there are not comparable cases with civil penalties for negligent misrepresentation"); *CGB Occupational Therapy, Inc. v. RHA Health Services, Inc.,* 499 F.3d 184, 188 (3d Cir. 2007) (agreeing with district court that third guidepost not instructive in case where $30 million in punitive damages awarded on tortious interference claim); *Inter Med. Supplies, Ltd. v. EBI Med. Sys.*, Inc., 181 F.3d 446, 468 (3d Cir.1999) (third guidepost "unhelpful" in case involving tortious interference and related common law tort claims); *see also Cont'l Trend Res., Inc. v. OXY USA Inc.*, 101 F.3d 634, 641 (10th Cir. 1996) ("OXY's misconduct involved a violation of common law tort duties that do not lend themselves to a comparison with statutory penalties.")

These Courts have either ignored the third guidepost or made comparison to similar punitive awards. *See generally* Colleen P. Murphy, *Comparison to Criminal Sanctions in the Constitutional Review of Punitive Damages,* 41 San Diego L.Rev. 1443, 1447 n. 26 (2004) ("Several lower courts since *Gore* have interpreted the third guidepost to require comparison to other punitive awards."); Laura J. Hines & N. William Hines, *Constitutional Constraints on Punitive Damages: Clarity, Consistency, and the Outlier Dilemma,* 66 Hastings L.J. 1257, 131012 (2015) (studying hundreds of cases from state and federal courts applying *Gore* and finding that in 14% of cases, courts have compared the punitive damage award to those in other cases and describing a trend toward such an approach).  Like the Plaintiffs in *Cont'l Trend Res., Inc.*, we have included a spreadsheet documenting products liability cases involving very large punitive awards. *Cont'l Trend Res., Inc.*, at 641. (Ex.1)  Per *Cont'l Trend Res., Inc.,* these cases "provided sufficient notice to [Tesla] of the potential for large punitive awards." *Id.*

Contrary to Tesla's final argument, Courts, like *Cont'l Trend Res., Inc.* have held that the wealth of the defendant remains a relevant consideration, "because $50,000 may be awesome punishment for an impecunious individual defendant but wholly insufficient to influence the behavior of a prosperous corporation." *Id.* at 641.  Tesla's current market capitalization of 1.46 trillion dollars makes it the tenth largest company in the world. https://companiesmarketcap.com/tesla/marketcap.

**D.  THE COURT SHOULD NOT DISTURB THE COMPENSATORY DAMAGE AWARDS.**

As starting point, we remind the Court that Tesla chose not to contest the Plaintiffs in this case. Tesla did not cross examine Plaintiffs' defense experts or the Plaintiffs themselves.[21] Tesla did not mention the Benavides' family's loss or Angulo's injuries during closing argument, let alone offer an alternative number for their damages. As to the damages case, the jury was presented with the functional equivalent of a damages trial against a defeated defendant. As a result, "[i]t is difficult for a party to challenge an award as excessive after the fact when that party declined to offer any guidance to the jury at trial." *Odom v. R.J. Reynolds Tobacco Co.*, 254 So. 3d 268, 280 (Fla. 2018).

Nevertheless, Tesla now seeks to override the jury's discretion.  Specifically, Tesla - certain that it is more capable than the jury of valuing Dillon Angulo's and Lilia Leon's pain and suffering - asks that Angulo's compensatory award be cut to one fifth of what the jury awarded and Leon's award reduced by 15 percent.  But Tesla has fallen well short of showing that the jury's discretion should be disregarded.

Indeed, Defendant' motion is notably silent regarding the enormous burden it must overcome if this Court is to ignore the discretion of the jury and alter the amount of the damages returned for Mrs. Garcia's and Manuel Jr's pain and suffering as a result of the loss of Mr. Garcia. Florida law is unequivocal that judges should rarely vacate the amount that a jury awards for non-economic damages.

As the Florida Supreme Court emphasized in one of the controlling decisions on this issue, "The trial judge does not sit as a seventh juror with veto power ...   not every verdict which raises a judicial eyebrow should shock the judicial conscience." *Laskey v. Smith,* 239 So. 2d 13, 14 (Fla. 1970).  This is because judges are in no better a position than juries to weigh the facts and value a life:

> Jurors know the nature of pain, embarrassment and inconvenience, and they also know the nature of money. Their problem of equating the two to afford reasonable and just compensation calls for a high order of human judgment, and the law has provided no better yardstick for their guidance than their enlightened conscience. Their problem is not one of mathematical calculation but involves an exercise of their sound judgment of what is fair and right.

---

[21] Other than to improperly highlight Angulo's assets resulting from the McGee settlement, in violation of this Court's order in limine.  Dkt. 582 at 36-37, and Dkt. 433 at 13.

EATON & WOLK

*Angrand v. Key,* 657 So. 2d 1146, 1149 (Fla. 1995) (citation omitted).

The broad discretion juries enjoy is particularly true for non-economic damages. As the Florida Supreme Court explained, pain and suffering damages are "even further removed from exact calculation and certain measurement." *Braddock v. Seaboard Air Line Railroad Co.,* 80 So. 2d 662, 668 (Fla. 1955). However, "such further uncertainty does not change the problem from one of judgment to one of calculation. It still rests within the enlightened conscience of the jury." *Id.*

Non-economic damages can be set aside only if "the jury's award is so extravagant that it shocks the judicial conscience, or is manifestly unsupported by the evidence or indicates the jury was influenced by passion, prejudice or other matters outside the record." *Citrus County v. McQuillin,* 840 So. 2d 343, 347 (Fla. 5th DCA 2003); *see also Lassiter v. Int'/ Union of Operating Eng'rs,* 349 So. 2d 622, 626-27 (Fla. 1976). Otherwise, "it must be presumed that the jury correctly followed the court's instructions, applied the law and considered all the elements of damage." *Nordin v. Gregory,* 566 So. 2d 60, 61-62 (Fla. 5th DCA 1990).

A large damage verdict by itself does not indicate excessiveness. *McQuillin,* 840 So. 2d at 347; *Zambrano v. Devanesan,* 484 So. 2d 603,607 (Fla. 4th DCA 1986). *See also Kerrivan v. R.J. Reynolds Tobacco Company*, 953 F.3d 1196, 1206-07 (2020) ("The fact that a damage award is large does not in itself render it excessive nor does it indicate that the jury was motivated by improper consideration in arriving at the award.") As the Florida Supreme Court observed in *Bould v. Touchette,* 349 So. 2d 1181, 1184-85 (Fla. 1977):

> [T]ort cases damages are to be measured by the jury's discretion. The court should never declare a verdict excessive merely because it is above the amount which the court itself considers the jury should have allowed. The verdict should not be disturbed unless it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.

For this reason, more than ordinary discretion is permitted for juries assessing non-economic damages. *Id.* at 1185.

Against that jurisprudential backdrop, the Florida Legislature has explicitly recognized "that the reasonable actions of a jury are a fundamental precept of American jurisprudence" and "such actions should be disturbed or modified with caution and discretion." §768.74(6), Fla. Stat.

(2016).  For that reason, the Legislature created section 768.74, directing that a remittitur inquiry be decided "in light of the facts and circumstances which were presented to the trier of fact."

§768.74(5), Fla. Stat.  Specifically, courts must examine whether the award "bears a reasonable relation to the amount of damages proved and the injury suffered" and whether it "is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons." §768.74(5)(d) & (e), Fla. Stat.

Here, the jury heard, in detail and without challenge, about the Plaintiffs' losses. When Lilia Leon lost Naibel, she lost her "best friend," her "reason for being." Dkt 582 at 45; Dkt. 581 at 99.  Naima Benavides described Lilia and Naibel as "inseparable." Dkt 582 at 45.  Lilia had to move from their home in Miami to New Jersey because she "couldn't even be in the same house knowing that [Naibel] was not going to come through the door" again. Dkt 582 at 45 Naima explained that Naibel's loss has simply been "too much" for Lilia, and how Lilia is always hoping to wake up to find that this was all just a nightmare. Dkt 582 at 53. Plaintiffs' counsel  asked the jury to award 30 million for her damages, one million per year. Dkt. 585 at 61-62. The jury awarded 36 million, an average of 1.16 million per year.

The jury heard extensive testimony about Angulo's life altering injuries.  When first responders arrived at the scene, they found Angulo lying on the ground completely unresponsive with agonal respirations. Dkt. 575 at 23:5-16; 24:15-22. An initial assessment by these first responders noted that Angulo had apparent internal bleeding, his pelvis was "shattered", and his jaw was visibly broken. Dkt. 575 at 23:21-24:9. Angulo was airlifted from the scene by helicopter to Jackson South where on arrival he was noted by the attending trauma surgeon to be in "life threatening condition." Dkt. 575 at 29:12-16; Dkt. 579 at 209:2-14. At Jackson South, in addition to the extensive and unstable fractures throughout the pelvis and jaw, Angulo was found to have suffered, among other injuries: (1) two different types of traumatic brain bleeding – intraparenchymal hemorrhaging and a subarachnoid hemorrhage; (2) an occipital condyle facture (the condyle attaches the skull to the spinal column); (3) numerous lumbar transverse process fractures; (4) a large scrotal laceration resulting in an exposed testicle; and (5) a ruptured bladder. Dkt. 579 at 196:2-5; 198:6; 202:7-20; 204: 21-205:1; and 205:22-206:14. During a near month-long hospitalization, among other treatment, Angulo required blood transfusions and substantial operations to stabilize his pelvis and reconstruct his jaw. Dkt. 579 at 197:25-198:8; 203:8-16; 207:4-208:6.

Today, after years of continuing medical treatment and care, Angulo lives with the permanent effects of his injuries. As a result of his traumatic brain injuries, he has lasting deficits in executive function, attention, and working memory, with slowed processing, emotional instability, and word-finding difficulty. Dkt. 580 at 44:6–49:17. He also suffers body-cycle dysfunction with headaches, light sensitivity, and insomnia. Dkt. 580 at 40:10–41:25. He is at long-term fall risk resulting from a permanent vestibular injury documented on balance testing. Dkt. 580 at 41:4–43:25. He suffers from urinary, bowel, and sexual dysfunction caused by combined pelvic-nerve and brain trauma. Dkt. 580 at 40:21–41:10. The pelvic reconstruction that stabilized his fractures left a structural deformity and a measurable leg-length discrepancy, which has resulted in an abnormal gait and chronic strain through his hips and lower back. Dkt. 579 at 183:19-184:10. He endures centralized chronic pain—his nervous system now over-amplifies pain long after tissue healing—and is getting ready for a spinal-cord-stimulator placement because conservative treatment has failed. Dkt. 579 at 182:16 – 83:18.  He also carries a formal diagnosis of post-traumatic stress disorder, which amplifies and compounds both his chronic pain and the cognitive and emotional effects of his brain injury. Dkt. 579 at 185:10-24; Dkt. 581 at 66:9-20, 68:72-17. Physiatrist Dr. Lichtblau testified these injuries have placed Dillon's body on a "fast-forward aging process," meaning his pain, fatigue, and cognitive decline will worsen over time. Dkt. 581 at 30:15–31:23. Neurologist Dr. Nedd described Angulo as one of the "walking wounded," someone who appears outwardly intact but lives with constant neurological and emotional impairment. Dkt. 580 at 54:15-56:15.

Plaintiffs' counsel  asked the jury to award 54 million for her damages, $10 million for the past six years of his life, (an average of 1.6 million annually) and one million per year for his remaining 44 year life expectancy.  Dkt. 585 at 67 The jury awarded 15 million for past damages (an average of 2.5 million annually) and 55 million for future damages (1.25 million annually).

Put simply, the evidence provided "a logical and sufficient basis for the jury to have reached its conclusion." *Marlo v. K-Mart Corp.,* 756 So. 2d 213,214 (Fla. 3d DCA 2000).  Because the jury's award is based "on substantial and competent evidence," this Court should deny the motion for remittitur and new trial. *See McQuillin,* 840 So. 2d at 347-348.

Tesla argues that engage in a "comparison with awards involving comparable injuries" in order to determine whether the awards here were excessive under the facts of this case. But as the 11th Circuit explained in *Kerrivan* in response to a similar request from its defendant:

> Florida courts have warned against the relative weighing of injuries. *See Loftin*, 67 So. 2d at 189 ("[E]ach case is different and must of necessity be measured in the light of the circumstances peculiar to it."). Juries are not required to exercise their judgment consistent with other juries in other cases. The evidence presented in this case supports the compensatory damages award. That other juries in other cases with different evidence of injury chose to award lower amounts does not justify overturning the award in this case. *See Odom*, 254 So. 3d at 277 ("Jurors know the nature of pain, embarrassment and inconvenience, and they also know the nature of money. Their problem of equating the two to afford reasonable and just compensation calls for a high order of human judgment .... Their problem is not one of mathematical calculation but involves an exercise of their sound judgment of what is fair and right." (quoting *Braddock v. Seaboard Air Line R.R. Co.*, 80 So.2d 662, 668 (Fla. 1955))).

*Kerrivan* at 1207-08. *Odom* also instructs us that "while verdicts in other similar cases may be instructive, those cases are not dispositive in determining whether a specific verdict is excessive." *Odom* at 281.

Tesla doesn't offer any comparison cases for Lilia's damages. It simply argues that 1.16 million per year for Lilia's loss is excessive, while 1 million per year is apparently not. This argument strains credulity. As noted by the court in *Gen. Motors Corp. v. McGee*, 837 So. 2d 1010, 1039 (Fla. 4th DCA 2002), *as modified on clarification* (Mar. 5, 2003), in affirming a 30 million dollar award to the plaintiff parents for the loss of their son, "[t]hose who have not brought a child into the world and loved it and planned for it, and then have it suddenly snatched away from them and killed, can hardly have an adequate idea of the mental pain and anguish that one undergoes from such a tragedy," quoting *Winner v. Sharp*, 43 So.2d 634, 637 (Fla.1950).[22] *See also Citrus County v. McQuillin*, 840 So.2d 343, 348 (Fla. 5th DCA 2003). ("Who can place a dollar value on a human life, measured by the loss and grief of a loved one? That difficult decision is generally

---

[22]  In addition to *McGee*, we were able to locate two similarly large verdicts involving the death of a child in a car accident. In *Criales, supra, v. The Georgetown Partnership, LLC*, 2022 WL 3704670 (Verdict Form); 2022 WL 4364353 (Florida Circuit Court, Eleventh Judicial Circuit, Miami-Dade County, Case No. 13-2017-CA-006062.) A 23-year-old woman driving a sedan was killed and her 21-year-old brother was permanently injured in a 2015 drunk-driving crash on I-95 in Miami-Dade. The jury awarded the parents of the victims $95-million-dollars, which included $58,527,108 for the medical care of the son and $37 million in wrongful death damages to the parents for loss of their daughter.  In *Stone v. Marcone*, 2009 WL 5874076 (Circuit Court, Hernando County, Florida, 2009, Case No. 08-0061), the jury awarded $55 million in compensatory damages and $275.4 million in punitive damages for a car accident that resulted in the death of a 13-year-old girl.

one for the jury or fact finder, not the appellate court.") *Id.* at 348. It is likely a result of this reasoning that Tesla did not cite to any Florida cases where a damage award to a surviving parent for the wrongful death of their child was successfully challenged as excessive.

Tesla does point to verdicts from other cases in challenging Angulo's damage award. While we acknowledge that the award is large, it is not unprecedented. In *Robinson v. Ford Motor Co*., 2013 WL 4041425 (Florida Circuit Court, Thirteenth Judicial Circuit, Hillsborough County, Case No. 05-CA-1729.), the jury awarded $53 million verdict for mother who suffered serious a brain injury due to a defective seatbelt. In *Criales, supra,* the jury awarded $58 million to the badly injured 21 year old. In a 24 year old case, *Ritter v. Stanton*, 745 N.E.2d 828, 850, 854 (Ind. Ct. App. 2001), the Court affirmed an award of $55 million for a plaintiff who suffered an "'open book' pelvic fracture with vertical shearing, hemorrhagic shock, fractured ribs, hemopneumothorax (blood in his chest), internal bleeding from the pelvic fracture, … a lung contusion, … a large scrotal hematoma, swelling of the testicles, swelling of the penis with infection, …necrosis secondary to demodialysis, … a foot drop and a fungal infection in the area of the injury, … fluid on the lungs, which caused respiratory distress syndrome and required treatment with a ventilator… [and] several other complications," including "one of his legs being several inches shorter than the other."

In *Morga v. FedEx Ground Package Sys., Inc.,* 2022-NMSC-013, ¶ 8, 512 P.3d 774, 780, a case involving a horrifically similar car accident, a jury awarded "damages totaling $61,000,000 for the wrongful death of Ylairam Morga, $32,000,000 for the wrongful death of Marialy Morga, $32,000,000 for the personal injury to Yahir Morga, $40,125,000 for the personal injury to Alfredo Morga." With respect to the personal injury cases:

> The evidence showed that Alfredo's epilepsy, which had previously been controlled with medication, was exacerbated and that since the accident he has suffered from PTSD and major depressive disorder and would require psychiatric care. Alfredo testified that after the accident, he could not work for a period of three months and when he did return to work, the effects of the accident interfered with his ability to do his job properly such that he had to leave his job and find another occupation. The evidence presented also showed that Yahir suffered damage to his lungs, a head injury, a lacerated liver, multiple abrasions and contusions, and a broken leg, all requiring future medical treatment.

*Morga* at 787. In *Wang v. Sexton*, 2017 WL 5153044, N.Y. Sup. Case No. 0155406/2013, the jury awarded $71 million in compensatory damages to 19-year-old involved in a head-on collision

with another vehicle that caused paraparesis, permanent loss of feeling in her feet, depression and psychological trauma. According to media sources, the plaintiff suffered a fractured lumbar spine, spinal cord injury with neurogenic bowel, requires leg braces to walk, cannot complete her courses at Cornell and will be wheelchair bound in the future.  In *Darden v. City of Chicago*, 2017 WL 4921787, Ill. Cir. Ct. Case No. 2015-L-008311, the jury awarded $148 million verdict to a 24-year-old female student who suffered a severed spinal cord and fractures at T11-T12 resulting in permanent paraplegia of her lower extremities, neurogenic bladder and bowel, chronic pain, depression and emotional distress.

In *Kerrivan*, the 11th Circuit determined after  "A review of compensatory damages awards in other *Engle* progeny cases [] that the verdict in this case should not be disturbed because it is not outside the maximum limit of a reasonable range' for such cases."  *Kerrivan* at 1206. This Court should reach the same conclusion here regarding Angulo's award.

Tesla's final argument is that Angulo's and Leon's awards should be reduced because they exceeded the amount that Plaintiffs requested.  Again, Tesla didn't contest damages in this case. Further, Plaintiffs counsel added a caveat to his damage suggestions for both Plaintiffs, telling the jury that they might think his request was too little, and to use award what they believe is "just and true." Dkt. 585 at 62, 67.   These facts are directly analogous to those in *Kerrivan* where the 11th Circuit rejected this same argument:

> Consistent with the notion that a jury can "award damages equal to or in excess of those requested by counsel," *Lopez*, 406 So. 2d at 1256, Kerrivan's counsel gave the jury a $10 million benchmark while reminding them that they could go higher or lower than that amount. *See* Doc. 106 at 60-61. By contrast, the Tobacco Companies' counsel offered no alternative amount or range, and "[i]t is difficult for a party to challenge an award as excessive after the fact when that party declined to offer any guidance to the jury at trial." *Odom*, 254 So. 3d at 280. That the jury chose, in its discretion, to exceed the benchmark offered does not justify remittitur of the compensatory damages award or compel a new trial.

*Kerrivan* at 1207.

Finally, there was no evidence that the jury's damage awards were the product of passion, prejudice or other improper considerations.  To the contrary, the verdict in this case clearly demonstrates that the jury adhered to the instruction that they were not to "be influenced in any way by either sympathy for or prejudice against anyone." Dkt. 536 at 1.  Plaintiff's counsel had requested $236 million dollars in punitive damages, and suggested that Mr. McGee's fault be

assessed at between 20 and 50 fifty percent or less.  Dkt. 585 at 59. The jury rejected those requests.

In *Philip Morris USA, Inc. v. Cuculino*, 165 So. 3d 36 (Fla. 3d DCA 2015), the Third District held that a $12.5 million dollar verdict awarded to a Plaintiff whose attorney had requested only $10 million dollars was not the product of emotion, based on other indicators in the verdict:

> Contrary to Philip Morris's assertion, the verdict reflects that the jury was not inflamed or highly prejudiced by the improper comments because the jury did not completely find in favor of Mr. Cuculino. First, the jury entered a verdict fully exonerating defendant R.J. Reynolds. Second, the jury found in favor of Philip Morris on Mr. Cuculino's intentional tort claims, thereby precluding the jury from reaching the issue of punitive damages, which is often substantially more than compensatory damages in *Engle*-progeny cases. Finally, the jury found that Mr. Cuculino was 60% at fault, thereby substantially reducing the $12.5 million verdict to an award of only $5 million.

*Cuculino* at 39.

In *R.J. Reynolds Tobacco Co. v. Schleider*, 273 So. 3d 63 (Fla. 3d DCA 2018), the Third District pointed to a number of similar factors in the jury's verdict to conclude that admittedly improper comments did not improperly influence the jury's verdict:

> The jury … found in favor of R.J. Reynolds on the question of punitive damages and concealment; *awarded less than the compensatory amount requested for the daughter; and attributed a higher percentage of comparative negligence to Mr. Schleider than what Plaintiffs' counsel argued for in closing*. These actions by the jury strongly indicate the jury was not inflamed, prejudiced, or improperly mislead by closing arguments.

*Schleider* at 70–71. (emphasis supplied).  In the instant case, while jury found for the Plaintiffs on more claims than the *Cuculino* or *Schleider* juries, it nevertheless awarded less than the requested punitive damage amount and assigned almost double the average of the range of Mr. McGee's fault suggested by Plaintiff's counsel.  These factors demonstrate that the verdict was not the product of passion, prejudice or other improper considerations, and this Court should affirm it in all respects.

## IV.   CONCLUSION

For the reasons set forth above, this Court should deny Tesla's Motion for Judgment as Matter of Law or, Alternatively, Motion for New Trial or to Amend the Judgment in its entirety.

Date: **October 20, 2025**                    Respectfully submitted,


By: */s/  Douglas F. Eaton*
        DOUGLAS F. EATON
        FBN: 129577
        **EATON & WOLK, PL**
        *Co-counsel for Plaintiff*
        2665 S. Bayshore Drive, Suite 609
        Miami, Florida 33133
        Telephone: 305-249-1640
        Email: deaton@eatonwolk.com
               cgarcia@eatonwolk.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this **20th** day of **October 2025**, I electronically filed the

foregoing document with the Clerk of Court using CM/ECF.


By:  */s/  Douglas F. Eaton*
     DOUGLAS F. EATON
     FBN: 129577
     **EATON & WOLK, PL**
     *Co-counsel for Plaintiff*
     2665 S. Bayshore Drive, Suite 609
     Miami, Florida 33133
     Telephone: 305-249-1640
     Email: deaton@eatonwolk.com
            cgarcia@eatonwolk.com