## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| NEIMA BENAVIDES, as Personal Representative of the Estate of Naibel Benavides Leon, deceased, | Case No. 21-cv-21940-BLOOM/Torres |
| Plaintiff, | |
| v. | |
| TESLA, INC., a/k/a/ Tesla Florida, Inc., | |
| Defendant. | |
| DILLON ANGULO, | Case No. 22-22607-BB |
| Plaintiff, | |
| v. | |
| TESLA, INC., a/k/a/ Tesla Florida, Inc., | **IN-PERSON HEARING REQUESTED** |
| Defendant. | |

### DEFENDANT TESLA, INC.'S REPLY IN SUPPORT OF AMENDED RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR A NEW TRIAL OR TO AMEND THE JUDGMENT

Wendy F. Lumish
Florida Bar No. 334332
BOWMAN AND BROOKE LLP
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134

Theodore J. Boutrous, Jr. (*admitted pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071

Paul D. Clement (*admitted pro hac vice*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314

*Attorneys for Defendant TESLA, Inc.*
(*Additional Attorneys in Signature Block*)

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1

I.   The Court Should Order a New Trial on All Issues Because Highly Inflammatory
     Data-Related Evidence Tainted the Entire Trial. ............................................................ 2

II.  The Court Should Grant Judgment as a Matter of Law on Punitive Damages or at
     Least Significantly Reduce Punitive Damages. ............................................................. 6

     A.   Florida Law Forecloses Any Award of Punitive Damages in This Case. .............. 6

          1.   Tesla's Compliance with Industry Standards Forecloses Any Award
               of Punitive Damages on These Facts. ......................................................... 7

          2.   *Banner* Forecloses Any Award of Punitive Damages on These Facts. ...... 9

          3.   The Evidence Was Insufficient as a Matter of Law to Support Any
               Award of Punitive Damages. ..................................................................... 11

     B.   Plaintiffs' Attempt at Inflating the Statutory Cap Based on Unawarded
          Damages Flouts Statutory Text, Precedent, and the Constitution. ....................... 12

     C.   The Punitive-Damages Award Violates Due Process by Dwarfing the
          Substantial Compensatory Damages ..................................................................... 15

          1.   Tesla's Conduct Was Not Reprehensible. ................................................. 15

          2.   The Disparity Between Punitive and Compensatory Damages Is
               Substantial ................................................................................................. 16

          3.   The Punitive-Damages Award Dwarfs Comparable Civil Penalties. ....... 17

III. The Court Should Grant Tesla Judgment as a Matter of Law (or at Least a New
     Trial) on Liability ......................................................................................................... 18

     A.   Plaintiffs Fail to Rehabilitate Their Experts' Speculative Testimony. ................. 19

     B.   Plaintiffs Failed to Prove Their Design-Defect Theories. ................................... 19

          1.   McGee's State-of-the-Art Tesla Was Not Defective. ............................... 19

          2.   McGee's Reckless Driving Was the Sole Cause of the Collision. ........... 21

     C.   Plaintiffs Did Not Prove Their Failure-to-Warn Claim. ...................................... 23

          1.   Tesla Had No Duty to Warn of the Obvious Danger of Reckless
               Driving. ..................................................................................................... 23

      2.     Tesla Repeatedly Warned Against Misusing Autopilot............................ 23

      3.     McGee's Recklessness—Not Tesla's Warnings—Caused the Crash....... 24

IV.    Other Highly Prejudicial Evidentiary Errors Call for a New Trial on All Issues. ............ 25

    A.    Plaintiffs Prejudiced Tesla Through Elon Musk's Inadmissible Statements........ 25

    B.    Plaintiffs Fail to Justify the Improper Admission of Dissimilar Accidents.......... 27

V.    The Compensatory Damages Awarded Were Also Grossly Excessive............................ 29

CONCLUSION............................................................................................................ 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*,
    37 F.3d 1460 (11th Cir. 1994) ...........................................................................................5

*Alderman v. Wysong & Miles Co.*,
    486 So. 2d 673 (Fla. Dist. Ct. App. 1986) ......................................................................19

*Allstate Life Ins. Co. v. Miller*,
    424 F.3d 1113 (11th Cir. 2005) ...................................................................................6, 14

*Am. Cyanamid Co. v. Roy*,
    498 So. 2d 859 (Fla. 1986).................................................................................................9

*Arevalo v. Havana Harry's II Inc.*,
    2024 WL 3363273 (S.D. Fla. Apr. 15, 2024) ....................................................................2

*Aubin v. Union Carbide Corp.*,
    177 So. 3d 489 (Fla. 2015)...............................................................................................25

*BMW of N. Am. v. Gore*,
    517 U.S. 559 (1996)...........................................................................................8, 18, 29

*Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*,
    801 F.3d 347 (3d Cir. 2015)............................................................................................18

*Bravo v. United States*,
    532 F.3d 1154 (11th Cir. 2008) ..................................................................................29, 30

*Chrysler Corp. v. Wolmer*,
    499 So. 2d 823 (Fla. 1986)........................................................................................7, 8, 12

*Clark v. Chrysler Corp.*,
    436 F.3d 594 (6th Cir. 2006) ......................................................................................14, 16

*Coates v. R.J. Reynolds Tobacco Co.*,
    375 So. 3d 168 (Fla. 2023)...............................................................................................13

*Drabik v. Stanley-Bostitch, Inc.*,
    997 F.2d 496 (8th Cir. 1993) ..............................................................................................8

*DZE Corp. v. Vickers*,
    299 So. 3d 538 (Fla. Dist. Ct. App. 2020) ..................................................................21, 22

*Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*,
    980 F.3d 1117 (7th Cir. 2020) .........................................................................................16

*Erie R.R. Co. v. Tompkins*,
    304 U.S. 64 (1938) ................................................................................................6

*Ernie Haire Ford, Inc. v. Ford Motor Co.*,
    260 F.3d 1285 (11th Cir. 2001) .........................................................................13

*Evers v. R.J. Reynolds Tobacco Co.*,
    195 So. 3d 1139 (Fla. Dist. Ct. App. 2015) ......................................................23

*Felix v. Hoffmann-LaRoche, Inc.*,
    540 So. 2d 102 (Fla. 1989) .................................................................................24

*Fla. Power & Light Co. v. Goldberg*,
    856 So. 2d 1011 (Fla. Dist. Ct. App. 2002) ................................................29, 30

*Gen. Motors Corp. v. McGee*,
    837 So. 2d 1010 (Fla. Dist. Ct. App. 2002) ........................................................4

*Glabman v. De La Cruz*,
    954 So. 2d 60 (Fla. Dist. Ct. App. 2007) ..........................................................30

*Grieco v. Daiho Sangyo, Inc.*,
    344 So. 3d 11 (Fla. Dist. Ct. App. 2022) .....................................................22, 23

*Guinn v. AstraZeneca Pharms. LP*,
    602 F.3d 1245 (11th Cir. 2010) .........................................................................22

*Hardee v. State*,
    534 So. 2d 706 (Fla. 1988) ...........................................................................10, 11

*State ex rel. Helseth v. Du Bose*,
    128 So. 4 (Fla. 1930) ....................................................................................13, 14

*Henderson v. Ford Motor Co.*,
    72 F.4th 1237 (11th Cir. 2023) ..........................................................................28

*Jaurequi v. Carter Mfg. Co.*,
    173 F.3d 1076 (8th Cir. 1999) .....................................................................19, 20

*Jeep Corp. v. Walker*,
    528 So. 2d 1203 (Fla. Dist. Ct. App. 1988) ........................................................7

*Johansen v. Combustion Eng'g, Inc.*,
    170 F.3d 1320 (11th Cir. 1999) .........................................................................15

*Johns-Manville Sales Corp. v. Janssens*,
    463 So. 2d 242 (Fla. Dist. Ct. App. 1984) ..........................................................8

*Johnson v. FFE Transp. Servs., Inc.*,
    227 F. App'x 780 (11th Cir. 2007) ...................................................................23

*Joler v. Scott Paper Co.*,
    65 F.3d 160, 1995 WL 520723 (1st Cir. 1995).......................................................3

*Kerrivan v. R.J. Reynolds Tobacco Co.*,
    953 F.3d 1196 (11th Cir. 2020) ...................................................................14, 15, 16

*Kilpatrick v. Breg, Inc.*,
    613 F.3d 1329 (11th Cir. 2010) ...................................................................19

*Lassitter v. Int'l Union of Operating Eng'rs*,
    349 So. 2d 622 (Fla. 1976)...........................................................................30

*Leoncio v. Louisville Ladder, Inc.*,
    2014 WL 11429056 (S.D. Fla. Apr. 8, 2014) ...........................................25

*Lopez v. S. Coatings, Inc.*,
    580 So. 2d 864 (Fla. Dist. Ct. App. 1991) ...............................................25

*McGinnis v. Am. Home Mortg. Servicing, Inc.*,
    901 F.3d 1282 (11th Cir. 2018) ...............................................................17

*McGriff v. Minn. Mut. Life Ins. Co.*,
    127 F.3d 1410 (11th Cir. 1997) ...............................................................19

*Minneapolis, St. P. & S. S. M. Ry. Co. v. Moquin*,
    283 U.S. 520 (1931)...................................................................................12

*Morgan v. N.Y. Life Ins. Co.*,
    559 F.3d 425 (6th Cir. 2009) ...................................................................16

*Owens-Corning Fiberglas Corp. v. Ballard*,
    749 So. 2d 483 (Fla. 1999).........................................................................4

*Philip Morris USA, Inc., v. Naugle*,
    103 So. 3d 944 (Fla. Dist. Ct. App. 2012) ...............................................14

*Philip Morris USA v. Williams*,
    549 U.S. 346 (2007)...........................................................................14, 16

*Proctor v. Fluor Enters., Inc.*,
    494 F.3d 1337 (11th Cir. 2007) ...............................................................29

*R.J. Reynolds Tobacco Co. v. Martin*,
    53 So. 3d 1060 (Fla. Dist. Ct. App. 2011) ...............................................14

*R.J. Reynolds Tobacco Co. v. Townsend*,
  118 So. 3d 844 (Fla. Dist. Ct. App. 2013) ..............................................................14

*R.J. Reynolds Tobacco Co. v. Townsend*,
  90 So. 3d 307 (Fla. Dist. Ct. App. 2012) ................................................................13

*Royal v. Black & Decker Mfg. Co.*,
  205 So. 2d 307 (Fla. Dist. Ct. App. 1967) ........................................................19, 20

*S. Union Co. v. Sw. Gas Corp.*,
  281 F. Supp. 2d 1117 (D. Ariz. 2003) .....................................................................4

*Sorrels v. NCL (Bahamas) Ltd.*,
  796 F.3d 1275 (11th Cir. 2015) ..............................................................................28

*Standard Havens Prods., Inc. v. Benitez*,
  648 So. 2d 1192 (Fla. 1994)....................................................................................22

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003)..........................................................4, 15, 16, 17, 18, 27

*State Farm Mut. Auto. Ins. Co. v. Duckworth*,
  648 F.3d 1216 (11th Cir. 2011) ..........................................................6, 9, 10, 11

*State v. Giorgetti*,
  868 So. 2d 512 (Fla. 2004)......................................................................................14

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*,
  370 U.S. 19 (1962)..................................................................................................18

*Tesla, Inc. v. Banner*,
  411 So. 3d 1 (Fla. Dist. Ct. App. 2025) ......................................1, 6, 7, 10, 20, 24

*United States v. McGregor*,
  960 F.3d 1319 (11th Cir. 2020) ..............................................................................28

*Valladares v. Bank of Am. Corp.*,
  197 So. 3d 1 (Fla. 2016)............................................................................................7

*Voynar v. Butler Mfg. Co.*,
  463 So. 2d 409 (Fla. Dist. Ct. App. 1985) ..............................................................21

*Walsh v. McCain Foods, Ltd.*,
  81 F.3d 722 (7th Cir. 1996) ....................................................................................28

*Weisgram v. Marley*,
  528 U.S. 440 (2000)................................................................................................19

*White Constr. Co. v. Dupont*,
    455 So. 2d 1026 (Fla. 1984) ................................................................................7

*Williams v. First Advantage LNS Screening Inc.*,
    947 F.3d 735 (11th Cir. 2020) ...........................................................................17

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*,
    746 F.3d 1008 (11th Cir. 2014) .........................................................................13

**Statutes**

49 U.S.C. § 30165(a) .................................................................................................17

Fla. Laws 1986, c. 86-160, § 60 ...............................................................................13

Fla. Laws 1988, c. 88-277, § 43 ...............................................................................13

Fla. Laws 1999, c. 99-225, § 27 ...............................................................................13

Fla. Laws 2006, c. 2006-6, § 1 .................................................................................13

Fla. Laws 2011, c. 2011-215, § 1 .............................................................................13

Fla. Stat. § 768.72(2) .........................................................................................7, 8, 11

Fla. Stat. § 768.73(1) .....................................................................................12, 13, 14

Fla. Stat. § 768.74(3) .................................................................................................29

Fla. Stat. § 768.81 .....................................................................................................13

Fla. Stat. § 768.1257 .................................................................................................19

**Rules**

Fed. R. Civ. P. 36 ..............................................................................................27, 28

Fed. R. Civ. P. 50(a) ..................................................................................................11

Fed. R. Civ. P. 50(b) ..................................................................................................30

Fed. R. Civ. P. 59 ......................................................................................................30

**INTRODUCTION**

The shocking $243 million judgment here resulted from prejudicial errors so pervasive that Plaintiffs' counsel boasted that if he "had asked that jury in Florida for a billion dollars, they would have given it to me." Ex. A (Declaration of Julian W. Poon), Ex. 1 at 8. As Tesla demonstrated in its Motion, judgment as a matter of law (JMOL) or a new trial is required on liability because Plaintiffs' design-defect and failure-to warn theories are legally insufficient. Plaintiffs' Response fails to show otherwise. Moreover, given Plaintiffs' Response, three issues in particular cry out for post-trial relief.

*First*, irrelevant evidence—most importantly, Plaintiffs' coverup ruse—tainted the entire trial. Even though this Court ruled (1) the data wasn't withheld in bad faith or intentionally concealed; (2) Plaintiffs weren't prejudiced by the delay in getting the data; and (3) the so-called "cover up" wasn't relevant to punitive damages, and even though Plaintiffs admitted at the charge conference that the data evidence was irrelevant to their liability claims, this "evidence" was nonetheless allowed to become a central feature of Plaintiffs' case. As Plaintiffs' counsel proudly trumpeted to the press, their data-deletion story was "one of the reasons they got the result in Florida that they did." Ex. A, Ex. 2 at 4. And Plaintiffs' primary liability expert confirmed that "the jury understood the punitive damages were due to Tesla's cover up of a lot of the data." Dkt. 591-1, Ex. 1 at 3.

*Second*, JMOL is required on punitive damages under Florida precedent, including *Tesla, Inc. v. Banner*, 411 So. 3d 1 (Fla. Dist. Ct. App. 2025), which was decided on materially indistinguishable facts and thus binds this Court. And because evidence admitted solely for purposes of punitive damages infected the entire trial by inflaming the jury, should the Court grant JMOL on punitive damages, it should also order a new trial on liability.

*Third*, the $200 million punitive-damages award far outstrips the outer limits permitted by

Florida law and federal due process.  Plaintiffs come nowhere close to justifying punitive damages more than four times the already excessive award of nearly $43 million in compensatory damages.

These crucial errors compounded others.  Plaintiffs' liability theories founder because their experts opined based on sheer speculation and *ipse dixit*, McGee's reckless driving—not Tesla's state-of-the-art vehicle—was the sole cause of the crash, and McGee disregarded Tesla's repeated warnings.  The erroneous, prejudicial introduction of Elon Musk's forward-looking statements and dissimilar accidents infected the whole trial.  And compensatory damages far exceeded comparable verdicts upheld by Florida courts and outstripped even the amount sought by Plaintiffs.

This Court should order JMOL, or a new trial or amendment of the judgment, lest this unjustifiable verdict chill safety-enhancing innovation for years to come.

## I.    The Court Should Order a New Trial on All Issues Because Highly Inflammatory Data-Related Evidence Tainted the Entire Trial.

Plaintiffs' Response confirms that they offered reams of evidence for a purpose prohibited by law and by this Court—to incite the jury against Tesla on all issues.  Perhaps the gravest error was Plaintiffs' whipping up the jury's passions and prejudices from start to finish with extensive, inflammatory, and highly prejudicial "evidence" of Tesla's post-accident handling of data— "evidence" Plaintiffs insisted was relevant *only* to punitive damages, before the Court correctly held it irrelevant for that purpose.  Dkt. 591 at 28–32.  Their attempt to reclaim this conceded ground (at 25–31) rests on the flimsy premise that "evidence of an attempted cover-up is admissible in order to demonstrate consciousness of guilt."  That premise is doubly wrong.

For starters, there was no cover-up.  Plaintiffs effectively seek reconsideration of this Court's sanctions ruling, without satisfying the requirements for that "extraordinary remedy"— especially after the evidence at trial further debunked their cover-up theory.  *Arevalo v. Havana Harry's II Inc.*, 2024 WL 3363273, at *1 (S.D. Fla. Apr. 15, 2024).  They previously contended

that Tesla had willfully and intentionally destroyed or withheld data.  Dkt. 405 at 5–6.  But this Court rejected that false cover-up narrative, finding that "Plaintiffs have failed to establish bad faith" on Tesla's part.  *Id.* at 14.  Nor was the Court "persuaded that Tesla willfully withheld information or deliberately attempted to destroy evidence." *Id.* at 12.

The evidence at trial confirmed as much.  Tesla was "cooperative with" the investigating officer, who didn't request the data even though he "could have asked" for it. Dkt. 575 at 62:5–7, 88:5–11, 89:20–24.  The Tesla technician assisting the officer mistakenly thought the data was corrupted, when in fact it wasn't.  *Id.* at 67:12–16; Dkt. 583 at 53:8–11.  As Plaintiffs' experts acknowledged, "nothing's really deleted" from the Autopilot computer in McGee's vehicle, Dkt. 583 at 47:4–6, Tesla "did not corrupt that particular file," *id.* at 53:8–11, and the data gave Plaintiffs a "treasure trove" of "all the data [they] need[ed]," Dkt. 577 at 189:6, Dkt. 578 at 148:1–3.  While Tesla's Autopilot manager suggested that "somebody at Tesla took an affirmative action to delete" the data from Tesla's servers, Plaintiffs omit his explanation that "[i]t's most likely they were deleting a large batch of files" unrelated to this collision and in doing so "accidently deleted this file." Dkt. 581 at 198:12–17, 199:16–25.  Routine data management is not a cover-up.  *See Joler v. Scott Paper Co.*, 65 F.3d 160, 1995 WL 520723, at *3 (1st Cir. 1995).

In any event, any (non-existent) cover-up was irrelevant to liability.  Plaintiffs still can't explain how Tesla's post-accident data handling could make any element of their strict-liability claims more probable.  That is presumably why, at the charge conference, they insisted that "consciousness of guilt" was "*not relevant to any of the liability claims in this case*."  Dkt. 586 at 254:21–25 (emphases added).  Plaintiffs remarkably and inexplicably try (at 25 n.9) to walk back that concession as "misspoke[n]," citing (at 25–27) cases holding that an alleged cover-up was relevant.  But every one of those cases involved crimes, intentional torts, negligence, or other

claims where a defendant's mental state was at issue.  *See, e.g.*, *S. Union Co. v. Sw. Gas Corp.*, 281 F. Supp. 2d 1117, 1124 (D. Ariz. 2003).  None involved only strict-liability claims, like this case.  Tesla's mental state has no bearing on whether its product design was defective or its warnings adequate.  Dkt. 591 at 30.

Because their data evidence is irrelevant to liability, Plaintiffs attempt (at 27–30) to relitigate its supposed relevance to punitive damages—even though such post-accident conduct couldn't have harmed Plaintiffs.  In their view, Tesla's data handling need not have harmed Plaintiffs because the jury was also instructed to "consider harms that Tesla's conduct caused to persons other than Plaintiffs."  Dkt. 602 at 28 (quoting Dkt. 536 at 12).  But Plaintiffs omit the instruction to the jury to consider such harms "only if the harms suffered by those other persons were caused by the same or similar conduct of Tesla that harmed Plaintiffs."  Dkt. 536 at 12.  Tesla's data handling caused no harm to Plaintiffs or anyone else—and thus can't provide a basis for punitive damages, as this Court correctly ruled.

Plaintiffs' state-law cases (at 28–30) don't suggest otherwise.  Plaintiffs cite (at 30) *Owens-Corning Fiberglas Corp. v. Ballard*, 749 So. 2d 483 (Fla. 1999) for its guideposts for awarding punitive damages, but unlike Tesla's after-the-fact data handling, the manufacturer there "concealed what it knew about the dangers of asbestos" *before and during* the time the plaintiff was exposed to its asbestos-containing product.  *Id.* at 484, 487.  Plaintiffs' disregard of this critical distinction also runs afoul of the federal Due Process Clause, which requires that evidence "probative" of punitive damages "must have a nexus to the specific harm suffered by the plaintiff." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003).  Plaintiffs also cite *General Motors Corp. v. McGee*, 837 So. 2d 1010 (Fla. Dist. Ct. App. 2002), but unlike the defendant there, Tesla didn't conceal any known defects that led to the accident, nor did it otherwise act in bad

faith.  *See supra*, at 3.  The Court has already considered these cases, Dkt. 586 at 271:1–3, 273:9–11, and correctly held that it "d[id] not believe that the case law supports, for purposes of the punitive damages, . . . that the concealment lends itself to reprehensibility."  Dkt. 587 at 6:7–10.

Plaintiffs don't even attempt to argue the error was harmless if the data evidence was inadmissible as to both liability and punitive damages.  That's because the prejudice is undeniable.  In their opening statement, Plaintiffs told the jury that Tesla "deleted . . . the file that gives us the ground truth about what actually happens," asking "[w]hy did Tesla delete it?"  Dkt. 574 at 193:10–25.[1]  Plaintiffs then paraded in three witnesses to testify exclusively about the data evidence and extensively examined a number of other witnesses about the same topic.  And they returned to the well in closing, inviting the jury to consider the data evidence for "consciousness of guilt," and declaring "[t]his wasn't a mistake" but rather a "conscious decision" and a "deliberate choice."  Dkt. 587 at 51:2, 16–17, 123:3–4.  As Plaintiffs admitted, this evidence took up so much time at trial that the jury would blame Plaintiffs for "wast[ing]" their time if the jury were told to disregard "all this stuff they heard."  Dkt. 587 at 13:3–5.  Plaintiffs' counsel have also boasted about their success in spinning this product-liability case into a trial over Tesla's data handling, telling the press "one of the reasons [Plaintiffs] got the result in Florida that they did was the story of the cover-up," Ex. A, Ex. 2 at 4.

The highly prejudicial and improper admission of data-related "evidence" infected every aspect of the trial, necessitating a new trial on all issues.  *See Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1465 (11th Cir. 1994).

---

[1]  Should the Court grant Tesla's pending Motion to Compel Plaintiffs to Provide Copies of Opening and Closing PowerPoint Slides Shown to the Jury (Dkt. 556), Tesla reserves the right to address those materials through supplemental briefing and at any hearing.

## II.   The Court Should Grant Judgment as a Matter of Law on Punitive Damages or at Least Significantly Reduce Punitive Damages.

Plaintiffs' improper evidence inflamed the jury into imposing a staggering $200 million punitive-damages award that violates Florida and federal law and can't be reconciled with *Banner*, which was decided on materially indistinguishable facts and is thus binding.  Dkt. 591 at 39–49. No punitive damages may be awarded here under Florida law given Tesla's undisputed compliance with all industry standards.  *See id.* at 46–47; *Banner*, 411 So. 3d at 5.  Even if punitive damages were available, Florida law and the Due Process Clause leave no doubt they can't be anywhere close to $200 million.

### A.   Florida Law Forecloses Any Award of Punitive Damages in This Case.

Plaintiffs argue (at 35–37) that this Court can cast *Banner* aside as wrong based on the "full body of Florida jurisprudence," relying heavily on federal district-court decisions applying Florida law.  But that's not how *Erie* works.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).  Florida law is what Florida courts say it is:  *Banner* binds this Court "absent some persuasive indication that the Florida Supreme Court would decide the issue otherwise."  *Allstate Life Ins. Co. v. Miller*, 424 F.3d 1113, 1116 (11th Cir. 2005).  That principle applies not only to the interpretation of Florida law but also to its application to "facts essentially indistinguishable from the facts at hand."  *State Farm Mut. Auto. Ins. Co. v. Duckworth*, 648 F.3d 1216, 1224 (11th Cir. 2011).  Plaintiffs come nowhere close to showing that the Florida Supreme Court would reject *Banner*.

The Court should grant Tesla JMOL on punitive damages for three reasons.  First, the Florida Supreme Court has set a very high bar for punitive damages that isn't satisfied when a defendant designs its product in compliance with industry standards, as Tesla indisputably did. Second, *Banner* faithfully applied this Supreme Court precedent to foreclose punitive damages on materially indistinguishable facts, requiring this Court to do the same.  Third, even if Tesla's

compliance with industry standards and *Banner* were not enough to foreclose any award of punitive damages, the evidence still would not clearly and convincingly establish that Tesla committed the kind of egregious wrongdoing needed for punitive damages.  Dkt. 591 at 40–49.

      **1.**      **Tesla's Compliance with Industry Standards Forecloses Any Award of Punitive Damages on These Facts.**

      Fundamental principles of Florida law undergird *Banner* and preclude any award of punitive damages here.  Plaintiffs must prove by "clear and convincing evidence" (as they recognize) that Tesla was "personally guilty of intentional misconduct or gross negligence."  Fla. Stat. § 768.72(2).  Before and after the most recent amendment of § 768.72 in 1999, Florida's Supreme Court has held that "the required level of negligence for punitive damages is equivalent to the conduct involved in criminal manslaughter."  *Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 11 (Fla. 2016); *see, e.g.*, *Chrysler Corp. v. Wolmer*, 499 So. 2d 823, 824 (Fla. 1986); *White Constr. Co. v. Dupont*, 455 So. 2d 1026, 1028 (Fla. 1984).

      Plaintiffs argue (at 35 n.15) that *Banner* misstated Florida law because Tesla's purported "actual knowledge" that some "drivers were misusing Autopilot" suffices to impose punitive damages.  But Plaintiffs are the ones who have misstated Florida law.  Evidence that a defendant knew or was "aware" of a danger is "*not* sufficient, as a matter of law, to submit the issue of punitive damages to the jury" because it doesn't establish "the character of negligence necessary to sustain a conviction for manslaughter."  *Dupont*, 455 So. 2d at 1028 (emphasis added; quotation marks omitted).  Given this stringent standard, "the Florida Supreme Court has all but eliminated punitive damage awards in products liability cases," even when the defendant "well knew of [a] most dangerous infirmity."  *Jeep Corp. v. Walker*, 528 So. 2d 1203, 1205–06 (Fla. Dist. Ct. App. 1988); *see Banner*, 411 So. 3d at 5 (*Jeep*'s observation "remains largely true" today).

      Plaintiffs critique (at 37) these principles as "outdated."  But that is as ironic as it is

misguided.  Their basis for arguing that the 2025 decision in *Banner* is outdated is the District Court of Appeal's more-than-forty-year-old disapproved decision in *Johns-Manville Sales Corp. v. Janssens*, 463 So. 2d 242 (Fla. Dist. Ct. App. 1984), which allowed punitive damages where a manufacturer was "shown to have knowledge" its product was "likely to cause injury or death, but nevertheless continue[d] to market the product without making feasible modifications" or "adequate disclosure and warning."  *Id.* at 249.  The Florida Supreme Court expressly rejected "the *Johns-Manville* standard"—which might apply to "inherently dangerous products such as asbestos"—as "clearly erroneous when applied to a claim," as here, "that a motor vehicle was insufficiently crashworthy when precautions had been taken to insure its crashworthiness." *Wolmer*, 499 So. 2d at 826.  Plaintiffs' view has not been the law in Florida for four decades.

Plaintiffs similarly give short shrift to the foundational principle of Florida law, applied in *Banner*, that follows from these tenets:   Compliance with industry standards disproves a defendant's "actual knowledge of the wrongfulness of [its] conduct" or "conscious disregard or indifference" to safety required for punitive damages.  Fla. Stat. § 768.72(2)(a)–(b).  Plaintiffs can't dispute that every product entails risk/benefit tradeoffs—so a defendant that's complied with industry standards can't be charged with "conscious disregard or indifference" or knowledge of "wrongfulness."  Dkt. 591 at 45.  Plaintiffs don't deny that companies "reasonably rely on" industry standards "for guidance," so compliance with those standards gives companies a "good-faith basis for believing" they've made permissible design decisions, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 579–80 (1996), and "negate[s] conscious disregard," *Drabik v. Stanley-Bostitch, Inc.*, 997 F.2d 496, 510 (8th Cir. 1993) (applying similar Missouri law).

Plaintiffs contest Florida's industry-standards rule by characterizing (at 38–39) the Florida Supreme Court's precedents as making compliance with those standards just one factor in the

punitive-damages assessment.  Wrong again.  That court has treated compliance with industry guidelines as virtually dispositive:  While "compliance with industry guidelines should not be taken as conclusive evidence bearing on the question of a corporation's *negligence*, such information *may certainly bear* on whether a party's behavior represents such an extreme departure from accepted standards of care as to justify *punitive damages*."  *Am. Cyanamid Co. v. Roy*, 498 So. 2d 859, 863 (Fla. 1986) (emphases added).  Such compliance "'simply do[es] not reflect the kind of flagrant misconduct that would justify a finding of willful and wanton disregard.'"  *Id.*  Put simply, no defendant could meet all industry standards while still exhibiting the extreme negligence needed for criminal manslaughter.

Plaintiffs do not (and cannot) deny that Tesla's Autopilot design met all industry standards, using the same features as virtually every comparable model.  Dkt. 591 at 46–47.  Tesla's compliance with industry standards therefore compels JMOL on punitive damages.

### 2.    *Banner* Foreclosses Any Award of Punitive Damages on These Facts*.*

Because the facts of *Banner* were "essentially indistinguishable from the facts at hand," *Erie* binds this Court to reach the same conclusion.  *Duckworth*, 648 F.3d at 1224.  Plaintiffs insist (at 37) that "*Banner* is distinguishable on its facts" because there was "no record evidence" on certain issues.  That assertion is flat wrong:  A side-by-side comparison of the evidence before the *Banner* court and in this case shows they are mirror images.

| Allegation | ***Banner* Record Evidence** | ***Benavides* Record Evidence** |
|---|---|---|
| **Tesla's knowledge of danger** | Similar cross-traffic accident involving Autopilot.  Ans. Br., 2024 WL 1291846, at *37. | Allegedly similar accidents involving Autopilot.  *See, e.g.*, Dkt. 587 at 42:2–4. |

| | | |
|---|---|---|
| **Other manufacturers' ability to avoid danger** | According to Cummings, other manufacturers warned that their technology would not brake for cross-traffic, whereas Tesla's manual only stated it "may not" brake. Ans. Br. at *11–12. And while most 2018 vehicles used torque-based DMS, Cadillac used a camera-based monitoring system of the sort that Plaintiffs advocated. Op. Br., 2024 WL 304945, at *18. | Similar evidence that a small number of 2019 vehicles used a camera-based monitoring system to gauge driver attentiveness and one vehicle used geofencing to restrict use of advanced driver-assist features. *See* Dkt. 577 at 88:13–23, 90:5–91:7. |
| **Tesla's ability to cure defect** | Tesla engineers admitted Tesla "had the ability to . . . train the Autopilot" to avoid cross-traffic accidents with trucks. Ans. Br. at *37. Cummings faulted Tesla for not geofencing Autopilot, relying on torque-based DMS, and not implementing additional alerts. Op. Br. at *16–18, *52; Ans. Br. at *11–12. | Cummings made the same arguments with respect to geofencing, DMS, and alerts. *See* Dkt. 576 at 32:21–25, 58:3–7, 91:24–94:14. |
| **Improper public statements on self-driving capabilities** | "[R]epresentations made by Elon Musk" along with videos Tesla released. Op. Br. at *57 (cleaned up). | Focus on "Mr. Musk's statements" as well as the "Paint it Black" video, to demonstrate Tesla's "choices about how they market" Autopilot. Dkt. 587 at 36:21–22, 37:6–10. |

This comparison confirms that the Fourth District Court of Appeal decided *Banner* on materially identical facts. If a state-court decision rejecting the *same* theory against the *same* defendant earlier this year based on essentially the *same* facts were not binding under *Erie*, then no decision would be. But it is; thus *Banner* controls here. *Duckworth*, 648 F.3d at 1224.

Plaintiffs resist factual comparisons based on the briefing and record in *Banner*, contending this Court should review only the "face of the opinion." Dkt. 602 at 38 n.16 (quoting *Hardee v. State*, 534 So. 2d 706, 708 n.* (Fla. 1988)). But *Banner* on its face makes clear that the court rejected a materially identical theory of punitive damages. *See* 411 So. 3d at 4; Dkt. 591 at 41–42. *Plaintiffs* are the ones who tried to go behind the face of the opinion, based on (incorrect) suppositions about the record in *Banner*. This Court indulged that and stated at the summary-

judgment stage that "there appears to have been no record evidence" in *Banner* that mirrored the record here.  Dkt. 428 at 97.  Having opened the door and led this Court to look through the *Banner* opinion to the record evidence behind it, Plaintiffs may not now try to block out what they have no answer to in *Banner*.  In any event, *Hardee* doesn't apply here, as it says nothing about the sources a federal court may examine in heeding *Erie*'s command*. See* 534 So. 2d at 708 n.\*.

Because *Banner* held that punitive damages were unavailable against Tesla on materially indistinguishable facts and there is no indication the Florida Supreme Court would decide the issue differently, this Court is bound to reach the same result.  *Duckworth*, 648 F.3d at 1224.

### 3. The Evidence Was Insufficient as a Matter of Law to Support Any Award of Punitive Damages.

Even if Tesla's compliance with industry standards and *Banner* did not compel JMOL on punitive damages (they do), this Court should still hold that punitive damages are unavailable as a matter of law in this case because a "reasonable jury would not have a legally sufficient evidentiary basis," Fed. R. Civ. P. 50(a), to conclude that there is "clear and convincing evidence" of intentional misconduct or gross negligence, Fla. Stat. § 768.72(2).

Plaintiffs rely on cherry-picked excerpts from Akshay Phatak's testimony to suggest (at 39–40) that Tesla didn't consider driver behavior when designing Autopilot.  But they ignore the ample evidence demonstrating that Tesla of course studied "'the impact of Autopilot on driver behavior'" and "'designed Autopilot to address'" it.  Dkt. 591 at 47–48.  While Plaintiffs fault Tesla for supposedly inadequate pre-production analysis, it ended up with functionally the same product as all other comparable driver-assist vehicles on the road in 2019.  Dkt. 591 at 46–47.  And contrary to Plaintiffs' assertion (at 39), the fact that Tesla used real-world safety data to continuously improve Autopilot *disproves* gross negligence.  *Id.* at 48.  Plaintiffs' theory would only *discourage* manufacturers from continuously innovating to save lives and improve safety.

Plaintiffs' reliance on prior accidents (at 41–42) to support the punitive-damages award fails to answer Tesla's point that this case is unlike those prior accidents because none involved a driver like McGee who actively and aggressively drove and misused his car.  Dkt. 591 at 48.  And Plaintiffs again ignore the evidence that Tesla *did* respond to reports of driver misuse with continual enhancements.  *Id.*  The evidence falls far short of clearly and convincingly proving Tesla intentionally designed a defective car or acted with a "wanton disregard for life equivalent to manslaughter."  *Wolmer*, 499 So. 2d at 826.

Whether this Court looks to Tesla's compliance with industry standards, *Banner*, or Plaintiffs' failure to establish conduct tantamount to criminal manslaughter, the result is the same: Florida law forecloses punitive damages.  The Court should not only grant Tesla JMOL on punitive damages, but also grant Tesla a new trial on liability because evidence admitted only for punitive damages—reports of past accidents and Tesla's wealth—infected the entire trial by inflaming the jury's "passion and prejudice."  *Minneapolis, St. P. & S. S. M. Ry. Co. v. Moquin*, 283 U.S. 520, 521 (1931); *see* Dkt. 591 at 49.  Even if the Court doesn't grant JMOL on punitive damages, it should grant a new trial based on the rejected jury instruction that compliance with industry standards forecloses punitive damages.  *Id.*

### B.  Plaintiffs' Attempt at Inflating the Statutory Cap Based on Unawarded Damages Flouts Statutory Text, Precedent, and the Constitution.

Even if any punitive damages were warranted, the $200 million award is grossly excessive because the statutory text, Florida Supreme Court precedent, and the Constitution all confirm that Fla. Stat. § 768.73(1)(a)'s 3:1 cap on punitive damages uses the *net* compensatory damages awarded as its denominator.  Dkt. 591 at 49–51.  Plaintiffs fail to establish otherwise.

Plaintiffs ignore the text and have no answer to Tesla's argument that the statutory cap turns on net compensatory damages because only that net figure is "the amount of compensatory

damages *awarded* to each claimant *entitled thereto*." Fla. Stat. § 768.73(1)(a) (emphases added), *see* Dkt. 591 at 49–50. The judgment shows that Plaintiffs were not "awarded" $127,710,000: Florida law entitled them to only $42,570,000. Dkt. 538 at 1–2. Plaintiffs never explain how money they were never awarded can qualify as an awarded entitlement under the statutory cap. And such a view would be impossible to reconcile with the Legislature's expressed intention in multiple amendments to Fla. Stat. § 768.81 to progressively limit defendants' liability—even for compensatory damages—to their share of any harm caused. Fla. Laws 1986, c. 86-160, § 60; Fla. Laws 1988, c. 88-277, § 43; Fla. Laws 1999, c. 99-225, § 27; Fla. Laws 2006, c. 2006-6, § 1; Fla. Laws 2011, c. 2011-215, § 1.

This Court is bound to apply Florida's statutory cap "'the way it appears the state's highest court would.'" *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 (11th Cir. 2001). And the Florida Supreme Court has (as Plaintiffs acknowledge (at 42–43)) used the "net compensatory damages award" as the denominator. *Coates v. R.J. Reynolds Tobacco Co.*, 375 So. 3d 168, 175–76 (Fla. 2023). Plaintiffs write off *Coates* (at 43) because the court didn't provide enough "discussion of why" it used net compensatory damages. But *Erie* requires federal courts to "give effect to the state rules of decision"—not grade whether the state court showed its work. *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1026 (11th Cir. 2014).

None of Plaintiffs' authorities can overcome the statute's plain text and *Coates*. Plaintiffs rely (at 43) on *R.J. Reynolds Tobacco Co. v. Townsend*, 90 So. 3d 307 (Fla. Dist. Ct. App. 2012), but that case is irrelevant. It never construed the cap in § 768.73(1)(a): It considered only whether the award was *constitutionally* excessive, and thus cannot be authority for a proposition it never considered. *Id.* at 312–16; *see State ex rel. Helseth v. Du Bose*, 128 So. 4, 6 (Fla. 1930). And the defendant there "did not challenge" the use of the "unreduced compensatory damages award" until

it was too late—making it doubly off-point. *R.J. Reynolds Tobacco Co. v. Townsend*, 118 So. 3d 844, 847 (Fla. Dist. Ct. App. 2013); *see Du Bose*, 128 So. at 6.  In any event, now there is "persuasive indication that the Florida Supreme Court would decide the issue otherwise": *Coates*. *Allstate*, 424 F.3d at 1116.  And other Florida appellate decisions use the net compensatory award. *See, e.g.*, *Philip Morris USA, Inc., v. Naugle*, 103 So. 3d 944, 946 (Fla. Dist. Ct. App. 2012); *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1070–71 (Fla. Dist. Ct. App. 2011).

Plaintiffs also cite *Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196 (11th Cir. 2020), but miss the mark once again:  Like *Townsend*, *Kerrivan* never construed the statutory cap.  *Id.* at 1210.  As Plaintiffs admit (at 43), *Kerrivan* also left open whether net or gross compensatory damages was the proper denominator.  *Id.*  And contrary to Plaintiffs' assertion (at 44), whether comparative fault generally should modify punitive-damages awards says nothing about how to calculate the ratio under § 768.73(1)(a)'s specific cap.

Plaintiffs' argument (at 43–45) that Tesla should be punished "for the harm" they suffered also falls wide of the mark and overlooks half the equation.  Plaintiffs selectively quote *Philip Morris USA v. Williams*, 549 U.S. 346 (2007), omitting the critical part that makes clear punitive damages must bear "a reasonable relationship to the actual and potential harm *caused by the defendant* to the plaintiff." *Id.* at 353 (emphasis added).  Due process thus prohibits punishing for another's misconduct.  *See, e.g.*, *Clark v. Chrysler Corp.*, 436 F.3d 594, 606 n.16 (6th Cir. 2006). Because Plaintiffs' interpretation of the statutory cap would allow another's misconduct to increase a defendant's maximum punishment, it raises grave constitutional doubts and should be rejected for that reason as well.  *See State v. Giorgetti*, 868 So. 2d 512, 518 (Fla. 2004).  A defendant only 1% at fault for damages of $300,000—a total of $3,000—could face punitive damages of up to $900,000—*300 times* the defendant's share of compensatory damages.

The Court should limit any punitive damages to no more than three times the net compensatory award. Because Plaintiffs were awarded $42,570,000, the maximum punitive damages would be $127,710,000, subject to any further reductions in compensatory damages.

## C.  The Punitive-Damages Award Violates Due Process by Dwarfing the Substantial Compensatory Damages.

All three *State Farm* guideposts for determining whether a punitive-damages award is constitutionally excessive—(1) reprehensibility, (2) the disparity between punitive and compensatory damages, and (3) the difference between punitive damages and authorized civil penalties—support at most a 1:1 ratio of punitive to compensatory damages. Dkt. 591 at 51–56.

### 1.  Tesla's Conduct Was Not Reprehensible.

Plaintiffs haven't shown that Tesla acted reprehensibly under the five *State Farm* factors. First, they don't dispute that the "harm caused" arose from McGee's reckless driving as opposed to Tesla's own "conduct." *State Farm*, 538 U.S. at 419. Second, Tesla's "significant efforts" to reduce the risk posed by drivers' negligence foreclose a finding of indifference to or reckless disregard for safety. *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1336 (11th Cir. 1999). Third, Plaintiffs don't argue Tesla targeted financially vulnerable individuals. *State Farm*, 538 U.S. at 419. And fourth and fifth, Tesla's efforts to reduce risk disprove it was "a recidivist" or that it acted with intentional malice. *Johansen*, 170 F.3d at 1336; *see State Farm*, 538 U.S. at 419.

Plaintiffs' analogy (at 46) to *Kerrivan* fails. There, tobacco companies sold deadly cigarettes while concealing and lying about harmful health effects they had known of for decades. 953 F.3d at 1208–09. Here, Tesla continuously innovated to enhance everyone's safety on the road. Dkt. 591 at 47–48. Far from "repeatedly den[ying]" the risks associated with using Autopilot, *Kerrivan*, 953 F.3d at 1209, Tesla did the opposite by repeatedly warning drivers of the need to pay attention, Dkt. 591 at 24–27. Tesla also didn't "deliberately design [its] product" to

enhance the danger inherent in driving, as tobacco companies did by making their cigarettes more addictive. *Kerrivan*, 953 F.3d at 1209. And while physical injury was involved here, Autopilot does not itself cause any "physical assault or trauma." *State Farm*, 538 U.S. at 426. None of the reprehensibility factors identified in *Kerrivan* or *State Farm* can be found here.

<strong>2.    The Disparity Between Punitive and Compensatory Damages Is Substantial.</strong>

Plaintiffs resist the 1:1 due-process limit on punitive damages in cases with "substantial" compensatory-damages awards. *State Farm*, 538 U.S. at 426. But the net compensatory award of $42.57 million is undeniably substantial, and the lack of evidence of reprehensible conduct counsels against a punitive award that exceeds it. The punitive element of the non-economic damages awarded also requires limiting punitive damages to avoid duplicative punishment.

Regardless of how the Court construes Florida's statutory cap, Plaintiffs provide no reason for this Court to depart from the settled rule that courts must use net compensatory damages when calculating the denominator for the ratio guidepost in *State Farm*—lest the defendant be punished for others' misconduct. Dkt. 591 at 55 (collecting cases); *see, e.g.*, *Clark*, 436 F.3d at 606 n.16; *see also Philip Morris*, 549 U.S. at 353–54.

Plaintiffs also provide no authority to refute the applicability of *State Farm*'s 1:1 ratio. Their citations (at 47–49) at most show that awards far smaller than the $42.57 million award here are not substantial. In any event, federal appellate courts have consistently held that the 1:1 cap applies if there is limited (or no) evidence of reprehensibility, as here. *See, e.g.*, *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1143–44 (7th Cir. 2020); *Morgan v. N.Y. Life Ins. Co.*, 559 F.3d 425, 442–43 (6th Cir. 2009).

Nor do Plaintiffs refute that the punitive aspect of the non-economic compensatory-damages award requires a substantial reduction in the punitive-damages award. The Eleventh

16

Circuit has recognized that non-economic damages "already contain [a] punitive element," so courts shouldn't allow "startling amount[s]" of punitive damages on top of them. *Williams v. First Advantage LNS Screening Inc.*, 947 F.3d 735, 765 & n.23 (11th Cir. 2020). Plaintiffs write off *Williams* (at 49 n.20) because the non-economic damages there arose from "a background check falsely tagging [the plaintiff] as a criminal." But the principle that non-economic damages "contain [a] punitive element" is deeply rooted in Supreme Court precedent, not some one-off doctrine applicable only to background checks. *State Farm*, 538 U.S. at 426. Plaintiffs also rely (at 47–48) on *McGinnis v. American Home Mortgage Servicing, Inc.*, 901 F.3d 1282 (11th Cir. 2018), where the court declined to "discount emotional distress damages when conducting the ratio analysis," *id.* at 1290. But there was less reason to think the jury punished the defendant in *McGinnis*, where non-economic damages were based on errors resulting in foreclosure. *Id.* at 1286. Here, by contrast, the jury was asked to award non-economic damages for the loss of a daughter—all while blaming Tesla for playing with "human lives." Dkt. 587 at 71:4–14. This is a clear case where non-economic damages were used to punish for the "outrage" and "'indignation aroused by the defendant's act.'" *State Farm*, 538 U.S. at 426. A reduction of the punitive-damages award is needed to avoid duplicative punishment.

### 3. The Punitive-Damages Award Dwarfs Comparable Civil Penalties.

The $200 million punitive-damages award here exceeds, by several orders of magnitude, the comparable civil penalty of $21,000 per violation per vehicle under the National Traffic and Motor Vehicle Safety Act (NTMVSA)—a fact Plaintiffs don't deny. *See* 49 U.S.C. § 30165(a). Instead, they cite a handful of out-of-circuit cases and law review articles deeming this guidepost unhelpful. But even if persuasive, they wouldn't support Plaintiffs' sweeping conclusion (at 51) that the third guidepost is irrelevant for all cases involving "only common-law tort claims." Rather, the third guidepost would be unhelpful only when there is no "comparable . . . civil

penalty" *for the tort at issue.  Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347, 363 (3d Cir. 2015).   Plaintiffs don't (and can't) contest that NTMVSA penalties (imposable for the sale of dangerous or defective vehicles) would be an appropriate comparator for their design-defect and failure-to-warn claims.  Tesla therefore lacked fair notice of "the severity of the penalty that a State may impose."  *Gore*, 517 U.S. at 574.

Because *State Farm* requires reduction of the massive punitive-damages award here, Plaintiffs resort (at 51) to Tesla's wealth.  But their out-of-circuit cases predate *Gore* and *State Farm*, which hold that the "wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award."  *State Farm*, 538 U.S. at 427.  The Constitution forbids a punitive award any greater than the net compensatory damages awarded (and awardable) here.

## III.   The Court Should Grant Tesla Judgment as a Matter of Law (or at Least a New Trial) on Liability.

Plaintiffs' Response also fails to salvage their liability case.  The verdict rests on sand, dependent on two experts who offered unreliable *ipse dixit* rather than analysis grounded in real-world evidence.  And the failure-to-warn and design-defect theories are equally unsustainable.

At a minimum, a new trial is necessary.  Plaintiffs admit (at 3) that a new trial is required if the basis for *either* their design-defect *or* failure-to-warn claim is legally insufficient.  While they insist (at 3) they can avoid a new trial based on the design-defect claim if any one of the three theories underlying that claim (operational design domain, driver monitoring system, and automatic emergency braking/forward collision warning) is upheld, that is not the law.  A new trial is required whenever "one theory of liability upon which the general verdict may have rested" is "erroneous," regardless of the possible "legality of the other theories."  *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 29–30 (1962).  The jury was instructed that "for purposes of determining whether a defect was a legal cause of Plaintiffs' damages, the issue is

whether *that particular defect* caused the damages alleged by Plaintiffs." Dkt. 536 at 7. And Plaintiffs told the jury "there [were] four ways to" reach a verdict for them—the three alleged defects plus failure to warn. Dkt. 587 at 132:1–4. Because there is "no evidence . . . to determine" which of those four theories the jury relied on, a new trial is warranted if the Court finds (as it should) there was insufficient evidence as to any one of them. *McGriff v. Minn. Mut. Life Ins. Co.*, 127 F.3d 1410, 1416 (11th Cir. 1997).

> **A.      Plaintiffs Fail to Rehabilitate Their Experts' Speculative Testimony.**

Plaintiffs' experts Moore and Cummings were indispensable to Plaintiffs' liability case, but they offered only "speculative, unreliable expert testimony." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010). They couldn't identify any car at the time that had all the safety features they faulted Tesla for lacking, or that otherwise would have avoided this crash. Dkt. 591 at 7–9. Plaintiffs insist (at 4) their experts weren't required to identify any such vehicle, but courts don't allow experts' "unabashed speculation" about product safety when they can't "point[ ] to any manufacturer that incorporates" the safety features they recommend. *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1084 (8th Cir. 1999). Speculation about non-existent cars is no basis for a quarter-billion-dollar verdict, and it calls for JMOL. *Weisgram v. Marley*, 528 U.S. 440, 457 (2000).

> **B.      Plaintiffs Failed to Prove Their Design-Defect Theories.**

> > **1.      McGee's State-of-the-Art Tesla Was Not Defective.**

Plaintiffs' design-defect theories fail. *See* Dkt. 591 at 9–23. Plaintiffs minimize (at 4–7) the significance of industry standards, with which Tesla's industry-leading vehicle fully complied. But the state of the art and the status of the industry are critical for design-defect claims. *See, e.g.*, *Royal v. Black & Decker Mfg. Co.*, 205 So. 2d 307, 310 (Fla. Dist. Ct. App. 1967); *Alderman v. Wysong & Miles Co.*, 486 So. 2d 673, 679 (Fla. Dist. Ct. App. 1986); *Jaurequi*, 173 F.3d at 1084; *see also* Fla. Stat. § 768.1257. Plaintiffs fault Tesla for failing to provide a vehicle that didn't exist

and to prevent a crash that no car could've avoided.  But Plaintiffs' inability to establish "any deviation from the norm" in this evolving, highly regulated industry—and Plaintiffs' reliance on isolated, inapposite examples—reveal key flaws in all of their design-defect theories.  *Royal*, 205 So. 2d at 310.  Over and over, Plaintiffs point to uncommon safety features that could have supposedly helped moderate driver *passivity*, but not ones that would have corrected for an *aggressive* driver like McGee who *intentionally* overrode a driver-assist system.

First, the lack of geofencing wasn't defective.  Plaintiffs point (at 9–10) to a single vehicle with geofencing at the time—the Cadillac CT-6.  But geofencing wasn't industry custom, Dkt. 577 at 88:16–89:6, wasn't required by federal regulators, Dkt. 586 at 70:16–21, and the Cadillac CT-6 used a hands-free system unlike Tesla's hands-on-wheel Autopilot, Dkt. 585 at 234:17, 235:8–14; Dkt. 585 at 234:9–14, 235:8–18 (none of 77 hands-on-wheel vehicles geofenced).  Plaintiffs' lone, inapt comparator can't establish a design defect.  *See Jaurequi*, 173 F.3d at 1084.

Second, the driver-monitoring system (DMS) wasn't defective either.  Plaintiffs have no answer to the fact that only two manufacturers (4 out of 81 vehicles—less than 5%) at the time used the camera-based monitoring system they prefer.  Dkt. 585 at 234:10–17.  Plaintiffs rely (at 11–12) on a 2024 NHTSA report, but the investigatory opinion (written years after the fact) focused on driver *passivity*, not drivers (like McGee) who *intentionally and aggressively* overrode vehicle safety features.  Tesla's DMS indisputably complied with industry standards and regulatory guidance at the time.  *See* Dkt. 585 at 234:10–17; *Banner*, 411 So. 3d at 5.

Third, the automatic emergency braking (AEB) and forward collision warning (FCW) also weren't defective.  The uncontradicted evidence is that in 2019 it was industry standard for FCW and AEB systems to be designed to mitigate only in-line and in-lane rear-endings—not this out-of-line, off-road collision.  *See, e.g.*, Dkt. 586 at 109:16–17; Dkt. 585 at 160:11–24.  Plaintiffs

point (at 16) to two vehicles supposedly capable of providing FCW under "similar conditions." But in the crash tests most similar to McGee's conditions, those vehicles warned far too late to avoid a collision at McGee's speed.  Dkt. 586 at 136:16–37:19.  And Plaintiffs never established that any car under the state-of-the-art at the time would have prevented a crash where a grossly reckless driver was ignoring the vehicle's alerts, overriding its safety systems, and pressing the accelerator in the dark while groping for his phone.  *See, e.g.*, Dkt. 574 at 203:20–04:3.

Plaintiffs failed to show that these design features were defective under the risk-utility test. Tesla utilized carefully tested, innovative safety advances that complied with industry custom and regulatory requirements at the time—and it could "permissibly choose[ ]" among reasonably safe designs that were well-accepted in the industry and permitted by regulators, rather than Plaintiffs' outlier approaches.  *Voynar v. Butler Mfg. Co.*, 463 So. 2d 409, 412 (Fla. Dist. Ct. App. 1985).

Plaintiffs also failed to satisfy the consumer-expectations test.  They contend (at 9) that consumers expected that Tesla's 2019 Model S could be "safely used."  But that asserted expectation is far too generalized to show consumer expectations about challenged aspects of the design—especially about how the car would perform when its safety features were ignored and overridden by a reckless driver who was accelerating his car and telling it to "go."

### 2.      McGee's Reckless Driving Was the Sole Cause of the Collision.

Plaintiffs failed to establish that any purported defect in Tesla's 2019 Model S—rather than McGee's reckless, aggressive driving—caused Plaintiffs' injuries.  McGee indisputably (1) held the wheel (telling the Tesla he was in control), (2) accelerated through the stop sign and intersection (overriding cruise control), and (3) fished around for his phone rather than watching the road (driving recklessly and dangerously).  *See* Dkt. 591 at 18–23.  McGee's intentional misuse of his car makes him the "sole proximate cause of [the] injuries as a matter of law."  *DZE Corp. v. Vickers*, 299 So. 3d 538, 540–41 (Fla. Dist. Ct. App. 2020).

Plaintiffs don't dispute these dispositive facts. Instead, they argue (at 18–20) that consumer misuse doesn't break the causal chain, and they assert (at 20–21) that McGee's extreme misconduct didn't make him the sole cause of Plaintiffs' injuries. Both arguments lack merit.

On the law, Plaintiffs insist that misuse of a product doesn't break the causal chain, but they tellingly rely (at 18) on a Fifth Circuit *dissent*. Dissents aside, binding Florida precedent is clear: A manufacturer cannot be the "proximate cause" where a consumer "intentionally misuses a product" in harming third parties and becomes the "sole proximate cause of [the] injuries as a matter of law." *DZE*, 299 So. 3d at 540–41; *see Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 23, 27 (Fla. Dist. Ct. App. 2022). Citing *Standard Havens Products, Inc. v. Benitez*, 648 So. 2d 1192, 1193 (Fla. 1994), Plaintiffs argue (at 19) that product misuse is a matter of comparative negligence, not a bar to liability. But *Standard Havens* is off-point because McGee *intentionally* misused his Tesla—overriding its safety features and becoming the sole legal cause of the crash. Where a consumer "intentionally misuses a product," the product's design cannot be a "proximate cause." *DZE*, 299 So. 3d at 540–41. Plaintiffs wrongly contend (at 19–20) that Florida law limits "intentional[ ] misuse[ ]" to "voluntar[y] intoxicat[ion]." But "Florida law does not permit a jury to consider proximate cause where a person responsible for the injury is voluntarily impaired *or* intentionally misuses a product." *Id.* (emphasis added). *Either* suffices; intentional misuse, standing alone, forecloses causation.

Plaintiffs are also wrong on the facts. They assert (at 20–21) McGee was disengaged from driving because of Autopilot. But McGee crashed only because he ignored Tesla's warnings and overrode its safety features while fishing for his phone. Dkt. 583 at 105:11–20. It is pure "speculation or conjecture" to suggest that McGee's grossly reckless driving was caused by anyone but him, making it "the duty of the court to direct a verdict for the defendant." *Guinn v.*

*AstraZeneca Pharms. LP*, 602 F.3d 1245, 1256 (11th Cir. 2010) (cleaned up).

Even if the Court finds McGee not solely responsible for the collision, his share of the fault was clearly much more than 67%.  Because the "percentages of fault" the jury allocated between McGee and Tesla are "against the manifest weight of the evidence," a new trial should be granted. *Johnson v. FFE Transp. Servs., Inc.*, 227 F. App'x 780, 782 n.4 (11th Cir. 2007).

**C.**     **Plaintiffs Did Not Prove Their Failure-to-Warn Claim.**

The record cannot sustain Plaintiffs' failure-to-warn claim either.  Tesla had no duty to warn McGee, who knew the danger of reckless driving and knew Autopilot wouldn't automatically stop at stop signs.  In any event, Tesla complied with any duty by warning about the Model S's limitations clearly, repeatedly, and emphatically.  Even more in-your-face warnings wouldn't have averted the crash when McGee failed to read or heed the existing warnings.

**1.**     **Tesla Had No Duty to Warn of the Obvious Danger of Reckless Driving.**

McGee pressed the accelerator and sent his vehicle hurtling through the dark, well above the speed limit, while groping for his phone.  Florida law required no warning for a danger so "well known and obvious."  *Grieco*, 344 So. 3d at 22; *see* Dkt. 591 at 23–24.  Plaintiffs' attempts (at 21–22) to shift the focus to Tesla's warnings are unavailing:  McGee *knew* the Model S wouldn't brake on its own at the Card Sound Road intersection he had crossed dozens of times before.  Dkt. 579 at 34:11, 73:3–11.  And Plaintiffs' reliance (at 22) on *Evers v. R.J. Reynolds Tobacco Co.*, 195 So. 3d 1139 (Fla. Dist. Ct. App. 2015), is misplaced because in that case—unlike here—there was "no evidence that [the user] was aware" of one of the product's key dangers.  *Id.* at 1141.

**2.**     **Tesla Repeatedly Warned Against Misusing Autopilot.**

Even if Tesla had a duty to warn, it more than satisfied any obligation by warning McGee repeatedly about Autopilot's limits and risks in the manual and with visual and audio alerts.  Dkt. 591 at 24–27.  *Banner* held as much, explaining that Tesla "repeatedly warned against misuse of

the [Autopilot] features." 411 So. 3d at 5. Plaintiffs try (at 22) to evade *Banner* based on "evidentiary deficiencies," but *Banner* recounted Tesla's warnings in detail. 411 So. 3d at 3–4.

Plaintiffs also quibble with the adequacy of Tesla's warnings. They assert (at 24) that the owner's manual didn't warn about the limitations of Tesla's FCW, but it did—the limitations were on the very next page. Dkt. 542-10 at 102–03. Plaintiffs also complain (at 23–24) that the manual was too difficult to access and that the in-car warnings should have included audio alerts. Both arguments are insubstantial. The manual was readily accessible by pressing a book-shaped icon on the vehicle's touchscreen labeled "Manual." Dkt. 587 at 107:20–08:4. Plaintiffs' only contrary evidence was Cummings's say-so, based only on an anecdote that her students found the manual hard to find. Dkt. 576 at 41:22–42:6. That simply doesn't suffice.

Tesla also provided McGee with in-car warnings, including audio alerts, up until the moment of impact. The first time McGee used Autosteer, he was required to acknowledge that it was a "driver-assistance feature" that would *not* make his "vehicle autonomous." Dkt. 579 at 97:22–98:13. Every time after that, his car displayed a warning to keep his hands on the wheel, watch the road, and remain prepared to take control. Dkt. 584 at 120:21–25. As McGee sped toward the intersection, his vehicle continuously warned him that he had deactivated cruise-control braking by pressing the accelerator. *Id.* at 118:10–19. And McGee received an array of visual and audial warnings in the final seconds before the crash, including an audible chime 50 seconds before impact because his hands weren't on the wheel, and a "[t]ake over immediately" collision warning 1.5 seconds before impact consisting of a repeating audial alert and a flashing red light. *Id.* at 116:6–21, 119:3–15. Florida law forecloses imposing liability on Tesla when its warnings were "quite clear." *Felix v. Hoffmann-LaRoche, Inc.*, 540 So. 2d 102, 105 (Fla. 1989).

### 3.     McGee's Recklessness—Not Tesla's Warnings—Caused the Crash.

Under Florida law, "an inadequate warning cannot be the proximate cause of the plaintiff's

injuries" when the product's user has "not read the [warning]." *Lopez v. S. Coatings, Inc.*, 580 So. 2d 864, 865 & n.2 (Fla. Dist. Ct. App. 1991). McGee failed to read or heed the host of warnings he received. McGee testified that he never read the owner's manual, just like he never did for his previous cars. Dkt. 579 at 52:1–3, 52:25–53:2. That forecloses the failure-to-warn claim.

Plaintiffs disagree (at 24–25), asserting (1) McGee's failure to read the manual does not absolve Tesla of its liability for the on-screen warnings, and (2) the manual did not "'induc[e] the user to read it.'" But McGee didn't just ignore the manual—he also failed to heed the on-screen warnings and actively circumvented the hands-on-wheel chime by taking the wheel without paying attention to the road. In just over a minute before impact, McGee received at least four visual warnings and two audible alerts. Dkt. 584 at 116:6–21, 118:10–19, 119:9–15. McGee effectively turned a blind eye and deaf ear to them all. A plaintiff "cannot establish an ineffective warning was the proximate cause of his injuries" when he "disregarded or ignored an allegedly inadequate warning." *Leoncio v. Louisville Ladder, Inc.*, 2014 WL 11429056, at *4 (S.D. Fla. Apr. 8, 2014), *aff'd*, 601 F. App'x 932 (11th Cir. 2015).

## IV.   Other Highly Prejudicial Evidentiary Errors Call for a New Trial on All Issues.

Plaintiffs' repeated misuse of inadmissible statements by Elon Musk as well as irrelevant, dissimilar accidents further call for a new trial across the board. Dkt. 591 at 32–38.

### A.   Plaintiffs Prejudiced Tesla Through Elon Musk's Inadmissible Statements.

Plaintiffs contend (at 31) that Musk's statements regarding Autopilot were relevant to the consumer-expectation test even if they didn't affect what consumers expected of Tesla's 2019 Model S specifically. But Plaintiffs' own cases prove them wrong: "The consumer expectations test intrinsically recognizes a manufacturer's central role in crafting the image of *a product* and establishing the consumers' expectations for *that product*—a portrayal which in turn motivates consumers to purchase *that particular product*." *Aubin v. Union Carbide Corp.*, 177 So. 3d 489,

507 (Fla. 2015) (emphases added).  Musk's statements about future vehicles were thus irrelevant to consumers' expectations of the then-current capabilities of the 2019 Model S.

This Court held that "forward-looking or aspirational" statements were inadmissible for that very reason.  Dkt. 433 at 34.  But Plaintiffs blew past that limit and repeatedly introduced statements discussing Autopilot's *future* capabilities.  Dkt. 591 at 32.  Plaintiffs introduced statements that Tesla's hardware "will continue to improve" such that greater autonomy would eventually become reality.  Dkt. 585 at 125:24–26:3; *id.* at 125:12–17 (objection).  Plaintiffs also used statements expressing Musk's "optimis[m] about the pace of improvement of the system" and his hopes that Autopilot may soon reach the point where "having a human intervene will decrease safety."  *Id.* at 130:12; 131:15–16; *id.* at 129:13–16 (objection).

Plaintiffs assert (at 32) that Musk's statements were not "all forward looking or aspirational," but instead of identifying those statements, Plaintiffs seek refuge in this Court's pre-trial remark that Musk "appear[ed] to be discussing Autopilot generally."  Dkt. 602 at 32 (citing Dkt. 433 at 34).  That merely set the trial's ground rules and left admissibility to be assessed on a statement-by-statement basis at trial, subject to Tesla's objections.  Dkt. 433 at 34.

Even if some of Musk's statements were somehow relevant to Plaintiffs' product-liability claims, Plaintiffs went way too far by using them to whip up punitive damages—which the Court clearly forbade.  The Court correctly held that Musk's statements "could not be considered by the jury" for punitive damages "because Mr. McGee did not personally hear them."  Dkt. 602 at 32; *see also* Dkt. 529 at 11; Dkt. 586 at 262:1–9.  Plaintiffs nonetheless charged ahead, telling the jury "[a] fish rots from the head down," Dkt. 587 at 53:20–21, and inciting it to "send a message" to Tesla "to change [its] choices and [its] *words*" through the "punitive damages award," *id.* at 72:15–24 (emphasis added).  Those tactics require a new trial.

Plaintiffs never deny they attempted to circumvent this Court's ruling that Musk's statements were inadmissible as to punitive damages. They instead insist (at 32) that Musk's statements *were* "relevant to punitive damages." Plaintiffs' counsel even boasted the jury "would have given [him] anything [he] asked for" because he "g[ot] to . . . juxtapose Musk's lies." Ex. A, Ex. 1 at 8. But the Court correctly held Musk's statements couldn't have been "a substantial cause of damages to Plaintiffs" when McGee never heard them. Dkt. 529 at 11; Dkt. 586 at 262:1–9. The erroneous admission of such "tangential" and "inflammatory" statements warrants a new trial on all issues. *State Farm*, 538 U.S. at 418.

**B.    Plaintiffs Fail to Justify the Improper Admission of Dissimilar Accidents.**

A new trial is also warranted given the undue prejudice stemming from the erroneous admission of evidence concerning past accidents that unfairly painted Tesla as a recidivist, including: (1) three recent accidents, (2) eight accidents mentioned in Tesla's discovery responses, and (3) an unspecified number of accidents referenced in a NHTSA report. Dkt. 591 at 34–38. Plaintiffs' Response rests on only non-precedential, out-of-circuit cases that don't apply here.

First, Plaintiffs cite the Court's order that the three recent accidents were substantially similar to this collision because they "'all involve[d] distracted drivers.'" Dkt. 602 at 32–33 (quoting Dkt. 466 at 9, 11–12). But those accidents didn't involve a driver who (like McGee) kept his hand on the wheel while actively pressing on the accelerator to take control of the vehicle and ignoring a message saying "Cruise Control Will Not Brake," Dkt. 578 at 116:3–19, so they would not have put Tesla on notice that its vehicle could be misused in that reckless manner.

Second, regarding the eight accidents mentioned in Tesla's discovery responses, as both the Court and Plaintiffs recognize, those accidents "'*did not satisfy the substantial-similarity test*'" for relevance. Dkt. 602 at 33 (emphases added); *see* Dkt. 486 at 13. Plaintiffs contend (at 33) they are automatically admissible under Federal Rule of Civil Procedure 36, which renders "[a] matter

admitted" in a discovery response "conclusively established."  But "[a]dmissions obtained under Rule 36 . . . are subject to all pertinent objections to admissibility . . . at the trial." *Walsh v. McCain Foods, Ltd.*, 81 F.3d 722, 726 (7th Cir. 1996); *see* Dkt. 452 at 13–14; Dkt. 582 at 5:23–6:13. Plaintiffs remain silent on the relevance of these accidents—the "starting place for evidentiary admissibility." *United States v. McGregor*, 960 F.3d 1319, 1323 (11th Cir. 2020).  The Court should have excluded those irrelevant and highly prejudicial accidents.

Third, as Plaintiffs don't dispute, the Court admitted the NHTSA reports of accidents under a *relaxed* version of the substantial-similarity test, even though the Eleventh Circuit has—in Plaintiffs' own words (at 34)—"not explicitly state[d] that a relaxed standard" applies for showing "notice."  Plaintiffs defend a watered-down standard based on the Eleventh Circuit's statement that the test allows "for some play in the joints depending on . . . the desired use of the evidence." *Henderson v. Ford Motor Co.*, 72 F.4th 1237, 1243 (11th Cir. 2023) (quoting *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1288, 1287 (11th Cir. 2015)).  Yet in both *Henderson* and *Sorrels*, the Eleventh Circuit applied the standard substantial-similarity test—in *unrelaxed* form—in assessing whether to admit evidence to show a "defendant's knowledge or ability to foresee the incident at issue." *Henderson*, 72 F.4th at 1243; *see Sorrels*, 796 F.3d at 1287–88.  Plaintiffs can't circumvent binding Eleventh Circuit precedent by resorting to out-of-circuit case law.

Plaintiffs argue (at 34 n.14) that the admission of the NHTSA report was harmless because Tesla's own report (Ex. P-94) allegedly showed 36 collisions with an in-path stationary object were "the fault of autopilot."  But the Tesla report "did not determine fault"; it merely identified potential ways to improve the driver-assistance system, Dkt. 585 at 102:3–8, 103:5–15, and so is hardly duplicative of the NHTSA report and doesn't render its admission harmless.

The Court amplified the error by letting Plaintiffs urge the jury to impose punitive damages

based on Tesla supposedly ignoring a string of similar incidents.  Dkt. 587 at 47:6–8.  Without a proper application of the substantial-similarity test, Tesla had no fair notice that it could be punished for not preventing a collision caused by an extremely reckless, aggressive driver.  *See Gore*, 517 U.S. at 574.  Because it is highly "'probabl[e]'" that the erroneous admission of this evidence led the jury to impose its eye-popping damages awards, the Court should order a new trial.  *Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1352 (11th Cir. 2007).

## V.      The Compensatory Damages Awarded Were Also Grossly Excessive.

The jury's $129 million compensatory-damages award was also grossly excessive, outstripping even Plaintiffs' own request by $20 million, Dkt. 591 at 57–60—an outcome Plaintiffs' counsel tellingly boasted is "unheard of."  Ex. A, Ex. 1 at 8.  Plaintiffs' attempts at defending that award can't be squared with Florida law.

Plaintiffs start by distorting the standard of review, urging (at 52–53) deference to jury verdicts.  But the Florida Legislature has made clear its "intention" that "awards of damages be subject to close scrutiny by the courts" to ensure they are "not excessive."  Fla. Stat. § 768.74(3).  While Plaintiffs contend (at 52) it is "difficult" to challenge a damages award without offering an alternative figure, there is no per se bar.  *See, e.g.*, *Fla. Power & Light Co. v. Goldberg*, 856 So. 2d 1011, 1026, 1028 (Fla. Dist. Ct. App. 2002) (remitting damages although defendant "gave the jury no evidence or argument as to what it could properly award"), *rev'd on reh'g en banc* (Oct. 1, 2003), *decision reinstated*, 899 So. 2d 1105 (Fla. 2005).

In determining whether non-economic compensatory damages are excessive under Florida law, this Court must consider the "'general trend of prior decisions in such cases.'"  *Bravo v. United States*, 532 F.3d 1154, 1162–63 (11th Cir. 2008).  While *Bravo* recognized "variation among [Florida's] appellate courts" as to the cases that qualify, "[t]his case was filed in the Miami Division of the United States District Court for the Southern District of Florida," so the rule of

Florida's "Third District Court of Appeal" applies:  The only proper comparators are published appellate decisions involving "awards that have been challenged and upheld on appeal"—*not* untested and unreliable jury verdicts.  *Id.* at 1164–66.  And the Court may consider only the "trend of judgments in Florida"—*not* those in other States.  *Id.* at 1165.  These rules render irrelevant the slew of out-of-state cases and untested jury verdicts Plaintiffs cite (at 55–58).

Plaintiffs fail to identify any Florida case in which an appellate court upheld a verdict even close to Angulo's $70 million in non-economic damages.  Rather, awards upheld on appeal in comparable cases confirm that a $15 million maximum would be closer to the "reasonable range within which the jury may properly operate."  *Lassitter v. Int'l Union of Operating Eng'rs*, 349 So. 2d 622, 627 (Fla. 1976); *see* Dkt. 591 at 58–59 (citing Florida appellate cases).

The verdict's excessiveness is also confirmed by the fact that the jury awarded more compensatory damages than Plaintiffs requested for Angulo and Leon.  Plaintiffs insist (at 58–59) that the jury's overshooting the request by $20 million isn't dispositive.  But the fact that a damages verdict was "more than what plaintiffs' counsel argued to the jury . . . would be a reasonable award" indicates the award was "based on . . . emotional testimony rather than the result of the record presented."  *Glabman v. De La Cruz*, 954 So. 2d 60, 62–63 (Fla. Dist. Ct. App. 2007); *see Goldberg*, 856 So. 2d at 1028–29 (reducing damages to amount plaintiffs agreed was appropriate).

To correct for improper passion and prejudice, the Court should remit total compensatory damages to no more than $69 million, if that:  $15 million for Angulo (in line with comparable Florida cases), $30 million for Leon (the amount requested), and $24 million for Benavides.

## CONCLUSION

The Court should enter judgment as a matter of law under Fed. R. Civ. P. 50(b) or, in the alternative, order a new trial or remittitur, or amend the judgment, under Fed. R. Civ. P. 59.

Dated:  November 7, 2025                    Respectfully submitted,


                                            /s/ *Wendy F. Lumish*
                                            Wendy F. Lumish (Florida Bar No. 334332)
                                            BOWMAN AND BROOKE LLP
                                            Two Alhambra Plaza, Suite 800
                                            Coral Gables, FL 33134
                                            (305) 995-5600
                                            wendy.lumish@bowmanandbrooke.com

                                            Theodore J. Boutrous, Jr. (admitted *pro hac vice*)
                                            Julian W. Poon (admitted *pro hac vice*)
                                            GIBSON, DUNN & CRUTCHER LLP
                                            333 South Grand Avenue
                                            Los Angeles, CA 90071
                                            (213) 229-7000
                                            tboutrous@gibsondunn.com
                                            jpoon@gibsondunn.com

                                            Miguel A. Estrada (admitted *pro hac vice*)
                                            Thomas H. Dupree, Jr. (admitted *pro hac vice*)
                                            GIBSON, DUNN & CRUTCHER LLP
                                            1700 M Street, N.W.
                                            Washington, D.C. 20036
                                            (202) 955-8500
                                            mestrada@gibsondunn.com
                                            tdupree@gibsondunn.com

                                            Paul D. Clement (admitted *pro hac vice*)
                                            CLEMENT & MURPHY, PLLC
                                            706 Duke Street
                                            Alexandria, VA 22314
                                            (202) 742-8900
                                            paulclement@clementmurphy.com

                                            Whitney V. Cruz (Florida Bar No. 800821)
                                            BOWMAN AND BROOKE LLP
                                            Two Alhambra Plaza, Suite 800
                                            Coral Gables, FL 33134
                                            (305) 995-5600
                                            whitney.cruz@bowmanandbrooke.com

31

Thomas P. Branigan (admitted *pro hac vice*)
Drew P. Branigan (admitted *pro hac vice*)
BOWMAN AND BROOKE LLP
101 W. Big Beaver Road, Suite 1100
Troy, MI 48084
(248) 205-3300
thomas.branigan@bowmanandbrooke.com
drew.branigan@bowmanandbrooke.com

Joel Smith (admitted *pro hac vice*)
BOWMAN AND BROOKE LLP
1441 Main Street, Suite 1200
Columbia, SC 29201
(803) 726-7420
joel.smith@bowmanandbrooke.com